| | |
|---|---|
| **From:** | ExecSecProcessUnit@treasury.gov |
| **To:** | Nauset75@treasury.gov |
| **Cc:** | ExecSecStaff@do.treas.gov; ExecSecProcessUnit@treasury.gov |
| **Subject:** | GSE Stress Test Projections |
| **Date:** | Friday, July 06, 2012 4:04:54 PM |
| **Attachments:** | _R Illustrative FNM Financial Forecast with Stress Scenarios.ppt |

Sir,

Per your conversation earlier this week with Tim Bowler, the attached presentation reviews financial projections for Fannie Mae under three credit scenarios designed by the housing team. Tim Bowler noted that developing GSE scenario analysis is complicated as past results were binary in nature. Prior to the crisis credit losses were very small, while recent losses materially exceeded any expectations heading into the crisis. Notwithstanding this, the presentation provides a good reference point for evaluating Fannie Mae's ability to withstand stress over the next 10 years, with and without the net worth sweep the housing team has been discussing.

Sam Valverde will follow up on any questions or comments you may have regarding this deck.

# Illustrative Financial Forecasts - Fannie Mae Base Case & Stress Scenarios

Market Sensitive and Pre-Decisional

**July 2012**

TREASURY-3884

# GSE Financial Modeling:  Estimating Future Credit Performance

Sensitive / Pre-Decisional

- **Estimating future credit performance is challenging**

- **Pre "bubble" losses were small due to strong underwriting standards and consistent HPA**
  - Annual losses <15 bps prior to the crisis
  - The "worst" books of business did not experience cumulative credit losses >100 bps

- **Crisis driven losses were multiples of what the GSEs "stress" models initially predicted**
  - Cumulative losses on Fannie Mae's pre conservatorship book of business will likely be ~500 bps (see second chart to the right)

- **Future stress scenarios are hard to estimate given a number of factors**
  - Beneficial considerations:  Credit underwriting has significantly improved and over 50% of the current book is post conservatorship
  - Risk considerations:  Home prices are unlikely to increase again at levels seen in the forty year period before the financial crisis and the uncertain economic environment

## Annual Credit Losses As A Percentage Of The GSE's Single Family Guarantee Book of Business[1]



| Credit losses and reserves at Fannie Mae primarily driven by pre-conservatorship Single Family guarantee book of business | |
|---|---|
| 2008 realized credit losses | $6.5B |
| 2009 realized credit losses | 13.4 |
| 2010 realized credit losses | 23.1 |
| 2011 realized credit losses | 18.4 |
| Total realized credit losses: 2008 - 2011 | $61.4B |
| Year end 2011 Single Family (SF) credit loss reserve | $75.3B |
| *Current credit losses: realized and reserved* | ***$136.7B*** |
| SF guarantee book of business - at year end 2008 | $2,715.0B |
| *Realized and Reserved Losses as a % of guarantee book* | *5.0%* |

[1] Figures calculated by dividing realized losses in a given year (charge offs and REO expense) by the then outstanding single family book of business.  For example in 2010, Fannie Mae's credit losses were equal to 0.77% of their single family book of business.

TREASURY-3885

# Fannie Mae Financial Analysis:  Developing Credit Scenarios

Sensitive / Pre-Decisional

**The following presentation reviews illustrative financial forecasts for Fannie Mae under the following three credit loss scenarios –with and without guarantee fee (g-Fee) increases:**

## Base Case

### Credit Losses

Avg. of 75 bps cumulative losses per vintage

12.5 bps of provisions / reserves taken per yr (6 yr avg. life)

### Rationale / Supporting Arguments

Historical GSE "base case" cumulative loss estimates for "prime conforming mortgages" averaged between 25-37.5 bps prior to the crisis

Post the financial crisis, investors will expect higher cumulative losses overtime due to reduced expectations for future home price appreciation

## Stress Case

### Credit Losses

Mid decade recession results in 150 bps of cumulative losses

Losses normalize post recession

Reserve taken over two years

### Rationale / Supporting Arguments

Historical GSE stress scenarios assumed ~100 bps of cumulative losses for "troubled" books

Future expectations of stress on prime books of business will likely be higher given expectations for future lower home price appreciation and recent GSE results

Reserves at financial institutions tend to build over two to three years

## Severe Stress Case

### Credit Losses

Mid decade recession results in 250 bps of cumulative losses

Losses normalize post recession

Reserve taken over three years

### Rationale / Supporting Arguments

Multiples of past stress losses, ex the financial crisis, at the GSEs

Cumulative singe family losses on the year end 2008 book of business will likely be ~500 bps. Given the creditworthiness of new underwriting, a scenario that produces 50% of crisis level losses is likely very severe

Reserves at financial institutions tend to build over two to three years




PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3886

# 10 Year Financial Analysis:  Core Financial Assumptions
(analysis based on Grant Thornton's 2011 model; Scenarios developed by Treasury Staff)

Sensitive / Pre-Decisional

## Scenario Assumptions

| | Base Case | Stress Case | Severe Stress Case |
|---|---|---|---|
| Cumulative Credit Losses on Guarantee Book of Business | 75 bps * | 150 bps | 250 bps |
| Time Period for Credit Loss Reserve Build In Stress Period (beginning in 2015) | - | 2 years | 3 years |

*Cumulative Expected Losses by Vintage for Base Case

## Assumptions for all Scenarios

| | Base Case | Stress Case | Severe Stress Case |
|---|---|---|---|
| Retained Portfolio - Annual Run-off | | 15% | |
| Net Interest Margin (NIM) - Average over 10-year period ** | | 125 bps | |
| Initial Size of Guarantee Book of Business (Unpaid Principal Balance (UPB)) | | $2.9 Tn | |
| Annual Expected Credit Loss Provisions - during non-stress periods | | 12.5 bps | |
| Initial Average g-Fee Average (includes 10 bp Payroll Tax Fee)*** | | 35 bps | |

** The NIM used each year is based on Grant Thornton's 2011 Financial Model for the Fannie Mae.
*** The 10 bp Payroll Tax Fee is not included in income.

## No g-fee Increase Assumptions

| | Base Case I | Stress Case I | Severe Stress Case I |
|---|---|---|---|
| Size of Guarantee Book of Business (UPB) - for all periods (no g-Fee Increase) | | $2.9 Tn **** | |

**** A constant guaranteed book of business assumes that new originations are offset by liquidations.

## g-Fee Increase Scenarios - Impact on Guarantee Book of Business

| | Base Case II | Stress Case II | Severe Stress Case II |
|---|---|---|---|
| Total Average g-Fee Increase (phased-in over 5 years) | | 40 bps | |
| Average g-Fees after increase phase-in period | | 75 bps | |
| Total decrease in new guaranteed originations during g-Fee phase-in ***** | | 50% | |
| Size of Guarantee Book of Business (UPB) - at year-end 2022 | | $1.8 Tn | |

***** New origination volume is assumed to decline due to increased competition from other sources.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3887

Sensitive / Pre-Decisional

# Financial Model Summary: 10 Year Projections

## Summary of Illustrative Scenario Results - Fannie Mae

| Scenario | g-Fee Increase Scenario | 10% Dividends | | Net Worth Sweep | | |
|---|---|---|---|---|---|---|
| | | 10Y Cumulative Net Dividends $B (Dividends less Draws) | Year PSPA Capacity Exhausted | 10Y Cumulative Net Dividends $B (Dividends less Draws) | Remaining PSPA Capacity in 2022 ($ billions) | Remaining PSPA Capacity as a % of Guarantee Book Balance in 2022 |
| Base Case I | No | $55.9 | 2024 | $55.9 | $125.0 | 4.4% |
| Base Case II | Yes | $73.4 | 2026 | $73.4 | $125.0 | 6.8% |
| Stress Case I | No | $7.9 | 2020 | $20.1 | $99.9 | 3.5% |
| Stress Case II | Yes | $25.2 | 2021 | $39.2 | $103.6 | 5.7% |
| Severe Stress Case I | No | ($21.2) | 2019 | ($4.9) | $79.3 | 2.8% |
| Severe Stress Case II | Yes | ($12.0) | 2019 | $15.2 | $85.6 | 4.7% |

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

# Illustrative Forecast – Fannie Mae:  Base Case I (no g-Fee increase)

Sensitive / Pre-Decisional

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Guarantee Book of Business (at year-end) | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 |
| 2 Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| 3 Credit Business - Income | (11.4) | (1.4) | 4.3 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 |
| 4 Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 Comprehensive Income | (3.1) | 8.3 | 12.1 | 5.6 | 5.0 | 4.5 | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| **10% Dividend** | | | | | | | | | | | |
| 6 Senior Preferred Stock Dividends (10%) | 11.7 | 13.2 | 13.7 | 13.8 | 14.7 | 15.6 | 16.8 | 18.0 | 19.4 | 20.9 | 22.6 |
| 7 Net Worth / (Deficit) | (14.8) | (4.9) | (1.6) | (8.2) | (9.7) | (11.2) | (12.7) | (13.9) | (15.3) | (16.9) | (18.6) |
| 8 PSPA Draw (including draw request) | 14.8 | 4.9 | 1.6 | 8.2 | 9.7 | 11.2 | 12.7 | 13.9 | 15.3 | 16.9 | 18.6 |
| 9 Cumulative Draws (at year-end) | 131.0 | 135.9 | 137.5 | 145.7 | 155.4 | 166.5 | 179.2 | 193.1 | 208.5 | 225.4 | 243.9 |
| 10 Remaining PSPA Capacity (at year-end) | 125.0 | 120.1 | 118.5 | 110.3 | 100.6 | 89.5 | 76.8 | 62.8 | 47.5 | 30.6 | 12.1 |
| 11 *PSPA Capacity as a % of Guarantee Book* | 4.4% | 4.2% | 4.1% | 3.9% | 3.5% | 3.1% | 2.7% | 2.2% | 1.7% | 1.1% | 0.4% |
| **Net Worth Sweep beginning in 2013 (no buffer)** | | | | | | | | | | | |
| 12 Senior Preferred Stock Dividends (Sweep) | 11.7 | 8.3 | 12.1 | 5.6 | 5.0 | 4.5 | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| 13 Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 PSPA Draw (including draw request) | 14.8 | - | - | - | - | - | - | - | - | - | - |
| 15 Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 |
| 16 Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| 17 *PSPA Capacity as a % of Guarantee Book* | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% | 4.4% |

Notes:  1) Figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

*Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:*     10% Dividend Scenario:  $55.9      Net Worth Sweep Scenario:  $55.9

# Illustrative Forecast – Fannie Mae:  Base Case II (with g-Fee Increase)

Sensitive / Pre-Decisional

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Guarantee Book of Business (at year-end) | $2,860 | $2,817 | $2,738 | $2,628 | $2,491 | $2,333 | $2,198 | $2,083 | $1,985 | $1,903 | $1,832 |
| 2 Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| 3 Credit Business - Income | (11.4) | (1.1) | 4.9 | 3.2 | 3.4 | 3.6 | 4.3 | 4.6 | 4.8 | 5.0 | 5.2 |
| 4 Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 Comprehensive Income | (3.1) | 8.5 | 12.7 | 6.6 | 6.3 | 5.9 | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |
| **10% Dividend** | | | | | | | | | | | |
| 6 Senior Preferred Stock Dividends (10%) | 11.7 | 13.2 | 13.7 | 13.8 | 14.5 | 15.3 | 16.2 | 17.2 | 18.3 | 19.5 | 20.7 |
| 7 Net Worth / (Deficit) | (14.8) | (4.7) | (1.0) | (7.2) | (8.2) | (9.4) | (10.0) | (10.8) | (11.6) | (12.6) | (13.7) |
| 8 PSPA Draw (including draw request) | 14.8 | 4.7 | 1.0 | 7.2 | 8.2 | 9.4 | 10.0 | 10.8 | 11.6 | 12.6 | 13.7 |
| 9 Cumulative Draws (at year-end) | 131.0 | 135.6 | 136.6 | 143.8 | 152.0 | 161.4 | 171.5 | 182.2 | 193.8 | 206.4 | 220.0 |
| 10 Remaining PSPA Capacity (at year-end) | 125.0 | 120.3 | 119.4 | 112.2 | 104.0 | 94.6 | 84.5 | 73.8 | 62.2 | 49.6 | 35.9 |
| 11 *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.3%* | *4.4%* | *4.3%* | *4.2%* | *4.1%* | *3.8%* | *3.5%* | *3.1%* | *2.6%* | *2.0%* |
| **Net Worth Sweep beginning in 2013 (no buffer)** | | | | | | | | | | | |
| 12 Senior Preferred Stock Dividends (Sweep) | 11.7 | 8.5 | 12.7 | 6.6 | 6.3 | 5.9 | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |
| 13 Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 PSPA Draw (including draw request) | 14.8 | - | - | - | - | - | - | - | - | - | - |
| 15 Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 | 131.0 |
| 16 Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| 17 *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.4%* | *4.6%* | *4.8%* | *5.0%* | *5.4%* | *5.7%* | *6.0%* | *6.3%* | *6.6%* | *6.8%* |

Notes:  1) Figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

*Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:*    10% Dividend Scenario:    $73.4        Net Worth Sweep Scenario:    $73.4

# Illustrative Forecast – Fannie Mae: Stress Case I (no g-Fee increase)

Sensitive / Pre-Decisional

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Guarantee Book of Business (at year-end) | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 |
| 2 Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| | | | | | | | | | | | |
| 3 Credit Business - Income | (11.4) | (1.4) | 4.3 | (15.7) | (15.7) | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 |
| 4 Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 Comprehensive Income | (3.1) | 8.3 | 12.1 | (12.3) | (12.9) | 4.5 | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| **10% Dividend** | | | | | | | | | | | |
| 6 Senior Preferred Stock Dividends | 11.7 | 13.2 | 13.7 | 13.8 | 16.5 | 19.4 | 20.9 | 22.6 | 12.9 | - | - |
| 7 Net Worth / (Deficit) | (14.8) | (4.9) | (1.6) | (26.1) | (29.3) | (14.9) | (16.8) | (18.5) | (20.3) | (21.6) | (21.6) |
| 8 PSPA Draw (including draw request) | 14.8 | 4.9 | 1.6 | 26.1 | 29.3 | 14.9 | 16.8 | 18.5 | 12.9 | - | - |
| 9 Cumulative Draws (at year-end) | 131.0 | 135.9 | 137.5 | 163.6 | 192.9 | 207.8 | 224.6 | 243.1 | 256.0 | 256.0 | 256.0 |
| 10 Remaining PSPA Capacity (at year-end) | 125.0 | 120.1 | 118.5 | 92.4 | 63.1 | 48.2 | 31.4 | 12.9 | - | - | - |
| 11 *PSPA Capacity as a % of Guarantee Book* | 4.4% | 4.2% | 4.1% | 3.2% | 2.2% | 1.7% | 1.1% | 0.5% | 0.0% | 0.0% | 0.0% |
| **Net Worth Sweep beginning in 2013 (no buffer)** | | | | | | | | | | | |
| 12 Senior Preferred Stock Dividends | 11.7 | 8.3 | 12.1 | - | - | 4.5 | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| 13 Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | (12.3) | (12.9) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 PSPA Draw (including draw request) | 14.8 | - | - | 12.3 | 12.9 | - | - | - | - | - | - |
| 15 Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 143.3 | 156.1 | 156.1 | 156.1 | 156.1 | 156.1 | 156.1 | 156.1 |
| 16 Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 112.7 | 99.9 | 99.9 | 99.9 | 99.9 | 99.9 | 99.9 | 99.9 |
| 17 *PSPA Capacity as a % of Guarantee Book* | 4.4% | 4.4% | 4.4% | 3.9% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% |

Notes: 1) figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

*Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:*    10% Dividend Scenario:    $7.9    Net Worth Sweep Scenario:    $20.1

Sensitive / Pre-Decisional

# Illustrative Forecast – Fannie Mae – Stress Case II (with g-Fee Increase)

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Guarantee Book of Business (at year-end) | $2,860 | $2,817 | $2,738 | $2,628 | $2,491 | $2,333 | $2,198 | $2,083 | $1,985 | $1,903 | $1,832 |
| 2 Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| 3 Credit Business - Income | (11.4) | (1.1) | 4.9 | (14.0) | (13.7) | 3.6 | 4.3 | 4.6 | 4.8 | 5.0 | 5.2 |
| 4 Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 Comprehensive Income | (3.1) | 8.5 | 12.7 | (10.5) | (10.9) | 5.9 | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |

## 10% Dividend

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 6 Senior Preferred Stock Dividends | 11.7 | 13.2 | 13.7 | 13.8 | 16.2 | 18.9 | 20.2 | 21.6 | 23.1 | 9.6 | - |
| 7 Net Worth / (Deficit) | (14.8) | (4.7) | (1.0) | (24.3) | (27.0) | (13.0) | (14.0) | (15.1) | (16.4) | (17.8) | (18.6) |
| 8 PSPA Draw (including draw request) | 14.8 | 4.7 | 1.0 | 24.3 | 27.0 | 13.0 | 14.0 | 15.1 | 16.4 | 9.6 | - |
| 9 Cumulative Draws (at year-end) | 131.0 | 135.6 | 136.6 | 160.9 | 188.0 | 201.0 | 214.9 | 230.0 | 246.4 | 256.0 | 256.0 |
| 10 Remaining PSPA Capacity (at year-end) | 125.0 | 120.3 | 119.4 | 95.1 | 68.0 | 55.0 | 41.0 | 25.9 | 9.6 | - | - |
| 11 PSPA Capacity as a % of Guarantee Book | 4.4% | 4.3% | 4.4% | 3.6% | 2.7% | 2.4% | 1.9% | 1.2% | 0.5% | 0.0% | 0.0% |

## Net Worth Sweep beginning in 2013 (no buffer)

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 12 Senior Preferred Stock Dividends | 11.7 | 8.5 | 12.7 | - | - | 5.9 | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |
| 13 Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | (10.5) | (10.9) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 PSPA Draw (including draw request) | 14.8 | - | - | 10.5 | 10.9 | - | - | - | - | - | - |
| 15 Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 141.5 | 152.4 | 152.4 | 152.4 | 152.4 | 152.4 | 152.4 | 152.4 |
| 16 Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 114.5 | 103.6 | 103.6 | 103.6 | 103.6 | 103.6 | 103.6 | 103.6 |
| 17 PSPA Capacity as a % of Guarantee Book | 4.4% | 4.4% | 4.6% | 4.4% | 4.2% | 4.4% | 4.7% | 5.0% | 5.2% | 5.4% | 5.7% |

Notes: 1) Figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:      10% Dividend Scenario:   $25.2      Net Worth Sweep Scenario:   $39.2

# Illustrative Forecast – Fannie Mae: Severe Stress Case I (no g-Fee increase)

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Guarantee Book of Business (at year-end) | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 | $2,860 |
| 2 Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| 3 Credit Business - Income | (11.4) | (1.4) | 4.3 | (18.1) | (18.1) | (18.1) | 2.2 | 2.2 | 2.2 | 2.2 | 2.2 |
| 4 Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 Comprehensive Income | (3.1) | 8.3 | 12.1 | (14.7) | (15.3) | (15.8) | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| **10% Dividend** | | | | | | | | | | | |
| 6 Senior Preferred Stock Dividends | 11.7 | 13.2 | 13.7 | 13.8 | 16.7 | 19.9 | 23.5 | 3.0 | - | - | - |
| 7 Net Worth / (Deficit) | (14.8) | (4.9) | (1.6) | (28.5) | (32.0) | (35.7) | (19.4) | (21.3) | (21.6) | (21.6) | (21.6) |
| 8 PSPA Draw (including draw request) | 14.8 | 4.9 | 1.6 | 28.5 | 32.0 | 35.7 | 19.4 | 3.0 | - | - | - |
| 9 Cumulative Draws (at year-end) | 131.0 | 135.9 | 137.5 | 166.0 | 197.9 | 233.6 | 253.0 | 256.0 | 256.0 | 256.0 | 256.0 |
| 10 Remaining PSPA Capacity (at year-end) | 125.0 | 120.1 | 118.5 | 90.0 | 58.1 | 22.4 | 3.0 | - | - | - | - |
| 11 *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.2%* | *4.1%* | *3.1%* | *2.0%* | *0.8%* | *0.1%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| **Net Worth Sweep beginning in 2013 (no buffer)** | | | | | | | | | | | |
| 12 Senior Preferred Stock Dividends | 11.7 | 8.3 | 12.1 | - | - | - | 4.1 | 4.1 | 4.1 | 4.1 | 4.1 |
| 13 Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | (14.7) | (15.3) | (15.8) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 PSPA Draw (including draw request) | 14.8 | - | - | 14.7 | 15.3 | 15.8 | - | - | - | - | - |
| 15 Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 145.6 | 160.9 | 176.7 | 176.7 | 176.7 | 176.7 | 176.7 | 176.7 |
| 16 Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 110.3 | 95.1 | 79.3 | 79.3 | 79.3 | 79.3 | 79.3 | 79.3 |
| 17 *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.4%* | *4.4%* | *3.9%* | *3.3%* | *2.8%* | *2.8%* | *2.8%* | *2.8%* | *2.8%* | *2.8%* |

Notes: 1) Figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

*Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:*     10% Dividend Scenario:     ($21.2)     Net Worth Sweep Scenario:     ($4.9)

# Illustrative Forecast – Fannie Mae – Severe Stress Case II (with g-Fee Increase)

Sensitive / Pre-Decisional

11

| (in $billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Guarantee Book of Business (at year-end) | $2,860 | $2,817 | $2,738 | $2,628 | $2,491 | $2,333 | $2,198 | $2,083 | $1,985 | $1,903 | $1,832 |
| 2 | Retained Portfolio Balance (at year-end) | 656 | 558 | 474 | 403 | 342 | 291 | 250 | 250 | 250 | 250 | 250 |
| 3 | Credit Business - Income | (11.4) | (1.1) | 4.9 | (16.2) | (16.0) | (15.8) | 4.3 | 4.6 | 4.8 | 5.0 | 5.2 |
| 4 | Retained Portfolio - Income | 8.3 | 9.7 | 7.8 | 3.4 | 2.8 | 2.3 | 1.9 | 1.9 | 1.9 | 1.9 | 1.9 |
| 5 | Comprehensive Income | (3.1) | 8.5 | 12.7 | (12.8) | (13.1) | (13.5) | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |
| | **10% Dividend** | | | | | | | | | | | |
| 6 | Senior Preferred Stock Dividends | 11.7 | 13.2 | 13.7 | 13.8 | 16.4 | 19.4 | 22.7 | 13.9 | - | - | - |
| 7 | Net Worth / (Deficit) | (14.8) | (4.7) | (1.0) | (26.6) | (29.6) | (32.9) | (16.4) | (17.8) | (19.0) | (18.8) | (18.6) |
| 8 | PSPA Draw (including draw request) | 14.8 | 4.7 | 1.0 | 26.6 | 29.6 | 32.9 | 16.4 | 13.9 | - | - | - |
| 9 | Cumulative Draws (at year-end) | 131.0 | 135.6 | 136.6 | 163.2 | 192.8 | 225.6 | 242.1 | 256.0 | 256.0 | 256.0 | 256.0 |
| 10 | Remaining PSPA Capacity (at year-end) | 125.0 | 120.3 | 119.4 | 92.8 | 63.2 | 30.4 | 13.9 | - | - | - | - |
| 11 | *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.3%* | *4.4%* | *3.5%* | *2.5%* | *1.3%* | *0.6%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* |
| | **Net Worth Sweep beginning in 2013 (no buffer)** | | | | | | | | | | | |
| 12 | Senior Preferred Stock Dividends | 11.7 | 8.5 | 12.7 | - | - | - | 6.2 | 6.5 | 6.7 | 6.9 | 7.1 |
| 13 | Net Worth / (Deficit) | (14.8) | 0.0 | 0.0 | (12.8) | (13.1) | (13.5) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| 14 | PSPA Draw (including draw request) | 14.8 | - | - | 12.8 | 13.1 | 13.5 | - | - | - | - | - |
| 15 | Cumulative Draws (at year-end) | 131.0 | 131.0 | 131.0 | 143.8 | 156.9 | 170.4 | 170.4 | 170.4 | 170.4 | 170.4 | 170.4 |
| 16 | Remaining PSPA Capacity (at year-end) | 125.0 | 125.0 | 125.0 | 112.2 | 99.1 | 85.6 | 85.6 | 85.6 | 85.6 | 85.6 | 85.6 |
| 17 | *PSPA Capacity as a % of Guarantee Book* | *4.4%* | *4.4%* | *4.6%* | *4.3%* | *4.0%* | *3.7%* | *3.9%* | *4.1%* | *4.3%* | *4.5%* | *4.7%* |

Notes:  1) Figures may not foot due to rounding; 2) 2012 & 2013 estimates based on FHFA published forecast adjusted for YTD results; & 3) Scenarios developed by Treasury Staff.

*Cumulative Net Dividends (Dividends less Draws) 2013 - 2022:*     10% Dividend Scenario:     ($12.0)     Net Worth Sweep Scenario:     $15.2

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

| From: | Bowler, Timothy |
|---|---|
| To: | Adeyemo, Adewale (Wally) |
| Cc: | Miller, Mary; Woolf, AndrewDisabled; Stegman, Michael; Mlynarczyk, Beth |
| Subject: | PSPA presentation |
| Date: | Tuesday, August 07, 2012 8:20:00 PM |
| Attachments: | GSE Capital Support Review and Key Issues Aug 7 Final.pptx |

The attached is a brief presentation that reviews the proposed PSPA modification

TJB

# Treasury's Capital Support For The GSEs
## Summary Review and Key Considerations

August 8, 2012

Sensitive / Pre-Decisional

# Discussion Agenda

*The financial support agreements that Treasury has in place with Fannie Mae and Freddie Mac (the GSEs) are unsustainable and need to be modified.*

1. Review of Treasury's capital support agreements with Fannie Mae and Freddie Mac (the GSEs)

2. Overview of why Treasury needs to modify the current capital support agreements

3. Proposed modification of the agreements

4. Financial impact associated with the proposed modification

   - Taxpayers

   - The GSEs

   - The financial markets

5. Key considerations before moving forward with a modification

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

Sensitive / Pre-Decisional

3

# Treasury's Support of the GSEs

- In 2008, Fannie Mae and Freddie Mac (the GSEs) were put into conservatorship

- Contemporaneous with the conservatorship, Treasury agreed to support the GSEs by providing each GSE with a $100B stand by capital commitment, the Preferred Stock Purchase Agreements (PSPAs)

  o Treasury agreed to buy *preferred stock* from each GSE any time their liabilities exceeded their assets (i.e. Treasury "backstopped" the GSE solvency so they could continue to operate)

  o Treasury earns a *10% dividend* on the preferred stock it purchases from the GSEs

- In 2009 the PSPAs were modified. The modifications allowed Treasury to provide *unlimited capital support to the GSEs through year end 2012*

  o At year end 2012, the amount of future support for the GSEs is capped ($125B to Fannie Mae, $149B to Freddie Mac)

- Treasury's support has been meaningful due to credit losses at the GSEs and the need to fund the dividends the GSEs are required to pay Treasury

  o Preferred investments to date have totaled $189B ($117B to Fannie Mae, $72B to Freddie Mac)

  o $163B has be used to fund operating losses, $26B to fund dividend payments to Treasury

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

Sensitive / Pre-Decisional

# Need to Change The Preferred Stock Dividend Rate

- Treasury is owed a 10% dividend on the $189B of preferred stock it has invested in the GSEs

- The GSEs need to generate ~$19B in yearly income in order to pay the 10% dividend *without drawing on Treasury's backstop line*

- If the enterprises are unable to generate the income necessary to meet the 10% dividend, they will draw on the PSPAs to fund dividend payments back to Treasury  (i.e. *circular flows*)

- Longer term, the GSEs will not generate enough income to meet their dividend requirement *due to the enterprises being wound down*

- Absent a change, this will lead to the GSE's insolvency as they will exhaust the finite amount of capital support remaining after 2012 (see next slide for details)

- Investors are focused on this issue given the long life of the GSEs guarantees (i.e. the core function of the GSEs is to guarantee 30 year mortgage backed securities)

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3899

# Illustrative Example: Fannie Mae Financial Projections

Sensitive / Pre-Decisional

5

| ($ billions) | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Worth: Start of the Year | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Projected Income | 14 | 10 | 8 | 6 | 5 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Dividends Paid - 10% Rate | -12 | -12 | -12 | -12 | -13 | -13 | -14 | -15 | -16 | -18 | -19 | -21 | -22 |
| Net Worth: Year End | 2 | 0 | -3 | -6 | -8 | -9 | -10 | -11 | -12 | -14 | -15 | -17 | -18 |
| Required Capital From Treasury | 0 | 0 | 3 | 6 | 8 | 9 | 10 | 11 | 12 | 14 | 15 | 17 | 18 |
| Remaining PSPA Capacity | 125 | 125 | 122 | 115 | 107 | 98 | 87 | 76 | 64 | 50 | 35 | 18 | 0 |

Note: Net Worth is defined as Assets *less* Liabilities on a GAAP basis
Source: FHFA and Grant Thornton Projections, Treasury staff estimates

- As the financial projections above highlight, Fannie Mae *will be insolvent* in 2024 due to the need to pay Treasury the fixed 10% preferred stock dividend

- This will be the case despite expectations for future profitability

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

Sensitive / Pre-Decisional

9

# Proposed Solution: Modify the Dividend Requirement

- Modify the GSEs' obligation to pay dividends to Treasury:

    o Replace the current fixed 10% dividend with a "net worth sweep" dividend

        ▪ If quarterly net worth is positive (i.e. assets are greater than liabilities), all of that value will be paid to Treasury as a dividend

        ▪ If quarterly net worth is negative , Treasury will make a capital injection to keep the GSE solvent

- The above will result in Treasury *receiving all future income generated by the GSEs*

- The proposal would also:

    o Eliminate the circularity of Treasury funding dividends paid to Treasury

    o Ensure that future capital draws are only used to protect the solvency of the GSEs

TREASURY-3901

7

# Economic and Market Impact of the Proposed Modifications

Sensitive / Pre-Decisional

- Taxpayers are in a stronger position as *all* future net income from the GSEs will be paid directly to Treasury

- The GSEs will be more financially sound which should lower their funding cost and improve future profitability

- GSE based mortgage rates should benefit as investors will likely be more confident in purchasing GSE mortgaged backed securities

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

Sensitive / Pre-Decisional

8

# Potential Criticisms

- Treasury is "bailing-out" the GSEs again, and did not obtain any help from the GSEs for struggling homeowners

- The dividend modification will allow the GSEs to exist longer in their current form

- Does not demonstrate meaningful progress on housing finance reform

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-Q

☑ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended June 30, 2012

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from    to

Commission File No.: 0-50231

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | |
|---|---|
| **Federally chartered corporation** | **52-0883107** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** | **20016** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(202) 752-7000**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☑ |
| Non-accelerated filer ☐ | (Do not check if a smaller reporting company) | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☑

As of June 30, 2012, there were 1,158,069,699 shares of common stock of the registrant outstanding.

**TABLE OF CONTENTS**

| | | Page |
|---|---|---|
| **PART I—Financial Information** | | 1 |
| Item 1. | Financial Statements | |
| | Condensed Consolidated Balance Sheets | 85 |
| | Condensed Consolidated Statements of Operations and Comprehensive Income (Loss ) | 86 |
| | Condensed Consolidated Statements of Cash Flows | 87 |
| | Note 1—Summary of Significant Accounting Policies | 88 |
| | Note 2—Consolidations and Transfers of Financial Assets | 92 |
| | Note 3—Mortgage Loans | 9 5 |
| | Note 4—Allowance for Loan Losses | 103 |
| | Note 5—Investments in Securities | 106 |
| | Note 6—Financial Guarantees | 113 |
| | Note 7—Acquired Property, Net | 115 |
| | Note 8—Short-Term Borrowings and Long-Term Debt | 116 |
| | Note 9—Derivative Instruments | 118 |
| | Note 10—Segment Reporting | 121 |
| | Note 11—Concentration of Credit Risk | 126 |
| | Note 12—Fair Value | 127 |
| | Note 13—Commitments and Contingencies | 152 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Introduction | 1 |
| | Executive Summary | 1 |
| | Legislative and Regulatory Developments | 13 |
| | Critical Accounting Policies and Estimates | 16 |
| | Consolidated Results of Operations | 18 |
| | Business Segment Results | 31 |
| | Consolidated Balance Sheet Analysis | 39 |
| | Supplemental Non-GAAP Information—Fair Value Balance Sheets | 43 |
| | Liquidity and Capital Management | 46 |
| | Off-Balance Sheet Arrangements | 54 |
| | Risk Management | 5 5 |
| | Forward-Looking Statements | 81 |
| Item 3. | Quantitative and Qualitative Disclosures about Market Risk | 156 |
| Item 4. | Controls and Procedures | 156 |
| **PART II—Other Information** | | 158 |
| Item 1. | Legal Proceedings | 158 |
| Item 1A. | Risk Factors | 159 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 163 |
| Item 3. | Defaults Upon Senior Securities | 164 |
| Item 4. | Mine Safety Disclosures | 164 |
| Item 5. | Other Information | 164 |
| Item 6. | Exhibits | 164 |

TREASURY-3905

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| 1 | Treasury Draws and Senior Preferred Stock Dividend Payments | 4 |
| 2 | Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period | 6 |
| 3 | Credit Statistics, Single-Family Guaranty Book of Business | 8 |
| 4 | Proposed Multifamily Housing Goals for 2012 to 2014 | 16 |
| 5 | Level 3 Recurring Financial Assets at Fair Value | 18 |
| 6 | Summary of Condensed Consolidated Results of Operations | 19 |
| 7 | Analysis of Net Interest Income and Yield | 20 |
| 8 | Rate/Volume Analysis of Changes in Net Interest Income | 22 |
| 9 | Impact of Nonaccrual Loans on Net Interest Income | 23 |
| 10 | Fair Value Losses, Net | 24 |
| 11 | Total Loss Reserves | 25 |
| 12 | Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves) | 26 |
| 13 | Nonperforming Single-Family and Multifamily Loans | 29 |
| 14 | Credit Loss Performance Metrics | 30 |
| 15 | Single-Family Credit Loss Sensitivity | 31 |
| 16 | Single-Family Business Results | 32 |
| 17 | Multifamily Business Results | 34 |
| 18 | Capital Markets Group Results | 36 |
| 19 | Capital Markets Group's Mortgage Portfolio Activity | 37 |
| 20 | Capital Markets Group's Mortgage Portfolio Composition | 38 |
| 21 | Summary of Condensed Consolidated Balance Sheets | 39 |
| 22 | Summary of Mortgage-Related Securities at Fair Value | 40 |
| 23 | Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities | 41 |
| 24 | Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps) | 42 |
| 25 | Comparative Measures—GAAP Change in Stockholders' Equity (Deficit) and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect) | 43 |
| 26 | Supplemental Non-GAAP Consolidated Fair Value Balance Sheets | 45 |
| 27 | Activity in Debt of Fannie Mae | 48 |
| 28 | Outstanding Short-Term Borrowings and Long-Term Debt | 50 |
| 29 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year | 51 |
| 30 | Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year | 52 |
| 31 | Cash and Other Investments Portfolio | 52 |
| 32 | Fannie Mae Credit Ratings | 53 |
| 33 | Composition of Mortgage Credit Book of Business | 56 |
| 34 | Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business | 58 |
| 35 | Selected Credit Characteristics of Single-Family Conventional Loans Acquired under HARP and Refi Plus | 61 |
| 36 | Delinquency Status of Single-Family Conventional Loans | 63 |
| 37 | Single-Family Serious Delinquency Rates | 63 |
| 38 | Single-Family Conventional Serious Delinquency Rate Concentration Analysis | 64 |
| 39 | Statistics on Single-Family Loan Workouts | 65 |

ii

| **Table** | **Description** | **Page** |
|---|---|---|
| 40 | Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post-Modification | 66 |
| 41 | Single-Family Foreclosed Properties | 66 |
| 42 | Single-Family Foreclosed Property Status | 67 |
| 43 | Multifamily Lender Risk-Sharing | 68 |
| 44 | Multifamily Guaranty Book of Business Key Risk Characteristics | 69 |
| 45 | Multifamily Concentration Analysis | 69 |
| 46 | Multifamily Foreclosed Properties | 70 |
| 47 | Repurchase Request Activity | 72 |
| 48 | Outstanding Repurchase Requests | 73 |
| 49 | Mortgage Insurance Coverage | 74 |
| 50 | Rescission Rates of Mortgage Insurance | 76 |
| 51 | Estimated Mortgage Insurance Benefit | 76 |
| 52 | Unpaid Principal Balance of Financial Guarantees | 77 |
| 53 | Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve | 80 |
| 54 | Derivative Impact on Interest Rate Risk (50 Basis Points) | 81 |

iii

### PART I — FINANCIAL INFORMATION

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*We have been under conservatorship, with the Federal Housing Finance Agency ("FHFA") acting as conservator, since September 6, 2008. As conservator, FHFA succeeded to all rights, titles, powers and privileges of the company, and of any shareholder, officer or director of the company with respect to the company and its assets. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. Our directors do not have any duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator. We describe the rights and powers of the conservator, key provisions of our agreements with the U.S. Department of the Treasury ("Treasury"), and their impact on shareholders in our Annual Report on Form 10-K for the year ended December 31, 2011 ("2011 Form 10-K") in "Business—Conservatorship and Treasury Agreements."*

*You should read this Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") in conjunction with our unaudited condensed consolidated financial statements and related notes and the more detailed information in our 2011 Form 10-K.*

*This report contains forward-looking statements that are based on management's current expectations and are subject to significant uncertainties and changes in circumstances. Please review "Forward-Looking Statements" for more information on the forward-looking statements in this report. Our actual results may differ materially from those reflected in these forward-looking statements due to a variety of factors including, but not limited to, those described in "Risk Factors" and elsewhere in this report and in "Risk Factors" in our 2011 Form 10-K.*

*You can find a "Glossary of Terms Used in This Report" in the "MD&A" of our 2011 Form 10-K.*

---

## INTRODUCTION

Fannie Mae is a government-sponsored enterprise ("GSE") that was chartered by Congress in 1938. Our public mission is to support liquidity and stability in the secondary mortgage market, where existing mortgage-related assets are purchased and sold, and increase the supply of affordable housing. Our charter does not permit us to originate loans and lend money directly to consumers in the primary mortgage market. Our most significant activity is securitizing mortgage loans originated by lenders into Fannie Mae mortgage-backed securities that we guarantee, which we refer to as Fannie Mae MBS. We also purchase mortgage loans and mortgage-related securities for our mortgage portfolio. We use the term "acquire" in this report to refer to both our guarantees and our purchases of mortgage loans. We obtain funds to support our business activities by issuing a variety of debt securities in the domestic and international capital markets.

We are a corporation chartered by the U.S. Congress. Our conservator, FHFA, is a U.S. government agency. Treasury owns our senior preferred stock and a warrant to purchase 79.9% of our common stock. Moreover, Treasury has made a commitment under a senior preferred stock purchase agreement to provide us with funds under specified conditions and, after 2012, up to a maximum amount, to maintain a positive net worth. The U.S. government does not guarantee our securities or other obligations.

Our common stock is traded in the over-the-counter market and quoted on the OTC Bulletin Board under the symbol "FNMA." Our debt securities are actively traded in the over-the-counter market.

---

## EXECUTIVE SUMMARY

The actions we have been taking since 2009 to provide liquidity and support to the market, grow a strong new book of business and minimize losses on loans we acquired prior to 2009 are having a positive impact on our business and our performance:

- *Financial Results.* We experienced significant improvement in our financial results for the second quarter and first half of 2012, as compared with the second quarter and first half of 2011, despite elevated levels of mortgage delinquencies and foreclosures compared with pre-housing crisis levels, as well as home prices that are significantly below their peak in 2006. As described under "Summary of Our Financial Performance for the Second Quarter and

1

First Half of 2012," we generated positive net worth for the second quarter, paid Treasury its quarterly dividend and were not required to draw funds from Treasury for the quarter under the senior preferred stock purchase agreement. We expect our financial results for 2012 to be significantly better than our 2011 results.

- *Strong New Book of Business*. Single-family loans we have acquired since the beginning of 2009 constituted 5 9% of our single-family guaranty book of business as of June 30, 2012, while the single-family loans we acquired prior to 2009 constituted 41% of our single-family book of business. We refer to the single-family loans we have acquired since the beginning of 2009 as our "new single-family book of business" and the single-family loans we acquired prior to 2009 as our "legacy book of business." Our new single-family book of business includes loans that are refinancings of loans that were in our legacy book of business. We provide information regarding the higher loan-to-value ("LTV") ratios of these loans in "Credit Risk Characteristics of Loans Acquired under Refi Plus and HARP." As described below in "Our Strong New Book of Business," we expect that our new single-family book of business will be profitable over its lifetime.

- *Credit Performance*. Our single-family serious delinquency rate has steadily declined each quarter since the first quarter of 2010, and was 3.53% as of June 30, 2012, compared with 4.08% as of June 30, 2011. See "Credit Performance" below for additional information about the credit performance of the mortgage loans in our single-family guaranty book of business.

- *Reducing Credit Losses and Helping Homeowners*. We continued to execute on our strategies for reducing credit losses on our legacy book of business, which are described below under "Reducing Credit Losses on Our Legacy Book of Business." As part of our strategy to reduce defaults, we provided approximately 65,200 workouts to help homeowners stay in their homes or otherwise avoid foreclosure in the second quarter of 2012.

- *Providing Liquidity and Support to the Mortgage Market*. We continued to be a leading provider of liquidity to the mortgage market in the second quarter of 2012. As described below under "Providing Liquidity and Support to the Mortgage Market," we remained the largest single issuer of mortgage-related securities in the secondary mortgage market in the second quarter of 2012 and remained a constant source of liquidity in the multifamily market.

- *Helping to Build a New Housing Finance System*. We also continued our work during the second quarter of 2012 to help build a new housing finance system, including pursuing the strategic goals identified by our conservator: build a new infrastructure for the secondary mortgage market; gradually contract our dominant presence in the marketplace while simplifying and shrinking our operations; and maintain foreclosure prevention activities and credit availability for new and refinanced mortgages. For more information on our strategic goals, see "Business—Executive Summary —Our Business Objectives and Strategy" in our 2011 Form 10-K and "Executive Compensation—Compensation Discussion and Analysis—2012 Executive Compensation Program—2012 Corporate Performance Objectives" in Amendment No. 1 on Form 10-K/A to our Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 Form 10-K/A").

*Helping Offset the Cost of a Nationwide Payroll Tax Cut.* In addition, we are helping offset the cost of the nationwide payroll tax cut. At the direction of FHFA, effective April 1, 2012, we increased the guaranty fee on all single-family residential mortgages delivered to us by 10 basis points. This fee increase was required by the Temporary Payroll Tax Cut Continuation Act of 2011 (the "TCCA") for new loans delivered to us until 2021 and requires that we remit this increase directly to Treasury to help offset the cost of a two-month extension of the payroll tax cut from January 1, 2012 through February 29, 2012. As of June 30, 2012, our liability to Treasury for the remittance of this guaranty fee was $26 million.

## Summary of Our Financial Performance for the Second Quarter and First Half of 2012

We experienced a significant improvement in our financial results for the second quarter and first half of 2012 compared with the second quarter and first half of 2011. Although our financial condition continues to be impacted by elevated mortgage delinquencies and foreclosures as well as home prices that are significantly below their peak in 2006, we saw improvement in the housing market in the first half of 2012. In addition, we have seen further improvement in the performance of our book of business, including lower delinquency rates and higher re-performance rates for our modified loans. These factors have resulted in a reduction in our loan loss reserves and a corresponding recognition of a benefit (rather than a provision) for credit losses for the second quarter and first half of 2012.

2

*Comprehensive Income (Loss)*

*Quarterly Results*

We recognized comprehensive income of $5.4 billion in the second quarter of 2012, consisting of net income of $5.1 billion and other comprehensive income of $328 million. In comparison, our comprehensive loss and net loss for the second quarter of 2011 were $2.9 billion.

The significant improvement in our second quarter results was primarily due to recognition of a benefit for credit losses of $3.0 billion in the second quarter of 2012 compared with a provision for credit losses of $6.5 billion in the second quarter of 2011. This benefit for credit losses was due to a decrease in our total loss reserves driven primarily by an improvement in the profile of our single-family book of business resulting from an increase in actual home prices, including the sales prices of our REO properties. In addition, our single-family serious delinquency rate continued to decline, driven in large part by the quality and growth of our new single-family book of business, our modification efforts and current period foreclosures. Key factors impacting our credit-related results include:

- Home prices increased by 3.2% in the second quarter of 2012 compared with 1.2% in the second quarter of 2011. We historically see seasonal improvement in home prices in the second quarter; however, the home price increase in the second quarter of 2012 was larger than expected and the largest quarterly increase we have seen in the last few years. Higher home prices decrease the likelihood that loans will default and reduce the amount of credit loss on loans that do default.

- Sales prices on dispositions of our REO properties improved in the second quarter of 2012 as a result of strong demand. We received net proceeds from our REO sales equal to 59% of the loans' unpaid principal balance in the second quarter of 2012, compared with 56% in the first quarter of 2012 and 54% in the second quarter of 2011.

- Our single-family serious delinquency rate declined to 3.53% as of June 30, 2012 from 3.67% as of March 31, 2012 and 4.08% as of June 30, 2011.

- In addition to the reasons described above, the cash flow projections on our individually impaired loans improved due to accelerated expected prepayment speeds as a result of lower mortgage interest rates: the average 30-year fixed-rate mortgage interest rate was 3.68% in June 2012, compared with 3.95% in March 2012 and 4.51% in June 2011, according to Freddie Mac's Primary Mortgage Market Survey®. The accelerated expected prepayment speeds reduced the expected lives of modified loans and thus reduced the expected expense related to the concessions we have granted to borrowers.

As discussed below in "Our Expectations Regarding Future Loss Reserves and Credit-Related (Income) Expenses," due to the large size of our guaranty book of business, even small changes in home prices, economic conditions and other variables can result in significant volatility in the amount of credit-related expenses or income we recognize from period to period.

The improvement in our credit results in the second quarter of 2012 was partially offset by fair value losses of $2.4 billion, compared with fair value losses of $1.6 billion in the second quarter of 2011. Our fair value losses in the second quarter of 2012 were primarily due to risk management derivative losses on pay-fixed swaps, primarily driven by a decrease in swap rates in the quarter. Derivative instruments are an integral part of how we manage interest rate risk and an inherent part of the cost of funding and hedging our mortgage investments. We expect high levels of period-to-period volatility in our results because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements.

*Year-to-Date Results*

Our comprehensive income for the first half of 2012 was $8.5 billion, consisting of net income of $7.8 billion and other comprehensive income of $690 million. In comparison, we recognized a comprehensive loss of $9.2 billion in the first half of 2011, consisting of a net loss of $9.4 billion and other comprehensive income of $183 million.

The significant improvement in our financial results was primarily due to recognizing a benefit for credit losses of $1.0 billion in the first half of 2012 compared with a provision of $17.1 billion in the first half of 2011. The improvement was a result of the same factors that impacted the second quarter of 2012, which are described above. The improvement in our credit results was partially offset by higher fair value losses on risk management derivatives.

See "Consolidated Results of Operations" for more information on our results.

**Net Worth**

Our net worth of $2.8 billion as of June 30, 2012 reflects our comprehensive income of $8.5 billion offset by our payment to Treasury of $5.8 billion in senior preferred stock dividends during the first half of 2012.

3

As a result of our positive net worth as of June 30, 2012, we are not requesting a draw from Treasury under the senior preferred stock purchase agreement. The aggregate liquidation preference on the senior preferred stock remains at $117.1 billion, which requires an annualized dividend payment of $11.7 billion. The amount of this dividend payment exceeds our reported annual net income for every year since our inception. As of June 30, 2012, we have paid an aggregate of $25.6 billion to Treasury in dividends on the senior preferred stock.

Table 1 below displays our Treasury draws and senior preferred stock dividend payments to Treasury since entering conservatorship on September 6, 2008.

**Table 1: Treasury Draws and Senior Preferred Stock Dividend Payments**

| | 2008 | 2009 | 2010 | 2011 | 2012 (first half) | Cumulative Total |
|---|---|---|---|---|---|---|
| | | | (Dollars in billions) | | | |
| Treasury draws[(1)(2)] | $ 15.2 | $ 60.0 | $ 15.0 | $ 25.9 | $ — | $ 116.1 |
| Senior preferred stock dividends[(3)] | — | 2.5 | 7.7 | 9.6 | 5.8 | 25.6 |
| Treasury draws less senior preferred stock dividends | $ 15.2 | $ 57.5 | $ 7.3 | $ 16.3 | $ (5.8) | $ 90.5 |
| Cumulative percentage of senior preferred stock dividends to Treasury draws | 0.2 % | 3.3 % | 11.3 % | 17.1 % | 22.0 % | 22.0 % |

[(1)] Represents the total draws received from Treasury based on our quarterly net worth deficits for the periods presented. Draw requests are funded in the quarter following each quarterly net worth deficit.

[(2)] Treasury draws do not include the initial $1.0 billion liquidation preference of the senior preferred stock, for which we did not receive any cash proceeds.

[(3)] Represents total quarterly cash dividends paid to Treasury during the periods presented based on an annual rate of 10% per year on the aggregate liquidation preference of the senior preferred stock.

### Total Loss Reserves

Our total loss reserves consist of (1) our allowance for loan losses, (2) our allowance for accrued interest receivable, (3) our allowance for preforeclosure property taxes and insurance receivables, and (4) our reserve for guaranty losses. Our total loss reserves, which reflect our estimate of the probable losses we have incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, decreased to $68.0 billion as of June 30, 2012 from $74.6 billion as of March 31, 2012 and $76.9 billion as of December 31, 2011. Our total loss reserve coverage to total nonperforming loans was 28% as of June 30, 2012, compared with 30% as of March 31, 2012 and 31% as of December 31, 2011.

### Our Expectations Regarding Future Loss Reserves and Credit-Related (Income) Expenses

We expect the trends of stabilizing home prices and declining single-family serious delinquency rates to continue, although we expect serious delinquency rates to decline at a slower pace than in recent periods. As a result of these trends, we believe that our total loss reserves peaked as of December 31, 2011 and will not increase above $76.9 billion in the foreseeable future. We also believe that our credit-related expenses will be lower in 2012 than in 2011.

Although we expect these positive trends to continue, the amount of credit-related income or expenses we recognize in future periods could vary significantly from period to period and may be affected by many different factors, such as those described below. Moreover, although we believe that our total loss reserves peaked as of December 31, 2011, we expect our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans that we acquired prior to 2009 and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully repaid or default.

Our expectations regarding our future credit-related expenses or income and loss reserves are based on our current expectations and assumptions about many factors that are subject to change. Factors that could result in higher credit-related expenses and loss reserves than we currently expect include: a drop in actual or expected home prices; an increase in our serious delinquency rate; an increase in interest rates; an increase in unemployment rates; future legislative or regulatory requirements that have a significant impact on our business, such as a requirement that we implement a principal forgiveness program; future updates to our models relating to our loss reserves, including the assumptions used by these models; future

4

changes to accounting policies relating to our loss reserves; significant changes in modification and foreclosure activity; changes in borrower behavior, such as an increasing number of underwater borrowers who strategically default on their mortgage loan; failures by our mortgage seller/servicers to fulfill their repurchase obligations in full; failures by our mortgage insurers to fulfill their obligations in full; and many other factors, including those discussed in "Outlook—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and in "Risk Factors" in both this report and in our 2011 Form 10-K. Due to the large size of our guaranty book of business, even small changes in these factors could have a significant impact on our financial results for a particular period.

In addition, in April 2012, FHFA issued an Advisory Bulletin that could have an impact on the amount of our future credit-related expenses or income and loss reserves; however, we are still assessing the impact of the Advisory Bulletin. See "Legislative and Regulatory Developments—FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information.

**Our Strong New Book of Business**

*Credit Risk Profile of Loans in our New Book of Business Compared with our Legacy Book of Business*

Since 2009, we have seen the effect of actions we took, beginning in 2008, to significantly strengthen our underwriting and eligibility standards and change our pricing to promote sustainable homeownership and stability in the housing market. While it is too early to know how the single-family loans we have acquired since January 1, 2009 will ultimately perform, given their strong credit risk profile and based on their performance so far, we expect that these loans, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them. In contrast, we expect that the single-family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime. Loans we have acquired since the beginning of 2009 constituted 59% of our single-family guaranty book of business as of June 30, 2012. Our 2005 through 2008 acquisitions, which are becoming a smaller percentage of our single-family guaranty book of business, constituted only 27% of our single-family guaranty book of business as of June 30, 2012.

The 59% of our single-family guaranty book of business that represents our new single-family book of business includes loans that are refinancings of existing Fannie Mae loans under our Refi Plus™ initiative. Refi Plus loans constituted 14% of our single-family guaranty book of business as of June 30, 2012. Refi Plus loans include loans that are refinancings under the Administration's Home Affordable Refinance Program ("HARP"). Because HARP and Refi Plus are designed to expand refinancing opportunities for borrowers who may otherwise be unable to refinance their mortgage loans due to a decline in home values, many of the loans we acquire under HARP and some of the loans we acquire under Refi Plus have higher LTV ratios than we would otherwise permit, greater than 100% in some cases. The volume of loans with high LTV ratios that we acquired under Refi Plus and HARP increased in the second quarter of 2012, as we discuss below in "Credit Risk Characteristics of Loans Acquired under Refi Plus and HARP." As a result, loans with LTV ratios greater than 100% constituted 10% of our acquisitions in the second quarter of 2012, compared with 3% in the second quarter of 2011, and the weighted average LTV ratio at origination of loans we acquired in the second quarter of 2012 increased to 76% from 71% in the second quarter of 2011.

Our expectations regarding the ultimate performance of our loans are based on numerous expectations and assumptions, including those relating to expected changes in regional and national home prices, borrower behavior, public policy and other macroeconomic factors. If future conditions are more unfavorable than our expectations, the loans we acquired since the beginning of 2009 could become unprofitable. For example, home prices are a key factor affecting the profitability we expect. When home prices decline, the LTV ratios on our loans increase, and both the probability of default and the estimated severity of loss increase. If home prices decline significantly from June 2012 levels, the loans we acquired since the beginning of 2009 could become unprofitable. See "Outlook—Home Prices" for our current expectations regarding changes in home prices. Also see "Outlook—Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations" in this report and "Risk Factors" in both this report and our 2011 Form 10-K for a discussion of factors that could cause our expectations regarding the performance of the loans in our new single-family book of business to change.

Table 2 below displays information regarding the credit characteristics of the loans in our single-family conventional guaranty book of business as of June 30, 2012 by acquisition period, which illustrates the improvement in the credit risk profile of loans we acquired beginning in 2009 compared with loans we acquired in 2005 through 2008.

5

**Table 2: Selected Credit Characteristics of Single-Family Conventional Loans Held, by Acquisition Period**

| | As of June 30, 2012 | | | |
| --- | --- | --- | --- | --- |
| | % of Single-Family Conventional Guaranty Book of Business[1] | Current Estimated Mark-to-Market LTV Ratio[1] | Current Mark-to-Market LTV Ratio >100%[1][2] | Serious Delinquency Rate[3] |
| Year of Acquisition: | | | | |
| New Single-Family Book of Business: | | | | |
| 2012 | 13 % | 71 % | 6 % | 0.01 % |
| 2011 | 18 | 69 | 3 | 0.14 |
| 2010 | 15 | 70 | 5 | 0.42 |
| 2009 | 13 | 72 | 6 | 0.76 |
| Total New Single-Family Book of Business | 59 | 70 | 5 | 0.33 |
| Legacy Book of Business: | | | | |
| 2005-2008 | 27 | 101 | 44 | 9.38 |
| 2004 and prior | 14 | 59 | 8 | 3.37 |
| Total Single-Family Book of Business | 100 % | 77 % | 16 % | 3.53 % |

[1] Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of June 30, 2012.

[2] The majority of loans in our new single-family book of business as of June 30, 2012 with mark-to-market LTV ratios over 100% were loans acquired under our Refi Plus initiative. See "Credit Risk Characteristics of Loans Acquired under Refi Plus and HARP" for more information on our recent acquisitions of loans with high LTV ratios.

[3] A substantial portion of the loans acquired in 2012 were originated so recently that they could not yet have become seriously delinquent. The serious delinquency rates for loans acquired in more recent years will be higher after the loans have aged, but we do not expect them to approach the levels of the June 30, 2012 serious delinquency rates of loans in our legacy book of business.

The single-family loans that we acquired in the first half of 2012 had a weighted average FICO credit score at origination of 762 and an average original LTV ratio of 73%. Of the single-family loans we acquired in the first half of 2012, approximately 14% had an original LTV ratio greater than 90%, and approximately 1% had a FICO credit score at origination of less than 620. The average original LTV ratio of single-family loans we acquired in the first six months of 2012, excluding HARP loans, was 68%, compared with 105% for HARP loans. See Table 2 in our 2011 Form 10-K for information regarding the credit risk profile of the single-family conventional loans we acquired during specified previous periods.

### Credit Risk Characteristics of Loans Acquired under Refi Plus and HARP

Since 2009, our acquisitions have included a significant number of loans refinanced under HARP. We acquire HARP loans under Refi Plus, which provides expanded refinance opportunities for eligible Fannie Mae borrowers. HARP loans, which have LTV ratios at origination in excess of 80%, must be secured by the borrower's primary residence. In addition, a HARP loan cannot (1) be an adjustable-rate mortgage loan, or ARM, if the initial fixed period is less than five years; (2) have an interest-only feature, which permits the payment of interest without a payment of principal; (3) be a balloon mortgage loan; or (4) have the potential for negative amortization. Under Refi Plus, we also acquire loans with LTV ratios at origination greater than 80% that do not meet the criteria for HARP because they are not secured by the borrower's primary residence, as well as loans that have LTV ratios at origination of less than 80%. Many of the loans we acquire under HARP and some of the loans we acquire under Refi Plus have higher LTV ratios than we would otherwise permit. Some borrowers for these loans also have lower FICO credit scores than we would otherwise require.

Loans we acquire under Refi Plus and HARP represent refinancings of loans that are already in our guaranty book of business. The credit risk associated with loans we acquire under Refi Plus and HARP essentially replaces the credit risk that we already held prior to the refinancing. Loans we acquire under Refi Plus and HARP have higher serious delinquency rates and may not perform as well as the other loans we have acquired since the beginning of 2009. However, we expect these loans will perform better than the loans they replace because Refi Plus and HARP loans should reduce the borrowers' monthly payments or provide more stable terms than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate).

6

Loans we acquired under Refi Plus represented 23% of our new single-family book of business as of June 30, 2012 and had a serious delinquency rate of 0.60%, compared with a serious delinquency rate for our new single-family book of business overall of 0.33%. These Refi Plus loans include the loans we acquired under HARP, which represented 10% of our new single-family book of business as of June 30, 2012 and had a serious delinquency rate of 1.06%. See "Table 35: Selected Credit Characteristics of Single-Family Conventional Loans Acquired under HARP and Refi Plus" for more information on the serious delinquency rates and mark-to-market LTV ratios as of June 30, 2012 of loans in our new single-family book of business overall and of loans we acquired under Refi Plus and HARP.

In the second quarter of 2012, the volume of loans we acquired under HARP and Refi Plus increased significantly from the first quarter as changes designed to make the benefits of HARP available to more borrowers were implemented. The approximately 128,000 loans we acquired under HARP in the second quarter of 2012 constituted 15% of our single-family acquisitions for the period, measured by unpaid principal balance, compared with 10% of single-family acquisitions in the first quarter of 2012. These loans were included in the approximately 247,000 loans we acquired under Refi Plus in the second quarter of 2012, which constituted 27% of our single-family acquisitions for the period, measured by unpaid principal balance, compared with 22% of single-family acquisitions in the first quarter of 2012.

As a result of recently implemented changes to HARP, we expect that if interest rates remain low we will continue to acquire a high volume of refinancings under HARP. In particular, we expect to acquire many refinancings with LTV ratios greater than 125%, because borrowers were unable to refinance loans with LTV ratios greater than 125% in large numbers until changes to HARP were fully implemented in the second quarter of 2012. We expect the elevated volume of HARP refinancings will decrease when interest rates rise sufficiently or when there is no longer a large population of borrowers with loans that have high LTV ratios who would benefit from refinancing. HARP is scheduled to end in December 2013.

### *Factors that May Affect the Credit Risk Profile and Performance of Loans in our New Book of Business in the Future*

Whether the loans we acquire in the future will exhibit an overall credit profile similar to our more recent acquisitions will depend on a number of factors, including our future pricing and eligibility standards and those of mortgage insurers and the Federal Housing Administration ("FHA"), the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under Refi Plus and HARP.

See "Business—Executive Summary—Our Strong New Book of Business and Expected Losses on our Legacy Book of Business—Building a Strong New Single-Family Book of Business" in our 2011 Form 10-K for a more detailed discussion of the changes in the credit profile of our single-family acquisitions. In addition, see "MD&A—Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management" for more detail regarding the credit risk characteristics of our single-family guaranty book of business.

### Credit Performance

Table 3 presents information for each of the last six quarters about the credit performance of mortgage loans in our single-family guaranty book of business and our workouts. The term "workouts" refers to home retention solutions and foreclosure alternatives. The workout information in Table 3 does not reflect repayment plans and forbearances that have been initiated but not completed, nor does it reflect trial modifications that have not become permanent.

TREASURY-3914

**Table 3: Credit Statistics, Single-Family Guaranty Book of Business[1]**

| | 2012 | | | 2011 | | | | |
|---|---|---|---|---|---|---|---|---|
| | Q2 YTD | Q2 | Q1 | Full Year | Q4 | Q3 | Q2 | Q1 |
| | | | | (Dollars in millions) | | | | |
| **As of the end of each period:** | | | | | | | | |
| Serious delinquency rate[2] | 3.53 % | 3.53 % | 3.67 % | 3.91 % | 3.91 % | 4.00 % | 4.08 % | 4.27 % |
| Seriously delinquent loan count | 622,052 | 622,052 | 650,918 | 690,911 | 690,911 | 708,847 | 729,772 | 767,161 |
| Nonperforming loans[3] | $ 240,472 | $ 240,472 | $ 243,981 | $248,379 | $248,379 | $ 248,134 | $245,848 | $248,444 |
| Foreclosed property inventory: | | | | | | | | |
| Number of properties[4] | 109,266 | 109,266 | 114,157 | 118,528 | 118,528 | 122,616 | 135,719 | 153,224 |
| Carrying value | $ 9,421 | $ 9,421 | $ 9,721 | $ 9,692 | $ 9,692 | $ 11,039 | $ 12,480 | $ 14,086 |
| Combined loss reserves[5] | $ 63,365 | $ 63,365 | $ 69,633 | $ 71,512 | $ 71,512 | $ 70,741 | $ 68,887 | $ 66,240 |
| Total loss reserves[6] | $ 66,694 | $ 66,694 | $ 73,119 | $ 75,264 | $ 75,264 | $ 73,973 | $ 73,116 | $ 70,466 |
| **During the period:** | | | | | | | | |
| Foreclosed property (number of properties): | | | | | | | | |
| Acquisitions[4] | 91,483 | 43,783 | 47,700 | 199,696 | 47,256 | 45,194 | 53,697 | 53,549 |
| Dispositions | (100,745) | (48,674) | (52,071) | (243,657) | (51,344) | (58,297) | (71,202) | (62,814) |
| Credit-related (income) expenses[7] | $ (630) | $ (3,015) | $ 2,385 | $ 27,218 | $ 5,397 | $ 4,782 | $ 5,933 | $ 11,106 |
| Credit losses[8] | $ 8,733 | $ 3,778 | $ 4,955 | $ 18,346 | $ 4,548 | $ 4,384 | $ 3,810 | $ 5,604 |
| REO net sales prices to UPB[9] | 58 % | 59 % | 56 % | 54 % | 55 % | 54 % | 54 % | 53 % |
| **Loan workout activity (number of loans):** | | | | | | | | |
| Home retention loan workouts[10] | 96,761 | 41,226 | 55,535 | 248,658 | 60,453 | 68,227 | 59,019 | 60,959 |
| Short sales and deeds-in-lieu of foreclosure | 46,226 | 24,013 | 22,213 | 79,833 | 22,231 | 19,306 | 21,176 | 17,120 |
| Total loan workouts | 142,987 | 65,239 | 77,748 | 328,491 | 82,684 | 87,533 | 80,195 | 78,079 |
| Loan workouts as a percentage of delinquent loans in our guaranty book of business[11] | 26.45 % | 24.14 % | 28.85 % | 27.05 % | 27.24 % | 28.39 % | 25.71 % | 25.01 % |

[1] Our single-family guaranty book of business consists of (a) single-family mortgage loans held in our mortgage portfolio, (b) single-family mortgage loans underlying Fannie Mae MBS, and (c) other credit enhancements that we provide on single-family mortgage assets, such as long-term standby commitments. It excludes non-Fannie Mae mortgage-related securities held in our mortgage portfolio for which we do not provide a guaranty.

[2] Calculated based on the number of single-family conventional loans that are 90 days or more past due and loans that have been referred to foreclosure but not yet foreclosed upon, divided by the number of loans in our single-family conventional guaranty book of business. We include all of the single-family conventional loans that we own and those that back Fannie Mae MBS in the calculation of the single-family serious delinquency rate.

[3] Represents the total amount of nonperforming loans including troubled debt restructurings. A troubled debt restructuring is a restructuring of a mortgage loan in which a concession is granted to a borrower experiencing financial difficulty. We generally classify loans as nonperforming when the payment of principal or interest on the loan is 60 days or more past due.

[4] Includes held for use properties, which are reported in our condensed consolidated balance sheets as a component of "Other assets" and acquisitions through deeds-in-lieu of foreclosure.

[5] Consists of the allowance for loan losses for loans recognized in our condensed consolidated balance sheets and the reserve for guaranty losses related to both single-family loans backing Fannie Mae MBS that we do not consolidate in our condensed consolidated balance sheets and single-family loans that we have guaranteed under long-term standby commitments. For additional information on the change in our loss reserves see "Consolidated Results of Operations—Credit-Related (Income) Expenses—(Benefit) Provision for Credit Losses."

[6] Consists of (a) the combined loss reserves, (b) allowance for accrued interest receivable, and (c) allowance for preforeclosure property taxes and insurance receivables.

[7] Consists of (a) the (benefit) provision for credit losses and (b) foreclosed property (income) expense.

[8] Consists of (a) charge-offs, net of recoveries and (b) foreclosed property expense, adjusted to exclude the impact of fair value losses resulting from credit-impaired loans acquired from MBS trusts.

8

[9] Calculated as the amount of sale proceeds received on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans at the time of foreclosure. Net sales price represents the contract sale price less selling costs for the property and other charges paid by the seller at closing.

[10] Consists of (a) modifications, which do not include trial modifications or repayment plans or forbearances that have been initiated but not completed and (b) repayment plans and forbearances completed. See "Table 39: Statistics on Single-Family Loan Workouts" in "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management—Problem Loan Management—Loan Workout Metrics" for additional information on our various types of loan workouts.

[11] Calculated based on annualized problem loan workouts during the period as a percentage of delinquent loans in our single-family guaranty book of business as of the end of the period.

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 5 9% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent has been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. As described in "Business—Executive Summary—Reducing Credit Losses on Our Legacy Book of Business—Managing Timelines for Workouts and Foreclosures" in our 2011 Form 10-K, high levels of foreclosures, continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process and the volume of loan modifications. We expect the number of our single-family loans that are seriously delinquent to remain well above pre-2008 levels for years. In addition, we anticipate that it will take a significant amount of time before our REO inventory is reduced to pre-2008 levels.

We provide additional information on our credit-related expenses or income in "Consolidated Results of Operations—Credit-Related (Income) Expenses" and on the credit performance of mortgage loans in our single-family book of business and our loan workouts in "Risk Management—Credit Risk Management —Single-Family Mortgage Credit Risk Management."

## Reducing Credit Losses on Our Legacy Book of Business

To reduce the credit losses we ultimately incur on our legacy book of business, we have been focusing our efforts on the following strategies:

- Helping underwater and other eligible Fannie Mae borrowers refinance to more sustainable loans, including loans that significantly reduce their monthly payments, through HARP and our Refi Plus initiative;

- Reducing defaults by offering borrowers solutions that significantly reduce their monthly payments and enable them to stay in their homes ("home retention solutions");

- Pursuing "foreclosure alternatives," which help borrowers avoid foreclosure and reduce the severity of the losses we incur overall;

- Efficiently managing timelines for home retention solutions, foreclosure alternatives and foreclosures;

- Improving servicing standards and servicers' execution and consistency;

- Managing our REO inventory to minimize costs and maximize sales proceeds; and

- Pursuing contractual remedies from lenders, servicers and providers of credit enhancement.

See "Business—Executive Summary—Reducing Credit Losses on our Legacy Book of Business" in our 2011 Form 10-K, as well as "Risk Management —Credit Risk Management—Single-Family Mortgage Credit Risk Management" in both this report and our 2011 Form 10-K, for more information on the strategies and actions we are taking to minimize our credit losses.

## Providing Liquidity and Support to the Mortgage Market

### *Our Liquidity and Support Activities*

We provide liquidity and support to the U.S. mortgage market in a number of important ways:

- We serve as a stable source of liquidity for purchases of homes and financing of multifamily rental housing, as well

9

as for refinancing existing mortgages. We provided approximately $2.7 trillion in liquidity to the mortgage market from January 1, 2009 through June 30, 2012 through our purchases and guarantees of loans, which enabled borrowers to complete 8.1 million mortgage refinancings and 2.2 million home purchases, and provided financing for 1.3 million units of multifamily housing.

- We have strengthened our underwriting and eligibility standards to support sustainable homeownership. As a result, our new single-family book of business has a strong credit risk profile. Our support enables borrowers to have access to a variety of conforming mortgage products, including long-term, fixed-rate mortgages, such as the prepayable 30-year fixed-rate mortgage that protects homeowners from interest rate swings.

- We helped 1.1 million homeowners stay in their homes or otherwise avoid foreclosure from January 1, 2009 through June 30, 2012, which helped to support neighborhoods, home prices and the housing market. Moreover, borrowers' ability to pay their modified loans has improved in recent periods as we have enhanced the structure of our modifications. One year after modification, 75% of the modifications we made in the second quarter of 2011 were current or paid off, compared with 70% of the modifications we made in the second quarter of 2010. See "Table 40: Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post-Modification" for more information on the performance of our modifications.

- We helped borrowers refinance loans through Refi Plus. From April 1, 2009, the date we began accepting delivery of Refi Plus loans, through June 30, 2012, we have acquired approximately 2.2 million loans refinanced under our Refi Plus initiative. Refinancings delivered to us through Refi Plus in the second quarter of 2012 reduced borrowers' monthly mortgage payments by an average of $208. Some borrowers' monthly payments increased as they took advantage of the ability to refinance through Refi Plus to reduce the term of their loan, to switch from an adjustable-rate mortgage to a fixed-rate mortgage or to switch from an interest-only mortgage to a fully amortizing mortgage.

- We support affordability in the multifamily rental market. Over 85% of the multifamily units we financed from 2009 through 2011 were affordable to families earning at or below the median income in their area.

- In addition to purchasing and guaranteeing loans, we provide funds to the mortgage market through short-term financing and other activities. These activities are described in more detail in our 2011 Form 10-K in "Business—Business Segments—Capital Markets."

### *2012 Acquisitions and Market Share*

In the first half of 2012, we purchased or guaranteed approximately $416 billion in loans, measured by unpaid principal balance, which includes $25.5 billion in delinquent loans we purchased from our single-family MBS trusts. These activities enabled our lender customers to finance approximately 1.8 million single-family conventional loans and loans for approximately 236,000 units in multifamily properties during the first half of 2012.

We remained the largest single issuer of mortgage-related securities in the secondary market during the second quarter of 2012, with an estimated market share of new single-family mortgage-related securities issuances of 46%. Our estimated market share of new single-family mortgage-related securities issuances was 51% in the first quarter of 2012 and 43% in the second quarter of 2011.

We remained a constant source of liquidity in the multifamily market. We owned or guaranteed approximately 21% of the outstanding debt on multifamily properties as of March 31, 2012 (the latest date for which information was available).

### Housing and Mortgage Market and Economic Conditions

Economic growth slowed in the second quarter of 2012 compared with the first quarter of 2012. The inflation-adjusted U.S. gross domestic product, or GDP, rose by 1.5% on an annualized basis in the second quarter of 2012, according to the Bureau of Economic Analysis advance estimate, compared with an increase of 2.0% in the first quarter of 2012. Growth in employment also slowed during the second quarter of 2012, as the overall economy gained an estimated 219,000 jobs, compared with 677,000 jobs in the first quarter, according to the U.S. Bureau of Labor Statistics. Over the past 12 months ending in June 2012, the economy created 1.7 million non-farm jobs. The unemployment rate was 8.2% in June 2012 and in March 2012. In July 2012, non-farm payrolls strengthened, rising by 163,000 during the month, but the unemployment rate rose to 8.3%.

Despite the slowdown in economic growth and continued high unemployment, housing activity improved or remained mostly unchanged during the second quarter of 2012. Total existing home sales averaged 4.5 million units annualized in the second quarter of 2012, a 0.7% decrease from the first quarter of 2012, according to data available through June 2012 from the National Association of REALTORS®. Sales of foreclosed homes and preforeclosure, or "short," sales (together, "distressed sales") accounted for 25% of existing home sales in June 2012, compared with 29% in March 2012 and 30% in June 2011.

10

New single-family home sales strengthened during the quarter, averaging an annualized rate of 363,000 units, a 3.1% increase from the prior quarter.

The overall mortgage market serious delinquency rate, which has trended down since peaking in the fourth quarter of 2009, remained high at 7.4% as of March 31, 2012, according to the Mortgage Bankers Association National Delinquency Survey. According to the National Association of REALTORS® July 2012 Existing Home Sales Report, the months' supply of existing unsold homes was 6.6 months as of June 30, 2012, compared with 6.2 months as of March 31, 2012 and 9.1 months as of June 30, 2011. Properties that are vacant and held off the market, combined with a portion of properties backing seriously delinquent mortgages not currently listed for sale, represent a significant shadow inventory putting downward pressure on home prices.

After declining by an estimated 23.6% from their peak in third quarter of 2006 to the first quarter of 2012, we estimate that home prices on a national basis increased by 3.2% in the second quarter of 2012. Our home price estimates are based on preliminary data and are subject to change as additional data become available. The decline in home prices over the past several years has left many homeowners with "negative equity" in their homes, which means their principal mortgage balance exceeds the current market value of their home. This increases the likelihood that borrowers will walk away from their mortgage obligations and that the loans will become delinquent and proceed to foreclosure. According to CoreLogic, approximately 11 million, or 24%, of all residential properties with mortgages were in a negative equity position at the end of the first quarter of 2012, the most recent date for which information is available. This potential supply also weighs on the supply/demand balance putting downward pressure on home prices. See "Risk Factors" in our 2011 Form 10-K for a description of risks to our business associated with the weak economy and housing market.

During the second quarter of 2012, the multifamily sector continued expanding due to ongoing rental demand and limited new apartment supply. Preliminary third-party data suggest that the national vacancy rate for professionally managed, institutional investment-type apartment properties decreased to an estimated 5.75% as of June 30, 2012, compared with an estimated 6.0% as of March 31, 2012 and an estimated 6.8% as of June 30, 2011. In addition, asking rents increased in the second quarter of 2012 by an estimated 1.0% on a national basis. As indicated by data from Axiometrics, multifamily concession rates, the rental discount rate as a percentage of asking rents, decreased during the second quarter of 2012 to -2.3% as of June 30, 2012, compared with -3.0% as of March 31, 2012 and -3.3% as of December 31, 2011. The increase in rental demand is also reflected in an estimated positive net absorption, or net change in the number of occupied rental units after deducting new supply added during the second quarter of 2012, of more than 25,000 units during the second quarter, according to preliminary data from Reis, Inc. Net absorption during second quarter declined from more than 36,000 units during the first quarter of 2012, even though the spring and summer months typically experience more net absorption than other times of the year. We believe the slowing in net absorption during the second quarter of 2012 is likely due to property owners responding to increased demand by pursuing rent increases rather than increasing occupancy.

Multifamily construction starts were at an annualized rate of over 220,000 units as of June 30, 2012, based on data from the Census Bureau. Although the number of completions expected to occur in 2012 and early 2013 remains below historical norms, based on recent trends, we expect that multifamily starts could return to their historical norm of an annualized rate of approximately 245,000 units started by as early as the end of this year. There is a potential for over-supply occurring over the next 24 months in a limited number of localized areas. Nevertheless, the overall national rental market's pace of supply is expected to remain constrained, based on expected construction completions, annualized obsolescence and anticipated household formation trends.

**Outlook**

*Overall Market Conditions.* We expect mortgage loan delinquencies and foreclosures to remain at high levels in the second half of 2012. The high level of delinquent mortgage loans has resulted in high levels of foreclosures, which have slowed the return of housing inventory to pre-housing crisis levels. Despite these pressures, we saw improvement in the housing market in the first half of 2012.

Although our results for the second half of 2012 may not be as strong as our results for the first half, we expect our financial results for 2012 overall to be significantly better than our 2011 results. We expect that single-family default and severity rates will remain high in the second half of 2012 compared to pre-housing crisis levels, but will be lower in 2012 overall than in 2011 overall. Despite signs of multifamily sector improvement at the national level, we expect multifamily foreclosures in 2012 to remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals. Conditions may worsen if the unemployment rate increases on either a national or regional basis.

As a result of the recently implemented changes to HARP, we expect that if interest rates remain low we will continue to acquire a high volume of refinancings under HARP. In particular, we expect to acquire many refinancings with LTV ratios greater than 125%, because borrowers were unable to refinance loans with LTV ratios greater than 125% in large numbers

11

until changes to HARP were fully implemented in the second quarter of 2012. We expect the elevated volume of HARP refinancings will decrease when interest rates rise sufficiently or when there is no longer a large population of borrowers with loans that have high LTV ratios who would benefit from refinancing. Overall, we now expect the volume of refinancings we acquire in 2012 will be similar to or greater than the volume of refinancings we acquired in 2011. For a description of the recently implemented changes to HARP, see "Business—Making Home Affordable Program—Changes to the Home Affordable Refinance Program" in our 2011 Form 10-K. Our loan acquisitions have been lower in 2012 than they otherwise could have been as a result of the decrease in the maximum size of loans we may acquire in specified high-cost areas from $729,750 to $625,500, which went into effect in the fourth quarter of 2011. As a result of these factors, we expect the volume of our loan acquisitions in 2012 will be similar to or greater than the volume of our loan acquisitions in 2011.

We estimate that total originations in the U.S. single-family mortgage market in 2012 will increase from 2011 levels by approximately 9% from an estimated $1.36 trillion to an estimated $1.49 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will increase from approximately $900 billion in 2011 to approximately $980 billion in 2012. Refinancings comprised approximately 78% of our single-family business volume in the second quarter of 2012, compared with approximately 83% in the first quarter of 2012, and approximately 76% for all of 2011.

*Home Prices.* After declining by an estimated 23.6% from their peak in the third quarter of 2006 to the first quarter of 2012, we estimate that home prices on a national basis increased by 3.2% in the second quarter of 2012. Although we believe home prices may decline again through early 2013, we expect that, if current market trends continue, home prices will not decline on a national basis below their first quarter 2012 levels. Future home price changes may be very different from our estimates as a result of significant inherent uncertainty in the current market environment, including uncertainty about the effect of actions the federal government has taken and may take with respect to tax policies, spending cuts, mortgage finance programs and policies, and housing finance reform; the management of the Federal Reserve's MBS holdings; the impact of those actions on and changes generally in unemployment and the general economic and interest rate environment; and the impact on the U.S. economy of the European debt crisis. Because of these uncertainties, the actual home price changes we experience may differ significantly from these estimates. We also expect significant regional variation in home price changes and the timing of home price stabilization. Our estimates of home price changes are based on our home price index, which is calculated differently from the S&P/Case-Shiller U.S. National Home Price Index and therefore results in different percentages for comparable changes. Our estimated 23.6% peak-to-trough decline in home prices on a national basis corresponds to a 35.1% decline according to the S&P/Case-Shiller's National Home Price Index.

*Credit-Related Income or Expenses and Credit Losses.* Our credit-related income or expenses, which include our benefit or provision for credit losses, reflect our recognition of losses on our loans. Through our provision for credit losses, we recognize credit-related expenses on loans in the period in which we determine that we have incurred a probable loss on the loans as of the end of the period, or in which we have granted concessions to the borrowers. Accordingly, our credit-related income or expenses in each period are affected by changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures we complete, and estimated recoveries from our lender and mortgage insurer counterparties. Our credit losses, which include our charge-offs, net of recoveries, reflect our realization of losses on our loans. We realize losses on loans, through our charge-offs, when foreclosure sales are completed or when we accept short sales or deeds-in-lieu of foreclosure.

We expect that our credit-related expenses for all of 2012 will be lower than for 2011. In addition, we expect our credit losses to remain high in 2012 relative to pre-housing crisis levels. To the extent delays in foreclosures continue in 2012, our realization of some credit losses will be delayed. We further describe our outlook for credit-related expenses in "Summary of Our Financial Performance for the Second Quarter and First Half of 2012—Our Expectations Regarding Future Loss Reserves and Credit-Related Expenses (Income)."

*Uncertainty Regarding our Future Status and Ability to Pay Dividends to Treasury.* There is significant uncertainty in the current market environment, and any changes in the trends in macroeconomic factors that we currently anticipate, such as home prices and unemployment, may cause our future credit-related expenses or income and credit losses to vary significantly from our current expectations. The dividend payments we make on Treasury's senior preferred stock are substantial, currently $11.7 billion per year. We have paid over $25 billion in dividends to Treasury since entering into conservatorship in 2008. Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term. However, we expect that in some future quarters we will be able to generate comprehensive income sufficient to cover at least a portion of our quarterly dividend payment to Treasury. We also expect that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement.

12

Receiving additional draws under the senior preferred stock purchase agreement would further increase the dividends we owe to Treasury on the senior preferred stock.

In addition, there is significant uncertainty regarding the future of our company, including how long the company will continue to be in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. We expect this uncertainty to continue. In February 2011, Treasury and the Department of Housing and Urban Development ("HUD") released a report to Congress on reforming America's housing finance market. The report states that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding long-term reform of the GSEs. See "Legislative and Regulatory Developments" in this report and "Business—Legislative and Regulatory Developments" in our 2011 Form 10-K for discussions of recent legislative reform of the financial services industry and proposals for GSE reform that could affect our business. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks to our business relating to the uncertain future of our company.

*Factors that Could Cause Actual Results to be Materially Different from Our Estimates and Expectations.* We present a number of estimates and expectations in this executive summary, including estimates and expectations regarding our future financial results, the profitability of single-family loans we have acquired, our single-family credit losses, our loss reserves and credit-related expenses, and our draws from and dividends to be paid to Treasury. These estimates and expectations are forward-looking statements based on our current assumptions regarding numerous factors, including future home prices and the future performance of our loans. Our future estimates of our performance, as well as the actual amounts, may differ materially from our current estimates and expectations as a result of: the timing and level of, as well as regional variation in, home price changes; changes in interest rates, unemployment rates and other macroeconomic variables; government policy; the length of time it takes to complete foreclosures; changes in generally accepted accounting principles ("GAAP"); credit availability; borrower behavior; the volume of loans we modify; the effectiveness of our loss mitigation strategies, management of our REO inventory and pursuit of contractual remedies; whether our counterparties meet their obligations in full; changes in the fair value of our assets and liabilities; impairments of our assets; and many other factors, including those discussed in "Risk Factors," "Forward-Looking Statements" and elsewhere in this report, and in "Risk Factors" in our 2011 Form 10-K. For example, if the economy were to enter a deep recession, we would expect actual outcomes to differ substantially from our current expectations.

## LEGISLATIVE AND REGULATORY DEVELOPMENTS

The information in this section updates and supplements information regarding legislative and regulatory developments set forth in "Business—Legislative and Regulatory Developments" and "Business—Our Charter and Regulation of Our Activities" in our 2011 Form 10-K and in "MD&A—Legislative and Regulatory Developments" in our quarterly report on Form 10-Q for the quarter ended March 31, 2012 ("First Quarter 2012 Form 10-Q"). Also see "Risk Factors" in this report and our 2011 Form 10-K for a discussion of risks relating to legislative and regulatory matters.

### GSE Reform

Policymakers and others have focused significant attention in recent years on how to reform the nation's housing finance system, including what role, if any, the GSEs should play. The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which was signed into law in July 2010, calls for enactment of meaningful structural reforms of Fannie Mae and Freddie Mac. The Dodd-Frank Act also required the Treasury Secretary to submit a report to Congress with recommendations for ending the conservatorships of Fannie Mae and Freddie Mac.

In February 2011, Treasury and HUD released their report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions.

The report identifies a number of policy steps that could be used to wind down Fannie Mae and Freddie Mac, reduce the government's role in housing finance and help bring private capital back to the mortgage market. These steps include

13

(1) increasing guaranty fees, (2) gradually increasing the level of required down payments so that any mortgages insured by Fannie Mae or Freddie Mac eventually have at least a 10% down payment, (3) reducing conforming loan limits to those established in the Federal Housing Finance Regulatory Reform Act of 2008 (the "2008 Reform Act"), (4) encouraging Fannie Mae and Freddie Mac to pursue additional credit loss protection and (5) reducing Fannie Mae's and Freddie Mac's portfolios, consistent with Treasury's senior preferred stock purchase agreements with the companies.

In addition, the report outlines three potential options for a new long-term structure for the housing finance system following the wind-down of Fannie Mae and Freddie Mac. The first option would privatize housing finance almost entirely. The second option would add a government guaranty mechanism that could scale up during times of crisis. The third option would involve the government offering catastrophic reinsurance behind private mortgage guarantors. Each of these options assumes the continued presence of programs operated by FHA, the Department of Agriculture and the Veterans Administration to assist targeted groups of borrowers. The report does not state whether or how the existing infrastructure or human capital of Fannie Mae may be used in the establishment of such a reformed system. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. A copy of the report can be found on the Housing Finance Reform section of Treasury's Web site, www.Treasury.gov. We are providing Treasury's Web site address solely for your information, and information appearing on Treasury's Web site is not incorporated into this quarterly report on Form 10-Q.

In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012.

During 2011, Congress held hearings on the future status of Fannie Mae and Freddie Mac, and members of Congress offered legislative proposals relating to the future status of the GSEs. We expect additional hearings on GSE reform and additional legislation to be considered and proposals to be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution. Several bills have been introduced that would place the GSEs into receivership after a period of time and either grant federal charters to new entities to engage in activities similar to those currently engaged in by the GSEs or leave secondary mortgage market activities to entities in the private sector. For example, legislation has been introduced in both the House of Representatives and the Senate that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined not to be financially viable, to place them into receivership. As drafted, these bills may, upon enactment, impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities.

In addition to bills that seek to resolve the status of the GSEs, numerous bills have been introduced and considered that could constrain the current operations of the GSEs or alter the existing authority that FHFA or Treasury has over the enterprises. For example, the Subcommittee on Capital Markets and Government Sponsored Enterprises of the House Financial Services Committee has approved bills that would:

- suspend current compensation packages and apply a government pay scale for GSE employees;

- require the GSEs to increase guaranty fees;

- subject GSE loans to the risk retention standards in the Dodd-Frank Act;

- require a quicker reduction of GSE portfolios than required under the senior preferred stock purchase agreement;

- require Treasury to pre-approve all GSE debt issuances;

- repeal the GSEs' affordable housing goals;

- provide additional authority to FHFA's Inspector General;

- prohibit FHFA from approving any new GSE products during conservatorship or receivership, with certain exceptions;

- prevent Treasury from amending the senior preferred stock purchase agreement to reduce the current dividend rate on our senior preferred stock;

- abolish the Affordable Housing Trust Fund that the GSEs are required to fund except when such contributions have been temporarily suspended by FHFA;

- require FHFA to identify mission critical assets of the GSEs and require the GSEs to dispose of non-mission critical assets;

14

- cap the maximum aggregate amount of funds Treasury or any other agency or entity of the federal government can provide to the GSEs subject to certain qualifications;

- grant FHFA the authority to revoke the enterprises' charters following receivership under certain circumstances; and

- subject the GSEs to the Freedom of Information Act.

Of these bills that passed at a subcommittee level, the only one that has passed the full committee is the bill that would put GSE employees on a government pay scale. We expect additional legislation relating to the GSEs to be introduced and considered by Congress. We cannot predict the prospects for the enactment, timing or content of legislative proposals concerning the future status of the GSEs, their regulation or operations.

In sum, there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks to our business relating to the uncertain future of our company. Also see "Risk Factors" in this report for a discussion of how the uncertain future of our company may adversely affect our ability to retain and recruit well-qualified employees, including senior management.

**Principal Forgiveness**

On July 31, 2012, the Acting Director of FHFA announced FHFA's decision not to direct Fannie Mae and Freddie Mac to participate in Treasury's HAMP Principal Reduction Alternative program. Based on its analysis, FHFA concluded that the economic benefit of participating in that program does not outweigh the costs and risks. In a letter sent to Congress regarding FHFA's decision, Acting Director DeMarco previewed for Congress several housing-related initiatives to strengthen the loss mitigation and borrower assistance efforts of Fannie Mae and Freddie Mac, as well as improve the operation of the housing finance market. These initiatives include new and consistent policies for lender representations and warranties, alignment and simplification of the Fannie Mae and Freddie Mac short sale programs, and further enhancements for borrowers looking to refinance their mortgages.

**Prudential Management and Operational Standards**

As required by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Housing Finance Regulatory Reform Act of 2008 (together, the "GSE Act"), in June 2012, FHFA published a final rule establishing prudential standards relating to the management and operations of Fannie Mae, Freddie Mac and the Federal Home Loan Banks in the following ten areas: (1) internal controls and information systems; (2) independence and adequacy of internal audit systems; (3) management of market risk exposure; (4) management of market risk—measurement systems, risk limits, stress testing, and monitoring and reporting; (5) adequacy and maintenance of liquidity and reserves; (6) management of asset and investment portfolio growth; (7) investments and acquisitions of assets; (8) overall risk management processes; (9) management of credit and counterparty risk; and (10) maintenance of adequate records. These standards are established as guidelines, which the Director of FHFA may modify, revoke or add to at any time by order or notice. The rule also specifies actions FHFA may take if a regulated entity fails to meet one or more of the standards or fails to comply with the rule, such as requiring the entity to submit a corrective plan or increasing its capital requirements.

**Proposed Housing Goals for 2012 to 2014**

On June 11, 2012, FHFA published a proposed rule establishing the following single-family home purchase and refinance housing goal benchmarks for 2012 to 2014 for Fannie Mae and Freddie Mac. A home purchase mortgage may be counted toward more than one home purchase benchmark.

- *Low-Income Families Home Purchase Benchmark:* At least 20% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be affordable to low-income families (defined as income equal to or less than 80% of area median income).

- *Very Low-Income Families Home Purchase Benchmark:* At least 7% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be affordable to very low-income families (defined as income equal to or less than 50% of area median income).

- *Low-Income Areas Home Purchase Goal Benchmark:* The benchmark level for our acquisitions of single-family owner-occupied purchase money mortgage loans for families in low-income areas is set annually by notice from FHFA, based on the benchmark level for the low-income areas home purchase subgoal (below), plus an adjustment factor reflecting the additional incremental share of mortgages for moderate-income families (defined as income equal to or less than 100% of area median income) in designated disaster areas.

15

- *Low-Income Areas Home Purchase Subgoal Benchmark*: At least 11% of our acquisitions of single-family owner-occupied purchase money mortgage loans must be affordable to families in low-income census tracts or to moderate-income families in minority census tracts.

- *Low-Income Families Refinancing Benchmark*: At least 21% of our acquisitions of single-family owner-occupied refinance mortgage loans must be affordable to low-income families.

Under FHFA's rule establishing our housing goals, private-label mortgage-related securities, second liens and single-family government loans do not count towards the housing goals. In addition, only permanent modifications of mortgages under HAMP completed during the year count towards the housing goals; trial modifications will not be counted. Moreover, these modifications count only towards the single-family low-income families refinance goal, not any of the home purchase goals. Refinancings under HARP also count toward the single-family low-income families refinancing goal.

If we do not meet these benchmarks, we may still meet our goals. Our single-family housing goals performance will be measured against these benchmarks and against goals-qualifying originations in the primary mortgage market. We will be in compliance with the housing goals if we meet either the benchmarks or market share measures.

To meet FHFA's proposed goals, our multifamily mortgage acquisitions must finance a certain number of units affordable to low-income families and a certain number of units affordable to very low-income families. The specific requirements for each year are set forth in Table 4 below. There is no market-based alternative measurement for the multifamily goals.

**Table 4: Proposed Multifamily Housing Goals for 2012 to 2014**

|  | Goals for | | |
|---|---|---|---|
|  | **2012** | **2013** | **2014** |
|  | (in units) | | |
| Affordable to low-income families | 251,000 | 245,000 | 223,000 |
| Affordable to very low-income families | 60,000 | 59,000 | 53,000 |

See "Risk Factors" in our 2011 Form 10-K for a description of how we may be unable to meet our housing goals and how actions we may take to meet these goals and other regulatory requirements could adversely affect our business, results of operations and financial condition.

**FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans**

On April 9, 2012, FHFA issued an Advisory Bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Fannie Mae, Freddie Mac and the Federal Home Loan Banks. The Advisory Bulletin establishes guidelines for adverse classification and identification of specified assets and off-balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the *Uniform Retail Credit Classification and Account Management Policy* issued by the federal banking regulators in June 2000.

Among other requirements, the Advisory Bulletin requires that we classify the portion of an outstanding single-family loan balance in excess of the fair value of the underlying property, less costs to sell, as "loss" when the loan is no more than 180 days delinquent, except in certain specified circumstances (such as properly secured loans with an LTV ratio equal to or less than 60%), and charge off the portion of the loan classified as "loss." The Advisory Bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged-off loan, we may report a recovery of the amount, either through our loss reserves or as a reduction in our foreclosed property expenses.

The accounting methods outlined in FHFA's Advisory Bulletin are different from our current methods of accounting for single-family loans that are 180 days or more delinquent. As described in "Risk Factors," we believe that implementation of these changes in our accounting methods present significant operational challenges for us. We have not yet determined when we will implement the accounting changes specified in the Advisory Bulletin. We are currently assessing the impact of implementing these accounting changes on our future financial results.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in accordance with GAAP requires management to make a number of judgments, estimates and assumptions that affect the reported amount of assets, liabilities, income and expenses in the condensed

16

consolidated financial statements. Understanding our accounting policies and the extent to which we use management judgment and estimates in applying these policies is integral to understanding our financial statements. We describe our most significant accounting policies in "Note 1, Summary of Significant Accounting Policies" in this report and in our 2011 Form 10-K.

We evaluate our critical accounting estimates and judgments required by our policies on an ongoing basis and update them as necessary based on changing conditions. Management has discussed any significant changes in judgments and assumptions in applying our critical accounting policies with the Audit Committee of our Board of Directors. We have identified three of our accounting policies as critical because they involve significant judgments and assumptions about highly complex and inherently uncertain matters, and the use of reasonably different estimates and assumptions could have a material impact on our reported results of operations or financial condition. These critical accounting policies and estimates are as follows:

- Fair Value Measurement
- Total Loss Reserves
- Other-Than-Temporary Impairment of Investment Securities

See "MD&A—Critical Accounting Policies and Estimates" in our 2011 Form 10-K for a detailed discussion of these critical accounting policies and estimates. We provide below information about our Level 3 assets and liabilities as of June 30, 2012 as compared with December 31, 2011. We also describe any significant changes in the judgments and assumptions we made during the first half of 2012 in applying our critical accounting policies and significant changes to critical estimates.

**Fair Value Measurement**

The use of fair value to measure our assets and liabilities is fundamental to our financial statements and our fair value measurement is a critical accounting estimate because we account for and record a portion of our assets and liabilities at fair value. In determining fair value, we use various valuation techniques. We describe the valuation techniques and inputs used to determine the fair value of our assets and liabilities and disclose their carrying value and fair value in "Note 12, Fair Value."

### *Fair Value Hierarchy—Level 3 Assets and Liabilities*

The assets and liabilities that we have classified as Level 3 consist primarily of financial instruments for which there is limited market activity and therefore little or no price transparency. As a result, the valuation techniques that we use to estimate the fair value of Level 3 instruments involve significant unobservable inputs, which generally are more subjective and involve a high degree of management judgment and assumptions. Our Level 3 assets and liabilities consist of certain mortgage-backed securities and residual interests, certain mortgage loans, certain acquired property, certain long-term debt arrangements and certain highly structured, complex derivative instruments.

Table 5 presents a comparison of the amount of financial assets carried in our condensed consolidated balance sheets at fair value on a recurring basis ("recurring assets") that were classified as Level 3 as of June 30, 2012 and December 31, 2011. The availability of observable market inputs to measure fair value varies based on changes in market conditions, such as liquidity. As a result, we expect the amount of financial instruments carried at fair value on a recurring basis and classified as Level 3 to vary each period.

17

**Table 5: Level 3 Recurring Financial Assets at Fair Value**

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | |
| | (Dollars in millions) | | | |
| Trading securities | $ | 2,305 | $ | 4,238 |
| Available-for-sale securities | | 26,328 | | 29,492 |
| Mortgage loans | | 2,331 | | 2,319 |
| Other assets | | 236 | | 238 |
| Level 3 recurring assets | $ | 31,200 | $ | 36,287 |
| Total assets | $ | 3,195,620 | $ | 3,211,484 |
| Total recurring assets measured at fair value | $ | 134,161 | $ | 156,552 |
| Level 3 recurring assets as a percentage of total assets | | 1% | | 1% |
| Level 3 recurring assets as a percentage of total recurring assets measured at fair value | | 23% | | 23% |
| Total recurring assets measured at fair value as a percentage of total assets | | 4% | | 5% |

Assets measured at fair value on a nonrecurring basis and classified as Level 3, which are not presented in the table above, primarily include mortgage loans and acquired property. The fair value of Level 3 nonrecurring assets totaled $27.3 billion as of June 30, 2012.

Financial liabilities measured at fair value on a recurring basis and classified as Level 3 consisted of long-term debt with a fair value of $1.7 billion as of June 30, 2012 and $1.2 billion as of December 31, 2011, and other liabilities with a fair value of $162 million as of June 30, 2012 and $173 million as of December 31, 2011.

**Other-Than-Temporary Impairment of Investment Securities**

We evaluate available-for-sale securities in an unrealized loss position as of the end of each quarter for other-than-temporary impairment. Our evaluation requires significant management judgment and consideration of various factors to determine if we will receive the amortized cost basis of our investment securities. We evaluate a debt security for other-than-temporary impairment using an econometric model that estimates the present value of cash flows given multiple factors. These factors include: the severity and duration of the impairment; recent events specific to the issuer and/or industry to which the issuer belongs; the payment structure of the security; external credit ratings and the failure of the issuer to make scheduled interest or principal payments. We rely on expected future cash flow projections to determine if we will recover the amortized cost basis of our available-for-sale securities.

In the second quarter of 2012, we updated our assumptions used to project cash flow estimates on our Alt-A and subprime private-label securities to incorporate recent observable market trends, which included extending the time it takes to liquidate loans underlying these securities and increasing severity rates for loans where the servicer stopped advancing payments. These updates resulted in lower net present value of cash flow projections on our Alt-A and subprime securities and increased our other-than-temporary impairment expense by approximately $500 million. We provide more detailed information on our accounting for other-than-temporary impairment in "Note 5, Investments in Securities."

**CONSOLIDATED RESULTS OF OPERATIONS**

This section provides a discussion of our condensed consolidated results of operations for the periods indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes.

Table 6 displays a summary of our condensed consolidated results of operations for the periods indicated.

18

**Table 6: Summary of Condensed Consolidated Results of Operations**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | **2012** | **2011** | **Variance** | **2012** | **2011** | **Variance** |
| | (Dollars in millions) | | | | | |
| Net interest income | $ 5,428 | $ 4,972 | $ 456 | $10,625 | $ 9,932 | $ 693 |
| Fee and other income | 395 | 265 | 130 | 770 | 502 | 268 |
| **Net revenues** | **$ 5,823** | **$ 5,237** | **$ 586** | **$ 11,395** | **$ 10,434** | **$ 961** |
| Investment gains, net | 131 | 171 | (40) | 247 | 246 | 1 |
| Net other-than-temporary impairments | (599) | (56) | (543) | (663) | (100) | (563) |
| Fair value losses, net | (2,449) | (1,634) | (815) | (2,166) | (1,345) | (821) |
| Administrative expenses | (567) | (569) | 2 | (1,131) | (1,174) | 43 |
| Credit-related income (expenses) | | | | | | |
| Benefit (provision) for credit losses | 3,041 | (6,537) | 9,578 | 1,041 | (17,091) | 18,132 |
| Foreclosed property income (expense) | 70 | 478 | (408) | (269) | (10) | (259) |
| Total credit-related income (expenses) | 3,111 | (6,059) | 9,170 | 772 | (17,101) | 17,873 |
| Other non-interest expenses[1] | (331) | (75) | (256) | (617) | (414) | (203) |
| Income (loss) before federal income taxes | 5,119 | (2,985) | 8,104 | 7,837 | (9,454) | 17,291 |
| Benefit for federal income taxes | — | 93 | (93) | — | 91 | (91) |
| **Net income (loss)** | **5,119** | **(2,892)** | **8,011** | **7,837** | **(9,363)** | **17,200** |
| Less: Net income attributable to the noncontrolling interest | (5) | (1) | (4) | (4) | (1) | (3) |
| **Net income (loss) attributable to Fannie Mae** | **$ 5,114** | **$ (2,893)** | **$ 8,007** | **$ 7,833** | **$ (9,364)** | **$ 17,197** |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 5,442 | $ (2,891) | $ 8,333 | $ 8,523 | $ (9,181) | $ 17,704 |

--------

[1] Consists of debt extinguishment losses, net and other expenses.

**Net Interest Income**

Table 7 displays an analysis of our net interest income, average balances, and related yields earned on assets and incurred on liabilities for the periods indicated. For most components of the average balances, we use a daily weighted average of amortized cost. When daily average balance information is not available, such as for mortgage loans, we use monthly averages. Table 8 displays the change in our net interest income between periods and the extent to which that variance is attributable to: (1) changes in the volume of our interest-earning assets and interest-bearing liabilities or (2) changes in the interest rates of these assets and liabilities.

19

**Table 7: Analysis of Net Interest Income and Yield**

| | For the Three Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
|---|---|---|---|---|---|---|
| | | | (Dollars in millions) | | | |
| Interest-earning assets: | | | | | | |
| Mortgage loans of Fannie Mae | $ 373,943 | $ 3,599 | 3.85 % | $ 394,687 | $ 3,720 | 3.77 % |
| Mortgage loans of consolidated trusts | 2,614,284 | 28,424 | 4.35 | 2,614,392 | 31,613 | 4.84 |
| Total mortgage loans | 2,988,227 | 32,023 | 4.29 | 3,009,079 | 35,333 | 4.70 |
| Mortgage-related securities | 274,585 | 3,266 | 4.76 | 319,395 | 4,029 | 5.05 |
| Elimination of Fannie Mae MBS held in portfolio | (177,235) | (2,178) | 4.92 | (204,465) | (2,643) | 5.17 |
| Total mortgage-related securities, net | 97,350 | 1,088 | 4.47 | 114,930 | 1,386 | 4.82 |
| Non-mortgage securities[1] | 54,451 | 20 | 0.15 | 76,829 | 30 | 0.15 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 21,916 | 10 | 0.18 | 21,833 | 6 | 0.11 |
| Advances to lenders | 5,637 | 30 | 2.11 | 3,144 | 19 | 2.39 |
| Total interest-earning assets | $ 3,167,581 | $ 33,171 | 4.19 % | $3,225,815 | $36,774 | 4.56 % |
| Interest-bearing liabilities: | | | | | | |
| Short-term debt[2] | $ 89,820 | $ 30 | 0.13 % | $ 162,071 | $ 79 | 0.19 % |
| Long-term debt | 569,211 | 2,997 | 2.11 | 589,269 | 3,802 | 2.58 |
| Total short-term and long-term funding debt | 659,031 | 3,027 | 1.84 | 751,340 | 3,881 | 2.07 |
| Debt securities of consolidated trusts | 2,684,443 | 26,894 | 4.01 | 2,657,571 | 30,564 | 4.60 |
| Elimination of Fannie Mae MBS held in portfolio | (177,235) | (2,178) | 4.92 | (204,465) | (2,643) | 5.17 |
| Total debt securities of consolidated trusts held by third parties | 2,507,208 | 24,716 | 3.94 | 2,453,106 | 27,921 | 4.55 |
| Total interest-bearing liabilities | $ 3,166,239 | $27,743 | 3.50 % | $ 3,204,446 | $31,802 | 3.97 % |
| Impact of net non-interest bearing funding | $ 1,342 | | — % | $ 21,369 | | 0.03 % |
| Net interest income/net interest yield | | $ 5,428 | 0.69 % | | $ 4,972 | 0.62 % |
| Net interest income/net interest yield of consolidated trusts [3] | | $ 1,530 | 0.23 % | | $ 1,049 | 0.16 % |

20

| | For the Six Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2012** | | | **2011** | | |
| | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid | Average Balance | Interest Income/ Expense | Average Rates Earned/Paid |
| | (Dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Mortgage loans of Fannie Mae | $  375,983 | $  7,168 | 3.81 % | $  399,898 | $  7,445 | 3.72 % |
| Mortgage loans of consolidated trusts | 2,605,744 | 57,425 | 4.41 | 2,605,087 | 63,478 | 4.87 |
| Total mortgage loans | 2,981,727 | 64,593 | 4.33 | 3,004,985 | 70,923 | 4.72 |
| Mortgage-related securities | 281,518 | 6,724 | 4.78 | 326,727 | 8,274 | 5.06 |
| Elimination of Fannie Mae MBS held in portfolio | (181,725) | (4,483) | 4.93 | (209,418) | (5,436) | 5.19 |
| Total mortgage-related securities, net | 99,793 | 2,241 | 4.49 | 117,309 | 2,838 | 4.84 |
| Non-mortgage securities[1] | 61,693 | 43 | 0.14 | 78,266 | 75 | 0.19 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 29,701 | 23 | 0.15 | 17,810 | 13 | 0.15 |
| Advances to lenders | 5,343 | 55 | 2.04 | 3,614 | 40 | 2.20 |
| Total interest-earning assets | $3,178,257 | $66,955 | 4.21 % | $3,221,984 | $  73,889 | 4.59 % |
| **Interest-bearing liabilities:** | | | | | | |
| Short-term debt[2] | $  111,564 | $  71 | 0.13 % | $  150,523 | $  183 | 0.24 % |
| Long-term debt | 573,683 | 6,182 | 2.16 | 610,594 | 7,998 | 2.62 |
| Total short-term and long-term funding debt | 685,247 | 6,253 | 1.82 | 761,117 | 8,181 | 2.15 |
| Debt securities of consolidated trusts | 2,673,505 | 54,560 | 4.08 | 2,653,872 | 61,212 | 4.61 |
| Elimination of Fannie Mae MBS held in portfolio | (181,725) | (4,483) | 4.93 | (209,418) | (5,436) | 5.19 |
| Total debt securities of consolidated trusts held by third parties | 2,491,780 | 50,077 | 4.02 | 2,444,454 | 55,776 | 4.56 |
| Total interest-bearing liabilities | $ 3,177,027 | $56,330 | 3.55 % | $ 3,205,571 | $  63,957 | 3.99 % |
| Impact of net non-interest bearing funding | $  1,230 | | 0.01 % | $  16,413 | | 0.02 % |
| Net interest income/net interest yield | | $ 10,625 | 0.67 % | | $  9,932 | 0.62 % |
| Net interest income/net interest yield of consolidated trusts [3] | | $ 2,865 | 0.22 % | | $  2,266 | 0.17 % |

| | As of June 30, | |
| --- | --- | --- |
| | **2012** | **2011** |
| **Selected benchmark interest rates[4]** | | |
| 3-month LIBOR | 0.46 % | 0.25 % |
| 2-year swap rate | 0.55 | 0.70 |
| 5-year swap rate | 0.97 | 2.03 |
| 30-year Fannie Mae MBS par coupon rate | 2.57 | 4.02 |

---

[1]   Includes cash equivalents.

[2]   Includes federal funds purchased and securities sold under agreements to repurchase.

[3]   Net interest income of consolidated trusts represents interest income from mortgage loans of consolidated trusts less interest expense from debt securities of consolidated trusts. Net interest yield is calculated based on net interest income from consolidated trusts divided by average balance of mortgage loans of consolidated trusts.

[4]   Data from British Bankers' Association, Thomson Reuters Indices and Bloomberg L.P.

21

**Table 8: Rate/Volume Analysis of Changes in Net Interest Income**

| | For the Three Months Ended June 30, 2012 vs. 2011 | | | For the Six Months Ended June 30, 2012 vs. 2011 | | |
|---|---|---|---|---|---|---|
| | Total Variance | Variance Due to:[1] | | Total Variance | Variance Due to:[1] | |
| | | Volume | Rate | | Volume | Rate |
| | (Dollars in millions) | | | | | |
| **Interest income:** | | | | | | |
| Mortgage loans of Fannie Mae | $ (121) | $ (198) | $ 77 | $ (277) | $ (453) | $ 176 |
| Mortgage loans of consolidated trusts | (3,189) | (1) | (3,188) | (6,053) | 16 | (6,069) |
| Total mortgage loans | (3,310) | (199) | (3,111) | (6,330) | (437) | (5,893) |
| Mortgage-related securities | (763) | (542) | (221) | (1,550) | (1,099) | (451) |
| Elimination of Fannie Mae MBS held in portfolio | 465 | 339 | 126 | 953 | 693 | 260 |
| Total mortgage-related securities, net | (298) | (203) | (95) | (597) | (406) | (191) |
| Non-mortgage securities[2] | (10) | (8) | (2) | (32) | (14) | (18) |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 4 | — | 4 | 10 | 9 | 1 |
| Advances to lenders | 11 | 14 | (3) | 15 | 18 | (3) |
| Total interest income | (3,603) | (396) | (3,207) | (6,934) | (830) | (6,104) |
| **Interest expense:** | | | | | | |
| Short-term debt [3] | (49) | (29) | (20) | (112) | (39) | (73) |
| Long-term debt | (805) | (126) | (679) | (1,816) | (462) | (1,354) |
| Total short-term and long-term funding debt | (854) | (155) | (699) | (1,928) | (501) | (1,427) |
| Debt securities of consolidated trusts | (3,670) | 306 | (3,976) | (6,652) | 450 | (7,102) |
| Elimination of Fannie Mae MBS held in portfolio | 465 | 339 | 126 | 953 | 693 | 260 |
| Total debt securities of consolidated trusts held by third parties | (3,205) | 645 | (3,850) | (5,699) | 1,143 | (6,842) |
| Total interest expense | (4,059) | 490 | (4,549) | (7,627) | 642 | (8,269) |
| Net interest income | $ 456 | $ (886) | $ 1,342 | $ 693 | $ (1,472) | $ 2,165 |

---

[1]   Combined rate/volume variances are allocated to both rate and volume based on the relative size of each variance .

[2]   Includes cash equivalents.

[3]   Includes federal funds purchased and securities sold under agreements to repurchase.

Although our portfolio balance declined, net interest income increased in the second quarter and first half of 2012, as compared with the second quarter and first half of 2011, primarily due to lower interest expense on funding debt, a reduction in the amount of interest income not recognized for nonaccrual mortgage loans and accelerated net amortization income on loans and debt of consolidated trusts. These factors were partially offset by lower interest income on Fannie Mae mortgage loans and securities. The primary drivers of these changes were:

- lower interest expense on funding debt due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher-cost debt with lower-cost debt;

- higher coupon interest income recognized on mortgage loans due to a reduction in the amount of interest income not recognized for nonaccrual mortgage loans due to a decline in the balance of nonaccrual loans in our condensed consolidated balance sheet as we continued to complete a high number of loan workouts and foreclosures, and fewer loans became seriously delinquent;

- accelerated net amortization income related to mortgage loans and debt of consolidated trusts driven by a high volume of prepayments due to declining interest rates;

- lower interest income on Fannie Mae mortgage loans due to a decrease in average balance and new business acquisitions which continued to replace higher-yielding loans with loans issued at lower mortgage rates; and

- lower interest income on mortgage securities due to lower interest rates and a decrease in the balance of our mortgage securities, as we continue to manage our portfolio requirements of the senior preferred stock purchase agreement.

TREASURY-3929

Additionally, our net interest income and net interest yield were higher than they would have otherwise been in the second quarter and first half of 2012 and 2011 because our debt funding needs were lower than would otherwise have been required as a result of funds we have received from Treasury to date under the senior preferred stock purchase agreement and dividends paid to Treasury are not recognized as interest expense.

Table 9 displays the interest income not recognized for loans on nonaccrual status and the resulting reduction in our net interest yield on total interest earning assets for the periods indicated.

**Table 9: Impact of Nonaccrual Loans on Net Interest Income**

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] | Interest Income not Recognized for Nonaccrual Loans[1] | Reduction in Net Interest Yield[2] |
|---|---|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | | | |
| Mortgage loans of Fannie Mae | $ (896) | | $ (1,184) | | $ (1,878) | | $ (2,545) | |
| Mortgage loans of consolidated trusts | (147) | | (219) | | (327) | | (478) | |
| Total mortgage loans | $ (1,043) | (13) bp | $ (1,403) | (17) bp | $ (2,205) | (14) bp | $ (3,023) | (18) bp |

[1] Amount includes cash received for loans on nonaccrual status.

[2] Calculated based on annualized interest income not recognized divided by total interest-earning assets, expressed in basis points .

For a discussion of the interest income from the assets we have purchased and the interest expense from the debt we have issued, see the discussion of our Capital Markets group's net interest income in "Business Segment Results."

**Other-Than-Temporary Impairment of Investment Securities**

Net other-than-temporary impairment for the second quarter and first half of 2012 increased significantly compared with the second quarter and first half of 2011, driven primarily by a decrease in the net present value of projected cash flows on our Alt-A and subprime private-label securities due to higher projected loss severity rates on loans underlying these securities. The net present value of projected cash flows decreased because we updated our assumptions due to recent observable market trends, including: (1) extending the time it takes to liquidate the loans; and (2) increasing loss severity rates for loans where the servicer stopped advancing payments. Although national home prices generally improved in the first half of 2012, the benefit of home price appreciation is not expected to offset the impact of extended liquidation timelines on loans underlying these securities and the increase in loss severity rates for loans where the servicer stopped advancing payments.

**Fair Value Losses, Net**

Table 10 displays the components of our fair value gains and losses.

23

**Table 10: Fair Value Losses, Net**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | **(Dollars in millions)** | | | |
| Risk management derivatives fair value losses attributable to: | | | | |
| Net contractual interest expense accruals on interest rate swaps | $ (391) | $ (658) | $ (765) | $ (1,293) |
| Net change in fair value during the period | (1,430) | (958) | (877) | (207) |
| Total risk management derivatives fair value losses, net | (1,821) | (1,616) | (1,642) | (1,500) |
| Mortgage commitment derivatives fair value losses, net | (562) | (61) | (767) | (38) |
| Total derivatives fair value losses, net | (2,383) | (1,677) | (2,409) | (1,538) |
| Trading securities (losses) gains, net | (14) | 135 | 270 | 360 |
| Other, net[1] | (52) | (92) | (27) | (167) |
| Fair value losses, net | $ (2,449) | $ (1,634) | $ (2,166) | $ (1,345) |

| | **2012** | **2011** |
|---|---|---|
| 5-year swap rate: | | |
| As of January 1 | 1.22% | 2.18% |
| As of March 31 | 1.27 | 2.47 |
| As of June 30 | 0.97 | 2.03 |

_____

[1] Consists of debt fair value gains (losses), net; debt foreign exchange gains (losses), net; and mortgage loans fair value gains (losses), net.

We can expect high levels of period-to-period volatility in our results of operations and financial condition due to changes in market conditions that result in periodic fluctuations in the estimated fair value of financial instruments that we mark to market through our earnings. These instruments include trading securities and derivatives. The estimated fair value of our trading securities and derivatives may fluctuate substantially from period to period because of changes in interest rates, credit spreads and interest rate volatility, as well as activity related to these financial instruments. While the estimated fair value of our derivatives may fluctuate, some of the financial instruments that the derivatives hedge are not recorded at fair value in our condensed consolidated financial statements.

*Risk Management Derivatives Fair Value Losses, Net*

Risk management derivative instruments are an integral part of our interest rate risk management strategy. We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. We recognized risk management derivative fair value losses in the second quarter and first half of 2012 and 2011 primarily as a result of a decrease in the fair value of our pay-fixed derivatives due to a decline in swap rates during the periods.

We present, by derivative instrument type, the fair value gains and losses on our derivatives for the three and six months ended June 30, 2012 and 2011 in "Note 9, Derivative Instruments."

*Mortgage Commitment Derivatives Fair Value Losses, Net*

We recognized fair value losses on our mortgage commitments in the second quarter and first half of 2012 and 2011 primarily due to losses on commitments to sell mortgage-related securities as a result of an increase in prices as interest rates decreased during the commitment period.

*Trading Securities (Losses) Gains, Net*

The losses from our trading securities in the second quarter of 2012 were primarily driven by the widening of credit spreads on commercial mortgage-backed securities ("CMBS"). The gains from our trading securities in the first half of 2012 were primarily due to the narrowing of credit spreads on CMBS in the first quarter of 2012, partially offset by the widening of credit spreads in the second quarter of 2012.

24

The gains from our trading securities in the second quarter of 2011 were primarily driven by a decrease in interest rates. The gains from our trading securities in the first half of 2011 were primarily driven by the narrowing of credit spreads on CMBS.

**Credit-Related (Income) Expenses**

We refer to our (benefit) provision for loan losses and our provision for guaranty losses collectively as our "(benefit) provision for credit losses." Credit-related (income) expenses consist of our (benefit) provision for credit losses and foreclosed property (income) expense.

*(Benefit) Provision for Credit Losses*

Our total loss reserves provide for an estimate of credit losses incurred in our guaranty book of business, including concessions we granted borrowers upon modification of their loans, as of each balance sheet date. We establish our loss reserves through our (benefit) provision for credit losses for losses that we believe have been incurred and will eventually be reflected over time in our charge-offs. When we determine that a loan is uncollectible, typically upon foreclosure, we record a charge-off against our loss reserves. We record recoveries of previously charged-off amounts as a reduction to charge-offs.

Table 11 displays the components of our total loss reserves and our total fair value losses previously recognized on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets. Because these fair value losses lowered our recorded loan balances, we have fewer inherent losses in our guaranty book of business and consequently require lower total loss reserves. For these reasons, we consider these fair value losses as an "effective reserve," apart from our total loss reserves, to the extent that we expect to realize these amounts as credit losses on the acquired loans in the future. As of June 30, 2012, we estimate that nearly two-thirds of this amount represents credit losses we expect to realize in the future and over one-third will eventually be recovered, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan. We exclude these fair value losses from our credit loss calculation as described in "Credit Loss Performance Metrics."

**Table 11: Total Loss Reserves**

| | As of | |
| --- | --- | --- |
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Allowance for loan losses | $ 63,375 | $ 72,156 |
| Reserve for guaranty losses [1] | 1,320 | 994 |
|     Combined loss reserves | 64,695 | 73,150 |
| Allowance for accrued interest receivable | 2,068 | 2,496 |
| Allowance for preforeclosure property taxes and insurance receivable [2] | 1,278 | 1,292 |
|     Total loss reserves | 68,041 | 76,938 |
| Fair value losses previously recognized on acquired credit-impaired loans [3] | 14,955 | 16,273 |
|     Total loss reserves and fair value losses previously recognized on acquired credit-impaired loans | $ 82,996 | $ 93,211 |

[1] Amount included in "Other liabilities" in our condensed consolidated balance sheets.

[2] Amount included in "Other assets" in our condensed consolidated balance sheets.

[3] Represents the fair value losses on loans purchased out of unconsolidated MBS trusts reflected in our condensed consolidated balance sheets.

The following table displays changes in the total allowance for loan losses , reserve for guaranty losses and the total combined loss reserves for the three and six months ended June 30, 2012 and 2011 .

25

**Table 12: Allowance for Loan Losses and Reserve for Guaranty Losses (Combined Loss Reserves)**

| | For the Three Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $ 67,557 |
| (Benefit) provision for loan losses | (3,329) | (58) | (3,387) | 3,040 | 2,762 | 5,802 |
| Charge-offs[1][2] | (3,783) | (208) | (3,991) | (5,460) | (758) | (6,218) |
| Recoveries | 441 | 44 | 485 | 1,819 | 550 | 2,369 |
| Transfers[3] | 1,616 | (1,616) | — | 2,762 | (2,762) | — |
| Other[4] | 136 | 23 | 159 | 97 | (101) | (4) |
| Ending balance[5] | $ 52,082 | $ 11,293 | $ 63,375 | $ 55,966 | $ 13,540 | $ 69,506 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance | $ 997 | $ — | $ 997 | $ 257 | $ — | $ 257 |
| Provision for guaranty losses | 346 | — | 346 | 735 | — | 735 |
| Charge-offs | (49) | — | (49) | (33) | — | (33) |
| Recoveries | 26 | — | 26 | 1 | — | 1 |
| Ending balance | $ 1,320 | $ — | $ 1,320 | $ 960 | $ — | $ 960 |
| Combined loss reserves: | | | | | | |
| Beginning balance | $ 57,998 | $ 13,108 | $ 71,106 | $ 53,965 | $ 13,849 | $ 67,814 |
| Total (benefit) provision for credit losses | (2,983) | (58) | (3,041) | 3,775 | 2,762 | 6,537 |
| Charge-offs[1][2] | (3,832) | (208) | (4,040) | (5,493) | (758) | (6,251) |
| Recoveries | 467 | 44 | 511 | 1,820 | 550 | 2,370 |
| Transfers[3] | 1,616 | (1,616) | — | 2,762 | (2,762) | — |
| Other[4] | 136 | 23 | 159 | 97 | (101) | (4) |
| Ending balance[5] | $ 53,402 | $ 11,293 | $ 64,695 | $ 56,926 | $ 13,540 | $ 70,466 |

26

| | For the Six Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Changes in combined loss reserves:** | | | | | | |
| Allowance for loan losses: | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $ 72,156 | $ 48,530 | $ 13,026 | $ 61,556 |
| (Benefit) provision for loan losses | (1,946) | 539 | (1,407) | 10,199 | 6,190 | 16,389 |
| Charge-offs[1][2] | (8,316) | (471) | (8,787) | (11,165) | (1,206) | (12,371) |
| Recoveries | 862 | 109 | 971 | 2,349 | 1,502 | 3,851 |
| Transfers[3] | 3,817 | (3,817) | — | 5,969 | (5,969) | — |
| Other[4] | 356 | 86 | 442 | 84 | (3) | 81 |
| Ending balance[5] | $ 52,082 | $ 11,293 | $ 63,375 | $ 55,966 | $ 13,540 | $ 69,506 |
| Reserve for guaranty losses: | | | | | | |
| Beginning balance | $ 994 | $ — | $ 994 | $ 323 | $ — | $ 323 |
| Provision for guaranty losses | 366 | — | 366 | 702 | — | 702 |
| Charge-offs | (100) | — | (100) | (68) | — | (68) |
| Recoveries | 60 | — | 60 | 3 | — | 3 |
| Ending balance | $ 1,320 | $ — | $ 1,320 | $ 960 | $ — | $ 960 |
| Combined loss reserves: | | | | | | |
| Beginning balance | $ 58,303 | $ 14,847 | $ 73,150 | $ 48,853 | $ 13,026 | $ 61,879 |
| Total (benefit) provision for credit losses | (1,580) | 539 | (1,041) | 10,901 | 6,190 | 17,091 |
| Charge-offs[1][2] | (8,416) | (471) | (8,887) | (11,233) | (1,206) | (12,439) |
| Recoveries | 922 | 109 | 1,031 | 2,352 | 1,502 | 3,854 |
| Transfers[3] | 3,817 | (3,817) | — | 5,969 | (5,969) | — |
| Other[4] | 356 | 86 | 442 | 84 | (3) | 81 |
| Ending balance[5] | $ 53,402 | $ 11,293 | $ 64,695 | $ 56,926 | $ 13,540 | $ 70,466 |

| | As of | |
| | June 30, 2012 | December 31, 2011 |
| **Allocation of combined loss reserves:** | | |
| Balance at end of each period attributable to: | | |
| Single-family | $ 63,365 | $ 71,512 |
| Multifamily | 1,330 | 1,638 |
| Total | $ 64,695 | $ 73,150 |
| **Single-family and multifamily combined loss reserves as a percentage of applicable guaranty book of business:** | | |
| Single-family | 2.23% | 2.52% |
| Multifamily | 0.67 | 0.84 |
| **Combined loss reserves as a percentage of:** | | |
| Total guaranty book of business | 2.13% | 2.41% |
| Recorded investment in nonperforming loans | 26.57 | 29.03 |

27

_____

(1) Includes accrued interest of $238 million and $438 million for the three months ended June 30, 2012 and 2011, respectively, and $511 million and $824 million for the six months ended June 30, 2012 and 2011, respectively.

(2) While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

(3) Includes transfers from trusts for delinquent loan purchases.

(4) Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

(5) Includes $293 million and $414 million as of June 30, 2012 and 2011, respectively, for acquired credit-impaired loans.

Our provision, and in some cases benefit, for credit losses continues to be a key driver of our results for each period presented. The amount of our provision for credit losses varies from period to period based on changes in actual and expected home prices, borrower payment behavior, the types and volumes of loss mitigation activities and foreclosures completed, and actual and estimated recoveries from our lender and mortgage insurer counterparties. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" for information on mortgage insurers and outstanding mortgage seller/servicer repurchase obligations. In addition, our provision for credit losses and our loss reserves can be impacted by updates to our allowance for loan loss models that we use to estimate our loss reserves.

The significant improvement in our second quarter results was primarily due to recognition of a benefit for credit losses of $3.0 billion in the second quarter of 2012 compared with a provision for credit losses of $6.5 billion in the second quarter of 2011. This benefit for credit losses was due to a decrease in our total loss reserves driven primarily by an improvement in the profile of our single-family book of business resulting from an increase in actual home prices, including the sales prices of our REO properties. In addition, our single-family serious delinquency rate continued to decline, driven in large part by the quality and growth of our new single-family book of business, our modification efforts and current period foreclosures. Key factors impacting our credit-related results include:

- Home prices increased by 3.2% in the second quarter of 2012 compared with 1.2% in the second quarter of 2011. We historically see seasonal improvement in home prices in the second quarter; however, the home price increase in the second quarter of 2012 was larger than expected and the largest quarterly increase we have seen in the last few years. Higher home prices decrease the likelihood that loans will default and reduce the amount of credit loss on loans that do default.

- Sales prices on dispositions of our REO properties improved in the second quarter of 2012 as a result of strong demand. We received net proceeds from our REO sales equal to 59% of the loans' unpaid principal balance in the second quarter of 2012, compared with 56% in the first quarter of 2012 and 54% in the second quarter of 2011.

- Our single-family serious delinquency rate declined to 3.53% as of June 30, 2012 from 3.67% as of March 31, 2012 and 4.08% as of June 30, 2011.

- In addition to the reasons described above, the cash flow projections on our individually impaired loans improved due to accelerated expected prepayment speeds as a result of lower mortgage interest rates: the average 30-year fixed-rate mortgage interest rate was 3.68% in June 2012, compared with 3.95% in March 2012 and 4.51% in June 2011, according to Freddie Mac's Primary Mortgage Market Survey®. The accelerated expected prepayment speeds reduced the expected lives of modified loans and thus reduced the expected expenses related to the concessions we have granted to borrowers.

In the first half of 2012, we identified misstatements in our consideration of the benefit for repurchase requests, as well as in the calculation used to discount the deferred payment obligation for certain mortgage insurers currently in run-off, when estimating the allowance for loan losses as of December 31, 2011. In the second quarter of 2012, we identified a misstatement in the calculation of the default rate used for certain bonds to estimate the reserve for guaranty losses as of December 31, 2011. To correct the above misstatements, we have recorded an out-of-period adjustment of $1.1 billion to "Benefit (provision) for credit losses" in our condensed consolidated statement of operations and comprehensive income (loss) for the first half of 2012.

We discuss our expectations regarding our future credit-related expenses and loss reserves in "Executive Summary—Summary of Our Financial Performance for the Second Quarter and First Half of 2012—Our Expectations Regarding Future Loss Reserves and Credit-Related (Income) Expenses."

We continue to experience high volumes of loan modifications involving concessions to borrowers, which are considered troubled debt restructurings ("TDRs"). Individual impairment for a TDR is based on the restructured loan's expected cash

28

flows over the life of the loan, taking into account the effect of any concessions granted to the borrower, discounted at the loan's original effective interest rate. If we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure the impairment based on the fair value of the collateral, less selling cost. The allowance calculated for an individually impaired loan has generally been greater than the allowance that would be calculated under the collective reserve.

In April 2012, FHFA issued an Advisory Bulletin that could have an impact on our provision for credit losses in the future; however, we are still assessing the impact of the Advisory Bulletin. See "Legislative and Regulatory Developments—FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans" for additional information.

### _Nonperforming Loans_

Our balance of nonperforming single-family loans remained high as of June 30, 2012 due to both high levels of delinquencies and an increase in TDRs. When a TDR occurs, the loan may return to a current status, but it will continue to be classified as a nonperforming loan as the loan is not performing in accordance with its original terms. Table 13 displays the composition of our nonperforming loans, which includes our single-family and multifamily held-for-investment and held-for-sale mortgage loans. For information on the impact of TDRs and other individually impaired loans on our allowance for loan losses, see "Note 3, Mortgage Loans."

**Table 13: Nonperforming Single-Family and Multifamily Loans**

| | As of | |
| --- | --- | --- |
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| On-balance sheet nonperforming loans including loans in consolidated Fannie Mae MBS trusts: | | |
| Nonaccrual loans | $ 126,692 | $ 142,998 |
| Troubled debt restructurings on accrual status[1] | 116,680 | 108,797 |
| Total on-balance sheet nonperforming loans | 243,372 | 251,795 |
| Off-balance sheet nonperforming loans in unconsolidated Fannie Mae MBS trusts [2] | 78 | 154 |
| Total nonperforming loans | 243,450 | 251,949 |
| Allowance for loan losses and allowance for accrued interest receivable related to individually impaired on-balance sheet nonperforming loans | (43,591) | (47,711) |
| Total nonperforming loans, net of allowance | $ 199,859 | $ 204,238 |
| Accruing on-balance sheet loans past due 90 days or more [3] | $ 816 | $ 768 |

| | For the Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (Dollars in millions) | |
| Interest related to on-balance sheet nonperforming loans: | | |
| Interest income forgone[4] | $ 4,318 | $ 4,555 |
| Interest income recognized for the period[5] | 2,981 | 2,990 |

---

[1]  Includes HomeSaver Advance first-lien loans on accrual status.

[2]  Represents loans that would meet our criteria for nonaccrual status if the loans had been on-balance sheet.

[3]  Recorded investment in loans that, as of the end of each period, are 90 days or more past due and continuing to accrue interest. The majority of this amount consists of loans insured or guaranteed by the U.S. government and loans for which we have recourse against the seller in the event of a default.

[4]  Represents the amount of interest income we did not record but would have recorded during the period for on-balance sheet nonperforming loans as of the end of each period had the loans performed according to their original contractual terms.

[5]  Represents interest income recognized during the period for on-balance sheet loans classified as nonperforming as of the end of each period. Includes primarily amounts accrued while the loans were performing and cash payments received on nonaccrual loans.

TREASURY-3936

*Foreclosed Property (Income) Expense*

Foreclosed property income decreased in the second quarter of 2012 compared with the second quarter of 2011 primarily due to increased estimated amounts due to us for repurchase requests recognized in the second quarter of 2011. Additionally, the second quarter of 2012 was impacted by an improvement in REO sales values and a 19% decline in our inventory of single-family REO properties compared with the second quarter of 2011.

Foreclosed property expense increased in the first half of 2012 compared with 2011 primarily due to the reasons described above.

*Credit Loss Performance Metrics*

Our credit-related (income) expenses should be considered in conjunction with our credit loss performance metrics. Our credit loss performance metrics, however, are not defined terms within GAAP and may not be calculated in the same manner as similarly titled measures reported by other companies. Because management does not view changes in the fair value of our mortgage loans as credit losses, we adjust our credit loss performance metrics for the impact associated with our acquisition of credit-impaired loans from unconsolidated MBS trusts. We also exclude interest forgone on nonperforming loans in our mortgage portfolio, other-than-temporary impairment losses resulting from deterioration in the credit quality of our mortgage-related securities and accretion of interest income on acquired credit-impaired loans from credit losses. We believe that credit loss performance metrics may be useful to investors as the losses are presented as a percentage of our book of business and have historically been used by analysts, investors and other companies within the financial services industry. Moreover, by presenting credit losses with and without the effect of fair value losses associated with the acquisition of credit-impaired loans, investors are able to evaluate our credit performance on a more consistent basis among periods.  Table 14 displays the components of our credit loss performance metrics as well as our average single-family and multifamily default rates and initial charge-off severity rates.

**Table 14: Credit Loss Performance Metrics**

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1] | Amount | Ratio[1] |
| | (Dollars in millions) | | | | | | | |
| Charge-offs, net of recoveries | $ 3,529 | 46.3 bp | $3,881 | 50.4 bp | $ 7,856 | 51.7bp | $8,585 | 55.9 bp |
| Foreclosed property (income) expense | (70) | (0.9) | (478) | (6.2) | 269 | 1.8 | 10 | 0.1 |
| Credit losses including the effect of fair value losses on acquired credit-impaired loans | 3,459 | 45.4 | 3,403 | 44.2 | 8,125 | 53.5 | 8,595 | 56.0 |
| Plus: Impact of acquired credit-impaired loans on charge-offs and foreclosed property expense[2] | 369 | 4.8 | 529 | 6.9 | 794 | 5.2 | 1,023 | 6.7 |
| Credit losses and credit loss ratio | $ 3,828 | 50.2 bp | $ 3,932 | 51.1 bp | $ 8,919 | 58.7bp | $ 9,618 | 62.7 bp |
| Credit losses attributable to: | | | | | | | | |
| Single-family | $ 3,778 | | $ 3,810 | | $ 8,733 | | $ 9,414 | |
| Multifamily | 50 | | 122 | | 186 | | 204 | |
| Total | $ 3,828 | | $ 3,932 | | $ 8,919 | | $ 9,618 | |
| Single-family default rate | | 0.41 % | | 0.46 % | | 0.82 % | | 0.90 % |
| Single-family initial charge-off severity rate [3] | | 30.59 % | | 34.47 % | | 32.07 % | | 35.29 % |
| Average multifamily default rate | | 0.10 % | | 0.17 % | | 0.25 % | | 0.29 % |
| Average multifamily initial charge-off severity rate [3] | | 30.86 % | | 35.82 % | | 38.78 % | | 36.23 % |

[1] Basis points are based on the annualized amount for each line item presented divided by the average guaranty book of business during the period.

[2] Includes fair value losses from acquired credit-impaired loans.

[3] Single-family and multifamily rates exclude fair value losses on credit-impaired loans acquired from MBS trusts and any costs, gains or losses associated with REO after initial acquisition through final disposition; single-family rate excludes charge-offs from short sales.

TREASURY-3937

Credit losses decreased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 primarily due to: (1) improved actual home prices and sales prices of our REO properties; and (2) lower REO acquisitions primarily due to the slow pace of foreclosures.

Our new single-family book of business accounted for approximately  4% of our single-family credit losses for the second quarter and first half of 2012. Credit losses on mortgage loans typically do not peak until the third through sixth years following origination; however, this range can vary based on many factors, including changes in macroeconomic conditions and foreclosure timelines. We provide more detailed credit performance information, including serious delinquency rates by geographic region and foreclosure activity, in "Risk Management—Credit Risk Management—Mortgage Credit Risk Management."

*Regulatory Hypothetical Stress Test Scenario*

Under a September 2005 agreement with FHFA's predecessor, the Office of Federal Housing Enterprise Oversight, we are required to disclose on a quarterly basis the present value of the change in future expected credit losses from our existing single-family guaranty book of business from an immediate 5% decline in single-family home prices for the entire United States followed by a return to the average of the possible growth rate paths used in our internal credit pricing models. The sensitivity results represent the difference between future expected credit losses under our base case scenario, which is derived from our internal home price path forecast, and a scenario that assumes an instantaneous nationwide 5% decline in home prices.

Table 15 displays the credit loss sensitivities as of the dates indicated for first-lien single-family loans that are in our portfolio or underlying Fannie Mae MBS, before and after consideration of projected credit risk sharing proceeds, such as private mortgage insurance claims and other credit enhancements.

**Table 15: Single-Family Credit Loss Sensitivity[1]**

| | | As of | | |
|---|---|---|---|---|
| | | June 30, 2012 | | December 31, 2011 |
| | | (Dollars in millions) | | |
| Gross single-family credit loss sensitivity | $ | 22,124 | $ | 21,922 |
| Less: Projected credit risk sharing proceeds | | (1,818) | | (1,690) |
| Net single-family credit loss sensitivity | $ | 20,306 | $ | 20,232 |
| Single-family loans in our portfolio and loans underlying Fannie Mae MBS | $ | 2,768,918 | $ | 2,769,454 |
| Single-family net credit loss sensitivity as a percentage of outstanding single-family loans in our portfolio and Fannie Mae MBS | | 0.73% | | 0.73% |

_____

[1]   Represents total economic credit losses, which consist of credit losses and forgone interest. Calculations are based on  97% of our total single-family guaranty book of business as of June 30, 2012 and December 31, 2011. The mortgage loans and mortgage-related securities that are included in these estimates consist of: (a) single-family Fannie Mae MBS (whether held in our mortgage portfolio or held by third parties), excluding certain whole loan REMICs and private-label wraps; (b) single-family mortgage loans, excluding mortgages secured only by second liens, subprime mortgages, manufactured housing chattel loans and reverse mortgages; and (c) long-term standby commitments. We expect the inclusion in our estimates of the excluded products may impact the estimated sensitivities set forth in this table.

Because these sensitivities represent hypothetical scenarios, they should be used with caution. Our regulatory stress test scenario is limited in that it assumes an instantaneous uniform 5% nationwide decline in home prices, which is not representative of the historical pattern of changes in home prices. Changes in home prices generally vary on a regional, as well as a local, basis. In addition, these stress test scenarios are calculated independently without considering changes in other interrelated assumptions, such as unemployment rates or other economic factors, which are likely to have a significant impact on our future expected credit losses.

## BUSINESS SEGMENT RESULTS

Results of our three business segments are intended to reflect each segment as if it were a stand-alone business. Under our segment reporting structure, the sum of the results for our three business segments does not equal our condensed consolidated

results of operations as we separate the activity related to our consolidated trusts from the results generated by our three segments. In addition, because we apply accounting methods that differ from our condensed consolidated results for segment reporting purposes, we include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to our condensed consolidated results of operations. We describe the management reporting and allocation process used to generate our segment results in our 2011 Form 10-K in "Notes to Consolidated Financial Statements—Note 14, Segment Reporting." We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

In this section, we summarize our segment results for the second quarter and first half of 2012 and 2011 in the tables below and provide a comparative discussion of these results. This section should be read together with our comparative discussion of our condensed consolidated results of operations in "Consolidated Results of Operations." See "Note 10, Segment Reporting" for a reconciliation of our segment results to our condensed consolidated results.

**Single-Family Business Results**

Table 16 displays the financial results of our Single-Family business for the periods indicated. For a discussion on Single-Family credit risk management, including information on serious delinquency rates and loan workouts, see "Risk Management—Credit Risk Management—Single-Family Mortgage Credit Risk Management." The primary source of revenue for our Single-Family business is guaranty fee income. Expenses and other items that impact income or loss primarily include credit-related income (expenses), net interest loss and administrative expenses.

**Table 16: Single-Family Business Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| | | | (Dollars in millions) | | | |
| Net interest loss[1] | $ (215) | $ (680) | $ 465 | $ (594) | $ (1,578) | $ 984 |
| Guaranty fee income[2][3] | 1,970 | 1,880 | 90 | 3,881 | 3,751 | 130 |
| Credit-related income (expenses)[4] | 3,015 | (5,933) | 8,948 | 630 | (17,039) | 17,669 |
| Other expenses[3][5] | (416) | (372) | (44) | (831) | (958) | 127 |
| Income (loss) before federal income taxes | 4,354 | (5,105) | 9,459 | 3,086 | (15,824) | 18,910 |
| Benefit for federal income taxes | — | 109 | (109) | — | 107 | (107) |
| Net income (loss) attributable to Fannie Mae | $ 4,354 | $ (4,996) | $ 9,350 | $ 3,086 | $ (15,717) | $ 18,803 |
| Single-family effective guaranty fee rate (in basis points)[3][6] | 27.7 | 26.1 | | 27.3 | 26.1 | |
| Single-family average charged guaranty fee on new acquisitions (in basis points)[3][7] | 40.3 | 31.6 | | 34.2 | 28.0 | |
| Average single-family guaranty book of business[8] | $ 2,848,947 | $ 2,886,509 | | $ 2,846,754 | $ 2,879,369 | |
| Single-family Fannie Mae MBS issuances[9] | $ 175,043 | $ 102,654 | | $ 371,798 | $ 269,327 | |

[1] Primarily includes: (1) the cost to reimburse the Capital Markets group for interest income not recognized for loans in our mortgage portfolio on nonaccrual status; (2) the cost to reimburse MBS trusts for interest income not recognized for loans in consolidated trusts on nonaccrual status; and (3) income from cash payments received on loans that have been placed on nonaccrual status.

[2] Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[3] Pursuant to the TCCA, effective April 1, 2012, we increased the guaranty fee on all single-family residential mortgages delivered to us on or after that date for securitization by 10 basis points, and the incremental revenue must be remitted to Treasury. The resulting revenue is included in guaranty fee income and the expense is included in other expenses. This increase in guaranty fee is also included in the single-family charged guaranty fee.

[4] Consists of the benefit (provision) for credit losses and foreclosed property income (expense).

[5] Consists of investment gains (losses), net, fair value losses, net, fee and other income, administrative expenses and other expenses.

[6] Calculated based on annualized Single-Family segment guaranty fee income divided by the average single-family guaranty book of business, expressed in basis points.

TREASURY-3939

<sup>(7)</sup> Calculated based on the average contractual fee rate for our single-family guaranty arrangements entered into during the period plus the recognition of any upfront cash payments ratably over an estimated average life, expressed in basis points.

<sup>(8)</sup> Consists of single-family mortgage loans held in our mortgage portfolio, single-family mortgage loans held by consolidated trusts, single-family Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on single-family mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

<sup>(9)</sup> Reflects unpaid principal balance of Fannie Mae MBS issued and guaranteed by the Single-Family segment during the period.

Single-Family business results reflected net income in the second quarter and first half of 2012 primarily due to credit-related income, compared with a net loss in the second quarter and first half of 2011 primarily due to credit-related expenses. In addition, net interest loss decreased and guaranty fee income increased in the second quarter and first half of 2012.

Single-family credit-related income represents the substantial majority of our consolidated activity. We provide a discussion of our credit-related income (expense) and credit losses in "Consolidated Results of Operations—Credit-Related (Income) Expenses."

The decrease in net interest loss in the second quarter and first half of 2012 was primarily due to a reduction in the amount of interest income not recognized for nonaccrual mortgage loans in our condensed consolidated balance sheet as we continued to complete a high number of loan workouts and foreclosures. In addition, as loans with stronger credit profiles become a larger portion of our single-family guaranty book of business, a smaller percentage of our loans are becoming seriously delinquent.

Guaranty fee income increased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 primarily due to an increase in the amortization of risk-based fees, reflecting the impact of higher risk-based pricing associated with our more recent acquisition vintages. Additionally, as described in "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in our 2011 Form 10-K, in December 2011, Congress enacted the TCCA which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit this increase to Treasury, rather than retaining the incremental revenue. Effective April 1, 2012, the guaranty fee on all single-family residential mortgages delivered to Fannie Mae and Freddie Mac on or after that date for securitization was increased by 10 basis points; accordingly, the Single-Family average charged guaranty fee increased. The resulting revenue is included in guaranty fee income, and the expense is included in other expenses. Under the terms of the TCCA, the first payment of $26 million is due to Treasury in the third quarter of 2012.

Growth in our average single-family guaranty book of business was relatively flat in the second quarter and first half of 2012 compared with the second quarter and first half of 2011, despite our continued high market share because of the decline in U.S. residential mortgage debt outstanding. Our estimated market share of new single-family mortgage-related securities issuances, which excludes previously securitized mortgages, remained high at  46% for the second quarter of 2012 and 48% for the first half of 2012.

**Multifamily Business Results**

Multifamily business results primarily reflect our multifamily guaranty business. Our multifamily business results also include activity relating to our low income housing tax credit ("LIHTC") and equity investments. Although we are no longer making new LIHTC or equity investments, we continue to make contractually required contributions for our legacy investments. Activity from multifamily products is also reflected in the Capital Markets group results, which include net interest income related to multifamily loans and securities, gains and losses from the sale of multifamily Fannie Mae MBS and re-securitizations, and other miscellaneous income. Estimated net interest income earned on multifamily mortgage loans and multifamily Fannie Mae MBS in the Capital Markets group results was $215 million for the second quarter of 2012 compared with  $222 million for the second quarter of 2011 and $419 million for the first half of 2012 compared with $452 million for the first half of 2011.

Table 17 displays the financial results of our Multifamily business for the periods indicated. The primary sources of revenue for our multifamily business are guaranty fee income and fee and other income. Expenses and other items that impact income or loss primarily include credit-related income (expenses) and administrative expenses.

33

**Table 17: Multifamily Business Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| | (Dollars in millions) | | | | | |
| Guaranty fee income[1] | $ 252 | $ 216 | $ 36 | $ 495 | $ 425 | $ 70 |
| Fee and other income | 49 | 57 | (8) | 96 | 115 | (19) |
| Gains from partnership investments[2] | 18 | 34 | (16) | 29 | 22 | 7 |
| Credit-related income (expense)[3] | 96 | (126) | 222 | 142 | (62) | 204 |
| Other expenses[4] | (57) | (38) | (19) | (125) | (105) | (20) |
| Income before federal income taxes | 358 | 143 | 215 | 637 | 395 | 242 |
| Provision for federal income taxes | — | (56) | 56 | — | (61) | 61 |
| Net income attributable to Fannie Mae | $ 358 | $ 87 | $ 271 | $ 637 | $ 334 | $ 303 |
| Multifamily effective guaranty fee rate (in basis points)[5] | 51.0 | 45.2 | | 50.3 | 44.6 | |
| Multifamily credit loss performance ratio (in basis points)[6] | 10.1 | 25.5 | | 18.9 | 21.4 | |
| Average multifamily guaranty book of business[7] | $ 197,691 | $ 191,039 | | $ 196,855 | $ 190,493 | |
| Multifamily new business volumes[8] | $ 6,738 | $ 5,439 | | $ 13,897 | $ 10,463 | |
| Multifamily units financed from new business volumes | 119,000 | 96,000 | | 236,000 | 179,000 | |
| Multifamily Fannie Mae MBS issuances[9] | $ 7,542 | $ 8,129 | | $ 16,393 | $ 16,710 | |
| Multifamily Fannie Mae structured securities issuances (issued by Capital Markets group)[10] | $ 1,186 | $ 1,622 | | $ 3,424 | $ 3,022 | |
| Additional net interest income earned on Fannie Mae multifamily mortgage loans and MBS (included in Capital Markets Group's results)[11] | $ 215 | $ 222 | | $ 419 | $ 452 | |
| Average Fannie Mae multifamily mortgage loans and MBS in Capital Markets Group's portfolio[12] | $ 100,639 | $ 112,208 | | $ 102,368 | $ 113,272 | |

| | As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Multifamily serious delinquency rate | 0.29 % | 0.59 % |
| Percentage of multifamily guaranty book of business with credit enhancement | 90 % | 90 % |
| Fannie Mae percentage of total multifamily mortgage debt outstanding[13] | 21.4 % | 21.2 % |
| Multifamily Fannie Mae MBS outstanding[14] | $ 112,944 | $ 101,574 |

[1]   Guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[2]   Gains from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss). Gains from partnership investments are reported using the equity method of accounting. As a result, net income attributable to noncontrolling interest from partnership investments is not included in income for the Multifamily segment.

[3]   Consists of the benefit (provision) for credit losses and foreclosed property income (expense).

[4]   Consists of net interest loss, investment gains, administrative expenses, and other income.

[5]   Calculated based on annualized Multifamily segment guaranty fee income divided by the average multifamily guaranty book of business, expressed in basis points.

[6]   Calculated based on the annualized Multifamily credit losses divided by the average multifamily guaranty book of business, expressed in basis points.

[7]   Consists of multifamily mortgage loans held in our mortgage portfolio, multifamily mortgage loans held by consolidated trusts,

TREASURY-3941

multifamily Fannie Mae MBS issued from unconsolidated trusts held by either third parties or within our retained portfolio, and other credit enhancements that we provide on multifamily mortgage assets. Excludes non-Fannie Mae mortgage-related securities held in our investment portfolio for which we do not provide a guaranty.

[8]  Reflects unpaid principal balance of multifamily Fannie Mae MBS issued (excluding portfolio securitizations) and multifamily loans purchased during the period.

[9]  Reflects unpaid principal balance of multifamily Fannie Mae MBS issued during the period. Includes: (a) issuances of new MBS, (b) Fannie Mae portfolio securitization transactions of $817 million and $2.8 billion for the three months ended June 30, 2012 and 2011, respectively, and $2.4 billion and $6.3 billion for the six months ended June 30, 2012 and 2011, respectively, and (c) conversions of adjustable-rate loans to fixed-rate loans and discount MBS ("DMBS") to MBS of $27 million for the three months ended June 30, 2012, and $190 million and $119 million for the six months ended June 30, 2012 and 2011, respectively. There were no conversions of adjustable-rate loans to fixed-rate loans and DMBS securities to MBS securities for the three months ended June 30, 2011.

[10]  Reflects original unpaid principal balance of out-of-portfolio multifamily structured securities issuances by our Capital Markets Group.

[11]  Interest expense estimate is based on allocated duration-matched funding costs. Net interest income was reduced by guaranty fees allocated to Multifamily from the Capital Markets Group on multifamily loans in Fannie Mae's portfolio.

[12]  Based on unpaid principal balance.

[13]  Includes mortgage loans and Fannie Mae MBS issued and guaranteed by the Multifamily segment. Information labeled as of June 30, 2012 is as of March 31, 2012 and is based on the Federal Reserve's March 2012 mortgage debt outstanding release, the latest date for which the Federal Reserve has estimated mortgage debt outstanding for multifamily residences. Prior period amounts have been changed to reflect revised historical data from the Federal Reserve.

[14]  Includes $30.2 billion and $28.3 billion of Fannie Mae multifamily MBS held in the mortgage portfolio, the vast majority of which have been consolidated to loans in our condensed consolidated balance sheets, as of June 30, 2012 and December 31, 2011, respectively, and $1.4 billion of bonds issued by state and local housing finance agencies as of June 30, 2012 and December 31, 2011.

Multifamily net income increased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 primarily due to an increase in guaranty fee income and credit-related income in the second quarter and first half of 2012 compared with credit-related expense in the second quarter and first half of 2011.

Guaranty fee income increased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 as we continue to acquire loans with higher guaranty fees. Our acquisitions of loans with higher guaranty fees have become a larger part of our multifamily guaranty book of business, while loans with lower guaranty fees continue to liquidate.

Multifamily credit-related income in the second quarter and first half of 2012 was primarily due to reductions to our total loss reserves resulting from an improvement in national multifamily market fundamentals. In comparison, multifamily credit-related expenses in the second quarter and first half of 2011 were primarily due to credit losses, combined with a stable allowance in the second quarter of 2011, as national improvement in the multifamily market was offset by weakness in certain local markets. Multifamily credit losses, which consist of net charge-offs and foreclosed property income (expense), were $50 million for the second quarter of 2012 compared with $122 million for the second quarter of 2011, and $186 million for the first half of 2012 compared with $204 million for the first half of 2011.

## Capital Markets Group Results

Table 18 displays the financial results of our Capital Markets group for the periods indicated. Following the table we discuss the Capital Markets group's financial results and describe the Capital Markets group's mortgage portfolio. For a discussion of the debt issued by the Capital Markets group to fund its investment activities, see "Liquidity and Capital Management." For a discussion of the derivative instruments that the Capital Markets group uses to manage interest rate risk, see "Consolidated Balance Sheet Analysis—Derivative Instruments" and "Risk Management—Market Risk Management, Including Interest Rate Risk Management—Derivative Instruments" in our 2011 Form 10-K and "Notes to Consolidated Financial Statements—Note 9, Derivative Instruments" in both this report and our 2011 Form 10-K. The primary sources of revenue for our Capital Markets group are net interest income and fee and other income. Expenses and other items that impact income or loss primarily include fair value gains and losses, investment gains and losses, other-than-temporary impairments, allocated guaranty fee expense and administrative expenses.

35

**Table 18: Capital Markets Group Results**

| | For the Three Months Ended June 30, | | | For the Six Months Ended June 30, | | |
|---|---|---|---|---|---|---|
| | 2012 | 2011 | Variance | 2012 | 2011 | Variance |
| | (Dollars in millions) | | | | | |
| Net interest income [1] | $ 3,443 | $ 3,867 | $ (424) | $ 6,984 | $ 7,577 | $ (593) |
| Investment gains, net[2] | 1,458 | 918 | 540 | 2,465 | 1,788 | 677 |
| Net other-than-temporary impairments | (597) | (55) | (542) | (661) | (99) | (562) |
| Fair value losses, net[3] | (2,461) | (1,507) | (954) | (2,291) | (1,289) | (1,002) |
| Fee and other income | 186 | 109 | 77 | 366 | 184 | 182 |
| Other expenses[4] | (556) | (560) | 4 | (1,086) | (1,113) | 27 |
| Income before federal income taxes | 1,473 | 2,772 | (1,299) | 5,777 | 7,048 | (1,271) |
| Benefit for federal income taxes | — | 40 | (40) | — | 45 | (45) |
| Net income attributable to Fannie Mae | $ 1,473 | $ 2,812 | $ (1,339) | $ 5,777 | $ 7,093 | $ (1,316) |

[1] Includes contractual interest income, excluding recoveries, on nonaccrual loans received from the Single-Family segment of $1.3 billion and $1.5 billion for the three months ended June 30, 2012 and 2011, respectively, and $2.7 billion and $3.5 billion for the six months ended June 30, 2012 and 2011, respectively. The Capital Markets group's net interest income is reported based on the mortgage-related assets held in the segment's portfolio and excludes interest income on mortgage-related assets held by consolidated MBS trusts that are owned by third parties and the interest expense on the corresponding debt of such trusts.

[2] We include the securities that we own regardless of whether the trust has been consolidated in reporting of gains and losses on securitizations and sales of available-for-sale securities.

[3] Includes fair value gains or losses on derivatives and trading securities that we own, regardless of whether the trust has been consolidated.

[4] Includes allocated guaranty fee expense, debt extinguishment losses, net, administrative expenses, and other expenses. Gains or losses related to the extinguishment of debt issued by consolidated trusts are excluded from the Capital Markets group's results because purchases of securities are recognized as such.

The Capital Markets group's results reflected a decrease in net income in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 primarily due to a decrease in net interest income and an increase in net other-than-temporary impairments and fair value losses, partially offset by an increase in investment gains.

Net interest income decreased in the second quarter and first half of 2012 primarily due to a decrease in the balance of mortgage-related securities and lower interest rates on loans in our mortgage portfolio. This decrease in interest income on our interest-earning assets was partially offset by a decline in interest expense due to lower funding needs and lower borrowing rates, which allowed us to continue to replace higher-cost debt with lower-cost debt.

Our net interest income and net interest yield were higher than they would have otherwise been in the second quarter and first half of 2012 and 2011 because our debt funding needs were lower than would otherwise have been required as a result of funds we have received from Treasury to date under the senior preferred stock purchase agreement and dividends paid to Treasury are not recognized as interest expense.

We supplement our issuance of debt securities with derivative instruments to further reduce duration risk, which includes prepayment risk. The effect of these derivatives, in particular the periodic net interest expense accruals on interest rate swaps, is not reflected in the Capital Markets group's net interest income but is included in our results as a component of "Fair value losses, net" and is displayed in " Table 10: Fair Value Losses, Net." If we had included the economic impact of adding the net contractual interest accruals on our interest rate swaps in our Capital Markets group's interest expense, the Capital Markets group's net interest income would have decreased by $391 million in the second quarter of 2012 compared with a decrease of $658 million in the second quarter of 2011, and would have decreased by $765 million for the first half of 2012 compared with a decrease of $1.3 billion for the first half of 2011.

The net other-than-temporary impairments recognized by the Capital Markets group during the second quarter and first half of 2012 are consistent with our condensed consolidated results of operations as described in "Consolidated Results of Operations—Other-Than-Temporary Impairment of Investment Securities." In addition, see "Note 5, Investments in Securities" for information on our other-than-temporary impairments by major security type and primary drivers for other-than-temporary impairments recorded in the second quarter and first half of 2012.

Fair value losses increased in the second quarter and first half of 2012 primarily due to an increase in derivative fair value losses. The derivatives fair value losses that are reported for the Capital Markets group are consistent with the losses reported in our condensed consolidated results of operations. We discuss our derivatives fair value losses in "Consolidated Results of Operations—Fair Value Losses, Net."

Investment gains increased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011 due to a higher volume of securitizations.

### The Capital Markets Group's Mortgage Portfolio

The Capital Markets group's mortgage portfolio consists of mortgage loans and mortgage-related securities that we own. Mortgage-related securities held by the Capital Markets group include Fannie Mae MBS and non-Fannie Mae mortgage-related securities. The Fannie Mae MBS that we own are maintained as securities on the Capital Markets group's balance sheet. Mortgage-related assets held by consolidated MBS trusts are not included in the Capital Markets group's mortgage portfolio.

The amount of mortgage assets that we may own is restricted by our senior preferred stock purchase agreement with Treasury. By December 31 of each year, we are required to reduce our mortgage assets to 90% of the maximum allowable amount that we were permitted to own as of December 31 of the immediately preceding calendar year, until the amount of our mortgage assets reaches $250 billion. The maximum allowable amount of mortgage assets we may own was reduced to $729 billion as of December 31, 2011 and will be reduced to $656.1 billion as of December 31, 2012. As of June 30, 2012, we owned $672.8 billion in mortgage assets, compared with $708.4 billion as of December 31, 2011.

Table 19 displays our Capital Markets group's mortgage portfolio activity for the periods indicated.

### Table 19: Capital Markets Group's Mortgage Portfolio Activity[1]

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (Dollars in millions) | | | |
| Mortgage loans: | | | | |
| Beginning balance | $ 394,777 | $ 421,856 | $ 398,271 | $ 427,074 |
| Purchases | 55,760 | 28,290 | 109,685 | 66,364 |
| Securitizations [2] | (44,521) | (22,559) | (82,893) | (46,542) |
| Liquidations [3] | (19,212) | (22,170) | (38,259) | (41,479) |
| Mortgage loans, ending balance | 386,804 | 405,417 | 386,804 | 405,417 |
| | | | | |
| Mortgage securities: | | | | |
| Beginning balance | 296,886 | 335,762 | 310,143 | 361,697 |
| Purchases [4] | 5,520 | 4,533 | 10,491 | 9,623 |
| Securitizations [2] | 44,521 | 22,559 | 82,893 | 46,542 |
| Sales | (45,249) | (21,635) | (86,495) | (57,061) |
| Liquidations [3] | (15,696) | (14,835) | (31,050) | (34,417) |
| Mortgage securities, ending balance | 285,982 | 326,384 | 285,982 | 326,384 |
| Total Capital Markets mortgage portfolio | $ 672,786 | $ 731,801 | $ 672,786 | $ 731,801 |

[1]   Based on unpaid principal balance.

[2]   Includes portfolio securitization transactions that do not qualify for sale treatment under GAAP.

[3]   Includes scheduled repayments, prepayments, foreclosures and lender repurchases.

[4]   Includes purchases of Fannie Mae MBS issued by consolidated trusts.

Table 20 displays the composition of the Capital Markets group's mortgage portfolio as of June 30, 2012 and December 31, 2011.

37

**Table 20: Capital Markets Group's Mortgage Portfolio Composition** [1]

| | As of | |
| --- | --- | --- |
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Capital Markets group's mortgage loans: | | |
| Single-family loans: | | |
| Government insured or guaranteed | $ 41,300 | $ 41,555 |
| Conventional: | | |
| Long-term, fixed-rate | 245,314 | 245,810 |
| Intermediate-term, fixed-rate | 10,037 | 10,289 |
| Adjustable-rate | 20,589 | 23,490 |
| Total single-family conventional | 275,940 | 279,589 |
| Total single-family loans | 317,240 | 321,144 |
| Multifamily loans: | | |
| Government insured or guaranteed | 336 | 362 |
| Conventional: | | |
| Long-term, fixed-rate | 3,459 | 3,629 |
| Intermediate-term, fixed-rate | 52,747 | 58,885 |
| Adjustable-rate | 13,022 | 14,251 |
| Total multifamily conventional | 69,228 | 76,765 |
| Total multifamily loans | 69,564 | 77,127 |
| Total Capital Markets group's mortgage loans | 386,804 | 398,271 |
| Capital Markets group's mortgage-related securities: | | |
| Fannie Mae | 201,911 | 220,061 |
| Freddie Mac | 12,954 | 14,509 |
| Ginnie Mae | 976 | 1,043 |
| Alt-A private-label securities | 18,392 | 19,670 |
| Subprime private-label securities | 15,796 | 16,538 |
| CMBS | 21,927 | 23,226 |
| Mortgage revenue bonds | 10,012 | 10,899 |
| Other mortgage-related securities | 4,014 | 4,197 |
| Total Capital Markets group's mortgage-related securities [2] | 285,982 | 310,143 |
| Total Capital Markets group's mortgage portfolio | $ 672,786 | $ 708,414 |

---

[1]  Based on unpaid principal balance.

[2]  The fair value of these mortgage-related securities was $293.1 billion and $316.5 billion as of June 30, 2012 and December 31, 2011, respectively.

The Capital Markets group's mortgage portfolio decreased as of June 30, 2012 compared with December 31, 2011 primarily due to liquidations, partially offset by purchases of delinquent loans from MBS trusts. The total unpaid principal balance of nonperforming loans in the Capital Markets group's mortgage portfolio was $233.9 billion as of June 30, 2012 and $236.2 billion as of December 31, 2011. This population includes loans that have been modified and have been classified as TDRs, as well as unmodified delinquent loans that are on nonaccrual status in our condensed consolidated financial statements.

We expect to continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement. We purchased approximately 152,600 delinquent loans with an unpaid principal balance of $25.5 billion from our single-family MBS trusts in the first half

38

of 2012. As of June 30, 2012, the total unpaid principal balance of all loans in single-family MBS trusts that were delinquent as to four or more consecutive monthly payments was $4.0 billion.

## CONSOLIDATED BALANCE SHEET ANALYSIS

This section provides a discussion of our condensed consolidated balance sheets as of the dates indicated and should be read together with our condensed consolidated financial statements, including the accompanying notes.

Table 21 displays a summary of our condensed consolidated balance sheets as of June 30, 2012 and December 31, 2011.

**Table 21: Summary of Condensed Consolidated Balance Sheets**

| | As of | | |
|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | Variance |
| | (Dollars in millions) | | |
| **Assets** | | | |
| Cash and cash equivalents and federal funds sold and securities purchased under agreements to resell or similar arrangements | $ 48,728 | $ 63,539 | $ (14,811) |
| Restricted cash | 55,985 | 50,797 | 5,188 |
| Investments in securities [1] | 120,629 | 151,780 | (31,151) |
| Mortgage loans: | | | |
| Of Fannie Mae | 370,043 | 380,379 | (10,336) |
| Of consolidated trusts | 2,616,574 | 2,590,398 | 26,176 |
| Allowance for loan losses | (63,375) | (72,156) | 8,781 |
| Mortgage loans, net of allowance for loan losses | 2,923,242 | 2,898,621 | 24,621 |
| Other assets [2] | 47,036 | 46,747 | 289 |
| Total assets | $ 3,195,620 | $ 3,211,484 | $ (15,864) |
| **Liabilities and equity (deficit)** | | | |
| Debt: | | | |
| Of Fannie Mae | $ 659,389 | $ 732,444 | $ (73,055) |
| Of consolidated trusts | 2,504,499 | 2,457,428 | 47,071 |
| Other liabilities [3] | 28,962 | 26,183 | 2,779 |
| Total liabilities | 3,192,850 | 3,216,055 | (23,205) |
| Senior preferred stock | 117,149 | 112,578 | 4,571 |
| Other deficit [4] | (114,379) | (117,149) | 2,770 |
| Total equity (deficit) | 2,770 | (4,571) | 7,341 |
| **Total liabilities and equity (deficit)** | $ 3,195,620 | $ 3,211,484 | $ (15,864) |

---

[1] Includes $27.6 billion as of June 30, 2012 and $49.8 billion as of December 31, 2011 of non-mortgage-related securities that are included in our other investments portfolio, which we present in "Table 31: Cash and Other Investments Portfolio."

[2] Consists of accrued interest receivable, net; acquired property, net; and other assets.

[3] Consists of accrued interest payable, federal funds purchased and securities sold under agreements to repurchase, and other liabilities.

[4] Consists of preferred stock, common stock, accumulated deficit, accumulated other comprehensive loss, treasury stock, and noncontrolling interest.

**Cash and Other Investments Portfolio**

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, and investments in non-mortgage-related securities. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for additional information on our cash and other investments portfolio.

**Restricted Cash**

Restricted cash primarily includes unscheduled borrower payments received by the servicer or consolidated trusts due to be remitted to the MBS certificateholders in the subsequent month. Our restricted cash increased as of June 30, 2012 compared with the balance as of December 31, 2011 primarily due to an increase in refinance activity, resulting in an increase in unscheduled payments received.

**Investments in Mortgage-Related Securities**

Our investments in mortgage-related securities are classified in our condensed consolidated balance sheets as either trading or available-for-sale and are measured at fair value. Unrealized and realized gains and losses on trading securities are included as a component of "Fair value losses, net" and unrealized gains and losses on available-for-sale securities are included in "Other comprehensive income (loss)" in our condensed consolidated statements of operations and comprehensive income (loss). Realized gains and losses on available-for-sale securities are recognized when securities are sold in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss). See "Note 5, Investments in Securities" for additional information on our investments in mortgage-related securities, including the composition of our trading and available-for-sale securities at amortized cost and fair value and the gross unrealized gains and losses related to our available-for-sale securities as of June 30, 2012 and December 31, 2011.

Table 22 displays the fair value of our investments in mortgage-related securities, including trading and available-for-sale securities, as of the dates indicated.

**Table 22: Summary of Mortgage-Related Securities at Fair Value**

| | As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 20,007 | $ 24,274 |
| Freddie Mac | 13,957 | 15,555 |
| Ginnie Mae | 1,111 | 1,189 |
| Alt-A private-label securities | 12,479 | 13,032 |
| Subprime private-label securities | 8,456 | 8,866 |
| CMBS | 23,598 | 24,437 |
| Mortgage revenue bonds | 10,046 | 10,978 |
| Other mortgage-related securities | 3,374 | 3,601 |
| Total | $ 93,028 | $ 101,932 |

*Investments in Private-Label Mortgage-Related Securities*

We classify private-label securities as Alt-A, subprime, multifamily or manufactured housing if the securities were labeled as such when issued. We have also invested in private-label subprime mortgage-related securities that we have resecuritized to include our guaranty ("wraps").

The continued negative impact of the current economic environment, including sustained weakness in the housing market and high unemployment, has adversely affected the performance of our Alt-A and subprime private-label securities. The unpaid principal balance of our investments in Alt-A and subprime securities was $34.2 billion as of June 30, 2012, of which $29.8 billion was rated below investment grade. Table 23 displays the unpaid principal balance and the fair value of our investments in Alt-A and subprime private-label securities along with an analysis of the cumulative losses on these investments as of June 30, 2012. We had realized actual cumulative principal shortfalls of approximately 7% as of June 30, 2012 and 6% as of December 31, 2011 of the total cumulative credit losses reported in this table and reflected in our condensed consolidated financial statements.

40

**Table 23: Analysis of Losses on Alt-A and Subprime Private-Label Mortgage-Related Securities**

| | As of June 30, 2012 | | | | |
|---|---|---|---|---|---|
| | Unpaid Principal Balance | Fair Value | Total Cumulative Losses [1] | Noncredit Component [2] | Credit Component [3] |
| | (Dollars in millions) | | | | |
| Trading securities: [4] | | | | | |
| Alt-A private-label securities | $ 2,523 | $ 1,296 | $ (1,188) | $ (17) | $ (1,171) |
| Subprime private-label securities | 2,516 | 1,226 | (1,289) | (381) | (908) |
| Total | 5,039 | 2,522 | (2,477) | (398) | (2,079) |
| Available-for-sale securities: [4] | | | | | |
| Alt-A private-label securities | 15,869 | 11,183 | (5,330) | (1,004) | (4,326) |
| Subprime private-label securities | 13,280 | 7,230 | (6,089) | (1,465) | (4,624) |
| Total | 29,149 | 18,413 | (11,419) | (2,469) | (8,950) |
| Grand Total | $ 34,188 | 20,935 | $ (13,896) | $ (2,867) | $ (11,029) |

[1] Amounts reflect the difference between the fair value and unpaid principal balance net of unamortized premiums, discounts and certain other cost basis adjustments.

[2] Represents the estimated portion of the total cumulative losses that is noncredit-related. We have calculated the credit component based on the difference between the amortized cost basis of the securities and the present value of expected future cash flows. The remaining difference between the fair value and the present value of expected future cash flows is classified as noncredit-related.

[3] For securities classified as trading, amounts reflect the estimated portion of the total cumulative losses that is credit-related. For securities classified as available-for-sale, amounts reflect the estimated portion of total cumulative other-than-temporary credit impairment losses, net of accretion, that are recognized in our condensed consolidated statements of operations and comprehensive income (loss).

[4] Excludes resecuritizations, or wraps, of private-label securities backed by subprime loans that we have guaranteed and hold in our mortgage portfolio as Fannie Mae securities.

Table 24 displays the 60 days or more delinquency rates and average loss severities for the loans underlying our Alt-A and subprime private-label mortgage-related securities for the most recent remittance period of the current reporting quarter. The delinquency rates and average loss severities are based on available data provided by Intex Solutions, Inc. ("Intex") and CoreLogic, LoanPerformance ("CoreLogic"). We also present the average credit enhancement and monoline financial guaranteed amount for these securities as of June 30, 2012. Based on the stressed condition of our non-governmental financial guarantors, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future. See "Risk Management—Credit Risk Management —Institutional Counterparty Credit Risk Management—Financial Guarantors" in this report and in our 2011 Form 10-K for additional information on our financial guarantor exposure and the counterparty risk associated with our financial guarantors.

41

**Table 24: Credit Statistics of Loans Underlying Alt-A and Subprime Private-Label Mortgage-Related Securities (Including Wraps)**

| | As of June 30, 2012 | | | | | | |
|---|---|---|---|---|---|---|---|
| | Unpaid Principal Balance | | | | Average | | Monoline Financial Guaranteed Amount [6] |
| | Trading | Available-for-Sale | Wraps [1] | ≥ 60 Days Delinquent [2][3] | Average Loss Severity [3][4] | Average Credit Enhancement [3][5] | |
| | (Dollars in millions) | | | | | | |
| **Private-label mortgage-related securities backed by:** [7] | | | | | | | |
| Alt-A mortgage loans: | | | | | | | |
| Option ARM Alt-A mortgage loans: | | | | | | | |
| 2004 and prior | $   — | $   460 | $   — | 29.8% | 60.0% | 13.6% | $   — |
| 2005 | — | 1,235 | — | 39.1 | 57.9 | 36.0 | 228 |
| 2006 | — | 1,084 | — | 41.2 | 66.3 | 22.5 | 69 |
| 2007 | 1,741 | — | — | 44.0 | 67.4 | 51.5 | 551 |
| Other Alt-A mortgage loans: | | | | | | | |
| 2004 and prior | — | 5,667 | — | 10.2 | 50.9 | 12.3 | 12 |
| 2005 | 80 | 3,787 | 104 | 21.1 | 58.2 | 5.0 | — |
| 2006 | 56 | 3,528 | — | 25.1 | 62.3 | 0.3 | — |
| 2007 | 646 | — | 150 | 38.1 | 70.1 | 32.8 | 255 |
| 2008 | — | 108 | — | 27.8 | 67.0 | 24.4 | — |
| Total Alt-A mortgage loans | 2,523 | 15,869 | 254 | | | | 1,115 |
| Subprime mortgage loans: | | | | | | | |
| 2004 and prior | — | 1,518 | 922 | 21.8 | 75.6 | 60.5 | 578 |
| 2005 | — | 155 | 1,166 | 38.5 | 77.3 | 56.8 | 221 |
| 2006 | — | 11,025 | — | 44.8 | 77.4 | 15.6 | 52 |
| 2007 | 2,516 | 582 | 5,216 | 44.9 | 77.4 | 19.8 | 169 |
| Total subprime mortgage loans | 2,516 | 13,280 | 7,304 | | | | 1,020 |
| Total Alt-A and subprime mortgage loans | $ 5,039 | $ 29,149 | $ 7,558 | | | | $ 2,135 |

---

[1] Represents our exposure to private-label Alt-A and subprime mortgage-related securities that have been resecuritized (or wrapped) to include our guarantee.

[2] Delinquency data provided by Intex, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The reported Intex delinquency data reflect information from June 2012 remittances for May 2012 payments. For consistency purposes, we have adjusted the Intex delinquency data, where appropriate, to include all foreclosures, all REO and loans that were in bankruptcy and 60 or more days delinquent.

[3] The average delinquency, severity and credit enhancement metrics are calculated for each loan pool associated with securities where Fannie Mae has exposure and are weighted based on the unpaid principal balance of those securities.

[4] Severity data obtained from CoreLogic, where available, for loans backing Alt-A and subprime private-label mortgage-related securities that we own or guarantee. The CoreLogic severity data reflect information from June 2012 remittances for May 2012 payments. For consistency purposes, we have adjusted the severity data, where appropriate.

[5] Average credit enhancement percentage reflects both subordination and financial guarantees. Reflects the ratio of the current amount of the securities that will incur losses in the securitization structure before any losses are allocated to securities that we own or guarantee. Percentage generally calculated based on the quotient of the total unpaid principal balance of all credit enhancements in the form of subordination or financial guarantee of the security divided by the total unpaid principal balance of all of the tranches of collateral pools from which credit support is drawn for the security that we own or guarantee. Beginning in March 2012, in calculating the weighted average credit enhancement percentage for bonds in the population that show negative credit enhancement in Intex due to under-collateralization, the negative credit enhancement amounts have been replaced with zero values.

[6] Reflects amount of unpaid principal balance supported by financial guarantees from monoline financial guarantors.

[7] Vintages are based on series date and not loan origination date.

42

**Mortgage Loans**

The increase in mortgage loans, net of the allowance for loan losses, in the first half of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs. For additional information on our mortgage loans, see "Note 3, Mortgage Loans." For additional information on the mortgage loan purchase and sale activities reported by our Capital Markets group, see "Business Segment Results—Capital Markets Group Results."

**Debt**

Debt of Fannie Mae is the primary means of funding our mortgage investments. We provide a summary of the activity of the debt of Fannie Mae and a comparison of the mix between our outstanding short-term and long-term debt in "Liquidity and Capital Management—Liquidity Management—Debt Funding." Also see "Note 8, Short-Term Borrowings and Long-Term Debt" for additional information on our outstanding debt.

Debt of consolidated trusts represents the amount of Fannie Mae MBS issued from consolidated trusts and held by third-party certificateholders. The increase in debt of consolidated trusts in the first half of 2012 was primarily driven by securitization activity from our lender swap and portfolio securitization programs.

---

**SUPPLEMENTAL NON-GAAP INFORMATION—FAIR VALUE BALANCE SHEETS**

As part of our disclosure requirements with FHFA, we disclose on a quarterly basis supplemental non-GAAP consolidated fair value balance sheets, which reflect our assets and liabilities at estimated fair value.

Table 25 summarizes changes in our stockholders' equity (deficit) reported in our GAAP condensed consolidated balance sheets and in the estimated fair value of our net assets in our non-GAAP consolidated fair value balance sheets for the six months ended June 30, 2012. The estimated fair value of our net assets is calculated based on the difference between the fair value of our assets and the fair value of our liabilities, adjusted for noncontrolling interests. We use various valuation techniques to estimate fair value, some of which incorporate internal assumptions that are subjective and involve a high degree of management judgment. We describe the specific valuation techniques used to determine fair value and disclose the carrying value and fair value of our financial assets and liabilities in "Note 12, Fair Value."

**Table 25: Comparative Measures—GAAP Change in Stockholders' Equity (Deficit) and Non-GAAP Change in Fair Value of Net Assets (Net of Tax Effect)**

| | For the Six Months Ended June 30, 2012 |
|---|---:|
| | (Dollars in millions) |
| **GAAP consolidated balance sheets:** | |
| Fannie Mae stockholders' deficit as of December 31, 2011 [1] | $ (4,624) |
| Total comprehensive income | 8,527 |
| Capital transactions:[2] | |
|    Funds received from Treasury under the senior preferred stock purchase agreement | 4,571 |
|    Senior preferred stock dividends | (5,750) |
| Capital transactions, net | (1,179) |
| Other | (4) |
| Fannie Mae stockholders' equity as of June 30, 2012 [1] | $ 2,720 |
| | |
| **Non-GAAP consolidated fair value balance sheets:** | |
| Estimated fair value of net assets as of December 31, 2011 | $ (127,848) |
| Capital transactions, net | (1,179) |
| Change in estimated fair value of net assets, excluding capital transactions | 4,950 |
| Increase in estimated fair value of net assets, net | 3,771 |
| Estimated fair value of net assets as of June 30, 2012 | $ (124,077) |

43

_____

(1)   Our net worth, as defined under the senior preferred stock purchase agreement, is equivalent to the "Total equity (deficit)" amount reported in our condensed consolidated balance sheets. Our net worth, or total deficit, consists of "Total Fannie Mae's stockholders' equity (deficit)" and "Noncontrolling interest" reported in our condensed consolidated balance sheets.

(2)   Represents capital transactions, which are reported in our condensed consolidated financial statements.

During the first half of 2012, the estimated fair value of our net assets, excluding capital transactions, increased by $5.0 billion. This increase was driven by a $16.5 billion improvement in fair value of our net assets primarily attributable to higher actual home prices experienced in the second quarter of 2012, which lowered the expected losses on our guaranty book of business and improved mark-to-market loan-to-property values, resulting in an increase in the fair value of our mortgage loans.

The increase in fair value from higher actual home prices was partially offset by a decrease in fair value of $11.5 billion primarily attributable to a change in the definition of principal market for certain of our loans as a result of the adoption of ASU 2011-04, *Amendments to Achieve Common Fair Value Measurements and Disclosure Requirements in U.S. GAAP and IFRS,* during the first half of 2012.

**Cautionary Language Relating to Supplemental Non-GAAP Financial Measures**

In reviewing our non-GAAP consolidated fair value balance sheets, there are a number of important factors and limitations to consider. The estimated fair value of our net assets is calculated as of a particular point in time based on our existing assets and liabilities. It does not incorporate other factors that may have a significant impact on our long-term fair value, including revenues generated from future business activities in which we expect to engage, the value from our foreclosure and loss mitigation efforts or the impact that legislation or potential regulatory actions may have on us. As a result, the estimated fair value of our net assets presented in our non-GAAP consolidated fair value balance sheets does not represent an estimate of our net realizable value, liquidation value or our market value as a whole. Amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary materially from the estimated fair values presented in our non-GAAP consolidated fair value balance sheets.

In addition, the fair value of our net assets attributable to common stockholders presented in our fair value balance sheet does not represent an estimate of the value we expect to realize from operating the company or what we expect to draw from Treasury under the terms of our senior preferred stock purchase agreement, primarily because:

•   The estimated fair value of our credit exposures significantly exceeds our projected credit losses as fair value takes into account certain assumptions about liquidity and required rates of return that a market participant may demand in assuming a credit obligation. Because we do not generally intend to have other parties assume the credit risk inherent in our book of business, and therefore would not be obligated to pay a market premium for its assumption, we do not expect the current market premium portion of our current estimate of fair value to impact future Treasury draws;

•   The fair value balance sheet does not reflect amounts we expect to draw in the future to pay dividends on the senior preferred stock; and

•   The fair value of our net assets reflects a point in time estimate of the fair value of our existing assets and liabilities, and does not incorporate the value associated with new business that may be added in the future.

The fair value of our net assets is not a measure defined within GAAP and may not be comparable to similarly titled measures reported by other companies.

**Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

We display our non-GAAP fair value balance sheets as of the dates indicated in Table 26.

**Table 26: Supplemental Non-GAAP Consolidated Fair Value Balance Sheets**

| | As of June 30, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | GAAP Carrying Value | Fair Value Adjustment(1) | Estimated Fair Value | GAAP Carrying Value | Fair Value Adjustment(1) | Estimated Fair Value |
| | (Dollars in millions) | | | | | |
| **Assets:** | | | | | | |
| Cash and cash equivalents | $ 80,713 | $ — | $ 80,713 | $ 68,336 | $ — | $ 68,336 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 24,000 | — | 24,000 | 46,000 | — | 46,000 |
| Trading securities | 50,935 | — | 50,935 | 74,198 | — | 74,198 |
| Available-for-sale securities | 69,694 | — | 69,694 | 77,582 | — | 77,582 |
| Mortgage loans: | | | | | | |
| Mortgage loans held for sale | 455 | 12 | 467 | 311 | 14 | 325 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | |
| Of Fannie Mae | 317,578 | (50,817) | 266,761 | 322,825 | (27,829) | 294,996 |
| Of consolidated trusts | 2,605,209 | 93,600 (2) | 2,698,809 (3) | 2,575,485 | 76,540 (2) | 2,652,025 (3) |
| Total mortgage loans | 2,923,242 | 42,795 | 2,966,037 (4) | 2,898,621 | 48,725 | 2,947,346 (4) |
| Advances to lenders | 7,343 | (90) | 7,253 (5)(6) | 5,538 | (118) | 5,420 (5)(6) |
| Derivative assets at fair value | 602 | — | 602 (5)(6) | 561 | — | 561 (5)(6) |
| Guaranty assets and buy-ups, net | 474 | 392 | 866 (5)(6) | 503 | 398 | 901 (5)(6) |
| Total financial assets | 3,157,003 | 43,097 | 3,200,100 (7) | 3,171,339 | 49,005 | 3,220,344 (7) |
| Credit enhancements | 451 | 2,094 | 2,545 (5)(6) | 455 | 2,550 | 3,005 (5)(6) |
| Other assets | 38,166 | (253) | 37,913 (5)(6) | 39,690 | (258) | 39,432 (5)(6) |
| Total assets | $ 3,195,620 | $ 44,938 | $ 3,240,558 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |
| **Liabilities:** | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase | $ 153 | $ — | $ 153 | $ — | $ — | $ — |
| Short-term debt: | | | | | | |
| Of Fannie Mae | 92,906 | 11 | 92,917 | 146,752 | 30 | 146,782 |
| Of consolidated trusts | 3,908 | — | 3,908 | 4,973 | — | 4,973 |
| Long-term debt: | | | | | | |
| Of Fannie Mae | 566,483 (8) | 27,082 | 593,565 | 585,692 (8) | 28,291 | 613,983 |
| Of consolidated trusts | 2,500,591 (8) | 142,607 (2) | 2,643,198 | 2,452,455 (8) | 144,202 (2) | 2,596,657 |
| Derivative liabilities at fair value | 919 | — | 919 (9)(10) | 916 | — | 916 (9)(10) |
| Guaranty obligations | 758 | 2,785 | 3,543 (9)(10) | 811 | 3,133 | 3,944 (9)(10) |
| Total financial liabilities | 3,165,718 | 172,485 | 3,338,203 (7) | 3,191,599 | 175,656 | 3,367,255 (7) |
| Other liabilities | 27,132 | (750) | 26,382 (9)(10) | 24,456 | (1,135) | 23,321 (9)(10) |
| Total liabilities | 3,192,850 | 171,735 | 3,364,585 | 3,216,055 | 174,521 | 3,390,576 |
| **Equity (deficit):** | | | | | | |
| Fannie Mae stockholders' equity (deficit): | | | | | | |
| Senior preferred(11) | 117,149 | — | 117,149 | 112,578 | — | 112,578 |
| Preferred | 19,130 | (18,062) | 1,068 | 19,130 | (18,163) | 967 |
| Common | (133,559) | (108,735) | (242,294) | (136,332) | (105,061) | (241,393) |
| **Total Fannie Mae stockholders' equity (deficit)/non-GAAP fair value of net assets** | $ 2,720 | $ (126,797) | $ (124,077) | $ (4,624) | $ (123,224) | $ (127,848) |
| Noncontrolling interest | 50 | — | 50 | 53 | — | 53 |
| Total equity (deficit) | 2,770 | (126,797) | (124,027) | (4,571) | (123,224) | (127,795) |
| Total liabilities and equity (deficit) | $ 3,195,620 | $ 44,938 | $ 3,240,558 | $ 3,211,484 | $ 51,297 | $ 3,262,781 |

45

---

**Explanation and Reconciliation of Non-GAAP Measures to GAAP Measures**

[1]    Each of the amounts listed as a "fair value adjustment" represents the difference between the carrying value included in our GAAP condensed consolidated balance sheets and our best judgment of the estimated fair value of the listed item.

[2]    Fair value of consolidated loans is impacted by credit risk, which has no corresponding impact on the consolidated debt.

[3]    Includes certain mortgage loans that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $5.2 billion and $3.6 billion as of June 30, 2012 and December 31, 2011, respectively.

[4]    Performing loans had a fair value of $2.9 trillion and an unpaid principal balance of $2.8 trillion as of June 30, 2012 compared with a fair value of $2.8 trillion and an unpaid principal balance of $2.7 trillion as of December 31, 2011. Nonperforming loans, which for the purposes of our non-GAAP fair value balance sheets consists of loans that are delinquent by one or more payments, had a fair value of $107.3 billion and an unpaid principal balance of $203.8 billion as of June 30, 2012 compared with a fair value of $128.9 billion and an unpaid principal balance of $226.5 billion as of December 31, 2011. See "Note 12, Fair Value" for additional information on valuation techniques for performing and nonperforming loans.

[5]    The following line items: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; (d) Credit enhancements; and (e) Other assets, together consist of the following assets presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest receivable, net; (b) Acquired property, net; and (c) Other assets.

[6]    "Other assets" include the following GAAP condensed consolidated balance sheets line items: (a) Accrued interest receivable, net and (b) Acquired property, net. The carrying value of these items in our GAAP condensed consolidated balance sheets totaled $20.1 billion and $21.4 billion as of June 30, 2012 and December 31, 2011, respectively. "Other assets" in our GAAP condensed consolidated balance sheets include the following: (a) Advances to lenders; (b) Derivative assets at fair value; (c) Guaranty assets and buy-ups, net; and (d) Credit enhancements. The carrying value of these items totaled $8.9 billion and $7.1 billion as of June 30, 2012 and December 31, 2011, respectively.

[7]    We estimated the fair value of these financial instruments in accordance with the fair value accounting guidance as described in "Note 12, Fair Value."

[8]    Includes certain long-term debt instruments that we elected to report at fair value in our GAAP condensed consolidated balance sheets of $5.4 billion and $4.8 billion as of June 30, 2012 and December 31, 2011, respectively.

[9]    The following line items: (a) Derivative liabilities at fair value; (b) Guaranty obligations; and (c) Other liabilities, consist of the following liabilities presented in our GAAP condensed consolidated balance sheets: (a) Accrued interest payable and (b) Other liabilities.

[10]   "Other liabilities" include Accrued interest payable in our GAAP condensed consolidated balance sheets. The carrying value of this item in our GAAP condensed consolidated balance sheets totaled $11.9 billion and $12.6 billion as of June 30, 2012 and December 31, 2011, respectively. We assume that certain other liabilities, such as deferred revenues, have no fair value. Although we report the "Reserve for guaranty losses" as part of "Other liabilities" in our GAAP condensed consolidated balance sheets, it is incorporated into and reported as part of the fair value of our guaranty obligations in our non-GAAP supplemental consolidated fair value balance sheets. "Other liabilities" in our GAAP condensed consolidated balance sheets include the following: (a) Derivative liabilities at fair value and (b) Guaranty obligations. The carrying value of these items totaled $1.7 billion as of June 30, 2012 and December 31, 2011.

[11]   The amount included in "estimated fair value" of the senior preferred stock is the liquidation preference, which is the same as the GAAP carrying value, and does not reflect fair value.

## LIQUIDITY AND CAPITAL MANAGEMENT

### Liquidity Management

Our business activities require that we maintain adequate liquidity to fund our operations. Our liquidity risk management policy is designed to address our liquidity risk. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. Liquidity risk management involves forecasting funding requirements, maintaining sufficient capacity to meet our needs based on our ongoing assessment of financial market liquidity and adhering to our regulatory requirements.

Our treasury function resides within the Capital Markets group and is responsible for implementing our liquidity and contingency planning strategies. We conduct liquidity contingency planning to prepare for an event in which our access to the unsecured debt markets becomes limited. We plan for alternative sources of liquidity that are designed to allow us to meet our cash obligations without relying upon the issuance of unsecured debt. While our liquidity contingency planning attempts to address stressed market conditions and our status under conservatorship and Treasury support arrangements, we believe that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances.

46

See "Liquidity and Capital Management—Liquidity Management—Liquidity Risk Management Practices and Contingency Planning" in our 2011 Form 10-K for a discussion of our liquidity contingency plans. Also see "Risk Factors" in our 2011 Form 10-K for a description of the risks associated with our liquidity risk and liquidity contingency planning.

One of our liquidity management policies requires that we maintain a minimum threshold of Treasury securities and/or cash deposits with the Federal Reserve Bank of New York. Effective August 2012, this minimum threshold represents 50% of our average projected 30-day cash needs over the previous three months. Prior to this change, this minimum threshold was 50% of the average of the previous three month-end balances of our cash and other investments portfolio.

Our liquidity position could be adversely affected by many factors, both internal and external to our business, including: actions taken by our conservator, the Federal Reserve, U.S. Treasury or other government agencies; legislation relating to us or our business; a U.S. government payment default on its debt obligations; a downgrade in the credit ratings of our senior unsecured debt or the U.S government's debt from the major ratings organizations; a systemic event leading to the withdrawal of liquidity from the market; an extreme market-wide widening of credit spreads; public statements by key policy makers; a significant decline in our net worth; potential investor concerns about the adequacy of funding available to us under the senior preferred stock purchase agreement after 2012; loss of demand for our debt, or certain types of our debt, from a major group of investors; a significant credit event involving one of our major institutional counterparties; a sudden catastrophic operational failure in the financial sector; or elimination of our GSE status.

### Debt Funding

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt.

We have a diversified funding base of domestic and international investors. Purchasers of our debt securities are geographically diversified and include fund managers, commercial banks, pension funds, insurance companies, foreign central banks, corporations, state and local governments, and other municipal authorities.

Although our funding needs may vary from quarter to quarter depending on market conditions, we currently expect our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement that we reduce our mortgage portfolio 10% per year until it reaches $250 billion.

#### Fannie Mae Debt Funding Activity

Table 27 displays the activity in debt of Fannie Mae for the periods indicated. This activity excludes the debt of consolidated trusts and intraday loans. The reported amounts of debt issued and paid off during the period represent the face amount of the debt at issuance and redemption, respectively. Activity for short-term debt of Fannie Mae relates to borrowings with an original contractual maturity of one year or less while activity for long-term debt of Fannie Mae relates to borrowings with an original contractual maturity of greater than one year.

47

**Table 27: Activity in Debt of Fannie Mae**

| | For the Three Months Ended June 30, | | | | For the Six Months Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | (Dollars in millions) | | | | | | | |
| **Issued during the period:** | | | | | | | | |
| Short-term: | | | | | | | | |
| Amount | $ | 54,011 | $ | 140,051 | $ | 99,605 | $ | 228,252 |
| Weighted-average interest rate | | 0.13% | | 0.12% | | 0.12% | | 0.13% |
| Long-term: | | | | | | | | |
| Amount | $ | 65,481 | $ | 29,687 | $ | 124,945 | $ | 81,424 |
| Weighted-average interest rate | | 1.24% | | 2.38% | | 1.34% | | 2.22% |
| Total issued: | | | | | | | | |
| Amount | $ | 119,492 | $ | 169,738 | $ | 224,550 | $ | 309,676 |
| Weighted-average interest rate | | 0.74% | | 0.51% | | 0.80% | | 0.68% |
| Paid off during the period: [1] | | | | | | | | |
| Short-term: | | | | | | | | |
| Amount | $ | 71,812 | $ | 125,171 | $ | 153,318 | $ | 218,202 |
| Weighted-average interest rate | | 0.10% | | 0.22% | | 0.11% | | 0.24% |
| Long-term: | | | | | | | | |
| Amount | $ | 74,925 | $ | 82,721 | $ | 146,235 | $ | 149,578 |
| Weighted-average interest rate | | 2.61% | | 2.82% | | 2.56% | | 2.82% |
| Total paid off: | | | | | | | | |
| Amount | $ | 146,737 | $ | 207,892 | $ | 299,553 | $ | 367,780 |
| Weighted-average interest rate | | 1.38% | | 1.26% | | 1.31% | | 1.29% |

---

[1] Consists of all payments on debt, including regularly scheduled principal payments, payments at maturity, payments resulting from calls and payments for any other repurchases. Calls and repurchases of zero-coupon debt are reported at original face value, which does not equal the amount of actual cash payment.

Overall debt funding activity decreased in the second quarter and first half of 2012 compared with the second quarter and first half of 2011. This decrease was primarily due to a decrease in our short-term debt activity as we redeemed more short-term debt than was issued during the quarter. The decrease in short-term debt activity was partially offset by an increase in long-term debt funding activity in the second quarter and first half of 2012. As interest rates declined in the second quarter and first half of 2012, we issued long-term debt with lower interest rates to replace redemptions of long-term debt with higher interest rates. Our debt funding activity is likely to continue to decline in future periods as the size of our mortgage portfolio decreases.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. For more information on GSE reform, see "Legislative and Regulatory Developments—GSE Reform" in this report and in our 2011 Form 10-K.

In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of our debt funding could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A

48

downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. See our discussion of credit ratings in "Risk Factors" in our 2011 Form 10-K for information about factors that may lead to the U.S. government's long-term debt rating being lowered, and  "Credit Ratings" for further discussion of our dependence on our credit ratings.

Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risks we face relating to (1) the uncertain future of our company; (2) our reliance on the issuance of debt securities to obtain funds for our operations and the relative cost to obtain these funds; and (3) our liquidity contingency plans.

*Outstanding Debt*

Total outstanding debt of Fannie Mae includes short-term and long-term debt, excluding debt of consolidated trusts.

As of June 30, 2012, our outstanding short-term debt, based on its original contractual maturity, as a percentage of our total outstanding debt decreased to  14% from 20% as of December 31, 2011. For information on our outstanding debt maturing within one year, including the current portion of our long-term debt, as a percentage of our total debt, see "Maturity Profile of Outstanding Debt of Fannie Mae." In addition, the weighted-average interest rate on our long-term debt, based on its original contractual maturity, decreased to  2.19% as of June 30, 2012 from 2.42% as of December 31, 2011.

Pursuant to the terms of the senior preferred stock purchase agreement, we are prohibited from issuing debt without the prior consent of Treasury if it would result in our aggregate indebtedness exceeding our outstanding debt limit, which is  120% of the amount of mortgage assets we were allowed to own on December 31 of the immediately preceding calendar year. Our debt limit under the senior preferred stock purchase agreement was reduced to  $874.8 billion in 2012. As of June 30, 2012, our aggregate indebtedness totaled $667.0 billion, which was $207.8 billion below our debt limit. The calculation of our indebtedness for purposes of complying with our debt limit reflects the unpaid principal balance and excludes debt basis adjustments and debt of consolidated trusts. Because of our debt limit, we may be restricted in the amount of debt we issue to fund our operations.

Table 28 displays information as of the dates indicated on our outstanding short-term and long-term debt based on its original contractual terms.

TREASURY-3956

**Table 28: Outstanding Short-Term Borrowings and Long-Term Debt**[1]

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012 | | | December 31, 2011 | | |
| | Maturities | Outstanding | Weighted-Average Interest Rate | Maturities | Outstanding | Weighted-Average Interest Rate |
| | | | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase [2] | — | $        153 | —% | — | $          — | —% |
| Short-term debt: | | | | | | |
| Fixed-rate: | | | | | | |
| Discount notes | — | $    92,424 | 0.14% | — | $  146,301 | 0.13% |
| Foreign exchange discount notes | — | 482 | 1.91 | — | 371 | 1.88 |
| Other [3] | — | — | — | — | 80 | 0.04 |
| Total short-term debt of Fannie Mae [4] | | 92,906 | 0.15 | | 146,752 | 0.13 |
| Debt of consolidated trusts | — | 3,908 | 0.17 | — | 4,973 | 0.09 |
| Total short-term debt | | $    96,814 | 0.15% | | $  151,725 | 0.13% |
| Long-term debt: | | | | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds | 2012 - 2030 | $  267,347 | 2.63% | 2012 - 2030 | $  277,146 | 2.81% |
| Medium-term notes [5] | 2012 - 2022 | 172,877 | 1.40 | 2012 - 2021 | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021 - 2028 | 669 | 5.27 | 2021 - 2028 | 662 | 5.44 |
| Other [6][7] | 2012 - 2040 | 39,848 | 5.27 | 2012 - 2040 | 50,912 | 5.29 |
| Total senior fixed | | 480,741 | 2.41 | | 505,606 | 2.64 |
| Senior floating: | | | | | | |
| Medium-term notes [5] | 2012 - 2019 | 77,026 | 0.31 | 2012 - 2016 | 71,855 | 0.32 |
| Other [6][7] | 2020 - 2037 | 377 | 8.63 | 2020 - 2037 | 420 | 8.01 |
| Total senior floating | | 77,403 | 0.34 | | 72,275 | 0.35 |
| Subordinated fixed-rate: | | | | | | |
| Qualifying subordinated [8] | 2012 - 2014 | 4,894 | 5.08 | 2012 - 2014 | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 3,054 | 9.91 | 2019 | 2,917 | 9.91 |
| Total subordinated fixed-rate | | 7,948 | 6.94 | | 7,811 | 6.88 |
| Secured borrowings [9] | 2021 - 2022 | 391 | 1.87 | — | — | — |
| Total long-term debt of Fannie Mae [10] | | 566,483 | 2.19 | | 585,692 | 2.42 |
| Debt of consolidated trusts [7] | 2012 - 2052 | 2,500,591 | 3.93 | 2012 - 2051 | 2,452,455 | 4.18 |
| Total long-term debt | | $ 3,067,074 | 3.61% | | $ 3,038,147 | 3.84% |
| Outstanding callable debt of Fannie Mae [11] | | $  174,028 | 1.76% | | $  187,937 | 2.17% |

[1]   Outstanding debt amounts and weighted-average interest rates reported in this table include the effect of unamortized discounts, premiums and other cost basis adjustments. Reported amounts include fair value gains and losses associated with debt that we elected to carry at fair value. The unpaid principal balance of outstanding debt of Fannie Mae, which excludes unamortized discounts, premiums and other cost basis adjustments, and debt of consolidated trusts, totaled  $666.6 billion and $741.6 billion as of June 30, 2012 and December 31, 2011, respectively.

[2]   Represents agreements to repurchase securities for a specified price, with repayment generally occurring on the following day.

[3]   Includes foreign exchange discount notes denominated in U.S. dollars.

[4]   Short-term debt of Fannie Mae consists of borrowings with an original contractual maturity of one year or less and, therefore, does not include the current portion of long-term debt. Reported amounts include a net discount and other cost basis adjustments of  $30 million and $53 million as of June 30, 2012 and December 31, 2011, respectively.

50

<sup>(5)</sup> Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

<sup>(6)</sup> Includes long-term debt that is not included in other debt categories.

<sup>(7)</sup> Includes a portion of structured debt instruments that is reported at fair value.

<sup>(8)</sup> Consists of subordinated debt with an interest deferral feature.

<sup>(9)</sup> Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale.

<sup>(10)</sup> Long-term debt of Fannie Mae consists of borrowings with an original contractual maturity of greater than one year. Reported amounts include the current portion of long-term debt that is due within one year, which totaled $137.8 billion and $134.3 billion as of June 30, 2012 and December 31, 2011, respectively. Reported amounts also include unamortized discounts, premiums and other cost basis adjustments of $7.5 billion and $9.2 billion as of June 30, 2012 and December 31, 2011, respectively. The unpaid principal balance of long-term debt of Fannie Mae, which excludes unamortized discounts, premiums, fair value adjustments and other cost basis adjustments and amounts related to debt of consolidated trusts, totaled $573.9 billion and $594.8 billion as of June 30, 2012 and December 31, 2011, respectively.

<sup>(11)</sup> Consists of long-term callable debt of Fannie Mae that can be paid off in whole or in part at our option or the option of the investor at any time on or after a specified date. Includes the unpaid principal balance, and excludes unamortized discounts, premiums and other cost basis adjustments.

*Maturity Profile of Outstanding Debt of Fannie Mae*

Table 29 displays the maturity profile, as of June 30, 2012, of our outstanding debt maturing within one year, by month, including amounts we have announced for early redemption. Our outstanding debt maturing within one year, including the current portion of our long-term debt, decreased as a percentage of our total outstanding debt, excluding debt of consolidated trusts, to 35% as of June 30, 2012, compared with 38% as of December 31, 2011. The weighted-average maturity of our outstanding debt that is maturing within one year was 123 days as of June 30, 2012, compared with 158 days as of December 31, 2011.

**Table 29: Maturity Profile of Outstanding Debt of Fannie Mae Maturing Within One Year<sup>(1)</sup>**



_____

<sup>(1)</sup> Includes unamortized discounts, premiums and other cost basis adjustments of $73 million as of June 30, 2012. Excludes debt of consolidated trusts maturing within one year of $6.5 billion as of June 30, 2012.

Table 30 displays the maturity profile, as of June 30, 2012, of the portion of our long-term debt that matures in more than one year, on a quarterly basis for one year and on an annual basis thereafter, excluding amounts we have announced for early redemption within one year. The weighted-average maturity of our outstanding debt maturing in more than one year was approximately 5 6 months as of June 30, 2012 and approximately 5 9 months as of December 31, 2011.

51

**Table 30: Maturity Profile of Outstanding Debt of Fannie Mae Maturing in More Than One Year**[1]



---

[1] Includes unamortized discounts, premiums and other cost basis adjustments of $7.5 billion as of June 30, 2012. Excludes debt of consolidated trusts of $2.5 trillion as of June 30, 2012.

We intend to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities.

### Cash and Other Investments Portfolio

Table 31 displays information on the composition of our cash and other investments portfolio as of the dates indicated.

**Table 31: Cash and Other Investments Portfolio**

| | As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Cash and cash equivalents | $ 24,728 | $ 17,539 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 24,000 | 46,000 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities [1] | 27,064 | 47,737 |
| Asset-backed securities [2] | 537 | 2,111 |
| Total non-mortgage-related securities | 27,601 | 49,848 |
| Total cash and other investments | $ 76,329 | $ 113,387 |

---

[1] Excludes $7.7 billion and $600 million of U.S. Treasury securities which are a component of cash equivalents as of June 30, 2012 and December 31, 2011, respectively, as these securities had a maturity at the date of acquisition of three months or less.

[2] Includes securities primarily backed by credit cards loans and student loans.

Our cash and other investments portfolio decreased from December 31, 2011 to June 30, 2012. The balance of our cash and other investments portfolio fluctuates based on changes in our cash flows, overall liquidity in the fixed income markets and our liquidity risk management policies and practices. See "Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management—Issuers of Investments Held in our Cash and Other Investments Portfolio" for additional information on the risks associated with the assets in our cash and other investments portfolio.

### Credit Ratings

Our credit ratings from the major credit ratings organizations, as well as the credit ratings of the U.S. government, are primary factors that could affect our ability to access the capital markets and our cost of funds. In addition, our credit ratings

52

are important when we seek to engage in certain long-term transactions, such as derivative transactions. Standard & Poor's Ratings Services ("S&P"), Moody's Investors Service ("Moody's") and Fitch Ratings Limited ("Fitch") have all indicated that, if they were to lower the sovereign credit ratings on the U.S, they would likely lower their ratings on the debt of Fannie Mae and certain other government-related entities. We cannot predict whether one or more of these ratings agencies will lower our debt ratings in the future. See "Risk Factors" in our 2011 Form 10-K for a discussion of the possibility of further downgrades and the risks to our business relating to a decrease in our credit ratings, which could include an increase in our borrowing costs, limits on our ability to issue debt, and additional collateral requirements under our derivatives contracts and other borrowing arrangements.

Table 32 displays the credit ratings issued by the three major credit rating agencies as of August 1, 2012.

**Table 32: Fannie Mae Credit Ratings**

|  | As of August 1, 2012 | | |
|---|---|---|---|
|  | **S&P** | **Moody's** | **Fitch** |
| Long-term senior debt | AA+ | Aaa | AAA |
| Short-term senior debt | A-1+ | P-1 | F1+ |
| Qualifying subordinated debt | A | Aa2 | AA- |
| Preferred stock | C | Ca | C/RR6 |
| Bank financial strength rating | — | E+ | — |
| Outlook | Negative | Negative | Negative |
|  | (for Long Term Senior Debt and Qualifying Subordinated Debt) | (for Long Term Senior Debt and Qualifying Subordinated Debt) | (for AAA rated Long Term Issuer Default Rating) |

### Cash Flows

*Six Months Ended June 30, 2012.*   Cash and cash equivalents increased from December 31, 2011 by $ 7.2 billion to $24.7 billion as of June 30, 2012. Net cash generated from investing activities totaled $ 277.0 billion, resulting primarily from proceeds received from repayments of loans held for investment. Net cash from operating activities totaled $ 24.1 billion. These net cash inflows were partially offset by net cash used in financing activities of $ 293.9 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt.

*Six Months Ended June 30, 2011.* Cash and cash equivalents of $ 14.3 billion as of June 30, 2011 decreased by $ 3.0 billion from December 31, 2010. Net cash generated from investing activities totaled $ 236.2 billion, resulting primarily from proceeds received from repayments of loans held for investment. These net cash inflows were offset by net cash outflows used in operating activities of $ 2.1 billion and net cash used in financing activities of $237.1 billion primarily attributable to a significant amount of debt redemptions in excess of proceeds received from the issuances of debt as well as proceeds received from Treasury under the senior preferred stock purchase agreement.

## Capital Management

### Regulatory Capital

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA and FHFA monitors our capital levels. The deficit of core capital over statutory minimum capital was $145.1 billion as of June 30, 2012 and $148.4 billion as of December 31, 2011.

### Senior Preferred Stock Purchase Agreement

As a result of the covenants under the senior preferred stock purchase agreement, Treasury's ownership of the warrant to purchase up to 79.9% of the total shares of our common stock outstanding and the uncertainty regarding our future, we effectively no longer have access to equity funding except through draws under the senior preferred stock purchase agreement.

Under the senior preferred stock purchase agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. We have received a total of $116.1 billion from Treasury pursuant to the

TREASURY-3960

senior preferred stock purchase agreement as of June 30, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, remains at $117.1 billion.

While we had a positive net worth as of June 30, 2012, in some future periods we expect to have a net worth deficit and therefore will be required to obtain additional funding from Treasury pursuant to the senior preferred stock purchase agreement.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011 and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011 and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011 and 2012.

As of August 8, 2012, the amount of the quarterly commitment fee payable by us to Treasury under the senior preferred stock purchase agreement had not been established; however, Treasury has waived the quarterly commitment fee under the senior preferred stock purchase agreement for each quarter of 2011 and the first, second and third quarters of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that imposing the commitment fee would not generate increased compensation for taxpayers. Treasury stated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set.

We are not permitted to redeem the senior preferred stock prior to the termination of Treasury's funding commitment under the senior preferred stock purchase agreement. Moreover, we are not permitted to pay down the liquidation preference of the outstanding shares of senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down. In addition, if we issue any shares of capital stock for cash while the senior preferred stock is outstanding, the net proceeds of the issuance must be used to pay down the liquidation preference of the senior preferred stock; however, the liquidation preference of each share of senior preferred stock may not be paid down below $1,000 per share prior to the termination of Treasury's funding commitment. Following the termination of Treasury's funding commitment, we may pay down the liquidation preference of all outstanding shares of senior preferred stock at any time, in whole or in part. The limited circumstances under which Treasury's funding commitment will terminate are described in "Business— Conservatorship and Treasury Agreements" in our 2011 Form 10-K.

### *Dividends*

Our second quarter dividend of $2.9 billion was declared by the conservator and paid by us on June 29, 2012. The annualized dividend on the senior preferred stock remains at $11.7 billion based on the 10% dividend rate. The level of dividends on the senior preferred stock will increase in future periods if, as we expect, the conservator requests additional funds on our behalf from Treasury under the senior preferred stock purchase agreement.

## OFF-BALANCE SHEET ARRANGEMENTS

Our maximum potential exposure to credit losses relating to our outstanding and unconsolidated Fannie Mae MBS and other financial guarantees is primarily represented by the unpaid principal balance of the mortgage loans underlying outstanding and unconsolidated Fannie Mae MBS and other financial guarantees of $58.7 billion as of June 30, 2012 and $62.0 billion as of December 31, 2011.

We also provide assistance to housing finance agencies under the temporary credit and liquidity facilities programs in which Treasury has purchased participation interests. For a description of these programs, see "MD&A—Off-Balance Sheet Arrangements—Treasury Housing Finance Agency Initiative" in our 2011 Form 10-K.

**RISK MANAGEMENT**

Our business activities expose us to the following three major categories of financial risk: credit risk, market risk (including interest rate and liquidity risk) and operational risk. We seek to actively monitor and manage these risks by using an established risk management framework. Our risk management framework is intended to provide the basis for the principles that govern our risk management activities. In addition to these financial risks, there is significant uncertainty regarding the future of our company, including how long we will continue to be in existence, which we discuss in more detail in "Legislative and Regulatory Developments—GSE Reform" in this report and in "Risk Factors" in our 2011 Form 10-K. We are also subject to a number of other risks that could adversely impact our business, financial condition, earnings and cash flow, including model, legal and reputational risks that may arise due to a failure to comply with laws, regulations or ethical standards and codes of conduct applicable to our business activities and functions.

In this section we provide an update on our management of our major risk categories. For a more complete discussion of the financial risks we face and how we manage credit risk, market risk and operational risk, see "MD&A—Risk Management" in our 2011 Form 10-K and "Risk Factors" in our 2011 Form 10-K and in this report.

**Credit Risk Management**

We are generally subject to two types of credit risk: mortgage credit risk and institutional counterparty credit risk. Mortgage credit risk is the risk that a borrower will fail to make required mortgage payments. Institutional counterparty credit risk is the risk that our institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances.

*Mortgage Credit Risk Management*

We are exposed to credit risk on our mortgage credit book of business because we either hold mortgage assets, have issued a guaranty in connection with the creation of Fannie Mae MBS backed by mortgage assets or provided other credit enhancements on mortgage assets. While our mortgage credit book of business includes all of our mortgage-related assets, both on- and off-balance sheet, our guaranty book of business excludes non-Fannie Mae mortgage-related securities held in our portfolio for which we do not provide a guaranty. We provide information on the performance of non-Fannie Mae mortgage-related securities held in our portfolio, including the impairment that we have recognized on these securities, in "Consolidated Balance Sheet Analysis—Investments in Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities."

*Mortgage Credit Book of Business*

Table 33 displays the composition of our mortgage credit book of business as of the dates indicated. Our total single-family mortgage credit book of business accounted for 93% of our total mortgage credit book of business as of June 30, 2012 and December 31, 2011.

TREASURY-3962

**Table 33: Composition of Mortgage Credit Book of Business** [1]

| | As of June 30, 2012 | | | As of December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Mortgage loans and Fannie Mae MBS [2] | $ 2,799,298 | $ 180,809 | $ 2,980,107 | $ 2,798,633 | $ 176,898 | $ 2,975,531 |
| Unconsolidated Fannie Mae MBS, held by third parties [3] | 16,544 | 1,598 | 18,142 | 17,910 | 1,702 | 19,612 |
| Other credit guarantees [4] | 24,405 | 16,120 | 40,525 | 25,824 | 16,582 | 42,406 |
| Guaranty book of business | $ 2,840,247 | $ 198,527 | $ 3,038,774 | $ 2,842,367 | $ 195,182 | $ 3,037,549 |
| Agency mortgage-related securities [5] | 13,898 | 32 | 13,930 | 15,522 | 33 | 15,555 |
| Other mortgage-related securities [6] | 40,339 | 29,802 | 70,141 | 43,019 | 31,511 | 74,530 |
| Mortgage credit book of business | $ 2,894,484 | $ 228,361 | $ 3,122,845 | $ 2,900,908 | $ 226,726 | $ 3,127,634 |
| **Guaranty Book of Business Detail:** | | | | | | |
| Conventional Guaranty Book of Business [7] | $ 2,769,416 | $ 196,307 | $ 2,965,723 | $ 2,769,919 | $ 192,797 | $ 2,962,716 |
| Government Guaranty Book of Business [8] | $ 70,831 | $ 2,220 | $ 73,051 | $ 72,448 | $ 2,385 | $ 74,833 |

---

[1]   Based on unpaid principal balance.

[2]   Consists of mortgage loans and Fannie Mae MBS recognized in our condensed consolidated balance sheets. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[3]   Reflects unpaid principal balance of unconsolidated Fannie Mae MBS, held by third-party investors. The principal balance of resecuritized Fannie Mae MBS is included only once in the reported amount.

[4]   Includes single-family and multifamily credit enhancements that we have provided and that are not otherwise reflected in the table.

[5]   Consists of mortgage-related securities issued by Freddie Mac and Ginnie Mae.

[6]   Consists primarily of mortgage revenue bonds, Alt-A and subprime private-label securities and CMBS.

[7]   Refers to mortgage loans and mortgage-related securities that are not guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

[8]   Refers to mortgage loans and mortgage-related securities guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies.

In the following sections, we discuss the mortgage credit risk of the single-family and multifamily loans in our guaranty book of business. The credit statistics reported below, unless otherwise noted, pertain generally to the portion of our guaranty book of business for which we have access to detailed loan-level information, which constituted approximately 99% of each of our single-family conventional guaranty book of business and our multifamily guaranty book of business, excluding defeased loans, as of June 30, 2012 and December 31, 2011. We typically obtain this data from the sellers or servicers of the mortgage loans in our guaranty book of business and receive representations and warranties from them as to the accuracy of the information. While we perform various quality assurance checks by sampling loans to assess compliance with our underwriting and eligibility criteria, we do not independently verify all reported information and we rely on lender representations regarding the accuracy of the characteristics of loans in our guaranty book of business. See "Risk Factors" in our 2011 Form 10-K for a discussion of the risk that we could experience mortgage fraud as a result of this reliance on lender representations.

### Single-Family Mortgage Credit Risk Management

Our strategy in managing single-family mortgage credit risk consists of four primary components: (1) our acquisition and servicing policies along with our underwriting and servicing standards, including the use of credit enhancements; (2) portfolio diversification and monitoring; (3) management of problem loans; and (4) REO management. These strategies may increase our expenses and may not be effective in reducing our credit-related expenses or credit losses. We provide information on our credit-related expenses and credit losses in "Consolidated Results of Operations—Credit-Related Income (Expenses)."

In evaluating our single-family mortgage credit risk, we closely monitor changes in housing and economic conditions and the impact of those changes on the credit risk profile of our single-family mortgage credit book of business. We regularly review and provide updates to our underwriting standards and eligibility guidelines that take into consideration changing market conditions.  The credit risk profile of our single-family mortgage credit book of business is influenced by, among other things,

the credit profile of the borrower, features of the loan, loan product type, the type of property securing the loan and the housing market and general economy. We focus more on loans that we believe pose a higher risk of default, which typically have been loans associated with higher mark-to-market LTV ratios, loans to borrowers with lower FICO credit scores and certain higher risk loan product categories, such as Alt-A loans. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment.

Because we believe we have limited credit exposure on our government loans, the single-family credit statistics we focus on and report in the sections below generally relate to our single-family conventional guaranty book of business, which represents the substantial majority of our total single-family guaranty book of business.

Table 34 displays our single-family conventional business volumes and our single-family conventional guaranty book of business for the periods indicated, based on certain key risk characteristics that we use to evaluate the risk profile and credit quality of our single-family loans.

57

**Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business** [1]

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
|---|---|---|---|---|---|---|
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | | | |
| | **2012** | **2011** | **2012** | **2011** | **June 30, 2012** | **December 31, 2011** |
| **Original LTV ratio:**[5] | | | | | | |
| <= 60% | 24 % | 28 % | 27 % | 29 % | 24 % | 24 % |
| 60.01% to 70% | 14 | 14 | 15 | 15 | 15 | 16 |
| 70.01% to 80% | 34 | 37 | 35 | 37 | 40 | 40 |
| 80.01% to 90%[6] | 9 | 10 | 9 | 9 | 10 | 10 |
| 90.01% to 100%[6] | 9 | 8 | 8 | 7 | 9 | 9 |
| Greater than 100%[6] | 10 | 3 | 6 | 3 | 2 | 1 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| Weighted average | 76 % | 71 % | 73 % | 69 % | 72 % | 71 % |
| Average loan amount | $ 210,493 | $ 194,598 | $ 212,467 | $ 206,313 | $ 156,777 | $ 156,194 |
| **Estimated mark-to-market LTV ratio:**[7] | | | | | | |
| <= 60% | | | | | 27 % | 26 % |
| 60.01% to 70% | | | | | 13 | 12 |
| 70.01% to 80% | | | | | 21 | 18 |
| 80.01% to 90% | | | | | 14 | 16 |
| 90.01% to 100% | | | | | 9 | 10 |
| Greater than 100% | | | | | 16 | 18 |
| Total | | | | | 100 % | 100 % |
| Weighted average | | | | | 77 % | 79 % |
| **Product type:** | | | | | | |
| Fixed-rate:[8] | | | | | | |
| Long-term | 74 % | 70 % | 73 % | 69 % | 72 % | 73 % |
| Intermediate-term | 22 | 22 | 23 | 24 | 16 | 15 |
| Interest-only | * | * | * | * | 1 | 1 |
| Total fixed-rate | 96 | 92 | 96 | 93 | 89 | 89 |
| Adjustable-rate: | | | | | | |
| Interest-only | * | 1 | * | 1 | 3 | 3 |
| Other ARMs | 4 | 7 | 4 | 6 | 8 | 8 |
| Total adjustable-rate | 4 | 8 | 4 | 7 | 11 | 11 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| **Number of property units:** | | | | | | |
| 1 unit | 97 % | 97 % | 98 % | 97 % | 97 % | 97 % |
| 2-4 units | 3 | 3 | 2 | 3 | 3 | 3 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| **Property type:** | | | | | | |
| Single-family homes | 91 % | 90 % | 91 % | 90 % | 91 % | 91 % |
| Condo/Co-op | 9 | 10 | 9 | 10 | 9 | 9 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |

58

| | Percent of Single-Family Conventional Business Volume[2] | | | | Percent of Single-Family Conventional Guaranty Book of Business[3][4] As of | |
| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | | | |
| | 2012 | 2011 | 2012 | 2011 | June 30, 2012 | December 31, 2011 |
|---|---|---|---|---|---|---|
| **Occupancy type:** | | | | | | |
| Primary residence | 89 % | 85 % | 89 % | 88 % | 89 % | 89 % |
| Second/vacation home | 4 | 6 | 4 | 5 | 5 | 5 |
| Investor | 7 | 9 | 7 | 7 | 6 | 6 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| **FICO credit score at origination:** | | | | | | |
| < 620 | 1 % | 1 % | 1 % | * % | 3 % | 3 % |
| 620 to < 660 | 2 | 3 | 2 | 2 | 6 | 7 |
| 660 to < 700 | 8 | 9 | 7 | 8 | 13 | 13 |
| 700 to < 740 | 16 | 18 | 15 | 17 | 20 | 20 |
| >= 740 | 73 | 69 | 75 | 73 | 58 | 57 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| Weighted average | 760 | 756 | 762 | 760 | 740 | 738 |
| **Loan purpose:** | | | | | | |
| Purchase | 22 % | 31 % | 20 % | 23 % | 29 % | 31 % |
| Cash-out refinance | 15 | 16 | 15 | 18 | 26 | 27 |
| Other refinance | 63 | 53 | 65 | 59 | 45 | 42 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| **Geographic concentration:[9]** | | | | | | |
| Midwest | 16 % | 14 % | 16 % | 15 % | 15 % | 15 % |
| Northeast | 18 | 20 | 18 | 20 | 19 | 19 |
| Southeast | 19 | 20 | 19 | 20 | 23 | 24 |
| Southwest | 15 | 16 | 15 | 15 | 16 | 15 |
| West | 32 | 30 | 32 | 30 | 27 | 27 |
| Total | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| **Origination year:** | | | | | | |
| <= 2001 | | | | | 2 % | 2 % |
| 2002 | | | | | 2 | 2 |
| 2003 | | | | | 7 | 9 |
| 2004 | | | | | 5 | 5 |
| 2005 | | | | | 6 | 7 |
| 2006 | | | | | 6 | 7 |
| 2007 | | | | | 8 | 10 |
| 2008 | | | | | 6 | 7 |
| 2009 | | | | | 14 | 17 |
| 2010 | | | | | 16 | 18 |
| 2011 | | | | | 17 | 16 |
| 2012 | | | | | 11 | — |
| Total | | | | | 100 % | 100 % |

———

\* Represents less than 0.5% of single-family conventional business volume or book of business.

(1) We reflect second lien mortgage loans in the original LTV ratio calculation only when we own both the first and second lien mortgage loans or we own only the second lien mortgage loan. Second lien mortgage loans represented less than 0.5% of our single-family conventional guaranty book of business as of June 30, 2012 and December 31, 2011. Second lien mortgage loans held by third parties are not reflected in the original LTV or mark-to-market LTV ratios in this table.

59

(2)   Calculated based on unpaid principal balance of single-family loans for each category at time of acquisition. Single-family business volume refers to both single-family mortgage loans we purchase for our mortgage portfolio and single-family  mortgage loans we guarantee.

(3)   Calculated based on the aggregate unpaid principal balance of single-family loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business as of the end of each period.

(4)   Our single-family conventional guaranty book of business includes jumbo-conforming and high-balance loans that represented  5% of our single-family conventional guaranty book of business as of June 30, 2012 and December 31, 2011. See "Business—Our Charter and Regulation of Our Activities—Charter Act—Loan Standards" and "Risk Management—Credit Risk Management—Single Family Mortgage Credit Risk Management—Credit Profile Summary" in our 2011 Form 10-K for additional information on loan limits.

(5)   The original LTV ratio generally is based on the original unpaid principal balance of the loan divided by the appraised property value reported to us at the time of acquisition of the loan. Excludes loans for which this information is not readily available.

(6)   We purchase loans with original LTV ratios above 80% to fulfill our mission to serve the primary mortgage market and provide liquidity to the housing system. Except as permitted under Refi Plus, our charter generally requires primary mortgage insurance or other credit enhancement for loans that we acquire that have an LTV ratio over 80%.

(7)   The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value. Excludes loans for which this information is not readily available.

(8)   Long-term fixed-rate consists of mortgage loans with maturities greater than 15 years, while intermediate-term fixed-rate has maturities equal to or less than 15 years. Loans with interest-only terms are included in the interest-only category regardless of their maturities.

(9)   Midwest consists of IL, IN, IA, MI, MN, NE, ND, OH, SD and WI. Northeast includes CT, DE, ME, MA, NH, NJ, NY, PA, PR, RI, VT and VI. Southeast consists of AL, DC, FL, GA, KY, MD, MS, NC, SC, TN, VA and WV. Southwest consists of AZ, AR, CO, KS, LA, MO, NM, OK, TX and UT. West consists of AK, CA, GU, HI, ID, MT, NV, OR, WA and WY.

### *Credit Profile Summary*

The single-family loans we purchased or guaranteed in the first half of 2012 have a strong credit profile with a weighted average original LTV ratio of  73%, a weighted average FICO credit score of  762, and a product mix with a significant percentage of fully amortizing fixed-rate mortgage loans.

The credit profile of our future acquisitions will depend on many factors, including our future pricing and eligibility standards and those of mortgage insurers and FHA, the percentage of loan originations representing refinancings, our future objectives, government policy, market and competitive conditions, and the volume and characteristics of loans we acquire under Refi Plus and HARP. We expect the ultimate performance of all our loans will be affected by borrower behavior, public policy, and macroeconomic trends, including unemployment, the economy, and home prices.

As a result of low mortgage rates in recent periods, the percentage of acquisitions that are refinanced loans remains elevated. Refinanced loans include acquisitions under our Refi Plus initiative. Under our Refi Plus initiative, which offers expanded refinance opportunities for eligible Fannie Mae borrowers and includes but is not limited to HARP, we allow our borrowers who have mortgage loans with current LTV ratios above 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Approximately  23% of our total single-family conventional business volume for the first half of 2012 consisted of loans with LTV ratios greater than 80% at the time of acquisition, compared with  19% for the first half of 2011. Refi Plus constituted approximately 24% of our total single-family acquisitions in the first half of 2012 and all of 2011. HARP loans constituted approximately  13% of our total single-family acquisitions in the first half of 2012, compared with approximately  9% of total single-family acquisitions in all of 2011.

Loans we acquire under Refi Plus and HARP represent refinancings of loans that are already in our guaranty book of business. The credit risk associated with loans we acquire under Refi Plus and HARP essentially replaces the credit risk that we already held prior to the refinancing. Loans we acquire under Refi Plus and HARP may not perform as well as the other loans we have acquired since the beginning of 2009. However, we expect these loans will perform better than the loans they replace because Refi Plus loans should either reduce the borrowers' monthly payments or provide more stable terms than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate). Due to the increase in the volume of HARP loans with higher LTV ratios, the weighted average LTV ratio at origination for our acquisitions in the first half 2012 was higher than for our acquisitions in the first half of 2011. The average original LTV ratio of single-family loans we acquired in the first half of 2012, excluding HARP loans, was  68%, compared with 105% for HARP loans. In addition, as a result of recently implemented changes to HARP, we expect that if interest rates remain low we will continue to acquire a high volume of refinancings under HARP. In particular, we expect to acquire many refinancings with LTV ratios greater than 125%, because borrowers were unable to refinance loans with LTV ratios greater than 125% in large numbers until changes to HARP were fully implemented in the second quarter of 2012. Approximately 4% of our total single-family conventional business volume for the second quarter of 2012 consisted of refinanced loans with LTV ratios greater than 125% at the time of acquisition.

60

We expect the elevated volume of HARP refinancings will decrease when interest rates rise sufficiently or when there is no longer a large population of borrowers with loans that have high LTV ratios who would benefit from refinancing.

Table 35 displays the serious delinquency rates and current mark-to-market LTV ratios as of June 30, 2012 of single-family loans we acquired under HARP and Refi Plus, compared with the other single-family loans we acquired since the beginning of 2009.

**Table 35: Selected Credit Characteristics of Single-Family Conventional Loans Acquired under HARP and Refi Plus**

| | As of June 30, 2012 | | |
|---|---|---|---|
| | Percentage of New Book | Current Mark-to-Market LTV Ratio > 100% | Serious Delinquency Rate |
| HARP[1] | 10 % | 34% | 1.06% |
| Other Refi Plus[2] | 13 | 4 | 0.34 |
| Total Refi Plus | 23 | 16 | 0.60 |
| Non-Refi Plus[3] | 77 | 1 | 0.25 |
| Total new book of business[4] | 100 % | 5% | 0.33% |

---

[1] HARP is targeted at borrowers who have demonstrated an acceptable payment history on their mortgage loans but may have been unable to refinance due to a decline in home prices or the unavailability of mortgage insurance. HARP loans, which have LTV ratios at origination in excess of 80%, must be secured by the borrower's primary residence.

[2] Other Refi Plus includes loans with LTV ratios at origination greater than 80% that do not meet the criteria for HARP because they are not secured by the borrower's primary residence, as well as loans that have LTV ratios at origination of less than 80%.

[3] Includes primarily other refinancings and home purchase mortgages.

[4] Refers to single-family mortgage loans we have acquired since the beginning of 2009.

In addition to the increase in refinancings under Refi Plus and HARP, our acquisitions of home purchase mortgages with LTV ratios greater than 80% increased in the first half of 2012 compared with the first half of 2011 because: (1) most mortgage insurance companies lowered their premiums in 2011 for loans with higher credit scores; and (2) in April 2011, FHA implemented a price increase in its annual mortgage insurance premium. Both price changes improved the economics of obtaining private mortgage insurance as compared to purchasing FHA insurance and drove an increase in our market share for these loans.

The prolonged and severe decline in home prices over the past several years has resulted in the overall estimated weighted average mark-to-market LTV ratio of our single-family conventional guaranty book of business remaining high at 77% as of June 30, 2012, and 79% as of December 31, 2011. The portion of our single-family conventional guaranty book of business with an estimated mark-to-market LTV ratio greater than 100% was 16% as of June 30, 2012, and 18% as of December 31, 2011. If home prices decline further, more loans may have mark-to-market LTV ratios greater than 100%, which increases the risk of delinquency and default.

_Alt-A and Subprime Loans_

We classify certain loans as subprime or Alt-A so that we can discuss our exposure to subprime and Alt-A loans in this Form 10-Q and elsewhere. However, there is no universally accepted definition of subprime or Alt-A loans. Our single-family conventional guaranty book of business includes loans with some features that are similar to Alt-A loans or subprime loans that we have not classified as Alt-A or subprime because they do not meet our classification criteria.

We do not rely solely on our classifications of loans as Alt-A or subprime to evaluate the credit risk exposure relating to these loans in our single-family conventional guaranty book of business. For more information about the credit risk characteristics of loans in our single-family guaranty book of business, please see "Note 3, Mortgage Loans," and "Note 6, Financial Guarantees."

Our exposure to Alt-A and subprime loans included in our single-family conventional guaranty book of business, based on the classification criteria described in this section, does not include (1) our investments in private-label mortgage-related securities backed by Alt-A and subprime loans or (2) resecuritizations, or wraps, of private-label mortgage-related securities backed by Alt-A mortgage loans that we have guaranteed. See "Consolidated Balance Sheet Analysis —Investments in

61

Mortgage-Related Securities—Investments in Private-Label Mortgage-Related Securities" for a discussion of our exposure to private-label mortgage-related securities backed by Alt-A and subprime loans. As a result of our decision to discontinue the purchase of newly originated Alt-A loans, except for those that represent the refinancing of an existing Fannie Mae loan, we expect our acquisitions of Alt-A mortgage loans to continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A to continue to decrease over time. We are also not currently acquiring newly originated subprime loans, although we are acquiring refinancings of existing Fannie Mae subprime loans in connection with our Refi Plus initiative. Unlike the loans they replace, these refinancings are not included in our reported subprime loans because they do not meet our classification criteria for subprime loans.

We have classified a mortgage as Alt-A if and only if the lender that delivered the loan to us classified the loan as Alt-A, based on documentation or other features. We have classified a mortgage loan as subprime if and only if the loan was originated by a lender specializing in subprime business or by a subprime division of a large lender; however, we exclude loans originated by these lenders from the subprime classification if we acquired the loans in accordance with our standard underwriting criteria, which typically require compliance by the seller with our Selling Guide (including standard representations and warranties) and/or evaluation of the loans through our Desktop Underwriter system. The unpaid principal balance of Alt-A loans included in our single-family conventional guaranty book of business of $169.0 billion as of June 30, 2012, represented approximately 6.1% of our single-family conventional guaranty book of business. The unpaid principal balance of subprime loans included in our single-family conventional guaranty book of business of  $5.4 billion as of June 30, 2012, represented approximately 0.2% of our single-family conventional guaranty book of business.

*Problem Loan Management*

Our problem loan management strategies are primarily focused on reducing defaults to avoid losses that would otherwise occur and pursuing foreclosure alternatives to attempt to minimize the severity of the losses we incur. If a borrower does not make required payments, or is in jeopardy of not making payments, we work with the servicers of our loans to offer workout solutions to minimize the likelihood of foreclosure as well as the severity of loss. Our loan workouts reflect our various types of home retention solutions, including loan modifications, repayment plans and forbearances, and foreclosure alternatives, including short sales and deeds-in-lieu of foreclosure. When appropriate, we seek to move to foreclosure expeditiously.

Loan modifications involve changes to the original mortgage terms such as product type, interest rate, amortization term, maturity date and/or unpaid principal balance. Additionally, we currently offer up to twelve months of forbearance for those homeowners who are unemployed as an additional tool to help homeowners avoid foreclosure.

Foreclosure alternatives may be more appropriate if the borrower has experienced a significant adverse change in financial condition due to events such as unemployment or reduced income, divorce, or unexpected issues like medical bills and is therefore no longer able to make the required mortgage payments. Since the cost of foreclosure can be significant to both the borrower and Fannie Mae, to avoid foreclosure and satisfy the first-lien mortgage obligation, our servicers work with a borrower to sell their home prior to foreclosure in a short sale or accept a deed-in-lieu of foreclosure whereby the borrower voluntarily signs over the title to their property to the servicer. These alternatives are designed to reduce our credit losses while helping borrowers avoid having to go through a foreclosure.

In the following section, we present statistics on our problem loans, describe specific efforts undertaken to manage these loans and prevent foreclosures and provide metrics regarding the performance of our loan workout activities. Unless otherwise noted, single-family delinquency data is calculated based on number of loans. We include single-family conventional loans that we own and that back Fannie Mae MBS in the calculation of the single-family delinquency rate. Seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Percentage of book outstanding calculations are based on the unpaid principal balance of loans for each category divided by the unpaid principal balance of our total single-family guaranty book of business for which we have detailed loan-level information.

*Problem Loan Statistics*

The following table displays the delinquency status of loans in our single-family conventional guaranty book of business (based on number of loans) as of the dates indicated.

62

**Table 36: Delinquency Status of Single-Family Conventional Loans**

| | As of | | |
|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | June 30, 2011 |
| Delinquency status: | | | |
| 30 to 59 days delinquent | 1.94% | 2.17% | 2.13% |
| 60 to 89 days delinquent | 0.62 | 0.74 | 0.72 |
| Seriously delinquent | 3.53 | 3.91 | 4.08 |
| Percentage of seriously delinquent loans that have been delinquent for more than 180 days | 75% | 70% | 73% |

Our single-family serious delinquency rate has decreased each quarter since the first quarter of 2010. The decrease in our serious delinquency rate is primarily the result of home retention solutions, foreclosure alternatives and completed foreclosures, as well as our acquisition of loans with stronger credit profiles since the beginning of 2009, as these loans are now 59% of our single-family guaranty book of business, resulting in a smaller percentage of our loans becoming seriously delinquent.

Although our single-family serious delinquency rate has decreased significantly since the first quarter of 2010, our serious delinquency rate and the period of time that loans remain seriously delinquent have been negatively affected in recent periods by the increase in the average number of days it is taking to complete a foreclosure. Continuing issues in the servicer foreclosure process and changing legislative, regulatory and judicial requirements have lengthened the time it takes to foreclose on a mortgage loan in many states. In addition, servicers and states are dealing with the backlog of foreclosures resulting from these delays and from the elevated level of foreclosures resulting from the housing market downturn. Longer foreclosure timelines result in these loans remaining in our book of business for a longer time, which has caused our serious delinquency rate to decrease more slowly in the last year than it would have if the pace of foreclosures had been faster. We believe the changes in the foreclosure environment will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses (income). We expect serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process and the volume of loan modifications. We expect the number of our single-family loans that are seriously delinquent to remain well above pre-2008 levels for years.

Table 37 displays a comparison, by geographic region and by loans with and without credit enhancement, of the serious delinquency rates as of the dates indicated for single-family conventional loans in our single-family guaranty book of business. Serious delinquency rates vary by geographic region due to many factors including regional home prices, unemployment, economic conditions and state foreclosure timelines.

**Table 37: Single-Family Serious Delinquency Rates**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | | June 30, 2011 | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate |
| Single-family conventional delinquency rates by geographic region:[1] | | | | | | |
| Midwest | 15 % | 3.20% | 15 % | 3.73% | 15 % | 3.89% |
| Northeast | 19 | 4.29 | 19 | 4.43 | 19 | 4.31 |
| Southeast | 23 | 5.14 | 24 | 5.68 | 24 | 5.92 |
| Southwest | 16 | 1.97 | 15 | 2.30 | 15 | 2.43 |
| West | 27 | 2.61 | 27 | 2.87 | 27 | 3.25 |
| Total single-family conventional loans | 100 % | 3.53% | 100 % | 3.91% | 100 % | 4.08% |
| Single-family conventional loans: | | | | | | |
| Credit enhanced | 14 % | 7.88% | 14 % | 9.10% | 14 % | 9.72% |
| Non-credit enhanced | 86 | 2.86 | 86 | 3.07 | 86 | 3.14 |
| Total single-family conventional loans | 100 % | 3.53% | 100 % | 3.91% | 100 % | 4.08% |

63

(1)   See footnote 9 to "Table 34:  Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

While loans across our single-family guaranty book of business have been affected by the weak market conditions, loans in certain states, certain higher-risk loan categories, such as Alt-A loans and loans with higher mark-to-market LTVs, and our 2005 through 2008 loan vintages continue to exhibit higher than average delinquency rates and/or account for a disproportionate share of our credit losses. California, Florida, Arizona, Nevada and some states in the Midwest have experienced more significant declines in home prices coupled with unemployment rates that remain high.

Table 38 displays the serious delinquency rates and other financial information for our single-family conventional loans with some of these higher-risk characteristics as of the dates indicated.  The reported categories are not mutually exclusive.

**Table 38: Single-Family Conventional Serious Delinquency Rate Concentration Analysis**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **As of** | | | | | | | | | | |
| | **June 30, 2012** | | | | **December 31, 2011** | | | | **June 30, 2011** | | |
| | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio (1) | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio (1) | Unpaid Principal Balance | Percentage of Book Outstanding | Serious Delinquency Rate | Estimated Mark-to-Market LTV Ratio (1) |
| | | | | **(Dollars in millions)** | | | | | | | |
| States: | | | | | | | | | | | | |
| Arizona | $ 65,400 | 3% | 2.82% | %% | $ 66,875 | 2% | 3.65% | 109% | $ 68,634 | 2% | 4.19% | 109% |
| California | 523,381 | 19 | 2.07 | 77 | 516,608 | 19 | 2.46 | 81 | 516,760 | 19 | 2.94 | 78 |
| Florida | 169,684 | 6 | 11.00 | 101 | 175,344 | 6 | 11.80 | 108 | 180,681 | 6 | 12.19 | 107 |
| Nevada | 27,803 | 1 | 7.15 | 131 | 28,766 | 1 | 7.42 | 138 | 29,763 | 1 | 7.88 | 134 |
| Select Midwest states (2) | 280,671 | 10 | 3.83 | 82 | 284,060 | 10 | 4.39 | 84 | 290,612 | 10 | 4.54 | 82 |
| All other states | 1,694,193 | 61 | 2.93 | 72 | 1,689,846 | 62 | 3.18 | 73 | 1,707,490 | 62 | 3.24 | 72 |
| Product type: | | | | | | | | | | | | |
| Alt-A | 169,001 | 6 | 11.83 | 99 | 182,236 | 7 | 12.43 | 101 | 195,284 | 7 | 13.04 | 100 |
| Subprime | 5,395 | * | 21.02 | 109 | 5,791 | * | 23.18 | 111 | 6,152 | * | 25.86 | 109 |
| Vintages: | | | | | | | | | | | | |
| 2005 | 165,850 | 6 | 7.34 | 93 | 190,521 | 7 | 7.27 | 95 | 212,417 | 8 | 7.06 | 93 |
| 2006 | 163,410 | 6 | 11.66 | 109 | 186,835 | 7 | 11.81 | 111 | 207,140 | 7 | 11.90 | 109 |
| 2007 | 233,666 | 8 | 12.38 | 110 | 269,012 | 10 | 12.62 | 112 | 298,856 | 11 | 12.75 | 109 |
| 2008 | 158,277 | 6 | 5.98 | 91 | 192,713 | 7 | 5.64 | 92 | 224,527 | 8 | 5.17 | 88 |
| All other vintages | 2,039,929 | 74 | 1.44 | 68 | 1,922,418 | 69 | 1.59 | 69 | 1,851,000 | 66 | 1.59 | 66 |
| Estimated mark-to-market LTV ratio: | | | | | | | | | | | | |
| Greater than 100%(1) | 433,906 | 16 | 13.44 | 130 | 493,762 | 18 | 13.76 | 131 | 472,549 | 17 | 15.13 | 132 |
| Select combined risk characteristics: | | | | | | | | | | | | |
| Original LTV ratio > 90% and FICO score < 620 | 18,631 | 1 | 15.83 | 113 | 18,992 | 1 | 18.67 | 115 | 20,063 | 1 | 19.36 | 113 |

\*   Percentage is less than 0.5%.

(1)   Second lien mortgage loans held by third parties are not included in the calculation of the estimated mark-to-market LTV ratios.

(2)   Consists of Illinois, Indiana, Michigan and Ohio.

*Loan Workout Metrics*

Table 39 displays statistics on our single-family loan workouts that were completed, by type, for the periods indicated. These statistics include loan modifications but do not include trial modifications or repayment and forbearance plans that have been initiated but not completed.

64

**Table 39: Statistics on Single-Family Loan Workouts**

| | For the Six Months Ended June 30, | | | |
| | 2012 | | 2011 | |
| | Unpaid Principal Balance | Number of Loans | Unpaid Principal Balance | Number of Loans |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Home retention strategies: | | | | |
| Modifications | $ 15,485 | 82,003 | $ 20,909 | 101,379 |
| Repayment plans and forbearances completed [1] | 2,110 | 14,758 | 2,598 | 18,599 |
| | 17,595 | 96,761 | 23,507 | 119,978 |
| Foreclosure alternatives: | | | | |
| Short sales | 8,366 | 38,717 | 7,587 | 34,047 |
| Deeds-in-lieu of foreclosure | 1,282 | 7,509 | 768 | 4,249 |
| | 9,648 | 46,226 | 8,355 | 38,296 |
| Total loan workouts | $ 27,243 | 142,987 | $ 31,862 | 158,274 |
| Loan workouts as a percentage of single-family guaranty book of business [2] | 1.92 % | 1.62 % | 2.22 % | 1.77 % |

[1]  Repayment plans reflect only those plans associated with loans that were 60 days or more delinquent. Forbearances reflect loans that were 90 days or more delinquent.

[2]  Calculated based on annualized loan workouts during the period as a percentage of our single-family guaranty book of business as of the end of the period.

The volume of home retention solutions completed in the first half of 2012 decreased compared with the first half of 2011, primarily due to a decline in the number of delinquent loans in the first half of 2012, compared with the first half of 2011.

During the first half of 2012, we initiated approximately 89,100 trial modifications, including Home Affordable Modification Program ("HAMP") and non-HAMP, compared with approximately 104,000 trial modifications during the first half of 2011. We also initiated other types of workouts, such as repayment plans and forbearances. It is difficult to predict how many of these trial modifications and initiated plans will be completed.

HAMP guidance directs servicers either to cancel or to convert trial modifications after three or four monthly payments, depending on the borrower's circumstances. As of June 30, 2012, 55% of our HAMP trial modifications had been converted to permanent HAMP modifications since the inception of the program. The conversion rate for HAMP modifications since June 1, 2010, when servicers were required to perform a full verification of a borrower's eligibility prior to offering a HAMP trial modification, was 86% as of June 30, 2012. The average length of a trial period for HAMP modifications initiated after June 1, 2010 was four months.

In addition to our home retention solutions, we continue to focus on alternatives to foreclosure for borrowers who are unable to retain their homes. The number of foreclosure alternatives we agreed to during the first half of 2012 remained high as these are favorable solutions for a large number of borrowers. We expect the volume of our home retention solutions and foreclosure alternatives to remain high throughout the remainder of 2012.

We continue to work with our servicers to implement our home retention and foreclosure prevention initiatives. Our approach to workouts continues to focus on the large number of borrowers facing financial hardships. Accordingly, the vast majority of loan modifications we have completed since 2009 have been concentrated on deferring or lowering the borrowers' monthly mortgage payments to allow borrowers to work through their hardships.

Table 40 displays the percentage of our loan modifications completed during the first half of 2011, 2010 and the second half of 2009 that were current or paid off one year after modification, as well as the percentage of our loan modifications completed during the first half of 2010 and the second half of 2009 that were current or paid off two years after modification.

**Table 40:  Percentage of Loan Modifications That Were Current or Paid Off at One and Two Years Post-Modification[1]**

| | 2011 | | 2010 | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|
| | Q2 | Q1 | Q4 | Q3 | Q2 | Q1 | Q4 | Q3 |
| **One Year Post-Modification** | | | | | | | | |
| HAMP Modifications | 78% | 77% | 74% | 74% | 74% | 76% | 73% | 71% |
| Non-HAMP Modifications | 69 | 69 | 67 | 67 | 65 | 55 | 50 | 39 |
| Total | 75 | 74 | 69 | 70 | 70 | 65 | 58 | 42 |
| **Two Years Post-Modification** | | | | | | | | |
| HAMP Modifications | | | | | 68% | 70% | 67% | 64% |
| Non-HAMP Modifications | | | | | 61 | 52 | 48 | 37 |
| Total | | | | | 65 | 60 | 55 | 39 |

---

[1]   Excludes loans that were classified as subprime ARMs that were modified into fixed rate mortgages. Modifications included permanent modifications, but do not reflect loans currently in trial modifications.

We began changing the structure of our non-HAMP modifications in 2010 to lower borrowers' monthly mortgage payments to a greater extent, which improved the performance of our non-HAMP modifications overall. In addition, because post-modification performance was greater for our HAMP modifications than for our non-HAMP modifications, we began in September 2010 to include trial periods for our non-HAMP modifications.

There is significant uncertainty regarding the ultimate long term success of our current modification efforts. We believe the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices. Modifications, even those with reduced monthly payments, may also not be sufficient to help borrowers with second liens and other significant non-mortgage debt obligations.   FHFA, other agencies of the U.S. government or Congress may ask us to undertake new initiatives to support the housing and mortgage markets should our current modification efforts ultimately not perform in a manner that results in the stabilization of these markets. See "Risk Factors" in our 2011 Form 10-K for a discussion of efforts we may be required or asked to undertake and their potential effect on us.

*REO Management*

Foreclosure and REO activity affect the amount of credit losses we realize in a given period.  Table 41 displays our foreclosure activity, by region, for the periods indicated. Regional REO acquisition and charge-off trends generally follow a pattern that is similar to, but lags, that of regional delinquency trends.

**Table 41: Single-Family Foreclosed Properties**

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| Single-family foreclosed properties (number of properties): | | |
| Beginning of period inventory of single-family foreclosed properties (REO) [1] | 118,528 | 162,489 |
| Acquisitions by geographic area: [2] | | |
| Midwest | 27,323 | 21,769 |
| Northeast | 6,113 | 4,786 |
| Southeast | 30,138 | 23,549 |
| Southwest | 15,329 | 26,950 |
| West | 12,580 | 30,192 |
| Total properties acquired through foreclosure [1] | 91,483 | 107,246 |
| Dispositions of REO | (100,745) | (134,016) |
| End of period inventory of single-family foreclosed properties (REO) [1] | 109,266 | 135,719 |
| Carrying value of single-family foreclosed properties (dollars in millions) [3] | $ 9,421 | $ 12,480 |
| Single-family foreclosure rate [4] | 1.04 % | 1.20 % |

66

---

(1) Includes held for use properties, which are reported in our condensed consolidated balance sheets as a component of "Other assets" and acquisitions through deeds-in-lieu of foreclosure.

(2) See footnote 9 to "Table 34: Risk Characteristics of Single-Family Conventional Business Volume and Guaranty Book of Business" for states included in each geographic region.

(3) Excludes foreclosed property claims receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

(4) Estimated based on the annualized total number of properties acquired through foreclosure or deeds-in-lieu of foreclosure as a percentage of the total number of loans in our single-family guaranty book of business as of the end of each respective period.

The ongoing weak economy, as well as high unemployment rates, continues to result in a high level of mortgage loans that transition from delinquent to REO status, either through foreclosure or deed-in-lieu of foreclosure. Our foreclosure rates remain high; however, foreclosures continue to proceed at a slow pace caused by continuing foreclosure process issues encountered by our servicers and changing legislative, regulatory and judicial requirements. The delay in foreclosures, as well as a net increase in the number of dispositions over acquisitions of REO properties, has resulted in a decrease in the inventory of foreclosed properties since December 31, 2010.

We continue to manage our REO inventory to minimize costs and maximize sales proceeds. However, as we are unable to market and sell a higher portion of our inventory, the pace at which we can dispose of our properties slows, resulting in higher foreclosed property expenses related to costs associated with ensuring that the property is vacant and costs of maintaining the property.

Table 42 displays the current status of our single-family foreclosed property inventory, including the percentage of our inventory that we are unable to market, as of the dates indicated.

**Table 42: Single-Family Foreclosed Property Status**

| | Percent of Single-Family Foreclosed Properties As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| Available-for-sale | 23 % | 28 % |
| Offer accepted(1) | 19 | 17 |
| Appraisal stage(2) | 11 | 8 |
| Unable to market: | | |
|    Redemption status(3) | 14 | 12 |
|    Occupied status(4) | 13 | 15 |
|    Rental property(5) | 8 | 7 |
|    Properties being repaired | 5 | 6 |
|    Other | 7 | 7 |
| Total unable to market | 47 | 47 |
| Total | 100 % | 100 % |

---

(1) Properties for which an offer has been accepted, but the property has not yet been sold.

(2) Properties that are pending appraisals and being prepared to be listed for sale.

(3) Properties that are within the period during which state laws allows the former mortgagor and second lien holders to redeem the property.

(4) Properties that are still occupied, and for which the eviction process is not yet complete.

(5) Properties with a tenant living in the home under our Tenant in Place or Deed for Lease programs.

67

In February 2012, FHFA announced the pilot of an REO initiative that solicited bids from qualified investors to purchase approximately 2,500 foreclosed properties from us with the requirement to rent the purchased properties for a specified number of years. The pilot involves the sale of pools of foreclosed homes including both vacant properties and occupied rental properties. The first pilot transaction involves the sale of pools of properties located in geographically concentrated locations across the United States. The winning bidders have been chosen and transactions are expected to close in the third quarter of 2012. We do not yet know whether this initiative will have a material impact on our future REO sales and REO inventory levels.

### Multifamily Mortgage Credit Risk Management

The credit risk profile of our multifamily mortgage credit book of business is influenced by the structure of the financing, the type and location of the property, the condition and value of the property, the financial strength of the borrower and lender, market and sub-market trends and growth, and the current and anticipated cash flows from the property. These and other factors affect both the amount of expected credit loss on a given loan and the sensitivity of that loss to changes in the economic environment. We provide information on our credit-related expenses (income) and credit losses in "Business Segment Results —Multifamily Business Results."

#### Multifamily Acquisition Policy and Underwriting Standards

Our Multifamily business, together with our Enterprise Risk Management division, which provides independent risk oversight of the Multifamily business, is responsible for pricing and managing the credit risk on multifamily mortgage loans we purchase and on Fannie Mae MBS backed by multifamily loans (whether held in our portfolio or held by third parties). Our primary multifamily delivery channel is the Delegated Underwriting and Servicing, or DUS ®, program, which is comprised of multiple lenders that span the spectrum from large financial institutions to smaller independent multifamily lenders. Multifamily loans that we purchase or that back Fannie Mae MBS are either underwritten by a Fannie Mae-approved lender or subject to our underwriting review prior to closing, depending on the product type and/or loan size. Loans delivered to us by DUS lenders and their affiliates represented  87% of our multifamily guaranty book of business as of  June 30, 2012 and 86% as of December 31, 2011.

We use various types of credit enhancement arrangements for our multifamily loans, including lender risk-sharing, lender repurchase agreements, pool insurance, subordinated participations in mortgage loans or structured pools, cash and letter of credit collateral agreements, and cross-collateralization/cross-default provisions. The most prevalent form of credit enhancement on multifamily loans is lender risk-sharing. Lenders in the DUS program typically share in loan-level credit losses in one of two ways: (1) they bear losses up to the first 5% of the unpaid principal balance of the loan and share in remaining losses up to a prescribed limit; or (2) they share up to one-third of the credit losses on an equal basis with us. Non-DUS lenders typically share or absorb credit losses based on a negotiated percentage of the loan or the pool balance.

Table 43 displays the percentage of the unpaid principal balance of loans in our multifamily guaranty book of business with lender risk-sharing and with no recourse to the lender as of the dates indicated.

### Table 43: Multifamily Lender Risk-Sharing

|  | As of | |
|---|---|---|
|  | **June 30, 2012** | **December 31, 2011** |
| Lender risk-sharing |  |  |
| DUS | 70% | 68% |
| Non-DUS negotiated | 10 | 11 |
| No recourse to the lender | 20 | 21 |

At the time of our purchase or guarantee of multifamily mortgage loans, we and our lenders rely significantly on sound underwriting standards, which often include third-party appraisals and cash flow analysis. Our standards for multifamily loans specify maximum original LTV and minimum original debt service coverage ratio ("DSCR") values that vary based on loan characteristics. Our experience has been that original LTV and DSCR values have been reliable indicators of future credit performance.

68

Table 44 displays original LTV and DSCR metrics for our multifamily guaranty book of business as of the dates indicated.

**Table 44: Multifamily Guaranty Book of Business Key Risk Characteristics**

| | As of | | |
|---|---|---|---|
| | **June 30, 2012** | **December 31, 2011** | **June 30, 2011** |
| Weighted average original LTV | 66% | 66% | 66% |
| Original LTV greater than 80% | 4 | 5 | 5 |
| Weighted average original DSCR | 1.59 | 1.57 | 1.56 |
| Original DSCR less than or equal to 1.10 | 8 | 8 | 9 |

*Multifamily Portfolio Diversification and Monitoring*

Diversification within our multifamily mortgage credit book of business by geographic concentration, term-to-maturity, interest rate structure, borrower concentration, and credit enhancement coverage is an important factor that influences credit performance and helps reduce our credit risk.

We and our lenders monitor the performance and risk concentrations of our multifamily loans and the underlying properties on an ongoing basis throughout the life of the loan; at the loan, property, and portfolio level. We closely monitor loans with an estimated current DSCR below 1.0, as that is an indicator of heightened default risk. The percentage of loans in our multifamily guaranty book of business with a current DSCR less than 1.0 was approximately 6% as of June 30, 2012 and 7% as of December 31, 2011.

*Problem Loan Management and Foreclosure Prevention*

The number of multifamily loans at risk of becoming seriously delinquent has continued to decrease in the first half of 2012, as early-stage delinquencies have decreased. Since delinquency rates are a lagging indicator, we expect to continue to incur additional credit losses. We periodically refine our underwriting standards in response to market conditions and implement proactive portfolio management and monitoring which are each designed to keep credit losses to a low level relative to our multifamily guaranty book of business.

*Problem Loan Statistics*

We classify multifamily loans as seriously delinquent when payment is 60 days or more past due. We include the unpaid principal balance of multifamily loans that we own or that back Fannie Mae MBS and any housing bonds for which we provide credit enhancement in the calculation of the multifamily serious delinquency rate.

Table 45 displays a comparison of our multifamily serious delinquency rates for loans acquired through DUS lenders versus loans acquired through non-DUS lenders and the percentage of total multifamily credit losses they represent.

**Table 45: Multifamily Concentration Analysis**

| | As of | | | | | | Percentage of Multifamily Credit Losses For the Six Months Ended June 30, | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | | June 30, 2011 | | | |
| | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | Percentage of Book Outstanding | Serious Delinquency Rate | 2012[1] | 2011 |
| DUS small balance loans [2] | 8 % | 0.34 % | 8 % | 0.45 % | 8 % | 0.50 % | 8 % | 6 % |
| DUS non small balance loans [3] | 74 | 0.18 | 72 | 0.51 | 71 | 0.31 | 85 | 76 |
| Non-DUS small balance loans [2] | 8 | 1.07 | 9 | 1.38 | 9 | 1.36 | 10 | 12 |
| Non-DUS non small balance loans [3] | 10 | 0.44 | 11 | 0.57 | 12 | 0.65 | (3) | 6 |
| Total multifamily loans | 100 % | 0.29 | 100 % | 0.59 | 100 % | 0.46 | 100 % | 100 % |

69

---

(1)   The percentage of credit losses for non-DUS non-small balance loans is negative for the six months ended June 30, 2012 because recoveries of previously charged-off amounts exceeded the amount that we charged off during the period.

(2)   Loans with original unpaid principal balances of up to $3 million as well as loans in high cost markets with original unpaid principal balances up to $5 million.

(3)   Loans with original unpaid principal balances greater than $3 million as well as loans in high cost markets with original unpaid principal balances greater than $5 million.

The multifamily serious delinquency rate decreased as of  June 30, 2012 compared with December 31, 2011 as national multifamily market fundamentals continued to improve.  The DUS loans in our guaranty book of business have lower delinquency rates when compared with the non-DUS loans in our guaranty book primarily due to the DUS model, which has several features that more closely align our interests with those of the lenders. Small balance non-DUS loans continue to represent a disproportionately large share of delinquencies, but they are generally covered by loss sharing arrangements that limit the credit losses we incur.

Multifamily loans with an original balance of up to $3 million nationwide or $5 million in high cost markets, which we refer to as small balance loans, acquired through non-DUS lenders continue to exhibit higher delinquencies than small balance loans acquired through DUS lenders. These small balance non-DUS loans account for 29% of our multifamily serious delinquencies and  8% of our multifamily guaranty book of business as of June 30, 2012 compared with 20% of our multifamily serious delinquencies and  9% of our multifamily guaranty book of business as of  December 31, 2011. These small balance non-DUS loan acquisitions were most common in 2007 and 2008 but have been less than  2% of the unpaid principal balance of our total multifamily acquisitions since 2008. Although our 2007 and early 2008 acquisitions were underwritten to our then-current credit standards and required borrower cash equity, they were acquired near the peak of multifamily housing values. During the second half of 2008, our underwriting standards were adjusted to reflect the evolving market trends at that time.

In addition, Nevada and Ohio have a disproportionately high share of seriously delinquent loans compared with their share of the multifamily guaranty book of business as a result of slow economic recovery in certain areas of these states. These states accounted for  20% of multifamily serious delinquencies but only 3% of the multifamily guaranty book of business as of  June 30, 2012.

### REO Management

Foreclosure and REO activity affect the level of our credit losses.  Table 46 displays our held for sale multifamily REO activity for the periods indicated.

**Table 46: Multifamily Foreclosed Properties**

|  | For the Six Months Ended June 30, | |
| --- | --- | --- |
|  | **2012** | **2011** |
| Multifamily foreclosed properties (number of properties): | | |
| Beginning of period inventory of multifamily foreclosed properties (REO) | 260 | 222 |
|     Total properties acquired through foreclosure | 108 | 124 |
|     Disposition of REO | (129) | (87) |
| End of period inventory of multifamily foreclosed properties (REO) | 239 | 259 |
| Carrying value of multifamily foreclosed properties (dollars in millions) (1) | $ 640 | $555 |

(1)   Excludes DUS lender risk-sharing receivables, which are reported in our condensed consolidated balance sheets as a component of "Acquired property, net."

The decrease in our multifamily foreclosed property inventory reflects the continued improvement of national multifamily market fundamentals in the first half of 2012. While the inventory of foreclosed properties decreased, the carrying value of foreclosed properties increased in the first half of 2012 compared with the first half of 2011 due to foreclosures on higher valued properties in 2012.

### Institutional Counterparty Credit Risk Management

We rely on our institutional counterparties to provide services and credit enhancements, including primary and pool mortgage

70

---

insurance coverage, risk sharing agreements with lenders and financial guaranty contracts that are critical to our business. Institutional counterparty credit risk is the risk that these institutional counterparties may fail to fulfill their contractual obligations to us, including seller/servicers who are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. Defaults by a counterparty with significant obligations to us could result in significant financial losses to us.

See "MD&A—Risk Management—Credit Risk Management—Institutional Counterparty Credit Risk Management" in our 2011 Form 10-K for additional information about our institutional counterparties, including counterparty risk we face from mortgage originators and investors, from debt security and mortgage dealers, and from document custodians.

*Mortgage Seller/Servicers*

Our primary exposures to institutional counterparty risk are with mortgage seller/servicers that service the loans we hold in our mortgage portfolio or that back our Fannie Mae MBS, as well as seller/servicers that are obligated to repurchase loans from us or reimburse us for losses in certain circumstances. We rely on mortgage seller/servicers to meet our servicing standards and fulfill their servicing and repurchase obligations.

Our business with our mortgage seller/servicers is concentrated. Our five largest single-family mortgage servicers, including their affiliates, serviced 61% of our single-family guaranty book of business as of June 30, 2012, compared with 63% as of December 31, 2011. Our largest mortgage servicer is Bank of America, N.A. which, together with its affiliates, serviced approximately 19% of our single-family guaranty book of business as of June 30, 2012, compared with 21% as of December 31, 2011. In addition, we had two other mortgage servicers, JPMorgan Chase Bank, N.A. and Wells Fargo Bank, N.A., that, with their affiliates, each serviced over 10% of our single-family guaranty book of business as of June 30, 2012 and December 31, 2011. In addition, Wells Fargo Bank serviced over 10% of our multifamily guaranty book of business as of June 30, 2012 and December 31, 2011. Although our business with our mortgage seller/servicers is concentrated, a number of our largest mortgage seller/servicer counterparties have recently reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders. As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions and some of our servicing volume is shifting to smaller or non-traditional servicers that may not have the same financial strength or operational capacity as our largest servicers. See "Risk Factors" for a description of the risks to our business associated with a decrease in the concentration of our business with large institutions.

If a significant mortgage seller/servicer counterparty fails, and its mortgage servicing obligations are not transferred to a company with the ability and intent to fulfill all of these obligations, we could incur penalties for late payment of taxes and insurance on the properties that secure the mortgage loans serviced by that mortgage seller/servicer. We could also be required to absorb losses on defaulted loans that a failed servicer is obligated to repurchase from us if we determine there was an underwriting or eligibility breach. In May 2012, Residential Capital LLC, GMAC Mortgage and other subsidiaries of Ally Financial Inc. ("Ally"), filed for Chapter 11 bankruptcy protection. We are evaluating the financial impact of the bankruptcy on our business; however, our exposure to possible losses in connection with GMAC Mortgage's bankruptcy would have been greater had we not entered into an agreement with certain wholly-owned subsidiaries of Ally in December 2010. Under the agreement we received a cash payment of $462 million in exchange for our release of certain claims against specified Ally affiliates.

Because we delegate the servicing of our mortgage loans to mortgage servicers and do not have our own servicing function, servicers' lack of appropriate process controls or the loss of business from a significant mortgage servicer counterparty could pose significant risks to our ability to conduct our business effectively. Many of our largest servicer counterparties continue to reevaluate the effectiveness of their process controls. Many servicers are also subject to consent orders by their regulators that require the servicers to correct foreclosure process deficiencies and improve their servicing and foreclosure practices. This has resulted in extended foreclosure timelines and, therefore, additional holding costs for us, such as property taxes and insurance, repairs and maintenance, and valuation adjustments due to home price changes. See "Executive Summary" in our 2011 Form 10-K for a discussion of managing foreclosure timelines.

Our mortgage seller/servicers are obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. We refer to our demands that seller/servicers meet these obligations collectively as "repurchase requests." The number of our repurchase requests remained high during the second quarter and first half of 2012, and we expect that the amount of our outstanding repurchase requests will remain high. As the volume of repurchase requests increases, so does the risk that affected seller/servicers will not meet the terms of their repurchase obligations, and we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations. Failure by a significant seller/servicer counterparty, or a number of seller/servicers, to fulfill repurchase obligations to us could result in a significant increase in our credit losses and credit-related expenses, and have a material adverse effect on our results of

71

operations and financial condition. In addition, actions we take to pursue our contractual remedies could increase our costs, reduce our revenues, or otherwise have a material adverse effect on our results of operations or financial condition. We estimate our allowance for loan losses assuming the benefit of repurchase demands only from those counterparties we determine have the financial capacity to fulfill this obligation. Accordingly, as of June 30, 2012, in estimating our allowance for loan losses, we assumed no benefit from repurchase demands due to us from seller/servicers that lacked the financial capacity to honor their contractual obligations.

Table 47 displays repurchase request activity, measured by unpaid principal balance, during the first half of 2012 and 2011. The dollar amounts of our outstanding repurchase requests provided below are based on the unpaid principal balance of the loans underlying the repurchase request issued, not the actual amount we have requested from the lenders. In some cases, we allow lenders to remit payment equal to our loss, including imputed interest, on the loan after we have disposed of the REO, which is less than the unpaid principal balance of the loan. As a result, we expect our actual cash receipts relating to these outstanding repurchase requests to be significantly lower than the unpaid principal balance of the loan. Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the total requests outstanding until the completion of a full underwriting review, once the documents and loan files are received.

**Table 47: Repurchase Request Activity**

|  | For the Six Months Ended June 30, | |
|---|---|---|
|  | 2012 | 2011 |
|  | (Dollars in millions) | |
| Beginning outstanding repurchase requests | $ 10,400 | $ 5,007 |
| Issuances | 13,996 | 12,266 |
| Collections | (4,705) | (4,513) |
| Other resolutions[1] | (4,529) | (2,609) |
| Total successfully resolved | (9,234) | (7,122) |
| Cancellations | (586) | (504) |
| Ending outstanding repurchase requests | $ 14,576 | $ 9,647 |

[1]  Includes repurchase requests that were successfully resolved through reimbursement of losses or other remedies such as, but not limited to, loan pricing adjustments, indemnification or future repurchase agreements, lender corrective action, or negotiated settlements.

As of June 30, 2012, less than 0.25% of loans in our new single-family book of business, which were acquired after 2008, have been subject to a repurchase request, compared with the more than 2% of single-family loans acquired between 2005 and 2008 that have been subject to a repurchase request.   Table 48 displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of June 30, 2012 and December 31, 2011.  Table 48 also displays the mortgage seller/servicers balance and percentage of our repurchase requests that were over 120 days outstanding, and the seller/servicers' repurchase requests outstanding over 120 days as a percentage of total repurchase requests outstanding over 120 days, as of June 30, 2012 and December 31, 2011.

72

**Table 48: Outstanding Repurchase Requests**[1]

| | Outstanding Repurchase Requests as of | | | | | | | |
| | June 30, 2012 | | | | December 31, 2011 | | | |
| | Total Outstanding Balance[3] | Over 120 Days[2] | | | Total Outstanding Balance[3] | Over 120 Days[2] | | |
| | | Balance[3] | % | % of Total | | Balance[3] | % | % of Total |
| | (Dollars in millions) | | | | | | | |
| **Mortgage Seller/Servicer Counterparty:** | | | | | | | | |
| Bank of America, N.A. | $ 9,417 | $ 4,499 | 48% | 76 % | $ 5,449 | $ 1,841 | 34% | 59 % |
| JPMorgan Chase Bank, N.A. | 1,101 | 305 | 28 | 5 | 1,136 | 197 | 17 | 6 |
| CitiMortgage[4] | 973 | 243 | 25 | 4 | 917 | 226 | 25 | 7 |
| Wells Fargo Bank, N.A.[4] | 677 | 225 | 33 | 4 | 830 | 259 | 31 | 8 |
| SunTrust Bank, Inc.[4] | 463 | 157 | 34 | 3 | 430 | 40 | 9 | 1 |
| Other[5] | 1,945 | 519 | 27 | 8 | 1,638 | 576 | 35 | 19 |
| Total | $ 14,576 | $ 5,948 | | 100 % | $ 10,400 | $ 3,139 | | 100 % |

[1] Amounts relating to repurchase requests originating from missing documentation or loan files are excluded from the outstanding repurchase requests until the completion of a full underwriting review.

[2] Measured from the repurchase request date. For lenders remitting after the property is disposed, the number of days outstanding is adjusted to allow for final loss determination.

[3] Based on the unpaid principal balance of the loans underlying the repurchase request issued. In some cases, lenders remit payment equal to our loss on sale of the loan as REO, which includes imputed interest, and is significantly lower than the unpaid principal balance of the loan. Also includes repurchase requests resulting from the rescission of mortgage insurance coverage.

[4] Seller/servicer has entered into a plan with us to resolve certain outstanding repurchase requests and/or has posted collateral to us.

[5] Includes some seller/servicers that have entered into a plan with us to resolve outstanding repurchase requests and/or have posted collateral to us.

We continue to aggressively pursue our contractual rights associated with outstanding repurchase requests. Failure by a seller/servicer to repurchase a loan or to otherwise make us whole for our losses may result in the imposition of certain sanctions including, but not limited to:

- requiring the posting of collateral,

- denying transfer of servicing requests or denying pledged servicing requests,

- modifying or suspending any contract or agreement with a lender, or

- suspending or terminating a lender or imposing some other formal sanction on a lender.

If we are unable to resolve these matters to our satisfaction, we may seek additional remedies. If we are unable to resolve our repurchase requests, either through collection or additional remedies, we will not recover the losses we have recognized from the associated loans.

Since the fourth quarter of 2011, Bank of America, the seller/servicer with which we have the most repurchase requests outstanding, slowed the pace of its repurchases. As a result of Bank of America's failure to honor its contractual obligations in a timely manner, the already high volume of our outstanding repurchase requests with Bank of America increased substantially. Measured by unpaid principal balance, Bank of America accounted for approximately 65% of our total outstanding repurchase requests as of June 30, 2012, compared with 52% as of December 31, 2011 and 41% as of December 31, 2010. Similarly, Bank of America accounted for 76% of our repurchase requests that had been outstanding for more than 120 days as of June 30, 2012, compared with 59% as of December 31, 2011 and 37% as of December 31, 2010. We are taking steps to address Bank of America's delays in honoring our repurchase requests. For example, we did not renew our existing loan delivery contract with Bank of America at the end of January 2012, which significantly restricts the types of loans it can deliver to us. Bank of America, however, can continue delivering loans to us under our Refi Plus initiative, including HARP loans. Bank of America's failure to honor repurchase obligations in a timely manner has not caused us to change our estimate of the amounts we expect to collect from it ultimately, and we continue to work with Bank of America to resolve these issues. If we collect less than the amount we expect from Bank of America, we may incur additional losses and as a result may be required to seek additional funds from Treasury under our senior preferred stock purchase agreement.

TREASURY-3980

Table 48 above displays our top five mortgage seller/servicers by outstanding repurchase requests based on the unpaid principal balance of the loans underlying repurchase requests issued as of June 30, 2012. We do not expect the change in our loan delivery agreement with Bank of America to be material to our business or results of operations. Bank of America represented less than 5% of our loan delivery volume in the first half of 2012.

We are also exposed to the risk that a mortgage seller/servicer or another party involved in a mortgage loan transaction will engage in mortgage fraud by misrepresenting the facts about the loan. We have experienced financial losses in the past and may experience significant financial losses and reputational damage in the future as a result of mortgage fraud. See "Risk Factors" in our 2011 Form 10-K for additional discussion on risks of mortgage fraud to which we are exposed.

### *Mortgage Insurers*

We use several types of credit enhancement to manage our single-family mortgage credit risk, including primary and pool mortgage insurance coverage.  Table 49 displays our maximum potential loss recovery for the primary and pool mortgage insurance coverage on single-family loans in our guaranty book of business and our unpaid principal balance covered by insurance for our mortgage insurer counterparties as of June 30, 2012 and December 31, 2011. The table includes our top nine mortgage insurer counterparties, which provided over 99% of our total mortgage insurance coverage on single-family loans in our guaranty book of business as of June 30, 2012 and December 31, 2011. See "Risk Management—Credit Risk Management—Institutional Counterparty Risk Management—Mortgage Insurers" in our 2011 Form 10-K for a discussion on the credit ratings of our mortgage insurers.

**Table 49: Mortgage Insurance Coverage**

| Counterparty:[3] | Maximum Coverage[1] | | | As of December 31, 2011 | Unpaid Principal Balance Covered By Insurance[2] | |
| | As of June 30, 2012 | | | | As of June 30, 2012 | As of December 31, 2011 |
| | Primary | Pool | Total | | | |
| | (Dollars in millions) | | | | | |
| Mortgage Guaranty Insurance Corporation | $ 19,486 | $1,454 | $ 20,940 | $21,479 | $ 83,601 | $ 89,872 |
| Radian Guaranty, Inc. | 16,142 | 312 | 16,454 | 15,505 | 67,309 | 63,534 |
| United Guaranty Residential Insurance Company | 15,380 | 217 | 15,597 | 14,579 | 62,828 | 59,233 |
| Genworth Mortgage Insurance Corporation | 13,348 | 53 | 13,401 | 13,628 | 53,995 | 54,893 |
| PMI Mortgage Insurance Co. | 9,787 | 220 | 10,007 | 11,128 | 42,738 | 47,734 |
| Republic Mortgage Insurance Company | 7,440 | 845 | 8,285 | 9,219 | 34,416 | 39,130 |
| Triad Guaranty Insurance Corporation | 2,270 | 614 | 2,884 | 3,150 | 11,372 | 12,400 |
| CMG Mortgage Insurance Company(4) | 2,026 | — | 2,026 | 1,951 | 8,535 | 8,241 |
| Essent Guaranty, Inc. | 853 | — | 853 | 395 | 3,567 | 1,685 |
| Others | 212 | — | 212 | 217 | 1,194 | 1,214 |
| Total | $86,944 | $3,715 | $ 90,659 | $91,251 | $369,555 | $ 377,936 |
| Total as a percentage of single-family guaranty book of business | | | 3 % | 3 % | 13 % | 13 % |

---

[1]  Maximum coverage refers to the aggregate dollar amount of insurance coverage (that is, "risk in force") on single-family loans in our guaranty book of business and represents our maximum potential loss recovery under the applicable mortgage insurance policies.

[2]  Represents the unpaid principal balance of single-family loans in our guaranty book of business covered under the applicable mortgage insurance policies (that is, "insurance in force").

[3]  Insurance coverage amounts provided for each counterparty may include coverage provided by consolidated affiliates and subsidiaries of the counterparty.

[4]  CMG Mortgage Insurance Company is a joint venture owned by PMI Mortgage Insurance Co. and CUNA Mutual Insurance Society.

As of August 8, 2012, of our largest mortgage insurers, one—PMI Mortgage Insurance Co. ("PMI")—has publicly disclosed that it is in receivership and two —Triad Guaranty Insurance Corporation ("Triad") and Republic Mortgage Insurance Company ("RMIC")—have publicly disclosed that they are in run-off. A mortgage insurer that is in run-off continues to collect renewal premiums and pay claims on its existing insurance business, but no longer writes new insurance, which increases the risk that the mortgage insurer will fail to pay our claims under existing insurance policies. In addition, Genworth Mortgage Insurance Corporation ("Genworth") is currently operating pursuant to a waiver it received from its

74

regulator of the state regulatory capital requirements applicable to its main insurance writing entity. Radian Guaranty, Inc. ("Radian") has disclosed that, in the absence of additional capital contributions to its main insurance writing entity, its capital might fall below state regulatory capital requirements in the future. In April 2012, Radian announced that it had entered into a reinsurance agreement with an external reinsurance provider to proactively manage its mortgage insurance risk-to-capital position. Additionally, Mortgage Guaranty Insurance Corporation ("MGIC") has disclosed that it expects that its capital fell below state regulatory capital requirements as of June 30, 2012, and is currently operating pursuant to a waiver it received from the regulator of the state regulatory capital requirements applicable to its main insurance writing entity. MGIC has further disclosed that Freddie Mac has contingently approved a subsidiary of MGIC to write new insurance in states in which MGIC does not have a waiver, subject to a number of conditions. Because lenders generally do not identify which GSE a loan will be delivered to at the time the insurance is obtained, if MGIC is not an approved insurer by Freddie Mac it could constrain MGIC's ability to write new business for all GSE guaranteed loans. These six mortgage insurers, PMI, Triad, RMIC, Genworth, Radian and MGIC, provided a combined $72.0 billion, or 79%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of June 30, 2012.

We do not know how long regulators will permit mortgage insurers that do not meet, or may soon fail to meet, state regulatory capital requirements to continue operating without obtaining additional capital. Nor do we know how long our mortgage insurer counterparties that are operating under waivers will continue to operate under waivers, or how long those that are currently below their state-imposed risk-to-capital limits will remain below these limits. If a mortgage insurer counterparty is unable to generate or obtain sufficient capital to stay below its risk-to-capital limits and cannot secure and maintain a waiver from its state regulator, it will likely be placed into run-off or receivership. This would increase the risk that these mortgage insurers will fail to pay our claims under insurance policies, and could also cause the quality and speed of their claims processing to deteriorate.

The weak financial condition of many of our mortgage insurer counterparties increases the significant risk that these counterparties will fail to fulfill their obligations to pay our claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

We evaluate each of our mortgage insurer counterparties individually to determine whether or under what conditions it will remain eligible to insure new mortgages sold to us. Based on our evaluation, we may impose additional terms and conditions of approval on some of our mortgage insurers, including: limiting the volume and types of loans they may insure for us; requiring them to obtain our consent prior to entering into risk sharing arrangements with mortgage lenders; requiring them to meet certain financial conditions, such as maintaining a minimum level of policyholders' surplus, a maximum risk-to-capital ratio, a maximum combined ratio, or a minimum amount of acceptable liquid assets; or requiring that they secure parental or other capital support agreements.

The claims obligations of RMIC, PMI and Triad have been partially deferred pursuant to orders from their state regulators. State regulators could take additional corrective actions against RMIC and Triad, including placing them into receivership. While our remaining mortgage insurers have continued to pay claims owed to us in full, there can be no assurance that they will continue to do so given their current financial condition.

Some mortgage insurers have explored corporate restructurings designed to provide relief from risk-to-capital limits in certain states. We have approved several restructurings so that certain of our mortgage insurer counterparties or their subsidiaries could continue to write new business. Additionally, mortgage insurers continue to approach us with various proposed corporate restructurings that would require our approval of affiliated mortgage insurance writing entities.

The number of mortgage loans for which our mortgage insurer counterparties have rescinded coverage decreased but remained high in the first half of 2012. In those cases where the mortgage insurer has rescinded coverage, we require the seller/servicer to repurchase the loan or indemnify us against loss. The table below displays cumulative rescission rates as of June 30, 2012, by the period in which the claim was filed. We do not present information for claims filed in the most recent two quarters to allow sufficient time for a substantial percentage of the claims filed to be resolved.

75

**Table 50: Rescission Rates of Mortgage Insurance**

| | As of June 30, 2012 | |
| --- | --- | --- |
| | Cumulative Rescission Rate[1] | Cumulative Claims Resolution Percentage[2] |
| **Primary mortgage insurance claims filed in:** | | |
| 2011 | 7% | 68% |
| 2010 | 11 | 91 |
| **Pool mortgage insurance claim filed in:** | | |
| 2011 | 10% | 94% |
| 2010 | 14 | 99 |

[1] Represents claims filed during the period where coverage was rescinded as of June 30, 2012, divided by total claims filed during the same period. Denied claims are excluded.

[2] Represents claims filed during the period that were resolved as of June 30, 2012, divided by the total claims filed during the same period. Claims resolved mainly consist of claims for which we have settled and claims for which coverage has been rescinded by the mortgage insurer.

When we estimate the credit losses that are inherent in our mortgage loan portfolio and under the terms of our guaranty obligations we also consider the recoveries that we will receive on primary mortgage insurance, as mortgage insurance recoveries would reduce the severity of the loss associated with defaulted loans. We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due recovery amounts to ensure that only probable losses as of the balance sheet date are included in our loss reserve estimate. As a result, if our assessment of one or more of our mortgage insurer counterparties' ability to fulfill their respective obligations to us worsens, it could result in an increase in our loss reserves.

The following table displays our estimated benefit from mortgage insurer recoveries.

**Table 51: Estimated Mortgage Insurance Benefit**

| | As of | |
| --- | --- | --- |
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 13,254 | $15,099 |
| Less: Collectability adjustment[1] | 2,043 | 2,867 |
| Estimated benefit included in total loss reserves | $ 11,211 | $ 12,232 |

[1] Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

When an insured loan held in our mortgage portfolio subsequently goes into foreclosure, we charge off the loan, eliminating any previously-recorded loss reserves, and record REO and a mortgage insurance receivable for the claim proceeds deemed probable of recovery, as appropriate. However, if a mortgage insurer rescinds, cancels or denies insurance coverage, the initial receivable becomes due from the mortgage seller/servicer. We had outstanding receivables of $3.8 billion as of June 30, 2012 and $3.6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans, of which $ 1.1 billion as of June 30, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectability, and they were recorded net of a valuation allowance of $ 848 million as of June 30, 2012 and $570 million as of December 31, 2011 in "Other assets." These mortgage insurance receivables are short-term in nature, having an average duration of approximately  six months, and the valuation allowance reduces our claim receivable to the amount that we consider probable of collection. We received proceeds under our primary and pool mortgage insurance policies for single-family loans of $ 1.2 billion for the second quarter of 2012 and $2.5 billion for the first half of 2012, compared with $ 1.5 billion for the second quarter of 2011 and $3.1 billion for the first half of 2011.

*Financial Guarantors*

We are the beneficiary of financial guarantees on non-agency securities held in our investment portfolio and on non-agency securities that have been resecuritized to include a Fannie Mae guaranty and sold to third parties. Table 52 displays the total unpaid principal balance of guaranteed non-agency securities in our portfolio as of June 30, 2012 and December 31, 2011.

**Table 52: Unpaid Principal Balance of Financial Guarantees**

|  | As of | |
|---|---|---|
|  | June 30, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Alt-A private-label securities | $ 1,115 | $ 1,279 |
| Subprime private-label securities | 1,334 | 1,398 |
| Mortgage revenue bonds | 4,778 | 4,931 |
| Other mortgage-related securities | 305 | 317 |
| Non mortgage-related securities | — | 46 |
| Total | $ 7,532 | $ 7,971 |

With the exception of Ambac Assurance Corporation ("Ambac"), none of our financial guarantor counterparties has failed to fully repay us for claims under guaranty contracts. During 2010, Ambac and its insurance regulator, the Wisconsin Office of the Commissioner of Insurance, imposed a court-ordered moratorium on certain claim payments under Ambac's bond insurance coverage, including claims arising under coverage on $1.2 billion of our private-label securities insured by Ambac as of December 31, 2010. In 2011, the Wisconsin Circuit Court of Dane County confirmed Ambac's rehabilitation plan; however, the plan is subject to stay and appeal. In the second quarter of 2012, the court approved a request for Ambac to commence partial payment on claims that meet specified requirements. Ambac provided coverage on $3.1 billion, or 42%, of our total non-governmental guarantees, as of June 30, 2012. Based on the stressed financial condition of our non-governmental financial guarantor counterparties, we believe that all but one of these counterparties may not be able to fully meet their obligations to us in the future. We model our securities without assuming the benefit of non-governmental financial guarantees. We then adjust results for those external financial guarantees from guarantors that we determine are creditworthy, although we continue to seek collection of any amounts due to us from all counterparties. As of June 30, 2012, when modeling our securities for impairments we did not assume the benefit of external financial guarantees from any non-governmental counterparties. See "Note 5, Investments in Securities" for a further discussion of our model methodology and key inputs used to determine other-than-temporary-impairment.

We are also the beneficiary of financial guarantees included in securities issued by Freddie Mac, the federal government and its agencies that totaled $29.5 billion as of June 30, 2012 and $31.4 billion as of December 31, 2011.

*Lenders with Risk Sharing*

We enter into risk sharing agreements with lenders pursuant to which the lenders agree to bear all or some portion of the credit losses on the covered loans. Our maximum potential loss recovery from lenders under these risk sharing agreements on single-family loans was $12.1 billion as of June 30, 2012 and $12.8 billion as of December 31, 2011. As of June 30, 2012 and December 31, 2011, 58% of our maximum potential loss recovery on single-family loans was from the same three lenders. Our maximum potential loss recovery from lenders under risk sharing agreements on DUS and non-DUS multifamily loans was $33.0 billion as of June 30, 2012 and $32.1 billion as of December 31, 2011. As of June 30, 2012 and December 31, 2011, 38% and 40% of our maximum potential loss recovery on multifamily loans was from three DUS lenders.

Unfavorable market conditions have adversely affected, and continue to adversely affect, the liquidity and financial condition of our lender counterparties. The percentage of single-family recourse obligations to lenders with investment grade credit ratings (based on the lower of S&P, Moody's and Fitch ratings) was 47% and 46% as of June 30, 2012 and December 31, 2011. The percentage of these recourse obligations to lender counterparties rated below investment grade was 25% and 26% as of June 30, 2012 and December 31, 2011. The remaining percentage of these recourse obligations were to lender counterparties that were not rated by rating agencies, which was 28% as of June 30, 2012 and December 31, 2011. Given the stressed financial condition of some of our single-family lenders, we expect in some cases we will recover less, perhaps significantly less, than the amount the lender is obligated to provide us under our risk sharing arrangement with them. Depending on the financial strength of the counterparty, we may require a lender to pledge collateral to secure its recourse obligations.

As noted above in "Multifamily Mortgage Credit Risk Management," our primary multifamily delivery channel is our DUS

77

program, which is comprised of lenders that span the spectrum from large depositories to independent non-bank financial institutions. Approximately 41% as of June 30, 2012, and 51% as of December 31, 2011, of the unpaid principal balance of loans in our multifamily guaranty book of business serviced by our DUS lenders was from institutions with an external investment grade credit rating or a guaranty from an affiliate with an external investment grade credit rating. Given the recourse nature of the DUS program, the lenders are bound by eligibility standards that dictate, among other items, minimum capital and liquidity levels, and the posting of collateral at a highly rated custodian to secure a portion of the lenders' future obligations. We actively monitor the financial condition of these lenders to help ensure the level of risk remains within our standards and to ensure required capital levels are maintained and are in alignment with actual and modeled loss projections.

*Custodial Depository Institutions*

A total of $64.5 billion in deposits for single-family payments were received and held by 287 institutions in the month of June 2012 and a total of $66.4 billion in deposits for single-family payments were received and held by 284 institutions in the month of December 2011. Of these total deposits, 94% as of June 30, 2012 and 92% as of December 31, 2011 were held by institutions rated as investment grade by S&P, Moody's and Fitch. Our transactions with custodial depository institutions is concentrated. Our six largest custodial depository institutions held 88% of these deposits as of June 30, 2012 and 87% of these deposits as of December 31, 2011.

If a custodial depository institution were to fail while holding remittances of borrower payments of principal and interest due to us in our custodial account, we would be an unsecured creditor of the depository for balances in excess of the deposit insurance protection and might not be able to recover all of the principal and interest payments being held by the depository on our behalf, or there might be a substantial delay in receiving these amounts. If this were to occur, we would be required to replace these amounts with our own funds to make payments that are due to Fannie Mae MBS certificateholders. Accordingly, the insolvency of one of our principal custodial depository counterparties could result in significant financial losses to us. In the month of June 2012, approximately $5.4 billion or 8% of our total deposits for single-family payments received and held by these institutions was in excess of the deposit insurance protection limit compared with approximately $6.1 billion or 9% in the month of December 2011. These amounts can vary as they are calculated based on individual payments of mortgage borrowers and we must estimate which borrowers are paying their regular principal and interest payments and other types of payments, such as prepayments from refinancing or sales.

*Issuers of Investments Held in our Cash and Other Investments Portfolio*

Our cash and other investments portfolio consists of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell or similar arrangements, U.S. Treasury securities and asset-backed securities. Our cash and other investment counterparties are primarily financial institutions and the Federal Reserve Bank. We held no unsecured positions with financial institutions as of June 30, 2012 or December 31, 2011. See "Liquidity and Capital Management—Liquidity Management—Cash and Other Investments Portfolio" for more detailed information on our cash and other investments portfolio.

*Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivatives contracts. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. The fair value of derivatives in a gain position is included in our condensed consolidated balance sheets in "Other assets." We manage our credit exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities. On June 21, 2012, Moody's completed a credit rating review of banks and securities companies with global capital market operations, which encompassed most of Fannie Mae's derivative counterparties. The companies were downgraded by Moody's, which resulted in an increase in the amount of collateral these companies are required to post to us under our derivative agreements. As of June 30, 2012 all of our derivative counterparties were in compliance with these additional collateral requirements.

Our net counterparty credit exposure on derivatives contracts decreased to $55 million as of June 30, 2012, from $96 million as of December 31, 2011. We had outstanding interest rate and foreign currency derivative transactions with 21 counterparties as of June 30, 2012 and December 31, 2011. Derivative transactions with 10 of our counterparties accounted for approximately 93% of our total outstanding notional amount as of June 30, 2012, with each of these counterparties accounting for between approximately 6% and 14% of the total outstanding notional amount. As of June 30, 2012, we had outstanding notional amounts and master netting agreements with 16 counterparties.

78

See "Note 9, Derivative Instruments" for information on the outstanding notional amount and additional information on our risk management derivative contracts as of June 30, 2012 and December 31, 2011, as well as a discussion of our collateral requirements including the impact of decreases in our credit ratings on our collateral obligations under our derivatives contracts.

**Market Risk Management, Including Interest Rate Risk Management**

We are subject to market risk, which includes interest rate risk, spread risk and liquidity risk. These risks arise from our mortgage asset investments. Interest rate risk is the risk of loss in value or expected future earnings that may result from changes to interest rates. Spread risk is the resulting impact of changes in the spread between our mortgage assets and our debt and derivatives we use to hedge our position. Liquidity risk is the risk that we will not be able to meet our funding obligations in a timely manner. We describe our sources of interest rate risk exposure and our strategy for managing interest rate risk and spread risk in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management" in our 2011 Form 10-K.

*Measurement of Interest Rate Risk*

Below we present two quantitative metrics that provide estimates of our interest rate exposure: (1) fair value sensitivity of net portfolio to changes in interest rate levels and slope of yield curve; and (2) duration gap. The metrics presented are calculated using internal models that require standard assumptions regarding interest rates and future prepayments of principal over the remaining life of our securities. These assumptions are derived based on the characteristics of the underlying structure of the securities and historical prepayment rates experienced at specified interest rate levels, taking into account current market conditions, the current mortgage rates of our existing outstanding loans, loan age and other factors. On a continuous basis, management makes judgments about the appropriateness of the risk assessments and will make adjustments as necessary to properly assess our interest rate exposure and manage our interest rate risk. The methodologies used to calculate risk estimates are periodically changed on a prospective basis to reflect improvements in the underlying estimation process.

*Interest Rate Sensitivity to Changes in Interest Rate Level and Slope of Yield Curve*

As part of our disclosure commitments with FHFA, we disclose on a monthly basis the estimated adverse impact on the fair value of our net portfolio that would result from the following hypothetical situations:

- A 50 basis point shift in interest rates.

- A 25 basis point change in the slope of the yield curve.

In measuring the estimated impact of changes in the level of interest rates, we assume a parallel shift in all maturities of the U.S. LIBOR interest rate swap curve.

In measuring the estimated impact of changes in the slope of the yield curve, we assume a constant 7-year rate and a shift of 16.7 basis points for the 1-year rate and 8.3 basis points for the 30-year rate. We believe the aforementioned interest rate shocks for our monthly disclosures represent moderate movements in interest rates over a one-month period.

*Duration Gap*

Duration gap measures the price sensitivity of our assets and liabilities to changes in interest rates by quantifying the difference between the estimated durations of our assets and liabilities. Our duration gap analysis reflects the extent to which the estimated maturity and repricing cash flows for our assets are matched, on average, over time and across interest rate scenarios to the estimated cash flows of our liabilities. A positive duration gap indicates that the duration of our assets exceeds the duration of our liabilities. We disclose duration gap on a monthly basis under the caption "Interest Rate Risk Disclosures" in our Monthly Summary, which is available on our website and announced in a press release.

The sensitivity measures presented in Table 53, which we disclose on a quarterly basis as part of our disclosure commitments with FHFA, are an extension of our monthly sensitivity measures. There are three primary differences between our monthly sensitivity disclosure and the quarterly sensitivity disclosure presented below: (1) the quarterly disclosure is expanded to include the sensitivity results for larger rate level shocks of plus or minus 100 basis points; (2) the monthly disclosure reflects the estimated pre-tax impact on the market value of our net portfolio calculated based on a daily average, while the quarterly disclosure reflects the estimated pre-tax impact calculated based on the estimated financial position of our net portfolio and the market environment as of the last business day of the quarter; and (3) the monthly disclosure shows the most adverse pre-tax impact on the market value of our net portfolio from the hypothetical interest rate shocks, while the quarterly disclosure includes the estimated pre-tax impact of both up and down interest rate shocks.

In addition, Table 53 also provides the average, minimum, maximum and standard deviation for duration gap and for the most adverse market value impact on the net portfolio for non-parallel and parallel interest rate shocks for the three months ended  June 30, 2012 and 2011.

**Table 53: Interest Rate Sensitivity of Net Portfolio to Changes in Interest Rate Level and Slope of Yield Curve** [1]

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | |
| | (Dollars in billions) | | | |
| Rate level shock: | | | | |
| -100 basis points | $ | 0.2 | $ | 0.3 |
| -50 basis points | | — | | 0.1 |
| +50 basis points | | 0.3 | | (0.1) |
| +100 basis points | | 0.5 | | (0.4) |
| Rate slope shock: | | | | |
| -25 basis points (flattening) | | — | | — |
| +25 basis points (steepening) | | — | | 0.1 |

| | For the Three Months Ended June 30, 2012 | | |
|---|---|---|---|
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | (0.1) | $ — | $ 0.1 |
| Minimum | (0.8) | — | — |
| Maximum | 0.9 | 0.1 | 0.1 |
| Standard deviation | 0.3 | — | 0.1 |

| | For the Three Months Ended June 30, 2011 | | |
|---|---|---|---|
| | Duration Gap | Rate Slope Shock 25 Bps | Rate Level Shock 50 Bps |
| | | Exposure | |
| | (In months) | (Dollars in billions) | |
| Average | 0.3 | $ 0.1 | $ 0.1 |
| Minimum | — | — | — |
| Maximum | 0.7 | 0.2 | 0.3 |
| Standard deviation | 0.2 | — | 0.1 |

---

[1]   Computed based on changes in LIBOR swap rates.

A majority of the interest rate risk associated with our mortgage-related securities and loans is hedged with our debt issuances, which includes callable debt. We use derivatives to help manage the residual interest rate risk exposure between our assets and liabilities. Derivatives have enabled us to keep our interest rate risk exposure at consistently low levels in a wide range of interest-rate environments.  Table 54 displays an example of how derivatives impacted the net market value exposure for a 50 basis point parallel interest rate shock.

80

**Table 54: Derivative Impact on Interest Rate Risk (50 Basis Points)**

|  | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
|  | (Dollars in billions) | | |
| As of June 30, 2012 | $   (1.3) | $   0.4 | $   1.7 |
| As of December 31, 2011 | $   (1.3) | $   (0.1) | $   1.2 |

_Other Interest Rate Risk Information_

The interest rate risk measures discussed above exclude the impact of changes in the fair value of our net guaranty assets resulting from changes in interest rates. We exclude our guaranty business from these sensitivity measures based on our current assumption that the guaranty fee income generated from future business activity will largely replace guaranty fee income lost due to mortgage prepayments.

In "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management—Measurement of Interest Rate Risk—Other Interest Rate Risk Information" in our 2011 Form 10-K, we provided additional interest rate sensitivities including separate disclosure of the potential impact on the fair value of our trading assets and other financial instruments. As of June 30, 2012, these sensitivities were relatively unchanged as compared with December 31, 2011. The fair value of our trading financial instruments and our other financial instruments as of June 30, 2012 and December 31, 2011 can be found in "Note 12, Fair Value."

**Liquidity Risk Management**

See "Liquidity and Capital Management—Liquidity Management" for a discussion on how we manage liquidity risk.

**Operational Risk Management**

See "Risk Management—Operational Risk Management" in our 2011 Form 10-K for more information on our framework for managing operational risk.

## FORWARD-LOOKING STATEMENTS

This report includes statements that constitute forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934 (the "Exchange Act"). In addition, our senior management may from time to time make forward-looking statements orally to analysts, investors, the news media and others. Forward-looking statements often include words such as "expect," "anticipate," "intend," "plan," "believe," "seek," "estimate," "forecast," "project," "would," "should," "could," "likely," "may," or similar words.

Among the forward-looking statements in this report are statements relating to:

- Our expectation that our financial results for 2012 will be significantly better than our 2011 results;

- Our expectation of high levels of period-to-period volatility in our results of operations and financial condition because our derivatives are recorded at fair value in our financial statements while some of the instruments they hedge are not recorded at fair value in our financial statements;

- Our expectation that the single-family loans we have acquired since the beginning of 2009, in the aggregate, will be profitable over their lifetime, by which we mean that we expect our fee income on these loans to exceed our credit losses and administrative costs for them;

- Our expectation that the single-family loans we acquired from 2005 through 2008, in the aggregate, will not be profitable over their lifetime;

- Our expectation that the serious delinquency rates for single-family loans acquired in recent years will be higher after the loans have aged, but not as high as the June 30, 2012 serious delinquency rates of loans in our legacy book of business;

- Our expectations regarding the credit profile of loans we acquire in the future, and the factors that will influence their credit profile;

- Our expectation that the trends of stabilizing home prices and declining single-family serious delinquency rates will continue, as well as our expectation that serious delinquency rates will decline at a slower pace than in recent periods;

- Our belief that our total loss reserves peaked as of December 31, 2011 and will not increase above $76.9 billion in the foreseeable future;

- Our expectation that our loss reserves will remain significantly elevated relative to historical levels for an extended period because (1) we expect future defaults on loans we acquired prior to 2009 and the resulting charge-offs will occur over a period of years and (2) a significant portion of our reserves represents concessions granted to borrowers upon modification of their loans and will remain in our reserves until the loans are fully paid or default;

- Our expectation that it will take a significant amount of time before our REO inventory is reduced to pre-2008 levels;

- Our estimate that we will realize as credit losses over two-thirds of the fair value losses on loans purchased out of unconsolidated MBS trusts that are reflected in our condensed consolidated balance sheets, and eventually recover the remaining nearly one-third, either through net interest income for loans that cure or through foreclosed property income for loans where the sale of the collateral exceeds our recorded investment in the loan;

- Our belief that the changes in the foreclosure environment will continue to negatively affect our single-family serious delinquency rates, foreclosure timelines and credit-related expenses (income);

- Our expectation that serious delinquency rates will continue to be affected in the future by home price changes, changes in other macroeconomic conditions, the length of the foreclosure process and the volume of loan modifications;

- Our expectation that the number of our single-family loans that are seriously delinquent will remain well above pre-2008 levels for years;

- Our belief that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding;

- Our expectation that changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations;

- Our belief that our liquidity contingency plan may be difficult or impossible to execute for a company of our size in our circumstances;

- Our expectation, based on recent trends, that multifamily starts could return to historical norms by as early as the end of this year, despite the fact that the number of completions expected to occur in 2012 and early 2013 remains below historical norms;

- Our expectation that mortgage loan delinquencies and foreclosures will remain at high levels in the second half of 2012;

- Our expectation that, although our results for the second half of 2012 may not be as strong as our results for the first half, our financial results for 2012 overall will be significantly better than our 2011 results;

- Our expectation that single-family default and severity rates will remain high in 2012 compared to pre-housing crisis levels, but will be lower than in 2011;

- Our expectation that multifamily foreclosures in 2012 will remain generally commensurate with 2011 levels as certain local markets and properties continue to exhibit weak fundamentals;

- Our expectation, as a result of recently implemented changes to HARP, that if interest rates remain low we will continue to acquire a high volume of refinancings under HARP;

- Our expectation that we will acquire many refinancings with LTV ratios greater than 125%, because borrowers were unable to refinance loans with LTV ratios greater than 125% in large numbers until changes to HARP were fully implemented in the second quarter of 2012;

- Our expectation that the elevated volume of HARP refinancings will decrease when interest rates rise sufficiently or when there is no longer a large population of borrowers with loans that have high LTV ratios who would benefit from refinancing;

82

- Our expectation that the volume of refinancings we acquire in 2012 will be similar to or greater than the volume of refinancings we acquired in 2011;

- Our expectation that the volume of our loan acquisitions in 2012 will be similar to or greater than our loan acquisitions in 2011;

- Our estimation that total originations in the U.S. single-family mortgage market in 2012 will increase from 2011 levels by approximately  9%, from an estimated $1.36 trillion to an estimated $1.49 trillion, and that the amount of originations in the U.S. single-family mortgage market that are refinancings will increase from approximately  $900 billion to approximately $980 billion;

- Our expectation that home prices may decline again through early 2013, and our additional expectation that, if current market trends continue, home prices will not decline on a national basis below their first quarter 2012 levels;

- Our expectation of continued significant regional variation in home price changes and the timing of home price stabilization;

- Our expectation that our credit-related expenses for all of 2012 will be lower than for 2011;

- Our expectation that our credit losses will remain high in 2012 relative to pre-housing crisis levels;

- Our expectation that our realization of some credit losses will be delayed to the extent delays in foreclosures continue in 2012;

- Our expectation that, although we may experience period-to-period volatility in earnings and comprehensive income, we will not generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term;

- Our expectation that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement;

- Our expectation that, in some future quarters, we will be able to generate comprehensive income sufficient to cover at least a portion of our quarterly dividend payment to Treasury;

- Our expectation that we will receive additional draws under the senior preferred stock purchase agreement, which will further increase the dividends we owe to Treasury on the senior preferred stock;

- Our expectation that uncertainty regarding the future of our company will continue;

- Our expectation that we will continue to purchase loans from MBS trusts as they become four or more consecutive monthly payments delinquent subject to market conditions, economic benefit, servicer capacity, and other factors, including the limit on the mortgage assets that we may own pursuant to the senior preferred stock purchase agreement;

- Our expectation that Congressional hearings on GSE reform will continue and additional legislation will be considered and proposals will be discussed, including proposals that would result in a substantial change to our business structure or that involve Fannie Mae's liquidation or dissolution;

- Our belief that, as drafted, bills introduced in Congress that would require FHFA to make a determination within two years of enactment regarding whether the GSEs were financially viable and, if the GSEs were determined to be not financially viable, to place them into receivership may, upon enactment, impair our ability to issue securities in the capital markets and therefore our ability to conduct our business, absent the federal government providing an explicit guarantee of our existing and future liabilities;

- Our expectation that our acquisitions of Alt-A mortgage loans (which are limited to refinancings of existing Fannie Mae loans) will continue to be minimal in future periods and the percentage of the book of business attributable to Alt-A will continue to decrease over time;

- Our expectation that loans we acquire under Refi Plus, including HARP, may not perform as well as the other loans we have acquired since the beginning of 2009;

- Our expectation that Refi Plus loans, including HARP loans, will perform better than the loans they replace because Refi Plus loans should reduce the borrowers' monthly payments or provide more stable terms than the borrowers' old loans (for example, by refinancing into a mortgage with a fixed interest rate instead of an adjustable rate);

- Our expectation that the current market premium portion of our current estimate of the fair value of our book of business will not impact future Treasury draws, which is based on our intention generally not to have other parties assume the credit risk inherent in our book of business;

83

- Our expectation that, although our funding needs may vary from quarter to quarter depending on market conditions, our debt funding needs will decline in future periods as we reduce the size of our mortgage portfolio in compliance with the requirement of the senior preferred stock purchase agreement;

- Our expectation that our debt funding activity will likely continue to decline in future periods as the size of our mortgage portfolio decreases;

- Our intention to repay our short-term and long-term debt obligations as they become due primarily through proceeds from the issuance of additional debt securities;

- Our expectations regarding our credit ratings and their impact on us as set forth in "MD&A—Liquidity and Capital Management—Liquidity Management—Credit Ratings";

- Our expectation that the volume of our home retention solutions and foreclosure alternatives will remain high throughout the remainder of 2012;

- Our belief that the performance of our workouts will be highly dependent on economic factors, such as unemployment rates, household wealth and income, and home prices;

- Our expectation that the amount of our outstanding repurchase requests to seller/servicers will remain high, and that we may be unable to recover on all outstanding loan repurchase obligations resulting from seller/servicers' breaches of contractual obligations;

- Our expectation that the change in our loan delivery agreement with Bank of America will not be material to our business or results of operations;

- Our expectations regarding recoveries from lenders under risk sharing arrangements, and the possibility that we may require a lender to pledge collateral to secure its recourse obligations;

- Our beliefs regarding whether our financial guarantor counterparties will be able to fully meet their obligations to us in the future;

- Our belief that we have limited credit exposure on government loans;

- Our expectation that the ultimate performance of all our loans will be affected by macroeconomic trends, including unemployment, the economy, and home prices; and

- Our expectation that implementing recent Congressional and FHFA directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period.

Forward-looking statements reflect our management's expectations, forecasts or predictions of future conditions, events or results based on various assumptions and management's estimates of trends and economic factors in the markets in which we are active, as well as our business plans. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. Our actual results and financial condition may differ, possibly materially, from the anticipated results and financial condition indicated in these forward-looking statements. There are a number of factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements contained in this report, including, but not limited to, the following: the uncertainty of our future; legislative and regulatory changes affecting us; challenges we face in retaining and hiring qualified employees; the deteriorated credit performance of many loans in our guaranty book of business; the conservatorship and its effect on our business; the investment by Treasury and its effect on our business; adverse effects from activities we undertake to support the mortgage market and help borrowers; a decrease in our credit ratings; limitations on our ability to access the debt capital markets; further disruptions in the housing and credit markets; defaults by one or more institutional counterparties; our reliance on mortgage servicers; guidance by the Financial Accounting Standards Board ("FASB"); operational control weaknesses; our reliance on models; the level and volatility of interest rates and credit spreads; changes in the structure and regulation of the financial services industry; and those factors described in "Risk Factors" in this report and in our 2011 Form 10-K, as well as the factors described in "Executive Summary—Outlook—Factors that Could Cause Actual Results to be Materially Different from our Estimates and Expectations" in this report.

Readers are cautioned to place forward-looking statements in this report or that we make from time to time into proper context by carefully considering the factors discussed in "Risk Factors" in our 2011 Form 10-K and in this report. These forward-looking statements are representative only as of the date they are made, and we undertake no obligation to update any forward-looking statement as a result of new information, future events or otherwise, except as required under the federal securities laws.

84

**Item 1.  Financial Statements**

<div align="center">

**FANNIE MAE**

**(In conservatorship)**

**Condensed Consolidated Balance Sheets — (Unaudited)**

**(Dollars in millions, except share amounts)**

</div>

| | As of | |
|---|---|---|
| | **June 30, 2012** | **December 31, 2011** |
| **ASSETS** | | |
| Cash and cash equivalents | $ 24,728 | $ 17,539 |
| Restricted cash (includes $51,205 and $45,900, respectively, related to consolidated trusts) | 55,985 | 50,797 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 24,000 | 46,000 |
| Investments in securities: | | |
| Trading, at fair value | 50,935 | 74,198 |
| Available-for-sale, at fair value (includes $998 and $1,191, respectively, related to consolidated trusts) | 69,694 | 77,582 |
| Total investments in securities | 120,629 | 151,780 |
| Mortgage loans: | | |
| Loans held for sale, at lower of cost or fair value (includes $72 and $66, respectively, related to consolidated trusts) | 455 | 311 |
| Loans held for investment, at amortized cost: | | |
| Of Fannie Mae | 369,660 | 380,134 |
| Of consolidated trusts (includes $5,231 and $3,611 respectively, at fair value and loans pledged as collateral that may be sold or repledged of $1,126 and $798, respectively) | 2,616,502 | 2,590,332 |
| Total loans held for investment | 2,986,162 | 2,970,466 |
| Allowance for loan losses | (63,375) | (72,156) |
| Total loans held for investment, net of allowance | 2,922,787 | 2,898,310 |
| Total mortgage loans | 2,923,242 | 2,898,621 |
| Accrued interest receivable, net (includes $8,107 and $8,466, respectively, related to consolidated trusts) | 9,668 | 10,000 |
| Acquired property, net | 10,387 | 11,373 |
| Other assets (includes cash pledged as collateral of $1,535 and $1,109, respectively) | 26,981 | 25,374 |
| Total assets | $ 3,195,620 | $ 3,211,484 |
| **LIABILITIES AND EQUITY (DEFICIT)** | | |
| Liabilities: | | |
| Accrued interest payable (includes $9,018 and $9,302, respectively, related to consolidated trusts) | $ 11,858 | $ 12,648 |
| Federal funds purchased and securities sold under agreements to repurchase | 153 | — |
| Debt: | | |
| Of Fannie Mae (includes $831 and $838, respectively, at fair value) | 659,389 | 732,444 |
| Of consolidated trusts (includes $4,600 and $3,939, respectively, at fair value) | 2,504,499 | 2,457,428 |
| Other liabilities (includes $762 and $629, respectively, related to consolidated trusts) | 16,951 | 13,535 |
| Total liabilities | 3,192,850 | 3,216,055 |
| Commitments and contingencies (Note 13) | — | — |
| Fannie Mae stockholders' equity (deficit): | | |
| Senior preferred stock, 1,000,000 shares issued and outstanding | 117,149 | 112,578 |
| Preferred stock, 700,000,000 shares are authorized—555,374,922 shares issued and outstanding | 19,130 | 19,130 |
| Common stock, no par value, no maximum authorization—1,308,762,703 shares issued, 1,158,069,699 and 1,157,767,400 shares outstanding, respectively | 687 | 687 |
| Accumulated deficit | (126,300) | (128,381) |
| Accumulated other comprehensive loss | (545) | (1,235) |
| Treasury stock, at cost, 150,693,004 and 150,995,303 shares, respectively | (7,401) | (7,403) |
| Total Fannie Mae stockholders' equity (deficit) | 2,720 | (4,624) |
| Noncontrolling interest | 50 | 53 |
| Total equity (deficit) | 2,770 | (4,571) |
| Total liabilities and equity (deficit) | $ 3,195,620 | $ 3,211,484 |

<div align="center">

See Notes to Condensed Consolidated Financial Statements

85

</div>

**FANNIE MAE**
**(In conservatorship)**
**Condensed Consolidated Statements of Operations and Comprehensive Income (Loss) — (Unaudited)**
(Dollars and shares in millions, except per share amounts)

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| Interest income: | | | | |
| Trading securities | $ 73 | $ 264 | $ 522 | $ 548 |
| Available-for-sale securities | 1,035 | 1,152 | 1,762 | 2,365 |
| Mortgage loans (includes $28,424 and $31,613, respectively, for the three months ended and $57,425 and $63,478, respectively, for the six months ended related to consolidated trusts) | 32,023 | 35,333 | 64,593 | 70,923 |
| Other | 40 | 25 | 78 | 53 |
| Total interest income | 33,171 | 36,774 | 66,955 | 73,889 |
| Interest expense: | | | | |
| Short-term debt | 32 | 81 | 74 | 188 |
| Long-term debt (includes $24,714 and $27,919, respectively, for the three months ended and $50,074 and $55,771, respectively, for the six months ended related to consolidated trusts) | 27,711 | 31,721 | 56,256 | 63,769 |
| Total interest expense | 27,743 | 31,802 | 56,330 | 63,957 |
| Net interest income | 5,428 | 4,972 | 10,625 | 9,932 |
| Benefit (provision) for credit losses | 3,041 | (6,537) | 1,041 | (17,091) |
| Net interest income (loss) after benefit (provision) for credit losses | 8,469 | (1,565) | 11,666 | (7,159) |
| Investment gains, net | 131 | 171 | 247 | 246 |
| Other-than-temporary impairments | (196) | (28) | (276) | (85) |
| Noncredit portion of other-than-temporary impairments recognized in other comprehensive income | (403) | (28) | (387) | (15) |
| Net other-than-temporary impairments | (599) | (56) | (663) | (100) |
| Fair value losses, net | (2,449) | (1,634) | (2,166) | (1,345) |
| Debt extinguishment losses, net | (93) | (43) | (127) | (30) |
| Fee and other income | 395 | 265 | 770 | 502 |
| Non-interest loss | (2,615) | (1,297) | (1,939) | (727) |
| Administrative expenses: | | | | |
| Salaries and employee benefits | 292 | 310 | 598 | 630 |
| Professional services | 179 | 169 | 347 | 358 |
| Occupancy expenses | 48 | 43 | 91 | 85 |
| Other administrative expenses | 48 | 47 | 95 | 101 |
| Total administrative expenses | 567 | 569 | 1,131 | 1,174 |
| Foreclosed property (income) expense | (70) | (478) | 269 | 10 |
| Other expenses | 238 | 32 | 490 | 384 |
| Total expenses | 735 | 123 | 1,890 | 1,568 |
| Income (loss) before federal income taxes | 5,119 | (2,985) | 7,837 | (9,454) |
| Benefit for federal income taxes | — | (93) | — | (91) |
| Net income (loss) | 5,119 | (2,892) | 7,837 | (9,363) |
| Other comprehensive income (loss): | | | | |
| Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes | 320 | (1) | 675 | 178 |
| Other | 8 | 3 | 15 | 5 |
| Total other comprehensive income | 328 | 2 | 690 | 183 |
| Total comprehensive income (loss) | 5,447 | (2,890) | 8,527 | (9,180) |
| Less: Comprehensive income attributable to the noncontrolling interest | (5) | (1) | (4) | (1) |
| Total comprehensive income (loss) attributable to Fannie Mae | $ 5,442 | $ (2,891) | $ 8,523 | $ (9,181) |
| Net income (loss) | $ 5,119 | $ (2,892) | $ 7,837 | $ (9,363) |
| Less: Net income attributable to the noncontrolling interest | (5) | (1) | (4) | (1) |
| Net income (loss) attributable to Fannie Mae | 5,114 | (2,893) | 7,833 | (9,364) |
| Preferred stock dividends | (2,929) | (2,282) | (5,746) | (4,498) |
| Net income (loss) attributable to common stockholders | $ 2,185 | $ (5,175) | $ 2,087 | $ (13,862) |
| Earnings (loss) per share: | | | | |
| Basic | $ 0.38 | $ (0.90) | $ 0.36 | $ (2.43) |
| Diluted | 0.37 | (0.90) | 0.35 | (2.43) |
| Weighted-average common shares outstanding: | | | | |

| | | | | |
|---|---|---|---|---|
| Basic | 5,762 | 5,730 | 5,762 | 5,714 |
| Diluted | 5,893 | 5,730 | 5,893 | 5,714 |

See Notes to Condensed Consolidated Financial Statements

86

**FANNIE MAE**
**(In conservatorship)**
**Condensed Consolidated Statements of Cash Flows — (Unaudited)**
**(Dollars in millions)**

| | For the Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| **Net cash provided by (used in) operating activities** | $ 24,135 | $ (2,095) |
| **Cash flows provided by investing activities:** | | |
| Purchases of trading securities held for investment | (1,095) | (545) |
| Proceeds from maturities and paydowns of trading securities held for investment | 1,763 | 1,051 |
| Proceeds from sales of trading securities held for investment | 693 | 516 |
| Purchases of available-for-sale securities | (25) | (44) |
| Proceeds from maturities and paydowns of available-for-sale securities | 5,972 | 6,933 |
| Proceeds from sales of available-for-sale securities | 696 | 1,850 |
| Purchases of loans held for investment | (81,192) | (26,000) |
| Proceeds from repayments of loans held for investment of Fannie Mae | 14,236 | 11,722 |
| Proceeds from repayments of loans held for investment of consolidated trusts | 355,110 | 226,210 |
| Net change in restricted cash | (5,188) | 26,099 |
| Advances to lenders | (56,489) | (27,990) |
| Proceeds from disposition of acquired property and preforeclosure sales | 20,570 | 24,142 |
| Net change in federal funds sold and securities purchased under agreements to resell or similar agreements | 22,000 | (7,749) |
| Other, net | (92) | (33) |
| Net cash provided by investing activities | 276,959 | 236,162 |
| **Cash flows used in financing activities:** | | |
| Proceeds from issuance of debt of Fannie Mae | 337,683 | 345,028 |
| Payments to redeem debt of Fannie Mae | (408,557) | (401,125) |
| Proceeds from issuance of debt of consolidated trusts | 160,523 | 117,760 |
| Payments to redeem debt of consolidated trusts | (382,520) | (305,465) |
| Payments of cash dividends on senior preferred stock to Treasury | (5,750) | (4,497) |
| Proceeds from senior preferred stock purchase agreement with Treasury | 4,571 | 11,100 |
| Net change in federal funds purchased and securities sold under agreements to repurchase | 153 | — |
| Other, net | (8) | 109 |
| Net cash used in financing activities | (293,905) | (237,090) |
| **Net increase (decrease) in cash and cash equivalents** | 7,189 | (3,023) |
| Cash and cash equivalents at beginning of period | 17,539 | 17,297 |
| Cash and cash equivalents at end of period | $ 24,728 | $ 14,274 |
| **Cash paid during the period for interest** | $ 60,926 | $ 65,710 |

See Notes to Condensed Consolidated Financial Statements

87

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**
**(UNAUDITED)**

**1. Summary of Significant Accounting Policies**

*Organization*

We are a stockholder-owned corporation organized and existing under the Federal National Mortgage Association Charter Act (the "Charter Act" or our "charter"). We are a government-sponsored enterprise ("GSE"), and we are subject to government oversight and regulation. Our regulators include the Federal Housing Finance Agency ("FHFA"), the U.S. Department of Housing and Urban Development ("HUD"), the U.S. Securities and Exchange Commission ("SEC"), and the U.S. Department of the Treasury ("Treasury"). The U.S. government does not guarantee our securities or other obligations.

*Conservatorship*

On September 7, 2008, the Secretary of the Treasury and the Director of FHFA announced several actions taken by Treasury and FHFA regarding Fannie Mae, which included: (1) placing us in conservatorship and (2) the execution of a senior preferred stock purchase agreement by our conservator, on our behalf, and Treasury, pursuant to which we issued to Treasury both senior preferred stock and a warrant to purchase common stock.

Under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Federal Housing Finance Regulatory Reform Act of 2008, (together, the "GSE Act"), the conservator immediately succeeded to (1) all rights, titles, powers and privileges of Fannie Mae, and of any stockholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and (2) title to the books, records and assets of any other legal custodian of Fannie Mae. The conservator has since delegated specified authorities to our Board of Directors and has delegated to management the authority to conduct our day-to-day operations. The conservator retains the authority to withdraw its delegations at any time.

The conservator has the power to transfer or sell any asset or liability of Fannie Mae (subject to limitations and post-transfer notice provisions for transfers of qualified financial contracts) without any approval, assignment of rights or consent of any party. The GSE Act, however, provides that mortgage loans and mortgage-related assets that have been transferred to a Fannie Mae mortgage-backed securities ("MBS") trust must be held by the conservator for the beneficial owners of the Fannie Mae MBS and cannot be used to satisfy the general creditors of Fannie Mae. As of August 8, 2012, FHFA has not exercised this power.

Neither the conservatorship nor the terms of our agreements with Treasury change our obligation to make required payments on our debt securities or perform under our mortgage guaranty obligations. FHFA issued a rule establishing a framework for conservatorship and receivership operations for the GSEs, which became effective in 2011. The rule established procedures for conservatorship and receivership, and priorities of claims for contract parties and other claimants. This rule is part of FHFA's implementation of the powers provided by the Federal Housing Finance Regulatory Reform Act of 2008, and does not seek to anticipate or predict future conservatorships or receiverships.

FHFA has announced that, during the conservatorship, our existing statutory and FHFA-directed regulatory capital requirements will not be binding and that FHFA will not issue quarterly capital classifications. We submit capital reports to FHFA and FHFA monitors our capital levels. The deficit of core capital over statutory minimum capital was $145.1 billion as of June 30, 2012 and $148.4 billion as of December 31, 2011.

The conservatorship has no specified termination date and there continues to be uncertainty regarding the future of our company, including how long the company will continue to exist in its current form, the extent of our role in the market, what form we will have, and what ownership interest, if any, our current common and preferred stockholders will hold in us after the conservatorship is terminated. Under the GSE Act, FHFA must place us into receivership if the Director of FHFA makes a written determination that our assets are less than our obligations or if we have not been paying our debts, in either case, for a period of 60 days. In addition, the Director of FHFA may place us in receivership at his discretion at any time for other reasons, including conditions that FHFA has already asserted existed at the time the former Director of FHFA placed us into conservatorship. Placement into receivership would have a material adverse effect on holders of our common stock, preferred stock, debt securities and Fannie Mae MBS. Should we be placed into receivership, different assumptions would be required to determine the carrying value of our assets, which could lead to substantially different financial results. We are not aware of any plans of FHFA to significantly change our business model or capital structure in the near term.

88

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the senior preferred stock purchase agreement, Treasury has committed to provide us with funding as described below to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above. We have received a total of $116.1 billion from Treasury pursuant to the senior preferred stock purchase agreement as of June 30, 2012. The aggregate liquidation preference of the senior preferred stock, including the initial aggregate liquidation preference of $1.0 billion, remains at $117.1 billion as of June 30, 2012.

The senior preferred stock purchase agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any net worth deficiencies attributable to periods during 2010, 2011, and 2012. If we do not have a positive net worth as of December 31, 2012, then the amount of funding available under the amended senior preferred stock purchase agreement after 2012 will be $124.8 billion ($200 billion less $75.2 billion in cumulative draws for net worth deficiencies through December 31, 2009).

In the event we have a positive net worth as of December 31, 2012, then the amount of funding available after 2012 under the amended senior preferred stock purchase agreement will depend on the size of that positive net worth relative to the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, as follows:

- If our positive net worth as of December 31, 2012 is less than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less our positive net worth as of December 31, 2012.

- If our positive net worth as of December 31, 2012 is greater than the cumulative draws for net worth deficiencies attributable to periods during 2010, 2011, and 2012, then the amount of available funding will be $124.8 billion less the cumulative draws attributable to periods during 2010, 2011, and 2012.

We were scheduled to begin paying a quarterly commitment fee to Treasury under the senior preferred stock purchase agreement beginning on March 31, 2011; however, Treasury waived the quarterly commitment fee for each quarter of 2011 and the first, second and third quarters of 2012 due to the continued fragility of the U.S. mortgage market and Treasury's belief that the imposition of the quarterly commitment fee would not generate increased compensation for taxpayers. In its notification to FHFA that it had waived the quarterly commitment fee for the third quarter of 2012, Treasury indicated that it will reevaluate the situation during the next calendar quarter to determine whether the quarterly commitment fee should then be set. The agreement provides that Treasury may waive the periodic commitment fee for up to one year at a time, in its sole discretion, based on adverse conditions in the U.S. mortgage market.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong primarily due to actions taken by the federal government to support us and the financial markets.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, due to our reliance on the U.S. government's support, our access to debt funding or the cost of debt funding also could be materially adversely affected by a change or perceived change in the creditworthiness of the U.S. government. A downgrade in our credit ratings could reduce demand for our debt securities and increase our borrowing costs. Standard & Poor's Ratings Services' ("S&P") downgrade of our credit rating on August 8, 2011, which was a result of a similar action on the U.S. government's sovereign credit rating, has not adversely affected our access to debt funding or the cost of our debt funding. Future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

In February 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The

89

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

report provides that the Obama Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both institutions. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. In February 2012, Treasury Secretary Geithner stated that the Administration intended to release new details around approaches to housing finance reform, including winding down Fannie Mae and Freddie Mac, and to work with Congressional leaders to explore options for legislation, but that he does not expect housing finance reform legislation to be enacted in 2012. We cannot predict the prospects for the enactment, timing or content of legislative proposals regarding the future of the GSEs.

### *Basis of Presentation*

The accompanying unaudited interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the SEC's instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and note disclosures required by GAAP for complete consolidated financial statements. In the opinion of management, all adjustments of a normal recurring nature considered necessary for a fair presentation have been included. The accompanying condensed consolidated financial statements include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany accounts and transactions have been eliminated. Results for the three and six months ended  June 30, 2012 may not necessarily be indicative of the results for the year ending December 31, 2012. The unaudited interim condensed consolidated financial statements as of and for the three and six months ended June 30, 2012 should be read in conjunction with our audited consolidated financial statements and related notes included in our Annual Report on Form 10-K for the year ended December 31, 2011 ("2011 Form 10-K"), filed with the SEC on February 29, 2012.

### *Related Parties*

As a result of our issuance to Treasury of the warrant to purchase shares of Fannie Mae common stock equal to  79.9% of the total number of shares of Fannie Mae common stock, we and Treasury are deemed related parties. As of June 30, 2012, Treasury held an investment in our senior preferred stock with an aggregate liquidation preference of $117.1 billion. Our administrative expenses were reduced by $26 million and $25 million for the three months ended June 30, 2012 and 2011, respectively, and $48 million and $60 million for the six months ended June 30, 2012 and 2011, respectively, due to reimbursements from Treasury and Freddie Mac for expenses incurred as program administrator for Treasury's Home Affordable Modification Program ("HAMP") and other initiatives under Treasury's Making Home Affordable Program.

During the six months ended June 30, 2011, we received a refund of $1.1 billion from the Internal Revenue Service ("IRS") related to the carryback of our 2009 operating loss to the 2008 and 2007 tax years. In addition, in June 2011, we effectively settled our 2007 and 2008 tax years with the IRS and, as a result, we recognized an income tax benefit of $90 million in our condensed consolidated statements of operations and comprehensive loss for the three and six months ended June 30, 2011.

Under the temporary credit and liquidity facilities ("TCLF") program, we had $2.5 billion and $3.0 billion outstanding, which includes principal and interest, of three-year standby credit and liquidity support as of  June 30, 2012 and December 31, 2011, respectively. Under the new issue bond ("NIB") program, we had $6.9 billion and $7.5 billion outstanding of pass-through securities backed by single-family and multifamily housing bonds issued by housing finance agencies ("HFAs") as of June 30, 2012 and December 31, 2011, respectively. Treasury will bear any initial losses of principal under the TCLF program and the NIB program up to 35% of the total original principal on a combined program-wide basis, and thereafter we will bear the losses of principal that are attributable to the TCLF and the securities we have issued. Treasury will also bear any losses of unpaid interest under the two programs. As of June 30, 2012, there had been no losses of principal or interest under the TCLF program or the NIB program.

As described in "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in our 2011 Form 10-K, in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, required that we increase our single-family guaranty fees by at least  10 basis points and remit this increase to Treasury. Effective April 1, 2012, the guaranty fee on all single-family residential mortgages delivered to Fannie Mae and Freddie Mac on or after that date for securitization was increased by 10 basis points. The resulting fee revenue and expense are recorded in "Mortgage loans interest income" and "Other expenses," respectively, in our condensed

90

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

consolidated statements of operations and comprehensive income (loss). As of June 30, 2012, our liability to Treasury for the remittance of this guaranty fee was $26 million.

FHFA's control of both us and Freddie Mac has caused us and Freddie Mac to be related parties. No transactions outside of normal business activities have occurred between us and Freddie Mac. As of June 30, 2012 and December 31, 2011, we held Freddie Mac mortgage-related securities with a fair value of $14.0 billion and $15.6 billion, respectively, and accrued interest receivable of $60 million and $69 million, respectively. We recognized interest income on these securities held by us of $142 million and $172 million for the three months ended June 30, 2012 and 2011, respectively, and $295 million and $360 million for the six months ended June 30, 2012 and 2011, respectively. In addition, Freddie Mac may be an investor in variable interest entities that we have consolidated, and we may be an investor in variable interest entities that Freddie Mac has consolidated.

### Use of Estimates

Preparing condensed consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions that affect our reported amounts of assets and liabilities, and disclosure of contingent assets and liabilities as of the dates of our condensed consolidated financial statements, as well as our reported amounts of revenues and expenses during the reporting periods. Management has made significant estimates in a variety of areas including, but not limited to, valuation of certain financial instruments, and other assets and liabilities, the allowance for loan losses and reserve for guaranty losses, and other-than-temporary impairment of investment securities. Actual results could be different from these estimates.

In the three months ended June 30, 2012, we updated our assumptions used to project cash flow estimates on our Alt-A and subprime private-label securities to incorporate recent observable market trends, which included extending the time it takes to liquidate loans underlying these securities and increasing severity rates for loans where the servicer stopped advancing payments. These updates resulted in lower net present value of cash flow projections on our Alt-A and subprime securities and increased our other-than-temporary impairment expense by approximately $500 million.

### Collateral

Our liability to third party holders of Fannie Mae MBS that arises as the result of a consolidation of a securitization trust is collateralized by the underlying loans and/or mortgage related securities.

We had reverse repurchase agreements outstanding of $36.1 billion and $49.5 billion as of June 30, 2012 and December 31, 2011, respectively. The fair value of non-cash collateral we accepted was $36.2 billion and $50.1 billion as of June 30, 2012 and December 31, 2011, respectively, of which we were permitted to sell or repledge $27.1 billion and $20.0 billion as of June 30, 2012 and December 31, 2011, respectively. None of the underlying collateral was sold or repledged as of June 30, 2012 or December 31, 2011.

### Allowance for Loan Losses and Reserve for Guaranty Losses

In the six months ended June 30, 2012, we identified misstatements in our consideration of the benefit for repurchase requests, as well as in the calculation used to discount the deferred payment obligation for certain mortgage insurers currently in run-off, when estimating the allowance for loan losses as of December 31, 2011. In the three months ended June 30, 2012, we identified a misstatement in the calculation of the default rate used for certain bonds to estimate the reserve for guaranty losses as of December 31, 2011.

To correct the above misstatements, we have recorded an out-of-period adjustment of $1.1 billion to "Benefit (provision) for credit losses" in our condensed consolidated statement of operations and comprehensive income (loss) for the six months ended June 30, 2012. We have evaluated the effects of these misstatements, both quantitatively and qualitatively, and concluded that no prior periods are materially misstated. We have also concluded that the misstatement is not material to our projected annual 2012 net income.

### Earnings (Loss) per Share

Earnings (loss) per share ("EPS") is presented for both basic EPS and diluted EPS. We compute basic EPS by dividing net income (loss) available to common stockholders by the weighted-average number of shares of common stock outstanding during the period. In addition to common shares outstanding, the computation of basic EPS includes instruments for which

91

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

the holder has (or is deemed to have) the present rights as of the end of the reporting period to share in current period earnings (loss) with common stockholders (*i.e.*, participating securities and common shares that are currently issuable for little or no cost to the holder). We include in the denominator of our basic EPS computation the weighted-average number of shares of common stock that would be issued upon the full exercise of the warrant issued to Treasury. Diluted EPS includes all the components of basic EPS, plus the dilutive effect of common stock equivalents such as convertible securities and stock options, but excludes those common stock equivalents from the calculation of diluted EPS when the effect of inclusion, assessed individually, would be anti-dilutive. There was no impact to the numerator of our diluted EPS calculation from the dilutive convertible preferred stock for the three and six months ended June 30, 2012.

The table below presents the computations of basic and diluted weighted average common shares outstanding.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| | (Shares in millions) | | | |
| Weighted average common shares outstanding—basic | 5,762 | 5,730 | 5,762 | 5,714 |
| Convertible preferred stock | 131 | — | 131 | — |
| Weighted average common shares outstanding—diluted | 5,893 | 5,730 | 5,893 | 5,714 |

### Reclassifications

To conform to our current period presentation, we have reclassified certain amounts reported in our condensed consolidated financial statements.

### Adoption of New Accounting Guidance

Effective January 1, 2012, we prospectively adopted guidance issued by the Financial Accounting Standards Board ("FASB") related to fair value measurement. The new guidance does not expand the use of fair value; instead, it provides guidance about how fair value should be determined where it already is required or permitted under U.S. GAAP. The new fair value guidance changes certain fair value principles and clarifies the FASB's intent on certain items, including a clarification that the principal market should be determined based on the market the entity has access to with the greatest volume and level of activity for the asset or liability. It also expands the disclosures about fair value measurements. The adoption of this guidance did not have a material impact on our condensed consolidated financial statements; however, it required us to expand our fair value disclosures. See "Note 12, Fair Value," for additional information regarding the impact upon adoption of this guidance.

## 2. Consolidations and Transfers of Financial Assets

We have interests in various entities that are considered to be variable interest entities ("VIEs"). The primary types of entities are securitization trusts guaranteed by us via lender swap and portfolio securitization transactions, mortgage and asset-backed trusts that were not created by us, as well as housing partnerships that are established to finance the acquisition, construction, development or rehabilitation of affordable multifamily and single-family housing. These interests include investments in securities issued by VIEs, such as Fannie Mae MBS created pursuant to our securitization transactions and our guaranty to the entity. We consolidate the substantial majority of our single-class securitization trusts because our role as guarantor and master servicer provides us with the power to direct matters (primarily the servicing of mortgage loans) that impact the credit risk to which we are exposed. In contrast, we do not consolidate single-class securitization trusts when other organizations have the power to direct these activities.

As of June 30, 2012, we consolidated certain VIEs that were not consolidated as of December 31, 2011, generally due to increases in the amount of the certificates issued by the entity that are held in our portfolio (for example, when we hold a substantial portion of the securities issued by Fannie Mae multi-class resecuritization trusts). As a result of consolidating these entities, which had combined total assets of $2.8 billion in unpaid principal balance as of June 30, 2012, we derecognized our investment in these entities and recognized the assets and liabilities of the consolidated entities at fair value.

As of June 30, 2012, we also deconsolidated certain VIEs that were consolidated as of December 31, 2011, generally due to decreases in the amount of the certificates issued by the entity that are held in our portfolio. As a result of deconsolidating

92

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

these entities, which had combined total assets of $102 million in unpaid principal balance as of December 31, 2011, we derecognized the assets and liabilities of the entities and recognized at fair value our retained interests as securities in our condensed consolidated balance sheets.

*Unconsolidated VIEs*

We do not consolidate VIEs when we are not deemed to be the primary beneficiary. Our unconsolidated VIEs include securitization trusts, as well as other investment entities. The following table displays the carrying amount and classification of our assets and liabilities that relate to our involvement with unconsolidated VIEs as of June 30, 2012 and December 31, 2011, as well as our maximum exposure to loss and the total assets of those unconsolidated VIEs.

| | As of June 30, 2012 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
|     Available-for-sale securities [1] | $ 62,010 | $ — | $ — |
|     Trading securities [1] | 23,285 | 537 | — |
|     Other assets | 272 | — | 116 |
|   Other liabilities | (1,695) | — | (138) |
|   **Net carrying amount** | $ 83,872 | $ 537 | $ (22) |
| **Maximum exposure to loss [1]** | $ 93,272 | $ 537 | $ 109 |
| **Total assets of unconsolidated VIEs [1]** | $ 636,023 | $ 78,306 | $ 11,336 |

| | As of December 31, 2011 | | |
|---|---|---|---|
| | Mortgage-Backed Trusts | Asset-Backed Trusts | Limited Partnership Investments |
| | (Dollars in millions) | | |
| **Assets and liabilities recorded in our condensed consolidated balance sheets:** | | | |
| Assets: | | | |
|     Available-for-sale securities [1] | $ 69,101 | $ — | $ — |
|     Trading securities [1] | 24,292 | 2,111 | — |
|     Other assets | 271 | — | 145 |
|   Other liabilities | (1,347) | — | (153) |
|   **Net carrying amount** | $ 92,317 | $ 2,111 | $ (8) |
| **Maximum exposure to loss [1]** | $ 100,146 | $ 2,111 | $ 137 |
| **Total assets of unconsolidated VIEs [1]** | $ 641,346 | $ 256,845 | $ 12,256 |

————————

[1]   Contains securities recognized in our condensed consolidated balance sheets due to consolidation of certain multi-class resecuritization trusts.

Our maximum exposure to loss generally represents the greater of our recorded investment in the entity or the unpaid principal balance of the assets covered by our guaranty. However, our securities issued by Fannie Mae multi-class resecuritization trusts that are not consolidated do not give rise to any additional exposure to loss as we already consolidate the underlying collateral.

93

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

### Transfers of Financial Assets

We issue Fannie Mae MBS through portfolio securitization transactions by transferring pools of mortgage loans or mortgage-related securities to one or more trusts or special purpose entities. We are considered to be the transferor when we transfer assets from our own portfolio in a portfolio securitization transaction. For the three months ended June 30, 2012 and 2011, the unpaid principal balance of portfolio securitizations was $46.4 billion and $27.3 billion, respectively. For the six months ended June 30, 2012 and 2011, the unpaid principal balance of portfolio securitizations was $88.1 billion and $56.6 billion, respectively.

The following table displays some key characteristics of the securities retained in unconsolidated portfolio securitization trusts.

| | Fannie Mae Single-class MBS & Fannie Mae Megas | REMICS & SMBS[1] |
|---|---|---|
| | (Dollars in millions) | |
| **As of June 30, 2012** | | |
| Unpaid principal balance | $ 526 | $ 10,407 |
| Fair value | 585 | 11,679 |
| Weighted-average coupon | 6.21 % | 5.67 % |
| Weighted-average loan age | 5.9 years | 4.3 years |
| Weighted-average maturity | 23.0 years | 16.1 years |
| **As of December 31, 2011** | | |
| Unpaid principal balance | $ 588 | $ 12,697 |
| Fair value | 654 | 14,043 |
| Weighted-average coupon | 6.21 % | 5.86 % |
| Weighted-average loan age | 5.4 years | 4.5 years |
| Weighted-average maturity | 23.5 years | 18.6 years |

_____

[1]   Consists of Real Estate Mortgage Investment Conduits ("REMICs") and stripped mortgage-backed securities ("SMBS").

For the three months ended June 30, 2012 and 2011, the principal and interest received on retained interests was $636 million and $715 million, respectively. For the six months ended June 30, 2012 and 2011, the principal and interest received on retained interests was $1.3 billion and $1.5 billion, respectively.

### Managed Loans

We define "managed loans" as on-balance sheet mortgage loans as well as mortgage loans that we have securitized in unconsolidated portfolio securitization trusts. The following table displays the unpaid principal balances of managed loans, including those managed loans that were delinquent as of June 30, 2012 and December 31, 2011.

94

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of | | | |
| --- | --- | --- | --- | --- |
| | June 30, 2012 | | December 31, 2011 | |
| | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] | Unpaid Principal Balance | Principal Amount of Delinquent Loans[1] |
| | (Dollars in millions) | | | |
| Loans held for investment: | | | | |
| Of Fannie Mae | $      385,172 | $      111,800 | $      396,276 | $      122,392 |
| Of consolidated trusts | 2,586,317 | 18,793 | 2,570,339 | 24,893 |
| Loans held for sale | 453 | 127 | 312 | 57 |
| Securitized loans | 2,196 | 2 | 2,273 | 71 |
| Total loans managed | $   2,974,138 | $   130,722 | $   2,969,200 | $   147,413 |

_____

[1]   Represents the unpaid principal balance of loans held for investment, loans held for sale and securitized loans for which we are no longer accruing interest and loans   90 days or more delinquent which are continuing to accrue interest.

### Qualifying Sales of Portfolio Securitizations

The majority of our portfolio securitization transactions do not qualify for sale treatment as we consolidate the substantial majority of our single-class MBS trusts. We report assets and liabilities of consolidated trusts created via portfolio securitization transactions that do not qualify as sales in our condensed consolidated balance sheets.

We recognize assets obtained and liabilities incurred in qualifying sales of portfolio securitizations at fair value. Proceeds from the initial sale of securities from portfolio securitizations were $163 million and $513 million for the three months ended June 30, 2012 and 2011, respectively. Proceeds from the initial sale of securities from portfolio securitizations were $296 million and $621 million for the six months ended June 30, 2012 and 2011, respectively. Our continuing involvement in the form of guaranty assets and guaranty liabilities with assets that were transferred into unconsolidated trusts is not material to our condensed consolidated financial statements.

### Other Securitizations

We also completed other portfolio securitization transactions that did not qualify as sales during the six months ended June 30, 2012 and were accounted for as secured borrowings. Proceeds from these transactions were $ 421 million and were recorded as long-term debt of Fannie Mae in our condensed consolidated balance sheet. As of June 30, 2012, the fair value of trading securities underlying these transactions was $ 201 million, and the unpaid principal balance of mortgage loans of consolidated trusts underlying these transactions was $ 227 million. The related assets have been transferred to MBS trusts and are restricted solely for the purpose of servicing the related MBS. We did not complete any securitizations of this type during the six months ended June 30, 2011.

### 3. Mortgage Loans

The following table displays our mortgage loans as of June 30, 2012 and December 31, 2011.

9 5

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012 | | | December 31, 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| Single-family | $ 316,090 | $ 2,475,043 | $ 2,791,133 | $ 319,496 | $ 2,470,533 | $ 2,790,029 |
| Multifamily | 69,463 | 111,346 | 180,809 | 77,026 | 99,872 | 176,898 |
| Total unpaid principal balance of mortgage loans | 385,553 | 2,586,389 | 2,971,942 | 396,522 | 2,570,405 | 2,966,927 |
| Cost basis and fair value adjustments, net | (15,510) | 30,185 | 14,675 | (16,143) | 19,993 | 3,850 |
| Allowance for loan losses for loans held for investment | (52,082) | (11,293) | (63,375) | (57,309) | (14,847) | (72,156) |
| Total mortgage loans | $ 317,961 | $ 2,605,281 | $ 2,923,242 | $ 323,070 | $ 2,575,551 | $ 2,898,621 |

During the three and six months ended June 30, 2012, we redesignated loans with a carrying value of $14 million from held for investment ("HFI") to held for sale ("HFS"). During the three months ended June 30, 2011, there were no loans redesignated from HFI to HFS. During the six months ended June 30, 2011, we redesignated loans with a carrying value of $561 million from HFI to HFS.

### Nonaccrual Loans

We discontinue accruing interest on loans when we believe collectibility of principal or interest is not reasonably assured, which for single-family loans we have determined, based on our historical experience, to be when the loan becomes 60 days or more past due according to its contractual terms. We generally place multifamily loans on nonaccrual status when the loan is deemed to be individually impaired, unless the loan is well secured such that collectibility of principal and accrued interest is reasonably assured.

When a loan is placed on nonaccrual status, interest previously accrued but not collected becomes part of our recorded investment in the loan and is collectively reviewed for impairment. For single-family loans, we recognize interest income for loans on nonaccrual status when cash is received. For multifamily loans on nonaccrual status, we apply any payment received on a cost recovery basis to reduce principal on the mortgage loan.

We return a single-family loan to accrual status at the point that the borrower has made sufficient payments to reduce their delinquency below our nonaccrual threshold. For modified single-family loans, the loan is not returned to accrual status until the borrower successfully makes all required payments during the trial period (generally three to four months) and the modification is made permanent. We generally return a multifamily loan to accrual status when the borrower cures the delinquency of the loan or we otherwise determine that the loan is well secured such that collectibility is reasonably assured.

### Aging Analysis

The following tables display an aging analysis of the total recorded investment in our HFI mortgage loans, excluding loans for which we have elected the fair value option, by portfolio segment and class as of June 30, 2012 and December 31, 2011.

96

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of June 30, 2012[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $ 38,978 | $ 12,844 | $ 73,084 | $ 124,906 | $ 2,387,341 | $ 2,512,247 | $ 105 | $ 85,781 |
| Government[4] | 86 | 42 | 328 | 456 | 50,884 | 51,340 | 328 | — |
| Alt-A | 6,297 | 2,522 | 25,048 | 33,867 | 131,105 | 164,972 | 16 | 27,549 |
| Other[5] | 2,911 | 1,158 | 9,829 | 13,898 | 66,441 | 80,339 | 76 | 10,842 |
| Total single-family | 48,272 | 16,566 | 108,289 | 173,127 | 2,635,771 | 2,808,898 | 525 | 124,172 |
| Multifamily[6] | 169 | NA | 540 | 709 | 182,640 | 183,349 | — | 2,072 |
| Total | $ 48,441 | $ 16,566 | $ 108,829 | $ 173,836 | $ 2,818,411 | $ 2,992,247 | $ 525 | $ 126,244 |

| | As of December 31, 2011[1] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 30 - 59 Days Delinquent | 60 - 89 Days Delinquent | Seriously Delinquent[2] | Total Delinquent | Current | Total | Recorded Investment in Loans 90 Days or More Delinquent and Accruing Interest | Recorded Investment in Nonaccrual Loans |
| | (Dollars in millions) | | | | | | | |
| Single-family: | | | | | | | | |
| Primary[3] | $ 43,516 | $ 15,282 | $ 80,712 | $ 139,510 | $ 2,341,646 | $ 2,481,156 | $ 111 | $ 95,959 |
| Government[4] | 109 | 49 | 327 | 485 | 51,391 | 51,876 | 327 | — |
| Alt-A | 7,155 | 3,054 | 28,323 | 38,532 | 138,880 | 177,412 | 14 | 31,356 |
| Other[5] | 3,403 | 1,431 | 11,277 | 16,111 | 73,115 | 89,226 | 96 | 12,533 |
| Total single-family | 54,183 | 19,816 | 120,639 | 194,638 | 2,605,032 | 2,799,670 | 548 | 139,848 |
| Multifamily[6] | 210 | NA | 1,105 | 1,315 | 177,906 | 179,221 | — | 2,764 |
| Total | $ 54,393 | $ 19,816 | $ 121,744 | $ 195,953 | $ 2,782,938 | $ 2,978,891 | $ 548 | $ 142,612 |

_____

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Single-family seriously delinquent loans are loans that are 90 days or more past due or in the foreclosure process. Multifamily seriously delinquent loans are loans that are 60 days or more past due.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A. Primarily consists of reverse mortgages which due to their nature are not aged and are included in the current column.

[5] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[6] Multifamily loans 60-89 days delinquent are included in the seriously delinquent column.

*Credit Quality Indicators*

The following table displays the total recorded investment in our single-family HFI loans, excluding loans for which we have elected the fair value option, by class and credit quality indicator as of June 30, 2012 and December 31, 2011. The single-family credit quality indicator is updated quarterly.

TREASURY-4005

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012[1][2] | | | December 31, 2011[1][2] | | |
| | Primary [3] | Alt-A | Other [4] | Primary [3] | Alt-A | Other [4] |
| | (Dollars in millions) | | | | | |
| Estimated mark-to-market LTV ratio: [5] | | | | | | |
| Less than or equal to 80% | $ 1,582,116 | $ 58,906 | $ 22,573 | $ 1,464,348 | $ 61,618 | $ 23,414 |
| Greater than 80% and less than or equal to 90% | 372,620 | 19,484 | 8,067 | 412,342 | 21,369 | 9,224 |
| Greater than 90% and less than or equal to 100% | 233,739 | 18,011 | 8,228 | 246,648 | 19,790 | 9,445 |
| Greater than 100% and less than or equal to 110% | 116,616 | 15,292 | 7,985 | 128,428 | 16,164 | 8,951 |
| Greater than 110% and less than or equal to 120% | 67,940 | 11,992 | 7,223 | 73,836 | 12,534 | 7,912 |
| Greater than 120% and less than or equal to 125% | 24,343 | 4,852 | 3,118 | 25,750 | 5,087 | 3,557 |
| Greater than 125% | 114,873 | 36,435 | 23,145 | 129,804 | 40,850 | 26,723 |
| Total | $ 2,512,247 | $ 164,972 | $ 80,339 | $ 2,481,156 | $ 177,412 | $ 89,226 |

---

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Excludes $51.3 billion and $51.9 billion as of June 30, 2012 and December 31, 2011, respectively, of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A loans. The segment class is primarily reverse mortgages for which we do not calculate an estimated mark-to-market LTV.

[3] Consists of mortgage loans that are not included in other loan classes.

[4] Includes loans with higher-risk loan characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The aggregate estimated mark-to-market LTV ratio is based on the unpaid principal balance of the loan as of the end of each reported period divided by the estimated current value of the property, which we calculate using an internal valuation model that estimates periodic changes in home value.

The following table displays the total recorded investment in our multifamily HFI loans, excluding loans for which we have elected the fair value option, by credit quality indicator as of June 30, 2012 and December 31, 2011. The multifamily credit quality indicator is updated quarterly.

| | As of | |
|---|---|---|
| | June 30, 2012[1] | December 31, 2011[1] |
| | (Dollars in millions) | |
| Credit risk profile by internally assigned grade: [2] | | |
| Green | $ 142,759 | $ 131,740 |
| Yellow[3] | 23,314 | 28,354 |
| Orange | 16,164 | 17,355 |
| Red | 1,112 | 1,772 |
| Total | $ 183,349 | $ 179,221 |

---

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Green (loan with acceptable risk); yellow (loan with signs of potential weakness); orange (loan with a well defined weakness that may jeopardize the timely full repayment); and red (loan with a weakness that makes timely collection or liquidation in full more questionable based on existing conditions and values).

[3] Includes approximately $5.6 billion and $6.9 billion of unpaid principal balance as of June 30, 2012 and December 31, 2011, respectively, classified as yellow due to no available financial information.

### Individually Impaired Loans

Individually impaired loans include TDRs, acquired credit-impaired loans, and multifamily loans that we have assessed as probable that we will not collect all contractual amounts due, regardless of whether we are currently accruing interest. The

98

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

following tables display the total recorded investment, unpaid principal balance, and related allowance as of June 30, 2012 and December 31, 2011 and interest income recognized and average recorded investment for the three and six months ended June 30, 2012 and 2011 for individually impaired loans.

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2012 | | | | December 31, 2011 | | | |
| | Unpaid Principal Balance | Total Recorded Investment [1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable | Unpaid Principal Balance | Total Recorded Investment [1] | Related Allowance for Loan Losses | Related Allowance for Accrued Interest Receivable |
| | (Dollars in millions) | | | | | | | |
| Individually impaired loans: | | | | | | | | |
| With related allowance recorded: | | | | | | | | |
| Single-family: | | | | | | | | |
| Primary [2] | $ 117,485 | $ 110,755 | $ 27,183 | $ 568 | $ 116,825 | $ 109,684 | $ 29,598 | $ 674 |
| Government [3] | 188 | 185 | 28 | 4 | 258 | 258 | 67 | 8 |
| Alt-A | 34,513 | 31,801 | 10,358 | 225 | 34,318 | 31,516 | 11,121 | 268 |
| Other [4] | 16,011 | 15,230 | 4,838 | 80 | 16,181 | 15,363 | 5,353 | 99 |
| Total single-family | 168,197 | 157,971 | 42,407 | 877 | 167,582 | 156,821 | 46,139 | 1,049 |
| Multifamily | 2,475 | 2,498 | 508 | 13 | 2,832 | 2,855 | 718 | 32 |
| Total individually impaired loans with related allowance recorded | 170,672 | 160,469 | 42,915 | 890 | 170,414 | 159,676 | 46,857 | 1,081 |
| | | | | | | | | |
| With no related allowance recorded: [5] | | | | | | | | |
| Single-family: | | | | | | | | |
| Primary [2] | 11,364 | 8,410 | — | — | 9,370 | 6,471 | — | — |
| Government [3] | 116 | 112 | — | — | 25 | 17 | — | — |
| Alt-A | 3,297 | 1,825 | — | — | 3,056 | 1,538 | — | — |
| Other [4] | 749 | 441 | — | — | 680 | 367 | — | — |
| Total single-family | 15,526 | 10,788 | — | — | 13,131 | 8,393 | — | — |
| Multifamily | 1,755 | 1,764 | — | — | 1,759 | 1,771 | — | — |
| Total individually impaired loans with no related allowance recorded | 17,281 | 12,552 | — | — | 14,890 | 10,164 | — | — |
| Total individually impaired loans [6] | $ 187,953 | $ 173,021 | $ 42,915 | $ 890 | $ 185,304 | $ 169,840 | $ 46,857 | $ 1,081 |

99

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended June 30, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | 2011 | | |
| | Average Recorded Investment | Total Interest Income Recognized [7] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized [7] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | |
| Individually impaired loans: | | | | | | |
| With related allowance recorded: | | | | | | |
| Single-family: | | | | | | |
| Primary [2] | $ 110,527 | $    967 | $ 149 | $ 97,984 | $    911 | $ 326 |
| Government [3] | 204 | 3 | — | 274 | 3 | — |
| Alt-A | 31,600 | 253 | 35 | 28,862 | 239 | 96 |
| Other [4] | 15,218 | 110 | 16 | 14,158 | 106 | 41 |
| Total single-family | 157,549 | 1,333 | 200 | 141,278 | 1,259 | 463 |
| Multifamily | 2,499 | 34 | 1 | 2,055 | 23 | 2 |
| Total individually impaired loans with related allowance recorded | 160,048 | 1,367 | 201 | 143,333 | 1,282 | 465 |
| With no related allowance recorded: [5] | | | | | | |
| Single-family: | | | | | | |
| Primary [2] | 7,367 | 254 | 61 | 7,399 | 144 | 31 |
| Government [3] | 88 | 1 | — | 15 | 3 | — |
| Alt-A | 1,672 | 60 | 13 | 1,959 | 53 | 7 |
| Other [4] | 399 | 20 | 6 | 541 | 13 | 3 |
| Total single-family | 9,526 | 335 | 80 | 9,914 | 213 | 41 |
| Multifamily | 1,712 | 26 | — | 686 | 10 | 2 |
| Total individually impaired loans with no related allowance recorded | 11,238 | 361 | 80 | 10,600 | 223 | 43 |
| Total individually impaired loans | $ 171,286 | $ 1,728 | $ 281 | $ 153,933 | $ 1,505 | $ 508 |

100

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | | **2011** | | |
| | Average Recorded Investment | Total Interest Income Recognized [7] | Interest Income Recognized on a Cash Basis | Average Recorded Investment | Total Interest Income Recognized [7] | Interest Income Recognized on a Cash Basis |
| | (Dollars in millions) | | | | | |
| Individually impaired loans: | | | | | | |
| With related allowance recorded: | | | | | | |
| Single-family: | | | | | | |
| Primary [2] | $ 110,154 | $ 1,940 | $ 322 | $ 97,723 | $ 1,815 | $ 367 |
| Government [3] | 227 | 6 | — | 265 | 6 | — |
| Alt-A | 31,543 | 506 | 74 | 29,213 | 481 | 98 |
| Other [4] | 15,232 | 220 | 34 | 14,108 | 212 | 47 |
| Total single-family | 157,156 | 2,672 | 430 | 141,309 | 2,514 | 512 |
| Multifamily | 2,620 | 65 | 1 | 2,135 | 48 | 3 |
| Total individually impaired loans with related allowance recorded | 159,776 | 2,737 | 431 | 143,444 | 2,562 | 515 |
| With no related allowance recorded: [5] | | | | | | |
| Single-family: | | | | | | |
| Primary [2] | 7,053 | 438 | 115 | 5,695 | 252 | 88 |
| Government [3] | 58 | 3 | — | 11 | 4 | — |
| Alt-A | 1,628 | 111 | 28 | 1,331 | 86 | 26 |
| Other [4] | 390 | 39 | 13 | 385 | 21 | 7 |
| Total single-family | 9,129 | 591 | 156 | 7,422 | 363 | 121 |
| Multifamily | 1,732 | 47 | 1 | 711 | 25 | 5 |
| Total individually impaired loans with no related allowance recorded | 10,861 | 638 | 157 | 8,133 | 388 | 126 |
| Total individually impaired loans | $ 170,637 | $ 3,375 | $ 588 | $ 151,577 | $ 2,950 | $ 641 |

---

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

[5] The discounted cash flows or collateral value equals or exceeds the carrying value of the loan and, as such, no valuation allowance is required.

[6] Includes single-family loans restructured in a TDR with a recorded investment of $165.9 billion and $161.9 billion as of June 30, 2012 and December 31, 2011, respectively. Includes multifamily loans restructured in a TDR with a recorded investment of $1.0 billion and $956 million as of June 30, 2012 and December 31, 2011, respectively.

[7] Total single-family interest income recognized of $1.7 billion and $1.5 billion for the three months ended June 30, 2012 and 2011, respectively, consists of $1.2 billion and $1.1 billion of contractual interest and $436 million and $383 million of effective yield adjustments. Total single-family interest income recognized of $3.3 billion and $2.9 billion for the six months ended June 30, 2012 and 2011, respectively, consists of $2.4 billion and $2.1 billion of contractual interest and $823 million and $735 million of effective yield adjustments.

*Troubled Debt Restructurings*

A modification to the contractual terms of a loan that results in granting a concession to a borrower experiencing financial difficulties is considered a TDR. In addition to formal loan modifications, we also engage in other loss mitigation activities with troubled borrowers, which include repayment plans and forbearance arrangements, both of which represent informal

101

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

agreements with the borrower that do not result in the legal modification of the loan's contractual terms. We account for these informal restructurings as a TDR if we defer more than three missed payments. The substantial majority of the loan modifications we complete result in term extensions, interest rate reductions or a combination of both. During the three months ended June 30, 2012 and 2011, the average term extension of a single-family modified loan was   119 and 76 months, respectively, and the average interest rate reduction was 2.34 and 3.37 percentage points, respectively. During the six months ended June 30, 2012 and 2011, the average term extension of a single-family modified loan was  124 and 71 months, respectively, and the average interest rate reduction was 2.30 and 3.46 percentage points, respectively.

The following table displays the number of loans and recorded investment in loans restructured in a TDR for the three and six months ended June 30, 2012 and 2011.

| | For the Three Months Ended June 30, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment [1] | Number of Loans | Recorded Investment [1] |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Single-family: | | | | |
| Primary [2] | 31,886 | $    5,367 | 35,192 | $    6,365 |
| Government [3] | 92 | 14 | 122 | 21 |
| Alt-A | 6,293 | 1,286 | 7,292 | 1,586 |
| Other [4] | 2,193 | 549 | 3,399 | 851 |
| Total single-family | 40,464 | 7,216 | 46,005 | 8,823 |
| Multifamily | 8 | 65 | 19 | 109 |
| Total troubled debt restructurings | 40,472 | $    7,281 | 46,024 | $    8,932 |

| | For the Six Months Ended June 30, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment [1] | Number of Loans | Recorded Investment [1] |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Single-family: | | | | |
| Primary [2] | 58,770 | $    9,954 | 71,957 | $    13,189 |
| Government [3] | 202 | 28 | 296 | 62 |
| Alt-A | 10,938 | 2,253 | 14,790 | 3,267 |
| Other [4] | 3,853 | 958 | 6,995 | 1,771 |
| Total single-family | 73,763 | 13,193 | 94,038 | 18,289 |
| Multifamily | 21 | 133 | 29 | 175 |
| Total troubled debt restructurings | 73,784 | $    13,326 | 94,067 | $    18,464 |

---

[1]   Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Based on the nature of our modification programs, which do not include principal or interest forgiveness, there is not a material difference between the recorded investment in our loans pre- and post- modification, therefore amounts represent recorded investment post-modification.

[2]   Consists of mortgage loans that are not included in other loan classes.

[3]   Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4]   Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

The following table displays the number of loans and recorded investment in loans that had a payment default for the three and six months ended June 30, 2012 and 2011 and were modified in a TDR in the twelve months prior to the payment default. For purposes of this disclosure, we define loans that had a payment default as single-family and multifamily loans with completed TDRs that liquidated during the period, either through foreclosure, deed-in-lieu of foreclosure or a short sale,

102

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

single-family loans with completed modifications that are two or more months delinquent during the period or multifamily loans with completed modifications that are one or more months delinquent during the period.

| | For the Three Months Ended June 30, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment [1] | Number of Loans | Recorded Investment [1] |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Single-family: | | | | |
| Primary [2] | 10,704 | $ 1,827 | 16,041 | $ 2,822 |
| Government [3] | 49 | 7 | 104 | 30 |
| Alt-A | 2,016 | 403 | 3,687 | 813 |
| Other [4] | 961 | 235 | 1,673 | 407 |
| Total single-family | 13,730 | 2,472 | 21,505 | 4,072 |
| Multifamily | 1 | 1 | 5 | 25 |
| Total TDRs that subsequently defaulted | 13,731 | $ 2,473 | 21,510 | $ 4,097 |

| | For the Six Months Ended June 30, | | | |
| | 2012 | | 2011 | |
| | Number of Loans | Recorded Investment [1] | Number of Loans | Recorded Investment [1] |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| Single-family: | | | | |
| Primary [2] | 22,576 | $ 3,901 | 37,987 | $ 6,696 |
| Government [3] | 99 | 17 | 182 | 51 |
| Alt-A | 4,259 | 869 | 8,696 | 1,879 |
| Other [4] | 2,156 | 523 | 3,865 | 937 |
| Total single-family | 29,090 | 5,310 | 50,730 | 9,563 |
| Multifamily | 2 | 3 | 8 | 49 |
| Total TDRs that subsequently defaulted | 29,092 | $ 5,313 | 50,738 | $ 9,612 |

_____

[1] Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable. Represents our recorded investment in the loan at time of payment default.

[2] Consists of mortgage loans that are not included in other loan classes.

[3] Consists of mortgage loans guaranteed or insured, in whole or in part, by the U.S. government or one of its agencies that are not Alt-A.

[4] Includes loans with higher-risk characteristics, such as interest-only loans and negative-amortizing loans that are neither government nor Alt-A.

## 4. Allowance for Loan Losses

Our allowance for loan losses is a valuation allowance that reflects an estimate of incurred credit losses related to our recorded investment in both single-family and multifamily HFI loans. This population includes both HFI loans held by Fannie Mae and by consolidated Fannie Mae MBS trusts. When calculating our loan loss allowance, we consider only our net recorded investment in the loan at the balance sheet date, which includes the loan's unpaid principal balance and accrued interest recognized while the loan was on accrual status and any applicable cost basis adjustments. We record charge-offs as a reduction to the allowance for loan losses when losses are confirmed through the receipt of assets in full satisfaction of a loan, such as the underlying collateral upon foreclosure or cash upon completion of a short sale.

We aggregate single-family HFI loans that are not individually impaired based on similar risk characteristics, for purposes of estimating incurred credit losses and establish a collective single-family loss reserve using an econometric model that derives an overall loss reserve estimate. We base our allowance and reserve methodology on historical events and trends, such as loss severity (in event of default), default rates, and recoveries from mortgage insurance contracts and other credit enhancements.

TREASURY-4011

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

In addition, management performs a review of the observable data used in its estimate to ensure it is representative of prevailing economic conditions and other events existing as of the balance sheet date.

Individually impaired single-family loans currently include those restructured in a TDR and acquired credit-impaired loans. When a loan has been restructured, we measure impairment using a cash flow analysis discounted at the loan's original effective interest rate. However, if we expect to recover our recorded investment in an individually impaired loan through probable foreclosure of the underlying collateral, we measure impairment based on the fair value of the collateral, reduced by estimated disposal costs and adjusted for estimated proceeds from mortgage, flood, or hazard insurance or similar sources.

We identify multifamily loans for evaluation for impairment through a credit risk assessment process. Based on this evaluation, we determine for loans that are not in homogeneous pools whether or not a loan is individually impaired. If we determine that a multifamily loan is individually impaired, we generally measure impairment on that loan based on the fair value of the underlying collateral less estimated costs to sell the property. If we determine that an individual loan that was specifically evaluated for impairment is not individually impaired, we include the loan as part of a pool of loans with similar characteristics that are evaluated collectively for incurred losses.

The following table displays changes in single-family, multifamily and total allowance for loan losses for the three and six months ended June 30, 2012 and 2011.

| | For the Three Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Single-family allowance for loan losses:** | | | | | | |
| Beginning balance | $ 56,108 | $ 12,630 | $ 68,738 | $ 52,671 | $ 13,413 | $ 66,084 |
| (Benefit) provision for loan losses [1] | (3,244) | (70) | (3,314) | 2,954 | 2,723 | 5,677 |
| Charge-offs [2][3] | (3,724) | (208) | (3,932) | (5,341) | (758) | (6,099) |
| Recoveries | 441 | 44 | 485 | 1,819 | 550 | 2,369 |
| Transfers [4] | 1,607 | (1,607) | — | 2,750 | (2,750) | — |
| Other [5] | 134 | 23 | 157 | 96 | (100) | (4) |
| Ending balance | $ 51,322 | $ 10,812 | $ 62,134 | $ 54,949 | $ 13,078 | $ 68,027 |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance | $ 893 | $ 478 | $ 1,371 | $ 1,037 | $ 436 | $ 1,473 |
| (Benefit) provision for loan losses [1] | (85) | 12 | (73) | 86 | 39 | 125 |
| Charge-offs [2][3] | (59) | — | (59) | (119) | — | (119) |
| Transfers [4] | 9 | (9) | — | 12 | (12) | — |
| Other [5] | 2 | — | 2 | 1 | (1) | — |
| Ending balance | $ 760 | $ 481 | $ 1,241 | $ 1,017 | $ 462 | $ 1,479 |
| **Total allowance for loan losses:** | | | | | | |
| Beginning balance | $ 57,001 | $ 13,108 | $ 70,109 | $ 53,708 | $ 13,849 | $ 67,557 |
| (Benefit) provision for loan losses [1] | (3,329) | (58) | (3,387) | 3,040 | 2,762 | 5,802 |
| Charge-offs [2][3] | (3,783) | (208) | (3,991) | (5,460) | (758) | (6,218) |
| Recoveries | 441 | 44 | 485 | 1,819 | 550 | 2,369 |
| Transfers [4] | 1,616 | (1,616) | — | 2,762 | (2,762) | — |
| Other [5] | 136 | 23 | 159 | 97 | (101) | (4) |
| Ending balance [6] | $ 52,082 | $ 11,293 | $ 63,375 | $ 55,966 | $ 13,540 | $ 69,506 |

104

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | **2012** | | | **2011** | | |
| | Of Fannie Mae | Of Consolidated Trusts | Total | Of Fannie Mae | Of Consolidated Trusts | Total |
| | (Dollars in millions) | | | | | |
| **Single-family allowance for loan losses:** | | | | | | |
| Beginning balance | $ 56,294 | $ 14,339 | $ 70,633 | $ 47,377 | $ 12,603 | $ 59,980 |
| (Benefit) provision for loan losses[1] | (1,844) | 550 | (1,294) | 10,197 | 6,092 | 16,289 |
| Charge-offs[2][3] | (8,128) | (471) | (8,599) | (10,964) | (1,206) | (12,170) |
| Recoveries | 862 | 109 | 971 | 2,349 | 1,502 | 3,851 |
| Transfers[4] | 3,800 | (3,800) | — | 5,912 | (5,912) | — |
| Other[5] | 338 | 85 | 423 | 78 | (1) | 77 |
| Ending balance | $ 51,322 | $ 10,812 | $ 62,134 | $ 54,949 | $ 13,078 | $ 68,027 |
| **Multifamily allowance for loan losses:** | | | | | | |
| Beginning balance | $ 1,015 | $ 508 | $ 1,523 | $ 1,153 | $ 423 | $ 1,576 |
| (Benefit) provision for loan losses[1] | (102) | (11) | (113) | 2 | 98 | 100 |
| Charge-offs[2][3] | (188) | — | (188) | (201) | — | (201) |
| Transfers[4] | 17 | (17) | — | 57 | (57) | — |
| Other[5] | 18 | 1 | 19 | 6 | (2) | 4 |
| Ending balance | $ 760 | $ 481 | $ 1,241 | $ 1,017 | $ 462 | $ 1,479 |
| **Total allowance for loan losses:** | | | | | | |
| Beginning balance | $ 57,309 | $ 14,847 | $ 72,156 | $ 48,530 | $ 13,026 | $ 61,556 |
| (Benefit) provision for loan losses[1] | (1,946) | 539 | (1,407) | 10,199 | 6,190 | 16,389 |
| Charge-offs[2][3] | (8,316) | (471) | (8,787) | (11,165) | (1,206) | (12,371) |
| Recoveries | 862 | 109 | 971 | 2,349 | 1,502 | 3,851 |
| Transfers[4] | 3,817 | (3,817) | — | 5,969 | (5,969) | — |
| Other[5] | 356 | 86 | 442 | 84 | (3) | 81 |
| Ending balance[6] | $ 52,082 | $ 11,293 | $ 63,375 | $ 55,966 | $ 13,540 | $ 69,506 |

---

[1]   (Benefit) provision for loan losses is included in benefit (provision) for credit losses in our condensed consolidated statements of operations and comprehensive income (loss).

[2]   While we purchase the substantial majority of loans that are four or more months delinquent from our MBS trusts, we do not exercise this option to purchase loans during a forbearance period. Accordingly, charge-offs of consolidated trusts generally represent loans that remained in our consolidated trusts at the time of default.

[3]   Total charge-offs include accrued interest of $238 million and $438 million for the three months ended June 30, 2012 and 2011, respectively and $511 million and $824 million for the six months ended June 30, 2012 and 2011, respectively. Single-family charge-offs include accrued interest of $228 million and $423 million for the three months ended June 30, 2012 and 2011, respectively and $486 million and $800 million for the six months ended June 30, 2012 and 2011, respectively. Multifamily charge-offs include accrued interest of $10 million and $15 million for the three months ended June 30, 2012 and 2011, respectively and $25 million and $24 million for the six months ended June 30, 2012 and 2011, respectively.

[4]   Includes transfers from trusts for delinquent loan purchases.

[5]   Amounts represent the net activity recorded in our allowances for accrued interest receivable and preforeclosure property taxes and insurance receivable from borrowers. The provision for credit losses, charge-offs, recoveries and transfer activity included in this table reflects all changes for both the allowance for loan losses and the valuation allowances for accrued interest and preforeclosure property taxes and insurance receivable that relate to the mortgage loans.

[6]   Total allowance for loan losses includes $293 million and $414 million as of June 30, 2012 and 2011, respectively, for acquired credit-impaired loans.

As of June 30, 2012, the allowance for accrued interest receivable for loans of Fannie Mae was $1.8 billion and for loans of consolidated trusts was $251 million. As of December 31, 2011, the allowance for accrued interest receivable for loans of Fannie Mae was $2.2 billion and for loans of consolidated trusts was $336 million.

TREASURY-4013

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

The following table displays the allowance for loan losses and total recorded investment in our HFI loans, excluding loans for which we have elected the fair value option, by impairment or reserve methodology and portfolio segment as of June 30, 2012 and December 31, 2011.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012 | | | December 31, 2011 | | |
| | Single-Family | Multifamily | Total | Single-Family | Multifamily | Total |
| | (Dollars in millions) | | | | | |
| Allowance for loan losses by segment: | | | | | | |
| Individually impaired loans | $ 42,115 | $ 507 | $ 42,622 | $ 45,765 | $ 717 | $ 46,482 |
| Collectively reserved loans | 19,727 | 733 | 20,460 | 24,494 | 805 | 25,299 |
| Acquired credit-impaired loans | 292 | 1 | 293 | 374 | 1 | 375 |
| Total allowance for loan losses | $ 62,134 | $ 1,241 | $ 63,375 | $ 70,633 | $ 1,523 | $ 72,156 |
| | | | | | | |
| Recorded investment in loans by segment: [1] | | | | | | |
| Individually impaired loans | $ 165,938 | $ 4,221 | $ 170,159 | $ 161,942 | $ 4,579 | $ 166,521 |
| Collectively reserved loans | 2,640,139 | 179,087 | 2,819,226 | 2,634,456 | 174,595 | 2,809,051 |
| Acquired credit-impaired loans | 2,821 | 41 | 2,862 | 3,272 | 47 | 3,319 |
| Total recorded investment in loans | $ 2,808,898 | $ 183,349 | $ 2,992,247 | $ 2,799,670 | $ 179,221 | $ 2,978,891 |

_____

[1]   Recorded investment consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments, and accrued interest receivable.

**5. Investments in Securities**

*Trading Securities*

Trading securities are recorded at fair value with subsequent changes in fair value recorded as "Fair value losses, net" in our condensed consolidated statements of operations and comprehensive income (loss). The following table displays our investments in trading securities as of June 30, 2012 and December 31, 2011.

| | As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Mortgage-related securities: | | |
| Fannie Mae | $ 6,819 | $ 7,424 |
| Freddie Mac | 2,974 | 2,732 |
| Ginnie Mae | 282 | 287 |
| Alt-A private-label securities | 1,296 | 1,349 |
| Subprime private-label securities | 1,226 | 1,280 |
| CMBS | 9,930 | 10,411 |
| Mortgage revenue bonds | 689 | 724 |
| Other mortgage-related securities | 118 | 143 |
| Total | 23,334 | 24,350 |
| Non-mortgage-related securities: | | |
| U.S. Treasury securities | 27,064 | 47,737 |
| Asset-backed securities | 537 | 2,111 |
| Total | 27,601 | 49,848 |
| Total trading securities | $ 50,935 | $ 74,198 |

106

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

The following table displays information about our net trading gains and losses for the three and six months ended June 30, 2012 and 2011.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (Dollars in millions) | | | |
| **Net trading gains (losses):** | | | | |
| Mortgage-related securities | $ (12) | $ 131 | $ 284 | $ 360 |
| Non-mortgage-related securities | (2) | 4 | (14) | — |
| Total | $ (14) | $ 135 | $ 270 | $ 360 |
| **Net trading gains (losses) recorded in the period related to securities still held at period end:** | | | | |
| Mortgage-related securities | $ (4) | $ 131 | $ 330 | $ 354 |
| Non-mortgage-related securities | 2 | 7 | (4) | 8 |
| Total | $ (2) | $ 138 | $ 326 | $ 362 |

### *Available-for-Sale Securities*

We measure available-for-sale ("AFS") securities at fair value with unrealized gains and losses recorded as a component of "Other comprehensive income," net of tax, and we record realized gains and losses from the sale of AFS securities in "Investment gains, net" in our condensed consolidated statements of operations and comprehensive income (loss).

The following table displays the gross realized gains, losses and proceeds on sales of AFS securities for the three and six months ended June 30, 2012 and 2011.

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (Dollars in millions) | | | |
| Gross realized gains | $ 9 | $ 73 | $ 27 | $ 133 |
| Gross realized losses | 1 | 47 | 10 | 53 |
| Total proceeds [1] | 132 | 839 | 400 | 1,229 |

---

[1] Excludes proceeds from the initial sale of securities from new portfolio securitizations included in "Note 2, Consolidations and Transfers of Financial Assets."

The following table displays the amortized cost, gross unrealized gains and losses and fair value by major security type for AFS securities we held as of June 30, 2012 and December 31, 2011.

107

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of June 30, 2012 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost [1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI [2] | Gross Unrealized Losses - Other [3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $ 12,100 | $ 1,101 | $ (2) | $ (11) | $ 13,188 |
| Freddie Mac | 10,143 | 840 | — | — | 10,983 |
| Ginnie Mae | 710 | 119 | — | — | 829 |
| Alt-A private-label securities | 12,187 | 267 | (1,084) | (187) | 11,183 |
| Subprime private-label securities | 8,695 | 51 | (1,110) | (406) | 7,230 |
| CMBS[4] | 13,251 | 458 | — | (41) | 13,668 |
| Mortgage revenue bonds | 9,295 | 175 | (54) | (59) | 9,357 |
| Other mortgage-related securities | 3,524 | 82 | (27) | (323) | 3,256 |
| Total | $ 69,905 | $ 3,093 | $ (2,277) | $ (1,027) | $ 69,694 |

| | As of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Total Amortized Cost [1] | Gross Unrealized Gains | Gross Unrealized Losses - OTTI [2] | Gross Unrealized Losses - Other [3] | Total Fair Value |
| | (Dollars in millions) | | | | |
| Fannie Mae | $ 15,486 | $ 1,381 | $ (3) | $ (14) | $ 16,850 |
| Freddie Mac | 11,906 | 917 | — | — | 12,823 |
| Ginnie Mae | 775 | 127 | — | — | 902 |
| Alt-A private-label securities | 13,314 | 233 | (1,618) | (246) | 11,683 |
| Subprime private-label securities | 9,556 | 17 | (1,534) | (453) | 7,586 |
| CMBS[4] | 13,949 | 181 | — | (104) | 14,026 |
| Mortgage revenue bonds | 10,172 | 202 | (56) | (64) | 10,254 |
| Other mortgage-related securities | 3,687 | 92 | (39) | (282) | 3,458 |
| Total | $ 78,845 | $ 3,150 | $ (3,250) | $ (1,163) | $ 77,582 |

_____

[1] Amortized cost consists of unpaid principal balance, unamortized premiums, discounts and other cost basis adjustments as well as the credit component of other-than-temporary impairments recognized in our condensed consolidated statements of operations and comprehensive income (loss).

[2] Represents the noncredit component of other-than-temporary impairment losses recorded in "Accumulated other comprehensive loss" as well as cumulative changes in fair value of securities for which we previously recognized the credit component of an other-than-temporary impairment.

[3] Represents the gross unrealized losses on securities for which we have not recognized an other-than-temporary impairment.

[4] Amortized cost includes $610 million and $686 million as of June 30, 2012 and December 31, 2011, respectively, of increase to the carrying amount from previous fair value hedge accounting.

The following table displays additional information regarding gross unrealized losses and fair value by major security type for AFS securities in an unrealized loss position that we held as of June 30, 2012 and December 31, 2011.

108

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

|  | As of June 30, 2012 | | | |
|  | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
|  | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
|  | (Dollars in millions) | | | |
| Fannie Mae | $ (2) | $ 350 | $ (11) | $ 248 |
| Alt-A private-label securities | (22) | 911 | (1,249) | 5,945 |
| Subprime private-label securities | (13) | 284 | (1,503) | 5,999 |
| CMBS | (5) | 854 | (36) | 526 |
| Mortgage revenue bonds | (31) | 513 | (82) | 1,085 |
| Other mortgage-related securities | (9) | 358 | (341) | 1,532 |
| Total | $ (82) | $ 3,270 | $ (3,222) | $ 15,335 |

|  | As of December 31, 2011 | | | |
|  | Less Than 12 Consecutive Months | | 12 Consecutive Months or Longer | |
|  | Gross Unrealized Losses | Fair Value | Gross Unrealized Losses | Fair Value |
|  | (Dollars in millions) | | | |
| Fannie Mae | $ (4) | $ 519 | $ (13) | $ 208 |
| Alt-A private-label securities | (133) | 1,414 | (1,731) | 6,525 |
| Subprime private-label securities | (73) | 471 | (1,914) | 6,686 |
| CMBS | (20) | 1,458 | (84) | 2,790 |
| Mortgage revenue bonds | (4) | 114 | (116) | 1,971 |
| Other mortgage-related securities | (21) | 547 | (300) | 1,588 |
| Total | $ (255) | $ 4,523 | $ (4,158) | $ 19,768 |

***Other-Than-Temporary Impairments***

We recognize the credit component of other-than-temporary impairments of our debt securities in "Net other-than-temporary impairments" and the noncredit component in "Other comprehensive income" in our condensed consolidated statements of operations and comprehensive income (loss) for those securities that we do not intend to sell and for which it is not more likely than not that we will be required to sell before recovery.

The fair value of our securities varies from period to period due to changes in interest rates, in the performance of the underlying collateral and in the credit performance of the underlying issuer, among other factors. As of June 30, 2012, $3.2 billion of the $3.3 billion of gross unrealized losses on AFS securities had existed for a period of 12 consecutive months or longer. Gross unrealized losses on AFS securities as of June 30, 2012 include unrealized losses on securities with other-than-temporary impairment in which a portion of the impairment remains in "Accumulated other comprehensive loss." The securities with unrealized losses for 12 consecutive months or longer, on average, had a fair value as of June 30, 2012 that was 83% of their amortized cost basis. Based on our review for impairments of AFS securities, which includes an evaluation of the collectibility of cash flows and any intent or requirement to sell the securities, we have concluded that we do not have an intent to sell and we believe it is not more likely than not that we will be required to sell the securities. Additionally, our projections of cash flows indicate that we will recover these unrealized losses over the lives of the securities.

The following table displays our net other-than-temporary impairments by major security type recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three and six months ended June 30, 2012 and 2011.

109

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (Dollars in millions) | | | |
| Alt-A private-label securities | $ 312 | $ 53 | $ 355 | $ 91 |
| Subprime private-label securities | 284 | — | 303 | — |
| Other | 3 | 3 | 5 | 9 |
| Net other-than-temporary impairments | $599 | $56 | $ 663 | $ 100 |

The net other-than-temporary impairment recorded in the three and six months ended June 30, 2012 increased compared with the three and six months ended June 30, 2011, driven primarily by a decrease in the net present value of projected cash flows on our Alt-A and subprime private-label securities due to higher projected loss severity rates on loans underlying these securities. The net present value of projected cash flows decreased because we updated our assumptions due to recent observable market trends, including extending the time it takes to liquidate the loans and increasing loss severity rates for loans where the servicer stopped advancing payments.

The following table displays activity related to the unrealized credit component on debt securities held by us and recognized in our condensed consolidated statements of operations and comprehensive income (loss) for the three and six months ended June 30, 2012 and 2011 . A related unrealized noncredit component has been recognized in "Other comprehensive income (loss)."

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (Dollars in millions) | | | |
| Balance, beginning of period | $ 8,870 | $ 8,040 | $ 8,915 | $ 8,215 |
| Additions for the credit component on debt securities for which OTTI was not previously recognized | 2 | — | 2 | 8 |
| Additions for credit losses on debt securities for which OTTI was previously recognized | 597 | 56 | 661 | 92 |
| Reductions for securities no longer in portfolio at period end | (2) | — | (2) | — |
| Reductions for amortization resulting from changes in cash flows expected to be collected over the remaining life of the securities | (101) | (220) | (210) | (439) |
| Balance, end of period | $ 9,366 | $ 7,876 | $ 9,366 | $ 7,876 |

As of June 30, 2012, those debt securities with other-than-temporary impairment for which we recognized in our condensed consolidated statements of operations and comprehensive income (loss) the amount of loss related to credit consisted predominantly of Alt-A and subprime securities. We evaluate Alt-A (including option adjustable rate mortgage ("ARM")) and subprime private-label securities for other-than-temporary impairment by discounting the projected cash flows from econometric models to estimate the portion of loss in value attributable to credit. Separate components of a third-party model project regional home prices, unemployment and interest rates. The model combines these factors with available current information regarding attributes of loans in pools backing the private-label mortgage-related securities to project prepayment speeds, conditional default rates, loss severities and delinquency rates. It incorporates detailed information on security-level subordination levels and cash flow priority of payments to project security level cash flows. We have recorded other-temporary impairments for the three and six months ended June 30, 2012 based on this analysis. For securities we determined were not other-than-temporarily impaired, we concluded that either the bond had no projected credit loss or if we projected a loss, that the present value of expected cash flows was greater than the security's cost basis.

The following table displays the modeled attributes, including default rates and severities, which are used to determine whether our senior interests in certain non-agency mortgage-related securities will experience a cash shortfall as of June 30, 2012. Assumption of voluntary prepayment rates is also an input to the present value of expected losses.

110

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | | As of June 30, 2012 | | | |
| | | | Alt-A | | |
| | Subprime | Option ARM | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (Dollars in millions) | | |
| **Vintage Year** | | | | | |
| **2004 & Prior:** | | | | | |
| Unpaid principal balance | $ 1,518 | $ 460 | $ 3,101 | $ 459 | $ 2,107 |
| Weighted average collateral default[1] | 41.0 % | 39.9 % | 13.3 % | 30.3 % | 17.8 % |
| Weighted average collateral severities[2] | 70.2 | 60.5 | 54.7 | 53.5 | 47.8 |
| Weighted average voluntary prepayment rates[3] | 6.3 | 5.7 | 11.3 | 6.0 | 8.9 |
| Average credit enhancement[4] | 51.3 | 13.6 | 12.1 | 22.9 | 10.0 |
| **2005** | | | | | |
| Unpaid principal balance | $ 155 | $ 1,235 | $ 1,097 | $ 499 | $ 2,191 |
| Weighted average collateral default[1] | 68.4 % | 54.8 % | 39.7 % | 52.3 % | 38.8 % |
| Weighted average collateral severities[2] | 76.3 | 67.8 | 66.1 | 64.4 | 55.4 |
| Weighted average voluntary prepayment rates[3] | 2.3 | 4.4 | 6.8 | 4.9 | 5.6 |
| Average credit enhancement[4] | 65.5 | 22.3 | 1.0 | 14.9 | 4.9 |
| **2006** | | | | | |
| Unpaid principal balance | $ 11,025 | $ 1,084 | $ 492 | $ 1,488 | $ 1,548 |
| Weighted average collateral default[1] | 71.4 % | 69.6 % | 40.5 % | 57.9 % | 37.4 % |
| Weighted average collateral severities[2] | 78.2 | 69.2 | 67.5 | 64.4 | 57.9 |
| Weighted average voluntary prepayment rates[3] | 2.2 | 3.1 | 5.6 | 3.8 | 5.5 |
| Average credit enhancement[4] | 15.4 | 16.2 | 0.5 | 0.7 | — |
| **2007 & After:** | | | | | |
| Unpaid principal balance | $ 582 | $ — | $ — | $ — | $ 108 |
| Weighted average collateral default[1] | 67.7 % | N/A | N/A | N/A | 40.9 % |
| Weighted average collateral severities[2] | 71.4 | N/A | N/A | N/A | 59.9 |
| Weighted average voluntary prepayment rates[3] | 1.9 | N/A | N/A | N/A | 6.5 |
| Average credit enhancement[4] | 31.3 | N/A | N/A | N/A | 24.4 |
| **Total** | | | | | |
| Unpaid principal balance | $ 13,280 | $ 2,779 | $ 4,690 | $ 2,446 | $ 5,954 |
| Weighted average collateral default[1] | 67.7 % | 58.1 % | 22.3 % | 51.6 % | 31.1 % |
| Weighted average collateral severities[2] | 77.0 | 67.2 | 58.7 | 62.4 | 53.4 |
| Weighted average voluntary prepayment rates[3] | 2.7 | 4.1 | 9.7 | 4.5 | 6.8 |
| Average credit enhancement[4] | 20.8 | 18.5 | 8.3 | 7.7 | 5.8 |

---

[1] The expected remaining cumulative default rate of the collateral pool backing the securities, as a percentage of the current collateral unpaid principal balance, weighted by security unpaid principal balance.

[2] The expected remaining loss given default of the collateral pool backing the securities, calculated as the ratio of remaining cumulative loss divided by cumulative defaults, weighted by security unpaid principal balance.

[3] The average monthly voluntary prepayment rate, weighted by security unpaid principal balance.

[4] The average percent current credit enhancement provided by subordination of other securities. Excludes excess interest projections and monoline bond insurance.

111

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Maturity Information*

The following table displays the amortized cost and fair value of our AFS securities by major security type and remaining maturity, assuming no principal prepayments, as of June 30, 2012. Contractual maturity of mortgage-backed securities is not a reliable indicator of their expected life because borrowers generally have the right to prepay their obligations at any time.

| | | | As of June 30, 2012 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | One Year or Less | | After One Year Through Five Years | | After Five Years Through Ten Years | | After Ten Years | |
| | Total Amortized Cost | Total Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | | (Dollars in millions) | | | | | | |
| Fannie Mae | $ 12,100 | $13,188 | $ — | $ — | $ 18 | $ 19 | $ 1,327 | $ 1,409 | $ 10,755 | $ 11,760 |
| Freddie Mac | 10,143 | 10,983 | 3 | 3 | 51 | 55 | 937 | 1,007 | 9,152 | 9,918 |
| Ginnie Mae | 710 | 829 | — | — | 2 | 2 | 4 | 4 | 704 | 823 |
| Alt-A private-label securities | 12,187 | 11,183 | — | — | 1 | 1 | 204 | 209 | 11,982 | 10,973 |
| Subprime private-label securities | 8,695 | 7,230 | — | — | — | — | — | — | 8,695 | 7,230 |
| CMBS | 13,251 | 13,668 | 62 | 65 | 9,590 | 9,929 | 3,304 | 3,401 | 295 | 273 |
| Mortgage revenue bonds | 9,295 | 9,357 | 56 | 58 | 338 | 346 | 711 | 728 | 8,190 | 8,225 |
| Other mortgage-related securities | 3,524 | 3,256 | — | — | — | — | — | 11 | 3,524 | 3,245 |
| Total | $ 69,905 | $69,694 | $ 121 | $ 126 | $ 10,000 | $ 10,352 | $6,487 | $6,769 | $53,297 | $52,447 |

*Accumulated Other Comprehensive Loss*

The following table displays our accumulated other comprehensive loss by major categories as of  June 30, 2012 and December 31, 2011.

| | As of | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (Dollars in millions) | |
| Net unrealized gains on available-for-sale securities for which we have not recorded other-than-temporary impairment, net of tax | $ 1,174 | $ 1,152 |
| Net unrealized losses on available-for-sale securities for which we have recorded other-than-temporary impairment, net of tax | (1,300) | (1,953) |
| Other losses | (419) | (434) |
| Accumulated other comprehensive loss | $ (545) | $ (1,235) |

The following table displays the activity in other comprehensive income (loss), net of tax, by major categories for the  three and six months ended June 30, 2012 and 2011.

112

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (Dollars in millions) | | | |
| Comprehensive income (loss): | | | | |
| Net income (loss) | $ 5,119 | $ (2,892) | $ 7,837 | $ (9,363) |
| Other comprehensive income (loss), net of tax effect: | | | | |
| Changes in net unrealized (losses) gains on available-for-sale securities (net of tax of $46 and $19, respectively, for the three months ended and net of tax of $150 and $68, respectively, for the six months ended) | (64) | (34) | 255 | 127 |
| Reclassification adjustment for other-than-temporary impairments recognized in net income (loss) (net of tax of $210 and $15, respectively, for the three months ended and $232 and $28, respectively, for the six months ended) | 389 | 40 | 431 | 72 |
| Reclassification adjustment for gains included in net income (loss) (net of tax of $3 for the three months ended and net of tax of $6 and $11, respectively, for the six months ended) | (5) | (7) | (11) | (21) |
| Other | 8 | 3 | 15 | 5 |
| Other comprehensive income | 328 | 2 | 690 | 183 |
| Total comprehensive income (loss) | $ 5,447 | $ (2,890) | $ 8,527 | $ (9,180) |

## 6. Financial Guarantees

We recognize a guaranty obligation for our obligation to stand ready to perform for our guarantees to unconsolidated trusts and other guaranty arrangements. These guarantees expose us to credit losses on the mortgage loans or, in the case of mortgage-related securities, the underlying mortgage loans of the related securities. The contractual terms of our guarantees range from 30 days to 40 years. However, the actual term of each guaranty may be significantly less than the contractual term based on the prepayment characteristics of the related mortgage loans.

For those guarantees recognized in our condensed consolidated balance sheets, our maximum potential exposure under these guarantees is primarily comprised of the unpaid principal balance of the underlying mortgage loans, which totaled $56.5 billion and $59.4 billion as of June 30, 2012 and December 31, 2011, respectively.

In addition, we had maximum potential exposure of $8.8 billion and $9.3 billion for other guarantees not recognized in our condensed consolidated balance sheets as of June 30, 2012 and December 31, 2011, respectively, which primarily represents the unpaid principal balance of loans underlying guarantees issued prior to the effective date of current accounting guidance on guaranty accounting.

The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees recognized in our condensed consolidated balance sheets was $13.5 billion and $14.1 billion as of June 30, 2012 and December 31, 2011, respectively. The maximum amount we could recover through available credit enhancements and recourse with third parties on guarantees not recognized in our condensed consolidated balance sheets was $3.8 billion and $4.0 billion as of June 30, 2012 and December 31, 2011, respectively. Recoverability of such credit enhancements and recourse is subject to, among other factors, our mortgage insurers' and financial guarantors' ability to meet their obligations to us.

The fair value of our guaranty obligations associated with the Fannie Mae MBS included in "Investments in securities" was $2.0 billion and $2.2 billion as of June 30, 2012 and December 31, 2011, respectively.

### *Risk Characteristics of our Book of Business*

We gauge our performance risk under our guaranty based on the delinquency status of the mortgage loans we hold in portfolio, or in the case of mortgage-backed securities, the mortgage loans underlying the related securities.

For single-family loans, management monitors the serious delinquency rate, which is the percentage of single-family loans 90

113

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

days or more past due or in the foreclosure process, and loans that have higher risk characteristics, such as high mark-to-market LTV ratios.

For multifamily loans, management monitors the serious delinquency rate, which is the percentage of loans 60 days or more past due, and other loans that have higher risk characteristics, to determine our overall credit quality indicator. Higher risk characteristics include, but are not limited to, original debt service coverage ratios ("DSCR") below 1.10, current DSCR below 1.0, and high original and current estimated LTV ratios. We stratify multifamily loans into different internal risk categories based on the credit risk inherent in each individual loan.

For single-family and multifamily loans, we use this information, in conjunction with housing market and economic conditions, to structure our pricing and our eligibility and underwriting criteria to reflect the current risk of loans with these higher-risk characteristics, and in some cases we decide to significantly reduce our participation in riskier loan product categories. Management also uses this data together with other credit risk measures to identify key trends that guide the development of our loss mitigation strategies.

The following tables display the current delinquency status and certain higher risk characteristics of our single-family conventional and total multifamily guaranty book of business as of June 30, 2012 and December 31, 2011.

| | As of June 30, 2012[1] | | | As of December 31, 2011[1] | | |
|---|---|---|---|---|---|---|
| | **30 Days Delinquent** | **60 Days Delinquent** | **Seriously Delinquent[2]** | **30 Days Delinquent** | **60 Days Delinquent** | **Seriously Delinquent[2]** |
| Percentage of single-family conventional guaranty book of business[3] | 1.76% | 0.61% | 4.01% | 1.98% | 0.73% | 4.47% |
| Percentage of single-family conventional loans [4] | 1.94 | 0.62 | 3.53 | 2.17 | 0.74 | 3.91 |

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012[1] | | December 31, 2011 [1] | |
| | **Percentage of Single-Family Conventional Guaranty Book of Business[3]** | **Percentage Seriously Delinquent[2][5]** | **Percentage of Single-Family Conventional Guaranty Book of Business[3]** | **Percentage Seriously Delinquent[2][5]** |
| Estimated mark-to-market loan-to-value ratio: | | | | |
| Greater than 100% | 16% | 13.44% | 18% | 13.76% |
| **Geographical distribution:** | | | | |
| Arizona | 3 | 2.82 | 2 | 3.65 |
| California | 19 | 2.07 | 19 | 2.46 |
| Florida | 6 | 11.00 | 6 | 11.80 |
| Nevada | 1 | 7.15 | 1 | 7.42 |
| Select Midwest states[6] | 10 | 3.83 | 10 | 4.39 |
| All other states | 61 | 2.93 | 62 | 3.18 |
| **Product distribution:** | | | | |
| Alt-A | 6 | 11.83 | 7 | 12.43 |
| Subprime | * | 21.02 | * | 23.18 |
| **Vintages:** | | | | |
| 2005 | 6 | 7.34 | 7 | 7.27 |
| 2006 | 6 | 11.66 | 7 | 11.81 |
| 2007 | 8 | 12.38 | 10 | 12.62 |
| 2008 | 6 | 5.98 | 7 | 5.64 |
| All other vintages | 74 | 1.44 | 69 | 1.59 |

114

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

---

\*    Represents less than 0.5% of the single-family conventional guaranty book of business.

(1)    Consists of the portion of our single-family conventional guaranty book of business for which we have detailed loan level information, which constituted approximately   99% of our total single-family conventional guaranty book of business as of  June 30, 2012 and December 31, 2011.

(2)    Consists of single-family conventional loans that were  90 days or more past due or in the foreclosure process, as of  June 30, 2012 and December 31, 2011.

(3)    Calculated based on the aggregate unpaid principal balance of single-family conventional loans for each category divided by the aggregate unpaid principal balance of loans in our single-family conventional guaranty book of business.

(4)    Calculated based on the number of single-family conventional loans that were delinquent divided by the total number of loans in our single-family conventional guaranty book of business.

(5)    Calculated based on the number of single-family conventional loans that were seriously delinquent divided by the total number of single-family conventional loans for each category included in our guaranty book of business.

(6)    Consists of Illinois, Indiana, Michigan, and Ohio.

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 (1) (2) | | December 31, 2011 (1) (2) | |
| | 30 Days Delinquent | Seriously Delinquent (3) | 30 Days Delinquent | Seriously Delinquent (3) |
| Percentage of multifamily guaranty book of business | 0.07% | 0.29% | 0.11% | 0.59% |

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 (1) | | December 31, 2011 (1) | |
| | Percentage of Multifamily Guaranty Book of Business (2) | Percentage Seriously Delinquent (3)(4) | Percentage of Multifamily Guaranty Book of Business (2) | Percentage Seriously Delinquent (3)(4) |
| **Original loan-to-value ratio:** | | | | |
| Greater than 80% | 4% | 0.51% | 5% | 2.51% |
| Less than or equal to 80% | 9 6 | 0.28 | 9 5 | 0.49 |
| **Original debt service coverage ratio:** | | | | |
| Less than or equal to 1.10 | 8 | 0.38 | 8 | 0.24 |
| Greater than 1.10 | 92 | 0.28 | 92 | 0.62 |
| Current debt service coverage ratio less than 1.0 (5) | 6 | 2.27 | 7 | 3.66 |

---

(1)    Consists of the portion of our multifamily guaranty book of business for which we have detailed loan level information, which constituted approximately   99% of our total multifamily guaranty book of business as of  June 30, 2012 and December 31, 2011 excluding loans that have been defeased.

(2)    Calculated based on the aggregate unpaid principal balance of multifamily loans for each category divided by the aggregate unpaid principal balance of loans in our multifamily guaranty book of business.

(3)    Consists of multifamily loans that were  60 days or more past due as of the dates indicated.

(4)    Calculated based on the unpaid principal balance of multifamily loans that were seriously delinquent divided by the aggregate unpaid principal balance of loans for each category included in our guaranty book of business.

(5)    Our estimates of current DSCRs are based on the latest available income information for these properties. Although we use the most recently available results of our multifamily borrowers, there is a lag in reporting, which typically can range from 6 to 18 months, as they prepare their results in the normal course of business.

## 7.  Acquired Property, Net

Acquired property, net consists of held-for-sale foreclosed property received in full satisfaction of a loan, net of a valuation allowance for declines in the fair value of the properties after initial acquisition. We classify properties as held for sale when we intend to sell the property and are actively marketing it for sale. The following table displays the activity in acquired property and the related valuation allowance for the three and six months ended  June 30, 2012 and 2011.

115

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended June 30, 2012 | | | For the Six Months Ended June 30, 2012 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Balance as of beginning of period | $ 11,409 | $ (790) | $ 10,619 | $ 12,401 | $ (1,028) | $ 11,373 |
| Additions | 4,282 | (120) | 4,162 | 8,108 | (241) | 7,867 |
| Disposals | (4,656) | 395 | (4,261) | (9,474) | 913 | (8,561) |
| Write-downs, net of recoveries | — | (133) | (133) | — | (292) | (292) |
| Balance as of end of period | $ 11,035 | $ (648) | $ 10,387 | $ 11,035 | $ (648) | $ 10,387 |

| | For the Three Months Ended June 30, 2011 | | | For the Six Months Ended June 30, 2011 | | |
|---|---|---|---|---|---|---|
| | Acquired Property | Valuation Allowance[1] | Acquired Property, Net | Acquired Property | Valuation Allowance[1] | Acquired Property, Net |
| | (Dollars in millions) | | | | | |
| Balance as of beginning of period | $16,928 | $ (1,664) | $15,264 | $ 18,054 | $ (1,881) | $ 16,173 |
| Additions | 4,998 | (149) | 4,849 | 9,887 | (278) | 9,609 |
| Disposals | (7,011) | 788 | (6,223) | (13,026) | 1,518 | (11,508) |
| Write-downs, net of recoveries | — | (298) | (298) | — | (682) | (682) |
| Balance as of end of period | $ 14,915 | $ (1,323) | $13,592 | $ 14,915 | $ (1,323) | $ 13,592 |

_____

[1] Reflects activities in the valuation allowance for acquired properties held primarily by our single-family segment.

## 8. Short-Term Borrowings and Long-Term Debt

### Short-Term Borrowings

The following table displays our outstanding short-term borrowings (borrowings with an original contractual maturity of one year or less) and weighted-average interest rates of these borrowings as of June 30, 2012 and December 31, 2011.

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | |
| | Outstanding | Weighted- Average Interest Rate [1] | Outstanding | Weighted- Average Interest Rate [1] |
| | (Dollars in millions) | | | |
| Federal funds purchased and securities sold under agreements to repurchase [2] | $ 153 | —% | $ — | —% |
| Fixed-rate short-term debt: | | | | |
| Discount notes[3] | $ 92,424 | 0.14% | $ 146,301 | 0.13% |
| Foreign exchange discount notes[4] | 482 | 1.91 | 371 | 1.88 |
| Other[5] | — | — | 80 | 0.04 |
| Total short-term debt of Fannie Mae | 92,906 | 0.15 | 146,752 | 0.13 |
| Debt of consolidated trusts | 3,908 | 0.17 | 4,973 | 0.09 |
| Total short-term debt | $ 96,814 | 0.15% | $151,725 | 0.13% |

_____

[1] Includes the effects of discounts, premiums, and other cost basis adjustments.

[2] Represents agreements to repurchase securities for a specified price, with repayment generally occurring on the following day.

116

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

(3)   Represents unsecured general obligations with maturities ranging from  overnight to 360 days from the date of issuance.

(4)   Represents foreign exchange discount notes we issue in the Euro commercial paper market with maturities ranging from  5 to 360 days which enable investors to hold short-term investments in different currencies. We do not incur foreign exchange risk on these transactions, as we simultaneously enter into foreign currency swaps that have the effect of converting debt that we issue in foreign denominated currencies into U.S. dollars.

(5)   Includes foreign exchange discount notes denominated in U.S. dollars.

### *Intraday Lines of Credit*

We periodically use secured and unsecured intraday funding lines of credit provided by several large financial institutions. We post collateral which, in some circumstances, the secured party has the right to repledge to third parties. As these lines of credit are uncommitted intraday loan facilities, we may be unable to draw on them if and when needed. We had secured uncommitted lines of credit of $25.0 billion and unsecured uncommitted lines of credit of $500 million as of June 30, 2012 and December 31, 2011. We had no borrowings outstanding from these lines of credit as of  June 30, 2012.

### *Long-Term Debt*

Long-term debt represents borrowings with an original contractual maturity of greater than one year. The following table displays our outstanding long-term debt as of June 30, 2012 and December 31, 2011.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | **June 30, 2012** | | | **December 31, 2011** | | |
| | **Maturities** | **Outstanding** | **Weighted- Average Interest Rate** [1] | **Maturities** | **Outstanding** | **Weighted- Average Interest Rate** [1] |
| | | | (Dollars in millions) | | | |
| Senior fixed: | | | | | | |
| Benchmark notes and bonds | 2012 - 2030 | $   267,347 | 2.63% | 2012 - 2030 | $   277,146 | 2.81% |
| Medium-term notes[2] | 2012 - 2022 | 172,877 | 1.40 | 2012 - 2021 | 176,886 | 1.61 |
| Foreign exchange notes and bonds | 2021 - 2028 | 669 | 5.27 | 2021 - 2028 | 662 | 5.44 |
| Other[3][4] | 2012 - 2040 | 39,848 | 5.27 | 2012 - 2040 | 50,912 | 5.29 |
| Total senior fixed | | 480,741 | 2.41 | | 505,606 | 2.64 |
| Senior floating: | | | | | | |
| Medium-term notes[2] | 2012 - 2019 | 77,026 | 0.31 | 2012 - 2016 | 71,855 | 0.32 |
| Other[3][4] | 2020 - 2037 | 377 | 8.63 | 2020 - 2037 | 420 | 8.01 |
| Total senior floating | | 77,403 | 0.34 | | 72,275 | 0.35 |
| Subordinated fixed: | | | | | | |
| Qualifying subordinated[5] | 2012 - 2014 | 4,894 | 5.08 | 2012 - 2014 | 4,894 | 5.08 |
| Subordinated debentures | 2019 | 3,054 | 9.91 | 2019 | 2,917 | 9.91 |
| Total subordinated fixed | | 7,948 | 6.94 | | 7,811 | 6.88 |
| Secured borrowings[6] | 2021 - 2022 | 391 | 1.87 | — | — | — |
| Total long-term debt of Fannie Mae[7] | | 566,483 | 2.19 | | 585,692 | 2.42 |
| Debt of consolidated trusts[4] | 2012 - 2052 | 2,500,591 | 3.93 | 2012 - 2051 | 2,452,455 | 4.18 |
| Total long-term debt | | $3,067,074 | 3.61% | | $   3,038,147 | 3.84% |

---

(1)   Includes the effects of discounts, premiums and other cost basis adjustments.

(2)   Includes long-term debt with an original contractual maturity of greater than 1 year and up to 10 years, excluding zero-coupon debt.

(3)   Includes long-term debt that is not included in other debt categories.

117

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

(4)   Includes a portion of structured debt instruments that is reported at fair value.

(5)   Consists of subordinated debt issued with an interest deferral feature.

(6)   Represents remaining liability for transfer of financial assets from our condensed consolidated balance sheets that did not qualify as a sale.

(7)   Reported amounts include a net discount and other cost basis adjustments of  $7.5 billion and $9.2 billion as of June 30, 2012 and December 31, 2011, respectively.

## 9.  Derivative Instruments

Derivative instruments are an integral part of our strategy in managing interest rate risk. Derivative instruments may be privately negotiated contracts, which are often referred to as over-the-counter derivatives, or they may be listed and traded on an exchange. We typically do not settle the notional amount of our risk management derivatives; rather, notional amounts provide the basis for calculating actual payments or settlement amounts. The derivatives we use for interest rate risk management purposes consist primarily of interest rate swaps and interest rate options. Our foreign currency swaps are used to manage foreign exchange risk.

We enter into forward purchase and sale commitments that lock in the future delivery of mortgage loans and mortgage-related securities at a fixed price or yield. Certain commitments to purchase mortgage loans and purchase or sell mortgage-related securities meet the criteria of a derivative. We typically settle the notional amount of our mortgage commitments that are accounted for as derivatives.

We recognize all derivatives as either assets or liabilities in our condensed consolidated balance sheets at their fair value on a trade date basis. Fair value amounts, which are netted to the extent a legal right of offset exists and is enforceable by law at the counterparty level and are inclusive of the right or obligation associated with the cash collateral posted or received, are recorded in "Other assets" or "Other liabilities" in our condensed consolidated balance sheets. We present cash flows from derivatives as operating activities in our condensed consolidated statements of cash flows.

### *Notional and Fair Value Position of our Derivatives*

The following table displays the notional amount and estimated fair value of our asset and liability derivative instruments as of  June 30, 2012 and December 31, 2011.

118

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of June 30, 2012 | | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Asset Derivatives | | Liability Derivatives | | Asset Derivatives | | Liability Derivatives | |
| | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| Risk management derivatives: | | | | | | | | |
| Swaps: | | | | | | | | |
| Pay-fixed | $ 21,900 | $ 37 | $ 207,327 | $ (19,559) | $ 30,950 | $ 102 | $ 155,807 | $ (17,391) |
| Receive-fixed | 241,703 | 9,791 | 23,890 | (14) | 170,668 | 8,118 | 59,027 | (93) |
| Basis | 4,872 | 133 | 16,050 | (8) | 382 | 122 | 9,240 | (44) |
| Foreign currency | 621 | 160 | 530 | (64) | 581 | 155 | 451 | (62) |
| Swaptions: | | | | | | | | |
| Pay-fixed | 34,400 | 109 | 15,875 | (81) | 48,600 | 165 | 47,750 | (194) |
| Receive-fixed | 23,895 | 5,214 | 15,875 | (2,605) | 33,695 | 6,371 | 47,750 | (3,238) |
| Other[1] | 8,399 | 55 | 37 | — | 8,214 | 52 | 75 | — |
| Total gross risk management derivatives | 335,790 | 15,499 | 279,584 | (22,331) | 293,090 | 15,085 | 320,100 | (21,022) |
| Accrued interest receivable (payable) | — | 1,087 | — | (1,482) | — | 920 | — | (1,238) |
| Netting adjustment[2] | — | (16,352) | — | 23,525 | — | (15,829) | — | 21,898 |
| Total net risk management derivatives | $ 335,790 | $ 234 | $ 279,584 | $ (288) | $ 293,090 | $ 176 | $ 320,100 | $ (362) |
| Mortgage commitment derivatives: | | | | | | | | |
| Mortgage commitments to purchase whole loans | $ 11,825 | $ 63 | $ 4,360 | $ (5) | $ 9,710 | $ 73 | $ 422 | $ — |
| Forward contracts to purchase mortgage-related securities | 43,987 | 281 | 18,566 | (34) | 32,707 | 309 | 2,570 | (6) |
| Forward contracts to sell mortgage-related securities | 14,403 | 24 | 83,078 | (592) | 1,370 | 3 | 54,656 | (548) |
| Total mortgage commitment derivatives | $ 70,215 | $ 368 | $ 106,004 | $ (631) | $ 43,787 | $ 385 | $ 57,648 | $ (554) |
| Derivatives at fair value | $ 406,005 | $ 602 | $ 385,588 | $ (919) | $ 336,877 | $ 561 | $ 377,748 | $ (916) |

[1] Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts that we account for as derivatives. The mortgage insurance contracts have payment provisions that are not based on a notional amount.

[2] The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, including cash collateral posted and received. Cash collateral posted was $7.2 billion and $6.8 billion as of June 30, 2012 and December 31, 2011, respectively. Cash collateral received was $3 million and $779 million as of June 30, 2012 and December 31, 2011, respectively.

A majority of our derivative instruments contain provisions that require our senior unsecured debt to maintain a minimum credit rating from S&P and Moody's. If our senior unsecured debt were to fall below established thresholds in our governing agreements, which range from A- to BBB+, we could be required to provide additional collateral to or terminate transactions with certain counterparties. The aggregate fair value of all derivatives with credit-risk-related contingent features that were in a net liability position as of June 30, 2012 was $7.3 billion, for which we posted collateral of $7.2 billion in the normal course of business. Had all of the credit-risk-related contingency features underlying these agreements been triggered, an additional  $147 million of collateral would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of June 30, 2012.

The aggregate fair value of all derivatives with credit risk-related contingent features that were in a net liability position as of

119

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

December 31, 2011 was $7.2 billion, for which we posted collateral of $6.8 billion in the normal course of business. Had all of the credit risk-related contingency features underlying these agreements been triggered, an additional $362 million would have been required to be posted as collateral or to immediately settle our positions based on the individual agreements and our fair value position as of December 31, 2011.

We record all derivative gains and losses, including accrued interest, in "Fair value losses, net" in our condensed consolidated statements of operations and comprehensive income (loss). The following table displays, by type of derivative instrument, the fair value gains and losses, net on our derivatives for the three and six months ended June 30, 2012 and 2011 .

| | For the Three Months Ended June 30, | | For the Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (Dollars in millions) | | | |
| Risk management derivatives: | | | | |
| Swaps: | | | | |
|     Pay-fixed | $ (5,858) | $ (5,474) | $ (4,683) | $ (4,872) |
|     Receive-fixed | 3,592 | 2,784 | 2,674 | 2,528 |
|     Basis | 18 | 10 | 56 | 29 |
|     Foreign currency | 8 | 53 | 9 | 83 |
| Swaptions: | | | | |
|     Pay-fixed | 79 | 327 | 57 | 272 |
|     Receive-fixed | 345 | 733 | 251 | 500 |
| Other[1] | (5) | (49) | (6) | (40) |
|     Total risk management derivatives fair value losses, net | (1,821) | (1,616) | (1,642) | (1,500) |
| Mortgage commitment derivatives fair value losses, net | (562) | (61) | (767) | (38) |
|     Total derivatives fair value losses, net | $ (2,383) | $ (1,677) | $ (2,409) | $ (1,538) |

_____
[1]   Includes interest rate caps, futures, swap credit enhancements and mortgage insurance contracts.

### *Derivative Counterparty Credit Exposure*

Our derivative counterparty credit exposure relates principally to interest rate and foreign currency derivative contracts. We are exposed to the risk that a counterparty in a derivative transaction will default on payments due to us. If there is a default, we may need to acquire a replacement derivative from a different counterparty at a higher cost or may be unable to find a suitable replacement. We estimate our exposure to credit loss on derivative instruments by calculating the replacement cost, on a present value basis, to settle at current market prices all outstanding derivative contracts in a net gain position at the counterparty level where the right of legal offset exists. For derivative instruments where the right of legal offset does not exist, we calculate the replacement cost of the outstanding derivative contracts in a gain position at the transaction level. We manage our exposure by requiring counterparties to post collateral, which includes cash, U.S. Treasury securities, agency debt and agency mortgage-related securities.

The table below displays our counterparty credit exposure on outstanding risk management derivative instruments in a gain position by counterparty credit ratings, as well as the notional amount outstanding and the number of counterparties for all risk management derivatives as of June 30, 2012 and December 31, 2011.

120

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of June 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Credit Rating[1] | | | | | |
| | AA+/ AA/AA- | A+/A/A- | BBB+/BBB/BBB- | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | | |
| Credit loss exposure[4] | $ — | $ 106 | $ 53 | $ 159 | $ 55 | $ 214 |
| Less: Collateral held[5] | — | 106 | 53 | 159 | — | 159 |
| Exposure net of collateral | $ — | $ — | $ — | $ — | $ 55 | $ 55 |
| Additional information: | | | | | | |
|   Notional amount | $ 15,032 | $ 555,148 | $ 44,705 | $ 614,885 | $ 489 | $ 615,374 |
|   Number of counterparties | 4 | 14 | 3 | 21 | | |

| | As of December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Credit Rating[1] | | | | | |
| | AA+/AA/AA- | A+/A/A- | BBB+/BBB/BBB- | Subtotal[2] | Other[3] | Total |
| | (Dollars in millions) | | | | | |
| Credit loss exposure[4] | $ — | $ 885 | $ — | $ 885 | $ 51 | $ 936 |
| Less: Collateral held[5] | — | 840 | — | 840 | — | 840 |
| Exposure net of collateral | $ — | $ 45 | $ — | $ 45 | $ 51 | $ 96 |
| Additional information: | | | | | | |
|   Notional amount | $ 63,294 | $ 546,967 | $ — | $ 610,261 | $ 2,929 | $ 613,190 |
|   Number of counterparties | 6 | 10 | — | 16 | | |

[1] We manage collateral requirements based on the lower credit rating of the legal entity, as issued by S&P and Moody's. The credit rating reflects the equivalent S&P's rating for any ratings based on Moody's scale.

[2] We had no credit loss exposure for interest rate and foreign currency derivative counterparties as of June 30, 2012. We had credit loss exposure to four counterparties for interest rate and foreign currency derivative counterparties which had notional balances of $127.5 billion as of December 31, 2011.

[3] Includes mortgage insurance contracts and swap credit enhancements accounted for as derivatives.

[4] Represents the exposure to credit loss on derivative instruments, which we estimate using the fair value of all outstanding derivative contracts in a gain position. We net derivative gains and losses with the same counterparty where a legal right of offset exists under an enforceable master netting agreement. This table excludes mortgage commitments accounted for as derivatives.

[5] Represents both cash and non-cash collateral posted by our counterparties to us. Does not include collateral held in excess of exposure. We reduce the value of non-cash collateral in accordance with the counterparty agreements to help ensure recovery of any loss through the disposition of the collateral.

## 10. Segment Reporting

Our three reportable segments are: Single-Family, Multifamily, and Capital Markets. We use these three segments to generate revenue and manage business risk, and each segment is based on the type of business activities it performs. During the three months ended June 30, 2012, a new chief executive officer was hired. Our new chief executive officer continues to be the chief operating decision maker who makes decisions about resources to be allocated to each segment and assesses segment performance. We are working on reorganizing our company by function rather than by business in order to improve our operational efficiencies and effectiveness. In future periods, we may change some of our management reporting and how we report our business segment results.

Under our segment reporting, the sum of the results for our three business segments does not equal our condensed consolidated statements of operations and comprehensive income (loss), as we separate the activity related to our consolidated trusts from the results generated by our three segments. Our segment financial results include directly

121

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

attributable revenues and expenses. Additionally, we allocate to each of our segments: (1) capital using FHFA minimum capital requirements adjusted for over- or under-capitalization; (2) indirect administrative costs; and (3) a provision or benefit for federal income taxes. In addition, we allocate intracompany guaranty fee income as a charge from the Single-Family and Multifamily segments to Capital Markets for managing the credit risk on mortgage loans held by the Capital Markets group. We also include an eliminations/adjustments category to reconcile our business segment results and the activity related to our consolidated trusts to net income (loss) in our condensed consolidated statements of operations and comprehensive income (loss).

The following tables display our segment results for the three and six months ended June 30, 2012 and 2011.

| | For the Three Months Ended June 30, 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments [2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (215) | $ (6) | $ 3,443 | $ 1,731 | $ 475 [3] | $ 5,428 |
| Benefit for credit losses | 2,956 | 85 | — | — | — | 3,041 |
| Net interest income after benefit for credit losses | 2,741 | 79 | 3,443 | 1,731 | 475 | 8,469 |
| Guaranty fee income (expense) | 1,970 | 252 | (326) | (1,206) [5] | (632) [5] | 58 [5] |
| Investment gains, net | 2 | 6 | 1,458 | 87 | (1,422) [6] | 131 |
| Net other-than-temporary impairments | — | — | (597) | (2) | — | (599) |
| Fair value losses, net | (3) | — | (2,461) | (60) | 75 [7] | (2,449) |
| Debt extinguishment (losses) gains, net | — | — | (102) | 9 | — | (93) |
| Gains from partnership investments | — | 18 | — | — | 5 | 23 [8] |
| Fee and other income (expense) | 207 | 49 | 186 | (100) | (5) | 337 |
| Administrative expenses | (382) | (60) | (125) | — | — | (567) |
| Foreclosed property income | 59 | 11 | — | — | — | 70 |
| Other (expenses) income | (240) | 3 | (3) | — | (21) | (261) |
| Net income | 4,354 | 358 | 1,473 | 459 | (1,525) | 5,119 |
| Less: Net income attributable to noncontrolling interest | — | — | — | — | (5) [9] | (5) |
| Net income attributable to Fannie Mae | $ 4,354 | $ 358 | $ 1,473 | $ 459 | $(1,530) | $ 5,114 |

122

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Six Months Ended June 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Business Segments | | | Other Activity/Reconciling Items | | |
| | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments [2] | Total Results |
| | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (594) | $ (13) | $ 6,984 | $ 3,300 | $ 948 [3] | $ 10,625 |
| Benefit for credit losses | 903 | 138 | — | — | — | 1,041 |
| Net interest income after benefit for credit losses | 309 | 125 | 6,984 | 3,300 | 948 | 11,666 |
| Guaranty fee income (expense) | 3,881 | 495 | (658) | (2,365) [5] | (1,233) [5] | 120 [5] |
| Investment gains, net | 3 | 12 | 2,465 | 114 | (2,347) [6] | 247 |
| Net other-than-temporary impairments | — | — | (661) | (2) | — | (663) |
| Fair value losses, net | (4) | — | (2,291) | (8) | 137 [7] | (2,166) |
| Debt extinguishment (losses) gains, net | — | — | (172) | 45 | — | (127) |
| Gains from partnership investments | — | 29 | — | — | 4 | 33 [8] |
| Fee and other income (expense) | 407 | 96 | 366 | (208) | (11) | 650 |
| Administrative expenses | (762) | (124) | (245) | — | — | (1,131) |
| Foreclosed property (expense) income | (273) | 4 | — | — | — | (269) |
| Other expenses | (475) | — | (11) | — | (37) | (523) |
| Net income | 3,086 | 637 | 5,777 | 876 | (2,539) | 7,837 |
| Less: Net income attributable to noncontrolling interest | — | — | — | — | (4) [9] | (4) |
| Net income attributable to Fannie Mae | $ 3,086 | $ 637 | $ 5,777 | $ 876 | $(2,543) | $ 7,833 |

123

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

|  | For the Three Months Ended June 30, 2011 | | | | | |
|  | Business Segments | | | Other Activity/Reconciling Items | | |
|  | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments [2] | Total Results |
|  | (Dollars in millions) | | | | | |
| Net interest (loss) income | $ (680) | $ (11) | $ 3,867 | $ 1,314 | $ 482 [3] | $ 4,972 |
| Provision for credit losses[4] | (6,414) | (123) | — | — | — | (6,537) |
| Net interest (loss) income after provision for credit losses | (7,094) | (134) | 3,867 | 1,314 | 482 | (1,565) |
| Guaranty fee income (expense) | 1,880 | 216 | (391) | (1,116) [5] | (539) [5] | 50 [5] |
| Investment (losses) gains, net | (6) | 1 | 918 | (143) | (599) [6] | 171 |
| Net other-than-temporary impairments | — | — | (55) | (1) | — | (56) |
| Fair value losses, net | (3) | — | (1,507) | (72) | (52) [7] | (1,634) |
| Debt extinguishment (losses) gains, net | — | — | (55) | 12 | — | (43) |
| Gains from partnership investments | — | 34 | — | — | 1 | 35 [8] |
| Fee and other income (expense) | 114 | 57 | 109 | (63) | (2) | 215 |
| Administrative expenses | (400) | (64) | (105) | — | — | (569) |
| Foreclosed property income (expense) | 481 | (3) | — | — | — | 478 |
| Other (expenses) income | (77) | 36 | (9) | — | (17) | (67) |
| (Loss) income before federal income taxes | (5,105) | 143 | 2,772 | (69) | (726) | (2,985) |
| Benefit (provision) for federal income taxes | 109 | (56) | 40 | — | — | 93 |
| Net (loss) income | (4,996) | 87 | 2,812 | (69) | (726) | (2,892) |
| Less: Net income attributable to noncontrolling interest | — | — | — | — | (1) [9] | (1) |
| Net (loss) income attributable to Fannie Mae | $ (4,996) | $ 87 | $ 2,812 | $ (69) | $ (727) | $ (2,893) |

124

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

|  | For the Six Months Ended June 30, 2011 | | | | | |
|  | Business Segments | | | Other Activity/Reconciling Items | | |
|  | Single-Family | Multifamily | Capital Markets | Consolidated Trusts[1] | Eliminations/ Adjustments [2] | Total Results |
|  | (Dollars in millions) | | | | | |
| Net interest (loss) income | $   (1,578) | $   (20) | $   7,577 | $2,888 | $   1,065   [3] | $   9,932 |
| Provision for credit losses[4] | (17,032) | (59) | — | — | — | (17,091) |
| Net interest (loss) income after provision for credit losses | (18,610) | (79) | 7,577 | 2,888 | 1,065 | (7,159) |
| Guaranty fee income (expense) | 3,751 | 425 | (790) | (2,226) [5] | (1,060) [5] | 100 [5] |
| Investment (losses) gains, net | (5) | 5 | 1,788 | (169) | (1,373) [6] | 246 |
| Net other-than-temporary impairments | — | — | (99) | (1) | — | (100) |
| Fair value losses, net | (3) | — | (1,289) | (105) | 52 [7] | (1,345) |
| Debt extinguishment (losses) gains, net | — | — | (79) | 49 | — | (30) |
| Gains from partnership investments | — | 22 | — | — | 1 | 23 [8] |
| Fee and other income (expense) | 261 | 115 | 184 | (155) | (3) | 402 |
| Administrative expenses | (816) | (132) | (226) | — | — | (1,174) |
| Foreclosed property expense | (7) | (3) | — | — | — | (10) |
| Other (expenses) income | (395) | 42 | (18) | — | (36) | (407) |
| (Loss) income before federal income taxes | (15,824) | 395 | 7,048 | 281 | (1,354) | (9,454) |
| Benefit (provision) for federal income taxes | 107 | (61) | 45 | — | — | 91 |
| Net (loss) income | (15,717) | 334 | 7,093 | 281 | (1,354) | (9,363) |
| Less: Net income attributable to noncontrolling interest | — | — | — | — | (1) [9] | (1) |
| Net (loss) income attributable to Fannie Mae | $   (15,717) | $   334 | $   7,093 | $   281 | $   (1,355) | $   (9,364) |

[1] Represents activity related to the assets and liabilities of consolidated trusts in our condensed consolidated balance sheets.

[2] Represents the elimination of intercompany transactions occurring between the three business segments and our consolidated trusts, as well as other adjustments to reconcile to our consolidated results.

[3] Represents the amortization expense of cost basis adjustments on securities that we own in our portfolio that on a GAAP basis are eliminated.

[4] Prior period amounts have been reclassified to conform to the current period presentation.

[5] Represents the guaranty fees paid from consolidated trusts to the Single-Family and Multifamily segments. The adjustment to guaranty fee income in the Eliminations/Adjustments column represents the elimination of the amortization of deferred cash fees related to consolidated trusts that were re-established for segment reporting. Total guaranty fee income is included in fee and other income in our condensed consolidated statements of operations and comprehensive income (loss).

[6] Primarily represents the removal of realized gains and losses on sales of Fannie Mae MBS classified as available-for-sale securities that are issued by consolidated trusts and retained in the Capital Markets portfolio. The adjustment also includes the removal of securitization gains (losses) recognized in the Capital Markets segment relating to portfolio securitization transactions that do not qualify for sale accounting under GAAP.

[7] Represents the removal of fair value adjustments on consolidated Fannie Mae MBS classified as trading that are retained in the Capital Markets portfolio.

[8] Gains from partnership investments are included in other expenses in our condensed consolidated statements of operations and comprehensive income (loss).

[9] Represents the adjustment from equity method accounting to consolidation accounting for partnership investments that are consolidated in our condensed consolidated balance sheets.

TREASURY-4033

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

## 11. Concentration of Credit Risk

*Mortgage Seller/Servicers.*  Mortgage servicers collect mortgage and escrow payments from borrowers, pay taxes and insurance costs from escrow accounts, monitor and report delinquencies, and perform other required activities on our behalf. Our mortgage seller/servicers are also obligated to repurchase loans or foreclosed properties, or reimburse us for losses if the foreclosed property has been sold, under certain circumstances, such as if it is determined that the mortgage loan did not meet our underwriting or eligibility requirements, if loan representations and warranties are violated or if mortgage insurers rescind coverage. Our business with mortgage servicers is concentrated. Our  five largest single-family mortgage servicers, including their affiliates, serviced  61% of our single-family guaranty book of business as of June 30, 2012, compared with  63% as of December 31, 2011. Our ten largest multifamily mortgage servicers, including their affiliates, serviced  65% of our multifamily guaranty book of business as of June 30, 2012, compared with  67% as of December 31, 2011.

If a significant seller/servicer counterparty, or a number of seller/servicers fails to meet its obligations to us, it could result in a significant increase in our credit losses and have a material adverse affect on our results of operations, liquidity, financial condition and net worth.

*Mortgage Insurers.*  Mortgage insurance "risk in force" represents our maximum potential loss recovery under the applicable mortgage insurance policies. We had total mortgage insurance coverage risk in force of $90.7 billion and $91.2 billion on the single-family mortgage loans in our guaranty book of business as of June 30, 2012 and December 31, 2011, which represented  3% of our single-family guaranty book of business. Our primary mortgage insurance coverage risk in force was $86.9 billion and $87.3 billion as of June 30, 2012 and December 31, 2011. Our pool mortgage insurance coverage risk in force was  $3.7 billion and $3.9 billion as of June 30, 2012 and December 31, 2011, respectively. Our top  six mortgage insurance companies provided 93% and 94% of our mortgage insurance as of June 30, 2012 and December 31, 2011.

As of August 8, 2012, of our largest mortgage insurers,  one—PMI Mortgage Insurance Co. ("PMI")—has publicly disclosed that it is in receivership, and two—Triad Guaranty Insurance Corporation ("Triad") and Republic Mortgage Insurance Company ("RMIC")—have publicly disclosed that they are in run-off. One mortgage insurer—Genworth Mortgage Insurance Corporation ("Genworth")—is currently operating pursuant to a waiver it received from its regulator of the state regulatory capital requirements applicable to its main insurance writing entity.  One of our mortgage insurers—Radian Guaranty, Inc. ("Radian") —has disclosed that, in the absence of additional capital contributions to its main insurance writing entity, its capital might fall below state regulatory capital requirements in the future. Another mortgage insurer, Mortgage Guaranty Insurance Corporation ("MGIC") has disclosed that it expects that its capital fell below state regulatory capital requirements as of June 30, 2012, and is currently operating pursuant to a waiver it received from the regulator of the state regulatory capital requirements applicable to its main insurance writing entity. These  six mortgage insurers provided a combined $72.0 billion, or 79%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of June 30, 2012.

The current weakened financial condition of our mortgage insurer counterparties creates an increased risk that these counterparties will fail to fulfill their obligations to reimburse us for claims under insurance policies. If we determine that it is probable that we will not collect all of our claims from one or more of these mortgage insurer counterparties, it could result in an increase in our loss reserves, which could adversely affect our earnings, liquidity, financial condition and net worth.

Our total loss reserves incorporate an estimated recovery amount from mortgage insurance coverage. We evaluate the financial condition of our mortgage insurer counterparties and adjust the contractually due mortgage insurance benefit for collectability in order to ensure that our total loss reserves reflect probable losses as of the balance sheet date. The following table displays our estimated benefit from mortgage insurers as of June 30, 2012 and December 31, 2011 that reduce our total loss reserves.

|  | As of | |
|---|---|---|
|  | June 30, 2012 | December 31, 2011 |
|  | (Dollars in millions) | |
| Contractual mortgage insurance benefit | $ 13,254 | $ 15,099 |
| Less: Collectability adjustment[1] | 2,043 | 2,867 |
| Estimated benefit included in total loss reserves | $ 11,211 | $ 12,232 |

126

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

---

(1)   Represents an adjustment that reduces the contractual benefit for our assessment of our mortgage insurer counterparties' inability to fully pay the contractual mortgage insurance claims.

We had outstanding receivables of $3.8 billion recorded in "Other assets" in our condensed consolidated balance sheets as of June 30, 2012 and  $3.6 billion as of December 31, 2011 related to amounts claimed on insured, defaulted loans that we have not yet received, of which  $1.1 billion as of June 30, 2012 and $639 million as of December 31, 2011 was due from our mortgage seller/servicers. We assessed the total outstanding receivables for collectability, and they are recorded net of a valuation allowance of $848 million as of June 30, 2012 and $570 million as of December 31, 2011. These mortgage insurance receivables are short-term in nature, having an average duration of approximately  six months, and the valuation allowance reduces our claim receivable to the amount which is considered probable of collection as of June 30, 2012 and December 31, 2011.

We received proceeds under our primary and pool mortgage insurance policies for single-family loans of  $1.2 billion and $2.5 billion for the three and six months ended June 30, 2012, respectively, and  $1.5 billion and $3.1 billion for the three and six months ended June 30, 2011, respectively.

*Derivatives Counterparties.*  For information on credit risk associated with our derivatives transactions refer to "Note 9, Derivative Instruments."

## 12.  Fair Value

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or nonrecurring basis.

### Fair Value Measurement

Fair value measurement guidance defines fair value, establishes a framework for measuring fair value and sets forth disclosures around fair value measurements. This guidance applies whenever other accounting guidance requires or permits assets or liabilities to be measured at fair value. The guidance establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on unadjusted quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements of assets and liabilities based on limited observable inputs or observable inputs for similar assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs.

Effective January 1, 2012, we adopted new accounting guidance that requires enhanced disclosures about fair value measurement. Upon adoption of the new fair value guidance, we made changes to the principal markets that we use to estimate the fair value of the following categories of mortgage loans: (a) for loans that are one month delinquent, we changed to the GSE securitization market; (b) for loans that are two and three months delinquent, we changed to the whole loan market; and (c) for loans that have been modified in a troubled debt restructuring but have been reperforming for nine months or more, we changed to the whole loan market. After making these changes, (a) the principal market for all performing loans and those loans that are one month delinquent is the GSE securitization market; and (b) the principal market for all loans that are two or more months delinquent and all loans that have been modified in a troubled debt restructuring is the whole loan market. The impact of making these changes to our principal markets was a net decrease in the estimated fair value of our loans of $24.4 billion as of March 31, 2012.

In addition, we enhanced our fair value estimation process for HARP loans as of March 31, 2012 to use the modified build-up approach, as described in "Fair Value of Financial Instruments—HARP Loans." Previously, we measured the fair value of these loans using our standard build-up approach.  The impact of this enhancement was an increase in the estimated fair value of HARP loans of  $7.4 billion as of March 31, 2012.

### Recurring Changes in Fair Value

The following tables display our assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis subsequent to initial recognition, including instruments for which we have elected the fair value option as of June 30, 2012 and December 31, 2011.

127

FANNIE MAE
(In conservatorship)
NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)
(UNAUDITED)

| | Fair Value Measurements as of June 30, 2012 | | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
|---|---|---|---|---|---|
| | | | (Dollars in millions) | | |
| **Recurring fair value measurements:** | | | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $ 7,699 | $ — | $ — | $ — | $ 7,699 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 6,737 | 82 | — | 6,819 |
| Freddie Mac | — | 2,972 | 2 | — | 2,974 |
| Ginnie Mae | — | 282 | — | — | 282 |
| Alt-A private-label securities | — | 1,108 | 188 | — | 1,296 |
| Subprime private-label securities | — | — | 1,226 | — | 1,226 |
| CMBS | — | 9,930 | — | — | 9,930 |
| Mortgage revenue bonds | — | — | 689 | — | 689 |
| Other | — | — | 118 | — | 118 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 27,064 | — | — | — | 27,064 |
| Asset-backed securities | — | 537 | — | — | 537 |
| Total trading securities | 27,064 | 21,566 | 2,305 | — | 50,935 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 13,154 | 34 | — | 13,188 |
| Freddie Mac | — | 10,972 | 11 | — | 10,983 |
| Ginnie Mae | — | 829 | — | — | 829 |
| Alt-A private-label securities | — | 4,727 | 6,456 | — | 11,183 |
| Subprime private-label securities | — | — | 7,230 | — | 7,230 |
| CMBS | — | 13,668 | — | — | 13,668 |
| Mortgage revenue bonds | — | 4 | 9,353 | — | 9,357 |
| Other | — | 12 | 3,244 | — | 3,256 |
| Total available-for-sale securities | — | 43,366 | 26,328 | — | 69,694 |
| Mortgage loans of consolidated trusts | — | 2,900 | 2,331 | — | 5,231 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 11,034 | 174 | — | 11,208 |
| Swaptions | — | 5,323 | — | — | 5,323 |
| Other | — | — | 55 | — | 55 |
| Netting adjustment | — | — | — | (16,352) | (16,352) |
| Mortgage commitment derivatives | — | 361 | 7 | — | 368 |
| Total other assets | — | 16,718 | 236 | (16,352) | 602 |
| Total assets at fair value | $ 34,763 | $ 84,550 | $ 31,200 | $ (16,352) | $ 134,161 |

128

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of June 30, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | | (Dollars in millions) | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $ — | $ 419 | $ — | $ — | $ 419 |
| Senior floating | — | — | 412 | — | 412 |
| Total of Fannie Mae | — | 419 | 412 | — | 831 |
| Of consolidated trusts | — | 3,281 | 1,319 | — | 4,600 |
| Total long-term debt | — | 3,700 | 1,731 | — | 5,431 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 20,968 | 159 | — | 21,127 |
| Swaptions | — | 2,686 | — | — | 2,686 |
| Netting adjustment | — | — | — | (23,525) | (23,525) |
| Mortgage commitment derivatives | — | 628 | 3 | — | 631 |
| Total other liabilities | — | 24,282 | 162 | (23,525) | 919 |
| Total liabilities at fair value | $ — | $ 27,982 | $ 1,893 | $ (23,525) | $ 6,350 |

129

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | | (Dollars in millions) | | | |
| Assets: | | | | | |
| Cash equivalents[2] | $    600 | $    — | $    — | $    — | $    600 |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 5,687 | 1,737 | — | 7,424 |
| Freddie Mac | — | 2,732 | — | — | 2,732 |
| Ginnie Mae | — | 278 | 9 | — | 287 |
| Alt-A private-label securities | — | 1,004 | 345 | — | 1,349 |
| Subprime private-label securities | — | — | 1,280 | — | 1,280 |
| CMBS | — | 10,411 | — | — | 10,411 |
| Mortgage revenue bonds | — | — | 724 | — | 724 |
| Other | — | — | 143 | — | 143 |
| Non-mortgage-related securities: | | | | | |
| U.S. Treasury securities | 47,737 | — | — | — | 47,737 |
| Asset-backed securities | — | 2,111 | — | — | 2,111 |
| Total trading securities | 47,737 | 22,223 | 4,238 | — | 74,198 |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Fannie Mae | — | 15,904 | 946 | — | 16,850 |
| Freddie Mac | — | 12,811 | 12 | — | 12,823 |
| Ginnie Mae | — | 902 | — | — | 902 |
| Alt-A private-label securities | — | 4,427 | 7,256 | — | 11,683 |
| Subprime private-label securities | — | — | 7,586 | — | 7,586 |
| CMBS | — | 14,026 | — | — | 14,026 |
| Mortgage revenue bonds | — | 7 | 10,247 | — | 10,254 |
| Other | — | 13 | 3,445 | — | 3,458 |
| Total available-for-sale securities | — | 48,090 | 29,492 | — | 77,582 |
| Mortgage loans of consolidated trusts | — | 1,292 | 2,319 | — | 3,611 |
| Other assets: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 9,247 | 170 | — | 9,417 |
| Swaptions | — | 6,536 | — | — | 6,536 |
| Other | — | 1 | 51 | — | 52 |
| Netting adjustment | — | — | — | (15,829) | (15,829) |
| Mortgage commitment derivatives | — | 368 | 17 | — | 385 |
| Total other assets | — | 16,152 | 238 | (15,829) | 561 |
| Total assets at fair value | $  48,337 | $  87,757 | $  36,287 | $ (15,829) | $156,552 |

130

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of December 31, 2011 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Estimated Fair Value |
| | (Dollars in millions) | | | | |
| Liabilities: | | | | | |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior fixed | $ — | $ 432 | $ — | $ — | $ 432 |
| Senior floating | — | — | 406 | — | 406 |
| Total of Fannie Mae | — | 432 | 406 | — | 838 |
| Of consolidated trusts | — | 3,174 | 765 | — | 3,939 |
| Total long-term debt | — | 3,606 | 1,171 | — | 4,777 |
| Other liabilities: | | | | | |
| Risk management derivatives: | | | | | |
| Swaps | — | 18,661 | 167 | — | 18,828 |
| Swaptions | — | 3,432 | — | — | 3,432 |
| Netting adjustment | — | — | — | (21,898) | (21,898) |
| Mortgage commitment derivatives | — | 548 | 6 | — | 554 |
| Total other liabilities | — | 22,641 | 173 | (21,898) | 916 |
| Total liabilities at fair value | $ — | $ 26,247 | $ 1,344 | $ (21,898) | $ 5,693 |

[1] Derivative contracts are reported on a gross basis by level. The netting adjustment represents the effect of the legal right to offset under legally enforceable master netting agreements to settle with the same counterparty on a net basis, including cash collateral posted and received.

[2] Cash equivalents are comprised of U.S. Treasuries that are classified as Level 1.

The following tables display a reconciliation of all assets and liabilities measured at fair value on a recurring basis using significant unobservable inputs (Level 3) for the three and six months ended June 30, 2012 and 2011. The tables also display gains and losses due to changes in fair value, including both realized and unrealized gains and losses, recognized in our condensed consolidated statements of operations and comprehensive income (loss) for Level 3 assets and liabilities for the three and six months ended June 30, 2012 and 2011. When assets and liabilities are transferred between levels, we recognize the transfer as of the end of the period.

131

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

**Fair Value Measurements Using Significant Unobservable Inputs (Level 3)**

**For the Three Months Ended June 30, 2012**

| | Balance, April 1, 2012 | Total Gains or (Losses) (Realized/Unrealized) Included in Net Income (Loss) | Total Gains or (Losses) (Realized/Unrealized) Included in Other Comprehensive Income (Loss)(1) | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3 (4) | Transfers into Level 3 (4) | Balance, June 30, 2012 | Net Unrealized (Losses) Gains Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2012(5) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 89 | $ (3) | $ — | $ — | $ — | $ — | (4) | $ — | $ — | $ 82 | $ (2) |
| Freddie Mac | 2 | — | — | — | — | — | — | — | — | 2 | — |
| Alt-A private-label securities | 569 | 56 | — | — | — | — | (50) | (416) | 29 | 188 | 7 |
| Subprime private-label securities | 1,305 | (37) | — | — | — | — | (42) | — | — | 1,226 | (37) |
| Mortgage revenue bonds | 668 | 28 | — | — | — | — | (7) | — | — | 689 | 28 |
| Other | 123 | (3) | — | — | — | — | (2) | — | — | 118 | (3) |
| Total trading securities | $ 2,756 | $ 41 | $ — | $ — | $ — | $ — | (105) | $ (416) | $ 29 | $ 2,305 | $ (7) |
| | | | | | | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 37 | $ — | $ — | 5 | $ (5) | $ — | (3) | $ — | $ — | $ 34 | $ — |
| Freddie Mac | 11 | — | — | — | — | — | — | — | — | 11 | — |
| Alt-A private-label securities | 7,136 | (85) | 127 | — | — | — | (275) | (922) | 475 | 6,456 | — |
| Subprime private-label securities | 7,595 | (230) | 203 | — | — | — | (338) | — | — | 7,230 | — |
| Mortgage revenue bonds | 9,732 | 1 | 117 | — | (18) | — | (479) | — | — | 9,353 | — |
| Other | 3,342 | 8 | (12) | — | — | — | (94) | — | — | 3,244 | — |
| Total available-for-sale securities | $ 27,853 | $ (306) | $ 435 | 5 | $ (23) | $ — | (1,189) | $ (922) | $ 475 | $ 26,328 | $ — |
| | | | | | | | | | | | |
| Mortgage loans of consolidated trusts | $ 2,271 | $ 47 | $ — | 142 | $ — | $ — | (110) | $ (26) | $ 7 | $ 2,331 | $ 43 |
| Net derivatives | 44 | 8 | — | — | — | (3) | 25 | — | — | 74 | 19 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (399) | $ (13) | $ — | — | $ — | $ — | — | $ — | $ — | $ (412) | $ (13) |
| Of consolidated trusts | (950) | (51) | — | — | — | (218) | 50 | — | (150) | (1,319) | (51) |
| Total long-term debt | $ (1,349) | $ (64) | $ — | — | $ — | $ (218) | 50 | $ — | $ (150) | $ (1,731) | $ (64) |

132

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

**Fair Value Measurements Using Significant Unobservable Inputs (Level 3)**

**For the Six Months Ended June 30, 2012**

| | Balance, December 31, 2011 | Total Gains or (Losses) (Realized/Unrealized) | | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3 (4) | Transfers into Level 3 (4) | Balance, June 30, 2012 | Net Unrealized (Losses) Gains Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2012(5) |
| | | Included in Net Income (Loss) | Included in Other Comprehensive Income (Loss)(1) | | | | | | | | |
| | | | | (Dollars in millions) | | | | | | | |
| Trading securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 1,737 | $ 2 | $ — | $ — | $ (33) | $ — | (108) | $ (1,581) | $ 65 | $ 82 | $ (2) |
| Freddie Mac | — | — | — | — | — | — | — | — | 2 | 2 | — |
| Ginnie Mae | 9 | — | — | — | — | — | — | (9) | — | — | — |
| Alt-A private-label securities | 345 | 69 | — | — | — | — | (67) | (416) | 257 | 188 | 13 |
| Subprime private-label securities | 1,280 | 22 | — | — | — | — | (76) | — | — | 1,226 | 22 |
| Mortgage revenue bonds | 724 | (26) | — | — | — | — | (9) | — | — | 689 | (26) |
| Other | 143 | (22) | — | — | — | — | (3) | — | — | 118 | (22) |
| Total trading securities | $ 4,238 | $ 45 | $ — | $ — | $ (33) | $ — | (263) | $ (2,006) | $ 324 | $ 2,305 | $ (15) |
| Available-for-sale securities: | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 946 | $ — | $ (8) | 6 | $ (6) | $ — | (19) | $ (895) | $ 10 | $ 34 | $ — |
| Freddie Mac | 12 | — | — | — | — | — | (1) | — | — | 11 | — |
| Alt-A private-label securities | 7,256 | (102) | 293 | — | — | — | (537) | (1,907) | 1,453 | 6,456 | — |
| Subprime private-label securities | 7,586 | (195) | 506 | — | — | — | (667) | — | — | 7,230 | — |
| Mortgage revenue bonds | 10,247 | 3 | (20) | — | (42) | — | (835) | — | — | 9,353 | — |
| Other | 3,445 | 14 | (38) | — | — | — | (177) | — | — | 3,244 | — |
| Total available-for-sale securities | $ 29,492 | $ (280) | $ 733 | 6 | $ (48) | $ — | (2,236) | $ (2,802) | $ 1,463 | $ 26,328 | $ — |
| Mortgage loans of consolidated trusts | $ 2,319 | $ 120 | $ — | 387 | $ — | $ — | (169) | $ (344) | $ 18 | $ 2,331 | $ (10) |
| Net derivatives | 65 | 15 | — | — | — | (6) | — | — | — | 74 | 33 |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (406) | $ (6) | $ — | $ — | $ — | $ — | — | $ — | $ — | $ (412) | $ (6) |
| Of consolidated trusts | (765) | (60) | — | — | — | (485) | 78 | 110 | (197) | (1,319) | (2) |
| Total long-term debt | $ (1,171) | $ (66) | $ — | $ — | $ — | $ (485) | 78 | $ 110 | $ (197) | $ (1,731) | $ (8) |

TREASURY-4041

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

**Fair Value Measurements Using Significant Unobservable Inputs (Level 3)**

**For the Three Months Ended June 30, 2011**

| | Balance, April 1, 2011 | Included in Net Income (Loss) | Included in Other Comprehensive Income (Loss)(1) | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3(4) | Transfers into Level 3(4) | Balance, June 30, 2011 | Net Unrealized Gains (Losses) Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2011(5) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (Dollars in millions) | | | | | |
| **Trading securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 1,651 | $ 1 | $ — | $ 124 | $ — | $ — | $ (97) | $ — | $ — | $ 1,679 | $ 2 |
| Alt-A private-label securities | 20 | 1 | — | — | — | — | (1) | — | 106 | 126 | 2 |
| Subprime private-label securities | 1,547 | (41) | — | — | — | — | (47) | — | — | 1,459 | (41) |
| Mortgage revenue bonds | 606 | 21 | — | — | — | — | (11) | — | — | 616 | 21 |
| Other | 155 | 1 | — | — | — | — | (2) | — | — | 154 | 1 |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities | 2 | — | — | — | — | — | (2) | — | — | — | — |
| Total trading securities | $ 3,981 | $ (17) | $ — | $ 124 | $ — | $ — | $ (160) | $ — | $ 106 | $ 4,034 | $ (15) |
| | | | | | | | | | | | |
| **Available-for-sale securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 546 | $ — | $ 8 | $ 473 | $ (24) | $ — | $ — | $ (368) | $ — | $ 635 | $ — |
| Freddie Mac | 12 | — | — | — | — | — | — | — | — | 12 | — |
| Alt-A private-label securities | 7,236 | 3 | (26) | — | — | — | (217) | (747) | 403 | 6,652 | — |
| Subprime private-label securities | 9,660 | 130 | (547) | — | — | — | (334) | — | — | 8,909 | — |
| Mortgage revenue bonds | 10,532 | (1) | 273 | — | (64) | — | (276) | — | — | 10,464 | — |
| Other | 3,776 | 2 | 40 | — | — | — | (111) | — | — | 3,707 | — |
| Total available-for-sale securities | $ 31,762 | $ 134 | $ (252) | $ 473 | $ (88) | $ — | $ (938) | $ (1,115) | $ 403 | $ 30,379 | $ — |
| | | | | | | | | | | | |
| Mortgage loans of consolidated trusts | $ 2,221 | $ 19 | $ — | $ 42 | $ — | $ — | $ (71) | $ (31) | $ 185 | $ 2,365 | $ 19 |
| Net derivatives | 118 | (9) | — | — | — | (1) | (29) | — | — | 79 | (26) |
| **Long-term debt:** | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (423) | $ 8 | $ — | $ — | $ — | $ — | 13 | $ — | $ — | $ (402) | $ 8 |
| Of consolidated trusts | (667) | 6 | — | — | — | (40) | 26 | 55 | (26) | (646) | 6 |
| Total long-term debt | $ (1,090) | $ 14 | $ — | $ — | $ — | $ (40) | $ 39 | 55 | (26) | $ (1,048) | $ 14 |

134

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

**Fair Value Measurements Using Significant Unobservable Inputs (Level 3)**
**For the Six Months Ended June 30, 2011**

| | Balance, December 31, 2010 | Total Gains or (Losses) (Realized/Unrealized) | | Purchases(2) | Sales(2) | Issues(3) | Settlements(3) | Transfers out of Level 3(4) | Transfers into Level 3(4) | Balance, June 30, 2011 | Net Unrealized (Losses) Gains Included in Net Loss Related to Assets and Liabilities Still Held as of June 30, 2011(5) |
| | | Included in Net Income (Loss) | Included in Other Comprehensive Income (Loss)(1) | | | | | | | | |
| | | | | | (Dollars in millions) | | | | | | |
| **Trading securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 2,202 | $ (12) | $ — | $ 124 | $ (15) | $ — | $ (229) | $ (391) | $ — | $ 1,679 | $ (6) |
| Alt-A private-label securities | 20 | 1 | — | | | | (1) | — | 106 | 126 | 1 |
| Subprime private-label securities | 1,581 | (30) | — | | | | (92) | — | | 1,459 | (30) |
| Mortgage revenue bonds | 609 | 21 | — | | | | (14) | — | | 616 | 24 |
| Other | 152 | 5 | — | | | | (3) | — | | 154 | 5 |
| Non-mortgage-related: | | | | | | | | | | | |
| Asset-backed securities | 12 | — | — | — | — | — | (5) | (9) | 2 | — | — |
| Total trading securities | $ 4,576 | $ (15) | $ — | $ 124 | $ (15) | $ — | $ (344) | $ (400) | $ 108 | $ 4,034 | $ (6) |
| | | | | | | | | | | | |
| **Available-for-sale securities:** | | | | | | | | | | | |
| Mortgage-related: | | | | | | | | | | | |
| Fannie Mae | $ 114 | $ — | $ 12 | $ 889 | $ (39) | $ — | $ (2) | $ (469) | $ 130 | $ 635 | $ — |
| Freddie Mac | 3 | — | — | | | | — | — | 9 | 12 | — |
| Alt-A private-label securities | 7,049 | 1 | 78 | | | | (475) | (1,064) | 1,063 | 6,652 | |
| Subprime private-label securities | 9,932 | 260 | (605) | | | | (678) | — | | 8,909 | — |
| Mortgage revenue bonds | 11,030 | (3) | 294 | | (106) | | (751) | — | | 10,464 | — |
| Other | 3,806 | 3 | 111 | | | | (213) | — | | 3,707 | — |
| Total available-for-sale securities | $ 31,934 | $ 261 | $ (110) | $ 889 | $ (145) | $ — | $ (2,119) | $ (1,533) | $ 1,202 | $ 30,379 | $ — |
| | | | | | | | | | | | |
| Mortgage loans of consolidated trusts | $ 2,207 | $ 30 | $ — | $ 57 | $ — | $ — | $ (150) | $ (37) | $ 258 | $ 2,365 | $ 30 |
| Net derivatives | 104 | 5 | | | | (1) | (29) | | | 79 | (16) |
| Long-term debt: | | | | | | | | | | | |
| Of Fannie Mae: | | | | | | | | | | | |
| Senior floating | $ (421) | $ (14) | $ — | $ — | $ — | $ — | $ 33 | $ — | $ — | $ (402) | $ (14) |
| Of consolidated trusts | (627) | (29) | — | — | — | (40) | 48 | 77 | (75) | (646) | (28) |
| Total long-term debt | $ (1,048) | $ (43) | $ — | $ — | $ — | $ (40) | $ 81 | $ 77 | $ (75) | $ (1,048) | $ (42) |

(1) Gains (losses) included in other comprehensive income (loss) are included in "Changes in unrealized losses on available-for-sale securities, net of reclassification adjustments and taxes" in the condensed consolidated statement of operations and comprehensive income (loss).

(2) Purchases and sales include activity related to the consolidation and deconsolidation of assets of securitization trusts.

(3) Issues and settlements include activity related to the consolidation and deconsolidation of liabilities of securitization trusts.

135

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

(4) Transfers out of Level 3 consisted primarily of Fannie Mae MBS and private-label mortgage-related securities backed by Alt-A loans. Prices for these securities were obtained from multiple third-party vendors supported by market observable inputs. Transfers into Level 3 consisted primarily of private-label mortgage-related securities backed by Alt-A loans. Prices for these securities are based on inputs from a single source or inputs that were not readily observable.

(5) Amount represents temporary changes in fair value. Amortization, accretion and other-than-temporary impairments are not considered unrealized and are not included in this amount.

The following tables display realized and unrealized gains and losses included in our condensed consolidated statements of operations and comprehensive income (loss) for the three and six months ended June 30, 2012 and 2011, for our Level 3 assets and liabilities measured in our condensed consolidated balance sheets at fair value on a recurring basis.

| | For the Three Months Ended June 30, 2012 | | | | |
| | Interest Income | Fair Value Losses, net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $ 79 | $ 33 | $ (388) | $ 2 | $ (274) |
| Net unrealized losses related to Level 3 assets and liabilities still held as of June 30, 2012 | $ — | $ (9) | $ — | $ — | $ (9) |

| | For the Six Months Ended June 30, 2012 | | | | |
| | Interest Income | Fair Value Losses, net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $ 145 | $ 120 | $ (439) | $ 8 | $ (166) |
| Net unrealized gains (losses) related to Level 3 assets and liabilities still held as of June 30, 2012 | $ — | $ — | $ — | $ — | $ — |

| | For the Three Months Ended June 30, 2011 | | | | |
| | Interest Income | Fair Value Losses, net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $ 135 | $ 8 | $ (6) | $ 4 | $ 141 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of June 30, 2011 | $ (1) | $ (7) | $ — | $ — | $ (8) |

| | For the Six Months Ended June 30, 2011 | | | | |
| | Interest Income | Fair Value Losses, net | Net Other-than-Temporary Impairments | Other | Total |
|---|---|---|---|---|---|
| | (Dollars in millions) | | | | |
| Total realized and unrealized gains (losses) included in net income (loss) | $270 | $ (16) | $(23) | $ 7 | $238 |
| Net unrealized losses related to Level 3 assets and liabilities still held as of June 30, 2011 | $ (1) | $ (33) | $ — | $ — | $ (34) |

136

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Nonrecurring Changes in Fair Value*

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when we evaluate for impairment) as of June 30, 2012.

| | Fair Value Measurements As of June 30, 2012 | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value |
|---|---|---|---|---|
| | (Dollars in millions) | | | |
| **Nonrecurring fair value measurements:** | | | | |
| Assets: | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $ — | $ 94 | $ 120 | $ 214 |
| Single-family mortgage loans held for investment, at amortized cost: [1] | | | | |
|     Of Fannie Mae | — | — | 21,808 | 21,808 |
|     Of consolidated trusts | — | — | 240 | 240 |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | |
|     Of Fannie Mae | — | — | 1,380 | 1,380 |
| Acquired property, net: | | | | |
|     Single-family | — | — | 3,381 | 3,381 |
|     Multifamily | — | — | 88 | 88 |
| Other assets | — | — | 303 | 303 |
|     Total nonrecurring fair value measurements | $ — | $ 94 | $ 27,320 | $ 27,414 |

_____

[1]   Excludes estimated recoveries from mortgage insurance proceeds.

The following table displays assets and liabilities measured in our condensed consolidated balance sheets at fair value on a nonrecurring basis and the gains or losses recognized for these assets and liabilities for the three and six months ended June 30, 2011.

137

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements | | | | For the Three Months Ended June 30, 2011 | For the Six Months Ended June 30, 2011 |
|---|---|---|---|---|---|---|
| | For the Six Months Ended June 30, 2011 | | | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Estimated Fair Value | Total Losses | Total Losses |
| | (Dollars in millions) | | | | | |
| Assets: | | | | | | |
| Mortgage loans held for sale, at lower of cost or fair value | $ — | $  2 | $  204 | $  206 [1] | $  (8) | $  (13) |
| Single-family mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae | — | — | 32,970 | 32,970 [2] | (66) | (1,080) |
| Of consolidated trusts | — | — | 749 | 749 [2] | (18) | (98) |
| Multifamily mortgage loans held for investment, at amortized cost: | | | | | | |
| Of Fannie Mae | — | — | 1,365 | 1,365 [2] | (28) | (108) |
| Acquired property, net: | | | | | | |
| Single-family | — | — | 14,806 | 14,806 [3] | (701) | (1,512) |
| Multifamily | — | — | 227 | 227 [3] | (33) | (49) |
| Other assets | — | — | 877 | 877 [4] | (35) | (65) |
| Total assets at fair value | $ — | $  2 | $51,198 | $ 51,200 | $ (889) | $ (2,925) |

---

[1] Includes $56 million of mortgage loans held for sale that were sold, deconsolidated, retained as a mortgage-related security or redesignated to mortgage loans held for investment as of June 30, 2011.

[2] Includes $3.6 billion of mortgage loans held for investment that were liquidated or transferred to foreclosed properties as of June 30, 2011.

[3] Includes $8.4 billion of acquired properties that were sold or transferred as of June 30, 2011.

[4] Includes $144 million of other assets that were sold or transferred as of June 30, 2011.

The following table displays valuation techniques and the range and weighted-average of significant unobservable inputs for our Level 3 assets and liabilities measured at fair value on a recurring basis as of June 30, 2012.

138

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

|  | | Fair Value Measurements as of June 30, 2012 | | | |
|---|---|---|---|---|---|
|  | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted - Average[1] | Fair Value |
|  | | | (Dollars in millions) | | |
| **Recurring fair value measurements:** | | | | | |
| Level 3 Assets: | | | | | |
| Trading securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Agency[2] | Other | | | | $    84 |
| Alt-A private-label securities | Discounted Cash Flow | Default Rate (%) | 7.8 - 15.0 | 11.7 | |
| | | Prepayment Speed (%) | 0.7 - 6.4 | 2.7 | |
| | | Severity (%) | 65.0 - 70.0 | 68.3 | |
| | | Spreads (bps) | 627.0 - 684.0 | 647.9 | 125 |
| | Other | | | | 63 |
| Total Alt-A private-label securities | | | | | 188 |
| Subprime private-label securities | Consensus | Default Rate (%) | 10.9 - 24.5 | 16.5 | |
| | | Prepayment Speed (%) | 0.0 - 5.6 | 2.6 | |
| | | Severity (%) | 80.0 | 80.0 | |
| | | Spreads (bps) | 651.0 - 823.0 | 700.4 | 613 |
| | Consensus | | | | 468 |
| | Discounted Cash Flow | Default Rate (%) | 15.6 - 20.6 | 17.5 | |
| | | Prepayment Speed (%) | 0.7 - 5.6 | 2.6 | |
| | | Severity (%) | 80.0 | 80.0 | |
| | | Spreads (bps) | 650.0 - 824.0 | 774.6 | 145 |
| Total subprime private-label securities | | | | | 1,226 |
| Mortgage revenue bonds | Discounted Cash Flow | Spreads (bps) | 275.0 - 390.0 | 335.4 | 640 |
| | Other | | | | 49 |
| Total mortgage revenue bonds | | | | | 689 |
| Other | Other | | | | 118 |
| Total trading securities | | | | | $2,305 |

139

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | | Fair Value Measurements as of June 30, 2012 | | | |
|---|---|---|---|---|---|
| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted - Average[1] | Fair Value |
| | | (Dollars in millions) | | | |
| Available-for-sale securities: | | | | | |
| Mortgage-related securities: | | | | | |
| Agency[2] | Other | | | | $   45 |
| Alt-A private-label securities | Consensus | Default Rate (%) | 0.0 - 19.5 | 2.8 | |
| | | Prepayment Speed (%) | 0.4 - 20.5 | 10.5 | |
| | | Severity (%) | 50.0 - 70.0 | 53.0 | |
| | | Spreads (bps) | 369.0 - 704.0 | 498.7 | 2,477 |
| | Consensus | | | | 1,958 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 15.3 | 7.4 | |
| | | Prepayment Speed (%) | 0.0 - 20.1 | 6.0 | |
| | | Severity (%) | 50.0 - 70.0 | 57.3 | |
| | | Spreads (bps) | 410.0 - 771.0 | 573.3 | 1,711 |
| | Single Vendor | | | | 226 |
| | Other | | | | 84 |
| Total Alt-A private-label securities | | | | | 6,456 |
| Subprime private-label securities | Consensus | Default Rate (%) | 0.0 - 26.4 | 16.4 | |
| | | Prepayment Speed (%) | 0.0 - 20.9 | 1.8 | |
| | | Severity (%) | 65.0 - 80.0 | 78.4 | |
| | | Spreads (bps) | 561.0 - 840.0 | 702.6 | 3,426 |
| | Consensus | | | | 2,043 |
| | Discounted Cash Flow | Default Rate (%) | 0.0 - 25.5 | 15.9 | |
| | | Prepayment Speed (%) | 0.0 - 16.0 | 2.4 | |
| | | Severity (%) | 65.0 - 80.0 | 76.2 | |
| | | Spreads (bps) | 531.0 - 842.0 | 713.0 | 1,651 |
| | Other | | | | 110 |
| Total subprime private-label securities | | | | | 7,230 |
| Mortgage revenue bonds | Single Vendor | | | | 7,294 |
| | Discounted Cash Flow | Spreads (bps) | 134.0 - 390.0 | 320.3 | 1,835 |
| | Other | | | | 224 |
| Total mortgage revenue bonds | | | | | 9,353 |
| Other | Consensus | | | | 928 |
| | Discounted Cash Flow | Default Rate (%) | 0.4 - 13.0 | 4.9 | |
| | | Prepayment Speed (%) | 0.0 - 10.8 | 3.3 | |
| | | Severity (%) | 50.0 - 85.0 | 84.0 | |
| | | Spreads (bps) | 567.0 - 793.0 | 676.0 | 805 |
| | Consensus | Default Rate (%) | 5.0 | 5.0 | |
| | | Prepayment Speed (%) | 3.0 | 3.0 | |
| | | Severity (%) | 85.0 | 85.0 | |
| | | Spreads (bps) | 626.0 - 812.0 | 706.1 | 688 |
| | Other | | | | 823 |
| Total Other | | | | | 3,244 |
| Total available-for-sale securities | | | | | $26,328 |

140

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | | Fair Value Measurements as of June 30, 2012 | | | |
|---|---|---|---|---|---|
| | Valuation Techniques | Significant Unobservable Inputs[1] | Range[1] | Weighted - Average[1] | Fair Value |
| | | (Dollars in millions) | | | |
| Mortgage loans of consolidated trusts: | | | | | |
| Single-family | Build-Up | Default Rate (%) | 0.1 - 91.9 | 14.5 | |
| | | Prepayment Speed (%) | 9.4 - 97.1 | 34.1 | |
| | | Severity (%) | 9.4 - 100.0 | 37.2 | $ 1,371 |
| | Consensus | | | | 333 |
| | Discounted Cash Flow | Default Rate (%) | 1.4 - 14.5 | 8.6 | |
| | | Prepayment Speed (%) | 0.2 - 8.3 | 3.6 | |
| | | Severity (%) | 50.0 - 65.0 | 60.5 | |
| | | Spreads (bps) | 587.0 - 1,269.0 | 661.4 | 212 |
| | Consensus | Default Rate (%) | 2.0 - 8.4 | 5.6 | |
| | | Prepayment Speed (%) | 2.5 - 8.3 | 4.6 | |
| | | Severity (%) | 65.0 - 70.0 | 65.9 | |
| | | Spreads (bps) | 605.0 - 866.0 | 691.5 | 209 |
| | Single Vendor | | | | 47 |
| Total single-family | | | | | 2,172 |
| Multifamily | Build-Up | Spreads (bps) | 103.0 - 423.4 | 199.7 | 159 |
| Total mortgage loans of consolidated trusts | | | | | $ 2,331 |
| Net derivatives | Dealer Mark | | | | $ 176 |
| | Internal Model | | | | (102) |
| Total net derivatives | | | | | $ 74 |
| Long-term debt: | | | | | |
| Of Fannie Mae: | | | | | |
| Senior floating | Discounted Cash Flow | | | | $ (412) |
| Of consolidated trusts | Discounted Cash Flow | Default Rate (%) | 1.4 - 10.0 | 6.1 | |
| | | Prepayment Speed (%) | 0.0 - 100.0 | 56.0 | |
| | | Severity (%) | 50.0 - 65.0 | 57.2 | |
| | | Spreads (bps) | 127.1 - 1,269.0 | 412.0 | (490) |
| | Consensus | | | | (456) |
| | Consensus | Default Rate (%) | 2.0 - 8.4 | 5.6 | |
| | | Prepayment Speed (%) | 2.5 - 8.3 | 4.5 | |
| | | Severity (%) | 65.0 - 70.0 | 65.9 | |
| | | Spreads (bps) | 605.0 - 866.0 | 691.0 | (227) |
| | Single Vendor | | | | (146) |
| Total of consolidated trusts | | | | | (1,319) |
| Total long-term debt | | | | | $(1,731) |

---

[1]   Valuation techniques for which no unobservable inputs are disclosed generally reflect the use of third-party pricing services or dealers, and the range of unobservable inputs applied by these sources is not readily available or cannot be reasonably estimated. Where we have disclosed unobservable inputs for consensus and single vendor techniques those inputs are based on our validations performed at the security level.

[2]   Includes Fannie Mae and Freddie Mac securities.

The following table displays valuation techniques for our Level 3 assets measured at fair value on a nonrecurring basis as of June 30, 2012. The significant unobservable inputs related to these techniques primarily relate to collateral dependent valuations. The related ranges and weighted averages are not meaningful when aggregated as they vary significantly from property to property.

141

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | Fair Value Measurements as of June 30, 2012 | |
| --- | --- | --- |
| | Valuation Techniques | Fair Value |
| | (Dollars in millions) | |
| **Nonrecurring fair value measurements:** | | |
| Level 3 Assets: | | |
| Single-family mortgage loans held for sale, at lower of cost or fair value | Consensus | $    120 |
| Single-family mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Internal Model | 21,808 |
| Of consolidated trusts | Internal Model | 240 |
| Multifamily mortgage loans held for investment, at amortized cost: | | |
| Of Fannie Mae | Appraisals | 202 |
| | Broker Price Opinions | 284 |
| | Asset Manager Estimate | 859 |
| | Other | 35 |
| Total of Fannie Mae | | 1,380 |
| Acquired property, net: | | |
| Single-family | Accepted Offers | 837 |
| | Appraisals | 527 |
| | Walk Forwards | 1,111 |
| | Internal Model | 856 |
| | Other | 50 |
| Total single-family | | 3,381 |
| Multifamily | Accepted Offers | 44 |
| | Appraisals | 16 |
| | Broker Price Opinions | 28 |
| Total Multifamily | | 88 |
| Other Assets | Appraisals | 66 |
| | Walk Forwards | 36 |
| | Internal Model | 88 |
| | Other | 113 |
| Total other assets | | 303 |
| Total nonrecurring assets at fair value | | $ 27,320 |

We use valuation techniques that maximize the use of observable inputs and minimize the use of unobservable inputs. The following is a description of the valuation techniques we use for fair value measurement and disclosure as well as our basis of classifying these measurements as Level 1, Level 2 or Level 3 of the valuation hierarchy.

*Cash Equivalents, Trading Securities and Available-for-Sale Securities*—These securities are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Fair value is measured using quoted market prices in active markets for identical assets, when available. Securities, such as U.S. Treasury Bills, whose value is based on quoted market prices in active markets for identical assets are classified as Level 1 of the valuation hierarchy.

We classify securities as Level 2 of the valuation hierarchy if quoted market prices in active markets for identical assets are not available. To estimate fair value, we use vendor prices provided by as many as three third-party pricing services which are calibrated to the quoted market prices in active markets for similar securities. The single vendor valuation technique utilizes one vendor price to estimate fair value. The consensus valuation technique utilizes an average of two or more vendors' prices to estimate fair value. In the absence of prices provided by third-party pricing services supported by observable market data, fair values are estimated using quoted prices of securities with similar characteristics or a discounted cash flow technique that uses inputs such as default rates, prepayment speed, loss severity and spreads based on market assumptions where available. Such instruments are generally classified as Level 2 of the valuation hierarchy.

For all valuation techniques used for securities where there is limited activity or less transparency around these inputs to the valuation, these are classified as Level 3 of the valuation hierarchy.

For agency and private-label securities, an increase in unobservable prepayment speeds in isolation would generally result in

142

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

an increase in fair value, and an increase in unobservable spreads, severity rates or default rates in isolation would generally result in a decrease in fair value. For mortgage revenue bonds classified as Level 3 of the valuation hierarchy, an increase in unobservable spreads would result in a decrease in fair value. Although the sensitivities of the fair value of our recurring Level 3 securities of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs.

*Mortgage Loans Held for Investment*—The majority of HFI loans are reported in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments and an allowance for loan losses. We estimate the fair value of HFI loans using the build-up and consensus valuation techniques, as discussed below, for periodic disclosure of financial instruments as required by GAAP. For our remaining loans, which include those containing embedded derivatives that would otherwise require bifurcation and consolidated loans of senior-subordinated trust structures, we elected the fair value option and therefore, we record these loans at fair value in our condensed consolidated balance sheets. We measure these loans on a recurring basis using the build-up, consensus, discounted cash flow and single vendor price techniques. Certain impaired loans are measured at fair value on a nonrecurring basis by using the fair value of their underlying collateral. Specific techniques used include internal models, broker price opinions and appraisals.

A description of our valuation techniques is as follows:

Build-Up: The fair value of performing loans represents an estimate of the prices we would receive if we were to securitize those loans and is determined based on comparisons to Fannie Mae MBS with similar characteristics, either on a pool or loan level. We use the observable market values of our Fannie Mae MBS determined primarily from third-party pricing services, quoted market prices in active markets for similar securities, and other observable market data as a base value. In the build-up valuation technique we start with the base value for our Fannie Mae MBS then we add or subtract the fair value of the associated guaranty asset, guaranty obligation ("GO") and master servicing arrangement. We set the GO equal to the estimated fair value we would receive if we were to issue our guaranty to an unrelated party in a stand-alone arm's length transaction at the measurement date. We estimate the fair value of the GO using our internal GO valuation models, which calculate the present value of expected cash flows based on management's best estimate of certain key assumptions such as current mark-to-market LTV ratios, future house prices, default rates, severity rates and required rate of return. We may further adjust the model values based on our current market pricing when such transactions reflect credit characteristics that are similar to our outstanding GO. These loans are generally classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable. To the extent that unobservable inputs are significant, the loans are classified as Level 3 of the valuation hierarchy.

Consensus: The fair value of single-family nonperforming loans represents an estimate of the prices we would receive if we were to sell these loans in the nonperforming whole-loan market. These nonperforming loans are either two or more months delinquent, in an open modification period, or in a closed modification state (both performing and nonperforming in accordance with the loan's modified terms). We calculate the fair value of nonperforming loans based on assumptions about key factors, including collateral value and mortgage insurance repayment. Collateral value is derived from the current estimated mark-to-market LTV ratio of the individual loan along with a state-level distressed property sales discount. Mortgage insurance is estimated by taking the loan-level coverage and adjusting it by the probability of repayment by the associated mortgage insurer. This probability is based on the credit rating of the mortgage insurance company. Using these assumptions, along with indicative bids for a representative sample of nonperforming loans, we estimate the fair value. The bids on sample loans are obtained from multiple active market participants. Fair value is estimated from the extrapolation of these indicative sample bids plus an amount for the recovery of any associated mortgage insurance estimated through our GO valuation models as described above. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

Discounted Cash Flow: We estimate the fair value of a portion of our senior-subordinated trust structures using discounted cash flow at the security level as a proxy for estimating fair value. This valuation technique uses unobservable inputs such as prepayment speeds, default rates, spreads, and loss severities to estimate the fair value of our securities. These inputs are weighted in a model that calculates the expected cash flow of the security which is used as the basis of fair value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

143

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

<u>Single Vendor:</u> We estimate the fair value of a portion of our senior-subordinated trust structures using the single vendor valuation technique at the security level as a proxy for estimating loan fair value. This valuation technique estimates fair value based upon prices received from one specific vendor. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

<u>Internal Model:</u> We estimate the fair value of a portion of our single-family nonperforming loans using the value of the underlying collateral. The inputs into this internal model include property level data such as prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales data. This internal model takes one of two approaches when valuing foreclosed properties. The first approach relies on comparable foreclosed property sales, where the value of the target property is the weighted average price of comparable foreclosed property sales. The weights in the comparable sales approach are determined by various factors such as geographic distance, transaction time, and the value difference. The second approach relies on model calibrations that consider the target property's attributes such as prior sales prices, tax assessment values, and property characteristics to derive the foreclosed property values. In the second approach, we build separate predictive models for each Metropolitan Statistical Area ("MSA"). Specifically, we use the data of prior sales prices, tax assessment values, property characteristics, and historical foreclosure sales to calibrate the models in each MSA. We can use the available data about that property and our MSA-level model to estimate the fair value for a given property. The majority of the internal model valuations come from the comparable sales approach. The determination of whether the internal model valuations in a particular geographic area should use the comparable sales approach or model calibration is based on the quarterly evaluation of these two approaches for valuation accuracy. The unobservable inputs used in this technique include model weights based upon geographic distance, transaction time, and metropolitan statistics. When a physical address is not available, we estimate fair value using state-average foreclosed property values. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

<u>Appraisals:</u> For a portion of our multifamily loans, we use appraisals to estimate the fair value of the loan. There are three approaches used to estimate fair value of a specific property: (1) cost, (2) income capitalization and (3) sales comparison. This technique uses an average of the three estimates. The cost approach uses the insurable value as a basis. The unobservable inputs used in this model include the estimated cost to construct or replace multifamily properties in the closest localities available. The income capitalization approach estimates the fair value using the present value of the future cash flow expectations by applying an appropriate overall capitalization rate to the forecasted net operating income. The significant unobservable inputs used in this calculation include rental income, fees associated with rental income, expenses associated with the property including taxes, payroll, insurance and other items, and the capitalization rates which are determined through market extraction and DSCR. The sales comparison approach compares the prices paid for similar properties, the prices asked by owners and offers made. The unobservable inputs to this methodology include ratios of sales prices to annual gross income, price paid per unit and adjustments made based on financing, conditions of sale, and physical characteristics of the property. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

<u>Broker Price Opinion ("BPO"):</u> For a portion of our multifamily loans, we use BPO to estimate the fair value of the loan. This technique uses both current property value and the property value adjusted for stabilization. These approaches compute net operating income based on current rents and expenses and use a range of market capitalization rates to estimate property value. The unobservable inputs used in this technique are property net operating income and market capitalization rates to estimate property value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

<u>Asset Manager Estimate ("AME"):</u> For a portion of our multifamily loans, AME is used to estimate the fair value of the loan. This technique uses the net operating income and tax assessments of the specific property as well as MSA-specific market capitalization rates and average per unit sales values to estimate property fair value. These loans are classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

An increase in prepayment speeds in isolation would generally result in an increase in the fair value of our mortgage loans classified as Level 3 of the valuation hierarchy, and an increase in severity rates, default rates, or spreads in isolation would generally result in a decrease in fair value. Although the sensitivities of the fair value of mortgage loans classified as Level 3 of the valuation hierarchy to various unobservable inputs are discussed above in isolation, interrelationships exist among these inputs such that a change in one unobservable input typically results in a change to one or more of the other inputs.

144

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Acquired Property, Net and Other Assets*—Acquired property, net represents foreclosed property received in full satisfaction of a loan net of a valuation allowance. Acquired property is initially recorded in our condensed consolidated balance sheets at its fair value less its estimated cost to sell. The initial fair value of foreclosed properties is determined using a hierarchy based on the reliability of available information. The hierarchy for single-family acquired property includes accepted offers, appraisals, broker price opinions and proprietary home price model values. The hierarchy for multifamily acquired property includes accepted offers, appraisals, and broker price opinions. We consider an accepted offer on a specific foreclosed property to be the best estimate of its fair value. If we have not accepted an offer on the property we use the highest available valuation methodology as described in our valuation hierarchy to determine fair value. While accepted offers represent an agreement in principle to transact, a significant portion of these agreements do not get executed for various reasons, and are therefore classified as Level 3 of the valuation hierarchy.

Third-party valuations can be obtained from either an appraisal or a broker price opinion. These valuations are kept current using a monthly walk forward process that updates them for any change in the value of the property. When accepted offers or third-party valuations are not available, we generally utilize the home price values determined using an internal model.

Subsequent to initial measurement, the foreclosed properties that we intend to sell are reported at the lower of the carrying amount or fair value less estimated costs to sell. Foreclosed properties classified as held for use, included in "Other Assets" in our condensed consolidated balance sheets, are depreciated and impaired when circumstances indicate that the carrying amount of the property is no longer recoverable. The fair values of our single-family foreclosed properties subsequent to initial measurement are determined using the same information hierarchy used for the initial fair value measurement.

The most commonly used techniques in our valuation of acquired property are proprietary home price model and appraisals (both current and walk forward). Based on the number of properties measured as of June 30, 2012, these methodologies comprised approximately  77% of our valuations, while accepted offers comprised approximately 22% of our valuations.

Acquired property is classified as Level 3 of the valuation hierarchy because significant inputs are unobservable.

A description of our valuation techniques to estimate the fair value of our acquired property is as follows.

*Single-family acquired property valuation techniques*

<u>Appraisal:</u> An appraisal is an estimate of the value of a specific property by a certified or licensed appraiser, in accordance with the Uniform Standards of Professional Appraisal Practice. Data most commonly used is from the local Multiple Listing Service and includes properties currently listed for sale, properties under contract, and closed transactions. The appraiser performs an analysis that starts with these data points and then adjusts for differences between the comparable properties and the property being appraised, to arrive at an estimated value for the specific property. Adjustments are made for differences between comparable properties for unobservable inputs such as square footage, location, and condition of the property. The appraiser typically uses recent historical data for the estimate of value.

<u>Broker Price Opinion:</u> This technique provides an estimate of what the property is worth based upon a real estate broker's knowledge. The broker uses research of pertinent data in the appropriate market, and a sales comparison approach that is similar to the appraisal process. The broker typically has insight into local market trends, such as the number of and terms of offers, lack of offers, increasing supply, shortage of inventory and overall interest in buying a home. This information, all of which is unobservable, is used along with recent and pending sales and current listings of similar properties to arrive at an estimate of value.

<u>Appraisal and Broker Price Opinion Walk Forwards ("Walk Forwards"):</u> We use these techniques to adjust appraisal and broker price opinion valuations for changing market conditions by applying a walk forward factor based on local price movements since the time the third-party value was obtained. The majority of third-party values are updated by comparing the difference in our internal home price model from the month of the original appraisal/broker price opinion to the current period and by applying the resulting percentage change to the original value. If a price is not determinable through our internal home price model, we use our zip code level home price index to update the valuations.

<u>Internal Model:</u> We use an internal model to estimate fair value for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

145

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Multifamily acquired property valuation techniques*

<u>Appraisals:</u> We use this method to estimate property values for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

<u>Broker Price Opinions:</u> We use this method to estimate property values for distressed properties. The valuation methodology and inputs used are described under "Mortgage Loans Held for Investment."

*Derivatives Assets and Liabilities (collectively "Derivatives")*— Derivatives are recorded in our condensed consolidated balance sheets at fair value on a recurring basis. The valuation process for the majority of our risk management derivatives uses observable market data provided by third-party sources, resulting in Level 2 classification of the valuation hierarchy. Interest rate swaps are valued by referencing yield curves derived from observable interest rates and spreads to project and discount swap cash flows to present value. Option-based derivatives use a model that projects the probability of various levels of interest rates by referencing swaption volatilities provided by market makers/dealers. The projected cash flows of the underlying swaps of these option-based derivatives are discounted to present value using yield curves derived from observable interest rates and spreads. Exchange-traded futures are valued using market quoted prices, resulting in Level 1 classification of the valuation hierarchy. Certain highly complex structured swaps primarily use a single dealer mark due to lack of transparency in the market and may be modeled using observable interest rates and volatility levels as well as significant unobservable assumptions, resulting in Level 3 classification of the valuation hierarchy. Mortgage commitment derivatives use observable market data, quotes and actual transaction price levels adjusted for market movement, and are typically classified as Level 2 of the valuation hierarchy. Mortgage commitment derivatives that include adjustments for market movement that cannot be corroborated by observable market data are classified as Level 3 of the valuation hierarchy.

*Debt*—The majority of debt of Fannie Mae is recorded in our condensed consolidated balance sheets at the principal amount outstanding, net of cost basis adjustments. We elected the fair value option for certain structured debt instruments, which are recorded in our condensed consolidated balance sheets at fair value on a recurring basis.

We use third-party pricing services that reference observable market data such as interest rates and spreads to measure the fair value of debt, and thus classify that debt as Level 2 of the valuation hierarchy.

For structured debt instruments that are not valued by third-party pricing services, cash flows are evaluated taking into consideration any structured derivatives through which we have swapped out of the structured features of the notes. The resulting cash flows are discounted to present value using a yield curve derived from market prices observed for Fannie Mae Benchmark Notes and adjusted to reflect fair values at the offer side of the market. Market swaption volatilities are also referenced for the valuation of callable structured debt instruments. Since the derivatives considered in the valuations of these structured debt instruments are classified as Level 3 of the valuation hierarchy, the valuations of the structured debt instruments result in a Level 3 classification.

Certain consolidated MBS debt with embedded derivatives is recorded in our condensed consolidated balance sheets at fair value on a recurring basis. Consolidated MBS debt is traded in the market as MBS assets. Accordingly, we estimate the fair value of our consolidated MBS debt using quoted market prices in active markets for similar liabilities when traded as assets. The valuation methodology and inputs used in estimating the fair value of MBS assets are described under "Cash Equivalents, Trading Securities and Available-for-Sale Securities."

### Valuation Control Processes

We have control processes that are designed to ensure that our fair value measurements are appropriate and reliable, that they are based on observable inputs wherever possible and that our valuation approaches are consistently applied and the assumptions used are reasonable. Our control processes consist of a framework that provides for a segregation of duties and oversight of our fair value methodologies and valuations, as well as validation procedures.

The Pricing Group within our Finance Division is responsible for estimating the fair value of the majority of our financial assets and financial liabilities. These fair values are verified by our Price Verification Group, which is a control group separate from the group responsible for obtaining prices. Our Modeling and Analytics Group develops models that are used in estimating the fair value of assets and liabilities for financial reporting purposes. In addition, our Model Oversight Committee ("MOC") facilitates the cross-functional coordination and effectiveness of our modeling efforts in terms of research, model use and risk governance. The MOC is comprised of senior representatives from Underwriting and Pricing, Capital Markets, Credit Portfolio Management, Enterprise Risk Management, Finance and Modeling & Analytics and is

146

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

chaired by our Chief Risk Officer. Our Model Risk Oversight Group is responsible for establishing risk management controls and for reviewing, validating and approving models used in the determination of fair value measurements for financial reporting. Fair value measurements for acquired property and collateral dependent loans are determined by other valuation groups in the Finance division.

Our Valuation Oversight Committee ("VOC") includes senior representation from our Capital Markets segment, our Enterprise Risk Office and our Finance division, and is responsible for providing overall governance for our valuation processes and results. The composition of the VOC is determined by the VOC chair, our Chief Financial Officer, with the objective of obtaining appropriate representation from finance, risk and select business units within Fannie Mae. Based on its review of valuation methodologies and fair value results for various financial instruments used for financial reporting, the VOC is responsible for advising the VOC Committee chair, who has the ultimate responsibility over all valuation processes and results. The VOC also reviews trend analysis for various financial assets and liabilities on a quarterly basis.

We use third-party vendor prices and dealer quotes to estimate fair value of some of our financial assets and liabilities. Third-party vendor prices are primarily used to estimate fair value for trading securities, available-for-sale securities, debt of Fannie Mae, and consolidated MBS debt. Our Pricing Group performs various review and validation procedures prior to utilizing these prices in our fair value estimation process. We verify selected prices, using a variety of methods, including corroborating the prices by reference to other independent market data, such as non-binding broker or dealer quotations, relevant benchmark indices, and prices of similar instruments. We also review prices for reasonableness based on variations from prices provided in previous periods, comparing prices to internally estimated prices, using primarily a discounted cash flow approach, and conducting relative value comparisons based on specific characteristics of securities.

We have discussions with the pricing services as part of our due diligence process in order to maintain a current understanding of the valuation processes and related assumptions and inputs that these vendors use in developing prices. The prices provided to us by third-party pricing services reflect the existence of market reliance upon credit enhancements, if any, and the current lack of liquidity in the marketplace. If we determine that a price provided to us is outside established parameters, we will further examine the price, including having follow-up discussions with the pricing service or dealer. If we conclude that a price is not valid, we will adjust the price for various factors, such as liquidity, bid-ask spreads and credit considerations. All of these procedures are executed before we use the prices in preparing our financial statements.

Our Price Verification Group is responsible for performing monthly independent price verification, primarily related to financial assets and financial liabilities that are priced by our Pricing Group. This is generally accomplished by comparing the value that the Price Verification Group obtains through its own sources and methods with values provided by the Pricing Group. Alternatively, the Price Verification Group may perform reviews of the assumptions used by the Pricing Group to estimate the fair value of products we hold that have material estimation risk because observable market-based inputs do not exist. This group provides an update to the VOC on results, relevant market information and pricing trends, and significant valuation challenges and resolution of those challenges with the Pricing Group on a quarterly basis.

We have an internal property valuation function that utilizes an internal model to compare the values received on a property and assign a risk rating based on several factors including the deviation between the various values. Property valuations with risk ratings above a specified threshold are reviewed for reasonableness by a team of property valuation experts. The internal model that is used to assign a risk rating and the threshold specified is subject to VOC oversight. In addition, our Quality Control Group reviews the overall work performed and inspects a portion of the properties in major markets, for which the third-party valuations are obtained, in order to assess the quality of the valuations.

We calibrate the performance of our proprietary internal model using actual offers on our properties and recent observed transactions. The internal model's performance is reviewed on a monthly basis by the REO valuation team and is compared with the review performed by our Modeling and Analytics team on a quarterly basis. These review results are presented to the Model Risk Oversight Group, who performs a review and evaluation of the model performance on a quarterly basis. The results of the validation are also reviewed with the VOC on a quarterly basis.

Our Appraisal Review Group reviews appraisals to determine whether they have been performed in accordance with appraisal standards and the results are consistent with our observed transactions on similar properties. We and/or third-party servicers review broker price opinions to determine whether the values provided are consistent with our observed transactions on similar properties. We conduct quarterly portfolio reviews, annual audits and periodic reviews of the counterparties that provide services to review broker price opinions. In addition, valuation results and trend analyses are reviewed at least monthly by REO management.

147

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Fair Value of Financial Instruments*

The following table displays the carrying value and estimated fair value of our financial instruments as of  June 30, 2012 and December 31, 2011. The fair value of financial instruments we disclose includes commitments to purchase multifamily and single-family mortgage loans which are off-balance sheet financial instruments that we do not record in our condensed consolidated balance sheets. The fair values of these commitments are included as "Mortgage loans held for investment, net of allowance for loan losses." The disclosure excludes certain financial instruments, such as plan obligations for pension and postretirement health care benefits, employee stock option and stock purchase plans, and also excludes all non-financial instruments. As a result, the fair value of our financial assets and liabilities does not represent the underlying fair value of our total consolidated assets and liabilities.

148

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | As of | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | June 30, 2012 | | | | | | December 31, 2011 | |
| | Carrying Value | Quoted Price in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment | Estimated Fair Value | Carrying Value | Estimated Fair Value |
| | (Dollars in millions) | | | | | | | |
| **Financial assets:** | | | | | | | | |
| Cash and cash equivalents and restricted cash | $ 80,713 | $ 68,663 | $ 12,050 | $ — | $ — | $ 80,713 | $ 68,336 | $ 68,336 |
| Federal funds sold and securities purchased under agreements to resell or similar arrangements | 24,000 | — | 24,000 | — | — | 24,000 | 46,000 | 46,000 |
| Trading securities | 50,935 | 27,064 | 21,566 | 2,305 | — | 50,935 | 74,198 | 74,198 |
| Available-for-sale securities | 69,694 | — | 43,366 | 26,328 | — | 69,694 | 77,582 | 77,582 |
| Mortgage loans held for sale | 455 | — | 280 | 187 | — | 467 | 311 | 325 |
| Mortgage loans held for investment, net of allowance for loan losses: | | | | | | | | |
| Of Fannie Mae | 317,578 | — | 36,665 | 230,096 | — | 266,761 | 322,825 | 294,996 |
| Of consolidated trusts | 2,605,209 | — | 2,405,153 | 293,656 | — | 2,698,809 | 2,575,485 | 2,652,025 |
| Mortgage loans held for investment | 2,922,787 | — | 2,441,818 | 523,752 | — | 2,965,570 | 2,898,310 | 2,947,021 |
| Advances to lenders | 7,343 | — | 6,638 | 615 | — | 7,253 | 5,538 | 5,420 |
| Derivative assets at fair value | 602 | — | 16,718 | 236 | (16,352) | 602 | 561 | 561 |
| Guaranty assets and buy-ups | 474 | — | — | 866 | — | 866 | 503 | 901 |
| Total financial assets | $ 3,157,003 | $ 95,727 | $ 2,566,436 | $ 554,289 | $ (16,352) | $ 3,200,100 | $ 3,171,339 | $ 3,220,344 |
| **Financial liabilities:** | | | | | | | | |
| Federal funds purchased and securities sold under agreements to repurchase | $ 153 | $ — | $ 153 | $ — | $ — | $ 153 | $ — | $ — |
| Short-term debt: | | | | | | | | |
| Of Fannie Mae | 92,906 | — | 92,917 | — | — | 92,917 | 146,752 | 146,782 |
| Of consolidated trusts | 3,908 | — | — | 3,908 | — | 3,908 | 4,973 | 4,973 |
| Long-term debt: | | | | | | | | |
| Of Fannie Mae | 566,483 | — | 592,491 | 1,074 | — | 593,565 | 585,692 | 613,983 |
| Of consolidated trusts | 2,500,591 | — | 2,627,334 | 15,864 | — | 2,643,198 | 2,452,455 | 2,596,657 |
| Derivative liabilities at fair value | 919 | — | 24,282 | 162 | (23,525) | 919 | 916 | 916 |
| Guaranty obligations | 758 | — | — | 3,543 | — | 3,543 | 811 | 3,944 |
| Total financial liabilities | $ 3,165,718 | $ — | $ 3,337,177 | $ 24,551 | $ (23,525) | $ 3,338,203 | $ 3,191,599 | $ 3,367,255 |

*Financial Instruments for which fair value approximates carrying value—* We hold certain financial instruments that are not carried at fair value but for which the carrying value approximates fair value due to the short-term nature and negligible credit risk inherent in them. These financial instruments include cash and cash equivalents, the majority of advances to lenders and federal funds and securities sold/purchased under agreements to repurchase/resell (exclusive of dollar roll repurchase transactions).

149

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

*Federal funds and securities sold/purchased under agreements to repurchase/resell*—The carrying value for the majority of these specific instruments approximates the fair value due to the short-term nature and the negligible inherent credit risk, as they involve the exchange of liquid collateral. Were we to calculate the fair value of these instruments we would use observable inputs resulting in Level 2 classification.

*Mortgage Loans Held for Sale*—Loans are reported at the lower of cost or fair value in our condensed consolidated balance sheets. The valuation methodology and inputs used in estimating the fair value of HFS loans are the same as for our HFI loans and are described under "Fair Value Measurement —Mortgage Loans Held for Investment" and these loans are classified as Level 2 of the valuation hierarchy to the extent that significant inputs are observable. To the extent that significant inputs are unobservable, the loans are classified within Level 3 of the valuation hierarchy.

*Advances to Lenders*—The carrying value for the majority of our advances to lenders approximates fair value due to the short-term nature and the negligible inherent credit risk. Were we to calculate the fair value of these instruments we would use discounted cash flow models that use observable inputs such as spreads based on market assumptions, resulting in Level 2 classification.

Advances to lenders also include loans for which the carrying value does not approximate fair value. These loans do not qualify for Fannie Mae MBS securitization and are valued using market-based techniques including credit spreads, severities and prepayment speeds for similar loans, through third-party pricing services or through a model approach incorporating both interest rate and credit risk simulating a loan sale via a synthetic structure. We classify these valuations as Level 3 given that significant inputs are not observable or are determined by extrapolation of observable points.

*Guaranty Assets and Buy-ups*—Guaranty assets related to our portfolio securitizations are recorded in our condensed consolidated balance sheets at fair value on a recurring basis and are classified within Level 3 of the valuation hierarchy. Guaranty assets in lender swap transactions are recorded in our condensed consolidated balance sheets at the lower of cost or fair value. These assets, which are measured at fair value on a nonrecurring basis, are classified within Level 3 of the fair value hierarchy.

We estimate the fair value of guaranty assets based on the present value of expected future cash flows of the underlying mortgage assets using management's best estimate of certain key assumptions, which include prepayment speeds, forward yield curves, and discount rates commensurate with the risks involved. These cash flows are projected using proprietary prepayment, interest rate and credit risk models. Because guaranty assets are like an interest-only income stream, the projected cash flows from our guaranty assets are discounted using one-month LIBOR plus the option-adjusted spread ("OAS") for interest-only trust securities. The interest-only OAS is calibrated using prices of a representative sample of interest-only trust securities. We believe the remitted fee income is less liquid than interest-only trust securities and more like an excess servicing strip. We take a further discount of the present value for these liquidity considerations. This discount is based on market quotes from dealers .

The fair value of the guaranty assets includes the fair value of any associated buy-ups, which is estimated in the same manner as guaranty assets but is recorded separately as a component of "Other assets" in our condensed consolidated balance sheets.

*Guaranty Obligations*—The fair value of all guaranty obligations, measured subsequent to their initial recognition, is our estimate of a hypothetical transaction price we would receive if we were to issue our guaranty to an unrelated party in a standalone arm's-length transaction at the measurement date. These obligations are classified within Level 3. The valuation methodology and inputs used in estimating the fair value of the guaranty obligation are described under "Fair Value Measurement—Mortgage Loans Held for Investment, Build up."

*HARP Loans*—We measure the fair value of loans that are delivered under the Home Affordable Refinance Program ("HARP") using a modified build-up approach while the loan is performing. Under this modified approach, we set the credit component of the consolidated loans (i.e., the guaranty obligation) equal to the compensation we would currently receive for a loan delivered to us under the program because the total compensation for these loans is equal to their current exit price in the GSE securitization market. For a description of the build-up valuation methodology, refer to "Fair Value Measurement –Mortgage Loans Held for Investment." We will continue to use this pricing methodology as long as the HARP program is available to market participants. If, subsequent to delivery, the refinanced loan becomes past due or is modified as a part of a troubled debt restructuring, the fair value of the guaranty obligation is then measured consistent with other loans that have these characteristics.

150

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures. If these benefits were not reflected in the pricing for these loans (that is, if the loans were valued using our standard build-up approach), the fair value disclosed in the table above would be lower by $8.4 billion as of June 30, 2012. The total fair value of the loans in our portfolio that have been refinanced under HARP as of June 30, 2012 as presented in the table above is $168.3 billion.

### Fair Value Option

We elected the fair value option for loans which contain embedded derivatives that would otherwise require bifurcation. Under the fair value option, we elected to carry these instruments at fair value instead of bifurcating the embedded derivative from the respective loan.

We elected the fair value option for all long-term structured debt instruments that are issued in response to specific investor demand and have interest rates that are based on a calculated index or formula and are economically hedged with derivatives at the time of issuance. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from the accounting asymmetry created by recording these structured debt instruments at cost while recording the related derivatives at fair value.

We elected the fair value option for the financial assets and liabilities of the consolidated senior-subordinate trust structures. By electing the fair value option for these instruments, we are able to eliminate the volatility in our results of operations that would otherwise result from different accounting treatment between loans at cost and debt at cost.

Interest income for the mortgage loans is recorded in "Mortgage loans interest income" and interest expense for the debt instruments is recorded in "Long-term debt interest expense" in our condensed consolidated statements of operations and comprehensive income (loss).

The following table displays the fair value and unpaid principal balance of the financial instruments for which we have made fair value elections as of June 30, 2012 and December 31, 2011.

| | As of | | | | | |
|---|---|---|---|---|---|---|
| | June 30, 2012 | | | December 31, 2011 | | |
| | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] | Loans of Consolidated Trusts[1] | Long-Term Debt of Fannie Mae | Long-Term Debt of Consolidated Trusts[2] |
| | (Dollars in millions) | | | | | |
| Fair value | $ 5,231 | $ 831 | $ 4,600 | $ 3,611 | $ 838 | $ 3,939 |
| Unpaid principal balance | 5,631 | 712 | 4,679 | 4,122 | 712 | 4,012 |

_____

[1] Includes nonaccrual loans with a fair value of $260 million and $195 million as of June 30, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these nonaccrual loans as of June 30, 2012 and December 31, 2011 is $240 million and $232 million, respectively. Includes loans that are 90 days or more past due with a fair value of $382 million and $310 million as of June 30, 2012 and December 31, 2011, respectively. The difference between unpaid principal balance and the fair value of these 90 or more days past due loans as of June 30, 2012 and December 31, 2011 is $270 million and $262 million, respectively.

[2] Includes interest-only debt instruments with no unpaid principal balance and a fair value of $107 million and $115 million as of June 30, 2012 and December 31, 2011, respectively.

### Changes in Fair Value under the Fair Value Option Election

The following table displays fair value gains and losses, net, including changes attributable to instrument-specific credit risk, for loans and debt for which the fair value election was made. Amounts are recorded as a component of "Fair value losses, net" in our condensed consolidated statements of operations and comprehensive income (loss) for the three and six months ended June 30, 2012 and 2011.

151

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

| | For the Three Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Loans | Long-Term Debt | Total Gains (Losses) | Loans | Long-Term Debt | Total Gains |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Changes in instrument-specific credit risk | $ 11 | $ — | $ 11 | $ 6 | $ 8 | $ 14 |
| Other changes in fair value | (38) | (17) | (55) | 76 | (26) | 50 |
| Fair value (losses) gains, net | $ (27) | $ (17) | $ (44) | $ 82 | $ (18) | $ 64 |

| | For the Six Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Loans | Long-Term Debt | Total Gains (Losses) | Loans | Long-Term Debt | Total (Losses) Gains |
|---|---|---|---|---|---|---|
| | (Dollars in millions) | | | | | |
| Changes in instrument-specific credit risk | $ 77 | $ (2) | $ 75 | $(211) | $ 4 | $ (207) |
| Other changes in fair value | (103) | 43 | (60) | 141 | 7 | 148 |
| Fair value (losses) gains, net | $ (26) | $ 41 | $ 15 | $ (70) | $ 11 | $ (59) |

In determining the changes in the instrument-specific credit risk for loans, the changes in the associated credit-related components of these loans, primarily the guaranty obligation, were taken into consideration with the overall change in the fair value of the loans for which we elected the fair value option for financial instruments. In determining the changes in the instrument-specific credit risk for debt, the changes in Fannie Mae debt spreads to LIBOR that occurred during the period were taken into consideration with the overall change in the fair value of the debt for which we elected the fair value option for financial instruments. Specifically, cash flows are evaluated taking into consideration any derivatives through which Fannie Mae has swapped out of the structured features of the notes and thus created a floating-rate LIBOR-based debt instrument. The change in value of these LIBOR-based cash flows based on the Fannie Mae yield curve at the beginning and end of the period represents the instrument-specific risk.

**13. Commitments and Contingencies**

We are party to various types of legal actions and proceedings, including actions brought on behalf of various classes of claimants. We also are subject to regulatory examinations, inquiries and investigations and other information gathering requests. In some of the matters, indeterminate amounts are sought. Modern pleading practice in the U.S. permits considerable variation in the assertion of monetary damages or other relief. Jurisdictions may permit claimants not to specify the monetary damages sought or may permit claimants to state only that the amount sought is sufficient to invoke the jurisdiction of the trial court. This variability in pleadings, together with our and our counsel's actual experience in litigating or settling claims, leads us to conclude that the monetary relief that may be sought by plaintiffs bears little relevance to the merits or disposition value of claims.

On a quarterly and annual basis, we review relevant information about all pending legal actions and proceedings for the purpose of evaluating and revising our contingencies, reserves and disclosures.

Legal actions and proceedings of all types are subject to many uncertain factors that generally cannot be predicted with assurance. Accordingly, the outcome of any given matter and the amount or range of potential loss at particular points in time is frequently difficult to ascertain. Uncertainties can include how fact finders will evaluate documentary evidence and the credibility and effectiveness of witness testimony, and how trial and appellate courts will apply the law. Disposition valuations are also subject to the uncertainty of how opposing parties and their counsel view the evidence and applicable law. Further, FHFA adopted a regulation on June 20, 2011, which provides, in part, that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. The presence of this regulation and the Director of FHFA's assertion that FHFA will not pay claims asserted in certain cases discussed below while we are in conservatorship creates additional uncertainty in those cases.

We establish a reserve for those matters when a loss is probable and we can reasonably estimate the amount of such loss.

152

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

Reserves have been established for certain of the matters noted below. These reserves did not have a material adverse effect on our financial statements. We note, however, that in light of the uncertainties involved in such actions and proceedings, there is no assurance that the ultimate resolution of these matters will not significantly exceed the reserves we have currently accrued.

For the remaining legal actions or proceedings, including those where there is only a reasonable possibility that a loss may be incurred, we are not currently able to estimate the reasonably possible losses or ranges of losses and we have not established a reserve with respect to those actions or proceedings. We are often unable to estimate the possible losses or ranges of losses, particularly for proceedings that are in their early stages of development, where plaintiffs seek substantial or indeterminate damages, where there may be novel or unsettled legal questions relevant to the proceedings, or where settlement negotiations have not occurred or progressed. Further, as noted above, FHFA's regulation and the Director of FHFA's assertion creates additional uncertainty with respect to certain cases.

Given the uncertainties involved in any action or proceeding, regardless of whether we have established a reserve, the ultimate resolution of certain of these matters may be material to our operating results for a particular period, depending on, among other factors, the size of the loss or liability imposed and the level of our net income or loss for that period. Based on our current knowledge with respect to the matters described below, we believe we have valid defenses to the claims in these proceedings and intend to defend these matters vigorously regardless of whether or not we have recorded a loss reserve.

In addition to the matters specifically described below, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that we do not expect will have a material impact on our business or financial condition. We have advanced fees and expenses of certain current and former officers and directors in connection with various legal proceedings pursuant to indemnification agreements.

_In re Fannie Mae Securities Litigation_

Fannie Mae is a defendant in a consolidated class action lawsuit initially filed in 2004 and currently pending in the U.S. District Court for the District of Columbia. In the consolidated complaint filed on March 4, 2005, lead plaintiffs Ohio Public Employees Retirement System and State Teachers Retirement System of Ohio allege that we and certain former officers, as well as our former outside auditor, made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and SEC Rule 10b-5 promulgated thereunder. Plaintiffs contend that Fannie Mae's accounting statements were inconsistent with GAAP requirements relating to hedge accounting and the amortization of premiums and discounts, and seek unspecified compensatory damages, attorneys' fees, and other fees and costs. On January 7, 2008, the court defined the class as all purchasers of Fannie Mae common stock and call options and all sellers of publicly traded Fannie Mae put options during the period from April 17, 2001 through December 22, 2004. On October 17, 2008, FHFA, as conservator for Fannie Mae, intervened in this case. On August 18, 2011, the parties filed various motions for summary judgment, which are fully briefed.

As discussed above, FHFA adopted a regulation on June 20, 2011, that provides in part that while we are in conservatorship, FHFA will not pay claims by our current or former shareholders, unless the Director of FHFA determines it is in the interest of the conservatorship. FHFA's regulation has been challenged by lead plaintiffs in a separate lawsuit also pending in the U.S. District Court for the District of Columbia.

In September and December 2010, plaintiffs served expert reports claiming damages to plaintiffs under various scenarios ranging cumulatively from $2.2 billion to $8.6 billion. Given the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

_2008 Class Action Lawsuits_

Fannie Mae is a defendant in two consolidated class actions filed in 2008 and currently pending in the U.S. District Court for the Southern District of New York—_In re Fannie Mae 2008 Securities Litigation_ and _In re 2008 Fannie Mae ERISA Litigation_. On February 11, 2009, the Judicial Panel on Multidistrict Litigation ordered that the cases be coordinated for pretrial proceedings.

153

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

Given the early status of these matters, the absence of a specified demand or claim by the plaintiffs, and the substantial and novel legal questions that remain, including those raised by FHFA's regulation and the Director of FHFA's determination, we are currently unable to estimate the reasonably possible loss or range of loss arising from these lawsuits.

*In re Fannie Mae 2008 Securities Litigation*

In a consolidated amended complaint filed on June 22, 2009, lead plaintiffs Massachusetts Pension Reserves Investment Management Board and Boston Retirement Board (for common shareholders) and Tennessee Consolidated Retirement System (for preferred shareholders) allege that we, certain of our former officers, and certain of our underwriters violated Sections 12(a)(2) and 15 of the Securities Act of 1933. Lead plaintiffs also allege that we, certain of our former officers, and our outside auditor, violated Sections 10(b) (and Rule 10b-5 promulgated thereunder) and 20(a) of the Securities Exchange Act of 1934. Lead plaintiffs seek various forms of relief, including rescission, damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On October 13, 2009, the Court entered an order allowing FHFA to intervene.

On November 24, 2009, the Court granted the defendants' motion to dismiss the Securities Act claims as to all defendants. On September 30, 2010, the Court granted in part and denied in part the defendants' motions to dismiss the Securities Exchange Act claims. As a result of the partial denial, some of the Securities Exchange Act claims remained pending against us and certain of our former officers. Fannie Mae filed its answer to the consolidated complaint on December 31, 2010. On July 28, 2011, lead plaintiffs filed motions to certify a class of persons who, between November 8, 2006 and September 5, 2008, inclusive, purchased or acquired (a) Fannie Mae common stock and options or (b) Fannie Mae preferred stock.

On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion. Briefing on the pending motions for class certification has been held in abeyance pending resolution of motions to dismiss the second amended complaint. Plaintiffs filed a second amended joint consolidated class action complaint on March 2, 2012 and added FHFA as a defendant. On April 4, 2012, defendants filed motions to dismiss the second amended complaint, which are fully briefed.

*In re 2008 Fannie Mae ERISA Litigation*

In a consolidated complaint filed on September 11, 2009, plaintiffs allege that certain of our current and former officers and directors, including former members of Fannie Mae's Benefit Plans Committee and the Compensation Committee of Fannie Mae's Board of Directors, as fiduciaries of Fannie Mae's Employee Stock Ownership Plan ("ESOP"), breached their duties to ESOP participants and beneficiaries by investing ESOP funds in Fannie Mae common stock when it was no longer prudent to continue to do so. Plaintiffs purport to represent a class of participants and beneficiaries of the ESOP whose accounts invested in Fannie Mae common stock beginning April 17, 2007. The plaintiffs seek unspecified damages, attorneys' fees and other fees and costs, and injunctive and other equitable relief. On February 1, 2012, plaintiffs sought leave to amend their complaint to add new factual allegations and the court granted plaintiffs' motion. Plaintiffs filed an amended complaint on March 2, 2012 adding two current Board members and then-CEO Michael J. Williams as defendants. On April 4, 2012, defendants filed motions to dismiss the amended complaint, which are fully briefed.

*Comprehensive Investment Services v. Mudd, et al.*

This individual securities action was originally filed on May 13, 2009, by plaintiff Comprehensive Investment Services, Inc. against certain of our former officers and directors, and certain of our underwriters in the U.S. District Court for the Southern District of Texas. On July 7, 2009, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on May 11, 2011 against us, certain of our former officers, and certain of our underwriters. The amended complaint alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; and violations of the Texas Business and Commerce Code, common law fraud, and negligent misrepresentation in connection with Fannie Mae's May 2008 $2.0 billion offering of 8.25% non-cumulative preferred Series T stock. Plaintiff seeks relief in the form of rescission, actual damages, punitive damages, interest, costs, attorneys' and experts' fees, and other equitable and injunctive relief. On February 1, 2012, plaintiff sought leave to amend its complaint to add new factual allegations and the court granted plaintiff's motion. Plaintiff filed a second amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the second amended complaint, which are fully briefed.

154

**FANNIE MAE**
**(In conservatorship)**
**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS - (Continued)**
**(UNAUDITED)**

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

*Smith v. Fannie Mae, et al.*

This individual securities action was originally filed on February 25, 2010, by plaintiff Edward Smith against Fannie Mae and certain of its former officers as well as several underwriters in the U.S. District Court for the Central District of California. On April 12, 2010, this case was transferred to the Southern District of New York for coordination with *In re Fannie Mae 2008 Securities Litigation* and *In re 2008 Fannie Mae ERISA Litigation*. Plaintiff filed an amended complaint on April 19, 2011, which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; violations of Section 20(a) of the Securities Exchange Act of 1934; common law fraud and negligence claims; and California state law claims for misrepresentation in connection with Fannie Mae's December 2007 $7.0 billion offering of 7.75% fixed-to-floating rate non-cumulative preferred Series S stock. Plaintiff seeks relief in the form of rescission, actual damages (including interest), and exemplary and punitive damages. On February 1, 2012, plaintiff sought leave to amend his complaint to add new factual allegations and the court granted plaintiff's motion. Plaintiff filed a second amended complaint on March 2, 2012. On April 4, 2012, defendants filed motions to dismiss the second amended complaint, which are fully briefed.

Given the preliminary stage of this lawsuit, the absence of a specified demand or claim by the plaintiff, and the substantial and novel legal questions that remain, we are currently unable to estimate the reasonably possible loss or range of loss arising from this litigation.

*Transfer Tax Litigation*

A number of lawsuits have been filed against us in multiple states challenging our right to claim an exemption under our charter from transfer taxes in connection with the recordation of deeds upon transfers of real property by sale or foreclosure. The plaintiffs in several of these lawsuits seek to represent a nationwide class of localities. In addition, we have filed a lawsuit against the state of Illinois and four counties seeking a judgment that we are exempt from these transfer taxes. If these lawsuits are decided against us, we may be required to pay past transfer taxes, damages, fees and/or costs. Although we believe that our charter provides us with an exemption from these taxes and therefore we have a valid defense in these lawsuits, in March 2012 a federal district court in Michigan held in two cases that we are not exempt from Michigan transfer taxes under our charter. On May 21, 2012, we, along with FHFA and Freddie Mac, filed a Petition for Permission to Appeal the two Michigan decisions with the U.S. Court of Appeals for the Sixth Circuit. On June 29, 2012, the plaintiff in one of the Michigan cases filed a motion with the Judicial Panel on Multidistrict Litigation seeking an order transferring all related cases filed as of that date, as well as all subsequently filed related actions, to the U.S. District Court for the Eastern District of Michigan for coordinated or consolidated pretrial proceedings; we have opposed this motion. These lawsuits may lead to additional lawsuits relating to the more than thirty states that impose these taxes. We are currently unable to estimate the reasonably possible loss or range of losses arising from these lawsuits given the following factors: (a) taxing authorities may conclude that our charter provides us with an exemption from these taxes, (b) existing opinions from taxing authorities in some jurisdictions may preclude retroactive collection, (c) no plaintiff has demanded a stated amount of damages, and (d) the scope of permissible claims has not yet been determined in any jurisdiction.

155

Confidential Commercial Information
Confidential Treatment and FOIA Exemption Requested

**Item 3.  Quantitative and Qualitative Disclosures about Market Risk**

Information about market risk is set forth in "MD&A—Risk Management—Market Risk Management, Including Interest Rate Risk Management."

**Item 4.  Controls and Procedures**

### Overview

We are required under applicable laws and regulations to maintain controls and procedures, which include disclosure controls and procedures as well as internal control over financial reporting, as further described below.

**Evaluation of Disclosure Controls and Procedures**

### *Disclosure Controls and Procedures*

Disclosure controls and procedures refer to controls and other procedures designed to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the Securities and Exchange Commission ("SEC"). Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding our required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management was required to apply its judgment in evaluating and implementing possible controls and procedures.

### *Evaluation of Disclosure Controls and Procedures*

As required by Rule 13a-15 under the Exchange Act, management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, the effectiveness of our disclosure controls and procedures as in effect as of June 30, 2012, the end of the period covered by this report. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective at a reasonable assurance level as of June 30, 2012 or as of the date of filing this report.

Our disclosure controls and procedures were not effective as of June 30, 2012 or as of the date of filing this report because they did not adequately ensure the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws. As a result, we were not able to rely upon the disclosure controls and procedures that were in place as of June 30, 2012 or as of the date of this filing, and we continue to have a material weakness in our internal control over financial reporting. This material weakness is described in more detail below under "Description of Material Weakness." Based on discussions with FHFA and the structural nature of the weakness in our disclosure controls and procedures, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Description of Material Weakness**

The Public Company Accounting Oversight Board's Auditing Standard No. 5 defines a material weakness as a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management has determined that we continued to have the following material weakness as of June 30, 2012 and as of the date of filing this report:

- *Disclosure Controls and Procedures.*  We have been under the conservatorship of FHFA since September 6, 2008. Under the 2008 Reform Act, FHFA is an independent agency that currently functions as both our conservator and our regulator with respect to our safety, soundness and mission. Because of the nature of the conservatorship under the 2008 Reform Act, which places us under the "control" of FHFA (as that term is defined in securities laws), some of the information that we may need to meet our disclosure obligations may be solely within the knowledge of FHFA. As our conservator, FHFA has the power to take actions without our knowledge that could be material to our shareholders and other stakeholders, and could significantly affect our financial performance or our continued existence as an ongoing business. Although we and FHFA attempted to design and implement disclosure policies and procedures that would account for the conservatorship and accomplish the same objectives as a disclosure controls and procedures

156

policy of a typical reporting company, there are inherent structural limitations on our ability to design, implement, test or operate effective disclosure controls and procedures. As both our regulator and our conservator under the 2008 Reform Act, FHFA is limited in its ability to design and implement a complete set of disclosure controls and procedures relating to Fannie Mae, particularly with respect to current reporting pursuant to Form 8-K. Similarly, as a regulated entity, we are limited in our ability to design, implement, operate and test the controls and procedures for which FHFA is responsible.

Due to these circumstances, we have not been able to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our condensed consolidated financial statements. As a result, we did not maintain effective controls and procedures designed to ensure complete and accurate disclosure as required by GAAP as of June 30, 2012 or as of the date of filing this report. Based on discussions with FHFA and the structural nature of this weakness, it is likely that we will not remediate this material weakness while we are under conservatorship.

**Mitigating Actions Relating to Material Weakness**

As described above under "Description of Material Weakness," we continue to have a material weakness in our internal control over financial reporting relating to our disclosure controls and procedures. However, we and FHFA have engaged in the following practices intended to permit accumulation and communication to management of information needed to meet our disclosure obligations under the federal securities laws:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the conservator.

- We have provided drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also have provided drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, have reviewed our SEC filings prior to filing, including this quarterly report on Form 10-Q for the quarter ended June 30, 2012 ("Second Quarter 2012 Form 10-Q"), and engaged in discussions regarding issues associated with the information contained in those filings. Prior to filing our Second Quarter 2012 Form 10-Q, FHFA provided Fannie Mae management with a written acknowledgement that it had reviewed the Second Quarter 2012 Form 10-Q, and it was not aware of any material misstatements or omissions in the Second Quarter 2012 Form 10-Q and had no objection to our filing the Second Quarter 2012 Form 10-Q.

- The Acting Director of FHFA and our Chief Executive Officer have been in frequent communication, typically meeting on at least a bi-weekly basis.

- FHFA representatives attend meetings frequently with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, credit and market risk management, external communications and legal matters.

- Senior officials within FHFA's Office of the Chief Accountant have met frequently with our senior finance executives regarding our accounting policies, practices and procedures.

**Changes in Internal Control over Financial Reporting**

*Overview*

Management has evaluated, with the participation of our Chief Executive Officer and Chief Financial Officer, whether any changes in our internal control over financial reporting that occurred during our last fiscal quarter have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Below we describe a change in our internal control over financial reporting since March 31, 2012 that management believes has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

*Change in Management*

In the second quarter of 2012, Timothy J. Mayopoulos succeeded Michael J. Williams as our President and Chief Executive Officer.

157

## PART II—OTHER INFORMATION

### Item 1. Legal Proceedings

The information in this item supplements and updates information regarding certain legal proceedings set forth in "Legal Proceedings" in our 2011 Form 10-K and First Quarter 2012 Form 10-Q. We also provide information regarding material legal proceedings in "Note 13, Commitments and Contingencies," which is incorporated herein by reference. In addition to the matters specifically described or incorporated by reference in this item, we are involved in a number of legal and regulatory proceedings that arise in the ordinary course of business that do not have a material impact on our business. Litigation claims and proceedings of all types are subject to many factors that generally cannot be predicted accurately.

We record reserves for legal claims when losses associated with the claims become probable and the amounts can be reasonably estimated. The actual costs of resolving legal claims may be substantially higher or lower than the amounts reserved for those claims. For matters where the likelihood or extent of a loss is not probable or cannot be reasonably estimated, we do not recognize in our condensed consolidated financial statements the potential liability that may result from these matters. We presently cannot determine the ultimate resolution of the matters described below or incorporated by reference into this item or in our 2011 Form 10-K or our First Quarter 2012 Form 10-Q. We have recorded a reserve for legal claims related to those matters when we were able to determine a loss was both probable and reasonably estimable. If certain of these matters are determined against us, it could have a material adverse effect on our results of operations, liquidity and financial condition, including our net worth.

#### Shareholder Derivative Litigation

Three shareholder derivative cases were filed at various times between June 2007 and June 2008 naming certain of our current and former directors and officers as defendants, and Fannie Mae as a nominal defendant. These cases were pending before the U.S. Court of Appeals for the District of Columbia Circuit: *Kellmer v. Raines, et al.* (filed June 29, 2007); *Middleton v. Raines, et al.* (filed July 6, 2007); and *Agnes v. Raines, et al.* (filed June 25, 2008). The cases relied on factual allegations that Fannie Mae's accounting statements were inconsistent with the GAAP requirements relating to hedge accounting and the amortization of premiums and discounts. *Agnes* relied on factual allegations that defendants wrongfully failed to disclose our exposure to the subprime mortgage crisis and that the Board improperly authorized the company to buy back $100 million in shares while the stock price was artificially inflated. Plaintiffs sought, on behalf of Fannie Mae, various forms of monetary and non-monetary relief, including unspecified money damages (including restitution, legal fees and expenses, disgorgement and punitive damages); corporate governance changes; an accounting; and attaching, impounding or imposing a constructive trust on the individual defendants' assets.

Pursuant to a June 25, 2009 order, FHFA, as our conservator, substituted itself for shareholder plaintiffs in all of these actions. On July 27, 2010, the U.S. District Court for the District of Columbia dismissed *Kellmer* and *Middleton* with prejudice and *Agnes* without prejudice. FHFA filed motions to reconsider the decisions dismissing *Kellmer* and *Middleton* with prejudice, and those motions were denied on October 22, 2010. FHFA appealed that denial on November 22, 2010. Plaintiffs Kellmer and Agnes also appealed the substitution and the dismissal orders. On January 20, 2011, the U.S. Court of Appeals for the District of Columbia Circuit issued an order in the *Kellmer* appeal granting FHFA's motions for the voluntary dismissal of defendants Kenneth M. Duberstein, Frederic Malek and Patrick Swygert. On that same day, in the *Middleton* appeal, the Court of Appeals issued an order granting FHFA's motions for the voluntary dismissal of defendants Stephen Ashley, Kenneth Duberstein, Thomas Gerrity, Ann Korologos, Frederic Malek, Donald Marron, Anne Mulcahy, Joe Pickett, Leslie Rahl, Patrick Swygert, and John Wulff. On March 30, 2012, the Court of Appeals affirmed the orders allowing FHFA to substitute itself for shareholder plaintiffs Kellmer and Agnes. Also, the Court of Appeals reversed the district court's dismissal with prejudice of the *Kellmer* and *Middleton* actions, and remanded with instructions for dismissal without prejudice. On May 23, 2012, the Court of Appeals entered a mandate consistent with its March 30, 2012 order. On June 12, 2012, the district court entered an order dismissing the *Kellmer* and *Middleton* actions without prejudice.

#### FHFA Private-Label Mortgage-Related Securities Litigation

In the third quarter of 2011, FHFA, as conservator for us and for Freddie Mac, filed 16 lawsuits on behalf of us and Freddie Mac against various financial institutions, their officers and affiliated and unaffiliated underwriters who were responsible for marketing and selling private-label mortgage-related securities to us. The lawsuits seek to recover losses we and Freddie Mac incurred on the securities. FHFA filed 13 of these lawsuits in the U.S. District Court for the Southern District of New York—against Bank of America Corp.; Barclays Bank PLC; Citigroup, Inc.; Credit Suisse Holdings (USA), Inc.; Deutsche Bank AG; First Horizon National Corporation; Goldman, Sachs & Co.; HSBC North America Holdings Inc.; JPMorgan Chase & Co.; Merrill Lynch & Co.; Nomura Holding America Inc.; SG Americas, Inc.; and UBS Americas Inc. ("UBS") and against

158

certain related entities and individuals. Two lawsuits—against Countrywide Financial Corporation ("Countrywide") and Morgan Stanley—were filed in the Supreme Court of the State of New York for the County of New York, and one—against The Royal Bank of Scotland Group PLC ("RBS")—was filed in the U.S. District Court for the District of Connecticut. The lawsuit against UBS was filed on July 27, 2011, and all the others were filed on September 2, 2011. The lawsuits allege that the defendants violated federal securities laws and state common law by making material misstatements and omissions in the offering documents for the securities that were sold to Fannie Mae and Freddie Mac regarding the characteristics of the loans underlying the securities. The complaints also allege state securities law violations and some allege common law fraud. The complaints seek, among other things, rescission and recovery of consideration paid for the securities at issue in the lawsuits, monetary damages and, in certain cases, punitive damages for common law fraud.

Defendants in the two cases filed in New York state court removed the cases to the U.S. District Court for the Southern District of New York and FHFA filed motions to remand the cases back to state court. On February 7, 2012, the Joint Panel on Multidistrict Litigation transferred the Countrywide case to the U.S. District Court for the Central District of California for inclusion in a multidistrict proceeding involving other actions pending against Countrywide. On April 6, 2012, the court denied FHFA's motion to remand the Countrywide case. On May 11, 2012, FHFA withdrew its motion to remand the Morgan Stanley case. On June 8, 2012, defendants in the Countrywide case filed motions to dismiss. FHFA filed an amended complaint in that case on June 29, 2012 and defendants filed renewed motions to dismiss on July 13, 2012.

On November 16, 2011, all of the cases pending in the Southern District of New York were transferred to one judge in the district, Judge Cote. The court stayed the time to answer or move to dismiss all of the cases except the UBS case. On December 21, 2011, FHFA filed an amended complaint in the UBS case. On January 20, 2012, defendants in the UBS case filed a motion to dismiss the amended complaint. On May 4, 2012, the court denied defendants' motion to dismiss in the UBS case with respect to the federal and state securities law claims and granted defendants' motion to dismiss with respect to the negligent misrepresentation claim. On June 19, 2012, the court certified the decision for interlocutory appeal.

On February 1, 2012, FHFA filed an amended complaint in the RBS case. On March 2, 2012, defendants in the RBS case filed a motion to dismiss the amended complaint.

On June 13, 2012 and June 28, 2012, FHFA filed amended complaints in the non-UBS cases pending in the Southern District of New York. On July 13, 2012, defendants in the JPMorgan Chase & Co., Deutsche Bank AG, Goldman, Sachs & Co., Morgan Stanley, and Merrill Lynch & Co. cases filed motions to dismiss the amended complaints in those cases.

**Item 1A.  Risk Factors**

In addition to the information in this report, you should carefully consider the risks relating to our business that we identify in "Risk Factors" in our 2011 Form 10-K. This section supplements and updates that discussion. For a complete understanding of the subject, you should read both together. Please also refer to "MD&A—Risk Management" in this report and in our 2011 Form 10-K for more detailed descriptions of the primary risks to our business and how we seek to manage those risks.

The risks we face could materially adversely affect our business, results of operations, financial condition, liquidity and net worth, and could cause our actual results to differ materially from our past results or the results contemplated by forward-looking statements contained in this report. However, these are not the only risks we face. In addition to the risks we discuss below, we face risks and uncertainties not currently known to us or that we currently believe are immaterial.

***Our business and results of operations may be materially adversely affected if we are unable to retain and hire qualified employees.***

Our business processes are highly dependent on the talents and efforts of our employees. The conservatorship, the uncertainty of our future, limitations on employee compensation, the heightened scrutiny of our actions by Congress and regulators and the working environment created thereby, and negative publicity concerning the GSEs have had and are likely to continue to have an adverse effect on our ability to retain and recruit well-qualified employees. We have already had significant departures by various members of executive management since shortly before we entered into conservatorship in September 2008, including three Chief Executive Officers and three Chief Financial Officers. Further turnover in key management positions and challenges in integrating new management could harm our ability to manage our business effectively and ultimately adversely affect our financial performance.

Actions taken by Congress, FHFA and Treasury to date, or that may be taken by them or other government agencies in the future, may have an adverse effect on the retention and recruitment of senior executives, management, and other valuable employees. We are subject to significant restrictions on the amount and type of compensation we may pay our executives and other employees under conservatorship. For example, in April 2012, the STOCK Act was enacted, which includes a provision that prohibits senior executives at Fannie Mae and Freddie Mac from receiving bonuses during any period of conservatorship on or after the date of enactment of the law. In addition, FHFA has directed us to maintain individual salaries and wage rates

159

for all employees at 2010 levels for 2011 and 2012 (except in the case of promotions or significant changes in responsibilities). We are also unable to offer equity-based compensation.

Congress has also considered other legislation that would alter the compensation for Fannie Mae and Freddie Mac employees. In 2011, the Financial Services Committee of the House of Representatives approved a bill that would put our employees on a federal government pay scale. If this or similar legislation were to become law, our employees could experience a sudden and sharp decrease in compensation. The Acting Director of FHFA stated on November 15, 2011 that this "would certainly risk a substantial exodus of talent, the best leaving first in many instances. [Fannie Mae and Freddie Mac] likely would suffer a rapidly growing vacancy list and replacements with lesser skills and no experience in their specific jobs. A significant increase in safety and soundness risks and in costly operational failures would, in my opinion, be highly likely." The Acting Director observed, "Should the risks I fear materialize, FHFA might well be forced to limit [Fannie Mae and Freddie Mac's] business activities. . . . Some of the business [Fannie Mae and Freddie Mac] would be unable to undertake might simply not occur, with potential disruption in housing markets and the economy."

We face competition from within the financial services industry and from businesses outside of the financial services industry for qualified employees. Additionally, an improving economy is putting additional pressures on turnover, as attractive opportunities become available to our employees. Our competitors for talent are able to provide market-based compensation and to link employees' pay to performance. The constraints on our compensation could adversely affect our ability to attract qualified candidates. While we engage in succession planning for our senior management and other critical positions and have been able to fill a number of important positions internally, our inability to offer market-based compensation may limit our ability to attract and retain qualified employees below the senior executive level that could fill our senior executive level positions if there is further turnover.

If we are unable to retain, promote and attract employees with the necessary skills and talent, we would face increased risks for operational failures. Our ability to conduct our business and our results of operations would likely be materially adversely affected.

***We expect our operational risk to increase as a result of recent FHFA and Congressional directives.***

We recently have been directed by FHFA and Congress to take specified actions that present significant operational challenges for us. We believe that implementing these directives will increase our operational risk and may potentially result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period.

As described in "Business—Legislative and Regulatory Developments—Changes to Our Single-Family Guaranty Fee Pricing" in our 2011 Form 10-K, in December 2011, Congress enacted the Temporary Payroll Tax Cut Continuation Act of 2011 which, among other provisions, requires that we increase our single-family guaranty fees by at least 10 basis points and remit the additional revenue to Treasury. In addition, as described in "Legislative and Regulatory Developments—FHFA Advisory Bulletin Regarding Framework for Adversely Classifying Loans," in April 2012, FHFA issued supervisory guidance requiring that we change our method of accounting for delinquent loans. Each of these directives creates significant operational burdens and costs for us. We are also currently working on implementing a number of other FHFA initiatives that may increase our operational burdens and our costs, including those described in "Executive Compensation—Compensation Discussion and Analysis—2012 Executive Compensation Program—2012 Corporate Performance Objectives" of our 2011 Form 10-K/A. In addition, FHFA, other agencies of the U.S. government or Congress may direct us to take actions in the future that could further increase our operational risk.

While implementation of each individual directive creates operational challenges, implementing multiple directives significantly increases these challenges. Implementing these directives requires a substantial time commitment from management and the employees responsible for implementing the changes, which could adversely affect our ability to retain these employees. In addition, some of these directives require significant changes to our accounting methods and systems. Due to the operational complexity associated with these changes and the limited time periods for implementing them, we believe there is a significant risk that implementing these changes may result in one or more significant deficiencies or material weaknesses in our internal control over financial reporting in a future period. If this were to occur, we could experience material errors in our reported financial results.

***Changes in accounting standards and policies can be difficult to predict and can materially impact how we record and report our financial results.***

Our accounting policies and methods are fundamental to how we record and report our financial condition and results of operations. From time to time, the FASB, the SEC or FHFA changes the financial accounting and reporting standards or the policies that govern the preparation of our financial statements. These changes can be difficult to predict and expensive to

160

implement, and can materially impact how we record and report our financial condition and results of operations. We could be required to apply new or revised guidance retrospectively, which may result in the revision of prior period financial statements by material amounts. The implementation of new or revised accounting guidance could have a material adverse effect on our net worth and result in or contribute to the need for additional draws from Treasury under the senior preferred stock purchase agreement.

***Given the deteriorated credit quality of many of our mortgage insurer counterparties, we may incur losses as a result of claims under our mortgage insurance policies not being paid in full or at all, and we may face business disruptions and increased concentration risk.***

We rely heavily on mortgage insurers to provide insurance against borrower defaults on single-family conventional mortgage loans with LTV ratios over 80% at the time of acquisition. Several of our mortgage insurer counterparties continued to incur losses in the second quarter of 2012, and their risk-to-capital position continued to erode, which may increase the risk that these counterparties will fail to fulfill their obligations to pay in full our claims under insurance policies.

Three of our largest mortgage insurance counterparties—Triad, RMIC and PMI—have publicly disclosed that they are in run-off. A mortgage insurer that is in run-off continues to collect renewal premiums on its existing insurance business, but no longer writes new insurance. Entering run-off may close off a source of profits and liquidity that may have otherwise assisted a mortgage insurer in paying claims under insurance policies, and could also cause the quality and speed of its claims processing to deteriorate. Triad, RMIC and PMI are currently paying only a portion of policyholder claims and deferring the remaining portion. As of August 8, 2012, Triad is paying only 60% of claims under its mortgage guaranty insurance policies and deferring the remaining 40%, and both PMI and RMIC are paying 50% of claims and deferring the remaining 50%. It is uncertain when, or if, regulators for Triad, RMIC or PMI will allow deferred policyholder claims to be paid or increase the amount paid on claims. In addition, PMI has publicly disclosed that it is in receivership.

In addition to the three mortgage insurers in run-off, Genworth is currently operating pursuant to a waiver it received from the regulator of the state regulatory capital requirements applicable to its main insurance writing entity. Radian has disclosed that, in the absence of additional capital contributions to its main insurance writing entity, its capital might fall below state regulatory capital requirements in the future. Additionally, MGIC disclosed that it expects that its capital fell below state regulatory capital requirements as of June 30, 2012, and MGIC is currently operating pursuant to a waiver it received from the regulator of the state regulatory capital requirements applicable to its main insurance writing entity. MGIC has further disclosed that Freddie Mac has contingently approved a subsidiary of MGIC to write new insurance in states in which MGIC does not have a waiver, subject to a number of conditions. Because lenders generally do not identify which GSE a loan will be delivered to at the time the insurance is obtained, if MGIC is not an approved insurer by Freddie Mac it could constrain MGIC's ability to write new business for all GSE guaranteed loans.

These six mortgage insurers—Triad, RMIC, PMI, Genworth, Radian and MGIC—provided a combined $72.0 billion, or 79%, of our risk in force mortgage insurance coverage of our single-family guaranty book of business as of June 30, 2012. We do not know how long regulators will permit mortgage insurers that do not meet, or may soon fail to meet, state regulatory capital requirements to continue operating without obtaining additional capital. Nor do we know how long our mortgage insurer counterparties that are operating under waivers will continue to operate under waivers, or how long those that are currently below their state-imposed risk-to-capital limits will remain below these limits. If a mortgage insurer counterparty is unable to generate or obtain sufficient capital to stay below its risk-to-capital limits and cannot secure and maintain a waiver from its state regulator, it will likely be placed into run-off or receivership.

Some mortgage insurers have explored corporate restructurings, which are intended to provide relief from risk-to-capital limits in certain states. A restructuring plan that would involve contributing capital to a subsidiary of a mortgage insurer would result in less liquidity available to the mortgage insurer to pay claims on its existing book of business and an increased risk that the mortgage insurer will not pay its claims in full in the future.

From time to time we assess our mortgage insurer counterparties' ability to fulfill their obligations to us, and our loss reserves take into account this assessment. If our assessment of their ability to pay claims deteriorates significantly, it could result in a significant increase in our loss reserves and our credit losses.

Beginning in 2007, many mortgage insurers stopped insuring new mortgages with certain higher risk characteristics such as higher LTV ratios, lower borrower FICO credit scores or select property types. Under our Refi Plus initiative, we allow our borrowers who have mortgage loans with current LTV ratios above 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Except as permitted under Refi Plus, our charter specifically requires us to obtain credit enhancement on single-family conventional mortgage loans with loan-to-value ratios over 80% at the time of purchase. As a result, an inability to obtain mortgage insurance may inhibit our ability to serve and support the housing and mortgage markets, meet our housing goals, and help borrowers remain in their homes by acquiring refinancings

161

into more affordable loans. In addition, access to fewer mortgage insurer counterparties increases our concentration risk with the remaining mortgage insurers in the industry.

**_Changes in the mortgage industry may negatively impact our business._**

A number of our largest mortgage seller/servicer counterparties have reduced or eliminated their purchases of mortgage loans from mortgage brokers and correspondent lenders. As a result, we are acquiring an increasing portion of our business volume directly from smaller financial institutions that may not have the same financial strength as our largest counterparties. Our top five lender customers in terms of single-family business acquisition volume, in the aggregate, accounted for approximately 47% of our single-family business acquisition volume in the second quarter of 2012, compared with approximately 65% of our single-family business acquisition volume in the second quarter of 2011. In addition, only  three of our top five lender customers for the second quarter of 2011 remained in our top five for the second quarter of 2012. Similarly, some of our servicing volume is shifting to smaller or non-traditional servicers. Our ten largest single-family mortgage servicers, including their affiliates, serviced  72% of our single-family guaranty book of business as of June 30, 2012, compared to 76% as of June 30, 2011. These smaller servicers may not have the same financial strength or operational capacity as our largest servicers, which could negatively affect their ability to service the loans on our behalf or to satisfy their repurchase or compensatory fee obligations. This decrease in the concentration of our business with large institutions could increase both our institutional counterparty credit risk and our mortgage credit risk, and could have a material adverse effect on our business, results of operations, financial condition, liquidity and net worth.

**_The loss of business volume from a key lender customer could adversely affect our business and result in a decrease in our revenues, especially if we are unable to replace the business volume that customer provided us._**

Our ability to generate revenue from the purchase and securitization of mortgage loans depends on our ability to acquire a steady flow of mortgage loans from the originators of those loans. Although we are acquiring an increasing portion of our business volume directly from smaller financial institutions, we continue to acquire a significant portion of our mortgage loans from several large mortgage lenders. Our top five lender customers in terms of single-family business acquisition volume, in the aggregate, accounted for approximately  47% of our single-family business acquisition volume in the second quarter of 2012, compared with approximately 65% of our single-family business acquisition volume in the second quarter of 2011. Accordingly, maintaining our current business relationships and business volumes with our top lender customers is important to our business. To the extent a key lender customer significantly reduces the volume or quality of mortgage loans that the lender delivers to us or that we are willing to buy from them, we could lose significant business volume that we might be unable to replace, which could adversely affect our business and result in a decrease in our revenues. In addition, a significant reduction in the volume of mortgage loans that we securitize could reduce the liquidity of Fannie Mae MBS, which in turn could have an adverse effect on their market value.

**_Actions taken by state and local governments to address the housing crisis or increase revenues could have an adverse effect on our business, results of operations, financial condition and net worth._**

Many state and local governments are seeking ways to address some of the effects of the housing crisis, including high levels of foreclosures. State and local governments are also seeking ways to address declining tax revenues. Some of the legislative, regulatory or litigation-related actions governments take to address these issues may adversely affect us by, for example, increasing our costs or affecting our ability to achieve our business goals efficiently and effectively.

For example, a number of lawsuits have been filed against us challenging our right to claim an exemption, under our charter, from transfer taxes in connection with the recordation of deeds upon transfers of real property. Additional similar lawsuits could be filed against us, and taxing authorities in jurisdictions that do not normally impose a tax on the transfer of real property could also seek to impose transfer taxes on us. If we were to become subject to real property transfer taxes in a large number of states and localities, and if we were required to pay a number of years of past transfer taxes in these states and localities, it would increase our costs going forward and could have an adverse effect on our financial results.

In another example, a number of local governments are considering or may consider using eminent domain to seize mortgage loans and forgive principal on the loans. Such seizures, if they are successful, could result in further losses and write-downs relating to our investment securities and could increase our credit losses.

These actions and others that state and local governments may pursue in the future could have an adverse effect on our business, results of operations, financial condition and net worth.

162

**Item 2.  Unregistered Sales of Equity Securities and Use of Proceeds**

**Recent Sales of Unregistered Securities**

Under the terms of our senior preferred stock purchase agreement with Treasury, we are prohibited from selling or issuing our equity interests, other than as required by (and pursuant to) the terms of a binding agreement in effect on September 7, 2008, without the prior written consent of Treasury. During the quarter ended June 30, 2012, we did not issue any equity securities.

**Information about Certain Securities Issuances by Fannie Mae**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Because the securities we issue are exempted securities under the Securities Act of 1933, we do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars or prospectuses (or supplements thereto) that we post on our Web site or in a current report on Form 8-K that we file with the SEC, in accordance with a "no-action" letter we received from the SEC staff in 2004. In cases where the information is disclosed in a prospectus or offering circular posted on our Web site, the document will be posted on our Web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The Web site address for disclosure about our debt securities is www.fanniemae.com/debtsearch. From this address, investors can access the offering circular and related supplements for debt securities offerings under Fannie Mae's universal debt facility, including pricing supplements for individual issuances of debt securities.

Disclosure about our obligations pursuant to some of the MBS we issue, some of which may be off-balance sheet obligations, can be found at www.fanniemae.com/mbsdisclosure. From this address, investors can access information and documents about our MBS, including prospectuses and related prospectus supplements.

We are providing our Web site address solely for your information. Information appearing on our Web site is not incorporated into this report.

**Our Purchases of Equity Securities**

We did not repurchase any of our equity securities during the second quarter of 2012.

**Dividend Restrictions**

Our payment of dividends is subject to the following restrictions:

*Restrictions Relating to Conservatorship.*  Our conservator announced on September 7, 2008 that we would not pay any dividends on the common stock or on any series of preferred stock, other than the senior preferred stock. In addition, FHFA's regulations relating to conservatorship and receivership operations, which became effective July 20, 2011, prohibit us from paying any dividends while in conservatorship unless authorized by the Director of FHFA. The Acting Director of FHFA directs us to make dividend payments on the senior preferred stock on a quarterly basis.

*Restrictions under Senior Preferred Stock Purchase Agreement.*  The senior preferred stock purchase agreement prohibits us from declaring or paying any dividends on Fannie Mae equity securities (other than the senior preferred stock) without the prior written consent of Treasury.

*Statutory Restrictions.*  Under the GSE Act, FHFA has authority to prohibit capital distributions, including payment of dividends, if we fail to meet our capital requirements. If FHFA classifies us as significantly undercapitalized, approval of the Director of FHFA is required for any dividend payment. Under the GSE Act, we are not permitted to make a capital distribution if, after making the distribution, we would be undercapitalized, except the Director of FHFA may permit us to repurchase shares if the repurchase is made in connection with the issuance of additional shares or obligations in at least an equivalent amount and will reduce our financial obligations or otherwise improve our financial condition.

*Restrictions Relating to Qualifying Subordinated Debt.*  During any period in which we defer payment of interest on qualifying subordinated debt, we may not declare or pay dividends on, or redeem, purchase or acquire, our common stock or preferred stock.

163

*Restrictions Relating to Preferred Stock.*  Payment of dividends on our common stock is also subject to the prior payment of dividends on our preferred stock and our senior preferred stock. Payment of dividends on all outstanding preferred stock, other than the senior preferred stock, is also subject to the prior payment of dividends on the senior preferred stock.

**Item 3.  Defaults Upon Senior Securities**

None.

**Item 4.  Mine Safety Disclosures**

None.

**Item 5.  Other Information**

None.

**Item 6.  Exhibits**

An index to exhibits has been filed as part of this report beginning on page E-1 and is incorporated herein by reference.

164

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal National Mortgage Association

By:    /s/ Timothy J. Mayopoulos
       Timothy J. Mayopoulos
       President and Chief Executive Officer

Date: August 8, 2012

By:    /s/ Susan R. McFarland
       Susan R. McFarland
       Executive Vice President and
       Chief Financial Officer

Date: August 8, 2012

165

## INDEX TO EXHIBITS

| Item | Description |
|---|---|
| 3.1 | Fannie Mae Charter Act (12 U.S.C. § 1716 et seq.) as amended through July 30, 2008 (Incorporated by reference to Exhibit 3.1 to Fannie Mae's Annual Report on Form 10-K, filed February 24, 2011.) |
| 3.2 | Fannie Mae Bylaws, as amended through January 30, 2009 (Incorporated by reference to Exhibit 3.2 to Fannie Mae's Annual Report on Form 10-K for the year ended December 31, 2008, filed February 26, 2009.) |
| 10.1 | Letter Agreement between Timothy J. Mayopoulos and Fannie Mae, effective as of June 18, 2012 (Incorporated by reference to Exhibit 99.1 to Fannie Mae's Current Report on Form 8-K, filed June 5, 2012.) |
| 10.2 | Amendment to Fannie Mae Supplemental Retirement Savings Plan for 2012 Executive Compensation Program, adopted May 18, 2012 |
| 10.3 | Amendment to Fannie Mae Supplemental Pension Plan of 2003 for 2012 Executive Compensation Program, adopted May 18, 2012 |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101. INS | XBRL Instance Document* |
| 101. SCH | XBRL Taxonomy Extension Schema* |
| 101. CAL | XBRL Taxonomy Extension Calculation* |
| 101. DEF | XBRL Taxonomy Extension Definition* |
| 101. LAB | XBRL Taxonomy Extension Label* |
| 101. PRE | XBRL Taxonomy Extension Presentation* |

---

\* The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Fannie Mae, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1



**FR011**

Exhibit 10.2

**AMENDMENT TO FANNIE MAE**
**SUPPLEMENTAL PENSION PLAN OF 2003**

<u>Amendment for 2012 Executive Compensation Program</u>

Pursuant to Section 5.5 of the Fannie Mae Supplemental Pension Plan of 2003 (the "Plan"), and as approved by the Board of Directors of Fannie Mae on May 18, 2012, the Plan is hereby amended as follows as follows:

1.   Section 2.14 of the Plan is amended to add the following new paragraph at the end thereof:

"References in the Plan to the Fannie Mae Deferred Pay Plan, and deferred pay under the Fannie Mae Deferred Pay Plan, shall include the Deferred Salary component of the 2012 Executive Compensation Program."

Exhibit 10.3

**AMENDMENT TO FANNIE MAE**
**SUPPLEMENTAL RETIREMENT SAVINGS PLAN**

Amendment for 2012 Executive Compensation Program

Pursuant to Section 9.2 of the Fannie Mae Supplemental Retirement Savings Plan (the "Plan"), and as approved by the Fannie Mae Board of Directors on May 18, 2012, the Plan is hereby amended as follows:

1.   Section 2.6 of the Plan is amended to add the following new paragraph to the end thereof:

"References in the Plan to the Fannie Mae Deferred Pay Plan, and deferred pay under the Fannie Mae Deferred Pay Plan, shall include the Deferred Salary component of the 2012 Executive Compensation Program."

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Timothy J. Mayopoulos, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  Timothy J. Mayopoulos
Timothy J. Mayopoulos
President and Chief Executive Officer

Date: August 8, 2012

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Susan R. McFarland, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of Fannie Mae (formally, the Federal National Mortgage Association);

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

/s/  Susan R. McFarland
Susan R. McFarland
Executive Vice President and
Chief Financial Officer

Date: August 8, 2012

**Exhibit 32.1**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended June 30, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Timothy J. Mayopoulos, President and Chief Executive Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

<div align="right">

/s/  Timothy J. Mayopoulos

Timothy J. Mayopoulos
President and Chief Executive Officer

</div>

Date: August 8, 2012

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.

**Exhibit 32.2**

## CERTIFICATION

In connection with the Quarterly Report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association) for the quarter ended June 30, 2012, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Susan R. McFarland, Executive Vice President and Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

<div style="text-align:right">

/s/  Susan R. McFarland

Susan R. McFarland
Executive Vice President and
Chief Financial Officer

</div>

Date: August 8, 2012

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document

Table of Contents

## UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-Q

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the quarterly period ended June 30, 2012**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.**

**For the transition period from                    to**

**Commission File Number: 001-34139**

# Federal Home Loan Mortgage Corporation
### *(Exact name of registrant as specified in its charter)*

**Freddie Mac**

| **Federally chartered corporation** | **8200 Jones Branch Drive** | **52-0904874** | **(703) 903-2000** |
|---|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *McLean, Virginia 22102-3110* *(Address of principal executive offices, including zip code)* | *(I.R.S. Employer Identification No.)* | *(Registrant's telephone number, including area code)* |

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports); and (2) has been subject to such filing requirements for the past 90 days. ☒ Yes ☐ No

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). ☒ Yes ☐ No

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                                                                                     Accelerated filer ☒

Non-accelerated filer (Do not check if a smaller reporting company) ☐                    Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☒

As of July 25, 2012, there were 650,033,623 shares of the registrant's common stock outstanding.

TREASURY-4083

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---:|
| **PART 1 — FINANCIAL INFORMATION** | | |
| Item 1. | Financial Statements | 105 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 1 |
| | Executive Summary | 1 |
| | Selected Financial Data | 12 |
| | Consolidated Results of Operations | 13 |
| | Consolidated Balance Sheets Analysis | 34 |
| | Risk Management | 50 |
| | Liquidity and Capital Resources | 87 |
| | Fair Value Measurements and Analysis | 92 |
| | Off-Balance Sheet Arrangements | 95 |
| | Critical Accounting Policies and Estimates | 95 |
| | Forward-Looking Statements | 95 |
| | Risk Management and Disclosure Commitments | 97 |
| | Legislative and Regulatory Matters | 98 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 100 |
| Item 4. | Controls and Procedures | 102 |
| **PART II — OTHER INFORMATION** | | |
| Item 1. | Legal Proceedings | 197 |
| Item 1A. | Risk Factors | 197 |
| Item 2. | Unregistered Sales of Equity Securities and Use of Proceeds | 197 |
| Item 6. | Exhibits | 199 |
| **SIGNATURES** | | 200 |
| **GLOSSARY** | | 201 |
| **EXHIBIT INDEX** | | E-1 |

i

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## MD&A TABLE REFERENCE

| Table | Description | Page |
|---|---|---|
| — | Selected Financial Data | 12 |
| 1 | Total Single-Family Loan Workout Volumes | 2 |
| 2 | Single-Family Credit Guarantee Portfolio Data by Year of Origination | 5 |
| 3 | Credit Statistics, Single-Family Credit Guarantee Portfolio | 6 |
| 4 | Mortgage-Related Investments Portfolio | 11 |
| 5 | Summary Consolidated Statements of Comprehensive Income | 13 |
| 6 | Net Interest Income/Yield and Average Balance Analysis | 14 |
| 7 | Derivative Gains (Losses) | 17 |
| 8 | Other Income | 19 |
| 9 | Non-Interest Expense | 20 |
| 10 | REO Operations (Income) Expense, REO Inventory, and REO Dispositions | 21 |
| 11 | Composition of Segment Mortgage Portfolios and Credit Risk Portfolios | 24 |
| 12 | Segment Earnings and Key Metrics — Investments | 25 |
| 13 | Segment Earnings and Key Metrics — Single-Family Guarantee | 28 |
| 14 | Segment Earnings Composition — Single-Family Guarantee Segment | 29 |
| 15 | Segment Earnings and Key Metrics — Multifamily | 32 |
| 16 | Investments in Securities | 35 |
| 17 | Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 36 |
| 18 | Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets | 37 |
| 19 | Mortgage-Related Securities Purchase Activity | 38 |
| 20 | Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics | 39 |
| 21 | Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans | 40 |
| 22 | Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings | 41 |
| 23 | Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans,  and CMBS | 43 |
| 24 | Mortgage Loan Purchases and Other Guarantee Commitment Issuances | 45 |
| 25 | Derivative Fair Values and Maturities | 46 |
| 26 | Changes in Derivative Fair Values | 47 |
| 27 | Freddie Mac Mortgage-Related Securities | 48 |
| 28 | Issuances and Extinguishments of Debt Securities of Consolidated Trusts | 49 |
| 29 | Changes in Total Equity (Deficit) | 50 |
| 30 | Repurchase Request Activity | 52 |
| 31 | Mortgage Insurance by Counterparty | 55 |
| 32 | Bond Insurance by Counterparty | 56 |
| 33 | Derivative Counterparty Credit Exposure | 58 |
| 34 | Characteristics of the Single-Family Credit Guarantee Portfolio | 62 |
| 35 | Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio | 66 |
| 36 | Single-Family Home Affordable Modification Program Volume | 68 |
| 37 | Single-Family Relief Refinance Loans | 71 |
| 38 | Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes | 72 |
| 39 | Quarterly Percentages of Modified Single-Family Loans — Current and Performing | 73 |
| 40 | Single-Family Serious Delinquency Rates | 74 |
| 41 | Credit Concentrations in the Single-Family Credit Guarantee Portfolio | 76 |
| 42 | Single-Family Credit Guarantee Portfolio by Attribute Combinations | 77 |
| 43 | Single-Family Credit Guarantee Portfolio by Year of Loan Origination | 79 |
| 44 | Multifamily Mortgage Portfolio — by Attribute | 80 |
| 45 | Non-Performing Assets | 82 |
| 46 | REO Activity by Region | 83 |
| 47 | Credit Loss Performance | 85 |
| 48 | Single-Family Impaired Loans with Specific Reserve Recorded | 86 |
| 49 | Single-Family Credit Loss Sensitivity | 87 |
| 50 | Other Debt Security Issuances by Product, at Par Value | 90 |
| 51 | Other Debt Security Repurchases, Calls, and Exchanges | 90 |
| 52 | Freddie Mac Credit Ratings | 91 |
| 53 | Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis on Our Consolidated Balance  Sheets | 93 |
| 54 | Summary of Change in the Fair Value of Net Assets | 94 |
| 55 | PMVS and Duration Gap Results | 102 |
| 56 | Derivative Impact on PMVS-L (50 bps) | 102 |

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4085                    Powered by Morningstar® Document Research℠

Table of Contents

## FINANCIAL STATEMENTS

|  | Page |
|---|---|
| Freddie Mac Consolidated Statements of Comprehensive Income | 106 |
| Freddie Mac Consolidated Balance Sheets | 107 |
| Freddie Mac Consolidated Statements of Equity (Deficit) | 108 |
| Freddie Mac Consolidated Statements of Cash Flows | 109 |
| Note 1: Summary of Significant Accounting Policies | 110 |
| Note 2: Conservatorship and Related Matters | 112 |
| Note 3: Variable Interest Entities | 115 |
| Note 4: Mortgage Loans and Loan Loss Reserves | 119 |
| Note 5: Individually Impaired and Non-Performing Loans | 124 |
| Note 6: Real Estate Owned | 129 |
| Note 7: Investments in Securities | 130 |
| Note 8: Debt Securities and Subordinated Borrowings | 139 |
| Note 9: Financial Guarantees | 141 |
| Note 10: Derivatives | 143 |
| Note 11: Freddie Mac Stockholders' Equity (Deficit) | 148 |
| Note 12: Income Taxes | 149 |
| Note 13: Segment Reporting | 149 |
| Note 14: Regulatory Capital | 157 |
| Note 15: Concentration of Credit and Other Risks | 158 |
| Note 16: Fair Value Disclosures | 164 |
| Note 17: Legal Contingencies | 190 |
| Note 18: Significant Components of Other Assets and Other Liabilities on our Consolidated Balance Sheets | 196 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## PART I — FINANCIAL INFORMATION

*We continue to operate under the conservatorship that commenced on September 6, 2008, under the direction of FHFA as our Conservator. The Conservator succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any shareholder, officer or director thereof, with respect to the company and its assets. The Conservator has delegated certain authority to our Board of Directors to oversee, and management to conduct, day-to-day operations. The directors serve on behalf of, and exercise authority as directed by, the Conservator. See "BUSINESS — Conservatorship and Related Matters" in our Annual Report on Form 10-K for the year ended December 31, 2011, or 2011 Annual Report, for information on the terms of the conservatorship, the powers of the Conservator, and related matters, including the terms of our Purchase Agreement with Treasury.*

*This Quarterly Report on Form 10-Q includes forward-looking statements that are based on current expectations and are subject to significant risks and uncertainties. These forward-looking statements are made as of the date of this Form 10-Q and we undertake no obligation to update any forward-looking statement to reflect events or circumstances after the date of this Form 10-Q. Actual results might differ significantly from those described in or implied by such statements due to various factors and uncertainties, including those described in: (a) the "FORWARD-LOOKING STATEMENTS" sections of this Form 10-Q, our 2011 Annual Report, and our Quarterly Report on Form 10-Q for the first quarter of 2012; and (b) the "RISK FACTORS" and "BUSINESS" sections of our 2011 Annual Report.*

*Throughout this Form 10-Q, we use certain acronyms and terms that are defined in the "GLOSSARY."*

### ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read this MD&A in conjunction with our consolidated financial statements and related notes for the three and six months ended June 30, 2012 included in "FINANCIAL STATEMENTS," and our 2011 Annual Report.*

### EXECUTIVE SUMMARY

**Overview**

Freddie Mac is a GSE chartered by Congress in 1970 with a public mission to provide liquidity, stability, and affordability to the U.S. housing market. We have maintained a consistent market presence since our inception, providing mortgage liquidity in a wide range of economic environments. We are working to support the recovery of the housing market and the nation's economy by providing essential liquidity to the mortgage market and helping to stem the rate of foreclosures. We believe our actions are helping communities across the country by providing America's families with access to mortgage funding at low rates while helping distressed borrowers keep their homes and avoid foreclosure, where feasible.

**Summary of Financial Results**

We continue to be affected by the ongoing weakness in the economy. However, certain actions taken since early 2009, including our participation in HAMP and HARP, are helping to stabilize the housing market. During the six months ended June 30, 2012, we observed certain signs of stabilization in the housing market, which contributed to our improved financial results in the second quarter of 2012. Our comprehensive income for the second quarter of 2012 was $2.9 billion, consisting of $3.0 billion of net income and $(128) million of total other comprehensive income (loss). By comparison, our comprehensive income (loss) for the second quarter of 2011 was $(1.1) billion, consisting of $(2.1) billion of net income (loss) and $1.0 billion of total other comprehensive income (loss).

Our total equity was $1.1 billion at June 30, 2012, reflecting our comprehensive income of $2.9 billion for the second quarter of 2012 and our dividend payment of $1.8 billion on our senior preferred stock in June 2012. As a result of our positive net worth at June 30, 2012, there is no need for a draw from Treasury under the Purchase Agreement for the second quarter of 2012.

**Our Primary Business Objectives**

We are focused on the following primary business objectives: (a) providing credit availability for mortgages and maintaining foreclosure prevention activities; (b) minimizing our credit losses; (c) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (d) contracting the dominant presence of

<div align="center">1</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the GSEs in the marketplace; (e) maintaining sound credit quality on the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees.

Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that establishes objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We continue to align our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard." Based on our charter, other legislation, public statements from FHFA and Treasury officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For more information, see "BUSINESS — Conservatorship and Related Matters — *Impact of Conservatorship and Related Actions on Our Business*" in our 2011 Annual Report.

### *Providing Credit Availability for Mortgages and Maintaining Foreclosure Prevention Activities*

Our consistent market presence provides lenders with a constant source of liquidity for conforming mortgage products even when other sources of capital have withdrawn. We believe this liquidity provides our customers with confidence to continue lending in difficult environments. We estimate that we, Fannie Mae, and Ginnie Mae collectively guaranteed more than 90% of the single-family conforming mortgages originated during the second quarter of 2012. We also enable mortgage originators to offer homebuyers and homeowners lower mortgage rates on conforming loan products, in part because of the value investors place on GSE-guaranteed mortgage-related securities. In June 2012, we estimate that borrowers were paying an average of 54 basis points less on these conforming loans than on non-conforming loans. These estimates are based on data provided by HSH Associates, a third-party provider of mortgage market data.

During the three and six months ended June 30, 2012, we guaranteed $88.7 billion and $193.7 billion in UPB of single-family conforming mortgage loans, representing approximately 433,000 and 924,000 loans, respectively.

We are focused on reducing the number of foreclosures and helping to keep families in their homes. Our relief refinance initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), is a significant part of our effort to keep families in their homes. HARP loans have been provided to more than 680,000 borrowers since the initiative began in 2009, including approximately 200,000 borrowers during the first half of 2012. Our loan workout programs, including HAMP, are designed to help borrowers experiencing hardship avoid foreclosure. Since 2009, we have helped more than 697,000 borrowers experiencing hardship complete a loan workout. We plan to introduce additional initiatives during the remainder of 2012 designed to help more struggling borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

The table below presents our single-family loan workout activities for the last five quarters.

### Table 1 — Total Single-Family Loan Workout Volumes[1]

|  | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
|  | 06/30/2012 | 03/31/2012 | 12/31/2011 | 09/30/2011 | 06/30/2011 |
|  | (number of loans) | | | | |
| Loan modifications | 15,142 | 13,677 | 19,048 | 23,919 | 31,049 |
| Repayment plans | 8,712 | 10,575 | 8,008 | 8,333 | 7,981 |
| Forbearance agreements[2] | 4,738 | 3,656 | 3,867 | 4,262 | 3,709 |
| Short sales and deed in lieu of foreclosure transactions | 12,531 | 12,245 | 12,675 | 11,744 | 11,038 |
| Total single-family loan workouts | 41,123 | 40,153 | 43,598 | 48,258 | 53,777 |

(1) Based on actions completed with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment, and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period.

(2) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarterly period; however, a single loan may be included under separate forbearance agreements in separate periods.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages, including borrowers whose mortgages have LTV ratios above 125%. As a result, our purchases of HARP loans increased 76% in the first half of 2012,

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4088                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

compared to the first half of 2011. Since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes.

During 2011, we also completed the initial implementation of the FHFA-directed servicing alignment initiative, under which we and Fannie Mae are aligning certain standards for servicing non-performing loans owned or guaranteed by the companies. As part of this initiative, we introduced a new non-HAMP standard loan modification, which became mandatory for our servicers beginning January 1, 2012. Unlike our prior non-HAMP modifications, the new non-HAMP standard modifications have trial periods and the modifications are not completed until the completion of the trial periods.

As of June 30, 2012, approximately 26,000 borrowers were in modification trial periods, including approximately 15,000 borrowers in trial periods for our non-HAMP standard modification. Based on information provided by the MHA Program administrator, our servicers had completed 200,705 loan modifications under HAMP from the introduction of the initiative in 2009 through June 30, 2012.

### Minimizing Our Credit Losses

To help minimize the credit losses related to our guarantee activities, we are focused on:

- pursuing a variety of loan workouts, including foreclosure alternatives, in an effort to reduce the severity of losses we experience over time;

- managing foreclosure timelines to the extent possible, given the prolonged foreclosure process in many states;

- managing our inventory of foreclosed properties to reduce costs and maximize proceeds; and

- pursuing contractual remedies against originators, lenders, servicers, and insurers, as appropriate.

We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family seller/servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure.

We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached (i.e., contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan, after consideration of other recoveries, if any. The amount we expect to collect on outstanding repurchase requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by the seller/servicers reimbursing us for realized credit losses. Some of these requests also may be rescinded in the course of the contractual appeals process. As of June 30, 2012, the UPB of loans subject to repurchase requests issued to our single-family seller/servicers was approximately $2.9 billion, and approximately 40% of these requests were outstanding for more than four months since issuance of our initial repurchase request (this figure includes repurchase requests for which appeals were pending). Of the total amount of repurchase requests outstanding at June 30, 2012, approximately $1.2 billion were issued due to mortgage insurance rescission or mortgage insurance claim denial.

Our credit loss exposure is also partially mitigated by mortgage insurance, which is a form of credit enhancement. Primary mortgage insurance is required to be purchased, typically at the borrower's expense, for certain mortgages with higher LTV ratios. Although we received payments under primary and other mortgage insurance of $1.0 billion and $1.3 billion in the six months ended June 30, 2012 and 2011, respectively, which helped to mitigate our credit losses, many of our mortgage insurers remain financially weak. We expect to receive substantially less than full payment of our claims from three of our mortgage insurance counterparties that are currently partially paying claims under orders of their state regulators. We believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge.

<div align="center">3</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Developing Mortgage Market Enhancements in Support of a New Infrastructure for the Secondary Mortgage Market

In the first half of 2012, we continued our efforts to build value for the industry and build the infrastructure for a future housing finance system. These efforts include the implementation of the Uniform Mortgage Data Program, or UMDP, which provides us with the ability to collect additional data that we believe will improve our risk management practices. In the first quarter of 2012, we completed a key milestone of the UMDP with the launch of the Uniform Collateral Data Portal for the electronic submission of appraisal reports for conventional mortgages. In the second quarter of 2012, we implemented the Uniform Loan Delivery Dataset, or ULDD, which provides for the efficient collection and use of consistent information about loan terms, collateral, and borrowers. We are also working with FHFA and others to develop a plan for the design and building of a single securitization platform that can be used in a future secondary mortgage market. We are continuing to work with FHFA and Fannie Mae to develop recommendations to align certain of the terms of the contracts we and Fannie Mae use with our respective single-family seller/servicers, as well as certain practices we follow in managing our respective business relationships with these companies.

### Contracting the Dominant Presence of the GSEs in the Marketplace

We continue to take steps toward the goal of gradually shifting mortgage credit risk from Freddie Mac to private investors, while simplifying and shrinking certain of our operations. In the case of single-family credit guarantees, we are exploring several ways to accomplish this goal, including increasing guarantee fees, establishing loss-sharing arrangements, and evaluating new risk-sharing transactions beyond the traditional charter-required mortgage insurance coverage. In addition, we are studying the steps necessary for our competitive disposition of certain investment assets, including non-performing loans. To evaluate how to accomplish the goal of contracting our operations in the multifamily business, we are conducting a market analysis of the viability of our multifamily operations without government guarantees. We also plan to continue to shift mortgage credit risk to private investors through our multifamily Other Guarantee Transactions.

### Maintaining Sound Credit Quality on the Loans We Purchase or Guarantee

We continue to focus on maintaining credit policies, including our underwriting standards, that allow us to purchase and guarantee loans made to qualified borrowers that we believe will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long-term, that exceeds our expected credit-related and administrative expenses on such loans. Under this Act, we were required to raise our guarantee fees by 10 basis points, and the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by us.

HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Mortgages originated after 2008, including HARP loans, represented 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, while the single-family loans originated from 2005 through 2008 represented 28% of this portfolio. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Approximately 95% of the single-family mortgages we purchased in both the three and six months ended June 30, 2012 were fixed-rate, first lien amortizing mortgages, based on UPB. Approximately 81% and 84% of the single-family mortgages we purchased in the three and six months ended June 30, 2012, respectively, were refinance mortgages, and approximately 32% and 25%, respectively, of these refinance mortgages were HARP loans, based on UPB. Approximately 21% and 14% of our single-family purchase volume in the first half of 2012 and 2011, respectively, were relief refinance mortgages with LTV ratios above 80%.

The proportion of loans we purchased with original LTV ratios over 100% increased from approximately 5% of our single-family mortgage purchases (including relief refinance loans) in the first half of 2011 to 11% of our single-family mortgage purchases in the first half of 2012 due, in large part, to the changes in HARP announced in the fourth quarter of 2011, which allow borrowers with higher LTV ratios to refinance.

<div align="center">4</div>

<div align="right"><em>Freddie Mac</em></div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The credit quality of the single-family loans we acquired in the first half of 2012 (excluding relief refinance mortgages, which represented approximately 30% of our single-family purchase volume during the first half of 2012) is significantly better than that of loans we acquired from 2005 through 2008 as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. The improvement in credit quality of loans we have purchased since 2008 (excluding relief refinance mortgages) is primarily the result of: (a) changes in our credit policies, including changes in our underwriting standards; (b) fewer purchases of loans with higher risk characteristics; and (c) changes in mortgage insurers' and lenders' underwriting practices.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented since 2008. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrower's potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increases the probability of default. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%.

The table below presents the composition, loan characteristics, and serious delinquency rates of loans in our single-family credit guarantee portfolio, by year of origination at June 30, 2012.

**Table 2 — Single-Family Credit Guarantee Portfolio Data by Year of Origination**[1]

| Year of Origination | Percent of Portfolio | Average Credit Score[2] | Original LTV Ratio[3] | Current LTV Ratio[4] | Current LTV Ratio >100%[4][5] | Serious Delinquency Rate[6] | Six Months Ended June 30, 2012 Percent of Credit Losses |
|---|---|---|---|---|---|---|---|
| | At June 30, 2012 | | | | | | |
| 2012 | 9% | 756 | 77% | 75% | 13% | —% | —% |
| 2011 | 16 | 754 | 71 | 69 | 5 | 0.13 | <1 |
| 2010 | 17 | 753 | 71 | 71 | 6 | 0.38 | 1 |
| 2009 | 15 | 752 | 69 | 72 | 6 | 0.68 | 2 |
| Combined-2009 to 2012 | 57 | 754 | 72 | 71 | 7 | 0.40 | 3 |
| 2008 | 6 | 722 | 74 | 92 | 35 | 6.30 | 9 |
| 2007 | 9 | 703 | 77 | 112 | 61 | 12.05 | 36 |
| 2006 | 6 | 708 | 75 | 110 | 56 | 11.20 | 26 |
| 2005 | 7 | 714 | 73 | 94 | 37 | 6.83 | 17 |
| Combined-2005 to 2008 | 28 | 711 | 75 | 103 | 48 | 9.21 | 88 |
| 2004 and prior | 15 | 717 | 71 | 59 | 8 | 2.98 | 9 |
| Total | 100% | 736 | 72 | 78 | 18 | 3.45 | 100% |

(1) Based on the loans remaining in the portfolio at June 30, 2012, which totaled $1.7 trillion, rather than all loans originally guaranteed by us and originated in the respective year. Includes loans acquired under our relief refinance initiative, which began in 2009.

(2) Based on FICO score of the borrower as of the date of loan origination and may not be indicative of the borrowers' creditworthiness at June 30, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available. As of June 30, 2012, the average credit score for all relief refinance loans was 742, compared to an average of 735 for all other loans in the portfolio.

(3) See endnote (4) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios.

(4) We estimate current market values by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios. As of June 30, 2012, the average current LTV ratio for all relief refinance loans was 82%.

(5) Calculated as a percentage of the aggregate UPB of loans with LTV ratios greater than 100% in relation to the total UPB of loans in the category.

(6) See "RISK MANAGEMENT— Credit Risk — Mortgage Credit Risk — Single-family Mortgage Credit Risk — Delinquencies " for further information about our reported serious delinquency rates.

***Strengthening Our Infrastructure and Improving Overall Efficiency While Also Focusing On Retention of Key Employees***

We are working to both enhance the quality of our infrastructure and improve our efficiency in order to preserve the taxpayers' investment. We are focusing our resources primarily on key projects, many of which are related to FHFA mandated initiatives and will likely take several years to fully implement.

We continue to actively manage our general and administrative expenses, while also continuing to focus on retaining key talent. In the first half of 2012, to help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. Under the program, the majority of employees will have a more predictable income,

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4091          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

as the program generally reduces the amount of compensation that is subject to variability. While uncertainty surrounding our future business model has contributed to employee turnover and low employee engagement, employee turnover moderated in the second quarter of 2012 compared to the same period of 2011. We are continuing to explore various strategic arrangements with outside firms to provide operational capability and staffing for key functions, as needed.

We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives will require additional resources and continue to affect our level of administrative expenses going forward.

### Single-Family Credit Guarantee Portfolio

The UPB of our single-family credit guarantee portfolio declined approximately 3% during the first half of 2012, as the amount of single-family loan liquidations exceeded new loan purchase and guarantee activity. We believe this is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The table below provides certain credit statistics for our single-family credit guarantee portfolio.

### Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio

| | As of | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| Payment status — | | | | | |
| One month past due | 1.79% | 1.63% | 2.02% | 1.94% | 1.92% |
| Two months past due | 0.60% | 0.57% | 0.70% | 0.70% | 0.67% |
| Seriously delinquent[1] | 3.45% | 3.51% | 3.58% | 3.51% | 3.50% |
| Non-performing loans (in millions)[2] | $ 118,463 | $ 119,599 | $ 120,514 | $ 119,081 | $ 114,819 |
| Single-family loan loss reserve (in millions)[3] | $ 35,298 | $ 37,771 | $ 38,916 | $ 39,088 | $ 38,390 |
| REO inventory (in properties) | 53,271 | 59,307 | 60,535 | 59,596 | 60,599 |
| REO assets, net carrying value (in millions) | $ 4,715 | $ 5,333 | $ 5,548 | $ 5,539 | $ 5,834 |

| | For the Three Months Ended | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in units, unless noted) | | | | |
| Seriously delinquent loan additions[1] | 75,904 | 80,815 | 95,661 | 93,850 | 87,813 |
| Loan modifications[4] | 15,142 | 13,677 | 19,048 | 23,919 | 31,049 |
| REO acquisitions | 20,033 | 23,805 | 24,758 | 24,378 | 24,788 |
| REO disposition severity ratio:[5] | | | | | |
| California | 41.6% | 44.2% | 44.6% | 45.5% | 44.9% |
| Arizona | 40.4% | 45.0% | 46.7% | 48.7% | 51.3% |
| Florida | 46.2% | 48.6% | 50.1% | 53.3% | 52.7% |
| Nevada | 54.3% | 56.5% | 54.2% | 53.2% | 55.4% |
| Illinois | 47.8% | 49.3% | 51.2% | 50.5% | 49.4% |
| Total U.S | 37.9% | 40.3% | 41.2% | 41.9% | 41.7% |
| Single-family provision for credit losses (in millions) | $ 177 | $ 1,844 | $ 2,664 | $ 3,643 | $ 2,542 |
| Single-family credit losses (in millions) | $ 2,858 | $ 3,435 | $ 3,209 | $ 3,440 | $ 3,106 |

(1) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Delinquencies*" for further information about our reported serious delinquency rates.

(2) Consists of the UPB of loans in our single-family credit guarantee portfolio that have undergone a TDR or that are seriously delinquent. As of June 30, 2012 and December 31, 2011, approximately $48.0 billion and $44.4 billion in UPB of TDR loans, respectively, were no longer seriously delinquent.

(3) Consists of the combination of: (a) our allowance for loan losses on mortgage loans held for investment; and (b) our reserve for guarantee losses associated with non-consolidated single-family mortgage securitization trusts and other guarantee commitments.

(4) Represents the number of modification agreements with borrowers completed during the quarter. Excludes forbearance agreements, repayment plans, and loans in modification trial periods.

(5) States presented represent the five states where our credit losses were greatest during 2011 and the six months ended June 30, 2012. Calculated as the amount of our losses recorded on disposition of REO properties during the respective quarterly period, excluding those subject to repurchase requests made to our seller/servicers, divided by the aggregate UPB of the related loans. The amount of losses recognized on disposition of the properties is equal to the amount by which the UPB of the loans exceeds the amount of sales proceeds from disposition of the properties. Excludes sales commissions and other expenses, such as property maintenance costs, as well as applicable recoveries from credit enhancements, such as mortgage insurance.

In discussing our credit performance, we often use the terms "credit losses" and "credit-related expenses." These terms are significantly different. Our "credit losses" consist of charge-offs and REO operations income (expense), while our "credit-related expenses" consist of our provision for credit losses and REO operations income (expense).

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.2 billion, and have recorded an additional $4.1 billion in losses on loans purchased from PC trusts, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred and, thus, have

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

not yet been provisioned for, we believe that, as of June 30, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations.

Borrower payment performance (for all stages of delinquency) improved at June 30, 2012, compared to December 31, 2011. In addition, the number of seriously delinquent loan additions declined in each of the first two quarters of 2012. Excluding relief refinance loans, recent improvement in borrower payment performance reflects an improved credit profile of borrowers with loans originated since 2008. However, several factors, including the lengthening of the foreclosure process, have resulted in loans remaining in serious delinquency for longer periods than prior to 2008, particularly in states that require a judicial foreclosure process. As of June 30, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 74% and 70%, respectively.

The credit losses and loan loss reserves associated with our single-family credit guarantee portfolio remained elevated in the first half of 2012, due, in part, to:

- Losses associated with the continued high volume of foreclosures and foreclosure alternatives. These actions relate to the continued efforts of our servicers to resolve our large inventory of seriously delinquent loans. Due to the length of time necessary for servicers either to complete the foreclosure process or pursue foreclosure alternatives on seriously delinquent loans in our portfolio, we expect our credit losses will continue to remain high even if the volume of new serious delinquencies continues to decline.

- Continued negative effect of certain loan groups within the single-family credit guarantee portfolio, such as those underwritten with certain lower documentation standards and interest-only loans, as well as 2005 through 2008 vintage loans. These groups continue to be large contributors to our credit losses.

- Cumulative decline in national home prices of 24% since June 2006, based on our own index. As a result of this price decline, approximately 18% of loans in our single-family credit guarantee portfolio, based on UPB, had estimated current LTV ratios in excess of 100% (i.e., underwater loans) as of June 30, 2012.

- Weak financial condition of many of our mortgage insurers, which has reduced our estimates of expected recoveries from these counterparties.

Some of our loss mitigation activities create fluctuations in our delinquency statistics. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Credit Performance — Delinquencies*" for further information about factors affecting our reported delinquency rates.

**Conservatorship and Government Support for our Business**

We have been operating under conservatorship, with FHFA acting as our conservator, since September 6, 2008. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition, and results of operations.

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

While the conservatorship has benefited us, we are subject to certain constraints on our business activities imposed by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement and by FHFA, as our Conservator.

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The $200 billion cap on Treasury's funding commitment will increase as necessary to eliminate any net worth deficits we may have during 2010, 2011, and 2012. We believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

We received cash proceeds of $19 million in June 2012 from a draw under Treasury's funding commitment related to our quarterly deficit in equity at March 31, 2012. As a result, the aggregate liquidation preference of the senior preferred stock was $72.3 billion at June 30, 2012. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement.

<div align="center">7</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We pay cash dividends to Treasury at an annual rate of 10%. Through June 30, 2012, we paid aggregate cash dividends to Treasury of $20.1 billion, an amount equal to 28% of our aggregate draws received under the Purchase Agreement. As of June 30, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock of $7.2 billion exceeded our annual historical earnings in all but one period. As a result, we expect to make additional draws in future periods, even if our operating performance generates net income or comprehensive income.

Neither the U.S. government nor any other agency or instrumentality of the U.S. government is obligated to fund our mortgage purchase or financing activities or to guarantee our securities or other obligations.

For more information on conservatorship and the Purchase Agreement, see "BUSINESS — Conservatorship and Related Matters" in our 2011 Annual Report.

## Consolidated Financial Results

Net income (loss) was $3.0 billion and $(2.1) billion for the second quarters of 2012 and 2011, respectively. Key highlights of our financial results include:

- Net interest income for the second quarter of 2012 decreased to $4.4 billion from $4.6 billion in the second quarter of 2011, mainly due to the impact of a reduction in the average balances of our higher-yielding mortgage-related assets, partially offset by lower funding costs.

- Provision for credit losses for the second quarter of 2012 declined to $155 million, compared to $2.5 billion for the second quarter of 2011. The decrease in the provision for credit losses primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and the positive impacts of an increase in national home prices.

- Non-interest income (loss) was $(751) million for the second quarter of 2012, compared to $(3.9) billion for the second quarter of 2011. The improvement was largely driven by a decrease in derivative losses during the second quarter of 2012 compared to the second quarter of 2011.

- Non-interest expense declined to $536 million in the second quarter of 2012, from $546 million in the second quarter of 2011.

- Comprehensive income (loss) was $2.9 billion for the second quarter of 2012 compared to $(1.1) billion for the second quarter of 2011. Comprehensive income for the second quarter of 2012 was driven by the $3.0 billion net income, partially offset by an increase in net unrealized losses related to our available-for-sale securities.

## Mortgage Market and Economic Conditions

### Overview

The U.S. real gross domestic product rose by 1.5% on an annualized basis during the second quarter of 2012, compared to 2.0% during the first quarter of 2012, according to the Bureau of Economic Analysis. The national unemployment rate was 8.2% in both June 2012 and March 2012, down from 8.5% in December 2011, based on data from the U.S. Bureau of Labor Statistics. In the data underlying the unemployment rate, an average of approximately 75,000 monthly net new jobs were added to the economy during the second quarter of 2012, which shows evidence of a slow, but steady positive trend for the economy and the labor market.

### Single-Family Housing Market

The single-family housing market exhibited certain signs of stabilization in the second quarter of 2012 despite continued weakness in the employment market and a significant inventory of seriously delinquent loans and REO properties in the market.

Based on data from the National Association of Realtors, sales of existing homes in the second quarter of 2012 averaged 4.54 million (at a seasonally adjusted annual rate), decreasing from 4.57 million in the first quarter of 2012. Based on data from the U.S. Census Bureau and HUD, new home sales in the second quarter of 2012 averaged approximately 363,000 (at a seasonally adjusted annual rate) increasing approximately 3.1% from approximately 352,000 in the first quarter of 2012. We estimate that home prices increased significantly during the second quarter of 2012, with our nationwide index registering approximately a 4.8% increase from March 2012 through June 2012 without seasonal adjustment. The second quarter of the

8

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

year has historically been a period of strong home sales and related home price increases, as compared to the other quarters of the year. From June 2011 through June 2012 our nationwide home price index increased 1.0% on an annual basis. These estimates were based on our own price index of mortgage loans on one-family homes funded by us or Fannie Mae. Other indices of home prices may have different results, as they are determined using different pools of mortgage loans and calculated under different conventions than our own.

The foreclosure process has lengthened significantly in recent years, due to a number of factors, but particularly in states that require a judicial foreclosure process. There have also been a number of legislative and regulatory developments in recent periods affecting single-family mortgage servicing and foreclosure practices. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. For information on these matters, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

### Multifamily Housing Market

Multifamily market fundamentals continued to improve on a national level during the second quarter of 2012. The multifamily sector experienced strong interest from prospective borrowers and investors and continued to outperform other components of the commercial real estate sector. As reported by Reis, Inc., the national apartment vacancy rate improved from 8.0% at the end of 2009 to 4.7% during the second quarter of 2012 representing the lowest level since the end of 2001. Vacancy rates and effective rents are important to loan performance because multifamily loans are generally repaid from the cash flows generated by the underlying property and these factors significantly influence those cash flows. We believe these improving fundamentals and optimism about demand for multifamily housing have contributed to improvement in property values in most markets.

### Mortgage Market and Business Outlook

Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties. For example, a number of factors could cause the actual performance of the housing and mortgage markets and the U.S. economy during the remainder of 2012 to be significantly worse than we expect, including adverse changes in national or international economic conditions and changes in the federal government's fiscal or monetary policies. See "FORWARD-LOOKING STATEMENTS" for additional information.

### Overview

We continue to expect key macroeconomic drivers of the economy, such as income growth, employment, and inflation, will affect the performance of the housing and mortgage markets in the remainder of 2012. Since we expect that economic growth will likely be stronger and mortgage interest rates lower in 2012 than in 2011, we believe that housing affordability will remain relatively high in 2012 for potential home buyers. We also expect that the volume of home sales will likely continue to increase in 2012, compared to the volume in 2011, but still remain relatively weak compared to historical levels. Important factors that we believe will continue to negatively impact single-family housing demand are the relatively high unemployment rate and relatively low consumer confidence measures. Consumer confidence measures, while up from recession lows, remain below long-term averages and suggest that households will likely continue to be cautious in home buying. We also expect to continue to experience a high level of refinancing activity in the near term, due to the impact of the expanded HARP initiative as well as the historically low interest rates on fixed-rate single-family mortgages. For information on the HARP initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*."

While home prices remain at significantly lower levels from their peak in most areas, declines in the market's inventory of vacant housing have supported stabilization in home prices in a number of metropolitan areas. To the extent a large volume of loans complete the foreclosure process in a short time period, the resulting increase in the market's inventory of homes for sale could have a negative impact on home prices. Due to these and other factors, our expectation for home prices,

9

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

based on our own index, is that national average home prices will continue to remain weak on an inflation-adjusted basis over the near term before a long-term recovery in housing begins.

### Single-Family

Our charge-offs remained high during the first half of 2012, and we expect they will likely remain high during the remainder of 2012. This is in part due to the substantial number of underwater mortgage loans in our single-family credit guarantee portfolio. For the near term, we also expect:

- REO disposition severity ratios to remain near their historical highs, though market conditions, such as home prices and the rate of home sales, have seen improvements in many key markets;

- the amount of non-performing assets and the volume of our loan workouts to continue to remain high; and

- continued high volume of loans in the foreclosure process as well as prolonged foreclosure timelines.

### Multifamily

The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. We expect further improvements in the rental market during the next twelve months due to increased rental demand. As a result of the positive market fundamentals and continuing strong portfolio performance, we expect our credit losses and delinquency rates to remain relatively low during the remainder of 2012.

We continued our strong support of the multifamily market and the nation's renters as evidenced by our $12.4 billion of multifamily purchase and guarantee volume in the first half of 2012, which provided financing for approximately 750 properties amounting to approximately 193,000 apartment units. The majority of these apartments were affordable to low and moderate income families. We expect an increase in our purchase and guarantee volumes for the full-year of 2012 when compared to 2011 levels as demand for multifamily financing remains strong as historically low interest rates are encouraging borrower interest.

### Long-Term Financial Sustainability

There is significant uncertainty as to our long-term financial sustainability. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship."

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term.

There continues to be significant uncertainty in the current mortgage market environment, and continued high levels of unemployment, weakness in home prices, and adverse changes in interest rates, mortgage security prices, and spreads could lead to additional draws. For discussion of other factors that could result in additional draws, see "RISK FACTORS —Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition* " in our 2011 Annual Report.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations. For a discussion of FHFA's strategic plan for us, see "LEGISLATIVE AND REGULATORY MATTERS — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Limits on Investment Activity and Our Mortgage-Related Investments Portfolio**

The conservatorship has significantly impacted our investment activity. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. However, from time to time we may purchase or retain mortgage-related investments based on a variety of factors which could improve the price of our PCs. Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. FHFA has indicated that such portfolio reduction targets should be viewed as minimum reductions and has encouraged us to reduce the mortgage-related investments portfolio at a faster rate than required. We are also subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury.

The table below presents the UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation.

**Table 4 — Mortgage-Related Investments Portfolio**[1]

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Investments segment — Mortgage investments portfolio | $ 386,404 | $ 449,273 |
| Single-family Guarantee segment — Single-family unsecuritized mortgage loans [2] | 60,053 | 62,469 |
| Multifamily segment — Mortgage investments portfolio | 134,822 | 141,571 |
| Total mortgage-related investments portfolio | $ 581,279 | $ 653,313 |

(1)   Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2)   Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.

We consider the liquidity of our assets in our mortgage-related investments portfolio based on three categories: (a) agency securities; (b) assets that are less liquid than agency securities; and (c) illiquid assets. Assets that are less liquid than agency securities include unsecuritized performing single-family mortgage loans, multifamily mortgage loans, CMBS, and housing revenue bonds. Our less liquid assets collectively represented approximately 31% of the UPB of the portfolio at June 30, 2012, compared to 32% as of December 31, 2011. Illiquid assets include unsecuritized seriously delinquent and modified single-family mortgage loans which we removed from PC trusts, and our investments in non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans. Our illiquid assets collectively represented approximately 32% of the UPB of the portfolio at June 30, 2012, as compared to 29% as of December 31, 2011. The elevated level of illiquid assets is primarily due to our removal of seriously delinquent and modified loans from PC trusts. The changing composition of our mortgage-related investments portfolio to a greater proportion of assets that are less liquid and illiquid may influence our decisions regarding funding and hedging. The description above of the relative liquidity of our assets is based on our own internal expectations given current market conditions. Changes in market conditions could adversely affect the liquidity of our assets at any given time.

<div align="center">11</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## SELECTED FINANCIAL DATA[1]

The selected financial data presented below should be reviewed in conjunction with MD&A and our consolidated financial statements and related notes for the three and six months ended June 30, 2012.

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions, except share-related amounts) | | | |
| **Statements of Comprehensive Income Data** | | | | |
| Net interest income | $ 4,386 | $ 4,561 | $ 8,886 | $ 9,101 |
| Provision for credit losses | (155) | (2,529) | (1,980) | (4,518) |
| Non-interest income (loss) | (751) | (3,857) | (2,267) | (5,109) |
| Non-interest expense | (536) | (546) | (1,132) | (1,243) |
| Net income (loss) | 3,020 | (2,139) | 3,597 | (1,463) |
| Comprehensive income (loss) | 2,892 | (1,100) | 4,681 | 1,640 |
| Net income (loss) attributable to common stockholders | 1,212 | (3,756) | (15) | (4,685) |
| Net income (loss) per common share: | | | | |
| Basic | 0.37 | (1.16) | — | (1.44) |
| Diluted | 0.37 | (1.16) | — | (1.44) |
| Cash dividends per common share | — | — | — | — |
| Weighted average common shares outstanding (in thousands): [2] | | | | |
| Basic | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |
| Diluted | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (dollars in millions) | |
| **Balance Sheets Data** | | |
| Mortgage loans held-for-investment, at amortized cost by consolidated trusts (net of allowances for loan losses) | $ 1,532,939 | $ 1,564,131 |
| Total assets | 2,066,335 | 2,147,216 |
| Debt securities of consolidated trusts held by third parties | 1,468,613 | 1,471,437 |
| Other debt | 581,743 | 660,546 |
| All other liabilities | 14,893 | 15,379 |
| Total equity (deficit) | 1,086 | (146) |
| **Portfolio Balances**[3] | | |
| Mortgage-related investments portfolio | $ 581,279 | $ 653,313 |
| Total Freddie Mac mortgage-related securities[4] | 1,594,401 | 1,624,684 |
| Total mortgage portfolio[5] | 2,012,224 | 2,075,394 |
| Non-performing assets[6] | 126,228 | 129,152 |

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| **Ratios**[7] | | | | |
| Return on average assets[8] | 0.6% | (0.4)% | 0.3% | (0.1)% |
| Non-performing assets ratio[9] | 6.8 | 6.4 | 6.8 | 6.4 |
| Equity to assets ratio[10] | — | — | — | — |

(1) See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for information regarding our accounting policies and the impact of new accounting policies on our consolidated financial statements.
(2) Includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury as part of the Purchase Agreement. This warrant is included in basic loss per share, because it is unconditionally exercisable by the holder at a cost of $0.00001 per share.
(3) Represents the UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(4) See "Table 27 — Freddie Mac Mortgage-Related Securities" for the composition of this line item.
(5) See "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios" for the composition of our total mortgage portfolio.
(6) See "Table 45 — Non-Performing Assets" for a description of our non-performing assets.
(7) The dividend payout ratio on common stock is not presented because the amount of cash dividends per common share is zero for all periods presented. The return on common equity ratio is not presented because the simple average of the beginning and ending balances of total equity (deficit), net of preferred stock (at redemption value) is less than zero for all periods presented.
(8) Ratio computed as net income divided by the simple average of the beginning and ending balances of total assets.
(9) Ratio computed as non-performing assets divided by the ending UPB of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities.
(10) Ratio computed as the simple average of the beginning and ending balances of total equity (deficit) divided by the simple average of the beginning and ending balances of total assets.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4098          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## CONSOLIDATED RESULTS OF OPERATIONS

The following discussion of our consolidated results of operations should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported results of operations.

### Table 5 — Summary Consolidated Statements of Comprehensive Income

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Net interest income | $ 4,386 | $ 4,561 | $8,886 | $ 9,101 |
| Provision for credit losses | (155) | (2,529) | (1,980) | (4,518) |
| Net interest income after provision for credit losses | 4,231 | 2,032 | 6,906 | 4,583 |
| Non-interest income (loss): | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (1) | (125) | (5) | 98 |
| Gains (losses) on retirement of other debt | (45) | 3 | (66) | 15 |
| Gains (losses) on debt recorded at fair value | 62 | (37) | 45 | (118) |
| Derivative gains (losses) | (882) | (3,807) | (1,938) | (4,234) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (135) | (230) | (610) | (1,284) |
| Portion of other-than-temporary impairment recognized in AOCI | 37 | (122) | (52) | (261) |
| Net impairment of available-for-sale securities recognized in earnings | (98) | (352) | (662) | (1,545) |
| Other gains (losses) on investment securities recognized in earnings | (356) | 209 | (644) | 89 |
| Other income | 569 | 252 | 1,003 | 586 |
| Total non-interest income (loss) | (751) | (3,857) | (2,267) | (5,109) |
| Non-interest expense: | | | | |
| Administrative expenses | (401) | (384) | (738) | (745) |
| REO operations income (expense) | 30 | (27) | (141) | (284) |
| Other expenses | (165) | (135) | (253) | (214) |
| Total non-interest expense | (536) | (546) | (1,132) | (1,243) |
| Income (loss) before income tax benefit | 2,944 | (2,371) | 3,507 | (1,769) |
| Income tax benefit | 76 | 232 | 90 | 306 |
| Net income (loss) | 3,020 | (2,139) | 3,597 | (1,463) |
| Other comprehensive income (loss), net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (238) | 903 | 909 | 2,844 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 107 | 135 | 218 | 267 |
| Changes in defined benefit plans | 3 | 1 | (43) | (8) |
| Total other comprehensive income (loss), net of taxes and reclassification adjustments | (128) | 1,039 | 1,084 | 3,103 |
| Comprehensive income (loss) | $ 2,892 | $ (1,100) | $ 4,681 | $ 1,640 |

### Net Interest Income

The table below presents an analysis of net interest income, including average balances and related yields earned on assets and incurred on liabilities.

13

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 6 — Net Interest Income/Yield and Average Balance Analysis**

| | Three Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 32,039 | $ 6 | 0.07% | $ 33,660 | $ 10 | 0.12% |
| Federal funds sold and securities purchased under agreements to resell | 37,995 | 15 | 0.16 | 32,227 | 8 | 0.09 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities(3) | 358,279 | 4,038 | 4.51 | 450,575 | 5,215 | 4.63 |
| Extinguishment of PCs held by Freddie Mac | (111,351) | (1,275) | (4.58) | (166,318) | (1,966) | (4.73) |
| Total mortgage-related securities, net | 246,928 | 2,763 | 4.48 | 284,257 | 3,249 | 4.57 |
| Non-mortgage-related securities(3) | 24,779 | 14 | 0.22 | 26,078 | 26 | 0.39 |
| Mortgage loans held by consolidated trusts(4) | 1,538,134 | 16,806 | 4.37 | 1,643,680 | 19,782 | 4.81 |
| Unsecuritized mortgage loans(4) | 240,693 | 2,224 | 3.69 | 242,471 | 2,274 | 3.75 |
| Total interest-earning assets | $2,120,568 | $ 21,828 | 4.12 | $ 2,262,373 | $ 25,349 | 4.48 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,560,470 | $ (15,900) | (4.08) | $ 1,656,150 | $ (19,227) | (4.64) |
| Extinguishment of PCs held by Freddie Mac | (111,351) | 1,275 | 4.58 | (166,318) | 1,966 | 4.73 |
| Total debt securities of consolidated trusts held by third parties | 1,449,119 | (14,625) | (4.04) | 1,489,832 | (17,261) | (4.63) |
| Other debt: | | | | | | |
| Short-term debt | 128,860 | (43) | (0.13) | 194,153 | (95) | (0.19) |
| Long-term debt(5) | 464,966 | (2,617) | (2.25) | 500,587 | (3,238) | (2.59) |
| Total other debt | 593,826 | (2,660) | (1.79) | 694,740 | (3,333) | (1.92) |
| Total interest-bearing liabilities | 2,042,945 | (17,285) | (3.38) | 2,184,572 | (20,594) | (3.77) |
| Expense related to derivatives(6) | — | (157) | (0.03) | — | (194) | (0.03) |
| Impact of net non-interest-bearing funding | 77,623 | — | 0.12 | 77,801 | — | 0.13 |
| Total funding of interest-earning assets | $2,120,568 | $ (17,442) | (3.29) | $ 2,262,373 | $ (20,788) | (3.67) |
| Net interest income/yield | | $ 4,386 | 0.83 | | $ 4,561 | 0.81 |

| | Six Months Ended June 30, | | | | | |
| | 2012 | | | 2011 | | |
| | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate | Average Balance(1)(2) | Interest Income (Expense)(1) | Average Rate |
|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | |
| **Interest-earning assets:** | | | | | | |
| Cash and cash equivalents | $ 41,535 | $ 10 | 0.05% | $ 35,611 | $ 26 | 0.14% |
| Federal funds sold and securities purchased under agreements to resell | 32,026 | 24 | 0.15 | 40,044 | 26 | 0.13 |
| Mortgage-related securities: | | | | | | |
| Mortgage-related securities (3) | 370,753 | 8,401 | 4.53 | 453,773 | 10,531 | 4.64 |
| Extinguishment of PCs held by Freddie Mac | (118,357) | (2,716) | (4.59) | (166,923) | (4,029) | (4.83) |
| Total mortgage-related securities, net | 252,396 | 5,685 | 4.50 | 286,850 | 6,502 | 4.53 |
| Non-mortgage-related securities(3) | 26,621 | 30 | 0.23 | 27,694 | 56 | 0.40 |
| Mortgage loans held by consolidated trusts (4) | 1,548,978 | 34,274 | 4.43 | 1,647,123 | 39,846 | 4.84 |
| Unsecuritized mortgage loans (4) | 247,785 | 4,536 | 3.66 | 241,514 | 4,608 | 3.82 |
| Total interest-earning assets | $ 2,149,341 | $ 44,559 | 4.15 | $2,278,836 | $ 51,064 | 4.48 |
| **Interest-bearing liabilities:** | | | | | | |
| Debt securities of consolidated trusts including PCs held by Freddie Mac | $ 1,570,609 | $ (32,594) | (4.15) | $ 1,660,879 | $ (38,693) | (4.66) |
| Extinguishment of PCs held by Freddie Mac | (118,357) | 2,716 | 4.59 | (166,923) | 4,029 | 4.83 |
| Total debt securities of consolidated trusts held by third parties | 1,452,252 | (29,878) | (4.11) | 1,493,956 | (34,664) | (4.64) |
| Other debt: | | | | | | |
| Short-term debt | 138,995 | (83) | (0.12) | 194,488 | (210) | (0.21) |
| Long-term debt(5) | 480,805 | (5,393) | (2.24) | 509,310 | (6,688) | (2.63) |
| Total other debt | 619,800 | (5,476) | (1.77) | 703,798 | (6,898) | (1.96) |
| Total interest-bearing liabilities | 2,072,052 | (35,354) | (3.41) | 2,197,754 | (41,562) | (3.78) |
| Expense related to derivatives(6) | — | (319) | (0.03) | — | (401) | (0.04) |
| Impact of net non-interest-bearing funding | 77,289 | — | 0.12 | 81,082 | — | 0.14 |
| Total funding of interest-earning assets | $ 2,149,341 | $ (35,673) | (3.32) | $2,278,836 | $ (41,963) | (3.68) |
| Net interest income/yield | | $ 8,886 | 0.83 | | $ 9,101 | 0.80 |

(1) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(2) We calculate average balances based on amortized cost.

(3) Interest income (expense) includes accretion of the portion of impairment charges recognized in earnings where we expect a significant improvement in cash flows.

(4) Non-performing loans, where interest income is generally recognized when collected, are included in average balances.

(5) Includes current portion of long-term debt.

(6) Represents changes in fair value of derivatives in closed cash flow hedge relationships that were previously deferred in AOCI and have been reclassified to earnings as the associated hedged forecasted issuance of debt affects earnings.

Net interest income decreased by $175 million and $215 million during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011. Net interest yield increased by two basis points and

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4100

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

three basis points during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011. The primary driver underlying the decreases in net interest income was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations, partially offset by lower funding costs from the replacement of debt at lower rates. The increases in net interest yield were primarily due to the benefits of lower funding costs, partially offset by the negative impact of the reduction in the average balance of higher-yielding mortgage-related assets.

We only recognize interest income on non-performing loans that have been placed on non-accrual status when cash payments are received. We refer to the interest income that we do not recognize as foregone interest income (i.e., interest income we would have recorded if the loans had been current in accordance with their original terms). Foregone interest income and reversals of previously recognized interest income, net of cash received, related to non-performing loans was $0.8 billion and $1.7 billion during the three and six months ended June 30, 2012, respectively, compared to $1.0 billion and $2.0 billion during the three and six months ended June 30, 2011, respectively. These reductions were primarily due to the decreased volume of non-performing loans on non-accrual status.

During the three and six months ended June 30, 2012, spreads on our debt and our access to the debt markets remained favorable relative to historical levels. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity."

## Provision for Credit Losses

We maintain loan loss reserves at levels we believe are appropriate to absorb probable incurred losses on mortgage loans held-for-investment and loans underlying our financial guarantees. Our loan loss reserves are increased through the provision for credit losses and are reduced by net charge-offs. The provision for credit losses primarily reflects our estimate of incurred losses for newly impaired loans as well as changes in our estimates of loss for previously impaired loans based on the likelihood of ultimate transition to loss events and the expected severity rates of incurred losses.

Our provision for credit losses declined to $0.2 billion in the second quarter of 2012, compared to $2.5 billion in the second quarter of 2011, and was $2.0 billion in the first half of 2012 compared to $4.5 billion in the first half of 2011. The decrease in the provision for credit losses for the second quarter and first half of 2012 compared to the respective periods in 2011 primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and lower estimated future losses due to the positive impact of an increase in national home prices. While national home prices exhibited strong growth in the second quarter of 2012, our expectation is that national average home prices will remain weak (on an inflation-adjusted basis) over the near term before a long-term recovery in housing begins. As such, we adjusted our estimated loss severity rates in the second quarter of 2012 to align with our expectations for near term home prices. Our provision for credit losses in the three and six months ended June 30, 2011 primarily reflected a decline in the rate at which delinquent loans transition into serious delinquency.

During the three and six months ended June 30, 2012, our charge-offs, net of recoveries for single-family loans exceeded the amount of our provision for credit losses. Our charge-offs in the first half of 2012 were less than they otherwise would have been because of the continued suppression of loan and collateral resolution activity due to the length of the foreclosure process. We believe the level of our charge-offs will continue to remain high for the remainder of 2012.

As of June 30, 2012 and December 31, 2011, the UPB of our single-family non-performing loans was $118.5 billion and $120.5 billion, respectively. These amounts include $48.0 billion and $44.4 billion, respectively, of single-family TDRs that are less than three months past due. However, TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments, which return the loan to a current payment status after modification. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, our loan loss reserves balance, and our non-performing assets.

The total number of seriously delinquent loans declined approximately 7% during the first half of 2012. However, our serious delinquency rates remain high compared to the rates we experienced in years prior to 2009 due to the continued weakness in home prices in the last several years, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. Our seller/servicers have an active role

<div align="center">15</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in our loan workout activities, including under the servicing alignment initiative and the MHA Program, and a decline in their performance could result in a failure to realize the anticipated benefits of our loss mitigation plans.

Since the beginning of 2008, on an aggregate basis, we have recorded provision for credit losses associated with single-family loans of approximately $75.2 billion, and have recorded an additional $4.1 billion in losses on loans purchased from our PCs, net of recoveries. The majority of these losses are associated with loans originated in 2005 through 2008. While loans originated in 2005 through 2008 will give rise to additional credit losses that have not yet been incurred, and thus have not been provisioned for, we believe that, as of June 30, 2012, we have reserved for or charged-off the majority of the total expected credit losses for these loans. Nevertheless, various factors, such as continued high unemployment rates or further declines in home prices, could require us to provide for losses on these loans beyond our current expectations. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Our provision for credit losses and amount of charge-offs in the future will be affected by a number of factors. These factors include: (a) the actual level of mortgage defaults; (b) the effect of the MHA Program, the servicing alignment initiative, and other loss mitigation efforts, including any requirement to utilize principal forgiveness in our loan modification initiatives; (c) any government actions or programs that affect the ability of troubled borrowers to obtain modifications, including legislative changes to bankruptcy laws; (d) changes in property values; (e) regional economic conditions, including unemployment rates; (f) additional delays in the foreclosure process; (g) third-party mortgage insurance coverage and recoveries; and (h) the realized rate of seller/servicer repurchases. In addition, in April 2012, FHFA issued an advisory bulletin that could have an effect on our provision for credit losses in the future. The advisory bulletin specifies that, once a loan is classified as "loss," we generally are required to charge-off the portion of the loan balance that exceeds the fair value of the property, less cost to sell. We are currently assessing the operational and accounting impacts of this advisory bulletin and have not yet determined when or how we will implement this bulletin or its impact on our consolidated financial statements. See "LEGISLATIVE AND REGULATORY DEVELOPMENTS — FHFA Advisory Bulletin" for additional information. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk*" for information on mortgage insurers and seller/servicer repurchase obligations.

We recognized a benefit for credit losses associated with our multifamily mortgage portfolio of $22 million and $13 million for the second quarters of 2012 and 2011, respectively, and $41 million and $73 million for the first half of 2012 and 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $496 million and $545 million as of June 30, 2012 and December 31, 2011, respectively. The decline in loan loss reserves for multifamily loans was driven primarily by an increase in property values underlying individually impaired loans.

**Non-Interest Income (Loss)**

*Gains (Losses) on Extinguishment of Debt Securities of Consolidated Trusts*

When we purchase PCs that have been issued by consolidated PC trusts, we extinguish a pro rata portion of the outstanding debt securities of the related consolidated trusts. We recognize a gain (loss) on extinguishment of the debt securities to the extent the amount paid to extinguish the debt security differs from its carrying value.

Losses on extinguishment of debt securities of consolidated trusts were $1 million and $125 million for the three months ended June 30, 2012 and 2011, respectively. For the three months ended June 30, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $0.7 billion and $22.2 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The losses during the three months ended June 30, 2011 were primarily due to the repurchase of debt securities of consolidated trusts at a larger net purchase premium driven by a decrease in interest rates during the period.

Gains (losses) on extinguishment of debt securities of consolidated trusts were $(5) million and $98 million for the six months ended June 30, 2012 and 2011, respectively. For the six months ended June 30, 2012 and 2011, we extinguished debt securities of consolidated trusts with a UPB of $1.4 billion and $47.0 billion, respectively (representing our purchase of single-family PCs with a corresponding UPB amount). The decrease in purchases of single-family PCs during the 2012 periods was primarily due to a lower volume of dollar roll transactions to support the market and pricing of our single-family PCs. The gains for the six months ended June 30, 2011 were due to the repurchases of debt securities of consolidated trusts at a net purchase discount during the first quarter of 2011 driven by an increase in interest rates during the period. See "Table 19 — Mortgage-Related Securities Purchase Activity" for additional information regarding purchases of mortgage-related securities, including those issued by consolidated PC trusts.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4102                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Gains (Losses) on Retirement of Other Debt

Gains (losses) on retirement of other debt were $(45) million and $3 million during the three months ended June 30, 2012 and 2011, respectively. Gains (losses) on retirement of other debt were $(66) million and $15 million during the six months ended June 30, 2012 and 2011, respectively. We recognized losses on debt retirements in the three and six months ended June 30, 2012 primarily due to write-offs of unamortized deferred issuance costs related to calls of other debt securities. We recognized gains on debt retirements in the six months ended June 30, 2011 primarily due to the repurchase of other debt securities at discounts. For more information, see "LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Other Debt Securities — Other Debt Retirement Activities*."

### Gains (Losses) on Debt Recorded at Fair Value

Gains (losses) on debt recorded at fair value primarily relate to changes in the fair value of our foreign-currency denominated debt. For the three and six months ended June 30, 2012, we recognized gains on debt recorded at fair value of $62 million and $45 million, respectively, primarily due to a combination of the U.S. dollar strengthening relative to the Euro and changes in interest rates. For the three and six months ended June 30, 2011, we recognized losses on debt recorded at fair value of $37 million and $118 million, respectively, primarily due to the U.S. dollar weakening relative to the Euro. We mitigate changes in the fair value of our foreign-currency denominated debt by using foreign currency swaps and foreign-currency denominated interest-rate swaps.

### Derivative Gains (Losses)

The table below presents derivative gains (losses) reported in our consolidated statements of comprehensive income. See "NOTE 10: DERIVATIVES — Table 10.2 — Gains and Losses on Derivatives" for information about gains and losses related to specific categories of derivatives. Changes in fair value and interest accruals on derivatives not in hedge accounting relationships are recorded as derivative gains (losses) in our consolidated statements of comprehensive income. At June 30, 2012 and December 31, 2011, respectively, we did not have any derivatives in hedge accounting relationships; however, there are amounts recorded in AOCI related to discontinued cash flow hedges. Amounts recorded in AOCI associated with these closed cash flow hedges are reclassified to earnings when the forecasted transactions affect earnings. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the forecasted transaction is reclassified into earnings immediately.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported net income because, while fair value changes in derivatives affect net income, fair value changes in several of the types of assets and liabilities being hedged do not affect net income. Beginning in the fourth quarter of 2011, we began to increase the portion of our debt issued with longer-term maturities. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

### Table 7 — Derivative Gains (Losses)

| | Derivative Gains (Losses) | | | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
|---|---|---|---|---|
| | (in millions) | | | |
| Interest-rate swaps | $ (2,506) | $ (3,749) | $(1,298) | $(2,026) |
| Option-based derivatives[1] | 2,276 | 1,602 | 1,199 | 795 |
| Other derivatives[2] | 310 | (308) | 199 | (402) |
| Accrual of periodic settlements[3] | (962) | (1,352) | (2,038) | (2,601) |
| Total | $ (882) | $ (3,807) | $(1,938) | $(4,234) |

(1)  Primarily includes purchased call and put swaptions and purchased interest-rate caps and floors.
(2)  Includes futures, foreign-currency swaps, commitments, swap guarantee derivatives, and credit derivatives.
(3)  Includes imputed interest on zero-coupon swaps.

Gains (losses) on derivatives not accounted for in hedge accounting relationships are principally driven by changes in: (a) interest rates and implied volatility; and (b) the mix and volume of derivatives in our derivative portfolio.

During the three and six months ended June 30, 2012, we recognized losses on derivatives of $0.9 billion and $1.9 billion, respectively, due to losses related to the accrual of periodic settlements on interest-rate swaps as we were in a net pay-fixed swap position. We recognized fair value losses on our pay-fixed swaps of $8.0 billion and $4.2 billion,

<div align="center">17</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

respectively, which were largely offset by: (a) fair value gains on our receive-fixed swaps of $5.4 billion and $2.9 billion, respectively; and (b) fair value gains on our option-based derivatives of $2.3 billion and $1.2 billion, respectively, resulting from gains on our purchased call swaptions due to a decrease in longer-term interest rates. During the three and six months ended June 30, 2012, the effect of the decline in longer-term interest rates was partially mitigated due to a change in the mix of our derivatives portfolio, whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities.

During the three and six months ended June 30, 2011, we recognized losses on derivatives of $3.8 billion and $4.2 billion, respectively, primarily due to declines in interest rates in the second quarter. We recognized fair value losses on our pay-fixed swap positions of $7.3 billion and $3.3 billion, respectively, partially offset by fair value gains on our receive-fixed swaps of $3.6 billion and $1.3 billion, respectively. We also recognized fair value gains of $1.6 billion and $0.8 billion, respectively, on our option-based derivatives, resulting from gains on our purchased call swaptions as interest rates decreased during these periods. Additionally, we recognized losses related to the accrual of periodic settlements during the three and six months ended June 30, 2011 due to our net pay-fixed swap position in the current interest rate environment.

### Investment Securities-Related Activities

#### *Impairments of Available-For-Sale Securities*

We recorded net impairments of available-for-sale securities recognized in earnings, which were related to non-agency mortgage-related securities, of $98 million and $662 million during the three and six months ended June 30, 2012, respectively, compared to $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively. The decrease in net impairments recognized in earnings during the three and six months ended June 30, 2012 was primarily driven by improvements in forecasted home prices over the expected life of the securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information.

#### *Other Gains (Losses) on Investment Securities Recognized in Earnings*

Other gains (losses) on investment securities recognized in earnings primarily consist of gains (losses) on trading securities. Trading securities mainly include Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating-rate, interest-only and principal-only securities. We recognized $(400) million and $(777) million related to gains (losses) on trading securities during the three and six months ended June 30, 2012, respectively, compared to $274 million and $74 million during the three and six months ended June 30, 2011, respectively.

The losses on trading securities during the three and six months ended June 30, 2012 were primarily driven by changes in market prepayment expectations for our interest-only and inverse-floater investment securities, given recent low interest rates. The gains on trading securities during the three and six months ended June 30, 2011 were primarily due to the impact of a decline in interest rates coupled with a tightening of OAS levels on agency securities.

### Other Income

The table below summarizes the significant components of other income.

<div align="center">18</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 8 — Other Income

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Other income: | | | | |
| Gains (losses) on sale of mortgage loans | $ 44 | $ 161 | $ 84 | $ 256 |
| Gains (losses) on mortgage loans recorded at fair value | 201 | 136 | 340 | 103 |
| Recoveries on loans impaired upon purchase | 87 | 132 | 176 | 257 |
| Guarantee-related income, net[1] | 130 | 81 | 200 | 135 |
| All other | 107 | (258) | 203 | (165) |
| Total other income | $ 569 | $ 252 | $ 1,003 | $ 586 |

(1) Most of our guarantee-related income relates to securitized multifamily mortgage loans where we have not consolidated the securitization trusts on our consolidated balance sheets.

### Gains (Losses) on Sale of Mortgage Loans

During the three months ended June 30, 2012 and 2011, we recognized $44 million and $161 million, respectively, of gains on sale of mortgage loans with associated UPB of $6.3 billion and $4.3 billion, respectively. During the six months ended June 30, 2012 and 2011, we recognized $84 million and $256 million, respectively, of gains on sale of mortgage loans with associated UPB of $10.0 billion and $7.7 billion, respectively. All such amounts relate to our securitizations of multifamily loans on our consolidated balance sheets, which we elected to carry at fair value. We had lower gains on sale of mortgage loans in the three and six months ended June 30, 2012, compared to the same periods of 2011, as a significant portion of the improved fair value of the loans was recognized within gains (losses) on mortgage loans recorded at fair value during periods prior to the loans' securitization.

### Gains (Losses) on Mortgage Loans Recorded at Fair Value

During the three months ended June 30, 2012 and 2011, we recognized $201 million and $136 million, respectively, of gains on mortgage loans recorded at fair value, and we recognized $340 million and $103 million of such gains during the six months ended June 30, 2012 and 2011, respectively. All such amounts relate to multifamily loans which we had elected to carry at fair value and were designated for securitization. We held higher balances of these loans on our consolidated balance sheets during the three and six months ended June 30, 2012, compared to the same periods in 2011 which, when combined with improving fair values on those loans, resulted in higher gains during the 2012 periods.

### Recoveries on Loans Impaired upon Purchase

Recoveries on loans impaired upon purchase represent the recapture into income of previously recognized losses associated with purchases of delinquent loans from our PCs in conjunction with our guarantee activities. Recoveries occur when a loan that was impaired upon purchase is repaid in full or when at the time of foreclosure the estimated fair value of the acquired property, less costs to sell, exceeds the carrying value of the loan. For impaired loans where the borrower has made required payments that return the loan to less than three months past due, the recovery amounts are recognized as interest income over time as periodic payments are received.

During the three months ended June 30, 2012 and 2011, we recognized recoveries on loans impaired upon purchase of $87 million and $132 million, respectively, and these recoveries were $176 million and $257 million during the six months ended June 30, 2012 and 2011, respectively. Our recoveries on loans impaired upon purchase declined in the second quarter and first half of 2012, compared to the same periods of 2011, due to a lower volume of foreclosure transfers and payoffs associated with loans impaired upon purchase.

### All Other

All other income consists primarily of transactional fees, fees assessed to our servicers, such as for technology use and late fees or other penalties, and other miscellaneous income. All other income increased during the three and six months ended June 30, 2012, compared to the same periods in 2011, principally due to the correction of certain prior period accounting errors not material to our financial statements that were recorded during the second quarter of 2011. During the second quarter of 2011, our largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other income during the three and six months ended June 30, 2011 by approximately $293 million.

19

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4105

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Non-Interest Expense**

The table below summarizes the components of non-interest expense.

**Table 9 — Non-Interest Expense**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Administrative expenses: | | | | |
| Salaries and employee benefits | $ 227 | $ 219 | $ 403 | $ 426 |
| Professional services | 81 | 64 | 152 | 120 |
| Occupancy expense | 14 | 15 | 28 | 30 |
| Other administrative expense | 79 | 86 | 155 | 169 |
| Total administrative expenses | 401 | 384 | 738 | 745 |
| REO operations (income) expense | (30) | 27 | 141 | 284 |
| Other expenses | 165 | 135 | 253 | 214 |
| Total non-interest expense | $ 536 | $ 546 | $1,132 | $ 1,243 |

### *Administrative Expenses*

Administrative expenses increased during the three months ended June 30, 2012 compared to the three months ended June 30, 2011, due to an increase in professional services expense and salaries and employee benefits expense. Professional services expense increased as a result of initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives. Salaries and employee benefits expense increased primarily because of a change in the timing of the recognition of compensation-related expenses as a result of our new compensation program for employees, which we introduced in the second quarter of 2012. During the six months ended June 30, 2012, administrative expenses decreased slightly compared to the six months ended June 30, 2011 as lower salaries and employee benefits expense and other administrative expenses more than offset higher professional services expense.

We currently expect that our general and administrative expenses for the full-year 2012 will be marginally higher than those we experienced in the full-year 2011, resulting from increased professional services expense, in part due to: (a) our need to respond to developments in the continually changing mortgage market; (b) an environment in which we are subject to increased regulatory oversight and mandates; and (c) strategic arrangements that we may enter into with outside firms to provide operational capability and staffing for key functions. We believe the initiatives we are pursuing under the 2012 conservatorship scorecard and other FHFA-mandated initiatives will require additional resources and continue to affect our level of administrative expenses going forward.

### *REO Operations (Income) Expense*

The table below presents the components of our REO operations (income) expense, and REO inventory and disposition information.

<div align="center">20</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 10 — REO Operations (Income) Expense, REO Inventory, and REO Dispositions**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (dollars in millions) | | | |
| REO operations (income) expense: | | | | |
| Single-family: | | | | |
| REO property expenses[1] | $   293 | $   300 | $   671 | $   608 |
| Disposition (gains) losses, net[2] | (182) | 56 | (260) | 182 |
| Change in holding period allowance, dispositions | (33) | (129) | (90) | (284) |
| Change in holding period allowance, inventory[3] | (27) | 5 | (26) | 156 |
| Recoveries[4] | (85) | (197) | (157) | (370) |
| Total single-family REO operations (income) expense | (34) | 35 | 138 | 292 |
| Multifamily REO operations (income) expense | 4 | (8) | 3 | (8) |
| Total REO operations (income) expense | $   (30) | $   27 | $   141 | $   284 |
| REO inventory (in properties), at June 30: | | | | |
| Single-family | 53,271 | 60,599 | 53,271 | 60,599 |
| Multifamily | 11 | 19 | 11 | 19 |
| Total | 53,282 | 60,618 | 53,282 | 60,618 |
| REO property dispositions (in properties): | | | | |
| Single-family | 26,069 | 29,348 | 51,102 | 60,975 |
| Multifamily | 7 | 7 | 11 | 8 |
| Total | 26,076 | 29,355 | 51,113 | 60,983 |

(1) Consists of costs incurred to maintain or protect a property after it is acquired in a foreclosure transfer, such as legal fees, insurance, taxes, and cleaning and other maintenance charges.
(2) Represents the difference between the disposition proceeds, net of selling expenses, and the fair value of the property on the date of the foreclosure transfer.
(3) Represents the (increase) decrease in the estimated fair value of properties that were in inventory during the period.
(4) Includes recoveries from primary mortgage insurance, pool insurance and seller/servicer repurchases.

REO operations (income) expense was $(30) million for the second quarter of 2012, as compared to $27 million during the second quarter of 2011 and was $141 million in the first half of 2012 compared to $284 million for the first half of 2011. The decline in expense for the 2012 periods was primarily due to improving home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory. Recoveries on REO properties also declined during the second quarter and first half of 2012, compared to the same periods of 2011. Lower recoveries on REO properties were primarily due to lower REO property volume, reduced recoveries from mortgage insurers, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

We believe the volume of our single-family REO acquisitions during the first half of 2012 was less than it otherwise would have been due to: (a) the length of the foreclosure process, particularly in states that require a judicial foreclosure process; and (b) resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at June 30, 2012, compared to December 31, 2011. We expect that the length of the foreclosure process will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting REO inventory could have a negative effect on the housing market. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

### Other Expenses

Other expenses were $165 million and $135 million in the second quarters of 2012 and 2011, respectively, and were $253 million and $214 million in the first half of 2012 and 2011, respectively. Other expenses consist primarily of HAMP servicer incentive fees, costs related to terminations and transfers of mortgage servicing, and other miscellaneous expenses.

### Income Tax Benefit

For the three months ended June 30, 2012 and 2011, we reported an income tax benefit of $76 million and $232 million, respectively. For the six months ended June 30, 2012 and 2011, we reported an income tax benefit of $90 million and $306 million, respectively. See "NOTE 12: INCOME TAXES" for additional information.

21

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4107          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Comprehensive Income (Loss)**

Our comprehensive income (loss) was $2.9 billion and $4.7 billion for the three and six months ended June 30, 2012, respectively, consisting of: (a) $3.0 billion and $3.6 billion of net income, respectively; and (b) $(128) million and $1.1 billion of total other comprehensive income (loss), respectively, primarily due to a change in net unrealized losses related to our available-for-sale securities.

Our comprehensive income (loss) was $(1.1) billion and $1.6 billion for the three and six months ended June 30, 2011, respectively, consisting of: (a) $(2.1) billion and $(1.5) billion of net income (loss), respectively; and (b) $1.0 billion and $3.1 billion of total other comprehensive income, respectively, primarily due to a reduction in net unrealized losses related to our available-for-sale securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Total Equity (Deficit)" for additional information regarding total other comprehensive income.

**Segment Earnings**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. Certain activities that are not part of a reportable segment are included in the All Other category.

The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment CMBS and held-for-sale loans that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses.

The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses.

The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit.

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes. The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss).

22 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods. The All Other category also includes the deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward.

In presenting Segment Earnings, we make significant reclassifications among certain financial statement line items in order to reflect a measure of net interest income on investments and a measure of management and guarantee income on guarantees that is in line with how we manage our business. We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments.

As a result of these reclassifications and allocations, Segment Earnings for our reportable segments differs significantly from, and should not be used as a substitute for, net income (loss) as determined in accordance with GAAP. Our definition of Segment Earnings may differ from similar measures used by other companies. However, we believe that Segment Earnings provides us with meaningful metrics to assess the financial performance of each segment and our company as a whole.

See "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report for further information regarding our segments, including the descriptions and activities of the segments and the reclassifications and allocations used to present Segment Earnings.

In the first half of 2012, under guidance from FHFA, we curtailed mortgage-related investments portfolio purchase and retention activities that are undertaken for the primary purpose of supporting the price performance of our PCs. We are evaluating possible strategies that could improve the price performance of our PCs.

<div align="center">23</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides information about our various segment mortgage portfolios at June 30, 2012 and December 31, 2011. For a discussion of each segment's portfolios, see "*Segment Earnings — Results*."

**Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios** [1]

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| **Segment mortgage portfolios:** | | |
| *Investments — Mortgage investments portfolio:* | | |
| Single-family unsecuritized mortgage loans [2] | $    92,462 | $    109,190 |
| Freddie Mac mortgage-related securities | 184,358 | 220,659 |
| Non-agency mortgage-related securities | 81,634 | 86,526 |
| Non-Freddie Mac agency securities | 27,950 | 32,898 |
| *Total Investments — Mortgage investments portfolio* | 386,404 | 449,273 |
| *Single-family Guarantee — Managed loan portfolio:* [3] | | |
| Single-family unsecuritized mortgage loans [4] | 60,053 | 62,469 |
| Single-family Freddie Mac mortgage-related securities held by us | 184,358 | 220,659 |
| Single-family Freddie Mac mortgage-related securities held by third parties | 1,376,822 | 1,378,881 |
| Single-family other guarantee commitments [5] | 13,691 | 11,120 |
| *Total Single-family Guarantee — Managed loan portfolio* | 1,634,924 | 1,673,129 |
| *Multifamily — Guarantee portfolio:* | | |
| Multifamily Freddie Mac mortgage related securities held by us | 2,633 | 3,008 |
| Multifamily Freddie Mac mortgage related securities held by third parties | 30,588 | 22,136 |
| Multifamily other guarantee commitments [5] | 9,844 | 9,944 |
| *Total Multifamily — Guarantee portfolio* | 43,065 | 35,088 |
| *Multifamily — Mortgage investments portfolio* | | |
| Multifamily investment securities portfolio | 55,225 | 59,260 |
| Multifamily loan portfolio | 79,597 | 82,311 |
| *Total Multifamily — Mortgage investments portfolio* | 134,822 | 141,571 |
| *Total Multifamily portfolio* | 177,887 | 176,659 |
| Less : Freddie Mac single-family and certain multifamily securities [6] | (186,991) | (223,667) |
| *Total mortgage portfolio* | $ 2,012,224 | $ 2,075,394 |
| **Credit risk portfolios:** [7] | | |
| *Single-family credit guarantee portfolio:* [3] | | |
| Single-family mortgage loans, on-balance sheet | $ 1,675,687 | $ 1,733,215 |
| Non-consolidated Freddie Mac mortgage-related securities | 9,929 | 10,735 |
| Other guarantee commitments | 13,691 | 11,120 |
| Less: HFA-related guarantees [8] | (7,751) | (8,637) |
| Less: Freddie Mac mortgage-related securities backed by Ginnie Mae certificates [8] | (709) | (779) |
| *Total single-family credit guarantee portfolio* | $ 1,690,847 | $ 1,745,654 |
| *Multifamily mortgage portfolio:* | | |
| Multifamily mortgage loans, on-balance sheet | $    79,597 | $    82,311 |
| Non-consolidated Freddie Mac mortgage-related securities | 33,221 | 25,144 |
| Other guarantee commitments | 9,844 | 9,944 |
| Less: HFA-related guarantees [8] | (1,206) | (1,331) |
| *Total multifamily mortgage portfolio* | $    121,456 | $    116,068 |

(1) Based on UPB and excludes mortgage loans and mortgage-related securities traded, but not yet settled.
(2) Excludes unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment. However, the Single-family Guarantee segment continues to earn management and guarantee fees associated with unsecuritized single-family loans in the Investments segment's mortgage investments portfolio.
(3) The balances of the mortgage-related securities in the Single-family Guarantee managed loan portfolio are based on the UPB of the security, whereas the balances of our single-family credit guarantee portfolio presented in this report are based on the UPB of the mortgage loans underlying the related security. The differences in the loan and security balances result from the timing of remittances to security holders, which is typically 45 or 75 days after the mortgage payment cycle of fixed-rate and ARM PCs, respectively.
(4) Represents unsecuritized seriously delinquent single-family loans managed by the Single-family Guarantee segment.
(5) Represents the UPB of mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.
(6) Freddie Mac single-family mortgage-related securities held by us are included in both our Investments segment's mortgage investments portfolio and our Single-family Guarantee segment's managed loan portfolio, and Freddie Mac multifamily mortgage-related securities held by us are included in both the multifamily investment securities portfolio and the multifamily guarantee portfolio. Therefore, these amounts are deducted in order to reconcile to our total mortgage portfolio.
(7) Represents the UPB of loans for which we present characteristics, delinquency data, and certain other statistics in this report. See "GLOSSARY" for further description.
(8) We exclude HFA-related guarantees and our reca securitizations of Ginnie Mae certificates from our credit risk portfolios and most related statistics because these guarantees do not expose us to meaningful amounts of credit risk due to the credit enhancement provided on them by the U.S. government.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Segment Earnings — Results*

*Investments*

The table below presents the Segment Earnings of our Investments segment.

**Table 12 — Segment Earnings and Key Metrics — Investments** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions) | | | |
| **Segment Earnings:** | | | | |
| Net interest income | $ 1,559 | $ 1,826 | $ 3,322 | $ 3,479 |
| Non-interest income (loss): | | | | |
| Net impairment of available-for-sale securities recognized in earnings | (14) | (139) | (510) | (1,168) |
| Derivative gains (losses) | 236 | (2,156) | 436 | (1,053) |
| Gains (losses) on trading securities | (413) | 256 | (811) | 22 |
| Gains (losses) on sale of mortgage loans | 6 | 4 | (8) | 16 |
| Gains (losses) on mortgage loans recorded at fair value | 257 | 167 | 219 | 84 |
| Other non-interest income (loss) | 673 | (184) | 1,186 | 357 |
| Total non-interest income (loss) | 745 | (2,052) | 512 | (1,742) |
| Non-interest expense: | | | | |
| Administrative expenses | (108) | (101) | (200) | (196) |
| Other non-interest expense | — | (1) | — | (1) |
| Total non-interest expense | (108) | (102) | (200) | (197) |
| Segment adjustments [2] | 164 | 126 | 319 | 329 |
| Segment Earnings (loss) before income tax benefit | 2,360 | (202) | 3,953 | 1,869 |
| Income tax benefit | 108 | 212 | 143 | 278 |
| Segment Earnings, net of taxes | 2,468 | 10 | 4,096 | 2,147 |
| Total other comprehensive income, net of taxes | 27 | 633 | 362 | 1,759 |
| Comprehensive income | $ 2,495 | $ 643 | $ 4,458 | $ 3,906 |
| **Key metrics:** | | | | |
| *Portfolio balances:* | | | | |
| Average balances of interest-earning assets: [3][4] | | | | |
| Mortgage-related securities [5] | $308,287 | $ 393,361 | $ 319,439 | $ 396,238 |
| Non-mortgage-related investments [6] | 94,806 | 91,965 | 100,173 | 103,348 |
| Unsecuritized single-family loans [7] | 98,158 | 92,339 | 103,732 | 88,927 |
| Total average balances of interest-earning assets | $501,251 | $577,665 | $523,344 | $588,513 |
| *Return:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 1.24% | 1.26% | 1.27% | 1.18% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING — Segment Earnings" in our 2011 Annual Report.

(3) Excludes mortgage loans and mortgage-related securities traded, but not yet settled.

(4) We calculate average balances based on amortized cost.

(5) Includes our investments in single-family PCs and certain Other Guarantee Transactions, which have been consolidated under GAAP on our consolidated balance sheet since January 1, 2010.

(6) Includes the average balances of interest-earning cash and cash equivalents, non-mortgage-related securities, and federal funds sold and securities purchased under agreements to resell.

(7) Excludes unsecuritized seriously delinquent single-family mortgage loans.

Segment Earnings for our Investments segment increased by $2.5 billion and $1.9 billion to $2.5 billion and $4.1 billion during the three and six months ended June 30, 2012, respectively, compared to $10 million and $2.1 billion during the three and six months ended June 30, 2011, respectively, primarily due to: (a) derivative gains during the three and six months ended June 30, 2012 versus losses during the three and six months ended June 30, 2011; (b) improvements in other non-interest income; and (c) a reduction in net impairments of available-for-sale securities recognized in earnings. These factors were partially offset by our recognition of losses on trading securities during the three and six months ended June 30, 2012 versus gains on trading securities during the three and six months ended June 30, 2011.

Comprehensive income for our Investments segment increased by $1.9 billion and $552 million to $2.5 billion and $4.5 billion during the three and six months ended June 30, 2012, respectively, compared to $643 million and $3.9 billion during the three and six months ended June 30, 2011, respectively, primarily due to higher Segment Earnings, partially offset by lower other comprehensive income, primarily due to a smaller improvement in the net unrealized loss position of AOCI.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During the three and six months ended June 30, 2012, the UPB of the Investments segment mortgage investments portfolio decreased at an annualized rate of 29.4% and 28.0%, respectively. We held $212.3 billion of agency securities and $81.6 billion of non-agency mortgage-related securities as of June 30, 2012, compared to $253.6 billion of agency securities and $86.5 billion of non-agency mortgage-related securities as of December 31, 2011. The decline in UPB of agency securities is due mainly to liquidations, including prepayments, and selected sales. Our selected sales during the six months ended June 30, 2012 were due to a variety of reasons, including the impact of tightening OAS levels on certain assets that we were able to sell at attractive levels. The decline in UPB of non-agency mortgage-related securities is due mainly to the receipt of monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral, representing a partial return of our investments in these securities. Since the beginning of 2007, we have incurred actual principal cash shortfalls of $2.1 billion on impaired non-agency mortgage-related securities in the Investments segment. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for additional information regarding our mortgage-related securities.

Segment Earnings net interest income decreased by $267 million and $157 million and net interest yield decreased by two basis points and increased by nine basis points during the three and six months ended June 30, 2012, respectively, compared to the three and six months ended June 30, 2011, respectively. The primary driver of the decreases in net interest yield during the three months ended June 30, 2012 and net interest income for both periods was the reduction in the average balance of higher-yielding mortgage-related assets due to continued liquidations, partially offset by lower funding costs, primarily due to the replacement of debt at lower rates. The increase in net interest yield during the six months ended June 30, 2012 compared to the six months ended June 30, 2011 was primarily due to the lower funding costs outweighing the impact of the reduction in the average balance of higher-yielding mortgage-related assets.

Segment Earnings non-interest income (loss) was $745 million and $512 million during the three and six months ended June 30, 2012, respectively, compared to $(2.1) billion and $(1.7) billion during the three and six months ended June 30, 2011, respectively. This improvement was primarily due to: (a) derivative gains during the three and six months ended June 30, 2012 versus losses during the three and six months ended June 30, 2011; (b) improvements in other non-interest income; and (c) a reduction in net impairments of available-for-sale securities recognized in earnings. These factors were partially offset by our recognition of losses on trading securities during the three and six months ended June 30, 2012 versus gains on trading securities during the three and six months ended June 30, 2011.

Impairments recorded in our Investments segment were $14 million and $510 million during the three and six months ended June 30, 2012, respectively, compared to $139 million and $1.2 billion during the three and six months ended June 30, 2011. The decrease in net impairments recognized in earnings during the three and six months ended June 30, 2012 was primarily driven by improvements in forecasted home prices over the expected life of the securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities — Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*" for additional information on our impairments.

We recorded gains (losses) on trading securities of $(413) million and $(811) million during the three and six months ended June 30, 2012, respectively, compared to $256 million and $22 million during the three and six months ended June 30, 2011, respectively. The losses on trading securities during the three and six months ended June 30, 2012 were primarily driven by changes in market prepayment expectations for our interest-only and inverse-floater investment securities, given recent low interest rates. The gains on trading securities during the three and six months ended June 30, 2011 were primarily due to the impact of a decline in interest rates coupled with a tightening of OAS levels on agency securities.

While derivatives are an important aspect of our strategy to manage interest-rate risk, they generally increase the volatility of reported Segment Earnings, because while fair value changes in derivatives affect Segment Earnings, fair value changes in several of the types of assets and liabilities being hedged do not affect Segment Earnings. We recorded derivative gains (losses) for this segment of $236 million and $436 million during the three and six months ended June 30, 2012, respectively, compared to $(2.2) billion and $(1.1) billion during the three and six months ended June 30, 2011, respectively. During the three and six months ended June 30, 2012 and 2011, longer-term swap interest rates decreased, resulting in fair value losses on our pay-fixed swaps, partially offset by: (a) fair value gains on our receive-fixed swaps; and (b) fair value gains on our option-based derivatives resulting from gains on our purchased call swaptions. Increased derivative gains in 2012 resulted from a change in the mix of our derivatives portfolio, whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities. During the three and six months ended June 30, 2012, we also recognized

<div align="center">26</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

gains on other derivative transactions, such as commitments to purchase mortgage loans. See "Non-Interest Income (Loss) — *Derivative Gains (Losses)"* for additional information on our derivatives.

Other non-interest income (loss) for this segment was $673 million and $1.2 billion during the three and six months ended June 30, 2012, respectively, compared to $(184) million and $357 million during the three and six months ended June 30, 2011, respectively. The improvement in other non-interest income was primarily due to an increase in amortization income of basis adjustments resulting from the securitization and sales of retained mortgage loans and sales of Freddie Mac mortgage-related securities from our mortgage-related investments portfolio. In addition, during the three months ended June 30, 2011 we recorded certain prior period accounting errors not material to our financial statements. During the three months ended June 30, 2011, the largest correction related to an error associated with the accrual of interest income for certain impaired mortgage-related securities during 2010 and 2009, which reduced other non-interest income during the three and six months ended June 30, 2011 by approximately $293 million.

Our Investments segment's total other comprehensive income was $27 million and $362 million during the three and six months ended June 30, 2012, respectively, compared to $633 million and $1.8 billion during the three and six months ended June 30, 2011, respectively. Net unrealized losses in AOCI on our available-for-sale securities for this segment increased by $81 million and decreased by $161 million during the three and six months ended June 30, 2012, respectively. The increase in our net unrealized losses in AOCI during the three months ended June 30, 2012 was primarily due to the impact of widening OAS levels on our non-agency mortgage-related securities, partially offset by fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and the impact of the decline in interest rates. The decrease in our net unrealized losses during the six months ended June 30, 2012, was primarily due to fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity and fair value gains due to the impact of the decline in interest rates, partially offset by the impact of widening OAS levels on our non-agency mortgage-related securities. Net unrealized losses in AOCI on our available-for-sale securities decreased by $498 million and $1.5 billion during the three and six months ended June 30, 2011, respectively, primarily due to the impact of fair value gains related to the movement of non-agency mortgage-related securities with unrealized losses towards maturity, the impact of declining rates on our agency securities, and the recognition in earnings of other-than-temporary impairments on our non-agency mortgage-related securities, partially offset by the impact of widening of OAS levels on our non-agency mortgage-related securities. The changes in fair value of CMBS, excluding impacts from the changes in interest rates which are included in the Investments segment, are reflected in the Multifamily segment.

For a discussion of items that may impact our Investments segment net interest income over time, see "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4113

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Single-Family Guarantee*

The table below presents the Segment Earnings of our Single-family Guarantee segment.

**Table 13 — Segment Earnings and Key Metrics — Single-Family Guarantee** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | *(dollars in millions)* | | | |
| Segment Earnings: | | | | |
| Net interest income (expense) | $ (1) | $ (30) | $ (33) | $ 70 |
| Provision for credit losses | (462) | (2,886) | (2,646) | (5,170) |
| Non-interest income: | | | | |
| Management and guarantee income | 1,026 | 848 | 2,037 | 1,718 |
| Other non-interest income | 171 | 208 | 352 | 419 |
| Total non-interest income | 1,197 | 1,056 | 2,389 | 2,137 |
| Non-interest expense: | | | | |
| Administrative expenses | (228) | (228) | (425) | (443) |
| REO operations income (expense) | 34 | (35) | (138) | (292) |
| Other non-interest expense | (82) | (106) | (155) | (172) |
| Total non-interest expense | (280) | (369) | (718) | (907) |
| Segment adjustments [2] | (192) | (143) | (388) | (328) |
| Segment Earnings (loss) before income tax (expense) benefit | 262 | (2,372) | (1,396) | (4,198) |
| Income tax (expense) benefit | (21) | (14) | (38) | (8) |
| Segment Earnings (loss), net of taxes | 241 | (2,386) | (1,434) | (4,206) |
| Total other comprehensive income (loss), net of taxes | 1 | 1 | (22) | (3) |
| Comprehensive income (loss) | $ 242 | $(2,385) | $ (1,456) | $ (4,209) |
| Key metrics: | | | | |
| *Balances and Volume (in billions, except rate):* | | | | |
| Average balance of single-family credit guarantee portfolio and HFA guarantees | $ 1,706 | $ 1,816 | $ 1,723 | $ 1,817 |
| Issuance - Single-family credit guarantees [3] | $ 100 | $ 62 | $ 210 | $ 158 |
| Fixed-rate products - Percentage of purchases [4] | 95% | 90% | 95% | 93% |
| Liquidation rate — Single-family credit guarantees (annualized) [5] | 32% | 17% | 31% | 23% |
| *Management and Guarantee Fee Rate (in bps, annualized):* | | | | |
| Contractual management and guarantee fees [6] | 14.8 | 13.7 | 14.5 | 13.6 |
| Amortization of delivery fees | 9.3 | 5.0 | 9.1 | 5.3 |
| Segment Earnings management and guarantee income | 24.1 | 18.7 | 23.6 | 18.9 |
| *Credit:* | | | | |
| Serious delinquency rate, at end of period | 3.45% | 3.50% | 3.45% | 3.50% |
| REO inventory, at end of period (number of properties) | 53,271 | 60,599 | 53,271 | 60,599 |
| Single-family credit losses, in bps (annualized) [7] | 66.7 | 68.4 | 72.7 | 69.7 |
| *Market:* | | | | |
| Single-family mortgage debt outstanding (total U.S. market, in billions) [8] | $ 10,179 | $10,383 | $ 10,179 | $10,383 |
| 30-year fixed mortgage rate [9] | 3.7% | 4.5% | 3.7% | 4.5% |

(1) For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING - Table 13.2 - Segment Earnings and Reconciliation to GAAP Results."
(2) For a description of our segment adjustments, see "NOTE 14: SEGMENT REPORTING - Segment Earnings" in our 2011 Annual Report.
(3) Based on UPB.
(4) Excludes Other Guarantee Transactions.
(5) Represents principal repayments relating to loans underlying Freddie Mac mortgage-related securities and other guarantee commitments, including those related to our removal of seriously delinquent and modified mortgage loans and balloon/reset mortgage loans out of PC pools.
(6) Results for the 2012 periods include the effect of the legislated 10 basis point increase in guarantee fees that became effective April 1, 2012.
(7) Calculated as the amount of single-family credit losses divided by the sum of the average carrying value of our single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees.
(8) Source: Federal Reserve Flow of Funds Accounts of the United States of America dated June 7, 2012. The outstanding amount for June 30, 2012 reflects the balance as of March 31, 2012.
(9) Based on Freddie Mac's Primary Mortgage Market Survey rate for the last week in the period, which represents the national average mortgage commitment rate to a qualified borrower exclusive of any fees and points required by the lender. This commitment rate applies only to financing on conforming mortgages with LTV ratios of 80%.

Segment Earnings (loss) for our Single-family Guarantee segment improved to $0.2 billion and $(1.4) billion for the three and six months ended June 30, 2012, respectively, compared to $(2.4) billion and $(4.2) billion for the three and six months ended June 30, 2011, respectively, primarily due to a decline in Segment Earnings provision for credit losses.

The table below provides summary information about the composition of Segment Earnings (loss) for this segment for the six months ended June 30, 2012 and 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4114          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 14 — Segment Earnings Composition — Single-Family Guarantee Segment**

| | Six Months Ended June 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses [2] | | Net Amount[4] | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination:[5] | | | | | | |
| 2012 | $ 78 | 16.4 | $ (23) | 4.3 | $ 55 | |
| 2011 | 368 | 25.9 | (106) | 7.5 | 262 | |
| 2010 | 386 | 26.8 | (178) | 11.9 | 208 | |
| 2009 | 382 | 27.7 | (160) | 11.6 | 222 | |
| 2008 | 174 | 26.5 | (161) | 30.7 | 13 | |
| 2007 | 165 | 19.6 | (883) | 117.7 | (718) | |
| 2006 | 105 | 19.4 | (525) | 93.9 | (420) | |
| 2005 | 121 | 19.7 | (584) | 91.8 | (463) | |
| 2004 and prior | 258 | 20.7 | (164) | 12.0 | 94 | |
| Total | $ 2,037 | 23.6 | $ (2,784) | 32.2 | $ (747) | |
| Administrative expenses | | | | | (425) | |
| Net interest income (expense) | | | | | (33) | |
| Other non-interest income and expenses, net | | | | | (229) | |
| Segment Earnings (loss), net of taxes | | | | | $ (1,434) | |

| | Six Months Ended June 30, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Segment Earnings Management and Guarantee Income[1] | | Credit Expenses [2] | | Net Amount[4] | |
| | Amount | Average Rate[3] | Amount | Average Rate[3] | | |
| | (dollars in millions, rates in bps) | | | | | |
| Year of origination:[5] | | | | | | |
| 2011 | $ 91 | 17.6 | $ (16) | 4.4 | $ 75 | |
| 2010 | 369 | 20.9 | (117) | 6.4 | 252 | |
| 2009 | 322 | 17.8 | (137) | 7.4 | 185 | |
| 2008 | 203 | 23.5 | (445) | 61.7 | (242) | |
| 2007 | 196 | 18.8 | (1,881) | 196.5 | (1,685) | |
| 2006 | 115 | 17.0 | (1,566) | 219.3 | (1,451) | |
| 2005 | 128 | 16.5 | (949) | 116.2 | (821) | |
| 2004 and prior | 294 | 18.0 | (351) | 19.5 | (57) | |
| Total | $ 1,718 | 18.9 | $ (5,462) | 60.2 | $ (3,744) | |
| Administrative expenses | | | | | (443) | |
| Net interest income (expense) | | | | | 70 | |
| Other non-interest income and expenses, net | | | | | (89) | |
| Segment Earnings (loss), net of taxes | | | | | $ (4,206) | |

(1) Includes amortization of delivery fees of $785 million and $476 million for the six months ended June 30, 2012 and 2011, respectively.
(2) Consists of the aggregate of the Segment Earnings provision for credit losses and Segment Earnings REO operations expense. Historical rates of average credit expenses may not be representative of future results. In the first quarter of 2012, we enhanced our method of allocating credit expenses by loan origination year. Prior period amounts have been revised to conform to the current period presentation.
(3) Calculated as the annualized amount of Segment Earnings management and guarantee income or credit expenses, respectively, divided by the sum of the average carrying values of the single-family credit guarantee portfolio and the average balance of our single-family HFA initiative guarantees. Segment Earnings management and guarantee income and average rate for the six months ended June 30, 2012 include the effect of the legislated 10 basis point increase in guarantee fees that became effective April 1, 2012.
(4) Calculated as Segment Earnings management and guarantee income less credit expenses.
(5) Segment Earnings management and guarantee income is presented by year of guarantee origination, whereas credit expenses are presented based on year of loan origination.

As of June 30, 2012, loans originated after 2008 have, on a cumulative basis, provided management and guarantee income that has exceeded the credit-related and administrative expenses associated with these loans. We currently believe our management and guarantee fee rates for guarantee issuances after 2008, when coupled with the higher credit quality of the mortgages within these new guarantee issuances, will provide management and guarantee fee income (excluding the amounts associated with the Temporary Payroll Tax Cut Continuation Act of 2011), over the long term, that exceeds our expected credit-related and administrative expenses associated with the underlying loans. Nevertheless, various factors, such as continued high unemployment rates, further declines in home prices, or negative impacts of HARP loans (which may not perform as well as other refinance mortgages, due in part to the high LTV ratios of the loans), could require us to incur expenses on these loans beyond our current expectations.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4115

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future expectations.

Table of Contents

Based on our historical experience, we expect that the performance of the loans in an individual origination year will vary over time. The aggregate UPB of the loans from an origination year will decline over time due to repayments, refinancing, and other liquidation events, resulting in declining management and guarantee fee income from the loans in that origination year in future periods. In addition, we expect that the credit-related expenses related to the remaining loans in the origination year will increase over time, as some borrowers experience financial difficulties and default on their loans. As a result, there will likely be periods when an origination year is not profitable, though it may remain profitable on a cumulative basis.

Our management and guarantee income associated with guarantee issuances in 2005 through 2008 has not been adequate to cover the credit and administrative expenses associated with such loans, primarily due to the high rate of defaults on the loans originated in those years coupled with the high volume of refinancing of these loans that has occurred since 2008. High levels of refinancing and delinquency since 2008 have significantly reduced the balance of performing loans from those years that remain in our portfolio and consequently reduced management and guarantee income associated with loans originated in 2005 through 2008 (we do not recognize Segment Earnings management and guarantee income on non-accrual mortgage loans). We also believe that the management and guarantee fees associated with originations after 2008 will not be sufficient to offset the future expenses associated with our 2005 to 2008 guarantee issuances for the foreseeable future. Consequently, we may report a net loss for the Single-family Guarantee segment for the full-year of 2012.

Segment Earnings management and guarantee income increased during the three and six months ended June 30, 2012, compared to the three and six months ended June 30, 2011, respectively, primarily due to an increase in amortization of delivery fees. This was driven by a higher volume of delivery fees in recent periods and a lower interest rate environment during the first half of 2012, which increased refinance activity.

Effective April 1, 2012, at the direction of FHFA, we increased the guarantee fee on single-family residential mortgages sold to Freddie Mac by 10 basis points under the Temporary Payroll Tax Cut Continuation Act of 2011. The proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by us. The receipt of these fees is recognized within Segment Earnings management and guarantee income, and the remittance of these fees to Treasury is reported in non-interest expense. We recognized $10 million of expense in the second quarter of 2012 (and a similar amount of income) associated with the legislated 10 basis point increase to single-family guarantee fees. While we expect these fees to become significant over time, the effect of the 10 basis point increase was not significant to the average rate of our aggregate Segment Earnings management and guarantee income in the second quarter of 2012. We will begin remitting the fees to Treasury on a quarterly basis in September 2012. As of June 30, 2012, there were approximately 432,000 loans totaling $88.3 billion in UPB in our single-family credit guarantee portfolio that are subject to the 10 basis point increase in guarantee fees associated with this legislation.

The UPB of the Single-family Guarantee managed loan portfolio was $1.6 trillion and $1.7 trillion at June 30, 2012 and December 31, 2011, respectively. The annualized liquidation rate on our securitized single-family credit guarantees was approximately 32% and 31% for the three and six months ended June 30, 2012, respectively, and remained high in the second quarter of 2012 due to recent declines in interest rates and, to a lesser extent, the impact of the expanded HARP initiative, that resulted in significant refinancing activity. Refinance activity has also resulted in an increase in our guarantee issuances from $158 billion in the first half of 2011 to $210 billion in the first half of 2012. However, we expect the size of our Single-family Guarantee managed loan portfolio will continue to decline during 2012.

Refinance volumes remained high during the second quarter of 2012 due to continued historically low interest rates and HARP, and represented 81% and 84% of our single-family mortgage purchase volume during the three and six months ended June 30, 2012, respectively, compared to 70% and 79% of our single-family mortgage purchase volume during the three and six months ended June 30, 2011, respectively, based on UPB. Relief refinance mortgages comprised approximately 35% and 36% of our total refinance volume during the first half of 2012 and 2011, respectively. Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. In addition, relief refinance mortgages may not be covered by mortgage insurance for the full excess of their UPB over 80%. Approximately 21% and 14% of our single-family purchase volume in the first half of 2012 and 2011, respectively, were relief refinance mortgages with LTV ratios above 80%. For more information about our relief refinance mortgage initiative, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program.*"

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4116                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The credit quality of the single-family loans we acquired beginning in 2009 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Including HARP loans, mortgages originated after 2008 represent 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, and their composition of that portfolio continues to grow. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Provision for credit losses for the Single-family Guarantee segment declined to $0.5 billion and $2.6 billion for the three and six months ended June 30, 2012, respectively, compared to $2.9 billion and $5.2 billion for the three and six months ended June 30, 2011, respectively. The decrease in the Segment Earnings provision for credit losses for the second quarter and first half of 2012 compared to the respective periods in 2011 primarily reflects improvements in the number of newly impaired loans (largely due to a decline in the portion of our single-family credit guarantee portfolio originated in 2005 through 2008) and lower estimated future losses due to the positive impact of an increase in national home prices. While national home prices exhibited strong growth in the second quarter of 2012, our expectation is that national average home prices will remain weak (on an inflation-adjusted basis) over the near term before a long-term recovery in housing begins. As such, we adjusted our estimated loss severity rates in the second quarter of 2012 to align with our expectations for near term home prices. Our Segment Earnings provision for credit losses in the three and six months ended June 30, 2011 primarily reflected a decline in the rate at which delinquent loans transition into serious delinquency. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for certain quarterly credit statistics for our single-family credit guarantee portfolio.

Single-family credit losses as a percentage of the average balance of the single-family credit guarantee portfolio and HFA-related guarantees were 73 basis points and 70 basis points for the six months ended June 30, 2012 and 2011, respectively. Charge-offs, net of recoveries, associated with single-family loans were $6.2 billion and $6.0 billion in the first half of 2012 and 2011, respectively. See "RISK MANAGEMENT — Credit Risk —  *Mortgage Credit Risk — Single-Family Mortgage Credit Risk"* for further information on our single-family credit guarantee portfolio, including credit performance, charge-offs, and our non-performing assets.

The serious delinquency rate on our single-family credit guarantee portfolio was 3.45% and 3.58% as of June 30, 2012 and December 31, 2011, respectively, and declined during the first half of 2012 primarily due to a high volume of foreclosure transfers and a slowdown in new serious delinquencies. Our serious delinquency rate remains high compared to the rates we experienced in years prior to 2009, due to the continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely affected by the decline in the size of our single-family credit guarantee portfolio in the first half of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

REO operations (income) expense for the Single-family Guarantee segment was $(34) million for the second quarter of 2012, as compared to $35 million during the second quarter of 2011 and $138 million in the first half of 2012 compared to $292 million for the first half of 2011. The decline in the 2012 periods, compared to the same periods of 2011, was primarily due to improving home prices in certain geographical areas with significant REO activity, which resulted in gains on disposition of properties as well as lower write-downs of single-family REO inventory. We also experienced lower recoveries on REO properties of $85 million for the second quarter of 2012, as compared to $197 million during the second quarter of 2011 and $157 million in the first half of 2012 compared to $370 million for the first half of 2011. Lower recoveries were primarily due to lower REO property volume, reduced recoveries from mortgage insurers, and a decline in reimbursements of losses from seller/servicers associated with repurchase requests.

Our REO inventory (measured in number of properties) declined 12% from December 31, 2011 to June 30, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. Although there was an improvement in REO disposition severity during the first half of 2012, the REO disposition severity ratios on sales of our REO inventory remain high as compared to periods before 2008. We believe the volume of our single-family REO acquisitions during the first half of 2012 was less than it otherwise would have been due to: (a) the length of the foreclosure process, particularly in states that require a judicial foreclosure process; and (b) resource constraints on foreclosure activities for certain larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily*

The table below presents the Segment Earnings of our Multifamily segment.

**Table 15 — Segment Earnings and Key Metrics — Multifamily** [1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (dollars in millions) | | | |
| Segment Earnings: | | | | |
| Net interest income | $ 330 | $ 304 | $ 648 | $ 583 |
| (Provision) benefit for credit losses | 22 | 13 | 41 | 73 |
| Non-interest income (loss): | | | | |
| Management and guarantee income | 36 | 30 | 69 | 58 |
| Net impairment of available-for-sale securities recognized in earnings | (19) | (182) | (35) | (317) |
| Gains (losses) on sale of mortgage loans | 38 | 157 | 92 | 240 |
| Gains (losses) on mortgage loans recorded at fair value | (56) | (31) | 121 | 19 |
| Other non-interest income (loss) | 119 | (13) | 228 | 43 |
| Total non-interest income (loss) | 118 | (39) | 475 | 43 |
| Non-interest expense: | | | | |
| Administrative expenses | (61) | (55) | (113) | (106) |
| REO operations income (expense) | (4) | 8 | (3) | 8 |
| Other non-interest expense | (83) | (28) | (98) | (41) |
| Total non-interest expense | (148) | (75) | (214) | (139) |
| Segment Earnings before income tax benefit (expense) | 322 | 203 | 950 | 560 |
| Income tax benefit (expense) | (4) | (3) | (8) | (1) |
| Segment Earnings, net of taxes | 318 | 200 | 942 | 559 |
| Total other comprehensive income (loss), net of taxes | (156) | 405 | 744 | 1,347 |
| Comprehensive income | $ 162 | $ 605 | $ 1,686 | $ 1,906 |
| Key metrics: | | | | |
| *Balances and Volume:* | | | | |
| Average balance of Multifamily loan portfolio | $81,238 | $83,718 | $ 82,184 | $ 84,749 |
| Average balance of Multifamily guarantee portfolio | $ 41,368 | $29,014 | $ 39,007 | $ 27,163 |
| Average balance of Multifamily investment securities portfolio | $ 55,761 | $ 61,909 | $ 56,895 | $ 62,376 |
| Multifamily new loan purchase and other guarantee commitment volume | $ 6,661 | $ 4,513 | $ 12,412 | $ 7,561 |
| Multifamily units financed from new volume activity | 107,049 | 74,251 | 193,480 | 126,892 |
| Multifamily Other Guarantee Transaction issuance | $ 5,309 | $ 3,686 | $ 8,448 | $ 6,592 |
| *Yield and Rate:* | | | | |
| Net interest yield — Segment Earnings basis (annualized) | 0.96% | 0.83% | 0.93% | 0.79% |
| Average Management and guarantee fee rate, in bps (annualized) [2] | 36.2 | 43.0 | 37.4 | 44.7 |
| *Credit:* | | | | |
| Delinquency rate: | | | | |
| Credit-enhanced loans, at period end | 0.44% | 0.70% | 0.44% | 0.70% |
| Non-credit-enhanced loans, at period end | 0.19% | 0.19% | 0.19% | 0.19% |
| Total delinquency rate, at period end [3] | 0.27% | 0.31% | 0.27% | 0.31% |
| Allowance for loan losses and reserve for guarantee losses, at period end | $ 496 | $ 705 | $ 496 | $ 705 |
| Allowance for loan losses and reserve for guarantee losses, in bps | 40.4 | 62.8 | 40.4 | 62.8 |
| Credit losses, in bps (annualized) [4] | 3.8 | 7.6 | 1.9 | 5.9 |
| REO inventory, at net carrying value | $ 94 | $ 98 | $ 94 | $ 98 |
| REO inventory, at period end (number of properties) | 11 | 19 | 11 | 19 |

(1) For reconciliations of Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "NOTE 13: SEGMENT REPORTING — Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

(2) Represents Multifamily Segment Earnings — management and guarantee income, excluding prepayment and certain other fees, divided by the sum of the average balance of the multifamily guarantee portfolio and the average balance of guarantees associated with the HFA initiative, excluding certain bonds under the NIBP.

(3) See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk - Multifamily Mortgage Credit Risk*" for information on our reported multifamily delinquency rate.

(4) Calculated as the amount of multifamily credit losses divided by the sum of the average carrying value of our multifamily loan portfolio and the average balance of the multifamily guarantee portfolio, including multifamily HFA initiative guarantees.

Segment Earnings for our Multifamily segment increased to $318 million and $942 million for the three and six months ended June 30, 2012, respectively, compared to $200 million and $559 million for the three and six months ended June 30, 2011, respectively. The improvement in the 2012 periods was primarily due to lower impairment associated with available-for-sale CMBS. In addition, we recognized higher gains on mortgage loans recorded at fair value in the first half of 2012 compared to the first half of 2011.

Comprehensive income for our Multifamily segment was $162 million and $1.7 billion for the three and six months ended June 30, 2012 respectively, consisting of: (a) Segment Earnings of $318 million and $942 million, respectively; and

32

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

(b) ($156) million and $744 million, respectively, of total other comprehensive income (loss), which was mainly attributable to adverse changes in fair value of available-for-sale CMBS during the second quarter of 2012 and favorable changes in fair value during the first half of 2012.

Our multifamily loan purchase and guarantee volume increased to $6.7 billion for the second quarter of 2012, compared to $4.5 billion for the second quarter of 2011. We expect an increase in our purchase and guarantee volumes for the full-year of 2012 when compared to 2011 levels since demand for multifamily financing remains strong as historically low interest rates are encouraging borrower interest. We completed Other Guarantee Transactions of $5.3 billion and $8.4 billion in UPB of multifamily loans in the three and six months ended June 30, 2012, respectively, as compared to $3.7 billion and $6.6 billion in the three and six months ended June 30, 2011, respectively. The UPB of the total multifamily portfolio increased slightly to $177.9 billion at June 30, 2012 from $176.7 billion at December 31, 2011. During the first half of 2012, increased issuances of new guarantees were partially offset by higher liquidations.

Segment Earnings net interest income increased by $65 million, or 11%, to $648 million, in the six months ended June 30, 2012 from $583 million in the six months ended June 30, 2011, primarily due to the cumulative effect of new business volumes since 2008, which have higher yields relative to allocated funding costs. Net interest yield was 93 and 79 basis points for the six months ended June 30, 2012 and 2011, respectively.

Segment Earnings non-interest income (loss) was $118 million and $(39) million for the three months ended June 30, 2012 and 2011, respectively, and was $475 million and $43 million in the six months ended June 30, 2012 and 2011, respectively. The improvement in the second quarter and first half of 2012, compared to the same 2011 periods was primarily driven by lower security impairments on CMBS. In addition, we recognized higher gains on mortgage loans recorded at fair value in the first half of 2012 compared to the first half of 2011. Higher gains on mortgage loan fair values in the first half of 2012 reflect favorable market spread movements and higher amounts of loans held for subsequent securitization as compared to the first half of 2011. Segment Earnings gains (losses) on mortgage loans recorded at fair value are presented net of changes in fair value due to changes in interest rates.

Our Multifamily Segment Earnings management and guarantee income increased 19% in the first half of 2012 compared to the first half of 2011, reflecting the effect of an increased volume of Other Guarantee Transactions in recent periods. The average management and guarantee fee rate on our guarantee portfolio declined to 37.4 basis points for the first half of 2012 from 44.7 basis points for the first half of 2011, reflecting the effect of an increased volume of Other Guarantee Transactions, which have lower credit risk associated with our guarantee (and thus we receive a lower rate) relative to other issued guarantees because these transactions contain significant levels of credit enhancement through subordination.

Multifamily credit losses as a percentage of the combined average balance of our multifamily loan and guarantee portfolios were 3.8 and 7.6 basis points in the second quarters of 2012 and 2011, respectively. Our Multifamily segment recognized a benefit for credit losses of $22 million and $41 million in the three and six months ended June 30, 2012, respectively, compared to a benefit for credit losses of $13 million and $73 million in the three and six months ended June 30, 2011, respectively. Our loan loss reserves associated with our multifamily mortgage portfolio were $496 million and $545 million as of June 30, 2012 and December 31, 2011, respectively. The decline in our loan loss reserves in the first half of 2012 was primarily driven by an increase in property values underlying individually impaired loans.

As a result of the positive multifamily market fundamentals and our prudent underwriting standards and practices, the credit quality of the multifamily mortgage portfolio remains strong. Our portfolio performance continued to experience minimal credit losses due to low foreclosure activity and an increase in net operating income of multifamily properties in most regional areas. The delinquency rate for loans in the multifamily mortgage portfolio was 0.27% and 0.22%, as of June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012, approximately half of the multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans. We expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Multifamily Mortgage Credit Risk*" for further information about our reported multifamily delinquency rates and credit enhancements on multifamily loans. For further information on delinquencies, including geographical and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# CONSOLIDATED BALANCE SHEETS ANALYSIS

The following discussion of our consolidated balance sheets should be read in conjunction with our consolidated financial statements, including the accompanying notes. Also, see "CRITICAL ACCOUNTING POLICIES AND ESTIMATES" for information concerning certain significant accounting policies and estimates applied in determining our reported financial position.

## Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell

Cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and other liquid assets discussed in "Investments in Securities — *Non-Mortgage-Related Securities*," are important to our cash flow and asset and liability management, and our ability to provide liquidity and stability to the mortgage market. We use these assets to help manage recurring cash flows and meet our other cash management needs. We consider federal funds sold to be overnight unsecured trades executed with commercial banks that are members of the Federal Reserve System. Securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities.

The short-term assets on our consolidated balance sheets also include those related to our consolidated VIEs, which are comprised primarily of restricted cash and cash equivalents and securities purchased under agreements to resell at June 30, 2012. These short-term assets related to our consolidated VIEs increased by $0.5 billion from December 31, 2011 to June 30, 2012, primarily due to an increase in the level of refinancing activity.

Excluding amounts related to our consolidated VIEs, we held $19.2 billion and $28.4 billion of cash and cash equivalents, no federal funds sold, and $20.6 billion and $12.0 billion of securities purchased under agreements to resell at June 30, 2012 and December 31, 2011, respectively. The slight aggregate decrease in these assets was primarily driven by a decline in funding needs for debt redemptions. In addition, excluding amounts related to our consolidated VIEs, we held on average $20.5 billion and $24.1 billion of cash and cash equivalents and $21.5 billion and $23.0 billion of federal funds sold and securities purchased under agreements to resell during the three and six months ended June 30, 2012, respectively.

For information regarding our liquidity management practices and policies, see "LIQUIDITY AND CAPITAL RESOURCES."

## Investments in Securities

The table below provides detail regarding our investments in securities as of June 30, 2012 and December 31, 2011. The table does not include our holdings of single-family PCs and certain Other Guarantee Transactions as of June 30, 2012 and December 31, 2011. For information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

<div align="center">34</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16 — Investments in Securities**

| | Fair Value | |
|---|---|---|
| | June 30, 2012 | December 31, 2011 |
| | (in millions) | |
| Investments in securities: | | |
| Available-for-sale: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | $ 73,224 | $ 81,092 |
| Subprime | 25,778 | 27,999 |
| CMBS | 52,982 | 55,663 |
| Option ARM | 5,428 | 5,865 |
| Alt-A and other | 10,733 | 10,879 |
| Fannie Mae | 17,689 | 20,322 |
| Obligations of states and political subdivisions | 7,308 | 7,824 |
| Manufactured housing | 726 | 766 |
| Ginnie Mae | 230 | 249 |
| Total available-for-sale mortgage-related securities | 194,098 | 210,659 |
| Total investments in available-for-sale securities | 194,098 | 210,659 |
| Trading: | | |
| Mortgage-related securities: | | |
| Freddie Mac[1] | 13,600 | 16,047 |
| Fannie Mae | 12,546 | 15,165 |
| Ginnie Mae | 147 | 156 |
| Other | 178 | 164 |
| Total trading mortgage-related securities | 26,471 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 526 | 302 |
| Treasury bills | 900 | 100 |
| Treasury notes | 18,140 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 1,399 | 2,184 |
| Total trading non-mortgage-related securities | 20,965 | 27,298 |
| Total investments in trading securities | 47,436 | 58,830 |
| Total investments in securities | $ 241,534 | $ 269,489 |

(1)   For information on the types of instruments that are included, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report.

*Non-Mortgage-Related Securities*

Our investments in non-mortgage-related securities provide an additional source of liquidity. We held investments in non-mortgage-related securities classified as trading of $21.0 billion and $27.3 billion as of June 30, 2012 and December 31, 2011, respectively. While balances of these securities may fluctuate from period to period, we continue to meet required liquidity and contingency levels.

*Mortgage-Related Securities*

Our investments in mortgage-related securities consist of securities issued by Fannie Mae, Ginnie Mae, and other financial institutions. We also invest in our own mortgage-related securities. However, the single-family PCs and certain Other Guarantee Transactions we purchase as investments are not accounted for as investments in securities because we recognize the underlying mortgage loans on our consolidated balance sheets through consolidation of the related trusts.

The table below provides the UPB of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets. The table below does not include our holdings of our own single-family PCs and certain Other Guarantee Transactions. For further information on our holdings of such securities, see "Table 11 — Composition of Segment Mortgage Portfolios and Credit Risk Portfolios."

35

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Fixed Rate | Variable Rate [1] | Total | Fixed Rate | Variable Rate [1] | Total |
| | (in millions) | | | | | |
| Freddie Mac mortgage-related securities: [2] | | | | | | |
| Single-family | $ 63,110 | $ 10,883 | $ 73,993 | $ 72,795 | $ 9,753 | $ 82,548 |
| Multifamily | 943 | 1,690 | 2,633 | 1,216 | 1,792 | 3,008 |
| Total Freddie Mac mortgage-related securities | 64,053 | 12,573 | 76,626 | 74,011 | 11,545 | 85,556 |
| Non-Freddie Mac mortgage-related securities: | | | | | | |
| Agency securities: [3] | | | | | | |
| Fannie Mae: | | | | | | |
| Single-family | 13,517 | 14,105 | 27,622 | 16,543 | 15,998 | 32,541 |
| Multifamily | 37 | 67 | 104 | 52 | 76 | 128 |
| Ginnie Mae: | | | | | | |
| Single-family | 231 | 97 | 328 | 253 | 104 | 357 |
| Multifamily | 15 | — | 15 | 16 | — | 16 |
| Total Non-Freddie Mac agency securities | 13,800 | 14,269 | 28,069 | 16,864 | 16,178 | 33,042 |
| Non-agency mortgage-related securities: | | | | | | |
| Single-family: [4] | | | | | | |
| Subprime | 327 | 46,336 | 46,663 | 336 | 48,696 | 49,032 |
| Option ARM | — | 12,958 | 12,958 | — | 13,949 | 13,949 |
| Alt-A and other | 1,959 | 13,849 | 15,808 | 2,128 | 14,662 | 16,790 |
| CMBS | 18,519 | 32,087 | 50,606 | 19,735 | 34,375 | 54,110 |
| Obligations of states and political subdivisions [5] | 7,142 | 21 | 7,163 | 7,771 | 22 | 7,793 |
| Manufactured housing | 777 | 132 | 909 | 831 | 129 | 960 |
| Total non-agency mortgage-related securities [6] | 28,724 | 105,383 | 134,107 | 30,801 | 111,833 | 142,634 |
| Total UPB of mortgage-related securities | $106,577 | $132,225 | 238,802 | $121,676 | $139,556 | 261,232 |
| Premiums, discounts, deferred fees, impairments of UPB and other basis adjustments | | | (12,664) | | | (12,363) |
| Net unrealized (losses) on mortgage-related securities, pre-tax | | | (5,569) | | | (6,678) |
| Total carrying value of mortgage-related securities | | | $220,569 | | | $242,191 |

(1) Variable-rate mortgage-related securities include those with a contractual coupon rate that, prior to contractual maturity, is either scheduled to change or is subject to change based on changes in the composition of the underlying collateral.

(2) When we purchase REMICs and Other Structured Securities and certain Other Guarantee Transactions that we have issued, we account for these securities as investments in debt securities as we are investing in the debt securities of a non-consolidated entity. We do not consolidate our resecuritization trusts since we are not deemed to be the primary beneficiary of such trusts. We are subject to the credit risk associated with the mortgage loans underlying our Freddie Mac mortgage-related securities. Mortgage loans underlying our issued single-family PCs and certain Other Guarantee Transactions are recognized on our consolidated balance sheets as held-for-investment mortgage loans, at amortized cost. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for further information.

(3) Agency securities are generally not separately rated by nationally recognized statistical rating organizations, but have historically been viewed as having a level of credit quality at least equivalent to non-agency mortgage-related securities AAA-rated or equivalent.

(4) For information about how these securities are rated, see "Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS."

(5) Consists of housing revenue bonds. Approximately 36% and 37% of these securities held at June 30, 2012 and December 31, 2011, respectively, were AAA-rated as of those dates, based on the UPB and the lowest rating available.

(6) Credit ratings for most non-agency mortgage-related securities are designated by no fewer than two nationally recognized statistical rating organizations. Approximately 21% of total non-agency mortgage-related securities held at both June 30, 2012 and December 31, 2011 were AAA-rated as of those dates, based on the UPB and the lowest rating available.

36                                                                                                      *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides the UPB and fair value of our investments in mortgage-related securities classified as available-for-sale or trading on our consolidated balance sheets.

**Table 18 — Additional Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets**

| | June 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Fair Value | UPB | Fair Value |
| | (in millions) | | | |
| Agency pass-through securities[1] | $ 20,583 | $ 22,346 | $ 24,283 | $ 26,193 |
| Agency REMICs and Other Structured Securities: | | | | |
| Interest-only securities[2] | — | 2,371 | — | 2,863 |
| Principal-only securities[3] | 2,965 | 2,815 | 3,569 | 3,344 |
| Inverse floating-rate securities[4] | 4,005 | 5,675 | 4,839 | 6,826 |
| Other Structured Securities | 77,142 | 84,229 | 85,907 | 93,805 |
| Total agency securities | 104,695 | 117,436 | 118,598 | 133,031 |
| Non-agency securities[5] | 134,107 | 103,133 | 142,634 | 109,160 |
| Total mortgage-related securities | $238,802 | $ 220,569 | $261,232 | $ 242,191 |

(1)  Represents an undivided beneficial interest in trusts that hold pools of mortgages.
(2)  Represents securities where the holder receives only the interest cash flows.
(3)  Represents securities where the holder receives only the principal cash flows.
     Additionally, these securities receive a portion of principal cash flows associated with the underlying collateral.
(4)  Represents securities where the holder receives interest cash flows that change inversely with the reference rate (i.e., higher cash flows when interest rates are low and lower cash flows when interest rates are high).
(5)  Includes fair values of $3 million and $2 million of interest-only securities at June 30, 2012 and December 31, 2011, respectively.

The total UPB of our investments in mortgage-related securities on our consolidated balance sheets decreased from $261.2 billion at December 31, 2011 to $238.8 billion at June 30, 2012, while the fair value of these investments decreased from $242.2 billion at December 31, 2011 to $220.6 billion at June 30, 2012. The reduction in UPB resulted from our purchase activity remaining less than liquidations, consistent with our efforts to reduce the size of our mortgage-related investments portfolio, as described in "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio."

The table below summarizes our mortgage-related securities purchase activity for the three and six months ended June 30, 2012 and 2011. The purchase activity includes single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated. Our purchases of single-family PCs and certain Other Guarantee Transactions issued by trusts that we consolidated are recorded as an extinguishment of debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

TREASURY-4123

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 19 — Mortgage-Related Securities Purchase Activity**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Non-Freddie Mac mortgage-related securities purchased for resecuritization: | | | | |
| Ginnie Mae Certificates | $ — | $ 56 | $ 5 | $ 72 |
| Non-agency mortgage-related securities purchased for Other Guarantee Transactions | 5,309 | 3,633 | 8,433 | 6,512 |
| Total non-Freddie Mac mortgage-related securities purchased for resecuritization | 5,309 | 3,689 | 8,438 | 6,584 |
| Non-Freddie Mac mortgage-related securities purchased as investments in securities: | | | | |
| Agency securities: | | | | |
| *Fannie Mae:* | | | | |
| Fixed-rate | — | 2,181 | — | 3,200 |
| Variable-rate | — | 60 | 50 | 228 |
| *Total agency securities* | — | 2,241 | 50 | 3,428 |
| Non-agency mortgage-related securities: | | | | |
| *CMBS:* | | | | |
| Fixed-rate | 10 | 14 | 10 | 14 |
| Variable-rate | 25 | 46 | 35 | 46 |
| *Total non-agency mortgage-related securities* | 35 | 60 | 45 | 60 |
| *Total non-Freddie Mac mortgage-related securities purchased as investments in securities* | 35 | 2,301 | 95 | 3,488 |
| Total non-Freddie Mac mortgage-related securities purchased | $ 5,344 | $ 5,990 | $ 8,533 | $10,072 |
| Freddie Mac mortgage-related securities purchased: | | | | |
| *Single-family:* | | | | |
| Fixed-rate | $ 9,001 | $ 24,304 | $12,466 | $60,983 |
| Variable-rate | 3,003 | 462 | 3,135 | 3,004 |
| *Multifamily:* | | | | |
| Fixed-rate | 39 | 26 | 39 | 51 |
| Variable-rate | — | 65 | — | 65 |
| *Total Freddie Mac mortgage-related securities purchased* | $12,043 | $24,857 | $15,640 | $64,103 |

(1) Based on UPB. Excludes mortgage-related securities traded but not yet settled

During the three and six months ended June 30, 2012, we reduced our participation in dollar roll transactions, which were primarily used to support the market and pricing of our PCs, as compared to the three and six months ended June 30, 2011. Our purchases during the three and six months ended June 30, 2011 reflected in "Table 19 — Mortgage-Related Securities Purchase Activity" are attributed primarily to dollar roll transactions. When these transactions involve our consolidated PC trusts, the purchase and sale represents an extinguishment and issuance of debt securities, respectively, and impacts our net interest income and recognition of gain or loss on the extinguishment of debt on our consolidated statements of comprehensive income. These transactions can cause short-term fluctuations in the balance of our mortgage-related investments portfolio. For more information, see "BUSINESS — Our Business Segments — *Investments Segment — PC Support Activities*" and "RISK FACTORS — Competitive and Market Risks — *Any decline in the price performance of or demand for our PCs could have an adverse effect on the volume and profitability of our new single-family guarantee business*" in our 2011 Annual Report.

*Unrealized Losses on Available-For-Sale Mortgage-Related Securities*

At June 30, 2012, our gross unrealized losses, pre-tax, on available-for-sale mortgage-related securities were $18.7 billion, compared to $20.1 billion at December 31, 2011. The decrease was primarily due to fair value gains related to: (a) the movement of our single-family non-agency mortgage-related securities with unrealized losses towards maturity; and (b) the impact of declining rates, partially offset by the impact of widening OAS levels on our single-family non-agency mortgage-related securities. We believe the unrealized losses related to these securities at June 30, 2012 were mainly attributable to poor underlying collateral performance, limited liquidity and large risk premiums in the market for residential non-agency mortgage-related securities. All available-for-sale securities in an unrealized loss position are evaluated to determine if the impairment is other-than-temporary. See "Total Equity (Deficit)" and "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding unrealized losses on our available-for-sale securities.

*Freddie Mac*

TREASURY-4124

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Higher-Risk Components of Our Investments in Mortgage-Related Securities*

As discussed below, we have exposure to subprime, option ARM, interest-only, and Alt-A and other loans as part of our investments in mortgage-related securities as follows:

- *Single-family non-agency mortgage-related securities*: We hold non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans.

- *Single-family Freddie Mac mortgage-related securities*: We hold certain Other Guarantee Transactions as part of our investments in securities. There are subprime and option ARM loans underlying some of these Other Guarantee Transactions. For more information on single-family loans with certain higher-risk characteristics underlying our issued securities, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*."

*Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, and Alt-A Loans*

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. Since the first quarter of 2008, we have not purchased any non-agency mortgage-related securities backed by subprime, option ARM, or Alt-A loans. The two tables below present information about our holdings of available-for-sale non-agency mortgage-related securities backed by subprime, option ARM and Alt-A loans.

**Table 20 — Non-Agency Mortgage-Related Securities Backed by Subprime First Lien, Option ARM, and Alt-A Loans and Certain Related Credit Statistics** [1]

| | As of | | | | |
|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (dollars in millions) | | | | |
| UPB: | | | | | |
| Subprime first lien [2] | $ 46,306 | $ 47,478 | $ 48,644 | $ 49,794 | $ 51,070 |
| Option ARM | 12,958 | 13,508 | 13,949 | 14,351 | 14,778 |
| Alt-A [3] | 13,471 | 13,885 | 14,260 | 14,643 | 15,059 |
| Gross unrealized losses, pre-tax: [4] | | | | | |
| Subprime first lien [2] | $ 12,810 | $ 12,661 | $ 13,401 | $ 14,132 | $ 13,764 |
| Option ARM | 2,997 | 2,909 | 3,169 | 3,216 | 3,099 |
| Alt-A [3] | 2,082 | 2,094 | 2,612 | 2,468 | 2,171 |
| Present value of expected future credit losses: [5] | | | | | |
| Subprime first lien [2] | $ 6,571 | $ 7,325 | $ 6,746 | $ 5,414 | $ 6,487 |
| Option ARM | 3,296 | 3,908 | 4,251 | 4,434 | 4,767 |
| Alt-A [3] | 1,956 | 2,237 | 2,235 | 2,204 | 2,310 |
| Collateral delinquency rate: [6] | | | | | |
| Subprime first lien [2] | 40% | 42% | 42% | 42% | 42% |
| Option ARM | 42 | 43 | 44 | 44 | 44 |
| Alt-A [3] | 24 | 25 | 25 | 25 | 26 |
| Average credit enhancement: [7] | | | | | |
| Subprime first lien [2] | 19% | 20% | 21% | 22% | 23% |
| Option ARM | 5 | 6 | 7 | 8 | 10 |
| Alt-A [3] | 5 | 6 | 7 | 7 | 8 |
| Cumulative collateral loss: [8] | | | | | |
| Subprime first lien [2] | 24% | 23% | 2.2% | 21% | 20% |
| Option ARM | 19 | 18 | 17 | 16 | 15 |
| Alt-A [3] | 9 | 9 | 8 | 8 | 7 |

(1) See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.

(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.

(3) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.

(4) Represents the aggregate of the amount by which amortized cost, after other-than-temporary impairments, exceeds fair value measured at the individual lot level.

(5) Represents our estimate of the present value of future contractual cash flows that we do not expect to collect, discounted at the effective interest rate implicit in the security's contractual yield based on the initial acquisition cost. This discount rate is only utilized to analyze the cumulative credit deterioration for securities since acquisition and may be lower than the discount rate used to measure ongoing other-than-temporary impairment to be recognized in earnings for securities that have experienced a significant improvement in expected cash flows since the last recognition of other-than-temporary impairment recognized in earnings.

(6) Determined based on the number of loans that are two monthly payments or more past due that underlie the securities using information obtained from a third-party data provider.

(7) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement.

(8) Based on the actual losses incurred on the collateral underlying these securities. Actual losses on the securities that we hold are significantly less than the losses on the underlying collateral as presented in this table, as non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements.

TREASURY-4125

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For purposes of our cumulative credit deterioration analysis, our estimate of the present value of expected future credit losses on our non-agency mortgage-related securities decreased to $12.8 billion at June 30, 2012 from $14.2 billion at March 31, 2012. All of these amounts have been reflected in our net impairment of available-for-sale securities recognized in earnings in this period or prior periods. The decrease in the present value of expected future credit losses was primarily due to: (a) the impact of declining forward interest rates resulting in a benefit from expected structural credit enhancements; and (b) improvements in forecasted home prices over the expected life of the securities. These factors were partially offset by an increase in expected loss severities resulting from lengthy foreclosure timelines.

The investments in non-agency mortgage-related securities we hold backed by subprime, option ARM, and Alt-A loans were structured to include credit enhancements, particularly through subordination and other structural enhancements. Bond insurance is an additional credit enhancement covering some of the non-agency mortgage-related securities. These credit enhancements are the primary reason we expect our actual losses, through principal or interest shortfalls, to be less than the underlying collateral losses in the aggregate. During the three and six months ended June 30, 2012, we continued to experience the erosion of structural credit enhancements on many securities backed by subprime, option ARM, and Alt-A loans due to poor performance of the underlying collateral. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk* — *Bond Insurers*."

### Table 21 — Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans [1]

| | Three Months Ended | | | | |
| --- | --- | --- | --- | --- | --- |
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in millions) | | | | |
| Principal repayments and cash shortfalls: [2] | | | | | |
| Subprime: | | | | | |
| Principal repayments | $ 1,180 | $ 1,175 | $ 1,159 | $ 1,287 | $ 1,341 |
| Principal cash shortfalls | 7 | 6 | 7 | 6 | 10 |
| Option ARM: | | | | | |
| Principal repayments | $ 300 | $ 272 | $ 298 | $ 318 | $ 331 |
| Principal cash shortfalls | 234 | 169 | 103 | 109 | 123 |
| Alt-A and other: | | | | | |
| Principal repayments | $ 405 | $ 374 | $ 385 | $ 425 | $ 464 |
| Principal cash shortfalls | 106 | 97 | 80 | 81 | 84 |

(1)   See "*Ratings of Non-Agency Mortgage-Related Securities*" for additional information about these securities.
(2)   In addition to the contractual interest payments, we receive monthly remittances of principal repayments from both the recoveries of liquidated loans and, to a lesser extent, voluntary repayments of the underlying collateral of these securities representing a partial return of our investment in these securities.

Since the beginning of 2007, we have incurred actual principal cash shortfalls of $2.1 billion on impaired non-agency mortgage-related securities, of which $339 million and $614 million related to the three and six months ended June 30, 2012, respectively. Many of the trusts that issued non-agency mortgage-related securities we hold were structured so that realized collateral losses in excess of structural credit enhancements are not passed on to investors until the investment matures. We currently estimate that the future expected principal and interest shortfalls on non-agency mortgage-related securities we hold will be significantly less than the fair value declines experienced on these securities.

*Other-Than-Temporary Impairments on Available-For-Sale Mortgage-Related Securities*

The table below provides information about the mortgage-related securities for which we recognized other-than-temporary impairments in earnings.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 22 — Net Impairment of Available-For-Sale Mortgage-Related Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | | |
| | Three Months Ended | | | | |
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 |
| | (in millions) | | | | |
| Subprime:[1] | | | | | |
| 2006 & 2007 | $ 51 | $ 433 | $ 472 | $ 29 | $ 67 |
| Other years | 7 | 8 | 8 | 2 | 3 |
| Total subprime | 58 | 441 | 480 | 31 | 70 |
| Option ARM: | | | | | |
| 2006 & 2007 | 18 | 32 | 40 | 15 | 43 |
| Other years | — | 16 | 19 | 4 | 22 |
| Total option ARM | 18 | 48 | 59 | 19 | 65 |
| Alt-A: | | | | | |
| 2006 & 2007 | — | 16 | 22 | 29 | 16 |
| Other years | 1 | 36 | 21 | 10 | 15 |
| Total Alt-A | 1 | 52 | 43 | 39 | 31 |
| Other loans | 1 | 5 | 3 | 41 | 1 |
| Total subprime, option ARM, Alt-A and other loans | 78 | 546 | 585 | 130 | 167 |
| CMBS | 19 | 16 | 8 | 27 | 183 |
| Manufactured housing | 1 | 2 | 2 | 4 | 2 |
| Total available-for-sale mortgage-related securities | $ 98 | $ 564 | $ 595 | $ 161 | $ 352 |

(1) Includes all first and second liens.

We recorded net impairment of available-for-sale mortgage-related securities recognized in earnings of $98 million and $662 million during the three and six months ended June 30, 2012, respectively, compared to $352 million and $1.5 billion during the three and six months ended June 30, 2011, respectively. We recorded these impairments because our estimate of the present value of expected future credit losses on certain individual securities increased during the period. These impairments include $78 million and $624 million related to securities backed by subprime, option ARM, and Alt-A and other loans during the three and six months ended June 30, 2012, respectively, compared to $167 million and $1.2 billion during the three and six months ended June 30, 2011, respectively. During the three months ended June 30, 2011, we recognized the unrealized fair value losses of $154 million related to three investments in CMBS as a net impairment of available-for-sale securities recognized in earnings because we had the intent to sell these securities prior to the recovery of the unrealized losses. We did not recognize any net impairment of available-for-sale securities in earnings during the three months ended June 30, 2012 as a result of an intent to sell available-for-sale securities prior to the recovery of the unrealized losses. For more information, see "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-for-Sale Securities."

While it is reasonably possible that collateral losses on our available-for-sale mortgage-related securities where we have not recorded an impairment charge in earnings could exceed our credit enhancement levels, we do not believe that those conditions were likely at June 30, 2012. Based on our conclusion that we do not intend to sell our remaining available-for-sale mortgage-related securities in an unrealized loss position and it is not more likely than not that we will be required to sell these securities before a sufficient time to recover all unrealized losses and our consideration of other available information, we have concluded that the reduction in fair value of these securities was temporary at June 30, 2012 and have recorded these unrealized losses in AOCI.

The credit performance of loans underlying our holdings of non-agency mortgage-related securities has declined since 2007. This decline has been particularly severe for subprime, option ARM, and Alt-A and other loans. Economic factors negatively impacting the performance of our investments in non-agency mortgage-related securities include high unemployment, a large inventory of seriously delinquent mortgage loans and unsold homes, tight credit conditions, and weak consumer confidence during recent years. In addition, subprime, option ARM, and Alt-A and other loans backing the securities we hold have significantly greater concentrations in the states that are undergoing the greatest economic stress, such as California and Florida. Loans in these states undergoing economic stress are more likely to become seriously delinquent and the credit losses associated with such loans are likely to be higher than in other states.

We rely on bond insurance, including secondary coverage, to provide credit protection on some of our investments in non-agency mortgage-related securities. We have determined that there is substantial uncertainty surrounding certain bond insurers' ability to pay our future claims on expected credit losses related to our non-agency mortgage-related security

41

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

investments. This uncertainty contributed to the impairments recognized in earnings during the three and six months ended June 30, 2012 and 2011. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Bond Insurers*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

Our assessments concerning other-than-temporary impairment require significant judgment and the use of models, and are subject to potentially significant change as conditions evolve. In addition, changes in the performance of the individual securities and in mortgage market conditions may also affect our impairment assessments. Depending on the structure of the individual mortgage-related security and our estimate of collateral losses relative to the amount of credit support expected to be available for the tranches we own, a change in collateral loss estimates can have a disproportionate impact on the loss estimate for the security. Additionally, servicer performance, loan modification programs and backlogs, bankruptcy reform and other forms of government intervention in the housing market can significantly affect the performance of these securities, including the timing of loss recognition of the underlying loans and thus the timing of losses we recognize on our securities. Impacts related to changes in interest rates may also affect our losses due to the structural credit enhancements on our investments in non-agency mortgage-related securities. The lengthening of the foreclosure timelines that has occurred in recent years can also affect our losses. For example, while defaulted loans remain in the trusts prior to completion of the foreclosure process, the subordinate classes of securities issued by the securitization trusts may continue to receive interest payments, rather than absorbing default losses. This may reduce the amount of funds available for the tranches we own. Given the extent of the housing and economic downturn, it is difficult to estimate the future performance of mortgage loans and mortgage-related securities with high assurance, and actual results could differ materially from our expectations. Furthermore, various market participants could arrive at materially different conclusions regarding estimates of future cash shortfalls.

For more information on risks associated with the use of models, see "RISK FACTORS — Operational Risks — *We face risks and uncertainties associated with the internal models that we use for financial accounting and reporting purposes, to make business decisions, and to manage risks. Market conditions have raised these risks and uncertainties*" in our 2011 Annual Report. For more information on how the lengthening of foreclosure timelines could adversely affect the values of, and the losses on, the non-agency mortgage-related securities we hold, see "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report.

For information regarding our efforts to mitigate losses on our investments in non-agency mortgage-related securities, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk.*"

*Ratings of Non-Agency Mortgage-Related Securities*

The table below shows the ratings of non-agency mortgage-related securities backed by subprime, option ARM, Alt-A and other loans, and CMBS held at June 30, 2012 based on their ratings as of June 30, 2012, as well as those held at December 31, 2011 based on their ratings as of December 31, 2011 using the lowest rating available for each security.

<div align="center">42</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 23 — Ratings of Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans, and CMBS**

| Credit Ratings as of June 30, 2012 | UPB | Percentage of UPB | Amortized Cost | Gross Unrealized Losses | Bond Insurance Coverage (1) |
|---|---|---|---|---|---|
| | | | (dollars in millions) | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 401 | 1% | $ 401 | $ (47) | $ 18 |
| Other investment grade | 2,289 | 5 | 2,289 | (280) | 376 |
| Below investment grade (2) | 43,973 | 94 | 35,842 | (12,488) | 1,559 |
| Total | $ 46,663 | 100% | $ 38,532 | $ (12,815) | $ 1,953 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 49 | — | 49 | (4) | 49 |
| Below investment grade (2) | 12,909 | 100 | 8,371 | (2,993) | 16 |
| Total | $ 12,958 | 100% | $ 8,420 | $ (2,997) | $ 65 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 73 | —% | $ 74 | $ (4) | $ 6 |
| Other investment grade | 2,181 | 14 | 2,197 | (271) | 282 |
| Below investment grade (2) | 13,554 | 86 | 10,582 | (1,954) | 1,996 |
| Total | $ 15,808 | 100% | $ 12,853 | $ (2,229) | $ 2,284 |
| **CMBS:** | | | | | |
| AAA-rated | $ 24,846 | 49% | $ 24,882 | $ (9) | $ 42 |
| Other investment grade | 22,876 | 45 | 22,826 | (156) | 1,582 |
| Below investment grade (2) | 2,884 | 6 | 2,781 | (375) | 1,692 |
| Total | $ 50,606 | 100% | $ 50,489 | $ (540) | $ 3,316 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 25,320 | 20% | $ 25,357 | $ (60) | $ 66 |
| Other investment grade | 27,395 | 22 | 27,361 | (711) | 2,289 |
| Below investment grade (2) | 73,320 | 58 | 57,576 | (17,810) | 5,263 |
| Total | $ 126,035 | 100% | $ 110,294 | $ (18,581) | $ 7,618 |
| Total investments in mortgage-related securities | $238,802 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 53% | | | | |
| **Credit Ratings as of December 31, 2011** | | | | | |
| **Subprime loans:** | | | | | |
| AAA-rated | $ 1,000 | 2% | $ 1,000 | $ (115) | $ 23 |
| Other investment grade | 2,643 | 5 | 2,643 | (399) | 383 |
| Below investment grade (2) | 45,389 | 93 | 37,704 | (12,894) | 1,641 |
| Total | $ 49,032 | 100% | $ 41,347 | $ (13,408) | $ 2,047 |
| **Option ARM loans:** | | | | | |
| AAA-rated | $ — | —% | $ — | $ — | $ — |
| Other investment grade | 76 | 1 | 76 | (8) | 76 |
| Below investment grade (2) | 13,873 | 99 | 8,943 | (3,161) | 39 |
| Total | $ 13,949 | 100% | $ 9,019 | $ (3,169) | $ 115 |
| **Alt-A and other loans:** | | | | | |
| AAA-rated | $ 350 | 2% | $ 348 | $ (20) | $ 6 |
| Other investment grade | 2,237 | 13 | 2,260 | (371) | 310 |
| Below investment grade (2) | 14,203 | 85 | 11,053 | (2,421) | 2,139 |
| Total | $ 16,790 | 100% | $ 13,661 | $ (2,812) | $ 2,455 |
| **CMBS:** | | | | | |
| AAA-rated | $ 25,499 | 47% | $ 25,540 | $ (22) | $ 42 |
| Other investment grade | 25,421 | 47 | 25,394 | (346) | 1,585 |
| Below investment grade (2) | 3,190 | 6 | 2,851 | (180) | 1,697 |
| Total | $ 54,110 | 100% | $ 53,785 | $ (548) | $ 3,324 |
| **Total subprime, option ARM, Alt-A and other loans, and CMBS:** | | | | | |
| AAA-rated | $ 26,849 | 20% | $ 26,888 | $ (157) | $ 71 |
| Other investment grade | 30,377 | 23 | 30,373 | (1,124) | 2,354 |
| Below investment grade (2) | 76,655 | 57 | 60,551 | (18,656) | 5,516 |
| Total | $ 133,881 | 100% | $ 117,812 | $ (19,937) | $ 7,941 |
| Total investments in mortgage-related securities | $261,232 | | | | |
| Percentage of subprime, option ARM, Alt-A and other loans, and CMBS of total investments in mortgage-related securities | 51% | | | | |

(1)    Represents the amount of UPB covered by bond insurance. This amount does not represent the maximum amount of losses we could recover, as the bond insurance also covers interest.

(2)    Includes securities with S&P equivalent credit ratings below BBB– and certain securities that are no longer rated.

43

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage Loans**

The UPB of mortgage loans on our consolidated balance sheets declined to $1.76 trillion as of June 30, 2012, from $1.82 trillion as of December 31, 2011. This decline reflects that the amount of single-family loan liquidations has exceeded new loan purchase and guarantee activity, which we believe is due, in part, to declines in the amount of single-family mortgage debt outstanding in the market and our competitive position compared to other market participants.

The UPB of unsecuritized single-family mortgage loans declined by $19.2 billion to $152.5 billion at June 30, 2012, from $171.7 billion at December 31, 2011, primarily due to: (a) loan prepayments, foreclosure transfers, and foreclosure alternative activities; and (b) securitizations of loans through our PC cash auction process.

Based on the amount of the recorded investment of single-family loans on our consolidated balance sheets, approximately $67.2 billion, or 4.0%, of these loans as of June 30, 2012 were seriously delinquent, as compared to $72.4 billion, or 4.2%, as of December 31, 2011. This decline was primarily due to modifications, foreclosure transfers, and short sale activity. The majority of these seriously delinquent loans are unsecuritized, and were removed by us from our PC trusts. As guarantor, we have the right to remove mortgages that back our PCs from the underlying loan pools under certain circumstances. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for more information on our removal of single-family loans from PC trusts.

The UPB of unsecuritized multifamily mortgage loans was $79.6 billion at June 30, 2012 and $82.3 billion at December 31, 2011. Our multifamily loan activity during the six months ended June 30, 2012 primarily consisted of purchases of loans intended for securitization and subsequent sale through Other Guarantee Transactions. To pursue our primary multifamily business strategy, we expect to continue to purchase and then securitize multifamily loans, which provides liquidity for the multifamily market, supports affordability for multifamily rental housing, and helps us manage our credit risks.

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. Collectively, we refer to our allowance for loan losses and our reserve for guarantee losses as our loan loss reserves. Our loan loss reserves were $35.8 billion and $39.5 billion at June 30, 2012 and December 31, 2011, respectively, including $35.3 billion and $38.9 billion, respectively, related to single-family loans. At June 30, 2012 and December 31, 2011, our loan loss reserves, as a percentage of our total mortgage portfolio, excluding non-Freddie Mac securities, were 1.9% and 2.1%, respectively, and as a percentage of the UPB associated with our non-performing loans were 29.5% and 32.0%, respectively. Our loan loss reserves declined during the first half of 2012 primarily due to continued high levels of charge-offs during the period combined with lower aggregate delinquent loan balances within our single-family guarantee portfolio at June 30, 2012 than at December 31, 2011. During the first half of 2012 we experienced improvements in both single-family borrower payment performance and in current LTV ratios for single-family loans. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further detail about the mortgage loans and associated allowance for loan losses recorded on our consolidated balance sheets.

The table below summarizes our mortgage purchase and other guarantee commitment issuances. This activity consists of: (a) mortgage loans underlying consolidated single-family PCs issued in the period (regardless of whether such securities are held by us or third parties); (b) single-family and multifamily mortgage loans purchased, but not securitized, in the period; and (c) mortgage loans underlying our mortgage-related financial guarantees issued in the period, which are not consolidated on our balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 24 — Mortgage Loan Purchases and Other Guarantee Commitment Issuances** [1]

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total | UPB Amount | % of Total |
|---|---|---|---|---|---|---|---|---|
| | (dollars in millions) | | | | | | | |
| Mortgage loan purchases and guarantee issuances: | | | | | | | | |
| Single-family: | | | | | | | | |
| 30-year or more amortizing fixed-rate | $55,827 | 59% | $40,345 | 60% | $117,674 | 57% | $103,243 | 61% |
| 20-year amortizing fixed-rate | 6,260 | 7 | 3,315 | 5 | 14,670 | 7 | 10,030 | 6 |
| 15-year amortizing fixed-rate | 22,162 | 23 | 13,001 | 19 | 51,736 | 25 | 35,111 | 21 |
| Adjustable-rate [2] | 4,312 | 4 | 6,125 | 9 | 9,464 | 5 | 11,866 | 7 |
| FHA/VA and other governmental | 89 | <1 | 117 | <1 | 179 | <1 | 204 | <1 |
| Total single-family [3] | 88,650 | 93 | 62,903 | 93 | 193,723 | 94 | 160,454 | 95 |
| Multifamily | 6,661 | 7 | 4,512 | 7 | 12,412 | 6 | 7,561 | 5 |
| Total mortgage loan purchases and other guarantee commitment issuances [4] | $95,311 | 100% | $67,415 | 100% | $206,135 | 100% | $168,015 | 100% |
| Percentage of mortgage purchases and other guarantee commitment issuances with credit enhancements [5] | 11% | | 9% | | 10% | | 8% | |

(1) Based on UPB. Excludes mortgage loans traded but not yet settled. Excludes the removal of seriously delinquent loans and balloon/reset mortgages out of PC trusts. Includes other guarantee commitments associated with mortgage loans. See endnote (4) for further information.
(2) Includes amortizing ARMs with 1-, 3-, 5-, 7-, and 10-year initial fixed-rate periods. We did not purchase any option ARM loans during the six months ended June 30, 2012 or 2011.
(3) Includes $14.4 billion and $13.3 billion of mortgage loans in excess of $417,000, which we refer to as conforming jumbo mortgages, for the six month ended June 30, 2012 and 2011, respectively.
(4) Includes issuances of other guarantee commitments on single-family loans of $4.1 billion and $2.5 billion and issuances of other guarantee commitments on multifamily loans of $1.6 billion and $0.4 billion during the six months ended June 30, 2012 and 2011, respectively.
(5) See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for further details on credit enhancement of mortgage loans in our multifamily mortgage and single-family credit guarantee portfolios.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk*" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio" for information about mortgage loans in our single-family credit guarantee portfolio that we believe have higher-risk characteristics.

**Derivative Assets and Liabilities, Net**

The composition of our derivative portfolio changes from period to period as a result of derivative purchases, terminations, or assignments prior to contractual maturity, and expiration of the derivatives at their contractual maturity. We classify net derivative interest receivable or payable, trade/settle receivable or payable, and cash collateral held or posted on our consolidated balance sheets in derivative assets, net and derivative liabilities, net. See "NOTE 10: DERIVATIVES" for additional information regarding our derivatives.

The table below shows the fair value for each derivative type, the weighted average fixed rate of our pay-fixed and receive-fixed swaps, and the maturity profile of our derivative positions reconciled to the amounts presented on our consolidated balance sheets as of June 30, 2012. A positive fair value in the table below for each derivative type is the estimated amount, prior to netting by counterparty, that we would be entitled to receive if the derivatives of that type were terminated. A negative fair value for a derivative type is the estimated amount, prior to netting by counterparty, that we would owe if the derivatives of that type were terminated.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
TREASURY-4131
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 25 — Derivative Fair Values and Maturities**

| | | | | June 30, 2012 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Fair Value [1] | | |
| | Notional or Contractual Amount [2] | Total Fair Value [3] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | | | (dollars in millions) | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 249,498 | $ 13,480 | $ 115 | $ 833 | $ 3,813 | $ 8,719 |
| Weighted average fixed rate [4] | | | 2.09% | 1.02% | 1.99% | 2.84% |
| Forward-starting swaps [5] | 10,930 | 1,347 | —% | —% | —% | 1,347 |
| Weighted average fixed rate [4] | | | —% | —% | —% | 3.79% |
| Total receive-fixed | 260,428 | 14,827 | 115 | 833 | 3,813 | 10,066 |
| Basis (floating to floating) | 2,350 | 4 | (1) | — | 5 | — |
| Pay-fixed: | | | | | | |
| Swaps | 275,951 | (32,685) | (29) | (2,584) | (5,366) | (24,706) |
| Weighted average fixed rate [4] | | | 0.85% | 2.92% | 2.86 % | 3.68% |
| Forward-starting swaps [5] | 16,709 | (2,041) | —% | —% | —% | (2,041) |
| Weighted average fixed rate [4] | | | —% | —% | —% | 3.35% |
| Total pay-fixed | 292,660 | (34,726) | (29) | (2,584) | (5,366) | (26,747) |
| Total interest-rate swaps | 555,438 | (19,895) | 85 | (1,751) | (1,548) | (16,681) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 48,500 | 9,616 | 2,579 | 4,182 | 260 | 2,595 |
| Written | 6,195 | (789) | — | (789) | — | — |
| Put swaptions | | | | | | |
| Purchased | 45,050 | 334 | 1 | 29 | 48 | 256 |
| Written | 250 | (1) | (1) | — | — | — |
| Other option-based derivatives [6] | 33,492 | 2,399 | — | — | — | 2,399 |
| Total option-based | 133,487 | 11,559 | 2,579 | 3,422 | 308 | 5,250 |
| Futures | 39,938 | (6) | (6) | — | — | — |
| Foreign-currency swaps | 1,123 | 28 | 27 | 1 | — | — |
| Commitments | 13,032 | 35 | 35 | — | — | — |
| Swap guarantee derivatives | 3,622 | (36) | — | (1) | (1) | (34) |
| Subtotal | 746,640 | (8,315) | $ 2,720 | $ 1,671 | $ (1,241) | $(11,465) |
| Credit derivatives | 9,272 | (3) | | | | |
| Subtotal | 755,912 | (8,318) | | | | |
| Derivative interest receivable (payable), net | | (900) | | | | |
| Trade/settle receivable (payable), net | | — | | | | |
| Derivative cash collateral (held) posted, net | | 9,050 | | | | |
| Total | $ 755,912 | $ (168) | | | | |

(1) Fair value is categorized based on the period from June 30, 2012 until the contractual maturity of the derivative.
(2) Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged. Notional or contractual amounts are not recorded as assets or liabilities on our consolidated balance sheets.
(3) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net, and includes derivative interest receivable or (payable), net, trade/settle receivable or (payable), net and derivative cash collateral (held) or posted, net.
(4) Represents the notional weighted average rate for the fixed leg of the swaps.
(5) Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of June 30, 2012.
(6) Primarily includes purchased interest-rate caps and floors.

At June 30, 2012, the net fair value of our total derivative portfolio was $(168) million, as compared to $(317) million at December 31, 2011. The increase in the net fair value of derivatives reflects a change in the mix of our derivatives whereby we increased our holdings of receive-fixed swaps relative to pay-fixed swaps to rebalance our portfolio during a period of steadily declining interest rates and increased our issuances of debt with longer-term maturities. See "NOTE 10: DERIVATIVES" for the notional or contractual amounts and related fair values of our total derivative portfolio by product type at June 30, 2012 and December 31, 2011, as well as derivative collateral posted and held.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the changes in derivative fair values.

## Table 26 — Changes in Derivative Fair Values

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012[1] | 2011[2] |
| | (in millions) | |
| Beginning balance, at January 1 — Net asset (liability) | $ (8,662) | $ (6,560) |
| Net change in: | | |
|   Commitments | 91 | 75 |
|   Credit derivatives | 1 | (9) |
|   Swap guarantee derivatives | 1 | — |
| Other derivatives:[3] | | |
|   Changes in fair value | (75) | (1,213) |
|   Fair value of new contracts entered into during the period [4] | — | 576 |
|   Contracts realized or otherwise settled during the period | 326 | 89 |
| Ending balance, at June 30 — Net asset (liability) | $ (8,318) | $ (7,042) |

(1) Refer to "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of net fair value to the amounts presented on our consolidated balance sheets as of June 30, 2012.

(2) At June 30, 2011, fair value in this table excludes derivative interest receivable or (payable), net of $(1.3) billion, trade/settle receivable or (payable), net of $6 million, and derivative cash collateral posted, net of $8.2 billion.

(3) Includes fair value changes for interest-rate swaps, option-based derivatives, futures, and foreign-currency swaps.

(4) Consists primarily of cash premiums paid or received on options.

See "CONSOLIDATED RESULTS OF OPERATIONS — Non-Interest Income (Loss) — *Derivative Gains (Losses)*" for a description of gains (losses) on our derivative positions.

## REO, Net

We acquire properties, which are recorded as REO assets on our consolidated balance sheets, typically as a result of borrower default on mortgage loans that we own, or for which we have issued our financial guarantee. The balance of our REO, net, declined to $4.8 billion at June 30, 2012 from $5.7 billion at December 31, 2011. We believe the volume of our single-family REO acquisitions in the first half of 2012 was less than it otherwise would have been due to the lengthening of the foreclosure timeline, particularly in states that require a judicial foreclosure process and, in part, to resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. The lower acquisition rate, coupled with high disposition levels, led to a lower REO property inventory level at June 30, 2012 compared to December 31, 2011. We expect that the length of the foreclosure timeline will continue to remain above historical levels. Additionally, we expect our REO activity to remain at elevated levels, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. To the extent a large volume of loans completes the foreclosure process in a short period of time, the resulting increase in the market's inventory of homes for sale could have a negative impact on home prices. See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Non-Performing Assets*" for additional information about our REO activity.

## Deferred Tax Assets, Net

After evaluating all available evidence, including our losses, the events and developments related to our conservatorship, volatility in the economy, related difficulty in forecasting future profit levels, and our assertion that we have the intent and ability to hold our available-for-sale securities until any temporary unrealized losses are recovered, we continue to record a valuation allowance on a portion of our net deferred tax assets. See "NOTE 12: INCOME TAXES" for additional information.

## Other Assets

Other assets consist of the guarantee asset related to non-consolidated trusts and other guarantee commitments, accounts and other receivables, and other miscellaneous assets. Other assets increased to $10.9 billion as of June 30, 2012 from $10.5 billion as of December 31, 2011 primarily due to an increase in servicer receivables resulting from an increase in the proceeds of mortgage loans paid off by borrowers at the end of the quarter that had not yet been remitted to us. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

47

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total Debt, Net**

PCs and Other Guarantee Transactions issued by our consolidated trusts and held by third parties are recognized as debt securities of consolidated trusts held by third parties on our consolidated balance sheets. Debt securities of consolidated trusts held by third parties represent our liability to third parties that hold beneficial interests in our consolidated trusts. The debt securities of our consolidated trusts may be prepaid as the loans that collateralize the debt may prepay without penalty at any time.

Other debt consists of unsecured short-term and long-term debt securities we issue to third parties to fund our business activities. It is classified as either short-term or long-term based on the contractual maturity of the debt instrument. See "LIQUIDITY AND CAPITAL RESOURCES" for information about our other debt.

The table below presents the UPB for Freddie Mac-issued mortgage-related securities by the underlying mortgage product type.

**Table 27 — Freddie Mac Mortgage-Related Securities** [1]

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total | Issued by Consolidated Trusts | Issued by Non-Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family: | | | | | | |
| 30-year or more amortizing fixed-rate | $ 1,077,467 | $ — | $ 1,077,467 | $ 1,123,105 | $ — | $ 1,123,105 |
| 20-year amortizing fixed-rate | 73,826 | — | 73,826 | 68,584 | — | 68,584 |
| 15-year amortizing fixed-rate | 264,501 | — | 264,501 | 252,563 | — | 252,563 |
| Adjustable-rate [2] | 70,394 | — | 70,394 | 69,402 | — | 69,402 |
| Interest-only [3] | 50,321 | — | 50,321 | 59,007 | — | 59,007 |
| FHA/VA and other governmental | 3,147 | — | 3,147 | 3,267 | — | 3,267 |
| *Total single-family* | 1,539,656 | — | 1,539,656 | 1,575,928 | — | 1,575,928 |
| Multifamily | — | 4,334 | 4,334 | — | 4,496 | 4,496 |
| *Total single-family and multifamily* | 1,539,656 | 4,334 | 1,543,990 | 1,575,928 | 4,496 | 1,580,424 |
| Other Guarantee Transactions: | | | | | | |
| HFA bonds: [4] | | | | | | |
| Single-family | — | 5,579 | 5,579 | — | 6,118 | 6,118 |
| Multifamily | — | 911 | 911 | — | 966 | 966 |
| Total HFA bonds | — | 6,490 | 6,490 | — | 7,084 | 7,084 |
| Other: | | | | | | |
| Single-family [5] | 11,595 | 3,641 | 15,236 | 12,877 | 3,838 | 16,715 |
| Multifamily | — | 27,976 | 27,976 | — | 19,682 | 19,682 |
| Total Other Guarantee Transactions | 11,595 | 31,617 | 43,212 | 12,877 | 23,520 | 36,397 |
| REMICs and Other Structured Securities backed by Ginnie Mae Certificates [6] | — | 709 | 709 | — | 779 | 779 |
| Total Freddie Mac Mortgage-Related Securities | $ 1,551,251 | $ 43,150 | $ 1,594,401 | $ 1,588,805 | $ 35,879 | $ 1,624,684 |
| Less: Repurchased Freddie Mac Mortgage-Related Securities [7] | (108,028) | | | (136,329) | | |
| Total UPB of debt securities of consolidated trusts held by third parties | $ 1,443,223 | | | $ 1,452,476 | | |

(1) Amounts are based on UPB of the securities and exclude mortgage-related securities traded, but not yet settled.

(2) Includes $1.1 billion and $1.2 billion in UPB of option ARM mortgage loans as of June 30, 2012 and December 31, 2011, respectively. See endnote (5) for additional information on option ARM loans that back our Other Guarantee Transactions.

(3) Represents loans where the borrower pays interest only for a period of time before the borrower begins making principal payments. Includes both fixed- and variable-rate interest-only loans.

(4) Consists of bonds we acquired and resecuritized under the NIBP.

(5) Backed by non-agency mortgage-related securities that include prime, FHA/VA, and subprime mortgage loans and also include $6.8 billion and $7.3 billion in UPB of securities backed by option ARM mortgage loans at June 30, 2012 and December 31, 2011, respectively.

(6) Backed by FHA/VA loans.

(7) Represents the UPB of repurchased Freddie Mac mortgage-related securities that are consolidated on our balance sheets and includes certain remittance amounts associated with our security trust administration that are payable to third-party mortgage-related security holders. Our holdings of non-consolidated Freddie Mac mortgage-related securities are presented in "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets."

Excluding Other Guarantee Transactions, the percentage of amortizing fixed-rate single-family loans underlying our consolidated trust debt securities, based on UPB, was approximately 92% at both June 30, 2012 and December 31, 2011. Freddie Mac single-family mortgage-related securities that we issued during the first half of 2012 were backed by a

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4134

Table of Contents

significant proportion of refinance mortgages. During the first half of 2012, the outstanding UPB of Freddie Mac mortgage-related securities issued by consolidated trusts declined approximately 2.4%, as the volume of our new issuances was less than the volume of liquidations of these securities. The outstanding UPB of multifamily Other Guarantee Transactions, excluding HFA-related securities, increased to $28.0 billion as of June 30, 2012 from $19.7 billion as of December 31, 2011, due to multifamily loan securitization activity.

The table below presents additional details regarding our issued and guaranteed mortgage-related securities.

### Table 28 — Issuances and Extinguishments of Debt Securities of Consolidated Trusts [(1)]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Beginning balance of debt securities of consolidated trusts held by third parties | $1,459,365 | $1,497,849 | $1,452,476 | $1,517,001 |
| Issuances to third parties of debt securities of consolidated trusts: | | | | |
| Issuances based on underlying mortgage product type: | | | | |
| 30-year or more amortizing fixed-rate | 63,985 | 36,517 | 128,026 | 98,308 |
| 20-year amortizing fixed-rate | 6,692 | 3,147 | 15,087 | 9,390 |
| 15-year amortizing fixed-rate | 22,928 | 15,648 | 53,600 | 35,514 |
| Adjustable-rate | 4,437 | 6,216 | 9,585 | 11,862 |
| Interest-only | — | — | — | 152 |
| FHA/VA | — | — | — | 160 |
| Debt securities of consolidated trusts retained by us at issuance | (8,536) | (313) | (11,441) | (6,658) |
| Net issuances of debt securities of consolidated trusts | 89,506 | 61,215 | 194,857 | 148,728 |
| Reissuances of debt securities of consolidated trusts previously held by us [(2)] | 11,010 | 11,977 | 22,652 | 36,553 |
| Total issuances to third parties of debt securities of consolidated trusts | 100,516 | 73,192 | 217,509 | 185,281 |
| Extinguishments, net [(3)] | (116,658) | (86,625) | (226,762) | (217,866) |
| Ending balance of debt securities of consolidated trusts held by third parties | $1,443,223 | $1,484,416 | $1,443,223 | $1,484,416 |

(1)  Based on UPB.

(2)  Represents our sales of PCs and certain Other Guarantee Transactions previously held by us.

(3)  Represents: (a) UPB of our purchases from third parties of PCs and Other Guarantee Transactions issued by our consolidated trusts; (b) principal repayments related to PCs and Other Guarantee Transactions issued by our consolidated trusts; and (c) certain remittance amounts associated with our trust security administration that are payable to third-party mortgage-related security holders as of June 30, 2012 and 2011.

## Other Liabilities

Other liabilities consist of the guarantee obligation, the reserve for guarantee losses on non-consolidated trusts and other mortgage-related financial guarantees, servicer liabilities, accounts payable and accrued expenses, and other miscellaneous liabilities. Other liabilities increased to $6.2 billion as of June 30, 2012 from $6.0 billion as of December 31, 2011 primarily due to an increase in: (a) accrued estimated losses on unsettled foreclosure alternative transactions at quarter end primarily related to an increase in short sales activity; and (b) real estate services payable relating to estimated taxes and insurance on REO properties held in inventory at quarter end. See "NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS" for additional information.

49

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Total Equity (Deficit)**

The table below presents the changes in total equity (deficit) and certain capital-related disclosures.

**Table 29 — Changes in Total Equity (Deficit)**

| | Three Months Ended | | | | | Six Months Ended |
|---|---|---|---|---|---|---|
| | 6/30/2012 | 3/31/2012 | 12/31/2011 | 9/30/2011 | 6/30/2011 | 6/30/2012 |
| | (in millions) | | | | | |
| Beginning balance | $    (18) | $    (146) | $  (5,991) | $  (1,478) | $  1,237 | $    (146) |
| Net income (loss) | 3,020 | 577 | 619 | (4,422) | (2,139) | 3,597 |
| Other comprehensive income (loss), net of taxes: | | | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (238) | 1,147 | 701 | (80) | 903 | 909 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 107 | 111 | 118 | 124 | 135 | 218 |
| Changes in defined benefit plans | 3 | (46) | 68 | 2 | 1 | (43) |
| Comprehensive income (loss) | 2,892 | 1,789 | 1,506 | (4,376) | (1,100) | 4,681 |
| Capital draw funded by Treasury | 19 | 146 | 5,992 | 1,479 | — | 165 |
| Senior preferred stock dividends declared | (1,809) | (1,807) | (1,655) | (1,618) | (1,617) | (3,616) |
| Other | 2 | — | 2 | 2 | 2 | 2 |
| Total equity (deficit)/Net worth | $  1,086 | $    (18) | $    (146) | $  (5,991) | $  (1,478) | $  1,086 |
| Aggregate draws under the Purchase Agreement (as of period end) [1] | $  71,336 | $  71,317 | $  71,171 | $  65,179 | $  63,700 | $  71,336 |
| Aggregate senior preferred stock dividends paid to Treasury in cash (as of period end) | $  20,137 | $  18,328 | $  16,521 | $  14,866 | $  13,248 | $  20,137 |
| Percentage of dividends paid to Treasury in cash to aggregate draws (as of period end) | 28% | 26% | 23% | 23% | 21% | 28% |

(1)   Does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

FHFA, as Conservator, requested a $19 million draw on our behalf from Treasury under the Purchase Agreement to eliminate our quarterly equity deficit at March 31, 2012. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement. In addition, we paid cash dividends to Treasury of $3.6 billion during the six months ended June 30, 2012.

Net unrealized losses on our available-for-sale securities in AOCI decreased by $0.9 billion during the six months ended June 30, 2012. The decrease was primarily due to fair value gains related to: (a) the movement of our single-family non-agency mortgage-related securities with unrealized losses towards maturity; and (b) the impact of declining rates, partially offset by the impact of widening OAS levels on our single-family non-agency mortgage-related securities. Net unrealized losses on our closed cash flow hedge relationships in AOCI decreased by $218 million during the six months ended June 30 2012, primarily attributable to the reclassification of losses into earnings related to our closed cash flow hedges as the originally forecasted transactions affected earnings.

<div align="center">

**RISK MANAGEMENT**

</div>

Our investment and credit guarantee activities expose us to three broad categories of risk: (a) credit risk; (b) interest-rate risk and other market risk; and (c) operational risk. See "RISK FACTORS" in our 2011 Annual Report for additional information regarding these and other risks.

**Credit Risk**

We are subject primarily to two types of credit risk: institutional credit risk and mortgage credit risk. Institutional credit risk is the risk that a counterparty that has entered into a business contract or arrangement with us will fail to meet its obligations. Mortgage credit risk is the risk that a borrower will fail to make timely payments on a mortgage we own or guarantee. We are exposed to mortgage credit risk on our total mortgage portfolio because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment.

***Institutional Credit Risk***

Our exposure to single-family mortgage seller/servicers remained high during the first half of 2012 with respect to their repurchase obligations arising from breaches of representations and warranties made to us for loans they underwrote and sold

<div align="center">50</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to us. We rely on our single-family seller/servicers to perform loan workout activities as well as foreclosures on loans that they service for us. Our credit losses could increase to the extent that our seller/servicers do not fully perform these obligations in a timely manner. The financial condition of the mortgage insurance industry remained weak during the first half of 2012, and the substantial majority of our mortgage insurance exposure is concentrated with four counterparties, certain of which are under significant financial stress. In addition, our exposure to derivatives counterparties remains highly concentrated as compared to historical levels. On June 21, 2012, Moody's downgraded the credit ratings of several banks with whom we have had derivative counterparty relationships. The failure of any of our significant counterparties to meet their obligations to us could have a material adverse effect on our results of operations, financial condition, and our ability to conduct future business.

*Non-Agency Mortgage-Related Security Issuers*

Our investments in securities expose us to institutional credit risk to the extent that servicers, issuers, guarantors, or third parties providing credit enhancements become insolvent or do not perform their obligations. Our investments in non-Freddie Mac mortgage-related securities include both agency and non-agency securities. However, agency securities have historically presented minimal institutional credit risk due to the guarantee provided by those institutions, and the U.S. government's support of those institutions.

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. The effectiveness of our efforts is highly uncertain and any potential recoveries may take significant time to realize.

In 2011, FHFA, as Conservator for Freddie Mac and Fannie Mae, filed lawsuits against 18 corporate families of financial institutions and related defendants seeking to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued or sold by these financial institutions or control persons thereof. Ally Financial Inc. is one of the financial institutions. Many of the Ally entities that are defendants in the Ally lawsuit (with respect to the securities owned by Freddie Mac) filed for bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York on May 14, 2012. This creates additional uncertainty as to the likelihood, timing, and nature of potential recoveries from the Ally lawsuit.

See "MD&A — RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Non-Agency Mortgage-Related Security Issuers*" in our 2011 Annual Report and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for information about efforts to mitigate our losses on our investments in non-agency mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities" for information on credit risk associated with our investments in mortgage-related securities, including higher-risk components and impairment charges we recognized in the three and six months ended June 30, 2012 related to these investments. For information about institutional credit risk associated with our investments in non-mortgage-related securities, see "NOTE 7: INVESTMENTS IN SECURITIES — Table 7.9 — Trading Securities" as well as "Cash and Other Investments Counterparties" below.

*Single-family Mortgage Seller/Servicers*

We acquire a significant portion of our single-family mortgage purchase volume from several large lenders, or seller/servicers. Our top 10 single-family seller/servicers provided approximately 77% of our single-family purchase volume during the first half of 2012. Wells Fargo Bank, N.A., U.S. Bank, N.A., and JPMorgan Chase Bank, N.A. accounted for 28%, 12%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the first half of 2012. In recent periods, certain large seller/servicers curtailed their lending activities, which may impact the concentration of our purchase volume in the remainder of 2012.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our mortgage seller/servicers, including non-performance of their repurchase obligations arising from breaches of the representations and warranties made to us for loans they underwrote and sold to us or failure to honor their recourse and indemnification obligations to us. We have contractual arrangements with our seller/servicers under which they agree to sell us mortgage loans, and represent and warrant that those loans have been originated under specified underwriting standards. If we subsequently discover that the representations and warranties were breached ( *i.e.*, that contractual standards were not followed), we can exercise certain contractual remedies to mitigate our actual or potential credit losses. These contractual

51

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

remedies include the ability to require the seller/servicer to repurchase the loan at its current UPB or make us whole for any credit losses realized with respect to the loan, after consideration of other recoveries, if any. As part of our expansion of HARP, we have agreed not to require lenders to provide us with certain representations and warranties that they would ordinarily be required to commit to in selling loans to us. As a result, we may face greater exposure to credit and other losses on these HARP loans. FHFA recently stated that, under its oversight, we and Fannie Mae are developing new, consistent requirements for the representations and warranties made by lenders with respect to single-family loans sold to us and Fannie Mae. These requirements are designed to give lenders greater certainty in the future that a loan that performs successfully for a period of time will not later be subject to repurchase except for very limited reasons. FHFA stated that it anticipates the new requirements will be issued by September 2012. For more information, see " *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program — Home Affordable Refinance Program and Relief Refinance Mortgage Initiative* ."

Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. In recent periods, some of our seller/servicers have failed to fully perform their repurchase obligations in a timely manner, and to a lesser extent, certain others have failed to perform their obligations due to their weakened financial capacity. The table below provides a summary of our repurchase request activity for the six months ended June 30, 2012 and 2011.

## Table 30 — Repurchase Request Activity[1]

|  | Six Months Ended June 30, | |
|  | 2012 | 2011 |
| --- | --- | --- |
|  | (in millions) | |
| Beginning balance, December 31, | $ 2,716 | $ 3,807 |
| New requests issued | 4,906 | 5,368 |
| Requests collected[2] | (2,030) | (2,540) |
| Requests cancelled[3] | (2,650) | (3,482) |
| Other[4] | (28) | (34) |
| Ending balance, June 30, | $ 2,914 | $ 3,119 |

(1) Beginning and ending balances represent the UPB of the loans associated with the repurchase requests. New requests issued and requests cancelled represent the UPB of the loans subject to the request, while requests collected represent the amount of cash payment received.

(2) Requests collected include payments received upon fulfillment of the repurchase request, reimbursement of losses for requests associated with foreclosed mortgage loans, negotiated settlements, and other alternative remedies.

(3) Consists primarily of those requests that were resolved by the servicer providing missing documentation or a successful appeal of the request.

(4) Other includes items that affect the UPB of the loan while the repurchase request is outstanding, such as changes in UPB due to payments made on the loan. Also includes requests deemed uncollectible due to the insolvency or other failure of the counterparty.

As shown in the table above, the UPB of loans subject to open repurchase requests increased to approximately $2.9 billion as of June 30, 2012 from $2.7 billion as of December 31, 2011 because the volume of new request issuances exceeded the combined volume of requests collected and cancelled. As measured by UPB, approximately 40% and 39% of the repurchase requests outstanding at June 30, 2012 and December 31, 2011, respectively, were outstanding for four months or more since issuance of the initial request (these figures include repurchase requests for which appeals were pending). As of June 30, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.4 billion, and approximately 57% of these requests were outstanding for four months or more since issuance of the initial request. The amount we expect to collect on the outstanding requests is significantly less than the UPB of the loans subject to the repurchase requests primarily because many of these requests will likely be satisfied by reimbursement of our realized credit losses by seller/servicers, instead of repurchase of loans at their UPB. Some of these requests also may be rescinded in the course of the contractual appeal process. Based on our historical loss experience and the fact that many of these loans are covered by credit enhancements ( *e.g.*, mortgage insurance), we expect the actual credit losses experienced by us should we fail to collect on these repurchase requests will also be less than the UPB of the loans.

Repurchase requests related to mortgage insurance rescission and claim denial tend to be outstanding longer than other repurchase requests. Of the total amount of repurchase requests outstanding at June 30, 2012 and December 31, 2011, approximately $1.2 billion at both dates were issued due to mortgage insurance rescission or mortgage insurance claim denial. Our actual credit losses will be higher should the mortgage insurance coverage not be reinstated or we fail to collect on these repurchase requests.

52

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar ® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

During 2010 and 2009, we entered into agreements with certain of our seller/servicers to release specified loans from certain repurchase obligations in exchange for one-time cash payments. As of June 30, 2012, loans totaling $143.4 billion in UPB, representing 8.5% of our single-family credit guarantee portfolio, were subject to such negotiated agreements. In a memorandum to the FHFA Office of Inspector General dated September 19, 2011, FHFA stated that it had "suspended certain future repurchase agreements with seller/servicers concerning their repurchase obligations pending the outcome" of a review by Freddie Mac of its loan sampling methodology. Since the issuance of this memorandum, FHFA conducted their review of our evaluation process and provided us with guidelines for future repurchase-related agreements, under which larger agreements will generally need to be reviewed and approved by FHFA. We did not enter into any agreements with seller/servicers concerning release of their repurchase obligations during 2011 or the first half of 2012 (in the ordinary course of business, however, we sometimes rescind certain repurchase requests through the contractual appeals process).

During the first half of 2012, we revised our loan sampling methodology. Our new methodology expands the coverage of our loan reviews as compared to our prior sampling methodology and may result in higher levels of repurchase requests. We expect that changes in our loan sampling methodology will additionally increase our repurchase request volumes with our seller/servicers.

We meet with our larger seller/servicers with deficiencies identified during our performing loan sampling to help ensure they make appropriate changes to their underwriting processes. In addition, for all of our largest seller/servicers, we actively manage the current quality of loan originations by providing monthly written and oral communications regarding loan defect rates and the drivers of those defects as identified in our performing loan quality control sampling reviews. If necessary, we work with seller/servicers to develop an appropriate plan of corrective action. Our contracts with some seller/servicers give us the right to levy certain compensatory fees when mortgage loans delivered to us fail to meet our aggregate loan quality metrics.

Our estimate of recoveries from seller/servicer repurchase obligations is considered in our allowance for loan losses; however, our actual recoveries may be different than our estimates. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at June 30, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

A significant portion of our single-family mortgage loans is serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A., serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans as of June 30, 2012, and together serviced approximately 49% of our single-family mortgage loans. Because we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, our business and financial results could be adversely affected. We also continue to be adversely affected by the length of the foreclosure timeline, particularly in states that require a judicial foreclosure process. See "RISK FACTORS — Operational Risks — *We have incurred, and will continue to incur, expenses and we may otherwise be adversely affected by delays and deficiencies in the foreclosure process*" in our 2011 Annual Report and "LEGISLATIVE AND REGULATORY MATTERS — Developments Concerning Single-Family Servicing Practices."

We also are exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we also have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans. We significantly revised our monitoring program for servicer performance during 2011. In March 2012, we announced changes to our monitoring program in order to provide for the assessment of certain fees to compensate us for deficiencies in servicer performance. Certain of these fees went into effect on June 1, 2012, and the remaining fees are scheduled to go into effect on September 1, 2012.

Residential Capital LLC ("ResCap") and a number of its subsidiaries, including GMAC Mortgage, LLC and Residential Funding Company, LLC (with GMAC Mortgage, LLC, collectively, "GMAC"), filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York on May 14, 2012. ResCap and GMAC are direct or indirect subsidiaries of Ally Financial Inc. GMAC serviced (either as a servicer or a subservicer) approximately 3% of our single-family mortgage loans as of June 30, 2012. In March 2010, we entered into an agreement with GMAC, under which GMAC made a one-time

53                                                                                                          *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. We continued to purchase loans from GMAC after January 1, 2009; Ally Bank (a subsidiary of Ally Financial Inc.) is liable for breaches of representations and warranties with respect to these loans. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about the GMAC bankruptcy. For more information on the March 2010 agreement with GMAC, see "MD&A — RISK MANAGEMENT — Institutional Credit Risk — Single-family Mortgage Seller/Servicers" in our 2011 Annual Report.

*Multifamily Mortgage Seller/Servicers*

A significant portion of our multifamily mortgage loans is serviced by several large multifamily servicers. We are exposed to certain institutional credit risks arising from the potential non-performance by our multifamily mortgage servicers and our multifamily sellers, or customers. As of June 30, 2012, our top three multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., and CBRE Capital Markets, Inc., each serviced more than 10% of our multifamily mortgage portfolio, and together serviced approximately 41% of our multifamily mortgage portfolio. We acquire a significant portion of our multifamily purchase volume from several large sellers. For the six months ended June 30, 2012, our top three multifamily sellers, CBRE Capital Markets, Inc., subsidiaries of Merrill Lynch & Co, Inc. (a wholly-owned subsidiary of Bank of America N.A.), and Wells Fargo Bank, N.A., accounted for 21%, 11%, and 10%, respectively, of our multifamily purchase volume. Our top 10 multifamily sellers represented an aggregate of approximately 83% of our multifamily purchase volume for the six months ended June 30, 2012.

*Mortgage Insurers*

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As a guarantor, we remain responsible for the payment of principal and interest if a mortgage insurer fails to meet its obligations to reimburse us for claims. If any of our mortgage insurers that provide credit enhancement fail to fulfill their obligation, we could experience increased credit losses.

As part of the estimate of our loan loss reserves, we evaluate the recovery and collectability related to mortgage insurance policies for mortgage loans that we hold on our consolidated balance sheets as well as loans underlying our non-consolidated Freddie Mac mortgage-related securities or covered by other guarantee commitments. We also evaluate the collectability of outstanding receivables from these counterparties related to outstanding and unpaid claims. We believe that many of our mortgage insurers are not sufficiently capitalized to withstand the stress of the current weak economic environment. Additionally, a number of our mortgage insurers have exceeded risk to capital ratios required by their state insurance regulators. In some cases, such states have issued waivers to allow the companies to continue writing new business in their states. Most waivers are temporary in duration or contain other conditions that the companies may be unable to continue to meet due to their weakened condition or other factors. Given the difficulties in the mortgage insurance industry, we believe it is likely that other mortgage insurers may exceed their regulatory capital limit in the future. As a result of these and other factors, we reduced our estimates of recovery associated with the expected amount of our claims for several insurers in determining our allowance for loan losses associated with our single-family loans or receivables from these mortgage insurers on our consolidated balance sheets at June 30, 2012 and December 31, 2011.

The table below summarizes our exposure to mortgage insurers as of June 30, 2012. In the event that a mortgage insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses resulting from such failure. Our most significant exposure to these insurers is through primary mortgage insurance, and, as of June 30, 2012, we had primary mortgage insurance coverage on loans that represent approximately 11% of the UPB of our single-family credit guarantee portfolio.

<div align="center">54</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 31 — Mortgage Insurance by Counterparty**

| | | | As of June 30, 2012 | | |
|---|---|---|---|---|---|
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Primary Insurance[2] | Pool Insurance[2] | Coverage Outstanding[3] |
| | | | (in billions) | | |
| Mortgage Guaranty Insurance Corporation (MGIC) | B | Negative | $ 44.8 | $ 21.8 | $ 11.8 |
| Radian Guaranty Inc. | B | Negative | 35.7 | 6.3 | 9.9 |
| Genworth Mortgage Insurance Corporation | B | Negative | 27.7 | 0.8 | 7.0 |
| United Guaranty Residential Insurance Co. | BBB | Stable | 29.1 | 0.2 | 7.2 |
| PMI Mortgage Insurance Co. (PMI)[4] | CCC− | Negative | 20.2 | 0.7 | 5.1 |
| Republic Mortgage Insurance Company (RMIC)[5] | Not Rated | N/A | 17.1 | 1.5 | 4.3 |
| Triad Guaranty Insurance Corp (Triad)[6] | Not Rated | N/A | 7.3 | 0.4 | 1.8 |
| CMG Mortgage Insurance Co. | BBB | Negative | 3.0 | 0.1 | 0.7 |
| Essent Guaranty, Inc. | Not Rated | N/A | 1.8 | — | 0.4 |
| Total | | | $ 186.7 | $ 31.8 | $ 48.2 |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest rating available as of July 25, 2012. Represents the lower of S&P and Moody's credit ratings and outlooks stated in terms of the S&P equivalent.

(2) Represents the amount of UPB at the end of the period for our single-family credit guarantee portfolio covered by the respective insurance type. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance. See "Table 4.5 — Recourse and Other Forms of Credit Protection" in "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for further information.

(3) Represents the remaining aggregate contractual limit for reimbursement of losses under policies of both primary and pool insurance. These amounts are based on our gross coverage without regard to netting of coverage that may exist to the extent an affected mortgage is covered under both types of insurance.

(4) In October 2011, PMI began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(5) In January 2012, RMIC began paying valid claims 50% in cash and 50% in deferred payment obligations under order of its state regulator.

(6) In June 2009, Triad began paying valid claims 60% in cash and 40% in deferred payment obligations under order of its state regulator.

We received proceeds of $1.0 billion and $1.3 billion during the six months ended June 30, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers, net of associated reserves, of $0.8 billion and $1.0 billion as of June 30, 2012 and December 31, 2011, respectively.

The UPB of single-family loans covered by pool insurance declined approximately 20% during the six months ended June 30, 2012, primarily due to prepayments and other liquidation events. We did not purchase pool insurance on single-family loans during the six months ended June 30, 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance policies.

In July 2012, MGIC requested a waiver from us to use a new subsidiary to write new insurance business in seven additional states. We have temporarily agreed to this request subject to certain conditions.

We and MGIC are involved in litigation concerning our current and future claims under certain of MGIC's pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to the aggregate limit indicated in the table above. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.5 billion lower than the amount of coverage outstanding set forth in the table above. For more information, see "NOTE 17: LEGAL CONTINGENCIES — Mortgage Guaranty Insurance Corporation."

In August 2011, we suspended PMI and its affiliates and RMIC and its affiliates as approved mortgage insurers, due to adverse developments concerning the companies. As a result, loans insured by either company (except relief refinance loans with pre-existing insurance) are ineligible for sale to Freddie Mac. Both PMI and RMIC have instituted partial claim payment plans, under which claim payments will be made 50% in cash, with the remaining amount deferred. We and FHFA are in discussions with the state regulators of PMI and RMIC concerning future payments of our claims. It is not yet clear how the state regulators of PMI and RMIC will administer their respective deferred payment plans, and neither company has begun paying its deferred payment obligations. In addition, to date, the state regulator has not allowed Triad to begin paying its deferred payment obligations, and it is uncertain when or if Triad will be permitted to do so. If Triad, PMI, and RMIC do not pay their deferred payment obligations, we would lose a significant portion of the coverage from these counterparties shown in the table above.

In addition to Triad, RMIC, and PMI, we believe that certain other of our mortgage insurance counterparties may lack sufficient ability to meet all their expected lifetime claims paying obligations to us as those claims emerge. In the future, we believe our mortgage insurance exposure will likely be concentrated among a smaller number of counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4141

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Bond Insurers*

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering certain of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. Bond insurance exposes us to the risk that the bond insurer will be unable to satisfy claims.

The table below presents our coverage amounts of bond insurance, including secondary coverage, for the non-agency mortgage-related securities we hold. In the event a bond insurer fails to perform, the coverage outstanding represents our maximum exposure to credit losses related to such a failure.

**Table 32 — Bond Insurance by Counterparty**

| | | | As of June 30, 2012 | |
|---|---|---|---|---|
| Counterparty Name | Credit Rating[1] | Credit Rating Outlook[1] | Coverage Outstanding[2] | Percent of Total[2] |
| | | | (dollars in billions) | |
| Ambac Assurance Corporation (Ambac)[3] | Not Rated | N/A | $ 4.2 | 45% |
| Financial Guaranty Insurance Company (FGIC)[3] | Not Rated | N/A | 1.7 | 18 |
| MBIA Insurance Corp. | B– | Negative | 1.2 | 13 |
| Assured Guaranty Municipal Corp. | AA– | Stable | 1.0 | 11 |
| National Public Finance Guarantee Corp. | BBB | Negative | 1.1 | 12 |
| Syncora Guarantee Inc.[3] | CC | Developing | 0.1 | 1 |
| Radian Guaranty Inc. (Radian) | B | Negative | <0.1 | <1 |
| Total | | | $ 9.3 | 100% |

(1) Represents the rating and exposure for the corporate entity to which we have the greatest exposure, which in some cases is a holding company. Coverage amounts may include coverage provided by consolidated affiliates and subsidiaries of the counterparty. Latest ratings available as of July 25, 2012. Represents the lower of S&P and Moody's credit ratings stated in terms of the S&P equivalent.
(2) Represents the remaining contractual limit for reimbursement of losses, including lost interest and other expenses, on non-agency mortgage-related securities.
(3) Ambac, FGIC, and Syncora Guarantee Inc. are currently operating under regulatory supervision.

We monitor the financial strength of our bond insurers in accordance with our risk management policies. Some of our larger bond insurers are in runoff mode where no new business is being written. We expect to receive substantially less than full payment of our claims from several of our bond insurers, including Ambac and FGIC, due to adverse developments concerning these companies. On June 28, 2012, a rehabilitation order was signed granting the Superintendent of Financial Services of the State of New York the authority to take possession and/or control of FGIC's property and assets and to conduct FGIC's business. Ambac and FGIC are currently not paying any of their claims. We believe that we will likely receive substantially less than full payment of our claims from some of our other bond insurers, because we believe they also lack sufficient ability to fully meet all of their expected lifetime claims-paying obligations to us as such claims emerge. In the event one or more of our other bond insurers were to become subject to a regulatory order or insolvency proceeding, our ability to recover certain unrealized losses on our mortgage-related securities would be negatively affected. We considered our expectations regarding our bond insurers' ability to meet their obligations in making our impairment determinations at June 30, 2012 and December 31, 2011. See "NOTE 7: INVESTMENTS IN SECURITIES — Other-Than-Temporary Impairments on Available-For-Sale Securities" for additional information regarding impairment losses on securities covered by bond insurers.

*Cash and Other Investments Counterparties*

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of June 30, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $68.3 billion and $68.5 billion, respectively, of cash and securities purchased under agreements to resell invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information on counterparty credit ratings and concentrations within our cash and other investments.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4142          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Derivative Counterparties*

We use exchange-traded derivatives and OTC derivatives and are exposed to institutional credit risk with respect to both types of derivatives. We are an active user of exchange-traded derivatives, such as Treasury and Eurodollar futures, and are required to post initial and maintenance margin with our clearing firm in connection with such transactions. The posting of this margin exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled directly between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations. When our net position with a counterparty in OTC derivatives subject to a master netting agreement has a market value above zero (*i.e.*, it would be an asset reported as derivative assets, net on our consolidated balance sheets), the counterparty is obligated to deliver collateral in the form of cash, securities, or a combination of both, in an amount equal to that market value (less a small unsecured "threshold" amount in most cases) as necessary to satisfy its net obligation to us under the master agreement.

All of our OTC derivative counterparties are major financial institutions and are experienced participants in the OTC derivatives market. On June 21, 2012, Moody's downgraded the credit ratings of several banks, which resulted in a change in the collateral posting threshold for two counterparties and a reduction of certain activities with others. A large number of our OTC derivative counterparties had credit ratings of A+, A, or A- as of July 25, 2012. We generally require counterparties with such credit ratings to post collateral if our net exposure to them on derivative contracts exceeds $1 million. One OTC derivative counterparty had a credit rating of BBB+ for which we require full collateralization. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information.

The relative concentration of our derivative exposure among our primary derivative counterparties remains high. This concentration has increased significantly since 2008 primarily due to industry consolidation and the failure or weakening of certain counterparties, and could further increase. In addition, on June 21, 2012, the Office of the Comptroller of the Currency published an interim final rule regarding limits on "loans and extensions of credit," which are defined to include credit exposures arising from derivative transactions. This rule might limit the ability of certain counterparties to engage in derivative transactions with us.

The table below summarizes our exposure to our derivative counterparties, which represents the net positive fair value of derivative contracts, related accrued interest and collateral held by us from our counterparties, after netting by counterparty as applicable ( *i.e.*, net amounts due to us under derivative contracts which are recorded as derivative assets). In addition, we have derivative liabilities where we post collateral to counterparties. Pursuant to certain collateral agreements we have with derivative counterparties, the amount of collateral that we are required to post is based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions. At June 30, 2012, our collateral posted exceeded our collateral held. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Derivative Assets and Liabilities, Net" and "Table 25 — Derivative Fair Values and Maturities" for a reconciliation of fair value to the amounts presented on our consolidated balance sheets as of June 30, 2012, which includes both cash collateral held and posted by us, net.

57

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 33 — Derivative Counterparty Credit Exposure

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **As of June 30, 2012** | | |
| Rating[1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA– | 4 | $ 26,844 | $ — | $ — | 5.0 | $10 million or less |
| A+ | 4 | 110,473 | 1,487 | 4 | 6.1 | $1 million or less |
| A | 6 | 342,394 | 808 | 40 | 6.0 | $1 million or less |
| A– | 4 | 160,402 | 84 | 56 | 5.9 | $1 million or less |
| BBB+ | 1 | 42,893 | — | — | 6.1 | $ — |
| Subtotal[7] | 19 | 683,006 | 2,379 | 100 | 6.0 | |
| Futures and clearinghouse-settled derivatives | | 41,488 | 20 | 20 | | |
| Commitments | | 13,032 | 47 | 47 | | |
| Swap guarantee derivatives | | 3,622 | — | — | | |
| Other derivatives[8] | | 14,764 | 1 | 1 | | |
| Total derivatives | | $ 755,912 | $ 2,447 | $ 168 | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | **As of December 31, 2011** | | |
| Rating [1] | Number of Counterparties[2] | Notional or Contractual Amount[3] | Total Exposure at Fair Value[4] | Exposure, Net of Collateral[5] | Weighted Average Contractual Maturity (in years) | Collateral Posting Threshold[6] |
| | | | (dollars in millions) | | | |
| AA– | 5 | $ 73,277 | $ 536 | $ 19 | 5.0 | $10 million or less |
| A+ | 6 | 337,013 | 2,538 | 1 | 5.8 | $1 million or less |
| A | 5 | 208,416 | 12 | 51 | 6.2 | $1 million or less |
| A– | 2 | 89,284 | — | — | 5.5 | $1 million or less |
| Subtotal[7] | 18 | 707,990 | 3,086 | 71 | 5.8 | |
| Futures and clearinghouse-settled derivatives | | 43,831 | 8 | 8 | | |
| Commitments | | 14,318 | 38 | 38 | | |
| Swap guarantee derivatives | | 3,621 | — | — | | |
| Other derivatives[8] | | 18,489 | 1 | 1 | | |
| Total derivatives | | $ 788,249 | $ 3,133 | $ 118 | | |

(1)   We use the lower of S&P's and Moody's ratings to manage collateral requirements. In this table, the Moody's rating of the legal entity is stated in terms of the S&P equivalent.

(2)   Based on legal entities.

(3)   Notional or contractual amounts are used to calculate the periodic settlement amounts to be received or paid and generally do not represent actual amounts to be exchanged.

(4)   For each counterparty, this amount includes derivatives with a positive fair value (recorded as derivative assets, net), including the related accrued interest receivable/payable, when applicable. For counterparties included in the subtotal, positions are shown netted at the counterparty level including accrued interest receivable/payable and trade/settle fees.

(5)   Calculated as Total Exposure at Fair Value less cash collateral held as determined at the counterparty level. Includes amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level. For derivatives settled through an exchange or clearinghouse, excludes consideration of maintenance margin posted by our counterparty.

(6)   Counterparties are required to post collateral when their exposure exceeds agreed-upon collateral posting thresholds. These thresholds are typically based on the counterparty's credit rating and are individually negotiated.

(7)   Consists of OTC derivative agreements for interest-rate swaps, option-based derivatives (excluding certain written options), foreign-currency swaps, and purchased interest-rate caps.

(8)   Consists primarily of certain written options, and certain credit derivatives. Written options do not present counterparty credit exposure, because we receive a one-time up-front premium in exchange for giving the holder the right to execute a contract under specified terms, which generally puts us in a liability position.

Over time, our exposure to individual counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps varies depending on changes in fair values, which are affected by changes in period-end interest rates, the implied volatility of interest rates, foreign-currency exchange rates, and the amount of derivatives held. If all of our counterparties for these derivatives had defaulted simultaneously on June 30, 2012, the combined amount of our uncollateralized and overcollateralized exposure to these counterparties, or our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $100 million. Our similar exposure as of December 31, 2011 was $71 million. Two counterparties each accounted for greater than 10% and collectively accounted for 86% of our net uncollateralized exposure to derivative counterparties, excluding futures and clearinghouse-settled derivatives, commitments, swap guarantee derivatives, and other derivatives at June 30, 2012. These counterparties were Royal Bank of Scotland and UBS AG., both of which were rated "A–" or above using the lower of S&P's or Moody's rating stated in terms of the S&P equivalent as of July 25, 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4144

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Approximately 98% of our counterparty credit exposure for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps was collateralized at June 30, 2012 (excluding amounts related to our posting of cash collateral in excess of our derivative liability as determined at the counterparty level). The remaining exposure was primarily due to exposure amounts below the applicable counterparty collateral posting threshold, as well as market movements during the time period between when a derivative was marked to fair value and the date we received the related collateral. In some instances, these market movements result in us having provided collateral that has fair value in excess of our obligation, which represents our overcollateralization exposure. Collateral is typically transferred within one business day based on the values of the related derivatives.

In the event a derivative counterparty defaults, our economic loss may be higher than the uncollateralized exposure of our derivatives if we are not able to replace the defaulted derivatives in a timely and cost-effective fashion. We could also incur economic loss if the collateral held by us cannot be liquidated at prices that are sufficient to recover the amount of such exposure. We monitor the risk that our uncollateralized exposure to each of our OTC counterparties for interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest rate caps will increase under certain adverse market conditions by performing daily market stress tests. These tests, which involve significant management judgment, evaluate the potential additional uncollateralized exposure we would have to each of these derivative counterparties on OTC derivatives contracts assuming certain changes in the level and implied volatility of interest rates and certain changes in foreign currency exchange rates over a brief time period. Our actual exposure could vary significantly from amounts forecasted by these tests.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives for accounting purposes, was $47 million and $38 million at June 30, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis in an effort to ensure that they continue to meet our internal risk-management standards.

*Selected European Sovereign and Non-Sovereign Exposures*

The sovereign debt of Spain, Italy, Ireland, Portugal, and Greece (which we refer to herein as the "troubled European countries") and the credit status of financial institutions with significant exposure to the troubled European countries has been adversely affected due to weaknesses in the economic and fiscal situations of those countries. In recent periods, Moody's and S&P downgraded a number of European countries. We are monitoring our exposures to European countries and institutions.

As of June 30, 2012, we did not hold any debt issued by the governments of the troubled European countries and did not hold any financial instruments entered into with sovereign governments in those countries. As of that date, we also did not hold any debt issued by corporations or financial institutions domiciled in the troubled European countries and did not hold any other financial instruments entered into with corporations or financial institutions domiciled in those countries. For purposes of this discussion, we consider an entity to be domiciled in a country if its parent entity is headquartered in that country.

Our derivative portfolio and cash and other investments portfolio counterparties include a number of major European and non-European financial institutions. Many of these institutions operate in Europe, and we believe that all of these financial institutions have direct or indirect exposure to the troubled European countries. For many of these institutions, their direct and indirect exposures to the troubled European countries change on a daily basis. We monitor our major counterparties' exposures to the troubled European countries, and adjust our exposures and risk limits to individual counterparties accordingly. Our exposures to derivative portfolio and cash and other investments portfolio counterparties are described in "Derivative Counterparties," "Cash and Other Investments Counterparties" and "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

We have taken a number of actions since mid-2011 designed to reduce our exposures to certain derivative portfolio and cash and other investments portfolio counterparties due to their exposure to the troubled European countries, including substantially reducing our derivative exposure limits, our limits on the amount of unsecured overnight deposits, and our limits for asset-backed commercial paper. For certain repurchase counterparties, we reduced the credit limit and restricted the term of such transactions to overnight. We also ceased investing in prime money funds that could hold substantial amounts of non-U.S. sovereign debt.

59                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

It is possible that continued adverse developments in Europe could significantly affect our counterparties that have direct or indirect exposure to the troubled European countries. In turn, this could adversely affect their ability to meet their obligations to us. For more information, see "RISK FACTORS — Competitive and Market Risks — *We depend on our institutional counterparties to provide services that are critical to our business, and our results of operations or financial condition may be adversely affected if one or more of our institutional counterparties do not meet their obligations to us*" in our 2011 Annual Report.

### Mortgage Credit Risk

We are exposed to mortgage credit risk principally in our single-family credit guarantee and multifamily mortgage portfolios because we either hold the mortgage assets or have guaranteed mortgages in connection with the issuance of a Freddie Mac mortgage-related security, or other guarantee commitment. All mortgages that we purchase or guarantee have some amount of default. We are also exposed to mortgage credit risk related to our investments in non-Freddie Mac mortgage-related securities. For information about our holdings of these securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities.*"

### Single-Family Mortgage Credit Risk

Single-family mortgage credit risk is primarily influenced by the credit profile of the borrower of the mortgage loan (*e.g.*, credit score, credit history, and monthly income relative to debt payments), documentation level, the number of borrowers, the features of the mortgage itself, the purpose of the mortgage, occupancy type, property type, the LTV ratio, and local and regional economic conditions, including home prices and unemployment rates. Through our delegated underwriting process, single-family mortgage loans and the borrowers' ability to repay the loans are evaluated using a number of critical risk characteristics, including, but not limited to, the borrower's credit score and credit history, the borrower's monthly income relative to debt payments, the original LTV ratio, the type of mortgage product, and the occupancy type of the loan.

As part of our quality control process, we review the underwriting documentation for a sample of loans we have purchased for compliance with our contractual standards. We recently completed our review of a sample of single-family loans we purchased or guaranteed during 2011. We have worked actively with our seller/servicers to improve loan manufacturing quality. As a result, we have observed improving quality control results for loans funded during 2011. The average aggregate deficiency rate across all seller/servicers for loans funded during 2011 and 2010 was approximately 6% and 13%, respectively. The most common underwriting deficiencies found in the review of loans funded during 2011 were related to insufficient income and inadequate or missing documentation to support borrower qualification. The next most common deficiency was inaccurate data entered into Loan Prospector, our automated underwriting system. We give our seller/servicers an opportunity to appeal ineligible loan determinations in response to our request for the repurchase of the loan. Starting in late 2011, we began to require certain of our larger seller/servicers to maintain ineligible loan rates below a certain stated threshold (generally 5%), with financial consequences for non-compliance, as part of the renewals of our contracts with them. We expect these changes in seller/servicer contracts to positively impact ineligible loan rates in the future.

For loans with identified underwriting deficiencies, we may require immediate repurchase or allow performing loans to remain in our portfolio subject to our continued right to issue a repurchase request to the seller/servicers at a later date. Our right to request repurchase by seller/servicers is intended to protect us against deficiencies in underwriting by our seller/servicers. While this protection is intended to reduce our mortgage credit risk, it increases our institutional credit risk exposure to seller/servicers. See "*Institutional Credit Risk — Single-Family Mortgage Seller/Servicers*" for further information on recent and expected changes in our loan reviews for quality control as well as repurchase request activity.

Conditions in the mortgage market improved in certain geographical areas, but continued to remain challenging during the first half of 2012. Most single-family mortgage loans, especially those originated from 2005 through 2008, have been affected by the compounding pressures on household wealth caused by significant declines in home values that began in 2006 and the ongoing weak employment environment. As of June 30, 2012 and December 31, 2011, the serious delinquency rate for loans originated in 2005 through 2008 in our single-family credit guarantee portfolio was 9.21% and 8.75%, respectively, whereas the serious delinquency rate for loans originated after 2008 was 0.35% and 0.30%, respectively. Our serious delinquency rates remained high in the first half of 2012 compared to the rates we experienced in years prior to 2009, as discussed in "Credit Performance — Delinquencies." The UPB of our single-family non-performing loans also remained at high levels during the first half of 2012.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                       Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Characteristics of the Single-Family Credit Guarantee Portfolio*

The average UPB of loans in our single-family credit guarantee portfolio was approximately $151,000 at both June 30, 2012 and December 31, 2011. We purchased or guaranteed approximately 433,000 and 301,000 single-family loans totaling $88.7 billion and $62.9 billion of UPB during the second quarters of 2012 and 2011, respectively, and 924,000 and 762,000 single-family loans totaling $193.7 billion and $160.5 billion during the first half of 2012 and 2011, respectively. Our single-family credit guarantee portfolio predominately consists of first-lien, fixed-rate mortgage loans secured by the borrower's primary residence. Our guarantees related to second-lien mortgage loans in the single-family credit guarantee portfolio are insignificant. Approximately 95% of the single-family mortgages we purchased in both the three and six months ended June 30, 2012 were fixed-rate amortizing mortgages, based on UPB.

The credit quality of the single-family loans we acquired beginning in 2009 (excluding relief refinance mortgages) is significantly better than that of loans we acquired from 2005 through 2008, as measured by original LTV ratios, FICO scores, and the proportion of loans underwritten with fully documented income. HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Mortgages originated after 2008, including HARP loans, represented 57% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012, and the composition of that portfolio continues to grow.

The percentage of home purchase loans in our loan acquisition volume continued to remain at low levels and refinance activity remained high during the first half of 2012. Approximately 81% and 84% of the single-family mortgages we purchased in the three and six months ended June 30, 2012, respectively, were refinance mortgages, and approximately 32% and 25%, respectively, of these refinance mortgages were HARP loans, based on UPB.

The table below provides additional characteristics of single-family mortgage loans purchased during the three and six months ended June 30, 2012 and 2011, and of our single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio [1]

| | Purchases During the Three Months Ended June 30, | | Purchases During the Six Months Ended June 30, | | Portfolio Balance at [2] | |
|---|---|---|---|---|---|---|
| | 2012 | 2001 | 2012 | 2011 | June 30, 2012 | December 31, 2011 |
| **Original LTV Ratio Range** [3][4] | | | | | | |
| 60% and below | 30% | 29% | 31% | 31% | 23% | 23% |
| Above 60% to 70% | 17 | 16 | 18 | 17 | 15 | 16 |
| Above 70% to 80% | 42 | 46 | 41 | 44 | 41 | 42 |
| Above 80% to 90% | 6 | 5 | 5 | 5 | 10 | 9 |
| Above 90% to 100% | 5 | 4 | 5 | 3 | 8 | 8 |
| Above 100% | <1 | <1 | <1 | <1 | 3 | 2 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average original LTV ratio | 68% | 68% | 67% | 67% | 72% | 72% |
| **Estimated Current LTV Ratio Range** [5] | | | | | | |
| 60 % and below | | | | | 26% | 25% |
| Above 60% to 70% | | | | | 13 | 12 |
| Above 70% to 80% | | | | | 19 | 18 |
| Above 80% to 90% | | | | | 15 | 15 |
| Above 90% to 100% | | | | | 9 | 10 |
| Above 100% to 110% | | | | | 6 | 6 |
| Above 110% to 120% | | | | | 4 | 4 |
| Above 120% | | | | | 8 | 10 |
| Total | | | | | 100% | 100% |
| Weighted average estimated current LTV ratio: | | | | | | |
| Relief refinance mortgages [6] | | | | | 82% | 79% |
| All other mortgages | | | | | 78% | 80% |
| Total mortgages | | | | | 78% | 80% |
| **Credit Score** [3][7] | | | | | | |
| 740 and above | 77% | 71% | 77% | 73% | 55% | 55% |
| 700 to 739 | 16 | 19 | 16 | 18 | 21 | 21 |
| 660 to 699 | 6 | 8 | 6 | 7 | 14 | 14 |
| 620 to 659 | 1 | 2 | 1 | 2 | 7 | 7 |
| Less than 620 | <1 | <1 | <1 | <1 | 3 | 3 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Weighted average credit score: | | | | | | |
| Relief refinance mortgages [6] | 740 | 738 | 741 | 742 | 742 | 744 |
| All other mortgages | 762 | 755 | 763 | 757 | 735 | 734 |
| Total mortgages | 754 | 751 | 756 | 753 | 736 | 735 |
| **Loan Purpose** | | | | | | |
| Purchase | 19% | 30% | 16% | 21% | 28% | 30% |
| Cash-out refinance | 13 | 19 | 15 | 19 | 26 | 27 |
| Other refinance [8] | 68 | 51 | 69 | 60 | 46 | 43 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Property Type** | | | | | | |
| Detached/townhome [9] | 93% | 93% | 94% | 94% | 92% | 92% |
| Condo/Co-op | 7 | 7 | 6 | 6 | 8 | 8 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| **Occupancy Type** | | | | | | |
| Primary residence | 91% | 89% | 91% | 91% | 91% | 91% |
| Second/vacation home | 4 | 5 | 4 | 4 | 5 | 5 |
| Investment | 5 | 6 | 5 | 5 | 4 | 4 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |

(1) Purchases and ending balances are based on the UPB of the single-family credit guarantee portfolio. Other Guarantee Transactions with ending balances of $1 billion and $2 billion at June 30, 2012 and December 31, 2011, respectively, are excluded from portfolio balance data since these securities are backed by non-Freddie Mac issued securities for which the loan characteristics data was not available.

(2) Includes loans acquired under our relief refinance initiative, which began in 2009.

(3) Purchases columns exclude mortgage loans acquired under our relief refinance initiative, unless otherwise noted. See "Table 37 — Single-Family Relief Refinance Loans" for further information on the LTV ratios of these loans.

(4) Original LTV ratios are calculated as the amount of the mortgage we guarantee including the credit-enhanced portion, divided by the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation because we generally do not receive data about them. The existence of a second lien mortgage reduces the borrower's equity in the home and, therefore, can increase the risk of default.

(5) Current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since origination. Estimated current LTV ratio range is not applicable to purchase activity, and excludes any secondary financing by third parties.

(6) Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of our single-family credit guarantee portfolio by UPB as of June 30, 2012 and December 31, 2011, respectively.

(7) Credit score data is based on FICO scores. Although we obtain updated credit information on certain borrowers after the origination of a mortgage, such as those borrowers seeking a modification, the scores presented in this table represent the credit score of the borrower at the time of loan origination and may not be indicative of borrowers' creditworthiness at June 30, 2012. Excludes less than 1% of loans in the portfolio because the FICO scores at origination were not available at June 30, 2012.

(8) Other refinance transactions include: (a) refinance mortgages with "no cash out" to the borrower; and (b) refinance mortgages for which the delivery data provided was not sufficient for us to determine whether the mortgage was a cash-out or a no cash-out refinance transaction.

(9) Includes manufactured housing and homes within planned unit development communities. The UPB of manufactured housing mortgage loans purchased during the six months ended June 30, 2012 and 2011, was $288 million and $206 million, respectively.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                      Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or sell the property for an amount at or above the balance of the outstanding mortgage loan. Based on our historical experience, there is an increase in borrower default risk as LTV ratios increase, particularly for loans with LTV ratios above 80%. The proportion of loans we purchased with original LTV ratios over 100% increased from approximately 5% of our single-family mortgage purchases (including relief refinance loans) in the first half of 2011 to 11% of our single-family mortgage purchases in the first half of 2012 due, in large part, to the changes in HARP announced in the fourth quarter of 2011, which allow borrowers with higher LTV ratios to refinance. Strong gains in home prices in most areas of the U.S. during the first half of 2012 led to improved current LTV ratios of the loans in our portfolio as of June 30, 2012. The UPB of mortgages in our single-family credit guarantee portfolio with estimated current LTV ratios greater than 100% was 18% and 20% at June 30, 2012 and December 31, 2011, respectively, and the serious delinquency rate for these loans was 12.9% and 12.8%, respectively. Due to declines in home prices since 2006, we estimate that as of June 30, 2012 and December 31, 2011, approximately 48% and 49%, respectively, of the loans originated in 2005 through 2008 that remained in our single-family credit guarantee portfolio as of those dates had current LTV ratios greater than 100%. In recent years, loans with current LTV ratios greater than 100% have contributed disproportionately to our credit losses.

A second lien mortgage reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both June 30, 2012 and December 31, 2011, approximately 15% of the loans in our single-family credit guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However, borrowers are free to obtain second lien financing after origination and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages.

Certain combinations of loan characteristics often can indicate a higher degree of credit risk. For example, single-family mortgages with both high LTV ratios and borrowers who have lower credit scores typically experience higher rates of serious delinquency and default. We estimate that there were $11.4 billion and $11.1 billion at June 30, 2012 and December 31, 2011, respectively, of loans in our single-family credit guarantee portfolio with both original LTV ratios greater than 90% and FICO scores less than 620 at the time of loan origination. Certain mortgage product types, including interest-only or option ARM loans, that have additional higher risk characteristics, such as lower credit scores or higher LTV ratios, will also have a higher risk of default than those same products without these characteristics. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about certain attribute combinations of single-family mortgage loans.

*Single-Family Mortgage Product Types*

Product mix affects the credit risk profile of our total mortgage portfolio. The primary mortgage products in our single-family credit guarantee portfolio are first lien, fixed-rate mortgage loans. In general, 15-year amortizing fixed-rate mortgages exhibit the lowest default rate among the types of mortgage loans we securitize and purchase, due to the accelerated rate of principal amortization on these mortgages and the credit profiles of borrowers who seek and qualify for them. In a rising interest rate environment, balloon/reset and ARM borrowers typically default at a higher rate than fixed-rate borrowers. However, in recent years, during which interest rates have generally remained relatively low, our delinquency and default rates on adjustable-rate and balloon/reset mortgage loans continue to be as high as, or higher than, those on fixed-rate loans because these borrowers also have been affected by declining housing and economic conditions and/or had other higher-risk characteristics. Interest-only and option ARM loans are higher-risk mortgage products based on the features of these types of loans. See "*Other Categories of Single-Family Mortgage Loans*" below for additional information on higher-risk mortgages in our single-family credit guarantee portfolio.

In recent periods, we experienced a high volume of loan modifications, as troubled borrowers were able to take advantage of the various programs that we offered. The majority of our loan modifications result in new terms that include predetermined interest rates for the remaining term of the loan. For example, our HAMP loan modifications result in an initial below-market interest rate that after five years gradually adjusts to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate products for presentation within this Form 10-Q and elsewhere in our reporting even though they have a rate adjustment provision because the future rates are determined at the time of modification rather than at a subsequent date.

The following paragraphs provide information on the interest-only, option ARM, and conforming jumbo loans in our single-family credit guarantee portfolio. Interest-only and option ARM loans have experienced significantly higher serious delinquency rates than fixed-rate amortizing mortgage products.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest-Only Loans

Interest-only loans have an initial period during which the borrower pays only interest, and at a specified date the monthly payment increases to begin reflecting repayment of principal. Interest-only loans represented approximately 4% of the UPB of our single-family credit guarantee portfolio at both June 30, 2012 and December 31, 2011. We discontinued purchasing such loans on September 1, 2010.

Option ARM Loans

Most option ARM loans have initial periods during which the borrower has various options as to the amount of each monthly payment, until a specified date, when the terms are recast. At both June 30, 2012 and December 31, 2011, option ARM loans represented less than 1% of the UPB of our single-family credit guarantee portfolio. Included in this exposure was $6.8 billion and $7.3 billion of option ARM securities underlying certain of our Other Guarantee Transactions at June 30, 2012 and December 31, 2011, respectively. While we have not categorized these option ARM securities as either subprime or Alt-A securities for presentation within this Form 10-Q and elsewhere in our reporting, they could exhibit similar credit performance to collateral identified as subprime or Alt-A. We have not purchased option ARM loans in our single-family credit guarantee portfolio since 2007. For information on our exposure to option ARM loans through our holdings of non-agency mortgage-related securities, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Conforming Jumbo Loans

We purchased $14.4 billion and $13.3 billion of conforming jumbo loans during the six months ended June 30, 2012 and 2011, respectively. The UPB of conforming jumbo loans in our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011 was $52.9 billion and $49.8 billion, respectively, or 3% of the UPB of our single-family credit guarantee portfolio at both dates. The average size of these loans was approximately $537,000 and $545,000 at June 30, 2012 and December 31, 2011, respectively. For loans originated after September 30, 2011, conforming jumbo loans on a one-family residence have UPB at origination that is greater than $417,000 and up to $625,500 in certain "high-cost" areas. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments*" in our 2011 Annual Report for further information on the conforming loan limits.

*Other Categories of Single-Family Mortgage Loans*

While we have classified certain loans as subprime or Alt-A for purposes of the discussion below and elsewhere in this Form 10-Q, there is no universally accepted definition of subprime or Alt-A, and our classification of such loans may differ from those used by other companies. For example, some financial institutions may use FICO scores to delineate certain residential mortgages as subprime. In addition, we do not rely primarily on these loan classifications to evaluate the credit risk exposure relating to such loans in our single-family credit guarantee portfolio. For a definition of the subprime and Alt-A single-family loans and securities in this Form 10-Q, see "GLOSSARY."

Subprime Loans

Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk (see " *Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio*" and "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for further information). In addition, we estimate that approximately $2.2 billion and $2.3 billion of security collateral underlying our Other Guarantee Transactions at June 30, 2012 and December 31, 2011, respectively, were identified as subprime based on information provided to us when we entered into these transactions.

We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions. At June 30, 2012 and December 31, 2011, we held $46.7 billion and $49.0 billion, respectively, in UPB of non-agency mortgage-related securities backed by subprime loans. These securities were structured to provide credit enhancements, and 6% and 7% of these securities were investment grade at June 30, 2012 and December 31, 2011, respectively. The credit performance of loans underlying these securities has deteriorated significantly since 2008. For more information on our exposure to subprime mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Alt-A Loans

Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. The UPB of Alt-A loans in our single-family credit guarantee portfolio declined to $84 billion as of June 30, 2012 from $94.3 billion as of December 31, 2011. The UPB of our Alt-A loans declined in the first half of 2012 primarily due to refinancing into other mortgage products, foreclosure transfers, and other liquidation events. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. As of June 30, 2012, for Alt-A loans in our single-family credit guarantee portfolio, the average FICO score at origination was 716. Although Alt-A mortgage loans comprised approximately 5% of our single-family credit guarantee portfolio as of June 30, 2012, these loans represented approximately 23% and 24% of our credit losses during the three and six months ended June 30, 2012, respectively.

Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in one of these programs and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. From the time the relief refinance initiative began in 2009 to June 30, 2012, we purchased approximately $18.4 billion of relief refinance mortgages that were previously categorized as Alt-A loans in our portfolio, including $3.1 billion during the six months ended June 30, 2012.

We also hold investments in non-agency mortgage-related securities backed by single-family Alt-A loans. At June 30, 2012 and December 31, 2011, we held investments of $15.8 billion and $16.8 billion, respectively, of non-agency mortgage-related securities backed by Alt-A and other mortgage loans and 14% and 15%, respectively, of these securities were categorized as investment grade. The credit performance of loans underlying these securities has deteriorated significantly since 2008. We categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. For more information on our exposure to Alt-A mortgage loans through our investments in non-agency mortgage-related securities see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities."

Higher-Risk Loans in the Single-Family Credit Guarantee Portfolio

The table below presents information about certain categories of single-family mortgage loans within our single-family credit guarantee portfolio that we believe have certain higher-risk characteristics. These loans include categories based on product type and borrower characteristics present at origination. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these characteristics will have an even higher risk of default than those with an individual characteristic.

<div align="center">65</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 35 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio** [1]

| | As of June 30, 2012 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $345.4 | 104% | 7.4% | 8.5% |
| Categories (individual characteristics): | | | | |
| Alt-A | 84.0 | 105 | 10.1 | 11.7 |
| Interest-only[5] | 61.4 | 118 | 0.2 | 17.1 |
| Option ARM[6] | 7.8 | 114 | 6.7 | 18.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[7] | 101.4 | 105 | 8.7 | 8.2 |
| Original LTV ratio greater than 90%, HARP mortgages[7] | 87.6 | 106 | 0.1 | 1.2 |
| Lower FICO scores at origination (less than 620)[7] | 53.1 | 92 | 14.2 | 12.5 |

| | As of December 31, 2011 | | | |
| --- | --- | --- | --- | --- |
| | UPB | Estimated Current LTV[2] | Percentage Modified[3] | Serious Delinquency Rate[4] |
| | | (dollars in billions) | | |
| Loans with one or more specified characteristics | $342.9 | 105% | 7.2% | 9.3% |
| Categories (individual characteristics): | | | | |
| Alt-A | 94.3 | 107 | 8.8 | 11.9 |
| Interest-only[5] | 72.0 | 120 | 0.2 | 17.6 |
| Option ARM[6] | 8.4 | 119 | 5.5 | 20.5 |
| Original LTV ratio greater than 90%, non-HARP mortgages[7] | 107.9 | 108 | 8.1 | 8.5 |
| Original LTV ratio greater than 90%, HARP mortgages[7] | 59.3 | 104 | 0.1 | 1.3 |
| Lower FICO scores at origination (less than 620)[7] | 55.6 | 93 | 13.4 | 12.9 |

(1)  Categories are not additive and a single loan may be included in multiple categories if more than one characteristic is associated with the loan.
(2)  See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of current LTV ratios.
(3)  Represents the percentage of loans based on loan count in our single-family credit guarantee portfolio at period end that have been modified under agreement with the borrower, including those with no changes in the interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan. Excludes loans underlying certain Other Guarantee Transactions for which data was not available.
(4)  See "Credit Performance — Delinquencies" for further information about our reported serious delinquency rates.
(5)  The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.
(6)  Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.
(7)  See endnotes (4) and (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of original LTV ratios and our presentation of FICO scores, respectively.

A significant portion of the loans in the higher-risk categories presented in the table above were originated in 2005 through 2008. Except for HARP loans with LTV ratios greater than 90%, we purchased a limited amount of loans in the higher-risk categories presented above since the beginning of 2009, and have fully discontinued purchases of Alt-A (effective March 1, 2009), interest-only (effective September 1, 2010), and option ARM (since 2007) loans. The UPB of loans originated in 2005 to 2008 within our single-family credit guarantee portfolio, which have a higher composition of loans with higher-risk characteristics, continues to decline primarily due to repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. We currently expect that, over time, the replacement (other than through relief refinance activity) of the 2005 to 2008 vintages should positively impact the serious delinquency rates and credit-related expenses of our single-family credit guarantee portfolio. However, the rate at which this replacement is occurring remains slow, primarily due to low volumes of home purchase mortgage originations and the length of the foreclosure process. For the first half of 2012, loans originated in 2005 through 2008 in our single-family credit guarantee portfolio comprised approximately 88% of our credit losses.

Loans within one or more of the higher-risk categories presented in the table above comprised approximately 20% of our single-family credit guarantee portfolio as of both June 30, 2012 and December 31, 2011. The total UPB of loans in our single-family credit guarantee portfolio with one or more of these characteristics increased slightly to $345.4 billion as of June 30, 2012 from $342.9 billion as of December 31, 2011. This slight increase was principally due to increased purchases of loans with original LTV ratios greater than 90% due to significant relief refinance mortgage activity in the first half of 2012, but was substantially offset by repayments and other liquidations, including completed foreclosure alternatives and foreclosure transfers. The serious delinquency rates associated with loans with one or more of the above characteristics declined to 8.5% as of June 30, 2012 from 9.3% as of December 31, 2011.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                TREASURY-4152                Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Enhancements*

The portfolio information below excludes our holdings of non-Freddie Mac mortgage-related securities. See "CONSOLIDATED BALANCE SHEETS ANALYSIS — Investments in Securities — *Mortgage-Related Securities*" for credit enhancement and other information about our investments in non-Freddie Mac mortgage-related securities.

Our charter requires that single-family mortgages with LTV ratios above 80% at the time of purchase be covered by specified credit enhancements or participation interests. However, as discussed below, under HARP, we allow eligible borrowers who have mortgages with current LTV ratios over 80% to refinance their mortgages without obtaining new mortgage insurance in excess of what was already in place. Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. In addition, for some mortgage loans, we elect to share the default risk by transferring a portion of that risk to various third parties through a variety of other credit enhancements. Our credit losses could increase if an entity that provides credit enhancement fails to fulfill its obligation, as this would reduce the amount of our recoveries.

At June 30, 2012 and December 31, 2011, our credit-enhanced mortgages represented 13% and 14%, respectively, of our single-family credit guarantee portfolio, excluding those backing Ginnie Mae Certificates and HFA bonds guaranteed by us under the HFA initiative. Our financial guarantees backed by Ginnie Mae Certificates and HFA bonds under the HFA initiative are excluded because we consider the incremental credit risk to which we are exposed to be insignificant.

We recognized recoveries from credit enhancements (excluding reimbursements for our expenses) of $0.6 billion and $1.0 billion that reduced our charge-offs of single-family loans during the six months ended June 30, 2012 and 2011, respectively, which was almost entirely associated with our primary and pool mortgage insurance policies. We recognized additional recoveries associated with credit enhancements that reduced our single-family REO operations expenses by $56 million and $216 million for the six months ended June 30, 2012 and 2011, respectively. The declines in our recoveries in the 2012 periods compared to the 2011 periods was primarily due to the effect of the weakened financial condition of several of our mortgage insurance counterparties who have instituted plans of deferred payment obligation on our claims. See "*Institutional Credit Risk*" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.

During the first half of 2012 and 2011, the percentage of our single-family loan purchases with credit enhancement coverage was lower than in periods before 2009, primarily as a result of high refinance activity. Refinance loans (other than relief refinance mortgages) typically have lower LTV ratios than home purchase loans, and are more likely to have an LTV ratio below 80% and not require credit protection as specified in our charter. In addition, we have been purchasing significant amounts of relief refinance mortgages. These mortgages allow for the refinance of existing loans guaranteed by us under terms such that we may not have mortgage insurance for some or all of the UPB of the mortgage in excess of 80% of the value of the property.

See "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-Family Mortgage Credit Risk — Credit Enhancements*" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit protection and other forms of credit enhancements covering loans in our single-family credit guarantee portfolio.

*Single-Family Loan Workouts and the MHA Program*

Loan workout activities are a key component of our loss mitigation strategy for managing and resolving troubled assets and lowering credit losses. Our loan workouts consist of: (a) forbearance agreements; (b) repayment plans; (c) loan modifications; and (d) foreclosure alternatives ( *e.g.*, short sales or deed in lieu of foreclosure transactions). Our single-family loss mitigation strategy emphasizes early intervention by servicers in delinquent mortgages and provides alternatives to foreclosure. Other single-family loss mitigation activities include providing our single-family servicers with default management tools designed to help them manage non-performing loans more effectively and to assist borrowers in maintaining home ownership where possible, or facilitate foreclosure alternatives when continued homeownership is not an option. See "BUSINESS — Our Business Segments — *Single-Family Guarantee Segment — Loss Mitigation and Loan Workout Activities*" in our 2011 Annual Report for a general description of our loan workouts.

Loan workouts are intended to reduce the number of delinquent mortgages that proceed to foreclosure and, ultimately, mitigate our total credit losses by reducing or eliminating a portion of the costs related to foreclosed properties and avoiding the additional credit losses that likely would be incurred in a REO sale. While we incur costs in the short term to execute our loan workout initiatives, we believe that, overall, these initiatives could reduce our ultimate credit losses over the long term. During the six months ended June 30, 2012, we helped approximately 81,000 borrowers either stay in their homes or sell

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

their properties and avoid foreclosures through our various workout programs, including HAMP, and we completed approximately 55,000 foreclosures. HAMP and our new non-HAMP standard loan modification are important components of our loan workout program and have many similar features, including the initial incentive fees paid to servicers upon completion of a modification.

Our seller/servicers have a significant role in servicing loans in our single-family credit guarantee portfolio, which includes an active role in our loss mitigation efforts. Therefore, a decline in their performance could impact the overall quality of our credit performance (including through missed opportunities for mortgage modifications), which could adversely affect our financial condition or results of operations and have significant effects on our ability to mitigate credit losses. The risk of such a decline in performance remains high.

The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts, and set market standards. Participation in the MHA Program is an integral part of our mission of providing stability to the housing market. Through our participation in this program, we help borrowers maintain home ownership. Some of the key initiatives of this program include HAMP and HARP, which are discussed below.

Home Affordable Modification Program

HAMP commits U.S. government, Freddie Mac and Fannie Mae funds to help eligible homeowners avoid foreclosures and keep their homes through mortgage modifications, where possible. Under this program, we offer loan modifications to financially struggling homeowners with mortgages on their primary residences that reduce the monthly principal and interest payments on their mortgages. HAMP requires that each borrower complete a trial period during which the borrower will make monthly payments based on the estimated amount of the modification payments. Trial periods are required for at least three months. After the final trial-period payment is received by our servicer and the borrower has provided necessary documentation, the borrower and servicer will enter into the modification. We bear the costs of these activities, including the cost of any monthly payment reductions. HAMP applies to loans originated on or before January 1, 2009.

The table below presents the number of single-family loans that completed modification under HAMP from the inception of the program through June 30, 2012 and December 31, 2011, or were in trial periods as of that date.

**Table 36 — Single-Family Home Affordable Modification Program Volume[1]**

| | As of June 30, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Amount[2] | Number of Loans | Amount[2] | Number of Loans |
| | | (dollars in millions) | | |
| Completed HAMP modifications[3] | $ 44,379 | 200,705 | $ 39,991 | 180,539 |
| Loans in the HAMP trial period | $ 2,390 | 11,219 | $ 2,790 | 12,802 |

(1)   Based on information reported by our servicers to the MHA Program administrator.

(2)   For loans in the HAMP trial period, this reflects the loan balance prior to modification. For completed HAMP modifications, the amount represents the balance of loans after modification under HAMP.

(3)   Amounts presented represent completed HAMP modifications with effective dates since our implementation of HAMP in 2009 through June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012 and December 31, 2011, amounts include approximately 37,000 and 28,000 loans, respectively, that completed the HAMP modification and subsequently became ineligible for borrower incentive payments under HAMP due to: (a) serious delinquency; (b) payoff; or (c) the loan transitioning to a loss event. Prior period amounts have been revised to conform to the current period presentation.

As of June 30, 2012, the borrower's monthly payment was reduced on average by an estimated $539, which amounts to an average of $6,468 per year, and a total of $1.3 billion in annual reductions for all of our completed HAMP modifications (these amounts are calculated by multiplying the number of completed modifications by the average reduction in monthly payment, and have not been adjusted to reflect the actual performance of the loans following modification).

Approximately 22% of our loans in the HAMP trial period as of June 30, 2012 have been in the trial period for more than the minimum duration of three months. Based on information provided by the MHA Program administrator, the average length of the trial period for loans in the program as of June 30, 2012 was five months. When a borrower's HAMP trial period is cancelled, the loan is considered for our other workout activities. For information about the percentage of completed loan modifications that remained current, see "Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing."

On January 27, 2012, Treasury announced enhancements to HAMP, including extending the end date to December 31, 2013, expanding the program's eligibility criteria for modifications, increasing incentives paid to investors who engage in

<div align="center">68</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

principal reduction, and extending to the GSEs the opportunity to receive investor incentives for principal reduction. FHFA noted that Treasury's expanded eligibility criteria for HAMP modifications are consistent with our standard non-HAMP modification.

On July 31, 2012, FHFA announced that, after analysis of the new HAMP incentives available to the GSEs for the use of principal reduction, FHFA concluded that the anticipated benefits do not outweigh the costs and risks, and that it would not direct us to implement the new principal reduction alternative under HAMP.

The costs we incur related to HAMP have been, and will likely continue to be, significant. We paid $37 million and $83 million of servicer incentives during the three and six months ended June 30, 2012, respectively, as compared to $36 million and $75 million of such incentives during the three and six months ended June 30, 2011 respectively. As of June 30, 2012, we accrued $91 million for both initial and recurring servicer incentives not yet due. We paid $28 million and $58 million of borrower incentives during the three and six months ended June 30, 2012, respectively, as compared to $17 million and $38 million of these incentives during the three and six months ended June 30, 2011, respectively. As of June 30, 2012, we accrued $74 million for borrower incentives not yet due. We also have the potential to incur additional servicer incentives and borrower incentives as long as the borrower remains current on a loan modified under HAMP. See "MD&A — RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Single-family Mortgage Credit Risk — Single-Family Loan Workouts and the MHA Program*" in our 2011 Annual Report for additional information about the costs associated with HAMP.

Servicing Alignment Initiative and Non-HAMP Standard Modifications

During 2011, we completed the initial implementation of the FHFA-directed servicing alignment initiative, under which we and Fannie Mae are aligning certain standards for servicing non-performing loans owned or guaranteed by the companies. We believe that the servicing alignment initiative will ultimately: (a) change, among other things, the way servicers communicate and work with troubled borrowers; (b) bring greater consistency and accountability to the servicing industry; and (c) help more distressed homeowners avoid foreclosure. We provided standards to our servicers under this initiative that require they initiate earlier and more frequent communication with delinquent borrowers, employ consistent requirements for collecting documents from borrowers, and follow consistent timelines for responding to borrowers and for processing foreclosures. These standards are expected to result in greater alignment of servicer processes for both HAMP and most non-HAMP workouts. We expect that the servicing alignment initiative, under FHFA's direction, will continue to be expanded in 2012.

Under these new servicing standards, we pay incentives to servicers that exceed certain performance standards with respect to servicing delinquent loans. We also assess compensatory fees from servicers if they do not achieve a minimum performance benchmark with respect to servicing delinquent loans. These incentives may result in our payment of increased fees to our seller/servicers, the cost of which may be at least partially mitigated by the compensatory fees paid to us by our servicers that do not perform as required.

As part of the servicing alignment initiative, we have also implemented a new non-HAMP standard loan modification initiative. Our servicers began offering standard modification trial period plans with effective dates on or after October 1, 2011. This standard modification fully replaced our previous non-HAMP modification initiative beginning January 1, 2012. The standard modification requires a three-month trial period (our previous non-HAMP modification program did not require a trial period). As of June 30, 2012, approximately 6,000 borrowers having loans with aggregate UPB of $1.1 billion had completed this type of modification, and approximately 15,000 borrowers were in the modification trial period. Our completed modification volume in the first half of 2012 was below what otherwise would be expected, as servicers completed the transition to the new standard modification initiative and borrowers completed the trial period. However, we expect to complete a significant number of these non-HAMP standard loan modifications in the future and the costs we incur related to these modifications will likely be significant. While we incur costs in the short-term to execute our non-HAMP standard modifications, we believe that, overall, our non-HAMP standard modifications could reduce our ultimate credit losses over the long-term.

Home Affordable Refinance Program and Relief Refinance Mortgage Initiative

Our relief refinance mortgage initiative, including HARP (which is the portion of our relief refinance initiative for loans with LTV ratios above 80%), gives eligible homeowners (whose monthly payments are current) with existing loans that are owned or guaranteed by us an opportunity to refinance into loans with more affordable monthly payments and/or fixed-rate

69

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

terms. HARP is targeted at borrowers with current LTV ratios above 80%; however, our relief refinance initiative also allows borrowers with LTV ratios of 80% and below to participate.

A number of FHFA-directed changes to HARP were announced in late 2011. These changes are intended to allow more borrowers to participate in the program and benefit from refinancing their home mortgages, including borrowers whose mortgages have LTV ratios above 125%. These revisions to HARP will help to reduce our exposure to credit risk to the extent that HARP refinancing strengthens the borrowers' potential to repay their mortgages and, in some cases, reduces the payments under their mortgages. These revisions to HARP could also reduce our credit losses to the extent that the revised program contributes to bringing stability to the housing market. However, we may face greater exposure to credit and other losses on these HARP loans because we are not requiring lenders to provide us with certain representations and warranties on the refinanced HARP loans. As of June 30, 2012, we had purchased approximately $27 billion in UPB of HARP loans with reduced representations and warranties. In July 2012, we announced that we will expand the eligibility of loans subject to reduced representations and warranties to include relief refinance mortgages with LTV ratios of 80% or less beginning January 1, 2013. We could also experience declines in the fair values of certain agency security investments classified as available-for-sale or trading resulting from changes in expectations of mortgage prepayments and lower net interest yields over time on other mortgage-related investments.

We began purchasing HARP loans under the expanded program in January 2012, and the volume of our purchases of HARP loans increased 76% in the first half of 2012, compared to the first half of 2011. However, since industry participation in HARP is not mandatory, implementation schedules have varied as individual lenders, mortgage insurers, and other market participants modify their processes. There can be no assurance that the benefits from the revised program will exceed our costs.

Our underwriting procedures for relief refinance mortgages are limited in many cases, and such procedures generally do not include all of the changes in underwriting standards we have implemented in the last several years. As a result, relief refinance mortgages generally reflect many of the credit risk attributes of the original loans. However, borrower participation in our relief refinance mortgage initiative may help reduce our exposure to credit risk in cases where borrower payments under their mortgages are reduced, thereby strengthening the borrowers' potential to make their mortgage payments.

Over time, relief refinance mortgages with LTV ratios above 80% (*i.e.*, HARP loans) may not perform as well as other refinance mortgages because the continued high LTV ratios of these loans increase the probability of default. Our relief refinance initiative is only for qualifying mortgage loans that we already hold or guarantee. We continue to bear the credit risk for refinanced loans under this program, to the extent that such risk is not covered by existing mortgage insurance or other existing credit enhancements.

The table below presents the composition of our purchases of relief refinance single-family loans during the six months ended June 30, 2012 and 2011, and ending balances of such loans in our portfolio as of June 30, 2012 and December 31, 2011.

70                                                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 37 — Single-Family Relief Refinance Loans[1]

| | Six Months Ended June 30, 2012 | | | Six Months Ended June 30, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount | Number of Loans | Percent[2] | Amount | Number of Loans | Percent[2] |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 8,118 | 38,466 | 5.0% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 9,831 | 47,350 | 6.0 | 4,638 | 20,072 | 3.6 |
| Above 80% to 105% LTV ratio | 22,544 | 114,302 | 13.8 | 18,431 | 85,328 | 14.5 |
| 80% and below LTV ratio | 17,326 | 116,844 | 10.6 | 22,269 | 137,053 | 17.5 |
| Total relief refinance mortgages | $ 57,819 | 316,962 | 35.4% | $ 45,338 | 242,453 | 35.6% |
| Total refinance loan volume[3] | $163,327 | 781,244 | 100% | $127,198 | 610,266 | 100% |

| | As of June 30, 2012 | | | As of December 31, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Amount | Number of Loans | Serious Delinquency Rate | Amount | Number of Loans | Serious Delinquency Rate |
| | (dollars in millions) | | | | | |
| Relief refinance mortgages: | | | | | | |
| Above 125% LTV ratio | $ 8,111 | 38,457 | 0.01% | $ — | — | —% |
| Above 105% to 125% LTV ratio | 21,545 | 99,891 | 1.18 | 12,056 | 53,335 | 1.34 |
| Above 80% to 105% LTV ratio | 105,335 | 504,785 | 1.08 | 87,614 | 406,290 | 1.02 |
| 80% and below LTV ratio | 108,492 | 697,525 | 0.27 | 100,861 | 621,720 | 0.23 |
| Total relief refinance mortgages | $243,483 | 1,340,658 | 0.64% | $200,531 | 1,081,345 | 0.58% |

(1) Consists of all single-family refinance mortgage loans that we either purchased or guaranteed during the period, including those associated with other guarantee commitments and Other Guarantee Transactions. Prior period amounts have been revised to conform to current period presentation.

(2) Based on UPB.

(3) Consists of relief refinance mortgages and other refinance mortgages.

Relief refinance mortgages comprised approximately 35% and 36% of our total refinance volume in the six months ended June 30, 2012 and 2011, respectively, based on UPB. Relief refinance mortgages with LTV ratios above 80% represented approximately 21% and 14% of our total single-family credit guarantee portfolio purchases during the six months ended June 30, 2012 and 2011, respectively. Relief refinance mortgages of all LTV ratios comprised approximately 14% and 11% of the UPB in our total single-family credit guarantee portfolio at June 30, 2012 and December 31, 2011, respectively.

Loan Workout Volumes and Modification Performance

The table below presents volumes of single-family loan workouts, serious delinquency, and foreclosures for the three and six months ended June 30, 2012 and 2011.

71                                                                                                       *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 38 — Single-Family Loan Workouts, Serious Delinquency, and Foreclosures Volumes[1]**

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances | Number of Loans | Loan Balances |
| | | | | (dollars in millions) | | | | |
| Home retention actions: | | | | | | | | |
| Loan modifications | | | | | | | | |
| with no change in terms[2] | 38 | $ 7 | 1,058 | $ 190 | 484 | $ 89 | 2,323 | $ 409 |
| with term extension | 495 | 74 | 4,528 | 836 | 1,666 | 296 | 9,808 | 1,797 |
| with reduction of contractual interest rate and, in certain cases, term extension | 11,445 | 2,325 | 19,781 | 4,403 | 20,308 | 4,233 | 42,749 | 9,570 |
| with rate reduction, term extension and principal forbearance | 3,164 | 818 | 5,682 | 1,520 | 6,361 | 1,681 | 11,327 | 3,025 |
| Total loan modifications[3] | 15,142 | 3,224 | 31,049 | 6,949 | 28,819 | 6,299 | 66,207 | 14,801 |
| Repayment plans [4] | 8,712 | 1,271 | 7,981 | 1,157 | 19,287 | 2,748 | 17,080 | 2,443 |
| Forbearance agreements[5] | 4,738 | 1,010 | 3,709 | 703 | 8,394 | 1,702 | 11,387 | 2,229 |
| Total home retention actions | 28,592 | 5,505 | 42,739 | 8,809 | 56,500 | 10,749 | 94,674 | 19,473 |
| Foreclosure alternatives: | | | | | | | | |
| Short sale | 12,281 | 2,739 | 11,038 | 2,515 | 24,333 | 5,470 | 21,515 | 5,003 |
| Deed in lieu of foreclosure transactions | 250 | 42 | 144 | 25 | 443 | 75 | 229 | 40 |
| Total foreclosure alternatives | 12,531 | 2,781 | 11,182 | 2,540 | 24,776 | 5,545 | 21,744 | 5,043 |
| Total single-family loan workouts | 41,123 | $ 8,286 | 53,777 | $ 11,349 | 81,276 | $ 16,294 | 116,418 | $ 24,516 |
| Seriously delinquent loan additions | 75,904 | | 87,813 | | 156,719 | | 185,459 | |
| Single-family foreclosures[6] | 26,050 | | 30,139 | | 55,004 | | 61,226 | |
| Seriously delinquent loans, at period end | 386,570 | | 417,457 | | 386,570 | | 417,457 | |

(1) Based on completed actions with borrowers for loans within our single-family credit guarantee portfolio. Excludes those modification, repayment and forbearance activities for which the borrower has started the required process, but the actions have not been made permanent or effective, such as loans in modification trial periods. Also excludes certain loan workouts where our single-family seller/servicers have executed agreements in the current or prior periods, but these have not been incorporated into certain of our operational systems, due to delays in processing. These categories are not mutually exclusive and a loan in one category may also be included within another category in the same period (see endnote 5).

(2) Under this modification type, past due amounts are added to the principal balance and reamortized based on the original contractual loan terms.

(3) Includes completed loan modifications under HAMP; however, the number of such completions differs from that reported by the MHA Program administrator in part due to differences in the timing of recognizing the completions by us and the administrator.

(4) Represents the number of borrowers as reported by our seller/servicers that have completed the full term of a repayment plan for past due amounts. Excludes the number of borrowers that are actively repaying past due amounts under a repayment plan, which totaled 16,940 and 20,342 borrowers as of June 30, 2012 and 2011, respectively.

(5) Excludes loans with long-term forbearance under a completed loan modification. Many borrowers complete a short-term forbearance agreement before another loan workout is pursued or completed. We only report forbearance activity for a single loan once during each quarter; however, a single loan may be included under separate forbearance agreements in separate periods.

(6) Represents the number of our single-family loans that complete foreclosure transfers, including third-party sales at foreclosure auction in which ownership of the property is transferred directly to a third-party rather than to us.

We experienced declines in loan modifications in the three and six months ended June 30, 2012, compared to the three and six months ended June 30, 2011. Our completed modification volume in the first half of 2012 was below what otherwise would be expected, as servicers completed the transition to the new standard modification initiative and borrowers completed the trial period. To a lesser extent, the decline in loan modifications is also due to improved credit performance of loans originated in recent years, which has resulted in a reduction in the volume of loans transitioning to serious delinquency and a reduction in our inventory of problem loans.

Foreclosure alternative volume increased 13.9% in the first half of 2012, compared to the first half of 2011, and we expect the volume of foreclosure alternatives to remain high in the remainder of 2012 primarily because we offer incentives to servicers to complete short sales instead of foreclosures. A short sale transaction typically provides us with a comparable or higher level of recovery than what we would receive through property sales from our REO inventory. In large part, the benefit of a short sale arises from the avoidance or reduction of costs we would otherwise incur to complete the foreclosure and dispose of the property, including maintenance and other property expenses associated with holding REO property, legal fees, commissions, and other selling expenses of traditional real estate transactions. We also benefit from deed in lieu of foreclosure transactions, as these transactions expedite the process by which we acquire properties from defaulted borrowers and allow us to avoid costs we would otherwise incur to acquire such properties pursuant to foreclosures. We plan to introduce additional initiatives during the remainder of 2012 designed to help more distressed borrowers avoid foreclosure through short sales and deed in lieu of foreclosure transactions.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The UPB of loans in our single-family credit guarantee portfolio for which we have completed a loan modification increased to $71 billion as of June 30, 2012 from $69 billion as of December 31, 2011. The number of modified loans in our single-family credit guarantee portfolio continued to increase and such loans comprised approximately 3.1% and 2.9% of our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011, respectively. The estimated current LTV ratio for all modified loans in our single-family credit guarantee portfolio was 121% and the serious delinquency rate on these loans was 17.1% as of June 30, 2012. Approximately $43 billion in UPB of our completed HAMP loan modifications at June 30, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to the market rate that was in effect at the time of the modification.

The table below presents the percentage of modified single-family loans that were current and performing in each of the last eight quarterly periods.

### Table 39 — Quarterly Percentages of Modified Single-Family Loans — Current and Performing [1]

| HAMP loan modifications: | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 89% | 89% | 86% | 87% | 86% | 85% | 82% | 81% |
| 6 to 8 months | | 85 | 84 | 82 | 83 | 82 | 81 | 78 |
| 9 to 11 months | | | 81 | 82 | 79 | 78 | 78 | 79 |
| 12 to 14 months | | | | 79 | 80 | 76 | 76 | 76 |
| 15 to 17 months | | | | | 77 | 76 | 73 | 73 |
| 18 to 20 months | | | | | | 74 | 74 | 71 |
| 21 to 23 months | | | | | | | 72 | 72 |
| 24 to 26 months | | | | | | | | 70 |

| Non-HAMP loan modifications: | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 72% | 78% | 73% | 76% | 78% | 80% | 77% | 73% |
| 6 to 8 months | | 69 | 70 | 67 | 69 | 71 | 74 | 66 |
| 9 to 11 months | | | 64 | 67 | 63 | 66 | 68 | 65 |
| 12 to 14 months | | | | 62 | 64 | 61 | 64 | 61 |
| 15 to 17 months | | | | | 60 | 63 | 61 | 56 |
| 18 to 20 months | | | | | | 60 | 62 | 54 |
| 21 to 23 months | | | | | | | 60 | 56 |
| 24 to 26 months | | | | | | | | 54 |

| Total (HAMP and Non-HAMP): | Quarter of Loan Modification Completion [2] | | | | | | | |
|---|---|---|---|---|---|---|---|---|
|  | 1Q 2012 | 4Q 2011 | 3Q 2011 | 2Q 2011 | 1Q 2011 | 4Q 2010 | 3Q 2010 | 2Q 2010 |
| Time since modification- | | | | | | | | |
| 3 to 5 months | 85% | 86% | 81% | 83% | 83% | 82% | 80% | 79% |
| 6 to 8 months | | 80 | 79 | 77 | 77 | 76 | 78 | 75 |
| 9 to 11 months | | | 75 | 76 | 73 | 72 | 74 | 75 |
| 12 to 14 months | | | | 73 | 73 | 68 | 71 | 71 |
| 15 to 17 months | | | | | 70 | 69 | 68 | 68 |
| 18 to 20 months | | | | | | 67 | 69 | 66 |
| 21 to 23 months | | | | | | | 67 | 68 |
| 24 to 26 months | | | | | | | | 65 |

(1)   Represents the percentage of loans that are current and performing (no payment is 30 days or more past due) or have been paid in full. Excludes loans in foreclosure status and loans in modification trial periods.

(2)   Loan modifications are recognized as completed in the quarterly period in which the servicer has reported the modification as effective and the agreement has been accepted by us. For loans that have been remodified (e.g., where a borrower has received a new modification after defaulting on the prior modification) the rates reflect the status of each modification separately. For example, in the case of a remodified loan where the borrower is performing, the previous modification would be presented as being in default in the applicable period.

The redefault rate is the percentage of our modified loans that have become seriously delinquent ( *i.e.*, three months or more delinquent or in foreclosure), transitioned to REO, or completed a loss-producing foreclosure alternative. As of June 30, 2012, the redefault rate for all of our single-family loan modifications (including those under HAMP) completed during the first quarter of 2012, and full years of 2011, 2010 and 2009 was 5%, 14%, 23%, and 52%, respectively. Many of the borrowers that received modifications in 2009 were negatively affected by worsening economic conditions, including high unemployment rates during the last several years. As of June 30, 2012, the redefault rate for loans modified under HAMP during the first quarter of 2012, and full years of 2011, 2010, and 2009 was approximately 3%, 10%, 19%, and 21%, respectively. These redefault rates may not be representative of the future performance of modified loans, including those modified under HAMP. We believe the redefault rate for loans modified in the last three years, including those modified under HAMP, is likely to increase, particularly since the housing and economic environments remain challenging.

73

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012     Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Credit Performance*

Delinquencies

We report single-family serious delinquency rate information based on the number of loans that are three monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent as long as the borrower is less than three monthly payments past due under the modified terms. Single-family loans for which the borrower is subject to a forbearance agreement will continue to reflect the past due status of the borrower. To the extent our borrowers participate in the HFA unemployment assistance initiatives and the full contractual payment is made by an HFA, a borrower's mortgage delinquency status will remain static and will not fall into further delinquency.

Our single-family delinquency rates include all single-family loans that we own, that back Freddie Mac securities, and that are covered by our other guarantee commitments, except Freddie Mac financial guarantees that are backed by either Ginnie Mae Certificates or HFA bonds because these securities do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancements provided on them by the U.S. government.

Some of our workout and other loss mitigation activities create fluctuations in our delinquency statistics. For example, single-family loans that we report as seriously delinquent before they enter a modification trial period continue to be reported as seriously delinquent for purposes of our delinquency reporting until the modifications become effective and the loans are removed from delinquent status by our servicers. Consequently, the volume and timing of loan modifications impact our reported serious delinquency rate. In addition, there may be temporary timing differences, or lags, in the reporting of payment status and modification completion due to differing practices of our servicers that can affect our delinquency reporting.

Our serious delinquency rates have been affected by delays, including those due to increases in foreclosure process timeframes, process requirements of HAMP and the servicing alignment initiative, general constraints on servicer capacity (which affects the rate at which servicers modify or foreclose upon loans), and court backlogs (in states that require a judicial foreclosure process). These delays lengthen the period of time in which loans remain in seriously delinquent status, as the delays extend the time it takes for seriously delinquent loans to be modified, foreclosed upon or otherwise resolved and thus transition out of seriously delinquent status. As a result, we believe our single-family serious delinquency rates were higher in the first half of 2012 than they otherwise would have been. As of June 30, 2012 and December 31, 2011, the percentage of seriously delinquent loans that have been delinquent for more than six months was 74% and 70%, respectively.

The table below presents serious delinquency rates for our single-family credit guarantee portfolio.

**Table 40 — Single-Family Serious Delinquency Rates**

| | As of | | | |
|---|---|---|---|---|
| | June 30, 2012 | | December 31, 2011 | |
| | Percentage of Portfolio | Serious Delinquency Rate | Percentage of Portfolio | Serious Delinquency Rate |
| Single-family: | | | | |
| Non-credit-enhanced | 87% | 2.76% | 86% | 2.84% |
| Credit-enhanced[1] | 13 | 7.85 | 14 | 8.03 |
| Total single-family credit guarantee portfolio[2] | 100% | 3.45 | 100% | 3.58 |

(1) See "Institutional Credit Risk" for information about our counterparties that provide credit enhancement on loans in our single-family credit guarantee portfolio.
(2) As of June 30, 2012 and December 31, 2011, approximately 72% and 68%, respectively, of the single-family loans reported as seriously delinquent were in the process of foreclosure.

Serious delinquency rates of our single-family credit guarantee portfolio declined to 3.45% as of June 30, 2012 from 3.58% as of December 31, 2011. Our serious delinquency rate remains high compared to the rates in years prior to 2009 due to continued weakness in home prices, persistently high unemployment, extended foreclosure timelines, and continued challenges faced by servicers processing large volumes of problem loans. In addition, our serious delinquency rate was adversely affected by the decline in the size of our single-family credit guarantee portfolio in the first half of 2012 because this rate is calculated on a smaller number of loans at the end of the period.

Serious delinquency rates for interest-only and option ARM products, which together represented approximately 4% of our total single-family credit guarantee portfolio at June 30, 2012, were 17.1% and 18.5%, respectively, as compared with

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

17.6% and 20.5% at December 31, 2011, respectively. Serious delinquency rates of single-family 30-year, fixed rate amortizing loans, a more traditional mortgage product, were approximately 3.8% and 3.9% at June 30, 2012 and December 31, 2011, respectively.

The tables below present serious delinquency rates categorized by borrower and loan characteristics, including geographic region and origination year, which indicate that certain concentrations of loans have been more adversely affected by declines in home prices and weak economic conditions since 2006. In certain states, our single-family serious delinquency rates have remained persistently high. As of June 30, 2012, single-family loans in Arizona, California, Florida, and Nevada comprised 25% of our single-family credit guarantee portfolio, and the serious delinquency rate of loans in these states was 5.8%. During the first half of 2012, we also continued to experience high serious delinquency rates on single-family loans originated between 2005 and 2008. We purchased significant amounts of loans with higher-risk characteristics in those years. In addition, those borrowers are more susceptible to the declines in home prices and weak economic conditions since 2006 than those homeowners that have built up equity in their homes over a longer period of time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    **TREASURY-4161**                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents credit concentrations for certain loan groups in our single-family credit guarantee portfolio.

**Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio**

| | As of June 30, 2012 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 35 | $ 394 | $ 429 | 88% | 5.0% | 5.8% |
| All other states | 49 | 1,213 | 1,262 | 75 | 2.7 | 2.8 |
| Year of origination: | | | | | | |
| 2012 | — | 148 | 148 | 75 | — | <0.1 |
| 2011 | — | 268 | 268 | 69 | 0.1 | 0.1 |
| 2010 | — | 285 | 285 | 71 | <0.1 | 0.4 |
| 2009 | <1 | 260 | 260 | 72 | 0.1 | 0.7 |
| 2008 | 6 | 92 | 98 | 92 | 5.6 | 6.3 |
| 2007 | 26 | 118 | 144 | 112 | 12.0 | 12.1 |
| 2006 | 23 | 84 | 107 | 110 | 11.0 | 11.2 |
| 2005 | 16 | 105 | 121 | 94 | 6.1 | 6.8 |
| 2004 and prior | 13 | 247 | 260 | 59 | 2.8 | 3.0 |

| | As of June 30, 2011 | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A UPB | Non Alt-A UPB | Total UPB | Estimated Current LTV Ratio[1] | Percentage Modified[2] | Serious Delinquency Rate |
| | (dollars in billions) | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $ 43 | $ 416 | $ 459 | 92% | 4.1% | 6.3% |
| All other states | 61 | 1,285 | 1,346 | 75 | 2.2 | 2.7 |
| Year of origination: | | | | | | |
| 2011 | — | 105 | 105 | 70 | — | <0.1 |
| 2010 | — | 361 | 361 | 71 | <0.1 | 0.1 |
| 2009 | <1 | 366 | 366 | 72 | 0.1 | 0.3 |
| 2008 | 9 | 131 | 140 | 90 | 3.4 | 4.9 |
| 2007 | 32 | 154 | 186 | 110 | 8.5 | 11.0 |
| 2006 | 28 | 111 | 139 | 109 | 7.7 | 10.3 |
| 2005 | 19 | 140 | 159 | 95 | 4.2 | 6.0 |
| 2004 and prior | 16 | 333 | 349 | 60 | 2.1 | 2.5 |

| | Six Months Ended June 30, 2012 | | | Six Months Ended June 30, 2011 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Alt-A | Non Alt-A | Total | Alt-A | Non Alt-A | Total |
| | (in millions) | | | (in millions) | | |
| **Credit Losses** | | | | | | |
| Geographical distribution: | | | | | | |
| Arizona, California, Florida, and Nevada | $1,001 | $ 2,431 | $ 3,432 | $ 1,395 | $ 2,556 | $ 3,951 |
| All other states | 483 | 2,378 | 2,861 | 507 | 1,874 | 2,381 |
| Year of origination: | | | | | | |
| 2012 | — | <1 | <1 | N/A | N/A | N/A |
| 2011 | — | 13 | 13 | — | — | — |
| 2010 | — | 70 | 70 | — | — | — |
| 2009 | <1 | 113 | 113 | <1 | 67 | 67 |
| 2008 | 52 | 507 | 559 | 50 | 434 | 484 |
| 2007 | 559 | 1,743 | 2,302 | 773 | 1,542 | 2,315 |
| 2006 | 528 | 1,096 | 1,624 | 680 | 1,150 | 1,830 |
| 2005 | 293 | 765 | 1,058 | 351 | 753 | 1,104 |
| 2004 and prior | 52 | 502 | 554 | 48 | 484 | 532 |

(1)   See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for information on our calculation of estimated current LTV ratios.

(2)   Represents the percentage of loans, based on loan count, in our single-family credit guarantee portfolio at period end that have been modified under agreement with the borrower, including those with no changes in interest rate or maturity date, but where past due amounts are added to the outstanding principal balance of the loan.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents statistics for combinations of certain characteristics of the mortgages in our single-family credit guarantee portfolio as of June 30, 2012 and December 31, 2011.

**Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations**

| | June 30, 2012 | | | | | | | | |
| | Current LTV Ratio ≤ 80%[1] | | Current LTV Ratio of > 80 to 100%[1] | | Current LTV > 100%[1] | | Current LTV Ratio All Loans[1] | | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
|---|---|---|---|---|---|---|---|---|---|
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 7.9% | 0.7% | 13.0% | 1.0% | 23.3% | 2.6% | 17.5% | 13.8% |
| 15- year amortizing fixed-rate | 0.2 | 4.1 | <0.1 | 8.7 | <0.1 | 14.3 | 0.2 | 1.2 | 4.5 |
| ARMs/adjustable rate[4] | 0.1 | 10.1 | <0.1 | 17.1 | <0.1 | 24.8 | 0.1 | 10.6 | 14.6 |
| Interest-only[5] | <0.1 | 13.6 | <0.1 | 21.4 | 0.1 | 34.2 | 0.1 | 0.4 | 29.2 |
| Other[6] | <0.1 | 4.0 | 0.1 | 6.0 | <0.1 | 11.9 | 0.1 | 4.6 | 5.5 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.1 | 1.1 | 23.5 | 3.1 | 14.2 | 12.5 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.2 | 1.4 | 9.0 | 2.0 | 18.5 | 5.4 | 12.5 | 9.9 |
| 15- year amortizing fixed-rate | 0.6 | 2.4 | <0.1 | 6.2 | <0.1 | 13.3 | 0.6 | 0.6 | 2.7 |
| ARMs/adjustable rate[4] | 0.1 | 5.2 | 0.1 | 11.3 | 0.1 | 23.0 | 0.3 | 2.3 | 11.7 |
| Interest-only[5] | <0.1 | 10.4 | 0.1 | 17.1 | 0.2 | 30.5 | 0.3 | 0.3 | 25.8 |
| Other[6] | <0.1 | 2.3 | <0.1 | 4.6 | <0.1 | 4.8 | <0.1 | 1.7 | 3.9 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.6 | 9.1 | 2.3 | 19.3 | 6.6 | 9.7 | 9.2 |
| **FICO scores of ≥ 660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 36.3 | 1.0 | 18.9 | 2.6 | 11.7 | 9.5 | 66.9 | 3.0 | 2.8 |
| 15- year amortizing fixed-rate | 14.2 | 0.4 | 1.0 | 1.1 | 0.2 | 4.4 | 15.4 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.8 | 1.0 | 0.8 | 4.3 | 0.7 | 14.6 | 4.3 | 0.5 | 3.9 |
| Interest-only[5] | 0.4 | 3.8 | 0.6 | 9.2 | 2.1 | 20.5 | 3.1 | 0.2 | 15.8 |
| Other[6] | <0.1 | 1.8 | <0.1 | 1.5 | 0.1 | 2.0 | 0.1 | 0.6 | 1.8 |
| Total FICO scores ≥ 660 | 53.7 | 0.8 | 21.3 | 2.7 | 14.8 | 10.9 | 89.8 | 2.1 | 2.5 |
| Total FICO scores not available | 0.3 | 4.9 | 0.1 | 11.9 | 0.1 | 21.9 | 0.5 | 6.0 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 39.5 | 1.6 | 21.1 | 3.5 | 14.6 | 11.8 | 75.2 | 4.4 | 3.8 |
| 15- year amortizing fixed-rate | 14.9 | 0.6 | 1.0 | 1.5 | 0.2 | 5.3 | 16.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 3.0 | 1.7 | 0.9 | 5.5 | 0.8 | 16.2 | 4.7 | 1.1 | 4.9 |
| Interest-only[5] | 0.4 | 4.5 | 0.7 | 10.3 | 2.5 | 21.9 | 3.6 | 0.2 | 17.1 |
| Other[6] | 0.1 | 9.1 | 0.1 | 7.7 | 0.2 | 8.3 | 0.4 | 7.2 | 8.5 |
| Total single-family credit guarantee portfolio[7] | 57.9% | 1.3% | 23.8% | 3.7% | 18.3% | 12.9% | 100.0% | 3.1% | 3.5% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 5.8% | 0.2% | 10.6% | 0.3% | 18.7% | 0.7% | 14.0% | 11.0% |
| Northeast | 0.4 | 9.5 | 0.2 | 18.9 | 0.2 | 29.4 | 0.8 | 15.3 | 15.4 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.5 | 0.3 | 28.7 | 0.7 | 14.8 | 15.3 |
| Southwest | 0.2 | 5.0 | 0.1 | 10.9 | <0.1 | 18.7 | 0.3 | 9.9 | 7.5 |
| West | 0.2 | 4.5 | 0.1 | 9.0 | 0.3 | 18.8 | 0.6 | 17.1 | 11.2 |
| Total FICO scores < 620 | 1.2 | 6.9 | 0.8 | 13.1 | 1.1 | 23.5 | 3.1 | 14.2 | 12.5 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.4 | 3.7 | 0.3 | 7.7 | 0.5 | 14.5 | 1.2 | 9.3 | 7.8 |
| Northeast | 0.8 | 6.0 | 0.5 | 13.3 | 0.4 | 24.3 | 1.7 | 9.9 | 10.9 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.0 | 1.4 | 9.9 | 11.8 |
| Southwest | 0.5 | 3.0 | 0.3 | 7.3 | 0.1 | 13.8 | 0.9 | 6.3 | 4.9 |
| West | 0.5 | 3.1 | 0.2 | 6.9 | 0.7 | 17.0 | 1.4 | 13.0 | 9.3 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.6 | 9.1 | 2.3 | 19.3 | 6.6 | 9.7 | 9.2 |
| **FICO scores ≥ 660:** | | | | | | | | | |
| North Central | 9.0 | 0.6 | 4.4 | 2.2 | 2.7 | 7.3 | 16.1 | 1.7 | 1.9 |
| Northeast | 15.0 | 1.1 | 5.6 | 4.0 | 2.1 | 13.2 | 22.7 | 1.8 | 2.5 |
| Southeast | 7.7 | 1.2 | 3.7 | 3.0 | 3.4 | 14.5 | 14.8 | 2.3 | 4.0 |
| Southwest | 7.8 | 0.6 | 2.4 | 2.0 | 0.3 | 6.0 | 10.5 | 1.0 | 1.0 |
| West | 14.2 | 0.5 | 5.2 | 2.0 | 6.3 | 10.0 | 25.7 | 3.2 | 2.8 |
| Total FICO scores ≥ 660 | 53.7 | 0.8 | 21.3 | 2.7 | 14.8 | 10.9 | 89.8 | 2.1 | 2.5 |
| Total FICO scores not available | 0.3 | 4.9 | 0.1 | 11.9 | 0.1 | 21.9 | 0.5 | 6.0 | 8.8 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.7 | 1.0 | 5.0 | 3.1 | 3.4 | 9.3 | 18.1 | 2.8 | 2.7 |
| Northeast | 16.3 | 1.7 | 6.3 | 5.4 | 2.8 | 16.4 | 25.4 | 2.9 | 3.6 |
| Southeast | 8.4 | 1.9 | 4.2 | 4.2 | 4.3 | 16.9 | 16.9 | 3.6 | 5.3 |
| Southwest | 8.6 | 1.0 | 2.7 | 3.2 | 0.5 | 9.2 | 11.8 | 1.9 | 1.7 |
| West | 14.9 | 0.7 | 5.6 | 2.4 | 7.3 | 11.1 | 27.8 | 4.1 | 3.3 |
| Total single-family credit guarantee portfolio[7] | 57.9% | 1.3% | 23.8% | 3.7% | 18.3% | 12.9% | 100.0% | 3.1% | 3.5% |

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4163                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

|  | As of December 31, 2011 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | Current LTV Ratio ≤ 80[1] | | Current LTV Ratio of > 80 to 100[1] | | Current LTV > 100[1] | | Current LTV Ratio All Loans[1] | | |
|  | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Percentage Modified[3] | Serious Delinquency Rate |
| **By Product Type** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 0.9% | 8.1% | 0.8% | 13.4% | 1.0% | 23.7% | 2.7% | 16.6% | 14.2% |
| 15- year amortizing fixed-rate | 0.2 | 4.2 | <0.1 | 10.1 | <0.1 | 17.6 | 0.2 | 1.2 | 4.7 |
| ARMs/adjustable rate[4] | 0.1 | 10.8 | <0.1 | 17.2 | <0.1 | 25.4 | 0.1 | 9.8 | 15.4 |
| Interest only[5] | <0.1 | 16.0 | <0.1 | 22.4 | 0.1 | 34.9 | 0.1 | 0.4 | 30.3 |
| Other[6] | <0.1 | 3.6 | <0.1 | 7.4 | 0.1 | 14.1 | 0.1 | 4.2 | 5.6 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 2.0 | 5.5 | 1.5 | 8.9 | 2.0 | 18.4 | 5.5 | 11.5 | 10.1 |
| 15- year amortizing fixed-rate | 0.6 | 2.5 | <0.1 | 6.1 | <0.1 | 15.1 | 0.6 | 0.6 | 2.8 |
| ARMs/adjustable rate[4] | 0.1 | 5.5 | 0.1 | 11.7 | 0.1 | 23.6 | 0.3 | 2.0 | 12.6 |
| Interest only[5] | <0.1 | 10.4 | 0.1 | 18.6 | 0.3 | 31.7 | 0.4 | 0.3 | 27.2 |
| Other[6] | <0.1 | 2.8 | <0.1 | 4.8 | <0.1 | 5.5 | <0.1 | 1.4 | 4.5 |
| Total FICO scores of 620 to 659: | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores of ≥ 660:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 34.6 | 1.0 | 20.3 | 2.4 | 12.4 | 9.2 | 67.3 | 2.7 | 2.8 |
| 15- year amortizing fixed-rate | 13.1 | 0.4 | 1.0 | 1.1 | 0.2 | 6.0 | 14.3 | 0.1 | 0.5 |
| ARMs/adjustable rate[4] | 2.5 | 1.1 | 0.8 | 4.3 | 0.8 | 14.8 | 4.1 | 0.5 | 4.5 |
| Interest only[5] | 0.4 | 3.7 | 0.7 | 9.2 | 2.5 | 20.7 | 3.6 | 0.2 | 16.2 |
| Other[6] | <0.1 | 2.0 | <0.1 | 2.0 | 0.1 | 2.0 | 0.1 | 0.5 | 2.0 |
| Total FICO scores ≥ 660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| 20 and 30- year or more amortizing fixed-rate | 37.7 | 1.6 | 22.5 | 3.4 | 15.6 | 11.5 | 75.8 | 4.1 | 3.9 |
| 15- year amortizing fixed-rate | 13.8 | 0.6 | 1.1 | 1.5 | 0.2 | 7.3 | 15.1 | 0.1 | 0.7 |
| ARMs/adjustable rate[4] | 2.7 | 1.8 | 1.0 | 5.5 | 0.9 | 16.4 | 4.6 | 1.0 | 5.5 |
| Interest only[5] | 0.5 | 4.4 | 0.8 | 10.5 | 2.8 | 22.2 | 4.1 | 0.2 | 17.6 |
| Other[6] | 0.1 | 8.9 | 0.1 | 8.4 | 0.2 | 8.4 | 0.4 | 6.8 | 8.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |
| **By Region[8]** | | | | | | | | | |
| **FICO scores < 620:** | | | | | | | | | |
| North Central | 0.2% | 6.3% | 0.2% | 11.7% | 0.2% | 20.1% | 0.6% | 13.4% | 12.0% |
| Northeast | 0.4 | 9.3 | 0.2 | 19.0 | 0.3 | 28.9 | 0.9 | 14.3 | 14.9 |
| Southeast | 0.2 | 7.9 | 0.2 | 13.9 | 0.3 | 29.5 | 0.7 | 13.9 | 15.9 |
| Southwest | 0.2 | 5.1 | 0.1 | 11.0 | 0.1 | 19.5 | 0.4 | 9.4 | 8.0 |
| West | 0.2 | 4.6 | 0.1 | 9.1 | 0.3 | 19.5 | 0.6 | 16.2 | 11.8 |
| Total FICO scores < 620 | 1.2 | 7.0 | 0.8 | 13.5 | 1.2 | 24.1 | 3.2 | 13.4 | 12.9 |
| **FICO scores of 620 to 659:** | | | | | | | | | |
| North Central | 0.5 | 4.0 | 0.3 | 8.2 | 0.5 | 15.1 | 1.3 | 8.7 | 8.4 |
| Northeast | 0.8 | 5.8 | 0.5 | 12.9 | 0.4 | 23.3 | 1.7 | 9.1 | 10.3 |
| Southeast | 0.5 | 5.2 | 0.3 | 9.5 | 0.6 | 24.1 | 1.4 | 9.1 | 12.2 |
| Southwest | 0.5 | 3.1 | 0.3 | 7.0 | 0.1 | 13.6 | 0.9 | 5.9 | 5.1 |
| West | 0.4 | 3.1 | 0.3 | 6.3 | 0.8 | 17.6 | 1.5 | 12.0 | 10.0 |
| Total FICO scores of 620 to 659 | 2.7 | 4.4 | 1.7 | 9.1 | 2.4 | 19.4 | 6.8 | 8.9 | 9.4 |
| **FICO scores of ≥660:** | | | | | | | | | |
| North Central | 8.5 | 0.7 | 4.7 | 2.3 | 2.8 | 7.4 | 16.0 | 1.6 | 2.0 |
| Northeast | 14.9 | 1.0 | 5.7 | 3.9 | 2.0 | 12.6 | 22.6 | 1.6 | 2.3 |
| Southeast | 7.1 | 1.2 | 3.9 | 2.8 | 3.8 | 14.4 | 14.8 | 2.1 | 4.2 |
| Southwest | 7.4 | 0.6 | 2.7 | 2.0 | 0.4 | 6.2 | 10.5 | 0.9 | 1.1 |
| West | 12.7 | 0.5 | 5.8 | 1.7 | 7.0 | 10.1 | 25.5 | 2.9 | 3.0 |
| Total FICO scores ≥660 | 50.6 | 0.8 | 22.8 | 2.6 | 16.0 | 10.8 | 89.4 | 1.9 | 2.6 |
| Total FICO scores not available | 0.3 | 4.8 | 0.2 | 11.9 | 0.1 | 21.4 | 0.6 | 5.5 | 8.9 |
| **All FICO scores:** | | | | | | | | | |
| North Central | 9.1 | 1.0 | 5.3 | 3.2 | 3.6 | 9.5 | 18.0 | 2.6 | 2.9 |
| Northeast | 16.1 | 1.6 | 6.4 | 5.3 | 2.7 | 15.8 | 25.2 | 2.7 | 3.4 |
| Southeast | 7.9 | 1.8 | 4.4 | 4.0 | 4.7 | 16.8 | 17.0 | 3.4 | 5.5 |
| Southwest | 8.2 | 1.1 | 3.2 | 3.1 | 0.6 | 9.4 | 12.0 | 1.8 | 1.8 |
| West | 13.5 | 0.7 | 6.2 | 2.1 | 8.1 | 11.3 | 27.8 | 3.8 | 3.6 |
| Total single-family credit guarantee portfolio[7] | 54.8% | 1.3% | 25.5% | 3.6% | 19.7% | 12.8% | 100.0% | 2.9% | 3.6% |

(1) The current LTV ratios are our estimates. See endnote (5) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information.

(2) Based on UPB of the single-family credit guarantee portfolio.

(3) See endnote (2) to "Table 41 — Credit Concentrations in the Single-Family Credit Guarantee Portfolio".

(4) Includes both fixed rate and adjustable rate loans. The percentages of interest-only loans which have been modified at period end reflect that a number of these loans have not yet been assigned to their new product category (post-modification), primarily due to delays in processing.

(5) Includes fixed-rate and adjustable-rate mortgage loans.

(6) Consist of FHA/VA and other government guaranteed mortgages.

(7) The total of all FICO scores categories may not sum due to the inclusion of loans where FICO scores are not available in the respective totals for all loans. See endnote (7) to "Table 34 — Characteristics of the Single-Family Credit Guarantee Portfolio" for further information about our presentation of FICO scores.

(8) Presentation with the following regional designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); and Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4164          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents foreclosure and short sale rate information for loans in our single-family credit guarantee portfolio based on year of origination.

**Table 43 — Single-Family Credit Guarantee Portfolio by Year of Loan Origination**

| Year of Loan Origination | As of June 30, 2012 | | As of December 31, 2011 | |
|---|---|---|---|---|
| | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] | Percentage of Portfolio | Foreclosure and Short Sale Rate[1] |
| 2012 | 9% | —% | N/A | N/A |
| 2011 | 16 | 0.02 | 14% | —% |
| 2010 | 17 | 0.11 | 19 | 0.05 |
| 2009 | 15 | 0.25 | 18 | 0.17 |
| Combined - 2009 to 2012 | 57 | 0.11 | 51 | 0.08 |
| 2008 | 6 | 2.74 | 7 | 2.23 |
| 2007 | 9 | 8.65 | 10 | 7.49 |
| 2006 | 6 | 7.82 | 7 | 6.95 |
| 2005 | 7 | 4.60 | 8 | 4.07 |
| Combined - 2005 to 2008 | 28 | 6.17 | 32 | 5.35 |
| 2004 and prior[2] | 15 | 1.12 | 17 | 1.04 |
| Total | 100% | | 100% | |

(1) Calculated for each year of origination as the number of loans that have proceeded to foreclosure transfer or short sale and resulted in a credit loss, excluding any subsequent recoveries, during the period from origination to June 30, 2012 and December 31, 2011, respectively, divided by the number of loans originated in that year that were acquired in our single-family credit guarantee portfolio.

(2) The foreclosure and short sale rate presented for loans originated in 2004 and prior represents the rate associated with loans originated in 2000 through 2004.

HARP loans represented 8% of the UPB of our single-family credit guarantee portfolio as of June 30, 2012. Including HARP loans, the UPB of loans originated after 2008 comprised 57% of our portfolio as of June 30, 2012. At June 30, 2012, approximately 28% of our single-family credit guarantee portfolio consisted of mortgage loans originated from 2005 through 2008. Loans originated from 2005 through 2008 have experienced higher serious delinquency rates in the earlier years of their terms as compared to our historical experience. We attribute this serious delinquency performance to a number of factors, including: (a) the expansion of credit terms under which loans were underwritten during these years; (b) an increase in the origination and our purchase of interest-only and Alt-A mortgage products in these years; and (c) an environment of persistently high unemployment, decreasing home sales, and broadly declining home prices in the period following the loans' origination. Interest-only and Alt-A products have higher inherent credit risk than traditional fixed-rate mortgage products.

*Multifamily Mortgage Credit Risk*

To manage our multifamily mortgage portfolio credit risk, we focus on several key areas: (a) underwriting standards and quality control process; (b) selling significant portions of credit risk through subordination in our Other Guarantee Transactions; (c) portfolio diversification, particularly by product and geographical area; and (d) portfolio management activities, including loss mitigation and use of credit enhancements. We monitor the loan performance, the underlying properties and a variety of mortgage loan characteristics that may affect the default experience on our multifamily mortgage portfolio, such as the DSCR, LTV ratio, geographic location, and loan maturity.

79

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012       Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides certain attributes of our multifamily mortgage portfolio at June 30, 2012 and December 31, 2011.

### Table 44 — Multifamily Mortgage Portfolio — by Attribute

| | UPB at | | Delinquency Rate[1] at | |
|---|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | June 30, 2012 | December 31, 2011 |
| | (dollars in billions) | | | |
| **Original LTV ratio[2]** | | | | |
| Below 75% | $ 82.8 | $ 78.8 | 0.13% | 0.10% |
| 75% to 80% | 32.5 | 30.9 | 0.17 | 0.08 |
| Above 80% | 6.1 | 6.4 | 2.64 | 2.34 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| Weighted average LTV ratio at origination | 70% | 70% | | |
| **Maturity Dates** | | | | |
| 2012 | $ 2.0 | $ 3.0 | 1.41% | 1.35% |
| 2013 | 3.7 | 5.6 | — | — |
| 2014 | 7.3 | 7.6 | 0.66 | 0.03 |
| 2015 | 10.7 | 11.0 | 0.27 | 0.17 |
| 2016 | 14.0 | 13.5 | 0.16 | 0.06 |
| Beyond 2016 | 83.7 | 75.4 | 0.24 | 0.25 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Year of Acquisition or Guarantee[3]** | | | | |
| 2004 and prior | $ 11.1 | $ 12.4 | 0.22% | 0.40% |
| 2005 | 6.9 | 7.2 | 0.64 | 0.20 |
| 2006 | 10.3 | 10.8 | 0.47 | 0.25 |
| 2007 | 19.4 | 19.8 | 0.73 | 0.74 |
| 2008 | 18.7 | 20.6 | 0.38 | 0.09 |
| 2009 | 13.1 | 13.8 | — | — |
| 2010 | 12.4 | 12.7 | — | — |
| 2011 | 17.5 | 18.8 | — | — |
| 2012 | 12.0 | N/A | — | N/A |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Current Loan Size** | | | | |
| Above $25 million | $ 44.4 | $ 42.8 | 0.12% | 0.06% |
| Above $5 million to $25 million | 67.8 | 64.0 | 0.38 | 0.31 |
| $5 million and below | 9.2 | 9.3 | 0.20 | 0.31 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Legal Structure** | | | | |
| Unsecuritized loans | $ 79.6 | $ 82.3 | 0.18% | 0.10% |
| Non-consolidated Freddie Mac mortgage-related securities | 32.3 | 24.2 | 0.45 | 0.64 |
| Other guarantee commitments | 9.5 | 9.6 | 0.40 | 0.18 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |
| **Credit Enhancement** | | | | |
| Credit-enhanced | $ 39.5 | $ 31.6 | 0.44% | 0.52% |
| Non-credit-enhanced | 81.9 | 84.5 | 0.19 | 0.11 |
| Total | $ 121.4 | $ 116.1 | 0.27% | 0.22% |

(1)   See "Delinquencies" below for more information about our multifamily delinquency rates.

(2)   Original LTV ratios are calculated as the UPB of the mortgage, divided by the lesser of the appraised value of the property at the time of mortgage origination or, except for refinance loans, the mortgage borrower's purchase price. Second liens not owned or guaranteed by us are excluded from the LTV ratio calculation. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(3)   Based on either: (a) the year of acquisition, for loans recorded on our consolidated balance sheets; or (b) the year that we issued our guarantee, for the remaining loans in our multifamily mortgage portfolio.

   Our multifamily mortgage portfolio consists of product types that are categorized based on loan terms. Multifamily loans may be interest-only or amortizing, fixed or variable rate, or may switch between fixed and variable rate over time. However, our multifamily loans generally have balloon maturities ranging from five to ten years. Amortizing loans reduce our credit exposure over time because the UPB declines with each mortgage payment. Fixed-rate loans may also create less risk for us because the borrower's payments are determined at origination, and, therefore, the risk that the monthly mortgage payment could increase if interest rates rise is eliminated. As of June 30, 2012 and December 31, 2011, approximately 84% and 85%, respectively, of the multifamily loans on our consolidated balance sheets had fixed interest rates while the remaining loans had variable interest rates.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Because most multifamily loans require a significant lump sum ( *i.e.,* balloon) payment of unpaid principal at maturity, the borrower's potential inability to refinance or pay off the loan at maturity is a serious concern for us. Borrowers may be less able to refinance their obligations during periods of rising interest rates, which could lead to default if the borrower is unable to find affordable refinancing. Loan size at origination does not generally indicate the degree of a loan's risk, but it does indicate our potential exposure to default.

Our primary business strategy in the multifamily segment is to purchase multifamily mortgage loans for aggregation and then securitization. Currently, our most significant multifamily securitization activity involves our guarantee of the senior tranches of these securitizations in Other Guarantee Transactions. The subordinate tranches, that we do not guarantee, provide credit loss protection to the senior classes that we do guarantee. Subordinated classes are allocated credit losses prior to the senior classes. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections and other forms of credit enhancements covering loans in our multifamily mortgage portfolio.

We also use credit enhancements to mitigate risk of loss on certain multifamily mortgages and housing revenue bonds. For example, we may require credit enhancements during construction or rehabilitation in cases where we commit to purchase or guarantee a permanent loan upon completion and in cases where occupancy has not yet reached a level that produces the operating income that was the basis for underwriting the mortgage.

In certain cases, we may provide short-term loan extensions of up to 12 months for certain borrowers. Modifications of loans (including short-term loan extensions) are performed in an effort to minimize our losses. During the first half of 2012, we modified unsecuritized multifamily loans totaling $249 million in UPB, compared with $170 million during the first half of 2011. Multifamily unsecuritized loan modifications in the first half 2012 included: (a) $58 million in UPB for short-term loan extensions; and (b) $191 million in UPB for other loan modifications. Where we have granted a concession to borrowers experiencing financial difficulties, we account for these loans as TDRs. When we execute a modification classified as a TDR, the loan is then classified as nonperforming for the life of the loan regardless of its delinquency status. At June 30, 2012 and December 31, 2011, we had $870 million and $893 million, respectively, in UPB of multifamily loans classified as TDRs on our consolidated balance sheets.

*Delinquencies*

Our multifamily delinquency rates include all multifamily loans that we own, that are collateral for Freddie Mac securities, and that are covered by our other guarantee commitments, except financial guarantees that are backed by HFA bonds because these guarantees do not expose us to meaningful amounts of credit risk due to the guarantee or credit enhancement provided by the U.S. government. We report multifamily delinquency rates based on UPB of mortgage loans that are two monthly payments or more past due or in the process of foreclosure, as reported by our servicers. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as delinquent as long as the borrower is less than two monthly payments past due under the modified terms. In addition, multifamily loans are not counted as delinquent if the borrower has entered into a forbearance agreement and is abiding by the terms of the agreement, whereas single-family loans for which the borrower has been granted forbearance will continue to reflect the past due status of the borrower, if applicable.

Our multifamily mortgage portfolio delinquency rate was 0.27% at June 30, 2012 and 0.22% at December 31, 2011. Our delinquency rate for credit-enhanced loans was 0.44% and 0.52% at June 30, 2012 and December 31, 2011, respectively, and for non-credit-enhanced loans was 0.19% and 0.11% at June 30, 2012 and December 31, 2011, respectively. As of June 30, 2012, approximately one-half of our multifamily loans that were two or more monthly payments past due, measured on a UPB basis, had credit enhancements that we currently believe will mitigate our expected losses on those loans.

Our delinquency rates have remained relatively low compared to other industry participants, which we believe to be, in part, the result of our prudent underwriting standards and practices versus those used by others in the industry. Our delinquency rates for multifamily loans are positively affected to the extent we have been successful in working with troubled borrowers to modify their loans prior to becoming delinquent or by providing temporary relief through loan modifications, including short-term extensions, or entering into a forbearance agreement. The most recent market data available continues to reflect improving national apartment fundamentals, including decreasing vacancy rates and increasing effective rents. As a result we expect our multifamily delinquency rate to remain relatively low during the remainder of 2012. For further information regarding the loans in our multifamily mortgage portfolio, including regional geographic composition and other concentrations, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012         TREASURY-4167         Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Non-Performing Assets*

Non-performing assets consist of single-family and multifamily loans that have undergone a TDR, single-family seriously delinquent loans, multifamily loans that are three or more payments past due or in the process of foreclosure, and REO assets, net. Non-performing assets also include multifamily loans that are deemed impaired based on management judgment. We place non-performing loans on non-accrual status when we believe the collectability of interest and principal on a loan is not reasonably assured, unless the loan is well secured and in the process of collection. When a loan is placed on non-accrual status, any interest income accrued but uncollected is reversed. Thereafter, interest income is recognized only upon receipt of cash payments. We did not accrue interest on any loans three monthly payments or more past due during the three and six months ended June 30, 2012.

We classify TDRs as those loans where we have granted a concession to a borrower that is experiencing financial difficulties. TDRs remain categorized as non-performing throughout the remaining life of the loan regardless of whether the borrower makes payments which return the loan to a current payment status after modification. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for further information about our TDRs.

The table below provides detail on non-performing loans and REO assets on our consolidated balance sheets and non-performing loans underlying our financial guarantees.

**Table 45 — Non-Performing Assets**[1]

| | June 30, 2012 | December 31, 2011 | June 30, 2011 |
|---|---|---|---|
| | (dollars in millions) | | |
| Non-performing mortgage loans—on balance sheet: | | | |
| Single-family TDRs: | | | |
| Less than three monthly payments past due | $ 47,960 | $ 44,440 | $ 36,243 |
| Seriously delinquent | 14,862 | 11,639 | 3,884 |
| Multifamily TDRs[2] | 870 | 893 | 988 |
| Total TDRs | 63,692 | 56,972 | 41,115 |
| Other seriously delinquent single-family loans[3] | 54,482 | 63,205 | 73,397 |
| Other multifamily loans[4] | 1,657 | 1,819 | 1,901 |
| Total non-performing mortgage loans - on balance sheet | 119,831 | 121,996 | 116,413 |
| Non-performing mortgage loans—off-balance sheet: | | | |
| Single-family loans | 1,159 | 1,230 | 1,295 |
| Multifamily loans | 429 | 246 | 221 |
| Total non-performing mortgage loans - off-balance sheet | 1,588 | 1,476 | 1,516 |
| Real estate owned, net | 4,809 | 5,680 | 5,932 |
| Total non-performing assets | $126,228 | $ 129,152 | $123,861 |
| Loan loss reserves as a percentage of our non-performing mortgage loans | 29.5% | 32.0% | 33.2% |
| Total non-performing assets as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | 6.8% | 6.8% | 6.4% |

(1)  Mortgage loan amounts are based on UPB and REO, net is based on carrying values.
(2)  As of June 30, 2012, approximately $837 million in UPB of these loans were current.
(3)  Represents loans recognized by us on our consolidated balance sheets, including loans removed from PC trusts due to the borrower's serious delinquency.
(4)  Of this amount, $1.5 billion, $1.8 billion, and $1.7 billion of UPB were current at June 30, 2012, December 31, 2011, and June 30, 2011, respectively.

The amount of non-performing assets declined to $126.2 billion as of June 30, 2012, from $129.2 billion as of December 31, 2011, primarily due to a decline in the rate at which loans transitioned into serious delinquency during the first half of 2012 combined with continued high levels of foreclosures and REO dispositions. The UPB of loans categorized as TDRs increased to $63.7 billion at June 30, 2012 from $57.0 billion at December 31, 2011, largely due to the significant volume of loan modifications and loans entering a modification trial period during the first half of 2012. TDRs during the first half of 2012 include HAMP and non-HAMP loan modifications as well as loans in modification trial periods and certain other loss mitigation actions. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report, and "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for information about TDRs, including our implementation of an amendment to the accounting guidance on classification of loans as TDRs in the third quarter of 2011. We expect our non-performing assets, including loans deemed to be TDRs, to remain at elevated levels for the remainder of 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

The table below provides detail by region for REO activity. Our REO activity consists almost entirely of single-family residential properties. See "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for information about regional serious delinquency rates.

### Table 46 — REO Activity by Region[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (number of properties) | | | |
| **REO Inventory** | | | | |
| Beginning property inventory | 59,323 | 65,174 | 60,555 | 72,093 |
| Properties acquired by region: | | | | |
| Northeast | 1,862 | 1,921 | 3,687 | 3,406 |
| Southeast | 5,924 | 5,131 | 12,991 | 9,865 |
| North Central | 6,737 | 6,405 | 14,375 | 12,780 |
| Southwest | 2,545 | 3,388 | 5,315 | 6,501 |
| West | 2,967 | 7,954 | 7,472 | 16,956 |
| Total properties acquired | 20,035 | 24,799 | 43,840 | 49,508 |
| Properties disposed by region: | | | | |
| Northeast | (1,956) | (2,427) | (3,878) | (5,088) |
| Southeast | (7,058) | (7,540) | (13,345) | (16,754) |
| North Central | (7,458) | (6,801) | (14,295) | (14,093) |
| Southwest | (3,279) | (3,539) | (6,532) | (7,019) |
| West | (6,325) | (9,048) | (13,063) | (18,029) |
| Total properties disposed | (26,076) | (29,355) | (51,113) | (60,983) |
| Ending property inventory | 53,282 | 60,618 | 53,282 | 60,618 |

(1)   See endnote (8) to "Table 42 — Single-Family Credit Guarantee Portfolio by Attribute Combinations" for a description of these regions.

Our REO inventory (measured in number of properties) declined 12% from December 31, 2011 to June 30, 2012 as the volume of single-family REO dispositions exceeded the volume of single-family REO acquisitions. We believe our single-family REO acquisition volume in the first half of 2012 has been less than it otherwise would have been due to the length of the single-family foreclosure timeline, particularly in states that require a judicial foreclosure process and, in part, to resource constraints on foreclosure activities for five larger servicers involved in a recent settlement with a coalition of state attorneys general and federal agencies. Foreclosures generally take longer to complete in states where judicial foreclosures (those sold under the supervision of a court) are required than in states where non-judicial foreclosures are permitted.

The average length of time for foreclosure of a Freddie Mac loan significantly increased in recent years due to temporary suspensions, delays, legislative and regulatory developments, changes in servicing practices, and other factors. During the six months ended June 30, 2012 and 2011, respectively, the nationwide average for completion of a foreclosure (as measured from the date of the last scheduled payment made by the borrower) on our single-family delinquent loans, excluding those underlying our Other Guarantee Transactions, was 597 days and 477 days, respectively, which included: (a) an average of 756 days and 576 days, respectively, for foreclosures completed in states that require a judicial foreclosure process; and (b) an average of 461 days and 442 days, respectively, for foreclosures completed in states that do not require a judicial foreclosure process. We continue to experience significant variability in the average time for foreclosure by state. For example, during the six months ended June 30, 2012, the average time for completion of foreclosures associated with loans in our single-family credit guarantee portfolio, excluding Other Guarantee Transactions, ranged from 383 days in Michigan to 1,002 days in Florida. As of June 30, 2012, our serious delinquency rate for the aggregate of those states that require a judicial foreclosure and all other states was 4.35% and 2.52%, respectively, compared to 4.47% and 2.74%, respectively, as of December 31, 2011.

We expect the pace of our REO acquisitions will continue to be affected for the remainder of 2012 by the length of the foreclosure process, particularly in states with a judicial foreclosure process. However, we expect the volume of our REO acquisitions will likely remain elevated, as we have a large inventory of seriously delinquent loans in our single-family credit guarantee portfolio. Our single-family REO acquisitions in the first half of 2012 were most significant in the states of Florida, Illinois, Michigan, California and Georgia, which collectively represented 42% of total REO acquisitions based on the number of properties. The states with the most properties in our REO inventory as of June 30, 2012 were Michigan and Illinois, which comprised 12% and 11%, respectively, of total REO property inventory, based on the number of properties.

83

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The percentage of interest-only and Alt-A loans in our single-family credit guarantee portfolio, based on UPB, was approximately 4% and 5%, respectively, at June 30, 2012 and was 7% on a combined basis. The percentage of our REO acquisitions in the six months ended June 30, 2012 that had been financed by either of these loan types represented approximately 25% of our total REO acquisitions, based on loan amount prior to acquisition.

We are limited in our single-family REO disposition efforts by the capacity of the market to absorb large numbers of foreclosed properties. A significant portion of our REO acquisitions are: (a) located in jurisdictions that require a period of time after foreclosure during which the borrower may reclaim the property; or (b) occupied and we have either retained the tenant under an existing lease or begun the process of eviction. All of these factors resulted in an increase in the aging of our inventory. During the period when the borrower may reclaim the property, or we are completing the eviction process, we are not able to market the property. As of both June 30, 2012 and December 31, 2011, approximately 33% of our REO properties were not marketable due to the above conditions. In addition, certain of our REO properties may not be actively marketed because we are readying the property for sale, or we are involved in litigation or other legal and regulatory issues concerning the property. Though it varied significantly in different states, the average holding period of our single-family REO properties was little changed during the first half of 2012. Excluding any post-foreclosure period during which borrowers may reclaim a foreclosed property, the average holding period associated with our single-family REO dispositions during the six months ended June 30, 2012 and 2011 was 200 days and 193 days, respectively. As of June 30, 2012 and December 31, 2011, the percentage of our single-family REO property inventory that had been held for sale longer than one year was 6.5% and 7.1%, respectively, though the number of aged assets has steadily declined through the first half of 2012. Although we continue to actively market available properties through our established initiatives, as discussed above, a high percentage of properties remain unavailable for marketing.

We also have a variety of alternative methods for REO sales that we employ from time to time, as appropriate, including bulk sales and auctions; however, auction sales represented an insignificant portion of our REO dispositions in the first half of 2012 and bulk sales were not utilized. In June 2012, we implemented an online bulk sale process and expect to see an increase in bulk sales of our REO properties in the remainder of 2012. We are continuing to participate in discussions with FHFA and other agencies on new options for sales and rentals of our single-family REO properties. It is too early to determine the impact any potential new initiatives may have on the levels of our REO property inventory, the process for disposing of REO property or our REO operations expense.

*Credit Loss Performance*

Many loans that are seriously delinquent, or in foreclosure, result in credit losses. The table below provides detail on our credit loss performance associated with mortgage loans and REO assets on our consolidated balance sheets and underlying our non-consolidated mortgage-related financial guarantees.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 47 — Credit Loss Performance

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | | (dollars in millions) | | |
| **REO** | | | | |
| REO balances, net: | | | | |
| Single-family | $ 4,715 | $ 5,834 | $4,715 | $5,834 |
| Multifamily | 94 | 98 | 94 | 98 |
| Total | $ 4,809 | $ 5,932 | $4,809 | $5,932 |
| REO operations (income) expense: | | | | |
| Single-family | $ (34) | $ 35 | $ 138 | $ 292 |
| Multifamily | 4 | (8) | 3 | (8) |
| Total | $ (30) | $ 27 | $ 141 | $ 284 |
| **Charge-offs** | | | | |
| Single-family: | | | | |
| Charge-offs, gross[1] (including $3.3 billion, $3.8 billion, $7.0 billion, and $7.3 billion relating to loan loss reserves, respectively) | $ 3,377 | $ 3,871 | $7,155 | $7,524 |
| Recoveries[2] | (485) | (800) | (1,000) | (1,484) |
| Single-family, net | $ 2,892 | $ 3,071 | $6,155 | $6,040 |
| Multifamily: | | | | |
| Charge-offs, gross[1] (including $7 million, $29 million, $8 million, and $41 million relating to loan loss reserves, respectively) | $ 7 | $ 29 | $ 8 | $ 41 |
| Recoveries[2] | — | — | — | — |
| Multifamily, net | $ 7 | $ 29 | $ 8 | $ 41 |
| Total Charge-offs: | | | | |
| Charge-offs, gross[1] (including $3.3 billion, $3.8 billion, $7.0 billion, and $7.4 billion relating to loan loss reserves, respectively) | $ 3,384 | $ 3,900 | $ 7,163 | $7,565 |
| Recoveries[2] | (485) | (800) | (1,000) | (1,484) |
| Total Charge-offs, net | $ 2,899 | $ 3,100 | $6,163 | $6,081 |
| **Credit Losses[3]** | | | | |
| Single-family | $ 2,858 | $ 3,106 | $6,293 | $ 6,332 |
| Multifamily | 11 | 21 | 11 | 33 |
| Total | $ 2,869 | $ 3,127 | $6,304 | $6,365 |
| Total (in bps)[4] | 62.5 | 64.9 | 68.1 | 66.0 |

(1) Represent the carrying amount of a loan that has been discharged in order to remove the loan from our consolidated balance sheets at the time of resolution, regardless of when the impact of the credit loss was recorded on our consolidated statements of comprehensive income through the provision for credit losses or losses on loans purchased. Charge-offs primarily result from foreclosure transfers and short sales and are generally calculated as the recorded investment of a loan at the date it is discharged less the estimated value in final disposition or actual net sales in a short sale.

(2) Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(3) Excludes foregone interest on non-performing loans, which reduces our net interest income but is not reflected in our total credit losses. In addition, excludes other market-based credit losses: (a) incurred on our investments in mortgage loans and mortgage-related securities; and (b) recognized in our consolidated statements of comprehensive income.

(4) Calculated as credit losses divided by the average carrying value of our total mortgage portfolio, excluding non-Freddie Mac mortgage-related securities and that portion of REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates.

Our credit loss performance metric generally measures losses at the conclusion of the loan and related collateral resolution process. There is a significant lag in time from the implementation of problem loan workout activities until the final resolution of seriously delinquent mortgage loans and REO assets. Our credit loss performance is based on our charge-offs and REO expenses. We primarily record charge-offs at the time we take ownership of a property through foreclosure and at the time of settlement of foreclosure alternative transactions. Single-family charge-offs, gross, for the three and six months ended June 30, 2012 were $3.4 billion and $7.2 billion, respectively, compared to $3.9 billion and $7.5 billion for the three and six months ended June 30, 2011, respectively. These charge-offs were associated with approximately $6.8 billion and $14.2 billion, in UPB of loans for the three and six months ended June 30, 2012, respectively, and $7.7 billion and $15.7 billion for the three and six months ended June 30, 2011, respectively. Our net charge-offs and credit losses in the first half of 2012 remained elevated, but were less than they otherwise would have been because of the suppression of loan and collateral resolution activity due to the length of the foreclosure timeline, particularly in states that require a judicial foreclosure process. We expect our charge-offs and credit losses to remain high for the remainder of 2012 due to the large number of single-family non-performing loans that will likely be resolved and because market conditions, such as home prices, continue to remain weak.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4171

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our credit losses during the first half of 2012 continued to be disproportionately high in those states that experienced significant declines in property values since 2006, such as California, Florida, Nevada, and Arizona, which collectively comprised approximately 54% and 55% of our total credit losses in both the three and six months ended June 30, 2012, respectively. Loans originated in 2005 through 2008 comprised approximately 28% of our single-family credit guarantee portfolio, based on UPB at June 30, 2012, however, these loans accounted for approximately 88% of our credit losses during the six months ended June 30, 2012. Due to declines in property values since 2006, we continued to experience high REO disposition severity ratios on sales of our REO inventory. In addition, although Alt-A loans comprised approximately 5% of our single-family credit guarantee portfolio at June 30, 2012, these loans accounted for approximately 24% of our credit losses during the six months ended June 30, 2012. See "Table 3 — Credit Statistics, Single-Family Credit Guarantee Portfolio" for information on REO disposition severity ratios, and see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about our credit losses.

*Loan Loss Reserves*

We maintain mortgage-related loan loss reserves at levels we believe appropriate to absorb probable incurred losses on mortgage loans held-for-investment on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities and other guarantee commitments. Determining the loan loss reserves is complex and requires significant management judgment about matters that involve a high degree of subjectivity. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for additional information on our accounting policies for loan loss reserves and TDR loans, including our implementation of changes to the accounting guidance related to the classification of loans as TDRs. In recent periods, the portion of our loan loss reserves attributable to individually impaired loans has increased while the portion of our loan loss reserves determined on a collective basis has declined. As of June 30, 2012 and December 31, 2011, the recorded investment of individually impaired single-family mortgage loans was $66.0 billion and $60.0 billion, respectively, and the loan loss reserves associated with these loans were $16.0 billion and $15.1 billion, respectively. See "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS" for additional information about our TDR loans. See "CONSOLIDATED RESULTS OF OPERATIONS — Provision for Credit Losses," for a discussion of our provision for credit losses and charge-off activity.

The table below summarizes our allowance for loan loss activity for individually impaired single-family mortgage loans on our consolidated balance sheets for which we have recorded a specific reserve.

**Table 48 — Single-Family Impaired Loans with Specific Reserve Recorded**

| | # of Loans | Amount (in millions) |
|---|---|---|
| TDRs (recorded investment): | | |
| March 31, 2012 balance | 267,939 | $  56,186 |
| New additions | 26,025 | 4,996 |
| Repayments | (1,686) | (404) |
| Loss events[1] | (3,829) | (761) |
| Other | (314) | (63) |
| June 30, 2012 balance | 288,135 | 59,954 |
| Other (recorded investment)[2] | 22,961 | 2,132 |
| June 30, 2012 balance | 311,096 | 62,086 |
| Total allowance for loan losses of individually impaired single-family loans | | (16,041) |
| Net investment, June 30, 2012 | | $  46,045 |

(1)   Consists of foreclosure transfers or foreclosure alternatives, such as a deed in lieu of foreclosure or short sale transaction.
(2)   Consists of loans impaired upon purchase, which experienced further deterioration in borrower credit.

*Credit Risk Sensitivity*

Under a 2005 agreement with FHFA, then OFHEO, we are required to disclose the estimated increase in the NPV of future expected credit losses for our single-family credit guarantee portfolio over a ten year period as the result of an immediate 5% decline in home prices nationwide, followed by a stabilization period and return to the base case. This sensitivity analysis is hypothetical and may not be indicative of our actual results. We do not use this analysis for determination of our reported results under GAAP.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4172          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 49 — Single-Family Credit Loss Sensitivity**

| | Before Receipt of Credit Enhancements[1] | | After Receipt of Credit Enhancements[2] | |
|---|---|---|---|---|
| | NPV[3] | NPV Ratio[4] | NPV[3] | NPV Ratio[4] |
| | (dollars in millions) | | | |
| At: | | | | |
| June 30, 2012 | $ 7,131 | 42.2 bps | $ 6,713 | 39.7 bps |
| March 31, 2012 | $ 8,568 | 49.6 bps | $8,095 | 46.8 bps |
| December 31, 2011 | $ 8,328 | 47.7 bps | $7,842 | 44.9 bps |
| September 30, 2011 | $ 8,824 | 49.5 bps | $8,229 | 46.1 bps |
| June 30, 2011 | $10,203 | 56.5 bps | $ 9,417 | 52.2 bps |

(1)   Assumes that none of the credit enhancements currently covering our mortgage loans has any mitigating effect on our credit losses.
(2)   Assumes we collect amounts due from credit enhancement providers after giving effect to certain assumptions about counterparty default rates.
(3)   Based on the single-family credit guarantee portfolio, excluding REMICs and Other Structured Securities backed by Ginnie Mae Certificates.
(4)   Calculated as the ratio of NPV of increase in credit losses to the single-family credit guarantee portfolio, defined in note (3) above.

**Interest Rate and Other Market Risks**

For a discussion of our interest rate and other market risks, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

**Operational Risks**

We face significant levels of operational risk, due to a variety of factors, including: (a) employee turnover and low employee engagement; (b) the level and pace of organizational change within our company; (c) the complexity of our business operations; (d) weaknesses in our core systems; and (e) the fact that we face a variety of different, and potentially competing, business objectives and new FHFA-mandated activities ( *e.g.*, the initiatives we are pursuing under the 2012 conservatorship scorecard). For more information on these matters and other operational risks that we face, see "MD&A — RISK MANAGEMENT — Operational Risks" and "RISK FACTORS — Operational Risks" in our 2011 Annual Report.

In the first half of 2012, to help mitigate the uncertainty surrounding compensation, we introduced a new compensation program for employees. Under the program, the majority of employees will have a more predictable income, as the program generally reduces the amount of compensation that is subject to variability. During the three months ended June 30, 2012, employee turnover moderated compared to the same period in 2011. Should we experience significant turnover in key areas, we may need to exercise strategic arrangements and significantly increase the number of outside firms and consultants used in our business operations, limit certain business activities, and/or increase our operational costs. The use of outside firms and consultants could increase our operational risk in the near term as consultants become accustomed to new roles and responsibilities.

On May 21, 2012, our new Chief Executive Officer joined Freddie Mac. On July 16, 2012, our new General Counsel and Corporate Secretary joined Freddie Mac. Our Executive Vice President — Single-Family Business, Operations and Technology resigned from his position effective May 11, 2012.

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2012. As of June 30, 2012, we had two material weaknesses in our internal control over financial reporting causing us to conclude that our disclosure controls and procedures were not effective as of June 30, 2012, at a reasonable level of assurance. For additional information, see "CONTROLS AND PROCEDURES."

## LIQUIDITY AND CAPITAL RESOURCES

**Liquidity**

Our business activities require that we maintain adequate liquidity to fund our operations, which may include the need to make payments of principal and interest on our debt securities, including securities issued by our consolidated trusts, and otherwise make payments related to our guarantees of mortgage assets; make payments upon the maturity, redemption or repurchase of our other debt securities; make net payments on derivative instruments; pay dividends on our senior preferred stock; purchase mortgage-related securities and other investments; purchase mortgage loans; and remove modified or seriously delinquent loans from PC trusts.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4173

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We fund our cash requirements primarily by issuing short-term and long-term debt. Other sources of cash include:

- receipts of principal and interest payments on securities or mortgage loans we hold;

- other cash flows from operating activities, including the management and guarantee fees we receive in connection with our guarantee activities (excluding those fees we must remit to Treasury pursuant to the Temporary Payroll Tax Cut Continuation Act of 2011);

- borrowings against mortgage-related securities and other investment securities we hold; and

- sales of securities we hold.

We have also received substantial amounts of cash from Treasury pursuant to draws under the Purchase Agreement, which are made to address quarterly deficits in our net worth. We received $19 million in cash in June 2012 from Treasury pursuant to a draw request under the Purchase Agreement to address the deficit in our net worth at March 31, 2012.

### Liquidity Management

Maintaining sufficient liquidity is of primary importance and we continually strive to enhance our liquidity management practices and policies. Under these practices and policies, we maintain an amount of cash and cash equivalent reserves in the form of liquid, high quality short-term investments that is intended to enable us to meet ongoing cash obligations for an extended period, in the event we do not have access to the short- or long-term unsecured debt markets. We also actively manage the concentration of debt maturities and closely monitor our monthly maturity profile. For a discussion of our liquidity management practices and policies, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Liquidity Management*" in our 2011 Annual Report.

Throughout the three months ended June 30, 2012, we complied with all requirements under our liquidity management policies or FHFA guidance, as applicable. The majority of the funds used to cover our short-term cash liquidity needs was invested in short-term assets with a rating of A-1/P-1 or AAA or was issued by a counterparty with that rating. In the event of a downgrade of a position or counterparty, as applicable, below minimum rating requirements, our credit governance policies require us to exit from the position within a specified period.

We also continue to manage our debt issuances to remain in compliance with the aggregate indebtedness limits set forth in the Purchase Agreement.

We continue to monitor events related to the troubled European countries and have taken a number of actions since mid-2011 designed to reduce our exposures, including exposures related to certain derivative portfolio and cash and other investments portfolio counterparties. For more information, see "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Selected European Sovereign and Non-Sovereign Exposures*."

To facilitate cash management, we forecast cash outflows. These forecasts help us to manage our liabilities with respect to asset purchases and runoff, when financial markets are not in crisis. For further information on our management of interest-rate risk associated with asset and liability management, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK."

Notwithstanding these practices and policies, our ability to maintain sufficient liquidity, including by pledging mortgage-related and other securities as collateral to other financial institutions, could cease or change rapidly and the cost of the available funding could increase significantly due to changes in market confidence and other factors. For more information, see "RISK FACTORS — Competitive and Market Risks — *Our investment activities may be adversely affected by limited availability of financing and increased funding costs*" in our 2011 Annual Report.

### Actions of Treasury and FHFA

Since our entry into conservatorship, Treasury and FHFA have taken a number of actions that affect our cash requirements and ability to fund those requirements. The conservatorship, and the resulting support we received from Treasury, has enabled us to access debt funding on terms sufficient for our needs.

88                                                                  *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Under the Purchase Agreement, Treasury made a commitment to provide funding, under certain conditions, to eliminate deficits in our net worth. The Purchase Agreement provides that the $200 billion maximum amount of the commitment from Treasury will increase as necessary to accommodate any cumulative reduction in our net worth during 2010, 2011, and 2012. If we do not have a capital surplus ( *i.e.*, positive net worth) at the end of 2012, then the amount of funding available after 2012 will be $149.3 billion ($200 billion funding commitment reduced by cumulative draws for net worth deficits through December 31, 2009). In the event we have a capital surplus at the end of 2012, then the amount of funding available after 2012 will depend on the size of that surplus relative to cumulative draws needed for deficits during 2010 to 2012, as follows:

- If the year-end 2012 surplus is lower than the cumulative draws needed for 2010 to 2012, then the amount of available funding is $149.3 billion less the surplus.

- If the year-end 2012 surplus exceeds the cumulative draws for 2010 to 2012, then the amount of available funding is $149.3 billion less the amount of those draws.

While we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, the costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012. The costs of our debt funding could also increase in the event of any future downgrades in our credit ratings or the credit ratings of the U.S. government. At June 30, 2012, our aggregate funding received from Treasury under the Purchase Agreement was $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received.

We are required to pay a quarterly commitment fee to Treasury under the Purchase Agreement, as discussed below in "*Dividend Obligation on the Senior Preferred Stock*."

For more information on these matters, see "BUSINESS — Conservatorship and Related Matters" and "— Regulation and Supervision" in our 2011 Annual Report.

### Dividend Obligation on the Senior Preferred Stock

As of June 30, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock is $7.2 billion, which exceeds our annual historical earnings in all but one period. The senior preferred stock accrues quarterly cumulative dividends at a rate of 10% per year or 12% per year in any quarter in which dividends are not paid in cash until all accrued dividends have been paid in cash. We paid dividends of $1.8 billion in cash on the senior preferred stock in June 2012 at the direction of our Conservator. Through June 30, 2012, we paid aggregate cash dividends to Treasury of $20.1 billion, an amount equal to 28% of our aggregate draws received under the Purchase Agreement. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth and will increasingly drive future draws. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if the fee is not waived. Treasury waived the fee for all quarters of 2011 and the first three quarters of 2012, but has indicated that it remains committed to protecting taxpayers and ensuring that our future positive earnings are returned to taxpayers as compensation for their investment. The amount of the fee has not yet been established and could be substantial.

The payment of dividends on our senior preferred stock in cash reduces our net worth. For periods in which our earnings and other changes in equity (including the cash payment of dividends on our senior preferred stock) do not result in positive net worth, draws under the Purchase Agreement effectively fund the cash payment of senior preferred dividends to Treasury. Under the Purchase Agreement, our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all.

As discussed in "Capital Resources," we expect to make additional draws under the Purchase Agreement in future periods. Further draws will increase the liquidation preference of and the dividends we owe on the senior preferred stock.

### Other Debt Securities

Spreads on our debt and our access to the debt markets remained favorable relative to historical levels during the three and six months ended June 30, 2012, which, we believe, is due largely to support from the U.S. government. As a result, we were able to replace certain higher cost debt with lower cost debt. Our short-term debt was 22% of outstanding other debt at June 30, 2012 as compared to 24% at December 31, 2011. Beginning in the fourth quarter of 2011, we started issuing a

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

higher percentage of debt with longer-term maturities. This allows us to take advantage of attractive long-term rates while decreasing our reliance on interest-rate swaps.

Because of the debt limit under the Purchase Agreement, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of June 30, 2012, we estimate that the par value of our aggregate indebtedness totaled $589.7 billion, which was approximately $285.1 billion below the applicable debt cap. As of December 31, 2011, we estimate that the par value of our aggregate indebtedness was approximately $297.7 billion below the then applicable limit. Our aggregate indebtedness is calculated as the par value of other debt. We disclose the amount of our indebtedness on this basis monthly under the caption "Other Debt Activities — Total Debt Outstanding" in our Monthly Volume Summary reports, which are available on our web site at www.freddiemac.com and in current reports on Form 8-K we file with the SEC.

### Other Debt Issuance Activities

The table below summarizes the par value of other debt securities we issued, based on settlement dates, during the three and six months ended June 30, 2012 and 2011.

**Table 50 — Other Debt Security Issuances by Product, at Par Value**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Other short-term debt: | | | | |
| Reference Bills® securities and discount notes | $77,920 | $104,200 | $142,083 | $208,046 |
| Medium-term notes — non-callable [2] | — | 250 | — | 450 |
| Total other short-term debt | 77,920 | 104,450 | 142,083 | 208,496 |
| Other long-term debt: | | | | |
| Medium-term notes — callable | 7,375 | 33,246 | 44,873 | 71,047 |
| Medium-term notes — non-callable | 1,577 | 18,482 | 12,281 | 47,657 |
| U.S. dollar Reference Notes® securities — non-callable | 10,500 | 8,000 | 32,000 | 18,000 |
| Total other long-term debt | 19,452 | 59,728 | 89,154 | 136,704 |
| Total other debt issued | $97,372 | $164,178 | $231,237 | $345,200 |

(1) Excludes federal funds purchased and securities sold under agreements to repurchase, and lines of credit. Also excludes debt securities of consolidated trusts held by third parties.
(2) Includes $0 million and $250 million of medium-term notes — non-callable issued for the three months ended June 30, 2012 and 2011, respectively, which were related to debt exchanges. For the six months ended June 30, 2012 and 2011, there were $0 million and $0.5 billion accounted for as debt exchanges, respectively.

### Other Debt Retirement Activities

We repurchase, call, or exchange our outstanding medium- and long-term debt securities from time to time to help support the liquidity and predictability of the market for our other debt securities and to manage our mix of liabilities funding our assets.

The table below provides the par value, based on settlement dates, of other debt securities we repurchased, called, and exchanged during the three and six months ended June 30, 2012 and 2011.

**Table 51 — Other Debt Security Repurchases, Calls, and Exchanges**[1]

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Repurchases of outstanding medium-term notes | $ 50 | $ 1,030 | $ 1,747 | $ 3,768 |
| Calls of callable medium-term notes | 31,979 | 45,697 | 81,007 | 85,532 |
| Exchanges of medium-term notes | — | 250 | — | 450 |

(1) Excludes debt securities of consolidated trusts held by third parties.

### Credit Ratings

Our ability to access the capital markets and other sources of funding, as well as our cost of funds, is highly dependent upon our credit ratings. The table below indicates our credit ratings as of July 25, 2012.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 52 — Freddie Mac Credit Ratings

| | Nationally Recognized Statistical Rating Organization | | |
| | S&P | Moody's | Fitch |
|---|---|---|---|
| Senior long-term debt [1] | AA+ | Aaa | AAA |
| Short-term debt [2] | A-1+ | P-1 | F1+ |
| Subordinated debt [3] | A | Aa2 | AA– |
| Preferred stock [4] | C | Ca | C/RR6 |
| Outlook | Negative (for senior long-term debt and subordinated debt) | Negative (for senior long-term debt and subordinated debt) | Negative (for AAA-rated long-term Issuer Default Rating) |

(1) Consists of medium-term notes, U.S. dollar Reference Notes® securities and €Reference Notes® securities.
(2) Consists of Reference Bills® securities and discount notes.
(3) Consists of Freddie SUBS® securities.
(4) Does not include senior preferred stock issued to Treasury.

For information about our ratings downgrade by S&P in 2011, factors that could lead to future ratings actions, and the potential impact of a downgrade in our credit ratings, see "RISK FACTORS — Competitive and Market Risks — *Any downgrade in the credit ratings of the U.S. government would likely be followed by a downgrade in our credit ratings. A downgrade in the credit ratings of our debt could adversely affect our liquidity and other aspects of our business*" in our 2011 Annual Report.

A security rating is not a recommendation to buy, sell or hold securities. It may be subject to revision or withdrawal at any time by the assigning rating organization. Each rating should be evaluated independently of any other rating.

### *Cash and Cash Equivalents, Federal Funds Sold, Securities Purchased Under Agreements to Resell, and Non-Mortgage-Related Securities*

Excluding amounts related to our consolidated VIEs, we held $60.8 billion in the aggregate of cash and cash equivalents, securities purchased under agreements to resell, and non-mortgage-related securities at June 30, 2012. These investments are important to our cash flow and asset and liability management and our ability to provide liquidity and stability to the mortgage market. At June 30, 2012, our non-mortgage-related securities primarily consisted of FDIC-guaranteed corporate medium-term notes, Treasury bills, and Treasury notes that we could sell to provide us with an additional source of liquidity to fund our business operations. For additional information on these assets, see "CONSOLIDATED BALANCE SHEETS ANALYSIS — Cash and Cash Equivalents, Federal Funds Sold and Securities Purchased Under Agreements to Resell" and "— Investments in Securities — *Non-Mortgage-Related Securities*."

### *Mortgage Loans and Mortgage-Related Securities*

We invest principally in mortgage loans and mortgage-related securities, certain categories of which are largely unencumbered and highly liquid. Our primary source of liquidity among these mortgage assets is our holdings of agency securities. In addition, our unsecuritized performing single-family mortgage loans are also a potential source of liquidity. Our holdings of CMBS are less liquid than agency securities. Our holdings of non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans are illiquid due to market conditions and the continued poor credit quality of the underlying assets. Our holdings of unsecuritized seriously delinquent and modified single-family mortgage loans are also illiquid.

We are subject to limits on the amount of mortgage assets we can sell in any calendar month without review and approval by FHFA and, if FHFA so determines, Treasury. See "EXECUTIVE SUMMARY — Limits on Investment Activity and Our Mortgage-Related Investments Portfolio" for more information on the relative liquidity of our mortgage assets.

### Cash Flows

Our cash and cash equivalents decreased $9.3 billion to $19.2 billion during the six months ended June 30, 2012 and decreased $19.5 billion to $17.5 billion during the six months ended June 30, 2011. Cash flows provided by operating activities during the six months ended June 30, 2012 and 2011 were $6.6 billion and $8.4 billion, respectively, primarily driven by cash proceeds from net interest income. Cash flows provided by investing activities during the six months ended June 30, 2012 and 2011 were $232.7 billion and $181.2 billion, respectively, primarily resulting from net proceeds received as a result of repayments of single-family held-for-investment mortgage loans. Cash flows used for financing activities during the six months ended June 30, 2012 and 2011 were $248.6 billion and $209.1 billion, respectively, largely attributable

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4177          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

to funds used to repay debt securities of consolidated trusts held by third parties. In addition, during the six months ended June 30, 2012, our net repayments of other debt were $78.9 billion.

**Capital Resources**

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. Obtaining funding from Treasury pursuant to its commitment under the Purchase Agreement enables us to avoid being placed into receivership by FHFA. At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement. See "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Receivership*" in our 2011 Annual Report for additional information on mandatory receivership.

We expect to request additional draws under the Purchase Agreement in future periods. Over time, our dividend obligation to Treasury on the senior preferred stock will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term. In addition, we are required under the Purchase Agreement to pay a quarterly commitment fee to Treasury, which could contribute to future draws if Treasury does not continue to waive the fee. See "Liquidity — *Dividend Obligation on the Senior Preferred Stock*" for more information.

The size and timing of our future draws will be determined by our dividend obligation on the senior preferred stock and a variety of other factors that could adversely affect our net worth. For more information on these other factors, see "RISK FACTORS — Conservatorship and Related Matters — *We expect to make additional draws under the Purchase Agreement in future periods, which will adversely affect our future results of operations and financial condition*" in our 2011 Annual Report.

For more information on the Purchase Agreement, its effect on our business and capital management activities, and the potential impact of making additional draws, see "MD&A — LIQUIDITY AND CAPITAL RESOURCES — Liquidity — *Dividend Obligation on the Senior Preferred Stock*," "BUSINESS — Executive Summary — *Government Support for Our Business*" and "RISK FACTORS" in our 2011 Annual Report.

## FAIR VALUE MEASUREMENTS AND ANALYSIS

**Fair Value Measurements**

Fair value represents the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. For additional information regarding the fair value hierarchy and measurements and validation processes, see "MD&A — FAIR VALUE MEASUREMENTS AND ANALYSIS" in our 2011 Annual Report.

We categorize assets and liabilities recorded or disclosed at fair value within the fair value hierarchy based on the valuation processes used to derive their fair values and our judgment regarding the observability of the related inputs. Those judgments are based on our knowledge and observations of the markets relevant to the individual assets and liabilities and may vary based on current market conditions. In applying our judgments, we review ranges of third-party prices and transaction volumes, and hold discussions with dealers and pricing service vendors to understand and assess the extent of market benchmarks available and the judgments or modeling required in their processes. Based on these factors, we determine whether the inputs are observable and whether the principal markets are active or inactive.

Our Level 3 assets recorded at fair value primarily consist of non-agency mortgage-related securities. The non-agency mortgage-related securities market continued to be illiquid during the second quarter of 2012, with low transaction volumes, wide credit spreads, and limited transparency. See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value on Our Consolidated Balance Sheets" for additional information regarding the valuation of non-agency mortgage-related securities.

The table below summarizes our assets and liabilities measured at fair value on a recurring basis on our consolidated balance sheets at June 30, 2012 and December 31, 2011.

<div align="center">92</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 53 — Summary of Assets and Liabilities Measured at Fair Value on a Recurring Basis on Our Consolidated Balance Sheets**

| | June 30, 2012 | | December 31, 2011 | |
| --- | --- | --- | --- | --- |
| | Total GAAP Recurring Fair Value | Percentage in Level 3 | Total GAAP Recurring Fair Value | Percentage in Level 3 |
| | (dollars in millions) | | | |
| **Assets:** | | | | |
| Investments in securities: | | | | |
| Available-for-sale, at fair value | $ 194,098 | 29% | $ 210,659 | 28% |
| Trading, at fair value | 47,436 | 4 | 58,830 | 4 |
| Mortgage Loans: | | | | |
| Held-for-sale, at fair value | 10,120 | 100 | 9,710 | 100 |
| Derivative assets, net[1] | 168 | — | 118 | — |
| Other assets: | | | | |
| Guarantee asset, at fair value | 862 | 100 | 752 | 100 |
| All other, at fair value | 139 | 100 | 151 | 100 |
| Total assets carried at fair value on a recurring basis[1] | $ 252,823 | 25 | $ 280,220 | 23 |
| **Liabilities:** | | | | |
| Debt securities recorded at fair value | $ 2,158 | 100% | $ 3,015 | —% |
| Derivative liabilities, net[1] | 336 | — | 435 | — |
| Other liabilities: | | | | |
| All other, at fair value | 1 | 100 | — | — |
| Total liabilities carried at fair value on a recurring basis[1] | $ 2,495 | 6 | $ 3,450 | — |

(1) Percentages by level are based on gross fair value of derivative assets and derivative liabilities before counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

### Changes in Level 3 Recurring Fair Value Measurements

At June 30, 2012 and December 31, 2011, we measured and recorded at fair value on a recurring basis, assets of $68.8 billion and $72.5 billion, respectively, or approximately 25% and 23% of total assets carried at fair value on a recurring basis, using significant unobservable inputs (Level 3), before the impact of counterparty and cash collateral netting. Our Level 3 assets at June 30, 2012 primarily consist of non-agency mortgage-related securities. At June 30, 2012 and December 31, 2011, we also measured and recorded at fair value on a recurring basis, Level 3 liabilities of $2.2 billion and $0.1 billion, or 6% and less than 1%, respectively, of total liabilities carried at fair value on a recurring basis, before the impact of counterparty and cash collateral netting. Our Level 3 liabilities at June 30, 2012 primarily consist of foreign-currency denominated and certain other debt securities recorded at fair value.

See "NOTE 16: FAIR VALUE DISCLOSURES — Recurring Fair Value Changes" for a discussion of changes in our Level 3 assets and liabilities and "— Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs" for the Level 3 reconciliation. For discussion of types and characteristics of mortgage loans underlying our mortgage-related securities, see "Table 17 — Characteristics of Mortgage-Related Securities on Our Consolidated Balance Sheets" and "RISK MANAGEMENT — *Credit Risk — Mortgage Credit Risk — Single-Family Mortgage Credit Risk.*"

### Consideration of Credit Risk in Our Valuation

We consider credit risk in the valuation of our assets and liabilities through consideration of credit risk of the counterparty in asset valuations and through consideration of our own institutional credit risk in liability valuations on our GAAP consolidated balance sheets.

We consider credit risk in our valuation of investments in securities based on fair value measurements that are largely the result of price quotes received from multiple dealers or pricing services. Some of the key valuation drivers of such fair value measurements include the collateral type, collateral performance, credit quality of the issuer, tranche type, weighted average life, vintage, coupon, and interest rates. We also make adjustments for items such as credit enhancements or other types of subordination and liquidity, where applicable. In cases where internally developed models are used, we maximize the use of market-based inputs or calibrate such inputs to market data.

We also consider credit risk when we evaluate the valuation of our derivative positions. The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. For derivatives that are in an asset position, we hold collateral against those positions in accordance with agreed upon thresholds. The amount of collateral held depends on the credit rating of the counterparty and is based on our credit risk

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4179

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

policies. Similarly, for derivatives that are in a liability position, we post collateral to counterparties in accordance with agreed upon thresholds. Based on this evaluation, our fair value of derivatives is not adjusted for credit risk because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation. See "RISK MANAGEMENT — Credit Risk — *Institutional Credit Risk — Derivative Counterparties*" for a discussion of our counterparty credit risk.

See "NOTE 16: FAIR VALUE DISCLOSURES — Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for additional information regarding the valuation of our assets and liabilities.

## Consolidated Fair Value Balance Sheets Analysis

Our consolidated fair value balance sheets present our estimates of the fair value of our financial assets and liabilities. See "NOTE 16: FAIR VALUE DISCLOSURES — Table 16.7 — Consolidated Fair Value Balance Sheets" for our fair value balance sheets. In conjunction with the preparation of our consolidated fair value balance sheets, we use a number of financial models. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks," in this Form 10-Q and our 2011 Annual Report, and "RISK FACTORS" and "RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report for information concerning the risks associated with these models.

### *Discussion of Fair Value Results*

The table below summarizes the change in the fair value of net assets for the six months ended June 30, 2012 and 2011.

### Table 54 — Summary of Change in the Fair Value of Net Assets

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2012 | 2011 |
|  | (in billions) | |
| Beginning balance | $ (78.4) | $ (58.6) |
| Changes in fair value of net assets, before capital transactions | 5.2 | (1.7) |
| Capital transactions: | | |
| Dividends and share issuances, net[1] | (3.4) | (2.7) |
| Ending balance | $ (76.6) | $ (63.0) |

(1) Includes the funds received from Treasury of $0.2 billion and $0.5 billion for the six months ended June 30, 2012 and 2011, respectively, under the Purchase Agreement, which increased the liquidation preference of our senior preferred stock.

During the six months ended June 30, 2012, the fair value of net assets, before capital transactions, increased by $5.2 billion, compared to a $1.7 billion decrease during the six months ended June 30, 2011. The increase in the fair value of net assets, before capital transactions during the six months ended June 30, 2012 was primarily due to an increase in the fair value of our single-family mortgage loans as the result of the improvement in realized and expected home prices and improvement in the credit environment coupled with high core spread income on our mortgage-related securities and a tightening of OAS levels on our agency securities. These benefits were offset by a decrease of $13.8 billion in the fair value of our single-family mortgage loans as the result of the adoption of an amendment to the guidance pertaining to fair value measurements and disclosures. In addition, OAS levels widened on our single-family non-agency mortgage-related securities during the six months ended June 30, 2012. See "NOTE 16: FAIR VALUE DISCLOSURES — Consolidated Fair Value Balance Sheets" for additional details.

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models or third-party market pricing. See "NOTE 16: FAIR VALUE DISCLOSURES — Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — Mortgage Loans — *Single-Family Loans*" for additional details.

During the six months ended June 30, 2011, the decrease in the fair value of net assets, before capital transactions, was primarily due to a decrease in the fair value of our single-family loans due to a decline in forecasted home prices (on a seasonally adjusted basis) and a continued weak credit environment, as well as a decrease in the fair value of our investments

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

in mortgage-related securities from the widening of OAS levels on our non-agency mortgage-related securities. The decrease in fair value was partially offset by an increase in fair value from a tightening of OAS levels on our agency and CMBS securities and high core spread income.

When the OAS on a given asset widens, the fair value of that asset will typically decline, all other market factors being equal. However, we believe such OAS widening has the effect of increasing the likelihood that, in future periods, we will recognize income at a higher spread on this existing asset. The reverse is true when the OAS on a given asset tightens — current period fair values for that asset typically increase due to the tightening in OAS, while future income recognized on the asset is more likely to be earned at a reduced spread. However, as market conditions change, our estimate of expected fair value gains and losses from OAS may also change, and the actual core spread income recognized in future periods could be significantly different from current estimates.

## OFF-BALANCE SHEET ARRANGEMENTS

We enter into certain business arrangements that are not recorded on our consolidated balance sheets or may be recorded in amounts that differ from the full contract or notional amount of the transaction, and may expose us to potential losses in excess of the amounts recorded on our consolidated balance sheets. We guarantee the payment of principal and interest on non-consolidated Freddie Mac mortgage-related securities we issue and on mortgage loans covered by our other guarantee commitments. Our maximum potential off-balance sheet exposure to credit losses relating to these securitization activities and the other guarantee commitments is primarily represented by the UPB of the underlying loans and securities, which was $66.7 billion and $56.9 billion, at June 30, 2012 and December 31, 2011, respectively, which consisted of: (a) $33.3 billion and $25.1 billion of multifamily non-consolidated Freddie Mac mortgage-related securities, (b) $9.9 billion and $10.7 billion of single-family non-consolidated Freddie Mac mortgage-related securities, (c) $9.8 billion and $10.0 billion of multifamily other guarantee commitments, and (d) $13.7 billion and $11.1 billion of single-family other guarantee commitments. We also enter into purchase commitments primarily related to future guarantor swap transactions for single-family loans, and, to a lesser extent, commitments to purchase or guarantee multifamily mortgage loans. These non-derivative commitments totaled $284.4 billion and $271.8 billion, in notional value at June 30, 2012 and December 31, 2011, respectively. For information on these and other off-balance sheet arrangements, see "OFF-BALANCE SHEET ARRANGEMENTS" in our 2011 Annual Report.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

The preparation of financial statements in conformity with GAAP requires us to make a number of judgments, estimates and assumptions that affect the reported amounts within our consolidated financial statements. Certain of our accounting policies, as well as estimates we make, are critical, as they are both important to the presentation of our financial condition and results of operations and require management to make difficult, complex, or subjective judgments and estimates, often regarding matters that are inherently uncertain. Actual results could differ from our estimates and the use of different judgments and assumptions related to these policies and estimates could have a material impact on our consolidated financial statements.

Our critical accounting policies and estimates relate to: (a) allowances for loan losses and reserve for guarantee losses; (b) fair value measurements; (c) impairment recognition on investments in securities; and (d) realizability of net deferred tax assets. For additional information about our critical accounting policies and estimates and other significant accounting policies, including recently issued accounting guidance, see "MD&A — CRITICAL ACCOUNTING POLICIES AND ESTIMATES" in our 2011 Annual Report and "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in this Form 10-Q.

## FORWARD-LOOKING STATEMENTS

We regularly communicate information concerning our business activities to investors, the news media, securities analysts, and others as part of our normal operations. Some of these communications, including this Form 10-Q, contain "forward-looking statements," including statements pertaining to the conservatorship, our current expectations and objectives for our efforts under the MHA Program, the servicing alignment initiative and other programs to assist the U.S. residential mortgage market, future business plans, liquidity, capital management, economic and market conditions and trends, market share, the effect of legislative and regulatory developments, implementation of new accounting guidance, credit losses,

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

internal control remediation efforts, and results of operations and financial condition on a GAAP, Segment Earnings, and fair value basis. Forward-looking statements involve known and unknown risks and uncertainties, some of which are beyond our control. Forward-looking statements are often accompanied by, and identified with, terms such as "objective," "expect," "trend," "forecast," "anticipate," "believe," "intend," "could," "future," "may," "will," and similar phrases. These statements are not historical facts, but rather represent our expectations based on current information, plans, judgments, assumptions, estimates, and projections. Actual results may differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties, including those described in the "RISK FACTORS" section of our 2011 Annual Report, and:

- the actions FHFA, Treasury, the Federal Reserve, the SEC, HUD, the Administration, Congress, and our management may take, including actions related to implementing FHFA's strategic plan for Freddie Mac and Fannie Mae's conservatorships;

- the effect of the restrictions and other terms of the conservatorship, the Purchase Agreement, the senior preferred stock, and the warrant on our business, including our ability to pay: (a) the dividend on the senior preferred stock; and (b) any quarterly commitment fee that we are required to pay to Treasury under the Purchase Agreement;

- our ability to maintain adequate liquidity to fund our operations, including following any changes in the support provided to us by Treasury or FHFA, a change in the credit ratings of our debt securities or a change in the credit rating of the U.S. government;

- changes in our charter or applicable legislative or regulatory requirements, including any restructuring or reorganization in the form of our company, whether we will remain a stockholder-owned company or continue to exist and whether we will be wound down or placed under receivership, regulations under the GSE Act, the Reform Act, or the Dodd-Frank Act, regulatory or legislative actions taken to implement the Administration's plan to reform the housing finance system, regulatory or legislative actions that require us to support non-mortgage market initiatives, changes to affordable housing goals regulation, reinstatement of regulatory capital requirements, or the exercise or assertion of additional regulatory or administrative authority;

- changes in the regulation of the mortgage and financial services industries, including changes caused by the Dodd-Frank Act, or any other legislative, regulatory, or judicial action at the federal, state, or local level;

- enforcement actions against mortgage servicers and other mortgage industry participants by federal or state authorities;

- the scope of various initiatives designed to help in the housing recovery (including the extent to which borrowers participate in HAMP, the recently expanded HARP, and the non-HAMP standard loan modification initiative), and the effect of such programs on our credit losses, expenses, and the size and composition of our mortgage-related investments portfolio;

- the effect of any deficiencies in foreclosure documentation practices and related lengthening of the foreclosure timeline;

- the ability of our financial, accounting, data processing, and other operating systems or infrastructure, and those of our vendors to process the complexity and volume of our transactions;

- changes in accounting or tax guidance or in our accounting policies or estimates, and our ability to effectively implement any such changes in guidance, policies, or estimates;

- changes in general regional, national, or international economic, business, or market conditions and competitive pressures, including changes in employment rates and interest rates, and changes in the federal government's fiscal and monetary policy;

- changes in the U.S. residential mortgage market, including changes in the rate of growth in total outstanding U.S. residential mortgage debt, the size of the U.S. residential mortgage market, and home prices;

- our ability to effectively implement our business strategies, including any efforts to improve the supply and liquidity of, and demand for, our securities, and restrictions on our ability to offer new products or engage in new activities;

- our ability to recruit, retain, and engage executive officers and other key employees;

- our ability to effectively identify and manage credit, interest-rate, operational, and other risks in our business, including changes to the credit environment and the levels and volatilities of interest rates, as well as the shape and slope of the yield curves;

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- the effects of internal control deficiencies and our ability to effectively identify, assess, evaluate, manage, mitigate, or remediate control deficiencies and risks, including material weaknesses and significant deficiencies, in our internal control over financial reporting and disclosure controls and procedures;

- incomplete or inaccurate information provided by customers and counterparties;

- consolidation among, or adverse changes in the financial condition of, our customers and counterparties;

- the failure of our customers and counterparties to fulfill their obligations to us, including the failure of seller/servicers to meet their obligations to repurchase loans sold to us in breach of their representations and warranties, and the potential cost and difficulty of legally enforcing those obligations;

- changes in our judgments, assumptions, forecasts, or estimates regarding the volume of our business and spreads we expect to earn;

- the availability of options, interest-rate and currency swaps, and other derivative financial instruments of the types and quantities, on acceptable terms, and with acceptable counterparties needed for investment funding and risk management purposes;

- changes in pricing, valuation or other methodologies, models, assumptions, judgments, estimates and/or other measurement techniques, or their respective reliability;

- changes in mortgage-to-debt OAS;

- the potential effect on the market for our securities resulting from any purchases or sales by the Federal Reserve of Freddie Mac debt or mortgage-related securities;

- adverse judgments or settlements in connection with legal proceedings, governmental investigations, and IRS examinations;

- volatility of reported results due to changes in the fair value of certain instruments or assets;

- the development of different types of mortgage servicing structures and servicing compensation;

- preferences of originators in selling into the secondary mortgage market;

- changes to our underwriting or servicing requirements (including servicing alignment efforts under the servicing alignment initiative), our practices with respect to the disposition of REO properties, or investment standards for mortgage-related products;

- investor preferences for mortgage loans and mortgage-related and debt securities compared to other investments;

- borrower preferences for fixed-rate mortgages versus ARMs;

- the occurrence of a major natural or other disaster in geographic areas in which our offices or portions of our total mortgage portfolio are concentrated;

- other factors and assumptions described in this Form 10-Q and our 2011 Annual Report, including in the "MD&A" sections;

- our assumptions and estimates regarding the foregoing and our ability to anticipate the foregoing factors and their effects; and

- market reactions to the foregoing.

Forward-looking statements speak only as of the date they are made, and we undertake no obligation to update any forward-looking statements we make to reflect events or circumstances occurring after the date of this Form 10-Q.

## RISK MANAGEMENT AND DISCLOSURE COMMITMENTS

In October 2000, we announced our adoption of a series of commitments designed to enhance market discipline, liquidity and capital. In September 2005, we entered into a written agreement with FHFA, then OFHEO, that updated these commitments and set forth a process for implementing them. A copy of the letters between us and OFHEO dated September 1, 2005 constituting the written agreement has been filed as an exhibit to our Registration Statement on Form 10, filed with the SEC on July 18, 2008, and is available on the Investor Relations page of our web site at www.freddiemac.com/investors/sec_filings/index.html.

<div align="center">97</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

In November 2008, FHFA suspended our periodic issuance of subordinated debt disclosure commitment during the term of conservatorship and thereafter until directed otherwise. In March 2009, FHFA suspended the remaining disclosure commitments under the September 1, 2005 agreement until further notice, except that: (a) FHFA will continue to monitor our adherence to the substance of the liquidity management and contingency planning commitment through normal supervision activities; and (b) we will continue to provide interest-rate risk and credit risk disclosures in our periodic public reports.

For disclosures concerning our PMVS and duration gap, see "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate and Other Market Risks — *PMVS and Duration Gap*." Our 2012 monthly average PMVS results, duration gap, and related disclosures are provided in our Monthly Volume Summary reports, which are available on our web site, www.freddiemac.com/investors/volsum and in current reports on Form 8-K we file with the SEC. For disclosures concerning credit risk sensitivity, see "RISK MANAGEMENT — Credit Risk — *Mortgage Credit Risk — Credit Risk Sensitivity*."

## LEGISLATIVE AND REGULATORY MATTERS

### FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships and 2012 Conservatorship Scorecard

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. FHFA's plan provides lawmakers and the public with an outline of how FHFA as Conservator intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build**. Build a new infrastructure for the secondary mortgage market;

- **Contract**. Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain**. Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that establishes objectives and performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We continue to align our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard. See "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — FHFA's Strategic Plan for Freddie Mac and Fannie Mae Conservatorships*" and "OTHER INFORMATION — 2012 Conservatorship Scorecard" in our 2011 Annual Report for further information.

### Legislated Increases to Guarantee Fees

Effective April 1, 2012, at the direction of FHFA, the guarantee fee on single-family residential mortgages sold to Freddie Mac was increased by 10 basis points. Under the Temporary Payroll Tax Cut Continuation Act of 2011, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by us. Guarantee fees related to mortgage loans held by our consolidated trusts, including those attributable to the 10 basis point increase, are reported within our GAAP consolidated statements of comprehensive income in net interest income and the remittance of the additional fees to Treasury is reported in non-interest expense. We will pay the fees to Treasury on a quarterly basis beginning in September 2012.

FHFA recently stated that, consistent with the Temporary Payroll Tax Cut Continuation Act of 2011 and with previous commitments FHFA has made, FHFA will be announcing by the end of August another set of gradual adjustments in guarantee fee pricing that will take effect late in the year. We expect that we will be allowed to retain the revenue from this fee increase.

### Legislation Related to Reforming Freddie Mac and Fannie Mae

Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. Congress continues to hold hearings and consider legislation on the future state of Freddie Mac and Fannie Mae.

A number of bills were introduced in Congress in 2011 relating to reforming Freddie Mac, Fannie Mae, and the secondary mortgage market. We cannot predict whether or when any of the bills discussed therein might be enacted. We

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

expect additional bills relating to Freddie Mac and Fannie Mae to be introduced and considered by Congress during the remainder of 2012.

For more information, see "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Administration Report on Reforming the U.S. Housing Finance Market*" and "*— Legislation Related to Reforming Freddie Mac and Fannie Mae*" in our 2011 Annual Report.

**Dodd-Frank Act**

The Dodd-Frank Act, which was signed into law on July 21, 2010, significantly changed the regulation of the financial services industry, including by creating new standards related to regulatory oversight of systemically important financial companies, derivatives, capital requirements, asset-backed securitization, mortgage underwriting, and consumer financial protection. The Dodd-Frank Act has directly affected and will continue to directly affect the business and operations of Freddie Mac by subjecting us to new and additional regulatory oversight and standards, including with respect to our activities and products. We may also be affected by provisions of the Dodd-Frank Act and implementing regulations that affect the activities of banks, savings institutions, insurance companies, securities dealers, and other regulated entities that are our customers and counterparties.

Implementation of the Dodd-Frank Act is being accomplished through numerous rulemakings, many of which are still in process. Accordingly, it is difficult to assess fully the impact of the Dodd-Frank Act on Freddie Mac and the financial services industry at this time. The final effects of the legislation will not be known with certainty until these rulemakings are complete. The Dodd-Frank Act also mandates the preparation of studies on a wide range of issues, which could lead to additional legislation or regulatory changes.

Recent developments with respect to Dodd-Frank rulemakings that may have a significant impact on Freddie Mac include the July 10, 2012 approval by the Commodity Futures Trading Commission ("CFTC") and the SEC (collectively, the "Commissions") of a joint final rule that further defined certain swap-related terms, including "swap." The rule will become effective 60 days after publication in the Federal Register. Earlier this year, the Commissions finalized other terms, including "major swap participant" ("MSP"). In light of these rulemakings, we are analyzing whether Freddie Mac meets the criteria of an MSP. In general, if Freddie Mac were to meet the MSP criteria, it would be required to register with the CFTC, and it would face significant regulations, including those relating to reporting, recordkeeping and business conduct standards. The Commissions' adoption of the final rule defining "swap" will also trigger the compliance dates for certain other swap rules that have been adopted by the Commissions, such as the final rule on real-time public reporting of swap transaction data. Meeting the requirements of these final rules may increase Freddie Mac's administrative and compliance costs.

We continue to review and assess the impact of rulemakings and other activities under the Dodd-Frank Act. For more information, see "RISK FACTORS — Legal and Regulatory Risks — *The Dodd-Frank Act and related regulation may adversely affect our business activities and financial results*" in our 2011 Annual Report.

**Developments Concerning Single-Family Servicing Practices**

There have been a number of legislative and regulatory developments in recent periods impacting single-family mortgage servicing and foreclosure practices, including those discussed below and in "BUSINESS — Regulation and Supervision — *Legislative and Regulatory Developments — Developments Concerning Single-Family Servicing Practices*" in our 2011 Annual Report. It is possible that these developments will result in significant changes to mortgage servicing and foreclosure practices that could adversely affect our business. New compliance requirements placed on servicers as a result of these developments could expose Freddie Mac to financial risk as a result of further extensions of foreclosure timelines if home prices remain weak or decline. We may need to make additional significant changes to our practices, which could increase our operational risk. It is difficult to predict other impacts on our business of these changes, though such changes could adversely affect our credit losses and costs of servicing, and make it more difficult for us to transfer mortgage servicing rights to a successor servicer should we need to do so. Recent developments include that a number of states are proposing and, in some cases, enacting a range of new rules that would affect the foreclosure process. For example, on July 11, 2012, the Governor of California signed into law a package of foreclosure prevention bills that will likely slow foreclosures in California, and impose stricter rules on mortgage servicers.

For more information on operational risks related to these developments in mortgage servicing, see "MD&A — RISK MANAGEMENT — Operational Risks" in our 2011 Annual Report.

<div align="center">99</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FHFA Advisory Bulletin**

On April 9, 2012, FHFA issued an advisory bulletin, "Framework for Adversely Classifying Loans, Other Real Estate Owned, and Other Assets and Listing Assets for Special Mention," which was effective upon issuance and is applicable to Freddie Mac, Fannie Mae, and the FHLBs. The advisory bulletin establishes guidelines for adverse classification and identification of specified assets and off-balance sheet credit exposures. The Advisory Bulletin indicates that this guidance considers and is generally consistent with the Uniform Retail Credit Classification and Account Management Policy issued by the federal banking regulators in June 2000. Among other provisions, the advisory bulletin requires that we classify a single-family loan as "loss" when the loan is no more than 180 days delinquent. The advisory bulletin specifies that, once a loan is classified as "loss," we generally are required to charge-off the portion of the loan balance that exceeds the fair value of the property, less cost to sell. The advisory bulletin also specifies that, if we subsequently receive full or partial payment of a previously charged-off loan, we may report a recovery of the amount, either through our loan loss reserves or as a reduction in REO operations expenses. The accounting methods outlined in FHFA's advisory bulletin are significantly different from our current methods of accounting for single-family loans that are 180 days or more delinquent. We are currently assessing the operational and accounting impacts of this advisory bulletin and have not yet determined when or how we will implement this bulletin or its impact on our consolidated financial statements.

**Rule Concerning Prudential Management and Operations Standards**

On June 8, 2012, FHFA published a final rule to establish prudential standards relating to the management and operations of Freddie Mac, Fannie Mae, and the FHLBs. The rule also includes other provisions relating to the possible consequences for a regulated entity that fails to operate in accordance with the standards or otherwise fails to comply with the rule. The standards became effective on August 7, 2012. For more information, see "BUSINESS — Regulation and Supervision — *Federal Housing Finance Agency — Prudential Management and Operations Standards*" in our 2011 Annual Report.

**Basel III Implementation**

On June 7, 2012, the Office of the Comptroller of the Currency, the Federal Reserve and the FDIC (collectively, the "Banking Agencies") jointly released three notices of proposed rulemaking that would revise and replace the Banking Agencies' current capital rules by implementing the Basel III regulatory reforms as well as certain provisions of the Dodd-Frank Act. Implementation of the proposed rules would occur over a period of several years, with full implementation by January 1, 2019. If adopted as proposed, the rules would significantly revise the capital requirements applicable to banks, with potential impacts on mortgage origination, servicing, investing and securitization.

**Market Risk Capital Rule**

On June 12, 2012, the Banking Agencies jointly announced the finalization of a market risk capital rule applicable to banking organizations with aggregate trading assets and liabilities equal to 10% of total assets, or $1 billion or more. The rule amends the calculation of market risk in an attempt to better characterize the risks facing a particular institution and to help ensure the adequacy of capital related to the institution's market risk-related positions. The standardized specific risk-weighting factors assigned to the GSEs' equity and debt exposures are unchanged from the previous market risk capital rules. However, covered banks might face increased capital requirements under the new rule with respect to exposures to securitizations with credit tranches, potentially including certain Freddie Mac Other Guarantee Transactions. The rule is effective January 1, 2013.

### ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

**Interest-Rate Risk and Other Market Risks**

Our investments in mortgage loans and mortgage-related securities expose us to interest-rate risk and other market risks arising primarily from the uncertainty as to when borrowers will pay the outstanding principal balance of mortgage loans and mortgage-related securities, known as prepayment risk, and the resulting potential mismatch in the timing of our receipt of cash flows related to our assets versus the timing of payment of cash flows related to the liabilities we use to fund those assets. See "QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK — Interest-Rate Risk and Other Market Risks" in our 2011 Annual Report for a discussion of our market risk exposures, including those related to derivatives, institutional counterparties, and other market risks.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### PMVS and Duration Gap

Our primary interest-rate risk measures are PMVS and duration gap.

PMVS is an estimate of the change in the market value of our net assets and liabilities from an instantaneous 50 basis point shock to interest rates, assuming no rebalancing actions are undertaken and assuming the mortgage-to-LIBOR basis does not change. PMVS is measured in two ways, one measuring the estimated sensitivity of our portfolio market value to parallel movements in interest rates (PMVS-Level or PMVS-L) and the other to nonparallel movements (PMVS-YC).

Duration gap measures the difference in price sensitivity to interest rate changes between our assets and liabilities, and is expressed in months relative to the market value of assets. For example, assets with a six month duration and liabilities with a five month duration would result in a positive duration gap of one month. A duration gap of zero implies that the duration of our assets equals the duration of our liabilities. Multiplying duration gap (expressed as a percentage of a year) by the fair value of our assets will provide an indication of the change in the fair value of our equity to be expected from a 1% change in interest rates.

The 50 basis point shift and 25 basis point change in slope of the LIBOR yield curve used for our PMVS measures reflect reasonably possible near-term changes that we believe provide a meaningful measure of our interest-rate risk sensitivity. Our PMVS measures assume instantaneous shocks. Therefore, these PMVS measures do not consider the effects on fair value of any rebalancing actions that we would typically expect to take to reduce our risk exposure.

#### Limitations of Market Risk Measures

Our PMVS and duration gap estimates are determined using models that involve our best judgment of interest-rate and prepayment assumptions. Accordingly, while we believe that PMVS and duration gap are useful risk management tools, they should be understood as estimates rather than as precise measurements. While PMVS and duration gap estimate our exposure to changes in interest rates, they do not capture the potential impact of certain other market risks, such as changes in volatility, basis, and foreign-currency risk. The impact of these other market risks can be significant.

There are inherent limitations in any methodology used to estimate exposure to changes in market interest rates. Our sensitivity analyses for PMVS and duration gap contemplate only certain movements in interest rates and are performed at a particular point in time based on the estimated fair value of our existing portfolio. These sensitivity analyses do not consider other factors that may have a significant effect on our financial instruments, most notably business activities and strategic actions that management may take in the future to manage interest-rate risk. As such, these analyses are not intended to provide precise forecasts of the effect a change in market interest rates would have on the estimated fair value of our net assets.

In addition, it has been more difficult in recent years to measure and manage the interest-rate risk related to mortgage assets as risk for prepayment model error remains high due to the low interest rate environment and uncertainty regarding default rates, unemployment, loan modification, and the volatility and impact of home price movements on mortgage durations. Misestimation of prepayments could result in hedging-related losses.

#### Duration Gap and PMVS Results

The table below provides duration gap, estimated point-in-time and minimum and maximum PMVS-L and PMVS-YC results, and an average of the daily values and standard deviation for the three and six months ended June 30, 2012 and 2011. The table below also provides PMVS-L estimates assuming an immediate 100 basis point shift in the LIBOR yield curve. We do not hedge the entire prepayment risk exposure embedded in our mortgage assets. The interest-rate sensitivity of a mortgage portfolio varies across a wide range of interest rates. Therefore, the difference between PMVS at 50 basis points and 100 basis points is non-linear. Our PMVS-L (50 basis points) exposure at June 30, 2012 was $135 million; approximately half was driven by our duration exposure and the other half was driven by our negative convexity exposure. The PMVS-L at June 30, 2012 declined compared to December 31, 2011 primarily due to a decline in our duration exposure. On an average basis for the three and six months ended June 30, 2012, our PMVS-L (50 basis points) was $156 million and $189 million, respectively, which was primarily driven by our negative convexity exposure on our mortgage assets.

101                                                                                       *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 55 — PMVS and Duration Gap Results

| | PMVS-YC | PMVS-L | |
|---|---|---|---|
| | 25 bps | 50 bps | 100 bps |
| | | (in millions) | |
| Assuming shifts of the LIBOR yield curve: | | | |
| June 30, 2012 | $ 15 | $ 135 | $ 423 |
| December 31, 2011 | $ 7 | $ 465 | $ 1,349 |

| | Three Month Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | 0.0 | $ 17 | $ 156 | 0.1 | $ 25 | $ 419 |
| Minimum | (0.5) | $ 1 | $ 58 | (0.2) | $ 4 | $ 288 |
| Maximum | 0.6 | $ 55 | $ 292 | 0.6 | $ 58 | $ 558 |
| Standard deviation | 0.2 | $ 13 | $ 53 | 0.2 | $ 13 | $ 62 |

| | Six Months Ended June 30, | | | | | |
|---|---|---|---|---|---|---|
| | 2012 | | | 2011 | | |
| | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps | Duration Gap | PMVS-YC 25 bps | PMVS-L 50 bps |
| | (in months) | (dollars in millions) | | (in months) | (dollars in millions) | |
| Average | 0.0 | $ 17 | $ 189 | (0.1) | $ 23 | $ 433 |
| Minimum | (0.5) | $ 1 | $ 58 | (1.0) | $ — | $ 280 |
| Maximum | 0.6 | $ 57 | $ 379 | 0.6 | $ 58 | $ 721 |
| Standard deviation | 0.2 | $ 13 | $ 61 | 0.3 | $ 13 | $ 84 |

Derivatives have historically enabled us to keep our interest-rate risk exposure at consistently low levels in a wide range of interest-rate environments. The table below shows that the PMVS-L risk levels for the periods presented would generally have been higher if we had not used derivatives. The derivative impact on our PMVS-L (50 basis points) was $(0.3) billion at June 30, 2012, a decline of $1.7 billion from December 31, 2011. The decline was primarily driven by an increase in our issuance of longer-term debt beginning in the fourth quarter of 2011, which decreased our reliance on derivatives. In addition, the continued decline in interest rates decreased the duration of our hedged assets, which resulted in requiring fewer derivatives to hedge our portfolio.

## Table 56 — Derivative Impact on PMVS-L (50 bps)

| | Before Derivatives | After Derivatives | Effect of Derivatives |
|---|---|---|---|
| | | (in millions) | |
| At: | | | |
| June 30, 2012 | $ 434 | $ 135 | $ (299) |
| December 31, 2011 | $ 2,470 | $ 465 | $ (2,005) |

The disclosure in our Monthly Volume Summary reports, which are available on our website at www.freddiemac.com and in current reports on Form 8-K we file with the SEC, reflects the average of the daily PMVS-L, PMVS-YC and duration gap estimates for a given reporting period (a month, quarter or year).

## ITEM 4. CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms and that such information is accumulated and communicated to management of the company, including the company's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure. In designing our disclosure controls and procedures, we recognize that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and we must apply judgment in implementing possible controls and procedures.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Management, including the company's Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of June 30, 2012. As a result of management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of June 30, 2012, at a reasonable level of assurance due to the two material weaknesses in our internal control over financial reporting discussed below.

- The first material weakness relates to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, including disclosures affecting our consolidated financial statements. We have not been able to update our disclosure controls and procedures to provide reasonable assurance that information known by FHFA on an ongoing basis is communicated from FHFA to Freddie Mac's management in a manner that allows for timely decisions regarding our required disclosure. Based on discussions with FHFA and the structural nature of this continuing weakness, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. We consider this situation to be a material weakness in our internal control over financial reporting.

- The second material weakness, which was identified during our evaluation as of December 31, 2011, relates to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from elevated levels of employee turnover. We are finding it difficult to retain and engage critical employees and attract people with the skills and experience we need. While we have been able to leverage succession plans and reassign responsibilities to maintain sound internal control over financial reporting in most areas, as a result of elevated levels of employee turnover, in the fourth quarter of 2011, we experienced a significant increase in the number of control breakdowns within certain areas of our information technology division, specifically within groups responsible for information change management and information security. During our evaluation as of December 31, 2011, we identified deficiencies in the following areas: (a) approval and monitoring of changes to certain technology applications and infrastructure; (b) monitoring of select privileged user activities; and (c) monitoring user activities performed on certain technology hardware systems. These control breakdowns could have affected applications which support our financial reporting processes. Elevated levels of employee turnover contributed to ineffective management oversight of controls in these areas resulting in these deficiencies. We believe that these issues aggregate to a material weakness in our internal control over financial reporting.

## Changes in Internal Control Over Financial Reporting During the Quarter Ended June 30, 2012

We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended June 30, 2012 and concluded that the following matters have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Employee turnover moderated in the second quarter of 2012 compared to the same period in 2011. We expect the public debate regarding the future role of the GSEs will affect employee turnover in the future. We continue to have concerns about staffing inadequacies, management depth, and low employee engagement which may affect our execution capabilities, cause delays in the implementation of critical technology and other projects, and erode our business, modeling, internal audit, risk management, information security, financial reporting, legal, compliance, and other capabilities. Donald H. Layton, our new Chief Executive Officer, joined Freddie Mac on May 21, 2012. Anthony N. Renzi, Executive Vice President — Single-Family Business, Operations and Technology, resigned from his position and responsibilities effective May 11, 2012. Following the quarter ended June 30, 2012, William H. McDavid, our new Executive Vice President — General Counsel and Corporate Secretary, joined Freddie Mac on July 16, 2012.

## Mitigating Actions Related to the Material Weaknesses in Internal Control Over Financial Reporting

As described under "Evaluation of Disclosure Controls and Procedures," we have two material weaknesses in internal control over financial reporting as of June 30, 2012 that we have not remediated.

Given the structural nature of the material weakness related to our inability to update our disclosure controls and procedures in a manner that adequately ensures the accumulation and communication to management of information known to FHFA that is needed to meet our disclosure obligations under the federal securities laws, we believe it is likely that we will not remediate this material weakness while we are under conservatorship. However, both we and FHFA have continued to engage in activities and employ procedures and practices intended to permit accumulation and communication to

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

management of information needed to meet our disclosure obligations under the federal securities laws. These include the following:

- FHFA has established the Office of Conservatorship Operations, which is intended to facilitate operation of the company with the oversight of the Conservator.

- We provide drafts of our SEC filings to FHFA personnel for their review and comment prior to filing. We also provide drafts of external press releases, statements and speeches to FHFA personnel for their review and comment prior to release.

- FHFA personnel, including senior officials, review our SEC filings prior to filing, including this quarterly report on Form 10-Q, and engage in discussions regarding issues associated with the information contained in those filings. Prior to filing this quarterly report on Form 10-Q, FHFA provided us with a written acknowledgement that it had reviewed the quarterly report on Form 10-Q, was not aware of any material misstatements or omissions in the quarterly report on Form 10-Q, and had no objection to our filing the quarterly report on Form 10-Q.

- The Acting Director of FHFA is in frequent communication with our Chief Executive Officer, typically meeting (in person or by phone) on a weekly basis.

- FHFA representatives hold frequent meetings, typically weekly, with various groups within the company to enhance the flow of information and to provide oversight on a variety of matters, including accounting, capital markets management, external communications, and legal matters.

- Senior officials within FHFA's accounting group meet frequently, typically weekly, with our senior financial executives regarding our accounting policies, practices, and procedures.

We have performed the following mitigating actions regarding the material weakness related to our inability to effectively manage information technology changes and maintain adequate controls over information security monitoring, resulting from increased levels of employee turnover:

- Reviewed potential unauthorized changes to applications supporting our financial statements for proper approvals.

- Reviewed and approved user access capabilities for applications supporting our financial reporting processes.

- Maintained effective business process controls over financial reporting.

- Filled the vacant positions or reassigned responsibilities within the information change management group.

- Took select actions targeted to reduce employee attrition in key control areas.

- Continued to explore various strategic arrangements with outside firms to provide operational capability and staffing for these functions, if needed.

- Assessed staffing requirements to ensure appropriate staffing over information security controls.

- Evaluated automation capabilities for the identification and resolution of potential unauthorized system changes.

- Initiated training for IT individuals who execute or manage change management and security controls.

We also intend to take the following remediation actions related to this material weakness:

- Develop cross-training programs within this area to mitigate the risk to the internal control environment should we continue to experience high levels of employee turnover.

- Fill the vacant positions or reassign responsibilities within the information security monitoring group.

- Update our policies and procedures to document control processes.

In view of our mitigating actions related to these material weaknesses, we believe that our interim consolidated financial statements for the quarter ended June 30, 2012 have been prepared in conformity with GAAP.

<div align="center">104</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**ITEM 1. FINANCIAL STATEMENTS**

105                                                                                                   *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**
**(UNAUDITED)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | (in millions, except share-related amounts) | | | |
| *Interest income* | | | | |
| Mortgage loans: | | | | |
| Held by consolidated trusts | $ 16,806 | $ 19,782 | $ 34,274 | $ 39,846 |
| Unsecuritized | 2,224 | 2,274 | 4,536 | 4,608 |
| *Total mortgage loans* | 19,030 | 22,056 | 38,810 | 44,454 |
| Investments in securities | 2,777 | 3,275 | 5,715 | 6,558 |
| Other | 21 | 18 | 34 | 52 |
| *Total interest income* | 21,828 | 25,349 | 44,559 | 51,064 |
| *Interest expense* | | | | |
| Debt securities of consolidated trusts | (14,625) | (17,261) | (29,878) | (34,664) |
| Other debt | (2,660) | (3,333) | (5,476) | (6,898) |
| *Total interest expense* | (17,285) | (20,594) | (35,354) | (41,562) |
| Expense related to derivatives | (157) | (194) | (319) | (401) |
| *Net interest income* | 4,386 | 4,561 | 8,886 | 9,101 |
| Provision for credit losses | (155) | (2,529) | (1,980) | (4,518) |
| *Net interest income after provision for credit losses* | 4,231 | 2,032 | 6,906 | 4,583 |
| *Non-interest income (loss)* | | | | |
| Gains (losses) on extinguishment of debt securities of consolidated trusts | (1) | (125) | (5) | 98 |
| Gains (losses) on retirement of other debt | (45) | 3 | (66) | 15 |
| Gains (losses) on debt recorded at fair value | 62 | (37) | 45 | (118) |
| Derivative gains (losses) | (882) | (3,807) | (1,938) | (4,234) |
| Impairment of available-for-sale securities: | | | | |
| Total other-than-temporary impairment of available-for-sale securities | (135) | (230) | (610) | (1,284) |
| Portion of other-than-temporary impairment recognized in AOCI | 37 | (122) | (52) | (261) |
| Net impairment of available-for-sale securities recognized in earnings | (98) | (352) | (662) | (1,545) |
| Other gains (losses) on investment securities recognized in earnings | (356) | 209 | (644) | 89 |
| Other income | 569 | 252 | 1,003 | 586 |
| *Non-interest income (loss)* | (751) | (3,857) | (2,267) | (5,109) |
| *Non-interest expense* | | | | |
| Salaries and employee benefits | (227) | (219) | (403) | (426) |
| Professional services | (81) | (64) | (152) | (120) |
| Occupancy expense | (14) | (15) | (28) | (30) |
| Other administrative expenses | (79) | (86) | (155) | (169) |
| *Total administrative expenses* | (401) | (384) | (738) | (745) |
| Real estate owned operations income (expense) | 30 | (27) | (141) | (284) |
| Other expenses | (165) | (135) | (253) | (214) |
| *Non-interest expense* | (536) | (546) | (1,132) | (1,243) |
| Income (loss) before income tax benefit | 2,944 | (2,371) | 3,507 | (1,769) |
| Income tax benefit | 76 | 232 | 90 | 306 |
| *Net income (loss)* | 3,020 | (2,139) | 3,597 | (1,463) |
| Other comprehensive income (loss), net of taxes and reclassification adjustments: | | | | |
| Changes in unrealized gains (losses) related to available-for-sale securities | (238) | 903 | 909 | 2,844 |
| Changes in unrealized gains (losses) related to cash flow hedge relationships | 107 | 135 | 218 | 267 |
| Changes in defined benefit plans | 3 | 1 | (43) | (8) |
| Total other comprehensive income (loss), net of taxes and reclassification adjustments | (128) | 1,039 | 1,084 | 3,103 |
| Comprehensive income (loss) | $ 2,892 | $ (1,100) | $ 4,681 | $ 1,640 |
| *Net income (loss)* | $ 3,020 | $ (2,139) | $ 3,597 | $ (1,463) |
| Preferred stock dividends | (1,808) | (1,617) | (3,612) | (3,222) |
| *Net income (loss) attributable to common stockholders* | $ 1,212 | $ (3,756) | $ (15) | $ (4,685) |
| Net income (loss) per common share: | | | | |
| Basic | $ 0.37 | $ (1.16) | $ — | $ (1.44) |
| Diluted | $ 0.37 | $ (1.16) | $ — | $ (1.44) |
| Weighted average common shares outstanding (in thousands): | | | | |
| Basic | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |
| Diluted | 3,239,711 | 3,244,967 | 3,240,627 | 3,245,970 |

*The accompanying notes are an integral part of these consolidated financial statements.*

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED BALANCE SHEETS**
**(UNAUDITED)**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions, except share-related amounts) | |
| **Assets** | | |
| Cash and cash equivalents (includes $1 and $2, respectively, related to our consolidated VIEs) | $ 19,182 | $ 28,442 |
| Restricted cash and cash equivalents (includes $9,905 and $27,675, respectively, related to our consolidated VIEs) | 10,240 | 28,063 |
| Federal funds sold and securities purchased under agreements to resell (includes $18,250 and $0, respectively, related to our consolidated VIEs) | 38,858 | 12,044 |
| *Investments in securities:* | | |
| Available-for-sale, at fair value (includes $166 and $204, respectively, pledged as collateral that may be repledged) | 194,098 | 210,659 |
| Trading, at fair value | 47,436 | 58,830 |
| *Total investments in securities* | 241,534 | 269,489 |
| *Mortgage loans:* | | |
| Held-for-investment, at amortized cost: | | |
| By consolidated trusts (net of allowances for loan losses of $6,258 and $8,351, respectively) | 1,532,939 | 1,564,131 |
| Unsecuritized (net of allowances for loan losses of $29,298 and $30,912, respectively) | 187,053 | 207,418 |
| Total held-for-investment mortgage loans, net | 1,719,992 | 1,771,549 |
| Held-for-sale, at lower-of-cost-or-fair-value (includes $10,120 and $9,710 at fair value, respectively) | 10,120 | 9,710 |
| *Total mortgage loans, net* | 1,730,112 | 1,781,259 |
| Accrued interest receivable (includes $5,867 and $6,242, respectively, related to our consolidated VIEs) | 7,460 | 8,062 |
| Derivative assets, net | 168 | 118 |
| Real estate owned, net (includes $53 and $60, respectively, related to our consolidated VIEs) | 4,809 | 5,680 |
| Deferred tax assets, net | 3,053 | 3,546 |
| Other assets (Note 18) (includes $6,637 and $6,083, respectively, related to our consolidated VIEs) | 10,919 | 10,513 |
| *Total assets* | $ 2,066,335 | $ 2,147,216 |
| **Liabilities and equity (deficit)** | | |
| *Liabilities* | | |
| Accrued interest payable (includes $5,636 and $5,943, respectively, related to our consolidated VIEs) | $ 8,322 | $ 8,898 |
| *Debt, net:* | | |
| Debt securities of consolidated trusts held by third parties | 1,468,613 | 1,471,437 |
| Other debt (includes $2,158 and $3,015 at fair value, respectively) | 581,743 | 660,546 |
| *Total debt, net* | 2,050,356 | 2,131,983 |
| Derivative liabilities, net | 336 | 435 |
| Other liabilities (Note 18) (includes $2 and $3, respectively, related to our consolidated VIEs) | 6,235 | 6,046 |
| *Total liabilities* | 2,065,249 | 2,147,362 |
| Commitments and contingencies (Notes 9, 10, and 17) | | |
| *Equity (deficit)* | | |
| Senior preferred stock, at redemption value | 72,336 | 72,171 |
| Preferred stock, at redemption value | 14,109 | 14,109 |
| Common stock, $0.00 par value, 4,000,000,000 shares authorized, 725,863,886 shares issued and 650,033,623 shares and 649,725,302 shares outstanding, respectively | — | — |
| Additional paid-in capital | 1 | 3 |
| Retained earnings (accumulated deficit) | (74,564) | (74,525) |
| *AOCI, net of taxes, related to:* | | |
| Available-for-sale securities (includes $9,869 and $10,334, respectively, related to net unrealized losses on securities for which other-than-temporary impairment has been recognized in earnings) | (5,304) | (6,213) |
| Cash flow hedge relationships | (1,512) | (1,730) |
| Defined benefit plans | (95) | (52) |
| *Total AOCI, net of taxes* | (6,911) | (7,995) |
| Treasury stock, at cost, 75,830,263 shares and 76,138,584 shares, respectively | (3,885) | (3,909) |
| *Total equity (deficit)* | 1,086 | (146) |
| *Total liabilities and equity (deficit)* | $ 2,066,335 | $ 2,147,216 |

*The accompanying notes are an integral part of these consolidated financial statements.*

107

*Freddie Mac*

TREASURY-4193

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## FREDDIE MAC
## CONSOLIDATED STATEMENTS OF EQUITY (DEFICIT)
## (UNAUDITED)

| | Freddie Mac Stockholders' Equity (Deficit) | | | | | | | | | | |
| | Shares Outstanding | | | | | | | | | | |
| | Senior Preferred Stock | Preferred Stock | Common Stock | Senior Preferred Stock, at Redemption Value | Preferred Stock, at Redemption Value | Common Stock, at Par Value | Additional Paid-In Capital | Retained Earnings (Accumulated Deficit) | AOCI, Net of Tax | Treasury Stock, at Cost | Total Equity (Deficit) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | |
| **Balance as of December 31, 2010** | 1 | 464 | 649 | $ 64,200 | $ 14,109 | $ — | $ 7 | $ (62,733) | $ (12,031) | $ (3,953) | $ (401) |
| *Comprehensive income (loss):* | | | | | | | | | | | |
| Net income (loss) | — | — | — | — | — | — | — | (1,463) | — | — | (1,463) |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 3,103 | — | 3,103 |
| *Comprehensive income (loss)* | — | — | — | — | — | — | — | (1,463) | 3,103 | — | 1,640 |
| Increase in liquidation preference | — | — | — | 500 | — | — | — | — | — | — | 500 |
| Stock-based compensation | — | — | — | — | — | — | 7 | — | — | — | 7 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Common stock issuances | — | — | 1 | — | — | — | (42) | — | — | 42 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 28 | (28) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (3,222) | — | — | (3,222) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (3) | — | — | (3) |
| **Ending balance at June 30, 2011** | 1 | 464 | 650 | $ 64,700 | $ 14,109 | $ — | $ 1 | $ (67,449) | $ (8,928) | $ (3,911) | $ (1,478) |
| **Balance as of December 31, 2011** | 1 | 464 | 650 | $ 72,171 | $ 14,109 | $ — | $ 3 | $ (74,525) | $ (7,995) | $ (3,909) | $ (146) |
| *Comprehensive income:* | | | | | | | | | | | |
| Net income | — | — | — | — | — | — | — | 3,597 | — | — | 3,597 |
| Other comprehensive income, net of taxes | — | — | — | — | — | — | — | — | 1,084 | — | 1,084 |
| *Comprehensive income* | — | — | — | — | — | — | — | 3,597 | 1,084 | — | 4,681 |
| Increase in liquidation preference | — | — | — | 165 | — | — | — | — | — | — | 165 |
| Stock-based compensation | — | — | — | — | — | — | 2 | — | — | — | 2 |
| Income tax benefit from stock-based compensation | — | — | — | — | — | — | 1 | — | — | — | 1 |
| Common stock issuances | — | — | — | — | — | — | (24) | — | — | 24 | — |
| Transfer from retained earnings (accumulated deficit) to additional paid-in capital | — | — | — | — | — | — | 19 | (19) | — | — | — |
| Senior preferred stock dividends declared | — | — | — | — | — | — | — | (3,616) | — | — | (3,616) |
| Dividend equivalent payments on expired stock options | — | — | — | — | — | — | — | (1) | — | — | (1) |
| **Ending balance at June 30, 2012** | 1 | 464 | 650 | $ 72,336 | $ 14,109 | $ — | $ 1 | $ (74,564) | $ (6,911) | $ (3,885) | $ 1,086 |

*The accompanying notes are an integral part of these consolidated financial statements.*

108

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-4194

Table of Contents

**FREDDIE MAC**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(UNAUDITED)**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| **Cash flows from operating activities** | | |
| Net income (loss) | $ 3,597 | $ (1,463) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | |
| Derivative (gains) losses | (98) | 1,632 |
| Asset related amortization - premiums, discounts, and basis adjustments | 1,862 | 595 |
| Debt related amortization - premiums and discounts on certain debt securities and basis adjustments | (2,231) | (311) |
| Net discounts paid on retirements of other debt | (346) | (469) |
| Net premiums received from issuance of debt securities of consolidated trusts | 2,416 | 1,927 |
| Losses (gains) on extinguishment of debt securities of consolidated trusts and other debt | 71 | (113) |
| Provision for credit losses | 1,980 | 4,518 |
| Losses on investment activity | 882 | 1,096 |
| (Gains) losses on debt recorded at fair value | (45) | 118 |
| Deferred income tax (benefit) expense | (101) | 15 |
| Purchases of held-for-sale mortgage loans | (10,462) | (5,434) |
| Sales of mortgage loans acquired as held-for-sale | 10,446 | 7,721 |
| Repayments of mortgage loans acquired as held-for-sale | 31 | 22 |
| Payments to servicers for pre-foreclosure expense and servicer incentive fees | (625) | (545) |
| Change in: | | |
| Accrued interest receivable | 602 | 190 |
| Accrued interest payable | (510) | (618) |
| Income taxes payable | 119 | (319) |
| Other, net | (1,022) | (181) |
| *Net cash provided by operating activities* | 6,566 | 8,381 |
| **Cash flows from investing activities** | | |
| Purchases of trading securities | (12,005) | (29,292) |
| Proceeds from sales of trading securities | 7,466 | 24,076 |
| Proceeds from maturities of trading securities | 14,896 | 10,122 |
| Purchases of available-for-sale securities | (2,821) | (7,687) |
| Proceeds from sales of available-for-sale securities | 1,242 | 2,107 |
| Proceeds from maturities of available-for-sale securities | 19,049 | 17,965 |
| Purchases of held-for-investment mortgage loans | (32,837) | (17,610) |
| Repayments of mortgage loans acquired as held-for-investment | 240,799 | 159,045 |
| Decrease in restricted cash | 17,823 | 5,778 |
| Net proceeds from mortgage insurance and acquisitions and dispositions of real estate owned | 5,886 | 6,782 |
| Net (increase) decrease in federal funds sold and securities purchased under agreements to resell | (26,814) | 12,915 |
| Derivative premiums and terminations and swap collateral, net | 53 | (2,965) |
| *Net cash provided by investing activities* | 232,737 | 181,236 |
| **Cash flows from financing activities** | | |
| Proceeds from issuance of debt securities of consolidated trusts held by third parties | 60,505 | 43,997 |
| Repayments of debt securities of consolidated trusts held by third parties | (226,720) | (217,330) |
| Proceeds from issuance of other debt | 365,365 | 521,779 |
| Repayments of other debt | (444,255) | (554,835) |
| Increase in liquidation preference of senior preferred stock | 165 | 500 |
| Payment of cash dividends on senior preferred stock | (3,616) | (3,222) |
| Excess tax benefits associated with stock-based awards | 1 | 1 |
| Payments of low-income housing tax credit partnerships notes payable | (8) | (31) |
| *Net cash used in financing activities* | (248,563) | (209,141) |
| Net decrease in cash and cash equivalents | (9,260) | (19,524) |
| Cash and cash equivalents at beginning of period | 28,442 | 37,012 |
| *Cash and cash equivalents at end of period* | $ 19,182 | $ 17,488 |
| **Supplemental cash flow information** | | |
| Cash paid (received) for: | | |
| Debt interest | $ 39,105 | $ 43,449 |
| Net derivative interest carry | 2,210 | 2,074 |
| Income taxes | (108) | (1) |
| Non-cash investing and financing activities: | | |
| Underlying mortgage loans related to guarantor swap transactions | 163,676 | 143,324 |
| Debt securities of consolidated trusts held by third parties established for guarantor swap transactions | 163,676 | 143,324 |

*The accompanying notes are an integral part of these consolidated financial statements.*

109

*Freddie Mac*

TREASURY-4195

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Freddie Mac was chartered by Congress in 1970 to stabilize the nation's residential mortgage market and expand opportunities for home ownership and affordable rental housing. Our statutory mission is to provide liquidity, stability and affordability to the U.S. housing market. We are a GSE regulated by FHFA, the SEC, HUD, and the Treasury, and are currently operating under the conservatorship of FHFA. For more information on the roles of FHFA and the Treasury, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in this Form 10-Q and in our Annual Report on Form 10-K for the year ended December 31, 2011, or our 2011 Annual Report.

We are involved in the U.S. housing market by participating in the secondary mortgage market. We do not participate directly in the primary mortgage market. Our participation in the secondary mortgage market includes providing our credit guarantee for mortgages originated by mortgage lenders in the primary mortgage market and investing in mortgage loans and mortgage-related securities.

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Single-family Guarantee, Investments, and Multifamily. Our Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Our Investments segment reflects results from our investment, funding, and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans, which are funded by debt issuances and hedged using derivatives. Our Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. In our Multifamily segment, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. See "NOTE 13: SEGMENT REPORTING" for additional information.

We are focused on the following primary business objectives: (a) providing credit availability for mortgages and maintaining foreclosure prevention activities; (b) minimizing our credit losses; (c) developing mortgage market enhancements in support of a new infrastructure for the secondary mortgage market; (d) contracting the dominant presence of the GSEs in the marketplace; (e) maintaining sound credit quality on the loans we purchase or guarantee; and (f) strengthening our infrastructure and improving overall efficiency while also focusing on retention of key employees. Our business objectives reflect direction we have received from the Conservator. On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that establishes objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan for Freddie Mac and Fannie Mae. We continue to align our resources and internal business plans to achieve the goals and objectives laid out in the 2012 conservatorship scorecard. Based on our charter, other legislation, public statements from FHFA and Treasury officials, and other guidance and directives from our Conservator, we have a variety of different, and potentially competing, objectives. For information regarding these objectives, see "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Business Objectives."

Throughout our consolidated financial statements and related notes, we use certain acronyms and terms which are defined in the "GLOSSARY."

### Basis of Presentation

The accompanying unaudited consolidated financial statements have been prepared in accordance with GAAP for interim financial information and include our accounts as well as the accounts of other entities in which we have a controlling financial interest. All intercompany balances and transactions have been eliminated. These unaudited consolidated financial statements should be read in conjunction with the audited consolidated financial statements and related notes in our 2011 Annual Report. We are operating under the basis that we will realize assets and satisfy liabilities in the normal course of business as a going concern and in accordance with the delegation of authority from FHFA to our Board of Directors and management. Certain financial statement information that is normally included in annual financial statements prepared in conformity with GAAP but is not required for interim reporting purposes has been condensed or omitted. Certain amounts in prior periods' consolidated financial statements have been reclassified to conform to the current presentation. In

110

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

the opinion of management, all adjustments, which include only normal recurring adjustments, have been recorded for a fair statement of our unaudited consolidated financial statements.

We recorded the cumulative effect of certain miscellaneous errors related to previously reported periods as corrections in the three and six months ended June 30, 2012. We concluded that these errors are not material individually or in the aggregate to our previously issued consolidated financial statements for any of the periods affected, or to our estimated earnings for the full year ended December 31, 2012, or to the trend of earnings. The impact to earnings, net of taxes, of the errors corrected during both the three and six months ended June 30, 2012 was $97 million.

### Use of Estimates

The preparation of financial statements requires us to make estimates and assumptions that affect: (a) the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements; and (b) the reported amounts of revenues and expenses and gains and losses during the reporting period. Management has significant estimates in preparing the financial statements, including, but not limited to, establishing the allowance for loan losses and reserve for guarantee losses, valuing financial instruments and other assets and liabilities, assessing impairments on investments, and assessing the realizability of net deferred tax assets. Actual results could be different from these estimates.

### Change in Estimate

#### *Single-family Loan Loss Reserve Severity*

During the second quarter of 2012, we updated our method of estimating loss severity rates for single-family loan loss reserves to change from the most recent three months of sales experience on our distressed property dispositions to the most recent six months of sales experience on our distressed property dispositions. This change did not have a material impact on our consolidated financial statements.

### Earnings Per Common Share

Because we have participating securities, we use the "two-class" method of computing earnings per common share. Basic earnings per common share is computed as net income attributable to common stockholders divided by the weighted average common shares outstanding for the period. The weighted average common shares outstanding for the period includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement. This warrant is included since it is unconditionally exercisable by the holder at a minimal cost. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for further information.

Diluted earnings per common share is computed as net income attributable to common stockholders divided by the weighted average common shares outstanding during the period adjusted for the dilutive effect of common equivalent shares outstanding. For periods with net income attributable to common stockholders, the calculation includes the effect of the following common equivalent shares outstanding: (a) the weighted average shares related to stock options if the average market price during the period exceeds the exercise price; and (b) the weighted average of unvested restricted stock units. During periods in which a net loss attributable to common stockholders has been incurred, potential common equivalent shares outstanding are not included in the calculation because it would have an antidilutive effect. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Earnings Per Common Share" in our 2011 Annual Report for further discussion of our significant accounting policies regarding our calculation of earnings per common share and "NOTE 11: FREDDIE MAC STOCKHOLDER'S EQUITY (DEFICIT) — Stock-Based Compensation" in this Form 10-Q for additional information on our earnings-per-share calculation.

### Recently Adopted Accounting Guidance

#### *Fair Value Measurement*

On January 1, 2012, we adopted an amendment to the accounting guidance pertaining to fair value measurement and disclosure. This amendment provided: (a) clarification about the application of existing fair value measurement and disclosure requirements; and (b) changes to the guidance for measuring fair value and disclosing information about fair value measurements. The adoption of this amendment did not have a material impact on our consolidated financial statements.

<div align="center">111</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Reconsideration of Effective Control for Repurchase Agreements*

On January 1, 2012, we adopted an amendment to the accounting guidance for transfers and servicing with regard to repurchase agreements and other agreements that both entitle and obligate a transferor to repurchase or redeem financial assets before their maturity. This amendment removed the criterion related to collateral maintenance from the transferor's assessment of effective control. It focuses the assessment of effective control on the transferor's rights and obligations with respect to the transferred financial assets and not whether the transferor has the practical ability to perform in accordance with those rights or obligations. The adoption of this amendment did not have a material impact on our consolidated financial statements.

## NOTE 2: CONSERVATORSHIP AND RELATED MATTERS

**Business Objectives**

We continue to operate under the conservatorship that commenced on September 6, 2008, conducting our business under the direction of FHFA, as our Conservator. The conservatorship and related matters have had a wide-ranging impact on us, including our regulatory supervision, management, business, financial condition and results of operations. Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director thereof, with respect to the company and its assets. The Conservator also succeeded to the title to all books, records, and assets of Freddie Mac held by any other legal custodian or third party. During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business. The directors serve on behalf of, and exercise authority as directed by, the Conservator.

We are also subject to certain constraints on our business activities by Treasury due to the terms of, and Treasury's rights under, the Purchase Agreement. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent. In addition, we believe that the support provided by Treasury pursuant to the Purchase Agreement currently enables us to maintain our access to the debt markets and to have adequate liquidity to conduct our normal business activities, although the costs of our debt funding could vary.

While in conservatorship, we can, and have continued to, enter into and enforce contracts with third parties. The Conservator continues to direct the efforts of the Board of Directors and management to address and determine the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct day-to-day operations, many management decisions are subject to review and approval by FHFA and Treasury. In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations.

Our business objectives and strategies have, in some cases, been altered since we were placed into conservatorship, and may continue to change. These changes to our business objectives and strategies may not contribute to our profitability. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" in our 2011 Annual Report for further discussion.

On February 21, 2012, FHFA sent to Congress a strategic plan for the next phase of the conservatorships of Freddie Mac and Fannie Mae. The plan sets forth objectives and steps FHFA is taking or will take to meet FHFA's obligations as Conservator. FHFA states that the steps envisioned in the plan are consistent with each of the housing finance reform frameworks set forth in the report delivered by the Administration to Congress in February 2011, as well as with the leading congressional proposals introduced to date. FHFA indicates that the plan leaves open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA's plan provides lawmakers and the public with an outline of how FHFA, as Conservator, intends to guide Freddie Mac and Fannie Mae over the next few years, and identifies three strategic goals:

- **Build**. Build a new infrastructure for the secondary mortgage market;

- **Contract**. Gradually contract Freddie Mac and Fannie Mae's dominant presence in the marketplace while simplifying and shrinking their operations; and

- **Maintain**. Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

On March 8, 2012, FHFA instituted a scorecard for use by both us and Fannie Mae that establishes objectives, performance targets and measures for 2012, and provides the implementation roadmap for FHFA's strategic plan. We

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                     Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

continue to align our resources and internal business plans to meet the goals and objectives laid out in the 2012 conservatorship scorecard.

Given the important role the Administration and our Conservator have placed on Freddie Mac in addressing housing and mortgage market conditions and our public mission, we may be required to take additional actions that could have a negative impact on our business, operating results, or financial condition. Certain changes to our business objectives and strategies are designed to provide support for the mortgage market in a manner that serves our public mission and other non-financial objectives, but may not contribute to our profitability. Some of these changes increase our expenses, while others require us to forego revenue opportunities in the near term. In addition, the objectives set forth for us under our charter and by our Conservator, as well as the restrictions on our business under the Purchase Agreement, have adversely impacted and may continue to adversely impact our financial results, including our segment results. For example, our efforts to help struggling homeowners and the mortgage market, in line with our public mission, may help to mitigate our credit losses, but in some cases may increase our expenses or require us to forgo revenue opportunities in the near term. There is significant uncertainty as to the ultimate impact that our efforts to aid the housing and mortgage markets, including our efforts in connection with the MHA Program, will have on our future capital or liquidity needs. We are allocating significant internal resources to the implementation of the various initiatives under the MHA Program and to the FHFA-directed servicing alignment initiative, which has increased, and will continue to increase, our expenses.

There is significant uncertainty as to whether or when we will emerge from conservatorship, as it has no specified termination date, and as to what changes may occur to our business structure during or following conservatorship, including whether we will continue to exist. The Acting Director of FHFA stated on September 19, 2011 that "it ought to be clear to everyone at this point, given [Freddie Mac and Fannie Mae's] losses since being placed into conservatorship and the terms of the Treasury's financial support agreements, that [Freddie Mac and Fannie Mae] will not be able to earn their way back to a condition that allows them to emerge from conservatorship." The Acting Director of FHFA stated on November 15, 2011 that "the long-term outlook is that neither [Freddie Mac nor Fannie Mae] will continue to exist, at least in its current form, in the future." We are not aware of any current plans of our Conservator to significantly change our business model or capital structure in the near-term. Our future structure and role will be determined by the Administration and Congress, and there are likely to be significant changes beyond the near-term. We have no ability to predict the outcome of these deliberations.

On February 11, 2011, the Administration delivered a report to Congress that lays out the Administration's plan to reform the U.S. housing finance market, including options for structuring the government's long-term role in a housing finance system in which the private sector is the dominant provider of mortgage credit. The report recommends winding down Freddie Mac and Fannie Mae, and states that the Administration will work with FHFA to determine the best way to responsibly reduce the role of Freddie Mac and Fannie Mae in the market and ultimately wind down both institutions. The report states that these efforts must be undertaken at a deliberate pace, which takes into account the impact that these changes will have on borrowers and the housing market.

The report states that the government is committed to ensuring that Freddie Mac and Fannie Mae have sufficient capital to perform under any guarantees issued now or in the future and the ability to meet any of their debt obligations, and further states that the Administration will not pursue policies or reforms in a way that would impair the ability of Freddie Mac and Fannie Mae to honor their obligations. The report states the Administration's belief that under the companies' senior preferred stock purchase agreements with Treasury, there is sufficient funding to ensure the orderly and deliberate wind down of Freddie Mac and Fannie Mae, as described in the Administration's plan.

The report identifies a number of policy levers that could be used to wind down Freddie Mac and Fannie Mae, shrink the government's footprint in housing finance, and help bring private capital back to the mortgage market, including increasing guarantee fees, phasing in a 10% down payment requirement, reducing conforming loan limits, and winding down Freddie Mac and Fannie Mae's investment portfolios, consistent with the senior preferred stock purchase agreements. These recommendations, if implemented, would have a material impact on our business volumes, market share, results of operations, and financial condition.

Since the report was delivered, the temporary high-cost area limits expired. In addition, as discussed below, we raised our guarantee fees and our mortgage-related investments portfolio has been reduced. We cannot predict the extent to which the other recommendations in the report will be implemented or when any actions to implement them may be taken.

On December 23, 2011, President Obama signed into law the Temporary Payroll Tax Cut Continuation Act of 2011. Among its provisions, this new law directs FHFA to require Freddie Mac and Fannie Mae to increase guarantee fees by no

<div align="center">113</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

less than 10 basis points above the average guarantee fees charged in 2011 on single-family mortgage-backed securities. Under the law, the proceeds from this increase will be remitted to Treasury to fund the payroll tax cut, rather than retained by the companies. Effective April 1, 2012, at the direction of FHFA, the guarantee fee on single-family residential mortgages sold to Freddie Mac and Fannie Mae was increased by 10 basis points.

**Impact of the Purchase Agreement and FHFA Regulation and Other Restrictions on the Mortgage-Related Investments Portfolio**

Under the terms of the Purchase Agreement and FHFA regulation, our mortgage-related investments portfolio is subject to a cap that decreases by 10% each year until the portfolio reaches $250 billion. As a result, the UPB of our mortgage-related investments portfolio could not exceed $729 billion as of December 31, 2011 and may not exceed $656.1 billion as of December 31, 2012. The UPB of our mortgage-related investments portfolio, for purposes of the limit imposed by the Purchase Agreement and FHFA regulation, was $581.3 billion at June 30, 2012. The annual 10% reduction in the size of our mortgage-related investments portfolio is calculated based on the maximum allowable size of the mortgage-related investments portfolio, rather than the actual UPB of the mortgage-related investments portfolio, as of December 31 of the preceding year. The limitation is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. FHFA has stated that we will not be a substantial buyer or seller of mortgages for our mortgage-related investments portfolio. We are also subject to limits on the amount of assets we can sell from our mortgage-related investments portfolio in any calendar month without review and approval by FHFA and, if FHFA determines, Treasury.

**Government Support for our Business**

We are dependent upon the continued support of Treasury and FHFA in order to continue operating our business. Our ability to access funds from Treasury under the Purchase Agreement is critical to keeping us solvent and avoiding the appointment of a receiver by FHFA under statutory mandatory receivership provisions.

Significant recent developments with respect to the support we received from the government during the three months ended June 30, 2012 include the following:

- In June 2012 we received $19 million in funding from Treasury under the Purchase Agreement. As a result, the aggregate liquidation preference of the senior preferred stock was $72.3 billion as of June 30, 2012; and
- In June 2012 we paid dividends of $1.8 billion in cash on the senior preferred stock to Treasury at the direction of the Conservator.

At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw from Treasury under the Purchase Agreement. As of June 30, 2012, our annual cash dividend obligation to Treasury on the senior preferred stock is $7.2 billion, which exceeds our annual historical earnings in all but one period.

Through June 2012, we paid $20.1 billion in cash dividends in the aggregate on the senior preferred stock. Continued cash payment of senior preferred dividends will have an adverse impact on our future financial condition and net worth. In addition, cash payment of quarterly commitment fees payable to Treasury will negatively impact our future net worth over the long-term. Treasury waived the fee for all quarters of 2011 and the first three quarters of 2012. The amount of the fee has not yet been established and could be substantial. As a result of additional draws and other factors: (a) the liquidation preference of, and the dividends we owe on, the senior preferred stock would increase and, therefore, we may need additional draws from Treasury in order to pay our dividend obligations; and (b) there is significant uncertainty as to our long-term financial sustainability.

See "NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS" and "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information on the terms of the conservatorship and the Purchase Agreement.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4200

Table of Contents

# NOTE 3: VARIABLE INTEREST ENTITIES

We use securitization trusts in our securities issuance process, and are required to evaluate the trusts for consolidation on an ongoing basis. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Consolidation and Equity Method of Accounting" in our 2011 Annual Report for further information regarding the consolidation of certain VIEs.

Based on our evaluation of whether we hold a controlling financial interest in these VIEs, we determined that we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions. Therefore, we consolidate on our balance sheet the assets and liabilities of these trusts. In addition to our PC trusts, we are involved with numerous other entities that meet the definition of a VIE, as discussed below.

**VIEs for which We are the Primary Beneficiary**

*Single-family PC Trusts*

Our single-family PC trusts issue pass-through securities that represent undivided beneficial interests in pools of mortgages held by these trusts. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for information on the nature of single-family PC trusts.

At June 30, 2012 and December 31, 2011, we were the primary beneficiary of, and therefore consolidated, single-family PC trusts with assets totaling $1.5 trillion and $1.6 trillion, respectively, as measured using the UPB of issued PCs. The assets of each PC trust can be used only to settle obligations of that trust. In connection with our PC trusts, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancement. We also have credit protection for certain of our PC trusts that issue PCs backed by loans or certificates of federal agencies (such as FHA, VA, and USDA). See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES — Credit Protection and Other Forms of Credit Enhancement" for additional information regarding third-party credit enhancements related to our PC trusts.

*Other Guarantee Transactions*

Other Guarantee Transactions are mortgage-related securities that we issue to third parties in exchange for non-Freddie Mac mortgage-related securities. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for information on the nature of Other Guarantee Transactions. The degree to which our involvement with securitization trusts that issue Other Guarantee Transactions provides us with power to direct the activities that most significantly impact the economic performance of these VIEs (*e.g.*, the ability to direct the servicing of the underlying assets of these entities) and our obligation to absorb losses that could potentially be significant to the VIEs (*e.g.*, the existence of third-party credit enhancements) varies by transaction. For all Other Guarantee Transactions, our variable interest in these VIEs represents some form of credit guarantee, whether covering all the issued beneficial interests or only the most senior ones. The nature of our credit guarantee typically determines whether we have power over the activities that most significantly impact the economic performance of the VIE.

We consolidate Other Guarantee Transactions when our credit guarantee is in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date and we also have the ability to direct servicing of the underlying assets, which is the power to direct the activities that most significantly impact the economic performance of these VIEs. For those Other Guarantee Transactions in which our credit guarantee is not in a first loss position to absorb credit losses on the underlying assets of these entities as of the reporting date ( *i.e.*, our credit guarantee is in a secondary loss position), or we do not have the ability to direct servicing of the underlying assets, then we are not the primary beneficiary, and we do not consolidate the VIE.

Our consolidation determination took into consideration the specific facts and circumstances of our involvement with each of these entities. As a result, we have concluded that we are the primary beneficiary of certain Other Guarantee Transactions with underlying assets totaling $11.6 billion and $12.9 billion at June 30, 2012 and December 31, 2011, respectively. For those Other Guarantee Transactions that we do consolidate, the investors in these securities have recourse only to the assets of those VIEs.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4201

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Consolidated VIEs

The table below represents the carrying amounts and classification of the assets and liabilities of consolidated VIEs on our consolidated balance sheets.

### Table 3.1 — Assets and Liabilities of Consolidated VIEs

| Consolidated Balance Sheets Line Item | June 30, 2012 | December 31, 2011 |
|---|---:|---:|
| | (in millions) | |
| Cash and cash equivalents | $ 1 | $ 2 |
| Restricted cash and cash equivalents | 9,905 | 27,675 |
| Federal funds sold and securities purchased under agreements to resell | 18,250 | — |
| Mortgage loans held-for-investment by consolidated trusts | 1,532,939 | 1,564,131 |
| Accrued interest receivable | 5,867 | 6,242 |
| Real estate owned, net | 53 | 60 |
| Other assets | 6,637 | 6,083 |
| Total assets of consolidated VIEs | $ 1,573,652 | $ 1,604,193 |
| Accrued interest payable | $ 5,636 | $ 5,943 |
| Debt securities of consolidated trusts held by third parties | 1,468,613 | 1,471,437 |
| Other liabilities | 2 | 3 |
| Total liabilities of consolidated VIEs | $ 1,474,251 | $ 1,477,383 |

### VIEs for which We are not the Primary Beneficiary

The table below represents the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. Our involvement with VIEs for which we are not the primary beneficiary generally takes one of two forms: (a) purchasing an investment in these entities; or (b) providing a guarantee to these entities. Our maximum exposure to loss for those VIEs in which we have purchased an investment is calculated as the maximum potential charge that we would recognize in earnings if that investment were to become worthless. This amount does not include other-than-temporary impairments or other write-downs that we previously recognized through earnings. Our maximum exposure to loss for those VIEs for which we have provided a guarantee represents the contractual amounts that could be lost under the guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements. We do not believe the maximum exposure to loss disclosed in the table below is representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation, including possible recoveries under credit enhancement arrangements.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary

| | | June 30, 2012 | | | |
| | Asset-Backed Investment Trusts[1] | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 34 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 24 | — | 19 | 196 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 73,224 | 113,566 | — | — |
| Trading, at fair value | 526 | 13,600 | 12,861 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 69,237 | — |
| Held-for-sale | — | — | — | 10,120 | — |
| Accrued interest receivable | — | 408 | 384 | 329 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 512 | — | 276 | 416 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (41) |
| Other liabilities | — | (637) | — | (25) | (682) |
| **Maximum Exposure to Loss** | $ 560 | $ 43,565 | $ 140,841 | $ 79,979 | $ 11,052 |
| **Total Assets of Non-Consolidated VIEs[5]** | $ 21,627 | $ 50,209 | $ 820,053 | $ 148,326 | $ 30,791 |

| | | December 31, 2011 | | | |
| | Asset-Backed Investment Trusts[1] | Mortgage-Related Security Trusts | | Unsecuritized Multifamily Loans[3] | Other[1][4] |
| | | Freddie Mac Securities[2] | Non-Freddie Mac Securities[1] | | |
| | | | (in millions) | | |
| **Assets and Liabilities Recorded on our Consolidated Balance Sheets** | | | | | |
| *Assets:* | | | | | |
| Cash and cash equivalents | $ 447 | $ — | $ — | $ — | $ — |
| Restricted cash and cash equivalents | — | 53 | — | 33 | 167 |
| *Investments in securities:* | | | | | |
| Available-for-sale, at fair value | — | 81,092 | 121,743 | — | — |
| Trading, at fair value | 302 | 16,047 | 15,473 | — | — |
| *Mortgage loans:* | | | | | |
| Held-for-investment, unsecuritized | — | — | — | 72,295 | — |
| Held-for-sale | — | — | — | 9,710 | — |
| Accrued interest receivable | — | 471 | 420 | 353 | 6 |
| Derivative assets, net | — | — | — | — | 1 |
| Other assets | — | 432 | 1 | 375 | 434 |
| *Liabilities:* | | | | | |
| Derivative liabilities, net | — | (1) | — | — | (42) |
| Other liabilities | — | (585) | — | (39) | (675) |
| **Maximum Exposure to Loss** | $ 749 | $ 36,438 | $ 153,620 | $ 82,766 | $ 11,198 |
| **Total Assets of Non-Consolidated VIEs[5]** | $ 16,748 | $ 41,740 | $ 921,219 | $ 134,145 | $ 25,616 |

(1) For our involvement with non-consolidated asset-backed investment trusts, non-Freddie Mac security trusts and certain other VIEs where we do not provide a guarantee, our maximum exposure to loss is computed as the carrying amount if the security is classified as trading or the amortized cost if the security is classified as available-for-sale for our investments and related assets recorded on our consolidated balance sheets, including any unrealized amounts recorded in AOCI for securities classified as available-for-sale.

(2) Freddie Mac securities include our variable interests in single-family multiclass REMICs and Other Structured Securities, multifamily PCs, multifamily Other Structured Securities, and Other Guarantee Transactions that we do not consolidate. For our variable interests in non-consolidated Freddie Mac security trusts for which we have provided a guarantee, our maximum exposure to loss is the outstanding UPB of the underlying mortgage loans or securities that we have guaranteed, which is the maximum contractual amount under such guarantees. However, our investments in single-family REMICs and Other Structured Securities that are not consolidated do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral.

(3) For unsecuritized multifamily loans, our maximum exposure to loss is based on the UPB of these loans, as adjusted for loan level basis adjustments, any associated allowance for loan losses, accrued interest receivable, and fair value adjustments on held-for-sale loans.

(4) For other non-consolidated VIEs where we have provided a guarantee, our maximum exposure to loss is the contractual amount that could be lost under the guarantee if the counterparty or borrower defaulted, without consideration of possible recoveries under credit enhancement arrangements.

(5) Represents the remaining UPB of assets held by non-consolidated VIEs using the most current information available, where our continuing involvement is significant. We do not include the assets of our non-consolidated trusts related to single-family REMICs and Other Structured Securities in this amount as we already consolidate the underlying collateral of these trusts on our consolidated balance sheets.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                TREASURY-4203                Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Asset-Backed Investment Trusts*

At June 30, 2012 and December 31, 2011, we had investments in 16 and 11 asset-backed investment trusts in which we had a variable interest but were not considered the primary beneficiary, respectively. Our investments in these asset-backed investment trusts as of June 30, 2012 were made in 2011 and 2012. At both June 30, 2012 and December 31, 2011, we were not the primary beneficiary of any such trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. As such, our investments in these asset-backed investment trusts are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. Our investments in these trusts totaled $0.6 billion and $0.7 billion at June 30, 2012 and December 31, 2011, respectively, and are included as cash and cash equivalents, available-for-sale securities, or trading securities on our consolidated balance sheets. At both June 30, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our asset-backed investments.

*Mortgage-Related Security Trusts*

*Freddie Mac Securities*

Freddie Mac securities related to our variable interests in non-consolidated VIEs primarily consist of our REMICs and Other Structured Securities and Other Guarantee Transactions. REMICs and Other Structured Securities are created by using PCs or previously issued REMICs and Other Structured Securities as collateral. For non-consolidated REMICs and Other Structured Securities and Other Guarantee Transactions, our investments are primarily included in either available-for-sale securities or trading securities on our consolidated balance sheets. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information on accounting for purchases of PCs and beneficial interests issued by resecuritization trusts. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Non-Freddie Mac Securities*

We invest in a variety of mortgage-related securities issued by third-parties, including non-Freddie Mac agency securities, CMBS, other private-label securities backed by various mortgage-related assets, and obligations of states and political subdivisions. These investments typically represent interests in trusts that consist of a pool of mortgage-related assets and act as vehicles to allow originators to securitize those assets. Securities are structured from the underlying pool of assets to provide for varying degrees of risk. The originators of the financial assets or the underwriters of the securities offering create the trusts and typically own the residual interest in the trust assets. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding our non-Freddie Mac securities.

Our investments in these non-Freddie Mac securities at June 30, 2012 were made between 1994 and 2012. We are not generally the primary beneficiary of non-Freddie Mac securities trusts because our investments are passive in nature and do not provide us with the power to direct the activities of the trusts that most significantly impact their economic performance. We were not the primary beneficiary of any significant non-Freddie Mac securities trusts as of June 30, 2012 or December 31, 2011. Our investments in non-consolidated non-Freddie Mac mortgage-related securities are accounted for as investment securities as described in "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report. At both June 30, 2012 and December 31, 2011, we did not guarantee any obligations of these investment trusts and our exposure was limited to the amount of our investment. Our investments in these trusts are funded through the issuance of unsecured debt, which is recorded as other debt on our consolidated balance sheets.

*Unsecuritized Multifamily Loans*

We purchase loans made to various multifamily real estate entities. We primarily purchase such loans for securitization. The loans we acquire usually are, at origination, equal to 80% or less of the value of the related underlying property. The remaining 20% of value is typically funded through equity contributions by the partners or members of the borrower entity. In certain cases, the 20% not funded through the loan we acquire also includes subordinate loans or mezzanine financing from third-party lenders.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.
Powered by Morningstar® Document Research℠

Table of Contents

We held approximately 7,000 unsecuritized multifamily loans at both June 30, 2012 and December 31, 2011. The UPB of our investments in these loans was $79.6 billion and $82.3 billion as of June 30, 2012 and December 31, 2011, respectively, and was included in unsecuritized held-for-investment mortgage loans, at amortized cost, and held-for-sale mortgage loans at fair value on our consolidated balance sheets. We are not generally the primary beneficiary of the multifamily real estate borrowing entities because the loans we acquire are passive in nature and do not provide us with the power to direct the activities of these entities that most significantly impact their economic performance. However, when a multifamily loan becomes delinquent, we may become the primary beneficiary of the borrowing entity depending upon the structure of this entity and the rights granted to us under the governing legal documents. At both June 30, 2012 and December 31, 2011, the amount of unsecuritized multifamily loans for which we could be considered the primary beneficiary of the underlying borrowing entity was not material. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for more information.

***Other***

Our involvement with other VIEs primarily includes certain of our other mortgage-related guarantees and other guarantee commitments that we account for as derivatives.

At June 30, 2012 and December 31, 2011, we were the primary beneficiary of two and one, respectively, real estate entities that invest in multifamily property, related to credit-enhanced multifamily housing revenue bonds that were not deemed to be material. We were not the primary beneficiary of the remainder of other VIEs because our involvement in these VIEs is passive in nature and does not provide us with the power to direct the activities of the VIEs that most significantly impact their economic performance. See "Table 3.2 — Variable Interests in VIEs for which We are not the Primary Beneficiary" for the carrying amounts and classification of the assets and liabilities recorded on our consolidated balance sheets related to our variable interests in non-consolidated VIEs, as well as our maximum exposure to loss as a result of our involvement with these VIEs. See "NOTE 9: FINANCIAL GUARANTEES" for additional information about our involvement with other VIEs.

## NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES

We own both single-family mortgage loans, which are secured by one to four family residential properties, and multifamily mortgage loans, which are secured by properties with five or more residential rental units. Our single-family loans are predominately first lien, fixed-rate mortgages secured by the borrower's primary residence. For a discussion of our significant accounting policies regarding our mortgage loans and loan loss reserves, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the types of loans on our consolidated balance sheets as of June 30, 2012 and December 31, 2011.

## Table 4.1 — Mortgage Loans

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Unsecuritized | Held by Consolidated Trusts | Total | Unsecuritized | Held by Consolidated Trusts | Total |
| | (in millions) | | | | | |
| Single-family: [1] | | | | | | |
| Fixed-rate | | | | | | |
| Amortizing | $ 135,982 | $ 1,390,242 | $1,526,224 | $ 153,177 | $ 1,418,751 | $ 1,571,928 |
| Interest-only | 2,942 | 11,842 | 14,784 | 3,184 | 14,758 | 17,942 |
| Total fixed-rate | 138,924 | 1,402,084 | 1,541,008 | 156,361 | 1,433,509 | 1,589,870 |
| Adjustable-rate | | | | | | |
| Amortizing | 3,013 | 68,967 | 71,980 | 3,428 | 68,362 | 71,790 |
| Interest-only | 9,137 | 37,467 | 46,604 | 10,376 | 43,655 | 54,031 |
| Total adjustable-rate | 12,150 | 106,434 | 118,584 | 13,804 | 112,017 | 125,821 |
| Other Guarantee Transactions | — | 11,522 | 11,522 | — | 12,776 | 12,776 |
| FHA/VA and other governmental | 1,441 | 3,132 | 4,573 | 1,494 | 3,254 | 4,748 |
| Total single-family | 152,515 | 1,523,172 | 1,675,687 | 171,659 | 1,561,556 | 1,733,215 |
| Multifamily: [1] | | | | | | |
| Fixed-rate | 67,151 | — | 67,151 | 69,647 | — | 69,647 |
| Adjustable-rate | 12,426 | — | 12,426 | 12,661 | — | 12,661 |
| Other governmental | 20 | — | 20 | 3 | — | 3 |
| Total multifamily | 79,597 | — | 79,597 | 82,311 | — | 82,311 |
| Total UPB of mortgage loans | 232,112 | 1,523,172 | 1,755,284 | 253,970 | 1,561,556 | 1,815,526 |
| Deferred fees, unamortized premiums, discounts and other cost basis adjustments | (5,846) | 16,025 | 10,179 | (6,125) | 10,926 | 4,801 |
| Lower of cost or fair value adjustments on loans held-for-sale [2] | 205 | — | 205 | 195 | — | 195 |
| Allowance for loan losses on mortgage loans held-for-investment | (29,298) | (6,258) | (35,556) | (30,912) | (8,351) | (39,263) |
| Total mortgage loans, net | $ 197,173 | $ 1,532,939 | $ 1,730,112 | $ 217,128 | $ 1,564,131 | $ 1,781,259 |
| Mortgage loans, net: | | | | | | |
| Held-for-investment | $ 187,053 | $ 1,532,939 | $ 1,719,992 | $ 207,418 | $ 1,564,131 | $ 1,771,549 |
| Held-for-sale | 10,120 | — | 10,120 | 9,710 | — | 9,710 |
| Total mortgage loans, net | 197,173 | 1,532,939 | 1,730,112 | 217,128 | 1,564,131 | 1,781,259 |

[1] Based on UPB and excluding mortgage loans traded, but not yet settled.
[2] Consists of fair value adjustments associated with mortgage loans for which we have made a fair value election.

During the three months ended June 30, 2012 and 2011, we purchased $86.8 billion and $62.2 billion, respectively, in UPB of single-family mortgage loans and $0.1 billion and $0.9 billion, respectively, in UPB of multifamily loans that were classified as held-for-investment at purchase. During the six months ended June 30, 2012 and 2011, we purchased $189.6 billion and $158.0 billion, respectively, in UPB of single-family mortgage loans and $0.4 billion and $1.7 billion, respectively, in UPB of multifamily loans that were classified as held-for-investment at purchase. Our sales of multifamily mortgage loans occur primarily through the issuance of multifamily Other Guarantee Transactions. See "NOTE 9: FINANCIAL GUARANTEES" for more information. We did not have any reclassifications of mortgage loans into held-for-sale during the three and six months ended June 30, 2012. We did not sell any held-for-investment loans during the three and six months ended June 30, 2012.

**Credit Quality of Mortgage Loans**

We evaluate the credit quality of single-family loans using different criteria than the criteria we use to evaluate multifamily loans. The current LTV ratio is one key factor we consider when estimating our loan loss reserves for single-family loans. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. A second lien mortgage also reduces the borrower's equity in the home, and has a similar negative effect on the borrower's ability to refinance or sell the property for an amount at or above the combined balances of the first and second mortgages. As of both June 30, 2012 and December 31, 2011, approximately 15% of loans in our single-family credit

120

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

guarantee portfolio had second lien financing by third parties at the time of origination of the first mortgage, and we estimate that these loans comprised 17% of our seriously delinquent loans at both dates, based on UPB. However, borrowers are free to obtain second lien financing after origination, and we are not entitled to receive notification when a borrower does so. Therefore, it is likely that additional borrowers have post-origination second lien mortgages. For further information about concentrations of risk associated with our single-family and multifamily mortgage loans, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS."

The table below presents information on the estimated current LTV ratios of single-family loans on our consolidated balance sheets, all of which are held-for-investment. Our current LTV ratio estimates are based on available data through the end of each respective period presented.

### Table 4.2 — Recorded Investment of Held-For-Investment Mortgage Loans, by LTV Ratio

| | As of June 30, 2012 | | | | As of December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Estimated Current LTV Ratio[1] | | | | Estimated Current LTV Ratio[1] | | | |
| | <= 80 | >80 to 100 | > 100[2] | Total | <= 80 | >80 to 100 | > 100[2] | Total |
| | (in millions) | | | | | | | |
| Single-family loans: | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[3] | $651,812 | $ 348,780 | $226,484 | $ 1,227,076 | $ 641,698 | $ 383,320 | $247,468 | $1,272,486 |
| 15-year amortizing fixed-rate [3] | 248,366 | 17,228 | 3,809 | 269,403 | 238,287 | 18,280 | 2,966 | 259,533 |
| Adjustable-rate[4] | 47,680 | 12,428 | 7,456 | 67,564 | 43,728 | 13,826 | 9,180 | 66,734 |
| Alt-A, interest-only, and option ARM[5] | 27,779 | 25,361 | 68,679 | 121,819 | 30,589 | 29,251 | 79,418 | 139,258 |
| Total single-family loans | $ 975,637 | $ 403,797 | $306,428 | 1,685,862 | $ 954,302 | $ 444,677 | $ 339,032 | 1,738,011 |
| Multifamily loans | | | | 69,686 | | | | 72,801 |
| Total recorded investment of held-for-investment loans | | | | $1,755,548 | | | | $1,810,812 |

(1) The current LTV ratios are management estimates, which are updated on a monthly basis. Current market values are estimated by adjusting the value of the property at origination based on changes in the market value of homes in the same geographical area since that time. The value of a property at origination is based on either: (a) the lesser of the appraised value of the property at the time of mortgage origination or the mortgage borrower's purchase price for purchase mortgages; or (b) a third-party appraisal for refinance mortgages. Changes in market value are derived from our internal index which measures price changes for repeat sales and refinancing activity on the same properties using Freddie Mac and Fannie Mae single-family mortgage acquisitions, including foreclosure sales. Estimates of the current LTV ratio include the credit-enhanced portion of the loan and exclude any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, can increase the risk of default.

(2) The serious delinquency rate for the total of single-family held-for-investment mortgage loans with estimated current LTV ratios in excess of 100% was 12.8% as of both June 30, 2012 and December 31, 2011.

(3) The majority of our loan modifications result in new terms that include fixed interest rates after modification. However, our HAMP loan modifications result in an initial interest rate that subsequently adjusts gradually after five years to a new rate that is fixed for the remaining life of the loan. We have classified these loans as fixed-rate for presentation even though they have a rate adjustment provision, because the future rates are determined at the time of the modification rather than at a subsequent date.

(4) Includes balloon/reset mortgage loans and excludes option ARMs.

(5) We have discontinued our purchases of Alt-A, interest-only, and option ARM loans. Modified loans within the Alt-A category remain as such, even though the borrower may have provided full documentation of assets and income to complete the modification. Modified loans within the option ARM category remain as such even though the modified loan no longer provides for optional payment provisions.

For information about the payment status of single-family and multifamily mortgage loans, including the amount of such loans we deem impaired, see "NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS." For a discussion of certain indicators of credit quality for the multifamily loans on our consolidated balance sheets, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Multifamily Mortgage Portfolio."

### Allowance for Loan Losses and Reserve for Guarantee Losses, or Loan Loss Reserve

We maintain an allowance for loan losses on mortgage loans that we classify as held-for-investment on our consolidated balance sheets. Our reserve for guarantee losses is associated with Freddie Mac mortgage-related securities backed by multifamily loans, certain single-family Other Guarantee Transactions, and other guarantee commitments, for which we have incremental credit risk. The table below presents loan loss reserves activity for the single-family and multifamily loans we own or guarantee.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4207

Table of Contents

**Table 4.3 — Detail of Loan Loss Reserves**

| | Three Months Ended June 30, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | | | 2011 | | | |
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | | | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | |
| | Unsecuritized | Held By Consolidated Trusts | | Total | | Unsecuritized | Held By Consolidated Trusts | | Total |
| | (in millions) | | | | | | | | |
| *Single-family:* | | | | | | | | | |
| Beginning balance | $ 30,436 | $ 7,139 | $ 196 | $ 37,771 | | $ 28,898 | $ 9,517 | $ 143 | $38,558 |
| Provision (benefit) for credit losses | (1,157) | 1,334 | — | 177 | | 318 | 2,203 | 21 | 2,542 |
| Charge-offs [2] | (3,074) | (226) | (3) | (3,303) | | (3,570) | (195) | (3) | (3,768) |
| Recoveries [2] | 456 | 29 | — | 485 | | 773 | 27 | — | 800 |
| Transfers, net [3] | 2,188 | (2,018) | (2) | 168 | | 2,864 | (2,604) | (2) | 258 |
| Ending balance | $ 28,849 | $ 6,258 | $ 191 | $35,298 | | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 |
| *Multifamily:* | | | | | | | | | |
| Beginning balance | $ 489 | $ — | $ 36 | $ 525 | | $ 673 | $ — | $ 74 | $ 747 |
| Provision (benefit) for credit losses | (33) | — | 11 | (22) | | (8) | — | (5) | (13) |
| Charge-offs [2] | (7) | — | — | (7) | | (29) | — | — | (29) |
| Ending balance | $ 449 | $ — | $ 47 | $ 496 | | $ 636 | $ — | $ 69 | $ 705 |
| *Total:* | | | | | | | | | |
| Beginning balance | $ 30,925 | $ 7,139 | $ 232 | $38,296 | | $ 29,571 | $ 9,517 | $ 217 | $ 39,305 |
| Provision (benefit) for credit losses | (1,190) | 1,334 | 11 | 155 | | 310 | 2,203 | 16 | 2,529 |
| Charge-offs [2] | (3,081) | (226) | (3) | (3,310) | | (3,599) | (195) | (3) | (3,797) |
| Recoveries [2] | 456 | 29 | — | 485 | | 773 | 27 | — | 800 |
| Transfers, net [3] | 2,188 | (2,018) | (2) | 168 | | 2,864 | (2,604) | (2) | 258 |
| Ending balance | $ 29,298 | $ 6,258 | $ 238 | $35,794 | | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 |

| | Six Months Ended June 30, | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | | | | | 2011 | | | |
| | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | | | Allowance for Loan Losses | | Reserve for Guarantee Losses[1] | |
| | Unsecuritized | Held By Consolidated Trusts | | Total | | Unsecuritized | Held By Consolidated Trusts | | Total |
| | (in millions) | | | | | | | | |
| *Single-family:* | | | | | | | | | |
| Beginning balance | $ 30,406 | $ 8,351 | $ 159 | $ 38,916 | | 27,317 | $ 11,644 | $ 137 | $ 39,098 |
| Provision (benefit) for credit losses | (888) | 2,867 | 42 | 2,021 | | 725 | 3,834 | 32 | 4,591 |
| Charge-offs [2] | (6,499) | (475) | (6) | (6,980) | | (6,874) | (437) | (4) | (7,315) |
| Recoveries [2] | 955 | 45 | — | 1,000 | | 1,437 | 47 | — | 1,484 |
| Transfers, net [3] | 4,875 | (4,530) | (4) | 341 | | 6,678 | (6,140) | (6) | 532 |
| Ending balance | $ 28,849 | $ 6,258 | $ 191 | $35,298 | | $ 29,283 | $ 8,948 | $ 159 | $ 38,390 |
| *Multifamily:* | | | | | | | | | |
| Beginning balance | $ 506 | $ — | $ 39 | $ 545 | | $ 730 | $ — | $ 98 | $ 828 |
| Provision (benefit) for credit losses | (49) | — | 8 | (41) | | (53) | — | (20) | (73) |
| Charge-offs [2] | (8) | — | — | (8) | | (41) | — | — | (41) |
| Transfers, net [3] | — | — | — | — | | — | — | (9) | (9) |
| Ending balance | $ 449 | $ — | $ 47 | $ 496 | | $ 636 | $ — | $ 69 | $ 705 |
| *Total:* | | | | | | | | | |
| Beginning balance | $ 30,912 | $ 8,351 | $ 198 | $ 39,461 | | $ 28,047 | $ 11,644 | $ 235 | $ 39,926 |
| Provision (benefit) for credit losses | (937) | 2,867 | 50 | 1,980 | | 672 | 3,834 | 12 | 4,518 |
| Charge-offs [2] | (6,507) | (475) | (6) | (6,988) | | (6,915) | (437) | (4) | (7,356) |
| Recoveries [2] | 955 | 45 | — | 1,000 | | 1,437 | 47 | — | 1,484 |
| Transfers, net [3] | 4,875 | (4,530) | (4) | 341 | | 6,678 | (6,140) | (15) | 523 |
| Ending balance | $ 29,298 | $ 6,258 | $ 238 | $ 35,794 | | $ 29,919 | $ 8,948 | $ 228 | $ 39,095 |
| Total loan loss reserve as a percentage of the total mortgage portfolio, excluding non-Freddie Mac securities | | | | 1.94% | | | | | 2.01% |

(1) Loans associated with our reserve for guarantee losses are those that underlie our non-consolidated securitization trusts and other guarantee commitments and are evaluated for impairment on a collective basis. Our reserve for guarantee losses is included in other liabilities on our consolidated balance sheets.

(2) Charge-offs represent the amount of a loan that has been discharged to remove the loan from our consolidated balance sheet principally due to either foreclosure transfers or short sales. Charge-offs exclude $74 million and $103 million for the three months ended June 30, 2012 and 2011, respectively, and $175 million and $209 million for the six months ended June 30, 2012 and 2011, respectively, recorded as losses on loans purchased within other expenses on our consolidated statements of comprehensive income, which relate to certain loans purchased under financial guarantees. We record charge-offs and recoveries on loans held by consolidated trusts when a loss event (such as a foreclosure transfer or foreclosure alternative) occurs on a loan while it remains in a consolidated trust. Recoveries of charge-offs primarily result from foreclosure alternatives and REO acquisitions on loans where: (a) a share of default risk has been assumed by mortgage insurers, servicers, or other third parties through credit enhancements; or (b) we received a reimbursement of our losses from a seller/servicer associated with a repurchase request on a loan that experienced a foreclosure transfer or a foreclosure alternative.

(3) Consists of: (a) approximately $2.0 billion and $2.6 billion during the three months ended June 30, 2012 and 2011, respectively, and $4.5 billion and $6.1 billion during the six months ended June 30, 2012 and 2011, respectively, of reclassified single-family reserves related to our removal of loans previously held by consolidated trusts; (b) approximately $159 million and $327 million during the three months ended June 30, 2012 and 2011, respectively, and $330 million and $623 million during the six months ended June 30, 2012 and 2011, respectively, attributable to recapitalization of past due interest on modified mortgage loans; (c) $0 million and $275 million during the three months ended June 30, 2012 and 2011, respectively, and $0 million and $323 million during the six months ended June 30, 2012 and 2011, respectively, related to agreements with seller/servicers where the transfer relates to recoveries received under these agreements to compensate us for estimated credit losses; and (d) $9 million and $206 million during the three months ended June 30, 2012 and 2011, respectively, and $10 million and $231 million during the six months ended June 30, 2012 and 2011, respectively of other transfers.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4208          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents our allowance for loan losses and our recorded investment in mortgage loans, held-for-investment, by impairment evaluation methodology.

**Table 4.4 — Net Investment in Mortgage Loans**

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Single-family | Multifamily | Total | Single-family | Multifamily | Total |
| | (in millions) | | | | | |
| *Recorded investment:* | | | | | | |
| Collectively evaluated | $ 1,619,911 | $ 67,179 | $ 1,687,090 | $ 1,677,974 | $ 70,131 | $1,748,105 |
| Individually evaluated | 65,951 | 2,507 | 68,458 | 60,037 | 2,670 | 62,707 |
| Total recorded investment | 1,685,862 | 69,686 | 1,755,548 | 1,738,011 | 72,801 | 1,810,812 |
| *Ending balance of the allowance for loan losses:* | | | | | | |
| Collectively evaluated | (19,066) | (217) | (19,283) | (23,657) | (260) | (23,917) |
| Individually evaluated | (16,041) | (232) | (16,273) | (15,100) | (246) | (15,346) |
| Total ending balance of the allowance | (35,107) | (449) | (35,556) | (38,757) | (506) | (39,263) |
| Net investment in mortgage loans | $ 1,650,755 | $ 69,237 | $ 1,719,992 | $ 1,699,254 | $ 72,295 | $1,771,549 |

A significant number of unsecuritized single-family mortgage loans on our consolidated balance sheets are individually evaluated for impairment and substantially all single-family mortgage loans held by our consolidated trusts are collectively evaluated for impairment. The ending balance of the allowance for loan losses associated with our held-for-investment unsecuritized mortgage loans represented approximately 13.5% and 13.0% of the recorded investment in such loans at June 30, 2012 and December 31, 2011, respectively. The ending balance of the allowance for loan losses associated with mortgage loans held by our consolidated trusts represented approximately 0.4% and 0.5% of the recorded investment in such loans as of June 30, 2012 and December 31, 2011, respectively.

**Credit Protection and Other Forms of Credit Enhancement**

In connection with many of our mortgage loans held-for-investment and other mortgage-related guarantees, we have credit protection in the form of primary mortgage insurance, pool insurance, recourse to lenders, and other forms of credit enhancements.

123                                                                                     *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents the UPB of loans on our consolidated balance sheets or underlying our financial guarantees with credit protection and the maximum amounts of potential loss recovery by type of credit protection.

**Table 4.5 — Recourse and Other Forms of Credit Protection**(1)

| | UPB at | | Maximum Coverage(2) at | |
|---|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | June 30, 2012 | December 31, 2011 |
| | (in millions) | | | |
| Single-family: | | | | |
| Primary mortgage insurance | $ 186,703 | $ 198,007 | $ 46,176 | $ 48,741 |
| Lender recourse and indemnifications | 8,467 | 8,798 | 8,313 | 8,453 |
| Pool insurance (3) | 21,481 | 26,754 | 2,008 | 2,210 |
| HFA indemnification(4) | 7,751 | 8,637 | 3,323 | 3,323 |
| Subordination(5) | 3,115 | 3,281 | 580 | 647 |
| Other credit enhancements | 122 | 133 | 75 | 99 |
| Total | $ 227,639 | $ 245,610 | $ 60,475 | $ 63,473 |
| Multifamily: | | | | |
| HFA indemnification(4) | $ 1,206 | $ 1,331 | $ 699 | $ 699 |
| Subordination(5) | 31,827 | 23,636 | 4,922 | 3,359 |
| Other credit enhancements | 8,092 | 8,334 | 2,523 | 2,554 |
| Total | $ 41,125 | $ 33,301 | $ 8,144 | $ 6,612 |

(1)  Includes the credit protection associated with unsecuritized mortgage loans, loans held by our consolidated trusts as well as our non-consolidated mortgage guarantees and excludes FHA/VA and other governmental loans. Except for subordination coverage, these amounts exclude credit protection associated with $15.2 billion and $16.6 billion in UPB of single-family loans underlying Other Guarantee Transactions as of June 30, 2012 and December 31, 2011, respectively, for which the information was not available.

(2)  Except for subordination, this represents the remaining amount of loss recovery that is available subject to terms of counterparty agreements.

(3)  Maximum coverage amounts presented here have been limited to the remaining UPB at period end, including amounts for certain policies that allow for cross collateralization, which represents duplicate coverage in certain cases. Prior period amounts have been revised to conform to current period presentation. Excludes approximately $10.3 billion and $13.5 billion in UPB at June 30, 2012 and December 31, 2011, respectively, where the related loans are also covered by primary mortgage insurance.

(4)  Represents the amount of potential reimbursement of losses on securities we have guaranteed that are backed by state and local HFA bonds, under which Treasury bears initial losses on these securities up to 35% of the original UPB issued under the HFA initiative on a combined program-wide basis. Treasury will also bear losses of unpaid interest.

(5)  Represents Freddie Mac issued mortgage-related securities with subordination protection, excluding those backed by HFA bonds. Excludes mortgage-related securities where subordination coverage was exhausted or maximum coverage amounts were limited to the remaining UPB at that date.

Primary mortgage insurance is the most prevalent type of credit enhancement protecting our single-family credit guarantee portfolio, and is typically provided on a loan-level basis. Pool insurance contracts provide insurance on a group of mortgage loans up to a stated aggregate loss limit. We did not buy pool insurance during the first half of 2012. In recent periods, we also reached the maximum limit of recovery on certain pool insurance contracts. For information about counterparty risk associated with mortgage insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Mortgage Insurers."

We also have credit protection for certain of the mortgage loans on our consolidated balance sheets that are covered by insurance or partial guarantees issued by federal agencies (such as FHA, VA, and USDA). The total UPB of these loans was $4.6 billion and $4.7 billion as of June 30, 2012 and December 31, 2011, respectively.

### NOTE 5: INDIVIDUALLY IMPAIRED AND NON-PERFORMING LOANS

**Individually Impaired Loans**

Individually impaired single-family loans include performing and non-performing TDRs, as well as loans acquired under our financial guarantees with deteriorated credit quality. Individually impaired multifamily loans include TDRs, loans three monthly payments or more past due, and loans that are impaired based on management judgment. For a discussion of our significant accounting policies regarding impaired and non-performing loans, which are applied consistently for multifamily loans and single-family loan classes, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report.

Total loan loss reserves consist of a specific valuation allowance related to individually impaired mortgage loans, and a general reserve for other probable incurred losses. Our recorded investment in individually impaired mortgage loans and the related specific valuation allowance are summarized in the table below by product class (for single-family loans).

124

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4210

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 5.1 — Individually Impaired Loans

| | Balance at June 30, 2012 | | | | For the Three Months Ended June 30, 2012 | | For the Six Months Ended June 30, 2012 | |
|---|---|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | | | |
| **Single-family —** | | | | | | | | |
| *With no specific allowance recorded[1]:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 6,570 | $ 3,015 | $ — | $ 3,015 | $ 3,025 | $ 82 | $ 3,075 | $ 161 |
| 15-year amortizing fixed-rate[2] | 54 | 21 | | 21 | 21 | 2 | 21 | 3 |
| Adjustable rate[3] | 11 | 5 | | 5 | 5 | — | 5 | — |
| Alt-A, interest-only, and option ARM[4] | 1,825 | 824 | — | 824 | 826 | 13 | 841 | 29 |
| Total with no specific allowance recorded | 8,460 | 3,865 | | 3,865 | 3,877 | 97 | 3,942 | 193 |
| *With specific allowance recorded:[5]* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | 49,655 | 48,535 | (12,077) | 36,458 | 47,700 | 335 | 46,360 | 646 |
| 15-year amortizing fixed-rate[2] | 400 | 384 | (46) | 338 | 359 | 4 | 345 | 8 |
| Adjustable rate[3] | 330 | 319 | (67) | 252 | 289 | 1 | 273 | 3 |
| Alt-A, interest-only, and option ARM[4] | 13,179 | 12,848 | (3,851) | 8,997 | 12,554 | 63 | 12,234 | 132 |
| Total with specific allowance recorded | 63,564 | 62,086 | (16,041) | 46,045 | 60,902 | 403 | 59,212 | 789 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | 56,225 | 51,550 | (12,077) | 39,473 | 50,725 | 417 | 49,435 | 807 |
| 15-year amortizing fixed-rate[2] | 454 | 405 | (46) | 359 | 380 | 6 | 366 | 11 |
| Adjustable rate[3] | 341 | 324 | (67) | 257 | 294 | 1 | 278 | 3 |
| Alt-A, interest-only, and option ARM[4] | 15,004 | 13,672 | (3,851) | 9,821 | 13,380 | 76 | 13,075 | 161 |
| Total single-family[6] | $ 72,024 | $ 65,951 | $ (16,041) | $ 49,910 | $ 64,779 | $ 500 | $ 63,154 | $ 982 |
| **Multifamily —** | | | | | | | | |
| *With no specific allowance recorded[7]* | $ 1,120 | $ 1,108 | $ — | $ 1,108 | $ 1,109 | $ 15 | $ 1,263 | $ 31 |
| *With specific allowance recorded* | 1,407 | 1,399 | (232) | 1,167 | 1,404 | 18 | 1,498 | 36 |
| Total multifamily | $ 2,527 | $ 2,507 | $ (232) | $ 2,275 | $ 2,513 | $ 33 | $ 2,761 | $ 67 |
| Total single-family and multifamily | $ 74,551 | $ 68,458 | $ (16,273) | $ 52,185 | $ 67,292 | $ 533 | $ 65,915 | $ 1,049 |

| | Balance at December 31, 2011 | | | | For the Three Months Ended June 30, 2011 | | For the Six Months Ended June 30, 2011 | |
|---|---|---|---|---|---|---|---|---|
| | UPB | Recorded Investment | Associated Allowance | Net Investment | Average Recorded Investment | Interest Income Recognized | Average Recorded Investment | Interest Income Recognized |
| | | | | (in millions) | | | | |
| **Single-family —** | | | | | | | | |
| *With no specific allowance recorded[1]:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $ 7,073 | $ 3,200 | $ — | $ 3,200 | $ 3,449 | $ 85 | $ 3,503 | $ 177 |
| 15-year amortizing fixed-rate[2] | 57 | 23 | | 23 | 43 | 2 | 45 | 4 |
| Adjustable rate[3] | 13 | 6 | | 6 | 7 | — | 7 | — |
| Alt-A, interest-only, and option ARM[4] | 1,987 | 881 | — | 881 | 986 | 19 | 1,007 | 40 |
| Total with no specific allowance recorded | 9,130 | 4,110 | | 4,110 | 4,485 | 106 | 4,562 | 221 |
| *With specific allowance recorded:[5]* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | 44,672 | 43,533 | (11,253) | 32,280 | 31,404 | 141 | 29,591 | 317 |
| 15-year amortizing fixed-rate[2] | 367 | 347 | (43) | 304 | 156 | 2 | 155 | 5 |
| Adjustable rate[3] | 280 | 268 | (59) | 209 | 105 | 1 | 102 | 2 |
| Alt-A, interest-only, and option ARM[4] | 12,103 | 11,779 | (3,745) | 8,034 | 8,279 | 21 | 7,777 | 54 |
| Total with specific allowance recorded | 57,422 | 55,927 | (15,100) | 40,827 | 39,944 | 165 | 37,625 | 378 |
| *Combined single-family:* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | 51,745 | 46,733 | (11,253) | 35,480 | 34,853 | 226 | 33,094 | 494 |
| 15-year amortizing fixed-rate[2] | 424 | 370 | (43) | 327 | 199 | 4 | 200 | 9 |
| Adjustable rate[3] | 293 | 274 | (59) | 215 | 112 | 1 | 109 | 2 |
| Alt-A, interest-only, and option ARM[4] | 14,090 | 12,660 | (3,745) | 8,915 | 9,265 | 40 | 8,784 | 94 |
| Total single-family[6] | $ 66,552 | $ 60,037 | $ (15,100) | $ 44,937 | $ 44,429 | $ 271 | $ 42,187 | $ 599 |
| **Multifamily —** | | | | | | | | |
| *With no specific allowance recorded[7]* | $ 1,049 | $ 1,044 | $ — | $ 1,044 | $ 837 | $ 12 | $ 891 | $ 22 |
| *With specific allowance recorded* | 1,644 | 1,626 | (246) | 1,380 | 2,027 | 26 | 2,122 | 50 |
| Total multifamily | $ 2,693 | $ 2,670 | $ (246) | $ 2,424 | $ 2,864 | $ 38 | $ 3,013 | $ 72 |
| Total single-family and multifamily | $ 69,245 | $ 62,707 | $ (15,346) | $ 47,361 | $ 47,293 | $ 309 | $ 45,200 | $ 671 |

(1) Individually impaired loans with no specific related valuation allowance primarily represent mortgage loans purchased out of PC pools and accounted for in accordance with the accounting guidance for loans and debt securities acquired with deteriorated credit quality that have not experienced further deterioration.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(5) Consists primarily of mortgage loans classified as TDRs.

(6) As of June 30, 2012 and December 31, 2011 includes $63.6 billion and $57.4 billion, respectively, of UPB associated with loans for which we have recorded a specific allowance, and $8.5 billion and $9.1 billion, respectively, of UPB associated with loans that have no specific allowance recorded. See endnote (1) for additional information.

(7) Individually impaired multifamily loans with no specific related valuation allowance primarily represent those loans for which the collateral value is sufficiently in excess of the loan balance to result in recovery of the entire recorded investment if the property were foreclosed upon or otherwise subject to disposition.

125

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Interest income foregone on individually impaired loans was $0.6 billion and $1.1 billion for the three and six months ended June 30, 2012, respectively, compared to $0.3 billion $0.7 billion for the three and six months ended June 30, 2011, respectively.

**Mortgage Loan Performance**

We do not accrue interest on loans three months or more past due.

The table below presents the recorded investment of our single-family and multifamily mortgage loans, held-for-investment, by payment status.

**Table 5.2 — Payment Status of Mortgage Loans**[1]

| | June 30, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | (in millions) | | | | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,153,027 | $ 21,757 | $ 7,592 | $ 44,700 | $1,227,076 | $ 44,583 |
| 15-year amortizing fixed-rate[2] | 266,530 | 1,298 | 296 | 1,279 | 269,403 | 1,272 |
| Adjustable-rate[3] | 65,080 | 638 | 213 | 1,633 | 67,564 | 1,629 |
| Alt-A, interest-only, and option ARM[4] | 96,960 | 3,675 | 1,603 | 19,581 | 121,819 | 19,551 |
| Total single-family | 1,581,597 | 27,368 | 9,704 | 67,193 | 1,685,862 | 67,035 |
| Total multifamily | 69,538 | 3 | — | 145 | 69,686 | 1,737 |
| Total single-family and multifamily | $1,651,135 | $ 27,371 | $ 9,704 | $ 67,338 | $1,755,548 | $ 68,772 |

| | December 31, 2011 | | | | | |
|---|---|---|---|---|---|---|
| | Current | One Month Past Due | Two Months Past Due | Three Months or More Past Due, or in Foreclosure | Total | Non-accrual |
| | (in millions) | | | | | |
| Single-family — | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate[2] | $1,191,809 | $ 24,964 | $ 9,006 | $ 46,707 | $1,272,486 | $ 46,600 |
| 15-year amortizing fixed-rate[2] | 256,306 | 1,499 | 361 | 1,367 | 259,533 | 1,361 |
| Adjustable-rate[3] | 63,929 | 724 | 239 | 1,842 | 66,734 | 1,838 |
| Alt-A, interest-only, and option ARM[4] | 109,967 | 4,617 | 2,172 | 22,502 | 139,258 | 22,473 |
| Total single-family | 1,622,011 | 31,804 | 11,778 | 72,418 | 1,738,011 | 72,272 |
| Total multifamily | 72,715 | 2 | 15 | 69 | 72,801 | 1,882 |
| Total single-family and multifamily | $1,694,726 | $ 31,806 | $ 11,793 | $ 72,487 | $1,810,812 | $ 74,154 |

(1) Based on recorded investment in the loan. Mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as past due as long as the borrower is current under the modified terms. The payment status of a loan may be affected by temporary timing differences, or lags, in the reporting of this information to us by our servicers.

(2) See endnote (3) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

(3) Includes balloon/reset mortgage loans and excludes option ARMs.

(4) See endnote (5) of "Table 4.2 — Recorded Investment of Held-for-Investment Mortgage Loans, by LTV Ratio."

We have the option under our PC agreements to remove mortgage loans that underlie our PCs under certain circumstances to resolve an existing or impending delinquency or default. Our practice generally has been to remove loans from PC trusts when the loans have been delinquent for 120 days or more. As of June 30, 2012, there were $2.1 billion in UPB of loans underlying our PCs that were 120 days or more delinquent, and that met our criteria for removing the loan from the PC trust. Generally, we remove these delinquent loans from the PC trust, and thereby extinguish the related PC debt, at the next scheduled PC payment date, unless the loans proceed to foreclosure transfer, complete a foreclosure alternative or are paid in full by the borrower before such date.

When we remove mortgage loans from PC trusts, we reclassify the loans from mortgage loans held-for-investment by consolidated trusts to unsecuritized mortgage loans held-for-investment and record an extinguishment of the corresponding portion of the debt securities of the consolidated trusts. We removed $7.5 billion and $16.7 billion in UPB of loans from PC trusts (or purchased delinquent loans associated with other guarantee commitments) during the three and six months ended

126

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

June 30, 2012, respectively, compared to $10.6 billion and $25.2 billion during the three and six months ended June 30, 2011, respectively.

The table below summarizes the delinquency rates of mortgage loans within our single-family credit guarantee and multifamily mortgage portfolios.

**Table 5.3 — Delinquency Rates**[1]

| | | June 30, 2012 | | December 31, 2011 |
|---|---|---|---|---|
| *Single-family:* | | | | |
| Non-credit-enhanced portfolio: | | | | |
| Serious delinquency rate | | 2.72% | | 2.80% |
| Total number of seriously delinquent loans | | 259,874 | | 273,184 |
| Credit-enhanced portfolio: | | | | |
| Serious delinquency rate | | 7.38% | | 7.56% |
| Total number of seriously delinquent loans | | 107,772 | | 120,622 |
| Other Guarantee Transactions:[2] | | | | |
| Serious delinquency rate | | 10.58% | | 10.54% |
| Total number of seriously delinquent loans | | 18,924 | | 20,328 |
| Total single-family: | | | | |
| Serious delinquency rate | | 3.45% | | 3.58% |
| Total number of seriously delinquent loans | | 386,570 | | 414,134 |
| *Multifamily:*[3] | | | | |
| Non-credit-enhanced portfolio: | | | | |
| Delinquency rate | | 0.19% | | 0.11% |
| UPB of delinquent loans (in millions) | $ | 154 | $ | 93 |
| Credit-enhanced portfolio: | | | | |
| Delinquency rate | | 0.44% | | 0.52% |
| UPB of delinquent loans (in millions) | $ | 177 | $ | 166 |
| Total Multifamily: | | | | |
| Delinquency rate | | 0.27% | | 0.22% |
| UPB of delinquent loans (in millions) | $ | 331 | $ | 259 |

(1) Single-family mortgage loans whose contractual terms have been modified under agreement with the borrower are not counted as seriously delinquent if the borrower is less than three monthly payments past due under the modified terms. Serious delinquencies on single-family mortgage loans underlying certain REMICs and Other Structured Securities, Other Guarantee Transactions, and other guarantee commitments may be reported on a different schedule due to variances in industry practice.

(2) Other Guarantee Transactions generally have underlying mortgage loans with higher risk characteristics, but some Other Guarantee Transactions may provide inherent credit protections from losses due to underlying subordination, excess interest, overcollateralization and other features.

(3) Multifamily delinquency performance is based on UPB of mortgage loans that are two monthly payments or more past due or those in the process of foreclosure and includes multifamily Other Guarantee Transactions. Excludes mortgage loans whose contractual terms have been modified under an agreement with the borrower as long as the borrower is less than two monthly payments past due under the modified contractual terms.

We continue to implement a number of initiatives to modify and restructure loans, including the MHA Program. As part of accomplishing certain of these initiatives, we pay various incentives to servicers and borrowers. We bear the full costs associated with these loan workout and foreclosure alternatives on mortgages that we own or guarantee, including the cost of any monthly payment reductions, and do not receive any reimbursement from Treasury.

**Troubled Debt Restructurings**

On July 1, 2011, we adopted an amendment to the accounting guidance for receivables, which clarifies the guidance regarding a creditor's evaluation of when a restructuring is considered a TDR. While our adoption of this amendment did not have an effect on how we account for TDRs, it did have a significant impact on the population of loans that we account for as TDRs. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Recently Adopted Accounting Guidance" in our 2011 Annual Report for further information on our implementation of this guidance.

*Single-Family TDRs*

We require our single-family servicers to contact borrowers who are in default and to identify a loan workout in accordance with our requirements. We establish guidelines for our servicers to follow and provide them default management tools to use, in part, in determining which type of loan workout would be expected to provide the best opportunity for minimizing our credit losses. We require our single-family servicers to first evaluate problem loans for a repayment or forbearance plan before considering modification. If a borrower is not eligible for a modification, our seller/servicers pursue other workout options before considering foreclosure. We receive information related to loan workouts, such as modifications and loans in a modification trial period, and other alternatives to foreclosure from our servicers at the loan

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4213

Table of Contents

level on at least a monthly basis. For loans in a modification trial period, we do not receive the terms of the expected completed modification until the modification is completed.

In the case of borrowers considered for modifications, our servicers typically obtain information on income, assets, and other borrower obligations to determine modified loan terms. Under HAMP, the goal of a single-family loan modification is to reduce the borrower's monthly mortgage payments to a specified percentage of the borrower's gross monthly income, which may be achieved through a combination of methods, including: (a) interest rate reduction; (b) term extension; and (c) principal forbearance. Principal forbearance is when a portion of the principal is made non-interest-bearing, but this does not represent principal forgiveness. Although HAMP contemplates that some servicers will also make use of principal forgiveness to achieve reduced payments for borrowers, we have only used forbearance of principal and have not used principal forgiveness in modifying our loans. During the three and six months ended June 30, 2012, approximately 76% and 70%, of completed modifications that were classified as TDRs involved interest rate reductions and term extensions and approximately 21% and 22%, respectively, involved principal forbearance in addition to interest rate reductions and term extensions. During the three and six months ended June 30, 2012, the average term extension was 122 and 108 months and the average interest rate reduction was 2.6% and 2.8%, respectively, on completed modifications classified as TDRs.

### Multifamily TDRs

The assessment as to whether a multifamily loan restructuring is considered a TDR contemplates the unique facts and circumstances of each loan. This assessment considers qualitative factors such as whether the borrower's modified interest rate is consistent with that of a borrower having a similar credit profile at the time of modification. In certain cases, for maturing loans we may provide short-term loan extensions of up to one year with no changes to the effective borrowing rate. In other cases, we may make more significant modifications of terms for borrowers experiencing financial difficulty, such as reducing the interest rate or extending the maturity for longer than one year. In cases where we do modify the contractual terms of the loan, the changes in terms may be similar to those of single-family loans, such as an extension of the term, reduction of contractual rate, principal forbearance, or some combination of these features.

### TDR Activity and Performance

The table below provides additional information about both our single-family and multifamily TDR activity during the three and six months ended June 30, 2012, based on the original category of the loan before the loan was classified as a TDR. Our presentation of TDR activity includes all loans that were newly classified as a TDR during the respective period. Loans classified as a TDR in one period may be subject to further action (such as a modification or remodification) in a subsequent period. In such cases, the subsequent activity would not be reflected in the table below since the loan would already have been classified as a TDR.

### Table 5.4 — TDR Activity, by Segment

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment | # of Loans | Post-TDR Recorded Investment |
| | | | | (in millions, except for number of loans) | | | | |
| *Single-family* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 20,492 | $ 3,642 | 17,295 | $ 3,579 | 35,564 | $ 6,285 | 36,195 | $ 7,504 |
| 15-year amortizing fixed-rate | 1,103 | 105 | 778 | 86 | 2,065 | 192 | 1,634 | 184 |
| Adjustable-rate[1] | 558 | 107 | 428 | 96 | 1,009 | 192 | 925 | 203 |
| Alt-A, interest-only, and option ARM | 4,931 | 1,239 | 5,924 | 1,643 | 8,656 | 2,200 | 12,651 | 3,487 |
| Total Single-family | 27,084 | 5,093 | 24,425 | 5,404 | 47,294 | 8,869 | 51,405 | 11,378 |
| *Multifamily* | 10 | 95 | 9 | 111 | 14 | 117 | 11 | 114 |
| Total | 27,094 | $ 5,188 | 24,434 | $ 5,515 | 47,308 | $ 8,986 | 51,416 | $ 11,492 |

(1)   Includes balloon/reset mortgage loans.

The measurement of impairment for single-family TDRs is based on the excess of our recorded investment in the loan over the present value of the loan's expected future cash flows. For multifamily loans, we use an estimate of the fair value of the loan's collateral rather than the present value of expected future cash flows to determine the amount of impairment. Generally, restructurings of single-family loans that are TDRs have a higher allowance for loan losses than restructurings that

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

are not considered TDRs because TDRs involve a concession being granted to the borrower. Our process for determining the appropriate allowance for loan losses for both single-family and multifamily loans considers the impact that our loss mitigation activities, such as loan restructurings, have on probabilities of default. For single-family loans evaluated individually and collectively for impairment that have been modified, the probability of default is affected by the incidence of redefault that we have experienced on similar loans that have completed a modification. For multifamily loans, the incidence of redefault on loans that have been modified does not directly affect the allowance for loan losses as our multifamily loans are generally evaluated individually for impairment. Individual impairment for our multifamily loans is based on the fair value of the underlying collateral and contemplates the unique facts and circumstances of the loan. The process for determining the appropriate allowance for loan losses for multifamily loans evaluated collectively for impairment considers the incidence of redefault on loans that have completed a modification.

The table below presents the volume of payment defaults of our TDR modifications based on the original category of the loan before restructuring. Modified loans within the Alt-A category continue to remain in that category, even though the borrower may have provided full documentation of assets and income before completing the modification. Modified loans within the option ARM category continue to remain in that category even though the modified loan no longer provides for optional payment provisions. Substantially all of our completed single-family loan modifications classified as a TDR during the six months ended June 30, 2012 resulted in a modified loan with a fixed interest rate. Approximately $43 billion in UPB of our completed HAMP loan modifications at June 30, 2012 had provisions for reduced interest rates that remain fixed for the first five years of the modification and then increase at a rate of one percent per year (or such lesser amount as may be needed) until the interest rate has been adjusted to the market rate that was in effect at the time of the modification. The table below reflects only performance of completed modifications and excludes loans subject to other loss mitigation activity that were classified as TDRs.

**Table 5.5 — Payment Defaults of Completed TDR Modifications, by Segment** [1]

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| | 2012 | | 2011 | | 2012 | | 2011 | |
| | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] | # of Loans | Post-TDR Recorded Investment[2] |
|---|---|---|---|---|---|---|---|---|
| | (in millions, except number of loans modified) | | | | | | | |
| *Single-family* | | | | | | | | |
| 20 and 30-year or more, amortizing fixed-rate | 4,149 | $ 765 | 5,740 | $ 1,070 | 9,037 | $ 1,684 | 11,349 | $ 2,144 |
| 15-year amortizing fixed-rate | 205 | 21 | 216 | 22 | 437 | 45 | 410 | 43 |
| Adjustable-rate | 102 | 22 | 122 | 25 | 200 | 44 | 245 | 51 |
| Alt-A, interest-only, and option ARM | 840 | 221 | 1,461 | 384 | 1,888 | 499 | 3,035 | 805 |
| Total single-family | 5,296 | $ 1,029 | 7,539 | $ 1,501 | 11,562 | $ 2,272 | 15,039 | $ 3,043 |
| Multifamily | 1 | $ 6 | — | $ — | 2 | $ 8 | — | $ — |

(1)  Represents TDR loans that experienced a payment default during the period and had completed a modification event during the year preceding the payment default. A payment default occurs when a borrower either: (a) became two or more months delinquent; or (b) completed a loss event, such as a short sale or foreclosure. We only include payment defaults for a single loan once during each quarter; however, a single loan will be reflected more than once if the borrower experienced another payment default in a subsequent period.

(2)  Represents the recorded investment at the end of the period in which the loan was modified and does not represent the recorded investment as of June 30, 2012.

During the six months ended June 30, 2012, there were 1,751 loans where we engaged in other loss mitigation activities ( *i.e.*, repayment plan, forbearance agreement, or trial period modifications) initially classified as TDRs, with a post-TDR recorded investment of $264 million that returned to a current payment status, and then subsequently became two months delinquent. In addition, during the six months ended June 30, 2012, there were 2,925 loans with other loss mitigation activities initially classified as TDRs, with a post-TDR recorded investment of $483 million that subsequently completed a loss event, such as a short sale or a foreclosure transfer.

## NOTE 6: REAL ESTATE OWNED

We obtain REO properties: (a) when we are the highest bidder at foreclosure sales of properties that collateralize non-performing single-family and multifamily mortgage loans owned by us; or (b) when a delinquent borrower chooses to transfer the mortgaged property to us in lieu of going through the foreclosure process. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report for a discussion of our significant accounting policies for REO.

129

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from this use, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below provides a summary of the change in the carrying value of our combined single-family and multifamily REO balances. For the periods presented in the table below, the weighted average holding period for our disposed properties was less than one year.

**Table 6.1 — REO**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | **2012** | **2011** | **2012** | **2011** |
| | | (in millions) | | |
| Beginning balance — REO, gross | $ 5,935 | $ 7,149 | $ 6,244 | $ 7,908 |
| Additions | 1,745 | 2,408 | 3,880 | 4,861 |
| Dispositions | (2,509) | (3,024) | (4,953) | (6,236) |
| Ending balance — REO, gross | 5,171 | 6,533 | 5,171 | 6,533 |
| Beginning balance, valuation allowance | (481) | (773) | (564) | (840) |
| Change in valuation allowance | 119 | 172 | 202 | 239 |
| Ending balance, valuation allowance | (362) | (601) | (362) | (601) |
| Ending balance — REO, net | $ 4,809 | $ 5,932 | $4,809 | $5,932 |

The REO balance, net at June 30, 2012 and December 31, 2011 associated with single-family properties was $4.7 billion and $5.5 billion, respectively, and the balance associated with multifamily properties was $94 million and $133 million, respectively. The North Central region represented approximately 34% and 26% of our single-family REO additions during the three months ended June 30, 2012 and 2011, respectively, based on the number of properties, and the Southeast region represented approximately 30% and 21% of our single-family REO additions during these periods, respectively. Our single-family REO inventory consisted of 53,271 properties and 60,535 properties at June 30, 2012 and December 31, 2011, respectively. The pace of our REO acquisitions slowed beginning in the fourth quarter of 2010 due to lengthening of the foreclosure process, particularly in states that require a judicial foreclosure process. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for additional information about regional concentrations in our portfolio.

Our REO operations expenses include: (a) REO property expenses; (b) net gains or losses incurred on disposition of REO properties; (c) adjustments to the holding period allowance associated with REO properties to record them at the lower of their carrying amount or fair value less the estimated costs to sell; and (d) recoveries from insurance and other credit enhancements. An allowance for estimated declines in the REO fair value during the period properties are held reduces the carrying value of REO property. Excluding holding period valuation adjustments, we recognized gains (losses) of $181 million and $(48) million on REO dispositions during the three months ended June 30, 2012 and 2011, respectively, and $261 million and $(174) million on REO dispositions during the six months ended June 30, 2012 and 2011, respectively. We increased (decreased) our valuation allowance for properties in our REO inventory by $(26) million and $5 million during the three months ended June 30, 2012 and 2011, respectively, and $(24) million and $156 million during the six months ended June 30, 2012 and 2011, respectively.

REO property acquisitions that result from extinguishment of our mortgage loans held on our consolidated balance sheets are treated as non-cash transfers. The amount of non-cash acquisitions of REO properties during the six months ended June 30, 2012 and 2011 was $3.5 billion and $4.4 billion, respectively.

## NOTE 7: INVESTMENTS IN SECURITIES

The table below summarizes amortized cost, estimated fair values, and corresponding gross unrealized gains and gross unrealized losses for available-for-sale securities by major security type. At June 30, 2012 and December 31, 2011, all available-for-sale securities are mortgage-related securities.

TREASURY-4216

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 7.1 — Available-For-Sale Securities

| June 30, 2012 | Amortized Cost | Gross Unrealized Gains | Gross Unrealized Losses | Fair Value |
|---|---|---|---|---|
| | | (in millions) | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 67,511 | $ 5,757 | $ (44) | $ 73,224 |
| Subprime | 38,532 | 61 | (12,815) | 25,778 |
| CMBS | 50,339 | 3,183 | (540) | 52,982 |
| Option ARM | 8,420 | 5 | (2,997) | 5,428 |
| Alt-A and other | 12,851 | 111 | (2,229) | 10,733 |
| Fannie Mae | 16,485 | 1,205 | (1) | 17,689 |
| Obligations of states and political subdivisions | 7,151 | 169 | (12) | 7,308 |
| Manufactured housing | 769 | 7 | (50) | 726 |
| Ginnie Mae | 200 | 30 | — | 230 |
| Total available-for-sale securities | $202,258 | $ 10,528 | $ (18,688) | $194,098 |
| | | | | |
| December 31, 2011 | | | | |
| Available-for-sale securities: | | | | |
| Freddie Mac | $ 74,711 | $ 6,429 | $ (48) | $ 81,092 |
| Subprime | 41,347 | 60 | (13,408) | 27,999 |
| CMBS | 53,637 | 2,574 | (548) | 55,663 |
| Option ARM | 9,019 | 15 | (3,169) | 5,865 |
| Alt-A and other | 13,659 | 32 | (2,812) | 10,879 |
| Fannie Mae | 19,023 | 1,303 | (4) | 20,322 |
| Obligations of states and political subdivisions | 7,782 | 108 | (66) | 7,824 |
| Manufactured housing | 820 | 6 | (60) | 766 |
| Ginnie Mae | 219 | 30 | — | 249 |
| Total available-for-sale securities | $ 220,217 | $ 10,557 | $ (20,115) | $210,659 |

**Available-For-Sale Securities in a Gross Unrealized Loss Position**

The table below shows the fair value of available-for-sale securities in a gross unrealized loss position, and whether they have been in that position less than 12 months, or 12 months or greater, including the non-credit-related portion of other-than-temporary impairments which have been recognized in AOCI.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position

| June 30, 2012 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $1,969 | $ — | $ (11) | $ (11) | $ 1,868 | $ — | $ (33) | $ (33) | $ 3,837 | $ — | $ (44) | $ (44) |
| Subprime | 71 | (12) | — | (12) | 25,520 | (10,518) | (2,285) | (12,803) | 25,591 | (10,530) | (2,285) | (12,815) |
| CMBS | 888 | (16) | (20) | (36) | 3,311 | (151) | (353) | (504) | 4,199 | (167) | (373) | (540) |
| Option ARM | 16 | (2) | — | (2) | 5,324 | (2,908) | (87) | (2,995) | 5,340 | (2,910) | (87) | (2,997) |
| Alt-A and other | 296 | (9) | — | (9) | 9,138 | (1,750) | (470) | (2,220) | 9,434 | (1,759) | (470) | (2,229) |
| Fannie Mae | 161 | — | — | — | 10 | — | (1) | (1) | 171 | — | (1) | (1) |
| Obligations of states and political subdivisions | 148 | — | (1) | (1) | 454 | — | (11) | (11) | 602 | — | (12) | (12) |
| Manufactured housing | 127 | (4) | — | (4) | 334 | (38) | (8) | (46) | 461 | (42) | (8) | (50) |
| Total available-for-sale securities in a gross unrealized loss position | $3,676 | $ (43) | $ (32) | $ (75) | $ 45,959 | $ (15,365) | $ (3,248) | $(18,613) | $ 49,635 | $ (15,408) | $ (3,280) | $(18,688) |

| December 31, 2011 | Less than 12 Months | | | | 12 Months or Greater | | | | Total | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | | Fair Value | Gross Unrealized Losses | | |
| | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total | | Other-Than-Temporary Impairment(1) | Temporary Impairment(2) | Total |
| | | | | | | (in millions) | | | | | | |
| Available-for-sale securities: | | | | | | | | | | | | |
| Freddie Mac | $2,196 | $ — | $ (4) | $ (4) | $ 1,884 | $ — | $ (44) | $ (44) | $ 4,080 | $ — | $ (48) | $ (48) |
| Subprime | 8 | (1) | — | (1) | 27,742 | (10,785) | (2,622) | (13,407) | 27,750 | (10,786) | (2,622) | (13,408) |
| CMBS | 997 | (20) | (41) | (61) | 3,573 | (9) | (478) | (487) | 4,570 | (29) | (519) | (548) |
| Option ARM | 95 | (13) | — | (13) | 5,743 | (3,067) | (89) | (3,156) | 5,838 | (3,080) | (89) | (3,169) |
| Alt-A and other | 1,197 | (114) | (4) | (118) | 9,070 | (2,088) | (606) | (2,694) | 10,267 | (2,202) | (610) | (2,812) |
| Fannie Mae | 1,144 | — | (2) | (2) | 14 | — | (2) | (2) | 1,158 | — | (4) | (4) |
| Obligations of states and political subdivisions | 292 | — | (6) | (6) | 2,157 | — | (60) | (60) | 2,449 | — | (66) | (66) |
| Manufactured housing | 197 | (5) | — | (5) | 345 | (44) | (11) | (55) | 542 | (49) | (11) | (60) |
| Total available-for-sale securities in a gross unrealized loss position | $6,126 | $ (153) | $ (57) | $(210) | $50,528 | $ (15,993) | $ (3,912) | $(19,905) | $56,654 | $ (16,146) | $ (3,969) | $(20,115) |

(1) Represents the gross unrealized losses for securities for which we have previously recognized other-than-temporary impairments in earnings.

(2) Represents the gross unrealized losses for securities for which we have not previously recognized other-than-temporary impairments in earnings.

At June 30, 2012, total gross unrealized losses on available-for-sale securities were $18.7 billion. The gross unrealized losses relate to 1,347 individual lots representing 1,289 separate securities, including securities with non-credit-related other-than-temporary impairments recognized in AOCI. We purchase multiple lots of individual securities at different times and at different costs. We determine gross unrealized gains and gross unrealized losses by specifically evaluating investment positions at the lot level; therefore, some of the lots we hold for a single security may be in an unrealized gain position while other lots for that security may be in an unrealized loss position, depending upon the amortized cost of the specific lot.

**Impairment Recognition on Investments in Securities**

We recognize impairment losses on available-for-sale securities within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings when we conclude that a decrease in the fair value of a security is other-than-temporary.

We conduct quarterly reviews to evaluate each available-for-sale security that has an unrealized loss for other-than-temporary impairment. An unrealized loss exists when the current fair value of an individual security is less than its amortized cost basis. We recognize other-than-temporary impairment in earnings if one of the following conditions exists: (a) we have the intent to sell the security; (b) it is more likely than not that we will be required to sell the security before recovery of its unrealized loss; or (c) we do not expect to recover the amortized cost basis of the security. If we do not intend to sell the security and we believe it is not more likely than not that we will be required to sell prior to recovery of its unrealized loss, we recognize only the credit component of other-than-temporary impairment in earnings and the amounts attributable to all other factors are recognized in AOCI. The credit component represents the amount by which the present value of expected future cash flows to be collected from the security is less than the amortized cost basis of the security. The present value of expected future cash flows represents our estimate of future contractual cash flows that we expect to collect, discounted at the effective interest rate implicit in the security's contractual yield based on the initial acquisition cost or the effective interest rate determined based on significantly improved cash flows subsequent to initial impairment.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our net impairment of available-for-sale securities recognized in earnings on our consolidated statements of comprehensive income for the three and six months ended June 30, 2012 and 2011, includes amounts related to certain securities where we have previously recognized other-than-temporary impairments through AOCI, but upon the recognition of additional credit losses, these amounts were reclassified out of non-credit losses in AOCI and charged to earnings. In certain instances, we recognized credit losses in excess of unrealized losses in AOCI.

The determination of whether unrealized losses on available-for-sale securities are other-than-temporary requires significant management judgments and assumptions and consideration of numerous factors. We perform an evaluation on a security-by-security basis considering all available information. The relative importance of this information varies based on the facts and circumstances surrounding each security, as well as the economic environment at the time of assessment. Important factors include, but are not limited to:

- whether we intend to sell the security and it is not more likely than not that we will be required to sell the security before sufficient time elapses to recover all unrealized losses;

- loan level default modeling for single-family residential mortgages that considers individual loan characteristics, including current LTV ratio, FICO score, and delinquency status, requires assumptions about future home prices and interest rates, and employs internal default models and prepayment assumptions. The modeling for CMBS employs third-party models that require assumptions about the economic conditions in the areas surrounding each individual property; and

- security loss modeling combining the modeled performance of the underlying collateral relative to its current and projected credit enhancements to determine the expected cash flows for each evaluated security.

For the majority of our available-for-sale securities in an unrealized loss position, we have asserted that we have no intent to sell and that we believe it is not more likely than not that we will be required to sell the security before recovery of its amortized cost basis. Where such an assertion has not been made, the security's entire decline in fair value is deemed to be other-than-temporary and is recorded within our consolidated statements of comprehensive income as net impairment of available-for-sale securities recognized in earnings.

See "Table 7.2 — Available-For-Sale Securities in a Gross Unrealized Loss Position" for the length of time our available-for-sale securities have been in an unrealized loss position. Also see "Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities" for the modeled default rates and severities that were used to determine whether our senior interests in certain non-agency mortgage-related securities would experience a cash shortfall.

### Freddie Mac and Fannie Mae Securities

We record the purchase of mortgage-related securities issued by Fannie Mae as investments in securities in accordance with the accounting guidance for investments in debt and equity securities. In contrast, our purchase of mortgage-related securities that we issued ( *e.g.*, PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions) is recorded as either investments in securities or extinguishment of debt securities of consolidated trusts depending on the nature of the mortgage-related security that we purchase. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Securitization Activities through Issuances of Freddie Mac Mortgage-Related Securities" in our 2011 Annual Report for additional information.

We hold these investments in securities that are in an unrealized loss position at least to recovery and typically to maturity. As the principal and interest on these securities are guaranteed and we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses, we consider these unrealized losses to be temporary.

### Non-Agency Mortgage-Related Securities Backed by Subprime, Option ARM, Alt-A and Other Loans

We believe the unrealized losses on the non-agency mortgage-related securities we hold are a result of poor underlying collateral performance, limited liquidity, and large risk premiums. We consider securities to be other-than-temporarily impaired when future credit losses are deemed likely.

Our review of the securities backed by subprime, option ARM, and Alt-A and other loans includes loan level default modeling and analyses of the individual securities based on underlying collateral performance, including the collectability of amounts from bond insurers. In the case of bond insurers, we also consider factors such as the availability of capital,

<div align="center">133</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

generation of new business, pending regulatory action, credit ratings, security prices, and credit default swap levels traded on the insurers. We consider loan level information including estimated current LTV ratios, FICO scores, and other loan level characteristics. We also consider the differences between the loan level characteristics of the performing and non-performing loan populations. For additional information regarding bond insurers, see "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers."

The table below presents the modeled default rates and severities, without regard to subordination, that are used to determine whether our senior interests in certain available-for-sale non-agency mortgage-related securities will experience a cash shortfall. Our proprietary default model incorporates assumptions about future home prices, as defaults and severities are modeled at the loan level and then aggregated. The model uses projections of future home prices at the state level. Assumptions about voluntary prepayment rates are also an input to the model and are discussed below.

**Table 7.3 — Significant Modeled Attributes for Certain Available-For-Sale Non-Agency Mortgage-Related Securities**

| | | | June 30, 2012 | | |
|---|---|---|---|---|---|
| | Subprime First Lien[2] | Option ARM | Alt-A[1] | | |
| | | | Fixed Rate | Variable Rate | Hybrid Rate |
| | | | (dollars in millions) | | |
| **Issuance Date** | | | | | |
| 2004 and prior: | | | | | |
| UPB | $  1,165 | $  111 | $  791 | $  483 | $  2,106 |
| Weighted average collateral defaults[3] | 32% | 31% | 8% | 45% | 25% |
| Weighted average collateral severities[4] | 56% | 49% | 43% | 47% | 36% |
| Weighted average voluntary prepayment rates[5] | 5% | 7% | 22% | 7% | 8% |
| Average credit enhancement[6] | 43% | 12% | 14% | 18% | 15% |
| 2005: | | | | | |
| UPB | $  5,646 | $  2,689 | $  1,122 | $  787 | $  3,787 |
| Weighted average collateral defaults[3] | 53% | 48% | 22% | 55% | 38% |
| Weighted average collateral severities[4] | 67% | 57% | 50% | 53% | 45% |
| Weighted average voluntary prepayment rates[5] | 4% | 6% | 15% | 6% | 7% |
| Average credit enhancement[6] | 51% | 9% | 2% | 24% | 4% |
| 2006: | | | | | |
| UPB | $ 18,964 | $  6,142 | $  508 | $  1,037 | $  1,119 |
| Weighted average collateral defaults[3] | 65% | 62% | 33% | 61% | 50% |
| Weighted average collateral severities[4] | 72% | 63% | 56% | 61% | 52% |
| Weighted average voluntary prepayment rates[5] | 5% | 5% | 14% | 7% | 7% |
| Average credit enhancement[6] | 12% | —% | 5% | (3)% | —% |
| 2007: | | | | | |
| UPB | $ 20,531 | $  4,016 | $  153 | $  1,286 | $  292 |
| Weighted average collateral defaults[3] | 62% | 52% | 50% | 58% | 57% |
| Weighted average collateral severities[4] | 73% | 62% | 66% | 61% | 61% |
| Weighted average voluntary prepayment rates[5] | 5% | 6% | 12% | 8% | 6% |
| Average credit enhancement[6] | 14% | 10% | 8% | (10)% | —% |
| Total: | | | | | |
| UPB | $ 46,306 | $ 12,958 | $  2,574 | $  3,593 | $  7,304 |
| Weighted average collateral defaults[3] | 61% | 56% | 22% | 56% | 37% |
| Weighted average collateral severities[4] | 72% | 62% | 53% | 58% | 46% |
| Weighted average voluntary prepayment rates[5] | 5% | 6% | 17% | 7% | 8% |
| Average credit enhancement[6] | 19% | 5% | 7% | 3% | 6% |

(1) Excludes non-agency mortgage-related securities backed by other loans, which are primarily comprised of securities backed by home equity lines of credit.
(2) Excludes non-agency mortgage-related securities backed exclusively by subprime second liens. Certain securities identified as subprime first lien may be backed in part by subprime second lien loans, as the underlying loans of these securities were permitted to include a small percentage of subprime second lien loans.
(3) The expected cumulative default rate expressed as a percentage of the current collateral UPB.
(4) The expected average loss given default calculated as the ratio of cumulative loss over cumulative default for each security.
(5) The security's voluntary prepayment rate represents the average of the monthly voluntary prepayment rate weighted by the security's outstanding UPB.
(6) Reflects the ratio of the current principal amount of the securities issued by a trust that will absorb losses in the trust before any losses are allocated to securities that we own. Percentage generally calculated based on: (a) the total UPB of securities subordinate to the securities we own, divided by (b) the total UPB of all of the securities issued by the trust (excluding notional balances). Only includes credit enhancement provided by subordinated securities; excludes credit enhancement provided by bond insurance, overcollateralization and other forms of credit enhancement. Negative values are shown when collateral losses that have yet to be applied to the tranches exceed the remaining credit enhancement, if any.

In evaluating the non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans for other-than-temporary impairment, we noted that the percentage of securities that were AAA-rated and the percentage that were investment grade declined significantly since acquisition. While these ratings have declined, the ratings themselves are not determinative that a loss is more or less likely. While we consider credit ratings in our analysis, we believe that our detailed security-by-security analyses provide a more consistent view of the ultimate collectability of contractual amounts due to us.

<div align="center">134</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our analysis is subject to change as new information regarding delinquencies, severities, loss timing, prepayments, and other factors becomes available. While it is reasonably possible that, under certain conditions, collateral losses on our remaining available-for-sale securities for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2012.

### Commercial Mortgage-Backed Securities

CMBS are exposed to stresses in the commercial real estate market. We use external models to identify securities that may have an increased risk of failing to make their contractual payments. We then perform an analysis of the underlying collateral on a security-by-security basis to determine whether we will receive all of the contractual payments due to us. While it is reasonably possible that, under certain conditions, collateral losses on our CMBS for which we have not recorded an impairment charge could exceed our credit enhancement levels and a principal or interest loss could occur, we do not believe that those conditions were likely as of June 30, 2012. We do not intend to sell the remaining CMBS and it is not more likely than not that we will be required to sell such securities before recovery of the unrealized losses.

### Obligations of States and Political Subdivisions

These investments consist of housing revenue bonds. We believe the unrealized losses on obligations of states and political subdivisions are primarily a result of movements in interest rates and liquidity and risk premiums. We have determined that the impairment of these securities is temporary based on our conclusion that we do not intend to sell these securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses. We believe that any credit risk related to these securities is minimal because of the issuer guarantees provided on these securities.

### Bond Insurance

We rely on bond insurance to provide credit protection on some of our non-agency mortgage-related securities. Circumstances in which it is likely a principal and interest shortfall will occur and there is substantial uncertainty surrounding a bond insurer's ability to pay all future claims can give rise to recognition of other-than-temporary impairment recognized in earnings. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS — Bond Insurers" for additional information.

### Other-Than-Temporary Impairments on Available-for-Sale Securities

The table below summarizes our net impairments of available-for-sale securities recognized in earnings by security type.

### Table 7.4 — Net Impairment of Available-For-Sale Securities Recognized in Earnings

| | Net Impairment of Available-For-Sale Securities Recognized in Earnings | | | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Available-for-sale securities: | | | | |
| Subprime | $ (58) | $ (70) | $ (499) | $ (804) |
| Option ARM | (18) | (65) | (66) | (346) |
| Alt-A and other | (2) | (32) | (59) | (72) |
| CMBS[1] | (19) | (183) | (35) | (318) |
| Manufactured housing | (1) | (2) | (3) | (5) |
| Total other-than-temporary impairments on available-for-sale securities | $ (98) | $ (352) | $ (662) | $ (1,545) |

(1) Includes $154 million of other-than-temporary impairments recognized in earnings for the three and six months ended June 30, 2011, as we had the intent to sell the related securities before recovery of their amortized cost basis.

The table below presents the changes in the unrealized credit-related other-than-temporary impairment component of the amortized cost related to available-for-sale securities: (a) that we have written down for other-than-temporary impairment; and (b) for which the credit component of the loss has been recognized in earnings. The credit-related other-than-temporary impairment component of the amortized cost represents the difference between the present value of expected future cash flows, including the estimated proceeds from bond insurance, and the amortized cost basis of the security prior to

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

considering credit losses. The beginning balance represents the other-than-temporary impairment credit loss component related to available-for-sale securities for which other-than-temporary impairment occurred prior to January 1, 2012, but will not be realized until the securities are sold, written off, or mature. Net impairment of available-for-sale securities recognized in earnings is presented as additions in two components based upon whether the current period is: (a) the first time the debt security was credit-impaired; or (b) not the first time the debt security was credit-impaired. The credit loss component is reduced if we sell, intend to sell or believe we will be required to sell previously credit-impaired available-for-sale securities. Additionally, the credit loss component is reduced by the amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security.

**Table 7.5 — Other-Than-Temporary Impairments Related to Credit Losses on Available-For-Sale Securities**

| | Six Months Ended June 30, 2012 |
|---|---|
| | (in millions) |
| Credit-related other-than-temporary impairments on available-for-sale securities recognized in earnings: | |
| Beginning balance — remaining credit losses to be realized on available-for-sale securities held at the beginning of the period where other-than-temporary impairments were recognized in earnings | $   15,988 |
| Additions: | |
| Amounts related to credit losses for which an other-than-temporary impairment was not previously recognized | 40 |
| Amounts related to credit losses for which an other-than-temporary impairment was previously recognized | 622 |
| Reductions: | |
| Amounts related to securities which were sold, written off or matured | (656) |
| Amounts previously recognized in other comprehensive income that were recognized in earnings because we intend to sell the security or it is more likely than not that we will be required to sell the security before recovery of its amortized cost basis | (15) |
| Amounts related to amortization resulting from significant increases in cash flows expected to be collected that are recognized over the remaining life of the security | (116) |
| Ending balance — remaining credit losses to be realized on available-for-sale securities held at period end where other-than-temporary impairments were recognized in earnings | $   15,863 |

**Realized Gains and Losses on Sales of Available-For-Sale Securities**

The table below illustrates the gross realized gains and gross realized losses received from the sale of available-for-sale securities.

**Table 7.6 — Gross Realized Gains and Gross Realized Losses on Sales of Available-For-Sale Securities**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| **Gross realized gains** | | | | |
| Mortgage-related securities: | | | | |
| Freddie Mac | $   34 | $   — | $   34 | $   77 |
| Fannie Mae | 1 | 14 | 13 | 14 |
| Option ARM | 3 | — | 3 | — |
| CMBS | 6 | — | 82 | — |
| Obligations of states and political subdivisions | — | 3 | 1 | 4 |
| Total mortgage-related securities gross realized gains | 44 | 17 | 133 | 95 |
| Non-mortgage-related securities: | | | | |
| Asset-backed securities | — | (2) | — | — |
| Total non-mortgage-related securities gross realized gains | — | (2) | — | — |
| Gross realized gains | 44 | 15 | 133 | 95 |
| **Gross realized losses** | | | | |
| Mortgage related securities:[1] | | | | |
| CMBS | — | (80) | — | (80) |
| Total mortgage-related securities gross realized losses | — | (80) | — | (80) |
| Gross realized losses | — | (80) | — | (80) |
| Net realized gains (losses) | $   44 | $   (65) | $   133 | $   15 |

(1)   These individual sales do not change our conclusion that we do not intend to sell the majority of our remaining mortgage-related securities and it is not more likely than not that we will be required to sell such securities before a recovery of the unrealized losses.

136                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Maturities of Available-For-Sale Securities**

The table below summarizes the remaining contractual maturities of available-for-sale securities.

**Table 7.7 — Maturities of Available-For-Sale Securities**[1]

| June 30, 2012 | Amortized Cost | Fair Value |
|---|---|---|
| | (in millions) | |
| Available-for-sale securities: | | |
| Due within 1 year or less | $ 17 | $ 18 |
| Due after 1 through 5 years | 1,963 | 2,068 |
| Due after 5 through 10 years | 3,253 | 3,436 |
| Due after 10 years | 197,025 | 188,576 |
| Total available-for-sale securities | $ 202,258 | $ 194,098 |

(1) Maturity information provided is based on contractual maturities, which may not represent expected life as obligations underlying these securities may be prepaid at any time without penalty.

**AOCI Related to Available-For-Sale Securities**

The table below presents the changes in AOCI related to available-for-sale securities. The net unrealized holding gains represent the net fair value adjustments recorded on available-for-sale securities throughout the periods presented, after the effects of our federal statutory tax rate of 35%. The net reclassification adjustment for net realized losses represents the amount of those fair value adjustments, after the effects of our federal statutory tax rate of 35%, that have been recognized in earnings due to a sale of an available-for-sale security or the recognition of an impairment loss.

**Table 7.8 — AOCI Related to Available-For-Sale Securities**

| | Six Months Ended June 30, | |
|---|---|---|
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance | $(6,213) | $(9,678) |
| Net unrealized holding gains[1] | 566 | 1,849 |
| Net reclassification adjustment for net realized losses [2][3] | 343 | 995 |
| Ending balance | $(5,304) | $(6,834) |

(1) Net of tax expense of $304 million and $1.0 billion for the six months ended June 30, 2012 and 2011, respectively.
(2) Net of tax benefit of $185 million and $536 million for the six months ended June 30, 2012 and 2011, respectively.
(3) Includes the reversal of previously recorded unrealized losses that have been recognized on our consolidated statements of comprehensive income as impairment losses on available-for-sale securities of $430 million and $1.0 billion, net of taxes, for the six months ended June 30, 2012 and 2011, respectively.

**Trading Securities**

The table below summarizes the estimated fair values by major security type for trading securities.

**Table 7.9 — Trading Securities**

| | June 30, 2012 | December 31, 2011 |
|---|---|---|
| | (in millions) | |
| Mortgage-related securities: | | |
| Freddie Mac | $ 13,600 | $ 16,047 |
| Fannie Mae | 12,546 | 15,165 |
| Ginnie Mae | 147 | 156 |
| Other | 178 | 164 |
| Total mortgage-related securities | 26,471 | 31,532 |
| Non-mortgage-related securities: | | |
| Asset-backed securities | 526 | 302 |
| Treasury bills | 900 | 100 |
| Treasury notes | 18,140 | 24,712 |
| FDIC-guaranteed corporate medium-term notes | 1,399 | 2,184 |
| Total non-mortgage-related securities | 20,965 | 27,298 |
| Total fair value of trading securities | $ 47,436 | $ 58,830 |

137

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Trading securities mainly consist of Treasury securities, agency fixed-rate and variable-rate pass-through mortgage-related securities, and agency REMICs, including inverse floating rate, interest-only and principal-only securities. With the exception of principal-only securities, our agency securities, classified as trading, were at a net premium ( *i.e.*, have higher net fair value than UPB) as of June 30, 2012.

For the three months ended June 30, 2012 and 2011, we recorded net unrealized gains (losses) on trading securities held at those dates of $0.4 billion and $0.2 billion, respectively. For the six months ended June 30, 2012 and 2011, we recorded net unrealized gains (losses) on trading securities held at those dates of $0.8 billion and $10 million, respectively.

Total trading securities include $1.6 billion and $1.9 billion, respectively, of hybrid financial assets as defined by the derivative and hedging accounting guidance regarding certain hybrid financial instruments as of June 30, 2012 and December 31, 2011. Gains (losses) on trading securities on our consolidated statements of comprehensive income include losses of $38 million and $89 million, respectively, related to these hybrid financial securities for the three and six months ended June 30, 2012. Gains (losses) on trading securities include gains (losses) of $11 million and $(30) million related to these trading securities for the three and six months ended June 30, 2011, respectively.

## Collateral Pledged

### Collateral Pledged to Freddie Mac

Our counterparties are required to pledge collateral for securities purchased under agreements to resell transactions, and most derivative instruments are subject to collateral posting thresholds generally related to a counterparty's credit rating. We consider the types of securities being pledged to us as collateral when determining how much we lend related to securities purchased under agreements to resell transactions. Additionally, we subsequently and regularly review the market values of these securities compared to amounts loaned in an effort to minimize our exposure to losses. We had cash and cash equivalents pledged to us related to derivative instruments of $2.4 billion and $3.2 billion at June 30, 2012 and December 31, 2011, respectively. Although it is our practice not to repledge assets held as collateral, a portion of the collateral may be repledged based on master agreements related to our derivative instruments. At June 30, 2012 and December 31, 2011, we did not have collateral in the form of securities pledged to and held by us under these master agreements. Also, at June 30, 2012 and December 31, 2011, we had $5.3 billion and $0 billion, respectively, of securities pledged to us for securities purchased under agreements to resell transactions that we had the right to repledge. From time to time we may obtain pledges of collateral from certain seller/servicers as additional security for certain of their obligations to us, including their obligations to repurchase mortgages sold to us in breach of representations and warranties. This collateral may, at our discretion, take the form of cash, cash equivalents, or agency securities.

In addition, we hold cash and cash equivalents as collateral in connection with certain of our multifamily guarantees and mortgage loans as credit enhancements. The cash and cash equivalents held as collateral related to these transactions at June 30, 2012 and December 31, 2011 was $230 million and $246 million, respectively.

### Collateral Pledged by Freddie Mac

We are required to pledge collateral for margin requirements with third-party custodians in connection with secured financings and derivative transactions with some counterparties. The level of collateral pledged related to our derivative instruments is determined after giving consideration to our credit rating. As of June 30, 2012, we had one secured, uncommitted intraday line of credit with a third party in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs, in connection with our use of the Fedwire system. In certain circumstances, the line of credit agreement gives the secured party the right to repledge the securities underlying our financing to other third parties, including the Federal Reserve Bank. We pledge collateral to meet our collateral requirements under the line of credit agreement upon demand by the counterparty.

The table below summarizes all securities pledged as collateral by us, including assets that the secured party may repledge and those that may not be repledged.

138                                                                                             *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 7.10 — Collateral in the Form of Securities Pledged**

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Securities pledged with the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties [1] | $ 10,361 | $ 10,293 |
| Available-for-sale securities | 166 | 204 |
| Securities pledged without the ability for the secured party to repledge: | | |
| Debt securities of consolidated trusts held by third parties [1] | 69 | 88 |
| Total securities pledged | $ 10,596 | $ 10,585 |

(1) Represents PCs held by us in our Investments segment mortgage investments portfolio and pledged as collateral which are recorded as a reduction to debt securities of consolidated trusts held by third parties on our consolidated balance sheets.

*Securities Pledged with the Ability of the Secured Party to Repledge*

At June 30, 2012, we pledged securities with the ability of the secured party to repledge of $10.5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

At December 31, 2011, we pledged securities with the ability of the secured party to repledge of $10.5 billion, of which $10.5 billion was collateral posted in connection with our secured uncommitted intraday line of credit with a third party as discussed above.

The remaining $17 million and $25 million of collateral posted with the ability of the secured party to repledge at June 30, 2012 and December 31, 2011, respectively, was posted in connection with our margin account related to futures transactions.

*Securities Pledged without the Ability of the Secured Party to Repledge*

At June 30, 2012 and December 31, 2011, we pledged securities, without the ability of the secured party to repledge, of $69 million and $88 million, respectively, at a clearinghouse in connection with the trading and settlement of securities.

*Collateral in the Form of Cash Pledged*

At June 30, 2012, we pledged $11.5 billion of collateral in the form of cash and cash equivalents, of which $11.5 billion related to our derivative agreements as we had $11.6 billion of such derivatives in a net loss position. At December 31, 2011, we pledged $12.7 billion of collateral in the form of cash and cash equivalents, of which $12.6 billion related to our derivative agreements as we had $12.7 billion of such derivatives in a net loss position. The remaining $61 million and $133 million was posted at clearinghouses in connection with our securities transactions at June 30, 2012 and December 31, 2011, respectively.

### NOTE 8: DEBT SECURITIES AND SUBORDINATED BORROWINGS

Debt securities that we issue are classified on our consolidated balance sheets as either debt securities of consolidated trusts held by third parties or other debt. We issue other debt to fund our operations.

Under the Purchase Agreement, without the prior written consent of Treasury, we may not incur indebtedness that would result in the par value of our aggregate indebtedness exceeding 120% of the amount of mortgage assets we are allowed to own on December 31 of the immediately preceding calendar year. Because of this debt limit, we may be restricted in the amount of debt we are allowed to issue to fund our operations. Under the Purchase Agreement, the amount of our "indebtedness" is determined without giving effect to the January 1, 2010 change in the accounting guidance related to transfers of financial assets and consolidation of VIEs. Therefore, "indebtedness" does not include debt securities of consolidated trusts held by third parties. We also cannot become liable for any subordinated indebtedness without the prior consent of Treasury.

Our debt cap under the Purchase Agreement is $874.8 billion in 2012 and will decline to $787.3 billion on January 1, 2013. As of June 30, 2012, we estimate that the par value of our aggregate indebtedness totaled $589.7 billion, which was approximately $285.1 billion below the applicable debt cap. Our aggregate indebtedness is calculated as the par value of other debt.

In the tables below, the categories of short-term debt (due within one year) and long-term debt (due after one year) are based on the original contractual maturity of the debt instruments classified as other debt.

139

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4225

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the interest expense and the balances of total debt, net per our consolidated balance sheets.

### Table 8.1 — Total Debt, Net

| | Interest Expense for the | | | | Balance, Net[1] | |
| | Three Months Ended June 30, | | Six Months Ended June 30, | | June 30, 2012 | December 31, 2011 |
| | 2012 | 2011 | 2012 | 2011 | | |
| | (in millions) | | | | (in millions) | |
| Other debt: | | | | | | |
| Short-term debt | $ 43 | $ 95 | $ 83 | $ 210 | $ 130,100 | $ 161,399 |
| Long-term debt: | | | | | | |
| Senior debt | 2,610 | 3,232 | 5,379 | 6,670 | 451,267 | 498,779 |
| Subordinated debt | 7 | 6 | 14 | 18 | 376 | 368 |
| Total long-term debt | 2,617 | 3,238 | 5,393 | 6,688 | 451,643 | 499,147 |
| Total other debt | 2,660 | 3,333 | 5,476 | 6,898 | 581,743 | 660,546 |
| Debt securities of consolidated trusts held by third parties | 14,625 | 17,261 | 29,878 | 34,664 | 1,468,613 | 1,471,437 |
| Total debt, net | $17,285 | $20,594 | $35,354 | $41,562 | $ 2,050,356 | $ 2,131,983 |

(1) Represents par value, net of associated discounts, premiums, and hedge-related basis adjustments, with $0 billion and $0.2 billion, respectively, of other short-term debt, and $2.2 billion and $2.8 billion, respectively, of other long-term debt that represents the fair value of debt securities with the fair value option elected at June 30, 2012 and December 31, 2011.

During the three months ended June 30, 2012 and 2011, we recognized fair value gains (losses) of $62 million and $(37) million, respectively, on our foreign-currency denominated debt, of which $55 million and $(46) million, respectively, are gains (losses) related to foreign-currency translation. During the six months ended June 30, 2012 and 2011, we recognized fair value gains (losses) of $45 million and $(118) million, respectively, on our foreign-currency denominated debt, of which $36 million and $(163) million, respectively, are gains (losses) related to foreign-currency translation.

### Other Debt

The table below summarizes the balances and effective interest rates for other debt. We had no balances in federal funds purchased and securities sold under agreements to repurchase at either June 30, 2012 or December 31, 2011.

### Table 8.2 — Other Debt

| | June 30, 2012 | | | December 31, 2011 | | |
| | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] | Par Value | Balance, Net[1] | Weighted Average Effective Rate[2] |
| | (dollars in millions) | | | | | |
| Other short-term debt: | | | | | | |
| Reference Bills® securities and discount notes | $ 130,144 | $ 130,100 | 0.14% | $ 161,193 | $ 161,149 | 0.11% |
| Medium-term notes | — | — | — | 250 | 250 | 0.24 |
| Total other short-term debt | 130,144 | 130,100 | 0.14 | 161,443 | 161,399 | 0.11 |
| Other long-term debt: | | | | | | |
| Original maturities on or before December 31, | | | | | | |
| 2012 | 66,035 | 66,039 | 1.91% | 127,798 | 127,776 | 1.79% |
| 2013 | 122,727 | 122,612 | 1.60 | 142,943 | 142,759 | 1.46 |
| 2014 | 83,579 | 83,416 | 1.85 | 87,453 | 87,267 | 1.91 |
| 2015 | 44,720 | 44,676 | 2.24 | 33,897 | 33,870 | 2.89 |
| 2016 | 40,759 | 40,709 | 3.19 | 45,526 | 45,473 | 3.21 |
| Thereafter | 101,717 | 94,191 | 3.23 | 75,254 | 62,002 | 4.58 |
| Total other long-term debt[3] | 459,537 | 451,643 | 2.24 | 512,871 | 499,147 | 2.27 |
| Total other debt | $589,681 | $ 581,743 | | $ 674,314 | $ 660,546 | |

(1) Represents par value, net of associated discounts or premiums and hedge-related basis adjustments.
(2) Represents the weighted average effective rate that remains constant over the life of the instrument, which includes the amortization of discounts or premiums, issuance costs, and hedge-related basis adjustments.
(3) Balance, net for other long-term debt includes callable debt of $89.9 billion and $121.4 billion at June 30, 2012 and December 31, 2011, respectively.

### Debt Securities of Consolidated Trusts Held by Third Parties

Debt securities of consolidated trusts held by third parties represents our liability to third parties that hold beneficial interests in our consolidated securitization trusts (*i.e.*, single-family PC trusts and certain Other Guarantee Transactions).

140

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4226

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below summarizes the debt securities of consolidated trusts held by third parties based on underlying mortgage product type.

**Table 8.3 — Debt Securities of Consolidated Trusts Held by Third Parties**[1]

| | June 30, 2012 | | | | December 31, 2011 | | | |
| | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] | Contractual Maturity[2] | UPB | Balance, Net[3] | Weighted Average Coupon[2] |
| | | (dollars in millions) | | | | (dollars in millions) | | |
| Single-family: | | | | | | | | |
| 30-year or more, fixed-rate | 2012-2048 | $1,010,158 | $1,027,415 | 4.75% | 2012-2048 | $1,034,680 | $1,047,556 | 4.92% |
| 20-year fixed-rate | 2012-2032 | 72,492 | 74,224 | 4.31 | 2012-2032 | 67,323 | 68,502 | 4.53 |
| 15-year fixed-rate | 2012-2027 | 255,971 | 261,178 | 3.83 | 2012-2027 | 242,077 | 246,023 | 4.09 |
| Adjustable-rate | 2013-2042 | 63,680 | 64,781 | 3.02 | 2012-2047 | 60,544 | 61,395 | 3.18 |
| Interest-only[4] | 2026-2041 | 39,064 | 39,128 | 4.64 | 2026-2041 | 45,807 | 45,884 | 4.91 |
| FHA/VA | 2012-2041 | 1,858 | 1,887 | 5.66 | 2012-2041 | 2,045 | 2,077 | 5.67 |
| Total debt securities of consolidated trusts held by third parties[5] | | $1,443,223 | $1,468,613 | | | $1,452,476 | $1,471,437 | |

(1)  Debt securities of consolidated trusts held by third parties are prepayable as the loans that collateralize the debt may prepay without penalty at any time.
(2)  Based on the contractual maturity and interest rate of debt securities of our consolidated trusts held by third parties.
(3)  Represents par value, net of associated discounts, premiums, and other basis adjustments.
(4)  Includes interest-only securities and interest-only mortgage loans that allow the borrowers to pay only interest for a fixed period of time before the loans begin to amortize.
(5)  The effective rate for debt securities of consolidated trusts held by third parties was 3.89% and 4.22% as of June 30, 2012 and December 31, 2011, respectively.

**Lines of Credit**

At both June 30, 2012 and December 31, 2011, we had one secured, uncommitted intraday line of credit with a third party totaling $10 billion. We use this line of credit regularly to provide us with additional liquidity to fund our intraday payment activities through the Fedwire system in connection with the Federal Reserve's payments system risk policy, which restricts or eliminates daylight overdrafts by the GSEs. No amounts were drawn on this line of credit at June 30, 2012 or December 31, 2011. We expect to continue to use the current facility to satisfy our intraday financing needs; however, as the line is uncommitted, we may not be able to draw on it if and when needed.

**Subordinated Debt Interest and Principal Payments**

The terms of certain of our subordinated debt securities provide for us to defer payments of interest in the event we fail to maintain specified capital levels. However, in a September 23, 2008 statement concerning the conservatorship, the Director of FHFA stated that we would continue to make interest and principal payments on our subordinated debt, even if we fail to maintain required capital levels.

### NOTE 9: FINANCIAL GUARANTEES

When we securitize single-family mortgages that we purchase, we issue mortgage-related securities that can be sold to investors or held by us. During the three and six months ended June 30, 2012, we issued approximately $98.0 billion and $206.3 billion, respectively, compared to $61.6 billion and $155.5 billion for the three and six months ended June 30, 2011, respectively, in UPB of Freddie Mac mortgage-related securities backed by single-family mortgage loans (excluding those backed by HFA bonds).

Beginning January 1, 2010, we no longer recognize a financial guarantee for such arrangements as we instead recognize both the mortgage loans and the debt securities of these securitization trusts on our consolidated balance sheets. The table below presents our maximum potential exposure, our recognized liability, and the maximum remaining term of our financial guarantees that are not consolidated on our balance sheets.

141                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 9.1 — Financial Guarantees

| | June 30, 2012 | | | December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term | Maximum Exposure[1] | Recognized Liability | Maximum Remaining Term |
| | (dollars in millions, terms in years) | | | | | |
| Non-consolidated Freddie Mac securities | $ 43,150 | $ 358 | 41 | $ 35,879 | $ 300 | 42 |
| Other guarantee commitments | 23,535 | 506 | 37 | 21,064 | 487 | 37 |
| Derivative instruments | 12,556 | 831 | 33 | 37,737 | 2,977 | 34 |
| Servicing-related premium guarantees | 169 | — | 5 | 151 | — | 5 |

(1)   Maximum exposure represents the contractual amounts that could be lost under the non-consolidated guarantees if counterparties or borrowers defaulted, without consideration of possible recoveries under credit enhancement arrangements, such as recourse provisions, third-party insurance contracts, or from collateral held or pledged. The maximum exposure disclosed above is not representative of the actual loss we are likely to incur, based on our historical loss experience and after consideration of proceeds from related collateral liquidation. The maximum exposure for our liquidity guarantees is not mutually exclusive of our default guarantees on the same securities; therefore, these amounts are included within the maximum exposure of non-consolidated Freddie Mac securities and other guarantee commitments.

### Non-Consolidated Freddie Mac Securities

We issue three types of mortgage-related securities: (a) PCs; (b) REMICs and Other Structured Securities; and (c) Other Guarantee Transactions. We guarantee the payment of principal and interest on these securities, which are backed by pools of mortgage loans, irrespective of the cash flows received from the borrowers. Commencing January 1, 2010, only our guarantees issued to non-consolidated securitization trusts are accounted for in accordance with the accounting guidance for guarantees (*i.e.*, a guarantee asset and guarantee obligation are recognized).

Our single-family securities issued in resecuritizations of our PCs and other previously issued REMICs and Other Structured Securities are not consolidated as they do not give rise to any additional exposure to credit loss as we already consolidate the underlying collateral. The securities issued in these resecuritizations consist of single-class and multiclass securities backed by PCs, REMICs, interest-only strips, and principal-only strips. Since these resecuritizations do not increase our credit-risk, no guarantee asset or guarantee obligation is recognized for these transactions and they are excluded from the table above.

We recognize a guarantee asset, guarantee obligation and a reserve for guarantee losses, as necessary, for securities issued by non-consolidated securitization trusts and other guarantee commitments for which we are exposed to incremental credit risk. Our guarantee obligation represents the recognized liability, net of cumulative amortization, associated with our guarantee of multifamily PCs and certain Other Guarantee Transactions issued to non-consolidated securitization trusts. In addition to our guarantee obligation, we recognize a reserve for guarantee losses, which is included within other liabilities on our consolidated balance sheets, which totaled $238 million and $198 million at June 30, 2012, and December 31, 2011, respectively. For many of the loans underlying our non-consolidated guarantees, there are credit protections from third parties, including subordination, covering a portion of our exposure. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for information about credit protections on loans we guarantee.

During the three and six months ended June 30, 2012, we issued approximately $5.3 billion and $8.4 billion, respectively, compared to $3.8 billion and $6.7 billion for the three and six months ended June 30, 2011, respectively, in UPB of non-consolidated Freddie Mac securities primarily backed by multifamily mortgage loans, for which a guarantee asset and guarantee obligation were recognized.

In connection with transfers of financial assets to non-consolidated securitization trusts that are accounted for as sales and for which we have incremental credit risk, we recognize our guarantee obligation in accordance with the accounting guidance for guarantees. Additionally, we may retain an interest in the transferred financial assets (*e.g.*, a beneficial interest issued by the securitization trust).

### Other Guarantee Commitments

We provide long-term standby commitments to certain of our customers, which obligate us to purchase seriously delinquent loans that are covered by those agreements. During the six months ended June 30, 2012 and 2011, we issued and guaranteed $4.1 billion and $2.5 billion, respectively, in UPB of long-term standby commitments. These other guarantee commitments totaled $11.5 billion and $8.6 billion of UPB at June 30, 2012 and December 31, 2011, respectively. We also had other guarantee commitments on multifamily housing revenue bonds that were issued by HFAs of $9.5 billion and $9.6 billion in UPB at June 30, 2012, and December 31, 2011, respectively. In addition, as of June 30, 2012, and

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4228

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

December 31, 2011, we had issued guarantees under the TCLFP on securities backed by HFA bonds with UPB of $2.5 billion, and $2.9 billion, respectively.

### Derivative Instruments

Derivative instruments include written options, written swaptions, interest-rate swap guarantees, and short-term default guarantee commitments accounted for as credit derivatives. See "NOTE 10: DERIVATIVES" for further discussion of these derivative guarantees.

We guarantee the performance of interest-rate swap contracts in two circumstances. First, we guarantee that a borrower will perform under an interest-rate swap contract linked to a borrower's ARM. And second, in connection with our issuance of certain REMICs and Other Structured Securities, which are backed by tax-exempt bonds, we guarantee that the sponsor of the transaction will perform under the interest-rate swap contract linked to the senior variable-rate certificates that we issued.

We also have issued REMICs and Other Structured Securities with stated final maturities that are shorter than the stated maturity of the underlying mortgage loans. If the underlying mortgage loans to these securities have not been purchased by a third party or fully matured as of the stated final maturity date of such securities, we will sponsor an auction of the underlying assets. To the extent that purchase or auction proceeds are insufficient to cover unpaid principal amounts due to investors in such REMICs and Other Structured Securities, we are obligated to fund such principal. Our maximum exposure on these guarantees represents the outstanding UPB of the REMICs and Other Structured Securities subject to stated final maturities.

### Servicing-Related Premium Guarantees

We provide guarantees to reimburse servicers for premiums paid to acquire servicing in situations where the original seller is unable to perform under its separate servicing agreement. The liability associated with these agreements was not significant at June 30, 2012 and December 31, 2011.

### Other Indemnifications

In connection with certain business transactions, we may provide indemnification to counterparties for claims arising out of breaches of certain obligations (e.g., those arising from representations and warranties) in contracts entered into in the normal course of business. Our assessment is that the risk of any material loss from such a claim for indemnification is remote and there are no significant probable and estimable losses associated with these contracts. In addition, we provided indemnification for litigation defense costs to certain former officers who are subject to ongoing litigation. See "NOTE 17: LEGAL CONTINGENCIES" for further information on ongoing litigation. The recognized liabilities on our consolidated balance sheets related to indemnifications were not significant at June 30, 2012 and December 31, 2011.

As part of the guarantee arrangements pertaining to multifamily housing revenue bonds, we provided commitments to advance funds, commonly referred to as "liquidity guarantees." These guarantees require us to advance funds to enable others to repurchase any tendered tax-exempt and related taxable bonds that are unable to be remarketed. Any such advances are treated as loans and are secured by a pledge to us of the repurchased securities until the securities are remarketed. We hold cash and cash equivalents on our consolidated balance sheets for the amount of these commitments. No advances under these liquidity guarantees were outstanding at June 30, 2012 and December 31, 2011.

### NOTE 10: DERIVATIVES

#### Use of Derivatives

We use derivatives primarily to:

- hedge forecasted issuances of debt;

- synthetically create callable and non-callable funding;

- regularly adjust or rebalance our funding mix in response to changes in the interest-rate characteristics of our mortgage-related assets; and

- hedge foreign-currency exposure.

<div align="center">143</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Hedge Forecasted Debt Issuances

When we commit to purchase mortgage investments, such commitments are typically for a future settlement ranging from two weeks to three months after the date of the commitment. To facilitate larger and more predictable debt issuances that contribute to lower funding costs, we use interest-rate derivatives to economically hedge the interest-rate risk exposure from the time we commit to purchase a mortgage to the time the related debt is issued.

### Create Synthetic Funding

We also use derivatives to synthetically create the substantive economic equivalent of various debt funding structures. For example, the combination of a series of short-term debt issuances over a defined period and a pay-fixed interest rate swap with the same maturity as the last debt issuance is the substantive economic equivalent of a long-term fixed-rate debt instrument of comparable maturity. Similarly, the combination of non-callable debt and a call swaption, or option to enter into a receive-fixed interest rate swap, with the same maturity as the non-callable debt, is the substantive economic equivalent of callable debt. These derivatives strategies increase our funding flexibility and allow us to better match asset and liability cash flows, often reducing overall funding costs.

### Adjust Funding Mix

We generally use interest-rate swaps to mitigate contractual funding mismatches between our assets and liabilities. We also use swaptions and other option-based derivatives to adjust the contractual terms of our debt funding in response to changes in the expected lives of our investments in mortgage-related assets. As market conditions dictate, we take rebalancing actions to keep our interest-rate risk exposure within management-set limits. In a declining interest-rate environment, we typically enter into receive-fixed interest rate swaps or purchase Treasury-based derivatives to shorten the duration of our funding to offset the declining duration of our mortgage assets. In a rising interest-rate environment, we typically enter into pay-fixed interest rate swaps or sell Treasury-based derivatives in order to lengthen the duration of our funding to offset the increasing duration of our mortgage assets.

### Foreign-Currency Exposure

We use foreign-currency swaps to eliminate virtually all of our exposure to fluctuations in exchange rates related to our foreign-currency denominated debt by entering into swap transactions that effectively convert foreign-currency denominated obligations into U.S. dollar-denominated obligations. Foreign-currency swaps are defined as swaps in which net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

## Types of Derivatives

We principally use the following types of derivatives:

- LIBOR- and Euribor-based interest-rate swaps;
- LIBOR- and Treasury-based options (including swaptions);
- LIBOR- and Treasury-based exchange-traded futures; and
- Foreign-currency swaps.

In addition to swaps, futures, and purchased options, our derivative positions include the following:

### Written Options and Swaptions

Written call and put swaptions are sold to counterparties allowing them the option to enter into receive- and pay-fixed interest rate swaps, respectively. Written call and put options on mortgage-related securities give the counterparty the right to execute a contract under specified terms, which generally occurs when we are in a liability position. We use these written options and swaptions to manage convexity risk over a wide range of interest rates. Written options lower our overall hedging costs, allow us to hedge the same economic risk we assume when selling guaranteed final maturity REMICs with a more liquid instrument, and allow us to rebalance the options in our callable debt and REMICs portfolios. We may, from time to time, write other derivative contracts such as interest-rate futures.

144                                                                                        *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Commitments

We routinely enter into commitments that include our: (a) commitments to purchase and sell investments in securities; (b) commitments to purchase mortgage loans; and (c) commitments to purchase and extinguish or issue debt securities of our consolidated trusts. Most of these commitments are considered derivatives and therefore are subject to the accounting guidance for derivatives and hedging.

### Swap Guarantee Derivatives

In connection with some of the guarantee arrangements pertaining to multifamily housing revenue bonds and multifamily pass-through certificates, we may also guarantee the sponsor's or the borrower's obligations as a counterparty on any related interest-rate swaps used to mitigate interest-rate risk, which are accounted for as swap guarantee derivatives.

### Credit Derivatives

We entered into credit-risk sharing agreements for certain credit enhanced multifamily housing revenue bonds held by third parties in exchange for a monthly fee. In addition, we have purchased mortgage loans containing debt cancellation contracts, which provide for mortgage debt or payment cancellation for borrowers who experience unanticipated losses of income dependent on a covered event. The rights and obligations under these agreements have been assigned to the servicers. However, in the event the servicer does not perform as required by contract, under our guarantee, we would be obligated to make the required contractual payments.

For a discussion of our significant accounting policies related to derivatives, please see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Derivatives" in our 2011 Annual Report.

<div align="center">145</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Derivative Assets and Liabilities at Fair Value

The table below presents the location and fair value of derivatives reported on our consolidated balance sheets.

### Table 10.1 — Derivative Assets and Liabilities at Fair Value

| | At June 30, 2012 | | | At December 31, 2011 | | |
|---|---|---|---|---|---|---|
| | Notional or Contractual Amount | Derivatives at Fair Value | | Notional or Contractual Amount | Derivatives at Fair Value | |
| | | Assets[1] | Liabilities[1] | | Assets[1] | Liabilities[1] |
| | | | (in millions) | | | |
| **Total derivative portfolio** | | | | | | |
| *Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[2]* | | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed | $ 260,428 | $14,852 | $ (25) | $ 211,808 | $ 12,998 | $ (108) |
| Pay-fixed | 292,660 | — | (34,726) | 289,335 | 19 | (34,507) |
| Basis (floating to floating) | 2,350 | 5 | (1) | 2,750 | 5 | (7) |
| Total interest-rate swaps | 555,438 | 14,857 | (34,752) | 503,893 | 13,022 | (34,622) |
| Option-based: | | | | | | |
| Call swaptions | | | | | | |
| Purchased | 48,500 | 9,616 | — | 76,275 | 12,975 | — |
| Written | 6,195 | — | (789) | 27,525 | — | (2,932) |
| Put Swaptions | | | | | | |
| Purchased | 45,050 | 334 | — | 70,375 | 638 | — |
| Written | 250 | — | (1) | 500 | — | (2) |
| Other option-based derivatives[3] | 33,492 | 2,400 | (1) | 38,549 | 2,256 | (2) |
| Total option-based | 133,487 | 12,350 | (791) | 213,224 | 15,869 | (2,936) |
| Futures | 39,938 | — | (6) | 41,281 | 5 | — |
| Commitments | 13,032 | 47 | (12) | 14,318 | 38 | (94) |
| Foreign-currency swaps | 1,123 | 49 | (21) | 1,722 | 106 | (9) |
| Credit derivatives | 9,272 | 2 | (5) | 10,190 | 1 | (5) |
| Swap guarantee derivatives | 3,622 | — | (36) | 3,621 | — | (37) |
| Total derivatives not designated as hedging instruments | 755,912 | 27,305 | (35,623) | 788,249 | 29,041 | (37,703) |
| Netting adjustments[4] | | (27,137) | 35,287 | | (28,923) | 37,268 |
| Total derivative portfolio, net | $ 755,912 | $ 168 | $ (336) | $ 788,249 | $ 118 | $ (435) |

(1) The value of derivatives on our consolidated balance sheets is reported as derivative assets, net and derivative liabilities, net.
(2) See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.
(3) Primarily includes purchased interest-rate caps and floors.
(4) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.1 billion and $0 million, respectively, at June 30, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(0.9) billion and $(1.1) billion at June 30, 2012 and December 31, 2011, respectively, which was mainly related to interest-rate swaps that we have entered into.

The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable and net trade/settle receivable or payable and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net asset position are reported as derivative assets, net. Similarly, derivatives in a net liability position are reported as derivative liabilities, net. Cash collateral we obtained from counterparties to derivative contracts that has been offset against derivative assets at June 30, 2012 and December 31, 2011 were $2.4 billion and $3.2 billion, respectively. Cash collateral we posted to counterparties to derivative contracts that has been offset against derivative liabilities at June 30, 2012 and December 31, 2011 was $11.5 billion and $12.6 billion, respectively. We are subject to collateral posting thresholds based on the credit rating of our long-term senior unsecured debt securities from S&P or Moody's. The lowering or withdrawal of our credit rating by S&P or Moody's may increase our obligation to post collateral, depending on the amount of the counterparty's exposure to Freddie Mac with respect to the derivative transactions.

The aggregate fair value of all derivative instruments with credit-risk-related contingent features that were in a liability position on June 30, 2012, was $11.6 billion for which we posted collateral of $11.5 billion in the normal course of business. If the credit-risk-related contingent features underlying these agreements were triggered on June 30, 2012, we would be required to post an additional $0.1 billion of collateral to our counterparties.

At June 30, 2012 and December 31, 2011, there were no amounts of cash collateral that were not offset against derivative assets, net or derivative liabilities, net, as applicable. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for further information related to our derivative counterparties.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    TREASURY-4232                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Gains and Losses on Derivatives**

The table below presents the gains and losses on derivatives reported in our consolidated statements of comprehensive income.

**Table 10.2 — Gains and Losses on Derivatives**

|  | Amount of Gain or (Loss) Reclassified from AOCI into Earnings (Effective Portion) | | | |
| --- | --- | --- | --- | --- |
| Derivatives in Cash Flow Hedging Relationships[1][2] | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Closed cash flow hedges[3] | $ (158) | $ (201) | $ (323) | $ (398) |

|  | Derivative Gains (Losses)[4] | | | |
| --- | --- | --- | --- | --- |
| Derivatives not designated as hedging instruments under the accounting guidance for derivatives and hedging[5] | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| Interest-rate swaps: | | | | |
| Receive-fixed | | | | |
| Foreign-currency denominated | $ (10) | $ (3) | $ (15) | $ (40) |
| U.S. dollar denominated | 5,454 | 3,561 | 2,871 | 1,357 |
| Total receive-fixed swaps | 5,444 | 3,558 | 2,856 | 1,317 |
| Pay-fixed | (7,953) | (7,307) | (4,161) | (3,344) |
| Basis (floating to floating) | 3 | — | 7 | 1 |
| Total interest-rate swaps | (2,506) | (3,749) | (1,298) | (2,026) |
| Option based: | | | | |
| Call swaptions | | | | |
| Purchased | 2,538 | 2,026 | 1,344 | 1,342 |
| Written | (447) | (196) | (77) | (158) |
| Put swaptions | | | | |
| Purchased | (188) | (355) | (222) | (477) |
| Written | 4 | — | 6 | 7 |
| Other option-based derivatives[6] | 369 | 127 | 148 | 81 |
| Total option-based | 2,276 | 1,602 | 1,199 | 795 |
| Futures | 136 | (99) | 71 | (140) |
| Foreign-currency swaps[7] | (56) | 47 | (47) | 156 |
| Commitments | 229 | (257) | 172 | (421) |
| Credit derivatives | — | — | — | 1 |
| Swap guarantee derivatives | 1 | 1 | 3 | 2 |
| Subtotal | 80 | (2,455) | 100 | (1,633) |
| Accrual of periodic settlements:[8] | | | | |
| Receive-fixed interest-rate swaps[9] | 864 | 1,066 | 1,643 | 2,312 |
| Pay-fixed interest-rate swaps | (1,828) | (2,428) | (3,686) | (4,932) |
| Foreign-currency swaps | 1 | 6 | 4 | 10 |
| Other | 1 | 4 | 1 | 9 |
| Total accrual of periodic settlements | (962) | (1,352) | (2,038) | (2,601) |
| Total | $ (882) | $ (3,807) | $(1,938) | $(4,234) |

(1)   Derivatives that meet specific criteria may be accounted for as cash flow hedges. Net deferred gains and losses on closed cash flow hedges (i.e., where the derivative is either terminated or redesignated) are also included in AOCI until the related forecasted transaction affects earnings or is determined to be probable of not occurring.

(2)   No amounts of gains or (losses) were recognized in AOCI on derivatives (effective portion) and in other income (ineffective portion and amount excluded from effectiveness testing).

(3)   Amounts reported in AOCI linked to interest payments on long-term debt are recorded in other debt interest expense and amounts not linked to interest payments on long-term debt are recorded in expense related to derivatives.

(4)   Gains (losses) are reported as derivative gains (losses) on our consolidated statements of comprehensive income.

(5)   See "Use of Derivatives" for additional information about the purpose of entering into derivatives not designated as hedging instruments and our overall risk management strategies.

(6)   Primarily includes purchased interest-rate caps and floors.

(7)   Foreign-currency swaps are defined as swaps in which the net settlement is based on one leg calculated in a foreign-currency and the other leg calculated in U.S. dollars.

(8)   For derivatives not in qualifying hedge accounting relationships, the accrual of periodic cash settlements is recorded in derivative gains (losses) on our consolidated statements of comprehensive income.

(9)   Includes imputed interest on zero-coupon swaps.

147

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Hedge Designation of Derivatives**

At June 30, 2012 and December 31, 2011, we did not have any derivatives in hedge accounting relationships; however, there are deferred net losses recorded in AOCI related to closed cash flow hedges. As shown in "Table 10.3 — AOCI Related to Cash Flow Hedge Relationships," the total AOCI related to derivatives designated as cash flow hedges was a loss of $1.5 billion and $2.0 billion at June 30, 2012 and 2011, respectively, composed of deferred net losses on closed cash flow hedges. Closed cash flow hedges involve derivatives that have been terminated or are no longer designated as cash flow hedges. Fluctuations in prevailing market interest rates have no effect on the deferred portion of AOCI relating to losses on closed cash flow hedges.

The previous deferred amount related to closed cash flow hedges remains in our AOCI balance and will be recognized into earnings over the expected time period for which the forecasted transactions affect earnings. Over the next 12 months, we estimate that approximately $370 million, net of taxes, of the $1.5 billion of cash flow hedge losses in AOCI at June 30, 2012 will be reclassified into earnings. The maximum remaining length of time over which we have hedged the exposure related to the variability in future cash flows on forecasted transactions, primarily forecasted debt issuances, is 22 years. However, over 70% and 90% of AOCI relating to closed cash flow hedges at June 30, 2012 will be reclassified to earnings over the next five and ten years, respectively.

The table below presents the changes in AOCI related to derivatives designated as cash flow hedges. Net reclassifications of losses to earnings represents the AOCI amount that was recognized in earnings as the originally hedged forecasted transactions affected earnings, unless it was deemed probable that the forecasted transaction would not occur. If it is probable that the forecasted transaction will not occur, then the deferred gain or loss associated with the hedge related to the forecasted transaction would be reclassified into earnings immediately.

**Table 10.3 — AOCI Related to Cash Flow Hedge Relationships**

| | Six Months Ended June 30, | |
| --- | --- | --- |
| | 2012 | 2011 |
| | (in millions) | |
| Beginning balance[1] | $ (1,730) | $(2,239) |
| Net reclassifications of losses to earnings [2] | 218 | 267 |
| Ending balance[1] | $(1,512) | $(1,972) |

(1)   Represents net deferred gains and losses on closed (i.e., terminated or redesignated) cash flow hedges.
(2)   Net of tax benefit of $105 million and $131 million for the six months ended June 30, 2012 and 2011, respectively.

### NOTE 11: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)

**Senior Preferred Stock**

We received $19 million in June 2012 pursuant to draw requests that FHFA submitted to Treasury on our behalf to address the deficits in our net worth as of March 31, 2012. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS — Government Support for our Business" for additional information. The aggregate liquidation preference on the senior preferred stock owned by Treasury was $72.3 billion and $72.2 billion as of June 30, 2012 and December 31, 2011, respectively. See "NOTE 14: REGULATORY CAPITAL" for additional information.

**Stock-Based Compensation**

We did not repurchase or issue any of our common shares or non-cumulative preferred stock during the six months ended June 30, 2012, except for issuances of treasury stock as reported on our consolidated statements of equity (deficit) relating to stock-based compensation granted prior to conservatorship. Common stock delivered under these stock-based compensation plans consists of treasury stock or shares acquired in market transactions on behalf of the participants. During the six months ended June 30, 2012, restrictions lapsed on 460,846 restricted stock units, all of which were granted prior to conservatorship. For a discussion regarding our stock-based compensation plans, see "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report.

For purposes of the earnings-per-share calculation, all stock-based compensation plan options outstanding at June 30, 2012 and 2011 were out of the money and excluded from the computation of dilutive potential common shares for the six months ended June 30, 2012 and 2011, respectively. The weighted average common shares outstanding for the period

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

includes the weighted average number of shares that are associated with the warrant for our common stock issued to Treasury pursuant to the Purchase Agreement.

**Dividends Declared During 2012**

No common dividends have been declared in 2012. In March 2012 and June 2012, we paid dividends of $1.8 billion and $1.8 billion respectively, in cash on the senior preferred stock at the direction of our Conservator. We did not declare or pay dividends on any other series of Freddie Mac preferred stock outstanding during the six months ended June 30, 2012.

## NOTE 12: INCOME TAXES

**Income Tax Benefit**

For the three months ended June 30, 2012 and 2011, we reported an income tax benefit of $76 million and $232 million, respectively, resulting in effective tax rates of (2.6)% and 9.8%, respectively. For the six months ended June 30, 2012 and 2011, we reported an income tax benefit of $90 million and $306 million, respectively, resulting in effective tax rates of (2.6)% and 17.3%, respectively. For the three and six months ended June 30, 2012, the decrease in the income tax benefit and the effective tax rate compared to the comparable periods of 2011 is primarily due to the carryback of income tax losses from 2008 and 2009 to prior years, the amortization of net deferred losses on pre-2008 closed cash flow hedges, and an offsetting expense for alternative minimum tax.

**Deferred Tax Assets, Net**

Our valuation allowance decreased by $989 million to $34.7 billion during the six months ended June 30, 2012 primarily due to a decrease in deferred tax assets. After consideration of the valuation allowance, we had a net deferred tax asset of $3.1 billion, primarily representing the tax effect of unrealized losses on our available-for-sale securities. We continue to be in a tax loss carryforward position.

***IRS Examinations and Unrecognized Tax Benefits***

We believe appropriate reserves have been provided for settlement on reasonable terms related to questions of timing and potential penalties raised by the IRS during examinations of the 1998 to 2007 tax years regarding our tax accounting method for certain hedging transactions. However, changes could occur in the balance of unrecognized tax benefits within the next 12 months that could have a material impact on income tax expense in the period the issue is resolved if the outcome reached is not in our favor and the assessment is in excess of the amount currently reserved. We received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. A Tax Court trial date was scheduled for November 13, 2012; however, on June 7, 2012 the Tax Court granted a joint motion for continuance in order for both parties to explore settlement options.

The IRS is currently auditing our income tax returns for tax years 2008 through 2010. Although the audit has not concluded, on July 25, 2012 the IRS advised us that they would not challenge certain deductions in those years. Therefore, the balance of unrecognized tax benefits will decrease by $367 million in the third quarter of 2012. The change in the balance of the unrecognized tax benefits will have a positive impact on the effective tax rate due to the reversal of the valuation allowance established against the deferred tax asset created by the uncertain tax position. This favorable impact will be offset by a $101 million tax expense related to the establishment of a valuation allowance against credits that have been carried forward. A valuation allowance has not been recorded against this amount because the unrecognized tax benefits were used as a source of taxable income in our realization assessment of our net deferred tax assets. We believe appropriate reserves have been provided for all income tax uncertainties.

For additional information, see "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" and "NOTE 13: INCOME TAXES" in our 2011 Annual Report.

## NOTE 13: SEGMENT REPORTING

We evaluate segment performance and allocate resources based on a Segment Earnings approach, subject to the conduct of our business under the direction of the Conservator. See "NOTE 2: CONSERVATORSHIP AND RELATED MATTERS" for additional information about the conservatorship.

149

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We present Segment Earnings by: (a) reclassifying certain investment-related activities and credit guarantee-related activities between various line items on our GAAP consolidated statements of comprehensive income; and (b) allocating certain revenues and expenses, including certain returns on assets and funding costs, and all administrative expenses to our three reportable segments. These reclassifications and allocations are described in "NOTE 14: SEGMENT REPORTING" in our 2011 Annual Report.

We do not consider our assets by segment when evaluating segment performance or allocating resources. We conduct our operations solely in the U.S. and its territories. Therefore, we do not generate any revenue from geographic locations outside of the U.S. and its territories.

<div align="center">150</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Segments**

Our operations consist of three reportable segments, which are based on the type of business activities each performs — Investments, Single-family Guarantee, and Multifamily. The chart below provides a summary of our three reportable segments and the All Other category. As reflected in the chart, certain activities that are not part of a reportable segment are included in the All Other category. The All Other category consists of material corporate level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. By recording these types of activities to the All Other category, we believe the financial results of our three reportable segments reflect the decisions and strategies that are executed within the reportable segments and provide greater comparability across time periods.

| Segment | Description | Activities/Items |
|---|---|---|
| Investments | The Investments segment reflects results from our investment, funding and hedging activities. In our Investments segment, we invest principally in mortgage-related securities and single-family performing mortgage loans that are funded by other debt issuances and hedged using derivatives. In our Investments segment, we also provide funding and hedging management services to the Single-family Guarantee and Multifamily segments. The Investments segment reflects changes in the fair value of the Multifamily segment CMBS and held-for-sale loans that are associated with changes in interest rates. Segment Earnings for this segment consist primarily of the returns on these investments, less the related funding, hedging, and administrative expenses. | • Investments in mortgage-related securities and single-family performing mortgage loans<br>• Investments in asset-backed securities<br>• All other traded instruments / securities, excluding CMBS and multifamily housing revenue bonds<br>• Debt issuances<br>• All asset / liability management returns<br>• Guarantee buy-ups / buy-downs, net of execution gains / losses<br>• Cash and liquidity management<br>• Deferred tax asset valuation allowance<br>• Allocated administrative expenses and taxes |
| Single-Family Guarantee | The Single-family Guarantee segment reflects results from our single-family credit guarantee activities. In our Single-family Guarantee segment, we purchase single-family mortgage loans originated by our seller/servicers in the primary mortgage market. In most instances, we use the mortgage securitization process to package the purchased mortgage loans into guaranteed mortgage-related securities. We guarantee the payment of principal and interest on the mortgage-related securities in exchange for management and guarantee fees. Segment Earnings for this segment consist primarily of management and guarantee fee revenues, including amortization of upfront fees, less credit-related expenses, administrative expenses, allocated funding costs, and amounts related to net float benefits or expenses. | • Management and guarantee fees on PCs, including those retained by us, and single-family mortgage loans in the mortgage investments portfolio, inclusive of up-front credit delivery fees<br>• Recognition and remittance to Treasury of guarantee fees resulting from the 10 basis point legislated increase<br>• Adjustments for security performance<br>• Credit losses on all single-family assets<br>• Expected net float income or expense on the single-family credit guarantee portfolio<br>• Deferred tax asset valuation allowance<br>• Allocated debt costs, administrative expenses and taxes |
| Multifamily | The Multifamily segment reflects results from our investment (both purchases and sales), securitization, and guarantee activities in multifamily mortgage loans and securities. Although we hold multifamily mortgage loans and non-agency CMBS that we purchased for investment, our purchases of such multifamily mortgage loans for investment have declined significantly since 2010, and our purchases of CMBS have declined significantly since 2008. The only CMBS that we have purchased since 2008 have been senior, mezzanine, and interest-only tranches related to certain of our securitization transactions, and these purchases have not been significant. Currently, our primary business strategy is to purchase multifamily mortgage loans for aggregation and then securitization. We guarantee the senior tranches of these securitizations in Other Guarantee Transactions. Our Multifamily segment also issues Other Structured Securities, but does not issue REMIC securities. Our Multifamily segment also enters into other guarantee commitments for multifamily HFA bonds and housing revenue bonds held by third parties. Segment Earnings for this segment consist primarily of the interest earned on assets related to multifamily investment activities and management and guarantee fee income, less credit-related expenses, administrative expenses, and allocated funding costs. In addition, the Multifamily segment reflects gains on sale of mortgages and the impact of changes in fair value of CMBS and held-for-sale loans associated only with market factors other than changes in interest rates, such as liquidity and credit. | • Multifamily mortgage loans held-for-sale and associated securitization activities<br>• Investments in CMBS, multifamily housing revenue bonds, and multifamily mortgage loans held-for-investment<br>• Allocated debt costs, administrative expenses and taxes<br>• Other guarantee commitments on multifamily HFA bonds and housing revenue bonds<br>• LIHTC and valuation allowance<br>• Deferred tax asset valuation allowance |
| All Other | The All Other category consists of material corporate-level expenses that are: (a) infrequent in nature; and (b) based on management decisions outside the control of the management of our reportable segments. | • Tax settlements, as applicable<br>• Legal settlements, as applicable<br>• The deferred tax asset valuation allowance associated with previously recognized income tax credits carried forward. |

*Freddie Mac*

**TREASURY-4237**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Segment Earnings

The financial performance of our Single-family Guarantee segment and Multifamily segment are measured based on each segment's contribution to GAAP net income (loss). Our Investments segment is measured on its contribution to GAAP comprehensive income (loss), which consists of the sum of its contribution to: (a) GAAP net income (loss); and (b) GAAP total other comprehensive income (loss), net of taxes.

The sum of Segment Earnings for each segment and the All Other category equals GAAP net income (loss). Likewise, the sum of comprehensive income (loss) for each segment and the All Other category equals GAAP comprehensive income (loss). However, the accounting principles we apply to present certain financial statement line items in Segment Earnings for our reportable segments, in particular Segment Earnings net interest income and management and guarantee income, differ significantly from those applied in preparing the comparable line items in our consolidated financial statements prepared in accordance with GAAP. Accordingly, the results of such line items differ significantly from, and should not be used as a substitute for, the comparable line items as determined in accordance with GAAP. For reconciliations of the Segment Earnings line items to the comparable line items in our consolidated financial statements prepared in accordance with GAAP, see "Table 13.2 — Segment Earnings and Reconciliation to GAAP Results."

### Segment Adjustments

In presenting Segment Earnings net interest income and management and guarantee income, we make adjustments to better reflect how management measures and assesses the performance of each segment and the company as a whole. These adjustments relate to amounts that, effective January 1, 2010, are no longer reflected in net income (loss) as determined in accordance with GAAP as a result of the adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. These adjustments are reversed through the segment adjustments line item within Segment Earnings, so that Segment Earnings (loss) for each segment equals GAAP net income (loss) for each segment. Segment adjustments consist of the following:

- We adjust our Segment Earnings net interest income for the Investments segment to include the amortization of cash premiums and discounts and buy-up and buy-down fees on the consolidated Freddie Mac mortgage-related securities we purchase as investments. As of June 30, 2012, the unamortized balance of such premiums and discounts and buy-up and buy-down fees was $1.8 billion. These adjustments are necessary to reflect the economic yield realized on investments in consolidated Freddie Mac mortgage-related securities purchased at a premium or discount or with buy-up or buy-down fees.

- We adjust our Segment Earnings management and guarantee income for the Single-family Guarantee segment to include the amortization of delivery fees recorded in periods prior to the January 1, 2010 adoption of accounting guidance for the transfers of financial assets and the consolidation of VIEs. As of June 30, 2012, the unamortized balance of such fees was $1.8 billion. We consider such fees to be part of the effective rate of the guarantee fee on guaranteed mortgage loans. This adjustment is necessary in order to better reflect the realization of revenue associated with guarantee contracts over the life of the underlying loans.

152   *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents Segment Earnings by segment.

**Table 13.1 — Summary of Segment Earnings and Comprehensive Income (Loss)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
|  | 2012 | 2011 | 2012 | 2011 |
|  | (in millions) | | | |
| Segment Earnings (loss), net of taxes: |  |  |  |  |
| Investments | $ 2,468 | $ 10 | $ 4,096 | $ 2,147 |
| Single-family Guarantee | 241 | (2,386) | (1,434) | (4,206) |
| Multifamily | 318 | 200 | 942 | 559 |
| All Other | (7) | 37 | (7) | 37 |
| Total Segment Earnings (loss), net of taxes | 3,020 | (2,139) | 3,597 | (1,463) |
| Net income (loss) | $ 3,020 | $ (2,139) | $ 3,597 | $(1,463) |
| Comprehensive income (loss) of segments: |  |  |  |  |
| Investments | $ 2,495 | $ 643 | $4,458 | $ 3,906 |
| Single-family Guarantee | 242 | (2,385) | (1,456) | (4,209) |
| Multifamily | 162 | 605 | 1,686 | 1,906 |
| All Other | (7) | 37 | (7) | 37 |
| Comprehensive income (loss) of segments | 2,892 | (1,100) | 4,681 | 1,640 |
| Comprehensive income (loss) | $ 2,892 | $ (1,100) | $4,681 | $ 1,640 |

153                                                                 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents detailed reconciliations between our GAAP financial statements and Segment Earnings by financial statement line item for our reportable segments and All Other.

**Table 13.2 — Segment Earnings and Reconciliation to GAAP Results**

Three Months Ended June 30, 2012

(in millions)

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 1,559 | $ (1) | $ 330 | $ — | $ 1,888 | $ 2,334 | $ 164 | $ 2,498 | $ 4,386 |
| (Provision) benefit for credit losses | | (462) | 22 | — | (440) | 285 | | 285 | (155) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 1,026 | 36 | — | 1,062 | (821) | (192) | (1,013) | 49 |
| Net impairment of available-for-sale securities recognized in earnings | (14) | — | (19) | — | (33) | (65) | | (65) | (98) |
| Derivative gains (losses) | 236 | — | 5 | — | 241 | (1,123) | | (1,123) | (882) |
| Gains (losses) on trading securities | (413) | — | 13 | — | (400) | — | | — | (400) |
| Gains (losses) on sale of mortgage loans | 6 | — | 38 | — | 44 | — | | — | 44 |
| Gains (losses) on mortgage loans recorded at fair value | 257 | — | (56) | — | 201 | — | | — | 201 |
| Other non-interest income (loss) | 673 | 171 | 101 | — | 945 | (610) | | (610) | 335 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (108) | (232) | (61) | — | (401) | — | | — | (401) |
| REO operations expense | — | 34 | (4) | — | 30 | — | | — | 30 |
| Other non-interest expense | — | (82) | (83) | — | (165) | — | | — | (165) |
| Segment adjustments[2] | 164 | (192) | — | — | (28) | | 28 | 28 | — |
| Income tax (expense) benefit | 108 | (21) | (4) | (7) | 76 | — | | — | 76 |
| Net income (loss) | 2,468 | 241 | 318 | (7) | 3,020 | — | | — | 3,020 |
| Total other comprehensive income (loss), net of taxes | 27 | 1 | (156) | — | (128) | — | | — | (128) |
| Comprehensive income (loss) | $ 2,495 | $ 242 | $ 162 | $ (7) | $ 2,892 | $ — | $ — | $ — | $ 2,892 |

Six Months Ended June 30, 2012

(in millions)

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Net interest income | $ 3,322 | $ (33) | $ 648 | $ — | $ 3,937 | $ 4,630 | $ 319 | $ 4,949 | $ 8,886 |
| (Provision) benefit for credit losses | | (2,646) | 41 | — | (2,605) | 625 | | 625 | (1,980) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 2,037 | 69 | — | 2,106 | (1,624) | (388) | (2,012) | 94 |
| Net impairment of available-for-sale securities recognized in earnings | (510) | — | (35) | — | (545) | (117) | | (117) | (662) |
| Derivative gains (losses) | 436 | — | 4 | — | 440 | (2,378) | | (2,378) | (1,938) |
| Gains (losses) on trading securities | (811) | — | 34 | — | (777) | — | | — | (777) |
| Gains (losses) on sale of mortgage loans | (8) | — | 92 | — | 84 | — | | — | 84 |
| Gains (losses) on mortgage loans recorded at fair value | 219 | — | 121 | — | 340 | — | | — | 340 |
| Other non-interest income (loss) | 1,186 | 352 | 190 | — | 1,728 | (1,136) | | (1,136) | 592 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (200) | (425) | (113) | — | (738) | — | | — | (738) |
| REO operations expense | — | (138) | (3) | — | (141) | — | | — | (141) |
| Other non-interest expense | — | (155) | (98) | — | (253) | — | | — | (253) |
| Segment adjustments[2] | 319 | (388) | — | — | (69) | | 69 | 69 | — |
| Income tax (expense) benefit | 143 | (38) | (8) | (7) | 90 | — | | — | 90 |
| Net income (loss) | 4,096 | (1,434) | 942 | (7) | 3,597 | — | | — | 3,597 |
| Total other comprehensive income (loss), net of taxes | 362 | (20) | 744 | — | 1,084 | — | | — | 1,084 |
| Comprehensive income (loss) | $ 4,458 | $ (1,456) | $ 1,686 | $ (7) | $ 4,681 | $ — | $ — | $ — | $ 4,681 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Three Months Ended June 30, 2011**

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (Loss), Net of Taxes | Reconciliation to Consolidated Statements of Comprehensive Income | | | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | |
| | | | | | | (in millions) | | | |
| Net interest income | $ 1,826 | $ (30) | $ 304 | $ — | $ 2,100 | $ 2,335 | $ 126 | $ 2,461 | $ 4,561 |
| (Provision) benefit for credit losses | — | (2,886) | 13 | — | (2,873) | 344 | — | 344 | (2,529) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 848 | 30 | — | 878 | (694) | (143) | (837) | 41 |
| Net impairment of available-for-sale securities recognized in earnings | (139) | — | (182) | — | (321) | (31) | — | (31) | (352) |
| Derivative gains (losses) | (2,156) | — | 2 | — | (2,154) | (1,653) | — | (1,653) | (3,807) |
| Gains (losses) on trading securities | 256 | — | 18 | — | 274 | — | — | — | 274 |
| Gains (losses) on sale of mortgage loans | 4 | — | 157 | — | 161 | — | — | — | 161 |
| Gains (losses) on mortgage loans recorded at fair value | 167 | — | (31) | — | 136 | — | — | — | 136 |
| Other non-interest income (loss) | (184) | 208 | (33) | — | (9) | (301) | — | (301) | (310) |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (101) | (228) | (55) | — | (384) | — | — | — | (384) |
| REO operations income (expense) | — | (35) | 8 | — | (27) | — | — | — | (27) |
| Other non-interest expense | (1) | (106) | (28) | — | (135) | — | — | — | (135) |
| Segment adjustments[2] | 126 | (143) | — | — | (17) | — | 17 | 17 | — |
| Income tax (expense) benefit | 212 | (14) | (3) | 37 | 232 | — | — | — | 232 |
| Net income (loss) | 10 | (2,386) | 200 | 37 | (2,139) | — | — | — | (2,139) |
| Total other comprehensive income, net of taxes | 633 | 1 | 405 | — | 1,039 | — | — | — | 1,039 |
| Comprehensive income (loss) | $ 643 | $ (2,385) | $ 605 | $ 37 | $ (1,100) | $ — | $ — | $ — | $ (1,100) |

**Six Months Ended June 30, 2011**

| | Investments | Single-family Guarantee | Multifamily | All Other | Total Segment Earnings (loss), Net of Taxes | Reconciliation to Consolidated Statements of Comprehensive Income | | | Total per Consolidated Statements of Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Reclassifications[1] | Segment Adjustments[2] | Total Reconciling Items | |
| | | | | | | (in millions) | | | |
| Net interest income | $ 3,479 | $ 70 | $ 583 | $ — | $ 4,132 | $ 4,640 | $ 329 | $ 4,969 | $ 9,101 |
| (Provision) benefit for credit losses | — | (5,170) | 73 | — | (5,097) | 579 | — | 579 | (4,518) |
| Non-interest income (loss): | | | | | | | | | |
| Management and guarantee income[3] | — | 1,718 | 58 | — | 1,776 | (1,369) | (328) | (1,697) | 79 |
| Net impairment of available-for-sale securities recognized in earnings | (1,168) | — | (317) | — | (1,485) | (60) | — | (60) | (1,545) |
| Derivative gains (losses) | (1,053) | — | 4 | — | (1,049) | (3,185) | — | (3,185) | (4,234) |
| Gains (losses) on trading securities | 22 | — | 52 | — | 74 | — | — | — | 74 |
| Gains (losses) on sale of mortgage loans | 16 | — | 240 | — | 256 | — | — | — | 256 |
| Gains (losses) on mortgage loans recorded at fair value | 84 | — | 19 | — | 103 | — | — | — | 103 |
| Other non-interest income (loss) | 357 | 419 | (13) | — | 763 | (605) | — | (605) | 158 |
| Non-interest expense: | | | | | | | | | |
| Administrative expenses | (196) | (443) | (106) | — | (745) | — | — | — | (745) |
| REO operations income (expense) | — | (292) | 8 | — | (284) | — | — | — | (284) |
| Other non-interest expense | (1) | (172) | (41) | — | (214) | — | — | — | (214) |
| Segment adjustments[2] | 329 | (328) | — | — | 1 | — | (1) | (1) | — |
| Income tax (expense) benefit | 278 | (8) | (1) | 37 | 306 | — | — | — | 306 |
| Net income (loss) | 2,147 | (4,206) | 559 | 37 | (1,463) | — | — | — | (1,463) |
| Total other comprehensive income (loss), net of taxes | 1,759 | (3) | 1,347 | — | 3,103 | — | — | — | 3,103 |
| Comprehensive income (loss) | $ 3,906 | $ (4,209) | $ 1,906 | $ 37 | $ 1,640 | $ — | $ — | $ — | $ 1,640 |

(1)   See "NOTE 14: SEGMENT REPORTING — Segment Earnings — *Investment Activity-Related Reclassifications*" and "— *Credit Guarantee Activity-Related Reclassifications*" in our 2011 Annual Report for information regarding these reclassifications.

(2)   See "Segment Earnings — *Segment Adjustments*" for additional information regarding these adjustments.

(3)   Management and guarantee income total per consolidated statements of comprehensive income is included in other income on our GAAP consolidated statements of comprehensive income.

155

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below presents comprehensive income (loss) by segment.

## Table 13.3 — Comprehensive Income (Loss) of Segments

| | Three Months Ended June 30, 2012 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,468 | $ (81) | $ 107 | $ 1 | $ 27 | $ 2,495 |
| Single-family Guarantee | 241 | — | — | 1 | 1 | 242 |
| Multifamily | 318 | (157) | — | 1 | (156) | 162 |
| All Other | (7) | — | — | — | — | (7) |
| Total per consolidated statements of comprehensive income | $ 3,020 | $ (238) | $ 107 | $ 3 | $ (128) | $ 2,892 |

| | Six Months Ended June 30, 2012 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 4,096 | $ 161 | $ 218 | $ (17) | $ 362 | $ 4,458 |
| Single-family Guarantee | (1,434) | — | — | (22) | (22) | (1,456) |
| Multifamily | 942 | 748 | — | (4) | 744 | 1,686 |
| All Other | (7) | — | — | — | — | (7) |
| Total per consolidated statements of comprehensive income | $ 3,597 | $ 909 | $ 218 | $ (43) | $ 1,084 | $ 4,681 |

| | Three Months Ended June 30, 2011 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 10 | $ 498 | $ 135 | $ — | $ 633 | $ 643 |
| Single-family Guarantee | (2,386) | — | — | 1 | 1 | (2,385) |
| Multifamily | 200 | 405 | — | — | 405 | 605 |
| All Other | 37 | — | — | — | — | 37 |
| Total per consolidated statements of comprehensive income | $ (2,139) | $ 903 | $ 135 | $ 1 | $ 1,039 | $ (1,100) |

| | Six Months Ended June 30, 2011 | | | | | |
| | | Other Comprehensive Income (Loss), Net of Taxes | | | | |
| | Net Income (Loss) | Changes in Unrealized Gains (Losses) Related to Available-For-Sale Securities | Changes in Unrealized Gains (Losses) Related to Cash Flow Hedge Relationships | Changes in Defined Benefit Plans | Total Other Comprehensive Income (Loss), Net of Taxes | Comprehensive Income (Loss) |
|---|---|---|---|---|---|---|
| | | | (in millions) | | | |
| Total comprehensive income (loss) of segments: | | | | | | |
| Investments | $ 2,147 | $ 1,497 | $ 266 | $ (4) | $ 1,759 | $ 3,906 |
| Single-family Guarantee | (4,206) | — | — | (3) | (3) | (4,209) |
| Multifamily | 559 | 1,347 | 1 | (1) | 1,347 | 1,906 |
| All Other | 37 | — | — | — | — | 37 |
| Total per consolidated statements of comprehensive income | $ (1,463) | $ 2,844 | $ 267 | $ (8) | $ 3,103 | $ 1,640 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          TREASURY-4242          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## NOTE 14: REGULATORY CAPITAL

On October 9, 2008, FHFA announced that it was suspending capital classification of us during conservatorship in light of the Purchase Agreement. FHFA continues to closely monitor our capital levels, but the existing statutory and FHFA-directed regulatory capital requirements are not binding during conservatorship. We continue to provide our submission to FHFA on minimum capital, however we no longer provide our submission of risk-based capital to FHFA.

Our regulatory minimum capital is a leverage-based measure that is generally calculated based on GAAP and reflects a 2.50% capital requirement for on-balance sheet assets and 0.45% capital requirement for off-balance sheet obligations. Based upon our adoption of amendments to the accounting guidance for transfers of financial assets and consolidation of VIEs, we determined that, under the new consolidation guidance, we are the primary beneficiary of trusts that issue our single-family PCs and certain Other Guarantee Transactions and, therefore, effective January 1, 2010, we consolidated on our balance sheet the assets and liabilities of these trusts. Pursuant to regulatory guidance from FHFA, our minimum capital requirement was not automatically affected by adoption of these amendments. Specifically, upon adoption of these amendments, FHFA directed us, for purposes of minimum capital, to continue reporting single-family PCs and certain Other Guarantee Transactions held by third parties using a 0.45% capital requirement. FHFA reserves the authority under the GSE Act to raise the minimum capital requirement for any of our assets or activities. The table below summarizes our minimum capital requirements and deficits and net worth.

### Table 14.1 — Net Worth and Minimum Capital

| | June 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | | (in millions) | | |
| GAAP net worth[1] | $ | 1,086 | $ | (146) |
| Core capital (deficit)[2][3] | $ | (64,339) | $ | (64,322) |
| Less: Minimum capital requirement[2] | | 22,701 | | 24,405 |
| Minimum capital surplus (deficit)[2] | $ | (87,040) | $ | (88,727) |

(1)  Net worth (deficit) represents the difference between our assets and liabilities under GAAP.

(2)  Core capital and minimum capital figures for June 30, 2012 are estimates. FHFA is the authoritative source for our regulatory capital.

(3)  Core capital excludes certain components of GAAP total equity (deficit) ( *i.e.*, AOCI and the liquidation preference of the senior preferred stock) as these items do not meet the statutory definition of core capital.

Following our entry into conservatorship and consistent with the objectives of conservatorship, we have focused our risk and capital management on, among other things, maintaining a positive balance of GAAP equity in order to reduce the likelihood that we will need to make additional draws on the Purchase Agreement with Treasury. The Purchase Agreement provides that, if FHFA determines as of quarter end that our liabilities have exceeded our assets under GAAP, Treasury will contribute funds to us in an amount at least equal to the difference between such liabilities and assets.

Under the GSE Act, FHFA must place us into receivership if FHFA determines in writing that our assets are and have been less than our obligations for a period of 60 days. FHFA has notified us that the measurement period for any mandatory receivership determination with respect to our assets and obligations would commence no earlier than the SEC public filing deadline for our quarterly or annual financial statements and would continue for 60 calendar days after that date. FHFA has advised us that, if, during that 60-day period, we receive funds from Treasury in an amount at least equal to the deficiency amount under the Purchase Agreement, the Director of FHFA will not make a mandatory receivership determination. If funding has been requested under the Purchase Agreement to address a deficit in our net worth, and Treasury is unable to provide us with such funding within the 60-day period specified by FHFA, FHFA would be required to place us into receivership if our assets remain less than our obligations during that 60-day period.

At June 30, 2012, our assets exceeded our liabilities under GAAP; therefore there is no need for a draw request from Treasury under the Purchase Agreement. As of June 30, 2012, our aggregate funding received from Treasury under the Purchase Agreement was $71.3 billion. This aggregate funding amount does not include the initial $1.0 billion liquidation preference of senior preferred stock that we issued to Treasury in September 2008 as an initial commitment fee and for which no cash was received. We paid quarterly dividends of $1.8 billion on the senior preferred stock in cash in both March 2012 and June 2012 at the direction of the Conservator. Our annual cash dividend obligation to Treasury on the senior preferred stock is $7.2 billion, which exceeds our annual historical earnings in all but one period.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4243

Table of Contents

## NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS

**Single-family Credit Guarantee Portfolio**

Our business activity is to participate in and support the residential mortgage market in the United States, which we pursue by both issuing guaranteed mortgage securities and investing in mortgage loans and mortgage-related securities.

The table below summarizes the concentration by year of origination and geographical area of the approximately $1.7 trillion UPB of our single-family credit guarantee portfolio at both June 30, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES" in our 2011 Annual Report and "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" and "NOTE 7: INVESTMENTS IN SECURITIES" for more information about credit risk associated with loans and mortgage-related securities that we hold.

**Table 15.1 — Concentration of Credit Risk — Single-Family Credit Guarantee Portfolio**

| | June 30, 2012 | | December 31, 2011 | | Percent of Credit Losses[1] Six Months Ended June 30, | |
| | Percentage of Portfolio[2] | Serious Delinquency Rate | Percentage of Portfolio[2] | Serious Delinquency Rate | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Year of Origination | | | | | | |
| 2012 | 9% | <0.1% | N/A | N/A | —% | N/A |
| 2011 | 16 | 0.1 | 14% | 0.1% | <1 | —% |
| 2010 | 17 | 0.4 | 19 | 0.3 | 1 | — |
| 2009 | 15 | 0.7 | 18 | 0.5 | 2 | 1 |
| 2008 | 6 | 6.3 | 7 | 5.7 | 9 | 8 |
| 2007 | 9 | 12.1 | 10 | 11.6 | 36 | 37 |
| 2006 | 6 | 11.2 | 7 | 10.8 | 26 | 29 |
| 2005 | 7 | 6.8 | 8 | 6.5 | 17 | 17 |
| 2004 and prior | 15 | 3.0 | 17 | 2.8 | 9 | 8 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| Region[3] | | | | | | |
| West | 28% | 3.3% | 28% | 3.6% | 44% | 56% |
| Northeast | 25 | 3.6 | 25 | 3.4 | 8 | 7 |
| North Central | 18 | 2.7 | 18 | 2.9 | 19 | 15 |
| Southeast | 17 | 5.3 | 17 | 5.5 | 24 | 18 |
| Southwest | 12 | 1.7 | 12 | 1.8 | 5 | 4 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |
| State[4] | | | | | | |
| California | 16% | 3.0% | 16% | 3.4% | 24% | 32% |
| Florida | 6 | 10.7 | 6 | 10.9 | 16 | 12 |
| Illinois | 5 | 4.5 | 5 | 4.7 | 8 | 4 |
| Georgia | 3 | 3.0 | 3 | 3.3 | 4 | 4 |
| Michigan | 3 | 2.1 | 3 | 2.3 | 4 | 5 |
| Arizona | 2 | 3.6 | 2 | 4.3 | 8 | 12 |
| Nevada | 1 | 8.9 | 1 | 9.8 | 7 | 6 |
| All other | 64 | 2.8 | 64 | 2.8 | 29 | 25 |
| Total | 100% | 3.5% | 100% | 3.6% | 100% | 100% |

(1) Credit losses consist of the aggregate amount of charge-offs, net of recoveries, and REO operations expense in each of the respective periods and exclude foregone interest on non-performing loans and other market-based losses recognized on our consolidated statements of comprehensive income.

(2) Based on the UPB of our single-family credit guarantee portfolio, which includes unsecuritized single-family mortgage loans held by us on our consolidated balance sheets and those underlying Freddie Mac mortgage-related securities, or covered by our other guarantee commitments.

(3) Region designation: West (AK, AZ, CA, GU, HI, ID, MT, NV, OR, UT, WA); Northeast (CT, DE, DC, MA, ME, MD, NH, NJ, NY, PA, RI, VT, VA, WV); North Central (IL, IN, IA, MI, MN, ND, OH, SD, WI); Southeast (AL, FL, GA, KY, MS, NC, PR, SC, TN, VI); Southwest (AR, CO, KS, LA, MO, NE, NM, OK, TX, WY).

(4) States presented are those with the highest percentage of credit losses during the six months ended June 30, 2012. Our top seven states based on the highest percentage of UPB as of June 30, 2012 are: California (16%), Florida (6%), Illinois (5%), New York (5%), Texas (4%), New Jersey (4%), and Virginia (4%), which collectively comprised 44% of our single-family credit guarantee portfolio as of June 30, 2012.

**Credit Performance of Certain Higher Risk Single-Family Loan Categories**

Participants in the mortgage market often characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. However, there is no universally

158 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

accepted definition of subprime or Alt-A. Although we discontinued new purchases of mortgage loans with lower documentation standards for assets or income beginning March 1, 2009 (or later, as our customers' contracts permitted), we continued to purchase certain amounts of these mortgages in cases where the loan was either: (a) purchased pursuant to a previously issued other guarantee commitment; (b) part of our relief refinance mortgage initiative; or (c) in another refinance mortgage initiative and the pre-existing mortgage (including Alt-A loans) was originated under less than full documentation standards. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as Alt-A in the table below because the new refinance loan replacing the original loan would not be identified by the seller/servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred.

Although we do not categorize single-family mortgage loans we purchase or guarantee as prime or subprime, we recognize that there are a number of mortgage loan types with certain characteristics that indicate a higher degree of credit risk. For example, a borrower's credit score is a useful measure for assessing the credit quality of the borrower. Statistically, borrowers with higher credit scores are more likely to repay or have the ability to refinance than those with lower scores.

Presented below is a summary of the serious delinquency rates of certain higher-risk categories (based on characteristics of the loan at origination) of single-family loans in our single-family credit guarantee portfolio. The table includes a presentation of each higher risk category in isolation. A single loan may fall within more than one category (for example, an interest-only loan may also have an original LTV ratio greater than 90%). Loans with a combination of these attributes will have an even higher risk of delinquency than those with an individual attribute.

**Table 15.2 — Certain Higher-Risk Categories in the Single-Family Credit Guarantee Portfolio** [1]

| | Percentage of Portfolio[1] | | Serious Delinquency Rate | |
|---|---|---|---|---|
| | June 30, 2012 | December 31, 2011 | June 30, 2012 | December 31, 2011 |
| Interest-only | 4% | 4% | 17.1% | 17.6% |
| Option ARM[2] | <1 | <1 | 18.5 | 20.5 |
| Alt-A[3] | 5 | 5 | 11.7 | 11.9 |
| Original LTV ratio greater than 90%[4] | 11 | 10 | 5.8 | 6.7 |
| Lower FICO scores at origination (less than 620) | 3 | 3 | 12.5 | 12.9 |

(1) Based on UPB.
(2) Loans within the option ARM category continue to remain in that category following modification, even though the modified loan no longer provides for optional payment provisions.
(3) Alt-A loans may not include those loans that were previously classified as Alt-A and that have been refinanced as either a relief refinance mortgage or in another refinance mortgage initiative.
(4) Based on our first lien exposure on the property. The LTV ratio considers the credit-enhanced portion of the loan and excludes any secondary financing by third parties. The existence of a second lien reduces the borrower's equity in the property and, therefore, increases the risk of default. Includes HARP loans. Our purchases of HARP loans are required as part of our participation in the MHA Program.

The percentage of borrowers in our single-family credit guarantee portfolio, based on UPB, with estimated current LTV ratios greater than 100% was 18% and 20% at June 30, 2012 and December 31, 2011, respectively. As estimated current LTV ratios increase, the borrower's equity in the home decreases, which negatively affects the borrower's ability to refinance or to sell the property for an amount at or above the balance of the outstanding mortgage loan. The serious delinquency rate for single-family loans with estimated current LTV ratios greater than 100% was 12.9% and 12.8% as of June 30, 2012 and December 31, 2011, respectively. Loans originated in the years of 2005 through 2008 have been more affected by declines in home prices since 2006 than loans originated in other years. Loans originated in 2005 through 2008 comprised approximately 28% of our single-family credit guarantee portfolio, based on UPB at June 30, 2012, and these loans accounted for approximately 88% and 91% of our credit losses during the six months ended June 30, 2012 and 2011, respectively.

We categorize our investments in non-agency mortgage-related securities as subprime, option ARM, or Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM, CMBS, obligations of states and political subdivisions, and manufactured housing securities as either subprime or Alt-A securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on these categories and other concentrations in our investments in securities.

159                                                                                                                                *Freddie Mac*

TREASURY-4245

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Multifamily Mortgage Portfolio**

The table below summarizes the concentration of multifamily mortgages in our multifamily mortgage portfolio by certain attributes. Information presented for multifamily mortgage loans includes certain categories based on loan or borrower characteristics present at origination. The table includes a presentation of each category in isolation. A single loan may fall within more than one category (for example, a non-credit enhanced loan may also have an original LTV ratio greater than 80%).

**Table 15.3 — Concentration of Credit Risk — Multifamily Mortgage Portfolio**

| | June 30, 2012 | | December 31, 2011 | |
|---|---|---|---|---|
| | UPB | Delinquency Rate[1] | UPB | Delinquency Rate[1] |
| | (in billions) | | | |
| State[2] | | | | |
| California | $ 21.0 | 0.14% | $ 20.2 | 0.02% |
| Texas | 14.7 | 0.50 | 14.0 | 0.46 |
| New York | 10.1 | 0.10 | 9.6 | — |
| Florida | 7.8 | — | 7.1 | 0.05 |
| Virginia | 6.4 | — | 6.3 | — |
| Georgia | 5.9 | 1.40 | 5.6 | 1.99 |
| All other states | 55.5 | 0.24 | 53.3 | 0.14 |
| Total | $121.4 | 0.27% | $116.1 | 0.22% |
| Region[3] | | | | |
| Northeast | $ 34.3 | 0.09% | $ 33.1 | 0.01% |
| West | 31.0 | 0.16 | 29.9 | 0.07 |
| Southwest | 23.6 | 0.55 | 22.4 | 0.44 |
| Southeast | 22.2 | 0.44 | 20.7 | 0.65 |
| North Central | 10.3 | 0.20 | 10.0 | 0.01 |
| Total | $121.4 | 0.27% | $116.1 | 0.22% |
| Category[4] | | | | |
| Original LTV ratio greater than 80% | $ 6.1 | 2.64% | $ 6.4 | 2.34% |
| Original DSCR below 1.10 | 2.7 | 2.35 | 2.8 | 2.58 |
| Non-credit enhanced loans | 81.9 | 0.19 | 84.5 | 0.11 |

(1)   Based on the UPB of multifamily mortgages two monthly payments or more delinquent or in foreclosure.
(2)   Represents the six states with the highest geographic concentration by UPB at June 30, 2012.
(3)   See endnote (3) to "Table 15.1 — Concentration of Credit Risk — Single-family Credit Guarantee Portfolio" for a description of these regions.
(4)   These categories are not mutually exclusive and a loan in one category may also be included within another category.

One indicator of risk for mortgage loans in our multifamily mortgage portfolio is the amount of a borrower's equity in the underlying property. A borrower's equity in a property decreases as the LTV ratio increases. Higher LTV ratios negatively affect a borrower's ability to refinance or sell a property for an amount at or above the balance of the outstanding mortgage. The DSCR is another indicator of future credit performance. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

Our multifamily mortgage portfolio includes certain loans for which we have credit enhancement. Credit enhancement can significantly reduce our exposure to a potential credit loss. As of June 30, 2012, approximately one-half of the multifamily loans that were two monthly payments or more past due, based on UPB, had credit enhancements that we currently believe will mitigate our expected losses on those loans. See "NOTE 4: MORTGAGE LOANS AND LOAN LOSS RESERVES" for additional information about credit enhancements on multifamily loans.

We estimate that the percentage of loans in our multifamily mortgage portfolio with a current LTV ratio of greater than 100% was approximately 5% at both June 30, 2012 and December 31, 2011, and our estimate of the current average DSCR for these loans was 1.1 at both dates. We estimate that the percentage of loans in our multifamily mortgage portfolio with a current DSCR less than 1.0 was 4% and 5% at June 30, 2012 and December 31, 2011, respectively, and the average current LTV ratio of these loans was 111% and 107%, respectively. Our estimates of current DSCRs are based on the latest available income information for these properties and our assessments of market conditions. Our estimates of the current LTV ratios for multifamily loans are based on values we receive from a third-party service provider as well as our internal estimates of property value, for which we may use changes in tax assessments, market vacancy rates, rent growth and comparable property sales in local areas as well as third-party appraisals for a portion of the portfolio. We periodically perform our own

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                         Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

valuations or obtain third-party appraisals in cases where a significant deterioration in a borrower's financial condition has occurred, the borrower has applied for refinancing, or in certain other circumstances where we deem it appropriate to reassess the property value. Although we use the most recently available financial results of our multifamily borrowers to estimate a property's value, there may be a significant lag in reporting, which could be six months or more, as they complete their financial results in the normal course of business. Our internal estimates of property valuation are derived using techniques that include income capitalization, discounted cash flows, sales comparables, or replacement costs.

**Non-Agency Mortgage-Related Security Issuers**

At the direction of our Conservator, we are working to enforce our rights as an investor with respect to the non-agency mortgage-related securities we hold, and are engaged in efforts to mitigate losses on our investments in these securities, in some cases in conjunction with other investors. Many of the parties from which we seek recovery under these efforts are also our seller/servicers.

In 2011, FHFA, as Conservator for Freddie Mac and Fannie Mae, filed lawsuits against 18 corporate families of financial institutions and related defendants seeking to recover losses and damages sustained by Freddie Mac and Fannie Mae as a result of their investments in certain residential non-agency mortgage-related securities issued or sold by these financial institutions or control persons thereof. During 2012, FHFA, as Conservator for Freddie Mac, has filed actions in New York state court that raise additional state law claims related to some of the securities that were the subject of FHFA's 2011 lawsuits. These new claims were raised on behalf of the relevant securitization trusts, and relate to breaches of representations and warranties with respect to loans underlying the securities. It is too early to determine the likelihood of success of these lawsuits. See "NOTE 16: CONCENTRATION OF CREDIT AND OTHER RISKS" in our 2011 Annual Report for further information.

**Seller/Servicers**

We acquire a significant portion of our single-family mortgage purchase volume from several large seller/servicers with whom we have entered into mortgage purchase volume commitments that provide for the lenders to deliver us up to a certain volume of mortgages during a specified period of time. Our top 10 single-family seller/servicers provided approximately 77% of our single-family purchase volume during the six months ended June 30, 2012. Wells Fargo Bank, N.A., U.S. Bank, N.A., and JPMorgan Chase Bank, N.A., accounted for 28%, 12%, and 10%, respectively, of our single-family mortgage purchase volume and were the only single-family seller/servicers that comprised 10% or more of our purchase volume during the six months ended June 30, 2012. We are exposed to the risk that we could lose purchase volume to the extent these arrangements are terminated without replacement from other lenders.

We are exposed to institutional credit risk arising from the potential insolvency or non-performance by our seller/servicers of their obligations to repurchase mortgages or (at our option) indemnify us in the event of: (a) breaches of the representations and warranties they made when they sold the mortgages to us; or (b) failure to comply with our servicing requirements. Our contracts require that a seller/servicer repurchase a mortgage after we issue a repurchase request, unless the seller/servicer avails itself of an appeals process provided for in our contracts, in which case the deadline for repurchase is extended until we decide the appeal. As of June 30, 2012 and December 31, 2011, the UPB of loans subject to our repurchase requests issued to our single-family seller/servicers was approximately $2.9 billion and $2.7 billion, and approximately 40% and 39% of these requests, respectively, were outstanding for more than four months since issuance of our initial repurchase request as measured by the UPB of the loans subject to the requests (these figures included repurchase requests for which appeals were pending). As of June 30, 2012, two of our largest seller/servicers had aggregate repurchase requests outstanding, based on UPB, of $1.4 billion, and approximately 57% of these requests were outstanding for four months or more since issuance of the initial request. During the three and six months ended June 30, 2012, we recovered amounts that covered losses with respect to $1.1 billion and $2.0 billion, respectively, of UPB on loans subject to our repurchase requests.

Residential Capital LLC ("ResCap") and a number of its subsidiaries, including GMAC Mortgage, LLC and Residential Funding Company, LLC (with GMAC Mortgage, LLC, collectively, "GMAC"), filed for bankruptcy in the U.S. Bankruptcy Court for the Southern District of New York on May 14, 2012. ResCap and GMAC are direct or indirect subsidiaries of Ally Financial Inc. GMAC serviced (either as a servicer or a subservicer) approximately 3% of our single-family mortgage loans as of June 30, 2012. In connection with the bankruptcy filing, the bankruptcy court approved a package of servicing assurances designed to provide comfort that GMAC will continue to maintain the existing quality of its servicing during the bankruptcy case, and that we will have the right to transfer our loans to another servicer in the event that GMAC fails to meet

161

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

certain servicing quality criteria. The primary purpose of the bankruptcy is to effect the sale and transfer of the GMAC origination and servicing platform, including servicing rights with respect to Freddie Mac loans, free and clear of liens and claims in an auction sale supervised by the bankruptcy court. The auction is currently scheduled for November 5, 2012. The transfer of servicing is subject to the consent of Freddie Mac and other parties.

In March 2010, we entered into an agreement with GMAC under which GMAC made a one-time payment to us for the partial release of repurchase obligations relating to loans sold to us prior to January 1, 2009. The partial release does not affect any of GMAC's potential repurchase obligations for loans sold to us by GMAC after January 1, 2009, nor does it affect the ability to recover amounts associated with failure to comply with our servicing requirements. GMAC's obligations under the partial release were guaranteed by GMAC Inc. (now known as Ally Financial Inc.). We continued to purchase loans from GMAC after January 1, 2009; Ally Bank (a subsidiary of Ally Financial Inc.) is liable for breaches of representations and warranties with respect to these loans. We have evaluated our remaining potential exposure for repurchase obligations relating to loans sold to us by GMAC prior to January 1, 2009, and we believe the impact on our consolidated results of operations will not be significant.

The ultimate amounts of recovery payments we receive from seller/servicers may be significantly less than the amount of our estimates of potential exposure to losses related to their obligations. Our estimate of probable incurred losses for exposure to seller/servicers for their repurchase obligations is considered in our allowance for loan losses as of June 30, 2012 and December 31, 2011. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Allowance for Loan Losses and Reserve for Guarantee Losses" in our 2011 Annual Report for further information. We believe we have appropriately provided for these exposures, based upon our estimates of incurred losses, in our loan loss reserves at June 30, 2012 and December 31, 2011; however, our actual losses may exceed our estimates.

We are also exposed to the risk that seller/servicers might fail to service mortgages in accordance with our contractual requirements, resulting in increased credit losses. For example, our seller/servicers have an active role in our loss mitigation efforts, including under the servicing alignment initiative and the MHA Program, and therefore, we have exposure to them to the extent a decline in their performance results in a failure to realize the anticipated benefits of our loss mitigation plans.

A significant portion of our single-family mortgage loans are serviced by several large seller/servicers. Our top three single-family loan servicers, Wells Fargo Bank N.A., JPMorgan Chase Bank, N.A., and Bank of America N.A. serviced approximately 26%, 12%, and 11%, respectively, of our single-family mortgage loans, as of June 30, 2012 and together serviced approximately 49% of our single-family mortgage loans. Since we do not have our own servicing operation, if our servicers lack appropriate process controls, experience a failure in their controls, or experience an operating disruption in their ability to service mortgage loans, it could have an adverse impact on our business and financial results.

As of June 30, 2012 our top three multifamily servicers, Berkadia Commercial Mortgage LLC, Wells Fargo Bank, N.A., and CBRE Capital Markets, Inc., each serviced more than 10% of our multifamily mortgage portfolio and together serviced approximately 41% of our multifamily mortgage portfolio.

**Mortgage Insurers**

We have institutional credit risk relating to the potential insolvency of, or non-performance by, mortgage insurers that insure single-family mortgages we purchase or guarantee. As of June 30, 2012, these insurers provided coverage, with maximum loss limits of $48.2 billion, for $218.5 billion of UPB, in connection with our single-family credit guarantee portfolio. Our top five mortgage insurer counterparties, Mortgage Guaranty Insurance Corporation (or "MGIC"), Radian Guaranty Inc., Genworth Mortgage Insurance Corporation, United Guaranty Residential Insurance Co., and PMI Mortgage Insurance Co. each accounted for more than 10% and collectively represented approximately 85% of our overall mortgage insurance coverage at June 30, 2012. All our mortgage insurance counterparties are rated BBB or below as of July 25, 2012, based on the lower of the S&P or Moody's rating scales and stated in terms of the S&P equivalent.

We and MGIC are involved in litigation concerning our current and future claims under certain of MGIC's pool insurance policies. We believe that our pool insurance policies with MGIC provide us with the right to obtain recoveries for losses up to specified aggregate limits. However, MGIC's interpretation of these policies would result in claims coverage approximately $0.5 billion lower than the amount of coverage outstanding determined under our interpretation of the policies. See "NOTE 17: LEGAL CONTINGENCIES" for further information.

<div align="center">162</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We received proceeds of $1.0 billion and $1.3 billion during the six months ended June 30, 2012 and 2011, respectively, from our primary and pool mortgage insurance policies for recovery of losses on our single-family loans. We had outstanding receivables from mortgage insurers of $1.7 billion and $1.8 billion as of June 30, 2012 and December 31, 2011, respectively. The balance of our outstanding accounts receivable from mortgage insurers, net of associated reserves, was approximately $0.8 billion and $1.0 billion as of June 30, 2012, and December 31, 2011, respectively.

## Bond Insurers

Bond insurance, which may be either primary or secondary policies, is a credit enhancement covering some of the non-agency mortgage-related securities we hold. Primary policies are acquired by the securitization trust issuing the securities we purchase, while secondary policies are acquired by us. At June 30, 2012, the remaining contractual limit for reimbursement of losses under such policies was $9.3 billion. At June 30, 2012, our top five bond insurers, Ambac Assurance Corporation (or Ambac), Financial Guaranty Insurance Company (or FGIC), MBIA Insurance Corp., Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corp., each accounted for more than 10% of our overall bond insurance coverage and collectively represented approximately 99% of our total coverage.

We evaluate the expected recovery from primary bond insurance policies as part of our impairment analysis for our investments in securities. FGIC and Ambac are currently not paying any claims. In addition, if a bond insurer fails to meet its obligations on our investments in securities, then the fair values of our securities may further decline, which could have a material adverse effect on our results and financial condition. We recognized other-than-temporary impairment losses during 2012 and 2011 related to investments in mortgage-related securities covered by bond insurance as a result of our uncertainty over whether or not certain insurers would be able to pay our future claims on expected credit losses on the securities. See "NOTE 7: INVESTMENTS IN SECURITIES" for further information on our evaluation of impairment on securities covered by bond insurance.

## Cash and Other Investments Counterparties

We are exposed to institutional credit risk arising from the potential insolvency or non-performance of counterparties of non-mortgage-related investment agreements and cash equivalent transactions, including those entered into on behalf of our securitization trusts. These financial instruments are investment grade at the time of purchase and primarily short-term in nature, which mitigates institutional credit risk for these instruments.

Our cash and other investment counterparties are primarily major financial institutions and the Federal Reserve Bank. As of June 30, 2012 and December 31, 2011, including amounts related to our consolidated VIEs, there were $68.3 billion and $68.5 billion, respectively, of cash and securities purchased under agreements to resell invested in financial instruments with institutional counterparties or deposited with the Federal Reserve Bank. As of June 30, 2012, these included:

- $2.1 billion of cash equivalents invested in five counterparties that had short-term credit ratings of A-1 or above on the S&P or equivalent scale;

- $35.9 billion of securities purchased under agreements to resell with seven counterparties that had short-term S&P ratings of A-1;

- $3.0 billion of securities purchased under agreements to resell with one counterparty that had a short-term S&P rating of A-2; and

- $26.2 billion of cash deposited with the Federal Reserve Bank (as a non-interest-bearing deposit).

## Derivative Portfolio

### Derivative Counterparties

Our use of exchange-traded derivatives and OTC derivatives exposes us to institutional credit risk. The requirement that we post initial and maintenance margin with our clearing firm in connection with exchange-traded derivatives such as futures contracts exposes us to institutional credit risk in the event that our clearing firm or the exchange's clearinghouse fail to meet their obligations. However, the use of exchange-traded derivatives lessens our institutional credit risk exposure to individual counterparties because a central counterparty is substituted for individual counterparties, and changes in the value of open exchange-traded contracts are settled daily via payments made through the financial clearinghouse established by each exchange. OTC derivatives, however, expose us to institutional credit risk to individual counterparties because transactions are executed and settled between us and each counterparty, exposing us to potential losses if a counterparty fails to meet its contractual obligations.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                      Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Our use of OTC interest-rate swaps, option-based derivatives, and foreign-currency swaps is subject to rigorous internal credit and legal reviews. All of our OTC derivatives counterparties are major financial institutions and are experienced participants in the OTC derivatives market.

On an ongoing basis, we review the credit fundamentals of all of our OTC derivative counterparties to confirm that they continue to meet our internal standards. We assign internal ratings, credit capital, and exposure limits to each counterparty based on quantitative and qualitative analysis, which we update and monitor on a regular basis. We conduct additional reviews when market conditions dictate or certain events affecting an individual counterparty occur.

### Master Netting and Collateral Agreements

We use master netting and collateral agreements to reduce our credit risk exposure to our active OTC derivative counterparties for interest-rate swaps, option-based derivatives, and foreign-currency swaps. Master netting agreements provide for the netting of amounts receivable and payable from an individual counterparty, which reduces our exposure to a single counterparty in the event of default. On a daily basis, the market value of each counterparty's derivatives outstanding is calculated to determine the amount of our net credit exposure, which is equal to derivatives in a net gain position by counterparty after giving consideration to collateral posted. Our collateral agreements require most counterparties to post collateral for the amount of our net exposure to them above the applicable threshold. Bilateral collateral agreements are in place for all of our active OTC derivative counterparties. Collateral posting thresholds are tied to a counterparty's credit rating. Derivative exposures and collateral amounts are monitored on a daily basis using both internal pricing models and dealer price quotes. Collateral is typically transferred within one business day based on the values of the related derivatives. This time lag in posting collateral can affect our net uncollateralized exposure to derivative counterparties.

Collateral posted by a derivative counterparty is typically in the form of cash, although U.S. Treasury securities, Freddie Mac mortgage-related securities, or our debt securities may also be posted. In the event a counterparty defaults on its obligations under the derivatives agreement and the default is not remedied in the manner prescribed in the agreement, we have the right under the agreement to direct the custodian bank to transfer the collateral to us or, in the case of non-cash collateral, to sell the collateral and transfer the proceeds to us.

Our uncollateralized exposure to counterparties for OTC interest-rate swaps, option-based derivatives, foreign-currency swaps, and purchased interest-rate caps, after applying netting agreements and collateral, was $100 million and $71 million at June 30, 2012 and December 31, 2011, respectively. In the event that all of our counterparties for these derivatives were to have defaulted simultaneously on June 30, 2012, our maximum loss for accounting purposes after applying netting agreements and collateral, would have been approximately $100 million. Two counterparties each accounted for greater than 10% and collectively accounted for 86% of our net uncollateralized exposure to derivative counterparties, excluding futures and clearinghouse-settled derivatives, commitments, swap guarantee derivatives, and other derivatives at June 30, 2012. These counterparties were Royal Bank of Scotland and UBS AG., both of which were rated "A-" or above using the lower of S&P's or Moody's rating stated in terms of the S&P equivalent as of July 25, 2012.

The total exposure on our OTC forward purchase and sale commitments, which are treated as derivatives, was $47 million and $38 million at June 30, 2012 and December 31, 2011, respectively. These commitments are uncollateralized. Because the typical maturity of our forward purchase and sale commitments is less than 60 days and they are generally settled through a clearinghouse, we do not require master netting and collateral agreements for the counterparties of these commitments. However, we monitor the credit fundamentals of the counterparties to our forward purchase and sale commitments on an ongoing basis to ensure that they continue to meet our internal risk-management standards.

### NOTE 16: FAIR VALUE DISCLOSURES

The accounting guidance for fair value measurements and disclosures defines fair value, establishes a framework for measuring fair value, and sets forth disclosure requirements regarding fair value measurements. This guidance applies whenever other accounting guidance requires or permits assets or liabilities to be measured at fair value. Fair value measurement assumes that the transaction to sell the asset or transfer the liability takes place either in the principal market for the asset or liability, or, in the absence of a principal market, in the most advantageous market for the asset or liability.

We use fair value measurements for the initial recording of certain assets and liabilities and periodic remeasurement of certain assets and liabilities on a recurring or non-recurring basis.

164                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Fair Value Hierarchy**

The accounting guidance for fair value measurements and disclosures establishes a three-level fair value hierarchy that prioritizes the inputs into the valuation techniques used to measure fair value. The fair value hierarchy gives the highest priority, Level 1, to measurements based on quoted prices in active markets for identical assets or liabilities. The next highest priority, Level 2, is given to measurements based on observable inputs other than quoted prices in active markets for identical assets and liabilities. The lowest priority, Level 3, is given to measurements based on unobservable inputs. Assets and liabilities are classified in their entirety within the fair value hierarchy based on the lowest level input that is significant to the fair value measurement.

During the first quarter of 2012, we adopted an amendment to the guidance pertaining to fair value measurements and disclosure. The amendment changed the definition of the principal market to the perspective of the overall market for the particular asset or liability being valued, with less emphasis on the perspective of the reporting entity. As a result of adopting this guidance, we made a change to our principal market assessment for certain single-family mortgage loans, primarily for loans that have not been modified and are delinquent four months or more or are in foreclosure. For these loans, we changed our principal market assessment to the whole loan market. The resulting impact was a decrease of $13.8 billion to our fair value of net assets on our fair value balance sheets.

During the fourth quarter of 2011, our fair value results as presented in our consolidated fair value balance sheets were affected by a change in estimate which increased the implied capital costs included in our valuation of single-family mortgage loans due to a change in the estimation of a risk premium assumption embedded in our modeled valuation of such loans. This change in estimate led to a $14.2 billion decrease in our fair value measurement of mortgage loans as of December 31, 2011.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below sets forth by level within the fair value hierarchy assets and liabilities measured and reported at fair value on a recurring basis in our consolidated balance sheets at June 30, 2012 and December 31, 2011.

**Table 16.1 — Assets and Liabilities Measured at Fair Value on a Recurring Basis**

| | Fair Value at June 30, 2012 | | | | |
|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
| | (in millions) | | | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $ — | $ 71,391 | $ 1,833 | $ — | $ 73,224 |
| Subprime | — | — | 25,778 | — | 25,778 |
| CMBS | — | 49,280 | 3,702 | — | 52,982 |
| Option ARM | — | — | 5,428 | — | 5,428 |
| Alt-A and other | — | — | 10,733 | — | 10,733 |
| Fannie Mae | — | 17,510 | 179 | — | 17,689 |
| Obligations of states and political subdivisions | — | — | 7,308 | — | 7,308 |
| Manufactured housing | — | — | 726 | — | 726 |
| Ginnie Mae | — | 212 | 18 | — | 230 |
| Total available-for-sale securities, at fair value | — | 138,393 | 55,705 | — | 194,098 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 12,181 | 1,419 | — | 13,600 |
| Fannie Mae | — | 12,172 | 374 | — | 12,546 |
| Ginnie Mae | — | 36 | 111 | — | 147 |
| Other | — | 120 | 58 | — | 178 |
| Total mortgage-related securities | — | 24,509 | 1,962 | — | 26,471 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 526 | — | — | 526 |
| Treasury bills | 900 | — | — | — | 900 |
| Treasury notes | 18,140 | — | — | — | 18,140 |
| FDIC-guaranteed corporate medium-term notes | — | 1,399 | — | — | 1,399 |
| Total non-mortgage-related securities | 19,040 | 1,925 | — | — | 20,965 |
| Total trading securities, at fair value | 19,040 | 26,434 | 1,962 | — | 47,436 |
| Total investments in securities | 19,040 | 164,827 | 57,667 | — | 241,534 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 10,120 | — | 10,120 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | 18 | 14,819 | 20 | — | 14,857 |
| Option-based derivatives | — | 12,350 | — | — | 12,350 |
| Other | — | 96 | 2 | — | 98 |
| Subtotal, before netting adjustments | 18 | 27,265 | 22 | — | 27,305 |
| Netting adjustments[1] | — | — | — | (27,137) | (27,137) |
| Total derivative assets, net | 18 | 27,265 | 22 | (27,137) | 168 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 862 | — | 862 |
| All other, at fair value | — | — | 139 | — | 139 |
| Total other assets | — | — | 1,001 | — | 1,001 |
| Total assets carried at fair value on a recurring basis | $ 19,058 | $ 192,092 | $ 68,810 | $ (27,137) | $252,823 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $ — | $ — | $ 2,158 | $ — | $ 2,158 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | 4 | 34,748 | — | — | 34,752 |
| Option-based derivatives | — | 790 | 1 | — | 791 |
| Other | 6 | 33 | 41 | — | 80 |
| Subtotal, before netting adjustments | 10 | 35,571 | 42 | — | 35,623 |
| Netting adjustments[1] | — | — | — | (35,287) | (35,287) |
| Total derivative liabilities, net | 10 | 35,571 | 42 | (35,287) | 336 |
| Other liabilities: | | | | | |
| All other, at fair value | — | — | 1 | — | 1 |
| Total liabilities carried at fair value on a recurring basis | $ 10 | $ 35,571 | $ 2,201 | $ (35,287) | $ 2,495 |

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4252

Table of Contents

|  | Fair Value at December 31, 2011 | | | | |
|---|---|---|---|---|---|
|  | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Netting Adjustment[1] | Total |
|  | (in millions) | | | | |
| **Assets:** | | | | | |
| Investments in securities: | | | | | |
| Available-for-sale, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | $   — | $   79,044 | $   2,048 | $   — | $ 81,092 |
| Subprime | — | — | 27,999 | — | 27,999 |
| CMBS | — | 51,907 | 3,756 | — | 55,663 |
| Option ARM | — | — | 5,865 | — | 5,865 |
| Alt-A and other | — | 11 | 10,868 | — | 10,879 |
| Fannie Mae | — | 20,150 | 172 | — | 20,322 |
| Obligations of states and political subdivisions | — | — | 7,824 | — | 7,824 |
| Manufactured housing | — | — | 766 | — | 766 |
| Ginnie Mae | — | 237 | 12 | — | 249 |
| Total available-for-sale securities, at fair value | — | 151,349 | 59,310 | — | 210,659 |
| Trading, at fair value: | | | | | |
| Mortgage-related securities: | | | | | |
| Freddie Mac | — | 14,181 | 1,866 | — | 16,047 |
| Fannie Mae | — | 14,627 | 538 | — | 15,165 |
| Ginnie Mae | — | 134 | 22 | — | 156 |
| Other | — | 74 | 90 | — | 164 |
| Total mortgage-related securities | — | 29,016 | 2,516 | — | 31,532 |
| Non-mortgage-related securities: | | | | | |
| Asset-backed securities | — | 302 | — | — | 302 |
| Treasury bills | 100 | — | — | — | 100 |
| Treasury notes | 24,712 | — | — | — | 24,712 |
| FDIC-guaranteed corporate medium-term notes | — | 2,184 | — | — | 2,184 |
| Total non-mortgage-related securities | 24,812 | 2,486 | — | — | 27,298 |
| Total trading securities, at fair value | 24,812 | 31,502 | 2,516 | — | 58,830 |
| Total investments in securities | 24,812 | 182,851 | 61,826 | — | 269,489 |
| Mortgage loans: | | | | | |
| Held-for-sale, at fair value | — | — | 9,710 | — | 9,710 |
| Derivative assets, net: | | | | | |
| Interest-rate swaps | — | 12,976 | 46 | — | 13,022 |
| Option-based derivatives | 1 | 15,868 | — | — | 15,869 |
| Other | 5 | 110 | 35 | — | 150 |
| Subtotal, before netting adjustments | 6 | 28,954 | 81 | — | 29,041 |
| Netting adjustments[1] | — | — | — | (28,923) | (28,923) |
| Total derivative assets, net | 6 | 28,954 | 81 | (28,923) | 118 |
| Other assets: | | | | | |
| Guarantee asset, at fair value | — | — | 752 | — | 752 |
| All other, at fair value | — | — | 151 | — | 151 |
| Total other assets | — | — | 903 | — | 903 |
| Total assets carried at fair value on a recurring basis | $   24,818 | $   211,805 | $   72,520 | $   (28,923) | $280,220 |
| **Liabilities:** | | | | | |
| Debt securities recorded at fair value | $   — | $   3,015 | $   — | $   — | $   3,015 |
| Derivative liabilities, net: | | | | | |
| Interest-rate swaps | — | 34,601 | 21 | — | 34,622 |
| Option-based derivatives | 1 | 2,934 | 1 | — | 2,936 |
| Other | — | 103 | 42 | — | 145 |
| Subtotal, before netting adjustments | 1 | 37,638 | 64 | — | 37,703 |
| Netting adjustments[1] | — | — | — | (37,268) | (37,268) |
| Total derivative liabilities, net | 1 | 37,638 | 64 | (37,268) | 435 |
| Total liabilities carried at fair value on a recurring basis | $   1 | $   40,653 | $   64 | $   (37,268) | $   3,450 |

(1) Represents counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable. The net cash collateral posted and net trade/settle receivable were $9.1 billion and $0 million, respectively, at June 30, 2012. The net cash collateral posted and net trade/settle receivable were $9.4 billion and $1 million, respectively, at December 31, 2011. The net interest receivable (payable) of derivative assets and derivative liabilities was approximately $(0.9) billion and $(1.1) billion at June 30, 2012 and December 31, 2011, respectively, which was mainly related to interest rate swaps that we have entered into.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4253

Table of Contents

**Recurring Fair Value Changes**

For the three and six months ended June 30, 2012, we had no significant transfers between Level 1 and Level 2 assets or liabilities.

Our Level 3 items mainly consist of non-agency mortgage-related securities. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets" for information about the valuation methods and assumptions used in our fair value measurements.

During the three and six months ended June 30, 2012, the fair value of our Level 3 assets decreased primarily due to principal repayments from the underlying collateral of non-agency mortgage-related securities. During the three and six months ended June 30, 2012, we had a net transfer into Level 3 assets of $547 million and $236 million respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

During the three months ended June 30, 2012, the fair value of our Level 3 liabilities decreased due to the U.S. dollar strengthening relative to the Euro. During the six months ended June 30, 2012, the fair value of our Level 3 liabilities increased primarily due to the transfer of $3.0 billion of foreign-currency denominated and certain other debt securities recorded at fair value from Level 2 to Level 3 given the illiquidity in the market as evidenced by low transaction volumes in these securities.

During the three and six months ended June 30, 2011, the fair value of our Level 3 assets decreased due to: (a) monthly remittances of principal repayments from the underlying collateral of non-agency mortgage-related securities; and (b) net sales of multifamily held-for-sale loans. In addition, the fair value of our investments in non-agency mortgage-related securities also decreased from the widening of OAS levels on these securities during the second quarter of 2011. During the three and six months ended June 30, 2011, we had a net transfer into Level 3 assets of $12 million and $160 million, respectively, resulting from a change in valuation method for certain mortgage-related securities due to a lack of relevant price quotes from dealers and third-party pricing services.

The table below provides a reconciliation of the beginning and ending balances for assets and liabilities measured at fair value using significant unobservable inputs (Level 3).

<div align="center">168</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Table 16.2 — Fair Value Measurements of Assets and Liabilities Using Significant Unobservable Inputs**

Three Months Ended June 30, 2012

(in millions)

| | Balance, March 31, 2012 | Realized and unrealized gains (losses) Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases | Issues | Sales | Settlements, net [5] | Transfers into Level 3[6] | Transfers out of Level 3[6] | Balance, June 30, 2012 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | $ 1,898 | $ — | 13 | $ 13 | $ — | $ — | $ — | $ (78) | $ — | $ — | $ 1,833 | $ — |
| Subprime | 27,145 | (58) | (149) | (207) | — | — | — | (1,160) | — | — | 25,778 | (57) |
| CMBS | 3,143 | — | 215 | 215 | — | — | — | (44) | 388 | — | 3,702 | — |
| Option ARM | 5,818 | (14) | (96) | (110) | — | — | (15) | (265) | — | — | 5,428 | (17) |
| Alt-A and other | 11,084 | (2) | 31 | 29 | — | — | — | (390) | 10 | — | 10,733 | (2) |
| Fannie Mae | 168 | — | (1) | (1) | — | — | — | (9) | 21 | — | 179 | — |
| Obligations of states and political subdivisions | 7,565 | — | 52 | 52 | — | — | (1) | (308) | — | — | 7,308 | — |
| Manufactured housing | 748 | (1) | 4 | 3 | — | — | — | (25) | — | — | 726 | (1) |
| Ginnie Mae | 11 | — | — | — | — | — | — | (1) | 8 | — | 18 | — |
| Total available-for-sale mortgage-related securities | 57,580 | (75) | 69 | (6) | — | — | (16) | (2,280) | 427 | — | 55,705 | (77) |
| Trading, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | 1,725 | (230) | — | (230) | 25 | — | (25) | (50) | 20 | (46) | 1,419 | (230) |
| Fannie Mae | 478 | (94) | — | (94) | — | — | — | (10) | — | — | 374 | (94) |
| Ginnie Mae | 20 | — | — | — | — | — | — | (4) | 95 | — | 111 | — |
| Other | 13 | (1) | — | (1) | — | — | (5) | — | 51 | — | 58 | (1) |
| Total trading mortgage-related securities | 2,236 | (325) | — | (325) | 25 | — | (30) | (64) | 166 | (46) | 1,962 | (325) |
| Mortgage loans: | | | | | | | | | | | | |
| Held-for-sale, at fair value | 11,337 | 245 | — | 245 | 5,095 | — | (6,542) | (15) | — | — | 10,120 | 150 |
| Other assets: | | | | | | | | | | | | |
| Guarantee asset[8] | 798 | (12) | — | (12) | — | 95 | — | (19) | — | — | 862 | 151 |
| All other | 143 | (4) | — | (4) | — | — | — | (19) | — | — | 139 | (4) |
| Total other assets | 941 | (16) | — | (16) | — | 95 | — | (19) | — | — | 1,001 | 147 |

| | Balance, March 31, 2012 | Realized and unrealized (gains) losses Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases | Issues | Sales | Settlements, net [5] | Transfers into Level 3[6] | Transfers out of Level 3[6] | Balance, June 30, 2012 | Unrealized (gains) losses still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | | | | | | | |
| Debt securities recorded at fair value | $ 2,221 | $ (63) | $ — | $ (63) | $ — | $ — | $ — | $ — | $ — | $ — | $ 2,158 | (63) |
| Net derivatives[9] | 30 | (10) | — | (10) | — | — | — | — | — | — | 20 | (7) |
| Other liabilities: | | | | | | | | | | | | |
| All other, at fair value | 4 | (3) | — | (3) | — | — | — | — | — | — | 1 | (3) |

169

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

Six Months Ended June 30, 2012

| | Balance, January 1, 2012 | Realized and unrealized gains (losses) | | Total | Purchases | Issues | Sales | Settlements, net[5] | Transfers into Level 3[6] | Transfers out of Level 3[6] | Balance, June 30, 2012 | Unrealized gains (losses) still held[7] |
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | | | | | | | | | |
| | | | | | | (in millions) | | | | | | |
| **Assets** | | | | | | | | | | | | |
| Investments in securities, at fair value: | | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | $ 2,048 | $ — | $ 11 | $ 11 | $ — | $ — | $ — | $ (106) | $ — | $ (120) | $ 1,833 | $ — |
| Subprime | 27,999 | (499) | 594 | 95 | — | — | — | (2,316) | — | — | 25,778 | (499) |
| CMBS | 3,756 | 77 | (107) | (30) | — | — | (330) | (88) | 394 | — | 3,702 | — |
| Option ARM | 5,865 | (62) | 162 | 100 | — | — | (15) | (522) | — | — | 5,428 | (65) |
| Alt-A and other | 10,868 | (59) | 662 | 603 | — | — | — | (749) | 11 | — | 10,733 | (59) |
| Fannie Mae | 172 | — | — | — | — | — | — | (15) | 22 | — | 179 | — |
| Obligations of states and political subdivisions | 7,824 | 1 | 115 | 116 | — | — | (8) | (624) | — | — | 7,308 | — |
| Manufactured housing | 766 | (3) | 11 | 8 | — | — | — | (48) | — | — | 726 | (3) |
| Ginnie Mae | 12 | — | — | — | — | — | — | (2) | 8 | — | 18 | — |
| Total available-for-sale mortgage-related securities | 59,310 | (545) | 1,448 | 903 | — | — | (353) | (4,470) | 435 | (120) | 55,705 | (626) |
| Trading, at fair value: | | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | | |
| Freddie Mac | 1,866 | (224) | — | (224) | 25 | 51 | (76) | (101) | 22 | (144) | 1,419 | (225) |
| Fannie Mae | 538 | (91) | — | (91) | (5) | — | 5 | (18) | — | (55) | 374 | (91) |
| Ginnie Mae | 22 | — | — | — | — | — | — | (9) | 98 | — | 111 | — |
| Other | 90 | 8 | — | 8 | — | — | (39) | (1) | — | — | 58 | 4 |
| Total trading mortgage-related securities | 2,516 | (307) | — | (307) | 20 | 51 | (110) | (129) | 120 | (199) | 1,962 | (312) |
| Mortgage loans: | | | | | | | | | | | | |
| Held-for-sale, at fair value | 9,710 | 424 | — | 424 | 10,462 | — | (10,446) | (30) | — | — | 10,120 | 195 |
| Other assets: | | | | | | | | | | | | |
| Guarantee asset[8] | 752 | (10) | — | (10) | — | 156 | — | (36) | — | — | 862 | 148 |
| All other | 151 | (12) | — | (12) | — | — | — | — | — | — | 139 | (12) |
| Total other assets | 903 | (22) | — | (22) | — | 156 | — | (36) | — | — | 1,001 | 136 |

| | Balance, January 1, 2012 | Realized and unrealized (gains) losses | | Total | Purchases | Issues | Sales | Settlements, net[5] | Transfers into Level 3[6] | Transfers out of Level 3[6] | Balance, June 30, 2012 | Unrealized (gains) losses still held[7] |
| | | Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | | | | | | | | | |
| | | | | | | (in millions) | | | | | | |
| **Liabilities** | | | | | | | | | | | | |
| Debt securities recorded at fair value | $ — | $ (45) | $ — | $ (45) | $ — | $ — | $ — | $ (812) | $ 3,015 | $ — | $ 2,158 | $ (35) |
| Net derivatives[9] | (17) | 8 | — | 8 | — | — | — | (4) | — | 33 | 20 | 3 |
| Other liabilities: | | | | | | | | | | | | |
| All other, at fair value | — | 1 | — | 1 | — | — | — | — | — | — | 1 | 1 |

170

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4256

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Three Months Ended June 30, 2011**

| | Balance, March 31, 2011 | Realized and unrealized gains (losses) Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases | Issues | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, June 30, 2011 | Unrealized gains (losses) still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | |
| **Assets** | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 1,896 | $ — | $ 40 | $ 40 | $ 8 | $ — | $ — | $ (27) | $ 66 | $ 1,983 | $ — |
| Subprime | 33,344 | (70) | (1,255) | (1,325) | — | — | — | (1,528) | — | 30,491 | (70) |
| CMBS | 3,093 | — | 136 | 136 | — | — | — | (22) | — | 3,207 | — |
| Option ARM | 6,989 | (65) | 76 | 11 | — | — | — | (409) | — | 6,591 | (65) |
| Alt-A and other | 12,924 | (32) | (182) | (214) | — | — | — | (513) | — | 12,197 | (32) |
| Fannie Mae | 195 | — | — | — | — | — | — | (8) | — | 187 | — |
| Obligations of states and political subdivisions | 8,875 | 3 | 244 | 247 | — | — | (158) | (404) | — | 8,560 | — |
| Manufactured housing | 878 | (2) | (1) | (3) | — | — | — | (31) | — | 844 | (2) |
| Ginnie Mae | 15 | — | — | — | — | — | — | (1) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 68,209 | (166) | (942) | (1,108) | 8 | — | (158) | (2,943) | 66 | 64,074 | (169) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,697 | (65) | — | (65) | 90 | — | — | (46) | (54) | 2,622 | (65) |
| Fannie Mae | 871 | (17) | — | (17) | — | — | — | (11) | — | 843 | (17) |
| Ginnie Mae | 26 | — | — | — | — | — | — | — | — | 26 | — |
| Other | 19 | (1) | — | (1) | — | — | — | — | — | 18 | (1) |
| Total trading mortgage-related securities | 3,613 | (83) | — | (83) | 90 | — | — | (57) | (54) | 3,509 | (83) |
| Mortgage loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 5,304 | 298 | — | 298 | 3,270 | — | (4,400) | (9) | — | 4,463 | 94 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset[8] | 597 | 6 | — | 6 | — | 77 | — | (13) | — | 667 | 6 |
| All other | 230 | (49) | — | (49) | — | — | — | — | — | 181 | (49) |
| Total other assets | 827 | (43) | — | (43) | — | 77 | — | (13) | — | 848 | (43) |

| | Balance, March 31, 2011 | Realized and unrealized gains (losses) Included in earnings[1][2][3][4] | Included in other comprehensive income[1] | Total | Purchases | Issues | Sales | Settlements, net[5] | Net transfers in and/or out of Level 3[6] | Balance, June 30, 2011 | Unrealized (gains) losses still held[7] |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | (in millions) | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Net derivatives[9] | $ 757 | $ (522) | $ — | $ (522) | $ — | $ 9 | $ — | 77 | $ (2) | $ 319 | $ (407) |
| Other liabilities: | | | | | | | | | | | |
| All other | — | 1 | — | 1 | — | — | — | — | — | 1 | 1 |

171

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Six Months Ended June 30, 2011 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Realized and unrealized gains (losses) | | | | | | | | | |
| | Balance, January 1, 2011 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases | Issues | Sales | Settlements, net (5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2011 | Unrealized gains (losses) still held(7) |
| | | | | | (in millions) | | | | | | |
| **Assets** | | | | | | | | | | | |
| Investments in securities: | | | | | | | | | | | |
| Available-for-sale, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | $ 2,037 | $ — | $ 39 | $ 39 | $ 17 | $ — | $ — | $ (78) | $ (32) | $ 1,983 | $ — |
| Subprime | 33,861 | (804) | 315 | (489) | — | — | — | (2,881) | — | 30,491 | (804) |
| CMBS | 3,115 | — | 112 | 112 | — | — | — | (20) | — | 3,207 | — |
| Option ARM | 6,889 | (346) | 768 | 422 | — | — | — | (720) | — | 6,591 | (346) |
| Alt-A and other | 13,155 | (72) | 56 | (16) | — | — | — | (942) | — | 12,197 | (72) |
| Fannie Mae | 212 | — | 2 | 2 | — | — | — | (22) | (5) | 187 | — |
| Obligations of states and political subdivisions | 9,377 | 4 | 242 | 246 | 1 | — | (195) | (869) | — | 8,560 | — |
| Manufactured housing | 897 | (5) | 11 | 6 | — | — | — | (59) | — | 844 | (5) |
| Ginnie Mae | 16 | — | — | — | — | — | — | (2) | — | 14 | — |
| Total available-for-sale mortgage-related securities | 69,559 | (1,223) | 1,545 | 322 | 18 | — | (195) | (5,593) | (37) | 64,074 | (1,227) |
| Trading, at fair value: | | | | | | | | | | | |
| Mortgage-related securities: | | | | | | | | | | | |
| Freddie Mac | 2,299 | (3) | — | (3) | 266 | — | (31) | (95) | 186 | 2,622 | (3) |
| Fannie Mae | 854 | (5) | — | (5) | — | — | — | (17) | 11 | 843 | (5) |
| Ginnie Mae | 27 | — | — | — | — | — | — | (1) | — | 26 | — |
| Other | 20 | (1) | — | (1) | — | — | — | (1) | — | 18 | (1) |
| Total trading mortgage-related securities | 3,200 | (9) | — | (9) | 266 | — | (31) | (114) | 197 | 3,509 | (9) |
| Mortgage loans: | | | | | | | | | | | |
| Held-for-sale, at fair value | 6,413 | 359 | — | 359 | 5,434 | — | (7,721) | (22) | — | 4,463 | 81 |
| Other assets: | | | | | | | | | | | |
| Guarantee asset(8) | 541 | 5 | — | 5 | — | 145 | — | (24) | — | 667 | 5 |
| All other | 235 | (54) | — | (54) | — | — | — | — | — | 181 | (54) |
| Total other assets | 776 | (49) | — | (49) | — | 145 | — | (24) | — | 848 | (49) |

| | Balance, January 1, 2011 | Included in earnings(1)(2)(3)(4) | Included in other comprehensive income(1) | Total | Purchases | Issues | Sales | Settlements, net(5) | Net transfers in and/or out of Level 3(6) | Balance, June 30, 2011 | Unrealized (gains) losses still held(7) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Realized and unrealized (gains) losses | | | | | | | | | |
| | | | | | (in millions) | | | | | | |
| **Liabilities** | | | | | | | | | | | |
| Net derivatives(9) | $ 691 | $ (395) | $ — | $(395) | $ — | $ 23 | $ — | $ 2 | $ (2) | $ 319 | $ (293) |
| Other liabilities: | | | | | | | | | | | |
| All other | — | 1 | — | 1 | — | — | — | — | — | 1 | 1 |

(1) Changes in fair value for available-for-sale investment securities are recorded in AOCI, while gains and losses from sales are recorded in other gains (losses) on investment securities recognized in earnings on our consolidated statements of comprehensive income. For mortgage-related securities classified as trading, the realized and unrealized gains (losses) are recorded in other gains (losses) on investment securities recognized in earnings on our consolidated statements of comprehensive income.

(2) Changes in fair value of derivatives are recorded in derivative gains (losses) on our consolidated statements of comprehensive income for those not designated as accounting hedges.

(3) Changes in fair value of the guarantee asset are recorded in other income on our consolidated statements of comprehensive income.

(4) For held-for-sale mortgage loans with fair value option elected, gains (losses) on fair value changes and from sales of mortgage loans are recorded in other income on our consolidated statements of comprehensive income.

(5) For non-agency mortgage-related securities, primarily represents principal repayments.

(6) Transfer in and/or out of Level 3 during the period is disclosed as if the transfer occurred at the beginning of the period.

(7) Represents the amount of total gains or losses for the period, included in earnings, attributable to the change in unrealized gains (losses) related to assets and liabilities classified as Level 3 that were still held at June 30, 2012 and 2011, respectively. Included in these amounts are credit-related other-than-temporary impairments recorded on available-for-sale securities.

(8) We estimate that all amounts recorded for unrealized gains and losses on our guarantee asset relate to those guarantee asset amounts still recorded on our balance sheet. The amounts reflected as included in earnings represent the periodic fair value changes of our guarantee asset.

(9) Net derivatives include derivative assets and derivative liabilities prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable and net derivative interest receivable or payable.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

TREASURY-4258

Table of Contents

**Non-recurring Fair Value Changes**

Certain assets are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances. We consider the fair value measurement related to these assets to be non-recurring. These assets include impaired held-for-investment multifamily mortgage loans and REO, net. These fair value measurements usually result from the write-down of individual assets to current fair value amounts due to impairments. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and "— *REO, Net*" for additional details.

The table below presents assets measured and reported at fair value on a non-recurring basis on our consolidated balance sheets by level within the fair value hierarchy at June 30, 2012 and December 31, 2011, respectively.

**Table 16.3 — Assets Measured at Fair Value on a Non-Recurring Basis**

| | Fair Value at June 30, 2012 | | | | Fair Value at December 31, 2011 | | | |
|---|---|---|---|---|---|---|---|---|
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
| | (in millions) | | | | | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | | | | | |
| Mortgage loans:[1] | | | | | | | | |
| Held-for-investment | $ — | $ — | $ 1,167 | $1,167 | $ — | $ — | $ 1,380 | $1,380 |
| REO, net[2] | — | — | 604 | 604 | — | — | 3,146 | 3,146 |
| Total assets measured at fair value on a non-recurring basis | $ — | $ — | $ 1,771 | $1,771 | $ — | $ — | $ 4,526 | $4,526 |

| | Total Gains (Losses)[3] | | | |
|---|---|---|---|---|
| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2012 | 2011 | 2012 | 2011 |
| | (in millions) | | | |
| **Assets measured at fair value on a non-recurring basis:** | | | | |
| Mortgage loans:[1] | | | | |
| Held-for-investment | $ (14) | $ (4) | $ (41) | $ 5 |
| REO, net[2] | 5 | (24) | 1 | (90) |
| Total gains (losses) | $ (9) | $ (28) | $ (40) | $ (85) |

(1) Represents carrying value and related write-downs of loans for which adjustments are based on the fair value amounts. These loans consist of impaired multifamily mortgage loans that are classified as held-for-investment and have a related valuation allowance.

(2) Represents the fair value and related losses of foreclosed properties that were measured at fair value subsequent to their initial classification as REO, net. The carrying amount of REO, net was written down to fair value of $0.6 billion, less estimated costs to sell of $41 million (or approximately $0.5 billion) at June 30, 2012. The carrying amount of REO, net was written down to fair value of $3.1 billion, less estimated costs to sell of $221 million (or approximately $2.9 billion) at December 31, 2011.

(3) Represents the total net gains (losses) recorded on items measured at fair value on a non-recurring basis as of June 30, 2012 and 2011, respectively.

**Fair Value Election**

We elected the fair value option for certain types of securities, multifamily held-for-sale mortgage loans, foreign-currency denominated debt, and certain other debt.

*Certain Available-for-Sale Securities with Fair Value Option Elected*

We elected the fair value option for certain available-for-sale mortgage-related securities to better reflect the natural offset these securities provide to fair value changes recorded historically on our guarantee asset at the time of our election. In addition, upon adoption of the accounting guidance for the fair value option, we elected this option for available-for-sale securities within the scope of the accounting guidance for investments in beneficial interests in securitized financial assets to better reflect any valuation changes that would occur subsequent to impairment write-downs previously recorded on these instruments. By electing the fair value option for these instruments, we reflect valuation changes through our consolidated statements of comprehensive income in other gains (losses) on investment securities recognized in earnings in the period they occur, including any increases in value.

173

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012
Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

For mortgage-related securities that were selected for the fair value option and subsequently classified as trading securities, the change in fair value is recorded in other gains (losses) on investment securities recognized in earnings in our consolidated statements of comprehensive income. See "NOTE 7: INVESTMENTS IN SECURITIES" for additional information regarding the net unrealized gains (losses) on trading securities, which include gains (losses) for other items that are not selected for the fair value option. Related interest income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Investments in Securities" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on investments in securities.

### Debt Securities with Fair Value Option Elected

We elected the fair value option for foreign-currency denominated debt and certain other debt securities. In the case of foreign-currency denominated debt, we have entered into derivative transactions that effectively convert these instruments to U.S. dollar denominated floating rate instruments. The fair value changes on these derivatives were recorded in derivative gains (losses) in our consolidated statements of comprehensive income. We elected the fair value option on these debt instruments to better reflect the economic offset these securities provide to the fair value changes on the related derivatives due to changes in interest rates. We also elected the fair value option for certain other debt securities containing potential embedded derivatives that required bifurcation.

The changes in fair value of debt securities with the fair value option elected were $62 million and $45 million for the three and six months ended June 30, 2012, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of comprehensive income. Included in these changes in fair value were changes in fair value related to fluctuations in exchange rates and interest rates of $66 million and $61 million for the three and six months ended June 30, 2012, respectively. The remaining changes in the fair value of $(4) million and $(16) million were attributable to changes in credit risk for the three and six months ended June 30, 2012, respectively.

The changes in fair value of debt securities with the fair value option elected were $(37) million and $(118) million for the three and six months ended June 30, 2011, respectively, which were recorded in gains (losses) on debt recorded at fair value in our consolidated statements of comprehensive income. Included in these changes in fair value were changes in fair value related to fluctuations in exchange rates and interest rates of $(44) million and $(116) million for the three and six months ended June 30, 2011, respectively. The remaining changes in the fair value of $7 million and $(2) million were attributable to changes in credit risk for the three and six months ended June 30, 2011, respectively.

The change in fair value attributable to changes in credit risk was primarily determined by comparing the total change in fair value of the debt to the total change in fair value of the interest-rate and foreign-currency derivatives used to hedge the debt. Any difference in the fair value change of the debt compared to the fair value change in the derivatives is attributed to credit risk.

The difference between the aggregate fair value and aggregate UPB for long-term debt securities with fair value option elected was $35 million and $43 million at June 30, 2012 and December 31, 2011, respectively. Related interest expense continues to be reported as interest expense in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Debt Securities Issued" in our 2011 Annual Report for additional information about the measurement and recognition of interest expense on debt securities issued.

### Multifamily Held-For-Sale Mortgage Loans with Fair Value Option Elected

We elected the fair value option for multifamily mortgage loans that were purchased for securitization. While this is consistent with our overall strategy with respect to our multifamily business, it differs from our previous buy-and-hold strategy with respect to multifamily loans held-for-investment. Therefore, these multifamily mortgage loans were classified as held-for-sale mortgage loans in our consolidated balance sheets to reflect our intent to sell them in the future.

We recorded $245 million and $424 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of comprehensive income for the three and six months ended June 30, 2012, respectively. We recorded $298 million and $359 million from the change in fair value in gains (losses) on mortgage loans recorded at fair value in other income in our consolidated statements of comprehensive income for the three and six months ended June 30, 2011, respectively. The changes in fair value of these loans were primarily attributable to changes in interest rates and other items such as liquidity. The changes in fair value attributable to instrument-specific credit

174

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012     Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

risk were not material given that these loans were generally originated within the past 12 months of June 30, 2012 and 2011, respectively, and have not seen any material change in their credit characteristics.

The difference between the aggregate fair value and the aggregate UPB for multifamily held-for-sale loans with the fair value option elected was $205 million and $195 million at June 30, 2012 and December 31, 2011, respectively. Related interest income continues to be reported as interest income in our consolidated statements of comprehensive income. See "NOTE 1: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES — Mortgage Loans" in our 2011 Annual Report for additional information about the measurement and recognition of interest income on our mortgage loans.

## Assets and Liabilities Measured at Fair Value on Our Consolidated Balance Sheets

We categorize assets and liabilities that we measure and report at fair value on our consolidated balance sheets within the fair value hierarchy based on the valuation processes used to derive the fair value and our judgment regarding the observability of the related inputs.

### *Investments in Securities*

#### *Agency Securities*

Fixed-rate agency securities are valued based on dealer-published quotes for a base TBA security, adjusted to reflect the measurement date as opposed to a forward settlement date ("carry") and pay-ups for specified collateral. The base TBA price varies based on a number of factors, including agency, term, coupon, and settlement month. The carry adjustment converts forward settlement date prices to spot or same-day settlement date prices such that the fair value is estimated as of the measurement date, and not as of the forward settlement date. The carry adjustment is determined using our internal prepayment and interest rate models. A pay-up is added to the base TBA price for characteristics that are observed to be trading at a premium versus TBAs. Haircuts are applied to a small subset of positions that are less liquid and are observed to trade at a discount relative to TBAs; this includes securities that are not eligible for delivery into TBA trades.

Adjustable-rate agency securities are valued based on the median of prices from multiple pricing services. The key valuation drivers used by the pricing services include the interest rate cap structure, term, agency, remaining term, and months-to-next coupon reset, coupled with prevailing market conditions, namely interest rates.

Because fixed-rate and adjustable-rate agency securities are generally liquid and are valued using observable pricing in the market, they generally are classified as Level 2.

Multiclass agency securities are valued using a variety of methods, depending on the product type. The predominant valuation methodology uses the median prices from multiple pricing services. This method is used for securities for which there is typically significant, relevant market activity. Some of the key valuation drivers used by the pricing services are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. Other tranche types that are more challenging to price are valued using the median prices from multiple dealers. These include structured interest-only, structured principal-only, inverse floating-rate, and inverse interest-only securities. Some of the key valuation drivers used by the dealers are the collateral type, tranche type, weighted average life, and coupon, coupled with interest rates. There is also a subset of positions for which prices are published on a daily basis; these include trust interest-only and trust principal-only strips. These are fairly liquid tranches and are quoted on a regular settlement date basis. In order to align the regular settlement date price with the balance sheet date, the OAS for these securities is calculated based on the published prices. Then the tranche is valued using that OAS applied to the balance sheet date.

Multiclass agency securities are classified as Level 2 or 3 depending on the significance of the inputs that are not observable.

In addition, there is a subset of agency residential mortgage-related securities for which there is a lack of relevant market activity. These are priced using either a proxy relationship, where the position is matched to the closest dealer-priced tranche, and then valued by calculating an OAS using our proprietary prepayment and interest rate models, or the position will be valued via a hedge ratio pricing method. This subset of agency residential mortgage-related securities is classified as Level 3 because it is valued using unobservable inputs, including those valued using either OAS or hedge ratio prices.

For the subset of our agency residential mortgage-related securities that is valued using an OAS approach, we determine the fair values for these securities by using the estimated OAS as an input to a discounted cash flow calculation in conjunction with interest-rate and prepayment models to calculate the NPV of the projected cash flows. These positions

175                                                                                                     *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

typically have smaller balances and are more difficult for dealers to value. The OAS-based prices are predominantly associated with interest-only and principal-only securities. Dealers publish regular settlement date prices for many of these securities, which provide the necessary starting point to create an OAS-based valuation as of the valuation date. These securities are sensitive to changes in prepayment expectations, interest rates, and changes in housing policy that could affect the level and timing of cash flows. In aggregate, as the cash flow streams are shortened (lengthened), the fair value of principal-only securities would increase (decrease) while interest-only securities would decrease (increase).

For a subset of agency residential mortgage-related securities, a hedge ratio pricing method is utilized as current information about cash flows is not readily available. The hedge ratio pricing method calculates a current period price from the prior period valuation and the associated risk metrics. Specifically, the securities' risk metrics, such as key rate durations, convexity, and volatility duration, are coupled with the market changes associated with each such metric to estimate the price change corresponding to that metric. The sum of the individual adjustments is added to the prior period valuation to produce the final valuation. If necessary, our judgment is applied to estimate the impact of differences in prepayment uncertainty or other unique cash flow characteristics related to that particular security. These valuations are sensitive to the market changes, specifically interest rate, spread, and volatility changes. As interest rates and/or volatility increase (decrease), the fair values of these securities will typically decrease (increase).

_Commercial Mortgage-Backed Securities_

CMBS are valued primarily based on the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the collateral type, collateral performance, capital structure, issuer, credit enhancement, coupon, weighted average life, and interest rates, coupled with the observed spread levels on trades of similar securities. Many of these securities have significant prepayment lockout periods or penalty periods that limit the window of potential prepayment to a relatively narrow band. These securities are primarily classified as Level 2.

There is a subset of CMBS comprised of military housing revenue bonds that is valued using a hedge ratio pricing method, and classified as Level 3 in the fair value hierarchy. These valuations are sensitive to market changes, specifically changes in interest rates and OAS. As interest rates increase (decrease) and/or OAS widens (tightens), fair values will typically decrease (increase).

_Subprime, Option ARM, and Alt-A and Other (Mortgage-Related)_

These private-label securities are valued using either the median of multiple dealer prices or the median prices from multiple pricing services. Some of the key valuation drivers used by the dealers and pricing services include the product type, vintage, collateral performance, capital structure, credit enhancements, and coupon, coupled with interest rates and spreads observed on trades of similar securities, where possible. The market for non-agency mortgage-related securities backed by subprime, option ARM, and Alt-A and other loans is illiquid, resulting in wide price ranges as well as wide credit spreads. These securities are primarily classified as Level 3.

The techniques used by these pricing services and dealers to develop the prices generally are either: (a) a comparison to transactions involving instruments with similar collateral and risk profiles; or (b) industry-standard modeling, such as a discounted cash flow model. For a large majority of the securities we value using dealers and pricing services, we obtain multiple external prices, which are non-binding both to us and our counterparties. When multiple prices are received, we use the median of the prices. The models and related assumptions used by the dealers and pricing services are owned and managed by them. However, we have an understanding of their processes used to develop the prices provided to us. We have discussions with our dealers and pricing service vendors at least annually and often more frequently to maintain a current understanding of the processes and inputs they use to develop prices. We make no adjustments to the individual prices we receive from third-party pricing services or dealers for non-agency mortgage-related securities beyond calculating median prices and discarding certain prices that are determined not to be valid based on our validation processes.

The fair value measurements of these assets are sensitive to changes in assumptions regarding probability of default, loss severity in the event of default, forecasts of home prices, or significant activity or developments in the non-agency mortgage-related securities market. Significant changes in any of those inputs in isolation may result in significantly higher or lower fair value measurements. Generally, a change in the assumption used for forecasts of home price changes is accompanied by directionally similar changes in the assumptions used for probability of default and loss severity. Positive (negative) reaction to portfolio sales could trigger changes in investor sentiment leading to higher (lower) fair values.

_Freddie Mac_

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We believe that the procedures executed by the pricing services and dealers, combined with our internal verification and analytical processes, help ensure that the prices used to value these securities are in accordance with the accounting guidance for fair value measurements and disclosures. See "Valuation Process and Controls Over Fair Value Measurement" for additional information regarding our validation processes.

The table below presents the fair value of subprime, option ARM, and Alt-A and other investments we held by origination year.

**Table 16.4 — Fair Value of Subprime, Option ARM, and Alt-A and Other Investments by Origination Year**

| | Fair Value at | |
| --- | --- | --- |
| Year of Origination | June 30, 2012 | December 31, 2011 |
| | (in millions) | |
| 2004 and prior | $      4,172 | $      4,287 |
| 2005 | 9,817 | 10,411 |
| 2006 | 15,034 | 16,155 |
| 2007 | 12,916 | 13,890 |
| 2008 and beyond | — | — |
| Total | $    41,939 | $    44,743 |

_Obligations of States and Political Subdivisions_

These primarily represent housing revenue bonds, which are valued by taking the median prices from multiple pricing services. Some of the key valuation drivers used by the pricing services include the structure of the bond, including call terms, cross-collateralization features, and tax-exempt features, coupled with municipal bond rates, credit ratings, and spread levels. These securities are unique, resulting in low trading volumes and are classified as Level 3 in the fair value hierarchy.

The investor base for most issues of municipal securities is fairly narrow, and within this investor base, there is only a subset that invests in housing revenue bonds, as these securities require an additional level of mortgage security expertise. Consequently, the market for these securities is fairly illiquid. These valuations are sensitive to trends in the broader municipal securities market, which includes credit risk. As market concerns associated with credit risk increase (decrease), the fair value of housing revenue bonds will generally decrease (increase). In addition, housing revenue bonds also are subject to the same interest rate risk, prepayment risk, and house price levels as other non-agency mortgage-related securities. As interest rates increase (decrease) or projected home price forecasts decrease (increase), the fair value of housing revenue bonds will generally decrease (increase).

_Manufactured Housing_

Securities backed by loans on manufactured housing properties are valued using the median of multiple dealer prices. Some of the key valuation drivers include the overall market direction, the collateral's performance, and vintage. These securities are classified as Level 3 in the fair value hierarchy because key inputs are unobservable in the market due to low levels of liquidity.

The fair values of our manufactured housing securities rely on unobservable inputs as there is no new production, and outstanding securities are very thinly traded. In some instances, a security may be comprised of so few loans, that the concentration risk will further limit the number of potential investors. Due to the seasoned nature of these securities, the primary valuation driver for manufactured housing is market demand at a particular point in time. An increase (decrease) in selling activity will typically result in a decrease (increase) in fair values. A secondary driver of the overall fair value measurement is the macroeconomic drivers of the economy. As the broader economy improves (deteriorates), the fair values will tend to increase (decrease).

_Asset-Backed Securities (Non-Mortgage-Related)_

These private-label non-mortgage-related securities are valued based on prices from pricing services. Some of the key valuation drivers include the discount margin, subordination level, and prepayment speed, coupled with interest rates. They are classified as Level 2 because of their liquidity and tight pricing ranges.

_Freddie Mac_

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Treasury Bills and Treasury Notes*

Treasury bills and Treasury notes are classified as Level 1 in the fair value hierarchy since they are actively traded and price quotes are widely available at the measurement date for the exact security we are valuing.

*FDIC-Guaranteed Corporate Medium-Term Notes*

Since these securities carry the FDIC guarantee, they are considered to have no credit risk. They are valued based on yield analysis. They are classified as Level 2 because of their high liquidity and tight pricing ranges.

**Mortgage Loans, Held-for-Sale**

Mortgage loans, held-for-sale consist of multifamily mortgage loans with the fair value option elected and are measured at fair value on a recurring basis. The fair values of mortgage loans, held-for-sale are generally based on market prices obtained from a third-party pricing service that uses a discounted cash flow approach. The pricing service forecasts cash flows for the various mortgage loans and discounts them at a market rate, including a spread. The spread is based on price data obtained from purchases and sales of similar mortgage loans traded in both the agency and non-agency markets, adjusted based on the mortgage loan's current LTV ratio and DSCR, which are unobservable.

Given the relative illiquidity in the marketplace for unsecuritized multifamily mortgage loans and the significance of the unobservable inputs to the valuation, these loans are classified as Level 3.

These values are sensitive to changes in benchmark interest rates, market pricing spreads to benchmark interest rates for credit and liquidity risk factors, estimated prepayment speeds subsequent to the expiration of yield maintenance periods, and portfolio credit quality as represented by each loan's current estimated DSCR and LTV ratios. Significant increases in interest rates and credit and liquidity spreads and/or deterioration in portfolio credit quality (e.g., increases in LTV ratios and/or decreases in DSCR) may result in significantly lower fair value measurement.

**Mortgage Loans, Held-for-Investment**

Mortgage loans, held-for-investment are measured at fair value on a non-recurring basis and represent impaired multifamily mortgage loans that have been written down to the fair value of the underlying collateral due to impairment. We primarily use the income capitalization technique and third-party appraisals to derive the fair value of the underlying collateral. The income capitalization approach estimates the fair value using the present value of expected future cash flows by applying an overall capitalization rate to the forecasted net operating income. The key input used in this calculation is the capitalization rate, which is determined through analysis of the DSCR. The valuations are also sensitive to current interest rates and investor return requirements. The third-party appraisers consider the physical condition of the property and use comparable sales and other market data in determining the appraised value. We use the prices provided by the third-party appraisers without adjustment. We classify impaired multifamily mortgage loans, held-for-investment as Level 3 in the fair value hierarchy as their valuation includes significant unobservable inputs.

**Derivative Assets, Net**

Derivative assets largely consist of interest-rate swaps, option-based derivatives, futures, and forward purchase and sale commitments that we account for as derivatives. The carrying value of our derivatives on our consolidated balance sheets is equal to their fair value, including net derivative interest receivable or payable, and trade/settle receivable or payable, and is net of cash collateral held or posted, where allowable by a master netting agreement. Derivatives in a net unrealized gain position are reported as derivative assets, net. Similarly, derivatives in a net unrealized loss position are reported as derivative liabilities, net.

*Interest-Rate Swaps and Option-Based Derivatives*

The fair values of interest-rate swaps are determined by using the appropriate yield curves to discount the expected cash flows of both the fixed and variable rate components of the swap contracts. In doing so, we first observe publicly available market spot interest rates, such as money market rates, Eurodollar futures contracts, LIBOR swap rates, and OIS rates. The spot curves are translated to forward curves using internal models. From the forward curves, the periodic cash flows are calculated on the pay and receive sides of the swap and discounted back at the relevant forward rates to arrive at the fair value of the swap. Since the fair values of the swaps are determined by using observable inputs from active markets, these are generally classified as Level 2 under the fair value hierarchy.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4264

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Option-based derivatives include call and put swaptions and other option-based derivatives. The majority of our option-based derivatives are European options. The fair values of the European call and put swaptions are calculated by using market observable interest rates and dealer-supplied interest rate volatility grids as inputs to our option-pricing models. Within each grid, prices are determined based on the option term of the underlying swap and the strike rate of the swap. Derivatives with embedded American options are valued using dealer-provided pricing grids. The grids contain prices corresponding to specified option terms of the underlying swaps and the strike rate of the swaps. Interpolation is used to calculate prices for positions for which specific grid points are not provided. Derivatives with embedded Bermudan options are valued based on prices provided directly by counterparties. Swaptions are classified as Level 2 under the fair value hierarchy. Other option-based derivatives include exchange-traded options that are valued by exchange-published daily closing prices. Therefore, exchange-traded options are classified as Level 1 under the fair value hierarchy. Other option-based derivatives also include purchased interest-rate cap and floor contracts that are valued by using observable market interest rates and cap and floor rate volatility grids obtained from dealers, and cancellable interest rate swaps that are valued by using dealer prices. Cap and floor contracts are classified as Level 2 and cancellable interest rate swaps with fair values using significant unobservable inputs are classified as Level 3 under the fair value hierarchy.

Cancelable swaps, which are interest rate swaps where one counterparty has the option to terminate on one or more payment dates, comprise the largest component of the Level 3 derivatives population. These positions are priced using counterparty prices. The cancelable swap valuation is largely driven by changes in interest rates and volatility. As we are in a net receive-fixed position with respect to cancelable swaps, we are effectively short a call option. As a result, an increase (decrease) in interest rates will result in a decrease (increase) to the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to the fair value measurement. These impacts are highly dependent on the specific terms of each deal and the degree to which the holder of the option is in the money or out of the money, as a decrease in interest rates will increase the likelihood that the counterparty will exercise the call option. In addition, changes in our or a counterparty's creditworthiness could impact the valuation. For example, a deterioration (improvement) in our creditworthiness decreases (increases) the fair value measurement.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

The table below shows the fair values, prior to counterparty and cash collateral netting adjustments, for our interest-rate swaps and option-based derivatives and the maturity profiles of our derivative positions. It also provides the weighted-average fixed rates of our pay-fixed and receive-fixed swaps. As of June 30, 2012 and December 31, 2011, our option-based derivatives had a remaining weighted-average life of 5.1 years and 5.0 years, respectively.

### Table 16.5 — Fair Values and Maturities for Interest-Rate Swaps and Option-Based Derivatives

| | June 30, 2012 | | | | | |
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | (dollars in millions) | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 249,498 | $ 13,480 | $ 115 | $ 833 | $ 3,813 | $ 8,719 |
| Weighted average fixed rate[3] | | | 2.09% | 1.02% | 1.99% | 2.84% |
| Forward-starting swaps[4] | 10,930 | 1,347 | — | — | — | 1,347 |
| Weighted average fixed rate[3] | | | | | | 3.79% |
| Basis (floating to floating) | 2,350 | 4 | (1) | — | 5 | — |
| Pay-fixed: | | | | | | |
| Swaps | 275,951 | (32,685) | (29) | (2,584) | (5,366) | (24,706) |
| Weighted-average fixed rate[3] | | | 0.85% | 2.92% | 2.86% | 3.68% |
| Forward-starting swaps[4] | 16,709 | (2,041) | — | — | — | (2,041) |
| Weighted-average fixed rate[3] | | | | | | 3.35% |
| Total interest-rate swaps | $ 555,438 | $(19,895) | $ 85 | $(1,751) | $ (1,548) | $ (16,681) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 54,695 | $ 8,827 | $ 2,579 | $ 3,393 | $ 260 | $ 2,595 |
| Put swaptions | 45,300 | 333 | — | 29 | 48 | 256 |
| Other option-based derivatives[5] | 33,492 | 2,399 | — | — | — | 2,399 |
| Total option-based | $ 133,487 | $ 11,559 | $ 2,579 | $ 3,422 | $ 308 | $ 5,250 |

| | December 31, 2011 | | | | | |
| | | | Fair Value[1] | | | |
| | Notional or Contractual Amount | Total Fair Value[2] | Less than 1 Year | 1 to 3 Years | Greater than 3 and up to 5 Years | In Excess of 5 Years |
| | (dollars in millions) | | | | | |
| Interest-rate swaps: | | | | | | |
| Receive-fixed: | | | | | | |
| Swaps | $ 195,716 | $ 10,651 | $ 22 | $ 390 | $ 2,054 | $ 8,185 |
| Weighted-average fixed rate[3] | | | 1.17% | 1.03% | 2.26% | 3.35% |
| Forward-starting swaps[4] | 16,092 | 2,239 | — | — | — | 2,239 |
| Weighted-average fixed rate[3] | | | | | | 3.96% |
| Basis (floating to floating) | 2,750 | (2) | — | (6) | 4 | — |
| Pay-fixed: | | | | | | |
| Swaps | 276,564 | (31,565) | (62) | (1,319) | (6,108) | (24,076) |
| Weighted average fixed rate[3] | | | 1.59% | 2.20% | 3.13% | 3.84% |
| Forward-starting swaps[4] | 12,771 | (2,923) | — | — | — | (2,923) |
| Weighted average fixed rate[3] | | | | | | 5.16% |
| Total interest-rate swaps | $ 503,893 | $ (21,600) | $ (40) | $ (935) | $ (4,050) | $ (16,575) |
| Option-based derivatives: | | | | | | |
| Call swaptions | $ 103,800 | $ 10,043 | $ 5,230 | $ 1,339 | $ 558 | $ 2,916 |
| Put swaptions | 70,875 | 636 | 22 | 49 | 166 | 399 |
| Other option-based derivatives[5] | 38,549 | 2,254 | — | — | — | 2,254 |
| Total option-based | $ 213,224 | $ 12,933 | $ 5,252 | $ 1,388 | $ 724 | $ 5,569 |

(1)   Fair value is categorized based on the period from June 30, 2012 and December 31, 2011, respectively, until the contractual maturity of the derivatives.
(2)   Represents fair value for each product type, prior to counterparty netting, cash collateral netting, net trade/settle receivable or payable, and net derivative interest receivable or payable adjustments.
(3)   Represents the notional weighted average rate for the fixed leg of the swaps.
(4)   Represents interest-rate swap agreements that are scheduled to begin on future dates ranging from less than one year to thirteen years as of June 30, 2012.
(5)   Primarily includes purchased interest rate caps and floors.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Other Derivatives*

Other derivatives mainly consist of exchange-traded futures, foreign-currency swaps, certain forward purchase and sale commitments, and credit derivatives. The fair value of exchange-traded futures is based on end-of-day observed closing prices obtained from third-party pricing services; therefore, they are classified as Level 1 under the fair value hierarchy. The fair value of foreign-currency swaps is determined by using the appropriate yield curves to calculate and discount the expected cash flows for the swap contracts; therefore, they are classified as Level 2 under the fair value hierarchy since the fair values are determined by using observable inputs from active markets.

Certain purchase and sale commitments are also considered to be derivatives and are classified as Level 2 or Level 3 under the fair value hierarchy, depending on the fair value hierarchy classification of the purchased or sold item, whether a security or loan. Such valuation techniques are further discussed in the *"Investments in Securities"* section above and "Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed — *Mortgage Loans*."

Credit derivatives primarily include short-term default guarantee commitments, which we value using a discounted cash flow approach and market-adjusted credit spreads. We classify fair value measurements related to credit derivatives as Level 3 under the fair value hierarchy because there are limited market benchmarks and significant unobservable inputs.

*Consideration of Credit Risk in Our Valuation of Derivatives*

The fair value of derivative assets considers the impact of institutional credit risk in the event that the counterparty does not honor its payment obligation. Additionally, the fair value of derivative liabilities considers the impact of our institutional credit risk. Based on this evaluation, and because we obtain collateral from, or post collateral to, most counterparties, typically within one business day of the daily market value calculation, our fair value of derivatives is not adjusted for credit risk. See "NOTE 15: CONCENTRATION OF CREDIT AND OTHER RISKS" for a discussion of our counterparty credit risk.

**Other Assets: Guarantee Asset and All Other Assets**

Our guarantee asset is valued either through obtaining dealer quotes on similar securities or through a discounted cash flow approach. Because of the broad range of liquidity discounts applied by dealers to these similar securities and because the discounted cash flow valuation approach uses significant unobservable inputs, we classified the guarantee asset as Level 3. Our guarantee asset is comprised mostly of guarantees on multifamily Freddie Mac securities. This asset is valued using a discounted cash flow approach that is sensitive to changes in benchmark interest rates and our current OAS to benchmark rates for the inception of new guarantees, which are in turn driven by changes in our view of credit risk and liquidity and changes in the credit profile of the guarantee portfolio. Significant increases in benchmark interest rates and credit and liquidity OAS and/or deterioration in portfolio credit quality may result in significantly lower fair value measurement.

All other assets at fair value consist of mortgage servicing rights, and are valued based on a discounted cash flow valuation performed by a third-party vendor that specializes in valuing and brokering sales of mortgage servicing rights. These values are classified as Level 3 and are sensitive to changes in unobservable inputs, including: benchmark interest rates, cost of servicing performing and non-performing loans, estimated prepayment speeds and default rates, and expected ancillary income. Significant increases or decreases in any of these inputs may result in significantly different fair value measurements.

**REO, Net**

REO is initially measured at its fair value less costs to sell, and is subsequently measured at the lower of cost or fair value less costs to sell. The fair value of REO is determined using an internal model that considers state and collateral level data to produce an estimate of fair value based on REO dispositions in the most recent three months. We use the actual disposition prices on REO and the current loan UPB at the state level to estimate the current fair value of REO. Certain adjustments, such as state specific adjustments, are made to the estimated fair value, as applicable. Due to the use of unobservable inputs, REO is classified as Level 3 under the fair value hierarchy.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### Debt Securities Recorded at Fair Value

We elected the fair value option for foreign-currency denominated debt instruments and certain other debt securities. See "Fair Value Election — *Debt Securities with Fair Value Option Elected*" for additional information. We determine the fair value of these instruments by obtaining multiple quotes from dealers. Given the weakness in the market as evidenced by low transaction volumes in these securities, these fair values are classified as Level 3 in the fair value hierarchy at June 30, 2012.

Our foreign-currency denominated debt instruments are priced using counterparty dealer prices. The fair value measurement is dependent on forward interest rates and spot exchange rates for the foreign currency. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement, while the strengthening (weakening) of the foreign currency versus the U.S. dollar will increase (decrease) the fair value measurement.

Certain other debt securities represent our debt whose maturity can be lengthened at the option of the issuer. These products are callable in nature with an embedded option. In this case, the valuation behaves similarly to that of a callable bond. As we are the debt issuer, an increase (decrease) in interest rates will result in a decrease (increase) in the fair value measurement. An increase (decrease) in volatility will generally result in a decrease (increase) to fair value. These impacts are highly dependent on the specific terms of each deal and the degree to which the bond could be called back, as a decrease in interest rates will increase the likelihood that we will exercise our call option. In addition, changes in our creditworthiness could impact the valuation, with a deterioration (improvement) in credit reducing (increasing) the fair value measurement.

### Derivative Liabilities, Net

See discussion under *"Derivative Assets, Net"* above.

### Quantitative Information about Level 3 Fair Value Measurements for Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets

The table below provides valuation techniques, the range, and the weighted average of significant unobservable inputs for assets and liabilities measured at fair value on a recurring and non-recurring basis using unobservable inputs (Level 3) as of June 30, 2012.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 16.6 — Quantitative Information about Level 3 Fair Value Measurements

| | Total Fair Value | Level 3 Fair Value | Predominant Valuation Technique(s) | Unobservable Inputs[1] | | |
|---|---|---|---|---|---|---|
| | | | | Type | Range | Weighted Average |
| | (dollars in millions) | | | | | |
| **Recurring fair value measurements** | | | | | | |
| *Assets* | | | | | | |
| Investments in securities | | | | | | |
| Available-for-sale, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac | | $ 1,493 | Hedge ratio | Effective duration[2] | 0.04 - 1.46 years | 1.45 years |
| | | 340 | Other | | | |
| Total Freddie Mac | $ 73,224 | 1,833 | | | | |
| Fannie Mae | | 144 | Median of external sources | External pricing sources | $104.7 - $111.4 | $108.2 |
| | | 35 | Other | | | |
| Total Fannie Mae | 17,689 | 179 | | | | |
| Ginnie Mae | | 10 | Discounted cash flows | | | |
| | | 8 | Median of external sources | | | |
| Total Ginnie Mae | 230 | 18 | | | | |
| Subprime, option ARM, and Alt-A: | | | | | | |
| Subprime | | 25,433 | Median of external sources | External pricing sources | $50.4 - $60.4 | $55.3 |
| | | 345 | Other | | | |
| Total subprime | 25,778 | 25,778 | | | | |
| Option ARM | | 5,422 | Median of external sources | External pricing sources | $38.5 - $45.3 | $42.0 |
| | | 6 | Other | | | |
| Total option ARM | 5,428 | 5,428 | | | | |
| Alt-A and other | | 8,630 | Median of external sources | External pricing sources | $63.7 - $71.2 | $67.6 |
| | | 2,103 | Other | | | |
| Total Alt-A and other | 10,733 | 10,733 | | | | |
| CMBS | | 2,271 | Single external source | External pricing sources | $93.6 - $93.6 | $93.6 |
| | | 1,029 | Hedge ratio | Effective duration[2] | 10.4 - 17.4 years | 15.4 years |
| | | 402 | Other | | | |
| Total CMBS | 52,982 | 3,702 | | | | |
| Obligations of states and political subdivisions | | 6,945 | Median of external sources | External pricing sources | $101.9 - $102.7 | $102.3 |
| | | 363 | Other | | | |
| Total obligations of states and political subdivisions | 7,308 | 7,308 | | | | |
| Manufactured housing | | 708 | Median of external sources | External pricing sources | $78.0 - $83.5 | $80.2 |
| | | 18 | Other | | | |
| Total manufactured housing | 726 | 726 | | | | |
| Total available-for-sale mortgage-related securities | 194,098 | 55,705 | | | | |
| Trading, at fair value | | | | | | |
| Mortgage-related securities | | | | | | |
| Agency securities: | | | | | | |
| Freddie Mac | | 932 | Discounted cash flows | OAS | (618) - 6,782 bps | 512 bps |
| | | 487 | Other | | | |
| Total Freddie Mac | 13,600 | 1,419 | | | | |
| Fannie Mae | | 368 | Discounted cash flows | OAS | (311) - 11,937 bps | 758 bps |
| | | 6 | Other | | | |
| Total Fannie Mae | 12,546 | 374 | | | | |
| Ginnie Mae | | 92 | Discounted cash flows | | | |
| | | 19 | Other | | | |
| Total Ginnie Mae | 147 | 111 | | | | |
| Other | 178 | 58 | Other | | | |
| Total trading mortgage-related securities | 26,471 | 1,962 | | | | |
| Total investments in securities | $220,569 | $ 57,667 | | | | |

183

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

| | Total Fair Value | Level 3 Fair Value | Predominant Valuation Technique(s) | Unobservable Inputs[1] | | |
|---|---|---|---|---|---|---|
| | | | | Type | Range | Weighted Average |
| | (dollars in millions) | | | | | |
| **Mortgage loans:** | | | | | | |
| Held-for-sale, at fair value | $10,120 | $ 10,120 | Discounted cash flows | DSCR | 1.25 - 6.79 | 1.85 |
| | | | | Current LTV | 10% - 80% | 71% |
| **Other assets:** | | | | | | |
| Guarantee asset, at fair value | | 717 | Discounted cash flows | OAS | 0 - 332 bps | 52 bps |
| | | 145 | Other | | | |
| Total guarantee asset, at fair value | 862 | 862 | | | | |
| All other, at fair value | 139 | 139 | Discounted cash flows | Prepayment rate[3] | 8.33% - 39.57% | 21.06% |
| | | | | Servicing income per loan | 0.19% - 0.51% | 0.25% |
| | | | | Cost to service per loan | $73 - $354 | $132 |
| Total other assets | 1,001 | 1,001 | | | | |
| **Liabilities** | | | | | | |
| Debt securities recorded at fair value | | 1,158 | Median of external sources | External pricing sources | $102.9 - $103.5 | $103.1 |
| | | 1,000 | Single external source | External pricing source | $100.0 - $100.0 | $100.0 |
| Total debt securities recorded at fair value | 2,158 | 2,158 | | | | |
| Net derivatives | 168 | 20 | Discounted cash flows | | | |
| | | | Counterparty marks | | | |
| All other, at fair value | 1 | 1 | Discounted cash flows | | | |
| **Non-recurring fair value measurements** | | | | | | |
| Mortgage loans | | | | | | |
| Held-for-investment | | $ 731 | Income capitalization | Capitalization rates[4] | 5% - 9% | 7% |
| | | 436 | Third-party appraisal | Property value | $2 million - $43 million | $19 million |
| Total held-for-investment | $ 1,167 | 1,167 | | | | |
| REO, net | | 598 | Market comparable data[5] | Historical average sale proceeds by state per property[6] | $33,834 - $335,272 | $105,965 |
| | | 6 | Other | | | |
| Total REO, net | 604 | 604 | | | | |

(1) Certain unobservable input types, range, and weighted average data are not disclosed in this table if they are associated with a class: (a) that has a Level 3 fair value measurement that is not considered material; or (b) where we have disclosed the predominant valuation technique with related unobservable inputs for the most significant portion of that class.

(2) Effective duration is used as a proxy to represent the aggregate impact of key rate durations.

(3) Represents the effective borrower prepayment and modeled foreclosure rate based upon the principal balance weighted expected life, derived from our prepayment model.

(4) The capitalization rate "Range" and "Weighted Average" represent those loans that are valued using the Income Capitalization approach, which is the predominant valuation technique used for this population. Certain loans in this population are valued using other techniques, and the capitalization rate for those is not represented in the "Range" or "Weighted Average" above.

(5) Represents internal models that use distressed property sales proceeds by state based on a three month average to measure the initial value of REO and the subsequent write-down to measure the current fair value for REO properties.

(6) Represents the average of three months of REO sales proceeds by state.

## Valuation Processes and Controls Over Fair Value Measurement

Groups within our Finance division, independent of our trading and investing function, execute and validate the valuation processes. Our Enterprise Valuation Risk group, or EVR, provides independent risk governance over all valuation processes with the goal of verifying that reasonable fair values are used for financial reporting and risk management. EVR creates, maintains, and updates corporate-wide valuation control policies related to our valuation processes, including providing notice to the business areas when updates are made and consulting with the business areas on policy implementation.

We employ control processes to validate the techniques and models we use to determine fair value including review and approval of new transaction types, valuation judgments, methods, models, process controls, and results. These processes are designed to help ensure that fair value measurements are appropriate, consistently applied, and reliable.

- Our control processes include performing monthly independent verification of fair value measurements by comparing the methodology driven price to other market source data (to the extent available), and using independent analytics to determine if assigned fair values are reasonable. This review covers all categories of products with increased attention given to higher risk/impact valuations, including those dependent on a single source.

184

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

- Our validation processes are intended to help ensure that the individual prices we receive from third parties are consistent with our observations of the marketplace and prices that are provided to us by dealers or pricing services. Where applicable, prices are back-tested by comparing the settlement prices to our fair value measurements.
- Analytical procedures include automated checks of prices for reasonableness based on variations from prices in previous periods, comparisons of prices to internally calculated expected prices based on market moves, analysis of changes to pricing ranges, and relative value and yield comparisons based on specific characteristics of securities and our proprietary models.

Our valuation processes and related fair value hierarchy assessments require us to make judgments regarding the liquidity of the marketplace. These judgments are based on the volume of securities traded in the marketplace, the width of bid/ask spreads, and the dispersion of prices on similar securities.

Thresholds are set for each product class by EVR to identify exceptions that require further analysis. To the extent that we determine that a price is outside of established parameters, we will further examine the price, including follow up discussions with the specific pricing service or dealer and/or supplemental analytics and review, and ultimately will not use that price if we are unable to validate the price. These processes are executed prior to the completion of the financial statements.

Additionally, the Valuation & Finance Model Committee, or Valuation Committee, which includes senior representation from business areas and our Enterprise Risk Management and Finance divisions, provides senior management's governance over valuation methodologies and controls, and reviews exceptions and resolution from the review and validation processes.

Where models are employed to assist in the measurement of fair value, all changes made to those models during the periods presented are put through the corporate model change governance process and material changes are reviewed by the Valuation Committee. Inputs used by those models maximize the use of market based inputs, are regularly updated for changes in the underlying data, assumptions, valuation inputs, or market conditions, and are subject to the valuation controls noted above.

We also consider credit risk in the valuation of our assets and liabilities, with the credit risk of the counterparty considered in asset valuations and our own credit risk considered in liability valuations.

**Consolidated Fair Value Balance Sheets**

The supplemental consolidated fair value balance sheets in the table below present our estimates of the fair value of our financial assets and liabilities at June 30, 2012 and December 31, 2011. The valuations of financial instruments on our consolidated fair value balance sheets are in accordance with the accounting guidance for fair value measurements and disclosures and the accounting guidance for financial instruments. The consolidated fair value balance sheets do not purport to present our net realizable, liquidation, or market value as a whole. Furthermore, amounts we ultimately realize from the disposition of assets or settlement of liabilities may vary significantly from the fair values presented.

<div align="center">185</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## Table 16.7 — Consolidated Fair Value Balance Sheets

| | June 30, 2012 | | | | | | December 31, 2011 | |
| | | Fair Value | | | | | | |
| | Carrying Amount(1) | Level 1 | Level 2 | Level 3 | Netting Adjustments | Total | Carrying Amount(1) | Fair Value |
| | | | | (in billions) | | | | |
| **Assets** | | | | | | | | |
| Cash and cash equivalents | $ 19.2 | $ 18.9 | $ 0.3 | $ — | $ — | $ 19.2 | $ 28.4 | $ 28.4 |
| Restricted cash and cash equivalents | 10.2 | 10.2 | — | — | — | 10.2 | 28.1 | 28.1 |
| Federal funds sold and securities purchased under agreements to resell | 38.9 | — | 38.9 | — | — | 38.9 | 12.0 | 12.0 |
| *Investments in securities:* | | | | | | | | |
| Available-for-sale, at fair value | 194.1 | — | 138.4 | 55.7 | — | 194.1 | 210.7 | 210.7 |
| Trading, at fair value | 47.4 | 19.0 | 26.4 | 2.0 | — | 47.4 | 58.8 | 58.8 |
| *Total investments in securities* | 241.5 | 19.0 | 164.8 | 57.7 | | 241.5 | 269.5 | 269.5 |
| *Mortgage loans:* | | | | | | | | |
| Mortgage loans held by consolidated trusts | 1,532.9 | — | 1,056.6 | 520.4 | — | 1,577.0 | 1,564.2 | 1,598.2 |
| Unsecuritized mortgage loans | 197.2 | — | 19.2 | 156.5 | — | 175.7 | 217.1 | 205.9 |
| *Total mortgage loans* | 1,730.1 | — | 1,075.8 | 676.9 | — | 1,752.7 | 1,781.3 | 1,804.1 |
| Derivative assets, net | 0.2 | — | 27.3 | — | (27.1) | 0.2 | 0.1 | 0.1 |
| Other assets | 26.2 | — | 0.9 | 25.2 | — | 26.1 | 27.8 | 28.5 |
| Total assets | $ 2,066.3 | $ 48.1 | $ 1,308.0 | $759.8 | $ (27.1) | $2,088.8 | $ 2,147.2 | $ 2,170.7 |
| **Liabilities** | | | | | | | | |
| *Debt, net:* | | | | | | | | |
| Debt securities of consolidated trusts held by third parties | $ 1,468.6 | — | $1,543.8 | $ 3.7 | $ — | $1,547.5 | $ 1,471.4 | $ 1,552.5 |
| Other debt | 581.7 | — | 580.9 | 20.6 | — | 601.5 | 660.6 | 681.2 |
| *Total debt, net* | 2,050.3 | — | 2,124.7 | 24.3 | — | 2,149.0 | 2,132.0 | 2,233.7 |
| Derivative liabilities, net | 0.3 | — | 35.6 | — | (35.3) | 0.3 | 0.4 | 0.4 |
| Other liabilities | 14.6 | 0.3 | 8.2 | 7.6 | — | 16.1 | 14.9 | 15.0 |
| Total liabilities | 2,065.2 | 0.3 | 2,168.5 | 31.9 | (35.3) | 2,165.4 | 2,147.3 | 2,249.1 |
| **Net assets** | | | | | | | | |
| Senior preferred stockholders | 72.3 | — | — | 72.3 | — | 72.3 | 72.2 | 72.2 |
| Preferred stockholders | 14.1 | — | 1.0 | — | — | 1.0 | 14.1 | 0.6 |
| Common stockholders | (85.3) | — | — | (149.9) | — | (149.9) | (86.4) | (151.2) |
| Total net assets | 1.1 | — | 1.0 | (77.6) | — | (76.6) | (0.1) | (78.4) |
| Total liabilities and net assets | $ 2,066.3 | $ 0.3 | $2,169.5 | $ (45.7) | $ (35.3) | $2,088.8 | $ 2,147.2 | $ 2,170.7 |

(1)   Equals the amount reported on our GAAP consolidated balance sheets.

## Limitations

Our consolidated fair value balance sheets do not capture all elements of value that are implicit in our operations as a going concern because our consolidated fair value balance sheets only capture the values of the current investment and securitization portfolios as of the dates presented. For example, our consolidated fair value balance sheets do not capture the value of new investment and securitization business that would likely replace prepayments as they occur, nor do they include any estimation of intangible or goodwill values. Thus, the fair value of net assets presented on our consolidated fair value balance sheets does not represent an estimate of our net realizable, liquidation, or market value as a whole.

The fair value of certain financial instruments is based on our assumed current principal exit market as of the dates presented. As new markets evolve, our assumed principal exit market may change. The use of different assumptions and methodologies to determine the fair values of certain financial instruments, including the use of different principal exit markets, could have a material impact on the fair value of net assets presented on our consolidated fair value balance sheets.

We report certain assets and liabilities that are not financial instruments (such as property and equipment and REO), as well as certain financial instruments that are not covered by the disclosure requirements in the accounting guidance for financial instruments, such as pension liabilities, at their carrying amounts in accordance with GAAP on our consolidated fair value balance sheets. We believe these items do not have a significant impact on our overall fair value results. Other non-financial assets and liabilities on our GAAP consolidated balance sheets represent deferrals of costs and revenues that are amortized in accordance with GAAP, such as deferred debt issuance costs and deferred fees. Cash receipts and payments

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

related to these items are generally recognized in the fair value of net assets when received or paid, with no basis reflected on our fair value balance sheets.

**Valuation Methods and Assumptions for Assets and Liabilities Not Measured at Fair Value in Our Consolidated Balance Sheets, but for Which the Fair Value is Disclosed**

The following are valuation assumptions and methods for items not subject to the fair value hierarchy either because they are not measured at fair value other than on the fair value balance sheet or are only measured at fair value at inception.

### Cash and Cash Equivalents (including Restricted Cash and Cash Equivalents)

Cash and cash equivalents (including restricted cash and cash equivalents) largely consist of highly liquid investment securities with an original maturity of three months or less used for cash management purposes, as well as cash held at financial institutions and cash collateral posted by our derivative counterparties. Given that these assets are short-term in nature with limited market value volatility, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Cash and restricted cash are classified as Level 1. Cash equivalents (including restricted cash equivalents) that are highly liquid investments for which we can obtain unadjusted quoted prices are also classified as Level 1. Cash equivalents (including restricted cash equivalents) are primarily classified as Level 2 because we use observable inputs other than quoted prices to determine the fair value measurement.

### Federal Funds Sold and Securities Purchased Under Agreements to Resell

Federal funds sold and securities purchased under agreements to resell principally consist of short-term contractual agreements such as reverse repurchase agreements involving Treasury and agency securities and federal funds sold. Given that these assets are short-term in nature, the carrying amount on our GAAP consolidated balance sheets is deemed to be a reasonable approximation of fair value. Federal funds sold and securities purchased under agreements to resell are classified as Level 2 because these are liquid, but there are no direct quotes available for our exact positions.

### Mortgage Loans

Single-family mortgage loans are classified as held-for-investment and recorded at amortized cost. Certain multifamily mortgage loans are recorded at fair value due to the election of the fair value option, or they are held for investment and recorded at fair value upon impairment, which is based upon the fair value of the collateral as multifamily loans are collateral-dependent.

#### Single-Family Loans

In determining the fair value of single-family mortgage loans, valuation outcomes can vary widely based on management judgments and decisions used in determining: (a) the principal market; (b) modeling assumptions, including default, severity, home prices, and risk premium; and (c) inputs used to determine variables including risk premiums, credit costs, security pricing, and implied management and guarantee fees. Our principal markets include the GSE securitization market and the whole loan market. To determine the principal market, we considered the market with the greatest volume and level of activity, and our ability to access that market. In the absence of a market with active trading, we determined the market that would maximize the amount we would receive upon sale.

#### GSE Securitization Market as Principal Market

For single-family mortgage loans where we determined the principal market is the GSE securitization market, we estimate fair value based on the estimate of the price we would receive if we were to securitize these loans. This principal market assumption applies to both loans held by consolidated trusts and unsecuritized loans.

Our estimate of fair value is based on: (a) comparisons to prices of actively traded mortgage-related securities with similar characteristics; (b) the excess coupon (implied management and guarantee fee); and (c) the credit obligation related to performing our guarantee.

The security price is derived from benchmark security pricing for similar actively traded mortgage-related securities, and is adjusted for yield, credit, and liquidity differences. This security pricing process is consistent with our approach for valuing similar securities retained in our investment portfolio or issued to third parties. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Investments in Securities*."

<div align="center">187</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

We derive the implied management and guarantee fees in excess of the coupon on the mortgage-related securities by estimating the present value of the additional cash flows from these elements. Our approach for estimating the fair value of the implied management and guarantee fees uses third-party market data as practicable. The valuation approach for the majority of implied management and guarantee fees relates to fixed-rate loan products with coupons at or near current market rates and involves obtaining dealer quotes on hypothetical securities constructed with collateral characteristics from our single-family credit guarantee portfolio. The remaining portion of the implied management and guarantee fees relates to underlying loan products for which comparable market prices are not readily available. These relate specifically to ARM products, highly seasoned loans, and fixed-rate loans with coupons that are not consistent with current market rates. For this portion of the single-family credit guarantee portfolio, the implied management and guarantee fees are valued using an expected cash flow approach, leveraging the market information received on the more liquid portion of the population and including only those cash flows expected to result from our contractual right to receive management and guarantee fees.

The estimate of fair value is also net of the related credit and other costs (such as general and administrative expense) and benefits (such as credit enhancements) inherent in our guarantee obligation. We use delivery and guarantee fees charged by us as a market benchmark for all guaranteed loans that would qualify for purchase under current underwriting standards (used for the majority of the guaranteed loans, but accounts for a small share of the overall fair value of the guarantee obligation). For loans that do not qualify for purchase based on current underwriting standards, we use our internal credit models, which incorporate factors such as loan characteristics, loan performance status information, expected losses, and risk premiums without further adjustment (used for less than half of the guaranteed loans, but accounts for the largest share of the overall fair value of the guarantee obligation).

For loans that have been refinanced under HARP, we value our guarantee obligation using the delivery and guarantee fees currently charged by us under that initiative. If, subsequent to delivery, the refinanced loan no longer qualifies for purchase based on current underwriting standards (such as becoming past due or being modified as a part of a troubled debt restructuring), the fair value of the guarantee obligation is then measured using our internal credit models as described above, or third-party market pricing as described below.

The total compensation that we receive for the delivery of a HARP loan reflects the pricing that we are willing to offer because HARP is a part of a broader government program intended to provide assistance to homeowners and prevent foreclosures. When HARP ends, the beneficial pricing afforded to HARP loans will no longer be reflected in our delivery and guarantee fee pricing structure. If these benefits were not reflected in the pricing for these loans, the fair value of our mortgage loans would have decreased by $10.1 billion as of June 30, 2012. The total fair value of the loans in our portfolio that reflects the pricing afforded to HARP loans as of June 30, 2012 as presented in our consolidated fair value balance sheets is $129.7 billion.

*Whole Loan Market as Principal Market*

For single-family mortgage loans where we determined the principal market is the whole loan market, we estimate fair value based on our estimate of prices we would receive if we were to sell these loans in the whole loan market. Prices for these loans are obtained from multiple dealers who reference market activity, where available, for deeply delinquent and the majority of modified loans and use internal models and their judgment to determine default rates, severity rates, home prices, and risk premiums.

*Level in the Fair Value Hierarchy*

Single-family mortgage loans are classified as Level 2 or Level 3 depending on whether the inputs are observable. Single-family mortgage loans that would qualify for purchase under current underwriting standards are assigned to Level 2 as the key inputs used for the valuation of these loans, such as TBA pricing, our externally-published credit pricing grids for delivery and guarantee fees, and third-party excess interest-only prices, are observable while modeled components comprise a small percentage of total value (e.g., general and administrative expense, credit enhancement). Other single-family mortgage loans are classified in Level 3 if our credit cost is based on our internal credit model or if loans are valued using prices obtained from dealers. The internal model and the dealer prices are based on assumptions, which include significant unobservable inputs.

<div align="center">188</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

*Multifamily Loans*

For a discussion of the techniques used to determine the fair value of held-for-sale and impaired held-for-investment multifamily mortgage loans, see "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Mortgage Loans, Held-for-Investment*" and *"— Mortgage Loans, Held-for-Sale,"* respectively. Non-impaired multifamily mortgage loans are valued using the same technique as held-for-sale multifamily mortgage loans.

### Other Assets

Most of our other assets are not financial instruments required to be valued at fair value under the accounting guidance for disclosures about the fair value of financial instruments, such as property and equipment. For most of these non-financial instruments in other assets, we use the carrying amounts from our GAAP consolidated balance sheets as the reported values on our consolidated fair value balance sheets, without any adjustment. These assets represent an insignificant portion of our GAAP consolidated balance sheets.

We adjust the GAAP-basis deferred taxes reflected on our consolidated fair value balance sheets to include estimated income taxes on the difference between our consolidated fair value balance sheets net assets, including deferred taxes from our GAAP consolidated balance sheets, and our GAAP consolidated balance sheets total equity (deficit). To the extent the adjusted deferred taxes are a net asset, this amount is included in other assets. In addition, if our net deferred tax assets on our consolidated fair value balance sheets, calculated as described above, exceed our net deferred tax assets on our GAAP consolidated balance sheets that have been reduced by a valuation allowance, our net deferred tax assets on our consolidated fair value balance sheets are limited to the amount of our net deferred tax assets on our GAAP consolidated balance sheets. If the adjusted deferred taxes are a net liability, this amount is included in other liabilities.

Accrued interest receivable is one of the components included within other assets on our consolidated fair value balance sheets. On our GAAP consolidated balance sheets, we reverse accrued but uncollected interest income when a loan is placed on non-accrual status. There is no such reversal performed for the fair value of accrued interest receivable disclosed on our consolidated fair value balance sheets. Rather, we include in our fair value disclosure the amount we deem to be collectible. As a result, there is a difference between the accrued interest receivable GAAP-basis carrying amount and its fair value disclosed on our consolidated fair value balance sheets.

Other assets are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Total Debt, Net

Total debt, net represents debt securities of consolidated trusts held by third parties and other debt that we issued to finance our assets. On our consolidated GAAP balance sheets, total debt, net, excluding debt securities for which the fair value option has been elected, is reported at amortized cost, which is net of deferred items, including premiums, discounts, and hedging-related basis adjustments.

For fair value balance sheet purposes, we use the dealer-published quotes for a base TBA security, adjusted for the carry and pay-up price adjustments, to determine the fair value of the debt securities of consolidated trusts held by third parties. The valuation techniques we use are similar to the approach we use to value our investments in agency securities for GAAP purposes. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Investments in Securities — Agency Securities*" for additional information regarding the valuation techniques we use.

Other debt includes both non-callable and callable debt, as well as short-term zero-coupon discount notes. The fair value of the short-term zero-coupon discount notes is based on a discounted cash flow model with market inputs. The valuation of other debt securities represents the proceeds that we would receive from the issuance of debt and is generally based on market prices obtained from broker/dealers or reliable third-party pricing service providers. We elected the fair value option for foreign-currency denominated debt and certain other debt securities and reported them at fair value on our GAAP consolidated balance sheets. See "Assets and Liabilities Measured at Fair Value in Our Consolidated Balance Sheets — *Debt Securities Recorded at Fair Value*" for additional information.

The majority of our debt is classified in Level 2, as these are liquid securities and multiple pricing sources are generally available (through pricing and verification), historically with a tight price range including verification sources. A smaller

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

population of debt, including debt where the fair value option is elected, is classified as Level 3 because these are illiquid securities with significant unobservable inputs and wide pricing ranges.

### Other Liabilities

Other liabilities consist of accrued interest payable on debt securities, the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities, the reserve for guarantee losses on non-consolidated trusts, servicer advanced interest payable and certain other servicer liabilities, accounts payable and accrued expenses, payables related to securities, and other miscellaneous liabilities. We believe the carrying amount of these liabilities is a reasonable approximation of their fair value, except for the guarantee obligation for our other guarantee commitments and guarantees issued to non-consolidated entities. The technique for estimating the fair value of our guarantee obligation related to the credit component of the loan's fair value is described in the "Mortgage Loans — Single-Family Loans" section.

As discussed in "Other Assets," other liabilities may include a deferred tax liability adjusted for fair value balance sheet purposes.

Other liabilities are classified primarily as Level 2 or Level 3 depending on whether unobservable inputs are significant to the fair value measurement.

### Net Assets Attributable to Senior Preferred Stockholders

Our senior preferred stock held by Treasury in connection with the Purchase Agreement is recorded at the stated liquidation preference for purposes of the consolidated fair value balance sheets, which is the same as the carrying value in our GAAP consolidated balance sheets, and does not reflect fair value. As the senior preferred stock is restricted as to its redemption, we consider the liquidation preference to be the most appropriate measure for purposes of the consolidated fair value balance sheets. Our senior preferred stock is classified as Level 3 because observable inputs are not available as this stock is not traded.

### Net Assets Attributable to Preferred Stockholders

To determine the preferred stock fair value, we use a market-based approach incorporating quoted dealer prices. Net Assets Attributable to Preferred Stockholders is classified as Level 2 because we receive multiple dealer quotes within a relatively narrow range, indicating an active market.

### Net Assets Attributable to Common Stockholders

Net assets attributable to common stockholders is equal to the difference between the fair value of total assets and total liabilities reported on our consolidated fair value balance sheets, less the value of net assets attributable to senior preferred stockholders and the fair value attributable to preferred stockholders. Our net assets attributable to common stockholders is classified as Level 3 because observable inputs are not available.

## NOTE 17: LEGAL CONTINGENCIES

We are involved as a party in a variety of legal and regulatory proceedings arising from time to time in the ordinary course of business including, among other things, contractual disputes, personal injury claims, employment-related litigation and other legal proceedings incidental to our business. We are frequently involved, directly or indirectly, in litigation involving mortgage foreclosures. From time to time, we are also involved in proceedings arising from our termination of a seller/servicer's eligibility to sell mortgages to, and/or service mortgages for, us. In these cases, the former seller/servicer sometimes seeks damages against us for wrongful termination under a variety of legal theories. In addition, we are sometimes sued in connection with the origination or servicing of mortgages. These suits typically involve claims alleging wrongful actions of seller/servicers. Our contracts with our seller/servicers generally provide for indemnification against liability arising from their wrongful actions with respect to mortgages sold to or serviced for Freddie Mac.

Litigation and claims resolution are subject to many uncertainties and are not susceptible to accurate prediction. In accordance with the accounting guidance for contingencies, we reserve for litigation claims and assessments asserted or threatened against us when a loss is probable and the amount of the loss can be reasonably estimated.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4276

Table of Contents

During the six months ended June 30, 2012, we paid approximately $4 million for the advancement of legal fees and expenses of former officers and directors pursuant to our indemnification obligations to them. These fees and expenses related to certain of the matters described below. This figure does not include certain administrative support costs and certain costs related to document production and storage.

**Putative Securities Class Action Lawsuits**

*Ohio Public Employees Retirement System ("OPERS") vs. Freddie Mac, Syron, et al*. This putative securities class action lawsuit was filed against Freddie Mac and certain former officers on January 18, 2008 in the U.S. District Court for the Northern District of Ohio purportedly on behalf of a class of purchasers of Freddie Mac stock from August 1, 2006 through November 20, 2007. The plaintiff alleges that the defendants violated federal securities laws by making false and misleading statements concerning our business, risk management and the procedures we put into place to protect the company from problems in the mortgage industry. On April 10, 2008, the Court appointed OPERS as lead plaintiff and approved its choice of counsel. On September 2, 2008, defendants filed motions to dismiss plaintiff's amended complaint. On November 7, 2008, the plaintiff filed a second amended complaint, which removed certain allegations against Richard Syron, Anthony Piszel, and Eugene McQuade, thereby leaving insider-trading allegations against only Patricia Cook. The second amended complaint also extends the damages period, but not the class period. The plaintiff seeks unspecified damages and interest, and reasonable costs and expenses, including attorney and expert fees. On November 19, 2008, the Court granted FHFA's motion to intervene in its capacity as Conservator. On April 6, 2009, defendants filed motions to dismiss the second amended complaint. On January 23, 2012, the Court denied defendants' motions to dismiss and set a briefing schedule for plaintiff's motion for leave to amend its complaint. On February 13, 2012, plaintiff filed motion for leave to amend, which sought leave to file a third amended complaint and add allegations based on a non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011. On March 27, 2012, the Court granted the plaintiff's motion for leave to amend, and plaintiff filed its third amended complaint on March 28, 2012. On April 26, 2012, defendants filed motions to dismiss the third amended complaint. The Court denied the motions on May 25, 2012. All defendants have filed answers to the third amended complaint. Discovery is ongoing.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential effect on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; and the fact that the parties have not yet briefed and the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

*Kuriakose vs. Freddie Mac, Syron, Piszel and Cook*. Another putative class action lawsuit was filed against Freddie Mac and certain former officers on August 15, 2008 in the U.S. District Court for the Southern District of New York for alleged violations of federal securities laws purportedly on behalf of a class of purchasers of Freddie Mac stock from November 21, 2007 through August 5, 2008. The plaintiffs claim that defendants made false and misleading statements about Freddie Mac's business that artificially inflated the price of Freddie Mac's common stock, and seek unspecified damages, costs, and attorneys' fees. On February 6, 2009, the Court granted FHFA's motion to intervene in its capacity as Conservator. On May 19, 2009, plaintiffs filed an amended consolidated complaint, purportedly on behalf of a class of purchasers of Freddie Mac stock from November 20, 2007 through September 7, 2008. Freddie Mac filed a motion to dismiss the complaint on February 24, 2010. On March 30, 2011, the Court granted without prejudice Freddie Mac's motion to dismiss all claims, and allowed the plaintiffs the option to file a new complaint, which they did on July 15, 2011. The defendants have filed motions to dismiss the second amended consolidated complaint. On February 17, 2012, plaintiff served a motion seeking leave to file a third amended consolidated complaint based on the non-prosecution agreement entered into between Freddie Mac and the SEC on December 15, 2011. These motions have been fully briefed and remain pending before the Court.

At present, it is not possible for us to predict the probable outcome of this lawsuit or any potential effect on our business, financial condition, or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the following factors, among others: the inherent uncertainty of pre-trial litigation; the fact that the Court has not yet ruled upon the defendants' motions to dismiss the second amended complaint or plaintiffs' motion seeking leave to file a third amended complaint; and the fact that the Court has not yet ruled upon motions for class certification or summary judgment. In particular, absent the certification of

191                                                                                                    *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

a class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

**Energy Lien Litigation**

On July 14, 2010, the State of California filed a lawsuit against Freddie Mac, Fannie Mae, FHFA, and others in the U.S. District Court for the Northern District of California, alleging that Freddie Mac and Fannie Mae committed unfair business practices in violation of California law by asserting that property liens arising from government-sponsored energy initiatives such as California's Property Assessed Clean Energy, or PACE, program cannot take priority over a mortgage to be sold to Freddie Mac or Fannie Mae. The lawsuit contends that the PACE programs create liens superior to such mortgages and that, by affirming Freddie Mac and Fannie Mae's positions, FHFA has violated the National Environmental Policy Act, or NEPA, and the Administrative Procedure Act, or APA. The complaint seeks declaratory and injunctive relief, costs and such other relief as the court deems proper.

Similar complaints have been filed by other parties. On July 26, 2010, the County of Sonoma filed a lawsuit against Fannie Mae, Freddie Mac, FHFA, and others in the U.S. District Court for the Northern District of California, alleging similar violations of California law, NEPA, and the APA. In a filing dated September 23, 2010, the County of Placer moved to intervene in the Sonoma County lawsuit as a party plaintiff seeking to assert similar claims, which motion was granted on November 1, 2010. On October 1, 2010, the City of Palm Desert filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA in the Northern District of California. On October 8, 2010, Leon County and the Leon County Energy Improvement District filed a similar complaint against Fannie Mae, Freddie Mac, FHFA, and others in the Northern District of Florida. On October 12, 2010, FHFA filed a motion before the Judicial Panel on Multi-District Litigation seeking an order transferring these cases as well as a related case filed only against FHFA, for coordination or consolidation of pretrial proceedings. This motion was denied on February 8, 2011. On October 14, 2010, the defendants filed a motion to dismiss the lawsuits pending in the Northern District of California. Also on October 14, 2010, the County of Sonoma filed a motion for preliminary injunction seeking to enjoin the defendants from giving any force or effect in Sonoma County to certain directives by FHFA regarding energy retrofit loan programs and other related relief. On October 26, 2010, the Town of Babylon filed a similar complaint against Fannie Mae, Freddie Mac, and FHFA, as well as the Office of the Comptroller of the Currency, in the U.S. District Court for the Eastern District of New York.

The defendants filed motions to dismiss these lawsuits. The courts have entered stipulated orders dismissing the individual officers of Freddie Mac and Fannie Mae from the cases. On December 17, 2010, the judge handling the cases in the Northern District of California requested a position statement from the United States, which was filed on February 8, 2011. On June 13, 2011, the complaint filed by the Town of Babylon was dismissed. On August 11, 2011, the Town of Babylon filed a notice of appeal to the U.S. Court of Appeals for the Second Circuit. On August 26, 2011, the California federal court granted in part defendants' motion to dismiss, leaving only plaintiffs' APA and NEPA claims against FHFA. The California federal district court cases were thereafter consolidated and the plaintiffs in those cases filed a joint motion for summary judgment on January 23, 2012. FHFA cross-moved for summary judgment on February 27, 2012.

Sonoma County's motion for preliminary injunction was granted in part, requiring FHFA to provide a notice and comment period with regard to its directives. FHFA filed an appeal of the injunction on September 15, 2011, and the District Court granted FHFA a 10-day stay of the injunction to allow FHFA to request a further stay from the U.S. Court of Appeals for the Ninth Circuit, which occurred on October 11, 2011. By order dated December 20, 2011, the Ninth Circuit denied the request for a stay with respect to the notice and comment period. Accordingly, on January 26, 2012, FHFA issued an advance notice of proposed rulemaking and notice of intent to prepare an environmental impact statement. On April 26, 2012, the Ninth Circuit issued an order stating that "the stay of the preliminary injunction remains in effect" and that it "will take no action on [the California plaintiffs'] appeal until after a decision on the summary judgment motions is issued." On June 15, 2012, FHFA issued a notice of proposed rulemaking.

On October 17, 2011 the City of Palm Desert voluntarily dismissed any remaining claims it might have had against Freddie Mac. The complaint filed by Leon County was dismissed by the Court on September 30, 2011. Leon County filed a notice of appeal to the U.S. Court of Appeals for the Eleventh Circuit on November 28, 2011.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential effect on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matters due to the following factors, among

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

others: the inherent uncertainty of pre-trial litigation; and the fact that the appeals filed by the Town of Babylon and Leon County are still pending.

**Government Investigations and Inquiries**

On December 16, 2011, the SEC announced that it had charged three former executives of Freddie Mac with securities laws violations. These executives are former Chairman of the Board and Chief Executive Officer Richard F. Syron, former Executive Vice President and Chief Business Officer Patricia L. Cook, and former Executive Vice President for the single-family guarantee business Donald J. Bisenius.

**Related Third Party Litigation and Indemnification Requests**

On December 15, 2008, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York against certain former Freddie Mac officers and others styled *Jacoby vs. Syron, Cook, Piszel, Banc of America Securities LLC, JP Morgan Chase & Co., and FTN Financial Markets.* The complaint, as amended on December 17, 2008, contends that the defendants made material false and misleading statements in connection with Freddie Mac's September 2007 offering of non-cumulative, non-convertible, perpetual fixed-rate preferred stock, and that such statements "grossly overstated Freddie Mac's capitalization" and "failed to disclose Freddie Mac's exposure to mortgage-related losses, poor underwriting standards and risk management procedures." The complaint further alleges that Syron, Cook, and Piszel made additional false statements following the offering. Freddie Mac is not named as a defendant in this lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the Underwriting Agreement in this case, including reimbursement of fees and disbursements of their legal counsel. The case is currently dormant and we believe plaintiff may have abandoned it.

By letter dated October 17, 2008, Freddie Mac received formal notification of a putative class action securities lawsuit, *Mark vs. Goldman, Sachs & Co., J.P. Morgan Chase & Co., and Citigroup Global Markets Inc.,* filed on September 23, 2008, in the U.S. District Court for the Southern District of New York, regarding the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock.

On January 29, 2009, a plaintiff filed a putative class action lawsuit in the U.S. District Court for the Southern District of New York styled *Kreysar vs. Syron, et al.* On April 30, 2009, the Court consolidated the Mark case with the Kreysar case, and the plaintiffs filed a consolidated class action complaint on July 2, 2009. The consolidated complaint alleged that three former Freddie Mac officers, certain underwriters and Freddie Mac's auditor violated federal securities laws by making material false and misleading statements in connection with the company's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. The complaint further alleged that certain defendants and others made additional false statements following the offering. The complaint named as defendants Syron, Piszel, Cook, Goldman, Sachs & Co., JPMorgan Securities Inc., Banc of America Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Co. Incorporated, UBS Securities LLC and PricewaterhouseCoopers LLP.

After the Court dismissed, without prejudice, the plaintiffs' consolidated complaint, amended consolidated complaint, and second consolidated complaint, the plaintiffs filed a third amended consolidated complaint against PricewaterhouseCoopers LLP, Syron and Piszel, omitting Cook and the underwriter defendants, on November 14, 2010. On January 11, 2011, the Court granted the remaining defendants' motion to dismiss the complaint with respect to PricewaterhouseCoopers LLP, but denied the motion with respect to Syron and Piszel. On April 4, 2011, Piszel filed a motion for partial judgment on the pleadings. The Court granted that motion on April 28, 2011. The plaintiffs moved for class certification on June 30, 2011, but withdrew this motion on July 5, 2011. The plaintiffs again moved for class certification on August 30, 2011, which motion was denied on March 27, 2012. Plaintiffs moved for reconsideration of this denial on April 11, 2012. The Court denied the motion for reconsideration on May 2, 2012. On May 31, 2012, the U.S. Court of Appeals for the Second Circuit denied plaintiffs' motion for leave to appeal the denial of class certification.

Freddie Mac is not named as a defendant in the consolidated lawsuit, but the underwriters previously gave notice to Freddie Mac of their intention to seek full indemnity and contribution under the underwriting agreement in this case, including reimbursement of fees and disbursements of their legal counsel. At present, it is not possible for us to predict the probable outcome of the lawsuit or any potential effect on our business, financial condition or results of operations. In addition, we are unable to reasonably estimate the possible loss or range of possible loss in the event of an adverse judgment in the foregoing matter due to the inherent uncertainty of litigation and the fact that plaintiffs may appeal the denial of class

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses are limited or excluded by applicable law. Past financial performance is no guarantee of future results.

TREASURY-4279

Powered by Morningstar® Document Research℠

Table of Contents

certification. Absent the certification of a specified class, the identification of a class period, and the identification of the alleged statement or statements that survive dispositive motions, we cannot reasonably estimate any possible loss or range of possible loss.

On July 6, 2011, plaintiffs filed a lawsuit in the U.S. District Court for Massachusetts styled *Liberty Mutual Insurance Company, Peerless Insurance Company, Employers Insurance Company of Wausau, Safeco Corporation and Liberty Life Assurance Company of Boston vs. Goldman, Sachs & Co.* The complaint alleges that Goldman, Sachs & Co. made materially misleading statements and omissions in connection with Freddie Mac's November 29, 2007 public offering of $6 billion of 8.375% Fixed to Floating Rate Non-Cumulative Perpetual Preferred Stock. Freddie Mac is not named as a defendant in this lawsuit.

In an amended complaint dated February 17, 2012, Western and Southern Life Insurance Company and others asserted claims against GS Mortgage Securities Corp., Goldman Sachs Mortgage Company and Goldman Sachs & Co. in the Court of Common Pleas, Hamilton County, Ohio. The amended complaint asserts, among other things, that "Goldman Sachs" is liable to plaintiffs under the Ohio Securities Act for alleged misstatements and omissions in connection with $6 billion of preferred stock issued by Freddie Mac on December 4, 2007. Freddie Mac is not named as a defendant in this lawsuit.

## Lehman Bankruptcy

On September 15, 2008, Lehman filed a chapter 11 bankruptcy petition in the Bankruptcy Court for the Southern District of New York. Thereafter, many of Lehman's U.S. subsidiaries and affiliates also filed bankruptcy petitions (collectively, the "Lehman Entities"). Freddie Mac had numerous relationships with the Lehman Entities which gave rise to several claims. On September 22, 2009, Freddie Mac filed proofs of claim in the Lehman bankruptcies aggregating approximately $2.1 billion. On April 14, 2010, Lehman filed its chapter 11 plan of liquidation and disclosure statement, providing for the liquidation of the bankruptcy estate's assets over the next three years. The plan and disclosure statement were subsequently modified several times, and the plan was confirmed by the court on December 6, 2011. The plan sets aside $1.2 billion to be available for payment in full of our priority claim relating to losses incurred on short-term lending transactions with certain Lehman Entities if it is ultimately allowed as a priority claim, but leaves open for subsequent litigation whether our claim of priority status is proper. In the event that this claim is not ultimately accorded priority status, it will be treated as a senior unsecured claim under the plan, pursuant to which Freddie Mac would be entitled to receive an estimated distribution of approximately 21% (or approximately $250 million) over the next three years. The plan also provides that general unsecured claims, such as our claim relating to repurchase obligations of $868 million, will be entitled to a distribution of approximately 19.9% of the allowed amount, if any. The plan does not adjudge or allow our unsecured repurchase obligations claim, but permits claims allowance proceedings to continue. Finally, the plan entitles Freddie Mac to a distribution of approximately 39% (or about $6.4 million) payable over the next three years on our allowed claim exceeding $16 million relating to losses on derivative transactions.

## Taylor, Bean & Whitaker and Ocala Funding, LLC Bankruptcies

On August 24, 2009, TBW, which had been one of our single-family seller/servicers, filed for bankruptcy in the Bankruptcy Court for the Middle District of Florida. In 2011, with the approval of FHFA, as Conservator, we entered into a settlement with TBW and the creditors' committee appointed in the TBW bankruptcy proceeding to represent the interests of the unsecured trade creditors of TBW. See "NOTE 18: LEGAL CONTINGENCIES" in our 2011 Annual Report for information on the settlement.

On July 20, 2012, Ocala Funding, LLC, or Ocala, which is a wholly owned subsidiary of TBW, filed for bankruptcy in the U.S. Bankruptcy Court for the Middle District of Florida. In connection with the bankruptcy filing, Ocala also filed a motion seeking an examination of Freddie Mac and FHFA, in which Ocala asserts that it has "viable, legitimate and valuable causes of action against Freddie Mac" to recover approximately $805 million of funds that were allegedly transferred from Ocala to Freddie Mac custodial accounts maintained by TBW. Ocala intends to distribute any monies recovered from Freddie Mac among its creditors, including various banks and the FDIC.

On or about May 14, 2010, certain underwriters at Lloyds, London and London Market Insurance Companies brought an adversary proceeding in bankruptcy court against TBW, Freddie Mac and other parties seeking a declaration rescinding $90 million of mortgage bankers bonds providing fidelity and errors and omissions insurance coverage. Several excess insurers on the bonds thereafter filed similar claims in that action. Freddie Mac has filed a proof of loss under the bonds, but we are unable at this time to estimate our potential recovery, if any, thereunder. Discovery is proceeding.

<div align="center">194</div>

<div align="right">*Freddie Mac*</div>

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**IRS Litigation**

In 2010, we received Statutory Notices from the IRS assessing $3.0 billion of additional income taxes and penalties for the 1998 to 2007 tax years. We filed a petition with the U.S. Tax Court on October 22, 2010 in response to the Statutory Notices for the 1998 to 2005 tax years. We paid the tax assessed in the Statutory Notice for the years 2006 to 2007 of $36 million in 2012 and will seek a refund through the administrative process, which could include filing suit in Federal District Court. A Tax Court trial date was scheduled for November 13, 2012; however, on May 31, 2012, counsels for the IRS and Freddie Mac filed a joint motion for continuance in order to explore settlement options. The motion was granted by the Tax Court on June 7, 2012, suspending the trial date until further notice. We believe appropriate reserves have been provided for settlement on reasonable terms. For information on this matter, see "NOTE 12: INCOME TAXES."

**Lawsuits Involving Real Estate Transfer Taxes and Recordation Taxes**

On June 20, 2011, Oakland County (Michigan) and the Oakland County Treasurer filed a lawsuit against Freddie Mac and Fannie Mae in the U.S. District Court for the Eastern District of Michigan alleging that the enterprises failed to pay real estate transfer taxes on transfers of real property in Oakland County where the enterprises were the grantors. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae. On November 10, 2011, Genesee County (Michigan) and the Genesee County Treasurer filed a class action lawsuit in the same court on behalf of itself and the other 82 Michigan Counties raising similar claims against FHFA (as Conservator), Freddie Mac, and Fannie Mae. The Court later certified the class, with two Michigan counties opting out. The Michigan Department of Attorney General and the Michigan Department of Treasury intervened in both actions against the defendants. In both actions, FHFA, Freddie Mac and Fannie Mae asserted that they were not liable for the transfer taxes based on statutory tax exemptions applicable to each. On March 23, 2012, the Court granted summary judgment against FHFA (as Conservator), Freddie Mac, and Fannie Mae in both actions, determining that the statutory exemptions did not exempt them from Michigan's state and county transfer tax. On April 24, 2012, the plaintiffs in the Oakland County case sought leave to file a second amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. Also on April 24, 2012, FHFA (as Conservator), Freddie Mac, and Fannie Mae requested that the Court certify its March 23, 2012 orders granting plaintiffs summary judgment for an interlocutory appeal to the U.S. Court of Appeals for the Sixth Circuit and stay the actions pending resolution of any resulting appeal. On April 26, 2012, the plaintiffs in the Genesee County case sought leave to file an amended complaint to cover purportedly taxable transactions where the enterprises received property as grantees through a Michigan Sheriff's deed or a deed in lieu of foreclosure. On May 21, 2012, FHFA (as Conservator), Freddie Mac, and Fannie Mae filed a petition for permission to appeal to the U.S. Court of Appeals for the Sixth Circuit. The Court has not yet ruled on the defendants' motion for certification of an interlocutory appeal and motion for a stay, the Oakland plaintiffs' motion to file a second amended complaint or the Genesee plaintiffs' motion to file an amended complaint, nor has it addressed the amount of damages the plaintiffs contend are owed in either case.

On or about June 22, 2011, Curtis Hertel (individually and as Register of Deeds of Ingham County, Michigan) filed suit in Michigan state court against Freddie Mac, Fannie Mae and others alleging, among other things, that the defendants failed to pay real estate transfer taxes on transfers of real property in Ingham County where the enterprises were the grantors and grantees. FHFA later intervened as Conservator for Freddie Mac and Fannie Mae, and the Michigan Department of Attorney General and the Michigan Department of Treasury intervened against the enterprises. The defendants removed the case to the U.S. District Court for the Western District of Michigan and then filed motions to dismiss and/or for summary judgment. The Court dismissed plaintiff Hertel from the case concluding that Hertel was not a proper plaintiff, but the Court has not yet ruled on the enterprises' and FHFA's motion to dismiss and/or for summary judgment as to the claims asserted by the Michigan Department of Attorney General and the Michigan Department of Treasury.

The plaintiffs in the Oakland County, Genesee County, and Ingham County cases are all seeking a declaration that the enterprises' statutory exemptions do not cover recording taxes such as the Michigan transfer taxes, damages against the enterprises for unpaid state transfer taxes, as well as penalties, interest, pre-judgment interest, costs and attorneys' fees.

We are also defendants in similar lawsuits in 13 states and the District of Columbia. These lawsuits, other than the one in the District of Columbia, were all filed after we received the unfavorable ruling in Michigan on March 23, 2012. Each of these lawsuits generally challenges our statutory exemption from transfer taxes imposed on the transfer of real estate properties and seeks damages in an amount yet to be determined for unpaid transfer taxes on transfers to and/or from the defendants as well as other items, which may include penalties, interest, liquidated penalties, pre-judgment interest, costs or

<div align="center">195</div>

<div align="right">*Freddie Mac*</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                           Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

attorneys' fees. These lawsuits may lead to additional similar lawsuits in other states and jurisdictions that impose these taxes.

At present, it is not possible for us to predict the probable outcome of these lawsuits or any potential effect on our business, financial condition or results of operation. In addition, we are unable to reasonably estimate the possible loss or range of possible loss with respect to these lawsuits due to the following factors, among others: (a) none of the plaintiffs have demanded a stated amount of damages they believe are due; (b) with respect to the Oakland County and Genesee County lawsuits, the scope of permissible claims has not yet been determined and discovery regarding the amount of damages is still in the early stages; and (c) with respect to the other lawsuits, discovery regarding the amount of damages has not yet begun.

### Mortgage Guaranty Insurance Corporation

Freddie Mac and Mortgage Guaranty Insurance Corporation, or MGIC, are involved in litigation concerning our current and future claims under certain of MGIC's pool insurance policies. Freddie Mac contends that the policies have approximately $0.5 billion more in coverage than MGIC contends is provided for under the policies.

On May 16, 2012, MGIC filed a lawsuit against Freddie Mac and FHFA in the U.S. District Court for the Eastern District of Wisconsin seeking a declaration that its interpretation of the policies is correct or, in the alternative, seeking reformation of the policies consistent with MGIC's interpretation. MGIC's complaint also seeks court costs. On May 17, 2012, Freddie Mac filed a lawsuit against MGIC in the U.S. District Court for the Eastern District of Virginia seeking a declaratory judgment that its interpretation of the policies is correct and that, pursuant to the doctrines of waiver, estoppel, and/or laches, MGIC may not take a contrary position. Freddie Mac's action additionally includes claims against MGIC for anticipatory breach of contract, breach of contract, breach of the duty of good faith, and conversion. Freddie Mac seeks compensatory and punitive damages, prejudgment interest, and attorneys' fees and costs.

On June 8, 2012, Freddie Mac and MGIC each filed motions to dismiss, stay, or transfer the other party's lawsuit. On June 14, 2012, Freddie Mac's complaint in the Virginia Court was amended to add FHFA as a co-plaintiff. On July 5, 2012, MGIC's motion was granted in part and denied in part by the Virginia court. The Virginia court's order provides for transfer of the case to the Wisconsin court, but stays execution of the order and all proceedings in the case pending a further order from the Virginia court after a decision by the Wisconsin court concerning whether it has jurisdiction to hear MGIC's case against us and FHFA.

On June 28, 2012, MGIC filed a motion in the Virginia court to dismiss Freddie Mac's amended complaint. Further action on this motion was stayed by the Virginia court in its order of July 5, 2012.

### NOTE 18: SIGNIFICANT COMPONENTS OF OTHER ASSETS AND OTHER LIABILITIES ON OUR CONSOLIDATED BALANCE SHEETS

The table below presents the significant components of other assets and other liabilities on our consolidated balance sheets.

### Table 18.1 — Significant Components of Other Assets and Other Liabilities on Our Consolidated Balance Sheets

|  | June 30, 2012 | December 31, 2011 |
|---|---|---|
|  | (in millions) | |
| Other assets: | | |
| Guarantee asset | $ 862 | $ 752 |
| Accounts and other receivables | 8,774 | 8,350 |
| All other | 1,283 | 1,411 |
| Total other assets | $ 10,919 | $ 10,513 |
| Other liabilities: | | |
| Guarantee obligation | $ 864 | $ 787 |
| Servicer liabilities | 3,544 | 3,600 |
| Accounts payable and accrued expenses | 946 | 845 |
| All other | 881 | 814 |
| Total other liabilities | $ 6,235 | $ 6,046 |

196

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

# PART II OTHER INFORMATION
## ITEM 1. LEGAL PROCEEDINGS

We are involved as a party to a variety of legal proceedings arising from time to time in the ordinary course of business. See "NOTE 17: LEGAL CONTINGENCIES" for more information regarding our involvement as a party to various legal proceedings.

## ITEM 1A. RISK FACTORS

This Form 10-Q should be read together with the "RISK FACTORS" section in our 2011 Annual report, which describes various risks and uncertainties to which we are or may become subject. These risks and uncertainties could, directly or indirectly, adversely affect our business, financial condition, results of operations, cash flows, strategies, and/or prospects.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**Recent Sales of Unregistered Securities**

The securities we issue are "exempted securities" under the Securities Act of 1933, as amended. As a result, we do not file registration statements with the SEC with respect to offerings of our securities.

Following our entry into conservatorship, we suspended the operation of, and ceased making grants under, equity compensation plans. Previously, we had provided equity compensation under those plans to employees and members of our Board of Directors. Under the Purchase Agreement, we cannot issue any new options, rights to purchase, participations, or other equity interests without Treasury's prior approval. However, grants outstanding as of the date of the Purchase Agreement remain in effect in accordance with their terms.

No stock options were exercised during the three months ended June 30, 2012, and all remaining restrictions on restricted stock units lapsed during the first quarter of 2012.

See "NOTE 12: FREDDIE MAC STOCKHOLDERS' EQUITY (DEFICIT)" in our 2011 Annual Report for more information.

**Dividend Restrictions**

Our payment of dividends on Freddie Mac common stock or any series of Freddie Mac preferred stock (other than senior preferred stock) is subject to certain restrictions as described in "MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES — Dividends and Dividend Restrictions" in our 2011 Annual Report.

**Information about Certain Securities Issuances by Freddie Mac**

Pursuant to SEC regulations, public companies are required to disclose certain information when they incur a material direct financial obligation or become directly or contingently liable for a material obligation under an off-balance sheet arrangement. The disclosure must be made in a current report on Form 8-K under Item 2.03 or, if the obligation is incurred in connection with certain types of securities offerings, in prospectuses for that offering that are filed with the SEC.

Freddie Mac's securities offerings are exempted from SEC registration requirements. As a result, we are not required to and do not file registration statements or prospectuses with the SEC with respect to our securities offerings. To comply with the disclosure requirements of Form 8-K relating to the incurrence of material financial obligations, we report our incurrence of these types of obligations either in offering circulars (or supplements thereto) that we post on our web site or in a current report on Form 8-K, in accordance with a "no-action" letter we received from the SEC staff. In cases where the information is disclosed in an offering circular posted on our web site, the document will be posted on our web site within the same time period that a prospectus for a non-exempt securities offering would be required to be filed with the SEC.

The web site address for disclosure about our debt securities, other than debt securities of consolidated trusts, is www.freddiemac.com/debt. From this address, investors can access the offering circular and related supplements for debt securities offerings under Freddie Mac's global debt facility, including pricing supplements for individual issuances of debt securities.

<div align="center">197</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Disclosure about the mortgage-related securities we issue, some of which are off-balance sheet obligations, can be found at www.freddiemac.com/mbs. From this address, investors can access information and documents about our mortgage-related securities, including offering circulars and related offering circular supplements.

<div align="center">198</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

### ITEM 6. EXHIBITS

The exhibits are listed in the Exhibit Index at the end of this Form 10-Q.

<div align="center">199</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

Federal Home Loan Mortgage Corporation

By: /s/ Donald H. Layton
      Donald H. Layton
      Chief Executive Officer

Date: August 7, 2012

By: /s/ Ross J. Kari
      Ross J. Kari
      Executive Vice President — Chief Financial Officer
      (Principal Financial Officer)

Date: August 7, 2012

*Freddie Mac*

TREASURY-4286

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## GLOSSARY

This Glossary includes acronyms and defined terms that are used throughout this Form 10-Q.

**Administration** — Executive branch of the U.S. government.

**Agency securities** — Generally refers to mortgage-related securities issued by the GSEs or government agencies.

**Alt-A loan** — Although there is no universally accepted definition of Alt-A, many mortgage market participants classify single-family loans with credit characteristics that range between their prime and subprime categories as Alt-A because these loans have a combination of characteristics of each category, may be underwritten with lower or alternative income or asset documentation requirements compared to a full documentation mortgage loan, or both. In determining our Alt-A exposure on loans underlying our single-family credit guarantee portfolio, we classified mortgage loans as Alt-A if the lender that delivers them to us classified the loans as Alt-A, or if the loans had reduced documentation requirements, as well as a combination of certain credit characteristics and expected performance characteristics at acquisition which, when compared to full documentation loans in our portfolio, indicate that the loan should be classified as Alt-A. In the event we purchase a refinance mortgage in either our relief refinance mortgage initiative or in another mortgage refinance initiative and the original loan had been previously identified as Alt-A, such refinance loan may no longer be categorized or reported as an Alt-A mortgage in this Form 10-Q and our other financial reports because the new refinance loan replacing the original loan would not be identified by the servicer as an Alt-A loan. As a result, our reported Alt-A balances may be lower than would otherwise be the case had such refinancing not occurred. For non-agency mortgage-related securities that are backed by Alt-A loans, we categorize our investments in non-agency mortgage-related securities as Alt-A if the securities were identified as such based on information provided to us when we entered into these transactions.

**AOCI** — Accumulated other comprehensive income (loss), net of taxes

**ARM** — Adjustable-rate mortgage — A mortgage loan with an interest rate that adjusts periodically over the life of the mortgage loan based on changes in a benchmark index.

**Bond insurers** — Companies that provide credit insurance principally covering securitized assets in both the primary issuance and secondary markets.

**BPs** — Basis points — One one-hundredth of 1%. This term is commonly used to quote the yields of debt instruments or movements in interest rates.

**Cash and other investments portfolio** — Our cash and other investments portfolio is comprised of our cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, and investments in non-mortgage-related securities.

**Charter** — The Federal Home Loan Mortgage Corporation Act, as amended, 12 U.S.C. § 1451 et seq.

**CMBS** — Commercial mortgage-backed security — A security backed by mortgages on commercial property (often including multifamily rental properties) rather than one-to-four family residential real estate. Although the mortgage pools underlying CMBS can include mortgages financing multifamily properties and commercial properties, such as office buildings and hotels, the classes of CMBS that we hold receive distributions of scheduled cash flows only from multifamily properties. Military housing revenue bonds are included as CMBS within investments-related disclosures. We have not identified CMBS as either subprime or Alt-A securities.

**Comprehensive income (loss)** — Consists of net income (loss) plus total other comprehensive income (loss).

**Conforming loan/Conforming jumbo loan/Conforming loan limit** — A conventional single-family mortgage loan with an original principal balance that is equal to or less than the applicable conforming loan limit, which is a dollar amount cap on the size of the original principal balance of single-family mortgage loans we are permitted by law to purchase or securitize. The conforming loan limit is determined annually based on changes in FHFA's housing price index. Any decreases in the housing price index are accumulated and used to offset any future increases in the housing price index so that conforming loan limits do not decrease from year-to-year. Since 2006, the base conforming loan limit for a one-family residence has been set at $417,000, and higher limits have been established in certain "high-cost" areas (currently, up to $625,500 for a one-family residence). Higher limits also apply to two- to four-family residences, and for mortgages secured by properties in Alaska, Guam, Hawaii and the U.S. Virgin Islands.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                   Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

Actual loan limits are set by FHFA for each county (or equivalent), and the loan limit for specific high-cost areas may be lower than the maximum amounts. We refer to loans that we have purchased with UPB exceeding the base conforming loan limit (i.e., $417,000) as conforming jumbo loans.

Beginning in 2008, pursuant to a series of laws, our loan limits in certain high-cost areas were increased temporarily above the limits that otherwise would have been applicable (up to $729,750 for a one-family residence). The latest of these increases expired on September 30, 2011.

**Conservator** — The Federal Housing Finance Agency, acting in its capacity as conservator of Freddie Mac.

**Convexity** — A measure of how much a financial instrument's duration changes as interest rates change.

**Core spread income** — Refers to a fair value estimate of the net current period accrual of income from the spread between mortgage-related investments and debt, calculated on an option-adjusted basis.

**Credit enhancement** — Any number of different financial arrangements that are designed to reduce credit risk by partially or fully compensating an investor in the event of certain financial losses. Examples of credit enhancements include mortgage insurance, overcollateralization, indemnification agreements, and government guarantees.

**Credit losses** — Consists of charge-offs and REO operations income (expense).

**Credit-related expenses** — Consists of our provision for credit losses and REO operations income (expense).

**Deed in lieu of foreclosure** — An alternative to foreclosure in which the borrower voluntarily conveys title to the property to the lender and the lender accepts such title (sometimes together with an additional payment by the borrower) in full satisfaction of the mortgage indebtedness.

**Delinquency** — A failure to make timely payments of principal or interest on a mortgage loan. For single-family mortgage loans, we generally report delinquency rate information based on the number of loans that are seriously delinquent. For multifamily loans, we report delinquency rate information based on the UPB of loans that are two monthly payments or more past due or in the process of foreclosure.

**Derivative** — A financial instrument whose value depends upon the characteristics and value of an underlying financial asset or index, such as a security or commodity price, interest or currency rates, or other financial indices.

**Dodd-Frank Act** — Dodd-Frank Wall Street Reform and Consumer Protection Act.

**DSCR** — Debt Service Coverage Ratio — An indicator of future credit performance for multifamily loans. The DSCR estimates a multifamily borrower's ability to service its mortgage obligation using the secured property's cash flow, after deducting non-mortgage expenses from income. The higher the DSCR, the more likely a multifamily borrower will be able to continue servicing its mortgage obligation.

**Duration** — Duration is a measure of a financial instrument's price sensitivity to changes in interest rates.

**Duration gap** — One of our primary interest-rate risk measures. Duration gap is a measure of the difference between the estimated durations of our interest rate sensitive assets and liabilities. We present the duration gap of our financial instruments in units expressed as months. A duration gap of zero implies that the change in value of our interest rate sensitive assets from an instantaneous change in interest rates would be expected to be accompanied by an equal and offsetting change in the value of our debt and derivatives, thus leaving the net fair value of equity unchanged.

**Effective rent** — The average rent actually paid by the tenant over the term of a lease.

**Euribor** — Euro Interbank Offered Rate

**Exchange Act** — Securities and Exchange Act of 1934, as amended

**Fannie Mae** — Federal National Mortgage Association

**FASB** — Financial Accounting Standards Board

**FDIC** — Federal Deposit Insurance Corporation

202 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Federal Reserve** — Board of Governors of the Federal Reserve System

**FHA** — Federal Housing Administration

**FHFA** — Federal Housing Finance Agency — An independent agency of the U.S. government established by the Reform Act with responsibility for regulating Freddie Mac, Fannie Mae, and the FHLBs.

**FHLB** — Federal Home Loan Bank

**FICO score** — A credit scoring system developed by Fair, Isaac and Co. FICO scores are the most commonly used credit scores today. FICO scores are ranked on a scale of approximately 300 to 850 points with a higher value indicating a lower likelihood of credit default.

**Fixed-rate mortgage** — Refers to a mortgage originated at a specific rate of interest that remains constant over the life of the loan.

**Foreclosure alternative** — A workout option pursued when a home retention action is not successful or not possible. A foreclosure alternative is either a short sale or deed in lieu of foreclosure.

**Foreclosure transfer** — Refers to our completion of a transaction provided for by the foreclosure laws of the applicable state, in which a delinquent borrower's ownership interest in a mortgaged property is terminated and title to the property is transferred to us or to a third party. State foreclosure laws commonly refer to such transactions as foreclosure sales, sheriff's sales, or trustee's sales, among other terms. When we, as mortgage holder, acquire a property in this manner, we pay for it by extinguishing some or all of the mortgage debt.

**Freddie Mac mortgage-related securities** — Securities we issue and guarantee, including PCs, REMICs and Other Structured Securities, and Other Guarantee Transactions.

**GAAP** — Generally accepted accounting principles

**Ginnie Mae** — Government National Mortgage Association

**GSE Act** — The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, as amended by the Reform Act.

**GSEs** — Government sponsored enterprises — Refers to certain legal entities created by the U.S. government, including Freddie Mac, Fannie Mae, and the FHLBs.

**Guarantee fee** — The fee that we receive for guaranteeing the payment of principal and interest to mortgage security investors, which consists primarily of a combination of management and guarantee fees paid on a monthly basis, as a percentage of the UPB underlying loans, and initial upfront payments, such as delivery fees.

**HAFA** — Home Affordable Foreclosures Alternative program — In 2009, the Treasury Department introduced the HAFA program to provide an option for HAMP-eligible homeowners who are unable to keep their homes. The HAFA program took effect on April 5, 2010 and we implemented it effective August 1, 2010.

**HAMP** — Home Affordable Modification Program — Refers to the effort under the MHA Program whereby the U.S. government, Freddie Mac and Fannie Mae commit funds to help eligible homeowners avoid foreclosure and keep their homes through mortgage modifications.

**HARP** — Home Affordable Refinance Program — Refers to the effort under the MHA Program that seeks to help eligible borrowers (whose monthly payments are current) with existing loans that are guaranteed by us or Fannie Mae to refinance into loans with more affordable monthly payments and/or fixed-rate terms. Through December 2011, under HARP, eligible borrowers who had mortgages sold to Freddie Mac or Fannie Mae on or before May 31, 2009 with current LTV ratios above 80% (and up to 125%) were allowed to refinance their mortgages without obtaining new mortgage insurance in excess of what is already in place. Beginning December 2011, HARP was expanded to allow eligible borrowers who have mortgages with current LTV ratios above 125% to refinance under the program. The relief refinance initiative, under which we also allow borrowers with LTV ratios of 80% and below to participate, is our implementation of HARP for our loans.

**HFA** — State or local Housing Finance Agency

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Powered by Morningstar® Document Research℠

Table of Contents

**HFA initiative** — An initiative among Treasury, FHFA, Freddie Mac, and Fannie Mae that commenced in 2009. Under the HFA initiative, we and Fannie Mae provide assistance to state and local HFAs so that the HFAs can continue to meet their mission of providing affordable financing for both single-family and multifamily housing. The HFA initiative includes the NIBP and the TCLFP.

**HUD** — U.S. Department of Housing and Urban Development — Prior to the enactment of the Reform Act, HUD had general regulatory authority over Freddie Mac, including authority over our affordable housing goals and new programs. Under the Reform Act, FHFA now has general regulatory authority over us, though HUD still has authority over Freddie Mac with respect to fair lending.

**Implied volatility** — A measurement of how the value of a financial instrument changes due to changes in the market's expectation of potential changes in future interest rates. A decrease in implied volatility generally increases the estimated fair value of our mortgage assets and decreases the estimated fair value of our callable debt and options-based derivatives, while an increase in implied volatility generally has the opposite effect.

**Interest-only loan** — A mortgage loan that allows the borrower to pay only interest (either fixed-rate or adjustable-rate) for a fixed period of time before principal amortization payments are required to begin. After the end of the interest-only period, the borrower can choose to refinance the loan, pay the principal balance in total, or begin paying the monthly scheduled principal due on the loan.

**IRS** — Internal Revenue Service

**LIBOR** — London Interbank Offered Rate

**LIHTC partnerships** — Low-income housing tax credit partnerships — Prior to 2008, we invested as a limited partner in LIHTC partnerships, which are formed for the purpose of providing funding for affordable multifamily rental properties. These LIHTC partnerships invest directly in limited partnerships that own and operate multifamily rental properties that generate federal income tax credits and deductible operating losses.

**Liquidation preference** — Generally refers to an amount that holders of preferred securities are entitled to receive out of available assets, upon liquidation of a company. The initial liquidation preference of our senior preferred stock was $1.0 billion. The aggregate liquidation preference of our senior preferred stock includes the initial liquidation preference plus amounts funded by Treasury under the Purchase Agreement. In addition, dividends and periodic commitment fees not paid in cash are added to the liquidation preference of the senior preferred stock. We may make payments to reduce the liquidation preference of the senior preferred stock only in limited circumstances.

**LTV ratio** — Loan-to-value ratio — The ratio of the unpaid principal amount of a mortgage loan to the value of the property that serves as collateral for the loan, expressed as a percentage. Loans with high LTV ratios generally tend to have a higher risk of default and, if a default occurs, a greater risk that the amount of the gross loss will be high compared to loans with lower LTV ratios. We report LTV ratios based solely on the amount of the loan purchased or guaranteed by us, generally excluding any second lien mortgages (unless we own or guarantee the second lien).

**MD&A** — Management's Discussion and Analysis of Financial Condition and Results of Operations

**MHA Program** — Making Home Affordable Program — Formerly known as the Housing Affordability and Stability Plan, the MHA Program was announced by the Administration in February 2009. The MHA Program is designed to help in the housing recovery, promote liquidity and housing affordability, expand foreclosure prevention efforts and set market standards. The MHA Program includes HARP and HAMP.

**Mortgage assets** — Refers to both mortgage loans and the mortgage-related securities we hold in our mortgage-related investments portfolio.

**Mortgage-related investments portfolio** — Our investment portfolio, which consists principally of mortgage-related securities and single-family and multifamily mortgage loans. The size of our mortgage-related investments portfolio under the Purchase Agreement is determined without giving effect to the January 1, 2010 change in accounting guidance related to transfers of financial assets and consolidation of VIEs. Accordingly, for purposes of the portfolio limit, when PCs and certain Other Guarantee Transactions are purchased into the mortgage-related investments portfolio, this is considered the acquisition of assets rather than the reduction of debt.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Mortgage-to-debt OAS** — The net OAS between the mortgage and agency debt sectors. This is an important factor in determining the expected level of net interest yield on a new mortgage asset. Higher mortgage-to-debt OAS means that a newly purchased mortgage asset is expected to provide a greater return relative to the cost of the debt issued to fund the purchase of the asset and, therefore, a higher net interest yield. Mortgage-to-debt OAS tends to be higher when there is weak demand for mortgage assets and lower when there is strong demand for mortgage assets.

**Multifamily mortgage** — A mortgage loan secured by a property with five or more residential rental units.

**Multifamily mortgage portfolio** — Consists of multifamily mortgage loans held by us on our consolidated balance sheets as well as those underlying non-consolidated Freddie Mac mortgage-related securities, and other guarantee commitments, but excluding those underlying our guarantees of HFA bonds under the HFA initiative.

**Net worth (deficit)** — The amount by which our total assets exceed (or are less than) our total liabilities as reflected on our consolidated balance sheets prepared in conformity with GAAP.

**NIBP** — New Issue Bond Program is a component of the HFA initiative in which we and Fannie Mae issued partially-guaranteed pass-through securities to Treasury that are backed by bonds issued by various state and local HFAs. The program provides financing for HFAs to issue new housing bonds. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses.

**NPV** — Net present value

**OAS** — Option-adjusted spread — An estimate of the incremental yield spread between a particular financial instrument ( *e.g.*, a security, loan or derivative contract) and a benchmark yield curve (*e.g.*, LIBOR or agency or U.S. Treasury securities). This includes consideration of potential variability in the instrument's cash flows resulting from any options embedded in the instrument, such as prepayment options.

**OFHEO —** Office of Federal Housing Enterprise Oversight. The predecessor to FHFA.

**OIS** — Overnight Index Swap — Interest-rate curve used to discount the future cash flows of certain collateralized derivatives, rather than the LIBOR curve.

**Option ARM loan** — Mortgage loans that permit a variety of repayment options, including minimum, interest-only, fully amortizing 30-year and fully amortizing 15-year payments. The minimum payment alternative for option ARM loans allows the borrower to make monthly payments that may be less than the interest accrued for the period. The unpaid interest, known as negative amortization, is added to the principal balance of the loan, which increases the outstanding loan balance. For our non-agency mortgage-related securities that are backed by option ARM loans, we categorize securities as option ARM if the securities were identified as such based on information provided to us when we entered into these transactions. We have not identified option ARM securities as either subprime or Alt-A securities.

**OTC** — Over-the-counter

**Other guarantee commitments** — Mortgage-related assets held by third parties for which we provide our guarantee without our securitization of the related assets.

**Other Guarantee Transactions** — Transactions in which third parties transfer non-Freddie Mac mortgage-related securities to trusts specifically created for the purpose of issuing mortgage-related securities, or certificates, in the Other Guarantee Transactions.

**PCs** — Participation Certificates — Securities that we issue as part of a securitization transaction. Typically we purchase mortgage loans from parties who sell mortgage loans, place a pool of loans into a PC trust and issue PCs from that trust. The PCs are generally transferred to the seller of the mortgage loans in consideration of the loans or are sold to third party investors if we purchased the mortgage loans for cash.

**PMVS** — Portfolio Market Value Sensitivity — One of our primary interest-rate risk measures. PMVS measures are estimates of the amount of average potential pre-tax loss in the market value of our net assets due to parallel (PMVS-L) and non-parallel (PMVS-YC) changes in LIBOR.

<div align="center">205</div>

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Primary mortgage market** — The market where lenders originate mortgage loans and lend funds to borrowers. We do not lend money directly to homeowners, and do not participate in this market.

**Purchase Agreement / Senior Preferred Stock Purchase Agreement** — An agreement the Conservator, acting on our behalf, entered into with Treasury on September 7, 2008, which was subsequently amended and restated on September 26, 2008 and further amended on May 6, 2009 and December 24, 2009.

**Recorded Investment** — The dollar amount of a loan recorded on our consolidated balance sheets, excluding any valuation allowance, such as the allowance for loan losses, but which does reflect direct write-downs of the investment. For mortgage loans, direct write-downs consist of valuation allowances associated with recording our initial investment in loans acquired with evidence of credit deterioration at the time of purchase. Recorded investment excludes accrued interest income.

**Reform Act** — The Federal Housing Finance Regulatory Reform Act of 2008, which, among other things, amended the GSE Act by establishing a single regulator, FHFA, for Freddie Mac, Fannie Mae, and the FHLBs.

**Relief refinance mortgage** — A single-family mortgage loan delivered to us for purchase or guarantee that meets the criteria of the Freddie Mac Relief Refinance Mortgage℠ initiative. Part of this initiative is our implementation of HARP for our loans, and relief refinance options are also available for certain non-HARP loans. Although HARP is targeted at borrowers with current LTV ratios above 80%, our initiative also allows borrowers with LTV ratios of 80% and below to participate.

**REMIC** — Real Estate Mortgage Investment Conduit — A type of multiclass mortgage-related security that divides the cash flows (principal and interest) of the underlying mortgage-related assets into two or more classes that meet the investment criteria and portfolio needs of different investors.

**REMICs and Other Structured Securities** (or in the case of Multifamily securities, **Other Structured Securities**) — Single- and multiclass securities issued by Freddie Mac that represent beneficial interests in pools of PCs and certain other types of mortgage-related assets. REMICs and Other Structured Securities that are single-class securities pass through the cash flows (principal and interest) on the underlying mortgage-related assets. REMICs and Other Structured Securities that are multiclass securities divide the cash flows of the underlying mortgage-related assets into two or more classes designed to meet the investment criteria and portfolio needs of different investors. Our principal multiclass securities qualify for tax treatment as REMICs.

**REO** — Real estate owned — Real estate which we have acquired through foreclosure or through a deed in lieu of foreclosure.

**S&P** — Standard & Poor's

**SEC** — Securities and Exchange Commission

**Secondary mortgage market** — A market consisting of institutions engaged in buying and selling mortgages in the form of whole loans ( *i.e.*, mortgages that have not been securitized) and mortgage-related securities. We participate in the secondary mortgage market by purchasing mortgage loans and mortgage-related securities for investment and by issuing guaranteed mortgage-related securities, principally PCs.

**Senior preferred stock** — The shares of Variable Liquidation Preference Senior Preferred Stock issued to Treasury under the Purchase Agreement.

**Seriously delinquent** — Single-family mortgage loans that are three monthly payments or more past due or in the process of foreclosure as reported to us by our servicers.

**Short sale** — Typically an alternative to foreclosure consisting of a sale of a mortgaged property in which the homeowner sells the home at market value and the lender accepts proceeds (sometimes together with an additional payment or promissory note from the borrower) that are less than the outstanding mortgage indebtedness in full satisfaction of the loan.

**Single-family credit guarantee portfolio** — Consists of unsecuritized single-family loans, single-family loans held by consolidated trusts, and single-family loans underlying non-consolidated Other Guarantee Transactions and covered by other guarantee commitments. Excludes our REMICs and Other Structured Securities that are backed by Ginnie Mae Certificates and our guarantees under the HFA initiative.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Single-family mortgage** — A mortgage loan secured by a property containing four or fewer residential dwelling units.

**Spread** — The difference between the yields of two debt securities, or the difference between the yield of a debt security and a benchmark yield, such as LIBOR.

**Strips** — Mortgage pass-through securities created by separating the principal and interest payments on a pool of mortgage loans. A principal-only strip entitles the security holder to principal cash flows, but no interest cash flows, from the underlying mortgages. An interest-only strip entitles the security holder to interest cash flows, but no principal cash flows, from the underlying mortgages.

**Subprime** — Participants in the mortgage market may characterize single-family loans based upon their overall credit quality at the time of origination, generally considering them to be prime or subprime. Subprime generally refers to the credit risk classification of a loan. There is no universally accepted definition of subprime. The subprime segment of the mortgage market primarily serves borrowers with poorer credit payment histories and such loans typically have a mix of credit characteristics that indicate a higher likelihood of default and higher loss severities than prime loans. Such characteristics might include, among other factors, a combination of high LTV ratios, low credit scores or originations using lower underwriting standards, such as limited or no documentation of a borrower's income. While we have not historically characterized the loans in our single-family credit guarantee portfolio as either prime or subprime, we do monitor the amount of loans we have guaranteed with characteristics that indicate a higher degree of credit risk. Notwithstanding our historical characterizations of the single family credit guarantee portfolio, certain security collateral underlying our Other Guarantee Transactions have been identified as subprime based on information provided to Freddie Mac when the transactions were entered into. We also categorize our investments in non-agency mortgage-related securities as subprime if they were identified as such based on information provided to us when we entered into these transactions.

**Swaption** — An option contract to enter into an interest-rate swap. In exchange for an option premium, a buyer obtains the right but not the obligation to enter into a specified swap agreement with the issuer on a specified future date.

**TBA** — To be announced

**TCLFP** — Temporary Credit and Liquidity Facility Program is a component of the HFA initiative in which we and Fannie Mae issued credit guarantees to holders of variable-rate demand obligations issued by various state and local HFAs. Treasury is obligated to absorb any losses under the program up to a certain level before we are exposed to any losses. The program is scheduled to expire on December 31, 2012; however, Treasury has given participants the option to extend the program facility to December 31, 2015.

**TDR** — Troubled debt restructuring — A type of loan modification in which the changes to the contractual terms result in concessions to borrowers that are experiencing financial difficulties.

**Total other comprehensive income (loss)** — Consists of the after-tax changes in: (a) the unrealized gains and losses on available-for-sale securities; (b) the effective portion of derivatives accounted for as cash flow hedge relationships; and (c) defined benefit plans.

**Total mortgage portfolio** — Includes mortgage loans and mortgage-related securities held on our consolidated balance sheets as well as the balances of our non-consolidated issued and guaranteed single-class and multiclass securities, and other mortgage-related financial guarantees issued to third parties.

**Treasury** — U.S. Department of the Treasury

**UPB** — Unpaid principal balance

**USDA** — U.S. Department of Agriculture

**VA** — U.S. Department of Veteran Affairs

**VIE** — Variable Interest Entity — A VIE is an entity: (a) that has a total equity investment at risk that is not sufficient to finance its activities without additional subordinated financial support provided by another party; or (b) where the group of equity holders does not have: (i) the ability to make significant decisions about the entity's activities; (ii) the obligation to absorb the entity's expected losses; or (iii) the right to receive the entity's expected residual returns.

207 *Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012   Powered by Morningstar® Document Research℠
The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

**Warrant** — Refers to the warrant we issued to Treasury on September 8, 2008 pursuant to the Purchase Agreement. The warrant provides Treasury the ability to purchase, for a nominal price, shares of our common stock equal to 79.9% of the total number of shares of Freddie Mac common stock outstanding on a fully diluted basis on the date of exercise.

**Workout, or loan workout** — A workout is either: (a) a home retention action, which is either a loan modification, repayment plan, or forbearance agreement; or (b) a foreclosure alternative, which is either a short sale or a deed in lieu of foreclosure.

**XBRL** — eXtensible Business Reporting Language

**Yield curve** — A graphical display of the relationship between yields and maturity dates for bonds of the same credit quality. The slope of the yield curve is an important factor in determining the level of net interest yield on a new mortgage asset, both initially and over time. For example, if a mortgage asset is purchased when the yield curve is inverted (i.e., short-term rates higher than long-term rates), our net interest yield on the asset will tend to be lower initially and then increase over time. Likewise, if a mortgage asset is purchased when the yield curve is steep (i.e., short-term rates lower than long-term rates), our net interest yield on the asset will tend to be higher initially and then decrease over time.

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Table of Contents

## EXHIBIT INDEX

| Exhibit No. | Description |
|---|---|
| 3.1 | Bylaws of the Federal Home Loan Mortgage Corporation, as amended and restated May 22, 2012 (incorporated by reference to Exhibit 3.1 to the Registrant's Current Report on Form 8-K as filed on May 23, 2012) |
| 10.1 | Memorandum Agreement, dated May 7, 2012, between Freddie Mac and Donald H. Layton (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K as filed on May 10, 2012) |
| 10.2 | Restrictive Covenant and Confidentiality Agreement, dated May 7, 2012, between Freddie Mac and Donald H. Layton (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K as filed on May 10, 2012) |
| 10.3 | PC Master Trust Agreement dated May 30, 2012 |
| 10.4 | Second Amendment To The Federal Home Loan Mortgage Corporation Mandatory Executive Deferred Base Salary Plan (As Effective January 1, 2009) |
| 12.1 | Statement re: computation of ratio of earnings to fixed charges and computation of ratio of earnings to combined fixed charges and preferred stock dividends |
| 31.1 | Certification of Chief Executive Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 31.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to Securities Exchange Act Rule 13a-14(a) |
| 32.1 | Certification of Chief Executive Officer pursuant to 18 U.S.C. Section 1350 |
| 32.2 | Certification of Executive Vice President — Chief Financial Officer pursuant to 18 U.S.C. Section 1350 |
| 101.INS | XBRL Instance Document[1] |
| 101.SCH | XBRL Taxonomy Extension Schema[1] |
| 101.CAL | XBRL Taxonomy Extension Calculation[1] |
| 101.LAB | XBRL Taxonomy Extension Labels[1] |
| 101.PRE | XBRL Taxonomy Extension Presentation[1] |
| 101.DEF | XBRL Taxonomy Extension Definition[1] |

[1] The financial information contained in these XBRL documents is unaudited. The information in these exhibits shall not be deemed "filed" for purposes of Section 18 of the Exchange Act, or otherwise subject to the liabilities of Section 18, nor shall they be deemed incorporated by reference into any disclosure document relating to Freddie Mac, except to the extent, if any, expressly set forth by specific reference in such filing.

E-1

*Freddie Mac*

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 10.3

# Freddie Mac

### PC MASTER TRUST AGREEMENT

**THIS PC MASTER TRUST AGREEMENT** is entered into as of May 30, 2012, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the PCs offered from time to time pursuant to Freddie Mac's Offering Circular referred to herein.

### WHEREAS:

(a) Freddie Mac is a corporation duly organized and existing under and by virtue of the Freddie Mac Act and has full corporate power and authority to enter into this Agreement and to undertake the obligations undertaken by it herein; and

(b) Freddie Mac may from time to time (i) purchase Mortgages, in accordance with the applicable provisions of the Freddie Mac Act, (ii) as Depositor, transfer and deposit such Mortgages into various trust funds that are established pursuant to this Agreement and that are referred to herein as "PC Pools," (iii) as Trustee, create and issue hereunder, on behalf of the related PC Pool, PCs representing undivided beneficial ownership interests in the assets of that PC Pool and otherwise act as trustee for each such PC Pool, (iv) as Guarantor, guarantee the payment of interest and principal for the benefit of the Holders of such PCs and (v) as Administrator, administer the affairs of each such PC Pool.

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained in this Agreement, the parties to this Agreement, do hereby declare and establish this Agreement and do hereby undertake and otherwise agree as follows with respect to the transfer of the Mortgages to various PC Pools, the issuance of the PCs and the establishment of the rights and obligations of the parties.

### Definitions

The following terms used in this Agreement have the respective meanings set forth below.

*Accrual Period:* As to any PC and any Payment Date, (i) the calendar month preceding the month of the Payment Date for Gold PCs or (ii) the second calendar month preceding the month of the Payment Date for ARM PCs.

*Administrator:* Freddie Mac, in its corporate capacity, as administrator of the PC Pools created under this Agreement.

*Agreement:* This PC Master Trust Agreement, dated as of May 30, 2012, by and among Freddie Mac in its corporate capacity as Depositor, Administrator and Guarantor, Freddie Mac in its capacity as Trustee, and the Holders of the various PCs, as originally executed, or as modified, amended or supplemented in accordance with the provisions set forth herein. Unless the context requires otherwise, the term "Agreement" shall be deemed to include any applicable Pool Supplement entered into pursuant to Section 1.01 of this Agreement.

*ARM:* An adjustable rate Mortgage.

1

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*ARM PC:* A PC with a Payment Delay of 75 days and which is backed by ARMs. ARM PCs include Deferred Interest PCs.

*Book-Entry Rules:* The provisions from time to time in effect, currently contained in Title 24, Part 81, Subpart H of the Code of Federal Regulations, setting forth the terms and conditions under which Freddie Mac may issue securities on the book-entry system of the Federal Reserve Banks and authorizing a Federal Reserve Bank to act as its agent in connection with such securities.

*Business Day:* A day other than (i) a Saturday or Sunday and (ii) a day when the Federal Reserve Bank of New York (or other agent acting as Freddie Mac's fiscal agent) is closed or, as to any Holder, a day when the Federal Reserve Bank that maintains the Holder's account is closed.

*Conventional Mortgage:* A Mortgage that is not guaranteed or insured by the United States or any agency or instrumentality of the United States.

*Custodial Account:* As defined in Section 3.05(e) of this Agreement.

*Deferred Interest:* The amount by which the interest due on a Mortgage exceeds the borrower's monthly payment, which amount is added to the unpaid principal balance of the Mortgage.

*Deferred Interest PC:* A PC representing an undivided beneficial ownership interest in a PC Pool that includes Mortgages providing for negative amortization.

*Depositor:* Freddie Mac, in its corporate capacity, as depositor of Mortgages into the PC Pools created under this Agreement.

*Eligible Investments:* Any one or more of the following obligations, securities or holdings maturing on or before the Payment Date applicable to the funds so invested:

    (i) obligations of, or obligations guaranteed as to the full and timely payment of principal and interest by, the United States;

    (ii) obligations of any agency or instrumentality of the United States (other than Freddie Mac) or taxable debt obligations of any state or local government (or political subdivision thereof) that have a long-term rating or a short-term rating, as applicable, from S&P, Moody's or Fitch in any case in one of its two highest rating categories for long-term securities or in its highest ratings category for short-term securities;

    (iii) time deposits of any depository institution or trust company domiciled in the Cayman Islands or Nassau and affiliated with a financial institution that is a member of the Federal Reserve System, provided that the short-term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short-term securities;

    (iv) federal funds, certificates of deposit, time deposits and bankers' acceptances with a fixed maturity of no more than 365 days of any depository institution or trust company, provided that the short-term securities of the depository institution or trust company are rated by S&P, Moody's or Fitch in the highest applicable ratings category for short-term securities;

    (v) commercial paper with a fixed maturity of no more than 270 days, of any corporation that is rated by S&P, Moody's or Fitch in its highest short-term ratings category;

<div align="center">2</div>

**TREASURY-4297**

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(vi) debt securities that have a long-term rating or a short-term rating, as applicable, from S&P, Moody's or Fitch, in any case in one of its two highest ratings categories for long-term securities or in its highest ratings category for short-term securities;

(vii) money market funds that are registered under the Investment Company Act of 1940, as amended, are entitled, pursuant to Rule 2a-7 of the Securities and Exchange Commission, or any successor to that rule, to hold themselves out to investors as money market funds, and are rated by S&P, Moody's or Fitch in one of its two highest ratings categories for money market funds;

(viii) asset-backed commercial paper that is rated by S&P, Moody's or Fitch in its highest short-term ratings category;

(ix) repurchase agreements on obligations that are either specified in any of clauses (i), (ii), (iv), (v), (vi) or (viii) above or are mortgage-backed securities insured or guaranteed by an entity that is an agency or instrumentality of the United States; provided that the counterparty to the repurchase agreement is an entity whose short-term debt securities are rated S&P, Moody's or Fitch in its highest ratings category for short-term securities; and

(x) any other investment without options that is approved by Freddie Mac and is within the two highest ratings categories of the applicable rating agency for long-term securities or the highest ratings category of the applicable rating agency for short-term securities.

The rating requirement will be satisfied if the relevant security, issue or fund at the time of purchase receives at least the minimum stated rating from at least one of S&P, Moody's or Fitch. The rating requirement will not be satisfied by a rating that is the minimum rating followed by a minus sign or by a rating lower than Aa2 from Moody's.

*Event of Default:* As defined in Section 5.01 of this Agreement.

*FHA/VA Mortgage:* A Mortgage insured by the Federal Housing Administration or by the Department of Agriculture Rural Development (formerly the Rural Housing Service) or guaranteed by the Department of Veterans Affairs or the Department of Housing and Urban Development.

*Final Payment Date:* As to any PC, the first day of the latest month in which the related Pool Factor will be reduced to zero. The Administrator publishes the Final Payment Date upon formation of the related PC Pool.

*Fitch:* Fitch, Inc., also known as Fitch Ratings, or any successor thereto.

*Freddie Mac:* The Federal Home Loan Mortgage Corporation, a corporation created pursuant to the Freddie Mac Act for the purpose of establishing and supporting a secondary market in residential mortgages. Unless the context requires otherwise, the term "Freddie Mac" shall be deemed to refer to Freddie Mac acting in one or more of its corporate capacities, as specified or as provided in context, and not in its capacity as Trustee.

*Freddie Mac Act:* Title III of the Emergency Home Finance Act of 1970, as amended, 12 U.S.C. §§1451-1459.

*Gold PC:* A PC with a Payment Delay of 45 days and which is backed by fixed-rate Mortgages.

*Guarantor:* Freddie Mac, in its corporate capacity, as guarantor of the PCs issued by each PC Pool.

3

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*Guide:* Freddie Mac's Single-Family Seller/Servicer Guide, as supplemented and amended from time to time, in which Freddie Mac sets forth its mortgage purchase standards, credit, appraisal and underwriting guidelines and servicing policies.

*Holder:* With respect to any PC Pool, any entity that appears on the records of a Federal Reserve Bank as a holder of the related PCs.

*Monthly Reporting Period:* The period, which period the Administrator has the right to change as provided in Section 3.05(d) of this Agreement, during which servicers report Mortgage payments to the Administrator, generally consisting of:

(i) in the case of all payments other than full prepayments on the Mortgages, the one-month period (A) ending on the 15 th of the month preceding the related Payment Date for Gold PCs and (B) ending on the 15 th of the second month preceding the related Payment Date for ARM PCs; and

(ii) in the case of full prepayments on the Mortgages (including repurchases of the Mortgages pursuant to Section 1.02(c) of this Agreement), the calendar month preceding the related Payment Date for Gold PCs and the second calendar month preceding the related Payment Date for ARM PCs; *provided, however*, that with respect to full prepayments on PCs issued before September 1, 1995, the Monthly Reporting Period generally is from the 16 th of a month through the 15th of the next month.

*Moody's:* Moody's Investors Service, Inc., or any successor thereto.

*Mortgage:* A mortgage loan or a participation interest in a mortgage loan that is secured by a first or second lien on a one-to-four family dwelling and that has been purchased by the Depositor and transferred by the Depositor to the Trustee for inclusion in the related PC Pool. With respect to each PC Pool, the Mortgages to be included therein shall be identified on the books and records of the Depositor and the Administrator.

*Mortgage Coupon:* The per annum fixed or adjustable interest rate of a Mortgage.

*MultiLender Swap Program:* A program under which Freddie Mac purchases Mortgages from one or more sellers in exchange for PCs representing undivided beneficial ownership interests in a PC Pool consisting of Mortgages that may or may not be those delivered by the seller(s).

*Negative Amortization Factor:* With respect to PCs backed by Mortgages providing for negative amortization, a truncated eight-digit decimal number that reflects the amount of Deferred Interest added to the principal balances of the related Mortgages in the preceding month.

*Offering Circular:* Freddie Mac's Mortgage Participation Certificates Offering Circular dated May 30, 2012, as amended and supplemented by any Supplements issued from time to time, or any successor thereto, as it may be amended and supplemented from time to time.

*Payment Date:* The 15th of each month or, if the 15th is not a Business Day, the next Business Day.

*Payment Delay:* The delay between the first day of the Accrual Period for a PC and the related Payment Date.

*PC:* With respect to each PC Pool, a Mortgage Participation Certificate issued pursuant to this Agreement, representing a beneficial ownership interest in such PC Pool. The term "PC" includes a Gold PC or an ARM PC unless the context requires otherwise.

4

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar ® Document Research ℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

*PC Coupon:* The per annum fixed or adjustable rate of a PC calculated as described in the Offering Circular or the applicable Pool Supplement, computed on the basis of a 360-day year of twelve 30-day months.

*PC Issue Date:* With respect to each PC Pool, the date specified in the related Pool Supplement or, if not specified therein, the date on which Freddie Mac issues a PC in exchange for the Mortgages delivered by a dealer or other customer.

*PC Pool:* With respect to each PC, the corpus of the related trust fund created by this Agreement, consisting of (i) the related Mortgages and all proceeds thereof, (ii) amounts on deposit in the Custodial Account, to the extent allocable to such PC Pool, (iii) the right to receive payments under the related guarantee and (iv) any other assets specified in the related Pool Supplement, excluding any investment earnings on any of the assets of that PC Pool. With respect to each PC Pool, and unless expressly stated otherwise, the provisions of this Agreement will be interpreted as referring only to the Mortgages included in that PC Pool, the PCs issued by that PC Pool and the Holders of those PCs.

*Person:* Any legal person, including any individual, corporation, partnership, limited liability company, financial institution, joint venture, association, joint stock company, trust, unincorporated organization or governmental unit or political subdivision of any governmental unit.

*Pool Factor:* With respect to each PC Pool, a truncated eight-digit decimal calculated for each month by the Administrator which, when multiplied by the original principal balance of the related PCs, will equal their remaining principal amount. The Pool Factor for any month reflects the remaining principal amount after the payment to be made on the Payment Date in the same month for Gold PCs or in the following month for ARM PCs.

*Pool Supplement:* Any physical or electronic document or record (which may be a supplement to the Offering Circular or any other supplemental document prepared by Freddie Mac for the related PCs), which, together herewith, evidences the establishment of a PC Pool and modifies, amends or supplements the provisions hereof in any respect whatsoever. The Pool Supplement for a particular PC Pool shall be binding and effective upon formation of the related PC Pool and issuance of the related PCs, whether or not such Pool Supplement is executed, delivered or published by Freddie Mac.

*Purchase Documents:* The mortgage purchase agreements between Freddie Mac and its Mortgage sellers and servicers, which are the contracts that govern the purchase and servicing of Mortgages and which include, among other things, the Guide and any negotiated modifications, amendments or supplements to the Guide.

*Record Date:* As to any Payment Date, the close of business on the last day of (i) the preceding month for Gold PCs or (ii) the second preceding month for ARM PCs.

*S&P:* Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

*Trustee:* Freddie Mac, in its capacity as trustee of each PC Pool formed under this Agreement, and its successors and assigns, which will have the trustee responsibilities specified in this Agreement, as amended or supplemented from time to time.

*Trustee Event of Default:* As defined in Section 6.06 of this Agreement.

TREASURY-4300

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

# ARTICLE I

## Conveyance of Mortgages; Creation of PC Pools

**Section 1.01. Declaration of Trust; Transfer of Mortgages.** The Depositor, by delivering any Mortgages pursuant to this Agreement, unconditionally, absolutely and irrevocably hereby transfers, assigns, sets over and otherwise conveys to the Trustee, on behalf of the related Holders, all of the Depositor's right, title and interest in and to such Mortgages, including all payments of principal and interest thereon received after the month in which the PC Issue Date occurs. Once Mortgages have been identified as being part of a related PC Pool for which at least one PC has been issued, they shall remain in that PC Pool unless removed in a manner consistent with this Agreement. Concurrently with the Depositor's transferring, assigning, setting over and otherwise conveying the Mortgages to the Trustee for a PC Pool, the Trustee hereby accepts the Mortgages so conveyed and acknowledges that it holds the entire corpus of each PC Pool in trust for the exclusive benefit of the related Holders and shall deliver to, or on the order of, the Depositor, the PCs issued by such PC Pool. The Administrator agrees to administer the related PC Pool and such PCs in accordance with the terms of this Agreement. On the related PC Issue Date and upon payment to the Depositor for any such PC by a Holder, such Holder shall, by virtue thereof, acknowledge, accept and agree to be bound by all of the terms and conditions of this Agreement.

A Pool Supplement shall evidence the establishment of a particular PC Pool and shall relate to specific PCs representing the entire beneficial ownership interests in such PC Pool. If for any reason the creation of a Pool Supplement is delayed, Freddie Mac shall create one as soon as practicable, and such delay shall not affect the validity and existence of the PC Pool or the related PCs. With respect to each PC Pool, the collective terms hereof and of the related Pool Supplement shall govern the issuance and administration of the PCs related to such PC Pool, and all matters related thereto, and shall have no applicability to any other PC Pool or PCs. As applied to each PC Pool, the collective terms hereof and of the related Pool Supplement shall constitute an agreement as if the collective terms of those instruments were set forth in a single instrument. In the event of a conflict between the terms hereof and the terms of a Pool Supplement for a PC Pool, the terms of the Pool Supplement shall control with respect to that PC Pool. A Pool Supplement is not considered an amendment to this Agreement requiring approval pursuant to Section 7.05.

**Section 1.02. Identity of the Mortgages; Substitution and Repurchase.**

(a) In consideration for the transfer of the related Mortgages by the Depositor to a PC Pool, the Depositor (i) shall receive the PCs issued by such PC Pool and (ii) may retain such PCs or transfer them to the related Mortgage seller or otherwise, as the Depositor deems appropriate.

(b) After the PC Issue Date but prior to the first Payment Date, the Depositor may, in accordance with its customary mortgage purchase and pooling procedures, adjust the amount and identity of the Mortgages to be transferred to a PC Pool, the PC Coupon and/or the original unpaid principal balance of the PCs and the Mortgages in the PC Pool, provided that any changes to the characteristics of the PCs shall be evidenced by an amendment or supplement to the related Pool Supplement.

(c) Except as provided in this Section 1.02 or in Section 1.03, once the Depositor has transferred a Mortgage to a particular PC Pool, such Mortgage may not be transferred out of such PC Pool, except (x) if a mortgage insurer exercises an option under an insurance contract to purchase such Mortgage or (y) in the case of repurchase by the Guarantor, the Administrator or the related Mortgage seller or servicer, under the following circumstances:

(i) The Guarantor may repurchase from the related PC Pool a Mortgage in connection with a guarantee payment under Section 3.09(a)(ii).

6

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(ii) The Administrator may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if a repurchase is necessary or advisable (A) to maintain servicing of the Mortgage in accordance with the provisions of the Guide, or (B) to maintain the status of the PC Pool as a grantor trust for federal income tax purposes.

(iii) The Guarantor may repurchase from the related PC Pool, or require or permit a Mortgage seller or servicer to repurchase, any Mortgage if (A) such Mortgage is 120 or more days delinquent, or (B) the Guarantor determines, on the basis of information from the related borrower or servicer, that loss of ownership of the property securing a Mortgage is likely or default is imminent due to borrower incapacity, death or hardship or other extraordinary circumstances that make future payments on such Mortgage unlikely or impossible.

(iv) The Guarantor may repurchase from the related PC Pool a Mortgage if a bankruptcy court approves a plan that materially affects the terms of the Mortgage or authorizes a transfer or substitution of the underlying property.

(v) The Administrator may require or permit a Mortgage seller or servicer to repurchase from the related PC Pool any Mortgage or (within six months of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if there is (A) a material breach of warranty by the Mortgage seller or servicer, (B) a material defect in documentation as to such Mortgage or (C) a failure by a seller or servicer to comply with any requirements or terms set forth in the Guide and, if applicable, other Purchase Documents.

(vi) The Administrator shall repurchase from the related PC Pool any Mortgage or (within two years of the issuance of the related PCs) substitute for any Mortgage a Mortgage of comparable type, unpaid principal balance, remaining term and yield, if (A) a court of competent jurisdiction or a federal government agency duly authorized to oversee or regulate Freddie Mac's mortgage purchase business determines that Freddie Mac's purchase of such Mortgage was unauthorized and Freddie Mac determines that a cure is not practicable without unreasonable effort or expense or (B) such court or government agency requires repurchase of such Mortgage.

(vii) To the extent a PC Pool includes convertible ARMs or Balloon/Reset Mortgages (each, as defined in the Offering Circular), the Administrator shall repurchase from the related PC Pool or require or allow the Mortgage seller or servicer to repurchase such Mortgages (a) when the borrower exercises its option to convert the related interest rate from an adjustable rate to a fixed rate, in the case of a convertible ARM; and (b) shortly before such Mortgage reaches its scheduled balloon repayment date, in the case of a Balloon/Reset Mortgage.

(d) The purchase price of a Mortgage repurchased by a Mortgage seller or servicer shall be equal to the then unpaid principal balance of such Mortgage, less any principal on such Mortgage that the Mortgage seller or servicer advanced to the Depositor or the Administrator. The purchase price of a Mortgage repurchased by the Administrator or the Guarantor under this Agreement shall be equal to the then unpaid principal balance of such Mortgage, less any outstanding advances of principal on such Mortgage that the Administrator, on behalf of the Trustee, distributed to Holders. The Administrator, on behalf of the Trustee, agrees to release any Mortgage from the PC Pool upon payment of the applicable purchase price.

(e) In determining whether a Mortgage shall be repurchased from the related PC Pool as described in this Section 1.02, the Guarantor and the Administrator may consider such factors as they deem appropriate, including the reduction of administrative costs (in the case of the Administrator) or possible exposure as Guarantor under its guarantee (in the case of the Guarantor).

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.03. Post-Settlement Purchase Adjustments**

(a) The Administrator shall make any post-settlement purchase adjustments necessary to reflect the actual aggregate unpaid principal balance of the related Mortgages or other Mortgage characteristics as of the date of their purchase by the Depositor or their delivery to the Trustee in exchange for PCs, as the case may be.

(b) Post-settlement adjustments may be made in such manner as the Administrator deems appropriate, but shall not adversely affect any Holder's rights to monthly payments of interest at the PC Coupon, any Holder's pro rata share of principal or any Holder's rights under the Guarantor's guarantees. Any reduction in the principal balance of the Mortgages held by a PC Pool shall be reflected by the Administrator as a corresponding reduction in the principal balance of the related PCs with a corresponding principal payment to the related Holders, on a pro rata basis.

**Section 1.04. Custody of Mortgage Documents.** With respect to each PC Pool, the Administrator, a custodian acting as its agent (which may be a third party or a trust or custody department of the related seller or servicer), or the originator or seller of the Mortgage may hold the related Mortgage documents, including Mortgage notes and participation certificates evidencing the Trustee's legal ownership interest in the Mortgages. The Administrator may adopt and modify its policies and procedures for the custody of Mortgage documents at any time, provided such modifications are prudent and do not materially and adversely affect the Holders' interests.

**Section 1.05. Interests Held or Acquired by Freddie Mac.** Freddie Mac shall have the right to purchase and hold for its own account any PCs. Subject to Section 7.06, PCs held or acquired by Freddie Mac from time to time and PCs held by other Holders shall have equal and proportionate benefits, without preference, priority or distinction. In the event that Freddie Mac retains any interest in a Mortgage, the remaining interest in which is part of a PC Pool, Freddie Mac's interest in such Mortgage shall rank equally with that of the related PC Pool, without preference, priority or distinction. No Holder shall have any priority over any other Holder.

**Section 1.06. Intended Characterization.** It is intended that the conveyance, transfer, assignment and setting over of the Mortgages by the Depositor to the Trustee pursuant to this Agreement be a true, absolute and unconditional sale of the related Mortgages by the Depositor to the Trustee, and not a pledge of the Mortgages to secure a debt or other obligation of the Depositor, and that the Holders of the related PCs shall be the beneficial owners of such Mortgages. Notwithstanding this express intention, however, if the Mortgages are determined by a court of competent jurisdiction or other competent authority to be the property of the Depositor, then it is intended that: (a) this Agreement be deemed to be a security agreement within the meaning of Articles 8 and 9 of the Uniform Commercial Code; (b) the conveyances provided for in Section 1.01 shall be deemed to be (1) a grant by the Depositor to the Trustee on behalf of the related Holders of a security interest in all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the related Mortgages, any and all general intangibles consisting of, arising from or relating to any of the foregoing, and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts from time to time held or invested in the Custodial Account and allocable to such Mortgages, whether in the form of cash, instruments, securities or other property and (2) an assignment by the Depositor to the Trustee on behalf of the related Holders of any security interest in any and all of the Depositor's right (including the power to convey title thereto), title and interest, whether now owned or hereafter acquired, in and to the property described in the foregoing clause (1); and (c) notifications to Persons holding such property, and acknowledgments, receipts or confirmations from Persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Trustee on behalf of the related Holders, for the purpose of perfecting such security interest under applicable law.

8

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 1.07. Encumbrances.**  Except as may otherwise be provided expressly in this Agreement, neither Freddie Mac nor the Trustee shall directly or indirectly, assign, sell, dispose of or transfer all or any portion of or interest in any PC Pool, or permit all or any portion of any PC Pool to be subject to any lien, claim, mortgage, security interest, pledge or other encumbrance of any other Person. This Section shall not be construed as a limitation on Freddie Mac's rights with respect to PCs held by it in its corporate capacity.

## ARTICLE II

### Administration and Servicing of the Mortgages

**Section 2.01. The Administrator as Primary Servicer.**  With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages and administer, on behalf of the Trustee, in accordance with the provisions of the Guide and this Agreement, including management of any property acquired through foreclosure or otherwise, all for the benefit of the related Holders. The Administrator shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration that the Administrator deems necessary or desirable. The Administrator shall seek from the Trustee, as representative of the related Holders, any consents or approvals relating to the control, management and servicing of the Mortgages included in any PC Pool and that are required hereunder.

**Section 2.02. Servicing Responsibilities.**  With respect to each PC Pool, the Administrator shall service or supervise servicing of the related Mortgages in a manner consistent with prudent servicing standards and in substantially the same manner as the Administrator services or supervises the servicing of unsold mortgages of the same type in its portfolio. In performing its servicing responsibilities hereunder, the Administrator may engage servicers, subservicers and other independent contractors or agents. The Administrator may discharge its responsibility to supervise servicing of the Mortgages by monitoring servicers' performance on a reporting and exception basis. Except as provided in Articles V and VI and Sections 7.05 and 7.06 of this Agreement, Freddie Mac, as Administrator shall not be subject to the control of the Holders in the discharge of its responsibilities pursuant to this Article. Except with regard to its guarantee obligations pursuant to Section 3.09 with respect to a PC Pool, the Administrator shall have no liability to any related Holder for the Administrator's actions or omissions in discharging its responsibilities under this Article II other than for any direct damage resulting from its failure to exercise that degree of ordinary care it exercises in the conduct and management of its own affairs. In no event shall the Administrator have any liability for consequential damages.

**Section 2.03. Realization Upon Defaulted Mortgages.**  With respect to each PC Pool, unless the Administrator deems that another course of action (e.g., charge-off) would be in the best economic interest of the Holders, the Administrator (or its authorized designee or representative) shall, as soon as practicable, foreclose upon (or otherwise comparably convert the ownership of) any real property securing a Mortgage which comes into and continues in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In connection with such foreclosure or conversion, the Administrator (or its authorized designee or representative) shall follow such practices or procedures as it deems necessary or advisable and consistent with general mortgage servicing standards.

**Section 2.04. Automatic Acceleration and Assumptions.**

(a) With respect to each PC Pool, to the extent provided in the Guide, the Administrator shall enforce the terms of each applicable Mortgage that gives the mortgagee the right to demand full payment of the unpaid principal balance of the Mortgage upon sale or transfer of the property securing the Mortgage regardless of the creditworthiness of the transferee (a right of "automatic acceleration"), subject to applicable state and federal law and the Administrator's then-current servicing policies.

9

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(b) With respect to each PC Pool, the Administrator shall permit the assumption by a new mortgagor of an FHA/VA Mortgage upon the sale or transfer of the underlying property, as required by applicable regulations. Any such assumption shall be in accordance with applicable regulations, policies, procedures and credit requirements and shall not result in loss or impairment of any insurance or guaranty.

**Section 2.05. Prepayment Penalties.** Unless otherwise provided in the Pool Supplement for a PC Pool, the related Holders shall not be entitled to receive any prepayment penalties, assumption fees or other fees charged on the Mortgages included in such PC Pool, and either the related servicer or the Administrator shall retain such amounts.

**Section 2.06. Mortgage Insurance and Guarantees.**

(a) With respect to each PC Pool, if a Conventional Mortgage is insured by a mortgage insurer and the mortgage insurance policy is an asset of such PC Pool, the related Holders acknowledge that the insurer shall have no obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives regarding the mortgagee's rights, benefits and obligations under the related insurance contract.

(b) With respect to each PC Pool, each FHA/VA Mortgage shall have in full force and effect a certificate or other satisfactory evidence of insurance or guaranty, as the case may be, as may be issued by the applicable government agency from time to time. None of these agencies has any obligation to recognize or deal with any Person other than the Administrator, the Trustee, or their respective authorized designees or representatives with regard to the rights, benefits and obligations of the mortgagee under the contract of insurance or guaranty relating to each FHA/VA Mortgage included in such PC Pool.

<div align="center">

## ARTICLE III

### Distributions to Holders; Guarantees

</div>

**Section 3.01. Monthly Reporting Period.** For purposes of this Agreement with respect to any PC Pool, any payment or any event with respect to any Mortgage included in such PC Pool that is reported to the Administrator by the related servicer as having been made or having occurred within a Monthly Reporting Period shall be deemed to have been received by the Administrator or to have in fact occurred within such Monthly Reporting Period used by the Administrator for such purposes. Payments reported by servicers include all principal and interest payments made by a borrower, insurance proceeds, liquidation proceeds and repurchase proceeds. Events reported by servicers include foreclosure sales, payments of insurance claims and payments of guarantee claims.

**Section 3.02. Holder's Undivided Beneficial Ownership Interest.** With respect to each PC Pool, the Holder of a PC on the Record Date shall be the owner of record of a pro rata undivided beneficial ownership interest in the remaining principal balance of the Mortgages in the related PC Pool as of such date and shall be entitled to interest at the PC Coupon on such pro rata undivided beneficial ownership interest, in each case on the related Payment Date. Such pro rata undivided beneficial ownership interest shall change accordingly if any Mortgage is added to or removed from such PC Pool in accordance with this Agreement. A Holder's pro rata undivided beneficial ownership interest in the Mortgages included in a PC Pool is calculated by dividing the original unpaid principal balance of the Holder's PC by the original unpaid principal balance of all the Mortgages in the related PC Pool.

**Section 3.03. Distributions of Principal.** With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of principal collections with respect to the Mortgages in such PC Pool, including, if applicable, each Holder's pro rata share of the aggregate amount of any Deferred Interest that has been

<div align="center">10</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

added to the principal balance of the related Mortgages; *provided, however,* that with respect to guarantee payments, the Guarantor's obligations herein shall be subject to its subrogation rights pursuant to Section 3.10. The Administrator may retain from any prepayment or delinquent principal payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee. For Mortgages purchased by the Depositor in exchange for PCs under its MultiLender Swap Program, the Depositor shall retain principal payments made on such Mortgages in the amount of any difference between the aggregate unpaid principal balance of the Mortgages as of delivery by the seller and the aggregate unpaid principal balance as of the PC Issue Date, and the Depositor shall purchase additional Mortgages with such principal payments; such additional Mortgages may or may not be included in the related PC Pool represented by the PCs received by the seller.

**Section 3.04. Distributions of Interest.** With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall withdraw from the Custodial Account and shall distribute to each related Holder its pro rata share of interest collections with respect to the Mortgages included in such PC Pool, at a rate equal to the PC Coupon (excluding, if applicable, each Holder's pro rata share of any Deferred Interest that has been added to the principal balance of the related Mortgages). Interest shall accrue during the applicable Accrual Periods. The Administrator may retain from any delinquent interest payment on any Mortgage, for reimbursement to the Guarantor, any amount not previously received with respect to such Mortgage but paid by the Guarantor to the related Holders under its guarantee. With respect to each PC Pool, a partial month's interest retained by Freddie Mac or remitted to the related Holders with respect to prepayments shall constitute an adjustment to the fee payable to the Administrator and the Guarantor pursuant to Section 3.08(a) for such PC Pool.

**Section 3.05. Payments.**

(a) With respect to each PC Pool, distributions of principal and interest on the related PCs shall begin in the month after issuance for Gold PCs and in the second month after issuance for ARM PCs. The Administrator, on behalf of the Trustee, shall calculate, or cause to be calculated, for each PC the distribution amount for the current calendar month.

(b) On or before each Payment Date, the Administrator, on behalf of the Trustee, shall instruct the Federal Reserve Banks to credit payments on PCs from the Custodial Account to the appropriate Holders' accounts. The related PC Pool's payment obligations shall be met upon transmittal of the Administrator's payment order to the Federal Reserve Banks provided sufficient funds are then on deposit in the Custodial Account. A Holder shall receive the payment of principal, if applicable, and interest on each Payment Date on each PC held by such Holder as of the related Record Date.

(c) The Administrator relies on servicers' reports of mortgage activity to prepare the Pool Factors. There may be delays or errors in processing mortgage information, such as a servicer's failure to file an accurate or timely report of its collections of principal or its having filed a report that cannot be processed. In these situations the Administrator's calculation of scheduled principal to be made on Gold PCs may not reflect actual payments on the related Mortgages. The Administrator shall account for and reconcile any differences as soon as practicable.

(d) The Administrator reserves the right to change the period during which a servicer may hold funds prior to payment to the Administrator, as well as the period for which servicers report payments to the Administrator, including adjustments to the Monthly Reporting Period. Either change may change the time at which prepayments are distributed to Holders. Any such change, however, shall not impair Holders' rights to payments as otherwise provided in this Section.

(e) The Administrator shall maintain one or more accounts (together, the "Custodial Account"), segregated from the general funds of Freddie Mac, in its corporate capacity, for the deposit of collections of

11

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

principal (including full and partial principal prepayments) and interest received from or advanced by the servicers in respect of the Mortgages. Mortgage collections in respect of the PC Pools established by Freddie Mac under this Agreement or trust funds established by Freddie Mac pursuant to any other trust agreements may be commingled in the Custodial Account, provided that the Administrator keeps, or causes to be kept, separate records of funds with respect to each such PC Pool and other trust fund. Collections due to Freddie Mac, in its corporate capacity as owner of mortgages held in its portfolio, may also be commingled in the Custodial Account, provided that the Administrator shall withdraw such amounts for remittance to Freddie Mac on a monthly basis. Funds on deposit in the Custodial Account may be invested by the Administrator in Eligible Investments. Investment earnings on deposits in the Custodial Account shall be for the benefit of the Administrator, and any losses on such investments shall be paid by the Administrator. On each Payment Date, amounts on deposit in the Custodial Account shall be withdrawn upon the order of the Administrator, on behalf of the Trustee, for the purpose of making distributions to the related Holders, in accordance with this Agreement.

### Section 3.06. Pool Factors.

(a) The Administrator, on behalf of the Trustee, shall calculate and make payments to Holders on each Payment Date based on the monthly Pool Factors (including Negative Amortization Factors) until such time as the Administrator determines that a more accurate and practicable method for calculating such payments is available and implements that method. Pursuant to Section 7.05(e), the Administrator may modify the Pool Factor methodology from time to time, without the consent of Holders. With respect to each PC Pool, the Administrator, on behalf of the Trustee, shall do the following:

(i) The Administrator shall publish or cause to be published for each month a Pool Factor with respect to each PC Pool. Beginning in the month after formation of a PC Pool, Pool Factors shall be published on or about the fifth Business Day of the month, which Pool Factors may reflect prepayments reported to the Administrator after the end of the related Monthly Reporting Period and before the publication of the applicable Pool Factors. However, the Administrator may, in its own discretion, publish Pool Factors on any other Business Day. The Pool Factor for the month in which the PC Pool is established is 1.00000000 and need not be published.

(ii) The Administrator shall distribute principal each month to a Holder of a Gold PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the Gold PC by the difference between its Pool Factors for the preceding and current months.

(iii) The Administrator shall distribute principal each month to a Holder of an ARM PC in an amount equal to such Holder's pro rata share of such principal, calculated by multiplying the original principal balance of the ARM PC by the difference between its Pool Factors for the two preceding months.

(iv) The Administrator shall distribute interest each month in arrears to a Holder (assuming no Deferred Interest) in an amount equal to 1/12th of the applicable PC Coupon multiplied by such Holder's pro rata share of principal, calculated by multiplying the original principal balance of such Holder's PC by the preceding month's Pool Factor for Gold PCs or by the second preceding month's Pool Factor for ARM PCs.

(v) For any month that Deferred Interest has accrued on a Deferred Interest PC, the Administrator shall distribute principal (if any is due) to a Holder in an amount equal to such Holder's pro rata share of principal, calculated by (A) subtracting the preceding month's Pool Factor from the second preceding month's Pool Factor, (B) adding to the difference the Negative Amortization Factor for the preceding month and (C) multiplying the resulting sum by the original PC principal balance. The interest payment on the Deferred Interest PC in that month shall be (i) 1/12th of the PC Coupon

12

TREASURY-4307

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

multiplied by (ii) the original principal balance of the Holder's PC multiplied by (iii) the preceding month's Pool Factor minus the preceding month's Negative Amortization Factor.

(b) With respect to each PC Pool, a Pool Factor shall reflect prepayments reported for the applicable Monthly Reporting Period. The Administrator, on behalf of the Trustee, may also, in its discretion, reflect in a Pool Factor any prepayments reported after the end of the applicable Monthly Reporting Period. To the extent a given Pool Factor (adjusted as necessary for payments made pursuant to the Guarantor's guarantee of timely payment of scheduled principal on Gold PCs) does not reflect the actual unpaid principal balance of the related Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable.

(c) In the case of a PC Pool that is comprised of ARMs, a Pool Factor shall be based upon the unpaid principal balance of the related Mortgages that servicers report to the Administrator for the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. The Administrator, on behalf of the Trustee, may also, in its discretion, include as part of the aggregate principal payment in any month any prepayments received after the Monthly Reporting Period that ended in the second month preceding the month in which the Pool Factor is published. To the extent a given Pool Factor does not reflect the actual aggregate unpaid principal balance of the Mortgages, the Administrator shall account for any difference by adjusting subsequent Pool Factors as soon as practicable.

(d) The Pool Factor method for a PC Pool may affect the timing of receipt of payments by related Holders but shall not affect the Guarantor's guarantee with respect to such PC Pool, as set forth in Section 3.09. The Guarantor's guarantee shall not be affected by the implementation of any different method for calculating and paying principal and interest for any PC Pool, as permitted by this Section 3.06.

**Section 3.07. Servicing Fees; Retained Interest.**

(a) To the extent provided by contractual arrangement with the Administrator, with respect to each PC Pool, the related servicer of each Mortgage included in such PC Pool shall be entitled to retain each month, as a servicing fee, any interest payable by the borrower on a Mortgage that exceeds the servicer's required remittance with respect to such Mortgage. Each servicer is required to pay all expenses incurred by it in connection with its servicing activities and shall not be entitled to reimbursement for those expenses, except as provided in Section 3.08(c). If a servicer advances any principal and/or interest on a Mortgage to the Administrator prior to the receipt of such funds from the borrower, the servicer may retain (i) from prepayments or collections of delinquent principal on such Mortgage any payments of principal so advanced, or (ii) from collections of delinquent interest on such Mortgage any payments of interest so advanced. To the extent permitted by its servicing agreement, the servicer is entitled to retain as additional compensation certain incidental fees related to Mortgages it services.

(b) With respect to a PC Pool, pursuant to the related Purchase Documents, a seller may retain each month as extra compensation a fixed amount of interest on a Mortgage included in such PC Pool. In such event, the related servicer shall retain each month as a servicing fee the excess of any interest payable by the borrower on such Mortgage (less the seller's retained interest amount) over the servicer's required remittance with respect to such Mortgage.

**Section 3.08. Administration Fee; Guarantee Fee.**

(a) Subject to any adjustments required by Section 3.04, with respect to any PC Pool, the Administrator and the Guarantor shall be entitled to receive from monthly interest payments on each related Mortgage a fee (to be allocated between the Administrator and the Guarantor as they may agree) equal to the excess of any interest received by the Administrator from the servicer over the amount of interest payable to the related Holders; *provided, however,* that the aggregate fee amount shall be automatically adjusted with respect to each PC Pool to the extent a Pool Factor does not reflect the unpaid principal

13

TREASURY-4308

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

balance of the Mortgages. Any such adjustment shall equal the difference between (i) interest at the applicable PC Coupon computed on the aggregate unpaid principal balance of the Mortgages for such month based on monthly principal payments actually received by the Administrator and (ii) interest at the applicable PC Coupon computed on the remaining balance of the Mortgages included in the PC Pool derived from the Pool Factor. The Administrator shall (i) withdraw the aggregate fee amount from the Custodial Account prior to distributions to the related Holders, (ii) retain its portion of the fee for the Administrator's own account and (iii) remit the remaining portion of the fee to the Guarantor as the guarantee fee. In addition, the Administrator is entitled to retain as additional compensation certain incidental fees on the Mortgages as provided in Section 2.05 and certain investment earnings as provided in Section 3.05(e).

(b) The Depositor shall pay all expenses incurred in connection with the transfer of the Mortgages, the establishment and administration of each PC Pool and the issuance of the PCs. Any amounts (including attorney's fees) expended by the Trustee or the Administrator (or the servicers on the Administrator's behalf) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages, shall be expenses to be borne pro rata by the Administrator and the Holders in accordance with their interests in each Mortgage. The Administrator, on behalf of the Trustee, may retain an amount sufficient to pay the portion of such expenses borne pro rata by the Depositor and the Holders from payments otherwise due to Holders, which may affect the timing of receipt of payments by Holders but shall not affect the Guarantor's obligations under Section 3.09.

(c) The Administrator shall reimburse a servicer for any amount (including attorney's fees) it expends (on the Administrator's behalf and with its approval) for the protection, preservation or maintenance of the Mortgages, or of the real property securing the Mortgages, or of property received in liquidation of or realization upon the Mortgages. Such expenses shall be reimbursable to the servicer from the assets of the related PC Pool, to the extent provided in the Guide.

(d) Any fees and expenses described above shall not affect the Guarantor's guarantee with respect to any PC Pool, as set forth in Section 3.09.

**Section 3.09. Guarantees.**

(a) With respect to each PC Pool, the Guarantor guarantees to the Trustee and to each Holder of a PC:

(i) the timely payment of interest at the applicable PC Coupon;

(ii) the full and final payment of principal on the underlying Mortgages on or before the Payment Date that falls (A) in the month of its Final Payment Date, for Gold PCs, or (B) in the month after its Final Payment Date, for ARM PCs; and

(iii) for Gold PCs only, the timely payment of scheduled principal on the underlying Mortgages.

In the case of Deferred Interest PCs, the Guarantor's guarantee of principal includes, and its guarantee of interest excludes, any Deferred Interest added to the principal balances of the related Mortgages. The Guarantor shall make payments of any guaranteed amounts by transfer to the Custodial Account for distribution to the related Holders, in accordance with Sections 3.03 and 3.04. The guarantees pursuant to this Section will inure to the benefit of each PC Pool and its related Holders, and shall be enforceable by the Trustee of that PC Pool and by such Holders, as provided in Article V of this Agreement.

(b) The Guarantor shall compute guaranteed scheduled monthly principal payments on any Gold PC, subject to any applicable adjustments, in accordance with procedures adopted by the Guarantor from time to time. With respect to each PC Pool, any payment the Guarantor makes to the Administrator, on behalf

14

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

of the Trustee, on account of the Guarantor's guarantee of scheduled principal payments shall be considered to be a payment of principal for purposes of calculating the Pool Factor for such PC Pool and the Holder's pro rata share of the remaining unpaid principal balance of the related Mortgages.

(c) The Guarantor's guarantees shall continue to be effective or shall be reinstated (i) in the event that any principal or interest payment made to a Holder is for any reason returned by the Holder pursuant to an order, decree or judgment of any court of competent jurisdiction that the Holder was not entitled to retain such payment pursuant to this Agreement and (ii) notwithstanding any provision hereof permitting fees, expenses, indemnities or other amounts to be paid from the assets of any PC Pool.

**Section 3.10. Subrogation.**  With respect to each PC Pool, the Guarantor shall be subrogated to all the rights, interests, remedies, powers and privileges of each related Holder in respect of any Mortgage included in such PC Pool on which it has made guarantee payments of principal and/or interest to the extent of such payments. Nothing in this Section shall impair the Guarantor's right to receive distributions in its capacity as Holder, if it is a Holder of any PCs.

**Section 3.11. Termination Upon Final Payment.**  Each PC Pool is irrevocable and will terminate only in accordance with the terms of this Agreement. Except as provided in Sections 3.05(e), 6.06 and 7.01, with respect to each PC Pool, Freddie Mac's and the Trustee's obligations and responsibilities under this Agreement shall terminate as to a PC Pool and its Holders upon (i) the full payment to such Holders of all principal and interest due to the Holders based on the Pool Factors or by reason of the Guarantor's guarantees or (ii) the payment to the Holder of all amounts held by Freddie Mac and the Trustee, respectively, and required to be paid hereunder; *provided, however*, that in no event shall any PC Pool created hereby continue beyond the expiration of 21 years from the death of the survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

**Section 3.12. Effect of Final Payment Date.**  The actual final payment on a PC may occur prior to the Payment Date specified in Section 3.09(a)(ii) due to prepayments of principal, including prepayments made in connection with the repurchase of any Mortgage from the related PC Pool.

**Section 3.13. Payment Error Corrections.**  In the event of a principal or interest payment error, the Administrator, in its sole discretion, may effect corrections by the adjustment of payments to be made on future Payment Dates or in such other manner as it deems appropriate.

## ARTICLE IV

## PCs

**Section 4.01. Form and Denominations.**  With respect to each PC Pool, the principal balances, PC Coupons and other characteristics of the PCs to be issued shall be specified in the related Pool Supplement. Delivery of the PCs of a PC Pool shall constitute the issuance of the PCs for that PC Pool. PCs shall be issued, held and transferable only on the book-entry system of the Federal Reserve Banks in minimum original principal amounts of $1,000 and additional increments of $1. PCs shall at all times remain on deposit with a Federal Reserve Bank in accordance with the provisions of the Book-Entry Rules. A Federal Reserve Bank will maintain a book-entry recordkeeping system for all transactions in PCs with respect to Holders.

**Section 4.02. Transfer of PCs.**  PCs may be transferred only in minimum original principal amounts of $1,000 and additional increments of $1. PCs may not be transferred if, as a result of the transfer, the

15

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                                                                 Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

transferor or the new Holder would have on deposit in its account PCs of the same issue with an original principal amount of less than $1,000.The transfer, exchange or pledge of PCs shall be governed by the fiscal agency agreement between Freddie Mac and a Federal Reserve Bank, the Book-Entry Rules and such other procedures as shall be agreed upon from time to time by Freddie Mac and a Federal Reserve Bank. A Federal Reserve Bank shall act only upon the instructions of the Holder in recording transfers of a PC. A charge may be made for any transfer of a PC and shall be made for any tax or other governmental charge imposed in connection with a transfer of a PC. Freddie Mac hereby assigns to the Trustee Freddie Mac's rights under each fiscal agency agreement with respect to PCs issued by any PC Pool.

**Section 4.03. Record Date.** The Record Date for each Payment Date shall be the close of business on the last day of the preceding month for Gold PCs and the second preceding month for ARM PCs. A Holder of a PC on the books and records of a Federal Reserve Bank on the Record Date shall be entitled to payment of principal and interest on the related Payment Date. A transfer of a PC made on or before the Record Date in a month shall be recognized as effective as of the first day of such month.

<div align="center">

**ARTICLE V**

**Remedies**

</div>

**Section 5.01. Events of Default.** With respect to each PC Pool, an "Event of Default" means any one of the following events:

(a) Default by the Guarantor or the Administrator in the payment of interest or principal to the related Holders as and when the same shall become due and payable as provided in this Agreement, and the continuance of such default for a period of 30 days.

(b) Failure by the Guarantor or the Administrator to observe or perform any other covenants of this Agreement relating to their respective obligations, and the continuance of such failure for a period of 60 days after the date of receipt by such party of written notice of such failure and a demand for remedy by the affected Holders representing not less than 65 percent of the remaining principal balance of any affected PC Pool.

(c) The entry by any court having jurisdiction over the Guarantor or the Administrator of a decree or order for relief in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of its property, or for the winding up or liquidation of its affairs, if such decree or order remains unstayed and in effect for a period of 60 consecutive days.

(d) Commencement by the Guarantor or the Administrator of a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consent by the Guarantor or the Administrator to the entry of an order for relief in an involuntary case under any such law, or its consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator (or other similar official) of the Guarantor or the Administrator or for any substantial part of their respective properties, or any general assignment made by the Guarantor or the Administrator for the benefit of creditors, or failure by the Guarantor or the Administrator generally to pay their debts as they become due.

The appointment of a conservator (or other similar official) by a regulator having jurisdiction over the Guarantor or the Administrator, whether or not such party consents to such appointment, shall not constitute an Event of Default.

<div align="center">16</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Section 5.02. Remedies.**

(a) If an Event of Default occurs and is continuing with respect to a PC Pool, the Holders of PCs representing a majority of the remaining principal balance of such PC Pool may, by written notice to Freddie Mac, remove Freddie Mac as Administrator and nominate its successor under this Agreement with respect to such PC Pool. The nominee shall be deemed appointed as Freddie Mac's successor as Administrator unless Freddie Mac objects within 10 days after such nomination. Upon such objection:

(i) The Administrator may petition any court of competent jurisdiction for the appointment of its successor; or

(ii) Any bona fide Holder that has been a Holder for at least six months may, on behalf of such Holder and all others similarly situated, petition any such court for appointment of the Administrator's successor.

(b) If a successor Administrator is appointed, the Administrator shall submit to its successor a complete written report and accounting of the Mortgages in the affected PC Pool and shall take all other steps necessary or desirable to transfer its interest in and administration of such PC Pool to its successor.

(c) Subject to the Freddie Mac Act, a successor may take any action with respect to the Mortgages as may be reasonable and appropriate in the circumstances. Prior to the designation of a successor, the Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool may waive any past or current Event of Default.

(d) Appointment of a successor shall not relieve Freddie Mac, in its capacity as Guarantor, of its guarantee obligations as set forth in this Agreement.

**Section 5.03. Limitation on Suits by Holders.**

(a) With respect to any PC Pool, except as provided in Section 5.02, no Holder shall have any right to institute any action or proceeding at law or in equity or in bankruptcy or otherwise or seek any other remedy whatsoever against Freddie Mac or the Trustee with respect to this Agreement or the related PCs or Mortgages, unless:

(i) Such Holder previously has given the Trustee written notice of an Event of Default and the continuance thereof;

(ii) The Holders of PCs representing a majority of the remaining principal balance of any affected PC Pool have made a written request to the Trustee to institute an action or proceeding in its own name and have offered the Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred;

(iii) The Trustee has failed to institute any such action or proceeding for 60 days after its receipt of the written notice, request and offer of indemnity described above; and

(iv) The Trustee has not received from such Holders any direction inconsistent with the written request described above during the 60-day period.

(b) No Holder shall have any right under this Agreement to prejudice the rights of any other Holder, to obtain or seek preference or priority over any other Holder or to enforce any right under this Agreement, except for the ratable and common benefit of all Holders of PCs representing interests in any affected PC Pool.

17

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(c) For the protection and enforcement of the provisions of this Section, Freddie Mac, the Trustee and each and every Holder shall be entitled to such relief as can be given either at law or in equity. Notwithstanding the foregoing, no Holder's right to receive payment (or to institute suit to enforce payment) of principal and interest as provided herein on or after the due date of such payment shall be impaired or affected without the consent of the Holder.

# ARTICLE VI

## Trustee

**Section 6.01. Duties of Trustee.**

(a) If an Event of Default has occurred and is continuing with respect to a PC Pool, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b) Except during the continuance of an Event of Default, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement and shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement and no implied covenants or obligations shall be read into this Agreement against the Trustee.

(c) The Trustee and its directors, officers, employees and agents may not be protected from liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of their respective duties or by reason of reckless disregard of obligations and duties under this Agreement, except that:

(i) this paragraph does not limit the effect of paragraph (b) of this Section;

(ii) the Trustee shall not be liable for any action taken, or not taken, by the Trustee in good faith pursuant to this Agreement or for errors in judgment; and

(iii) the Trustee shall not be required to take notice or be deemed to have notice or knowledge of any default or Event of Default, unless the Trustee obtains actual knowledge or written notice of such default or Event of Default. In the absence of such actual knowledge or notice, the Trustee may conclusively assume that there is no default or Event of Default.

(d) Every provision of this Agreement shall be subject to the provisions of this Section and Section 6.02.

(e) The Trustee shall not be liable for indebtedness evidenced by or arising under this Agreement, including principal of or interest on the PCs, or interest on any money received by it except as the Trustee may agree in writing.

(f) Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law or the terms of this Agreement.

(g) No provision of this Agreement shall require the Trustee to expend, advance or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

18

TREASURY-4313

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(h) The Trustee may, but shall not be obligated to, undertake any legal action that it deems necessary or desirable in the interest of Holders. The Trustee may be reimbursed for the legal expenses and costs of such action from the assets of the related PC Pool.

**Section 6.02. Certain Matters Affecting the Trustee.**

(a) The Trustee, and any director, officer, employee or agent of the Trustee may rely in good faith on any certificate, opinion or other document of any kind which, prima facie, is properly executed and submitted by any appropriate Person respecting any matters arising hereunder. The Trustee may rely on any such documents believed by it to be genuine and to have been signed or presented by the proper Person and on their face conforming to the requirements of this Agreement. The Trustee need not investigate any fact or matter stated in such documents.

(b) Before the Trustee acts or refrains from acting, it may require an officer's certificate or an opinion of counsel, which shall not be at the expense of the Trustee. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an officer's certificate or opinion of counsel. The right of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty and the Trustee shall not be answerable for other than its willful misfeasance, bad faith or gross negligence in the performance of such act.

(c) The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee.

(d) The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, that the Trustee's conduct does not constitute willful misfeasance, bad faith or gross negligence. In no event shall the Trustee have any liability for consequential damages.

(e) The Trustee may consult with and rely on the advice of counsel, accountants and other advisors and shall not be liable for errors in judgment or for anything it does or does not do in good faith if it so relies. Any opinion of counsel with respect to legal matters relating to this Agreement and the PCs shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with any opinion of such counsel.

(f) Any fees, expenses and indemnities payable from the assets of any PC Pool to Freddie Mac, in its capacity as Trustee, in the performance of its duties and obligations hereunder shall not affect Freddie Mac's guarantee with respect to that PC Pool, as set forth in Section 3.09.

**Section 6.03. Trustee's Disclaimer.** The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Agreement, the assets of the PC Pool or the PCs.

**Section 6.04. Trustee May Own PCs.** Subject to Section 7.06, the Trustee in its individual or any other capacity may become the owner or pledgee of PCs with the same rights as it would have if it were not the Trustee.

**Section 6.05. Indemnity.** Each PC Pool shall indemnify the Trustee and the Trustee's employees, directors, officers and agents, as provided in this Agreement, against any and all claims, losses, liabilities or expenses (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties under this Agreement (to the extent not previously reimbursed above), including, without limitation, the execution and filing of any federal or state tax returns and information returns and being the mortgagee of record with respect to the related Mortgages. The Trustee shall notify the Administrator promptly of any claim for which it may seek indemnity. Failure by the Trustee to so

19

TREASURY-4314

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

notify the Administrator shall not relieve the related PC Pool of its obligations hereunder. A PC Pool shall not be required to reimburse any expense or indemnify against any loss, liability or expense incurred by the Trustee through the Trustee's own willful misfeasance, bad faith or gross negligence.

The Trustee's rights pursuant to this Section shall survive the discharge of this Agreement.

**Section 6.06. Replacement of Trustee.** The Trustee may resign at any time. Any successor Trustee shall resign if it ceases to be eligible in accordance with the provisions of Section 6.09. In either case, the resignation of the Trustee shall become effective, and the resigning Trustee shall be discharged from its obligations with respect to the PC Pools created under this Agreement by giving 90 days' written notice of the resignation to the Depositor, the Guarantor and the Administrator and upon the effectiveness of an appointment of a successor Trustee, which may be as of a date prior to the end of the 90-day period. Upon receiving such notice of resignation, the Depositor shall promptly appoint one or more successor Trustees by written instrument, one copy of which is delivered to the resigning Trustee and one copy of which is delivered to the successor Trustee. The successor Trustee need not be the same Person for all PC Pools. If no successor Trustee has been appointed for a PC Pool, or one that has been appointed has not accepted the appointment within 90 days after giving such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor Trustee.

Prior to an Event of Default, or if an Event of Default has occurred and has been cured with respect to a PC Pool, Freddie Mac cannot be removed as Trustee with respect to that PC Pool. If an Event of Default has occurred and is continuing while Freddie Mac is the Trustee, at the direction of Holders of PCs representing a majority of the remaining principal balance of such PC Pool, Freddie Mac shall resign or be removed as Trustee, and to the extent permitted by law, all of the rights and obligations of the Trustee with respect to the related PC Pool only, will be terminated by notifying the Trustee in writing. Holders of PCs representing a majority of the remaining principal balance of the PC Pool will then be authorized to name and appoint one or more successor Trustees. Notwithstanding the termination of the Trustee, its liability under this Agreement and arising prior to such termination shall survive such termination.

If a successor Trustee is serving as the Trustee, the following events are "Trustee Events of Default" with respect to a PC Pool:

(i) the Trustee fails to comply with Section 6.09;

(ii) the Trustee is adjudged bankrupt or insolvent;

(iii) a receiver or other public officer takes charge of the Trustee or its property; or

(iv) the Trustee otherwise becomes incapable of acting.

If at any time a Trustee Event of Default has occurred and is continuing, the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) may, and if directed by Holders of PCs representing a majority of the remaining principal balance of such PC Pool, shall, remove the Trustee as to such PC pool and appoint a successor Trustee by written instrument, one copy of which shall be delivered to the Trustee so removed and one copy of which shall be delivered to the successor Trustee, and the Guarantor (or if an Event of Default has occurred and is continuing, the Depositor) shall give written notice of the successor Trustee to the Holders affected by the succession. Notwithstanding the termination of the Trustee, its liability under this Agreement arising prior to such termination will survive such termination.

If the Trustee resigns or is removed or if a vacancy exists in the office of the Trustee for any reason (the Trustee in such event being referred to herein as the retiring Trustee), the Depositor shall promptly appoint a successor Trustee that satisfies the eligibility requirements of Section 6.09.

20

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

The retiring Trustee agrees to cooperate with the Depositor and any successor Trustee in effecting the termination of the retiring Trustee's responsibilities and rights hereunder and shall promptly provide such successor Trustee all documents and records reasonably requested by it to enable it to assume the Trustee's functions hereunder.

A successor Trustee shall deliver a written acceptance of its appointment to the retiring Trustee and to the Depositor, the Guarantor and the Administrator. Thereupon the resignation or removal of the retiring Trustee shall become effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under this Agreement with respect to such PC Pool. The successor Trustee shall mail a notice of its succession to the related Holders. The retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

If a successor Trustee does not take office within 30 days after the retiring Trustee resigns or is removed, the retiring Trustee or the Depositor may petition any court of competent jurisdiction for the appointment of a successor Trustee.

**Section 6.07. Successor Trustee By Merger.** If a successor Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or transferee corporation without any further act shall be the successor Trustee; provided, that, such corporation or banking association shall be otherwise qualified and eligible under Section 6.09.

**Section 6.08. Appointment of Co-Trustee or Separate Trustee.**

(a) Notwithstanding any other provisions of this Agreement, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of a PC Pool may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of such PC Pool and to vest in such Person or Persons, in such capacity and for the benefit of the related Holders, such title to such PC Pool, or any part thereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.09 and no notice to the related Holders of the appointment of any co-trustee or separate trustee shall be required under Section 6.06 hereof.

(b) With respect to each PC Pool, every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the related PC Pool or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii) no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

21

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012                    Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

(iii) the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

**Section 6.09. Eligibility; Disqualification.** Freddie Mac is eligible to act as the Trustee and is initially the Trustee for the PC Pools created under this Agreement. Any successor to Freddie Mac (i) at the time of its appointment as Trustee, must be reasonably acceptable to Freddie Mac and (ii) must be organized as a corporation or association doing business under the laws of the United States or any State thereof, be authorized under such laws to exercise corporate trust powers, have combined capital and surplus of at least $50,000,000 and be subject to supervision or examination by federal or state financial regulatory authorities. If any successor Trustee shall cease to satisfy the eligibility requirements set forth in (ii) above, that successor Trustee shall resign immediately in the manner and with the effect specified in Section 6.06.

## ARTICLE VII

### Miscellaneous Provisions

**Section 7.01. Annual Statements.** Within a reasonable time after the end of each calendar year, the Administrator (or its agent) shall furnish to each Holder on any Record Date during such year information that the Administrator deems necessary or desirable to enable Holders and beneficial owners of PCs to prepare their United States federal income tax returns, if applicable.

**Section 7.02. Limitations on Liability.** Neither Freddie Mac, in its corporate capacity, nor any of its directors, officers, employees, authorized designees, representatives or agents ("related persons") shall be liable to Holders for any action taken, or not taken, by them or by a servicer in good faith pursuant to this Agreement or for errors in judgment. This provision shall not protect Freddie Mac or any related person against any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties under this Agreement. In no event shall Freddie Mac or any related person be liable for any consequential damages. Freddie Mac and any related person may rely in good faith on any document or other communication of any kind properly executed and submitted by any Person with respect to any matter arising under this Agreement. Freddie Mac has no obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service or supervise the servicing of the Mortgages in accordance with this Agreement and which in its opinion may involve any expense or liability for Freddie Mac. Freddie Mac may, in its discretion, undertake or participate in any action it deems necessary or

22

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

desirable with respect to any Mortgage, this Agreement, the PCs or the rights and duties of the parties hereto and the interests of the Holders hereunder. In such event, the legal expenses and costs of such action and any resulting liability shall be expenses for the protection, preservation and maintenance of the Mortgages borne pro rata by Freddie Mac and Holders as provided in Section 3.08(b).

**Section 7.03. Limitation on Rights of Holders.**  The death or incapacity of any Person having an interest in a PC shall not terminate this Agreement or any PC Pool. Such death or incapacity shall not entitle the legal representatives or heirs of such Person, or any Holder for such Person, to claim an accounting, take any action or bring any proceeding in any court for a partition or winding up of the related PC Pool, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

**Section 7.04. Control by Holders.**  With respect to any PC Pool, except as otherwise provided in Articles V and VI and Sections 7.05 and 7.06, no Holder shall have any right to vote or to otherwise control in any manner the operation and management of the Mortgages included in such PC Pool, or the obligations of the parties hereto. This Agreement shall not be construed so as to make the Holders from time to time partners or members of an association. Holders shall not be liable to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

**Section 7.05. Amendment.**

(a) Freddie Mac and the Trustee may amend this Agreement (including any related Pool Supplement) from time to time without the consent of any Holders to (i) cure any ambiguity or correct or supplement any provision in this Agreement,  *provided, however,* that any such amendment shall not have a material adverse effect on any Holder; (ii) maintain the classification of any PC Pool as a grantor trust for federal income tax purposes; or (iii) avoid the imposition of any state or federal tax on a PC Pool; it being understood that any amendment permitting the repurchase of a Mortgage by Freddie Mac due to a delinquency of less than 120 days, other than in the circumstances described in Section 1.02(c)(iii), may not be adopted under this clause (a).

(b) Except as provided in Section 7.05(c), Freddie Mac and the Trustee may amend this Agreement as to any PC Pool, with the consent of Holders representing not less than a majority of the remaining principal balance of the affected PC Pool.

(c) Freddie Mac and the Trustee may not amend this Agreement, without the consent of a Holder, if such amendment would impair or affect the right of such Holder to receive payment of principal and interest on or after the due date of such payment or to institute suit for the enforcement of any such payment on or after such date.

(d) To the extent that any provisions of this Agreement differ from the provisions of any Freddie Mac Mortgage Participation Certificates Agreement or PC Master Trust Agreement dated prior to the date of this Agreement, this Agreement shall be deemed to amend such provisions of the prior agreement, but only to the extent that Freddie Mac, under the terms of such prior agreement, could have effected such change as an amendment of such prior agreement without the consent of Holders of PCs thereunder; *provided, however,* that the trust declarations and related provisions set forth in Section 7.05(d) of the PC Master Trust Agreement dated as of December 31, 2007 are hereby reaffirmed with respect to each PC Pool created before December 31, 2007.

(e) Notwithstanding any other provision of this Section, (i) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to reflect any modification in the Administrator's methodology of calculating payments to Holders, including any modifications described in Section 3.05(d) and Section 3.06(a) and the manner in which it distributes prepayments to Holders, (ii) the Administrator (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend this Agreement to cure any inconsistency between this

23

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Agreement and the provisions of the Guide and (iii) the Depositor (in its own discretion and in its own interest) and the Trustee (at the Administrator's direction) may amend any Pool Supplement to make the adjustments described in Section 1.02(b) to the characteristics of the Mortgages to be transferred to a PC Pool or to the related PCs.

**Section 7.06. Voting Rights.**

If Freddie Mac is acting as Administrator or Trustee and an Event of Default has occurred and is continuing, any PCs held by Freddie Mac for its own account shall be disregarded and deemed not to be outstanding for purposes of exercising the remedies set forth in Section 5.02 and the second paragraph of Section 6.06.

**Section 7.07. Persons Deemed Owners.** With respect to each PC Pool, Freddie Mac, the Trustee, the Administrator and a Federal Reserve Bank (or any agent of any of them) may deem and treat the related Holder(s) as the absolute owner(s) of a PC and the undivided beneficial ownership interests in the Mortgages included in the related PC Pool for the purpose of receiving payments and for all other purposes, and none of Freddie Mac, the Trustee, the Administrator or a Federal Reserve Bank (nor any agent of any of them) shall be affected by any notice to the contrary. All payments made to a Holder, or upon such Holder's order, shall be valid, and, to the extent of the payment, shall satisfy and discharge the related PC Pool's payment obligations with respect to the Holder's PC. None of Freddie Mac, the Trustee, the Administrator or any Federal Reserve Bank shall have any direct obligation to any beneficial owner unless it is also the Holder of a PC.

**Section 7.08. Governing Law.** THIS AGREEMENT AND THE PARTIES' RIGHTS AND OBLIGATIONS WITH RESPECT TO PCs, SHALL BE GOVERNED BY THE LAWS OF THE UNITED STATES. INSOFAR AS THERE MAY BE NO APPLICABLE PRECEDENT, AND INSOFAR AS TO DO SO WOULD NOT FRUSTRATE THE PURPOSES OF THE FREDDIE MAC ACT OR ANY PROVISION OF THIS AGREEMENT OR THE TRANSACTIONS GOVERNED HEREBY, THE LOCAL LAWS OF THE STATE OF NEW YORK SHALL BE DEEMED REFLECTIVE OF THE LAWS OF THE UNITED STATES.

**Section 7.09. Grantor Trust Status.** No provision in this Agreement shall be construed to grant Freddie Mac, the Trustee or any other Person authority to act in any manner which would cause a PC Pool not to be treated as a grantor trust for federal income tax purposes.

**Section 7.10. Payments Due on Non-Business Days.** If the date fixed for any payment on any PC is a day that is not a Business Day, then such payment shall be made on the next succeeding Business Day, with the same force and effect as though made on the date fixed for such payment, and no interest shall accrue for the period after such date.

**Section 7.11. Successors.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, including any successor by operation of law, and permitted assigns.

**Section 7.12. Headings.** The headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

**Section 7.13. Notice and Demand.**

(a) Any notice, demand or other communication required or permitted under this Agreement to be given to or served upon any Holder may be given or served (i) in writing by deposit in the United States mail, postage prepaid, and addressed to such Holder as such Holder's name and address may appear on the books and records of a Federal Reserve Bank or (ii) by transmission to such Holder through the communication system of the Federal Reserve Banks. Any notice, demand or other communication to or

24

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

upon a Holder shall be deemed to have been sufficiently given or made, for all purposes, upon mailing or transmission.

(b) Any notice, demand or other communication which is required or permitted to be given to or served under this Agreement may be given in writing addressed as follows (i) in the case of Freddie Mac in its corporate capacity, to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President — General Counsel and Secretary and (ii) in the case of the Trustee, to: Freddie Mac (as Trustee), 8200 Jones Branch Drive, McLean, Virginia 22102, Attention: Executive Vice President — General Counsel and Secretary.

(c) Any notice, demand or other communication to or upon Freddie Mac or the Trustee shall be deemed to have been sufficiently given or made only upon its actual receipt of the writing.

<div align="center">25</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

THE SALE OF A PC AND RECEIPT AND ACCEPTANCE OF A PC BY OR ON BEHALF OF A HOLDER, WITHOUT ANY SIGNATURE OR FURTHER MANIFESTATION OF ASSENT, SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER AND ALL OTHERS HAVING A BENEFICIAL INTEREST IN SUCH PC OF ALL THE TERMS AND PROVISIONS OF THIS AGREEMENT (INCLUDING THE RELATED POOL SUPPLEMENT) AND THE AGREEMENT OF FREDDIE MAC, SUCH HOLDER AND SUCH OTHERS THAT THOSE TERMS AND PROVISIONS SHALL BE BINDING, OPERATIVE AND EFFECTIVE.

FEDERAL HOME LOAN MORTGAGE CORPORATION,
in its corporate capacity and as Trustee

/s/               Mark D. Hanson
Authorized Signatory

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

<div align="right">**Exhibit 10.4**</div>

<div align="center">

**SECOND AMENDMENT**
**TO THE**
**FEDERAL HOME LOAN MORTGAGE CORPORATION**
**MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN**
**(As Effective January 1, 2009)**

</div>

SECOND AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN (the "Plan") by the FEDERAL HOME LOAN MORTGAGE CORPORATION (the "Corporation"), a corporation organized and existing under the laws of the United States of America.

<div align="center">

**W I T N E S S E T H:**

</div>

WHEREAS, the Plan was adopted effective January 1, 2009, and first amended in 2011;

WHEREAS, the Corporation now desires to further amend the Plan, to reflect certain changes to the Corporation's compensation structure effective January 1, 2012;

WHEREAS, Section 8.1 of the Plan permits the Corporation to amend the Plan; and

WHEREAS, the appropriate officer of the Corporation has been duly authorized to execute this amendment.

NOW, THEREFORE, the Plan is amended, as follows, effective January 1, 2012:

1.  Article I (*Establishment of the Plan*) is hereby amended as follows:

    (i)  Section 1.2 (*Effective Date*), and Section 1.3 (*Name*) are hereby redesignated as Sections 1.3 and 1.4, respectively.

    (ii)  The following new Section 1.2 (*Plan Applicability and Automatic Termination*) is hereby added, following Section 1.1 (*Purpose*):

    "1.2  Plan Applicability and Automatic Termination .

    (a)  The Plan is applicable solely to amounts paid as Deferred Base Salary under the Federal Home Loan Mortgage Corporation Executive Management Compensation Program. That compensation program applied to calendar years prior to 2012. For calendar years beginning on or after January 1, 2012, Executives are not compensated under that program, and do not earn Deferred Base Salary with respect to 2012 or future years. Therefore, the Plan does not apply to pay earned in 2012 or future years, including pay under the so-called "2012 Executive Management Compensation Program.

<div align="center">TREASURY-4322</div>

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

     (b)     By operation of this section, the Plan shall terminate automatically as of the earlier of (i) December 31, 2012, or, (ii) the date as of which no further distributions to Participants will occur."

IN WITNESS WHEREOF, the Corporation has caused this SECOND AMENDMENT TO THE FEDERAL HOME LOAN MORTGAGE CORPORATION MANDATORY EXECUTIVE DEFERRED BASE SALARY PLAN to be executed by its duly authorized representative this 14th day of June, 2012.

FEDERAL HOME LOAN MORTGAGE CORPORATION

By:  /s/ Scott Coolidge
      Scott Coolidge
      Vice President – Compensation & Benefits

ATTEST:

/s/ Alicia S. Myara
Alicia S. Myara
Assistant Secretary

2

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012        Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 12.1**

### RATIO OF EARNINGS TO FIXED CHARGES AND
### RATIO OF EARNINGS TO COMBINED FIXED CHARGES AND PREFERRED STOCK DIVIDENDS

| | Six Months Ended June 30, | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2012 | 2011 | 2011 | 2010 | 2009 | 2008 | 2007 |
| | | | (dollars in millions) | | | | |
| Net income (loss) before income tax benefit (expense) and cumulative effect of changes in accounting principles | $ 3,507 | $ (1,769) | $ (5,666) | $(14,882) | $(22,384) | $(44,564) | $ (5,989) |
| Add: | | | | | | | |
| Low-income housing tax credit partnerships | — | — | — | — | 4,155 | 453 | 469 |
| Total interest expense | 35,354 | 41,562 | 79,988 | 92,131 | 22,150 | 33,332 | 38,482 |
| Interest factor in rental expenses | 2 | 3 | 4 | 5 | 7 | 8 | 7 |
| Earnings (loss), as adjusted | $38,863 | $ 39,796 | $74,326 | $ 77,254 | $  3,928 | $(10,771) | $ 32,969 |
| Fixed charges: | | | | | | | |
| Total interest expense | $35,354 | $41,562 | $79,988 | $ 92,131 | $ 22,150 | $ 33,332 | $38,482 |
| Interest factor in rental expenses | 2 | 3 | 4 | 5 | 7 | 8 | 7 |
| Capitalized interest | — | — | — | — | — | — | — |
| Total fixed charges | $35,356 | $41,565 | $79,992 | $ 92,136 | $ 22,157 | $ 33,340 | $38,489 |
| Senior preferred stock and preferred stock dividends [1] | 3,612 | 3,222 | 6,498 | 5,749 | 4,105 | 675 | 398 |
| Total fixed charges including preferred stock dividends | $38,968 | $44,787 | $86,490 | $ 97,885 | $ 26,262 | $ 34,015 | $38,887 |
| Ratio of earnings to fixed charges [2] | 1.10 | — | — | — | — | — | — |
| Ratio of earnings to combined fixed charges and preferred stock dividends [3] | — | — | — | — | — | — | — |

(1)   Senior preferred stock and preferred stock dividends represent pre-tax earnings required to cover any senior preferred stock and preferred stock dividend requirements computed using our effective tax rate, whenever there is an income tax provision, for the relevant periods.

(2)   Ratio of earnings to fixed charges is computed by dividing earnings (loss), as adjusted by total fixed charges. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $1.8 billion, $5.7 billion, $14.9 billion, $18.2 billion, $44.1 billion, and $5.5 billion for the six months ended June 30, 2011 and for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

(3)   Ratio of earnings to combined fixed charges and preferred stock dividends is computed by dividing earnings (loss), as adjusted by total fixed charges including preferred stock dividends. For the ratio to equal 1.00, earnings (loss), as adjusted must increase by $105 million, $5.0 billion, $12.2 billion, $20.6 billion, $22.3 billion, $44.8 billion, and $5.9 billion for the six months ended June 30, 2012 and 2011 and for the years ended December 31, 2011, 2010, 2009, 2008, and 2007, respectively.

TREASURY-4324

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.1**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Donald H. Layton, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 7, 2012

/s/ Donald H. Layton
Donald H. Layton
Chief Executive Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 31.2**

## CERTIFICATION

### PURSUANT TO SECURITIES EXCHANGE ACT RULE 13a-14(a)

I, Ross J. Kari, certify that:

1. I have reviewed this Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of the Federal Home Loan Mortgage Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 7, 2012

/s/ Ross J. Kari
Ross J. Kari
Executive Vice President – Chief Financial Officer

TREASURY-4326

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

**Exhibit 32.1**

## CERTIFICATION

### PURSUANT TO 18 U.S.C. SECTION 1350,

### AS ENACTED BY SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Donald H. Layton, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 7, 2012

/s/ Donald H. Layton
_____
Donald H. Layton
Chief Executive Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Exhibit 32.2

**1 ECRTI TI FRTAO**

**NP CUP F OR RA S8 P .U 1 . UE1 RTAO S350,**

**F UEOF1 RED BY UE1 RTAO 906 A1  RHE UFCBFOEU-AXLEY F1 R AI  2002**

In connection with the Quarterly Report on Form 10-Q for the quarter ended June 30, 2012 of the Federal Home Loan Mortgage Corporation (the "Company"), as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Ross J. Kari, Executive Vice President – Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

2.  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

Date: August 7, 2012

/s/ Ross J. Kari
Ross J. Kari
Executive Vice President – Chief Financial Officer

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012          Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

Source: FEDERAL HOME LOAN MORTGAGE CORP, 10-Q, August 07, 2012

TREASURY-4329

Powered by Morningstar® Document Research℠

The information contained herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or losses arising from any use of this information, except to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.



DEPARTMENT OF THE TREASURY
WASHINGTON, D.C.  20220

August 15, 2012

**ACTION MEMORANDUM FOR SECRETARY GEITHNER**

**FROM:**    Michael Stegman, Counselor

**SUBJECT:**    Third Amendments to the Senior Preferred Stock Purchase Agreements with
Fannie Mae and Freddie Mac

**Recommendation**

That you **approve** and execute the attached Third Amendments to the Amended and Restated
Senior Preferred Stock Purchase Agreements (PSPAs) between Treasury and each of Fannie Mae
and Freddie Mac (the GSEs).  The Federal Housing Finance Agency, as conservator of both
Fannie Mae and Freddie Mac, will be executing the Third Amendments on behalf of the GSEs.

_____ **Approve**          _____ Disapprove          _____ Let's Discuss

**Background and Amendments**

Section 1117 of the Housing and Economic Recovery Act of 2008 (HERA) authorized Treasury
to purchase "obligations and other securities" issued by the GSEs.  Under this HERA authority,
Treasury entered into the PSPAs and purchased senior preferred stock from each GSE at the
same time that the GSEs were put into conservatorship.  The purposes of preferred stock
purchases and the Treasury funding commitments in the PSPAs were to (i) provide stability to
the financial markets, (ii) prevent disruptions in the availability of mortgage finance, and
(iii) protect the taxpayers.

The PSPAs initially provided for Treasury to make funding advances up to $100 billion to each
GSE to help them maintain a positive net worth.  In February 2009, the $100 billion cap for each
GSE was increased to $200 billion.  In December 2009, the $200 billion cap for each GSE was
replaced with a formula – the cap adjusts upwards in an amount equal to the amount of draws
made by the GSEs through 2012.  At the end of 2012, the funding caps under the PSPAs will be
permanently fixed based on the December 31, 2012 financial results of the GSEs.  At that time,
Fannie Mae and Freddie Mac will have only $124.8 billion and $149.3 billion (less any positive
net worth in December 2012), respectively, of funding capacity remaining under the PSPAs.
Therefore, we propose that the PSPAs be amended by the following modifications so that the
GSEs continue to be able to meet current and legacy obligations after the PSPA caps are fixed at
the end of 2012 and so that the GSEs may continue to make mortgage credit available –

- ***Replace the fixed 10 percent dividend with a net worth sweep dividend*** – Quarterly
dividend payments starting in 2013 will equal the positive net worth of the GSEs (i.e.,
GAAP assets less liabilities at quarter end), less a defined Capital Reserve Amount.  The

1

Capital Reserve Amount will be $3.0 billion in 2013 and will be reduced annually on a straight-line basis to zero in 2018.

- *Accelerate the wind-down of the retained investment portfolios* – The required reduction rate for the retained investment portfolios will be increased from 10 percent per annum to 15 percent until such time that each GSE's portfolio reaches a target $250 billion balance ($250 billion was set in the original PSPAs). The 15 percent reduction rate requirement will result in reaching the $250 billion target by 2018 (vs. 2022 under the existing 10 percent reduction rate requirement).

- *Require an annual risk management plan be delivered to Treasury* – On an annual basis, each GSE will submit to Treasury a plan that details the steps it will take to reduce the financial and operational risk profile associated with both their mortgage guarantee and retained investment portfolio businesses in order to help protect taxpayers from future losses.

- *Suspend the Periodic Commitment Fee setting process* – Treasury will suspend setting any Periodic Commitment Fee (PCF), which is intended to compensate taxpayers for the financial support that Treasury provides to the GSEs through the PSPAs, for so long as the net worth sweep dividend feature of the preferred stock remains in effect. No PCF has been paid to date and the GSEs have not generated sufficient earnings to do so.

- *Allow for asset and property sales less than $250 million in fair market value without prior written consent from Treasury* – Currently Treasury must give prior written consent before the GSEs may sell any assets and properties outside of their ordinary course of business. This change allows for small asset sales without written consent in order to facilitate a more rapid wind-down of the GSEs legacy assets.

**Purpose of Amendments**

*Replace the fixed 10 percent dividend with a net worth sweep dividend*

Replacing the fixed 10 percent dividend with a net worth sweep dividend is necessary to avoid the risk of the GSEs potentially exhausting the finite amount of funding capacity that will remain available to them under the PSPAs beginning in 2013 through the payment of dividends back to Treasury. Under the current financial arrangement, the GSEs draw to pay dividends if they are unable to generate enough comprehensive income to meet the fixed 10 percent dividend requirement. This modification will end the circularity of Treasury funding the dividend payments that the GSEs pay back to Treasury so that any future draws on the PSPAs are only used to fund operating losses.

The GSEs are obligated to pay Treasury a 10 percent dividend on the $189 billion that Treasury has invested in the GSEs. The GSEs need to generate approximately $19 billion in yearly income in order to pay the 10 percent dividend without drawing on the PSPAs.

2

Under Treasury's projections (and the projections of certain third-party experts), the GSEs will not generate enough income to meet their dividend requirements in the long term. Absent a modification, the continued draws under the PSPAs to pay the dividends will exhaust the GSEs' finite amount of remaining funding capacity and thereby lead to their insolvency. Investors in mortgage-backed securities guaranteed by the GSEs are focused on this issue, given the long life of the GSEs' guarantees.

By modifying the dividend to a net worth sweep, the GSEs will only make draws under the PSPAs when they incur losses due to business activities, rather than for paying dividend payments. Under the net worth sweep dividend, if their quarterly net worth is positive (i.e., if assets are greater than liabilities), this positive net worth amount, less a defined capital reserve amount, will be paid to Treasury as a dividend. If the quarterly net worth is negative, Treasury will make a funding advance under the PSPAs in the same way that it has been doing to keep the GSE solvent. The economic rationale behind the capital reserve amount – defined as being $3 billion in 2013 and declining annually on a straight-line basis to zero beginning in 2018 – is to avoid having unnecessary PSPA draws that could result from price volatility in the GSEs' mortgage investment portfolios.

In summary, the modification has the following benefits for the government:

(1)  It eliminates the potential for the circularity of Treasury making payments to the GSEs to fund the dividends that the GSEs pay back to Treasury the following quarter;

(2)  It captures all future net income and asset appreciation at the GSEs for reimbursement to taxpayers; and

(3)  It reduces the risk of potential future payments to the GSEs under the PSPAs as such payments would only be made when needed to fund quarterly net losses.

The modification should also help maintain market stability by preserving Treasury's ability to support the continued solvency of the GSEs over a longer time horizon. As a result of the change, the GSEs will be more financially sound, which should lower their funding costs and improve future profitability. GSE-based mortgage rates should also benefit as investors will likely be more confident in purchasing longer-term GSE mortgage-backed securities.

Because this modification relates to vested contract rights of the government, Treasury staff consulted with representatives of the Justice Department's Commercial Litigation Branch. The Justice Department approved Treasury's request for authority to modify its dividend rights under the PSPAs with the GSEs. The Justice Department agreed that the proposed modification is fiscally prudent and in the best interest of the United States.

### *Accelerate wind-down of retained investment portfolios*

The accelerated wind-down of the retained investment portfolios will help reduce the financial and operational risk profile of the GSEs at a faster pace. Faster portfolio reduction could also help encourage non-performing loan sales. These sales will reduce the financial risk profile of

3

the GSEs as these assets are the most exposed to a fall in home prices, as well as increase the use of alternatives to foreclosure by moving the assets to specialized servicers.

### *Require an annual risk management plan to be delivered to Treasury*

An annual risk management plan from each of the GSEs will help protect the taxpayer. Each plan will review in reasonable detail the steps the GSEs will take to reduce their financial and operational risk profile. Treasury and the GSEs' regulator, FHFA, can use these plans to evaluate the progress each GSE is making in reducing the potential need for future taxpayer support. The plans will also serve as an opportunity for Treasury to communicate directly with the GSEs if there are concerns surrounding the then current or potential future risk management practices at each GSE.

### *Suspend the Periodic Commitment Fee setting process*

The PSPAs call for Treasury to set a Periodic Commitment Fee (PCF) payable by each GSE that is intended to compensate taxpayers for the financial support that Treasury provides to each GSE through the PSPAs. The PSPAs allow Treasury to waive the Periodic Commitment Fee for up to one year at a time at its sole discretion based on adverse conditions in the mortgage market. Since 2008, Treasury has made the determination to waive PCF for the following reasons: (1) the expected financial draws from Fannie Mae and Freddie Mac were likely to be in excess of dividends those firms pay back to taxpayers under the PSPAs, in other words, setting a PCF would not produce any additional income for taxpayers; and (2) setting the PCF could place greater strains on the housing market recovery, which remains fragile. Since the net worth sweep dividend will capture all future net income and asset appreciation at the GSEs for reimbursement to taxpayers, there is no purpose served by requiring additional compensation to taxpayers, especially when that additional compensation would have to be funded through additional draws under the PSPAs beginning in 2018. Therefore, the amendment will suspend the PCF-setting process for as long as the net worth sweep provision in the preferred stock purchased by Treasury remains in effect.

### *Allow non-ordinary course asset and property sales of less than $250 million in fair market value without prior written consent from Treasury*

Allowing the GSEs to undertake non-ordinary course sales of assets and property of value less than $250 million will facilitate a more rapid wind-down of their legacy, pre-conservatorship assets as well as better allow the GSEs to manage their risk in a timely and effective manner. Requiring Treasury to approve each individual non-ordinary course asset sale is administratively burdensome for the GSEs and FHFA and results in delays in completing asset dispositions.

**Attachments:**
Counterparts of Third Amendments to PSPAs
- Two copies each of (1) Fannie Mae Third Amendment Counterpart and (2) Freddie Mac Third Amendment Counterpart

TREASURY-4333

## THIRD AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

THIRD AMENDMENT dated as of August 17, 2012, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  In consideration for Purchaser's commitment, Seller agreed to sell, and did sell, to Purchaser 1,000,000 shares of senior preferred stock, in the form of the Variable Liquidation Preference Senior Preferred Stock of Seller attached as Exhibit A to the Amended and Restated Agreement, with an initial liquidation preference equal to $1,000 per share.

D.  The Amended and Restated Agreement provides that the aggregate liquidation preference of the outstanding shares of senior preferred stock shall be automatically increased by an amount equal to the amount of each draw under Purchaser's funding commitment, and the senior preferred stock sold by Seller to Purchaser provides that the senior preferred stock shall accrue dividends at the annual rate per share equal to 10 percent on the then-current liquidation preference.

E.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

F.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated

Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

G.   Purchaser and Seller have heretofore entered into the Second Amendment dated as of December 24, 2009, to the Amended and Restated Agreement (the "Second Amendment").

H.   In the Second Amendment, Purchaser modified the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, as previously amended, by replacing the fixed maximum aggregate amount with the new formulaic maximum amount specified therein, and amended the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

I.   Purchaser and Seller are each authorized to enter into this Third Amendment to the Amended and Restated Agreement ("this Third Amendment") that (i) includes an agreement by Seller to modify the dividend rate provision of the senior preferred stock sold by Seller to Purchaser, and (ii) amends the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

## Terms and Conditions

1.   **Definitions.**

Capitalized terms used and not defined in this Third Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment (the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment, being the "Existing Agreement").

2.   **Amendment to Paragraph 2(a) of Senior Preferred Stock (Relating to Dividend Payment Dates and Dividend Periods).**

With respect to the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, dated September 7, 2008 (the "Senior Preferred Stock Certificate"), sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(a) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that,  by not later than September 30, 2012, paragraph 2(a) reads as follows:

(a)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends in an amount equal to the then-current Dividend Amount.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008.  Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, the amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period through and including December 31, 2012, that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month.  For the avoidance of doubt, for each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

3.     **Amendment to Paragraph 2(c) of Senior Preferred Stock (Relating to Dividend Rate and Dividend Amount).**

With respect to the Senior Preferred Stock Certificate sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(c) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that, effective September 30, 2012, paragraph 2(c) reads as follows:

(c)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0%.

For each Dividend Period from January 1, 2013, through and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero. For each Dividend Period from January 1, 2018, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero. In each case, "Net Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP. "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter, $3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero. For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

4.      **Amendment to Section 3.2 (Relating to the Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

(d) Notwithstanding anything to the contrary in paragraphs (a), (b), or (c) above, and in consideration of the modification made to the Senior Preferred Stock effective September 30, 2012, for each quarter commencing January 1, 2013, and continuing for as long as paragraph 2 of the Senior Preferred Stock remains in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012, no Periodic Commitment Fee shall be set, accrue, or be payable.

**5.**     **Amendment to Section 5.4 (Relating to Transfer of Assets).**

Section 5.4 of the Existing Agreement is hereby amended to read as follows:

5.4.   *Transfer of Assets.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a) to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) of assets and properties having fair market value individually or in aggregate less than $250,000,000 in one transaction or a series of related transactions;

(d) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(e) of cash or cash equivalents for cash or cash equivalents; or

(f) to the extent necessary to comply with the covenant set forth in Section 5.7 below.

**6.**     **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7.   Mortgage Assets.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2012, $650 billion, or (ii) on December 31 of each year thereafter, 85.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

**7.     Amendment to Section 5 (Adding New Section 5.11 Relating to "Annual Risk Management Plans").**

Section 5 of the Existing Agreement is hereby amended by inserting after section 5.10 the following:

      5.11.   Annual Risk Management Plans.  Not later than December 15, 2012, and not later than December 15 of each year thereafter while Seller remains in conservatorship pursuant to Section 1367 of the FHE Act, Seller shall, under the direction of Conservator, deliver a risk management plan to Purchaser.  Each annual risk management plan shall set out Seller's strategy for reducing its enterprise-wide risk profile and shall describe, in reasonable detail, the actions Seller will take, to reduce both the financial and operational risk associated with each reportable business segment of Seller.  Plans delivered subsequent to December 15, 2012 shall also include an assessment of Seller's performance relative to the planned actions described in the prior year's plan. The submission of annual risk management plans under this section shall not in any way limit or affect the Agency in any of its capacities to carry out its statutory responsibilities, including but not limited to providing direction to and oversight of Seller."

**8.     Existing Agreement to Continue, as Amended.**

Except as expressly modified by this Third Amendment, the Existing Agreement shall continue in full force and effect.

**9.     Effective Date.**

This Third Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Third Amendment has been so executed, it shall become effective as of the date first above written.

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

- 8 -

## THIRD AMENDMENT TO AMENDED AND RESTATED
## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

THIRD AMENDMENT dated as of August 17, 2012, to the AMENDED AND RESTATED SENIOR PREFERRED STOCK PURCHASE AGREEMENT dated as of September 26, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY ("Purchaser"), and FEDERAL HOME LOAN MORTGAGE CORPORATION ("Seller"), acting through the Federal Housing Finance Agency (the "Agency") as its duly appointed conservator (the Agency in such capacity, "Conservator").

### Background

A.  Purchaser and Seller have heretofore entered into the Amended and Restated Senior Preferred Stock Purchase Agreement dated as of September 26, 2008 (the "Amended and Restated Agreement").

B.  In the Amended and Restated Agreement, Purchaser committed itself to provide to Seller, on the terms and conditions provided in the Amended and Restated Agreement, immediately available funds in an amount as determined from time to time as provided in the Amended and Restated Agreement, but in no event in an aggregate amount exceeding $100,000,000,000.

C.  In consideration for Purchaser's commitment, Seller agreed to sell, and did sell, to Purchaser 1,000,000 shares of senior preferred stock, in the form of the Variable Liquidation Preference Senior Preferred Stock of Seller attached as Exhibit A to the Amended and Restated Agreement, with an initial liquidation preference equal to $1,000 per share.

D.  The Amended and Restated Agreement provides that the aggregate liquidation preference of the outstanding shares of senior preferred stock shall be automatically increased by an amount equal to the amount of each draw under Purchaser's funding commitment, and the senior preferred stock sold by Seller to Purchaser provides that the senior preferred stock shall accrue dividends at the annual rate per share equal to 10 percent on the then-current liquidation preference.

E.  Purchaser and Seller have heretofore entered into the Amendment dated as of May 6, 2009, to the Amended and Restated Agreement (the "First Amendment").

F.  In the First Amendment, Purchaser increased to $200,000,000,000 the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated

Agreement, and amended the terms of the Amended and Restated Agreement in certain other respects.

G.  Purchaser and Seller have heretofore entered into the Second Amendment dated as of December 24, 2009, to the Amended and Restated Agreement (the "Second Amendment").

H.  In the Second Amendment, Purchaser modified the maximum aggregate amount permitted to be provided to Seller under the Amended and Restated Agreement, as previously amended, by replacing the fixed maximum aggregate amount with the new formulaic maximum amount specified therein, and amended the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

I.  Purchaser and Seller are each authorized to enter into this Third Amendment to the Amended and Restated Agreement ("this Third Amendment") that (i) includes an agreement by Seller to modify the dividend rate provision of the senior preferred stock sold by Seller to Purchaser, and (ii) amends the terms of the Amended and Restated Agreement, as previously amended, in certain other respects.

THEREFORE, for and in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Purchaser and Seller agree as follows:

**Terms and Conditions**

1.    **Definitions.**

Capitalized terms used and not defined in this Third Amendment shall have the respective meanings given such terms in the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment (the Amended and Restated Agreement, as amended by the First Amendment and the Second Amendment, being the "Existing Agreement").

2.    **Amendment to Paragraph 2(a) of Senior Preferred Stock (Relating to Dividend Payment Dates and Dividend Periods).**

With respect to the Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (Par Value $1.00 Per Share) dated September 7, 2008 (the "Senior Preferred Stock Certificate"), sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(a) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that,  by not later than September 30, 2012, paragraph 2(a) reads as follows:

- 2 -

(a)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference.  For each Dividend Period from January 1, 2013, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends in an amount equal to the then-current Dividend Amount.  Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008.  If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment.  "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008.  Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date.  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, the amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period through and including December 31, 2012, that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month.  For the avoidance of doubt, for each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

- 3 -

3.   **Amendment to Paragraph 2(c) of Senior Preferred Stock (Relating to Dividend Rate and Dividend Amount).**

With respect to the Senior Preferred Stock Certificate sold by Seller to Purchaser and purchased by Purchaser from Seller, Seller agrees either to amend the existing paragraph 2(c) of the Senior Preferred Stock Certificate, or to issue a replacement Senior Preferred Stock Certificate, in either case so that,  effective September 30, 2012, paragraph 2(c) reads as follows:

(c)  For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2012, "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) the "Dividend Rate" shall mean 12.0%.

For each Dividend Period from January 1, 2013, through and including December 31, 2017, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter, less the Applicable Capital Reserve Amount, exceeds zero.  For each Dividend Period from January 1, 2018, the "Dividend Amount" for a Dividend Period means the amount, if any, by which the Net Worth Amount at the end of the immediately preceding fiscal quarter exceeds zero.  In each case, "Net  Worth Amount" means (i) the total assets of the Company (such assets excluding the Commitment and any unfunded amounts thereof) as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP, less (ii) the total liabilities of the Company (such liabilities excluding any obligation in respect of any capital stock of the Company, including this Certificate), as reflected on the balance sheet of the Company as of the applicable date set forth in this Certificate, prepared in accordance with GAAP.  "Applicable Capital Reserve Amount" means, as of any date of determination, for each Dividend Period from January 1, 2013, through and including December 31, 2013, $3,000,000,000; and for each Dividend Period occurring within each 12-month period thereafter, $3,000,000,000 reduced by an equal amount for each such 12-month period through and including December 31, 2017, so that for each Dividend Period from January 1, 2018, the Applicable Capital Reserve Amount shall be zero.  For the avoidance of doubt, if the calculation of the Dividend Amount for a Dividend Period does not exceed zero, then no Dividend Amount shall accrue or be payable for such Dividend Period.

- 4 -

4.   **Amendment to Section 3.2 (Relating to the Periodic Commitment Fee).**

Section 3.2 of the Existing Agreement is hereby amended to read as follows:

3.2. *Periodic Commitment Fee.* (a) Commencing March 31, 2011, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a "Periodic Fee Date"), a periodic commitment fee (the "Periodic Commitment Fee"). The Periodic Commitment Fee shall accrue from January 1, 2011.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2010. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2010 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided, that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

(d) Notwithstanding anything to the contrary in paragraphs (a), (b), or (c) above, and in consideration of the modification made to the Senior Preferred Stock effective September 30, 2012, for each quarter commencing January 1, 2013, and continuing for as long as paragraph 2 of the Senior Preferred Stock remains in form and content substantially the same as the form and content of the Senior Preferred Stock in effect on September 30, 2012, no Periodic Commitment Fee shall be set, accrue, or be payable.

TREASURY-4346

5.    **Amendment to Section 5.4 (Relating to Transfer of Assets).**

Section 5.4 of the Existing Agreement is hereby amended to read as follows:

5.4. *Transfer of Assets.*  Seller shall not, and shall not permit any of its subsidiaries to, in each case without prior written consent of Purchaser, sell, transfer, lease or otherwise dispose of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a "Disposition"), other than Dispositions for fair market value:

(a) to a limited life regulated entity ("LLRE") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) of assets and properties having fair market value individually or in aggregate less than $250,000,000 in one transaction or a series of related transactions;

(d) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(e) of cash or cash equivalents for cash or cash equivalents; or

(f) to the extent necessary to comply with the covenant set forth in Section 5.7 below.

6.    **Amendment to Section 5.7 (Relating to Owned Mortgage Assets).**

Section 5.7 of the Existing Agreement is hereby amended to read as follows:

5.7. Mortgage Assets.  Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2012, $650 billion, or (ii) on December 31 of each year thereafter, 85.0% of the aggregate amount of Mortgage Assets that Seller was permitted to own as of December 31 of the immediately preceding calendar year; provided, that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

- 6 -

7.  **Amendment to Section 5 (Adding New Section 5.11 Relating to "Annual Risk Management Plans").**

Section 5 of the Existing Agreement is hereby amended by inserting after section 5.10 the following:

> 5.11. Annual Risk Management Plans.  Not later than December 15, 2012, and not later than December 15 of each year thereafter while Seller remains in conservatorship pursuant to Section 1367 of the FHE Act, Seller shall, under the direction of Conservator, deliver a risk management plan to Purchaser.  Each annual risk management plan shall set out Seller's strategy for reducing its enterprise-wide risk profile and shall describe, in reasonable detail, the actions Seller will take, to reduce both the financial and operational risk associated with each reportable business segment of Seller.  Plans delivered subsequent to December 15, 2012 shall also include an assessment of Seller's performance relative to the planned actions described in the prior year's plan. The submission of annual risk management plans under this section shall not in any way limit or affect the Agency in any of its capacities to carry out its statutory responsibilities, including but not limited to providing direction to and oversight of Seller."

8.  **Existing Agreement to Continue, as Amended.**

Except as expressly modified by this Third Amendment, the Existing Agreement shall continue in full force and effect.

9.  **Effective Date.**

This Third Amendment shall not become effective until it has been executed by both of Purchaser and Seller.  When this Third Amendment has been so executed, it shall become effective as of the date first above written.

TREASURY-4348

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator


Edward J. DeMarco
Acting Director


UNITED STATES DEPARTMENT
OF THE TREASURY


Timothy F. Geithner
Secretary of the Treasury

- 8 -

Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and Mortgage-Related Securities

The five tables that follow provide data on activities by the Department of the Treasury and the Federal Reserve System to support mortgage markets through purchases of securities issued by the housing government-sponsored enterprises (GSEs; Fannie Mae, Freddie Mac, and the Federal Home Loan Banks) and by Ginnie Mae, a federal agency that guarantees securities backed by mortgages insured or guaranteed by the Federal Housing Administration, the Department of Veterans Affairs, and other federal agencies. Those activities include purchases by the Treasury of senior preferred stock and mortgage-backed securities guaranteed by Fannie Mae and Freddie Mac. For more information on Treasury support for Fannie Mae and Freddie Mac, see Mortgage Market Note 10-1. In addition, the Federal Reserve announced in November 2008 its intention to buy up to $500 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to $100 billion of debt securities issued by the housing GSEs. Those purchases commenced in January 2009. In March 2009, the Federal Reserve announced its intention to purchase up to an additional $750 billion of MBS guaranteed by Fannie Mae, Freddie Mac, and Ginnie Mae and up to an additional $100 billion of debt issued by the housing GSEs.

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Purchase Agreements**
**Table 2: Dividends on Enterprise Draws from Treasury**
**Table 3: Treasury Purchases of GSE MBS**
**Table 4: Federal Reserve Purchases of GSE and Ginnie Mae MBS**
**Table 5: Federal Reserve Purchases of GSE Debt**

**Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac per the Senior Preferred Stock Purchase Agreements[1] ($ billions)**

| Quarter | Freddie Mac | | | | Fannie Mae | | | |
|---|---|---|---|---|---|---|---|---|
| | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] | Reported GAAP Net Worth | Requested Draw | Draw Date | Cumulative Enterprise Draws[2] |
| 2008 Q3 | -$13.7 | $13.8 | 11/24/2008 | $13.8 | $9.4 | N/A | N/A | $0 |
| 2008 Q4 | -30.6 | 30.8 | 3/31/2009 | 44.6 | -15.2 | 15.2 | 3/31/2009 | 15.2 |
| 2009 Q1 | -6.0 | 6.1 | 6/30/2009 | 50.7 | -18.9 | 19.0 | 6/30/2009 | 34.2 |
| 2009 Q2 | 8.2 | 0 | N/A | 50.7 | -10.6 | 10.7 | 9/30/2009 | 44.9 |
| 2009 Q3 | 10.4 | 0 | N/A | 50.7 | -15.0 | 15.0 | 12/31/2009 | 59.9 |
| 2009 Q4 | 4.4 | 0 | N/A | 50.7 | -15.3 | 15.3 | 3/31/2010 | 75.2 |
| 2010 Q1 | -10.5 | 10.6 | 6/30/2010 | 61.3 | -8.4 | 8.4 | 6/30/2010 | 83.6 |
| 2010 Q2 | -1.7 | 1.8 | 9/30/2010 | 63.1 | -1.4 | 1.5 | 9/30/2010 | 85.1 |
| 2010 Q3 | -0.1 | 0.1 | 12/30/2010 | 63.2 | -2.4 | 2.5 | 12/30/2010 | 87.6 |
| 2010 Q4 | -0.4 | 0.5 | 3/31/2011 | 63.7 | -2.5 | 2.6 | 3/31/2011 | 90.2 |
| 2011 Q1 | 1.2 | 0 | N/A | 63.7 | -8.4 | 8.5 | 6/30/2011 | 98.7 |
| 2011 Q2 | -1.478 | 1.479 | 9/30/2011 | 65.179 | -5.087 | 5.087 | 9/30/2011 | 103.787 |
| 2011 Q3 | -5.991 | 5.992 | 12/30/2011 | 71.171 | -7.791 | 7.791 | 12/30/2011 | 111.578 |
| 2011 Q4 | -0.146 | 0.146 | 3/30/2012 | 71.317 | -4.571 | 4.571 | 3/30/2012 | 116.149 |
| 2012 Q1 | -0.019 | 0.019 | 6/29/2012 | 71.336 | 0.268 | 0.000 | N/A | 116.149 |
| 2012 Q2 | 1.086 | 0.000 | N/A | 71.336 | 2.770 | 0.000 | N/A | 116.149 |
| 2012 Q3 | 4.906 | 0.000 | N/A | 71.336 | 2.412 | 0.000 | N/A | 116.149 |
| 2012 Q4 | 8.826 | 0.000 | N/A | 71.336 | 7.224 | 0.000 | N/A | 116.149 |
| 2013 Q1 | 6.971 | 0.000 | N/A | 71.336 | 59.368 | 0.000 | N/A | 116.149 |
| 2013 Q2 | 7.357 | 0.000 | N/A | 71.336 | 13.243 | 0.000 | N/A | 116.149 |
| 2013 Q3 | 33.436 | 0.000 | N/A | 71.336 | 11.568 | 0.000 | N/A | 116.149 |
| Remaining Treasury Support | | | $140.474 | | | | $117.576 | |
| Cumulative Draws by Both Enterprises | | | | | $187.485 | | | |

Source: Freddie Mac and Fannie Mae                    N/A = not applicable

[1] Freddie Mac's draws have been based on reported GAAP stockholders' equity, while Fannie Mae's draw was based on GAAP net worth. Both GAAP stockholders' equity and GAAP net worth are measures of the difference between an Enterprise's assets and liabilities. Both measures include realized and unrealized losses as of the reporting date. Losses ultimately realized in the future may differ from unrealized losses as of the reporting date.

The full text of the Senior Preferred Stock Purchase Agreements and the amendments to those agreements are available online here. For an overview of those agreements, see MMN 10-1 "Treasury Support for Fannie Mae and Freddie Mac". For Fannie Mae's quarterly financial results, click here. For Fannie Mae's annual financial results, click here. For Freddie Mac's quarterly financial results, click here. For Freddie Mac's annual financial results, click here.

[2] Excludes $1 billion in liquidation preference on the senior preferred stock position obtained by Treasury from each Enterprise upon initiation of the Senior Preferred Stock Purchase Agreement. The initial $1 billion is not a draw on the Treasury's commitment under the agreement.

## Table 2: Dividends on Enterprise Draws from Treasury[3] ($ billions)

| Quarter | Freddie Mac | | | Fannie Mae | | |
|---|---|---|---|---|---|---|
| | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] | Dividends Accrued | Date Paid | Cumulative Dividends Paid[4] |
| 2008 Q3 | $0.006 | N/A | $0.000 | $0.006 | N/A | $0.000 |
| 2008 Q4 | 0.167 | 12/31/2008 | 0.173 | 0.025 | 12/31/2008 | 0.031 |
| 2009 Q1 | 0.370 | 3/31/2009 | 0.543 | 0.025 | 3/31/2009 | 0.056 |
| 2009 Q2 | 1.149 | 6/30/2009 | 1.691 | 0.409 | 6/30/2009 | 0.465 |
| 2009 Q3 | 1.294 | 9/30/2009 | 2.986 | 0.885 | 9/30/2009 | 1.351 |
| 2009 Q4 | 1.293 | 12/31/2009 | 4.278 | 1.150 | 12/31/2009 | 2.501 |
| 2010 Q1 | 1.293 | 3/31/2010 | 5.571 | 1.527 | 3/31/2010 | 4.028 |
| 2010 Q2 | 1.293 | 6/30/2010 | 6.863 | 1.909 | 6/30/2010 | 5.937 |
| 2010 Q3 | 1.560 | 9/30/2010 | 8.424 | 2.117 | 9/30/2010 | 8.055 |
| 2010 Q4 | 1.603 | 12/31/2010 | 10.027 | 2.153 | 12/31/2010 | 10.207 |
| 2011 Q1 | 1.605 | 3/31/2011 | 11.632 | 2.216 | 3/31/2011 | 12.424 |
| 2011 Q2 | 1.618 | 6/30/2011 | 13.249 | 2.281 | 6/30/2011 | 14.705 |
| 2011 Q3 | 1.618 | 9/30/2011 | 14.867 | 2.495 | 9/30/2011 | 17.199 |
| 2011 Q4 | 1.655 | 12/30/2011 | 16.522 | 2.621 | 12/30/2011 | 19.821 |
| 2012 Q1 | 1.808 | 3/30/2012 | 18.329 | 2.819 | 3/30/2012 | 22.639 |
| 2012 Q2 | 1.808 | 6/29/2012 | 20.137 | 2.931 | 6/29/2012 | 25.571 |
| 2012 Q3 | 1.808 | 9/28/2012 | 21.946 | 2.929 | 9/28/2012 | 28.499 |
| 2012 Q4 | 1.808 | 12/31/2012 | 23.754 | 2.929 | 12/31/2012 | 31.428 |
| 2013 Q1 | 5.826 | 3/29/2013 | 29.580 | 4.224 | 3/29/2013 | 35.652 |
| 2013 Q2 | 6.971 | 6/28/2013 | 36.552 | 59.368 | 6/28/2013 | 95.020 |
| 2013 Q3 | 4.357 | 9/30/2013 | 40.909 | 10.243 | 9/30/2013 | 105.263 |
| 2013 Q4 | 30.436 | TBD | 71.345 | 8.568 | TBD | 113.831 |

**Cumulative Dividends Paid by Both Enterprises[4]**    $185.176

TBD = to be determined but not later than 12/31/2013

Source: Freddie Mac and Fannie Mae

---

[3] As set forth in the Third Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement, between January 1, 2013 and December 31, 2017, dividend amounts will be the Net Worth Amount at the end of the immediately preceding fiscal quarter minus the applicable capital reserve amount. The 2013 capital reserve amount of $3 billion will be reduced by $600 million each calendar year until it reaches zero on January 1, 2018.
[4] Dividends accrued may not add up to cumulative dividends due to rounding.

**Table 3: Treasury Purchases of Freddie Mac and Fannie Mae MBS[5]**
($ billions, current face value as of purchase)

| Period | Purchases of: | |
|---|---|---|
| | **Freddie Mac MBS** | **Fannie Mae MBS** |
| September 2008 | $2.5 | $0.9 |
| October 2008 | 4.3 | 11.6 |
| November 2008 | 10.0 | 10.5 |
| December 2008 | 10.3 | 18.1 |
| January 2009 | 7.4 | 13.9 |
| February 2009 | 11.9 | 2.8 |
| March 2009 | 10.2 | 9.2 |
| April 2009 | 5.5 | 11.2 |
| May 2009 | 5.7 | 6.9 |
| June 2009 | 5.6 | 3.4 |
| July 2009 | 9.4 | 1.7 |
| August 2009 | 3.8 | 5.9 |
| September 2009 | 4.4 | 5.2 |
| October 2009 | 6.7 | 3.0 |
| November 2009 | 6.6 | 3.1 |
| December 2009 | 1.7 | 7.6 |
| **Total[6]** | 105.9 | 114.8 |
| **Total Purchases** | **$220.8** | |

Source: Department of the Treasury

---

[5] The Treasury's GSE MBS purchase program terminated on December 31, 2009.
[6] Columns may not add to totals due to rounding.

**Table 4: Federal Reserve GSE and Ginnie Mae MBS Purchase Program**
($ billions, current face value as of purchase)

| Period[8] | Freddie Mac MBS | Net Transactions[7] Fannie Mae MBS | Ginnie Mae MBS |
|---|---|---|---|
| January 5-7, 2009 | $6.9 | $2.9 | $0.4 |
| January 8-14, 2009 | 15.8 | 5.6 | 2.0 |
| January 15-21, 2009 | 5.4 | 11.7 | 1.8 |
| January 22-28, 2009 | 5.3 | 7.2 | 4.3 |
| January 29-February 4, 2009 | 9.7 | 10.5 | 2.0 |
| February 5-11, 2009 | 14.7 | 7.2 | 1.4 |
| February 12-18, 2009 | 7.9 | 10.9 | 1.0 |
| February 19-25, 2009 | 8.4 | 15.6 | 1.0 |
| February 26-March 4, 2009 | 15.6 | 13.6 | 1.0 |
| March 5-11, 2009 | 9.7 | 16.8 | 0.6 |
| March 12-18, 2009 | 12.5 | 5.2 | 2.1 |
| March 19-25, 2009 | 13.5 | 18.5 | 1.3 |
| March 25-April 1, 2009 | 14.4 | 17.0 | 1.6 |
| April 2-8, 2009 | 7.4 | 22.2 | 0.9 |
| April 9-15, 2009 | 1.3 | 20.2 | 0.3 |
| April 16-22, 2009 | 5.6 | 19.8 | 0.8 |
| April 23-29, 2009 | 9.1 | 13.5 | 0.5 |
| April 30-May 6, 2009 | 5.0 | 17.2 | 3.3 |
| May 7-13, 2009 | 4.4 | 20.6 | 2.2 |
| May 14-20, 2009 | 7.5 | 13.1 | 4.1 |
| May 21-27, 2009 | 11.0 | 12.0 | 2.5 |
| May 29-June 3, 2009 | 5.0 | 18.8 | 2.1 |
| June 4-10, 2009 | 7.4 | 14.6 | 1.0 |
| June 11-17, 2009 | 5.5 | 11.3 | 3.5 |
| June 18-24, 2009 | 8.5 | 10.2 | 3.6 |
| June 25-July 1, 2009 | 7.2 | 13.1 | 2.8 |
| July 2-8, 2009 | 3.2 | 9.9 | 4.1 |
| July 9-15, 2009 | 6.9 | 11.3 | 4.1 |
| July 16-22, 2009 | 6.5 | 11.2 | 3.5 |
| July 23-29, 2009 | 5.4 | 14.5 | 0.3 |
| July 20-August 5, 2009 | 5.0 | 14.2 | 0.0 |
| **[Table continued on next page]** | | | |

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.

| Period[8] | Net Transactions[7] | | |
|---|---|---|---|
| | Freddie Mac MBS | Fannie Mae MBS | Ginnie Mae MBS |
| August 6-12, 2009 | 2.3 | 17.7 | 0.5 |
| August 13-19, 2009 | 5.9 | 17.5 | 1.7 |
| August 20-26, 2009 | 7.3 | 15.8 | 2.4 |
| August 27-September 2, 2009 | 8.3 | 17.3 | 0.0 |
| September 3-9, 2009 | 3.6 | 12.4 | 2.9 |
| September 10-16, 2009 | 6.3 | 15.7 | 3.5 |
| September 17-23, 2009 | 6.0 | 15.9 | 1.1 |
| September 24-30, 2009 | 7.6 | 10.6 | 1.8 |
| October 1-7, 2009 | 8.0 | 8.1 | 4.0 |
| October 8-14, 2009 | 7.3 | 8.4 | 0.5 |
| October 15-21, 2009 | 6.7 | 8.4 | 3.0 |
| October 22-28, 2009 | 5.3 | 11.4 | 1.4 |
| October 29-November 4, 2009 | 3.3 | 12.6 | 0.2 |
| November 5-11, 2009 | 2.9 | 9.8 | 0.8 |
| November 12-18, 2009 | 5.9 | 3.8 | 6.4 |
| November 19-25, 2009 | 6.5 | 6.0 | 3.5 |
| November 26-December 2, 2009 | 5.7 | 7.7 | 2.6 |
| December 3-9, 2009 | 4.8 | 9.6 | 1.5 |
| December 10-16, 2009 | 7.6 | 7.2 | 1.2 |
| December 17-23, 2009 | 7.8 | 7.2 | 0.0 |
| December 24-30, 2009 | 3.3 | 6.0 | 0.0 |
| December 31, 2009-January 6, 2010 | 1.8 | 10.2 | 0.0 |
| January 7-13, 2010 | 9.7 | 3.5 | 0.9 |
| January 14-20, 2010 | 1.3 | 8.5 | 2.3 |
| January 21-27, 2010 | 5.1 | 4.2 | 2.7 |
| January 28-February 3, 2010 | 5.7 | 3.7 | 2.7 |
| February 4-10, 2010 | 4.0 | 4.5 | 2.6 |
| February 11-17, 2010 | 4.5 | 4.0 | 2.6 |
| February 18-24, 2010 | 5.4 | 4.3 | 1.4 |
| February 25-March 3, 2010 | 3.6 | 6.3 | 0.1 |

**[Table continued on next page]**

**Table 4 (Continued): Federal Reserve GSE and Ginnie Mae MBS Purchase Program** ($ billions, current face value as of purchase)

| Period[8] | Freddie Mac MBS | Net Transactions[7] | | Ginnie Mae MBS |
| | | Fannie Mae MBS | |
| --- | --- | --- | --- |
| March 4-10, 2010 | 4.4 | 5.6 | 0.0 |
| March 11-17, 2010 | 4.8 | 4.8 | 0.4 |
| March 18-24, 2010 | 3.6 | 4.1 | 0.3 |
| March 25-31, 2010 | 5.2 | 0.9 | 0.0 |
| Total net transactions[9] | 432.3 | 703.6 | 114.0 |
| Total committed | | $1,250 | |
| Unused commitment | | $0 of $1,250 | |

Source: Federal Reserve Bank of New York

[7] The Federal Reserve Bank of New York reported "transactions" through the period ending February 25, 2009 and "net purchases" thereafter.
[8] Federal Reserve transactions commenced on January 5, 2009, and are reported on a weekly basis for weeks beginning on a Thursday and therefore overlap months.
[9] Columns may not add to totals due to rounding.

**Table 5: Federal Reserve Purchases of GSE Debt** ($ billions, par amount)

| Period | Freddie Mac Debt | Purchases of: Fannie Mae Debt | FHLB Debt |
|---|---|---|---|
| December 2008 | $6.1 | $5.8 | $3.1 |
| January 2009 | 4.8 | 4.0 | 2.5 |
| February 2009 | 4.2 | 2.4 | 2.8 |
| March 2009 | 5.8 | 7.1 | 4.0 |
| April 2009 | 2.9 | 6.6 | 5.0 |
| May 2009 | 5.2 | 6.4 | 2.2 |
| June 2009 | 6.7 | 6.1 | 3.0 |
| July 2009 | 3.8 | 4.8 | 1.9 |
| August 2009 | 4.6 | 5.2 | 1.5 |
| September 2009 | 5.7 | 4.3 | 2.6 |
| October 2009 | 7.6 | 5.4 | 2.7 |
| November 2009 | 2.4 | 4.0 | 1.7 |
| December 2009 | 1.9 | 1.5 | 1.4 |
| January 2010 | 2.3 | 1.7 | 0.9 |
| February 2010 | 1.6 | 1.1 | 1.6 |
| March 2010 | 1.4 | 0.9 | 0.7 |
| **Total[10]** | **67.1** | **67.4** | **37.7** |
| **Total committed** | | **$172.1** | |
| **Unused commitment** | | **$2.9 of $175[11]** | |

Source: Federal Reserve Bank of New York

[10] Columns may not add to totals due to rounding.
[11] On November 4, 2009, the Federal Reserve lowered its target level of purchases of GSE debt to $175 billion from $200 billion.