# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>            Plaintiffs,<br>      v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>            Defendants. | Civil Action No. 13-cv-1053 (RCL) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>            Plaintiffs,<br>      v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>            Defendants. | Civil Action No. 13-cv-1439 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred<br>Stock Purchase Agreement Class Action Litigations<br>_____<br><br>This document relates to:<br>ALL CASES | Misc. Action No. 13-mc-01288 (RCL) |

**OPPOSITION OF DEFENDANTS FEDERAL HOUSING FINANCE AGENCY
AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA DIRECTOR
MELVIN L. WATT, FANNIE MAE, AND FREDDIE MAC
TO PLAINTIFFS' MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE
RECORDS, FOR LIMITED DISCOVERY, FOR SUSPENSION OF BRIEFING ON
<u>DEFENDANTS' DISPOSITIVE MOTIONS, AND FOR A STATUS CONFERENCE</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................4

I.     The Importance of the Enterprises to the National Economy, and Their Collapse............................................................................................................5

II.    FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law to All the Rights of the Enterprises and Their Shareholders ......................................6

III.   The PSPAs Provide Unprecedented Financial Support to the Enterprises ........................7

IV.   The Third Amendment Preserves and Extends the Treasury Commitment by Replacing the Dividend and Periodic Commitment Fee With a Variable Dividend Based on Net Worth ..........................................................................................9

PROCEDURAL HISTORY ...............................................................................................12

ARGUMENT .....................................................................................................................13

I.     The Court Should Resolve Defendants' Threshold Motion to Dismiss Before Resolving Fairholme's Request for Discovery in Connection With the Administrative Records.................................................................................13

II.    The Motion to Dismiss Should Not Be Converted Into a Motion for Summary Judgment Because It Relies Exclusively Upon the Complaints, Documents Incorporated by Reference into the Complaints, and Judicially-Noticeable Documents. ...................................................................15

III.   Discovery into Whether the Conservator Possessed an Ulterior Motive in Executing the Third Amendment, Beyond Ending the Circularity Problem, Is Unnecessary and Irrelevant. .........................................................................17

IV.   If the Court Finds That the Motion to Dismiss Relies Upon Matters Outside the Pleadings and Judicially-Noticeable Documents, the Court Should Simply Ignore Those Matters, Rather Than Convert the Motion into One for Summary Judgment.......................................................................24

V.    The Court Should Reject Fairholme's Argument That the Court Skip Consideration of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction In Favor of Discovery and Summary Judgment................................25

VI.   Supplementation of FHFA's Document Compilation Is Not Warranted..........................28

A.    FHFA's Document Compilation Is Complete and Fairholme Has
      Not Demonstrated Otherwise.................................................................29

B.    Fairholme Does Not Seek, Nor Is It Entitled to, Any Data From
      FHFA .......................................................................................................31

VII.  Fairholme Is Not Entitled to Take Discovery Regarding the Completeness
      of the Document Compilation................................................................33

VIII. The Court of Federal Claims' Recent Discovery Order Does Not Compel
      Discovery Here. .......................................................................................35

CONCLUSION.....................................................................................................37

## TABLE OF AUTHORITIES

**Page(s)**

CASES:

*American Farm Bureau v. EPA,*
    121 F. Supp. 2d 84 (D.D.C. 2000) ........................................................................27, 28

*Amfac Resorts, L.L.C. v. U.S. Dept. of the Interior,*
    143 F. Supp. 2d 7, 13-14 (D.D.C. 2001) ....................................................................33

*Anderson v. U.S. Attorneys Office,*
    No. CIV. A. 91-2262-LFO, 1992 WL 159186 (D.D.C. June 19, 1992) ......................13

*Antoine v. U.S. Bank Nat'l Ass'n,*
    547 F. Supp. 2d 30 (D.D.C. 2008) ........................................................................15, 16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................23, 24

*Bank of Am. N.A. v. Colonial Bank,*
    604 F.3d 1239 (11th Cir. 2010) .................................................................................19

*Banner Health v. Sebelius,*
    945 F. Supp. 2d 1 (D.D.C. 2013) .........................................................................29, 31

*Blue Ocean Inst. v. Gutierrez,*
    503 F. Supp. 2d 366 (D.D.C. 2007) ...............................................................29, 30, 31

*Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,*
    201 F.R.D. 1 (D.D.C. 2001) .................................................................................13, 14

*Citizens to Preserve Overton Park v. Volpe,*
    401 U.S. 402, 420 (1971) ...........................................................................................33

*City of Dania Beach v. FAA,*
    628 F.3d 581 (D.C. Cir. 2010) ...................................................................................30

*City of Duluth v. Jewell,*
    --- F. Supp. 2d ---, 2013 WL 5422453 (D.D.C. Sept. 29, 2013) ...............................30

*Cnty. of Sonoma v. FHFA,*
    710 F.3d 987 (9th Cir. 2013) ...............................................................................19, 28

*Commercial Drapery Contractors, Inc. v. United States,*
    133 F.3d 1 (D.C. Cir. 1998) .......................................................................................33

*Ctr. for Arms Control & Non-Proliferation v. Lago*,
   No. CIV A 05-682 RMC, 2006 WL 3328257 (D.D.C. Nov. 15, 2006) ................................26

*Dist. Hosp. Partners, L.P. v. Sebelius*,
   --- F. Supp. 2d ---, 2013 WL 5273929 (D.D.C. Sept. 19, 2013)........................................31, 32

*Dopico v. Goldschmidt*,
   687 F.2d 644, 654 (D.C. Cir. 1982) ................................................................................34

*Esther Sadowsky Testamentary Trust v. Syron*,
   639 F. Supp. 2d 347 (S.D.N.Y. 2009)...............................................................................19

*Fairholme Funds, Inc. v. United States*,
   No. 1:13cv465 (Ct. Fed. Cl.)...............................................................................4, 35, 36

*Franks v. Salazar*,
   751 F. Supp. 2d 62 (D.D.C. 2010) ..............................................................................29, 30

*Freeman v. FDIC*,
   56 F.3d 1394 (D.C. Cir. 1995) ........................................................................................19

*Friends of the Earth v. U.S. Dep't of Interior*,
   236 F.R.D. 39 (D.D.C. 2006)..........................................................................................33

*Furgatch v. Resolution Trust Corp.*,
   No. 93-20304 SW, 1993 WL 149084 (N.D. Cal. Apr. 30, 1993)...........................................19

*Gross v. Bell Sav. Bank PaSA*,
   974 F.2d 403 (3d Cir. 1992).........................................................................................19, 22

*Herbert v. Nat'l Acad. of Sciences*,
   974 F.2d 192 (D.C. Cir. 1992) ....................................................................................26, 27

*Hindes v. F.D.I.C.*,
   No. CIV. A. 94-2355, 1995 WL 82684 (E.D. Pa. Feb. 28, 1995) ....................................22, 23

*Hinton v. Corrections Corp. of Am.*,
   624 F. Supp. 2d 45 (D.D.C. 2006) ..................................................................................16

*Holmes-Ramsey v. D.C.*,
   747 F. Supp. 2d 32 (D.D.C. 2010) ..................................................................................24

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
   643 F. Supp. 2d 790 (E.D. Va. 2009) ..............................................................................19

*In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*,
   629 F. Supp. 2d 1 (D.D.C. 2009).....................................................................................19

*Kellmer v. Raines*,
674 F.3d 848 (D.C. Cir. 2012) ................................................................25

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
674 F. Supp. 2d 483 (S.D.N.Y. 2009) ......................................................19

*Leon Cnty. v. FHFA*,
700 F.3d 1273 (11th Cir. 2012) ...............................................................19

*Leon County v. FHFA*,
816 F. Supp. 2d 1205 (N.D. Fla. 2011),
*aff'd*, 700 F.3d 1273 (11th Cir. 2012) ......................................................20

*Loughlin v. United States*,
230 F. Supp. 2d 26 (D.D.C. 2002) ...........................................................27

*Luna v. Rambo*,
273 F.R.D. 346 (D.D.C. 2011) .................................................................24

*Malloy v. Ass'n of State & Territorial Solid Waste Mgmt. Officials*,
955 F. Supp. 2d 50 (D.D.C. 2013) ...........................................................24

*McWilliams Ballard, Inc. v. Level 2 Dev.*,
697 F. Supp. 2d 101 (D.D.C. 2010) .........................................................24

*Midcoast Fisherman's Association v. Gutierrez*,
592 F. Supp. 2d 40, 42 (D.D.C. 2008) ..............................................34, 35

*Nat'l Shopmen Pension Fund v. Disa*,
583 F. Supp. 2d 95 (D.D.C. 2008) ...........................................................24

*Nat'l Trust for Historic Preserv. in U.S. v. FDIC*,
21 F.3d 469 (D.C. Cir. 1994) ...................................................................19

*Nat'l Trust for Historic Preserv. v. FDIC*,
995 F.2d 238 (D.C. Cir. 1993) ...........................................................21, 23

*National Wilderness Institute v. U.S. Army Corps of Engineers*,
No. 01-0273, 2002 WL 34724414 (D.D.C. Oct. 9, 2002) .......................34

*NRDC v. Train*,
519 F.2d 287, 291-92 (D.C. Cir. 1975) ..............................................33, 34

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*,
448 F. Supp. 2d 1 (D.D.C. 2006) ........................................................29, 30

*Phx. Consulting Inc. v. Republic of Angola*,
216 F.3d 36 (D.C. Cir. 2000) ...................................................................26

*Ruffin v. Gray,*
    443 F. App'x 562 (D.C. Cir. 2011)........................................................................24

*Shane v. United States,*
    No. CIV. A. 07-577, 2008 WL 101739 (D.D.C. Jan. 9, 2008)...........................26, 27

*Stewart v. Nat'l Educ. Ass'n,*
    471 F.3d 169 (D.C. Cir. 2006) ......................................................................15, 26

*Tex. Alliance for Home Care Servs. v. Sebelius,*
    811 F. Supp. 2d 76 (D.D.C. 2011) ..................................................................26

*Tex. Rural Legal Aid v. Legal Servs. Corp.,*
    940 F.2d 685, 698 (D.C. Cir. 1991) ...............................................................30

*Todd v. Campbell,*
    446 F. Supp. 149 (D.D.C. 1978) ...............................................................31, 32

*Town of Babylon v. FHFA,*
    699 F.3d 221 (2d Cir. 2012).......................................................................19, 20

*Unite Here Local 25 v. Madison Ownership, LLC,*
    850 F. Supp. 2d 219 (D.D.C. 2012) .............................................................27

*Volges v. Resolution Trust Corp.,*
    32 F.3d 50 (2d Cir. 1994).............................................................................22

*Ward v. Resolution Trust Corp.,*
    996 F.2d 99 (5th Cir. 1993) ...................................................................21, 22, 23

*Wilson v. Fullwood,*
    772 F. Supp. 2d 246 (D.D.C. 2011) ............................................................24

## STATUTES, RULES & REGULATIONS:

5 U.S.C. § 701(a)(2)...........................................................................................28

12 U.S.C. § 1821(j) ...................................................................................19, 22, 23

Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101,
    122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*)................................6, 18

12 U.S.C. § 4513(a)(1)(B) ..................................................................................6

12 U.S.C. § 4617....................................................................................................17

12 U.S.C. § 4617(a)(1)............................................................................................6

12 U.S.C. § 4617(a)(2)...................................................................................................6

12 U.S.C. § 4617(a)(4)...................................................................................................8

12 U.S.C. § 4617(b)(2) .............................................................................................6, 20

12 U.S.C. § 4617(f) .............................................................................................. *passim*

5C Fed. Prac. & Proc. Civ. § 1366 (3d ed.) ................................................................24

Fed. R. Civ. P. 12(b)(1)...........................................................................................26, 27

Fed. R. Civ. P. 12(b)(6)....................................................................................24, 26, 28

Fed. R. Civ. P. 12(d) .....................................................................................................24

Fed. R. Civ. P. 25(d) .......................................................................................................1

Fed. R. Civ. P. 56..........................................................................................................24

Fed. R. Civ. P. 56(d) ...............................................................................................12, 13

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," together with Fannie Mae, the "Enterprises"), Melvin L. Watt, in his official capacity as Director of FHFA[1] (together with FHFA, the "FHFA Defendants"), and the Enterprises hereby oppose the Motion of Plaintiffs Fairholme Funds, Inc. *et al.* ("Fairholme") for Supplementation of the Administrative Records, for Limited Discovery, for Suspension of Briefing on Defendants' Dispositive Motions, and for a Status Conference (Doc. # 32) (the "Discovery Motion"), as well as the Joinders to the Discovery Motion filed by the Consolidated Class Action and Derivative Plaintiffs (Doc. # 23 (1:13mc1288)), and the Arrowood Plaintiffs (Doc. # 40 (1:13cv1439)).[2]

## <u>INTRODUCTION</u>

Fairholme seeks early discovery into the motives and purposes behind, and potential alternatives to, the FHFA as Conservator's response to the most calamitous economic crisis in generations.  Fairholme makes this request despite an explicit statutory prohibition against judicial review of the Conservator's exercise of its broad powers and authorities to, among other things, conduct the business and perform all functions of the Enterprises.  Indeed, Section 4617(f) provides that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."  12 U.S.C. § 4617(f).  As numerous courts have recognized, this statute plainly bars any second-guessing of the Conservator's judgment.  Thus, there is no basis for discovery into such matters.

---

[1]    Because he has succeeded Edward DeMarco, the originally named defendant, as FHFA Director, Melvin L. Watt "is automatically substituted as a party" under Federal Rule of Civil Procedure 25(d).

[2]    Perry Capital LLC (No. 1:13cv1025) has not joined Fairholme's Discovery Motion.

Fairholme nevertheless argues that it is entitled to discovery in connection with the FHFA Defendants' and Enterprises' motion to dismiss (Doc. # 32) (the "Motion to Dismiss") with respect to two sets of claims: the Administrative Procedure Act ("APA") claims and breach of fiduciary duty claims.  Fairholme's arguments fail for numerous reasons.

First, the vast majority of the Discovery Motion's demands are aimed at attacking the sufficiency of the FHFA Defendants' Document Compilation (and Treasury's administrative record) and demanding supplementation of and discovery into those records.  But these demands are premature at best because FHFA's Document Compilation, if relevant at all, would only be relevant to the FHFA Defendants' *alternative* motion for summary judgment on Plaintiffs' arbitrary and capricious claims under the APA, which motion is entirely separate from and independent of the FHFA Defendants' and Enterprises' threshold Motion to Dismiss under Rule 12.  Thus, the Motion to Dismiss, if granted, would moot all issues underlying Fairholme's claimed entitlement to discovery.

Second, Fairholme argues that the FHFA Defendants allegedly rely on matters outside of the pleadings in connection with the Motion to Dismiss the breach of fiduciary duty claims and thus have "converted" the motion into one for summary judgment, entitling Fairholme to discovery.  Fairholme's "conversion" theory is wholly unfounded.  The Motion to Dismiss relies exclusively on the complaints, documents incorporated by reference into the complaints, and documents subject to judicial notice.

Third, Fairholme expressly seeks discovery into the subjective motive, intent, and purposes of the Conservator in executing the Third Amendment.  But such discovery is unwarranted and irrelevant.  The complaints and other judicially-noticeable documents show that the Third Amendment—executed by the FHFA in its capacity as Conservator of the

Enterprises—ended the harmful practice of the Enterprises drawing funds *from* Treasury in order to pay dividends *back to* Treasury, and thereby preserved the adequacy of the Treasury funds made available to the Enterprises.  Fairholme speculates that, even though the Third Amendment solved this circularity problem, the Conservator nevertheless possessed an ulterior and nefarious motive for executing the Third Amendment—namely, to harm the shareholder-Plaintiffs and benefit Treasury—and that Fairholme thus is entitled to discover such motivations in its effort to undo the Third Amendment.  The law is unanimously against Fairholme's position.  So long as the Conservator takes an action—as it did here—that is within its broad statutory authorities to operate and perform all functions of the Enterprises, that action is protected by Section 4617(f).  This Congressionally mandated protection cannot be evaded by allegations that the Conservator acted improperly, with a bad intent, or even in violation of other laws.  Thus, Plaintiffs' allegations cannot be the basis for discovery.

Fourth, even accepting Fairholme's counterfactual premise that the FHFA Defendants have relied on matters outside of the pleadings—they have not—the proper course would be for the Court simply to ignore such matters, rather than convert the motion into one for summary judgment.  Because Fairholme's entire "conversion" theory is based on one paragraph of one argument in favor of dismissing one of Plaintiffs' claims, excluding the purportedly offending paragraph is feasible and would leave unaffected the numerous other dispositive legal reasons to dismiss all of Plaintiffs' claims.

Fifth, Fairholme argues that consideration of the jurisdictional issues raised in the Motion to Dismiss—including Section 4617(f)—should be deferred until after discovery because those issues allegedly are "intertwined" with the "merits" of these cases.  But Fairholme fails to recognize that the Motion to Dismiss does not challenge any facts alleged in the complaints;

3

instead, the motion raises only facial challenges to the Court's subject matter jurisdiction, and thus the "intertwinement" theory is simply inapplicable.

Sixth, if the Court is inclined to address the sufficiency of the FHFA Defendants' Document Compilation now, no supplementation or related discovery is warranted. Fairholme has utterly failed to meet its heavy burden to overcome the presumption that FHFA's Document Compilation is complete by, for example, identifying with particularity what materials are missing from the compilation.

Finally, the February 26 order by the U.S. Court of Federal Claims (the "CFC") granting discovery in *Fairholme Funds, Inc. v. United States,* No. 1:13cv465 (Ct. Fed. Cl.) is irrelevant to the issues raised in the instant motion. Here, Fairholme seeks discovery only in connection with its APA claim and breach of fiduciary duty claim, and neither of those claims is presented in any of the CFC actions. Further, none of Fairholme's discovery requests here are addressed by the CFC discovery order, nor had the CFC been presented with the dispositive jurisdictional defense of 12 U.S.C. § 4617(f) advanced in Defendants' pending Motion to Dismiss.

In sum, no discovery is necessary to assess the purely legal arguments that require no factual analysis and are appropriately before the Court for decision under Rule 12. The express language of HERA and the undisputed context of the conservatorships and Third Amendment make clear that the entire complaint should be dismissed now as a matter of law.

## **BACKGROUND**

Plaintiffs are shareholders in the Enterprises that by the end of 2008 had negative net worth, and thus no stockholder equity and no prospects for continued operations absent an unprecedented infusion of capital from Treasury. Treasury made capital infusions totaling almost $200 billion under terms and conditions that assured that the federal taxpayers would be the beneficiaries of the federal rescue. Now that the Enterprises have generated profits, directly

as a result of taxpayer capital investments made after all shareholder equity was exhausted and when no other source of capital was willing or able to invest, Plaintiffs seek to second-guess FHFA's extensive efforts to avert mandatory receivership and liquidation of the Enterprises, and to lay claim to the profits of the Enterprises earned only after the complete exhaustion of all shareholder capital.

## I.     The Importance of the Enterprises to the National Economy, and Their Collapse

Fannie Mae and Freddie Mac are federally chartered corporations created by Congress to provide liquidity to the national housing finance system and to stabilize the nation's residential mortgage market.  To fulfill their congressional mandate, the Enterprises purchase residential mortgages originated by banks and other qualified lenders, which then can use the sale proceeds to originate additional mortgages.  To finance their purchases, the Enterprises borrow funds from large investors, and also bundle the mortgages into mortgage-backed securities ("MBS") that are sold to investors.

As a result of the housing crisis, the value of the Enterprises' assets substantially deteriorated and the Enterprises suffered major credit losses in their portfolios.  *See* Fairholme Compl. ¶ 38; Consol. Compl. ¶ 47.  In September 2008, FHFA and Treasury concluded that significant action and an infusion of new capital were required to address the systemic risk posed by the Enterprises' condition and to avoid a mandatory triggering of receivership and liquidation, which would have had dire consequences for the housing finance system and the economy.[3]

---

[3]     FHFA's Director is required as a matter of law to appoint FHFA as receiver for an Enterprise when the Enterprise's obligations exceed its assets or when the Enterprise is generally unable to pay its debts as they come due for the preceding 60 days.  *See* 12 U.S.C. § 4617(a)(4).

## II.    FHFA Is Appointed Statutory Conservator and Succeeds by Operation of Law to All the Rights of the Enterprises and Their Shareholders

Congress created FHFA in July 2008 as an independent agency to supervise and regulate the Enterprises, as well as the Federal Home Loan Banks, and to serve if necessary as the statutory conservator or receiver for the Enterprises.  Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*).  HERA charges FHFA as regulator with ensuring that the Enterprises operate in a "safe and sound manner," while "foster[ing] liquid, efficient, competitive, and resilient national housing finance markets."  12 U.S.C. § 4513(a)(1)(B).  HERA also authorizes FHFA's Director to "appoint the [FHFA] as conservator or receiver for a regulated entity . . . for the purpose of reorganizing, rehabilitating, or winding up [its] affairs."  *Id.* § 4617(a)(1), (2).

On September 6, 2008, FHFA's Director placed the Enterprises in FHFA's conservatorship.  As a matter of law, FHFA as Conservator "immediately succeed[ed] to . . . all rights, titles, powers, and privileges of the [Enterprises], and of ***any stockholder***, officer, or director of [the Enterprises]."  *Id*. § 4617(b)(2)(A) (emphasis added).

As Conservator, FHFA is expressly authorized to take any action that is "necessary to put [the Enterprises] in a sound and solvent condition" and "appropriate to carry on the business of [the Enterprises]."  *Id.* § 4617(b)(2)(D).  FHFA thus has express plenary authority as Conservator to:

- "conduct all business of the [Enterprises]," *id.* § 4617(b)(2)(B)(i);

- "perform all functions of the [Enterprises] in the name of the [Enterprises] which are consistent with the appointment as conservator," *id.* § 4617(b)(2)(B)(iii);

- "preserve and conserve the assets and property of the [Enterprises]," *id.* § 4617(b)(2)(B)(iv);

- "take over the assets of and operate the [Enterprises] with all the powers of the shareholders, the directors, and the officers," *id.* § 4617(b)(2)(B)(i);

- "transfer or sell any asset or liability of the [Enterprises] . . . without any approval, assignment, or consent with respect to such transfer or sale," *id.* § 4617(b)(2)(G); and

- "take any [authorized action], which the Agency determines is in the best interests of the [Enterprises] or the Agency," *id.* § 4617(b)(2)(J)(ii).

Reinforcing and facilitating the exercise of the Conservator's plenary operational authority, Congress insulated the full range of the Conservator's actions in directing and overseeing the conservatorships from all judicial review.  Under 12 U.S.C. § 4617(f), "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator."

### III.    The PSPAs Provide Unprecedented Financial Support to the Enterprises

In connection with the conservatorship appointments, Treasury and FHFA—expressly in its capacity as Conservator of the Enterprises—entered into two Senior Preferred Stock Purchase Agreements (together, the "PSPAs"), one for each Enterprise.  Treasury agreed to exercise its newly granted Congressional authority to infuse billions of taxpayer dollars into the Enterprises through the PSPAs to provide the capital needed for the Enterprises to remain in operation and avoid statutorily mandated receivership and liquidation.  FHFA0128-0155 (PSPAs (September 26, 2008)).  This lifeline of unprecedented federal taxpayer financial support provided the market with assurances that Treasury would provide a "financial backstop" to the Enterprises, FHFA3545 (OIG Report (May 24, 2012)), and "effectively provide a very long-term federal guarantee" to holders of Enterprise debt (i.e., bondholders) and MBS.  *See* FHFA0253 (FHFA Mortgage Market Note (Dec. 5, 2008)).[4]

---

[4]    All documents cited herein can be considered by the Court because they are (a) relied upon in the complaints and therefore effectively incorporated by reference into the complaints, and/or (b) judicially-noticeable.  *See infra* Sec. II.  Each such document, along with an explanation of the bases for which it can be considered, is identified in the pending Motion for Judicial Notice filed by the FHFA Defendants and the Enterprises (Doc. # 29).

Treasury funding under the PSPAs is straightforward: if in any quarter an Enterprise's net worth is negative—defined as liabilities exceeding assets in accordance with U.S. GAAP—then the Enterprise draws funds from Treasury in the amount necessary to cure its negative net worth and bring its capital position back up to zero.  FHFA0131; 0145 (PSPAs § 2.2).  Thus, Treasury's funding under the PSPAs, by definition, saved the Enterprise from mandatory receivership, which would be triggered were an Enterprise's liabilities to exceed its assets.  *See* 12 U.S.C. § 4617(a)(4).

By late 2008, the Enterprises' liabilities exceeded their assets and, with all stockholder equity completely exhausted, both Enterprises began drawing on the Treasury commitment in amounts needed to cure that deficit and bring the Enterprises' net worth back up to zero.  *See* Fairholme Compl. ¶ 48 (acknowledging that PSPAs ensure that the Enterprises "maintain[] a positive net worth").  To date, the Enterprises have drawn over $187 billion from Treasury—$116.1 billion for Fannie Mae, and $71.3 billion for Freddie Mac.  While the PSPAs initially capped Treasury's commitment at $100 billion per Enterprise, the parties subsequently amended the PSPAs several times to increase the amount of Treasury funds available.  As of January 1, 2013, the remaining amount of Treasury's commitment to Fannie Mae became fixed at $117.6 billion (over and above the $116.1 billion already infused), and the remaining capacity to the cap on Treasury's commitment to Freddie Mac became fixed at $140.5 billion (over and above the $71.3 billion already infused).  *See* FHFA1137; 1143 (Amended and Restated PSPAs (Dec. 24, 2009)).

In consideration of its unprecedented commitment to invest hundreds of billions of federal tax dollars into the Enterprises, and in order to protect this massive investment, the

PSPAs gave Treasury a comprehensive and integrated bundle of rights, entitlements, and

financial commitments.  These entitlements include:

- Initial Commitment Fee consisting of (a) an initial senior liquidation preference of $1 billion for each Enterprise and (b) warrants to acquire 79.9% of the Enterprises' common stock for a nominal payment.  FHFA0133; 0147 (PSPAs § 3.1).

- Senior Liquidation Preference equal to the total amount of Enterprise draws on Treasury funds, plus the $1 billion initial liquidation preference—currently $189 billion.  Thus, if the Enterprises are liquidated through receivership, Treasury must be paid $189 billion from the proceeds of the liquidation before preferred and common shareholders may recover anything.  From the outset of the PSPAs—long before the Third Amendment— Enterprise dividend payments did not reduce Treasury's liquidation preference.  *See* Fairholme Compl. ¶ 50.  They still do not.

- Annual 10% Dividends, assessed quarterly, based on the total amount of the liquidation preference.  By late 2010, the amount of the liquidation preference had grown so large, that the 10% dividend was expected—by itself—to transfer to Treasury "virtually all profits" of the Enterprises.  FHFA1392 (Treasury 2010 Performance and Accountability Report (Nov. 15, 2010)).  The PSPAs also permitted the Enterprises to pay the dividend by adding the amount of the dividend payment to Treasury's liquidation preference at an annualized dividend rate of 12% instead of 10%.  AR0033; 0067-68.

- Annual Periodic Commitment Fee, to be imposed beginning January 2010, that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment" and to reflect "the market value of the Commitment as then in effect." FHFA0133; 0147 (PSPAs § 3.2(b)).  Treasury exercised its right to waive the Periodic Commitment Fee for 2010 and 2011, years in which the Enterprises had insufficient capital to pay the 10% dividend, let alone an additional Periodic Commitment Fee.[5]

## IV.  The Third Amendment Preserves and Extends the Treasury Commitment by Replacing the Dividend and Periodic Commitment Fee With a Variable Dividend Based on Net Worth

The Enterprises could not consistently generate enough income to make the

contractually-specified 10% dividend payments.  The Enterprises thus drew funds from Treasury

in order to pay the dividends back to Treasury.  Fairholme Compl. ¶ 56.  Additionally, each time

---

[5]    *See* FHFA2437 (Freddie Mac, Form 10-Q Q3 (Nov. 3, 2011)) (describing Treasury's waiver of the Periodic Commitment Fee); FHFA1832 (Freddie Mac, Annual Report (Form 10-K)) (Feb. 24, 2011)) (same); FHFA2251 (Fannie Mae Form 10-Q Q1 (May 6, 2011)) (same); FHFA1457 (Fannie Mae, Annual Report (Form 10-K) (Feb. 24, 2011)) (same).

the Enterprises drew funds to pay the 10% dividend, the total amount of the Treasury draw

increased, in turn increasing the amount of the next 10% dividend payment.  *See* Perry Compl. ¶

42; Consol. Compl. ¶ 62.  As Plaintiffs allege, this created a "harmful feedback loop" (Perry

Compl. ¶ 42) that "requir[ed] the Companies to draw down Treasury's funding commitment,

which, in turn, required the Companies to pay increased dividends to Treasury."  Consol. Compl.

¶ 62; *see also* Arrowood Compl. ¶ 70 (the Enterprises "had to draw on the Government's funding

commitment to pay the Government [10%] dividends on the Government's senior preferred

stock").  By early August 2012, the amount of the annual 10% dividend had grown so large—

$11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac—the Enterprises announced that it

was unlikely they would be able to meet that amount consistently without drawing additional

funds from Treasury.[6]  Additionally, market forecasts at the time predicted that the Enterprises'

ongoing payment of the 10% dividend would completely exhaust Treasury's funding

commitment within 10 years, leading to potential downgrades in the Enterprises' credit ratings.[7]

These concerns undermined the very purpose of the PSPAs: to express financial support to

holders of Enterprise debt (i.e., bondholders) and MBS.

---

[6]    *See* FHFA3598 (Freddie Mac, Form 10-Q Q2 (Aug. 7, 2012)) ("Over time, our dividend
obligation to Treasury will increasingly drive future draws.  Although we may experience
period-to-period variability in earnings and comprehensive income, it is unlikely that we will
generate net income or comprehensive income in excess of our annual dividends payable to
Treasury over the long term."); FHFA3857-58 (Fannie Mae, Form 10-Q Q2 (Aug. 8, 2012))
("Although we may experience period-to-period volatility in earnings and comprehensive
income, we do not expect to generate net income or comprehensive income in excess of our
annual dividend obligation to Treasury over the long term.").

[7]    FHFA2404 (Moody's, Sector Comment, *Plan To Raise Fannie Mae and Freddie Mac
Guarantee Fees Raises Question of Support* (Sept. 26, 2011); *see also* FHFA4028 (Moody's
Issuer Comment: *Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting* (Aug. 13,
2012) (observing that the Enterprises "will deplete their capital bases because the dividends
they'll be paying on their preferred securities will be greater than their earnings"); FHFA3101
(Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac* (Mar. 14, 2012))
(observing that "diminishing Treasury support raises the risk that the agencies one day might
face challenges in covering MBS losses" and that such a risk "becomes greater in a housing
market catastrophe, such as the one that started in the US after 2006").

Thus, on August 17, 2012, FHFA and Treasury executed the Third Amendment, which (1) eliminated the fixed annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprise's positive net worth, and (3) suspended the Periodic Commitment Fee for as long as the quarterly variable dividend is in effect.  The new dividend structure eliminated the risk that taking draws to make the 10% dividend payment would lead to the exhaustion of the Treasury commitment.  *See* FHFA4047 (FHFA Statement (Aug. 17, 2012)) ("[T]he continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs.").

The same market participants who had previously expressed concern about the adequacy of Treasury's commitment in light of the 10% dividend responded positively to the Third Amendment, expressing confidence that the Treasury commitment would now be adequate because of the change from the fixed 10% dividend to a variable dividend based on net worth. Moody's stated that "limiting dividends to the amount of earnings each GSE generates and eliminating the burden of the former high dividends ensures that each company will have sufficient contingent capital under its Capital Agreement with the US Treasury, a credit positive."  FHFA4051 (Moody's, Issuer Comment: *US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive* (Aug. 23, 2012)).  Likewise, another large international bank stated that "we see virtually no chance of the . . . capital supports being exhausted over a multi-decade period. . . .  In our view, this puts to rest any worries about GSE credit risk even in intermediate/longer maturities."  FHFA4049 (Barclays, Interest Rates Research, *Treasury Changes the PSPAs: Initial Thoughts* (Aug. 17, 2012)).  FHFA's Inspector General also observed:  "The change to the dividends provides the market with greater assurance that the Enterprises will have sufficient capital to fulfill their obligations on their bonds and

MBS, which encourages continued liquidity in the mortgage market."  OIG Report (Mar. 20, 2013) at 14 (Ex. G to MJN).

## PROCEDURAL HISTORY

On November 6, 2013, the parties filed a Joint Status Report across these coordinated actions addressing case management issues and proposing a coordinated briefing schedule.  *See* Doc. # 20 (1:13cv1053).  The Joint Status Report stipulated that the briefing schedule was being proposed "without prejudice to parties' rights to oppose any summary judgment motions under Federal Rule of Civil Procedure 56(d), in whole or in part, on the ground that further factual development is needed."  *Id*. at 4.

Additionally, though the Joint Status Report set a deadline for Defendants to file an administrative record, the report also stated that the FHFA Defendants "maintain that they are not required to file an administrative record in these circumstances, wherein the conduct at issue concerns actions allegedly taken by FHFA in its conservatorship capacity.  [The FHFA Defendants] do, however, intend to file an administrative record or to provide equivalent materials explaining the rationale for their actions."  *Id*. at 4.

The Court entered the agreed-upon briefing schedule on November 18, 2013, adopting the proposed schedule and ordering that parties may "oppose any summary judgment motions under Federal Rule of Civil Procedure 56(d), in whole or in part, on the ground that further factual development is needed."  *See* Doc. # 21 (1:13cv1053) (the "Order Regarding Briefing").

On December 17, 2013, the FHFA Defendants filed their document compilation (the "Document Compilation"), and stated in their cover notice:

> Plaintiffs allege that the Third Amendment to the Treasury Agreement is arbitrary and capricious under the Administrative Procedure Act ("APA").  It is undisputed that the actions challenged by plaintiffs were undertaken by FHFA in its capacity as statutory Conservator of Fannie Mae and Freddie Mac.  This

> Court is without jurisdiction to review such actions of the Conservator. 12 U.S.C. § 4617(f). As the APA does not permit review of actions of the Conservator (5 U.S.C. § 701(a)(2)), Defendants FHFA and DeMarco are not required to—and have not—created or maintained an administrative record relating to the execution of the Third Amendment. Nevertheless, the enclosed documents reflect the considerations and views FHFA as Conservator took into account in connection with execution of the Third Amendment. The enclosed index to the documents identifies the relevant considerations.

Doc. # 24 (1:13cv1053).

On January 17, 2014, the FHFA Defendants and the Enterprises filed their Motion to Dismiss All Claims and, in the Alternative, for Summary Judgment as to Plaintiffs' Arbitrary and Capricious Claims. Doc. # 28 (1:13cv1053).

On February 12, 2014, Fairholme filed the Discovery Motion, which seeks discovery only in connection with Fairholme's APA claims against Treasury and FHFA, and breach of fiduciary duty claim against FHFA. By filing the Discovery Motion, Fairholme deviated from the parties' agreement and the Court's Order Regarding Briefing. Instead of raising any arguments under Rule 56(d) in the context of its brief in opposition to Defendants' dispositive motions—as required by the Order Regarding Briefing—Fairholme filed the Discovery Motion, thereby igniting a separate round of briefing concerning Rule 56(d) that is not contemplated by the Order Regarding Briefing. For this reason, the Discovery Motion is procedurally improper and should be denied outright. In all events, the Discovery Motion wholly fails on the merits.

## **ARGUMENT**

**I.     The Court Should Resolve Defendants' Threshold Motion to Dismiss Before Resolving Fairholme's Request for Discovery in Connection With the Administrative Records.**

"It is well settled that discovery is generally considered inappropriate while a motion that would be thoroughly dispositive of the claims in the Complaint is pending." *Anderson v. U.S.*

*Attorneys Office*, No. CIV. A. 91-2262-LFO, 1992 WL 159186, at *1 (D.D.C. June 19, 1992).

Indeed, precluding discovery while a dispositive motion is pending "is an eminently logical

means to prevent wasting the time and effort of all concerned, and to make the most efficient use

of judicial resources." *Chavous v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 201

F.R.D. 1, 2 (D.D.C. 2001) (internal citation and quotation marks omitted).  Here, the most

efficient and logical course is for the Court to address and resolve the Motion to Dismiss first, as

it raises threshold legal issues that are dispositive of all Plaintiffs' claims.

      The vast majority of Fairholme's Discovery Motion is dedicated to seeking discovery

into the adequacy of the FHFA Defendants' Document Compilation and Treasury's

administrative record.  *See* Discovery Motion, 14-27.  But these records are simply irrelevant to

resolving the pending Motion to Dismiss, which raises threshold legal issues and does not rely

upon the Document Compilation.  Instead, as explained below, the Motion to Dismiss relies

exclusively upon the allegations in the complaints, documents incorporated by reference into the

complaints, and other judicially-noticeable documents.  Thus, if the Motion to Dismiss is

granted, the adequacy of the Document Compilation will become a moot point.  Only if the

Motion to Dismiss is denied will the Document Compilation play any role at all, as the FHFA

Defendants rely on that compilation only in support of their *alternative* motion for summary

judgment on Plaintiffs' arbitrary and capricious claims.  *See* Motion to Dismiss, 63-70.[8]

Moreover, even if the Motion to Dismiss is granted only in part, there is a substantial likelihood

the Court's ruling would narrow the issues in dispute, enabling the Court and the parties to

---

[8]    FHFA's alternative request for summary judgment makes up only a small fraction of the Motion to Dismiss.  The first argument that relies upon FHFA's Document Compilation appears at page 63 of FHFA's 70-page brief.  The first 62 pages explain why Plaintiffs' claims must be dismissed for threshold legal reasons, separate and apart from the Document Compilation.

consider with more particularity the sufficiency of the Document Compilation (or Treasury's administrative record) and the propriety of Fairholme's proposed discovery requests.

Accordingly, the Court should defer consideration of Fairholme's request for discovery in connection with the Document Compilation (or Treasury's administrative record) until after the Court has resolved the threshold Motion to Dismiss.

## II.     The Motion to Dismiss Should Not Be Converted Into a Motion for Summary Judgment Because It Relies Exclusively Upon the Complaints, Documents Incorporated by Reference into the Complaints, and Judicially-Noticeable Documents.

Fairholme attempts to justify its premature demand for discovery on the theory that one component of the Motion to Dismiss supposedly relies on matters outside the pleadings and therefore the Motion to Dismiss should be converted into a motion for summary judgment under Rule 12(d).  *See* Discovery Motion, 27-34.  Fairholme argues that it is entitled to take discovery in order to respond to the converted motion for summary judgment.  *Id*.  Fairholme's "conversion" theory fails and the request for discovery on this basis should be denied.

The only portion of the FHFA Defendants' 70-page memorandum that Fairholme identifies as supposedly raising disputed facts is one lone paragraph that reads:

> [T]he Third Amendment also is consistent with, and undertaken to promote, the public missions in the charters and HERA.  As explained above, the Third Amendment ended the circular practice of the Enterprises drawing funds from Treasury merely to make dividend payments to Treasury, which threatened to erode the amount of the Treasury commitment available to the Enterprises. This potential erosion was the source of growing concern to the housing finance markets because it exposed the Enterprises to greater risk and increased the potential for instability in housing finance.  The Third Amendment avoided continuing erosion of the Treasury commitment, thereby promoting the stability of the Enterprises and the housing market that FHFA seeks to protect.

Motion to Dismiss, 56 (citation omitted).  The Court can—and should—consider this paragraph in resolving the Motion to Dismiss the breach of fiduciary duty claims because it simply

summarizes matters already encompassed within the complaints, documents incorporated by reference into the complaints, or documents for which the Court may take judicial notice—all of which can be considered by the Court in resolving the Motion to Dismiss under Rule 12(b)(6). *See Stewart v. Nat'l Educ. Ass'n,* 471 F.3d 169, 173 (D.C. Cir. 2006); *see also Antoine v. U.S. Bank Nat'l Ass'n*, 547 F. Supp. 2d 30, 38 n.3 (D.D.C. 2008) ("A court may take judicial notice of a matter of public record without converting a motion to dismiss into a motion for summary judgment."); *Hinton v. Corrections Corp. of Am.*, 624 F. Supp. 2d 45, 46 (D.D.C. 2006) (documents relied upon in complaints are effectively incorporated by reference and may be considered without converting motion to dismiss into a motion for summary judgment).

In particular, the following essential facts can be taken as true for purposes of resolving the Motion to Dismiss and considered by the Court without converting the motion to one for summary judgment:

1.  The Enterprises drew funds from the Treasury commitment in order to pay the 10% dividend back to Treasury (Fairholme ¶¶ 56; Arrowood Compl. ¶ 70), which created a "harmful feedback loop" (Perry Compl. ¶ 42) that "required the Companies to pay increased dividends to Treasury."  Consol. Compl. ¶ 62.

2.  In early August 2012, the Enterprises announced that they could not consistently afford the 10% dividend payments, and thus would continue their practice of drawing funds from Treasury in order to pay the 10% dividend to Treasury.

    > Freddie Mac announced: "Over time, our dividend obligation to Treasury will increasingly drive future draws.  Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."  *See* FHFA3598 (Freddie Mac Form 10-Q Q2 (Aug. 7, 2012)).

    > Fannie Mae announced: "Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term. . . . We also expect that, over time, our dividend obligation to Treasury will increasingly drive our future draws under the senior preferred stock purchase agreement." *See* FHFA3857-58 (Fannie Mae Form 10-Q Q2 (Aug. 8, 2012)).

16

3.  Market analysts, such as Moody's Investors Service, observed that the Enterprises' circular draws to pay dividends threatened to exhaust the finite Treasury commitment, leading to potential downgrades in the Enterprises' credit rating.  *See* FHFA2404 (Moody's, *Sector Comment: Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support* (Sept. 26, 2011)); FHFA4028 (Moody's, *Issuer Comment: Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting* (Aug. 13, 2012)).

4.  The Third Amendment eliminated the 10% dividend and implemented a net worth dividend.  *See* Fairholme Compl. ¶¶ 66, 124, 132, 139; Arrowood ¶¶ 74-75.

5.  The Third Amendment solved the circularity problem because it "eliminate[d] the need for Fannie Mae and Freddie Mac to continue to borrow from the Treasury Department to pay dividends[,]  . . . [which] could have called into question the adequacy of the financial commitment contained in the PSPAs."  *See* FHFA4047 (FHFA Statement (Aug. 17, 2012)).

6.  Market analysts praised the Third Amendment for ending the circularity problem and preserving the Treasury commitment.  The Enterprises' credit ratings were preserved.  *See* FHFA4051 (Moody's, Issuer Comment: *US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive* (Aug. 23, 2012)); FHFA4049 (Barclays, Interest Rates Research, *Treasury Changes the PSPAs: Initial Thoughts* (Aug. 17, 2012)).

The single paragraph from the Motion to Dismiss that Fairholme relies upon for its conversion argument is merely a summation of these undisputed facts.  The Court can resolve the Motion to Dismiss based on these facts because they demonstrate that the Third Amendment was an exercise of the Conservator's statutory powers and functions, and thus Section 4617(f) applies to bar Plaintiffs' claims for equitable and declaratory relief, including the breach of fiduciary duty claim.  These facts also demonstrate that any alleged state law fiduciary duty owed to the shareholders that would have prohibited the Conservator from executing the Third Amendment would be preempted by federal law.  *See* Motion to Dismiss, 53-56.

## III.  Discovery into Whether the Conservator Possessed an Ulterior Motive in Executing the Third Amendment, Beyond Ending the Circularity Problem, Is Unnecessary and Irrelevant.

It is beyond dispute that entering into contracts on behalf of the Enterprises and preserving the capital available to the Enterprises—as was done in the Third Amendment—falls

within the scope of conducting the business of and operating the Enterprises, and other aspects of Section 4617.  Accordingly, as an exercise of the Conservator's powers under Section 4617, the Third Amendment is not subject to judicial review.

Fairholme seeks to pierce the protections of Section 4617(f) and undo the Third Amendment by arguing that the Conservator possessed an improper ulterior motive in executing that amendment—namely, "to serve only the interests of the Federal Government at the expense of the Enterprises and their shareholders."  Discovery Motion, 29; *see also id*. at 32, 35 (referring to FHFA's "*supposed* desire to conserve Treasury's financial commitment" and "*supposed* concerns regarding the erosion of Treasury's commitment") (emphases added).  Thus, Fairholme seeks to take discovery on the purportedly "disputed question of *why* the FHFA entered into the Third Amendment," so that Plaintiffs may attempt to uncover "any *other purposes* that Defendants may have had in instituting the net worth sweep."  *Id*. at 31-32 (emphases added).  Fairholme also seeks discovery into whether the Conservator considered other "alternatives to the Net Worth Sweep that could address the supposed concerns regarding the erosion of Treasury's commitment."  *Id*. at 25, 32.

Judicial review of the Conservator's motives and intent—and any other second-guessing of the Conservator's judgment and discretion—are absolutely foreclosed by HERA's bar on court action that would affect or restrain the Conservator's exercise of its statutory powers.  Accordingly, Fairholme's requested discovery is wholly irrelevant to resolving the threshold Motion to Dismiss.  Whether the Conservator possessed an allegedly improper motive or intent in executing the Third Amendment, or whether the Conservator could have addressed the same problem in a manner Fairholme finds less objectionable, is not a proper subject of discovery because it is not subject to judicial review in the first place.

Under 12 U.S.C. § 4617(f), "no court may take any action to restrain or affect the exercise of the powers or functions of the Agency as a conservator." This Court and others across the country consistently and routinely apply Section 4617(f) to bar claims—such as Plaintiffs' breach of fiduciary duty claims here—seeking relief that would "restrain or affect" the exercise of the powers of FHFA as Conservator of the Enterprises.[9] The D.C. Circuit has described this statutory language as "effect[ing] a sweeping ouster of courts' power to grant equitable remedies," that bars not only injunctive relief, but also any declaratory relief "that would effectively 'restrain'" the exercise of the conservator's powers. *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (interpreting materially identical 12 U.S.C. § 1821(j)).[10] Indeed, "given the breadth of the statutory language . . . the statute would appear to bar a court from acting in virtually all circumstances." *Nat'l Trust for Historic Preserv. in U.S. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring).

The Court's "jurisdictional inquiry" under Section 4617(f) is "quite narrow." *Bank of Am. N.A. v. Colonial Bank*, 604 F.3d 1239, 1243 (11th Cir. 2010). "[T]he only relevant question" is "whether the conservator or receiver is carrying out a statutory function or power. If so, no injunction may issue." *Furgatch v. Resolution Trust Corp.*, No. 93-20304 SW, 1993 WL 149084, at *2 (N.D. Cal. Apr. 30, 1993). Stated differently, only when the Conservator is

---

[9]    *See Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013); *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278-79 (11th Cir. 2012); *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012); *In re Fed. Nat. Mortg. Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1, 4 (D.D.C. 2009) ("*In re Fannie Mae*"), *aff'd sub nom., Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012); *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009), *aff'd sub nom., La. Mun. Police Emp. Ret. Sys. v. Syron*, 434 F. App'x 188 (4th Cir. 2011); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 674 F. Supp. 2d 483, 494 (S.D.N.Y. 2009).

[10]    Section 1821(j) states that "no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." 12 U.S.C. § 1821(j). "In analyzing the limits of the Court's authority under § 4617(f), the Court may turn to precedent relating to . . . § 1821(j)." *Kuriakose*, 674 F. Supp. 2d at 493 (citing cases).

"acting clearly outside its statutory powers" is Section 4617(f) inapplicable.  *Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992); *see also Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012) ("A conclusion that the challenged acts were directed to an institution in conservatorship and within the powers given to the conservator ends the inquiry.").

Accordingly, to resolve the breach of fiduciary duty claims, the Court need only answer the narrow legal question of whether FHFA was acting within its broad statutory authority in executing the Third Amendment.  The Motion to Dismiss explains that the Conservator's actions fell squarely within its statutory powers not only when it secured the much-needed Treasury funds through the original PSPAs, but also when the Conservator preserved and effectively extended those funds through the Third Amendment.  These actions were patently authorized by the Conservator's statutory authorization to "carry on the business" of the Enterprises, "operate [the Enterprises] with all the powers of the shareholders, the directors, and the officers," "put the [Enterprises] in a sound and solvent condition," "transfer or sell any asset" of the Enterprises "without any approval, assignment, or consent," and "take any [authorized action], which [FHFA] determines is in the best interests of the [Enterprises] or [FHFA]."  *See* 12 U.S.C. § 4617(b)(2).

Whether the Conservator possessed an allegedly improper motive or intent when carrying out its statutory powers and functions—the stated goal of Fairholme's sought-after discovery—is irrelevant to the Section 4617(f) analysis; there is simply no "bad motive" exception to Section 4617(f).  For example, in *Leon County v. FHFA*, 816 F. Supp. 2d 1205, 1208 (N.D. Fla. 2011), *aff'd*, 700 F.3d 1273 (11th Cir. 2012), the plaintiff challenged the Conservator's issuance of a letter directive to the Enterprises that the  plaintiff alleged was motivated purely to advantage the Conservator in ongoing litigation.  The Court rejected this motive argument, finding that the

facial purpose of the letter—to direct the Enterprises to refrain from purchasing certain risky mortgages—demonstrated that the Conservator acted within its powers and functions when it issued the letter.  The Court observed:  "Congress surely knew, when it enacted § 4617(f), that challenges to agency action sometimes assert an improper motive.  ***But Congress barred judicial review of the conservator's actions without making an exception for actions said to be taken from an improper motive***."  *Id.* (emphasis added).  The exact same principle applies here:  the Court's role is to determine whether the Third Amendment—on its face—was within the Conservator's statutory powers and functions.  Whether the Conservator possessed an allegedly improper ulterior motive is irrelevant to the analysis.  Indeed, if intent or motive *were* relevant, Section 4617(f) would be rendered a nullity because plaintiffs could simply plead around it by alleging that the Conservator's actions—even ones that fit within its powers and functions—were nevertheless subject to judicial review because they were rooted in an improper motive.  This is not the rule, nor should it be.[11]

Likewise, Section 4617(f) cannot be avoided merely by alleging that the Conservator's exercise of its powers was improper, unwarranted, or even in violation of other law.  So long as the Conservator takes an action that is not clearly outside its statutory powers and functions, Section 4617(f) applies and "immuniz[es]" the Conservator from "outside second-guessing." *Nat'l Trust for Historic Preserv. v. FDIC*, 995 F.2d 238, 240 (D.C. Cir. 1993) (holding Section 1821(j) precluded injunction of property sale, despite allegation that sale would violate another statute, the National Historic Preservation Act).  For example, in *Ward v. Resolution Trust Corp.*,

---

[11]   For the same reasons, Plaintiffs' demand for discovery into whether the Conservator "acted independently" or allegedly at the behest Treasury—the other party to the Third Amendment—must fail because it is based on the same flawed premise that the Conservator's motivation for an action—i.e., allegedly to accede to Treasury's direction in connection with the Third Amendment—is relevant to the analysis of whether the Conservator's action is within its powers and functions.  *See* Discovery Motion, 31.

996 F.2d 99, 103 (5th Cir. 1993), the plaintiff alleged that the receiver acted outside of its

statutory powers because it allegedly failed to properly carry out its role as receiver—i.e., it sold

an asset for a "viciously low price," failed to maximize the value of the failed entity's assets, and

unfairly favored a potential purchaser over the plaintiff.  The Court rejected these arguments,

holding that the materially-identical Section 1821(j) barred plaintiffs' claims for equitable relief.

*Id*. at 104.  In so doing, the Court recognized that, as long as the conservator or receiver acts

within its powers and functions, allegations that those actions are otherwise improper are

irrelevant:

> Ward fails (or refuses) to recognize the difference between the
> exercise of a function or power that is clearly outside the statutory
> authority of the [conservator or receiver] on the one hand, and
> improperly or even unlawfully exercising a function or power that
> is clearly authorized by statute on the other.  None can question
> that the [conservator or receiver] is statutorily authorized to sell
> real estate of an institution which is under RTC conservatorship or
> receivership . . . .  Therefore, even assuming arguendo, that (as
> alleged by Ward) the [conservator or receiver] exercised the power
> or function of selling the Building in a way that failed to maximize
> the net present value return or to afford fair and consistent
> treatment to all offerors, Ward could not prevail.  For, even if the
> [conservator or receiver] improperly or unlawfully exercised an
> authorized power or function, it clearly did not engage in an
> activity outside its statutory powers.  Yet only the latter type of act
> could conceivably subject the [conservator or receiver] to
> injunction . . . .

*Id*. at 103.  Other circuits are in accord.  *See, e.g.*, *Gross*, 974 F.2d at 408 (rejecting the argument

that a conservator or receiver is "only authorized to run [the troubled institution] in a legal

manner," finding "no such limitation in the language of § 1821(j)," and holding that "the

unavailability of injunctive relief does not hinge on our view of the proper exercise of otherwise

legitimate powers"); *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir. 1994) (holding

"the fact that the [conservator or receiver's] actions might violate some other provision of law

does not render the anti-injunction provision inapplicable"); *Hindes v. F.D.I.C.*, No. CIV. A. 94-

2355, 1995 WL 82684, at *1 (E.D. Pa. Feb. 28, 1995), *aff'd*, 137 F.3d 148 (3d Cir. 1998)

(holding that alleged "misconduct and derelictions of duty" by conservator or receiver "do not

give the Court jurisdiction to issue the injunction plaintiffs seek here").

    In light of these authorities, the discovery Fairholme seeks is irrelevant to the legal

analysis required to decide the Motion to Dismiss.  Allegations of improper motive or intent, as

well as allegations that the Conservator acted improperly or in violation of some other law, are

outside the scope of judicial review.  Likewise, allegations that the Conservator could have

addressed the same problem in an alternative manner, perhaps one more preferable to Fairholme,

are irrelevant because they constitute the very type of "outside second-guessing" of the

Conservator's judgment and discretion that Congress specifically prohibited.  *See Nat'l Trust for

Historic Preserv.*, 995 F.2d at 240.[12]  The only relevant question is whether the Conservator's

execution of the Third Amendment—which indisputably was done as part of carrying on the

business and operations of the Enterprises—was within its statutory powers and functions.  This

threshold legal question can and should be resolved exclusively based on the pleadings and other

judicially noticeable documents, and without the sought-after discovery.[13]

---

[12]    For example, Plaintiffs may argue that the Conservator could have addressed the circularity problem not by executing the Third Amendment, but instead by electing to forego payment of the 10% dividend payments to Treasury and permitting those unpaid dividends to be added to Treasury's outstanding liquidation preference at a 12% interest rate.  *See* Discovery Motion, 7. But such an argument would constitute pure second-guessing of the *means* by which the Conservator took action to address a problem Plaintiffs themselves recognize was "harmful" to the Enterprises. Perry Compl. ¶ 42.  Allegations that the Conservator could have done its job in a manner that would have been more preferable to Plaintiffs plainly cannot overcome the sweeping language of Section 4617(f).  *See Ward*, 996 F.2d at 103 (allegation that receiver treated third parties unfairly and failed to maximize the institution's assets insufficient to overcome Section 1821(j)); *Hindes*, 1995 WL 82684, at *1 (alleged "misconduct and derelictions of duty" insufficient to overcome Section 1821(j); *Gross*, 974 F.2d at 408 (application of Section 1821(j) "does not hinge on our view of the proper exercise of otherwise legitimate powers").

[13]    Fairholme's allegation that the Third Amendment did not serve any "legitimate" purpose (*see* Discovery Motion, 29 (citing Fairholme Compl. ¶ 144)) is merely conclusory rhetoric that need not be taken as true for purposes of FHFA's Motion to Dismiss, particularly in light of the

*[Footnote continued on following page]*

**IV.   If the Court Finds That the Motion to Dismiss Relies Upon Matters Outside the Pleadings and Judicially-Noticeable Documents, the Court Should Simply Ignore Those Matters, Rather Than Convert the Motion into One for Summary Judgment.**

Rule 12(d) provides in pertinent part:  "If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to *and not excluded by the court*, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d) (emphasis added).  Thus, "when a Court is presented with materials outside the pleadings in a Rule 12(b)(6) motion, it may *either* exclude this extrinsic evidence *or* convert the motion to one for Summary Judgment under Rule 56."  *Luna v. Rambo*, 273 F.R.D. 346, 349 (D.D.C. 2011) (emphases added); *see also* 5C Fed. Prac. & Proc. Civ. § 1366 (3d ed.) (courts have "complete discretion" to exclude and "simply not consider" extraneous materials).

As explained above, the Motion to Dismiss does not rely upon matters outside the pleadings, and thus Rule 12(d) does not apply.  Nevertheless, even assuming *arguendo* that the motion did rely upon matters outside the pleadings, the proper course here would be for the Court simply to exclude those matters from its consideration, rather than converting the Motion to Dismiss into a Rule 56 motion for summary judgment.  This Court routinely takes this approach when confronted with similar "conversion" arguments.[14]

---

*[Footnote continued from previous page]*
fact that Plaintiffs themselves acknowledge that the circularity problem resolved by the Third Amendment was "harmful" to the Enterprises. Perry Compl. ¶ 42; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (the Court need not accept "legal conclusions" or "mere conclusory statements" as true; the federal rules do not "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

[14]     *See, e.g.*, *Ruffin v. Gray*, 443 F. App'x 562, 563-64 (D.C. Cir. 2011); *Malloy v. Ass'n of State & Territorial Solid Waste Mgmt. Officials*, 955 F. Supp. 2d 50, 54 (D.D.C. 2013); *Luna*, 273 F.R.D. at 349; *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 258 n.6 (D.D.C. 2011); *McWilliams Ballard, Inc. v. Level 2 Dev.*, 697 F. Supp. 2d 101, 109 n.9 (D.D.C. 2010); *Holmes-Ramsey v. D.C.*, 747 F. Supp. 2d 32, 37 n. 5 (D.D.C. 2010); *Nat'l Shopmen Pension Fund v. Disa*, 583 F. Supp. 2d 95, 99 n.1 (D.D.C. 2008) (Lamberth, J.).

Exclusion of matters purportedly outside of the pleadings would be simple in this case because Fairholme's conversion theory is quite narrow.  That theory is based on one paragraph of one argument supporting dismissal of one of Fairholme's claims: breach of fiduciary duty. *See* Discovery Motion, 29-30 (discussing page 56 of the Motion to Dismiss).  Fairholme does not contend that the Motion to Dismiss any of its six other claims should be converted to a motion for summary judgment, or that Fairholme needs discovery to respond to any of FHFA's or the Enterprises' other arguments.  Accordingly, if the Court finds FHFA has relied upon matters outside the complaint, it should exclude consideration of the first paragraph on page 56 of the Motion to Dismiss.  Even with this exclusion, the breach of fiduciary duty claim would fail for other threshold legal reasons, including that (a) the Court lacks jurisdiction over that claim because it seeks exclusively equitable and declaratory relief (*see* Motion to Dismiss, 19-32), and (b) HERA bars shareholder derivative actions in light of the Conservator's succession to all rights, titles, powers, and privileges of the Enterprises' shareholders.  *See id*. at 46-53 (discussing *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012)).  The Motion to Dismiss also explains why no "conflict of interest" exception applies to this claim.  *Id*. at 50-53.  All of these issues are purely legal— Fairholme does not contend otherwise—and are independently dispositive of Fairholme's breach of fiduciary duty claim.

## V.    The Court Should Reject Fairholme's Argument That the Court Skip Consideration of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction In Favor of Discovery and Summary Judgment.

In addition to its "conversion" theory, Fairholme urges the Court to permit discovery to proceed before addressing Defendants' threshold motions to dismiss because the jurisdictional issues raised in those motions allegedly are "inextricably intertwined with the merits of the cause of action."  Discovery Motion, 34-36.  Fairholme thus argues that the Court should treat the motions to dismiss as Rule 56 motions for summary judgment "so that the overlapping

jurisdictional and merits issues can be decided on an appropriate record." *Id.* at 35. Fairholme's "intertwinement" theory not only fails as a matter of law, it also is a mere re-packaging of Fairholme's "conversion" theory and thus should be rejected on the same basis.

Fairholme fails to acknowledge that there are two types of motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1): facial challenges and factual challenges. *See Phx. Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Shane v. United States*, No. CIV. A. 07-577, 2008 WL 101739, at *3 (D.D.C. Jan. 9, 2008). Facial challenges to the Court's jurisdiction accept the allegations of the complaint as true and thus are governed by "substantially the same standard of review that is used to evaluate motions under Rule 12(b)(6)." *Ctr. for Arms Control & Non-Proliferation v. Lago*, No. CIV A 05-682 RMC, 2006 WL 3328257, at *2 (D.D.C. Nov. 15, 2006), *aff'd*, 531 F.3d 836 (D.C. Cir. 2008). The Court thus may consider the allegations of the complaint, documents incorporated by reference into the complaint, and judicially noticeable documents. *Stewart*, 471 F.3d at 173. Additionally, unlike a motion under Rule 12(b)(6), the Court may "consider the complaint supplemented by undisputed facts." *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992). Moreover, "the plaintiff's factual allegations in the complaint will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Tex. Alliance for Home Care Servs. v. Sebelius*, 811 F. Supp. 2d 76, 86 (D.D.C. 2011) (Lamberth, J.) (internal quotation marks and citation omitted).

Factual challenges, on the other hand, directly challenge—as a factual matter—the jurisdictional allegations in the complaint. *See Shane*, 2008 WL 101739, at *3. When considering factual challenges to subject matter jurisdiction, the Court is *not* limited to allegations in the complaint, and instead can rely upon outside evidence to resolve *disputed*

26

jurisdictional issues.  *See Phx. Consult.*, 216 F.3d at 40.  It is only when considering factual—not facial—challenges to jurisdiction that courts must consider whether jurisdictional discovery is appropriate.  *See, e.g.*, *Herbert*, 974 F.2d at 198; *Shane*, 2008 WL 101739, at *3.

Here, the Motion to Dismiss under Rule 12(b)(1) raises a *facial*—not factual—challenge to the Court's subject matter jurisdiction because it accepts all allegations in the complaint as true and does not rely upon matters that are not incorporated into the complaint or otherwise judicially noticeable.  In addition, the judicially noticeable documents can be considered by the Court on the independent basis that they constitute undisputed facts that may supplement the complaint.  *See Herbert*, 974 F.2d at 198.

The cases cited by Fairholme in support of its "intertwinement" theory generally involve motions to dismiss raising *factual*—not facial—challenges to the Court's subject matter jurisdiction that rely upon matters outside the pleadings.  *See* Discovery Motion, 35.  For example, in *Loughlin v. United States*, 230 F. Supp. 2d 26, 35-36 (D.D.C. 2002), this Court addressed the facial vs. factual distinction and observed that the defendant was making a factual—not facial—challenge to jurisdiction, and thus that the "allegations in the complaint are not controlling."  Likewise, the defendant in *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219, 229 (D.D.C. 2012), challenged the Court's subject matter jurisdiction as a factual matter, and the Court recognized that jurisdiction depended upon a "significant factual dispute" that was "not easily resolved," even after a two-day evidentiary hearing.  The Court thus permitted further discovery before resolving the factual dispute concerning subject matter jurisdiction.  *Id.*; *see also Herbert*, 974 F.2d 198 (observing the district court had "rested its decision regarding jurisdiction" upon resolution of "a hotly contested factual issue").  On the other hand, in *American Farm Bureau v. EPA*, 121 F. Supp. 2d 84, 104 (D.D.C. 2000), even

though "the jurisdictional question and the merits [were] intertwined," the Court did not convert the motion into one for summary judgment.  Instead, the Court applied the traditional Rule 12(b)(6) standard of review "because discovery has not occurred and because the court has not been presented with materials outside the scope of the pleadings that are sufficient to rule on summary judgment."  *Id*.

Finally, whether Section 4617(f) deprives the Court of jurisdiction is a pure, threshold legal issue—not one to be resolved on the "merits" after discovery.  Indeed, *every* court that has addressed the application of Section 4617(f) to various Conservator actions to date has done so as a matter of law; no Court has ever required discovery to resolve the issue.  *See supra* n.9 (collecting cases).  Fairholme's request that this Court be the first to do so should be rejected.

## VI.   Supplementation of FHFA's Document Compilation Is Not Warranted.

As explained above, the Document Compilation (and Treasury's administrative record) are irrelevant to the FHFA Defendants' and Enterprises' threshold Motion to Dismiss, which should be resolved first.  *See supra* 15-17.  Further, the FHFA Defendants were not required to— and did not—create or maintain an administrative record relating to the execution of the Third Amendment because FHFA took that action expressly in its capacity as Conservator.  The APA does not apply where other "statutes preclude judicial review," 5 U.S.C. § 701(a)(2), and here, HERA clearly precludes judicial review of the Conservator's action.  *See* 12 U.S.C. § 4617(f); *see also Cnty. of Sonoma*, 710 F.3d at 994 (noting that the APA does not apply when "the action falls within the broad . . . conservator authority"); *see also* Motion to Dismiss, 19-32.  As such, the APA did not require the Conservator to create or maintain an administrative record relating to the execution of the Third Amendment, and there is thus no basis for this Court to grant Fairholme's demand to supplement an administrative record.

### A.    FHFA's Document Compilation Is Complete and Fairholme Has Not Demonstrated Otherwise

In all events, the FHFA Defendants produced the Document Compilation, which reflects the considerations and views FHFA as Conservator took into account in connection with execution of the Third Amendment.  *See* Doc. # 24.  Supplementation of this Document Compilation is not warranted because the compilation is complete—no documents considered by FHFA in connection with the decision to execute the Third Amendment were excluded from the Document Compilation.  Moreover, Fairholme fails to make the highly-specific factual showing necessary for this Court to order FHFA to supplement its Document Compilation.

This Court orders supplementation of an agency's administrative record in only the rarest of circumstances.  *See Franks v. Salazar*, 751 F. Supp. 2d 62, 67 (D.D.C. 2010) ("A court that orders an administrative agency to supplement the record of its decision is a rare bird.") (Lamberth, J.).  This is the consequence of "a strong presumption of regularity that [the agency] properly designated the administrative record."  *Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006); *see also Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 269 (D.D.C. 2007).  The rationale for this rule comes from the Court's understanding of its functional role in the administrative state.  "Were courts cavalierly to supplement the record, they would be tempted to second-guess agency decisions in the belief that they were better informed than the administrators empowered by Congress and appointed by the President."  *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 15 (D.D.C. 2013) (internal quotation marks and citations omitted).  "Common sense dictates that the agency determines what constitutes the whole administrative record, because it is the agency that did the considering, and that therefore is in a position to indicate initially which of the materials were before it — namely, were directly or indirectly considered."  *Pac. Shores*, 448 F. Supp. 2d at 6

29

(internal citations and quotation marks omitted).  This Court "do[es] not allow parties to supplement the record 'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'"  *City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)).  "[T]o rebut the presumption of regularity, the party seeking supplementation must introduce '*concrete evidence*' to '*prove*' that the *specific documents* allegedly missing from the record were 'before the actual decisionmakers' involved in the challenged agency action."  *City of Duluth v. Jewell*, --- F. Supp. 2d ---, 2013 WL 5422453, at *4 (D.D.C. Sept. 29, 2013) (quoting *Pac. Shores*, 448 F. Supp. 2d at 6) (emphases added).

Here, Fairholme has utterly failed to satisfy its burden.  Fairholme does not identify any allegedly excluded items with particularity, or present any "concrete evidence" that proves documents that were before FHFA decisionmakers were omitted from the Document Compilation.  *See id.* at *4.  Instead, Fairholme generically asserts that "several categories of records" were not produced that Fairholme believes are "likely to exist."  Discovery Motion, 17. This is patently insufficient to overcome "the strong presumption of regularity to which [FHFA is] entitled" in compiling its record.  *See Franks*, 751 F. Supp. 2d at 73-74.  "Plaintiff must identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record."  *City of Duluth*, 2013 WL 5422453, at *5.  Fairholme has not done so.

Fairholme's requests are strikingly similar to the requests this Court rejected in *Blue Ocean Institute*.  In that case, the plaintiff "largely [sought] unspecified documents that [were] likely to exist, it argue[d], as a result of other documents that [were] included in the

30

administrative record." *Blue Ocean Inst.*, 503 F. Supp. 2d at 369.  But—like Fairholme here—the plaintiff did "not indicat[e] specific, known additional documents," but "[i]nstead . . . reason[ed] that because there [were] certain documents in the administrative record, it follow[ed] that there must have been discussions and analyses of the issues raised by those documents." *Id.* The Court held the plaintiff's speculations insufficient: "theorizing that the documents *may* exist . . . fails to overcome the presumption that the record is complete." *Id.* at 371 (emphasis in original).  For the same reasons, Fairholme's speculative requests must likewise be denied.

### B.      Fairholme Does Not Seek, Nor Is It Entitled to, Any Data From FHFA

Though characterized as a demand for materials from "Defendants," Fairholme's request that it be provided with "financial projections and associated records" is directed primarily to Treasury.  *See* Discovery Motion, 17-18 (citing Treasury's administrative record and seeking Grant Thornton projections and Treasury "scenarios" and analyses).  Indeed, in the Motion to Dismiss, the FHFA Defendants rely upon the statements of the Enterprises themselves, made in their SEC filings in early August 2012, that it was "unlikely" the Enterprises would generate sufficient income to be able to afford the 10% dividend over the long term.  *See* Motion to Dismiss, 67.  Moreover, even if sought, Fairholme is not entitled to any data from FHFA.

"Generally, 'the Court does not need to examine the raw data in order to determine whether or not the [agency's] decision was arbitrary and capricious or otherwise not in accordance with law.'" *Dist. Hosp. Partners, L.P. v. Sebelius*, --- F. Supp. 2d ---, 2013 WL 5273929, at *7 (D.D.C. Sept. 19, 2013) (quoting *Todd v. Campbell*, 446 F. Supp. 149, 152 (D.D.C. 1978)).  "'[R]equiring an agency to produce source data upon source data so that its analysis can be replicated in minute detail would appear, in most instances, to exceed the bounds of arbitrary and capricious review.'" *Id.* (quoting *Banner Health*, 945 F. Supp. 2d at 28).

Fairholme's requests for financial data and other data underlying projections are akin to the arguments the Court rejected in *Todd v. Campbell*. There, plaintiffs argued that because agency decisionmakers failed to consider the data underlying the agency staff's recommendations to the decisionmakers, the agency should produce that underlying data so the Court could "judge the rationality of the [agency decisionmakers'] decision." *Todd*, 446 F. Supp. at 152. The Court rejected the arguments. After noting that the commission delegated "much of its responsibility to its staff" who reviewed pertinent data, the Court concluded that "[t]here was no need for the Commission to have seen the data itself." *Id.* The Court did "not need to examine the raw data in order to determine whether or not the Commission decision was arbitrary and capricious or otherwise not in accordance with law." *Id.*

Additionally, Fairholme makes no attempt to demonstrate how any underlying data would facilitate judicial review. In *District Hospital Partners*, the court concluded that underlying data was not necessary to supplement the record even though plaintiffs demonstrated that the Secretary of Health and Human Services had relied on it: "In this case, although plaintiffs have demonstrated that the Secretary did indeed utilize the [underlying] data . . . they have not demonstrated in what way the raw data is necessary for this Court's review of the outlier threshold determination." *Dist. Hosp. Partners*, 2013 WL 5273929, at *7. Consequently, the court did not require "the Secretary to supplement the . . . administrative record with" the specific data plaintiffs sought. *Id.* Fairholme's motion suffers the same defect here: it is devoid of any showing regarding how supplementing the record with the requested underlying data will further this Court's review of FHFA's decision. Thus, supplementing the Document Compilation with the requested data is unwarranted and inappropriate.

**VII.    Fairholme Is Not Entitled to Take Discovery Regarding the Completeness of the Document Compilation.**

Discovery beyond the administrative record is an extraordinary remedy that is only available where the party requesting discovery has made a "'strong showing of bad faith or improper behavior' or when the record is so bare that it prevents effective judicial review." *Commercial Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971); *see also Friends of the Earth v. U.S. Dep't of Interior*, 236 F.R.D. 39, 42 (D.D.C. 2006) (Lamberth, J.).  Though Fairholme demands "limited discovery into the completeness of the record," (Discovery Motion, 20), Fairholme makes no effort to make the showing necessary to secure the extra-record evidence sought.  Fairholme merely asserts that it is entitled to discovery into the completeness of FHFA's Document Compilation on the same grounds that it is entitled to supplementation. *See id.*  This is insufficient; the identification of broad categories of documents that Fairholme speculates *may* be in the possession of the FHFA Defendants does not amount to the "substantial showing" necessary to obtain discovery.  *See Amfac Resorts, L.L.C. v. U.S. Dept. of the Interior*, 143 F. Supp. 2d 7, 13-14 (D.D.C. 2001) (noting that "the mere fact that certain information is not in the record does not alone suggest the record is incomplete" because "large categories of information are routinely excluded from the record").

Moreover, even in those rare circumstances in which discovery into the completeness of the record is permitted, there must first be a showing that the agency has omitted from the administrative record materials that it should have included.  For instance, in *NRDC v. Train*, the court concluded that the agency improperly omitted specific documents from the record, and determined "the plaintiffs [were] entitled to an opportunity to determine, by limited discovery, whether any other documents which are properly part of the administrative record have been

33

withheld." 519 F.2d 287, 291-92 (D.C. Cir. 1975).  The court reached a similar result in

*National Wilderness Institute v. U.S. Army Corps of Engineers*, No. 01-0273, 2002 WL

34724414 (D.D.C. Oct. 9, 2002).  There, the court determined that certain expert reports were

improperly excluded from the administrative record, and it therefore concluded "[i]t [was] clear

that the completeness of the administrative record [was] at issue" in the action; therefore, it

"permit[ted] discovery to ensure that the complete record [was] before the Court."  *Id.* at *5.

Here, by contrast, Fairholme has not overcome the presumption that FHFA's Document

Compilation is complete, or shown that any of the three unusual circumstances that justify

supplementation are present.[15]  Unlike *Dopico v. Goldschmidt*, this is not a case "where there is a

strong suggestion that the record before the Court [is] not complete."  687 F.2d 644, 654 (D.C.

Cir. 1982).  Despite Fairholme's vague allegations, no documents that are "fundamental" to

FHFA's decision to enter into the Third Amendment are "conspicuously absent" from the

administrative record.  *See id.*  Absent concrete evidence indicating that FHFA excluded a

document that it considered in its decision but omitted from the record, there is no basis to grant

Fairholme's request to take discovery into the completeness of the Document Compilation.

Indeed, Fairholme's arguments largely concern what Fairholme believes FHFA *should*

*have* considered in connection with its decision to execute the Third Amendment.  *See* Discovery

Motion, 26.  This is insufficient and amounts to an inappropriate and prohibited challenge to the

merits of FHFA's decision to enter the Third Amendment.  For example, in *Midcoast*

*Fisherman's Association v. Gutierrez*, the plaintiff sought supplementation of the record with

additional data it thought the agency should have considered in coming to its decision.

---

[15]    As stated above, the FHFA Defendants were not required to create or maintain an
administrative record relating to the execution of the Third Amendment because FHFA took that
action expressly in its capacity as Conservator.  *See supra* at 28.

592 F. Supp. 2d 40, 42 (D.D.C. 2008).  Plaintiffs argued "that it is impossible that the agency only considered the documents in the record because those documents only cover a two year period, and [the] issue had existed since 1998."  *Id.* at 44.  The Court denied the motion.  "Rather than present concrete evidence that demonstrates that the agency did in fact rely on that data, the plaintiffs basically make a merits argument in a discovery motion:  that the agency's failure to review data for the period prior to the 2006 Framework Adjustment would be arbitrary and capricious."  *Id.*  So too here.  Fairholme's arguments that FHFA should have considered various issues not reflected in FHFA's Document Compilation is a premature argument as to the merits of its arbitrary and capricious claim, and does not support Fairholme's request for discovery.

## VIII.   The Court of Federal Claims' Recent Discovery Order Does Not Compel Discovery Here.

Currently pending in the U.S. Court of Federal Claims (the "CFC") is another series of lawsuits concerning the Third Amendment, including one initiated by Fairholme.  *See, e.g.*, *Fairholme Funds, Inc. v. United States,* No. 1:13cv465 (Ct. Fed. Cl.).  Each of those actions present Takings claims seeking just compensation for the alleged taking of the plaintiffs' property as a result of the Third Amendment.

On December 20, 2013, Fairholme filed a motion for leave to take discovery it contended was necessary to enable it to respond to the United States' pending motion to dismiss.  Doc. # 22 (1:13cv465 (Ct. Fed. Cl.)).  The United States opposed the discovery motion.  Doc. # 30 (1:13cv465 (Ct. Fed. Cl.)).  On February 26, 2014, the CFC granted Fairholme's discovery motion, ordering the parties to file a joint status report proposing a discovery schedule by March 20, 2014.  Doc. # 32 (1:13cv465 (Ct. Fed. Cl.)).

The CFC discovery order is irrelevant to the instant motion because it does not address the discovery sought by Fairholme in this case and concerned jurisdictional issues particular to

the CFC itself.  In the CFC, Fairholme sought—and the court permitted—discovery in connection with three issues:  (1) whether Fairholme's Takings claims are ripe in relation to the future profitability of the Enterprises, (2) whether FHFA is the United States for purposes of the CFC's Tucker Act jurisdiction, and (3) the effect of the GSEs' solvency (or lack thereof) on the reasonableness of investment-backed expectations about their future profitability.  *See id*. at 1.  Here, Fairholme has not sought discovery into *any* of these issues.  Rather, Fairholme in these cases seeks discovery only in connection with its APA claim—i.e., the sufficiency of the FHFA Defendants' Document Compilation and Treasury's administrative record (Discovery Motion, 14-29)—and its breach of fiduciary duty claim—i.e., the purportedly "disputed question of why the FHFA entered into the Third Amendment."  *Id*. at 31.  Neither claim is presented in any of the CFC actions, and none of Fairholme's associated discovery requests here are addressed by the CFC discovery order.

Moreover, in the CFC cases, the United States did not move to dismiss the takings claims based on Section 4617(f).  *See* Doc. # 20 (1:13cv465 (Ct. Fed. Cl.)).  Here, by contrast, the FHFA Defendants and the Enterprises have moved to dismiss Plaintiffs' APA and breach of fiduciary duty claims—which seek extensive equitable and declaratory relief, including vacating and setting aside the Third Amendment—on the ground that they are barred by Section 4617(f) as numerous courts have found.  As explained above, the Conservator's motive and intent behind the Third Amendment is irrelevant as a matter of law, and thus discovery into these issues is not warranted.  *None* of these issues in connection with Section 4617(f) are implicated by the United States' motion to dismiss pending in the CFC or addressed by that court's discovery order.

## CONCLUSION

For the foregoing reasons, the FHFA Defendants and the Enterprises respectfully request that the Court deny Fairholme's Discovery Motion and proceed to rule on the FHFA Defendants' and Enterprises' pending Motion to Dismiss.

Dated:  March 4, 2014                              Respectfully submitted,


                                                   /s/ Howard N. Cayne
                                                   Howard N. Cayne (D.C. Bar # 331306)
                                                   Asim Varma (D.C. Bar # 426364)
                                                   David B. Bergman (D.C. Bar # 435392)
                                                   ARNOLD & PORTER LLP
                                                   555 12th Street, N.W.
                                                   Washington, D.C.  20004
                                                   Telephone: (202) 942-5000
                                                   Facsimile: (202) 942-5999
                                                   Howard.Cayne@aporter.com
                                                   Asim.Varma@aporter.com
                                                   David.Bergman@aporter.com

                                                   *Attorneys for Defendants Federal Housing
                                                   Finance Agency and Director Melvin L.
                                                   Watt*

s/ Michael Joseph Ciatti                           /s/ Paul D. Clement
Michael Joseph Ciatti (D.C. Bar # 467177)          Paul D. Clement (D.C. Bar # 433215)
mciatti@kslaw.com                                  pclement@bancroftpllc.com
Graciela Maria Rodriguez                           BANCROFT PLLC
(D.C. Bar # 438955)                                1919 M Street, N.W., Suite 470
gmrodriguez@kslaw.com                              Washington, D.C.  20036
KING & SPALDING, LLP                               Telephone:  202.234.0090
1700 Pennsylvania Avenue, N.W.                     Facsimile:  202.234.2806
Suite 200
Washington, D.C.  20006                            *Attorney for the Federal National Mortgage
Telephone:  202.626.5508                           Association*
Facsimile:  202.626.3737

*Attorneys for the Federal Home Loan
Mortgage Corporation*

37