# *Exhibit A*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                  )

FAIRHOLME FUNDS, INC., et al.,     )

          )

       *Plaintiffs,*      )

          )

      v.       )     No. 13-cv-1053-RCL

          )

THE FEDERAL HOUSING FINANCE    )

    AGENCY, et al.,      )

          )

       *Defendants.*     )
_____ )

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUPPLEMENTATION OF THE ADMINISTRATIVE RECORDS, FOR LIMITED DISCOVERY, FOR SUSPENSION OF BRIEFING ON DEFENDANTS' DISPOSITIVE MOTIONS, AND FOR A STATUS CONFERENCE

Charles J. Cooper (Bar No. 248070)
Vincent J. Colatriano (Bar No. 429562)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

March 13, 2014

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ii

ARGUMENT ................................................................................................................................1

I.     FAIRHOLME'S MOTION IS NOT BARRED UNDER THE STIPULATED
       BRIEFING SCHEDULE .................................................................................................1

II.    THE COURT SHOULD NOT AWAIT RESOLUTION OF DEFENDANTS'
       JURISDICTIONAL ARGUMENTS BEFORE DECIDING FAIRHOLME'S
       MOTION.........................................................................................................................2

III.   SUPPLEMENTATION OF DEFENDANTS' DOCUMENT SUBMISSIONS IS
       NECESSARY ..................................................................................................................9

IV.   FAIRHOLME IS ENTITLED TO TAKE LIMITED DISCOVERY INTO THE
       COMPLETENESS OF DEFENDANTS' ADMINISTRATIVE RECORD
       SUBMISSIONS ............................................................................................................17

       A.     FHFA's Representation that Its Document Compilation Is Complete
             Contradicts Its Own Prior Statements and Is Implausible on Its Face......................18

       B.     Treasury's Arguments Suggest that It Applied the Wrong Legal Standard
             when Compiling Its Administrative Record. ...........................................................21

V.    FAIRHOLME IS ENTITLED TO DISCOVERY IN ORDER TO RESPOND TO
       DEFENDANTS' CONVERTED MOTION FOR SUMMARY JUDGMENT ON
       THE BREACH OF FIDUCIARY DUTY CLAIM..............................................................22

VI.   THERE IS SUBSTANTIAL OVERLAP BETWEEN THE DISCOVERY
       ALLOWED IN FAIRHOLME'S COURT OF FEDERAL CLAIMS ACTION
       AND THE LIMITED DISCOVERY SOUGHT HERE .......................................................24

CONCLUSION............................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Action for Children's Television v. FCC*, 564 F.2d 458 (D.C. Cir. 1977)......................................12

*Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134 (D.D.C. 2002) ........................................18

*Air Transp. Ass'n v. National Mediation Bd.*,
   No. 10-0804, 2010 WL 8917910 (D.D.C. June 4, 2010)...................................................17, 18

\* *Amfac Resorts, LLC v. Department of Labor*, 143 F. Supp. 2d 7 (D.D.C. 2001)................. *passim*

\* *Banner Health v. Sebelius*, 945 F. Supp. 2d 1 (D.D.C. 2013) ......................................................12

*Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366 (D.D.C. 2007) ........................................12, 17

*California v. Federal Housing Finance Agency*, No. 10-3084 (N.D. Cal. Oct. 28, 2011)............19

*Checkosky v. SEC*, 23 F.3d 452 (D.C. Cir. 1994) .........................................................................12

*Delta Savings Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001)............................................8

*District Hosp. Partners v. Sebelius*,
   No. 11-0116, 2013 WL 5273929 (D.D.C. Sept. 19, 2013)......................................................12

*Dopico v. Goldschmidt*, 687 F.2d 644 (2d Cir. 1982)..................................................................20

*Exxon Corp. v. Department of Energy*, 91 F.R.D. 26 (N.D. Tex. 1981) ......................................21

*First Hartford Corp. Pension Plan & Trust v. United States*,
   194 F.3d 1279 (Fed. Cir. 1999).................................................................................................8

*Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331 (1990) ................................................9

*Friends of the Earth v. Department of the Interior*, 236 F.R.D. 39 (D.D.C. 2006).....................18

*Fund for Animals v. Williams*, 245 F. Supp. 2d 49 (D.D.C. 2003)...............................................19

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191 (D.D.C. 2005)......................................21, 22

*Gaff v. FDIC*, 814 F.2d 311 (6th Cir. 1987) ..................................................................................9

*Greenpeace, U.S.A. v. Mosbacher*,
   No. 88-2158, 1989 WL 15854 (D.D.C. Feb. 15, 1989)....................................................18, 21

*In re Apple iPhone Antitrust Litig.*,
   No. 11-6714, 2013 WL 4425720 (N.D. Cal. Aug. 15, 2013) ....................................................6

*In re Kaplan*, 143 F.3d 807 (3d Cir. 1998) ...................................................................................9

*In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165 (D.D.C. 2007) .....................6

*Int'l Longshoremen's Ass'n v. National Mediation Bd.*,
   No. 04-824, 2006 WL 197461 (D.D.C. Jan. 25, 2006)......................................................17, 18

\* *Kellmer v. Raines*, 674 F.3d 848 (D.C. Cir. 2012) .......................................................................8

*Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81 (D.D.C. 2012)..................................................6

*Loving v. Department of Defense*, 550 F.3d 32 (D.C. Cir. 2008)...............................................14

*Mead Data Central, Inc. v. United States Dep't of Air Force*,
566 F.2d 242 (D.C. Cir. 1977) ................................................................................14

*National Ass'n of Drug Stores v. Department of Health & Human Servs.*,
631 F. Supp. 2d 23 (D.D.C. 2009) ......................................................................16, 17

*National Courier Ass'n v. Board of Governors*, 516 F.2d 1229 (D.C. Cir. 1975) ........................14

*National Res. Def. Council v. Train*, 519 F.2d 287 (D.C. Cir. 1975) ............................................18

*National Wilderness Inst. v. United States Army Corps of Eng'rs*,
No. 01-0273, 2002 WL 34724414 (D.D.C. Oct. 9, 2002) ................................12, 18

*Pacific Shores Subdiv. v. United States Army Corps of Eng'rs*,
448 F. Supp. 2d 1 (D.D.C. 2006) ........................................................................9, 19

*Schaffer v. Universal Rundle Corp.*, 397 F.2d 893 (5th Cir. 1968) ................................................9

*Styrene Info. & Research Ctr. v. Sebelius*, 851 F. Supp. 2d 57 (D.D.C. 2012) ............................10

*Tax Analysts v. IRS*, 117 F.3d 607 (D.C. Cir. 1997) ....................................................................15

*Tenneco v. Department of Energy*, 475 F. Supp. 299 (D. Del. 1979)............................................21

*Todd v. Campbell*, 446 F. Supp. 149 (D.D.C. 1978) ....................................................................12

*United States Airline Pilots Ass'n v. Pension Ben. Guar. Corp.*,
274 F.R.D. 28 (D.D.C. 2011)............................................................................16

*Union Nat'l Bank v. Weaver*, 604 F.2d 543 (7th Cir. 1979) ........................................................15

\* *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219 (D.D.C. 2012)...............6

*WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1 (D.D.C. 2009) ............................................20

## **Statutes and Rules**

5 U.S.C. § 706 ................................................................................................................13, 21

12 U.S.C. § 4617(a)(7)......................................................................................................7

12 U.S.C. § 4617(b) ........................................................................................................8

12 U.S.C. § 4617(b)(2) ....................................................................................................7

12 U.S.C. § 4617(f)....................................................................................................3, 4, 5, 6, 7

FED. R. CIV. P. 56(d) ......................................................................................................1

FED. R. EVID. 201(b) ......................................................................................................6

FED. R. EVID. 502(a) ......................................................................................................16

## **Other**

5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE
§ 1366 (3d ed. 2013) ................................................................................................3

# ARGUMENT

## I. FAIRHOLME'S MOTION IS NOT BARRED UNDER THE STIPULATED BRIEFING SCHEDULE

Lacking (as we discuss below) any meritorious objection to Fairholme's demonstration of why both supplementation of Defendants' document submissions and limited discovery are appropriate, Defendants engage in  a sustained effort to convince the Court that it should not even consider the merits of Fairholme's Motion.  Defendants' first attempt to avoid such scrutiny comes in the form of their complaint that the Motion conflicts with the agreed-upon briefing schedule.  Treas. Opp. 10-11; FHFA Opp. 13.[1]  Notably, no Defendant can point to *any* provision in the scheduling order that precludes the relief Fairholme seeks.  The most they can do is point to a provision that explicitly *preserves* Fairholme's right to seek discovery, and argue that that provision somehow renders Fairholme's decision to seek to invoke that right *at this time* not only premature, but improper.[2]  Defendants' argument is meritless.

The order provides only that the briefing schedule was "without prejudice to the parties' rights to oppose any summary judgment motions under Federal Rule of Civil Procedure 56(d), in whole or in part, on the ground that further factual development is needed."  Order Regarding Briefing Schedule In All Cases at 2 (Doc. 21) (Nov. 18, 2013).  Nothing in this provision waives Fairholme's right, once it received Defendants' facially deficient administrative records and dispositive motions relying on those records and on disputed assertions of fact, from seeking sup-

---

[1] We refer to Fairholme's Opening brief in support of their motion (Doc. 32, Feb. 12, 2014) as "Motion," to the Treasury Defendants' opposition to the Motion (Doc. 33, March 4, 2014) as "Treas. Opp.," and to the FHFA Defendants' opposition to the Motion (Doc. 34, March 4, 2014) as "FHFA Opp."  We also cite to the brief in support of the Treasury Defendants' pending dispositive motion (Doc. 27-1, Jan. 17, 2014) as "Treas. Mot." and to the brief in support of the FHFA Defendants' pending dispositive motion (Doc. 29, Jan. 17, 2014) as "FHFA Mot."

[2] Interestingly, while the Treasury Defendants argue primarily that Fairholme's Motion is premature, elsewhere they complain that it came too late.  *See* Treas. Opp. 28.

plementation of the record and limited discovery *before* filing its response to the motions.

The Treasury Defendants suggest that Fairholme's motion reflects its attempt to get two cracks, instead of one, at an opposition to Defendants' dispositive motions. Treas. Opp. 10. Precisely the opposite is true. It is Defendants, not Fairholme, who apparently believe that it somehow makes sense for Fairholme to file a full opposition to the dispositive motions now, before having access to the record supplementation and the discovery to which it is entitled, and for it to file a second opposition later, after it has had the benefit of such supplementation and discovery. The much more efficient course would be for the Court to address whether Fairholme is indeed entitled to the information needed to respond fully to the numerous arguments Defendants chose to include in their omnibus dispositive motions. Significantly, no Defendant suggests that such a procedure would prejudice them in any way. That fact alone should end the inquiry.[3]

## II. THE COURT SHOULD NOT AWAIT RESOLUTION OF DEFENDANTS' JURISDICTIONAL ARGUMENTS BEFORE DECIDING FAIRHOLME'S MOTION

Defendants next contend that the Court should at least reach their jurisdictional arguments without wading into the issues raised by Fairholme's Motion. *See* Treas. Opp. 11-16; FHFA Opp. 13-15, 17-23, 25-28. Defendants' arguments fail for several independent reasons.

1. To begin with, even assuming that Defendants' jurisdictional arguments are both purely legal and colorable – which they are not – they present no obstacle to the limited relief Fairholme seeks. Defendants have chosen to file omnibus dispositive motions, including requests in the alternative for summary judgment, that assert a wide variety of defenses against

---

[3] Although Fairholme's Motion is not foreclosed by, or inconsistent with, the scheduling order, even if it was, the facts here provide ample good cause for the Court to deviate from that order by addressing and resolving Fairholme's Motion at this time rather than requiring Fairholme to make all of the same points in its opposition to Defendants' dispositive motions.

Fairholme's claims.  It is undisputed, and indisputable, that a central feature of Defendants' motions is their attempt to provide a justification, on the merits, for the Net Worth Sweep.  That justification, in turn, is premised in large part on Defendants' disputed characterization of the Treasury's and FHFA's reasons for implementing a new dividend scheme, *see, e.g.*, Treas. Opp. 3-5; FHFA Opp. 9-12 – a characterization that Fairholme maintains is pretextual.

Where, as here, Defendants have chosen to file omnibus motions that largely depend on Defendants' factual assertions, the Court need not and ought not halt progress in this case to pluck out of the motions discrete legal issues for briefing and resolution in isolation.[4]  Defendants have cited to no decision that would require such an inefficient course of action.  Rather, the Court should defer ruling on such issues until the completion of the requested supplementation of the record and discovery on the disputed factual assertions, so that each entire omnibus motion may be resolved at one time.  At a minimum, if the Court is inclined to decide such legal issues now, it should permit the requested supplementation and discovery to go forward while those issues are briefed and resolved.

2.      Even considered on their own terms, however, Defendants' "threshold" jurisdictional arguments lack merit under settled precedent.  Moreover, despite Defendants' claims to the contrary, their attacks on this Court's jurisdiction clearly depend in large part on Defendants' own characterization of disputed facts as to which Fairholme seeks discovery.

Defendants' primary jurisdictional argument is that Fairholme's claims are barred as a matter of law by Section 4617(f) of the Housing and Economic Recovery Act of 2008 ("HERA"), 12 U.S.C. § 4617(f), which provides that "no court may take any action to restrain or af-

---

[4] *See* 5C CHARLES ALAN WRIGHT, ARTHUR R. MILLER ET AL., FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2013) (court may convert a motion to dismiss where discovery is desirable and conversion is "likely to facilitate the disposition of the action").

fect the exercise of powers or functions of [FHFA] as a conservator . . . ."  *See* FHFA Opp. 17-23, 26-27; Treas. Opp. 12-14.  The FHFA Defendants go so far as to say that Section 4617(f) presents a "facial" challenge to this Court's jurisdiction, FHFA Opp. 26-27, and precludes any inquiry into whether Defendants implemented the Net Worth Sweep solely for the plainly unlawful purpose of expropriating hundreds of billions of dollars of Fannie Mae's and Freddie Mac's positive net worth, as well as every penny of the Companies' future net earnings.  *Id.* at 17-23.

The breathtaking scope of the immunity that Defendants claim under Section 4617(f) can be squared with neither the law nor the theory underlying Defendants' dispositive motions.  As we've discussed, Motion 34-35, Defendants *concede* that section 4617(f) does not bar relief when the FHFA is acting clearly in excess of its statutory powers.  *See* FHFA Mot. 21; Treas. Mot. 23.  In keeping with this concession, Defendants attempt at great length, both in their dispositive motions and their oppositions to the Motion, to justify the Net Worth Sweep as necessary to conserve Treasury's financial commitment to Fannie and Freddie by eliminating the so-called "death spiral" caused by the Companies' "circular" process of drawing funds from Treasury in order to pay 10% cash dividends to Treasury.  *See* FHFA Mot. 22-26; Treas. Mot. 24.

Thus, the FHFA Defendants asserted, *in connection with their Section 4617(f) argument,* the following *factual* justifications for the Net Worth Sweep: (1) by executing the Net Worth Sweep, FHFA "preserved and effectively extended the finite Treasury funds that can be drawn by the Enterprises, which was essential to ensuring the safety and soundness of the Enterprises and well within the core functions of the Conservator," FHFA Mot. 22-23; (2) at the time the Net Worth Sweep was instituted, the existing dividend regime "raised concerns in the marketplace over the adequacy of the remaining Treasury funds," *id.* at 24; (3) the FHFA as conservator entered into the Net Worth Sweep "with the specific purpose of arresting this erosion of Treasury's

4

commitment, as well as public confidence," *id.* at 25; (4) the Net Worth Sweep "successfully re-solved a very real problem – drawing funds from Treasury to pay the 10% dividend to Treasury – that threatened to drain the Treasury commitment and disrupt the housing market that FHFA is charged to protect," *id.* at 26; and (5) by executing the Net Worth Sweep, FHFA "agreed to transfer an Enterprise asset – potential future profits – to Treasury in exchange for relief from an obligation – 10% dividends – in order to minimize the possibility that the Enterprises would ex-haust the Treasury commitment and thereby maximize the possibility that the Enterprises would survive and avoid receivership," *id.* at 27. Similarly, the Treasury Defendants contended, *in connection with their Section 4617(f) argument*, that the Net Worth Sweep was within FHFA's statutory powers because it supposedly "ended the need for the [Enterprises] to draw funds from Treasury to pay dividends to Treasury, and materially reduced the risk that the [Enterprises] would be insolvent in the future." Treas. Mot. 24. *See also id.* at 28-29.

Even in their oppositions to the Motion, in which they contend that such factual issues are irrelevant to the jurisdictional inquiry and to Fairholme's entitlement to discovery, Defendants nonetheless double down on their reliance on these factual assertions for purposes of their Sec-tion 4617(f) argument. *See, e.g.*, Treas. Opp. 2-5; FHFA Opp. 7-12, 23 n.12. Indeed, the FHFA Defendants argue that the Court can resolve this jurisdictional argument "based on" their charac-terization of the facts regarding the need for and purpose of the Net Worth Sweep. FHFA Opp. 17. Contrary to the FHFA Defendants' suggestion, *id.*, the "facts" relating to the need for and purpose of the Net Worth Sweep are not "undisputed." Fairholme maintains, for example, that it was obvious when the Net Worth Sweep was announced that the Companies would be able to pay dividends under the prior arrangement for the foreseeable future and that Defendants' im-plausible claims to the contrary were a pretext for seizing the hundreds of billions of dollars the

Companies would soon generate. *See* Motion 8-11; Fairholme Compl. ¶¶ 56-59.

Nor can the FHFA Defendants excuse their reliance on their version of such disputed "facts" by claiming that they are based on documents of which the Court may take judicial notice. *See* FHFA Opp. 16-17. They ask the Court to take judicial notice not of the fact that certain documents make certain statements regarding the need for and purposes of the Net Worth Sweep, but rather of *the truth* of such statements. When such statements go to the heart of disputed questions of fact, judicial notice is not proper.[5]

In short, Defendants' own arguments under Section 4617(f) plainly put at issue disputed factual questions going to the justification for the Net Worth Sweep – the perceived problems that the Net Worth Sweep was designed to address, other alternatives that could address such supposed needs and problems, and FHFA's and Treasury's asserted purposes in implementing the Net Worth Sweep. These factual questions indisputably go to the substantive merits of Fairholme's challenges to the Net Worth Sweep and are questions on which Fairholme is entitled to discovery. And it is clear on the face of Defendants' own filings in this Court that the jurisdictional issues are inextricably intertwined with the merits of the cause of action. *See* Motion 35 (citing cases). "[W]here the jurisdictional question is closely intertwined with the merits of the case, the D.C. Circuit has instructed that it is appropriate for a court to allow discovery to proceed, and to consider the issue of subject matter jurisdiction on a motion for summary judgment thereafter." *Unite Here Local 25 v. Madison Ownership, LLC*, 850 F. Supp. 2d 219 (D.D.C. 2012) (citing *Herbert v. National Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992)).

---

[5] *See Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 93 n.5 (D.D.C. 2012); *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007); *In re Apple iPhone Antitrust Litig.*, No. 11-6714, 2013 WL 4425720, at *9 (N.D. Cal. Aug. 15, 2013). *Cf.* FED. R. EVID. 201(b) (court "may judicially notice a fact that is not subject to reasonable dispute.").

The FHFA Defendants also argue at length that whether FHFA had an "ulterior" motive in implementing the Net Worth Sweep, in addition to its alleged desire to avoid the "circularity" problem arising under the previous dividend regime, is irrelevant to the Section 4617(f) inquiry. FHFA Opp. 17-23.  But even leaving aside that, as discussed, the FHFA Defendants' jurisdictional arguments themselves put at issue FHFA's purposes in implementing the Net Worth Sweep, the FHFA Defendants misapprehend the nature of Fairholme's claims.  Fairholme does not contend simply that FHFA acted with an "ulterior motive" or "improper purpose" in taking action that was otherwise within its statutory powers as conservator (although the facts amply support such a contention), but rather that the Net Worth Sweep was clearly outside FHFA's statutory powers.  Whether FHFA was acting as a "conservator" or outside of its statutory mandate is, all agree, at the core of the Section 4617(f) jurisdictional inquiry.  Fairholme has alleged that by sweeping Fannie's and Freddie's entire net worth into Treasury without securing any corresponding benefit to the Enterprises, the Net Worth Sweep was directly contrary to FHFA's statutory duties, under 12 U.S.C. § 4617(b)(2), to take actions "necessary to put the regulated entit[ies] in sound and solvent condition" and to "preserve and conserve the[ir] assets and property."  *See* Fairholme Compl. ¶ 89.  Fairholme has also alleged that because the Net Worth Sweep was explicitly designed to further FHFA's plan to wind down Fannie and Freddie, a power that HERA reserves to a receiver and not a conservator, it exceeded FHFA's powers as conservator.  *See id.* ¶ 87.  And Fairholme has alleged that FHFA violated HERA by acting as conservator at the direction of Treasury in implementing the Net Worth Sweep.  *See id.* ¶ 92.  *Cf.* 12 U.S.C. § 4617(a)(7) (FHFA as conservator "shall not be subject to the direction or supervision of any other agency of the United States").

Fairholme's contentions that the Net Worth Sweep clearly exceeds FHFA's statutory

conservatorship powers themselves raise disputed factual questions regarding the circumstances underlying FHFA's actions.  At a minimum, those contentions provide a more than colorable basis for this Court's jurisdiction notwithstanding HERA's bar on judicial review and thus further underscore that that Court need not delay the limited supplementation and discovery Fairholme seeks in light of Defendants' challenges to jurisdiction.

      3.      Defendants argue that this action is also barred by Section 4617(b) of HERA, 12 U.S.C. § 4617(b), which they say "bars suits brought by shareholders for the duration of the conservatorship."  Treas. Opp. 14.  *See also* FHFA Opp. 25.  Section 4617(b) presents no impediment to this Court's jurisdiction, as the law is settled that shareholder suits are allowed where the conservator labors under a manifest conflict of interest.[6]  Indeed, the very decision cited by Defendants acknowledges the applicability of such a common-sense conflict of interest exception under HERA.  *See Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012) ("[A]bsent a manifest conflict of interest by the conservator not at issue here, the statutory language bars shareholder derivative actions.").  Defendants have not cited to any authority holding that under HERA, the appointment of a conservator bars suits by shareholders even when the conservator has a manifest conflict of interest.  There can be no serious question that FHFA labors under a direct conflict of interest in this case, which challenges an arrangement in which one arm of the federal government, FHFA, acting together with another closely related arm of the federal government, Treasury, set up a regime under which FHFA as conservator for the Enterprises forever transferred to Treasury the Enterprises' entire net worth, amounting to hundreds of billions of dollars.  If the term "manifest conflict of interest" has any meaning at all, it describes the facts here.

---

[6] *See, e.g.*, *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1283, 1295-96 (Fed. Cir. 1999) (interpreting analogous statute governing FDIC as conservator/receiver); *Delta Savings Bank v. United States*, 265 F.3d 1017, 1021-24 (9th Cir. 2001).

4.      Finally, the Treasury Defendants similarly claim that Fairholme lacks prudential standing under the so-called "shareholder standing" rule.  Treas. Opp. 15-16.  But they cite to no authority which holds or suggests that such a rule has any application in the context of a claim under the Administrative Procedures Act ("APA").  Even leaving that point aside, the shareholder standing rule does not foreclose "a shareholder with a direct, personal interest in a cause of action [from bringing] suit even if the corporation's rights are also implicated."  *Franchise Tax Bd. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990).[7]  Because Fairholme has asserted direct claims for breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing, this exception to the shareholder standing rule applies here.

## III.   SUPPLEMENTATION OF DEFENDANTS' DOCUMENT SUBMISSIONS IS NECESSARY

Supplementation of the administrative record is necessary because Defendants' submissions do not contain all documents and materials that Defendants directly or indirectly considered.  Contrary to Defendants' assertions, Fairholme has made the showing necessary to overcome "the standard presumption" that Treasury " 'properly designated the Administrative Record,' " *Amfac Resorts, LCC v. Dep't of Labor*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)) – a presumption that, as discussed below, does not even apply to FHFA in light of its concession that it did not create an administrative record in the first place.

A properly designated administrative record must include "all documents and materials that the agency directly or indirectly considered."  *Pacific Shores Subdiv. v. United States Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 4 (D.D.C. 2006) (internal quotation marks omitted).  If an

---

[7] *See also In re Kaplan*, 143 F.3d 807, 812 (3d Cir. 1998); *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir. 1987); *Schaffer v. Universal Rundle Corp.*, 397 F.2d 893, 896 (5th Cir. 1968).

agency's final decision was based "on the work and recommendations of subordinates, those materials should be included as well." *Amfac Resorts,* 143 F. Supp. 2d at 12; *see also Styrene Info. & Research Ctr. v. Sebelius*, 851 F. Supp. 2d 57, 61-65 (D.D.C. 2012).  Defendants do not dispute these fundamental propositions of administrative law, but neither do they offer any explanation for their decision to selectively withhold materials that the rest of the record makes clear were at least indirectly considered.  The Court should accordingly order Defendants to supplement the record with the materials Fairholme has identified, including the following:

**Financial Projections and Associated Records.**  The cornerstone of Defendants' defense of the Net Worth Sweep is their projections of Fannie's and Freddie's financial performance, projections that underestimated the Companies' net income by more than *$100 billion* over an 18 month period.  *See* Treas. MTD 16-18, 24-25, 49-55; FHFA MTD 15-16, 23-26, 64-70.  But despite their heavy reliance on those facially flawed, and wildly inaccurate, projections, Defendants insist that they are entitled to withhold the most basic facts about the assumptions underlying the projections and how they should be interpreted.  Do Defendants' projections account for the tens of billions of dollars of deferred tax assets, loan loss reserve releases, and settlement proceeds that began to appear on the Companies' balance sheets within months of the Net Worth Sweep?  Do they reflect the fact that the Companies had the contractual option to pay the Government dividends "in kind" (additional senior preferred stock) rather than in cash?  Did Defendants consult with outside advisors for independent financial analysis?  Was there any effort to correct for errors in FHFA's wildly pessimistic October 2010 and 2011 projections, on which Treasury's subsequent projections purport to rely?  *See* T3837, T3843.[8]  It is not hard to

---

[8] Cited excerpts to Defendants' administrative record submissions that were not originally attached to Fairholme's Motion are appended hereto as Exhibit 1.

infer the answers to those questions given that events would quickly prove that the projections dramatically undervalued the Companies.  But there is no reason for the Court to guess; this Court is entitled to know what the Defendants' knew and considered in imposing the Net Worth Sweep, and Fairholme is entitled to an administrative record that allows it to understand the basis for Defendants' conclusion that the Companies could not afford to pay the required dividends without a radical change to the Preferred Stock Purchase Agreements ("PSPAs") that expropriated the entire value of private shareholders' investments.

The Treasury Defendants first resist their obligation to disclose those fundamental materials by claiming that they "were already incorporated in the material contained within the administrative record."  Treas. Opp. 18.  Not so.  As Fairholme has explained, Treasury's administrative record selectively reveals the *results* of *some* financial projections while withholding others and providing almost no information about how those results were reached.  Motion 17-18.  At an absolute minimum, Defendants must disclose the Grant Thornton analysis and the "scenarios developed by Treasury staff," which are specifically cited in the administrative record as used to generate the forecasts on which Defendants so heavily rely.  *See* T3786, T3887, T3894.

Nor is there any merit in Treasury's claim, unsupported by citation to any case, that "[u]nder the governing case law, the administrative record . . . includes the *most critical* data the agency used in the disputed actions, and nothing more is needed."  Treas. Opp. 19 (emphasis added).  To the contrary, "a complete administrative record should include *all* materials that might have influenced the agency's decision," *Amfac Resorts*, 143 F. Supp. 2d at 12 (emphasis added) (internal quotation marks omitted), not merely those the agency later deems "most critical."  And far from being "disconnected from any practical reality," Treas. Opp. 19, materials such as the analyses, models, and data at issue here are routinely disclosed by administrative

agencies in APA cases.

Defendants try to change the subject by citing cases in which this Court has denied APA plaintiffs' motions to supplement the record with "raw data." Treas. Opp. 19-20; FHFA Opp. 31-32. This is a red herring. Unlike the plaintiffs in the cases Defendants cite, Fairholme is not requesting "raw data" that may or may not exist out of a "bare desire to replicate each calculation" the Defendants made. *District Hosp. Partners v. Sebelius*, No. 11-0116, 2013 WL 5273929, at *6 (D.D.C. Sept. 19, 2013); *see Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 371 (D.D.C. 2007). Rather, Fairholme is seeking what the plaintiffs in those cases already had: "detail sufficient to alert" the Court to "the nature of the judgment" the Defendants made. *Todd v. Campbell*, 446 F. Supp. 149, 152 (D.D.C. 1978).[9]

And lest the Defendants' briefing give the misimpression that supplementation of the record with *data* is somehow specially disfavored, it bears emphasis that "data files and data analysis . . . are necessarily subject to the same standards governing supplementation of the administrative record as reports, draft rules, or any other item of information." *Banner Health v. Sebelius*, 945 F. Supp. 2d 1, 27 (D.D.C. 2013). Where, as here, models or data would reveal the basic assumptions that underlie a challenged administrative decision, this Court has not hesitated to supplement the record. *Id.* at 33 (ordering supplementation with Excel files plaintiffs needed to make sense of apparent "discrepancies" in the administrative record); *National Wilderness Inst. v. United States Army Corps of Eng'rs*, No. 01-0273, 2002 WL 34724414, at *5 (D.D.C. Oct. 9, 2002) (ordering record supplemented with fish population data).

---

[9] The Treasury Defendants cite two cases that are irrelevant. *Action for Children's Television v. FCC*, 564 F.2d 458, 477 (D.C. Cir. 1977), explains when an agency must disclose its *ex parte* communications, and *Checkosky v. SEC*, 23 F.3d 452, 489 (D.C. Cir. 1994), describes the scope of the deliberative process privilege. Neither concerns the extent to which an agency must include in the administrative record materials on which it directly or indirectly relied.

To illustrate its need for additional information about the projections and their discrepancies, Fairholme observed that the administrative record is *silent* as to why projections for the Companies' annual income for 2015 and beyond declined by approximately 50 percent between the June 2012 and July 2012 projections.  *See* Motion 18 (citing T3847 and T3889).  Attempting to explain the shift between June and July, the Treasury Defendants suggest that the June projections made more optimistic assumptions about the Companies' guarantee fee revenues and the rate at which they would reduce their retained investment portfolios.  Treas. Opp. 21.  But the only citation they can muster in support of this theory is to a slide in the June presentation that says nothing about guarantee fees and that observes that the Companies were contractually required under the original PSPAs to reduce their investment portfolios by a minimum of 10 percent per year.[10]  *See* T3841.  Nothing in the record, therefore, substantiates the Treasury Defendants' representations about the June projections.

Also unavailing is the Treasury Defendants' claim that the sudden change in the *post-2014* outlook is somehow explained by the June projection's reliance on numbers from an October 2011 FHFA projection that only ran to the end of 2014.  *See* T1900, T3837.  And despite the Treasury Defendants' nonsensical argument to the contrary, the decision about whether to use fiscal or calendar years cannot explain an approximate 50 percent decline in income for every year starting in 2015.  The Treasury Defendants' halfhearted attempts to reconcile the June and July projections only further underscore the fact that they have not satisfied their obligation to submit "the whole record" for judicial review.  5 U.S.C. § 706.

---

[10] One might have thought that all of Treasury's projections would assume that, absent the Third Amendment to the PSPAs, the Companies would reduce their investment portfolios at the contractually required rate of 10 percent per year.  But in fact Treasury's July 2012 projections assume a 15 percent reduction.  *See* T3887.  Despite Treasury's suggestion to the contrary, the June 2012 presentation now in the record does not say what rate of reduction was assumed.

**Freddie Projections after June 2012.**  In its motion, Fairholme observed that the record includes two series of financial projections from July and August 2012 for Fannie Mae for which no corresponding Freddie Mac projections were disclosed.  Motion 18.  In response, the Treasury Defendants reiterate their representation that *they* did not create any Freddie Mac projections after June 2012, Treas. Opp. 22, but the FHFA Defendants are conspicuously silent.  It hardly seems likely that Freddie's conservator made no quantitative attempt to assess the Company's prospects during the critical eight weeks before it decided that the outlook was so grim that *de facto* nationalization and receivership of the Company was the only available alternative.  To the extent that any such Freddie projections exist, FHFA must disclose them.  We note that this issue is particularly important because the last set of projections for Freddie currently in the record show that Freddie would still have between $102.6 and $137.1 billion of remaining Treasury funding available in 2023.  T3849-50.

**Factual Portions of Department of Justice Records.**  Fairholme argued that Treasury's record should have included the factual portions of a Department of Justice ("DOJ") memo and other DOJ communications that Secretary Geithner admittedly relied upon when he approved the Net Worth Sweep.  Motion 18-19.  In their opposition, the Treasury Defendants make no attempt to explain why the factual contents of these communications are covered by the deliberative process privilege, and for good reason: that privilege cannot be used as a basis for withholding purely factual information.  *Loving v. Department of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008).[11]

The Treasury Defendants instead rest their argument for withholding these documents in

---

[11] *See also Mead Data Cent., Inc. v. United States Dep't of Air Force*, 566 F.2d 242, 255 n.28 (D.C. Cir. 1977) (factual portions of documents otherwise covered by deliberative process privilege must be disclosed); *National Courier Ass'n v. Board of Governors*, 516 F.2d 1229, 1242 (D.C. Cir. 1975) ("Purely factual material is, after all, not deliberative, and the agency has no good reason to withhold it.").

their entirety on the attorney-client privilege, contending that the record does not reveal enough about Treasury's communications with DOJ to effect a subject matter waiver of the privilege. Treas. Opp. 23.  As an initial matter, Treasury's claim that the record's "recitation of the conclusions reached by the Department of Justice *apart from* the specific legal advice sought does not constitute a waiver" raises grave doubts that these communications are fully covered by the attorney-client privilege.  *Id.*  If, as the Treasury Defendants intimate, DOJ was not giving legal advice when it told Treasury that the Net Worth Sweep was "fiscally prudent and in the best interest of the United States," T4332, then DOJ's analysis of that issue is not covered by the privilege and must be disclosed.  *See Tax Analysts v. IRS*, 117 F.3d 607, 619-20 (D.C. Cir. 1997).

More fundamentally, the Treasury Defendants are wrong when they assert that the memo Secretary Geithner signed to approve the Net Worth Sweep does not "convey[ ] the particular issues on which legal advice was sought or the specific legal advice provided."  Treas. Opp. 23. To the contrary, it is apparent that Treasury consulted DOJ "[b]ecause [the Third Amendment] relates to vested contract rights of the government," T4332, thus implicating the rule that governmental officials may not "modify existing contracts . . . or . . . waive contract rights vested in the government" absent "a compensatory benefit to the United States," Dep't of Airforce-Sewage Util. Contracts, B-189395, 1978 WL 9944, at *2 (Comp. Gen. Apr. 27, 1978); *see Union Nat'l Bank v. Weaver*, 604 F.2d 543, 545 (7th Cir. 1979).  After examining the impact that the Net Worth Sweep would have on government receipts, "[t]he Justice Department approved Treasury's request for authority to modify its dividend rights" because it "agreed that the proposed modification is fiscally prudent and in the best interest of the United States."  T4332.  In short, Treasury has already disclosed *both* the subject of its request for legal advice *and* the content of the advice it received.  It is difficult to imagine a clearer example of waiver.

Under Federal Rule of Evidence 502(a), when a litigant intentionally discloses privileged material, other documents concerning the same subject matter must also be disclosed if "in fairness" they "ought . . . to be considered together."  That is manifestly the case here.  By revealing that "[t]he Justice Department agreed that the proposed modification is fiscally prudent and in the best interest of the United States," T4332, Treasury seeks to bolster its contention that the Net Worth Sweep "accomplished the goals of maintaining the solvency of the [Enterprises] while also protecting the interests of taxpayers," Treas. Mot. 54.  Fairholme will be prejudiced if Treasury is allowed to rely on DOJ's conclusion while withholding the facts and analysis on which that conclusion was based.[12]  At a minimum, the Court should examine *in camera* the DOJ memo and related documents to determine the bona fides of the Treasury Defendants' claim of attorney-client privilege.

**Privilege Log.**  The FHFA Defendants did not respond to Fairholme's argument that it is entitled to a privilege log, and have thus forfeited any argument that they need not provide one. For their part, the Treasury Defendants object to Fairholme's request for a privilege log on the ground that "[p]rivileged materials 'are not a part of the administrative record.' "  Treas. Opp. 24 (quoting *Blue Ocean*, 503 F. Supp. 2d at 372).  But the cases they cite say only that materials covered by the *deliberative process privilege* are not part of the record—a rule that arguably follows from the fact that an agency's predecisional deliberations are not normally relevant in APA cases.  *See National Ass'n of Drug Stores v. Department of Health & Human Servs.*, 631 F.

---

[12] *See United States Airline Pilots Ass'n v. Pension Benefit Guar. Corp.*, 274 F.R.D. 28, 32 (D.D.C. 2011) ("[S]ubject-matter waiver is appropriate as a matter of fairness where 'the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials.' " (quoting 8 Charles A. Wright et al., Fed. Practice & Procedure § 2016.2 (3d ed., 2010 update))).

Supp. 2d 23, 27-28 (D.D.C. 2009); *Blue Ocean*, 503 F. Supp. 2d at 371.  Not surprisingly given the rationale employed in those decisions, this Court has never extended that rule to other privileges.[13] At an absolute minimum, Fairholme is entitled to privilege logs identifying materials Defendants withheld on grounds other than the deliberative process privilege.

In any event, it is well within this Court's discretion to order Defendants to also log materials withheld on the basis of the deliberative process privilege, and Fairholme submits that it would be appropriate to do so under the unusual circumstances presented here.  Neither set of Defendants disclosed a single document that was partially redacted on deliberative process grounds.  Given the conspicuous, and suspicious, paucity of nonpublic materials Defendants included in their records, the only reasonable inference is that they made little or no effort to release redacted versions of materials partially covered by any claim of privilege.

## IV. FAIRHOLME IS ENTITLED TO TAKE LIMITED DISCOVERY INTO THE COMPLETENESS OF DEFENDANTS' ADMINISTRATIVE RECORD SUBMISSIONS

The standard for allowing an APA plaintiff to take discovery into the completeness of the administrative record is well-settled: when the plaintiff is able to make "a significant showing— variously described as a 'strong,' 'substantial,' or 'prima facie' showing—that it will find material in the agency's possession indicative of . . . an incomplete record."  *Amfac Resorts*, 143 F. Supp. 2d at 12 (citation omitted).[14]  Defendants rely on decisions in which this Court has said

---

[13] Tellingly, the Treasury Defendants' current position goes well beyond the position taken by the DOJ in prior litigation.  *See* Memo from Ronald J. Tenpas, Assistant Attorney General, Guidance to Federal Agencies on Compiling the Administrative Record (Dec. 23, 2008) (attached as Exhibit 2) ("The Department of Justice has defended in litigation the legal position that *deliberative documents* are not generally required in an administrative record, and thus has also defended the position that in such circumstances no privilege log reflecting such documents would need to be prepared." (emphasis added)).

[14] *See also Air Transp. Ass'n v. National Mediation Bd.*, No. 10-0804, 2010 WL

that discovery into an agency's *decisionmaking process* "is normally unavailable in an APA case, 'except when there has been a strong showing of bad faith or improper behavior or when the record is so bare that it prevents effective judicial review.' " *Friends of the Earth v. Department of the Interior*, 236 F.R.D. 39, 42 (D.D.C. 2006) (quoting *Commercial Drapery Contractors v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998)); *see* Treas. Opp. 24-25; FHFA Opp. 33. Yet Fairholme has been careful not to seek discovery into Defendants' decisionmaking process. Rather, Fairholme seeks discovery into the completeness of the record—limited discovery to which a more permissive legal standard applies.

### A.    FHFA's Representation that Its Document Compilation Is Complete Contradicts Its Own Prior Statements and Is Implausible on Its Face.

The FHFA Defendants represent for the first time that "no documents considered by FHFA in connection with the decision to execute the Third Amendment were excluded" from the documents in its "compilation." FHFA Opp. 29. That representation is difficult to square with their prior concession that they "have not . . . created or maintained an administrative record relating to the execution of the Third Amendment." Notice of Filing Document Compilation by [FHFA Defendants] Regarding Third Amendment to Senior Preferred Stock Purchase Agreements (Doc. 24) (filed Dec. 17, 2013) at 2. *See also* FHFA Opp. 28. The FHFA Defendants make no attempt to reconcile their claim that they have already submitted a complete administrative record with their original statement that they did not create or maintain such an administra-

---

8917910, at *2 (D.D.C. June 4, 2010); *Int'l Longshoremen's Ass'n v. National Mediation Bd.*, No. 04-824, 2006 WL 197461, at *3 n.1 (D.D.C. Jan. 25, 2006) ; *see also, e.g.*, *National Res. Def. Council v. Train*, 519 F.2d 287, 291 (D.C. Cir. 1975); *National Wilderness Inst. v. United States Army Corps of Eng'rs*, No. 01-0273, 2002 WL 34724414, at *4-5 (D.D.C. Oct. 9, 2002) ; *Greenpeace, U.S.A. v. Mosbacher*, No. 88-2158, 1989 WL 15854, at *1 (D.D.C. Feb. 15, 1989). *Cf. Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 140 n.5 (D.D.C. 2002) ("Contrary to defendants' contention, a showing of bad faith or improper behavior is not required for a court to supplement the record.").

tive record.  The FHFA Defendants' self-contradictory position underscores Fairholme's need

for discovery and is more than enough to defeat "the presumption of administrative regularity"

on which it relies.  *Pacific Shores*, 448 F. Supp. 2d at 6; *see Fund for Animals v. Williams*, 245 F.

Supp. 2d 49, 57 (D.D.C. 2003) ("The 'presumption of administrative regularity' is just that—a

presumption—and may be overcome.").[15]

Moreover, the FHFA Defendants' representation that their document compilation consti-

tutes a complete administrative record is implausible on its face.  It simply cannot be that FHFA

agreed to a *de facto* nationalization of the two most significant companies it regulates and was

purportedly "conserving" without a document or email memorializing its decision.  Nor is it to

be believed that the agency chose to take such a momentous step after referencing a total of *43

pages* of nonpublic materials, none of which record FHFA's independent assessment of the

Companies' financial prospects or how the Net Worth Sweep was expected to affect government

revenue.  Also implausible is FHFA's apparent contention that it made no effort to verify state-

ments in the Companies' SEC filings suggesting that they were unlikely to earn enough to pay

the government dividends under the prior arrangement.[16]  And while Defendants are no doubt

correct that their failure to consider factors that had a major impact on the Companies' financial

health, such as the likely (if not certain) reversal of prior writedowns of deferred tax assets and

the release of loan loss reserves, could provide a basis for holding their decision arbitrary and

---

[15] We note that the FHFA Defendants do not disavow their argument, made in prior liti-
gation and discussed in Fairholme's motion, *see* Motion 21, that "[d]iscovery is especially ap-
propriate . . . where FHFA did not compile a formal administrative record in real time because it
did not believe it was required to utilize APA procedures."  FHFA Consent to Request for Man-
agement Conference, *California v. FHFA*, No. 10-3084, at 7 (N.D. Cal. Oct. 28, 2011) (Doc.
139).  Indeed, the FHFA Defendants do not respond to this point at all.

[16] *See* FHFA Office of Inspector General, FHFA's Certifications for the Preferred Stock
Purchase Agreements 10 (Aug. 23, 2012), http://fhfaoig.gov/Content/Files/EVL-2012-006_3.pdf
(observing that "FHFA's review of the Enterprises' SEC filings is a fairly extensive process").

capricious, FHFA Opp. 34-35; Treas. Opp. 27, it is incredible that either agency simply "forgot" about this predictable source of hundreds of billions of dollars in net worth when it decided to impose the Net Worth Sweep.  The conspicuous absence of these and other "fundamental" materials puts this case on all fours with *Dopico v. Goldschmidt*, in which the Second Circuit held that the district court abused its discretion by declining to order discovery into the completeness of the record.  687 F.2d 644, 654 (2d Cir. 1982).

Notably, the FHFA Defendants do not respond to Fairholme's argument that the declaration by Mario Ugoletti contains numerous factual statements that are unsupported by any other document in the record.  Under the circumstances, Fairholme should be accorded an opportunity to take discovery, including a deposition, into the bases for Mr. Ugoletti's declaration.  *See* Motion 24.  More fundamentally, the FHFA Defendants' reliance on Mr. Ugoletti's declaration and other materials that FHFA could not have considered in August 2012 provides yet another reason to doubt their late representation that the Court has before it "all documents and materials that the agency directly or indirectly considered and nothing more nor less."  *WildEarth Guardians v. Salazar*, 670 F. Supp. 2d 1, 4 (D.D.C. 2009) (internal quotation marks and alterations omitted).

Rather than attempting to account for the numerous gaps and irregularities discussed above, the FHFA Defendants criticize Fairholme for not describing the improperly withheld documents with sufficient specificity.  FHFA Opp. 30-31, 33-34.  This argument borders on the perverse.  FHFA's all but total withholding of nonpublic materials makes it impossible for Fairholme to identify specific documents, other than the conspicuously missing documents reflecting FHFA's final approval of the Net Worth Sweep.  *See Amfac Resorts*, 143 F. Supp. 2d at 12 (recognizing that when an agency negligently or intentionally withholds materials from the administrative record "the only way a non-agency party can demonstrate to a court the need for extra-

20

record judicial review is to first obtain discovery from the agency"). And the FHFA Defendants are simply wrong when they argue that an APA plaintiff must identify a specific document that is missing before obtaining discovery into the completeness of the record; all that is required is a "significant showing" that there is "reason to believe that discovery will uncover evidence relevant to the Court's decision to look beyond the record" submitted by Defendants. *Id.*; *see Greenpeace*, 1989 WL 15854, at *1; *Exxon Corp. v. Department of Energy*, 91 F.R.D. 26, 34 (N.D. Tex. 1981); *Tenneco v. Department of Energy*, 475 F. Supp. 299, 318 (D. Del. 1979).

**B.     Treasury's Arguments Suggest that It Applied the Wrong Legal
Standard when Compiling Its Administrative Record.**

The Treasury Defendants' opposition betrays a fundamental misunderstanding of the scope of their duty to disclose the "whole record" for judicial review. 5 U.S.C. § 706. At one point, the Treasury Defendants suggest that they withheld the analyses, models, and data on which their financial projections were based because they do not consider those materials to be among the "most critical" documents that Treasury considered. Treas. Opp. 19. Elsewhere, they suggest that they need not disclose those documents because they are "internal proprietary Treasury material" the results of which are "reflected in the administrative record in Treasury's financial presentations." Treas. Opp. 26. But as previously discussed, a complete administrative record includes *all* of the documents an agency considered, not just those the agency deems to be "most critical." There is no "internal proprietary material" exception to that rule. It is apparent that the Treasury Defendants compiled their administrative record using the wrong legal standard, and that they have information that they plainly should have disclosed but withheld. Chief among the materials that should have been disclosed are the missing analyses, models, and data discussed at length above. Treasury's withholding of such plainly pertinent materials suggests the troubling prospect that Treasury improperly "skew[ed] the record in its favor by excluding

pertinent but unfavorable information." *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005). Treasury's refusal to disclose materials that would allow Fairholme to probe the basic assumptions underlying the financial projections on which it allegedly based the Net Worth Sweep appears to reflect an ad hoc, results-driven approach to compiling the record that makes discovery particularly appropriate. Indeed, Treasury included in its record many hundreds of pages of public SEC filings to which final decisionmakers no doubt gave less attention than to the analyses, models, and data it withheld from the record.

Finally, Treasury's administrative record included an April 2012 Moody's analysis of the Companies' financial prospects but excluded a Grant Thornton analysis prepared at around the same time and on which Treasury's subsequent projections heavily rely. The Treasury Defendants' only answer is to say that the difference between the documents is "obvious" and to characterize the Grant Thornton analysis as "internal proprietary Treasury material." Treas. Opp. 26. The "obvious" difference in these documents escapes us. Indeed, the only thing that is "obvious" is that the Defendants indirectly, at least, relied on the Grant Thornton materials when they decided to impose the Net Worth Sweep. *See* T3786 ("[T]he . . . Grant Thornton analysis [was] used to generate the forecast estimates on the subsequent pages."). With Treasury having improperly withheld so many documents that are readily identifiable, there are very likely additional documents that it should have disclosed. Under these circumstances, limited discovery into the completeness of the Treasury record is appropriate.

## V. FAIRHOLME IS ENTITLED TO DISCOVERY IN ORDER TO RESPOND TO DEFENDANTS' CONVERTED MOTION FOR SUMMARY JUDGMENT ON THE BREACH OF FIDUCIARY DUTY CLAIM

Fairholme has demonstrated that in moving to dismiss its breach of fiduciary duty claim for failure to state a claim, the FHFA Defendants responded to Fairholme's well-pled factual allegations by disputing them on the merits and by mounting a substantive defense of their deci-

sion to implement the Net Worth Sweep.  Motion 29-30.  The FHFA Defendants thus converted

their motion into one for summary judgment, *id.* 28-29, entitling Fairholme to discovery in order

to respond to the FHFA Defendants' motion, *id.* 30-33.

The FHFA Defendants argue that their motion to dismiss the fiduciary duty claim should

not be so converted because it relies on matters either cited or incorporated by reference in the

Complaint or as to which the Court may take judicial notice.  FHFA Opp. 15-17.  But as we have

already discussed, the FHFA Defendants' request for judicial notice of the truth of "facts" relat-

ing to the need for and purposes underlying the Net Worth Sweep – "facts" that are actually hot-

ly contested by Fairholme – is inappropriate and must be rejected.

The FHFA Defendants further argue that, in any event, the Court should not reach this is-

sue because Fairholme's fiduciary duty claim is barred by HERA's bar on actions seeking to re-

strain the actions of a conservator and by HERA's bar on actions by shareholders.  *See* FHFA

Opp. 25.  For reasons already discussed, however, these supposedly threshold legal defenses lack

merit, are (at least in the case of the former) inextricably intertwined with disputed questions of

fact, and present no impediment to the limited relief Fairholme seeks through this Motion.

The FHFA Defendants therefore fall back on one final argument:  the Court may simply

ignore the matters that are outside the pleadings rather than convert their motion into one for

summary judgment.  FHFA Opp. 24-25.[17]  That is, of course, an option for the Court.  But given

that this would leave Defendants with, at most, only their meritless "threshold" jurisdictional ar-

---

[17] The FHFA Defendants suggest that only one paragraph of their motion would need to be excluded from the Court's consideration.  FHFA Opp. 25.  They ignore, however, that that paragraph is supported by cross-references to other pages of the FHFA Defendants' brief, *see* FHFA Mot. 56 (cross-referencing FHFA Mot. 23-25), which themselves refer to numerous extra-pleading materials.  More fundamentally, the FHFA Defendants ignore that, regardless of their length, the passages at issue go the heart of their substantive defense of the Net Worth Sweep.

guments as a defense to the breach of fiduciary duty claim (arguments that themselves depend at least in part on disputed questions of fact), it is difficult to imagine a scenario in which Fairholme would not ultimately be entitled to the discovery it is now seeking. In any event, for the reasons previously discussed, because Defendants have chosen to file, and to maintain, omnibus dispositive motions, the most efficient course is for the Court to allow the limited discovery that is necessary to address the disputed factual issues raised by those motions, especially since Fairholme would still be entitled to discovery into the completeness of Defendants' record submissions. Tellingly, that is the course the Court of Federal Claims ("CFC") recently took in allowing Fairholme to proceed with discovery against Defendants under very similar circumstances.

## VI.  THERE IS SUBSTANTIAL OVERLAP BETWEEN THE DISCOVERY ALLOWED IN FAIRHOLME'S COURT OF FEDERAL CLAIMS ACTION AND THE LIMITED DISCOVERY SOUGHT HERE

Defendants acknowledge the CFC's recent order ("CFC Order") allowing discovery in Fairholme's pending action in that court, but they argue that that order and such discovery are irrelevant to the issues raised in Fairholme's Motion in this Court. *See* FHFA Opp. 35-36; Treas. Opp. 16 n. 6. To be sure, Fairholme has raised different substantive challenges (e.g., takings and illegal exaction claims) to the Net Worth Sweep in the CFC action than they do in this Court. It is also true that the Government has raised a different set of jurisdictional and merits arguments in the CFC action. But the disputed factual issues that were raised by the Government's dispositive motion in the CFC action are closely similar to disputed issues implicated by Defendants' dispositive motions in this case. In short, contrary to Defendants' assertions, there is substantial overlap between the discovery allowed by the CFC and the discovery Plaintiffs seek here.

For example, one of the issues as to which the CFC authorized discovery is "whether the FHFA acted at the direct behest of the Treasury." *Id.* There can be no question that FHFA's purposes in entering into the Net Worth Sweep, and whether FHFA acted at the behest and for

the benefit of Treasury, are also directly implicated by Defendants' dispositive motions with respect to, at a minimum, Fairholme's breach of fiduciary duty and APA claims.[18]

Likewise, the CFC concluded that "discovery would reveal information relevant to resolving the factual dispute between plaintiffs and defendant regarding each party's assessment of future profitability," *id.* at 3, and it ordered discovery into "the disputed factual issues about Fannie and Freddie's solvency and the reasonableness of expectations about their future profitability" and "why the government allowed the preexisting capital structure and stockholders to remain in place." *Id.* at 4. In this case Defendants' dispositive motions also seek to justify imposition of the Net Worth Sweep largely on the basis of their contemporaneous expectations regarding Fannie and Freddie's future performance and profitability, and thus on the basis of one of the subjects as to which the CFC explicitly authorized discovery.

## CONCLUSION

For the foregoing reasons, Fairholme respectfully requests that the Motion be granted.

Date:  March 13, 2014                           Respectfully submitted,

                                                /s/ Charles J. Cooper
                                                Charles J. Cooper (Bar No. 248070)
                                                ccooper@cooperkirk.com
                                                Vincent J. Colatriano (Bar No. 429562)
                                                David H. Thompson (Bar No. 450503)
                                                Peter A. Patterson (Bar No. 998668)
                                                COOPER & KIRK, PLLC
                                                1523 New Hampshire Avenue, N.W.
                                                Washington, D.C. 20036
                                                (202) 220-9600
                                                (202) 220-9601 (fax)

---

[18] *See, e.g.*, Motion 31 (requested "discovery is likely to disclose information highly relevant to the disputed question of why the FHFA entered into the Third Amendment, and whether it acted independently, or at the direction of Treasury, in agreeing to the Net Worth Sweep").

# EXHIBIT 1

# No. 13-cv-1053-RCL

TREASURY-1898



Federal Housing Finance Agency

Projections of the Enterprises' Financial Performance

October 2011

## Summary

- This report provides updated information on possible future Treasury draws by Fannie Mae and Freddie Mac (the "Enterprises") under specified scenarios, using consistent assumptions for both Enterprises.  FHFA published initial projections of the Enterprises' financial performance in October 2010.  The report on the initial projections can be found in FHFA's Projections of the Enterprises' Financial Performance, October 2010.  The projections have been updated to reflect the current outlook for house prices, interest rates, and recent trends in borrower behavior.  The projection period has been extended an additional year.

- To date, the Enterprises have drawn $169 billion from Treasury under the terms of the Senior Preferred Stock Purchase Agreements (PSPAs), as amended, between the Treasury and each of the Enterprises.  FHFA worked with the Enterprises to develop forward-looking financial projections across three possible house price paths.  **Under the three scenarios used in the projections, cumulative Treasury draws (including dividends) at the end of 2014 range from $220 billion to $311 billion.  In the initial projections released in October 2010, cumulative Treasury draws (including dividends) at the end of 2013 ranged from $221 billion to $363 billion.**

- The difference in the range of ending cumulative Treasury draws between the October 2010 projections and the October 2011 projections can be attributed primarily to the fact that actual results for the first year of the projection period in the October 2010 projections were substantially better than projected.  (See page 8 for further details.)

- The projections reported here are not expected outcomes.  They are modeled projections in response to "what if" exercises based on assumptions about Enterprise operations, loan performance, macroeconomic and financial market conditions, and house prices.  The projections do not define the full range of possible outcomes.  Actual outcomes may be very different.  This effort should be interpreted as a sensitivity analysis of future draws to possible house price paths.

- FHFA provided the Enterprises with key assumptions for each scenario. The Enterprises used their respective internal models to project their financial results based on the assumptions provided by FHFA.  While this effort achieves a degree of comparability between the Enterprises, it does not allow for actions that the Enterprises might undertake in response to the economic conditions specified in the scenarios.  Those Enterprise-specific business changes could lead to different results across the scenarios than are presented in these projections.

TREASURY-1900

Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results

The assumptions used in each of the three scenarios are described on page 11.  The projected combined cumulative
Treasury draws for both Enterprises through December 31, 2014 reach $220 billion under Scenario 1, $226 billion
under Scenario 2, and $311 billion under Scenario 3. Fannie Mae's cumulative draws are higher than Freddie Mac's in
part because Fannie Mae's mortgage book of business is approximately fifty percent larger than Freddie Mac's.  In
addition, Fannie Mae's serious delinquency rates are higher than Freddie Mac's.

**Figure 1: Cumulative Treasury Draws\*** *($ in billions)*



Federal Housing Finance Agency

Projections of the
Enterprises' Financial Performance
October 2011

## Results (continued)

The Enterprises are required to pay a 10 percent dividend on the amount of funds drawn by the Enterprises under the Senior Preferred Stock Purchase Agreements (PSPAs) with Treasury.  The PSPAs do not allow for dividends to reduce prior draws.  However, for illustrative purposes, if dividend payments were subtracted from the projected cumulative draws, the net amounts would reach $121 billion under Scenario 1, $124 billion under Scenario 2, and $193 billion under Scenario 3.  Most dividends to date have been paid from funds acquired with additional draws.  The projections show a portion of future dividends being paid out of comprehensive income.

**Figure 2: Cumulative Treasury Draws less dividends paid** *($ in billions)*





**Cumulative Treasury Draw through 2014**

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $105 | $110 | $161 |
| Related to senior preferred dividends | 40 | 40 | 58 |
| Cumulative Treasury Draw | $145 | $150 | $219 |
| Senior preferred dividends (not financed through Treasury Draws) | $20 | $22 | $18 |
| Total senior preferred dividends | $60 | $62 | $76 |

**Cumulative Treasury Draw through 2014**

| | Scenario 1 | Scenario 2 | Scenario 3 |
|---|---|---|---|
| Related to operating losses and other* | $58 | $59 | $66 |
| Related to senior preferred dividends | 17 | 17 | 26 |
| Cumulative Treasury Draw | $75 | $76 | $92 |
| Senior preferred dividends (not financed through Treasury Draws) | $22 | $22 | $17 |
| Total senior preferred dividends | $39 | $39 | $43 |

*Operating losses and other refers to net losses reported on the income statement, changes in unrealized losses reported on the balance sheet, and the impact of other accounting changes for consolidation and security impairments.
In accordance with Senior Preferred Stock Purchase Agreements (PSPAs), the Enterprises are not permitted to paydown the Treasury draw amounts, even if the Enterprises generate positive net income or total comprehensive income.
Numbers may not foot due to rounding.

Case 1:13-cv-01053-RLW   Document 23-12   Filed 12/17/13   Page 17 of 33

TREASURY-3833

## ***HIGHLY CONFIDENTIAL***
## DO NOT DISTRIBUTE OR SHARE WITH OTHER PARTIES

# GSE Preferred Stock Purchase Agreements (PSPA)
# Overview and Key Considerations

Sensitive and Pre-Decisional

June 13, 2012

# Primary GSE Financial Forecast Assumptions

Sensitive / Pre-Decisional

- As conservator, FHFA evaluated the GSEs financial future by performing sensitivity analyses, commonly referred to as the "stress tests."

    - The sensitivity analyses included a base and downside case and were projected out to year 2014.

    - The sensitivity analyses were based on assumptions about GSE operations, loan performance, macroeconomic and financial market conditions, and house prices.

- Treasury also evaluated the financial prospects of the GSEs.

    - Grant Thornton was engaged as an independent, third-party consultant to perform a valuation of the entities for the Treasury Financial Report and OMB budget estimation figures.

    - Grant Thornton developed their own forecasts based, in part, on the forecasts prepared by each GSE based on a consistent set of assumptions provided by FHFA.

    - The Grant Thornton models were projected out until each GSE depleted its PSPA capacity.

- Both the FHFA and Grant Thornton analyses were used to generate the forecast estimates on the subsequent pages.

TREASURY-3837

# PSPAs: Key Terms

Sensitive / Pre-Decisional

| As of December 31, 2011 | |
|---|---|
| **Core Terms** | |
| Amended & Restated PSPAs | Signed on September 26, 2008. |
| Amendments Dated | 1st Amendment – May 6, 2009;  2nd Amendment – December 24, 2009. |
| Liquidation Preference | Increases with draws under the funding commitment.[1] |
| Dividend Rate | Cash 10%;  if elected to be paid in kind ("PIK") 12%. |
| Seniority of Senior Preferred Stock | Senior Preferred Stock is senior to the existing preferred stock issued prior to conservatorship and common equity but is junior to all debt claims and obligations. |
| | |
| **Covenants** | |
| Retained Investment Portfolio | Reduce by 10% per year until the GSEs' retained portfolios each reach $250 billion. |
| Dividend Payments to Other Parties | None permitted until senior preferred stock is repaid in full. |
| Asset Sales | No sale, transfer, or disposition of any assets other than dispositions for fair value in the ordinary course of business. |
| Leverage Limitation | Not permitted to increase debt to more than 120% of the total amount of mortgages and mortgage-backed securities owned by each enterprise. |
| | |
| **Other Terms** | |
| Warrants | Right to purchase up to 79.9 percent of the common equity at one-thousandth of one cent ($0.00001) per share, fully diluted.  Warrants expire Sept. 7, 2028. |

[1] As amended on December 24, 2009, each PSPA commits Treasury to provide additional support to each Enterprise through the end of 2012 in exchange for a greater liquidation preference. Treasury's financial commitment now equals the greater of $200 billion or $200 billion plus cumulative net worth deficits experienced during 2010, 2011, and 2012, less any surplus remaining as of December 31, 2012.  Beginning in 2013, the capacity available becomes fixed and the remaining capacity declines as there are further draws.

TREASURY-3841

# Remaining Preferred Stock Purchase Agreement Capacity

Sensitive / Pre-Decisional

- Initial Purchase Agreement had a specified funding commitment cap of $100 billion for each GSE.

- The May 2009 amendment increased the specified cap for each institution to a fixed $200 billion.

- The Dec. 2009 amendment modified the fixed cap and allowed the cap to increase dollar for dollar for any draws between Jan. 1, 2010 and Dec. 31, 2012.

    - At the end of 2009, Fannie Mae had drawn $75.2 billion and Freddie Mac had drawn $50.7 billion, excluding the initial $1.0 billion liquidation preference for which the GSEs did not receive cash proceeds.

- At the end of 2012, these caps become fixed and there will be ~$125 billion of capacity remaining for Fannie Mae and ~$149 billion for Freddie Mac.

    - This remaining capacity will decline to the extent there are further draws from 2013 onward.

**Fannie Mae:**

| | |
|---|---|
| PSPA cap as of 12/24/09 amendment | $200 billion |
| + Est. PSPA draws[1] Jan. '10 – Dec. '12 + | $65.9 billion |
| Total est. PSPA cap on Dec. 31, 2012 | $265.9 billion |
| - PSPA draws through Dec. 31, 2009 | - $75.2 billion |
| - Est. PSPA draws[1] Jan. '10 – Dec. '12 | - $65.9 billion |
| = Remaining capacity Dec. 31, 2012 | $124.8 billion |

*(less any positive net worth on Dec. 31, 2012)*

**Freddie Mac:**

| | |
|---|---|
| PSPA cap as of 12/24/09 amendment | $200 billion |
| + Est. PSPA draws[2] Jan. '10 – Dec. '12 + | $25.1 billion |
| Total est. PSPA cap on Dec. 31, 2012 | $225.1 billion |
| - PSPA draws through Dec. 31, 2009 | - $50.7 billion |
| - Est. PSPA draws[1] Jan. '10 – Dec. '12 | - $25.1 billion |
| = Remaining capacity Dec. 31, 2012 | $149.3 billion |

*(less any positive net worth on Dec. 31, 2012)*

[1] Actual draws between January 1, 2010 and March 31, 2012, forecasted draws thereafter. Forecasted draws through December 31, 2012 as estimated by the base case forecast in the Federal Housing Finance Agency's annual "Projections of the Enterprises' Financial Performance" report, released October 2011.

TREASURY-3843

Case 1:13-cv-01053-RLW   Document 23-12   Filed 12/17/13   Page 31 of 33

# Fannie Mae Base Case PSPA Forecast

*Sensitive / Pre-Decisional*

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($13.1) | $5.4 | $13.1 | $13.5 | $9.1 | $8.5 | $8.0 | $7.9 | $8.5 | $8.4 | $8.1 | $8.0 |
| Total Gross PSPA Draw | $28.7 | $11.4 | $2.9 | $1.2 | $7.0 | $7.1 | $8.2 | $9.4 | $9.8 | $10.7 | $12.1 | $13.5 |
| Total Dividend Paid | ($11.8) | ($14.0) | ($14.8) | ($15.0) | ($15.2) | ($15.9) | ($16.6) | ($17.5) | ($18.4) | ($19.4) | ($20.6) | ($21.8) |
| Total PSPA Draw Net of PSPA Dividends | $16.9 | ($2.6) | ($11.9) | ($13.8) | ($8.2) | ($8.8) | ($8.4) | ($8.1) | ($8.6) | ($8.7) | ($8.5) | ($8.3) |
| Projected End of Period Net Worth[2] | ($6.2) | ($3.4) | ($2.2) | ($2.5) | ($1.6) | ($1.9) | ($2.3) | ($2.4) | ($2.5) | ($2.9) | ($3.3) | ($3.6) |
| Percent of Dividends Funded by PSPA Draws | 100% | 81% | 20% | 8% | 46% | 45% | 49% | 54% | 53% | 55% | 59% | 62% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $2.6 | $11.9 | $13.8 | $8.2 | $8.8 | $8.4 | $8.1 | $8.6 | $8.7 | $8.5 | $8.3 |
| Cumulative Cash Dividends Funded by Earnings | $0.0 | $2.6 | $14.5 | $28.3 | $36.5 | $45.3 | $53.7 | $61.7 | $70.4 | $79.1 | $87.6 | $95.9 |
| Cumulative Net Return To Taxpayers By FY2023[3] | - | - | - | - | - | - | - | - | - | - | - | $92.4 |
| Beginning PSPA Liquidation Preference | $112.6 | $141.3 | $152.7 | $155.6 | $156.8 | $163.8 | $170.9 | $179.1 | $188.5 | $198.3 | $209.0 | $221.1 |
| Total Gross Liquidation Preference | $28.7 | $11.4 | $2.9 | $1.2 | $7.0 | $7.1 | $8.2 | $9.4 | $9.8 | $10.7 | $12.1 | $13.5 |
| Cumulative Gross Liquidation Preference | $141.3 | $152.7 | $155.6 | $156.8 | $163.8 | $170.9 | $179.1 | $188.5 | $198.3 | $209.0 | $221.1 | $234.6 |
| Remaining PSPA Funding Capacity | $125.0 | $120.8 [4] | $117.9 | $116.7 | $109.7 | $102.6 | $94.4 | $85.0 | $75.2 | $64.5 | $52.4 | $38.9 |
| Cumulative Net PSPA Investment[5] | $112.3 | $109.7 | $97.7 | $84.0 | $75.8 | $67.0 | $58.6 | $50.5 | $41.9 | $33.2 | $24.7 | $16.4 |

## Per annum projected PSPA draws and dividends



$ in billions

10% Cash Dividend   Net Compreh. Income (1)   Gross PSPA Liqd. Pref.

## Projected PSPA funding capacity as a result of draws



$ in billions

PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative every year because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

TREASURY-3847

# Freddie Mac Base Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | $6.7 | $9.5 | $10.6 | $6.0 | $5.5 | $5.5 | $5.6 | $5.3 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1.5 | $2.5 | $2.6 | $3.0 | $3.3 |
| Total Dividend Paid | ($7.3) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.9) | ($8.2) | ($8.4) | ($8.7) |
| Total PSPA Draw Net of PSPA Dividends | $3.2 | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($7.7) | ($6.2) | ($5.4) | ($5.6) | ($5.4) | ($5.4) |
| Projected End of Period Net Worth[2] | $3.5 | $5.3 | $8.2 | $6.6 | $4.4 | $2.3 | $0.2 | ($0.7) | ($0.6) | ($0.7) | ($0.8) | ($0.8) |
| Percent of Dividends Funded by PSPA Draws | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 19% | 32% | 32% | 36% | 38% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $7.7 | $7.7 | $7.7 | $7.7 | $7.7 | $7.7 | $6.2 | $5.4 | $5.6 | $5.4 | $5.4 |
| Cumulative Cash Dividends Funded by Earnings | $0.0 | $7.7 | $15.3 | $23.0 | $30.7 | $38.3 | $46.0 | $52.2 | $57.6 | $63.2 | $68.6 | $74.0 |
| Cumulative Net Return To Taxpayers By FY2023[3] | - | - | - | - | - | - | - | - | - | - | - | $73.2 |
| Beginning PSPA Liquidation Preference | $72.2 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $84.2 | $86.7 | $89.3 | $92.3 |
| Total Gross Liquidation Preference | $10.5 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $1.5 | $2.5 | $2.6 | $3.0 | $3.3 |
| Cumulative Gross Liquidation Preference | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $82.7 | $84.2 | $86.7 | $89.3 | $92.3 | $95.6 |
| Remaining PSPA Funding Capacity | $150.0 | $150.0 [4] | $150.0 | $150.0 | $150.0 | $150.0 | $150.0 | $148.5 | $146.0 | $143.4 | $140.4 | $137.1 |
| Cumulative Net PSPA Investment[5] | $60.5 | $52.8 | $45.2 | $37.5 | $29.8 | $22.2 | $14.5 | $8.3 | $2.9 | ($2.7) | ($8.1) | ($13.5) |

## Per annum projected PSPA draws and dividends





## Projected PSPA funding capacity as a result of draws



(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative in some years because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

TREASURY-3849

# Freddie Mac Downside Case PSPA Forecast

Sensitive / Pre-Decisional

| Projections: $ in billions | FY2012 | FY2013 | FY2014 | FY2015 | FY2016 | FY2017 | FY2018 | FY2019 | FY2020 | FY2021 | FY2022 | FY2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Comprehensive Income (Loss)[1] | ($7.8) | $6.6 | $8.9 | $6.1 | $5.6 | $5.6 | $5.7 | $5.4 | $5.5 | $5.4 | $5.4 | $5.4 |
| Total Gross PSPA Draw | $20.7 | $2.3 | $0.5 | $2.7 | $3.6 | $4.0 | $4.4 | $5.1 | $5.5 | $6.2 | $6.8 | $7.5 |
| Total Dividend Paid | ($7.6) | ($8.8) | ($9.0) | ($9.1) | ($9.4) | ($9.7) | ($10.2) | ($10.6) | ($11.2) | ($11.7) | ($12.4) | ($13.1) |
| Total PSPA Draw Net of PSPA Dividends | $13.1 | ($6.5) | ($8.4) | ($6.4) | ($5.8) | ($5.7) | ($5.8) | ($5.5) | ($5.7) | ($5.5) | ($5.6) | ($5.6) |
| Projected End of Period Net Worth[2] | ($1.1) | ($0.9) | ($0.5) | ($0.8) | ($0.9) | ($1.1) | ($1.2) | ($1.3) | ($1.5) | ($1.6) | ($1.8) | ($2.0) |
| Percent of Dividends Funded by PSPA Draws | 100% | 26% | 6% | 30% | 38% | 41% | 43% | 48% | 49% | 53% | 55% | 57% |
| Dollar Amt. of Dividends Funded by Earnings | $0.0 | $6.5 | $8.4 | $6.4 | $5.8 | $5.7 | $5.8 | $5.5 | $5.7 | $5.5 | $5.6 | $5.6 |
| Cumulative Cash Dividends Funded by Earnings | $0.0 | $6.5 | $14.9 | $21.3 | $27.0 | $32.8 | $38.6 | $44.1 | $49.7 | $55.3 | $60.8 | $66.4 |
| Cumulative Net Return To Taxpayers By FY2023[3] | - | - | - | - | - | - | - | - | - | - | - | $64.4 |
| Beginning PSPA Liquidation Preference | $72.2 | $92.9 | $95.2 | $95.7 | $98.4 | $102.0 | $106.0 | $110.4 | $115.5 | $121.0 | $127.2 | $134.0 |
| Total Gross Liquidation Preference | $20.7 | $2.3 | $0.5 | $2.7 | $3.6 | $4.0 | $4.4 | $5.1 | $5.5 | $6.2 | $6.8 | $7.5 |
| Cumulative Gross Liquidation Preference | $92.9 | $95.2 | $95.7 | $98.4 | $102.0 | $106.0 | $110.4 | $115.5 | $121.0 | $127.2 | $134.0 | $141.5 |
| Remaining PSPA Funding Capacity | $150.0 | $149.0 [4] | $148.4 | $145.7 | $142.1 | $138.1 | $133.7 | $128.6 | $123.1 | $116.9 | $110.1 | $102.6 |
| Cumulative Net PSPA Investment[5] | $70.4 | $64.0 | $55.6 | $49.2 | $43.4 | $37.7 | $31.9 | $26.4 | $20.7 | $15.2 | $9.6 | $4.0 |

TREASURY-3850

## Per annum projected PSPA draws and dividends

$ in billions



■ 10% Cash Dividend   ■ Net Compreh. Income (1)   ■ Gross PSPA Liqd. Pref.

## Projected PSPA funding capacity as a result of draws

$ in billions



◆ PSPA Capacity Left

(1) Net comprehensive income is defined as the sum of economic net interest margin, fees and other income less a provision for credit losses, administrative expenses and other non-interest expenses.
(2) Negative every year because of a one quarter timing delay in payment of PSPA draw requests. Calculated as the sum of net comprehensive income and total gross PSPA draws less total dividends paid.
(3) The cumulative net return to taxpayers by FY2023 represents the sum of the cumulative cash dividends funded by earnings as of FY2023 and the projected end of period net worth in FY2023.
(4) Remaining PSPA funding capacity reduced by draws that occur after January 1, 2013. Potential PSPA draws in 4Q 2012 appear as FY2013 but do not reduce PSPA capacity.
(5) The cumulative net PSPA investment decreases by the dollar amount of dividends funded by earnings paid to the U.S. Department of the Treasury.

PRE-DECISIONAL – MARKET SENSITIVE – PLEASE DO NOT DISTRIBUTE

# EXHIBIT 2
# No. 13-cv-1053-RCL



**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Assistant Attorney General*
*950 Pennsylvania Avenue, N.W.*
*Washington, DC 20530-0001*

*Telephone (202) 514-2701*
*Facsimile (202) 514-0557*

December 23, 2008

**MEMORANDUM**

To:      Selected Agency Counsel

From:   Ronald J. Tenpas
         Assistant Attorney General

Re:      "Guidance to Federal Agencies on Compiling the Administrative Record"
         (January 1999)


In January 1999, the Environment and Natural Resources Division authored a document entitled "Guidance to Federal Agencies on Compiling the Administrative Record." That document identified issues that agencies may confront in assembling an administrative record. As explicitly stated in the document, it was intended only as internal Department of Justice guidance, and did not create any rights, substantive or procedural, nor did it limit the "otherwise lawful prerogatives of the Department of Justice or any other federal agency." As was stated in a recent brief by the Department of Justice, the 1999 memorandum "does not represent a formal policy of the Department of Justice, nor even an official directive of the Environment and Natural Resources Division (ENRD). The memorandum focuses on the compilation of an administrative record in the absence of a contemporaneous docket."

It has come to our attention, however, that outside parties have sought to use this 1999 document in litigation against federal agencies, and have argued that it supports a particular composition of the administrative record, or a particular process for its assembly. This memorandum serves to clarify that the January 1999 document does not dictate any requirement for, or otherwise provide binding guidance to, federal agencies on the assembly of the administrative record. The composition of an administrative record is left to the sound discretion of the relevant federal agency, within the bounds of controlling law. This is an agency responsibility in the first instance and the Supreme Court has made clear that an agency has discretion in how to create the record to make and explain its decisions. *See, e.g., Vermont Yankee Nuclear Power Corp. v Natural Resources Defense Council, Inc.*, 435 U.S. 519, 544 (1978) (in rejecting the need for adjudicatory hearing in the context of rulemaking, the Court refers to the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure" and noting that "the agency should normally be allowed to 'exercise its administrative discretion in deciding how, in light of internal organization considerations, it may best proceed to develop the needed evidence. . . .'").

The Department of Justice has defended in litigation the legal position that deliberative documents are not generally required in an administrative record, and thus has also defended the position that in such circumstances no privilege log reflecting such documents would need to be prepared. The 1999 document should not be read as casting doubt on this legal position. Obviously,

specific statutory provisions and/or case law in the jurisdiction will play a significant role in determining the appropriate approach in a particular case. Agencies would likely benefit from having their own internal guidance regarding the contents and compilation of the record. An agency's guidance should, of course, be informed by applicable case law and the agency's experience and internal procedures.

Should you have any question about the development of agency procedures for compiling an administrative record, or the preparation of a particular administrative record, the Division would be pleased to consult with you. This memorandum is being sent to agencies with whom the Division frequently works, although it is available for use or reference by any federal agency.