# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** <br><br> _____ <br><br> **THIS DOCUMENT RELATES TO:** <br> **ALL CASES** | **Misc. Action No. 13-mc-1288 (RCL)** <br><br> CLASS ACTION <br><br> **OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT** |

**CONSOLIDATED CLASS ACTION AND DERIVATIVE PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................. 5

I.      BACKGROUND OF FANNIE MAE AND FREDDIE MAC ........................................ 5

II.     THE ENTERPRISES ARE PLACED INTO CONSERVATORSHIP ............................. 7

III.    FHFA DIRECTS THE ENTERPRISES TO INITIATE MASSIVE
WRITEDOWNS AND BORROW BILLIONS FROM TREASURY ............................. 10

IV.    THE ENTERPRISES RETURN TO PROFITABILITY .................................................. 12

V.     FHFA AND TREASURY ENTER INTO THE THIRD
AMENDMENT TO EXPROPRIATE ALL SHAREHOLDER
VALUE WITHOUT REGARD TO THE ENTERPRISES'
ABILITY TO REPAY THE GOVERNMENT'S INVESTMENT .................................. 13

VI.    THE THIRD AMENDMENT IS CONTRARY TO THE EXPRESS TERMS
OF CONTRACTS GOVERNING FANNIE MAE AND FREDDIE MAC
PREFERRED STOCK AND FREDDIE MAC COMMON STOCK............................... 16

ARGUMENT ...................................................................................................................... 18

I.      BECAUSE DEFENDANTS' MOTIONS RELY ON MATTERS
OUTSIDE THE PLEADINGS, THEY ARE PROCEDURALLY
INAPPROPRIATE AND MUST  BE DENIED ............................................................... 18

II.     HERA'S "ANTI-INJUNCTION" PROVISION DOES NOT
PRECLUDE JUDICIAL REVIEW OF PLAINTIFFS' CLAIMS................................... 21

        A.      Section 4617(f) Does Not Preclude
Plaintiffs' Claims For Monetary Damages .......................................................... 21

        B.      Section 4617(f) Does Not Preclude Declaratory Or
Equitable Relief Relating To Any Actions Taken
Beyond And Contrary To FHFA's Statutory Authority ....................................... 24

III.    PLAINTIFFS HAVE STANDING TO ASSERT
THEIR DIRECT AND DERIVATIVE CLAIMS .......................................................... 25

        A.      Plaintiffs Have Standing To Assert Their Direct Contract-Based Claims............ 25

        B.      Plaintiffs Have Standing to Assert Their Derivative Claims ................................ 32

IV.  PLAINTIFFS ADEQUATELY STATE THEIR COMMON LAW CLAIMS ................ 36

A.  Plaintiffs Adequately State Claims For Breach Of Contract ................................ 36

B.  Plaintiffs Adequately State Claims For Breach Of The
Implied Covenant Of Good Faith And Fair Dealing ............................................ 40

C.  Plaintiffs Adequately State Claims for Breach of Fiduciary Duty ...................... 41

1.  Treasury Controls Fannie Mae, And Therefore Has
the Fiduciary Duties of a Controlling Stockholder ................................... 44

2.  Federal Law Does Not Preempt State Law Fiduciary Duties .................. 47

3.  The Tucker Act Does Not Require Plaintiffs To Bring Their
Fiduciary Duty Claims In The Court Of Federal Claims.......................... 51

V.  PLAINTIFFS ADEQUATELY STATE THEIR TAKINGS CLAIMS .......................... 52

A.  This Court Has Jurisdiction Over Plaintiffs'
Takings Claims Under The "Little Tucker Act".................................................... 52

B.  Defendants Are The "United States" For Purposes Of The Takings Clause ........ 54

1.  The United States Treasury Is Part Of The United States
Government, And Cannot Avoid Liability Under The Takings
Clause By Asserting That It "Was A Commercial Actor" ....................... 54

2.  FHFA Is Also The United States ............................................................. 57

C.  Plaintiffs' Shareholder Rights Constitute A Cognizable
Property Interest Under The Takings Clause....................................................... 61

D.  The Third Amendment Is A Taking..................................................................... 66

E.  The Third Amendment Effects A Direct Appropriation Of Plaintiffs'
Shareholder Rights, And The *Omnia* Case Is Inapposite .................................... 70

F.  Plaintiffs' Claim Under The Takings Clause Is Ripe .......................................... 72

CONCLUSION.................................................................................................................... 75

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acceptance Ins. Cos., v. U.S.,*
  84 Fed. Cl. 111 (Fed. Cl. 2008), *affirmed,* 583 F.3d 849 (Fed. Cir. 2009)..............................64

*Air Pegasus of D.C. Inc. v. U.S.,*
  424 F.3d 1206 (Fed. Cir. 2005).............................................................................................72

*Alaska Airlines v. Johnson,*
  8 F.3d 791 (Fed. Cir. 1993) ...................................................................................................57

*Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.,*
  357 F.3d 62 (D.C. Cir. 2004) ...........................................................................................51, 52

*Am. Cont'l Corp. v. U.S.,*
  22 Cl. Ct. 692 (Ct. Cl. 1991)..................................................................................................63

*Ambase Corp. v. U.S.,*
  61 Fed. Cl. 794 (2004) ...........................................................................................................23

*Anderson v. U.S.,*
  47 Fed. Cl. 438 (2000) ...........................................................................................................29

*Aref v. Holder,*
  953 F. Supp. 2d 133 (D.D.C. 2013) .......................................................................................19

*Armstrong v. U.S.,*
  364 U.S. 40 (1960)..................................................................................................................67

*Auction Co. of Am. v. FDIC,*
  132 F.3d 746 (D.C. Cir. 1997).........................................................................................58, 60

*Auction Co. of Am. v. FDIC,*
  141 F.3d 1198 (D.C. Cir. 1998).......................................................................................58, 60

*Branch v. FDIC,*
  825 F. Supp. 384 (D. Mass. 1993) ...................................................................................29, 33

*Branch v. U.S.,*
  69 F.3d 1571 (Fed. Cir. 1995).................................................................................................63

*Brown v. Legal Found. of Wash.,*
  538 U.S. 216 (2003)................................................................................................................67

*C&E Servs., Inc. v. Ashland Inc.*,
    601 F. Supp. 2d 262 (D.D.C. 2009) ...................................................51

*Cal. Hous. Sec., Inc. v. U.S.*,
    959 F.2d 955 (Fed. Cir. 1992)..................................................30, 61, 62

*Chamison v. HealthTrust, Inc. Hosp. Co.*,
    735 A.2d 912 (Del. Ch. 1999).................................................6, 18

*Cienega Gardens v. U.S.*,
    331 F.3d 1319 (Fed. Cir. 2003).................................................64

*Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.*,
    489 U.S. 561 (1989)...................................................24

*Coleman v. Johnson*,
    No. 12-cv-1352, 2014 WL 116150 (D.D.C. Jan. 14, 2014)............19, 20

*Commonwealth of Pa., by Sheppard v. Nat'l Ass'n of Flood Insurers*,
    520 F.2d 11 (3d Cir. 1975)..................................................53

*Convertino v. U.S. Dept. of Justice*,
    684 F.3d 93 (D.C. Cir. 2012) ...................................................19

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000)...................................................47

*Cummings Props. Mgmt., Inc. v. FDIC*,
    786 F. Supp. 144 (D. Mass. 1992), vacated as moot after settlement, appeal
    dismissed, 1992 WL 366909 (1st Cir. Sept. 1, 1992)...........................24

*Delta Sav. Bank v. U.S.*,
    265 F.3d 1017 (9th Cir. 2001) ...................................................33, 35

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) ...................................................40

*E.I. du Pont de Nemours & Co. v. FDIC*,
    32 F.3d 592 (D.C. Cir. 1994)..................................................42

*Esther Sadowsky Testamentary Trust v. Syron*,
    639 F. Supp. 2d 347 (S.D.N.Y. 2009)...................................................34

*FDIC v. Cobblestone Corp.*,
    No. 91-12741, 1992 WL 333961 (D. Mass. Oct. 28, 1992) ...................39

*FDIC v. Hartford Ins. Co. of Ill.*,
    877 F.2d 590 (7th Cir. 1989)...................................................58

*FDIC v. Olympic Towers Assocs.*,
    94-cv-0197E, 1994 WL 148136 (W.D.N.Y. Apr. 12, 1994) ................................................25

*Filak v. George*,
    594 S.E.2d 610 (Va. 2004)...............................................................................................36

*Firestone v. Wiley*,
    485 F. Supp. 2d 694 (E.D. Va. 2007) ...............................................................................41

*First Hartford Corp. Pension Plan & Trust v. U.S.*,
    194 F.3d 1279 (Fed. Cir. 1999)................................................................................ *passim*

*First Ind. Fed. Sav. Bank v. FDIC*,
    964 F.2d 503 (5th Cir. 1992) ...........................................................................................39

*Fitzgerald v. Cantor*,
    No. CA 16297, 1998 WL 842316 (Del. Ch. Nov. 10, 1998).............................................40

*Frank v. Elgamal*,
    No. 6120-VCN, 2012 WL 1096090 (Del. Ch. Mar. 30, 2012) .........................................45

*Franklin Sav. Corp. v. U.S.*,
    56 Fed. Cl. 720 (Fed. Cl. 2003) .......................................................................................50

*Freeman v. FDIC.*,
    56 F.3d 1394 (D.C. Cir. 1995) .........................................................................................22

*Gatz v. Ponsoldt*,
    925 A.2d 1265 (Del. 2007) ..............................................................................................45

*Gibralter Fin. Corp. v. Fed. Home Loan Bank Bd.*,
    No. 89-cv-3489, 1990 WL 394298 (C.D. Cal. June 15, 1990).....................................42, 50

*Golden Pac. Bancorp v. U.S.*,
    15 F.3d 1066 (Fed. Cir. 1994).....................................................................................61, 62

*Hampshire Grp., Ltd. v. Kuttner*,
    No. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010).........................................51

*Hansen Bancorp, Inc. v. U.S.*,
    49 Fed. Cl. 168 (2001), *aff'd*, 344 F.3d 1343 (Fed. Cir. 2003).......................................29

*Hindes v. FDIC.*,
    137 F.3d 148 (3d Cir. 1998).............................................................................................22

*Holy Land Found. for Relief and Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) .........................................................................................19

*Huntleigh USA Corp. v. U.S.*,
   525 F.3d 1370 (Fed. Cir. 2008)...................................................................71

*In re Fannie Mae Sec., Derivative, and "ERISA" Litig.*,
   629 F. Supp. 2d 1 (D.D.C. 2009) .......................................................31, 34

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
   643 F. Supp. 2d 790 (E.D. Va. 2009) *aff'd sub nom.* 434 F. App'x 188
   (4th Cir. 2011)..............................................................24, 31, 32, 34

*In re Sunrise Sec. Litig.*,
   916 F.2d 874 (3d Cir. 1980).........................................................................33

*Kellmer v. Raines*,
   674 F.3d 848 (D.C. Cir. 2012) .......................................................27, 31, 34, 35

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   133 S. Ct. 2586 (2013)..................................................................................67

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986)......................................................................................50

*Lafayette Fed. Credit Union v. Nat'l Credit Union Admin*,
   960 F. Supp. 999 (E.D. Va. 1997) ...............................................................34

*Landy v. Fed. Deposit Ins. Corp.*,
   486 F.2d 139 (3d Cir. 1973).........................................................................32

*Loretto v. Teleprompter Manhattan CATV Corp.*,
   458 U.S. 419 (1982)......................................................................................67

*Lucas v. S.C. Coastal Council*,
   505 U.S. 1003 (1992)....................................................................................68

*Malone v. Brincat*,
   722 A.2d 5 (Del. 1998) .................................................................................42

*Maritrans v. U.S.*,
   342 F.3d 1344 (Fed. Cir. 2003).....................................................................68

*Natural Res. Def. Council, Inc. v. Fed. Hous. Fin. Agency*,
   815 F. Supp. 2d 630 (S.D.N.Y. 2011)..........................................................21

*O'Connor v. Rhodes*,
   79 F.2d 146 (D.C. Cir. 1935), *aff'd sub nom U.S. Shipping Bd. Merchant
   Fleet Corp. v. Rhodes*, 297 U.S. 383 (1936)...............................................32

*O'Melveny & Myers v. FDIC*,
    512 U.S. 79 (1994)....................................................................................................59, 60

*Omnia Commercial Co. v. U.S.*,
    261 U.S. 502 (1923)..............................................................................................70, 71, 72

*Owens v. Owens*,
    589 S.E.2d 488 (Va. App. 2003)...........................................................................................6

*Pa. Life Ins. Co. v. Bumbrey*,
    665 F. Supp. 1190 (E.D. Va. 1987) ...............................................................................6, 18

*Palmyra Pac. Seafoods, L.L.C. v. U.S.*,
    561 F.3d 1361 (Fed. Cir. 2009)..........................................................................................71

*Pareto v. FDIC*,
    139 F.3d 696 (9th Cir. 1998) .......................................................................................34, 35

*Parfi Holding AB v. Mirror Image Internet, Inc.*,
    817 A.2d 149 (Del. 2002) ...................................................................................................52

*Penn Cent. Transp. Co. v. City of New York*,
    438 U.S. 104 (1978)............................................................................................................68

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*,
    534 F.3d 779 (D.C. Cir. 2008)............................................................................................48

*Plaintiffs in All Winstar-Related Cases at the Court v. U.S.*,
    44 Fed. Cl. 3 (1999)....................................................................................................28, 29

*Portsmouth Redevelopment and Hous. Auth. v. Pierce*,
    706 F.2d 471 (4th Cir. 1983) .............................................................................................58

*Ramer v. US*,
    620 F. Supp. 2d 90 (D.D.C. 2009).....................................................................................44

*Ricci v. DeStefano*,
    557 U.S. 557 (2009)............................................................................................................28

*Robinson v. CAS 4000 Kansas LLC*,
    No. 13-740, 2013 WL 6704840 (D.D.C. Dec. 16, 2013)....................................................75

*Ruckelshaus v. Monsanto Co.*,
    467 U.S. 986 (1984)............................................................................................................64

*Shandler v. DLJ Merchant Banking, Inc.*,
    No. 4797-VCS, 2010 WL 2929654 (Del. Ch. July 26, 2010)..............................................46

*Sharpe v. FDIC.*,
   126 F.3d 1147 (9th Cir. 1997) ...............................................................22, 23, 24

*St. Christopher's Assocs. v. U.S.*,
   511 F.3d 1376 (Fed. Cir. 2008)......................................................................56, 57

*Suess v. U.S.*,
   33 Fed. Cl. 89 (Fed. Cl. 1995) ........................................................................33, 42

*Sun Oil Co. v. U.S.*,
   215 Ct. Cl. 716 (1978) .....................................................................................56, 57

*U.S. v. 50 Acres of Land*,
   469 U.S. 24 (1984)...................................................................................................73

*U.S. v. Bormes*,
   133 S. Ct. 12 (2012)................................................................................................52

*United Nuclear Corp. v. U.S.*,
   912 F.2d 1432 (Fed. Cir. 1990)..............................................................................64

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
   840 A.2d 606 (Del. 2003) .......................................................................................36

*Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*,
   988 F.2d 1480 (7th Cir. 1993) ...............................................................................50

*Waters v. Rumsfeld*,
   320 F.3d 265 (D.C. Cir. 2003)...............................................................................53

*Waterview Mgmt. Co. v. FDIC*,
   105 F.3d 696 (D.C. Cir. 1997) ........................................................................50, 51

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*,
   449 U.S. 155 (1980)................................................................................................67

*Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*,
   473 U.S. 172 (1985)................................................................................................74

*Williamson v. Cox Commc'ns, Inc.*,
   No. 1663-N, 2006 WL 1586375 (Del. Ch. June 5, 2006)................................43, 47

*Willow Grove, Ltd. v. Fed. Nat'l Mortg. Ass'n*,
   No. 13-cv-0723, 2013 WL 6865127 (D. Colo. Dec. 31, 2013) ........................21, 22

*Womble v. Dixon*,
   752 F.2d 80 (4th Cir. 1984) ...................................................................................32

*Wyeth v. Levine,*
 555 U.S. 555 (2009)...................................................................................49

*Yuba Goldfields, Inc. v. U.S.,*
 723 F.2d 884 (Fed. Cir. 1983)...................................................55, 56, 57

*Zumerling v. Devine,*
 769 F.2d 745 (Fed. Cir. 1985)...................................................................53

**Statutes & Rules**

5 U.S.C. § 703 .............................................................................................58

12 C.F.R. 1710.10(b) .............................................................................5, 48

12 U.S.C. § 1451(c) .....................................................................................48

12 U.S.C. § 1452(a)(1) .................................................................................48

12 U.S.C. § 1455(l)(1)(A) .............................................................................55

12 U.S.C. § 1455(l)(1)(B), 1719(g)(1)(B) .....................................................8

12 U.S.C. §§ 1455(l)(4) ...............................................................................18

12 U.S.C. § 1464(d)(6)(C) ...........................................................................24

12 U.S.C. § 1719(g)(1)(A) ...........................................................................55

12 U.S.C. § 1719(g)(1)(B) .............................................................................8

12 U.S.C. § 1719(g)(4) .................................................................................18

12 U.S.C. § 1723(a) .....................................................................................48

12 U.S.C. § 1821(d)(ii) .................................................................................69

12 U.S.C. § 1821(d)(2)(A)(i) ...........................................................28, 29, 30

12 U.S.C. § 4617(a)(2) ...................................................................................7

12 U.S.C. § 4617(b)(2)(A)(i) ................................................................ *passim*

12 U.S.C. § 4617(b)(2)(D) ...............................................................7, 16, 50

12 U.S.C. § 4617(b)(2)(E) ..............................................................................8

12 U.S.C. § 4617(b)(2)(K) ..............................................................................8

12 U.S.C. § 4617(b)(2)(K)(i) ........................................................................26, 27, 28, 30

12 U.S.C. §§ 4617(b)(2)(K)(i), 4617(c)(1) ...................................................................69

12 U.S.C. §§ 4617(b)(2)(K)(i), (c)(1)(D) ....................................................................65

12 U.S.C. § 4617(c)(1)..........................................................................8, 26, 30, 66

12 U.S.C. § 4617(d) ..................................................................................................23

12 U.S.C. § 4617(e) ...............................................................................................38, 39

12 U.S.C. § 4617(f) ...............................................................................................21, 22

28 U.S.C. § 1346(a)(2)..............................................................................................52

28 U.S.C. § 1346(b) ..................................................................................................51

28 U.S.C. § 2401(a) ..................................................................................................60

31 U.S.C. § 301(a) ....................................................................................................55

31 U.S.C. § 321 .........................................................................................................55

Fed. R. Civ. P. 15(a) ................................................................................................75

Va. Code Ann. § 13.1-672.1 ....................................................................................41

Va. Code Ann. § 13.1-690(A).....................................................................................6

**Other Authorities**

J. Travis Laster & Michelle D. Morris, *Breaches of Fiduciary Duty & the Del. Uniform Contribution Act*, 11 Del. L. Rev. 71 (2010) ........................................................51

Margaret Chadbourn, *Freddie Mac profit moves U.S. housing bailout further into black*, Reuters, Feb. 27, 2014 ..............................................................................................74

Office of Fed. Hous. Enter. Oversight, *Corporate Governance*, 67 Fed. Reg. 38361 (Final Rule, June 4, 2002)..........................................................................................48

Restatement (Second) of Torts, § 874 cmt b. (1979)................................................51

Plaintiffs in the above-captioned class and derivative action ("Plaintiffs") file this omnibus opposition brief to the motions to dismiss their Consolidated Amended Class Action and Derivative Complaint ("Complaint"), and in the alternative, for summary judgment, filed by Federal Housing Finance Agency ("FHFA") and the associated FHFA defendants, and the United States Treasury Department ("Treasury").

## **INTRODUCTION**

The defendants would like this Court to believe that this case is about their "response to the most calamitous economic crisis in generations," FHFA Memo at 1,[1] and their "extraordinary" efforts in 2008 to "save two key financial institutions – the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac")." Treasury Memo at 1.[2] In fact, this case is about a specific decision made by the defendants in August 2012, almost four years after the financial calamity of September 2008.

In September 2008, FHFA placed Fannie Mae and Freddie Mac into conservatorship. That decision is not being challenged here. In September 2008, Treasury entered into Preferred Stock Purchase Agreements ("PSPAs") with FHFA acting as conservator for Fannie Mae and Freddie Mac (collectively, the "Enterprises" or "GSEs"). Those PSPAs are not being challenged here. In fact, Plaintiffs rely upon the terms of those PSPAs as establishing the baseline for their

---

[1] Citations to the Memorandum in Support of Motion to Dismiss all Claims by Defendants Federal Housing Finance Agency as Conservator for Fannie Mae and Freddie Mac, FHFA Director Melvin Watt, Fannie Mae, and Freddie Mac and, in the Alternative, for Summary Judgment as to Plaintiffs' Arbitrary and Capricious Claims [ECF No. 20] will be referenced as "FHFA Memo at ___."

[2] Citations to the Treasury Defendants' Memorandum in Support of Their Motion to Dismiss, or in the Alternative, for Summary Judgment [ECF No. 19-1] will be referenced as "Treasury Memo at __."

claims.  Under the PSPAs as they existed prior to August 2012, Treasury was entitled to receive

(among other things):

- A liquidation preference equal to the full amount of money it provided to Fannie Mae or Freddie Mac from September 2008 onward, *plus* an extra $1 billion;

- A cumulative annual dividend equal to 10% of the amount Treasury contributed to Fannie Mae or Freddie Mac; and

- The right to purchase 79.9% of the common stock of Fannie Mae and Freddie Mac for a nominal price.

These were the terms Treasury required in order to provide the financial support it

committed to giving Fannie Mae and Freddie Mac during the September 2008 financial crisis.

Implicit in these terms is the proposition that if Fannie Mae and Freddie Mac returned to

profitability, Treasury would not only be paid back all the money that it had invested with a 10%

annual return, but it also reserved to itself the right to capture 79.9% of any future profits by

exercising its right to acquire 79.9% of the common stock for a nominal price.  That option to

buy 79.9% of the common stock would have been meaningless if it had not been contemplated

that there was some chance that the Enterprises would return to profitability.  The terms of the

PSPAs effectively provide that if that ever happened, Treasury would capture the lion's share of

those profits, but some portion of the profits would remain for private shareholders.  Similarly,

by providing for a "liquidation preference," the PSPAs recognized that there were other

stakeholders who would have rights to the proceeds of such a liquidation.  The governing statute

("HERA") also expressly recognizes that shareholders have a right to any such proceeds after

payment of administrative expenses and higher priority creditors.  Thus, the PSPAs, along with

HERA, recognized that the preferred and common shareholders of the Enterprises still had

property rights that were potentially valuable.  The market recognized this too: the outstanding

preferred stock issued by the Enterprises continued to trade after the conservatorship and was not

cancelled by FHFA, and the common stock also continued to trade, even though it was subject at any time to the 79.9% dilution that would result from the government exercising its warrant.

By August 2012, the Enterprises had in fact returned to profitability, in a big way.  The Enterprises posted profits of more than $10 billion for the first two quarters of 2012 alone.  ¶65.[3] This level of profitability was such that the Enterprises were clearly on track to pay back Treasury and be able to distribute profits to private shareholders, making the government's warrant to acquire 79.9% of the common stock for a nominal price extremely valuable.  But the government was not content to capture just the profits it was promised in the September 2008 PSPAs.   Instead, it wanted everything.   Thus, in response to profit announcements, the government took immediate action to ensure that these profits would never be distributed to private shareholders.   On August 17, 2012, FHFA and Treasury entered into a "Third Amendment" to the PSPAs.  This Third Amendment requires Fannie Mae and Freddie Mac to pay a quarterly dividend to Treasury equal to the *entire net worth* of each Enterprise, minus a small reserve that shrinks to zero over time.  It has therefore rightly been called the "Net Worth Sweep" or the "Sweep Amendment."   Whatever it is called, its effect is clear: the rights that millions of private shareholders had to receive dividends and liquidation proceeds from Fannie Mae and Freddie Mac were directly expropriated by the government for the benefit of Treasury.

Contrary to defendants' statement that this case concerns their "response to the most calamitous economic crisis in generations," this August 2012 decision was not made in the midst of a crisis or in response to any imminent disaster.  Nor was it made for the purpose of avoiding or containing a financial meltdown or widespread systemic risk.   Rather, in the words of Treasury, the decision in August 2012 was made to "make sure that every dollar of earnings each

---

[3] Citations to the Complaint [ECF No. 4] will be referenced as "¶ __."

firm generates is used to benefit taxpayers [*i.e.* the government]," and to ensure that Fannie Mae and Freddie Mac "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  ¶72.  In other words, the purpose of the Sweep Amendment was to ensure that Fannie Mae and Freddie Mac's private shareholders would receive *nothing*.  As FORTUNE magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement?  ***By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone***.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players.  Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  ***The "sweep clause" that grabbed the entire windfall in profits*** was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

¶71 (emphasis added) (quoting FORTUNE, July 8, 2013).

Whether the motivation behind the Sweep Amendment was to keep Fannie Mae and Freddie Mac as "wards of the state" or merely to enrich Treasury, or both, it violated the rights of the Fannie Mae and Freddie Mac private shareholders.  Those shareholders invested their money in Fannie Mae and Freddie Mac securities and were entitled to rely on the contracts and laws governing their rights as shareholders, both of which made clear that if the Enterprises returned to profitability or generated positive value, the shareholders would be entitled to receive distributions of any surplus value (as dividends and/or as liquidation proceeds).  The Sweep Amendment expropriates this right of the private shareholders to receive distributions from the Enterprises, and transfers it directly to Treasury.  That is a breach of the Enterprises' contractual obligations to the shareholders, a breach of Treasury and FHFA's fiduciary duties to the shareholders, and a taking of a valuable property right, and triggers an obligation on the part of

the government to pay shareholders damages and just compensation for the deprivation of their rights.

As explained in more detail below, the Court should deny defendants' motions, and should allow the Plaintiffs to pursue discovery and to proceed expeditiously to resolve the merits of this case.[4]

## STATEMENT OF FACTS

## I.    BACKGROUND OF FANNIE MAE AND FREDDIE MAC

Fannie Mae and Freddie Mac are private, shareholder-owned corporations that Congress created to increase mortgage market liquidity.  ¶45.  They seek to accomplish this by purchasing mortgages that private banks originate and bundling them into mortgage-related securities to be sold to investors, which then enables banks to make additional loans to individuals for home purchases.  *Id.*

To raise the capital needed to support these operations, both Fannie Mae and Freddie Mac issued common stock and several series of preferred stock.  ¶¶80-81.  Like any corporations, the Enterprises needed rules to govern their relationships with their shareholders, and the regulations governing the Enterprises required them to elect state corporate governance practices in their bylaws.  12 C.F.R. 1710.10(b).  Fannie Mae elected that it would follow Delaware corporate governance practices and procedures, and Freddie Mac chose Virginia law.  ¶83.  Delaware and Virginia law protect shareholders from managerial abuses by providing that

---

[4] As shown below, defendants rely on factual assertions that are outside the pleadings, and that should cause the Court to convert their motion to dismiss into a motion for summary judgment. Indeed, Treasury's motion explicitly says that it seeks summary judgment "in the alternative," without ever limiting that alternative relief solely to the Administrative Procedure Act ("APA") claim.  Thus, in response to these summary judgment motions, Plaintiffs have submitted a declaration in accordance with Fed. R. Civ. P. 56(d) identifying the topics of discovery that would be needed before the Court could ever consider granting such motions.

the officers and directors of a corporation owe the corporation and its shareholders fiduciary obligations to act in the best interests of the corporation. ¶102; s*ee also* Va. Code Ann. § 13.1-690(A); *Owens v. Owens*, 589 S.E.2d 488, 494 (Va. App. 2003).

Furthermore, under both Delaware and Virginia law, stock designations are deemed as amendments to a corporation's charter and are therefore generally deemed to be contractual in nature. *Id.* The Certificates of Designation (the "Certificates") governing each series of preferred stock (as well as Freddie Mac's common stock, which is also governed by a Certificate of Designation) thus constituted contracts, with provisions governing (among other matters) the holders' dividend rights and liquidation rights. ¶¶84-85. The Enterprises agreed that they would not amend the terms of the preferred stock and Freddie Mac common stock in any way that had a material and adverse impact on shareholders unless they first received the permission of two-thirds of the affected holders. ¶86. Furthermore, in addition to their explicit terms, inherent in the Certificates was an implied covenant by Fannie Mae and Freddie Mac to fulfill their contractual obligations in good faith, and not to take actions that would deprive shareholders of the benefit of the bargain. ¶90. *See also Chamison v. HealthTrust, Inc. Hosp. Co.*, 735 A.2d 912, 920-21 (Del. Ch. 1999); *Pa. Life Ins. Co. v. Bumbrey*, 665 F. Supp. 1190, 1195 (E.D. Va. 1987).

Before FHFA placed the Enterprises into conservatorship, Fannie Mae and Freddie Mac preferred stock enjoyed strong credit ratings. ¶59. Treasury and other federal agencies encouraged private entities to invest in the Enterprises, and banking regulators permitted banks to carry the Enterprises' preferred stock on their balance sheets at a lower risk weighting than other companies' preferred stock. *Id.* The Enterprises' preferred stock was long perceived as a conservative investment paying modest but reliable rates of return, and the common stock

participated in the Enterprises' earnings for many years.  ¶6.  Prior to the financial crisis, the Enterprises were consistently profitable.  ¶¶46-47.  Fannie Mae's most recent full-year loss had been in 1985, and Freddie Mac had never recorded an annual loss at all.  *Id.*

## II.     THE ENTERPRISES ARE PLACED INTO CONSERVATORSHIP

Beginning in 2006, however, industry-wide financial upheavals and a nationwide decline in the housing market caused the Enterprises to suffer losses.  ¶47.  Despite these losses, in July 2008 the Enterprises' regulator published a news release stating that the Enterprises were holding capital "well in excess" of their regulatory requirements, and both the Secretary of the Treasury and the Chairman of the Federal Reserve testified before the House Financial Services Committee that the Enterprises were adequately capitalized.  ¶49.

In July 2008, in response to the crisis in the housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating FHFA to oversee the operations of Fannie Mae and Freddie Mac.  ¶7.  HERA provides that under certain enumerated circumstances, FHFA has the power to place the Enterprises into *conservatorship* or *receivership*.  12 U.S.C. § 4617(a)(2).  There are significant differences in FHFA's statutory authority between its roles as conservator and receiver.  When it is acting as a *conservator*, FHFA has the power under HERA to "take such action as may be – (i) necessary to put the regulated entity in a sound and solvent condition; and (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D).  Furthermore, when operating as conservator, FHFA does **not** have the power to wind down the Enterprises.  Rather, as the director of FHFA stated in a February 2, 2010 letter to Congressional leaders, "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters."  ¶72.

-7-

By contrast, when FHFA is acting as a *receiver*, HERA provides that in addition to the powers it may exercise as a conservator, FHFA also has the power to place the regulated entity into liquidation. ¶63; 12 U.S.C. § 4617(b)(2)(E).  By statute, receivership terminates all rights or claims that the shareholders of the regulated entity have against the assets or charter of the regulated entity, *except* for the right of those shareholders to participate in a statutory claims process.  12 U.S.C. § 4617(b)(2)(K).  That statutory claims process entitles those shareholders to receive a distribution from the regulated entity after payment of all superior claims (such as administrative expenses and creditor claims).  *See* 12 U.S.C. § 4617(c)(1) (recognizing right of shareholders to receive payment in the priority scheme for "[a]ny obligation to shareholders or members arising as a result of their status as shareholder or members.").  Thus, even in a receivership, HERA expressly recognizes and preserves the right of shareholders to receive distributions of any surplus value that the Enterprises might have.

On September 6, 2008, FHFA placed the Enterprises into *conservatorship*, not receivership.  ¶¶8, 51.  By assuming the role of conservator, FHFA assumed the power of their boards and management. ¶51.  FHFA stressed that the conservatorship was intended to be a temporary process that would "stabilize" the Enterprises, "with the objective of returning the entities to normal business operations," and that that once the Enterprises had been returned to a safe and solvent condition, the conservatorship would end.  *Id.*  Treasury and FHFA specified that while dividends were being suspended, the Enterprises' common and preferred stock were not being eliminated and would continue to remain outstanding.  ¶¶53-54.

Treasury was authorized under HERA to strengthen the Enterprises' balance sheets by purchasing their securities, so long as the Secretary considered several statutory factors in making such purchase decisions.  ¶55; *see also* 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).  This

statutory authority to purchase the Enterprises' securities was only temporary, and was set to expire at the end of 2009. ¶58. Treasury used its temporary HERA authority to enter into the PSPAs with FHFA, which acted on behalf of both Enterprises. ¶56. Under these contracts, Treasury would receive a newly created class of securities in the Enterprises, known as Senior Preferred Stock ("Government Stock"), in exchange for which each Company would be allowed to draw funds from Treasury. *Id.* In return for its commitment to provide the Enterprises with enough funding to maintain a positive net worth, Treasury received $1 billion of Government Stock in each Company as a commitment fee, as well as warrants to acquire 79.9% of the common stock of the Enterprises at a nominal price. *Id.* The Government Stock and PSPAs entitled Treasury to quarterly dividends. *Id.* The PSPAs also entitled Treasury to certain other rights, including a variable periodic commitment fee, which Treasury possessed discretion to waive, and covenants precluding the Enterprises from paying dividends, redeeming stock, or exiting from conservatorship without Treasury consent. FHFA0133,[5] 0135-36, 0138, 0147, 0149, 0150, 0152 (PSPA §§ 3.2(b); 5.1; 5.3; 5.6; 6.1).

Under the PSPAs, the payment of dividends to Treasury by the Enterprises was to be based on decisions of the Board of Directors of each Enterprise "in its sole discretion, out of funds legally available therefor." TREASURY0032-33[6] (PSPA § 2(a)). To the extent a dividend is not paid for a given "Dividend Period," the dividend that was owed for that period "shall accrue and shall be added to the Liquidation Preference." TREASURY0033 (PSPA §

---

[5] Citations to the Document Compilation by Defendants Federal Housing Finance Agency and Edward DeMarco Regarding Third Amendment to Senior Preferred Stock Purchase Agreements [ECF Nos. 7, 7-1 – 7-18] will be referenced as "FHFA___."

[6] Citations to the Administrative Record of the Department of Treasury [ECF Nos. 6, 6-1 – 6-14, 8, 8-1 – 8-6] will be referenced as "TREASURY___."

2(b)).  The PSPA also provides that "if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner," then from that point thereafter (unless cured by a subsequent cumulative cash dividend), dividends would accrue at the rate of 12%, rather than 10%. *Id*. (PSPA § 2(c)).  The net effect of these provisions is that if the Enterprises were unable or unwilling to pay cash dividends, they could simply convert the amounts owed into an incremental increase in the liquidation preference, and thereafter accrue dividends at a 12% rate. Thus, it is inaccurate for defendants to assert that it was necessary to enter into the Third Amendment to relieve the Enterprises from the burden of paying the 10% cash dividends; the PSPA Certificates, without amendments, expressly permitted the Enterprises to avoid any cash flow problem by rolling the cash dividend amount into the liquidation preference, subject to a slightly higher accrual rate going forward.

III.  **FHFA DIRECTS THE ENTERPRISES TO INITIATE MASSIVE WRITEDOWNS AND BORROW BILLIONS FROM TREASURY**

FHFA took an extremely pessimistic view of the Enterprises' assets and business prospects, deciding that it did not expect them to be profitable, and that they likely would incur large losses in the coming years.  ¶61.  FHFA therefore directed the Enterprises to book substantial loss reserves – recording loan losses before they were actually incurred – and required the Enterprises to eliminate from their balance sheets the value of non-cash deferred tax assets that would only be of use if the Enterprises became profitable.  *Id.*  Between the beginning of 2007 and the second quarter of 2012, FHFA directed the Enterprises to set aside more than $234 billion to absorb anticipated loan losses.  ¶64.  FHFA also required the Enterprises to write down approximately $100 billion in deferred tax assets, since it did not anticipate that the Enterprises would earn the profits needed to make use of those assets.  ¶¶61, 65. These

accounting adjustments and others caused the Enterprises' net worth to drop into negative territory, requiring the Enterprises to draw on Treasury's funding commitment.  ¶62.

Drawing on Treasury's funding commitment gave rise to a circular payment obligation. *Id.*  Under the initial PSPAs, Treasury committed to make quarterly payments to the Enterprises if necessary to keep the Enterprises from having negative net worth.  *Id.*  Each quarter, FHFA looked to the Enterprises' financial statements to determine if their liabilities exceeded their assets.  *Id.*  If so, FHFA would request that Treasury draw down the Enterprises' funding commitment and provide funds equal to the net worth deficit.  *Id.*

The Enterprises would then pay to Treasury as dividends 10% of the outstanding liquidation preference (the sum total of all their Treasury draws, plus the initial $1 billion liquidation preference).  *Id.*  In other words, each Treasury draw increased the dividends that the Enterprises paid back to Treasury.  *Id.*  When the Enterprises lacked the funds to pay these dividends, they made further Treasury draws (which in turn, further increased the size of the outstanding liquidation preference and the amount of future 10% dividends).  *Id.*  As shown above, these further draws to pay dividends were not actually necessary or required.  Under the PSPA Certificates, the Enterprises had the option to convert any cash dividend into a liquidation preference, subject to giving Treasury a 12% accrual rate going forward.  TREASURY0032-33, 0036-37 (PSPA §§ 2(a)-(c), 8).  Thus, the decision by the Enterprises to draw down funds in order to pay dividends was a choice, not a strict requirement under the terms of the PSPAs.

Before Treasury's statutory authority to purchase the Enterprises' securities expired, Treasury and FHFA amended the PSPAs twice.  ¶58.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per company from $100 billion per company.  *Id*. Second, in December 2009, Treasury agreed to a funding commitment that would be sufficient to

allow the Enterprises to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years. *Id.* Neither of these amendments to the PSPAs was beyond FHFA's power to conserve the assets and property of the Enterprises, and therefore neither of these amendments to the PSPAs is challenged in this litigation. According to the documents the Secretary of the Treasury signed in approving the execution of these amendments to the PSPAs, these amendments to the PSPAs were made pursuant to Treasury's authority to purchase securities and other obligations of the Enterprises. (TREASURY0163-64, 0187-88).[7] That authority expired at the end of 2009. ¶58.

## IV.   THE ENTERPRISES RETURN TO PROFITABILITY

In 2012, it became clear that FHFA had overestimated the Enterprises' likely losses and underestimated the possibility of a return to profitability. ¶64. Between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Enterprises to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period. This indicates that projected losses had been overestimated by $109 billion. *Id.* Contrary to FHFA's earlier projections that the Enterprises would not be profitable again, the Enterprises posted profits of more than $10 billion in the first two quarters of 2012. ¶65. Even more importantly, the Enterprises disclosed that they expected to be consistently profitable for the foreseeable future, such that they eventually would be able to remove the $100 billion valuation allowance against their deferred tax assets. *Id.* Thus, the Enterprises were positioned to pay back the government for the support they had received, with

---

[7] Plaintiffs cite non-public documents contained in the administrative record solely to illustrate some of the facts that discovery will uncover, and do not believe that it would be appropriate for the Court to take judicial notice of these documents. Should the Court find that the facts contained in these documents are necessary for Plaintiffs to state a claim, Plaintiffs respectfully request permission to amend their Complaint to incorporate these documents, which were not available at the time Plaintiffs' Complaint was drafted and filed.

residual assets left over to provide a financial return to their private investors, leading to substantial increases in the trading prices of the Enterprises' preferred stock.  ¶¶66-68.  The President's proposed fiscal year 2014 budget estimates that the Enterprises will together pay $238.5 billion in dividends to Treasury over the next ten years, far outstripping the government's investments.  ¶74.  Thus, the government clearly anticipated that the Enterprises would generate sufficient funds to pay back Treasury, with a substantial amount left over.  Indeed, this has already occurred.  In a February 21, 2014 news release which Fannie Mae filed with the U.S. Securities and Exchange Commission ("SEC"), it announced that after making a $7.2 billion dividend payment planned for March 2014, "Fannie Mae will have paid a total of $121.1 billion in dividends to Treasury in comparison to $116.1 billion in draw requests," and that "Fannie Mae expects to be profitable for the foreseeable future[.]"  *See* Fannie Mae February 21, 2014 Form 8-K, at 1 (attached to the Declaration of Eric L. Zagar in Support of Plaintiffs' Omnibus Opposition to Defendants' Motions to Dismiss, or, in the Alternative, for Summary Judgment ("Zagar Decl.") as Exhibit A).  On February 27, 2014, Freddie Mac similarly announced that as of March 2014, "Freddie Mac's aggregate cash dividends to Treasury will total $81.8 billion, versus cumulative cash draws of $71.3 billion received from Treasury[.]"  *See* Freddie Mae February 27, 2014 Form 8-K, at 4 (attached to the Zagar Decl. as Exhibit B).

V.     **FHFA AND TREASURY ENTER INTO THE THIRD AMENDMENT TO EXPROPRIATE ALL SHAREHOLDER VALUE WITHOUT REGARD TO THE ENTERPRISES' ABILITY TO REPAY THE GOVERNMENT'S INVESTMENT**

On August 17, 2012, shortly after the Enterprises had announced their return to profitability, Treasury and FHFA implemented the Third Amendment to seize *all* of the Enterprises' net worth in perpetuity without regard to the government's investment or the need for Treasury involvement going forward.  ¶¶1, 16.  The Third Amendment altered the PSPAs by replacing the 10% dividend with a dividend of 100% of all current and future profits of the

Enterprises.  ¶16.  This ensured that no matter how profitable the Enterprises were or thereafter became, no matter how much they distribute to Treasury, and no matter how much their assets are worth in any potential liquidation, there will **never** be any surplus to redeem the Government Stock or distribute to private stockholders.  *Id.*  Internal Treasury documents state that one of the goals of the Third Amendment was that, "[t]he maximum financial upside possible should be retained for the taxpayer if/when the GSEs return to sustained profitability."  TREASURY3852.

In fact, defendants had decided to take all of the Enterprises' net worth well before the Third Amendment.  As far back as December 2010, Treasury had internally discussed "the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future," and told FHFA of Treasury's intention "that future positive earnings of the Enterprises [will be] returned to taxpayers as compensation for their investment."  TREASURY0202, 0204.  But this information was not made public.  It was only when the Third Amendment was executed that this intention became clear.

The Third Amendment has resulted in windfall payments to Treasury, far exceeding what it would have received under the previous 10% dividend.  ¶¶73.  In the first quarter of 2013 the Enterprises posted combined profits of approximately $15 billion, and Fannie Mae added approximately $51 billion to its balance sheet by reversing write-downs of deferred tax assets. *Id.*  At the end of the second quarter of 2013, the Third Amendment required the Enterprises to pay $66.3 billion to Treasury, followed by a $39 billion dividend at the end of the third quarter. ¶73.  The shareholders' stake in the Enterprises' assets has been taken since the moment the Third Amendment took effect, and this taking of their property will continue for as long as the Enterprises exist.  ¶77.

By removing tens of billions of dollars from the Enterprises in the form of dividends to Treasury, the Third Amendment has undermined the Enterprises' ability to rebuild their capital base, directly contradicting FHFA's statutory responsibilities and exceeding its powers as a conservator.  ¶92.  Prior to the Third Amendment, FHFA itself acknowledged that "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity."  *Id*.  Yet the enormous dividends mandated by the Third Amendment's net worth sweep have had a corresponding enormously negative effect on the Enterprises' core capital.  ¶97.  Borrowing money to pay dividends runs directly contrary to the goal of operating the Enterprises in a safe and sound manner and restoring them to financial health.  ¶98.  Indeed, Fannie Mae has identified the dividend obligations imposed by the Third Amendment and its consequent inability to rebuild capital reserves as posing a "specific risk to [its] business."  ¶92.

Defendants have emphasized that the Third Amendment is intended to capture all profits of the Enterprises, prevent them from rebuilding capital, and gradually eliminate them.  For example, in a press release announcing the Third Amendment, Treasury said the changes would "help expedite the wind down of Fannie Mae and Freddie Mac [and] make sure that every dollar of earnings each firm generates is used to benefit taxpayers[.]"  ¶72.  Treasury said that the Third Amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  *Id.*  Similarly, FHFA's director told Congress that the Third Amendment "reinforce[s] the notion that the [Enterprises] will not be building capital as a potential step to regaining their former corporate status," and that it had

begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie

Mae and Freddie Mac."   ¶95.   This language was in stark contrast to FHFA's earlier

representations that they sought only to "stabilize" the Enterprises and return them "to normal

business operations."   ¶51.   More importantly, it is in consistent with the agency's powers as

conservator, which are intended to put the Enterprises into a "sound and solvent condition,"

"carry on [their] business," and "conserve [their] assets and property."   12 U.S.C. §

4617(b)(2)(D).  While HERA expressly contemplates that a *receiver* has the power to wind down

the Enterprises, FHFA has always maintained that its relationship with the Enterprises is that of

conservator rather than receiver or liquidator.  ¶63.

Defendants say that the Third Amendment was motivated by a "concern" over the

"burden" on the Enterprises created by the PSPAs' 10% dividend.  But as shown above, the

PSPA Certificates made clear that the Enterprises could avoid the cash dividend and effective

pay that dividend "in kind" by converting into an additional increase to the liquidation

preference, subject to incurring a 12% accrual rate going forward.  TREASURY0032-33, 0036-

37 (PSPA §§ 2(a)-(c), 8).  Hence, the circular flow of cash to and from Treasury was entirely

avoidable at the Enterprises' option.  Moreover, there many other options available to address the

"concern" that defendants claim motivated the Third Amendment, such as temporarily

suspending or deferring dividends.  Consequently, the Third Amendment cannot be justified as a

mechanism for protecting the Enterprises from the 10% dividend.

## VI.   THE THIRD AMENDMENT IS CONTRARY TO THE EXPRESS TERMS OF CONTRACTS GOVERNING FANNIE MAE AND FREDDIE MAC PREFERRED STOCK AND FREDDIE MAC COMMON STOCK

The Third Amendment's net worth sweep violated shareholders' rights in a number of

ways.  First, the contracts governing Fannie Mae preferred stock, Freddie Mac preferred stock,

and Freddie Mac common stock provide shareholders with a contractual right to dividends.

¶¶82-86.  For example, the Certificate of Designation for Fannie Mae's Series T Preferred Stock (which is materially similar to the other contracts) states that:

> Holders of record of Series T Preferred Stock . . . will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefore, non-cumulative cash dividends at [specified rate] per annum of the [specified] value . . . of Series T Preferred Stock.

¶84.  The net worth sweep of the Third Amendment effectively terminated this contractual right by making it impossible for there ever to be funds available to pay these dividends.  ¶¶87, 139-156.

The relevant contracts also provide shareholders with a liquidation preference on the residual assets of the Enterprises, *i.e.,* the assets remaining after paying higher-priority claims, should the Enterprises be voluntarily or involuntarily liquidated.  ¶¶82-86.  Again using the Certificate of Designation for Fannie Mae's Series T Preferred Stock as an example, that Certificate states that:

> Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock will be entitled to receive out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders . . . the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment[.]

¶84.  Should the residual assets be insufficient to pay these amounts in full, all holders of Preferred Stock ranking on par with each other are entitled to a pro rata distribution.  *Id.*  The Third Amendment's net worth sweep eliminated these contractual rights by claiming for Treasury all residual assets that would otherwise have been available to pay liquidation preferences.  ¶¶87, 139-156.

Finally, the relevant contracts provide that the Enterprises may alter or repeal the contractual terms in a manner that "materially and adversely affect[s]" shareholder rights "only

with the consent of the Holders of at least two-thirds of the shares" so affected. ¶84. While the contracts provide that shareholders do ***not*** have the right to vote regarding the issuance of superior classes of stock, the Third Amendment did not purport to be the issuance of a new class of superior stock and could not have constituted the issuance of a new class of superior stock, since Treasury's statutory authority to acquire new series of stock in the Enterprises expired at the end of 2009. ¶¶86, 89; 12 U.S.C. §§ 1455(l)(4), 1719(g)(4). Thus, shareholders had a contractual right to vote on the repeal of their dividend rights and liquidation preferences. ¶86. Defendants held no such vote before implementing the Third Amendment. ¶88.

In addition to their explicit terms, inherent in the Certificates was an implied covenant by the Enterprises to deal with their shareholders and fulfill their contractual obligations in good faith. ¶90. *See Chamison*, 735 A.2d at 920 ("Under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract. . . . This implied covenant is a judicial convention designed to protect the spirit of an agreement when, without violating an express term of the agreement, one side uses oppressive or underhanded tactics to deny the other side the fruits of the parties' bargain."); *Pa. Life Ins.*, 665 F. Supp. at 1195 ("Under Virginia law, every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement."). Fannie Mae, Freddie Mac and FHFA violated this covenant by making it impossible for the Enterprises' private shareholders to realize any value from their contractual rights, thus depriving those shareholders of the fruits of their bargain. ¶91.

## ARGUMENT

### I.    BECAUSE DEFENDANTS' MOTIONS RELY ON MATTERS OUTSIDE THE PLEADINGS, THEY ARE PROCEDURALLY INAPPROPRIATE AND MUST BE DENIED

"The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) is to test 'the sufficiency of the allegations within the four corners of the complaint after taking

those allegations as true.'" *Aref v. Holder*, 953 F. Supp. 2d 133, 142 (D.D.C. 2013) (quotation omitted). A district court abuses its discretion when it considers matters outside the complaint on a motion to dismiss without giving the non-moving party the opportunity to conduct discovery. *See Holy Land Found. for Relief and Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). Defendants also seek, in the alternative, summary judgment. "[S]ummary judgment is premature unless all parties have 'had a full opportunity to conduct discovery.'" *Convertino v. U.S. Dept. of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012); *see also Coleman v. Johnson*, No. 12-cv-1352, 2014 WL 116150, at *8 (D.D.C. Jan. 14, 2014) (denying summary judgment because the non-movant had not had the opportunity to conduct any discovery, and collecting cases). Defendants' motions to dismiss are procedurally improper because their briefing relies on matters outside the Complaint, and their motions for summary judgment are procedurally improper because Plaintiffs have not been afforded any opportunity to conduct discovery.

Defendants have produced an (incomplete) administrative record and document compilation.[8] But Plaintiffs do not advance a claim under the APA, and therefore the production of an administrative record cures neither the defendants' improper citation to facts outside the pleadings in support of their motions to dismiss nor their improper attempt to seek summary judgment before discovery. Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty and violations of the Takings Clause involve the larger course of dealing between defendants and the Enterprises. Hence, even

---

[8] The reasons why defendants' document productions are insufficient and should be supplemented are laid out in detail in the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Supplementation of the Administrative Records, For Limited Discovery, For Suspension Of Briefing On Defendants' Dispositive Motions, And For A Status Conference, filed in *Fairholme Funds, Inc., et al. v. Federal Housing Finance Agency*, *et al.*, No. 13-cv-1053-RCL on February 12, 2014. Plaintiffs have joined in this motion. [ECF Nos. 23, 28].

if the present administrative record was complete (which it is not), it would not provide a sufficient basis for summary judgment briefing on these claims to proceed.

Defendants' briefing regarding Plaintiffs' claims is replete with references to documents outside the pleadings that cannot be considered on a motion to dismiss, including news articles, FHFA financial projections, comments from ratings agencies, and reports to Congress. *See* FHFA Memo at 23-26, 31, 42; Treasury Memo at 26, 29. These items are not appropriate subjects for judicial notice for the reasons discussed in Plaintiffs' Opposition to Defendants' Motion for Judicial Notice (filed herewith).

Because defendants' motions to dismiss rely upon factual matters outside the pleadings, the motion should be converted to a motion for summary judgment and denied as premature without addressing the merits of defendants' arguments. *See Coleman*, 2014 WL 116150, at **4, 8 (converting motion to dismiss that relied upon facts outside the complaint into motion for summary judgment and denying motion as untimely as to some claims). Indeed, Treasury's motion expressly says that it seeks summary judgment "in the alternative," and never makes clear that this alternative request applies only to the APA claim.[9] Pursuant to Fed. R. Civ. P. 56(d), Plaintiffs should be permitted to take discovery before this or any other summary judgment motion by defendants is considered. In that regard, Plaintiffs file herewith a declaration in accordance with Rule 56(d) setting forth some of the categories of information with respect to which they seek discovery. These categories include the information covered by the pending motion by the plaintiffs in the related and coordinated action captioned *Fairholme*

---

[9] In this regard, Treasury's motion is deficient because it fails to comply with Local Rule 7(h)(1), which requires a party moving for summary judgment to file a statement of material facts as to which there is no genuine dispute. Treasury failed to make such a filing.

*Funds, Inc., et al. v. Federal Housing Finance Agency, et al.*, No. 13-cv-1053-RCL, s*ee* 13-cv-1053-RCL, ECF Nos. 31, 32, which Plaintiffs have joined.  *See* ECF Nos. 23, 29.[10]

In any event, without waiving the argument that defendants' motions to dismiss are procedurally inappropriate and should be denied for that reason alone, Plaintiffs demonstrate below that the motions are meritless and should be denied regardless.

## II.     HERA'S "ANTI-INJUNCTION" PROVISION DOES NOT PRECLUDE JUDICIAL REVIEW OF PLAINTIFFS' CLAIMS

### A.     Section 4617(f) Does Not Preclude Plaintiffs' Claims For Monetary Damages

Defendants argue that Plaintiffs' claims are barred by HERA Section 4617(f), which provides: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver."  12 U.S.C. § 4617(f).  Defendants admit that in interpreting Section 4617(f), the Court may rely on decisions addressing Section 1821(j) of the Financial Institutions, Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), since Section 1821(j) and Section 4617(f) are virtually identical.  FHFA Memo at 20; Treasury Memo at 23.[11]  Defendants' argument fails because Plaintiffs seek monetary damages.

It is well-settled that HERA's "anti-injunction" provision, Section 4617(f), like Section 1821(j) of FIRREA, does not preclude judicial review of a damages claim.  *Willow Grove, Ltd. v. Fed. Nat'l Mortg. Ass'n*, No. 13-cv-0723, 2013 WL 6865127, at *2 (D. Colo. Dec. 31, 2013)

---

[10] To be clear, while it would *not* be possible for the Court to grant any of defendants' motions without granting discovery first, it *would* not be possible for the Court to grant summary judgment *for Plaintiffs* based on the record as it currently stands.  Plaintiffs reserve the right to seek such summary judgment on some or all of their claims at any time.

[11] *See also Natural Res. Def. Council, Inc. v. Fed. Hous. Fin. Agency,* 815 F. Supp. 2d 630, 641 (S.D.N.Y. 2011) ("[C]ourts interpreting the scope of section 4617(f) have relied on decisions addressing the nearly identical jurisdictional bar applicable to the [FDIC] conservatorships contained in 12 U.S.C. § 1821(j).").

("Section 4617(f) does not preclude the recovery of monetary damages."); *Hindes v. FDIC.*, 137

F.3d 148, 161 (3d Cir. 1998) ("Courts uniformly have held that the preclusion of section 1821(j)

does not affect a damages claim.") (collecting cases); *Sharpe v. FDIC.*, 126 F.3d 1147, 1155 (9th

Cir. 1997) ("The damages claim is not affected by the jurisdictional bar imposed by § 1821(j)");

*Freeman v. FDIC.*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (same).

For example, in *Freeman*, cited by defendants, the D.C. Circuit interpreted the scope of

§1821(j) of FIRREA as preventing courts from granting certain "nonmonetary remedies,

including injunctive relief, declaratory relief and rescission." *Id.*  The D.C. Circuit emphasized,

however, that in "many cases . . . aggrieved parties will have opportunities to seek money

damages or other relief" and that such claims are "subject to judicial review." *Id.*  Similarly, the

Ninth Circuit has explained that the anti-injunction provision does not permit a conservator "to

breach contracts at will" and avoid paying any compensatory damages. *Sharpe*, 126 F.3d at

1155.  "Although . . . the FDIC can escape the obligations of contracts, it may do so only through

the prescribed mechanism" by "disaffirm[ing] or repudiat[ing] any contract it deems burdensome

and pay[ing] only compensatory damages." *Id.*  Recently, in *Willow Grove*, the court rejected

FHFA's argument that HERA Section 4617(f) precluded the plaintiff's contract and tort claims

for monetary damages and squarely held that "Section 4617(f) does not preclude the recovery of

monetary damages."  2013 WL 6865127, at *2.

Each of the claims asserted in the Complaint seeks money damages or compensatory

relief.  The claims for breach of contract, breach of the implied covenant of good faith and fair

dealing, and breach of fiduciary duty allege that Plaintiffs (or Fannie Mae) "suffered damages"

as a direct and proximate result of defendants' wrongful actions.  *See* Counts I-VII, ¶¶144, 150,

156, 162, 168, 174, 182.  Likewise, the Complaint asserts a claim under the Fifth Amendment for compensatory relief as a result of defendants' taking of property.  *See* Count VIII, ¶192.

Further, none of the underlying contracts (Certificates) between the Enterprises and Plaintiffs have been repudiated or disaffirmed by FHFA.  *See* 12 U.S.C. § 4617(d) (providing authority for FHFA to repudiate or disaffirm contracts entered into before the conservatorship); *Sharpe*, 126 F.3d at 1154.  Plaintiffs' *ex post* pursuit of money damages or other compensatory relief for breach of these contracts, fiduciary duties, and Fifth Amendment takings does not "restrain or affect" FHFA's exercise of its powers or functions as Conservator of the Enterprises.  *See Ambase Corp. v. U.S.*, 61 Fed. Cl. 794, 799 (2004) (holding that "§ 1281(j) is not directed to the pursuit of money damages *ex post* as the result of FDIC actions" and "does not prevent this Court from hearing Plaintiff's claims" for contract damages).  Accordingly, Section 4617(f) does not prevent this Court from hearing Plaintiffs' claims for monetary damages or other compensatory relief.

Tellingly, FHFA concedes that Section 4617(f) does not bar Plaintiffs' claims for monetary damages, and limits its challenge under Section 4617(f) to equitable or declaratory relief.  *See* FHFA Memo at 19-32 (arguing that "The Court Lacks Jurisdiction over Plaintiffs' Claims Seeking Declaratory and Equitable Relief" and not raising any challenge under § 4617(f) to the Court's jurisdiction over Plaintiffs' claims for damages).  As for Treasury's misguided attempt to invoke Section 4617(f), HERA includes no provision limiting judicial review of claims against Treasury, whether for damages or otherwise.[12]  Consequently, Section 4617(f) provides no basis to dismiss Plaintiffs' claims.

---

[12] Plaintiffs hereby adopt and incorporate by reference the arguments set forth on pages [29-31] of the Individual Plaintiffs' Memorandum Of Law In Opposition To Defendants' Motions To

**B.     Section 4617(f) Does Not Preclude Declaratory
        Or Equitable Relief Relating To Any Actions Taken
        Beyond And Contrary To FHFA's Statutory Authority**

It is well-settled that HERA's anti-injunction provision does not preclude judicial review where FHFA acted beyond, or contrary to, its statutory powers or functions. *See In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009) *aff'd sub nom.* 434 F. App'x 188 (4th Cir. 2011) ("The Court agrees with the plaintiffs that, if the FHFA were to act beyond statutory or constitutional bounds in a manner that adversely impacted the rights of others, § 4617(f) would not bar judicial oversight or review of its actions."); *Sharpe*, 126 F.3d at 1155 (Section 1821(j) "shields only 'the exercise of powers or functions' Congress gave to the FDIC; the provision does not bar injunctive relief when the FDIC has acted beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions.").[13]

Defendants recognize this established principle (FHFA Memo at 21; Treasury Memo at 25), but urge the Court to rule that the Third Amendment was within the FHFA's statutory powers as conservator. Accordingly, the threshold issue of whether the Third Amendment was inconsistent and in conflict with FHFA's statutory authority as Conservator of Fannie Mae and Freddie Mac, ¶¶92-101, and thus whether FHFA was acting contrary to or outside the scope of its powers as conservator, is appropriate for judicial review. *See Coit Independence Joint Venture v. Fed. Sav. & Loan Ins. Corp.,* 489 U.S. 561, 575 (1989) (holding that 12 U.S.C. §

---

Dismiss and Motions for Summary Judgment And In Support Of The Individual Plaintiffs' Cross-Motion For Summary Judgment On Administrative Procedure Act Claims (to be filed with the Court today).

[13] As one court explained, the anti-injunction statute "does not elevate the FDIC to the position of a sacred cow which may graze upon the rights of others at will, unchecked by the courts." *See Cummings Props. Mgmt., Inc. v. FDIC*, 786 F. Supp. 144, 146 (D. Mass. 1992) (analyzing scope of FIRREA § 1821(j)), vacated as moot after settlement, appeal dismissed, 1992 WL 366909 (1st Cir. Sept. 1, 1992)).

1464(d)(6)(C), FIRREA's precursor, prevents courts from interfering with the functions of the FSLIC as receiver, but not from *adjudicating* whether a particular act is within the powers of the FSLIC as a receiver); *FDIC v. Olympic Towers Assocs.*, 94-cv-0197E, 1994 WL 148136, at *3 (W.D.N.Y. Apr. 12, 1994) (under *Joint Venture*, courts have the power to adjudicate whether an action sought to be taken by FDIC is indeed within its powers as receiver).

The issue of whether FHFA's conduct in this case fell outside of its statutory authority is being fully briefed by the plaintiffs in the related and coordinated actions captioned *Perry Capital, LL, et al. v. Lew*, No. 13-cv-1025-RCL and *Fairholme Funds, Inc., et al. v. Federal Housing Finance Agency, et al.*, No. 13-cv-1053-RCL. If the Court concludes that FHFA acted outside of its statutory authority, then Plaintiffs' claims for declaratory and injunctive relief would survive the defendants' motions.

## III.   PLAINTIFFS HAVE STANDING TO ASSERT THEIR DIRECT AND DERIVATIVE CLAIMS

Defendants argue that 12 U.S.C. § 4617(b)(2)(A)(i) blocks Plaintiffs from bringing contract-based or derivative claims. FHFA Memo at 36-38, 46-53; Treasury Memo at 29-33. Defendants are wrong, and their interpretation of Section 4617(b)(2)(A)(i) cannot be squared either with the structure of HERA (which expressly contemplates that shareholders retain some rights even in conservatorship), or with relevant precedent.

### A.   Plaintiffs Have Standing To Assert Their Direct Contract-Based Claims

In Counts I-VI, Plaintiffs assert direct claims against Fannie Mae, Freddie Mac, and their conservator FHFA for breach of contract and breach of the implied covenant of good faith and fair dealing. ¶¶139-74. Contrary to FHFA's argument, HERA does not deprive Plaintiffs of standing to assert these claims. This is clear both from the text of HERA and from case law

confirming that the FIRREA provision that mirrors Section 4617(b)(2)(A)(i) of HERA does not preclude shareholders from bringing direct claims for damages.

First, Section 4617(b)(2)(A)(i) has to be interpreted in light of the rest of HERA, which expressly confirms that Fannie Mae and Freddie Mac shareholders retain the right to receive any distributions from the Enterprises after payment of all superior claims in the HERA priority scheme.  FHFA acknowledges and even emphasizes this.  *See* FHFA Memo at 34.  HERA specifically provides that FHFA's "succession, by operation of law, to the rights, titles, powers, and privileges described in subsection (b)(2)(A) shall terminate all rights and claims that the stockholders and creditors of the regulated entity may have against the assets or charter of the regulated entity or the Agency arising as a result of their status as stockholders or creditors, ***except for their right to payment, resolution, or other satisfaction of their claims, as permitted under subsections (b)(9), (c), and (e)***."   12 U.S.C. § 4617(b)(2)(K)(i) (emphasis added).  Subsection (c) referred to here (*i.e.*, 12 U.S.C. § 4617(c)(1)) sets forth a priority scheme for claims against the Enterprises, as follows:

> (c) **Priority of expenses and unsecured claims**.
>
> (1) In general. Unsecured claims against a regulated entity, or the receiver therefor, that are proven to the satisfaction of the receiver shall have priority in the following order:
>
> (A) Administrative expenses of the receiver.
> (B) Any other general or senior liability of the regulated entity (which is not a liability described under subparagraph (C) or (D).
> (C) Any obligation subordinated to general creditors (which is not an obligation described under subparagraph (D)).
> (D) ***Any obligation to shareholders or members arising as a result of their status as shareholder or members***."

12 U.S.C. § 4617(c)(1) (emphasis added).  Thus, HERA provides that FHFA does ***not*** succeed to the right of shareholders to receive any distribution under the HERA priority scheme (in which

shareholders admittedly rank last), so long as the distribution is owed to them "arising as a result of their status as shareholders."  Thus, on its face, HERA provides that shareholders retain property rights in any surplus property that exists after paying creditors, and expressly provides that FHFA does ***not*** succeed to those rights.[14]

Plaintiffs' right to receive their contractually-mandated distributions of the residual value of the Enterprises, *i.e.*, their rights to dividends and liquidation preferences, are among the contractual rights Plaintiffs assert in this action.  Since HERA expressly preserves these rights for shareholders, it likewise preserves Plaintiffs' standing to assert claims for the deprivation or breach of those rights.  Accordingly, this Court should hold that Plaintiffs have standing to assert their direct claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

Furthermore, this section of the statute specifies that FHFA's appointment as ***receiver*** "terminate[s] all rights and claims" of the shareholders, except for their right to participate in the statutory claims process regarding the residual assets.  12 U.S.C. § 4617(b)(2)(K)(i).  This language applies only to the appointment of FHFA as ***receiver,*** and therefore by implication demonstrates that appointment of FHFA as a ***conservator*** does ***not*** "terminate all rights and claims" of shareholders.  Since the Enterprises are currently in conservatorship, not receivership, the only logical interpretation of this is that Plaintiffs' rights and claims have not been terminated.  ¶63.

_____

[14] The existence of provisions governing shareholders' rights to residual assets demonstrates that the dictum from *Kellmer v. Raines* relied on by the government, that "Congress has transferred everything it could" to the conservator and that "nothing was missed," is overstated.  *Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012).  If HERA truly transferred "all" shareholder rights to FHFA, as defendants claim, then including shareholders within the priority structure for distributing residual assets would be nonsensical, since any surplus left after resolving higher-priority claims would escheat to FHFA.

Defendants' broad reading of Section 4617(b)(2)(A)(i) as transferring all shareholder rights conflicts with Section 4617(b)(2)(K)(i) by rendering the latter provision's language regarding termination of shareholder rights superfluous. This contradicts a standard principle of statutory construction. A court's task "in interpreting separate provisions of a single Act is to give the Act the most harmonious, comprehensive meaning possible in light of the legislative policy and purpose," and defendants' maximalist interpretation of Section 4617(b)(2)(A)(i) violates that principle. *Ricci v. DeStefano*, 557 U.S. 557, 625 (2009).

Moreover, the actions taken by the government at the time FHFA was appointed conservator over the Enterprises confirms Plaintiffs' interpretation. The Action Memorandum Secretary Paulson reviewed in initially approving the original PSPA notes that, "Conservatorship preserves the status and claims of the preferred and common shareholders," and that there was a "[n]eed to maintain the Housing GSEs' . . . status as private shareholder-owned companies[.]") (TREASURY0005). Thus, Plaintiffs retain their contractual rights, including, but not limited to, their right to receive contractually-mandated dividends and liquidation preferences.

Although no court has interpreted the scope of Section 4617(b)(2)(A)(i) with regard to direct claims (as opposed to derivative ones), courts have interpreted the scope of the identical provision in FIRREA, 12 U.S.C. § 1821(d)(2)(A)(i),[15] in the context of direct claims for breach of contract and have rejected the identical arguments the government makes here. In *Plaintiffs in All Winstar-Related Cases at the Court v. U.S.*, 44 Fed. Cl. 3 (1999), the plaintiffs, former

---

[15] 12 U.S.C. § 1821(d)(2)(A)(i) provides that the FDIC "shall, as conservator or receiver, and by operation of law, succeed to – (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution." Hence, the operative language of this section of FIRREA is identical to that of the analogous section of HERA, Section 4617(b)(2)(A)(i).

stockholders of failed thrifts, asserted against the government direct claims for "breach of contract, frustration of purpose and/or Fifth Amendment takings claims," *id*. at 9 n.6, and the FDIC, relying on 12 U.S.C. § 1821(d)(2)(A)(i), "sought to intervene as party-plaintiff and substitute itself as sole party-plaintiff." *Id*. at 4.  As FHFA does here, in *Winstar-Related*, "FDIC argued that it should be substituted for all shareholder plaintiffs in these 43 cases.  It claimed that it is the legal owner of all the claims pleaded by the shareholder plaintiffs. . . ."  *Id*. at 9.  Notwithstanding the broad language of 12 U.S.C. § 1821(d)(2)(A)(i), which nominally gave FDIC "all rights, titles, powers, and privileges" of the stockholders, *id*. at 5, the court held that the stockholder plaintiffs retained standing to assert their direct claims and "FDIC will not be substituted at this juncture for those shareholder plaintiffs who alleged direct contract or takings claims."  *Id*. at 10.  *See also Hansen Bancorp, Inc. v. U.S.*, 49 Fed. Cl. 168 (2001) (holding that former stockholders of failed thrift had standing to maintain direct claims for breach of contract), *aff'd*, 344 F.3d 1343 (Fed. Cir. 2003); *Anderson v. U.S.*, 47 Fed. Cl. 438 (2000) (same).  As Section 4617(b)(2)(A)(i) of HERA contains the identical language as Section 1821(d)(2)(A)(i) of FIRREA, this Court should reach the same result as have courts interpreting FIRREA and hold that Plaintiffs have standing to assert their direct claims for breach of contract and breach of the implied covenant of good faith and fair dealing.

With regard to shareholders' right to receive the residual value of Fannie Mae and Freddie Mac, case law interpreting parallel provisions of FIRREA is again instructive.  In *Branch v. FDIC,* 825 F. Supp. 384 (D. Mass. 1993), the bankruptcy trustee and sole shareholder of two failed thrifts asserted, among other things, derivative claims against FDIC, and the court considered whether the trustee had standing to maintain those claims.  As FHFA does here, FDIC pointed to the expansive language of Section 1821(d)(2)(A)(i) of FIRREA, that FDIC, as

receiver, succeeded to "all rights, titles, powers and privileges . . . of any stockholder . . . with respect to the institution and the assets of the institution," and argued that "this section unequivocally and unambiguously places all incidents of ownership with FDIC-Receiver." *Id*. at 403 (emphasis omitted).   The court acknowledged that "[s]ection 1821(d)(2)(A)(i) employs strong language" and that "looking only at the language used, it would seem that section 1821(d)(2)(A)(i) might indeed divest shareholders of any rights they might have with respect to the failed institution," but nonetheless held that:

> Section 1821(d)(11)(B), however, substantially undermines a literal interpretation of section 1821(d)(2)(A)(i).  Under section 1821(d)(11)(B), also enacted in 1989 by FIRREA, the shareholders of a failed national bank remain entitled to "distribution . . . of amounts remaining [in the receivership] after payment of all other claims and expenses."   Thus, through section 1821(d)(11)(B), failed financial institutions' shareholders retain virtually the same rights as do the shareholders of any other bankrupt corporation – the rights to the residual assets once debts to higher priority creditors have been satisfied. Therefore, despite its strong language, section 1821(d)(2)(A)(i) does not transfer all incidents of stock ownership.

*Id*. at 404 (internal citation omitted).  *See also Cal. Hous. Sec., Inc. v. U.S.*, 959 F.2d 955, 957 n.2 (Fed. Cir. 1992) (holding that shareholder of failed thrift sought to recover potential surplus and therefore "reject[ing] the government's challenge of [the shareholder's] individual standing to sue").[16]

Like FIRREA, HERA explicitly preserves shareholders' rights to receive the residual value of the Enterprises upon liquidation.  *See* 12 U.S.C. § 4617(b)(2)(K)(i) and 12 U.S.C. §4617(c)(1).  Consequently, as in the foregoing cases, this Court should hold that Plaintiffs have standing to assert their claims for breach of contract and breach of the implied covenant of good

---

[16] FHFA specifically relies on and endorses *Cal. Hous. Sec*. at pages 60-61 of its Memorandum.

faith and fair dealing arising out of the deprivation of their rights to receive the residual value of the Enterprises.

The case law FHFA cites is inapplicable.  Neither *Kellmer*, 674 F.3d 848, nor *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347 (S.D.N.Y. 2009), addresses whether under HERA shareholders retain standing to assert direct claims, nor whether FHFA, as conservator, succeeds to shareholders' rights to receive the residual value of the Enterprises.[17] Rather, both cases hold only that HERA deprives stockholders of standing to assert **derivative** claims on behalf of Fannie Mae and Freddie Mac **against their former officers and directors**, which is not at issue in this action.[18]  FHFA therefore has no authority for its argument, and there is no basis to dismiss Plaintiffs' direct claims.

---

[17] In a related proceeding in *Kellmer*, this Court held "I do not find persuasive the reasoning in *Branch*" that the preservation of shareholders' rights to receive the residual value of the enterprises upon liquidation necessarily implies that stockholders' standing to assert derivative claims is also preserved.  *In re Fannie Mae Sec., Derivative, and "ERISA" Litig.*, 629 F. Supp. 2d 1, 4 n.4 (D.D.C. 2009).  *See also In re Freddie Mac Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 797 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. May 5, 2011) (finding "unpersuasive" *Branch*'s "holding that because Congress provided that shareholders retain rights to 'residual assets of the failed financial institution,' they also retain the ability 'to protect the failed institution's interests'").  Neither of these cases, however, disputes that under HERA the shareholders of Fannie Mae and Freddie Mac in fact retain their rights to the residual value of the Enterprises, and neither case addresses shareholders' standing to assert direct, as opposed to derivative, claims.  Moreover, as discussed *infra* at section III.B, in light of the holdings in *First Hartford Corp. Pension Plan & Trust v. U.S.*, 194 F.3d 1279 (Fed. Cir. 1999), *Delta Sav. Bank v. U.S.*, 265 F.3d 1017 (9th Cir. 2001), and their progeny, this Court should hold that as a result of FHFA's "manifest conflict of interest," Plaintiffs retain standing to assert derivative claims against FHFA on behalf of Fannie Mae and Freddie Mac.  Plaintiff's direct claims are also asserted against FHFA (among others), and therefore the same "manifest conflict of interest" should result in Plaintiffs' retaining standing to assert their direct claims, as well.

[18] Hence, these cases are inapplicable even as to Plaintiffs' derivative claims for the reasons discussed in section III.B, *infra*.

### B.       Plaintiffs Have Standing To Assert Their Derivative Claims

In Count VII, Plaintiffs asset derivative claims for breach of fiduciary duty against Treasury and FHFA.   ¶¶175-82.   Unlike the cases on which defendants rely, Plaintiffs are not asserting derivative claims against former officers and directors of the Enterprises.   Defendants nonetheless claim that HERA precludes Plaintiffs' derivative claims.   FHFA Memo at 46-47; Treasury Memo at 45-46.   But defendants ignore that it has long been the rule that shareholders retain the right to bring derivative actions to assert the rights of financial institutions placed under the supervision of a receiver, conservator or trustee, and nothing about HERA alters or abridges this rule.   Plaintiffs still retain certain rights in the Enterprises, and given the Conservator's obvious conflict of interest with regard to the transactions at issue, Plaintiffs should be allowed to protect those rights via a derivative action.

"[T]he very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so[.]"   *First Hartford,* 194 F.3d at 1295.   The Court of Appeals for the District of Columbia has held – and the Supreme Court has affirmed – that where a financial institution has been placed under federal receivership, shareholders retain the right to institute derivative suits. *O'Connor v. Rhodes,* 79 F.2d 146, 149 (D.C. Cir. 1935), *aff'd sub nom U.S. Shipping Bd. Merchant Fleet Corp. v. Rhodes*, 297 U.S. 383 (1936).[19]   Other appellate courts have reached the same result.   *See Womble v. Dixon*, 752 F.2d 80, 82-83 (4th Cir. 1984) (permitting shareholders of a savings and loan to assert derivative claims that the receiver had not pursued); *Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 148 (3d Cir. 1973)

---

[19] *In re Freddie Mac Derivative Litig.*, 643 F. Supp. 2d at 796 n.14, held that *O'Connor*'s reasoning does not apply to HERA due to the language of the statute, but that decision rested upon the notion that HERA stripped all rights from the shareholders, which, as discussed in section III.A, *supra*, is incorrect.

("A derivative suit by shareholders should not be precluded merely because a bank is in the receivership of the FDIC. . . . To say that in every case the rule of exclusive power in the receiver is positive and admits of no exception, would be to sacrifice substantial rights to matters of form.").

Again, cases regarding FIRREA are particularly on point, and the majority of courts to address the issue have held that where a FIRREA receiver or conservator faces a manifest conflict of interest, shareholders maintain standing to prosecute derivative suits. *See First Hartford*, 194 F.3d at 1295 (holding that shareholders of a bank in receivership could assert a derivative action); *Delta Savs. Bank*, 265 F.3d at 1024 (holding that "a common-sense, conflict of interest exception" permits derivative suits against FDIC-appointed conservators and receivers); *Suess v. U.S.*, 33 Fed. Cl. 89, 96 (Fed. Cl. 1995) ("[T]he fact that a failed association has been placed into receivership does not preclude [its shareholders] from bringing a derivative suit."); *Branch*, 825 F. Supp. at 404-05 ("[T]his Court cannot conclude that Congress intended to preserve shareholders' rights to the residual assets of the failed financial institution, yet terminate the shareholders' ability to protect the failed institution's interests. Such a bold departure from common law adjudicatory principles would place unfettered discretion in the hands of the FDIC–Receiver, and might deny shareholders any avenue of redress should the FDIC improperly neglect to assert the failed institution's rights."); *see also In re Sunrise Sec. Litig.*, 916 F.2d 874, 888 (3d Cir. 1980) (holding a claim could "be brought by the receiver on behalf of all depositors and creditors or as a derivative claim[.]").

Given this substantial body of case law permitting derivative suits to proceed under a statutory provision that is materially identical to HERA, defendants' argument that HERA bars this action by transferring all of the Enterprises' rights to the conservator (FHFA Memo at 46-

47) is untenable.  Defendants' argument that *First Hartford* and *Delta Savings* can be distinguished because HERA purportedly "eliminates the distinction between shareholder interests on the one hand, and officer and director interests on the other" (FHFA Memo at 52) is baseless.  Indeed, the derivative suit exists precisely so that shareholders can assert claims which ordinarily corporate management would have the exclusive right, power and privilege to control.[20]

It is true that some courts have reached the conclusion that HERA bars derivative claims for breaches of fiduciary duty.  *See Kellmer*, 674 F.3d at 850; *Sadowsky,* 639 F. Supp. 2d at 351; *In re Fannie Mae Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d at 4 n.4; *In re Freddie Mac Deriv. Litig.*, 643 F. Supp. 2d at 796-97.[21]  But each of these cases dealt with derivative claims regarding generalized harms to the Enterprises perpetrated by their former officers, directors, or third parties (where the conservator can be expected to adequately safeguard the interests of the Enterprises), not claims against the conservator itself.[22]  As such, they did not involve anything like the severe conflict of interest presented by the government's conduct here.  For example, the *Kellmer* court noted that in the decisions it relied upon, the relevant statutory language barred shareholder derivative claims "absent a manifest conflict of interest by the conservator not at

---

[20] Defendants' argument that *First Hartford* and *Delta Savings* can be distinguished because neither of those cases involved the anti-injunction provision of HERA also fails because, as discussed in section II.B, *supra*, FHFA was acting outside the scope of its conservatorship duties when it entered into the Third Amendment.

[21] *See also Pareto v. FDIC*, 139 F.3d 696, 701 (9th Cir. 1998); *Lafayette Fed. Credit Union v. Nat'l Credit Union Admin*, 960 F. Supp. 999, 1005 (E.D. Va. 1997).

[22] *See Kellmer*, 674 F.3d at 849 (derivative claims regarding pre-conservatorship accounting); *Sadowsky*, 639 F. Supp. 2d at 349 (derivative claims against former directors and officers); *In re Fannie Mae*, 629 F. Supp. 2d at 2 (derivative claims against former officers, directors and third parties primarily relating to pre-conservatorship accounting and business decisions); *In re Freddie Mac.*, 643 F. Supp. 2d at 793 (derivative action regarding pre-conservatorship harms to Freddie Mac).

issue here."  674 F.3d at 850.  Thus, by its own terms, *Kellmer* is inapplicable here.  Similarly, the Ninth Circuit's *Pareto* decision expressly noted that a case such as this one was outside its purview, noting that, "[W]e need not concern ourselves with what claims, if any, interested parties may have against the [conservator] should it commit some wrongdoing.  That issue is not before us."  *Pareto*, 139 F.3d at 701.  When the Ninth Circuit later heard a case presenting a conflicted conservator, it distinguished *Pareto* and held that barring derivative actions "would be at least impracticable, and arguably absurd."  *Delta Savings*, 265 F.3d at 1023-24.

Finally, defendants' claim that "[a]pplying a conflict-of-interest exception to HERA would open the floodgates" of derivative litigation, "threatening dramatic interference with the exercise of the Conservators' powers," is fanciful.  FHFA Memo at 53.  Defendants have identified only four other cases in which plaintiffs have attempted to assert derivative claims regarding the Enterprises, all of which were dismissed.  At best this is a trickle, not a flood.  Moreover, none of these other cases would have come out any differently had a conflict of interest exception been applied, because none involved a conflict of interest with FHFA.  *See* n.17, *supra.*  As the *First Hartford* court stressed, the conflict-of-interest exception applies only "in a very narrow range of circumstances."  *First Hartford*, 194 F.3d at 1295.  But in cases such as this one, where the government has engaged in self-dealing to the detriment of institutions it is supposed to be conserving, a derivative action is a vital tool to protect legitimate shareholder interests. Otherwise, a conservatorship would simply be a license to loot private property for the benefit of the government without just (or any) compensation.  Accordingly, this Court should hold that Plaintiffs have standing to assert their derivative claims for breach of fiduciary duty, and therefore the Court should deny FHFA's motion to dismiss.

## IV.   PLAINTIFFS ADEQUATELY STATE THEIR COMMON LAW CLAIMS

### A.   Plaintiffs Adequately State Claims For Breach Of Contract

In Counts I-III, Plaintiffs assert claims against Fannie Mae, Freddie Mac, and their conservator FHFA for breach of contract. ¶¶139-56.   Specifically, Plaintiffs allege that these defendants breached the terms of the Certificates by depriving Plaintiffs of their contractual rights to receive dividends and liquidation preferences and by amending, altering, supplementing, or repealing those rights in a manner that materially affected Plaintiffs' interests without obtaining the contractually-required consent of the shareholders. *Id.*   Contrary to FHFA's arguments, Plaintiffs adequately state claims for breach of contract, and therefore the Court should deny FHFA's motion to dismiss.

The elements of a claim for breach of contract are the existence of a contract, the breach of an obligation imposed by that contract, and resulting damages to the plaintiff. *See VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 612 (Del. 2003); *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004).   FHFA does not dispute that the Certificates constitute contracts between Plaintiffs and the Enterprises.   Rather, FHFA confines its arguments to the second and third elements – whether there were breaches of obligations imposed by the Certificates and whether Plaintiffs sustained damages as a result of such breaches.   FHFA's arguments are incorrect. Plaintiffs had, and have been unlawfully deprived of, a present right to dividends and liquidation preferences and have sustained damages as a result.

The Certificates could not be clearer that, prior to the Third Amendment, Plaintiffs had a present, albeit contingent, right to receive dividends and liquidation preferences.   For example, the Certificates for the various series of Fannie Mae Preferred Stock provide that the shareholders:

• "will be *entitled to receive*, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefore, non-cumulative cash dividends. . . .;" and

• "Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae . . . will be *entitled to receive* out of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders, . . . the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or not declared) for the then-current quarterly Dividend Period accrued to but excluding the date of such liquidation payment."

¶84 (emphasis added).  Although the *exercisability* of Plaintiffs' dividend and liquidation rights is contingent upon the occurrence of certain events, *i.e.*, the declaration of dividends and the liquidation of the Enterprises, respectively, the present *existence* of these rights is indisputable.

Likewise indisputable is that notwithstanding the contingent nature of their exercisability, prior to the Third Amendment these present rights had a present value.  Like options, warrants, and any number of other instruments containing bundles of rights whose exercisability is contingent on future events, the market valued Fannie Mae and Freddie Mac preferred and common stocks based in part on the existence of their attendant dividend and liquidation rights and an evaluation of the likelihood that the pertinent contingencies would occur.  Although the Enterprises are generating billions of dollars in profits, the Third Amendment has made it impossible for Fannie Mae and Freddie Mac ever to have "funds legally available" to pay dividends to anyone other than Treasury or to have assets "available for distribution to stockholders" other than Treasury.  The Third Amendment has thus eliminated Plaintiffs' present dividend and liquidation rights in breach of the Certificates, which unconditionally "entitled" Plaintiffs to those present rights.  As a proximate result of the Third Amendment, the present value of Plaintiffs' rights has been reduced to zero.  Consequently, Plaintiffs adequately allege all necessary elements of their claims for breach of contract.

FHFA's contention that "Plaintiffs' contract, implied covenant, fiduciary duty, and takings claims appear to seek recovery of Plaintiffs' liquidation preference as damages," FHFA Memo at 32, is simply wrong.  On the contrary, as discussed above, Plaintiffs' damages are the difference between the positive value their dividend and liquidation rights had prior to the Third Amendment and the zero value they now have as a result of the Third Amendment.  Plaintiffs are not seeking to receive their liquidation preferences now; rather, they are seeking to recover the value of their liquidation rights that Fannie Mae, Freddie Mac, and FHFA destroyed.  Hence, FHFA's argument that "[t]hese claims fail because they are not ripe and Plaintiffs have suffered no injury," *id.*, is baseless.

Citing 12 U.S.C. § 4617(e), FHFA further argues that "HERA provides that Plaintiff shareholders are entitled only to what they would have received had the Enterprises been placed in receivership at the time of the conservatorship appointment.  Thus, following the placement of the Enterprises in receivership, Plaintiffs would be entitled to no more than what they would have received had the Enterprises been liquidated as of September 6, 2008."  FHFA Memo at 33. Again, FHFA is wrong, as neither the plain language of Section 4617(e) nor the cases FHFA cites remotely supports its argument.

12 U.S.C. § 4617(e), entitled "Valuation of claims in default," provides in its entirety:

> (1) In general. Notwithstanding any other provision of Federal law or the law of any State, and regardless of the method which the Agency determines to utilize with respect to a regulated entity in default or in danger of default, including transactions authorized under subsection (i), this subsection shall govern the rights of the creditors of such regulated entity.

> (2) Maximum liability. The maximum liability of the Agency, acting as receiver or in any other capacity, to any person having a claim against the receiver or the regulated entity for which such receiver is appointed shall be not more than the amount that such claimant would have received if the Agency had liquidated the assets and liabilities of the regulated entity without exercising the authority of the Agency under subsection (i).

12 U.S.C. § 4617(e).  Subsection (i), entitled "Limited-life regulated entities," sets forth a series of rules and procedures to be employed in receivership.  Nothing in subsections (e) or (i), however, provides, or even suggests, that claims against Fannie Mae and Freddie Mac are "cut off" as of the date the Enterprises were placed in conservatorship.  Indeed, neither subsection mentions conservatorship at all, much less the timing of conservatorship vis-à-vis receivership or the effect of such timing on claims against the Enterprises.  As Fannie Mae and Freddie Mac are in conservatorship, not receivership, subsections (e) and (i) are inapplicable and irrelevant.  The cases FHFA cites are likewise inapposite, as both concern payment of claims in receivership, not conservatorship.  *See First Ind. Fed. Sav. Bank v. FDIC*, 964 F.2d 503 (5th Cir. 1992) (affirming judgment dismissing bank's claims against FDIC as receiver of failed thrift for breach of participation agreement); *FDIC v. Cobblestone Corp.*, No. 91-12741, 1992 WL 333961, at *3 (D. Mass. Oct. 28, 1992) (granting summary judgment in favor of FDIC as receiver of failed thrift on borrower's claim for repudiation damages).  In short, the "receivership claims process" on which FHFA's argument relies, FHFA Memo at 35, has no relevance to Plaintiffs' claims against the Enterprises and FDIC as their conservator.

In a further attempt to avoid liability, FHFA argues that "it is clear that Plaintiffs have no right to vote on amendments to *other* stock certificates, including the stock certificates issued to Treasury," FHFA Memo at 39, but this argument contradicts the plain language of the Certificates, which explicitly provides that shareholder consent is required for Fannie Mae and Freddie Mac to "amend, alter, supplement or repeal" provisions of the Certificates in a manner that "materially and adversely affect[s]" the shareholders' interests.  ¶¶84-85.  FHFA cannot avoid the voting requirement merely by effectuating the repeal of Plaintiffs' dividend and liquidation rights via an amendment to the PSPAs rather than an amendment to the Certificates.

Furthermore, FHFA's argument that "the Third Amendment did not "materially or adversely affect" shareholder interests any more than issuance of superior stock could have," FHFA Memo at 41, is irrelevant because FHFA's statutory authority to issue superior stock expired on December 31, 2009, more than two years before the Third Amendment. ¶¶11, 58, 86. Thus, since January 1, 2010, there "could have" been no "issuance of superior stock" that would have been exempt from the voting requirement. There is no basis to dismiss Plaintiffs' claims for breach of contract, and therefore the Court should deny the motion to dismiss.

### B. Plaintiffs Adequately State Claims For Breach Of The Implied Covenant Of Good Faith And Fair Dealing

In Counts IV-VI, Plaintiffs assert claims against Fannie Mae, Freddie Mac, and their conservator FHFA for breach of the implied covenant of good faith and fair dealing. ¶¶157-74. The implied covenant "requires 'a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Dunlap v. State Farm Fire & Cas. Co*., 878 A.2d 434, 442 (Del. 2005). The elements of a claim for breach of the implied covenant are "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Fitzgerald v. Cantor*, No. CA 16297, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998). Plaintiffs adequately allege each of these elements, and therefore the Court should deny the motion to dismiss.

Plaintiffs allege, and FHFA does not dispute, that inherent in the Certificates is a duty to deal fairly with Plaintiffs and to act in good faith and not deprive Plaintiffs of the fruits of their bargain. ¶¶159, 165, 171. Plaintiffs further allege, and FHFA likewise does not dispute, that Fannie Mae and Freddie Mac, through their conservator FHFA, entered into the Third Amendment "with the purpose of effectively depriving Plaintiffs . . . of any possibility of

receiving dividends or a liquidation preference. . . ."   ¶¶161, 167, 173; *see also*

TREASURY0202 (discussing "the Administration's commitment to ensure existing common

equity holders will not have access to any positive earnings from the GSEs in the future").

Finally, Plaintiffs allege, and again FHFA does not dispute, that Plaintiffs sustained damages as a

result of defendants' conduct.   ¶¶162, 168, 174.   Contrary to FHFA's contention, Plaintiffs do

not "assert that the Conservator could not amend the terms of senior stock certificates in a way

that impaired the value of the junior stock certificates," FHFA Memo at 45.   Rather, Plaintiffs

allege that FHFA could not take *any* action, regardless of the mechanism, for the purpose and

with the effect of eliminating Plaintiffs' dividend and liquidation rights, yet that is what FHFA

did.   That it did so via the Third Amendment to the PSPAs as opposed to some other means is of

no moment because deliberate destruction of Plaintiffs' dividend and liquidation rights is

"manifestly inconsistent with both the text and spirit of Plaintiffs' stock certificates," FHFA

Memo at 44, no matter how it is accomplished.   Consequently, Plaintiffs adequately state their

claims for breach of the implied covenant of good faith and fair dealing, and therefore the Court

should deny the motion to dismiss.

### C.   Plaintiffs Adequately State Claims For Breach Of Fiduciary Duty

Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws,[23] and under

Delaware law, officers and directors of a corporation owe that corporation and its shareholders

---

[23]   At this time, Plaintiffs assert derivative claims only on behalf of Fannie Mae and its shareholders.   This is because Virginia law applies to Freddie Mac's corporate governance procedures (¶83), and Virginia law requires that shareholders seeking to assert a derivative action present the board of directors with a pre-suit demand and wait 90 days even in cases (as here) where the board faces a conflict of interest that renders such a demand futile.   Va. Code Ann. § 13.1-672.1; *see also Firestone v. Wiley*, 485 F. Supp. 2d 694, 701-02 (E.D. Va. 2007).   Plaintiffs sent a demand letter to Freddie Mac's board of directors on January 7, 2014, and anticipate that they will seek to amend their complaint to add a derivative claim on behalf of Freddie Mac and

fiduciary obligations of due care, good faith, loyalty, and candor, and are required to use their utmost ability to control and manage the corporation in a fair, just, honest, and equitable manner. ¶102; *see also Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).   Defendants' commitment to prevent Fannie Mae's shareholders from accessing any of the Company's earnings (TREASURY0202, 3852) is manifestly inconsistent with those duties.

When FHFA put Fannie Mae into conservatorship, it assumed the powers and obligations of Fannie Mae's officers and directors.   ¶51; *see also* ¶¶63, 103-05.   By operation of law, FHFA succeeded not merely to the powers and privileges of Fannie Mae's directors, but to their titles as well.   12 U.S.C. § 4617(b)(2)(A)(i).   Accordingly, FHFA has stepped into the shoes of Fannie Mae's board and has assumed the board's fiduciary duties.[24]   *See Gibralter Fin. Corp. v. Fed. Home Loan Bank Bd.*, No. 89-cv-3489, 1990 WL 394298, at *3 (C.D. Cal. June 15, 1990) (holding that where a FIRREA bank conservator assumes control of the operations of an institution, the conservator assumes fiduciary duties); *Suess*, 770 F. Supp. 2d at 38 ("[A]s [FIRREA] Receiver, the FDIC also has a fiduciary responsibility to its shareholders."); *see also E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994) (holding that breach of fiduciary duty claim could proceed against FDIC because "[i]n its capacity as a court-appointed receiver, the FDIC steps into the shoes of the failed bank and takes possession of its

---

its shareholders after the 90-day waiting period has expired in the event that Freddie Mac does not take steps to remedy the unlawful acts identified in the demand letter.

[24] While Fannie Mae still has a board of directors, that board has no independent authority apart from what FHFA chooses to give it.   As Fannie Mae's 2011 Form 10-K states, "During the conservatorship, the Conservator has delegated certain authority to the Board of Directors to oversee, and to management to conduct, day-to-day operations so that the company can continue to operate in the ordinary course of business.   The directors serve on behalf of, and exercise authority as directed by, the Conservator.   The Conservator retains the authority to withdraw or revise its delegations of authority at any time.   The Conservator also retained certain significant authorities for itself, and did not delegate them to the Board."   Fannie Mae 2011 Form 10-K (FHFA2731-32).

assets and liabilities . . . As receiver the FDIC has a responsibility to marshal the assets of the bank and to distribute them to the bank's creditors and shareholders.").

In addition, a shareholder of a corporation owes fiduciary duties to the corporation and its minority shareholders if that shareholder possesses majority voting rights or exercises actual control over the business and affairs of the corporation. *See Williamson v. Cox Commc'ns, Inc.*, No. 1663-N, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006). It is not necessary that the shareholder exert control over the day-to-day operations of the corporation, but only the particular transaction that is being challenged. *See id.* at *4. As a result of Treasury's majority voting control over Fannie Mae through its effective 79.9% voting rights, Treasury is the Enterprises' controlling shareholder. ¶107. Moreover, it is clear that Treasury exercised actual control over the Third Amendment. The Third Amendment's net worth sweep offers no benefits whatsoever to the Enterprises, and is a one-sided deal solely favoring Treasury. ¶108. There is no evidence that the Enterprises' conservator made any effort to bargain for less onerous terms. The only reasonable inference that can be drawn from the terms and circumstances of the Third Amendment is that the Third Amendment's net worth sweep was controlled by Treasury and was not the product of arm's-length negotiations. ¶93. As such, Treasury owes fiduciary duties to Fannie Mae and its other shareholders (or at a minimum, owed such fiduciary duties with respect to the Third Amendment).

By entering into the self-dealing Third Amendment and confiscating Fannie Mae's entire net worth, FHFA and Treasury have violated their fiduciary duties to Fannie Mae and its shareholders. ¶¶175-82. Tellingly, defendants do not even attempt to argue that the Third Amendment's net worth sweep was a permissible exercise of managerial discretion under Delaware law, implicitly conceding that if an enforceable fiduciary duty does exist, they have

breached it.  *See Ramer v. US*, 620 F. Supp. 2d 90, 103 (D.D.C. 2009) (arguments not raised in a party's opening brief are waived).

Plaintiffs have asserted derivative claims on Fannie Mae's behalf to seek a remedy for those violations.  ¶¶175-82.  Defendants attempt to deny the existence of their duties, arguing that Treasury does not fit the definition of a controlling shareholder and that state law fiduciary duty claims are preempted by federal law.  FHFA Memo at 45-56; Treasury Memo at 43-49.  Defendants also argue that fiduciary duty claims are contract claims that must proceed in the Court of Federal Claims under the Tucker Act.  Treasury Memo at 44-45.  For the reasons set forth below, these arguments are meritless and defendants' motion to dismiss Plaintiffs' derivative claims should be denied.[25]

### 1.    Treasury Controls Fannie Mae, And Therefore Has The Fiduciary Duties Of A Controlling Stockholder

Treasury claims that it does not owe any state law fiduciary duties because only a controlling shareholder owes such obligations and it neither owns a majority of Fannie Mae's common stock nor exercises actual control over Fannie Mae.  Treasury Memo at 47-49.  This argument fails for a number of reasons.  First, while Treasury says that it does not possess a majority of Fannie Mae's common stock, the PSPAs granted Treasury warrants to acquire 79.9% of Fannie Mae's common stock at a nominal price.  ¶9.  Fannie Mae itself has admitted that these warrants give Treasury the effective ability to decide any matter that is presented for a shareholder vote.  Fannie Mae's SEC filings caution investors that:

> Until Treasury exercises its rights under the warrant or its right to exercise the warrant expires on September 7, 2028 without being executed, the holders of our common stock continue to have the risk that, as a group, they will own no more

---

[25] Defendants' argument that HERA strips the Enterprises and their shareholders of the right to bring fiduciary duty claims (FHFA Memo at 46-47; Treasury Memo at 45-46) is addressed in section III.B, *supra*.

> than 20.1% of the total voting power of the company.  Under our charter, bylaws,
> and applicable law, 20.1% is insufficient to control the outcome of any vote that is
> presented to the common shareholders.  Accordingly, existing common
> shareholders have no assurance that, as a group, they will be able to control the
> election of our directors or the outcome of any other vote after the
> conservatorship ends.

FHFA0293 (Fannie Mae, Annual Report (Form 10-K) (Feb. 13, 2009)).  Given that Treasury has

the right to take a majority position at any time it pleases, and Fannie Mae itself has cautioned its

shareholders that Treasury can decide any vote against them, Treasury's argument that it does

not possess more than 50% of the voting power of Fannie Mae falls flat.  Defendants themselves

admit that Fannie Mae's shareholders have not had meaningful voting rights since the PSPAs

were first entered into in 2008.  FHFA Memo at 12.  Notwithstanding the fact that the warrants

have not yet been exercised, "[i]t is the very nature of equity to look beyond form to the

substance of an arrangement," and the substance of this arrangement is that if it so chooses,

Treasury can cast 79.9% of the votes for any matter that is presented to the shareholders.  *Gatz v.

Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007).

Treasury argues that "even if Treasury did possess voting rights, it could not exercise

them during the period of conservatorship" because FHFA presently is making all decisions that

ordinarily would be resolved by shareholder votes.  Treasury Memo at 48.  Assuming *arguendo*

that Treasury's effective ability to decide any shareholder vote does not constitute control during

a conservatorship, Treasury may still be deemed a controlling shareholder due to its relationship

with the conservator.  ¶¶93, 107.  "Delaware case law has recognized that a number of

shareholders . . . can collectively form a control group where those shareholders are connected in

some legally significant way – *e.g.,* by contract, common ownership, agreement, or other

arrangement – to work together toward a shared goal."  *Frank v. Elgamal*, No. 6120-VCN, 2012

WL 1096090, at *8 (Del. Ch. Mar. 30, 2012).  Here, there can be no doubt that as two

government agencies within the same cabinet department and through the PSPAs, Treasury and FHFA are connected in legally significant ways and share common goals regarding the management of the Enterprises.   Notwithstanding the statutory designation of FHFA as an independent regulatory body, at the pleading stage its alignment of interest and close working relationship with Treasury justify treating the government entities as a unitary "control group" under Delaware law.   To the extent defendants argue that their interests or missions are somehow adverse to each other, the relationship between them is a factual matter to be explored during discovery.   *See Shandler v. DLJ Merchant Banking, Inc.*, No. 4797-VCS, 2010 WL 2929654, at *15-16 (Del. Ch. July 26, 2010) (holding that at pleading stage, complaint had sufficiently alleged facts to create an inference that members of a corporate family constituted a unified control group).

Finally, the circumstances of the Third Amendment give rise to a reasonable implication that Treasury exercised actual control over the transaction.   This case presents a situation where Treasury, the government entity that controls the provision of funds to Fannie Mae (¶177) and can preclude Fannie Mae from paying dividends, redeeming stock, or exiting from conservatorship (FHFA0135-36; 0138 (PSPAs §§ 5.1; 5.3; 5.6; 6.1)), entered into an agreement with Fannie Mae's government conservator FHFA to transfer to Treasury "every dollar of earnings" that Fannie Mae generates.   ¶94.   The documents produced by defendants indicate that the structure of the Third Amendment's net worth sweep originated with Treasury, and characterize the net worth sweep as "Treasury's PSPA Modification Proposal." (TREASURY3793).   At this stage it is reasonable for the Court to infer that this one-sided deal between related parties was controlled by Treasury, as the only entity with any leverage.   For example, in *Williamson*, the Delaware Court of Chancery held that the plaintiff had adequately

alleged "actual control" where the corporation relied on the allegedly controlling shareholders to stay in business and the allegedly controlling shareholders had the ability to veto board actions. *See Williamson*, 2006 WL 1586375, at *5. Under these circumstances, the court held that the plaintiff could be able to prove facts showing that the shareholders' leverage was enough for them "to obtain a far better deal than they would have in an arm's-length transaction." *Id.* The same is true here with regard to Treasury, and therefore at this stage the Court should treat Treasury as Fannie Mae's controlling shareholder with its attendant fiduciary duties.

### 2.      Federal Law Does Not Preempt State Law Fiduciary Duties

Defendants argue that the federal statutory charters of the Enterprises preempt this action, because recognizing shareholder rights purportedly would be inconsistent with the Enterprises' statutory mission to provide stability in the secondary mortgage market, assist the secondary market for residential mortgages, and promote access to mortgage credit. FHFA Memo at 53-56. This argument fails because the fiduciary duties imposed on corporate management by Delaware law are in fact consistent with the objectives set forth in Fannie Mae's charter and HERA, while using the Third Amendment to capture all of Fannie Mae's net worth for Treasury is not. Defendants cannot be heard to argue that federal law preempts state law when their actions go well beyond what federal law permits.

State law may be preempted by Congress where Congress intends a federal law to "occupy the field," where it is impossible for a private party to comply with both state and federal law, or where under the circumstances of a particular case, the challenged law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 372-73 (2000). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373.

Defendants do not argue that Congress intended federal law to "occupy the field" regarding the corporate governance of the Enterprises, nor could they, as federal regulations require the Enterprises to comply with state corporate governance practices or the Revised Model Business Corporation Act insofar as those corporate governance practices are "not inconsistent" with federal law.   12 C.F.R. 1710.10(b); *see also* Office of Fed. Hous. Enter. Oversight, *Corporate Governance*, 67 Fed. Reg. 38361, 38363 (Final Rule, June 4, 2002) ("[Section 1710.10] neither supplants nor displaces traditional standards of corporate governance as commonly defined by State laws regarding the relationships of corporate board members and management to shareholders.").   As such, the regulations governing Fannie Mae are intended to ensure that the company will "operate with an eye toward both Federal and State law and regulation."  67 Fed. Reg. at 38367.[26]  The Enterprises' bylaws similarly provide that they will abide by state law corporate governance practices and procedures.   ¶83; *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines*, 534 F.3d 779, 783 n.1 (D.C. Cir. 2008) ("[T]he relevant Fannie Mae statute and regulation have been applied so as to incorporate Delaware General Corporation Law.").[27]   Thus, the intent of Congress and the Enterprises'

---

[26] Indeed the statutory provisions creating Freddie Mac specifically provide that the Freddie Mac board's power to set corporate policy is circumscribed "[w]ithin the limitations of law and regulation," and defines the term "law" to include "any law of the United States or of any State (including any rule of law or of equity)."  12 U.S.C. § 1452(a)(1); 12 U.S.C. § 1451(c).  The statute creating Fannie Mae contains identical language limiting the powers of the board, but does not include a definitions section.  12 U.S.C. § 1723(a).

[27] Furthermore, the bylaws specifically reference the fiduciary duties of the Board members whose titles and powers FHFA has assumed.  *See* Fannie Mae Bylaws, Corporate Governance Practices & Procedures, Art. 6, § 1.05 (Fannie Mae will not indemnify officers and directors for "any breach of such person's duty of loyalty to the corporation or its stockholders"); Art. 4, § 4.18 (bylaw limiting directors' liability "does not affect the availability of equitable remedies for breach of fiduciary duties").

regulator was that both federal and state law would govern the Enterprises to the extent the two bodies of law were not inconsistent.

Defendants also do not argue that it would be impossible for them to comply with both federal law and their fiduciary obligations, nor could they. "Impossibility pre-emption is a demanding defense." *Wyeth v. Levine*, 555 U.S. 555, 573 (2009). Defendants argue that they needed to impose the Third Amendment to end the circular practice of the Enterprises drawing funds from Treasury to make payments to Treasury (a practice that defendants themselves had instituted by initially structuring the PSPAs as they did), and that this was necessary to promote the stability of the Enterprises and the housing market. FHFA Memo at 56. Even accepting defendants' premise *arguendo*, there is no evidence that expropriating all of the Enterprises' net worth in perpetuity was the only way to achieve this goal (and even if there were, it would not be appropriate to resolve that disputed issue of fact on a motion to dismiss). Defendants readily could have complied with both their fiduciary obligations and federal law by structuring the Third Amendment such that the circular dividends were ended, the Enterprises agreed to a reasonable dividend schedule designed to repay Treasury's investment with interest, and whatever residual assets remained would be left with the Enterprises and their shareholders. Nothing in defendants' briefing suggests that structuring the Third Amendment in such a manner would have had any adverse effects on the housing or finance markets, or that it would have been inconsistent with federal law.

This leaves only the argument that recognizing state-law fiduciary duties would represent an obstacle to the conservator's statutory responsibilities. This is not so. Defendants' fiduciary obligations of "due care, good faith, loyalty and candor" (¶102) are entirely consistent with FHFA's statutory charge to manage the Enterprises with the goal of putting them in a sound and

solvent financial condition while preserving and conserving their assets.   12 U.S.C. § 4617(b)(2)(D).  As one court stated in holding that a FIRREA conservator owed fiduciary duties to the institution's shareholders:

> Notwithstanding the important public policy function served by FSLIC, nothing in the statutory or regulatory scheme would indicate the need to permit FSLIC to function in its capacity as conservator with impunity, leaving all shareholders in a financial institution bereft of the protections provided by the fiduciary duties imposed upon those who control such institutions.

*Gibralter Fin. Corp. v. Fed. Home Loan Bank Bd.*, No. 89-cv-3489, 1990 WL 394298, at \*3 (C.D. Cal. June 15, 1990); *see also Waterview Mgmt. Co. v. FDIC*, 105 F.3d 696, 698 (D.C. Cir. 1997) (holding that pre-receivership purchase option and marketing contracts created valid state law rights that were not inconsistent with FIRREA and therefore were not preempted).[28]

Indeed, as discussed in section III.B, *supra*, the challenged aspects of the Third Amendment are themselves inconsistent with FHFA's statutory responsibilities to conserve the Enterprises' assets and restore them to financial health, so it is defendants' own actions, rather than this lawsuit, that represent an obstacle to the fulfillment of the statutory scheme.  "[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority. . . . [A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Accordingly, courts have refused to find that state law represents an "obstacle" to the fulfillment of federal objectives where, as here, the government has gone beyond its statutory powers.  *See, e.g., Wabash Valley*

---

[28] *But see Franklin Sav. Corp. v. U.S.*, 56 Fed. Cl. 720, 747-55 (Fed. Cl. 2003) (holding that no fiduciary duties existed under a FIRREA conservatorship because the plaintiffs had not identified any source of a duty.  *Franklin Sav. Corp.* does not apply here because Plaintiffs **have** identified a source of fiduciary duties, namely, Fannie Mae's bylaws adopting Delaware law.

*Power Ass'n, Inc. v. Rural Electrification Admin.*, 988 F.2d 1480, 1491 (7th Cir. 1993) (holding that government agency that made loans to utility companies was not authorized to preempt state rate regulations in order to ensure that taxpayer-funded loans would be repaid); *Waterview Mgmt.*, 105 F.3d at 701-02 (holding that applying FIRREA to preempt state law contract rights would exceed the scope of the statute).

### 3. The Tucker Act Does Not Require Plaintiffs To Bring Their Fiduciary Duty Claims In The Court Of Federal Claims

Finally, Treasury argues that the Tucker Act requires that Plaintiffs' breach of fiduciary duty claims be brought in the Court of Federal Claims because those claims are supposedly contract-based actions. Treasury Memo at 44-45. Treasury is wrong because "[t]he breach of fiduciary duty claim sounds in tort[.]" *C&E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 276 (D.D.C. 2009); *see also Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 WL 2739995, at *54 (Del. Ch. July 12, 2010) ("A breach of fiduciary duty is easy to conceive of as an equitable tort[.]"); Restatement (Second) of Torts, § 874 cmt. b (1979) ("A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act."); J. Travis Laster and Michelle D. Morris, *Breaches of Fiduciary Duty and the Del. Uniform Contribution Act*, 11 Del. L. Rev. 71, 71 (2010) ("We conclude that a breach of a fiduciary duty is in fact a tort, although a unique species historically called an 'equitable tort.'"). Because Plaintiffs' fiduciary duty claims are tort claims, this Court has jurisdiction to hear them under the Federal Tort Claims Act. 28 U.S.C. § 1346(b).

Treasury misquotes *Albrecht v. Comm. on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 68-69 (D.C. Cir. 2004). That case did not hold that a "breach of fiduciary claim is essentially a contract action." Treasury Memo at 44. Rather, it held that "the district court lacks jurisdiction *if* appellants' breach of fiduciary duty claim is essentially a

contract action." *Albrecht*, 357 F.3d at 68 (emphasis added).  In *Albrecht*, the court found that the case was essentially a contract action within the scope of the Tucker Act because it turned entirely on the terms of a retirement plan contract.  *See id.* at 69.  Here, by contrast, Plaintiffs seek a remedy for a breach of equitable fiduciary duties that defendants assumed under Delaware law as a result of their control over Fannie Mae, and not under any contract.  *See Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156-57 (Del. 2002) (holding that controlling shareholder's fiduciary duties to the corporation "consist of a set of rights and obligations that are independent of any contract[.]").  There is no contract between FHFA and Fannie Mae, and Treasury's fiduciary obligations arise as a result of its status as a controlling shareholder and its control over the implementation of the Third Amendment, not due to the explicit or implicit terms of the PSPAs.  *See* section IV.C.1, *supra.*  As such, Plaintiffs' fiduciary duty claims fall within the ambit of the Federal Tort Claims Act, not the Tucker Act, and therefore this Court possesses jurisdiction to hear them.  Hence, there is no basis to dismiss Plaintiffs' claims for breach of fiduciary duty.

## V.     PLAINTIFFS ADEQUATELY STATE THEIR TAKINGS CLAIMS

### A.     This Court Has Jurisdiction Over Plaintiffs' Takings Claims Under The "Little Tucker Act"

The Court has jurisdiction to hear the Takings Claims under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), because the Complaint defines the Takings Class as limited to persons and entities who held shares of Fannie Mae and/or Freddie Mac stock as of the Third Amendment and who "suffered less than $10,000 damages thereby, measured individually."  ¶120, and Prayer For Relief at ¶¶1, 9, 10.  *See also U.S. v. Bormes*, 133 S. Ct. 12, 17 n.1 (2012) (quoting *U.S. v. Will*, 449 U.S. 200, 211, n.10 (1980)) ("It is undisputed that this class action satisfied the Little Tucker Act's amount-in-controversy limitation.  We have held that to require only that the

'claims of individual members of the clas[s] do not exceed $10,000.'"); *Zumerling v. Devine*, 769 F.2d 745, 748 (Fed. Cir. 1985) ("The amount in controversy for jurisdictional purposes must be ascertained by the requests in the pleadings without consideration of success on the merits.").

Defendants argue that jurisdiction is lacking because the named Plaintiffs have not expressly waived claims in excess of $10,000.  But, unlike here, in none of the cases defendants cite did the plaintiffs expressly limit the prospective takings class to individuals who suffered losses less than $10,000.  *See, e.g.*, *Waters v. Rumsfeld*, 320 F.3d 265, 271 (D.C. Cir. 2003) (observing that plaintiffs did not cap individual class members' claims at $10,000); *Commonwealth of Pa., by Sheppard v. Nat'l Ass'n of Flood Insurers*, 520 F.2d 11, 25 (3d Cir. 1975) (complaint failed to state the amount individual class members sought against defendants).  Moreover, a waiver at this stage in the proceedings would be premature.  While the amount in controversy for the claims of individual Takings Class members is fixed at an amount below $10,000, the named Plaintiffs' losses need not be so limited.  At the class certification phase, Plaintiffs will proffer class representative(s) for the Takings Claims who suffered less than $10,000 in losses.

To satisfy any concern that at least one named Plaintiff would be a suitable class representative for the Takings Class, Plaintiffs submit that Mary Meiya Liao meets the Little Tucker Act's amount-in-controversy requirement.  Ms. Liao held 300 shares of Fannie Mae Preferred Series T (par value $25/share) as of the Third Amendment and no other securities issued by the Enterprises.  *See* Declaration of Plaintiff Mary Meiya Liao in Support of Omnibus Opposition to Defendants' Motions to Dismiss (filed herewith).  Thus, Ms. Liao could not have suffered a loss of more than $10,000 under any plausible calculation.  Plaintiffs reserve the right

to offer additional representatives for the Takings Class at later stages of the proceedings, including class certification.

### B.  Defendants Are The "United States" For Purposes Of The Takings Clause

FHFA argues that Plaintiffs' Takings claims must be dismissed because FHFA "is not the United States for purposes of Plaintiffs' takings claims." Treasury Memo at 59. Likewise, Treasury argues that it cannot be considered part of the United States government for purposes of Plaintiffs' Takings claims because its actions were taken "as a market participant." Treasury Memo at 64-66. As shown below, the Court should reject these arguments as meritless.

### 1.  The United States Treasury Is Part Of The United States Government, And Cannot Avoid Liability Under The Takings Clause By Asserting That It "Was A Commercial Actor"

Treasury's motion depends upon a factual assertion that falls outside of, and directly contradicts, the allegations of the Complaint: "When it agreed with FHFA to modify the PSPAs (and, indeed, when it chose to invest in the GSEs in the first place), Treasury was a commercial actor acting as an investor entering into a contractual relationship." Treasury Memo at 64. Because this assertion is both unsupported and contradicts Plaintiffs' allegations, the Court should ignore it. Alternatively, the Court should treat this assertion as converting Treasury's motion to dismiss into a motion for summary judgment, and should give Plaintiffs an opportunity to take discovery and to present contrary evidence demonstrating that Treasury's actions, while driven by a naked desire for money, were nonetheless undertaken in its sovereign capacity.

There is also no statutory basis for asserting that Treasury is even authorized to engage in commerce. The HERA provision authorizing Treasury to provide funding to the Enterprises says nothing about Treasury's actions being "commercial." Nor does the government cite any case law holding that Treasury has ever been found to have engaged in commerce as a market participant. The entire notion is antithetical to the statute creating and authorizing the United

States Treasury, which provides "The Department of the Treasury is an executive department of the United States Government at the seat of the Government…." 31 U.S.C. § 301(a). Nor is there any mention of Treasury becoming a commercial actor in the statute setting forth Treasury's general powers and responsibilities. *See* 31 U.S.C. § 321. Indeed, Treasury needed a special act of Congress (*i.e.*, specific provisions of HERA) authorizing it to enter into the PSPAs. *See* 12 U.S.C. § 1719(g)(1)(A); 12 U.S.C. § 1455(l)(1)(A). As the government itself admits, these provisions authorized Treasury to acquire securities from the Enterprises only if Treasury determined that doing so would "provide stability to the financial markets," "prevent disruptions" in mortgage financing, and "protect the taxpayer." *See* Treasury Memo at 8 (quoting 12 U.S.C. § 1719(g)(1)(B); *Id.* § 1455(l)(1)(B)). These authorizations make clear that Treasury's actions with respect to the PSPAs were *sovereign* actions, not commercial ones.

The Court should also reject the government's argument as legally erroneous. The Federal Circuit has held that "the resolution of the 'proprietary-sovereign' dichotomy is not in itself controlling in just compensation jurisprudence." *Yuba Goldfields, Inc. v. U.S.*, 723 F.2d 884, 889 (Fed. Cir. 1983). For this reason, in *Yuba Goldfields* the Federal Circuit reversed a grant of summary judgment that had been based on the government's argument that it was acting in its "proprietary" capacity. *Id.* It would obviously be even more inappropriate to grant a motion to dismiss on these grounds, especially where the motion is based on an unsupported factual assertion, as discussed above.

Moreover, the Federal Circuit further explained that the "proprietary-sovereign" dichotomy is typically of no relevance to a Takings claim:

> In whatever other context it might be useful, moreover, determination of whether the United States has acted in a proprietary or governmental-sovereign capacity is of little, if any, use in Fifth Amendment-just compensation analysis. The purpose and function of the Amendment being to secure citizens against governmental

expropriation, and to guarantee just compensation for the property taken, what counts is not what the government said it was doing, or what it later says its intent was, or whether it may have used the language of a proprietor. ***What counts is what the government did.***

*Yuba Goldfields*, 723 F.2d at 889 (emphasis added).

Ignoring this guidance from the Federal Circuit, Treasury relies on snippets from three inapposite cases. First, Treasury relies on *Sun Oil Co. v. U.S.*, 215 Ct. Cl. 716 (1978),[29] which held that certain actions taken by the government constituted breaches of the plaintiffs' lease rights, and certain actions did not. The court then rejected plaintiffs' alternative claim that the actions which were held not to be breaches of their lease rights were takings of private property under the Fifth Amendment. *Id.* at 768-71. In doing so, the court relied on the principle that when private parties "voluntarily" enter into contracts with the government, "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Id.* at 770. That principle has no application in this case because the contracts governing Plaintiffs' rights were entered into between Plaintiffs and the Enterprises when they were private sector entities. Unlike in *Sun Oil*, the Plaintiffs here never entered into any contracts with the government. Moreover, the PSPAs entered into between Treasury and FHFA were contracts between two government entities to implement governmental policies, which is also completely different from the leasehold contracts entered into between oil companies and the Department of Interior in *Sun Oil*.

Treasury also relies on *St. Christopher's Assocs. v. U.S.*, 511 F.3d 1376 (Fed. Cir. 2008),[30] but that decision is inapposite for precisely the same reason as *Sun Oil*: it involved a

---

[29] *See* Treasury Memo at 64-65.

[30] *See* Treasury Memo at 65.

private party that entered into a contract with HUD, and then sued HUD alleging a breach of contract. *Id.* at 1378. The court rejected the breach of contract claim, *id.* at 1385, and then rejected the alternative takings claim for the same reasons as those set forth in *Sun Oil*. Indeed, *St. Christopher's* cites and quotes *Sun Oil* for the proposition that when a private party enters into a contract with the government, "interference with such contractual rights generally gives rise to a breach claim not a taking claim." *Id.* (quoting *Sun Oil*, 215 Ct. Cl. at 770). In this case, by contrast, Plaintiffs did not enter into a contract with the government. Thus, the Court should reject the government's reliance on *Sun Oil* and *St. Christopher's.*

Finally, the government relies on *Alaska Airlines v. Johnson*, 8 F.3d 791 (Fed. Cir. 1993),[31] which held that the inability to obtain post-judgment interest from the government was not a taking of private property under the Fifth Amendment. *Id.* at 798. Its one-sentence reference to *Sun Oil* and the "proprietary" versus "sovereign" dichotomy is one of a number of grounds supporting the decision, and cannot be read to mean that the government is free to appropriate private property so long as it can characterize its actions as "proprietary" rather than "sovereign." No case makes such a sweeping pronouncement, and any such assertion would contradict the longstanding principles articulated in *Yuba Goldfields*.

### 2.      FHFA Is Also The United States

Since the Treasury Department is indisputably part of the United States government, and since the government's arguments about the Treasury being a "commercial actor" are meritless (*see* section V.B.1, *supra*), this Court clearly has jurisdiction over the Plaintiffs' Takings claim irrespective of whether FHFA is also considered part of the United States that can be sued for a taking. Indeed, it is well-established that a claim against an agency of the United States is

---

[31] *See* Treasury Memo at 64-65.

generally considered to be a claim against the United States itself, even if the United States is not expressly listed in the caption of the complaint. *See, e.g., Auction Co. of Am. v. FDIC*, 132 F.3d 746, 750 (D.C. Cir. 1997) (noting that "the idea that the captioning of the lawsuit somehow outweighs the functional identity of the United States and its instrumentalities for the purposes of [the Little Tucker Act's statute of limitations provision] has been overwhelmingly rejected, by this circuit and others"); *FDIC v. Hartford Ins. Co. of Ill.,* 877 F.2d 590, 592 (7th Cir. 1989) (in applying statute assigning venue for certain cases against the FDIC applicable even though case captioned as against the United States, asks rhetorically, "What is 'the Federal Deposit Insurance Corporation as receiver' other than part of the United States?"); *Portsmouth Redevelopment and Hous. Auth. v. Pierce,* 706 F.2d 471, 473 (4th Cir. 1983) (discussing conditions under which action against federal agency is against United States); 5 U.S.C. § 703 (under the APA suits are permitted against agencies, officers, or the United States, with no requirement to expressly name the United States).[32]

The fact is that this Court does have jurisdiction to hear Takings claims brought against FHFA.  First, the D.C. Circuit has held that suits against a federal instrumentality like FHFA based on acts it has taken to carry out the government's purpose are suits against the United States for purposes of the Tucker Act. *Auction Co. of Am. v. FDIC*, 141 F.3d 1198, 1199 (D.C. Cir. 1998).  Second, FHFA is a government agency, and there is no case holding that it may participate in the taking of private property for the benefit of Treasury yet be immune from suit under the Takings Clause.

---

[32] Even if FHFA were correct that this Court had no jurisdiction over Takings claims brought solely against FHFA, that would not impact the unassailable fact that this Court *does* have jurisdiction over Takings claims brought against Treasury.

FHFA cites *O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994), claiming that it "held that the FDIC acting as receiver was 'not the United States.'"   FHFA Memo at 59.   But the government fails to explain the context of this statement, which was arguably mere *dicta*, and which certainly did not address whether FDIC or similarly situated entities could appropriate private property while being immune from suit under the Takings Clause.   The only issue in *O'Melveny* was whether the FDIC was entitled to invoke a "federal common law" rule of decision to govern the question of whether knowledge of the bad acts of the managers and agents of a savings and loan ("S&L") were imputed to the FDIC as receiver of that S&L, or whether state law governed that question.   512 U.S. at 83.   In resolving that issue, the Supreme Court relied principally on the following principles: (1) the question of imputation is a state law question; (2) there is generally no such thing as "federal common law," and (3) there was no federal statute preempting the state law of imputation, and the mere fact that the FDIC was acting as receiver for the failed S&L did not create a federal statute preempting the state law of imputation.   *See id.* at 83-89.   None of those principles, which fully explain the holding in *O'Melveny*, has anything to do with this case.   In what appears to be *dicta* in *O'Melveny*, the Court rejected the FDIC's argument that federal law should govern questions involving the rights of the United States under nationwide federal programs, and it was in that context that the Court said "The FDIC is not the United States."   *Id.* at 85.   Defendants overlook that the D.C Circuit has explained that statement, and placed it in its proper context:

> Immediately after the Court's declaration that the FDIC was not the United States, it twice discounted the significance of the remark, noting that: (1) even if the FDIC were the United States it would be begging the question to assume that it was asserting its own rights rather than those of the S&L; and (2) even if federal law governed in the sense explained in *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 59 L. Ed. 2d 711, 99 S. Ct. 1448 (1979), *i.e.*, a sense that includes federal adoption of state law rules, that would "not much advance the ball." The Court decided that state law should apply: "[T]his is not one of those

extraordinary cases in which the judicial creation of a federal rule of decision is warranted."

*Auction Co.*, 132 F.3d at 748-49 (citing *O'Melveny,* 512 U.S. at 89).

Thus, per the D.C. Circuit, the actual holding in *O'Melveny* is very narrow: it is merely that state law rules of imputation should govern a state law claim brought by the FDIC on behalf of a failed S&L. *O'Melveny* did not hold that the FDIC, or any other agency acting as a receiver or conservator for a failed financial institution, could appropriate private property yet be immune from suit because it is "not the United States."

Moreover, in the *Auction Co.* case, the D.C. Circuit held that "***the FDIC counted as 'the United States'*** for the purposes of the catch-all federal statute of limitations for any 'civil action commenced against the United States,' 28 U.S.C. § 2401(a)." 141 F.3d at 1199 (emphasis added). In denying the rehearing petition, the D.C. Circuit made clear that its decision was based on the fact that the Tucker Act "provides jurisdiction for suits against the United States whenever 'a federal instrumentality acts within its statutory authority to carry out the government's purposes' as long as no other specific statutory provision bars jurisdiction." *Id.* (internal brackets removed) (citing *Butz Eng'g Corp. v. U.S.,* 499 F.2d 619, 622 (Ct. Cl. 1974); *L'Enfant Plaza Props., Inc. v. U.S.,* 668 F.2d 1211, 1212 (Ct. Cl. 1982)).[33] Thus, binding D.C. Circuit precedent holds that if FHFA was acting pursuant to its statutory authority to carry out the government's

---

[33] Defendants try to explain away the decision in *Auction Co.* by arguing that it was based on the fact that the FDIC was "not acting as receiver for any particular financial institution" but instead "related to the assets of an unspecified number of unnamed depositories….," FHFA Memo at 59 n.35 (citation and quotation omitted), but this is misleading. In denying the rehearing petition, the D.C. Circuit relied on the fact that the FDIC was acting on behalf of "an unspecified number of unnamed depositories" in explaining its analysis of the statutory jurisdictional limits on suits against the FDIC. *Auction Co.*, 141 F.3d at 1201-02. The court did not rely on this point in any way in reaching its threshold ruling that an agency can be sued under the Tucker Act as "the United States" whenever it acts "'within its statutory authority to carry out the government's purposes' as long as no other specific statutory provision bars jurisdiction."

purposes, then it was acting as "the United States" for purposes of Tucker Act jurisdiction.  In responding to the APA claims, FHFA argues that it was acting pursuant to its statutory authority, FHFA Memo at 63, and it therefore cannot say otherwise in order to avoid jurisdiction under the Little Tucker Act.

### C.   Plaintiffs' Shareholder Rights Constitute A Cognizable Property Interest Under The Takings Clause

Defendants argue that the Plaintiffs lacked "the 'full bundle of property rights' that could establish a cognizable property interest," and therefore cannot state a claim under the Takings Clause.  FHFA Memo at 60-62; Treasury Memo at 58-60.  Defendants base this argument on decisions from the Federal Circuit rejecting Takings claims brought by shareholders in failed financial institutions that were placed into receivership by government regulators.  *See* FHFA Memo at 60-61 (citing *Golden Pac. Bancorp v. U.S.*, 15 F.3d 1066 (Fed. Cir. 1994), and *Cal. Hous. Sec., Inc. v. U.S.*, 959 F.2d 955 (Fed. Cir. 1992)); Treasury Memo at 59 (also citing *Golden Pacific* and *California Housing*).  Treasury, however, reads far too much into decisions such as *Golden Pacific* and *California Housing*.  Those cases hold that shareholders in regulated financial institutions are on notice that government regulators may place the institution into conservatorship or receivership if they conclude that the institution is insolvent or being operated in an unsafe and unsound manner, and therefore those shareholders lack the "right to exclude" the government in such circumstances.  Accordingly, they hold that shareholders cannot bring a Takings claim when their financial institutions are seized for the kind of unsafe or unsound practices that have traditionally been regulated and that an investor could reasonably foresee leading to such a seizure. *Golden Pac.*, 15 F.3d at 1074; *Cal. Hous.*, 959 F.2d at 958.  These decisions do not hold that shareholders of regulated financial institutions *never* own *any* property rights and do not stand for the sweeping proposition that the government can confiscate the

shareholder rights of the owners of regulated financial institutions whenever and however it wishes without the Takings Clause ever conceivably applying.

Indeed, in *California Housing*, the Federal Circuit was careful to say that "[o]ur holding today is very narrow." *Cal. Hous.,* 959 F.2d at 958. In that case, the Office of Thrift Supervision concluded that the Saratoga Bank was being operated in an unsafe and unsound manner, and placed the thrift into conservatorship and receivership with the Resolution Trust Corporation ("RTC"). In its "very narrow" holding, the Federal Circuit made clear that both Saratoga and its owners were on notice that federal regulators might seize the bank if it became insolvent or financially unstable, or was otherwise operated in an unsafe or unsound manner. *Id.* at 958-59.

Similarly, the circumstances presented in *Golden Pacific* were that the Comptroller of the Currency had concluded that Golden Pacific bank was improperly failing to treat certain "Yellow CDs" it had issued as "deposits" (*i.e.*, as liabilities), and was therefore failing to hold sufficient assets to offset those liabilities. *Golden Pac.,* 15 F.3d at 1069. There followed a "run on the bank" and a finding by the Comptroller that the bank held inadequate assets, which led to the Comptroller's decision to place the bank into receivership. *See id.* The Federal Circuit rejected the Takings claim brought by the owners of the bank, relying principally on its "narrow" holding of *California Housing*, which it explained as follows:

> We held that the "RTC's occupation and seizure of Saratoga, and its subsequent liquidation of Saratoga's assets, cannot constitute a physical fifth amendment taking because neither Saratoga nor CHS could have developed a historically rooted expectation of compensation for such a seizure." *Id.* at 958. "Saratoga lacked the fundamental right to exclude the government from its property ***at those times when the government could legally impose a conservatorship or receivership on Saratoga***."

*Id.* at 1073 (emphasis added).

Unlike the plaintiffs in *California Housing* and *Golden Pacific*, in this case Plaintiffs do not allege a Takings claim based on the decision to place the Enterprises into conservatorship in September 2008.  Rather, Plaintiffs challenge something far different: four years after placing the Enterprises into conservatorship, the government decided to expropriate *all* of the profits the Enterprises might ever earn, and to prevent the private shareholders of the Enterprises from ever receiving one penny of those profits.  ¶¶14-20.  As alleged in the Complaint, this expropriation had *nothing* to do with the traditional regulation of the Enterprises (or of any financial institution); instead, it was based purely on Treasury's naked desire to ensure that it captured 100% of the future profits of the Enterprises even though at the time of the conservatorship it had expressly agreed that its financial stake in the Enterprises would be less than that. There is no precedent for the government expropriating the financial rights of shareholders precisely in order to capture their economic value rather than to protect the depositors or general public from the failure or potential failure of the financial institution, which is what happened here.  It is therefore entirely different from the situations presented in *Golden Pacific* and *California Housing*.[34]

If defendants' over-reading of *Golden Pacific* and *California Housing* were accepted, it would mean that the defendants could expropriate all of the shares in the most profitable and

---

[34] The other cases on which the government relies all involved the normal application of established regulations, and therefore are likewise inapposite.  *See* Treasury Memo at 59 (citing *Acceptance Ins. Cos., Inc. v. U.S.*, 583 F.3d 849 (Fed. Cir. 2009) (rejecting takings claim by insurance company that was denied approval by its regulator to sell a portfolio of policies held by its subsidiary); *Branch v. U.S.*, 69 F.3d 1571 (Fed. Cir. 1995) (rejecting takings claim based on application of a statute making banks liable for losses caused by the failure of sister banks owned by same bank holding companies); *Am. Cont'l Corp. v. U.S.*, 22 Cl. Ct. 692 (Ct. Cl. 1991) (rejecting takings claim based on the appointment of a conservator and receiver for a failed savings and loan that was found to have engaged in "dishonest" and "abusive" transactions that placed the bank in "an unsafe and unsound condition").

stable financial institutions in the country without triggering the Takings Clause.  According to the government, the shareholders of Goldman Sachs, JP Morgan Chase, and every other financial institution in the country do not own *any property at all,* and even if those institutions are reporting record profits and are deemed to be completely stable and safely managed, the government can seize all of their shares without triggering the Takings Clause.  That cannot be the law, and there is no case that so holds.

Indeed, one of the cases cited by defendants confirms that the Treasury's argument is overstated.  In *Acceptance Ins. Cos.*, *Inc. v. U.S.,* the Federal Circuit held that "mere participation in a heavily regulated environment does not bar a plaintiff from showing that it has a property interest compensable under the Fifth Amendment."  84 Fed. Cl. 111, 117 (Fed. Cl. 2008), *affirmed*, 583 F.3d 849.  *See also, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 998 (1984) (holding that plaintiff's trade secret qualified as private property despite extensive federal regulation of pesticide industry); *Cienega Gardens v. U.S.*, 331 F.3d 1319, 1334 (Fed. Cir. 2003) (finding that federal statutes preventing the prepaying of federally subsidized mortgages were a taking of private property despite heavy regulation of the federal housing program); *United Nuclear Corp. v. U.S.*, 912 F.2d 1432 (Fed. Cir. 1990) (taking found in highly regulated mining industry).

Defendants' argument boils down to the assertion that because the Enterprises' shareholders allegedly had no property rights before the conservatorship, they cannot possibly have any right to just compensation after the conservatorship.  This is specious.  Fannie Mae and Freddie Mac shareholders have always held property rights, including, but not limited to, the rights to dividends and liquidation preferences established by the Certificates.  While those property rights were subject to the significant limitation that the Enterprises might be placed into

conservatorship in accordance with the provisions of HERA (reflecting "historically rooted expectations" regarding the regulated nature of the Enterprises), that does not mean the property rights did not exist at all.   Notwithstanding the "historically rooted expectation" that a conservatorship of Fannie Mae and Freddie Mac might occur under appropriate circumstances, defendants' decision to expropriate 100% of the Enterprises' profits for all time is "rooted" in nothing but defendants' avarice and does not eliminate Plaintiffs' constitutional right to receive just compensation for the unprecedented expropriation of their property rights.

Treasury also argues that Plaintiffs had no property right because they did "not possess an unfettered right to a dividend; indeed, the PSPAs explicitly prohibited the payment of dividends absent Treasury's approval."   Treasury Memo at 60.   But Treasury cites no authority for the proposition that a conditional right to receive dividends is not property.   Indeed, that proposition would be truly shocking.   If the government were to pass a law requiring that the future dividends of Apple, Microsoft, and Google must be paid to the government rather than to their shareholders, that would obviously be a taking of private property notwithstanding that those shareholders have only a conditional right to future dividends.   It therefore cannot be the case that the conditional nature of a right to a dividend removes that property right from the protections of the Takings Clause.   Indeed, the fact that the PSPAs provide that dividends will not be paid absent approval from Treasury actually *confirms* the existence of a property right, since it shows that the possibility of future dividends to private shareholders was contemplated when the PSPAs were created.

In addition, irrespective of Plaintiffs' rights to dividends, they also had rights to liquidation proceeds that were taken by the Third Amendment, which Treasury does not dispute. *See, e.g.*, 12 U.S.C. §§ 4617(b)(2)(K)(i), (c)(1)(D).

**D.      The Third Amendment Is A Taking**

Treasury argues that even if Plaintiffs owned a property right in their shares, that property has not been "taken." Treasury Memo at 61-64. That is obviously incorrect. Prior to the Third Amendment, the Plaintiffs who are junior preferred shareholders had a right to receive any dividends that would be paid after payment of the 10% dividend on the Government Stock, *i.e.*, Treasury could not receive anything more than its 10% dividend without the Enterprises first paying the required dividends to the junior preferred stockholders. ¶¶ 22, 53-54, 79-87. After the Third Amendment, the junior preferred shareholders no longer have that right. *Id.* at 16, 22, 87. Prior to the Third Amendment, the Plaintiffs who are common shareholders had a right to receive any dividends paid out beyond what was promised to all preferred shareholders (subject to Treasury's ability to acquire 79.9% of the common stock for a nominal price and thereby receive 79.9% of any common stock dividends). ¶¶ 85-86. After the Third Amendment, the common shareholders no longer have that right. Finally, prior to the Third Amendment, all of the Plaintiffs had a right to receive liquidation proceeds according to the priority scheme set forth in HERA. ¶¶ 22, 112; 12 U.S.C. § 4617(c)(1). After the Third Amendment, Plaintiffs no longer have this right.

Based on the facts alleged in the Complaint, the rights to receive dividends and liquidation proceeds from the now exceptionally profitable Enterprises were worth *billions of dollars*. ¶¶ 19-20, 73-76. Thus, prior to the Third Amendment, Plaintiffs held rights that would entitle them to receive *billions of dollars*; after the Third Amendment, those billions of dollars will be paid *to the government*, and Plaintiffs will receive *nothing*. There could be no clearer example of a "taking."

Proffering doctrinal sophistry to distract the Court from common sense, Treasury argues that Plaintiffs failed to allege a "physical taking," and therefore their claim "can only be

understood" to be alleging that the Third Amendment "amounted to a regulatory taking." Treasury Memo at 61. This is not correct. The government's appropriation of all dividend and liquidation rights held by private shareholders constitutes a taking under any doctrinal formulation.

First, the Third Amendment is a *per se* taking. The Supreme Court has applied a *per* se takings analysis whenever the government has seized a property interest for itself, whether that property interest be a small portion of real property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), or intangible property such as a boat lien. *See Armstrong v. U.S.*, 364 U.S. 40 (1960). For example, the Supreme Court has held that it is a *per se* taking when the government imposes a rule requiring interest on trust accounts to be paid to the government and not to the private owners of the underlying funds. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980). Likewise, it is a *per se* taking when the government imposes a rule requiring all dividends and liquidation proceeds to be paid to the government and not to the private shareholders. Treasury does not and cannot explain how the government's seizure of private property for its own use is anything other than a *per se* taking, *see Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2600 (2013) ("when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, a *per se* [takings] approach is the proper mode of analysis."), and has not cited a single case where a court refused to apply a *per se* analysis to a situation in which the government seized private property and kept that property for itself.

Second, even if the regulatory takings framework were applied to this case, the result would be the same – the Third Amendment is a taking. Since the Third Amendment eliminates

all of the economic value associated with the shares, it constitutes a "total wipeout" of the property owned by the shareholders, and thus is a taking under the "total wipeout" doctrine established in *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). Treasury argues this doctrine "applies only to allegations regarding real property," Treasury Memo at 61, but the Federal Circuit has applied the doctrine to personal property. *Maritrans v. U.S.*, 342 F.3d 1344, 1353-54 (Fed. Cir. 2003) (applying *Lucas* doctrine to takings claim involving a boat). Moreover, the only reason *Lucas* is not typically applied to the government's seizure of intangible property as occurred in this case is that such seizures are both rare and, as shown above, trigger application of the *per se* takings doctrine.

The result is also the same under the multi-factored test established in *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). First, the economic impact of the Third Amendment is devastating: it transfers billions of dollars of value that would have been paid to private shareholders straight into the coffers of Treasury. It is hard to imagine an "economic impact" that weighs more heavily in favor of finding a taking. Treasury's only answer to this is to point to the diminished value of the property held by Plaintiffs at the beginning of the conservatorship. Treasury Memo at 62. But that is not the relevant inquiry. By August 2012, it became apparent that Plaintiffs owned extremely valuable property, and that is why the government took it away. ¶¶15, 64-66, 71-72, 109.

Second, Plaintiffs had a reasonable, investment-backed expectation that the government would not unilaterally amend the PSPAs to appropriate all future dividends and liquidation proceeds for the benefit of Treasury. Treasury argues that "shareholders do not have reasonable investment-backed expectations that highly-regulated entities, such as the GSEs, will not be placed into conservatorship or receivership," Treasury Memo at 63, but again, that is not the

-68-

relevant inquiry. Whether Plaintiffs bought their shares before or after the conservatorship, they had a reasonable, investment-backed expectation that the government would not first provide financial support based on one very specific agreement, and then, once the Enterprises returned to profitability, unilaterally change those terms to expropriate all of the value that would otherwise go to shareholders. Indeed, the Certificates expressly precluded the Enterprises and their conservator from adversely affecting the junior preferred stockholders' rights without their consent. Moreover, both HERA and prior conservatorship and receivership regimes contain priority schemes that expressly tell shareholders that if the seized financial institution ends up having positive value after paying all creditors and claimants, that positive value will be paid to shareholders, not to the government. *See* 12 U.S.C. §§ 4617(b)(2)(K)(i), 4617(c)(1); *see also* 12 U.S.C. § 1821(d)(ii).

Finally, the "nature of the governmental action" here is a pure money grab. As alleged in the Complaint, the Third Amendment was motivated by a desire to ensure that, no matter how profitable the Enterprises might become, the private shareholders would *never* be allowed to receive any distributions. ¶¶15, 64-66, 71-72, 109. This weighs heavily in favor of finding a taking. Defendants argue that it was the Treasury who provided the financing to help bring the Enterprises back to financial health, and therefore private shareholders should not benefit. Treasury Memo at 63. But this ignores the fact that Treasury entered into a very specific agreement governing the Government Stock that guaranteed it extraordinarily favorable terms: a 10% cumulative dividend for every dollar invested *plus* an additional $1 billion *plus* the right to buy 79.9% of the common stock for a nominal price. ¶¶9, 56. Once the housing market rebounded and the Enterprises returned to profitability in 2012, the government stood to make *tens of billions of dollars* in profits on its investment without having to change the PSPAs at all.

*Id.* at ¶¶12-14, 66.   But it was not content with that, and therefore imposed the Third Amendment to ensure that it received *everything* and private shareholders would get *nothing*. Whether that action is described as an expropriation, a seizure, a hijacking, or daylight robbery, the Takings Clause was triggered.

>    **E.     The Third Amendment Effects A Direct Appropriation Of Plaintiffs' Shareholder Rights, And The *Omnia* Case Is Inapposite**

Finally, defendants try to dismiss Plaintiffs' Takings claims based upon the "form over substance" argument that it has not physically taken Plaintiffs' shares, but has merely taken the profits from the Enterprises that would otherwise have been paid out to Plaintiffs based on their shares.   FHFA Memo at 62-63.   FHFA says that Plaintiffs' claim fails "because the government stands to receive dividends (and liquidation proceeds) through a new series of more senior preferred shares, not through Plaintiff's shares."   *Id.* at 62.   In essence, defendants contend that even if it would be a taking of private property under the Fifth Amendment for the government to appropriate the shares owned by the Plaintiff classes, it is somehow *not* a taking under the Fifth Amendment if the government accomplishes the same result by unilaterally amending the terms of the Government Stock to expropriate the *economic value* that would otherwise flow to the Plaintiffs' shares.   There is no legal support for this elevation of form over substance, and the Court should reject it.

Defendants rely on *Omnia Commercial Co. v. U.S.*, 261 U.S. 502 (1923),[35] but that case held that when the government exercises its police power to regulate property owned by one person, the fact that this causes a consequential loss to a third party cannot constitute a compensable taking under the Fifth Amendment.   *See id.* at 510-511.   In that case, in response to the outbreak of World War I, the government requisitioned all of the steel held by the Allegheny

---

[35] *See* FHFA Memo at 62-63.

Steel Company, and ordered it not to deliver any of that steel to the plaintiff in that case, Omnia. *See id.* at 507. Since Omnia had a contract to buy steel at a below-market price, it sued the government claiming that its contract rights had been taken.  *See id.* at 508.  The Supreme Court disagreed, reasoning as follows:

> **There are many laws and governmental operations which injuriously affect the value of or destroy property – for example, restrictions upon the height or character of buildings, destruction of diseased cattle, trees, etc., to prevent contagion – but for which no remedy is afforded. Contracts in this respect do not differ from other kinds of property**. *See Calhoun v. Massie*, 253 U.S. 170, where an act of Congress invalidating contracts made with attorneys for compensation exceeding a certain percentage for the prosecution of claims against the government was sustained, although it had the effect of putting an end to an existing contract. This Court said (pp. 175-176):

> **An appropriate exercise by a state of its police power is consistent with the Fourteenth Amendment, although it results in serious depreciation of property values;** and the United States may, consistently with the Fifth Amendment, impose for a permitted purpose, restrictions upon property which produce like results.

*Id*. at 508-09 (quoting *Calhoun v. Massie*, 253 U.S. 170 (1920)) (emphasis added, citations omitted).

The Federal Circuit's more recent reliance on *Omnia* confirms that it stands for the proposition that when the government exercises its police power over property that it owns or controls, a third party cannot claim that it has suffered a taking merely because that police power regulation causes its property to lose value.  *See Palmyra Pac. Seafoods, L.L.C. v. U.S.*, 561 F.3d 1361, 1365 (Fed. Cir. 2009) (citing *Omnia* in support of holding that government did not take property when it prohibited commercial fishing within 12 miles of atoll, merely because this devalued commercial fishing operation owned by plaintiff on the atoll); *Huntleigh USA Corp. v. U.S.*, 525 F.3d 1370, 1377-82 (Fed. Cir. 2008) (applying *Omnia* to reject takings claim by private provider of airport security services who lost its contracts after creation of Transportation

Security Administration); *Air Pegasus of D.C. Inc. v. U.S.,* 424 F.3d 1206, 1215-16 (Fed. Cir. 2005) (relying on *Omnia* to support rejection of takings claim by heliport operator after new federal air traffic restrictions in the vicinity of the heliport caused loss in value).

This case is nothing like *Omnia* and the progeny on which defendants rely.  Here, the government did not exercise its "police power" in a way that indirectly and unintentionally caused Plaintiffs' property to lose value.   On the contrary, the government intentionally expropriated the economic value of Plaintiffs' property rights for the sole and express purpose of ensuring that the government, and not Plaintiffs, received that economic value.   ¶¶14-20. Plaintiffs were not *indirectly* impacted by the taking of *another* private person's property; they were *directly* affected when the government took *their* property.   If the government had simply seized the Plaintiffs' shares, it would not be invoking *Omnia* as a defense to the Takings claim, but neither *Omnia* nor any other case holds that extracting the economic value of Plaintiffs' property while leaving Plaintiffs with legal title to the empty vessel allows the government to avoid the Takings Clause.   There is therefore no support for the notion that the government can avoid the Takings Clause by using the formality of amending its PSPAs to appropriate the value of Plaintiffs' shares where that amendment achieves precisely the same substantive result as would be achieved by a direct appropriation of the shares.   Accordingly, there is no basis to dismiss Plaintiffs' Takings claim.

### F.   Plaintiffs' Claim Under The Takings Clause Is Ripe

Treasury argues that Plaintiffs' Takings claim is unripe because it is not possible to tell whether "the GSEs will be profitable over the entire period of the conservatorships," or whether they might "suffer a setback."  Treasury Memo at 67.  According to Treasury, "at a minimum, the conservatorships must end before the plaintiffs' claims can ripen."  *Id.*  This is absurd.  The Third Amendment was executed on August 17, 2012, and took effect immediately.  As of that

date, it became legally impossible for Plaintiffs ever to receive a distribution from the Enterprises, whether as a dividend or liquidation proceeds.  Thus, their shareholder rights under the HERA priority scheme were immediately appropriated for the benefit of the government as of that date.  Nothing more needs to happen to make their takings claim ripe.

Treasury argues that the claim is not ripe until the full extent of the Enterprises future profitability is known, *i.e.*, that all future facts that might impact the *value* of the property that was appropriated must occur before Plaintiffs may bring a Takings claim, but that is clearly wrong as a matter of law.  The Supreme Court has held that the measure of just compensation is the value of the property at the time it was taken.  *See U.S. v. 50 Acres of Land*, 469 U.S. 24, 29 (1984).  "Deviation from this measure of just compensation has been required only 'when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public.'"  *Id.* (quoting *U.S.* v. *Commodities Trading Corp*., 339 U.S. 121, 123 (1950); *Kirby Forest Indus., Inc. v. U.S.*, 467 U.S. 1, 10 n.14 (1984)).  Implicit in this general rule (and in its exception) is that a party does *not* have to wait until all future events that might impact the value of its property have occurred before it can bring a takings claim, Treasury does not and cannot cite a single case for its extreme and unworkable proposition.

A straightforward application of the ripeness doctrine confirms that this case is ripe for decision.  As Treasury notes, the standard for ripeness inquires into (1) the "fitness of the issues for judicial decision," and (2) "the extent to which withholding a decision will cause hardship to the parties."  Treasury Memo at 66 (citing *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (internal quotations omitted)).  The Takings issue in this case is fit for judicial decision now.  The Third Amendment was adopted over a year ago, there is nothing more that has to happen for it to take full effect, and it is final, not tentative.  Moreover, the Third

Amendment is already having an enormous economic impact.  As a consequence of that amendment the Enterprises have already paid the government approximately $203 billion dollars that would not otherwise have been paid under the PSPAs and are poised to pay tens of billions more as they continue to generate record profits.  *See* Margaret Chadbourn, *Freddie Mac profit moves U.S. housing bailout further into black*, REUTERS, Feb. 27, 2014 ("After [Fannie Mae and Freddie Mac] make their latest dividend payments, taxpayers will have received $202.9 billion for their support, $15.4 billion more than the $187.5 billion provided in bailout funds") (attached to the Zagar Decl. as Exhibit C).

Furthermore, withholding a decision will cause hardship to the Plaintiffs, and indeed to the financial markets generally, because the prices of the millions of shares of Fannie Mae and Freddie Mac common and preferred securities owned by the Plaintiff classes are beset with volatility and uncertainty as a result of the legal challenges being brought against the Third Amendment in this litigation.  A prompt resolution of those legal challenges is the only way to end the uncertainty and foster stability for Plaintiffs and the market as a whole.

There is no authority for Treasury's argument that Plaintiffs must wait indefinitely – perhaps forever – before they can bring their claim that the August 12, 2012 Third Amendment constituted a taking of their property.  This is not a case where the government has provided some other process through which shareholders might be compensated, rendering their claims unripe.  *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985).  Rather, this is a case where the government has taken billions of dollars and will continue to take billions more, quarter after quarter, while Plaintiffs have no recourse but to pursue their claims in the courts.  Plaintiffs are entitled to have their claims heard *now*, and therefore this Court should deny Treasury's motion to dismiss for lack of ripeness.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny defendants'

motions to dismiss in their entirety.  Should the Court grant the motions in whole or in part,

Plaintiffs respectfully request leave to replead in the interests of justice.  *See* Fed. R. Civ. P.

15(a) ("The court should freely give leave [to amend] when justice so requires."); *Robinson v.*

*CAS 4000 Kansas LLC*, No. 13-740, 2013 WL 6704840, at *1 (D.D.C. Dec. 16, 2013) (holding

that the non-movant generally carries the burden in persuading the court to deny leave to amend,

and denial of leave to amend without sufficient reason is an abuse of discretion).

Dated:  March 21, 2014                    Respectfully Submitted,

                                          BOIES, SCHILLER & FLEXNER LLP

                                          */s/ Hamish P.M. Hume*
                                          Hamish P.M. Hume
                                          Jonathan M. Shaw
                                          5301 Wisconsin Ave., NW, Suite 800
                                          Washington, DC 20015
                                          Tel:  (202) 237-2727
                                          Fax:  (202) 237-6131
                                          hhume@bsfllp.com

                                          BERNSTEIN LITOWITZ BERGER &
                                          GROSSMANN LLP

                                          */s/ David L Wales*
                                          David L. Wales (Bar No. 417440)
                                          1285 Avenue of the Americas
                                          New York, NY 10019
                                          Tel:  (212) 554-1409
                                          Fax:  (212) 554-1444 (fax)
                                          dwales@blbglaw.com

                                          Blair A. Nicholas
                                          David R. Kaplan
                                          12481 High Bluff Drive, Suite 300
                                          San Diego, CA 92130
                                          Tel:  (858) 793-0070
                                          Fax:  (858) 793-0323
                                          blairn@blbglaw.com

davidk@blbglaw.com

GRANT & EISENHOFER, P.A.

/s/ *Geoffrey C. Jarvis*
Jay W. Eisenhofer
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501
jeisenhofer@gelaw.com

Geoffrey C. Jarvis
Michael J. Barry
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100
gjarvis@gelaw.com
mbarry@gelaw.com

KESSLER TOPAZ MELTZER & CHECK, LLP

/s/ *Lee D. Rudy*
Lee D. Rudy
Eric L. Zagar
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
lrudy@ktmc.com
ezagar@ktmc.com
mgoldstein@ktmc.com

*Interim Co-Lead Class Counsel*