IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>     Plaintiff,<br><br>   v.<br><br>JACOB J. LEW, in his official capacity as<br>Secretary of the Treasury, *et al.,*<br><br>     Defendants. | Case No. 1:13-cv-1025-RCL |
| FAIRHOLME FUNDS, INC., *et al.,*<br><br>     Plaintiffs,<br><br>   v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et<br>al.,*<br><br>     Defendants. | Case No. 1:13-cv-1053-RCL |
| ARROWOOD INDEMNITY COMPANY, *et al.,*<br><br>     Plaintiffs,<br><br>   v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.,*<br><br>     Defendants. | Case No. 1:13-cv-1439- |
| In re Fannie Mae / Freddie Mac Senior Preferred<br>Stock Purchase Agreement Class Action<br>Litigations. | Case No. 1:13-mc-1288-RCL |
| This document relates to<br>ALL CASES | |

**PLAINTIFFS' MEMORANDUM IN PARTIAL OPPOSITION
TO DEFENDANTS' MOTION FOR JUDICIAL NOTICE**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ II

ARGUMENT — FHFA'S MOTION FOR JUDICIAL NOTICE IMPROPERLY REQUESTS NOTICE OF "FACTS" WHICH ARE INTENSELY DISPUTED AND WHICH GO TO THE CORE ISSUES IN THESE CASES ............................................................................................................. 1

I.   DOCUMENTS WHICH DEFENDANTS CONTEND ARE SUBJECT TO JUDICIAL NOTICE .................. 5

  A.   Government Documents ......................................................................................... 5

  B.   Congressional Testimony ...................................................................................... 9

  C.   SEC Filings and Other Corporate Documents of Fannie and Freddie ......................... 12

    1.   Forms 10-K and 10-Q Filed by Fannie and Freddie ............................... 12

    2.   Freddie's Press Release ...................................................................... 14

    3.   Certificates of Designation for Certain Issues of Stock ......................... 15

    4.   Fannie's By-Laws ............................................................................... 15

    5.   Preferred Stock Purchase Agreements and Amendments ...................... 15

  D.   Publications and News Articles ............................................................................ 16

II.  DOCUMENTS CITED IN THE COMPLAINTS ............................................................................ 22

  A.   Documents Incorporated by Reference into the Complaints ..................................... 22

    1.   Preferred Stock Purchase Agreements and Amendments ...................... 22

    2.   Certificates of Designation for Certain Issues of Stock ......................... 22

  B.   Other Documents To Which Reference Is Made in Complaints ................................. 22

    1.   FHFA and Treasury Announcements Regarding the Third Amendment .............. 23

    2.   FHFA OIG Reports ............................................................................. 25

CONCLUSION.................................................................................................................... 26

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors v. Slater,*
  228 F.3d 1147 (10th Cir. 2000) ..................................................................... 10

*Antoine v. U.S. Bank Nat. Ass'n,*
  547 F. Supp. 2d 30 (D.D.C. 2008) ................................................................. 21

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ....................................................................................... 23

*Blue Man Vegas, LLC v. N.L.R.B.,*
  529 F.3d 417 (D.C. Cir. 2008) ...................................................................... 16

*Cofield v. Alabama Pub. Serv. Comm'n,*
  936 F.2d 512 (11th Cir. 1991) ...................................................................... 16

*Coleman v. Dretke,*
  409 F.3d 665 (5th Cir. 2005) ........................................................................... 6

*Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,*
  993 F.2d 269 (1st Cir. 1993) ......................................................................... 17

*Fox Television Stations, Inc. v. FilmOn X LLC,*
  13-cv-758 RMC, -- F. Supp. 2d --, 2013 WL 4763414 (D.D.C. Sept. 5, 2013) ....................... 10

*Fox Television Stations, Inc. v. FilmOn X, LLC,*
  13-cv-758 RMC, -- F. Supp. 2d --, 2013 WL 4852300 (D.D.C. Sept. 12, 2013) .............. 15, 16

*Freeman v. Town of Hudson,*
  714 F.3d 29 (1st Cir. 2013) ........................................................................... 23

*Gammel v. Hewlett-Packard Co.,*
  2013 WL 1947525 (C.D. Cal., May 8, 2013) ................................................ 12

*Goldman v. Belden,*
  754 F.2d 1059 (2d Cir.1985) ......................................................................... 23

*Gov't of Rwanda v. Rwanda Working Grp.,*
  227 F. Supp. 2d 45 (D.D.C. 2002) ................................................................. 21

*Greenspan v. Random House, Inc.*,
    12-1594, 2012 WL 5188792 (1st Cir., Oct. 16, 2012)............................................................ 16

*Hamilton v. Paulson*,
    542 F. Supp. 2d 37 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012) .. 6

*Hollie v. Smith*,
    813 F. Supp. 2d 214 (D.D.C. 2011)...................................................................................... 21

*Hyson v. Architect of Capitol*,
    802 F.Supp.2d 84 (D.D.C. 2011)...................................................................................... 5, 6

*Ieradi v. Mylan Labs., Inc.*,
    230 F.3d 594 (3d Cir. 2000) ............................................................................................... 21

*In re American Apparel, Inc. Shareholder Litigation*,
    855 F.Supp.2d 1043 (C.D. Cal. 2012) ................................................................................ 12

*In re Apple iPhone Antitrust Litigation*,
    2013 WL 4425720 (N.D. Cal., August 15, 2013)................................................................ 15

*In re Newbridge Networks Securities Litigation*,
    767 F.Supp. 275 (D.D.C. 1991)........................................................................................... 23

*In re XM Satellite Radio Holdings Sec. Litig.*,
    479 F. Supp. 2d 165 (D.D.C. 2007)................................................................................. 9, 12

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir.1996) ............................................................................................... 13

*Mehle v. Am. Mgmt. Sys., Inc.*,
    01-7197, 2002 WL 31778773 (D.C. Cir. Dec. 4, 2002) ......................................................... 9

*Muller-Paisner v. TIAA*,
    289 Fed. Appx. 461 (2d Cir. 2008)........................................................................................ 9

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 06-cv-6278,
    2006 WL 3771013 (S.D.N.Y. Dec. 18, 2006) ...................................................................... 20

*Seifert v. Winter*,
    555 F.Supp.2d 3 (D.D.C. 2008)............................................................................................. 6

*United States v. Philip Morris USA, Inc.*,
    99-cv-2496, 2004 WL 5355971 (D.D.C. Aug. 2, 2004)........................................................ 21

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
    592 F.3d 954 (9th Cir. 2010) ................................................................ 16

*Whiting v. AARP*,
    637 F.3d 355 (D.C. Cir. 2011) ................................................................ 7

*Winder v. Erste*,
    905 F. Supp. 2d 19 (D.D.C. 2012) .......................................................... 20

*Wise v. Glickman*,
    257 F. Supp. 2d 123 (D.D.C. 2003) ........................................................ 21

## STATUTES

12 U.S.C. § 1719(g)(1)(C) ......................................................................... 12

12 U.S.C. §1455(*l*)(1)(C) ........................................................................... 12

## RULES

FED. R. EVID. 201(b) ...................................................................... 3, 5, 21

FED. R. EVID. 201(b)(2) ................................................................... 16

FED. R. EVID.201 ............................................................................. 5

Plaintiffs respectfully submit this Memorandum and the accompanying proposed Order in partial opposition to the Motion for Judicial Notice (Dkt. 37 in 13-1439) ("MJN") made by defendants Federal Housing Finance Agency ("FHFA"), as Conservator for Federal National Mortgage Association ("Fannie Mae" or "Fannie") and Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"), FHFA Director Melvin L. Watt, Fannie Mae, and Freddie Mac (collectively, the "FHFA Defendants"). Defendants Department of the Treasury (the "Treasury") and Jacob J. Lew, in his capacity as Secretary of the Treasury (collectively, the "Treasury Defendants") joined the FHFA Defendants' motion.

## ARGUMENT

—

### FHFA's MOTION FOR JUDICIAL NOTICE IMPROPERLY REQUESTS NOTICE OF "FACTS" WHICH ARE INTENSELY DISPUTED AND WHICH GO TO THE CORE ISSUES IN THESE CASES

In these related actions, plaintiffs, as shareholders of Preferred Stock and Common Stock in Fannie and Freddie, seek to recover damages, and obtain injunctive and declaratory relief, for injuries they sustained when, in August 2012, two arms of the Federal Government—Treasury, as the owner of the Government Stock, and FHFA, as Conservator —made a deal with each other to wipe out the value of the Preferred Stock and Common Stock in Fannie and Freddie, just as those entities had returned to profitability and the housing market had begun to recover.[1] The purpose of that deal—embodied in the Third Amendment to the Preferred Stock Purchase Agreements ("PSPAs"), which govern the terms and conditions of the Government Stock—was, as Treasury announced at the time, to "mak[e] sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers…," and to prohibit Fannie and

---

[1] This motion refers to the preferred stock, issued prior to September 2008 and held by plaintiffs and other members of the public as the "Preferred Stock," and to the senior preferred stock issued in September 2008 to the Treasury as the "Government Stock."

Freddie from "retain[ing] profits, rebuild[ing] capital, [or] return[ing] to the market."
(Consolidated Amended Class Action and Derivative Complaint ("Consol. Compl.") ¶ 72;
Arrowood Compl. ¶ 76; Fairholme Compl. ¶ 65; Perry Compl. ¶ 52).

Four years earlier, in September 2008, Treasury had obtained the Government Stock,
along with Warrants for Common Stock, in return for providing financial support to Fannie and
Freddie on terms that were designed to and did fully protect Treasury's interests, including a
10% dividend (the dividend rate would increase to 12% if Fannie and Freddie paid the dividend
in additional Government Stock instead of in cash). Fannie and Freddie drew substantial funds
from Treasury. But Fannie and Freddie returned to profitability in 2012, as the housing market
rebounded. This renewed profitability—indeed, record profitability in 2013—would have
provided Fannie and Freddie the ability (very likely in the near term), with Treasury's consent, to
redeem the Government Stock and return to private ownership. That is exactly the result—the
Government would get its money back, with interest, and the company would be restored to
private ownership—that Treasury has deemed reasonable and a successful result for taxpayers in
other high-profile Government rescues of distressed companies, from Chrysler, to General
Motors, to AIG.

But here, Treasury, with the complicity of FHFA, decided that was not enough. The
Third Amendment replaced the 10% dividend with a "Net Worth Sweep" under which Fannie
and Freddie were each obliged, each quarter, to pay a dividend to Treasury equal to its full net
worth without reducing the outstanding amount of the Government Stock or its liquidation
preference. The impact of the Third Amendment has been breathtaking. According to Fannie and
Freddie, with the March 2014 dividend payment, Fannie will have paid $121.1 billion in
dividends to Treasury, exceeding by $5.0 billion the $116.1 billion in cumulative draws since

2008,[2] and Freddie will have paid $81.8 billion in dividends to Treasury, exceeding by $10.5 billion the $71.3 billion in cumulative draws since 2008.[3] Under the Net Worth Sweep, even though, by March 2014, Treasury will have been paid $202.9 billion in dividends, the full $189.4 billion in Government Stock remains outstanding. Of course, if those payments to Treasury had been treated as redemptions of the Government Stock, essentially no future dividend obligations would accrue at all.

Defendants purport to justify this extraordinary overreach by claiming that the Government acted reasonably in imposing the Net Worth Sweep because it spared Fannie and Freddie from possible future borrowings when they might lack funds to pay the requisite 10% dividend. To bolster that position and avoid conversion of their motions to dismiss to motions for summary judgment requiring discovery, Defendants flout the purpose of judicial notice—to take notice of a "fact that is not subject to reasonable dispute'' which "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201(b)—and request that this Court take judicial notice of the fundamental disputed facts which bear upon whether the Third Amendment was reasonable, or impermissibly arbitrary and capricious.

For example, Defendants try to use the documents which are the subject of their motion for judicial notice to establish, as an indisputable fact, that as holders of Preferred Stock and Common Stock in Fannie and Freddie, Plaintiffs should have recognized, from prior to 2008, that the Federal Government could, through increasing regulation, take away their rights as

---

[2] "Fannie Mae Reports Comprehensive Income of $84.8 Billion for 2013 and $6.6 Billion for Fourth Quarter 2013; Fannie Mae Paid Treasury $82.5 Billion in Dividends in 2013," Fannie Mae News Release, Feb. 21, 2014

[3] "Freddie Mac Reports Net Income of $48.7 Billion for Full-Year 2013; Comprehensive Income of $51.6 Billion," Freddie Mac News Release, Feb. 27, 2014.

shareholders; that the PSPAs made Treasury the sole owner of the companies with virtually untrammeled authority; and that as of September 2008, the Preferred Stock and Common Stock had no value. Plaintiffs maintain that they have rights, as stockholders in Fannie and Freddie, which the Federal Government cannot simply take away through regulation or self-dealing contracts. Moreover, the evidence will show that the September 2008 PSPAs left the capital structure of Fannie and Freddie—including Preferred Stock and Common Stock—in place underneath the Government Stock. In fact, as part of the consideration for the PSPAs, Treasury took Warrants for Common Stock, which would only have value if the Preferred Stock was fully paid, thus recognizing that the Preferred Stock and Common Stock had value. Of course, the $203 billion in dividends that the Government has already received undercuts all of the Government's positions—including the Government's central position that the Net Worth Sweep was needed to save Fannie and Freddie from insolvency.

What makes the Government's arguments particularly troubling is that they rely heavily on the purported truth of a raft of statements in corporate documents, press releases, publications by non-parties, and even newspaper articles, and do so in a procedural posture which aggravates the impropriety of the request for judicial notice. The FHFA Defendants have purportedly not moved for summary judgment on Plaintiffs' claims that FHFA acted beyond its statutory authority; they have only moved to dismiss those claims for lack of jurisdiction, based on 12 U.S.C. § 4617(f).  If there were truly a basis for such a motion, it could be made based on the face of the complaints.  But the complaints, on their face, unquestionably are sufficient to establish jurisdiction.  So, while neither filing an administrative record nor submitting to discovery, the FHFA attempts to use judicial notice to gain acceptance of FHFA's version of disputed facts, and thus give false credence to the FHFA Defendants' motion to dismiss.

We set forth below an item-by-item review of the matters which are the subject of the MJN, identifying (1) those of which the Court can properly take judicial notice to establish undisputed facts (*e.g.,* the terms of the Third Amendment, which are not in dispute), (2) those of which the Court can take judicial notice for the limited purpose of establishing that a statement—whether true or false—was made (*e.g.,* the contents of Fannie and Freddie's SEC filings), and (3) those which are not properly the subject of judicial notice (*e.g.,* selective news articles and statements by "market participants," which neither establish underlying facts, nor establish that the statements were representative of comments by market participants).

The accompanying proposed Order sets forth the results of this analysis.

I.   DOCUMENTS WHICH DEFENDANTS CONTEND ARE
     SUBJECT TO JUDICIAL NOTICE

A.   **Government Documents**

FHFA's expansive claim that "[g]overnment documents located on government websites are considered part of the public record and are thus proper subjects for judicial notice" (MJD, p. 3) goes far beyond the terms of FED. R. EVID. 201(b), which limits judicial notice to facts "not subject to reasonable dispute" because the fact "is generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

That an assertion of fact is set forth in "[g]overnment documents located on government websites" does not, *per se,* establish that the assertion meets the standards under Rule 201. The application of the Rule 201 standards to such assertions depends, of course, on the nature of the assertion of the fact, as is apparent from the cases upon which FHFA relies. In each of those cases, the facts established through judicial notice were limited to the terms and procedures used in government programs—facts which, truly, were "not subject to reasonable dispute." For example, in *Hyson v. Architect of Capitol*, 802 F.Supp.2d 84 (D.D.C. 2011) (cited in MJN, p. 3),

an employment discrimination case in which the evidence established that it had been suggested that the employee enroll in a government "Employee Assistance Program ('EAP')," the Court took "judicial notice of the description of federal agency EAPs" from a government website, for the limited purpose of finding that the EAPs include "free, voluntary, short-term counseling and referral for various issues affecting employee mental and emotional well-being." 802 F.Supp.2d at 90-91. In *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 52 n.15 (D.D.C. 2008), *rev'd on other grounds*, 666 F.3d 1344 (D.C. Cir. 2012) (cited in MJN, pp. 3-4), the court took judicial notice of a government document which set forth the terms of a position classification system, for the limited purpose of determining what those terms were. In *Seifert v. Winter*, 555 F.Supp.2d 3, 11 n. 5 (D.D.C. 2008) (cited in MJN, p.4), the court took judicial notice of the Manual for Courts Martial that had been in effect at the relevant time, available on the website of the Judge Advocate General of the Navy. In each of these cases, there could be no "reasonable dispute" as to the facts which were the subject of the judicial notice: What are the terms of the EAP program? What are the terms of the position classification system? Is this a copy of the Manual for Courts Martial in effect at that time?[4]

This limited use of judicial notice of government documents stands in stark contrast to FHFA's request for judicial notice.

FHFA seeks to cite four government documents—FHFA 2008 and 2009 Reports to Congress, a letter from FHFA Acting Director DeMarco to certain senators and representatives,

---

[4] Broader judicial notice of government documents is permitted where an opposing party seeks to use a government document against the government. For example, in *Coleman v. Dretke*, 409 F.3d 665, 667 (5th Cir. 2005) (one of the cases permitting judicial notice which, as the FHFA notes, are collected in *Seifert v. Winter*), the court rejected the State of Texas's contention that it was improper to take judicial notice of material on the state website, stating that "There is no support in this record for the assertion in the state's petition for rehearing that [the fact] is anything other than [as] outlined on the [state's] website."

and a Congressional Budget Office analysis[5]—to support its assertion that "it has been widely observed that common shares were rendered 'virtually worthless,' and common and preferred shareholders 'effectively lost their investments' when the Enterprises became insolvent" in 2008. Memorandum in Support of Motion to Dismiss All Claims by FHFA Defendants (Dkt. 36 in 13-1439) ("FHFA Memo MD"), pp. 14-15. To the extent that FHFA is merely suggesting that those statements were made—*"it has been widely observed"*—there is no reason to take judicial notice, because the fact that those statements were made is utterly irrelevant to any issue before this Court. *Whiting v. AARP*, 637 F.3d 355, 364 (D.C. Cir. 2011) ("the Senate Finance Committee materials are irrelevant to disposition of the motion to dismiss, which turns on the adequacy of the well-pleaded factual allegations in the complaint, which are assumed to be true").

To the extent that FHFA is asking that the Court take judicial notice of the underlying factual assertion—that the shareholders of Preferred Stock and Common Stock "effectively lost their investments" in 2008—that assertion of fact is disputed. Shares of stock in a going concern may have substantial value even if the company is insolvent, as long as there is a prospect that the company's financial condition will improve. HERA recognized that there was such a prospect. The terms of the September 2008 PSPAs recognized that there was such a prospect, by leaving the capital structure of Fannie and Freddie—including Preferred Stock and Common Stock—in place underneath the Government Stock. Treasury recognized that there was such a prospect, by taking, as part of the consideration for the PSPAs, Warrants for Common Stock, which would only have *any* value if the Preferred Stock had its *full* value.

---

[5] FHFA0693; 1203 (FHFA 2008 and 2009 Reports to Congress); FHFA1181 (Letter from FHFA Acting Dir. Edward J. DeMarco to Sens. Dodd, Shelby and Reps. Frank, Bachus (Feb. 2, 2010)); FHFA1165 (Congressional Budget Office, CBO's Budgetary Treatment of Fannie Mae and Freddie Mac (Jan. 13, 2010)).

FHFA cites a Mortgage Market Note *issued by FHFA*[6] to support the assertion that the September 2008 PSPAs were a "lifeline of unprecedented federal taxpayer financial support [which] provided the market with assurances that Treasury … 'effectively provide a very long-term federal guarantee' to holders of [Fannie and Freddie] debt (i.e. bondholders) and MBS [mortgage backed securities]." FHFA Memo MD, pp. 10-11. Thus, through this request for judicial notice, the FHFA is simply quoting itself as to the effect and purpose of the PSPAs. As noted below, it is entirely proper for this Court to take judicial notice of the terms of the PSPAs. And the FHFA is, of course, free to make whatever legal arguments it wants about their purpose and effect. But it mocks the purpose of judicial notice—the ready acceptance of facts "not subject to reasonable dispute"—for a federal agency to attempt to use judicial notice simply to quote itself on the purpose and effect of a contract.

FHFA asks that this Court take judicial notice of a Treasury Performance and Accountability Report, dated November 15, 2010[7] and covering the financial period ending September 30, 2010 to support the factual assertion that "the 10% dividend was expected—by itself—to transfer to Treasury 'virtually all profits' of the Enterprises." FHFA Memo MD, p. 13. Thus, FHFA improperly asks this Court to accept, as an indisputable fact, financial projections made by Treasury—projections that proved to be wildly wrong. Worse yet, FHFA muddles the issue because the validity of the Third Amendment turns on what was done in August 2012, after Fannie and Freddie had returned to profitability, based on financial information available as of that date, not based on projections made two years earlier.

FHFA requests that the Court take judicial notice of government data to support FHFA's assertion that "By the end of the third quarter of 2008—at the outset of the conservatorships—

---

[6] FHFA0253 (FHFA Mortgage Market Note (Dec. 5, 2008)).

[7] FHFA1392 (Treasury 2010 Performance and Accountability Report (Nov. 15, 2010)).

Freddie Mac had a negative net worth of $13.7 billion, and by the end of the fourth quarter of 2008, Fannie Mae had a negative net worth of $15.2 billion." FHFA Memo MD, p. 11. But, as reviewed below in connection with the request to take judicial notice of SEC filings, a court may therefore properly take judicial notice of the fact of such data, but not for the truth, accuracy, or completeness of their content.  *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 (D.D.C. 2007).

In sum, while it might well have been appropriate for FHFA to ask this Court to take judicial notice of some of the "government documents" for limited purposes—comparable to 'this is a copy of the Manual for Courts-Martial'—FHFA improperly seeks to use the government documents to establish, as indisputable facts, issues that are intensely disputed, using as the basis for judicial notice that someone in the Government had said so. Judicial notice of the government documents should therefore be denied.[8]

### B.    Congressional Testimony

While Courts may take judicial notice of the fact that testimony and statements were given to committees of Congress, such judicial notice *is limited to "the fact that the statements were made,"* and cannot be used to establish the truth of their contents. *Muller-Paisner v. TIAA,* 289 Fed. Appx. 461, 466 n. 5 (2d Cir. 2008) (emphasis added); *see also Mehle v. Am. Mgmt. Sys., Inc.,* 01-7197, 2002 WL 31778773 (D.C. Cir. Dec. 4, 2002) (taking notice of the existence of certain court records, "not the accuracy of any legal or factual arguments made therein"); *Fox Television Stations, Inc. v. FilmOn X LLC*, 13-cv-758 RMC, -- F. Supp. 2d --, 2013 WL 4763414

---

[8] The remaining two "government documents" included in the MJN are press releases issued by FHFA and Treasury when the Third Amendment was executed, which are quoted in the Complaints, and discussed below in the review of documents quoted or cited in the Complaints. Treasury Press Release (Aug. 17, 2012) (Ex. A to MJN); FHFA4047 (FHFA Statement (Aug. 17, 2012)).

(D.D.C. Sept. 5, 2013) ("to the extent that [defendant] wishes the Court to take judicial notice of the content of the amicus filings or the arguments made therein, the request is denied").[9] However, in asking that the Court take judicial notice of three statements made before Congressional committees,[10] Defendants improperly cite those statements to establish the truth of their contents and, in so doing, ask the Court to accept, as undisputed, highly-disputed contentions at the core of this case.

For example, Defendants cite written testimony of Timothy F. Geithner, then Secretary of the Treasury[11] to establish, as a matter of undisputed fact, that "Because the Enterprises benefited from preferential tax treatment, far lower capital requirements, and a widely perceived Government guarantee, Plaintiffs should have anticipated that the Enterprises would be subject to substantial and likely increasing regulation." FHFA Memo MD, p. 61, n.37. If Secretary Geithner's statement simply means that shareholders of Fannie and Freddie should have known that regulations might increase, it is irrelevant; the Net Worth Sweep was confiscation, not merely increased regulation. And if Secretary Geithner's statement was intended to mean that shareholders of Fannie and Freddie should have realized that their stock could be confiscated, that is disputed: As stockholders in stockholder-owned corporations which were, until the 2008 financial crisis, self-sustaining and funded exclusively with private capital, shareholders of

_____

[9] In *Adarand Constructors v. Slater,* 228 F.3d 1147 (10th Cir. 2000), cited by Defendants (MJD, p. 5), the Tenth Circuit took judicial notice of the content of hearings and testimony before Congressional committees because the question before the Court, in assessing whether there was a compelling interest to support an affirmative action remedy "is not merely whether the government has considered evidence, but rather the nature and extent of the evidence it has considered." 228 F.3d at 1167 (emphasis removed). There is no issue here as to the nature and extent of evidence considered *by Congress*. The nature and extent of the evidence considered *by Treasury* is limited to the administrative record filed (and additional documents that should have been filed) by Treasury.

[10] FHFA 0029, at 0103, 0105, 0106, 0107; FHFA1187 at 1191, 1192; FHFA2359 at 2362.

[11] FHFA1187 at 1191, 1192.

Fannie and Freddie had the right to anticipate that their rights would be respected by the Federal Government, and could not simply by taken away by regulation or self-dealing contracts between two Government entities.

Similarly, the FHFA Defendants cite a statement of Deborah Lucas of the Congressional Budget Office,[12] made in June 2011, more than a year prior to the Third Amendment, that, under the Preferred Stock Purchase Agreements, "In return [for Treasury's financial commitment], the government received senior preferred stock and warrants that made the Treasury the effective owners of the GSEs." FHFA Memo MD, p. 15 n. 8. Ms. Lucas's statement is not only disputed but simply wrong: As noted above, the PSPAs left the capital structure of Fannie and Freddie— including Preferred Stock and Common Stock—in place underneath the Government Stock, and the Treasury took Warrants for Common Stock which would only have value if the Preferred Stock and Common Stock had value.[13]

Finally, the FHFA Defendants cite a statement of FHFA Director James B. Lockhart III[14] submitted to a House committee to establish that "one of the central purposes of the PSPAs [is] to express financial support to holders of Enterprise debt (*i.e.,* bondholders) and MBS [mortgage backed securities]." FHFA Memo MD, p. 66. While that may be a secondary purpose of the PSPAs, the central purposes of the PSPAs were explicitly set forth by Congress in HERA. Those purposes included Fannie and Freddie's "orderly resumption of private market funding or capital

---

[12] FHFA2359 at 2362.

[13] The citation to Ms. Lucas's statement is prefaced in the FHFA Motion to Dismiss, with the phrase, "It has been widely observed that … common and preferred shareholders 'effectively lost their investments' when the Enterprises became insolvent." FHFA Memo MD, pp. 14 – 15. If that prefatory comment is intended to restrict the proposed judicial notice of Ms. Lucas's statement to the fact that the statement was made, there is no reason for judicial notice. The fact that Ms. Lucas made that statement has no bearing whatsoever on any issue in this case.

[14] FHFA 0029, at 0103, 0105, 0106, 0107.

market access" and "The need to maintain [Fannie and Freddie's] status … as private

shareholder-owned compan[ies]"—not to provide "financial support" to bondholders and MBS.

12 U.S.C. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

Because FHFA seeks to cite these statements submitted or made to Congress to establish

the truth of their content, this Court should decline to take judicial notice of the statements.

### C.   SEC Filings and Other Corporate Documents of Fannie and Freddie

Defendants ask that the Court take judicial notice of a broad range of corporate

documents of Fannie and Freddie, including within this general category (1) Forms 10-K and 10-

Q filed by Fannie and Freddie, (2) a press release issued by Freddie, (3) certificates of

designation for certain issues of preferred stock, (4) Fannie's By-Laws, and (5) the Preferred

Stock Purchase Agreements, and amendments thereto, for each of Fannie and Freddie. MJN, pp.

6 – 8. These different documents present different issues.

### 1.   Forms 10-K and 10-Q Filed by Fannie and Freddie

SEC filings are matters of public record, and a court may therefore properly take judicial

notice of the fact of the filings, but not for the truth, accuracy, or completeness of their content.

*In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d at 174 (courts may consider "SEC

filings, press releases, analyst reports and conference call transcripts" to "establish the content of

the disclosures therein" but not the truth of the matters asserted therein); *Gammel v. Hewlett-*

*Packard Co.,* 2013 WL 1947525, at *3 (C.D. Cal., May 8, 2013) ("Court therefore takes judicial

notice of Items 5 and 14 [of Form 10-Ks], but not for the truth of what they assert."); *In re*

*American Apparel, Inc. Shareholder Litigation,* 855 F.Supp.2d 1043, 1062 n. 143 (C.D. Cal.

2012) ("The court takes judicial notice of only the existence and contents of the SEC filings, not

the truth of information contained in them."); *Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015,

1018 (5th Cir.1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents ...").

If judicial notice of an SEC filing established the truth, accuracy or completeness of the filing, every complaint which alleged that a corporate defendant made materially false statements in its SEC filings could be dismissed, on its face, by the court taking judicial notice of the very filing at issue, and thus accepting its accuracy.

Therefore, this Court can take judicial notice of the fact that Fannie Mae and Freddie Mac filed the Forms 10-K and 10-Q to which Defendants make reference,[15] but the Court should not accept such filings for the truth, accuracy, or completeness of the statements and information contained therein, which cannot and should not be resolved on Defendants' motion to dismiss.

By that standard, some (but not all) of FHFA's citations to the Fannie and Freddie SEC filings are improper. For example, FHFA cites Fannie and Freddie's Forms 10-Q for the second quarter of 2012 to support a factual assertion that "By mid-2012 … it appeared unlikely that either of the Enterprises would be able to meet [the 10% dividend] consistently without drawing additional funds from Treasury." FHFA Memo MD, pp. 15-16. This Court should not accept the SEC filings to establish the truth (or falsity) of that statement, or of any other statement in the SEC filings.

---

[15] FHFA 0258 at 0293; FHFA1419 at 1457, 1480; FHFA1822 at 1832; FHFA 2193 at 2251; FHFA2423 at 2437; FHFA 3584 at 3680; FHFA3842 at 3857, 3858; Exhibit B.

### 2.  Freddie's Press Release

Defendants sanctify a press release issued by Freddie,[16] terming it a "verifiable public document" which is "publically available." MJN, p. 7. In their motion to dismiss, the FHFA Defendants cite the press release not for the fact that it was issued but for the truth of its contents, to establish that "Freddie Mac's annual 10% dividend obligation 'exceed[ed] the company's annual historical earnings in all but one period.'" FHFA Memo MD, p. 13. This is part of Defendants' attempt to establish that there was no reasonable prospect that Fannie or Freddie would be able to continue to pay the 10% dividend, and therefore that the Net Worth Sweep made matters no worse for holders of Preferred Stock and Common Stock. If, in fact, the statements in the press release are accurate, FHFA can introduce that data through competent evidence at trial.

If this Court were to accept FHFA's improper invitation to try this case through selective judicial notice on a motion to dismiss, Plaintiff s would ask that the Court note that Fannie and Freddie's press releases on their 2013 financial performance show this: In 2013, Fannie paid Treasury dividends of $82.5 billion under the Net Worth Sweep—about seven times the $11.7 billion in dividends that would have been due as 10% of the $117.1 billion of Fannie Government Stock.  Had the additional dividends been used to pay down the Fannie Government Stock, the Fannie Government Stock outstanding would have been reduced from $117.1 billion to about $46 billion. In 2013, Freddie paid Treasury dividends of $47.6 billion under the Net Worth Sweep—similarly about seven times the $7.2 billion in dividends that would have been due as 10% of the $72.3 billion in Freddie Government Stock. Had the additional dividends been

---

[16] FHFA2178.

used to pay down the Freddie Government Stock, the Freddie Government Stock would have been reduced from $72.3 billion to about $31.9 billion.[17]

Given that SEC filings cannot be used to establish, as an indisputable fact, the registrant's earnings, a press release—one would hope prepared with care, but not the care required for an SEC filing—cannot be used for that purpose. *See* cases cited above regarding SEC filings; *see also Fox Television Stations, Inc. v. FilmOn X, LLC,* -- F. Supp. 2d --, 2013 WL 4852300, at *1 n.1 (D.D.C. Sept. 12, 2013)  (declining to take judicial notice of press release); *In re Apple iPhone Antitrust Litigation,*2013 WL 4425720, at *9 (N.D. Cal., August 15, 2013) (declining to take judicial notice of press release because "The fact of the issuance of press releases may be undisputed, but the contents therein may nonetheless be subject to a reasonable dispute.").

### 3.   Certificates of Designation for Certain Issues of Stock

This issue is discussed below, as part of the review of documents to which reference is made in the Complaints.

### 4.   Fannie's By-Laws

This Court may take judicial notice of Fannie's By-Laws; such notice simply establishes that the By-Laws are the By-Laws.

### 5.   Preferred Stock Purchase Agreements and Amendments

This issue is discussed below, as part of the review of documents to which reference is made in the Complaints.

---

[17] "Fannie Mae Reports Comprehensive Income of $84.8 Billion for 2013 and $6.6 Billion for Fourth Quarter 2013; Fannie Mae Paid Treasury $82.5 Billion in Dividends in 2013," Fannie Mae News Release, Feb. 21, 2014; "Freddie Mac Reports Net Income of $48.7 Billion for Full-Year 2013; Comprehensive Income of $51.6 Billion," Freddie Mac News Release, Feb. 27, 2014. The reduction in outstanding Government Stock which would have occurred had the additional dividends been applied to reduce the Stock would have been greater than stated, because this calculation does not take into account that the quarterly dividend, at the 10% rate, would have been reduced each quarter.

### D.      Publications and News Articles

Ignoring the limited purposes for which courts may take judicial notice of publications and news articles—"to indicate what was in the public realm at the time, not whether the contents of those articles were in fact true," *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010)—FHFA asks that this Court take judicial notice of a *Wall Street Journal* article and publications of Moody's, Barclays, and Deutsche Bank to establish the truth of factual assertions made therein, and also apparently to establish that the opinions expressed should be accepted, conclusively, as the general opinion of the financial markets. Judicial notice cannot be used for either of these purposes. *Blue Man Vegas, LLC v. N.L.R.B.*, 529 F.3d 417, 427 (D.C. Cir. 2008) (court declines Blue Man Group's motion to take judicial notice of publications that "'aptly describe the unique and highly unusual experience of attending a Blue Man Group performance'"); *Cofield v. Alabama Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir. 1991) (district court erred in taking judicial notice of the truth of facts asserted in news article; "That a statement of fact appears in a daily newspaper does not of itself establish that the stated fact is 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.' FED. R. EVID. 201(b)(2)"); *Greenspan v. Random House, Inc.*, 12-1594, 2012 WL 5188792 (1st Cir., Oct. 16, 2012) ("Because appellant's request asks us to take notice of the truth of the matters asserted in the article, the motion is denied"); *Fox Television,* 2013 WL 4852300, at *1 n.1 (declining to take judicial notice of press release).

For example, after a prefatory note that the process of Fannie and Freddie's borrowing funds from Treasury to pay the fixed 10% dividend to Treasury raised "concerns in the marketplace," FHFA asserts that "Moody's, a leading credit rating service, stated that the 10% dividend payments would 'eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's

16

by 2022, . . . [even] assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely.'" FHFA Memo MD, p. 24, citing FHFA2404 (Moody's, Sector Comment: *Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support* (Sept. 26, 2011)). If the statement is offered to prove that Moody's said it, or that it was representative of investor opinions, the statement is irrelevant to the legal questions before the Court. In all events, the Government introduced no evidence (nor could it introduce any such evidence) that Moody's opinion was representative of investor opinions. *Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co.,* 993 F.2d 269, 273 (1st Cir. 1993) ("the district court's use of scattered press reports . . . was beyond the proper scope of judicial notice"). And to the extent that this statement is offered as proof of the factual assertion that contingent capital would be depleted by those dates, that is a disputed fact, which, if necessary for proof, would require testimony (and perhaps expert testimony) at trial. FHFA similarly cites a Moody's publication issued on August 13, 2012, which FHFA notes was "four days before execution of the Third Amendment," which stated that Fannie and Freddie "'will deplete their capital bases because the dividends they'll be paying on their preferred securities will be greater than their earnings.'" FHFA Memo MD, p. 24, citing FHFA4028 (Moody's Issuer Comment: *Fannie Mae's and Freddie Mac's Return to Profitability is Fleeting* (Aug. 13, 2012). The request that this Court take judicial notice of this publication suffers from the same infirmities as the request for notice of the September 2011 Moody's publication—and from the additional problem that, on its face, the only authority which Moody's cites in its August 2012 publication—as FHFA says "four days before" the Third Amendment—is what Moody's itself said in its September 2011 publication.

FHFA's citation to a Deutsche Bank publication provides an additional reason why judicial notice should be denied: In asking the Court to take judicial notice of a news article or other publication, is FHFA asking that the Court take judicial notice only of FHFA's selective quotation from that publication? Or of the entire publication? FHFA states "a large international bank" observed that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006." FHFA MD Memo, p. 24, quoting FHFA3101 (Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac* (Mar. 14, 2012)). But what Deutsche Bank actually wrote was:

> For MBS investors, diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses. *The high quality of current loans and prospect of rising guarantee fees should allow the agencies to cover losses in most scenarios.* The risk becomes greater in a housing market catastrophe, such as the one that started in the US after 2006.

(emphasis added). And a few paragraphs later, in the same publication, Deutsche Bank wrote:

> If Treasury and the agencies [Fannie and Freddie] want to avoid the possible market implications of diminishing Treasury support, then the parties to the PSPA could elect to amend it and defer or reduce the dividend. Deferring the dividend would almost surely leave the agencies with enough guarantee and investment income to cover MBS losses and manage portfolio funding. … Alternatively, the parties could reduce the dividend to a level that the agencies would be able to cover comfortably with the guarantee and investment income. . . . [A] 5% dividend might be manageable for both agencies.

FHFA3096 at 3101. Do FHFA and Treasury agree that, if this Court is to take judicial notice of the Deutsche Bank statement, the Court should thereby accept, as an indisputable fact, that the Third Amendment was unreasonable because, as Deutsche Bank suggested, any problem created by the fixed 10% dividend could have been mitigated by deferring or reducing that dividend?

FHFA also fails to note that some of these publications were simply printing information taken from FHFA's financial statements or press releases. For example, FHFA cites a *Wall Street*

*Journal* article to support its statement that "on August 7, 2012, Freddie Mac announced: 'Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term.'" FHFA Memo MD, p. 23, citing FHFA4026 (Nick Timiraos, *Fannie Mae Posts Profit as Home Prices Rise*, Wall St. J. (Aug. 8, 2012). Since the FHFA financial statements and press releases, by themselves, would not be subject to judicial notice to establish the truth of their contents, the publication, by a third party, of information gleaned from the financial statements and press releases, does not make judicial notice appropriate.

Finally, FHFA asks that this Court take judicial notice of publications made after the Third Amendment as an attempt to bolster the reasonableness of the conduct of FHFA and Treasury. FHFA Memo MD, pp. 25-26, *citing* FHFA4051 (Moody's, Issuer Comment: *US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive* (Aug. 23, 2012)); FHFA4049 (Barclays, Interest Rates Research, Treasury Changes the PSPAs: Initial Thoughts (Aug. 17, 2012)). This request is improper for the additional reason that the reasonableness and legality of FHFA and Treasury's conduct in executing the Third Amendment cannot be gauged by news articles and publications made after the fact.

Lest there be any doubt that FHFA cites these news articles and publications for the truth of their contents, FHFA concludes these citations with the bold assertion of fact: "*In sum,* the Third Amendment successfully resolved a very real problem—drawing funds from Treasury to pay the 10% dividend to Treasury—that threatened to drain the Treasury." FHFA Memo MD, p. 26. (emphasis added). That is disputed, and it cannot be established by taking judicial notice of news articles and publications.

In *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 06-cv-6278, 2006 WL 3771013 at *1 (S.D.N.Y. Dec. 18, 2006), the court rejected a similar attempt to shoehorn selected publications into the limited scope of judicial notice:

> defendants ask the Court to take notice of the *existence* of the advertisements-as in the cases defendants cite, which relate primarily to inquiry notice based on the fact of publication-and to extrapolate from that existence the otherwise not-widely-known proposition that the "use of a handwriting style and arrows is not 'unique' in advertising and is often used in print and website advertisements."
>
> This is an inappropriate use of judicial notice, and risks creating misleading results. . . .

*Id.* at *1-2 (emphasis in original). Thus, while the existence of a publication may be an appropriate subject for judicial notice, in *O'Keefe* the defendants were in reality seeking more, notwithstanding their attempt to present the issue as an innocuous request for notice of the existence of the publication. Accordingly, the Court granted the plaintiff's request to strike the disputed exhibits which the defendants sought to introduce in support of their motion to dismiss. *Id.* at *2.

FHFA's request for the Court to take notice of selected market commentary and news articles is a similarly inappropriate use of judicial notice which risks creating misleading results. Even if FHFA frames its request as one for notice of the existence of the publications, the use of a selective subset of the existing market commentary would be misleading and would allow FHFA to circumvent the fundamental rule that a plaintiff's allegations are accepted as true in the context of a motion to dismiss.

None of the three cases from this Court which FHFA cites as support for the proposition that courts may take judicial notice of news articles and other publications arose in the context of a motion to dismiss. *See Winder v. Erste*, 905 F. Supp. 2d 19 (D.D.C. 2012) (cited in MJN, p.8) (motion for summary judgment); *United States v. Philip Morris USA, Inc.*, 99-cv-2496, 2004 WL

5355971 (D.D.C. Aug. 2, 2004) (cited in MJN, p.8) (shortly before trial: opinion does not state

procedural posture, but ECF docket indicates that the opinion was issued in the midst of motions

*in limine* and less than two months before trial); *Gov't of Rwanda v. Rwanda Working Grp.*, 227

F. Supp. 2d 45, 50 (D.D.C. 2002) (cited in MJN, p.8) (bench trial).[18]

The Third Circuit's decision in *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594 (3d Cir. 2000)

(cited in MJN, p. 8) involved an appeal from a decision on a motion to dismiss, but the facts

asserted in the noticed article were not disputed and were not subject to reasonable dispute, thus

satisfying the threshold requirement of Rule 201(b). The article noticed in *Ieradi* was cited for

the straightforward fact that a separate action involving one of the parties had been settled. 230

F.3d at 598 n.2. This is a far cry from the types of facts for which FHFA cites the publications it

offers, including highly disputed facts regarding the purpose of the Third Amendment.

Similarly, cases such as *Philip Morris* only serve to underscore the stark contrast between

the material that FHFA asks the Court to consider and that which was considered in the cases on

which FHFA attempts to rely. In *Philip Morris*, notice was taken only of the fact "that the

publications have been in circulation; . . . the dates of such circulation; and . . . that the

publications were mailed[.]" *Philip Morris*, 2004 WL 5355971 at *1. By contrast, FHFA

incorporates the substance of the cited publications throughout its motion to dismiss and thus

seeks notice of much more than the fact of publication or date of publication. FHFA's request for

---

[18] While FHFA cites to other cases for the general proposition that notice may be taken of a
matter of public record without converting a motion to dismiss into a motion for summary
judgment, none of those cited cases involved news articles, market commentary, or similar
publications. *See Antoine v. U.S. Bank Nat. Ass'n*, 547 F. Supp. 2d 30, 38 n.3 (D.D.C. 2008)
(cited in MJN, p.2) (taking judicial notice of hearing transcript); *Hollie v. Smith*, 813 F. Supp. 2d
214, 219 n.6 (D.D.C. 2011) (cited in MJN, p.2) (notice of labor union's constitution); *Wise v.
Glickman*, 257 F. Supp. 2d 123, 130 n.5 (D.D.C. 2003) (cited in MJN, p.2) (notice of arbitrator's
rulings).

the Court to take judicial notice of news articles and market commentary satisfies neither Rule 201 nor the applicable case law, and therefore must be denied.

## II.   DOCUMENTS CITED IN THE COMPLAINTS

Defendants' request that the Court consider documents cited in the Complaints improperly puts, on the same analytical basis, documents which are properly treated as incorporated into the Complaints by reference, because the terms of those documents help to define Plaintiffs' claims (*e.g*., the PSPAs) and documents cited by the Complaints for a limited purpose, such as an admission by FHFA or Treasury (*e.g.,* FHFA's and Treasury's announcements regarding the Third Amendment). These different types of documents require different analysis.

### A.   Documents Incorporated by Reference into the Complaints

#### 1.   Preferred Stock Purchase Agreements and Amendments

The PSPAs and the Amendments thereto are properly treated as incorporated into the Complaints by reference—because the terms of those documents help to define Plaintiffs' claims. This Court should, of course, consider those documents in its consideration of Defendants' Motions to Dismiss.

#### 2.   Certificates of Designation for Certain Issues of Stock

Similarly, because Plaintiffs' rights derive, in part, from the Certificates of Designation for issues of Fannie and Freddie's Preferred Stock and Common Stock, this Court should properly consider those Certificates.

### B.   Other Documents To Which Reference Is Made in Complaints

The Complaints cite or quote statements made in FHFA and Treasury announcements, and from reports of FHFA's Office of the Inspector General ("FHFA OIG"), because specific

22

statements made in those documents are, in effect, admissions by FHFA and Treasury of key aspects of Plaintiff's claims. Such "limited quotation does not constitute incorporation by reference" of the document cited or quoted, and thus cannot warrant this Court's consideration of the entire document on a motion addressed to the face of the Complaints. *In re Newbridge Networks Securities Litigation,* 767 F. Supp. 275, 279 n.4 (D.D.C. 1991) ("Extraneous material may be considered but only if it is attached to the complaint or incorporated by reference, and limited quotation does not constitute incorporation by reference."), citing *Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir.1985). *See also Freeman v. Town of Hudson,* 714 F.3d 29, 36 (1st Cir. 2013).

This Court may consider those cited documents for the limited purpose of assessing whether the citations are fair and accurate. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 569 (2007) (where complaint included "truncated quotations," court was entitled to take judicial notice of the statements "from which the truncated quotations were drawn."). The Court should not otherwise take judicial notice or consider those documents. And because the FHFA OIG Reports are cited by FHFA and Treasury only for impermissible purposes, this Court should not consider those documents at all.

### 1.   FHFA and Treasury Announcements Regarding the Third Amendment

The Complaints cite Acting Director DeMarco's statement that the Third Amendment reflected FHFA's goal of "gradually contracting [Fannie and Freddie's] operations"[19] because that goal is directly contrary to FHFA's role as Conservator of Fannie and Freddie, and Congress's mandate, as set forth in HERA. That is an admission by FHFA.

---

[19] FHFA Statement (Aug. 17, 2012) (cited at Consol. Compl. ¶ 95; Arrowood Compl. ¶ 90; Fairholme Compl. ¶¶ 71-72; Perry Compl. ¶¶ 52, 55).

FHFA makes no claim that that quotation was unfair, inaccurate, "truncated," or taken out of context. Instead, FHFA cites its own announcement to establish, as a matter of undisputed fact, self-serving statements included in that announcement—*e.g.,* quoting the FHFA statement that "[T]he continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs" to support FHFA's argument that "FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the remaining amount, and thus the effective duration, of the Treasury commitment starting in 2013." FHFA Memo MD, p. 16. That contention is intensely disputed; Treasury's motive for the Third Amendment was to take every dollar which Fannie and Freddie generated. The citation of an admission by FHFA in one part of its public announcement is hardly grounds for the Court to accept, as indisputably true, the self-serving statements in other parts of the announcement. To exceed the permitted scope of judicial notice in this manner would be particularly egregious in the context of a motion to dismiss, when the Plaintiffs' allegations must be assumed to be true.

The Complaints also quote a Treasury Press Release, issued at the time of the Third Amendment, which stated that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market." Treasury Press Release (Aug. 17, 2012) (cited at Consol. Compl. ¶ 72). FHFA argues that this quote is taken "completely out of context," stating that Treasury was merely referring to the reduction of Fannie and Freddie's retained mortgage portfolios, which had been contemplated by the original PSPAs. Plaintiffs respectfully submit that the quotation is fair and accurate, and not out-of-context at all. And it is entirely proper for

this Court to review the Treasury Press Release for the limited purpose of assessing whether the quotation was unfairly "truncated."

### 2. FHFA OIG Reports

FHFA asks that the Court consider two reports issued by the FHFA OIG—one dated May 24, 2012 (three months prior to the Third Amendment) and one dated March 20, 2013 (seven months after the Third Amendment).

The citation to the May 24, 2012 FHFA OIG Report in the Perry Complaint (the only Complaint which cites that report) was apparently made in error, as FHFA itself recognizes. In a paragraph which discusses the Third Amendment, the Perry Complaint stated that FHFA OIG concluded that shareholders "effectively lost their investments." Perry Compl. ¶ 17. As FHFA correctly points out, FHFA OIG made that statement before the Third Amendment was executed, and the statement thus could not have been made in reference to the Third Amendment. FHFA Memo MD, p. 22 n. 16. Because that was the only citation in any Complaint to the May 24, 2012 FHFA OIG Report, and that citation was in error, FHFA cannot use that citation as a pretext to ask the Court to consider other aspects of that FHFA OIG Report. But that is exactly what FHFA does—for example, citing the FHFA OIG report as evidence that "one of the central purposes of the PSPAs [was] to express financial support to holders of Enterprise debt (i.e., bondholders) and MBS." FHFA Memo MD, p. 66.

Three of the Complaints cited a statement in the March 30, 2013 FHFA OIG Report that, as a result of the New Worth Sweep, reversal of Fannie and Freddie's deferred tax assets valuation allowance could result in "an extraordinary payment to Treasury," and one Complaint cited that report's statement that Fannie and Freddie had not required draws from Treasury in the

second quarter of 2012 due to the fact that the housing market had improved.[20] FHFA does not contend that those quotations are unfair or out-of-context; if it did, it would be entirely proper for this Court to review the Report on that issue. Instead, FHFA uses those citations as a basis to argue that this Court should accept, as an indisputable fact, that the Third Amendment was reasonable because "The circular practice thus threatened to undermine the very purpose of the PSPAs: to provide the market with assurances that federal support stood behind the Enterprises' debts. FHFA's Inspector General recognized as much, observing that '[m]arket participants [had] expressed concern that the dividends could siphon off Treasury money needed to keep the Enterprises solvent.'" FHFA Memo MD, pp. 24-25. Treasury uses the citation to the FHFA OIG report to support its assertion that "The $19 billion annual dividend amount exceeded the highest combined profits of both companies in any previous year." Treasury Defendants' Memorandum in Support of Motion to Dismiss (Dkt. 35 in 13-1439), p. 16.

This use of judicial notice is astonishing: A federal agency and a federal department ask that the entire report of the agency's own Inspector General be accepted as indisputable fact because an adversary cited one statement, or one section, of that report on a narrow issue. Because the purpose for which judicial notice is requested is improper, this Court should not consider the report.

### CONCLUSION

Plaintiffs respectfully request that the Court grant Defendants' motion for judicial notice only to the limited extent set forth above and in the accompanying Order, and otherwise deny the motion.

---

[20] FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements (Mar. 20, 2013) (cited at Consol. Compl. ¶¶ 19, 96; Fairholme Compl. ¶¶ 58, 63, 64, 73; Perry Compl. ¶ 49).

Dated: March 14, 2014

/s/ Drew W. Marrocco
DREW W. MARROCCO (Bar No. 453205)
drew.marrocco@dentons.com
DENTONS US LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005-3364
Tel.: (202) 408-6400
Fax: (202) 408-6399

MICHAEL H. BARR (pro hac vice)
michael.barr@dentons.com
RICHARD M. ZUCKERMAN (pro hac vice)
richard.zuckerman@dentons.com
SANDRA HAUSER (pro hac vice)
sandra.hauser@dentons.com
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 768-6700
Fax: (212) 768-6800

Attorneys for
Arrowood Indemnity Co. et al.

/s/ Matthew D. McGill
THEODORE B. OLSON, SBN 367456
tolson@gibsondunn.com
DOUGLAS R. COX, SBN 459668
dcox@gibsondunn.com
MATTHEW D. MCGILL, SBN 481430
mmcGill@gibsondunn.com
NIKESH JINDAL, SBN 492008
njindal@gibsondunn.com
DEREK S. LYONS, SBN 995720
dlyons@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
Facsimile: 202.467.0539

Attorneys for Perry Capital LLC

DAVID L. WALES (Bar No. 417440)
dwales@blbglaw.com
BERNSTEIN LITOWITZ BERGER & GROSSMANN
LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: (212) 554-1409
Fax: (212) 554-1444 (fax)

BLAIR A. NICHOLAS
blairn@blbglaw.com
DAVID R. KAPLAN
davidk@blbglaw.com
BERNSTEIN LITOWITZ BERGER & GROSSMANN
LLP
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323

/s/ Hamish P.M. Hume
HAMISH P.M. HUME
hhume@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave., NW, Suite 800
Washington, DC 20015
Tel: (202) 237-2727
Fax: (202) 237-6131

JAY W. EISENHOFER
jeisenhofer@gelaw.com
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

*/s/ David H. Thompson*
Charles J. Cooper (Bar No. 248070)
ccooper@cooperkirk.com
Vincent J. Colatriano (Bar No. 429562)
David H. Thompson (Bar No. 450503)
Peter A. Patterson (Bar No. 998668)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

*Attorneys for Fairholme Funds, Inc., et al.*

GEOFFREY C. JARVIS
gjarvis@gelaw.com
MICHAEL J. BARRY
mbarry@gelaw.com
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Telephone: (302) 622-7000
Facsimile: (302) 622-7100

LEE D. RUDY
lrudy@ktmc.com
ERIC L. ZAGAR
ezagar@ktmc.com
MATTHEW A. GOLDSTEIN
mgoldstein@ktmc.com
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

*Interim Co-Lead Class Counsel
in Class Action Litigations*