**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERRY CAPITAL LLC, | |
|               Plaintiff, | |
|    v. | Civil Action No. 13-cv-1025 (RCL) |
| JACOB J. LEW, *et al.*, | |
|               Defendants. | |
| FAIRHOLME FUNDS, INC., *et al.*, | |
|               Plaintiffs, | |
|    v. | Civil Action No. 13-cv-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
|               Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
|               Plaintiffs, | |
|    v. | Civil Action No. 13-cv-1439 (RCL) |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*, | |
|               Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | |
| This document relates to: | Misc. Action No. 13-mc-01288 (RCL) |
| ALL CASES | |

**DEFENDANTS FHFA, WATT, FANNIE MAE, AND FREDDIE MAC'S COMBINED REPLY IN SUPPORT OF THEIR MOTION TO DISMISS WITH ALTERNATIVE MOTION FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

<u>Page</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

ARGUMENT ......................................................................................................................3

I.    Section 4617(f) Bars Plaintiffs' Claims Seeking Declaratory and Equitable
Relief .....................................................................................................................3

        A.    Section 4617(f) Takes Statutory Precedence over Any Presumption
in Favor of Judicial Review of Agency Action and Bars Judicial
Review of Allegations That the Conservator's Actions Were
Arbitrary and Capricious ................................................................................3

        B.    Section 4617(f) Bars Plaintiffs' Claims Because the Third
Amendment Indisputably Falls Within the Conservator's Power to
Transfer Assets .............................................................................................5

        C.    Section 4617(f) Bars Plaintiffs' Attempt to Second-Guess the
Conservator's Exercise of Its Discretion to Promote the Best
Interests of the Enterprises or the Agency by Executing the Third
Amendment ...................................................................................................7

        D.    HERA Bars Plaintiffs' Claims Because the Conservator Has the
Express Power to Wind Up the Enterprises .........................................................11

II.    Plaintiffs Lack Standing Because They Have Failed to Allege Any Injury-
in-Fact to Their Liquidation Preference ............................................................17

III.    Plaintiffs Have No Right to Pursue Their Contract and Fiduciary Duty
Claims During Conservatorship .......................................................................21

        A.    Plaintiffs' Contract and Fiduciary Duty Claims Are Derivative, and
Thus Are Barred by HERA .............................................................................21

        B.    Section 4617(f) Bars Plaintiffs from Utilizing the Equitable
Remedy of Derivative Standing ......................................................................24

        C.    There Is No Manifest Conflict of Interest Exception to HERA ...........................25

        D.    Even if Plaintiffs' Claims Are Considered Direct Rather Than
Derivative, Plaintiffs Have No Right to Pursue Their Contract and
Fiduciary Duty Claims During Conservatorship. ...............................................28

IV.    Plaintiffs' Claims for Breach of Contract and Breach of the Implied
Covenant of Good Faith and Fair Dealing Fail as a Matter of Law ...............32

A.   Plaintiffs' Breach of Contract Claims Fail to State a Claim ...................................33

B.   Treasury's Senior Preferred Stock Has Not Been "Converted" to Common Stock.........................................................................................................35

C.   Plaintiffs' Claim for Breach of the Implied Duty of Good Faith and Fair Dealing Fails to State a Claim .....................................................................37

V.   Plaintiffs' Breach of Fiduciary Duty Claims Are Preempted ...........................................38

VI.   Plaintiffs' Takings Claims Against the Conservator Fail as a Matter of Law .............................................................................................................................40

A.   Regardless of Whether Plaintiffs Have a Cognizable Property Interest, the Government Did Not "Take" Any Such Interest ...............................40

B.   Plaintiffs Lack a Cognizable Property Interest .....................................................45

1.   *Plaintiffs' "Rights" to Dividends and Liquidation Preferences Are Not Cognizable Property Interests Under the Fifth Amendment*................................45

2.   *Plaintiffs Had No Cognizable Property Interests Under the Regulatory Framework Established by HERA* .......................................48

C.   The Named Plaintiffs Have Failed to Waive All Claims Over $10,000...................................................................................................................50

D.   The Conservator is Not the United States for Purposes of a Takings Claim.......................................................................................................................51

VII.   FHFA's Decision to Enter into the Third Amendment Was Not Arbitrary or Capricious...................................................................................................................52

CONCLUSION...............................................................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*A&D Auto Sales v. United States*,
    --- F.3d ----, 2014 WL 1345499 (Fed. Cir. April 7, 2014)......................................................43

*Acceptance Ins. Cos. v. United States*,
    84 Fed. Cl. 111 (2008), *aff'd*, 583 F.3d 849 (Fed. Cir. 2009)..................................................44

*Adagio Investment Holding Ltd. v. FDIC*,
    338 F.Supp.2d 71 (D.D.C. 2004) ...........................................................................................7

*Air Pegasus of D.C., Inc. v. United States*,
    424 F.3d 1206 (Fed. Cir. 2005)..............................................................................................48

*Allen v. Wright*,
    468 U.S. 737 (1984)................................................................................................................21

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
    910 A.2d 1020 (Del. Ch. 2006)......................................................................................34, 38

*Amazon.com, Inc. v. Hoffman*,
    No. 2239, 2009 WL 2031789 (Del. Ch. June 30, 2009)..................................................34, 37

*Amusement Indus., Inc. v. Stern*,
    No. 07 CIV 11586, 2010 WL 2976199 (S.D.N.Y. July 26, 2010) .........................................22

*Auction Co. of America v. FDIC*,
    132 F.3d 746 (D.C. Cir. 1997) ..........................................................................................51, 52

*Bank of Am. Nat. Ass'n v. Colonial Bank*,
    604 F.3d 1239 (11th Cir. 2010) ...........................................................................................4, 9

*Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*,
    922 A.2d 1169 (Del. Ch. 2006)..............................................................................................24

*Bowen v. Mich. Acad. of Family Physicians*,
    476 U.S. 667 (1986).................................................................................................................4

*Branch v. FDIC*,
    825 F. Supp. 384 (D. Mass. 1993) .............................................................................29, 30, 47

*\*Broad v. Sealaska Corp.*,
    85 F.3d 422 (9th Cir. 1996) ..................................................................................44, 45, 46, 47

*Brown v. Legal Foundation of Washington*,
    538 U.S. 216 (2003)..........................................................................................................46, 47

*Cal. Hous. Secs., Inc. v. United States*,
    959 F.2d 955 (Fed. Cir. 1992) ............................................................47

*Calhoun v. Massie*,
    253 U.S. 170 (1920) ...........................................................................45

*City of Arlington v. FCC*,
    133 S.Ct. 1863 (2013) ........................................................................10

*Clapper v. Amnesty Intern. U.S.A.*,
    133 S.Ct. 1138 (2013) .....................................................................17,18

*Cnty. of Sonoma v. FHFA*,
    710 F.3d 987 (9th Cir. 2013) ..........................................................4, 5, 7

*Coal. for Responsible Regulation, Inc. v. E.P.A.*,
    684 F.3d 102 (D.C. Cir. 2012) ...........................................................18

*Cobell v. Norton*,
    283 F. Supp. 2d 66 (D.D.C. 2003) (Lamberth, J.) ...............................48

*Courtney v. Halleran*,
    485 F.3d 942 (7th Cir. 2007) ...........................................................6, 7

*Davis Trust Co. v. Hardee*,
    85 F.2d 571 (D.C. Cir. 1936) ........................................................16, 17

*Delta Savs. Bank v. United States*,
    265 F.3d 1017 (9th Cir. 2001) ......................................................25, 26

*DeTroia v. Schweitzer*,
    662 N.E.2d 779 (N.Y. 1996) ..............................................................33

*Deutsche Bank Nat. Trust Co. v. FDIC*,
    717 F.3d 189 (D.C. Cir. 2013) ...........................................................54

*Domestic Sec., Inc. v. SEC*,
    333 F.3d 239 (D.C. Cir. 2003) ...........................................................57

*Dorris v. FDIC*,
    No. Civ. 93-1659, 1994 WL 774535 (D.D.C. Oct. 27, 1994) ...............57

*Elliott Assocs., L.P. v. Avatex Corp.*,
    715 A.2d 843 (Del. 1998) ...................................................................36

*Esther Sadowsky Testamentary Trust v. Syron*,
    639 F. Supp. 2d 347 (S.D.N.Y. 2009) ................................................25

*In re Delphi Financial Group Shareholder Litigation*,
   No. 7144, 2012 WL 729232 (Del. Ch. March 6, 2012) ........................................................38

*In re Fed. Home Loan Mortgage Corp. Derivative Litig.*,
   643 F. Supp. 2d 790 (E.D. Va. 2009), *aff'd sub nom. Louisiana Mun. Police*
   *Employees Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011) ...............................25, 26, 30

*In re Fed. Nat. Mortgage Ass'n Sec., Derivative, ERISA Litig.*,
   629 F. Supp. 2d 1 (D.D.C. 2009) *aff'd sub nom. Kellmer*, 674 F.3d 848 ...................24, 26, 30

*First Hartford Corp. Pension Plan & Trust v. United States*,
   194 F.3d 1279 (Fed. Cir. 1999) ...............................................................................25, 26, 47

*First Hartford Corp. Pension Plan & Trust v. United States*,
   42 Fed. Cl. 599 (Fed. Cl. 1998) *aff'd in pertinent part*, 194 F.3d 1279 (Fed.
   Cir. 1999) .........................................................................................................................30

*First Ind. Fed. Sav. Bank v. FDIC*,
   964 F.2d 503 (5th Cir. 1992) ..............................................................................................18, 48

*Franklin Savs. Ass'n v. Director, Office of Thrift Supervision*,
   934 F.2d 1127 (10th Cir.1991) ...........................................................................................57

*Franks v. Salazar*,
   751 F. Supp. 2d 62 (D.D.C. 2010) ......................................................................................53

*Gaff v. FDIC*,
   814 F.2d 311 (6th Cir. 1987) ...............................................................................................22

*GECCMC 2005–C1 Plummer St. Office L.P. v. JPMorgan Chase Bank, N.A.*,
   671 F.3d 1027 (9th Cir. 2012) .............................................................................................54

*Gentile v. Rossette*,
   906 A.2d 91 (Del. 2006) ..........................................................................................22, 23, 24

*Gibraltar Financial Corp. v. Federal Home Loan Bank Board*,
   No. 89-cv-3489, 1990 WL 394298 (C.D. Cal. June 15, 1990) ..............................................40

*Gosnell v. FDIC*,
   No. 90-1266L, 1991 WL 533637 (W.D.N.Y. Feb. 4, 1991), *aff'd*, 938 F.2d
   372 (2d Cir. 1991) .................................................................................................................6

*Gross v. Bell Sav. Bank PaSA*,
   974 F.2d 403 (3d Cir. 1992) ................................................................................................5, 9

*GTS 900F, LLC v. FDIC*,
   No. 11-cv-06607, 2012 WL 2086305 (C.D. Cal. June 1, 2012) .............................................58

*Guam Indus. Servs, Inc. v. Rumsfeld*,
  383 F. Supp. 2d 112 (D.D.C. 2005) ...................................................................................15

*Hansen Bancorp, Inc. v. United States*,
  49 Fed. Cl. 168 (2001) .....................................................................................................32

*Heckler v. Chaney*,
  470 U.S. 821 (1985).................................................................................................4, 5, 52

*Herron v. Fannie Mae*,
  857 F. Supp. 2d 87 (D.D.C. 2012) ....................................................................................51

*Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*,
  No. 12-3302-CV, --- F.3d ---, 2014 WL 401303 (2d Cir. Feb. 4, 2014) ................................54

*Hindes v. F.D.I.C.*,
  No. CIV. A. 94-2355, 1995 WL 82684 (E.D. Pa. Feb. 28, 1995), *aff'd*, 137
  F.3d 148 (3d Cir. 1998)........................................................................................................9

*Hometown Fin. Inc. v. United States*,
  56 Fed. Cl. 477 (Fed. Cl. 2003) .......................................................................................22

*Huntleigh USA Corp. v. United States*,
  525 F.3d 1370 (Fed. Cir. 2008)........................................................................................43

*Innovative Therapies, Inc. v. Meents*,
  No. CIV.A. 12-3309, 2013 WL 2919983 (D. Md. June 12, 2013)........................................24

*Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*,
  704 F.3d 927 (11th Cir.2013) ...........................................................................................54

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
  906 A.2d 766 (Del. 2006) ................................................................................................23

*James Madison LTD. By Hecht v. Ludwig*,
  868 F. Supp. 3 (1994) .......................................................................................................57

*JPMorgan Chase Bank, N.A. v. FDIC*,
  Nos. 12-2094, 13-1172, at 11 (6th Cir. Apr. 24, 2014) ........................................................54

*Kearney & Trecker Corp. v. United States*,
  688 F.2d 780 (Ct. Cl. 1982) .............................................................................................42

*Kellmer v. Raines*,
  674 F.3d 848 (D.C. Cir. 2012) ................................................................................... *passim*

*Landy v. FDIC*,
  486 F.2d 139 (3d Cir. 1973)..............................................................................................26

*Lebron v. Nat'l R.R. Passenger Corp.*,
  513 U.S. 374 (1995)..................................................................................................51

*Legal Tender Cases* (*sub nom. Knox v. Lee*),
  79 U.S. 457, 551 (1870)..........................................................................................41

*Len v. Fuller*,
  No. 15352, 1997 WL 305833 (Del. Ch. May 30, 1997) ..........................................36

*Leon Cnty., Fla. v. Fed. Hous. Fin. Agency*,
  816 F. Supp. 2d 1205 (N.D. Fla. 2011) *aff'd*, 700 F.3d 1273 (11th Cir. 2012)..................4, 11

*Leon Cnty., Fla. v. FHFA*,
  700 F.3d 1273 (11th Cir. 2012) ........................................................................5, 7

*Lion Raisins, Inc. v. United States*,
  416 F.3d 1356 (Fed. Cir. 2005)................................................................................41

*In re Louisville Gas & Elec. Co.*,
  77 F. Supp. 176 (D. Del. 1948)................................................................................35

*Matulich v. Aegis Commc'ns Group, Inc.*,
  942 A.2d 596 (Del. 2008) ........................................................................................36

*Menkes v. U.S. Dept. of Homeland Sec.*,
  637 F.3d 319 (D.C. Cir. 2011)..................................................................................53

*Mitchell Arms, Inc. v. United States*,
  7 F.3d 212 (Fed. Cir. 1993)......................................................................................43

*Mohamad v. Palestinian Authority*,
  132 S. Ct. 1702 (2012)........................................................................................14, 31

*NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*,
  No. 10 CIV. 5762 PAE, 2013 WL 489020 (S.D.N.Y. Feb. 8, 2013) .......................22

*Nat'l Insulation Transp. Comm. v. I.C.C.*,
  683 F.2d 533 (D.C. Cir. 1982)............................................................................14, 31

*Nat'l Trust for Historic Preserv. v. FDIC*,
  995 F.2d 238 (D.C. Cir. 1993)....................................................................................8

*Nikoonahad v. Greenspun Corp.*,
  No. C09-02242, 2010 WL 1268124 (N.D. Cal. Mar. 31, 2010)...............................24

*O'Connor v. Rhodes*,
  79 F.2d 146 (D.C. Cir. 1935).....................................................................................26

*Omnia Commercial Co. v. United States,*
   261 U.S. 502 (1923) .................................................................................. *passim*

*Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs,*
   448 F. Supp. 2d 1 (D.D.C. 2006) ....................................................................52, 53

*Palmyra Pacific Seafoods v. United States,*
   561 F.3d 1361 (Fed. Cir. 2009) .......................................................................42, 43

*Pareto v. FDIC,*
   139 F.3d 696 (9th Cir. 1998) ...............................................................................30

*Plaintiffs in All Winstar-Related Cases at the Court v. United States,*
   44 Fed. Cl. 3 (1999) ............................................................................................32

*Protas v. Cavanagh,*
   No. CIV.A. 6555-VCG, 2012 WL 1580969 (Del. Ch. May 4, 2012) ..............23, 24

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.,*
   No. C.A. 16362, 1998 WL 778359 (Del. Ch. Oct. 21, 1998) ...........................37, 38

*QVT Fund LP v. Eurohypo Capital Funding L.L.C.,*
   C.A. No. 5881, 2011 WL 2672092 (Del. Ch. July 8, 2011) .......................35, 37, 38

*Reiter v. Sonotone Corp.,*
   442 U.S. 330 (1979) ..............................................................................................15

*Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship,*
   956 F.2d 1446 (8th Cir. 1992) ..............................................................................13

*Russello v. United States,*
   464 U.S. 16 (1983) ................................................................................................19

*Santiago v. Puerto Rico,*
   655 F.3d 61 (1st Cir. 2011) ...................................................................................33

*Shintom Co. Ltd. v. Audiovox Corp.,*
   888 A.2d 225 (Del. 2005) ................................................................................36, 37

*Starr Int'l Co. v. Fed. Reserve Bank of New York,*
   906 F. Supp. 2d 202 (S.D.N.Y. 2012) ..........................................................38, 39, 40

*Starring v. Am. Hair & Felt. Co.,*
   191 A. 887 (Del. Ch. 1937) ...................................................................................35

*Stone v. United States,*
   683 F.2d 449 (D.C. Cir. 1982) ..............................................................................50

*Sunshine State Bank v. FDIC,*
   783 F.2d 1580 (11th Cir.1986) ..................................................................58

*Tabb Lakes, Ltd. v. United States,*
   10 F.3d 796 (Fed. Cir. 1993)...................................................................41

*Texas v. E.PA.,*
   726 F.3d 180 (D.C. Cir. 2013) .................................................................18

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
   845 A.2d 1031 (Del. 2004) ...........................................................22, 23, 24

*Town of Babylon v. Fed. Hous. Fin. Agency,*
   790 F. Supp. 2d 47 (E.D.N.Y. 2011) *aff'd* 699 F.3d 221 (2d Cir. 2012).............................4, 5

*United States v. Beszborn,*
   21 F.3d 62 (5th Cir. 1994) .......................................................................51

*United States v. Grand River Dam Auth.,*
   363 U.S. 229 (1960).................................................................................41

*United States v. Ron Pair Enters., Inc.,*
   489 U.S. 235 (1989).........................................................................25, 26

*United W. Bank v. Office of Thrift Supervision,*
   793 F. Supp. 2d 357 (D.D.C. 2011) .........................................................25

*Vill. S. Joint Venture v. FDIC,*
   733 F. Supp. 50 (N.D. Tex. 1990) ...........................................................18

*Volges v. Resolution Trust Corp.,*
   32 F.3d 50 (2d Cir. 1994)......................................................................4, 9

*Ward v. Resolution Trust Corp.,*
   996 F.2d 99 (5th Cir. 1993) ......................................................................9

*Waters v. Rumsfeld,*
   320 F.3d 265 (D.C. Cir. 2003) .................................................................50

*Waterview Management Co. v. FDIC,*
   105 F.3d 696 (D.C. Cir. 1997)..................................................................40

*Winer Family Trust v. Queen,*
   503 F.3d 319 (3d Cir. 2007).....................................................................22

*Wolak v. United States,*
   366 F. Supp. 1106 (D. Conn. 1973)..........................................................50

*Zumerling v. Devine*,
  769 F.2d 745 (Fed. Cir. 1985) .................................................................51

**Statutes**

5 U.S.C. § 701(a)(1) ....................................................................4, 5, 52

12 U.S.C. § 1441a(b)(4)(A) .....................................................................17

12 U.S.C. § 1821(i) .........................................................................19, 49

12 U.S.C. § 1821(d)(2)(A) ......................................................................26

12 U.S.C. § 1821(d)(2)(G)(i)(II) ...............................................................48

12 U.S.C. § 1821(e) ..............................................................................49

12 U.S.C. § 1821(j) ........................................................................4, 7, 9

12 U.S.C. § 1821(p)(3)(A) ........................................................................7

12 U.S.C. § 4502(8)(A) ...........................................................................19

12 U.S.C. § 4513(a)(1)(B) ........................................................................39

12 U.S.C. § 4617(a)(2) .................................................................12, 14, 15

12 U.S.C. § 4617(a)(5)(A) ........................................................................27

*12 U.S.C. § 4617(b)(2)(A)(i) ......................................................21, 25, 28, 31

12 U.S.C. § 4617(b)(2)(B) ........................................................................12

12 U.S.C. § 4617(b)(2)(G) ...............................................................5, 6, 12, 48

*12 U.S.C. § 4617(b)(2)(J)(ii) ........................................................... *passim*

12 U.S.C. § 4617(b)(2)(K)(i) .......................................................18, 28, 29, 31

12 U.S.C. § 4617(b)(3)(B) ........................................................................15

12 U.S.C. § 4617(c)(1)(D) ........................................................................28

12 U.S.C. § 4617(d)(1) ...........................................................................49

12 U.S.C. § 4617(d)(2) ...........................................................................49

*12 U.S.C. § 4617(e) .................................................................... *passim*

*12 U.S.C. § 4617(f) .................................................................... *passim*

Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1101, 122
    Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*).................................................. *passim*

**Other Authorities**

135 Cong. Rec. 7193 (1989)...........................................................................................19

12B Fletcher Cyc. Corp. § 5913 ....................................................................................22

Frank H. Easterbrook & Daniel F. Fischel, *Voting in Corporate Law*, 26 J.L. &
    Econ. 395, 403, 405 (1983)........................................................................................36

Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in*
    Benchmarks 196, 202 (1967)......................................................................................15

*Managing the Crisis: The FDIC and RTC Experience* 216 (1998)...............................17

McKinney's Cons. Laws of N.Y., Book 1, Stat. § 237....................................................34

William W. Bratton, *Corporate Finance* (6th ed. 2008) ..............................................36

**INTRODUCTION**

In opposing the motion to dismiss by the Federal Housing Finance Agency ("FHFA" or the "Conservator"), Fannie Mae and Freddie Mac, Plaintiffs urge this Court to intrude into the Conservator's congressionally-sanctioned exercise of judgment and discretion in operating the Enterprises in conservatorships.  Plaintiffs ask this Court to second-guess the Conservator's continuing response to the economic crisis that left both Fannie Mae and Freddie Mac with negative net worth and threatened the domestic housing market.  Plaintiffs ask this Court to exercise jurisdiction contrary to express statutory language and plain congressional intent, in support of their judicial and legislative efforts to obtain a share of the Enterprises' recent profits—profits that resulted from massive federal taxpayer investments in Fannie Mae and Freddie Mac.  Indeed, Plaintiffs have supplied none of the capital infused into the Enterprises subsequent to the total elimination in late 2008 of any remaining shareholder-supplied net worth. The United States Treasury infused that capital with taxpayer funds—$188 billion to date. Plaintiffs thus have no legal or equitable basis to deprive federal taxpayers of the financial returns produced by their investment in the Enterprises, both of which would have been placed into mandatory receivership and liquidated had the federal taxpayers not made their investments and commitments.

Plaintiffs simply ignore the profound economic crisis that led to the conservatorships and the continuing challenges facing the Enterprises.  For example, they belittle the importance of Treasury's immense financial support in an effort to minimize the significance and value of the Periodic Commitment Fee.  They ignore the real risks that the housing finance market could again spiral downward based on the potential erosion of the Treasury commitment and failure to make regular dividend payments.  They propose various alternatives to the Third Amendment, suggesting that the Conservator should have gambled with the national and international

financial markets' perception of the adequacy of the Treasury commitment or negotiated down the size of the Periodic Commitment Fee owed to Treasury.

The Housing and Economic Recovery Act of 2008 ("HERA") plainly bars the speculative relief prayed for by Plaintiffs.  Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*).  HERA gives the Conservator broad powers—including the power to wind up the Enterprises, transfer Enterprise assets, and take other actions deemed appropriate by the Conservator to stabilize the housing markets.  Indeed, HERA explicitly sanctions the Conservator to act as "the Agency determines is in the best interests of the [Enterprises] or the Agency."  12 U.S.C. § 4617(b)(2)(J)(ii).  Thus, Congress authorized the Agency, and the Agency alone, to determine the best interests of the Enterprises or the Agency.  Plaintiffs are not entitled to substitute their judgment for that of FHFA, nor are they entitled to put their interests above those of the Enterprises or those of the Agency.

HERA expressly precludes Plaintiffs from using the courts to circumscribe the Conservator's exercise of its statutory authority, providing that "no court may take any action to restrain or affect the exercise of powers or functions" of the Conservator.  *Id.* § 4617(f).  In addition, HERA imposes an array of mandatory timing and procedural requirements on the exercise of the rights of Plaintiff shareholders, who knowingly invested in a highly regulated industry.  It is no secret that the Enterprises are subject to a detailed statutory scheme that includes, in the event of conservatorship, transfer of the rights of shareholders, officers, and directors to the Conservator, and, in the event of receivership, a statutory cap on the maximum liability owed to all claimants, including shareholders.  Thus, Plaintiffs have no standing to bring their claims.  Moreover, HERA itself limits Plaintiffs' maximum recovery on any claim to the amount they would have received in a liquidation at the time of default in 2008.  In light of this

statutory cap, there is no basis in law for Plaintiffs' claim to have been injured by the Third

Amendment, which was executed nearly four years after the Enterprises went into statutory

default in 2008.

There are other legal deficiencies in the complaint, addressed in the motion to dismiss

and below, which are fatal to Plaintiffs' claims and require dismissal.  There simply is no basis

for the Plaintiffs to substitute their judgment and discretion for that of the Conservator, or obtain

the benefits that may arise from Treasury's unprecedented infusions of capital into the

Enterprises in default.

## ARGUMENT

### I.     Section 4617(f) Bars Plaintiffs' Claims Seeking Declaratory and Equitable Relief

Plaintiffs assert a litany of arguments in an attempt to overcome Section 4617(f)'s

jurisdictional bar, each of which fails.  Plaintiffs variously argue that, notwithstanding Section

4617(f), (i) the Conservator's conduct is subject to arbitrary and capricious review under the

APA; and (ii) Plaintiffs should be permitted to attack the Conservator's exercise of its powers

and functions because the Conservator supposedly acted in ways that were unwise, motivated by

bad intent, or otherwise improper.  Plaintiffs cannot overcome the jurisdictional bar of Section

4617(f), which prohibits them from second-guessing the *manner* in which the Conservator

exercises its broad powers and functions.

### A.     Section 4617(f) Takes Statutory Precedence over Any Presumption in Favor of Judicial Review of Agency Action and Bars Judicial Review of Allegations That the Conservator's Actions Were Arbitrary and Capricious

Plaintiffs first attempt to erode the jurisdictional bar of Section 4617(f) by citing a

"strong presumption that Congress intends judicial review of administrative action."  *See, e.g.*, SJ

Memo. at 29-30, 34[1] (quoting *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670

(1986)).  Even assuming, contrary to law, that such a presumption applies when FHFA acts as

Conservator, the plain language of the statute easily overcomes it.  Section 4617(f), titled

"Limitation on court action," provides that "*no court may take any action* to restrain or affect the

exercise of powers or functions of the Agency as a conservator."  12 U.S.C. § 4617(f) (emphasis

added).  Congress could not have been clearer in precluding judicial review of Conservator

actions.[2]  Thus, even if a presumption of judicial review otherwise might have applied, Section

4617(f) negates it.

Next, Plaintiffs argue that Section 4617(f) does not protect Conservator actions that

allegedly are arbitrary and capricious under the APA.  SJ Memo. 34-36.  But the APA expressly

does not apply where other "statutes preclude judicial review," and Section 4617(f) plainly is

such a statute.  5 U.S.C. § 701(a)(1); *see also Heckler v. Chaney*, 470 U.S. 821, 828 (1985)

("[B]efore any [APA] review at all may be had, a party must first clear the hurdle of § 701(a).");

---

[1]    The Memorandum in support of the Cross-Motion for Summary Judgment filed by Plaintiffs Perry Capital LLC, Fairholme Funds, Inc., *et al.*, and Arrowood Indemnity Company, *et al.* (Doc. #37 (No. 1:13-cv-1025)), is hereinafter referred to as "**SJ Memo**."  The Supplemental Memorandum filed by Plaintiffs Fairholme Funds, Inc., *et al.*, and Arrowood Indemnity Company, *et al.* (Doc. #39 (No. 1:13-cv-1053)), is hereinafter referred to as "**Suppl. Opp**." And the Omnibus Memorandum filed by the Consolidated Class Action and Derivative Plaintiffs (Doc. #33 (No. 1:13-mc-1288)), is hereinafter referred to as "**Class. Opp**."

[2]    *See, e.g.*, *Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 990 (9th Cir. 2013) ("HERA substantially limits judicial review of FHFA's actions as conservator."); *Town of Babylon v. FHFA*, 790 F. Supp. 2d 47, 50 (E.D.N.Y. 2011) ("Congress has specifically limited the power of courts to review the actions of the FHFA when acting as a conservator.") *aff'd* 699 F.3d 221 (2d Cir. 2012); *Leon Cnty., Fla. v. FHFA*, 816 F. Supp. 2d 1205, 1208 (N.D. Fla. 2011) *aff'd*, 700 F.3d 1273 (11th Cir. 2012) ("Congress barred judicial review of the conservator's actions . . . ."); *Bank of Am. Nat'l Ass'n v. Colonial Bank*, 604 F.3d 1239, 1244 (11th Cir. 2010) ("[T]he plain language of § 1821(j) clearly and unambiguously reflects congressional intent to bar courts from granting the precise type of injunctive relief sought here . . . ."); *Volges v. Resolution Trust Corp.*, 32 F.3d 50, 52 (2d Cir. 1994)  (the "anti-injunction provision [of Section 1821(j)] is a direct manifestation of Congress's intent to prevent courts from interfering with the [conservator or receiver] in the exercise of its statutory powers.").

*Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 993 (9th Cir. 2013) (holding APA claims barred by Section 4617(f)); *Town of Babylon v. FHFA*, 699 F.3d 221, 228 (2d Cir. 2012) (same); *Leon Cnty., Fla. v. FHFA*, 700 F.3d 1273, 1279 (11th Cir. 2012) (same).  Moreover, Plaintiffs' theory makes no sense on its own terms, as it would require the Court to ignore the mandatory provisions of Section 4617(f).  To determine whether Section 4617(f) applies (and thus whether the APA does not apply) the Court must answer but a single question: whether the Conservator was acting within its enumerated powers and functions *under HERA*.  *See* SJ Memo. at 35. Unless the Conservator is "acting clearly outside its statutory powers" under HERA, the inquiry ends and the claims are barred.  *See Gross v. Bell Sav. Bank PaSA*, 974 F.2d 403, 407 (3d Cir. 1992).

Notwithstanding the clear applicability of Section 4617(f), Plaintiffs propose that the Court consider the *merits* of the Conservator's conduct—i.e., whether that conduct was arbitrary and capricious under the APA—*in order to determine* whether that conduct is within the Conservator's powers and functions under HERA.  But that would put the merits cart before the jurisdictional horse, sidestepping the "hurdle of § 701(a)."  *Heckler*, 470 U.S. at 828.  If the Conservator's exercise of its powers can be subjected to judicial review merely based on an allegation that it was arbitrary and capricious, the special operational protections Congress afforded the Conservator under Section 4617(f) would be nullified.  This is not the law.

**B.       Section 4617(f) Bars Plaintiffs' Claims Because the Third Amendment Indisputably Falls Within the Conservator's Power to Transfer Assets**

As explained in the FHFA Defendants' and Enterprises' motion to dismiss, the Conservator has the express statutory power to "transfer or sell any asset" of the Enterprises "without any approval, assignment, or consent" (12 U.S.C. § 4617(b)(2)(G)), and thus any such transfers are immune from challenge under Section 4617(f).  *See* FHFA Mot. Dismiss at 27-29.

In their opposition, Plaintiffs *concede* that the Third Amendment constitutes a "transfer" of Enterprise assets. *See* Perry at 66. This concession is dispositive. Nevertheless, Plaintiffs maintain that the Court has jurisdiction to vacate and set aside these asset transfers. *See id.* at 63-66. Plaintiffs' arguments fail.[3]

First, Plaintiffs attempt to distinguish between a conservator's and a receiver's ability to transfer assets, suggesting that while a receiver may have transfer powers, the Conservator does not. *See* SJ Memo. at 64-66. But there is no basis for Plaintiffs' purported distinction—and Plaintiffs cite none—because HERA provides the *exact* same transfer powers to FHFA "as conservator *or* receiver." 12 U.S.C. § 4617(b)(2)(G) (emphasis added).

Second, Plaintiffs argue that the Conservator's power to transfer any Enterprise asset is constrained by other provisions of HERA, such as the receivership priority distribution provisions. SJ Memo. at 65. Plaintiffs are wrong: the language of the transfer provision "does not provide any limitation;" indeed, "[i]t is hard to imagine more sweeping language." *Gosnell v. FDIC*, No. 90-1266L, 1991 WL 533637, at *6 (W.D.N.Y. Feb. 4, 1991) (interpreting FIRREA), *aff'd*, 938 F.2d 372 (2d Cir. 1991). In fact, the Seventh Circuit rejected Plaintiffs' exact argument—that the statutory priority structure constrains a conservator's or receiver's asset transfer power—when interpreting FIRREA's materially identical asset transfer language. *Courtney v. Halleran*, 485 F.3d 942, 949 (7th Cir. 2007) ("As we see it, *plaintiffs are reading language into [the priority statute] that is not there*—essentially, they have equated transfers of existing assets with the disposition of amounts received upon 'liquidation or other resolution' of

---

[3]   Because the asset transfer provision, 12 U.S.C. § 4617(b)(2)(G), by its terms applies to all transfers of assets, there is no need for formal agency action to invoke the provision, regardless of whether it was contemporaneously announced as such. *See, e.g.*, Fannie Mae Form 10-Q Q-3, Note 1, at 88 (Nov. 7, 2013).

an institution.  In our view, *[the priority statute] cannot be read to limit the [conservator or receiver]'s authority* under [the transfer provision] so significantly.") (emphases added).[4]

Third, Plaintiffs argue that although the Conservator may have the power to transfer a single Enterprise asset, the Conservator lacks the power to transfer a category of Enterprise assets via the Third Amendment.  SJ Memo. at 66.  Again, Plaintiffs are wrong.  "Nothing precludes a conservator from making business decisions that are both broad in scope and entirely prospective."  *Cnty. of Sonoma*, 710 F.3d at 994; *see also id.* ("The categorical nature of the [Conservator's decision], as opposed to a case-by-case [approach to the same issue], does not change the fact that FHFA's decision is in furtherance of the conservation and preservation of the Enterprises' assets."); *Leon Cnty.*, 700 F.3d at 1279 (similar).

### C.   Section 4617(f) Bars Plaintiffs' Attempt to Second-Guess the Conservator's Exercise of Its Discretion to Promote the Best Interests of the Enterprises or the Agency by Executing the Third Amendment

The Third Amendment also falls under the scope of the Conservator's authority to take actions in the "best interests of the [Enterprises] or the Agency," and to "carry on the business" of the Enterprises and their statutory role in providing market stability.  12 U.S.C. §§ 4617(b)(2)(J)(ii); 4617(b)(2)(D).  The Third Amendment preserved and effectively extended the finite amount of Treasury funds that can be drawn by the Enterprises, which was important to

---

[4]   Plaintiffs attempt to distinguish *Courtney* on the ground that it concerned only a receiver's power to settle legal claims under a different statutory provision, 12 U.S.C. § 1821(p)(3)(A).  SJ Memo. at 65.  This is incorrect.  The Seventh Circuit addressed that separate provision only in connection with a different issue—whether the assets at issue would have been subject to liquidation at all.  *See Courtney*, 485 F.3d at 949.

Moreover, this Court's decision in *Adagio Investment Holding Ltd. v. FDIC*, 338 F. Supp. 2d 71 (D.D.C. 2004)—relied on by Plaintiffs (SJ Memo. at 65)—is inapposite because not only did it not address FIRREA's jurisdiction withdrawal statute (Section 1821(j)), it also did not involve a transfer or sale of assets.  *See* 338 F. Supp. 2d at 81 n.18 (noting that the transactions at issue "were reclassifications, not 'transfers' . . . . Therefore, [FIRREA's] 'transfer' authority does not apply to this case.").  The Seventh Circuit in *Courtney* correctly distinguished *Adagio* on this basis.  485 F.3d at 949.

ensuring the safety and soundness of the Enterprises. As such, the execution of the Third

Amendment was well within the core powers and functions of the Conservator. *See* FHFA Mot.

Dismiss at 21-32.

In their oppositions, Plaintiffs do not—and cannot—dispute that the practice of drawing

funds *from* Treasury to pay dividends *to* Treasury was problematic because it decreased

Treasury's funding commitment. *See* Perry Compl. ¶ 42; Consol. Compl. ¶ 62; Arrowood

Compl. ¶ 70. Plaintiffs also do not dispute that, in the months before the Third Amendment,

leading market analysts expressed public concern about the Enterprises' creditworthiness based

on the potential inadequacy of the Treasury Commitment in light of the Enterprises' dividend

obligations. *See* FHFA Mot. Dismiss at 22-26. By executing the Third Amendment, the

Conservator addressed this "harmful" problem (Perry Compl. ¶ 42), preserving the Treasury

commitment and calming the market for Enterprise securities.

Plaintiffs nevertheless attack the Third Amendment on the ground that, in their view, the

Conservator could have done a better job, both in avoiding the circularity problem in the first

place and also in addressing the issue in a manner supposedly more favorable to the

shareholders. But Section 4617(f) absolutely bars Plaintiffs from looking over the Conservator's

shoulder in its exercise of discretion to advance the "best interests of the [Enterprises] or the

Agency," including to stabilize and support the housing and financial markets. 12 U.S.C.

§ 4617(b)(2)(J)(ii). Assertions that the Conservator could have done its job in a wiser manner or

a manner more preferable to Plaintiffs simply cannot overcome the sweeping language of

Sections 4617(f) and 4617(b)(2)(J)(ii). *See, e.g., Nat'l Trust for Historic Preserv. v. FDIC*, 995

F.2d 238, 240 (D.C. Cir. 1993) (recognizing "immuni[ty] from. . . second-guessing" unless the

Conservator takes actions that are "outside" its statutory powers and functions); *Gross v. Bell*

*Sav. Bank PA SA*, 974 F.2d 403, 408 (3d Cir. 1992) (applying FIRREA Section 1821(j) and

holding that jurisdictional bar "does not hinge on [the court's] view of the proper exercise of

otherwise-legitimate powers").

The Fifth Circuit rejected claims similar to those here when it held that the jurisdictional

bar of FIRREA precludes the courts from considering whether a receiver sold an asset at a "low

price" and otherwise acted improperly:

> Ward fails (or refuses) to recognize the difference between the
> exercise of a function or power that is clearly outside the statutory
> authority of the [conservator or receiver] on the one hand, and
> improperly or even unlawfully exercising a function or power that
> is clearly authorized by statute on the other.  None can question
> that the [conservator or receiver] is statutorily authorized to sell
> real estate of an institution which is under RTC conservatorship or
> receivership . . . .  Therefore, even assuming arguendo, that (as
> alleged by Ward) the [conservator or receiver] exercised the power
> or function of selling the Building in a way that failed to maximize
> the net present value return or to afford fair and consistent
> treatment to all offerors, Ward could not prevail.  For, even if the
> [conservator or receiver] improperly or unlawfully exercised an
> authorized power or function, it clearly did not engage in an
> activity outside its statutory powers.  Yet only the latter type of act
> could conceivably subject the [conservator or receiver] to
> injunction . . . .

*Ward v. Resolution Trust Corp.*, 996 F.2d 99, 103 (5th Cir. 1993).  Likewise, in *Bank of America*

*N.A. v. Colonial Bank*, 604 F.3d 1239, 1244 (11th Cir. 2010), the Eleventh Circuit applied

Section 1821(j) to bar plaintiff's claim notwithstanding plaintiff's "fear" that the receiver would

"make an erroneous determination" in the exercise of its duties.  The court held that such a

concern is "immaterial to our analysis because it is merely a fear of the [receiver's] improper

performance of its legitimate receivership functions."  *Id.*; *see also Volges*, 32 F.3d at 52

(holding "the fact that the [conservator or receiver's] actions might violate some other provision

of law does not render the anti-injunction provision inapplicable"); *Hindes v. FDIC*, No. CIV. A.

94-2355, 1995 WL 82684, at *1 (E.D. Pa. Feb. 28, 1995), *aff'd*, 137 F.3d 148 (3d Cir. 1998)

(holding that allegations of "misconduct and derelictions of duty" by conservator or receiver "do not give the Court jurisdiction to issue the injunction plaintiffs seek here").[5]

Illustrative of the overreaching nature of Plaintiffs' arguments is their response to the fact that both Enterprises announced—the week before the Third Amendment—that the Enterprises did not expect to generate income sufficient to cover the annual 10% dividend obligation over the long term, and thus the Enterprises' "dividend obligation to Treasury w[ould] increasingly drive future draws," thereby further exhausting the Treasury commitment. FHFA3598 (Freddie Mac, Form 10-Q Q2 (Aug. 7, 2012)); FHFA3857-58 (Fannie Mae, Form 10-Q Q2 (Aug. 8, 2012)). Plaintiffs argue that the Conservator should have disregarded such statements because the Enterprises "d[id] not say that the Companies will *never* out-earn the dividend," only that it was "*unlikely*" the Enterprises would out-earn the dividend. SJ Memo. at 68 n.25 (emphasis added). Thus, Plaintiffs ask this Court to substitute their judgment about the risks and rewards and odds of the Enterprises' expected future financial performance for the judgment the Conservator made in 2012, and to put the Plaintiffs' interests over those of the Enterprises or the Agency, despite Congress's express mandate to the contrary. Sections 4617(f) and 4617(b)(2)(J)(ii) plainly prohibit this.

For the same reasons, Section 4617(f) forecloses Plaintiffs' conclusory allegations that the Conservator failed to act independently of Treasury or allegedly entered into the Third Amendment only at Treasury's behest. *See, e.g.,* SJ Memo. at 51. Whether the Conservator

---

[5]    Plaintiffs cite *City of Arlington v. FCC*, 133 S.Ct. 1863, 1869 (2013), asserting that the Supreme Court "recently rejected any distinction between unlawful agency conduct and conduct beyond the scope of the agency's powers." SJ Memo. at 32. That is not the law with respect to conservators and receivers, for whom Congress has explicitly precluded judicial review under Section 4617(f). Indeed, *City of Arlington* did not address HERA, FIRREA, or any jurisdiction withdrawal statutes pertaining to conservators and receivers. Thus it is wholly inapt. *See supra* Section I.A.

possessed an allegedly improper motive or intent when carrying out its statutory powers and functions is irrelevant to the Section 4617(f) analysis; there simply is no "bad motive" exception to Section 4617(f). "Congress surely knew, when it enacted § 4617(f), that challenges to agency action sometimes assert an improper motive. *But Congress barred judicial review of the conservator's actions without making an exception for actions said to be taken from an improper motive*." *Leon Cnty.*, 816 F. Supp. 2d at 1208 (emphasis added).

>    **D.      HERA Bars Plaintiffs' Claims Because the Conservator Has the Express Power to Wind Up the Enterprises**

Section 4617(f) bars Plaintiffs' claims for the additional reason that the Conservator has the express statutory authority to "wind[] up" the Enterprises by, *inter alia*, shrinking their operations, transferring or selling their assets, and reducing their revenue streams, all in an effort to both ensure their safety and soundness, and also to prepare them for potential liquidation. *See* FHFA Mot. Dismiss at 29-32.

Plaintiffs raise a hodgepodge of arguments that seek to avoid this plain meaning of HERA, but those arguments fail. Plaintiffs attempt to draw a bright line distinction between the powers of conservators on the one hand and the powers of receivers on the other, arguing that a conservator must have an "*inherently optimistic outlook*," while a receiver must have an "*inherently pessimistic outlook*." SJ Memo. at 54 (emphases added). Relying on this unsupported and false characterization, Plaintiffs argue that the Conservator's entry into the Third Amendment must have been outside of its statutory powers as conservator because it allegedly "winds down" the Enterprises, instead of "reviv[ing]" them and returning them to "normal business operations." *Id*. at 52-54. Plaintiffs' argument fails not only because the plain text of HERA gives the Conservator broad powers specifically to "reorganiz[e]," "wind[] up," and "transfer all assets" of the Enterprises, and any variation or combination of the three, but also

because Plaintiffs' purported dichotomy between the powers of a conservator and those of a receiver does not withstand scrutiny.[6]

The plain and unambiguous language of HERA gives the conservator and a receiver substantially overlapping powers.  For example, under HERA, the Conservator is expressly empowered to, *inter alia*, "take over the assets of and operate" the Enterprises, "conduct all business" of the Enterprises, and "preserve and conserve" the assets of the Enterprises.  12 U.S.C. § 4617(b)(2)(B).  But HERA *also* expressly empowers the Conservator to "reorganiz[e]" or "wind[] up" the Enterprises (*id*. § 4617(a)(2)), and "transfer or sell any asset" of the Enterprises (*id*. § 4617(b)(2)(G))—which powers Plaintiffs apparently would characterize as "pessimistic" and belonging exclusively to receivers.  Not so under the plain terms of the statute. Likewise, HERA also gives great flexibility to the FHFA as receiver:  as "conservator *or* receiver," FHFA may "operate" the Enterprises, "conduct all business of" the Enterprises, "perform all functions of" the Enterprises, and "preserve and conserve the assets and property" of the Enterprises (*id*. § 4617(b)(2)(B) (emphasis added))—which powers Plaintiffs would apparently characterize as "optimistic" and belonging exclusively to conservators.  This overlap in statutory powers reflects Congress's intent to give FHFA wide latitude and flexibility for determining the most appropriate way to resolve the Enterprises, whether through conservatorship, receivership, or both, rather than operate under a program of "optimism" or "pessimism."

---

[6]     FIRREA differs in one material respect from HERA in delineating the powers and functions of conservators and receivers:  FIRREA does *not* include the provision, present in HERA, that the agency may be appointed "conservator or receiver for the purpose of reorganizing, rehabilitating, *or winding up* the affairs" of the Enterprises.  12 U.S.C. § 4617(a)(2) (emphasis added).

Moreover, that Congress specifically set out which powers are held by conservators and receivers jointly, and which powers are held by each individually, itself compels the conclusion that Congress meant what it said and the plain language interpretation of the statute should be honored.  For example, in FIRREA—like HERA—"Congress specifically articulated when the [agency] was to exercise a duty, right, or power in its capacity as a 'conservator or receiver.'  *In each instance, it is clear that Congress intended the duty, right, or power to be enjoyed or exercised by both the conservator and the receiver*. . . . More instructive, however, is the care Congress took to delineate those duties, rights, and powers the [agency] could pursue only in its capacity as receiver, or only in its capacity as conservator, but not both."  *Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1451-52 (8th Cir. 1992) (emphasis added).  In light of this statutory structure and precision, "[i]t stretches credibility to assume Congress intended any of [the jointly shared] rights to be forfeited" when the agency elects to serve in one capacity or the other (or both).  *Id*. at 1452 (holding that, where a receiver is appointed after a conservator, both have the power to repudiate contracts).

Plaintiffs attempt to avoid the plain language of the statute in a variety of ways.  Plaintiffs first argue that HERA uses the terms "liquidation" and "winding up" synonymously, and because the conservator is not permitted to liquidate the Enterprises, then the conservator must not be permitted to "wind[] up" the Enterprises either.  *See* SJ Memo. at 60-61.  This argument fails for a simple reason:  the Conservator has not liquidated the Enterprises, as Plaintiffs must concede.  *See, e.g.*, Perry Compl. ¶¶ 23, 36, 92.  The Enterprises remain in operation today.  Indeed, Plaintiffs' entire lawsuit is predicated on the increased revenues the Enterprises recently have earned while under FHFA conservatorships.  Thus, whether "winding up" really means

"liquidation" is irrelevant because the Conservator has not exercised or attempted to exercise any power to liquidate the Enterprises.

In all events, "liquidation" and "winding up" are not synonymous under HERA.  The Court "must, if possible, give effect to every phrase of a statute so that no part is rendered superfluous.  Thus, we presume that the use of different terminology within a statute indicates that Congress intended to establish a different meaning."  *Nat'l Insulation Transp. Comm. v. I.C.C.*, 683 F.2d 533, 537 (D.C. Cir. 1982) (internal citations omitted); *see also Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1708 (2012) ("We generally seek to respect Congress' decision to use different terms to describe different categories of people or things.").  Through HERA, Congress gave both the conservator and receiver the power to "reorganiz[e]" and "wind[] up" the Enterprises.  12 U.S.C. § 4617(a)(2).  Winding up includes prudential steps—short of liquidation—that can be taken by the Conservator to shrink the Enterprises' operations, not only to ensure their safety and soundness, but also to prepare for the Enterprises' potential liquidation and to take any authorized action that FHFA determines is in the best interests of the Enterprises or FHFA.  *Id*. § 4617(b)(2)(J)(ii).  For example, the references to "wind down" in Treasury's Press Release announcing the Third Amendment refer to the "Accelerated Wind Down" of the Enterprises' mortgage portfolio at an annual rate of 15%, rather than the prior rate of 10%, an act that accelerates the shrinkage of the Enterprises and their role in the secondary mortgage market.  Because the Conservator has the express statutory authority to conduct these "winding up"

activities—that stop well short of liquidating the Enterprises—the Third Amendment cannot be vacated on this basis.[7]

Plaintiffs further attempt to avoid the plain language of the statute by arguing that the "context" of HERA—as informed by the pre-HERA history of conservatorships—precludes a plain language reading of the statute that gives the Conservator the power to "wind[] up" the Enterprises. This argument likewise fails. Indeed, the D.C. Circuit already has rejected other shareholders' attempts to evade HERA's plain meaning by resorting to historical arguments. In *Kellmer*, Fannie Mae shareholders "ma[d]e many arguments, delving deep into pre-HERA common law and expounding HERA's legislative history" to argue that the Conservator did not, in fact, succeed to "all" shareholder rights. *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012). The D.C. Circuit rejected these arguments—with no further analysis of the purported history—stating that the court need "only heed Professor Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'" *Id.* (quoting Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in* Benchmarks 196, 202 (1967)). The same "timeless advice" applies here. *Id.*

---

[7]   Plaintiffs also point to another section of HERA, 12 U.S.C. § 4617(b)(3)(B), to argue that HERA itself uses the terms "winding up" and "liquidation" interchangeably. *See* SJ Memo. at 60. Plaintiffs are incorrect. To the contrary, this provision states: "The receiver, in any case involving the liquidation or winding up of the affairs of a closed regulated entity, shall (i) promptly publish a notice . . . ." That these two terms are used in the same sentence does not mean they are synonymous. In fact, that Congress used the disjunctive "or" is evidence that the terms are *not* synonymous. *See, e.g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 338–39 (1979) (rejecting a proposed construction that "would have us ignore the disjunctive 'or' and rob the term [in question] of its independent and ordinary significance"); *Guam Indus. Servs., Inc. v. Rumsfeld*, 383 F. Supp. 2d 112, 117 (D.D.C. 2005) (holding that, because the statute "distinguishes between Guam and the United States," the Court would "construe this distinction so as not to render it meaningless"). Further, this notice provision pertains only to "receiver[ship]" of a "closed regulated entity." 12 U.S.C. § 4617(b)(3)(B). It does not apply to a conservator that—like here—is operating a regulated entity that is not "closed," and thus does not speak to the nature of a *conservator's* power to wind up under Section 4617(a)(2).

Plaintiffs next argue that the purpose of conservatorship has always been to "revive" failed financial institutions, while the purpose of receivership has always been to liquidate failed financial institutions.  But Plaintiffs' own cited authorities do not bear out this dichotomy.  For example, Plaintiffs rely heavily on this Court's decision in *Davis Trust Co. v. Hardee*, 85 F.2d 571, 572-73 (D.C. Cir. 1936), quoting its statement that conservators are appointed where "there [is] a prospect that the bank . . . might, under his direction and control, later reopen and resume its corporate functions."  *See* SJ Memo. at 52-53.

Ultimately, *Davis Trust* provides no comfort to Plaintiffs.  In that case, a conservator appointed to take over a failed bank sold a substantial number of the bank's assets to another institution, after which the conservator was replaced by a receiver.  Shareholders of the failed bank then sued, claiming that the conservator lacked the authority to sell the institution's assets before receivership.  Much like Plaintiffs allege here, the shareholders in *Davis Trust* alleged that "there was no authority under . . . the applicable statutes for the sale of the bank's assets by the conservator and, in addition, that the terms of the sale were unfair to the [bank] and to its creditors and stockholders"  *Id*. at 572.  Shareholders further argued that the conservator lacked the power to make the pre-receivership asset transfers because "the design and purpose" of conservatorship was "to conserve and preserve the status quo until in good time the bank could work out its own destiny."  *Id*.  The D.C. Circuit rejected the shareholders' arguments and upheld the conservator's sale of assets because the operative statute gave conservators and receivers the *same* powers: "it was the intent of Congress to give to the conservator . . . precisely the power exercised in this case."  *Id*.  Indeed, the Court specifically rejected the central argument Plaintiffs make here—i.e., that the conservator must retain assets while the receiver must sell assets— holding that there is "*no substance in the argument made by [the shareholders] that*

*'conservation' contemplates only 'retaining intact*.'" *Id.* at 573 (emphasis added).  Accordingly,

not only does *Davis Trust* disprove Plaintiffs' historical premise—conservators have long been

permitted to transfer or sell assets, including a sale, in anticipation of receivership—it also

demonstrates the impropriety of straying from the plain text of the operative statute in favor of

purported historical practices or alleged common understandings of the role of a conservator.[8]

## II.     Plaintiffs Lack Standing Because They Have Failed to Allege Any Injury-in-Fact to Their Liquidation Preference

One of the cornerstones of Plaintiffs' claims is that the Third Amendment allegedly

restricts their ability to recover a liquidation preference in the event the Enterprises are liquidated

through receivership.  *See, e.g.*, Class Opp. at 37-38; Suppl. Opp. at 29-30.  But as a matter of

law the Third Amendment could not have actually injured any such interest because 12 U.S.C.

§ 4617(e) limits Plaintiffs' claim in receivership to the amount which they would have received

had FHFA liquidated the Enterprises at the time of default (that is, *instead of* appointing FHFA

as Conservator).  Section 4617(e) caps Plaintiffs' entitlements as of the statutory default in

September 2008 and bars Plaintiffs from benefitting in receivership from any post-default

infusions of capital or other commitments by Treasury.  Thus, the Third Amendment—some four

years later—cannot have affected Plaintiffs' right to the liquidation preference in a subsequent

receivership.  In these circumstances, Plaintiffs cannot allege the requisite injury in fact to their

contractual rights to the liquidation preference.  *See Clapper v. Amnesty Int'l U.S.A.,* 133 S.Ct.

---

[8]     Further undermining Plaintiffs' context argument is the fact that the very FDIC Manual on which Plaintiffs rely (*see* SJ Memo. at 53 (citing *Managing the Crisis: The FDIC and RTC Experience* 216 (1998)) describes how the Resolution Trust Corporation ("RTC") exercised its powers as conservator to "downsize[] and stabilize[] the operations of the failed institutions until a more permanent solution could be found," rather than "operating [the] institutions with the objective of returning them to a sound position," as was the FDIC's practice as conservator. *Managing the Crisis*, at 216 n.9; *see also id.* at 7.  The RTC had the same statutory conservatorship powers as the FDIC.  *See* 12 U.S.C. § 1441a(b)(4)(A) (1993).

1138, 1147 (2013) ("To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.") (internal quotation marks omitted); *see also Texas v. E.P.A.*, 726 F.3d 180, 198 (D.C. Cir. 2013) (holding plaintiffs lacked standing where the relief sought did not affect the automatic operation of a statute); *Coal. for Responsible Regulation, Inc. v. E.P.A.*, 684 F.3d 102, 146 (D.C. Cir. 2012) (same).

Under HERA, the value of claims against the Enterprises in receivership cannot exceed their value at the time of default, regardless of whether the Enterprises in default were placed in conservatorship or receivership. The maximum liability provision expressly applies "regardless of the method which [FHFA] determines to utilize." 12 U.S.C. § 4617(e)(1). The purpose of the maximum liability provision is to assure that creditors and shareholders[9] of an Enterprise in default do not reap the rewards of taxpayer assistance provided to an Enterprise that the Agency subsequently places in receivership. Longstanding congressional policy "requires . . . creditors of failed institutions [to] look only to the assets of the institution for recovery of their losses, *and not to the taxpayers*." *First Ind. Fed. Sav. Bank v. FDIC*, 964 F.2d 503, 507 (5th Cir. 1992) (emphasis added); *see also Vill. S. Joint Venture v. FDIC*, 733 F. Supp. 50, 52 (N.D. Tex. 1990) ("In enacting § 1821(i)(2), Congress adopted a policy of requiring creditors of failed institutions *to look only to the assets of the institution and not to the taxpayer's pocketbooks for recovery of*

---

[9]      12 U.S.C. § 4617(b)(2)(K)(i) makes clear that the shareholders' claims are subject to Section 4617(e).

*their losses*." (emphasis added)).[10]   That policy animates the maximum liability provision of HERA; Plaintiffs' contorted reading of the statute contradicts it.

Plaintiffs argue in passing that HERA's maximum liability provision is "inapplicable and irrelevant" because 4617(e) supposedly "[does not] mention[] conservatorship at all."  Class Opp. at 39.  That is wrong.  Section 4617(e) expressly applies to "a regulated entity *in default* or in danger of default."  12 U.S.C. § 4617(e) (emphasis added).  By statutory definition, the Enterprises in conservatorship are "in default," because HERA defines "default" to include "any . . . official determination by . . . the Agency, pursuant to which a conservator . . . is appointed."  *Id.* § 4502(8)(A).[11]

The stated purpose of the maximum liability provision of HERA, Section 4617(e), is to "[v]alu[e] … claims in *default*"—that is, to establish the maximum liability with respect to the "rights of the creditors of [the Enterprises in default,]" whether the defaulted Enterprises are placed in conservatorship *or* receivership.

Section 4617(e) states in its entirety:

(e) Valuation of claims *in default*

(1) In general

---

[10]   Indeed, early versions of FIRREA's materially identical provision, 12 U.S.C. § 1821(i), excluded "nonliquidating conservators" from the maximum liability provision, suggesting that conservators were not subject to it.  However, Congress deleted this limitation from the final, enacted version of FIRREA, demonstrating a deliberate intent to apply the Maximum Value limitation regardless of whether an institution in default is placed in conservatorship or receivership.  135 Cong. Rec. 7193 (1989) (publishing an early version of S. 774).  "Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."  *Russello v. United States*, 464 U.S. 16, 23-24 (1983).

[11]   "The term 'default' means, with respect to a regulated entity, any adjudication or other official determination by any court of competent jurisdiction, or the Agency, pursuant to which a conservator, receiver, limited-life regulated entity, or legal custodian is appointed for a regulated entity."  12 U.S.C. § 4502(8)(A).

Notwithstanding any other provision of Federal law or the law of any State, and *regardless of the method which the Agency determines to utilize with respect to a regulated entity in default or in danger of default*, including transactions authorized under subsection (i), this subsection *shall govern the rights of the creditors of such regulated entity*.

(2) Maximum liability

The maximum liability of the Agency, acting as receiver *or in any other capacity*, to any person having a claim against the receiver or the regulated entity for which such receiver is appointed shall be not more than the amount that such claimant would have received if the Agency had liquidated the assets and liabilities of the regulated entity without exercising the authority of the Agency under subsection (i).

12 U.S.C. § 4617(e) (emphases added).

Paragraph (1) makes clear that the triggering event to establish maximum liability is when an Enterprise is "in default or in danger of default," not, as Plaintiffs contend, when an Enterprise is placed in receivership.  Indeed, HERA unambiguously states that Section 4617(e) "shall govern," "regardless of the method," i.e., conservatorship or receivership, that FHFA utilizes.  Similarly, Paragraph (2) makes clear that the maximum liability of the Agency to any person having a claim in a subsequent receivership is limited to the amount the person would have received had the Agency liquidated the entity at the time of default.

Plaintiffs ask this Court to disregard these statutory provisions, giving no meaning or effect to the phrases "in default or in danger of default" or "in any other capacity" or "regardless of the method the Agency determines to utilize."  Plaintiffs would have this Court read out large portions of the statute, and in the process Plaintiffs would contradict the plain legislative purpose to ensure that, regardless of the method that FHFA utilizes to address an entity in default, the maximum amount due any claimant is fixed at the time of default and should not increase as the result of any taxpayer infusion.  Since nothing the Conservator has done has injured plaintiffs,

they lack standing to maintain their claims and the Court should dismiss the Complaint.  *Allen v.*

*Wright*, 468 U.S. 737, 750-52 (1984).

### III.     Plaintiffs Have No Right to Pursue Their Contract and Fiduciary Duty Claims During Conservatorship

Plaintiffs' claims for breach of contract, breach of the implied duty of good faith and fair

dealing, and breach of fiduciary duty are all premised upon alleged rights and duties owed to

Plaintiffs by virtue of their status as stockholders.  But Congress specifically precluded the

prosecution of all such shareholder claims—whether derivative or direct—during

conservatorship by (a) transferring to the Conservator "all rights, titles, powers, and privileges

. . . of any stockholder" of the Enterprises (12 U.S.C. § 4617(b)(2)(A)(i)) and (b) prohibiting all

court action that would "restrain or affect" the exercise of the Conservator's powers or functions

(12 U.S.C. § 4617(f)).  There simply is no exception to this statutory bar to Plaintiffs' claims.

### A.     Plaintiffs' Contract and Fiduciary Duty Claims Are Derivative, and Thus Are Barred by HERA

Plaintiffs concede that the D.C. Circuit has definitively held that shareholder derivative

claims are barred during conservatorship by virtue of the Conservator's succession to "all"

shareholder rights.  *See* SJ Memo. at 26; Class Opp. at 31; Suppl. Opp. at 26 (citing *Kellmer v.*

*Raines*, 674 F.3d 848 (D.C. Cir. 2012)).  Plaintiffs nonetheless attempt to evade this controlling

precedent by characterizing *some* of their claims as direct (i.e., the contract claims and the

Fairholme Plaintiffs' fiduciary duty claims), while acknowledging *some* of their claims—based

on the same alleged facts—are derivative (i.e., the Class Plaintiffs' fiduciary duty claims).

*Compare* Class Compl. ¶ 129 *with* Suppl. Opp. at 12-14.  But Plaintiffs' "have-their-cake-and-

eat-it-too-approach" fails because Plaintiffs' contract and fiduciary duty claims all are derivative,

not direct.

First, by asserting that they seek to recover the alleged diminution or elimination in the value of their stock caused by the Third Amendment, Plaintiffs confirm that their contract claims are derivative, not direct.  *See* Class Opp. at 37-38; Suppl. Opp. at 12, 29.  It is well settled that "shareholders cannot sue in their own names and on their own behalf to recover for a loss resulting from depreciation of the value of their stock as the result of an injury to the corporation."  12B Fletcher Cyc. Corp. § 5913; *see also NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 CIV. 5762 PAE, 2013 WL 489020, at *6 (S.D.N.Y. Feb. 8, 2013) ("[T]he Delaware Supreme Court has repeatedly emphasized that a decrease in a shareholder's stock's value can be asserted only as a derivative claim.") (citing, *inter alia*, *Gentile v. Rossette*, 906 A.2d 91 (Del. 2006)); *Hometown Fin. Inc. v. United States*, 56 Fed. Cl. 477, 486 (Fed. Cl. 2003) ("[C]ourts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends.").[12]  This is because reduction in stock value is an "*indirect* injury" that is contingent upon an injury to the company itself; "[i]t does not arise out of any independent or direct harm to the stockholders, individually."  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original).  Thus, where—as here—the alleged wrongdoing "deplete[d] corporate assets that might otherwise [have] be[en] used to benefit the stockholders, such as through a dividend," the claims are derivative because

---

[12]     *See also Winer Family Trust v. Queen*, 503 F.3d 319, 338 (3d Cir. 2007) (finding claim derivative where minority shareholder alleged that the majority shareholder "engaged in self-dealing at the direct expense" of the company, which "ultimately resulted in a diminution in value of [company] stock," because such injury "belongs to" the company); *Gaff v. FDIC*, 814 F.2d 311, 315 (6th Cir. 1987) ("A depreciation or diminution in the value of a shareholder's corporate stock is generally not recognized, however, as the type of direct, personal injury which is necessary to sustain a direct cause of action."); *Amusement Indus., Inc. v. Stern*, No. 07 CIV 11586, 2010 WL 2976199, at *6 (S.D.N.Y. July 26, 2010) ("It is well settled under Delaware law that diminution in the value of a stockholder's interest in the corporation is a derivative injury.") (collecting cases).

the wrongdoing "harms the stockholders only derivatively so far as their stock loses value."

*Protas v. Cavanagh*, No. CIV.A. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012)

(citing *Gentile*, 906 A.2d at 99).

Second, all of Plaintiffs' fiduciary duty claims are likewise derivative, not direct.  Again, the Class Plaintiffs have *expressly* pleaded their fiduciary duty claims as derivative.  Class Compl. ¶ 129.  The Fairholme Plaintiffs nevertheless argue their fiduciary duty claims, based on the same underlying facts, are direct because their claims are "not dependent on an injury to [either] corporation."  Suppl. Opp. at 12.  But this argument is belied by Plaintiffs' entire theory of the case—namely, that the Third Amendment allegedly depletes the Enterprises' assets, thereby leaving no money to distribute to shareholders via dividends and/or upon liquidation. *See, e.g.*, Fairholme Compl. ¶ 69 (alleging the Third Amendment "plainly harms, rather than promotes, the soundness and solvency of the Companies"); *id.* ¶ 74 (alleging "Fannie is now in a *worse* position" because of the Third Amendment); *id.* ¶ 89 (alleging the Third Amendment "expropriate[s] the Companies' entire net worth . . . to the detriment of the Companies"); Class Compl. ¶¶ 92, 129, 132, 182.  Indeed, the Fairholme and Class Plaintiffs specifically allege that the Third Amendment "constituted waste" of the Enterprises' assets (Fairholme Compl. ¶ 143; Class Compl. ¶ 181), and "claims of waste are classically derivative."  *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 771 (Del. 2006).  Because the Fairholme Plaintiffs cannot "prevail without showing an injury to the corporation[s]"—indeed, they specifically *allege* injury to the corporations—their fiduciary duty claims are derivative, not direct.  *Tooley*, 845 A.2d at 1039.

The Fairholme Plaintiffs' fiduciary duty claims also fail under the second *Tooley* prong, by which a claim is direct only if the relief sought "flows directly to the stockholders, not to the

corporation."  845 A.2d at 1036; *see also Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1179 (Del. Ch. 2006) (claim is direct only where "no relief flows to the corporation").  Here, the relief sought—namely, vacating the Third Amendment and returning its resulting dividends from Treasury to the Enterprises (Fairholme Compl. ¶ 146(d)-(e))—would flow first and foremost to the Enterprises.  That this corporate relief could also have some indirect, allegedly restorative effect on the value of Plaintiffs' shares (Suppl. Opp. at 13-14) does not make the fiduciary duty claims direct.[13]

**B.    Section 4617(f) Bars Plaintiffs from Utilizing the Equitable Remedy of Derivative Standing**

In addition to being barred by virtue of the Conservator's succession to "all" shareholder rights, Plaintiffs' contract and fiduciary duty claims are also barred by Section 4617(f).  This and every other court that has addressed shareholder derivative claims under HERA has held that "allowing plaintiffs to continue to pursue derivative claims independent of FHFA would require this Court to take action that would 'restrain or affect' FHFA's discretion, which HERA explicitly prohibits."  *See In re Fed. Nat. Mortgage Ass'n Sec., Derivative, ERISA Litig.*, 629 F.

---

[13]    Plaintiffs' suggestion that their claims fit into the narrow exception under Delaware law by which shareholders can assert both direct *and* derivative claims is incorrect.  *See* SJ Memo. at 24-25 (citing *Gentile*, 906 A.2d 91); Suppl. Opp. at 12, 14 (same).  Even assuming that Delaware law applies, the *Gentile* exception applies only where (a) the company issues excessive shares (not cash) to a majority shareholder without receiving assets of commensurate value in return, *and* (b) that share issuance increases the majority shareholders' voting power to the detriment of the minority shareholders.  *See Gentile*, 906 A.2d at 99-100.  Neither of these elements is present here, as Plaintiffs allege that the Third Amendment constitutes an asset transfer via payment of cash dividends to Treasury, not an issuance of new stock that dilutes Plaintiffs' voting power.  Indeed, the Conservator succeeded to all shareholder voting power by virtue of its appointment as Conservator, not its execution of the Third Amendment.  *See, e.g.*, *Innovative Therapies, Inc. v. Meents*, No. CIV.A. 12-3309, 2013 WL 2919983, at *5 (D. Md. June 12, 2013) (*Gentile* inapplicable and claim derivative where the "allegations rest solely on a purported loss in the economic value of [plaintiff's] ownership stake rather than any loss of voting power"); *Protas*, 2012 WL 1580969, at *6 (*Gentile* inapplicable and claim derivative where harm is "entirely dependent" upon allegation that "the corporation's funds have been wrongfully depleted"); *Nikoonahad v. Greenspun Corp.*, No. C09-02242, 2010 WL 1268124, at *5 (N.D. Cal. Mar. 31, 2010) (same).

Supp. 2d 1, 4 n. 4 (D.D.C. 2009) *aff'd sub nom. Kellmer*, 674 F.3d 848; *see also In re Fed. Home Loan Mortgage Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009) ("allowing the [shareholder] plaintiffs to remain in this action would violate § 4617(f)"), *aff'd sub nom. Louisiana Mun. Police Employees Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011); *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347, 351 (S.D.N.Y. 2009) ("maintenance of this suit would violate Section 4617(f) of HERA and cannot be permitted"). As these decisions recognize, allowing Plaintiffs to pursue these claims would unlawfully permit private parties, separate and apart from the Conservator, to control, direct, manage, and dispose of claims belonging to the Enterprises. Such dual management of Enterprise assets would run afoul of HERA and necessarily restrain or affect the Conservator.

### C. There Is No Manifest Conflict of Interest Exception to HERA

Plaintiffs contend that the Court should disregard HERA's plain language and adopt a "conflict of interest" exception to both the Conservator's mandatory succession to "all" shareholder rights under Section 4617(b)(2)(A)(i) and the withdrawal of jurisdiction effected by Section 4617(f). Plaintiffs base their argument on decisions from the Ninth and Federal Circuits applying FIRREA. *See* Class Opp. at 33-34; Suppl. Opp. at 15-16; SJ Memo. at 27-28 (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999); *Delta Savs. Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001)). But the statutory text of HERA, not inapplicable FIRREA decisions from other circuits involving materially different factual situations, controls the outcome of this case. "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989) (internal quotation marks and citation omitted); *see also United W. Bank v. Office of Thrift Supervision*, 793 F. Supp. 2d 357, 366 (D.D.C. 2011) (relying

on "clear statutory language" to interpret FIRREA, notwithstanding numerous non-binding decisions that did not adhere to the statutory language). Plaintiffs make no effort to show that HERA's transfer of "all rights" to the Conservator, including any right to bring a derivative suit based on the Conservator's actions, is "demonstrably at odds" with the purposes of HERA.[14]

Neither *First Hartford* nor *Delta Savings* are controlling or persuasive because neither addressed or even cited the FIRREA equivalents of the provisions of HERA that are dispositive here—namely, succession to "all rights, titles, powers, and privileges of the insured depository institution, *and of any stockholder*," 12 U.S.C. § 1821(d)(2)(A) (emphasis added), or the bar on court action that would "restrain or affect the exercise of powers or functions" of the FDIC. *See generally* FHFA Mot. Dismiss at 51-53 (explaining the shortcomings of *First Hartford* and *Delta Savings*).

Plaintiffs suggest that *Kellmer* "recognize[d]" the "conflict of interest" exception, but this is not correct. *See* Suppl. Opp. at 14-15. Indeed, *Kellmer* confirms that Plaintiffs' derivative suits are barred, notwithstanding Plaintiffs' attempt to delve into pre-HERA and pre-FIRREA law to show otherwise. *See* Class Opp. at 32-33.[15] *Kellmer* did not decide whether the D.C.

---

[14]    Notably, neither *First Hartford* nor *Delta Savings* contain any discussion whether the conflict of interest exception to FIRREA was necessary to avoid a "result demonstrably at odds with the intentions of its drafters." *Ron Pair Enters.*, 489 U.S. at 242. *See also Delta Savings*, 265 F.3d at 1021-24.

[15]    Plaintiffs all but concede that cases decided prior to FIRREA or HERA are irrelevant. Buried in a footnote is their acknowledgment that the primary case they cite for the proposition that shareholders may bring derivative actions, *O'Connor v. Rhodes*, 79 F.2d 146 (D.C. Cir. 1935), has been expressly distinguished because it is contrary to HERA's plain language. Class Opp. at 32 n.19 (citing *In re Freddie Mac Derivative Litig.*, 643 F. Supp. 2d 790, 796 n.14 (E.D. Va. 2009)). Similarly, the district court decision affirmed by the D.C. Circuit in *Kellmer—In re Fannie Mae Secs., Derivative, and "ERISA" Litig.*, 629 F. Supp. 2d 1 (D.D.C. 2009)—expressly rejected any application of the cases on which Plaintiffs now rely, *O'Connor* and *Landy v. FDIC*, 486 F.2d 139 (3d Cir. 1973), stating that these cases "are not persuasive in light of HERA's plain language." 629 F. Supp. 2d at 3. The D.C. Circuit upheld this Court's rejection of such pre-HERA case law, and expressly followed the *In re Freddie Mac* decision Plaintiffs now attempt to criticize. *See* Class Opp. at 32 n.19.

Circuit ever would recognize such an exception under FIRREA or HERA.  The D.C. Circuit expressly stated that the exception recognized by the out-of-circuit receivership decisions upon which Plaintiffs rely was "not at issue" in *Kellmer*.  674 F.3d at 850.  Moreover, *Kellmer's* reference to these decisions does nothing more than acknowledge the fact that "[a]ll of these courts have found that, absent a manifest conflict of interest by the conservator not at issue here, the statutory language bars shareholder derivative actions. . . ."  *Id.*  For Plaintiffs to characterize this passage of *Kellmer* as "recognizing" a conflict of interest exception is wrong.

Plaintiffs seem to believe that *Kellmer* and similar cases are distinguishable because they involved "generalized harms to the Enterprises perpetrated by their former officers, directors, or third parties . . . not claims against the conservator itself."  Class Opp. at 34.  If anything, this distinction shows why Plaintiffs' arguments are *weaker* than those rejected in *Kellmer*.  Here, Plaintiffs allege the Conservator itself, rather than third parties, inflicted harm on the Enterprises.  But the Conservator has succeeded to "all" of the Enterprises' rights, including whatever rights Plaintiffs are now alleging have been violated by the Conservator.  HERA simply does not permit the Enterprises to sue the Conservator because "all rights" of the *Enterprises* (and shareholders) belong to the Conservator during conservatorship—otherwise, the Enterprises would be suing the entity that has all of the rights subject to the suit.  Thus—in addition to Plaintiffs' own lack of standing by virtue of HERA—Plaintiffs also lack any right to sue derivatively on behalf of the Enterprises because the Enterprises themselves lack the right to sue the Conservator during conservatorship.  *See* FHFA Mot. Dismiss at 46-47.[16]

---

[16]    HERA does not authorize the Enterprises to bring any actions relating to the conservatorship, but for one exception that allows the Enterprises, within 30 days of the appointment of the Conservator, to challenge the appointment.  12 U.S.C. § 4617(a)(5)(A).  A rule that allows Plaintiffs to sue the Conservator on the Enterprises' behalf whenever a "conflict of interest" is alleged to exist would swallow this exceedingly narrow exception.

> **D.      Even if Plaintiffs' Claims Are Considered Direct Rather Than Derivative, Plaintiffs Have No Right to Pursue Their Contract and Fiduciary Duty Claims During Conservatorship**

As described above, *all* of Plaintiffs' contract and breach of fiduciary duty claims are derivative.  Nevertheless, even if construed as direct, Plaintiffs have no right to pursue these claims during conservatorship because the Conservator has succeeded by operation of law to "all" shareholder rights, including all rights arising out of Plaintiffs' stock certificates.  *See* FHFA Mot. Dismiss at 35-38, 46-50.

HERA's treatment of shareholder rights is straightforward and reflected in three interrelated provisions of the statute.  First, HERA provides that upon its appointment as conservator, FHFA "immediately *succeed[s] to all rights*, titles, powers, and privileges" of any shareholders of the Enterprises.  12 U.S.C. § 4617(b)(2)(A)(i).  The D.C. Circuit's construction of this provision is dispositive here; specifically, the Circuit ruled that "Congress has transferred everything it could" to the Conservator.  *Kellmer*, 674 F.3d at 851.  Second, HERA provides that appointment of the FHFA as *receiver*—i.e., subsequent to its appointment as conservator—"shall *terminate all rights* and claims that the stockholders . . . may have against . . . the Agency arising as a result of their status as stockholders . . . , except for their right to payment, resolution, or other satisfaction of their claims, as permitted under subsections (b)(9), (c), and (e)," which provisions govern the "valuation of claims in default."  12 U.S.C. § 4617(b)(2)(K)(i) (emphasis added).  Third, HERA provides that shareholder claims asserted against an institution in default fall last in the statutory receivership priority scheme.  *Id*. § 4617(c)(1)(D).

In sum, HERA provides that shareholder rights are held and may be exercised only by the Conservator during conservatorship.  *Id*. § 4617(b)(2)(A)(i).  Upon appointment of FHFA as receiver, all shareholder rights are terminated, with the sole exception of the shareholders'

statutory right to assert claims against the Enterprises or FHFA as part of the administrative and judicial receivership claims process.  *Id.* § 4617(b)(2)(K)(i).

Plaintiffs' effort to avoid the Congressionally intended application of the interrelated statutory provisions referenced above by advancing the implausible argument that because HERA preserves shareholders' ability to "receive any distributions from the Enterprises after payment of all superior claims," then HERA must also preserve shareholders' ability to assert claims for deprivation of those rights now, during conservatorship.  Class Opp. at 26-27.  Not so.  Plaintiffs' attempt to craft a creative argument cannot overcome the plain terms of HERA which expressly transfer to the Conservator "all" shareholder rights for the duration of conservatorships.  There is no basis in congressional policy, logic, or most importantly—the plain words of the governing statute—to support Plaintiffs' erroneous contention.  To the contrary, only upon appointment of FHFA as receiver may Plaintiffs assert "claims that the stockholders . . . may have against . . . the Agency arising as a result of their status as stockholders."  12 U.S.C. § 4617(b)(2)(K)(i).

In support of their misguided argument, Plaintiffs rely heavily on *Branch v. FDIC*, 825 F. Supp. 384 (D. Mass. 1993), which held that, despite the receiver's succession to all shareholder rights, shareholders can still pursue claims on behalf of the failed institution because FIRREA preserves shareholders' "rights to the residual assets [of the company] once debts to higher priority creditors have been satisfied."  *Id.* at 404.  But Plaintiffs fail to acknowledge that the *Branch* approach has been rejected by *every* other court—including this one and the D.C. Circuit—that has since addressed the issue.  Indeed, in an opinion affirmed by the D.C. Circuit in *Kellmer*, Judge Leon held:

> I do not find persuasive the reasoning in *Branch v. FDIC,* 825 F.Supp. 384 (D. Mass. 1993) . . . .  Congress has determined that

> responsibility for deciding how to best preserve and conserve
> Fannie Mae's assets lies solely with FHFA for the conservatorship
> period. *That plaintiffs may retain the beneficial ownership of their
> shares in Fannie Mae for the duration of the conservatorship does
> not compel a different result.*

*In re Fed. Nat. Mortgage Ass'n Sec., Derivative, ERISA Litig.*, 629 F. Supp. 2d 1, 4 n.4 (D.D.C.

2009) ("*In re Fannie Mae*") (emphasis added).  On appeal of Judge Leon's ruling, the

shareholder plaintiffs again relied on *Branch*, arguing that because shareholders possess a

"fractual residual right in corporate property," the shareholders must retain the ability to pursue

claims during conservatorship.  *See* Kellmer Br. at 35 n.24  (No. 09-5253) (filed May 26, 2011)

(internal quotation marks and citation omitted).  The D.C. Circuit rejected this invitation to

follow the *Branch* approach, followed Justice Frankfurter's "advice" to "read the statute," and

held that, by virtue of HERA's succession provision: "Congress has transferred everything it

could to the [conservator], and that includes a stockholder's right, power, or privilege to demand

corporate action or to sue directors or others when action is not forthcoming."  *Kellmer* 674 F.3d

at 851 (internal quotation marks and citation omitted).[17]

In sum, the D.C. Circuit already has rejected the *Branch* approach, holding that the

Conservator possesses "all" shareholder rights during conservatorship, notwithstanding the fact

that shareholders still may have a place in the receivership claims process.  Accordingly, the

Court should reject Plaintiffs' invitation to embrace the *Branch* approach here.

---

[17]  Other courts have rejected the *Branch* approach as well.  *See, e.g.*, *Pareto v. FDIC*, 139 F.3d
696, 701 (9th Cir. 1998) ("we cannot agree with *Branch*'s conclusion"); *In re Fed. Home Loan
Mortgage Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 797 (E.D. Va. 2009) (finding *Branch*
"unpersuasive in light of the broad, sweeping language of HERA"), *aff'd sub nom. Louisiana
Mun. Police Employees Ret. Sys. v. FHFA*, 434 F. App'x 188 (4th Cir. 2011); *First Hartford
Corp. Pension Plan & Trust v. United States*, 42 Fed. Cl. 599, 614 (Fed. Cl. 1998) (rejecting
*Branch* because "the fact that a surplus may exist does not give this Court the right to interfere
with the FDIC in its role as receiver") *aff'd in pertinent part*, 194 F.3d 1279 (Fed. Cir. 1999).

Plaintiffs next argue that they must retain their rights as shareholders during conservatorship because HERA provides for "terminat[ion]" of all shareholder rights upon appointment of FHFA as receiver.  Class Opp. at 27.  Plaintiffs argue that this termination provision "by implication demonstrates that appointment of FHFA as a *conservator* does *not* 'terminate all rights and claims' of shareholders."  *Id.* (emphasis in original); *see also* SJ Memo. at 26 (arguing that the termination provision "presuppose[s] that, prior to receivership, the Companies' shareholders retain an array of rights").  But Plaintiffs' strained interpretation of HERA also runs afoul of the principle that, when Congress uses different terms, particularly within the same statute, Congress intends to convey different meanings.  *See Nat'l Insulation Transp. Comm.*, 683 F.2d at 537; *Mohamad*, 132 S. Ct. at 1708.  Section 4617(b)(2)(A)(i) provides that the Conservator "succeed[s]" to all shareholder rights during conservatorship.  And Section 4617(b)(2)(K)(i) provides that those shareholder rights are "terminate[d]" at receivership, but for the right to participate in the claims receivership process.  "Succession" and "termination" are two different terms with two obviously different meanings, which must be taken into account in order to interpret the statute in a "harmonious, comprehensive" manner, as Plaintiffs concede the Court must.  Plaintiffs' argument fails to do so.

Moreover, interpreting HERA to preserve shareholders' ability to assert claims based on their rights as shareholders during conservatorship would render the Conservator's succession to all shareholder rights meaningless.  As Plaintiffs themselves allege, the *only* rights arising out of the Enterprises' preferred shares are the very same rights Plaintiffs assert are being vindicated here:  namely, the right to recover a potential liquidation preference in receivership and potential dividends.  *See* Class Compl. ¶ 22; Fairholme Compl. ¶ 98.  If the Conservator's succession to

"all rights" of the shareholders were construed to exclude possession of these rights, then the Conservator would succeed to nothing, thereby nullifying the statutory provision.[18]

### IV.  Plaintiffs' Claims for Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Fail as a Matter of Law

In addition to the fact that HERA does not permit Plaintiffs to assert their contract-based and common-law claims during conservatorship, these claims also fail on the merits as a matter of law.

As an initial matter, Plaintiffs' claims lodged against the Enterprises themselves should be dismissed outright.  Plaintiffs' oppositions to the FHFA Defendants' and the Enterprises' motion to dismiss confirm what is apparent on the face of the Complaints:  The conduct Plaintiffs challenge "is solely conduct that was undertaken by the Conservator on behalf of the Enterprises"—i.e., the Enterprises themselves have not been accused of any wrongdoing or of violating any duties owed.  *See* Mot. Dismiss at 35 n.22.  Plaintiffs say nothing of this argument in their oppositions to the motion to dismiss.  But what they do say is telling.  They repeatedly describe the authority the Conservator wields to control and direct the Enterprises, emphasizing that Fannie Mae's (and by extension Freddie Mac's) board of directors "has no independent authority apart from what FHFA chooses to give it," Class Opp. at 42 n.24, and that the Conservator, and not the Enterprises, owe implied duties of good faith and fair dealing to the Enterprises' shareholders, Suppl. Opp. at 28, 37.  Because the challenged actions and the duties

---

[18]    Plaintiffs incorrectly argue that, in interpreting FIRREA's analogous "succession" language, several courts have purportedly "rejected the identical arguments" raised by defendants here.  Class Opp. at 28.  Not one of the cases cited by Plaintiffs addresses whether a conservator's succession to all shareholder rights precludes both direct *and* derivative shareholder claims during conservatorship.  *See, e.g., Plaintiffs in All Winstar-Related Cases at the Court v. United States*, 44 Fed. Cl. 3 (1999) (substituting receiver in place of shareholder plaintiffs for derivative claims, but not addressing the effect of FIRREA on shareholders' direct claims); *Hansen Bancorp, Inc. v. United States*, 49 Fed. Cl. 168 (2001) (holding receiver had standing to pursue claims on behalf of the institution, but not addressing any shareholder claims).

allegedly owed are those of FHFA, and not the Enterprises, all claims against the Enterprises should be dismissed.  Regardless, Plaintiffs' claims also fail on the merits.

### A.       Plaintiffs' Breach of Contract Claims Fail to State a Claim

Plaintiffs' contract claims are premised on the theory that, by providing superior economic benefits to Treasury as the senior preferred stockholder, the Conservator eliminated the ability of junior stockholders to recover economic benefits (i.e., dividends and liquidation preference), and therefore effectuated a material change in Plaintiffs' stock, necessitating a 2/3 majority vote of the relevant class of shareholders.  Plaintiffs' theory begins with a false premise—that they have the right to vote on changes to the terms of *other* stockholders' certificates, if those changes have the potential to impact Plaintiffs.

Contrary to Plaintiffs' arguments (Suppl. Opp. 34-36), Plaintiffs' stock certificates expressly authorize this very type of action, by permitting the issuance of new stock that would give superior rights to more senior classes of shareholders.  Plaintiffs' stock certificates deem such changes—which will necessarily diminish the ability of junior shareholders to receive dividends and liquidation preferences—as *not* material to the Plaintiffs' stock and therefore do not trigger Plaintiffs' voting rights.  *See, e.g.*, Ex. D to Mot. for Judicial Notice (Doc. # 33, No. 1:13cv1025) (Fannie Mae, Cert. of Desig. for Series T Preferred Stock, § 7(b)-(c)); Ex. E to Mot. for Judicial Notice (Freddie Mac Common Stock Cert. of Desig. § 10(h)(ii)).  Taking *lesser* action that affects junior shareholders in the exact same way—i.e., amending existing stock agreements for already superior stock to ensure the same superiority of the more senior stock— does not constitute a material change that would trigger Plaintiffs' voting rights.  *See Santiago v. Puerto Rico*, 655 F.3d 61, 69 (1st Cir. 2011) (discussing the "greater includes the lesser" canon); *see also DeTroia v. Schweitzer*, 662 N.E.2d 779, 780 (N.Y. 1996) (discussing "canon of

construction" that "a term of greater comprehension includes a lesser term" (quoting

McKinney's Cons. Laws of N.Y., Book 1, Stat. § 237, at 403)).[19]

Additionally, Plaintiffs' stock certificates do not give Plaintiffs any right to vote on

amendments to *other* stock certificates, such as the amendment to Treasury's stock effectuated

by the Third Amendment.  In response, Plaintiffs argue for a broad, flexible reading of the voting

rights provision, not "literally" limited to amendments to their own stock, which would entitle

Plaintiffs to vote on amendments to any *other* stock that would "effectively br[ing] about" an

amendment to Plaintiffs' stock.  Suppl. Opp. at 33-34.  But the provision permitting issuance of

new senior stock forecloses any interpretation that would consider such "functional" or

"effective" amendments, because that provision illustrates that the company's treatment of *other*

stock certificates is not to be considered an amendment to *Plaintiffs'* stock certificate requiring a

vote—even when the treatment of other preferred stock might impact or diminish the value of

Plaintiffs' stock.  In all events, Plaintiffs' broad reading of the scope of the material-affects

provision is in sharp contrast to their rigid argument that only the *issuance* of senior stock

without a junior stockholder vote, and not materially identical *amendments* to existing senior

stock are expressly permitted.  *See* Suppl. Opp. at 34-36.  Plaintiffs cannot have it both ways:  If

Plaintiffs' stock certificates are construed in accordance with their actual terms, Plaintiffs are not

entitled to vote on amendments to *other* stock certificates.  If Plaintiffs' stock certificates are

---

[19]  The cases on which Plaintiffs rely (Suppl. Opp. at 35-36) reject arguments that amount to the inverse of this common-sense rule—claims that the lesser should include the greater (*Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789 (Del. Ch. June 30, 2009) and *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020 (Del. Ch. 2006)).  As the *Allied Capital* court put it: "That a note restricts a highly specific form of investment does not mean that the parties were using that form as an exemplar to illustrate a capacious range of like conduct that was impliedly precluded . . . ."  *Allied Capital*, 910 A.2d at 1033-34.

read broadly, the Enterprises should be permitted to amend senior stock certificates allegedly to the detriment of junior stockholders.  Under either interpretive method, Plaintiffs' claims fail.

### B.     Treasury's Senior Preferred Stock Has Not Been "Converted" to Common Stock

In support of their breach of contract argument, Plaintiffs argue that the Third Amendment "effectively convert[s] the Government Stock into common stock."  Supp. Opp. at 30.  Plaintiffs further argue that as a consequence of the conversion, payment of dividends to Treasury "represent a distribution to the common shareholder ahead of and in violation of the contractual rights of Plaintiffs and other preferred shareholders."  *Id.*  This argument fails.[20]

"The term 'preferred stock' is not a term of art under the Delaware Corporation Law, and the nature of the security must be determined from its rights and character and not its name."  *In re Louisville Gas & Elec. Co.*, 77 F. Supp. 176, 178 (D. Del. 1948).  Courts applying Delaware law have characterized preferred stock as "'a stock which in relation to other classes enjoys certain defined rights and privileges.  *These rights and privileges are generally associated with specified dividend and liquidation priorities.*'"  *Id.* at 179 (quoting *Starring v. Am. Hair & Felt. Co.*, 191 A. 887, 891 (Del. Ch. 1937)) (emphasis added); *see also Starring*, 191 A. at 891 (noting that preferences generally involve "rights or favors in relation to other stock as opposed to "burdens").  Here, Treasury's rights under the Third Amendment to the PSPAs are characteristic of preferred shares.  Treasury's dividend and liquidation rights are both senior to all classes of shareholders, its status is subordinate to all senior debt, and Treasury is not due any dividend should the Enterprises fail to generate profits.  *See QVT Fund LP v. Eurohypo Capital Funding L.L.C.*, C.A. No. 5881, 2011 WL 2672092, at *10 (Del. Ch. July 8, 2011) (describing these

---

[20]    To the extent Plaintiffs seek any sort of recharacterization of the Treasury stock based on this flawed argument, such declaratory and equitable relief would be barred by Section 4617(f) for the reasons described above.

features as characteristic of preferred shares); *see also Shintom Co. Ltd. v. Audiovox Corp.*, 888

A.2d 225, 228 (Del. 2005) ("Preferred stock may have a priority as to dividends or as to the

distribution of assets *and frequently has a priority as to both*." (emphasis added)).

Plaintiffs argue that Treasury's dividend gives its preferred shares the defining

characteristic of common stock, namely "the 'residual value of the firm.'"  Supp. Opp. at 31

(quoting *Len v. Fuller*, No. 15352, 1997 WL 305833, at *4 (Del. Ch. May 30, 1997)).[21]  Not so.

Delaware corporate law "affords Delaware corporations the ability to provide for flexible

financing" and provides "the drafter . . . a blank slate on which to fill in the rights," which "the

drafter may parse . . . among multiple classes of stock as he or she sees fit."  *Matulich v. Aegis*

*Commc'ns Group, Inc.*, 942 A.2d 596, 599-600 (Del. 2008) (quoting William W. Bratton,

*Corporate Finance*, 486 (6th ed. 2008)).  All Delaware law requires is that the "rights,

preferences and limitations of preferred stock that distinguish that stock from common stock

[are] expressly and clearly stated."  *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del.

1998).  Here, the Treasury Stock Certificate expressly states that Treasury may receive dividends

"without the payment of any dividends on the common stock, preferred stock or any other class

---

[21]    Plaintiffs' reliance on *Len v. Fuller*, No. 15352, 1997 WL 305833, at *4 (Del. Ch. May 30, 1997) is misplaced.  *Len* addressed the issue of whether a corporation's exercise of its right to repurchase the stock of a former employee impacted the former employee's voting rights.  The court concluded that following the exercise of the repurchase option, the former employee no longer needed the protection that voting rights afford to common shareholders.  *Len*, 1997 WL 305833, at *4.  The case has nothing to do with the issues before this Court, and it nowhere identifies the right to the residual value of the firm as "the defining characteristic of common stock," as Plaintiffs suggest.  *See* Supp. Opp. at 31.  Furthermore, the Easterbrook article cited in *Len* notes that "voting rights flow to whichever group holds the residual claim at any given time" because these parties have the "appropriate incentives . . . to make discretionary decisions." Frank H. Easterbrook & Daniel F. Fischel, *Voting in Corporate Law*, 26 J.L. & Econ. 395, 403, 405 (1983).  While the residual claim usually resides with common shareholders, "shareholders lose the controlling votes when their shares are under water[, and] managers become answerable to other investors." *Id.* at 404.  As a result, "[o]ther groups, such as preferred stockholders or creditors, will receive the benefit of new decisions and projects until their claims are satisfied[.]" *Id.*  Thus, entitlement to the residual value of the firm, standing alone, is not enough to convert preferred stock into common stock.

or series of stock . . . ranking junior to the Senior Preferred Stock with respect to the payment of

dividends."  Treasury Stock Certificate § 2(e) (AR0033-34).  Defendants' "bargained for

preferences" are clearly stated in the certificates of designation, satisfying all that Delaware law

requires of preferred stock.  *See Shintom Co. Ltd.*, 888 A.2d at 230.  Thus, the payment of

dividends pursuant to the terms of the Senior Preferred Stock certificates does not breach

Plaintiffs' certificates.

### C.      Plaintiffs' Claim for Breach of the Implied Duty of Good Faith and Fair Dealing Fails to State a Claim

Plaintiffs argue that the Conservator was not free "to take any action, regardless of the

mechanism, for the purpose and with the effect of eliminating Plaintiffs' dividend and liquidation

rights" because to do so is "inconsistent with the text and spirit of Plaintiffs' stock certificates."

Class Opp. at 41 (emphasis omitted).  However, as recognized by the cases cited by Plaintiffs,

"[t]he express terms of a contract and not an implied covenant of good faith and fair dealing . . .

will govern the parties' relations when the terms expressly address the dispute."  *Quadrangle*

*Offshore (Cayman) LLC v. Kenetech Corp.*, No. C.A. 16362, 1998 WL 778359, at *6 (Del. Ch.

Oct. 21, 1998); *QVT Fund*, 2011 WL 2672092, at *14 (same).  To the extent the doctrine will fill

gaps, "it does so only regarding unanticipated developments and not events that the parties

merely failed to consider."  *QVT Fund*, 2011 WL 2672092, at *14.  Here, as explained above,

Plaintiffs' stock certificates specifically permit the issuance of more senior shares that will

necessarily have an adverse effect on Plaintiffs as junior shareholders.  Plaintiffs, when

purchasing their shares, agreed to take on this risk.  To the extent any "gap" needs to be filled, it

must be filled in accordance with—not contrary to—the existing express terms.  *See*

*Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789, at *4 (Del. Ch. June 30, 2009)

(rejecting implied covenant claims where the parties included specific contract terms that

undermined implied duty claims); *Allied Capital*, 910 A.2d at 1033-34 (same).[22]

## V.      Plaintiffs' Breach of Fiduciary Duty Claims Are Preempted

Even assuming *arguendo* that Plaintiffs could bring derivative suits on behalf of the

Enterprises—as explained above, they cannot—any state law fiduciary duty claims based on the

Third Amendment are preempted.  Plaintiffs contend that there can be no preemption because the

Third Amendment is inconsistent with Fannie Mae's charter and HERA and because Delaware

fiduciary duty law is purportedly consistent with these statutes.  Class Opp. at 47-51.  Plaintiffs

are incorrect on both counts.

Delaware fiduciary duty law, to the extent even applicable, requires a fiduciary to remain

"narrowly—even myopically—focused on the corporation and its shareholders."  *Starr Int'l Co.*

*v. Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202, 243-44 (S.D.N.Y. 2012).  In arguing

that such a myopic focus is fully consistent with Fannie Mae's charter and HERA, Plaintiffs

again rely on the misconception on which so much of their complaint is predicated—namely,

that the only legitimate goal of conservatorship is to put the Enterprises "in a sound and solvent

financial condition while preserving and conserving their assets,"  Class Opp. at 49-50, and to do

---

[22]     Plaintiffs' reliance on *In re Delphi Financial Group Shareholder Litigation*, No. 7144, 2012 WL 729232 (Del. Ch. March 6, 2012), is misplaced.  In *Delphi*, the question of whether the controlling stockholder violated an implied duty was not resolved by the court.  *Id.* at *17. Moreover, the problem in *Delphi* was how to construe two conflicting provisions—one that gave the controlling shareholder rights to amend the certificates and another that precluded issuance of a control premium on preferred shares.  The issue was whether he could amend the certificates in a way that eliminated an express restriction on the controlling shareholder's powers.  There is no similar conflict here.

Plaintiffs' reliance on *QVT Fund LP* and *Quadrangle Offshore (Cayman) L.L.C. v. Kenetech Corp.*, No. 16362, 1998 WL 778359 (Del. Ch. Sept. 24, 1999) is similarly misplaced.  In *QVT Fund*, the bank had undertaken both an obligation to make mandatory distributions under certain circumstances and also to "protect the holders of [certain securities] should it cease to be profit-seeking"—but neither obligation exists here.  *See* 2011 WL 2672092, at *15.  Indeed, there is no circumstance in which the Enterprises would ever be *required* to make dividend distributions to Plaintiffs.

so in a manner they would chart.  Plaintiffs refuse to acknowledge the full range of the

Conservator's explicit statutory powers, including to "wind[] up" the affairs of the Enterprises.

*See supra* Section I.D.

Plaintiffs assert that the Third Amendment violated fiduciary duties because it amounted

to "self-dealing," Class Opp. at 43-44, is similarly preempted.  HERA permits the Conservator to

"take any action authorized by this section, which the Agency determines is in the best interests

of the regulated entity *or the Agency*."  12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added).  The

Agency's director is obligated to ensure that the Agency acts "consistent with the public

interests," 12 U.S.C. § 4513(a)(1)(B), and courts have recognized that the public interests may be

inconsistent with the interests of private shareholders; in such circumstances, private interests

must yield to the superior federal interest.  *See Starr*, 906 F. Supp. at 244.  Thus, by authorizing

the Conservator to act in the best interest of the Agency—and suggesting that this might be

something different from the best interests of the regulated entity—HERA undermines the

premise that the Conservator has "an 'unyielding duty' to act in the best interests of the

shareholders of a corporation," as Delaware fiduciary duty law would require.  *Id.*  And that is

precisely why HERA preempts Plaintiffs' claims that the Third Amendment violated Delaware

fiduciary duty law.

Finally, Plaintiffs devote much of their briefs to arguing that the Conservator could have

crafted some other arrangement that would be a better fit with the fiduciary duty requirements of

Delaware law.  But this is precisely the type of state law interference that the Supremacy Clause

of the U.S. Constitution is intended to prevent.  As the *Starr* court explained in its opinion

holding that the Federal Reserve Bank of New York was not subject to fiduciary duties, the

relevant question is whether imposing fiduciary duties would "retard, impede, burden, or . . .

control" an entity in its performance of statutorily-authorized duties.  906 F. Supp. 2d at 243

(alteration in original).  This is a "functional question," *id.* at 242, focusing on whether officials

would be deterred from taking actions in the public interest because "even if the responsible

FRBNY officials believed that [the action in question] was within FRBNY's statutory authority,"

they "could not ignore the possibility that a court would later hold otherwise—and expose

FRBNY to vast monetary damages."  *Id.* at 245.  Similarly, applying fiduciary duty law to the

Conservator would impede its pursuit of its statutory mission, since it would create the prospect

of liability whenever a shareholder believes that the Conservator's approach to a problem is

suboptimal.[23]

## VI.    Plaintiffs' Takings Claims Against the Conservator Fail as a Matter of Law

### A.    Regardless of Whether Plaintiffs Have a Cognizable Property Interest, the Government Did Not "Take" Any Such Interest

Plaintiffs' takings claim fails for many reasons, most prominently because this case falls

squarely within the doctrine established by *Omnia Commercial Co. v. United States*, 261 U.S.

502 (1923).  In that case, the Supreme Court held that no taking occurred when the government

rendered worthless the plaintiff's contractual right to receive steel by requisitioning all of the

steel the plaintiff expected to receive from its contract counterparty.  *Id*. at 507-11.  Substitute

"dividends and potential liquidation proceeds" for "steel," and *Omnia* fits Plaintiffs' allegations

like a glove.  *See, e.g.*, Class Opp. at 67 (government "require[d] all dividends and liquidation

proceeds to be paid to the government and not to [Plaintiffs]").

---

[23]    The cases cited by Plaintiffs do not advance their argument.  *Gibraltar Financial Corp. v. Federal Home Loan Bank Board*, No. 89-cv-3489, 1990 WL 394298 (C.D. Cal. June 15, 1990), is easily distinguished because it was decided based on the pre-FIRREA statute, which did *not* provide for the transfer of shareholder rights to the conservator.  1990 WL 394298, at *5 (emphasis added).  Plaintiffs also cite *Waterview Management Co. v. FDIC*, 105 F.3d 696, 700 (D.C. Cir. 1997), which is not on point because it relied on FIRREA's provisions relating to the repudiation of contracts; FIRREA and HERA contain no equivalent provisions relating to fiduciary duty law that could salvage Plaintiffs' claims.

As *Omnia* explains, "for *consequential loss or injury* resulting from lawful governmental action the law affords no remedy" under the Takings Clause.  261 U.S. at 510 (emphasis added).

Quoting the *Legal Tender Cases*, the Court explains that the Takings Clause:

> has always been understood as referring only to a *direct appropriation*, and not to *consequential injuries* resulting from the exercise of lawful power.  It has never been supposed to have any bearing upon or to inhibit laws that indirectly work harm and loss to individuals.  A new tariff, an embargo, a draft, or a war, may inevitably bring upon individuals great losses; may, indeed, render valuable property almost valueless.  *They may destroy the worth of contracts.*

*Id*. at 509-10 (quoting *Legal Tender Cases* (*sub nom. Knox v. Lee*), 79 U.S. 457, 551 (1870)) (emphasis added); *see also United States v. Grand River Dam Auth.*, 363 U.S. 229, 236 (1960) (takings claim must "distinguish between an appropriation of property and the frustration of an enterprise by reason of the exercise of a superior governmental power").

Here, Plaintiffs complain of consequential losses from frustration of an expectancy for which they purportedly contracted, not a taking.[24]  They do not and cannot allege that the government stands to receive dividends through Plaintiffs' shares.  *See* Consol Compl. ¶ 9 ("Treasury agreed to invest in a *newly created* class of securities") (emphasis added).  Instead,

---

[24]   As *Omnia* and other cases confirm, for purposes of their takings claim Plaintiffs must concede that the government's actions were lawful; otherwise the claim fails as a matter of law.  *See, e.g.*, *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 (Fed. Cir. 2005) (affirming dismissal of takings claim "premised on . . . allegations that [government action] violated [a] statute and regulations"; "in a takings case [the court] assume[s] that the underlying governmental action was lawful"); *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 802 (Fed. Cir. 1993) (a plaintiff "must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act").  Plaintiffs' central takings allegations—that "[e]ntry into the Third Amendment by Treasury and FHFA . . . constituted an *unlawful* taking of private property," Class Compl. ¶ 26 (emphasis added), and that the Government "took and/or exacted . . . [Plaintiffs'] property and legally cognizable property rights . . . by, among other things, (1) *improperly* taking all of the net worth of the Companies; and (2) by *improperly* imposing the stock agreements and conservatorships over the Companies," *id.* ¶ 186 (takings count) (emphasis added)—flout this fundamental rule.  Accordingly, Plaintiffs have pled themselves out of the claim.  We present our other arguments in the alternative.

they claim that the Third Amendment made it "impossible for Plaintiffs . . . to realize any value from their contractual right to share in the Companies' future profits or from their liquidation preference."  Consol. Compl. ¶ 115; Class Opp. at 66 ("prior to the Third Amendment, Plaintiffs held rights that would entitle them to receive billions of dollars; after the Third Amendment, those billions of dollars will be paid to the government" (emphasis omitted)).  That is a classic description of frustration of a contractual expectation under *Omnia*; *Omnia* therefore bars the claim.  *See, e.g.*, *Kearney & Trecker Corp. v. United States*, 688 F.2d 780, 783 (Ct. Cl. 1982) (based on the "principles announced and applied in *Omnia*," no taking occurred where "[t]he government did not appropriate the contract . . . [but] merely frustrated [its] performance"; "[t]he government did not appropriate any of the rights the plaintiff had under the contract.").

Plaintiffs assert that *Omnia* is inapposite because "the government did not exercise its 'police power' in a way that indirectly and unintentionally caused Plaintiffs' property to lose value," but instead "directly" and "intentionally" took the economic value of their property (i.e., contract rights inherent in their shares).  Class Opp. at 70-72.  This purported distinction fails.

Under *Omnia*, frustration of contractual expectations is inherently "indirect."  In the context of *Omnia*, "direct" government action is appropriative—i.e., acquiring contract rights themselves—not merely expected or intended to make a specific contract less valuable.  261 U.S. at 509-10.  Here, the actions that Plaintiffs challenge were no less "indirect" than the actions in *Omnia*, where the government not only requisitioned the steel company's "*entire production* of steel plate*," notwithstanding Omnia's contract, but it also instructed the company "not to comply with the terms of *appellant's contract*."  261 U.S. at 507 (emphasis added).  As the Federal Circuit observed about *Omnia* in *Palmyra Pacific Seafoods v. United States*, "the government's action was specifically directed at Omnia," in the sense that it was unquestionably expected to

frustrate Omnia's contract rights while benefitting the government.  561 F.3d 1361, 1369 (Fed.

Cir. 2009) (citing *Omnia*, 261 U.S. at 507).  *Palmyra* also explained that "well-settled case law"

confirms that *Omnia* applies even when the government has "targeted" or "directed" its action at

the plaintiff in that sense, so long as the government does not appropriate the plaintiff's contract.

561 F.3d at 1369 (citing *Huntleigh USA Corp. v. United States*, 525 F.3d 1370 (Fed. Cir. 2008);

*Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993)).[25]

　　　*Omnia* turns on whether the government appropriated the contract right itself or only

requisitioned "the subject-matter" that made the contract valuable.  *Omnia*, 261 U.S. at 510-11.

Plaintiffs' claim is *not* that the government took their shares—Plaintiffs still own the shares,

which still trade over the counter.  *See* Consol. Compl. ¶ 8 ("public trading in the Companies'

stock was allowed to, and did, continue").  Plaintiffs' theory is instead that "the government

decided to expropriate *all* of the profits the Enterprises might earn, and to prevent the private

shareholders of the Enterprises from ever receiving one penny of those profits."  Class Opp. at 63

(citing Class Compl. at ¶¶ 14-20) (emphasis in original).  This leaves Plaintiffs to argue that the

government cannot "extract[] the economic value" of property while leaving "legal title to the

empty vessel," Class Opp. at 72, but that is *exactly* what *Omnia* permitted—the government

rendered a contract of "great value" worthless by requiring Omnia's counterparty to deliver to

the government the very things Omnia expected to receive, and would have received, under the

---

[25]　　The Federal Circuit's recent decision in *A&D Auto Sales v. United States*, --- F.3d ----, 2014
WL 1345499 (Fed. Cir. April 7, 2014) similarly recognizes that *Omnia* governs where
government action affects a contract "collateral[ly]" or "consequential[ly]."  2014 WL 1345499
at *6-7.  In *A&D*, the Federal Circuit held that *Omnia* did not control where the government
allegedly took Plaintiffs' contracts by causing their formal "termination."  *Id.* at *7.  The Federal
Circuit reasoned that formal termination of a contract is a "direct" action distinct from the
"collateral" or "consequential" effects of frustration, which the Circuit concedes are not
compensable under *Omnia*.  *Id*.  That reasoning has no application here—Plaintiffs still own their
shares, which have never been canceled or terminated.  Plaintiffs' claim is that the government's
acquisition of different, more senior shares frustrated their contractual rights and expectations, so
this case is controlled by *Omnia*, not by *A&D*.

contract.  *Omnia*, 261 U.S. at 507; *see also Acceptance Ins.*, 84 Fed. Cl. at 117-18.[26]  Plaintiffs'

*ipse dixit* cannot negate *Omnia*.

Moreover, Plaintiffs are mistaken when they say that the government took "*their*

property."  Class Opp. at 72.  If the government took any "property," it belonged to the

Enterprises in conservatorship, not Plaintiffs.  In that respect again, this case is just like *Omnia*,

where "the government dealt only with the steel company, which company thereupon became

liable to deliver its product to the government."  *Omnia*, 261 U.S. at 511.  Likewise, Treasury

and the Conservator dealt only with the Enterprises, which became liable to deliver their profits

as dividends to Treasury.  Plaintiffs' alleged dividend and liquidation rights were not

appropriated, but frustrated as a practical consequence of the Third Amendment—Treasury does

not stand to receive dividends through Plaintiffs' shares, but instead through its more senior

shares.  *Compare id. with* Class Compl. ¶ 79 (Plaintiffs' shares "are, as a result of the PSPAs,

subordinate to the Government Stock").  Even if Plaintiffs were correct that *Omnia* draws a line

between a taking of "their" property and "another" person's property, their claims fall on the

wrong side of that line: "corporate shareholders do not directly own any part of a corporation's

property or assets" and thus have no cognizable property interest in expected distributions until

the corporation declares a dividend.  *Broad v. Sealaska Corp.*, 85 F.3d 422, 430 (9th Cir. 1996).

---

[26]    As the Court of Federal Claims aptly explained in a 2008 decision Plaintiffs suggest favors them, *see* Class Opp. at 64, the principles articulated in *Omnia* have "remain[ed] unchanged, and ha[ve] been affirmed in a wide variety of takings claims where the Government, acting in either a regulatory or commercial capacity, has caused the loss of the benefits of a contract or frustrated business expectations.  In each of these cases, the plaintiff failed to receive its expected compensation from private agreements as a results of the Government's actions," yet no compensable taking was found.  *Acceptance Ins. Cos. v. United States*, 84 Fed. Cl. 111, 117-18 (2008) (citing and discussing cases in dismissing takings claim), *aff'd*, 583 F.3d 849 (Fed. Cir. 2009).

Finally, Plaintiffs are incorrect that *Omnia* only applies to the government's exercise of "police power." *See* Class Opp. at 71-72. *Omnia* explained that "[t]he character of the power exercised is not material," and that the relevant question is whether the government, "under any power," took the contract as opposed to its subject matter. 261 U.S. at 510. Plaintiffs quote a passage from *Omnia* that refers to "police power," but this is actually a passage from another case (involving *state* police power) that *Omnia* quotes shortly before explaining that the character of the *federal* power exercised in an alleged takings case is irrelevant. *Id.* at 510 (quoting *Calhoun v. Massie*, 253 U.S. 170, 175-76 (1920)). Plaintiffs do not and cannot cite any case that limits *Omnia* to federal "police power," if such a power even exists.

### B.    Plaintiffs Lack a Cognizable Property Interest

*Omnia* controls this case and provides sufficient grounds to dismiss Plaintiffs' takings claim. But it is not the only basis for dismissal. Independent of *Omnia*, Plaintiffs cannot plausibly allege any cognizable property interest that the government could have taken.

> *1.    Plaintiffs' "Rights" to Dividends and Liquidation Preferences Are Not Cognizable Property Interests Under the Fifth Amendment*

Plaintiffs insist that they have property interests in the "right to a portion of the profits earned by the companies," based on Plaintiffs' contractual rights to dividends and liquidation preferences. *See, e.g.*, Consol. Compl. ¶ 78. These interests cannot support a takings claim.

Plaintiffs provide no legal support for their argument that they have a constitutionally protected property right to "a portion of the profits," or any dividends or other distributions, and the Ninth Circuit's decision in *Broad v. Sealaska Corp.* confirms that they do not. 85 F.3d 422 (9th Cir. 1996). There, a federal statute created corporations in which eligible Native Americans were made shareholders with equal rights to distributions; Sealaska was one such corporation. When a later statutory amendment authorized larger distributions to shareholders over age 65,

which Sealaska funded a trust to make, a class of younger shareholders brought a takings claim.

The shareholders alleged that "by transferring corporate assets to the [trust] . . . Sealaska

decreased its corporate equity, thus decreasing the value of its stock"—substantially the same

theory Plaintiffs offer here.  *See* 85 F.3d at 430 n.4.  In affirming dismissal of the claim, the

Ninth Circuit explained that:

> corporate shareholders do not directly own any part of a
> corporation's property or assets.  They only own shares of stock,
> which represent a proportionate interest in the corporate equity
> remaining after a corporation meets all its other debts and
> obligations.  *The profits themselves belong to the corporation*, and
> do not pass to the shareholders unless and until the board of
> directors declares a dividend.  *Thus, the plaintiff shareholders have
> no proprietary interest that could have been "taken."*

*Id.* at 430 (emphasis added).  The same logic applies to Plaintiffs' claim here that the government

took their "right to a portion of the profits," or their "right to dividends" or other distributions.

Plaintiffs have no cognizable property interest in any such rights.  The Enterprises' future,

discretionary dividends would not become Plaintiffs' "property" until declared, even if the

expected absence of future dividends "decreas[ed] the value of [their] shares."[27]

Plaintiffs liken this case to *Brown v. Legal Foundation of Washington*, 538 U.S. 216

(2003), which they describe as holding that a government-imposed rule "requiring interest on

[certain] trust accounts to be paid to the government and not to *the private owners of the*

*underlying funds*" effected a *per se* taking.  *See* Class Opp. at 67 (citing *Brown*) (emphasis

added).  Plaintiffs contend that "[l]ikewise, it is a *per se* taking when the government imposes a

rule requiring all dividends and liquidation proceeds to be paid to the government and not to *the*

---

[27]   Instead of providing legal authority to show that dividends are a cognizable property
interest, Plaintiffs describe a hypothetical situation in which the government confiscates future
undeclared dividends of Apple, Microsoft, and Google, which they say would "obviously be a
taking."  Class Opp. at 65.  But any taking in that scenario would be a taking of the corporations'
property, not the shareholders."

*private shareholders*." *See id.* (emphasis added).  Plaintiffs' contention disregards a dispositive

distinction—the *Brown* plaintiffs were "owners of the underlying funds," while Plaintiffs here

are mere "shareholders."  As shareholders, Plaintiffs have no ownership interest in funds

invested in (or earned by) the corporation, or in the corporation's equity, and cannot premise a

takings claim on non-payment of dividends.  *See Broad*, 85 F.3d at 430.

       Similarly, Plaintiffs' purported "right to a liquidation preference" is not a cognizable

property interest.  As with dividends, any profits that could be distributed as a liquidation

preference belong to the corporation, not the shareholder, at least until the imposition of a

receivership—which has not happened here.  Plaintiffs cite several cases for the proposition that

shareholders have standing to bring claims to recover their liquidation preference.  *See* Class

Opp. at 29-32 (citing *Cal. Hous. Secs., Inc. v. United States*, 959 F.2d 955, 957 n.2 (Fed. Cir.

1992); *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir.

1999); *Branch v. FDIC*, 825 F. Supp. 384, 404 (D. Mass. 1993)).  But each of these cases

involves an actual receivership, which the decisions treat as a prerequisite to the legal

recognition of shareholders' statutory distribution rights.  *See First Hartford*, 194 F.3d at 1288

(concluding that plaintiff could claim a property interest in a liquidation surplus "provided that a

liquidation was underway that could create a surplus thereby triggering a shareholder distribution

. . . ."); *Cal. Hous. Secs.*, 959 F.2d at 957 n.2 (explaining that plaintiff claimed a surplus under

FIRREA's provision for payment of claims in receivership); *Branch*, 825 F. Supp. at 404

(explaining that shareholders' "rights to the residual assets" are based on a provision of FIRREA

applicable only to receiverships).  Here, the Enterprises are not in receivership, so these

decisions are inapposite.[28]  Plaintiffs have no existing property interest in a liquidation

preference, and they lack standing to pursue a takings claim premised on such an interest.

        2.     *Plaintiffs Had No Cognizable Property Interests Under the Regulatory*
               *Framework Established by HERA*

Even if dividend rights and liquidation preferences might support a takings claim in some

circumstances, background legal principles that define and limit the specific dividend and

liquidation rights Plaintiffs assert would preclude any such claim here.  "[E]xisting rules and

understandings, . . . such as state, federal, or common law, define the dimensions of the requisite

property rights for purposes of establishing a cognizable taking."  *Air Pegasus of D.C., Inc. v.*

*United States*, 424 F.3d 1206, 1213 (Fed. Cir. 2005) (citations omitted).

Plaintiffs acknowledge that their "property rights were subject to the significant

limitation that the Enterprises might be placed into conservatorship in accordance with the

provisions of HERA.  Class Opp. at 64-65.  But Plaintiffs ignore three HERA provisions that

negate their takings claim.  *First*, Plaintiffs' rights were at all times subject to the Conservator's

statutory right to transfer any asset of the Enterprises without any consent or approval, a

provision common to federal financial regulatory statutes.  *See* 12 U.S.C. § 4617(b)(2)(G); *id.*

§ 1821(d)(2)(G)(i)(II).  Thus, whatever alleged interest Plaintiffs might have had in the

Enterprises' assets (including their profits and equity), any such interest was always subject to

the Conservator's right to transfer those assets to someone else on whatever terms the

Conservator deemed appropriate.  An allegation that the Conservator exercised that background

right cannot give rise to a takings claim.  *Second*, the Conservator has the express right under

---

[28]    Any assertion that the Enterprises are in *de facto* receivership would fail as a matter of law.
As this Court has explained, "[t]he notion of a 'de facto receivership' is rather akin to the
concept of 'semi-pregnancy': an entity is either in *de jure* receivership or it is not."  *Cobell v.*
*Norton*, 283 F. Supp. 2d 66, 91 n.12 (D.D.C. 2003) (Lamberth, J.).

HERA to repudiate contracts, with its liability limited to direct compensatory damages as of the date of Conservatorship—a provision also common to federal conservatorship and receivership statutes. *See* 12 U.S.C. § 4617(d)(1), (2); *id*. § 1821(e). Plaintiffs' claim is, in substance, that the Conservator has repudiated their contractual rights;[29] it must therefore be valued as of the inception of conservatorships—September 2008—*before* Treasury contributed any of the taxpayer funds that kept the Enterprises alive, and *years before* any of the profits upon which Plaintiffs base their claim. Plaintiffs do not and cannot allege that any of those profits were anticipated in 2008; instead, they allege that "*[i]n 2012*" it supposedly "became clear that FHFA had overestimated the Companies' likely losses and underestimated the possibility of a return to profitability," and they concede that the Companies' 2012 financial performance was "*[c]ontrary to FHFA's 2008 projections*." Consol. Compl. ¶ 64-65 (emphasis added).[30] Plaintiffs' claim, therefore, seeks compensation for the alleged taking of value that background law expressly excises from their alleged property interests. *Third*, HERA (again like the analogous statutes applicable to other federal receivers, *see* 12 U.S.C. § 1821(i)) limits the FHFA receiver's potential liability to any shareholder to the amount the shareholder would have received had a

---

[29]    Plaintiffs note that the Conservator did not formally repudiate their contracts. *See* Consol Compl. ¶ 57. Plaintiffs nevertheless allege in a variety of ways that "[t]he Third Amendment . . . *eliminated the contractual rights*" of preferred and common stock holders. *See id*. ¶ 17; *see also id*. ¶ 22 (alleging that "the Third Amendment has *effectively eliminated the . . . contractual rights* of Plaintiffs"); *id*. ¶ 26 (alleging that "Treasury and FHFA violated [Plaintiffs'] property rights by *effectively expropriating these contractual rights*"); *id*. ¶ 87 (alleging that "FHFA *eliminated the Preferred Stockholders' . . . contractual rights* to receive dividends . . . and to receive a pro rata distribution of any liquidation proceeds"); *id*. (that "the Third Amendment . . . *repealed . . . the contractual terms* governing [Plaintiffs'] rights to receive dividends and liquidation distributions"); *id*. ¶¶ 188-90 (alleging that Plaintiffs had "a legally cognizable property interest . . . in the share of the Companies' future earnings to which they . . . were *contractually entitled*" and in the "liquidation rights to which [Plaintiffs] were *contractually entitled*" while Defendants allegedly "took [those] vested, legally cognizable property rights . . . without paying just compensation") (all emphases added).

[30]    Plaintiffs also concede that it was only "with the Companies' return to consistent and record profitability," which they allege took place in 2012, that shareholders "had reason to believe and expect that they would in time regain a return on their investment." Consol Compl. ¶ 69.

liquidation taken place at default, which here is the date of inception of the conservatorships. *See* 12 U.S.C. § 4617(e).  Because the maximum value of Plaintiffs' rights was fixed long before the Third Amendment came into being, the Third Amendment cannot have effected a taking. Accordingly, the background law of conservatorship and receivership precludes Plaintiffs' takings claim.

### C.     The Named Plaintiffs Have Failed to Waive All Claims Over $10,000

Remarkably, Plaintiffs refuse to comply with the Tucker Act's jurisdictional requirement that they "expressly disclaim monetary damages over $10,000."  *Waters v. Rumsfeld*, 320 F.3d 265, 271 (D.C. Cir. 2003).  They assert that it is sufficient to define the Takings Class to exclude class members with more than $10,000 in damages and that "a waiver at this stage in the proceedings would be premature."  Class Opp. at 53.  To the contrary, a waiver is overdue. "Generally a plaintiff's waiver should be set forth in the initial pleadings," although "[t]he court may make an exception . . . if the issue of jurisdictional amount does not arise until a subsequent stage in the proceedings."  *Stone v. United States*, 683 F.2d 449, 454 n.8 (D.C. Cir. 1982).  Here, the issue arose when Plaintiffs filed their Complaint.[31]

Plaintiffs grudgingly identify one "suitable class representative" whose damages purportedly would be less than $10,000.  Class Opp. at 53-54.  But even she does not *expressly disclaim* damages over $10,000; she merely describes her stock.  *See* Decl. of Pl. Mary Meiya Liao (Dkt. 33-3).  Plaintiffs imply that Ms. Liao seeks damages of $7,500—the number of her shares multiplied by each share's "par value," Class Opp. at 53—but nothing in the Complaint

---

[31]     The issue might arise later if, for example, the plaintiff's original complaint seeks an amount under $10,000, but the plaintiff subsequently discovers damages that exceed $10,000.  In *Wolak v. United States*, the plaintiff's initial complaint sought $8,000 in damages, but he had to make an express waiver after discovering additional damages and amending the complaint to seek $20,000.  366 F. Supp. 1106, 1109-10 (D. Conn. 1973).

establishes that Plaintiffs only seek to recover each share's par value. Plaintiffs assert that their property includes rights to liquidation preferences *and* dividends, so Ms. Liao could claim $7,500 *plus* compensation for dividends (plus attorney's fees and costs[32]). Or, if Plaintiffs intend to measure just compensation by the shares' decline in market value, Ms. Liao's requested damages might be unrelated to the shares' par value. Plaintiffs could defer these questions by having a named class member make an express disclaimer, but because they apparently are unwilling to do this, this Court should order Plaintiffs to make the required disclaimer or face dismissal of their takings claims for lack of jurisdiction.

> **D.     The Conservator is Not the United States for Purposes of a Takings Claim**

Plaintiffs' takings claim against the Conservator also fails because the Conservator is not the United States for purposes of a takings claim. Plaintiffs rely on *Auction Co. of America v. FDIC*, 132 F.3d 746, 749-50 (D.C. Cir. 1997), which held that the "FDIC as Receiver" is the United States for purposes of the general federal statute of limitations. But *Auction Co.* does not address whether federal conservators and receivers are the United States for takings purposes, and this Court has held that FHFA as Conservator is *not* the United States for purposes of constitutional claims. *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 94-95 (D.D.C. 2012) (citing *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995)); *see also United States v. Beszborn*,

---

[32]     *See Zumerling v. Devine*, 769 F.2d 745, 748 (Fed. Cir. 1985) ("the amount claimed must not be in excess of $10,000 *including attorney's fees*." (emphasis added)).

21 F.3d 62, 68 (5th Cir. 1994) ("In its capacity as receiver, the RTC stands as a private, non-governmental entity, and is not the Government for purpose of the Double Jeopardy Clause.").[33]

## VII.    FHFA's Decision to Enter into the Third Amendment Was Not Arbitrary or Capricious

As explained above (*see supra* Section I), Section 4617(f) bars judicial review of all Plaintiffs' claims seeking declaratory or equitable relief, and therefore the APA does not apply. *See* 5 U.S.C. § 701(a)(1) (APA review unavailable where other "statutes preclude judicial review"); *Heckler*, 470 U.S. at 828.  Plaintiffs' APA claims should be dismissed on this basis alone.  In all events, even if the APA applied, the FHFA Defendants would be entitled to summary judgment on Plaintiffs' arbitrary and capricious claims.

As an initial matter, Plaintiffs' assertion—without citation to any authority—that "FHFA's refusal to produce the 'whole record' justifies vacatur" of the Third Amendment"  (SJ Memo. at 50) should be rejected out of hand.  Contrary to Plaintiffs' speculative arguments (SJ Memo. at 48-49), FHFA's Document Compilation is more than adequate to satisfy any hypothetical record production requirements FHFA as Conservator may be alleged to have under the APA..  As explained in FHFA's opposition to the Fairholme Plaintiffs' Discovery Motion, the Document Compilation reflects the considerations that FHFA as Conservator took into account in executing the Third Amendment, including "the materials [which] were before it" and "were directly or indirectly considered," and is more than adequate to satisfy any obligations under the APA.  Opp. to Discovery Mot. 29 (Doc. # 34, No. 1:13-cv-1053) (quoting *Pac. Shores*

---

[33]    Also, as FHFA Defendants have explained, *Auction Co.* is distinguishable because the FDIC was acting as a "generic receiver," not a receiver that stepped into the shoes of any particular entity.  FHFA's Mot. Dismiss at 59 n.35.  Although Plaintiffs argue that *Auction Co.* did not expressly rely on this fact to interpret the Tucker Act, this distinction affects whether the FDIC was acting to "carry out [the government's] purposes" or those of a particular entity.  *Auction Co.*, 132 F.3d at 749 (internal quotation marks omitted) (alteration in original).

*Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006)).

Plaintiffs have failed to identify any allegedly excluded items with particularity, or to present

concrete evidence that materials before FHFA decision makers were omitted, and thus have not

satisfied their burden to rebut the "strong presumption of regularity" to which FHFA's

Document Compilation is entitled. *Id.* at 29-30 (quoting *Pac Shores*, 448 F. Supp. 2d at 5, and

*Franks v. Salazar*, 751 F. Supp. 2d 62, 67, 73-74 (D.D.C. 2010)).

Moreover, Plaintiffs' contention that the Document Compilation and Ugoletti Declaration

it contains are "post hoc rationalizations" insufficient to permit adequate review is incorrect. *See*

SJ Memo. at 48-50. Declarations by agency decision-makers are permissible because "the '*post*

*hoc*' rationalization rule' is not a time barrier which freezes an agency's exercise of its judgment

after an initial decision has been made" to "bar [the agency] from further articulation of its

reasoning." *Menkes v. U.S. Dept. of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011)

(considering post-litigation agency declaration). Where—as here—a "proper decision maker"

explains why the agency acted, there is no "impermissible *post hoc* rationalization." *Id.*

The Document Compilation shows that the Conservator made a reasonable and

considered decision to execute the Third Amendment to avoid continued erosion of the Treasury

commitment, assuage concerns of market participants, and promote the best interests of the

Enterprises and the Agency. Further, FHFA reasonably believed that, in light of the precarious

position of the Enterprises, the value of the Periodic Commitment Fee was incalculably large.

FHFA0005 (Decl. ¶ 9). Accordingly, FHFA understood that the Third Amendment did not

change the underlying economics between Treasury and the Enterprises—the sum of the fixed

dividend plus the Periodic Commitment Fee was the economic equivalent of the variable

dividend. *Id.* ¶ 19.

Plaintiffs assert a variety of reasons why they think the value of the Periodic Commitment Fee must be something less than what FHFA believed it to be.  *See* SJ Memo. at 70-72.  But Plaintiffs concede—as they must—that the Enterprises' obligation to pay the Periodic Commitment Fee arose from a contract between Treasury and the Conservator—namely, the PSPAs.  And, under the terms of that contract, the amount of the Fee was "designed to be mutually negotiated between Treasury and FHFA, subject to *their* 'reasonable discretion.'" SJ Memo. at 70-71 (emphasis added).  Because Plaintiffs are neither parties to nor third party beneficiaries of the PSPAs (*see* PSPA § 6.1), Plaintiffs lack standing to argue—let alone enforce—their own interpretation of the PSPAs.  *See Deutsche Bank Nat. Trust Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013).  For example, in *Deutsche Bank*, the D.C. Circuit held that third parties lacked standing to "to be heard on the specific question of contract interpretation," where the contract at issue was between the FDIC as receiver and another party, even where the third party stood to benefit from (or be harmed by) the interpretation.  *Id.*[34]  Here, as strangers to the contract, Plaintiffs lack standing to assert their own interpretation of the PSPAs as to the value of the Periodic Commitment Fee, particularly where Plaintiffs' interpretation is at odds with the contracting parties' interpretation.  *See* FHFA0005 (Decl. ¶ 9); Treasury Mot. Dismiss at 15.

In all events, Plaintiffs' arguments as to the value of the Periodic Commitment Fee fail to acknowledge that Treasury's funding provided the essential lifeline to the Enterprises at a time

---

[34]   *See also JPMorgan Chase Bank, N.A. v. FDIC*, Nos. 12-2094, 13-1172, at 11 (6th Cir. Apr. 24, 2014) (holding third party "lacks prudential standing to challenge the FDIC[as receiver]'s and Chase's understanding of their own contract"); *Hillside Metro Assocs., LLC v. JPMorgan Chase Bank, N.A.*, No. 12-3302-CV, --- F.3d ---, 2014 WL 401303, at *4 (2d Cir. Feb. 4, 2014) (holding plaintiff lacked standing to assert breach of contract claim that depended upon plaintiffs' interpretation of a different contract between receiver and another party); *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 933 (11th Cir.2013) (same); *GECCMC 2005–C1 Plummer St. Office L.P. v. JPMorgan Chase Bank, N.A.*, 671 F.3d 1027, 1033-34 (9th Cir. 2012) (same).

when there were no other sources of capital in the markets.  The Treasury commitment thus saved the Enterprises from mandatory receivership and preserved the market's confidence in the Enterprises' ability to honor their obligations to MBS and debt holders, which was one of the fundamental purposes of the conservatorships and the PSPAs.  Considering their import to the housing market and to the national economy, that the Conservator deemed the value of preserving the Enterprises' creditworthiness as "incalculably large" was certainly reasonable, and far from arbitrary and capricious.

As a matter of law, the Court need not—and should not—judge the wisdom of the Conservator's actions.  Nevertheless, Plaintiffs' theory about the relative merits of paying dividends at 10% or accruing them at 12% ignores real concerns the Conservator had.  Plaintiffs argue that, instead of entering into the Third Amendment and agreeing to a variable net worth dividend, the Conservator should have directed the Enterprises to accrue the Treasury dividend at a 12% rate.  But Plaintiffs fail to recognize and acknowledge the significant concerns FHFA had that accruing 12% dividend payments would have been more expensive than making the 10% dividend payments, and the severe negative impact this could have had on market confidence.

The Enterprises were "required" by the Treasury stock certificates "to pay [10%] dividends in cash in a timely manner" to Treasury.  Treasury Stock Certificate § 2(c) (AR0033).  If the Enterprises "failed to pay dividends in cash," then the Enterprises would have been required to accrue dividends at a rate of 12% by adding the accrued amounts to Treasury's outstanding liquidation preference.  *Id.*; *see also id.* § 8(b)(iii) (AR0036).  Like the circularity problem that preceded the Third Amendment, accruing dividends at this higher rate would have had a compounding effect, increasing the size of the Enterprises' next dividend payment based on the size of the outstanding liquidation preference.

The federal backstop provided by the Treasury commitment was intended, in part, as a message to investors and other market participants that the Enterprises would be able to meet their obligations.  *See* FHFA0253 (FHFA Mortgage Market Note (Dec. 5, 2008)); FHFA0103 (FHFA Dir. Lockhart, Statement to Congress (Sept. 25, 2008)).  Failing to meet the 10% dividend obligation risked undermining this message and fostering further market concerns about the creditworthiness of the Enterprises.  Indeed, in the months before the Third Amendment, market confidence in the Enterprises already was beginning to wane due to the perceived inadequacy of the Treasury commitment in light of the annual 10% dividend obligation.  Given these circumstances, it was reasonable for FHFA to believe that failing to meet the 10% dividend obligation risked causing holders of Enterprise debt and MBS to fear that the Enterprises likewise would fail to meet their obligations with respect to these investors too, further eroding market confidence in the Enterprises.

Plaintiffs also criticize the Conservator for being too conservative in its forecasts.  *See* SJ Memo. at 75; Suppl. Opp. at 9.  A fiscally responsible conservator—assigned the momentous task of managing the Enterprises during an unprecedented economic crisis—must consider potential risk to the housing market and national economy.  The Conservator should not, as Plaintiffs suggest, overvalue non-recurring events such as the recognition of deferred tax assets, the release of loan loss reserves, or proceeds from legal settlements, or assume the rosiest economic scenario.

Indeed, Plaintiffs' own submissions belie the exuberant forecasts they would have had the Conservator reply on:

> The sustainability of the nascent U.S. home price recovery remains uncertain, and we believe GSE results could be volatile over coming quarters. While both agencies are now funding preferred dividends to the Treasury . . . both GSEs will be limited in their

> ability to build reserves to consistently fund dividends if solid
> profitability is not sustained. Fannie and Freddie reported net
> worth of $2.8 billion and $1.1 billion in the second quarter,
> respectively, which is still *de minimis* in the context of the overall
> balance sheets.

Fitch, *Improved GSE Results May Ease Push for Immediate Reform* (Aug. 13, 2012), *available at* http://in.reuters.com/article/2012/08/13/idINWNA330420120813 (cited at SJ Memo. at 15).[35]

"The presumption of the correctness of an agency's determination 'is even stronger where Congress has charged an agency with complex analytical responsibilities and the duty to make predictive judgments.'" *James Madison LTD. By Hecht v. Ludwig*, 868 F. Supp. 3, 8 (1994) (quoting *Franklin Savs. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1147-48 (10th Cir.1991)); *see also Domestic Sec., Inc. v. SEC*, 333 F.3d 239, 248 (D.C. Cir. 2003) ("agency determinations based upon highly complex and technical matters are entitled to great deference") (quotation marks and brackets omitted). Where, as here, a case involves financial analysis that "is not based solely on an analysis of . . . past performance but a prediction of . . . future performance as well," a court should give a substantial amount of deference to the reviewing agency. *Dorris v. FDIC*, No. Civ. 93-1659, 1994 WL 774535, at *5 (D.D.C. Oct. 27, 1994) (observing that "[c]ourts have found that deference especially should be paid to the agency 'in the case of technical expertise and informed predictions about the likely course of future events.'" (quoting *Sunshine State Bank v. FDIC*, 783 F.2d 1580, 1582 (11th Cir.1986)); *see also*

---

[35]   *See also* Margaret Chadbourn, *Freddie Mac Profit Moves U.S. Housing Bailout Further into Black*, Reuters, Feb. 27, 2014, attached as Ex. C to Zagar's Decl. in Support of Class Opp. (Doc. # 33-1 (No. 13-mc-01288)) (" 'NOT SUSTAINABLE' 'The year and quarter were extremely strong,' Donald Layton, Freddie Mac's chief executive officer, said on a call with reporters. 'These levels of income are not sustainable,' he cautioned.  [Freddie Mac] said it is seeing a moderation in home price growth that will impact future earnings."); FHFA 2012 Annual Report to Congress, at iv (Jun. 13, 2013) ("The conservatorships of the Enterprises, combined with Treasury's financial support, has stabilized the Enterprises but not restored them to a sound financial condition.  The Enterprises remain exposed to credit, counterparty, and operational risks."), *available at* http://www.fhfa.gov/webfiles/25320/FHFA2012_AnnualReport.pdf (cited at SJ Memo. at 57).

*GTS 900F, LLC v. FDIC*, No. 11-cv-06607, 2012 WL 2086305, at \*8 (C.D. Cal. June 1, 2012) ("Even if the FDIC's assumption regarding the housing recovery turns out to be incorrect, that does not render its Determination arbitrary and capricious.").

## CONCLUSION

In sum, Congress gave the Conservator the discretion to make decisions concerning the matters addressed herein.  This Court should honor that legislative mandate, as nothing the Conservator did in this matter was outside its authority; to the contrary, the decisions were strictly within its legislated authority.  For the foregoing reasons, as well as the reasons stated in the motions to dismiss or, in the alternative, for summary judgment, the FHFA Defendants and the Enterprises respectfully request that the Court grant the motion and dismiss Plaintiffs' complaints with prejudice.

Dated:  May 2, 2014                      Respectfully submitted,


                                         /s/ Howard N. Cayne
                                         Howard N. Cayne (D.C. Bar # 331306)
                                         Asim Varma (D.C. Bar # 426364)
                                         David B. Bergman (D.C. Bar # 435392)
                                         ARNOLD & PORTER LLP
                                         555 12th Street, N.W.
                                         Washington, D.C.  20004
                                         Telephone: (202) 942-5000
                                         Facsimile: (202) 942-5999
                                         Howard.Cayne@aporter.com
                                         Asim.Varma@aporter.com
                                         David.Bergman@aporter.com

                                         *Attorneys for Defendants Federal Housing
                                         Finance Agency and Director Melvin L.
                                         Watt*


s/ Michael Joseph Ciatti                 /s/ Paul D. Clement
Michael Joseph Ciatti (D.C. Bar # 467177)   Paul D. Clement (D.C. Bar # 433215)
mciatti@kslaw.com                        pclement@bancroftpllc.com
Graciela Maria Rodriguez                 BANCROFT PLLC
(D.C. Bar # 438955)                      1919 M Street, N.W., Suite 470
gmrodriguez@kslaw.com                    Washington, D.C.  20036
KING & SPALDING, LLP                     Telephone:  202.234.0090
1700 Pennsylvania Avenue, N.W.           Facsimile:  202.234.2806
Suite 200
Washington, D.C.  20006                  *Attorney for the Federal National Mortgage
Telephone:  202.626.5508                 Association*
Facsimile:  202.626.3737

*Attorneys for the Federal Home Loan
Mortgage Corporation*