# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Misc. Action No. 13-mc-1288 (RCL)** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | **DERIVATIVE COMPLAINT** |

# TABLE OF CONTENTS

**Page(s)**

NATURE AND SUMMARY OF THE ACTION .......................................................................... 1

JURISDICTION AND VENUE ................................................................................................... 6

THE PARTIES ............................................................................................................................. 7

FACTS ......................................................................................................................................... 8

I.      BACKGROUND OF FREDDIE MAC .......................................................................... 8

II.     FHFA PLACES THE COMPANIES INTO RECEIVERSHIP AND
        CAUSES THEM TO INITIATE MASSIVE WRITE-DOWNS ...................................... 9

III.    FREDDIE MAC RETURNS TO PROFITABILITY ...................................................... 14

IV.     THE THIRD AMENDMENT BARS FREDDIE MAC FROM BENEFITING
        FROM THE COMPANY'S RETURN TO PROFITABILITY........................................ 16

V.      THE THIRD AMENDMENT HARMS FREDDIE MAC BY PREVENTING
        IT FROM REBUILDING CAPITAL ............................................................................. 19

VI.     BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY
        VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FREDDIE MAC..................... 21

PLAINTIFFS HAVE SATISFIED THE DEMAND REQUIREMENT ...................................... 25

CAUSES OF ACTION ............................................................................................................... 27

BREACH OF FIDUCIARY DUTY (AGAINST TREASURY AND FHFA) ............................. 27

PRAYER FOR RELIEF ............................................................................................................. 28

Plaintiffs American European Insurance Company ("AEIC"), Joseph Cacciapalle ("Cacciapalle") and Michelle M. Miller ("Miller" and collectively with AEIC and Cacciapalle, "Plaintiffs"), by the undersigned attorneys, submit this Derivative Complaint against defendants United States Department of the Treasury ("Treasury") and Federal Housing Finance Agency ("FHFA," and together with Treasury, "Defendants").

## NATURE AND SUMMARY OF THE ACTION

1.      This is a derivative action brought by Plaintiffs on behalf of the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"), seeking damages for breach of fiduciary duty in connection with the Third Amendment to the Amended and Restated Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment"), between Defendant Treasury and Defendant FHFA in its capacity as conservator for Freddie Mac.

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, the investigation of Plaintiffs' counsel.

3.      Freddie Mac and the Federal National Mortgage Association ("Fannie Mae" or "Fannie") are government sponsored enterprises chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages. While they are commonly referred to as "Government Sponsored Enterprises" or "GSEs," Freddie Mac and Fannie Mae (together, the "Companies") are not government agencies. Instead, as private, for-profit corporations, the Companies have shareholders, directors, and officers like other non-governmental corporations, and their debt and equity securities have for years been privately owned and publicly traded, including by public pension funds, mutual funds, community banks, insurance companies, and myriad individual investors.

4.      Although Freddie Mac was chartered by the U.S. Congress, the federal government did not guarantee, directly or indirectly, its securities or other obligations.  Freddie Mac was a stockholder-owned corporation, and, before the 2008 financial crisis, its business was self-sustaining and funded exclusively with private capital.

5.      To raise capital Freddie Mac issued several publicly traded securities including common stock and numerous classes of non-cumulative preferred stock ("Preferred Stock").  The Preferred Stock, which had the essential characteristics of a fixed income security, was long perceived to be a conservative investment paying modest but reliable rates of return and carrying high credit ratings.  The common stock, in turn, participated in the earnings of Freddie Mac for many years.  By 2008, Freddie Mac was one of the largest privately owned financial institutions in the world, and had been consistently profitable for decades.

6.      In July 2008, in response to the crisis in the residential housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating FHFA to oversee the operations of Freddie Mac and Fannie Mae.  Congress empowered FHFA to serve as Conservator to the Companies when necessary to preserve their financial health.  When acting as Conservator, FHFA is obligated to manage the Companies with the goal of putting them in a sound and solvent financial condition while preserving and conserving their assets. 12 U.S.C. § 4617(b)(2)(D).  Congress also authorized Treasury to provide limited financial assistance to the Companies by purchasing securities issued by the Companies if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

7.      Just two months after HERA's enactment, on September 6, 2008, FHFA placed Freddie Mac and Fannie Mae into temporary conservatorship.   The objective of the

conservatorship was to stabilize the institutions so they could return to their normal business operations. Indeed, by statute, the purpose of appointing the conservator was "to preserve and conserve the [Companies'] assets and property and to put the [Companies] in a sound and solvent condition." HERA expressly grants FHFA, as Conservator, the power to take such action as may be necessary to put the Companies in a "sound and solvent condition" and that is appropriate to "carry on the business of the Companies" and "preserve and conserve the[ir] assets and property." FHFA itself vowed, at the time the Companies were placed into conservancy, that it was committed to operating the Companies "until they are stabilized" and that the conservatorship would be terminated upon successful completion of its plan to restore the Companies to "a safe and solvent condition." The public was entitled to rely on these official statements of the purposes of the conservatorship, and public trading in the Companies' stock was allowed to, and did, continue.

8. In connection with the appointment of FHFA as Conservator, Freddie Mac and Fannie Mae each entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with Treasury. Under these contracts, Treasury agreed to invest in a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Stock"), when and as necessary for the Companies to maintain a positive net worth. In return for its commitment to purchase Government Stock, Treasury received $1 billion of Government Stock in each company as a commitment fee and warrants to acquire 79.9% of the common stock of the Companies at a nominal price. The Government Stock ranked senior in priority to all other series of Freddie Mac and Fannie Mae Preferred Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference, *i.e.*, the sum of the $1 billion commitment fee plus the total amount of Government Stock outstanding. The warrants to

acquire a 79.9% ownership stake in the Companies gave Treasury a significant "long" position – over and above the substantial 10% coupon on its Government Stock – which, if exercised, could result in enormous profits to the government in the event the Companies returned to profitability.

9.      Shortly after being placed into conservatorship, Freddie Mac, under the control of FHFA, wrote down its assets significantly.  FHFA caused Freddie Mac to declare large non-cash losses in the value of deferred tax assets, and to take out large loss reserves on its balance sheets. For example, in 2008, Freddie Mac wrote down the valuation of its deferred tax assets by $40.2 billion, and made a $16.4 billion provision for credit losses.  To fill the holes in Freddie Mac's balance sheet created by these significant write-downs, Treasury immediately began purchasing Government Stock.  By mid-2012, Freddie Mac had made aggregate Treasury draws of $71.3 billion, and had paid aggregate cash dividends to Treasury of $20.1 billion.

10.      Treasury made its investment in Freddie Mac and Fannie Mae pursuant to temporary authority established under Section 1117 of HERA.  That authority expired on December 31, 2009.  Before the authority expired, Treasury and FHFA made two substantive amendments to the PSPAs (neither of which are challenged in this lawsuit).

11.      By the second quarter of 2012, Freddie Mac had returned to profitability and was solvent.  Freddie Mac made a quarterly profit of $2.8 billion in the second quarter of 2012, or approximately 150% of the $1.8 billion quarterly dividend payable to Treasury on its Government Stock.  Consequently, by no later than the second quarter of 2012, Treasury was well-positioned to reap the fruits of its investment in Freddie Mac.  Treasury was entitled to a substantial 10% coupon on its Government Stock, and to 79.9% of Freddie Mac's profits going forward, subject to Freddie Mac's fulfillment of its contractual obligations to the holders of its Preferred Stock.  In addition, Treasury, through FHFA as Conservator, could require Freddie

Mac to begin repaying the principal of Treasury's investment by redeeming Treasury's Government Stock.

12.     Instead, Treasury insisted on all of Freddie Mac's profits in perpetuity. Accordingly, rather than exercising its right to purchase up to 79.9% of Freddie Mac's common stock or taking steps to enable Freddie Mac to redeem the Government Stock, FHFA, as Conservator, and Treasury acted together to ensure that Treasury would be the sole beneficiary, to the exclusion of all other stockholders, of Freddie Mac as an operating enterprise.

13.     Specifically, FHFA and Treasury announced the "Third Amendment" to the PSPAs.  The Third Amendment had devastating consequences for holders of the Preferred Stock and common stock.  In place of the 10% coupon due on Treasury's Government Stock, the Third Amendment changed the PSPAs to entitle Treasury to a dividend of 100% of all current and future profits of the Companies.  As a result of this purported "amendment" to the terms of the Companies' PSPAs with Treasury, Freddie Mac would be left with no funds to redeem Treasury's Government Stock or rebuild its capital.

14.     Freddie Mac did not receive any meaningful value in return for the Third Amendment.  As noted above, under the Third Amendment, the amount of cash Freddie Mac transfers to Treasury as a dividend does not reduce the amount of the Government Stock outstanding.   Furthermore, Freddie Mac has not been permitted to redeem Treasury's Government Stock.  Thus, regardless of how much money Freddie Mac sends to Treasury, all of the Government Stock will remain outstanding, and Treasury will continue to take substantially all of Freddie Mac's net worth, as long as it remains in business. The Third Amendment and its "Net Worth Sweep" thus enriches the federal government through a self-dealing arrangement.

Treasury and FHFA effectively nationalized one of the nation's largest financial institutions after it returned to profitability and while FHFA was supposed to be serving as its Conservator.

15.     Each of the Companies has now repaid Treasury for its investment.  As of June 2014, Freddie Mac has paid Treasury total cash dividends of $86.3 billion, exceeding its cumulative cash draws of $71.3 billion, and Fannie Mae had paid total dividends of $126.8 billion in comparison to $116.1 billion in draw requests.  However, Treasury and FHFA propose that these dividend payments do not represent a return on capital invested, and do not account for them as a repayment of funds that Treasury advanced to Freddie Mac.  Therefore, the liquidation preference of Treasury's Government Stock has not been reduced and stands at approximately $72.3 billion – *i.e.*, the same amount as of the time of the Third Amendment.

16.     Treasury, as *de facto* controlling stockholder of Freddie Mac, stood on both sides of the decision to implement the Third Amendment.  Although Treasury has gained, and will gain, enormous benefits from the Third Amendment, Freddie Mac received nothing in return.  As such, the Third Amendment was, and is, waste and not entirely fair to Freddie Mac, and constituted a breach of the fiduciary duties owed to Freddie Mac by FHFA and Treasury, as Freddie Mac's controlling stockholder.  Furthermore, the Third Amendment was inconsistent and in conflict with FHFA's statutory responsibilities, as Conservator to Freddie Mac, to put Freddie Mac back into "a sound and solvent condition" and to "conserve its assets and property."  Accordingly, this action seeks, derivatively on behalf of Freddie Mac, an award of compensatory damages and disgorgement for such breach.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452(c), 1723a(a) and 4617.  In addition, this Court has subject matter jurisdiction under 28

U.S.C. § 1332(d)(2)(A) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs.

18. Venue is proper in this district under 28 U.S.C. §§ 1391(e)(1)(A) and (B), because this is an action against agencies of the United States; one or more of the Defendants reside in this district; and a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. In addition, one or more of the Defendants maintains executive offices in this district, and Defendants have engaged in regular activities and conducted business here, which have had an effect in this district. Moreover, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## **THE PARTIES**

19. Plaintiff AEIC is a New Jersey corporation with offices in New York, New York, and is a holder of Freddie Mac Variable Rate Series M Preferred Stock. AEIC purchased Freddie Mac Preferred Stock in January 2001, and has been a holder of Freddie Mac Preferred Stock continuously since then.

20. Plaintiff Joseph Cacciapalle is a citizen of the state of New Jersey, and is a holder of Freddie Mac 8.375% Series Z Preferred Stock. Mr. Cacciapalle purchased Freddie Mac Preferred Stock in February 2008, and has been a holder of Freddie Mac Preferred Stock continuously since then.

21. Plaintiff Michelle M. Miller is a citizen of the state of Missouri, and is a holder of Freddie Mac common stock. Ms. Miller purchased Freddie Mac common stock in October 2009, and has been a holder of Freddie Mac common stock continuously since then.

22. Defendant FHFA, as Conservator of Freddie Mac, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street,

S.W., Washington, D.C. 20024, and therefore is a citizen of the District of Columbia. According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of Fannie Mae and Freddie Mac . . . with responsibility of overseeing management and governance of the Enterprises."

23.    Defendant Treasury is an executive agency of the United States government with its headquarters located at 1500 Pennsylvania Avenue, N.W., Washington, D.C. 20220, and therefore is a citizen of the District of Columbia. The Department of the Treasury owns the Government Stock, and is a signatory to certain agreements central to this Complaint.

24.    Nominal defendant Freddie Mac is a federally chartered Government Sponsored Enterprise with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102, and is therefore a citizen of Virginia.

## FACTS

### I.    BACKGROUND OF FREDDIE MAC

25.    Freddie Mac is a stockholder-owned corporation organized and existing under the Federal Home Loan Mortgage Corporation Act. Freddie Mac was created as an alternative to Fannie Mae to make the secondary mortgage market more competitive and efficient. Freddie Mac is a Government Sponsored Enterprise, which is a private corporation that Congress created to increase mortgage market liquidity. It seeks to accomplish this by purchasing mortgages that private banks originate and bundling them into mortgage-related securities to be sold to investors. Through the creation of this secondary mortgage market, Freddie Mac increased liquidity for private banks, which enables it to make additional loans to individuals for home purchases.

26.    Notwithstanding their government charters, private shareholders owned Freddie Mac and Fannie Mae until 2007. Before 2007, the Companies were consistently profitable. In

fact, prior to that time, Freddie Mac had never experienced an annual loss, according to the Companies' regulator.

## II. FHFA PLACES THE COMPANIES INTO RECEIVERSHIP AND CAUSES THEM TO INITIATE MASSIVE WRITE-DOWNS

27.     Beginning in 2006, an industry-wide financial crisis and nationwide declines in the housing market caused the Companies to suffer losses.  As the Office of Federal Housing Enterprise Oversight (the "OFHEO"), which was Freddie Mac and Fannie Mae's regulator at that time, stated in its 2008 annual report to Congress:

> In 2007, a confluence of factors – turmoil in the housing and mortgage markets, loss of liquidity in the credit marks, and volatility in the capital markets adversely impacted the financial performance of financial institutions . . . with significant exposure to mortgage markets.  The Enterprises' financial results suffered along with the results of other financial institutions.  Both Enterprises were unprofitable in 2007 – Freddie Mac's first annual net loss ever, and Fannie Mae's first since 1985.

28.     Despite these losses, the OFHEO continued to assure the marketplace of the Companies' soundness.  For example, in a March 19, 2008 statement, OFHEO director James Lockhart said that, "Fannie Mae and Freddie Mac have played a very important and beneficial role in the mortgage markets over the last year.  Let me be clear – both companies have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves.  We believe they can play an even more positive role in providing the stability and liquidity the markets need right now."  On that date, Lockhart also said that the idea of a bailout is "nonsense in my mind.  The companies are safe and sound, and they will continue to be safe and sound." *As Crisis Grew, A Few Options Shrank To One*, N.Y. Times, Sept. 7, 2008.  Similarly, on June 9, 2008, OFHEO published a news release stating that it classified Freddie Mac and Fannie Mae as "adequately capitalized as of March 31, 2008."

29.     In July 2008, Congress enacted HERA, establishing FHFA to replace the OFHEO as the Companies' regulator, and granting Treasury temporary authority to assist the Companies through the purchase of securities.  HERA provided a specific list of enumerated circumstances under which FHFA would have the power to place the Companies into conservatorship or receivership.  HERA was passed not because Freddie Mac or Fannie Mae was deemed to be insolvent or operating unsafely at that time, but rather, to provide the struggling mortgage and financial markets with added confidence.  As Treasury Secretary Henry Paulson testified to a Congressional panel, "If you've got a bazooka, and people know you've got it, you may not have to take it out."  *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008. Indeed, on July 10, 2008, Paulson and Federal Reserve Chairman Ben Bernanke both testified before the House Financial Services committee that Freddie Mac and Fannie Mae were adequately capitalized, and on July 10, 2008, the OFHEO issued a statement that, as of March 31, 2008, Freddie Mac and Fannie Mae were "holding capital well in excess of the OFHEO-directed requirement[.]"

30.     Similarly, in support of HERA, Senator Johnny Isakson (R-GA) commented that:

> The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans.  It is an infusion of confidence the financial markets need.  Fannie and Freddie suffer by perception from the difficulties of our mortgage market.  If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing the problem.  That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae.  They have $50 billion in capital, when the requirement is to have $15 billion, so they are sound.  But the financial markets, because of the collapse of the mortgage market, have gotten worse.

31.     Nonetheless, on September 6, 2008, FHFA placed the Companies into conservatorship and, in a press release issued the next day, said that, "as the conservator, FHFA will assume the power of the Board and management."  As the Conservator for the Companies,

FHFA became responsible for "preserv[ing] and conserv[ing] [their] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).  At the time, FHFA stated that the goal of this action was "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market."  According to FHFA's press release, the conservatorship was "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized."  FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship.  At present, there is no exact time frame that can be given as to when this conservatorship may end."

32.    The decision to place the Companies into conservatorship was driven not by analysis of the HERA statutory factors, but by broader macroeconomic and political concerns and the need to provide support for the struggling mortgage market.  As *The New York Times* stated, the administration sought "to shrink drastically [Freddie Mac and Fannie Mae's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades."  *In Rescue To Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES, Sept. 7, 2008.  "In the end, [Secretary of the Treasury] Mr. Paulson's decision seems to have been a philosophical one, rather than one forced by imminent crisis.  Of course, for stagecraft purposes, it was played as impending disaster."  *Paulson's Itchy Finger, on the Trigger of a Bazooka*, N.Y. TIMES, Sept. 9, 2008.

33.     Treasury was authorized under HERA to strengthen the Companies' balance sheets by purchasing their securities, within set time frames and consistent with prescribed statutory requirements.   Beginning with HERA's enactment in 2008 until the end of 2009, Congress authorized Treasury to "purchase any obligations and other securities issued by the [Companies] . . . on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine." 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A).   To exercise this authority, the Secretary was required to determine that purchasing the Companies' securities was "necessary to . . . provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).   The Secretary was required to consider several factors in making these determinations:

> (i) [t]he need for preferences or priorities regarding payments to the Government; (ii) [l]imits on maturity or disposition of obligations or securities to be purchased; (iii) [t]he [Companies'] plan[s] for the orderly resumption of private market funding or capital market access; (iv) [t]he probability of the [Companies] fulfilling the terms of any such obligation or other security, including repayment; (v) [t]he need to maintain the [Companies'] status as private shareholder-owned compan[ies]; [and] (vi) Restrictions on the use of [the Companies'] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

*Id.* §§ 1455(l)(1)(C), 1719(g)(1)(C).

34.     Treasury used its temporary authority under HERA to enter into the PSPAs with FHFA, which acted on behalf of both Companies.   The PSPAs are identical in all material respects.   Under the PSPAs, Treasury purchased one million shares of Government Stock from each Company in exchange for allowing the Companies to draw up to $100 billion each from Treasury.   The Government Stock has a liquidation preference equal to $1 billion plus the sum of all draws by each company against Treasury's funding commitment.   The Government Stock is

also entitled to a cumulative dividend equal to 10% of the outstanding liquidation preference.  If a company pays a dividend, the PSPAs require Treasury to be paid dividends declared in full, but not paid, for prior dividend periods, before any privately held securities may receive a dividend. Indeed, the PSPAs explicitly prohibit any shareholder other than Treasury from being paid any dividend without Treasury's consent.  Further, if the Companies liquidate, no shareholder can recover anything before the Treasury recovers the full liquidation value of its shares.  Treasury also has the right under the PSPAs to purchase up to 79.9% of the Companies' common stock at a nominal price.

35.     At the end of 2009, Treasury's statutory authority to purchase the Companies' securities expired. To enable Treasury to provide the Companies with liquidity beyond 2009, Treasury and FHFA amended the PSPAs twice.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per company from $100 billion per company.  Then, on December 24, 2009, just before the expiration of Treasury's temporary authority under HERA, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

36.     After FHFA took control of the Companies, it decided that it did not expect them to be profitable, and that they would likely incur large losses in the coming years.  FHFA therefore directed the Companies to book substantial loss reserves – recording loan losses before they were actually incurred – and required the Companies to eliminate from their balance sheets the value of non-cash deferred tax assets that would only be of use if the Companies became profitable.

37.     These write-downs and accounting decisions directed by FHFA led to a circular payment obligation requiring the Companies to draw down Treasury's funding commitment, which, in turn, required the Companies to pay increased dividends to Treasury.  Under the initial PSPAs, Treasury committed to make quarterly payments to the Companies in order to maintain a zero net worth.  Each quarter, FHFA looked to the Companies' financial statements to determine if their liabilities exceeded their assets.  If so, FHFA would request that Treasury draw down the Companies' funding commitment and provide funds equal to the net worth deficit.  Because of the impact of the accounting adjustments directed by FHFA, the Companies had less capital, and therefore needed capital from Treasury both to operate and to pay the quarterly dividends due under the PSPAs.  The Companies thus were required to draw additional funds from Treasury's funding commitment, thereby increasing the amount of Treasury's aggregate liquidation preference, and thus the amount of dividends payable to Treasury.  Between 2008 and 2012, under the PSPAs, as amended, Treasury provided approximately $71.3 billion to Freddie Mac.

38.     Throughout this time, the Companies continued to be managed in conservatorship by FHFA.  HERA empowered FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA always has maintained that its relationship with the Companies is that of Conservator rather than liquidator. *See* FHFA News Release, *A Strategic Plan For Enterprise Conservatorships: The Next Chapter In A Story That Needs An Ending,* at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by Congress, FHFA must continue to look to the existing statutory provisions that guide ***the conservatorships***.") (emphasis added).

## III.   FREDDIE MAC RETURNS TO PROFITABILITY

39.     In 2012, Freddie Mac returned to profitability, recording comprehensive income of $4.6 billion for the six-month period ending June 30, 2012.  Its Treasury draw in the first

quarter of the year was only $19 million, and since Freddie Mac's net worth was positive during the second quarter, there was no need for it to draw upon additional Treasury funding for that quarter.  Moreover, Freddie Mac's dividend payments to Treasury during the first six months of the year were only $3.6 billion.  Thus, Freddie Mac had approximately one billion dollars with which to begin rebuilding its capital base, repaying the government for its financial support, or providing a financial return to its private investors.  Yet instead of allowing any of these options to proceed, Treasury and FHFA instead implemented the Third Amendment to ensure that Freddie Mac could not benefit from its recovery.

40.    The return of Freddie Mac to profitability in 2012 led to a substantial increase in the trading prices of its Preferred Stock.  The price of each series of Freddie Mac Preferred Stock increased an average of 86% from May 1, 2012, to August 17, 2012.  The Series X Preferred Stock, for example, increased by 84% during that time period, but suffered a material decline after the Third Amendment was announced:



### IV.    THE THIRD AMENDMENT BARS FREDDIE MAC FROM BENEFITING FROM THE COMPANY'S RETURN TO PROFITABILITY

41.    As noted above, FHFA agreed to sweep all of Freddie Mac's profits to Treasury exactly when it had returned to profitability.    At a dividend rate of 10%, Treasury's approximately $72.3 billion in outstanding Government Stock earns annual dividends of some $7.2 billion, payable in quarterly installments of approximately $1.8 billion.  Thus, in any quarter in which Freddie Mac's combined profits exceed $1.8 billion (or more precisely, any quarter in which Freddie Mac's profits exceed the dividend owed on its Government Stock), that value would inure to the benefit of the company *but for the Third Amendment*.    As FORTUNE magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement?  By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded.  If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone.  That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players.  Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie.  The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, FORTUNE, July 8, 2013.

42.    In an August 17, 2012 press release announcing the modification of the PSPAs, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market."  It called the amendment a full income sweep of "every dollar of profit that [the] firm earns going forward," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Freddie Mac and Fannie Mae] will be wound

down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." This language was in stark contrast to their earlier representations that they sought only to "stabilize" the Companies and return them "to normal business operations" (as well as the February 2, 2010 statement of Edward DeMarco, Acting Director of FHFA, that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters.").

43.     The "Net Worth Sweep" is especially significant because Freddie Mac expects that it will be consistently profitable in the future. Freddie Mac had certain tax credits that it could only use if it generated taxable profits. When the company did not expect to be profitable, it maintained a valuation allowance against its net deferred tax assets. In the third quarter of 2013, however, Freddie Mac decided that the positive evidence that it would be sufficiently profitable to make use of the deferred tax assets outweighed the negative evidence. As a result, Freddie Mac recorded a $23.9 billion income tax benefit. But due to the Third Amendment, this benefit accrued directly to the Treasury. Because the income tax benefit increased Freddie Mac's net worth, it increased the amount of the dividend that Freddie Mac owed under the Third Amendment, such that Freddie Mac was required to make an enormous $30.4 billion dividend payment at the end of the year.

44.     Treasury has received a windfall in payments of dividends under the Third Amendment. As of the date of filing of this Complaint, the Companies have together paid $213.1 billion to Treasury, exceeding their collective Treasury draws by $25.7 billion. Freddie Mac has now been profitable for ten consecutive quarters (and Fannie Mae for nine), but the Companies are not permitted to share in their own profits.

45.     The President's proposed fiscal year 2015 budget estimates that Freddie Mac and Fannie Mae will together pay $181.5 billion in dividends to Treasury over the next ten years (*i.e.*, fiscal 2014 to 2024), far outstripping the government's investments.  According to the President's proposed budget, "[t]he cumulative budgetary impact of the PSPA agreements from the first PSPA purchase through FY 2024 is estimated to be a net return to taxpayers of $179.2 billion."

46.     The Third Amendment is even capturing the Companies' recoveries on legal claims that preceded the conservatorships.  For example, on October 1, 2013, Freddie Mac announced that it had entered into a $1.3 billion settlement with three financial institutions concerning Freddie Mac's claims relating to representations and warranties on loans that it had purchased, and that FHFA, as Freddie Mac's Conservator, had approved the settlement.  The claims at issue involved loans that Freddie Mac purchased between 2000 and 2012, such that many of them preceded the conservatorship by years.  Yet none of the funds recouped will benefit Freddie Mac.  Rather, Freddie Mac's Chief Executive Officer stated that, "[w]ith these settlements, Freddie Mac is recouping funds effectively due to the nation's taxpayers."

47.     Moreover, FHFA has announced other, similar settlements with financial institutions relating to breaches of representations and warranties, securities law violations, and common law fraud with respect to mortgage loans or mortgage-backed securities ("MBS") purchased by Freddie Mac and Fannie Mae well before the conservatorship.   For example, on October 25, 2013, FHFA announced a $1.1 billion settlement in its role as Conservator to Freddie Mac and Fannie Mae, with JP Morgan relating to claims that the bank repurchase breaching loans sold to Fannie and Freddie in the years leading up to the financial crisis. In addition, FHFA announced a separate $4 billion settlement with JP Morgan, also in FHFA's role

as Conservator to the Companies, relating to claims that the bank violated the federal securities laws in connection with the sales and securitizations of loans to the Companies from 2005 to 2007.  Similarly, on May 28, 2013, FHFA announced a $3.5 billion settlement, in its role as Conservator to the Companies with Citigroup, covering claims of alleged violations of federal and state securities laws in connection with private-label residential mortgage-backed securities purchased by Freddie Mac and Fannie Mae.  FHFA announced similar settlements last year with UBS ($885 million), General Electric ($549 million), Bank of America ($404 million), and Wells Fargo ($335 million).  This year, FHFA has already announced settlements, in its role as Conservator to the Companies, totaling approximately $9.7 billion with Bank of America ($9.33 billion aggregate payment), Barclays Bank PLC ($280 million) and RBS Securities ($99.5 million) which cover private-label MBS purchased by the Companies from 2005 to 2007.

## V.   THE THIRD AMENDMENT HARMS FREDDIE MAC BY PREVENTING IT FROM REBUILDING CAPITAL

48.     FHFA has acknowledged that the agency "has a statutory charge to work to restore a regulated entity in conservatorship to a sound and solvent condition . . . ." Conservatorship and Receivership, 76 Fed. Reg. 35,727 (June 20, 2011).  Accordingly, "allowing capital distributions to deplete the entity's conservatorship assets would be inconsistent with the agency's statutory goals, as they would result in removing capital at a time when the Conservator is charged with rehabilitating the regulated entity."  *Id.*  The Third Amendment's quarterly sweep of all net profits clearly harms, rather than promotes, Freddie Mac's soundness and solvency by effectively preventing it from rebuilding its capital.

49.     Furthermore, statements by both FHFA and Treasury confirm that the Third Amendment is intended not merely to prevent Freddie Mac from rebuilding its capital, but to facilitate the company's eventual elimination.  Treasury, for example, stated the Third

Amendment would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  Press Release, U.S. Dep't of Treasury, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012).  Indeed, Treasury emphasized that the Third Amendment would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  *Id.*

50.     Likewise, FHFA Acting Director DeMarco stated that the Third Amendment reflected the agency's goal of "gradually contracting [the Companies'] operations." Edward J. DeMarco, Acting Director, FHFA, *Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements*.  DeMarco later informed a Senate Committee that the "recent changes to the [Purchase Agreements], replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Senate Comm. on Banking, Housing and Urban Affairs, at 3 (Apr. 18, 2013).  Likewise, in its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac."  FHFA, Report to Congress 2012, at 13 (June 13, 2013).  Thus, according to FHFA, the Third Amendment "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id*. at 1, 13.

51.     Additionally, the dividend under the Government Stock must be paid to Treasury in cash, even though Freddie Mac's net worth may include non-cash assets, such as deferred tax

assets.  As a result, Freddie Mac has had to sell non-liquid assets or issue debt to pay the dividend, which has had the foreseeable effect of preventing it from maximizing the value of its assets.  Borrowing money to pay a dividend on a paper profit is directly contrary to operating Freddie Mac in a safe and sound manner and restoring it to financial health, as FHFA is statutorily required to do when it is acting as a conservator.

52.     Further, Freddie Mac can never accumulate capital under the Third Amendment and can never redeem the Government Stock: so long as the Companies remain in operation, all of its net worth will be transferred to Treasury but the outstanding balance of the Government Stock will remain $72.3 billion.

## VI.    BY ENTERING INTO THE THIRD AMENDMENT, FHFA AND TREASURY VIOLATED THEIR FIDUCIARY OBLIGATIONS TO FREDDIE MAC

53.     Virginia law applies to Freddie Mac pursuant to Section 11.3 of its bylaws. Under Virginia law, officers and directors of a corporation owe that corporation and its shareholders fiduciary obligations to exercise the utmost good faith in their dealings with the corporation, not to place themselves in any position where their individual interests clash with their duty to the corporation, and not to use their position to acquire personal advantage or profit.

54.     By reason of its purported conservatorship of Freddie Mac and because of its ability to control the business and corporate affairs of Freddie Mac, FHFA is a *de facto* officer or director of Freddie Mac and, therefore, owed Freddie Mac fiduciary obligations to exercise the utmost good faith in its dealings with the company.

55.     As disclosed in Freddie Mac's 2013 Form 10-K filing, "Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets. . . . We conduct our business subject to the direction of FHFA as our

-21-

Conservator. . . . The Conservator continues to determine, and direct the effects of the Board of Directors and management to address, the strategic direction for the company.  While the Conservator has delegated certain authority to management to conduct business operations, many management decisions are subject to review and approval by FHFA and Treasury.  In addition, management frequently receives directions from FHFA on various matters involving day-to-day operations."

56.     Freddie Mac's current directors "serve on behalf of, and exercise authority as directed by, the Conservator."  FHFA has instructed Freddie Mac's directors to consult with it and obtain its written approval before taking action in a wide variety of areas, including but not limited to:

   (a)     Engaging in redemptions or repurchases of subordinated debt;

   (b)     Matters that relate to the Conservator's powers, Freddie Mac's conservatorship status, or the legal effect of the conservatorship on contracts;

   (c)     Agreements relating to litigation, claims, regulatory proceedings, or tax-related matters where the value of the claim exceeds a specified threshold;

   (d)     Actions that are likely to cause significant reputational risk;

   (e)     Establishing the annual operating budget; and

   (f)     Matters requiring the approval of or consultation with Treasury under the PSPAs.

57.     While Freddie Mac's officers are under FHFA's control, in a February 2, 2010 letter to Congress, the Director of FHFA confirmed that "Like other corporate executives, the Enterprises' executive officers are subject to the legal responsibility to use sound and prudent business judgment in their stewardship of their companies," and that FHFA had charged the Companies' boards with "ensuring normal corporate governance practices and procedures are in

place."  FHFA was and is required to act in furtherance of the best interests of the Companies and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.  Because of its position of control and authority as the conservator of Freddie Mac, FHFA was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.     Additionally, under Virginia law, dominant or controlling stockholders also owe fiduciary duties, and must exercise good faith and care in their dealings with the corporation. Any disposition of the corporation or its assets to deprive the minority holders of their just share of it or to gain for themselves at the expense of the holders of the minority of the stock is a breach of their duties and of trust.  It is the fact of control held and exercised of the common property, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation.  *See Parsch v. Massey*, No. 04-193, 2009 WL 7416040, at *11 (Va. Cit. Ct. Nov. 5, 2009).

59.     Treasury exercises *de facto* control over Freddie Mac, including through its Senior Preferred Stock, and warrants to purchase the Companies' common stock, as well as its control of the provision of funds to Freddie Mac.  Freddie Mac's 2012 Form 10-K admits that "Treasury has significant rights and powers with respect to our company as a result of the Purchase Agreement," and that Freddie Mac is "dependent upon the continued support of Treasury" in order to keep operating its business.  Without the prior written consent of Treasury, Freddie Mac may not, *inter alia*:

(a)     Declare or pay any dividend;

(b)     Redeem, purchase, retire, or otherwise acquire any Freddie Mac equity securities;

(c)     Sell or issue any Freddie Mac equity securities;

-23-

(d)  Seek to terminate the conservatorship; or

(e)  Enter into a corporate reorganization, recapitalization, merger, acquisition, or similar event.

60.  In addition, Treasury's warrants to purchase 79.9% of Freddie Mac's common stock provide Treasury with the effective ability to decide any vote that is presented to Freddie Mac stockholders.  Freddie Mac's 2012 Form 10-K states that, "Treasury has the ability to acquire almost 80% of our common stock for nominal consideration by exercising the warrant we issued to it pursuant to the Purchase Agreement.  Consequently, the company could effectively remain under the control of the U.S. government even if the conservatorship were ended and the voting rights of common stockholders restored."  Due to Treasury's warrants, "existing common stockholders have no assurance that, as a group, they will be able to control the election of our directors or the outcome of any other vote after the time, if any, that the conservatorship ends."

61.  The administrative record produced by Defendants in a related litigation indicates that the structure of the Third Amendment's Net Worth Sweep originated with Treasury, and characterize the Net Worth Sweep as "Treasury's PSPA Modification Proposal."

62.  As controlling stockholder of Freddie Mac, Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Freddie Mac.  Because of Treasury's *de facto* position of control and authority over Freddie Mac, it stood on both sides of the decision to engage in the Third Amendment and it was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

63.  The Third Amendment offered no benefits whatsoever to Freddie Mac.  Rather, it was an egregiously self-dealing transaction, the benefits of which flowed entirely to the Treasury

as Freddie Mac's controlling stockholder, and indirectly to FHFA through its status as an agency of the federal government.

64.     The Third Amendment was in no way an exercise of valid business judgment or deemed to be in the best interests of Freddie Mac.  Indeed, it was specifically intended to ensure that the Company could not function as a private enterprise and would have to be wound down. By preventing Freddie Mac from rebuilding capital or returning to the market, as Treasury stated in its press release, the purpose and effects of the Third Amendment ran directly contrary to FHFA's purported statutory mission to "put the regulated entity in a sound and solvent condition," "carry on the business of the regulated entity," and "preserve and conserve the assets and property of the regulated entity."   12 U.S.C. § 4617(b)(2)(D).   As such, the Third Amendment was inconsistent and in manifest conflict with FHFA's statutory functions and responsibilities as Conservator to the Companies.

## PLAINTIFFS HAVE SATISFIED THE DEMAND REQUIREMENT

65.     Plaintiffs bring this action derivatively on behalf of and for the benefit of Freddie Mac to redress injuries suffered by Freddie Mac as a direct and proximate result of the breaches of fiduciary duty alleged herein.  Freddie Mac is named as a nominal defendant in a derivative capacity.

66.     Plaintiffs AEIC, Cacciapalle and Miller are holders of Freddie Mac Preferred Stock and common stock, respectively.  Plaintiff AEIC was a holder of Freddie Mac Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of said securities continuously since then.  Plaintiff Cacciapalle was a holder of Freddie Mac Preferred Stock prior to September 6, 2008, including prior to and on August 17, 2012, and has been a holder of said securities continuously since then.  Plaintiff Miller was a holder of Freddie Mac common stock prior to and on August 17, 2012, and has been a holder of said

securities continuously since then.  Plaintiffs have retained counsel that is competent and experienced in derivative litigation.

67.     Plaintiffs AEIC, Cacciapalle and Miller intend to retain their shares of Preferred Stock and common stock, respectively, throughout the duration of this litigation.

68.     The breaches of fiduciary duties complained of herein subject, and will persist in subjecting, Freddie Mac to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

69.     Va Code Ann. 13.1-672.1 provides that "[n]o shareholder may commence a derivative proceeding until: (1) A written demand has been made on the corporation to take suitable action; and (2) Ninety days have expired from the date delivery of the demand was made[.]"

70.     On January 6 and 7, 2014, Plaintiffs each sent a letter to Freddie Mac regarding the Third Amendment and the matters at issue in this Complaint, demanding that the Board of Directors of Freddie Mac and/or FHFA commence a civil action against FHFA and Treasury to recover for the benefit of Freddie Mac all damages that Freddie Mac has suffered as a result of FHFA and Treasury's breaches of their respective fiduciary duties, and commence a civil action for a declaration that the Third Amendment is null and void.  Copies of these letters are attached to this Complaint as Exhibits A, B and C.

71.     On April 9, 2014, FHFA rejected Plaintiffs' demands, stating that, "the conservator does not intend to authorize Freddie Mac or its directors or officers on behalf of Freddie Mac to take the actions that the Letter demands."  Copies of the letters that FHFA sent to Plaintiffs rejecting Plaintiffs' demands are attached to this Complaint as Exhibits D, E, and F.

## CAUSES OF ACTION

### BREACH OF FIDUCIARY DUTY
### (Against Treasury and FHFA)

72.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

73.     By imposing a conservatorship over Freddie Mac, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care, good faith, loyalty, and candor, to Freddie Mac, and was and is required to use its utmost ability to control and manage Freddie Mac in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Freddie Mac and its stockholders so as to benefit all stockholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

74.     Treasury exercises *de facto* control over Freddie Mac, including through its Senior Preferred Stock and warrants to purchase Freddie Mac common stock, as well as its control of the provision of funds to Freddie Mac.  As controlling stockholder of Freddie Mac, Treasury owed fiduciary duties of due care, good faith, loyalty, and candor, to Freddie Mac.

75.     The Third Amendment constituted a self-dealing transaction.  Treasury, as controlling stockholder of Freddie Mac, stood on both sides of the decision to implement the Third Amendment, to the benefit of Treasury and the detriment of Freddie Mac and its stockholders other than Treasury.  Moreover, as an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

76.     Through the Third Amendment, FHFA and Treasury breached their fiduciary duties to Freddie Mac.  The Third Amendment was not entirely fair to Freddie Mac, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Third Amendment,

which effectively delivers all of Freddie Mac's profits to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Freddie Mac in return.

77.     The Third Amendment was neither entirely nor intrinsically fair, nor did it further any valid business purpose of Freddie Mac, nor did it reflect a good faith business judgment as to what was in the best interests of Freddie Mac.

78.     The Third Amendment constituted waste and a gross abuse of discretion.

79.     As a direct and proximate result of the foregoing breach of fiduciary duty, Freddie Mac suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.     Declaring that this action is a proper derivative action and that the presuit demand requirement has been satisfied;

2.     Declaring that the Third Amendment was neither entirely nor intrinsically fair to Freddie Mac, did not further any valid business purpose of Freddie Mac, did not reflect a good faith business judgment as to what was in the best interests of Freddie Mac, and constituted waste and a gross abuse of discretion;

3.     Declaring that, through the Third Amendment, Defendants FHFA and Treasury breached their respective fiduciary duties to Freddie Mac;

4.     Awarding compensatory damages and disgorgement in favor of Freddie Mac against Defendants FHFA and Treasury, jointly and severally, as a result of such defendants' breach of their respective fiduciary duties, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

5.     Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

6.      Such other and further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury.

Dated:  July 30, 2014                          Respectfully Submitted,

                                               BOIES, SCHILLER & FLEXNER LLP

                                               */s/ Hamish P.M. Hume*
                                               Hamish P.M. Hume
                                               Jonathan M. Shaw
                                               5301 Wisconsin Ave., NW, Suite 800
                                               Washington, DC 20015
                                               Tel:  (202) 237-2727
                                               Fax:  (202) 237-6131
                                               hhume@bsfllp.com

                                               BERNSTEIN LITOWITZ BERGER &
                                               GROSSMANN LLP

                                               */s/ David L. Wales*
                                               David L. Wales (Bar No. 417440)
                                               1285 Avenue of the Americas
                                               New York, NY 10019
                                               Tel:  (212) 554-1409
                                               Fax:  (212) 554-1444 (fax)
                                               dwales@blbglaw.com

                                               Blair A. Nicholas
                                               David R. Kaplan
                                               12481 High Bluff Drive, Suite 300
                                               San Diego, CA 92130
                                               Tel:  (858) 793-0070
                                               Fax:  (858) 793-0323
                                               blairn@blbglaw.com
                                               davidk@blbglaw.com

                                               GRANT & EISENHOFER, P.A.

                                               */s/ Geoffrey C. Jarvis*
                                               Jay W. Eisenhofer
                                               485 Lexington Avenue
                                               New York, NY  10017
                                               Telephone:  (646) 722-8500
                                               Facsimile:  (646) 722-8501

jeisenhofer@gelaw.com

Geoffrey C. Jarvis
Michael J. Barry
123 Justison Street
Wilmington, DE  19801
Tel:  (302) 622-7000
Fax:  (302) 622-7100
gjarvis@gelaw.com
mbarry@gelaw.com

KESSLER TOPAZ MELTZER & CHECK, LLP

*/s/ Lee D. Rudy*
Lee D. Rudy
Eric L. Zagar
Matthew A. Goldstein
280 King of Prussia Road
Radnor, PA 19087
Tel:  (610) 667-7706
Fax:  (610) 667-7056
lrudy@ktmc.com
ezagar@ktmc.com
mgoldstein@ktmc.com

*Interim Co-Lead Class Counsel*

POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Tel:  (212) 661-1100
Fax:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Tel: (312) 377-1181
Fax: (312) 377-1184
pdahlstrom@pomlaw.com

*Additional Counsel for Plaintiffs*

-30-

## VERIFICATION

I, Steve Klein, Treasurer of American European Insurance Company, hereby verify that I have authorized the filing of the attached Derivative Complaint, that I have reviewed the Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/21/2014

_____
Steve Klein

**VERIFICATION**

I, Joseph Cacciapalle, hereby verify that I have authorized the filing of the attached Derivative Complaint, that I have reviewed the Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/25/14

Joseph Cacciapalle

## VERIFICATION

I, Michelle M. Miller, hereby verify that I have authorized the filing of the attached Derivative Complaint, that I have reviewed the Derivative Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: __7/23/14__

_____
Michelle M. Miller