UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA



**FILED**

SEP 3 0 2014

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>JACOB J. LEW, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil No. 13-1025 (RCL)<br>)<br>)<br>)<br>)<br>)<br>) |
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE<br>AGENCY, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)     Civil No. 13-1053 (RCL)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCATION, *et al.*,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)     Civil No. 13-1439 (RCL)<br>)<br>)<br>)<br>)<br>)<br>) |

|  | ) |  |
|---|---|---|
| **In re Fannie Mae/Freddie Mac** | ) | |
| **Senior Preferred Stock Purchase Agreement** | ) | |
| **Class Action Litigations** | ) | **Miscellaneous No. 13-1288 (RCL)** |
| ——————————————— | ) | |
|  | ) | |
| This Memorandum Opinion relates to: | ) | <u>CLASS ACTION</u> |
| ALL CASES | ) | |
| ——————————————— | ) | |

## <u>MEMORANDUM OPINION</u>

Before the Court are motions to dismiss or, in the alternative, for summary judgment, filed by the defendants United States Department of the Treasury ("Treasury") and Federal Housing Finance Agency ("FHFA"), as well as a cross-motion for summary judgment on Administrative Procedure Act ("APA") claims filed by the *Perry*, *Fairholme*, and *Arrowood* plaintiffs (collectively, "individual plaintiffs").   Upon consideration of the defendants' respective motions to dismiss, the individual plaintiffs' cross-motion for summary judgment, the various opposition and reply briefs thereto filed by the defendants, the individual plaintiffs, and the class action plaintiffs ("class plaintiffs"), the applicable law, and the entire record herein, the Court will GRANT the defendants' motions to dismiss and DENY the individual plaintiffs' cross-motion for summary judgment.

## I.    BACKGROUND

This matter is brought before the Court by both a class action lawsuit and a set of three individual lawsuits.  These four lawsuits contain numerous overlapping, though not identical, claims.  The purported class plaintiffs consist of private individual and institutional investors who own either preferred or common stock in the Federal National Mortgage Association ("Fannie Mae") or the Federal Home Loan Mortgage Corporation ("Freddie Mac").  Am. Compl. at ¶¶ 30-44, *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class*

*Action Litigs.*, No. 13-1288 (D.D.C. Dec. 3, 2013), ECF No. 4 ("*In re Fannie Mae/Freddie Mac Am. Compl.*"); Derivative Compl. at ¶¶ 19-21, *In re Fannie Mae/Freddie Mac*, No. 13-1288 (D.D.C. July 30, 2014), ECF No. 39 ("*In re Fannie Mae/Freddie Mac* Derivative Compl."). The individual plaintiffs comprise a collection of private investment funds and insurance companies. Compl. at ¶¶ 25-27, *Perry Capital LLC v. Lew*, No. 13-1025 (D.D.C. July 7, 2013), ECF No. 1 ("*Perry* Compl."); Compl. at ¶¶ 18-28, *Fairholme Funds, Inc., v. FHFA*, No. 13-1053 (D.D.C. July 10, 2013), ECF No. 1 ("*Fairholme* Compl."); Compl. at ¶¶ 15-19, *Arrowood Indem. Co. v. Fannie Mae*, No. 13-1439 (D.D.C. Sept. 20, 2013), ECF No. 1 ("*Arrowood* Compl.").

Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs"),[1] born from statutory charters issued by Congress. *See* Federal National Mortgage Association Charter Act, 12 U.S.C. §§ 1716-1723; Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451-1459. Congress created the GSEs in order to, among other goals, "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." 12 U.S.C. § 1716(3). In other words, the GSEs' shared purpose was to make it easier (*i.e.*, less risky) for local banks and other lenders to offer mortgages to prospective home buyers. The GSEs sought to accomplish this objective by purchasing mortgage loans from lenders, thus relieving lenders of default risk and "freeing up lenders' capital to make additional loans." *See* Treasury Defs.'s Mot. to Dismiss, or, in the Alternative, for Summ. J. at 6 (D.D.C. Jan. 17, 2014) ("Treasury Mot.").[2] In order to finance this operation, the GSEs would, primarily,

---

[1] While Fannie Mae and Freddie Mac are not the only GSEs, *see, e.g.*, Federal Home Loan Banks, for convenience, this Memorandum Opinion will employ the term "GSE" to refer to Fannie Mae and Freddie Mac exclusively.

[2] Rather than list each of the numerous dockets on which the briefs in this matter have been filed, this Memorandum Opinion will cite the name of the brief, the date on which it was filed on all relevant dockets, and the short form citation by which the brief will be referenced thereinafter.

pool the many mortgage loans they purchased into various mortgage-backed securities and sell these securities to investors.  *See, e.g.*, Individual Pls.'s Opp'n and Cross-Mot. for Summ. J. at 4 (D.D.C. Mar. 21, 2014) ("Individual Pls.'s Opp'n").

Fannie Mae and Freddie Mac are considered government-*sponsored*, rather than government-*owned*, because both congressionally chartered entities were eventually converted, by statute, into publicly traded corporations.  Housing and Urban Development Act, Pub. L. No. 90-448, § 802, 82 Stat. 536-538 (1968); Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73, § 731, 103 Stat. 432-433 (1989).  Yet despite this historically market-driven ownership structure, "the GSEs have benefitted from a public perception that the federal government had implicitly guaranteed the securities they issued; this perception allowed the GSEs to purchase more mortgages and [mortgage-backed securities], at cheaper rates, than would otherwise prevail in the private market."  Treasury Mot. at 6-7.

By 2008, the United States economy faced dire straits, in large part due to a massive decline within the national housing market.  *See* Individual Pls.'s Opp'n at 7.  "As a result of the housing crisis, the value of the [GSEs'] assets . . . deteriorated and the [GSEs] suffered . . . credit losses in their portfolios."  FHFA Mot. to Dismiss, or, in the Alternative, for Summ. J. at 7 (D.D.C. Jan. 17, 2014) ("FHFA Mot.").

Given the systemic danger that a Fannie Mae or Freddie Mac collapse posed to the already fragile national economy, among other housing market-related perils, Congress enacted the Housing and Economic Recovery Act ("HERA") on July 30, 2008.  *See* Individual Pls.'s Opp'n at 6; Pub. L. No. 110-289, 122 Stat. 2654.  HERA established FHFA as an independent agency to supervise and regulate the GSEs.  12 U.S.C. § 4511.  HERA further granted FHFA's director the authority to appoint the agency as conservator or receiver for the GSEs.  12 U.S.C.

4

§ 4617(a).  Of most relevance to the present litigation, HERA empowered FHFA, as conservator or receiver, to "immediately succeed to—(i) all rights, titles, powers, and privileges of the [GSE], and of any stockholder, officer, or director of such [GSE] with respect to the [GSE] and the assets of the [GSE]."  12 U.S.C. § 4617(b)(2)(A)(i).  The statute also set forth a "[l]imitation on court action," noting that, "[e]xcept as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver."  12 U.S.C. § 4617(f).  Moreover, apparently recognizing that Treasury (*i.e.*, taxpayer) funds may soon be necessary to capitalize the struggling GSEs,[3] Congress, under HERA, amended the GSEs' charters to temporarily authorize Treasury to "purchase any obligations and other securities issued by the [GSEs]."  12 U.S.C. § 1455(*l*)(1)(A) (Freddie Mac); 12 U.S.C. § 1719(g)(1)(A) (Fannie Mae).[4]  This provision also provided that the "Secretary of the Treasury may, at any time, exercise any rights received in connection with such purchases."  12 U.S.C. § 1719(g)(2)(A).  Treasury's authority to invest in the GSEs expired on December 31, 2009.  12 U.S.C. § 1719(g)(4).

Following the GSEs' unsuccessful effort to "raise capital in the private markets," FHFA Mot. at 7-8, FHFA placed the GSEs into conservatorship on September 6, 2008.  *See, e.g.*, Class Pls.'s Opp'n at 7 (D.D.C. Mar. 21, 2014) ("Class Pls.'s Opp'n").  One day later, Treasury, pursuant to 12 U.S.C. § 1719(g), entered into Senior Preferred Stock Purchase Agreements ("PSPAs") with each of the GSEs.  Individual Pls.'s Opp'n at 8.  Under the initial PSPAs,

---

[3] The purpose of HERA's provision authorizing Treasury to invest in the GSEs was, in part, to "prevent disruptions in the availability of mortgage finance"—disruptions presumably due to the challenges confronting the GSEs in 2008.  *See* 12 U.S.C. § 1455(*l*)(1)(B); 12 U.S.C. § 1719(g)(1)(B) ("Emergency determination required[.]  In connection with any use of this [purchasing] authority, the [Treasury] Secretary must determine that such actions are necessary to—(i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer.").

[4] Since 12 U.S.C. § 1455(*l*) and 12 U.S.C. § 1719(g) are identical provisions, this Memorandum Opinion, hereinafter, will refer only to the Fannie Mae provision, § 1719(g).

Treasury committed to provide up to $100 billion in funding to each GSE "to ensure that their assets were equal to their liabilities"—*i.e.*, to "cure [the GSEs'] negative net worth"—at the end of any fiscal quarter. *Id.*; FHFA Mot. at 11. On May 6, 2009, Treasury and the GSEs, through FHFA, entered into the First Amendment to the PSPAs, whereby Treasury doubled its funding cap to $200 billion for each GSE. Individual Pls.'s Opp'n at 11. On December 24, 2009, the parties executed the Second Amendment, which permitted the GSEs to continue to "draw unlimited sums from Treasury [as required to cure any quarterly negative net worth] until the end of 2012," and then, as of December 31, 2012, permanently fixed the funding cap for each GSE (at an amount that, in the end, totaled greater than $200 billion per GSE), in accordance with an agreed-upon formula. *Id.* at 11-12; FHFA Mot. at 12; *see also* Treasury AR at 190-91, 196-97.[5]

In exchange for its funding commitment, Treasury received senior preferred stock in each GSE, which entitled Treasury to four principal contractual rights under the PSPAs. *See, e.g.*, Treasury AR at 14. First, Treasury received a senior liquidation preference[6] of $1 billion for each GSE *plus* a dollar-for-dollar increase each time the GSEs drew upon Treasury's funding commitment. Individual Pls.'s Opp'n at 8-9 (citing Treasury AR at 100, 133). Second, the PSPAs entitled Treasury to dividends equivalent to 10% of Treasury's existing liquidation preference, paid quarterly.[7] *Id.* at 9 (citing AR at 32-33, 67-68); Treasury Mot. at 13. Third,

---

[5] Citations to the administrative record filed by the Treasury defendants, *e.g.*, Administrative R., *In re Fannie Mae/Freddie Mac*, No. 13-1288 (D.D.C. Dec. 17, 2013), ECF No. 6, are noted as "Treasury AR." Citations to the document compilation regarding the Third Amendment filed by the FHFA defendants, *e.g.*, *In re Fannie Mae/Freddie Mac*, ECF No. 7, are noted as "FHFA Docs."

[6] "A liquidation preference is a priority right to receive distributions from the [GSEs'] assets in the event they are dissolved." Individual Pls.'s Opp'n at 5.

[7] Given the Court's ruling to grant the defendants' motion to dismiss, there is no need to evaluate the merits of the defendants' decision to execute the Third Amendment instead of selecting other options in lieu of the cash dividend that, under the PSPAs, was equal to 10% of Treasury's liquidation preference. Nevertheless, the Court notes its disagreement with the plaintiffs' characterization of one purported alternative to the Third Amendment. The plaintiffs claim that the GSEs "had no obligation to pay the 10 percent dividend in cash," and instead could simply opt to pay a 12% dividend that would be added to the outstanding liquidation preference rather than be paid in cash each quarter. Individual Pls.'s Opp'n at 9, 66-67. However, the plaintiffs' contention that paying 10% in cash or

Treasury received warrants to acquire up to 79.9% of the GSEs' common stock at a nominal price. Individual Pls.'s Opp'n at 9; *e.g.*, Treasury AR at 15, 43. Fourth, beginning on March 31, 2010, Treasury would be entitled to a periodic commitment fee "to fully compensate [Treasury] for the support provided by the ongoing [funding] [c]ommitment." Treasury AR at 22, 56. The amount of the periodic commitment fee was to be determined by mutual agreement, and Treasury reserved the right to waive the fee for one year at a time "based on adverse conditions in the United States mortgage market." *Id.* Treasury waived the commitment fee in 2010 and 2011, and later, under the Third Amendment, the fee was suspended. Treasury Mot. at 14, 18.

As of August 8, 2012, Treasury had provided $187.5 billion in funding to the GSEs,[8] and, thus, held a total $189.5 billion senior liquidation preference between both GSEs, including the

---

adding 12% to the liquidation preference was merely a matter of choice, Class Pls.'s Opp'n at 11, directly contravenes the unambiguous language of the contract. The relevant provisions, which are identical, in Treasury's respective stock certificates with each of the GSEs, state:

> "'Dividend Rate' means 10.0%; provided, however, that if at any time the [GSE] shall have for any reason *failed to pay dividends in cash in a timely manner as required by this Certificate*, then immediately following such *failure* and for all Dividend Periods thereafter until the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the 'Dividend Rate' shall mean 12.0%."

Treasury AR at 33, 67-68 (Treasury Senior Preferred Stock Certificates § 2(c)) (emphasis added). The provision makes clear that 10% cash dividends were "required by" the stock certificates, and that 12% dividends deferred to the liquidation preference were only triggered upon a "failure" to meet the 10% cash dividend requirement. Thus, classifying the 12% dividend feature as a "penalty," as Treasury does, is surely more accurate than classifying it as a "right." *Compare* Treasury Defs.'s Reply at 49-50 (D.D.C. May 2, 2014) ("Treasury Reply"), *with* Individual Pls.'s Opp'n at 9. The plaintiffs cannot gloss over this distinction by repetitively using the phrase "in kind" to describe the 12% dividend feature. *See* Individual Pls.'s Opp'n at 9, 66-67, 80-81; Class Pls.'s Opp'n at 16. Inclusion of "in kind" within § 2(c) would have slightly improved the plaintiffs' argument that the contract expressly permitted the GSEs to simply choose between a 10% cash dividend or 12% dividend deferred to the liquidation preference. But, as plaintiffs are certainly aware, "in kind" appears nowhere within the stock certificates' dividends provision. *See* Treasury AR at 33, 67-68.

With regard to the two other hypothetical alternatives presented by the individual plaintiffs—Treasury accepting lower dividends or allowing the GSEs to use excess profits to pay down the liquidation preference and, thus, the basis for the 10% dividend—the Court has no occasion to determine whether the plaintiffs' arguments demonstrate arbitrary and capricious decisionmaking or only amount to second-guessing decisionmakers charged with exercising predictive judgments. *Compare* Individual Pls.'s Opp'n at 79-82, *with* FHFA Defs.'s Reply at 52-58 (D.D.C. May 2, 2014) ("FHFA Reply").

[8] A figure that is unchanged through 2013. *See* Treasury AR 4351.

initial $1 billion liquidation preferences from each GSE.  Therefore, "the GSEs' dividend obligations to Treasury were nearly $19 billion per year."  Treasury Mot. at 16.

On August 17, 2012, Treasury and the GSEs, through FHFA, agreed to the Third Amendment to the PSPA, which is the focus of this litigation.  The Third Amendment "replaced the previous dividend formula with a requirement that the GSEs pay, as a dividend, the amount by which their net worth for the quarter exceeds a capital buffer of $3 billion.  The capital buffer gradually declines over time by $600 million per year, and is entirely eliminated in 2018."  Treasury Mot. at 18.  In simpler terms, the amendment "requires Fannie Mae and Freddie Mac to pay a quarterly dividend to Treasury equal to the *entire net worth* of each Enterprise, minus a small reserve that shrinks to zero over time."  Class Pls.'s Opp'n at 3.  These dividend payments do not reduce Treasury's outstanding liquidation preferences.  *See* Individual Pls.'s Opp'n at 16.

The plaintiffs cite multiple justifications offered publicly by the defendants for this "net worth sweep."  *See* Individual Pls.'s Opp'n at 16-17.  First, Treasury asserted that the amendment will end "the circular practice of the Treasury advancing funds to the [GSEs] simply to pay dividends back to Treasury."  *Id.* at 16 (citing Press Release, Treasury Dep't Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx); *see also* Treasury Mot. at 2, 5, 50; FHFA Mot. at 3, 15-16.  However, the plaintiffs counter that in 2012, the GSEs were once again profitable and, pertinently, able to pay the 10% dividend without drawing additional funds from Treasury.  *Id.* at 14-15; *but see Fairholme* Compl. at ¶ 26 (stating that "approximately $26 billion" of Treasury's current liquidation preference "were required simply to pay the 10% dividend payments owed to Treasury").  Second, quoting from the same Treasury press release, the plaintiffs note Treasury's statement that the net worth sweep is

consistent with the Obama Administration's "commitment . . . that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." *Id.* at 16-17. Third, according to the press release, the net worth sweep would "make sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms." *Id.* at 17.

Under the Third Amendment net worth sweep, the GSEs paid Treasury nearly $130 billion in 2013.[9] Treasury AR at 4352. As mentioned above, under the former dividend arrangement requiring payment equivalent to 10% of Treasury's existing liquidation preference, the GSEs would have owed nearly $19 billion. Through 2013, the cumulative draws of Treasury funding taken by the GSEs remained $187.5 billion, *id.* at 4351, and the cumulative dividends paid to Treasury by the GSEs totaled $185.2 billion, *id.* at 4352.

Notwithstanding the plaintiffs' attempt to downplay the need for a GSE bailout in the first place, *see, e.g.*, Individual Pls.'s Opp'n at 6, 10-11, the plaintiffs do not contest the initial PSPA or subsequent two amendments to the PSPA, *see, e.g.*, Class Pls.'s Opp'n at 11, but rather only challenge the Third Amendment to the PSPA. The class plaintiffs have brought claims of breach of contract, regarding allegedly promised dividends and liquidation preferences, breach of the implied covenant of good faith and fair dealing, and an unconstitutional taking, as well as derivative claims of breach of fiduciary duty. The *Perry* plaintiff has brought claims under the Administrative Procedure Act ("APA"). The *Arrowood* plaintiffs have also brought APA claims, as well as claims of breach of contract, regarding allegedly promised dividends and liquidation preferences, and breach of the implied covenant of good faith and fair dealing. The *Fairholme* plaintiffs have brought the same claims as the *Perry* and *Arrowood* plaintiffs with an additional

---

[9] Though this figure includes the outlier $59.3 billion dividend paid by Fannie Mae in the second quarter and $30.4 billion dividend paid by Freddie Mac in the fourth quarter. Treasury AR 4352.

claim of breach of fiduciary duty against FHFA.   The parties dispute whether the *Fairholme* plaintiffs' fiduciary duty claim is direct or derivative.   *See infra* n.24.

On January 17, 2014, the defendants moved to dismiss the complaints against the Third Amendment for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).   In the alternative, the defendants moved for summary judgment pursuant to Rule 56.   In their opposition, filed March 21, 2014, the individual plaintiffs presented a cross-motion for summary judgment.

## II.   LEGAL STANDARD

"Federal courts are of limited jurisdiction."   *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).   Under Rule 12(b)(1), the plaintiffs bear the burden of demonstrating that subject matter jurisdiction exists.   *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).   The Court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting [the] plaintiff[s] the benefit of all inferences that can be derived from the facts alleged."   *Am. Nat. Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (internal quotation marks and citation omitted).   But "[b]ecause subject-matter jurisdiction focuses on the [C]ourt's power to hear the claim . . . , the [C]ourt must give the plaintiff[s'] factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim."   *Youming Jin v. Ministry of State Sec.*, 475 F. Supp. 2d 54, 60 (D.D.C. 2007).   Furthermore, when evaluating a Rule 12(b)(1) motion to dismiss, "it has been long accepted that the [Court] may make appropriate inquiry beyond the pleadings to satisfy itself on authority to entertain the case."   *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

A motion to dismiss is also appropriate when the complaint fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Once again, "the complaint is construed liberally in the plaintiffs' favor, and [the Court] grant[s] plaintiffs the benefit of all inferences that can be derived from the facts alleged. However, the [C]ourt need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the [C]ourt accept legal conclusions cast in the form of factual allegations. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal quotation marks and citation omitted). "If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the [C]ourt, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12.

## III. ANALYSIS

### A. HERA Bars the Plaintiffs' Prayers for Declaratory, Injunctive, and Other Equitable Relief against FHFA and Treasury

By this Court's calculation, twenty-four of the thirty-one substantive prayers for relief[10] requested by the plaintiffs across their five complaints seek declaratory, injunctive, or other equitable relief against FHFA or Treasury. *See also* FHFA Mot. at 22 n.13. Such relief runs up against HERA's anti-injunction provision, which declares that "no court may take any action to restrain or affect the exercise of powers or functions of [FHFA] as a conservator or a receiver." 12 U.S.C. § 4617(f).

---

[10] This thirty-one prayers for relief figure does not include the two prayers for "reasonable costs, including attorneys' fees, incurred in bringing this action" and "such other and further relief as this Court deems just and proper" that appear in each of the five complaints at issue here. *See, e.g.*, *Fairholme* Compl. at ¶ 146(i) and (j).

While case law adjudicating HERA-related disputes is generally sparse, "[c]ourts interpreting the scope of [§] 4617(f) have relied on decisions addressing the nearly identical jurisdictional bar applicable to the Federal Deposit Insurance Corporation ('FDIC') conservatorships contained in 12 U.S.C. § 1821(j)."[11] *Natural Res. Def. Council, Inc. v. FHFA*, 815 F. Supp. 2d 630, 641 (S.D.N.Y. 2011), *aff'd sub nom. Town of Babylon v. FHFA*, 699 F.3d 221 (2d Cir. 2012). Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183, during the savings and loan crisis to enable the FDIC (and, formerly, the Resolution Trust Corporation ("RTC")) to serve as a conservator or receiver for troubled financial institutions. It was with this backdrop that the Court of Appeals for the District of Columbia Circuit, in *Freeman v. FDIC*, explained that the language of § 1821(j) "does indeed effect a sweeping ouster of courts' power to grant equitable remedies." 56 F.3d 1394, 1399 (D.C. Cir. 1995).[12] The Circuit held that the FIRREA provision precludes courts from granting "non-monetary remedies, including injunctive relief [] [and] declaratory relief" that would "effectively 'restrain' the [agency] from" exercising its statutorily authorized responsibilities. *Id.* (quoting 12 U.S.C. § 1821(j)). As the parties both agree, an equivalent bar on jurisdiction derives from HERA's substantially identical anti-injunction provision. *E.g.*, Individual Pls.'s Opp'n at 31-32.

Like a number of its sister circuits, however, this Circuit has established that, if the agency "has acted or proposes to act beyond, or contrary to, its statutorily prescribed,

---

[11] Section 1821(j) reads: ". . . no court may take any action . . . to restrain or affect the exercise of powers or functions of the [FDIC] as a conservator or a receiver." 12 U.S.C. § 1821(j).

[12] "Although this limitation on courts' power to grant equitable relief may appear drastic, it fully accords with the intent of Congress at the time it enacted FIRREA in the midst of the savings and loan insolvency crisis to enable the FDIC and the [RTC] to expeditiously wind up the affairs of literally hundreds of failed financial institutions throughout the country." *Id.* at 1398. Whether or not FHFA is "winding up the affairs of" the GSEs, the Circuit's interpretation of congressional intent to grant the FDIC enormous discretion to act as a conservator or receiver during the savings and loan crisis of 1989 applies with equal force to the mortgage finance crisis of 2008.

constitutionally permitted, powers or functions," then 12 U.S.C. § 4617(f) shall not apply.  *Nat'l Trust for Historic Pres. v. FDIC*, 21 F.3d 469, 472 (D.C. Cir. 1994) (Wald, J., concurring) (internal quotation marks and citation omitted) (referring to 12 U.S.C. § 1821(j)); *see also Leon Cnty., Fla. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012) ("'[I]f the FHFA were to act beyond statutory or constitutional bounds in a manner that adversely impacted the rights of others, § 4617(f) would not bar judicial oversight or review of its actions.'") (quoting *In re Freddie Mac Derivative Litig.*, 643 F. Supp. 2d 790, 799 (E.D. Va. 2009)); *Cnty. of Sonoma v. FHFA*, 710 F.3d 987, 992 (9th Cir. 2013) ("[T]he anti-judicial review provision is inapplicable when FHFA acts beyond the scope of its conservator power.").  Thus, the question for this Court is whether the plaintiffs sufficiently plead that FHFA acted beyond the scope of its statutory "powers or functions . . . as a conservator" when the agency executed the Third Amendment to the PSPAs with Treasury.  12 U.S.C. § 4617(f).  If not, the Court must dismiss all of the defendants' claims for declaratory, injunctive, or other equitable relief.[13]

> ## 1. Section 4617(f) Bars Claims of Arbitrary and Capricious Conduct, under APA § 706(2)(A), Which Seek Declaratory, Injunctive, or Other Equitable Relief

While there is a "strong presumption that Congress intends judicial review of administrative action," *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986), that presumption is "defeated if the substantive statute precludes review."  *Heckler v. Chaney*, 470 U.S. 821, 843 (1985) (citing 5 U.S.C. § 701(a)(1)).  The plaintiffs do not discuss the applicability of 5 U.S.C. § 701(a)(1) of the APA to the present case in any of their oppositions, except to cite *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 63-64 (1993), in the individual plaintiffs' opposition and reply briefs for the proposition that the Court can preclude APA review

---

[13] As the Court will explain below, this is true regardless of whether the defendants have levied some of their non-monetary claims against Treasury instead of FHFA.

"only if presented with clear and convincing evidence" of congressional intent to preclude such review. *E.g.*, Individual Pls.'s Reply to Defs.'s Mot. for Summ. J. at 15-16 (D.D.C. June 2, 2014) ("Individual Pls.'s Reply").  The individual plaintiffs are correct in that the "presumption of judicial review [under the APA] is, after all, a presumption, and like all presumptions used in interpreting statutes, may be overcome by, *inter alia,* specific language . . . that is a reliable indicator of congressional intent . . . to preclude judicial review." *Bowen*, 476 U.S. at 673 (internal quotation marks and citation omitted).   HERA's express anti-injunction provision, which, as explained below, necessarily covers litigation arising out of contracts executed by FHFA in accordance with its duties as a conservator, qualifies as a reliable indicator of congressional intent to preclude review of non-monetary APA claims brought against both FHFA and Treasury.  Importantly, when applying FIRREA's anti-injunction provision, 12 U.S.C § 1821(j), this Circuit has only considered whether the FDIC acted beyond "its statutorily prescribed, constitutionally permitted, powers or functions" under FIRREA, specifically, and not whether it acted beyond any of its more general APA obligations under 5 U.S.C. § 702(2).  *See Nat'l Trust*, 21 F.3d at 472 (Wald, J., concurring and further noting that, "given the breadth of the statutory language [of § 1821(j)], untempered by any persuasive legislative history pointing in a different direction, the statute would appear to bar a court from acting in virtually all circumstances"); *Freeman*, 56 F.3d at 1398-99; *MBIA Ins. Corp. v. FDIC*, 816 F. Supp. 2d 81, 103 (D.D.C. 2011), *aff'd*, 708 F.3d 234 (D.C. Cir. 2013); *see also Leon Cnty.*, 700 F.3d at 1278-79.  In other words, this Circuit, like the APA itself, implicitly draws a distinction between acting beyond the scope of the constitution or a statute, *see* § 702(2)(B) and (C), and acting within the scope of a statute, but doing so arbitrarily and capriciously, *see* § 702(2)(A).  This distinction arises directly from the text of § 4617(f), which prohibits the Court from restraining "the *exercise*

of powers or functions of [FHFA]"—*i.e.*, restraining *how* FHFA employs its powers or functions—but does not prohibit review based upon the statutory or constitutional origin of the powers or functions themselves.  12 U.S.C. § 4617(f) (emphasis added).  Consequently, it does appear that § 4617(f) bars all declaratory, injunctive, or other equitable relief stemming from claims of arbitrary and capricious decisionmaking, under APA § 706(2)(A).  Thus, the two counts in each of the *Perry*, *Fairholme*, and *Arrowood* Complaints, and related prayers for relief, that claim APA violations for arbitrary and capricious conduct by both Treasury and FHFA are hereby dismissed pursuant to Rule 12(b)(1).[14]

## 2. *Section 4617(f) Applies to Treasury's Authority under HERA*

As a threshold matter, the plaintiffs contend that § 4617(f) does not bar claims against Treasury because the provision only governs claims against FHFA.  However, the defendants' argument that granting relief against the counterparty to a contract with FHFA would directly restrain FHFA's ability as a conservator vis-à-vis that contract is based on sound reasoning.  *See, e.g.*, Treasury Reply at 12-13 (collecting cases outside of this Circuit).  Conduct by a counterparty that is required under a contract with FHFA does not merely constitute "a peripheral connection to FHFA's activities as the [GSEs'] conservator."  *See* Individual Pls.'s Opp'n at 29.  To the contrary, such interdependent, contractual conduct is directly connected to FHFA's activities as a conservator.  A plaintiff is not entitled to use the technical wording of her

---

[14] The class, *Arrowood*, and *Fairholme* plaintiffs each present a claim of breach of the implied covenant of good faith and fair dealing that closely parallels the individual plaintiffs' APA claims for arbitrary and capricious conduct. *See, e.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶ 161 (". . . Fannie Mae, acting through FHFA, acted arbitrarily and unreasonably and not in good faith or with fair dealing toward the members of the Fannie Preferred Class.").  Given the breadth of HERA and this Circuit's wariness toward evaluating *how* FHFA carries out its conservatorship responsibilities, *any* claim—APA- or contract-based—dependent upon allegations of arbitrary and capricious behavior coupled with a request for equitable relief probably should be summarily dismissed under § 4617(f).  Yet regardless of whether the Circuit sees fit to establish a categorical rule, the plaintiffs' claims of breach of the implied covenant which seek equitable relief are still generally dismissed on § 4617(f) grounds because the Court finds that FHFA acted within its statutory authority under HERA.  *See infra* Section III(A)(4).  And because some plaintiffs include within their breach of the implied covenant allegations a request for monetary relief, dismissal is also proper on ripeness and failure to state a claim grounds.  *See infra* Section III(C).

complaint—*i.e.,* bringing a claim against a counterparty when the contract in question is intertwined with FHFA's responsibilities as a conservator—as an end-run around HERA. Therefore, § 4617(f) applies generally to litigation concerning a contract signed by FHFA pursuant to its powers as a conservator.

Additionally, when the counterparty to FHFA's contract—Treasury—is also a government entity operating based on authority derived from HERA, *e.g.* 12 U.S.C. § 1719(g) (temporarily authorizing Treasury to purchase GSE securities), HERA's anti-injunction provision may be logically extended to that government counterparty.  Likewise, if FHFA, as a conservator or receiver, signs a contract with another government entity that is acting beyond the scope of its HERA powers, then FHFA is functionally complicit in its counterparty's misconduct, and such unlawful actions may be imputed to FHFA.  Here, as noted above, there can be little doubt that enjoining Treasury from partaking in the Third Amendment would restrain FHFA's uncontested authority to determine how to conserve the viability of the GSEs. Accordingly, the Court must decide whether Treasury acted in contradiction of its temporary power, under HERA, to invest in the GSEs.

The individual plaintiffs argue that Treasury acted beyond the scope of HERA because the Third Amendment constitutes the purchase of new GSE securities after HERA's December 31, 2009 sunset provision and because Treasury violated the APA by acting arbitrarily and capriciously when entering into the net worth sweep.  Here, given § 4617(f)'s bar on non-monetary claims of arbitrary and capricious decisionmaking under the APA, the Court must only consider whether Treasury purchased new securities through the Third Amendment.

### 3.     Treasury's Execution of the Third Amendment Does Not Constitute the Purchase of New Securities in Contravention of HERA

The individual plaintiffs argue that Treasury violated the sunset provision associated with its authority to purchase GSE securities under 12 U.S.C. § 1719(g) because the Third Amendment was not an "exercise of rights" under the statute and because the Third Amendment was effectively a purchase of new securities after December 31, 2009.  Individual Pls.'s Opp'n at 37.  Both claims are unpersuasive.

Asserting that the Third Amendment was not the exercise of a right, as allegedly required for any "market participa[tion]" after 2009, the individual plaintiffs state that, "[a]s of 2010, Treasury's authority as a market participant was limited to 'hold[ing], exercis[ing] any rights received in connection with, or sell[ing] any obligations or securities purchased'" from the GSEs.   Individual Pls.'s Opp'n at 36-37 (quoting 12 U.S.C. § 1719(g)(2)(D)).   But this contention overreads the provision governing the application of the statutory expiration date to purchased securities.  While § 1719(g)(2)(D) notes that holding securities, exercising any rights under the securities contract, or selling securities are specifically *exempt* from the sunset provision, the existence of that provision does not therefore preclude other non-security-purchasing activities otherwise permitted under an already agreed-upon, pre-2010 investment contract with the GSEs.[15]   To then say that the purchase authority sunset provision also categorically prohibits any provision within Treasury's contracts with the GSEs that requires "mutual assent" is to reach too far.  *Cf.* Individual Pls.'s Opp'n at 38.  Thus, whether or not amending the PSPA is a "right," as understood under § 1719(g), is irrelevant, as long as the Third Amendment did not constitute a purchase of new securities.

---

[15] While legislative history on this issue is unrevealing, the Court can easily imagine that Congress, with its exclusion from the sunset provision of Treasury's ability to "exercise any rights received in connection with . . . securities purchased," was contemplating an investment agreement whereby Treasury maintained future rights to purchase more GSE securities.

Here, Treasury purchased one million senior preferred shares in each GSE in exchange for a number of contractual entitlements.  *E.g.*, Treasury AR at 21-22 (Fannie Mae PSPA).  This "purchase" of GSE securities required Treasury to provide the GSEs with a funding commitment.   While in all three amendments that followed this purchase Treasury never received additional GSE shares, under the first two amendments, Treasury provided the GSEs with an expanded funding commitment.   The individual plaintiffs cite the "Action Memorandum for [Treasury] Secretary Geithner," which invokes Treasury's statutory purchasing authority under § 1719(g) as a justification for the funding expansion, as evidence that the Third Amendment was also a purchase of securities.   Individual Pls.'s Reply at 21 (Treasury AR at 181-88).   The Court, however, does not accept that a reference to Treasury's general purchasing authority in a memorandum to Secretary Geithner regarding the Second Amendment means that the Second Amendment (and First Amendment, for that matter) was, in fact, a purchase of new obligations or securities according to § 1719(g)(1)(a).   While Treasury's funding commitment is the currency by which Treasury purchased shares, which came with additional rights for Treasury, in the original PSPAs, no new shares or obligations were purchased during the first two amendments.   Treasury's receipt of "valuable consideration"—*i.e.*, the potential for increased liquidation preferences as the GSEs drew more funding—for these amendments does not, on its own, constitute the purchase of new GSE securities under § 1719(g)(1)(a).[16]   *Cf.* Individual Pls.'s Reply at 21.

Yet regardless of whether the first two amendments to the PSPAs should be considered a purchase of new securities, the Court finds that Treasury did not purchase new securities under

---

[16] Similarly, the fact that Treasury, prior to executing the First and Second Amendments, made § 1719(g)(1)(B) "emergency determinations" generally required before purchasing new securities does not, alone, signify the purchase of new securities.  *See* Treasury Reply at 37-38 (determinations made "because [Treasury] was pledging additional taxpayer funds to the GSEs").

the Third Amendment.   Under the Third Amendment—unlike the first two amendments—Treasury *neither* granted the GSEs additional funding commitments *nor* received an increased liquidation preference.   Instead, Treasury agreed to a net worth sweep in exchange for eliminating the cash dividend equivalent to 10% of the GSEs' liquidation preference.   This net worth sweep represented a new formula of dividend compensation for a $200 billion-plus investment Treasury had already made.   As FHFA further claims, the agency executed the Third Amendment to ameliorate the existential challenge of paying the dividends it *already* owed pursuant to the GSE securities Treasury purchased through the PSPA; it did not do so in order to sell more GSE securities.   FHFA Mot. at 3 ("The [GSEs] were unable to meet their 10% dividend obligations without drawing more from Treasury, causing a downward spiral of repaying *preexisting obligations* to Treasury through additional draws from Treasury.") (emphasis added).   Notwithstanding plaintiffs' contentions regarding the "fundamental change doctrine," Treasury's own tax regulations, or otherwise, the present fact pattern strikes the Court as straightforward, at least in the context of the applicability of § 1719(g)'s sunset provision.   Without providing an additional funding commitment or receiving new securities from the GSEs as consideration for its Third Amendment to the already existing PSPAs, Treasury cannot be said to have purchased new securities under § 1719(g)(1)(a).   Treasury may have amended the compensation structure of its investment in a way that plaintiffs find troubling, but doing so did not violate the purchase authority sunset provision.   § 1719(g)(4).

### 4.      *FHFA Acted within Its Statutory Authority*

The individual plaintiffs put forth a number of claims that FHFA violated HERA by entering into the Third Amendment.[17] These arguments concern both FHFA's conduct and the purported reasons *for* FHFA's conduct—the *what* and the *why*, so to speak.[18]

At bottom, the Third Amendment sweeps nearly all GSE profit dollars to Treasury. The result for non-Treasury shareholders is virtually no likelihood of dividend payments (given the lack of profits along with Treasury's discretion to pay dividends, *see, e.g.* Treasury AR at 58 (Freddie Mac PSPA § 5.1)) and a decrease in the potential liquidation preference they would receive if the company liquidated during a period of profitability. Both parties essentially admit this same depiction in their briefs, biased adjectives aside. Looking past the financial engineering involved in the PSPAs and subsequent amendments, the question for this Court, simply, is whether the net worth sweep amendment represents conduct that exceeds FHFA's authority under HERA—a statute of exceptional scope that gave immense discretion to FHFA as a conservator. It is surely true that "FHFA cannot evade judicial scrutiny by merely labeling its actions with a conservator stamp." *Leon Cnty. v. FHFA*, 700 F.3d 1273, 1278 (11th Cir. 2012). Yet construing the allegations in a light most favorable to the plaintiffs, the Court finds that the plaintiffs fail to demonstrate by a preponderance of the evidence—if at all—that FHFA's execution of the Third Amendment violated HERA. *See, e.g.*, *Pitney Bowes, Inc. v. U.S. Postal Serv.*, 27 F. Supp. 2d 15, 19 (D.D.C. 1998) ("The plaintiff bears the burden of persuasion to establish subject matter jurisdiction by a preponderance of the evidence."). As such, the plaintiffs cannot overcome § 4617(f)'s jurisdictional bar on equitable relief.

---

[17] The class plaintiffs appear to adopt the individual plaintiffs' briefing on this issue. *See* Class Pls.'s Opp'n at 25.

[18] The Court has already dismissed, *supra*, claims of arbitrary and capricious decisionmaking brought pursuant to 5 U.S.C. 706(2)(A). This subsection, then, will address all other claims for equitable relief against FHFA.

a.    *FHFA's Justifications for Executing the Third Amendment and, Consequently, the Accompanying Administrative Record, Are Irrelevant for § 4617(f) Analysis*

The extraordinary breadth of HERA's statutory grant to FHFA as a conservator or receiver for the GSEs, likely due to the bill's enactment during an unprecedented crisis in the housing market, *Cf. Freeman*, 56 F.3d at 1398, coupled with the anti-injunction provision, narrows the Court's jurisdictional analysis to *what* the Third Amendment entails, rather than *why* FHFA executed the Third Amendment. *See also id.* (the anti-injunction provision applies "unless [the conservator] has acted . . . beyond, or contrary to, its statutorily prescribed, constitutionally permitted, powers or functions."). Nevertheless, the individual plaintiffs focus a sizable portion of their opposition and reply briefs on disputing FHFA's *justifications* for the Third Amendment. *See* Individual Pls.'s Opp'n at 58-73; Individual Pls.'s Reply at 31-39. Similarly, the individual plaintiffs argue that FHFA violated HERA by not producing the full administrative record. Individual Pls.'s Opp'n at 46-51; Individual Pls.'s Reply at 26-29. Both sets of claims ask the Court, directly or indirectly, to evaluate FHFA's rationale for entering into the Third Amendment—a request that contravenes § 4617(f).

Claims that FHFA's varying explanations for entering into the Third Amendment reveal that the agency's conduct went beyond its statutory authority under HERA—which are merely extensions of the individual plaintiffs' arbitrary and capricious arguments under a different subheading—share the same fate as the plaintiff's APA arbitrary and capricious claims. Once again, to determine whether it has jurisdiction to adjudicate claims for equitable relief against FHFA as a conservator, the Court must look at *what* has happened, not *why* it happened. For instance, the Court will examine whether the Third Amendment *actually* resulted in a *de facto* receivership, *infra*; not what FHFA has publicly stated regarding any power it may or may not

have, as conservator, to prepare the GSEs for liquidation, *see* Individual Pls.'s Opp'n at 58-66. FHFA's underlying motives or opinions—*i.e.*, whether the net worth sweep would arrest a downward spiral of dividend payments (*see also supra* n.7), increase payments to Treasury, or keep the GSEs in a holding pattern, Individual Pls.'s Opp'n at 66-73—do not matter for the purposes of § 4617(f). *Cf. Leon Cnty., Fla. v. FHFA*, 816 F. Supp. 2d 1205, 1208 (N.D. Fla. 2011) *aff'd*, 700 F.3d 1273 (11th Cir. 2012) ("Congress surely knew, when it enacted § 4617(f), that challenges to agency action sometimes assert an improper motive. But Congress barred judicial review of the conservator's actions without making an exception for actions said to be taken from an improper motive."). Moreover, contrary to the individual plaintiffs' assertion, *id.* at 46-51, and consistent with the Court's ruling regarding the bar on arbitrary and capricious review under § 4617(f), *supra*, the Court need not view the full administrative record to determine whether the Third Amendment, *in practice*, exceeds the bounds of HERA.

Generally, "[i]t is not [the Court's] place to substitute [its] judgment for FHFA's," *Cnty. of Sonoma*, 710 F.3d at 993, let alone in the face of HERA's "sweeping ouster of courts' power to grant equitable remedies," *Freeman*, 56 F.3d at 1398. *See also MBIA Ins. Corp.*, 816 F. Supp. 2d at 103 ("In seeking injunctive or declaratory relief, it is not enough for [the plaintiffs] to allege that [conservator] came to the wrong conclusion . . . ."). Requiring the Court to evaluate the merits of FHFA's decisionmaking each time it considers HERA's jurisdictional bar would render the anti-injunction provision hollow, disregarding Congress' express intention to divest the Court of jurisdiction to restrain FHFA's "exercise of [its] powers or functions" under HERA—*i.e.*, *how* FHFA employs its powers or functions. *See* 12 U.S.C. § 4617(f). Therefore, the Court will only consider FHFA's actual conduct.

b.      *FHFA Has Not Violated 12 U.S.C. § 4617(a)(7)*

The individual plaintiffs briefly argue that FHFA violated HERA's prescription "not [to] be subject to the direction or supervision of any other agency of the United States . . . in the exercise of the rights, powers, and privileges of the Agency."  12 U.S.C. § 4617(a)(7); *see* Individual Pls.'s Opp'n at 51; *Fairholme* and *Arrowood* Plaintiffs' Supplemental Opp'n at 7-10 (D.D.C. Mar. 21, 2014) ("Sup. Opp'n"); Individual Pls.'s Reply at 13, 40.  However, "records" showing that Treasury "invented the net-worth sweep concept with no input from FHFA" do not come close to a reasonable inference that "FHFA considered itself bound to do whatever Treasury ordered."  *See* Individual Pls.'s Opp'n at 51.  The plaintiffs cannot transform subjective, conclusory allegations into objective facts.  *See* Sup. Opp'n at 9-10 (claiming that "[o]nly a conservator that has given up the will to exercise its independent judgment could agree to forfeit so much").  Notwithstanding the plaintiffs' perspective that the Third Amendment was a "one-sided deal" favoring Treasury, the amendment was executed by two sophisticated parties, and there is nothing in the pleadings or the administrative record provided by Treasury that hints at coercion actionable under § 4617(a)(7).  *See* Individual Pls.'s Opp'n at 51 (citing Treasury AR at 3775-802, 3833-62, 3883-94, 3895-903).  Undoubtedly, many negotiations arise from one party conjuring up an idea, and then bringing their proposal to the other party.  This claim does not pass muster under either Rule 12(b)(1) or Rule 12(b)(6).

c.      *FHFA Has Not Placed the GSEs in* De Facto *Liquidation*

The individual plaintiffs further contend that the Third Amendment amounts to a *de facto* liquidation, which exceeds FHFA's statutory authority as a conservator.  By entering into an agreement that sweeps away nearly all GSE profits, they argue, FHFA has forsaken its statutory responsibility to "rehabilitate" the GSEs and, instead, has effectively placed the GSEs in

receivership.  Individual Pls.'s Opp'n at 55-58; *see* 12 U.S.C. § 4617(a)(2).  But FHFA counters that full-scale rehabilitation is not the only possible statutory duty of a conservator—that the statute also permits a conservator to "reorganize" or "wind up" the affairs of a GSE.  FHFA Mot. at 30 (citing 12 U.S.C. § 4617(a)(2)).  The Court has no occasion to decide whether the conservator is empowered to wind down the GSEs.  It is unnecessary to engage in a lengthy debate over statutory interpretation because the facts, as stated in the plaintiffs' pleadings, belie the individual plaintiffs' claims of *de facto* liquidation under receivership authority.

Here, the Court need not look further than the current state of the GSEs to find that FHFA has acted within its broad statutory authority as a conservator.  Four years ago, on the brink of collapse, the GSEs went into conservatorship under the authority of FHFA.  *E.g.*, *Fairholme* Compl. at ¶ 3.  Today, both GSEs continue to operate, and have now regained profitability.  *E.g.*, *Fairholme* Compl at ¶¶ 8, 60, 63 ("Fannie and Freddie are now immensely profitable."); *cf. id.* at ¶ 14 (noting that prior to the Third Amendment, "[t]he conservatorship of Fannie and Freddie achieved the purpose of restoring the Companies to financial health").  Unquestionably, the plaintiffs take great issue with FHFA's conduct between and since these two bookend facts.  However, when the Court is asked to determine whether FHFA acted beyond, or contrary to, its responsibilities as conservator under a statute that grants the agency expansive discretion to act as it sees fit, it is the current state of affairs that must weigh heaviest on this analysis.  If the Third Amendment were really part of a scheme to liquidate the GSEs, then the GSEs would, presumably, be in liquidation rather than still be "immensely profitable."  *See Fairholme* Compl. at ¶ 60.  There is no dispute that the Third Amendment substantially changed the flow of profits,

directing billions of dollars into Treasury's coffers.[19]   But that alteration, alone, is in no way

sufficient to reclassify a conservatorship into a receivership.[20]

The individual plaintiffs cite no precedent stating that a net worth sweep, or some

equivalent, is functionally akin to liquidation.   The case law cited in their opposition actually

supports the position that FHFA is acting as a conservator.   Individual Pls.'s Opp'n at 52-54

(collecting cases).   In sum, these cases stand for the proposition that a conservator should "carry

on the business of the institution," *MBIA Ins. Corp. v. FDIC*, 708 F.3d 234, 236 (D.C. Cir. 2013),

and "take actions necessary to restore a financially troubled institution to solvency," *McAllister

v. RTC*, 201 F.3d 570, 579 (5th Cir. 2000).   Here, the GSEs maintain an operational mortgage

finance business and are, once again, profitable—two facts indicative of a successful

---

[19] It is worth noting that Treasury's insistence on receiving cash dividends, as required under the PSPAs, rather than accepting a 12% dividend deferred to the liquidation preference, suggests that Treasury believed there was no intention to imminently liquidate the GSEs.  *See* Treasury Reply at 49-50; *see also supra* n.7.  A belief that there was no planned liquidation—and thus no forthcoming receipt of liquidation payments—would mean that adding owed dividends to Treasury's ever-growing liquidation preference would produce increased risk for the taxpayer.

[20] The individual plaintiffs specifically argue that the net worth sweep exceeds FHFA's authority as a conservator because it (1) depletes available capital; (2) "eliminates the possibility of normal business operations"; and (3) carries an ultimate intent to wind down the GSEs.  Individual Pls.'s Opp'n at 56-58.  First, the original dividend distribution scheme under the PSPAs also depleted the GSEs' capital.  Dividends distributed to security holders, by nature, constitute a depletion of available capital.  Second, there is no HERA provision that requires a conservator to abide by every public statement it has made.  To the contrary, HERA permits a conservator wide latitude to flexibly operate the GSEs over time.  *See* 12 U.S.C. § 4617(b)(2)  Third, even if FHFA has explicitly stated an intent to eventually wind down the GSEs, such an intent is not automatically inconsistent with acting as a conservator.  There surely can be a fluid progression from conservatorship to receivership without violating HERA, and that progression could very well involve a conservator that acknowledges an ultimate goal of liquidation.  FHFA can lawfully take steps to maintain operational soundness and solvency, conserving the assets of the GSEs, until it decides that the time is right for liquidation.  *See* 12 U.S.C. § 4617(b)(2)(D) ("[p]owers as conservator").

Moreover, since the Third Amendment remains consistent with FHFA's wide-ranging authority as a conservator, there is no need for the Court to further resolve whether the amendment falls within FHFA's authority to "transfer or sell any asset" under § 4617(b)(2)(G).  *Compare* FHFA Mot. at 27-29 *and* FHFA Reply at 5-7, *with* Individual Pls.'s Opp'n at 63-66 *and* Individual Pls.'s Reply at 31-33.  The plaintiffs essentially argue that the Third Amendment runs counter to FHFA's power to transfer assets *because* FHFA is not seeking to "rehabilitate" the GSEs when making this transfer.  Individual Pls.'s Opp'n at 64-66.  Yet, as explained, the Court finds the plaintiffs' premise— that FHFA's conduct is inconsistent with a conservatorship—to be lacking.  Therefore, whether or not FHFA classifies the Third Amendment as a transfer of assets is of no moment.  The breadth of Congress' grant of authority to FHFA under HERA means that the Court's analysis must center much more on the ends than the means.

conservatorship.[21]  Thus, the plaintiffs plead no facts demonstrating that FHFA has exceeded its

statutory authority as a conservator.

Given that § 4617(f) bars subject matter jurisdiction[22] over all declaratory, injunctive, and

other equitable relief requested against the defendants that would restrain the conservator's

ability to "exercise [its statutory] powers or functions," all claims related to these prayers for

relief must be dismissed pursuant to Rule 12(b)(1).  Included are the individual plaintiffs' APA

claims against both FHFA and Treasury,[23] the *Fairholme* plaintiffs' claim of breach of fiduciary

duty against FHFA, and any part of the plaintiffs' claims of breach of the implied covenant of

good faith and fair dealing which request declaratory relief.

### B.       HERA Bars the Plaintiffs' Derivative Claims against FHFA and Treasury

The class plaintiffs bring derivative claims against both FHFA and Treasury on behalf of

Fannie Mae and Freddie Mac.  *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 72-79 (Fannie

Mae); *In re Fannie Mae/Freddie Mac* Derivative Compl. at ¶¶ 175-82 (Freddie Mac).[24]  Under

---

[21] Indeed, the GSE's current profitability is the fundamental justification for the plaintiffs' prayers for equitable and monetary relief.  In other words, this litigation only exists *because* the GSEs have, under FHFA's authority, progressed from insolvency to profitability.

[22] The Court acknowledges that there appears to be some confusion over whether Rule 12(b)(1) or Rule 12(b)(6) applies to § 4617(f).  This Circuit has framed FIRREA's substantially identical anti-injunction provision, 12 U.S.C. § 1821(j), as a bar on *relief*.  *See Freeman*, 56 F.3d at 1396, 1398, 1406; *see also MBIA Ins. Corp.*, 816 F. Supp. 2d at 104, 106 (explicitly dismissing claims on § 1821(j) grounds pursuant to Rule 12(b)(6)).  However, recent rulings by courts in the Second, Ninth, and Eleventh Circuits framing § 4617(f) as a *jurisdictional* bar, *see Town of Babylon*, 699 F.3d at 227-28; *Cnty. of Sonoma*, 710 F.3d at 990, 994-95; *Leon Cnty.*, 700 F.3d at 1275 n.1, 1276, coupled with the parties in this case doing the same, *see, e.g.*, Individual Pls.'s Opp'n at 31-32 ("HERA's jurisdictional bar"); FHFA Mot. at 28 ("[t]he jurisdictional bar of Section 4617(f)"), leads the Court to believe that the breadth of § 4617(f) better represents a jurisdictional bar, with related claims subject to dismissal under Rule 12(b)(1), than a bar on relief.  But regardless of the proper basis for dismissal, the Court would dismiss the plaintiffs' claims for equitable relief under 12(b)(1) *or* 12(b)(6).

[23] Accordingly, the *Perry* Complaint is dismissed in its entirety.

[24] The Court need not determine whether the individual plaintiffs' APA claims should be considered derivative, since all such claims are dismissed pursuant to § 4617(f).  *Compare* Treasury Mot. at 30-33, *with* Individual Pls.'s Reply at 9-11.

Similarly, the *Fairholme* plaintiffs' fiduciary duty claim against FHFA, which seeks only equitable relief, is also dismissed pursuant to § 4617(f).  *See* Sup. Opp'n at 13 ("The Fairholme Plaintiffs, moreover, have expressly limited their fiduciary duty claim to seek only 'equitable and declaratory relief' aimed at unwinding the Sweep Amendment

HERA, FHFA "shall, as conservator or receiver, and by operation of law, immediately succeed to (i) all rights, titles, powers, and privileges of the [GSE], and of any stockholder . . . ." 12 U.S.C. § 4617(b)(2)(A)(i).[25]   The Circuit has held that "[t]his language plainly transfers shareholders' ability to bring derivative suits—a 'right[ ], title[ ], power[ ], [or] privilege[ ]'—to FHFA." *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012).

### *1.    An Exception to HERA's Bar on Shareholder Derivative Claims Would Contravene the Plain Language of the Statute*

The plaintiffs argue that, despite the general bar against derivative suits, they have standing to sue derivatively because FHFA, due to a conflict of interest, would be unwilling to sue itself or Treasury.[26]   Class Pls.'s Opp'n at 32-35; Sup. Opp'n at 14-16.   In passing, *Kellmer* notes the existence, among other circuits, of an exception to the equivalent bar on shareholder

---

and eliminating its harmful effect on Plaintiffs' interests in Fannie and Freddie.") (internal quotations and citation to Complaint omitted).   As such, there is no requirement for the Court to decide whether such claims are derivative or direct.   However, if such a determination were necessary, the Court notes that it would find that the *Fairholme* plaintiffs' fiduciary duty claim is derivative in nature and, therefore, barred under § 4617(b)(2)(A)(i) as well. Without resolving whether Delaware and/or Virginia law applies to the *Fairholme* plaintiffs' fiduciary duty claim, the Court—like both parties—will briefly utilize the analysis established by the Supreme Court of Delaware in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).   To determine whether a shareholder's claim is derivative or direct, the Court asks:   "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"   *Id.* at 1033.   Regardless of whether the *Fairholme* plaintiffs plead injuries to both the GSEs and the individual plaintiff shareholders, *see* FHFA Reply at 23; *but see* Sup. Opp'n at 12-13, the claim qualifies as derivative, not direct, under *Tooley*'s second prong.   Here, recovery or relief will not flow "directly to the stockholders." *Tooley*, 845 A.2d at 1036.   Instead, the equitable relief *Fairholme* seeks—"namely, vacating the Third Amendment and returning its resulting dividends from Treasury to the Enterprises (*Fairholme* Compl. ¶ 146(d)-(e))—would flow first and foremost to the [GSEs]." *FHFA Reply* at 24.   That relief will *not* flow directly to the *Fairholme* plaintiffs is especially true since, after signing the PSPAs, Treasury effectively maintained discretion over GSE dividend payments, *see, e.g.*, Treasury AR at 24 (Fannie Mae PSPA § 5.1), and the GSEs, still in conservatorship, are not liquidating assets pursuant to any liquidation preferences.

Finally, Treasury's argument that the plaintiffs lack prudential standing, Treasury Mot. at 34-36, does not require consideration here. *Cf. Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996) ("[The Court has] no difficulty dismissing a case based on one jurisdictional bar rather than another. . . .   Because issues of standing, ripeness, and other such 'elements' of justiciability are each predicate to any review on the merits, a court need not identify all such elements that a complainant may have failed to show in a particular case.").

[25] The statute also provides that FHFA may, as conservator, ". . . operate the [GSE] with all the powers of the shareholders."   12 U.S.C. § 4617(b)(2)(B)(i).

[26] "The party invoking federal jurisdiction bears the burden of establishing [standing]."   *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

derivative actions brought against the FDIC under the substantially similar FIRREA provision, 12 U.S.C. § 1821(d)(2)(A), for instances of "manifest conflict of interest." *Kellmer*, 674 F.3d at 850. The defendants are right, however, that this Circuit has not adopted such an exception. *E.g.*, Treasury Mot. at 31. While *Kellmer* concerned a suit against officers and directors rather than one against FHFA and Treasury, *see* Class Pls.'s Opp'n at 31, the Circuit's holding puts no limitations on HERA's rule against shareholder derivative suits. Based on the Circuit's discussion of the text of 12 U.S.C. § 4617(b)(2)(A)(i), it stands to reason that if the *Kellmer* Court had occasion to consider the purported conflict of interest exception, it would not have found that such an exception exists.

The idea of an exception to HERA's rule against derivative suits comes from two cases, both considering FIRREA § 1821(d)(2)(A). First, the Federal Circuit held that, notwithstanding the "general proposition" that the FDIC assumed "the right to control the prosecution of legal claims on behalf of the insured depository institution now in its receivership," a plaintiff has standing to bring a derivative suit when the FDIC has a "manifest conflict of interest"—*i.e.*, when the plaintiffs ask the receiver to bring a suit based on a breach allegedly caused by the receiver. *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1295-96 (Fed. Cir. 1999). Then, the Ninth Circuit "adopt[ed] the *First Hartford* exception" in *Delta Savings Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001), for instances of conflict of interest between sufficiently "interdependent entities." *Id.* at 1021-23.[27]

It strikes this Court as odd that a statute like HERA, through which Congress grants immense discretionary power to the conservator, § 4617(b)(2)(A), and prohibits courts from interfering with the exercise of such power, § 4617(f), would still house an *implicit* end-run

---

[27] The Court can reasonably presume the Ninth Circuit's exception would also apply to instances where a plaintiff demands that the FDIC sue itself.

around FHFA's conservatorship authority by means of the shareholder derivative suits that the statute explicitly bars. "To resolve this [oddity, however,] we need only heed Professor Frankfurter's timeless advice: '(1) Read the statute; (2) read the statute; (3) read the statute!'" *Kellmer*, 674 F.3d at 850 (second internal quotation marks omitted) (citing Henry J. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in* Benchmarks 196, 202 (1967)). The Circuit tells the Court that HERA, by its unambiguous text, removes the power to bring derivative suits from shareholders and gives it to FHFA. *Id.* (citing § 4617(b)(2)(A)).[28] As the *basis* for its exception to the rule against shareholder derivative suits, the Federal Circuit explained that "the very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation." *First Hartford*, 194 F.3d at 1295; *see also* Class Pls.'s Opp'n at 32 (quoting the same). Yet the existence of a rule against shareholder derivative suits, § 4617(b)(2)(A)(i), indicates that courts cannot use the *rationale* for why derivative suits are available to shareholders as a legal tool—including the conflict of interest rationale—to carve out an *exception* to that prohibition. Derivative suits largely exist so that shareholders can protect a corporation from those who run it—and HERA takes the right to such suits away from shareholders.[29] How, then, can a court base the exception to a rule barring shareholder

---

[28] *See also La. Mun. Police Emps. Ret. Sys. v. FHFA*, 434 F. App'x 188, 191 (4th Cir. 2011) (affirming and quoting *In re Freddie Mac Derivative Litig.*, 643 F. Supp. 2d 790, 795 (E.D. Va. 2009) ("[T]he plain meaning of the statute is that *all* rights previously held by Freddie Mac's stockholders, including the right to sue derivatively, now belong exclusively to the [Agency].")).

[29] "Indeed, as the Supreme Court has explained, 'the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers.'" *First Hartford*, 194 F.3d at 1295 (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991)).

derivative suits on the purpose of the "derivative suit mechanism" that rule seeks to bar?  *See First Hartford*, 194 F.3d at 1295.  Such an exception would swallow the rule.[30]

By looking outside HERA's statutory language to find an exception to the rule against derivative suits that is based on the reason the judicial system permits derivative suits in the first place, a court would effectively be asserting its disagreement with the breadth of HERA's text.  HERA provides no qualification for its bar on shareholder derivative suits, and neither will this Court.  § 4617(b)(2)(A) (the conservator "shall . . . immediately succeed to . . . *all* rights, titles, powers, and privileges . . . of any stockholder) (emphasis added).[31]  It is a slippery slope for the Court to poke holes in, or limit, the plain language of a statute, especially when, as here, the plaintiffs have not asked the Court to weigh in on the statute's constitutionality.  Therefore, the Court finds that HERA's plain language bars shareholder derivative suits, without exception.

## 2.   *Even If the Exception Applies, There Is No Conflict of Interest between FHFA and Treasury*

Even assuming *arguendo* that the *First Hartford* and *Delta Savings* exceptions to HERA's prohibition on shareholder derivative suits applied to HERA § 4617(b)(2)(A)(i), there is no conflict of interest between FHFA and Treasury, and the class plaintiffs' fiduciary duty claims against Treasury would be dismissed.  The *First Hartford* decision would not apply to the

---

[30] The Court further notes that the *First Hartford* and *Delta Savings* decisions both involved the FDIC in receivership.  Applying an exception to the statutory rule against derivative suits makes still less sense in the conservatorship context, where FHFA enjoys even greater power free from judicial intervention.  Consistent with congressional intent to decrease restrictions governing the emergency scenario during which FHFA would need to conserve the viability of the GSEs, under HERA, court involvement on issues brought by outside stakeholders, and not by the GSEs themselves, *cf.* § 4617(a)(5), is most available throughout the *receivership* claims process.  *E.g.*, § 4617(b)(5), (6).

[31] The Court respectfully disagrees with the Ninth Circuit's argument that "strict adherence to an absolute rule would be at least impracticable, and arguably absurd."  *Delta Sav. Bank v. United States*, 265 F.3d 1017, 1023-24 (9th Cir. 2001).  This Court believes that an unequivocal, "absolute rule" against shareholder derivative suits enacted by Congress during a time of economic crises requires "strict adherence."  HERA's anti-injunction provision, § 4617(f), is illustrative of Congress' intention to transfer "all" shareholder rights to the conservator so that it could work, unimpeded, to save the GSEs from impending collapse, without a concern for preserving any such shareholder rights to derivative suits.

Treasury fiduciary duty claims because the plaintiffs are not demanding that FHFA sue itself or sue another government entity on account of FHFA's own breach, 194 F.3d at 1295—the plaintiffs' claims against Treasury are due to Treasury's alleged breach.  *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 177-79.  In *Delta Savings*, the Ninth Circuit's finding of a "manifest conflict of interest" was not just based on the presence of two government entities, but rather two sufficiently *interrelated* government agencies.  265 F.3d at 1023 ("We do not suggest that the FDIC-as-receiver is faced with a disqualifying conflict every time a bank-in-receivership is asked to sue another federal agency; it is the nature of the [Office of Thrift Supervision ('OTS')]–FDIC relationship that raises the conflict here.").  As the *Delta Savings* Court explained, the FDIC and the OTS were "interrelated agencies with overlapping personnel, structures, and responsibilities." *Id.* at 1021-22.  The relationship between FHFA and Treasury fails the Ninth Circuit's interrelatedness test.  The class plaintiffs point to no "operational or managerial overlap," and the agencies do not "share a common genesis."  *Id.* at 1022-23.  Unlike OTS, which supervised thrift institutions and retained the ability to "choose the FDIC to be the conservator," *id.* at 1023, Treasury plays no role in choosing FHFA to act as a conservator for the GSEs.  While Treasury and FHFA, *inter alia*, have jointly proposed regulations, *e.g.*, Credit Risk Retention, 78 Fed. Reg. 183 (proposed Sept. 20, 2013), the fact that both entities exist within the financial regulation space cannot, on its own, satisfy *Delta Savings*' narrowly applied interrelatedness test.  *See* 265 F.3d at 1022-1023.

Furthermore, the Court understands that Treasury represented the only feasible entity—public or private—capable of injecting sufficient liquidity into and serving as a backstop for the GSEs within the short timeframe necessary to preserve their existence in September 2008.  There was no other investment partner at FHFA's disposal.  *See* FHFA Mot. at 7-8.  In fact, Congress

expressly foresaw the need for a Treasury-FHFA relationship, specifically authorizing Treasury to invest in the GSEs.  12 U.S.C. § 1719(g); *see also* 12 U.S.C. § 4617(b)(5)(D)(iii)(I) (Congress highlighted Treasury's potential role as creditor to the GSEs by explicitly creating an exception to FHFA's authority, as receiver, to disallow creditor claims made by Treasury).[32]   A relationship-based conflict of interest analysis, *see Delta Sav. Bank*, 265 F.3d at 1023, does not require the Court to ignore the harsh economic realities facing the GSEs—and the national financial system if the GSEs collapsed—when FHFA and Treasury executed the PSPAs in 2008. Courts, generally, should be wary of labeling a transaction with an investor of last resort as a conflict of interest.[33]

Thus, the class plaintiffs' derivative claims, on behalf of the GSEs, for breach of fiduciary duty by FHFA and Treasury, are dismissed pursuant to Rule 12(b)(1) for lack of standing.[34]

### C.   The Plaintiffs' Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims for Monetary Damages Must Also Be Dismissed

The plaintiffs further request monetary damages for claims of breach of contract and breach of the implied covenant of good faith and fair dealing, specifically regarding the dividends and liquidation preference provisions within their respective GSE stock certificates. *See In re Fannie Mae/Freddie Mac* Am. Compl. at 64 (¶ 7); *Arrowood* Compl. at 52 (¶ E);[35]

---

[32] Notably, Congress omitted Treasury from its list of potential credit providers exempt from FDIC's authority to disallow claims under FIRREA.  *See* 12 U.S.C. § 1821(d)(5)(D)(iii)(I).

[33] A recent ruling by Judge Jackson provides additional persuasive reasoning that, even if the conflict of interest exception existed in this Circuit, the FHFA-Treasury relationship does not constitute such a conflict.  *Gail C. Sweeney Estate Marital Trust v. U.S. Treasury Dep't*, No. 13-0206, 2014 WL 4661983 (D.D.C. Sept. 19, 2014).

[34] "[T]he defect of standing is a defect in subject matter jurisdiction."  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

[35] It is unclear to the Court whether the *Arrowood* plaintiffs incorporate their claim of breach of the implied covenant into their request for monetary relief, *Arrowood* Compl. at 52 (¶ E).  Yet, regardless of the *Arrowood* plaintiff's intention, the claim is dismissed.  If the claim of breach of the implied covenant is included within ¶ E,

*Fairholme* Compl. at ¶ 146(h).   As the class plaintiffs correctly assert, HERA's anti-injunction

provision, § 4617(f), does not bar requests for *monetary* relief.   *See* Class Pls.'s Opp'n at 21-22

(citing, among other cases, *Hindes v. FDIC*., 137 F.3d 148, 161 (3d Cir. 1998); *Willow Grove,

Ltd. v. Fed. Nat'l Mortg. Ass'n*, No. 13-0723, 2013 WL 6865127, at *2 (D. Colo. Dec. 31,

2013)); *see also Freeman*, 56 F.3d at 1399 (concluding that FIRREA § 1821(j) precluded

nonmonetary remedies, but noting that "aggrieved parties will [still] have opportunities to seek

money damages").   Nevertheless, the plaintiffs' contract-based claims seeking monetary

damages must also be dismissed under the threshold analyses required by Rule 12(b)(1) and Rule

12(b)(6).

### 1.      The Plaintiffs' Liquidation Preference Claims Are Not Ripe

FHFA's entrance into the Third Amendment, allegedly in contravention of the GSEs'

existing contract—*i.e.*, stock certificates—with the plaintiffs, constitutes a decision by an

administrative agency.   *See* 12 U.S.C. § 4511(a) ("There is established the Federal Housing

Finance Agency, which shall be an independent agency of the Federal Government.").   While the

class and *Arrowood* plaintiffs also include the GSEs as targets of their claims of breach of

contract and breach of the implied covenant, the action in question was undeniably one taken by

FHFA.   As such, the ripeness doctrine, which is most often applied to pre-enforcement review of

agency determinations, may also govern the Court's assessment of subject matter jurisdiction

here.[36]   "Ripeness entails a functional, not a formal, inquiry."   *Pfizer Inc. v. Shalala*, 182 F.3d

975, 980 (D.C. Cir. 1999).   "Determining whether administrative action is ripe for judicial

---

then the claim is dismissed pursuant to Rule 12(b)(1) and Rule 12(b)(6).  *See infra*.  If the *Arrowood* plaintiffs only
intended to seek declaratory relief for the alleged breach of the implied covenant, then Count VI of the *Arrowood*
Complaint is dismissed, under HERA § 4617(f), pursuant to Rule 12(b)(1).  *See supra* Section III(A).

[36] "The question of ripeness goes to [the Court's] subject matter jurisdiction . . . ."  *Duke City Lumber Co.* v. *Butz*,
539 F.2d 220, 221 n.2 (D.C. Cir. 1976).

review requires us to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Products Co.*, 473 U.S. 568, 580-81).

An analysis of the plaintiffs' contentions regarding the liquidation preference written into their preferred stock certificates is uncomplicated. The certificates grant the plaintiffs "a priority right to receive distributions from the Companies' assets in the event they are dissolved." Individual Pls.'s Opp'n at 5.[37] Therefore, by definition, the GSEs owe a liquidation preference payment to a preferred shareholder only during liquidation. It follows that there can be no loss of a liquidation preference prior to the time that such a preference can, contractually, be paid. Here, the GSEs remain in conservatorship, not receivership, and there is no evidence of *de facto* liquidation.[38] *See supra* Section III(A)(4)(c).

The question for the Court cannot be whether the Third Amendment diminishes an *opportunity* for liquidation preferences at some point in the future, but rather whether the plaintiffs have suffered an injury to their right to a liquidation preference in fact and at present. Yet the individual plaintiffs assert that the Third Amendment "has clearly injured Plaintiffs in a direct and personal way" because "[t]heir right to an opportunity to benefit from the liquidation

---

[37] The common stockholders among the class plaintiffs similarly claim deprivation "of any possibility of receiving dividends or a liquidation preference." *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶ 155.

[38] The *Arrowood* and *Fairholme* plaintiffs' citation to *Quadrangle Offshore (Cayman), LLC v. Kenetech Corp.*, No. 16362, 1998 WL 778359 (Del. Ch. Oct. 21, 1998) is, thus, inapposite, since that case concerns what the plaintiffs would aptly classify as *de facto* liquidation. *See* Sup. Opp'n at 41-42, 45 ("In *Quadrangle*, the defendant company had pursued no business and sold most of its assets to pay creditors, but because the company did not formally declare that it was in liquidation, it did not pay the preferred shareholders their contractually-specified liquidation preference.").

preferences in their preferred stock—once valuable—is now worthless . . . ."  Individual Pls.'s Opp'n at 36.  But, just as there was a Third Amendment, the Court cannot definitively say there will be no Fourth or Fifth Amendment that will transform the current "opportunity to benefit from the liquidation preferences in [the plaintiffs'] preferred stock."  A ripeness requirement prevents the Court from deciding a case "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. at 300.  Indeed, the purpose of the ripeness doctrine is to ensure the Court hears only an "actual case or controversy." *Cf. Pfizer*, 182 F.3d at 980.  Thus, the plaintiffs' liquidation preference claims are not fit for a judicial decision until liquidation occurs.[39]

Given that the plaintiffs maintain no current right to a liquidation preference while the GSEs are in conservatorship, the plaintiffs are no worse off today than they were before the Third Amendment.  Therefore, there is no hardship imposed on the plaintiffs by withholding court consideration until this contingent right matures at the moment of liquidation.  Once again, any present injury is, at most, a decrease in share value, which can only be claimed as part of a derivative action that would be barred by HERA.  *See supra* n.39.  "Moreover, no irremediable adverse consequences flow from requiring a later challenge to" the Third Amendment with regard to liquidation preferences since, as the defendants acknowledge, FHFA Mot. at 34-35, the right to a liquidation preference can be adjudicated during the statutorily prescribed receivership claims process.  *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967); *see also* 12

---

[39] Even if the plaintiffs could presently claim damages as a result of a prospective contractual breach regarding the plaintiff shareholders' liquidation preference, this claim would, at best, be one of damage to the price of their GSE shares, as valued by the market "based in part on the existence of their attendant . . . liquidation rights."  Class Pls.'s Opp'n at 37-38.  Such claims are considered derivative under Delaware law, and would be barred under HERA § 4617(b)(2)(A)(i), *supra* Section III(B).  *E.g., Labovitz v. Wash. Times Corp.*, 172 F.3d 897, 904-05 (D.C. Cir. 1999) ("the loss [plaintiffs] suffered in share value is a derivative harm") (citing *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988), for the proposition that "Delaware courts have long recognized that actions charging mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; *i.e.*, the stockholders collectively, to be enforced by a derivative action") (internal quotation marks and citation omitted).

U.S.C. § 4617(b)(2)(K)(i), (b)(3)-(10).  Until then, the plaintiffs have no direct claims to

liquidation preference-related damages that are ripe for judicial review, and their existing claims

must be dismissed under Rule 12(b)(1).[40]

In addition, for largely the same reasons that lead the Court to conclude that the

plaintiffs' liquidation preference claims lack ripeness, the plaintiffs' breach of contract and

breach of implied covenant claims regarding liquidation preferences fail to state a claim upon

which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  The right to this elevated preference for

asset distribution, given to preferred shareholders under GSE stock certificates, is only triggered

during liquidation.  Consequently, the plaintiffs' direct breach of contract claims for injuries

related to their liquidation preference rights can provide them no "plausible" relief against

FHFA—or against the GSEs, for that matter—until the agency places the GSEs into receivership

and commences the dissolution process.  *See Twombly*, 550 U.S. at 570; *see also supra* n.39 (the

plaintiffs' attempt to amorphously straddle the line between direct injury to their contingent right

to a liquidation preference and derivative injury to the present "value" of their GSE holdings

further demonstrates the uncertainty of their claims).  The Court's reasoning requiring dismissal

---

[40] FHFA and Treasury further argue that, under 12 U.S.C. § 4617(e)(2), which limits the maximum liability of FHFA during receivership, the plaintiffs liquidation preference claims are limited "to the amount that shareholders would have received had the GSEs' assets and liabilities been liquidated at the time the conservator was appointed in September 2008." Treasury Mot. at 28, 34.  The Court is unable to identify any case law discussing this HERA provision, though a number of courts, including a handful within this Circuit, have examined FIRREA's similar provision capping liability, 12 U.S.C. § 1821(i)(2).  *E.g.*, *Bank of Am., N.A. v. F.D.I.C.*, 962 F. Supp. 2d 165, 173 (D.D.C. 2013) ("12 U.S.C. § 1821(i)(2) unequivocally limits the maximum liability of the FDIC to the amount a claimant would have received in liquidation under the distribution scheme set forth in FIRREA.").  The Tenth Circuit has noted that § 1821(i)(2) limits creditor claims against the agency to the "pro rata share of the assets which would have been available *on the day the institution was placed in receivership*." *Castleglen, Inc. v. RTC*, 984 F.2d 1571, 1583 (10th Cir. 1993) (emphasis added).  Identifying the point at which to measure FHFA's maximum liability as "the day the institution was placed in receivership"—as opposed to the day the GSEs were placed in conservatorship, like the defendants suggest here—is consistent with the fact that this maximum liability is set only in reference to "a claim against the *receiver* or the regulated entity for which such *receiver* is appointed." 12 U.S.C. § 1821(i)(2) (emphasis added).  As such, § 4617(e)(2) "has no relevance outside of receivership," and provides the court with no guidance regarding potential damages—or lack thereof—from claims made against FHFA as a conservator or against the GSEs while in conservatorship.  *See* Individual Pls.'s Opp'n at 23; *see also* Class Pls.'s Opp'n at 39.

of such breach of contract claims also requires dismissal of the plaintiffs' claims of breach of the implied covenant of good faith and fair dealing, insofar as such claims request monetary relief. "Although an implied covenant of good faith and honest conduct exists in every contract, . . . such subjective standards cannot override the literal terms of an agreement." *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1143 (Del. 1990).  As mentioned, the stock certificates, on their face, only require liquidation preference payments when the GSEs enter liquidation.  Since no liquidation has occurred, the plaintiffs' implied covenant claims relating to liquidation preference rights cannot stand at this time.

## 2. *The Plaintiffs' Dividend Claims Fail to State a Claim upon Which Relief Can Be Granted*

The stock certificates upon which the plaintiffs base their claims of breach of contract and breach of the implied covenant state that "holders of outstanding shares of . . . Preferred Stock . . . shall be entitled to receive, ratably, *when, as and if declared by the Board of Directors, in its sole discretion*, out of funds legally available therefor, non-cumulative cash dividends . . . ."  *E.g.*, Individual Pls.'s Opp'n Ex. A at A-1 (Fannie Mae Preferred Stock Series S); Ex. B at A-1 (Freddie Mac Preferred Stock) (emphasis added).  The "right" to dividends to which the plaintiffs refer throughout their briefs, then, is, in actuality, wholly dependent upon the discretion of the GSEs' board of directors.  As the individual plaintiffs stress, "[a] contractual 'right' is an entitlement to certain performance from the counter-party, and it is 'exercised' through unilateral action that does not require negotiation or mutual assent."  Individual Pls.'s Opp'n at 38.  Here, the payment of a dividend expressly requires "mutual assent," since, under the contract, plaintiffs cannot receive such payment without board approval.

This Court—like many courts over the past two centuries—agrees with the defendants that shareholders do not have a present or absolute right to dividends which are subject to the

discretion of the board.  FHFA Mot. at 41-42.  As Justice Holmes fittingly explained eighty-four

years ago, an investment in stock "presupposes that the business is to go on, and therefore even if

there are net earnings, the holder of stock, preferred as well as common, is entitled to have a

dividend declared only out of such part of them as can be applied to dividends consistently with

a wise administration of a going concern."  *Wabash Ry. Co. v. Barclay*, 280 U.S. 197, 203-04

(1930) (further noting that dividend payments are "in the first instance at least a matter for the

directors to determine").[41]

The history of case law finding no contractual right to discretionary dividends is only

bolstered by the specific facts of this case.  Under HERA, FHFA succeeded to all rights and

powers of the board of directors.  *See* 12 U.S.C. § 4617(b)(2)(A)(i) ("[FHFA] shall, as

conservator or receiver, and by operation of law, immediately succeed to—(i) all rights, titles,

powers, and privileges of the [GSEs], and of any . . . director of such regulated entity with

respect to the regulated entity and *the assets of the [GSEs]*.")  FHFA's power over the assets of

the GSEs surely includes the power to declare discretionary dividends from the surplus assets of

the GSEs.  Consistent with FHFA's assumption of the board's power, FHFA's director, James

Lockhart, stated that "the common stock and preferred stock dividends will be eliminated."  *In re*

*Fannie Mae/Freddie Mac* Am. Compl. at ¶ 53 (quoting Statement of FHFA Director James B.

Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac

---

[41] *See also New York, L.E. & W.R. Co. v. Nickals*, 119 U.S. 296, 305-07 (1886) (By qualifying dividend payments with "as declared by the board" language, the preferred stock contract did "not intend[] to confer upon the former an absolute right to a dividend in any particular year. . . .  We are of opinion that . . . preferred stockholders . . . are not entitled, of right, to dividends, payable out of the net profits accruing in any particular year, unless the directors of the company formally declare, or ought to declare, a dividend payable out of such profits."); *In re Terex Corp.*, No. 91-3864, 1993 WL 7519, at *1 (6th Cir. Jan. 12, 1993) ("The decision to pay (or not to pay) a dividend was within the sole discretion of Metropolitan's board of directors; accordingly, Terex had no contractual right to receive a dividend for any given year."); *Crawford Drug Stores v. United States*, 220 F.2d 292, 296 (10th Cir. 1955) ("[I]n ordinary circumstances the holder of preferred stock has no such absolute right to the payment of dividends."); *Comm'r of Internal Revenue v. Meridient & Thirteenth Realty Co.*, 132 F.2d 182, 187 (7th Cir. 1942) (unlike a creditor's absolute right to interest, "[s]tockholders have no absolute right to dividends until they are declared").

(Sept. 7, 2008), *available at* http://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-FHFA-Director-James-B--Lockhart-at-News-Conference-Annnouncing-Conservatorship-of-Fannie-Mae-and-Freddie-Mac.aspx).   Once the agency executed the PSPAs, however, FHFA effectively transferred discretionary power over dividend issuance to Treasury.  *See* Treasury AR at 24, 58 (Fannie Mae and Freddie Mac PSPAs § 5.1, requiring Treasury's written consent for declaration of any dividends, "preferred or otherwise").   Thus, not only do the plaintiffs lack a right to dividend payments under their original stock certificates, but FHFA—the primary target of the plaintiffs' breach of contract and breach of the implied covenant claims concerning dividends—no longer has exclusive discretion to issue such dividends.

Without a contractual right to dividends, the plaintiffs cannot state a claim for breach of contract specifically based on their alleged dividend entitlements.  *See In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 155, 161, 167; *Fairholme* Compl. at ¶ 122.[42]   And when the contract is unambiguous regarding a lack of contractual right, there cannot be a coinciding claim of breach of the implied covenant of good faith and fair dealing.  *Dave Greytak Enters, Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992), *aff'd sub nom. David Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, No. 64, 1992 WL 135147 (Del. 1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play."); *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) ("Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty . . . unattached to the underlying legal document.") (internal quotation

---

[42] While the *Arrowood* Complaint does not specify dividends and liquidation preferences as the "rights" affected by the Third Amendment, *see Arrowood* Compl. ¶¶ 135-38, other sections of the Complaint clarify that dividends and liquidation preferences are the rights for which the *Arrowood* plaintiffs seek monetary damages. *See, e.g., id.* at ¶ 7.

marks and citation omitted); *QVT Fund LP v. Eurohypo Capital Funding LLC I*, No. 5881, 2011 WL 2672092, at *14 (Del. Ch. July 8, 2011) ("If the contract clearly delineates the parties' rights, there is no room for the implied covenant because it cannot override the express terms of a contract.") (internal quotation marks and citation omitted).[43]  As such, the plaintiffs' claims for breach of contract[44] and breach of the implied covenant regarding the dividend provisions of the plaintiffs' stock certificates must be dismissed pursuant to Rule 12(b)(6).

Even if the implied covenant was applicable to this case—and it is not—the plaintiffs would have failed to plead such a cause of action.  The Court has ruled that the plaintiffs fail to demonstrate through their pleadings that FHFA violated its statutory authority under HERA by entering into the Third Amendment with Treasury.  *See supra* Section III(A)(4).  Yet the plaintiffs attempt to brand agency actions that fall within FHFA's statutorily established powers to succeed to all the rights of shareholders and stabilize the GSEs as performed in "bad faith." *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 90-91, 161.  But the plaintiffs cannot overcome FHFA's sweeping congressional mandate with conclusory statements regarding the Third Amendment's effect on the plaintiffs' *prospective*—and not present—rights to dividends and liquidation preferences.  *E.g.*, *Arrowood* Compl. at ¶¶ 96, 141.[45]  Furthermore, the class and

---

[43] The individual plaintiffs' citation to *QVT Fund*, Sup. Opp'n at 40-41, 44-45, is distinguishable from this case.  In *QVT Fund*, the plaintiffs claim that the alleged breach of an "implied obligation"—which the Court of Chancery deemed sufficiently pleaded—is the reason why *mandatory* dividend payments were not triggered.  *See* 2011 WL 2672092, at *14-15.  Here, no contractual obligation—implicit or explicit—exists that could transform unmistakably discretionary dividends into mandatory dividends.

[44] The Court rejects the individual plaintiffs' additional contention that the Third Amendment "effectively converted [Treasury's stock] into common stock," which would "represent a distribution to the common shareholder ahead of and in violation of the contractual rights of Plaintiffs and other preferred shareholders." Sup. Opp'n at 30.  Here, the characteristics of preferred stock "that distinguish that stock from common stock"—*e.g.*, senior-most dividend and liquidation rights—remain "expressly and clearly stated" under the Third Amendment.  *See Elliot Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del. 1998); *see also* FHFA Reply at 35-37.

[45] Since the plaintiffs have not demonstrated, through their pleadings, that FHFA acted in bad faith, Delaware case law under which discretionary dividends will only be compelled in the rare instance of a judicial finding of "fraud or gross abuse of discretion" by the board of directors is inapposite. *See, e.g.*, *Gabelli & Co. v. Liggett Grp. Inc.*, 479 A.2d 276, 280 (Del. 1984); *Moskowitz v. Bantrell*, 190 A.2d 749, 750 (Del. 1963).

*Arrowood* plaintiffs fail to plead claims of breach of the implied covenant against the GSEs, since the plaintiffs attribute all alleged "arbitrar[y] and unreasonabl[e]" conduct only to FHFA, as a conservator that assumed all rights of the GSEs, and not to the GSEs themselves.[46]  *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 161, 167, 173; *see also* FHFA Reply at 32-33.[47]

### D.   The Class Plaintiffs Fail to Plead That the Third Amendment Is an Unconstitutional Taking

Finally, the class plaintiffs claim that the Third Amendment effected an unconstitutional taking of their alleged dividend entitlements and liquidation rights without just compensation. U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"); *see In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 110-16, 183-92.  Takings claims are reviewed as either physical or regulatory takings.  A "paradigmatic" physical taking "is a direct government appropriation or physical invasion of private property."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Since the class plaintiffs do not allege a physical taking, the Court must decide whether they adequately plead a taking as a result of government regulation.  Class Pls.'s Opp'n at 67-70.  Before determining which takings rubric to utilize for its analysis, a court must first evaluate whether a plaintiff has a cognizable property interest protected by the Fifth Amendment.  *See, e.g.*, *Conti v. United States*, 291 F.3d 1334, 1339 (Fed.

---

Additionally, even if the plaintiffs presented allegations of "gross abuse of discretion" resulting in *present* damage to the "value" of the plaintiffs' investment, such claims would be considered derivative and barred under HERA § 4617(b)(2)(A)(i).  *See supra* n.39; *cf. U.S. v. Byrum*, 408 U.S. 125, 141 (1972) ("Although vested with broad discretion in determining whether, when, and what amount of dividends shall be paid, that discretion is subject to legal restraints.  If, in obedience to the will of the majority stockholder, corporate directors disregard the interests of shareholders by accumulating earnings to an unreasonable extent, they are vulnerable to a derivative suit.")

[46] The *Fairholme* plaintiffs bring their claims only against FHFA.  *See Fairholme* Compl. Count VI.

[47] The reasoning of this section would also apply to dividend and liquidation preference claims for non-monetary relief *even if* § 4617(f) did not bar such claims.  "In assessing whether a declaratory judgment action is ripe, courts must determine 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *RDP Technologies, Inc. v. Cambi AS*, 800 F. Supp. 2d 127, 136 (D.D.C. 2011) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

Cir. 2002); *Nat'l Leased Hous. Ass'n v. U.S. Dep't of Hous. & Urban Dev.*, No. 03-1509, 2007 WL 148829, at *11 (D.D.C. Jan. 16, 2007).  Here, the class plaintiffs do not allege a cognizable property interest and, as such, fail to state a claim against FHFA and Treasury for a violation of the Fifth Amendment's Takings Clause.

### 1.    *The Jurisdictional Defect in the Class Plaintiffs' Pleadings Is Not Dispositive of Their Takings Claims*

As an initial matter, the defendants argue that the class plaintiffs' takings claims belong in the Court of Federal Claims rather than in this Court.  Pursuant to the so-called "Big" Tucker Act, 28 U.S.C. § 1491(a)(1), the Court of Claims maintains exclusive jurisdiction over claims against the United States that exceed $10,000.   Under the "Little" Tucker Act, 28 U.S.C. § 1346(a)(2), the Court of Claims shares concurrent jurisdiction with federal district courts over claims against the United States not exceeding $10,000.   In this Circuit, for complaints that include *potential* claims over $10,000, Little Tucker Act jurisdiction is only satisfied by a "clearly and adequately expressed" waiver of such claims.   *See Waters v. Rumsfeld*, 320 F.3d 265, 271-272 (D.C. Cir. 2003) ("[F]or a district court to maintain jurisdiction over a claim that might otherwise exceed $10,000, a plaintiff's waiver of amounts over that threshold must be clearly and adequately expressed.") (internal quotation marks and citation omitted).  Here, the class plaintiffs argue that "expressly limit[ing] the prospective takings class to individuals who suffered losses less than $10,000" is an adequate alternative to waiver, and that waiver is "premature" until the class certification phase.   Class Pls.'s Opp'n at 53.  Yet the plaintiffs' refusal to clearly and adequately waive claims exceeding $10,000 in either their pleadings or subsequent opposition brief contravenes Circuit precedent.   *See Goble v. Marsh*, 684 F.2d 12, 15-16 (D.C. Cir. 1982); *Stone v. United States*, 683 F.2d 449, 454 n.8 (D.C. Cir. 1982) ("Generally a plaintiffs' waiver should be set forth in the initial pleadings.").   Nevertheless, the

Circuit has also made clear its preference that the District Court should not transfer a case that is defective on Little Tucker Act grounds to the Court of Claims "without first giving [the plaintiffs] an opportunity to amend their complaints to effect an adequate waiver." *Goble*, 684 F.2d at 17.

Thus, while the class plaintiffs' takings pleading is inadequate for jurisdiction in this Court under the "Little" Tucker Act, in keeping with the tenor of Circuit case law, the Court would generally provide the class plaintiffs "an opportunity to amend their complaints to effect an adequate waiver." *Id.* However, doing so here is unnecessary, since the Court finds that the class plaintiffs' takings claims are dismissed on alternative grounds.

### 2.    *The Class Plaintiffs Fail to Plead a Cognizable Property Interest*

Any property rights that the class plaintiffs claim can only arise from their GSE stock certificates.  Yet "existing rules," "understandings," or "background principles" derived from legislation enacted prior to the share purchase inhere in the plaintiffs' title to the stock certificates and "define the range of interests that qualify for protection as 'property' under the Fifth" Amendment. *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1028-30 (1992); *see also Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1379 (Fed. Cir. 2004).[48] Since 1992, when Congress established FHFA's predecessor, the Office of Federal Housing Enterprise Oversight ("OFHEO"), the GSEs have been subject to regulatory oversight, including the specter of conservatorship or receivership under which the regulatory agency succeeds to "all rights" of the GSEs and shareholders.  *See* Federal Housing Enterprises Financial Safety and Soundness Act of 1992, Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3672, 3941-4012 (establishing OFHEO); 12 U.S.C. § 4617(b)(2)(i).  This enduring regulatory scheme governing

---

[48] Given the extensive history of Takings Clause jurisprudence within the Court of Appeals for the Federal Circuit, the Court will look to such cases for guidance.

the GSEs at the time the class plaintiffs purchased their shares represents the "background principle" that inheres in the stock certificates.

The defendants argue that the plaintiffs fail to plead a cognizable property interest, for takings purposes, because the GSEs—and, therefore, the plaintiff shareholders—lack the right to exclude the government from their property.  Treasury Mot. at 59-60; FHFA Mot. at 60-62; *but see* Class Pls.'s Opp'n at 61-65.  The Court agrees.  "[T]he 'right to exclude' is doubtless . . . 'one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Yee v. City of Escondido*, 503 U.S. 519, 528 (1992) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)).  The defendants analogize the "federal oversight and regulation" to which the GSEs have been subject to that of regulated financial institutions.  *See* Treasury Mot. at 59.  Utilizing this analogy, the defendants cite Federal Circuit case law for the proposition that the plaintiff shareholders have no present cognizable property interest in the dividends or liquidation preferences referenced in their stock certificates.

In two cases involving statutorily regulated financial institutions, placed under the authority of either the FDIC or RTC, the Federal Circuit found that the shareholders of these institutions lacked the requisite property interests to support a takings claim.  *Golden Pac. Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992).[49]  On account of the existing regulatory structure permitting the appointment of a conservator or receiver, the financial institutions "lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership on [the institutions]."  *Golden Pac.*, 15 F.3d at 1073

---

[49] The fact that the *California Housing* Court only considered the "permanent physical occupation" rubric of regulatory takings analysis from *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), which would not apply to the present facts, has no effect on its holding regarding the threshold determination of a cognizable property interest.

(quoting *Cal. Hous.*, 959 F.2d at 958) (internal quotation marks omitted).  And the result of this "regulated environment" is imputed to the shareholders of the financial institution, who thus hold "less than the full bundle of property rights."  *Id.* (internal quotation marks omitted).

The Court finds this reasoning to be persuasive.  By statutory definition, the GSEs are subject to governmental control at the discretion of FHFA's director.  12 U.S.C. § 4617(a)(2).  Therefore, the GSE shareholders necessarily lack the right to exclude the government from their investment when FHFA places the GSEs under governmental control—*e.g.*, into conservatorship.[50]  This conclusion is especially true since the statute explicitly grants FHFA the power to assume "all rights . . . of the regulated entity, and of any stockholder . . . ."  *See* 12 U.S.C. § 4617(b)(2)(i).[51]

Without disputing the broader analogy that the defendants draw between regulated financial institutions and the GSEs,[52] the class plaintiffs seek to distinguish the Federal Circuit decisions based on *why* FHFA and Treasury entered into the Third Amendment.  *Id.* at 63.  But motives are irrelevant, for takings purposes, if the plaintiffs possess no cognizable property interests in the first place. *Golden Pacific* and *California Housing* stand for the general notion that investors have no right to exclude the government from their alleged property interests when the regulated institution in which they own shares is placed into conservatorship or receivership.

---

[50] The Court notes that FHFA overreads the Federal Circuit holdings.  Unlike FHFA's contention that "shareholders had no cognizable property interest within the meaning of the Takings Clause *before* conservatorship," FHFA Mot. at 61, the shareholders only lose their cognizable property interests "when [the GSEs are] in conservatorship," Treasury Mot. at 58.

[51] The class plaintiffs' alarmist assertion that a holding like the one at present "would mean that the defendants could expropriate all of the shares in the most profitable and stable financial institutions in the country without triggering the Takings Clause" is unwarranted.  Class Pls.'s Opp'n at 63-64.  There is no right to exclude, and therefore no cognizable property interest upon which to state a takings claim, only when the government may "legally impose a conservatorship"—*i.e.*, when necessary to stabilize a stressed financial institution.  *See Cal. Hous.*, 959 F.2d at 958; 12 U.S.C. § 4617(a)(2).

[52] *See* Class Pls.'s Opp'n at 61-62 ("Those cases hold that shareholders in regulated financial institutions are on notice that government regulators may place the institution into conservatorship or receivership if they conclude that the institution is insolvent or being operated in an unsafe and unsound manner, and therefore those shareholders lack the 'right to exclude' the government in such circumstances.")

*See Cal. Hous.*, 959 F.2d at 958 (no right to exclude when a conservatorship or receivership is legally imposed).  Whether the defendants executed the Third Amendment to generate profits for taxpayers or to escape a "downward spiral" of the GSEs seeking funding in order to pay owed dividends back to Treasury, it does not change the fact that it was executed during a period of conservatorship and, thus, after the plaintiffs' property interests—whatever they may have been prior to the Third Amendment—were extinguished.  Unless the plaintiffs can demonstrate that FHFA could not legally impose a conservatorship upon the GSEs at the time of the Third Amendment, allegations of mischievous intentions during a conservatorship do not revive already eliminated cognizable property interests.  *See id.*  And here, the class plaintiffs only plead that the Third Amendment was inconsistent with FHFA's responsibilities *as* conservator— not that FHFA lacked any legal right to *be* a conservator on August 17, 2012.  *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 92-101 (alleging that "the Third Amendment was inconsistent and in conflict with FHFA's statutory responsibilities as a conservator"); *see also* 12 U.S.C. § 4617(a)(2) ("[FHFA] may, *at the discretion of the Director*, be appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity.") (emphasis added).  Given that the class plaintiffs cannot repair the overarching threshold defect of having no cognizable property interest at stake, their takings claim must be dismissed under Rule 12(b)(6).  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").[53]

---

[53] In consideration of the class plaintiffs' takings claims concerning dividends, specifically, the Court further acknowledges the multitude of federal cases, in different contexts, finding a lack of a cognizable property interest when another party maintains *discretion* to grant a plaintiff's alleged property interest. *E.g.*, *Toxco, Inc. v. Chu*, 801 F. Supp. 2d 1, 10 (D.D.C. 2011) ("[I]f the government is vested with complete discretion as to whether or not it must undertake any of its contractual obligations, the plaintiff does not have a constitutional property interest in that contract.") (citing *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1295-96 (5th Cir. 1994); *Christ Gatzonis Elec. Contractor, Inc. v. N.Y. City Sch. Constr. Auth.*, 23 F.3d 636, 640 (2d Cir. 1994)); *Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp.*, 246 F.3d 1, 5-6 (1st Cir. 2001) (finding that a plaintiff has no cognizable property interest in "'promised' federal income tax credits" because a state agency maintained "absolute discretion to

### 3. *The Class Plaintiffs Further Fail to Plead a Regulatory Taking*

Even if the class plaintiffs could claim a cognizable property interest—and they cannot—their claims would still fail on a motion to dismiss under existing Supreme Court regulatory takings precedent. "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). The Supreme Court has developed a series of analytical rubrics under which courts are to determine "whether a regulation 'reaches a certain magnitude' in depriving an owner of the use of property." *See Dist. Intown Props. Ltd. P'ship v. D.C.*, 198 F.3d 874, 878 (D.C. Cir. 1999) (quoting *Mahon*, 260 U.S. at 413). There are two principal "narrow categories" of *per se* takings. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). First, "a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 426. Here, the government has not physically occupied the plaintiffs' property.[54] Second, a government regulation that deprives an owner of "*all* economically beneficial uses" of his property is also a taking. *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Regardless of whether *Lucas* only applies to real property, *compare* Treasury Mot. at 61, *with* Class Pls.'s Opp'n at 67-68, the

---

determine whether" such tax credits are awarded); *Nello L. Teer Co. v. Orange Cnty.*, No. 92-2240, 1993 WL 177872, at *2 (4th Cir. 1993) ("Under our precedents, if a local zoning authority possesses any significant discretion in granting a permit, there is no cognizable property interest in the issuance of that permit.") (internal quotation marks, alteration, and citation omitted). The logic of these decisions would appear to extend to dividends that are issued at the "sole discretion" of a GSE board—or, in this case, the regulatory entity that has succeeded to all the rights of the board. Much like how plaintiffs cannot claim that discretionary dividends amount to a contractual right, the class plaintiffs cannot contend that such dividend provisions constitute a cognizable property interest.

[54] The Supreme Court has also held that "when the government commands the relinquishment of funds linked to a specific, identifiable property interest such as a bank account or parcel of real property, 'a *per se* [takings] approach' is the proper mode of analysis." *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2600 (2013) (citing *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003)). Despite citing this language in their opposition brief, Class Pls.'s Opp'n at 67, the class plaintiffs have not alleged that the government has commanded them to *relinquish* any funds—or property, for that matter—already owned or possessed. *See* Treasury Reply at 56 ("The plaintiffs' claim, instead, is that the value of their expectation of dividends or a liquidation preference has been diminished . . . .").

plaintiffs cannot find relief under a "total wipeout" theory.  *See* Class Pls.'s Opp'n at 67-68.  The plaintiffs maintain "economically beneficial use" of their shares, since the stock very much remains a tradable equity.  Indeed, GSE shares are traded daily on public over-the-counter (OTC) exchanges.[55]   And given the Court's rejection of the plaintiffs' alleged present rights to dividends and liquidation payments, it is clear that the government has not "seized [the plaintiffs'] private property and kept that property for itself."  Class Pls.'s Opp'n at 67.

A regulatory taking, on the other hand, is evaluated under the "ad hoc" inquiry set forth in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).  *Id.* at 124.  *Penn Central* identified three "factors that have particular significance" in evaluating regulatory takings claims:  (1) "[t]he economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."  *Id.*  A plaintiff is not required to demonstrate favorable results under all three *Penn Central* factors in order for the Court to find a taking—it is a balancing test.  *See Dist. Intown Props.*, 198 F.3d at 878-79 (*Penn Central* submits "three primary factors [to be] weigh[ed] in the balance").  While regulatory takings require a "more fact specific inquiry", *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 332 (2002), no supplementation of the factual record could alter dismissal here.

At present, the Third Amendment has had no economic impact on the plaintiffs' alleged dividend or liquidation preference rights.  In view of the unambiguous language of the stock certificate's dividend provision coupled with Treasury's discretion to pay dividends under the PSPAs, the plaintiffs cannot show that the Third Amendment rendered their prospects of

---

[55] That the plaintiffs retained value in their market traded shares is consistent with the statement from Freddie Mac's Form 8-K filing on September 8, 2011, which the class plaintiffs quote in the Amended Complaint.  *See In re Fannie Mae/Freddie Mac* Am. Compl. at ¶ 53 ("The holders of Freddie Mac's existing common stock and preferred stock . . . will retain all their rights in the financial worth of those instruments, *as such worth is determined by the market*.") (emphasis added) (quoting Freddie Mac 2011 8-K (Sept. 11, 2008)).

receiving dividends any less discretionary than they were prior to the amendment.  Additionally, since liquidation preference rights only ripen *during liquidation*, any impact on such rights is, at best, theoretical while the GSEs remain in conservatorship.

"A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)).  "In determining whether a reasonable investment-backed expectation exists, one relevant consideration is the extent of government regulation within an industry." *Ascom Hasler Mailing Sys., Inc. v. U.S. Postal Serv.*, 885 F. Supp. 2d 156, 195 (D.D.C. 2012) (collecting cases).  For decades—and at the time each of the class plaintiffs purchased their GSE stock—the GSEs have been under the watchful eye of regulatory agencies and subject to conservatorship or receivership largely at the government's discretion.  *See supra* Section III(D)(2).[56]  As the Federal Circuit's holdings in *California Housing* and *Golden Pacific* elucidate, by lacking the right to exclusive possession of their stock certificates—and therefore lacking a cognizable property interest—at the time of the Third Amendment, the plaintiff shareholders could not have "developed a historically rooted expectation of compensation" for any possible seizures that occurred during FHFA's conservatorship.  *See Cal. Hous.*, 959 F.2d at 958.  The plaintiffs "voluntarily entered into [investment contracts with] the highly regulated" GSEs.  *See Golden Pac.*, 15 F.3d at 1073.[57]  In fact, a number of the class plaintiffs purchased their shares mere

---

[56] Furthermore, as FHFA cogently explains, "[b]ecause the [GSEs] benefited from preferential tax treatment, far lower capital requirements, and a widely perceived government guarantee, [the] [p]laintiffs should have anticipated that the [GSEs] would be subject to . . . regulation."  FHFA Mot. at 61 n.37 (citation omitted).  The tradeoff when investing in government-sponsored entities that receive meaningfully different benefits than private corporations is increased regulation and the prospect of a government takeover.

[57] Both Fannie Mae and Freddie Mac preferred stock certificates provide notice that "[t]he ability of the Board of Directors to declare dividends may be restricted by [FHFA's predecessor] OFHEO."  *See* Individual Pls.'s Opp'n Ex. A at 20 (Fannie Mae Preferred Stock Series S); Ex. B at 27 (Freddie Mac Preferred Stock).

months before or shortly after FHFA exercised its statutory authority to place the GSEs into conservatorship.  *E.g.*, *In re Fannie Mae/Freddie Mac* Am. Compl. at ¶¶ 30-35; *In re Fannie Mae/Freddie Mac* Derivative Compl. at ¶¶ 20-21.  There can be no doubt that the plaintiff shareholders understood the risks intrinsic to investments in entities as closely regulated as the GSEs, and, as such, have not now been deprived of any *reasonable* investment-backed expectations.

Looking to the character of the governmental action in dispute, the *Penn Central* Court explained that "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  438 U.S. at 124.  Here, the plaintiffs do not plead a physical invasion of their property.  Whether the regulatory action taken by FHFA and Treasury when executing the Third Amendment "promote[s] the common good" or advances a public purpose, however, is in dispute.  The Supreme Court in *Kelo v. City of New London*, a public use case, reaffirmed that courts should take a deferential stance regarding what constitutes a legitimate public purpose.  545 U.S. 469, 487-88 (2005) ("When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings . . . are not to be carried out in the federal courts.");  *see also Hilton Washington Corp. v. D.C.*, 777 F.2d 47, 49-50 (D.C. Cir. 1985) (looking only for a "valid public purpose" when examining *Penn Central*'s "character of the governmental action" factor).  The plaintiffs would be hard pressed to argue that actions taken to "benefit taxpayers" do not qualify as a legitimate public purpose.  *E.g.*, Class Pls.'s Opp'n at 15.  To reach this conclusion with certainty, however, the Court would likely need to permit additional fact-finding.  Nevertheless, more discovery is unnecessary

because *Penn Central*'s first two factors weigh strongly enough against the plaintiffs' takings claims that dismissal would be proper in this case.  *See Monsanto*, 467 U.S. at 1005 ("[T]he force of [the reasonable investment-backed expectations] factor [here] is so overwhelming . . . that it disposes of the taking question . . . .").

### 4.   *Claims of an Unconstitutional Taking of Liquidation Rights Are Not Ripe*

Moreover, the Court would also dismiss the class plaintiffs' takings claims, at least in relation to liquidation preference rights, on ripeness grounds.  As mentioned above, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. at 300 (internal quotation marks and citation omitted).  Liquidation preferences only entitle a preferred stockholder to payment in the event of liquidation.  Consistent with the Court's reasoning discussed *supra*, Section III(C)(1), the government cannot take a property right that has not yet matured.  This Court's findings concerning cognizable property interests aside, a claim of an unconstitutional taking of liquidation preference rights may only be brought once a liquidation process has commenced.[58]

---

[58] Regarding another possible basis for dismissal, the Court appreciates the logical appeal of FHFA's comparison of the *Omnia* Court's finding that consequential—rather than direct—injuries to a third party do not entitle that third party to a takings remedy and the alleged injury caused to the plaintiffs here by the Third Amendment agreement between FHFA and Treasury.  FHFA Mot. at 62-63; FHFA Reply at 40-45 (citing *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923)); *but see* Class Pls.'s Opp'n at 70-72.  However, the Court is wary of applying to the present facts a decision that came just five months after the concept of a regulatory taking was born, *see Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), and many decades before the Supreme Court began actively developing its regulatory takings jurisprudence.  *See Lingle*, 544 U.S. at 536-40 (outlining the evolution of regulatory takings case law since the Supreme Court's *Penn Central* decision in 1978).

The Court need not address whether the class plaintiffs' takings claims are further barred because FHFA is not the United States for takings purposes, FHFA Mot. at 59-60, or because Treasury entered into the Third Amendment as a "market participant," Treasury Mot. at 64-65.  Such additional arguments are unnecessary to consider in order to resolve the takings issue at the motion to dismiss stage.

## IV.   CONCLUSION

It is understandable for the Third Amendment, which sweeps nearly all GSE profits to Treasury, to raise eyebrows, or even engender a feeling of discomfort.  But any sense of unease over the defendants' conduct is not enough to overcome the plain meaning of HERA's text. Here, the plaintiffs' true gripe is with the language of a statute that enabled FHFA and, consequently, Treasury, to take unprecedented steps to salvage the largest players in the mortgage finance industry before their looming collapse triggered a systemic panic.  Indeed, the plaintiffs' grievance is really with Congress itself.  It was Congress, after all, that parted the legal seas so that FHFA and Treasury could effectively do whatever they thought was needed to stabilize and, if necessary, liquidate, the GSEs.  Recognizing its role in the constitutional system, this Court does not seek to evaluate the merits of whether the Third Amendment is sound financial—or even moral—policy.  The Court does, however, find that HERA's unambiguous statutory provisions, coupled with the unequivocal language of the plaintiffs' original GSE stock certificates, compels the dismissal of all of the plaintiffs' claims.

Thus, for the foregoing reasons, the Court GRANTS the defendants' motions to dismiss and DENIES the individual plaintiffs' cross-motion for summary judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.


9-30-14
Date

ROYCE C. LAMBERTH
United States District Judge