**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*. | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| ARROWOOD INDEMNITY COMPANY, *et al.*, | |
| Plaintiffs, | |
| v. | Civil No. 13-1439 (RCL) |
| FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-01288 (RCL) |
| This document relates to: ALL CASES | |

**MOTION TO DISMISS AMENDED COMPLAINTS ON REMAND**
**BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY**
**AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC,**
**FHFA DIRECTOR MELVIN L. WATT, AND FANNIE MAE AND FREDDIE MAC**

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "Enterprises,"), Melvin L. Watt, in his official capacity as Director of FHFA, and the Enterprises hereby move to dismiss the amended complaints on remand as to all claims in the above-captioned actions for the reasons set forth in the Memorandum in Support filed with this motion. A proposed order granting the relief requested by this motion is also being filed with this motion.

Pursuant to Local Rule 7(f), FHFA, Director Watt, and the Enterprises respectfully request oral argument on this motion.

Dated:  January 10, 2018              Respectfully submitted,

/s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Howard.Cayne@apks.com
Asim.Varma@apks.com
David.Bergman@apks.com

*Attorneys for Defendant Federal Housing*
*Finance Agency and Director Melvin L. Watt*

| s/ Michael J. Ciatti | s/ Meaghan VerGow |
|---|---|
| Michael J. Ciatti  (D.C. Bar # 467177) | Meaghan VerGow  (D.C. Bar # 977165) |
| KING & SPALDING LLP | O'MELVENY & MYERS LLP |
| 1700 Pennsylvania Ave. N.W. | 1625 Eye Street, N.W. |
| Washington, DC 20006 | Washington, DC 20006 |
| Tel: (202) 626-5508 | Tel: (202) 383-5300 |
| Fax: (202) 626-3737 | Fax: (202) 383-5414 |
| mciatti@kslaw.com | mvergow@omm.com |
| | |
| *Attorney for the Federal Home Loan* | *Attorney for the Federal National Mortgage* |
| *Mortgage Corp.* | *Association* |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*.<br><br>                  Plaintiffs,<br><br>      v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>                 Defendants. | Civil No. 13-1053 (RCL) |
| ARROWOOD INDEMNITY COMPANY, *et al.*,<br><br>                  Plaintiffs,<br><br>      v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION, *et al.*,<br><br>                 Defendants. | Civil No. 13-1439 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-01288 (RCL) |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINTS ON REMAND BY DEFENDANTS FEDERAL HOUSING FINANCE AGENCY AS CONSERVATOR FOR FANNIE MAE AND FREDDIE MAC, FHFA DIRECTOR MELVIN L. WATT, AND FANNIE MAE AND FREDDIE MAC

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..........................................................................................................................1

STATEMENT OF FACTS ...........................................................................................................5

I.     Fannie Mae and Freddie Mac: Their Federal Charters and Public Mission ..........................5

II.    The Enterprises' Common and Preferred Stock ....................................................................6

III.   Pre-HERA Perception and Regulation of Fannie Mae and Freddie Mac ............................8

IV.   Congress Enacts HERA and the Director Appoints FHFA as Conservator ..........................9

V.    The Conservator and Treasury Execute the PSPAs, Which Compensate Treasury In Exchange For A Significant Commitment of Taxpayer Funds to the Enterprises ...............10

VI.   The Conservator and Treasury Execute the Third Amendment ...........................................11

PROCEDURAL HISTORY.........................................................................................................12

ARGUMENT ...............................................................................................................................15

I.     Plaintiffs Fail to State a Claim for Breach of Contract Regarding Liquidation Preferences..........................................................................................................................15

     A.    The Doctrine of Anticipatory Breach Does Not Apply to Plaintiffs' Claims..............15

     B.    The Third Amendment Does Not Breach Plaintiffs' Alleged Right to a Liquidation Preference ...............................................................................................17

     C.    Arrowood's Breach Claims Against Director Watt Are Barred By Sovereign Immunity........................................................................................................................18

II.    Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing With Respect to Liquidation Preferences and Dividends ........................18

     A.    The Implied Covenant Is a Narrow Device for Inferring Limited Additional Terms to Fill Gaps in a Contract..................................................................................20

     B.    The Express Provisions of Plaintiffs' Stock Certificates Preclude Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts ...................................................................................21

     C.    The Highly-Regulated Nature of the Enterprises Precludes Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts...................................................................................................24

D.   HERA, Which Forms Part of Plaintiffs' Contract as Stockholders, Precludes Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts .................................................................26

E.   The PSPAs, Which Also Form Part of Plaintiffs' Contract, Independently Preclude Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts ..........................................29

F.   Statements by FHFA's Director Do Not Provide Plaintiffs With a Reasonable Expectation of Receiving Receive Dividends and Liquidation Preference Payouts .................................................................................................30

III.   Plaintiffs' Breach of Fiduciary Duty Claims Fail as a Matter of Law .................................31

A.   Plaintiffs' Breach of Fiduciary Duty Claims Are Derivative and Thus Are Barred By HERA ...............................................................................................32

1.   The Breach of Fiduciary Duty Claims Brought By Freddie Mac Shareholders Are Barred ................................................................ 33

2.   The Breach of Fiduciary Duty Claims Brought By Fannie Mae Shareholders Are Derivative, and Thus Barred ................................... 34

B.   HERA Preempts Plaintiffs' Claims for Breach of Fiduciary Duty ............................37

IV.   Plaintiffs Fail To State a Claim That the Treasury Stock Certificates, As Amended by the Third Amendment, Violate Delaware or Virginia Statutes ........................................38

A.   Federal Law, Not State Law, Governs the Conservator's Ability to Agree to the Third Amendment and the Resulting Treasury Stock Certificates .......................39

B.   The Third Amendment Complies With the Delaware and Virginia Statutes Upon Which Plaintiffs Rely ...............................................................................42

V.   Plaintiffs' Claims That Are Squarely Barred by The D.C. Circuit's Decision Should Be Dismissed. .................................................................................................45

CONCLUSION .................................................................................................45

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*A.W. Fin. Servs., S.A. v. Empire Resources, Inc.*,
    981 A.2d 1114 (Del. 2009) ......................................................................................38

*In re Activision Blizzard, Inc. Stockholder Litig.*,
    124 A.3d 1025 (Del. Ch. 2015)..............................................................................26

*Allied Capital Corp. v. GC-Sun Holdings L.P.*,
    910 A.2d 1020 (Del. Ch. 2006)..............................................................................21

*Allis–Chalmers Corp. v. Lueck*,
    471 U.S. 202 (1985) ...............................................................................................42

*Amazon.com, Inc. v. Hoffman*,
    No. 2239, 2009 WL 2031789 (Del. Ch. June 30, 2009) ........................................22

*Arnold v. Soc. for Sav. Bancorp.*,
    678 A.2d 533 (Del. 1996) ......................................................................................38

*Banneker Ventures, LLC v. Graham*,
    798 F.3d 1119 (D.C. Cir. 2015) ..............................................................................7

*Barnett Bank of Marion Cty., N.A. v. Nelson*,
    517 U.S. 25 (1996)..................................................................................................42

*DCG&T ex rel. Battaglia/IRA v. Knight*,
    68 F. Supp. 3d 579 (E.D. Va. 2014) ......................................................................33

\* *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*,
    73 A.3d 934 (Del. Ch. 2013)............................................................................26, 27

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988)................................................................................................37

*Chamison v. HealthTrust, Inc. Hosp. Co.*,
    735 A.2d 912 (Del. Ch. 1999)................................................................................23

*Clark v. Library of Cong.*,
    750 F.2d 89 (D.C. Cir. 1984) .................................................................................18

*Collins v. FHFA*,
    254 F. Supp. 3d 841, 846 (S.D. Tex. 2017) .............................................................1

iv

*Cont'l W. Ins. Co. v. FHFA*,
  83 F. Supp. 3d 828 (S.D. Iowa 2015) ............................................................2

\* *Corporate Property Associates 14, Inc. v. CHR Holding Corp.*,
  No. 3231, 2008 WL 963048 (Del. Ch. 2008) ..........................................23

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..................................................................................37

*Cumana Invs. S.A. v. Fluor Corp.*,
  593 F. Supp. 310 (D. Del. 1984) ..............................................................16

*Dunlap v. State Farm Fire & Cas. Co.*,
  878 A.2d 434 (Del. 2005) ....................................................................20, 21

*Edwards v. Deloitte & Touche, LLP*,
  No. 16-21221-CIV, 2017 WL 1291994 (S.D. Fla. Jan. 18, 2017).........41

*Elliott Assocs., L.P. v. Avatex Corp.*,
  715 A.2d 843 (Del. 1998) ..........................................................................43

*F.D.I.C. v. Bank of Boulder*,
  911 F.2d 1466 (10th Cir. 1990) ................................................................42

*Fairfax-Falls Church Community Servs. Bd. v. Herren*,
  230 Va. 390 (1985) ....................................................................................16

\* *Fasano v. Federal Reserve Bank of N.Y.*,
  457 F.3d 274 (3d Cir. 2006)......................................................................42

*Gerber v. Enters. Prods. Holdings, LLC*,
  67 A.3d 400 (Del. 2013) ............................................................................21

*Glinert v. Wickes Companies, Inc.*,
  16 Del. J. Corp. L. 764 (Del. Ch.)............................................................23

*Hartsel v. Vanguard Grp., Inc.*,
  No. 5394, 2011 WL 2421003 (Del. Ch. June 15, 2011) ....................32, 36

*Hillman v. Maretta*,
  569 U.S. 483 (2013)..................................................................................37

*In re Ionosphere Clubs, Inc.*,
  17 F.3d 600 (2d Cir. 1994)........................................................................36

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
  906 A.2d 766 (Del. 2006) ..........................................................................35

*Jacobs v. FHFA*,
   No. CV 15-708-GMS, 2017 WL 5664769 (D. Del. Nov. 27, 2017) ..................................1, 38

*Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*,
   883 A.2d 837 (Del. Ch. 2004)...................................................................................43

*Kain v. Angle*,
   69 S.E. 355 (Va. 1910).............................................................................................44

*Kramer v. W. Pac. Indus., Inc.*,
   546 A.2d 348 (Del. 1988) .........................................................................................36

*Lafayette Fed. Credit Union v. Nat'l Credit Union Admin.*,
   960 F. Supp. 999 (E.D. Va. 1997) ............................................................................24

*Loew's Theatres, Inc. v. Commercial Credit Co.*,
   243 A.2d 78 (Del. Ch. 1968)....................................................................................27

*Matulich v. Aegis Commc'ns Grp., Inc.*,
   942 A.2d 596 (Del. 2008) .........................................................................................43

*Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*,
   62 A.3d 62 (Del. Ch. 2013).......................................................................................16

*Middleburg Training Center, Inc. v. Firestone*,
   477 F. Supp. 2d 719 (E.D. Va. 2007) .......................................................................26

*Nemec v. Shrader*,
   991 A.2d 1120 (Del. 2010) ..........................................................................20, 21, 24

*Pagliara v. Fed. Home Loan Mortg. Corp.*,
   203 F. Supp. 3d 678, 690 (E.D. Va. 2016) ...............................................................33

* *Parker v. Moitzfield*,
   733 F. Supp. 1023 (E.D. Va. 1990) ..........................................................................16

*Perry Capital LLC v. Mnuchin*,
   848 F.3d 1072 (D.C. Cir. Feb. 21, 2017) .................................................................27

* *Perry Capital v. Lew*,
   70 F. Supp. 3d 208, 215 (D.D.C. 2014) ......................................................... *passim*

* *Perry Capital v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ........................................................................ *passim*

*Protas v. Cavanagh*,
   No. 6555, 2012 WL 1580969 (Del. Ch. May 4, 2012) ......................................35, 36

vi

* *Remora Investments, LLC v. Orr*,
　　673 S.E.2d 845 (Va. 2009)..................................................................................33

*Roberts v. FHFA*,
　　243 F. Supp. 3d 950, 961-63 (N.D. Ill. 2017) ..........................................................1

*Robinson v. FHFA*,
　　876 F.3d 220 (6th Cir. 2017) ................................................................................1

*Saxton v. FHFA*,
　　245 F. Supp. 3d 1063, 1075-77 (N.D. Iowa 2017) ...................................................1

*Schupp v. Jump! Info. Techs., Inc.*,
　　65 F. App'x 450 (4th Cir. 2003) .........................................................................38

*Shintom Co., Ltd. v. Audiovox Corp.*,
　　No. Civ. A. 693-N, 2005 WL 1138740 (Del. Ch. May 4, 2005) ...............................44

* *Shintom Co. v. Audiovox Corp.*,
　　888 A.2d 225 (Del. 2005) ...................................................................................43

*Skillstorm, Inc. v. Elec. Data Sys., LLC*,
　　666 F. Supp. 2d 610 (E.D. Va. 2009) ...................................................................20

*STAAR Surgical Co. v. Waggoner*,
　　588 A.2d 1130 (Del. 1991) .............................................................................27, 29

*SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*,
　　No. 3:11CV861-HEH, 2012 WL 1942056 (E.D. Va. May 29, 2012) ....................21

*Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*,
　　No. 1668, 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) ........................................20

*Surrick v. Killion*,
　　449 F.3d 520 (3d Cir. 2006)................................................................................42

* *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
　　845 A.2d 1031 (Del. 2004) ................................................................34, 35, 36, 37

*United States v. Ins. Co. of N. Am.*,
　　131 F.3d 1037 (D.C. Cir. 1997)...........................................................................32

*Ward's Equip., Inc. v. New Holland N. Am., Inc.*,
　　254 Va. 379 (1997) ...........................................................................................20

**Statutes**

12 U.S.C.

&ast; § 1451................................................................................5, 25, 37, 39

§ 1452.................................................................................................5

§ 1452(b)(1)...................................................................................6, 39

§ 1452(c)(3)...................................................................................5, 40

§ 1454.................................................................................................6

§ 1455(f)........................................................................................6, 39

§ 1455(l)........................................................................................9, 28

&ast; § 1716................................................................................5, 25, 37, 39

§ 1717(b)............................................................................................6

§ 1718(a)....................................................................................6, 8, 39

§ 1718(c)(1)...................................................................................6, 39

§ 1719(g)......................................................................................9, 28

§ 1723(b)......................................................................................5, 40

§ 4501 *et seq.*...................................................................................9

§ 4617(a)(2)........................................................................................9

§ 4617(a)-(c)......................................................................................8

§ 4617(b)(2).....................................................................................40

&ast; § 4617(b)(2)(A)(i).........................................................................9, 32

§ 4617(b)(2)(B)(i).............................................................................10

§ 4617(b)(2)(D)................................................................................10

&ast; § 4617(b)(2)(J).............................................................................10, 24

§ 4617(f)............................................................................................1


Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*..............................12


8 Del. Code

§ 151(a)...........................................................................................45

§ 151(c)...........................................................................................42


Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 1101, 122
Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*)...........................9


Va. Code

§ 13.1-638(A)...................................................................................44

§ 13.1-638(C)..............................................................................42, 44

§ 13.1-638(D)...................................................................................45

§ 13.1-638(F)....................................................................................44

**Other Authorities**

&ast; 12 C.F.R. § 1710.10................................................................6, 40, 41


67 Fed. Reg. 38361 (Jun. 4, 2002)..........................................................6, 41


12B Fletcher Cyc. Corp. § 5913 ................................................................36

Housing Finance Regulatory Improvement Act, H.R. 3703, 106th Cong. (2000) ........................25

Restatement (Second) of Contracts § 250.......................................................................................15

* Restatement (Second) of Contracts § 253............................................................................15, 16

Williston on Contracts § 63:62 (4th ed. 2002)..........................................................................16

## INTRODUCTION

As the Court is aware, this litigation involves a series of complaints filed by stockholders of Fannie Mae and Freddie Mac ("the Enterprises") challenging the terms of the U.S. Government's "extraordinary capital infusion" into those enterprises. *Perry Capital v. Mnuchin,* 864 F.3d 591, 601 (D.C. Cir. 2017).  At bottom, each of these complaints allege that a 2012 amendment (the "Third Amendment") to the terms of the funding agreement between FHFA (as Conservator of Fannie Mae and Freddie Mac) and the Department of Treasury—pursuant to which Treasury has infused $187 billion of taxpayer funds into Fannie Mae and Freddie Mac, and remains committed to infusing many billions more—allegedly diminished or eliminated Plaintiffs' ability to profit from their stock.  As this Court recognized in becoming the first to dismiss claims premised on the Third Amendment, Congress took the extraordinary step of authorizing Treasury to infuse massive amounts of taxpayer funds into Fannie Mae and Freddie Mac to avert the "systemic danger that a Fannie Mae or Freddie Mac collapse posed to the already fragile national economy." *Perry Capital v. Lew*, 70 F. Supp. 3d 208, 215 (D.D.C. 2014).

On appeal, the D.C. Circuit affirmed dismissal of the vast majority of those claims, agreeing that the Conservator acted within its statutory authority in agreeing to the Third Amendment.  *Perry Capital*, 864 F.3d at 606.  Every other court that has addressed the issue—including the Sixth Circuit—has agreed and held that 12 U.S.C. § 4617(f) bars all claims seeking declaratory or injunctive relief aimed at undoing the Third Amendment.[1]  Specifically, the D.C.

---

[1]     *See Robinson v. FHFA*, 876 F.3d 220, 227-33 (6th Cir. 2017); *Jacobs v. FHFA*, No. CV 15-708-GMS, 2017 WL 5664769, at *2-6 (D. Del. Nov. 27, 2017), *appeal pending* No. 17-3794 (3d Cir.); *Collins v. FHFA*, 254 F. Supp. 3d 841, 846 (S.D. Tex. 2017), *appeal pending* No. 17-20364 (5th Cir.); *Saxton v. FHFA*, 245 F. Supp. 3d 1063, 1075-77 (N.D. Iowa 2017), *appeal pending* No. 17-1727 (8th Cir.); *Roberts v. FHFA*, 243 F. Supp. 3d 950, 961-63 (N.D. Ill. 2017),

Footnote continued on next page

1

Circuit affirmed this Court's dismissal of all claims except Plaintiffs' breach of contract claims related to the liquidation preference, and their claims for breach of the implied covenant of good faith and fair dealing, while emphasizing that it had not assessed the viability of these remaining claims. Accordingly, the D.C. Circuit instructed this Court to address "in the first instance" whether Plaintiffs have stated a claim. *Id*. at 633. On remand, Plaintiffs have now filed amended complaints adding a purportedly "direct" breach of fiduciary duty claim and newly-concocted claims for purported violations of state statutes—claims none of these Plaintiffs, in the over four years these cases had been pending, ever raised. Each of the remanded claims, and all of Plaintiffs' newly-added claims, fail as a matter of law and should be dismissed with prejudice.

*First*, Plaintiffs allege that the Third Amendment breached their contracts as shareholders with the Enterprises by purportedly preventing Plaintiffs from receiving a payout on their contractual liquidation preferences. This claim fails. The Third Amendment does not and cannot constitute an anticipatory breach because Plaintiffs have fully performed, and all that remains is for the Enterprises to satisfy a payment obligation upon liquidation, in the event liquidation were to occur at some future point in time. Further, as a matter of law, there has been no breach, anticipatory or otherwise, of any liquidation preference rights because Plaintiffs retain the same contractual rights they previously had in the event of a future liquidation. The Third Amendment does not deprive Plaintiffs of their place in the liquidation waterfall, and the stock certificates upon which Plaintiffs base their claim do not guarantee a payout at liquidation. Rather, the stock certificates provide that assets will be available to make payments to the more junior stockholders only if assets are left over after all more senior liabilities have been paid in

---

Footnote continued from previous page

*appeal pending* No. 17-1880 (7th Cir.); *Cont'l W. Ins. Co. v. FHFA*, 83 F. Supp. 3d 828, 840 n.6 (S.D. Iowa 2015).

full.  Thus, even accepting Plaintiffs' allegation that the Third Amendment will result in more assets being distributed to Treasury (a senior stockholder), leaving more junior stockholders with no payout in liquidation, that is not a breach of contract.

*Second*, Plaintiffs allege that the Third Amendment breached the implied covenant of good faith and fair dealing by preventing Plaintiffs from receiving dividends or payouts on their liquidation preferences.  These claims likewise fail.  The implied covenant is a narrow gap-filling device that can be used only to enforce the contracting parties' reasonable expectations.  Here, Plaintiffs could not have reasonably expected that they would receive dividends or liquidation preference payouts after a capital infusion by the federal government for numerous reasons, including that:

(1) Plaintiffs' stock certificates expressly permit Fannie Mae and Freddie Mac to *issue* more senior stock that necessarily would dilute Plaintiffs' contingent right to dividends, and could also leave no liquidation proceeds available for distribution. Plaintiffs could not, as matter of law, have reasonably expected that *amendments* to more senior stock (such as the Treasury stock issued pursuant to the PSPAs) would operate any differently.

(2) For decades the Enterprises have been highly regulated and subject to government conservatorship, which precluded any reasonable expectation that stockholders would receive dividends and liquidation preference payouts after a conservatorship was put in place.

(3) When HERA was enacted, it became part of the broad, flexible contract between Plaintiffs as stockholders and the Enterprises.  Thus, all stockholders' reasonable expectations were informed by HERA and the extraordinary powers it grants to the Conservator, including to take over and operate the Enterprises, exercise all powers of the Enterprises, transfer Enterprise assets without consent, and act in the best interests of the Enterprises *or FHFA itself*.

(4) Plaintiffs' reasonable expectations were also informed by the PSPAs, which granted Treasury an array of contractual rights as compensation for its unprecedented investment in the Enterprises, including an ability to veto any dividends paid to junior stockholders like Plaintiffs.

In light of these circumstances, Plaintiffs could not have had any reasonable expectations for dividends or liquidation payouts that were violated by the Third Amendment.  Plaintiffs' implied covenant claims thus fail as a matter of law.

*Third*, Plaintiffs' breach of fiduciary duty claims fail because, although labeled "direct," they are in character and substance derivative.  Moreover, as this Court and the D.C. Circuit have recognized, HERA bars all shareholder derivative claims while the Enterprises are in conservatorships.  The claims here are derivative because they allege that the Third Amendment harmed the Enterprises and caused an alleged decline in the value of Plaintiffs' stock.  Such allegations are the hallmarks of *derivative* claims.  Further, even if considered direct—and they are not—Plaintiffs' claims would fail because HERA preempts any purported state law fiduciary duties that would require the Conservator to elevate the interests of the shareholders over the Enterprises' public mission and the statutorily protected interests of the Agency.  Moreover, the claims against Freddie Mac fail because direct breach of fiduciary duty claims are not cognizable under Virginia law.

*Fourth*, Plaintiffs assert new claims alleging that the nature of the dividend under the Third Amendment violates Delaware and Virginia corporate law.  These claims likewise fail.  Federal law—not state law—governs, and authorizes the Third Amendment.  In any event, the state statutes relied upon by Plaintiffs are broad and enabling and do not bar the Third Amendment.  Under either federal or state law, the Enterprises—and thus the Conservator—have broad discretion to define preferred stock dividends, provided (as here) that the dividend terms are stated in the certificates of designation.

*Fifth*, Plaintiffs include in their amended complaints a variety of claims that were expressly rejected, or were necessarily foreclosed, by the D.C. Circuit's decision in *Perry Capital*, and thus must be dismissed.

## STATEMENT OF FACTS

The factual background of these cases is well known and has been recounted by this Court and the D.C. Circuit. *See Perry Capital,* 70 F. Supp. 3d 208; *Perry Capital*, 864 F.3d 591.

## I.     Fannie Mae and Freddie Mac: Their Federal Charters and Public Mission

Congress created Fannie Mae and Freddie Mac to achieve public purposes, including to "establish secondary market facilities for residential mortgages," "provide stability in" that market, and "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing."  12 U.S.C. § 1716 (Fannie Mae); *see also id*. § 1451 note (Freddie Mac).  These government-sponsored enterprises provide liquidity to the mortgage market by purchasing residential loans from banks and other lenders, thereby providing lenders with capital to make additional loans.  The Enterprises finance these purchases by borrowing money in the credit markets and by packaging many of the loans they buy into mortgage-backed securities, which they sell to investors.

Although Fannie Mae and Freddie Mac are private, publicly traded companies, their corporate charters were acts of Congress and appear in the U.S. Code.  *See* 12 U.S.C. § 1716 *et seq*. (Fannie Mae); 12 U.S.C. § 1451 *et seq*. (Freddie Mac).  Not only do these statutory charters constitute legislative proclamations of the public purpose for which Congress created the Enterprises, they prescribe each company's structure, management, and operations—including, for example, the composition of the board of directors (*id*. §§ 1723(b), 1452), the issuance of bylaws (*id*. §§ 1723(b), 1452(c)(3)), and the characteristics of the loans the Enterprises may

purchase.  *Id*. §§ 1454, 1717(b).  The Enterprises' charters also address common and preferred

stock, expressly granting the Enterprises broad discretion to create "preferred stock on such

terms and conditions as the board of directors shall prescribe" (*id*. §§ 1718(a), 1455(f)), and to

pay dividends to stockholders "as may be declared by the board of directors."  *Id*.

§§ 1718(c)(1), 1452(b)(1).  Congress has amended the charters many times since their creation,

most recently in July 2010.[2]

The Enterprises are creatures of federal law that "shall comply with [their] applicable

[federal] chartering acts and other Federal law, rules, and regulations."  12 C.F.R. § 1710.10(a).

However, to provide guidance to the Enterprises on corporate governance issues not specifically

addressed by federal law, Office of Federal Housing Enterprise Oversight ("OFHEO," FHFA's

predecessor agency) directed the Enterprises to follow a chosen state's corporate laws as a gap-

filling measure.  *See* 67 Fed. Reg. 38361 (Jun. 4, 2002).  Thus, in 2002, the Enterprises enacted

bylaws in which they elected to "follow" a chosen state's law—Delaware law for Fannie Mae,

and Virginia law for Freddie Mac—on corporate governance issues, but only "to the extent not

inconsistent with the [federal] Charter Act and other Federal law, rules, and regulations."

(Fannie Bylaws § 1.05); *see also* (Freddie Bylaws § 11.3(a)).

## II.     The Enterprises' Common and Preferred Stock

The Enterprises have issued both common and preferred stock, as their federal charters

authorize them to do.  12 U.S.C. §§ 1718(a), 1455(f).  *See* Class SAC ¶¶ 72-73 (Doc. # 62-2).

Indeed, prior to the appointment of the Conservator in September 2008, the Enterprises had

issued over 30 series of preferred stock.  *Id*.  Plaintiffs allege that they purchased both common

---

[2]     Fannie Mae's entire charter is attached as **Exhibit A** and can be found here:
https://goo.gl/5ACfMb, and Freddie Mac's entire charter is attached as **Exhibit B** and can be
found here https://goo.gl/42jAnc.

and preferred stock in the Enterprises at various times, including before and after the passage of

HERA in July 2008, before and after the appointment of the Conservator in September 2008, and

before and after the execution of the Third Amendment in August 2012. *See* Class SAC ¶¶ 18-

27; Fairholme FAC ¶ 16 (Doc. # 67-1); Arrowood FAC ¶¶ 6-10 (Doc. # 73-1).

In general, each preferred stock certificate provides that the stockholder is entitled to

receive (a) dividends, if and when declared by the board of directors, and (b) a liquidation

preference, which is a contractually specified payout that stands in "preference" to (*i.e.*, ahead

of) common stockholders in the event of liquidation. The preferred stock certificates also

contain the following key terms:

- Dividends. Dividends will be awarded only "when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefor." Fannie Mae Certificate of Designation of Terms of 8.25% Non-Cumulative Preferred Stock, Series T, § 2(a)) (attached as **Exhibit C**); *see also* Freddie Mac Certificate of Creation, Designation of Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock § 2(a) (attached as **Exhibit D**); Freddie Mac Eighth Amended & Restated Certificate of Designation for Common Stock, § 2(a) (attached as **Exhibit E**).[3]

- Liquidation Preference. Liquidation preference payouts will be made only if all prior, more senior obligations are paid first: preferred stockholders "will not be entitled to be paid any amount [upon liquidation] . . . until holders of any classes or series of stock of Fannie Mae ranking . . . prior to [the series of preferred stock] have been paid all amounts to which such classes or series are entitled." Ex. C § 4(c) (Fannie Preferred); *see also id.* § 4(a) (liquidation preferences paid only "after payment or provision for the liabilities of [the Enterprise] and the expenses of such dissolution, liquidation or winding up."); Ex. D § 7(b) (Freddie Preferred); Ex. E § 8(b) (Freddie Common).

---

[3]     The Court may consider Plaintiffs' stock certificates (also known as "certificates of designation") in considering this motion to dismiss. Plaintiffs' stock certificates are integrated into the complaints because Plaintiffs assert contractual claims based on these documents, and also quote from these documents in the complaints (*e.g.*, Class SAC ¶¶ 77-78). *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1133 (D.C. Cir. 2015) ("The prototypical incorporation by reference occurs where a complaint claims breach of contract, and either party attaches to its pleading an authentic copy of the contract itself.").

- Issuance of Senior Stock.  More senior stock may be issued by the Enterprises without the consent of more junior stockholders, even if the issuance of new shares "materially and adversely affect the interests" of the junior stockholders.  Ex. C §§ 7(b), 8 (Fannie Preferred); *see* Ex. D §§ 8, 9(h)(ii) (Freddie Preferred); Ex. E §§ 9, 10(h)(ii) (Freddie Common).

- Governing Law.  For Freddie Mac, federal law applies, with Virginia law providing the "federal rule of decision" except where Virginia law is inconsistent with the Enterprises "enabling legislation, its public purposes or any provision of this [stock] Certificate."  Ex. D § 9(f) (Freddie Preferred); Ex. E § 10(f) (Freddie Common).  For Fannie Mae, federal law applies by virtue of its charter (12 U.S.C. § 1718(a)) and its bylaws (Ex. A at Sec. 1.05), in which Fannie Mae elected to follow Delaware law for corporate governance issues not addressed by federal law or its charter.

## III.    Pre-HERA Perception and Regulation of Fannie Mae and Freddie Mac

Although Fannie Mae and Freddie Mac are privately owned, they and their shareholders had historically "benefitted from a public perception that the federal government had implicitly guaranteed the securities they issued; this perception allowed the [Enterprises] to purchase more mortgages and [mortgage-backed securities], at cheaper rates, than would otherwise prevail in the private market."  *Perry Capital*, 70 F. Supp. 3d at 215.  As this Court recognized, "[t]he tradeoff when investing in government-sponsored entities that receive meaningfully different benefits than private corporations is increased regulation and the prospect of a government takeover."  *Id*. at 244 n.56.  Indeed, the Enterprises have always been closely regulated and were subject to the prospect of federal conservatorship well before HERA, in light of their large, systemically important status.  *Id*. at 244.  Before HERA, the Enterprises were regulated under the Federal Housing Enterprises Safety and Soundness Act of 1992, which gave OFHEO (FHFA's predecessor agency) the power, among others, to appoint a conservator for Fannie Mae and Freddie Mac.  *See* 12 U.S.C. § 4617(a)-(c) (1992).

**IV.      Congress Enacts HERA and the Director Appoints FHFA as Conservator**

"In 2007-2008, the national economy went into a severe recession due in significant part to a dramatic decline in the housing market." *Perry Capital,* 864 F.3d at 598.  "Congress concluded that resuscitating Fannie Mae and Freddie Mac was vital for the Nation's economic health, and to that end passed [HERA]." *Id*.  On July 30, 2008, responding to the "systemic danger that a Fannie Mae or Freddie Mac collapse posed to the already fragile national economy," Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, § 1101, 122 Stat. 2654, 2661 (codified at 12 U.S.C. § 4511 *et seq.*).  *Perry Capital*, 70 F. Supp. 3d at 215.  HERA created FHFA, an independent federal agency, to supervise and regulate Fannie Mae, Freddie Mac, and the Federal Home Loan Banks.  12 U.S.C. §§ 4501 *et seq*.  HERA also granted the Director of FHFA the discretionary authority to place Fannie Mae and Freddie Mac in conservatorships "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."  12 U.S.C. § 4617(a)(2).

In HERA, Congress granted Treasury and FHFA expansive new statutory powers, including by amending the Enterprises' charters to give Treasury the ability to purchase stock issued by the Enterprises "in such amounts as the Secretary [of the Treasury] may determine" were necessary to enable the Enterprises to continue their operations.  *See* 12 U.S.C. §§ 1719(g), 1455(l).  Congress also specified that, when Treasury exercised this purchase power, Treasury must "take into consideration" a variety of factors in furtherance of the central goal to "protect the taxpayer."  *Id*. §§ 1719(g)(1)(C), 1455(l)(1)(C).

On September 6, 2008, FHFA placed both Fannie Mae and Freddie Mac into conservatorships.  On that date, by operation of law, the Conservator succeeded to "all rights, titles, powers, and privileges . . . of any stockholder, officer, or director of [the Enterprises]."  12 U.S.C. § 4617(b)(2)(A)(i).  HERA authorized the Conservator to "take over the assets of and

9

operate [the Enterprises] with all the powers of the shareholders, the directors, and the officers of

the [Enterprises] and conduct all business of the [Enterprises]." *Id.* § 4617(b)(2)(B)(i).  In

addition, Congress empowered the Conservator to "take such action as may be—(i) necessary to

put the [Enterprises] in a sound and solvent condition; and (ii) appropriate to carry on the

business of the [Enterprises] and preserve and conserve [their] assets and property." *Id.*

§ 4617(b)(2)(D).  Further, HERA provided that the Conservator may exercise its "powers and

authorities" "in the best interests of the [Enterprises] or the Agency [that is, FHFA]." *Id.*

§ 4617(b)(2)(J)(i) and (ii).  *See Perry Capital*, 864 F.3d at 601.

## V.    The Conservator and Treasury Execute the PSPAs, Which Compensate Treasury In Exchange For A Significant Commitment of Taxpayer Funds to the Enterprises

Upon its appointment as Conservator, and as directly contemplated by Congress in

HERA, FHFA entered into an agreement with Treasury (the Senior Preferred Stock Purchase

Agreements, or "PSPAs," attached as **Exhibit F**) causing the Enterprises to issue a new class of

senior preferred stock to Treasury (*see* Treasury Stock Certificate, attached as **Exhibit G**)

pursuant to which Treasury committed to investing billions of federal tax dollars into the

Enterprises.  Under the PSPAs, Treasury infused new capital at a time when there was no other

investor—private or public—willing and able to do so.  *Perry Capital*, 864 F.3d at 600-601, 614.

Consistent with the Congressional mandate that Treasury act in ways to "protect the taxpayer,"

and in compensation for the massive and continuing commitment of federal tax dollars, Treasury

received a bundle of rights and benefits.  *Id.* at 600.  As the D.C. Circuit noted, the PSPAs

included a variety of provisions, including "a flat prohibition on Fannie and Freddie 'declar[ing]

or pay[ing] any dividend (preferred or otherwise) or mak[ing] any other distribution . . .' without

Treasury's advance consent."  *Id.* at 601 (alterations in original) (citations omitted).

The PSPAs provided that whenever the Enterprises' net worth (as measured by GAAP) fell below zero, Treasury would infuse sufficient capital to eliminate the deficit.  Ex. F §§ 2.1, 2.2.  In exchange, the Enterprises were to pay Treasury a 10% annual dividend (assessed quarterly) and a liquidation preference upon dissolution in amounts tied to the Treasury capital infusions.  *See id*. § 3.3; Ex. G § 2(c).  If the Enterprises failed to make a required dividend payment, the rate would be increased to 12% and the unpaid amount would be added to Treasury's liquidation preference.  *Id*.; *see also Perry Capital*, 70 F. Supp. 3d at 216 n. 7.  Payment of dividends to Treasury did not reduce Treasury's liquidation preference.  *See* Class SAC §§ 60, 69.  In addition, the Enterprises committed to pay Treasury a periodic commitment fee in any amount necessary to fully compensate federal taxpayers for the market value of the continuing commitment.  Ex. F. § 3.2(b) (at p.7).  The periodic commitment fee was not charged by Treasury during the first four years of the PSPAs and had not been assessed as of the time of the Third Amendment.  *See* Fairholme FAC ¶ 46.

The PSPAs initially capped the Treasury commitment at $100 billion per Enterprise.  Ex. F § 1 (at p.3) ("Maximum Amount").  In a first amendment to the PSPAs in May 2009, the cap was doubled to $200 billion per Enterprise, and in a second amendment in December 2009, the method for calculating the cap was changed, ultimately resulting in a further increase to approximately $234 billion for Fannie Mae and $212 billion for Freddie Mac.  *Perry Capital*, 864 F.3d at 601.  As the D.C. Circuit explained, no party has challenged the original PSPAs, or the First or Second Amended PSPAs, and they are "presumptively proper."  *Id*. at 609.

## VI.   The Conservator and Treasury Execute the Third Amendment

By June 30, 2012, the Enterprises were obligated under the PSPAs, as amended, to collectively pay Treasury dividends of approximately $19 billion per year—which exceeded the Enterprises' average historical earnings per year—plus commitment fees equal to the market

value of Treasury's massive commitment.[4]  On August 17, 2012, FHFA and Treasury executed the Third Amendment to the PSPAs, which (1) replaced the fixed, ten percent dividend with a variable dividend equal to the net worth of the Enterprises (minus a capital reserve), and (2) suspended the periodic commitment fee for as long as the variable dividend remains in effect. *See* Ex. F at pp. 52-67.  "In simple terms, the Third Amendment requires Fannie and Freddie to pay quarterly to Treasury a dividend equal to their net worth—however much or little that might be." *Perry Capital*, 864 F.3d at 602.[5]

"Under the Third Amendment, and FHFA's conservatorship, Fannie and Freddie have continued their operations for more than [five] years.  During that time, Fannie and Freddie, among other things, collectively purchased at least 11 million mortgages on single-family owner-occupied properties, and Fannie issued over $1.5 trillion in single-family mortgage-backed securities." *Perry Capital*, 864 F.3d at 602.  All in all, Treasury's infusion has provided the Enterprises with $187 billion in funds to date that have enabled the Enterprises to continue performing their vital missions under their statutory charters.

## PROCEDURAL HISTORY

Despite having successfully steadied the Enterprises, FHFA became the target of several groups of stockholders who filed complaints alleging, among other things, that FHFA and Treasury violated the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*., breached fiduciary duties, and breached express and implied contractual obligations by agreeing to the Third Amendment.  This Court dismissed the complaints in full, holding, *inter alia*, that (i) HERA bars

---

[4]    *See* Fannie Mae, Quarterly Report (Form 10-Q), at 4 (Aug. 8, 2012), http://goo.gl/bGLVXz; Freddie Mac, Quarterly Report (Form 10-Q), at 8 (Aug. 7, 2012), http://goo.gl/2dbgey.

[5]    On December 21, 2017, FHFA and Treasury entered into a letter agreement to the PSPAs which provides that, starting on January 1, 2018, the Enterprises will maintain a capital reserve of $3 billion.  *See* Letter to M. Watt (Dec. 21, 2017) (*available at* goo.gl/hnPmKL).

Plaintiffs' claims for equitable relief, including all APA claims; (ii) the Conservator has succeeded to all shareholder derivative claims; (iii) Plaintiffs' contract and implied covenant claims with respect to liquidation preferences are not ripe; and (iv) Plaintiffs' contract and implied covenant claims with respect to dividends fail to state a claim.  70 F. Supp. 3d at 228-31, 233-34.

Plaintiffs appealed.  On appeal, the D.C. Circuit expressly held that the Conservator acted within its statutory powers and authorities when it agreed to and implemented the Third Amendment.  *Perry Capital*, 864 F.3d at 606 ("FHFA's Actions Fall Within Its Statutory Authority");  *see also id.* ("adoption of the Third Amendment falls within FHFA's statutory conservatorship powers").  The D.C. Circuit thus affirmed the dismissal of Plaintiffs' statutory claims under the APA, which sought exclusively injunctive and declaratory relief, holding that those claims are "barred by [HERA's] strict limitation on judicial review."  *Id*. at 598; *see also id.* at 633 ("claims against the FHFA and Treasury alleging arbitrary and capricious conduct and conduct in excess of their statutory authority . . . are barred by 12 U.S.C. § 4617(f).").

The D.C. Circuit also affirmed dismissal of "most of the . . . common-law claims," finding that "some are barred because FHFA succeeded to all rights, powers, and privileges of the stockholders under [HERA] . . . [and] others fail to state a claim upon which relief can be granted."  *Id.* at 598-99.

The Class Plaintiffs had asserted two sets of contract-based claims—breach of contract and breach of implied covenant—regarding two sets of issues—dividends and liquidation preferences.  As for the claims related to dividends, the D.C. Circuit affirmed dismissal of the breach of contract claim, holding that the relevant stock certificates "accord the Companies complete discretion to declare or withhold dividends."  *Id.* at 629.  However, the D.C. Circuit

remanded the Class Plaintiffs' implied covenant claim regarding dividends for this Court to "evaluate it under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties," with reference to several factors discussed below. *Id.* at 631. As to the claims related to liquidation preferences, the D.C. Circuit held they are constitutionally ripe because Plaintiffs allege that the Third Amendment "immediately harmed them by diminishing the value of their shares." *Id.* at 632. The D.C. Circuit thus remanded the Class Plaintiffs' breach of contract and breach of implied covenant claims related to liquidation preferences. The court made clear that "[w]hether the class plaintiffs stated claims for breach of contract and breach of the implied covenant is best addressed by the district court in the first instance." *Id.* at 633.[6]

In November 2017, three sets of stockholder plaintiffs each filed amended complaints in this Court—the Fairholme Funds and its affiliated entities ("Fairholme"), the Arrowood Indemnity Company and its affiliated entities ("Arrowood"), and a group of individual and entity stockholders purporting to represent a class of Fannie Mae and Freddie Mac stockholders (the "Class Plaintiffs"). The Amended Complaints assert the claims that the D.C. Circuit remanded—breach of contract for liquidation preferences, and breach of implied covenant for liquidation preferences and dividends. The Amended Complaints also present two new sets of claims: (i) purportedly "direct" claims for breach of fiduciary duty; and (ii) claims that the Third Amendment violates certain state corporate governance laws of Delaware (Fannie Mae) and Virginia (Freddie Mac) concerning the permissible characteristics of dividends.

All of Plaintiffs' remaining claims fail as a matter of law and should be dismissed.

---

[6]    Following the D.C. Circuit's decision, Plaintiffs filed petitions for certiorari in the United States Supreme Court, seeking review of D.C. Circuit's judgment. The petitions were docketed on October 18, 2017, and responses to the petitions are due on January 17, 2018.

**ARGUMENT**

**I.     Plaintiffs Fail to State a Claim for Breach of Contract Regarding Liquidation Preferences**

Each amended complaint asserts a claim for breach of contract based on the allegation that the Third Amendment breached Plaintiffs' alleged contractual rights to receive a liquidation preference.  *See* Class SAC Counts I-III, Fairholme FAC Count II, Arrowood FAC Count II. Plaintiffs' theory is that they are entitled to "a share of the Companies' assets upon liquidation," *Perry Capital*, 864 F.3d at 632, but that the Third Amendment "nullified entirely the contractual right of preferred shareholders to receive a liquidation preference."  Fairholme FAC ¶ 121; Arrowood FAC ¶ 112.  While this Court previously dismissed these claims for lack of subject matter jurisdiction as unripe, *see* 70 F. Supp. 3d at 234-36, the D.C. Circuit held that they are "better understood" as asserting a claim for anticipatory breach, over which federal courts have jurisdiction.  *Perry Capital*, 864 F.3d at 633.  However, the D.C. Circuit emphasized that its "holding that the claims are ripe sheds no light on the merits of those claims," leaving for this Court to address "in the first instance" whether Plaintiffs have stated a claim under the substantive elements prescribed by Virginia and Delaware common law.[7]  *Id*.  They have not, for two separate and independent reasons.

**A.     The Doctrine of Anticipatory Breach Does Not Apply to Plaintiffs' Claims**

The D.C. Circuit understood Plaintiffs to be alleging a theory of anticipatory breach under the Restatement (Second) of Contracts §§ 250 and 253.  *Perry Capital*, 864 F.3d at 632. But that cause of action is subject to the "established limit[]" that "an obligor's repudiation alone . . . gives rise to no claim for damages at all if he has already received all of the agreed exchange

---

[7]     Plaintiffs allege that Delaware law governs Plaintiffs' breach of contract claims against Fannie Mae, and Virginia law governs Plaintiffs' breach of contract claims against Freddie Mac. *See* Class SAC ¶ 76.

for it."  Restatement (Second) of Contracts § 253, comment c (1981); *accord*, *e.g.*, *Parker v. Moitzfield*, 733 F. Supp. 1023, 1025 (E.D. Va. 1990) ("the doctrine does not apply to unilateral contracts or to contracts the complaining party has fully performed"); Williston on Contracts § 63:62 (4th ed. 2002) ("the doctrine of anticipatory breach has no application to suits to enforce contracts for future payment of money only").  Where "one party has fully performed his undertaking, and all that remains for the opposite party to do is to pay a certain sum of money at a certain time or times" in the future, "the doctrine of anticipatory breach does not apply," even if the obligor disavows that future obligation to pay money.  *Parker*, 733 F. Supp. at 1026.  Both Virginia and Delaware apply this basic limitation on liability for anticipatory breach.  *See*, *e.g.*, *Fairfax-Falls Church Community Servs. Bd. v. Herren*, 230 Va. 390, 395 (1985); *Cumana Invs. S.A. v. Fluor Corp.*, 593 F. Supp. 310, 314 (D. Del. 1984); *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n.102 (Del. Ch. 2013).

This limitation is fatal to Plaintiffs' breach of contract claims.  Having paid the purchase price for their respective shares of stock, Plaintiffs do not have any further obligations under their shareholder contracts with the Enterprises, and the alleged breach they are complaining about simply involves a potential payment of money by the Enterprises at some unknown point in the future (regardless of the damages Plaintiffs are now seeking).  Although Virginia and Delaware recognize a cause of action for anticipatory repudiation, that cause of action does not apply in the circumstances presented here.  Indeed, the Restatement limitation bars anticipatory suits to enforce unilateral obligations to pay even a sum certain of money on a definite future date.  *See*, *e.g.*, *Parker*, 733 F. Supp. at 1026 (dismissing claim for $220,000 due four months from date of decision under repudiated indemnity agreement).  Since part of the function of the limitation is to help "avoid[] difficult problems of forecasting damages," Restatement (Second)

of Contracts § 253, comment d, there is all the more reason not to entertain this claim where the existence of any sums due to Plaintiffs, the amount of any such sums, and the date any such sums might be due are both unknown and unascertainable.

      **B.**    **The Third Amendment Does Not Breach Plaintiffs' Alleged Right to a Liquidation Preference**

      While Plaintiffs' contracts with the Enterprises are not limited to the four corners of their stock certificates (as discussed in more detail below), the terms of those certificates alone defeat any claim that a liquidation preference right has been breached.  Those stock certificates entitle the holders to a *priority* in recovering a liquidation preference—that is, a place in line of the distribution waterfall that sits above common stockholders.  Plaintiffs are *not* contractually guaranteed to receive a payout on their liquidation preference, because their stock certificates do not guarantee that there will be assets available for distribution upon liquidation.  In fact, Plaintiffs' stock certificates condition any payout on the availability of assets *after* satisfaction of more senior claims and obligations:  preferred stockholders "will not be entitled to be paid any amount [upon liquidation] . . . until holders of any classes or series of stock of Fannie Mae ranking . . . prior to [this series of preferred stock] have been paid all amounts to which such classes or series are entitled."  Ex. C §§ 4(a), (c) (Fannie Preferred); Ex. D § 7(b) (Freddie Preferred); Ex. E § 8(b) (Freddie Common).  Thus, while the Third Amendment could affect Plaintiffs' ability to obtain a liquidation payout, it did not constitute a breach of contract because it did not eliminate Plaintiffs' contractual right to be paid in liquidation before certain other shareholders are paid.  Even after the Third Amendment, Plaintiffs still have their place in the liquidation waterfall, as their stock certificates provide.

      Moreover, Plaintiffs' stock certificates also expressly permit the Enterprises to issue more senior securities without the consent of the more junior stockholders, even if such issuance of

new shares "materially and adversely affects the interests" of the junior stockholders.  *See* Ex. C §§ 7(b), 8 (Fannie Preferred); *see* Ex. D §§ 8, 9(h)(ii) (Freddie Preferred); Ex. E §§ 9, 10(h)(ii) (Freddie Common).  In this respect, Plaintiffs' claims for breach of contract with respect to liquidation preference are akin to their claims with respect to dividends, which the D.C. Circuit rejected because, *inter alia*, "the plaintiffs have not shown their certificates guarantee that more senior shareholders will not exhaust the funds available for distribution as dividends."  864 F.3d at 630.  In the same manner, Plaintiffs' stock certificates do not guarantee that more senior shareholders will not exhaust the funds available for distribution as a liquidation preference.  Plaintiffs thus fail to state a claim for breach of contract.

### C.   Arrowood's Breach Claims Against Director Watt Are Barred By Sovereign Immunity

Arrowood names FHFA Director Watt as a defendant "in his official capacity" to all of their claims seeking money damages, including the breach of contract claim, even though Director Watt is not a party to the contract and was not Director at the time of the Third Amendment.  *See* Arrowood FAC ¶ 14.  Sovereign immunity, "bar[s] suits for money damages against officials in their official capacity absent a specific waiver by the government."  *Clark v. Library of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984) (emphasis removed).  Here, because there has been no waiver, the claims against FHFA Director Watt should additionally be dismissed on the basis of sovereign immunity.

### II.   Plaintiffs Fail to State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing With Respect to Liquidation Preferences and Dividends

Each complaint asserts claims for breach of the implied covenant of good faith and fair dealing based on Plaintiffs' alleged right to receive liquidation preferences and dividends.  *See* Class SAC Counts IV-VI; Fairholme FAC Count III; Arrowood FAC Count III.  According to Plaintiffs, the Third Amendment "violated the[ir] reasonable expectations" as stockholders

18

(Class SAC ¶¶ 150, 157, 164) because it prevented the stockholders "from receiving any of the fruits of their bargain" in the form of liquidation preferences and dividends.  Fairholme FAC ¶¶ 128-29; *see also* Arrowood FAC ¶ 119.

This Court previously dismissed Plaintiffs' implied covenant claims on the ground that the Conservator acted within its statutory authority under HERA in executing the Third Amendment.  *Perry Capital*, 70 F. Supp. 3d at 238-39.  However, the D.C. Circuit held that the Conservator's exercise of statutory powers does not "preempt" the implied covenant, and thus remanded the implied covenant claims for this Court "to evaluate [them] under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties."  *Perry Capital*, 864 F.3d at 631; *see also id*. at 633 (whether Plaintiffs state a claim "is best addressed by the district court in the first instance").

The D.C. Circuit thus tasked this Court with determining the "reasonable expectations" of the parties, and specifically directed the Court to consider whether "the enactment of [HERA] and the FHFA's appointment as conservator affected these expectations."  *Id*. at 631.  The D.C. Circuit reasoned that if those events did affect the stockholders' expectations, then this Court should also consider, *inter alia*:

> (1) Section 4617(b)(2)(J)(ii) (authorizing the FHFA to act "in the best interests of the [Companies] or the Agency"),
>
> (2) Provision 5.1 of the [PSPAs], J.A. 2451, 2465 (permitting the Companies to declare dividends and make other distributions only with Treasury's consent), and
>
> (3) Pertinent statements by the FHFA, *e.g.*, J.A. 217 ¶ 8, referencing *Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac* (Sept. 7, 2008) (The "FHFA has placed Fannie Mae and Freddie Mac into conservatorship. [Conservatorship] is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business

operations.  FHFA will act as the conservator to operate the
Enterprises until they are stabilized.").

*Id.*

Here, Plaintiffs fail to state a claim for breach of the implied covenant because Plaintiffs

cannot plausibly allege that the Third Amendment violated their reasonable expectations as

stockholders.  Plaintiffs' contractual expectations were necessarily informed by the express terms

of Plaintiffs' stock certificates, the nature of investing in heavily regulated government

sponsored enterprises, the governing statutory provisions in HERA, and the terms of the PSPAs.

In light of this combination of factors, Plaintiffs could not have had a reasonable expectation of

receiving dividends or a liquidation payout following an extraordinary federal intervention and

infusion of funds.

### A.    The Implied Covenant Is a Narrow Device for Inferring Limited Additional Terms to Fill Gaps in a Contract

The implied covenant of good faith and fair dealing "is a limited and extraordinary legal

remedy."  *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010).  It "cannot be the vehicle for

rewriting an unambiguous contract in order to create duties that do not otherwise exist."  *Ward's*

*Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997); *see also Dunlap v. State*

*Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (implied covenant does not create a "free-

floating duty . . . unattached to the underlying legal document"); *Skillstorm, Inc. v. Elec. Data*

*Sys., LLC*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009) (implied covenant does not permit a party

to "attempt to rewrite" a contract term that later "proves unfavorable to [him].").  As such,

imposing an implied covenant "is a cautious enterprise and instances should be rare."  *Superior*

*Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, No. 1668, 2006 WL 2521426, at *6 (Del. Ch. Aug.

25, 2006).  As now Delaware Supreme Court Chief Justice Strine emphasized, "Delaware courts

apply the implied covenant rarely, and only in narrow circumstances," namely to "implement

any clear interstitial intent discernible from the language" in the parties' express contract.  *Allied Capital Corp. v. GC-Sun Holdings L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006).

"The covenant is best understood as a way of implying terms in the agreement, whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap*, 878 A.2d at 441 (internal quotation marks and citations omitted).  The implied covenant asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Gerber v. Enters. Prods. Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013).  This analysis hinges on the parties' "reasonable expectations at the time of contracting." *Nemec*, 991 A.2d at 1126; *see also Dunlap*, 878 A.2d at 442 (implied covenant "ensures the parties' 'reasonable expectations' are fulfilled") (citation omitted); *see also SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*, No. 3:11CV861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (under Virginia law, implied covenant includes "consistency with the justified expectations of the other party [to a contract]") (citation omitted).

## B.   The Express Provisions of Plaintiffs' Stock Certificates Preclude Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts

Because the contract between stockholders and the Enterprise is a broad, flexible, and ever-updating agreement (as explained further below), the contractual rights of shareholders vis-à-vis the Enterprises at the time of the Third Amendment were not defined simply by the four corners of the stock certificates, but by the charter, bylaws, and governing law as they existed at that point in time.  Nevertheless, the Court need look no further than the express terms of Plaintiffs' stock certificates to dismiss Plaintiffs' implied covenant claims.  Those terms show that Plaintiffs could not have had any reasonable expectation that the Enterprises (or the

Conservator acting on their behalf) would not alter more senior stock in a manner that could diminish or eliminate Plaintiffs' likelihood of receiving dividends or a liquidation payout.

As explained above, Plaintiffs' stock certificates expressly allow the Enterprises, and the Conservator acting on their behalf, to issue more senior stock without the consent of the Plaintiffs as stockholders, even if such stock issuance would "materially and adversely affect[]" Plaintiffs' ability to obtain liquidation preference payouts and receive dividends. *See supra* Sec. I(B). Accordingly, Plaintiffs cannot credibly allege that it is clear from the text of the stock certificates that, had the Enterprises and its stockholders thought to negotiate with respect to *amendments* to existing senior stock certificates, the Enterprises would have agreed to treat amendments differently than issuance of new stock certificates. Put differently, Plaintiffs explicitly agreed that more senior stock could be issued that "materially and adversely affected" their rights; it makes no sense that Plaintiffs would nevertheless have a cause of action when the company amends existing stock in a way that allegedly does exactly the same thing.

Additionally, with respect to dividends, Plaintiffs agreed to provide the Enterprises' Boards (and, thus, the Conservator) with "sole discretion" to declare dividends, and also agreed they would "have no claim" for unpaid dividends unless the Enterprises pay dividends to more junior stockholders, which has not occurred. Ex. C §§ 2(a), (b); *see* Ex. D §§ 2(a), (c).

The import of the contractual language—and the "spirit" of the agreement—is clear: the Enterprises have the right to create and expand entitlements to senior stock, and the exercise of that right (here, by altering the dividend structure on the Treasury stock) may affect junior shareholders' ability to receive dividends and liquidation payouts. *See Amazon.com, Inc. v. Hoffman*, No. 2239, 2009 WL 2031789, at *4 (Del. Ch. June 30, 2009) (rejecting implied covenant claims where express contract terms contradicted the implied duty sought to be

22

imposed); *Chamison v. HealthTrust, Inc. Hosp. Co.*, 735 A.2d 912, 920-21 (Del. Ch. 1999) (implied covenant cannot be contrary to the "spirit" of the agreement); *Glinert v. Wickes Companies, Inc.*, 16 Del. J. Corp. L. 764, 778-80 (Del. Ch.), *aff'd* 586 A.2d 1201 (Del. 1990) (refusing to invoke implied covenant where there were no plausible allegations that the "parties would have regarded another form of corporate transaction that *accomplished the same thing* [as had been expressly allowed] . . . as implicitly forbidden") (emphasis added).

Dilution of interests by issuance of dividends or creation of more senior securities is such a common occurrence that courts routinely reject implied covenant claims attacking these sanctioned practices.  For example, the court in *Corporate Property Associates 14, Inc. v. CHR Holding Corp.*, No. 3231, 2008 WL 963048 (Del. Ch. 2008), rejected implied covenant claims that alleged a corporation had secretly issued large cash dividends to shareholders to dilute the value of warrants held by the plaintiffs.  The court emphasized that "[i]ssuing cash dividends . . . is a simple and well known dilution technique.  Sophisticated parties . . . know that . . . the only protection against dilution is contractual, and that there are methods for protecting themselves contractually." *Id*. at *5.  Because dilution by issuance of dividends is anticipated, the court held that "the only reasonable inference to be drawn from the Warrants' silence on this point is that the parties did not agree to protect the Warrants against dilution by cash dividends," and refused to "us[e] the implied covenant of good faith and fair dealing to imply contractual protection" that the investors "failed to secure for themselves at the bargaining table." *Id.*  The same is true here: the only reasonable inference is that the parties did not agree to insulate the stockholders from any potentially dilutive effects of amendments to more senior stock.[8]

---

[8]     That Plaintiffs' implied covenant claims fail is even clearer than in *Corporate Property Associates*, because the contracts here go far beyond silence—as discussed below, the contracts incorporate provisions of HERA and thereby *expressly* authorize the Conservator to exercise its

Footnote continued on next page

**C.** **The Highly-Regulated Nature of the Enterprises Precludes Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts**

Because of the highly-regulated nature of the Enterprises, Plaintiffs could not as a matter of law have had reasonable expectations that were violated by the Third Amendment. For many years, the Enterprises have been highly regulated and susceptible to being placed into conservatorship. As this Court previously held in dismissing Plaintiffs' takings claims (which was not appealed), "[t]here can be no doubt that the plaintiff shareholders understood the risks intrinsic to investments in entities as closely regulated as the GSEs, and, as such, have not now been deprived of any *reasonable* investment backed expectations." *Perry Capital*, 70 F. Supp. 3d at 245 (emphasis in original).[9] This Court noted that "[f]or decades—and at the time each of the class plaintiffs purchased their GSE stock—the GSEs have been under the watchful eye of regulatory agencies and subject to conservatorship or receivership largely at the government's discretion." *Id.* at 244. The Court accurately explained that "[t]he tradeoff when investing in government-sponsored entities that receive meaningfully different benefits than private corporations"—such as a widely perceived government guarantee—"is increased regulation and the prospect of a government takeover." *Id.* at 244 n.56; *cf. Lafayette Fed. Credit Union v. Nat'l Credit Union Admin.*, 960 F. Supp. 999, 1005 (E.D. Va. 1997), *aff'd*, 133 F.3d 915 (4th Cir.

---

Footnote continued from previous page

discretion with respect to the issuance and amendment of other securities, payment of dividends, and all manner of other actions "in the best interests of the Agency." 12 U.S.C. § 4617(b)(2)(J).

[9]    While the analysis for takings claims under the Fifth Amendment and for breach of implied covenant claims under state law both look at the reasonable expectations of the plaintiff, the temporal focus of the analysis may vary between the two types of claims. The takings analysis focuses on the plaintiff property owner's "reasonable, investment backed expectations" when the plaintiff made its investment while the implied covenant analysis focuses on the contracting parties' "reasonable expectations *at the time of contracting*." *Nemec*, 991 A.2d at 1126 (emphasis added). *See* Treasury Response to Class Plaintiffs' Petition for Panel Rehearing (filed June 2, 2017), No. 14-5243 (D.C. Cir.) (discussing takings standards). Thus, as demonstrated below, the Court must evaluate Plaintiffs' reasonable contract expectations in connection with their shareholder contracts as they existed when the contract was last amended before the breach.

24

1998) (dismissing due process claim because "the heavily-regulated nature of the financial services industry and the intrusiveness of federal regulations, including those set forth in FIRREA, diminish a credit union's (and by extension, the credit union's shareholders') expectations that the government will not seize the institution's assets under FIRREA").

Indeed, from day one, the charters of the Enterprises made clear their special, public missions.  12 U.S.C. § 1716 (Fannie Mae's purpose is, *inter alia*, to "provide stability in" and "ongoing assistance to the secondary market for residential mortgages" and to "promote access to mortgage credit throughout the Nation" ); *see also id.* § 1451 note (Freddie Mac's purpose is, *inter alia*, to "provide stability in" and "ongoing assistance to the secondary market for residential mortgages" and to "promote access to mortgage credit throughout the Nation").

Further, given the public missions and import of the Enterprises, stockholders also should reasonably have expected—even before HERA—that the law could change in a way that would increase the government's regulatory and supervisory powers over the Enterprises.  Indeed, Congress began considering legislation as early as 2000 to increase the powers of its regulator, including by granting the authority to place the Enterprises in receivership.  *See* Housing Finance Regulatory Improvement Act, H.R. 3703, 106th Cong. (2000) (proposing the creation of an independent agency to regulate the Enterprises, including authority to place the Enterprises in receivership).  Throughout this period, investors should have known that significant regulatory reform was in the works.  Such reform came to fruition with the passage of HERA in 2008.

Thus, Plaintiffs should reasonably have expected—especially in the context of a massive economic crisis—that the Enterprises could be put in a conservatorship or receivership that could leave stockholders with no dividends or distributions in liquidation.  Accordingly, the Third Amendment could not have "violated the reasonable expectations of the parties," 864 F.3d at

631, and Plaintiffs cannot invoke the exceptional doctrine of an implied covenant to require the Conservator to prioritize potential dividends and liquidation preferences for Plaintiffs above other interests, including those of the Agency.

**D.     HERA, Which Forms Part of Plaintiffs' Contract as Stockholders, Precludes Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts**

In addressing Plaintiffs' implied covenant claim, the D.C. Circuit instructed this Court to consider on remand whether the pertinent provisions of HERA (including the "best interests" provision of Section 4617(b)(2)(J)(ii)) informed the reasonable expectations of the parties.  *See Perry Capital*, 864 F.3d at 631.  It did, because HERA forms part of Plaintiffs' contracts with the Enterprises.  As such, Plaintiffs should have known that their ability to obtain liquidation preference payouts and dividends could be diminished or eliminated, precluding any reasonable expectations to the contrary.

"[W]hen [investors] purchase stock," they enter into a "binding broader contract among the directors, officers, and stockholders" that "is, by design, flexible and subject to change." *Boilermakers Local 154 Retirement Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013). That "binding broader contract" between a corporation and its shareholders includes not only the stock certificate itself, but also the corporate charter, bylaws, and corporate law under which the corporation is formed and regulated.  *Id*. at 940; *see also In re Activision Blizzard, Inc. Stockholder Litig.*, 124 A.3d 1025, 1050 & n.11 (Del. Ch. 2015) (organic corporate documents and general corporation law "together constitute" the contract between corporation and shareholder); *Middleburg Training Center, Inc. v. Firestone*, 477 F. Supp. 2d 719, 725 (E.D. Va. 2007) (shareholder contract includes "the corporation's articles of incorporation, its corporate charter, and "the general corporation laws of the state of incorporation").  For corporations chartered pursuant to Delaware's or Virginia's sovereign authority, the respective governing

corporate statutes of those states form an integral part of the contract. *See Boilermakers*, 73 A.3d at 940; *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del. 1991) ("it is a basic concept that the General Corporation Law is part of the certificate of incorporation of every Delaware company").

Moreover, the elements comprising the contract between shareholder and corporation are, by their nature, subject to amendment. *See Loew's Theatres, Inc. v. Commercial Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) ("The established Delaware law is that the contract rights of the stockholders . . . do not rest upon an unchangeable base."). Accordingly, when an investor buys stock in the secondary market, it buys into the shareholder-corporation contract as it exists at the time of his purchase, with the knowledge that the contract's terms may be different than when the stock was first issued, and that the terms may further change over time as there are amendments to the governing law, charters, and bylaws.[10]

For Fannie Mae and Freddie Mac, which were chartered by Congress, the broad, flexible contract between Plaintiffs and the Enterprises includes not only the stock certificates themselves, but also the Enterprises' federal charters, bylaws, and governing corporate laws—

---

[10]   For example, if an investor buys stock today that was issued in 2000 but subject to charter, bylaw, and statutory amendments in the intervening years, the shareholder's contractual rights vis-à-vis the corporation are determined not by the 2000 version of the charter, bylaws, and governing law, but by the subsequently modified versions.

In a rehearing petition in the D.C. Circuit, Plaintiffs disagreed, arguing that the contractual expectations of stockholders are set—and fixed—at the time the Enterprises first *issued* the stock. In its initial opinion, the D.C. Circuit directed this Court to evaluate Plaintiffs' implied covenant claims by assessing "whether the Third Amendment violated the reasonable expectations of the parties *at the various times the class plaintiffs purchased their shares*." *Perry Capital LLC v. Mnuchin*, 848 F.3d 1072, 1111 (D.C. Cir. Feb. 21, 2017) (emphasis added). In response to the Class Plaintiffs' rehearing petition on this issue, the D.C. Circuit amended its opinion to remove the references to the time of purchase, leaving it to this Court to resolve the issue, to the extent needed, in the first instance. *See Perry Capital*, 864 F.3d at 631 (directing this Court to evaluate simply "whether the Third Amendment violated the reasonable expectations of the parties.").

including those provisions of HERA that govern the shareholders' relationship with the Enterprises during a conservatorship.

Accordingly, Plaintiffs' implied covenant claims must be considered in light of the stockholder contract as it existed at the time of the alleged breach—*i.e.*, at the time of the Third Amendment in August 2012.  This is because the parties' reasonable expectations were updated with each amendment to the broad, flexible contract, including *inter alia* the enactment of HERA (and its amendments to the Enterprises' charters).  Thus, HERA informs the reasonable-expectations analysis regardless of when Plaintiffs purchased their stock because (as described above) that statute became incorporated into each stockholder's broad, flexible contract with the Enterprises.

HERA is incorporated into Plaintiffs' contract in two ways.  First, HERA amended the Enterprises' charters, empowering the Enterprises (and thus the Conservator acting on their behalf) to issue, and Treasury to purchase, stock on terms mutually agreeable between the Enterprises and Treasury.  *See* 12 U.S.C. §§ 1719(g), 1455(l).  Significantly, Congress authorized Treasury to expend taxpayer funds to purchase Enterprise stock "in such amounts as the Secretary [of the Treasury] may determine" was necessary to enable the Enterprises to continue their critical operations.  *Id.*  In so doing, Congress made clear that a guiding principle and primary purpose of HERA was to empower Treasury to "protect the public interest" and "protect the taxpayer," who was the ultimate source of these funds.  *Perry Capital*, 864 F.3d at 600 (citations and quotation marks omitted).

Second, other provisions of HERA altered the relationship between the shareholders and the Enterprises during conservatorship, and thus were incorporated into Plaintiffs' contract. With HERA, Congress gave FHFA extraordinary powers to operate the Enterprises in

conservatorship and place them into receivership.  As such, Plaintiffs reasonably expected (or should have reasonably expected) that (i) the Enterprises could be placed in conservatorships and receiverships, (ii) in conservatorships, all stockholder rights would be transferred to the Conservator, (iii) the Conservator could operate Enterprises with all of the powers of the Enterprises, their boards, and their stockholders, (iv) the Conservator could operate the Enterprises in the best interests of the Enterprises or FHFA itself, and (v) the Conservator could transfer or sell any Enterprise assets without approval or consent.  Further, the D.C. Circuit concluded that HERA itself authorized the Conservator to enact the Third Amendment.  *Perry Capital*, 864 F.3d at 606-14.  Thus, in light of HERA, Plaintiffs should have known that their ability to obtain liquidation preference payouts and dividends could be diminished or eliminated, precluding any reasonable expectations to the contrary.

### E.    The PSPAs, Which Also Form Part of Plaintiffs' Contract, Independently Preclude Any Reasonable Expectation That Plaintiffs Would Receive Dividends and Liquidation Preference Payouts

The D.C. Circuit also instructed this Court to consider on remand whether the PSPAs (including Treasury's ability to veto dividends to stockholders) informed the reasonable expectations of the parties.  *See Perry Capital*, 864 F.3d at 631.  They did, because the PSPAs and their corresponding Treasury stock certificates are themselves incorporated into the Enterprises' contracts with all shareholders.  *See STAAR Surgical*, 588 A.2d at 1136 (preferred stock "amends the certificate of incorporation and fundamentally alters the contract between all the parties").

With the PSPAs in place, Plaintiffs could not have had any reasonable expectation that they would receive liquidation preferences and dividends.  Plaintiffs knew and reasonably expected (or should have reasonably expected) that, due to the PSPAs, (i) they would not receive any dividends absent Treasury's consent, (ii) the Enterprises owed Treasury substantial, ongoing

dividends and periodic commitment fees, (iii) the Enterprises could not be released from

conservatorship other than into a receivership without the consent of Treasury, and (iv) payment

of dividends and the periodic commitment fee to Treasury would not reduce Treasury's

liquidation preference.  All of these provisions were effectuated by the stock certificates issued

in connection with the First and Second Amendments to the PSPAs, which, in the words of the

D.C. Circuit, are "unchallenged and presumptively proper."  *Perry Capital*, 864 F.3d at 609.  In

light of these provisions of the PSPAs—which were incorporated into Plaintiffs' contract—

Plaintiffs could not have reasonably expected to receive dividends and liquidation preferences.

       **F.**      **Statements by FHFA's Director Do Not Provide Plaintiffs With a Reasonable Expectation of Receiving Receive Dividends and Liquidation Preference Payouts**

      The D.C. Circuit also directed this Court to consider how "pertinent statements by the

FHFA" may have affected the parties' reasonable expectations for purposes of resolving

Plaintiffs' implied covenant claims.  *Perry Capital*, 864 F.3d at 631.  As an initial matter, to the

extent such statements inform Plaintiffs' expectations, the Court should consider the FHFA

Director's statement, made on September 7, 2008—the day the conservatorships were

announced—that "common stock and [junior] preferred stock dividends will be eliminated."  *See*

Statement of FHFA Director James B. Lockhart (Sept. 7, 2008), *available at* goo.gl/GwYrS5.  In

light of this statement, Plaintiffs simply could not have expected to thereafter receive dividends.

      The D.C. Circuit also identified the FHFA Director's statement, made on the same day,

that conservatorship is "a statutory process designed to stabilize a troubled institution with the

objective of returning the entities to normal business operations."  *Perry Capital*, 864 F.3d at

631.  Plaintiffs' amended complaints, in turn, cite this "normal business operations" language

and allege that it provided them an expectation that, once the Enterprises became profitable,

FHFA would "accumulate capital for the benefit of the Companies and their private

shareholders," "redeem" the PSPAs (essentially buy Treasury out), and "exit conservatorship," all of which would increase "the economic value of their shares."  Class SAC ¶¶ 57-58; *see also* Fairholme FAC ¶ 31; Arrowood FAC ¶¶ 24, 27.

Plaintiffs' alleged expectations based on the phrase "normal business operations" in the context of the Director's statement are simply not reasonable as a matter of law.  On September 6, 2008, the financial markets were in utter turmoil and Lehman Brothers had just entered bankruptcy.  At this historic precipice, FHFA announced to the public that the conservatorships were part of a process attempting to return the Enterprises to "normal business operations."  This was simply a statement that Fannie Mae and Freddie Mac would continue to support the housing finance market and the secondary market for residential mortgages during conservatorship, and Plaintiffs' attempt to turn it into a pledge to, among other things, accumulate capital for the benefit of Plaintiffs as stockholders and to issue dividends fails as a matter of law.  Moreover, normal business operations, for these Enterprises and their stockholders, means being subject to a regulatory and contractual framework that, as discussed above, made dividends or liquidation payouts uncertain at best.

III.    **Plaintiffs' Breach of Fiduciary Duty Claims Fail as a Matter of Law**

Plaintiffs allege that the Conservator owed and breached state law fiduciary duties to shareholders by executing the Third Amendment.  *See* Class SAC Counts VII-VIII and XI-XII; Fairholme FAC Count IV; Arrowood FAC Count IV.  Plaintiffs' breach of fiduciary duty claims fail for multiple reasons.  As an initial matter, the fiduciary duty claims asserted by the Fairholme Plaintiffs should be dismissed because the D.C. Circuit held that they had forfeited their claims for breach of fiduciary duty in the appellate court, and it refused to "relieve them of the consequences of this forfeiture."  *Perry Capital*, 864 F.3d at 617.  Fairholme's attempt to plead fiduciary duty claims, therefore, has been forfeited, and their effort to re-plead these

claims is contrary to law-of-the-case principles and the mandate rule.  *See United States v. Ins. Co. of N. Am.*, 131 F.3d 1037, 1041 (D.C. Cir. 1997).

Additionally, all Plaintiffs' fiduciary duty claims fail because (a) the claims are derivative, not direct, and thus are barred by HERA, and (b) HERA preempts state law fiduciary duty claims against the Conservator.

### A.    Plaintiffs' Breach of Fiduciary Duty Claims Are Derivative and Thus Are Barred By HERA

As this Court is aware, HERA provides that the Conservator "succeed[s] to—all rights, titles, powers, and privileges" of the Enterprises and of "any stockholder" of the Enterprises.  12 U.S.C. § 4617(b)(2)(A)(i).  This Court previously dismissed several shareholder derivative claims on the basis of this Succession Clause.  *See Perry Capital*, 70 F. Supp. 3d at 230-32.  On appeal, the D.C. Circuit affirmed that the Succession Clause "does not permit shareholders to bring derivative suits on behalf of the Companies even where the FHFA will not bring a derivative suit due to a conflict of interest."  *Perry Capital*, 864 F.3d at 625.  However, the D.C. Circuit held that the Succession Clause does not bar "direct" stockholder claims, and allowed the Class Plaintiffs to attempt to plead direct fiduciary duty claims on remand.  *Id*. at 627.

On remand, Plaintiffs attempt to plead direct breach of fiduciary duty claims, on behalf of both Fannie Mae and Freddie Mac stockholders.  But their "direct" label is not controlling. "The manner in which a plaintiff labels its claim and the form of words used in the complaint are not dispositive; rather, the court must look to the nature of the wrong alleged, taking into account all of the facts alleged in the complaint, and determine for itself whether a direct claim exists."  *Hartsel v. Vanguard Grp., Inc.*, No. 5394, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012).  Plaintiffs have here asserted only derivative claims, which are barred by HERA.

### 1.    The Breach of Fiduciary Duty Claims Brought By Freddie Mac Shareholders Are Barred

Freddie Mac has elected to follow Virginia law for corporate governance issues not addressed by federal law or the Enterprises' federal charters.  *See* Class SAC ¶ 76 (citing Freddie Mac Bylaws § 11.3).  Under Virginia law, there is no such thing as a direct shareholder claim for breach of fiduciary duty; *all* breach of fiduciary duty claims alleging misconduct by a corporate officer or director *must* be brought derivatively.  For example, in *Remora Investments, LLC v. Orr*, 673 S.E.2d 845 (Va. 2009), the Virginia Supreme Court explained that "corporate shareholders cannot bring individual, direct suits against officers or directors for breach of fiduciary duty, but instead shareholders must seek their remedy derivatively on behalf of the corporation."  673 S.E.2d at 848 (citing *Simmons v. Miller*, 544 S.E.2d 666, 675 (Va. 2001)); *see also Pagliara v. Fed. Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 690 (E.D. Va. 2016) ("shareholders may assert claims of fiduciary breach against corporate directors only through shareholder derivative suits") (quoting *Wenzel v. Knight*, No. 3:14-cv-432, 2015 WL 222182, at *3 (E.D. Va. Jan. 14, 2015)); *DCG&T ex rel. Battaglia/IRA v. Knight*, 68 F. Supp. 3d 579, 586 (E.D. Va. 2014) ("Ultimately, whether the corporation or the shareholder sustained the injury, a breach of fiduciary duty by a director can be redressed only through a derivative action" under Virginia law).  Virginia law thus makes explicit that shareholder claims for breach of fiduciary duty against officers and directors (or successors to the rights of officers and directors such as the Conservator) are derivative, not direct.

Accordingly, under Virginia law, Plaintiffs cannot state direct claims for breach of fiduciary duty related to Freddie Mac (Class SAC Counts XII, Arrowood FAC Count IV (as related to Freddie Mac)), and Fairholme FAC Count IV (as related to Freddie Mac)), and

pursuant to the D.C. Circuit's holding in *Perry Capital,* HERA bars Plaintiffs' derivative claims

for breach of fiduciary duty.

### 2.   The Breach of Fiduciary Duty Claims Brought By Fannie Mae Shareholders Are Derivative, and Thus Barred

Plaintiffs' fiduciary duty claims concerning Fannie Mae also are derivative, and thus

barred by HERA.  Fannie Mae has elected to follow Delaware law for corporate governance

issues not addressed by federal law or the Enterprises' federal charters.  *See* Class SAC ¶ 76

(citing Fannie Mae Bylaws § 1.05).  Under Delaware law, Plaintiffs' fiduciary duty claims are

derivative because they are premised upon an injury to Fannie Mae, and the proper relief sought

would flow directly to Fannie Mae.  Thus, as the D.C. Circuit held with respect to the Class

Plaintiffs' claims when first presented:  "[t]he class plaintiffs' claims for breach of fiduciary

duty are derivative and therefore barred" by HERA's succession clause.  *Perry Capital*, 864

F.3d at 624.  Plaintiffs' attempted amendments are insufficient to alter the D.C. Circuit's

holding.

Under Delaware law, a claim is classified as derivative or direct by determining "(1) who

suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who

would receive the benefit of any recovery or other remedy (the corporation or the stockholders,

individually)?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del.

2004).[11]  Here, both parts of the inquiry confirm that Plaintiffs' claims for breach of fiduciary

duty are derivative.

---

[11]   For purposes of the present motion only, FHFA assumes without conceding that Delaware and Virginia law concerning whether a claim is direct or derivative are not inconsistent with federal law.  However, as discussed herein, to the extent Plaintiffs' claims are based on alleged state law duties that are inconsistent with HERA, those claims are preempted by federal law.

First, Plaintiffs' fiduciary duty claims are premised upon an alleged harm to the Enterprises.  Plaintiffs expressly allege that the Third Amendment has "subject[ed] *the Companies to continuing harm* because the adverse consequences of the injurious actions are still in effect and ongoing."  Class SAC ¶ 117 (emphasis added); *see also* Fairholme FAC ¶¶ 2, 107 (alleging Third Amendment "has forced the Companies to operate with almost no capital and in an inherently unsound condition," and has "render[ed] *the Companies* fundamentally unsafe and unsound") (emphasis added).  Plaintiffs also allege that the Third Amendment "constituted waste" of Enterprise assets, Class SAC ¶ 199, and "claims of waste are classically derivative."  *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 771 (Del. 2006). Indeed, the theory underlying all of Plaintiffs' claims is that the Third Amendment allegedly depletes the Enterprises' assets, thereby leaving no money to distribute to shareholders via dividends and liquidation preferences.  *See, e.g.*, Class SAC ¶ 12 (alleging Third Amendment "completely eliminated any prospect for any other stockholders ever to receive any dividends, no matter how profitable the Companies are").  These alleged injuries are derivative, not direct. *See Protas v. Cavanagh*, No. 6555, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012) (holding claims direct where alleged wrongdoing "deplete[d] corporate assets that might otherwise [have] be[en] used to benefit the stockholders, such as through a dividend").  Because the Plaintiffs cannot "prevail without showing an injury to the corporation[s]" (*Tooley*, 845 A.2d at 1039)—indeed, they specifically *allege* injury to the corporations—their fiduciary duty claims are derivative.

The D.C. Circuit observed that Plaintiffs' claims are based on the allegation that the Third Amendment "immediately diminished the value of their shares."  *Perry Capital*, 864 F.3d at 632.  In their Amended Complaints, Plaintiffs continue to allege that the Third Amendment

harmed the value of their stock, further confirming that their fiduciary duty claims are

derivative. *See, e.g.*, Class SAC ¶ 57 (alleging Third Amendment "eliminated" the "economic

value of their shares"); *id.* ¶ 60 (alleging Third Amendment "destroys . . . value" in the

Companies' stock); Fairholme FAC ¶ 5 (alleging Third Amendment "expropriates the value of

Fairholme's preferred stock"); *id.* ¶ 107 (alleging Third Amendment leaves "no prospect of ever

generating value for private shareholders").  It is well-established that a reduction in stock value

is an "indirect injury" to a shareholder that is derived from—and thus derivative of—an injury

to the company itself, "[i]t does not arise out of any independent or direct harm to the

stockholders, individually." *Tooley*, 845 A.2d at 1037.[12]  Thus, because Plaintiffs' claims are

based on alleged injury to the value of their stock, those claims are derivative, not direct.

  *Tooley*'s second prong, which provides that a claim is direct only if the relief sought

"flows directly to the stockholders, not to the corporation," 845 A.2d at 1036, also establishes

that Plaintiffs' claims are derivative.  The fact that Plaintiffs (wrongly) request direct money

damages does not transform the claims from derivative to direct.  Instead, the court "should

look to the nature of the wrong and to whom the relief *should* go." *Id.* at 1039 (emphasis

added); *see also Hartsel*, 2011 WL 2421003 at *18 (rejecting shareholders' claims for direct

damages separate from any recovery for the company itself because shareholders "failed to

allege an injury separate and distinct from an injury alleged to have been suffered by the

[company]"); *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 605 (2d Cir. 1994) (holding claim

---

[12] *See also* 12B Fletcher Cyc. Corp. § 5913 ("[S]hareholders cannot sue in their own names
and on their own behalf to recover for a loss resulting from depreciation of the value of their
stock as the result of an injury to the corporation."); *see Kramer v. W. Pac. Indus., Inc.*, 546 A.2d
348, 353 (Del. 1988) ("Delaware courts have long recognized that actions charging
mismanagement which depress[ ] the value of stock [allege] a wrong to the corporation; *i.e.*, the
stockholders collectively, to be enforced by a derivative action") (internal quotation marks and
citation omitted)); *Protas*, 2012 WL 1580969, at *6 (alleged wrongdoing "harms the
stockholders only derivatively so far as their stock loses value").

derivative because "payment of damages directly to the plaintiff-stockholders for the diminution in the value of their stock would be inappropriate").  Because the purported injury alleged here constitutes harm to the Enterprises—*i.e.*, the allegedly improper transfer of assets from the Enterprises to Treasury in the form of dividends—the relief (if any) that would flow from such an asserted injury is the return of those dividends to the Enterprises, rather than a direct payment to Plaintiffs.  Accordingly, the *Tooley* test establishes that Plaintiffs' breach of fiduciary duty claims are derivative, not direct.

### B.    HERA Preempts Plaintiffs' Claims for Breach of Fiduciary Duty

Even if Plaintiffs' breach of fiduciary duty claims were direct—they are not—those claims fail for the additional reason that HERA preempts state fiduciary duty laws as against the Conservator.  Courts may not apply state law if "the application of state law would frustrate specific objections of federal legislation," *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal citations and quotation marks omitted), or if the application of state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Hillman v. Maretta*, 569 U.S. 483, 490 (2013).  "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

Plaintiffs' fiduciary duty claims seek to force the Conservator to promote the interests of the Enterprises' shareholders over any Enterprise interests or the public interests.  *See* 12 U.S.C. §§ 1716, 1451.  As the D.C. Circuit noted, "[HERA] refers only to the best interests of FHFA and the [Enterprises]—and *not* those of the [Enterprises'] shareholders or creditors.  Congress, consistent with its concern to protect the public interest, thus made a deliberate choice in [HERA] to permit FHFA to act in its own best governmental interests, which may include the

taxpaying public's interest."  864 F.3d at 608 (emphasis in original).  *See also id.* at 600 (HERA

"invested . . . [the] [C]onservator with the authority to [act] . . . in the manner that 'the Agency

[FHFA] determines is in the best interests of the regulated entity *or the Agency*'") (emphasis in

original).  Thus, HERA preempts any state law that would prioritize duties to shareholders over

the interest of FHFA or the Enterprises, and for that independent reason Plaintiffs' amended

claims for breach of fiduciary duty fail.[13]

## IV.   Plaintiffs Fail To State a Claim That the Treasury Stock Certificates, As Amended by the Third Amendment, Violate Delaware or Virginia Statutes

Each complaint also asserts entirely new claims—raised for the first time on remand—

alleging that the form of dividend prescribed by the Third Amendment violated Delaware and

Virginia statutes concerning dividends.  Arrowood FAC ¶¶ 133-143; Class SAC ¶¶ 178-92;

Fairholme FAC ¶¶ 142-52.  Plaintiffs seek unspecified money damages, and the Arrowood and

Fairholme Plaintiffs also seek injunctive relief, based on these alleged state statutory violations.

As a threshold matter, all requests for injunctive relief are barred by the D.C. Circuit's *Perry*

*Capital* decision, which held that Section 4617(f) bars requests for such relief based on the

Conservator's execution of the Third Amendment.  *See Jacobs*, 2017 WL 5664769 at *7

(dismissing identical claims seeking relief for same alleged statutory violations).

---

[13]   Even if the state fiduciary duty law were not preempted, Plaintiffs' breach of fiduciary duty claims would fail because they are premised on a non-existent duty—namely a duty owed by *the Enterprises themselves* to the stockholders.  *See* Class SAC ¶ 91 (alleging "the Companies owed and owe fiduciary duties to the Companies' stockholders"); *see also id.* at ¶¶ 167-68, 173-74; Fairholme FAC ¶ 134; Arrowood FAC ¶ 148.  "Under Delaware law, the issuing corporation does not owe fiduciary duties to its stockholders."  *A.W. Fin. Servs., S.A. v. Empire Resources, Inc.*, 981 A.2d 1114, 1127 n.36 (Del. 2009); *see also Arnold v. Soc. for Sav. Bancorp.*, 678 A.2d 533, 539 (Del. 1996) ("Plaintiff has not cited a single case in which Delaware courts have held a corporation directly liable for breach of the fiduciary duty of disclosure.  Fiduciary duties are owed by the directors and officers to the corporation and its stockholders.").  Likewise, there is "no indication Virginia courts would permit such [fiduciary duty] action directly against the corporation."  *Schupp v. Jump! Info. Techs., Inc.*, 65 F. App'x 450, 454 (4th Cir. 2003).

With respect to their claims for money damages, Plaintiffs' state statutory claims also fail for two reasons:  *First*, pursuant to the express terms of the Enterprises' charters, bylaws, and the Treasury Stock Certificates, federal law—not state law—governs the Conservator's authority to agree to the Third Amendment, and federal law permits the Third Amendment. *Second*, even if state law governs, the net worth dividend does not violate the state statutes upon which Plaintiffs rely.

### A.   Federal Law, Not State Law, Governs the Conservator's Ability to Agree to the Third Amendment and the Resulting Treasury Stock Certificates

The Enterprises are creations of federal law—*not* state law—notwithstanding Plaintiffs' attempts to impose upon the Enterprises purported requirements of Delaware and Virginia law. Congress itself issued the federal charters creating the Enterprises, and those charters do not incorporate any state law.  *See* 12 U.S.C. § 1716 *et seq*.; § 1451 *et seq*.  The Treasury Stock Certificates themselves also state they are governed by federal law.  *See* Ex. G § 10(e).

In fact, the Enterprises' federal statutory charters expressly address the precise question at issue in these claims: the terms for issuance of stock and payment of dividends by the Enterprises.  In particular, the statutory charters authorize the Enterprises (and thus the Conservator) to: (1) issue preferred stock "on such terms and conditions as the board of directors shall prescribe," 12 U.S.C. §§ 1718(a), 1455(f); and (2) make dividend payments to Enterprise stockholders in the manner "as may be declared by the board of directors."  *Id*. §§ 1718(c)(1), 1452(b)(1).  Accordingly, the Enterprises' boards of directors (and thus the Conservator) have broad, unqualified authority under *federal* law to issue preferred stock and dividends in the manner the Enterprises' boards (and the Conservator) see fit.  This necessarily includes the Third Amendment to the PSPAs and the payment of dividends on the Treasury stock.  Additionally, under HERA, the Conservator has broad powers to conduct all business of

39

the Enterprises and their boards—and also to exercise all rights and powers of the Enterprises'
shareholders—which likewise include the power to execute the Third Amendment and issue
dividends thereunder.  *See* 12 U.S.C. § 4617(b)(2); *Perry Capital*, 864 F.3d at 606-15.

In their complaints, Plaintiffs assert that Delaware and Virginia statutes—not federal
law—govern the Enterprises' ability to issue preferred stock *See* Arrowood FAC ¶¶ 134, 140;
Class SAC ¶¶ 179, 187; Fairholme FAC ¶¶ 143, 149.  Plaintiffs are wrong.

The Enterprises' bylaws make clear that *federal* law applies, and that the Enterprises will
look to state law corporate governance practices and procedures only "to the extent not
inconsistent with" federal law.  *See* Freddie Mac Bylaws § 11.3(a); Fannie Mae Bylaws § 1.05.
The Enterprises' bylaws were themselves issued pursuant to federal statute.  12 U.S.C.
§ 1723(b) (granting Fannie Mae the "power to adopt, amend, and repeal bylaws"); § 1452(c)(3)
(granting Freddie Mac the power "to make and enforce such bylaws").  Further, Fannie Mae's
bylaws authorize the board to issue preferred stock by identifying the "dividend rate or rates"
and "the relative preferences in relation to the dividends payable on any other class or classes or
series of stock."  Fannie Mae Bylaws § 2.02.  Freddie Mac's bylaw provision also authorizes
the board to issue preferred stock so long as the "preferences" and "privileges" of that stock are
"set forth in the certificate of designation."  Freddie Mac Bylaws § 2.3.  The Treasury Stock
Certificates, as amended by the Third Amendment, comply with these broad, enabling bylaw
provisions, which were issued pursuant to *federal* law.

Additionally, the Enterprises identified Delaware and Virginia law in their bylaws
pursuant to a federal regulation, 12 C.F.R. § 1710.10, issued in 2002 by OFHEO.  That
regulation also confirms that federal law, not state law, governs the Enterprises' issuance of
stock and dividends.  The 2002 regulation provides first and foremost that the Enterprises "shall

comply with [their] applicable chartering acts and other Federal law, rules, and regulations."  12

C.F.R. § 1710.10(a).  The regulation then directs the Enterprises to elect to follow Delaware law

(or the law of the jurisdiction in which the principal office of the Enterprise sits) *only* with

respect to issues *not* already addressed in the Enterprises' federal charters.  *See* 67 Fed. Reg.

38361 (June 4, 2002).  Indeed, in issuing the regulation, OFHEO specifically observed that:

> The chartering acts contain several provisions related to matters of
> corporate governance[, including *common and preferred stock*.
> The chartering acts, however, are silent with respect to *other*
> corporate governance provisions that are commonly addressed for
> state-chartered corporations under State law.

*Id*. at 38362 (emphases added); *see also id*. at 38364 (observing state law is *not* "incorporated

wholesale by the election of [state] law by an Enterprise").  Additionally, the regulation makes

clear that state law applies only "[t]o the extent not inconsistent with" the Enterprises' charters

and other federal law.  12 C.F.R. § 1710.10(b); *see also Edwards v. Deloitte & Touche, LLP*,

No. 16-21221-CIV, 2017 WL 1291994, at *6 (S.D. Fla. Jan. 18, 2017) (recognizing that Fannie

Mae follows Delaware law only "[f]or *issues not addressed* by the charter or federal law" and

only "so long as that [state] law is not inconsistent with federal law") (emphasis added).  Here,

the Enterprises' federal charters are not "silent" regarding the issuance of stock and payment of

dividends by the Enterprises—they address those topics directly.  Thus, no state law applies.

Finally, even if state law were to apply—and it does not—it could not impose more

stringent requirements on the Enterprises for the issuance of preferred stock than do the federal

charters.  Any state law requirements that would conflict with HERA or the Enterprises' federal

statutory charters, including imposing limits on the discretion of the Enterprises' boards or the

Conservator to issue stock "on such terms and conditions" as they see fit, are preempted.

Conflict preemption applies where state law "would frustrate the federal scheme," *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985), and applies even where "federal and state law [are] not . . . contradictory on their faces . . . .  It is sufficient that the state law 'impose[s] . . . additional conditions' not contemplated by Congress."  *Surrick v. Killion*, 449 F.3d 520, 532 (3d Cir. 2006) (citation omitted); *see also Barnett Bank of Marion Cty., N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (conflict preemption applies where federal statute provides banks authority to engage in an activity that state law prohibits).  For example, in *Fasano v. Federal Reserve Bank of N.Y.*, the Third Circuit held that a federal statute permitting Federal Reserve Banks to "dismiss [employees] at pleasure" preempted state statutes that "indisputably impose substantive and procedural burdens well beyond those imposed by federal law, and thereby frustrate Congressional intent to provide the Federal Reserve Banks with relatively unfettered employment discretion."  457 F.3d 274, 283 (3d Cir. 2006); *see also F.D.I.C. v. Bank of Boulder*, 911 F.2d 1466, 1472-73 (10th Cir. 1990) (federal law permitting FDIC to purchase assets preempted state law limiting purchases).  So too here: Congress provided the Enterprises with broad, unqualified discretion to issue preferred stock and dividends, thus preempting state statutes that would otherwise limit or impose conditions on that discretion.

**B.      The Third Amendment Complies With the Delaware and Virginia Statutes Upon Which Plaintiffs Rely**

Even if Plaintiffs were correct that state law applies, Plaintiffs' state statutory claims fail because the net-worth dividend instituted through the Third Amendment is not inconsistent with the Delaware General Corporation Law ("DGCL") and the Virginia Stock Corporation Act ("VSCA").  Plaintiffs assert that the Treasury Stock Certificates, as amended by the Third Amendment, violate 8 Del. Code § 151(c) and Va. Code § 13.1-638(C) because the net worth dividend is not set at a "rate" that is "payable in preference to" other classes of stock.  *See*

Arrowood FAC ¶¶ 136, 142; Class SAC ¶¶ 182, 190; Fairholme FAC ¶¶ 145, 151.  Delaware and Virginia law do not support Plaintiffs' cramped reading of the relevant state statutes.

The DGCL and the VSCA are broad, enabling statutes that permit corporations to issue preferred stock with contractually-defined dividend rights.  The DGCL "provides great flexibility" and "considerable latitude in creating classes of stock," and permits corporations to issue preferred stock that is "entitled to certain preference over other stock."  *Shintom Co. v. Audiovox Corp.*, 888 A.2d 225, 227-228 (Del. 2005).  Indeed, the DGCL is "widely regarded as the most flexible in the nation," *Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 845 (Del. Ch. 2004).  Section 151 of the DGCL—the section on which Plaintiffs rely—is specifically designed to enable corporations "to provide for the flexible financing that is necessary to meet the unique funding needs of [a particular] enterprise."  *Matulich v. Aegis Commc'ns Grp., Inc.*, 942 A.2d 596, 599 (Del. 2008).  This section provides the company with "a blank slate on which to fill in the rights of different classes" of stock, on which "the drafter may parse those rights among multiple classes of stock as he or she sees fit."  *Id.* at 599-600.

Accordingly, "[t]he Delaware statutory scheme *does not . . . require any particular form of preference*.  It allows private parties,"—here, the Enterprises (as the issuing corporations) and Treasury (as the purchaser of the preferred stock)—"to contract for preferences between themselves."  *Shintom*, 888 A.2d at 230 (emphasis added).  The only requirement imposed by Section 151 is that the dividend rates be stated in the authorizing documents—here, the Treasury Stock Certificates.  *See id.* at 229; *see also Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del. 1998) ("Any rights, preferences and limitations of preferred stock that distinguish that stock from common stock must be expressly and clearly stated, as provided by statute.") (citing 8 Del. Code § 151(a)).

43

Similarly, the VSCA allows corporations to issue preferred shares that "[e]ntitle the holders" to dividends "calculated in any manner."  *See* Va. Code § 13.1-638(C).  Indeed, the VSCA states only that corporations may issue shares that "[h]ave preference over any other class or series of shares with respect to distributions."  *Id.*  Thus, the VSCA does not purport to exhaustively describe the possible preferences, rights, and limitations of classes of stock, but merely requires that they be stated in the authorizing documents.  Va. Code § 13.1-638(A), (F); *see also Kain v. Angle*, 69 S.E. 355, 357 (Va. 1910).

Here, the Third Amendment aligns with these state statutes:  the Treasury Stock Certificates, as amended, clearly state that Treasury's preferred stock ranks senior to all other outstanding classes of stock as to dividends, and that the net-worth dividend is calculated every quarter based on the Enterprises' quarterly performances.  *See*  Ex. F §§ 2-3 (at pp. 53-56). There is no requirement under Delaware or Virginia law that the rate used to calculate a dividend be a percentage (although 100% is both a percentage and a rate), and Plaintiffs' proposed interpretation to the contrary is unprecedented and reads into the DGCL and the VSCA restrictive requirements that are contrary to their broad, enabling statutory schemes.  *See Shintom Co., Ltd. v. Audiovox Corp.*, No. Civ. A. 693-N, 2005 WL 1138740, at *2 (Del. Ch. May 4, 2005), *aff'd* 888 A.2d 225 ("Choosing to set dividend rates at zero is as much an act of setting rates as choosing a substantive rate.").[14]  Moreover, the Delaware statute provides that "[a]ny of the . . . preferences, [and] rights [of preferred shares] may be made dependent upon

---

[14]   The Court should reject Plaintiffs' claim that the Third Amendment's dividend structure is not a legitimate preferred stock because "Treasury's participation in corporate earnings growth is unlimited."  *See* Arrowood FAC ¶ 137; Class SAC ¶ 183; Fairholme FAC ¶ 146.  This claim is analogous to the claim that the Third Amendment converted the Senior Preferred Stock into common stock, which this Court previously—and correctly—rejected (a conclusion not disturbed by the D.C. Circuit): "the characteristics of preferred stock 'that distinguish that stock from common stock'—*e.g.*, senior-most dividend and liquidation rights—remain 'expressly and clearly stated' under the Third Amendment."  70 F. Supp. 3d at 238 n.44.

facts ascertainable outside the certificate of incorporation or of any amendment thereto . . . .
The term 'facts' . . . includes . . . the occurrence of any event, including a determination or
action by any person or body, including the corporation."  8 Del. C. § 151(a); *see also* Va. Code
§ 13.1-638(D) ("Any of the terms of shares may be made dependent upon facts objectively
ascertainable outside the articles of incorporation . . ."). Thus, it is permissible for a preferred
dividend rate to be tied to an interest rate that changes over time (such as LIBOR) or the
performance of the corporation (such as its net worth, less a buffer, at the end of the quarter).

## V.   Plaintiffs' Claims That Are Squarely Barred by The D.C. Circuit's Decision Should Be Dismissed.

Finally, each complaint purports to assert several claims and to seek forms of relief that
were already dismissed by this Court and affirmed by the D.C. Circuit in *Perry Capital*—in
particular, APA claims (Fairholme FAC Count I, Arrowood FAC Count I), expressly
"derivative" breach of fiduciary duty claims (Class SAC Counts XI and XII), Fairholme's
breach of fiduciary duty claim (Fairholme Count IV, *see supra* at 31), and all requests seeking
injunctive or declaratory relief (*see* Prayers for Relief in all amended complaints). In some
cases, the amended complaints concede that these claims are barred and represent that they are
included only for preservation purposes (*see* Class SAC ¶ 1 n.1), in others not. Irrespective of
Plaintiffs' petitions filed with the Supreme Court, the Court should follow the D.C. Circuit's
mandate and dismiss these claims.

## CONCLUSION

For the foregoing reasons, FHFA, Director Watt, and the Enterprises respectfully request
the Court dismiss with prejudice all claims asserted against them in the amended complaints.

Dated:  January 10, 2018    Respectfully submitted,

           /s/ Howard N. Cayne
           Howard N. Cayne (D.C. Bar # 331306)
           Asim Varma (D.C. Bar # 426364)
           David B. Bergman (D.C. Bar # 435392)
           ARNOLD & PORTER KAYE SCHOLER LLP
           601 Massachusetts Ave NW
           Washington, D.C. 20001
           (202) 942-5000
           Howard.Cayne@apks.com
           Asim.Varma@apks.com
           David.Bergman@apks.com

           *Attorneys for Defendant Federal Housing*
           *Finance Agency and Director Melvin L. Watt*

| s/ Michael J. Ciatti | s/ Meaghan VerGow |
|---|---|
| Michael J. Ciatti  (D.C. Bar # 467177) | Meaghan VerGow  (D.C. Bar # 977165) |
| KING & SPALDING LLP | O'MELVENY & MYERS LLP |
| 1700 Pennsylvania Ave. N.W. | 1625 Eye Street, N.W. |
| Washington, DC 20006 | Washington, DC 20006 |
| Tel: (202) 626-5508 | Tel: (202) 383-5300 |
| Fax: (202) 626-3737 | Fax: (202) 383-5414 |
| mciatti@kslaw.com | mvergow@omm.com |
| *Attorney for the Federal Home Loan* | *Attorney for the Federal National Mortgage* |
| *Mortgage Corp.* | *Association* |