## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Misc. Action No. 13-mc-1288 (RCL)** |
| **THIS DOCUMENT RELATES TO: ALL CASES** | <u>CLASS ACTION</u><br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION AND DERIVATIVE COMPLAINT** |

## TABLE OF CONTENTS

NATURE AND SUMMARY OF THE ACTION ........................................................................ 1

JURISDICTION AND VENUE ........................................................................................ 7

THE PARTIES.............................................................................................................. 8

ADDITIONAL PARTIES ............................................................................................ 11

FACTUAL ALLEGATIONS ......................................................................................... 12

    I.       Through 2008, Fannie Mae and Freddie Mac
           Were Financed By Private Investment ............................................................ 12

    II.      In July 2008, Congress Created FHFA, Which In September 2008
           Placed The Companies Into Conservatorship .............................................. 14

    III.     In Exchange For Funding, FHFA Executed An Agreement Giving
           Treasury A 10% Senior Preferred Stock Dividend And Warrants
           To Buy 79.9% of Each Company's Common Stock For A Nominal Price............... 17

    IV.     At the Beginning of 2012, The Housing Market Rebounded And
           The Companies Returned To Profitability.................................................. 18

    V.      On August 17, 2012 FHFA And Treasury Executed The
           Third Amendment, Giving Treasury A Right To A Quarterly
           Dividend Equal To 100% Of The Companies' Net Worth
           (Minus A Small Reserve That Shrinks To Zero In 2018) ........................ 20

    VI.     The Third Amendment Repudiated And Violated
           The Contractual Rights Of Holders Of The Companies'
           Preferred Stock and Common Stock........................................................ 29

    VII.    The Companies And FHFA Violated The Fiduciary
           Obligations Owed To The Companies' Stockholders .............................. 38

    VIII.   The Net Worth Sweep Violates The Corporate Laws
           of Delaware and Virginia.......................................................................... 41

    IX.     Class Action Allegations ......................................................................... 42

    X.      Derivative Allegations ............................................................................ 45

CAUSES OF ACTION................................................................................................ 49

PRAYER FOR RELIEF ............................................................................................. 64

## SECOND AMENDED CONSOLIDATED CLASS
## ACTION AND DERIVATIVE COMPLAINT

Plaintiffs Joseph Cacciapalle, John Cane, the Estate of Francis J. Dennis, Michelle M. Miller, Marneu Holdings, Co., United Equities Commodities, Co., 111 John Realty Corp., N. Bradford Isbell, Charles Rattley, and Timothy Cassell, (collectively "Plaintiffs"), by the undersigned attorneys, submit this Second Amended Consolidated Class Action and Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a class action brought by Plaintiffs on behalf of themselves and several classes (the "Classes," as defined herein) of holders of Preferred and Common Stock issued by the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie;" Fannie Mae and Freddie Mac together, the "Companies"). Plaintiffs seek damages under direct claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duties, and violation of Delaware and Virginia corporate law against the Companies and the Federal Housing Finance Agency ("FHFA") in connection with the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, dated August 17, 2012 (the "Third Amendment"), between FHFA (in its capacity as Conservator for the Companies) and the United States Department of the Treasury ("Treasury").[1]

2.      Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on, *inter alia*, documents in the public record (including certain documents

---

[1] In addition to the claims articulated above, Plaintiffs also state derivative claims on behalf of Fannie Mae and Freddie Mac. Plaintiffs concede that such claims are barred under the D.C. Circuit's opinion in this matter, and include them here solely for the purpose of preserving them in the event the D.C. Circuit's opinion is reversed or otherwise abrogated.

produced by the government in a related case that have already been entered into the public record) as well as the investigation of Plaintiffs' counsel.

3.     Fannie Mae and Freddie Mac are government sponsored enterprises chartered by the U.S. Congress to facilitate liquidity and stability in the secondary market for home mortgages. While they have been commonly referred to as "Government Sponsored Enterprises" or "GSEs," Fannie Mae and Freddie Mac are not government agencies. Instead, as private, for-profit corporations, the Companies have stockholders, directors, and officers like other non-governmental corporations, and their debt and equity securities have for years been privately owned and publicly traded, by individuals, including employees of the Companies, as well as by public pension funds, mutual funds, community banks, and insurance companies, among other institutional investors.

4.     Fannie and Freddie were and are stockholder-owned corporations.  Before the 2008 financial crisis, their businesses were self-sustaining and funded exclusively with private capital.

5.     To raise capital, the Companies issued several publicly traded securities, including Common Stock and numerous classes of non-cumulative preferred stock ("Preferred Stock").  By 2008, Fannie Mae and Freddie Mac were two of the largest privately owned financial institutions in the world, and had been consistently profitable for decades. The Companies marketed their securities aggressively to investors, both large and small, and continued to do so through 2008.  Indeed, when the Companies came into financial distress in 2007 and 2008, they successfully asked private shareholders to provide much needed capital by issuing new shares of preferred stock.

6.     In July 2008, in response to the crisis in the residential housing and mortgage markets, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating FHFA.   Congress empowered FHFA to appoint itself Conservator to the Companies when necessary to preserve their financial health.

7.     On September 6, 2008, FHFA exercised this authority and placed Fannie Mae and Freddie Mac into "temporary" conservatorship. The objective of this conservatorship was to stabilize the institutions and return them to normal business operations. HERA expressly grants FHFA, as Conservator, the power to take such action as may be necessary to put the Companies in a "sound and solvent condition" and that is appropriate to "carry on the business of the Companies" and "preserve and conserve the[ir] assets and property." 12 U.S.C. § 4617(b)(2)(D). At the outset of the conservatorship, FHFA stated publicly that it was committed to operating the Companies "until they are stabilized," and that the conservatorship would be terminated upon successful completion of its plan to restore the Companies to "a safe and solvent condition." Public trading of the Companies' common and preferred stock was allowed to, and did, continue.

8.     When FHFA became Conservator, Fannie Mae and Freddie Mac each entered into a Senior Preferred Stock Purchase Agreement ("PSPA") with Treasury. Under these contracts, Treasury agreed to invest in the Companies in exchange for the issuance of a newly created class of securities in the Companies, known as Senior Preferred Stock ("Government Preferred Stock"). In return for its commitment to purchase Government Preferred Stock, Treasury received $1 billion of Government Preferred Stock in each Company as a commitment fee, as well warrants to acquire 79.9% of the Common Stock of the Companies at a nominal price.   The PSPA also provided that the Treasury would hold a liquidation preference in each Company equal to the $1 billion commitment fee plus the total amount Treasury invested in that respective

Company. The Government Preferred Stock ranked senior in priority to all other series of Fannie Mae and Freddie Mac Preferred Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference, *i.e.*, 10% of the sum of the $1 billion commitment fee plus the total amount Treasury invested in that Company.  If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Government Preferred Stock with a face value equal to 12% of the liquidation preference. The warrants to acquire a 79.9% ownership stake in the Companies gave Treasury a significant "long" position—over and above the substantial 10% coupon on its Government Preferred Stock. If exercised, these warrants would allow Treasury to receive enormous profits in the event the Companies returned to profitability and started paying dividends on their common stock. However, any dividends paid on that common stock would be paid only after the Companies paid dividends to the privately held preferred stock which ranked junior to the Government Preferred Stock, but senior to any and all common stock (whether privately held or held by the Treasury based on the exercise of the warrants).

9.      Shortly after placing the Companies into conservatorship, FHFA caused them to declare large losses in the form of write downs of the value of deferred tax assets, and to take out large loss reserves on their balance sheets.  These accounting adjustments, which were based on unjustifiably negative views about the Companies' future financial prospects, temporarily decreased the Companies' operating capital and their net worth by hundreds of billions of dollars.  To fill the holes in the Companies' balance sheets created by these unnecessary or excessive write-downs, and pursuant to the PSPAs, Treasury purchased more Government Preferred Stock.  By mid-2012, Treasury's combined investment in both Companies was equal to approximately $189 billion in Government Preferred Stock, the majority attributable to these

accounting adjustments. Under the PSPAs, Treasury therefore had a right to receive $189 billion of the Company's net worth in the event of liquidation, and was entitled to an annual dividend (paid quarterly) equal to 10% of $189 billion if paid in cash, or 12% of that amount if paid in Government Preferred Stock.

10.    However, the Companies' actual financial condition was never as bad as FHFA projected.  Between 2008 and 2012, the Companies' actual realized loan losses were about $100 billion less than had been anticipated.  By the second quarter of 2012, both Fannie Mae and Freddie Mac had returned to profitability and were comfortably solvent.  And, as their financial conditions improved, the Companies were set to reverse the earlier write-downs of their deferred tax assets and loss reserves.  The Companies made a combined quarterly profit of $8.3 billion in the second quarter of 2012, far more than enough to cover the quarterly dividend it owed to Treasury, and still have sufficient profits to pay a dividend to its other, private stockholders.

11.    As the market turned around in 2012, Treasury was well-positioned to reap the fruits of its investment. The stream of profits on Treasury's investments in the Companies was projected to continue, and grow, in the coming years.  The Companies' net worth was poised to increase by several hundred billion dollars.  Treasury was not only entitled to the substantial 10% coupon on its Government Preferred Stock, but also to acquire 79.9% of the Companies' common stock at a nominal price—allowing it to capture close to 80% of the Companies' profits going forward (subject to the Companies' fulfillment of their contractual obligations to pay dividends first to the private holders of Preferred Stock, and a pro rata payment to private common shareholders who would own roughly 20% of the common stock).  In addition, Fannie Mae and Freddie Mac could have begun to repay the principal of Treasury's investment, by redeeming Treasury's Government Preferred Stock.  Thus, as of 2012, FHFA expected that,

according to Fannie Mae projections, cumulative dividends paid by Fannie and Freddie would exceed the amount Treasury had invested in the Companies by 2020.  (FHFA00047889.)

12.     But Treasury concluded that it was not satisfied with capturing the enormous expected profits from Fannie and Freddie in the manner dictated by the terms of the PSPAs. Instead, on August 17, 2012, the Treasury and the FHFA, purportedly acting on behalf of the Companies, executed an amendment to the PSPAs with the purpose and effect of ensuring that *none* of the Companies' profits or value would ever be passed along to any of its stockholders other than the Treasury. This "Third Amendment"[2] to the PSPAs has been described as the "Net Worth Sweep" because it replaced Treasury's coupon of 10% (or 12% if paid in kind) under the original PSPAs with a right to receive a dividend of ***100% of all current and future Company net worth***, subject to a small reserve that shrinks to zero by 2018.  This completely eliminated any prospect for any other stockholders ever to receive any dividends, no matter how profitable the Companies are.  Further, under the Third Amendment, if the Companies were ever liquidated, Treasury would be guaranteed to receive the full amount of their net worth or any surplus—completely eliminating any prospect for other stockholders to receive anything at all in the event of a liquidation, no matter how large the surplus might be.

13.     Treasury has reaped immense profits from the Third Amendment. In total, the Companies have paid over $276 billion in dividends to Treasury.  Of that amount, approximately $55 billion was paid before the Net Worth Sweep, and approximately $221 billion was paid after the Net Worth Sweep.  This total amount of $276 billion is approximately $88 billion more than Treasury's total investment in the Companies.  Moreover, the total amount of dividends paid under the Net Worth Sweep is roughly $130 billion more than Treasury would have received

---

[2] As discussed below, Treasury and FHFA had previously executed two amendments to the PSPAs, neither of which are challenged in this lawsuit.

under the 10% dividend provided for in the original PSPAs. Meanwhile, Treasury's liquidation preference has not been reduced at all, and still stands at $189 billion.

14.     The stockholders, on the other hand, have been severely damaged. As Treasury stated on the day the Third Amendment was announced in 2012, the deal was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers." In other words, the Third Amendment was designed to ensure that the private stockholders would not ever receive a single dollar in the form of dividends, liquidation preference, or otherwise.  In short, the Third Amendment completely eviscerated and destroyed the economic rights held by private shareholders, both preferred and common shareholders.

15.     The Third Amendment breaches the contractual rights of the Companies' stockholders, violates the fiduciary duties that the Companies (and FHFA as their Conservator) owed to these stockholders, and is unlawful under governing state corporate law. Plaintiffs and other class members bring this action against the Companies and FHFA seeking damages as compensation for their injuries.[3]

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 12 U.S.C. §§ 1452(c), (f), 1723a(a), and 4617. In addition, this Court has subject matter jurisdiction under

---

[3] On July, 2013, some of the Plaintiffs in this action also filed a class action complaint in the Court of Federal Claims ("CFC Complaint") seeking just compensation from the United States for the appropriation of their property rights caused by the August 2012 Third Amendment. This case advances alternative claims for relief based on the same conduct alleged in the CFC Complaint. Plaintiffs do not seek a double recovery; but they do seek to ensure that the Plaintiffs and the Classes receive the compensation they are owed—either as just compensation paid by the Government for its appropriation of their private property (the CFC Complaint) or as damages for breach of contract, breach of the implied covenant, breach of fiduciary duties, or violation of Delaware and Virginia corporate law paid by Fannie Mae, Freddie Mac, and/or FHFA. Moreover to the extent the Government seeks to defend the CFC Complaint by claiming that the FHFA was not acting as an arm of the Government when it agreed to the Third Amendment (which is exactly what it has done to date), then it must concede that FHFA, Fannie, and Freddie can be sued as non-governmental entities in this case.

28 U.S.C. § 1332(d)(2)(A) in that Plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs.

17.     Venue is proper in this district under 28 U.S.C. §§ 1391(e)(1)(A) and (B), because this is an action against an agency of the United States; one or more of the Defendants reside in this district; and a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. In addition, one or more of the Defendants maintains executive officers in this district, and Defendants have engaged in regular activities and conducted business here, which have had an effect in this district. Moreover, a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## THE PARTIES

18.     Plaintiff N. Bradford Isbell is a citizen of the state of Maryland, and is a holder of Fannie Mae Common Stock. Mr. Isbell first purchased Fannie Mae Common Stock before July 30, 2008, while he was an employee at Fannie Mae, as an investment for his daughter's college savings fund. He has been a holder of Fannie Mae Common Stock continuously since then.

19.     Plaintiff Joseph Cacciapalle is a citizen of the state of New Jersey, and is a holder of Fannie Mae 8.25% Series S Preferred Stock, Fannie Mae 8.25% Series T Preferred Stock, and Freddie Mac 8.375% Series Z Preferred Stock. Mr. Cacciapalle purchased Fannie Mae Preferred Stock in January 2008, purchased Freddie Mac Preferred Stock in February 2008, and has been a holder of Fannie Mae Stock and Freddie Mac Preferred Stock continuously since then. He is recently retired, and purchased these securities to be a source of stable income in his retirement.

20.     Plaintiff John Cane is a citizen of the state of Vermont, and is a holder of Fannie Mae Preferred 8.25% Series T Preferred Stock. Mr. Cane purchased Fannie Mae Preferred Stock in 2009, held Fannie Mae Preferred Stock as of August 17, 2012, and has been a holder of

Fannie Mae Preferred Stock continuously since then. Mr. Cane is a retired teacher after 39 years with the Burlington Township High School in Burlington, Vermont.

21.     Plaintiff Estate of Francis J. Dennis is a holder of Fannie Mae 8.25% Series S Preferred Stock and Fannie Mae 8.25% Series T Preferred Stock.  Mr. Dennis purchased Fannie Mae Preferred Stock as early as May 2008, and was a holder of Fannie Mae Preferred Stock until his death, at which time the stock became a part of his estate. Mr. Dennis was a citizen of the state of New Jersey.

22.     Plaintiff Michelle M. Miller is a citizen of the state of Missouri, and is a holder of Fannie Mae Common Stock and Freddie Mac Common Stock.  Ms. Miller purchased Fannie Mae Common Stock in July 2010 and Freddie Mac Common Stock in October 2009, and has been a holder of Fannie Mae Common Stock and Freddie Mac Common Stock continuously since then.  Ms. Miller works in a retirement community and manages her own investments.

23.     Plaintiff Marneu Holdings, Co. is a New York general partnership, with offices in New York, N.Y.  Its partners are New York citizens, such that it is also a New York citizen. Marneu Holdings, Co. is a holder of Fannie Mae 5.375% Series I Preferred Stock, Fannie Mae Variable Rate Series P Preferred Stock, Fannie Mae 4.75% Series M Preferred Stock, Fannie Mae 8.25% Series S Preferred Stock, Fannie Mae 5.375% Convertible Series 2004-1 Preferred Stock, Freddie Mac Fixed-to-Floating Rate Series Z Preferred Stock, and Freddie Mac 6.02% Series X Preferred Stock.  Marneu Holdings, Co. purchased Fannie Mae Preferred Stock in December 2009, and Freddie Mac Preferred Stock in October 2012, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

24.     Plaintiff 111 John Realty Corp. is a New York "S" corporation, with offices in New York, New York, and is therefore a citizen of the state of New York.  111 John Realty

Corp. is a holder of Fannie Mae 8.25% Series S Preferred Stock.  111 John Realty Corp. purchased Fannie Mae Preferred Stock in September 2012, and has been a holder of Fannie Mae Preferred Stock continuously since then.

25.     Plaintiff United Equities Commodities, Co. is a New York general partnership, with offices in New York, New York.  Its partners are New York citizens, such that it is also a New York citizen.  United Equities Commodities, Co. is a holder of Fannie Mae 8.25% Series T Preferred Stock and Freddie Mac Variable Rate Series M Preferred Stock.  United Equities Commodities, Co. purchased Fannie Mae Preferred Stock in June 2011, and Freddie Mac Preferred Stock in October 2012, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

26.     Plaintiff Charles Rattley is a citizen of the state of Georgia, and is a holder of Fannie Mae Common Stock. Mr. Rattley purchased Fannie Mae Common Stock in November 2008, and has been a holder of Fannie Mae Common Stock since then. Mr. Rattley is a contractor who works with the U.S. Military.

27.     Timothy J. Cassell is a citizen of the state of Ohio, and is a holder of Freddie Mac Common Stock. Mr. Cassell purchased Freddie Mac Common Stock on July 28, 2008 and August 26, 2008, and has been a holder of Freddie Mac Common Stock since then.  Mr. Cassell is the Managing Partner at Governmental Networking, a business dedicated to bringing together business and governmental agencies to foster collaboration and working relationships.  He also served as a State Representative for the 63rd District of Ohio from January 2005 to December 2006.

28.     Defendant FHFA, as Conservator of Fannie Mae, is an independent agency of the United States government with its headquarters located at Constitution Center, 400 7th Street,

S.W., Washington, D.C. 20024, and therefore is a citizen of the District of Columbia.  According to FHFA's strategic plan for fiscal years 2013-17, "[s]ince September 2008, FHFA has been the conservator of Fannie Mae and Freddie Mac . . . with responsibility of overseeing management and governance of the Enterprise[]."

29.     Defendant Fannie Mae is a federally-chartered company with its principal executive offices located at 3900 Wisconsin Avenue, N.W., Washington, D.C. 20016, and therefore is a citizen of the District of Columbia.

30.     Defendant Freddie Mac is a federally chartered company with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia, and is therefore a citizen of Virginia.[4]

## ADDITIONAL PARTIES

31.     Plaintiff American European Insurance Company is a New Jersey corporation with offices in New York, New York, and is a holder of Fannie Mae 8.25% Series T Preferred Stock and Freddie Mac Variable Rate Series M Preferred Stock. American European Insurance Company held Fannie Mae Preferred Stock in May 2008 and Freddie Mac Preferred Stock in January 2001, and has been a holder of Fannie Mae Preferred Stock and Freddie Mac Preferred Stock continuously since then.

32.     Plaintiff Barry P. Borodkin (acting individually and on behalf of his IRA and SEP IRA) is a citizen of the state of New York, and is a holder of Fannie Mae Variable Rate Series F Preferred Stock, Fannie Mae Variable Rate Series G Preferred Stock, Fannie Mae 5.81% Series H Preferred Stock, Fannie Mae 5.125% Series L Preferred Stock, Fannie Mae 4.75% Series M

---

[4] Plaintiffs do not name Treasury as a defendant. Treasury has stipulated that if the D.C. Circuit's decision in this matter is reversed, Treasury would not oppose amendment to add Treasury back as a defendant, for any claims, on the ground that Plaintiffs caused undue delay by not seeking to bring claims against Treasury in 2017, or on the ground that the Complaint has already been amended. *See* Jt. Stip. And Proposed Scheduling Order, (Oct. 4, 2017), ECF No. 61.

Preferred Stock, Fannie Mae 5.50% Series N Preferred Stock, Fannie Mae Variable Rate Series

P Preferred Stock, Fannie Mae 6.75% Series Q Preferred Stock, Fannie Mae 7.625% Series R

Preferred Stock, and Fannie Mae 8.25% Series S Preferred Stock and Fannie Mae 8.25% Series

T Preferred Stock.  Mr. Borodkin held Fannie Mae Preferred Stock prior to August 2012, and has

been a holder of Fannie Mae Preferred Stock continuously since then.

33.    Plaintiff Mary Meiya Liao is a citizen of the state of California, and is a holder of

Fannie Mae 8.25% Series T. Preferred Stock.  Ms. Liao purchased Fannie Mae Preferred Stock

in May 2008, and has been a holder of Fannie Mae Preferred Stock continuously since then.

## FACTUAL ALLEGATIONS

**I.    THROUGH 2008, FANNIE MAE AND FREDDIE MAC WERE FINANCED BY PRIVATE INVESTMENT**

34.    Fannie Mae and Freddie Mac are stockholder-owned corporations organized and

existing under the Federal National Mortgage Act and the Federal Home Loan Corporation Act,

respectively.  Fannie Mae was established in 1938 as a federal agency to provide the mortgage

market with supplemental liquidity, and was converted to a private corporation in 1968.  Freddie

Mac was created in 1970 as an alternative to Fannie Mae to make the secondary mortgage

market more competitive and efficient.   Both Companies are sometimes referred to as

Government Sponsored Enterprises, which means they are private corporations that Congress

created to increase mortgage market liquidity.  They purchase mortgages originated by private

banks and bundle them into mortgage-related securities to be sold to investors.  By creating this

secondary mortgage market, the Companies increase liquidity for private banks, which enables

them to make additional loans to individuals for home purchases.

35.    Notwithstanding their government charters, until 2008, Fannie Mae and Freddie

Mac were financed by private investment. The Companies actively marketed their securities to a

wide variety of investors – including through 2008. The Companies had a variety of programs to encourage their midlevel employees to buy Company stock. *See Worker Assets Shrink at Fannie and Freddie,* N.Y. TIMES (Aug. 28, 2008). In May 2008, Fannie Mae produced a "Capital Raise Roadshow" presentation in which the company touted its "[l]ong-term growth and profitability prospects" and the "[c]ompelling investment opportunities in current environment." The "rationale" was to "[e]nhance long-term shareholder value" and the presentation noted that the "[m]ix of the offering maintains an appropriate ratio of preferred to common equity in our capital structure . . . ." Also in May 2008, Fannie Mae marketed 80 million shares of Preferred Stock to private investors, advertising an 8.25% annual dividend.

36.    All three major credit rating agencies assigned high investment-grade ratings on the Companies' Preferred Stock from the dates of issuance until 2008. Banking regulators permitted banks to carry the Companies' Preferred Stock on their balance sheets at a lower risk weighting than other companies' preferred stock.

37.    The Companies' federal regulators also actively promoted investment in the companies – including through 2008. The Office of Federal Housing Enterprise Oversight (the "OFHEO") continued to assure the marketplace of the Companies' soundness through 2008. On June 9, 2008, OFHEO published a news release stating that it classified Fannie Mae and Freddie Mac as "adequately capitalized as of March 31, 2008." And, in a March 19, 2008 statement, OFHEO director James Lockhart said "both companies have prudent cushions above the OFHEO-directed capital requirements and have increased their reserves" and "We believe they can play an even more positive role in providing the stability and liquidity the markets need right now." Lockhart also said that the idea of a bailout is "nonsense in my mind" because "The

companies are safe and sound, and they will continue to be safe and sound." *As Crisis Grew, A Few Options Shrank To One*, N.Y. TIMES (Sept. 7, 2008).

## II.    IN JULY 2008, CONGRESS CREATED FHFA, WHICH  IN SEPTEMBER 2008 PLACED THE COMPANIES INTO CONSERVATORSHIP

38.    In July 2008, in response to the crisis in the housing and mortgage markets, Congress enacted HERA. That Act established FHFA to replace the OFHEO as the Companies' regulator, and granted Treasury temporary authority to assist the Companies through the purchase of securities.  HERA provided a specific list of enumerated circumstances under which FHFA would have the power to place the Companies into conservatorship or receivership.

39.    Key leaders repeatedly reassured the public, including the Companies' private investors, that neither Company was approaching insolvency or operating unsafely. Rather, they explained, the goal of the legislation was to provide confidence to the housing market. For instance, while HERA was under consideration, both Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke testified before the House Financial Services committee that Fannie Mae and Freddie Mac were adequately capitalized. Similarly, while HERA was under consideration, the Companies' then-regulator, OFHEO, issued a statement that, as of 2008, Fannie Mae and Freddie Mac were "holding capital well in excess of the OFHEO-directed requirement[.]" Similarly, in support of HERA, Senator Isakson (R-GA) commented that:

> The bill we are doing tomorrow is not a bailout to Freddie Mac and Fannie Mae or the institutions that made bad loans. It is an infusion of confidence the financial markets need. Fannie and Freddie suffer by perception from the difficulties of our mortgage market. If anybody would take the time to go look at the default rates, for example, they would look at the loans Fannie Mae holds, and they are at 1.2 percent, well under what is considered a normal, good, healthy balance.  The subprime market's defaults are in the 4 to 6 to 8-point range.  That is causing the problem. That wasn't Fannie Mae paper, and it wasn't securitized by Fannie Mae.  They have $50 billion in capital, when

14

the requirement is to have $15 billion, so they are sound. But the financial markets, because of the collapse of the mortgage market, have gotten worse.

40.     On September 6, 2008, FHFA placed the Companies into conservatorship.  As the Conservator, FHFA became responsible for "preserv[ing] and conserv[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition."  12 U.S.C. § 4617(b)(2)(D).  At the time, FHFA stated that the goal of this action was "to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market."  According to FHFA's press release, the conservatorship was "designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized." FHFA also issued a Fact Sheet indicating that, "[u]pon the [FHFA] Director's determination that the Conservator's plan to restore the Company to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship."  And, as FHFA noted in an October 2008 presentation, "[c]onservatorship statutes provide broad authority for a conservator to operate the institution until it is stabilized and then returned to shareholders."  (FHFA00047705.)

41.     Reporting indicates that FHFA's decision to place the Companies into conservatorship was based primarily on a political judgment, not an analysis of the HERA statutory factors. As the *New York Times* reported, the administration sought "to shrink drastically [Fannie Mae and Freddie Mac's] outsize influence on Wall Street and on Capitol Hill while at the same time counting on them to pull the nation out of its worst housing crisis in decades."  *In Rescue To Stabilize Lending, U.S. Takes Over Mortgage Finance Titans*, N.Y. TIMES (Sept. 7, 2008).  And "In the end, [Treasury Secretary] Paulson's decision seems to have

15

been a philosophical one, rather than one forced by imminent crisis.  Of course, for stagecraft

purposes, it was played as impending disaster." *Paulson's Itchy Finger, on the Trigger of a*

*Bazooka*, N.Y. TIMES (Sept. 9, 2008).

42.     The conservatorship did not purport to involve the appropriation of any privately

held Preferred Stock or Common Stock, to amend any of the Certificates of Designation, or

otherwise to modify any contractual rights held by private shareholders such as Plaintiffs or the

other members of the Classes.   FHFA's director told investors that "the common and all

preferred stocks will continue to remain outstanding."   Treasury Secretary Paulson likewise

made clear that, "conservatorship does not eliminate the outstanding preferred stock, but does

place preferred shareholders second, after the common shareholders, in absorbing losses."   In a

Form 8-K filing issued by Freddie Mac on September 11, 2008, Freddie Mac stated that, "The

holders of Freddie Mac's existing common stock and preferred stock . . . **will retain all their**

**rights** in the financial worth of those instruments, as such worth is determined by the market."

(emphasis added).

43.     In Fannie Mae's September 11, 2008 Form 8-K, it stated that "FHFA, as

Conservator, has the power to repudiate contracts entered into by Fannie Mae prior to the

appointment of FHFA as Conservator if FHFA determines, in its sole discretion, that

performance of the contract is burdensome and that repudiation of the contract promotes the

orderly administration of Fannie Mae's affairs.  FHFA's right to repudiate any contract must be

exercised within a reasonable period of time after its appointment as Conservator."   FHFA did

not, either within a reasonable period of time after its appointment as Conservator or at any other

time before August 17, 2012, purport to repudiate any of the contracts governing the Companies'

Preferred Stock or Common Stock.

44.     Moreover, FHFA stated that it was critical to complete key regulations "so that any new investor will understand the investment proposition," clearly showing that FHFA intended that private investors would continue to purchase Fannie Mae and Freddie Mac securities.

### III.   IN EXCHANGE FOR FUNDING, FHFA EXECUTED AN AGREEMENT GIVING TREASURY A 10% SENIOR PREFERRED STOCK DIVIDEND AND WARRANTS TO BUY 79.9% OF EACH COMPANY'S COMMON STOCK FOR A NOMINAL PRICE

45.     When the Companies were placed into conservatorship, FHFA and Treasury entered into PSPAs with FHFA, which acted on behalf of both Companies.   The PSPAs for Fannie Mae and Freddie Mac are identical in all material respects. Through these agreements, Treasury agreed to make investments in the Companies in exchange for Government Preferred Stock plus warrants to acquire common stock equal to 79.9% of the common stock in the Companies. Under the instruments laying out the terms of the Government Preferred Stock for each Company:

> (a)     Treasury was given the right to receive a senior preferred dividend each quarter in an amount equal (on an annual basis) to 10% of the outstanding principal value of the Government Preferred Stock if the dividend was paid in cash;
>
> (b)     If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Government Preferred Stock with a face value equal to 12% of the outstanding principal value of the Government Preferred Stock;
>
> (c)     The principal value of the Government Preferred Stock in each Company would equal the amount invested by Treasury in each Company, plus $1

billion to reflect a commitment fee with respect to each Company (plus any stock dividends distributed based upon the 12% dividend right referenced above);

(d)     The Government Preferred Stock ranked senior in priority to all other Fannie Mae and Freddie Mac Stock, so that no dividends or liquidation distributions could be paid to any other owner of stock in the Companies until after Treasury had received its dividend or liquidation distributions under its Government Preferred Stock (the liquidation preference was equal to the principal value of the Government Preferred Stock plus any unpaid dividends);

(e)     Treasury also received warrants to acquire 79.9% of the common stock of each Company for a nominal price; and

(f)     Treasury was also given the right to receive a quarterly periodic commitment fee, to be set for five-year periods by agreement of the Companies and Treasury, but Treasury had the option to waive the fee for up to a year at a time.

46.     The foregoing terms, particularly those referring to priority over the rights of other (private) shareholders, would have been nonsensical if the rights of other shareholders had been nullified by the conservatorship.  The PSPAs clearly contemplate that private shareholders retained their rights to dividends and liquidation preferences, albeit subject to the preferences given to the Treasury under the PSPAs.

47.     After FHFA took control of the Companies, it claimed that it did not expect them to be profitable, and that they would likely incur large losses in the coming years.  FHFA

therefore directed the Companies to book substantial loss reserves—recording anticipated mortgage loan losses before they were actually incurred—and required the Companies to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the Companies became profitable (*i.e.*, generated positive taxable income).

48.     These write-downs and accounting decisions directed by FHFA led to the payment of some circular dividend payments. To pay a quarterly dividend payment to Treasury, the FHFA caused the Companies to draw on Treasury's funding commitment. This, in turn, increased the amount of stock held by Treasury, which further increased the amount of dividends the Companies were required to pay. FHFA, Treasury, and the Companies were all aware of this in 2008.

49.     At the end of 2009, Treasury's statutory authority to purchase the Companies' securities expired.  To enable Treasury to provide the Companies with liquidity beyond 2009, Treasury and FHFA amended the PSPAs twice.  First, in May 2009, Treasury agreed to expand its funding commitment to $200 billion per company from $100 billion per company.  Then, on December 24, 2009, it agreed to a funding commitment that would be sufficient to allow the Companies to satisfy their 2010, 2011, and 2012 capitalization requirements and a funding commitment up to a limit determined by an agreed-upon formula for subsequent years.

50.     Throughout this time, the Companies continued to be managed in conservatorship by FHFA. HERA empowered FHFA to force the Companies into receivership and to liquidate their assets under certain circumstances, 12 U.S.C. § 4617(b)(2)(E), but FHFA always has maintained that its relationship with the Companies is that of Conservator rather than liquidator. *See* News Release FHFA, *A Strategic Plan For Enterprise Conservatorships: The Next Chapter In A Story That Needs An Ending*, at 9 (Feb. 21, 2012) (asserting that "[w]ithout action by

Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships."). FHFA has never stated that it was placing the Companies into receivership.

## IV.   AT THE BEGINNING OF 2012, THE HOUSING MARKET REBOUNDED AND THE COMPANIES RETURNED TO PROFITABILITY

51.   By the beginning of 2012, it became clear that FHFA had overestimated the Companies' likely losses and underestimated the possibility of a return to profitability.  Contrary to FHFA's 2008 projections, the Companies posted profits of more than $10 billion in the first two quarters of 2012.  Even more importantly, the Companies disclosed that they expected to be consistently profitable for the foreseeable future, such that they would soon be able to reverse the valuation allowance against their deferred tax assets, worth approximately $100 billion.  In addition, the Companies' actual loan losses were far less than anticipated.  Between the beginning of 2007 and the second quarter of 2012, more than $234 billion had been set aside by the Companies to absorb anticipated loan losses, whereas loan losses of just over $125 billion were actually recognized during that period, such that the projected losses had been overestimated by $109 billion. These losses were offset by operating revenues.

52.   By the beginning of 2012, the Companies, FHFA, and Treasury were very well aware that Fannie Mae and Freddie Mac were expected to be sufficiently profitable for years to come to pay the 10% dividend on the Government Preferred Stock without the necessity of drawing from the Treasury.  In fact, as early as November 8, 2011, the accounting and consulting firm Grant Thornton LLP prepared a report for Treasury acknowledging that "[f]rom December 31, 2012 through September 30, 2018, Freddie Mac is not projected to draw on the liquidity commitment to make its dividend payments because of increased earnings driven by significantly reduced credit losses in 2012 and 2014."  (GT007342.)   A December 2011 internal Treasury

memorandum acknowledged that "both Fannie Mae and Freddie Mac are expected to be net income positive (before dividends) on a stable, ongoing bases after 2012 . . . ." (UST00473633.)

53.     In June 2012, Treasury was aware that "the GSEs will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future even with the caps." (UST00533645.)   Similarly, a Treasury presentation acknowledged that in mid-2012, earnings for the Companies would be "in excess of current 10% dividend paid to Treasury." (UST00385572).

54.     By the end of 2011 and the beginning of 2012, the Companies, FHFA, and Treasury were aware that, beginning in 2012, the Companies were forecast to be so consistently profitable that the Companies could afford to repay Treasury its initial investment within eight years.  In her 2015 deposition, Susan McFarland, Fannie Mae's then-Chief Financial Officer, testified that at a meeting with Treasury that was also "probably" attended by FHFA, shortly before learning of the Third Amendment, she had expressed her view that Fannie Mae was "able to deliver sustainable profits over time." (McFarland Tr., 45:2-4, 46.)  According to July 13, 2012 documents circulated among FHFA officials regarding a Fannie Mae Executive Management Meeting held on July 9, 2012, the following eight years were likely to be the "golden years of GSE earnings." (FHFA00047889.)  In the same documents, Fannie Mae official Ann Gehrig noted that "[c]umulative 2012 – 2016 income is now forecast at $56.6 billion, $12.3 billion higher than the last projection." (FHFA00047890.)  The Fannie Mae Executive Management Meeting documents also included a report from Fannie Mae Treasurer Dave Benson acknowledging that "[c]urrent projections show that cumulative GSE dividends paid will surpass cumulative GSE Treasury draws by 2020." (FHFA00047889.)  The report by David Benson, dated July 19, 2012 and distributed to the Fannie Mae board of directors,

included projections demonstrating that "[th]e cumulative dividends from both GSEs exceed government investment by 2020 in baseline scenario" as well as forecasts of positive annual Total Comprehensive Income from 2012 through 2022.  (FM_Fairholme_CFC-00000220-221, 231-232.)

55.     In addition, as FHFA and Treasury were aware, the Companies had certain deferred tax credits that would further enhance their profitability. In a May 29, 2012 meeting between Treasury and various financial advisors, there was a discussion of "[r]eturning the deferred tax asset to the GSE balance sheets." (UST00405880.)  A series of August 14, 2012 emails between FHFA officials acknowledged that "re-recording certain deferred tax assets" had been discussed "on the view that" the Companies "were going to be profitable going forward." (FHFA00038592.)  In her 2015 deposition, McFarland testified that shortly before learning of the Third Amendment, she had expressed her view at a meeting with Treasury that approximately $50 billion of deferred tax assets might soon be released.  (McFarland Tr., 45:8; 59:18.)

56.     Thus, as of the beginning of 2012, FHFA, Treasury, and the Companies all knew that the Companies were positioned to pay back the Government for the support they had received, with money left over to provide a financial return to their other stockholders.

## V.     ON AUGUST 17, 2012 FHFA AND TREASURY EXECUTED THE THIRD AMENDMENT, GIVING TREASURY A RIGHT TO A QUARTERLY DIVIDEND EQUAL TO 100% OF THE COMPANIES' NET WORTH (MINUS A SMALL RESERVE THAT SHRINKS TO ZERO IN 2018).

57.     With the Companies' return to consistent, and indeed record profitability, the private holders of the Preferred Stock and Common Stock had a reason to believe and expect that the Companies would soon become healthy enough to redeem the Government Preferred Stock, exit conservatorship, and be "return[ed] to normal business operations," as FHFA's director had

vowed when the conservatorship was established. Certainly, the holders of the Preferred Stock and Common Stock had a reason to believe and expect that the economic value of their shares, and the rights they had as stockholders, would likely be increasing, and would not be eliminated.

58.     But, rather than taking steps to enable the Companies to redeem the Government Preferred Stock or at least to accumulate capital for the benefit of the Companies and their private shareholders, FHFA, as Conservator for the Companies, ensured that Treasury would be the sole beneficiary, to the exclusion of all other stockholders, of the Companies as operating, profitable enterprises. On August 17, 2012, FHFA, acting (purportedly) as Conservator for the Companies, implemented the "Third Amendment" to the PSPAs.  In place of the 10% coupon due on Treasury's Government Preferred Stock, the Third Amendment changed the PSPAs so as to entitle Treasury to a dividend of 100% of all current and future profits of the Companies (minus a small reserve that shrinks to zero in 2018).  And, since the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac, the Government would receive a liquidation preference that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury would receive the full amount of their net worth in that liquidation.

59.     The Third Amendment, which Fannie Mae, Freddie Mac, and the Government implemented without seeking or obtaining the consent of the holders of Preferred Stock or Common Stock as contractually required, sidestepped the rules of priority, eliminated the contractual rights of the Preferred Stock and Common Stock holders, and expropriated for the Government the economic value of these privately-held securities.  As Treasury stated on the day of the announcement, the Third Amendment was intended to ensure that "every dollar of

earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers" – *i.e.,* not the preferred and common stockholders.

60.     The Companies' stockholders received nothing of value in return for the Third Amendment. Under the Third Amendment, the amount of cash the Companies transfer to Treasury as a dividend does not reduce the amount of the Government Preferred Stock outstanding.   Furthermore, the Companies have not been permitted to redeem Treasury's Government Preferred Stock.   Thus, regardless of how much money the Companies send to Treasury, all of the Government Preferred Stock will remain outstanding, and Treasury will continue to take all of the Companies' net worth.   The Third Amendment thus enriches the federal government through a self-dealing arrangement, and destroys tens of billions of dollars of value in the Companies' Preferred Stock and Common Stock.

61.     The Companies and FHFA implemented the Third Amendment to promote the economic and political interests of one stockholder—the U.S. Treasury—at the expense of all others. The Net Worth Sweep furthered Treasury's political goal to wind-down the GSEs and ensure that all future profits be transferred to the taxpayers, not the stockholders. For instance, in a draft Question and Answer presentation circulated among Treasury officials on August 13, 2012, Treasury stated that the Third Amendment was "consistent with Treasury's policy to wind-down the GSEs," and specifically intended to "ensure that the GSEs will not be able to rebuild capital as they are wound down."  (UST00406551; UST00406544.)

62.     On August 15, 2012, Treasury officials circulated emails regarding an update to the "PSPA Q&As" in which the sought-after demise of the Companies was discussed.  "By taking all of their profits going forward, we are making clear that the GSEs will *not* ever be

allowed to return to profitable entities at the center of our housing finance system."
(UST00554584; UST00505919) (emphasis in originals).

63. Treasury's determination to wind down the Companies reflected a pre-existing,
but not publicly known commitment to eradicating private stockholder rights. As early as
December 20, 2010, then Under Secretary for Domestic Finance Jeffrey A. Goldstein authored
an "ACTION MEMORANDUM" for Secretary Geithner noting that setting a Periodic
Commitment Fee as part of the PSPA would "[make] clear the Administration's commitment to
ensure existing common equity holders will not have access to any positive earnings from the
GSEs in the future." *See* 13-cv-1053 (D.D.C.) ECF No. 23-5 at TREASURY-0202.

64. Similarly, at least as early as January 2012, FHFA had also determined to "wind
down" the Companies, a "goal" FHFA explicitly shared in "common" with Treasury. On
January 4, 2012 Mary Miller (of Treasury) sent then-FHFA Director DeMarco an Agenda noting
the "common goals" shared by FHFA and Treasury to "promote a strong housing market
recovery, reduce government involvement in the housing market over time and to provide the
public and financial markets *with a clear plan to wind down the GSEs*" (FHFA00025816)
(emphasis added). Subsection 2 of the Agenda was titled "Establish meaningful policies that
demonstrate a commitment to winding down the GSEs." *Id.*

65. August 14, 2012 emails between FHFA officials under the subject line "SPSPA
Meeting" acknowledged that the Third Amendment was "designed to demonstrate wind down,"
notwithstanding that the Companies "were going to be profitable going forward."
(FHFA00038592.) On August 17, 2012, FHFA official Mario Ugoletti emailed colleagues,
noting that the Third Amendment "does not allow the [Companies] to build up retained surplus,
which may give the impression that they are healthy institutions." (FHFA00031721.)

66.     At a dividend rate of 10%, Treasury's approximately $189 billion in outstanding Government Preferred Stock would yield annual dividends of some $18.9 billion, payable in quarterly installments of approximately $4.7 billion.   Thus, ***but for the Third Amendment,*** in any  quarter in which the Companies' combined profits exceed $4.7 billion (or more precisely, any quarter in which Fannie Mae or Freddie Mac's profits exceed the dividend owed on their Government Preferred Stock), that value would inure to the benefit of the private stockholders. As *Fortune* magazine reported:

> Why did the Treasury enact the so-called Third Amendment that so radically altered the preferred-stock agreement? By mid-2012, Fannie and Freddie were beginning to generate what would become gigantic earnings as the housing market rebounded. If the original agreement remained in place, the GSEs would build far more than $100 billion in retained earnings, and hence fresh capital, in 2013 alone. That would exert pressure for Congress to allow Fannie and Freddie to pay back the government in full, and reemerge as private players. Timothy Geithner was strongly opposed to the rebirth of the old Fannie and Freddie. The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

*What's Behind Perry Capital's Fannie and Freddie Gambit*, FORTUNE (July 8, 2013).

67.     In an August 17, 2012 press release announcing the Third Amendment, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market."   It called the Third Amendment a full sweep of "every dollar of profit that [the] firm earns going forward," and that the amendment will fulfill the "commitment made in the Administration's 2011 White Paper that [Fannie Mae and Freddie Mac] will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."   This language was in stark contrast to their earlier public representations that they sought only to "stabilize" the Companies and return them "to normal business operations" (as

well as Demarco's February 2, 2010 statement that "[t]here are a variety of options available for post-conservatorship outcomes, but the only one that FHFA may implement today under existing laws is to reconstitute the two companies under their current charters."

68.     Winding down the Companies via the Net Worth Sweep offered much higher returns to Treasury than the pre-amendment 10% dividend, an opportunity not lost on Treasury. A "KEY POINTS TO MAKE" document made clear that the Net Worth Sweep "means the taxpayer will benefit from all future earnings of the GSEs.  Under the current framework we are limited to the 10% dividend." (UST00061421) (emphasis in original).  The document describes taxpayers as being in a "better position" because they are not "capped at the 10% dividend." (UST00061422.)  Similarly, an August 13, 2012 email to Bowler (of Treasury) confirmed that "[t]he taxpayer will thus ultimately collect more money with the changes" and "not just the 10% dividend."  (UST00061143.)

69.     Treasury has received and will continue to receive a massive windfall pursuant to the terms of the Third Amendment – approximately $130 billion more than it was entitled to receive under the 10% cash dividend payable under the original terms of Treasury's Senior Preferred Stock Purchase Agreements. In total, Treasury has received over $276 billion in dividends from the Companies; that is over $88 billion more than Treasury's total investment into both Companies.  Yet the principal value of Treasury's Government Preferred Stock has not been reduced at all, and it continues to receive dividends equal to the net worth of the two Companies.

70.     The Third Amendment has even captured the Companies' recoveries on legal claims that preceded the conservatorships.  For example, on October 1, 2013, Freddie Mac announced that it had entered into a $1.3 billion settlement with three financial institutions

concerning Freddie Mac's claims relating to representations and warranties on loans that it had purchased, and that FHFA, as Freddie Mac's Conservator, had approved the settlement.  The claims at issue involved loans that Freddie Mac purchased between 2000 and 2012, most of which preceded the conservatorship by several years, yet none of the funds recouped will go to benefit Freddie Mac stockholders. Rather, Freddie Mac's CEO stated that, "[w]ith these settlements, Freddie Mac is recouping funds effectively due to the nation's taxpayers." On May 28, 2013, FHFA announced a $3.5 billion settlement of claims of alleged violations of federal and state securities laws in connection with private-label residential mortgage-backed securities purchased by Fannie Mae and Freddie Mac in the years prior to the conservatorships.  Similarly, on October 25, 2013, FHFA announced a $1.1 billion settlement with JP Morgan relating to claims based on loans sold to Fannie and Freddie in the years leading up to the financial crisis and a separate $4 billion settlement with JP Morgan relating to claims for violations of federal securities laws in the connection with the sales and securitizations of loans to the Companies from 2005 to 2007.  In 2013 alone FHFA announced similar settlements with General Electric ($549 million), UBS ($885 million), Wells Fargo ($335 million), and Bank of America ($404 million), every penny of which went to Treasury. In 2014, FHFA announced settlements, in its role as Conservator to the Companies, totaling approximately $9.7 billion with Bank of America ($9.33 billion aggregate payment), Barclays Bank PLC ($280 million) and RBS Securities ($99.5 million) which cover private-label MBS purchased by the Companies from 2005 to 2007. More recently, in 2017, FHFA reached a $5.5 billion settlement with the Royal Bank of Scotland. The entirety of the Companies' recoveries in these settlements has been paid to Treasury.

71.     In sum, since the implementation of the Third Amendment, the Government has expropriated "every dollar of earnings that each firm earns" on a quarterly basis, and will

continue to do so forever. This guarantees that there can never be a distribution to the holders of Preferred Stock or Common Stock no matter how much income the Companies earn and no matter how much their assets are worth in any liquidation.

## VI. THE THIRD AMENDMENT REPUDIATED AND VIOLATED THE CONTRACTUAL RIGHTS OF HOLDERS OF THE COMPANIES' PREFERRED STOCK AND COMMON STOCK

72.    The Companies have issued Common Stock and several series of Preferred Stock that are, as a result of the PSPAs, subordinate to the Government Preferred Stock.  Prior to September 6, 2008, Fannie Mae had issued Common Stock and several series of Preferred Stock, including:

### FANNIE MAE STOCK

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 586 109 | FNMA |
| 5.25% Non-Cumulative Preferred Stock, Series D | 313 586 505 | FDDXD |
| 5.10% Non-Cumulative Preferred Stock, Series E | 313 586 604 | FNMFM |
| Variable Rate Non-Cumulative Preferred Stock, Series F | 313 586 703 | FNMAP |
| Variable Rate Non-Cumulative Preferred Stock, Series G | 313 586 802 | FNMAO |
| 5.81% Non-Cumulative Preferred Stock, Series H | 313 586 885 | FNMAM |
| 5.375% Non-Cumulative Preferred Stock, Series I | 313 586 877 | FNMAG |
| 5.125% Non-Cumulative Preferred Stock, Series L | 313 586 844 | FNMAN |
| 4.75% Non-Cumulative Preferred Stock, Series M | 313 586 836 | FNMAL |
| 5.50% Non-Cumulative Preferred Stock, Series N | 313 586 828 | FNMAK |
| Variable Rate Non-Cumulative Preferred Stock, Series O | 313 586 794 | FNMFN |

29

| | | |
|---|---|---|
| 5.375% Non-Cumulative Convertible Series 2004-1 Pref. Stock | 313 586 810 | FNMFO |
| Variable Rate Non-Cumulative Preferred Stock, Series P | 313 586 786 | FNMAH |
| 6.75% Non-Cumulative Preferred Stock, Series Q | 313 586 778 | FNMAI |
| 7.625% Non-Cumulative Preferred Stock, Series R | 313 586 760 | FNMAJ |
| Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S | 313 586 752 | FNMAS |
| 8.25% Non-Cumulative Preferred Stock, Series T | 313 586 737 | FNMAT |

73.     Likewise, prior to September 6, 2008, Freddie Mac had issued Common Stock and several series of Preferred Stock, including:

### FREDDIE MAC STOCK

| Security | CUSIP | Ticker Symbol |
|---|---|---|
| Common Stock | 313 400 301 | FMCC |
| 5.1% Preferred Stock, due 12/31/2049 | 313 400 814 | FREJO |
| 5.3% Non-Cumulative Perpetual Preferred Stock | 313 400 822 | FREJP |
| 5.81% Perpetual Preferred Stock | 313 400 889 | FREGP |
| Variable-Rate Preferred Stock, Series B | 313 400 608 | FMCCI |
| 5% Preferred Stock, Series F | 313 400 863 | FMCKK |
| Variable-Rate Preferred Stock, Series G | 313 400 848 | FMCCG |
| 5.1% Preferred Stock, Series H | 313 400 855 | FMCCH |
| 5.79% Preferred Stock, Series K | 313 400 830 | FMCCK |
| Variable-Rate Preferred Stock, Series L | 313 400 798 | FMCCL |
| Variable-Rate Preferred Stock, Series M | 313 400 780 | FMCCM |

| | | |
|---|---|---|
| Variable-Rate Preferred Stock, Series N | 313 400 764 | FMCCN |
| 5.81% Preferred Stock, Series O | 313 400 772 | FMCCO |
| 6% Preferred Stock, Series P | 313 400 749 | FMCCP |
| Variable-Rate, Series Q | 313 400 756 | FMCCJ |
| 5.7% Preferred Stock, Series R | 313 400 731 | FMCKP |
| Variable-Rate, Series S | 313 400 715 | FMCCS |

74.     This Preferred Stock and Common Stock, which was issued prior to the issuance of the Government Preferred Stock, is held by private investors such as pension funds, community banks, insurance companies, and individual investors.  As of March 31, 2013, the Companies' outstanding Preferred Stock had an aggregate liquidation preference of $33 billion. Each class of Preferred Stock has its own contractual dividend rate and liquidation value.

75.     Prior to September 8, 2008, each series of Fannie Mae Preferred Stock ranked on a parity with all other issued and outstanding series of Fannie Mae Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, and each series of Freddie Mac Preferred Stock ranked on a parity with all other issued and outstanding series of Freddie Mac Preferred Stock as to the payment of dividends and the distribution of assets upon dissolution, liquidation, or winding up of Freddie Mac.  In other words, each series of Fannie Mae and Freddie Mac Preferred Stock carried equal contractual rights with regards to the dividends, and each series of Fannie Mae and Freddie Mac Preferred Stock carried equal liquidation preferences (or their respective pro rata portions thereof) upon dissolution, liquidation, or winding up of Fannie Mae and Freddie Mac.  Prior to September 6,

2008, Fannie Mae and Freddie Mac each regularly declared and paid dividends on each series of their respective Preferred Stock.

76.     Delaware law applies to Fannie Mae pursuant to Section 1.05 of its bylaws, which provides that "the corporation has elected to follow the applicable corporate governance practices and procedures of the Delaware General Corporation Law."  Virginia law applies to Freddie Mac pursuant to Section 11.3 of its bylaws, which provides that, "[T]he Corporation shall follow the corporate governance practices and procedures of the law of the Commonwealth of Virginia[.]" Under both Delaware and Virginia law, certificates of designation are deemed to be contractual agreements between the stockholders and the company.

77.     Thus, the Certificate of Designation for each series of Preferred Stock constitutes a contract with provisions governing the holders' dividend and liquidation rights.   These provisions are materially similar to, for example, the Certificate of Designation for Fannie Mae's Series T Preferred Stock, as described below:

    **1.     Dividends.**

(a) Holders of record of Series T Preferred Stock (each individually a "Holder," or collectively the "Holders") ***will be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion out of funds legally available therefore, non-cumulative cash dividends at [specified rate] per annum of the [specified] stated value . . . of Series T Preferred Stock.***

                    \* \* \*

    **4.     Liquidation Rights.**

(a) Upon any voluntary or involuntary dissolution, liquidation or winding up of Fannie Mae, after payment or provision for the liabilities of Fannie Mae and  the expenses of such dissolution, liquidation or winding up, the Holders of outstanding shares of the Series T Preferred Stock ***will be entitled to receive out  of the assets of Fannie Mae or proceeds thereof available for distribution to stockholders***, before any payment or distribution of assets is made to holders of Fannie Mae's common stock (or any other stock of Fannie Mae ranking, as to the distribution of assets upon dissolution, liquidation or

winding up of Fannie Mae, junior to the Series T Preferred Stock), ***the amount of [the stated value] per share plus an amount . . . equal to the dividend (whether or not declared) for the then- current quarterly Dividend Period accrued to but excluding the date of such liquidation payment***, but without accumulation of unpaid dividends on the Series T Preferred Stock for prior Dividend Periods.

(b) If the assets of Fannie Mae available for distribution in such event are insufficient to pay in full the aggregate amount payable to Holders of Series T Preferred Stock and holders of all other classes or series of stock of Fannie Mae, if any, ranking, as to the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, on a parity with the Series T Preferred Stock, the  assets will be distributed to the Holders of Series T Preferred Stock and holders of all such other stock pro rata, based on the full respective preferential amounts to which they are entitled (but without, in the case of any non-cumulative preferred stock, accumulation of unpaid dividends for prior Dividend Periods).[5]

\* \* \*

7.      **Voting Rights; Amendments.**

\* \* \*

(b)      Without the consent of the Holders of Series T Preferred Stock, Fannie Mae will have the right to amend, alter, supplement or repeal any terms of this Certificate or the Series T Preferred Stock (1) to cure any ambiguity, or to cure, correct or supplement any provision contained in this Certificate of Designation that may be defective or inconsistent with any other provision herein or (2) to make any other provision with respect to matters or questions arising with respect to the Series T Preferred Stock that is not inconsistent with the provisions of this Certificate of Designation ***so long as such action does not materially and adversely affect the interests of the Holders of Series T Preferred Stock***; provided, however, that any increase in the amount of authorized or issued Series T Preferred Stock or the creation and issuance, or an increase in the authorized or issued amount, of any other class or series of stock of Fannie Mae, whether ranking prior to, on a parity with or junior to the Series T Preferred Stock, as to the payment of dividends or the distribution of assets upon dissolution, liquidation or winding up of Fannie Mae, or otherwise, will not be deemed to materially and adversely affect the interests of the Holders of Series T Preferred Stock.

(c) ***Except as set forth in paragraph (b) of this Section 7, the terms of this Certificate or the Series T Preferred Stock may be amended, altered, supplemented, or repealed only with the consent of the Holders of at least two- thirds of the shares of Series T Preferred Stock then outstanding***, given

---

[5] All emphasis is added unless otherwise noted.

in person or by proxy, either in writing or at a meeting of stockholders at which the Holders of Series T Preferred Stock shall vote separately as a class. On matters requiring their consent, Holders of Series T Preferred Stock will be entitled to one vote per share.

78.     The Certificate of Designation for the Common Stock issued by Freddie Mac also

constitutes a contract with provisions governing the holders' dividend and liquidation rights.

These provisions provide, in pertinent part:

**2.      Dividends.**

(a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor. The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors"). Each such dividend shall be paid to the holders of record of outstanding shares of the Common Stock as they appear in the books and records of Freddie Mac on such record date, not to be earlier than 45 days nor later than 10 days preceding the applicable dividend payment date, as shall be fixed in advance by the Board of Directors.

* * *

**8.      Liquidation Rights.**

(a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other class or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share, plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution. The holders of the outstanding shares of any class or series of stock of Freddie Mac ranking prior to, on a parity with or junior to the Common Stock upon liquidation shall also receive out of such assets payment of any corresponding preferential amount to which the holders of such stock may, by the terms thereof, be entitled. Thereafter, subject to the foregoing and to the provisions of paragraph (b) of this Section 8, the balance of any assets of Freddie Mac available for distribution to stockholders upon such dissolution, liquidation or winding up

34

shall be distributed to the holders of outstanding Common Stock in the aggregate.

(b) Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Common Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 8 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Common Stock have been paid all amounts to which such classes or series of stock are entitled pursuant to their respective terms.

\* \* \*

**10.   Miscellaneous.**

\* \* \*

(h)(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock.

79.    Thus, the Fannie Preferred Class, Freddie Preferred Class, and Freddie Common Class had contractual rights to dividends and liquidation rights, as well as a right to exclude the Companies from destroying these rights. Plaintiffs and the other members of the Classes paid valuable consideration in exchange for these contractual rights, and in doing so helped provide financial support for Fannie Mae and Freddie Mac's business both before and after the imposition of the conservatorship.

80.    The Companies and their Conservator FHFA neither sought nor obtained the permission of the Companies' stockholders before entering into the Third Amendment.  There can be no doubt that the Third Amendment made "materially adverse" changes to rights of the stockholders, such that it violated the Classes' contractual rights.  The only exception to this requirement was if Fannie Mae or Freddie Mac issued a new class or series of stock.  In

executing the Third Amendment, FHFA, Fannie Mae, and Freddie Mac have not purported  to issue a new series of stock, and therefore the contractual provision against amending the terms of the stock in a way that is materially adverse to stockholders has been violated.  Indeed, if the Third Amendment in fact constituted the issuance of a new series of stock to the Treasury, then the Third Amendment was illegal, because the statutory authority allowing the Treasury to acquire new series of stock in Fannie Mae and Freddie Mac expired at the end of 2009.  12 U.S.C. §§ 1455(l)(4), 1719(g)(4).

81.    Through the Third Amendment, Fannie Mae and Freddie Mac and their Conservator FHFA clearly and unequivocally repudiated their contracts with the stockholders by eliminating the stockholders' contractual rights to receive a pro rata distribution of any liquidation proceeds available after the Government received full recovery of the face amount of the Government Preferred Stock.  Thus, the Third Amendment amended, altered, and repealed the terms of the Certificates of Designation, *e.g.*, the contractual terms governing the holders' rights to receive liquidation distributions, in a manner that materially and adversely affected— indeed, completely destroyed—the rights and interests of the stockholders.

82.    Fannie Mae's and Freddie Mac's agreement to the Third Amendment did not purport to create and issue any other class or series of Fannie Mae or Freddie Mac stock, nor did it purport to be an increase in the authorized or issued amount of any other class or series of Fannie Mae or Freddie Mac stock.  Rather, the Third Amendment to which the Companies, through their Conservator FHFA, agreed in August 2012 was described simply as an amendment to the terms of the Government Preferred Stock that Fannie Mae and Freddie Mac had issued in September 2008.  Accordingly, the amendment, alteration, and repeal of the terms of the

Certificates via their agreement to the Third Amendment was not exempt from the two-thirds vote requirement set forth in the Certificates.

83.     In addition to their explicit terms, inherent in the Certificates was an implied covenant by Fannie Mae and Freddie Mac to deal fairly with the stockholders and to fulfill the issuers' contractual obligations in good faith. This covenant required Fannie Mae and Freddie Mac, and FHFA, as their Conservator, not to take actions that would violate the stockholders' reasonable expectations regarding their dividend and liquidation rights.

84.     Plaintiffs and members of the Classes had a reasonable expectation that the Companies would not completely nullify their contractual dividend and liquidation rights, even if the Company were to issue new classes of senior stock. Plaintiffs and members of the classes also had reasonable expectations that the Companies would be operated at a profit for the benefit of *all* stockholders, that the Companies would exercise their discretion to pay dividends in good faith, and that the Companies would not self-liquidate to avoid and eliminate stockholders' liquidation rights.

85.     By executing the Third Amendment, Fannie Mae, Freddie Mac, and their Conservator FHFA have violated the reasonable expectations of Plaintiffs and other class members regarding the fruits of their agreements with Fannie Mae and Freddie Mac. Under the Third Amendment, Plaintiffs and class members are absolutely and forever precluded from ever being eligible to receive a dividend, liquidation preference, or any value from these contractual rights. Similarly, under the Third Amendment, the companies are no longer operated at a profit for the benefit of all stockholders, but rather are operated for the sole and exclusive benefit of a single controlling stockholder: the U.S. Treasury. Further, under the Third Amendment, the Companies (through FHFA) are not exercising their discretion to pay dividends in good faith

with regard to all stockholders, but rather are continuously paying enormous dividends only to a single, controlling stockholder: the U.S. Treasury. And, under the Third Amendment, the Companies (through FHFA) are required to pay all of their Net Worth each quarter to the U.S. Treasury without diminishing Treasury's outstanding liquidation preference, which effectively eliminates the preferred and common stockholders' liquidation preference.  Accordingly, by executing the Third Amendment, the Companies and their Conservator FHFA acted unfairly and in bad faith with respect to the stockholders and breached the implied covenant of good faith and fair dealing.

## VII.  THE COMPANIES AND FHFA VIOLATED THE FIDUCIARY OBLIGATIONS OWED TO THE COMPANIES' STOCKHOLDERS

86.    Under Delaware and Virginia law, officers and directors of a corporation owe that corporation and its stockholders fiduciary obligations of good faith and loyalty, and are required to use their utmost ability to control and manage the corporation in a fair, just, honest, and equitable manner. Fannie Mae and Freddie Mac were and are required to treat all of their stockholders fairly, to act in furtherance of the best interests of their stockholders so as to benefit all stockholders equally, and to not subordinate the interests of one group of stockholders to those of another stockholder.

87.    By imposing a conservatorship over Fannie Mae and Freddie Mac, through which FHFA assumed the powers of their officers and directors, FHFA assumed these fiduciary duties to the Companies' stockholders, including Plaintiffs and the other members of the Classes.

88.    As disclosed in Fannie Mae's 2012 Form 10-K filing, "Upon its appointment, the conservator [FHFA] immediately succeeded to all rights, titles, powers and privileges of Fannie Mae, and of any shareholder, officer or director of Fannie Mae with respect to Fannie Mae and its assets, and succeeded to the title to the books, records and assets of any other legal custodian

of Fannie Mae.  As a result, our Board of Directors no longer had the power or duty to manage, direct or oversee our business and affairs."  Fannie Mae's current directors "serve on behalf of the conservator and exercise their authority as directed by and with the approval, where required, of the conservator. FHFA has instructed Fannie Mae's directors to consult with it and obtain its written approval before taking action in a wide variety of areas, including but not limited to:

    (a)    Engaging in redemptions or repurchases of subordinated debt;

    (b)    Matters that relate to the Conservator's powers, Fannie Mae's conservatorship status, or the legal effect of the conservatorship on contracts;

    (c)    Agreements relating to litigation, claims, regulatory proceedings, or tax-related matters where the value of the claim exceeds a specified threshold;

    (d)    Actions that are likely to cause significant reputational risk;

    (e)    Establishing the annual operating budget; and

    (f)    Matters requiring the approval of or consultation with Treasury under the PSPAs.

89.     Similarly, as disclosed in Freddie Mac's 2013 Form 10-K filing, "Upon its appointment, FHFA, as Conservator, immediately succeeded to all rights, titles, powers and privileges of Freddie Mac, and of any stockholder, officer or director of Freddie Mac with respect to Freddie Mac and its assets. . . . We conduct our business subject to the direction of FHFA as our Conservator. . . . The Conservator continues to determine, and direct the effects of the Board of Directors and management to address, the strategic direction for the company. While the Conservator has delegated certain authority to management to conduct business operations, many management decisions are subject to review and approval by FHFA and Treasury.  In addition, management frequently receives directions from FHFA on various matters

involving day-to-day operations." Freddie Mac's current directors "serve on behalf of, and exercise authority as directed by, the Conservator." FHFA has instructed Freddie Mac's directors to consult with it and obtain its written approval before taking action in a wide variety of areas, including but not limited to:

(a)     Engaging in redemptions or repurchases of subordinated debt;

(b)     Matters that relate to the Conservator's powers, Freddie Mac's conservatorship status, or the legal effect of the conservatorship on contracts;

(c)     Agreements relating to litigation, claims, regulatory proceedings, or tax-related matters where the value of the claim exceeds a specified threshold;

(d)     Actions that are likely to cause significant reputational risk;

(e)     Establishing the annual operating budget; and

(f)     Matters requiring the approval of or consultation with Treasury under the PSPAs.

90.     While Fannie Mae's and Freddie Mac's officers are under FHFA's control, in a February 2, 2010 letter to Congress, the Director of FHFA confirmed that "Like other corporate executives, the [Companies'] executive officers are subject to the legal responsibility to use sound and prudent business judgment in their stewardship of their companies," and that FHFA had charged the Companies' boards with "ensuring normal corporate governance practices and procedures are in place."

91.     Thus, under Delaware and Virginia law, both FHFA and the Companies owed and owe fiduciary duties to the Companies' stockholders.

92.     The Third Amendment offered no benefits whatsoever to the Plaintiffs or the Classes. Rather, it expropriates the value of their shares and transfers that value to the Treasury, the Companies' controlling stockholder.

40

93.     The Third Amendment was in no way an exercise of valid business judgment or deemed to be in the best interests of the Plaintiffs or the Classes.  Indeed, it was specifically intended to ensure that stockholders (other than Treasury) could never again recover any value from their investments.

## VIII.   THE NET WORTH SWEEP VIOLATES THE CORPORATE LAWS OF DELAWARE AND VIRGINIA

94.     The laws of Delaware and Virginia impose some basic limitations on the dividends that a company may pay to holders of Preferred Stock, like the Government Preferred Stock held by the Treasury. The dividends that the Companies, through FHFA, are required to pay to the Treasury under the Third Amendment violate these limitations.

95.     Section 151(c) of the Delaware General Corporation Law ("DGCL") provides that preferred stock holders may receive dividends "at such rates, on such conditions and at such times as shall be stated in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors." But the Net Worth Sweep dividend is not paid at any "rate." Treasury's participation in Fannie Mae's (and Freddie Mac's) earnings growth is unlimited, absolute, and perpetual. While the law allows preferred stockholders to take priority over common stockholders in the receipt of dividends, it does not permit such dividends to appreciate in an absolute and unlimited manner with the growth of the corporation.

96.     Section 151(c) also provides that dividends may be "payable in preference to, or in . . . relation to, the dividends payable on any other class or classes or of any other series of stock[.]" 8 Del. C. § 151(c).  But as a result of the Net Worth Sweep, dividends on the Senior Preferred Stock are payable to the absolute and permanent exclusion of dividends payable on other classes or series of Fannie Mae stock. After payment of the Net Worth Sweep each quarter,

41

there are no remaining assets of the Company available for dividends on any other classes or series of stock. Delaware law does not permit dividends to be paid exclusively to "preferred" stock.

97.     The Net Worth Sweep also violates Virginia law, which similarly prohibits corporations from entering into unconditional agreements to pay dividends so as to preclude in perpetuity all other classes and series of stock from the potential to receive dividends. *See* Va. Code § 13.1-638 (providing that a corporation may authorize "one or more classes or series of shares that . . . have preference over any other class or series of shares with respect to distributions [such as dividends]"). Virginia law requires that dividend preferences be "limited" and "definitely fixed," and that dividends paid on preferred stock must be payable "in preference to" the dividends paid on junior stock. As such, the Net Worth Sweep violates Virginia corporate law applicable to Freddie Mac.

## IX.    CLASS ACTION ALLEGATIONS

98.     With respect to Counts I and IV hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a class consisting of all persons and entities who held shares of Fannie Mae Preferred Stock on August 17, 2012 and who were damaged thereby, and their successors in interest (meaning current shareholders) (the "Fannie Preferred Class").   Excluded from the Fannie Preferred Class are the Defendants.

99.     With respect to Counts II and V hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a class consisting of all persons and entities who held shares of Freddie Mac Preferred Stock on August 17, 2012 and who were damaged thereby, and their successors in interest (the "Freddie Preferred Class").   Excluded from the Freddie Preferred Class are the Defendants.

100.    With respect to Counts III and VI hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of a class consisting of all persons and entities who held shares of Freddie Mac Common Stock on August 17, 2012 and who were damaged thereby and their successors in interest (the "Freddie Common Class").  Excluded from the Freddie Common Class are the Defendants.

101.    With respect to Counts VII and IX hereof, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the Fannie Preferred Class as well as a class consisting of all persons and entities who held shares of Fannie Mae Common Stock on August 17, 2012 and who were damaged thereby and their successors in interest (the "Fannie Common Class").   Excluded from the Fannie Common Class are the Defendants.

102.    With respect to Counts VIII and X, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b) on behalf of the Freddie Preferred Class as well as the Freddie Common Class.

103.    The Fannie Preferred Class, Fannie Common Class, Freddie Preferred Class, and Freddie Common Class, are referred to herein collectively as the "Classes."

104.    The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least thousands of members in the proposed Classes.  As of August 17, 2012, and the date of the filing of this action, there were hundreds of millions of shares of Fannie Mae and Freddie Mac Preferred Stock and Common Stock outstanding.  As of June 30, 2017, there were 1,158,087,567 shares of Fannie Mae Common Stock outstanding, and as of December 31, 2016, there were 556

million shares of Fannie Mae Preferred Stock outstanding.  As of July 18, 2017, there were 650,054,731 shares of Freddie Mac Common Stock outstanding, and as of December 31, 2016, there were 464,170,000 shares of Freddie Mac Preferred Stock outstanding.  Record owners and other members of the Classes may be identified from records maintained by Fannie Mae and Freddie Mac and/or their transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.    Plaintiffs' claims are typical of the claims of the other members of the Classes, as all members of the Classes purchased or otherwise acquired Fannie Mae or Freddie Mac stock during the class period, and were similarly affected by Defendants' wrongful conduct that is complained of herein.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Classes, and have retained counsel competent and experienced in class action, derivative, securities, and constitutional litigation.   Plaintiffs have no interests that are adverse or antagonistic to the Classes.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

108.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes.  Among the questions of law and fact common to the Classes are:

(a)     Whether one or more Defendants breached the terms of the Certificates for the Preferred Stock and Common Stock and/or the implied covenant of good faith and fair dealing inherent in those Certificates;

(b)     Whether one or more Defendants breached the fiduciary duties owed to members of the Classes;

(c)     Whether one or more Defendants violated state corporate law governing dividends;

(d)     Whether one or more Defendants are liable for damages to the members of the Classes, and the proper measure thereof, for breaches of contract, breaches of the implied covenant of good faith and fair dealing, breaches of fiduciary duties, and violations of state corporate law governing dividends.

109.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

110.     Defendants have acted on grounds generally applicable to the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Classes as a whole.

## X.     DERIVATIVE ALLEGATIONS

111.     With respect to Counts XI and XII, Plaintiffs bring this action derivatively on behalf of and for the benefit of the Companies against FHFA. For purposes of these Counts, Fannie Mae and Freddie Mac are named as nominal defendants in a derivative capacity.

Plaintiffs concede that, under the D.C. Circuit's opinion in this matter, they do not have authority to assert derivative claims on behalf of the Companies. Plaintiffs include these allegations solely for the purpose of preserving these derivative claims in the event the D.C. Circuit's opinion is reversed or otherwise abrogated.

112.    In addition to violating the fiduciary duties owed to the Companies' stockholders, the Net Worth Sweep also violates the fiduciary duties owed by FHFA to the Companies themselves.

113.    Under the Third Amendment, the Companies can never accumulate capital under the Third Amendment and can never redeem the Government Preferred Stock; so long as the Companies remain in operation, all of their net worth will be transferred to Treasury but the outstanding balance of the Government Preferred Stock will not be diminished.

114.    The Third Amendment was not executed to serve the interests of the Companies, but to further the political goal of winding down the Companies. Statements by both FHFA and Treasury confirm that the Third Amendment is intended not merely to prevent the Companies from rebuilding its capital, but to facilitate their eventual elimination.  Treasury, for example, stated the Third Amendment would "expedite the wind down of Fannie Mae and Freddie Mac," and it emphasized that the "quarterly sweep of every dollar of profit that each firm earns going forward" would make "sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers."  U.S. Dep't of Treasury, Press Release, *Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac* (Aug. 17, 2012).  Indeed, Treasury emphasized that the Third Amendment would ensure that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."  *Id.*

46

115.    Likewise, FHFA Acting Director DeMarco stated that the Third Amendment reflected the agency's goal of "gradually contracting [the Companies'] operations." Edward J. DeMarco, Acting Director, FHFA, *Statement on Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements*.  DeMarco later informed a Senate Committee that the "recent changes to the [PSPAs], replacing the 10 percent dividend with a net worth sweep, reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status."  Edward J. DeMarco, Acting Director, FHFA, Statement Before the U.S. Senate Comm. on Banking, Housing and Urban Affairs, at 3 (Apr. 18, 2013). Likewise, in its 2012 report to Congress, FHFA explained that it had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie Mae and Freddie Mac." FHFA, Report to Congress 2012, at 13 (June 13, 2013).  Thus, according to FHFA, the Third Amendment "ensures all the [Companies'] earnings are used to benefit taxpayers" and "reinforces the fact that the [Companies] will not be building capital." *Id*. at 1, 13.

116.    Plaintiffs were holders of Fannie Mae and Freddie Mac Preferred Stock and common stock prior to and on August 17, 2012 and have been holders of said securities continuously since then.  Plaintiffs have retained counsel that is competent and experienced in class action, derivative and securities litigation. Plaintiffs intend to retain their shares of Preferred Stock and common stock throughout the duration of this litigation.

117.    The breaches of fiduciary duty complained of herein subject, and will persist in subjecting, the Companies to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

118.    As to Fannie Mae, to the extent any demand requirement with respect to the Fannie Mae's Board of Directors would otherwise be applicable in this context, such demand is

excused and Plaintiffs are entitled to pursue the derivative claim alleged herein as a result of FHFA's domination of the Board.  Fannie Mae's 2012 Form 10-K discloses that "[o]ur directors do not have any fiduciary duties to any person or entity except to the conservator and, accordingly, are not obligated to consider the interests of the company, the holders of our equity or debt securities or the holders of Fannie Mae MBS unless specifically directed to do so by the conservator."  Fannie Mae's Board of Directors is prohibited from taking action on "matters that relate to the conservator's powers" or "the legal effect of the conservatorship on contracts," such as this litigation, without prior written approval of FHFA.

119.    To the extent any demand requirement with respect to FHFA would otherwise be applicable in this context, such demand is excused and Plaintiffs are entitled to pursue the derivative claim alleged herein as a result of FHFA's manifest conflict of interest. Plaintiffs' claims are against FHFA, which cannot sue itself.  Indeed, FHFA faces a substantial threat of liability with respect to the breach of fiduciary duty claim.

120.    Accordingly, FHFA has a manifest conflict of interest that makes it incapable of pursing the derivative claim for breach of fiduciary duty alleged herein.  A derivative action offers the only reasonable avenue for the pursuit of the breach of fiduciary duty claim.

121.    As to Freddie Mac, Virginia law provides that "[n]o shareholder may commence a derivative proceeding until: (1) A written demand has been made on the corporation to take suitable action; and (2) Ninety days have expired from the date delivery of the demand was made[.]"  Va Code Ann. 13.1-672.1.

122.    On January 6 and 7, 2014, Plaintiffs AEIC, Cacciapalle and Miller each sent a letter to Freddie Mac regarding the Third Amendment and the matters at issue in this Complaint, demanding that the Board of Directors of Freddie Mac and/or FHFA commence a civil action

against FHFA and Treasury to recover for the benefit of Freddie Mac all damages that Freddie Mac has suffered as a result of FHFA and Treasury's breaches of their respective fiduciary duties, and commence a civil action for a declaration that the Third Amendment is null and void. Copies of these letters have been filed in this action as ECF No. 39-1, Exhibits A, B, and C.

123.    On April 9, 2014, FHFA rejected Plaintiffs' demands, stating that, "the conservator does not intend to authorize Freddie Mac or its directors or officers on behalf of Freddie Mac to take the actions that the Letter demands." Copies of these letters have been filed in this action as ECF No. 39-1, Exhibits D, E, and F.

## CAUSES OF ACTION
### COUNT I
### BREACH OF CONTRACT - ANTICIPATORY BREACH
#### (Fannie Preferred Class)
#### Direct Claim Against Fannie Mae and FHFA

124.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

125.    The Certificates for the Fannie Mae Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

126.    Plaintiffs and the other members of the Fannie Preferred Class paid valuable consideration in exchange for these contractual rights.

127.    The Certificates for the Fannie Mae Preferred Stock provide for contractually-specified liquidation preferences for the holders of Preferred Stock.

128.    As Fannie Mae's Conservator, FHFA is obligated to act consistently with Fannie Mae's responsibilities under the Certificates.

129.    By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Fannie Preferred Class of any possibility of a liquidation preference,

Fannie Mae, acting through FHFA, has clearly and unequivocally repudiated the contractually-specified liquidation preferences of the holders of Fannie Mae Preferred Stock.

130.    Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of contact. Plaintiffs' injuries are direct and independent of any injury to Fannie Mae and any recovery for this claim would benefit the stockholders directly, and not the Company.

**COUNT II**

**BREACH OF CONTRACT - ANTICIPATORY BREACH**

**(Freddie Preferred Class)**

**Direct Claim Against Freddie Mac and FHFA**

131.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

132.    The Certificates for the Freddie Mac Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

133.    Plaintiffs and the other members of the Freddie Preferred Class paid valuable consideration in exchange for these contractual rights.

134.    The Certificates for the Freddie Mac Preferred Stock provide for contractually-specified liquidation preferences for the holders of Freddie Mac Preferred Stock.

135.    As Freddie Mac's Conservator, FHFA is obligated to act consistently with Freddie Mac's responsibilities under the Certificates.

136.    By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Freddie Preferred Class of any possibility of receiving a liquidation

preference, the Companies, acting through FHFA, has clearly and unequivocally repudiated the contractually-specified liquidation preferences of the holders of Freddie Mac Preferred Stock.

137.     Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of contact. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac and any recovery for this claim would benefit the stockholders directly, and not the Company.

**COUNT III**

**BREACH OF CONTRACT - ANTICIPATORY BREACH**

**(Freddie Common Class)**

**Direct Claim Against Freddie Mac and FHFA**

138.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

139.     The Certificate for the Freddie Mac Common Stock was and is, for all purposes relevant hereto, a contract between the members of the Freddie Common Class and Freddie Mac.

140.     Plaintiffs and the other members of the Freddie Common Class paid valuable consideration in exchange for these contractual rights.

141.     The Certificate for the Freddie Mac Common Stock provides for contractually-specified liquidation preferences for the holders of Freddie Mac Common Stock.

142.     As Freddie Mac's Conservator, FHFA is obligated to act consistently with Freddie Mac's responsibilities under the Certificate.

143.     By entering into the Third Amendment so as to effectively deprive Plaintiffs and the other members of the Freddie Common Class of any possibility of receiving a liquidation preference, Freddie Mac, acting through FHFA, has clearly and unequivocally repudiated the contractually-specified liquidation preferences of the holders of Freddie Mac Common Stock.

144.     Plaintiffs and the other members of the Freddie Common Class suffered damages as a direct and proximate result of the foregoing breach of contact. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT IV
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Fannie Preferred Class)
### Direct Claim Against Fannie Mae and FHFA

145.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

146.     The Certificates for Fannie Mae Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Fannie Preferred Class and Fannie Mae.

147.     Plaintiffs and the other members of the Fannie Preferred Class paid valuable consideration in exchange for these contractual rights.

148.     The Certificates for Fannie Mae Preferred stock provide for dividends "if declared by the Board of Directors, in its sole discretion," and provide for contractually-specified liquidation preferences for the holders of Preferred Stock. Also inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Fannie Mae to deal fairly with Plaintiffs and the other members of the Fannie Preferred Class, to fulfill their obligations to Plaintiffs and the Fannie Preferred Class in good faith, and not to deprive Plaintiffs and the Fannie Preferred Class of the fruits of their bargain.

149.     As Fannie Mae's Conservator, FHFA is obligated to act consistently with Fannie Mae's responsibilities under the implied covenant of good faith and fair dealing.

150.    By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Fannie Preferred Class of any possibility of receiving dividends or a liquidation preference, Fannie Mae, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Preferred Stock. Through the implied covenant of good faith and fair dealing, Fannie Mae, acting through FHFA, was obligated not to eliminate the rights and interests of the Fannie Preferred Class in receiving dividends or a liquidation preference.   In effectively eliminating such rights and interests entirely, through the Third Amendment Fannie Mae, acting through FHFA, violated the reasonable expectations of the members of the Fannie Preferred Class.

151.    Plaintiffs and the other members of the Fannie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing. Plaintiffs' injuries are direct and independent of any injury to Fannie Mae and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT V
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Freddie Preferred Class)
### Direct Claim Against Freddie Mac and FHFA

152.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

153.    The Certificates for Freddie Mac Preferred Stock were and are, for all purposes relevant hereto, contracts between the members of the Freddie Preferred Class and Freddie Mac.

154.    Plaintiffs and the other members of the Freddie Preferred Class paid valuable consideration in exchange for these contractual rights.

155.    The Certificates for Freddie Mac Preferred stock provide for dividends "if declared by the Board of Directors, in its sole discretion," and provide for contractually-specified liquidation preferences for the holders of Preferred Stock. Also inherent in these contracts was, and is, an implied covenant of good faith and fair dealing, requiring Freddie Mac to deal fairly with Plaintiffs and the other members of the Freddie Preferred Class, to fulfill their obligations to Plaintiffs and the Freddie Preferred Class in good faith, and not to deprive Plaintiffs and the Freddie Preferred Class of the fruits of their bargain.

156.    As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the implied covenant of good faith and fair dealing.

157.    By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Freddie Preferred Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificates for the Freddie Mac Preferred Stock.  Through the implied covenant of good faith and fair dealing, Freddie Mac, acting through FHFA, was obligated not to eliminate the rights and interests of the Freddie Preferred Class in receiving dividends or a liquidation preference.   In effectively eliminating such rights and interests entirely, through the Third Amendment Freddie Mac, acting through FHFA, violated the reasonable expectations of the members of the Freddie Preferred Class.

158.    Plaintiffs and the other members of the Freddie Preferred Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT VI

**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Freddie Common Class)**
**Direct Claim Against Freddie Mac and FHFA**

159.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

160.     The Certificate for Freddie Mac Common Stock was and is, for all purposes relevant hereto, a contract between the members of the Freddie Common Class and Freddie Mac.

161.     Plaintiffs and the other members of the Freddie Common Class paid valuable consideration in exchange for these contractual rights.

162.     The Certificates for Freddie Mac Common Stock provide for dividends "if declared by the Board of Directors, in its sole discretion," and provide for contractually-specified liquidation preferences for the holders of Common Stock. Also inherent in this contract was, and is, an implied covenant of good faith and fair dealing, requiring Freddie Mac to deal fairly with Plaintiffs and the other members of the Freddie Common Class, to fulfill their obligations to Plaintiffs and the Freddie Common Class in good faith, and not to deprive Plaintiffs and the Freddie Common Class of the fruits of their bargain.

163.     As Freddie Mac's Conservator, FHFA also became obligated to act consistently with Freddie Mac's responsibilities under the implied covenant of good faith and fair dealing.

164.     By entering into the Third Amendment with the purpose of effectively depriving Plaintiffs and the other members of the Freddie Common Class of any possibility of receiving dividends or a liquidation preference, Freddie Mac, acting through FHFA, breached the implied covenant of good faith and fair dealing inherent in the Certificate for the Freddie Mac Common Stock. Through the implied covenant of good faith and fair dealing, Freddie Mac, acting through

FHFA, was obligated not to eliminate the rights and interests of the Freddie Common Class in receiving dividends or a liquidation preference. In effectively eliminating such rights and interests entirely, through the Third Amendment Freddie Mac, acting through FHFA, violated the reasonable expectations of the members of the Freddie Common Class.

165.    Plaintiffs and the other members of the Freddie Common Class suffered damages as a direct and proximate result of the foregoing breach of the implied covenant of good faith and fair dealing. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT VII
## BREACH OF FIDUCIARY DUTIES
### (Fannie Preferred Class & Fannie Common Class)
### Direct Claims Against Fannie Mae and FHFA

166.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

167.    Fannie Mae owed and owes fiduciary duties of good faith and loyalty to its stockholders, including Plaintiffs and the other members of the Fannie Preferred Class and Fannie Common Class.  Fannie Mae was and is required to treat all stockholders fairly, to act in furtherance of the best interests its stockholders so as to benefit all stockholders equally, and to not subordinate the interests of one group of stockholders to those of another stockholder.

168.    By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA assumed these fiduciary duties to Fannie Mae's stockholders, including Plaintiffs and the other members of the Fannie Preferred Class and Fannie Common Class.

169.    By entering into the Third Amendment, Fannie Mae, acting through FHFA, violated the fiduciary duties it owed to Plaintiffs and the other members of the Fannie Preferred Class and Fannie Common Class. By entering into the Third Amendment, Fannie Mae, acting through FHFA, deliberately expropriated economic value from Plaintiffs and other members of the Fannie Preferred Class and Fannie Common Class and transferred it to another Fannie Mae stockholder: the U.S. Treasury.

170.    The Third Amendment constituted a self-dealing transaction. As an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

171.    Plaintiffs and other members of the Fannie Common Class and Fannie Preferred Classes suffered damages as a direct and proximate result of the foregoing breach of fiduciary duties. Plaintiffs' injuries are direct and independent of any injury to Fannie Mae, and any recovery for this claim would benefit the stockholders directly, and not the Company.

**COUNT VIII**

**BREACH OF FIDUCIARY DUTIES**

**(Freddie Preferred Class & Freddie Common Class)**

**Direct Claims Against Freddie Mac and FHFA**

172.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

173.    Freddie Mac owed and owes fiduciary duties of good faith and loyalty to its stockholders, including Plaintiffs and the other members of the Freddie Preferred Class and Freddie Common Class.  Freddie Mac was and is required to treat all stockholders fairly, to act in furtherance of the best interests its stockholders so as to benefit all stockholders equally, and to not subordinate the interests of one group of stockholders to those of another stockholder.

174.     By imposing a conservatorship over Freddie Mac, through which FHFA assumed the powers of its officers and directors, FHFA assumed these fiduciary duties to Freddie Mac's stockholders, including Plaintiffs and the other members of the Freddie Preferred Class and Freddie Common Class.

175.     By entering into the Third Amendment, Freddie Mac, acting through FHFA, violated the fiduciary duties it owed to Plaintiffs and the other members of the Freddie Preferred Class and Freddie Common Class. By entering into the Third Amendment, Freddie Mac, acting through FHFA, deliberately expropriated economic value from Plaintiffs and other members of the Freddie Preferred Class and Fannie Common Class and transferred it to another Freddie Mac stockholder: the U.S. Treasury.

176.     The Third Amendment constituted a self-dealing transaction. As an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

177.     Plaintiffs and other members of the Freddie Common Class and Freddie Preferred Classes suffered damages as a direct and proximate result of the foregoing breach of fiduciary duties. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac, and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT IX
### VIOLATION OF DELAWARE LAW GOVERNING DIVIDENDS
#### (Fannie Preferred Class & Fannie Common Class)
#### Direct Claim Against Fannie Mae and FHFA

178.     Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

179.     Pursuant to its enabling legislation, applicable federal law, and Section 1.05 of its bylaws, Fannie Mae has designated that the DGCL controls for purposes of its corporate governance practices and procedures.

180.     By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA became obligated to manage Fannie Mae in a manner consistent with DGCL.

181.     Under Delaware law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity. The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

182.     Section 151 of the DGCL allows preferred stockholders to receive dividends "*at such rates*, on such conditions and at such times as shall be stated in the certificate of incorporation or in the [board] resolution . . . ." 8 *Del. C.* § 151(c) (emphasis added). Preferred stock dividends must be made "payable *in preference to, or in . . . relation to*, the dividends payable on any other class or classes or of any other series of stock[.]" *Id.* (emphasis added). Section 151 does not permit a provision requiring that a series of preferred stock receive a quarterly dividend equal to the entire net worth of a corporation to the necessary exclusion (in perpetuity) of any dividends ever being paid on junior stock. In fact, Section 151(c) specifically contemplates that, after payment of preferential dividends on senior preferred stock, "a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends . . . ." *Id.*

183.     Because the Net Worth Sweep diverts, in perpetuity, all of the net worth of Fannie Mae to Treasury, it neither is paid at a "rate" nor is it payable "in preference to" or "in relation

to" the dividends payable to other classes or series of stock. The Net Worth Sweep is not paid at a "rate" because Treasury's participation in corporate earnings growth is unlimited, absolute, and perpetual. The Net Worth Sweep is not payable "in preference to" or "in relation to" the dividends payable to other classes or series of stock because it is payable to the absolute, permanent exclusion of dividends to other stockholders. Once the Net Worth Sweep is paid each quarter, there necessarily will be no assets remaining in the Company that would ever be available for the payment of dividends on any other classes or series of stock regardless of how valuable the Company may become in the future.

184.    Accordingly, the Net Worth Sweep is invalid under the DGCL.

185.    As a direct and proximate result of the wrongful implementation of the Net Worth Sweep, Plaintiffs and the other members of the Fannie Preferred Class and Fannie Common Class have suffered damages. Plaintiffs' injuries are direct and independent of any injury to Fannie Mae and any recovery for this claim would benefit the stockholders directly, and not the Company.

**COUNT X**

**VIOLATION OF VIRGINIA LAW GOVERNING DIVIDENDS**

**(Freddie Preferred Class & Freddie Common Class)**

**Direct Claim Against Freddie Mac and FHFA**

186.    Plaintiffs incorporate by reference and reallege each and every allegation set forth in this complaint, as though fully set forth herein.

187.    Pursuant to its enabling legislation and Section 11.3 of its bylaws, Freddie Mac has designated that the VSCA controls for purposes of its corporate governance practices and procedures.

188.     By imposing a conservatorship over Freddie Mac, through which FHFA assumed the powers of its officers and directors, FHFA became obligated to manage Freddie Mac in a manner consistent with VSCA.

189.     Under Virginia law, preferred stock of a corporation cannot be given a cumulative dividend right equal to all the net worth of the corporation in perpetuity. The Net Worth Sweep therefore is an illegal term for any preferred stock instrument, whether or not held by the federal government.

190.     The VSCA provides that a corporation may authorize "one or more classes or series of shares that . . . have preference over any other class or series of shares with respect to distributions [such as dividends]." Va. Code § 13.1-638 (emphasis added). While there is no question that the VSCA permits corporations to establish a dividend "preference" that operates as a priority, it does not permit corporations to establish a dividend preference that operates to preclude all other classes of stockholders from the potential to receive dividends in perpetuity.

191.     Accordingly, the Net Worth Sweep is invalid under the VSCA.

192.     As a direct and proximate result of the wrongful implementation of the Net Worth Sweep, Plaintiffs and the other members of the Freddie Preferred Class and Freddie Common Class have suffered damages. Plaintiffs' injuries are direct and independent of any injury to Freddie Mac and any recovery for this claim would benefit the stockholders directly, and not the Company.

## COUNT XI

## BREACH OF FIDUCIARY DUTIES

### (Fannie Preferred Plaintiffs & Fannie Common Plaintiffs)

### Derivative Claims Against FHFA

193.     Plaintiffs concede that this count is barred under the D.C. Circuit's opinion, and include it here solely for the purpose of preserving the claims in the event that the D.C. Circuit's opinion is reversed or otherwise abrogated on this issue.

194.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

195.     By imposing a conservatorship over Fannie Mae, through which FHFA assumed the powers of its officers and directors, FHFA assumed fiduciary duties of due care, good faith, loyalty, and candor, to Fannie Mae and its stockholders, including Plaintiffs and the other members of the Fannie Preferred Class and Fannie Common Class. FHFA was and is required to use its utmost ability to control and manage Fannie Mae in a fair, just, honest, and equitable manner.  FHFA was and is required to act in furtherance of the best interests of Fannie Mae and its stockholders so as to benefit all stockholders equally and not in furtherance of the personal interest or benefit of FHFA, Treasury, or the federal government.

196.     The Third Amendment constituted a self-dealing transaction. As an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

197.     Through the Third Amendment, FHFA breached its fiduciary duties to Fannie Mae.  The Third Amendment was not entirely fair to Fannie Mae, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Third Amendment, which effectively delivers all of Fannie Mae's profits to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Fannie Mae in return.

198.    The Third Amendment was neither entirely nor intrinsically fair, nor did it further

any valid business purpose of Fannie Mae, nor did it reflect a good faith business judgment as to

what was in the best interests of Fannie Mae or its stockholders.

199.    The Third Amendment constituted waste and a gross abuse of discretion.

200.    As a direct and proximate result of the foregoing breach of fiduciary duty, Fannie

Mae suffered damages.

## COUNT XII
### BREACH OF FIDUCIARY DUTIES
#### (Freddie Preferred Plaintiffs & Freddie Common Plaintiffs)
#### Derivative Claims Against FHFA

201.    Plaintiffs concede that this count is barred under the D.C. Circuit's opinion, and

include it here solely for the purpose of preserving the claims in the event that the D.C. Circuit's

opinion is reversed or otherwise abrogated on this issue.

202.    Plaintiffs incorporate by reference and reallege each and every allegation set forth

above, as though fully set forth herein.

203.    By imposing a conservatorship over Freddie Mac, through which FHFA assumed

the powers of its officers and directors, FHFA assumed fiduciary duties of due care, good faith,

loyalty, and candor, to Freddie Mac and its stockholders, including Plaintiffs and the other

members of the Freddie Preferred Class and Freddie Common Class. FHFA was and is required

to use its utmost ability to control and manage Freddie Mac in a fair, just, honest, and equitable

manner.  FHFA was and is required to act in furtherance of the best interests of Freddie Mac, and

its stockholders so as to benefit all stockholders equally and not in furtherance of the personal

interest or benefit of FHFA, Treasury, or the federal government.

204.     The Third Amendment constituted a self-dealing transaction. As an agency of the federal government, FHFA was interested in and benefited from the Third Amendment.

205.     Through the Third Amendment, FHFA breached its fiduciary duties to Freddie Mac.  The Third Amendment was not entirely fair to Freddie Mac, as it was neither the product of a fair process nor reflected a fair price.  Indeed, the Third Amendment, which effectively delivers all of Freddie Mac's profits to Treasury in perpetuity, was granted to benefit the Treasury, with no benefit to Freddie Mac in return.

206.     The Third Amendment was neither entirely nor intrinsically fair, nor did it further any valid business purpose of Freddie Mac, nor did it reflect a good faith business judgment as to what was in the best interests of its stockholders.

207.     The Third Amendment constituted waste and a gross abuse of discretion.

208.     As a direct and proximate result of the foregoing breach of fiduciary duty, Freddie Mac suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief and judgment, as follows:

1. Certifying that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Classes defined herein;

2. Awarding Plaintiffs and the Classes the amount of damages they sustained as a result of Defendants' breaches of contract, breaches of the implied covenant of good faith and fair dealing, breaches of fiduciary duties, and violations of Delaware and Virginia law governing dividends;

3. Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4. Granting such other and further relief as the Court may deem just and proper.

In addition, in the event the D.C. Circuit's opinion in this matter is reversed or otherwise abrogated, Plaintiffs also pray for relief and judgment, as follows:

64

5. Declaring that this action is a proper derivative action and that presuit demand is excused or satisfied as to Fannie Mae and Freddie Mac;

6. Declaring that the Third Amendment was neither entirely nor intrinsically fair to Fannie Mae or Freddie Mac, did not further any valid business purpose of Fannie Mae or Freddie Mac, did not reflect a good faith business judgment as to what was in the best interests of Fannie Mae or Freddie Mac, and constituted waste and a gross abuse of discretion;

7. Declaring that, through the Third Amendment, FHFA breached its fiduciary duties to Fannie Mae and Freddie Mac;

8. Awarding compensatory damages and disgorgement in favor of Fannie Mae and Freddie Mac, as a result of FHFA's breach of its fiduciary duties, in an amount to be proven at trial, including interest thereon;

9. Declaring that Fannie Mae and Freddie Mac, acting through FHFA, breached the terms of the certificates of designation and the implied covenant of good faith and fair dealing; and

10. Granting appropriate equitable and injunctive relief to remedy Defendants' breaches of contract, breaches of the implied covenant of good faith and fair dealing, breaches of fiduciary duty, and violations of Delaware and Virginia Corporate law, including rescission of the Third Amendment.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 1, 2017                    Respectfully Submitted,

                                             */s/ Hamish Hume*
                                         Hamish P.M. Hume

| | |
|---|---|
| KESSLER TOPAZ MELTZER & CHECK LLP | BOIES SCHILLER FLEXNER LLP |
| Eric L. Zagar (*Pro Hac Vice*) | Hamish P.M. Hume (D.C. Bar No. 449914) |
| *280 King of Prussia Rd.* | Stacey K. Grigsby (D.C. Bar No. 491197) |
| *Radnor, PA 19087* | Jonathan M. Shaw (D.C. Bar No. 446249) |
| *Tel: (610) 667-7706* | Alexander I. Platt (D.C. Bar No. 1019844) |
| *Fax: (610) 667-7056* | *1401 New York Ave. NW* |
| *ezagar@ktmc.com* | *Washington, DC 20005* |
| | *Tel: (202) 237-2727* |
| GRANT & EISENHOFER, P.A. | *Fax: (202) 237-6131* |
| Michael J. Barry (*Pro Hac Vice*) | *hhume@bsfllp.com* |
| *123 Justison Street* | *sgrigsby@bsfllp.com* |
| *Wilmington, DE 19801* | *jshaw@bsfllp.com* |
| *Tel: (302) 622-7000* | *aplatt@bsfllp.com* |
| *Fax: (302) 622-7100* | |
| *mbarry@gelaw.com* | BERNSTEIN LITOWITZ BERGER & |
| | GROSSMANN  LLP |
| | Blair A. Nicholas (*Pro Hac Vice*) |
| | David R. Kaplan  (*Pro Hac Vice*) |
| | *12481 High Bluff Drive* |
| | *Suite 300* |
| | *San Diego, CA 92130* |
| | *Tel: (858) 793-0070* |
| | *Fax: (858) 793-0323* |
| | *blairn@blbglaw.com* |
| | *davidk@blbglaw.com* |

*Interim Co-Lead Class Counsel*