# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>**THIS DOCUMENT RELATES TO:**<br><br>ALL CASES | **Misc. Action No. 13-mc-1288 (RCL)**<br><br><u>CLASS ACTION</u><br><br>**ORAL ARGUMENT REQUESTED** |

## <u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
David R. Kaplan
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
davidk@blbglaw.com

BOIES SCHILLER FLEXNER LLP
Hamish P.M. Hume
Stacey K. Grigsby
Jonathan M. Shaw
Alexander I. Platt
1401 New York Ave., NW
Washington, D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
sgrigsby@bsfllp.com
jshaw@bsfllp.com
aplatt@bsfllp.com

GRANT & EISENHOFER P.A.
Michael J. Barry
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

KESSLER TOPAZ MELTZER & CHECK
LLP
Eric L. Zagar
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

*Interim Co-Lead Class Counsel*

(Additional Counsel Listed In Signature Block)

# TABLE OF CONTENTS

GLOSSARY ........................................................................................................... viii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 5

      A.     Before 2008, The Companies Were Financed By Private Investment
Through The Issuance Of Securities That Constitute Binding Contracts
Governed By State Law. ................................................................................. 5

      B.     In July 2008, Congress Enacted HERA. ................................................... 6

      C.     In September 2008, FHFA Placed The Companies Into Conservatorship And
Executed A Preferred Stock Purchase Agreement ("PSPA") With Treasury........ 7

      D.     At The Beginning Of 2012, The Housing Market Rebounded And The
Companies Returned To Profitability. ................................................... 8

      E.     In August 2012, FHFA And The Treasury Amended The PSPAs To Give
Treasury A Quarterly Dividend Equal To 100% Of The Companies' Entire
Net Worth (Minus A Small Reserve That Would Shrink To Zero)..................... 10

PROCEDURAL HISTORY......................................................................................... 11

LEGAL STANDARD................................................................................................. 13

ARGUMENT ............................................................................................................. 13

I.      PLAINTIFFS HAVE STATED VALID CLAIMS FOR BREACH OF THEIR
CONTRACTUAL RIGHTS TO LIQUIDATION DISTRIBUTIONS............................ 13

      A.     The Court Should Reject Defendants' Effort To Relitigate The Ripeness
Argument That The D.C. Circuit Squarely Rejected. .......................................... 13

      B.     The Court Should Reject Defendants' Argument That The Net
Worth Sweep Left Intact Plaintiffs' Contractual Right To A Liquidation
Distribution. ...................................................................................................... 16

II.     PLAINTIFFS HAVE STATED VALID CLAIMS FOR BREACH OF
THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.................... 19

      A.     No Reasonable Shareholder Could Have Expected The Third Amendment....... 21

1.      Plaintiffs Could Not Have Reasonably Expected That Defendants Would Agree to Change A 10% Preferred Dividend Into A Full Sweep Of The Companies' Entire Net Worth Every Quarter, No Matter How Large The Net Worth May Become, In Exchange For No Investment Or Any Meaningful Consideration. .................................................................... 21

2.      Plaintiffs Could Not Have Reasonably Expected That Defendants Would Act In Bad Faith To Deprive Them Of Any Chance Of Future Dividends Or Liquidation—No Matter How Much Profit The Companies Make. ................................................................. 28

B.      The Correct Measure Of Shareholder Expectations Is "As Of The Time Of Contracting," Which For All Shareholders Predates HERA. ............................. 31

III.    DEFENDANTS HAVE STATED VALID CLAIMS FOR BREACH OF THE FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH....................................... 34

A.      Plaintiffs' Claims For Breach Of Fiduciary Duty Are Direct, Not Derivative. .... 35

1.      Delaware Law Holds That Fannie Mae Shareholders Have A Direct Claim................................................................................................ 35

2.      The Supreme Court of Virginia Has Left Open The Possibility Of Adopting Delaware's Standard That Would Allow Freddie Shareholders To Bring Direct Fiduciary Breach Claims—This Court Should Allow The Claims Or Certify The Question To The Supreme Court of Virginia. .................................................................................. 38

B.      HERA Does Not Preempt Defendants' Fiduciary Breach Claims...................... 40

IV.     PLAINTIFFS HAVE STATED VALID CLAIMS UNDER CORPORATE LAWS THAT HAVE LONG DEFINED "PREFERRED STOCK" AND THE NATURE OF "DIVIDENDS" PAID ON SUCH STOCK................................................................... 43

A.      These Claims Are Not Preempted..................................................................... 43

B.      Defendants Are Wrong That Delaware And Virginia Law Permit A Perpetual Net Worth Sweep To Be Characterized As A "Dividend" On "Preferred Stock." ........................................................................................... 44

CONCLUSION.................................................................................................................... 45

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdelfattah v. DHS*,
    787 F.3d 524 (D.C. Cir. 2015) ....................................................................... 13

*Abella v. Universal Leaf Tobacco Co., Inc.*,
    546 F. Supp. 795 (E.D. Va. 1982) ................................................................... 39

*Allied Capital Corp. v. GC-Sun Holdings, L.P.*,
    910 A.2d 1020 (Del. Ch. 2006) ....................................................................... 33

*Amazon.com, Inc. v. Hoffman*,
    2009 WL 2031789 (Del. Ch. June 30, 2009) .................................................. 23

*Baum v. Whitehorse Marine, Inc.*,
    46 Va. Cir. 527 (Va. Cir. Ct. 1996) ................................................................ 31

*\*Black Horse Capital, LP v. Xstelos Holdings, Inc.*,
    2014 WL 5025926 (Del. Ch. Sept. 30, 2014) ......................................... 28, 31

*Boilermakers Local 154 Ret. Fund v. Chevron Corp.*,
    73 A.3d 934 (Del. Ch. 2013) ........................................................................... 43

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ......................................................................................... 42

*Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*,
    2014 WL 2943570 (Del. Ch. June 27, 2014) .................................................. 33

*Carsanaro v. Bloodhound Technologies, Inc.*,
    65 A.3d 618 (Del. Ch. March 15, 2013) ................................................... 35, 36

*Centaur Partners, IV v. Nat'l Intergroup, Inc.*,
    582 A.2d 923 (Del. 1990) ................................................................................ 43

*Chamison v. HealthTrust, Inc. Hosp. Co.*,
    735 A.2d 912 (Del. Ch. 1999) ......................................................................... 23

*Charles Schwab & Co. v. WS Wealth Mgmt., LLC*,
    2016 WL 7033699 (E.D. Va. Dec. 2, 2016) ................................................... 39

*CIR v. Bosch's Estate*,
    387 U.S. 456 (1967) ......................................................................................... 39

*Citibank (S. Dakota), N.A. v. F.D.I.C.,*
    857 F. Supp. 976 (D.D.C. 1994) ........................................................ 19

*Compare FI Assocs., LLC v. Lobo Mach. Corp.,*
    2012 WL 975705 (W.D. Va. Mar. 22, 2012) ..................................... 39

*CTS Corp. v. Waldburger,*
    134 S. Ct. 2175 (2014) ...................................................................... 40

*Cumana Investments S.A. v. Fluor Corp.,*
    593 F. Supp. 310 (D. Del. 1984) ....................................................... 14

*E.I. du Pont de Nemours & Co. v. FDIC,*
    32 F.3d 592 (D.C. Cir. 1994) ............................................................ 40

*FDIC v. Citibank N.A.,*
    2016 WL 8737356 (S.D.N.Y. Sept. 30, 2016) ................................... 33

*Gatz v. Ponsoldt,*
    925 A.2d 1265 (Del. 2007) ..................................... 35, 36, 37, 38

*Gentile v. Rossette,*
    906 A.2d 91 (Del. 2006) ......................................... 35, 36, 37, 38

*Gerber v. Enter. Prod. Holdings, LLC,*
    67 A.3d 400 (Del. 2013) ............................................................. 19, 31

*Gibralter Fin. Corp. v. Fed. Home Loan Bank Bd.,*
    1990 WL 394298 (C.D. Cal. June 15, 1990) ..................................... 40

*Glass v. Glass,*
    321 S.E.2d 69 (Va. 1984) .................................................................. 41

*Glinert v. Wickes Companies,*
    1990 WL 34703 (Del. Ch. 1990) ....................................................... 23

*Hartsel v. Vanguard Group, Inc.,*
    2011 WL 2421003 (Del. Ch. June 15, 2011) ..................................... 38

*Historic Green Springs, Inc. v. Brandy Farm, Ltd.,*
    32 Va. Cir. 98 (1993) .................................................................. 23, 28

*In re Activision Blizzard, Inc. Stockholder Litig.,*
    124 A.3d 1025 (Del. Ch. 2015) ......................................................... 33

*In re Ionosphere Clubs, Inc.,*
    17 F.3d 600 (2d Cir. 1994) .......................................................... 36, 38

iv

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
　906 A.2d 766 (Del. 2006) ........................................................................ 38

*In re Rural Metro Corp. Stockholders Litig.*,
　88 A.3d 54 (Del. Ch. 2014) ...................................................................... 40

*In re Staples, Inc. Shareholders Litig.*,
　792 A.2d 934 (Del. Ch. 2001) ................................................................... 41

*In re Sunstates Corp. S'holder Litig., C.A.*,
　2001 WL 432447 (Del. Ch. Apr. 18, 2001) ................................................. 33

*Kaplan v. Block*,
　183 Va. 327 (1944) ................................................................................ 32

*Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*,
　977 A.2d 867 (Del. 2009) ........................................................................ 38

*Middleburg Training Ctr., Inc. v. Firestone*,
　477 F. Supp. 2d 719 (E.D. Va. 2007) ........................................................ 32

*Milstead v. Bradshaw*,
　1997 WL 33616661 (Va. Cir. Ct. Oct. 3, 1997) ........................................... 39

*Nemec v. Shrader*,
　991 A.2d 1120 (Del. 2010) ................................................................ 28, 31

*O'Connell v. Bean*,
　556 S.E.2d 741 (Va. 2002) ...................................................................... 40

*Pagliara v. Fed. Home Loan Mortg. Corp.*,
　203 F. Supp. 3d 678 (E.D. Va. 2016) ........................................................ 39

*Parker v. Moitzfield*,
　733 F. Supp. 1023 (E.D. Va. 1990) ........................................................... 15

*\*Perry Capital LLC v. Lew* (*"Perry I"*),
　70 F. Supp. 3d 208 (D.D.C. 2014) ............................................................ 12

*\*Perry Capital LLC v. Mnuchin* (*"Perry II"*),
　864 F.3d 591 (D.C. Cir. 2017) ................................................................. 12

*Property Associates 14 Inc. v. CHR Holding Corp.*,
　2008 WL 963048 (Del. Ch. Apr. 10, 2008) ................................................. 23

*Protas v. Cavanagh*
　2012 WL 1580969 (De. Ch. May 4, 2012) .................................................. 38

v

*Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.,*
      1998 WL 778359 (Del. Ch. Oct. 21, 1998) ........................................................ 23, 28

*QVT Fund LP v. Eurohypo Capital Funding LLC I,*
      2011 WL 2672092 (Del. Ch. Jul. 8, 2011)................................................................... 22

*Remora Investments, LLC v. Orr*,
      673 S.E.2d 845 (Va. 2009).............................................................................. 38, 39

*San Antonio Fire & Police Pension Fund v. Bradbury,*
      2010 WL 4273171 (Del. Ch. Oct. 28, 2010) ............................................................ 37

*Schultz v. Ginsburg,*
       965 A.2d 661 (Del. 2009) ...................................................................................... 33

*Stone v. Ritter,*
      911 A.2d 362 (Del. 2006) ......................................................................................... 41

*Suess v. FDIC,*
      770 F. Supp. 2d 32 (D.D.C. 2011) ......................................................................... 40

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.,*
      845 A.2d 1031 (Del. 2004) ...................................................................... 35, 36, 38, 39

*U.S. Inspect Inc. v. McGreevy,*
      2000 WL 33232337 (Va. Cir. Ct. Nov. 27, 2000) .......................................................... 39

*Unocal Corp. v. Mesa Petroleum Co*.,
      493 A.2d 946 (Del. 1985) ......................................................................................... 41

*Virginia Vermiculite Ltd. v. W.R. Grace & Co.-Ct.,*
      156 F.3d 535 (4th Cir. 1998) ................................................................................... 23

*W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC,*
      2009 WL 458779 (Del. Ch. Feb. 23, 2009) ...................................................................... 19

*Wyeth v. Levine,*
      555 U.S. 555 (2009)................................................................................................ 40

**Statutes**

12 U.S.C. § 1455............................................................................................................. 32

12 U.S.C. § 1719............................................................................................................. 32

12 U.S.C. § 1821(c) ......................................................................................................... 24

12 U.S.C. § 4617(b)(2) ................................................................................................. *passim*

Del. Code Ann. tit. 6, § 8-302 ............................................................................................ 33

Va. Code § 13.1-638 ........................................................................................................... 44

Va. Code Ann. § 8.8A-302 ............................................................................................. 33, 34

**Regulations**

12 C.F.R. § 1710.10(b)(1), ................................................................................................. 43

**Other Authorities**

FARNSWORTH ON CONTRACTS,
    (3d. ed.) at § 8.20 ...................................................................................................... 16

WILLISTON ON CONTRACTS
    (4th ed. 2002) at § 63.62 ......................................................................................... 16

RESTATEMENT (SECOND) OF CONTRACTS
    § 250 (1981) .............................................................................................................. **21**

## GLOSSARY

| | |
|---|---|
| Companies | Fannie Mae and Freddie Mac |
| DGCL | Delaware General Corporate Law |
| Dkt. | District Court docket in No. 13-mc-1288 |
| Enterprises | Fannie Mae and Freddie Mac |
| Fannie Mae | Federal National Mortgage Association |
| FDIC | Federal Deposit Insurance Corporation |
| FIRREA | Financial Institutions Reform, Recovery, and Enforcement Act of 1989 |
| Freddie Mac | Federal Home Loan Mortgage Corporation |
| FHFA | Federal Housing Finance Agency |
| GSEs | Government Sponsored Entities – i.e., Fannie Mae and Freddie Mac |
| HERA | Housing and Economic Recovery Act of 2008 |
| OFHEO | Office of Federal Housing Enterprise Oversight |
| PSPAs | Preferred Stock Purchase Agreements between FHFA and the Department of Treasury |
| SAC | Second Amended Consolidated Class Action and Derivative Complaint, Dkt. 71 |
| Third Amendment | Third amendment to the Preferred Stock Purchase Agreements, containing the Net Worth Sweep |
| Treasury | United States Department of the Treasury |
| VSCA | Virginia Stock Corporation Act |

## INTRODUCTION

On September 6, 2008, the FHFA placed Fannie Mae and Freddie Mac into conservatorship.  Acting as conservator, the FHFA then agreed to a Senior Preferred Stock Purchase Agreement ("PSPA") between each Company and the Treasury.  Under each PSPA, the Company issued Senior Preferred Stock to the Treasury in exchange for the Treasury's commitment to provide funding up to a specified cap.  The principal value of the preferred stock in each Company was equal to $1 billion (in exchange for the commitment) plus any dollars actually invested into the Company.  And the PSPA generally gave Treasury (a) a dividend equal to 10% per year (if paid in cash), paid out quarterly with senior priority before any dividend could be paid to any other preferred shareholders or common shareholders, (b) the right to buy 79.9% of the common stock in each Company for a nominal price, and (c) a liquidation preference equal to the full principal value of the Senior Preferred Stock plus any unpaid dividends.

Plaintiffs do not challenge the foregoing arrangement made in September 2008.  While Plaintiffs do not concede that all the measures taken in September 2008 were justified or necessary, they are not here to challenge the placement of Fannie and Freddie into conservatorship at the height of the financial crisis, or the original deal struck by Treasury and FHFA at that time.  Moreover, Plaintiffs certainly recognize the extraordinary circumstances surrounding the financial crisis of September 2008.

But four years later, something very different happened.  Just as the housing market was recovering and the Companies were returning to robust profitability, the Treasury and FHFA (purportedly acting as conservator) agreed to an "amendment" to the PSPAs under which the 10% preferred stock dividend was converted into a "Net Worth Sweep" that required the Companies to pay the full amount of their net worth to Treasury every quarter, minus a small

reserve that was set to shrink to zero by 2018.  Under this "Net Worth Sweep" (formally called the "Third Amendment" to the PSPAs), it became impossible for any private shareholders ever to receive any dividend or liquidation distribution from the Companies.  Even if the Companies generate trillions of dollars in profits and positive net worth, it all goes to the Treasury, and nothing can ever be distributed to private shareholders—not as a dividend, and not even if the Companies are liquidated.  Defendants have never disputed this central fact, and they cannot. Moreover, it is alleged in our complaint, ¶¶ 12, 14, 59, 85,[1] and therefore must be taken as true at this stage.

Some might think that private shareholders had no right to receive anything even before the Third Amendment was agreed to on August 17, 2012—or that they did not "deserve" to receive anything given that they were owners in distressed entities that Treasury "bailed out" through its funding commitments.  But that is neither legally correct nor fair.

There can be no question that the private shareholders in Fannie and Freddie had a legal right to receive dividends and liquidation proceeds, subject to certain conditions and contingencies.  For the preferred shareholders, they had a contractual right to receive dividends before any common shareholders could receive a dividend.  Thus, for example, if Treasury had exercised its warrant to acquire 79.9% of the common stock in each Company (which was obviously contemplated when the PSPAs were executed in September 2008), then Treasury would obviously have an interest in receiving dividends on that common stock.  But before it could receive those common stock dividends, the private shareholders would have been entitled to receive their preferred stock dividends, at the rates set forth in their preferred stock

---

[1]  Except where otherwise indicated, all citations to ¶¶ are to Plaintiffs' Second Amended Consolidated Class Action And Derivative Complaint, Dkt. 71.

certificates.  Likewise, the private common shareholders would have been entitled to receive dividends on a pro rata basis with Treasury's receipt of dividends on the 79.9% of common stock it owned.

As for liquidation proceeds, the stock certificates of the preferred shareholders make clear that they must receive any such distributions that may be available before the common shareholders.  Dkt. 66-3 at ¶ 4(a); Dkt. 66-4 at ¶ 7(a).  And the receivership provisions of HERA enacted in 2008 provide that shareholders are entitled to receive distributions of any value created in a liquidation after the payment of creditors given higher priority.   12 U.S.C. § 4617(c)(1).

This is how things stood, legally, as of August 16, 2012, the day before the Net Worth Sweep.  Private shareholders had legal rights to dividends and liquidation proceeds, and those rights had economic value.  Once the Net Worth Sweep was put in place, however, those legal rights were obliterated.  Their economic value was therefore also wiped out.  The only value the preferred and common stock has had since the Net Worth Sweep is a value that depends on the litigation challenging the Net Worth Sweep—or seeking to recover the damages caused by the Net Worth Sweep. Again, Defendants do not and cannot dispute this.

In terms of basic fairness—which, of course, is relevant to both the implied covenant and fiduciary duty claims—we ask the Court to consider the following.  First, the legal rights described above reflect the residual rights held by real people who made real investments into Fannie and Freddie.  For years, Fannie and Freddie were able to fulfill their public mission because of investments made by private citizens—often very ordinary citizens who invested their life savings, or small institutions who were told by their regulators to invest in these entities. ¶¶ 4, 18-20, 35-36.   These private investments were made not only in good times but also when the

Companies faced financial distress in 2007.  ¶ 35.  Some of those private investors later sold their stock, but others did not.  Either way, the stockholders today own the residual rights of those initial private investors—whether they be individuals and families who invested their life savings or hedge funds who paid prior investors in reliance on the legal rights they held.  There is therefore nothing "fair" about nullifying these private shareholder rights.

Second, at the time the Companies were placed into conservatorship and the original PSPAs were executed, FHFA announced that "the common and all preferred stocks will continue to remain outstanding." ¶ 42.  The Treasury Secretary likewise stated that "conservatorship does not eliminate the outstanding preferred stock." *Id.*  And Freddie Mac assured investors they "will retain all their rights in the financial worth of those instruments, as such worth is determined by the market." *Id.*  There is nothing fair about FHFA and Treasury disregarding these statements by agreeing to the Net Worth Sweep that—unlike the original PSPAs—*guaranteed* that private shareholders could never receive anything no matter how profitable Fannie and Freddie might become, and thereby *nullified* the residual legal rights of private shareholders.

Third, quite foreseeably, the Net Worth Sweep has resulted in windfall profits for the Treasury.  We are not here to dispute that Treasury, and taxpayers generally, deserve to receive an extraordinary profit from the investments Treasury made.  But that extraordinary profit was reflected in the terms of the original PSPAs.  The Net Worth Sweep goes way beyond that, and transfers billions of dollars in value from the private investors to the Treasury.  Specifically, the Net Worth Sweep has resulted in "dividends" being paid to Treasury that are $130 billion *more* than Treasury would have received under the already generous 10% dividend set forth in the PSPAs.  ¶ 13, 69.  As of the date of the Complaint, Treasury has now received total dividends of over $278 billion, compared to a total investment of $187.4 billion.  Thus, Treasury has already

gotten its money back plus a 50% return.  And it still receives net worth sweeps every quarter, in perpetuity.

Fourth, Treasury could have captured most of the $130 billion in windfall profit referenced above by exercising its common stock warrants and authorizing dividends on common stock.  But that would have required distributions to private preferred stockholders (who have to be paid dividends before a common shareholder can be paid), and pro rata distributions to private common stockholders.  Treasury still would have gotten almost all of it.  But Treasury wanted *absolutely all* of it, and did not want private shareholders to receive *anything*, no matter how profitable the Companies might become.  ¶¶ 51-71.  That is what motivated the Net Worth Sweep. *Id.*  There is nothing fair about that.

We respectfully ask the Court to recognize the basic fairness underlying Plaintiffs' claims not because the law is against us, but because the law is overwhelmingly *with* us.  The only thing that could be against us is an instinct to favor the Government based on the perception that it stepped into the breach during a crisis.  But even if that perception were fully accurate, it is not the whole story, and it cannot justify what happened in August 2012.

## **STATEMENT OF FACTS**

### A. Before 2008, The Companies Were Financed By Private Investment Through The Issuance Of Securities That Constitute Binding Contracts Governed By State Law.

Congress created Fannie Mae and Freddie Mac, but it also provided for them to be private, shareholder-owned, for-profit corporations.  ¶¶ 3-4, 34. Fannie Mae's bylaws provide that it will follow "the applicable corporate governance practices and procedures of the Delaware General Corporation Law," and Freddie Mac's say it will follow "the corporate governance practices and procedures of the law of the Commonwealth of Virginia." *See* ¶ 76.

Since their inception, both Fannie and Freddie were capitalized by private investors. ¶¶ 5, 34-37.  Fannie Mae issued Common Stock at various dates, but none later than May 2008, and numerous series of Preferred Stock between 1998 and May 2008.[2]  Freddie Mac issued Common Stock at various dates, none later than November 1998, and numerous series of Preferred Stock between 1996 and 2007.[3]

The Preferred Stock issued by both Companies, and the Common Stock issued by Freddie Mac are governed by Certificates of Designation that constitute binding contracts between the Company and the shareholder. *See* ¶¶ 77-79; *accord* Dkt. 66 at 7; *see also* Dkt. 66-3 (Fannie Mae Preferred Stock Certificate); Dkt. 66-4 (Freddie Mac Preferred Stock Certificate); Dkt. 66-5 (Freddie Mac Common Stock Certificate).  These contracts give preferred stockholders the right to receive dividends and liquidation distributions before common stockholders, and give common stockholders the right to receive dividends and liquidation distributions on a pro rata basis with other common stockholders. *See* Dkt. 66-3 at ¶¶ 2, 4; Dkt. 66-4 at ¶¶ 2, 7; Dkt. 66-5 at ¶¶ 2, 8; *see also Perry Capital LLC v. Mnuchin* (*Perry II*), 864 F.3d 591, 629 (D.C. Cir. 2017).

**B.  In July 2008, Congress Enacted HERA.**

In July 2008, in response to a crisis in the housing and mortgage markets, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). ¶ 38.  The legislation granted Treasury temporary authority to purchase securities in the Companies (expiring in 2009). *Id.*; *Perry II*, 864 F.3d at 600.  It also created the FHFA, giving it the power, under certain

---

[2] 1998 (Series D), 1999 (Series E), 2000 (Series F & G), 2001 (Series H), 2002 (Series I), 2003 (Series L, M & N), 2004 (Series 0, 2004-1), 2007 (Series P, Q, R & S), and 2008 (Series 2008-1 & T). *See* ¶ 72.

[3] 1996 (Series B), 1997, 1998 (Series F, G, H, and unlisted), 1999 (Series K, L and unlisted), 2001 (Series M, N, O, P, Q & R), 2002 (not listed), 2006 (Series S, T & U), and 2007 (Series V, W, X, Y & Z). *See* ¶ 73.

enumerated circumstances, to place the Companies into conservatorship or receivership.  ¶¶ 6, 7, 38.

### C. In September 2008, FHFA Placed The Companies Into Conservatorship And Executed A Preferred Stock Purchase Agreement ("PSPA") With Treasury.

On September 6, 2008, FHFA placed the Companies into "temporary" conservatorship. ¶¶ 40, 41.  Under HERA, FHFA had a period of 18 months after the conservatorship began to repudiate any contracts of Fannie or Freddie.  During that period, FHFA never purported to repudiate any of the shareholder contracts held by the plaintiff class.  ¶ 43. To the contrary, in announcing the conservatorship, FHFA's director told the public that "the common and all preferred stocks will continue to remain outstanding." ¶ 42.  The Treasury Secretary likewise stated that "conservatorship does not eliminate the outstanding preferred stock." *Id.*  And Freddie Mac assured investors they "will retain all their rights in the financial worth of those instruments, as such worth is determined by the market." *Id.*

On the same day the Companies were placed in conservatorship, FHFA and Treasury entered into materially identical Senior Preferred Stock Purchase Agreements with respect to both Companies (the "PSPAs"). ¶ 45; Ex. A; Ex. B.  Through these agreements, Treasury made a commitment to provide funding to the Companies up to a specified cap, and in exchange received (a) Senior Preferred Stock with a principal value of $1 billion plus any amount invested by Treasury, plus (b) warrants to acquire common stock equal to 79.9% of the common stock in the Companies for a nominal price. ¶ 45; Dkt. 66-6 at 7 ¶ 3.1; *id.* at 21 ¶ 3.1.  Treasury was given the right to receive a senior preferred dividend each quarter in an amount equal (on an annual basis) to 10% of the outstanding principal value of the Senior Preferred Stock if the dividend was paid in cash. ¶ 45; Ex. A at ¶ 2; Ex. B at ¶ 2.  If a Company elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Senior Preferred Stock with a

face value equal to 12% of the outstanding principal value of the Senior Preferred Stock. ¶ 45; Ex. A at ¶ 2(c); Ex. B at ¶ 2(c).  The Senior Preferred Stock ranked senior in priority to all other Fannie and Freddie shares, so no dividends or liquidation distributions could be paid to any other owner of stock until after Treasury had received its dividends or liquidation distributions under its Senior Preferred Stock. ¶ 45.

The PSPA also refers to the possibility of Treasury receiving a "periodic commitment fee," to be agreed upon by the Companies and Treasury for five-year periods. *Id.*; Dkt. 66-6 at 7 ¶ 3.2; *id.* at 21 ¶ 3.2.  But this fee may be waived each year.  Unless one considers the $1 billion in initial value assigned to its Senior Preferred Stock in each Company, Treasury has never asked for or received any periodic commitment fee.  Dkt. 66 at 11.

After the Companies were placed in conservatorship, FHFA directed the Companies to book substantial loss reserves—recording anticipated mortgage loan losses before they were actually incurred—and required the Companies to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the Companies became profitable (*i.e.*, generated positive taxable income). ¶ 47.  These write-downs forced the Companies to take further draws on Treasury's funding commitment just to pay the required quarterly dividend to Treasury. ¶ 48.  This in turn increased the value of the Preferred Stock held by Treasury. *Id.*

**D.  At The Beginning Of 2012, The Housing Market Rebounded And The Companies Returned To Profitability.**

By the beginning of 2012, it was clear that FHFA had vastly overestimated the Companies' likely losses, and vastly underestimated their prospects of a return to profitability. ¶ 51.  The Companies posted profits of more than $10 billion in the first two quarters of 2012 and projected consistent profitability into the future. *Id.*  Among other benefits, these projections

would mean that the Companies would be able to reverse the valuation allowance against their deferred tax assets, worth approximately $100 billion. ¶¶ 51, 55.

By the middle of 2012, the Companies, FHFA, and Treasury understood that the Companies were on course to achieve sustained profitability. ¶¶ 51-56.  A December 2011 Treasury memorandum stated that both Companies were "expected to be net income positive (before dividends) on a stable, ongoing basis after 2012 . . . ." ¶ 52.  A November 2011 report to Treasury stated that Freddie Mac was "not projected to draw on the liquidity commitment to make its dividend payments because of increased earnings driven by significantly reduced credit losses in 2012 and 2014." *Id.*  Other documents state that, by mid-2012, Treasury knew that the Companies "will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future" and that their earnings would be "in excess of current 10% dividend paid to Treasury." ¶ 53.  Fannie Mae's CFO told those responsible for the Net Worth Sweep that Fannie would soon recognize tens of billions of dollars in profits due to the reversal of prior accounting decisions made while Fannie was under FHFA's control. ¶ 54.  Documents circulated among FHFA officials at the same time projected that the next eight years would be the "golden years of GSE earnings." *Id.*  Those same documents also included a July 2012 report by Fannie Mae's Treasurer projecting a "base scenario" in which the cumulative dividends paid by both Companies to the Treasury would exceed Treasury's total investment by no later than 2020.  *Id.*  Thus, as of the middle of 2012, FHFA, Treasury, and the Companies all knew that the Companies would be able to pay back the Government for the support they had received, with money left over to provide a financial return to their other stockholders.

With the Companies' return to profitability, and based on the public statements cited above, the stockholders reasonably expected the Companies would soon become healthy enough

to exit conservatorship and "return to normal business operations," as FHFA's director had vowed (¶¶ 57, 67); that the Companies would use their profits to redeem the Senior Preferred Stock or accumulate capital for the benefit of the Companies and their private shareholders (¶ 58); and that the economic value of their shares, and the rights they had as stockholders, would likely be increasing—and certainly would not be nullified (¶ 57).

### E. In August 2012, FHFA And The Treasury Amended The PSPAs To Give Treasury A Quarterly Dividend Equal To 100% Of The Companies' Entire Net Worth (Minus A Small Reserve That Would Shrink To Zero).

Contrary to any reasonable expectation, Defendants reacted to the prospect of "sustainable profits" and "golden years" by dramatically changing the deal they agreed upon in September 2008 to ensure that Treasury would be the sole recipient of any future profits earned by the Companies. On August 17, 2012, FHFA and Treasury implemented the "Third Amendment" to the PSPAs, replacing the 10% dividend due under the 2008 PSPAs with a dividend of ***100% of all current and future profits*** (minus a small reserve). ¶ 58; Dkt. 66-6 at 52-67.[4] Treasury provided no new investment in exchange for this enormous benefit, and no meaningful consideration of any kind. *See Perry Capital LLC v. Lew* ("*Perry I*"), 70 F. Supp. 3d 208, 224 (D.D.C. 2014).

As Treasury stated on the day of the announcement, this action was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers"—*i.e.*, nothing would ever go to the private stockholders. ¶ 59. This so-called "Net

---

[4] Under the original terms of the Third Amendment, the capital reserve was set to shrink to zero in 2018. ¶ 58. In December 2017, after Plaintiffs filed the SAC, FHFA and Treasury executed a Fourth Amendment to the PSPAs that prolongs the existence of a $3 billion capital reserve, so that the quarterly dividend is equal to the "Net Worth Amount" minus that $3 billion reserve. *See* Ex. C. But Defendants and the Treasury also expressly agreed that the "the Liquidation Preference shall be increased by $3,000,000,000.00." *Id.*

Worth Sweep" completely nullified the private shareholders' contractual rights to dividends and liquidation distributions. ¶¶ 12, 59, 81, 85, 93. Going forward, no dividends could be paid to the private shareholders because any profits earned by the Companies must be paid to Treasury or retained by the Companies' as part of its small capital buffer. ¶¶ 12, 14, 85. And because the PSPAs provided that in the event of a liquidation of the Companies the Government would receive a liquidation distribution that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that, in a liquidation, Treasury would receive the full amount of the Companies' net worth with nothing left over for private stockholders. ¶¶ 12-14, 58, 79, 81, 85.

The Third Amendment not only had the effect of eliminating the shareholders' contractual rights, it was conceived and implemented precisely for that purpose. ¶¶ 51-71. Unbeknownst to the private investors, Defendants and Treasury had been conspiring for years to ensure that private stockholders would not receive any value from their investments. A December 2010 memorandum from Under Secretary for Domestic Finance Jeffrey A. Goldstein to Treasury Secretary Geithner referred to "the Administration's commitment to ensure existing common equity holders will not have access to any positive earnings form the GSEs in the future." ¶ 63. Other documents say this "goal" was shared by FHFA and Treasury. ¶ 64.

**<u>PROCEDURAL HISTORY</u>**

Several plaintiffs filed class action complaints in this Court seeking to recover for the harm caused by the Third Amendment.[5] In 2013, Plaintiffs filed a consolidated complaint seeking damages for breach of contract, breach of the implied covenant, and breach of fiduciary

---

[5] Certain Plaintiffs also filed a Takings claim in the Court of Federal Claims based on the Third Amendment. *See Cacciapalle v. United States*, No. 13-cv-466 (Fed. Cl. filed July 10, 2013).

duties. Dkt. 4.[6]   In separate complaints, Perry Capital and Fairholme sought to invalidate the

Third Amendment under the APA. *See Perry Capital LLC v. Lew,* No. 13-cv-1025 (D.D.C.);

*Fairholme Funds, Inc. v. FHFA,* No. 13-cv-1053 (D.D.C.).

This Court granted defendants' motion to dismiss all claims. *Perry I,* 70 F. Supp. 3d 208.

On appeal, the D.C. Circuit affirmed in part and reversed in part. *Perry II,* 864 F.3d 591.   The

court affirmed the dismissal of the APA claims, the derivative claims, and the breach of contract

claims based on dividend rights.   The D.C. Circuit reversed the dismissal of the breach of

contract and breach of implied covenant claims based on liquidation rights, holding these claims

were both constitutionally and prudentially ripe because plaintiffs had asserted a "certainly

impending injury" that "immediately harmed them by diminishing the value of their shares." *Id.*

at 631-33.     The court also reversed this Court's dismissal of the breach of implied covenant

claims relating to dividend rights, holding that (a) HERA did not "preempt state law imposing an

implied covenant," and that (b) although plaintiffs' contractual right to dividends was subject to

discretion, the implied covenant required defendants to exercise that discretion "reasonably" and

"in good faith." *Id.* at 631 (citations omitted).   The D.C. Circuit remanded this claim for this

Court to "evaluate it under the correct legal standard, namely, whether the Third Amendment

violated the reasonable expectations of the parties."  *Id.*

On remand, Class Plaintiffs filed a Second Amended Consolidated Class Action and

Derivative Complaint ("SAC"). Dkt. 71.   The SAC includes thirteen named plaintiffs

representing all persons holding shares of Fannie Preferred, Fannie Common, Freddie Preferred,

or Freddie Common on August 17, 2012 (or their successors in interest).  ¶¶ 18-27, 31-33, 98-

---

[6]  The original complaint included other claims that the D.C. Circuit held were barred in a
decision that is currently subject to petitions to the Supreme Court.  *See* Nos. 17-578, 17-580, 17-
591 (U.S.). If the Supreme Court reverse the D.C. Circuit, Plaintiffs will reinstate these claims.

101.  It includes direct claims seeking damages for breach of contract, breach of the implied

covenant, breach of fiduciary duty, and violation of state law governing dividends. ¶¶ 124-192.[7]

## LEGAL STANDARD

In deciding this motion, the Court must "treat the complaint's factual allegations as true"

and give the plaintiff the benefit of all reasonable inferences. *Abdelfattah v. DHS*, 787 F.3d 524,

529 (D.C. Cir. 2015).

## ARGUMENT

**I.    PLAINTIFFS HAVE STATED VALID CLAIMS FOR BREACH OF THEIR
CONTRACTUAL RIGHTS TO LIQUIDATION DISTRIBUTIONS.**

### A.  The Court Should Reject Defendants' Effort To Relitigate The Ripeness
Argument That The D.C. Circuit Squarely Rejected.

The D.C. Circuit reversed this Court's holding that Plaintiffs' claim for breach of their

liquidation rights was unripe.  The D.C. Circuit held that these claims are "better understood" as

claims for "anticipatory breach," which "is a doctrine of accelerated ripeness."  *Perry II,* 864

F.3d at 632-33 (quotations and citations omitted).   While refraining from prejudging the merits,

the Court made crystal clear that it was "**holding that the claims are ripe**."[8] *Id.* at 633

(emphasis added).  The issue of ripeness has therefore been decided, and this Court is bound by

the D.C. Circuit's "holding that the claims are ripe."

Yet Defendants now ask this Court to once again dismiss Plaintiffs' liquidation claims as

unripe.  They try to hide this, but a careful review of the legal principle they invoke reveals that

they are simply re-arguing ripeness.  They say that the doctrine of "anticipatory breach" does not

---

[7]  The SAC also included derivative fiduciary breach claims that are barred under the D.C.
Circuit's decision, which are included in case that decision is reversed or otherwise abrogated.

[8]  Contrary to Defendants' suggestion, the D.C. Circuit held that these claims were both
constitutionally ***and*** prudentially ripe. *Compare* Dkt. 66 at 14, *with Perry II,* 864 F.3d at 632-33.

apply when the *plaintiff* has fully performed its contractual performance, and it is merely the *defendant* who has failed to perform, and who has announced its intention not to perform. Dkt. 66 at 15-16. As superficially presented by Defendants, this would be a nonsensical rule that would permanently let breaching parties off the hook. But that is obviously not the law. Instead, the legal principle invoked by Defendants is nothing more than a ripeness rule. For example, Defendants quote a snippet from § 63.62 of the treatise WILLISTON ON CONTRACTS, saying that "the doctrine of anticipatory breach has no application to suits to enforce contracts for future payment of money only." Dkt. 66 at 16 (quoting WILLISTON ON CONTRACTS (4th ed. 2002) at § 63.62). Defendants fail to tell the Court what the Williston treatise says at the beginning of that section, which provides the full context and contours of the principle they invoke:

> The general rule is that a unilateral promise for an executed agreed exchange to pay money at a future date may not be enforced **until that day arrives**…. In this regard, **an injured party remains protected as to the future amounts due, as a court may validate or specifically enforce future installment obligations**.

WILLISTON ON CONTRACTS, § 63:62. Likewise, another leading treatise explains that when the doctrine of anticipatory breach does not apply based on the exception invoked by Defendants, "**The injured party must then await the time of performance to sue for damages**." FARNSWORTH ON CONTRACTS, (3d. ed.) at § 8.20 (emphasis added). Thus, the exception to the anticipatory breach doctrine invoked by Defendants governs <u>whether</u> a claim may be brought now or must await future non-performance, not whether it may be brought at all. In other words, the principle of law Defendants invoke is ripeness.

The cases cited by Defendants confirm that Defendants are relying on a ripeness principle. Dkt. 66 at 16 (relying on *Cumana Invs. S.A. v. Fluor Corp.*, 593 F. Supp. 310, 314 (D. Del. 1984) ("**Without a ripened duty**, there could be no breach…if the plaintiff has a valid

claim at all, it is yet only in embryo and **the plaintiff must wait to bring suit**."); *Parker v. Moitzfield*, 733 F. Supp. 1023, 1025-26 (E.D. Va. 1990) ("**the action had been prematurely brought**" and "**it is premature to sue now** for the total amount that may become due under the indemnity agreement")).

By invoking the exception to the anticipatory breach doctrine that holds certain claims to be too "premature" to be brought under that doctrine, Defendants are asking this Court to dismiss Plaintiffs' liquidation claims as unripe. This Court is not free to issue any such ruling. The D.C. Circuit has already squarely held that Plaintiffs' claims are ripe.

Moreover, the D.C. Circuit was clearly correct in holding that the doctrine of anticipatory breach applies here. Plaintiffs' right to receive their pro rata share of any future liquidation is not a contract for a fixed payment of money on a fixed date, as is usually the case where the exception invoked by Defendants is applied. *See* Dkt. 66 at 16 (stating that the rule applies where "all that remains for the opposite party to do is pay *a certain sum of money* at *a certain time or times* in the future") (quoting *Parker*, 733 F. Supp. at 1026). Instead, Plaintiffs had a contractual right to participate in any future liquidation, and Defendants have now *permanently nullified* that right. That immediately reduced the value of Plaintiffs' stock, and permanently eliminated one of Plaintiffs' contractual rights. That is not analogous at all to any of Defendants' cases.[9]

---

[9]   Similarly, Plaintiffs' contractual stock certificates are neither "unilateral contracts" nor "contracts the complaining party has fully performed." Dkt. 66 at 16. Plaintiffs' entitlement to receive liquidation payment is contractually conditioned on Plaintiffs continuously maintaining their status as "holders" of the shares. Dkt. 66-3 ¶ 4; Dkt. 66-4 ¶ 7; Dkt. 66-5 ¶ 8. Thus, Plaintiffs' performance was not fully complete at any point during the class period and will not be complete unless and until they hold the stock at the time of liquidation. None of the cases cited by FHFA involve liquidation distributions or bilateral stock purchase agreements.

In short, the D.C. Circuit's decision squarely forecloses Defendants' ripeness argument. Even if that were not true, Defendants' argument is misplaced because the exception to the anticipatory repudiation doctrine invoked by Defendants does not apply.

### B. The Court Should Reject Defendants' Argument That The Net Worth Sweep Left Intact Plaintiffs' Contractual Right To A Liquidation Distribution.

Defendants also argue that Plaintiffs have failed to state a claim because, they claim, the Net Worth Sweep "did not eliminate Plaintiffs' contractual right to be paid in liquidation before certain other shareholders are paid. Even after the Third Amendment, Plaintiffs still have their place in the liquidation waterfall, as their stock certificates provide." Dkt. 66 at 17-18.

This is completely untrue.   The D.C. Circuit correctly recognized that "The Third Amendment makes it *impossible* for the class plaintiffs to receive . . . a liquidation preference." *Perry II,* 864 F.3d at 629 (emphasis added); *see also* ¶¶ 12, 14, 81, 84.

Defendants have presented no basis to genuinely dispute the accuracy of that indisputable fact, let alone to override it as an allegation at the motion to dismiss stage.  The brutal fact is inescapable:  the Third Amendment makes it *impossible* for the class plaintiffs to receive a liquidation distribution—no matter how large the surplus may be in any liquidation.  Even if the liquidation of Fannie and Freddie generated *hundreds of trillions of dollars* in surplus value—or any amount at all, to infinity and beyond—private shareholders still get *nothing*.  That is *guaranteed*.  It is preposterous for Defendants to blithely say "Plaintiffs still have their place in the liquidation waterfall, as their stock certificates provide."  Dkt. 66 at 17-18.  The "waterfall"

---

In any case, even if the Court concluded that Plaintiffs' claims should somehow be plead as breach of contract claims instead of anticipatory breach claims—given Plaintiffs' allegations that they have already suffered harm—such a formalistic distinction in the pleadings is not a basis for granting a motion to dismiss. *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) (the Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

may formalistically remain in place; but Defendants agreed to an insurmountable "dam wall" that funnels *everything* to Treasury, and makes it *impossible* for private shareholders to ever receive a penny in liquidation proceeds.

The mechanics are simple.  Under the PSPAs, the amount of Treasury's "Liquidation Preference" is increased by "an amount….equal to the dividend otherwise payable for the then-current Dividend Period…" prior to the liquidation.  Ex. A at ¶ 8(a); Ex. B. at ¶ 8(a).  Treasury's "Liquidation Preference" is also increased by any unpaid dividend.  Ex. A at ¶ 8(b)(iii); Ex. B at ¶ 8(b)(iii).  This made sense when the dividend was just a generous 10% annual dividend.  But the Third Amendment changed that by providing that the "Dividend Amount" owed to the Treasury for each quarter from January 1, 2013 onward is equal to 100% of the "**Net Worth Amount** at the end of the immediately preceding fiscal quarter," minus a small capital reserve that was set to disappear on January 1, 2018.  Ex. 66-6 at 55 ¶ 3.  Thus, the "Liquidation Preference" includes a "Dividend Amount" equal to Fannie and Freddie's "Net Worth Amount." That means 100% of Fannie and Freddie's net worth will always be owed to Treasury in liquidation no matter when the liquidation occurs—which in turn means it is *impossible* for Fannie or Freddie to *ever* pay out *any* liquidation distribution to private shareholders. Defendants dance around this fact, but they do not deny it—and they cannot.

Indeed, Defendants have recently confirmed their intention to make absolutely certain that it is impossible for private shareholders ever to receive a liquidation distribution.  In December 2017, Treasury and FHFA agreed to prolong the existence of a $3 billion capital reserve while the Companies were in operation, so that the quarterly dividend is equal to the "Net Worth Amount" minus that $3 billion reserve.  Ex. C.  But Defendants and Treasury made sure this capital reserve did not create any possible risk of any amount being available for

distribution to private shareholders in a liquidation by expressly agreeing that "the Liquidation Preference shall be increased by $3,000,000,000.00." *Id.*  Thus, even the capital reserve has to be paid out to Treasury.  No matter what happens—no matter how much money or positive net value Fannie and Freddie make—there is ***zero chance*** that private shareholders can ever receive anything in a liquidation.

Defendants say Plaintiffs have nothing to complain about because Fannie and Freddie always had the right "to issue more senior securities" that might adversely affect junior shareholders.  Dkt. 66 at 17-18.  But as this Court previously found, "Treasury did **not purchase new securities** under the Third Amendment." *Perry I,* 70 F. Supp. 3d at 224 (emphasis added); *Robinson v. FHFA,* 876 F.3d 220, 234 (6th Cir. 2017) ("The Third Amendment does not effectuate a new 'purchase' of the Companies' securities.").  And one of the main reasons this Court made that finding was that Treasury did not make any new investment into the Companies in exchange for the Third Amendment.  *Perry I,* 70 F. Supp. 3d at 224.  Defendants cannot avoid their nullification of Plaintiffs' contractual rights by saying their action was analogous to a transaction that would have been completely different.

Moreover, it would have been *illegal* for Defendants to issue more securities to Treasury in August 2012.[10]  And the Treasury vigorously resisted prior arguments by Fairholme and Perry Capital claiming that the Third Amendment was unlawful because it was substantively akin to the issuance of new securities.  Dkt. 19-1 at 4, 36; Dkt. 38 at 29-38.  Defendants cannot now claim that what they did in August 2012 is perfectly reasonable and consistent with Plaintiffs' contractual rights because they could have achieved the same result by doing something ***illegal***.

---

[10] *Perry II*, 864 F.3d at 600 ("A sunset provision terminated Treasury's authority to purchase such securities after December 31, 2009."); *Perry I,* 70 F. Supp. 3d at 216.

As the D.C. Circuit recognized, the doctrine of anticipatory breach "gives the plaintiff the option to have the law treat . . . [an] **act rendering performance impossible** as a breach itself." *Perry II,* 864 F.3d at 632-33 (quotations omitted) (emphasis added); *see also W. Willow-Bay Court, LLC v. Robino-Bay Court Plaza, LLC,* 2009 WL 458779, at *5 (Del. Ch. Feb. 23, 2009); *Citibank (S. Dakota), N.A. v. FDIC*, 857 F. Supp. 976, 982 n.5 (D.D.C. 1994) (Hogan, J.). Here, the Third Amendment makes it "impossible" for Defendants ever to pay out a liquidation distribution to Plaintiffs, and therefore constitutes an anticipatory breach of Plaintiffs' contractual rights to liquidation distributions. *See Perry II,* 864 F.3d at 632-33.

## II. PLAINTIFFS HAVE STATED VALID CLAIMS FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING.

Defendants ask the Court to dismiss Plaintiffs' claims for breach of the implied covenant of good faith and fair dealing "because Plaintiffs cannot plausibly allege that the Third Amendment violated their reasonable expectations as stockholders." Dkt. 66 at 20. Granting this motion would require the Court to make factual findings that contradict both Plaintiffs' allegations and the undisputed facts. Thus, the Court cannot resolve this question against Plaintiffs at the motion to dismiss stage. If anything, the only way to resolve this without more factual inquiry would be to grant summary judgment in Plaintiffs' favor.

This Court previously dismissed the implied covenant claims, and the D.C. Circuit reversed that dismissal, holding that the Plaintiffs' contractual rights implicitly prevented Defendants from doing anything inconsistent with the "reasonable expectations of the parties." *Perry II,* 864 F.3d at 629-32. As Defendants recognize, this Court must decide "**what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting**." Dkt. 66 at 21 (emphasis added) (quoting *Gerber v. Enter. Prod. Holdings, LLC*, 67 A.3d 400, 418 (Del. 2013)).

The "issue" here is the Net Worth Sweep set forth in the Third Amendment.  Thus, the inquiry on remand is "what the parties would have agreed to themselves had they considered" the Net Worth Sweep "in their original bargaining positions at the time of contracting."

Defendants argue that the Court should analyze this inquiry by assessing the expectations of shareholders after HERA was enacted and after the PSPAs and the first two amendments to the PSPAs were agreed upon.  Dkt. 66 at 26-30.  As shown in Section II(B), below, that is incorrect, since that does not reflect the reasonable expectations of shareholders "in their original bargaining positions at the time of contracting"—since all the shares were issued, and thus all shareholder contracts entered into, prior to HERA's enactment.  *See* ¶¶ 72-73.  Defendants try to evade this by saying the shareholder contracts incorporate all subsequent legislative amendments (federal and state) plus all agreements with other shareholders—an argument that, when taken to its logical conclusion, is unsupportable and circular. *See* Section II(B).

Nevertheless, as shown in Section II(A) below, the Court need not resolve that question at this stage because it actually does not matter whether the Court assesses shareholder expectations as they would have existed on the eve of the Third Amendment (as Defendants claim), or as they would have existed "at the time of contracting."  In either scenario, reasonable parties would never have expected or agreed that Fannie and Freddie (or their conservator FHFA) could transfer the entire net worth of the Companies to the Treasury, in perpetuity, in exchange for essentially nothing.  Further, reasonable parties would never have expected or agreed that Defendants could have done this with the intent to deprive Plaintiffs of their economic interest in the Companies (thereby acting in bad faith).

### A.  No Reasonable Shareholder Could Have Expected The Third Amendment.

1.  <u>Plaintiffs Could Not Have Reasonably Expected That Defendants Would Agree to Change A 10% Preferred Dividend Into A Full Sweep Of The Companies' Entire Net Worth Every Quarter, No Matter How Large The Net Worth May Become, In Exchange For No Investment Or Any Meaningful Consideration.</u>

The Third Amendment—which made it "impossible for the class plaintiffs to receive dividends or a liquidation preference" (*Perry II,* 864 F.3d at 629)—was not adopted as consideration for any investment in the Companies. *See Perry I,* 70 F. Supp. 3d at 224.  That investment was provided for in the PSPAs—which provided for the healthy profit of a 10% dividend *plus* the right to acquire 79.9% of the common stock in the Companies for essentially nothing (a nominal price on the order of $10,000).  ¶ 45; Ex. A; Ex. B.  It is one thing to assert that the parties would have agreed to that extraordinarily generous deal as a fair price for Treasury's 2008 funding commitment.  But that is not the issue, as Plaintiffs do not challenge that original deal.  Instead, Plaintiffs contest the later action of the Third Amendment in which Treasury took **everything**, and eliminated completely any possible chance for private shareholders ever to receive any residual value from the Companies in which they had invested. Under no circumstances would reasonable parties have expected or agreed that the Companies could give away all of Plaintiffs' residual rights to dividends and liquidation surplus in exchange for no investment and no meaningful consideration.

Defendants argue that the stock certificates preclude any such reasonable expectation because they expressly vest discretion in the Companies' board to issue more senior stock and to declare (or not declare) dividends. Dkt. 21-22.  But as this Court previously held, the Third Amendment was not the issuance of new stock.  *Perry I,* 70 F. Supp. 3d at 224 ("Treasury did *not* purchase new securities under the Third Amendment").  Indeed, it would have been *illegal* for Defendants to issue new securities to Treasury in 2012. *See supra* pp. 18-19.

More fundamentally, the parties would have a reasonable expectation that the issuance of new securities would be accompanied by some investment from the recipient of those securities back to the Companies.[11] No such investment, or any other meaningful consideration, was given here.[12] Thus, Defendants' power to issue new securities could not have given Plaintiffs a reason to expect that the Companies could give away their entire net worth, in perpetuity and no matter how large it might become, in exchange for essentially nothing.

Similarly, Plaintiffs' implied covenant claims cannot be barred merely because the rights to dividends generally depend on the exercise of Defendants' discretion. To the contrary, as the D.C. Circuit recognized, "A party to a contract providing for such discretion violates the implied covenant if it acts arbitrarily or unreasonably." *Perry II,* 864 F.3d at 631 (quotations omitted). More specifically, corporate actions that make it impossible for shareholders ever to receive dividends or liquidation distributions—no matter what, and without obtaining anything meaningful in return—violate "reasonable expectations" even where such dividend and liquidation distribution rights are otherwise contingent. *QVT Fund LP v. Eurohypo Capital*

---

[11] *See Perry I,* 70 F. Supp. 3d at 224 (Treasury did not purchase new securities under the Third Amendment because Treasury did not grant the Companies any "additional funding commitment"); *Robinson,* 876 F.3d at 234 (Treasury did not purchase new securities under the Third Amendment because "it did not commit any additional funds to the Companies"); Dkt. 38 at 29 (Treasury arguing that the Third Amendment was not a purchase of securities because "Treasury did not commit any additional funds to the GSEs under the Third Amendment").

[12] Although the Third Amendment "suspended" the Periodic Commitment Fee (Dkt. 66 at 24; *see also* Dkt. 66-6 at 56 ¶ 4(d); *id.* at 64 ¶ 4(d)), this was not meaningful consideration because Treasury had **always** waived that fee. Dkt. 66 at 11 ("The periodic commitment fee was not charged by Treasury during the first four years of the PSPAs and had not been assessed as of the time of the Third Amendment.").

*Funding LLC I*, 2011 WL 2672092, *14 (Del. Ch. Jul. 8, 2011)[13]; *Quadrangle Offshore (Cayman) LLC v. Kenetech Corp.*, 1998 WL 778359, *6 (Del. Ch. Oct. 21, 1998)[14]; *see also Va. Vermiculite Ltd. v. W.R. Grace & Co.-Ct.,* 156 F.3d 535, 537, 542 (4th Cir. 1998); *Historic Green Springs, Inc. v. Brandy Farm, Ltd.,* 32 Va. Cir. 98, *4 (1993).[15]

---

[13] This Court's prior treatment of *QVT Fund* must be revisited in light of the D.C. Circuit's holdings. *Compare Perry I,* 70 F. Supp. 3d at 238 n.43 (rejecting the prospect of any claim based on the "unmistakably discretionary dividends" in the present case), *with Perry II,* 864 F.3d at 629 (explaining that defendants would violate the implied covenant by exercising their contractual "discretion" regarding dividends in an arbitrary or unreasonably manner).

[14] In the Court's prior dismissal of these claims based on ripeness, the Court distinguished *Quadrangle* as concerning "de facto liquidation." *Perry I,* 70 F. Supp. 3d at 234 n.38. Now that the D.C. Circuit has reversed this Court on the issue of ripeness, it is clear that *Quandrangle* applies with full force to this case. *Perry II,* 864 F.3d at 632-33.

[15] None of Defendants' cases are to the contrary. *Amazon.com, Inc. v. Hoffman,* 2009 WL 2031789, (Del. Ch. June 30, 2009) rejected an implied covenant claim based on a sale of stock at $1.39 per share, where the contract "expressly and clearly" allowed for sales at any price higher than $1.36 per share. Defendants cannot point to any parallel provision that "expressly and clearly" allows them to completely eliminate Plaintiffs' contract rights in exchange for no meaningful consideration. *Chamison v. HealthTrust, Inc. Hosp. Co.*, 735 A.2d 912, 920-21 (Del. Ch. 1999) construed an indemnification provision covering fees incurred by counsel "selected by" the defendant as including an "implied" promise that defendant would not exercise its selection discretion to choose a counsel who would was "markedly inferior to an existing and known alternative." The same principle applies here: although the stock certificates gave Defendants' discretion regarding dividends and liquidation payments, there are implied limits on how defendants exercise that discretion, which they breached by adopting the Third Amendment, just as the defendant did in *Chamison* by abusing its selection discretion. And in *Corporate Property Associates 14 Inc. v. CHR Holding Corp.*, 2008 WL 963048 (Del. Ch. Apr. 10, 2008), the court rejected an implied covenant claim targeting an action not expressly prohibited by the contract because both parties involved were "sophisticated," and had "thought about and negotiated" the issue, and where the specific type of action would have been "well-known" to such "sophisticated parties." *Id.* at *5. By relying on this case, Defendants appear to be suggesting that all Plaintiffs are well-financed investors, unworthy of this Court's sympathy or time. In fact, the named plaintiffs in this action include a retired schoolteacher (¶ 20), an employee of a retirement community (¶ 22), a former Ohio State Representative (¶27), a U.S. Military Contractor (¶ 26), a former employee of Fannie Mae who purchased these securities for his daughter's college savings funds (¶ 18), and others. And the classes that these plaintiffs propose to represent include tens of thousands of other ordinary Americans, many of whom purchased shares in the Companies as a sound and secure investment for retirement. There is no

Defendants contend that the "highly regulated" nature of the Companies indicates that Plaintiffs should have reasonably expected that the Companies "could be put in a conservatorship or receivership that could leave stockholders with no dividends or distributions in liquidity." Dkt. 66 at 24-25.  But that misstates the issue.  Plaintiffs are not challenging the conservatorship, and FHFA has consistently denied that it has put the Companies into a receivership. ¶ 50.  The issue here is the Net Worth Sweep in the Third Amendment:  *i.e.*, could Plaintiffs have reasonably foreseen that, in exchange for no meaningful consideration, four years after the financial crisis, and after the Companies had returned to profitability, Defendants could agree to convert a 10% dividend to a "Net Worth Sweep" that pays Treasury all future profits no matter how large they may be.  No amount of regulation in an industry could make Plaintiffs reasonably expect that.[16]  Plaintiffs reasonably expected that their contract rights would have been protected under the State laws each Company expressly elected to govern its relationship with stockholders, pursuant to federal regulation. 67 Fed. Reg. 38,361, 38,364, 38,367 (2002); ¶ 76.

Defendants also contend that Plaintiffs' implied covenant claims are barred by the D.C. Circuit's holding that the Third Amendment was authorized by HERA. Dkt 66 at 29 (citing *Perry II,* 864 F.3d at 606-14).  But this cannot be squared with the D.C. Circuit's decision.

---

evidence that Plaintiffs knew or should have known to expect anything like the Third Amendment, which is not merely not "well-known," it is completely unprecedented. *Id.* at *5; *see also Glinert v. Wickes Cos.*, 1990 WL 34703 (Del. Ch. Mar. 27, 1990) (applying California law, not Delaware law).

[16]  Defendants' argument that the availability of conservatorship or receivership creates a reasonable expectation of the Third Amendment would have extremely broad consequences for shareholder contract rights. Many other types of institutions *could* be taken into conservatorship or receivership. *E.g.*, 12 U.S.C. § 1821(c) (FDIC); DGCL § 291 (receivership authority over Delaware corporations).

While it rejected the APA challenge to the Third Amendment, the D.C. Circuit specifically recognized that Plaintiffs' contract rights "remain in force" after HERA. *Perry II,* 864 F.3d at 630-31.  Further, the implied covenant of good faith and fair dealing can obviously breached by actions which do not violate any statute—otherwise every implied covenant claim would be resolved solely by determinations of statutory authority, which is not how those claims are resolved.   The implied covenant imposes a distinct, and in this case higher, standard on Defendants than did the APA claims rejected by the D.C. Circuit: as the D.C. Circuit made clear, while "allegations of motive are neither here nor there" for purposes of the APA claims, the same is not true for the implied covenant claims (or, as discussed below, fiduciary duty claims), under which Defendants had an obligation to act in "good faith." *Perry II,* 864 F.3d at 612, 630.

Defendants also argue that HERA's authorization for FHFA to issue and sell Company stock to Treasury put Plaintiffs on notice of the Third Amendment. Dkt. 66 at 28.  But, again, Defendants cannot rely on this authority to justify their conduct here because "Treasury did *not* purchase new securities under the Third Amendment" (*Perry I,* 70 F. Supp. 3d at 224), and indeed it would have been *illegal* for them to do so. *See supra* pp. 18-19. Further, the issuance of new securities would generally include receipt of investment, which did not happen here.

None of the other particular HERA provisions invoked by Defendants would have given Plaintiffs any reason to expect the Third Amendment.  Defendants point to § 4617(b)(2)(J)(ii), which allows FHFA to act in its own "best interests," but the D.C. Circuit held that this provision does ***not*** defeat Plaintiffs' implied covenant claims. *Compare* Dkt. 66 at 23-24 n.8 & 29, *with Perry II,* 864 F.3d at 630.  Similarly, FHFA's assertion that HERA transfers "***all*** stockholder rights" to FHFA cannot be squared with the D.C. Circuit's express holding that stockholders retain their contractual rights.  *Compare* Dkt. 66 at 29, *with Perry II,* 864 F.3d at 630.  And,

again, the fact that HERA gives FHFA the power to place the Companies into "conservatorships and receiverships" is irrelevant (Dkt. 66 at 29); Plaintiffs do not challenge the conservatorship, and FHFA has consistently maintained that the companies are not in receivership. ¶ 50.  Further, HERA expressly provides that Plaintiffs would have a right to receive a distribution in receivership.  12 U.S.C. § 4617(c)(1).  Finally, Defendants say that the power to "transfer or sell any Enterprise assets without approval or consent" somehow put Plaintiffs on notice that their contract rights might be deliberately nullified in exchange for no meaningful consideration. Dkt 66 at 29.  That makes no sense, and is meritless.

Defendants also argue that the PSPAs gave Plaintiffs a reason to expect the Third Amendment. Dkt. 66 at 29-30.  But the opposite is true.   The PSPAs were a two-way exchange: the Companies gave Treasury Senior Preferred Stock and other rights; Treasury gave the Companies a funding commitment and actual investments.  Based on this precedent, Plaintiffs would have reasonably expected that any future transfer of value to Treasury would be in exchange for additional investment or some other form of meaningful consideration.  Further, in the event the Companies returned to profitability, the PSPAs made clear how Treasury could enjoy profits above and beyond the 10% dividend on the Senior Preferred Stock without nullifying Plaintiffs' contract rights. Specifically, the PSPAs contemplated that Treasury could exercise its right to acquire 79.9% of the Companies' common stock for a nominal value, and then receive *additional* dividends through its ownership of that common stock—above and beyond the 10% preferred dividend.   Such an action would have triggered a mandatory contractual obligation for the Companies (a) to first pay dividends to the private preferred shareholders (*See* Dkt. 66-3 at ¶ 2(b); Dkt. 66-4 at ¶ 2(c)), and (b) to pay pro rata dividends to the private common shareholders, whose certificates of designation expressly provide that they have

the right to receive dividends "ratably" with other common shareholders (Dkt. 66-5 at ¶ 2(a)). *See* ¶ 85.  That is what the PSPAs made Plaintiffs reasonably expect would happen if Treasury wanted to get more than its 10% Senior Preferred Stock dividend.

The PSPAs also contain a provision (¶ 5.1) making dividend and other distributions conditional on Treasury's consent.  But the need for such consent could not possibly have put Plaintiffs on notice that Treasury might ignore the common stock warrants provided for in the PSPAs, and might decide that the best way to get more in dividends would be to simply demand an amendment to its Senior Preferred Stock so that the 10% dividend would be converted into a 100% "dividend" of the Companies' entire net worth—forever.  Nothing could have put Plaintiffs on notice of that—let alone putting Plaintiffs on notice this could happen in a deliberate effort to deprive shareholders of any participation in the Companies' "golden years" of "sustainable profits."

Quite to the contrary, the expectations of a reasonable shareholder were informed by various statements made by the Companies, FHFA, and Treasury when the PSPAs were entered that:

- investors "will retain all their rights in the financial worth of those instruments, as such worth is determined by the market";

- "conservatorship does not eliminate the outstanding preferred stock";

- "the common and all preferred stocks will continue to remain outstanding"; and

- the "objective" of the conservatorship was to "return[] the entities to normal business operations."

¶¶ 40-42.  These statements reassured investors that their contract rights were safe—and certainly did not provide any indication that these rights would be destroyed in exchange for no investment or other meaningful consideration.  Shareholder expectations were also reassured by HERA's instruction that FHFA, as conservator, was responsible for "preserv[ing] and

conserve[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D).

> 2. Plaintiffs Could Not Have Reasonably Expected That Defendants Would Act In Bad Faith To Deprive Them Of Any Chance Of Future Dividends Or Liquidation—No Matter How Much Profit The Companies Make.

As the D.C. Circuit recognized, "where discretion is lodged in one of two parties to a contract . . . such discretion must, of course, be exercised in good faith." *Perry II,* 864 F.3d at 631 (quoting *Historic Green*, 32 Va. Cir. 98); *see also id.* ("A party to a contract providing for such discretion violates the implied covenant if it 'act[s] arbitrarily or unreasonably.'") (quoting *Nemec v. Shrader,* 991 A.2d 1120, 1126 (Del. 2010)).   Delaware courts have recognized that contractual rights to dividends or liquidation distributions (like those in the Stock Certificates here) imply an additional promise that the issuing company will refrain from acting in bad faith to deliberately deprive stockholders of the ability to receive any benefits from those rights.

For example, in *Black Horse Capital, LP v. Xstelos Holdings, Inc,* 2014 WL 5025926 (Del. Ch. Sept. 30, 2014), the plaintiffs stated a valid claim for breach of the implied covenant based on the defendants' "bad faith exercise of discretion" regarding the issuance of dividends, where the plaintiffs alleged that the defendants "had no corporate purpose or valid business reason" for issuing dividends in the manner they did, and that the defendants' actual motivation for doing so was "to cause harm to" the plaintiffs.  *Id.* at *30.  Similarly, in *Quadrangle,* the plaintiffs stated a viable claim for breach of the implied covenant of good faith and fair dealing, where they plausibly alleged that the defendants acted "intentionally . . . to prevent Plaintiffs from receiving the Liquidation Preference" to which they were contingently entitled under the contract. 1998 WL 778359, at *6; *see also QVT Fund,* 2011 WL 2672092 at*14-15 (holding that plaintiffs stated a valid implied covenant claim based on the non-payment of dividends where the

plaintiff had alleged that the defendant bank had "take[n] action deliberately" to circumvent its obligation to pay dividends).[17]

In the SAC, Class Plaintiffs allege in detail that the Third Amendment was conceived and implemented for the express purpose of making it impossible for Plaintiffs to receive any dividends or liquidation distributions. ¶¶ 61-68.  Unbeknownst to plaintiffs, Treasury and FHFA had been conspiring since as early as 2010 to "ensure existing common equity holders will not have access to any positive earnings from the GSEs in the future." ¶ 63.  Internal documents from Treasury show that the Third Amendment was the culmination of this plan, and was designed to ensure that "the taxpayer will benefit from all future earnings of the GSEs" and leave nothing for the preferred or common shareholders.  ¶ 68.  Indeed, Treasury's press release announcing the Third Amendment confirms as much, explaining that the plan was designed to "make sure that *every dollar* of earnings each firm generates is used to benefit taxpayers"—*i.e.*, not the private investors.  ¶ 67 (emphasis added).

In prior filings, FHFA had proffered an alternative, innocent justification for the Third Amendment; they claimed it was implemented to end the "circularity" or "downward spiral" caused by the Companies' drawing on Treasury funding to pay dividends to Treasury, which in turn increased Treasury's stake. *E.g.*, Dkt. 20 at 3, 23-24, 56, 65-66, 69-70; Dkt. 36 at 8. If that were truly the motivation, there were obviously less confiscatory ways to meet that goal. In any event, Defendants have not advanced this argument here.  This is not surprising in light of the well-supported allegations in the SAC demonstrating that, prior to the Third Amendment, Treasury, FHFA, and the Companies were all well aware that the Companies had already

---

[17] *See also Va. Vermiculite*, 156 F.3d at 538 (applying Virginia law and holding that plaintiff stated a viable claim where it alleged that "the *purpose* of the donation was to prevent [plaintiff] from obtaining access to the vermiculite deposits on the land.").

returned to profitability, and were projected to continue to earn profits going forward, such that

the circularity would no longer be an issue. ¶¶ 51-56.  Specifically, various internal documents

from Treasury, FHFA and the Companies show that by mid-2012, they each understood that:

- the Companies "will be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future" (¶ 53);

- the Companies' profits would be "in excess of current 10% dividend paid to Treasury" (¶ 53);

- Freddie Mac was "not projected to draw on the liquidity commitment to make its dividend payments because of increased earnings driven by significantly reduced credit losses in 2012 and 2014" (¶ 52);

- The Companies would "be net income positive (before dividends) on a stable, ongoing basis after 2012 . . . ." (¶ 52);

- 2012 through 2020 would be the "golden years of GSE earnings," and that "Cumulative 2012-2016 income is now forecast at $56.6 billion, $12.3 billion higher than the last projection." (¶ 54); and

- By 2020, cumulative dividends paid by both Companies to Treasury would exceed Treasury's total investment (¶54).

In addition, Fannie Mae's then-Chief Financial Officer Susan McFarland also testified that she

told Treasury (and "probably" FHFA too) in mid-2012 (before the Net Worth Sweep) that Fannie

Mae would be "able to deliver sustainable profits over time." ¶ 54.  *Id.*  In the face of this

overwhelming evidence, it is not surprising that Defendants have chosen not to suggest that the

Third Amendment was designed to cut off the circularity problem.

In August 2012, there were several courses available to Defendants that would have

helped protect taxpayer interests.  Without making any changes, Treasury stood to reap

substantial benefits from the Companies' profits in the form of the 10% dividends—based on

their own projections, they would have recouped the full amount of their investment in a few

years, with all additional earnings constituting pure profit.  If Treasury wished to expand its

upside, it could have exercised the warrants it held under the PSPAs to acquire 79.9% of the

Common Stock of the Companies for a nominal fee.  With this expanded stake, Treasury would have stood to enjoy unlimited upside from the Companies' projected profitability.

But Defendants did not pursue any of these options, which would have helped the taxpayer but also left the Plaintiffs with some prospects of future dividend and liquidation preference.  Instead, they chose a course designed to completely eliminate any value the private shareholders would receive from the Companies going forward.  And they did so not at the moment of initial intervention, but only later, once the Companies had turned the corner and were headed towards rapid profitability.  Defendants acted in bad faith to deliberately cut off any prospect of future economic value accruing to the private shareholders.  The product of this bad faith action, the Third Amendment, violated the parties' "reasonable expectations."

### B.  The Correct Measure Of Shareholder Expectations Is "As Of The Time Of Contracting," Which For All Shareholders Predates HERA.

When assessing a claim under the implied covenant, courts "must assess the parties' reasonable expectations *at the time of contracting*." *Nemec*, 991 A.2d at 1126 (emphasis added). "An implied covenant claim . . . looks to the past" at "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Gerber*, 67 A.3d at 418; *see also id.* ("temporal focus is critical"); *Black Horse Capital,* 2014 WL 5025926, at *28 ("temporally constrained"); *see also Baum v. Whitehorse Marine, Inc.*, 46 Va. Cir. 527 (1996) ("a contract 'must be construed with reference to the intent of the parties when it was made, irrespective of events afterwards occurring.'"); Dkt. 66 at 21.

Defendants argue that, irrespective of the time of contracting, HERA and the PSPAs both "form[ed] part" of Plaintiffs contracts, and therefore are relevant to their reasonable expectations. Dkt. 66 at 26-30.  But this collapses into a tautology: according to Defendants, every legislative enactment and every agreement with other shareholders becomes part of Plaintiffs contracts with

Fannie and Freddie, and therefore part of what Plaintiffs should have reasonably expected; under this theory, the **Third Amendment itself** formed a "part" of Plaintiffs' contracts, and for that reason was "reasonably expected" by Plaintiffs.  This is circular. It also would define the implied covenant doctrine out of existence for all shareholder contracts.

Defendants are correct that the general corporate laws of Delaware and Virginia are incorporated into the corporate charters of Delaware and Virginia corporations, which, in turn, are incorporated into the contracts between shareholders and corporations in those states. Dkt. 66 at 26-27 ("the General Corporation Law is part of the certificate of incorporation of every Delaware company"); *see also Middleburg Training Ctr., Inc. v. Firestone*, 477 F. Supp. 2d 719, at 725 n.15 (E.D. Va. 2007) ("the general corporate laws are incorporated into the corporate charter") (citing *Kaplan v. Block*, 183 Va. 327, 333–34 (1944)). In Delaware, this rule derives from a statute. 8 Del. C. § 394 (providing that the DGCL and "all amendments thereof shall be a part of the charter or certificate of incorporation of every corporation.").  However, Defendants cite no authority extending that principle to all federal laws that might impact the Companies.

In any event, HERA draws a critical distinction between provisions that amend the Companies' corporate charters and those that do not. *Compare* HERA § 1117 (amending 12 U.S.C. § 1719 (Fannie charter) *and* 12 U.S.C. § 1455 (Freddie charter)), *with, e.g.*, HERA § 1145 (amending 12 U.S.C. § 4617, which is not part of the Companies' charters).  Therefore, at most, it is not the entirety of HERA that forms a part of Plaintiffs' contracts (as Defendants suggest), but only those provisions that amend the Companies' corporate charters.  Defendants identify only one such provision: the one authorizing Treasury to purchase Company stock.  As discussed above, that authority expired years before the Third Amendment, which (as this Court

held) did not involve the purchase of any securities.  Accordingly, this provision cannot show that Plaintiffs should have expected the Third Amendment.

Finally, Defendants suggest that the relevant "time of contracting" is "the time of his purchase." Dkt. 66 at 21, 27.  This is incorrect—it is when the securities were issued.  *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1034-35 (Del. Ch. 2006).  Under both Delaware and Virginia law, "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer[.]"  Del. Code tit. 6, § 8-302; Va. Code § 8.8A-302.  Delaware courts have explained that the phrase "all rights in the security" in Section 302 "can be understood as distinguishing between personal rights of the holder, on the one hand, and rights that inhere in the security itself, on the other.'"  *Schultz v. Ginsburg*, 965 A.2d 661, 667 n.12 (Del. 2009); *In re Sunstates Corp. S'holder Litig., C.A.*, 2001 WL 432447, at *3 (Del. Ch. Apr. 18, 2001); *Brevan Howard Credit Catalyst Master Fund Ltd. v. Spanish Broad. Sys., Inc.*, 2014 WL 2943570, at *4 (Del. Ch. June 27, 2014).  Where "the claim concerns the relationship between the stockholder and the corporation, or attributes of the security or bond *itself*, the claim 'inheres' in the security and passes with the sale of the security."  *FDIC v. Citibank N.A.*, 2016 WL 8737356, at *4 (S.D.N.Y. Sept. 30, 2016) (applying Delaware law).  In other words, "[w]hen a share of stock is sold, the ***property rights*** associated with the shares, ***including any claim for breach of those rights*** and the ability to benefit from any recovery or other remedy, travel with the shares."  *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049–51 (Del. Ch. 2015) (emphasis added); *see also Schultz*, 965 A.2d at 666 ("As a matter of law, a Charter Violation claim transfers to a later purchaser because the injury is to the stock and not the holder."); *Brevan Howard*, 2014 WL 2943570, at *4 (plaintiffs who had

purchased their shares after alleged breach of share certificate had standing to pursue breach of contract claim in light of Section 302).[18]

Because the contract rights at issue here—to dividends and liquidation distributions—"inhere in" the securities at issue,[19] the reasonable expectations informing these contractual rights are those of the original contracting parties.  *Sunstates*, 2001 WL 432447, at *3 (class definition properly included "persons who acquired shares of the preferred stock after the end of the class period" where the wrong alleged was "to a provision of the corporate charter designed to protect the dividend preference of the shares"); 6 A.L.R. 802 (collecting cases). Since HERA was enacted—and the PSPAs adopted—subsequent to the issuance of all of the securities at issue in this action, neither is relevant to the implied covenant claims.

## III.   DEFENDANTS HAVE STATED VALID CLAIMS FOR BREACH OF THE FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH.

Defendants argue that Plaintiffs' fiduciary breach claims are derivative claims that shareholders are barred from bringing by HERA's Succession Clause.  They also argue that these claims are preempted by HERA.  Both arguments fail.[20]

---

[18] There is no reason to believe Virginia courts' interpretation of Va. Code § 8.8A-302 would differ from the Delaware courts' interpretation of the identical Delaware statute.

[19] *See* Dkt. 66-3 ¶¶ 2, 4 (providing for dividends and liquidation rights for "Holders" of outstanding shares); Dkt. 66-4 ¶¶ 2, 7 (same); Dkt. 66-5 ¶¶ 2, 8 (same).

[20] Plaintiffs are not advancing breach of fiduciary duty claims against the Companies as such, but instead are advancing those claims against FHFA as the conservator in charge of the Companies that succeeded to "all rights, titles, powers, and privileges . . . of any . . . officer, or director of" the Companies. 12 U.S.C. § 4617(b)(2)(a)(i); ¶¶ 87-91, 168, 174.  Thus, the arguments advanced in footnote 38 of Defendants' brief are inapposite as Plaintiffs' claims against FHFA do not depend on the Companies owing any duties.

**A. Plaintiffs' Claims For Breach Of Fiduciary Duty Are Direct, Not Derivative.**

1. <u>Delaware Law Holds That Fannie Mae Shareholders Have A Direct Claim.</u>

In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004), the Delaware Supreme Court held that a claim is direct, not derivative, if:  (1) the stockholders, not the corporation, suffered the alleged harm triggering the claim, and (2) the benefit sought from the litigation would accrue to the stockholders, not the corporation.  "Although each question is framed in terms of exclusive alternatives (either the corporation or the stockholders), some injuries affect both the corporation and the stockholders," and thus give rise to both direct and derivative claims. *Carsanaro v. Bloodhound Techs., Inc.,* 65 A.3d 618, 655 (Del. Ch. Mar. 15, 2013).

Here, Plaintiffs satisfy *Tooley*'s first prong because private shareholders directly suffered the injury inflicted by the Third Amendment.  By making it impossible for private shareholders ever to receive a dividend or liquidation distribution from the Companies (no matter how profitable or valuable they become), the Third Amendment directly injured those shareholders. ¶¶ 14, 59, 60, 85.  Plaintiffs' injury is not shared by all shareholders equally; the Third Amendment transferred value and voting power from one group of shareholders (Plaintiffs) to a single controlling shareholder (Treasury).  Defendants say the harm was suffered *only* by the Companies, but that overlooks what *Tooley* and its progeny hold.  Specifically, Delaware cases hold that when corporate officers and directors exercise "control over the corporate machinery to cause an expropriation of economic value and voting power from the public shareholders" for the benefit of a dominant shareholder, "**a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action**." *Gatz v. Ponsoldt*, 925 A.2d 1265, 1274, 1281 (Del. 2007) (emphasis added); *see also Gentile v. Rossette*, 906 A.2d 91, 100 (Del. 2006)

(holding minority shareholders have right to advance direct claims where there has been "an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder"). For the same reason, Defendants are wrong that "a reduction in stock value" is necessarily a derivative injury. Dkt. 36.

Similarly, Defendants say that these claims are derivative because Plaintiffs "cannot prevail without showing an injury to the corporations." Dkt. 66 at 35. But the Delaware courts have repeatedly held that Plaintiffs who sustain individual injury from improper conduct by a person controlling the corporation are not deprived of the right to bring a direct action merely because the same conduct also damaged the corporation and thus gave rise to a derivative claim. *Gatz*, 925 A.2d at 1278; *Gentile*, 906 A.2d at 100; *Carsanaro*, 65 A.3d at 655.

Likewise, Plaintiffs satisfy the second prong of *Tooley* because they seek relief that belongs "directly to the stockholders," not the Companies. *See Tooley*, 845 A.2d at 1036. Plaintiffs' claims for breach of fiduciary duty seek money damages payable directly to a class of common and preferred stockholders. ¶¶ 171, 177 (seeking recovery to "benefit the stockholders directly, and not the Company."). As alleged in the SAC, Plaintiffs and other putative classes of stockholders suffered damages caused by Defendants' breach of fiduciary duties owed to Plaintiffs, when Defendants deliberately expropriated the economic rights from the private stockholders and transferred those rights to the largest stockholder—the Treasury. ¶¶ 169, 175. Thus, if damages are awarded for Plaintiffs' direct fiduciary breach claim, they could only be awarded to Plaintiffs and the classes of common and preferred stockholders, not the Companies. ¶¶ 171, 177.[21]

---

[21] Defendants misleadingly cite *In re Ionosphere Clubs, Inc.*, 17 F.3d 600, 605 (2d Cir. 1994) for the proposition that a claim should be held derivative because "payment of damages directly to

Defendants argue that the D.C Circuit "held" that Plaintiffs' fiduciary claims were derivative, but the D.C. Circuit made clear that its holding was based solely on the fact Class Plaintiffs originally plead the claims as derivative, and sought relief only for the benefit of the corporations. *Perry II*, 864 F.3d at 624. The D.C. Circuit also made clear that it was not ousting this Court of its jurisdiction to decide whether an amended claim for direct fiduciary breach should be permitted to proceed. *Id.* at 627.

Even if the Court were to find that the relief should first flow to the company—which it should not—Plaintiffs' claims would still be direct. The fact that *both* Plaintiffs and the Companies may benefit if Treasury's excessive dividend payments are returned (and stockholders' contractual rights were restored) does not somehow transform Plaintiffs' well-plead claims from direct to derivative. Delaware law holds that the same set of facts may give rise to *both* direct *and* derivative claims. *See Gatz*, 925 A.2d at 1280-81 (holding that Chancery Court erred in finding that a recapitalization claim was exclusively derivative); *Gentile*, 906 A.2d at 99, 102-3 (holding that claims were "both derivative and direct" because "[a]lthough the corporation suffered harm (in the form of a diminution of its net worth), the minority shareholders also suffered a harm that was unique to them and independent of any injury to the corporation."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 (Del. Ch. Oct. 28, 2010) ("[t]he same facts may support both direct and derivative claims"). As

---

the plaintiff stockholders for the diminution in value of their stock would be inappropriate." Dkt. 66 at 36-37. In the cited portion of that case, the Second Circuit explains that, in the "classic" derivative suit case—"where officers or directors of the corporation appropriate for themselves (or their friends) an opportunity of the corporation, or embezzle its funds"—"Return of the stolen funds to the corporation would rectify the injury; payment of damages directly to the plaintiff-stockholders for the diminution in the value of their stock would be inappropriate." By contrast, the court continues, "Where the wrong committed by a third party consists of an injury inflicted on stockholders' rights rather than upon the corporation, the stockholders' action seeks relief awarded directly in their favor against the third party." 17 F.3d at 605.

the Delaware Supreme Court has noted, this result "fits comfortably" with the *Tooley* test. *Gentile*, 906 A.2d at 102; *see also Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 869 (Del. 2009) (finding stockholders have a direct claim arising from the same transaction as derivative claim).   Indeed, given the early stage of the litigation, the claim should still be considered direct even if there were a variety of possible remedies that could support a derivative or a direct characterization.   *Allen v. El Paso Pipeline G.P. Co.*, 90 A.3d 1097, 1111 (Del. Ch. 2014) (concluding that shareholder claims were direct where it would be "premature" to rule out certain remedies).[22]

2.   The Supreme Court of Virginia Has Left Open The Possibility Of Adopting Delaware's Standard That Would Allow Freddie Shareholders To Bring Direct Fiduciary Breach Claims—This Court Should Allow The Claims Or Certify The Question To The Supreme Court Of Virginia.

Defendants argue that Virginia law does not permit shareholders ever to bring direct fiduciary breach claims against corporate officers and directors.   The primary case on which they rely is *Remora Investments, LLC v. Orr*, 673 S.E.2d 845 (Va. 2009). Dkt. 66 at 33.   In that case, however, the Supreme Court of Virginia expressly held that it "need not decide whether to adopt the analysis employed by the Delaware Supreme Court in *Tooley*." *Remora*, 673 S.E. 2d at 848. And since that decision, lower courts have adopted conflicting positions on the question.

---

[22]   Defendants' cases are inapposite, and do not (and cannot) contradict the holding of *Tooley* as applied in *Gatz* and *Gentile* and the others cases cited above.   In *In re J.P. Morgan Chase & Co. S'holder Litig.,* the court rejected plaintiffs' argument because plaintiffs conflated their direct claims with the corporation's rights to recovery for a separate claim.  906 A.2d 766, 772-73 (Del. 2006).   In *Protas v. Cavanagh*, plaintiffs' claims involved indirect harm from corporate waste that [was] "entirely dependent on the harm caused to the Fund by the alleged overpayment for Preferred Shares."   2012 WL 1580969, at *6 (Del. Ch. May 4, 2012).   In *Hartsel v. Vanguard Grp., Inc.*, the court dismissed claims based on a decision of the N.D. Cal. that conflicted with Delaware law.  2011 WL 2421003, at *17 (Del. Ch. June 15, 2011).   Finally, in *In re Ionosphere Clubs, Inc.*, the court rejected plaintiffs' claims because they were based upon an incorrect application of Delaware law governing the relationship between preferred and common stockholders in a direct action claim. 17 F.3d at 605-07.

*Compare VFI Assocs., LLC v. Lobo Mach. Corp.*, 2012 WL 975705, at *6 (W.D. Va. Mar. 22, 2012) (applying Virginia law and explaining that "There may be exceptions to this rule where the shareholder/member can show that it suffered injury independent and distinct from that suffered by the corporation.") (citing *Remora*), *and Charles Schwab & Co. v. WS Wealth Mgmt., LLC*, 2016 WL 7033699, at *11 (E.D. Va. Dec. 2, 2016) (explaining that, in *Remora,* "there was no basis upon which to formulate or adopt an exception to the derivative suit requirement, as the Delaware Supreme Court has adopted [in *Tooley*]"), *with* Dkt. 66 at 33 (collecting cases).

"Absent controlling precedent from the Virginia Supreme Court," Virginia courts "look[] to the decisions of the Supreme Court of Delaware for guidance." *U.S. Inspect, Inc. v. McGreevy*, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000); *see also Pagliara v. Fed. Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 689 (E.D. Va. 2016) ("It is not uncommon for courts interpreting Virginia corporate law to look for guidance from other courts, especially Delaware corporate law."); *Milstead v. Bradshaw*, 1997 WL 33616661, at *6 (Va. Cir. Ct. Oct. 3, 1997) (finding "great persuasive authority" in Delaware cases discussing standing to bring a derivative lawsuit); *Abella v. Universal Leaf Tobacco Co., Inc*., 546 F. Supp. 795, 799–800 (E.D. Va. 1982) (looking to Delaware for guidance on stockholder derivative litigation).[23]   Accordingly, this Court should hold that, if presented with the facts of this case, the Virginia courts would apply Delaware's *Tooley* standard (and its progeny) to permit Freddie shareholders to bring direct fiduciary breach claims. *CIR v. Bosch's Estate*, 387 U.S. 456, 465 (1967) (explaining that, where there is no decision by a State's highest court, then "federal authorities must apply what they find

---

[23] Further, to the extent Virginia courts have frowned upon direct breach of fiduciary duty claims against corporations and their representatives, it was in the context of individual suits, and out of a concern to "prevent[ a] multiplicity of lawsuits by shareholders." *Remora*, 673 S.E.2d at 848 (internal citation omitted).  This is of no concern here, where Plaintiffs are proceeding on a class basis.

to be the state law after giving 'proper regard' to relevant rulings of other courts of the State" and "may be said to be, in effect, sitting as a state court."). Alternatively, this Court should certify the question for resolution by the Supreme Court of Virginia. Va. S. Ct. R. 5:40.

### B. HERA Does Not Preempt Defendants' Fiduciary Breach Claims.

Defendants also argue that HERA preempts Plaintiffs' fiduciary breach claims. They do not try to argue that HERA expressly preempts the state laws governing Plaintiffs' fiduciary duty clams. It does not. Moreover, a large body of case law holds that federal conservators and receivers have fiduciary duties under state law—even while they fulfill the purposes of the federal conservatorship and receivership statute that was the model for HERA (*i.e.,* FIRREA).[24]

Notwithstanding the foregoing (which Defendants never address or contest), Defendants argue that HERA preempts state law claims if those claims would "frustrate" or create a "sufficient obstacle" to the accomplishment of HERA's purposes. Dkt. 66 at 37. Because Defendants interpret the statute as intruding in "a field which the States have traditionally occupied "– namely "traditional authority to provide tort remedies to their citizens as they see fit," *CTS Corp. v. Waldburger,* 134 S. Ct. 2175, 2166-89 (2014)[25] — Defendants must overcome "the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

---

[24] *Gibralter Fin. Corp. v. Fed. Home Loan Bank Bd.*, 1990 WL 394298, at *3 (C.D. Cal. June 15, 1990); *Suess v. FDIC*, 770 F. Supp. 2d 32, 38 (D.D.C. 2011); *E.I. du Pont de Nemours & Co. v. FDIC*, 32 F.3d 592, 595 (D.C. Cir. 1994).

[25] *In re Rural Metro Corp. Stockholders Litig.,* 88 A.3d 54, 98 (Del. Ch. 2014) ("A breach of fiduciary duty is an equitable tort"); *O'Connell v. Bean,* 556 S.E.2d 741, 743 (Va. 2002) (a breach of fiduciary duty "sound[s] in tort").

In an effort to satisfy the standard for "conflict preemption," Defendants are forced to mischaracterize Plaintiffs' fiduciary breach claims as seeking "to force the Conservator to promote the interests of the Enterprises' shareholders *over* any Enterprise interests or the public interests." Dkt. 66 at 37 (emphasis added).  Plaintiffs make no such claim.  Plaintiffs argue only that, in addition to considering the interests of Treasury and the Enterprises, Defendants were required by state law to consider, in good faith, the interests of private shareholders.  We do not contend, as FHFA would have it, that shareholder interests were entitled to primacy no matter what.  We claim that FHFA should have made a good faith effort to consider shareholder interests before agreeing to the Third Amendment.[26]  As the allegations of the SAC show, FHFA did not do this.  ¶¶ 12, ¶ 85 ("by executing the Third Amendment…FHFA acted unfairly and in bad faith with respect to the stockholders.").[27]

FHFA makes no effort to show how giving good faith consideration to the interests of shareholders alongside the interests of Treasury and the Enterprises would somehow "frustrate"

---

[26] FHFA's discharge of its fiduciary duties to the plaintiff shareholders is in no way inconsistent with the provisions of HERA that permit it *also* to consider the interests of Treasury and the Enterprises. Directors are often called upon to consider, in good faith, the competing interests of various constituencies. *Unocal Corp. v. Mesa Petroleum Co*., 493 A.2d 946, 955 (Del. 1985) (acknowledging that "Corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders," but holding that a board's may also consider the impact of a proposed takeover bid on "'constituencies' other than shareholders (*i.e*., creditors, ... customers, employees, and perhaps even the community generally)"); *In re Staples, Inc. S'holder Litig.*, 792 A.2d 934, 950 (Del. Ch. 2001) ("Delaware case law has recognized that there will be circumstances when corporate directors must balance the competing interests of two classes of their company's stock.").

[27] The essence of the fiduciary duty is to give good faith consideration of the interests of those to whom the duty is owed.  *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006) ("[The] failure to act in good faith may result in liability because the requirement to act in good faith is a ... condition of the ... duty of loyalty") (internal quotations and citation omitted); *Glass v. Glass*, 321 S.E.2d 69, 74 (Va. 1984) ("directors have a fiduciary duty in their dealings with shareholders and must exercise good faith in such dealings").

or create a "sufficient obstacle" to fulfilling HERA's purposes.  Nor could it.  HERA was not enacted for the purpose of taking future profits from the Companies and giving them to the Treasury—over and above the billions of dollars Treasury was already making under the original PSPA.  Because it is possible for FHFA to "comply with both [its federal] obligations and the state-prescribed duty," the statutory purposes cited by FHFA provide no basis for preemption. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 509 (1988).[28]

As the court in *Gibralter Financial* held in analogous circumstances:

> Notwithstanding the important public policy function served by FSLIC, nothing in the statutory or regulatory scheme would indicate the need to permit FSLIC to function in its capacity as conservator with impunity, leaving all shareholders in a financial institution bereft of the protections provided by the fiduciary duties imposed upon those who control such institutions.

1990 WL 394298, at * 3.  Here, Plaintiffs contend that FHFA owed a duty to give good faith consideration to their interests alongside its other considerations, and the rationale of *Gibralter* and the other cases cited above fully applies.

---

[28] Conflict preemption usually occurs where "it is impossible ... to comply with both state and federal law," but courts sometimes find preemption the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Trade Council*, 530 U.S. 363, 372-73 (2000) (alterations in original). But to establish preemption under that test, FHFA must offer more than the cursory assertions and mischaracterizations of Plaintiffs' claims set forth in its brief. As the Supreme Court has explained, "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield ...." *Id.*  FHFA has made no such showing here.

## IV.   PLAINTIFFS HAVE STATED VALID CLAIMS UNDER CORPORATE LAWS THAT HAVE LONG DEFINED "PREFERRED STOCK" AND THE NATURE OF "DIVIDENDS" PAID ON SUCH STOCK.

### A.  These Claims Are Not Preempted.

Defendants assert that these claims are preempted because the Companies are "creations of federal law—*not* state law." Dkt. 66 at 39.  But federal law, in turn, directs the Companies to select state law to govern their corporate affairs, 12 C.F.R. § 1710.10(b)(1), and both Companies have done so.  Fannie Mae enacted bylaws selecting Delaware law, and Freddie Mac enacted bylaws selecting Virginia law. ¶ 76.  Moreover, both Plaintiffs' stock certificates and Treasury's PSPAs provide that these State laws, respectively, will generally "**serve as the federal rule of decision**" in determining the rights therein. Dkt. 66-4 at ¶ 9(f) (emphasis added); Dkt. 66-5 at ¶ 10(f); Ex. A at ¶ 10(e); Ex. B at ¶ 10(e).  Defendants ignore this language, which defeats their preemption defense.

Defendants argue that the Companies' federal charters grant the Companies *carte blanche* power regarding anything to do with preferred stock or dividends, superseding any and all restrictions imposed under state law. Dkt.  66 at 39. This directly contradicts what is stated in the stock certificates.  There is also nothing in federal law that purports to grant such limitless power or to override pre-existing state laws.  Further, accepting Defendants' argument would nullify the Companies' bylaws, which contain provisions governing preferred stock and dividends, and which select specific State laws to govern corporate governance.  This argument also ignores a basic principle of corporate law that Defendants themselves invoke in their argument about how to assess "reasonable expectations" for the implied covenant claim: company charters and bylaws together—along with the broader DGCL or VSCA—form a contract among the corporation and its directors, officers, and stockholders, *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 940 (Del. Ch. 2013), and, as such, must be read

43

"in tandem" and are "intended to be complementary." *Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del. 1990).

The federal laws creating the Companies, the Companies' bylaws selecting Delaware and Virginia law (respectively) for corporate governance, and the underlying laws of those States are all in complete harmony here.  Defendants fail to identify any conflict between the State laws invoked by Plaintiffs and anything set forth in Federal law.  The Supreme Court has admonished that the doctrine of "conflict preemption" should be applied cautiously, only where it reflects the "clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996).  Defendants do not come close to meeting this standard.

### B.  Defendants Are Wrong That Delaware And Virginia Law Permit A Perpetual Net Worth Sweep To Be Characterized As A "Dividend" On "Preferred Stock."

Defendants argue that Delaware and Virginia law permit corporations to transfer their entire net worth every quarter to a single shareholder, forever, and to call that a "dividend" paid on "preferred stock." Dkt. 66 at 42-44.  Plaintiffs are aware of no instance in which any corporation has done such a thing.  The Net Worth Sweep is inconsistent with long-established State law defining "preferred stock" and "dividends" on such stock.

Delaware law provides that dividends issued to preferred stockholders "***shall*** be" "***at such rates***, on such conditions and at such times as shall be stated in the certificate of incorporation or in the [board] resolution . . ." and also "***shall be***" "payable ***in preference to, or in . . . relation to***, the dividends payable on" other classes or series of stock.  DGCL §151(c).  Delaware law also contemplates that, after payment of preferential dividends on senior preferred stock, "a dividend on the remaining class or classes or series of stock may then be paid out of the remaining assets of the corporation available for dividends . . . ." *Id.*  Virginia law has similar provisions. *See*  Va. Code § 13.1-638.

44

These provisions cannot be reconciled with an agreement to pay out the entire net worth of a corporation every single quarter, in perpetuity, to a "preferred stockholder," no matter how large that net worth might be. Such an agreement guarantees that no other shareholder will ever receive anything—ever. This is not "preferred stock." This is a nullification of all other stock, and the elevation of the preferred stockholder into the *only* stockholder. There are no other stockholders for this sole stockholder to be "***in preference to***," and there is no possibility—not even the faintest chance—of any "dividends payable on" any shares held by any other stockholders. The Net Worth Sweep is neither paid at a "rate" nor payable "in preference to" or "in relation to" dividends payable on other classes of stock; it completely displaces those other classes. It is unprecedented in the history of corporate law, and cannot be reconciled with the long-established legal definition of "preferred stock" as set forth in the State laws selected by the Companies for their corporate governance.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

Dated:  February 16, 2018

Respectfully submitted,

  */s/ Hamish P.M. Hume*
Hamish P.M. Hume (Bar No. 449914)
Stacey K. Grigsby (Bar No. 491197)
Jonathan M. Shaw (Bar No. 446249)
Alexander I. Platt (Bar No. 1019844)
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., NW
Washington, D.C. 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
sgrigsby@bsfllp.com
jshaw@bsfllp.com
aplatt@bsfllp.com

David R. Kaplan   (*Pro Hac Vice*)
BERNSTEIN LITOWITZ BERGER &
GROSSMANN LLP
12481 High Bluff Drive
Suite 300
San Diego, CA 92130
Tel: (858) 793-0070
Fax: (858) 793-0323
davidk@blbglaw.com

Michael J. Barry (*Pro Hac Vice*)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Eric L. Zagar (*Pro Hac Vice*)
KESSLER TOPAZ MELTZER & CHECK
LLP
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

*Interim Co-Lead Class Counsel*

BOTTINI & BOTTINI, INC.
Frank A. Bottini
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
fbottini@bottinilaw.com

GLANCY PRONGAY & MURRAY LLP
Lionel Z. Glancy
Michael M. Goldberg
Ex Kano S. Sams II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
esams@glancylaw.com

LOWEY DANNENBERG, P.C.
Barbara Hart (*pro hac vice*)
Thomas M. Skelton
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035

POMERANTZ LLP
Jeremy A. Lieberman
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com

Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

FINKELSTEIN THOMPSON LLP
Michael G. McLellan (Bar #489217)
3201 New Mexico Avenue NW, Suite 395
Washington, DC 20016
Telephone: (202) 337-8000
Facsimile: (202) 337-8090
mmclellan@finkelsteinthompson.com

*Additional Counsel for Plaintiffs*