# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FAIRHOLME FUNDS, INC.,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil No. 13-1053 (RCL)** |
| | ) | |
| **FEDERAL HOUSING FINANCE AGENCY,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **ARROWOOD INDEMNITY COMPANY,** *et al.,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil No. 13-1439 (RCL)** |
| | ) | |
| **FEDERAL NATIONAL MORTGAGE ASSOCATION,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | ) | **Miscellaneous No. 13-1288 (RCL)** |
| | ) | |
| This Memorandum Opinion relates to: ALL CASES | ) | <u>CLASS ACTION</u> |
| | ) | |

## **MEMORANDUM OPINION**

Before the Court is a motion to dismiss filed by the defendants Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "GSEs,"); Melvin L. Watt, in his official capacity as Director of FHFA; and the GSEs (collectively, "Defendants"). The motion applies to all three of the above-captioned cases [ECF No. 68 for Civil No. 13-1053; ECF No. 77 for Civil No. 13-1439; ECF No. 66 for Miscellaneous No. 13-1288]. Upon consideration, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**. Additionally, because the Court considered the various plaintiffs' sur-replies in coming to this decision, the motions for leave to file sur-reply [ECF No. 79 for Civil No. 13-1053, ECF No. 87 for Civil No. 13-1439, and ECF No. 78 for Miscellaneous No. 13-1288] will be **GRANTED**.

## I.     BACKGROUND[1]

This matter is brought before the Court by a class action law suit and two individual lawsuits. Following this Court's prior opinion, *see generally Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) ("*Perry I*"), and the D.C. Circuit's opinion, *see generally Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ("*Perry II*"), these lawsuits contain substantially identical claims.[2] The class action law suit was brought by a purported class of private individual and institutional investors (the "Class Plaintiffs") who own either preferred or common stock in the Fannie Mae or Freddie Mac. Second Am. Consolidated Class Action Compl. at ¶¶ 18-33, *In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class*

---

[1] The recited facts are taken from plaintiffs' complaints, which for the purpose of the motions to dismiss, the court accepts as true and from sources from which the Court may properly take judicial notice.

[2] Due to the similarity of the claims, this opinion will refer to the Class Plaintiffs and the institutional investors collectively, as "Plaintiffs".

*Action Litigs.*, Misc. No. 13-1288 (D.D.C. Feb. 1, 2018), ECF No. 71 ("Class SAC"). The individual lawsuits were brought by separate institutional investors owning junior preferred stock in the GSEs. First Am. Compl. at ¶¶ 5-20, *Fairholme Funds, Inc. v. FHFA*, Civ. No. 13-1053 (D.D.C. Feb. 1, 2018), ECF No. 75 ("Fairholme FAC"); First Am. Compl. at ¶¶ 6-18, *Arrowood Indem. Co. v. Fannie Mae*, Civ. No. 13-1439 (D.D.C. Feb. 1, 2018), ECF No. 83 ("Arrowood FAC").

### A. The GSEs

Fannie Mae and Freddie Mac are government-sponsored enterprises, born from statutory charters issued by Congress. *See* Federal National Mortgage Association Charter Act, 12 U.S.C. §§ 1716-1723; Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451-1459. Congress created the GSEs in order to, among other goals, "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." 12 U.S.C. § 1716(3). The GSEs accomplish this objective by purchasing mortgages from lenders, thereby relieving the lenders of default risk and clearing up funds to be used to make more loans. To finance these purchases, the GSEs pool the many mortgage loans they purchase into various mortgage-backed securities and sell these securities to investors.

Fannie Mae and Freddie Mac are considered government-*sponsored*, rather than government-*owned*, because both congressionally chartered entities were eventually converted, by statute, into publicly traded corporations. In 1968, Congress made Fannie Mae a publicly traded, stockholder-owned corporation. Housing and Urban Development Act, Pub. L. No. 90-448, § 802, 82 Stat. 536-538 (1968). And in 1989, Freddie Mac followed suit. Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73, § 731, 103 Stat. 432-433 (1989). To provide

guidance to the GSEs on corporate governance issues not specifically addressed by federal law, the Office of Federal Housing Enterprise Oversight directed the GSEs to follow a chosen state's corporate laws as a gap-filling measure. *See* 67 Fed. Reg. 38361 (Jun. 4, 2002). The GSEs hence enacted bylaws in which they elected to follow a chosen state's law—Delaware law for Fannie Mae and Virginia law for Freddie Mac.

Since their founding, the GSEs have been major players in the United States' housing market. In the lead up to 2008, the GSEs' mortgage portfolios had a combined value of $5 trillion and accounted for nearly half of the United States' mortgage market.

### B. The 2008 Recession, the Creating of the FHFA, and the Beginning of Conservatorship

In 2008, the United States' mortgage and housing markets went into crisis, leading in part to a severe recession. Despite the GSEs' comparatively strong financial position amidst the crisis, Congress worried that a potential default by Fannie or Freddie would imperil the already fragile national economy. In response to these concerns, Congress enacted the Housing and Economic Recovery Act ("HERA" or "the Act"). HERA established the FHFA, granting it broad authority to ensure the GSEs remained stable. The Act denominated the GSEs as "regulated entit[ies]" subject to the direct "supervision" of FHFA, 12 U.S.C. § 4511(b)(1), and the "general regulatory authority" of FHFA's director (the "Director"). *Id.* § 4511(b)(1), (2). The Director was charged by HERA with "over see[ing] the prudential operations" of the GSEs and "ensur[ing] that" they "operate[] in a safe and sound manner," "consistent with the public interest." *Id.* § 4513(a)(1)(A), (B)(i), (B)(v).

Additionally, HERA authorized the Director to appoint FHFA as either conservator or receiver for the GSEs "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs." 12 U.S.C. § 4617(a)(2). If appointed as conservator, the Act granted the FHFA broad

powers and authority over the GSEs. The Act provided that the FHFA "shall, as conservator or receiver, . . . immediately succeed to . . . all rights, titles, powers, and privileges of the regulated entity and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity." *Id.* § 4617(b)(2)(B)(i), (iv). It also gave the FHFA general powers to take actions "necessary to put the [GSEs] in a sound and solvent condition" and "appropriate to carry on the business of the [GSEs] and preserve and conserve the assets and property of the [GSEs]." *Id.* § 4617(b)(2)(D)(i), (ii). And the Act further provides that the FHFA, as conservator, may take any action authorized under the act "which [it] determines is in the best interests of the [GSEs] or the [FHFA]." *Id.* § 4617(b)(2)(J)(ii).

On September 6, 2008, FHFA placed the GSEs into conservatorship, assuming the powers granted to the conservator by the Act. According to statements by the Director, conservatorship was "designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." Class SAC at ¶ 40 (relying on Press Release, Federal Housing Finance Agency, Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008)). And that the "FHFA [would] act as the conservator to operate the GSEs until they [were] stabilized." *Id.* Once the FHFA determined that the GSEs were in a safe and solvent condition, the Director would issue an order terminating conservatorship.

Despite the conservatorship, the common and preferred stock remained outstanding. In its Form 8-K filing just days after the beginning of conservatorship, Freddie Mac stated, "The holders of Freddie Mac's existing common and preferred stock . . . will retain all their rights in the financial worth of those instruments, as such worth is determined by the market." Class SAC at ¶ 42 (relying on Federal Home Loan Mortgage Corporation, Current Report (Form 8-K) (Sept. 11, 2008)).

### C. The GSEs Enter into a Senior Preferred Stock Purchase Agreement ("PSPA") with Treasury

A day after its appointment as conservator, the FHFA struck a deal with the Treasury Department ("Treasury"), entering into the PSPAs. The state of the market limited access to private capital markets for Freddie and Fannie. To shore up the GSEs' financial positions, Treasury agreed to invest billions of dollars in the GSEs in exchange for one million senior preferred shares ("Government Preferred Stock") in each company. These shares had a principal value equal to the amount invested by Treasury in each company, plus $1 billion to reflect a commitment fee with respect to each GSE. The shares also entitled Treasury to:

- a senior preferred dividend each quarter in an amount equal to 10% of the outstanding principal value of the Government Preferred Stock if the dividend was paid in cash;

- a stock dividend, if the senior preferred dividend was not paid in cash, in the form of additional Government Preferred Stock with a face value equal to 12% of the outstanding principal value of the Government Preferred Stock;

- a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the GSEs were dissolved;

- warrants allowing Treasury to purchase up to 79.9% of the GSEs' common stock; and

- the possibility of periodic commitment fees over and above dividends.

Additionally, the PSPAs included a variety of covenants. Most relevantly, the GSEs would have to receive Treasury's approval before declaring or paying any dividend or distribution. However, this covenant only applied during conservatorship.

6

Initially, Treasury's commitment to invest capital was capped at $100 billion per company. But it was determined that this would not be enough to meet the GSEs' funding needs. The PSPAs were amended twice. First, in May 2009, Treasury agreed to expand the funding commitment to $200 billion for each company. Seven months, later the PSPAs were amended again, raising the cap to an adjustable figure determined by an agreed-upon formula. As of June 30, 2012, the GSEs together had drawn $187.5 billion from Treasury's funding commitment.

### D. The Return to Profitability

When appointed as conservator, the FHFA did not expect the GSEs to be profitable. Expecting large losses in the coming years, FHFA directed the GSEs to book substantial loss reserves—recording anticipated mortgage loan losses before they were actually incurred—and required the GSEs to eliminate from their balance sheets the value of deferred tax assets that would only be of use if the GSEs became profitable. This accounting decision caused a strain on the GSEs' balance sheets, necessitating (in part) an increased draw from the Treasury's commitment. It even led to the payment of some circular dividend payments, where the GSEs drew on Treasury's funding commitment to pay Treasury its senior preferred dividend.

By 2012, though, it became clear that FHFA had overestimated the Companies' likely losses and underestimated the possibility of a return to profitability. More than $234 billion had been set aside by the GSEs to absorb loan losses, whereas losses of just over $125 billion were actually realized.

Additionally, the housing market had rebounded and the companies were well-positioned to begin generating profits for the foreseeable future. The GSEs, FHFA, and Treasury learned the GSEs were expected to be sufficiently profitable in the coming years to pay the 10% dividend on the Government Preferred Stock without the necessity of drawing from Treasury. It was believed

that the period between 2012 and 2020 would be the "golden years of GSE earnings." *See* Class SAC ¶ 54; Arrowood ¶ 53; Fairholme FAC ¶ 56. In fact, the GSEs were forecasted to be so consistently profitable that they could repay Treasury its initial investment within the following eight years.

### E.  The Enactment of the Third Amendment

Despite this positive outlook, FHFA and Treasury agreed to amend the PSPAs for a third time (the "Third Amendment"). The Third Amendment changed the government's senior preferred dividend from 10% of the outstanding principal value of the Government Preferred Stock to a quarterly dividend equal to 100% of each company's net worth that exceeded a capital buffer of $3 billion, with that buffer decreasing annually down to zero by 2018 (the "Net Worth Sweep"). And, since the PSPAs provided that in the event of a liquidation of the GSEs, the government would receive a liquidation preference that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that even if the GSEs were liquidated, Treasury would receive the full amount of the GSEs' net worth in that liquidation.

The GSEs received no new investment in exchange for the change in dividend structure. The reason given publicly for the Third Amendment was to end the practice of circular dividends paid to Treasury from funds drawn from Treasury's commitment to the GSEs. As of February 2018, Treasury has received over $276 billion in dividends from the companies—$88 billion more than Treasury's total investment in both companies.

## II.   PROCEDURAL HISTORY

In 2013, Plaintiffs filed suit challenging the Third Amendment. They alleged that, in adopting the Third Amendment, FHFA and the GSEs breached the terms governing dividends, liquidation preferences, and voting rights in the stock certificates for Freddie's Common Stock

and for both Fannie's and Freddie's Preferred Stock.   Additionally, they alleged that those defendants breached the implied covenant of good faith and fair dealing in those certificates.   The Plaintiffs also alleged that FHFA and Treasury breached state-law fiduciary duties owed by a corporation's management and controlling shareholder, respectively.   The Plaintiffs asked the Court to declare their lawsuit a "proper derivative action" and to award damages as well as injunctive and declaratory relief.

The Court dismissed Plaintiffs' claims entirely for failure to state a claim, along with different claims by institutional investors under HERA and the Administrative Procedure Act ("APA") seeking only equitable relief. *See generally Perry I*, 70 F. Supp. 3d 208. On appeal, the D.C. Circuit affirmed in part and reversed in part, remanding some of Plaintiffs' claims. *See generally Perry II*, 864 F.3d 591.

Having amended their respective complaints, all plaintiffs bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and violations of Delaware and Virginia statutory law governing dividends.[3] *See* Class SAC; Fairholme FAC; Arrowood FAC. Additionally, the Class Plaintiffs bring derivative claims against FHFA for breach of fiduciary duties. And the individual plaintiffs bring APA claims. Again, Defendants move to dismiss Plaintiffs' claims. And once again, this Court must decide whether Plaintiffs have stated a claim upon which relief may be granted.

## III.   LEGAL STANDARD

A motion to dismiss is appropriate when the complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The Court does not "require heightened fact

---

[3] In its complaint, Arrowood named FHFA Director Watt, in his official capacity, as a defendant on claims seeking money damages.  Arrowood has since withdrawn those claims. Ind. Pls.' Resp.to Defs.' Mot. to Dismiss the Am. Compl. at 19, n. 6.

pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[T]he complaint is construed liberally in

the plaintiffs' favor, and [the Court] grant[s] plaintiffs the benefit of all inferences that can be

derived from the facts alleged. However, the [C]ourt need not accept inferences drawn by

plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI*

*Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) (internal quotation marks and citation

omitted).

## IV.    ANALYSIS

### A.    Plaintiffs' Breach of Contract Claims Fail on the Merits

In each case, the respective plaintiffs assert the Third Amendment breached Plaintiffs'

contractual rights to receive a liquidation preference. *See* Class SAC Counts I-III; Fairholme FAC

Count II; Arrowwood FAC Count III. While this Court previously dismissed these claims as

unripe, *see Perry I*, 70 F. Supp. 3d at 234–26, the D.C. Circuit reversed that decision, holding that

the "claims for breach of contract with respect to liquidation preferences are better understood as

claims for anticipatory breach[.]" *Perry II*, 864 F.3d at 633. Under this doctrine, "a voluntary

affirmative act which renders the obligor unable . . . to perform" is a repudiation, RESTATEMENT

(SECOND) OF CONTRACTS § 250(b), that "ripens into a breach prior to the time for performance . .

. if the promisee elects to treat it as such" by, for instance, suing for damages. *Franconia Assocs.*

*v. United States*, 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (internal quotation

marks omitted); RESTATEMENT (SECOND) OF CONTRACTS §§ 253(1), 256 cmt. c; *accord Lenders*

*Fin. Corp. v. Talton*, 249 Va. 182, 189, 455 S.E.2d 232, 236 (Va. 1995); *W. Willow-Bay Court,*

*LLC v. Robino-Bay Court Plaza, LLC, C.A.* No. 2742-VCN, 2009 WL 458779, at *5 & n.37 (Del.

Ch. Feb. 23, 2009). As the Circuit explained, "anticipatory breach is 'a doctrine of accelerated

ripeness' because it 'gives the plaintiff the option to have the law treat the promise to breach [or the act rendering performance impossible] as a breach itself.'" *Perry II*, 864 F.3d at 633–34 (quoting *Homeland Training Ctr, LLC v. Summit Point Auto. Research Ctr.*, 594 F.3d 285, 294 (4th Cir. 2010)). The Circuit, therefore, reversed this Court's decision, holding the Plaintiffs' breach of contract claims ripe for decision. *Id.* at 634.

In making this determination, the D.C. Circuit made clear that it was not addressing the merits of the breach of contract claim. *Id.* ("Our holding that the claims are ripe sheds no light on the merits of those claims . . . ."). Instead, that court held that "[w]hether the class plaintiffs stated claims for breach of contract . . . is best addressed by the district court in the first instance." *Id.* After evaluating the merits of the claim, and for the reasons set forth below, the Court finds that Plaintiffs fail to state a claim for anticipatory breach of their contractual rights to receive a liquidation preference. As such, Defendants' motion will be granted as to these counts in the respective cases.

As Defendants point out in their briefs, the doctrine of anticipatory breach is not limitless. *See* Defs.' Mot. To Dismiss at 15–17. As this Court recently explained, *see Glenn v. Fay*, 281 F. Supp. 3d 130, 139 (D.D.C. 2017), the doctrine traditionally does not apply to unilateral contracts, especially when the only remaining performance is the payment of money. *Smyth v. United States*, 302 U.S. 329, 356, 58 S.Ct. 248, 82 L.Ed. 294 (1937) ("[T]he rule of law is settled that the doctrine of anticipatory breach has in general no application to unilateral contracts, and particularly to such contracts for the payment of money only."). And, importantly for the purposes of this opinion, the limitation also applies to "bilateral contracts that have become unilateral by full performance on one side." 23 WILLISTON ON CONTRACTS § 63:60 (quoting *Phelps v. Herro*, 215 Md. 223, 137 A.2d 159 (1957)); *see also* 23 WILLISTON ON CONTRACTS § 63:61 ("[W]hen a bilateral contract

has become a unilateral obligation by full performance on one side, anticipatory repudiation of that obligation does not permit the immediate filing of an action."). In other words, "if the payee has completely performed his side of the contract and is just awaiting payment, he can't declare a breach and sue for immediate payment just because he has reason (even compelling reason) to doubt that the other party will pay when due." *Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc.*, 252 F.3d 911, 915 (7th Cir. 2001).

Admittedly, as pointed out by Plaintiffs, the limitation is not without criticism. RESTATEMENT (SECOND) OF CONTRACTS § 253, comment d. The Seventh Circuit, for example, characterized the rule as "dubious" and remarked that the rationale for the limitation "eludes [] understanding." *Cent. States*, 252 F.3d at 915. Various commentators have expressed similar sentiments. *See, e.g.*, 4 CORBIN ON CONTRACTS 872-73 (1951) ("[A] plaintiff should not be deprived of his remedy in damages for an anticipatory repudiation merely because the promised performance is similar in character to the performance that is required by the judicial remedy that is commonly given for all kinds of breaches of contract."); *Doctrine of Anticipatory Breach as Applicable to a Contract which the Complaining Party Has Fully Performed*, 105 A.L.R. 460 (1936) ("From his own examination of the cases the writer is unable to state upon what substantial reason the limitation in question may be said to rest.").

But it is not the role of this Court to evaluate the soundness of the limitation. Rather, the Court must determine whether the limitation exists under the laws of the states of Delaware (Fannie Mae) and Virginia (Freddie Mac). The Court finds that it does. The Virginia Supreme Court has plainly held "[t]here is no cause of action for the anticipatory repudiation of [unilateral] contracts." *Fairfax-Falls Church Cmty. Servs. Bd. V. Herren*, 230 Va. 390, 395, 337 S.E.2d 741 (1985). Delaware courts have not been as explicit; but a decision from the Chancery Court cites with

approval a commentator acknowledging the limitation. *Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH*, 62 A.3d 62, 78 n. 102 ("An anticipatory breach of contract occurs when an obligor repudiates a duty before the time for the obligor's performance, and the aggrieved party elects, *before completion of his or her performance*, to consider the obligor's repudiation to be a present breach.") (quoting 1 C. CORMAN, LIMITATION OF ACTIONS § 7.2.1, p. 488 (1991)) (emphasis added).

Plaintiffs' attempts to downplay the significance of these cases amount to claims that these statements were merely dicta or assertions the limitation surely does not apply without limitation. *See* Ind. Pls.' Resp.to Defs.' Mot. to Dismiss the Am. Compl. at 15. But Plaintiffs cite no authority from the relevant jurisdictions renouncing the rule or narrowing it in any way. Instead, both jurisdictions generally follow the Restatement, which states "an obligor's repudiation alone . . . gives rise to no claim for damages at all if he has already received all the agreed exchange for it." RESTATEMENT (SECOND) OF CONTRACTS § 253, comment c. And Plaintiffs have not directed the Court to any caselaw in either relevant jurisdiction that even implies disagreement with this comment to the Restatement. Having found no authority to the contrary, there is no basis for this Court to determine that the limitation does not exist under both Delaware and Virginia law. Therefore, the viability of Plaintiffs' breach of contract claims depends on whether or not the limitation applies. This Court finds that it does.

As noted by the D.C. Circuit, Plaintiffs' claims for breach of contract with respect to liquidation preferences sound in anticipatory breach. *Perry II*, 864 F.3d at 633. Plaintiffs claim Defendants effectively repudiated their contractual obligations with regards to the liquidation preference by rendering performance impossible. *Id.* at 633 n. 26. Typically, this amounts to a claim for anticipatory breach. But here, Plaintiffs' contract with the GSEs with respect to

liquidation preferences is a unilateral contract. Plaintiffs completed their end of the bargain by purchasing preferred shares in the GSEs. With respect to the liquidation preference, the only remaining performance is payment of the preference by Fannie Mae or Freddie Mac upon liquidation (if it ever occurs). This clearly implicates the limitation. And therefore, Plaintiffs "can't declare a breach and sue for immediate payment just because [they have] reason (even compelling reason) to doubt that the other party will pay when due." *Basic Am. Indus.*, 252 F.3d at 915. Plaintiffs fail to state a claim for breach of contract.

Plaintiffs' claim that "[t]his Court is not free to issue any such ruling" is mistaken. Class Opp'n to Defs.' Mot. To Dismiss at 15. The Court is not dismissing the breach of contract claims as unripe. Ripeness is a doctrine of justiciability. And the limitation relates to the merits of a claim for anticipatory breach—it helps define the cause of action itself. The overlapping of issues in determining whether the claim is ripe and whether the limitation applies does not make them the same. "The ripeness doctrine generally deals with when a federal court can or should decide a case." *Perry II*, 864 F.3d at 633. In its opinion, the D.C. Circuit held that the Court may hear a claim for anticipatory breach, but left to this Court to determine whether there is actually a claim to be heard. *Id.* at 634. Because Plaintiffs' claim falls within the exception to the anticipatory breach doctrine, Plaintiffs have failed to state a valid claim.

### B. Plaintiffs State a Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Each complaint asserts the Third Amendment breached the implied covenant of good faith and fair dealing based on Plaintiffs' right to receive liquidation preferences and dividends. *See* Class SAC Counts IV-VI; Fairholme FAC Count III; Arrowood FAC Count III. The Court previously dismissed these claims, holding that the absence of a contractual right to dividends and the nonoccurrence of a liquidation precluded recovery on these theories. *See Perry Capital*, 70 F.

14

Supp. 3d at 233-39. However, the D.C. Circuit reversed this decision, directing the Court "to evaluate [the implied covenant claims] under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties." *Perry II*, 864 F.3d at 631. Having assessed these claims accordingly, the Court finds that Plaintiffs effectively state a claim for breaches of the implied covenant.

### i. The Implied Covenant of Good Faith and Fair Dealing

In both Delaware and Virginia, every contract contains an implied covenant of good faith and fair dealing. *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017); *Va. Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541-42 (4th Cir. 1998). Applying the implied covenant is a "cautious enterprise," though, whereby courts "infer[] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010). It is not a "vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997); *see also Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (noting the implied covenant does not create a "free-floating duty . . . unattached to the underlying legal document"). Parties are free to enter into good and bad contracts, and the law enforces both. In fact, "good faith" in this context simply entails "faithfulness to the scope, purpose, and terms of the parties' contract." *Gerber v. Enters. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). Similarly, "fair dealing" does not imply equitable behavior, but rather, actions consonant "with the terms of the parties' agreement and its purpose." *Id.* Courts "will only imply contract terms when the party asserting the implied covenant proves that the other

party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1126.

The implied covenant generally applies only if the contract is silent as to the subject at issue. If the contract directly addresses the matter at hand, "[e]xisting contract terms control . . . such that implied good faith cannot be used to circumvent the parties' bargain." *Dunlap*, 878 A.2d at 441; *see also Ward's Equip.*, 254 Va. at 385 ("[W]hen parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights."). But if the contract is silent on the issue, the Court must consider whether implied contractual terms fill the gap. *MHS Capital LLC v. Goggin*, C.A. No. 2017-0449-SG, 2018 WL 2149718, at *12 (Del. Ch. May 10, 2018). To do this, the implied covenant asks "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Gerber v. Enters. Prods. Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). As noted by the D.C. Circuit, *Perry II*, 864 F.3d at 631, this analysis hinges on the parties' "reasonable expectations at the time of contracting." *Nemec*, 991 A.2d at 1126; *see also SunTrust Mortg. Inc. v. Morts. Unlimited, Inc.*, No. 3:11CV861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (noting that, under Virginia law, the implied covenant includes "consistency with the justified expectation of the other party to a contract") (internal quotations omitted).

### ii.   The Time of Contracting

Timing is a large point of contention in this case. While all the parties acknowledge that the determinative factor for the implied covenant claims is the reasonable expectations of the parties *at the time of contracting*, they disagree over when that is in this case.

The Plaintiffs, for example, argue that the time of contracting is the time the securities were issued—a time predating HERA and the FHFA's appointment as conservator. *See* Class Resp. at 33; Fairholm & Arrowood Resp. at 31. They say that the contractual rights they seek to enforce—namely, to dividends and liquidation preferences—inhere in the security, traveling to each subsequent acquirer. Class Pls.' Resp. at 34.

Defendants, on the other hand, believe Plaintiffs' implied covenant claims must be considered in light of the stockholder contract as it existed at the time of the alleged breach—*i.e.*, at the time of the Third Amendment in August 2012. Defs.' Mot. at 28. This is because, according to Defendants, the parties' reasonable expectations were updated with each amendment to the broad, flexible contract, including the enactment of HERA. *Id.*

The Court agrees with Plaintiffs in theory, but it is ultimately Defendants whose position wins out. Plaintiffs are correct that the original bargaining took place when the GSEs issued the shares, irrespective of whether the securities changed hands after that. Further, the bargained-for rights related to dividends and liquidation preferences traveled with the shares to subsequent purchasers. Under both Delaware and Virginia statutory law, "a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer[.]" Del. Code tit. 6, § 8-302; Va. Code § 8.8A-302. "All rights in the security" as used in the statutes "means rights in the security itself as opposed to personal rights." *E.g., Schultz v. Ginsburg*, 965 A.2d 661, 667 n.12 (Del. 2009). In other words, "[w]hen a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit for any recovery or other remedy, travel with the shares." *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1049–51 (Del. Ch. 2015). Rights associated with dividends and liquidation preferences inhere in the security.

Plaintiffs are also correct that "[a]n implied covenant claim . . . looks to the past" at "what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *Gerber*, 67 A.3d at 418. Accordingly, Courts do not ask "what duty the law should impose on the parties given their relationship at the time of the wrong, but rather what the parties would have agreed to themselves had they considered the issue in their original bargaining positions at the time of contracting." *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440-42 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grouds*, 68 A.3d 665 (Del. 2013).

Defendants are correct, however, that investor contracts with corporations are different. *See* Defs.' Mot. at 26; Defs.' Reply at 22. Corporations are creatures of the state. *See, e.g.*, *Goldman v. Postal Telegraph*, 52 F. Supp. 763, 769 (D. Del. 1942). Because of this fact, an investor's contract with the corporation includes not only documents such as the stock certificate, certificate of designations, the corporate charter, and bylaws, but also the corporate law under which the corporation is formed and regulated. *See, e.g.*, *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013); *Middleburg Training Ctr., Inc. v. Firestone*, 477 F. Supp. 2d 719, 725 (E.D. Va. 2007); *see also STAAR Surgical Co. v. Waggoner*, 588 a.2d 1130, 1136 (Del. 1991) ("[I]t is a basic concept that the General Corporation Law is a part of the certificate of incorporation of every Delaware company.").

These investor contracts are, "by design, flexible and subject to change." *Boilermakers*, 73 A.3d at 939; *see also Loew's Theatres, Inc. v. Commercial Credit Co.*, 243 A.2d 78, 81 (Del. Ch. 1968) (stating "the contract rights of the stockholders . . . do not rest upon an unchangeable base . . ."). Changes to these contracts may come in the form of standard amendments to organic corporate documents. But they may also come in the form of changes in law affecting the nature

of the corporation, its governance, and its relationship with shareholders. *See Goldman v. Postal Telegraph*, 52 F. Supp. 763, 769 (D. Del. 1943) (noting that "since the corporation is the creature of the state, and since the corporation law is part of the corporate charter . . . it is self-evident that the state has the right to reserve to itself . . . the power to change the contract between the corporation and its stockholders . . ."); *see also Bove v. Cmty. Hotel Corp.*, 249 A.2d 89, 96 (R.I. 1969) (stating that legislative enactments concerning the "relationship between the stockholder and the corporation or between the stockholders *inter sese*" may "alter or amend the charters of corporations"). For a typical corporation, this would mean changes to state laws. But for the GSEs, which were chartered by Congress and subject to extensive federal regulation, certain changes to federal law—*i.e.*, those affecting the governance of the GSEs and their relationships with their shareholders—amend or inform the investor contract.

For an investor contract, the *time of contracting* for the purposes of the implied covenant inquiry must be the time of the most recent change in contract—whether by amendment or change in law. This must be the case because otherwise, conduct consistent with an amendment to a shareholder's contract or consistent with background corporate law could violate the reasonable expectations at the time of the issuance, supporting an implied covenant claim. Such would frustrate the corporate form's flexibility by making amendments practically impossible and changes to background law of no effect.

Even if the Court were to credit Plaintiffs' position that the reasonable expectations must be evaluated at the time of issuance, the analysis would come out the same. An investor in a corporation—let alone a corporation as highly regulated as Fannie and Freddie—reasonably expects that the shareholder contractor may be amended. An investor also knows that there may be a change in law affecting her relationship with the corporation and that her original contract

with the corporation does not trump such a change. And an investor reasonably expects that the corporation will act in accordance with any such amendment or change in law. Put differently, corporate conduct consistent with the law or the amended shareholder contract is not arbitrary or unreasonable behavior, such that it would give rise to an implied covenant claim.

In light of these principles, the Court will look to HERA and the FHFA's appointment as conservator in evaluating the reasonable expectations of the parties. As instructed by the D.C. Circuit, the Court will consider:

> (1) Section 4617(b)(2)(J)(ii) (authorizing the FHFA to act "in the best interests of the [Companies] or the Agency"), (2) Provision 5.1 of the Stock Agreements, J.A. 2451, 2465 (permitting the Companies to declare dividends and make other distributions only with Treasury's consent), and (3) pertinent statements by the FHFA, e.g., J.A. 217 ¶ 8, referencing Statement of FHFA Director James B. Lockhart at News Conference Announcing Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008) (The "FHFA has placed Fannie Mae and Freddie Mac into conservatorship. [Conservatorship] is a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the [GSEs] until they are stabilized.").

*Perry II*, 864 F.3d at 631. Additionally, the Court will examine the express provisions of Plaintiffs' stock certificates, as well as the nature of the GSEs as highly regulated entities in determining the reasonable expectations of the parties.

### iii.   Plaintiffs Plead Sufficient Facts to Support a Finding that their Reasonable Expectations were Violated by the Third Amendment

Defendants argue any finding that the Third Amendment violated the Plaintiffs' reasonable expectations is precluded by (1) the express provisions of the stock certificates, (2) the highly-regulated nature of the GSEs, (3) HERA, and (4) the PSPAs. Defs.' Mot. at 21-30. Additionally, Defendants do not believe any statements by the FHFA's Director affect this foregone conclusion. And Defendants assert all of this can be resolved at the motion to dismiss stage. The Court

disagrees.   Treating the complaint's factual allegations as true and giving the benefit of all reasonable inferences, Plaintiffs state a claim for breach of the implied covenant relating to dividends and liquidation preferences.

1.   The Express Provisions of Plaintiffs' Stock Certificates

None of the provisions of Plaintiffs' respective stock certificates preclude an implied covenant claim based on Plaintiffs' rights to dividends and liquidation preferences.   More pointedly, nothing in the certificates would allow the Plaintiffs reasonably to expect the Net Worth Sweep.

Defendants point to the provision in the certificates permitting the GSEs to issue more senior stock without the consent of more junior holders, even if the issuances "materially and adversely affect" the interests of the junior stockholders.   Defs.' Mot. Ex. C §§ 7(b), 8 (Fannie Preferred); *see* Ex. D §§ 8, 9(h)(ii) (Freddie Preferred); Ex. E §§ 9, 10(h)(ii) (Freddie Common). They note that the effect of more senior issuances could be to diminish the likelihood of Plaintiffs receiving dividends or liquidation preferences.   Specifically, Defendants argue in light of this provision of the certificate that "Plaintiffs cannot credibly allege that . . . had the [GSEs] and its stockholders thought to negotiate with respect to *amendments* to existing senior stock certificates, the [GSEs] would have agreed to treat amendments differently than issuance of new stock certificates." Defs.' Mot. at 22 (emphasis in original).   But the Court finds Defendants' argument unpersuasive.   An issuance of securities is typically accompanied by investment and junior shareholders reasonably expect the company to receive value in exchange for providing senior shareholders with enhanced disbursement rights.   But the Third Amendment was unaccompanied by any increased funding commitment.   *See* Class SAC ¶ 60; *see also Perry I*, 70 F. Supp. 3d at 224 (noting that Treasury did not grant the GSEs additional funding commitments); *Robinson v.*

*Fed. Hous. Fin. Agency*, 876 F.3d 220, 234 (6th Cir. 2017) (observing that Treasury "did not commit any additional funds to the [GSEs]"). It is the GSEs' alleged relinquishment of value in exchange for no new investment that the Plaintiffs claim they could not reasonably expect. And so, Defendants' "new issuance" analogy falls flat.

Defendants also retread the argument that Plaintiffs could not expect dividends when they agreed to provide the GSEs' Boards (and thus, FHFA) with "sole discretion" to declare dividends. But as noted by the D.C. Circuit, "[a] party to a contract providing for such discretion violates the implied covenant if it 'act[s] arbitrarily or unreasonably.'" *Perry II*, 864 F.3d at 631 (quoting *Nemec*, 991 A.2d at 1126); *see also Va. Vermiculite, Ltd. v. W.R. Grace & Co.—Conn.*, 156 F.3d 535 , 542 (4th Cir. 1998). So while Plaintiffs could reasonably expect the GSEs to exercise discretion as it relates to dividends, they could not expect the GSEs to extinguish the possibility of dividends arbitrarily or unreasonably. This is what Plaintiffs allege. Class SAC ¶¶ 150, 157, 164; Fairholme FAC ¶ 148; Arrowood FAC ¶ 142. And at this stage of the litigation, the claim that Defendants' discretion was not reasonable is plausibly supported by the factual averments from the various plaintiffs' complaints, including that:

- at the time the Third Amendment was enacted, the GSEs, FHFA, and Treasury understood that the GSEs were about to achieve sustained profitability, Class SAC ¶¶ 51-56; Fairholme FAC ¶¶ 55-67; Arrowood FAC ¶¶ 51-63,

- the GSEs and FHFA knew this profitability would permit the GSEs to pay the 10% dividend without the necessity of drawing from the Treasury, Class SAC ¶¶ 52-53; Fairholme FAC ¶¶ 69-70; Arrowood FAC ¶¶ 65-66,

- the Third Amendment permitted the Treasury to reap enormous benefits in exchange for no new investment, Class SAC ¶ 60; *see also Perry I*, 70 F. Supp. 3d at 224; *Robinson v. Fed. Hous. Fin. Agency*, 876 F.3d at 234, and

- the Third Amendment guaranteed that Plaintiffs would never receive dividends or liquidation distributions, *e.g.*, Class SAC ¶¶ 12-14; Fairholme FAC; Arrowood FAC.

The Court finds nothing in the Plaintiffs' stock certificates suggesting they could have reasonably expected the Net Worth Sweep.

### 2. The Highly-Regulated Nature of the GSEs

Next, Defendants claim that "[b]ecause of the highly-regulated nature of the [GSEs], Plaintiffs could not as a matter of law have had reasonable expectations that were violated by the Third Amendment." Defs.' Mot. at 24. In support of this theory, Defendants primarily rely on the portion of this Court's prior opinion dismissing the Class Plaintiffs' regulatory taking claim.[4] *See* Defs.' Mot. at 24; Defs.' Reply at 21-22. There—as part of the *Penn Central* analysis—the Court held that Plaintiffs were not "deprived of any *reasonable* investment-backed expectations" because "plaintiff shareholders understood the risks intrinsic to investments in entities as closely regulated as the GSEs[.]" *Perry I*, 70 F. Supp. 3d at 245. Specifically, the Court pointed to the history of the GSEs "under the watchful eye of regulatory agencies" and even noted that "[t]he tradeoff when investing in government-sponsored entities that receive meaningfully different benefits than private corporations is increased regulation and the prospect of a government takeover." *Id.* at 244 n. 56. This is not the knock-out punch for which Defendants hope.

---

[4] This ruling was not challenged on appeal. *See Perry II*, 864 F.3d at 603 n. 6.

The takings "reasonable investment-backed expectations" inquiry and the implied covenant "reasonable expectations" inquiry sound alike in nomenclature but differ in focus and application.

In the regulatory takings context, whether a government action interferes with reasonable investment-back expectations is a factor to consider to determine whether the action has gone beyond "regulation" and effects a "taking". *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). The focus of the analysis is on a property owner's expectations as they relate to *the government*. If the property owner knows she does business in a highly regulated industry, it is more difficult for her to claim an entitlement to compensation. *See, e.g., Burlington N. R.R. Co. v. United Transp. Union*, 822 F. Supp. 797, 802 (D.D.C. 1991) ("As a general matter, in an area as heavily regulated as the railroads and in which Congress has repeatedly demonstrated its willingness to legislate solutions to labor disputes, any expectancy would seem unreasonable if not naïve."). She chose to do business in an industry subject to extensive regulation. And she should thus not be surprised when *the government* enacts a policy or takes an action affecting her property rights.

For implied covenant claims, the focus is not on what a party reasonably expects of the government, but what she reasonably expects of her co-contracting party. *See Nemec*, 991 A.2d at 1126 ("We will only imply contract terms when the party asserting the implied covenant proves that *the other party* has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.") (emphasis added); *Sun Trust Mortg., Inc. v. Mortgs. Unlimited, Inc.*, No. 3:11-CV-861-HEH, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2012) (stating that the implied covenant "prohibits *a party* from acting arbitrarily, unreasonably, and in bad faith") (emphasis added). The analysis centers on each contracting party's expectation

that her counterparty will refrain from conduct "frustrat[ing] the 'overarching purpose' of the contract" or conduct "prevent[ing] the other party to the contract from receiving the fruits of the bargain." *Dunlap*, 878 A.2d at 442 (internal quotations omitted). This is not to say that the highly-regulated nature of a company is irrelevant to the inquiry. On the contrary, it may well inform how a shareholder expects the corporation to behave under their contract. But the focus is on the corporation's behavior, not the government's regulations.

Here, of course, the analysis is complicated by the fact that it can be difficult to tell where the government ends and the GSEs begin. Obviously, the FHFA is a federal agency. But when it acts as conservator, the FHFA "steps into [the GSEs] shoes, shedding its government character and also becoming a private party." *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017); *Collins v. Mnuchin*, No. 17-20364, 2018 WL 3430826, at *8 (5th Cir. July 16, 2018). And "the FHFA's adoption of the Third Amendment . . . was taken on behalf of the [GSEs]." *Perry II*, 864 F.3d at 631. Thus, the complained-of conduct by the FHFA is that of the GSEs, not the government.

The Court stands by its takings holding and sees no contradiction in holding that the highly-regulated nature of the GSEs does not preclude an implied covenant claim. When investing in companies as closely regulated as the GSEs, Plaintiffs should have been aware of the risks that *the government* may take action effecting their property rights. But it does not follow that the Plaintiffs could reasonably expect that the GSEs themselves—through the FHFA—would give away all of Plaintiffs' residual rights to dividends and liquidation surplus in exchange for no investment and no meaningful consideration at a time when the GSEs were highly profitable.

3.  HERA, the PSPAs, and Statements by the FHFA Director

As discussed in Part III.B.ii, *supra*, the Court will consider the events surrounding the placement of the GSEs into conservatorship in evaluating the reasonable expectations of the parties. Defendants rely heavily on the language of both HERA and the PSPAs to demonstrate that Plaintiffs could reasonably expect the Net Worth Sweep. While some of Defendants' argument is compelling, none of it permits the Court to grant dismissal of Plaintiffs' implied covenant claims at this stage.

### a. HERA does not require dismissal of Plaintiffs' implied covenant claims

HERA undoubtedly impacted the Plaintiffs' reasonable expectations in relation to their shareholder contracts. As noted in Part I, it gave the FHFA's Director regulatory authority over the GSEs, 12 U.S.C. § 4511(b)(1), and authorized the Director to appoint FHFA as either conservator or receiver of the GSEs. *Id.* § 4617(a)(2). If the Director did choose to appoint the agency as conservator, HERA vests the FHFA with broad authority and discretion over the operation of the GSEs. *Perry II*, 864 F.3d at 600.

As part of this authority, HERA empowers the FHFA to take actions consistent with the statute, "which the Agency determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii). Defendants see this as a death knell for Plaintiffs' implied covenant claims. They argue that because HERA gives "the Conservator [] broad authority and discretion to act in the best interests of the [GSEs] or the Agency," Defs.' Reply at 26, "the implied covenant does not apply" and even if it did, it precludes any reasonable expectation that the Net Worth Sweep would not occur. *E.g.*, *id.* at 20. The Court disagrees.

Defendants' claim the implied covenant does not apply is directly contrary to the D.C. Circuit's opinion. Defendants are correct that the "best interests" provision grants the FHFA broad discretion as conservator. But the agency may not act with impunity. "A party to a contract

providing for such discretion violates the implied covenant if it 'act[s] arbitrarily or unreasonably.'" *Perry II*, 864 F.3d at 631 (quoting *Nemec*, 991 A.2d at 1126); *see also Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at *3 (Va. Cir. 1993) (stating that "where discretion is lodged in one of two parties to a contract . . . such discretion must, of course, be exercised in good faith"). Defendants cannot simply say that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise. The question is whether Defendants exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract. Plaintiffs plausibly allege that they have.

Throughout this litigation, Defendants proffered reason for entering into the Third Amendment was to end the "circularity" or "downward spiral" caused by the GSEs' drawing on Treasury funding to pay dividends to Treasury. *See, e.g.*, [No. 13-1288 ECF No. 20 at 3, 23-24, 56, 65-66, 69-70]. But Plaintiffs claim that this was merely pretextual. Plaintiffs allege that—at the time of the Third Amendment—the FHFA and the GSEs knew:

- the GSEs would "be generating large revenues over the coming years, thereby enabling them to pay the 10% annual dividend well into the future" (Class SAC ¶ 53; Arrowood FAC ¶ 64; Fairholme FAC ¶ 69);

- the GSEs' profits would be "in excess of current 10% dividend paid to Treasury" (Class SAC ¶ 53; Arrowood FAC ¶ 67; Fairholme FAC ¶ 71);

- 2012 through 2020 would be the "golden years of GSE earnings" (Class SAC ¶ 54; Arrowood FAC ¶ 53; Fairholme FAC ¶ 56); and

- by 2020, cumulative dividends paid by the GSEs to Treasury would exceed Treasury's total investment (Class SAC ¶ 54).

The pleaded facts not only show that the GSEs would not need to draw on Treasury's funds to pay dividends, but also that the GSEs could repay Treasury for its investment under the pre-Third Amendment dividend structure. Such facts could support a finding that Defendants exercised their discretion arbitrarily or unreasonably.

Moreover, other provisions of HERA actually advance Plaintiffs' position that they could not reasonably expect the Net Worth Sweep. For example, while HERA gave the Treasury temporary authority to purchase new shares in the GSEs,[5] Treasury was required to consider "[t]he [GSEs'] plan[s] for the orderly resumption of private market funding or capital market access" and "[t]he need to maintain the [GSEs'] status[es] as a private shareholder-owned company." 12 U.S.C. §§ 1719(g)(1)(C), 1455(l)(1)(C). These provisions signal to shareholders a Congressional expectation that the GSEs would work back towards normalcy, and lend support to Plaintiffs who claim they could not reasonably expect the Net Worth Sweep (which essentially permanently closed off access to capital markets) at a time when the GSEs were entering a period of profitability.

b.   The PSPAs and the Statements by the FHFA

The original PSPAs were entered into on September 7, 2008—the same day the GSEs entered into conservatorship. *See, e.g.*, Arrowood FAC ¶ 30, 34. They included a provision giving Treasury the authority to prevent the GSEs from declaring dividends during conservatorship. *See* Defs.' Mot. Ex. F § 5.1. Defendants argue—in light of this provision—that Plaintiffs could not reasonably expect to receive dividends and could therefore not be surprised by the Net Worth Sweep. Defs. Mot. at 29-30.

---

[5] This authority expired on December 31, 2009, well before the enactment of the Third Amendment. 12 U.S.C. §§ 1719(g)(4), 1455(l)(4).

The Net Worth Sweep—however—is fundamentally different than Treasury's right to veto capital distributions. For one thing, if Treasury withheld approval for a dividend to Plaintiffs under the original terms of the PSPAs, that available cash on hand would not simply be handed out to Treasury. One would expect that cash to increase the value of Plaintiffs' underlying securities either by way of reinvestment into the company or reduction of debt. The Net Worth Sweep does exactly the opposite. It decreases the value of all securities other than the PSPAs by eliminating the possibility of profits accruing in any way to their benefit.

Furthermore, Treasury's authority to prevent distributions existed only *during conservatorship.* And Plaintiffs believed conservatorship would be temporary. At the time of the enactment of the PSPAs, the FHFA stated, "Upon the Director's determination that the Conservator's plan to restore the [GSEs] to a safe and solvent condition has been completed successfully, the Director will issue an order terminating the conservatorship[s]." Class SAC ¶ 40 (quoting *FHFA Fact Sheet, Questions and Answers on Conservatorship* 2); Fairholme FAC ¶ 34; Arrowood FAC ¶ 30. In fact, the FHFA Director described the conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning the entities to normal business operations." Fairholme FAC ¶ 31; Arrowood FAC ¶ 27. These statements are important to the implied covenant analysis. They inform what Plaintiffs reasonably believed at the time the GSEs entered into conservatorship and the PSPAs with Treasury. And at the nascent of a sustained period of profitability, Plaintiffs would have reasonably expected the GSEs to be moving out of conservatorship, not doubling down by executing the Net Worth Sweep.

*     *     *

Motions to dismiss pleadings are not favored; they are to be granted sparingly and with caution. At this stage in the proceedings, Plaintiffs plausibly allege that they could not have

29

reasonably expected their rights to dividends and liquidation preferences to be extinguished by the Third Amendment. Accordingly, Defendants' motion with respect to Plaintiffs' implied covenant claims will be denied. Those claims will move forward.

### C. Plaintiffs' Claims for Breaches of Fiduciary Duties are Preempted by HERA

Plaintiffs claim that the FHFA—as conservator—breached state law fiduciary duties owed to shareholders by executing the Third Amendment. *See* Class SAC Counts VII-VIII and XI-XII; Fairholme FAC Count IV; Arrowood FAC Count IV. This Court previously dismissed various shareholder derivative claims, confirming that the power to bring such suits rests solely in the FHFA. *Perry I*, 70 F. Supp. 3d at 230. The D.C. Circuit affirmed this ruling while holding that HERA's Succession Clause does not bar "direct" stockholder claims. *Perry II*, 864 F.3d at 627.

Counts XI and XII from the Class Plaintiffs' complaint are revivals of their derivative fiduciary duty claims to preserve these issues for appeal. Those counts will be dismissed.

The remaining claims before the Court represent Plaintiffs' second chance—an attempt to plead direct claims for breach of fiduciary duties. As an initial matter, all such claims against Freddie Mac (Class SAC Count VIII, Arrowood FAC Count IV (as related to Freddie Mac), and Fairholme FAC Count IV (as related to Freddie Mac)) must be dismissed as Virginia does not recognize a direct shareholder claim for breach of fiduciary duty. Irrespective of this, all of these claims against both Freddie and Fannie must be dismissed because any direct claim for breach of fiduciary duty is preempted by HERA.

As previously discussed, Freddie Mac has elected to follow Virginia law for corporate governance issues not addressed by federal law or Freddie's charter. In Virginia, "corporate shareholders cannot bring individual, direct suits against officers or directors for breach of fiduciary duty, but instead shareholders must seek their remedy derivatively on behalf of the

corporation." *Remora Invs., LLC v. Orr*, 277 Va. 316, 323, 673 S.E.2d 845 (2009) (citing *Simmons v. Miller*, 261 Va. 561, 576, 544 S.E.2d 66 (2001)); *see also Pagliara v. Fed. Home Loan Mortg. Corp.*, 203 F. Supp. 3d 678, 690 (E.D. Va. 2016) (stating "shareholders may assert claims of fiduciary breach against corporate directors only through derivative suits"). Since the opinion in *Perry II* foreclosed the possibility of derivative suits against Defendants, 864 F.3d at 625, Plaintiffs cannot state a claim for breach of fiduciary against Freddie Mac.[6]

Even if that were not the case, the Court finds that *all* the direct claims for breach of fiduciary duty must be dismissed as they are preempted by HERA. State law is preempted to the extent of any conflict with a federal statute. *Hillman v. Maretta*, 569 U.S. 483, 490, 133 S.Ct. 1943, 186 L.Ed.2d 43 (2013). "Such a conflict occurs when compliance with both federal and state regulations is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations and quotations omitted). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects[.]" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352.

Directors of a corporation owe two fiduciary duties to stockholders—care and loyalty. *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (citing *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006)); *Bank of Am. v. Musselman*, 222 F. Supp. 2d 792, 796 n. 5 (E.D. Va. 2002). Here, Plaintiffs allege the enactment of the Third Amendment amounted to a breach of the duty of loyalty. *See* Class SAC Counts VII-VIII and XI-

---

[6] Plaintiffs ask this Court to make an *Erie* guess that the next time the Virginia Supreme Court is confronted with this issue, it would adopt the standard from the Delaware case *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, which allows direct claims for breach of fiduciary duties. In support, Plaintiffs note that in *Remora Investments*, the court specifically stated it "need not decide whether to adopt the analysis employed by the Delaware Supreme Court in *Tooley*." 277 Va. at 324. The Court declines Plaintiffs' invitation. The Court does not find sufficient indication that the Virginia Supreme Court would change the law. Moreover, even if Plaintiffs could state a direct claim for breach of fiduciary duty in Virginia, in this case, such a claim is preempted by HERA.

XII; Fairholme FAC Count IV; Arrowood FAC Count IV. "Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

Problematic for Plaintiffs is the fact that HERA specifically permits the FHFA—on behalf of the GSEs—to "take any action [within its statutory powers] which the Agency determines is in the best interests of the regulated entity *or the Agency*." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added). As pointed out by the D.C. Circuit, "[HERA] refers only to the best interests of FHFA and the [GSEs]—and *not* those of the [GSEs'] shareholders or creditors." *Perry II*, 864 F.3d at 608. The Circuit described this as a "deliberate choice" by Congress "to permit FHFA to act in its own governmental interests[.]" *Id.* It stands to reason then how Plaintiffs can complain about self-dealing when the statute authorizes exactly that. So state and federal law clearly conflict and the state law fiduciary claims are preempted.

Plaintiffs attempt to get around preemption by claiming that they do not seek to force the FHFA to promote the interests of the GSEs' shareholders over the GSEs or the FHFA, "only that, in addition to considering the interests of Treasury and the [GSEs], Defendants were required by state law to consider, in good faith, the interests of private shareholders." Class Resp. at 50. They essentially ask the Court to amend HERA so it reads the FHFA may "take any action [within its statutory powers] which the Agency determines is in the best interests of the regulated entity or the Agency, *as long as it takes into account the interests of the GSEs' shareholders*." To do this, the Court must contravene Congress' "deliberate choice."

In Section 4617(a)(7), HERA makes clear that "[w]hen acting as conservator . . . the [FHFA] shall not be subject to the direction or supervision of . . . any State in the exercise of the

rights, powers, and privileges of the [FHFA]." 12 U.S.C. § 4617(a)(7). To impose state fiduciary duty law on the FHFA would be just such direction, obstructing the "extraordinarily broad flexibility" endowed to the agency by HERA. *See Perry II*, 864 F.3d at 606. "[T]he purpose of § 4617(a)(7) 'is to provide a preemption defense for FHFA in its role as conservator.' In other words, § 4617(a)(7) specifically functions to remove obstacles to FHFA's exercise of conservator powers—i.e. to preserve FHFA's interests, not those of GSE shareholders." *Saxton v. Fed. Hous. Fin. Agency*, 245 F. Supp. 3d 1063, 1077 (N.D. Iowa 2017) (quoting *Robinson v. Fed. Hous. Fin. Agency*, 223 F. Supp. 3d 659, 668 (E.D. Ky. 2016)) (citation omitted). Fiduciary duties, especially the duty of loyalty, represent such an obstacle. Plaintiffs breach of fiduciary duty claims are preempted by HERA and must be dismissed.

### D. Plaintiffs Fail to State a Claim that the Treasury Stock Certificates, as Amended by the Third Amendment, Violate Delaware or Virginia Statutes

On remand, Plaintiffs assert new claims that the form of dividend prescribed by the Third Amendment violates Delaware and Virginia statutes. Class SAC Counts IX-X; Fairholme FAC Counts V-VI; Arrowood FAC Counts VII-VIII. As an initial matter, any claim for injunctive relief on these counts is dismissed. Upon review, the claims for damages will be dismissed as well.

Plaintiffs allege Fannie Mae's enactment of the Third Amendment violates Section 151(c) of the Delaware General Corporation Law, which states:

> The holders of preferred or special stock of any class or of any series thereof shall be entitled to receive dividends *at such rates*, on such conditions and at such times as shall be stated in the certificate of incorporation or in the resolution or resolutions providing for the issue of such stock adopted by the board of directors as hereinabove provided, payable *in preference to*, or *in such relation to*, the dividends payable on any other class or classes or of any other series of stock, and cumulative or noncumulative as shall be so stated and expressed.

8 Del. C. § 151(c) (emphasis added). Specifically, Plaintiffs claim the Third Amendment is neither

paid at a "rate" nor paid "in preference to" or "in relation to" other classes or series of stock, thus,

violating the statute.

Similarly, Plaintiffs argue that by adopting the Third Amendment Freddie Mac violated

Virginia law, which states that a corporation may authorize "one or more classes or series of shares

that . . . have preference over any other class or series of shares with respect to distributions[.]"

Va. Code § 13.1-638(C)(4). Plaintiffs claim that while this statute permits corporations to establish

a dividend preference, it does not permit corporation to establish a preference that operates to

preclude all other classes from ever receiving dividends.

Both of these theories fail. First, the GSEs' federal statutory charters specifically grant the

GSEs authority to: (1) issue preferred stock "on such terms and conditions as the board of directors

shall prescribe," 12 U.S.C. §§ 1718(a), 1455(f); and (2) make dividend payments to GSE

stockholders in the manner "as may be declared by the board of directors." *Id* §§ 1718(c)(1),

1452(b)(1). And the GSEs follow Delaware or Virginia law only to the extent not inconsistent

with the GSEs' charters or other federal law. 67 Fed. Reg. 38361 (June 4, 2002); *see also Edwards*

*v. Deloitte & Touche, LLP*, No. 16-21221-CIV, 2017 WL 1291994, at *6 (S.D. Fla. Jan. 18, 2017).

Second, even if the Court were to apply these state statutes, Plaintiffs fail to cite a single

case or other authority supporting their claims. The Treasury Stock Certificates state the

Treasury's preferred stock ranks senior to all other classes of stock as to dividends, and that

Treasury's dividend is calculated every quarter based on the GSEs' quarterly performance. *See*

Defs.' Mot. Ex. G §§ 2, 3, 8. Without any case law in support of their theory, the Court sees no

basis to hold that this is not a "preference", not "in relation to" other classes, or not paid at a "rate."

Plaintiffs fail to state a claim that the Treasury Stock Certificates, as amended by the Third Amendment, violate Delaware or Virginia statutes.

### E.  Plaintiffs Remaining Claims are Dismissed

Finally, in light of the D.C. Circuit's opinion in *Perry II*, all APA claims (Fairholme FAC Count I, Arrowood FAC Counts I-III) and all requests seeking injunctive or declaratory relief are dismissed.

## V.    CONCLUSION

In accordance with the above analysis,

1) In Civil No. 13-1053, Defendants' motion [ECF No. 68] will be **GRANTED** with respect to Counts I, II, IV, V, and VI and **DENIED** with respect to Count III.

2) In Civil No. 13-1439, Defendants' motion [ECF No. 77] will be **GRANTED** with respect to Counts I, IV, VI, VII, VIII and **DENIED** with respect to Count V.

3) In Miscellaneous Action No. 13-1288, Defendants' motion [ECF No. 66] will be **GRANTED** with respect to Counts I, II, III, VII, VIII, IX, X, XI, and XII and **DENIED** with respect to Counts IV, V, and VI.

In coming to its decision, the Court considered the various sur-replies filed in the above-captioned actions. Accordingly, the motions for leave to file sur-reply [ECF No. 79 for Civil No. 13-1053, ECF No. 87 for Civil No. 13-1439, and ECF No. 78 for Miscellaneous No. 13-1288] will be **GRANTED**.

Separate orders in each case consistent with this Memorandum Opinion shall issue this date.

9/28/18
Date

ROYCE C. LAMBERTH
United States District Judge