**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** ⎯⎯⎯⎯⎯⎯⎯⎯⎯ **THIS DOCUMENT RELATES TO: ALL CASES** | **Misc. Action No. 13-mc-1288 (RCL)** **CLASS ACTION** |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR CLASS CERTIFICATION**

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 2

II.   STATEMENT OF FACTS ................................................................................... 3

    A.    Pre-2008 ................................................................................................... 3

    B.    FHFA Places the GSEs Into Conservatorship ........................................ 4

    C.    The Housing Market Begins to Rebound in 2012 ................................... 5

    D.    The Third Amendment ............................................................................. 5

III.  THE PROPOSED CLASSES .............................................................................. 6

IV.   ARGUMENT ....................................................................................................... 7

    A.    The Requirements of Rule 23 .................................................................. 7

    B.    The Proposed Classes Satisfy the Requirements of Rule 23(a) .............. 8

        1.    Rule 23(a)(1) Numerosity is Satisfied ....................................... 8

        2.    Rule 23(a)(2) Commonality is Satisfied .................................... 9

        3.    Rule 23(a)(3) Typicality is Satisfied ........................................ 11

        4.    Rule 23(a)(4) Adequacy is Satisfied ........................................ 13

    C.    The Proposed Class Satisfies the Requirements of Rule 23(b) ............. 18

V.    CONCLUSION ................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alvarez v. Keystone Plus Constr. Corp.*,
  303 F.R.D. 152 (D.D.C. 2014)................................................................12

*Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*,
  No. CIV. A. 14348, 1995 WL 707916 (Del. Ch. Nov. 28, 1995)...........................11

*Coleman through Bunn v. Dist. of Columbia*,
  306 F.R.D. 68 (D.D.C. 2015)...........................................................21, 22

*Collins v. Mnuchin*,
  896 F.3d 640 (5th Cir. 2018) ...............................................................3

*Daskalea v. Washington Humane Soc'y*,
  275 F.R.D. 346 (D.D.C. 2011)...........................................10, 12, 14, 18

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
  No. 98CIV.4318, 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000).........................13

*Eisenberg v. Gagnon*,
  766 F.2d 770 (3d Cir. 1985).................................................................13

*Fairholme Funds, Inc. v. FHFA*,
  No. CV 13-1053 (RCL), 2018 WL 4680197 (D.D.C. Sept. 28, 2018).................9, 11, 20

*Healthy Futures of Texas v. Dep't of Health & Human Servs.*,
  326 F.R.D. 1 (D.D.C. 2018)...................................................... *passim*

*Hoyte v. District of Columbia*,
  325 F.R.D. 485 (D.D.C. 2017)...........................................................21, 22

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015)...................................................................21

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997) .........................................................13

*Parker v. Bank of Am., N.A.*,
  99 F. Supp. 3d 69 (D.D.C. 2015)...................................................9, 10, 11, 18

*Perry Capital, LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017)...............................................................2

*Saxton v. FHFA*,
    901 F.3d 954 (8th Cir. 2018) ...................................................................3

*Schultz v. Ginsburg*,
    965 A.2d 661 (Del. 2009) .....................................................................9

*\*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) ............................................................................20

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................10

**Statutes**

Del. Code tit. 6, § 8-302 ............................................................................9

Delaware General Corporation Law ..........................................................3

Housing and Economic Recovery Act of 2008 .........................................4

Va. Code § 8.8A-302 .................................................................................9

**Rules**

F.R.C.P. 23 ........................................................................................1, 7, 13

F.R.C.P. 23(a) ................................................................................. *passim*

F.R.C.P. 23(a)(1) ......................................................................................8

F.R.C.P. 23(a)(2) .................................................................................9, 11

F.R.C.P. 23(a)(3) ...............................................................................11, 13

F.R.C.P. 23(a)(4) ..........................................................................13, 14, 18

F.R.C.P. 23(b) ...........................................................................7, 8, 18

F.R.C.P. 23(b)(1) ....................................................................................18

F.R.C.P. 23(b)(1)(B) ...............................................................................19

F.R.C.P. 23(b)(2) ...............................................................................18, 19

F.R.C.P. 23(b)(3) ...............................................................................18, 20

Plaintiffs Joseph Cacciapalle ("Cacciapalle"), Michelle M. Miller ("Miller"), Timothy J. Cassell ("Cassell"), and Barry P. Borodkin ("Borodkin") (collectively, "Plaintiffs"), hereby submit this memorandum of law in support of their Motion for Class Certification.  Plaintiffs bring this action on behalf of themselves and other similarly situated holders of preferred stock[1] issued by the Federal National Mortgage Association ("Fannie Mae" or "Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie"; Fannie Mae and Freddie Mac together, the "Companies") and common stock issued by Freddie Mac, and assert claims arising out of the wrongful conduct of Fannie and Freddie and their Conservator the Federal Housing Finance Agency ("FHFA") in connection with the implementation of the Third Amendment (the "Third Amendment") to the Senior Preferred Stock Purchase Agreements (the "PSPAs") between the Companies and the United States Treasury ("Treasury"), dated August 17, 2012.

By the accompanying motion, and pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs move for certification of three classes ("Classes"), as described below.

---

[1] Fannie Mae had 16 series of preferred stock:  5.25% Non-Cumulative Preferred Stock, Series D; 5.10% Non-Cumulative Preferred Stock, Series E; Variable Rate Non-Cumulative Preferred Stock, Series F; Variable Rate Non-Cumulative Preferred Stock, Series G; 5.81% Non-Cumulative Preferred Stock, Series H; 5.375% Non-Cumulative Preferred Stock, Series I; 5.125% Non-Cumulative Preferred Stock, Series L; 4.75% Non-Cumulative Preferred Stock, Series M; 5.50% Non-Cumulative Preferred Stock, Series N; Variable Rate Non-Cumulative Preferred Stock, Series O; 5.375% Non-Cumulative Convertible Series 2004-1 Pref. Stock; Variable Rate Non-Cumulative Preferred Stock, Series P; 6.75% Non-Cumulative Preferred Stock, Series Q; 7.625% Non-Cumulative Preferred Stock, Series R; Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S; and 8.25% Non-Cumulative Preferred Stock, Series T (collectively, the "Fannie Preferred").

Freddie Mac had 16 series of preferred stock: 5.1% Preferred Stock, due 12/31/2049; 5.3% Non-Cumulative Perpetual Preferred Stock; 5.81% Perpetual Preferred Stock; Variable-Rate Preferred Stock, Series B; 5% Preferred Stock, Series F; Variable-Rate Preferred Stock, Series G; 5.1% Preferred Stock, Series H; 5.79% Preferred Stock, Series K; Variable-Rate Preferred Stock, Series L; Variable-Rate Preferred Stock, Series M; Variable-Rate Preferred Stock, Series N; 5.81% Preferred Stock, Series O; 6% Preferred Stock, Series P, Variable-Rate, Series Q; 5.7% Preferred Stock, Series R; Variable-Rate, Series S (collectively, the "Freddie Preferred" and collectively with the Fannie Preferred, the "Junior Preferred Stock").

# I.   __INTRODUCTION__

This case concerns one of the largest government appropriations of private property in the history of our Nation, more befitting "a banana republic" than "a constitutional one." *Perry Capital, LLC v. Mnuchin*, 864 F.3d 591, 648 (D.C. Cir. 2017) (Brown, J., dissenting).  Fannie Mae and Freddie Mac operate under federal charters that establish them as privately-owned, for-profit companies.   Since 2008, however, the Companies have been under the control of the federal government through conservatorships initiated and directed by FHFA, the Companies' regulator.  FHFA exercised its authority over the Companies by entering into investment agreements with Treasury, the "PSPAs."  Treasury committed to provide Fannie and Freddie with funds to maintain a positive net worth, for which Treasury received a generous return, including $1 billion of senior preferred stock in each Company, liquidation rights requiring that upon windup Treasury be paid that $1 billion plus any additional amount drawn from Treasury's funding commitment, dividends equal to 10% of this liquidation preference if paid in cash or 12% if paid in kind, and warrants to purchase 79.9% of the Companies' common stock for a nominal fee.  The common stock warrants made clear that this transaction did not eliminate the rights of other Fannie and Freddie shareholders.   The warrants gave Treasury an economic upside, on top of its above-market dividend return, but that upside would have to be shared with other investors.  That is because to pay Treasury dividends or liquidation payments on common shares, Fannie and Freddie would be bound to make such payments first to the Companies' junior preferred shareholders, with corresponding payments to all of the Companies' common shareholders.

In August 2012, however, after the housing market rebounded and it became apparent that Fannie and Freddie were positioned to become tremendously profitable, FHFA and Treasury sought to ensure that Treasury would *not* have to share any profits with private shareholders.  They accomplished this goal by adopting the "Net Worth Sweep."  The Net Worth Sweep replaced the

prior dividend structure with one that required Fannie and Freddie to pay their *entire net worth*, minus a small capital buffer, to Treasury on a quarterly basis. Private shareholders are now left "holding worthless stock," with the economic interest they once had in the Companies now expropriated by Treasury. *Saxton v. FHFA*, 901 F.3d 954, 961 (8th Cir. 2018) (Stras, J., concurring).

The Net Worth Sweep also prohibits Fannie and Freddie from rebuilding capital and exiting conservatorship—precisely the ends FHFA as conservator is supposed to be pursuing, not thwarting. "Fannie Mae and Freddie Mac are forever trapped in a zombie-like trance as wards of the state, bled of their profits quarter after quarter in perpetuity." *Collins v. Mnuchin*, 896 F.3d 640, 679, 690-91 (5th Cir. 2018) (Willett, J., dissenting). No conservatorship in the history of the United States has operated in such a manner, as it defies the common-sense purpose of what a conservatorship is. Accordingly, Plaintiffs bring claims seeking damages, asserting that the Companies and the FHFA violated the implied covenant of good faith and fair dealing inherent in the Companies' stock certificates.

## II.   STATEMENT OF FACTS

### A.   Pre-2008

Although created by Congress, Fannie Mae and Freddie Mac are stockholder-owned corporations. Fannie Mae's bylaws provide that it will follow "the applicable corporate governance practices and procedures of the Delaware General Corporation Law," and Freddie Mac's say it will follow "the corporate governance practices and procedures of the law of the Commonwealth of Virginia." Each was established by legislation and was later converted to a private corporation. Both Companies are referred to as "Government Sponsored Enterprises" (or "GSEs"), and were created by Congress to increase liquidity in the secondary mortgage market. The Companies purchase mortgages originated by private banks and bundle them into mortgage-

related securities to be sold to investors.  By facilitating this secondary mortgage market, the Companies increase liquidity for private banks, which enables them to make additional loans to individuals for home purchases.

To raise capital, the Companies issued several publicly traded securities, including both common stock and numerous classes of non-cumulative Junior Preferred Stock issued to private investors.  *See* ¶¶ 72-73[2].  All of the series of Junior Preferred Stock were governed by materially similar terms in their respective certificates of designation relating to the dividend and liquidation rights of their holders.  *See* ¶¶ 77-79.

### B.     FHFA Places the GSEs Into Conservatorship

As a result of the market downturn in 2008, Congress passed the Housing and Economic Recovery Act of 2008 ("HERA"), creating a new federal agency, FHFA, and empowering it to appoint itself as conservator of the Companies under certain circumstances.  On September 6, 2008, FHFA placed Fannie Mae and Freddie Mac into "temporary" conservatorship.  When FHFA took control of the Companies, the agency made clear that the conservatorships would be temporary, that they were designed to rehabilitate the Companies, and that the Companies' shareholders retained their economic interest in the Companies.  FHFA announced that "the common and all preferred stocks will continue to remain outstanding."  The Treasury Secretary likewise stated that "conservatorship does not eliminate the outstanding preferred stock."  And Freddie Mac assured investors they "will retain all their rights in the financial worth of those instruments, as such worth is determined by the market."

When FHFA became Conservator, Fannie Mae and Freddie Mac each entered into the PSPAs with Treasury.  Under these contracts, Treasury agreed to invest in the Companies in

---

[2]  References to "¶" are to Plaintiffs' Second Amended Consolidated Class Action and Derivative Complaint, ECF No. 71.

exchange for shares of a newly created class of securities, known as Senior Preferred Stock. The PSPAs provided that Treasury would hold a liquidation preference in each Company equal to the $1 billion commitment fee plus the total amount Treasury invested in each respective Company. The Senior Preferred Stock ranked senior in priority to all other series of Fannie Mae and Freddie Mac Junior Preferred Stock, and would earn an annual dividend, paid quarterly, equal to 10% of the outstanding liquidation preference. If Fannie or Freddie elected not to pay the dividend in cash, Treasury would receive a dividend in the form of additional Senior Preferred Stock with a face value equal to 12% of the liquidation preference.

### C.    The Housing Market Begins to Rebound in 2012

By early 2012, it was clear that the Companies were poised to begin generating significant profits and that FHFA had vastly overstated the Companies' likely losses. The Companies posted profits of more than $10 billion in the first two quarters of 2012. Documents produced in discovery demonstrate that the Companies themselves and Treasury knew that the GSEs were soon to be entering the "golden years" of profitability, and Treasury desired to capture those earnings for itself, rather than sharing them with the Companies' stockholders. *See* ¶¶ 51-56.

### D.    The Third Amendment

On August 17, 2012, after the housing market had begun to recover and the Companies were returning to profitability, Treasury and FHFA agreed to the Third Amendment to the PSPAs. The Third Amendment replaced the 10% Senior Preferred Stock dividend with a "Net Worth Sweep" that required the Companies to pay Treasury a dividend equal to the full amount of their net worth every quarter, minus a small reserve buffer that was set to shrink to zero by 2018. And because the PSPAs provided that in the event of a liquidation of Fannie Mae or Freddie Mac the Government would receive a liquidation distribution that included the amount of any prior unpaid dividend, the Third Amendment guaranteed that even if the Companies were liquidated, Treasury

would receive 100% of their net worth.  Thus, the Net Worth Sweep made it impossible for any private shareholder ever to receive any dividend or liquidation distribution from the Companies, no matter how profitable they were.[3]  Treasury stated on the day of the announcement of the Third Amendment that this action was intended to ensure that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers"—i.e., nothing would ever go to the private stockholders.

The Government has reaped immense profits from the Third Amendment.  In total, the Companies have paid $301.3 billion in dividends to Treasury.  Of that amount, approximately $55 billion was paid before the Net Worth Sweep, and approximately $246.3 billion was paid after the Net Worth Sweep.  This total amount of $301.3 billion is approximately $109.9 billion more than Treasury's total investment in the Companies.  Moreover, as of the date of this filing, the total amount of dividends paid under the Net Worth Sweep is roughly $110.5 billion more than Treasury would have received under the 10% dividend provided for in the original PSPAs.  Meanwhile, the principal amount of Treasury's Senior Preferred Stock has not been reduced at all, and still stands at $193.4 billion.

## III.  **THE PROPOSED CLASSES**

Plaintiffs seek to certify three Classes consisting of:

---

[3] The PSPAs were subsequently amended by letter agreements in December 2017, September 2019, and January 2021.  The December 2017 letter agreement reversed the shrinking of the capital reserve buffers the Companies were permitted to retain and restored the capital reserve to $3 billion.  The September 2019 letter agreement amended the PSPAs to permit additional capital retention of up to $25 billion for Fannie Mae and up to $20 billion for Freddie Mac, but also provided that the liquidation preferences for Treasury's Senior Preferred Stock would increase by the amount of capital the GSEs retained.  The January 2021 letter agreement further allowed the Companies to retain their earnings up to certain thresholds set forth in a new regulatory capital framework , but provided that the full positive net worth of the Companies is to be added to Treasury's liquidation preference.  Under the January 2021 letter agreement, once the GSEs reach the "Capital Reserve End Date" (i.e., after they retain sufficient capital to meet the regulatory targets), Treasury's dividend is the lesser of 10% of the liquidation preference, or the increase in the Companies' net worth.

(1)  All current holders of junior preferred stock in Fannie Mae as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Fannie Preferred Class");

(2)  All current holders of junior preferred stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Preferred Class"); and

(3)  All current holders of common stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Common Class").

Excluded from all Classes are the defendants, the United States Department of the Treasury, and their respective officers and directors.

## IV.   <u>ARGUMENT</u>

### A.   **The Requirements of Rule 23**

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). Rule 23(a) provides that a class action may proceed only if the following prerequisites are met: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  FRCP 23(a).

Additionally, Rule 23(b) provides that a class action is maintainable only if the Court finds that:

(1) prosecuting separate actions by or against individual class members would create a risk of:

(A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FRCP 23(b).

As demonstrated herein, Rules 23(a) and (b) are easily satisfied in this case, and therefore the Court should certify the proposed Classes.

**B.      The Proposed Classes Satisfy the Requirements of Rule 23(a)**

**1.      Rule 23(a)(1) Numerosity is Satisfied**

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable . . . ." FRCP 23(a)(1).  In the District Court for the District of Columbia, "[t]here is no specific threshold that must be surpassed in order to satisfy the numerosity requirement; rather, the determination requires examination of the specific facts of each case and imposes no absolute limitations."  *Healthy Futures of Texas v. Dep't of Health & Human Servs.*, 326 F.R.D. 1, 6 (D.D.C. 2018).  However, as a general rule of thumb, "the numerosity requirement is satisfied and [ ] joinder is impracticable where a proposed class has at least forty members."  *Id.*  (finding that sixty members that were geographically dispersed throughout the United States satisfied numerosity).

Each of the proposed Classes easily satisfies any test for numerosity, as there are hundreds of millions of shares of Junior Preferred Stock and common stock outstanding, held by many thousands of Class members dispersed throughout the world.  ¶ 104.  The Classes consist of all

current holders of the shares as of the date of certification.  Those stockholders who held on August 17, 2012 but sold their shares thereafter are not members of the Classes, as their claims traveled to the purchasers of their shares.[4]

Accordingly, there is no doubt that joinder would be impracticable.

### 2.      Rule 23(a)(2) Commonality is Satisfied

Rule 23(a)(2) requires that "there are questions of law or fact common to the class . . . ." FRCP 23(a)(2).  The key to the commonality requirement is whether the members of a proposed class have "suffered the same injury" such that their claims depend upon the resolution of a "common contention" that "is capable of classwide resolution."  *Parker v. Bank of Am., N.A.,* 99 F. Supp. 3d 69, 79 (D.D.C. 2015) (citing *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)). The Court must ask whether there is a common question of fact or law whose resolution will "resolve an issue that is central to the validity of each one of the claims in one stroke."  *Id.*  The commonality inquiry is simplified in cases that challenge "a uniform policy or practice that affects all class members in the same way," which "clearly gives rise to common questions of fact or law." *Healthy Futures of Texas*, 326 F.R.D. at 7.  When determining class certification based on a

---

[4] As this Court has recognized, Plaintiffs' rights related to dividends and liquidation preferences inhere in the securities and, therefore, such claims travel to purchasers of the securities.  *See Fairholme Funds, Inc. v. FHFA*, No. CV 13-1053 (RCL), 2018 WL 4680197, at *8 (D.D.C. Sept. 28, 2018) ("Under both Delaware and Virginia statutory law, 'a purchaser of a certificated or uncertificated security acquires all rights in the security that the transferor had or had power to transfer[.]' Del. Code tit. 6, § 8-302; Va. Code § 8.8A-302.  'All rights in the security' as used in the statutes 'means rights in the security itself as opposed to personal rights.'  In other words, '[w]hen a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit for any recovery or other remedy, travel with the shares.'  Rights associated with dividends and liquidation preferences inhere in the security.") (citations omitted); *see also See Schultz v. Ginsburg*, 965 A.2d 661, 667 (Del. 2009) ("As a matter of law, a Charter Violation claim transfers to a later purchaser because the injury is to the stock and not the holder.").

contract claim, "a factor to consider … is whether the terms of the putative class members' contracts are relatively uniform such that the circumstances of the alleged breach are virtually identical . . . ." *Parker* , 99 F. Supp. 3d at 78.

All aspects of the commonality inquiry are satisfied here for the three Classes.  For all Classes, the claims of the members within each Class are based on the same events that affected all Class members in the same way, i.e., the Third Amendment to the PSPAs, which destroyed preferred and common stockholders' dividend and liquidation rights.  All stockholders have lost their ability to receive dividends or a liquidation preference, and each has "suffered the same injury" on a per share basis. *Wal-Mart Stores, Inc.*, 564 U.S. at 350.  Moreover, there are common questions of law and fact, the resolution of which will "resolve an issue that is central to the validity of each one of the claims in one stroke," *id.,* including whether Defendants breached the implied covenant of good faith and fair dealing inherent in those certificates and whether Defendants are liable for damages to the members of the Classes.  The resolution of these issues will have the same effect on all members of the putative Classes, which itself satisfies the commonality element. *See Daskalea v. Washington Humane Soc'y*, 275 F.R.D. 346, 373 (D.D.C. 2011) ("commonality [ ] is met when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.") (internal quotations omitted).

The applicable terms of the stock certificates for the various series of Fannie Mae and Freddie Mac preferred stock are all materially uniform such that class certification of the Freddie Preferred Class and the Fannie Preferred Class is appropriate.  *See Parker*, 99 F. Supp. 3d at 78. While each series of Junior Preferred Stock has its own contractual dividend rate and liquidation preference value, the certificates of designation for all series of Junior Preferred Stock entitle their holders to dividends and liquidation rights in the same manner and contain substantially similar or

identical language, and all series of each Company's Junior Preferred Stock are on parity with each other with respect to dividend and liquidation rights.  The Freddie Mac common stock certificate of designation also constitutes a contract with provisions governing the holders' dividend and liquidation rights, and because there is only one class of common stock, the rights of all holders of Freddie common stock are governed by the same terms.  And whether Defendants breached the implied covenant of good faith and fair dealing inherent in those certificates is dependent on whether the Third Amendment violated the stockholders' "reasonable expectations" at the time of contracting.[5]  This "reasonable expectations" standard is an objective standard and therefore is subject to common proof.[6]

There is commonality with respect to each of the Fannie Preferred Class, the Freddie Preferred Class, and the Freddie Common Class because "the terms of the putative class members' contracts are relatively uniform such that the circumstances of the alleged breach are virtually identical"[7] and the members of a proposed Class have "suffered the same injury such that their claims depend upon the resolution of a common contention."  *Healthy Futures of Texas*, 326 F.R.D. at 7 (internal citations omitted).  Accordingly, Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### 3.    Rule 23(a)(3) Typicality is Satisfied

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . . ."  FRCP 23(a)(3).  Typicality requires the Court to "assess whether the proposed party representative's injury is similar to that of other class

---

[5] *Fairholme Funds, Inc.*, 2018 WL 4680197, at *7.

[6] *Bell Atl. Meridian Sys. v. Octel Commc'ns Corp.*, No. CIV. A. 14348, 1995 WL 707916, at *5 (Del. Ch. Nov. 28, 1995) (noting that in construction of contract language, Delaware courts adhere to an "objective" theory of contracts.).

[7] *Parker*, 99 F. Supp. 3d at 78.

members," and "whether the claims of the representative and absent class members are sufficiently similar so that the representatives' acts are also acts on behalf of, and safeguard the interests of the class." *Healthy Futures of Texas*, 326 F.R.D. at 7.  To the extent that "each class member's claim arises from the same course of events that led to the claims for the representative parties and each class member makes similar legal arguments to prove the defendant's liability[,] typicality is obviously established." *Id.*  In practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." *Daskalea,* 275 F.R.D. at 375.

Typicality is satisfied here.  Plaintiffs' claims share the same essential characteristics as the claims of the proposed Classes because they are based on the same events and legal predicates. Plaintiffs and the putative Class members are holders of Fannie Mae and/or Freddie Mac Junior Preferred Stock or Freddie Mac common stock.  Plaintiffs and the putative Class members seek a remedy for the same conduct premised upon the same legal theory—that the imposition of the Third Amendment's Net Worth Sweep violated the implied covenant of good faith and fair dealing in the stock certificates of Fannie and Freddie common and preferred stock.  *See also Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 161 (D.D.C. 2014) (finding the typicality requirement satisfied when the injuries that the named plaintiffs suffer are identical to the injuries of the class members and "caused by the exact same conduct").

Further, the claims of the named Plaintiffs moving for certification as Class representatives are typical of the claims of the absent Class members in each of the respective Classes they are seeking to represent.  Specifically:

- Plaintiff Cacciapalle owns Fannie Mae Series S Preferred Stock, Fannie Mae Series T Preferred Stock, and Freddie Mac Series J Preferred Stock.  Cacciapalle seeks to be appointed a class representative of the Fannie Preferred Class and the Freddie Preferred Class.

- Plaintiff Miller owns Freddie Mac common stock and seeks to be appointed a class representative of the Freddie Common Class.

- Plaintiff Cassell owns Freddie Mac common stock and seeks to be appointed a class representative of the Freddie Common Class.

- Plaintiff Borodkin owns Fannie Mae Preferred Stock in the following series: Series P, Series F, Series N, Series S, Series G, Series M, Series N, Series L, Series T, Series Q, Series H, and Series R.  Borodkin seeks to be appointed a class representative of the Fannie Preferred Class.

Because the terms of each series of Fannie Mae Junior Preferred Stock and Freddie Mac Junior Preferred Stock are materially identical to each other, Plaintiffs are proper class representatives and can represent the interests of all holders, including for series of stocks they do not themselves own.  Federal courts have long held that to be the case where, as here, the investments are uniform. *See, e.g., Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir. 1985) (finding Rule 23 typicality satisfied where named plaintiffs invested in two of three partnerships); *In re PaineWebber Ltd. P'ships Litig.,* 171 F.R.D. 104, 123 (S.D.N.Y. 1997) (finding class representatives' claims sufficiently typical when they invested in only twenty of seventy partnerships); *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98CIV.4318, 2000 WL 1357509, at *5 (S.D.N.Y. Sept. 20, 2000) (certifying a class of investors in two mutual funds even though the named plaintiffs invested in only one of the funds).

Thus, Plaintiffs' claims are typical of the Classes, and the typicality requirement of Rule 23(a)(3) is satisfied.

### 4. Rule 23(a)(4) Adequacy is Satisfied

The fourth and final prerequisite requires that "the representative parties will fairly and adequately protect the interests of the class."  FRCP 23(a)(4).  This "adequacy requirement" is satisfied once the moving party demonstrates that "(1) there is no conflict of interest between the proposed class representative and other members of the class, and (2) the proposed class

representative will vigorously prosecute the interests of the class through qualified counsel." *Healthy Futures of Texas,* 326 F.R.D. at 7.  The Rule 23(a)(4) adequacy-of-representation requirement "tends to merge" with the commonality and typicality requirements of Rule 23(a), which "serve as guideposts" for determining whether a class action should be maintained and whether the class representative's claim and class claims are "so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Daskalea ,* 275 F.R.D. at 377.

Plaintiffs have no interests that are adverse or antagonistic to the Classes and there are no "fundamental disagreements that go to the heart of the litigation at issue in this case."  *Healthy Futures of Texas,* 326 F.R.D. at 8.  Rather, the interests of Plaintiffs and the proposed Class members are aligned because they all assert the same claims based on the same misconduct. Within each Class, the members have identical interests, proportionate to their shareholdings.

Further, the proposed class representatives have vigorously prosecuted the interests of the Classes and will continue to do so.  Plaintiffs have all held their respective shares since prior to the imposition of the Net Worth Sweep, despite the lack of dividends and languishing stock prices of those securities, and the testimony of each Plaintiff demonstrates their adequacy, understanding of the claims, and commitment to the proposed Classes.

Cacciapalle testified that he originally purchased more than 8,000 shares of Fannie and Freddie preferred stock because "[i]t had a nice yield.  It kind of sounds government related, it's safe, and it had a good rating.  And the interest dividend was good."  Transcript of Deposition of Joseph Cacciapalle, Jan. 28, 2021, at 41:1-4 ("Cacciapalle Dep.").  He further testified that after the Companies were placed into conservatorship, his expectation was that "once the conservator got things running well and management was doing what they had to do and they were beginning

to show signs of life, that they would withdraw and let the company run itself again."  Cacciapalle Dep. 56:1-5.  Cacciapalle's understanding of the role of a conservator was that it would "help management and organize finances to bring the thing into some kind of profitability.  How long it took, two or three years, I don't know.  I just thought eventually things would go back to the way they were, common and preferred would go back to being the -- receive their profits."  Cacciapalle Dep. 62:17-22.  Cacciapalle succinctly stated the basis of his expectations that the Companies would eventually be returned to shareholders, rather than being nationalized: "The government is not in the business of running a business."  Cacciapalle Dep. 61:9-10.  Due to that expectation, Cacciapalle testified that he was surprised by the "gusto" of the Third Amendment, explaining that "to go and take all future profits from a company and they don't know what the future holds and leave the existing hold[ers] of common and preferred with no chance to ever receive any of the profits, it just sounded too totalitarian to me."  Cacciapalle Dep. 83:7-11.  Mr. Cacciapalle "understood that they had to pay back what they were lent and for the cost of the time and -- for lending the money, a reasonable return.  That's about it . . . ."  Cacciapalle Dep. 85:11-13.  The Third Amendment defied that expectation.

The other Plaintiffs testified similarly.  Miller testified that her "expectation was that [the Companies] were going through this conservatorship to be able to get stable again and then to be able to get back to how they had historically been of paying a dividend quarterly with an increase in their stock price."  Transcript of Deposition of Michelle Miller, Feb. 8, 2021, at 80:4-9 ("Miller Dep.").  Miller "was well aware . . . that this was not something that was going to turn around right away, especially building up confidence in the housing market again, since there were so many issues going on," but her "expectation of the stock was that once they were able to pay back the loan or the bailout, that they would return to paying dividends again and the stock price would

increase." Miller Dep. 101:8-19. Miller was clear that she did not expect dividends during the conservatorship, but she "did expect them for, when they became profitable again and they became a sound company, to reinstate those dividends." Miller Dep. 106:19-21. She testified that "[her] expectation was that [the conservatorship] would not be indefinite . . . ." Miller Dep. 120:13. Miller further testified that all shareholders were harmed "due to the lack of dividends [and] the stagnant price of the stock." Miller Dep. 276:5-6. She further testified that she believed she was an adequate class representative because:

> [S]ince 2013 I've worked with Kessler Topaz through, you know, giving them documentation of my assets, of, you know, holdings of Fannie Mae and Freddie, reading drafts, answering questions, you know, for seven-plus years. There's communication at least four times a year, if not more, of things that are going on with the case. You know, I have given up quite -- many hours for this deposition and also for us, you know, kind of talking about it beforehand. And I am willing to, you know, take it all the way to trial, if that's what needs to be, in 2022.

Miller Dep. 261:9-21.

Cassell similarly demonstrated his adequacy at his deposition. Cassell testified that he was willing to faithfully represent the interests of the class. Transcript of Deposition of Timothy Cassell, Feb. 1, 2021, at 227:6-11 ("Cassell Dep."). He testified that he invested in Freddie Mac because he "believed at the time, and I still believe, that Fannie and Freddie would both return to profitability and be able to continue their prior practices of paying dividends and increased stock prices." Cassell Dep. 43:2-6;44. Cassell understood that there would not be dividends paid during the conservatorship, Cassell Dep. 116, but testified that "in 2012 I believed that Fannie and Freddie . . . were turning a corner . . . were doing much, much better at that period of time. The housing market had substantially recovered." Cassell Dep. 147:12-14;148:10-13. He believed in 2012 that "they were generating sufficient revenue as to have a profit, meaning that eventually, over time, as they continued to grow, they should have [ ] had no problem in repaying the Treasury." Cassell

Dep. 149:19-150:1.  He testified to his understanding of the conservatorship, stating that he "believed that … once the conservator returned [ ] the company to profitability, which was going to take some time, that we would return to receiving dividends and potential stock price increases." Cassell Dep. 173:22-174:5.  Cassell also testified that Freddie Mac's public statements did not change his expectations.  Cassell Dep. 173-178.  When Cassell was specifically asked, in reference to a market analyst discussing the possibility of a net worth sweep, "would you have expected that the net worth sweep was a possibility at that time?", he responded "… where in the history of this has this ever happened before?  That's why you can't even believe this would even happen. It's a ludicrous suggestion to begin with. That's why I wouldn't have believed it. . . . There's no - - history that I'm aware of anywhere that this type of action was ever taken in regards to a company, a net worth sweep or an earnings sweep like this.  So no … I didn't believe it would be possible." Cassell Dep. 190:9-10, 20-191:1-2, 6-13.

Finally, Borodkin's testimony demonstrates his adequacy as well.  He testified to his expectations of the conservatorship, explaining that "I expected the conservatorship to return [ ] the . . . corporation back -- back to the shareholders and -- and back to the way -- basically, the way it was."  Transcript of Deposition of Barry Borodkin, Apr. 28, 2021, at 89:10-15 ("Borodkin Dep.").  He testified that he was "Absolutely" harmed by the Third Amendment, stating that "If the third amendment held, then . . . somewhere along the way, the [ ] entity would be completely broken up.  And as far as I am concerned, the [ ] conservator would have improperly taken away the entity's well-being, and conservator simply means protection, not demise."  Borodkin Dep. 147:4, 10-16.  Borodkin also testified that he believed that he would have received dividends absent the imposition of the Third Amendment, and "as far as I am concerned, the government did

an improper action.  That, therefore, entitles me and the other shareholders to full dividend restitution plus interest on the dividends."  Borodkin Dep. 163-165.

Further, Plaintiffs have retained competent counsel well versed in prosecuting class action litigation.  Accordingly, the adequacy requirement of Rule 23(a)(4) is met.

### C.  The Proposed Class Satisfies the Requirements of Rule 23(b)

Once the prerequisites of Rule 23(a) are satisfied, a class action may be certified if Rule 23(b) is met.  Here, certification under any of Rule 23(b)(1), 23(b)(2), and 23(b)(3) is appropriate.

To satisfy Rule 23(b)(1), Plaintiffs must show that:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> > (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
> >
> > (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

FRCP 23(b)(1).

"Classic examples" of proper 23(b)(1)(B) class actions include "actions by shareholders to fix their rights."  *See Parker*, 99 F. Supp. 3d at 80; *Daskalea*, 275 F.R.D. at 366.  This is because shareholder actions implicate "a shared or collective right . . . with the common thread being that the shared character of rights claimed or relief awarded entails that any individual adjudication by a class member disposes of, or substantially affects, the interests of absent class members." *Daskalea*, 275 F.R.D. at 366.  This is the case here, where the Classes are composed of private shareholders of the Companies seeking to enforce their rights under the certificates of designation of Fannie and Freddie Junior Preferred Stock and Freddie common stock.  Defendants owed the same contractual duties to all Classes and Class members equally, and thus any individual

adjudication by a Class member would be dispositive of the interests of absent Class members, which satisfies Rule 23(b)(1)(B).

Further, certification under Rule 23(b)(2) is appropriate.  Rule 23(b)(2) states that a class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ."  Rule 23(b)(2) permits a class action where "a single injunction or declaratory judgment would provide relief to each member of the class, which means that a district court should not certify a 23(b)(2) class action if each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  *Healthy Futures of Texas*, 326 F.R.D. at 8 (internal quotations and citations omitted).  Thus, courts within this district have certified Rule 23(b)(2) class actions only if "(1) the defendant's action or refusal to act [was] generally applicable to the class," and if "(2) plaintiff [sought] final injunctive relief or corresponding declaratory relief on behalf of the class." *Id.*

Both of these requirements are met here.  First, Defendants' actions in imposing the Third Amendment and Net Worth Sweep were generally applicable to each proposed Class and all members of the proposed Classes equally.  Second, Plaintiffs' Complaint seeks a declaration that "Fannie Mae and Freddie Mac, acting through FHFA, breached the terms of the certificates of designation and the implied covenant of good faith and fair dealing," and seeks "appropriate equitable and injunctive relief to remedy Defendants' breaches of contract, [and] breaches of the implied covenant of good faith and fair dealing . . . including rescission of the Third Amendment." ¶¶ 64-65.  Such a declaration and associated equitable relief would provide the same relief to all members of the Classes equally, and there would be no need for individualized relief.  *See Healthy Futures of Texas*, 326 F.R.D. at 8-9.

Certification under subdivision (b)(3) is also appropriate because "questions of law or fact common to class members predominate over any questions affecting only individual members, and [ ] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Rule 23(b)(3)'s "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."   *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).  Rule 23(b)(3) "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case."  *Id.*  An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Id*. (citations omitted).   The predominance inquiry "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues."  *Id.*  When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.  *Id.*

Here, the major issues in this action are common to all class members: i.e., whether the Third Amendment's Net Worth Sweep violated the implied covenant of good faith and fair dealing inherent in the Fannie and Freddie stock certificates and whether the Class members' reasonable expectations at the time of contracting were violated.  *See Fairholme Funds, Inc.* , 2018 WL 4680197, at *7-10.  Proving these claims will require common evidence that applies to all members of each Class.

Additionally, common damages issues predominate over individualized issues because damages can and will be calculated using a common methodology that applies to all members of the respective classes.[8]  As explained in the Expert Report of Joseph R. Mason, dated August 12, 2021, because the Net Worth Sweep deprived Freddie common and Junior Preferred Stockholders of the possibility of receiving dividends or a liquidation preference associated with their shares, damages can and will be calculated using a discounted cash flow model to determine for each of the three classes the present value of the expected dividends that would have been paid to holders of Freddie Mac common stock and the Junior Preferred Stockholders but-for the Net Worth Sweep. Once those values are determined, it is a simple arithmetical operation to determine each class member's proportionate share of the class-wide damage number.  Plaintiffs and their expert will accomplish this through common evidence for all Class members, rather than relying on individualized proof.

Further, there are few, if any, individualized issues, and there will be no need for members of the proposed Classes to present evidence that varies from person to person due to the objective nature of the "reasonable expectations" inquiry.[9]  *See Coleman through Bunn v. Dist. of Columbia,* 306 F.R.D. 68, 85 (D.D.C. 2015).  Plaintiffs "raise common legal questions regarding their liability claims.  These common questions, which comprise nearly the entirety of the class's liability claim, are themselves sufficient to support a finding that common issues predominate over individualized ones."  *Id*. at 85-86; *see also In re Nexium Antitrust Litig.,* 777 F.3d 9, 21 (1st Cir. 2015) ("Where common questions predominate regarding liability, then courts generally find the predominance

---

[8] *Hoyte v. District of Columbia,* 325 F.R.D. 485, 495 (D.D.C. 2017) ("[a]t the certification stage, the preliminary inquiry in assessing the proposed methods [of calculating damages] is limited: The inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis.").

[9] *See supra* at 11.

requirement to be satisfied even if individual damages issues remain."); *Hoyte*, 325 F.R.D. at 494-95.  "The predominance requirement is therefore met because the class challenges a generalized practice, the central element of Plaintiffs' theory of liability ... is common to every class member, and even the minor differences between the class members—such as the amount of total damages—are susceptible to generalized proof since a common formula can be used to calculate the individual damages." *Coleman*, 306 F.R.D. at 87 (internal citations omitted).

## V.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully requests that the Court grant Plaintiffs' motion to certify the Classes.

Dated:  August 12, 2021

Respectfully submitted,

/s/ Hamish P.M. Hume

| | |
|---|---|
| KESSLER TOPAZ MELTZER & CHECK, LLP | BOIES SCHILLER FLEXNER LLP |
| Eric L. Zagar (*Pro Hac Vice*) | Hamish P.M. Hume (D.C. Bar No. 449914) |
| Lee D. Rudy (*Pro Hac Vice*) | Samuel Kaplan (D.C. Bar No. 463350) |
| Grant Goodhart | 1401 New York Ave. NW |
| 280 King of Prussia Rd. | Washington, DC 20005 |
| Radnor, PA 19087 | Tel: (202) 237-2727 |
| Tel: (610) 667-7706 | Fax: (202) 237-6131 |
| Fax: (610) 667-7056 | hhume@bsfllp.com |
| ezagar@ktmc.com | skaplan@bsfllp.com |
| lrudy@ktmc.com | |
| ggoodhart@ktmc.com | BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP |
| GRANT & EISENHOFER, P.A. | Adam Wierzbowski *(Pro Hac Vice)* |
| Michael J. Barry (*Pro Hac Vice*) | 1251 Avenue of the Americas |
| 123 Justison Street | New York, NY  10020 |
| Wilmington, DE 19801 | Tel: (212) 554-1400 |
| Tel: (302) 622-7000 | Fax: (212) 554-1444 |
| Fax: (302) 622-7100 | adam@blbglaw.com |
| mbarry@gelaw.com | |
| | *Co-Lead Counsel for Plaintiffs* |