UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations**

This Memorandum Opinion relates to:
ALL CASES.

**Case No. 1:13-mc-1288-RCL**

## MEMORANDUM OPINION

Before the Court are plaintiffs' motion to certify three classes and appoint class counsel, Pls.' Mot., ECF No. 132; plaintiffs' memorandum in support of their motion, Pls.' Br., ECF No. 132-1; and the parties' joint stipulation to class certification, ("Joint Stip"), ECF No. 133. After reviewing the parties' filings—in which they represented that they wished to withdraw plaintiffs' motion—the Court expressed doubts as to the propriety of the parties' proposed course of action. ECF No. 134. In response, the parties asked that the Court construe plaintiffs' motion as still pending and uncontested to the extent that it requests certification under Federal Rule of Civil Procedure 23(b)(3). ECF No. 135. Upon consideration of the parties' filings, the Court will **GRANT** plaintiffs' motion for class certification, certify the proposed classes, and appoint class counsel by separate order.

### I.   BACKGROUND

This Court assumes familiarity with the background of this litigation from its prior memorandum opinions and the opinion of the D.C. Circuit. *See Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, No. 13-cv-1053 (RCL), 2018 WL 4680197 (D.D.C. Sept. 28, 2018); *Perry Cap. LLC v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) ("*Perry I*"), *aff'd in part, remanded in part*

*sub nom. Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ("*Perry II*"). The Court will briefly summarize the relevant background here.

## A. Factual Background and Allegations

The Federal National Mortgage Association ("Fannie Mae" or "Fannie") and Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie," and together with Fannie Mae, the "GSEs,") are government-sponsored entities originating from statutory charters issued by Congress. *See* Federal National Mortgage Association Charter Act, 12 U.S.C. §§ 1716–23; Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451–59. The purposes of these GSEs are to, among other things, "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." 12 U.S.C. § 1716(4). They accomplish this objective by purchasing mortgages from lenders, which relieves the lenders of default risk and frees up funds to make additional loans. *See Fairholme Funds*, 2018 WL 4680197, at *1. The GSEs finance their purchases by pooling the many mortgage loans they have purchased into various mortgage-backed securities that are sold to investors. *See id.*

Both GSEs have been major players in the United States' housing market. *Id.* at *2. By 2008, their mortgage portfolios had a combined value of $5 trillion and accounted for nearly half of the United States mortgage market. *Id.* But in 2008, the United States mortgage and housing markets went into a crisis, leading in part to a severe recession. *Id.* Concerned that a default by Fannie Mae and Freddie Mac would imperil the already fragile national economy, Congress enacted the Housing and Economic Recovery Act ("HERA" or "the Recovery Act"), which established the Federal Housing Finance Agency ("FHFA") and authorized it to undertake significant economic measures to resuscitate the GSEs. *Id.*; *see* Pub. L. No. 110-289, 122 Stat.

2654 (2008).  Both GSEs were subjected to the FHFA's supervision and regulatory authority.  *See,*
*e.g.*, 12 U.S.C. § 4511(b)(1), (b)(2).

As relevant here, the Recovery Act authorized the Director of the FHFA to appoint the
FHFA as either a conservator or receiver for Fannie Mae and Freddie Mac "for the purpose of
reorganizing, rehabilitating, or winding up [their] affairs."  12 U.S.C. § 4617(a)(2).  If appointed
conservator, the FHFA is invested with broad authority and discretion over the operation of Fannie
Mae and Freddie Mac.  For example, the Recovery Act provides the FHFA with expansive
"[g]eneral powers," explaining that the FHFA "may," among other things, "take such action as
may be . . . necessary to put the regulated entity in a sound and solvent condition" and "appropriate
to carry on the business of the regulated entity and preserve and conserve [its] assets and
property[.]"  12 U.S.C. § 4617(b)(2), (b)(2)(D); *see id.* § 4617(b)(2)(J)(ii) (providing that the
FHFA, as conservator, may take any action authorized under the act "which [it] determines is in
the best interests of the [GSEs] or the [FHFA]").

On September 6, 2008, the FHFA placed the GSEs into conservatorship, assuming the
powers granted to the conservator by the Recovery Act.  Statements by the FHFA's Director
explained that conservatorship was "designed to stabilize a troubled institution with the objective
of returning the entities to normal business operations."  Second Am. Consolidated Class Action
Compl. ("SAC") ¶ 40 (D.D.C. Feb. 1, 2018), ECF No. 71 (citing Press Release, Fed. Hous. Fin.
Agency, Statement of FHFA Director James B. Lockhart at News Conference Announcing
Conservatorship of Fannie Mae and Freddie Mac (Sept. 7, 2008)).

The next day, the U.S. Department of the Treasury ("Treasury") entered into Senior
Preferred Stock Purchase Agreements ("PSPAs") with Fannie and Freddie, under which Treasury
committed to invest billions of dollars promptly to keep the GSEs from defaulting.  *Fairholme*

*Funds*, 2018 WL 4680197, at *3. Fannie and Freddie had been "unable to access [private] capital markets" to shore up their financial condition, "and the only way they could [raise capital] was with Treasury support." Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Fin. Servs., 110th Cong. 12 (2008) (Statement of James B. Lockhart III, Director, FHFA).

In exchange for that extraordinary capital infusion, Treasury received one million senior preferred shares in each company. *Fairholme Funds*, 2018 WL 4680197, at *3. Those shares entitled Treasury to: "(i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were dissolved; (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie and Freddie drew upon Treasury's funding commitment; (iii) quarterly dividends that the Companies could either pay at a rate of 10% of Treasury's liquidation preference or a commitment to increase the liquidation preference by 12%; (iv) warrants allowing Treasury to purchase up to 79.9% of Fannie's and Freddie's common stock; and (v) the possibility of periodic commitment fees over and above any dividends." *Perry II*, 864 F.3d at 601.

Initially, Treasury's commitment to invest capital was capped at $100 billion per company. *Fairholme Funds*, 2018 WL 4680197, at *3. But it was determined that this would not be enough to meet the GSEs' funding needs. So, the FHFA and Treasury amended the PSPAs twice. First, in May 2009, Treasury agreed to expand the funding commitment to $200 billion for each company. SAC ¶ 49. Seven months later, the PSPAs were amended again, raising the cap to an adjustable figure determined by an agreed-upon formula. *Id.* As of June 30, 2012, the GSEs together had drawn $187.5 billion from Treasury's funding commitment. *Fairholme Funds*, 2018 WL 4680197, at *3

On August 17, 2012, the FHFA and Treasury agreed to amend the PSPAs for a third time (the "Third Amendment"). The Third Amendment changed the government's senior preferred dividend from 10% of the outstanding principal value of the Government Preferred Stock to a quarterly dividend equal to 100% of each company's net worth that exceeded a capital buffer of $3 billion, with that buffer annually decreasing down to zero by 2018 (the "Net Worth Sweep"). *Id.* at *4; SAC ¶ 58. Since the PSPAs granted Treasury a liquidation preference encompassing any prior unpaid dividend, the Third Amendment entitled Treasury to the *full amount* of the GSEs' net worth upon liquidation. *Fairholme Funds*, 2018 WL 4680197, at *4.

The GSEs received no new investment in exchange for the change in dividend structure. *See, e.g.*, SAC ¶ 60. The public reason for the Third Amendment was to end the practice of circular dividends paid to Treasury from funds drawn from Treasury's commitment to the GSEs. *Fairholme Funds*, 2018 WL 4680197, at *4. As of February 2018, Treasury received over $276 billion in dividends from the companies—$88 billion more than Treasury's total investment in both companies. SAC ¶ 69.

## B. Procedural History

Plaintiffs filed this lawsuit to challenge the Third Amendment. *See generally* SAC. They alleged that, by adopting the Third Amendment, FHFA and the GSEs breached the terms governing dividends, liquidation preferences, and voting rights in the stock certificates for Freddie's common stock and for both Fannie's and Freddie's preferred stock. *See, e.g.*, *id.* ¶¶ 1, 15, 124–44. They also alleged that defendants breached the implied covenant of good faith and fair dealing in those certificates. *Id.* ¶¶ 85, 145–65.

After this Court dismissed plaintiffs' claims in their entirety, the D.C. Circuit affirmed in part, reversed in part, and remanded some of plaintiffs' claims. *See Perry II*, 864 F.3d at 633–34.

On remand, this Court dismissed all of plaintiffs' claims except their claim for breach of the implied covenant of good faith and fair dealing. *See Fairholme Funds*, 2018 WL 4680197, at *17.

On August 12, 2021, plaintiffs moved to certify three different classes, to appoint class representatives, and to appoint their attorneys as class counsel. Pls.' Mot. The three proposed classes consist of:

> (1) All current holders of junior preferred stock in Fannie Mae as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Fannie Preferred Class");
>
> (2) All current holders of junior preferred stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Preferred Class"); and
>
> (3) All current holders of common stock in Freddie Mac as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement (the "Freddie Common Class").

Pls.' Mot. 1.

On October 14, 2021, the parties filed a joint stipulation for class certification. Joint Stip. In that stipulation, the parties informed the Court that they agree that the proposed classes satisfy all the requirements of Rule 23(a). *Id.* at 1. They also agree that the Court can certify the class under Rule 23(b)(3) because "questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* at 3. And the parties agree that the named representatives and class counsel proposed in plaintiffs' motion are adequate. *See id.* 3–4. The parties' proposed order includes deadlines for addressing the notice requirements in Rule 23(c)(2)(B). ECF No. 133-1 at 4. Finally, the parties represented that "in light of this

Stipulation, the Class Plaintiffs' Motion for Class Certification (ECF No. 132) should be treated as withdrawn." Joint Stip. 5.

On November 15, 2021, the Court issued an Order explaining that it "doubt[ed] the propriety of entering the parties' stipulated order and proceeding according to the parties' proposed course." ECF No. 134 at 1. The Court expressed its concerns that entering the stipulated order would be inconsistent with its obligation to undertake a "rigorous" analysis of the class certification requirements and this Court's local rules' requirement that class certification occurs as a result of "ruling upon [a] motion." *Id.* (citations omitted) (alteration in original).

On November 22, 2021, the parties filed a joint response to the Court's order. ECF No. 135. The parties explained that they believed the best way for the Court to proceed is to treat the class plaintiffs' motion for class certification as pending and not withdrawn. *Id.* at 2. First, plaintiffs agreed to "limit the scope of the currently pending Motion for Class Certification to a motion to certify the prospective classes pursuant to Rule 23(b)(3) only." *Id.* Next, the parties expressed their agreement that the class plaintiffs' memorandum in support "sets forth the necessary bases" for this Court to certify the class pursuant to Rule 23(b)(3). *Id.* Finally, defendants explained that "[f]or the reasons stated in the Stipulation, [d]efendants do not oppose certification of the prospective classes under Rule 23(b)(3) and, therefore, the [p]arties respectfully submit that the narrowed motion should be treated as uncontested." *Id.*

At the parties' request, the Court will construe plaintiffs' motion for class certification as narrowed and uncontested. The motion is ripe for review.

## II.    LEGAL STANDARD

Class litigation is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). Lest the exception swallow the rule, Federal Rule of Civil Procedure 23 imposes prerequisites to

class certification that "effectively limit the class claims to those fairly encompassed by the named

plaintiff's claims." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  Under Rule 23(a),

the party seeking certification must demonstrate that

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345, 350 (2011) ("A party

seeking class certification must affirmatively demonstrate his compliance with [Rule 23].").  These

requirements are commonly referred to as numerosity, commonality, typicality, and adequacy of

representation. *See Radosti v. Envision EMI, LLC*, 717 F. Supp. 2d 37, 50 (D.D.C. 2010).  Courts

also recognize an "implied" requirement that the proposed class be definite and ascertainable. *See,*

*e.g., D.L. v. District of Columbia*, 302 F.R.D. 1, 16–17 (D.D.C. 2013), *aff'd*, 860 F.3d 713 (D.C.

Cir. 2017).  In addition to meeting each of these prerequisites, the class must fit at least one of the

three "types" described in Rule 23(b).

Plaintiffs argue—and defendants agree—that the proposed class can be certified under

Rule 23(b)(3).  Rule 23(b)(3) provides for certification when "the questions of law or fact common

to class members predominate over any questions affecting only individual members," and "a class

action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Fed. R. Civ. P. 23(b)(3).  Thus, there are two primary requirements for Rule 23(b)(3)

certification: predominance and superiority. *Barnes v. District of Columbia*, 242 F.R.D. 113, 123

(D.D.C. 2007).

Rule 23's requirements are not "a mere pleading standard." *Wal-Mart*, 564 U.S. at 350. Instead, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.* While the D.C. Circuit has not decided the precise burden of proof applicable to establishing that the requirements of Rule 23 have been met, courts in this Circuit have routinely applied a preponderance of the evidence standard. *See, e.g.*, *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 80 (D.D.C. 2015) (collecting cases).

## III.   ANALYSIS

Though the parties in this case agree that the Court may certify the three requested classes, certification is proper only if this Court "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *D.L.*, 302 F.R.D. at 10–11. As noted above, and consistent with the parties' response to this Court's order, the Court will construe plaintiffs' motion as narrowed and uncontested. Plaintiffs' motion thus requests certification under Rule 23(b)(3) only. The Court's factual findings below are informed not only by the arguments in plaintiffs' motion and the record in this case, but also by the parties' stipulation.

The Court finds that Rule 23(a)'s requirements—numerosity, commonality, typicality, and adequacy of representation—are satisfied here. So too is Rule 23(a)'s implicit requirement that the proposed classes be definite and ascertainable. And plaintiffs have demonstrated that the Court can certify the requested classes under Rule 23(b)(3). Accordingly, the Court will certify the requested classes and appoint plaintiffs' attorneys as class counsel.

### A.   Rule 23(a) Requirements

#### 1.   Numerosity

Rule 23(a)(1) requires plaintiff to show that "joinder of all members is impracticable." That does not mean that joinder would be impossible—instead, plaintiff must show "only that the

difficulty or inconvenience of joining all members of the class make use of the class action appropriate." *D.L.*, 302 F.R.D. at 11. Although there is no minimum number of class members required to establish numerosity, courts in this district presume that classes with forty or more members satisfy the numerosity requirement. *See N.S. v. Hughes*, 335 F.R.D. 337, 352 (D.D.C. 2020); *Garnett v. Zeilinger*, 301 F. Supp. 3d 199, 206 (D.D.C. 2018). Here, there are millions of shares of Junior Preferred stock and common stock outstanding, held by thousands of putative class members worldwide. Compl. ¶ 104; Joint Stip. ¶ 1. Joinder of all these members would be impracticable.

Rule 23(a)(1)'s numerosity requirement is satisfied.

### 2. Commonality

Rule 23(a)(2) requires the existence of "questions of law or fact common to the class." However, "at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Love v. Johanns*, 439 F.3d 723, 729–30 (D.C. Cir. 2006) (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998)). For that reason, a "common question" must be one "of such a nature that . . . determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see Abraha v. Colonial Parking, Inc.*, No. 16-cv-680 (CKK), 2020 WL 4432250, at *4 (D.D.C. July 31, 2020). In other words, "class members must have suffered the same injury for the same reason, such as a uniform policy or practice that is illegal." *D.L.*, 302 F.R.D. at 12 (citing *Wal-Mart*, 564 U.S. at 349–50). As the Supreme Court has explained, "it is not common questions that matter so much as the 'capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350).

But common answers may be harder to obtain when putative class actions involve alleged breaches of contract. Indeed, the class members' claims may turn on any number of different agreements with a corresponding variety of contractual terms. That variety may defeat a court's ability to determine "'in one stroke' whether a defendant's actions have resulted in the breach of every class member's contract." *Parker v. Bank of Am., N.A.*, 99 F. Supp. 3d 69, 82 (D.D.C. 2015) (quoting *Wal-Mart*, 564 U.S. at 350). Accordingly, to satisfy the commonality requirement when a class action involves alleged breach of contract, a class plaintiff must demonstrate that "the material terms of the disputed agreements are essentially identical across all class members . . . [and] that there are no material variations in the class members' agreements." *Id.* at 82 (citations omitted).

In this case, commonality is satisfied because plaintiffs and the class members have allegedly suffered "the same injury for the same reason." *D.L.*, 302 F.R.D. at 12. For all three proposed classes, their claims stem from a common occurrence—the execution of the Third Amendment on August 17, 2012. The complained-of injuries—lost dividends and liquidation preference—are also common to the class members on a per-share basis. And the members' claims invoke a common legal theory. All members claim that defendants' execution of the Third Amendment breached the implied covenant of good faith and fair dealing applicable to the members' stock certificates. *See* Joint Stip. ¶ 2. The Court's analysis will turn on whether defendants' execution of the Third Amendment breached the "reasonable expectations" of the stockholders at the time of contracting, which, as this Court's analysis prior analysis demonstrates, is subject to common proof. *See Fairholme Funds*, 2018 WL 4680197, at *7, *9. It is undisputed that the applicable terms of the stock certificates for the various series of Fannie Mae and Freddie Mac stock are materially uniform. *See, e.g.*, SAC ¶¶ 77–79; *see also* Joint Stip. ¶ 5; ECF No. 135

at 2.  While each series of Junior Preferred Stock has its own contractual dividend rate and liquidation preference value, the certificates for all series of Junior Preferred Stock entitle their holders to dividends and liquidation rights in the same manner using identical or substantially similar language.  SAC ¶¶ 77, 79; *see* Joint Stip. ¶ 5; ECF No. 135 at 2.  And because there is only one class of Freddie Mac common stock, the dividend and liquidation terms of Freddie Mac's common-stock certificate of designation govern the rights of all those who hold Freddie common stock.  *See, e.g.*, SAC ¶ 78 (listing provisions of the Certificate of Designation for Freddie Mac common stock).

Thus, a class-wide proceeding would permit the Court to determine "in one stroke" whether the Third Amendment breached the implied covenant.  *Wal-Mart*, 564 U.S. at 350.  Accordingly, the Court finds that the proposed class-wide proceeding not only implicates common questions, but also would generate "common answers" with the same effect on all members of the putative classes.

Rule 23(a)(2)'s commonality requirement is satisfied.

### 3. Typicality

Next, Rule 23(a)(3) requires that the "claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A named plaintiff's claim is typical "if it arises from the same event or practice or course of conduct that gives rise to a claim of another class member's where his or her claims are based on the same legal theory."  *D.L.*, 302 F.R.D. at 14 (quoting *Stewart v. Rubin*, 948 F. Supp. 1077, 1088 (D.D.C. 1996)).  "The facts and claims of each class member do not have to be identical to support a finding of typicality; rather, typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff."  *Radosti*, 717 F. Supp. 2d at 52 (quoting *Abraha*, 2020 WL 4432250, at *5)

(internal quotation marks and alterations in original omitted). This requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Wal-Mart*, 564 U.S. at 349.

Plaintiffs' claims are typical of the proposed classes. Plaintiffs and the putative class members are holders of Fannie Mae or Freddie Mac Junior Preferred Stock or Freddie Mac common stock. The Court agrees with the parties that plaintiffs and the class members challenge the same conduct based on the same legal theory, i.e., that the imposition of the Third Amendment Net Worth Sweep violated the implied covenant of good faith and fair dealing in the GSEs' stock certificates. *Cf. Fairholme Funds*, 2018 WL 4680197, at *7.

Based on the record in this case, the Court concludes that the named plaintiffs' claims are typical of each respective class that they seek to represent. Plaintiff Joseph Cacciapalle owns Fannie Mae Series S Preferred Stock, Fannie Mae Series T Preferred Stock, and Freddie Mac Series J Preferred Stock. *See* Joint Stip. ¶ 8; ECF No. 4 at 72 (Cacciapalle verification). Cacciapalle seeks to be appointed as a class representative of the Fannie Preferred Class and the Freddie Preferred Class. Pls.' Br. 12. Plaintiff Barry P. Borodkin owns Fannie Mae Preferred Stock in the following series: Series P, Series F, Series N, Series S, Series G, Series M, Series N, Series L, Series T, Series Q, Series H, and Series R. *See* Joint Stip. ¶ 11; ECF No. 16 (Borodkin verification). Borodkin seeks to be appointed as a class representative of the Fannie Preferred Class. Pls.' Br. 13. Cacciapalle and Borodkin are proper class representatives for the Fannie Preferred Class. And Caciappalle is a proper representative of the Freddie Preferred Class. Indeed, Cacciapalle and Borodkin can represent the interests of all holders in their respective classes— even for series of stocks that they do not themselves own—because the terms of each series of Junior Preferred Stock are materially identical to each other. *See, e.g., Eisenberg v. Gagnon*, 766

F.2d 770, 786 (3d Cir. 1985), *superseded on other grounds by* Fed. R. Civ. P. 23 (amended 2003), *as recognized by Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 483 (3d Cir. 2018).

Plaintiffs Michelle M. Miller and Timothy J. Cassell own Freddie Mac common stock and seek to be appointed class representatives of the Freddie Common Class. *See, e.g.*, Joint Stip. ¶ 9–10; ECF No. 15 (Miller's verification); Pls.' Br. 13. · Because there is only one class of Freddie common stock—and the rights of all holders are governed by the same terms—Miller and Cassell's claims share the same essential characteristics with the putative class members of the Freddie Common Class.

Rule 23(a)(3)'s typicality requirement is satisfied.

### 4. Adequacy of Representation

The next prerequisite to class certification, adequacy of representation, requires a finding that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). There are two criteria for adequacy: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *D.L.*, 302 F.R.D. at 14 (quoting *Twelve John Does v. District of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997)).

The Court finds that the representative parties will fairly and adequately protect the interests of the class. On the current record, the Court sees no evidence that the named plaintiffs have any antagonistic or conflicting interests with unnamed members of the class. Instead, their interests are aligned with the interests of the unnamed class members. They share the same claims, premised on the same legal theories. Plaintiffs' statements in their depositions—in which they explain their commitment to their claims and to this litigation—only reinforce the Court's

conclusion. *See* Pls.' Br. 14–17. They have remained engaged in this lawsuit as it has dragged on for several years. The named plaintiffs in this case do not display the "total lack of interest and unfamiliarity with the suit" that is typically required to reject class certification for lack of adequate representation. *Harris v. Koenig*, 271 F.R.D. 383, 391 (D.D.C. 2010) (internal quotations omitted). Finally, plaintiffs have retained competent counsel to prosecute this class action litigation. *See also infra* section III.C.

Rule 23(a)(4)'s adequacy requirement is satisfied.

### 5. Definiteness

Definiteness is not mandated by Rule 23 but is a judicial creation requiring that the class be "adequately defined" and "clearly ascertainable." *D.L.*, 302 F.R.D. at 16 (quoting 1 William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed.)). The requirement is "intended to protect absent plaintiffs by enabling notice and to protect defendants 'by enabling a final judgment that clearly identifies who is bound by it.'" *Id.* (quoting Rubenstein, Newberg on Class Actions § 3:7). Indeed, in a 23(b)(3) action, definiteness is important because "all class members must be identified in order to notify each of his or her opt-out rights, and, later, to distribute monetary relief." *Thorpe v. District of Columbia*, 303 F.R.D. 120, 139 (D.D.C. 2014) (quoting *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, 293 F.R.D. 254, 264 (D.N.H. 2013)).

Definiteness is satisfied here. The class definitions provide objective criteria by which the Court can identify class members during the stages of this proceeding. *See* Rubenstein, Newberg on Class Actions § 3:3. Each class is defined by the type of stock at issue. And classes include "current holders . . . as of the date of certification, or their successors in interest to the extent shares are sold after the date of certification and before any final judgment or settlement." Pls.' Mot. 1.

Treasury and the defendants are excluded from these classes. *Id.* These class members are readily ascertainable by looking at each GSEs' shareholder registry.

The D.C. Circuit instructed this Court to consider whether further redefining or subdividing the classes would be necessary to account for various members' reasonable expectations. This is because some members "purchased their shares before the Recovery Act was enacted in July 2008 and the FHFA was appointed conservator . . . while others purchased their shares later." *Perry II*, 864 F.3d at 631. But on remand, this Court concluded that "[f]or an investor contract, the time of contracting for the purposes of the implied covenant inquiry must be the time of the most recent change in contract—whether by amendment or change in law." *Fairholme Funds*, 2018 WL 4680197, at *9.[1] Accordingly, the Court set the date of the Recovery Act's enactment and the FHFA's appointment as conservator as the barometer to evaluate the parties' reasonable expectations. *Id.* Thus, the Court need not further redefine or divide the classes to capture different reasonable expectations of the parties up until the Third Amendment. And because the "[r]ights associated with dividends and liquidation preferences inhere in the security," *id.* at *8, the Court need not further divide the classes for those who purchased their shares after the Third Amendment.

Rule 23's definiteness requirement is satisfied here.

## B.  Rule 23(b)(3) Requirements

The parties agree that the Court can certify the proposed classes under Rule 23(b)(3). As explained previously, Rule 23(b)(3) has two primary requirements: predominance and superiority. The Court addresses each requirement in turn below.

---

[1] The Court also determined that even if it were to adopt plaintiffs' position that "reasonable expectations must be evaluated at the time of issuance, the analysis would come out the same" because "[a]n investor in a corporation—let alone a corporation as highly regulated as Fannie and Freddie—reasonably expects that the shareholder contract[] may be amended." *Fairholme Funds*, 2018 WL 4680197, at *9.

### 1. Predominance

Rule 23(b)(3) first requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). While the same analytical principles govern both the Rule 23(a) commonality and the predominance requirements, the predominance criterion "is even more demanding." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Predominance analysis "entails two distinct steps—the characterization step and the weighing step." 2 Rubenstein, Newberg on Class Actions § 4:50. The Court will address each below.

First, the Court must "characterize the issues in the case as common or individual." *Id.* (emphasis omitted). This determination is "primarily based on the nature of the evidence." *Id.* An individual issue is one where "members of a proposed class will need to present evidence that varies from member to member," while a common issue is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting Rubenstein, Newberg on Class Actions § 4:50) (alteration in original).

Here, plaintiffs identify a common issue that "is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.*, 577 U.S. at 453. The common issue in this case is whether the Third Amendment violated the implied covenant of good faith and fair dealing. *See Fairholme Funds*, 2018 WL 4680197, at *7. That issue will require determining whether the Third Amendment violated the reasonable expectations of the parties. This is an objective inquiry. *See, e.g., Gerber v. Enter. Prods. Holdings, LLC.*, 67 A.3d 500, 418–19 (Del. 2013), *overruled on other grounds by*

*Winshall v. Viacom Int'l Inc.*, 76 A.3d 808 (Del. 2013); *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, 3 F.4th 605, 611–12 (4th Cir. 2021).  As noted previously, the contractual provisions within each class are materially identical.  *See supra* section III.A.2.  And beyond the express terms of the contracts, the circumstances surrounding this dispute are also susceptible to generalized proof.  Indeed, as explained previously, the class claims will involve examining the reasonable expectations of the contracting parties at the "time of the most recent change in contract" before the Third Amendment.  *See supra* section III.A.5.  This proof would include, but not be limited to, the Recovery Act's enactment, the FHFA's appointment as conservator, and the FHFA's public statements.  *See Fairholme Funds*, 2018 WL 4680197, at *9.  Those stockholders that held stock on August 12, 2012, but sold shares thereafter are no longer members of the class and their claims traveled to the purchasers of their shares.  *See supra* section III.A.5.  Thus, generalized, class-wide proof can be used to prove the claims at issue.

The Court also agrees that common damages issues likely predominate over individualized issues.  Plaintiffs have proffered expert testimony that damages can be calculated using a common methodology that applies to all members of the respective classes.  Pls.' Br. 21.  At this stage, that showing suffices.  *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C. 2002).  ("At the certification stage, the preliminary inquiry in assessing the proposed methods [of calculating damages] is limited: [t]he inquiry is not whether the methods are valid, but is only to assess whether the methods are available to prove damages on a class-wide basis.").

Next in the predominance inquiry is the "weighing" step.  The Court must "compare the issues subject to common proof against the issues subject solely to individualized proof to assess whether the common issues predominate."  Rubenstein, Newberg on Class Actions § 4:50.  This comparison is "a qualitative rather than a quantitative concept."  *Parko*, 739 F.3d at 1085.  "[T]he

common issues do not have to be shown to be dispositive." *In re Vitamins Antitrust Litig.*, 209

F.R.D. at 262. But after the Court's ruling at the motion-to-dismiss stage, the claim for breach of

the implied covenant of good faith comprises the *entirety* of the class's claims.

Predominance is satisfied here.

### 2. Superiority

Rule 23(b)(3) also requires that "a class action is superior to other available methods for

fairly and efficiently adjudicating the controversy." Rule 23(b)(3) identifies several nonexhaustive

factors to consider in determining whether a class action is in fact "superior to other available

methods for the fair and efficient adjudication of the controversy":

> (A) the interest of members of the class in individually controlling
> the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the
> controversy already commenced by or against members of the class;
> (C) the desirability or undesirability of concentrating the litigation
> of the claims in the particular forum;
> (D) the difficulties likely to be encountered in the management of a
> class action.

Fed. R. Civ. P. 23(b)(3).

The Court agrees with the parties that a class action is superior to individual actions or

other available methods of adjudicating this controversy. *Cf. In re Newbridge Networks Secs.*

*Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) ("[C]ourts have widely recognized the utility of,

and the necessity for, class actions in securities litigation."). Many of the individual members of

the classes may have suffered relatively small damages, so the expense and burden of individual

actions may make it impracticable for many of those class members to seek relief on their own.

*See, e.g.*, SAC ¶ 107; *see also Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 424

(D.D.C. 2017) ("Individual litigants often do not have the incentive to shoulder the burden of a

complex case, but when combined into a class, the risks can be shared."); *Kinard v. E. Capitol*

*Fam. Rental, L.P.*, 331 F.R.D. 206, 215 (D.D.C. 2019) (same).   While there is other pending litigation challenging the Third Amendment, the contract-specific claims have largely been transferred and consolidated before this Court, and a class action would eliminate the risk of inconsistent adjudications.   Finally, given that the common issues of law and fact predominate among the class members and are susceptible to common proof, the Court concludes that it is efficient and otherwise desirable to litigate these claims in a single consolidated class action. Superiority is satisfied here.

Rule 23(b)(3)'s requirements are satisfied.

### C. Rule 23(g) Requirements And Appointment Of Class Counsel

When appointing class counsel, Rule 23(g) requires the Court to consider (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Fed. R. Civ. P. 23(g).   After considering these factors and counsels' actions so far in this case, the Court finds that these factors weigh in favor of appointment as class counsel.   Indeed, the district judge previously assigned to this case also concluded that counsel "have superior knowledge, experience, and resources to prosecute the Consolidated Class Action." *See* ECF No. 1 at 6.   Counsel have ably discharged the duties imposed on them by this Court. *See id.* at 6–8.   The Court therefore will appoint the law firms of Boies Schiller Flexner LLP; Kessler Topaz Meltzer & Check, LLP; Grant & Eisenhofer, P.A.; and Bernstein Litowitz Berger & Grossman LLP as class counsel.

## IV.   CONCLUSION

Based on the foregoing, the Court will **GRANT** plaintiffs' motion for class certification by separate order.

Date:   12/7/21

Royce C. Lamberth
United States District Judge