UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

**DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h), Defendants hereby identify the following material facts as to which there is no genuine dispute.

1. Congress created the Federal National Mortgage Association ("Fannie Mae") in 1938 and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together with Fannie Mae, the "Enterprises") in 1970 to support the Nation's home mortgage system by increasing the funds available to lend to borrowers and thus increasing home ownership. *See* National Housing Act Amendments of 1938, 52 Stat. 23; Federal Home Loan Mortgage Corporation Act, 84 Stat. 451. The Enterprises purchase mortgages, pool them into mortgage-backed securities (MBS), and sell them to investors guaranteeing payment of principal and interest. *See* Second Amended

Consolidated Class Action and Derivative Complaint ¶ 34 (ECF No. 71, 1:13mc1288) ("Class Compl."); Fairholme Amended Complaint ¶ 21 (ECF No. 75, 1:13cv1053) ("Fairholme Compl."). By doing so, the Enterprises "relieve mortgage lenders of the risk of default and free up their capital to make more loans," *Jacobs v. FHFA,* 908 F.3d 884, 887 (3rd Cir. 2018), and this, in turn, increases the liquidity and stability of America's home lending market and promotes access to mortgage credit.

2.  The Enterprises have issued common stock and numerous series of non-cumulative preferred stock (the "Preferred Stock"), all of which are publicly traded. *See* Class Compl. ¶ 5. Of the Fannie Mae Preferred Stock currently outstanding, the earliest series was issued in September 1998 (Fannie Mae, Series D (FDDXD)), and the latest series was issued in May 2008 (Fannie Mae, Series T (FNMAT)). *See* Mason Report, Exhibit 7, Supporting Schedule 7.1 (excerpt attached as **Exhibit A**). Of the Freddie Mac Preferred Stock currently outstanding, the earliest series was issued in April 1996 (Freddie Mac, Series I (FMCCI)), and the latest series was issued in December 2007 (Freddie Mac, Series KJ (FMCKJ)). *Id*. No Preferred Stock has been issued by the Enterprises since the conservatorships began in September 2008. *Id*.

3.  The price at which each series of Preferred Stock was initially sold by the Enterprises to the public is referred to as the "issuance price" or "face value" or "par value" of the stock. The Preferred Stock entitles the holder to quarterly dividends, if declared by the Enterprises' board of directors, that are calculated based on a percentage of the stock's face value. For the Preferred Stock, the face value also represents the amount of liquidation preference per share. *See, e.g.*, Offering Circular for Fannie Mae 5.375% Non-Cumulative Preferred Stock, Series I (excerpt attached as **Exhibit B**). After preferred shares are issued, they

are traded on the secondary market, with the price of the share fluctuating based on the market's perception of the shares' ability to earn income for the holder—namely, through dividends and liquidation preferences.  *See* Class Plaintiffs' Opp'n to Mot. to Dismiss at 37 (ECF No. 33, 1:13mc1288) ("[T]he market valued Fannie Mae and Freddie Mac preferred and common stocks based in part on the existence of their attendant dividend and liquidation rights and an evaluation of the likelihood that the pertinent contingencies would occur.").

4. The 2008 financial crisis produced unprecedented losses for the Enterprises.  The Enterprises lost more in 2008 ($108 billion) than they had earned in the previous 37 years combined ($95 billion).  *See* FHFA Office of Inspector General, Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements at 5 (Mar. 20, 2013) ("OIG Report") (attached as **Exhibit C**).

5. In July 2008, in response to the crisis, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA").  Class Compl. ¶ 38.  HERA created FHFA, established it as the Enterprises' regulator, and empowered it to place the Enterprises into conservatorship or receivership under certain circumstances.  *Id*.  HERA also amended the charters of the Enterprises by granting the U.S. Department of the Treasury ("Treasury") temporary authority to fund the Enterprises by purchasing Enterprise stock.  *Id*.

6. On September 6, 2008, FHFA's Director placed both Enterprises into conservatorship in light of the ongoing deterioration of the secondary mortgage market and doubts about the Enterprises' ability to absorb further losses.  *See* Class Compl. ¶ 7; FHFA Statement of FHFA Director James B. Lockhart (Sept. 7, 2008) (attached as **Exhibit D**). Director Lockhart determined that because the Enterprises could not continue to operate safely and soundly and fulfill their critical public mission, conservatorship was necessary to stabilize

these troubled institutions. *Id*. at 2. Director Lockhart also announced on September 7, 2008, that, in order to preserve capital, "the common stock and preferred stock dividends will be eliminated." *Id*. at 3. The next day, Treasury entered into the Senior Preferred Stock Purchase Agreements (the "PSPAs") with FHFA as Conservator acting on behalf of the Enterprises. *See* Senior Preferred Stock Purchase Agreements for Fannie Mae (attached as **Exhibit E**)[1]. Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise as needed to ensure that the Enterprises maintained a positive net worth (the Treasury "Commitment"). Fairholme Compl. ¶ 36. For quarters in which an Enterprise's liabilities exceed its assets under Generally Accepted Accounting Principles, the PSPAs authorize draws upon Treasury's Commitment in an amount equal to the difference between liabilities and assets. *Id*.

7. In return for Treasury's Commitment under the PSPAs, Treasury received one million shares in a newly created class of securities in the Enterprises, known as Senior Preferred Stock. Ex. E § 3.1 (PSPA). The specific terms of the Senior Preferred Stock were contained in the Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2, referred to herein as the "Treasury Stock Certificate" (Fannie Mae copy attached as **Exhibit F**). The PSPAs entitled Treasury to the following consideration for each Enterprise: (i) a $1 billion senior liquidation preference—a priority right above all other stockholders, whether preferred or otherwise, to receive distributions from assets if the entities were liquidated (Ex. E § 3.1 (PSPA)); (ii) a dollar-for-dollar increase in that liquidation preference each time Fannie or Freddie drew upon the Treasury Commitment (*id*.); (iii) an annual cash dividend (paid quarterly) of 10% of Treasury's liquidation, or if not paid in cash, an

---

[1] The PSPAs and Treasury Stock Certificates are materially identical for each Enterprise. Here, we attach and cite to the Fannie Mae versions of each.

increase of the liquidation preference at a rate of 12% of Treasury's liquidation preference (*see* Ex. F § 2(a)-(c) (Treasury Stock Certificate)); (iv) warrants allowing Treasury to purchase up to 79.9% of the Enterprises' common stock at a nominal price (Ex. E §§ 1, 3.1 (PSPA)); and (v) periodic commitment fees, over and above the dividends (*id*. § 3.2(b) (PSPA)).  The PSPAs also barred the Enterprises from "mak[ing] any other distribution" with respect to Enterprise equity interests—including dividends to shareholders—without Treasury's consent.  *See id*. § 5.1 (PSPA).

**Treasury Liquidation Preference**

8. The Treasury Stock Certificates, as issued in 2008, stated:

> *Prior to termination of the Commitment*, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but *only to the extent of* (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference.

Ex. F § 3(a) (Treasury Stock Certificate) (emphases added).  Accordingly, the Enterprises are contractually prohibited from paying down the Treasury liquidation preference except in certain circumstances that have never, in fact, occurred—*i.e.*, termination of the Treasury Commitment, addition of dividends or periodic commitment fees to the liquidation preference in lieu of the Enterprises paying those obligations in cash, or issuance of new Enterprise shares.  *See id*. §§ 3(a), 4(a).

9. This "no-pay-down" feature of the Treasury Stock Certificates has long been publicly acknowledged and disclosed by the Enterprises.  For example, in its 10-Q issued in August 2012, Fannie Mae stated:  "we are not permitted to pay down the liquidation preference

5

of the outstanding shares of [Treasury] senior preferred stock except to the extent of (1) accrued and unpaid dividends previously added to the liquidation preference and not previously paid down; and (2) quarterly commitment fees previously added to the liquidation preference and not previously paid down." Fannie Mae, Quarterly Report (Form 10-Q) 54 (Aug. 8, 2012) (excerpt attached as **Exhibit G**). Freddie Mac similarly stated: "Under the [PSPA], our ability to repay the liquidation preference of the senior preferred stock is limited and we will not be able to do so for the foreseeable future, if at all." Freddie Mac, Quarterly Report (Form 10-Q) 89 (Aug. 7, 2012) (excerpt attached as **Exhibit H**).

10.  In 2009, in the course of negotiations around the First and Second Amendment to the PSPAs, FHFA asked Treasury to amend the PSPAs to allow for the Enterprises to voluntarily pay down their liquidation preferences. *See* Letter from A. Pollard to S. Albrecht (Feb. 25, 2009) (TREASDDC00002323) (proposing a "simple revision to each [Treasury stock] Certificate, easing the impediments to optional pay down" of the liquidation preference) (attached as **Exhibit I**); E-mail from S. Smith to R. Covino, M. Ugoletti (Dec. 3, 2009) (FHFA-DDC-0402385 and 2386) (similar, proposing revisions to allow Enterprises to pay down liquidation preference "at any time") (attached as **Exhibit J**). Treasury did not agree to these requests, and the First and Second Amendments did not amend the PSPAs to allow the Enterprises to voluntarily pay down the liquidation preference. *See* Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (May 6, 2009) (attached as **Exhibit K**); Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (Dec. 24, 2009) (attached as **Exhibit L**). Further, the PSPAs have been amended three times after the Third Amendment, but none of those amendments permitted paydown of the liquidation preference. *See* Letter Agreement (Dec. 21, 2017) (attached as **Exhibit M**); Letter

Agreement (Sept. 27, 2019) (attached as **Exhibit N**); Letter Agreement (Jan. 14, 2021) (attached as **Exhibit O**).

**The Third Amendment**

11.     Following the appointment of FHFA as conservator, the Enterprises' losses continued, leading to draws on the Treasury Commitment and increases in the liquidation preference. Freddie Mac's existing capital was fully exhausted by September 30, 2008 (*see* Freddie Mac Press Release for 3Q 2008 (Nov. 14, 2008) (FHFA-DDC-0189788) (reporting net worth deficit of $13.8 billion)) (attached as **Exhibit P**), and Fannie Mae's existing capital was fully exhausted by December 31, 2008 (*see* Fannie Mae Press Release for 4Q 2008 (Feb. 26, 2009) (FHFA-DDC-0189732) (reporting net worth deficit of $15.2 billion)) (attached as **Exhibit Q**). In light of continued and projected losses, FHFA and Treasury twice amended the PSPAs to increase the amount of the Treasury Commitment. In the First Amendment to the PSPAs, Treasury doubled its Commitment for each Enterprise, from $100 billion each ($200 billion total) to $200 billion each ($400 billion total). Ex. K (First Amendment to PSPAs); Ex. C at 6, 9-10 (OIG Report). In the Second Amendment to the PSPAs, Treasury agreed to provide as much funding as the Enterprises needed through December 31, 2012, after which time the cap on the Commitment would be reinstated and fixed pursuant to a formula. Ex. L (Second Amendment to PSPAs); Ex. C at 6, 9-10 (OIG Report).

12.     From the outset of the conservatorships in 2008 through the first quarter of 2012, the Enterprises consistently lacked the cash necessary to pay the 10% dividend to Treasury. Ex. C at 1, 14 (OIG Report); *Collins v. Yellen*, 141 S. Ct. 1761, 1773 (2021). As such, the Enterprises drew sizeable amounts from the Treasury Commitment in order to pay Treasury its quarterly dividend. *See* Fairholme Compl. ¶ 53; Class Compl. ¶ 48; Ex. C at 1, 14 (OIG Report);

*Collins*, 141 S. Ct. at 1773.  This circular practice—of drawing on Treasury's Commitment to pay Treasury dividends—increased the size of the liquidation preference, thereby increasing the size of the Enterprises' dividend obligation.  If it continued, this practice would erode the Treasury Commitment after it became fixed in January 2013.  *See* Ex. C at 6 n.6, 9 (OIG Report).

13. Since its execution, the Treasury Commitment has allowed the Enterprises to continue to operate and maintain liquidity in the secondary mortgage market, satisfy their obligations as they come due, and provide confidence to purchasers of their guaranteed MBS. *See* Fannie Mae, Annual Report (Form 10-K) at F-11 (Feb. 26, 2009) (excerpt attached as **Exhibit R**).  Erosion of the Commitment, or a risk of a future erosion, would diminish the Enterprises' ability to issue new debt and MBS investors' confidence in the Enterprises' ability to honor their guarantees, and thereby diminish the value of the Enterprises' guarantee.  *See* Moody's Investors Service, "Weekly Credit Outlook," Sept. 26, 2011, p. 15 (Fairholme-DDC-0208005) (attached as **Exhibit S**); *see also* Fannie Mae, Annual Report (Form 10-K) at 58 and F-10 (Feb. 24, 2011) (excerpt attached as **Exhibit T**) ("Market concerns about matters such as the extent of government support for our business . . . could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt."); Freddie Mac, Annual Report (Form 10-K) at p. 51 (Feb. 24, 2011) (excerpt attached as **Exhibit U**) ("[T]he costs of our debt funding could vary due to the uncertainty about the future of the GSEs and potential investor concerns about the adequacy of funding available to us under the Purchase Agreement after 2012.").  This would jeopardize liquidity of the housing finance market.  *See* Setia, Rajiv & Ma, James, *Achtung Baby!*, Barclays Capital US Agencies Outlook 2012, Dec. 14, 2011 FHFA00104880 (attached as **Exhibit V**) ("Continued losses at the GSEs post-2012 (driven by

senior preferred dividends, []) at a time when they do not have the benefit of an unlimited capital backstop would pose a threat to global financial stability, in our view."); *see also* Ex. C at 1, 14, 19 (OIG Report).

14. By August 2012, the dividend owed by each Enterprise to Treasury was substantial: Fannie Mae's annual dividend obligation was $11.7 billion and Freddie Mac's annual dividend obligation was $7.2 billion. *See* Freddie Mac Press Release for 2Q 2012 (Aug. 8, 2012) (FHFA-DDC-0162503) (attached as **Exhibit W**); Fannie Mae Press Release for 2Q 2012 (Aug. 7, 2012) (FHFA-DDC-0196829) (attached as **Exhibit X**). For Fannie Mae, this dividend amount exceeded its annual net income for every year since its inception. *See* Fannie Mae, Quarterly Report (Form 10-Q) 4 (Aug. 8, 2012) (excerpt attached as **Exhibit Y**). For Freddie Mac, this dividend amount exceeded its annual historical earnings in all but one year. *See* Freddie Mac, Quarterly Report (Form 10-Q) 8 (Aug. 7, 2012) (excerpt attached as **Exhibit Z**). Further, by August 2012, the Treasury liquidation preferences had grown to a total of approximately $189.4 billion—$117.1 billion for Fannie Mae and $72.3 billion for Freddie Mac. *See* Ex. G at p.4 (Fannie Mae Form 10-Q for 2Q 2012); Ex. H at p.7 (Freddie Mac Form 10-Q for 2Q 2012).

15. In 2011 and 2012, market analysts expressed concern over the impact of the dividend obligation on the Treasury Commitment. For example, in December 2011, analysts at Barclays stated that "capital draws from Treasury will be driven by the 10% annual dividend paid to the Treasury. . . . Continued losses at the Enterprises post-2012 (driven by senior preferred dividends) at a time when they do not have the benefit of an unlimited capital backstop would pose a threat to global financial stability, in our view." Ex. V at p.5 (Barclays Capital, Dec. 4, 2011) (emphasis in original) (exhibit citations omitted). Moody's Investors Service

similarly stated: "dividends will continue to increase even if Fannie Mae and Freddie Mac can break even after provisioning for credit losses.  In effect, Fannie Mae and Freddie Mac will be borrowing money from the US Treasury in order to pay the US Treasury its 10% dividend on the senior preferred stock."  Ex. S at p. 15 (Moody's Investors Service, Sept. 26, 2011).  On August 13, 2012, Moody's repeated this concern, stating the Enterprises "will deplete their capital bases because the dividends they'll be paying on their preferred securities will be greater than their earnings."  Moody's Investors Service, "Fannie Mae and Freddy Mac's Return to Profitability is Fleeting," Aug. 13, 2012, p. 1 (UST00532011) (attached as **Exhibit AA**).  Deutsche Bank expressed the same concerns: "Both Fannie Mae and Freddie Mac have subsequently said that the need to pay dividends to Treasury creates 'significant uncertainty about our long-term financial sustainability.' That uncertainty puts both their MBS and debt at risk." Deutsche Bank Outlook at 4-6 (Mar. 14, 2012) (FHFA-DDC-0048935) (attached as **Exhibit BB**).

      16.     Certain of these analysts also anticipated that FHFA and Treasury might agree to revise the PSPA dividend structure, including via a mechanism by which all of the Enterprises' profits would be paid to Treasury.  *See, e.g.*, Ex. V at 6 (Barclays Capital, Dec. 14, 2011) ("As a matter of public policy, we think a better solution is to cut the preferred coupon to zero, but levy a commitment fee for PSPA support … and to sweep all future net income back to the taxpayer."); Barclays Capital, "Global Rates Weekly, Crunch time again," June 17, 2011 (FHFA-DDC-0163468) (attached as **Exhibit CC**) ("Although we support the idea of cutting the dividend to zero at YE 12 [year end 2012], our view is that this should be replaced with a commitment fee equal to the GSEs' earnings.").

      17.     Edward DeMarco, the Acting Director of FHFA at the time the Third Amendment was executed, testified in his deposition that the "fixed 10 percent dividend [was] creating . . . a

risk and an instability over time," Deposition of Edward DeMarco at 62 (Dec. 21, 2020) ("DeMarco Dep.") (excerpts attached as **Exhibit DD**), and concluded that "[t]he net worth sweep solved my issues with the circular draw and the long-term stability of the companies in conservatorship." *Id*. at 64.  Thus, "replacing the fixed 10 percent dividend and the commitment fee with the net worth sweep improved the stability of the companies." *Id*. at 66.

18.   Acting Director DeMarco was also concerned about "several major uncertainties," including the possibility of a "further downturn or a subsequent downturn in the economy and in the housing markets." *See id*. at 61.  FHFA also was "on a path, as conservator, to shrink the footprints of the [Enterprises], which is going to reduce their income, and . . . the Treasury Department, is actively advocating for the wind-down of these companies, and . . . in Congress, there is nobody saying we want to keep these companies as they are." *See id*. at 247.

19.   On August 17, 2012, FHFA and Treasury amended the PSPAs a third time.  *See* Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement (Aug. 17, 2012) (attached as **Exhibit EE**) (the "Third Amendment"); see also Amended and Restated Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Aug. 17, 2012) (attached as **Exhibit FF**).  The Third Amendment replaced the fixed 10% dividend with a variable dividend formula tied to each Enterprise's net worth, which eliminated circular draws.  *See id*. §§ 2-3; Ex. C at 2, 21 (OIG Report).  Under the new dividend formula, the Enterprises were required to pay a dividend equal to the amount, if any, by which their net worth exceeded a pre-determined capital reserve.  *Id*.  In addition, the Third Amendment suspended the Enterprises' obligations to pay periodic commitment fees.  *See* Ex. EE § 4 (Third Amendment); Ex. C at 11 (OIG Report).

20.     The Third Amendment eliminated the risk that the 10% dividend obligation would erode the Treasury Commitment by replacing the fixed-rate dividend formula with a variable one.  Ex. C at 21 (OIG Report).  Under the new formula, the Enterprises would no longer draw from the Treasury Commitment to pay their dividends.  *Id*. at 14.  That, in turn, ensured that all of Treasury's commitment was available to backstop the Enterprises' operations if losses were incurred in any quarters.  *Id*.

21.     Acting Director DeMarco testified in his deposition that the Third Amendment would help provide market stability for the Enterprises.  *See* Ex. DD at 75 (DeMarco Dep.) ("My concern was with the stability of the companies and their ability to continue to serve their mission and operate in the marketplace through … a variety of future paths"), *id*. at 197 ("Third Amendment was going to make the companies more stable for the duration of the conservatorship"), *id*. at 217 ("my goal here was actually to instill greater stability for the companies as a result of entering into the Third Amendment.  That was the overriding goal.  I wanted greater stability in the capital support of these companies while in conservatorship."), *id*. at 266 ("part of the motivation for the Third Amendment was … that market participants were already getting nervous … that the fixed 10 percent dividend was going to erode that commitment and that the companies would have … greater difficulty accessing the markets.").

22.     Market analysts observed that the Third Amendment shored up the Enterprises' access to capital and avoided the problem of circular draws.  Fitch Ratings observed that the Third Amendment "alleviate[d] potential concerns about a breach of the [Treasury] support cap, which kicks in next year [in 2013] under the funding agreement with Treasury."  Fitch Ratings, "Fitch Affirms Fannie Mae and Freddie Mac at 'AAA'; Outlook Negative," November 28, 2012, p. 2 (attached as Exhibit GG).  Moody's called the Third Amendment "a credit positive" because

it "ensures that each company will have sufficient contingent capital under its Capital Agreement with the US Treasury."  Moody's, Issuer Comment: US Treasury Amends Fannie Mae's and Freddie Mac's Capital Agreement, a Credit Positive (Aug. 23, 2012) (FRE-FAIRHOLME-0077864) (attached as Exhibit HH).  Barclays stated that the Third Amendment "puts to rest any worries about [Enterprise] credit risk even in intermediate/longer maturities," Barclays Capital, "Interest Rates Research, Treasury changes the PSPAs: Initial thoughts," August 17, 2012, p. 2 (FHFA-DDC-0065665) (attached as Exhibit II), and Guggenheim Partners concluded that "Fannie and Freddie will be on a stronger financial footing" because of the Third Amendment.  Guggenheim Partners, Washington Research Group, "What to Watch: Housing Finance Reform Long Off," August 20, 2012, pp. 1-2 (FHFA-DDC-0067168-69) (attached as Exhibit JJ).

**Preferred Stock Prices**

23. By August 16, 2012—the day before the Third Amendment was executed—the market price of the Enterprises' Preferred Shares was, on average, 7% of the par or face value of the stock.  *See* Kothari Report, Exhibit 6(A) (dividing Aug. 16, 2012 market price by par value per share) (attached as **Exhibit KK**).  In other words, the Preferred Shares had lost approximately 93% of their value at issuance before the Third Amendment was executed.

**January 2021 Amendment**

24. On January 14, 2021, FHFA and Treasury agreed to amend again the PSPAs to allow the Enterprises to retain earnings until they satisfy their regulatory capital requirements.  *See* Ex. O (Jan. 14, 2021 Letter Agreement); *see also* Fourth Amended and Restated Certificate of Designation of Terms of Variable Liquidation Preference Senior Preferred Stock, Series 2008-2 (Apr. 13, 2021) (attached as **Exhibit LL**).  The amendment provides that, in each quarter in which the Enterprises have a positive net worth, the Enterprises' net worth is not paid in cash to

Treasury but rather is added to Treasury's liquidation preference with the Enterprises retaining their net worth as capital. Ex. O at 6 (Jan. 14, 2021 Letter Agreement). Thus, Treasury's liquidation preference increases as the Enterprises' net worth increases.

Dated: March 21, 2022

Respectfully submitted,

 /s/ Howard N. Cayne
Howard N. Cayne (D.C. Bar # 331306)
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Howard.Cayne@arnoldporter.com
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency and Acting Director Sandra L. Thompson*

 /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING &SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

 /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY &MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*