# **EXHIBIT C**

# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

## Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements





# FEDERAL HOUSING FINANCE AGENCY
# OFFICE OF INSPECTOR GENERAL

# AT A GLANCE

## Analysis of the 2012 Amendments to the Senior Preferred Stock Purchase Agreements

### Background

In order to support stability and liquidity in the mortgage market during the 2008 housing crisis, in September 2008, the U.S. Department of the Treasury (Treasury) committed to provide funds—up to a cap—to the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises) when needed to ensure that their liabilities do not exceed their assets. It did this through Senior Preferred Stock Purchase Agreements (PSPAs). As of December 31, 2012, Treasury had provided $187.5 billion to the Enterprises.

The PSPAs initially required the Enterprises to pay dividends on Treasury's investments at an annual rate of 10%, totaling about $19 billion a year by 2012, an amount greater than the highest combined annual profit that the Enterprises ever earned. As of December 31, 2012, the Enterprises had paid $55 billion in dividends, and they frequently had to draw additional funds from Treasury in order to pay the dividends, further increasing Treasury's investment. Market participants expressed concern that the dividends could siphon off Treasury money needed to keep the Enterprises solvent.

On August 17, 2012, Treasury and the Federal Housing Finance Agency (FHFA), acting as the Enterprises' conservator, amended the PSPAs (2012 Amendments). The 2012 Amendments, among other things, modify the structure of the dividend payments owed to Treasury, ending the circular practice of having Treasury provide money to the Enterprises to enable them to pay the dividends; phase in a requirement for the Enterprises to pay as dividends their positive net worth every quarter; accelerate the reduction of Enterprise mortgage assets; and require an annual risk management report from each Enterprise.

### Scope

This report describes the 2012 Amendments, examines their goals, and assesses their potential impacts.

### Conclusion

Treasury's announcement of the 2012 Amendments said that the changes would "make sure that every dollar of earnings" the Enterprises generate would be "used to benefit taxpayers," "support the continued flow of mortgage credit," and "help expedite the[ir] wind down."

Ending the circularity of draws from Treasury to pay dividends will prevent the erosion of Treasury's commitment level, and may help reassure investors in the Enterprises' bonds and mortgage-backed securities (MBS). The change in the dividend structure also will affect quarterly payments to Treasury, potentially resulting in the Enterprises returning more money to federal taxpayers sooner. Indeed, because of accounting treatment, sustained profitability of the Enterprises could result in a one-time large dividend payment from each Enterprise to Treasury. However, the significance of the impact of the change in the dividend structure depends on a variety of factors, including the magnitude of fluctuations in the Enterprises' net worth.

Increasing the rate at which the Enterprises shrink their retained mortgage portfolios may pose challenges as their remaining investments are less liquid. At the same time, this will reduce risk. However, although the 2012 Amendments more quickly reduce the Enterprises' investments, they do not directly affect their securitization business. As such, they do not diminish the Enterprises' importance in the housing system.

Additionally, the changes to the PSPAs help to safeguard policymakers' options to reform the role of the Enterprises in the nation's secondary mortgage market.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. 1

ABBREVIATIONS ................................................................................................................ 3

PREFACE ................................................................................................................................. 4

BACKGROUND ................................................................................................................... 5

    Fannie Mae, Freddie Mac, and the Mortgage Crisis ............................................. 5

    The Senior Preferred Stock Purchase Agreements ............................................... 5

    Terms of the PSPAs ................................................................................................... 6

        Commitments, Draws, and Covenants ............................................... 6

        Senior Preferred Stock ........................................................................... 7

        Dividends .................................................................................................. 9

    Amendments to the PSPAs ...................................................................................... 9

        Changes to the Dividends ...................................................................... 11

        Increase in the Rate of Mortgage Asset Reduction ......................... 12

        Suspension of the Periodic Commitment Fee .................................... 12

        Annual Risk Management Plans ........................................................... 12

        Floor for Enterprise Transactions Requiring Treasury Consent ...... 13

POTENTIAL IMPACTS ..................................................................................................... 14

    I. Potential Financial Impacts ................................................................................. 14

        A. Investors Will Have More Assurance that Treasury's Commitment Will Cover Enterprise Needs ........................................................................................ 14

        B. The Enterprises May Pay More to Treasury than Under the Previous 10% Dividend ................................................................................................................... 14

        C. Quarterly Net Worth of the Enterprises Will Be Gradually Reduced to Zero ........... 15

        D. Accounting Treatment Could Result in One-Time Large Dividend Payments to Treasury ................................................................................................ 15

    II. Potential Management Ramifications ............................................................... 17

        A. Infrastructure and Operating Expenses ........................................... 17

B. Possible Negative Impact of Accelerated Reduction of Illiquid Assets in the
Retained Portfolios ................................................................................... 18

III. Preserving Options for Future Permanent Reforms ....................................... 18

CONCLUSION ............................................................................................................ 20

SCOPE AND METHODOLOGY ............................................................................... 21

APPENDIX A:  TREASURY PRESS RELEASE .................................................... 22

APPENDIX B:  FHFA PRESS STATEMENT .......................................................... 24

ADDITIONAL INFORMATION AND COPIES ...................................................... 25

# ABBREVIATIONS

2012 Amendments ....................................................August 17, 2012, Amendments to the PSPAs

Enterprises........................................................................................ Fannie Mae and Freddie Mac

Fannie Mae...................................................................... Federal National Mortgage Association

FHFA or the Agency....................................................................Federal Housing Finance Agency

Freddie Mac ............................................................Federal Home Loan Mortgage Corporation

HERA................................................................Housing and Economic Recovery Act of 2008

MBS ...............................................................................................Mortgage-Backed Securities

OIG ...............................................Federal Housing Finance Agency Office of Inspector General

PSPA ....................................................................Senior Preferred Stock Purchase Agreement

SEC .........................................................................U.S. Securities and Exchange Commission

Treasury ......................................................................... U.S. Department of the Treasury

**Federal Housing Finance Agency**
**Office of Inspector General**
Washington, DC

# PREFACE

The Office of Inspector General (OIG) was established by the Housing and Economic Recovery Act of 2008 (HERA),[1] which amended the Inspector General Act of 1978.[2]  OIG is authorized, with respect to FHFA's programs and operations, to:  conduct audits, evaluations, investigations, and other studies; recommend policies that promote effective and efficient administration; and prevent and detect fraud and abuse.

This report is one in a series of audits, evaluations, and special reports published as part of OIG's oversight responsibilities.  It is intended to describe and assess the goals and potential effects of the 2012 Amendments to the PSPAs.

David P. Bloch, Director, Division of Mortgage, Investments, and Risk Analysis; Alan Rhinesmith, Senior Policy Advisor; Ezra Bronstein, Investigative Counsel; and Beth Preiss, Program Analyst, conducted this study.  OIG appreciates the assistance of all those who contributed to this report.  It has been distributed to Congress, the Office of Management and Budget, and others and will be posted on OIG's website, www.fhfaoig.gov.

George F. Grob
Deputy Inspector General for Evaluations

---

[1] Pub. L. No. 110-289.

[2] Pub. L. No. 95-452.

# BACKGROUND

## Fannie Mae, Freddie Mac, and the Mortgage Crisis

Fannie Mae and Freddie Mac provide liquidity to the housing finance system by supporting the secondary mortgage market, in which the Enterprises purchase residential mortgages that meet their underwriting criteria.  The loan sellers can then use the sales proceeds to originate additional mortgages.  The Enterprises can hold the mortgages in their own investment portfolios or package them into MBS that are, in turn, sold to investors.  For a fee, the Enterprises guarantee the payment of mortgage principal and interest on the MBS.

The financial crisis produced unprecedented losses for the Enterprises.  In 2008, Fannie Mae lost $58.7 billion and Freddie Mac lost $50.1 billion.  To put these losses in perspective, over the 37-year period from 1971 to mid-year 2008, Fannie Mae and Freddie Mac together earned $95 billion, less than they lost in 2008 alone.

## The Senior Preferred Stock Purchase Agreements

In July 2008, Congress enacted HERA, which established FHFA as regulator of the Enterprises.  HERA also gave Treasury temporary authority to assist the Enterprises through the purchase of securities.  On September 6, 2008, the Enterprises entered into conservatorships supervised by FHFA.  The next day, Treasury acted pursuant to its temporary authority to protect the Enterprises and allow them to continue their key role in the housing market.  Treasury did this through the PSPAs,[3] by committing to provide funds to the Enterprises as necessary to prevent their liabilities from exceeding their assets, subject to a cap.  Treasury's support of the Enterprises has allowed their securitization business and bond offerings to continue since 2008, notwithstanding the financial upheaval caused by the housing crisis.

---

[3] The PSPAs were established between FHFA, as conservator for Fannie Mae and Freddie Mac, and Treasury on September 7, 2008.  They were amended and restated on September 26, 2008, and have been amended three times since:  on May 6, 2009, December 24, 2009, and August 17, 2012.

## Terms of the PSPAs

*Commitments, Draws, and Covenants*

Under the PSPAs, Treasury has committed to make quarterly payments to the Enterprises, if needed, to maintain a zero **net worth**.[4]  Each quarter, FHFA looks to each Enterprise's financial statements to determine if its liabilities have exceeded its assets.  If so, FHFA delivers a request to Treasury, on that Enterprise's behalf, to make a "draw" under the applicable PSPA.  Treasury then provides funds equal to the Enterprise's net worth deficit.[5]

> **Net Worth**
> Net worth equals total assets minus total liabilities, as reflected on a company's balance sheet.

When the PSPAs were first signed in September 2008, Treasury committed to provide up to $100 billion per Enterprise.  In February 2009, Treasury announced that it would expand its commitment to $200 billion for each Enterprise.  Then, just before its temporary authority under HERA expired at the end of 2009, Treasury agreed to provide as much as the Enterprises needed to cover quarterly net worth deficits from 2010 to 2012, and then for future years subject to a cap.[6]  As of January 1, 2013, Freddie Mac had $140.5 billion in commitment available.  Fannie Mae's remaining cap will be the greater of $83.9 billion, or $124.8 billion less the company's net worth, if positive, on December 31, 2012.[7]

---

[4] In a letter opinion to Treasury, the Justice Department further strengthened this commitment by indicating that sovereign immunity had been waived to allow lawsuits against Treasury by Enterprise bond and MBS holders should Treasury fail to make good on this commitment.  *See* Department of Justice, Letter Opinion for the Secretary of the Treasury (Sept. 26, 2008) (online at www.justice.gov/olc/2008/treasury-gse-ltr-opinion.pdf).

[5] Draws are made with a one-quarter lag.  For example, if there is a net worth deficit for the first quarter the draw is made in the second quarter.

[6] The $200 billion per Enterprise cap was replaced by a formulaic cap in 2009.  Treasury committed to provide each Enterprise a total, from the beginning of the PSPAs in 2008, of up to the greater of:  (i) $200 billion, or (ii) $200 billion plus the Enterprise's quarterly negative net worth for 2010, 2011, and 2012, less the Enterprise's positive net worth, if any, on December 31, 2012.  On January 1, 2013, the cap became fixed for future years.  The remaining cap for Fannie Mae will be the greater of:  (i) $200 billion − $116.1 billion (draws from 2008-2012) = $83.9 billion; or (ii) $200 billion + $40.9 billion (draws for 2010-2012) − (net worth if positive on December 31, 2012) − $116.1 billion (draws from 2008-2012) = $124.8 billion − (net worth if positive on December 31, 2012).  The remaining cap for Freddie Mac is $140.5 billion:  $200 billion + $20.6 billion (draws for 2010-2012) − $8.8 billion (positive net worth on December 31, 2012) − $71.3 (draws from 2008-2012) = $140.5 billion.  (The alternative cap would be lower: $200 billion − $71.3 billion (draws from 2008-2012) = $128.7 billion).

[7] Freddie Mac reported its 2012 financial results on February 28, 2013.  As this report went to press, Fannie Mae had not reported its 2012 results.  This report uses currently available information for Fannie Mae (third quarter of 2012).

In exchange for Treasury's funding commitment, the Enterprises were required to provide Treasury senior preferred stock, quarterly dividends, **warrants** to purchase 79.9% of each Enterprise's common stock, and commitment fees.[8]  In addition, the PSPAs required the Enterprises to adhere to certain covenants.  Among other things, the covenants initially required that each Enterprise reduce its mortgage portfolio by 10% per year down to $250 billion.[9]

**Warrant**
A warrant gives the holder the right to purchase stock in a company in accordance with the terms of the instrument.  Treasury received a warrant to purchase, at its option, common stock in an amount up to 79.9% of the outstanding common stock of each Enterprise until September 7, 2028.

*Senior Preferred Stock*

Under the PSPAs, Treasury's financial support is in the form of an equity investment in the Enterprises.  The investment is not in common stock, but rather in senior preferred stock.  Preferred stock is typically regarded as a hybrid instrument in that it has some features like bonds and others like common stock.  Preferred stock is an equity interest, like common stock.  However, like a bond, it usually does not confer voting rights, and offers a **liquidation preference**.  A liquidation preference gives the preferred shareholder the right, in the event that the company is dissolved, to receive compensation for its preferred stock typically before common stockholders (but not before bondholders).  Senior preferred stock has priority over other preferred stock.  A dividend, should one be paid under the terms of preferred stock, is typically a quarterly payment based on a specified rate applied to the amount of preferred stock held.

**Liquidation Preference**
A liquidation preference specifies the order in which security holders receive payments and how much they are paid in the event a company is liquidated. Under the PSPAs, through 2012, the liquidation preference also was used to determine the Enterprises' dividend payments to Treasury. The liquidation preference for Treasury's senior preferred stock in each Enterprise equals the draws made, plus $1 billion representing the liquidation preference on the stock Treasury received upon entering into the agreements.

---

[8] The original liquidation preference of the senior preferred stock Treasury received in each Enterprise was considered a commitment fee.  (See the section Senior Preferred Stock below.)  Treasury waived the periodic commitment fees each quarter, and then the 2012 Amendments suspended these fees for as long as the sweep is in effect.

[9] The PSPAs also prohibited the Enterprises, without the consent of Treasury, from making any changes to their capital structures, issuing capital stock, increasing their debt significantly, paying any dividends (other than those to Treasury), engaging in certain transactions with affiliates, or disposing of any assets unless they are for "fair market value" in "the ordinary course of business."  The Enterprises also must have FHFA approval to set new compensation for certain high-level executives.  In addition, the Enterprises may not seek to terminate the conservatorships overseen by FHFA without the consent of Treasury, unless the termination is in connection with a receivership.

Under the PSPAs, Treasury received senior preferred stock with a stated value of $2 billion (i.e., a $1 billion commitment fee for each Enterprise). The forms of these stock certificates were attached to and part of the PSPAs. The liquidation preference of the senior preferred stock increases dollar for dollar for each draw made to keep the Enterprises' liabilities from exceeding their assets each quarter.[10]  As of December 2012, Treasury held senior preferred stock with a liquidation preference of $189.5 billion for the two Enterprises combined – the original $2 billion at the time of the issuance of the senior preferred stock certificates plus $187.5 billion in draws since then. (See Figure 1.)

**Figure 1.  Federal Government Support Since Conservatorship**[11]



Thus, Treasury has liquidation preferences ahead of other stockholders to receive $189.5 billion if the Enterprises are liquidated. This liquidation preference does not decrease by the amount of dividends paid. In addition, the Enterprises generally cannot redeem the senior preferred stock.[12]

---

[10] Hence the stock is called Variable Liquidation Preference Senior Preferred Stock.

[11] Source:  FHFA, *Data as of December 18, 2012 on Treasury and Federal Reserve Purchase Programs for GSE* [Government-Sponsored Enterprise] *and Mortgage-Related Securities*, at Table 1 (online at www.fhfa.gov/webfiles/24847/TSYSupport%202012-12-18.pdf).

[12] Absent express consent from Treasury and FHFA, an Enterprise cannot redeem the senior preferred stock until the termination of Treasury's funding commitment.  Treasury's funding commitment to an Enterprise will terminate if: (i) the Enterprise's assets are completely liquidated; (ii) the Enterprise pays its liabilities and obligations (including MBS) in full; or (iii) the Enterprise reaches the funding cap.

*Dividends*

The **dividend** payment owed to Treasury by each
Enterprise is set forth in the senior preferred stock
certificates.  Until the 2012 Amendments, the stock
certificates required a dividend at an annual rate of 10% of
the liquidation preference, to be paid quarterly.  As a result,
even before Treasury provided any funds to the
Enterprises, they each owed Treasury payments of $100
million per year, based on 10% of the $1 billion liquidation
preference on the senior preferred stock Treasury received
from each Enterprise for entering into the PSPAs.  As
Treasury provided funds to the Enterprises under the PSPAs, the required dividend increased to
nearly $19 billion per year from both Enterprises combined (10% of $189.5 billion).  As
indicated above, Treasury provided funds to the Enterprises as needed to enable them to pay the
full amount of dividends owed to Treasury.  This, in turn, increased the liquidation preferences
and, consequently, the amount of the dividends.

> **Dividends**
> Dividends are distributions a
> company pays to its stockholders.
> Under the PSPAs, through 2012,
> each Enterprise paid Treasury
> quarterly dividends at an annual rate
> of 10% of the liquidation preference.
> Beginning in 2013, the Enterprises
> pay quarterly dividends equal to
> their positive net worths above a
> buffer.

Figure 2 summarizes the funds transferred between Treasury and the Enterprises to date.

**Figure 2.  Summary of Funds Transferred (as of December 31, 2012)**

|  | **Fannie Mae** | **Freddie Mac** |
|---|---|---|
| Draws from Treasury | $116.1 billion | $71.3 billion |
| Dividends Paid to Treasury | 31.4 billion | 23.8 billion |
| "Net" Funds Received from Treasury | $ 84.7 billion | $47.5 billion |
| Remaining Commitment | The greater of $83.9 billion or $124.8 billion less net worth, if positive | $140.5 billion |

## Amendments to the PSPAs

On February 18, 2009, Treasury announced that it was increasing the amount of its commitment
under the PSPAs from $100 billion to $200 billion per Enterprise "to provide assurance to
market participants that Congress gave these companies a special purpose to support housing

finance … [and Treasury] stand[s] firmly behind their ability to provide that support."[13]  This change was memorialized in amendments to the PSPAs dated May 6, 2009.

On December 24, 2009, facing the December 31, 2009, deadline for its HERA authorization to commit funds to the Enterprises, Treasury again announced that it was increasing its commitment to support the Enterprises.  Treasury committed to provide as much funding as the Enterprises needed to prevent insolvency through 2012, with a cap for later years.[14]

According to Treasury, this formulaic funding cap was intended once again to "leave no uncertainty about the Treasury's commitment to support these firms as they continue to play a vital role in the housing market during this current crisis."[15]  Nevertheless, insofar as Treasury was providing billions of additional dollars to the Enterprises to fund the 10% dividends that were paid back to Treasury, various market participants raised concerns about depleting the available commitment amount.

After 2009, Treasury no longer had the statutory authority under HERA to increase the commitment caps for the Enterprises.  However, it did have authority to change other aspects of the PSPAs.  Nearly 17% of total PSPA draws by Fannie Mae and nearly 10% of total PSPA draws by Freddie Mac had been used to pay the dividends to Treasury through the first quarter of 2012.  Treasury decided to focus on ways to ensure that the Enterprises would no longer be required to take draws just to make dividend payments.  A number of options were considered for reformulating the dividend structure.

In the end, in 2012, Treasury settled on the "positive net worth" model, in which Treasury would simply take, as dividends, the entire positive net worth of each Enterprise each quarter.  Treasury is phasing in this change by establishing a net worth "**buffer**" such that net worth above the level of the buffer will be paid to Treasury.  The buffer was set at $3 billion for each Enterprise initially, to be incrementally reduced to zero over five years.  If an Enterprise has positive net worth that is less than the buffer, then the dividend payment to Treasury under the 2012 Amendments would be zero.

> **Buffer**
> The buffer is the amount of positive net worth the Enterprises keep under the 2012 Amendments.  The buffer was set at $3 billion for each Enterprise for 2013, to be reduced by $600 million each year until reaching zero for 2018, when the Enterprises begin paying their entire positive net worths as dividends.

---

[13] Treasury, *Statement by Secretary Tim Geithner on Treasury's Commitment to Fannie Mae and Freddie Mac* (Feb. 18, 2009) (online at www.treasury.gov/press-center/press-releases/Pages/tg32.aspx).

[14] *See* Footnote 6 for the calculation of the cap.

[15] Treasury, *Treasury Issues Update on Status of Support for Housing Programs* (Dec. 24, 2009) (online at www.treasury.gov/press-center/press-releases/Pages/20091224153345924543.aspx).

As the 2012 Amendments were under consideration, Fannie Mae and Freddie Mac were experiencing a turnaround in their profitability.  Due to rising house prices and reductions in credit losses, in early August 2012 the Enterprises reported significant income for second quarter 2012.  Fannie Mae had net income of $5 billion and Freddie Mac had net income of $3 billion, and neither required a draw from Treasury under the PSPAs.

On August 17, 2012, less than two weeks after the Enterprises announced their positive quarterly earnings, Treasury and FHFA announced that they had modified the terms of the PSPAs.  In its press release, Treasury said that the changes would "help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market."  (See Appendix A for Treasury's press release.)

The 2012 Amendments modify five areas of the PSPAs.  They:  (1) change the structure of dividend payments owed to Treasury; (2) increase the Enterprises' rate of mortgage asset reduction; (3) suspend the periodic commitment fee; (4) require that the Enterprises produce annual risk management plans; and (5) exempt dispositions at fair market value under $250 million from the requirement of Treasury consent.  These changes are described in further detail below.

### Changes to the Dividends

As indicated above, the PSPAs' original dividend rate was 10% of the liquidation preference, which is equal to the amount that each Enterprise has drawn from Treasury each quarter to keep its liabilities from exceeding its assets, plus the initial $1 billion commitment fee per Enterprise.  Because of the 10% dividend rate and the large amount drawn in the four years since the inception of the PSPAs, the Enterprises' combined dividend obligation had risen to approximately $19 billion per year in 2012.  Even with the Enterprises' improving financial conditions, that number is considerable.  As Fannie Mae's CFO was quoted saying, "It's hard for me to envision that we would be able to make enough every single quarter to cover the dividend payment."[16]  Thus, even as the Enterprises returned to financial health, they might still have required draws just to make the dividend payments to Treasury.

The 2012 Amendments significantly altered the structure of the dividend payment, such that the Enterprises are no longer required to draw funds from Treasury just to pay Treasury dividends.  As of January 1, 2013, the dividend payment is no longer based on a fixed percentage of the liquidation preference.  Instead, the dividend is based on the amount of positive net worth

---

[16] *Fannie Mae Posts Profit as Home Prices Rise*, Wall Street Journal (Aug. 8, 2012) (online at online.wsj.com/article/SB10000872396390443991704577576913741014248.html).

reported by each Enterprise.[17]  Net worth is the amount by which assets exceed liabilities.  For 2013, each Enterprise must pay Treasury the amount of its positive net worth over $3 billion.  As discussed above, this $3 billion buffer will gradually decline—by $600 million per year—until it disappears in 2018.

In its press release announcing the 2012 Amendments, Treasury called this a full income sweep of "every dollar of profit that each firm earns going forward."  Treasury noted that this change would end "the circular practice of the Treasury advancing funds to the [Enterprises] simply to pay dividends back to Treasury."

### Increase in the Rate of Mortgage Asset Reduction

The PSPAs originally required that each Enterprise reduce its mortgage assets by 10% per year down to $250 billion.  The 2012 Amendments accelerate the reduction to 15% per year.  In announcing the 2012 Amendments, FHFA's Acting Director indicated that the goal of "the faster reduction in the retained mortgage portfolio" was to "further reduce risk exposure and simplify the operations of Fannie Mae and Freddie Mac."  (See Appendix B for FHFA's press statement.) As of December 31, 2012, each Enterprise could own mortgage assets valued at no more than $650 billion.  With the 15% reduction rate, the Enterprises would reduce their portfolios to $250 million by 2018, four years earlier than previously scheduled.  So far, the Enterprises have met or exceeded their annual 10% reduction target.

### Suspension of the Periodic Commitment Fee

Under the original PSPAs, each Enterprise was supposed to begin paying in 2010 a quarterly "periodic commitment fee" in an amount to be agreed on by Treasury and the Enterprises.  The amount was never set and Treasury consistently waived the fee, so it was never paid.  Although the 2012 Amendments retain the fee within the PSPAs, they suspend it as long as the new dividend formulation is in place.

### Annual Risk Management Plans

The 2012 Amendments added a new requirement that each Enterprise, under the direction of FHFA, provide a "risk management plan" to Treasury on December 15th each year starting in 2012.  The risk management plan "shall set out [the Enterprise's] strategy for reducing its enterprise-wide risk profile and shall describe, in reasonable detail, the actions [the Enterprise] will take, to reduce both the financial and operational risk associated with each reportable

---

[17] Net worth is calculated in accordance with Generally Accepted Accounting Principles, commonly known as GAAP.

business segment." In its press release announcing the 2012 Amendments, Treasury indicated that these plans would "support a thoughtfully managed wind down" of the Enterprises. Treasury also described the plans as focusing on how each Enterprise intends to "reduce taxpayer exposure to mortgage credit risk for both its guarantee book of business and retained investment portfolio." The Enterprises provided these plans to FHFA for 2012.

*Floor for Enterprise Transactions Requiring Treasury Consent*

The PSPAs require that the Enterprises obtain Treasury's consent for certain transactions. Those transactions requiring consent include any asset dispositions, with a few exceptions. For example, one exception was that the required mortgage asset reductions by the Enterprises (i.e., the annual 10%—now 15%—reductions) do not require Treasury consent. The PSPAs also excepted any asset dispositions for fair market value "in the ordinary course of business, consistent with past practice," presumably to allow the Enterprises to conduct their business without having to seek Treasury approval for routine transactions. The 2012 Amendments add an exception to the consent requirement, allowing the Enterprises to dispose of assets or properties at a fair market value of less than $250 million without seeking Treasury's approval, even if the transaction does not fit into the category of "ordinary course of business." The Enterprises may still need FHFA approval for the transactions.

# POTENTIAL IMPACTS

## I. Potential Financial Impacts

The 2012 Amendments will have an impact on the cash flows to and from Treasury (i.e., dividends and draws), the size of the liquidation preference, and the total amount of Treasury support available to cover Enterprise losses.  Some of the key impacts are summarized below.

### A. Investors Will Have More Assurance that Treasury's Commitment Will Cover Enterprise Needs

The new dividend structure ends the circular practice of Treasury providing the Enterprises money solely for the purpose of the Enterprises paying dividends to Treasury.  This practice had increased Treasury's investment, thereby diminishing the amount available to support the Enterprises.  Under the 2012 Amendments, the amount of the total draw and liquidation preference will not increase as quickly as before, and it is less likely that the cap on Treasury's commitment will be reached.

FHFA's press statement announcing the 2012 Amendments said that "[a]s Fannie Mae and Freddie Mac shrink, the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs."  The change to the dividends provides the market with greater assurance that the Enterprises will have sufficient capital to fulfill their obligations on their bonds and MBS, which encourages continued liquidity in the mortgage market.

### B. The Enterprises May Pay More to Treasury than Under the Previous 10% Dividend

Effective in 2013, the Enterprises will pay dividends as long as they have positive net worth (exceeding the buffer).  Whether the new dividend structure results in larger or smaller payments to Treasury than the previous 10% dividend depends on the level of the Enterprises' net worth and the size of the remaining buffer.

For example, Freddie Mac's dividend obligation to Treasury in March 2013—based on its 2012 year-end net worth of $8.8 billion—will be $5.8 billion.  (Because this is the first dividend under the sweep it reflects the accumulation of positive net worth from prior quarters, and the full impact of the $3 billion buffer.)  Under the 10% dividend, the dividend would have been $1.8 billion for the quarter.

Absent the buffer, the net payment to Treasury would be greater if positive net worth is above what the 10% dividend would have been; otherwise the net payment would be the same.[18] Recent experience indicates that quarterly positive net worth greater than the dividend under the old system is possible.  In fact, Fannie Mae and Freddie Mac were able to pay to Treasury their dividends for the second and third quarters of 2012 (and Freddie Mac was able to pay its dividend for the fourth quarter of 2012) without any draws under the PSPAs.  As a result, over the long run, the new system could result in larger net payments to Treasury.

Additionally, as discussed below, accounting treatment related to deferred tax assets might result in substantial one-time dividend payments from each Enterprise to Treasury under the new system.  Furthermore, as also discussed below, infrastructure, operating expenses, and other costs within the Enterprises' discretion may affect the generation of positive net worth.

### C. Quarterly Net Worth of the Enterprises Will Be Gradually Reduced to Zero

The 2012 Amendments make it impossible for the Enterprises to build up any capital because their net worths, except for the temporary buffer amount, will be zero after they make each quarterly dividend payment to Treasury.  Treasury's press release announcing the amendments stated that with this change, the Enterprises "will not be allowed to retain profits, rebuild capital, and return to the market in their prior form."

### D. Accounting Treatment Could Result in One-Time Large Dividend Payments to Treasury

The reformulation of the dividend structure may produce an extraordinary payment to Treasury when an Enterprise's net worth is significantly and suddenly enhanced.  This could occur due to the accounting treatment surrounding deferred tax assets.  The timing could be different for Fannie Mae and Freddie Mac as a result of the different tax elections made by each Enterprise.

Generally, a company uses deferred tax assets to offset future taxable income.  These assets typically only have value to the company to the extent that the company expects to generate taxable income.  Deferred tax assets arise from differences in accounting and tax treatment of assets and liabilities.  For example, a deferred tax asset can arise due to differences in the treatment of credit losses.  The Enterprises also hold other types of deferred tax assets such as low-income housing tax credits that they may be able use in the future.

---

[18] Here, as of January 1, 2013, "net payment" means dividend payment or draw; prior to January 1, 2013, it meant dividend payment minus draw.

In 2008, the Enterprises did not expect to use these assets because they were uncertain that they would produce future taxable income; indeed, they were experiencing significant losses. Because the assets were not likely to be used, the Enterprises created valuation allowances—essentially reserve accounts—to offset their value.[19]  So long as the Enterprises were unable to use these tax assets, they would be counterbalanced for accounting purposes by the valuation allowance.

Much has changed since 2008.  The housing market is improving, house prices are rising, and guarantee fees have been increased, all resulting in greater profitability at Fannie Mae and Freddie Mac.  These positive indicators, should they continue, would mean that the Enterprises may realize taxable income, and thus would be able to recognize all or a portion of the tax assets. Moreover, accounting principles require that when a valuation allowance is no longer necessary, it must be released.

Application of accounting principles may require the Enterprises to reverse their valuation allowances for some or all of their deferred tax assets.  The reversal of an Enterprise's valuation allowance could result in a large one-time dividend payment to Treasury.[20]  With the net worth sweep beginning in 2013, a reversal would require the Enterprise to pay to Treasury as a dividend the full amount of the value of the deferred tax assets recognized on the balance sheet as positive net worth—minus whatever portion of the $3 billion buffer is in effect at the time.

On March 14, 2013, Fannie Mae disclosed that it was analyzing whether conditions existed as of December 31, 2012, that would require it to release any portion of its valuation allowance in the fourth quarter of 2012, and that a release would have a material impact on its 2012 financial statements and result in a significant dividend payment to Treasury.  Fannie Mae also said if it did not release its valuation allowance in the fourth quarter of 2012, it would continue to analyze the need to release it in future periods.  Freddie Mac has said that it continues to maintain a valuation allowance as of December 31, 2012, and it is possible that, in future periods, it will assess the need for a reduction of its valuation allowance, which could have a material effect on its financial position.

---

[19] Financial Accounting Standards Board (FASB) provides that a "valuation allowance is recognized if, based on the weight of available evidence, it is *more likely than not* that some portion or all of the deferred tax asset will not be realized" (emphasis in original).  FASB No. 109, at 5 (Feb. 1992) (online at www.fasb.org/pdf/fas109.pdf).

[20] These amounts were effectively funded in part by Treasury as the Enterprises drew funds under the PSPAs.

Figure 3 shows the Enterprises' valuation allowances.[21]

**Figure 3.  Valuation Allowance Related to Deferred Tax Assets**

|  | **Fannie Mae** <br> **(as of September 30, 2012)** | **Freddie Mac** <br> **(as of December 31, 2012)** |
|---|---|---|
| Valuation Allowance | $61.5 billion[22] | $31.7 billion |

Conditions could worsen, however.  If, after reversing a valuation allowance, an Enterprise again begins to lose money it may be required under the accounting rules to establish another valuation allowance for its deferred tax assets.  Such an allowance would magnify negative net worth and could require another significant draw from Treasury to avoid insolvency.  This in turn would trigger a reduction in Treasury's remaining commitment level for the Enterprise.

## II. Potential Management Ramifications

### A. Infrastructure and Operating Expenses

In overseeing the Enterprises, FHFA has to balance its responsibilities for maintaining the viability of the Enterprises and for protecting the interests of taxpayers.  As noted above, the sweep may return more funds to taxpayers sooner than the previous 10% dividend.  However, this change in the dividend structure may heighten the need for FHFA's scrutiny.  Even prudent and necessary expenditures can reduce the amount of the sweep.  The Enterprises might choose to make significant expenditures to upgrade their information technology systems or physical plants.  From a business point of view, money spent upfront could be justified by return on investment over many years.  Yet, the future role of the Enterprises is uncertain.  At the same time, taxpayers could benefit from the Enterprises' potentially greater capacity and efficiency in managing the secondary mortgage market functions.  Of course, wasteful expenditures would inappropriately reduce the amount of the sweep.

FHFA could mitigate such risk of wasteful expenditures through strong oversight, including effective implementation of its recent requirement for the Enterprises to submit their budgets for review.

---

[21] The amount of the valuation allowance is expected to be reduced over time as credit losses decrease.

[22] On March 14, 2013, Fannie Mae reported that it was unable to file its Form 10-K for the year ended December 31, 2012, by the filing deadline because it needed to analyze whether, under generally accepted accounting principles, it needed to release any portion of its valuation allowance on its deferred tax assets.  It estimated its valuation allowance on deferred tax assets to be $61.5 billion as of September 30, 2012.

   B. *Possible Negative Impact of Accelerated Reduction of Illiquid Assets in the Retained Portfolios*

The faster reduction in the Enterprises' retained mortgage portfolios required by the 2012 Amendments is intended to reduce their risk exposure and simplify their operations. However, as the Enterprises decrease their portfolios, they may be required to sell less liquid assets at unfavorable prices.

The Enterprises' portfolios typically shrink as mortgagors prepay or the Enterprises sell their holdings. The Enterprises may comply with the mandated reductions that exceed prepayments by selling assets that are readily marketable such as their own MBS, while continuing to hold non-performing whole mortgages or certain private-label MBS that are more difficult to sell. At the same time, many of the mortgages the Enterprises are now adding to their portfolios are delinquent loans that have been removed from their MBS under guarantee programs. FHFA has observed that as the Enterprises' retained portfolios are becoming smaller, they also are becoming less liquid.

The assets in the Enterprises' portfolios can be categorized as liquid or illiquid in different ways. For example, from 2009 to mid-2012, readily marketable MBS declined substantially as a percentage of both Fannie Mae's and Freddie Mac's portfolios, whereas, their whole loans—at least half of which were distressed as of June 30, 2012—rose.[23]

In a similar vein, Freddie Mac reported that 35% of its portfolio consisted of illiquid assets (such as seriously delinquent and modified mortgages removed from its MBS, and private-label MBS backed by subprime loans) at the end of 2012, up from 29% in 2011. The company attributed the increase primarily to the faster rate at which Enterprise MBS were prepaying relative to other assets. The future value of distressed assets is unpredictable. Freddie Mac said it, "can provide no assurance that the cap on [its] mortgage-related investments portfolio will not, over time, force [it] to sell mortgage assets at unattractive prices."[24]

## III. Preserving Options for Future Permanent Reforms

The announcement of the 2012 Amendments emphasized three overarching themes:

- Benefit to taxpayers;

---

[23] *See* OIG, *The Housing Government-Sponsored Enterprises' Challenges in Managing Interest Rate Risks*, WPR-2013-01 (Mar. 11, 2013) (online at www.fhfaoig.gov/Content/Files/WPR-2013-01_2.pdf).

[24] Freddie Mac, Form 10-K for the Fiscal Year Ended December 31, 2012, at 32, 56 (Feb. 28, 2013) (online at www.freddiemac.com/investors/er/pdf/10k_022813.pdf).

- Continued flow of mortgage credit; and

- Wind down of the Enterprises.

To some extent, the 2012 Amendments provide the mechanisms to achieve these goals.  For example, as discussed earlier, the replacement of the 10% dividend with the sweep of quarterly net worth may result in more money being returned to Treasury and hence to taxpayers.  The elimination of the circularity of financing the dividend also reduces the erosion of Treasury's remaining commitment level, thus shoring up its reassurance to investors and promoting the continued flow of mortgage credit.

Additionally, the 2012 Amendments accelerate the wind down of the Enterprises' retained mortgage investment portfolios.  However, they do not wind down the Enterprises' securitization business.  Indeed, that side of their businesses may continue to prosper, at least in the near term, as a result of improvements in the mortgage markets and recent increases in guarantee fees.[25]

Fundamentally, the 2012 Amendments position the Enterprises to function in a holding pattern, awaiting major policy decisions in the future.

---

[25] Generally, increases of the Enterprises' guarantee fees will increase their earnings in the short term (although they may attract private competitors in the longer term).  However, legislation required proceeds from a 2012 increase in guarantee fees of 10 basis points to be remitted to Treasury to fund the now-expired payroll tax cut.

# CONCLUSION

Treasury's announcement of the 2012 PSPA Amendments said that the changes would "make sure that every dollar of earnings" the Enterprises generate would be "used to benefit taxpayers," "support the continued flow of mortgage credit," and "help expedite the[ir] wind down."

Ending the circularity of draws from Treasury to pay dividends increases the likelihood that ample funds will remain available for Treasury support of the Enterprises, if such support becomes necessary.  The change in the dividend structure also will affect quarterly payments to Treasury, potentially resulting in the Enterprises returning more money to federal taxpayers sooner.  Indeed, because of accounting treatment, sustained profitability of the Enterprises could result in one-time large dividend payments to Treasury from each Enterprise.  However, the significance of the impact of the change in the dividend structure depends on a variety of factors, including the magnitude of fluctuations in the Enterprises' net worth.  Further, increasing the rate at which the Enterprises shrink their retained mortgage portfolios may pose challenges as the remaining investments are less liquid.  At the same time, this will reduce risk.

Although the 2012 Amendments more quickly reduce the Enterprises' investments, they do not diminish their importance in the housing finance system.  Accordingly, the changes to the PSPAs help to safeguard future policymakers' options to reform the role of the Enterprises in the nation's secondary mortgage market.

# SCOPE AND METHODOLOGY

The objective of this report was to:

1.  Describe the 2012 Amendments to the PSPAs;

2.  Examine the goals of the 2012 Amendments; and

3.  Assess their potential impacts.

To address this objective, OIG:

- Reviewed the PSPAs and amendments thereto; the stock certificates received by Treasury from the Enterprises; press releases from FHFA and Treasury; public statements made by the Enterprises including their financial disclosures; FHFA's *A Strategic Plan for Enterprise Conservatorships*; and pronouncements from the Financial Accounting Standards Board;

- Interviewed senior FHFA officials;

- Interviewed senior Enterprise staff;

- Interviewed senior Treasury officials; and

- Conducted quantitative analysis of potential financial impacts of the change in the PSPA dividend structure based on a variety of scenarios.

This report was prepared under the authority of the Inspector General Act and in accordance with the *Quality Standards for Inspection and Evaluation* (January 2012), which were promulgated by the Council of the Inspectors General on Integrity and Efficiency. These standards require OIG to plan and perform an evaluation that obtains evidence sufficient to provide a reasonable basis to support the findings made herein. OIG believes that the analysis and conclusions discussed in this report meet these standards.

The performance period for this study was from August 2012 to March 2013.

# APPENDIX A:
# Treasury Press Release

## Treasury Department Announces Further Steps to Expedite Wind Down of Fannie Mae and Freddie Mac

8/17/2012

*Modifications to Preferred Stock Purchase Agreements Will Make Sure That Every Dollar of Earnings Fannie Mae and Freddie Mac Generate Will Benefit Taxpayers*

*Announcement Will Support the Continued Flow of Mortgage Credit during a Responsible Transition to a Reformed Housing Finance Market*

**WASHINGTON --** The U.S. Department of the Treasury today announced a set of modifications to the Preferred Stock Purchase Agreements (PSPAs) between the Treasury Department and the Federal Housing Finance Agency (FHFA) as conservator of Fannie Mae and Freddie Mac (the Government Sponsored Enterprises or GSEs) that will help expedite the wind down of Fannie Mae and Freddie Mac, make sure that every dollar of earnings each firm generates is used to benefit taxpayers, and support the continued flow of mortgage credit during a responsible transition to a reformed housing finance market.

"With today's announcement, we are taking the next step toward responsibly winding down Fannie Mae and Freddie Mac, while continuing to support the necessary process of repair and recovery in the housing market," said Michael Stegman, Counselor to the Secretary of the Treasury for Housing Finance Policy. "As we continue to work toward bi-partisan housing finance reform, we are committed to putting in place measures right now that support continued access to mortgage credit for American families, promote a responsible transition, and protect taxpayer interests."

The modifications to the PSPAs announced today are consistent with FHFA's strategic plan for the conservatorship of Fannie Mae and Freddie Mac that it released in February 2012. The modifications include the following key components:

**Accelerated Wind Down of the Retained Mortgage Investment Portfolios at Fannie Mae and Freddie Mac**

The agreements require an accelerated reduction of Fannie Mae and Freddie Mac's investment portfolios. Those portfolios will now be wound down at an annual rate of 15 percent – an increase from the 10 percent annual reduction required in the previous agreements. As a result of this change, the GSEs' investment portfolios must be reduced to the $250 billion target set in the previous agreements four years earlier than previously scheduled.

**Annual Taxpayer Protection Plan**
To support a thoughtfully managed wind down, the agreements require that on an annual basis, each GSE will – under the direction of their conservator, the Federal Housing Finance Agency – submit a plan to Treasury on its actions to reduce taxpayer exposure to mortgage credit risk for both its guarantee book of business and retained investment portfolio.

**Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers for Their Investment**

The agreements will replace the 10 percent dividend payments made to Treasury on its preferred stock investments in Fannie Mae and Freddie Mac with a quarterly sweep of every dollar of profit that each firm earns going forward.

This will help achieve several important objectives, including:

- Making sure that every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers for their investment in those firms.
- Ending the circular practice of the Treasury advancing funds to the GSEs simply to pay dividends back to Treasury.
- Acting upon the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form.
- Supporting the continued flow of mortgage credit by providing borrowers, market participants, and taxpayers with additional confidence in the ability of the GSEs to meet their commitments while operating under conservatorship.
- Providing greater market certainty regarding the financial strength of the GSEs.

For a copy of the modification agreements for the PSPAs, please visit, link and link.

###

# APPENDIX B:
# FHFA Press Statement

## FEDERAL HOUSING FINANCE AGENCY



## STATEMENT

| For Immediate Release | **Contact:** | Corinne Russell | (202) 649-3032 |
|---|---|---|---|
| August 17, 2012 | | Stefanie Johnson | (202) 649-3030 |

### Statement of FHFA Acting Director Edward J. DeMarco On Changes to Fannie Mae and Freddie Mac Preferred Stock Purchase Agreements

"The steps taken today between the Federal Housing Finance Agency (FHFA), as conservator of Fannie Mae and Freddie Mac, and the U.S. Department of the Treasury to amend the Preferred Stock Purchase Agreements (PSPAs) are important for ensuring stability in the housing finance market. These steps reaffirm our commitment to move forward with the components of the Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac, which includes building for the future, gradually contracting their operations, and maintaining foreclosure prevention activities and credit availability. Replacing the current fixed dividend in the PSPAs with a variable dividend based on net worth will help to ensure stability, fully capture financial benefits for taxpayers, and eliminate the need for Fannie Mae and Freddie Mac to continue to borrow from the Treasury Department to pay dividends. As Fannie Mae and Freddie Mac shrink, the continued payment of a fixed dividend could have called into question the adequacy of the financial commitment contained in the PSPAs. In addition, the faster reduction in the retained mortgage portfolio will further reduce risk exposure and simplify the operations of Fannie Mae and Freddie Mac.

"These changes provide certainty to Fannie Mae, Freddie Mac and market participants as they continue to perform their critical mission of providing liquidity and stability to the country's housing market. The steps today are also important as Congress and policymakers contemplate the future of Fannie Mae and Freddie Mac."

Link to FHFA Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac

###

*The Federal Housing Finance Agency regulates Fannie Mae, Freddie Mac and the 12 Federal Home Loan Banks. These government-sponsored enterprises provide more than $5.7 trillion in funding for the U.S. mortgage markets and financial institutions.*

# ADDITIONAL INFORMATION AND COPIES

For additional copies of this report:

> Call OIG at:  202-730-0880

> Fax your request to:  202-318-0239

> Visit the OIG website at:  www.fhfaoig.gov

To report alleged fraud, waste, abuse, mismanagement, or any other kind of criminal or noncriminal misconduct relative to FHFA's programs or operations:

> Call our Hotline at:  1-800-793-7724

> Fax your written complaint to:  202-318-0358

> E-mail us at:  oighotline@fhfaoig.gov

> Write to us at:  FHFA Office of Inspector General
> Attn:  Office of Investigation – Hotline
> 400 Seventh Street, S.W.
> Washington, DC  20024