# **EXHIBIT T**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# Form 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2010**

**Commission File No.: 0-50231**

# Federal National Mortgage Association

*(Exact name of registrant as specified in its charter)*

**Fannie Mae**

| | | |
|---|---|---|
| **Federally chartered corporation** *(State or other jurisdiction of incorporation or organization)* | | **52-0883107** *(I.R.S. Employer Identification No.)* |
| **3900 Wisconsin Avenue, NW Washington, DC** *(Address of principal executive offices)* | | **20016** *(Zip Code)* |

**Registrant's telephone number, including area code:
(202) 752-7000**

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of Each Class** | **Name of Each Exchange on Which Registered** |
|---|---|
| None | |

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, without par value**
*(Title of class)*
**8.25% Non-Cumulative Preferred Stock, Series T, stated value $25 per share**
*(Title of class)*
**8.75% Non-Cumulative Mandatory Convertible Preferred Stock, Series 2008-1, stated value $50 per share**
*(Title of class)*
**Fixed-to-Floating Rate Non-Cumulative Preferred Stock, Series S, stated value $25 per share**
*(Title of class)*
**7.625% Non-Cumulative Preferred Stock, Series R, stated value $25 per share**
*(Title of class)*
**6.75% Non-Cumulative Preferred Stock, Series Q, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series P, stated value $25 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series O, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Convertible Series 2004-1 Preferred Stock, stated value $100,000 per share**
*(Title of class)*
**5.50% Non-Cumulative Preferred Stock, Series N, stated value $50 per share**
*(Title of class)*
**4.75% Non-Cumulative Preferred Stock, Series M, stated value $50 per share**
*(Title of class)*
**5.125% Non-Cumulative Preferred Stock, Series L, stated value $50 per share**
*(Title of class)*
**5.375% Non-Cumulative Preferred Stock, Series I, stated value $50 per share**
*(Title of class)*
**5.81% Non-Cumulative Preferred Stock, Series H, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series G, stated value $50 per share**
*(Title of class)*
**Variable Rate Non-Cumulative Preferred Stock, Series F, stated value $50 per share**
*(Title of class)*
**5.10% Non-Cumulative Preferred Stock, Series E, stated value $50 per share**
*(Title of class)*
**5.25% Non-Cumulative Preferred Stock, Series D, stated value $50 per share**
*(Title of class)*

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☑    No o

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  Yes o    No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☑    No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☑    No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☑

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| Large accelerated filer o | Accelerated filer ☑ | Non-accelerated filer o (Do not check if a smaller reporting company) | Smaller Reporting company o |
|---|---|---|---|

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  Yes o    No ☑

The aggregate market value of the common stock held by non-affiliates of the registrant computed by reference to the last reported sale price of the common stock quoted on the New York Stock Exchange on June 30, 2010 (the last business day of the registrant's most recently completed second fiscal quarter) was approximately $383 million.

As of January 31, 2011, there were 1,119,639,748 shares of common stock of the registrant outstanding.

**DOCUMENTS INCORPORATED BY REFERENCE:**  None

***We may be unable to meet our housing goals and duty to serve requirements, and actions we take to meet those requirements may adversely affect our business, results of operations, financial condition, liquidity and net worth.***

To meet our housing goals obligations, a portion of the mortgage loans we acquire must be for low- and very-low income families, families in low-income census tracts and moderate-income families in minority census tracts or designated disaster areas. In addition, when a final duty-to-serve rule is issued, we will have a duty to serve three underserved markets: manufactured housing, affordable housing preservation and rural areas. We may take actions to meet these obligations that could increase our credit losses and credit-related expenses. If we fail to meet our housing goals in a given year and FHFA finds that they were feasible, or if we fail to comply with our duty to serve requirements, we may become subject to a housing plan that could require us to take additional steps that could have an adverse effect on our financial condition. The housing plan must describe the actions we would take to meet the goals and/or duty to serve in the next calendar year and be approved by FHFA. With respect to our housing goals, the potential penalties for failure to comply with housing plan requirements are a cease-and-desist order and civil money penalties.

Mortgage market conditions during 2010 negatively affected our ability to meet our goals. These conditions included a reduction in single-family borrowing by low-income purchasers following the expiration of the home buyer tax credits, an increase in the share of mortgages made to moderate-income borrowers due to low interest rates, continuing high unemployment, strengthened underwriting and eligibility standards, increased standards of private mortgage insurers and the increased role of FHA in acquiring goals-qualifying mortgage loans. Some or all of these conditions are likely to continue in 2011. We cannot predict the impact that market conditions during 2011 will have on our ability to meet our 2011 housing goals and duty to serve requirements.

For more information about our housing goals and duty to serve requirements, as well as our 2010 housing goals performance, please see "Business—Our Charter and Regulation of Our Activities—Housing Goals and Duty to Serve Underserved Markets."

***Limitations on our ability to access the debt capital markets could have a material adverse effect on our ability to fund our operations and generate net interest income.***

Our ability to fund our business depends primarily on our ongoing access to the debt capital markets. Our level of net interest income depends on how much lower our cost of funds is compared to what we earn on our mortgage assets. Market concerns about matters such as the extent of government support for our business and the future of our business (including future profitability, future structure, regulatory actions and GSE status) could cause a severe negative effect on our access to the unsecured debt markets, particularly for long-term debt. We believe that our ability in 2010 to issue debt of varying maturities at attractive pricing resulted from federal government support of us and the financial markets, including the Federal Reserve's purchases of our debt and MBS. As a result, we believe that our status as a GSE and continued federal government support of our business is essential to maintaining our access to debt funding. Changes or perceived changes in the government's support of us or the markets could have a material adverse effect on our ability to fund our operations. On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly wind down both Fannie Mae and Freddie Mac. The report emphasizes the importance of proceeding with a careful transition plan and providing the necessary financial support to Fannie Mae and Freddie Mac during the transition period. Please see "MD&A—Liquidity and Capital Management—Liquidity Management—Debt Funding—Fannie Mae Debt Funding Activity" for a more complete discussion of actions taken by the federal government to support us and the financial markets. However, there can be no assurance that the government will continue to support us or that our current level of access to debt funding will continue.

In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, as well as our liquidity position. If we are unable to issue both short- and long-term debt securities at attractive rates and in amounts sufficient to operate our business and meet our

**FANNIE MAE**
**(In conservatorship)**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)**

a request for an additional $2.6 billion from Treasury to eliminate our net worth deficit as of December 31, 2010. The aggregate liquidation preference of the senior preferred stock was $88.6 billion as of December 31, 2010 and will increase to $91.2 billion as a result of FHFA's request on our behalf for funds to eliminate our net worth deficit as of December 31, 2010.

On September 7, 2008, we issued a warrant to Treasury giving it the right to purchase, at a nominal price, shares of our common stock equal to 79.9% of the total common stock outstanding on a fully diluted basis on the date Treasury exercises the warrant. Treasury has the right to exercise the warrant, in whole or in part, at any time on or before September 7, 2028. We recorded the warrant at fair value in our stockholders' equity as a component of additional paid-in-capital. The fair value of the warrant was calculated using the Black-Scholes Option Pricing Model. Since the warrant has an exercise price of $0.00001 per share, the model is insensitive to the risk-free rate and volatility assumptions used in the calculation and the share value of the warrant is equal to the price of the underlying common stock. We estimated that the fair value of the warrant at issuance was $3.5 billion based on the price of our common stock on September 8, 2008, which was after the dilutive effect of the warrant had been reflected in the market price. Subsequent changes in the fair value of the warrant are not recognized in the financial statements. If the warrant is exercised, the stated value of the common stock issued will be reclassified as "Common stock" in our consolidated balance sheets. Because the warrant's exercise price per share is considered non-substantive (compared to the market price of our common stock), the warrant was determined to have characteristics of non-voting common stock, and thus is included in the computation of basic and diluted loss per share. The weighted-average shares of common stock outstanding for the years ended December 31, 2010, 2009 and 2008, included shares of common stock that would be issuable upon full exercise of the warrant issued to Treasury.

*Impact of U.S. Government Support*

We are dependent upon the continued support of Treasury to eliminate our net worth deficit, which avoids our being placed into receivership. Based on consideration of all the relevant conditions and events affecting our operations, including our dependence on the U.S. Government, we continue to operate as a going concern and in accordance with our delegation of authority from FHFA.

Pursuant to the amended senior preferred stock purchase agreement, Treasury has committed to provide us with funding as needed to help us maintain a positive net worth thereby avoiding the mandatory receivership trigger described above.

We fund our business primarily through the issuance of short-term and long-term debt securities in the domestic and international capital markets. Because debt issuance is our primary funding source, we are subject to "roll-over," or refinancing, risk on our outstanding debt. Our ability to issue long-term debt has been strong in 2009 and 2010 primarily due to actions taken by the federal government to support us and the financial markets. Demand for our long-term debt securities continues to be strong.

We believe that continued federal government support of our business and the financial markets, as well as our status as a GSE, are essential to maintaining our access to debt funding. Changes or perceived changes in the government's support could materially adversely affect our ability to refinance our debt as it becomes due, which could have a material adverse impact on our liquidity, financial condition and results of operations. In addition, future changes or disruptions in the financial markets could significantly change the amount, mix and cost of funds we obtain, which also could increase our liquidity and roll-over risk and have a material adverse impact on our liquidity, financial condition and results of operations.

On February 11, 2011, Treasury and HUD released a report to Congress on reforming America's housing finance market. The report provides that the Administration will work with FHFA to determine the best way to responsibly reduce Fannie Mae's and Freddie Mac's role in the market and ultimately wind down both

**CERTIFICATION**

In connection with the Annual Report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association) for the year ended December 31, 2010, as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, David C. Hisey, Executive Vice President and Deputy Chief Financial Officer of Fannie Mae, certify, pursuant to 18 U.S.C. Section 1350, that to my knowledge:

1. The Report fully complies with the requirements of Section 13(a) or 15(d), as applicable, of the Securities Exchange Act of 1934; and

2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Fannie Mae.

/s/  David C. Hisey
David C. Hisey
Executive Vice President and
Deputy Chief Financial Officer

Dated: February 24, 2011

The foregoing certification is being furnished solely pursuant to 18 U.S.C. Section 1350 and is not being filed as part of the Report or as a separate disclosure document.