# EXHIBIT V

# US AGENCIES OUTLOOK 2012

# Achtung Baby!

This is reprinted from *Global Rates Outlook 2012: A Sisyphean task*, December 14, 2011.

- Political gridlock is likely to delay GSE reform far into the future. While some signs of bipartisan consensus on housing finance reform are slowly emerging, we see little legislative movement until well into 2013-14. We expect progress on a US covered bond framework in 2012, but not necessarily new issuance activity.

- Worries about GSE credit risk could become a factor starting in late 2012, when the limits on PSPA draws are reinstated. These concerns may increase if a Republican administration is elected, and be compounded by the rising risk of a US (and agency) ratings downgrade by Moody's as soon as early 2013.

- To allay GSE credit worries, we propose that the FHFA redefine the senior preferred dividend to the lesser of 10% or after-tax net income. This serves the dual purpose of recapturing the GSEs' income for the taxpayer, while retaining post-2012 PSPA capacity in case of another housing downturn.

- We believe the distinct geographic shift in the agency investor base over the past few years makes demand for the product far more stable than it was in 2008. While overall foreign holdings have declined, marginal external demand is now located in EM countries far more comfortable with GSE credit risk. In addition, regulatory changes such as Basel 3 should also help maintain "captive" demand for the product.

- Supply technicals should remain favorable. We expect agency debt outstanding to shrink by $210bn in 2012, with long-term debt representing $150bn of this amount.

- We advise a nimble approach to agencies near term, but for investors with cash to put to work, we recommend the 3y sector at about 26bp over Treasuries.

- As we expect the Fed-on-hold regime to last well beyond 2013, we recommend investors sell vol by owning agency callables, especially 3nc1 and 5nc1 structures.

- Farther afield, although headwinds could continue into Q1 12, we are turning more constructive on USD SSA paper, particularly single-country issuers, given cheaper valuations relative to agencies. In our view, investors comfortable with the credit would be better served by owning EUR SSA paper and swapping it back to USD.

- USD covered bonds have underperformed, and we especially like Canadian names which trade at levels even with multinational SSA paper such as EIB; the covered bonds offer protection through the collateral, as well as an explicit guarantee.

Rajiv Setia
+1 212 412 5507
rajiv.setia@barcap.com

James Ma
+1 212 412 2563
james.ma@barcap.com

www.barcap.com

PLEASE SEE ANALYST CERTIFICATIONS AND IMPORTANT DISCLOSURES STARTING AFTER PAGE 15

Protected Information To Be Disclosed Only In Accordance With Protective Order      FHFA00104876

## GSE legislation: Building bridges to nowhere

Even in the best of circumstances, forging bipartisan compromise in election years is next to impossible. This time around, with rancor between the parties only likely to increase as they espouse opposite, competing visions of tax and entitlement reform ahead of the presidential election, housing finance reform will likely take a backseat until well into 2013. Moreover, we have long held the view that the transition to a new housing finance framework will take 20-25 years at least, given the relative sizes of the mortgage and banking sectors.[1]

In the meantime, there are increasing signs that some lawmakers are trying to bridge the partisan philosophical divide on how best to implement housing finance reform and the future of the GSEs. Recall the timeline of proposals that were released in 2011:

- **February:** The Treasury publishes a white paper on GSE reform, including a proposed five- to seven-year timeline for winding down the retained portfolios, and presenting three options to transition away from the Fannie Mae (FNM)/Freddie Mac (FRE) guarantee businesses with varying degrees of government involvement.

- **April-May:** House Republicans introduce 15 separate bills, each tackling a separate facet of GSE reform; the most workable included increased g-fees, a formal 5y wind-down period, and applying risk retention rules to non-QRM loans sold to the GSEs. None of these has been voted on by the full House.

- **July:** HR 2143 is the first bill with bipartisan sponsorship to be introduced in the House, proposing to combine FNM/FRE and replace them with a new facility featuring an explicit guarantee for MBS investors in exchange for a reinsurance fee.

- **October:** Rep. Scott Garrett (R, NJ-3) introduces a plan to make the FHFA regulator of the non-agency market, standardizing it in preparation to succeed FNM/FRE, and is the first GOP proposal not to specify a horizon for winding down the GSEs. This bill is well received by leading House Democrats, including Barney Frank.

- **December:** Competing House and Senate budget proposals incorporate up to $38bn of income from FNM/FRE through a 10-25bp increase in guarantee fees collected over 10 years. By construction, this assumes the GSEs' continued operation until that time and, in our view, indicates the administration's intent to use FNM/FRE as sources of income.

Figure 1: Net income has improved since conservatorship



Source: FHFA, Barclays Capital

Figure 2: Cumulative capital infusions



Source: Barclays Capital

[1] "US housing finance: No silver bullet," *US Securitization Research*, 13 December 2010.

Protected Information To Be Disclosed Only In Accordance With Protective Order　　　　FHFA00104877

In all, we expect progress on housing finance reform to remain slow, but the latest proposals coalesce around ways to rehabilitate private origination while preserving the worthwhile GSE functions. This extends to our own GSE credit tranching proposal as well, and FHFA Director DeMarco has indicated that deals are in the pipeline for 2012. [2]

By contrast, we are considerably more optimistic that a US covered bond framework will be formally put into place as soon as next year, as Rep. Garrett's House proposal (HR 940) was met in November by a Senate bill (S 1835) with considerable similarities and a long list of bipartisan sponsors. In our view, this is a signal that both parties and both chambers of Congress can cooperate to pass the bill relatively quickly. Key points include:

- Both bills allow a wide range of collateral beyond single-family residential mortgages (S 1835 excludes HELs), but insist on homogenous cover pools.

- The two bills agree on the mechanic of forcing the FDIC to perform on covered bonds issued by banks it places into receivership, and transferring the collateral to an estate.

- In both bills, the FDIC has the power to assess the banking system to recoup any potential losses arising from transferring away the cover pool.

- S 1835 is the only one to expressly limit outstandings to a percent of assets, but neither bill addresses the interaction of covered bond programs with the FHLB.

As long as FHLB advances are available without restrictions and banks stay flush with cash, we do not expect a US covered bond market to gain momentum. In any event, covered bonds can only be part of the solution, and not the primary mechanism to replace the $4.5trn FNM/FRE guarantee books. Assuming only the large banks have market access, and using a cap of 4% of liabilities as per the 2008 FDIC/Treasury best practices, we expect the market to total about $300bn. [3]

Until consensus is achieved on GSE reform and the future of housing finance, the existing framework of FNM/FRE will come under increased investor scrutiny; in particular, unlimited capital support from Treasury expires in 2012. Next, we detail our expectations for GSE draws and capital support in 2012 and beyond.

Figure 3: GSE delinquencies/NPA in line with our estimates



Source: Barclays Capital

Figure 4: Loss estimates could be high due to severities

| (in 000 loans) | FNM | FRE | Total |
|---|---|---|---|
| 90d+ Delinquencies, as of 3Q11 | 710 | 414 | 1,124 |
| REO on Balance Sheet, 3Q11 | 123 | 60 | 183 |
| Cum REO Liquidations, 3Q08-3Q11 | 526 | 265 | 791 |
| Cum Short Sales/DIL, 3Q08-3Q11 | 175 | 98 | 273 |
| Total NPA Loans, as of 3Q11 | 1,534 | 837 | 2,371 |
| Total Loans Serviced | 17,738 | 11,808 | 29,546 |
| As a % of Guarantees | 8.6% | 7.1% | 8.0% |
| Total NPA Loans, in $bn | 284 | 155 | 439 |
| As a % of Guarantees in $bn | 10.3% | 8.7% | 9.6% |

Source: Barclays Capital

[2] "GSEs Shedding Credit Risk," *US Securitization Research*, 18 November 2011.
[3] "US housing finance: No silver bullet," *US Securitization Research*, 13 December 2010.

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00104878

## GSE credit: Legacy losses should be fully absorbed in 2012

Over the past year, we have repeatedly made the case that GSE net income, before preferred dividends to Treasury, should turn sustainably positive by early 2012. This has been premised on our belief that credit provisioning for legacy losses at both GSEs will be largely complete by next year. Further, post-conservatorship originations have been relatively pristine and are not susceptible to much in the way of credit losses, absent a massive double dip in housing.

On the revenue front, retained portfolio income remains buoyed by ultra-low funding costs, even as the asset base shrinks. In addition, income from the guarantee book should continue to benefit from a historically high market share on new originations and modestly rising g-fees, at the same time that borrower credit quality is improving.

Indeed, recent quarterly results have borne out our thesis, and we expect these trends to continue next year (Figures 1 and 2). However, with the nature of the Preferred Stock Purchase Agreements (PSPAs) changing at the end of 2012, any unexpected disruptions in credit fundamentals could pose a material threat to financial markets. Recall that the capital support provided by the Treasury through 2012 is unlimited, but support beyond that date, at least in theory, is finite, as laid out by the PSPAs:

- Through year-end 2012, any quarterly capital shortfalls, as defined by GAAP net assets, will be made up by the Treasury in full within 60 days of the reporting date, with no maximum.

- Draws made *after* 2012 will be subject to a cumulative limit of $125bn at FNM and $149bn at FRE, less any positive amount in GAAP equity on December 31, 2012. As an example, if FNM has net worth of +$5bn by year-end 2012, the limit post-2012 would be reduced to $120bn from $125bn. Paradoxically, improved results in 2012, whether through higher g-fee income, MTM derivative gains from a backup in rates, or a markup of non-agency MBS, would actually decrease the PSPA capacity in 2013 and beyond.

By distinguishing between FNM/FRE losses recorded before and after 2012, we believe that the Treasury has essentially made the *timing*, not the *magnitude*, of credit losses the main factor determining GSE creditworthiness. **In our view, as long as losses are provisioned for before 2012, agency risk is analogous with Treasury credit risk.**

Figure 5: Credit provisioning



Source: Barclays Capital

Figure 6: Cumulative provisions



Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order    FHFA00104879

### Recognition of legacy losses

Given this, we project the remaining credit provisions the GSEs will recognize on the legacy g-book. As of Q3 11, we estimate that the GSEs have recognized almost 2.4mn non-performing loans by count (ie, 90d+ delinquent or worse), or $440bn by volume. Our base case estimates have presumed that 10-11% of the GSEs' $4.6trn legacy book of business would default; this translates to a loan count of 2.9mn, or a par balance of just over $500bn (Figures 3 and 4). In other words, while NPA will likely continue to grow in 2012, the GSEs have already absorbed around 85% of our expectation for eventual cumulative defaults.

*Given our default expectations, we expect the GSEs to recognize roughly $250bn in combined cumulative credit losses on their legacy books, split about 2:1 at FNM/FRE, respectively. As of Q3 11, FNM and FRE have recognized a cumulative $155bn and $75bn, respectively, in credit loss provisions; this is just over 90% of our total estimates (Figures 5 and 6). Clearly, GSE loss provisioning has continued to keep pace with the NPA pipeline.*

Our estimates may prove light in the event that home prices decline substantially (we assume prices bottom in Q1 12) and mortgage insurance recoveries are markedly lower. Our estimates already build in some cushion as we assume 50% severities on overall defaults versus actual realized severities, which have been tracking in the low 40s thus far. Therefore, this is the key metric we will be watching for in the next few quarterly results.

**Our key message is that the credit provisions that are yet to be taken – roughly $10bn at FNM and FRE by our estimates – should easily be recognized in full before year-end 2012.**

### So what does this mean for draws?

As credit loss provisioning recedes in importance, paradoxically capital draws from Treasury will be driven by the 10% annual dividend *paid to the Treasury* (Figure 10). Cumulative capital draws by FNM and FRE through 3Q11 already total $113bn and $72bn, respectively, implying annualized dividend payments of $11.3bn and $7.2bn, respectively. In comparison, annualized GAAP income in 2012 before dividends will total roughly $9bn/y at each GSE.

Already, both GSEs have noted that it is "unlikely that we will regularly generate net income…in excess of our annual dividends payable to Treasury." **Continued losses at the GSEs post-2012 (driven by senior preferred dividends, Figure 7) at a time when they do not have the benefit of an unlimited capital backstop would pose a threat to global financial stability, in our view.**

Figure 7: Preferred dividends begin to outstrip net losses



Figure 8: FHFA projected draws outstanding



Source: Barclays Capital

Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order          FHFA00104880

Importantly, Treasury has the discretion to change the coupon rate without Congressional approval, and we fully expect this to occur in late 2012, purely in the interest of maintaining global financial stability.

- After 2012, we recommend that the senior preferred dividend rate be modified, such that it becomes the lower of 10% of the senior preferred outstanding or that year's net income. **This ensures that all after-tax profits accrue to taxpayers, while preventing further capital draws simply driven by preferred coupon payments to Treasury.**

- To be clear, from our perspective, the only justification for modifying the preferred coupon is to prevent any further draws on the capital support available to the GSEs after 2012. While many feel that the 10% coupon is too high and should be cut to zero, we believe this argument has no merit, even if the goal is to "pay back" the taxpayer. The GSEs are essentially government entities now – their ability to retain market share and pricing power and to fund at advantageous rates, all comes courtesy of taxpayer support.

- In fact, cutting the coupon to zero simply to appear to repay "taxpayers" would only end up diluting taxpayer interest in favor of legacy private shareholders. Cutting the coupon to zero also shortchanges taxpayers by not charging for ongoing support.

- As a matter of public policy, we think a better solution is to cut the preferred coupon to zero, but levy a commitment fee for PSPA support along the lines we suggest, and to sweep all future net income back to the taxpayer.

- We must stress that this is purely our view about what FHFA/Treasury *should* do with respect to the dividend, driven by the twin objectives of maintaining financial stability and minimizing taxpayer losses. Acting FHFA Director Edward DeMarco, as well as the Treasury, has said that (for now) there are no plans to change the 10% coupon rate.

Given our assumption about the preferred coupon, we expect cumulative draws of $120bn and $80bn at FNM and, FRE respectively. Importantly, the FHFA has publicized its official forecasts of FNM/FRE draws, crucially with a look ahead through 2014, across base- and stress-case scenarios. Notably, the projections through 2012 are well in line with our earlier forecasts (Figure 8); furthermore, the FHFA expects $8bn of draws in 2013 in the base-case, where home prices decline 0-5%, and $28bn in a stress case, where HPA is -30%.

### Can the Treasury somehow renege on the PSPAs?

- Legally, the PSPAs are bilateral agreements mutually entered by the Treasury and the respective GSE (FNM or FRE). Thus, they cannot be terminated prematurely, including before the limit is reached, by the Treasury unilaterally. To be clear, December 31, 2012, is only the last day capital support is unlimited; it does not imply the end of capital support altogether, nor does it signify the end of the FNM/FRE conservatorships.

- "The US government stands behind the [PSPAs] and will honor its commitments. Contracts are respected in this country as a rule of law." [4] With about half of Treasuries still financed by foreign savings and the US likely to run very large deficits for the foreseeable future, it is hard to imagine the fallout if the PSPAs were changed arbitrarily – the costs for Treasury would far outweigh any benefits.

- Recall that the Fed still owns around $930bn of agency debt and MBS, an amount that could grow in 2012 if QE3 is implemented. Any substantial credit-related haircut on these holdings could render the central bank insolvent.

---

[4] *Frequently Asked Questions: Treasury Senior Preferred Stock Purchase Agreement*, US Treasury, 11 September 2008.

Protected Information To Be Disclosed Only In Accordance With Protective Order                          FHFA00104881

Figure 9: Agency investor base evolution



Source: Barclays Capital

Figure 10: Foreign primary demand for agencies



Source: Barclays Capital

Congressional lawmakers have also indicated that regardless of the eventual direction housing finance takes in the US, existing commitments would be honored. Regardless of any Congressional rhetoric, there is no viable housing finance alternative to the GSE model in the near term, and any shift will take decades. **When push comes to shove, we expect Congress to amend the PSPAs as needed to support the GSEs for the sake of global financial stability.** Overall, we are confident that agency credit and Treasury credit are now analogous.

## Demand projections: Filling in the blanks

### Agencies have some inherent resistance to an investor strike

As we have noted, with the return of finite capital support for the GSEs at the end of 2012, worries about the future of the GSEs could re-emerge, potentially affecting investor demand. Compounding this concern is our belief that that Congress will have made little progress in fixing US fiscal finances next year, making the probability of a US sovereign (and, therefore, US agency) downgrade by Moody's and/or others in early 2013 particularly high. [5]

Figure 11: Investor type breakdown of primary demand



Source: Barclays Capital

Figure 12: Maturity schedule of TLGP and GGB debt



Source: Barclays Capital

[5] For more details, please refer to "Beyond the 'Supercommittee,'" 18 November 2011

Protected Information To Be Disclosed Only In Accordance With Protective Order　　　FHFA00104882

Last but not least, given the hard-line stance on the GSEs taken by most Republican presidential candidates, a change in the administration may add to near-term worries about the future of the GSEs. The question we are often asked is whether these events, in isolation or in combination, could affect investor demand for agencies.

To answer this, let us first examine the dominant trends in agency demand over the past few years. There have been two overarching themes in the agency debt market over this period. First, the universe has been shrinking rapidly – since 4Q08, total GSE debt outstanding has declined from $3trn to $2.2trn. Second, there has been a noticeable decrease in external interest in the sector. We estimate that foreign investors owned $850bn in agency debt outstanding pre-crisis, versus $415bn as of 2Q11; ie, foreign holdings are 20% of outstandings now versus 30% pre-crisis (Figure 9).

Diminished reliance on external funding for the sector should make it less prone to demand shocks. Further, with the universe likely to shrink by $300-400bn over the next few years, as long as there are no abrupt liquidations, reliance on foreign investors can continue to shrink as it has in recent years without necessarily having a noticeable effect on valuations.

Also, recent trends highlight a subtle geographic shift within the foreign investor base, from Asia to EM (Figures 10 and 11). These newer investors are clearly more comfortable with the GSE credit story, and are, therefore, likely to remain a somewhat more stable source of demand despite an uptick in headline risk. While we would expect a further runoff of foreign investors' agency debt holdings in 2012, we can also see some mitigating factors.

Offsetting the reduction in foreign interest has been a significant increase in domestic support for agency debt, starting with QE by the Fed in 2009, and relatively steady demand from mutual funds, bank portfolios, insurance and pension funds, and state and local governments. This part of the investor base, especially mutual funds, were a major source of support for the agency market when GSE credit concerns intensified at the end of 2009. Domestic investors tend to be more conscious of relative value, and agencies certainly are rich versus other asset classes at present.

However, the confluence of low Treasury yields, an unsettled environment in Europe, and regulatory changes (Basel 3, etc.) fuelling demand in low-risk weight assets should all support demand in 2012. In any case, at the "right price," we think that the domestic demand for GSE debt is likely assured.

| Figure 13: FNM retained portfolio | Figure 14: FRE retained portfolio |
|---|---|
|  |  |
| Source: Barclays Capital | Source: Barclays Capital |

In addition, one unexpected uptick in demand could come from TLGP (FDIC guaranteed) and GGB (guaranteed by foreign governments) investors, who will be looking to replace roughly $165bn and $105bn, respectively, in maturing debt in 2012 (Figure 12). There are few viable replacements – consider that the $65bn in GGB maturing after year-end 2012 is guaranteed by European governments. This demand could crossover into agency debt as the closest available analogue that picks up spread to Treasuries, despite the potential buildup of headline risk late in the year.

Overall, we remain confident that domestic demand will be robust enough for the GSEs not to face funding troubles in 2012, and regard any sustained headline-related cheapening as a buying opportunity.

## Funding needs

### FNM and FRE still dominated by required shrinkage

Turning to supply, balance sheet shrinkage was the common thread at the three housing GSEs in 2011. Recall that the PSPAs capped the FNM/FRE portfolios to $729bn by year-end 2011, and required the GSEs to shrink by 10% per year going forward. This necessitated a reduction of at least $60bn at FNM in 2011, while FRE was already below the limit at year-end 2010. As such, FNM shrunk its portfolio to $721bn by October 31, and FRE reduced its balance to $669bn (Figures 13 and 14). These are reductions of $68bn and $28bn, respectively, or $8bn and $60bn more than required.

This mandated shrinkage of the GSEs balance sheets will continue into 2012, as the portfolio caps reduce to $656bn. Thus, from current levels, the *required* shrinkage in 2012 will be at least $65bn at FNM and $13bn at FRE.

In practice, it is possible that both GSEs shrink even more. Recall that the Treasury white paper suggested that the portfolios could be wound down in five to seven years, as long as the market could bear it, implying a shrinkage rate much faster than the 10% mandated by the PSPAs. Further, with any potential QE3 in 2012 likely to be focused on MBS, there should be no shortage of MBS demand next year, allowing for brisk run-off of the portfolios.

Figure 15: FHLB advance business shrinkage



Source: Barclays Capital

Figure 16: Short term, callables as a % of outstandings



Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA00104884

However, for the purposes of our 2012 issuance forecast, we assume that the GSEs shrink by slightly more than the minimum requirement. From our perspective, the need to reduce GSE systemic risk has to be balanced against the need to minimize taxpayer losses. In Q1-Q3 11, both GSEs generated over $20bn in net interest income from the retained portfolios, helping to reduce required Treasury draws. Greater portfolio shrinkage is clearly possible in theory, but with funding costs at rock bottom levels, inordinate portfolio shrinkage could prove costly for taxpayers. But clearly, the risks to our balance sheet shrinkage assumptions are mainly to the downside (ie, even lower funding needs than we project).

### FHLB advance business could stabilize in H2

The FHLB System shrunk even more rapidly than FNM/FRE combined through November 30, 2011, reducing debt outstanding by $104bn this year. Historically, the main driver of the FHLB's balance sheet has been the advance business, which similarly has shrunk $84bn year-to-date through Q3 to $415bn. Recall that advances outstanding peaked in Q4 08 at almost $1.1trn, as other forms of bank borrowing dried up (Figure 15); the FHLBs' flexible collateral schedule was instrumental in providing liquidity across the US banking sector for banks of varying sizes. US banks' advance borrowings reached 7.5% of total liabilities in 2008, but have reduced to less than 3.5% as of 3Q11.

Looking to 2012, we expect advances to decline further, to roughly 3% of total bank liabilities for the following reasons:

- Bank balance sheets are flush with cash (10% of assets in 3Q11), and cash will only go up if the Fed pursues QE3 in 2012.

- New regulatory requirements (Basel 3) also de-emphasize all forms of wholesale funding, including FHLB advances, in favor of more stable funding sources such as deposits.

- Increased flexibility of collateral and haircuts makes it more advantageous for banks to fund loans, rather than securities, through the FHLB advance window. However, mortgage loans are likely to remain a decreasing percentage of bank balance sheets.

- Emergence of a US covered bond market could take some of the FHLBs' market share, although this is more likely an issue for 2013 and beyond.

Figure 17: Bellwether rolloff and refunding



Source: Barclays Capital

Figure 18: 2011 supply and 2012 projections

| Net Issuance ($bn) | | | | |
|---|---|---|---|---|
| Jan-Nov 2011 | FNM | FRE | FHLB | Total |
| ST | 3 | -33 | -17 | -47 |
| Bullet | -15 | 11 | -61 | -65 |
| Callable | -42 | -17 | -25 | -84 |
| Total | -54 | -39 | -104 | -197 |
| Portfolio | -68 | -28 | | |
| 2012 | FNM | FRE | FHLB | Total |
| ST | -18 | -10 | -25 | -53 |
| Bullet | -35 | -20 | -50 | -105 |
| Callable | -18 | -10 | -25 | -53 |
| Total | -70 | -40 | -100 | -210 |

Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order　　FHFA00104885

We look for advances to shrink by a further $100bn in 2012, implying continuing System shrinkage of the same amount.

### Net issuance projections and implications for the funding mix

We expect net debt issuance at FNM and FRE to match expected portfolio shrinkage of -$70bn and -$40bn, respectively, in 2012, just as they have year-to-date in 2011. Also, we expect FHLB to reduce debt outstanding by about $100bn in 2012, also. In all cases, we look for the GSEs to maintain flexibility regarding the potential funding mix (Figure 18):

- If we assume that FNM/FRE retain the same target composition of funding sources in 2012 that they have had in the past few years, then roughly half the shrinkage would be in long-term bullet debt outstanding, with the remainder evenly split between callables and discount notes (Figure 16). We also assume this is the case for FHLB.

- Importantly for investors in bellwethers, the $165bn maturing in 2012 is even more than the $159bn in 2011, which has been refunded with only $94bn+ of paper (Figure 17). We would expect a similar drop-off in 2012, leading the $660bn bellwether universe to local low levels in dollar and percentage terms. If $60-70bn of our projected -$150bn in net agency issuance were to come from bellwethers, gross funding needs would be similar to 2011 at $100bn. Thus, despite continued shrinkage in outstandings, 2012 gross issuance activity in the bellwether markets will likely be similar to 2011.

## Relative value across agencies and SSA asset classes

### Agencies

Overall, we expect front-end agency-Treasury spreads to move directionally with swap spreads as a first-order effect in 2012; thus, we believe the risks are biased toward a widening in the early part of the year before tightening later. Furthermore, given how much the agency asset swap curve has steepened in the front end, we think there is less room for agencies to resist swap spread widening (Figure 19).

Near term, we maintain a cautious view on agency-Treasury spreads; for investors with cash to put to work, we would recommend the 3y sector for its relative cheapness on the curve. At +26bp, the sector provides the most yield pickup to Treasuries on a percentage



Figure 19: Agency asset swap curves

Source: Barclays Capital



Figure 20: Some agency-Treasury spreads are at wides

Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order                FHFA00104886

Figure 21: Universe of "safe" assets has shrunk



Left col: Total Amount Outstanding, Tsy indices
Right col: Total Amt Outstanding, Tsy indices, CDS < 100

Source: Barclays Capital

Figure 22: Agency MBS cheapens to debt on OAS basis



Source: Barclays Capital

basis versus 2s or 5s, and both it and the 5y sector are at two-year wides (Figure 20). Of course, a 10bp retracement back near the 2011 wides would provide an ideal entry point to add sector exposure.

Medium term, we believe agency-Treasury spreads are likely to grind tighter along with other high-quality spread products. In our view, the following factors bolster this case:

- **Favorable supply technicals.** As outlined, we are looking for a secular decline in outstanding agency debt. In contrast, the stock of Treasuries outstanding is expected to double over the next decade. This is a positive for spreads, although, at some point (likely well beyond 2012), liquidity in agency debt may become an issue.

- **Few "safe" alternatives.** Persistently high deficits in developed countries have ostensibly caused the overall stock of highly rated government and government-related debt to soar over the past few years. Yet, the stock of debt perceived as "safe" by investors (as measured by CDS spreads of less than 100bp, a measure independent of credit ratings) has dwindled substantially. Only the US, Germany, the UK, Australia, Canada, Finland, and Sweden have 5y CDS below 100 as we write this, and Germany and the UK are borderline "safe" under our definition. (Figure 21). Further, with eurozone woes unlikely to dissipate anytime soon, US, Canadian, and Australian names should find better support from investors (at least in the near term until attention shifts to the state of US fiscal finances).

- With **a strong possibility of QE3** in 2012, agency debt could benefit, even if it is not included in purchases, as investors rebalance their portfolios to adjust for the reduced float of the securities that are likely to be eligible (agency MBS).

- **Favorable banking regulations.** Implementation of Basel 3 should continue to increase bank demand for liquid Treasury surrogates, including agency debt.

At the same time, we believe agencies face the following headwinds:

- **Relative valuations are already rich.** Competing spread product, including agency MBS and USD SSA paper, and covered bonds trade considerably behind agency debt (Figures 22 and 23). Given that demand is now driven by domestic investors who are far more conscious of relative value, agency performance would lag versus other asset classes on any concrete signs of normalization in Europe. Of course, there is no clear indication that this will occur anytime soon.

Protected Information To Be Disclosed Only In Accordance With Protective Order    FHFA00104887

- **Headline risks remain a prominent concern.** If worries about the future of the GSEs re-emerge, along with a US ratings downgrade (which we find quite possible in late 2012 or early 2013), there could be some knee-jerk cheapening. Given our view that agency and Treasury credit are analogous, we would recommend using any inordinate widening as a buying opportunity.

On balance, we advocate a nimble approach to take advantage of any spread widening, given the backdrop of Europe-related risk aversion. Over a longer horizon, we expect agency spreads to be supported and grind tighter, owing to the parallel declines in GSE portfolios and the supply of debt deemed as "safe" by global investors.

## SSA paper and USD covered bonds

In last year's outlook, we advocated caution on SSA and GGB paper, given our expectations of eurozone uncertainty. Our view was guided primarily by the scant spread pick-up offered by these names versus US agencies, especially in light of their worse relative liquidity. [6] While our thesis did not work early in the year, in Q4, spreads versus agencies have blown out substantially (Figure 23); KFW now trades 40-50bp behind agency debt, while EIB now trades 70-80bp behind. At these levels, we are becoming more constructive on these names, but maintain our overall cautionary approach on Euro names. A solution for the sovereign risk crisis in Europe is still to be determined, and absent that, we find it hard to envision a catalyst for spread retracement.

We foresee the following continued headwinds for the USD SSA asset class:

- The supply technical for USD SSA paper remains as disadvantageous as it has been in the past. Despite central bank lending programs, the USD funding shortage in Europe continues to be reflected in the very negative EUR/USD cross-currency basis swap. This implies that SSA issuers can fund in USD much more cheaply than in EUR with 3-5y sector KFW paper at E-30 to E-40bp versus synthetic EUR debt at E-60 to E-70bp.

- There has been relatively little USD issuance by the major supras in Q4, and we suspect there is a robust pipeline. Given the economic advantage of issuing in USD, we would not be surprised to see healthy spread concessions offered to investors as supply hits the market. For investors comfortable with the names involved, this could be an attractive opportunity to add exposure.

Figure 23: SSA paper has also cheapened to agencies



Source: Barclays Capital

Figure 24: SSA and cross-currency basis



Source: Barclays Capital

---

[6] "2011 Agencies outlook: With or without you," Interest Rates Research, 17 December 2010

Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA00104888

- Dealer liquidity is almost certain to be lower in USD SSA space than for agencies.

- Potential QE programs undertaken by the ECB are likely to focus on other asset classes (existing examples are sovereign debt and covered bonds) rather than SSAs directly.

- Growing ratings risk, contingent on the health of the underlying sovereigns.

In our view, these factors imply that SSA spreads are still susceptible to further widening. At some point in Q1 12, however, we expect more clarity on crisis resolution in Europe and would be more constructive. In the interim, we would focus on single-country SSA issuers with simple business models and clear ownership structures. As our European colleagues have highlighted, names such as KFW and CADES fit this description, and there should be more clarity on government support of these issuers than, for example, multinationals, regardless of the outcome in Europe.[7]

The flip side of the cross-currency basis-related distortions is that SSA investors comfortable with European credit can pick up spread over cash USD SSA bonds by creating synthetic USD SSA paper. This involves buying EUR-denominated SSA debt and swapping it back to USD; compare 3-5y KFW cash bonds in USD at L+40bp to synthetic USD debt at L+55 to L+60bp (Figure 24). Note that this does create an exposure for the investor to the cross-currency basis.

Lastly, note that USD covered bonds have also cheapened along with SSA paper in the risk aversion flight to quality, even for those issuers outside the EMU (Figure 25). In particular, investors can pick up 40-50bp over agencies by owning Canadian covered bonds, which offer several layers of protection – bank cash flows *pari passu* with senior unsecured debt, Canadian mortgage collateral, and an explicit guarantee of that collateral by the Canadian government. Among sovereigns, we favor Canada, given its sound fiscal metrics in relation to most other developed economies.

## Callables

Next year, we look for intermediate rates to remain rangebound and drift lower toward the second half, making 2012 an almost ideal environment to pick yield via agency callables, in our view. Extension risk should remain low, spreads are unlikely to blow out too much, and implied volatility on intermediate tails should also continue to drift lower, in our view.

Figure 25: Relative value in USD covered bonds



Source: Barclays Capital

Figure 26: Cushion of 1y lockouts to the agency curve



Source: Barclays Capital

---

[7] "Resilience of supranationals' triple-A ratings," The AAA Investor, 9 December 2011

Protected Information To Be Disclosed Only In Accordance With Protective Order                                      FHFA00104889

Front-end rates are especially unlikely to be volatile, given the Fed's pledge to keep the target rate unchanged through mid-2013, and we would expect this horizon to be extended into 2014 if economic weakness lingers. Further, worries in Europe, potential QE3 by the Fed (which is more likely to be focused in the belly), and concerns over US fiscal austerity in 2013 make a material rate sell-off in 2012 unlikely, in our view.

As such, we believe structures in the 3-5y maturity bucket offer the most cushion against a subsequent sell-off along the curve (Figures 26 and 27). These structures also limit the terminal maturity of the bond in case of an extension. For example, consider a 3nc1 European with a 0.85% coupon, which would cushion against a 40bp sell-off in 2y agency rates over the next year. In other words, for an extension, 2y agency bullet rates currently at 0.45% would have to almost double. We believe this is exceedingly unlikely, given our outlook for rangebound front-end rates and the Fed on hold.

Extension risk is also posed by the potential widening of 2y agency-Treasury spreads, although if rates stay unchanged, spreads would have to widen from 17bp to 57bp – another unlikely scenario, in our view. For agency-Treasury spreads to widen 40bp, swap spreads would likely have to widen by well over 60bp and stay there; consider that agencies widened 15bp to Treasuries in November, in a period where swap spreads widened 25bp.

Further out in maturity, 4nc1 and 5nc1 European structures pay roughly 1.20% and 1.55% par coupons, respectively. With 3y and 4y spot agency rates at 0.70% and 1.05%, respectively, this is a cushion of about 50bp in both cases (Figure 28).

Investors seeking to guard against short-term spikes in rates or vol can further reduce extension risk by considering Bermudan structures, which give up only a handful of bp in par coupon.

Figure 27: A better case for selling vol in 1y5y



Source: Barclays Capital

Figure 28: Summary of callable structures

| European structure | 3nc1 | 4nc1 | 5nc1 |
|---|---|---|---|
| Coupon, % | 0.86 | 1.21 | 1.56 |
| OAD, y | 1.95 | 2.39 | 2.81 |
| Cushion to spot, bp | 40 | 50 | 50 |
| Bullet yield to first call, % | 0.15 | 0.15 | 0.15 |
| Similar OAD-bullet YTM, % | 0.31 | 0.56 | 0.59 |
| Similar-maturity YTM, % | 0.71 | 1.06 | 1.42 |

Source: Barclays Capital

Protected Information To Be Disclosed Only In Accordance With Protective Order                    FHFA00104890

**Analyst Certification(s)**
We, James Ma and Rajiv Setia, hereby certify (1) that the views expressed in this research report accurately reflect our personal views about any or all of the subject securities or issuers referred to in this research report and (2) no part of our compensation was, is or will be directly or indirectly related to the specific recommendations or views expressed in this research report.

**Important Disclosures**
For current important disclosures regarding companies that are the subject of this research report, please send a written request to: Barclays Capital Research Compliance, 745 Seventh Avenue, 17th Floor, New York, NY 10019 or refer to https://ecommerce.barcap.com/research/cgi-bin/all/disclosuresSearch.pl or call 212-526-1072.
Barclays Capital does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that Barclays Capital may have a conflict of interest that could affect the objectivity of this report. Any reference to Barclays Capital includes its affiliates. Barclays Capital and/or an affiliate thereof (the "firm") regularly trades, generally deals as principal and generally provides liquidity (as market maker or otherwise) in the debt securities that are the subject of this research report (and related derivatives thereof). The firm's proprietary trading accounts may have either a long and / or short position in such securities and / or derivative instruments, which may pose a conflict with the interests of investing customers. Where permitted and subject to appropriate information barrier restrictions, the firm's fixed income research analysts regularly interact with its trading desk personnel to determine current prices of fixed income securities. The firm's fixed income research analyst(s) receive compensation based on various factors including, but not limited to, the quality of their work, the overall performance of the firm (including the profitability of the investment banking department), the profitability and revenues of the Fixed Income Division and the outstanding principal amount and trading value of, the profitability of, and the potential interest of the firms investing clients in research with respect to, the asset class covered by the analyst. To the extent that any historical pricing information was obtained from Barclays Capital trading desks, the firm makes no representation that it is accurate or complete. All levels, prices and spreads are historical and do not represent current market levels, prices or spreads, some or all of which may have changed since the publication of this document. Barclays Capital produces a variety of research products including, but not limited to, fundamental analysis, equity-linked analysis, quantitative analysis, and trade ideas. Recommendations contained in one type of research product may differ from recommendations contained in other types of research products, whether as a result of differing time horizons, methodologies, or otherwise.

Protected Information To Be Disclosed Only In Accordance With Protective Order              FHFA00104891

This publication has been prepared by Barclays Capital, the investment banking division of Barclays Bank PLC, and/or one or more of its affiliates as provided below. It is provided to our clients for information purposes only, and Barclays Capital makes no express or implied warranties, and expressly disclaims all warranties of merchantability or fitness for a particular purpose or use with respect to any data included in this publication. Barclays Capital will not treat unauthorized recipients of this report as its clients. Prices shown are indicative and Barclays Capital is not offering to buy or sell or soliciting offers to buy or sell any financial instrument. Without limiting any of the foregoing and to the extent permitted by law, in no event shall Barclays Capital, nor any affiliate, nor any of their respective officers, directors, partners, or employees have any liability for (a) any special, punitive, indirect, or consequential damages; or (b) any lost profits, lost revenue, loss of anticipated savings or loss of opportunity or other financial loss, even if notified of the possibility of such damages, arising from any use of this publication or its contents. Other than disclosures relating to Barclays Capital, the information contained in this publication has been obtained from sources that Barclays Capital believes to be reliable, but Barclays Capital does not represent or warrant that it is accurate or complete. The views in this publication are those of Barclays Capital and are subject to change, and Barclays Capital has no obligation to update its opinions or the information in this publication.

The analyst recommendations in this publication reflect solely and exclusively those of the author(s), and such opinions were prepared independently of any other interests, including those of Barclays Capital and/or its affiliates. This publication does not constitute personal investment advice or take into account the individual financial circumstances or objectives of the clients who receive it. The securities discussed herein may not be suitable for all investors. Barclays Capital recommends that investors independently evaluate each issuer, security or instrument discussed herein and consult any independent advisors they believe necessary. The value of and income from any investment may fluctuate from day to day as a result of changes in relevant economic markets (including changes in market liquidity). The information herein is not intended to predict actual results, which may differ substantially from those reflected. Past performance is not necessarily indicative of future results.

This communication is being made available in the UK and Europe primarily to persons who are investment professionals as that term is defined in Article 19 of the Financial Services and Markets Act 2000 (Financial Promotion Order) 2005. It is directed at, and therefore should only be relied upon by, persons who have professional experience in matters relating to investments. The investments to which it relates are available only to such persons and will be entered into only with such persons. Barclays Capital is authorized and regulated by the Financial Services Authority ('FSA') and member of the London Stock Exchange.

Barclays Capital Inc., U.S. registered broker/dealer and member of FINRA (www.finra.org), is distributing this material in the United States and, in connection therewith accepts responsibility for its contents. Any U.S. person wishing to effect a transaction in any security discussed herein should do so only by contacting a representative of Barclays Capital Inc. in the U.S. at 745 Seventh Avenue, New York, New York 10019. Non-U.S. persons should contact and execute transactions through a Barclays Bank PLC branch or affiliate in their home jurisdiction unless local regulations permit otherwise. This material is distributed in Canada by Barclays Capital Canada Inc., a registered investment dealer and member of IIROC (www.iiroc.ca). To access Barclays Capital policy on the dissemination of research reports, please go to http://www.barcap.com/Client+offering/Research/Research+Policy. Subject to the conditions of this publication as set out above, Absa Capital, the Investment Banking Division of Absa Bank Limited, an authorised financial services provider (Registration No.: 1986/004794/06), is distributing this material in South Africa. Absa Bank Limited is regulated by the South African Reserve Bank. This publication is not, nor is it intended to be, advice as defined and/or contemplated in the (South African) Financial Advisory and Intermediary Services Act, 37 of 2002, or any other financial, investment, trading, tax, legal, accounting, retirement, actuarial or other professional advice or service whatsoever. Any South African person or entity wishing to effect a transaction in any security discussed herein should do so only by contacting a representative of Absa Capital in South Africa, 15 Alice Lane, Sandton, Johannesburg, Gauteng 2196. Absa Capital is an affiliate of Barclays Capital. In Japan, foreign exchange research reports are prepared and distributed by Barclays Bank PLC Tokyo Branch. Other research reports are distributed to institutional investors in Japan by Barclays Capital Japan Limited. Barclays Capital Japan Limited is a joint-stock company incorporated in Japan with registered office of 6-10-1 Roppongi, Minato-ku, Tokyo 106-6131, Japan. It is a subsidiary of Barclays Bank PLC and a registered financial instruments firm regulated by the Financial Services Agency of Japan. Registered Number: Kanto Zaimukyokucho (kinsho) No. 143. Barclays Bank PLC, Hong Kong Branch is distributing this material in Hong Kong as an authorised institution regulated by the Hong Kong Monetary Authority. Registered Office: 41/F, Cheung Kong Center, 2 Queen's Road Central, Hong Kong. This material is issued in Taiwan by Barclays Capital Securities Taiwan Limited. This material on securities not traded in Taiwan is not to be construed as 'recommendation' in Taiwan. Barclays Capital Securities Taiwan Limited does not accept orders from clients to trade in such securities. This material may not be distributed to the public media or used by the public media without prior written consent of Barclays Capital. This material is distributed in South Korea by Barclays Capital Securities Limited, Seoul Branch. All equity research material is distributed in India by Barclays Securities (India) Private Limited (SEBI Registration No: INB/INF 231292732 (NSE), INB/INF 011292738 (BSE), Registered Office: 208 | Ceejay House | Dr. Annie Besant Road | Shivsagar Estate | Worli | Mumbai - 400 018 | India, Phone: + 91 22 67196363). Other research reports are distributed in India by Barclays Bank PLC, India Branch. Barclays Bank PLC Frankfurt Branch distributes this material in Germany under the supervision of Bundesanstalt für Finanzdienstleistungsaufsicht (BaFin). This material is distributed in Malaysia by Barclays Capital Markets Malaysia Sdn Bhd. This material is distributed in Brazil by Banco Barclays S.A. This material is distributed in Mexico by Barclays Bank Mexico, S.A. Barclays Bank PLC in the Dubai International Financial Centre (Registered No. 0060) is regulated by the Dubai Financial Services Authority (DFSA). Barclays Bank PLC-DIFC Branch, may only undertake the financial services activities that fall within the scope of its existing DFSA licence. Barclays Bank PLC in the UAE is regulated by the Central Bank of the UAE and is licensed to conduct business activities as a branch of a commercial bank incorporated outside the UAE in Dubai (Licence No.: 13/1844/2008, Registered Office: Building No. 6, Burj Dubai Business Hub, Sheikh Zayed Road, Dubai City) and Abu Dhabi (Licence No.: 13/952/2008, Registered Office: Al Jazira Towers, Hamdan Street, PO Box 2734, Abu Dhabi). Barclays Bank PLC in the Qatar Financial Centre (Registered No. 00018) is authorised by the Qatar Financial Centre Regulatory Authority (QFCRA). Barclays Bank PLC-QFC Branch may only undertake the regulated activities that fall within the scope of its existing QFCRA licence. Principal place of business in Qatar: Qatar Financial Centre, Office 1002, 10th Floor, QFC Tower, Diplomatic Area, West Bay, PO Box 15891, Doha, Qatar. This material is distributed in Dubai, the UAE and Qatar by Barclays Bank PLC. Related financial products or services are only available to Professional Clients as defined by the DFSA, and Business Customers as defined by the QFCRA. This material is distributed in Saudi Arabia by Barclays Saudi Arabia ('BSA'). It is not the intention of the Publication to be used or deemed as recommendation, option or advice for any action (s) that may take place in future. Barclays Saudi Arabia is a Closed Joint Stock Company, (CMA License No. 09141-37). Registered office Al Faisaliah Tower | Level 18 | Riyadh 11311 | Kingdom of Saudi Arabia. Authorised and regulated by the Capital Market Authority, Commercial Registration Number: 1010283024. This material is distributed in Russia by OOO Barclays Capital, affiliated company of Barclays Bank PLC, registered and regulated in Russia by the FSFM. Broker License #177-11850-100000; Dealer License #177-11855-010000. Registered address in Russia: 125047 Moscow, 1st Tverskaya-Yamskaya str. 21. This material is distributed in Singapore by the Singapore branch of Barclays Bank PLC, a bank licensed in Singapore by the Monetary Authority of Singapore. For matters in connection with this report, recipients in Singapore may contact the Singapore branch of Barclays Bank PLC, whose registered address is One Raffles Quay Level 28, South Tower, Singapore 048583. Barclays Bank PLC, Australia Branch (ARBN 062 449 585, AFSL 246617) is distributing this material in Australia. It is directed at 'wholesale clients' as defined by Australian Corporations Act 2001.

IRS Circular 230 Prepared Materials Disclaimer: Barclays Capital and its affiliates do not provide tax advice and nothing contained herein should be construed to be tax advice. Please be advised that any discussion of U.S. tax matters contained herein (including any attachments) (i) is not intended or written to be used, and cannot be used, by you for the purpose of avoiding U.S. tax-related penalties; and (ii) was written to support the promotion or marketing of the transactions or other matters addressed herein. Accordingly, you should seek advice based on your particular circumstances from an independent tax advisor.

Barclays Capital is not responsible for, and makes no warranties whatsoever as to, the content of any third-party web site accessed via a hyperlink in this publication and such information is not incorporated by reference.

© Copyright Barclays Bank PLC (2011). All rights reserved. No part of this publication may be reproduced in any manner without the prior written permission of Barclays Capital or any of its affiliates. Barclays Bank PLC is registered in England No. 1026167. Registered office 1 Churchill Place, London, E14 5HP. Additional information regarding this publication will be furnished upon request.

US20194

Protected Information To Be Disclosed Only In Accordance With Protective Order       FHFA00104892