UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al.*,<br><br>            Plaintiffs,<br><br>      v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>            Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

**DEFENDANTS' PRETRIAL STATEMENT**

Pursuant to Rule 16.5 of the Local Civil Rules, and the Proposed Seventh Amended Scheduling Order (ECF No. 148-1 in No. 13-mc-1288, ECF No. 152-1 in No. 13-cv-1053), Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "Enterprises,"), Sandra L. Thompson, in her official capacity as Director of FHFA, and the Enterprises hereby present their Pretrial Statement.

I.  **Statement of the Case**

Brief Description of the Nature of the Case.  This case arises out of the continuing consequences of one of the greatest financial crises in our country's history.  In response to the 2008 financial crisis, the government took unprecedented (and successful) efforts to assure the stability of the secondary mortgage market, a critical component of the country's economy.  On September 6, 2008, FHFA's then-Director placed Fannie Mae and Freddie Mac (the "Enterprises") into conservatorships to stem the ongoing deterioration of the secondary mortgage market and doubts about the Enterprises' ability to absorb further losses.  Failure to stem this crisis would have negatively impacted the national and international economies.

The next day, FHFA as Conservator on behalf of each Enterprise entered into Senior Preferred Stock Purchase Agreements (the "PSPAs") with the Department of Treasury ("Treasury").  Under the PSPAs, Treasury committed to invest up to $100 billion in each Enterprise to ensure they maintained a positive net worth (the "Treasury Commitment" or "Commitment").  In exchange for this extraordinary commitment to each Enterprise, Treasury received consideration from each Enterprise in the form of fixed dividends, warrants, a liquidation preference, and an entitlement to periodic commitment fees.  In 2009, the PSPAs were amended twice to increase the size of the Treasury Commitment, including to make the Commitment unlimited through December 31, 2012, when it would be capped.  Between 2008 and 2012 the Enterprises drew over $187 billion from the Commitments.  Plaintiffs do not challenge the decision to place each of the Enterprises into conservatorship, the decision to enter into the PSPAs on behalf of each of the Enterprises, or the decision to amend each of the PSPAs twice in 2009.

On August 17, 2012, FHFA, acting as Conservator of the Enterprises, and Treasury amended the PSPAs for a third time.  Among other things, the "Third Amendment" (a) replaced

2

the fixed quarterly dividend owed to Treasury which was based on 10% of each of the Enterprises' outstanding liquidation preference with a variable dividend based on each of the Enterprises' net worth; and (b) suspended Treasury's imposition of any periodic commitment fees so long as the new dividend based on net worth was in effect.  The Third Amendment is the focus of this case.  Plaintiffs are shareholders of Fannie Mae and Freddie Mac and allege that the Conservator's decision to enter into the Third Amendment on behalf of Fannie Mae and Freddie Mac was arbitrary and unreasonable and that, in the absence of the Third Amendment they would have received dividends from the Enterprises starting around 2030.  Defendants maintain that the Third Amendment was a reasonable exercise of FHFA's power to act in the best interests of the public and the secondary mortgage market, that the Enterprise shareholders did not reasonably expect to receive dividends and that the Third Amendment caused no harm to private shareholders.

Identities of the Parties.

In the Class Action (No. 13-mc-1388), this Court has certified three classes, consisting of all current shareholders of (1) Fannie Mae preferred stock, (2) Freddie Mac preferred stock, and (3) Freddie Mac common stock, or their successors in interest to the extent shares are sold before any final judgment or settlement.  See Order Certifying Classes (ECF No. 139 in 1:13-mc-1288) (Dec 7, 2021).

The *Fairholme* action (No. 13-1053) includes several Enterprise shareholders, known as the Berkley Plaintiffs, who opted out of the classes and are pursuing their claims individually.[1]

---

[1] The Berkley Plaintiffs consist of Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred Employers Insurance Company.  See Am. Compl. ¶¶ 6-15 in *Fairholme* (ECF No. 75 in 1:13cv1053).

The Berkley Plaintiffs are several affiliated insurance companies that own preferred stock in both Enterprises.  The two Fairholme entities that were also plaintiffs in the *Fairholme* action—Fairholme Funds, Inc., and The Fairholme Fund (the "Fairholme Plaintiffs")—did not opt out of the classes, and this Court granted their motion to sever and stay their claims pending resolution of the class action.  *See* Order (ECF No. 164 in No. 1:13cv1053) (May 31, 2022).

In both the Class Action and *Fairholme* action, Defendants are FHFA as Conservator of the Enterprises, Fannie Mae, and Freddie Mac.  In the *Fairholme* action, Sandra L. Thompson is also named as a defendant in her official capacity as Director of FHFA.

All of the Plaintiffs' claims will be tried to a jury.  *See id*.

Basis of the Court's Jurisdiction.  This Court has jurisdiction over the Class Action under 28 U.S.C. § 1332(d)(2)(A) (providing original jurisdiction over class actions exceeding $5 million in which "any member of a class of plaintiffs is a citizen of a State different from any defendant").  The Court has jurisdiction over the Berkley Plaintiffs' claims under 28 U.S.C. § 1332(a) (diversity jurisdiction).

## II.     Statement of Claims

Plaintiffs' sole remaining claim against Defendants is for breach of the implied covenant of good faith and fair dealing arising under Delaware and Virginia law, which this Court has held is contained in the Enterprises' contracts with each group of shareholders.  As stated in this Court's prior ruling, "[t]he question" for liability on this claim is whether, in entering into the Third Amendment on behalf of the Enterprises, FHFA as Conservator "exercised [its] discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract."  *Fairholme Funds, Inc. v. FHFA,* No. CV 13-1053, 2018 WL 4680197, at *13 (D.D.C. Sept. 28, 2018).

There are no counterclaims, cross-claims, or third-party claims.

### III.  Statement of Defenses

Defendants did not breach the implied covenant of good faith and fair dealing under the Enterprises' contracts with shareholders.  The evidence demonstrates that Plaintiffs cannot satisfy either prong of the two-part liability test.

First, the Third Amendment did not violate Plaintiffs' reasonable expectations under the shareholder contract.  Enterprise shareholders' expectations are informed by the risks inherent in investing in stocks, the heightened risks of investing in stocks of highly regulated government-sponsored enterprises, and the knowledge that dividends are never guaranteed, even in profitable companies.  Moreover, by August 2012, no reasonable shareholder of Fannie Mae or Freddie Mac stock expected to be paid dividends in light of, *inter alia*, the Enterprises public statements that they could not afford to pay the 10% Treasury dividend over the long term, Treasury's massive liquidation preferences (totaling $187 billion), Treasury's veto power over dividends to shareholders, the Conservator's elimination of dividends to private shareholders while the Enterprises are in conservatorship, and FHFA's statutory authority as Conservator to put the public's interests in the stable operation of the secondary mortgage market over the interests of Fannie Mae and Freddie Mac shareholders.  Moreover, by August 2012, market analysts had recognized the problem posed by the Enterprises' inability to pay the 10% dividend without drawing down the Treasury Commitment and expected that FHFA and Treasury would amend the PSPAs to address it.

Second, the Conservator's execution of the Third Amendment on behalf of each of the Enterprises was neither arbitrary nor unreasonable.  Rather, the Third Amendment was a reasonable solution to a problem that had caused significant market concern about the stability of the secondary mortgage market: it eliminated the risk that the finite Treasury Commitment providing crucial capital to the Enterprises would be eroded by the fixed 10% dividend payments

owed by each of the Enterprises to Treasury.  "Whether or not this new arrangement was in the best interests of the companies or their shareholders, the FHFA could have reasonably concluded that it was in the best interests of members of the public who rely on a stable secondary mortgage market." *Collins v. Yellen*, 141 S. Ct. 1761, 1777, 210 L. Ed. 2d 432 (2021).

At the time of the Third Amendment, FHFA as Conservator reasonably anticipated that there were scenarios in which the Treasury Commitment would be eroded for two reasons.  First, when the Enterprises did not generate enough profit to pay the 10% fixed quarterly dividend, they drew on their respective Commitment to pay the dividend, thereby reducing the amount of their respective Commitment and increasing the next dividend payment.  Second, the Treasury Commitment would become fixed (and could not be increased) after December 31, 2012.  In turn, the risk that the Commitment would be eroded threatened the Enterprises' ability to issue new debt, diminished MBS investors' confidence in the Enterprises' ability to honor their guarantees and stood to decrease the value of the Enterprises' guarantee of mortgage-backed securities.  Erosion of the Commitment would deplete the capital backstop that was available to each Enterprise to cover any future significant operating losses.  Thus, the Conservator faced a reasonably possible risk of developments that would have jeopardized the liquidity of the entire housing finance market, and thus the national economy.

By executing the Third Amendment, FHFA as Conservator eliminated the risk that paying dividends to Treasury would erode Treasury's Commitment and furthered the public interest in a stable secondary mortgage market.  The Third Amendment guaranteed that each of the Enterprises would never again draw money from Treasury just to make their quarterly dividend payments.  This ensured that the Treasury Commitment, capped as of January 1, 2013, would be available to backstop the Enterprises' operations during quarters in which either of the

Enterprises incurred losses. Maximizing the amount of the Treasury Commitment available to cover potential future losses maximized the ability of the Enterprises to survive in stress case scenarios. It was reasonable for the Conservator to consider and plan for stress scenarios and guard against downside risk from future financial downturns that could threaten the stability of the secondary mortgage market. Thus, FHFA's execution of the Third Amendment on behalf of each of the Enterprises was a reasonable action to promote the public interest in a stable secondary mortgage market.

Finally, Plaintiffs cannot prove that FHFA's execution of the Third Amendment harmed the Enterprises' shareholders. Plaintiffs contend that, absent the Third Amendment, the Enterprises would have begun paying dividends to private shareholders at some point between 2026 and 2057—that is, dividends would not have commenced until decades after the Third Amendment. This theory is based on a chain of speculative assumptions, without record support, each of which would be required to be met before dividends could be paid. These include that the Enterprises could have met their pre-Third Amendment obligations to Treasury (*i.e.,* 10% dividends and periodic commitment fees) while at the same time building the necessary capital. Plaintiffs further assume, without basis in the record, that the Enterprises would have begun paying down Treasury's liquidation preference in January 2013, despite (a) the express prohibition of paydown in the PSPAs, and (b) the fact that when FHFA asked Treasury to allow the Enterprises to begin paying down the liquidation preference as their finances permitted, Treasury did not agree. Any suggestion that Treasury would have changed its mind by January 2013 has no basis in the record and is pure speculation. Because Plaintiffs cannot prove with reasonable certainty that the Third Amendment caused the shareholders not to receive dividends, their implied covenant claim fails.

**IV.   Schedule of Witnesses**

The names of witnesses whose testimony Defendants expect to present at trial, or whose testimony Defendants may present if the need arises, are set forth below. Defendants reserve the right to call any witnesses identified by Plaintiffs and to call any witnesses not previously identified or disclosed for impeachment purposes. Defendants further reserve the right to revise or supplement these disclosures if warranted, including in response to Plaintiffs' pretrial disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any pending or forthcoming motions in limine), and any information discovered between now and trial. Defendants also intend to present the testimony of multiple witnesses by deposition designation, which are identified in Section VI below.

<u>Witnesses Defendants Expect to Call at Trial</u>

- **Edward DeMarco**

    - Address: contact through Defendants' counsel

    - Brief description of testimony: Mr. DeMarco was a senior official at FHFA since its inception in 2008, and was Acting Director of FHFA in August 2012, at which time he executed the Third Amendment as Conservator on behalf of each of the Enterprises. He will testify about the role of the Enterprises in the mortgage market; impact of the financial crisis on the Enterprises' business and financial condition; FHFA's conservatorship operations and strategic plans; the payment of dividends by the Enterprises; the periodic commitment fee under the PSPAs; FHFA's decision to execute the Third Amendment, including the factors considered by FHFA; the capital requirements applicable to the Enterprises; and the financial condition, performance, and forecasts of the Enterprises during his tenure at FHFA. He may also provide additional testimony consistent with his deposition testimony on May 7, 2015, and December 21, 2020.

    - Estimate of time for direct testimony: 6 hours

- **Nicholas Satriano**

    - Address: contact through Defendants' counsel

- o   Brief description of testimony:  Mr. Satriano was FHFA's Chief Accountant when the Third Amendment was executed and continues to be its Chief Accountant today.  He will testify about issues relating to the accounting policies and financial reporting for the Enterprises, including but not limited to how Enterprise financial statements reflect the capital levels, financial condition, and performance of the Enterprises.  He will also testify about the Enterprises' deferred tax assets, valuation allowances set on those assets, and loan loss reserves.  He may also provide additional testimony consistent with his deposition testimony on December 1, 2020.

- o   Estimate of time for direct testimony:  3 hours

- **Dr. Mukarram Attari\* (expert)**

    - o   Address:  contact through Defendants' counsel

    - o   Brief description of testimony:  Dr. Attari is a financial economist and will testify that, based on his expertise, knowledge, and review of the record, it was reasonable for FHFA to agree to the Third Amendment because it furthered FHFA's goals and the Enterprises' public mission to promote the stability and liquidity of the secondary mortgage market, including in stress situations.  He will also testify that shareholders were not harmed by the Third Amendment and that Plaintiffs' experts' estimates of the periodic commitment fee and damages purportedly caused by the Third Amendment are flawed and unreliable and do not support Plaintiffs' conclusions.  Dr. Attari will also provide additional testimony consistent with his expert report of February 1, 2022, and his deposition testimony of February 14-15, 2022.  He will also provide testimony in response to Plaintiffs' experts' reports of August 12, 2021, and March 1, 2022, and the depositions of Plaintiffs' experts on September 8, 2021 (Thakor), March 25, 2022 (Thakor), September 16, 2021 (Mason), March 16, 2022 (Mason), September 11, 2021 (Dharan), and April 6, 2022 (Dharan).

    - o   Estimate of time for direct testimony:  6 hours

- **Dr. Shri Prakash Kothari\* (expert)**

    - o   Address:  contact through Defendants' counsel

    - o   Brief description of testimony:  Dr. Kothari holds the Gordon Y. Billard Professorship of Accounting and Finance at the Massachusetts Institute of Technology, Sloan School of Management.  Dr. Kothari will testify that, based on his expertise, knowledge, and review of the record, shareholders reasonably expected that FHFA as Conservator would run the Enterprises in a manner that facilitated stability in the secondary mortgage market and provided certainty regarding the government's commitment to the Enterprises, and would not run them with the purpose of benefitting shareholders.  He will testify that a PSPA

9

amendment whereby Treasury was paid the Enterprises' earnings for its indispensable support, was within the reasonable expectations of shareholders. He will further testify that, before the Third Amendment, shareholders did not reasonably expect to be paid dividends. Dr. Kothari will also provide additional testimony consistent with his expert report of October 14, 2021, and his deposition testimony of November 2, 2021. He will also provide testimony in response to Plaintiffs' experts' reports of August 12, 2021, and March 1, 2022, and the depositions of Plaintiffs' experts on September 8, 2021 (Thakor), March 25, 2022 (Thakor), September 16, 2021 (Mason), March 16, 2022 (Mason), September 11, 2021 (Dharan), and April 6, 2022 (Dharan).

- o Estimate of time for direct testimony:  4 hours

Witnesses Defendants May Call at Trial

- **Naa Awaa Tagoe (FHFA)**

  - o Address:  contact through Defendants' counsel

  - o Brief description of testimony:  Ms. Tagoe has been a senior official at FHFA since its inception in 2008. She may testify regarding the FHFA regulatory capital requirements applicable to the Enterprises and FHFA's rulemaking regarding the same. She may also testify regarding FHFA's projections of the Enterprises' financial performance. She may also provide additional testimony consistent with her deposition testimony on December 16, 2020.

  - o Estimate of time for direct testimony:  2 hours

- **David C. Benson (Fannie Mae)**

  - o Address:  contact through Defendants' counsel

  - o Brief description of testimony:  Mr. Benson has been a senior official at Fannie Mae since 2002 and its currently its President and Interim Chief Executive Officer. He may testify about the placement of Fannie Mae in conservatorship, Fannie Mae's relationship with FHFA as Conservator, the Conservator's directives to Fannie Mae's management during his tenure, the operations and financial condition of Fannie Mae, and projections prepared by Fannie Mae. He may also testify about the dividends paid by Fannie Mae to Treasury, Fannie Mae's reliance on the Treasury Commitment, and the impact of market responses on Fannie Mae's business activities. He may also provide additional testimony consistent with his deposition testimony on February 28, 2020.

  - o Estimate of time for direct testimony:  4.0 hours

## V. Defendants' Exhibit List

Defendants' Exhibit List is attached hereto as **Exhibit A**. Defendants reserve the right to revise or supplement their exhibit list if warranted, including in response to Plaintiffs' pretrial disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any pending or forthcoming motions in limine), and any information discovered between now and trial. Defendants also reserve the right to remove any exhibit from their exhibit list. Further, the documents identified in Defendants' trial exhibit list does not constitute a waiver of any objections Defendants have raised or will raise in objections or forthcoming motions in limine as to the admissibility of certain documents, including those produced by Treasury. Defendants' inclusion of such documents is conditional on the scope of the Court's resolution of such objections or motions in limine. Further, Defendants reserve the right to utilize any exhibits listed by Plaintiffs and to use, introduce, or rely upon any other discovery materials, including but not limited to deposition transcripts, for impeachment or cross-examination.

## VI. Defendants' Deposition Designations

Defendants' Deposition Designations are attached as **Exhibit B.** Those designations are portions of deposition testimony that Defendants intend to present at trial, to the extent the witnesses are not called by either party to testify live at trial. Defendants reserve the right to revise or supplement these designations if warranted, including in response to Plaintiffs' pretrial disclosures and other pretrial filings, any rulings or orders issued by the Court (including those resolving any objections or pending or forthcoming motions in limine), and any information discovered between now and trial. Defendants also reserve the right to remove any deposition designations from their list, and to add additional designations to the extent any currently available witnesses become unavailable. Out of an abundance of caution, Defendants are also

11

designating deposition testimony of certain witnesses located within the subpoena power of the court in case the witness becomes unavailable at the time of trial.

## VII. Itemization of Damages

Defendants do not seek any damages against Plaintiffs.

It appears Plaintiffs intend to present at trial—through their damages expert, Dr. Joseph Mason—four different expectation damages scenarios ranging from $5.2 billion (Scenario 6) to $27.2 billion (Scenario 1). *See* Defendants' Reply in Support of Motion in Limine to Exclude Testimony of Dr. Mason at 3 (previously filed at ECF No. 166 in No. 1:13-mc-1288). Each scenario relies on Dr. Mason's assumptions about what could have happened in his "but-for" world absent the Third Amendment. Defendants have moved to exclude all of Dr. Mason's expectation damages scenarios under *Daubert*. *See* Defendants' Motion in Limine to Exclude Testimony of Dr. Mason (ECF No. 155 in No. 1:13-mc-1288).

## VIII. Other Relief Sought

Based on their expert disclosures, it appears Plaintiffs intend to request rescission and restitution of the Enterprises' preferred shares as an alternative to their requested expectation damages. This relief is equitable in nature, as it would require unwinding the preferred shareholder contracts in their entirety, awarding $47.9 billion to the preferred shareholders (reflecting the shares' collective issuance price) and requiring all preferred shareholders to return their stock to the Enterprises and relinquish the right to their shares. As explained in Defendants' Motion for Summary Judgment, this alternative request is barred as a matter of law, including by 12 U.S.C. § 4617(f). *See* ECF No. 143 at 31-37 (No. 1:13-mc-01288-RCL).

## IX. Defendants' Proposed Stipulations of Fact

Defendants' proposed stipulations of fact are attached hereto as **Exhibit C**.

X. **Proposed Voir Dire**

The Parties intend to request jointly that the Court approve a supplemental jury questionnaire to be completed by prospective jurors in advance of jury selection, which is scheduled to begin on October 17, 2022.  The Parties believe that having responses to the supplemental questionnaire will facilitate, focus, and potentially reduce the time spent by the Court and prospective jurors on voir dire.  The Parties have agreed to the attached proposed supplemental juror questionnaire (attached as **Exhibit D**).  Should the Court decide not to provide the proposed supplemental juror questionnaire to prospective jurors in advance of jury selection, the Parties agree that the proposed supplemental jury questionnaire constitutes their joint proposed voir dire.  If the Court orders that the supplemental questionnaire or voir dire be revised, the Parties would propose to meet and confer to discuss any revisions required by the Court's direction.

XI. **Proposed Jury Instructions, and Verdict Forms**

Defendants proposed preliminary jury instructions are attached hereto as **Exhibit E**.

Defendants proposed final jury instructions are attached hereto as **Exhibit F**.

Defendants' proposed verdict forms are attached hereto as **Exhibit G**.

Dated: August 19, 2022                    Respectfully submitted,

  /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency and Director Sandra L. Thompson*

  /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

  /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*