# EXHIBIT B

Page 1

1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
2

          _____
3                                       )
          In re Fannie Mae/Freddie Mac )Miscellaneous No.
4         Senior Preferred Stock        )13-1288(RCL)
          Purchase Agreement Class      )
5         Action Litigation             )CLASS ACTION
                                        )
6                                       )
                                        )
7         This document relates to:     )
                                        )
8         ALL CASES                     )
          _____
9

10

11

12              Remote Videotaped Deposition of
13                    SUSAN HARTMAN
14                   August 23, 2022
15                     8:41 a.m.
16

17

18

19

20

21

          Reported by:  Bonnie L. Russo
22        Job No. 5367728

1          Q.     And do you go by Dr. Hartman?

2          A.     I don't.  I'm not sure where that

3     came from.  I was going to point that out.

4          Q.     Very good.  I --

5          A.     I do not have a doctorate.

6          Q.     I hadn't seen a Ph.D. on your CV,

7     but just wanted to confirm because I heard

8     someone say it before we got started.

9                 So is Ms. Hartman okay for today?

10         A.     That's fine.

11         Q.     Great.  Have you been deposed

12    before?

13         A.     Yes.

14         Q.     Okay.  How many times?

15         A.     I think roughly 20.

16         Q.     When -- when was the most recent

17    time you were deposed?

18         A.     About a year ago.

19         Q.     Okay.  And of those roughly 20

20    times, were -- were those cases in which you

21    were either a plaintiff or a defendant as a

22    party to the lawsuit, or were those cases where

1    you were serving some role as a -- as a

2    witness?

3        A.    I was not a party to the lawsuits.

4    It was part of my business.

5        Q.    Okay.  And in -- in those cases

6    where you were deposed before, were you serving

7    as an -- as an expert and being deposed as an

8    -- as an expert for one of the litigants?

9        A.    Yes.

10       Q.    Okay.  In -- in all 20 of the cases

11   where -- 20 or so cases where you have been

12   deposed previously, were all of those

13   situations where you were serving as an expert

14   for one of the parties in the litigation?

15       A.    Yes, although I would say they

16   weren't all litigations.  Sometimes I have

17   testified in investigations.

18       Q.    Okay.  Well, whether it was

19   litigation or investigation, arbitration, any

20   sort of legal proceeding where you have

21   testified before, it's always been as an expert

22   for one of the parties involved in the legal

Page 11

1       proceeding?

2            A.    That's correct.

3            Q.    Okay.  Have you ever testified at a

4       trial?

5            A.    Yes.

6            Q.    Okay.  How many times?

7            A.    Again, probably roughly 20.

8            Q.    Okay.  Roughly -- would you say that

9       is roughly the same 20 or so cases in which you

10      were also deposed?

11           A.    Not one for one.  Some cases

12      settled.  Some cases, there were a deposition

13      before trial.

14           Q.    Okay.  In the 20 or so cases where

15      you have testified at a trial, were all of

16      those situations where you were serving and

17      testifying as an expert on behalf of one of the

18      parties to the matter?

19           A.    Yes.

20           Q.    Okay.  So you have never testified

21      in a -- in a deposition or an investigation or

22      a trial or any other legal proceeding in any

Page 12

1      capacity other than as an expert for one of the

2      parties?

3           A.    That's correct.

4           Q.    Okay.  And have you always been paid

5      for your work as an expert in those other

6      matters?

7           A.    Yes.

8           Q.    Okay.  And have you served as an

9      expert for parties in legal proceedings in

10     other cases where you didn't give any

11     testimony, either at a deposition or

12     investigation or trial or any other proceeding?

13          A.    I'm sorry, could you repeat the

14     question.

15          Q.    Sure.  In addition to the various

16     matters you have already described in which you

17     testified as an expert, have you also served as

18     an expert in other cases where you didn't give

19     any testimony?

20          A.    Yes.

21          Q.    Okay.  And were you always paid in

22     connection with those matters as well?

1      this case?

2           A.    I believe it was Michael Barry.  My

3      -- my firm was already doing some work on this

4      case in -- on another capacity, so the first

5      person I spoke to was either Michael Barry or

6      Sam Kaplan.

7           Q.    Okay.  And that's Dr. Joseph Mason

8      who is affiliated with your firm, BVA Group, is

9      also an expert for the plaintiffs in this case.

10                Is that -- that's what you are

11     referring to?

12          A.    Yes.

13          Q.    Okay.  And am -- am I understanding

14     correctly that Dr. Mason was already involved

15     in the case working as an expert for the

16     plaintiffs at the time that Mr. Barry or Mr.

17     Kaplan reached out to you about the case?

18          A.    That's my understanding, yes.

19          Q.    Okay.  When, to the best of your

20     recollection, did they first reach out to you

21     about this case?

22          A.    It -- it hasn't been that long.  It

Page 17

1    has only been a few months but I couldn't tell
2    you a date.
3         Q.    Okay.  Order of magnitude, four
4    months, five months, six months?
5         A.    Somewhere between four and six would
6    be my best remembrance.
7         Q.    Okay.  And -- and did they initially
8    ask you to serve as a summary witness?  Was
9    that their opening request?
10        A.    Yes.
11        Q.    Okay.  Did -- did they tell you or
12   do you have any understanding of why you were
13   asked to serve as a summary witness in this
14   case?
15        A.    My understanding is they needed a
16   summary witness to consolidate a lot of
17   materials that are publicly available and
18   present them in summary fashion.
19        Q.    Before they reached out to you in
20   the last four to six months or so to ask you to
21   serve as a summary witness in this case, did
22   you have any connection before that to this

1          and your team at BVA Group about this case?

2               A.    No.

3               Q.    Okay.  Plaintiffs have said that you

4          will testify about a number of different topics

5          or issues in this case.

6                     Are you aware of that?

7               A.    Yes.

8               Q.    Who determined what topics you will

9          testify about?

10              A.    Counsel.

11              Q.    Plaintiffs' counsel did?

12              A.    Yes.

13              Q.    They -- they just came and told you

14         which issues they would like you to testify

15         about?

16              A.    Yes.  They told me what information

17         they would like consolidated.

18              Q.    You did not prepare any expert

19         report in this case, right?

20              A.    Correct.

21              Q.    Were you ever asked to prepare an

22         expert report in this case?

Page 22

1       School and you are also a CPA, right?

2            A.    Correct.

3            Q.    Okay.  For your analyses in this

4       case, did you rely on any of your specialized

5       expertise either as an MBA or CPA or otherwise?

6            A.    No.

7            Q.    Other than your role as a summary

8       witness in this case, do you have any prior

9       experience or done any prior work relating to

10      Fannie Mae, Freddie Mac or FHFA?

11           A.    No.

12           Q.    Okay.  Have you done any other prior

13      work relating to the 2008 housing and financial

14      crisis?

15           A.    No.

16           Q.    None?

17           A.    None.

18           Q.    You are a partner at BVA Group,

19      right?

20           A.    Correct.

21           Q.    And BVA is an expert consulting

22      firm; is that right?

Page 29

1        Q.    Including for the time that you

2     spend testifying at trial as a summary witness

3     in this case?

4        A.    Yes.

5        Q.    Okay.  You are billing -- you are

6     charging the plaintiffs $850 an hour for your

7     time at today's deposition?

8        A.    Yes.

9        Q.    Do you have a written agreement with

10    plaintiffs or plaintiffs' counsel relating to

11    your work in this case, like, an engagement or

12    retainer agreement or letter?

13       A.    Yes.

14       Q.    Okay.  When was that -- do you

15    recall when was that signed?

16       A.    A few months ago.  I don't know

17    exactly.

18       Q.    Okay.  And you mentioned that you

19    have a team of people at BVA Group working with

20    you; is that right?

21       A.    That's correct.

22       Q.    How many people is that?

1    not as an expert, as a summary witness in this

2    case?

3         A.    Yes.

4         Q.    Okay.  And -- and how much do you

5    all charge the plaintiffs for those folks'

6    time?

7         A.    I think anywhere from 300 to 650 an

8    hour.

9         Q.    And do you know, either specifically

10   or just order of magnitude, how many hours have

11   those four people spent working, supporting you

12   in this case?

13        A.    I don't know.

14        Q.    Okay.  Do you have any sense for how

15   much you have invoiced the plaintiffs for the

16   time of those four people so far?

17        A.    I don't.

18        Q.    You would have to consult the -- the

19   invoices?

20        A.    Correct.

21        Q.    Okay.  Even order of magnitude, do

22   you have any sense, hundreds of dollars,

Page 53

1      word, does this list of topics that you are

2      going to address at trial match or line up with

3      your understanding of the topics that you are

4      going to address at trial?

5           A.    Everything except No. 3.  I don't

6      know that there was a discussion about HERA and

7      the date it was adopted, but that is easy to

8      look up, and No. 7, I was not asked by counsel

9      to look into the deferred tax asset issue.

10          Q.    Okay.  You -- on No. 7, am I right,

11     you have not been asked by plaintiffs' counsel

12     to look into the deferred tax assets or DTA

13     issue?

14          A.    Correct.

15          Q.    And have you looked into that issue,

16     the DTA issue?

17          A.    No.

18          Q.    Do you have any plans to look into

19     it?

20          A.    No.

21          Q.    Okay.  Do you have any plans to

22     offer any testimony at trial as a summary

Page 54

1        witness or otherwise about DTAs?

2              A.    No.

3              Q.    Have you -- have you been asked to

4        look at or testify about anything related to

5        loan loss reserves in this case?

6              A.    No.

7              Q.    Have you been asked to look at or

8        testify about anything relating to GAAP?

9              A.    No.

10             Q.    You are familiar with GAAP as a CPA,

11       sure.

12             A.    Yes.

13             Q.    Okay.  And you haven't been asked or

14       look at or testify to anything relating to GAAP

15       in this case?

16             A.    That's correct.

17             Q.    Okay.  Have you been asked to look

18       at or testify about anything relating to the

19       relationship between FHFA and Fannie or Freddie

20       with respect to accounting matters?

21             A.    Could you be more specific.

22             Q.    Have you ever heard or seen claims

1          or statements that FHFA forced Fannie or

2          Freddie to take certain -- or to take or make

3          certain accounting decisions?

4               A.    I have not looked into that.

5               Q.    Okay.  Have you been asked to look

6          into anything like that?

7               A.    No.

8               Q.    Do you have plans to look into those

9          issues?

10              A.    No.

11              Q.    Okay.  Other than No. 7 in this list

12         of topics in the -- in the July 8, 2022 e-mail

13         from Mr. Barry, and the question of whether the

14         date HERA was adopted, was one of the dates you

15         looked at in Topic 3, other than those two

16         items, does this list otherwise accurately and

17         completely describe the topics that you are

18         planning to cover in your testimony at trial?

19              A.    Yes, it does.

20              Q.    Other than what is listed here, are

21         there any other topics or issues that you are

22         planning to address in your testimony at trial

Page 65

1          Q.    Okay.  Who identified the particular

2     documents here that you're going to offer into

3     evidence and -- and read certain portions of

4     them out loud?

5          A.    Plaintiffs' counsel.

6          Q.    Okay.  And who identified which

7     portions of these documents you'll read?

8          A.    Plaintiffs' counsel.

9          Q.    Did you have any input -- did -- did

10     you or -- or anyone at BVA Group have any input

11     in selecting the particular documents listed

12     here that you will offer into evidence and read

13     certain portions out loud?

14          A.    No, we did not.

15          Q.    Did you or anyone at BVA Group have

16     any input in selecting the particular portions

17     of these documents that you will read out loud

18     at trial?

19          A.    No, we did not.

20          Q.    Have you been told which portions of

21     these documents you'll read out loud?

22          A.    Yes.

Page 67

1        A.    No.

2        Q.    Okay.  Do you have any understanding

3    of why these particular documents were chosen

4    by the plaintiffs' counsel for you to offer

5    into evidence and read certain portions of them

6    out loud at trial?

7        A.    I do not.

8        Q.    They never told you?

9        A.    No.

10        Q.    You never asked?

11        A.    No.

12        Q.    Okay.  Do you have any understanding

13    of how the plaintiffs' counsel went about

14    choosing which portions of each of these

15    documents you will read out loud at trial?

16        A.    No.

17        Q.    They never told you?

18        A.    No.

19        Q.    And you ever asked?

20        A.    No.

21        Q.    So what happened was the plaintiffs'

22    counsel identified these documents without any

1          input from you, identified specific portions of

2          the documents that they want you to read out

3          loud at trial, again without any input from

4          you, and you've -- you've looked at the

5          documents, you've read the parts that they want

6          you to -- to read into the record, and you're

7          planning to read those portions out loud at

8          trial, but not offer any additional testimony

9          about those documents.

10                   Is that all right?

11              A.    That's correct.

12              Q.    Okay.  Ju- -- just being given a

13          document with some of the text highlighted or

14          underlined and -- and reading it out loud, it

15          doesn't require -- well, anyone who can read

16          English could do that, right?

17              A.    Correct.

18              Q.    Okay.  Do you have any understanding

19          of why the plaintiffs are -- are paying $850 an

20          hour for you to just read documents out loud at

21          trial?

22              A.    I don't have an understanding of

Page 69

1          that.

2                Q.    All right.  Seems like a good gig.

3                     MR. JONES:  We've been going about

4          an hour.

5                     Do you want to take a short break or

6          keep going?  Totally -- I leave it totally to

7          y'all.

8                     THE WITNESS:  I would like to take a

9          short break if that's all right.

10                     MR. JONES:  Absolutely.  When --

11          whenever you like.

12                     How long -- it's 10 -- I have 10:43.

13                     Do you want to take 5 minutes, 10

14          minutes, 15 minutes?

15                     THE WITNESS:  10 minutes is fine.

16                     MR. JONES:  Let's -- Michael, can we

17          come back on at 10:55?

18                     MR. BARRY:  That's fine with me.

19          Thank you.

20                     MR. JONES:  Excellent.

21                     THE VIDEOGRAPHER:  The time is 9:43.

22          This ends Unit 1.

Page 83

1          A.     No.

2          Q.     They never asked you?

3          A.     No.

4          Q.     I mean, they never told you?

5          A.     No.

6          Q.     And you never asked?

7          A.     No.

8          Q.     Okay.  Unlike some of the other

9     topics that we look at that were listed in this

10    e-mail, this description of your testimony

11    about the certificates of designation under

12    Topic 1, it does not say that you are going to

13    read certain portions or any portions of the

14    certificates into the record, correct?

15         A.     Correct.

16         Q.     Okay.  And -- and is that your

17    understanding, that you're not going to read

18    out loud into the record any portions of the

19    certificates of designation, you're just going

20    to explain certain of the terms in your own

21    words?

22         A.     I can't remember if this has changed

Page 84

1    since this document.  It may have, but I can't

2    remember.

3         Q.    Okay.  Well, at least as of the time

4    of -- of this document, which the plaintiffs'

5    counsel wrote, the -- the plan as of this time

6    was -- was just for you to describe certain of

7    the terms in the certificates of designation

8    using the language in red there that the

9    plaintiffs' counsel wrote, right?

10        A.    That's correct.

11        Q.    Okay.  Other than just reading what

12   the plaintiffs' counsel wrote here in red for

13   you to say about the certificates of

14   designation, are you planning to offer any

15   other testimony or analysis or summary of the

16   certificates of designation?

17        A.    I'm willing to ask -- answer

18   questions about which Certificate of

19   Designation to the extent I've reviewed them.

20        Q.    Okay.  Other than what is disclosed

21   here under Topic 1 in this e-mail, which the

22   plaintiffs' counsel wrote regarding your

Page 86

1      portions of those documents into the record,

2      you're not going to read portions of the

3      certificates of designation into the record,

4      but -- but you are effectively going to read or

5      recite what the plaintiffs' counsel have

6      written here about certain terms of the

7      certificates, right?

8           A.   Yes, I'm going to discuss certain

9      terms of the certificates.

10          Q.   Okay.  And -- and you're going to

11     explain those terms of the certificates, which

12     the plaintiffs' counsel identified, and you're

13     going to explain them in the manner in which

14     they are described here in the July 29th

15     e-mail, right?

16               MR. BARRY:  Objection.

17               THE WITNESS:  Yes.

18               A summary of what the terms are,

19     certain terms.

20               BY MR. JONES:

21          Q.   Okay.  You're going to provide what

22     you describe as a summary of certain terms, the

1      underlying and I looked at the underlying

2      documentation to confirm dates of each of these

3      events.

4          Q.    Okay.  So other than looking at

5      underlying documentation for each event to

6      confirm the date in order to put them in

7      chronological order, this timeline is not

8      otherwise a summary of any other document or

9      source?

10         A.    Other than what it shows to be,

11     which is the timeline of certain events.

12         Q.    Okay.  It is just a chronological

13     timeline of events that were selected by the

14     plaintiffs' counsel without any input from you?

15         A.    Correct.

16         Q.    Okay.  Do you know who wrote the

17     description of each event in this -- in this

18     timeline graphic?

19         A.    I do not know the answer to that.

20         Q.    Okay.  Possible that your staff were

21     involved?

22         A.    Yes.

Page 110

1      Amendment" and "Executed," and then there is a

2      separate entry for:  "Third Amendment's Net

3      Worth Sweep Takes Effect."

4                Do you see that?

5         A.    Yes.

6         Q.    Okay.  Are there any events that you

7      considered, you or your staff considered

8      including in this timeline but ultimately did

9      not include?

10        A.    No.

11        Q.    Okay.  You and your staff just

12     didn't have any input at all on what particular

13     events either are or are not included on this

14     timeline, right?

15                These events were just given to you

16     and you found their dates and included them,

17     right?

18        A.    Correct.

19        Q.    This timeline doesn't include

20     anything about the periodic commitment fee or

21     the PCF under the PSPAs; is that right?

22        A.    Yes.

Page 116

1          description that the plaintiffs wrote -- the

2          plaintiffs' counsel wrote of your testimony on

3          that topic, right?

4               A.    Yes.

5               Q.    Okay.  Have you -- have you read

6          this description written by the plaintiffs'

7          counsel of your testimony about the PSPAs and

8          the various amendments before?

9               A.    Yes, I have.

10              Q.    Was that about a month ago when you

11         -- when you first received this -- this list?

12              A.    Yes, I have read them several times.

13              Q.    Okay.  This topic, just testifying

14         about the PSPAs and the various amendments to

15         them, it doesn't involve any calculation or

16         computation, right?  It doesn't involve any

17         data?

18              A.    Correct.

19              Q.    Okay.  These are just shareholder

20         agreements between treasury and each of -- of

21         Fannie and Freddie and various amendments to

22         those shareholder agreements and you have read

Page 117

1        them and you are going to effectively

2        paraphrase them in your testimony; is that

3        right?

4              A.    That's correct.

5              Q.    Sorry, I didn't hear.

6              A.    Sorry.  That's correct.

7              Q.    Okay.  You have read the PSPAs and

8        all of the amendments; is that right?

9              A.    Yes.

10             Q.    Okay.  So for each agreement, for

11       each PSPA and each amendment, there is one for

12       Fannie and one for Freddie, right?

13             A.    Yes.

14             Q.    Okay.  And for each agreement and

15       each amendment, the Fannie version and the

16       Freddie version are virtually substantively

17       identical other than just changing their names,

18       right?

19                   MR. BARRY:  Objection.  Lacks

20       foundation.  It's also not correct.

21                   THE WITNESS:  Yes, except for one

22       letter agreement, I believe changes the capital

Page 121

1              A.    That's right.

2              Q.    Okay.  Am I correct in understanding

3        that your explanation of those terms, those

4        specific agreement or amendment terms that the

5        plaintiffs' counsel asked you to specifically

6        highlight, your descriptions of them, your

7        paraphrasing of them will be consistent with

8        what the plaintiffs' counsel have written here

9        about them, right?

10             A.    Yes.

11             Q.    In -- in paraphrasing -- well,

12       strike that.

13                   In focusing on certain terms of the

14       PSPAs and amendments that the plaintiffs'

15       counsel direct you to and paraphrasing those

16       specific terms in your testimony, are you

17       relying on any specialized training or

18       knowledge or expertise or education or

19       familiarity with these types of documents?

20             A.    No.

21             Q.    Okay.  Any -- any layperson could do

22       this, could just be handed these documents,

Page 127

1      wrote that you will offer into evidence the

2      Form 8-K filed by Freddie Mac on September 11,

3      2008, and will read certain portions into the

4      record?

5           A.    Yes.

6           Q.    Okay.  So this is one of the

7      documents that we talked about earlier where

8      you were just going to offer this document into

9      evidence and read certain portions of it that

10     the plaintiffs' counsel direct into the record,

11     right?

12          A.    Correct.

13          Q.    And you are not going to offer any

14     other testimony about this document?

15          A.    Correct.

16          Q.    Okay.  Have you -- have you received

17     a copy of this document before?

18          A.    Yes.

19          Q.    Did you read it?

20          A.    I -- that one may be -- I think I

21     received that recently.  I have not read it

22     yet.

Page 213

1      will offer into evidence 12 U.S.C. Section 4617

2      and will read into the record the following

3      subsections of that statute:  (A)(1) and (2)

4      and (b)(1), (b)(2)(A) through (D), (G), and

5      (H).

6                  Did I read that correctly?

7          A.    Yes.

8          Q.    Okay.  What is 12 U.S.C. Section

9      4617 in your understanding?

10         A.    I do not know.

11         Q.    Okay.  Do you know what U.S.C.

12     stands for?

13         A.    United States Supreme Court?

14         Q.    No.

15         A.    Oh.

16         Q.    It stands for United States Code.

17     That -- so the -- the thing that you are going

18     to testify about here at trial in a couple of

19     months is a -- is a federal statute.  It's 12

20     U.S. Code Section 4617.  It's a part of the

21     Housing and Economic Recovery Act of 2008.

22                  Were you familiar with that before

1    compares Fannie and Freddie's year-over-year

2    comprehensive income for Q1 and Q2 2012

3    compared to the same quarters in 2011?

4         A.    It's more -- sorry -- 2008 through

5    2012 and then 2013 going forward comparing that

6    comprehensive -- comprehensive income of which

7    those quarters would be a subset.

8         Q.    Okay.  So the -- you would -- you

9    are saying that from that graphic it would

10   include the figures that would allow you to

11   draw the comparison that is described here, the

12   year-over-year comparison between Q1 and Q2

13   2012 versus 2011?

14        A.    It's -- the way it's presented in

15   the graphic is broader than that.  It's years

16   2008 through 2012 and then 2013 to the present,

17   but that encompasses these quarters we're

18   talking about.  But it doesn't directly compare

19   them the way this paragraph does.

20        Q.    Okay.  Do you know anything about

21   why plaintiffs want you to compare the

22   year-over-year comprehensive income for Fannie

Page 252

1          and Freddie specifically in the first and
2          second quarters of 2012 compared to 2011?
3                    MR. BARRY:  Objection.  Beyond the
4          scope of her testimony as a summary witness.
5                    THE WITNESS:  I do not know.
6                    BY MR. JONES:
7               Q.    Okay.  They didn't tell you, and you
8          didn't ask?
9               A.    That's correct.
10              Q.    Okay.  Were you -- were you asked to
11         do any other specific comparisons of
12         comprehensive income in any other quarters of
13         any other years besides the first two quarters
14         of 2012 compared to 2011?
15              A.    Not specific quarters over quarters,
16         but as I said, they are encompassed in the
17         broader graphs we put together about
18         comprehensive income from 2008 through 2012
19         versus 2013 though present.
20              Q.    Okay.  The next two paragraphs there
21         in Exhibit 1 identify two more documents that
22         they say plaintiffs' counsel wrote you are

Page 258

1          Q.    So you see here there's a section

2     starting around the middle of the page that's

3     labeled "Dividend Obligation on the Senior

4     Preferred Stock"?

5          A.    Yes.

6          Q.    And you understand that refers to

7     the Freddie Mac, the senior preferred stock

8     issued to the Treasury Department?

9          A.    Yes.

10         Q.    Okay.  And the --

11              MR. BARRY:  First, objection to the

12     extent because this exceeds her scope of her

13     testimony as a summary witness.  We didn't

14     designate this for her to read -- read into the

15     record.

16              BY MR. JONES:

17         Q.    The second paragraph there says "The

18     payment of dividends on our," that is Freddie

19     Mac's, "senior preferred stock in cash reduces

20     our net worth."

21              And that's -- that's consistent with

22     your understanding, right, Ms. Hartman?

Page 279

1                    MR. BARRY:  I just want to clarify

2         that's -- we're not hiding the ball on that

3         one.

4                    MR. JONES:  Got it.  Yeah, we got --

5         we got the graphics last week.

6                    BY MR. JONES:

7         Q.    I gather plaintiffs' counsel just

8         told you that they want you to introduce this

9         index into evidence and provide some testimony

10        about it?

11        A.    Yes.

12        Q.    Did -- did they tell you anything

13        about why they want that?

14        A.    No.

15        Q.    Okay.  So after they asked you to go

16        -- after they -- after they told you about the

17        existence of this home price index, which you

18        had never heard of before, and asked you to --

19        they asked you to go do some analysis about it

20        and create some graphics; is that right?

21        A.    They introduced us -- us to it and

22        someone from my team pulled the graphic

1     directly from the Case-Shiller website.

2         Q.   So the -- the graphics that you

3     produced us to us --

4              MR. JONES:  Can we just pull those

5     up.

6              BY MR. JONES:

7         Q.   Are your graphics relating to the

8     home price index pulled directly from the

9     website you -- that is, you didn't create them?

10        A.   Exactly.

11        Q.   Okay.

12             MR. JONES:  Can we just flip to

13    those.

14             BY MR. JONES:

15        Q.   Okay.  So this is one of your

16    graphics.  This is Exhibit 3 to the deposition,

17    one of your graphics about the Case-Shiller

18    index; is that right?

19        A.   Correct.

20        Q.   And then can we scroll down.

21             This is another one?

22        A.   Yes.

Page 281

1          Q.    Are those the only two?

2          A.    Yes.

3          Q.    And these -- these graphics, do I

4     understand correctly you and your team did not

5     create these?  All you did was download them

6     or -- or screen shot them from a website and

7     embed them in your list of graphics here?

8          A.    Yes.

9                But on the website you can put in a

10    date range.  So once you put in the date range

11    the -- the graphic shows up and you can pull it

12    into and that's what we did.

13         Q.    So all you did was plug in a date

14    range to this website and the website then

15    produced this exact graphic, which you have

16    just embedded in your graphics?

17         A.    Correct.

18         Q.    Okay.  So you didn't -- you did not

19    alter it or manipulate it or summarize it in

20    any way.  You just took this graph -- this

21    graphic exactly as the website gave it to you

22    once you put in the date range, and that's what

Page 282

1          we're looking at now?

2                    A.      Correct.

3                    Q.      And that's the same for both of

4          these?

5                    A.      Yes, just different date ranges.

6                    Q.      Okay.  Before this case, had you

7          ever encountered or done any work relating to

8          any other home price index besides the

9          S&P/Case-Shiller?

10                   A.      No.

11                   Q.      Okay.  So all of your exposure to

12         and familiarity with home price indexes, both

13         this one specifically and all of them

14         generally, is exclusively from your work on

15         this case for the plaintiffs in the last few

16         months, right?

17                   A.      Yeah, this is -- my knowledge of

18         this index is the website and pulling these two

19         graphs directly from that website.

20                   Q.      Okay.  Does the website allow you to

21         pull different graphs that would show different

22         things other than these two?

Page 283

1          A.    You can change the dates and you can

2     change whether it's run annually, monthly,

3     biannually.  I don't know much more than that

4     about how you can change the fields.

5          Q.    Did -- did you actually do the work

6     of sort of inserting the parameters into the

7     website that produced --

8               MR. BARRY:  Objection.

9               THE WITNESS:  I personally did not,

10    but I looked at it with my team.

11              BY MR. JONES:

12         Q.    Okay.  But your understanding is

13    that you could insert different parameters,

14    both different date ranges and also other

15    different parameters and the website would

16    produce for you different graphs; is that

17    right?

18         A.    But they've use the same underlying

19    data.  But depending on date ranges or how you

20    want it calculated, it would look differently.

21         Q.    Okay.  And so these charts, these

22    graphs that appear in your graphics here are

Page 284

1          based on the date range parameter and some
2          other parameters that you and your team plugged
3          into the website?
4               A.    No, I believe these both were
5          calculated monthly.
6               Q.    Okay.  Who made the decision about
7          which date range and other parameters to plug
8          into the Case-Shiller index website to produce
9          these graphs?
10              A.    I believe it was plaintiffs'
11         counsel.
12              Q.    Okay.  Did -- did your team actually
13         do this and create these, or did the
14         plaintiffs' counsel create them or just
15         specifically directly how -- to direct you-all
16         how to create them?
17              A.    No, my team created them on the
18         Case-Shiller website.
19              Q.    Okay.  Your team created these
20         graphs on the Case-Shiller website using date
21         range and other para- -- other parameters that
22         were directed to you by the plaintiffs'

Page 285

1          counsel?

2                A.    Yes.

3                Q.    Okay.  Other than what you mentioned

4          earlier about what this home price index is,

5          what else do you plan to tell the jury about

6          these graphics or otherwise about the

7          Case-Shiller index?

8                A.    Just -- like, we just talked about

9          what it is and if asked about what this trend

10         shows.

11               Q.    Okay.  If -- if asked what this

12         trend shows, what would your testimony be?

13               A.    That beginning in 2007, it's up

14         above 180, it dips down below to -- be -- right

15         below 140 in 2012 and then gradually increases

16         into 2022 to above where it was in 2007.

17               Q.    Okay.  Would it also be fair to say

18         that as of early 2012, it -- the trend had been

19         consistently downward since the beginning of

20         your date range parameter here?

21               A.    Yes.

22               Q.    Had been -- it would be fair to say

Page 297

1           A.     No, I'm -- it's a graph.

2           Q.     One of the graphics?

3           A.     Yes.

4           Q.     Okay.

5                  MR. JONES:  All right.  I have no

6      more questions.  Thank you for your time this

7      afternoon.

8                  THE WITNESS:  Thank you.

9                  MR. BARRY:  This deposition is

10     concluded.  Thank you.

11                 THE VIDEOGRAPHER:  The time is 3:27

12     p.m.

13                 We're off the record.

14                 (Whereupon, the proceeding was

15     concluded at 3:27 p.m.)

16

17

18

19

20

21

22