# EXHIBIT I

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, D.C. 20549**

**Exhibit**
**0004**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): September 6, 2008

**FEDERAL HOME LOAN MORTGAGE CORPORATION**
*(Exact name of registrant as specified in its charter)*
**Freddie Mac**

| **Federally chartered corporation** | **000-53330** | **52-0904874** |
|---|---|---|
| *(State or other jurisdiction of incorporation)* | *(Commission File Number)* | *(IRS Employer Identification No.)* |

| **8200 Jones Branch Drive McLean, Virginia** | **22102** |
|---|---|
| *(Address of principal executive offices)* | *(Zip Code)* |

Registrant's telephone number, including area code: **(703) 903-2000**

**Not applicable**
*(Former name or former address, if changed since last report)*

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions *(see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01.  Entry into a Material Definitive Agreement**

On September 6, 2008, the Board of Directors (the "Board") of Freddie Mac (formally known as the Federal Home Loan Mortgage Corporation) adopted a resolution consenting to the appointment of the Federal Housing Finance Agency ("FHFA") as conservator of Freddie Mac. On September 6, 2008, the Director of FHFA (the "Director") appointed FHFA as conservator of Freddie Mac in accordance with the Federal Housing Finance Reform Act of 2008 (the "Reform Act") and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. In a statement made on September 7, 2008, the Director stated his conclusion that Freddie Mac could not continue to operate safely and soundly and fulfill its mission without significant action and summarized the FHFA's concerns in this regard. A copy of the Director's statement is attached as Exhibit 99.1 to this report. On the same day, the Secretary of the U.S. Department of the Treasury ("Treasury") made a statement concerning the appointment of the FHFA as conservator of Freddie Mac. A copy of the Secretary's statement is attached as Exhibit 99.2 to this report.

On September 7, 2008, in connection with the appointment of FHFA as conservator, Freddie Mac and Treasury entered into a Senior Preferred Stock Purchase Agreement ("Purchase Agreement"). A copy of the Purchase Agreement is attached as Exhibit 10.1 to this report. The principal terms of the Purchase Agreement are as follows:

As consideration for Treasury's entry into the Purchase Agreement, Freddie Mac has issued $1 billion aggregate liquidation preference of senior preferred stock to Treasury, together with a warrant for the purchase of common stock representing 79.9% of Freddie Mac's common stock on a fully diluted basis, determined as of the exercise date. The warrant is exercisable at any time and from time to time through September 7, 2028 at a price of $0.00001 per share.

The senior preferred stock will pay quarterly cumulative dividends at a rate of 10% per year, or 12% in any quarter in which dividends are not paid in cash, until all accrued dividends have been paid in cash. If FHFA determines that Freddie Mac's liabilities have exceeded its assets (excluding Treasury's commitment and any unfunded amounts thereof under the Purchase Agreement) under generally accepted accounting principles, Treasury will contribute funds to Freddie Mac in an amount equal to the difference between such liabilities and assets. The maximum aggregate amount funded under the Purchase Agreement is $100 billion. An amount equal to each such contribution will be added to the aggregate liquidation preference of the senior preferred stock. In addition, Freddie Mac will be required to pay a quarterly commitment fee to Treasury based on the market value of Treasury's commitment, in an amount to be determined, beginning March 31, 2010. At the election of Freddie Mac, it may pay the quarterly commitment fee in cash or by adding the amount of such fee to the aggregate liquidation preference of the senior preferred stock held by Treasury. The senior preferred stock will be senior to all other existing or future issues of preferred stock, common stock or other capital stock of Freddie Mac.

The Purchase Agreement provides that, without the prior consent of Treasury, Freddie Mac shall not:

- Make any payment to purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other than dividends on the senior preferred stock);

- Issue capital stock of any kind (other than the senior preferred stock, the warrant or any shares of common stock issued pursuant to the warrant);

- Terminate the conservatorship other than in connection with a receivership;

- Sell, transfer, lease or otherwise dispose of any of its assets outside the ordinary course of business except under limited circumstances, including as necessary to meet its obligation under the Purchase Agreement to reduce Freddie Mac's portfolio of retained mortgages and mortgage-backed securities;

- Increase Freddie Mac's total indebtedness to more than 110% of its indebtedness as of June 30, 2008 or become liable for any subordinated indebtedness;

- Acquire or consolidate with, or merge into, another entity; or

- Engage in any transaction with an affiliate unless the terms of such transaction are no less favorable to Freddie Mac than in an arm's-length transaction with a non-affiliate or such transaction is undertaken in the ordinary course or pursuant to an existing contractual obligation or customary employment arrangement.

Under the Purchase Agreement, Freddie Mac shall not, without the consent of the Director in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any "named executive officers" of Freddie Mac.

In addition, Freddie Mac's retained mortgage and mortgage-backed securities portfolio as of December 31, 2009 may not exceed $850 billion, and must decline by 10% per year thereafter until it reaches $250 billion.

### Item 1.03.  Bankruptcy or Receivership

See Item 1.01 above for a description of the appointment of FHFA as conservator of Freddie Mac.

### Item 3.01.  Notice of Delisting or Failure to Satisfy a Continued Listing Rule or Standard; Transfer of Listing

Since September 7, 2008, we have been in discussions with the New York Stock Exchange (NYSE) concerning the effect of conservatorship on our ongoing compliance with the NYSE's corporate governance listing standards. At this time, we have not been notified by the NYSE that we are not in compliance with these listing standards. We continue to be in discussions with the NYSE.

### Item 3.02.  Unregistered Sales of Equity Securities

In connection with the Purchase Agreement, Treasury acquired $1 billion in senior preferred stock of Freddie Mac as of September 8, 2008 as consideration for entering into the Purchase Agreement. See Item 1.01 above. The terms of the senior preferred stock are set forth in the Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock, a copy of which is attached as Exhibit 4.2 to this report.

Pursuant to the Purchase Agreement, Freddie Mac issued to Treasury on September 7, 2008 a warrant for the purchase of common stock of Freddie Mac representing 79.9% of the common stock of Freddie Mac on a fully diluted basis at a price of $0.00001 per share. See Item 1.01 above.

The senior preferred stock and the warrant were issued directly to Treasury by Freddie Mac in consideration of the commitment set forth in the Purchase Agreement, and for no additional consideration. The senior preferred stock and the warrant were issued without the participation

of an underwriter or placement agent. A copy of the warrant is attached to this report as Exhibit 10.2.

Under its Congressional charter, securities issued by Freddie Mac are "exempted securities" for purposes of the Securities Act of 1933. Accordingly, no registration statement for the issuance of the senior preferred stock or the warrant has been filed with the SEC.

**Item 3.03.  Material Modification to Rights of Security Holders**

Under the terms of the Purchase Agreement, the senior preferred stock ranks senior to all other existing and future issues of preferred stock, common stock or other capital stock of Freddie Mac.

On September 7, 2008, the Director of FHFA, acting as conservator for Freddie Mac, adopted a resolution eliminating the par value of Freddie Mac's common stock and approving any amendment to the Seventh Amended and Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock of Freddie Mac (the "Common Stock Certificate") necessary for such elimination. The resolution also increased the number of shares of Freddie Mac common stock authorized for issuance to 4,000,000,000 and approved any amendment to the Common Stock Certificate necessary for such increase. A copy of the amended Common Stock Certificate is attached as Exhibit 4.1 to this report.

As conservator, FHFA has succeeded to all rights and powers of Freddie Mac's common and preferred stockholders. The Purchase Agreement provides that, without the prior consent of Treasury, Freddie Mac shall not make any payment to purchase or redeem its capital stock, or pay any dividends, including preferred dividends (other than dividends on the senior preferred stock). The holders of Freddie Mac's existing common stock and preferred stock (other than the senior preferred stock) will retain all their rights in the financial worth of those instruments, as such worth is determined by the market.

**Item 5.01.  Changes in Control of Registrant**

On September 6, 2008 the Director of FHFA appointed FHFA as conservator of Freddie Mac in accordance with the Reform Act and the Federal Housing Enterprises Financial Safety and Soundness Act of 1992. As conservator, FHFA is in control of Freddie Mac.

Specifically, the Reform Act provides that FHFA, as conservator, has

(i)   all rights, titles, powers, and privileges of Freddie Mac, and of any stockholder, officer, or director of Freddie Mac with respect to Freddie Mac and its assets; and

(ii)  title to the books, records, and assets of any other legal custodian of Freddie Mac.

As conservator, FHFA is authorized under the Reform Act to, among other things:

(i)   take over the assets of and operate Freddie Mac with all the powers of the shareholders, the directors, and the officers of Freddie Mac and conduct all the business of Freddie Mac;

(ii)   collect all obligations and money due to Freddie Mac;

(iii)   perform all functions of Freddie Mac in the name of Freddie Mac which are consistent with the FHFA's appointment as conservator;

(iv)   preserve and conserve the assets and property of Freddie Mac; and

(v)   provide by contract for assistance in fulfilling any function, activity, action, or duty of FHFA as conservator.

The exercise by Treasury of its warrant to purchase 79.9% of the common stock of Freddie Mac would result in Treasury holding a majority of Freddie Mac's common stock.

**Item 5.02.  Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers**

On September 7, 2008, the Director of FHFA, acting as conservator for Freddie Mac, appointed David M. Moffett as Chief Executive Officer of Freddie Mac, effective immediately. Mr. Moffett replaces Richard F. Syron as Chief Executive Officer.

Mr. Moffett, age 56, was a Senior Advisor at The Carlyle Group since August 2007 until his resignation on September 7, 2008. From February 2001 until February 2007, Mr. Moffett was Vice Chairman and Chief Financial Officer of U.S. Bancorp. Information with respect to the terms of Mr. Moffett's employment is not yet determined or available.

**Item 8.01.  Other Events**

**Treasury GSE Credit Facility**

Pursuant to its authority under the Reform Act, Treasury has established the Government Sponsored Enterprise Credit Facility ("GSECF"). The GSECF is a lending facility to ensure credit availability to Freddie Mac, Fannie Mae, and the Federal Home Loan Banks that will provide secured funding on an as needed basis under terms and conditions established by the Secretary of the Treasury to protect taxpayers. The facility will offer liquidity if needed until December 31, 2009.

Any funding to Freddie Mac under the GSECF will be provided directly by Treasury in exchange for eligible collateral consisting of guaranteed mortgage-backed securities issued by Freddie Mac, with appropriate collateral margins as determined by Treasury.

Loans under the GSECF will be for short-term durations and would in general be expected to be for less than one month but no shorter than one week. The term of a loan may not be extended, but a maturing loan may be replaced with a new loan under the same borrowing procedures as the initial loan. The rate on a loan request ordinarily will be based on the daily LIBOR fix for a similar term of the loan plus 50 basis points (LIBOR +50 bp). The rate is set at the discretion of the Secretary of the Treasury with the objective of protecting the taxpayer, and is subject to change.

**Treasury MBS Purchase Program**

Pursuant to its authority under the Reform Act, Treasury announced a program under which Treasury will purchase Government Sponsored Enterprise ("GSE") mortgage-backed securities ("MBS") in the open market. The size and timing of Treasury's investments in agency MBS will be subject to the discretion of the Secretary of the Treasury. The scale of the program will be based on developments in the capital markets and housing markets. Treasury's authority to purchase MBS expires on December 31, 2009.

Treasury will designate independent asset managers as financial agents to undertake the purchase and management of a portfolio of GSE MBS on behalf of Treasury. The primary objectives of this portfolio will be to promote market stability, ensure mortgage availability, and protect the taxpayer.

**Ratings**

Various credit ratings assigned to Freddie Mac and its securities have recently been revised by nationally recognized statistical rating organizations. The table below reflects our credit ratings as of September 8, 2008.

|  | **Standard & Poor's** | **Moody's** | **Fitch** |
|---|---|---|---|
| Senior Long-Term Debt | AAA | Aaa | AAA |
| Short-Term Debt | A-1+ | P-1 | F-1+ |
| Subordinated Debt | BBB+/Watch Positive | Aa2 | AA-/Rating Watch Evolving |
| Preferred Stock | C | Ca | C/RR6 |
| Risk-to-the-Government | NR (Not Rated) | Not Applicable | Not Applicable |
| Bank Financial Strength | Not Applicable | E+ | Not Applicable |

Ratings are not a recommendation to purchase, hold or sell securities and may be changed, suspended or withdrawn at any time by the assigning rating agency. Freddie Mac's current ratings and the rating outlooks currently assigned to Freddie Mac are dependent upon economic conditions and other factors affecting credit risk that are outside the control of Freddie Mac. Each rating should be evaluated independently of the others. Detailed explanations of the ratings may be obtained from the rating agencies. The information above was obtained from information available on the websites of the rating agencies.

**Impact of Transactions**

The company is evaluating the impact of the transactions described in this report on its current and future business model and earnings as well as on its future reported results of operations and financial condition. Such impact may be material and could cause actual results to differ materially and adversely from our previously stated expectations and other forward-looking statements, including, among other things, with respect to portfolio growth, capital, deferred tax assets, credit losses, loan loss reserves, other than temporary impairment of MBSs and other matters.

**Forward-Looking Statements**

This Report includes forward-looking statements, which include matters relating to the conservatorship and expectations related to our operating results, financial condition, business, capital management, credit losses, trends and other matters. You should not rely unduly on our forward-looking statements. Actual results might differ significantly from those described in or implied by such forward-looking statements due to various factors and uncertainties.

**Item 9.01.  Financial Statements and Exhibits**

 **(d)  Exhibits**

The following exhibits are being filed as part of this Report on Form 8-K:

| Exhibit Number | Description of Exhibit |
| --- | --- |
| 4.1 | Eighth Amended and Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock (no par value per share), dated September 10, 2008 |
| 4.2 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (par value $1.00 per share), dated September 7, 2008 |
| 10.1 | Senior Preferred Stock Purchase Agreement dated as of September 7, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed conservator |
| 10.2 | Warrant to Purchase Common Stock, dated September 7, 2008 |
| 99.1 | Statement of FHFA Director James B. Lockhart dated September 7, 2008 |
| 99.2 | Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers dated September 7, 2008 |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

FEDERAL HOME LOAN MORTGAGE
CORPORATION

By:   /s/  David M. Moffett
        David M. Moffett
        Chief Executive Officer

Date: September 11, 2008

**EXHIBIT INDEX**

| Exhibit Number | Description of Exhibit |
|---|---|
| 4.1 | Eighth Amended and Restated Certificate of Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Voting Common Stock (no par value per share), dated September 10, 2008 |
| 4.2 | Certificate of Creation, Designation, Powers, Preferences, Rights, Privileges, Qualifications, Limitations, Restrictions, Terms and Conditions of Variable Liquidation Preference Senior Preferred Stock (par value $1.00 per share), dated September 7, 2008 |
| 10.1 | Senior Preferred Stock Purchase Agreement dated as of September 7, 2008, between the United States Department of the Treasury and Federal Home Loan Mortgage Corporation, acting through the Federal Housing Finance Agency as its duly appointed conservator |
| 10.2 | Warrant to Purchase Common Stock, dated September 7, 2008 |
| 99.1 | Statement of FHFA Director James B. Lockhart dated September 7, 2008 |
| 99.2 | Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers dated September 7, 2008 |

Exhibit 4.1

**FREDDIE MAC**

**EIGHTH AMENDED AND RESTATED CERTIFICATE OF DESIGNATION,
POWERS, PREFERENCES, RIGHTS, PRIVILEGES, QUALIFICATIONS,
LIMITATIONS, RESTRICTIONS, TERMS AND CONDITIONS
of
VOTING COMMON STOCK
(No Par Value Per Share)**

I, ROBERT E. BOSTROM, Corporate Secretary of the Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America ("Freddie Mac"), do hereby certify, pursuant to resolutions adopted on September 7, 2008 by the Federal Housing Finance Agency in its capacity as the conservator of Freddie Mac (the "Conservator") and the authority delegated to the authorized officers thereunder (which resolutions are in full force and effect), that:

— Pursuant to Section 304(a) of the Federal Home Loan Mortgage Corporation Act, as amended (12 U.S.C. §1453(a)) (the "Freddie Mac Act"), the voting common stock of Freddie Mac (the "Common Stock") shall be issued to such holders and in the manner and amount, and subject to any limitations on concentration of ownership, as Freddie Mac prescribes; and

— The Common Stock has the following designation, powers, rights, privileges, qualifications, limitations, restrictions, terms and conditions:

**1. Designation, Par Value and Number of Shares.**

The Common Stock of Freddie Mac shall be designated "Common Stock," shall have no par value per share, and shall consist of 4,000,000,000 shares that have been issued or authorized for issuance (without limitation upon the authority of the Board of Directors to authorize the issuance of additional shares from time to time).

**2. Dividends.**

(a) The holders of outstanding shares of Common Stock shall be entitled to receive, ratably, dividends (in cash, stock or other property), when, as and if declared by the Board of Directors out of assets legally available therefor. The amount of dividends, if any, to be paid to holders of the outstanding Common Stock from time to time and the dates of payment shall be fixed by the Board of Directors of Freddie Mac (the "Board of Directors"). Each such dividend shall be paid to the holders of record of outstanding shares of the Common Stock as they appear in the books and records of Freddie Mac on such record date, not to be earlier than 45 days nor later than 10 days preceding the applicable dividend payment date, as shall be fixed in advance by the Board of Directors.

(b) Holders of shares of Common Stock shall not be entitled to any dividends, in cash, stock or other property, other than as herein provided and shall not be entitled to interest, or any sum in lieu of interest, on or in respect of any dividend payment.

**3. Voting Rights.**

(a) The holders of the outstanding shares of Common Stock shall have the right to vote (i) for the election of directors of Freddie Mac to the extent prescribed by applicable federal law, (ii) with respect to the amendment, alteration, supplementation or repeal of the provisions of this Certificate to the extent provided in Section 10(h) hereof, and (iii) with respect to such other matters, if any, as may be prescribed by the Board of Directors, in its sole discretion, or by applicable federal law; provided, however, that no vote shall be cast or counted in respect of any shares of Common Stock which, pursuant to procedures implemented in accordance with Section 7(b) hereof, may not be voted, nor shall such shares be considered outstanding for the purposes of calculating the requisite number or percentage of shares whose vote is required as to any matter.

(b) Holders of the outstanding shares of Common Stock entitled to vote shall be entitled to one vote per share on all matters presented to them for their vote. Such vote shall be cast in person or by proxy at a meeting of such holders or, if so determined by the Board of Directors, by written consent of the holders of the requisite number of

1

shares of Common Stock. In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of Common Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the vote of holders of Common Stock at any such meeting or otherwise, as to the conduct of such vote, as to quorum requirements therefor, as to the requisite number or percentage of affirmative votes required for the approval of any matter and as to all related questions. Such rules and procedures shall conform to the requirements of any national securities exchange on which the Common Stock may be listed.

## 4. No Redemption.

Freddie Mac shall not, and shall not have the right to, redeem any shares of Common Stock whether for cash, stock or other property.

## 5. No Conversion Rights.

The holders of shares of Common Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligation of Freddie Mac.

## 6. No Preemptive Rights.

No holder of Common Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of Freddie Mac which at any time may be sold or offered for sale by Freddie Mac.

## 7. Ownership Reports.

(a) Except as otherwise provided herein, any beneficial owner (as such term is defined in Securities and Exchange Commission ("SEC") Rule 13d-3 under the Securities Exchange Act of 1934 (the "Exchange Act")) of the outstanding Common Stock shall furnish in writing to Freddie Mac and to each exchange where the Common Stock is listed such statements of beneficial ownership of the Common Stock, and amendments thereto, on such forms, in such time periods and in such manner as would be required by Exchange Act Sections 13(d) and 13(g) and by SEC regulations thereunder if the Common Stock were an equity security of a class registered under Exchange Act Section 12. Statements of beneficial ownership furnished to Freddie Mac under this Section 7 shall be publicly available and may be furnished to any person upon request and payment of any costs therefor, and Freddie Mac shall assume no liability for the contents of such documents. All references to the Exchange Act and any rules and regulations promulgated thereunder shall mean such statute, or such rules and regulations, as amended and in effect from time to time, including any successor statute, rules or regulations.

(b) The CEO or his designee shall be empowered to take such steps and implement such procedures as he deems to be necessary or appropriate to ensure compliance with the reporting requirements set forth in this Section 7, including the refusal to permit the voting of any excess shares of Common Stock beneficially owned by any person failing to comply with such requirements. For purposes of this Section 7, excess shares shall include all shares of Common Stock beneficially owned by a person other than that number of shares the beneficial ownership of which would not give rise to a reporting obligation if such number constituted all of the shares beneficially owned by such person.

(c) Any beneficial owner of shares of Common Stock believed by Freddie Mac to be in violation of the reporting requirements imposed by this Section 7 shall be required to respond to inquiries by the CEO or his designee made for the purpose of determining the existence, nature or extent of any such violation. Such inquiry shall be made in writing sent by first class mail, postage prepaid, shall set forth the reporting requirements referred to in this Section 7 and shall require such beneficial owner to provide Freddie Mac with such information concerning such beneficial ownership as may be specified in such inquiry. If such inquiry shall not have been responded to in a manner satisfactory to Freddie Mac within five business days after the date on which it was mailed, the shares to which the inquiry pertains shall be considered for all purposes to be beneficially owned in violation of the reporting requirements imposed by this Section 7, and the CEO or his designee shall be authorized to invoke the measures authorized by paragraph (b) of this Section 7, including the refusal to permit the voting of such shares.

(d) Any resolution or determination of, or decision or exercise of any discretion or power by, the Board of Directors or the officers, employees and agents of Freddie Mac hereunder shall be conclusive and binding on any beneficial owner of Common Stock affected and all persons concerned and shall not be open to challenge, whether as to its validity or otherwise, on any grounds whatsoever, and the Board of Directors, Freddie Mac and its officers, employees and agents shall not have any liability whatsoever in respect thereof.

(e) Each certificate representing a share or shares of Common Stock issued after December 10, 1990 shall bear a conspicuous legend to the effect that ownership of the Common Stock is subject to the reporting requirements of this Section 7.

(f) The Board of Directors shall have the right at any time to remove, relax or grant exceptions to the reporting requirements imposed under this Section 7.

**8. Liquidation Rights.**

(a) Upon the dissolution, liquidation or winding up of Freddie Mac, after payment of or provision for the liabilities of Freddie Mac and the expenses of such dissolution, liquidation or winding up, and after any payment or distribution shall have been made on any other class or series of stock of Freddie Mac ranking prior to the Common Stock upon liquidation, the holders of the outstanding shares of the Common Stock shall be entitled to receive out of the assets of Freddie Mac available for distribution to stockholders, before any payment or distribution shall be made on any other class or series of stock of Freddie Mac ranking junior to the Common Stock upon liquidation, the amount of $0.21 per share, plus a sum equal to all dividends declared but unpaid on such shares to the date of final distribution. The holders of the outstanding shares of any class or series of stock of Freddie Mac ranking prior to, on a parity with or junior to the Common Stock upon liquidation shall also receive out of such assets payment of any corresponding preferential amount to which the holders of such stock may, by the terms thereof, be entitled. Thereafter, subject to the foregoing and to the provisions of paragraph (b) of this Section 8, the balance of any assets of Freddie Mac available for distribution to stockholders upon such dissolution, liquidation or winding up shall be distributed to the holders of outstanding Common Stock in the aggregate.

(b) Notwithstanding the foregoing, upon the dissolution, liquidation or winding up of Freddie Mac, the holders of shares of the Common Stock then outstanding shall not be entitled to be paid any amounts to which such holders are entitled pursuant to paragraph (a) of this Section 8 unless and until the holders of any classes or series of stock of Freddie Mac ranking prior upon liquidation to the Common Stock have been paid all amounts to which such classes or series of stock are entitled pursuant to their respective terms.

(c) Neither the sale of all or substantially all the property or business of Freddie Mac, nor the merger, consolidation or combination of Freddie Mac into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

**9. Additional Classes or Series of Stock.**

The Board of Directors shall have the right at any time in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of Freddie Mac, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof. Any such class or series of stock may rank prior to or on a parity with or junior to the Common Stock as to dividends or upon liquidation or otherwise.

**10. Miscellaneous.**

(a) Any stock of any class or series of Freddie Mac shall be deemed to rank:

(i) prior to the shares of the Common Stock, either as to dividends or upon liquidation, if the holder of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in preference or priority to the holders of shares of the Common Stock;

(ii) on a parity with shares of the Common Stock, either as to dividends or upon liquidation, whether or not the dividend rates or amounts, dividend payment dates or redemption or liquidation prices per share, if any,

3

be different from those of the Common Stock, if the holders of such class or series shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in proportion to their respective dividend rates or amounts or liquidation prices, without preference or priority, one over the other, as between the holders of such class or series and the holders of shares of the Common Stock; and

(iii) junior to shares of the Common Stock, either as to dividends or upon liquidation, if the holders of shares of the Common Stock shall be entitled to the receipt of dividends or of amounts distributable upon dissolution, liquidation or winding up of Freddie Mac, as the case may be, in preference or priority to the holders of shares of such class or series.

(b) Freddie Mac and any agent of Freddie Mac may deem and treat the holder of a share or shares of Common Stock, as shown in Freddie Mac's books and records, as the absolute owner of such share or shares of Common Stock for the purpose of receiving payment of dividends in respect of such share or shares of Common Stock and for all other purposes whatsoever, and neither Freddie Mac nor any agent of Freddie Mac shall be affected by any notice to the contrary. All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by Freddie Mac on or with respect to any such share or shares of Common Stock.

(c) The shares of the Common Stock, when duly issued, shall be fully paid and non-assessable. Any shares owned by Freddie Mac shall retain the status of issued shares, unless and until Freddie Mac shall retire and cancel the same, but such shares shall not be regarded as outstanding while so owned.

(d) Except as otherwise provided in Freddie Mac's Employee Stock Purchase Plan or any other executive compensation or employee benefit plan or any direct stock purchase plan currently in effect or hereafter adopted by Freddie Mac, the Common Stock shall be issued, and shall be transferable on the books of Freddie Mac, only in whole shares, it being intended that, except as provided in said Plan or plans, no fractional interests in shares of the Common Stock shall be created or recognized by Freddie Mac.

(e) For the purposes of this Certificate, the term "Freddie Mac" means the Federal Home Loan Mortgage Corporation and any successor thereto by operation of law or by reason of a merger, consolidation or combination.

(f) This Certificate and the respective rights and obligations of Freddie Mac and the holders of Common Stock with respect to such Common Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances except where such law is inconsistent with Freddie Mac's enabling legislation, its public purposes or any provision of this Certificate.

(g) Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon Freddie Mac shall be given or served in writing addressed (unless and until another address shall be published by Freddie Mac) to the Federal Home Loan Mortgage Corporation, 8200 Jones Branch Drive, McLean, Virginia 22102, Attn: Executive Vice President, General Counsel and Corporate Secretary. Such notice, demand or other communication to or upon Freddie Mac shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by Freddie Mac. Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by Freddie Mac hereunder may be given or served by being deposited first class, postage prepaid in a United States post office letter box addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of Freddie Mac or (ii) if to a person or entity other than a holder of record of Common Stock, to such person or entity at such address as appears to Freddie Mac to be appropriate at such time.

(h) Freddie Mac, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

(i) Without the affirmative vote of the holders of the Common Stock, Freddie Mac may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not materially and adversely affect the interests of the holders of the Common Stock.

4

(ii) The affirmative vote by the holders of shares representing at least 66 2/3% of all of the shares of the Common Stock at the time outstanding and entitled to vote, voting together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal of any of the provisions of this Certificate if such amendment, alteration, supplementation or repeal would materially and adversely affect the powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms or conditions of the Common Stock. The creation and issuance of any other class or series of stock of Freddie Mac, whether ranking prior to, on a parity with or junior to the Common Stock, or any split or reverse split of the Common Stock (including any attendant proportionate adjustment to the par value thereof), shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

**(i) RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF COMMON STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN FREDDIE MAC AND THE HOLDER (AND ALL SUCH OTHERS).**

IN WITNESS WHEREOF, I have executed this Certificate as of this 10 th day of September, 2008.

**[Seal]**

/s/  Robert E. Bostrom
_____

Robert E. Bostrom, *Corporate Secretary*

5

Exhibit 4.2

EXECUTION VERSION

**FREDDIE MAC**

**CERTIFICATE OF CREATION, DESIGNATION, POWERS,
PREFERENCES, RIGHTS, PRIVILEGES, QUALIFICATIONS,
LIMITATIONS, RESTRICTIONS, TERMS AND CONDITIONS
OF
VARIABLE LIQUIDATION PREFERENCE SENIOR PREFERRED STOCK
(PAR VALUE $1.00 PER SHARE)**

The Federal Housing Finance Agency, as Conservator of the Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America (the "Company"), does hereby certify that, pursuant to authority vested in the Board of Directors of the Company by Section 306(f) of the Federal Home Loan Mortgage Corporation Act, and pursuant to the authority vested in the Conservator of the Company by Section 1367 (b) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (12 U.S.C. §4617), as amended, the Conservator adopted Resolution FHLMC 2008-24 on September 7, 2008, which resolution is now, and at all times since such date has been, in full force and effect, and that the Conservator approved the final terms of the issuance and sale of the preferred stock of the Company designated above.

The Senior Preferred Stock shall have the following designation, powers, preferences, rights, privileges, qualifications, limitations, restrictions, terms and conditions:

**1. Designation, Par Value, Number of Shares and Seniority**

The class of preferred stock of the Company created hereby (the "Senior Preferred Stock") shall be designated "Variable Liquidation Preference Senior Preferred Stock," shall have a par value of $1.00 per share and shall consist of 1,000,000 shares. The Senior Preferred Stock shall rank prior to the common stock of the Company as provided in this Certificate and shall rank, as to both dividends and distributions upon liquidation, prior to (a) the Fixed-to-Floating Rate Non-Cumulative Perpetual Preferred Stock issued on December 4, 2007, (b) the 6.55% Non-Cumulative Preferred Stock issued on September 28, 2007, (c) the 6.02% Non-Cumulative Preferred Stock issued on July 24, 2007, (d) the 5.66% Non-Cumulative Preferred Stock issued on April 16, 2007, (e) the 5.57% Non-Cumulative Preferred Stock issued on January 16, 2007, (f) the 5.9% Non-Cumulative Preferred Stock issued on October 16, 2006, (g) the 6.42% Non-Cumulative Preferred Stock issued on July 17, 2006, (h) the Variable Rate, Non-Cumulative Preferred Stock issued on July 17, 2006, (i) the 5.81% Non-Cumulative Preferred Stock issued on January 29, 2002, (j) the 5.7% Non-Cumulative Preferred Stock issued on October 30, 2001, (k) the 6% Non-Cumulative Preferred Stock issued on May 30, 2001, (l) the Variable Rate, Non-Cumulative Preferred Stock issued on May 30, 2001 and June 1, 2001, (m) the 5.81% Non-Cumulative Preferred Stock issued on March 23, 2001, (n) the Variable Rate, Non-Cumulative Preferred Stock issued on March 23, 2001, (o) the Variable Rate, Non-Cumulative Preferred Stock issued on January 26, 2001, (p) the Variable Rate, Non-Cumulative Preferred Stock issued on November 5, 1999, (q) the 5.79% Non-Cumulative Preferred Stock issued on July 21, 1999, (r) the 5.1% Non-Cumulative Preferred Stock issued on March 19, 1999, (s) the 5.3% Non-Cumulative Preferred Stock issued on October 28, 1998, (t) the

5.1% Non-Cumulative Preferred Stock issued on September 23, 1998, (u) the Variable Rate, Non-Cumulative Preferred Stock issued on September 23, 1998 and September 29, 1998, (v) the 5% Non-Cumulative Preferred Stock issued on March 23, 1998, (w) the 5.81% Non-Cumulative Preferred Stock issued on October 27, 1997, (x) the Variable Rate, Non-Cumulative Preferred Stock issued on April 26, 1996, (y) any other capital stock of the Company outstanding on the date of the initial issuance of the Senior Preferred Stock, and (z) any capital stock of the Company that may be issued after the date of initial issuance of the Senior Preferred Stock.

## 2.  Dividends

(a) For each Dividend Period from the date of the initial issuance of the Senior Preferred Stock, holders of outstanding shares of Senior Preferred Stock shall be entitled to receive, ratably, when, as and if declared by the Board of Directors, in its sole discretion, out of funds legally available therefor, cumulative cash dividends at the annual rate per share equal to the then-current Dividend Rate on the then-current Liquidation Preference. Dividends on the Senior Preferred Stock shall accrue from but not including the date of the initial issuance of the Senior Preferred Stock and will be payable in arrears when, as and if declared by the Board of Directors quarterly on March 31, June 30, September 30 and December 31 of each year (each, a "Dividend Payment Date"), commencing on December 31, 2008. If a Dividend Payment Date is not a "Business Day," the related dividend will be paid not later than the next Business Day with the same force and effect as though paid on the Dividend Payment Date, without any increase to account for the period from such Dividend Payment Date through the date of actual payment. "Business Day" means a day other than (i) a Saturday or Sunday, (ii) a day on which New York City banks are closed, or (iii) a day on which the offices of the Company are closed.

If declared, the initial dividend will be for the period from but not including the date of the initial issuance of the Senior Preferred Stock through and including December 31, 2008. Except for the initial Dividend Payment Date, the "Dividend Period" relating to a Dividend Payment Date will be the period from but not including the preceding Dividend Payment Date through and including the related Dividend Payment Date. The amount of dividends payable on the initial Dividend Payment Date or for any Dividend Period that is not a full calendar quarter shall be computed on the basis of 30-day months, a 360-day year and the actual number of days elapsed in any period of less than one month. For the avoidance of doubt, in the event that the Liquidation Preference changes in the middle of a Dividend Period, the amount of dividends payable on the Dividend Payment Date at the end of such Dividend Period shall take into account such change in Liquidation Preference and shall be computed at the Dividend Rate on each Liquidation Preference based on the portion of the Dividend Period that each Liquidation Preference was in effect.

(b) To the extent not paid pursuant to Section 2(a) above, dividends on the Senior Preferred Stock shall accrue and shall be added to the Liquidation Dividend Preference pursuant to Section 8, whether or not there are funds legally available for the payment of such dividends and whether or not dividends are declared.

(c) "Dividend Rate" means 10.0%; provided, however, that if at any time the Company shall have for any reason failed to pay dividends in cash in a timely manner as required by this Certificate, then immediately following such failure and for all Dividend Periods thereafter until

2

the Dividend Period following the date on which the Company shall have paid in cash full cumulative dividends (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8), the "Dividend Rate" shall mean 12.0%.

(d) Each such dividend shall be paid to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the applicable Dividend Payment Date. The Company may not, at any time, declare or pay dividends on, make distributions with respect to, or redeem, purchase or acquire, or make a liquidation payment with respect to, any common stock or other securities ranking junior to the Senior Preferred Stock unless (i) full cumulative dividends on the outstanding Senior Preferred Stock in respect of the then-current Dividend Period and all past Dividend Periods (including any unpaid dividends added to the Liquidation Preference pursuant to Section 8) have been declared and paid in cash (including through any pay down of Liquidation Preference pursuant to Section 3) and (ii) all amounts required to be paid pursuant to Section 4 (without giving effect to any prohibition on such payment under any applicable law) have been paid in cash.

(e) Notwithstanding any other provision of this Certificate, the Board of Directors, in its discretion, may choose to pay dividends on the Senior Preferred Stock without the payment of any dividends on the common stock, preferred stock or any other class or series of stock from time to time outstanding ranking junior to the Senior Preferred Stock with respect to the payment of dividends.

(f) If and whenever dividends, having been declared, shall not have been paid in full, as aforesaid, on shares of the Senior Preferred Stock, all such dividends that have been declared on shares of the Senior Preferred Stock shall be paid to the holders pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder, and any amounts due but not paid in cash shall be added to the Liquidation Preference pursuant to Section 8.

## 3.  Optional Pay Down of Liquidation Preference

(a) Following termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, in whole or in part, out of funds legally available therefor, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below. Prior to termination of the Commitment, and subject to any limitations which may be imposed by law and the provisions below, the Company may pay down the Liquidation Preference of all outstanding shares of the Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference and (ii) Periodic Commitment Fees previously added to the Liquidation

3

Preference pursuant to Section 8 below and not repaid by any prior pay down of Liquidation Preference. Any pay down of Liquidation Preference permitted by this Section 3 shall be paid by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment.

(b) In the event the Company shall pay down of the Liquidation Preference of the Senior Preferred Stock as aforesaid, notice of such pay down shall be given by the Company by first class mail, postage prepaid, mailed neither less than 10 nor more than 45 days preceding the date fixed for the payment, to each holder of record of the shares of the Senior Preferred Stock, at such holder's address as the same appears in the books and records of the Company. Each such notice shall state the amount by which the Liquidation Preference of each share shall be reduced and the pay down date.

(c) If after termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

## 4.  Mandatory Pay Down of Liquidation Preference Upon Issuance of Capital Stock

(a) If the Company shall issue any shares of capital stock (including without limitation common stock or any series of preferred stock) in exchange for cash at any time while the Senior Preferred Stock is outstanding, then the Company shall, within 10 Business Days, use the proceeds of such issuance net of the direct costs relating to the issuance of such securities (including, without limitation, legal, accounting and investment banking fees) to pay down the Liquidation Preference of all outstanding shares of Senior Preferred Stock pro rata, out of funds legally available therefor, by making a payment in cash to the holders of record of outstanding shares of the Senior Preferred Stock as they appear in the books and records of the Company on such record date as shall be fixed in advance by the Board of Directors, not to be earlier than 45 days nor later than 10 days preceding the date fixed for the payment, with such payment first being used to reduce any accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 below and, to the extent all such accrued and unpaid dividends have been paid, next being used to reduce any Periodic Commitment Fees (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below) previously added to the Liquidation Preference pursuant to Section 8 below; provided that, prior to the termination of the Commitment (as defined in the Preferred Stock Purchase Agreement referred to in Section 8 below), the Liquidation Preference of each share of Senior Preferred Stock shall not be paid down below $1,000 per share.

4

(b) If the Company shall not have sufficient assets legally available for the pay down of the Liquidation Preference of the shares of Senior Preferred Stock required under Section 4(a), the Company shall pay down the Liquidation Preference per share to the extent permitted by law, and shall pay down any Liquidation Preference not so paid down because of the unavailability of legally available assets or other prohibition as soon as practicable to the extent it is thereafter able to make such pay down legally. The inability of the Company to make such payment for any reason shall not relieve the Company from its obligation to effect any required pay down of the Liquidation Preference when, as and if permitted by law.

(c) If after the termination of the Commitment the Company pays down the Liquidation Preference of each outstanding share of Senior Preferred Stock in full, such shares shall be deemed to have been redeemed as of the date of such payment, and the dividend that would otherwise be payable for the Dividend Period ending on the pay down date will be paid on such date. Following such deemed redemption, the shares of the Senior Preferred Stock shall no longer be deemed to be outstanding, and all rights of the holders thereof as holders of the Senior Preferred Stock shall cease, with respect to shares so redeemed, other than the right to receive the pay down amount (which shall include the final dividend for such redeemed shares). Any shares of the Senior Preferred Stock which shall have been so redeemed, after such redemption, shall no longer have the status of authorized, issued or outstanding shares.

**5.  No Voting Rights**

Except as set forth in this Certificate or otherwise required by law, the shares of the Senior Preferred Stock shall not have any voting powers, either general or special.

**6.  No Conversion or Exchange Rights**

The holders of shares of the Senior Preferred Stock shall not have any right to convert such shares into or exchange such shares for any other class or series of stock or obligations of the Company.

**7.  No Preemptive Rights**

No holder of the Senior Preferred Stock shall as such holder have any preemptive right to purchase or subscribe for any other shares, rights, options or other securities of any class of the Company which at any time may be sold or offered for sale by the Company.

**8.  Liquidation Rights and Preference**

(a) Except as otherwise set forth herein, upon the voluntary or involuntary dissolution, liquidation or winding up of the Company, the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive out of the assets of the Company available for distribution to stockholders, before any payment or distribution shall be made on the common stock or any other class or series of stock of the Company ranking junior to the Senior Preferred Stock upon liquidation, the amount per share equal to the Liquidation Preference plus an amount, determined in accordance with Section 2(a) above, equal to the dividend otherwise payable for the then-current Dividend Period accrued through and including the date of payment in respect of such dissolution, liquidation or winding up; provided, however, that if the assets of the Company

5

available for distribution to stockholders shall be insufficient for the payment of the amount which the holders of the outstanding shares of the Senior Preferred Stock shall be entitled to receive upon such dissolution, liquidation or winding up of the Company as aforesaid, then, all of the assets of the Company available for distribution to stockholders shall be distributed to the holders of outstanding shares of the Senior Preferred Stock pro rata based on the aggregate Liquidation Preference of the shares of Senior Preferred Stock held by each holder.

(b) "Liquidation Preference" shall initially mean $1,000 per share and shall be:

(i) increased each time a Deficiency Amount (as defined in the Preferred Stock Purchase Agreement) is paid to the Company by an amount per share equal to the aggregate amount so paid to the Company divided by the number of shares of Senior Preferred Stock outstanding at the time of such payment;

(ii) increased each time the Company does not pay the full Periodic Commitment Fee (as defined in the Preferred Stock Purchase Agreement) in cash by an amount per share equal to the amount of the Periodic Commitment Fee that is not paid in cash divided by the number of shares of Senior Preferred Stock outstanding at the time such payment is due;

(iii) increased on the Dividend Payment Date if the Company fails to pay in full the dividend payable for the Dividend Period ending on such date by an amount per share equal to the aggregate amount of unpaid dividends divided by the number of shares of Senior Preferred Stock outstanding on such date; and

(iv) decreased each time the Company pays down the Liquidation Preference pursuant to Section 3 or Section 4 of this Certificate by an amount per share equal to the aggregate amount of the pay down divided by the number of shares of Senior Preferred Stock outstanding at the time of such pay down.

(c) "Preferred Stock Purchase Agreement" means the Preferred Stock Purchase Agreement dated September 7, 2008, between the Company and the United States Department of the Treasury.

(d) Neither the sale of all or substantially all of the property or business of the Company, nor the merger, consolidation or combination of the Company into or with any other corporation or entity, shall be deemed to be a dissolution, liquidation or winding up for the purpose of this Section 8.

**9.  Additional Classes or Series of Stock**

The Board of Directors shall have the right at anytime in the future to authorize, create and issue, by resolution or resolutions, one or more additional classes or series of stock of the Company, and to determine and fix the distinguishing characteristics and the relative rights, preferences, privileges and other terms of the shares thereof; provided that, any such class or series of stock may not rank prior to or on parity with the Senior Preferred Stock without the prior written consent of the holders of at least two-thirds of all the shares of Senior Preferred Stock at the time outstanding.

6

**10.   Miscellaneous**

(a) The Company and any agent of the Company may deem and treat the holder of a share or shares of Senior Preferred Stock, as shown in the Company's books and records, as the absolute owner of such share or shares of Senior Preferred Stock for the purpose of receiving payment of dividends in respect of such share or shares of Senior Preferred Stock and for all other purposes whatsoever, and neither the Company nor any agent of the Company shall be affected by any notice to the contrary. All payments made to or upon the order of any such person shall be valid and, to the extent of the sum or sums so paid, effectual to satisfy and discharge liabilities for moneys payable by the Company on or with respect to any such share or shares of Senior Preferred Stock.

(b) The shares of the Senior Preferred Stock, when duly issued, shall be fully paid and non-assessable.

(c) The Senior Preferred Stock may be issued, and shall be transferable on the books of the Company, only in whole shares.

(d) For purposes of this Certificate, the term "the Company" means the Federal Home Loan Mortgage Corporation and any successor thereto by operation of law or by reason of a merger, consolidation, combination or similar transaction.

(e) This Certificate and the respective rights and obligations of the Company and the holders of the Senior Preferred Stock with respect to such Senior Preferred Stock shall be construed in accordance with and governed by the laws of the United States, provided that the law of the Commonwealth of Virginia shall serve as the federal rule of decision in all instances except where such law is inconsistent with the Company's enabling legislation, its public purposes or any provision of this Certificate.

(f) Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served to or upon the Company shall be given or served in writing addressed (unless and until another address shall be published by the Company) to Freddie Mac, 8200 Jones Branch Drive, McLean, Virginia 22102, Attn: Executive Vice President and General Counsel. Such notice, demand or other communication to or upon the Company shall be deemed to have been sufficiently given or made only upon actual receipt of a writing by the Company. Any notice, demand or other communication which by any provision of this Certificate is required or permitted to be given or served by the Company hereunder may be given or served by being deposited first class, postage prepaid, in the United States mail addressed (i) to the holder as such holder's name and address may appear at such time in the books and records of the Company or (ii) if to a person or entity other than a holder of record of the Senior Preferred Stock, to such person or entity at such address as reasonably appears to the Company to be appropriate at such time. Such notice, demand or other communication shall be deemed to have been sufficiently given or made, for all purposes, upon mailing.

(g) The Company, by or under the authority of the Board of Directors, may amend, alter, supplement or repeal any provision of this Certificate pursuant to the following terms and conditions:

7

(i) Without the consent of the holders of the Senior Preferred Stock, the Company may amend, alter, supplement or repeal any provision of this Certificate to cure any ambiguity, to correct or supplement any provision herein which may be defective or inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Certificate, provided that such action shall not adversely affect the interests of the holders of the Senior Preferred Stock.

(ii) The consent of the holders of at least two-thirds of all of the shares of the Senior Preferred Stock at the time outstanding, given in person or by proxy, either in writing or by a vote at a meeting called for the purpose at which the holders of shares of the Senior Preferred Stock shall vote together as a class, shall be necessary for authorizing, effecting or validating the amendment, alteration, supplementation or repeal (whether by merger, consolidation or otherwise) of the provisions of this Certificate other than as set forth in subparagraph (i) of this paragraph (g). The creation and issuance of any other class or series of stock, or the issuance of additional shares of any existing class or series of stock, of the Company ranking junior to the Senior Preferred Stock shall not be deemed to constitute such an amendment, alteration, supplementation or repeal.

(iii) Holders of the Senior Preferred Stock shall be entitled to one vote per share on matters on which their consent is required pursuant to subparagraph (ii) of this paragraph (g). In connection with any meeting of such holders, the Board of Directors shall fix a record date, neither earlier than 60 days nor later than 10 days prior to the date of such meeting, and holders of record of shares of the Senior Preferred Stock on such record date shall be entitled to notice of and to vote at any such meeting and any adjournment. The Board of Directors, or such person or persons as it may designate, may establish reasonable rules and procedures as to the solicitation of the consent of holders of the Senior Preferred Stock at any such meeting or otherwise, which rules and procedures shall conform to the requirements of any national securities exchange on which the Senior Preferred Stock may be listed at such time.

(h)  **RECEIPT AND ACCEPTANCE OF A SHARE OR SHARES OF THE SENIOR PREFERRED STOCK BY OR ON BEHALF OF A HOLDER SHALL CONSTITUTE THE UNCONDITIONAL ACCEPTANCE BY THE HOLDER (AND ALL OTHERS HAVING BENEFICIAL OWNERSHIP OF SUCH SHARE OR SHARES) OF ALL OF THE TERMS AND PROVISIONS OF THIS CERTIFICATE. NO SIGNATURE OR OTHER FURTHER MANIFESTATION OF ASSENT TO THE TERMS AND PROVISIONS OF THIS CERTIFICATE SHALL BE NECESSARY FOR ITS OPERATION OR EFFECT AS BETWEEN THE COMPANY AND THE HOLDER (AND ALL SUCH OTHERS).**

IN WITNESS WHEREOF, I have hereunto set my hand and the seal of the Company this 7 th day of September, 2008.

[Seal]

FEDERAL HOME LOAN MORTGAGE CORPORATION, by

The Federal Housing Finance Agency, its Conservator

/s/  James B. Lockhart III

James B. Lockhart III
Director

*Signature Page to Certificate of Designations of Senior Preferred Stock*

Exhibit 10.1

EXECUTION VERSION

## SENIOR PREFERRED STOCK PURCHASE AGREEMENT

SENIOR PREFERRED STOCK PURCHASE AGREEMENT (this " Agreement ") dated as of September 7, 2008, between the UNITED STATES DEPARTMENT OF THE TREASURY (" Purchaser ") and FEDERAL HOME LOAN MORTGAGE CORPORATION (" Seller "), acting through the Federal Housing Finance Agency (the " Agency ") as its duly appointed conservator (the Agency in such capacity, " Conservator "). Reference is made to Article 1 below for the meaning of capitalized terms used herein without definition.

### Background

A. The Agency has been duly appointed as Conservator for Seller pursuant to Section 1367(a) of the Federal Housing Enterprises Financial Safety and Soundness Act of 1992 (as amended, the " FHE Act "). Conservator has determined that entry into this Agreement is (i) necessary to put Seller in a sound and solvent condition; (ii) appropriate to carry on the business of Seller and preserve and conserve the assets and property of Seller; and (iii) otherwise consistent with its powers, authorities and responsibilities.

B. Purchaser is authorized to purchase obligations and other securities issued by Seller pursuant to Section 306(l) of the Federal Home Loan Mortgage Corporation Act, as amended (the " Charter Act "). The Secretary of the Treasury has determined, after taking into consideration the matters set forth in Section 306(l)(1)(C) of the Charter Act, that the purchases contemplated herein are necessary to (i) provide stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer.

THEREFORE, the parties hereto agree as follows:

### Terms and Conditions

## 1. DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

*"Affiliate"* means, when used with respect to a specified Person (i) any direct or indirect holder or group (as defined in Sections 13(d) and 14(d) of the Exchange Act) of holders of 10.0% or more of any class of capital stock of such Person and (ii) any current or former director or officer of such Person, or any other current or former employee of such Person that currently exercises or formerly exercised a material degree of Control over such Person, including without limitation each current or former Named Executive Officer of such Person.

*"Available Amount"* means, as of any date of determination, the lesser of (a) the Deficiency Amount as of such date and (b) the Maximum Amount as of such date.

*"Business Day"* means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under United States federal law and the law of the State of New York.

*"Capital Lease Obligations"* of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other similar arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for purposes hereof, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

*"Control"* shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

*"Deficiency Amount"* means, as of any date of determination, the amount, if any, by which (a) the total liabilities of Seller exceed (b) the total assets of Seller (such assets excluding the Commitment and any unfunded amounts thereof), in each case as reflected on the balance sheet of Seller as of the applicable date set forth in this Agreement, prepared in accordance with GAAP; provided , however , that:

> (i) for the avoidance of doubt, in measuring the Deficiency Amount liabilities shall exclude any obligation in respect of any capital stock of Seller, including the Senior Preferred Stock contemplated herein;

> (ii) in the event that Seller becomes subject to receivership or other liquidation process or proceeding, "Deficiency Amount" shall mean, as of any date of determination, the amount, if any, by which (a) the total allowed claims against the receivership or other applicable estate (excluding any liabilities of or transferred to any LLRE (as defined in Section 5.4(a)) created by a receiver) exceed (b) the total assets of such receivership or other estate (excluding the Commitment, any unfunded amounts thereof and any assets of or transferred to any LLRE, but including the value of the receiver's interest in any LLRE);

> (iii) to the extent Conservator or a receiver of Seller. or any statute, rule, regulation or court of competent jurisdiction, specifies or determines that a liability of Seller (including without limitation a claim against Seller arising from rescission of a purchase or sale of a security issued by Seller (or guaranteed by Seller or with respect to which Seller is otherwise liable) or for damages arising from the purchase, sale or retention of such a security) shall be subordinated (other than pursuant to a contract providing for such subordination) to all other liabilities of Seller or shall be treated on par with any class of equity of Seller, then such liability shall be excluded in the calculation of Deficiency Amount; and

> (iv) the Deficiency Amount may be increased above the otherwise applicable amount by the mutual written agreement of Purchaser and Seller, each acting in its sole discretion.

*"Designated Representative"* means Conservator or (a) if Conservator has been superseded by a receiver pursuant to Section 1367(a) of the FHE Act, such receiver, or (b) if Seller is not in con-

servatorship or receivership pursuant to Section 1367(a) of the FHE Act, Seller's chief financial officer.

*"Director"* shall mean the Director of the Agency.

*"Effective Date"* means the date on which this Agreement shall have been executed and delivered by both of the parties hereto.

*"Equity Interests"* of any Person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity, ownership or profits of such Person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing,

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

*"GAAP"* means generally accepted accounting principles in effect in the United States as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board from time to time.

*"Indebtedness"* of any Person means, for purposes of Section 5.5 only, without duplication, (a) all obligations of such Person for money borrowed by such Person, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (d) all obligations of such Person issued or assumed as the deferred purchase price of property or services, other than trade accounts payable, (e) all Capital Lease Obligations of such Person, (f) obligations, whether contingent or liquidated, in respect of letters of credit (including standby and commercial), bankers' acceptances and similar instruments and (g) any obligation of such Person, contingent or otherwise, guaranteeing or having the economic effect of guaranteeing any Indebtedness of the types set forth in clauses (a) through (f) payable by another Person other than Mortgage Guarantee Obligations.

*"Liquidation End Date"* means the date of completion of the liquidation of Seller's assets.

*"Maximum Amount"* means, as of any date of determination, $100,000,000,000 (one hundred billion dollars), less the aggregate amount of funding under the Commitment prior to such date.

*"Mortgage Assets"* of any Person means assets of such Person consisting of mortgages, mortgage loans, mortgage-related securities, participation certificates, mortgage-backed commercial paper, obligations of real estate mortgage investment conduits and similar assets, in each case to the extent such assets would appear on the balance sheet of such Person in accordance with GAAP as in effect as of the date hereof (and, for the avoidance of doubt, without giving effect to any

- 3 -

change that may be made hereafter in respect of Statement of Financial Accounting Standards No. 140 or any similar accounting standard).

*"Mortgage Guarantee Obligations"* means guarantees, standby commitments, credit enhancements and other similar obligations of Seller, in each case in respect of Mortgage Assets.

*"Named Executive Officer"* has the meaning given to such term in Item 402(a)(3) of Regulation S-K under the Exchange Act, as in effect on the date hereof.

*"Person"* shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof, or any other entity whatsoever.

*"SEC"* means the Securities and Exchange Commission.

*"Senior Preferred Stock"* means the Variable Liquidation Preference Senior Preferred Stock of Seller, substantially in the form of Exhibit A hereto.

" *Warrant"* means a warrant for the purchase of common stock of Seller representing 79.9% of the common stock of Seller on a fully-diluted basis, substantially in the form of Exhibit B hereto.

## 2. COMMITMENT

2.1. *Commitment.*   Purchaser hereby commits to provide to Seller, on the terms and conditions set forth herein, immediately available funds in an amount up to but not in excess of the Available Amount, as determined from time to time (the " Commitment "); provided , that in no event shall the aggregate amount funded under the Commitment exceed $100,000,000,000 (one hundred billion dollars). The liquidation preference of the Senior Preferred Stock shall increase in connection with draws on the Commitment, as set forth in Section 3.3 below.

2.2. *Quarterly Draws on Commitment.*   Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the end of each fiscal quarter of Seller which ends on or before the Liquidation End Date, the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the end of such quarter. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount as of the end of the applicable quarter. Purchaser shall provide such funds within sixty (60) days of its receipt of such request or, following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller if such funds are not received sooner, such shorter period as may be necessary to avoid such mandatory appointment of a receiver if reasonably practicable taking into consideration Purchaser's access to funds.

2.3. *Accelerated Draws on Commitment.*   Immediately following any determination by the Director that the Director will be mandated by law to appoint a receiver for Seller prior to the Liquidation End Date unless Seller's capital is increased by an amount (the " Special Amount ")

- 4 -

up to but not in excess of the then current Available Amount (computed based on a balance sheet of Seller prepared in accordance with GAAP that differs from the most recent balance sheet of Seller delivered in accordance with Section 5.9(a) or (b)) on a date that is prior to the date that funds will be available to Seller pursuant to Section 2.2, Conservator may, on behalf of Seller, request that Purchaser provide to Seller the Special Amount in immediately available funds. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains certifications of Conservator that (i) the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the then existing Deficiency Amount) and (ii) the requested amount is required to avoid the imminent mandatory appointment of a receiver for Seller. Purchaser shall provide such funds within thirty (30) days of its receipt of such request or, if reasonably practicable taking into consideration Purchaser's access to funds, any shorter period as may be necessary to avoid mandatory appointment of a receiver.

2.4. *Final Draw on Commitment.*   Within fifteen (15) Business Days following the determination of the Deficiency Amount, if any, as of the Liquidation End Date (computed based on a balance sheet of Seller as of the Liquidation End Date prepared in accordance with GAAP), the Designated Representative may, on behalf of Seller, request that Purchaser provide immediately available funds to Seller in an amount up to but not in excess of the Available Amount as of the Liquidation End Date. Any such request shall be valid only if it is in writing, is timely made, specifies the account of Seller to which such funds are to be transferred, and contains a certification of the Designated Representative that the requested amount does not exceed the Available Amount (including computations in reasonable detail and satisfactory to Purchaser of the Deficiency Amount as of the Liquidation End Date). Purchaser shall provide such funds within sixty (60) days of its receipt of such request.

2.5. *Termination of Purchaser's Obligations.*   Subject to earlier termination pursuant to Section 6.7, all of Purchaser's obligations under and in respect of the Commitment shall terminate upon the earliest of: (a) if the Liquidation End Date shall have occurred, (i) the payment in full of Purchaser's obligations with respect to any valid request for funds pursuant to Section 2.4 or (ii) if there is no Deficiency Amount on the Liquidation End Date or if no such request pursuant to Section 2.4 has been made, the close of business on the 15th Business Day following the determination of the Deficiency Amount, if any, as of the Liquidation End Date; (b) the payment in full of, defeasance of or other reasonable provision for all liabilities of Seller, whether or not contingent, including payment of any amounts that may become payable on, or expiry of or other provision for, all Mortgage Guarantee Obligations and provision for unmatured debts; and (c) the funding by Purchaser under the Commitment of an aggregate of $100,000,000,000 (one hundred billion dollars). For the avoidance of doubt, the Commitment shall *not* be terminable by Purchaser solely by reason of (i) the conservatorship, receivership or other insolvency proceeding of Seller or (ii) the Seller's financial condition or any adverse change in Seller's financial condition.

## 3.  PURCHASE OF SENIOR PREFERRED STOCK AND WARRANT; FEES

3.1. *Initial Commitment Fee.*   In consideration of the Commitment, and for no additional consideration, on the Effective Date (or as soon thereafter as is practicable) Seller shall sell and issue to Purchaser, and Purchaser shall purchase from Seller, (a) one million (1,000,000) shares of Senior Preferred Stock, with an initial liquidation preference equal to $1,000 per share

- 5 -

($1,000,000,000 (one billion dollars) liquidation preference in the aggregate), and (b) the Warrant.

3.2. *Periodic Commitment Fee.*   (a) Commencing March 31, 2010, Seller shall pay to Purchaser quarterly, on the last day of March, June, September and December of each calendar year (each a " Periodic Fee Date "), a periodic commitment fee (the " Periodic Commitment Fee "). The Periodic Commitment Fee shall accrue from January 1, 2010.

(b) The Periodic Commitment Fee is intended to fully compensate Purchaser for the support provided by the ongoing Commitment following December 31, 2009. The amount of the Periodic Commitment Fee shall be set not later than December 31, 2009 with respect to the ensuing five-year period, shall be reset every five years thereafter and shall be determined with reference to the market value of the Commitment as then in effect. The amount of the Periodic Commitment Fee shall be mutually agreed by Purchaser and Seller, subject to their reasonable discretion and in consultation with the Chairman of the Federal Reserve; provided , that Purchaser may waive the Periodic Commitment Fee for up to one year at a time, in its sole discretion, based on adverse conditions in the United States mortgage market.

(c) At the election of Seller, the Periodic Commitment Fee may be paid in cash or by adding the amount thereof ratably to the liquidation preference of each outstanding share of Senior Preferred Stock so that the aggregate liquidation preference of all such outstanding shares of Senior Preferred Stock is increased by an amount equal to the Periodic Commitment Fee. Seller shall deliver notice of such election not later than three (3) Business Days prior to each Periodic Fee Date. If the Periodic Commitment Fee is not paid in cash by 12:00 pm (New York time) on the applicable Periodic Fee Date (irrespective of Seller's election pursuant to this subsection), Seller shall be deemed to have elected to pay the Periodic Commitment Fee by adding the amount thereof to the liquidation preference of the Senior Preferred Stock, and the aggregate liquidation preference of the outstanding shares of Senior Preferred Stock shall thereupon be automatically increased, in the manner contemplated by the first sentence of this section, by an aggregate amount equal to the Periodic Commitment Fee then due.

3.3. *Increases of Senior Preferred Stock Liquidation Preference as a Result of Funding under the Commitment.* The aggregate liquidation preference of the outstanding shares or Senior Preferred Stock shall be automatically increased by an amount equal to the amount of each draw on the Commitment pursuant to Article 2 that is funded by Purchaser to Seller, such increase to occur simultaneously with such funding and ratably with respect to each share of Senior Preferred Stock.

3.4. *Notation of Increase in Liquidation Preference.*   Seller shall duly mark its records to reflect each increase in the liquidation preference of the Senior Preferred Stock contemplated herein (but, for the avoidance of doubt, such increase shall be effective regardless of whether Seller has properly marked its records).

- 6 -

## 4. REPRESENTATIONS

Seller represents and warrants as of the Effective Date, and shall be deemed to have represented and warranted as of the date of each request for and funding of an advance under the Commitment pursuant to Article 2, as follows:

4.1. *Organization and Good Standing.*   Seller is a corporation, chartered by the Congress of the United States, duly organized, validly existing and in good standing under the laws of the United States and has all corporate power and authority to carry on its business as now conducted and as proposed to be conducted.

4.2. *Organizational Documents.*   Seller has made available to Purchaser a complete and correct copy of its charter and bylaws, each as amended to date (the " Organizational Documents "). The Organizational Documents are in full force and effect. Seller is not in violation of any provision of its Organizational Documents.

4.3. *Authorization and Enforceability.*   All corporate or other action on the part of Seller or Conservator necessary for the authorization, execution, delivery and performance of this Agreement by Seller and for the authorization, issuance and delivery of the Senior Preferred Stock and the Warrant being purchased under this Agreement, has been taken. This Agreement has been duly and validly executed and delivered by Seller and (assuming due authorization, execution and delivery by the Purchaser) shall constitute the valid and legally binding obligation of seller, enforceable against Seller in accordance with its terms, except to the extent the enforceability thereof may be limited by bankruptcy laws, insolvency laws, reorganization laws, moratorium laws or other laws of general applicability affecting creditors' rights generally or by general equitable principles (regardless of whether enforcement is sought in a proceeding in equity or at law). The Agency is acting as conservator for Seller under Section 1367 of the FHE Act. The Board of Directors of Seller, by valid action at a duly called meeting of the Board of Directors on September 6, 2008, consented to the appointment of the Agency as conservator for purposes of Section 1367(a)(3)(I) of the FHE Act, and the Director of the Agency has appointed the Agency as Conservator for Seller pursuant to Section 1367(a)(I) of the FHE Act, and each such action has not been rescinded, revoked or modified in any respect.

4.4. *Valid Issuance.*   When issued in accordance with the terms of this Agreement, the Senior Preferred Stock and the Warrant will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights. The shares of common stock to which the holder of the Warrant is entitled have been duly and validly reserved for issuance. When issued and delivered in accordance with the terms of this Agreement and the Warrant, such shares will be duly authorized, validly issued, fully paid and nonassessable, free and clear of all liens and preemptive rights.

4.5. *Non-Contravention.*

(a) The execution, delivery or performance by Seller of this Agreement and the consummation by Seller of the transactions contemplated hereby do not and will not (i) conflict with

- 7 -

or violate any provision of the Organizational Documents of Seller; (ii) conflict with or violate any law, decree or regulation applicable to Seller or by which any property or asset of Seller is bound or affected, or (iii) result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of a lien upon any of the properties or assets of Seller, pursuant to any note, bond, mortgage, indenture or credit agreement, or any other contract, agreement, lease, license, permit, franchise or other instrument or obligation to which Seller is a party or by which Seller is bound or affected, other than, in the case of clause (iii), any such breach, default, termination, amendment, acceleration, cancellation or lien that would not have and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the business, property, operations or condition of the Seller, the authority of the Conservator or the validity or enforceability of this Agreement (a " Material Adverse Effect ").

(b) The execution and delivery of this Agreement by Seller does not, and the consummation by Seller of the transactions contemplated by this Agreement will not, require any consent, approval, authorization, waiver or permit of, or filing with or notification to, any governmental authority or any other person, except for such as have already been obtained.

## 5. COVENANTS

From the Effective Date until such time as the Senior Preferred Stock shall have been repaid or redeemed in full in accordance with its terms:

5.1. *Restricted Payments.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, declare or pay any dividend (preferred or otherwise) or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of Seller's Equity Interests (other than with respect to the Senior Preferred Stock or the Warrant) or directly or indirectly redeem, purchase, retire or otherwise acquire for value any of Seller's Equity Interests (other than the Senior Preferred Stock or the Warrant), or set aside any amount for any such purpose.

5.2. *Issuance of Capital Stock.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell or issue Equity Interests of Seller or any of its subsidiaries of any kind or nature, in any amount, other than the sale and issuance of the Senior Preferred Stock and Warrant on the Effective Date and the common stock subject to the Warrant upon exercise thereof, and other than as required by (and pursuant to) the terms of any binding agreement as in effect on the date hereof.

5.3. *Conservatorship.*   Seller shall not (and Conservator, by its signature below, agrees that it shall not), without the prior written consent of Purchaser, terminate, seek termination of or permit to be terminated the conservatorship of Seller pursuant to Section 1367 of the FHE Act, other than in connection with a receivership pursuant to Section 1367 of the FHE Act.

5.4. *Transfer of Assets.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, sell, transfer, lease or otherwise dispose

- 8 -

of (in one transaction or a series of related transactions) all or any portion of its assets (including Equity Interests in other persons, including subsidiaries), whether now owned or hereafter acquired (any such sale, transfer, lease or disposition, a " Disposition "), other than Dispositions for fair market value:

(a) to a limited life regulated entity (" LLRE ") pursuant to Section 1367(i) of the FHE Act;

(b) of assets and properties in the ordinary course of business, consistent with past practice;

(c) in connection with a liquidation of Seller by a receiver appointed pursuant to Section 1367(a) of the FHE Act;

(d) of cash or cash equivalents for cash or cash equivalents; or

(e) to the extent necessary to comply with the covenant set forth in Section 5.7 below.

5.5. *Indebtedness.*   Seller shall not, and shall not permit any of its subsidiaries to, in each case without the prior written consent of Purchaser, incur, assume or otherwise become liable for (a) any Indebtedness if, after giving effect to the incurrence thereof, the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis would exceed 110.0% of the aggregate Indebtedness of Seller and its subsidiaries on a consolidated basis as of June 30, 2008 or (b) any Indebtedness if such Indebtedness is subordinated by its terms to any other Indebtedness of Seller or the applicable subsidiary. For purposes of this covenant the acquisition of a subsidiary with Indebtedness will be deemed to be the incurrence of such Indebtedness at the time of such acquisition.

5.6. *Fundamental Changes.*   Seller shall not, and shall not permit any or its subsidiaries to, in each case without the prior written consent of Purchaser, (i) merge into or consolidate or amalgamate with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it, (ii) effect a reorganization or recapitalization involving the common stock of Seller, a reclassification of the common stock of Seller or similar corporate transaction or event or (iii) purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or substantially all of the assets of any other Person or any division, unit or business of any Person.

5.7. *Mortgage Assets.*   Seller shall not own, as of any applicable date, Mortgage Assets in excess of (i) on December 31, 2009, $850 billion, or (ii) on December 31 of each year thereafter, 90.0% of the aggregate amount of Mortgage Assets of Seller as of December 31 of the immediately preceding calendar year; provided , that in no event shall Seller be required under this Section 5.7 to own less than $250 billion in Mortgage Assets.

5.8. *Transactions with Affiliates.*   Seller shall not, and shall not permit any of its subsidiaries to, without the prior written consent of Purchaser, engage in any transaction of any kind or nature with an Affiliate of Seller unless such transaction is (i) pursuant to this Agreement, the Senior Preferred Stock or the Warrant, (ii) upon terms no less favorable to Seller than would be ob-

- 9 -

tained in a comparable arm's-length transaction with a Person that is not an Affiliate of Seller or (iii) a transaction undertaken in the ordinary course or pursuant to a contractual obligation or customary employment arrangement in existence as of the date hereof.

5.9. *Reporting.*   Seller shall provide to Purchaser:

(a) not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, annual reports on Form 10-K (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(b) not later than the time period specified in the SEC's rules and regulations with respect to issuers as to which Section 13 and 15(d) of the Exchange Act apply, reports on Form 10-Q (or any successor or comparable form) containing the information required to be contained therein (or required in such successor or comparable form);

(c) promptly from time to time after the occurrence of an event required to be therein reported (and in any event within the time period specified in the SEC's rules and regulations), such other reports on Form 8-K (or any successor or comparable form);

(d) concurrently with any delivery of financial statements under paragraphs (a) or (b) above, a certificate of the Designated Representative, (i) certifying that Seller is (and since the last such certificate has at all times been) in compliance with each of the covenants contained herein and that no representation made by Seller herein or in any document delivered pursuant hereto or in connection herewith was false or misleading in any material respect when made, or, if the foregoing is not true, specifying the nature and extent of the breach of covenant and/or representation and any corrective action taken or proposed to be taken with respect thereto, and (ii) setting forth computations in reasonable detail and satisfactory to the Purchaser of the Deficiency Amount, if any;

(e) promptly, from time to time, such other information regarding the operations, business affairs, plans, projections and financial condition of Seller, or compliance with the terms of this Agreement, as Purchaser may reasonably request; and

(f) as promptly as reasonably practicable, written note of the following:

(i) the occurrence of the Liquidation End Date;

(ii) the filing or commencement of, or any written threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any governmental authority or in arbitration, against Conservator, Seller or any other Person which, if adversely determined, would reasonably be expected to have a Material Adverse Effect;

(iii) any other development that is not a matter of general public knowledge and that has had, or would reasonably be expected to have, a Material Adverse Effect.

- 10 -

5.10. *Executive Compensation.*   Seller shall not, without the consent of the Director, in consultation with the Secretary of the Treasury, enter into any new compensation arrangements with, or increase amounts or benefits payable under existing compensation arrangements of, any Named Executive Officer of Seller.

## 6.  MISCELLANEOUS

6.1. *No Third-Party Beneficiaries.*   Until the termination of the Commitment, at any time during the existence and continuance of a payment default with respect to debt securities issued by Seller and/or a default by Seller with respect to any Mortgage Guarantee Obligations, any holder of such defaulted debt securities or beneficiary of such Mortgage Guarantee Obligations (collectively, the " Holders ") may (a) deliver notice to the Seller and the Designated Representative requesting exercise of all rights available to them under this Agreement to draw on the Commitment up to the lesser of the amount necessary to cure the outstanding payment defaults and the Available Amount as of the last day of the immediately preceding fiscal quarter, and (b) if Seller and the Designated Representative fail to act as requested within thirty (30) days of such notice, or if Purchaser shall fail to perform its obligations in respect of any draw on the Commitment and Seller and/or the Designated Representative shall not be diligently pursuing remedies in respect of such failure, seek judicial relief requiring Seller to draw on the Commitment or Purchaser to fund the Commitment, as applicable. The Holders shall have no other rights under or in respect of this Agreement, and the Commitment shall not otherwise be enforceable by any creditor of Seller or by any other Person other than the parties hereto, and no such creditor or other Person is intended to be, or shall be, a third party beneficiary of any provision of this Agreement.

6.2. *Non-Transferable; Successors.*   The Commitment is solely for the benefit of Seller and shall not inure to the benefit of any other Person (other than the Holders to the extent set forth in Section 6.1), including any entity to which the charter of Seller may be transferred, to any LLRE or to any other successor to the assets, liabilities or operations of Seller. The Commitment may not be assigned or otherwise transferred, in whole or in part, to any Person (including, for the avoidance of doubt, any LLRE to which a receiver has assigned all or a portion of Seller's assets) without the prior written consent of Purchaser (which may be withheld in its sole discretion). In no event shall any successor to Seller (including such an LLRE) be entitled to the benefit of the Commitment without the prior written consent of Purchaser. Seller and Conservator, for themselves and on behalf of their permitted successors, covenant and agree not to transfer or purport to transfer the Commitment in contravention of the terms hereof, and any such attempted transfer shall be null and void *ab initio.* It is the expectation of the parties that, in the event Seller were placed into receivership and an LLRE formed to purchase certain of its assets and assume certain of its liabilities, the Commitment would remain with Seller for the benefit of the holders of the debt of Seller not assumed by the LLRE.

6.3. *Amendments; Waivers.*   This Agreement may be waived or amended solely by a writing executed by both of the parties hereto, and, with respect to amendments to or waivers of the provisions of Sections 5.3, 6.2 and 6.11, the Conservator; provided , however , that no such waiver or amendment shall decrease the aggregate Commitment or add conditions to funding the amounts required to be funded by Purchaser under the Commitment if such waiver or amendment would,

in the reasonable opinion of Seller, adversely affect in any material respect the holders of debt securities of Seller and/or the beneficiaries of Mortgage Guarantee Obligations, in each case in their capacities as such, after taking into account any alternative arrangements that may be implemented concurrently with such waiver or amendment. In no event shall any rights granted hereunder prevent the parties hereto from waiving or amending in any manner whatsoever the covenants of Seller hereunder.

6.4. *Governing Law; Jurisdiction; Venue.*   This Agreement and the Warrant shall be governed by, and construed in accordance with, the federal law of the United States of America if and to the extent such federal law is applicable, and otherwise in accordance with the laws of the State of New York. The Senior Preferred Stock shall be governed as set forth in the terms thereof. The United States District Court for the District of Columbia shall have exclusive jurisdiction over all civil actions arising out of this Agreement, the Commitment, the Senior Preferred Stock and the Warrant, and venue for any such civil action shall lie exclusively in the United States District Court for the District of Columbia.

6.5. *Notices.*   Any notices delivered pursuant to or in connection with this Agreement shall be delivered to the applicable parties at the addresses set forth below:

If to Seller:

Federal Home Loan Mortgage Corporation
c/o Federal Housing Finance Authority
1700 G Street, NW
4th Floor
Washington, DC 20552
Attention: General Counsel

If to Purchaser:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC 20220
Attention: Under Secretary for Domestic Finance

with a copy to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington DC 20220
Attention: General Counsel

If to Conservator:

Federal Housing Finance Authority
1700 G Street, NW

- 12 -

4th Floor
Washington, DC 20552
Attention: General Counsel

All notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail. All notices hereunder shall be effective upon receipt.

6.6. *Disclaimer of Guarantee.*   This Agreement and the Commitment are not intended to and shall not be deemed to constitute a guarantee by Purchaser or any other agency or instrumentality of the United States of the payment or performance of any debt security or any other obligation, indebtedness or liability of Seller of any kind or character whatsoever.

6.7. *Effect of Order; Injunction; Decree.*   If any order, injunction or decree is issued by any court of competent jurisdiction that vacates, modifies, amends, conditions, enjoins, stays or otherwise affects the appointment of Conservator as conservator of Seller or otherwise curtails Conservator's powers as such conservator (except in each case any order converting the conservatorship to a receivership under Section 1367(a) of the FHE Act), Purchaser may by written notice to Conservator and Seller declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

6.8. *Business Day.*   To the extent that any deadline or date of performance of any right or obligation set forth herein shall fall on a day other than a Business Day, then such deadline or date of performance shall automatically be extended to the next succeeding Business Day.

6.9. *Entire Agreement.*   This Agreement, together with the Senior Preferred Stock and Warrant, contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, term sheets, statements, letters of intent or representations, written or oral, with respect thereto.

6.10. *Remedies.*   In the event of a breach by Seller of any covenant or representation of Seller set forth herein, Purchaser shall be entitled to specific performance (in the case of a breach of covenant), damages and such other remedies as may be available at law or in equity; provided , that Purchaser shall not have the right to terminate the Commitment solely as a result of any such breach, and compliance with the covenants and the accuracy of the representations set forth in this Agreement shall not be conditions to funding the Commitment.

6.11. *Tax Reporting.*   Neither Seller nor Conservator shall take, or shall permit any of their respective successors or assigns to take, a position for any tax, accounting or other purpose that is inconsistent with Internal Revenue Service Notice 2008-76 (or the regulations to be issued pursuant to such Notice) regarding the application of Section 382 of the Internal Revenue Code of 1986, as amended, a copy of which Notice has been provided to Seller in connection with the execution of this Agreement.

- 13 -

6.12. *Non-Severability.*   Each of the provisions of this Agreement is integrated with and integral to the whole and shall not be severable from the remainder of the Agreement. In the event that any provision of this Agreement, the Senior Preferred Stock or the Warrant is determined to be illegal or unenforceable, then Purchaser may, in its sole discretion, by written notice to Conservator and Seller, declare this Agreement null and void, whereupon all transfers hereunder (including the issuance of the Senior Preferred Stock and the Warrant and any funding of the Commitment) shall be rescinded and unwound and all obligations of the parties (other than to effectuate such rescission and unwind) shall immediately and automatically terminate.

[Signature Page Follows]

- 14 -

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

Federal Housing Finance Agency,
its Conservator

/s/  James B. Lockhart III
_____
James B. Lockhart III
Director


UNITED STATES DEPARTMENT
OF THE TREASURY

/s/  Henry M. Paulson, Jr.
_____
Henry M. Paulson, Jr.
Secretary of the Treasury


Acknowledged and, solely as
to Sections 5.3, 6.2 and 6.11,
agreed:

FEDERAL HOUSING
FINANCE AGENCY
as Conservator

/s/  James B. Lockhart III
_____
James B. Lockhart III
Director


*Signature Page to Senior Preferred Stock Purchase Agreement*

Exhibit 10.2

EXECUTION VERSION

## FEDERAL HOME LOAN MORTGAGE CORPORATION
## WARRANT TO PURCHASE COMMON STOCK

NO. 2008-1                                                                                      September 7, 2008

### VOID AFTER SEPTEMBER 7, 2028

THIS CERTIFIES THAT, for value received, the United States Department of the Treasury, with its principal office at 1500 Pennsylvania Avenue, NW, Washington, DC 20220 (the " Holder "), is entitled to purchase at the Exercise Price (defined below) from Federal Home Loan Mortgage Corporation, a government-sponsored enterprise of the United States of America, with its principal office at 8200 Jones Branch Drive, McLean, Virginia 22102 (the " Company "), shares of common stock, no par value, of the Company, as provided herein.

1.  Definitions . As used herein, the following terms shall have the following respective meanings:

" Affiliate " shall mean, as to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control," when used with respect to any Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise and the terms "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

" Business Day " shall mean each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York, New York are authorized or obligated by law or executive order to close.

" Common Stock " shall mean the common stock, no par value, of the Company, and all other stock of any class or classes (however designated) of the Company from time to time outstanding, the holders of which have the right, without limitation as to amount, either to all or to a share of the balance of current dividends or liquidating distributions after the payment of dividends and distributions on any shares entitled to preference.

" Exercise Period " shall mean the time period commencing with the date hereof and ending at 5:00 p.m. New York time on the 20th anniversary of the date hereof.

" Exercise Price " shall mean one one-thousandth of a cent ($0.00001) per share.

" Exercise Shares " shall mean the shares of the Common Stock issuable upon exercise of this Warrant, subject to adjustment pursuant to the terms herein, and shall also mean any other shares, securities, assets or property otherwise issuable upon exercise of this Warrant.

" Fair Market Value " shall mean, with respect to a share of Common Stock, or any other security of the Company or any other issuer:

(a)  the volume weighted average daily Market Price during the period of the most recent twenty (20) Trading Days, ending on the last Trading Day before the date of determination of Fair Market Value, if such class of Common Stock or other security is (i) traded

on the New York Stock Exchange or any other U.S. national or regional securities exchange, or admitted to unlisted trading privileges on such an exchange, or (ii) is quoted or reported on the Over-the-Counter Bulletin Board ("OTCBB") or by Pink OTC Markets Inc. or a similar organization or agency succeeding to its functions of reporting prices; or

(b)  if such class of Common Stock or other security is not then so listed, admitted to trading or quoted, the Fair Market Value shall be the Market Price on the last Business Day before the date of determination at Fair Market Value.

" Fully Diluted " shall mean, as of immediately prior to the exercise of this Warrant (or a portion of this Warrant), the sum of, without duplication, (i) the total number of shares of Common Stock outstanding and (ii) all shares of Common Stock issuable in respect of securities convertible into or exercisable or exchangeable for Common Stock, stock appreciation rights or options, warrants (including this Warrant) and other rights to purchase or subscribe for Common Stock or securities convertible into or exercisable or exchangeable for Common Stock (in each case, assuming that no restrictions apply with respect to conversion, exercise, exchange, subscription or purchase).

" Market Price " shall be, as of any specified date with respect to any share of any class of Common Stock or any other security of the Company or any other issuer:

(i)  the closing price on that date or, if no closing price is reported, the last reported sale price, of shares of the Common Stock or such other security on the New York Stock Exchange on that date; or

(ii)  if the Common Stock or such other security is not traded on the New York Stock Exchange, the closing price on that date as reported in composite transactions for the principal U.S. national or regional securities exchange on which the Common Stock or such other security is so traded or, if no closing price is reported, the last reported sale price of shares of the Common Stock or such other security on the principal U.S. national or regional securities exchange on which the Common Stock or such other security is so traded on that date; or

(iii)  if the Common Stock or such other security is not traded on a U.S. national or regional securities exchange, the last quoted bid price on that date for the Common Stock or such other security in the over-the-counter market as reported (x) by the OTCBB or (y) if reports are unavailable under clause (x) above by Pink OTC Markets Inc. or a similar organization or agency succeeding to its functions of reporting prices; or

(iv)  if the Common Stock or such other security is not so quoted by OTCBB or Pink OTC Markets Inc. or a similar organization, the Market Price shall be determined in accordance with the Valuation Procedure.

" Participating Securities " shall mean, (i) any equity security (other than Common Stock) that entitles the holders thereof to participate in liquidations or other distributions with the holders of Common Stock or otherwise participate in the capital of the Company other than through a fixed or floating rate of return on capital loaned or invested, and (ii) any stock appreciation rights, phantom stock rights, or any other profit participation rights with respect to

- 2 -

any of the Company's capital stock or other equity ownership interest, or any rights or options to acquire any such rights.

" Person " shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, estate, unincorporated organization or government or any agency or political subdivision thereof, or any other entity whatsoever.

" Trading Day " shall mean, with respect to any class of Common Stock or any other security of the Company or any other issuer a day (i) on which the securities exchange or other trading platform applicable for purposes of determining the Market Price of a share or unit of such class of Common Stock or other security shall be open for business or (ii) for which quotations from such securities exchange or other trading platform of the character specified for purposes of determining such Market Price shall be reported.

" Valuation Procedure " shall mean a determination made in good faith by the Board of Directors of the Company (the " Board ") that is set forth in resolutions of the Board that are certified by the Secretary of the Company, which certified resolutions (i) set forth the basis of the Board's determination, which, in the case of a valuation in excess of $100 million, shall include the Board's reliance on the valuation of a nationally recognized investment banking or appraisal firm, and (ii) are delivered to the Holder within ten (10) Business Days following such determination. A Valuation Procedure with respect to the value of any capital stock shall be based on the price that would be paid for all of the capital stock of the issuer in an arm's-length transaction between a willing buyer and a willing seller (neither acting under compulsion).

2.  Exercise of Warrant; Number of Shares .

2.1  Exercise . This Warrant may be exercised in whole or in part at any time during the Exercise Period, by delivery of the following to the Company at its address set forth above (or at such other address as it may designate by notice in writing to the Holder):

(a)  an executed Notice of Exercise in the form attached hereto;

(b)  payment of the Exercise Price (i) in cash or by check, (ii) by cancellation of indebtedness or (iii) pursuant to Section 2.2 hereof; and

(c)  this Warrant.

This Warrant will be exercisable for a number of shares of Common Stock that, together with the shares of Common Stock previously issued pursuant to this Warrant, is equal to 79.9% of the total number of shares of Common Stock outstanding on a Fully Diluted basis on the date of exercise. Whenever the Holder exercises this Warrant in whole or in part, it may assign its right to receive the Exercise Shares issuable upon such exercise to any other Person.

As soon as practicable (and in any event within five Business Days) after this Warrant shall have been exercised, a certificate or certificates for the Exercise Shares so purchased, registered in the name of the Holder or such other Person as may be designated by the Holder (to the extent such transfer is not validly restricted and upon payment of any transfer taxes that are

- 3 -

required to be paid by the Holder in connection with any such transfer), shall be issued and delivered by the Company to the Holder or such other Person.

The Person in whose name any certificate or certificates for the Exercise Shares are to be issued upon exercise of this Warrant shall be deemed to have become the holder of record of such shares on the date on which this Warrant was surrendered and payment of the Exercise Price was made, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such surrender and payment is a date when the stock transfer books of the Company are closed, such Person shall be deemed to have become the holder of such shares at the close of business on the next succeeding date on which the stock transfer books are open (whether before or after the end of the Exercise Period).

2.2   Net Exercise . Notwithstanding any provision herein to the contrary, if the Market Price of one share of the Common Stock is greater than the Exercise Price (at the date of calculation as set forth below), in lieu of exercising this Warrant by payment of cash, check or cancellation of indebtedness, the Holder may elect (the " Conversion Right ") to receive shares equal to the value (as determined below) of this Warrant (or the portion thereof being canceled) by surrender of this Warrant at the principal office of the Company together with the properly endorsed Notice of Exercise in which event the Company shall issue to the Holder a number of shares of Common Stock computed using the following formula:

$$X = \frac{Y(A - B)}{A}$$

Where X = the number of shares of Common Stock to be issued

Y = the number of shares of Common Stock purchasable under this Warrant or, if only a portion of this Warrant is being exercised, the portion of this Warrant being exercised (at the date of such calculation)

A = the Market Price of one share of the Common Stock (at the date of such calculation)

B = Exercise Price (as adjusted pursuant to the terms herein to the date of such calculation)

The Company shall pay all reasonable administrative costs incurred by the Holder in connection with the exercise of the Conversion Right by the Holder pursuant to this Section 2.2.

3.   Covenants and Representations of the Company

3.1   Covenants as to Exercise Shares .

(a)  The Company covenants and agrees that all Exercise Shares that may be issued upon the exercise of this Warrant will, upon issuance, be validly authorized, issued and outstanding, fully paid and nonassessable, free of preemptive rights and free from all taxes, liens and charges with respect to the issuance thereof. If the Common Stock or the class of securities of any other Exercise Shares is then listed or quoted on a national securities exchange

- 4 -

or a regional securities exchange, all such Exercise Shares shall, upon issuance, also be so listed or quoted. The Company further covenants and agrees that the Company will at all times during the Exercise Period, have authorized and reserved solely for purposes of the exercise of this Warrant, free from preemptive rights, a sufficient number of shares of its Common Stock or the class of securities of any other Exercise Shares to provide for the exercise in full of this Warrant (without taking into account any possible exercise pursuant to Section 2.2 hereof). If at any time during the Exercise Period the number of authorized but unissued shares of Common Stock or the class of securities of any other Exercise Shares shall not be sufficient to permit exercise in full of this Warrant (without taking into account any possible exercise pursuant to Section 2.2 hereof), the Company will take such corporate action as shall be necessary to increase its authorized but unissued shares of Common Stock or the class of securities of any other Exercise Shares to such number of shares as shall be sufficient for such purposes.

(b)  If at any time the Exercise Shares shall include any shares or other securities other than shares of Common Stock, or any other property or assets, the terms of this Warrant shall be modified or supplemented (and in the absence of express written documentation thereof, shall be deemed to be so modified or supplemented), and the Company shall take all actions as may be necessary to preserve, in a manner and on terms as nearly equivalent as practicable to the provisions of this Warrant as they apply to the Common Stock, the rights of the Holder hereunder, including any equitable replacements of the term "Common Stock" with the term "Exercise Shares" and adjustments of any formula included herein.

(c)  The Company's filings under the Securities Exchange Act of 1934, as amended (the " Exchange Act "), will comply in all material respects as to form with the Exchange Act and the rules and regulations thereunder.

(d)  Without prior written consent of the Holder, the Company shall not permit any Significant Subsidiary (as defined by Rule 1-02(w) of Regulation S-X under the Securities Act or any successor rule) to (i) issue or grant any capital stock or equity ownership interest, including any Participating Security; (ii) any rights, options, warrants or convertible security that is exercisable for or convertible into any capital stock or other equity ownership interest, including any Participating Security; or (iii) any stock appreciation rights, phantom stock rights, or any other profit participation rights, or any rights or options to acquire any such rights, in each case of clauses (i), (ii) and (iii) above, to any Person other than the Company or its wholly owned subsidiaries.

(e)  The Company shall not take any action that will result in an increase in the par value of Common Stock.

3.2   No Impairment . Except and to the extent as waived or consented to in writing by the Holder, the Company will not, by amendment of its charter, bylaws or other governing documents or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all the provisions of this Warrant and in the taking of all such action as may be necessary or appropriate in order to protect the exercise rights of the Holder against impairment or dilution consistent with the intent and principles

- 5 -

expressed herein. If any event or occurrence shall occur (including without limitation, stock dividends and stock splits) as to which the failure to make any adjustment to the Exercise Price and/or the number of shares or other assets or property subject to this Warrant would adversely affect the purchase rights or value represented by this Warrant, including any issuance of Common Stock or Participating Securities, then, in each such case, the Company shall determine the adjustment, if any, on a basis consistent with the essential intent and principles herein, necessary to preserve, without dilution, the purchase rights represented by this Warrant. If such determination involves or is based on a determination of the Fair Market Value of any securities or other assets or property, such determination shall be made in accordance with the Valuation Procedure. Without limiting the foregoing, in the event of any dividend or distribution by the Company of assets or property (including shares of any other Person) on or with respect to the Common Stock, or any exchange of the shares of Common Stock into any other assets, property or securities, this Warrant will be equitably adjusted to permit the Holder to receive upon exercise the assets, property or securities that would have been received if the Warrant had been exercised immediately prior to such dividend, distribution or exchange.

   3.3   Notice of Record Date . In the event (i) the Company takes a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, (ii) the Company authorizes the granting to the holders of Common Stock (or holders of the class of securities of any other Exercise Shares) of rights to subscribe to or purchase any shares of capital stock of any class or securities convertible into any shares of capital stock or of any other right, (iii) the Company authorizes any reclassification of, or any recapitalization involving, any class of Common Stock or any consolidation or merger to which the Company is a party and for which approval of the stockholders of the Company is required, or of the sale or transfer of all or substantially all of the assets of the Company, (iv) the Company authorizes or consents to or otherwise commences the voluntary or involuntary dissolution, liquidation or winding up of the Company or (v) the Company authorizes or takes any other action that would trigger an adjustment in the Exercise Price or the number or amount of shares of Common Stock or other Exercise Shares subject to this Warrant, the Company shall mail to the Holder, at least ten (10) days prior to the earlier of the record date for any such action or stockholder vote and the date of such action, a notice specifying (a) which action is to be taken and the date on which any such record is to be taken for the purpose of any such action, (b) the date that any such action is to take place and (c) the amount and character of any stock, other securities or property and amounts, or rights or options with respect thereto, proposed to be issued, granted or delivered to each holder of Common Stock (or holders of the class of securities of any other Exercise Shares).

   4.   Fractional Shares . No fractional shares shall be issued upon the exercise of this Warrant. All Exercise Shares (including fractions) issuable upon exercise of this Warrant may be aggregated for purposes of determining whether the exercise would result in the issuance of any fractional share. If, after aggregation, the exercise would result in the issuance of a fractional share, the Company shall, in lieu of issuance of any fractional share, pay the Holder otherwise entitled to such fraction a sum in cash equal to the product resulting from multiplying such fractional amount by the Fair Market Value of one share of Common Stock.

- 6 -

5.   Listing Rights . The Company shall use its best efforts, upon the request of the Holder, to cause the Exercise Shares to be listed or quoted on a national securities exchange or a regional securities exchange.

6.   No Stockholder Rights or Liabilities . Without limiting the consent rights of the Holder contained in Section 3, this Warrant in and of itself shall not entitle the Holder to any voting rights or other rights as a stockholder of the Company. No provision of this Warrant, in the absence of affirmative action by the Holder to exercise this Warrant in exchange for shares of Common Stock, and no mere enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the Exercise Price or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

7.   Transfer of Warrant . This Warrant is not transferable; provided, however, that the Holder may assign its rights to receive shares upon exercise of this Warrant pursuant to Section 2.1.

8.   Payment of Taxes on Stock Certificate Issues Upon Exercise . The initial issuance of certificates of Common Stock upon any exercise of this Warrant shall be made without charge to the exercising Holder for any transfer, stamp or similar tax or for any other governmental charges that may be imposed in respect of the issuance of such stock certificates, and such stock certificates shall be issued in the respective names of, or in such names as may be directed by, the Holder; provided, however, that the Company shall not be required to pay any tax or such other charges that may be payable in respect of any transfer involved in the issuance and delivery of any such stock certificate, any new warrants or other securities in a name other than that of the Holder upon exercise of this Warrant (other than to an Affiliate), and the Company shall not be required to issue or deliver such certificates or other securities unless and until the Person or Persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company that such tax has been paid or is not payable.

9.   Lost, Stolen, Mutilated or Destroyed Warrant . If this Warrant is lost, stolen, mutilated or destroyed, the Company may, on such terms as to indemnity or otherwise as it may reasonably impose (which shall, in the case of a mutilated Warrant, include the surrender thereof), issue a new Warrant of like denomination and tenor as this Warrant so lost, stolen, mutilated or destroyed. Any such new Warrant shall constitute an original contractual obligation of the Company, whether or not the allegedly lost, stolen, mutilated or destroyed Warrant shall be at any time enforceable by anyone.

10.   Closing of Books . The Company will at no time close its transfer books against the transfer of any shares of Common Stock issued or issuable upon the exercise or conversion of any Warrant in any manner which interferes with the timely exercise or conversion of this Warrant.

- 7 -

11.  Notices, Etc . All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex or facsimile if sent during normal business hours of the recipient or if not, then on the next Business Day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) Business Day after deposit with a nationally recognized overnight courier, specifying next Business Day delivery, with written verification of receipt. All notices and other communications shall be sent to the Company at the address listed on the signature page and to Holder at the address set forth below or at such other address as the Company or Holder may designate by ten (10) days advance written notice to the other parties hereto:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220
Attn: Under Secretary for Domestic Finance

with a copy to:

United States Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, DC 20220
Attn: General Counsel

12.  Acceptance . Receipt of this Warrant by the Holder shall constitute acceptance of and agreement to all of the terms and conditions contained herein.

13.  Binding Effect on Successors . This Warrant shall be binding upon any Person succeeding the Company by merger, consolidation or acquisition of all or substantially all of the Company's assets, and all of the obligations of the Company relating to the Common Stock issuable upon the exercise or conversion of this Warrant shall survive the exercise, conversion and termination of this Warrant and all of the covenants and agreements of the Company shall inure to the benefit of the successors and assigns of the Holder.

14.  Governing Law . This Warrant and all rights, obligations and liabilities hereunder shall be governed and construed in accordance with Federal law, if and to the extent such Federal law is applicable, and otherwise in accordance with the law of the State of New York.

IN WITNESS WHEREOF, the Company has caused this Warrant to be executed by its duly authorized officer as of September 7, 2008.

FEDERAL HOME LOAN MORTGAGE
CORPORATION, by

The Federal Housing Finance Agency, its Conservator

/s/  James B. Lockhart III

James B. Lockhart III
Director

Address: 8200 Jones Branch Drive
              McLean, Virginia 22102

*Signature Page to Warrant*

## <u>NOTICE OF EXERCISE</u>

TO:  FEDERAL HOME LOAN MORTGAGE CORPORATION

(1)    ☐    The undersigned hereby elects to purchase _____shares of the Common Stock of Federal Home Loan Mortgage Corporation (the " <u>Company</u> ") pursuant to the terms of the attached Warrant, and tenders herewith or is delivering by wire transfer to account number _____at _____(bank) payment of the exercise price in full.

☐    The undersigned hereby elects to purchase _____shares of the Common Stock of the Company pursuant to the terms of the net exercise provisions set forth in Section 2.2 of the attached Warrant.

(2)   Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below:

_____
(Name)

_____
_____
(Address)

_____
(Date)

_____
(Signature)

_____
(Print name)

**FEDERAL HOUSING FINANCE AGENCY**



**STATEMENT**

|          |                                  |
|----------|----------------------------------|
| **Contact:** | Corinne Russell  (202) 414-6921 |
|          | Stefanie Mullin  (202) 414-6376 |

For Immediate
Release September 7, 2008

**STATEMENT OF FHFA DIRECTOR JAMES B. LOCKHART**

Good Morning

Fannie Mae and Freddie Mac share the critical mission of providing stability and liquidity to the housing market. Between them, the Enterprises have $5.4 trillion of guaranteed mortgage-backed securities (MBS) and debt outstanding, which is equal to the publicly held debt of the United States. Their market share of all new mortgages reached over 80 percent earlier this year, but it is now falling. During the turmoil last year, they played a very important role in providing liquidity to the conforming mortgage market. That has required a very careful and delicate balance of mission and safety and soundness. A key component of this balance has been their ability to raise and maintain capital. Given recent market conditions, the

1

balance has been lost. Unfortunately, as house prices, earnings and capital have continued to deteriorate, their ability to fulfill their mission has deteriorated. In particular, the capacity of their capital to absorb further losses while supporting new business activity is in doubt.

Today's action addresses safety and soundness concerns. FHFA's rating system is called GSE Enterprise Risk or G-Seer. It stands for Governance, Solvency, Earnings and Enterprise Risk which includes credit, market and operational risk. There are pervasive weaknesses across the board, which have been getting worse in this market.

Over the last three years OFHEO, and now FHFA, have worked hard to encourage the Enterprises to rectify their accounting, systems, controls and risk management issues. They have made good progress in many areas, but market conditions have overwhelmed that progress.

The result has been that they have been unable to provide needed stability to the market. They also find themselves unable to meet their affordable housing mission. Rather than letting these conditions fester and worsen and put our markets in jeopardy, FHFA, after painstaking review, has decided to take action now.

2

Key events over the past six months have demonstrated the increasing challenge faced by the companies in striving to balance mission and safety and soundness, and the ultimate disruption of that balance that led to today's announcements. In the first few months of this year, the secondary market showed significant deterioration, with buyers demanding much higher prices for mortgage backed securities.

In February, in recognition of the remediation progress in financial reporting, we removed the portfolio caps on each company, but they did not have the capital to use that flexibility.

In March, we announced with the Enterprises an initiative to increase mortgage market liquidity and market confidence. We reduced the OFHEO-directed capital requirements in return for their commitments to raise significant capital and to maintain overall capital levels well in excess of requirements.

In April, we released our Annual Report to Congress, identifying each company as a significant supervisory concern and noting, in particular, the deteriorating mortgage credit environment and the risks it posed to the companies.

3

In May OFHEO lifted its 2006 Consent Order with Fannie Mae after the company completed the terms of that order. Subsequently, Fannie Mae successfully raised $7.4 billion of new capital, but Freddie Mac never completed the capital raise promised in March.

Since then credit conditions in the mortgage market continued to deteriorate, with home prices continuing to decline and mortgage delinquency rates reaching alarming levels. FHFA intensified its reviews of each company's capital planning and capital position, their earnings forecasts and the effect of falling house prices and increasing delinquencies on the credit quality of their mortgage book.

In getting to today, the supervision team has spent countless hours reviewing with each company various forecasts, stress tests, and projections, and has evaluated the performance of their internal models in these analyses. We have had many meetings with each company's management teams, and have had frank exchanges regarding loss projections, asset valuations, and capital adequacy. More recently, we have gone the extra step of inviting the Federal Reserve and the OCC to have some of their senior mortgage credit experts join our team in these assessments.

4

The conclusions we reach today, while our own, have had the added benefit of their insight and perspective.

After this exhaustive review, I have determined that the companies cannot continue to operate safely and soundly and fulfill their critical public mission, without significant action to address our concerns, which are:

• the safety and soundness issues I mentioned, including current capitalization;

• current market conditions;

• the financial performance and condition of each company;

• the inability of the companies to fund themselves according to normal practices and prices; and

• the critical importance each company has in supporting the residential mortgage market in this country,

Therefore, in order to restore the balance between safety and soundness and mission, FHFA has placed Fannie Mae and Freddie Mac into conservatorship. That is a statutory process designed to stabilize a troubled institution with the

5

objective of returning the entities to normal business operations. FHFA will act as the conservator to operate the Enterprises until they are stabilized.

The Boards of both companies consented yesterday to the conservatorship. I appreciate the cooperation we have received from the boards and the management of both Enterprises. These individuals did not create the inherent conflict and flawed business model embedded in the Enterprises' structure.

The goal of these actions is to help restore confidence in Fannie Mae and Freddie Mac, enhance their capacity to fulfill their mission, and mitigate the systemic risk that has contributed directly to the instability in the current market. The lack of confidence has resulted in continuing spread widening of their MBS, which means that virtually none of the large drop in interest rates over the past year has been passed on to the mortgage markets. On top of that, Freddie Mac and Fannie Mae, in order to try to build capital, have continued to raise prices and tighten credit standards.

FHFA has not undertaken this action lightly. We have consulted with the Chairman of the Board of Governors of the Federal Reserve System, Ben Bernanke, who was appointed a consultant to FHFA under the new legislation. We

6

have also consulted with the Secretary of the Treasury, not only as an FHFA Oversight Board member, but also in his duties under the law to provide financing to the GSEs. They both concurred with me that conservatorship needed to be undertaken now.

There are several key components of this conservatorship:

First, Monday morning the businesses will open as normal, only with stronger backing for the holders of MBS, senior debt and subordinated debt.

Second, the Enterprises will be allowed to grow their guarantee MBS books without limits and continue to purchase replacement securities for their portfolios, about $20 billion per month without capital constraints.

Third, as the conservator, FHFA will assume the power of the Board and management.

Fourth, the present CEOs will be leaving, but we have asked them to stay on to help with the transition.

Fifth, I am announcing today I have selected Herb Allison to be the new CEO of Fannie Mae and David Moffett the CEO of Freddie Mac. Herb has been the Vice Chairman of Merrill Lynch and for the last eight years chairman of TIAA-CREF. David was the Vice Chairman and CFO of US Bancorp. I appreciate the willingness of these two men to take on these tough jobs during these challenging times. Their compensation will be significantly lower than the outgoing CEOs. They will be joined by equally strong non-executive chairmen.

Sixth, at this time any other management action will be very limited. In fact, the new CEOs have agreed with me that it is very important to work with the current management teams and employees to encourage them to stay and to continue to make important improvements to the Enterprises.

Seventh, in order to conserve over $2 billion in capital every year, the common stock and preferred stock dividends will be eliminated, but the common and all preferred stocks will continue to remain outstanding. Subordinated debt interest and principal payments will continue to be made.

Eighth, all political activities — including all lobbying — will be halted immediately. We will review the charitable activities.

8

Lastly and very importantly, there will be the financing and investing relationship with the U.S. Treasury, which Secretary Paulson will be discussing. We believe that these facilities will provide the critically needed support to Freddie Mac and Fannie Mae and importantly the liquidity of the mortgage market.

One of the three facilities he will be mentioning is a secured liquidity facility which will be not only for Fannie Mae and Freddie Mac, but also for the 12 Federal Home Loan Banks that FHFA also regulates. The Federal Home Loan Banks have performed remarkably well over the last year as they have a different business model than Fannie Mae and Freddie Mac and a different capital structure that grows as their lending activity grows. They are joint and severally liable for the Bank System's debt obligations and all but one of the 12 are profitable. Therefore, it is very unlikely that they will use the facility.

During the conservatorship period, FHFA will continue to work expeditiously on the many regulations needed to implement the new law. Some of the key regulations will be minimum capital standards, prudential safety and soundness standards and portfolio limits. It is critical to complete these regulations so that any new investor will understand the investment proposition.

9

This decision was a tough one for the FHFA team as they have worked so hard to help the Enterprises remain strong suppliers of support to the secondary mortgage markets. Unfortunately, the antiquated capital requirements and the turmoil in housing markets over-whelmed all the good and hard work put in by the FHFA teams and the Enterprises' managers and employees. Conservatorship will give the Enterprises the time to restore the balances between safety and soundness and provide affordable housing and stability and liquidity to the mortgage markets. I want to thank the FHFA employees for their work during this intense regulatory process. They represent the best in public service. I would also like to thank the employees of Fannie Mae and Freddie Mac for all their hard work. Working together we can finish the job of restoring confidence in the Enterprises and with the new legislation build a stronger and safer future for the mortgage markets, homeowners and renters in America.

Thank you and I will now turn it back to Secretary Paulson.

10

Exhibit 99.2

September 7, 2008
hp-1129

### Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing
### Finance Agency Action to Protect Financial Markets and Taxpayers

**Washington, DC--** Good morning. I'm joined here by Jim Lockhart, Director of the new independent regulator, the Federal Housing Finance Agency, FHFA.

In July, Congress granted the Treasury, the Federal Reserve and FHFA new authorities with respect to the GSEs, Fannie Mae and Freddie Mac. Since that time, we have closely monitored financial market and business conditions and have analyzed in great detail the current financial condition of the GSEs – including the ability of the GSEs to weather a variety of market conditions going forward. As a result of this work, we have determined that it is necessary to take action.

Since this difficult period for the GSEs began, I have clearly stated three critical objectives: providing stability to financial markets, supporting the availability of mortgage finance, and protecting taxpayers – both by minimizing the near term costs to the taxpayer and by setting policymakers on a course to resolve the systemic risk created by the inherent conflict in the GSE structure.

Based on what we have learned about these institutions over the last four weeks – including what we learned about their capital requirements – and given the condition of financial markets today, I concluded that it would not have been in the best interest of the taxpayers for Treasury to simply make an equity investment in these enterprises in their current form.

The four steps we are announcing today are the result of detailed and thorough collaboration between FHFA, the U.S. Treasury, and the Federal Reserve.

We examined all options available, and determined that this comprehensive and complementary set of actions best meets our three objectives of market stability, mortgage availability and taxpayer protection.

Throughout this process we have been in close communication with the GSEs themselves. I have also consulted with Members of Congress from both parties and I appreciate their support as FHFA, the Federal Reserve and the Treasury have moved to address this difficult issue.

Before I turn to Jim to discuss the action he is taking today, let me make clear that these two institutions are unique. They operate solely in the mortgage market and are therefore more exposed than other financial institutions to the housing correction. Their statutory capital requirements are thin and poorly defined as compared to other institutions. Nothing about our actions today in any way reflects a changed view of the housing correction or of the strength of other U.S. financial institutions.

***

I support the Director's decision as necessary and appropriate and had advised him that conservatorship was the only form in which I would commit taxpayer money to the GSEs.

I appreciate the productive cooperation we have received from the boards and the management of both GSEs. I attribute the need for today's action primarily to the inherent conflict and flawed business model embedded in the GSE structure, and to the ongoing housing correction. GSE managements and their Boards are responsible for neither. New CEOs supported by new non-executive Chairmen have taken over management of the enterprises, and we hope and expect that the vast majority of key professionals will remain in their jobs. I am particularly pleased that the departing CEOs, Dan Mudd and Dick Syron, have agreed to stay on for a period to help with the transition.

I have long said that the housing correction poses the biggest risk to our economy. It is a drag on our economic growth, and at the heart of the turmoil and stress for our financial markets and financial institutions. Our economy and our markets will not recover until the bulk of this housing correction is behind us. Fannie Mae and Freddie Mac are critical to turning the corner on housing. Therefore, the primary mission of these enterprises now will be to proactively work to increase the availability of mortgage finance, including by examining the guaranty fee structure with an eye toward mortgage affordability.

To promote stability in the secondary mortgage market and lower the cost of funding, the GSEs will modestly increase their MBS portfolios through the end of 2009. Then, to address systemic risk, in 2010 their portfolios will begin to be gradually reduced at the rate of 10 percent per year, largely through natural run off, eventually stabilizing at a lower, less risky size.

Treasury has taken three additional steps to complement FHFA's decision to place both enterprises in conservatorship. First, Treasury and FHFA have established Preferred Stock Purchase Agreements, contractual agreements between the Treasury and the conserved entities. Under these agreements, Treasury will ensure that each company maintains a positive net worth. These agreements support market stability by providing additional security and clarity to GSE debt holders – senior and subordinated – and support mortgage availability by providing additional confidence to investors in GSE mortgage backed securities. This commitment will eliminate any mandatory triggering of receivership and will ensure that the conserved entities have the ability to fulfill their financial obligations. It is more efficient than a one-time equity injection, because it will be used only as needed and on terms that Treasury has set. With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government senior preferred shares.

These Preferred Stock Purchase Agreements were made necessary by the ambiguities in the GSE Congressional charters, which have been perceived to indicate government support for agency debt and guaranteed MBS. Our nation has tolerated these ambiguities for too long, and as a result GSE debt and MBS are held by central banks and investors throughout the United States and around the world who believe them to be virtually risk-free. Because the U.S. Government created these ambiguities, we have a responsibility to both avert and ultimately address the systemic risk now posed by the scale and breadth of the holdings of GSE debt and MBS.

Market discipline is best served when shareholders bear both the risk and the reward of their investment. While conservatorship does not eliminate the common stock, it does place common shareholders last in terms of claims on the assets of the enterprise.

Similarly, conservatorship does not eliminate the outstanding preferred stock, but does place preferred shareholders second, after the common shareholders, in absorbing losses. The federal banking agencies are assessing the exposures of banks and thrifts to Fannie Mae and Freddie Mac. The agencies believe that, while many institutions hold common or preferred shares of these two GSEs, only a limited number of smaller institutions have holdings that are significant compared to their capital.

The agencies encourage depository institutions to contact their primary federal regulator if they believe that losses on their holdings of Fannie Mae or Freddie Mac common or preferred shares, whether realized or unrealized, are likely to reduce their regulatory capital below "well capitalized." The banking agencies are prepared to work with the affected institutions to develop capital restoration plans consistent with the capital regulations.

Preferred stock investors should recognize that the GSEs are unlike any other financial institutions and consequently GSE preferred stocks are not a good proxy for financial institution preferred stock more broadly. By stabilizing the GSEs so they can better perform their mission, today's action should accelerate stabilization in the housing market, ultimately benefiting financial institutions. The broader market for preferred stock issuance should continue to remain available for well-capitalized institutions.

The second step Treasury is taking today is the establishment of a new secured lending credit facility which will be available to Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. Given the combination of actions we are taking, including the Preferred Share Purchase Agreements, we expect the GSEs to be in a stronger position to fund their regular business activities in the capital markets. This facility is intended to serve as an ultimate liquidity backstop, in essence, implementing the temporary liquidity backstop authority granted by Congress in July, and will be available until those authorities expire in December 2009.

Finally, to further support the availability of mortgage financing for millions of Americans, Treasury is initiating a temporary program to purchase GSE MBS. During this ongoing housing correction, the GSE portfolios have been constrained, both by their own capital situation and by regulatory efforts to address systemic risk. As the GSEs have grappled with their difficulties, we've seen mortgage rate spreads to Treasuries widen, making mortgages less affordable for homebuyers. While the GSEs are expected to moderately increase the size of their portfolios over the next 15 months through prudent mortgage purchases, complementary government efforts can aid mortgage affordability. Treasury will begin this new program later this month, investing in new GSE MBS. Additional purchases will be made as deemed appropriate. Given that Treasury can hold these securities to maturity, the spreads between Treasury issuances and GSE MBS indicate that there is no reason to expect taxpayer losses from this program, and, in fact, it could produce gains. This program will also expire with the Treasury's temporary authorities in December 2009.

Together, this four part program is the best means of protecting our markets and the taxpayers from the systemic risk posed by the current financial condition of the GSEs. Because the GSEs are in conservatorship, they will no longer be managed with a strategy to maximize common shareholder returns, a strategy which historically encouraged risk-taking. The Preferred Stock Purchase Agreements minimize current cash outlays, and give taxpayers a large stake in the future value of these entities. In the end, the ultimate cost to the taxpayer will depend on the business results of the GSEs going forward. To that end, the steps we have taken to support the GSE debt and to support the mortgage market will together improve the housing market, the US economy and the GSEs' business outlook.

Through the four actions we have taken today, FHFA and Treasury have acted on the responsibilities we have to protect the stability of the financial markets, including the mortgage market, and to protect the taxpayer to the maximum extent possible.

And let me make clear what today's actions mean for Americans and their families. Fannie Mae and Freddie Mac are so large and so interwoven in our financial system that a failure of either of them would cause great turmoil in our financial markets here at home and around the globe. This turmoil would directly and negatively impact household wealth: from family budgets, to home values, to savings for college and retirement. A failure would affect the ability of Americans to get home loans, auto loans and other consumer credit and business finance. And a failure would be harmful to economic growth and job creation. That is why we have taken these actions today.

While we expect these four steps to provide greater stability and certainty to market participants and provide long-term clarity to investors in GSE debt and MBS securities, our collective work is not complete. At the end of next year, the Treasury temporary authorities will expire, the GSE portfolios will begin to gradually run off, and the GSEs will begin to pay the government a fee to compensate taxpayers for the on-going support provided by the Preferred Stock Purchase Agreements. Together, these factors should give momentum and urgency to the reform cause. Policymakers must view this next period as a "time out" where we have stabilized the GSEs while we decide their future role and structure.

Because the GSEs are Congressionally-chartered, only Congress can address the inherent conflict of attempting to serve both shareholders and a public mission. The new Congress and the next Administration must decide what role government in general, and these entities in particular, should play in the housing market. There is a consensus today that these enterprises pose a systemic risk and they cannot continue in their current form. Government support needs to be either explicit or non-existent, and structured to resolve the conflict between public and private purposes. And policymakers must address the issue of systemic risk. I recognize that there are strong differences of opinion over the role of government in supporting housing, but under any course policymakers choose, there are ways to structure these entities in order to address market stability in the transition and limit systemic risk and conflict of purposes for the long-term. We will make a grave error if we don't use this time out to permanently address the structural issues presented by the GSEs.

In the weeks to come, I will describe my views on long term reform. I look forward to engaging in that timely and necessary debate.