**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FAIRHOLME FUNDS, INC.**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:13-cv-1053-RCL** |
| **FEDERAL HOUSING FINANCE AGENCY**, *et al.*, | |
| *Defendants.* | |
| | |
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Case No. 1:13-mc-1288-RCL** |
| | |
| This Memorandum Opinion relates to: ALL CASES | <u>CLASS ACTION</u> |

~~*** FILED UNDER SEAL***~~

       unsealed October 3, 2022
       /s/ RCL

<u>**MEMORANDUM OPINION**</u>

Before the Court are the parties' cross-motions for summary judgment. *See* Defs.' Motion for S.J., Fairholme ECF No. 145, Class ECF No. 143; Pls.' Mot. for Partial S.J., Fairholme ECF No. 146, Class ECF No. 144.[1] Defendants the Federal Housing Finance Agency ("FHFA") as conservator for Fannie Mae and Freddie Mac, FHFA Acting Director Sandra L. Thompson, Fannie Mae, and Freddie Mac move for summary judgment on plaintiffs' remaining claims in both of the above-captioned cases. Plaintiffs Fairholme Funds, Inc., Fairholme Fund, Berkeley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance

---

[1] The summary judgment filings in both cases are identical. For ease of reference, the Court cites the ECF number under which the same document is filed in each case, using the citation "Fairholme ECF No." for No. 1:13-cv-1053-RCL and "Class ECF No." for No. 1:13-mc-1288-RCL.

Company, Berkeley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred Employers Insurance Company in No. 1:13-cv-1053-RCL and the class-action Plaintiffs in No. 1:13-mc-1288-RCL move for partial summary judgment on the enforceability of a single contractual provision in both cases. Upon consideration, defendants' motion is **GRANTED** in part and **DENIED** in part, and plaintiffs' motion is **DENIED**.

## I.    BACKGROUND

The Court has explained the factual background of this matter extensively in prior opinions. *See Fairholme Funds, Inc. v. Federal Housing Finance Agency*, No. 1:13-cv-1053-RCL, 2018 WL 4680197, at *1–4 (D.D.C. Sept. 28, 2018); *Perry Capital LLC v. Lew* ("*Perry I*"), 70 F. Supp. 3d 208, 214-19 (D.D.C. 2014). The Court will therefore set out the facts here only as necessary to resolve the cross-motions for summary judgment, drawing on the parties' statements and counter-statements of material fact and other materials in the summary judgment record. *See generally* Defs.' Statement of Undisputed Material Facts ("DSUMF"), Fairholme ECF No. 145-1, Class ECF No. 143-1; Pls.' Resp. to Defs.' Statement of Undisputed Material Facts ("PRDSUMF"), Fairholme ECF No. 151-1, Class ECF No. 147-1; Pls.' Statement of Add'l Material Facts ("PSAMF"), Fairholme ECF No. 151-2, Class ECF No. 147-2; Defs.' Resp. to Pls.' Statement of Add'l Material Facts ("DRPSAMF"), Fairholme ECF No. 157-1, Class ECF No. 152-1; Pls.' Statement of Undisputed Material Facts, Fairholme ECF No. 147-1, Class ECF No. 144-1 (D.D.C. Mar. 21, 2022); Defs.' Counter-Statement of Facts, Fairholme ECF No. 150-1, Class ECF No. 146-1.

This matter is brought before the Court by a class-action lawsuit and an individual lawsuit. The class-action lawsuit was brought by a class of private individual institutional investors who own either preferred or common stock in Fannie Mae or Freddie Mac. Second Am. Consolidated

Class Action Compl. ¶¶ 18-33, Class ECF No. 71. The individual lawsuit was brought by an institutional investor owning junior preferred stock in Fannie Mae and Freddie Mac and by various insurance companies. First Am. Compl. ¶¶ 5-20, Fairholme ECF No. 75.Following this Court's most recent opinion, *see Fairholme Funds*, 2018 WL 4680197, a single, substantially identical claim remains in both cases.

Fannie Mae and Freddie Mac are government-sponsored entities ("GSEs") created by Congress to, among other goals, "promote access to mortgage credit throughout the Nation . . . by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing." 12 U.S.C. § 1716(4). Although the GSEs are government-sponsored, Congress has converted them by statute to publicly traded companies. *See* Housing and Urban Development Act, Pub. L. No. 90-448, § 802, 82 Stat. 536–538 (1968); Financial Institutions Reform, Recovery and Enforcement Act, Pub. L. No. 101-73, § 731, 103 Stat. 432–433 (1989). The GSEs have issued both common stock and non-cumulative preferred stock over the years, but neither has issued any further publicly traded stock since 2008. DSUMF ¶ 2; PRDSUMF ¶ 2.

The GSEs suffered substantial losses following the onset of the 2008 financial crisis, including a loss of $108 billion in 2008 alone. DSUMF ¶ 4; PRDSUMF ¶ 4. In response, Congress enacted the Housing and Economic Recovery Act ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (2008), which, among other things, created the FHFA and authorized it to act as a conservator or receiver for both of the GSEs "for the purpose of reorganizing, rehabilitating, or winding up the[ir] affairs." 12 U.S.C. § 4617(a)(2). The FHFA placed both GSEs into conservatorship on September 6, 2008. DSUMF ¶ 6; PRDSUMF ¶ 6.

Almost immediately after the conservatorship began, the GSEs entered into Senior Preferred Stock Purchase Agreements ("PSPAs") with the U.S. Department of the Treasury ("Treasury"), with Treasury committing to invest up to $100 billion in each of the GSEs ("the Treasury Commitment"). DSUMF ¶ 6; PRDSUMF ¶ 6; *see* PSPA, Ex. E to Defs.' Mot. for S.J., Fairholme ECF No. 145-6, Class ECF No. 143-6. The PSPAs set out the general terms of the agreements between the GSEs and Treasury, with more specific terms set out in the Certificates of Designation of Terms of Variable Preference Senior Preferred Stock ("Treasury Stock Certificates") for each  GSE. DSUMF ¶ 7; PRDSUMF ¶ 7; *see* Treasury Stock Certificate, Ex. F to Defs.' Mot. for S.J., Fairholme ECF No. 145-7, Class ECF No. 143-7.

As relevant here, the PSPAs and the Treasury Stock Certificates provided that, as consideration for investing in the GSEs, Treasury was entitled to (1) a $1 billion senior liquidation preference ("the Liquidation Preference")—a priority right before all other stockholders to receive distributions from assets in the event of a liquidation, PSPA § 3.1; (2) an increase in that Liquidation Preference equal to every dollar that the GSEs draw on the Treasury Commitment, *id.* § 3.3; (3) an annual dividend equal to 10 percent of the Liquidation Preference if paid in cash, Treasury Stock Certificate § 2(a)–(c); (4) warrants allowing Treasury to purchase up to 79.9 percent of the GSEs' common stock at a nominal price, PSPA §§ 1, 3.1; and (5) periodic commitment fees ("PCFs") to be agreed upon at a later date, *id.* § 3.2(b). The Treasury Stock Certificates also provided that the GSEs, "[p]rior to the termination of the Commitment . . . may pay down the Liquidation Preference of all outstanding shares of [Treasury's] Senior Preferred Stock pro rata, at any time, out of funds legally available therefor, but only to the extent of (i) accrued and unpaid dividends previously added to the Liquidation Preference pursuant to Section 8 [of the Treasury Stock Certificate] and not repaid by any prior pay down of Liquidation

Preference and (ii) Periodic Commitment Fees previously added to the Liquidation Preference pursuant to Section 8 [] and not repaid by any prior pay down of Liquidation Preference." Treasury Stock Certificate § 3(a).[2] The parties do not dispute that because of that provision, the GSEs were contractually prohibited from paying down the Liquidation Preference except under the conditions provided. DSUMF ¶ 8; PRDSUMF ¶ 8. Furthermore, the PSPAs prohibited the GSEs from making "any other distribution," including paying dividends to non-Treasury shareholders, without Treasury's permission. PSPA § 5.1.

Treasury and FHFA twice agreed to amend the PSPAs before the amendment at issue in this case. The First Amendment doubled Treasury's Commitment to $200 billion for each of the GSEs, while the Second Amendment provided that Treasury would invest as much as the GSEs needed until December 31, 2012, before reinstating the $200 billion cap on the Treasury Commitment. DSUMF ¶ 11; PRDSUMF ¶ 11. In the course of negotiating the first two amendments to the PSPAs, FHFA sent a letter to Treasury proposing a "simple revision to each [Treasury Stock] Certificate, easing the impediments to optional paydown" to correct the original Treasury Stock Certificates' "unintended consequence of dissuading the companies from repurchasing preferred shares when they are able," Letter from A. Pollard to S. Albrecht (Feb. 25, 2009), Ex. I to Defs.' Mot. for S.J., Fairholme ECF No. 145-10, Class ECF No. 143-10. However, Treasury declined to adopt that proposed revision, DSUMF ¶ 10; PRDSUMF ¶ 10.

By early 2012, the GSEs had turned a corner and begun to record net profits. PSAMF ¶ 37; DRPSAMF ¶ 37. Nevertheless, the GSEs found themselves in a circular problem of having to draw further on the Treasury Commitment to pay its required dividends to Treasury, and so on August

---

[2] The same section provided less restrictive terms for paying down the Liquidation Preference *after* the termination of Treasury's Commitment. *See* Treasury Stock Certificate § 3(a).

17, 2012, Treasury and FHFA adopted the Third Amendment to the PSPAs, the subject of the parties' present dispute. DSUMF ¶ 17; PRDSUMF ¶ 17. The Third Amendment replaced the fixed 10 percent dividend each GSE would pay to Treasury with a process known as the "Net Worth Sweep," whereby each GSE would be required to pay Treasury the difference between its net worth and a predetermined capital reserve each year, with that capital reserve decreasing until it reached zero in 2018. DSUMF ¶ 17; PRDSUMF ¶ 17; *see* Third Amendment § 2, Ex. FF to Defs.' Mot. for S.J., Fairholme ECF No. 145-33, Class ECF No. 143-33. The Third Amendment thus eliminated the circular-draw problem, but it also eliminated any future possibility for any non-Treasury stockholder, including plaintiffs, to receive dividends from the GSEs, because the GSEs owed their net worth to Treasury and would not take on further debt to pay dividends to other shareholders. Importantly, the Third Amendment did not alter the Treasury Stock Certificates' restrictions on paying down the Liquidation Preference. *See id.* § 3(a). Treasury and FHFA amended the PSPAs three times after the Third Amendment, no amendment eased the existing restrictions on paydown of the Liquidation Preference. DSUMF ¶ 10; PRDSUMF ¶ 10.

## II.   PROCEDURAL HISTORY

Plaintiffs filed their respective suits challenging the Third Amendment in 2013. The initial complaint in each suit alleged various claims for violations of the Administrative Procedure Act, breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, seeking damages as well as injunctive relief. The Court dismissed the initial complaints in their entirety for failure to state a claim on September 30, 2014. *See Perry I*, 70 F. Supp. 3d at 246. On appeal, the D.C. Circuit affirmed in part, remanding certain of plaintiffs' breach of contract and implied covenant claims. *See Perry Capital LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 633–34 (D.C. Cir. 2017). Plaintiffs then filed an amended complaint in each case, each of which defendants moved to dismiss. On September 28, 2018, the Court granted in part and

denied in part defendants' motion to dismiss in each case, holding that plaintiffs failed to state a claim for breach of contract but allowing the implied covenant claim in each case to proceed. *See Fairholme Funds*, 2018 WL 4680197, at *17.

Earlier this year, defendants moved for summary judgment in both cases, and plaintiffs moved for partial summary judgment in both cases on the issue of whether the provisions of the PSPAs entitling Treasury to PCFs are legally enforceable. A trial is set for October of this year.

### III.    LEGAL STANDARDS

#### A. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court evaluating a summary judgment motion must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Arthridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

#### B. The Implied Covenant of Good Faith and Fair Dealing

Under Delaware and Virginia law, which govern the claims of the Fannie Mae and Freddie Mac shareholders, respectively, *see Fairholme Funds*, 2018 WL 4680197, at *2, an implied covenant of good faith and fair dealing "attaches to every contract," *Dunlap v. State Farm Fire and Cas. Co.*, 878 A.2d 434, 442 (Del. 2005); *see also Historic Green Springs, Inc. v. Brandy Farm, Ltd.*, 32 Va. Cir. 98, 1993 WL 13029827, at *3 (Va. Cir. 1993). The difference between an ordinary breach of contract claim and an implied covenant claim is that while the former turns on the express terms of the contract, the latter involves a "cautious enterprise" whereby the court

"infer[s] contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (internal quotation marks and citation omitted). A breach of the implied covenant occurs where one party "'act[s] arbitrarily or unreasonably,'" which is to say that it "violate[s] the reasonable expectations of the parties" at the time of contracting, *Perry II*, 864 F.3d at 631 (first alteration in original; second alteration added) (quoting *Nemec*, 991 A.2d at 1126, and citing *Historic Green Springs*, 1993 WL 13029827, at *3).

Otherwise, "[t]he elements of an implied covenant claim remain those of a breach of contract claim: 'a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff.'" *ASB Allegiance Real Estate Fund. v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 444 (Del. Ch. 2012) (quoting *Fitzgerald v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998)), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013); *see also Charles E. Brauer Co., Inc. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 33 (1996) ("The breach of the implied duty [of good faith and fair dealing] gives rise only to a cause of action for breach of contract."). In both Delaware and Virginia, the last element—damages resulting from the breach—must be proven "with reasonable certainty." *SIGA Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015); *see also MCR Federal, LLC v. JB&A, Inc.*, 294 Va. 446, 462 (2017).

## IV.   ANALYSIS

### A. Defendants' Motions for Summary Judgment

Defendants make four arguments in support of summary judgment: (1) that the Supreme Court's decision in *Collins v. Yellen*, 141 S. Ct. 1761 (2021) definitively establishes that FHFA acted reasonably and therefore could not have breached the implied covenant of good faith and fair dealing; (2) that the contracts between plaintiffs and defendants incorporate HERA, which

authorized the execution of the Third Amendment, and thus left no relevant "gaps" for the implied covenant of good faith and fair dealing to fill; (3) that plaintiffs will not be able to prove the fact or amount of damages; and (4) that plaintiffs' alternative request for "restitution" is barred by HERA and as a windfall impermissible under equitable principles governing that remedy.

For the reasons explained below, the Court is not persuaded by the first two arguments, but defendants are entitled to summary judgment on the third issue in part and the fourth in full. Although a reasonable jury could conclude from the record with reasonable certainty that the Third Amendment injured plaintiffs by depriving their shares of much of their value, a reasonable jury could not conclude from the record with reasonable certainty that the Third Amendment in fact deprived plaintiffs of dividends that they otherwise would have received. Furthermore, plaintiffs may not pursue their proposed alternative remedy, because the type of "restitution" they request includes rescission, an equitable remedy barred by HERA.

### 1. *Collins* Does Not Govern Plaintiffs' Claim

Defendants' first argument for summary judgment is that the Supreme Court's decision in *Collins* definitively establishes that FHFA acted reasonably and therefore could not have breached the implied covenant of good faith and fair dealing. That argument falls wide of the mark. Defendants both misconstrue the relevant standard, by taking the Supreme Court's use of the word "reasonable" in *Collins* out of context, and fail to make any alternative argument as to why they might be entitled to judgment as a matter of law under the correct standard.

The Supreme Court used the word "reasonable" in *Collins* in the course of analyzing whether FHFA exceeded its statutory authority under HERA by enacting the Third Amendment. The plaintiffs in that case sought, among other relief, an injunction that would effectively undo the Third Amendment. *Collins*, 141 S. Ct. at 1775. The Supreme Court held that such an injunction

would violate a provision of HERA providing that "no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." 12 U.S.C. § 4617(f). The Court noted that HERA authorizes FHFA, in its capacity as conservator of the GSEs, to act "in the best interests of the regulated entity or the Agency." *Id.* § 4617(b)(2)(J)(ii). The Court reasoned that because of that statutory authorization, "when the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves." *Collins*, 141 S. Ct. at 1776. Because "the FHFA could have reasonably concluded that [the Third Amendment] was in the best interests of members of the public who rely on a stable secondary mortgage market," the Court explained, HERA "authorized the Agency to choose this option." *Id.* at 1777. And because the FHFA was acting within the scope of its authority as conservator, HERA barred the plaintiffs' claim for injunctive relief. *Id.* at 1778.

These cases involve a different type of reasonableness analysis. A party to a contract violates the implied covenant of good faith and fair dealing if it "act[s] arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec*, 991 A.2d at 1125. The question is not whether defendants acted reasonably *in the abstract*—rather, "[w]hen conducting this analysis, [a court] must assess the parties' reasonable expectations at the time of contracting." *Id.* at 1126; *see also Perry II*, 864 at 631 ("We remand [the implied covenant] claim . . . for the district court to evaluate it under the correct legal standard, namely, whether the Third Amendment violated the reasonable expectations of the parties.").

In other words, *Collins* does not resolve the issue here, because although reasonableness factors into both analyses, it is reasonableness with respect to different matters. At issue in *Collins* was whether FHFA could reasonably have determined that adopting the Third Amendment was

"in the *best interests* of the *regulated entity* or the *Agency*," 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis added), and thus acted within its statutory authority as conservator of the GSEs in so doing. Here, in contrast, the issue is whether FHFA "violated the reasonable *expectations* of the *parties*" by adopting the Third Amendment. *Perry II*, 864 F.3d at 631 (emphasis added).

Defendants miss the difference between the relevant inquiries because they misapprehend the applicable legal standard for implied covenant claims. Defendants argue that "[a] breach of implied covenant claim involves a two-pronged inquiry: (1) whether the defendant acted arbitrarily and unreasonably, *and* (2) whether the defendant acted in a way that was not reasonably expected by the plaintiff." Defs.' Mot. for S.J. at 12 n.1 (emphasis in original). On defendants' understanding, the Court need not reach the question of whether FHFA violated plaintiffs' reasonable expectations so long as FHFA acted reasonably *in the abstract*. That simply is not a correct reading of Delaware or Virginia law.

Whether defendants acted reasonably and whether they violated plaintiffs' reasonable expectations are not two separate prongs; rather, the former is determined *in reference* to the latter. Defendants cite one Delaware Superior Court case stating that "[i]f [the plaintiff] succeeds in demonstrating that its reasonable expectations under the [contract] have been thwarted, in order to benefit from the implied covenant of good faith and fair dealing, [the plaintiff] *next* must prove that Defendants have acted arbitrarily or unreasonably." *TWA Res. v. Complete Production Servs., Inc.*, No. N11C-08-100-MMJ, 2013 WL 1304457, at *11 (Del. Super. Mar. 28, 2013) (emphasis added) (citing *Nemec*, 991 A.2d at 1126). But that unreported trial-court opinion appears to mischaracterize governing Delaware law. The Delaware Supreme Court has stated plainly that "what is 'arbitrary' or 'unreasonable'—or conversely 'reasonable'—depends on the parties' original contractual expectations." *Gerber v. Ent. Pords. Holdings, LLC*, 67 A.3d 400, 419 (Del.

11

2013) (quoting *ASB Allegiance*, 50 A.3d at 442), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013); *see also Nemec*, 991 A.2d at 1126 (emphasis added) ("[Courts] will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, *thereby* frustrating the fruits of the bargain that the asserting party reasonably expected."). While the Virginia Supreme Court has not so clearly laid out a standard for evaluating implied covenant claims, courts applying Virginia law have favorably cited the Second Restatement's definition of the implied covenant and its comment stating that "[g]ood faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 & cmt. a (1981); *see SunTrust Mortg., Inc. v. Mortgages Unlimited, Inc.*, 2012 WL 1942056, at *3 (E.D. Va. May 29, 2013); *Howie v. Atl. Home Inspection, Inc.*, 62 Va. Cir. 164, 2003 WL 23162330, at *4–5 (Va. Cir. Ct. 2003). Moreover, defendants cite no Virginia authority for their bifurcated test.

Defendants make no argument at this stage concerning plaintiffs' reasonable expectations. Accordingly, their reliance on *Collins* does not help them to meet their burden as movants for summary judgment of showing that they are entitled to judgment as a matter of law.

### 2.  The Contract Itself Did Not Specifically Authorize the Third Amendment

Defendants next argue that a claim for breach of the implied covenant of good faith and fair duty cannot lie because this Court has held that plaintiffs' shareholder contracts incorporate HERA, which the Supreme Court held in *Collins* "authorized" the Third Amendment, leaving no "gaps" for the implied covenant to fill. *See Nemec*, 991 A.2d at 1125–26. That argument, like the previous one, fails because defendants misread Delaware and Virginia law.

It is true that in Delaware, "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." *Nemec*, 991 A.2d at 1125–26 (alteration removed) (quoting *Dunlap*, 878 A.2d at 441). Similarly, "in Virginia, when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights." *Ward's Equipment, Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997). And it is true that this Court held in a previous opinion that "certain changes to federal law—*i.e.*, those affecting governance of the GSEs and their relationships with their shareholders—amend or inform the investor contract." *Fairholme Funds*, 2018 WL 4680197, at *9.

But whether a certain act falls within FHFA's statutorily authorized discretion and whether FHFA may incur monetary damages for exercising that discretion in a manner inconsistent with its independent contractual obligations are two separate inquiries. HERA makes that much clear by authorizing FHFA, in its capacity as conservator of the GSEs, to repudiate contracts, 12 U.S.C. § 4617(d)(1), while also providing for the assessment of damages when FHFA does so, *id.* § 4617(d)(3); *see also Perry II*, 864 F.3d at 630 (citing repudiation provision for proposition that "the Companies' contractual obligations otherwise remain in force"). As this Court previously explained when evaluating a similar argument at the motion to dismiss stage, "Defendants cannot simply say that since HERA permits the conservator to act in its own best interests, the FHFA can do whatever it wants and Plaintiffs could not expect otherwise. The question is whether Defendants exercised their discretion arbitrarily or unreasonably in a way that frustrated Plaintiffs' expectations under the contract." *Fairholme Funds*, 2018 WL 4680197, at *13.

Because HERA only authorizes the *discretion* through which FHFA agreed to the Third Amendment, rather than the Third Amendment itself, the prohibition of implied covenant claims

based on contractually authorized conduct does not bar plaintiffs' claims and does not entitle defendants to summary judgment.

### 3.   Some Disputed Issues of Material Fact Remain as to Damages

Next, defendants argue that they are entitled to summary judgment because a reasonable jury could not conclude from the summary judgment record that the Third Amendment caused plaintiffs harm, a key element of plaintiffs' implied covenant claim. Defendants argue that in order to accept either plaintiffs' theory of harm or their proposed measure of damages, a jury would have to rely on inferences that the record does not reasonably support. The Court agrees in part.

As an initial matter, an impermissibly speculative *measure* of damages does not necessarily preclude a finding of *harm* for purposes of liability, as both Delaware and Virginia law distinguish between the degree of certainty required to establish each. *See SIGA Technologies*, 132 A.3d at 1111 (emphasis in original) (footnotes and citations omitted) ("[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty. The *amount* of damages can be an estimate."); *MCR Federal*, 294 Va. at 462 (2017) (internal quotation marks and citation omitted) ("When it is certain that substantial damages have been caused by the breach of a contract, and the uncertainty is not whether there have been any damages, but only an uncertainty as to their true amount, then there can rarely be any good reason for refusing all damages due to the breach merely because of that uncertainty.").

Accordingly, the Court begins with the question of whether a reasonable jury could conclude from the summary judgment record that the Third Amendment caused plaintiffs any harm. In both Delaware and Virginia, plaintiffs seeking to establish liability on a contract must prove the fact of harm resulting from the alleged breach "with reasonable certainty." *SIGA Technologies*, 132 A.3d at 1111; *see also MCR Federal*, 294 Va. at 461–62. In other words, though

the evidentiary burden is only a preponderance of the evidence, "speculation and conjecture" as to whether the plaintiff suffered any substantial amount of harm "cannot form the basis for recovery." *Condominium Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.*, 281 Va. 561, 577 (internal quotation marks omitted) (quoting *Shepherd v. Davis*, 265 Va. 108, 125 (2003)); *see also Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004) (quoting *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del.1964)) ("Under Delaware law, plaintiffs . . . cannot recover damages that are 'merely speculative or conjectural.'").

To be sure, Delaware and Virginia law do not necessarily bar liability on a theory of harm that relies on contingencies other than the alleged breach, but the plaintiff must be able to prove to a reasonable factfinder that such contingencies were reasonably certain to occur. For example, in *BTG Int'l, Inc. v. Wellstate Therapeutics Corp.*, No. 12562-VCL, 2017 WL 4151172 (Del. Ch. Sept. 19, 2017), the Delaware Chancery Court noted that Delaware "[c]ourts will award damages for a renewal term" of a contract whose renewal was forgone because of the alleged breach "when a plaintiff can prove that the contract would have been renewed with reasonable certainty," but nevertheless determined that such an award of damages was inappropriate in the case before it because the initial contract did not expire until eight years after the alleged breach, and "[p]redicting how [the parties] would approach the renewal right eight years in the future would be, at best, an educated guess." *Id.* at *20. And in *TechDyn Sys. Corp. v. Whittaker Corp.*, 245 Va. 291 (1993), the Virginia Supreme Court affirmed a trial court's decision to exclude as speculative evidence of lost profits that depended on the assumption that the plaintiff "would have been the successful bidder on" other contracting projects. *Id.* at 299. In other words, under both Delaware and Virginia law, neither the overall theory of harm nor the contingencies upon which it depends may be speculative or conjectural; both must be reasonably certain to have occurred.

The Court must therefore evaluate whether the summary judgment record contains evidence from which a reasonable jury could conclude that the harms plaintiffs allege, and any contingencies upon which those harms depend, occurred without relying on mere speculation and conjecture. At this stage, plaintiffs appear to offer two different theories of harm that they contend they can prove with reasonable certainty. First, and primarily, they argue that the Third Amendment deprived them of future dividends that they otherwise would have received. Second, and in the alternative, they argue—and defendants do not directly dispute on the merits—that by eliminating any possibility of future dividends, the Third Amendment at least caused their shares to decline significantly in value. The Court will refer to those theories as "the lost-dividends theory" and "the lost-value theory," respectively.[3] For the reasons that follow, the Court concludes that defendants are entitled to summary judgment on the lost-dividends theory but that a genuine dispute of material fact precludes summary judgment on the lost-value theory.

### (i)   No genuine dispute remains as to the lost-dividends theory.

Before applying the legal principles outlined above to plaintiffs' lost-dividends theory—that the Third Amendment deprived plaintiffs of dividends that they would have eventually received—it is important to note three propositions that neither party disputes. First, before the Third Amendment, the PSPAs and Treasury Stock Certificates prohibited the GSEs from paying down Treasury's Liquidation Preference absent certain conditions that have never in fact occurred, and the Third Amendment did not change that. *See* PRDSUMF ¶ 8.[4] Second, and as a result, any

---

[3] One might hypothesize that a decline in stock price caused by the Third Amendment would reflect a corresponding decline in probability-adjusted expectations regarding future dividends, and thus that these two theories of harm are closely related. But plaintiffs apparently do not believe that the post–Third-Amendment decline in stock price captured the entire value of the possible future dividends extinguished by the Net Worth Sweep. *See* Pls.' Opp'n to Defs.' Mot. for S.J. at 36, Fairholme ECF No. 151, Class ECF No. 147 ("[E]ven [the decline in stock price] establishes the existence of damages, although it significantly understates them.").

[4] Plaintiffs "[d]ispute[]" that proposition only insofar as they maintain that "[t]he PSPAs can be *amended* to permit Fannie Mae and Freddie Mac to pay down the Treasury liquidation preference." *Id.* (emphasis added).

significant paydown would only be possible through a further amendment to the PSPAs. *See id.* Third, even without the Third Amendment, the GSEs would not have been able to resume paying plaintiffs dividends without first paying down Treasury's Liquidation Preference, which in the real world they have yet to do. *See* Pls.' Opp'n to Defs.' Mot. for S.J. ("Pls.' Opp'n") at 26–37, Fairholme ECF No. 151, Class ECF No. 147. Thus, in order to find it reasonably certain that the Third Amendment actually deprived plaintiffs of future dividends, a jury would have to find it reasonably certain that, among other things, Treasury and FHFA eventually would have amended the PSPAs to allow a paydown of the Liquidation Preference.

Defendants argue that they are entitled to summary judgment on the fact of damages under plaintiffs' lost-dividends theory because there is insufficient evidence in the record from which a reasonable factfinder could conclude with reasonable certainty that Treasury and FHFA would have amended the PSPAs to allow such a paydown. The Court agrees.

There certainly is no *direct* evidence in the record that Treasury and FHFA planned to amend the PSPAs to allow a paydown if they did not implement the Net Worth Sweep. Defendants have adduced evidence that early in negotiations leading to the first two amendments, FHFA proposed a revision that at least would have eased restrictions on paydown and Treasury rejected that proposal. *See* Letter from A. Pollard to S. Albrecht (Feb. 25, 2009); DSUMF ¶ 10; PRDSUMF ¶ 10. Plaintiffs can point to no evidence that Treasury had any actual plans to reverse that position around the time it agreed to the Third Amendment. Plaintiffs must therefore rely on circumstantial evidence to prove a key assumption underlying the lost-dividends theory.

Plaintiffs argue that a reasonable jury could infer that Treasury would have allowed a paydown for four reasons cited in the report of their expert, Dr. Joseph R. Mason: First, the federal government has historically allowed prompt repayment of emergency financial assistance it has

given to companies in times of financial crisis; second, allowing a paydown would have served the conservatorship's goal of returning the GSEs to stability and normal operations; third, a paydown would serve Treasury's financial interests by resulting in the prompt return of the money it loaned to the GSEs and maximizing the value of its stock warrants; and fourth, continuing to prohibit a paydown would have been politically unpopular because the GSEs would have built up substantial capital while still owing taxpayers billions of dollars. *See* Pls.' Opp'n at 31–33; Corrected Expert Report of Joseph R. Mason ("Mason Report") ¶ 43, Ex. MM to Defs.' Mot. for S.J., Fairholme ECF No. 145-40, Class ECF No. 143-40. In sum, plaintiffs essentially argue that they could convince a reasonable jury that but for the Third Amendment, Treasury and FHFA would have had every financial and political incentive to bargain for a paydown and that doing so would be consistent with historical practice. Then, plaintiffs contend, the jury could reasonably infer that Treasury and FHFA would have acted on those incentives.

The flaw in plaintiffs' argument is that it requires the jury simply to *guess* how Treasury and FHFA would have balanced their obligations to different stakeholders and responded to financial and political incentives in a counterfactual world. For example, it is conceivable that Treasury would have considered it more financially advantageous in the medium or long term to keep the GSEs on the hook for substantial payments based on the large Liquidation Preference— or even to wind them down by some means other than the Net Worth Sweep—than to take advantage of large capital surpluses in the short term by allowing prompt repayment. It also is uncertain how strong the political will would have been to see the GSEs repay taxpayers by paying down the Liquidation Preference rather than continuing to pay Treasury dividends and PCFs. Moreover, even if Treasury and FHFA found it mutually beneficial to negotiate an amendment easing restrictions on paydown of the Liquidation Preference, it is difficult to say whether they

ultimately would be able to reach an agreement and whether the specific terms of that agreement in fact would result in a paydown in the foreseeable future that would be substantial enough for the GSEs to resume paying dividends to plaintiffs.

To be sure, it might be a "reasonable inference," in the sense of the summary judgment standard, to infer from the incentives at play that it would have been *rational* for Treasury and FHFA to agree to a paydown of the Liquidation Preference, eventually, in some way, shape, or form. But, as explained above, Delaware and Virginia law both require *reasonable certainty* as to the fact of damages; and a reasonable inference that it would be *rational* for one to take a course of action does not alone support a further inference that it is *reasonably certain* one would take that course of action. That Treasury and FHFA would have amended the PSPAs to allow a paydown rather than responding to their incentives in some other manner would be, "at best, an educated guess" that assumes the occurrence of contingencies for which there is no specific support in the record. *Cf. BTG Int'l*, 2018 WL 4151172, at *20.

Nor does the federal government's past practice of generally allowing recipients of financial assistance to repay their debts support an inference of reasonable certainty that Treasury would have allowed the GSEs to pay down the Liquidation Preference in the foreseeable future. Plaintiffs cite *M & G Polymers, LLC v. Carestream Health, Inc.*, No. 07C-11-242-PLA, 2010 WL 1611042 (Del. Super. Apr. 21, 2010) for the proposition that courts often allow theories of harm to proceed to trial where past practice would allow a factfinder to determine with reasonable certainty that a key contingency would have occurred, but that case is inapposite here. The court in that case concluded that expert testimony opining that the plaintiff and defendant likely would have renewed their contract for one period was not merely speculative. *Id.* at *39–40. Key to the court's reasoning was uncontroverted evidence that "both [parties] have a history of renewing"

similar contracts for at least one period. *Id.* at *40 (quoting *M & G Polymers, LLC v. Carestream Health, Inc.*, No. 07C-11-242-PLA, 2009 WL 353466, at *9 (Del. Super. Aug. 5, 2009)). In other words, both parties to the contract had a demonstrated history of doing something uncomplicated and not inconsistent with the contract's terms—renewing it—in precisely the same way it was theorized they would have done again but for the breach. Here, in contrast, plaintiffs and their expert base their conclusion that Treasury would have amended the PSPAs, which prohibited a substantial paydown, to allow such a paydown, on federal agencies' general historical practice of minimizing the amount of time spent as conservators of private companies and Treasury's post-2008 practice of allowing a redemption of stock it had purchased in non–government-sponsored companies like AIG, without any evidence of whether Treasury previously had agreements with those companies prohibiting such a redemption. *See* Mason Report, App. C, ¶¶ 1–14. Moreover, plaintiffs cannot point to *any* historical practices by the other party to the PSPAs—FHFA—which did not even exist prior to HERA.[5]

Even taking into account the general historical practices plaintiffs cite, a jury would be left to guess as to whether Treasury would have behaved similarly under materially different circumstances and made the affirmative decision to amend a contract that did not allow the paydown that plaintiffs' primary theory of harm assumes—and whether FHFA, which has no prior history with similar financial arrangements, even would have pushed the issue. Even a good guess would require an inherently speculative logical leap that could not result in the reasonable certainty that Delaware and Virginia law require as to damages. The Court therefore concludes that defendants are entitled to summary judgment on plaintiffs' lost-dividends theory of harm.

---

[5] Plaintiffs also cite *LG Display Co., Ltd. V. AU Optronics Corp.*, 722 F. Supp. 2d 466 (D. Del. 2010), but that is a patent case applying a test that the Federal Circuit has approved for determining a "reasonable royalty" for a patent license based on, among other things, industry practice, *see id.* at 471–72, and thus is of little relevance to determining damages based on the parties' past practice in a Delaware-and-Virginia–law contract case.

*(ii) A genuine dispute remains as to the lost-value theory.*

However, in their opposition to defendants' motions for summary judgment, plaintiffs suggest an alternative theory of harm: that the Third Amendment, by eliminating any possibility of future dividends for non-Treasury shareholders, deprived plaintiffs' shares of much of their value, even if such dividends were not reasonably certain to occur in the foreseeable future. Specifically, plaintiffs argue that an event study by one of defendants' experts showing a sharp decline in stock prices after the Third Amendment's announcement "refutes the claim that this action caused no harm." Pls.' Opp'n at 35.[6] The Court agrees that on that lost-value theory, disputed issues of material fact preclude summary judgment as to the fact of harm.

Defendants do not dispute on the merits the proposition that a decline in share value caused by the elimination of possible future dividends would constitute a cognizable harm under Delaware or Virginia law. Instead, they argue in conclusory fashion that "[p]laintiffs cannot avoid summary judgment based on a theory of harm that their own expert rejected," Defs.' Reply to Pls.' Opp'n ("Defs.' Reply") at 18, Fairholme ECF No.157-3, Class ECF No. 152-3, a reference to Dr. Mason's argument that the decline in stock price underestimates the value of possible future dividends, *see* Expert Reply Report of Joseph R. Mason ("Mason Reply Report") ¶ 85, Fairholme ECF No. 145-42, Class ECF No. 143-42; Depo. of Joseph R. Mason at 51:1–22, 55:6–22, 79:20–81:13, Ex. SS to Defs.' Reply, Fairholme ECF No. 157-3, Class ECF No. 152-3. But defendants cite no authority for the proposition that relying on expert testimony for one assertion estops a party from making an argument inconsistent with another assertion in that expert's testimony. Such an estoppel

---

[6] The parties do not cite the event study itself, referring instead to PSAMF ¶ 97, which draws conclusions about damage calculations from it but does not appear to describe or cite it. Neither party, however, disputes its basic content, and other materials in the summary judgment record, cited below, show a robust dispute between the parties' experts over the relevance of the drop in stock price.

argument makes especially little sense here, as it is clear that plaintiffs' expert considered the drop in stock price an *underestimate* of the harm plaintiffs suffered rather than a non-harm entirely.

There is no reason to preclude plaintiffs from relying on the lost-value theory in the alternative to defeat total summary judgment. The Court therefore concludes that defendants are not entitled to summary judgment *in full* on the question of damages, there being a lingering dispute of material fact as to whether the Third Amendment and its elimination of possible future dividends harmed plaintiffs by depriving them of much of the value of their shares. Since defendants do not specifically dispute that plaintiffs can prove the amount of damages resulting from that alleged harm, the Court has no occasion to consider that separate question at this time.

### 4.  Plaintiffs' Proposed Alternative Remedy Is Barred

Finally, defendants argue that plaintiffs' alternative request for "restitution" is barred as a matter of law, both by HERA and as an impermissible windfall under equitable principles governing that remedy.  The "alternative request" to which defendants refer comes in two passages in Dr. Mason's expert report proposing "restitution" as an "alternative measure of damages." Mason Report ¶ 15; *see also id.* ¶¶ 94–95. The Court agrees that HERA bars the alternative remedy that plaintiffs seek and accordingly does not reach defendants' further argument that that remedy would grant plaintiffs an impermissible windfall.

According to defendants, plaintiffs' alternative request for "restitution" would violate a provision of HERA found at 12 U.S.C. § 4617(f), which states that, "[e]xcept as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." The D.C. Circuit has described that clause as "draw[ing] a sharp line in the sand against litigative interference— through judicial injunctions, declaratory judgments, or other equitable relief—with FHFA's

statutorily permitted actions as conservator or receiver." *Perry II*, 864 F.3d at 606. Defendants argue that "restitution," as plaintiffs use that word, is a form of "other equitable relief" that the statute bars. By "equitable relief," this Court understands the D.C. Circuit to mean remedies other than a money judgment or enforcement thereof. That is apparent from its grouping of "other equitable relief" with "judicial injunctions," *id.*, and from the text of the statute, which speaks of remedies that "restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver," 12 U.S.C. § 4617(f). Thus, the Court must determine what type of alternative remedy plaintiffs propose and whether it requires only the payment of a money judgment or something more.

Despite Dr. Mason's use of the word "restitution," the remedy he describes is more precisely characterized as "rescission." Courts often use the word "restitution" to mean at least three different things—the first an independent cause of action and the others alternative remedies for breach of contract. *See* Restatement (Third) of Restitution & Unjust Enrichment, Intro. Note to Pt. 2, Ch. 4 (2011). In his report, Dr. Mason explains that the proposed alternative remedy of "restitution" would "requir[e] the Defendants to disgorge the net benefits they have received under the contracts" and plaintiffs to "give up [their] right to the shares," resulting in an "unwinding [of] the [shareholder] contracts in their entirety." Mason Report ¶¶ 94–95. That describes a use of the word "restitution" that the Restatement calls "rescission," an alternative remedy for breach of contract which "requires a mutual restoration and accounting in which each party (a) restores property received from the other, to the extent such restoration is feasible, (b) accounts for additional benefits obtained at the expense of the other party as a result of the transaction and its subsequent avoidance, as necessary to prevent unjust enrichment, and (c) compensates the other for loss from related expenditure as justice may require." Restatement (Third) of Restitution &

Unjust Enrichment § 54(2). And indeed, Dr. Mason himself notes that his proposed alternative remedy is called "'rescission' in some courts." Mason Report ¶ 94.

Although Dr. Mason describes that remedy as "an alternative measure of damages," *id.* ¶ 15, it is actually a form of equitable relief barred by § 4617(f). The Supreme Courts of Delaware and Virginia, whose laws govern plaintiffs' claims, have both described rescission as an equitable remedy. *See Devine v. Buki*, 289 Va. 162, 172–73 (2015) (describing rescission as an "equitable remedy"); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P*, 817 A.2d 160, 176–78 (Del. 2002) (describing "rescission" and "rescissory damages" as "equitable remedies"). And that classification fits the way the D.C. Circuit used the phrase "equitable relief" in *Perry II*, 864 F.3d at 606. Rescission here would require more than a money judgment. It would terminate plaintiffs' shareholder contracts, extinguishing their ownership rights and forcing a reorientation of the GSEs' capital structure. And because that remedy would be for an action that FHFA took within the scope of its authority as conservator—adopting the Third Amendment—it would violate § 4617(f).

Plaintiffs argue that "monetary restitution" is a legal remedy rather than an equitable one, but the four principal cases they cite for that proposition do not support their position. One describes as legal (in *dictum*) a remedy that it calls "unjust enrichment" or "restitution" but the Restatement calls "performance-based damages," whereby the nonbreaching party simply recovers the value it bestowed on the breaching party without any further need to unwind an ongoing contractual relationship. *Dickerson v. Villages of Five Points Property Owners Ass'n, Inc.*, No. 2020-0420-PWG, 2020 WL 7251512, at *5 (Del. Ch. Dec. 9, 2020); *see* Restatement (Third) of Restitution & Unjust Enrichment § 38. Two others concern money judgments as a remedy for the *cause of action* known as restitution. *Clark v. Teeven Holding Co., Inc.*, 625 A.2d

869, 878 (Del. Ch. 1992); *Belcher v. Kirkwood*, 238 Va. 430, 432–33 (1989). The last case describes a "claim for return of the payments" as "one cognizable at law" but a "request for rescission [as] solely for equitable relief." *Primrose Dev. Corp. v. Benchmark Acquisition Fund I Ltd. P'ship*, 45 Va. Cir. 461, 1998 WL 972200, at *2–3 (Va. Cir. 1998). None of those cases stand for the proposition that the remedy of *rescission* is, or can be, legal rather than equitable, and all of them discuss remedies that *solely* involve a money judgment.[7] Here, in contrast, Dr. Mason proposes a wholesale unwinding of the shareholder contracts, with plaintiffs giving up their rights as shareholders. That is an equitable remedy that, as explained above, includes more than just a money judgment.

Properly understood, the alternative remedy of rescission that Dr. Mason proposes asks the Court to "affect the exercise of powers or functions of the Agency as a conservator or a receiver" in violation of HERA. 12 U.S.C. § 4617(f). Accordingly, defendants are entitled to summary judgment on the unavailability of that remedy.[8]

## B. Plaintiffs' Motions for Partial Summary Judgment

Plaintiffs in both cases also move for partial summary judgment on a narrow issue: whether the provision of the PSPAs entitling Treasury to PCFs would have been enforceable in a world without the Third Amendment. Plaintiffs argue that those provisions are unenforceable as a matter

---

[7] The Restatement takes the position that "[r]escission as a remedy for breach of contract is not available against a defendant whose defaulted obligation is exclusively an obligation to pay money." Restatement (Third) of Restitution & Unjust Enrichment § 37(2).

[8] The Court further notes that even if HERA did not bar rescission as a remedy for the alleged breach of the implied covenant of good faith and fair dealing, under both Delaware and Virginia law, "the remedy of equitable rescission [for a contract claim] is only available when the underlying breach . . . is 'substantial' or 'material.'" *Young-Allen v. Bank of America, N.A.*, 298 Va. 462, 469 (2020); *see also Segovia v. Equities First Holdings, LLC*, C.A. No. 06C-09-149-JRS, 2008 WL 2251218, at *23 (Del. Super. May 30, 2008) (emphasis added) ("The concept of cancelling contracts upon a *material breach* is well-settled in Delaware law."). "A material breach is a failure to do something that is so fundamental to the contract that the failure to perform that obligation defeats an essential purpose of the contract." *Horton v. Horton*, 254 Va. 111, 115 (1997). While defendants do not raise that issue in their summary judgment motion, and thus the Court will not grant summary judgment on that ground, plaintiffs also do not explain how they intend to prove at trial that the alleged breach here was material.

of New York law, which governs them, and under federal statutes setting out the GSEs' charters; or, in the alternative, that no PCF could have been assessed before 2016 because of the expiration of a contractual deadline for setting a periodic commitment fee for the period between 2011 and 2015. Thus, plaintiffs contend, no disputed issue of material fact remains as to whether, in their but-for world, the GSEs would have paid Treasury PCFs, at least before 2016. Plaintiffs argue that the alleged unenforceability of the PCF provisions affects both liability, because it informs what plaintiffs' reasonable expectations were at the time of the Third Amendment,[9] and damages, because it affects the GSEs' projected profitability in the but-for world.

Defendants raise a host of counterarguments, both procedural and substantive, in opposition to plaintiffs' motion. Most importantly, they argue that without evidence suggesting that the PCFs *would not* have been assessed as a matter of fact, a determination in 2022 that they *should not* have been assessed as a matter of law would not itself be material to determining plaintiffs' reasonable expectations at the time of the Third Amendment or the profits the GSEs could have been expected to reap but for the Net Worth Sweep. The Court agrees.

Plaintiffs are not necessarily wrong to suggest that the assessment of PCFs or lack thereof would have affected their reasonable expectations of what FHFA might "bargain away" in negotiations over an amendment to the PSPAs, and they are doubtless correct that it would have affected the GSEs' ability to pay future dividends in a world without the Net Worth Sweep. But whether plaintiffs reasonably could have expected the GSEs to pay PCFs to Treasury and whether the GSEs in fact would have done so—and thus burdened their future ability to pay dividends to

---

[9] This Court has previously held that the relevant time of "contracting" for purposes of evaluating plaintiffs' implied covenant claim is the time immediately before the enactment of the Third Amendment. *See Fairholme Funds*, 2018 WL 4680197, at *8–9.

non-Treasury shareholders—are factual questions conceptually distinct from the legal question of whether the GSEs could have been *required* to do so.

With respect to liability, plaintiffs argue that "[a]n interpretation of the [PSPAs] that is at odds with governing law is per se unreasonable," and thus, "[i]f the PCF was legally unenforceable, the only reasonable shareholder expectation, as a matter of law, was that the PCF would never be paid," Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Partial S.J. at 3, Fairholme ECF No. 156, Class ECF No. 151, but that argument is unpersuasive for two reasons. First, plaintiffs do not cite any authority, whether from Delaware, Virginia, or elsewhere, to support it. Second, it makes no logical sense. It does not follow from a third party's legal conclusion—even a correct one—that a contractual provision is unenforceable that the parties to the contract will not perform according to the terms of that provision. The logical link that is missing is evidence that some person would have challenged the provision, or that one of the parties to the contract would have declined to perform. And plaintiffs point to no evidence, much less undisputed evidence, that anyone at FHFA or Treasury considered the PCF provisions unenforceable or had any plans not to comply with their terms, nor that any person planned to challenge them in court. Plaintiffs therefore have not demonstrated that no genuinely disputed issue of material fact remains as to whether they reasonably could have expected the GSEs to pay PCFs to Treasury.

With respect to damages, plaintiffs argue that if the PCF provisions are unenforceable, the jury can assume for purposes of calculating expectation damages that the GSEs would not have paid PCFs to Treasury in a world without the Net Worth Sweep. But again, that does not follow, because plaintiffs point to no evidence suggesting that the GSEs in fact would not have done so.

Plaintiffs therefore have not demonstrated that no genuinely disputed issue of material fact remains as to whether the GSEs would have paid PCFs to Treasury but for the Net Worth Sweep.[10]

Because plaintiffs have not met their burden as the moving party of demonstrating that no genuine dispute of material fact remains as to the issues raised in their motion, they are not entitled to partial summary judgment regarding the enforceability of the PCF provisions. The Court has no occasion to consider on the merits whether the provisions are enforceable.

## V.   CONCLUSION

In accordance with the above analysis,

1) In No. 1:13-cv-1053-RCL, Defendants' Motion [145] for Summary Judgment will be **GRANTED** with respect to the lost-dividends theory of harm and plaintiffs' proposed alternative remedy of rescission and **DENIED** in all other respects, and Plaintiffs' Motion [146] for Partial Summary Judgment will be **DENIED**.

2) In No. 1:13-mc-1288-RCL, Defendants' Motion [143] for Summary Judgment will be **GRANTED** with respect to the lost-dividends theory of harm and plaintiffs' proposed alternative remedy of rescission and **DENIED** in all other respects, and Plaintiffs' Motion [144] for Partial Summary Judgment will be **DENIED**.

Separate orders in each case consistent with this Memorandum Opinion shall issue this date.

Date: September 23, 2022                                         /s/ Royce C. Lamberth
                                                                                    Royce C. Lamberth
                                                                                    United States District Judge

---

[10] The Court further notes that given its determination that defendants are entitled to summary judgment on plaintiffs' lost-dividends theory of harm, it is now less clear what effect PCFs would have on damage calculations.