# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., | |
| Plaintiffs, | |
| v. | Civil No. 13-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Miscellaneous No. 13-1288 (RCL) |
| This document relates to: ALL CASES | |

## JOINT SUBMISSION OF OBJECTIONS TO DEPOSITION DESIGNATIONS TO BE PRESENTED IN PLAINTIFFS' CASE IN CHIEF

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

DESIGNATIONS AND OBJECTIONS ................................................................................... 1

I.      Susan McFarland ............................................................................................................ 1

    A.      Defendants' Objections to Plaintiffs' Designations ............................................ 1

    B.      Plaintiffs' Objections to Defendants' Designations ........................................... 10

II.     Timothy J. Mayopoulos ............................................................................................... 15

III.    David C. Benson ............................................................................................................ 18

IV.     Donald Layton ............................................................................................................... 21

## PRELIMINARY STATEMENT

In advance of trial, the parties undertook an effort to streamline the objections lodged against deposition testimony designated to be shown to the jury at trial.  Having conferred, the parties have substantially narrowed the scope of disputes and now present to the Court the limited set on which the parties have reached an impasse and which are ripe for judicial resolution.  The parties have identified below designations that are expected to be used during Plaintiffs' case-in-chief, and therefore require timely resolution.[1]  Further, the parties have identified the issues below in the order of priority, with the first witnesses and objections identified below being the highest priority.  The parties have agreed to confer further about designations to be used in Defendants' case-in-chief, and will endeavor to bring any further disputes to the Court's attention sufficiently in advance of Defendants' case-in-chief.

## DESIGNATIONS AND OBJECTIONS

### I.  Susan McFarland

Both sides designated testimony from Plaintiffs' deposition on Susan McFarland, who is the former Chief Financial Officer of Fannie Mae.  Ms. McFarland's full deposition transcript is attached as **Exhibit A**.

#### A.  Defendants' Objections to Plaintiffs' Designations

The following are deposition excerpts designated by Plaintiffs to which Defendants have objected.

- **Susan McFarland -- Pages 92:15 – 93:4**

```
15 Q. (BY MR. THOMPSON) And at the time of the
16 net worth sweep, did you feel that Fannie Mae was in a
```

---

[1]     For the Court's convenience, the parties have attached copies of the full deposition transcripts for each witness as exhibits, in addition to including the relevant text with each objection.

17 <u>death spiral</u>?
18 MR. LAUFGRABEN: Object to the form of
19 the question.
20 A. <u>No, I did not think Fannie Mae was in a</u>
21 <u>death spiral in mid August of 2012</u>.
22 Q. (BY MR. THOMPSON) Why not?
23 A. The company was making money. The projections
24 that I had been involved in and reviewed and felt
25 comfortable with seemed to indicate that there was a
1 good chance that the company would continue to make
2 money. There were a lot of things that were improving
3 within the company, and I felt the company was on a
4 positive trajectory.

### Defendants' Objections: Vague, Ambiguous, Confusing, Relevance, Prejudice

The question presented in this designation is vague, ambiguous and prejudicial in that it

asks if the witness thought Fannie Mae was in a "death spiral" without any definition or

description of that term, which is itself argumentative and inflammatory.  The jury will be left to

simply guess what "death spiral" means, allowing Plaintiffs to later fill in the blanks by arguing

that Ms. McFarland's "no" answer supports their allegations, even though it is not clear what the

witness understood "death spiral" to mean.  For example, the witness could have understood

"death spiral" to mean generally dire and declining financial circumstances, and her answer

seems to indicate that is what she understood Plaintiffs' counsel to be asking.  However, it

appears Plaintiffs intend to use the phrase "death spiral" to refer to the specific problem of

Fannie Mae's inability to afford to pay the fixed 10% dividend to Treasury, which had caused

Fannie Mae to make circular draws on the Treasury commitment just to pay those dividends to

Treasury, thereby eroding the Treasury commitment.  That implication—which is possible only

because of the vague and confusing nature of the question—is unsupported by Ms. McFarland's

testimony wherein she confirmed her belief that, in early August 2012, before execution of the

Third Amendment, Fannie Mae would *not* be able to meet its 10% dividend obligations in the

future.  *See* 201:10-18.  That conclusion is also reflected in Fannie Mae's SEC filings.  *See* 206:9-212:14.

In the absence of a clear definition of "death spiral"—which Plaintiffs' counsel did not provide at the deposition–the witness's "no" answer and explanation is confusing, prejudicial, and ultimately irrelevant.  The term "death spiral" itself is also inflammatory, argumentative and prejudicial, particularly where Plaintiffs did not establish with the witness (nor can they establish at trial) that FHFA ever used that term.

***Plaintiffs' Response:***

As Defendants concede, Ms. McFarland appears to have understood the phrase "death spiral" to mean Fannie Mae's generally dire and declining financial circumstances.  Although counsel did not define this phrase during Ms. McFarland's deposition, her detailed answer concerning why she did not believe Fannie Mae to have been in a death spiral in 2012 evinces her common sense understanding of the term.  Specifically, she testified, "The company was making money," and she explains—based on her personal knowledge of reviewing Fannie Mae's projections and financial results—that the company would continue to make money and "was on a positive trajectory." This testimony is hardly confusing, argumentative, or inflammatory, and it is based on Ms. McFarland's detailed testimony concerning her responsibilities as Fannie Mae's CFO and the access to information she gained in that position.

- **Susan McFarland -- 148:10 – 151:2**

10 Q. And do you recall what Tim Mayopoulos' reaction
11 was to the Third Amendment?
12 MR. LAUFGRABEN: Object to the form of
13 the question; lack of foundation.

. . .

19 I think -- you know, the sense I got was
20 maybe not that dissimilar from my reaction. When you're
21 in the unique situation that the GSEs were in, you're
22 never shocked at anything. But I -- there was a little
23 bit of surprise and yet not surprise, in the sense that
24 the chance that they -- we didn't believe that Treasury
25 would be too fond of a significant amount of capital
1 buildup inside the enterprises.
2 Q. Why not.

[Lines 3-4 not at issue]

5 MR. LAUFGRABEN: Objection to the form of
6 the question; calls for speculation.
7 A. There was a desire to reach a more wholistic
8 solution for housing finance reform.
9 So as time passed and the companies
10 continued to operate and things happened through the
11 operation of those companies, you had -- all of the
12 parties involved, whether that's Treasury or FHFA or
13 Fannie, had to deal with the outcomes of those in the
14 absence of a more wholistic solution.
15 Some of those outcomes could start taking
16 things down a certain path that might affect or make the
17 ultimate solution, if there ever is one, more difficult
18 to deal with.
19 And I don't know. I am just saying that
20 if you start allowing capital to accumulate up in the
21 enterprises, then that creates an additional variable or
22 factor that has to be taken into account if and when
23 perhaps a more wholistic solution is put in place.
24 You know, again, I am giving you sort of

4

```
25 my perspective on why, you know, there might be a reason
1 to prefer that not to happen -- you know, capital
2 accumulation to happen at that point in time.
```

**Defendants' Objections: Foundation, Personal Knowledge, Speculation, Relevance, Prejudice**

This line of questioning is highly speculative, while simultaneously lacking in personal knowledge and foundation.  At the outset, Plaintiffs' counsel began by inquiring what the witness believes the *Department of the Treasury's* state of mind was at the time of the Third Amendment.  *See* 148:1-23 ("[D]o you really want her to answer what was her sense of what the Government thought was possible? [Plaintiffs' Counsel]: Yeah.").  This inquiry fails to lay any foundation that Ms. McFarland—a Fannie Mae employee who was not privy to Treasury's negotiating position, let alone state of mind—had a basis to know what Treasury's objectives were in executing the Third Amendment, and is highly speculative.  Indeed, later in the deposition, the witness conceded: "***I couldn't get in the minds of Treasury and what they were thinking.***"  225:6-8 (emphasis added).  By Ms. McFarland's own admission, her statements about Treasury's state of mind are nothing more than her speculation.

Further, the witness speculates about other Fannie Mae executives' reaction to hearing about the Third Amendment, but the witness testified earlier in the same answer that she was on vacation in Mexico and thus could not get a full sense of others' reactions.  There is no foundation laid to show that that she would know of anyone else's reaction.

**Plaintiffs' Response:**

As the former Chief Financial Officer of Fannie Mae, Ms. McFarland's testimony regarding her supervisor Tim Mayopolous's reaction to the Third Amendment is plainly relevant.  Fannie Mae executives, including Ms. Farland and Mr. Mayopolous met regularly with FHFA and Treasury officials to discuss the Company's actual and projected financial results.  *See, e.g.,*

45:17-47:15; 54:20-58:2; 58:8-60:3, 71:3-15.  Given those regular interactions, Ms. McFarland and her colleagues had unique insight into Fannie Mae's performance and the manner in which the Company operated throughout the conservatorship.  That FHFA did not consult the GSEs prior to agreeing to the Third Amendment, or ask the GSEs to perform additional modeling or projections regarding future capital accumulation, further demonstrates the arbitrary or unreasonable nature of FHFA's pretextual decision to enter into the Net Worth Sweep.

Further, the testimony is not speculative. Ms. McFarland testified that she learned about the Third Amendment by speaking directly with Mr. Mayopolous. Specifically, she testified, "Tim [Mayopolous] subsequently had a briefing call with myself and a few other executives at Fannie Mae after that to inform us" about the Third Amendment. 149:10-12. Ms. McFarland testified in detail concerning that phone call with Mr. Mayopolous, stating, "[H]e was very factual providing the information that was provided to him by Treasury. . . . Kind of discussing, okay, what does this mean? What do we need to do?" 151:5-9. She described Mr. Mayopolous's "call to action"—a discussion of "communication issues .  . . logistical issues, different things that . . . we had to be prepared to deal with it," and "what do we as a company need to do and by when and who is on point for different things." *Id*. at 10-15. Further, the two discussed Fannie Mae's need "to communicate to the Board. . . . to communicate to the employees, and the "timing" of these imminent conversations. *Id*. at 16-17. This testimony concerning Ms. McFarland and Mr. Mayopolous's conversation reveals Ms. McFarland's personal knowledge of Mr. Mayopolous's reaction to the Third Amendment and the relevance of her testimony about the same.

- **Susan McFarland -- 157:17 – 159:14**

17 Q. (BY MR. THOMPSON) I mean, from your
18 perspective, you were dealing with the Government, and
19 you said you weren't surprised totally by the net worth
20 sweep.
21 I just really want you to explain why.
22 MR. LAUFGRABEN: Same objections, and
23 same instructions [not to answer].
24 A. I will tell you -- yeah. <u>This is from my</u>
25 <u>vantage point. I am not presuming what the Government</u>
1 <u>was thinking or wanted. I am not trying to represent</u>
2 <u>anything from them. I may represent my perspective on</u>
3 <u>what they may have been thinking.</u>
4 I just sat down with them -- to the
5 Treasury and said, "We think we're sustaining
6 profitable."
7 The numbers were decent-sized. I also
8 put on the radar that there was a possibility of a
9 deferred tax allowance release that could be sitting in
10 the not-so-distant future.
11 So the fact that this happened shortly
12 thereafter -- so the time -- the time connection there
13 was part of why -- that was part of why I wasn't
14 surprised. Okay. I just told them that.
15 So then the question is <u>why would they be</u>
16 <u>concerned of us making money and creating capital inside</u>
17 <u>the enterprise. I think in my own opinion</u>, a lot of --
18 a lot of people got wiped out, and the Government had to
19 step in on a lot of fronts during the financial crisis.
20 <u>I think politically it seemed a little -- it would seem</u>
21 <u>to me that there would be individuals bothered that some</u>
22 <u>individuals might profit from the Government's support</u>
23 <u>of the enterprises, okay?</u>
24 So, you know, it wouldn't -- would it
25 be -- how would it play out if somebody made big bucks
1 because -- off the backs of the taxpayers? I am kind
2 of -- <u>how some people could connect dots that the</u>
3 <u>Government stepped in</u>, put a bunch of money into the
4 GSEs using taxpayers' funds, and now Daddy Big Bucks
5 over here is making a big profit off of Fannie Mae
6 stock.
7 <u>You could see how positioned that way,</u>

7

```
 8 how that would be pretty politically unpalatable. I
 9 could see why there could be a concern that anybody
10 plays things out that way. So, thus, why -- I wasn't
11 trying to presume that they completely wanted to wipe
12 out the shareholders, but I certainly would appreciate
13 why there would be sensitivity of things playing out in
14 a way that somebody would glob on to that story line.
```

**Defendants' Objections: Foundation, Personal Knowledge, Speculation, Relevance, Prejudice**

This question again calls for Ms. McFarland to speculate about Treasury's motivations

for executing the Third Amendment, and the witness's answer is untethered from her personal

knowledge.  Indeed, Plaintiffs' counsel acknowledged, just before the designated portion above,

that he wanted Ms. McFarland to testify about "her sense of *what the Government thought.*"

157:11-14.  Ms. McFarland's very next answer, designated above, explicitly states that she is

presenting her own "perspective on what they [*Treasury*] *may have been thinking*" in executing

the Third Amendment.  158:2-3 (emphasis added).  She then proceeds to speculate about

Treasury's purported motivations, the factors that Treasury supposedly used to evaluate the need

for an amendment to the PSPAs, and possible political ramifications of the choices Treasury was

facing.  Specifically, Ms. McFarland speculates about "why would they [Treasury] be concerned

of us [Fannie Mae] making money and creating capital inside the enterprise," whether Treasury

would be concerned "how it would play out if somebody made big bucks . . . off the backs of the

taxpayers," like a "Daddy Big Bucks" profiting off of Fannie Mae stock due to capital build up

inside the Enterprises, and whether Treasury believed that such capital build-up would be "pretty

politically unpalatable."  The questioning also failed to lay any foundation that witness has any

knowledge of Treasury's motivations.

Ms. McFarland's speculation about Treasury's motivations is confirmed by her later

concessions that she has no personal knowledge whatsoever of Treasury's motivations behind

the Third Amendment.  *See* 193:16–194:16 (confirming that she did not "know either way" whether her alleged disclosures to Treasury "had some influence on" the Third Amendment; "Q.  And no one from Treasury ever indicated that the Third Amendment was somehow connected in any way to your disclosure to Mary Miller or to Treasury during the August 9th meeting?  A. Yeah; no one at Treasury ever said that.  Q.  And no one from FHFA ever said that, either, did they?  A.  No.").  Ms. McFarland's testimony about why Treasury executed the Third Amendment is speculative, prejudicial, and inadmissible.

>        ***Plaintiffs' Response:***

As referenced above, Ms. McFarland testified that she conveyed information to Treasury officials either in meetings attended by FHFA officials or after first sharing that same information with FHFA officials (see, e.g., 45:17-47:15; 54:20-58:2; 58:8-60:3, 71:3-15).  Ms. McFarland's statements that she told Treasury officials that "We think we're sustaining profitable," that the "numbers were decent-sized," and that "I also put on the radar that was a possibility of a deferred tax allowance release that could be sitting in the not-so-distant future" (158:4-10) go to core cases issues regarding Defendants' breach of the implied covenant by entering into the Net Worth Sweep.  *See, e.g.,* Oct. 13 Mem. Op. (ECF No. 221) at 5 ("plaintiffs could logically argue that shareholders would have reasonably expected at the time of contracting that FHFA as conservator would act in good faith on whatever information it had at the time of the alleged breach"); *id.* at 13 (finding as relevant information that "factored into FHFA's decisionmaking process").

Further, Ms. McFarland's testimony concerning her own reaction to the Third Amendment is relevant and not speculative. McFarland testified that, as CFO of Fannie Mae, she had access to specialized, insider information about Fannie Mae—including "the best projections

of anyone who was trying to forecast Fannie's future profitability" (30:15-16) and quarterly

forecasts that "might inform disclosures that we may want to make within our public filings"

(31:13-14). This testimony evinces Ms. McFarland's personal knowledge of the events leading

up to the Third Amendment, reveals her understanding of Fannie Mae's financial position, and

provides a relevant "perspective" from Ms. McFarland's "vantage point" as a CFO who dealt

regularly with FHFA and Treasury officials prior to the Third Amendment.


### B.      Plaintiffs' Objections to Defendants' Designations

For the reasons discussed below, Plaintiffs object to the admission of the following

passages from the July 15, 2015 deposition of former Fannie Mae Chief Financial Officer Susan

McFarland (the "McFarland Testimony"):

- **McFarland -- 201:3 - 201:18, 202:6 - 202:12, 203:13 - 203:21, 203:23, 204:5, 204:18 – 205:18**

```
201: 3 Q.   (BY MR. LAUFGRABEN)  What's been handed to you,
     4 Ms. McFarland, is what's been marked for identification
     5 as McFarland Exhibit No. 30.
     6 On or around August 8th, 2012, do you
     7 remember speaking with Reuters?
     8 A.   Reuters would be a normal media outlet that I
     9 would normally speak with.
    10 Q.   Now, if you look at the second paragraph from
    11 the bottom of the first page, it says, "Although
    12 Fannie Mae did not need taxpayer funds this quarter to
    13 cover required 10 percent dividend payments, McFarland
    14 says she expects there may be periods where the
    15 company's income would not be sufficient enough to meet
    16 the requirements."
    17 Was that an accurate statement?
    18 A.   Yes.
```

        ***

10

202: 6 given to Reuters?
    7 A.   Yes.
    8 You -- there are normal seasonal
    9 fluctuations in home prices, and so certain quarters
   10 tend to see -- your high-selling periods and buying
   11 periods tend to see a greater benefit than your
   12 low-selling buying periods.  So that's the gist of what

    ***

203:13 Q.   And in the last paragraph on that page, it
   14 says, quote, "A lot of things are out of our control
   15 with the economy being soft," end quote, "she said."
   16 Quote, "We have to be a bit cautious
   17 before we declare a permanent victory, and we will be
   18 able to sustain profits quarter in and quarter out."
   19 Was that a true statement when you made
   20 it?
   21 A.   Yes.

    ***

203:23 Q.   (BY MR. LAUFGRABEN)  What's been handed to you
   24 what is what's been marked for identification as
   25 McFarland No. 31.  It's a re-printout of a story from
204: 1 the Washington Post dated August 9th, 2012.
    2 Do you remember speaking with reporters
    3 from the Washington Post on or around
    4 August 8th or 9th, 2012?
    5 A.   I don't.

***

204:18 Q.   Sure.  Let's see if we can refresh your
   19 recollection.
   20 If you look at the fourth paragraph from
   21 the top, quote, "The magnitude of the home price
   22 improvement that we saw was greater than we would have
   23 expected from normal seasonal upticks, so that's
   24 encouraging," said Susan McFarland, Fannie Mae's
   25 Chief Financial Officer in a statement.
205: 1 "But I don't think we're going to see
    2 this level of earnings repeat itself quarter in and
    3 quarter out."

```
 4 Do you remember making such a statement?
 5 A.   This could have been taken from a press
 6 release.  That's why I don't know whether this was a --
 7 they picked something up out of our official
 8 press release or whether they picked that up from
 9 something I said in an interview with them.
10 Q.   Okay.
11 A.   That's why I am expressing uncertainty.
12 Q.   Whether or not there was an oral interview or a
13 written statement, you know, was this -- was the quote
14 that's attributed to you here one that you made?
15 A.   Yes.
16 Q.   And was it one that you believed was true at
17 the time you made it?
18 A.   Yes.
```

***Plaintiffs' Objections***

Plaintiffs object to the admission of the McFarland Testimony because the news articles about which Ms. McFarland testified are hearsay and do not qualify for any exception under F.R.E. 803 or 804.  Accordingly, the articles are inadmissible, and therefore Ms. McFarland's testimony about the articles is inadmissible.  For this reason, Plaintiffs respectfully request that the Court exclude the McFarland Testimony.

***Defendants' Response (to 201:3 - 201:13, 202:6 - 202:12, 203:13 - 203:21)[2]:***

In these passages, Plaintiffs object to Ms. McFarland being asked whether she spoke with Reuters, and whether quotes from an article are accurate statements—*i.e.*, whether the statements are themselves true.  At the outset, many of the questions and answers covered by these objections come nowhere near being excludable hearsay.  For example, the question whether Ms. McFarland recalled speaking with Reuters contains no reference to any out of court statements that are being

---

[2]      A series of these objections cover only portions of answers or questions.  Defendants reserve all rights to respond to any objections lodged against wider ranges of Ms. McFarland's testimony.

offered for their truth. *See* McFarland Dep. 201:3 - 201:13 ("Q: On or around August 8th, 2012,
do you remember speaking with Reuters? A: Reuters would be a normal media outlet that I would
normally speak with."). Plaintiffs' objections to any quotes from the August 8, 2012 Reuters
article that were read to Ms. McFarland also fall short of exclusion. The quotes are not being
offered to prove their *own* truth. Rather, they are being offered to facilitate Ms. McFarland's
deposition testimony, which is plainly not hearsay and itself establishes the truth of the contents
of the quotes. Plaintiffs' objections are meritless, as they concern Ms. McFarland's testimony
which adopts the truthfulness of statements she made out of court, and it is these adoptions that
establish the truthfulness of the facts, not the out of court statements (from the articles) themselves.
Ms. McFarland's testimony is admissible. *See* F.R.E. 802.

      *Defendants' Response (to 203:23-204:5, 204:18 – 205:18)*

      In the first passage, Ms. McFarland is handed an exhibit and is asked whether she recalls
speaking to Washington Post reporters on or around August 8 or 9, 2012 -- just over one week
before the Third Amendment is executed. As with Plaintiffs' objections to questions concerning
Ms. McFarland speaking to Reuters, there is no out of court statement being offered for the truth
of matter asserted. Ms. McFarland's only statements in this section are that she does not recall
speaking with reporters. Because this testimony is not an out-of-court statement being offered for
its truth, it is not excludable as hearsay. Further, Plaintiffs' objection to Ms. McFarland's
testimony in the second passage, adopting the statement she made previously, again fails for the
reasons stated above. Ms. McFarland's statements to the Washington Post, as reflected in the
August 9, 2012 article, are not themselves being offered for their truth. Instead, they are being
offered in support of the position she adopts in her deposition testimony, which is plainly not
hearsay. *See* McFarland Dep. 204:18 - 205:18 (affirming her belief in the truth of her prior

statement that "I don't think we're going to see this level of earnings repeat itself quarter in and quarter out.")).  Because Ms. McFarland's quotes to reporters are not offered for their own truth but rather in facilitation of her adoption of those same viewpoints, they are not excludable hearsay. *See* F.R.E. 801; 802.

II.     **Timothy J. Mayopoulos**

Both sides designated testimony from Plaintiffs' deposition on Timothy Mayopoulos,

who is the former President and CEO of Fannie Mae.  Mr. Mayopoulos's full deposition

transcript is attached as **Exhibit B**.   The following are deposition excerpts designated by

Plaintiffs to which Defendants have objected.

- **Mayopoulos -- 261:9 – 262:1**

```
260:13
13 Regardless of that, would you agree
14 that during this time frame, the last decade, 10
15 percent has been -- is a fairly expensive cost of
16 capital?
. . .
19 THE WITNESS:  What I would say is that in
20 commercial context, yes, 10 percent was an expensive
21 amount of cost of capital.  This wasn't a commercial
22 transaction.
1 BY MR. HUME:
2 Q. No. I understand. And the point of my
3 question is not to criticize --
4 A. And I -- I wasn't involved in negotiating
5 it -- [the original PSPA]
6 Q. Right.
7 A. -- so I have no vested stake in it one
8 way or the other.
9 Q. Right.
10 A. I'm not trying to defend it [the original PSPA]. I'm
just
11 saying it's not an arm's length commercial
12 transaction. It's as much of a -- you know, a
13 political transaction, where the people extending
14 the taxpayers' credit need to satisfy political
15 constituencies that they are getting adequate
16 compensation for that.
17 Q. Right. I understand. And would you say
18 the same is true for the transaction that took place
19 in August 2012 with the third amendment, that it's
20 not an arm's length commercial transaction; it's a
21 political transaction? Would you say the same is
```

15

22 basically true?
1 A. <u>Yes</u>.

***Defendants' Objections: Vague, Ambiguous, Foundation, Personal Knowledge,
Speculation, Relevance, Prejudice***

Mr. Mayopoulos joined Fannie Mae in 2009 and was Fannie Mae's President and CEO at

the time the Third Amendment was executed.  Here, Mr. Mayopoulos states that he *was not*

*present* for negotiation of original PSPAs with the fixed 10% dividend—indeed, he was not even

at Fannie Mae at the time.  On page 261:4-5, Mr. Mayopoulos states that he "wasn't involved in

negotiating [the original PSPAs]."  This means Ms. Mayopoulos has no personal knowledge of

anything about the origins or negotiations of the original PSPA.  Nevertheless, he speculates here

that the original PSPA "wasn't a commercial transaction" and was "not an arm's length

transaction" and that Treasury "needed to satisfy political constituencies that they are getting

adequate compensation for that."  This is all speculation, not based on any personal knowledge,

that is both confusing to the jury and prejudicial.

The same objections apply to Plaintiffs' questions concerning whether the Third

Amendment was "not an arm's length commercial transaction" and instead was a "political

transaction."  Mr. Mayopoulos was *not involved* in the negotiation of the Third Amendment, and

his characterizations of whether it was "arm's length" or "political" are based on after the fact

characterization and speculation, and are also irrelevant and highly prejudicial.  Further, his

personal opinions about the PSPAs and their amendments are irrelevant to this case.

(To be clear, Defendants are not pressing their objections to pages 260:13 to 260:22, but

are including them in the excerpt above for context.)

***Plaintiffs' Response:***

Mr. Mayopolous is a seasoned executive with an extensive background in the financial services industry.  His testimony that the original PSPA and the Third Amendment were not "arm's length commercial transaction[s]" is well within his personal knowledge regardless of whether he was involved in the negotiation and execution of the transactions.  Any sophisticated observer of the PSPA and the Third Amendment would understand that they were not ordinary commercial transactions, and there is no prejudice in Mr. Mayopolous testifying to that obvious point.

III.   **David C. Benson**

Both sides designated testimony from Plaintiffs' deposition on David Benson, the

President and Interim CEO of Fannie Mae.  Mr. Benson's full deposition transcript is attached as

**Exhibit C**.   The following are deposition excerpts designated by Plaintiffs to which Defendants

have objected.

- **Benson -- 203:17 –203:22**

```
17 Q. Did the Treasury Department take on any
18 additional risk when it entered into the August
19 amendment to the -- the August 2012 amendment to the
20 preferred stock purchase agreements?
21 MS. VERGOW: Objection, vague.
22 THE WITNESS: I don't believe so.
```

*Defendants' Objections: Vague, Confusing, Lack of Personal Knowledge, Lacks Foundation*

First, the question posed lacks foundation because Plaintiffs did not lay a foundation that

Mr. Benson would know anything about risk *to Treasury* resulting from the Third Amendment.

Mr. Benson was a Fannie executive at the time of the Third Amendment—not a Treasury

employee—and he had no role in the negotiation of the Third Amendment; he thus has no

personal knowledge of this issue and no ability to assess what additional risks *Treasury* may

have taken-on with the Third Amendment.  Accordingly, his answer is speculative, prejudicial,

and misleading.

Second, Mr. Benson's answer is also infected by a series of vague, ambiguous, and

confusing questions that immediately precede the designated testimony above.  In particular, at

pages 202:2 - 203:15, Plaintiffs' counsel repeatedly asked Mr. Benson if Treasury's "net

dividend receipts" would be less under the Third Amendment, or if Treasury would receive

"less" "on a net basis" when compared to the pre-Third Amendment PSPA.  Plaintiffs never

defined or explained to Mr. Benson what was meant by "net" dividend receipts.  And the
confusing nature of the questions lead to a plainly incorrect answer.  In particular, Mr. Benson
answered "that's true" to the question of whether Treasury's "net" dividends could decrease
under the variable dividend under Third Amendment.  But it *was* possible for Treasury's
dividends to decrease under the Third Amendment.  It is undisputed that, under the Third
Amendment, in any quarter in which the Enterprises' net worth is less than 10% of the
outstanding liquidation preference, then the Enterprises would pay a dividend that is *less than*
what the 10% dividend would have been.  Any suggestion to the contrary ignores reality and the
explicit terms of the Third Amendment.  Here, the witness's factually incorrect answer confirms
the confusing nature of these questions.

Further, Mr. Benson's confusion lingered into the very next question—the one designated
above—when he answered that he did not believe Treasury took on any additional risk by
executing the Third Amendment.  As explained above, Treasury *did* take on the additional risk of
receiving less in dividends if Fannie Mae's net worth was less than the 10% dividend payment.
Again, all of this confusion stemmed from Plaintiffs' repeated and unclear references to "net"
dividends.  Accordingly, the testimony is likely to confuse and mislead the jury, just as it
confused and mislead Mr. Benson.

**Plaintiffs' Response:**

Defendants claim that the testimony at 202:2 – 203:3 was vague and confusing, but they
did not object at the deposition.  In any event, it is clear that the question of whether Treasury
took on "any additional risk" in entering into the Third Amendment refers to the financial risk of
Treasury's investment in Fannie Mae.  As an experienced senior executive at Fannie Mae, Mr.
Benson understood both the question and the undisputed fact that the Third Amendment did not

require Treasury to invest in nor make available to Fannie Mae any additional funds.  There is nothing speculative or prejudicial about this testimony.

Moreover, Defendants' contention that Treasury could receive less in dividends under the Third Amendment than it would under the 10% dividend is mathematically wrong.  In a quarter in which Fannie Mae generated additional net worth *less* than the amount of the 10% dividend, Treasury would receive dividends as follows:

**10% dividend:**  Entire increase in net worth, and Treasury would fund the shortfall

**Third Amendment:**  Entire increase in net worth.

In a quarter in which Fannie Mae generated additional net worth *greater than or equal* to the amount of the 10% dividend, Treasury would receive dividends as follows:

**10% dividend:**  Full 10% dividend

**Third Amendment:** Entire increase in net worth.

Hence, under the Third Amendment, Treasury would always receive at least as much in dividends, if not much more, than it would under the 10% dividend.

IV.    **Donald Layton**

Both sides designated testimony from Plaintiffs' deposition on Donald Layton, who is the

former CEO of Freddie Mac.  Mr. Layton's full deposition transcript is attached as **Exhibit D**.

The following are deposition excerpts designated by Defendants to which Plaintiffs have

objected.

For the reasons discussed below, Plaintiffs object to the admission of the following

passages from the January 7, 2021 deposition of former Freddie Mac Chief Executive Officer

Donald Layton (the "Layton Testimony"):

- **Layton -- 149:19 - 153:19; 189:3 - 195:20**

```
149:19 Q.    Got it.  And it sounded like
    20 depending on what I meant by learn about,
    21 there might be a different answer; is
    22 that right?
150: 1 A.    Well, I had known from earlier
     2 in the summer there was an issue to be
     3 addressed that was concerning to the
     4 markets, which was extremely important to
     5 resolve.  And that issue is that the
     6 PSPA -- the amount of the PSPA available
     7 to the Freddie Mac in the summer of 2012
     8 was unlimited.  And by its terms was
     9 going limited near year-end by a formula.
    10 And that because of the expectation of
    11 earnings of the company was that it would
    12 from time to time, and maybe in a
    13 downturn a lot have draws that it would
    14 "use up the limited amount leaving too
    15 small amounts to maintain the market's
    16 confidence that the Government was behind
    17 our credit quality guarantee of the MBS."
    18 Q.    How did that concern manifest
    19 itself?
    20 MS. RODRIGUEZ:  Objection to
    21 form.
    22 A.    Yeah, I'm not sure -- can you
151: 1 ask that --
     2 Q.    How did you know that was a
     3 concern of the markets?
```

21

4 A.    Relatively soon into my tenure
5 which started in late May of 2012, so I
6 am estimating sometime in June, I was
7 asked to join an existing meeting with
8 one of the -- that was going on with a
9 delegation from one of the major mortgage
10 securities dealers where that was why
11 they were coming to tell us about their
12 seeing this problem.  And that this was
13 highly concerning to them, because it
14 could lead to a real financeability
15 issue, as well as losses to them,
16 obviously.
17 Q.    Which mortgage securities
18 dealer are you referring to?
19 A.    Credit Suisse.
20 Q.    Do you remember who was at that
21 meeting?
22 A.    It's too long ago to remember
152: 1 names.  I don't deal with people
2 normally, so the answer is I don't
3 remember the names anymore.
4 Q.    Okay.  Do you remember if
5 anyone from FHFA was there?
6 A.    No.  I was told at the time
7 they were talking to us about their
8 concern and making the rounds in
9 Washington telling all of the interested
10 parties.  So I am under the impression
11 they visited with Fannie Mae and FHFA and
12 Treasury.  They left me with that
13 impression.
14 Q.    Got it.  And do you remember if
15 anyone else from Freddie Mac was in the
16 meeting?
17 A.    Well, yes.  This meeting was
18 not with me.  I was not supposed to be
19 there originally.  I was asked to join
20 the person who asked me to join who from
21 the meeting was the individual who was
22 then head of the markets area of the
153: 1 Freddie Mac, his last name is Ghose,
2 G-h-o-s-e.
3 Q.    Got it.  And was it just you
4 and Mr. Ghose for Freddie or there might
5 have been others, do you recall?
6 A.    It might have been others, but

22

7 I don't remember.
8 Q.    Got it.  And was anyone from
9 Fannie Mae there?
10 A.    No, this is a single company
11 meeting.
12 Q.    Got it.  And did you ever, in
13 the lead-up to mid-August 2012 and the
14 Third Amendment, did you have any other
15 meetings with market participants where
16 market participants expressed this
17 concern or is that the only one?
18 A.    That's the only one that I
19 recall at this time.

       * * *

189: 3 Q.    Welcome back, Mr. Layton.  Just
    4 very briefly, we had a conversation a
    5 little earlier about Credit Suisse and
    6 some expressions of concern that they had
    7 about the dividend arrangement that
    8 preceded the Third Amendment.  Do you
    9 recall that?
   10 A.    Yes, I do.
   11 Q.    And as I understand it, the
   12 substance of the concern was that Freddie
   13 might, over the course of the years, be
   14 put in a position where it needed to draw
   15 on Treasury's funding commitment to
   16 finance dividends to Treasury.  Do I have
   17 that right?
   18 A.    Yes.
   19 Q.    And I think you mentioned early
   20 on in the deposition that you didn't have
   21 any involvement in and weren't consulted
   22 about FHFA's decisions with regard to
190: 1 whether or not to declare dividends on
    2 Treasury's senior preferred stock.  Did I
    3 catch that right?
    4 A.    Correct.  Because of the lack
    5 of the delegation about capital matters
    6 to the board of management, we acted just
    7 as execution agents for FHFA and anything
    8 related to the capital.  So they
    9 literally gave us an order to pay the
   10 quarterly dividend, the 10 percent coupon
                     23

11 when the time was due.  It was
12 administrative, but that was the paper
13 plug.
14 Q.    Right.  And if FHFA had adopted
15 a policy that it would just not direct
16 Freddie to declare dividends in quarters
17 when doing so would cause Freddie to make
18 a draw on Treasury's funding commitment,
19 would that have addressed the Credit
20 Suisse concern that you were referring to
21 earlier?
22 MS. RODRIGUEZ:  Objection to
191: 1 form.
2 A.    Say that again?  Ask that
3 again?  I didn't follow the logic.
4 Q.    Sure.  So if in quarters when
5 Freddie was in a position where it would
6 need to make a draw in order to pay the
7 10 percent dividend, if FHFA during those
8 quarters had just declined to direct
9 Freddie to declare dividends on Treasury
10 stock, would that have addressed the
11 Credit Suisse concern?
12 A.    Only in the most narrow sense,
13 because not paying the 10 percent would
14 be a violation of the PSPA, and that
15 would have caused a real stir.
16 Q.    Okay.  And what is your basis
17 for saying that it would have been a
18 violation of the PSPA?
19 A.    As far as I knew we were
20 obligated to pay the 10 percent coupon
21 and FHFA telling us nothing, to do
22 nothing looks like on the surface to be a
192: 1 violation of the agreement.  And Treasury
2 would be, you know, concerned it would
3 leak out.  The market would wonder what's
4 going on.  This is not a confidence
5 building path to be on.
6 Q.    Do you know whether the PSPA,
7 as it existed prior to the Third
8 Amendment, permitted Freddie or FHFA to
9 add to the liquidation preference on
10 Treasury's senior preferred stock in lieu
11 of paying cash dividends?
12 A.    I actually don't remember
13 learning of that until it became brought

24

14 up later after the Third Amendment as
15 part of the lawsuits.  So if I knew it,
16 it never impacted my thought process,
17 because I didn't pay attention to it.
18 However, just to tie you up in
19 your question, we still would have been
20 told to issue paperwork to do the
21 preference.
22 MR. BARNES:  Did Mr. Layton cut
193: 1 out there for you?
2 MS. RODRIGUEZ:  I could hear
3 him.
4 THE COURT REPORTER:  I could
5 hear him.
6 MS. RODRIGUEZ:  Do you want to
7 have the reporter read it back?
8 MR. BARNES:  Yes, that would be
9 great.
10 (Record read.)
11 Q.    Okay.  And if you had issued
12 the paperwork to do the preference in
13 that manner, would the concern that was
14 expressed to you by Credit Suisse have
15 still been a concern?
16 MS. RODRIGUEZ:  Objection to
17 form.
18 A.    I don't know what Credit
19 Suisse's thought process would have been,
20 but it would have been a switch about the
21 concern of the unused running down to a
22 concern about the preference continually
194: 1 increasing, which would be unusual in its
2 own right.
3 Q.    Credit Suisse was expressing
4 this concern from the perspective of
5 mortgage-backed securities holders and
6 bondholders; is that right?
7 A.    Yes, liability holders.  Not
8 equity holders.
9 Q.    And so liability holders, they
10 are senior in the capital stack to
11 Treasury senior preferred stock, is that
12 right?
13 A.    That is correct.  That's the
14 whole purpose.
15 Q.    And so why would an investor
16 who is a senior in the capital stack to

25

```
17 Treasury be concerned about a growing
18 Treasury preference on senior preferred
19 stock?
20 A.    Only because it's so unusual,
21 it raises concerns.
22 Q.    What concerns?
195: 1 A.    It makes the company look
 2 unsustainable because you can't
 3 constantly have this growing senior
 4 preference.  At some point it just
 5 doesn't make any sense.  So it would be
 6 more symptomatic of it's a short-term
 7 solution, it can't last for the long
 8 term.
 9 Q.    I guess as the liquidation
10 preference ballooned, at some point one
11 would say that any investors that were
12 junior to Treasury in the capital stack
13 had been effectively wiped out; is that
14 right?
15 MS. RODRIGUEZ:  Objection to
16 form.
17 A.    If the senior preferred keeps
18 going up and up, there is less left for
19 people below them in the stack, that is
20 correct.
```

*Plaintiffs' Objections:*

Plaintiffs object to the admission of the Layton Testimony for the following four reasons:

(1)    The Layton Testimony, which concerns a June 2012 meeting Mr. Layton attended

with representatives of Credit Suisse, "one of the major mortgage securities dealers" (151:9-10),

is hearsay and does not qualify for any exception under F.R.E. 803 or 804.  Mr. Layton's testimony

about what he heard from Credit Suisse is quintessential hearsay that has no place in this trial.

(2)    The Layton Testimony is inadmissible pursuant to this Court's October 13, 2022

Memorandum Opinion and Order adjudicating the parties' pre-trial motions in limine (the

"October 13 Order").  In the October 13 Order, this Court ruled, among other things, that the

pertinent "date of contracting" is no later than December 24, 2009 and that reports from securities

analysts are inadmissible unless Defendants "can show that any specific report factored into FHFA's decisionmaking process [with regard to the Third Amendment] or a hearsay exception applies." Although the Court did not have occasion specifically to rule on the admissibility of oral communications between a securities dealer (Credit Suisse) and a Freddie Mac executive (Mr. Layton), the implications of the October 13 Order are obvious: hearsay testimony about a June 2012 conversation cannot be admissible because any such conversation would be probative of neither shareholders' reasonable expectations (because shareholders had no knowledge of the conversation, which occurred well after the date of contracting) nor the arbitrariness and unreasonableness of FHFA's decision to enter into the Net Worth Sweep (because there is no evidence that FHFA had any knowledge of the conversation, much less that the conversation factored into FHFA's decisionmaking process).

(3)     The Layton Testimony has no tendency to make any fact of consequence in this action more or less probable than it would be without the testimony. As noted in point (2) above, there is no evidence that anyone other than the (mostly unnamed) attendees at the June 2012 meeting between Credit Suisse and Freddie Mac had any knowledge of what was discussed at that meeting, and therefore the Layton Testimony could not possibly have any bearing on any fact of consequence in this case. Accordingly, the Layton Testimony is irrelevant, and therefore it should be excluded pursuant to F.R.E. 402.

(4)     Even if the Layton Testimony arguably were permitted pursuant to the October 13 Order, which it is not, and otherwise relevant, which it is not, its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, and wasting time, and therefore it should be excluded pursuant to F.R.E. 403. There is no rational basis for the jury to hear testimony about a conversation that could not possibly have had any impact on

anything the jury will consider in this action.  The only possible result would be confusion and time-wasting.

For all these reasons, Plaintiffs respectfully request that the Court exclude the Layton Testimony.

***Defendants' Response:***

None of Plaintiffs' objections to the admission of Mr. Layton's testimony has merit.

(1)      Mr. Layton's testimony about the Credit Suisse meeting is not hearsay because Defendants are not offering it for the truth of the matters asserted.  *See* Fed. R. Evid. 801(c); *see generally U.S. v. Wright*, 739 F.3d 1160 (8th Cir. 2014) (statement offered to show its effect on the listener is not hearsay).  Defendants are not offering the cited testimony to establish the truth or correctness of Credit Suisse's concerns about circular draws -- in particular, that the Treasury commitment would be eroded, or the risk that the Treasury commitment would insufficient to protect Freddie Mac against losses in the future.  Rather, this testimony is being offered to show the effect it had on Mr. Layton and to explain why Mr. Layton expressed concern about erosion of the Treasury commitment to FHFA.  The conversations with Credit Suisse, among other things, caused Mr. Layton to believe that an amendment to the PSPAs was necessary.  Indeed, Mr. Layton testified during his deposition that he was not surprised at there being a Third Amendment "to solve the problem that was – that I had indicated that had first been brought to my attention by Credit Suisse.  That was an extremely important topic.  There is nothing more core to the GSEs than maintaining the market confidence in the real credit risk on the MBS [mortgage-backed securities].  It[']s [the] core of the business.  Ultimately, the business is built on it."  *See* Layton Dep. at 163:20-164:7.

28

(2)     Mr. Layton's meeting with Credit Suisse is not comparable to the analyst reports discussed in the Court's October 13, 2022 Order.  Unlike the analyst reports, which were published and not necessarily brought to FHFA or the GSEs' attention, Credit Suisse, "one of the major mortgage securities dealers" (Layton Dep. at 151:9-10), met with the CEO of Freddie Mac, a party to the PSPA, to express concern about the exact issue that motivated Mr. DeMarco to enter into the Third Amendment on behalf of Freddie Mac and Fannie Mae.  Moreover, Plaintiffs are incorrect that there is no evidence that knowledge about the meeting factored in to FHFA's decision-making process.  As an initial matter, the meeting informed Mr. Layton's thinking about the need for a solution to address erosion of the Treasury commitment, and Mr. Layton conveyed that concern to FHFA.  For example, in an agenda for a June 2012 meeting between Mr. Layton, Ms. Miller (Treasury), and Mr. DeMarco, Mr. Layton's talking points included notes that "investors are increasingly focused on the implications of the expiration of our unlimited preferred stock funding from Treasury . . . Even if we generate comprehensive income in the future, we are likely to need additional Treasury draws to cover our dividend obligation, which is currently over $7 billion annually."  *See* FRE-FAIRHOLME-0077587 at p. 77597 (attached as **Exhibit E**). Ultimately, this precise concern was one reason Mr. DeMarco listed for agreeing to the Third Amendment.  *See* DeMarco Dep. 266:7-15 ("And part of the motivation for the Third Amendment was so that market participants were already getting nervous, and we had this conversation this morning, were -- were getting concerned that -- that the fixed 10 percent dividend was going to erode that commitment and that the companies would have to -- would -- would have greater difficulty accessing the markets.").  In addition, Mr. Layton testified that he was under the impression that Credit Suisse met separately with FHFA and Fannie Mae.  He states that while an FHFA representative did not attend the meeting with Credit Suisse, Mr. Layton "was told at the

time [Credit Suisse was] talking to [Freddie Mac] about their concern and making the rounds in Washington telling all of the interested parties. So <u>I am under the impression they visited with Fannie Mae and FHFA and Treasury</u>." Layton Dep. at 152:6-13 (emphasis added).  This testimony supports the notion that Credit Suisse shared the same concern with FHFA.  In any event,

(3)     the Credit Suisse meeting is highly relevant to the determination of whether FHFA acted arbitrarily or unreasonably.  Plaintiffs plan to argue that FHFA's stated reasons for entering into the Third Amendment on behalf of the GSEs—including to address market concerns about erosion of the Treasury commitment—were pretextual.  This testimony confirms that the erosion of the Treasury commitment was a legitimate concern for Freddie Mac's CEO at least in part because of the Credit Suisse meeting, a concern he expressed to FHFA prior to the Third Amendment.

(4)     Plaintiffs identify no prejudice to the admission of Mr. Layton's testimony, let alone prejudice that would outweigh the probative value of this important testimony.

Dated: October 16, 2022

Respectfully submitted,

/s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Howard N. Cayne (D.C. Bar # 331306)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Howard.Cayne@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
*Attorneys for Defendant Federal Housing
Finance Agency and Director Sandra L.
Thompson*

/s/ Michael J. Ciatti

Michael J. Ciatti (D.C. Bar #467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com
*Attorney for the Federal Home Loan
Mortgage Corp.*

/s/ Meaghan VerGow

Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com
*Attorney for the Federal National Mortgage
Association*

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
*Counsel for Berkley Plaintiffs, et al.*

/s/ Hamish P.M. Hume
Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
*Co-Lead Counsel for the Class*