# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL HOUSING FINANCE AGENCY, *et al.*, <br><br> Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations <br><br> _____ <br><br> This document relates to: <br> ALL CASES | Miscellaneous No. 13-1288 (RCL) |

**JOINT SUBMISSION OF OBJECTION TO DEPOSITION DESIGNATION OF MARIO UGOLETTI TO BE PRESENTED IN PLAINTIFFS' CASE-IN-CHIEF**

**PRELIMINARY STATEMENT**

In an effort to streamline the trial and avoid duplicative testimony from being presented to the jury, the Plaintiffs have agreed to withdraw their trial subpoena of Mario Ugoletti and instead substitute in place of his live testimony, certain designated portions of his video-taped deposition. Defendants agreed to permit the late-stage designation in exchange for withdrawing the subpoena, identified certain counter designations to be included in the presentation of the video deposition, and agreed not to call Mr. Ugoletti live in their case-in-chief.

Having conferred over the designations, the parties have narrowed the scope of disputed testimony from Mr. Ugoletti to one passage and now present to the Court this limited portion of the deposition on which the parties have reached an impasse and which is ripe for judicial resolution. The parties have identified the below designation that is expected to be used during Plaintiffs' case-in-chief, and therefore requires timely resolution.

**I.      Mario Ugoletti**

Mario Ugoletti was the former Special Advisor to Acting Director Edward DeMarco of FHFA at the time of the Third Amendment. Defendants have objected to the following excerpt of Mr. Ugoletti's deposition.

**Pages 235:21 – 242:20:**

> 21 MR. THOMPSON: Our next one is 19?
> 22 Yes, 19. And it has a Bates number of
>
> 1 FHFA 25815.
> 2 (Exhibit No. 19 marked.)[1]
> 3 BY MR. THOMPSON:
> 4 Q. Now, this cover email is from Mary Miller
> 5 to Ed DeMarco dated January 4, 2012.

---

[1]     Exhibit No. 19 from the deposition corresponds to PX-0144, and is attached hereto as Exhibit A for the Court's convenience.

6 Who -- what was Ms. Miller's role at
7 Treasury?
8 MS. HOSFORD: Objection; lack of
9 foundation on the document.
10 THE WITNESS: Assistant secretary for
11 Financial Institutions -- no, assistant -- she was an
12 assistant secretary.
13 BY MR. THOMPSON:
14 Q. Did --
15 A. I can't remember -- I can't remember what
16 position -- and she may have been the Under -- she
17 was the Under Secretary for a while, too. So she was
18 somewhere in that mix. I can't remember in 2012
19 where she was.
20 Q. Did Tim Bowler report to her?
21 A. Yes.
22 Q. Okay. And then if we go to the second

1 page, it says "FHFA and Treasury share common goals
2 to promote a strong housing market recovery, reduce
3 government involvement in the housing market over
4 time and to provide the public and financial markets
5 with a clear plan to wind down the GSEs."
6 Was that an accurate statement in the
7 run-up to the Net Worth --
8 MS. HOSFORD: Objection --
9 BY MR. THOMPSON:
10 Q. -- Sweep?
11 MS. HOSFORD: -- lack of foundation.
12 THE WITNESS: Well, I mean, this was
13 before we had issued -- I mean, this is -- this is a
14 Treasury document, I believe. It's coming from Mary
15 Miller.
16 BY MR. THOMPSON:
17 Q. Yes, I'm asking you if it's accurate, at
18 least with respect to FHFA.
19 A. Well, I'd have to -- I'll go through piece
20 by piece.
21 Q. Please.
22 A. All right? "Strong housing market

1 recovery." I mean, it's good for the enterprises;
2 but I don't view FHFA's mission as the housing
3 market. Our mission is to provide liquidity within
4 the housing market, which then can help a strong
5 housing market recovery. But I would never write

3

6 anywhere in an FHFA document that our mission is to
7 promote -- is to promote the housing market. That's
8 not --
9  Q. Fair enough.
10  A. Maybe that's HUD's mission.
11  Q. Fair enough.
12  A. But I don't think that's in here.
13  "Reduce government involvement in the
14 housing market over time."
15   Those are things that, given the failure
16 of these two companies, that was a potential goal.
17 Everyone had said that private market -- getting more
18 private market capital into the -- into the economy,
19 into the housing market would be good, reducing
20 Government involvement.
21   And what we had happen here was we turned
22 an implicit guarantee into an explicit guarantee, and

1 that was not the design of the GSEs from the start.
2 It wasn't an explicit guarantee. So we were in
3 situation now where we had much -- something that
4 looked more like an explicit guarantee. It wasn't
5 the full faith and credit, but it was very large.
6 Q. Where --
7 A. So that's not that ...
8 Q. But just to be clear, was that one of the
9 goals behind the Net Worth Sweep, was to reduce
10 Government involvement in the housing market over
11 time?
12 A. Well, I don't think that was a stated goal
13 within the third amendment, but I think if you go
14 back to FHFA's strategic plan that was issued in
15 February of 2012, I mean, one of the goals was to
16 contract the enterprises' footprint.
17 Q. Okay.
18 A. And that was a goal, to contract the
19 enterprises' footprint, in light of the fact that the
20 capital commitment was now going to be fixed and we
21 needed to manage that capital commitment. All right?
22 So that, from the safety and soundness

1 perspective of FHFA as a conservator, that is one of
2 the goals and stated in a number of statements that
3 that is one of the goals.
4 Q. All right. And then, continue. "Provide
5 the public and financial markets with a clear plan to

6 wind down the GSEs," was that another goal --
7 A. Well --
8 Q. -- of the FHFA?
9 A. There's a question of what "wind down"
10 means. And does it mean wind down to, what, to zero
11 or wind down to what? All right. So that's a
12 question. I don't think Treasury used that word all
13 the time. I'm not sure they ever defined exactly
14 what it meant.
15 I mean, but clearly in the strategic plan,
16 one of our goals was to contract the operations and
17 to provide a -- to provide a clear plan of what we
18 were doing so that other people, mainly the
19 legislative branch, could figure out what they wanted
20 to do with the nation's housing finance system and to
21 have something there remaining with the GSEs that
22 they could decide what to do with it.

1 So if you're going to say, Is this exactly
2 what FHFA said? I'd probably word it in the way I
3 just worded it, slightly differently; but broadly,
4 probably goals that were shared by both of us.
5 Q. Okay. Now, if we look at Point 2 on this
6 memo, it says "Establish meaningful policies that
7 demonstrate a commitment to winding down the GSEs."
8 Was the Net Worth Sweep one of those
9 policies?
10 MS. HOSFORD: Again, objection; lack of
11 foundation. This is not an FHFA document.
12 THE WITNESS: Well, it's not listed there.
13 BY MR. THOMPSON:
14 Q. Well, this is January. But I'm saying,
15 ultimately, was the Net Worth Sweep a manifestation
16 of the commitment to wind down the GSEs?
17 A. Well, the commitment to contract the
18 operations and to reduce the risk footprints, we
19 talked about this earlier. And so, I mean, if you
20 look at Bullet 2, this -- these are things that we
21 were getting ready to do. All right?
22 The risk-sharing transactions. And, as we

1 talked about earlier, if you're going to do risk-
2 sharing transactions and you're going to increase the
3 amount of risk, all right, that the enterprises have,
4 that's good for the risk side but it's also going to
5 limit their revenue.

5

      6 Q. Um-hmm.
      7 A. All right? And if I limited the rev- --
      8 if the revenue was going to be limited, if this was
      9 going to be ratcheted up, there was going to be less
     10 and less revenue to pay the 10 percent dividend.
     11 All right, so, I forgot your complete
     12 train of thought there, but the idea that this one
     13 item here is consistent with the Net Worth Sweep
     14 because revenue was going to decline. The same thing
     15 with guarantee fees. We talked about that. Yes, it
     16 can increase it for a while, but it may decrease
     17 revenue.
     18 So if you have a declining revenue base --
     19 and that was the strategic plan -- the 10 percent
     20 dividend was going to be more difficult.

*Defendants' Objections:*

Defendants' objections to the selected excerpt are twofold.

First, there is plainly a lack of foundation. The entire line of questioning involves showing Mr. Ugoletti a document he had never seen before. In particular, PX-144 is an email from Mary Miller, a Treasury official, to Ed DeMarco, the acting director of FHFA, attaching an agenda for a meeting that apparently was between only the two of them and not Mr. Ugoletti. Ugoletti Dep. 234:4-5; PX-0144 (attached as Ex. B). Mr. Ugoletti is not copied on the email, and there is no foundation demonstrating that Mr. Ugoletti had any personal knowledge whatsoever of the document or its contents. *See, e.g.*, Ugoletti Dep. at 236:22-237:15 (when asked if a statement in the email was accurate, Ugoletti responded, "[T]his is a Treasury document, I believe. It's coming from Mary Miller."). If Mr. Ugoletti were called live, it would be wholly improper to show him a document he had never seen before and ask him extensive

questions about it.  Plaintiffs will have the opportunity to ask Mr. DeMarco about this meeting during his examination.

Second, the underlying document (PX-0144 (attached as Ex. B)) is inadmissible hearsay.  Under this Court's prior ruling, it is not a public record under Rule 803(8) as it is not a record "memorializ[ing] Treasury activities as they ostensibly occurred."  *See* Opinion at 8-9 (ECF 221).  Rather, it is a simple agenda for an upcoming meeting that had not yet occurred.  Further, the document is "preliminary" and "evaluative," as indicated (among other things) its header that states "*DRAFT / SENSITIVE / PRE-DECISIONAL*."  This is simply not a public record under Rule 803(8) and thus is inadmissible hearsay.[2]

*Plaintiffs' Response:*

Defendants' objections are meritless.  First, as examination of the testimony makes clear, the testimony is relevant and not hearsay not for purposes of admitting PX-0144 but because it contains an extended discussion by FHFA's chief negotiator of *FHFA's* goals for the Third Amendment.  Such testimony is highly relevant and admissible for that independent purpose wholly apart from the underlying admissibility of the document that prompted that discussion.

Second, PX-0144 is admissible for the reasons set out in the Court's October 13, 2022 Memorandum Opinion (the "Memorandum Opinion") concerning Plaintiffs' motion in limine to admit certain Treasury documents.  The Court held that "documents [that] actually memorialize Treasury activities as they ostensibly occurred"—such as a memo recording the discussions during

---

[2] Although Defendants previously indicated "no objection," that was both before the Court's ruling on the motions in limine and also on the assumption that it would be offered through a witness after laying a proper foundation.  Now, the Court has ruled on the motions in limine and it has become clear there is no such witness to lay a foundation.

a meeting—were admissible under F.R.E. 803(8)(A)(i).  *See* October 13, 2022, Memorandum Opinion at 8-9.  The Court further explained that just because a Treasury document otherwise admissible as a public record also includes information about FHFA (here a meeting between Treasury and FHFA), does not render it inadmissible simply because its description of Treasury business also includes information about FHFA.  *Id*.

PX-0144 is such a document.  The exhibit is a January 4, 2012 memorandum sent from Mary Miller, then the Under Secretary for Domestic Finance at Treasury, to Edward DeMarco, then the Acting Director of FHFA.  The memorandum is an agenda that sets forth the topics of discussion, and commentary about those topics, for a meeting between FHFA and Treasury that would occur a mere ten minutes after the email was sent.  It therefore memorializes Treasury's and FHFA's joint activities as they occurred.  The agenda documents the topics discussed during the meeting, and the extraordinarily close temporal proximity of PX-0144 to the meeting in question demonstrates that the document sets forth Treasury's activities "as they [ ] occurred."

Further, this document does not include the sort of "preliminary or interim evaluative opinions" that the Court noted some courts had refused to permit under F.R.E. 803(8)(A)(i).  There is no expression of opinion or deliberative uncertainty in the agenda.  Rather the document recounts in a factual manner topics of discussion, including FHFA's and Treasury's "share[d] common goals to . . . reduce government involvement in the housing market over time and to provide the public and financial markets with a clear plan to wind down the GSEs."  *See* PX-0144, p. 2 of 2. During his deposition, Mr. Ugoletti confirmed that FHFA shared this goal, stating from FHFA's perspective that "I think if you go back to FHFA's strategic plan that was issued in February of 2012, I mean, one of the goals was to contract the enterprises' footprint."  Ugoletti Dep. 239:13-16.  While Mr. Ugoletti states that he would "probably word it in the way I just worded it, slightly

8

differently" he agreed that "broadly, [they were] probably goals that were shared by both of us." *Id.* at 241:2-4.  The agenda memo sets forth in a factual manner that during the meeting, Treasury planned to discuss with FHFA "[a]ctions necessary to facilitate this" shared goal, which included "[e]stablish meaningful policies that demonstrate a commitment to winding down the GSEs," and then proposing a plan for doing so.  *See* PX-0144, p. 2 of 2.

Third, in addition to its lack of merit, this objection comes far too late in the process to be sustained.  As Defendants acknowledge, they failed previously to object to the exhibit, stating "no objection," and they do not claim this was a mistake.  Instead, they claim that they did not object because they thought a proper foundation would be laid for the exhibit by a witness but that it has now "become clear there is no such witness."  This makes no sense.  Mary Miller (the sender of the email) was never expected to be a witness in this case, and the recipient Edward DeMarco has yet to testify. Additionally, and as discussed above, the exhibit prompted highly relevant, admissible testimony.  This explanation also defies the purpose of the pretrial process.  "No objection" means "no objection," not "no objection unless you do x, y, or z."  If Defendants' objection was conditional, they could have said so.  There are innumerable exhibits that will not be coming through a witness, and indeed, the purpose of the pretrial process of identifying exhibits

and objections is to determine what documents can be admitted without the need to take scarce trial time in calling a witness for the purpose of getting the document into evidence.

Accordingly, the testimony is relevant apart from its admissibility for the additional reasons set forth above. Further, PX-0144 is admissible based on the reasoning set forth in the Court's Memorandum Opinion and Defendants' lack of prior objection.


*/s/ Asim Varma*                              .
Howard N. Cayne (D.C. Bar #331306)
Asim Varma (D.C. Bar #426364)
David B. Bergman (D.C. Bar #435392)
ARNOLD &PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, DC 20001
Tel: (202) 942-5000
Howard.Cayne@arnoldporter.com
Asim.Varma@arnoldporter.com
David.Bergman@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency and Director Mark A. Calabria*

*/s/ Michael J. Ciatti*                              .
Michael J. Ciatti (D.C. Bar #467177)
KING &SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 626-5508
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

*/s/ Meaghan VerGow*                              .
Meaghan VerGow (D.C. Bar # 977165)

*/s/ Hamish P.M. Hume*                              .
BOIES SCHILLER FLEXNER LLP
Hamish P.M. Hume (D.C. Bar #449914)
Samuel Kaplan (D.C. Bar #463350)
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

KESSLER TOPAZ MELTZER & CHECK, LLP
Eric L. Zagar (*Pro Hac Vice*)
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

GRANT & EISENHOFER, P.A.
Michael J. Barry (*Pro Hac Vice*)
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP

| | |
|---|---|
| O'MELVENY &MYERS LLP<br>1625 Eye Street, N.W.<br>Washington, DC 20006<br>Tel: (202) 383-5300<br>Fax: (202) 383-5414<br>mvergow@omm.com<br><br>*Attorney for the Federal National Mortgage Association* | Adam Wierzbowski (*Pro Hac Vice*)<br>1251 Avenue of the Americas<br>New York, NY 10020<br>Tel: (212) 554-1400<br>Fax: (212) 554-1444<br>adam@blbglaw.com<br><br>*Co-Lead Counsel for Plaintiffs*<br><br>*/s/ David Thompson*              .<br>Charles J. Cooper (Bar No. 24870)<br>David Thompson (Bar No. 450503)<br>COOPER & KIRK, PLLC<br>1523 New Hampshire Avenue, N.W.<br>Washington, D.C. 20036<br>Telephone: 202.220.9600<br>Facsimile: 202.220.9601<br>ccooper@cooperkirk.com<br><br>*Counsel for Plaintiffs in No. 13-1053* |