# *Exhibit G*

## Ugoletti, Mario 2015-05-15
Designation List Report

**13:1-2**
1 MARIO UGOLETTI,
2 having been first duly sworn, testified as follows:

**17:10-18:6**
10 Q. Okay. Great. Then -- so and what year
11 did you graduate from college?
12 A. 1984.
13 Q. Okay. And then when did you cease being a
14 golf pro?
15 A. Well, after those two years in Ohio, it
16 sounds like a very exciting job and very fun job, but
17 I think when you're actually in the business, you --
18 you realize that you work very long hours, you don't
19 play much golf, and it's not a very -- not that great
20 of a job. And so I kind of got tired of being a golf
21 professional and decided that, well, I think I need
22 to go back to school.
1 Q. Okay.
2 A. And somehow over that time period, I mean,
3 I got interested in economics.
4 Q. Okay.
5 A. And so I decided I wanted to go back to
6 school either for economics or an MBA.

**18:19-19:5**
19 A. Accepted into Penn State's Master's Degree
20 program in Economics. I did quite well there for a
21 couple years, and they asked me, do you want to get a
22 Ph.D., I'm like, do you want to join the Ph.D.
1 program.  I said, Well, if you guys can find some
2 funding, get me in the Ph.D. program, I'll gladly
3 try, so they got -- put me on a stipend, and I ended
4 up getting a Ph.D. from Penn State in 1995 in
5 Economics.

**20:13-21**
13 Q. Okay. Now, when you got your Ph.D. from
14 Penn State, then you went to work at the Treasury
15 Department --
16 A. I did --
17 Q. -- is that right?
18 A. -- yeah.

19 Q. And what was your job title when you got
20 there?
21 A. Financial economist.

**26:18-20**
18 [A]nd you stayed at
19 Treasury until 2009; is that right?
20 A. I did.

**31:7-33:13**
7 Q. Now, at some point, you switched over to
8 being an employee of FHFA; is that right?
9 A. I did, yes.
10 Q. And when was that?
11 A. September of 2009.
12 Q. Okay. Were you a detailee at any point
13 from Treasury to FHFA?
14 A. It was the other way around.
15 Q. Okay.
16 A. So I became a full-time employee at FHFA
17 in September of 2009. Treasury requested that I
18 detail back initially for a six-month period, and
19 then that was extended.
20 Q. Why did Treasury want you back for six
21 months?
22 A. Well, I mean, at the time, so you have a
1 new administration that came in, well, about nine
2 months prior to that, I knew pretty much all the
3 people pretty well: you know, they had Secretary
4 Geithner; Neal Wolin, I worked with Neal Wolin back
5 in the Clinton administration; my direct report
6 Michael Barr, I worked with him back in the Clinton
7 administration; Lee Sachs was there somewhere as a
8 counselor, I worked with him in the Clinton
9 administration. So they all knew me quite well. I
10 think they valued my perspective and what I did, and
11 given that I did have really the historical knowledge
12 of 15, 16 years of Treasury policy and Treasury --
13 what Treasury had been doing on this wide range of
14 issues, including the GS -- especially the GSE, that
15 they felt that it was a -- it would have been
16 difficult to just cut, cut it off immediately, so
17 they, they wanted me to help them out a little more.
18 BY MR. THOMPSON:
19 Q. Okay. And sorry again for being ignorant,
20 I don't know how this works, but you're an FHFA

21 employee starting in September --
22 A. Yeah.
1 Q. -- 2009, but do you go to work at the
2 Treasury Department if you're in --
3 A. I split my time.
4 Q. Okay.
5 A. Because we were actually -- it was much
6 easier then because our office was right on the other
7 side of the White House, so a half a day at Treasury
8 and a half a day at FHFA.
9 Q. Okay. And how long did that last for?
10 A. I said, it was six months, and then it was
11 extended, I think it was extended for another six
12 months, but it might have been shorter than that, I
13 don't recall, but there was another extension.

**37:6-9**
6 Q. Now, while you were at Treasury, you
7 participated in the creation and imple- --
8 implementation of the PSPAs; is that right?
9 A. Yes.

**45:8-15**
8 Q. Okay. And who was, on Treasury, who was
9 involved in working on the PSPAs?
10 A. Well, of course, there were various people
11 involved. But I would say on a day-to-day basis, the
12 primary people involved in working on coming up with
13 the substance and then what became the actual PSPA
14 document would have been Dan Jester and Jeremiah
15 Norton and myself.

**55:4-56:20**
4 Q. Let -- before we get to the others --
5 A. Yeah.
6 Q. -- now, the payment-in-kind feature,
7 though, it would allow the companies to preserve
8 their funding commitment; is that right?
9 In a quarter in which they didn't make
10 enough to pay a cash dividend, if they decided to do
11 a payment in kind rather than a circular draw, they
12 maintained their funding commitment; isn't that
13 right?
14 A. I'm not sure if that's correct.
15 Q. You're not sure if --
16 A. I'm not a re- --

3

17 Q. -- that's correct?
18 A. -- I'm not a legal expert, but I'm -- I'm
19 not sure if that's correct.
20 Q. Did -- so you don't have an opinion on
21 that?
22 A. Yeah, I'm -- I'm not a legal expert.
1 Q. I'm not asking for a legal opinion. I'm
2 saying, on -- when you were thinking about the third
3 amendment, did you have an opinion as to whether the
4 funding commitment would be unaffected -- -
7 Q. -- by a payment in kind?
10 You may answer.
11 THE WITNESS: Yeah, as I said, I'm not a
12 legal expert on this; and the -- and the primary
13 issue, as I stated earlier, about the payment in kind
14 was the difference in cost. I mean, that -- that's
15 the issue that everybody was thinking about, 10 and
16 12 percent. Right?
17 BY MR. THOMPSON:
18 Q. Yeah.
19 A. Right. So it doesn't make economic sense
20 to pay in kind when you can pay in cash.

**58:2-14**
2 And on the eve of the third amendment, did
3 you have an understanding as to whether -- if a
4 payment-in-kind dividend had been paid, as to whether
5 that would affect the amount of the funding
6 commitment?
9 You may answer.
10 THE WITNESS: I certainly may have had a
11 thought about that, but it was not a factor that went
12 into the decision, I mean, about whether you would
13 pay in kind or not pay in kind. I mean, that was all
14 based on the -- that was based on the economics.

**132:5-12**
5 Q. Yes. Do you know whether the Federal
6 Reserve ever was consulted on this topic?
7 A. Again, I had left Treasury by time -- by
8 the time they were potentially thinking about this,
9 because it wasn't to be set until after if I left;
10 but I do not recall any discussions with Treasury or
11 the Federal Reserve on the topic of what to set the
12 periodic commitment fee at.

**135:22-138:1**
22 Q. Have you ever attempted to calculate any
1 periodic commitment fee in any context?
2 A. I'm not aware of where that calculation
3 would occur.
4 Q. So that's a no, you haven't done that?
8 Q. Any commitment fee. Have you ever
9 attempted to calculate what a com- -- any commitment
10 fee should be in any context?
11 A. I'm not in the business of calculating
12 commitment fees.
13 Q. And have you --
14 A. And I'm not aware of where they exist, so
15 I guess the answer is no.
16 Q. You know, but you say in terms of where
17 they exist. I mean, if you go and you get a line of
18 credit, I mean, aren't there fees that people are
19 charged for getting a line of credit?
20 A. Yeah, I, I agree. I'm --
21 Q. Yeah.
22 A. -- I'm not sure it's the same concept as
1 this, but there's a fee that you get for a line of
2 credit, that's -- that's, that's true.
3 Q. Well, I understand the magnitude of this
4 is bigger.
5 A. Yeah, that's what I'm saying, yeah. Sure,
6 yeah, you, you charge a fee for somebody willing to
7 provide you some amount of credit. Yeah, that's
8 clearly one, yeah.
9 Q. Okay. Have you ever done such a valuation
10 yourself of a commitment fee?
11 A. No.
12 Q. Okay. And have you ever read a valuation
13 of a commitment?
14 A. Not that I recall.
15 Q. Okay. Isn't it true that commitment fees
16 are calculated typically as a percentage of the
17 amount that the borrower is willing to extend?
20 THE WITNESS: Yeah, I can't, I can't
21 speculate. I'm, I'm not the expert on commitment
22 fees, so I can't speculate on how they're typically
1 calculated.

**169:2-10**
2 With respect to the periodic commitment
3 fee, do you know if anyone at FHFA ever tried to
4 calculate what the value of it would be?
5 A. No.
6 Q. Okay. And do you know if anyone at
7 Treasury ever tried to calculate the value of it?
10 THE WITNESS: Not that I'm aware of.

**170:7-13**
7 Q. Did you discuss your view that it was an
8 incalculably large fee or would have been with anyone
9 at Treasury?
10 A. Not that I recall.
11 Q. Anyone at FHFA?
12 A. Not that I recall. The issue did not --
13 wasn't coming up.

**175:6-21**
6 Was the option of preserving the funding
7 commitment --
8 A. Yeah.
9 Q. -- by having the companies pay a
10 12 percent payment-in-kind dividend, was that
11 something that was discussed at FHFA, you know, in
12 the leadup to the Net Worth Sweep?
13 A. Not that I recall and for the reasons that
14 we talked about. I mean, one of them was the basic
15 10 percent versus 12 percent, that it just -- that
16 had been -- unless there was some economic aspect
17 that would make that an economic transaction, it
18 wasn't even part of the discussion.
19 So that's -- that's one that I would point
20 to at FHFA. So it really wasn't -- it just never was
21 on the table.

**235:21-242:20**
21 MR. THOMPSON: Our next one is 19?
22 Yes, 19. And it has a Bates number of
1 FHFA 25815.
2 (Exhibit No. 19 marked.)
3 BY MR. THOMPSON:
4 Q. Now, this cover email is from Mary Miller
5 to Ed DeMarco dated January 4, 2012.
6 Who -- what was Ms. Miller's role at
7 Treasury?

10 THE WITNESS: Assistant secretary for
11 Financial Institutions -- no, assistant -- she was an
12 assistant secretary.
13 BY MR. THOMPSON:
14 Q. Did --
15 A. I can't remember -- I can't remember what
16 position -- and she may have been the Under -- she
17 was the Under Secretary for a while, too. So she was
18 somewhere in that mix. I can't remember in 2012
19 where she was.
20 Q. Did Tim Bowler report to her?
21 A. Yes.
22 Q. Okay. And then if we go to the second
1 page, it says "FHFA and Treasury share common goals
2 to promote a strong housing market recovery, reduce
3 government involvement in the housing market over
4 time and to provide the public and financial markets
5 with a clear plan to wind down the GSEs."
6 Was that an accurate statement in the
7 run-up to the Net Worth --
10 Q. -- Sweep?
12 THE WITNESS: Well, I mean, this was
13 before we had issued -- I mean, this is -- this is a
14 Treasury document, I believe. It's coming from Mary
15 Miller.
16 BY MR. THOMPSON:
17 Q. Yes, I'm asking you if it's accurate, at
18 least with respect to FHFA.
19 A. Well, I'd have to -- I'll go through piece
20 by piece.
21 Q. Please.
22 A. All right? "Strong housing market
1 recovery." I mean, it's good for the enterprises;
2 but I don't view FHFA's mission as the housing
3 market. Our mission is to provide liquidity within
4 the housing market, which then can help a strong
5 housing market recovery. But I would never write
6 anywhere in an FHFA document that our mission is to
7 promote -- is to promote the housing market. That's
8 not --
9 Q. Fair enough.
10 A. Maybe that's HUD's mission.
11 Q. Fair enough.
12 A. But I don't think that's in here.
13 "Reduce government involvement in the
14 housing market over time."

7

15 Those are things that, given the failure
16 of these two companies, that was a potential goal.
17 Everyone had said that private market -- getting more
18 private market capital into the -- into the economy,
19 into the housing market would be good, reducing
20 Government involvement.
21 And what we had happen here was we turned
22 an implicit guarantee into an explicit guarantee, and
1 that was not the design of the GSEs from the start.
2 It wasn't an explicit guarantee. So we were in
3 situation now where we had much -- something that
4 looked more like an explicit guarantee. It wasn't
5 the full faith and credit, but it was very large.
6 Q. Where --
7 A. So that's not that ...
8 Q. But just to be clear, was that one of the
9 goals behind the Net Worth Sweep, was to reduce
10 Government involvement in the housing market over
11 time?
12 A. Well, I don't think that was a stated goal
13 within the third amendment, but I think if you go
14 back to FHFA's strategic plan that was issued in
15 February of 2012, I mean, one of the goals was to
16 contract the enterprises' footprint.
17 Q. Okay.
18 A. And that was a goal, to contract the
19 enterprises' footprint, in light of the fact that the
20 capital commitment was now going to be fixed and we
21 needed to manage that capital commitment. All right?
22 So that, from the safety and soundness
1 perspective of FHFA as a conservator, that is one of
2 the goals and stated in a number of statements that
3 that is one of the goals.
4 Q. All right. And then, continue. "Provide
5 the public and financial markets with a clear plan to
6 wind down the GSEs," was that another goal --
7 A. Well --
8 Q. -- of the FHFA?
9 A. There's a question of what "wind down"
10 means. And does it mean wind down to, what, to zero
11 or wind down to what? All right. So that's a
12 question. I don't think Treasury used that word all
13 the time. I'm not sure they ever defined exactly
14 what it meant.
15 I mean, but clearly in the strategic plan,
16 one of our goals was to contract the operations and

17 to provide a -- to provide a clear plan of what we
18 were doing so that other people, mainly the
19 legislative branch, could figure out what they wanted
20 to do with the nation's housing finance system and to
21 have something there remaining with the GSEs that
22 they could decide what to do with it.
1 So if you're going to say, Is this exactly
2 what FHFA said? I'd probably word it in the way I
3 just worded it, slightly differently; but broadly,
4 probably goals that were shared by both of us.
5 Q. Okay. Now, if we look at Point 2 on this
6 memo, it says "Establish meaningful policies that
7 demonstrate a commitment to winding down the GSEs."
8 Was the Net Worth Sweep one of those
9 policies?
12 THE WITNESS: Well, it's not listed there.
13 BY MR. THOMPSON:
14 Q. Well, this is January. But I'm saying,
15 ultimately, was the Net Worth Sweep a manifestation
16 of the commitment to wind down the GSEs?
17 A. Well, the commitment to contract the
18 operations and to reduce the risk footprints, we
19 talked about this earlier. And so, I mean, if you
20 look at Bullet 2, this -- these are things that we
21 were getting ready to do. All right?
22 The risk-sharing transactions. And, as we
1 talked about earlier, if you're going to do risk-
2 sharing transactions and you're going to increase the
3 amount of risk, all right, that the enterprises have,
4 that's good for the risk side but it's also going to
5 limit their revenue.
6 Q. Um-hmm.
7 A. All right? And if I limited the rev- --
8 if the revenue was going to be limited, if this was
9 going to be ratcheted up, there was going to be less
10 and less revenue to pay the 10 percent dividend.
11 All right, so, I forgot your complete
12 train of thought there, but the idea that this one
13 item here is consistent with the Net Worth Sweep
14 because revenue was going to decline. The same thing
15 with guarantee fees. We talked about that. Yes, it
16 can increase it for a while, but it may decrease
17 revenue.
18 So if you have a declining revenue base --
19 and that was the strategic plan -- the 10 percent
20 dividend was going to be more difficult.

**271:15-18**
15 Q. Was there ever any discussion about not
16 doing the Net Worth Sweep for Freddie, just doing it
17 for Fannie?
18 A. No.

**359:17-361:14**
17 Q. Now, you, in 2008, were working on the
18 PSPAs on the Treasury side of the table?
19 A. Um-hmm.
20 Q. And then in 2012 you're on the opposite
21 side of the table, same transaction, it's an
22 amendment, that same -- representing the other party,
1 right?
2 A. Right.
3 Q. Did you go to your ethics officer and say,
4 Look, am I allowed to participate in the same
5 transaction?
6 A. No, nobody ever said that that would have
7 been a necessary issue because I no longer have any
8 affiliation with Treasury, I'm working on an issue
9 for FHFA.
10 Q. But you were working on that issue
11 standing in the shoes of the companies, right?
12 A. As FHFA, as conservator.
16 Q. Did -- did you have an understanding of
17 the conflict-of-interest rules, that if you had
18 rotated out to Fannie or Freddie you couldn't have
19 negotiated against Treasury on the PSPAs, could you
20 have?
1 THE WITNESS: I do not understand that
2 rule completely, but I don't understand what the
3 conflict-of-interest rule would apply between two
4 government agencies.
5 BY MR. THOMPSON:
6 Q. Well, you weren't acting -- were you
7 acting in your capacity as conservator and standing
8 in the shoes of the companies or were you acting in
9 your capacity as a government employee when you
10 negotiated the third amendment?
11 A. I am a government employee that works for
12 FHFA, and this was a transaction that was done as
13 part of a conservatorship. And I do not sign the
14 documents.