# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>        Defendants. | Civil No. 13-1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations<br><br>_____<br><br>This document relates to:<br>ALL CASES | Miscellaneous No. 13-1288 (RCL) |

### PLAINTIFFS' MOTION FOR LEAVE TO SERVE SUPPLEMENTAL EXPERT REPORTS AND INCOROPRATED MEMO OF SUPPORTING POINTS AND AUTHORITIES

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

    I.    Professor Dharan's Supplemental Report Should Be Permitted............................ 4

        A.    The Supplemental Report Addresses Topics Covered in Dr. Dharan's Prior Expert Reports and Trial Testimony. ......................................................... 4

        B.    Dr. Dharan's Supplemental Report Will Not Prejudice Defendants .......... 7

    II.    Dr. Mason's Supplemental Report Relates to His Pre-existing Opinion That There Was At Least $1.6 Billion in Damages and to Defense Counsel's Unfounded Suggestion That There Was a "Recovery" of the Value Lost Due to The Net Worth Sweep. ............................................................................................................. 8

        A.    Background of Dr. Mason's Testimony ..................................................... 8

        B.    Dr. Mason's Supplemental Report Describes Why He Previously Concluded There Was No Value "Recovery" Tied to the Net Worth Sweep ........................................................................................................ 10

CONCLUSION ................................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. District of Columbia*,
    289 F.R.D. 1 (D.D.C. 2012) .................................................................................................. 4

*Capitol Justice LLC v. Wachovia Bank N.A.*,
    706 F. Supp.2d 34 (D.D.C. 2009) ................................................................................. 2, 3, 11

*Dormu v. District of Columbia*,
    795 F. Supp.2d 7 (D.D.C. 2011) ............................................................................... 3, 4, 11, 12

*Fairholme Funds, Inc. v. Federal Housing Finance Agency*,
    2018 WL 4680197 (D.D.C. Sept. 28, 2018) ........................................................................ 11

*Fairholme Funds, Inc. v. Federal Housing Finance Agency*,
    2022 WL 11110548 (D.D.C. Oct. 19, 2022) ....................................................................... 11

*Hoffman v. Tonnemacher*,
    2006 WL 3457201 (E.D. Cal. Nov. 30, 2006) ...................................................................... 2

*Johnson v. H.K. Webster, Inc.*,
    775 F.2d 1 (1st Cir. 1985) .................................................................................................. 3, 7

*Mondis Tech. v. LG Elecs.*,
    Civil Action 15-4431 (SRC) (D.N.J. Sep. 8, 2021) .............................................................. 2

*Nnadili v. Chevron, U.S.A., Inc.*,
    2005 WL 6271043 (D.D.C. Aug. 11, 2005) ...................................................................... 2, 4

*Richardson v. Korson*,
    905 F. Supp.2d 193 (D.D.C. 2012) ....................................................................................... 4

*Tedder v. American Railcar Indus., Inc.*,
    739 F.3d 1104 (8th Cir. 2014) ............................................................................................ 6

*United States v. Gatling*,
    96 F.3d 1511 (D.C. Cir. 1996) .............................................................................................. 6

*United States v. Phillip Morris USA, Inc.*,
    2022 WL 1101730 (D.D.C. April 13, 2022) ........................................................................ 5

*White v. McDermott*,
    2010 WL 4876025 (D. Conn. Nov. 19, 2010) ...................................................................... 2

*Yong v. The Nemours Found.*,
    432 F. Supp. 2d 439 (D. Del. 2006) ...................................................................................... 2

**Treatises**

MOORE'S FEDERAL PRACTICE 3D § 26.131[2] .............................................................................. 2

3 FEDERAL EVIDENCE §7.15 ........................................................................................................ 6

**INTRODUCTION**

Plaintiffs seek leave to serve supplemental expert reports authored by Professor Bala Dharan and Professor Joseph Mason.  The supplemental reports address evidence or argument advanced by Defendants during the October 2022 trial regarding the opinions and testimony that Professors Dharan and Mason provided previously in this case.  The reports have already been provided to Defendants, and this motion merely seeks the Court's approval to permit their service and use as disclosure of expected trial testimony.  The parties have separately agreed on a schedule for briefing of this motion, and for submission of rebuttal reports and expert depositions that would apply if the Court grants the motion (or that will apply if the motion remains pending).

Case law holds that experts may supplement their reports to support their prior opinions so long as there is no prejudice to the other side.  That includes allowing supplemental expert reports after a mistrial and before a retrial—indeed, while not requested here, courts allow parties to present entirely new experts and new expert opinions before a retrial.  Here, the supplemental reports merely address facts and issues underlying the <u>same</u> opinions already provided at the first trial.  Indeed, Plaintiffs believe the expert testimony disclosed in these supplemental reports would be admissible at trial even if no supplemental reports were provided.  Plaintiffs provide the supplements in an abundance of caution and to ensure clarity well in advance of trial as to the opinions advanced, materials relied on, and the role that the materials play in those opinions.  Defendants will suffer no prejudice from allowing these supplements because the reports merely provide supplemental support for previously disclosed opinions, they are narrow in scope, Defendants will have ample time to depose the experts on the points addressed in the supplements, and Defendants may have their experts disclose any responsive reports.

Pursuant to an overall scheduling plan the parties have negotiated, Plaintiffs provided the two supplemental reports to Defendants on Friday, February 10, 2023.  On Tuesday, February 14,

2023, Defendants informed Plaintiffs they do not consent to Plaintiffs' request to allow for the supplements. This motion is therefore contested.[1]

## ARGUMENT

As this Court has recognized, Rule 26(e) "anticipates that in complex litigation an expert witness may 'refine ... his or her opinion as he or she prepares for trial.'" *Capitol Justice LLC v. Wachovia Bank N.A.*, 706 F. Supp.2d 34, 38 (D.D.C. 2009) (citing *Nnadili v. Chevron, U.S.A., Inc.*, Civ. No. 02–1620, 2005 WL 6271043, at *1 (D.D.C. Aug. 11, 2005)); *see also* MOORE'S FEDERAL PRACTICE 3D § 26.131[2]. This principle has been applied to permit an expert to serve a supplemental report before a retrial following a trial's vacated verdict. *Mondis Tech. v. LG Elecs.*, Civil Action 15-4431 (SRC), 2021 WL 4077563, at *1 (D.N.J. Sep. 8, 2021) ("After this Court vacated the jury's damages verdict, and ordered a retrial on damages, [Plaintiff] was permitted to submit a supplemental expert report on reasonable royalty damages.") (but excluding report under Rule 702). Indeed, some courts have held that after a mistrial, parties are permitted to present a ***new expert*** with a ***new expert opinion*** in the retrial. *See White v. McDermott*, No. 08-CV-634, 2010 WL 4876025, at *2 (D. Conn. Nov. 19, 2010) (permitting testimony of new expert witness at retrial); *Hoffman v. Tonnemacher*, 2006 WL 3457201, at *2 (E.D. Cal. Nov. 30, 2006) (permitting new expert witness to testify at retrial); *Yong ex rel. Yong v. The Nemours Found.*, 432 F. Supp. 2d 439, 441 (D. Del. 2006) (permitting new expert to testify at retrial).

It is Plaintiffs' position that Professors Dharan and Mason could testify at the second trial regarding the opinions set forth in their supplemental reports without any supplemental disclosure—or at most, with regards to certain portions of their supplements, by simply identifying additional materials considered. Nevertheless, in an abundance of caution, Plaintiffs have asked

---

[1] Professor Dharan's supplemental report is attached as Exhibit 1 to this motion, and Professor Mason's supplemental report is attached as Exhibit 2.

2

their experts to prepare the supplemental disclosures to leave no doubt as to the anticipated scope of testimony and to ensure that Defendants have ample notice and opportunity to respond. As the Court will see, the supplemental reports are limited to supporting the original opinions offered by Professors Dharan and Mason at trial by specifically addressing trial testimony by Defendants' expert, as well as questioning and argument from Defendants' counsel at trial, and considering additional materials previously produced by Defendants and Treasury as they relate to previously offered opinions. Such supplementation is permitted under Rule 26(e). *See, e.g., Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir. 1985) (holding that Rule 26(e) does not "foreclose[] an expert from revising or further clarifying opinions during redirect examination or surrebuttal in response to points raised by the opposing party during its cross-examination or the presentation of its case"). Because the supplemental expert reports do not advance any new opinions, or "wholly change…the substance of their contentions," supplementation is proper. *Capitol Justice LLC*, 706 F. Supp.2d at 38-39.

Defendants will suffer no prejudice from the Court's permitting the supplemental reports. "Rule 26 was designed to 'prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert, and to prepare for depositions and cross-examinations at trial." *Dormu v. District of Columbia*, 795 F. Supp.2d 7, 28 n.16 (D.D.C. 2011). According to this Court, the "central inquiry is 'whether [a party's] supplemental report comes so late in the game that [the opposing party] has no meaningful opportunity to respond or prepare for deposition or trial.'" *Capitol Justice LLC*, 706 F.Supp.2d at 39.

Here, the proffered supplements give Defendants ample time to respond. They also are designed to reduce the likelihood of surprise and to eliminate any conceivable surprise, confusion, and potential for prejudice that could otherwise occurred for either side. Defendants will have a

meaningful opportunity to respond to the supplemental reports, to the extent they conclude a response is needed or warranted. The Court recently scheduled the retrial to begin on July 24, 2023, over five-and-one-half months away. *Richardson v. Korson*, 905 F. Supp.2d 193, 200 (D.D.C. 2012) (stating that the exclusion of evidence is an "extreme sanction" where "there is sufficient time" to cure any potential prejudice). Plaintiffs do not oppose Defendants filing rebuttal expert report(s) or deposing Drs. Mason and Dharan on the supplemental reports, which will "ensure the [defendants] a fair opportunity to respond to the plaintiffs' reports." *Barnes v. District of Columbia*, 289 F.R.D. 1, 13 (D.D.C. 2012). These actions may be accomplished well in advance of trial, and well in advance of any motions practice regarding the substance of the supplemental reports, thus resulting in no prejudice to Defendants. *See Dormu*, 795 F. Supp.2d at 28 n.16 (finding that any purported harm "did not justify striking the supplemental affidavit" where the plaintiff's motion "comes several months prior to trial, leaving defendants with sufficient time to adjust their trial preparation" and that "[a]ny harm they do experience…can be minimized by allowing defendants to depose the expert if they so choose"); *Nnadili*, 2005 WL 6271043, at *1 (finding no prejudice where the defendants "will have had the supplemental report for just over six months").

Finally, as shown in the brief descriptions below, the substance of the supplemental reports is important to furthering the interests of justice in this case.

## I. Professor Dharan's Supplemental Report Should Be Permitted.

### A. The Supplemental Report Addresses Topics Covered in Dr. Dharan's Prior Expert Reports and Trial Testimony.

Dr. Dharan's supplemental report addresses four topics covered in his prior expert reports and trial testimony, which support his overall opinion that the Net Worth Sweep was not reasonably necessary to address the alleged concern that the practice of circular draws to pay the

4

10% dividend would materially erode the Treasury Commitment once caps on that Commitment were imposed as of December 31, 2012, and which respond to Defendant arguments or expert testimony at the trial.

First, Dr. Dharan provides additional analysis regarding the payment-in-kind (PIK) option that he addressed in his initial expert report and testified about at trial. *See* Dharan Rebuttal Rpt. at 17-18; Tr. 1256:25-1257:20; 2311:25-2314:17.[2] Dr. Dharan's supplement specifically addresses the trial testimony of Defendants' expert Dr. Attari that the PIK option would have made the GSE's situation "worse." Exhibit 1 (Dharan Supp. Rpt.) ¶¶3–4, 8 (citing Tr. 1964:7-9). Dr. Dharan's supplement explains that this assertion is incorrect, and that the PIK option never makes the GSEs' situation worse than the Net Worth Sweep; he further explains that under all scenarios, the PIK option was at least as protective as the Net Worth Sweep of any possible concerns that bond and MBS investors may have had about circular dividends causing an erosion of the Treasury Commitment (and was superior in addressing those concerns under some scenarios), and that under any scenario involving significant future profits, the PIK option would have been vastly superior for the GSEs and private shareholders than the Net Worth Sweep. His Exhibit A illustrates that if the PIK option had been used instead of the circular dividend practice from 2008-12, the GSEs' would have been in a better financial position. All of this is proper rebuttal testimony that would be permissible even without a supplemental report, and thus cannot be objected to as part of a supplemental report many months before the retrial. *See, e.g., United States v. Phillip Morris USA, Inc.*, 2022 WL 1101730, at *5 (D.D.C. April 13, 2022) ("Rebuttal testimony is proper if it "explain[s], repel[s], counteract[s], or disprove[s] evidence of the adverse party.") (citations

---

[2] Citations to "Tr.__" are to the trial transcript for the trial conducted in this case in October 2022.

5

omitted); *United States v. Gatling*, 96 F.3d 1511, 1523 (D.C. Cir. 1996) (permitting new expert testimony at trial to directly refute testimony of a defendant).

Dr. Dharan also refers to a document admitted at trial (PX-210) as support for his "opinion that the PIK alternative was a viable and superior option for addressing concerns in situations where the GSEs did not have the ability to pay a cash dividend without drawing on the Treasury Commitment." Exhibit 1 (Dharan Supp. Rpt.) ¶13. *See, e.g., Tedder v. American Railcar Indus., Inc.*, 739 F.3d 1104, 1109 (8th Cir. 2014) (stating that an expert may rely on data learned at trial in connection with rendering an opinion, citing Rule 703); 3 FEDERAL EVIDENCE §7.15 ("an expert may testify on the basis of 'facts or data' that the expert 'has been made aware of' at the trial or hearing or trial, or has 'personally observed'").

Second, Dr. Dharan identifies supplemental support in response to Dr. Attari's event study by showing the absence of concern among GSE bond and MBS investors, a topic that Dr. Dharan addressed in his Rebuttal Report. Dharan Rebuttal Rpt. at 19-21. This section of the supplemental report refers to specific documents refuting Dr. Attari's conclusions, all of which either were admitted at trial, referenced in Dr. Mason's report, or produced by Defendants in discovery. Exhibit 1 (Dharan Supp. Rpt.) ¶¶15–24. Dr. Dharan also refers to his prior observation that bond yield spreads had been "tightening *all year* due to investors designating them as safe asset cohorts to Treasuries," *id.* ¶20, and states that he confirmed the information in PX-444 and PX-445—charts prepared by Dr. Mason depicting narrowing yield spreads prior to the Net Worth Sweep that were admitted at trial. *Id.* ¶¶20–21 & Exs. B1, B2. In addition, Dr. Dharan describes the absence of any change to the GSE credit ratings, ratings outlooks, or ratings watch status of the GSE bonds by credit agencies, which responds to Dr. Attari's trial testimony that MBS investors had cause for concern. *See* Tr. 2192:9-2198:17. Finally, Dr. Dharan prepared a chart depicting GSE MBS

6

issuance from 2008-2012 drawn directly from data published by the FHFA that is otherwise admissible at trial. Exhibit 1 (Dharan Supp. Rpt.) ¶¶25–26 & Ex. C. The publicly-available MBS data further supports Dr. Dharan's preexisting opinion that the Net Worth Sweep was not necessary to reassure MBS investors. *See* Dharan Rebuttal Rpt. at 21.

Third, Dr. Dharan refers to multiple documents admitted as trial, as well as additional documents produced by FHFA and Treasury, supporting his preexisting opinion that the Net Worth Sweep was not reasonably needed to address any concerns over circular draws eroding the Treasury Commitment. Exhibit 1 (Dharan Supp. Rpt.) ¶¶27–37.

Fourth, Dr. Dharan supplements his trial testimony about "the outsized role played by non-cash accounting adjustments on the GSEs' financial performance between 2008 and 2021, particularly 2008 to 2013," in support of which he presented data (at trial) showing the impact that DTA valuation allowances and loan loss reserves (non-cash accounting adjustments) had on the GSEs' reported comprehensive income. Exhibit 1 (Dharan Supp. Rpt.) ¶38 & Ex. D (reproducing Dharan Trial Demonstrative, Slide 17). In his supplemental report, Dr. Dharan includes a reference to a Fannie Mae document, admissible at trial, that is consistent with that prior analysis. Exhibit 1 (Dharan Supp. Rpt.) ¶38. Dr. Dharan also responds specifically to Dr. Attari's trial testimony and defense counsel arguments and assertions, addressing the proposition that cash invested by private preferred shareholders was "lost" or "gone" by the end of 2008. Exhibit 1 (Dharan Supp. Rpt.) ¶39.

### B. Dr. Dharan's Supplemental Report Will Not Prejudice Defendants

As set forth above, each topic addressed in Dr. Dharan's supplemental report was covered in his prior expert reports and trial testimony. Dr. Dharan does not express any new opinions, but rather he responds to specific defense testimony and trial exhibits in a manner consistent with proper rebuttal testimony at trial. *See, e.g., Johnson*, 775 F.2d at 7. Such testimony should be

7

permitted even without a supplemental report. Further, Defendants will suffer no prejudice—they will have Dr. Dharan's supplemental report for over five-and-one-half months in advance of trial, may depose him, and may offer a rebuttal report. *See* pages 3-4, *supra*. Further, Dr. Dharan's supplement will ensure a complete presentation of these important topics to the jury while eliminating any risk or claim of unfair surprise or juror confusion, either as to Dr. Dharan's testimony or to any rebuttal testimony.

**II.     Dr. Mason's Supplemental Report Relates to His Pre-existing Opinion That There Was At Least $1.6 Billion in Damages and to Defense Counsel's Unfounded Suggestion That There Was a "Recovery" of the Value Lost Due to The Net Worth Sweep.**

    **A.  Background of Dr. Mason's Testimony**

At trial, Dr. Mason testified that he confirmed the results of the event study performed by Dr. Attari and opined that "the measure of damages to the plaintiffs from the net worth sweep" was $1.61 billion. Tr. 1515:24-1516:7. In forming that opinion, Dr. Mason did not just review PowerPoint slides prepared by Dr. Attari; rather, Dr. Mason reviewed multiple spreadsheets and source code data underlying the event study, which were admitted as evidence at trial. *See* Tr. 1488:12-19 (admitting PX-495-2, 496-2, 497-2, 497-3, 497-4, and 497-5); Tr. 1501:15-1506:14 (testimony that Dr. Mason's review of the statistical model and computer code, the model inputs, stock price movements, and regression results spanning January 2012 through December 2012 related directly to his opinion). Dr. Mason also testified that he specifically examined "whether share prices moved with response to *other information*," i.e., information unrelated to the net worth sweep ("Net Worth Sweep"). Tr. 1507:22-1508:4 (emphasis added).

Based on his "years of experience of performing event studies," Dr. Mason characterized the magnitude of the stock decline in response to the Net Worth Sweep as "dramatic" and "massive" and "the kind of declines that, in my opinion, one would expect to see from an

announcement that said that the Treasury was going to take all the profits of Fannie Mae and Freddie Mac so that the companies couldn't use those at all and the shareholders would derive no benefit from those whatsoever." Tr. 1509:20-1510:1. Dr. Mason testified further (without objection) that the Net Worth Sweep had an ongoing impact on the GSEs. For example, Dr. Mason explained that the Net Worth Sweep would "take every dollar of profit the GSEs earned going forward." Tr. 1538:15-21. Dr. Mason also stated that the Net Worth Sweep "prevented the companies from building capital." Tr. 1539:4-6. And Dr. Mason described how the net worth sweep "insured that shareholders would receive little to no benefit from any future positive financial performance by the GSEs." Tr. 1539:7-10.

On cross-examination, defense counsel asked Dr. Mason three questions relating to the event study's accompanying PowerPoint presentation. First, defense counsel read to the jury a single sentence from the PowerPoint stating that the "Price of the common stock *recovered* in September 2012 and that of the junior preferred stocks *recovered* during October 2012," and then asked Dr. Mason, "Did I read that correctly?" Tr. 1524:1-7 (emphasis added). Defense counsel then asked whether "September 2012 was…the month after August 2012, when the Third Amendment was announced. Correct?" Tr. 1524:11-14. Finally, defense counsel asked whether "October 2012 was the month after that, the one right after September. Correct?" Tr. 1524:15-17.

On redirect, Plaintiffs' counsel referred to the cross-examination questions "about the stock quote recovering in September for the common and October for the junior preferred," and asked: "Do you believe, as a financial economist, that those price increases that occurred in October recovered the $1.6 billion of losses that occurred when the net worth sweep was announced?" Tr. 1535:2-7. Defense counsel objected that the question exceeded the scope of Dr. Mason's expert

9

report, Tr. 1535:8-1536:5, and claimed, incorrectly, that an answer would yield "an entire new line of expert opinions that we have heard nothing about until literally right now." Tr. 1537:1-4. The Court sustained the objection. Tr. 1537:25.

In Defendants' closing argument, counsel commented on the purported recovery, stating that "shareholders didn't lose that one-day reduction in share price for 10 years, as plaintiffs claim. The share prices started to increase immediately in 2012." Tr. 2688:3-8.

### B. Dr. Mason's Supplemental Report Describes Why He Previously Concluded There Was No Value "Recovery" Tied to the Net Worth Sweep

Defendants' objection to Dr. Mason's testimony was misplaced. As represented explicitly in the supplemental expert report, Dr. Mason

> considered the entirety of Dr. Attari's analysis summarized in the presentation of his equity event study results, including the statements pertaining to changes in GSE share prices (among them, the statement regarding the "recovery") and the corresponding backup materials to weigh Dr. Attari's analysis in its entirety. Implicit in my opinion, therefore, was the conclusion that the so-called price "recovery" noted by Dr. Attari in no way mitigated the harm the Net Worth Sweep caused GSE shareholders or the damages resulting from that harm through the remainder of 2012, the period analyzed by Dr. Attari.

Exhibit 2 (Mason Supp. Rpt.) ¶ 6. In other words, Dr. Mason would not have testified that damages were $1.61 billion had he concluded that a purported "recovery" mitigated *any* harm caused by the Net Worth Sweep. As Dr. Mason explains in his supplemental report, any statement in the PowerPoint about a purported "recovery" is "irrelevant to damages in this case" because any stock price changes "are unrelated to any new developments about the Net Worth Sweep that would offset or mitigate damages..." *Id.* ¶12.

The Court itself acknowledged prior to trial that it was Dr. Mason's opinion that the $1.61 billion in damages "understates damages because it does not fully encompass the shares' fundamental value." *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2022 WL

10

11110548, at *2 (D.D.C. Oct. 19, 2022) (emphasis added).[3]  At trial, Dr. Mason testified about the Net Worth Sweep's ongoing impact on GSEs and private shareholders, including how it swept "every dollar of profit the GSEs earned going forward," "prevented the companies from building capital," and "insured that shareholders would receive little to no benefit from any future positive financial performance by the GSEs." Tr. 1538:15-1539:10.  The supplemental report clarifies how the GSEs' performance makes the $1.61 billion measure of damages conservative, as an increase in GSE assets or a decrease in the liquidation preference (each of which would have occurred absent the Net Worth Sweep) would have increased the value of GSE shares.  Exhibit 2 (Mason Supp. Rpt.) ¶¶17; *see also* ¶¶14-16, 18-19.  The Court recognized as much in its order denying Defendants' motion to dismiss, explaining that the large transfers of GSE net worth to Treasury would have, at minimum, "increase[d] the value of Plaintiffs' underlying securities either by way of reinvestment into the company or reduction of debt." *Fairholme Funds, Inc. v. Federal Housing Finance Agency*, 2018 WL 4680197, at *14 (D.D.C. Sept. 28, 2018).

Thus, the supplemental report does not set forth a "new opinion" or "blindside defendants with new information." *Dormu*, 795 F. Supp.2d at 28 n.16.  If anything, the supplemental report "produce[s] a more complete and accurate" rendition of Dr. Mason's preexisting opinion and trial testimony, a permissible purpose to supplement in response to trial testimony and argument several months prior to trial. *Capitol Justice LLC,* 706 F. Supp.2d at 39 (permitting supplemental expert

---

[3] Plaintiffs do not seek reconsideration of the Court's earlier ruling denying Dr. Mason from quantifying the extent of the additional harm.  Rather, the supplemental report makes clear what was, at the very least, implicit in Dr. Mason's rebuttal report and what he would have testified at trial: there was no mitigation in the damages caused by the Net Worth Sweep because the Net Worth Sweep remains in existence and has caused continuing harm. *See* Exhibit 2 (Mason Supp. Rpt.) ¶ 9.

11

report where an expert "used the same methodology in his revised report as in his initial report" to "produce a more complete and accurate report").

Supplementation will also ensure that the jury is not led astray by misleading suggestions of stock price "recovery." As Dr. Mason makes clear, such suggestions are economically unsound and unsupported by any expert testimony, including that of Defendant's own expert. It was defense counsel that introduced this concept through the misleading cross-examination surrounding the purported "recovery," as well as defense counsel's argument incorrectly suggesting there was no continuing harm to the value of the shares, when in fact the shares would be worth at least $1.6 billion more than their traded prices had there never been any Net Worth Sweep (and likely far more than that amount). If Defendants wish to contend that their suggestions of a "recovery" of the damage caused by the Net Worth Sweep were *not* economically unsound, they will have ample opportunity to do so via the opportunity to depose Dr. Mason on this subject and through a rebuttal report by the creator of the event study on which Dr. Mason relies (i.e., Dr. Attari).

Defendants will suffer no prejudice given the "very narrow" scope of the supplemental report, *Korson*, 905 F. Supp.2d at 200-01. Defendants will also have sufficient time to depose Dr. Mason and prepare a rebuttal report well in advance of trial. *Dormu*, 795 F. Supp.2d at 28 n.16. Under either scenario the most that would be lost to Defendants is the opportunity to offer misleading attorney argument and questioning without any supporting expert testimony to back it up. That, to put it mildly, is not the type of prejudice that the law views to be meaningful. Finally, supplementation will ensure that there is a full airing before the jury of this important issue related to class-wide harm, and it will eliminate any risk of, and disputes over, claims of unfair surprise.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully ask the Court to grant this motion and permit Plaintiffs to serve the supplemental expert reports of Dr. Mason and Dr. Dharan.

Dated:  February 17, 2023

Respectfully submitted,

s/ Hamish P.M. Hume
Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

*Co-Lead Counsel for the Class*

Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**

1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*