## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL HOUSING FINANCE AGENCY, *et al.*, <br><br> Defendants. | Civil No. 13–1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations <br><br> _____ <br><br> This document relates to: ALL CASES | Miscellaneous No. 13–1288 (RCL) |

## <u>DEFENDANTS' OMNIBUS MOTION IN LIMINE</u>

Defendants Federal Housing Finance Agency ("FHFA" or "Conservator"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, the "Enterprises"), and the Enterprises hereby move to exclude the following at the upcoming trial:

I.    Motion in Limine #1: To Exclude Speculative Deposition Testimony of Susan McFarland;

II.   Motion in Limine #2: To Exclude Evidence and Argument Referring to Treasury's Investment as a Form of "Borrowing" By the Enterprises or "Similar to a Loan;"

III.  Motion in Limine #3:  To Exclude Evidence and Argument Comparing the Original Price Paid for Junior Preferred Shares at the Time of Issuance ($33.2 Billion) and Dividends Paid to Junior Preferred Shareholders Pre–Conservatorship ($5.1 Billion); and

IV.   Motion in Limine #4:  To Exclude Evidence and Argument Concerning Dividends Paid and Value Transferred to Treasury After the Third Amendment.

The reasons supporting the exclusion of the foregoing are set forth in the accompanying Memorandum in Support, and the relief requested is reflected in the Proposed Order being filed with this motion.

Dated: May 26, 2023

Respectfully submitted,

 /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942–5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency*

/s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661–7828
Fax: (202) 626–3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corp.*

/s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383–5300
Fax: (202) 383–5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL HOUSING FINANCE AGENCY, *et al.*, <br><br> Defendants. | Civil No. 13–1053 (RCL) |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations <br><br> _____ <br><br> This document relates to: <br> ALL CASES | Miscellaneous No. 13–1288 (RCL) |

## <u>DEFENDANTS' MEMORANDUM IN SUPPORT OF OMNIBUS MOTION IN LIMINE</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

I.      Motion in Limine # 1: To Exclude Speculative Deposition Testimony of Susan
        McFarland ................................................................................................ 1

II.     Motion in Limine # 2:  To Exclude Evidence and Argument Referring to Treasury's
        Investment as a Form of "Borrowing" By the Enterprises or "Similar to a Loan" ........... 3

III.    Motion in Limine # 3: To Exclude Evidence and Argument Comparing the Original Price
        Paid for Junior Preferred Shares at the Time of Issuance ($33.2 Billion) and Dividends
        Paid to Junior Preferred Shareholders Pre–Conservatorship ($5.1 Billion) ...................... 6

        A.      Plaintiffs Repeatedly Emphasized the Delta Between the $33.2 Billion Paid for
                Junior Preferred Shares and the $5.1 Billion in Dividends Paid to Junior Preferred
                Shareholders Pre–Conservatorship ......................................................... 8

        B.      Plaintiffs' Arguments That Shareholders Are Entitled to, or Reasonably Expected,
                Future Dividends as a Form of "Repayment" Based on Notions of "Fairness" Are
                Unsupported By the Evidence ............................................................. 10

        C.      Plaintiffs' Arguments That Shareholders Are Entitled to, or Reasonably Expected,
                "Repayment" of the Purchase Price of Their Shares At Issuance As a Matter of
                "Fairness" Are Irrelevant ................................................................ 13

        D.      Plaintiffs' Arguments Are Substantially More Prejudicial Than Probative Because
                They Confuse the Issues and Mislead the Jury About the Governing Legal
                Standard .................................................................................. 15

        E.      Request for Relief ....................................................................... 18

IV.     Motion in Limine # 4: To Exclude Evidence and Argument Concerning Dividends Paid
        and Value Transferred to Treasury After the Third Amendment .................................... 19

        A.      Plaintiffs Repeatedly Emphasized the Dividends Paid and Value Transferred to
                Treasury Pursuant to—and After—the Third Amendment .................................. 21

        B.      Evidence and Argument About the Value Transferred to Treasury After the Third
                Amendment Is Not Relevant to Whether the Third Amendment Was Reasonable
                and Would Be Improperly Prejudicial to Defendants. .......................................... 24

        C.      Evidence and Argument About the Value Transferred to Treasury After the Third
                Amendment Is Not Relevant to Damages and Would Be Improperly Prejudicial to
                Defendants. .............................................................................. 27

        D.      Request for Relief ....................................................................... 29

CONCLUSION .................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>:**                                                                                                                                        **<u>Page(s)</u>:**

*U.S. ex rel. Bagley v. TRW, Inc.*,
    204 F.R.D. 170 (C.D. Cal. 2001) ........................................................................................25

*Barnett v. PA Consulting Grp., Inc.*,
    35 F. Supp. 3d 11 (D.D.C. 2014) ..........................................................................................2

*Democracy Partners, LLC v. Project Veritas Action Fund*,
    No. 17–cv–1047 (PLF), 2022 WL 3334689 (D.D.C. Aug. 12, 2022) ....................................10

*DFC Global Corp. v. Muirfield Value Partners, L.P.*,
    172 A.3d 346 (Del. 2017) ....................................................................................................27

*Dowling v. United States*,
    493 U.S. 342 (1990) ............................................................................................................13

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del. 2005) ..............................................................................................14, 15

*English v. District of Columbia*,
    651 F.3d 1 (D.C. Cir. 2011) ...........................................................................................25, 26

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
    No. 1:13-cv-1053-RCL, 2022 WL 4745970 (D.D.C. Oct. 3, 2022) ................................. 8, 27

*Fox v. CDX Holdings, Inc.*,
    No. CV 8031–VCL, 2015 WL 4571398 (Del. Ch. July 28, 2015),
    *aff'd*, 141 A.3d 1037 ..........................................................................................................26

*Hecht v. Pro–Football, Inc.*,
    570 F.2d 982 (D.C. Cir. 1977) ......................................................................................25, 26

*Jinsun, L.L.C. v. Mireskandari*,
    710 F. App'x 622 (5th Cir. 2017) ........................................................................................27

*LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*,
    No. 16–cv–2752, 2018 WL 4259979 (E.D.N.Y. Sept. 6, 2018)............................................27

*Meijer, Inc. v. Biovail Corp.*,
    533 F.3d 857 (D.C. Cir. 2008) ............................................................................................2

*\*U.S. ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*,
    No. 95–cv–1231, 2007 WL 861110 (D.D.C. Mar. 20, 2007) (Lamberth, J.) .........................13

*Miller v. HCP & Co.*,
  No. CV 2017–0291–SG, 2018 WL 656378 (Del. Ch. Feb. 1, 2018), *aff'd sub
  nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018) ...............................14, 15

*MOSAID Techs. Inc. v. LSI Corp.*,
  No. CV 10–192–RGA, 2014 WL 12775325 (D. Del. Feb. 26, 2014) ....................................27

*Perry Cap. LLC v. Mnuchin*,
  864 F.3d 591 (D.C. Cir. 2017) .........................................................................................11

*Premo v. Moore*,
  562 U.S. 115 (2011) .........................................................................................................26

*Quadrangle Dev. Corp. v. Antonelli*,
  935 F.2d 1337 (D.C. Cir. 1991) ........................................................................................26

*United States v. Mejia*,
  597 F.3d 1329 (D.C. Cir. 2010) ........................................................................................10

*United States v. Ring*,
  706 F.3d 460 (D.C. Cir. 2013) .......................................................................................5, 17

*United States v. Watson*,
  171 F.3d 695 (D.C. Cir. 1999) ..........................................................................................10

*United Va. Bank of Fairfax v. Dick Herriman Ford, Inc.*,
  210 S.E.2d 158 (Va. 1974) ................................................................................................27

*Wabash Ry. Co. v. Barclay*,
  280 U.S. 197 (1930) (Holmes, J.) .....................................................................................12

*Whole Foods Mkt. Grp., Inc. v. Wical L.P.*,
  No. 1:17–cv–01079, 2019 WL 6910168 (D.D.C. Oct. 22, 2019) (Lamberth, J.) ...................15

## Statutes, Rules & Regulations

Uniform Commercial Code § 1–203:5 ...................................................................................14

Fed. R. Evid. 401 .............................................................................................................4, 13

Fed. R. Evid. 402 .............................................................................................................13, 20

Fed. R. Evid. 403 ................................................................................................... *passim*

## <u>Other Authorities</u>

Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in Hindsight*,
    65 U. Chi. L. Rev. 571, 576–602 (1998) ................................................................................26

I.      **Motion in Limine # 1: To Exclude Speculative Deposition Testimony of Susan McFarland**

At the first trial, the Court excluded deposition testimony from former Fannie Mae CFO

Susan McFarland about the Treasury Department's possible motivations for executing the Third

Amendment, ruling that such testimony is speculative, lacks foundation, and is unduly

prejudicial to Defendants.  Plaintiffs now seek to designate more of the same kind of testimony

from Ms. McFarland.  This testimony should be excluded on the same grounds.

Specifically, Defendants objected at the first trial to the following speculative deposition

testimony from Ms. McFarland:

- "[W]e didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises." Tr. of Oral Dep. of Susan McFarland Dep. at 149:24–150:1 (Class ECF No. 227–1, *Fairholme* ECF No. 224–1) (attached as **Exhibit A**).[1]

- "I am giving you sort of my perspective on why [Treasury might] prefer that not to happen—you know, capital accumulation to happen at that point in time." *Id.* at 150:19–151:2.

- "[T]he question is why would [Treasury] be concerned of us making money and creating capital inside the enterprise. I think in my own opinion . . . I think politically it seemed a little—it would seem to me that there would be individuals bothered that some individuals might profit from the Government's support of the enterprises, okay?" *Id.* at 158:15–23.

*See generally* Joint Submission of Objections to Dep. Designations at 5, 8–9 (Class ECF

No. 227, *Fairholme* ECF No. 224).

The Court sustained Defendants' objections and excluded this testimony, finding:

[This testimony] goes into detail about why McFarland believed Treasury would not want a buildup in capital at the GSEs.  That could potentially confuse the jury into thinking that McFarland had personal knowledge of Treasury's position, which might lend credence to the idea that FHFA adopted that position.  For that reason, the testimony is likely to be substantially more prejudicial than probative. . . . [It

---

[1]      "*Fairholme* ECF No." refers to Case No. 1:13–cv–1053–RCL, and "Class ECF No." refers to Case No. 1:13–mc–1288–RCL.

also] amounts to McFarland's speculation as to what Treasury's reasoning might have been.

Trial Tr. 226:24–227:1, 227:10–11;[2] *see also* Ex. A at 225:6–8 (conceding that she "couldn't get in the minds of Treasury and what they were thinking").

Plaintiffs now seek to designate other testimony from Ms. McFarland that suffers from the same defects. In the testimony now at issue, Ms. McFarland again speculates about Treasury's motivations for executing the Third Amendment:

> So when the amendment went into place, part of my reaction was they did that in response to my communication of our forecasts and the implication of those forecasts, that it was probably a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves.

Ex. A at 45:11–16; *see also id*. at 44:13–45:4 (testifying that she had told Treasury she believed Fannie Mae was entering a period of "sustained profitability").[3] Plaintiffs quoted this testimony from Ms. McFarland twice in their closing argument at the first trial. *See* Trial Tr. 2713:9–15, 2718:16–22.

Like the McFarland testimony already excluded by the Court, this testimony should be excluded as speculative, lacking foundation, and prejudicial. *See Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 863 (D.C. Cir. 2008) (excluding affidavits as speculative and unfairly prejudicial); *Barnett v. PA Consulting Grp., Inc.*, 35 F. Supp. 3d 11, 21 (D.D.C. 2014) (excluding opinion testimony as to another person's motivation where not based in witness's own perception). Indeed, this testimony is nearly verbatim to testimony the Court already excluded. For example:

---

[2] The trial transcripts from the first trial are docketed at ECF Nos. 263–289 on the *Fairholme* docket, No. 1:13–cv–1053–RCL; the transcripts are not docketed on the Class docket. In this brief, we cite to the page–line numbers in the transcripts themselves.

[3] Ms. McFarland was not available to testify at trial and her deposition had not been videotaped, so her deposition testimony was read at trial by an actor. This section of her testimony appears at Trial Tr. 1410:4–9.

| Testimony Excluded at Trial 1 | Testimony at Issue for Trial 2 |
|---|---|
| "[W]e didn't believe that Treasury would be too fond of a significant amount of capital buildup inside the enterprises." | Treasury "probably [had] a desire not to allow capital to build up within the enterprises and not to allow the enterprises to recapitalize themselves." |

Ms. McFarland's speculation about Treasury's motivations was not based on any personal knowledge.  As such, it lacks foundation and would be prejudicial.  As the Court previously ruled, admitting this kind of "speculation as to what Treasury's reasoning might have been" risks "confus[ing] the jury into thinking that McFarland had personal knowledge of Treasury's position, which might lend credence to the idea that FHFA adopted that position." Trial Tr. 227:1–4, 227:10–11.  This testimony is thus "likely to be substantially more prejudicial than probative."  *Id.* at 227:4–5.

For the foregoing reasons, the Court should exclude Ms. McFarland's deposition testimony appearing at page 45, lines 11–16, of her deposition transcript.[4]

## II.    Motion in Limine # 2:  To Exclude Evidence and Argument Referring to Treasury's Investment as a Form of "Borrowing" By the Enterprises or "Similar to a Loan"

During the first trial, Plaintiffs repeatedly mischaracterized Treasury's investment in the Enterprises as a "loan" and the Enterprises' draws on that investment as a form of "borrowing." For example, Plaintiffs argued in their opening statement:

- "[T]he terms of that original deal were . . . [v]ery similar to a <u>10 percent loan</u>. Whatever was <u>borrowed</u>, Fannie and Freddie would have to pay 10 percent of that back to Treasury each year."  Trial Tr. 261:8–14 (emphasis added).

---

[4]     The parties are currently meeting and conferring about their respective objections to each side's deposition designations.  Defendants reserve the right to assert additional objections to other portions of Ms. McFarland's deposition testimony (and other witnesses' deposition testimony) on or before June 30 per the March 10, 2023 Scheduling Order.

- "Remember when I said it's like a <u>10 percent loan</u>?  The <u>principal on that loan</u> is called a liquidation preference, because if there is a liquidation where everything is sold, that's Treasury's preference."  *Id.* at 311:6–9 (emphasis added).

- "What they were having to do was <u>borrow more money from the Treasury</u> to pay the 10 percent dividend."  *Id.* at 283:17–19 (emphasis added).

- "Treasury had a liquidation preference of $191 billion.  And they said: From now on, we're going to do the net worth sweep this way.  You make 10, and our <u>principal on our loan</u> goes up 10. Let's say you make 50.  Now you've got 60 of capital, and that 60 we're going to go increase the <u>principal of our loan</u>.  But if you make even 100, we're going to increase the <u>principal on our loan</u>."  *Id.* at 311:15–21 (emphasis added).

In all, Plaintiffs repeated some version of this "loan" or "borrowing" characterization at least a dozen times during the course of the trial.

But it is undisputed that the draws taken by the Enterprises were *not* a "loan," and that the Enterprises did *not* "borrow" money from Treasury pursuant to the Treasury Commitment. Treasury received an *equity* interest in the Enterprises—not a debt interest—in return for its Commitment.  "Treasury committed to invest" in the Enterprises, in return for "one million shares in a newly created class of non–voting stock in each Enterprise, known as Senior Preferred Stock."  *See* Joint Stipulation of Undisputed Facts ¶¶ 17, 19 (Class ECF No. 230) ("JX–1").  Accordingly, Plaintiffs' incorrect statements characterizing Treasury's investment as a "loan" or "borrowing" should be excluded as irrelevant because they do not have "any tendency to make a fact more or less probable."  Fed. R. Evid. 401.

Relevance aside, Plaintiffs' incorrect statements should be excluded under Rule 403.  In closing argument, Plaintiffs attempted to downplay the significance of these mischaracterizations, stating:  "I sometimes said 'borrowed.'  That makes [Defendants] very unhappy.  I don't think it matters."  Trial Tr. 2523:9–10.  It does matter.  Plaintiffs' mischaracterizations can only confuse and mislead the jury.  The jury is likely to infer from

Plaintiffs' mischaracterization of Treasury's investment that the draws the Enterprises made were more similar to loans than an equity investment in the sense that the draws could be paid back or that any dividend paid to Treasury would reduce the liquidation preference. Those inferences would be wrong. Indeed, Plaintiffs cannot dispute that Treasury received stock in return for its Commitment, or that Treasury's equity interest in the Enterprises cannot be "paid back" like a loan.

Finally, Plaintiffs' repeated mischaracterizations are unfairly prejudicial as they suggest that it was unreasonable for FHFA to agree to the Net Worth Sweep because the terms were unfair to the Enterprises as "borrowers." Under Plaintiffs' theory, the Third Amendment was arbitrary and unreasonable in part because it could cause the Enterprises to compensate Treasury in amounts greater than Treasury would have otherwise expected to receive under a loan's interest rate. Trial Tr. 312:5–9. In other words, Plaintiffs' use of "loan" and "borrowing" may mislead the jury into believing that the Net Worth Sweep's quarterly variable dividend unfairly benefitted Treasury because a typical commercial loan has predetermined payments of principal and interest. But the terms of the Third Amendment, like the other iterations of the PSPAs that came before and after, do not operate as a loan—it operates as an equity investment. When jurors consider whether FHFA's execution of the Third Amendment in August 2012 was reasonable, they should not deliberate under the false belief that money drawn from the Treasury Commitment was "borrowing" on a "loan," or something like it. Rule 403 bars the introduction of such an unfairly prejudicial argument. *See United States v. Ring,* 706 F.3d 460, 472 (D.C. Cir. 2013) ("Unfair prejudice within its context means an undue tendency to suggest [making a] decision on an improper basis, commonly, though not necessarily, an emotional one.") (quoting Advisory Committee's Note, Fed. R. Evid. 403).

For the foregoing reasons, the Court should exclude any argument or suggestion that mischaracterizes Treasury's investment as a "loan" or "similar to a loan."

III.    **Motion in Limine # 3: To Exclude Evidence and Argument Comparing the Original Price Paid for Junior Preferred Shares at the Time of Issuance ($33.2 Billion) and Dividends Paid to Junior Preferred Shareholders Pre–Conservatorship ($5.1 Billion)**

At the first trial, Plaintiffs repeatedly emphasized to the jury that from 1996 to 2008, Fannie Mae and Freddie Mac junior preferred shareholders received $5.1 billion in dividends on shares that originally sold for roughly $33.2 billion at the time of issuance.  Relying on these figures, Plaintiffs made three primary arguments to the jury: (1) they suggested that "repayment" of private shareholders' original $33.2 billion "investment" is required as a matter of "overall" and "basic fairness," irrespective of what the shareholder contract provides, Trial Tr. 273:3, 2537:15–16; (2) they argued that the $28.2 billion delta between what the shares sold for at issuance and what shareholders received in dividends before the conservatorships made it "reasonable" for shareholders to expect additional dividends in the future, *id.* at 2537:16–17; 2722:18–21; and (3) they argued that Enterprise shares are "supposed to be better than a loan" because private shareholders are "supposed to keep getting dividends," and "[y]ou keep getting dividends as long as they can pay them," *id.* at 2536:19–22.

The Court should preclude Plaintiffs from making these arguments or otherwise arguing or implying that the $33.2 billion aggregate issuance price of the shares, the $5.1 billion in pre–conservatorship dividends, or the $28.2 billion delta between those two figures are in any way relevant to shareholders' objectively reasonable expectations under the shareholder contracts, the alleged harm incurred by shareholders, or the measure of damages.  The Court should do so for three reasons.

*First*, Enterprise shares do not operate as a loan; dividends are not a "repayment" of the price of a share at issuance; and shareholders have no entitlement to receive dividends under the shareholder contracts.  The evidence refutes any such notion.  Under the shareholder contracts, dividends are discretionary.  *See* JX–1 ¶ 7.  Indeed, Plaintiffs conceded that their argument would require the jury to "pretend" that dividends constitute "repayment" of the original price of a share at issuance, which they acknowledged is "not exactly the way a financial expert would look at this."  Trial Tr. 271:18–24.  The Court should not countenance arguments that are unsupported—and, indeed, contradicted—by the facts and the evidence.

*Second*, Plaintiffs' arguments are irrelevant under the applicable legal standard.  To prevail on their implied covenant claim, Plaintiffs must prove that the Third Amendment violated the reasonable expectations of a hypothetical reasonable shareholder under the shareholder contracts as of December 2009.  Plaintiffs' arguments that the original issuance price of the shares should be "repa[id] as a matter of "fairness" or that shareholders could "reasonably expect" to receive dividends based on that issuance price are not grounded in or tied to the shareholder contracts; they have no relevance to any question the jury must answer.

*Third*, Plaintiffs' arguments are confusing and risk misleading the jury in a manner that is unfairly prejudicial to Defendants.  By suggesting that the Enterprises were obligated to "repa[y]" shareholders—as of right, *see id.* at 2536:19–22 (arguing shareholders are "supposed to keep getting dividends"), and as a matter of equity, *id.* at 273:3; 2537:15–16 (arguing "repayment" was required as a matter of "fairness")—Plaintiffs improperly imply that the Enterprises lacked discretion over whether to declare dividends.  And Plaintiffs' argument that shareholders in December 2009 could have reasonably expected (or been legally entitled to) future dividends because "a lot of money" was paid for their shares at issuance, *id.* at 2538:2, is

likewise likely to mislead the jury, and unfairly prejudicial to Defendants by causing the jury to believe that the amount paid for shares at issuance or the delta between that amount of dividends paid pre–conservatorship somehow entitles shareholders to recover on their claim in this case.

A. **Plaintiffs Repeatedly Emphasized the Delta Between the $33.2 Billion Paid for Junior Preferred Shares and the $5.1 Billion in Dividends Paid to Junior Preferred Shareholders Pre–Conservatorship**

To prevail on their implied covenant claim, Plaintiffs must prove that FHFA's decision to enter into the Third Amendment arbitrarily or unreasonably violated shareholders' objectively reasonable expectations under the shareholder contracts, and that as a result, Plaintiffs' shares became less valuable.  Final Jury Instructions at 9 (Class ECF No. 250, *Fairholme* ECF No. 240) ("Final Jury Instructions").  If a jury finds a breach of the implied covenant, Plaintiffs would be "entitled to recover damages equal to the loss in value of their shares that they prove was caused by the Net Worth Sweep." *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency* ("*Fairholme MSJ Ruling*"), No. 1:13-cv-1053-RCL, 2022 WL 4745970, at *10 (D.D.C. Oct. 3, 2022).  In other words, Plaintiffs' theory of harm is that "they purchased shares that were supposed to come with dividend rights, and that as a result of the Net Worth Sweep, they ended up with shares that effectively did not come with dividend rights and thus were less valuable." *Id*.

During opening statement and closing argument at the first trial, Plaintiffs made numerous references to the amount originally paid by shareholders for junior preferred shares from 1996 to 2008 ($33.2 billion) and the amount of dividends collectively received by junior preferred shareholders over the same period ($5.1 billion).  Based on these figures, Plaintiffs made three related arguments to the jury about shareholders' entitlement to dividends.

First, Plaintiffs argued to the jury that Enterprise shares are "supposed to be better than a loan" because private shareholders are "supposed to keep getting dividends," and "[y]ou keep getting dividends as long as they can pay them."  Trial Tr. 2536:19–22.

Second, Plaintiffs argued that the $28.2 billion delta between the amount originally paid

for the shares and the amount paid in dividends pre–conservatorship was a "stranded"

investment, despite acknowledging that the concept makes no sense as a matter of financial

economics.  Plaintiffs told the jury that the dividends shareholders received from 1996 to 2008

(totaling $5.1 billion) "stopped in September 2008 when [the Enterprises] went into

conservatorship.  So what does this mean?  I'll tell you." *Id.* at 271:14–18.  Plaintiffs' counsel

prefaced the answer to this rhetorical question by cautioning, "[t]his is not exactly the way a

financial expert would look at this because you're supposed to keep getting dividends forever;

it's not just getting repaid back.  But even if you disregard that and *pretend, well, let's treat the*

*5 billion as a repayment*, they still have $28.2 billion they put in that was stranded there in

Fannie Mae and Freddie Mac." *Id.* at 271:18–24 (emphasis added).  Plaintiffs thus suggested the

$28.2 billion delta may be "treat[ed]" as "repayment" that is still owed to shareholders.

In further support of this argument, Plaintiffs, throughout opening and closing,

commented on the "money that the preferred shareholders invested and never got back,"

implying that the Enterprises had an obligation to repay those invested amounts. *Id.* at 313:18–

20; *see also id.* at 280:20–22 ("[T]hese shareholders had put in, as you saw, $35 billion [*sic*] and

only gotten 5 back."); *id.* at 2536:23–24 ("[L]ook how low the dividends is [*sic*] compared to the

total amount invested"); *id.* at 2538:2–4 ("these private investors put in a lot of money, and they

didn't get a lot out").  Plaintiffs implored the jury to "remember the classes we represent invested

$33.2 billion and only got $5 billion back." *Id.* at 314:25–315:1.  And, according to Plaintiffs,

the issue of shareholders' "stranded" $28.2 billion investment related to "overall" and "basic

fairness." *Id.* at 273:3; 2537:15–16.[5]  Plaintiffs emphasized these points by showing
demonstratives juxtaposing the total amounts shareholders paid for their shares at issue and the
total dividends shareholders received before dividends stopped in 2008.  *See* PX–4–F; PX–4–
4AA.

Third, in closing argument, Plaintiffs asserted that the $28.2 billion delta supports their
argument that shareholders "reasonably expected" to receive additional dividends in the future.
According to Plaintiffs, "it's not unreasonable to have that expectation when you've invested that
much money into the enterprises to help them perform their mission."  Trial Tr. 2722:18–21.

**B.**     **Plaintiffs' Arguments That Shareholders Are Entitled to, or Reasonably
          Expected, Future Dividends as a Form of "Repayment" Based on Notions of
          "Fairness" Are Unsupported By the Evidence**

"The D.C. Circuit 'has long made clear . . . that statements made in opening and closing
arguments to the jury [must be] supported by evidence introduced at trial." *Democracy Partners,
LLC v. Project Veritas Action Fund*, No. 17–cv–1047 (PLF), 2022 WL 3334689, at *3 (D.D.C.
Aug. 12, 2022) (quoting *United States v. Watson*, 171 F.3d 695, 702 (D.C. Cir. 1999)).  A party
therefore "errs in closing argument by making a statement unsupported by evidence, misstating
evidence or misquoting testimony." *United States v. Mejia*, 597 F.3d 1329, 1341 (D.C. Cir.
2010).  In short, arguments unsupported by the evidence are barred.  *See id.*

Here, in both opening and closing arguments, Plaintiffs argued that the Enterprises were
obligated to repay shareholders for their investment as of right and as a matter of "fairness," and

---

[5]     Plaintiffs made these same arguments with regard to the 2007 and 2008 components of
the $33.2 billion aggregate issuance price.  For example, Plaintiffs argued that the Enterprises
"raised a lot" of the $33.2 billion—$19.7 billion—in 2007 and 2008, and that investors
purchased their shares "to help Fannie and Freddie in the crises in exchange for a contract," but
that "these people stranded $18.6, if you look at it that way, which is not really – you're
supposed to keep getting the dividends, and you're not paid down."  Trial Tr. 272:14–24.

that such a repayment was something shareholders could "reasonably expect."  Trial Tr. 273:3; 2537:15–17; 2536:19–22; 2722:18–21.  They told the jury that shareholders were "supposed to keep getting the dividends," *id.* at 2536:19–22, that the jury should "treat the 5 billion as repayment," *id.* at 271:18–24, and asserted that the $28.2 billion shareholders "put in . . . was stranded."  *Id.* at 271:18–23; *see also id.* at 271:24; 272:13–24 (arguing that the $28.2 billion delta was "stranded").  In support of these arguments, Plaintiffs emphasized to the jury that "these private investors put in a lot of money, and they didn't get a lot out."  *Id.* at 2538:2–4.

Plaintiffs' arguments are plainly wrong.  The shareholder contract makes clear that shareholders have no legal entitlement to dividends, which the Enterprises have discretion to declare or not declare.  For example, the Certificates of Designation—documents which form the contract and bear directly on shareholders' "objectively reasonable expectations under the shareholder contracts," *see* Final Jury Instructions at 9—"do not require the Board of either enterprise to declare dividends," JX–1 ¶ 7.  As the D.C. Circuit explained, "the stock certificates upon which the class plaintiffs rely provide for dividends 'if declared by the Board of Directors, in its sole discretion.'"  *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 631 (D.C. Cir. 2017) (citation omitted).  And when an Enterprise board decides, in its sole discretion, not to pay dividends, shareholders "will have no claim in respect of such non–payment . . . ."  DX0013, Freddie Mac Preferred Stock Offering Circular (Apr. 23, 1996) at 10 (attached as **Exhibit B**); *see also* DX0016, Fannie Mae Preferred Stock Offering Circular (Aug. 20, 1998) at A–2 (attached as **Exhibit C**).  These principles—that shareholders are not entitled to dividends at all and that dividends do not reflect repayment of shareholders' investments—are bedrocks of investing long–recognized by courts:

> When a man buys stock instead of bonds he takes a greater risk in the business.  No one suggests that he has a right to dividends if there are no net earnings.  But the

> investment presupposes that the business is to go on, and therefore even if there are net earnings, the holder of stock, preferred as well as common, is entitled to have a dividend declared only out of such part of them as can be applied to dividends consistently with a wise administration of a going concern.

*Wabash Ry. Co. v. Barclay*, 280 U.S. 197, 203–04 (1930) (Holmes, J.) (further noting that dividend payments are "in the first instance at least a matter for the directors to determine"). Stated plainly, share purchases were investments, not loans that the Enterprises were obligated to repay. Suggestions to the contrary are incorrect and should not be permitted.

Plaintiffs have not challenged that FHFA suspended payment of dividends to private shareholders in 2008. JX–1 ¶¶ 14, 16. Any reasonable shareholder knew that FHFA could bar dividends if the Enterprises were undercapitalized. *See id.* ¶ 7. Moreover, any reasonable shareholder knows that the value of their shares may change over time for a host of reasons including changing economic conditions and, here, the insolvency of the Enterprises. Indeed, Plaintiffs have acknowledged that the value of all the three classes of shares before the Third Amendment was $2.9 billion, *see* Trial Tr. 313:20–24, far less than the $33.2 billion aggregate issuance price. Consequently, there is no legal or factual basis for Plaintiffs' arguments and suggestions in their opening statement and closing argument that shareholders are owed dividends—let alone dividends equal to the *issuance* price—or that the delta between the issuance price and amounts paid in dividends supports an "objectively reasonable expectation" to receive future dividends. The Court should preclude Plaintiffs from making those types of arguments and statements at the second trial.

C.     **Plaintiffs' Arguments That Shareholders Are Entitled to, or Reasonably Expected, "Repayment" of the Purchase Price of Their Shares At Issuance As a Matter of "Fairness" Are Irrelevant**

Plaintiffs' arguments that the Enterprises were obligated to "repay[ ]" shareholders' investment as a matter of "fairness," and that the $28.2 billion delta made it "reasonable" for shareholders to expect future dividends, are also irrelevant under the applicable legal standard.

The proponent of evidence must establish its relevancy.  *Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990).  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401; *see also United States ex rel. Miller v. Bill Harbert Int'l Constr. Inc.*, No. 95–cv–1231, 2007 WL 861110, at *1 (D.D.C. Mar. 20, 2007) (Lamberth, J.).  "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.

Plaintiffs' sole claim in this case is that FHFA breached the implied covenant of good faith and fair dealing by executing the Third Amendment.  The Court has specified the relevant inquiry as whether FHFA "arbitrarily or unreasonably violated shareholders' *objectively* reasonable expectations under the *shareholder contracts*."  Final Jury Instructions at 9 (emphasis added).  For a reasonable shareholder to objectively believe that dividends are a form of "repayment" tied to the amount originally paid for their shares, and that, as a result, they may reasonably expect to receive that "repayment" through dividends, there would have to be some basis for that belief in the shareholder contracts.

There is none.  The shareholder contracts, as defined by the Court, do not state or even suggest that a shareholder's likelihood of receiving dividends is in any way a function of the amount that the shareholder invested or the amount of dividends that the shareholder already received.  The testimony of Plaintiffs' own expert Dr. Mason supports this conclusion.  *See* Tr. of Dep. of Joseph Mason at 233:20–234:3 (Sept. 16, 2021) (attached as **Exhibit D**) ("Q:  Is it

your understanding, when a shareholder buys a share, that they get a guarantee that they will get the present value of the dividends forecast? . . . The Witness:  No. I know of no underlying guarantee.").  And Plaintiffs conceded that viewing dividends as a form of repayment of the amount originally paid for a share is "not exactly the way a financial expert would look at this," and that accepting Plaintiffs' own argument would require the jury to "pretend" dividends constitute "repayment."  Trial Tr. 271:18–24.  As noted above, the evidence conclusively establishes that shareholders are not entitled to dividends under their shareholder contracts.  The Enterprises never had any obligation to repay any shareholder in any amount, let alone the full value of shareholders' investment.  The Court should not permit arguments or suggestions to the contrary.

Likewise, arguments about unspecified notions of "fairness"—divorced from the terms of the shareholder contract—are irrelevant.  A claim for breach of the implied covenant is contractual; it requires "actions consonant with the terms of the parties' agreement and its purpose."  *Miller v. HCP & Co.*, No. CV 2017–0291–SG, 2018 WL 656378, at *9 (Del. Ch. Feb. 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908 (Del. 2018).  The implied covenant does not "circumvent the parties' bargain, or [ ] create a 'free–floating duty' unattached to the underlying legal document."  *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up).  To "guard against the danger of impairing the stability of contracts," a breach of implied covenant claim "does not entitle a court to rewrite a contract on the basis of some 'unspecified notion of fairness."  Lawrence's Anderson on the Uniform Commercial Code § 1–203:5 (3d. ed.); *see also Miller*, 2018 WL 656378, at *9 ("The Court does not derive implied obligations from its own notions of justice or fairness.").

Here, Plaintiffs' suggestion that repayment was required as a matter of "fairness" is not based on any terms—express or implied—in the shareholder contract.  Plaintiffs instead seek to create a "free–floating duty," one based on Plaintiffs' own notion of fairness.  *Dunlap*, 878 A.2d at 441.  In essence, Plaintiffs ask the jury to "derive implied obligations from [the jury's] own notions of justice or fairness," irrespective of the parties' contractual obligations.  *Miller*, 2018 WL 656378, at *9.  That argument, like shareholders' testimony about their subjective perceptions and beliefs, is "totally irrelevant" to the objective standard that governs Plaintiffs' implied covenant claim.  *See* Motions in Limine Opinion at 17–19 (Class ECF No. 222, *Fairholme* ECF No. 221) (precluding shareholders from testifying about their "subjective expectations" but permitting them to testify about "the contents of the shareholder contract").

Accordingly, the Court should preclude Plaintiffs from arguing or suggesting that the $28.2 billion delta is relevant as a matter of "fairness."  For the same reasons, the Court should preclude any additional argument or suggestion that the $33.2 billion issuance price, $5.1 billion in pre–conservatorship dividends, or $28.2 billion delta are relevant to harm, damages, or shareholders' objectively reasonable expectations.  Those facts have no bearing on any obligation—express or implied—created by the shareholder contracts.

**D.     Plaintiffs' Arguments Are Substantially More Prejudicial Than Probative Because They Confuse the Issues and Mislead the Jury About the Governing Legal Standard**

Plaintiffs' arguments are also misleading.  The Court may exclude the argument "if its probative value is substantially outweighed by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, waste of time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403; *see also Whole Foods Mkt. Grp., Inc. v. Wical L.P.*, No. 1:17–cv–01079, 2019 WL 6910168, at *4 (D.D.C. Oct. 22, 2019) (Lamberth, J.).  To the extent Plaintiffs' three arguments have any probative value (and they do not), that value is substantially

15

outweighed by the risk of confusing and misleading the jury and unfairly prejudicing Defendants.

First, these arguments mischaracterize shareholders' right to dividends. At the first trial, Plaintiffs stated in their closing argument that shareholders were "supposed to keep getting dividends. It's supposed to be better than a loan. <u>You keep getting dividends as long as they can pay them</u>." Trial Tr. 2536:19–22 (emphasis added). The jury is likely to infer from such a statement that shareholders are entitled to dividends as of right whenever the Enterprises "can pay them." That inference is wrong. Under the shareholder contracts, private shareholders have no entitlement to receive dividends unless and until the board declares them, and the Enterprises have no obligation to declare them. The sole effect of Plaintiffs' contrary suggestion would be to risk misleading and confusing the jury about shareholders' right to dividends.

Second, by incorrectly framing dividends as a "repayment" of the original issuance price for a shareholder's shares, mischaracterizing the delta between original issuance price and dividends paid as a "stranded" investment, arguing that shareholders were "supposed to keep getting" dividends, and emphasizing the $33.2 billion issuance price—"a lot of money," *see* Trial Tr. 2538:2—Plaintiffs risk confusing the jury about the applicable legal standard and the harm alleged in this case. Indeed, while Plaintiffs repeatedly emphasized the aggregate issuance price and their "stranded" investment to imply the Enterprises had an obligation to repay them, they also acknowledge that the alleged harm took place when the aggregate value of the shares was $2.9 billion, far less than the $33.2 billion aggregate issuance price. *Id.* at 313:22–24. And while Plaintiffs told the jury that the $33.2 billion issuance price, $5.1 billion in dividend payouts, and $28.2 billion delta are unrelated to *damages*, their arguments risk confusing the jury about whether those amounts relate to *liability*. *Id.* at 272:25–273:4 ("But I want to say now, we

16

aren't asking for those numbers as damages.  We're asking for a small fraction of that . . . it's an important fact to explain the overall fairness and facts of what happened here.").

Third, Plaintiffs' arguments risk confusing the jury about the evidence they can consider when assessing shareholders' "objectively reasonable expectations."  As the Court has explained, the jury may not consider information that is neither "objective" nor grounded in the "shareholder contracts."  *See* Final Jury Instructions at 9.  Yet Plaintiffs' emphasis on unspecified notions of "fairness" and argument that it was reasonable for shareholders to expect dividends—not because of an express or implied term in the shareholder contracts, but because "it's not unreasonable to have that expectation when you've invested that much money into the enterprises," Trial Tr. 2722:18–21—risk confusing the jury about the meaning of "objectively reasonable expectations."

Finally, Plaintiffs' arguments are unfairly prejudicial to Defendants because they suggest that the amount paid for shares at issuance or the delta between that amount and the dividends paid pre–conservatorship somehow entitles shareholders to recover on their claim in this case. For example, Plaintiffs' framing of "repayment" of private shareholders' original $33.2 billion "investment" as a matter of "overall" and "basic fairness" asks jurors to find for Plaintiffs irrespective of what the shareholder contract provides.  Trial Tr. 273:3, 2537:15–16.  When jurors consider whether FHFA's execution of the Third Amendment in August 2012 was arbitrary or unreasonable, they should not deliberate under the incorrect premise that shareholders' investment is subject to "repayment" based on a general notion of "fairness."  Rule 403 bars the introduction of such an unfairly prejudicial argument.  *See Ring,* 706 F.3d at 472 ("Unfair prejudice within its context means an undue tendency to suggest [making a] decision on

17

an improper basis, commonly, though not necessarily, an emotional one.") (quoting Advisory

Committee's Note, Fed. R. Evid. 403).

Whatever probative value Plaintiffs' arguments may have is substantially outweighed by

a risk of confusing and misleading the jury and unfairly prejudicing Defendants, and the Court

should exclude those arguments.

### E.      Request for Relief

For reasons set forth above, the Court should preclude Plaintiffs from presenting

evidence or argument that:

(1) the Enterprises were obligated to, or that shareholders reasonably expected them to,

"repay[ ]" shareholders for their supposedly "stranded" $28.2 billion investment as a matter of

"fairness" or otherwise; Trial Tr. 271:18–24;

(2) shareholders could "reasonably expect" additional dividends in the future based on

the magnitude of the aggregate issuance price from 1996 to 2008 or the $28.2 billion delta

between what was paid for their shares at issuance and the dividends shareholders received

before dividend payments stopped in 2008, *id.* at 2722:18–21;

(3) that the $33.2 billion issuance price, components of the aggregate issuance price, the

$5.1 billion in pre–conservatorship dividends, and/or the $28.2 billion delta are relevant to

shareholders' objectively reasonable expectations under the shareholder contracts, the alleged

harm incurred by shareholders, or the measure of damages; and

(4) Enterprise shares are "supposed to be better than a loan" because private shareholders

are "supposed to keep getting dividends," *id*. at 2536:19–22.

IV.     **Motion in Limine # 4: To Exclude Evidence and Argument Concerning Dividends Paid and Value Transferred to Treasury After the Third Amendment**

Throughout the first trial, Plaintiffs repeatedly emphasized that from January 2013 through the second quarter of 2022, the Enterprises paid Treasury $150 billion more in dividends under the Net Worth Sweep than they would have paid under the 10% fixed dividend.[6]  Despite denying that these references were offered as a basis for damages, Trial Tr. 2569:23–2570:1, Plaintiffs' counsel argued to the jury in closing that the scale of that $150 billion delta showed "how devastating [the Third Amendment] was," *id.*  This evidence, according to Plaintiffs' counsel, showed that the Third Amendment was "unreasonable" because its "consequences . . . were catastrophic."  *Id.* at 307:16–22.  Defendants hereby move to exclude Plaintiffs' evidence or arguments about: (1) the amounts in dividends the Enterprises paid in cash to Treasury from January 2013 to the second quarter of 2019; (2) the value transferred to Treasury (as increases in liquidation preference) from the third quarter of 2019 to the second quarter of 2022; (3) the sum of those two numbers; and (4) the difference between the sum and the 10% dividends, which plaintiffs hypothesize would have continued to the present.  This evidence and argument are not relevant to whether FHFA acted arbitrarily or unreasonably in entering into the Third Amendment or to the damages Plaintiffs may claim, and is misleading and therefore unduly prejudicial to Defendants.

*First*, the value that the Enterprises transferred to Treasury after the Third Amendment is not relevant to the assessment of whether FHFA acted arbitrarily or unreasonably by entering into the Third Amendment.  That assessment must be made based on FHFA's objectives and the

---

[6]     *See, e.g.*, Trial Tr. 259:21, 265:12–20, 284:16–17, 307:20–21, 312:5–9, 312:23–25, 314:23–24 (Plaintiffs' opening statement); *id.* at 1277:15–16 (testimony of Plaintiffs' expert Dr. Dharan); *id.* at 2524:25–2525:4, 2540:21–24, 2546:22–24, 2571:4 (Plaintiffs' closing argument).

uncertainty of the Enterprises' financial performance as of the execution of the Third Amendment in August 2012, not through the lens of what transpired after the Third Amendment was executed.  Not only does this evidence not bear on any relevant issue, it runs the risk of being confusing to the jury and prejudicial to Defendants.  Permitting Plaintiffs to present evidence and arguments concerning value transferred to Treasury after the Third Amendment would improperly encourage the jury to evaluate the reasonableness of FHFA's decision based on events that followed it, without regard for the factors that actually affected FHFA's decision–making process in 2012.  Plaintiffs' presentation of such evidence and argument to the jury would therefore be prejudicial to Defendants.

*Second*, the transfer of value from the Enterprises to Treasury after the Third Amendment is not relevant to determining the alleged harm to shareholders here.  Under the "lost–value" theory of harm that the Court allowed to proceed to trial, the measure of harm the Third Amendment allegedly caused was a one–day decline in share prices on August 17, 2012, resulting in a loss of $1.6 billion in shareholder value.  By Plaintiffs' own admission, post–Third Amendment transfers are "not . . . the basis for damages."  Trial Tr. 2569:23–2570:1.  Under Delaware and Virginia law, when the decline in share value at the time of the breach is known, what the value of the shares would have been absent the alleged breach is irrelevant.  Ultimately, Plaintiffs' evidence and arguments concerning the dividends paid *after* the August 17 stock value drop has absolutely no bearing on the change in stock price.

Moreover, permitting Plaintiffs to compare the $150 billion in value transferred to Treasury over 10 years to the actual loss in shareholder value of $1.6 billion as a result of the Third Amendment is likely to mislead the jury in concluding that Plaintiffs suffered a greater

loss than they are able to show or entitled to recover.  Plaintiffs' presentation of such evidence

and argument to the jury would therefore be prejudicial to Defendants.

As explained further below, the Court should exclude evidence and argument referencing

cash dividends or value transferred to Treasury after January 2013 pursuant to Rules 402 and

403.  *See, e.g.*, Trial Tr. 307:16–22.

### A. Plaintiffs Repeatedly Emphasized the Dividends Paid and Value Transferred to Treasury Pursuant to—and After—the Third Amendment

At the first trial, Plaintiffs repeatedly presented evidence and argument relying on

dividends paid or value transferred by the Enterprises to Treasury after announcement of the

Third Amendment on August 17, 2012.  For instance, at least five times Plaintiffs presented a

version of a slide showing post–Third Amendment dividends paid to Treasury under the Net

Worth Sweep in 2013, the calendar year following the Third Amendment:



Trial Tr. 285:8–11 (Plaintiffs' opening); *id*. at 473:18–23 (testimony of Plaintiffs' summary

witness Susan Hartman); *id*. at 1136:5–22 (expert testimony of Dr. Bala Dharan); *id*. at 2319:14–

18 (same); *id*. at 2570:4–8 (Plaintiffs' closing).

Likewise, at least three times Plaintiffs presented a slide showing cash dividends paid to Treasury between January 2013 and the second quarter of 2019 (when cash dividends to Treasury ceased) and the total increase in liquidation preference from the third quarter of 2019 to the second quarter of 2022.  The same slide then added the cash dividends to the increase in liquidation value and claimed that this sum was the value transferred to Treasury from January 2013 to the second quarter of 2022.



Trial Tr. 312:1–4 (Plaintiffs' opening); *id*. at 1275:12–1276:11 (expert testimony of Dr. Bala Dharan); *id*. at 2570:20–25 (Plaintiffs' closing).

Plaintiffs presented a third slide that purported to show the "impact" of the Third Amendment by subtracting from the value transferred to Treasury the total amount in cash dividends that would have been paid to Treasury had the 10% dividend (with no periodic commitment fee ("PCF")) continued through the second quarter of 2022.



Trial Tr. 312:5–9 (Plaintiffs' opening); *id*. at 1277:1–16 (expert testimony of Dr. Bala Dharan);

*id*. at 2570:25–2571:4 (Plaintiffs' closing).

Similarly, at least three times Plaintiffs presented the same information in a bar graph.



Trial Tr. 481:10–25 (testimony of Susan Hartman); *id*. at 1283:8–1284:2 (expert testimony of Dr.

Bala Dharan); *id*. at 2571:8–9 (ECF No. 284) (Plaintiffs' closing).

Plaintiffs urged the jury to "[k]eep your eye on that $150 billion," *id.* at 314:24, a number they referenced nearly a dozen times in their opening statement alone.  Plaintiffs acknowledged that these post–Third Amendment financial outcomes were "not . . . the basis for damages," but they asserted that this evidence was nonetheless relevant because it supposedly showed "how devastating [the Third Amendment] was."  *Id.* at 2569:23–2570:1.  Plaintiffs specifically told the jury that the Third Amendment was "unreasonable" because its "consequences . . . were catastrophic."  *Id.* at 307:16–22.

### B. Evidence and Argument About the Value Transferred to Treasury After the Third Amendment Is Not Relevant to Whether the Third Amendment Was Reasonable and Would Be Improperly Prejudicial to Defendants.

The dividends paid and value transferred to Treasury after the Third Amendment are not relevant to the jury's assessment of whether the implied covenant in the shareholder contract was breached.  In evaluating whether FHFA acted arbitrarily or unreasonably in entering into the Third Amendment in August 2012, the factfinder must look to "the *existing* facts and circumstances" at the time the decision was made.  Final Jury Instructions at 8 (emphasis added). In assessing whether FHFA acted reasonably, the jury might consider: i) the reasonableness of FHFA's stated objective of precluding the erosion of the Treasury Commitment in light of possible losses in a stress scenario; ii) the reasonableness of the concern by FHFA and the market that the Enterprises may not be able to consistently pay a 10% dividend given the uncertainty of the housing market and future financial performance of the Enterprises; or iii) the fit between the action taken, *i.e.*, the Third Amendment, and the objective, *i.e.*, maximizing the duration of the Commitment.[7]

---

[7]     By their own expert's concession, the Third Amendment ensured that circular dividends would not erode the Treasury Commitment and was thus a reasonable means to achieve FHFA's desired goal.  Tr. of Dep. of Dr. Bala Dharan at 92:9–14 (Apr. 20, 2023) (attached as **Exhibit E**) ("Q. You agree that the net worth sweep was, in fact, effective in ensuring there would be no

Plaintiffs' references to value transferred to Treasury in the decade after the Third Amendment is irrelevant to the jury's evaluation of whether FHFA acted reasonably in light of the information known to FHFA and the uncertainty it faced in August 2012.  No one—not the Enterprises, not Treasury, and not FHFA—could have known with certainty that the Enterprises would be profitable in the decade after the Third Amendment.  That is reinforced by Mr. DeMarco's testimony that his decision to execute the Third Amendment was based on a stress scenario that might occur over a 30–year period.  Trial Tr. 886:21–887:12 (testimony of Edward DeMarco); *id.* at 1062:18–1063:5 (same).  The fact that no such stress scenario has occurred is not probative of whether Mr. DeMarco was reasonable to plan for such a scenario in light of the facts known at the time and the unknowable future.[8]

Evidence and argument relating to the value transferred to Treasury, even if marginally relevant, is also highly prejudicial.  *See English v. District of Columbia*, 651 F.3d 1, 10 (D.C. Cir. 2011); *Hecht v. Pro–Football, Inc.*, 570 F.2d 982, 997 (D.C. Cir. 1977).  For this reason, courts have refused to admit evidence or countenance arguments that permit juries to assess reasonableness "with the 20–20 vision of hindsight," which "can be misleading, not to mention unfair."  *U.S. ex rel. Bagley v. TRW, Inc.*, 204 F.R.D. 170, 180 (C.D. Cal. 2001).  The Supreme Court has warned that a court's ability to assess the reasonableness of a past judgment can be compromised by the "all too real" "potential for distortions and imbalance that can inhere in a

---

erosion of the Treasury commitment cost by circular dividends, correct? A. As far as circular dividends is concerned, correct . . . .").

[8]     To the extent the value transferred to Treasury after the Third Amendment is even tangentially relevant to the projections of the Enterprises' future performance, such relevance is highly attenuated because the occurrence of such transfers reflects a wide array of factors not specifically considered or evaluated by the projections.  As discussed below, there are numerous more direct sources of this information that do not run the risk of prejudicing Defendants.

hindsight perspective." *Premo v. Moore*, 562 U.S. 115, 125 (2011); *see also Quadrangle Dev. Corp. v. Antonelli*, 935 F.2d 1337, 1340 (D.C. Cir. 1991) ("In our view . . . the district court mistakenly considered commercial reasonableness in hindsight (*ex post*) instead of commercial reasonableness 'surrounding the making of the contract' (*ex ante*).") (citation omitted).  Where the risk of such improper influence on the jury substantially outweighs the probative value of evidence, as is the case here, the evidence must be excluded.  *See English*, 651 F.3d at 10; *Hecht*, 570 F.2d at 997.

There is no question that Plaintiffs' statements would be likely to influence the jury by appealing to improper hindsight bias.  Plaintiffs' references to $150 billion convey to the jury that the value Treasury received over 10 years following the Third Amendment is something not only that the jury should consider, but that is of great significance—or, as Plaintiffs' counsel put it, a "devastating" "catastroph[e]" for shareholders.  Trial Tr. 307:20 (Plaintiffs' opening argument); *id.* at 2570:1 (Plaintiffs' closing argument).  The jury, however, is tasked with evaluating whether FHFA acted reasonably in August 2012.[9]  The instructions to the jury to focus on the circumstances in August 2012, when the decision was made, would be overwhelmed if Plaintiffs were permitted to repeat the reference to $150 billion in value 21 times as they did in the first trial.

---

[9]     Hindsight bias by juries has been extensively studied. Research shows that evidence of events after the decision is made compromises a jury's ability to assess the reasonableness of the decision. *See, e.g., Fox v. CDX Holdings, Inc.*, No. CV 8031–VCL, 2015 WL 4571398, at *3–4 (Del. Ch. July 28, 2015) (quoting Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in Hindsight*, 65 U. Chi. L. Rev. 571, 576–602 (1998) and others), *aff'd*, 141 A.3d 1037 (Del. 2016).

**C.      Evidence and Argument About the Value Transferred to Treasury After the Third Amendment Is Not Relevant to Damages and Would Be Improperly Prejudicial to Defendants.**

The dividends paid and value transferred to Treasury after the Third Amendment are equally irrelevant to the jury's assessment of damages.  Plaintiffs are claiming $1.6 billion in damages because that is the loss in market value caused by the Third Amendment.  They can claim no more as a matter of law if the jury finds Defendants breached the shareholder contract.  Where the loss of contract value on the date of the alleged breach is known, that loss is the measure of damages.[10]  Here, the decrease in market value of the shareholder contracts is undisputed at $1.6 billion.[11]  Whether that number constitutes damages turns on whether FHFA acted unreasonably in executing the Third Amendment.  But the $150 billion transfer of value to

---

[10]      *See, e.g.*, *Jinsun, L.L.C. v. Mireskandari*, 710 F. App'x 622, 624 (5th Cir. 2017) (holding damages were "no more and no less" than the lost contract value on the date of breach, which was not influenced by "[w]hether the stock price went up or down" following the contracted transfer of stock); *LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*, No. 16–cv–2752, 2018 WL 4259979, at *4 (E.D.N.Y. Sept. 6, 2018) (holding damages for the deprivation of an item with determinable market value should be measured by the value of the item on the date of the breach); *MOSAID Techs. Inc. v. LSI Corp.*, No. CV 10–192–RGA, 2014 WL 12775325, at *1 (D. Del. Feb. 26, 2014) ("[T]he crucial question is: what is the difference in value between what [plaintiff] was promised and the value of what it actually received.  The difference in value is measured at the *time of the breach . . . .*") (emphasis added); *United Va. Bank of Fairfax v. Dick Herriman Ford, Inc.,* 210 S.E.2d 158, 161 (Va. 1974) ("The general rule is that damages are to be determined at the time of breach of a contract.") (citation omitted).

[11]      It is well accepted, and Plaintiffs no longer dispute, that the market price of the share reflects the value of the shareholder contract.  *See, e.g.*, *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 369 (Del. 2017) (explaining "market prices are typically viewed superior to other valuation techniques because, unlike, e.g., a single person's discounted cash flow model, the market price should distill the collective judgment of the many based on all the publicly available information about a given company and the value of its shares"); *see also* *Fairholme MSJ Ruling* at 16 n.3 ("One might hypothesize that a decline in stock price . . . would reflect a corresponding decline in probability–adjusted expectations regarding future dividends.").

Treasury after the Third Amendment is not probative of the $1.6 billion loss in the value of the shares caused by the Third Amendment.

Moreover, Plaintiffs' argument that the decline in market value of $1.6 billion has some relationship to the $150 billion in value that Plaintiffs contend was transferred to Treasury over the subsequent 10 years is highly prejudicial.[12]  Presenting such evidence and argument will invite the jury to mistakenly infer that in the absence of the Third Amendment, the $150 billion of value transferred to Treasury would have been retained by the Enterprises, and this retention by the Enterprises would somehow have increased shareholders' expectations of dividends (at some unknown time after the Enterprises were out of conservatorship) and eventually raised the Enterprises' share prices.  That strained and highly speculative line of reasoning would improperly confuse and mislead the jury and thereby prejudice Defendants.

As noted above, Plaintiffs told the jury that the Third Amendment was "unreasonable" because its "consequences . . . were catastrophic."  Trial Tr. 307:16–22.  They argued that the value transferred to Treasury showed "how devastating [the Third Amendment] was."  Trial Tr. 2569:23–2570:1.  The jury is likely to infer that the so–called catastrophe or purportedly devastating impact of the Third Amendment harmed the shareholders and that the $1.6 billion in claimed losses is not nearly enough to compensate them.  The minute (if any) probative value of any argument that references the $150 billion in value transferred to Treasury is far outweighed by the prejudicial effect to Defendants of such misleading references.

---

[12]     Plaintiffs' own expert emphasized that "[t]he $150 billion in value that accrued to Treasury amounts to *roughly 100 times* the estimated damages of $1.6 billion."  Supp. Expert Report of Joseph R. Mason ¶ 7 (Class ECF No. 276–2, *Fairholme* ECF No. 291–2) (footnote omitted).

### D.      Request for Relief

For the foregoing reasons, the Court should preclude Plaintiffs from presenting evidence or argument about (1) the amounts in dividends the Enterprises paid in cash to Treasury from January 2013 to the second quarter of 2019, (2) the value transferred to Treasury (as increases in liquidation preference) from third quarter 2019 to second quarter 2022, (3) the sum of those two numbers, or (4) the difference between the sum and the 10% dividends, which Plaintiffs hypothesize would have continued through the present.

## CONCLUSION

For the foregoing reasons, this Court should:

I.     Exclude speculative deposition testimony of Susan McFarland;

II.    Exclude evidence and argument referring to Treasury's investment as a form of "borrowing" by the Enterprises or "similar to a loan;"

III.   Exclude evidence and argument comparing the original price paid for junior preferred shares at the time of issuance ($33.2 billion) and dividends paid to junior preferred shareholders pre–conservatorship ($5.1 billion); and

IV.   Exclude evidence and argument concerning dividends paid and value transferred to Treasury after the Third Amendment.

A proposed order is being submitted with this motion.

Dated: May 26, 2023

Respectfully submitted,

 /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942–5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing
Finance Agency*

/s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar #467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661–7828
Fax: (202) 626–3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan
Mortgage Corp.*

/s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383–5300
Fax: (202) 383–5414
mvergow@omm.com

*Attorney for the Federal National Mortgage
Association*