# EXHIBIT A

        IN THE UNITED STATES COURT OF FEDERAL CLAIMS
                    NO. 13-465 C
             (FILED FEBRUARY 26, 2014)


    ------------------------------x
    FAIRHOLME FUNDS, INC., ET AL

    VS.                           RCFC 12(b); RCFC 12(b)(6);
                                  RCFC 56(d)
    THE UNITED STATES
    ------------------------------x
            PROTECTED INFORMATION ONLY TO BE DISCLOSED

         IN ACCORDANCE WITH PROTECTIVE ORDER

       ORAL DEPOSITION OF MS. SUSAN MCFARLAND

                   HOUSTON,  TEXAS

                  JULY 15TH, 2015

                    10:01 A.M.




    Reported By:
    SAMANTHA DOWNING, CSR
    JOB NO. 39652

Page 44

1    December 2010.  You weren't there.

2        A.   Correct.

3        Q.   But when you did arrive in the middle of 2011,

4    did you see any manifestations of the administration's

5    commitment to ensure existing common equity holders

6    would not have access to any positive earnings from

7    Fannie?

8                   MR. LAUFGRABEN:  Object to the form of

9    the question; lack of foundation.

10       A.   The only example that I -- that comes to mind

11   of note is the Third Amendment.

12       Q.   (BY MR. THOMPSON)  Yeah.

13                  And what was your reaction when you

14   learned -- you learned of a Third Amendment a couple of

15   days beforehand; is that right?

16       A.   Correct.

17       Q.   All right.  And what was your reaction to it?

18                  MR. LAUFGRABEN:  Objection; vague.

19       Q.   (BY MR. THOMPSON)  Did you think it was the

20   effective nationalization of the companies?

21                  MR. LAUFGRABEN:  Objection; form.

22                  MR. BARTOLOMUCCI:  Objection; form.

23       A.   No, I didn't view it as nationalizing.  It

24   borders on that; I can see.

25                  But I had, shortly before that, had

 1    a meeting with Treasury whereby we reviewed our

 2    forecasts.  I had expressed a view that I believed we

 3    were now in a sustainable profitability, that we would

 4    be able to deliver sustainable profits over time.  I

 5    even mentioned the possibility that it could get to a

 6    point in the not-so-distant future where the factors

 7    might exist whereby the allowance on the

 8    deferred tax asset would be released.  We were not there

 9    yet, but, you know, you could see positive things

10    occurring.

11                  So when the amendment went into place,

12    part of my reaction was they did that in response to my

13    communication of our forecasts and the implication of

14    those forecasts, that it was probably a desire not to

15    allow capital to build up within the enterprises and not

16    to allow the enterprises to recapitalize themselves.

17       Q.    (BY MR. THOMPSON)  And with whom at Treasury do

18    you have this meeting?

19       A.    So the -- which meeting?

20       Q.    The one you just referenced where --

21       A.    Where I had the discussion about the forecasts?

22       Q.    Yes.

23       A.    So it was a common practice for us to meet with

24    Treasury on a quarterly basis to review our results from

25    the past quarter and to update them on our forecasts;

1                    MR. LAUFGRABEN:  Object to the form of

2   the question.

3        Q.   (BY MR. THOMPSON)  The sweep was the 17th, I

4   will represent to you.

5        A.   Yeah.

6                    This is August 6th?

7        Q.   Yeah.

8        A.   So as of this meeting, no, I did not know that

9   the Third Amendment was going to be put in place.

10       Q.   And do you recall what Tim Mayopoulos' reaction

11  was to the Third Amendment?

12                   MR. LAUFGRABEN:  Object to the form of

13  the question; lack of foundation.

14       A.   I can tell you the logistics of the

15  communication of the Third Amendment.  That might be

16  helpful.

17       Q.   (BY MR. THOMPSON)  Sure.

18       A.   I was on vacation in Mexico and was contacted,

19  I believe it was Tuesday of that week -- I may be off a

20  day -- that Secretary Geithner would like to meet with

21  the CEOs and CFOs of the two GSEs the next morning.  I

22  inquired into flight arrangements that could get me back

23  in time for the meeting, only to discover there were no

24  commercial arrangements to make that happen.

25                   So I let Tim know that I couldn't find a

1    way to get back in time.  And apparently there were some

2    other individuals -- I don't know if it was the CEO or

3    CFO of Freddie.  I was not the only one logistically

4    challenged to make the meeting at 8:00 the next morning.

5              The decision was then made that

6    Secretary Geithner would not then meet.  Instead, they

7    set up a meeting with Mary Miller that I know Tim

8    attended in person, and she communicated the -- that

9    they were going to put the Third Amendment in place.

10              Tim subsequently had a briefing call with

11   myself and a few other executives at Fannie Mae after

12   that to inform us.  So I was still in Mexico on vacation

13   on the phone receiving -- being informed of the

14   Third Amendment.

15              So I say that only in the context of, you

16   know, I have to assess it based on what I heard.  I

17   wasn't in the room.  I couldn't, you know, get a sense

18   from body language or any of the other things.

19              I think -- you know, the sense I got was

20   maybe not that dissimilar from my reaction.  When you're

21   in the unique situation that the GS Es were in, you're

22   never shocked at anything.  But I -- there was a little

23   bit of surprise and yet not surprise, in the sense that

24   the chance that they -- we didn't believe that Treasury

25   would be too fond of a significant amount of capital

 1    buildup inside the enterprises.

 2       Q.    Why not.

 3                    They had mortgaged 79.9 percent of the

 4    economy.

 5                    MR. LAUFGRABEN:  Objection to the form of

 6    the question; calls for speculation.

 7       A.    There was a desire to reach a more wholistic

 8    solution for housing finance reform.

 9                    So as time passed and the companies

10    continued to operate and things happened through the

11    operation of those companies, you had -- all of the

12    parties involved, whether that's Treasury or FHFA or

13    Fannie, had to deal with the outcomes of those in the

14    absence of a more wholistic solution.

15                    Some of those outcomes could start taking

16    things down a certain path that might affect or make the

17    ultimate solution, if there ever is one, more difficult

18    to deal with.

19                    And I don't know.  I am just saying that

20    if you start allowing capital to accumulate up in the

21    enterprises, then that creates an additional variable or

22    factor that has to be taken into account if and when

23    perhaps a more wholistic solution is put in place.

24                    You know, again, I am giving you sort of

25    my perspective on why, you know, there might be a reason

1   to prefer that not to happen -- you know, capital

2   accumulation to happen at that point in time.

3        Q.   And what did Mr. Mayopoulos say during this

4   conference call when you were in Mexico?

5        A.   Well, he was very factual providing the

6   information that was provided to him by Treasury.

7        Q.   Yeah.

8        A.   Kind of discussing, okay, what does this mean?

9   What do we need to do?

10                    You know, there were communication

11  issues, there's logistical issues, different things that

12  had to be -- you know, we had to be prepared to deal

13  with it.  And so what do we as a company need to do and

14  by when and who is on point for different things.  So

15  there was a little bit of a call to action.

16                    And, you know, we needed to communicate

17  to the Board.  We also ultimately needed to communicate

18  to the employees.  But you -- you know, the timing of

19  when and how you did that was very important because we

20  couldn't get out in front of, you know, the

21  communications that Treasury needed to make.  So we

22  needed to make sure that we were clear on that -- you

23  know, that type of thing --

24       Q.   Okay.

25       A.   -- and working through that.

Page 157

1      Q.   (BY MR. THOMPSON)  So was there a -- did you

2   have the sense that the Government simply was not going

3   to allow the private shareholders to participate in

4   future profits when you were at Fannie?

5             Do you think that was one of the

6   possibilities that might ultimately come out?

7                  MR. LAUFGRABEN:  Renew our objections and

8   our instruction to the witness not to answer.

9                  Counsel still has not tied this to the

10  Discovery Order.

11                 MR. BARTOLOMUCCI:  David, do you really

12  want her to answer what was her sense of what the

13  Government thought was possible?

14                 MR. THOMPSON:  Yeah.

15                 I mean, it goes to the reasonable

16  investment -- yeah.

17     Q.   (BY MR. THOMPSON)  I mean, from your

18  perspective, you were dealing with the Government, and

19  you said you weren't surprised totally by the net worth

20  sweep.

21                 I just really want you to explain why.

22                 MR. LAUFGRABEN:  Same objections, and

23  same instructions.

24     A.   I will tell you -- yeah.  This is from my

25  vantage point.  I am not presuming what the Government

Page 158

1    was thinking or wanted.  I am not trying to represent

2    anything from them.  I may represent my perspective on

3    what they may have been thinking.

4                    I just sat down with them -- to the

5    Treasury and said, "We think we're sustaining

6    profitable."

7                    The numbers were decent-sized.  I also

8    put on the radar that there was a possibility of a

9    deferred tax allowance release that could be sitting in

10   the not-so-distant future.

11                   So the fact that this happened shortly

12   thereafter -- so the time -- the time connection there

13   was part of why -- that was part of why I wasn't

14   surprised.  Okay.  I just told them that.

15                   So then the question is why would they be

16   concerned of us making money and creating capital inside

17   the enterprise.  I think in my own opinion, a lot of --

18   a lot of people got wiped out, and the Government had to

19   step in on a lot of fronts during the financial crisis.

20   I think politically it seemed a little -- it would seem

21   to me that there would be individuals bothered that some

22   individuals might profit from the Government's support

23   of the enterprises, okay?

24                   So, you know, it wouldn't -- would it

25   be -- how would it play out if somebody made big bucks

Page 159

1  because -- off the backs of the taxpayers?  I am kind

2  of -- how some people could connect dots that the

3  Government stepped in, put a bunch of money into the

4  GSEs using taxpayers' funds, and now Daddy Big Bucks

5  over here is making a big profit off of Fannie Mae

6  stock.

7               You could see how positioned that way,

8  how that would be pretty politically unpalatable.  I

9  could see why there could be a concern that anybody

10  plays things out that way.  So, thus, why -- I wasn't

11  trying to presume that they completely wanted to wipe

12  out the shareholders, but I certainly would appreciate

13  why there would be sensitivity of things playing out in

14  a way that somebody would glob on to that story line.

15               Does that make sense?

16     Q.   (BY MR. THOMPSON)  Yes.  Thank you.  And let's

17  go on.

18               MR. LAUFGRABEN:  Is this a good time to

19  take a five-minute break?

20               MR. THOMPSON:  Sure.

21               THE REPORTER:  Okay.  It's 2:58.

22               (Recess from 2:58 p.m. to 3:05 p.m.)

23               THE REPORTER:  It's 3:05.

24     Q.   (BY MR. THOMPSON)  Okay.  We're on to

25  McFarland 20, and it has a Bates number of Fannie Mae

1   But as it relates to mortgages, they may be considering

2   taking positions in different types of entities or

3   companies, or they may already have position in

4   different types of entities or companies that are

5   related to the mortgage industry.

6             Because Fannie and Freddie happen to be

7   part of that industry, it's possible that they might

8   have positions.

9       Q.   Do you know if any of the firms with which you

10  interviewed has positions in Fannie or Freddie?

11      A.   I didn't -- you know, I -- I don't know for

12  certain.  I didn't, like, ask for and see a list of all

13  their holdings, no.

14             So -- and they're -- no.

15             MR. THOMPSON:  I just want the record to

16  reflect that all these questions are outside the

17  Government's understanding of the temporal dimension of

18  these depositions.  I think it's just fine, but

19  continue.

20      Q.   (BY MR. LAUFGRABEN)  Do you recall any of the

21  questions that the people you met with asked concerning,

22  you know, either this litigation or anything else

23  concerning the Third Amendment?

24      A.   I think I remember getting a question in the

25  vein of, "What do you think Treasury was thinking when

1   they put the Third Amendment in place?"

2                And I think my response was that, you

3   know, while, you know, Treasury, you know, informed us

4   that the amendment was going in place before it was put

5   in place and provided their perspective or rationale for

6   why they were doing it, I am not Treasury.  I couldn't

7   get in the minds of Treasury and what they were

8   thinking.

9                I think someone may have asked, "Do you

10  think they put this in place so they could solve the

11  debt ceiling problem?"

12               I said, "There's lots of people that

13  found it interesting that it happened at a time when

14  there was some challenges around the debt ceiling."

15               I said, "I never had conversations with

16  Treasury about solving debt ceiling problems with the

17  Third Amendment."

18               I am trying to think.  I am trying to

19  think of other questions.

20               I might have gotten kind of a wind-down

21  question.  I want to be careful here because I am trying

22  to remember the -- you know, there were a lot of

23  different topics and conversations we were discussing

24  far beyond this particular topic, but it did -- there

25  were -- on occasion, a question or two would come up

1   with somebody I was meeting with about it, whether that

2   was idle curiosity on their part, or whether they had a

3   specific desire or need to understand something.

4        Q.   When did this trip to New York take place?

5        A.   In April, late April of 2015.

6        Q.   Okay.  If you could find out who you did meet

7   with --

8        A.   I want to be careful, because, I mean, these

9   are -- you know, I don't feel -- I want to be careful

10  that I am treating their business confidentially.

11                  In other words, just as I wouldn't want

12  to discuss certain things at Capital One with you guys

13  that aren't relevant to -- you know what I mean?  I want

14  to be respectful of confidentiality, as need be.

15       Q.   We're under a Protective Order.

16       A.   So --

17                  MR. BARTOLOMUCCI:  I think they're only

18  interested in conversations about these lawsuits.

19       A.   Yeah.  Nobody asked me the question, like,

20  "Okay.  The lawsuit -- the such and such lawsuit and" --

21  they never positioned questions in the construct of,

22  "Okay.  For this particular lawsuit," and then go into a

23  series of questions.

24                  There were questions that were asked that

25  were not dissimilar to some of the questions that were