# EXHIBIT G

```
                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA


    FAIRHOLME FUNDS, INC., et al.,   .
                                     .
            Plaintiffs,               .
                                     .  Case Number 13-cv-1053
        vs.                          .
                                     .
    FEDERAL HOUSING FINANCE AGENCY,  .
    et al.,                          .
                                     .
            Defendants.               .
    - - - - - - - - - - - - - - - - -
    IN RE FANNIE MAE/FREDDIE MAC     .  Case Number 13-mc-1288
    SENIOR PREFERRED STOCK PURCHASE  .
    AGREEMENT CLASS ACTION           .  Washington, D.C.
    LITIGATIONS.                     .  October 20, 2022
    - - - - - - - - - - - - - - - - -  10:03 a.m.


                 TRANSCRIPT OF JURY TRIAL, MORNING SESSION
                   BEFORE THE HONORABLE ROYCE C. LAMBERTH
                       UNITED STATES DISTRICT JUDGE

    APPEARANCES:

    For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                 Cooper & Kirk, PLLC
                                 1523 New Hampshire Avenue Northwest
                                 Washington, D.C. 20036

    For Class Plaintiffs:        LEE RUDY, ESQ.
                                 Kessler Topaz Meltzer & Check, LLP
                                 280 King of Prussia Road
                                 Radnor, Pennsylvania 19087

                                 HAMISH HUME, ESQ.
                                 SAMUEL KAPLAN, ESQ.
                                 KENYA DAVIS, ESQ.
                                 Boies Schiller Flexner LLP
                                 1401 New York Avenue Northwest
                                 Washington, D.C. 20005


                              -- continued --
```

1    represent the plaintiffs in this case.
2    A.   Good morning, Mr. Hume.
3    Q.   Thank you for appearing today.
4         Now, Mr. DeMarco, you were the acting director of the FHFA
5    in August of 2012; correct?
6    A.   Correct.
7    Q.   And it was your decision to agree to the net worth sweep;
8    correct?
9    A.   Yes.
10   Q.   And am I correct that you made the final decision to agree
11   to the net worth sweep in August of 2012?
12   A.   The final decision, yes.
13   Q.   And am I correct that while you were the final
14   decisionmaker, Mario Ugoletti was the point person on the actual
15   negotiations with the Treasury Department?
16   A.   Yes.
17   Q.   And am I correct, Mr. DeMarco, that the reason you agreed
18   to the net worth sweep was to address the concern that the
19   enterprises were going to have to borrow money from Treasury in
20   order to pay the 10 percent dividend to Treasury, and those
21   borrowings would then reduce the amount of the Treasury
22   commitment?  Is that the reason that you agreed to the net worth
23   sweep?
24   A.   Yes, that was the central concern.
25   Q.   That was the reasoning.  And am I also correct that from

1   your perspective, the net worth sweep was not agreed to in order
2   to demonstrate a wind-down of the enterprises; is that correct?
3   A.   No, it's not to demonstrate that.  It was to do what we
4   said in the previous question.  It was to assure the stability
5   of the companies through the remaining Treasury commitment.
6   Q.   So it was not done for a wind-down?  It was not done to
7   demonstrate or begin a wind-down; correct?
8   A.   I was aware that wind-down was something that both the
9   Treasury Department, the administration, and members of Congress
10  were actively advocating for and was one of the risks that I was
11  considering in the context of this decision.
12  Q.   But am I correct that you did not agree to the net worth
13  sweep in order to demonstrate wind-down?
14  A.   It was not to demonstrate wind-down, whatever that means.
15  Q.   I just want to make sure that the record is clear.  Can
16  you -- you can look at tab 1 of your binder.  It should be the
17  deposition from 2015.
18       Actually, we can just play a clip.  Can you play the 2015
19  deposition clip?
20           COURTROOM DEPUTY:  Exhibit number?
21           MR. HUME:  It's a deposition.  It's not an exhibit.
22  Are we permitted to play the deposition?
23           THE COURT:  If there's no objection.
24           MR. STERN:  No objection, Your Honor.
25       (Video played.)

```
                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x
FAIRHOLME FUNDS, INC., et al.,
                                        CA No: 1:13-cv-01053-RCL
            Plaintiffs,
                                        Washington, D.C.
                                        Friday, October 21, 2022
vs.                                     2:15 p.m.

FEDERAL HOUSING FINANCE AGENCY,
et al.,

            Defendants.
- - - - - - - - - - - - - - - -x
IN RE: FANNIE MAE/FREDDIE MAC           Case Number 1:13-cv-1288
SENIOR PREFERRED STOCK PURCHASE
AGREEMENT CLASS ACTION
LITIGATIONS

_____

           TRANSCRIPT OF JURY TRIAL - MORNING SESSION
         HELD BEFORE THE HONORABLE ROYCE C. LAMBERTH
                    UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

For the Berkley Plaintiffs:   BRIAN BARNES, ESQ.
                              COOPER & KIRK, PLLC
                              1523 New Hampshire Avenue, NW
                              Washington, D.C. 20036

For Class Plaintiffs:         LEE D. RUDY  ESQ.
                              KESSLER TOPAZ MELTZER & CHECK
                              280 King of Prussia Road
                              Radnor, Pennsylvania 19087

                              HAMISH HUME, ESQ.
                              KENYA DAVIS, ESQ.
                              SAMUEL KAPLAN, ESQ.
                              BOIES SCHILLER FLEXNER LLP
                              1401 New York Avenue Northwest
                              Washington, D.C. 20005

(CONTINUED ON NEXT PAGE)
```

1  and I've been talking directly to my senior staff.  And at
2  the end of the day, you know, when Treasury was ready to
3  move, there was very little time at that point to move to
4  get it done.
5  Q.  Now, let's -- and one other thing on process.  You say
6  that you didn't ask for recommendations from Fannie or
7  Freddie.  Why not?
8  A.  All the negotiations and amendments over the stock
9  purchase agreements from the original one, the First
10 Amendment, Second Amendment, Third Amendment, were all done
11 between FHA as conservator and the Treasury Department, and
12 I felt like that was our responsibility.
13         But there's a couple of other things here.
14         I am meeting weekly or every other week with the
15 CEOs of these companies, and so I am having exchanges with
16 them in which I am hearing from them what their concerns
17 are.  And I have -- I may be able to take account of what
18 they're looking at and the things that they're looking at,
19 and I'm able to ask some questions that help inform me as
20 I'm making judgments, not just about this, but across an
21 array of conservatorship responsibilities, so I have -- I
22 have that input as well.
23         Oh, and I'm sorry, one other thing, Mr. Stern,
24 with regard to this is that there is -- there are issues
25 about sort of disclosures and leaks.  We've talked about

```
 1                BEFORE THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3    FAIRHOLME FUNDS, INC., et al.,   .
                                       .
 4             Plaintiffs,             .
                                       . Case Number 13-cv-1053
 5        vs.                          .
                                       .
 6    FEDERAL HOUSING FINANCE AGENCY,  .
      et al.,                          .
 7                                     .
               Defendants.             .
 8    - - - - - - - - - - - - - - - - -
      In re FANNIE MAE/FREDDIE MAC     . Case Number 13-mc-1288
 9    SENIOR PREFERRED STOCK PURCHASE  .
      AGREEMENT CLASS ACTION           . Washington, D.C.
10    LITIGATIONS.                     . October 21, 2022
      - - - - - - - - - - - - - - - - -   1:38 p.m.
11

12              TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                   BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                     UNITED STATES DISTRICT JUDGE

14    APPEARANCES:

15    For Berkley Plaintiffs:     BRIAN BARNES, ESQ.
                                  Cooper & Kirk, PLLC
16                                1523 New Hampshire Avenue Northwest
                                  Washington, D.C. 20036
17
      For Class Plaintiffs:       LEE RUDY, ESQ.
18                                ERIC ZAGAR, ESQ.
                                  Kessler Topaz Meltzer & Check LLP
19                                280 King of Prussia Road
                                  Radnor, Pennsylvania 19087
20
                                  HAMISH HUME, ESQ.
21                                SAMUEL KAPLAN, ESQ.
                                  KENYA DAVIS, ESQ.
22                                Boies Schiller Flexner LLP
                                  1401 New York Avenue Northwest
23                                Washington, D.C. 20005

24

25                          -- continued --
```

1       Do you remember that?
2   A.  Yes.
3   Q.  "PSPA alert," do you see that, subject?
4   A.  Yes.
5   Q.  And just highlight the date, 8/9/2012.
6       So this is eight days before the net worth sweep is
7   announced; correct?
8   A.  Yes.
9   Q.  It was announced on August 17th, 2012.  Do you remember
10  whether you signed it on the 17th or the 16th?
11  A.  I do not recall.
12  Q.  Okay.  The first sentence says -- Mr. Ugoletti writing to
13  you and others at the FHFA, says, "As a heads-up, there appears
14  to be a renewed push to move forward on PSPA amendments."
15      Do you see that?
16  A.  I do.
17  Q.  Mr. Stern went through the rest of the paragraph with you.
18  I just wanted to ask you this question:  Was it your
19  understanding when you received this that that renewed push came
20  from Treasury?
21  A.  Yes.
22  Q.  Okay.  I would like to show you PX -- oh, one other
23  question about this.  August 9th, 2012, can we show the date
24  again?  That would have been two days or -- one or two days
25  after Fannie Mae and Freddie Mac publicly released their second

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA

FAIRHOLME FUNDS, INC., ET AL., et al,    Civil Action
                                         No. 1:13-1053
              Plaintiffs,

     vs.
                                         October 25, 2022
FEDERAL HOUSING FINANCE                  1:44 p.m.
     AGENCY, et al,                      Washington, DC


              Defendants.
_____

In re: FANNIE MAE/FREDDIE MAC            Civil Action
SENIOR PREFERRED STOCK PURCHASE          13-1288
AGREEMENT CLASS ACTION
LITIGATIONS.
_____
```

TRANSCRIPT OF **JURY TRIAL - AFTERNOON SESSION**
**BEFORE THE HONORABLE ROYCE C. LAMBERTH**
UNITED STATES DISTRICT JUDGE


PLAINTIFFS' APPEARANCES:

| | |
|---|---|
| **For Plaintiffs:** | **CHARLES COOPER**<br>**DAVID THOMPSON**<br>**VINCENT COLATRIANO**<br>**PETER PATERSON**<br>**BRIAN BARNES**<br>  Cooper & Kirk, PLLC<br>  1523 New Hampshire Avenue NW<br>  Washington, D.C. 20036 |
| **For Class Plaintiffs:** | **ERIC ZAGAR**<br>  Kessler Topaz Meltzer & Check, LLP<br>  280 King of Prussia Road<br>  Radnor, Pennsylvania 19087 |
| | **HAMISH HUME**<br>**SAMUEL KAPLAN**<br>  Boies Schiller Flexner LLP<br>  1401 New York Avenue NW<br>  Washington, D.C. 20005 |

1    terms, the return on the investment has to be on an
2    investment that has already been made, and that's the amount
3    of the commitment that's been drawn down by the GSEs.
4        **Q.**   And that's the 10 percent dividend?
5        **A.**   That's the 10 percent dividends, the warrants, and
6    so on.  Yes.
7        **Q.**   So, Professor, do you have a slide that just
8    summarizes the implication of the contractual language, the
9    use of market value, the absence of internal analysis that
10   you've been discussing?  Is that the next slide?
11       **A.**   Yes, please, if we could advance.
12           **THE COURT:**  We'll do that at 10:00 tomorrow.
13           **MR. KAPLAN:**  Your Honor?
14           **THE COURT:**  We'll do that at 10:00 tomorrow.
15           **MR. KAPLAN:**  Thank you.
16           **THE COURT:**  Don't talk about the case.  Don't let
17   anyone talk to you about the case.  I will see you all at
18   10:00 tomorrow.
19           (Jury exited the courtroom)
20           **THE COURT:**  One other thing I'll do on the record
21   before I take you off the bench about our scheduling, since
22   the issue on the Plaintiffs' Exhibit 226 has been fully
23   briefed now, the Plaintiffs' Motion to Exhibit Plaintiffs'
24   226 is denied.
25           While I said in my Motion in Limine opinion that

1  it was conceivable that evidence of Treasury's negotiating
2  position could provide -- you all can be seated -- could
3  provide some insight into whether FHFA, in fact, negotiated
4  the Third Amendment in accordance with shareholders'
5  reasonable expectations, there is no reason to believe that
6  this Deputy Assistant Secretary's brief remark in an email
7  would actually reflect on the Treasury's negotiating
8  position or that his individual position would ever have
9  even been communicated to the FHFA in the course of the
10 negotiations.
11         It's not like a statement from the Secretary or
12 someone who we know was actively involved in the
13 negotiations.  Even if the email were of some limited
14 relevance to FHFA's motive, I find that relevance is
15 substantially outweighed by risk of jury confusion because
16 the jury might not understand the relationship between a
17 mid-level Treasury official's beliefs and FHFA's motives.
18         And by risk of wasting time and needlessly
19 presenting cumulative evidence, there's plenty of evidence
20 of Treasury's overall position in the record.  So
21 Plaintiffs' 236 will not be admitted.  If defendants had
22 persisted in trying to present Bowler's deposition, I might
23 have a different reaction, but plaintiff having withdrawn
24 that, it's my final ruling.
25         Off the record.  Then I'll talk to counsel about

```
                    BEFORE THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF COLUMBIA


   FAIRHOLME FUNDS, INC., et al.,    .
                                     .
            Plaintiffs,              .
                                     .  Case Number 13-cv-1053
       vs.                           .
                                     .
   FEDERAL HOUSING FINANCE AGENCY,   .
   et al.,                           .
                                     .
            Defendants.              .
   - - - - - - - - - - - - - - - -
   In re FANNIE MAE/FREDDIE MAC      .  Case Number 13-mc-1288
   SENIOR PREFERRED STOCK PURCHASE   .
   AGREEMENT CLASS ACTION            .  Washington, D.C.
   LITIGATIONS.                      .  October 26, 2022
   - - - - - - - - - - - - - - - -     1:54 p.m.


              TRANSCRIPT OF JURY TRIAL, AFTERNOON SESSION
                BEFORE THE HONORABLE ROYCE C. LAMBERTH
                    UNITED STATES DISTRICT JUDGE

   APPEARANCES:

   For Berkley Plaintiffs:      BRIAN BARNES, ESQ.
                                Cooper & Kirk, PLLC
                                1523 New Hampshire Avenue Northwest
                                Washington, D.C. 20036

   For Class Plaintiffs:        LEE RUDY, ESQ.
                                ERIC ZAGAR, ESQ.
                                Kessler Topaz Meltzer & Check, LLP
                                280 King of Prussia Road
                                Radnor, Pennsylvania 19087

                                HAMISH HUME, ESQ.
                                SAMUEL KAPLAN, ESQ.
                                KENYA DAVIS, ESQ.
                                Boies Schiller Flexner LLP
                                1401 New York Avenue Northwest
                                Washington, D.C. 20005


                          -- continued --
```

1  documents that we thought were important, and we tried to get
2  them all in in one motion.  And the reason we did it was because
3  if we needed a witness, we have to go through the Touhy process.
4  So we tried to do it en masse and without a whole lot of nuance,
5  as Your Honor noted, document by document.
6      It is not inconsistent with that to say, you know what,
7  many of these documents actually come in as state of mind.
8  There's nothing inconsistent about that.  This is state of mind.
9      Two points on this very well described series of chains in
10 the link of communication.  This could be completely fabricated.
11 It could be made up by a fairy monster.  It doesn't matter.
12 What matters is that Mr. Parrot says "exactly right on substance
13 and intent."
14     Now, lest it be confusing --
15         THE COURT:  If Mr. Parrot was at Treasury, it might
16 have some more impact.
17     I will sustain the objection.  He's thinking he knows what
18 Treasury thinks.  Somebody at Treasury needs to tell me what
19 they think, not Mr. Parrot.
20         MR. HUME:  We would submit he's Treasury's boss, but
21 we respectfully --
22         THE COURT:  He's not Treasury's boss.  He's a flunky
23 at the White House.  I know he might not like me saying it that
24 way, but he works at the White House.  The secretary works --
25         MR. HUME:  Understood, Your Honor.

1           THE COURT: I'm sorry I called him a flunky. He's
2 just a staff member at the White House. He's nobody's boss.
3           MR. HUME: Understood.
4      Your Honor, that concludes the issues on the exhibits.
5 There's one other loose end on plaintiffs' case-in-chief, which
6 is during -- and I don't think we need to resolve it now but
7 just to identify it.
8      During Mr. DeMarco's testimony, I asked him if he had
9 plans; the plans involved legislation. I asked him, Did you
10 really think it could pass in 2012, President Obama in the White
11 House and Republicans in the House? And he quite definitely
12 said there was legislation that passed, and he said it passed
13 the Senate Banking Committee.
14      And the question was about 2012. We think it was an error,
15 and we checked. There is no legislation that passed in 2012.
16      We ask defendants to correct the record.
17           THE COURT: I thought maybe he meant out of committee.
18           MR. HUME: What he was talking about was something
19 that happened in 2014. There's no dispute. Defendants have
20 said that was what he was referring to. But the testimony came
21 in as 2012.
22      I think the solution may be that we seek judicial notice
23 that nothing came out of committee in '12, in 2012. My
24 colleague, Mr. Kaplan, has been dealing with this. And I think
25 we're trying to work something out cooperatively.

```
 1                    BEFORE THE UNITED STATES DISTRICT COURT
                            FOR THE DISTRICT OF COLUMBIA
 2

 3      FAIRHOLME FUNDS, INC., et al.,    .
                                          .
 4             Plaintiffs,                .
                                          .  Case Number 13-cv-1053
 5         vs.                            .
                                          .
 6      FEDERAL HOUSING FINANCE AGENCY,   .
        et al.,                           .
 7                                        .
               Defendants.                .
 8      - - - - - - - - - - - - - - - - -
        In re FANNIE MAE/FREDDIE MAC      .  Case Number 13-mc-1288
 9      SENIOR PREFERRED STOCK PURCHASE   .
        AGREEMENT CLASS ACTION            .  Washington, D.C.
10      LITIGATIONS.                      .  October 28, 2022
        - - - - - - - - - - - - - - - -     10:09 a.m.
11

12                 TRANSCRIPT OF JURY TRIAL, MORNING SESSION
                      BEFORE THE HONORABLE ROYCE C. LAMBERTH
13                         UNITED STATES DISTRICT JUDGE

14      APPEARANCES:

15      For Berkley Plaintiffs:       BRIAN BARNES, ESQ.
                                      Cooper & Kirk, PLLC
16                                    1523 New Hampshire Avenue Northwest
                                      Washington, D.C. 20036
17
        For Class Plaintiffs:         LEE RUDY, ESQ.
18                                    ERIC ZAGAR, ESQ.
                                      Kessler Topaz Meltzer & Check, LLP
19                                    280 King of Prussia Road
                                      Radnor, Pennsylvania 19087
20
                                      HAMISH HUME, ESQ.
21                                    SAMUEL KAPLAN, ESQ.
                                      KENYA DAVIS, ESQ.
22                                    Boies Schiller Flexner LLP
                                      1401 New York Avenue Northwest
23                                    Washington, D.C. 20005

24

25                          -- continued --
```

1      we can understand all of what we're talking about.
2              Thank you, Your Honor.  Court's indulgence for just a
3      moment.
4              Just to orient the Court, Your Honor, this is a document
5      that's already in evidence, and this is a document that
6      plaintiffs have highlighted several times.  And it's an e-mail
7      chain back and forth three days before the Third Amendment was
8      signed, and the sender of the original e-mail is Mr. Jim Griffin
9      and recipient is the witness, Mr. Satriano.  Mr. Griffin, as
10     Mr. Satriano just testified, was one of his deputies, and it's a
11     back and forth between them.
12             So the top-most e-mail is the one we were talking about at
13     the last objection.  Mr. Satriano has already testified as to
14     his understanding of the first few sentences of this e-mail.
15     And the point where there was an objection before we took the
16     break, Your Honor, is about three or four lines down in the
17     first e-mail.  I'm going to ask Mr. Salazar to highlight it just
18     so we can see what we're talking about, Your Honor.
19             And so, Your Honor, the sentence that we're talking about
20     is the one that's being highlighted now.  "I do not think that
21     makes sense, given the amendments are designed to demonstrate
22     wind-down."
23             The question I asked the witness is, What did you
24     understand Mr. Griffin to mean by that?  And I believe the
25     objection was that it called for speculation.

```
 1            I'm not asking the witness to speculate as to what
 2   Mr. Griffin meant.  I'm asking the witness what his
 3   understanding was at the time as the recipient of this e-mail.
 4            Again, this is a document that plaintiffs have shown to the
 5   jury over and over again and have characterized that this means
 6   Mr. Satriano was the recipient of this e-mail, and Mr. Griffin's
 7   boss at the time, and the jury is obviously entitled to know
 8   what Mr. Satriano understood this to mean at the time.
 9            THE COURT:  I understand.  Just rephrase your question
10   that way.
11            MR. HOFFMAN:  I will, Your Honor, as to what
12   Mr. Satriano understood this to mean at the time.
13            THE COURT:  That's fine.
14            MR. HOFFMAN:  Thank you, Your Honor.
15       (End of bench conference.)
16            THE COURT:  The jury is on its way.
17       (Jury entered courtroom.)
18            THE COURT:  You may be seated.
19       Counsel, you may proceed.
20            MR. HOFFMAN:  Thank you, Your Honor.
21            BY MR. HOFFMAN:
22   Q.   If I could ask Mr. Salazar to display Plaintiff's Exhibit
23   259, which again is in evidence, and this is the document we
24   were looking at before we took a break.
25       Okay.  So just to reorient us, Mr. Satriano, you recall I
```

1   was asking you some questions about this e-mail exchange.  And
2   this was a back and forth between you and Mr. Griffin; right?
3   A.   Yes.
4   Q.   And Mr. Griffin worked for you at the time or worked under
5   you?
6   A.   Yes.
7   Q.   And this e-mail back and forth happened on August 14th,
8   2012, and that was three days before the Third Amendment was
9   signed?
10  A.   Yes.
11  Q.   So in this top-most e-mail, I already asked you some
12  questions about the first few sentences.  Before we took the
13  break, I asked you to focus on the sentence that we have
14  highlighted here where Mr. Griffin says, "I do not think that
15  makes sense, given the amendments are designed to demonstrate
16  wind-down."
17       What did you understand this to mean at the time?
18  A.   At the time I understood this to mean -- well, he thought
19  there were two things that weren't consistent.  And one of the
20  features of the Third Amendment that will be disclosed shortly,
21  right, so Jim knew, a lot of other people, Fannie Mae did not
22  know yet, was that one of the components of it was to accelerate
23  the wind-down of their asset portfolio, alternatively known as
24  retained portfolio or mortgage portfolio.
25       Indirectly, if you have a smaller portfolio, smaller

1  earnings, most likely lower profitability.  That is what I
2  understood him to be meaning when he said it doesn't make sense.
3  Q.   So the Third Amendment had a net worth sweep component, and
4  it also had this component that talked about an accelerated
5  reduction in the retained portfolio; is that correct?
6  A.   Yes.
7  Q.   And so what you were just testifying about a moment ago was
8  the accelerated reduction part of the Third Amendment?
9  A.   Yes.
10 Q.   And the wind-down of those assets?
11 A.   Right.
12 Q.   And you didn't understand this sentence to mean at the time
13 shutting the companies altogether; right?
14 A.   Not at all.  The purpose of the Third Amendment was to put
15 them into preserve and conserve assets and put them in a safe
16 and sound position to meet their mission.
17 Q.   And to preserve and conserve the Treasury commitment?
18 A.   Yes.
19 Q.   Now, you can take that down, Mr. Salazar.
20      Now, the Third Amendment was signed a few days later on
21 August 17th, 2012; right?
22 A.   Yes.
23 Q.   And in the weeks that followed, did you discuss anything
24 about Fannie Mae's deferred tax assets with Susan McFarland?
25 A.   Yes, I did.