# EXHIBIT H



# A Strategic Plan for Enterprise Conservatorships:

## The Next Chapter in a Story that Needs an Ending

**February 21, 2012**

FHFA 2682



EXHIBIT 18

DeMarco

5-7-15 RLS

PENGAD 800-631-6989

## *Summary*

Since establishing conservatorships for Fannie Mae and Freddie Mac (the Enterprises) in 2008, the Federal Housing Finance Agency (FHFA) and the Enterprises have focused on three key goals:

- mitigating Enterprise losses, which ultimately accrue to taxpayers;
- ensuring families have access to mortgages to buy a home or refinance an existing mortgage; and
- offering borrowers in trouble on their mortgage an opportunity to modify their loan or otherwise avoid foreclosure.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations. It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today. In particular, with the conservatorships operating for more than three years and no near-term resolution in sight, it is time to assess the goals and directions of the conservatorships.

This assessment has been made in light of FHFA's statutory mandate to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition." FHFA also needs to make sure strategic decisions about the Enterprises' future are in accord with the statutory purpose of the conservator for "reorganizing, rehabilitating, or winding up the affairs of a regulated entity."

This strategic plan outlines the steps FHFA has taken and will be taking to address these challenges. The plan sets forth three strategic goals for the next phase of conservatorship:

1.    **Build.**  Build a new infrastructure for the secondary mortgage market.

2.    **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3.    **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

The strategic plan explores each of these goals and identifies particular actions FHFA is contemplating, or already taking, to accomplish them.

The first goal – building a new infrastructure – recognizes that the country would be without a secondary market for non-government-insured mortgages without the Enterprises. No private sector infrastructure exists today that is capable of securitizing the $100 billion per month in new mortgages being originated. Simply shutting down the Enterprises would drive up interest rates and limit mortgage availability. This goal establishes the steps FHFA and the Enterprises will take to create that necessary infrastructure, including a securitization platform and national

2

FHFA 2683

standards for mortgage securitization that Congress and market participants may use to develop the mortgage market of the future.

The second goal – contracting Enterprise operations – describes steps that FHFA plans to take to gradually shift mortgage credit risk from the Enterprises to private investors and eliminate the direct funding of mortgages by the Enterprises.  This goal is consistent with the fundamental goals of the conservatorship, of the Enterprises operating in a sound and solvent condition, and of limiting future risk exposure in the face of uncertainty.

The third goal – maintaining foreclosure prevention efforts and credit availability – recognizes that the work begun three years ago is not finished.  Programs and strategies to ensure ongoing mortgage credit availability, assist troubled homeowners, and minimize taxpayer losses while restoring stability to housing markets continue to require energy, focus, and resources.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future.  Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;
- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here.  The managers and staff at each company also have critical roles to play since the numerous activities and changes necessary to accomplish the strategic goals will require substantial effort by many people at Fannie Mae and Freddie Mac.

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and real estate owned (REO) disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of the story, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the

3

FHFA 2684

Enterprises. This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers. Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters and set forth a vision for a new secondary market structure.

One critical point: The steps envisioned in this strategic plan are consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by the U.S. Department of the Treasury and the U.S. Department of Housing and Urban Development as well as with the leading congressional proposals introduced to-date. This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

4

FHFA 2685

# A Strategic Plan for Enterprise Conservatorships:

# The Next Chapter in a Story that Needs an Ending

## Introduction

The Housing and Economic Recovery Act of 2008 (HERA), which created the Federal Housing Finance Agency (FHFA), granted the Director of FHFA discretionary authority to appoint FHFA conservator or receiver of the Enterprises "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity."[1]

On September 6, 2008, well over three years ago, FHFA exercised that authority, placing the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (together, the Enterprises) into conservatorships. FHFA has since overseen the largest, most complex conservatorships in history.

Two years ago, FHFA sent Congress a letter setting forth the agency's understanding of its conservatorship obligations and how it planned to fulfill those obligations. It is time to update and extend that plan in view of the status of the Enterprises and the country's housing system today.

The two companies have received more than $180 billion in taxpayer support. The benefit to the country from maintaining their operations has been to ensure the secondary mortgage market continues to function. During this time, the Enterprises have completed more than 2 million foreclosure prevention actions, including more than 1 million loan modifications and they have refinanced more than 10 million mortgages. Together they are guaranteeing roughly $100 billion per month in new mortgage production, representing about 3 of every 4 mortgages being originated. But the Enterprises' ongoing operations are entirely dependent on taxpayer support provided through the Senior Preferred Stock Purchase Agreements with the U.S. Department of the Treasury.

The future of the Enterprises and the housing finance system continues to be the subject of many questions and much debate. A new structure for housing finance requires congressional action,

---

[1] Housing and Economic Recovery Act of 2008, Section 1367 (a)(2), amending the Federal Housing Enterprises Financial Safety and Soundness Act, 12 USC 4617(a)(2).

5

FHFA 2686

but no clear legislative consensus has emerged from the Administration or Congress.  In the meantime, like other large, complex financial institutions, the Enterprises require strategic direction though they face an uncertain future.  Market participants are also seeking answers about the future.

This strategic plan provides lawmakers and the public with an outline for how FHFA as conservator intends to guide the Enterprises over the next few years.  FHFA has developed this plan because of the following:

- The Enterprises' boards of directors and management teams can more readily fulfill the goals of conservatorship with a clear and transparent course of action.
- As investors in the Enterprises today, taxpayers deserve a plan on how their continued support will be used.
- Proposals for rebuilding the secondary mortgage market vary in their reliance on government credit guarantees but most assume some sort of securitization infrastructure to take the place of the Enterprises or assume the Enterprises' securitization infrastructures are used in some way in the future.
- Lawmakers have asked FHFA for ideas on a stable transition from a secondary market dominated by the Enterprises to one that could operate without them.
- FHFA committed to provide a strategic plan for the next stage of the conservatorships in response to a request from the Chairman of the House Financial Services Subcommittee on Oversight and Investigations in December 2011.

As with any strategic plan, this document is not a step-by-step guide.  Rather, it sets forth certain broad objectives that are consistent with FHFA's legal mandate and the policy direction that has emerged from the Administration and Congress.  Importantly, this plan is consistent with each of the housing finance reform frameworks set forth in the white paper produced last year by Treasury and the U.S. Department of Housing and Urban Development (HUD) and with the leading congressional proposals introduced to-date.  This plan envisions actions by the Enterprises that will help establish a new secondary mortgage market, while leaving open all options for Congress and the Administration regarding the resolution of the conservatorships and the degree of government involvement in supporting the secondary mortgage market in the future.

FHFA remains committed to its obligation to ensure a stable and liquid secondary mortgage market while preserving and conserving Enterprise assets to minimize taxpayer losses.  FHFA looks forward to continuing to work with Congress and the Administration on a resolution of the conservatorships and a comprehensive review of the country's housing finance system.

6

FHFA 2687

## Background:  The Early Chapters of the Conservatorship Story

### The Law

As conservator and regulator, FHFA has three legal obligations that direct the agency's activities and decisions involving the Enterprises.

First, HERA specified two conservator powers, stating that the agency may "take such action as may be

(i)      necessary to put the regulated entity in a sound and solvent condition; and

(ii)     appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity."[2]

FHFA has reported on numerous occasions that, with taxpayers providing the capital supporting Enterprise operations, this "preserve and conserve" mandate directs FHFA to minimize losses on behalf of taxpayers.

Second, although each Enterprises is in conservatorship, without statutory changes their mission of supporting a stable and liquid mortgage market remains the same as before the conservatorships.  FHFA has a statutory responsibility to ensure each Enterprise "operates in a safe and sound manner"[3] and that "the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets."[4]

Third, under the Emergency Economic Stabilization Act of 2008 (EESA), FHFA has a statutory responsibility to "implement a plan that seeks to maximize assistance for homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of … available programs to minimize foreclosures."[5]

---

[2] 12 USC 4617(b)(2)(D)

[3] 12 USC 4513(a)(1)(B)(i)

[4] 12 USC 4513(a)(1)(B)(ii)

[5] 12 USC 5220(b)(1)

7

**Conservatorship Goals**

In 2008, the immediate objectives of conservatorship were to help restore confidence in the companies, enhance their capacity to fulfill their mission, and mitigate the systemic risk that contributed directly to instability in financial markets. Because the private mortgage securitization market had already retreated and there were no other effective secondary market mechanisms in place, the Enterprises' continued operations were necessary for most Americans to obtain a mortgage or refinance an existing mortgage.

Since 2008, several government efforts have kept the country's housing finance system functioning, including:

- the Treasury Department's financial backstop of Enterprise debt and mortgage-backed securities (MBS);
- Treasury's and the Federal Reserve's MBS purchases;
- FHFA's and the Enterprises' actions to ensure the continued functioning of the secondary mortgage market; and
- the Federal Housing Administration's (FHA) rapidly growing market presence.

As a result, credit has remained available, albeit with more restrictive underwriting terms, and more than 10 million Americans have refinanced Fannie Mae and Freddie Mac mortgages.

During these years, these same government agencies together with the Enterprises and other market participants undertook a series of efforts to help families avoid foreclosure through loan modification programs and foreclosure alternatives. For FHFA and the Enterprises, these efforts directly relate to the "preserve and conserve" mandate because such activities are designed to reduce credit losses on mortgages originated primarily in the years before conservatorship. In addition, these efforts are consistent with FHFA's other mandates, including the EESA mandate to maximize assistance for homeowners. Since conservatorship began, the Enterprises have completed more than two million foreclosure prevention actions, including more than one million loan modifications.

Today, loss mitigation efforts focus on helping households as early as possible when they become delinquent on their mortgages, and employing innovative strategies for returning foreclosed properties back to the market. The continued high level of mortgage delinquencies shows that more is left to do, but several programs now exist to address these challenges. FHFA and the Enterprises will remain vigilant in ensuring that appropriate assistance and support is offered to all homeowners in distress through loan modifications and other foreclosure avoidance tools.

Three years into conservatorship, it is time to update and extend the goals of conservatorship in light of FHFA's statutory mandate and the market environment that has evolved since 2008. As noted, the operations of the Enterprises in conservatorship are unlike anything the country has experienced. The conservatorship structure was designed to allow a temporary period for an institution to stabilize and return to the market or to lead to an orderly disposition of a firm.

8

**PX-0154 - p. 8 of 21**

Unlike the banking industry, there are not thousands of potential firms ready to step into the business of mortgage securitization. Indeed, outside of the securitization available through the Government National Mortgage Association (Ginnie Mae) for loans primarily backed by FHA, there is little else in place today to assume the secondary market functions served by the Enterprises.

### What Needs to Be Done Now

Policymakers need to address the future structure of housing finance, which would allow for a smooth transition from today's market. Without action by Congress, FHFA must continue to look to the existing statutory provisions that guide the conservatorships. In particular, FHFA must consider what it means to "take such action as may be necessary to put [Fannie Mae and Freddie Mac] in a sound and solvent condition" when it is clear that the draws the companies have taken from the Treasury are so large they cannot be repaid under any foreseeable scenarios.

Without further statutory direction, FHFA views the mandate to restore the Enterprises to a sound and solvent condition as best accomplished not only through aggressive loss mitigation efforts, but also by reducing the risk exposure of the companies, through appropriate underwriting and pricing of mortgages. Such actions are consistent with what would be expected of a private company operating without government support. At the same time, the unanticipated length of the conservatorships poses additional risks for taxpayers and markets not contemplated by HERA. FHFA views those risks as best managed by contracting the Enterprises' footprint in the marketplace.

To achieve these outcomes, FHFA will need to make strategic decisions regarding the Enterprises' level of participation in the market while developing ways for the taxpayers to ultimately derive value, consistent with FHFA's "preserve and conserve" mandate.

## Reviewing the Existing Landscape:  Considerations for Moving Forward

In view of FHFA's statutory mandates and in light of the current environment, it is necessary to define new goals for the Enterprises operating in conservatorship. Key issues and circumstances FHFA faces include the following:

- The Enterprises' losses are of such magnitude that the companies cannot repay taxpayers in any foreseeable scenario.

- The operational infrastructures at each company are working but require substantial investment to support future business. The question is whether to improve the current infrastructure or to consider this an opportunity to build something new.

9

FHFA 2690

- In the absence of other comparable market infrastructure, minimizing future taxpayer losses and ensuring market liquidity and stability requires preserving the Enterprises as working companies. But some of the things this approach requires, such as retaining some semblance of private sector pay comparability, have generated concerns because the companies receive substantial taxpayer assistance.

- Although the housing finance system cannot be called healthy, it is stable and functioning, albeit with substantial ongoing government support.

- Congress and the Administration have not reached consensus on how to resolve the conservatorships and define a path for housing finance. Legislative proposals have begun to emerge, but enactment soon appears unlikely.

Absence of consensus on a resolution of the conservatorships does not imply a lack of consensus on general direction. Both the Administration and Congress have expressed discomfort with the level of government involvement in the mortgage market and a desire for greater private sector participation and risk-taking. A central issue remains: whether a government guarantee is essential to a functioning mortgage market. On other market issues, some consensus has emerged on what is needed to fix the problems we have witnessed over the past several years. At a minimum there is a desire for greater standardization and more equitable and transparent treatment of borrowers and investors in mortgage origination, mortgage servicing, and securities disclosure.

Over the past two years, FHFA has initiated several long-term improvements to the housing finance system that address shortcomings in the current system, meet the goal of reducing taxpayer exposures, and provide flexibility for lawmakers as they move toward legislative action on housing finance. These improvements include the following:

- The Uniform Mortgage Data Program will improve the consistency, quality, and uniformity of data collected at the beginning of the lending process. Developing standard terms, definitions, and industry standard data reporting protocols will decrease costs for originators and appraisers and reduce repurchase risk. It will allow new entrants to use industry standards rather than having to develop their own proprietary data systems to compete with other systems already in the market. Common data definitions, electronic data capture, and standardized data protocols will improve efficiency, lower costs and enhance risk monitoring. Standardizing data will be a key building block of housing finance reform.

- The Joint Servicing Compensation Initiative is considering alternatives for future mortgage servicing compensation for single-family mortgage loans. The goals of any changes to the current Enterprise model of compensation will be improving service for borrowers, reducing financial risk to servicers, and providing flexibility for guarantors to better manage non-performing loans, while promoting continued liquidity in the "To Be Announced" mortgage securities market. More broadly, the goals of the initiative are to consider changes to the servicing compensation structure that would improve competition

10

FHFA 2691

in the market for mortgage servicing and which could be replicated across any form of housing finance reform.

- The <u>Servicing Alignment Initiative</u> has produced a single, consistent set of protocols for servicing Enterprise mortgages from the moment they first become delinquent. This initiative responds to concerns about how delinquent mortgages have been serviced and it simplifies the rules for mortgage servicers by giving them just one set of procedures to follow whether a mortgage is owned by Fannie Mae or Freddie Mac. The first phase of this initiative has already been implemented. Developed in consultation with the federal banking agencies and state attorneys general, the new requirements could serve as the basis for establishing broad national mortgage servicing standards.

- The <u>Loan-Level Disclosures Initiative</u> will produce loan-level investor disclosures on Enterprise MBS, both at the time of origination and throughout a security's life. Improving MBS disclosures will help establish consistency and quality of data. With better information, private investors can efficiently measure and price mortgage credit risk, which will likely be a hallmark of any form of housing finance reform.

## Writing the Next Chapter:  Setting the Strategic Goals

Looking ahead, three broad goals will define the focus of the conservatorships for the next few years:

1. **Build.**  Build a new infrastructure for the secondary mortgage market.

2. **Contract.**  Gradually contract the Enterprises' dominant presence in the marketplace while simplifying and shrinking their operations.

3. **Maintain.**  Maintain foreclosure prevention activities and credit availability for new and refinanced mortgages.

Achieving these strategic goals will fulfill the legal requirements Congress assigned FHFA as conservator and also prepare the foundation for a new, stronger housing finance system in the future. Although that future may not include Fannie Mae and Freddie Mac, at least as they are known today, this important work in conservatorship can be a lasting, positive legacy for the country and its housing system.

Properly implemented, this strategic plan should benefit:

- Homeowners, by ensuring continued emphasis on foreclosure prevention and credit availability;

11

FHFA 2692

- Taxpayers, by furthering efforts to limit losses from past activities while simplifying risk management and reducing future risk exposure;
- Market participants, by creating a path by which the Enterprises' role in the mortgage market is gradually reduced while maintaining market stability and liquidity; and
- Lawmakers, by building a foundation on which they may develop new legal frameworks and institutional arrangements for a sound and resilient secondary mortgage market of the future.

***Strategic Goal 1:*** **Building a New Infrastructure**

The absence of any meaningful secondary mortgage market mechanisms beyond the Enterprises and Ginnie Mae is a dilemma for policymakers expecting to replace the Enterprises. This fact was a key motivation for the conservatorships and for the Treasury support agreements in the first place. Without an alternative market infrastructure that investors could rely on, new mortgages would have been largely unavailable if the Enterprises suddenly had been shut down.

The elements for rebuilding the market system are known and work on them can begin without knowing whether there will be a government guarantee apart from FHA in the mortgage market of the future. In fact, the four initiatives FHFA and the Enterprises have already begun would be essential to any new infrastructure.

A secondary mortgage market infrastructure without Fannie Mae and Freddie Mac would likely include the following elements:

- A framework to connect capital markets investors to homeowners – specifically, a securitization platform that bundles mortgages into any of an array of securities structures and provides all the operational support to process and track the payments from borrowers through to the investors.

- A standardized pooling and servicing agreement that replaces the Enterprises' current Servicer Participation Agreement and corrects the many shortcomings found in the pooling and servicing agreements used in the private-label MBS market before the housing bubble burst.

- Transparent servicing requirements that set forth requirements for mortgage servicers' responsibilities to borrowers and investors across a spectrum of issues including delinquent loan servicing, solicitation for refinance or loan modifications, and servicing transfers.

- A servicing compensation structure that promotes competition for, rather than concentration of, mortgage servicing. Such a structure would take full account of

12

FHFA 2693

mortgage servicers' costs and requirements, and consider the appropriate interaction between origination and servicing revenue.

- Detailed, timely, and reliable loan-level data for mortgage investors at the time a security is issued and throughout the life of the security. Such transparency is a prerequisite for private capital to bear a meaningful portion of mortgage credit risk.

- A sound, efficient system for document custody and electronic registration of mortgages, notes, titles, and liens that respects local property laws but also enhances the liquidity of mortgages so that borrowers may benefit from a liquid secondary market for buying and selling mortgages. Such a system should be especially attuned to privacy and security issues while providing full transparency where required by law or in the interest of borrowers.

- An open architecture for all these elements, to facilitate entry to and exit from the marketplace and an ability to adapt to emerging technologies and legal requirements over time.

<u>Securitization Platform</u>

Beyond the initiatives FHFA and the Enterprises have begun, a cornerstone to building for the future is a new securitization platform. While competing securitization platforms may emerge in the future, back-office operations arguably lend themselves to a public utility construct, at least in the early stages of building a new secondary mortgage market infrastructure. The economies of scale are substantial as are the potential market benefits of standardization to a single securitization platform. Neither Enterprise has a securitization infrastructure capable of becoming a market utility today. Taking on that role would require substantial investment of both human capital and information technology resources.

Both Enterprises would have to draw from the American taxpayer to make such a long-term infrastructure investment, so it makes more sense to do this only once. FHFA will determine how Fannie Mae and Freddie Mac can work together to build a single securitization platform that would replace their current separate proprietary systems.

In the intermediate term, a single platform would allow for a single mortgage-backed security. Accomplishing this objective will take time. FHFA and the Enterprises will provide market participants with ample time to adjust to the new structure in order to minimize disruptions and uncertainty. Ensuring, indeed enhancing, liquidity for mortgage-backed securities will be a central objective.

For the platform to have long-term value, it should have an open architecture that will permit multiple future issuers of mortgage-backed securities to access the platform and it should be flexible enough to permit a wide array of securities and mortgage structures. Since this platform could become a type of public utility (in effect) that would outlast the Enterprises as we know them today, input from all market stakeholders will be sought.

13

PX-0154 - p. 13 of 21

The intended outcome of such an important infrastructure investment is to provide a sound securitization platform on which to rebuild the country's secondary mortgage market. The platform itself will be one way American taxpayers realize a return on their substantial investment in the Enterprises while also making it possible to retire the Enterprises' proprietary systems and programs from the marketplace. The platform will be designed to issue securities supported with or without a government guarantee.

Pooling and Servicing Agreements

Beyond building the operational infrastructure to issue mortgage-backed securities, building for the future also requires developing and implementing standards for underwriting, disclosures, servicing and other considerations. Creating a robust and standardized pooling and servicing agreement is key. The strategic goal is to learn from the Enterprises' existing practices and the shortcomings identified in the private-label mortgage-backed securities market and to solicit broad public input to build a better standard for the future. Input from investors and a careful review of applicable Securities and Exchange Commission rules and best practices will be essential.

As with the securitization platform, the goal is not to rebuild Fannie Mae and Freddie Mac but rather to leverage the experience and human capital expertise at these firms to build a new infrastructure for the future. The goal is not a proprietary system but rather an open system that promotes competition and transparency while forming a basis for a stable, liquid, and efficient secondary mortgage market.

Developing these standards will not only correct past problems, it will make the existing system better. We know how past shortcomings have harmed borrowers and investors. Since the point of a secondary mortgage market is to operate an infrastructure that most efficiently brings investor capital to individual families seeking to finance a home, standards must be more transparent and accessible for both of these "end-users."


***Strategic Goal 2:*** **Contracting Enterprise Operations**

Since entering conservatorship in September 2008, Fannie Mae and Freddie Mac have bought or guaranteed roughly three of every four mortgages originated in the country. Mortgages guaranteed by FHA make up most of the rest. Reducing the Enterprises' position in the marketplace and doing so in a safe and sound manner, in the absence of other comparable private-sector players operating in this market, is the second strategic goal.

The Enterprises operate three lines of business: a single-family mortgage credit guarantee business, a multifamily mortgage credit guarantee business, and a capital markets business that finances single-family and multifamily mortgages by issuing debt securities in the capital markets.

14

<u>Single-Family Credit Guarantees</u>

The first strategic goal sets forth a plan for moving away from each company's proprietary securitization platform but it does not address the mortgage credit insurance business. It is that business for which the securitization platform provides the architecture for delivering the Enterprise guarantee to investors. Establishing a path for shifting mortgage credit risk from the Enterprises (and, thereby, taxpayers) to private investors is central to the second goal.

Gradually shifting mortgage credit risk from Fannie Mae and Freddie Mac to private investors could be accomplished in several ways. The following are under consideration or already being implemented:

- <u>Increase guarantee fee pricing.</u> Continued gradual increases in the Enterprises' guarantee fee (or, g-fee) pricing may move their pricing structure closer to the level one might expect to see if mortgage credit risk was borne solely by private capital. In September 2011, FHFA announced its intention to continue a path of gradual price increases based on risk and the cost of capital. In December 2011, in the Temporary Payroll Tax Cut Continuation Act of 2011, Congress directed FHFA to increase guarantee fees by at least an average of 10 basis points and further directed that FHFA consider the cost of private capital and the risk of loss in setting guarantee fees. Congress also encouraged FHFA to require guarantee fee changes that reduce cross-subsidization of relatively risky loans and eliminate differences in fees across lenders that are not clearly based on cost or risk.

- <u>Establish loss-sharing arrangements.</u> Most Enterprise mortgage securitization yields securities fully guaranteed by the Enterprises. Alternative securities structures could result in private investors bearing some or all of the credit risk. FHFA is considering various approaches, including senior-subordinated security structures.

- <u>Expand reliance on mortgage insurance.</u> As required by law, most mortgages purchased or guaranteed by the Enterprises with less than 20 percent borrower equity in the property have private mortgage insurance in the first-credit-loss position. While some mortgage insurers are facing financial challenges as a result of housing market conditions, others may have the capital capacity to insure a portion of the mortgage credit risk currently retained by the Enterprises. This could be accomplished through deeper mortgage insurance coverage on individual loans or through pool-level insurance policies.

<u>Multifamily Credit Guarantees</u>

Unlike the single-family credit guarantee business, each Enterprise's multifamily business has weathered the housing crisis and generated positive cash flow. In contrast to their common approach to their single-family businesses, Fannie Mae and Freddie Mac do not take the same approach to their multifamily businesses. For a significant portion of its business, Fannie Mae shares multifamily credit risk with loan originators through its delegated underwriting program. For a significant and increasing portion of its business, Freddie Mac shares multifamily credit

15

FHFA 2696

risk with investors by issuing classes of securities backed by multifamily mortgages where the investor bears the credit risk. Both approaches are broadly accepted in the marketplace.

Rising rental rates and declining vacancy and delinquency rates reflect, in part, the shift of some households from home ownership to renting as well as other demographic trends. The demand for Enterprise employees with expertise in this specialized market is also strong; both companies have lost key personnel to other market participants.

Multifamily lending has played an important role in how the Enterprises have fulfilled past affordable housing mandates, but the activity itself is more akin to other commercial real estate lending than to the Enterprises' single-family businesses. In conservatorship, the Enterprises have seen their market share grow in the multifamily sector but they do not dominate that market as they do in single-family.

Given these conditions, generating potential value for taxpayers and contracting the Enterprises' multifamily market footprint should be approached differently from single-family, and it may be accomplished using a much different and more direct method. To evaluate how to accomplish the second strategic goal in the multifamily business, each Enterprise will undertake a market analysis of the viability of its multifamily operations without government guarantees. This will require market reviews of their respective business models and the likely viability of those models operating on a stand-alone basis after attracting private capital and adjusting pricing, if needed, to attract and retain that capital.

Capital Markets

Before conservatorship, many Enterprise observers and analysts thought capital market activities to be each company's source of greatest profits, controversy and risk. With the numerous subsidies inherent in the government-sponsored enterprise (GSE) charters granted by Congress, the Enterprises have long been able to borrow money in the capital markets by issuing debt securities at interest rates approaching those of Treasury securities. They did this not by virtue of their financial strength and strong capital base, but because of a broad perception in the marketplace that the government would not let the companies default on their obligations. With this borrowing advantage, which was unavailable to other investors, the Enterprises issued debt to buy mortgages, including their own MBS, in competition with private investors.

The Enterprises fund their retained portfolios through their capital markets operations, which need to continually monitor and hedge the interest rate risk inherent in mortgages, including the risk that changing interest rates could lead to either sudden mortgage prepayments or a slowdown in mortgage prepayments. Interest rate risk overwhelmed the savings and loan industry in the 1980s and made Fannie Mae technically insolvent in the early 1980s. Although capital markets operations were not the leading contributor to the losses that led the Enterprises into conservatorship and the accompanying taxpayer support, it remains a complex business activity requiring specialized and expert risk managers.

16

Today, this business line is already on a gradual wind-down path. The Treasury support agreements require the Enterprises to shrink their retained mortgage portfolios at a rate of 10 percent per year. Most mortgages the Enterprises add to their retained portfolios today are delinquent mortgages removed from their mortgage-backed securities. Each Enterprise also has certain legacy assets from before conservatorship, including private-label MBS, for which there is little or no liquidity in the marketplace. Thus, over time the Enterprises' retained portfolios are becoming smaller, but also less liquid.

Maximizing returns for taxpayers on the $1.4 trillion in mortgage assets currently owned and financed by the Enterprises is a key element of FHFA's mandate as conservator. The gradual wind-down of the retained portfolios since 2009 has led FHFA to consider strategic sales of assets that maximize value for the conservatorships. But depressed market prices for many of these assets, particularly when tied to market illiquidity rather than a permanent decline in asset value, argues for holding some of them for a longer period to minimize taxpayer loss.

In view of the need to retain capital market expertise to operate this business, accomplishing the second strategic goal for this line of business has two basic options: retain each company's in-house capital markets expertise to continue to manage these portfolios to maximize value while managing risk or retain a third-party investment firm(s) to manage each company's portfolio. The first is less disruptive but retains human capital risk, especially in view of proposed legislation on Enterprise compensation. The second option would hasten the shrinkage in Enterprise headcount but is likely to be the more costly, and it poses new control and oversight challenges for FHFA.

### *Strategic Goal 3:* **Maintaining Foreclosure Prevention Efforts and Credit Availability**

Amidst the building up and winding down activities defined by the first two strategic goals, there remains a critical third goal: ensuring ongoing stability and liquidity in the marketplace for new mortgages and mortgage refinancing, and continuing the critical tasks of foreclosure prevention and loss mitigation. This third goal has been central to the conservatorships since they began and it continues to be essential today.

Together, the Enterprises purchase or guarantee roughly $100 billion in home purchase and refinanced mortgages each month. Market confidence in the Enterprises' ongoing ability to provide this stable, liquid flow of mortgage-backed securities to investors is essential to stabilizing house prices and ensuring stability in the value of nearly $3.9 trillion in outstanding Enterprise mortgage-backed securities.

Other ongoing Enterprise activities that must be continued and enhanced include:

- Successful implementation of the Home Affordable Refinance Program (HARP), including the significant program changes announced in October 2011.

17

- Continued implementation of the Servicing Alignment Initiative, including its rigorous approach to loss mitigation through loan modifications and other means by reaching out to borrowers at the first signs of distress.

- Renewed focus on short sales, deeds-in-lieu, and deeds-for-lease options that enable households and the Enterprises to avoid foreclosure. The frictions and barriers to more successful use of these tools should be identified and removed using the same renewed focus brought to HARP last year. Enhanced use of these foreclosure avoidance tools may have important benefits for borrowers, neighborhoods, and taxpayers. Given the large backlog of pending foreclosures, renewed focus on these alternatives is a near-term priority.

- Further development and implementation of the real estate owned (REO) disposition initiative announced by FHFA last year. Adding creative strategies for placing foreclosed homes back into the marketplace, including efforts to convert properties into rental units, remains a promising path to reduce losses and to stabilize house prices and neighborhoods hit hard by the housing crisis.

Beyond these sensible strategies to assist homeowners and reduce taxpayer losses, achieving the third strategic goal will require FHFA and the Enterprises to work harder to resolve certain long-standing concerns in the marketplace that may be suppressing a more robust recovery and limiting credit availability. Each of these will be particularly challenging to resolve as they are essential to conservatorship efforts to minimize losses and to put the Enterprises in a more sound and solvent condition to manage the new business being taken on with taxpayer support.

First, representations and warranties are a long-standing means for enhancing liquidity in the mortgage origination process while protecting the Enterprises from loans not underwritten to prescribed standards. Representations and warranties are a loan originator's assurance to an Enterprise that a mortgage sold to the Enterprise has been underwritten as specified by contract, and, if that is found not to be the case, the originator undertakes responsibility for buying the loan back at par. Enforcing these claims ensures the Enterprises are compensated for losses that are the legal responsibility of another party. Still, such enforcement is costly and some have argued it has delayed market recovery because it led to new mortgage originations being underwritten to stricter standards than the Enterprises require.

FHFA and the Enterprises will respond to this market concern by aligning and making policies for representations and warranties more transparent (consistent with the first strategic goal). As noted earlier, a long-term goal associated with the Uniform Mortgage Data Program is to reduce representation and warranty risk through up-front monitoring of loan quality. In conjunction with this initiative and, in the interim, defining more clearly under what conditions representations and warranties will be employed to put back mortgages is an objective under the third strategic goal. Completing the resolution of outstanding "put back" requests is a related objective.

18

FHFA 2699

Second, FHFA has filed 18 separate lawsuits in connection with alleged securities law violations in private-label mortgage-backed securities purchased by the Enterprises.  Speedy resolution of these claims would also help restore some vibrancy to the mortgage market and put claims related to past deficiencies to rest.

## Accomplishing the Strategic Goals:  Human Capital and Business Realities

No business endeavor can be successful without careful consideration of human capital.  The numerous activities and changes necessary to accomplish the three strategic goals described here cannot be accomplished solely by legislation or declaration.  They require substantial effort by many people at both Fannie Mae and Freddie Mac.

The boards and executives responsible for the business decisions that resulted in the Enterprises entering conservatorship and subsequent taxpayer support are long gone.  Nearly every current top executive at each company either joined the company *after* the conservatorships were established or were promoted from within to replace departed executives.  It is also worth noting that shareholders of each Enterprise effectively have already lost their entire investment.

The public interest is best served by ensuring that Fannie Mae and Freddie Mac have the best available corporate leaders to carry out the work necessary to meet the critical goals set forth here.  FHFA and the Enterprises' boards of directors currently are engaged in a search for a new chief executive officer (CEO) for each company.  We are seeking accomplished corporate leaders willing to undertake the unique challenge of running a large, complex financial institution while fulfilling the public goals described here in an uncertain legislative environment.  FHFA and the boards are seeking highly qualified executives willing to take on these daunting challenges as a form of public service, despite the ongoing criticism of the companies and their executives.  The success of these new CEOs will depend directly on the stability and experience of the executive teams and staff already in place at each company.  Disrupting what has taken more than three years to achieve will only add to taxpayer losses and threaten the fragile housing recovery.

FHFA and the Enterprise boards of directors have taken seriously the concerns raised by members of Congress and the public regarding executive compensation.  For 2012, work on a new compensation structure that eliminates bonuses is nearly complete.  The new structure will be all salary, some paid currently, but a larger portion will be deferred.  The deferred salary will be at-risk, meaning it may be reduced (but not increased) from the target amount, and reductions would be based on shortcomings in achieving individual performance goals and corporate conservatorship goals tied to this strategic plan.

Mid-level managers and rank and file staff have been held to a pay freeze the past two years.  Yet retention of these staff is at least as important as retaining senior management.  The day-to-day running of the businesses and the countless decisions that result in gains or losses are made

19

FHFA 2700

in these ranks.  Even with the great uncertainty as to the future of their companies, many Enterprise staff have remained committed to the important work taking place there.

When the conservatorships were created, FHFA made clear to Enterprise employees, Congress, and the public that retaining corporate managers and staff was essential to the work of the conservatorships.  Conservatorship did not turn once-private companies into government agencies, nor their workers into government employees.  As with everything else with these conservatorships, there has been a challenging yet critical balancing required.

In addition to the senior managers and staff, the Enterprises' boards of directors have played, and continue to play, an important role in assisting Enterprise management and FHFA.  Board members themselves are engaged in a form of public service while retaining fiduciary responsibility as board members, and they too face unique challenges as boards of companies in government conservatorship.

From FHFA's standpoint, part of what is being preserved and conserved at the Enterprises is the processes and procedures, including business decision-making and requirements, of private financial institutions.  These are critical to safe and sound operations, and can be disrupted by a failure at the senior management or operational staff levels.  Each board's oversight of its Enterprise helps to preserve and reinforce among managers and staff these important private-sector disciplines.  Each board's review and consideration of risk management practices, key business decisions, human capital management, and other key functions greatly assists FHFA in its regulatory and conservatorship responsibilities by providing the discipline and rigor expected of corporate boards.  In these ways, the boards help FHFA enhance the corporate value at each Enterprise for ultimate disposition by Congress.

## Conservatorship:  Writing the Final Chapter

The early chapters of the conservatorship story focused on market functioning and loss mitigation.  More recent chapters have covered renewed efforts to enhance refinancing opportunities and REO disposition.  The strategic goals and performance objectives set forth here provide an outline for the next chapter of conservatorship, one that focuses in earnest on building a secondary mortgage market infrastructure that will live beyond the Enterprises themselves.  This next chapter will also see a gradual reduction in the Enterprises' dominant position in holding mortgage credit risk as private capital is encouraged back into that role.

The final chapter, though, remains the province of lawmakers.  Fannie Mae and Freddie Mac were chartered by Congress and by law, only Congress can abolish or modify those charters.  The strategic plan set forth here will move the housing finance system forward and enhance the foundation on which Congress can make decisions about the role of government in the future of the country's housing finance system.  Congress then can decide on the disposition of the Enterprises and their business operations.

FHFA 2701

PX-0154 - p. 20 of 21

This plan does not anticipate Fannie Mae and Freddie Mac continuing as they existed before conservatorship.  And though the Enterprises may well cease to exist at some point in the future, at least as they are known today, the country's $10 trillion single-family mortgage market will not go away.  Therefore, an orderly transition to a new structure is needed.

Ensuring the ongoing liquidity and stability of the market, and establishing new conduits that connect local mortgage originators with the capacity of global capital market investors, will require new institutions and legal frameworks.  The executives and employees of Fannie Mae and Freddie Mac are well situated to begin the process of building for that future and they can be expected to remain key contributors to housing finance in whatever new companies and institutional arrangements arise to replace Fannie Mae and Freddie Mac.  Getting the most value for taxpayers and bringing stability and liquidity to housing finance during this long transition remain the overriding objectives of FHFA as conservator.

FHFA 2702