# EXHIBIT J

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| PERRY CAPITAL LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>JACOB J. LEW, *et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1025 (RLW) |
| FAIRHOLME FUNDS, INC., *et al.*<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE AGENCY,<br>*et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1053 (RLW) |
| ARROWOOD INDEMNITY COMPANY,<br>*et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION, *et al.*,<br><br>        Defendants. | Civil Action No. 13-cv-1439 (RLW) |

## DECLARATION OF MARIO UGOLETTI

FHFA 0001

Protected Information to Be Disclosed Only in Accordance With Protective Order

I, Mario Ugoletti, hereby declare, based on personal knowledge of the facts, as follows:

1.     I am Special Advisor to the Office of the Director of the Federal Housing Finance Agency ("FHFA"), a role I assumed in September 2009. As Special Advisor, my responsibilities include advising FHFA's Acting Director Edward DeMarco concerning the Senior Preferred Stock Purchase Agreements ("PSPAs"), described *infra*. Additionally, I serve as the primary liaison with Treasury concerning the PSPAs and any amendments to the PSPAs.

2.     I was employed at Treasury from 1995 to 2009, serving as Director of the Office of Financial Institutions Policy from 2004-2009. In that capacity, I participated in the creation and implementation of the PSPAs.

3.     FHFA is an independent federal agency with regulatory authority over the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the "Enterprises") and the twelve Federal Home Loan Banks ("Banks"). 12 U.S.C. § 4511.

4.     On September 6, 2008, FHFA's Director appointed FHFA as Conservator of the Enterprises, and on September 7, 2008 FHFA as Conservator of the Enterprises entered into two materially identical Senior Preferred Stock Purchase Agreements (together, the "PSPAs") with the United States Treasury ("Treasury")—one for Fannie Mae and one for Freddie Mac. The Amended and Restated Agreements dated September 26, 2008 and subsequent amendments are currently available at http://www.fhfa.gov/Default.aspx?Page=364.

5.     The PSPAs were a last resort after it became apparent that no infusions of capital from the private sector were forthcoming to save the Enterprises. *See Oversight Hearing to Examine Recent Treasury and FHFA Actions Regarding the Housing GSEs Before the H. Comm. on Financial Services*, 110th Cong., at 5 (Sep. 25, 2008) (statement of James B. Lockhart III,

PX-0351 - p. 2 of 10

Director, Federal Housing Finance Agency), currently *available at*

http://archives.financialservices.house.gov/hearing110/lockhart092508.pdf ("After substantial

effort and communication with market participants, each company reported to FHFA and to

Treasury that it was unable to access capital markets to bolster its capital position without

Treasury financing. FHFA's and Treasury's own discussions with investment bankers and

investors corroborated this conclusion."). The PSPAs provided the market with assurances that

Treasury would provide a backstop to the Enterprises. Absent the commitments of Treasury, the

Enterprises would have collapsed. *See id.* at 5-6 ("In the absence of access to new capital, the only

alternative left to the firms was to cease new business and shed assets in a weak market. That would

have been disastrous for the mortgage markets as mortgage rates would have continued to move

higher and, in turn, disastrous for the Enterprises as the prices of their securities would have fallen

and credit losses would have increased."); Timothy F. Geithner, Secretary, U.S. Dep't of the

Treasury, Written Testimony Before the H. Comm. on Financial Services (Mar. 23, 2010),

currently *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg603.aspx ("In

2007, the GSEs reported combined losses of over $5 billion . . . The GSEs ultimately reported

combined 2008 losses in excess of $108 billion. . . . Both companies were severely

undercapitalized and would not have been able to meet their obligations without the intervention

and financial support of the government."). With the PSPAs and the market assurance they

provided, the Enterprises were able to remain in operation.

6. The PSPAs provided that the Enterprises would draw funds from Treasury against

the Treasury commitment if the Enterprises exhausted all of their stockholder equity and had a

negative net worth (defined as liabilities exceeding assets). If Enterprise liabilities exceeded

assets, the provision for mandatory receivership in the Housing and Economic Recovery Act of

2008 ("HERA") would be triggered. The PSPAs were designed so that the Enterprises could

draw funds from Treasury in amounts necessary to cure their negative net worth and bring their capital to zero. By the end of 2008, all shareholder equity had been exhausted and the Enterprises drew on the Treasury commitment to avoid mandatory receivership. *See* FHFA Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE & Mortgage-Related Securities at 2, currently *available at* http://www.fhfa.gov/webfiles/25784/TSYSupport%202013-11-13.pdf (Freddie Mac draw of $13.8 billion for third quarter 2008; Fannie Mae draw of $15.2 billion for fourth quarter 2008).

7.  The PSPAs gave Treasury an expansive bundle of rights and entitlements in exchange for the lifeline that Treasury provided, without which the Enterprises would have gone out of business. For example, Treasury received warrants to acquire 79.9% of the common stock of the Enterprises for a nominal payment. In addition, under the PSPAs, Treasury obtained Senior Preferred Stock that is senior in priority over all other series of preferred stock. The Treasury Senior Preferred Stock in each Enterprise had an initial face value of $1 billion, which increases by any amount that the Enterprises draw from Treasury under the Treasury Commitment. Further, the Treasury Senior Preferred Stock has a liquidation preference so that Treasury has priority over any other preferred or common shareholders in the event of a liquidation — that is, Treasury is entitled to the value of its Senior Preferred Stock (face value plus any amounts drawn from Treasury by the Enterprises, without reduction for dividends or other amounts that the Enterprises might pay to Treasury) before any other shareholders — preferred or common — are paid anything in liquidation.

8.  The Treasury Senior Preferred Stock also included payment obligations from the Enterprises to Treasury, commensurate with the enormous risks and financial commitments that Treasury assumed. The Enterprises were obligated to pay a 10% annual dividend together with a

PX-0351 - p. 4 of 10

Periodic Commitment Fee ("PCF") that was "intended to fully compensate [Treasury] for the support provided by the ongoing Commitment." Amended and Restated Agreements, § 3.2(b) (Sept. 26, 2008). The PSPAs provided that the amount of the PCF to be imposed beginning January 2010 "shall be determined with reference to the market value of the Commitment as then in effect." *Id.*

9.      The PSPA gave Treasury the right, in its sole discretion, to waive the PCF for a year at a time "based on adverse conditions in the United States mortgage market." Treasury exercised this right to waive the PCF for 2010 and 2011, years in which the Enterprises had insufficient funds to pay even the 10% dividend, let alone an additional PCF, stating that "the imposition of the PCF at this time would not fulfill its intended purpose of generating increased compensation to the American taxpayer." Periodic Commitment Fee Waiver Letters from Dept. of Treasury to FHFA (Dec. 29, 2010; Mar. 31, 2011; Jun. 30, 2011; Sept. 30, 2011; Dec. 21, 2011). It was clear by this time that, given the risks of the Enterprises and the enormity of the Treasury commitment, the value of the PCF was incalculably large.

10.      Under the Second Amendment to the PSPAs (executed December 24, 2009), Treasury was obligated to commit any amount of funds necessary to maintain the Enterprises' positive net worth through December 31, 2012, subject to an initial cap of $200 billion for each of the Enterprises plus the amount of draws between January 1, 2010 and December 31, 2012. As of January 1, 2013, however, Treasury's financial commitment cap became fixed: the amount

PX-0351 - p. 5 of 10

remaining available to Fannie Mae under the cap was $117.6 billion, and the amount remaining available to Freddie Mac under the cap was $140.5 billion.[1]

11.     By late 2011, analysts and key stakeholders, including institutional and Asian investors in the Enterprises' debt and mortgage backed securities (MBS), began expressing concerns about the adequacy of Treasury's financial commitment to the Enterprises after January 1, 2013, when the cap on Treasury's funding commitment would become fixed.

12.     The principal driver of these concerns about the adequacy of Treasury's capital commitment were questions about the Enterprises' ability to pay the 10% annual dividend to Treasury without having to draw additional funds from Treasury, thereby eating away at the amount remaining available under the capped Treasury commitment.  From the outset of the PSPAs, the Enterprises could not at times generate enough income to make these dividend payments.

13.     The Enterprises drew funds from Treasury to pay the required 10% dividend back to Treasury.  Of the $188 billion the Enterprises drew from Treasury from the outset of the PSPAs (September 2008) to the execution of the Third Amendment (August 2012), $45.7 billion was drawn solely to pay the 10% annual dividend back to Treasury.  *See* FHFA, Data as of November 14, 2013 on Treasury and Federal Reserve Purchase Programs for GSE and

---

[1]     Under the Second Amendment to the PSPAs, Treasury committed to provide each Enterprise the greater of: (i) $200 billion or (ii) $200 billion plus the Enterprise's cumulative draws for 2010, 2011, and 2012, less the Enterprise's positive net worth, if any, on December 31, 2012.  Second Amendment to Amended and Restated Senior Preferred Stock Purchase Agreement, at 3.

For Fannie Mae, alternative (ii) provided the greater amount: $200 billion + $40.9 billion (cumulative draws for 2010-2012) – $7.2 billion (positive net worth on December 31, 2012) – $116.1 billion (total draws from 2008-2012) = $117.6 billion.

For Freddie Mac, alternative (ii) provided the greater amount:  $200 billion + $20.6 billion (cumulative draws for 2010-2012) – $8.8 billion (positive net worth on December 31, 2012) – $71.3 (total draws from 2008-2012) = $140.5 billion.

PX-0351 - p. 6 of 10

Mortgage-Related Securities at 2, 3. Additionally, each time the Enterprises drew funds to pay the 10% dividend, the total amount of the Treasury draw increased, in turn increasing the amount of the next 10% dividend payment.

14.     By mid-2012, the amount of the annual 10% dividend had grown so large—$11.7 billion for Fannie Mae and $7.2 billion for Freddie Mac—that it appeared unlikely that either of the Enterprises would be able to meet that amount consistently without drawing additional funds from Treasury. *See* Freddie Mac, Quarterly Report (Form 10-Q) at 10, 85 (May 3, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html ("Over time, our dividend obligation to Treasury will increasingly drive future draws. Although we may experience period-to-period variability in earnings and comprehensive income, it is unlikely that we will generate net income or comprehensive income in excess of our annual dividends payable to Treasury over the long term."); Freddie Mac, Quarterly Report (Form 10-Q) at 10, 92 (Aug. 7, 2012), currently *available at* http://www.freddiemac.com/investors/sec_filings/index.html (same); Fannie Mae, Quarterly Report (Form 10-Q) at 11, 81 (May 9, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q12012.pdf ("Although we may experience period-to-period volatility in earnings and comprehensive income, we do not expect to generate net income or comprehensive income in excess of our annual dividend obligation to Treasury over the long term."); Fannie Mae, Quarterly Report (Form 10-Q) at 12-13, 83 (Aug. 8, 2012), currently *available at* http://www.fanniemae.com/resources/file/ir/pdf/quarterly-annual-results/2012/q22012.pdf (same). Because the cap on the Treasury commitment became fixed on January 1, 2013, each dollar drawn from Treasury merely to repay the Treasury dividend was one less dollar available

PX-0351 - p. 7 of 10

to the Enterprises to draw in the event the Enterprise suffered losses due, for example, to a decline in the housing market or broader economic turbulence.

15.     Market forecasts—which FHFA monitored—predicted that the Enterprises' ongoing payment of the 10% dividend would completely exhaust Treasury's funding commitment within ten years, leading to potential downgrades in the Enterprises' credit ratings. Moody's rating service opined that the 10% dividend payments would "eliminate Fannie Mae's contingent capital by 2019 and Freddie Mac's by 2022 . . . [even] assum[ing] that the GSEs are able to fully offset credit losses, which we believe is unlikely." Moody's, Sector Comment, "Plan To Raise Fannie Mae and Freddie Mac Guarantee Fees Raises Question of Support," at 2 (Sept. 26, 2011). Moody's stated that this "would be credit negative and prompt a review of [the Enterprises'] Aaa ratings." *Id*. Likewise, Deutsche Bank observed that "diminishing Treasury support raises the risk that the agencies one day might face challenges in covering MBS losses" and that such a risk "becomes greater in a housing market catastrophe, such as the one that started in the US after 2006." Deutsche Bank, *The Path of US Support for Fannie Mae, Freddie Mac*, THE OUTLOOK, Mar. 14, 2012, at 6.

16.     FHFA shared the concerns that the 10% annual dividend to Treasury would reduce the amount of the Treasury commitment starting in 2013. Treasury also generated and provided certain forecasts to FHFA that were similar to those prepared by market participants.

17.     These concerns about the adequacy of Treasury's financial commitment undermined the purpose of the PSPAs to express financial support to holders of Enterprise debt (*i.e.*, bondholders) and mortgage backed securities. *See* FHFA Mortgage Market Note (Dec. 5, 2008), currently *available at* http://www.fhfa.gov/webfiles/1241/mmnote084.pdf. The strength of that support depends upon the Enterprises having a sufficiently large pool of available funds

FHFA 0008

**PX-0351 - p. 8 of 10**

from Treasury that will permit the Enterprises to continue to operate under adverse market conditions that may arise in the coming years.

18.     To resolve these concerns, FHFA and Treasury agreed on the provisions that were incorporated into the Third Amendment, executed on August 17, 2012.  The Third Amendment (1) eliminated the 10% annual dividend, (2) added a quarterly variable dividend in the amount (if any) of each Enterprises' positive net worth (above net worth values that were specified in the Third Amendment), and (3) suspended the PCF for as long as the quarterly variable dividend is in effect.  The new dividend structure eliminated the risk that borrowings to make fixed dividend payments would lead to the exhaustion of the Treasury commitment.

19.     These changes in structure did not change the underlying economics of the PSPAs.  It was my belief at this time, given the size and importance of the Treasury commitment, that through the liquidation preference, fixed dividends, and the market value of the PCF, Treasury would receive as much from the Enterprises under the Second Amendment as it would under the Third Amendment.  Thus, the intention of the Third Amendment was not to increase compensation to Treasury — the Amendment would not do that — but to protect the Enterprises from the erosion of the Treasury commitment that was threatened by the fixed dividend.  The Third Amendment was therefore consistent with the intent of the original PSPAs to (1) fully compensate Treasury for the value of its financial support, without which the Enterprises would have been forced into receivership, and (2) protect the Enterprises and the national housing market.

20.     At the time of the negotiation and execution of the Third Amendment, the Conservator and the Enterprises had not yet begun to discuss whether or when the Enterprises would be able to recognize any value to their deferred tax assets.  Thus, neither the Conservator

nor Treasury envisioned at the time of the Third Amendment that Fannie Mae's valuation allowance on its deferred tax assets would be reversed in early 2013, resulting in a sudden and substantial increase in Fannie Mae's net worth, which was paid to Treasury in mid-2013 by virtue of the net worth dividend.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this ⎯⎯ 17 day of ⎯⎯ DECEMBER ⎯⎯ 2013 at Washington, D.C.

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
MARIO UGOLETTI

*Special Advisor to the Office of the Director,*
*Federal Housing Finance Agency*

10

FHFA 0010