# EXHIBIT K



Deposition of:
# Edward DeMarco

*December 21, 2020*

In the Matter of:

# In re Fannie Mae/Freddie Mac Litigation

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

- - -

IN RE:
  FANNIE MAE/FREDDIE MAC  :  Misc. Action No.
  SENIOR PREFERRED STOCK  :  13-mc-1288(RCL)
  AGREEMENT  :

- - -

MONDAY, DECEMBER 21, 2020

- - -

Remote Videotape Zoom Deposition of EDWARD DeMARCO, taken pursuant to Notice, commencing at approximately 9:04 a.m., on the above date, before Rose A. Tamburri, RPR, CM, CCR, CRR, USCRA Speed and Accuracy Champion and Notary Public.

- - -

VERITEXT LEGAL SOLUTIONS
Mid-Atlantic Region
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania  19103

Page 14

1  looked up the rest of it.
2     Q.  Okay.
3         Any other documents you recall
4  looking up?
5     A.  I -- I looked up a timeline of events
6  in -- in -- during the -- the start of the
7  great financial crisis, just to refresh myself
8  on the -- the timing of certain things.
9     Q.  Was that a timeline of events that
10 you had prepared or one that --
11    A.  No, I -- I just Googled it.  I think
12 I got it from USA Today.
13    Q.  Okay.
14        Have you prepared any documents in
15 connection with your deposition today?
16    A.  No.  As I went through -- as I went
17 through the materials, I did take notes.  I
18 did write some notes to myself.
19    Q.  Okay.
20        When you were deposed back in 2015
21 in the Court of Federal Claims, did you have
22 an opportunity to review your deposition

Page 15

1  transcript and make any changes that you
2  thought appropriate?
3     A.  Yes, I believe I did.
4     Q.  And did you submit any changes or did
5  you --
6     A.  I -- I believe I submitted some
7  changes, some edits or whatever.
8     Q.  Okay.
9         Have you had a chance to review
10 your deposition transcript more recently in
11 connection with this deposition?
12    A.  I did review it, yes.
13    Q.  Okay.
14        So are you the person who decided,
15 on behalf of FHFA, to agree to the net worth
16 sweep?
17    A.  Yes, I am.
18    Q.  Did you solicit or entertain any
19 recommendations from anyone else on whether to
20 agree to the net worth sweep?
21    A.  I certainly consulted with certain
22 members of my staff, and obviously, since this

Page 16

1  was a negotiation with the Treasury
2  Department, I had discussions with senior
3  officials at the Treasury Department?
4     Q.  Who on your staff did you consult
5  with?
6     A.  Mario Ugoletti, who was a senior
7  advisor to me at the time and was the person I
8  designated to work directly with the Treasury
9  Department in developing the Third Amendment.
10        But there were also other senior
11 staff from the legal department, accounting,
12 conservatorship operations.  I don't remember
13 the full list of folks that I would have
14 consulted, but there were folks in those
15 areas' offices as we were work -- doing this
16 work.
17    Q.  Okay.
18        Were -- these consultations, were
19 they in the nature of gathering information
20 from them, or was it in the nature of them
21 making a recommendation on whether to enter
22 the net worth sweep or not?

Page 17

1     A.  It was probably a bit of both.
2  Certainly gathering information from them
3  and -- and not so much -- and going through
4  where the negotiations stood and talking about
5  what we -- what we thought we should do.
6     Q.  I had the impression, just generally
7  from your prior deposition, that it was pretty
8  much your decision, and kind of your decision
9  alone, to enter the net worth sweep.
10        Is that not right?
11    A.  It's right.  I was the director of
12 the -- acting director of the agency.  It was
13 my decision to make, certainly.
14    Q.  Okay.
15        Did anyone recommend -- anyone in
16 your team or staff recommend -- make the
17 ultimate recommendation to enter or not enter
18 the net worth sweep?
19    A.  Make an ultimate recommendation to
20 enter or not enter.  No, I mean, I -- I -- as
21 I say, I had a consultative process with my
22 team, especially with -- with Mario, but

Page 178

1  net worth sweep?
2  A.  Mary Miller was the Under Secretary
3  of Domestic Finance.  She reported to Treasury
4  Secretary Geithner, and she was -- she was an
5  important and central figure in the
6  discussions FHFA had over the -- over the
7  Third Amendment.
8  Q.  Did you interact with her on other
9  issues, as well?
10  A.  Yes, I did.
11  Q.  Was just -- this just a number of
12  issues she interacted with you on, or was this
13  a predominant issue that she interacted with
14  you on?
15  A.  No.  Mary Miller interacted with me
16  on -- on a wide array of issues.
17  Q.  And who else at Treasury did you have
18  occasion to interact with on the issue of the
19  net worth sweep?
20  A.  The Treasury Secretary, Mary Miller,
21  Tim Bowler would be the -- would be the
22  principal officials at Treasury that I would

Page 179

1  be interacting with.
2  Q.  Her email to you below says, "I'm
3  sure you're aware of the work going on with
4  the PSPA agreements."
5  Who was doing that work at this
6  point?  Is this Treasury doing the work?
7  A.  That would be Treasury and FHFA.  I
8  mean, you saw the earlier note from Mario, so
9  Treasury is in communication with Mario, and I
10  believe that there are others involved, as
11  well.
12  Q.  Do you know, in this time frame, is
13  the work that's being referred to, is that the
14  drafting of the actual agreements?
15  A.  I believe so.
16  Q.  But were there drafts as of this time
17  that were just being finalized, or were they
18  doing first drafts at this time?
19  A.  No, I think drafts had been around,
20  and I believe that during this time frame, the
21  Treasury and FHFA staffs are sharing drafts --
22  Treasury sharing drafts with FHFA and FHFA is

Page 180

1  responding.
2  Q.  You propose a call with Ms. Miller to
3  get caught up in the morning, and then
4  speaking with her.
5  Do you recall having that call
6  with Ms. Miller?
7  A.  I believe Mary and I spoke.  Whether
8  it was that day or the next day, yes.
9  Q.  Can you remember the substance of
10  that call at all?
11  A.  Not the particulars, just that Mary
12  conveying that they really weren't ready to
13  get this wrapped up and that these were the --
14  you know, confirming that these were the
15  component parts that we were settling in on
16  and really having an interest in -- on the
17  operational side of it in terms of, you know,
18  communicating with the -- with the companies
19  and then the public.
20  Q.  Did she indicate why they were moving
21  forward at this particular time?
22  A.  Not that I recall.

Page 181

1  Q.  Okay.
2  Let me ask you to look at
3  Exhibit 11, please.
4  (Whereupon, a document was marked,
5  for identification purposes, as Exhibit 11.)
6  THE WITNESS:  Okay.
7  BY MR. THOMAS:
8  Q.  And do you see the first page of this
9  is entitled, Conference Call Led by Mary
10  Miller, Treasury?
11  A.  Yes.
12  Q.  And I've got to say, it's, you know,
13  it's about 30 pages in this document, which
14  appear to be a number of different sub
15  documents.  I'm not sure why it's put together
16  as one exhibit.  It may have been somebody's
17  file folder; I have no idea.
18  A.  Could be.
19  Q.  Do you rec -- do you recognize this
20  document?
21  A.  I've seen it, yes.
22  Q.  Okay.

46 (Pages 178 - 181)

Page 302

1  Were you referring to an analyst
2  report that looked at the periodic commitment
3  fee or just the -- the dividend situation more
4  generally?
5     A.  This was the dividend situation more
6  generally.
7     Q.  Okay.
8         Did you rely on any analyst
9  reports that opined on the likely amount of
10 the periodic commitment fee when formulating
11 your views on the likely size of that fee?
12    A.  No, I don't believe so.
13    Q.  Okay.
14        So specifically with respect to
15 your view on the amount of the periodic
16 commitment fee that the companies were likely
17 to be charged, you relied on the quarterly
18 letters from Treasury, you relied on the text
19 of the PSPAs.
20        Was there anything else?
21    A.  And my own -- and my own judgment
22 about what the -- what the text of the -- of

Page 303

1  the PSPA was -- was saying, that -- that it
2  was to compen -- fully compensate Treasury for
3  the -- for the support provided by the
4  commitment.
5         And as I spent time earlier today
6  discussing with Mr. Thomas, that commitment
7  was, in fact, the $250 billion remaining, that
8  was the -- that was the only equity that was
9  allowing these companies to continue to
10 operate.
11        So that was -- you know, so in
12 essence, that's all the equity, and what
13 equity, you know, normally gets is the -- is
14 the income of a company.
15    Q.  Okay.
16        And I wanted to ask you a question
17 or two about the financial projections for
18 Fannie and Freddie, and specifically I was
19 curious, in the course of your negotiations
20 with the Treasury Department over the Third
21 Amendment, did Treasury ever share with you
22 financial projections for -- for Fannie and

Page 304

1  Freddie?
2         MS. VARMA:  Objection to form.
3         THE WITNESS:  Yeah.  I believe
4  that there was -- there were at least a few
5  discussions about it.  I know that -- that --
6  I believe that there were projections that the
7  companies had provided to them and that there
8  were discussions between Treasury staff and
9  FHFA staff regarding those projections at
10 the -- at the very end of all of this.
11 BY MR. BARNES:
12    Q.  And do you know what the substance of
13 those conversations were between FHFA and
14 Treasury regarding the projections that Fannie
15 and Freddie had provided?
16    A.  No.  I mean, I wasn't involved in
17 them, but I -- but -- no.
18    Q.  Who was involved in them?
19    A.  I believe it would have been some
20 combination of Mario Ugoletti and perhaps
21 people in either the financial reporting part
22 of FHFA or the accounting office.

Page 305

1     Q.  Do you know who their counterparts
2  would have been in Treasury and having these
3  discussions?
4     A.  Well, I believe the point person at
5  Treasury probably would have been Tim Bowler.
6     Q.  Okay.
7         And apart from the financial
8  projections provided by Fannie and Freddie to
9  the Treasury Department, were there any other
10 financial projections that Treasury shared
11 with you or anyone else at FHFA in connection
12 with the negotiations of the -- over the Third
13 Amendment?
14    A.  I believe Treasury was relying on an
15 outside party to provide another set of
16 assessments.  I believe that was Grant
17 Thornton.
18    Q.  And did Treasury share those
19 projections with you or anyone at FHFA in
20 connection with the negotiations over the
21 Third Amendment?
22    A.  I believe at some point there was

Page 310

1  In Re: Fannie Mae/Freddie Mac Senior v.
2  Edward DeMarco (#4369768)
3        E R R A T A  S H E E T
4  PAGE_____ LINE_____ CHANGE_____
5  _____
6  REASON_____
7  PAGE_____ LINE_____ CHANGE_____
8  _____
9  REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____   _____
24 Edward DeMarco              Date
25

Page 311

1  In Re: Fannie Mae/Freddie Mac Senior v.
2  Edward DeMarco (#4369768)
3        ACKNOWLEDGEMENT OF DEPONENT
4    I, Edward DeMarco, do hereby declare that I
5  have read the foregoing transcript, I have made any
6  corrections, additions, or changes I deemed necessary as
7  noted above to be appended hereto, and that the same is
8  a true, correct and complete transcript of the testimony
9  given by me.
10
11 _____   _____
12 Edward DeMarco              Date
13 *If notary is required
14        SUBSCRIBED AND SWORN TO BEFORE ME THIS
15        _____ DAY OF _____, 20___.
16
17
18        _____
19        NOTARY PUBLIC
20
21
22
23
24
25