# EXHIBIT M

Mario Ugoletti　　　　　　　　　CONFIDENTIAL　　　　　　　　　May 15, 2015
　　　　　　　　　　　　SUBJECT TO PROTECTIVE ORDER　　　　　　　　Washington, D.C.

```
 1         IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2     - - - - - - - - - - - - - - - X

 3     FAIRHOLME FUNDS, INC, et al.,  :

 4         Plaintiffs,                :

 5             v.                     :   Case No. 13-465C

 6     THE UNITED STATES,             :

 7         Defendant.                 :

 8     - - - - - - - - - - - - - - - X

 9                         Washington, D.C.

10                         Friday, May 15, 2015

11        CONFIDENTIAL - PROTECTED INFORMATION TO BE

12      DISCLOSED ONLY IN ACCORDANCE WITH PROTECTIVE ORDER

13             Videotaped Deposition of MARIO UGOLETTI, a

14     witness herein, called for examination by counsel for

15     Plaintiffs in the above-entitled matter, pursuant to

16     notice, the witness being duly sworn by AMANDA

17     BLOMSTROM, a Notary Public in and for the District of

18     Columbia, taken at the offices of Cooper & Kirk,

19     1523 New Hampshire Avenue NW, Washington, D.C., at

20     9:34 a.m., Friday, May 15, 2015, and the proceedings

21     being taken down by Stenotype by AMANDA BLOMSTROM,

22     CRR/RMR/CLR/CSR, and transcribed under her direction.
```

Mario Ugoletti                    CONFIDENTIAL                       May 15, 2015
                        SUBJECT TO PROTECTIVE ORDER                  Washington, D.C.

Page 2

```
 1      APPEARANCES:
 2         On behalf of the Plaintiffs:
 3            CHARLES J. COOPER, ESQ.
 4            DAVID H. THOMPSON, ESQ.
 5            HOWARD SLUGH, ESQ.
 6            Cooper & Kirk
 7            1523 New Hampshire Avenue NW
 8            Washington, DC  20036
 9            (202) 220-9600
10            ccooper@cooperkirk.com
              dthompson@cooperkirk.com
11            hslugh@cooperkirk.com
12
13         On behalf of the US DOJ:
14            ELIZABETH M. HOSFORD, ESQ.
15            AGATHA KOPROWSKI, ESQ.
16            KENNETH M. DINTZER, ESQ.
17            US Department of Justice
18            1100 L Street NW
19            Washington, DC  20530
20            (202) 353-2345
21            elizabeth.hosford@usdoj.gov
              agatha.m.koprowksi@usdoj.gov
22            kenneth.dinzter@usdoj.gov
```

Page 3

```
 1      APPEARANCES:
 2         On behalf of the Treasury:
 3            BRENDAN J. CRIMMINS, ESQ.
 4            KATHERINE BRANDES, ESQ.
 5            US Department of the Treasury
 6            1500 Pennsylvania Avenue NW
 7            Washington, DC  20220
 8            (202) 622-0351
              brendan.crimmins@treasury.gov
 9            katherine.brandes@treasury.gov
10
11         On behalf of the FHFA:
12            IAN S. HOFFMAN, ESQ.
13            ASIM VARMA, ESQ.
14            Arnold & Porter
15            555 Twelfth Street NW
16            Washington, DC  20004-1206
17            (202) 942-5000
              ian.hoffman@aporter.com
18            asim.varma@aporter.com
19
20
21
22
```

Page 4

```
 1      APPEARANCES:
 2         On behalf of the FHFA:
 3            FRANK WRIGHT, ESQ.
 4            Federal Housing Finance Agency
 5            1700 G Street NW
 6            Washington, DC  20552
 7            (202) 414-6439
 8            frank.wright@fhfa.gov
 9              -and-
10            MICHAEL SITCOV, ESQ.
11            U.S. Department of Justice
12            Civil Division, Federal Programs Branch
13            20 Massachusetts Ave NW, Room 7108
14            Washington, DC  20530
15            (202) 514-4960
16            michael.sitcov@usdoj.gov
17
18      ALSO PRESENT:
19         Selma Blair, Cooper & Kirk, PLLC
20         Dan Reidy, Videographer
21
22
```

Page 5

```
 1                    I N D E X
 2      WITNESS                               PAGE
 3      MARIO UGOLETTI
 4         BY MR. THOMPSON                     13
 5
 6                    E X H I B I T S
 7
 8      NO.     DESCRIPTION                   PAGE
 9      Exhibit 1   Cost of Capital (8-21-12
10                  Management Committee Meetings)
11                  FHFA000047771-83            77
12      Exhibit 2   Draft Agenda, Meeting with FHFA,
13                  Fannie Mae and Freddie Mac,
14                  Analysis of Pushdown Accounting,
15                  PWC-FM 00008743            110
16      Exhibit 3   10-15-08 Email, Ugoletti to Lingebach
17                  UST00500869                117
18      Exhibit 4   10-24-11 Email, David to Ugoletti
19                  FHFA00105305-13            119
20      Exhibit 5   11-5-08 Email, DeMarco to Ugoletti
21                  FHFA00047700-01            128
22
```

Mario Ugoletti  CONFIDENTIAL  May 15, 2015
SUBJECT TO PROTECTIVE ORDER  Washington, D.C.

Page 150

1    THE WITNESS: It was, it was earlier in
2  that year, sometime in the early part of 2012 is when
3  the discussions about whether there was going to be a
4  third amendment started to take place.
5  BY MR. THOMPSON:
6    Q.   Okay. And whose idea was it to have a Net
7  Worth Sweep as part of the third amendment?
8    MS. HOSFORD: Objection; calls for
9  speculation potentially.
10    THE WITNESS: Well, I mean, these were --
11  the issue of concern at the time was that the
12  commitment was going to become fixed, was that going
13  to start -- cause questions in the market, so there
14  were discussions about what to do about that.
15    My recollection is that Treasury brought
16  the idea of the Net Worth Sweep up, we had some other
17  ideas that could be useful in the context of a third
18  amendment, that FHFA thought was useful, we did
19  understand this issue and we were very concerned
20  about it. We also thought about whether or not you
21  could put some other structure around it, like
22  whether you'd have to draw so much before a Net Worth

Page 151

1  Sweep would kick in, what the buffer should be. We
2  negotiated that back and forth with Treasury. And we
3  ended up where we ended up.
4  BY MR. THOMPSON:
5    Q.   So who at Treasury brought it up?
6    A.   Person?
7    Q.   Yeah.
8    A.   That probably would have been Tim Bowler.
9    Q.   Okay. Was he your primary point of
10  contact?
11    A.   Yes, yes.
12    Q.   And were the two of -- were you the
13  primary negotiator for FHFA and was he the primary
14  negotiator for Treasury?
15    A.   Yes, you could characterize it that way
16  because Ed DeMarco was the acting director, I was his
17  special advisor, Tim Bowler was deputy assistant
18  secretary for something or other, capital markets,
19  yeah, Mary Miller, she reported up to the secretary,
20  so that would have been, Negotiator, you see what
21  your boss thinks about stuff, they see what their
22  boss thinks about stuff, you get together and see how

Page 152

1  you can work it out.
2    Q.   Sure. And in terms of the decision-making
3  process at FHFA --
4    A.   Yeah.
5    Q.   -- how, how would you describe, you know,
6  how the decision was made to enter into the Net Worth
7  Sweep?
8    MS. HOSFORD: Objection to the extent it
9  calls for predecision deliberations or discussions
10  within FHFA about potential options.
11  BY MR. THOMPSON:
12    Q.   Yeah, and I'm not asking you for the
13  substance of those discussions. I'm just asking what
14  was the process.
15    A.   Yeah, so, I mean, the pro- -- the process
16  works in various ways, right? You could have: Ed
17  DeMarco meets at times with Mary Miller or someone
18  else at Treasury or Secretary Geithner. I met with
19  Secretary Geithner with Ed. You get some feedback at
20  that level, all right.
21    Take that feedback. In my discussions
22  with Bowler, work that through; come to some issues

Page 153

1  with Bowler, whatever the issue, what do they want,
2  what do we want; take that back up to Ed; he takes
3  that back up to Mary. We can -- everybody is fine.
4  That might be good. If not, they need to discuss. I
5  mean, it's a process -- it's an iterative process of
6  working through your decision-makers at FHFA.
7    Acting Director DeMarco was the
8  decision-maker at Treasury. Ultimately, Secretary
9  Geithner is the decision-maker. So there's one more
10  level that you -- but, you know, everybody -- I
11  worked at Treasury for years. You'd make the
12  Secretary aware of what's going on, he's generally in
13  the lane, and go down, try to do something, bring it
14  back up to him. That's generally how the process
15  worked.
16    Q.   And -- and certainly I understand
17  Mr. DeMarco signed the -- the Net Worth Sweep, but
18  who -- who else, if anyone, was part of the
19  decision-making process to enter into it at FHFA? I
20  mean, were you part of the decision-making process?
21  Did you give advice to Secretary -- I mean Acting
22  Director DeMarco?

39 (Pages 150 to 153)

Mario Ugoletti  CONFIDENTIAL  May 15, 2015
SUBJECT TO PROTECTIVE ORDER  Washington, D.C.

Page 234

1    Well, I don't think the obstacle was much
2    different than it would have been back in 2008.
3        Q.   Okay.  What was it?
4        A.   In 2008 when they were put in
5    conservatorship, which if they wouldn't have been,
6    they would have been in receivership, PSPA specified
7    a number of things that would have had to happen
8    before the enterprises could exit conservatorship.
9        And by "exit conservatorship," I assume
10   you mean it as exit conservatorship as a private
11   company; is that what -- was that your meaning of
12   what --
13       Q.   Yes.
14       A.   -- "exit conservatorship" means?
15       Well, things that didn't change at all
16   prior to the -- to the third amendment, were that the
17   liquidation preference would have to be paid in full
18   and it would had to be paid in full from issuance of
19   private equity.
20       So you would have -- for a company to exit
21   conservatorship, they would have had to go to the
22   market and raise new, new money of 187,5 between

Page 235

1    them, and then whatever the split was, a hundred and
2    sixteen and seventy-five for each company, they would
3    have had to have raised new money.  That money would
4    not go into the capitalization of the companies.
5    That money would go to Treasury.
6        Q.   Yes.
7        A.   Treasury also would have had the
8    79.9 percent warrants.
9        So, in addition to that slug of
10   liquidation preference that you would have to get the
11   market to pay that they wouldn't have -- would not be
12   part of the capitalization of the company.  All
13   right?  You would now have to issue new equity that
14   would be already diluted, 79.9 percent goes to
15   Treasury.  Then you would have to raise enough equity
16   that they would be a well-capitalized institution
17   because that would be the standard that they would
18   have to meet to get out of conservatorship.
19       So I don't have those numbers on the top
20   of my head, but they would be massive.
21       MR. THOMPSON:  Our next one is 19?
22       Yes, 19.  And it has a Bates number of

Page 236

1    FHFA 25815.
2        (Exhibit No. 19 marked.)
3    BY MR. THOMPSON:
4        Q.   Now, this cover email is from Mary Miller
5    to Ed DeMarco dated January 4, 2012.
6        Who -- what was Ms. Miller's role at
7    Treasury?
8        MS. HOSFORD:  Objection; lack of
9    foundation on the document.
10       THE WITNESS:  Assistant secretary for
11   Financial Institutions -- no, assistant -- she was an
12   assistant secretary.
13   BY MR. THOMPSON:
14       Q.   Did --
15       A.   I can't remember -- I can't remember what
16   position -- and she may have been the Under -- she
17   was the Under Secretary for a while, too.  So she was
18   somewhere in that mix.  I can't remember in 2012
19   where she was.
20       Q.   Did Tim Bowler report to her?
21       A.   Yes.
22       Q.   Okay.  And then if we go to the second

Page 237

1    page, it says "FHFA and Treasury share common goals
2    to promote a strong housing market recovery, reduce
3    government involvement in the housing market over
4    time and to provide the public and financial markets
5    with a clear plan to wind down the GSEs."
6        Was that an accurate statement in the
7    run-up to the Net Worth --
8        MS. HOSFORD:  Objection --
9    BY MR. THOMPSON:
10       Q.   -- Sweep?
11       MS. HOSFORD:  -- lack of foundation.
12       THE WITNESS:  Well, I mean, this was
13   before we had issued -- I mean, this is -- this is a
14   Treasury document, I believe.  It's coming from Mary
15   Miller.
16   BY MR. THOMPSON:
17       Q.   Yes, I'm asking you if it's accurate, at
18   least with respect to FHFA.
19       A.   Well, I'd have to -- I'll go through piece
20   by piece.
21       Q.   Please.
22       A.   All right?  "Strong housing market

Case 1:13-mc-01288-RCL   Document 294-13   Filed 05/26/23   Page 6 of 6

Mario Ugoletti                 CONFIDENTIAL                    May 15, 2015
                        SUBJECT TO PROTECTIVE ORDER            Washington, D.C.

Page 362

1   questions, if she likes.
2       A.   Better not.
3            MS. HOSFORD:  We have no questions.
4            MR. THOMPSON:  Okay.
5            THE VIDEOGRAPHER:  This concludes the
6   video deposition of Mario Ugoletti.  The time on the
7   video is 6:02 p.m.  We are off the record.
8            MS. HOSFORD:  He would like the
9   opportunity to read and sign.
10           MR. THOMPSON:  Sure.
11           (Whereupon, at 6:02 p.m., the taking of
12      the instant deposition ceased.)

Page 363

1   Notice Date: May 19, 2015
2   Deposition Date: May 15, 2015
3   Deponent: Mario Ugoletti
4   Case Name: McClendon v. United States

6   Page:Line       Now Reads        Should Read

Page 364

1   CERTIFICATE OF DEPONENT - MARIO UGOLETTI - MAY 15, 2015

3   I hereby certify that I have read and examined the
4   foregoing transcript, and the same is a true and
5   accurate record of the testimony given by me.
6   Any additions or corrections that I feel are
7   necessary, I will attach on a separate sheet of
8   paper to the original transcript.

10                  Signature of Deponent

12  I hereby certify that the individual representing
13  himself/herself to be the above-named individual,
14  appeared before me this _____ day of _____,
15  2015, and executed the above certificate in my
16  presence.

18              NOTARY PUBLIC IN AND FOR

21                  County Name
22  MY COMMISSION EXPIRES:

Page 365

1            Reporter's Certificate
2   I, Amanda Blomstrom, Certified Realtime Reporter,
3   Certified Livenote Reporter, Registered Merit Reporter,
4   Certified Shorthand Reporter, and the Notary Public
5   before whom the proceedings occurred, do hereby certify
6   that the witness was duly sworn, that the testimony of
7   said witness was taken by me and thereafter reduced to
8   this typewritten transcript under my supervision, that
9   said transcript is a true record of the testimony given
10  by said witness, that I am neither counsel for, related
11  to, nor employed by any of the parties to the
12  proceeding, and further, that I am not a relative or an
13  employee of any attorney or counsel employed by the
14  parties thereto, or financially or otherwise interested
15  in the outcome of the proceeding, or any action involved
16  therewith.
17  Witness my signature and seal:

20  AMANDA BLOMSTROM
21  Notary Public in and for the District of Columbia
22  My commission expires:  October 31, 2016

92 (Pages 362 to 365)