# EXHIBIT A

## SUSAN MCFARLAND AGREED TO DESIGNATIONS

| | |
|---|---|
| **Page 5:9-5:12**<br>9 Q. Good morning.<br>10 Would you please state your full name for<br>11 the record?<br>12 A. Susan McFarland. | Plaintiffs |
| **Page 9:5-9:21**<br>5 Q. When did you graduate from college?<br>6 A. 1983.<br>7 Q. Okay. And where did you go?<br>8 A. Texas A & M University.<br>9 Q. And what was your degree in?<br>10 A. A bachelor of business administration in<br>11 accounting.<br>12 Q. And after you graduated from A & M, where did<br>13 you go?<br>14 A. I came to Houston to work with<br>15 Deloitte, Haskins & Sells.<br>16 Q. And what were you doing for Deloitte?<br>17 A. I was an Auditor.<br>18 Q. Okay. And what type of companies did you<br>19 audit?<br>20 A. Predominately financial institutions and<br>21 Governmental entities. | Plaintiffs |
| **Page 10:8-10:13**<br>8 Q. Okay. And how long did you stay on with<br>9 Deloitte?<br>10 A. I left Deloitte in February of 1986.<br>11 Q. Okay. And where did you go after that?<br>12 A. To work for what was then mBank Houston, one of<br>13 my clients, my largest client. | Plaintiffs |
| **Page 11:10-11:15**<br>10 Q. Okay. And how long did you stay on with mBank?<br>11 A. Well, mBank failed and was put into<br>12 receivership with the FDIC in March of 1989. It<br>13 subsequently was acquired by Bank One<br>14 January 1st of 1990. I continued on through that, and<br>15 then thus became an employee of Bank One. | Plaintiffs |
| **Page 13:8-13:15**<br>8 Okay. So continue on.<br>9 A. And then I left Bank One in the fall of 2002 to | Plaintiffs |

| | |
|---|---|
| 10 join Capital One.<br>11 Q. Okay. And how -- and what was your role at<br>12 Capital One?<br>13 A. Initially I was Chief Financial Officer for all<br>14 of the operations and infrastructure and administrative<br>15 groups, as well as CFO for its legal entity bank. | |
| **Page 14:11-12**<br>11 How long did you stay with Capital One?<br>12 A. Until I left in 2011 to join Fannie Mae. | Plaintiffs |
| **Page 14:19-14:25**<br>19 Q. Okay. And during this time period, you know,<br>20 from graduation at A & M through the end of your tenure<br>21 at Capital One, did you ever encounter the concept of a<br>22 deferred tax asset?<br>23 A. Yes.<br>24 Q. So you knew what that was?<br>25 A. Yes. | Defendants |
| **Page 15:1-15:25**<br>1 Q. What is a deferred tax asset?<br>2 A. Basically timing differences between when you<br>3 recognize items for tax purposes versus when you<br>4 recognize items for GAAP earning purposes.<br>5 Q. Is one example of that a net operating loss<br>6 carryforward?<br>7 MR. LAUFGRABEN: Object to the form of<br>8 the question.<br>9 A. It can be.<br>10 Q. (BY MR. THOMPSON) Okay. And when you arrived<br>11 at -- when did you arrive at Fannie Mae?<br>12 A. The middle of 2011.<br>13 Q. Okay. And when you arrived, did Fannie Mae<br>14 have net operating loss carryforwards?<br>15 A. Yes.<br>16 Q. And was there a reserve on its Balance Sheet<br>17 against those net operating loss carryforwards?<br>18 A. Yes.<br>19 Q. Okay. And was that because at that time the<br>20 company had made a decision that it was more likely than<br>21 not they wouldn't be able to use the NOLs?<br>22 A. Correct.<br>23 MR. BARTOLOMUCCI: Object to the form of<br>24 the question.<br>25 A. Yes. | Plaintiffs |

| | |
|---|---|
| **Page 18:7-24**<br>7 Q. And when did you leave Fannie Mae?<br>8 A. Mid 2013.<br>9 Q. And why did you leave?<br>10 A. A number of different reasons.<br>11 I felt like, one, the first objective of<br>12 improving the financial performance had been achieved,<br>13 that Fannie Mae was on strong financial footing, had<br>14 been delivering profits consistently for several<br>15 quarters in all the forecasts that we were preparing and<br>16 I was reviewing, and it looked to be going a very<br>17 positive direction financially.<br>18 Two, it was clear, because of other<br>19 political priorities, the timeline on housing reform was<br>20 going to be well into the future. And so if you were<br>21 going to be able to have a meaningful part in that, you<br>22 would be -- need to be in it for the long haul, for a<br>23 long time. So that obviously causes one to ask a<br>24 question of, "Okay. To be, or not to be?" | Plaintiffs |
| **Page 28:8-28:20**<br>8 Q. (BY MR. THOMPSON) So were there instances<br>9 where someone at FHFA provided a directive to Fannie Mae<br>10 about an accounting item?<br>11 A. No.<br>12 MR. LAUFGRABEN: Same objection as<br>13 before.<br>14 A. And quite frankly, if they had directed me, if<br>15 I didn't agree that that was the appropriate accounting,<br>16 I would not have done it.<br>17 Q. (BY MR. THOMPSON) Okay.<br>18 A. My integrity as an accountant, as a CPA, is far<br>19 more important -- I would never do anything that was not<br>20 correct, period. | Defendants |
| **Page 28:21-29:6**<br>21 Q. Okay. And, now, one of your -- do you have<br>22 people who worked for you at Fannie Mae who were<br>23 responsible for putting together projections of<br>24 profitability?<br>25 A. Yes.<br>1 Q. Who headed up that team?<br>2 A. Anne Gehring was the head of Planning.<br>3 Q. And -- sorry.<br>4 A. So she and her team prepared and compiled the<br>5 forecast with inputs from a variety of areas from | Plaintiffs |

| | |
|---|---|
| 6 Fannie Mae. | |
| **Page 30:1-31:23**<br>1 Q. In light of this process where you have<br>2 different managers feeding information into the team<br>3 that worked for you to put together these projections,<br>4 would it be fair to say that an outsider trying to<br>5 project Fannie Mae's profitability would not have had<br>6 access to the type of detailed information that your<br>7 team had access to?<br>8 MR. LAUFGRABEN: Objection; form,<br>9 foundation, calls for speculation, calls for an<br>10 expert opinion.<br>11 A. It would be very difficult for someone to have<br>12 access to all the information that we clearly had access<br>13 to inside the company.<br>14 Q. (BY MR. THOMPSON) Do you think your team was<br>15 making the best projections of anyone who was trying to<br>16 forecast Fannie's future profitability?<br>17 A. Yes.<br>18 MR. LAUFGRABEN: Objection; form, calls<br>19 for speculation.<br>20 A. Yes. In hindsight, I believe that proved out<br>21 to be the case, proved to be so.<br>22 Q. (BY MR. THOMPSON) Okay. Now, why was<br>23 Fannie Mae producing these projections?<br>24 A. It was a normal -- I produced quarterly<br>25 forecasts at Bank One. I produced quarterly forecasts<br>1 at Capital One. It's a fairly normal thing that large<br>2 enterprises do in order for management to have a<br>3 perspective on what the future of the company might be,<br>4 and that might affect decisions and actions that<br>5 management may take or may want to take. It also can<br>6 help inform other constituents as to what the<br>7 expectations of performance would be for a company.<br>8 So Fannie was no different than the<br>9 companies I had worked for previously. So we -- we<br>10 would prepare forecasts on a quarterly basis and then<br>11 update the FHFA and the Treasury on what our<br>12 expectations for performance were. Also those forecasts<br>13 might inform disclosures that we may want to make within<br>14 our public filings.<br>15 Q. In 2012, did anyone at Treasury tell you that<br>16 your projections at Fannie Mae were too optimistic?<br>17 MR. LAUFGRABEN: Object to the form of<br>18 the question. | Plaintiffs |

| | |
|---|---|
| 19 A. No.<br>20 Q. (BY MR. THOMPSON) Did anyone at the FHFA in<br>21 2012 tell you that Fannie Mae's projections were too<br>22 optimistic?<br>23 A. No. | |
| **Page 44:13-17**<br>13 And what was your reaction when you<br>14 learned -- you learned of a Third Amendment a couple of<br>15 days beforehand; is that right?<br>16 A. Correct.<br>17 Q. All right. And what was your reaction to it? | Plaintiffs |
| **Page 44:25-45:10**<br>25 But I had, shortly before that, had<br>1 a meeting with Treasury whereby we reviewed our<br>2 forecasts. I had expressed a view that I believed we<br>3 were now in a sustainable profitability, that we would<br>4 be able to deliver sustainable profits over time. I<br>5 even mentioned the possibility that it could get to a<br>6 point in the not-so-distant future where the factors<br>7 might exist whereby the allowance on the<br>8 deferred tax asset would be released. We were not there<br>9 yet, but, you know, you could see positive things<br>10 occurring. | Plaintiffs |
| **Page 45:17-47:6**<br>17 Q. (BY MR. THOMPSON) And with whom at Treasury do<br>18 you have this meeting?<br>19 A. So the -- which meeting?<br>20 Q. The one you just referenced where --<br>21 A. Where I had the discussion about the forecasts?<br>22 Q. Yes.<br>23 A. So it was a common practice for us to meet with<br>24 Treasury on a quarterly basis to review our results from<br>25 the past quarter and to update them on our forecasts;<br>1 you know, our updated forecast.<br>2 And that meeting -- I don't remember<br>3 every specific person in the meeting. I was there;<br>4 Tim Mayopoulos, who was the CEO of Fannie Mae was there;<br>5 Dave Benson I think would have been there. He -- he was<br>6 the Treasurer of Fannie Mae at the time. That would<br>7 have been normal for him to be in attendance. Mary<br>8 Miller, the Secretary of the Treasury, was there.<br>9 Tim --<br>10 Q. Bowler? | Plaintiffs |

| | |
|---|---|
| 11 A. Thank you.<br>12 I believe he was there. He was normally<br>13 at those meetings.<br>14 I believe there was a gentleman -- and I<br>15 can't remember his name -- who used to work at Fannie<br>16 that was now at Treasury that was, like, a<br>17 Financial Analyst. I think he was there because they<br>18 knew part of the topic we wanted to talk about was these<br>19 projections.<br>20 And then there were probably other<br>21 members of -- excuse me -- FHFA, the U.S. Treasury, and<br>22 Fannie Mae to talk about some other topics that were<br>23 going to be covered in that meeting. Because normally<br>24 we reviewed financials, but they were -- you know, there<br>25 may be one, two, or three other topics that would be<br>1 discussed.<br>2 And both Fannie and Treasury would then<br>3 make sure they had the -- the personnel around the table<br>4 to facilitate those conversations. I don't remember in<br>5 this particular meeting what those topics were and who<br>6 those individuals were. | |
| **Page 47:25-48:12**<br>25 Q. Okay. And so would it be fair to say that<br>1 there were at least five or six Treasury officials at<br>2 this meeting?<br>3 A. Probably, yes.<br>4 Q. Okay. And did the meeting take place at<br>5 Treasury?<br>6 A. Yes, it did.<br>7 Q. And was this within less than a month before<br>8 the net worth sweep?<br>9 A. I believe it was the week before.<br>10 Q. Okay.<br>11 A. It was very -- it was within the week or two.<br>12 It was very close to. | Plaintiffs |
| **Page 48:13-48:23**<br>13 Q. Would it surprise you to know that there's an<br>14 e-mail from Tim Bowler where he's saying, "We need to<br>15 make a renewed push on the net worth sweep"?<br>16 MR. LAUFGRABEN: Objection; form, lack of<br>17 foundation.<br>18 MR. BARTOLOMUCCI: Objection.<br>19 A. I don't have knowledge of that e-mail.<br>20 Q. (BY MR. THOMPSON) Okay. And was this | Defendants |

| | |
|---|---|
| 21 meeting -- I am sorry if I asked this.<br>22 Was it at Treasury?<br>23 A. Yes. | |
| **Page 53:8-53:16**<br>8 Q. Okay. Did you take notes of this meeting?<br>9 A. No.<br>10 I don't generally take notes in those<br>11 types of meetings.<br>12 Q. Would there have been anyone on your team who<br>13 would typically take notes on those meetings?<br>14 A. No one on my team was present. In other words,<br>15 nobody from the Finance Team was present at the meeting<br>16 other than me. | Defendants |
| **Page 54:20-60:6**<br>20 Did you ever have any similar type of<br>21 conversation with anyone at the FHFA about the<br>22 deferred tax asset prior to the Third Amendment?<br>23 A. Yes.<br>24 Q. Okay. And tell me about that meeting.<br>25 A. Well --<br>1 MR. LAUFGRABEN: Object to the form of<br>2 the question; vague.<br>3 A. I don't -- so just as we -- you know, we had a<br>4 formal quarterly sit-down with Treasury. We had more<br>5 regular interactions with individuals at FHFA. So one<br>6 either Jeff Spohn and/or Brad Martin would attend our<br>7 Executive Committee meetings.<br>8 And so generally anything I was going to<br>9 say at Treasury, I was already telling the<br>10 Executive Committee, and Brad or Jeff would have been<br>11 present at those meetings.<br>12 And as such, my reviews of actuals and<br>13 forecasts and even the -- the -- the raising of the<br>14 potential that that allowance might be reversed in the<br>15 not-so-distant future I would have mentioned at an<br>16 Executive Committee meeting, and Jeff and/or Brad would<br>17 have been present to hear that.<br>18 Q. (BY MR. THOMPSON) And just to be clear on<br>19 that, that would have been within a month of the<br>20 Third Amendment?<br>21 A. It would have been prior to that --<br>22 Q. Yes.<br>23 A. -- because it's all part of the discussions we<br>24 have through the quarter-end-close process and forecast | Plaintiffs |

25 preparation and Board prep and all that kind of stuff
1 that takes place in that cycle.
2 Q. Just so the record is clear, when you say,
3 "prior to that," what period would that have been?
4 A. Well, it would have been probably -- I would
5 suspect it was -- something that occurred in July would
6 be my -- because of the timing.
7 You know, you're closing the books for
8 the second quarter. We're prepping for the upcoming
9 Board meetings, getting the forecasts done, letting the
10 team know when the results are coming out for the
11 quarter, all of those kinds of conversations that would
12 happen internal at Fannie Mae before we would ever have
13 that conversation with Treasury.
14 Q. Okay. And I am sorry I interrupted you.
15 You described these --
16 A. And then with the -- we also provide -- so we
17 cannot file our Q unless DeMarco gave us permission to
18 file the Q.
19 So drafts of our filings were also
20 provided to FHFA first. They had the opportunity to
21 provide feedback, and then we could incorporate that
22 feedback and then got approval for the final filings.
23 We also had a press release that would go
24 along with -- when we filed a Q, we would go out with a
25 press release. There is where you might see a little
1 more color.
2 There would normally be a quote for the
3 CEO like Tim and a quote from me, and we would also kind
4 of preclear that press release with FHFA before issuing
5 the press release.
6 As far as -- I believe during 2012, I
7 began to signal -- there began to be some public
8 communication as to our view that things were starting
9 to look good and starting to head in a positive
10 direction.
11 I would have to refresh my memory through
12 documents as to the timing of what I said and when. But
13 I know through the course of early 2012 and then
14 throughout that summer, the messaging was getting a bit
15 more and more positive that we were sending out. And
16 certainly FHFA was aware of our communications, our
17 external communications in that regard.
18 As far as the deferred tax asset, I -- I
19 don't recollect that we had some big formal meeting to
20 break the news to them, okay? I believe that it was

21 just something that we talked about in the normal course
22 of keeping them informed about kind of what we're
23 seeing.
24 And also, Jeff Spohn and/or Brad Martin
25 would attend our Board meetings, so they would also
1 hear that the same comments I was making to Treasury, I
2 was making to the Board.
3 Q. Okay. In the same timetable?
4 A. I don't remember exactly when the Board
5 meetings were within that window, but it would have been
6 Board meetings shortly before that that I would have
7 reviewed this very same information.
8 Q. Okay. And when you say that you would have had
9 dialogue with people at FHFA about the deferred tax
10 assets, with who would you have had the dialogue?
11 Would that have been Mario Ugoletti?
12 MR. LAUFGRABEN: Object to the form of
13 the question; vagueness as to time period.
14 A. Yeah.
15 So early on, it's probably through the
16 Chief Accountant's office of the FHFA, because it is a
17 technical accounting matter.
18 Q. And do you happen to recall --
19 A. I can pick him out of a lineup.
20 Q. Okay. We'll show you some names later on.
21 A. I tell you, I -- ask me a number, I can
22 probably give it to you. People's names...
23 It would have started there. Eventually
24 there were conversations with Director DeMarco and key
25 direct reports of his, but that -- the -- those -- the
1 DeMarco conversations occurred when we were actually in
2 the serious mode of potentially -- we were looking --
3 we did a full analysis at the end of the second quarter;
4 no release. We did a full analysis at the end of the
5 third quarter; no release.
6 When we were doing the analysis for the
7 fourth quarter of 2012, we started to get to a point
8 where we were tipping towards release, and that's when I
9 began to have conversations with more senior folks at
10 FHFA on it. But they were already aware of the
11 statement that I made to Treasury. I mean, in general,
12 I put it on people's radar screens that it's something
13 that could happen in the not-so-distant future.
14 I will say that I believe Mary Miller
15 asked me in this meeting about how large would it be and
16 did I have any idea of when.

| | |
|---|---|
| 17 Q. Yeah.<br>18 A. And I believe my response was around<br>19 50 billion, but that could be larger or smaller<br>20 depending upon when. The further out in time it is, the<br>21 smaller it probably would be. It is part of the<br>22 evidence that it might be good.<br>23 So the further out in time that it would<br>24 be released, the smaller the release size would be.<br>25 But I said probably in the<br>1 50-billion-dollar range and probably sometime mid 2013<br>2 at that time when I met with them late July, early<br>3 August 2012.<br>4 But I said we had not done a real<br>5 in-depth analysis, so I was just kind of giving her kind<br>6 of my off-the-cuff perspective in the moment. | |
| **Page 58:18-58:22**<br>18 Q. And do you happen to recall --<br>19 A. I can pick him out of a lineup.<br>20 Q. Okay. We'll show you some names later on.<br>21 A. I tell you, I -- ask me a number, I can<br>22 probably give it to you. People's names... | Defendants |
| **Page 65:5-66:23**<br>5 Q. Now, the periodic commitment fee.<br>6 Do you recall there being any discussion<br>7 while you were at Fannie Mae about the amount of the<br>8 periodic commitment fee?<br>9 MR. LAUFGRABEN: Objection as to time<br>10 period.<br>11 Q. (BY MR. THOMPSON) As I said, at the<br>12 beginning -- the assumption is -- that I am asking<br>13 about --<br>14 A. The main discussions were the -- that they were<br>15 continuing to waive our need to pay the commitment fee.<br>16 Q. Okay. Was the commitment fee regarded by<br>17 yourself as akin -- not the commitment fee, but the<br>18 commitment itself as akin to a line of credit?<br>19 MR. LAUFGRABEN: Objection; vague.<br>20 A. Yeah.<br>21 I mean, obviously the<br>22 Preferred Stock Purchase Agreement provides for<br>23 funding -- access to funding if in the event certain<br>24 conditions exist. One could say that's not dissimilar<br>25 to some forms -- you can call it a line of credit, or<br>1 you can call it an LC, a letter of credit, because it's | Plaintiffs |

| | |
|---|---|
| 2 a little bit more you draw if in the event certain<br>3 conditions exist, whereas a line of credit is open-ended<br>4 as to where one can draw and pay down and whatnot on it.<br>5 So you -- yeah. The commitment fee would<br>6 probably be very similar to fees that you would see<br>7 structured into those types of instruments.<br>8 Q. And are those types of fees generally<br>9 calculated as a percentage of the outstanding<br>10 commitment?<br>11 MR. LAUFGRABEN: Objection; lack of<br>12 foundation, calls for speculation, calls for<br>13 expert testimony.<br>14 A. I would say it -- for letters of credit and<br>15 lines of credit in the normal ordinary course of banks'<br>16 dealings with customers, since I have a lot of banking<br>17 experience, that would be a customary structure --<br>18 Q. (BY MR. THOMPSON) Okay.<br>19 A. -- Yes.<br>20 Q. All right. Did anyone at FHFA or Treasury tell<br>21 you that the periodic commitment fee would be<br>22 incalculably large if they didn't waive it?<br>23 A. No. | |
| **Page 72:1-72:5**<br>1 Do you recall anyone at FHFA ever<br>2 criticizing any of the projections of<br>3 future profitability that Fannie was making in<br>4 2011 and 2012 up through the time of the<br>5 net worth sweep? | Defendants |
| **Page 72:8-73:2**<br>8 A. I -- my recollection is there wasn't criticism.<br>9 There were questions. There were<br>10 cautions. In other words, you know, let's not forget<br>11 that, you know, this -- that a lot of bad things have<br>12 happened, right?<br>13 And, you know, with some history in mind,<br>14 when the declines were occurring, the degradations were<br>15 occurring, the company was having a hard time keeping up<br>16 with the face of the degradations. As a result, the<br>17 forecasts that the company had been producing prior to<br>18 my arrival -- and I am basing this on what I have been<br>19 told, so I don't know if it's relevant here or not --<br>20 that the actual outcomes tended to be a little bit worse<br>21 than what the company had been projecting.<br>22 But when I got there, we focused very | Defendants |

| | |
|---|---|
| 23 heavily on trying to continue to improve the quality of<br>24 the forecasts. And I think if you look at the actual<br>25 results vis-a-vis a lot of the forecasts we were<br>1 producing, you would see the results and forecasts being<br>2 more in alignment. In fact, it improved over time. | |
| **Page 73:3-73:18**<br>3 Having had experience at other companies,<br>4 that's not unusual that it's hard to catch up with<br>5 trends, whether that's negative trends or positive<br>6 trends.<br>7 So if some things are going bad,<br>8 sometimes it's hard to catch up to how bad. And, you<br>9 know -- but on the flip side, when things start to turn<br>10 good, sometimes it's hard to catch up with how fast and<br>11 the magnitude of the tailwinds and how much things are<br>12 going to improve and how fast. So that's not a unique<br>13 thing to Fannie Mae.<br>14 I just remember there being some general<br>15 discussions about, you know, are we -- you know, let's<br>16 not forget that there have been times in the past where<br>17 the forecasts didn't reflect all the badness that<br>18 ultimately happened, right? | Defendants |
| **Page 75:19-77:5**<br>19 Q. (BY Mr. THOMPSON) And if someone had come to<br>20 you on the eve of the net worth sweep and said to you,<br>21 "I think Fannie Mae is going to lose 13 billion dollars<br>22 in 2012," do you think that would have been an<br>23 unreasonable statement of future profitability as of<br>24 August 2012?<br>25 MR. LAUFGRABEN: Object to the form of<br>1 the question; calls for speculation, calls for an expert<br>2 opinion.<br>3 A. In the first quarter -- here's where my numbers<br>4 recollection comes in versus names recollection -- I<br>5 believe we made 2 to 3 billion in the first quarter of<br>6 '12. I think Fannie Mae was 6 billion dollars in the<br>7 second quarter of 2012. I am sure we can go look at<br>8 publically-available documents to determine whether I<br>9 was right or not.<br>10 So let's say the total profit to date<br>11 after June 30th was 8 to 9 billion dollars. So if<br>12 someone said, "We're going to lose 13 billion," that<br>13 would mean we would have to have a pretty big loss, a<br>14 substantial loss during the latter part of the year that | Plaintiffs |

| | |
|---|---|
| 15 would have had to have been greater than the loss we had<br>16 for all of 2011.<br>17 I -- certainly that was not what we were<br>18 expecting. That's not anywhere close to what our<br>19 projections were showing. They -- that was not in any<br>20 way, shape, or form, what we had reviewed with Treasury<br>21 and FHFA at that point in time.<br>22 So if somebody had come to me, I would<br>23 say, "Okay. Tell me what I missed. What is it that you<br>24 think is going to happen in the last few months of the<br>25 year that's going to completely wipe out the profits<br>1 that we've already posted, and then, you know, take it a<br>2 further 13 billion in the red?"<br>3 I would have a hard time -- I can't think<br>4 of situations that could happen that would cause that<br>5 outcome to be so. | |
| **Page 77:6-79:23**<br>6 Q. (BY MR. THOMPSON) Okay. If you were making an<br>7 important financial decision for Fannie Mae's future on<br>8 the date of the net worth sweep, would you have relied<br>9 on projections from September 30, 2011?<br>10 MR. LAUFGRABEN: Object to the form of<br>11 the questions; calls for speculation, lack of<br>12 foundation.<br>13 A. The reason we did updates to the forecast<br>14 quarterly were so that we could have, you know, fairly<br>15 current perspectives from which to make decisions on.<br>16 Q. (BY MR. THOMPSON) Why was it important to have<br>17 a fairly current perspective?<br>18 MR. LAUFGRABEN: Objection; form.<br>19 A. The situation was very fluid. A lot of things<br>20 were changing and quickly, and so things could become<br>21 very dated very quickly in that particular environment<br>22 at that particular time.<br>23 So it was very important to ensure -- we<br>24 were picking up goods and bad that were happening as<br>25 quick as we could -- we recognized them and could<br>1 consume them into our projections.<br>2 MR. LAUFGRABEN: David, I am sorry.<br>3 If you have a couple of more questions,<br>4 let's go, but can we go for a break?<br>5 MR. THOMPSON: Just another minute or<br>6 two, and then we'll move away from this document.<br>7 Q. (BY MR. THOMPSON) So -- but you said there<br>8 were goods and bad. | Plaintiffs |

| | |
|---|---|
| 9 If we look at the period from<br>10 September 30, 2011 to the date of the net worth sweep,<br>11 the goods outweighed the bad insofar as, you know, these<br>12 projections that Fannie put together in McFarland 4<br>13 showed a projected loss of 2 billion or so for 2012, and<br>14 yet you had -- any had made almost 8 billion halfway<br>15 through the year; is that right?<br>16 MR. LAUFGRABEN: Object to the form of<br>17 the question.<br>18 MR. BARTOLOMUCCI: Objection; form.<br>19 A. There were a lot of things that moved in a<br>20 positive direction between September of 2011 and late<br>21 July, early August 2012.<br>22 You can look at publically-available<br>23 information, look at the Home Price Index as it was<br>24 published out there and how much those changed during<br>25 that period of time.<br>1 Fannie does produce its own Home Price<br>2 Index. But you can look at non-published information,<br>3 and you can see improvements in projections coming from<br>4 third parties during that period of time. You can look<br>5 at average loss statistics on different work-out<br>6 situations. You can look at how much G fees changed<br>7 during that period of time.<br>8 If you look at what existed September 11,<br>9 and you compared that to what existed in mid, late<br>10 summer 2012, there's a number of key factors that moved<br>11 in a positive direction during that period.<br>12 Q. Okay. And those positive developments<br>13 outweighed any negative developments in that time period<br>14 on balance?<br>15 MR. LAUFGRABEN: Object to the form of<br>16 the question.<br>17 A. Our forecasts attempted to incorporate all of<br>18 those changes good and bad, and the outcomes, you can<br>19 see, improved.<br>20 So the collective -- so if you said if we<br>21 added up all the puts and takes in a quantifiable<br>22 fashion, then the net benefits outweighed the net<br>23 negatives. | |
| **Page 100:13-102:12**<br>13 Q. So the next one is going to be McFarland 9, and<br>14 it has a Bates number of FHFA49970 through 49973.<br>15 (McFarland Exhibit No. 9 was marked.)<br>16 Q. (BY MR. THOMPSON) This is an e-mail from | Plaintiffs |

17 January 12, 2012. The subject is Fannie Mae executive
18 management meeting of January 9, 2012. And then if we
19 turn to the second page under, "2012 Financial Plan," it
20 says, "Susan McFarland started discussion of the draft
21 2012 plan by highlight that the financial base case
22 project a 1.5 billion-dollar profit."
23 And then three or four sentences later,
24 it says, "Susan said the plan reflects the view that the
25 company is at an inflection point in the credit cycle,
1 the loss allowance, and credit-related expenses
2 projected to fall compared to 2011."
3 What do you mean by an inflection point?
4 MR. LAUFGRABEN: Object to the form of
5 the question; lack of foundation.
6 A. That the company had been -- the way the
7 allowance-for-loan-loss process works is you're not only
8 recognizing actual losses on loans that you are
9 resolving in the current period; you're building
10 reserves for expected future losses on loans not yet
11 resolved.
12 So in some ways, you get a double
13 headwind. You have a large amount of actual losses
14 hitting at the same time you're building reserves for
15 future losses.
16 My inflection point was kind of referring
17 to the fact that we were starting to see the tilting the
18 other way, whether the actual losses were going to begin
19 to improve. And as a result, you would begin to see
20 reductions in allowance over time because the amount of
21 expectation of future losses would be less than what we
22 had -- you know, because we had already worked through
23 -- a bunch through of it. As time goes by, you start to
24 work through those . As you work through those, they're
25 actual losses.
1 The actual charge-offs taken in a period
2 would begin to be lower than what they were in the same
3 period the previous year. Instead of having allowance
4 build, we might have allowance reductions.
5 Q. (BY MR. THOMPSON) So you could get a double
6 tailwind?
7 A. Correct.
8 MR. LAUFGRABEN: Objection.
9 Q. (BY MR. THOMPSON) And you did that --
10 MR. LAUFGRABEN: Object to the form of
11 the question.
12 A. Yes, we did.

| **Page 126:10-129:9** | Plaintiffs |
|---|---|
| 10 So let's go to our next one, which will<br>11 be Fannie 16. It has a Bates number of Fannie 255<br>12 through 302.<br>13 (McFarland Exhibit No. 16 was marked.)<br>14 Q. (BY MR. THOMPSON) This says, "Board Meeting<br>15 July 20, 2012, Fannie Mae Headquarters, Agenda."<br>16 If you want a minute just to look at it,<br>17 that's fine, but my question is going to be about<br>18 page 258, which just says 1 on the bottom of it. Yeah,<br>19 it's that page.<br>20 And the second paragraph from the bottom<br>21 says, "The current five-year forecast is for the years<br>22 2012 to 2016, and cumulative forecasted comprehensive<br>23 income is expected to be 56.6 billion dollars, which is<br>24 12.3 billion dollars higher than the May Board of<br>25 Directors' forecast for that period primarily due to an<br>1 improved credit outlook."<br>2 And this is yet another indication that<br>3 Fannie's prospects were improving, you know, in<br>4 July 2012; is that right?<br>5 Was that your sense?<br>6 MR. LAUFGRABEN: Object to the form of<br>7 the question; foundation.<br>8 A. Yes. It's an indication that our expectations<br>9 from the prior forecast to the current forecast, we're<br>10 now discussing had improved.<br>11 Q. (BY MR. THOMPSON) Okay. And the improved<br>12 credit outlook, how did that mechanically translate into<br>13 increased earnings?<br>14 Was there going to be reversing of loan<br>15 loss provisions?<br>16 MR. LAUFGRABEN: Objection to the form of<br>17 the question; foundation.<br>18 A. It would have shown up in lower actual<br>19 charge-offs.<br>20 Q. (BY MR. THOMPSON) Okay.<br>21 A. Probably a higher level of loan loss reserve<br>22 decline over that five-year period.<br>23 Q. (BY MR. THOMPSON) Okay.<br>24 A. So release.<br>25 Q. Okay.<br>1 A. And it can also show up in foreclosed asset<br>2 expense improvements.<br>3 There are other aspects of the P&L, the<br>4 Financial Statements, that could be positively impacted | |

| | |
|---|---|
| 5 by lower costs of loan workouts --<br>6 Q. Okay.<br>7 A. -- if you have fewer loans that need working<br>8 out.<br>9 Q. And FHFA would have been aware of the estimates<br>10 since they were made aware at Board meetings; is that<br>11 right?<br>12 MR. LAUFGRABEN: Object to the form of<br>13 the question.<br>14 A. Because this was presented at a Board meeting,<br>15 and it was normal for Jeff Spohn or Brad Martin to be<br>16 present at the Board meetings -- you know, I am sure the<br>17 minutes of the Board meeting documents who is present.<br>18 It would be normal for a member of FHFA<br>19 to be present.<br>20 Q. (BY MR. THOMPSON) If we look at slide 11 of<br>21 the PowerPoint deck, which is page 270, the title of the<br>22 slide is, "The Company is Projected to Achieve<br>23 Sustainable Profitability Beginning 2012."<br>24 And what was the basis for that<br>25 statement?<br>1 MR. LAUFGRABEN: Object to the form of<br>2 the question; lack of foundation.<br>3 A. I would draw your attention to the net income<br>4 and comprehensive income lines that are shaded. And as<br>5 you will see, that there are projected profits in all<br>6 five years of the five-year forecast period.<br>7 Q. (BY MR. THOMPSON) Okay. You can put that one<br>8 to the side.<br>9 A. Okay. | |
| **Page 131:23-134:8**<br>23 their methodology was and -- let me ask it this way:<br>24 Other than errors correction, you can't think of any<br>25 basis for projections of profitability for Fannie to<br>1 fall in half from June to July of 2012, given that your<br>2 own projections were getting better, right?<br>3 MR. LAUFGRABEN: Object to the form of<br>4 the question; lack of foundation, calls for speculation,<br>5 calls for an expert opinion.<br>6 MR. BARTOLOMUCCI: Objection; form.<br>7 A. Okay. Well, I thought I had answered that in<br>8 the way I answered the last question, which I am not<br>9 aware of any key factors that were degrading at that<br>10 point in time.<br>11 Q. (BY MR. THOMPSON) Okay. That's fine. | Plaintiffs |

12 Okay. Let's move on to another document.
13 Okay. So this next one is going to be McFarland 17. It
14 has a Bates number of Fannie Mae 3142 through 3152.
15 (McFarland Exhibit No. 17 was marked.)
16 Q. (BY MR. THOMPSON) So these are minutes of a
17 meeting of the Board of Directors of Fannie Mae
18 July 20, 2012. And if we turn to the last page of this
19 document, it says in the last paragraph, "The Board
20 discussed key sensitivities and assumptions in the
21 multiyear forecast and drivers to credit-related
22 expenses that might impact the forecast. Of these,
23 changes to home prices have the most significant impact
24 on the company's net worth over a five-year time frame."
25 Was that an accurate statement?
1 A. Yes.
2 MR. LAUFGRABEN: Objection.
3 Q. (BY MR. THOMPSON) Okay. And -- but why were
4 the home prices the most -- why did they have the most
5 significant impact?
6 MR. LAUFGRABEN: Lack of foundation;
7 objection.
8 A. Because the revenue streams were more stable
9 because they were based predominately on the
10 book of business that already existed and didn't -- in
11 other words, Fannie Mae earns revenue off of long-term
12 assets. So the vast majority of Fannie Mae's revenue in
13 a given period is based on business that's already been
14 produced and on the books and isn't as sensitive to the
15 amount of new business coming on in, you know, future
16 periods.
17 Expenses, as I mentioned earlier, are --
18 noninterest expenses are not a huge item on the
19 financial performance of the company. At this point in
20 time, credit losses was substantial and was the most
21 volatile or variable. And the single biggest driver of
22 credit losses or expectation of credit losses is home
23 prices because that directly affects the severity of any
24 loans that you have to go to foreclosure because the
25 value you're going to get for the home, as, you know,
1 you sell it to recover some part of the loan amount is
2 going to be higher or lower. It can affect the
3 borrower's ability to refinance their home, to sell out
4 of their home. In other words, to take actions that
5 could help them make good on the mortgage.
6 So home prices is the single biggest, but
7 not only -- the single biggest variable in what the

| | |
|---|---|
| 8 expectations for credit loses would be. | |
| **Page 137:21-139:4**<br>21 And our next one is going to be<br>22 McFarland 19, and it has the Bates number of Fannie Mae<br>23 3160 through 3165.<br>24 (McFarland Exhibit No. 19 was marked.)<br>25 Q. (BY MR. THOMPSON) So this says, "Minutes of<br>1 the Audit Committee of the Board of Directors of<br>2 Fannie Mae, August 6th, 2012."<br>3 And again, my apologies for my ignorance,<br>4 but what does an Audit Committee do?<br>5 What is its function?<br>6 MR. LAUFGRABEN: Objection; vague.<br>7 A. The Audit Committee is one of the committees of<br>8 the Board, and they focus on generally matters of risks<br>9 and controls and financial performance.<br>10 So, for instance, that would be the<br>11 committee that the Internal Auditor would report out to<br>12 on their work and findings and any issues that they<br>13 identified that they thought rose to the level of the<br>14 Board.<br>15 The Chief Compliance Officer -- you know,<br>16 so think of different individuals that sit in some kind<br>17 of risk or control position or position responsible for<br>18 risks and controls would generally report out to the<br>19 Audit Committee.<br>20 Q. (BY MR. THOMPSON) Okay. And we can see on<br>21 this that you were present, it says, in the third<br>22 paragraph, second line. Then in the last sentence of<br>23 that third paragraph, it says Jeff Spohn, Brad Martin,<br>24 and James Giffin of the Federal Housing Finance Agency,<br>25 F HFA, also participated in the call.<br>1 Is that consistent with the practice you<br>2 have been describing today, that FHFA would participate<br>3 in Audit Committee meetings?<br>4 A. Yes. | Plaintiffs |
| **Page 161:18-21**<br>18 Q. (BY MR. THOMPSON) So take a moment,<br>19 Ms. McFarland, to look through this, and my question is<br>20 whether this is the PowerPoint presentation that was<br>21 provided to Treasury at that meeting? | Plaintiffs |

| | |
|---|---|
| **Page 161:25-162:12**<br>25 A. This is it, although this is the update.<br>1 So from time to time, presentations,<br>2 whether that's -- you know, Treasury or Board or<br>3 whatever, it looks like this has some updates. Normally<br>4 those updates are minor corrections. Maybe it's<br>5 spellings or -- you know, I can't tell you what got<br>6 changed, but clearly we met with them on August 9th.<br>7 So the version I would have used would<br>8 have been the version that existed on August 9th, not<br>9 the updated version as of August 15th. I am not aware<br>10 of substantive changes made the document. In all<br>11 material respects, probably the information here is the<br>12 same material that I reviewed with Treasury. | Plaintiffs |
| **Page 162:19-164:12**<br>19 Q. (BY MR. THOMPSON) Okay. So -- and you walked<br>20 them through each of these slides --<br>21 MR. LAUFGRABEN: Object to the form of<br>22 the question.<br>23 Q. (BY MR. THOMPSON) -- the Treasury officials<br>24 who were present?<br>25 A. I walked Treasury through the financial slides.<br>163<br>1 Q. The financial slides, okay.<br>2 A. Correct.<br>3 Q. Including the projections of future<br>4 profitability?<br>5 A. Yes.<br>6 MR. LAUFGRABEN: Objection.<br>7 Q. (BY MR. THOMPSON) Okay. And what was their<br>8 reaction to the projections of future profitability?<br>9 MR. LAUFGRABEN: Object to the form of<br>10 the question. It's vague.<br>11 A. I remember there being a few questions asked<br>12 that I would put more in the category of seek to<br>13 understand.<br>14 Q. (BY MR. THOMPSON) Okay.<br>15 A. And I do think there was a, you know -- a<br>16 little bit of question around, well, you know, what<br>17 could cause the outcomes to be, you know, different than<br>18 this. And I believe I gave them a brief update of some<br>19 sensitivity analyses that we do, which we kind of do on<br>20 a recurring basis.<br>21 But there wasn't any expression of -- I<br>22 want to be careful here. | Plaintiffs |

| | |
|---|---|
| 23 Generally in our meetings with Treasury,<br>24 they wanted to hear a lot more from us than they were<br>25 giving.<br>164<br>1 Q. Yes. I understand.<br>2 A. They kept things fairly close to the vest, if<br>3 you will.<br>4 Q. Yes.<br>5 A. So this was not untypical of that.<br>6 But they asked a few questions.<br>7 Sometimes from the questions they ask, you can kind of<br>8 get a sense of what's on their mind.<br>9 That is where, you know, Mary did ask me<br>10 -- when I brought up the deferred tax asset allowance<br>11 valuation, you know, she asked me that question as an<br>12 example. But -- | |
| **Page 190:20-22**<br>20 Q. Good afternoon, Ms. McFarland. As I mentioned<br>21 earlier, my name is Eric Laufgraben, and I represent the<br>22 United States in this action. | Defendants |