# EXHIBIT C

## Fannie Mae/Freddie Mac

Joseph Cacciapalle, et al. / (2013-036)

# Benson Agreed To Designations

Deponent: David C Benson                                                                                February 28, 2020

Created: 6/29/2023 6:45 pm by Bridget Wing



The operating system for lawyers®

# TRANSCRIPT INDEX

| Transcript | Page |
| --- | --- |
| Deposition of David C Benson | 2 |

Designation Report                                                                                  Fannie Mae/Freddie Mac (2013-036)

**Deposition of David C Benson**   (February 28, 2020)                                        (25 Clips / Runtime: 00:25:06)



CONFIDENTIAL                                                                                      Kessler Topaz Meltzer & Check, LLP

Designation Report                                                                Fannie Mae/Freddie Mac (2013-036)

| Page 15:8 to 17:2 | ▶ 00:02:25 | Plaintiffs | Affirmative |
|---|---|---|---|

```
 8         Q.    And how did you end up taking the job at
 9   Fannie Mae?  Sort of what transpired that got you to
10   make that move?
11         A.    I was contacted when the firm was looking
12   for an assistant treasurer, somebody who had deep --
13   deep experience in the various products that Fannie
14   Mae used to manage its liability profile, its risk
15   management process.  And so I was contacted, and then
16   I showed an interest, and we went from there.
17         Q.    And why were you interested?  What made
18   you want to work at Fannie Mae?
19         A.    The firm was one of the, if not the
20   largest participants in the fixed income market in
21   many of the markets that I knew -- you know, knew
22   well.  And so I knew of their involvement from the
 1   other side of the equation, from the sell side.  And
 2   as -- you know, I knew them as a very, you know,
 3   important part of the marketplace.  And it was very
 4   attractive to me to sort of, you know, be able to
 5   kind of look at things from that perspective, and to
 6   come in with that level of import, you know, and try
 7   to make a difference.
 8         Q.    And can you now give me sort of the same
 9   type of thumbnail sketch of the different positions
10   you've had at Fannie Mae up to present?
11         A.    Sure.  So I came in as the assistant
12   treasurer.  I was promoted to treasurer a few years
13   after that.  And then within a couple of years, I was
14   promoted to executive vice president of capital
15   markets.  And I also served as treasurer during, you
16   know, part of that time.
17               As the executive vice president of capital
18   markets, I think over a period of about five years, I
19   took on additional roles, you know, that came into
20   that, including strategy and some other things.  But
21   the primary role was to run our balance sheet.  And
```

CONFIDENTIAL                                                              Kessler Topaz Meltzer & Check, LLP

|  |  |
|---|---|
| 22 | then I became the CFO, and was CFO for about five |
| 1 | years.  And then about two years ago, or a year and a |
| 2 | half ago, I became president. |

**Page 75:22 to 76:7** ▶ 00:00:22    Plaintiffs    Affirmative

|  |  |
|---|---|
| 22 | And I guess the first thing I'd like to ask is, |
| 1 | meetings of the Fannie Mae executive management |
| 2 | committee, would those be meetings that typically |
| 3 | somebody from FHFA would attend? |
| 4 | MS. VERGOW:  Objection.  The question |
| 5 | lacks foundation. |
| 6 | THE WITNESS:  Since the inception of the |
| 7 | conservatorship, yes. |

**Page 136:17 to 136:21** ▶ 00:00:13    Plaintiffs    Affirmative

|  |  |
|---|---|
| 17 | (Benson Exhibit No. 11 was |
| 18 | marked for identification.) |
| 19 | BY MR. BARNES: |
| 20 | Q.   This will be Benson 11.  The Bates stamp |
| 21 | on this one is FNM-Fairholme-0022595.  And this is a |

| Page 142:14 to 143:10 | ▶ 00:01:11 | Plaintiffs | Affirmative |

```
14        Q.    And can you say a little more about the
15   kind of progress that had been made as of March of
16   2012?
17        A.    Well, as is noted in this document, the
18   firm was expecting at some point that year to
19   become -- potentially to become profitable with some
20   various categories in the income statement that were
21   somewhat unknowable, but it was at least seeing its
22   way through that.  So that was a change from what had
 1   been going on in the previous few years.
 2              And, you know, there was a recognition of
 3   the book of business that had been generated since
 4   2009 as becoming, you know, the larger part of the
 5   assets on the balance sheet, which were of much
 6   higher quality and were expected to perform, you
 7   know, well going forward.  And that much of the
 8   damage that had been created in the crisis up to that
 9   point had been reflected in the financial statements
10   already.  So I think that's what the changes were.
```

| Page 143:11 to 144:7 | ▶ 00:01:12 | Defendants | Affirmative |

```
11        Q.    And early on in that answer, you made
12   reference to various categories in the income
13   statement that were unknowable.
14        A.    Uh-huh.
15        Q.    What categories do you have in mind there?
16        A.    Fair value, gains and losses, the
17   amortization -- amortization income from the GSE
18   book.  At the time, I think the expectation was that
19   the credit-related income would become -- would begin
20   to -- would have stabilized, which had been very,
21   very negative for quite some time, would stabilize
22   and go positive.  But that's an unknowable also,
 1   meaning it's dependent upon a number of factors.
 2            So, you know, interest rates are not
 3   knowable, in terms of the direction they're going to
 4   head, and that impacts a number of these items as
 5   well.  Home price appreciation or depreciation in any
 6   given period is unknowable, and would have impact on
 7   credit-related income.
```

| Page 144:8 to 145:5 | ▶ 00:01:02 | Plaintiffs | Affirmative |
|---|---|---|---|

```
 8       Q.    And I think you also mentioned that the
 9  book of business that Fannie had from 2009 forward
10  was better or more profitable.  Do I have that right?
11       A.    Correct.
12       Q.    And can you just kind of explain the
13  difference between the 2009 and thereafter book of
14  business versus the earlier book of business?
15             MS. VERGOW:  Objection to form, vague as
16  to time.
17             THE WITNESS:  Underwriting standards were
18  tightened, so the loans that were originated during
19  those periods were, on average, and in the tails,
20  meaning in their worst components, better than what
21  had been the case.  Many of the kinds of products
22  that had been problematic that created losses in the
 1  prior periods no longer existed even in the
 2  marketplace at all.  So there were just very
 3  significant changes in the industry and at Fannie to
 4  generate what was expected to be a very, you know,
 5  profitable book.
```

| Page 158:16 to 158:17 | ▶ 00:00:26 | Plaintiffs | Affirmative |
|---|---|---|---|

```
16       Q.    And this will be Benson 14, and it's Bates
17  number FHFA-00047951.  And, Mr. Benson, again, you're
```

| Page 158:22 to 159:17 | ▶ 00:01:58 | Plaintiffs | Affirmative |
|---|---|---|---|

```
22         Q.    And the date on this document is July 9th,
 1    2012.  And I guess, as an initial matter, can you
 2    give me a sense for the trajectory of Fannie's
 3    expectations with respect to credit expenses in the
 4    summer of 2012?
 5            MS. VERGOW:  Objection to form, vague.
 6            THE WITNESS:  That they would improve.
 7    BY MR. BARNES:
 8         Q.    And what was the reason for thinking that
 9    they would improve?
10         A.    Home prices were starting to recover, and
11    the overall credit environment was recovering with
12    them.
13         Q.    And was the expectation that that would
14    make an appreciable difference, in terms of Fannie's
15    profitability?
16            MS. VERGOW:  Objection, vague.
17            THE WITNESS:  Over time, yes.
```

| Page 160:4 to 160:5 | ▶ 00:00:10 | Plaintiffs | Affirmative |
|---|---|---|---|

```
 4         Q.    And this is Benson 15, Bates number
 5    FHFA-00073824.  This is just basically a one-page
```

**Page 160:18 to 161:18**  ▶ 00:01:14                                              Plaintiffs                                      Affirmative

```
18         Q.    Okay.  And the author of the email -- this
19   is an internal FHFA email -- suggests that Fannie
20   could see a roaring recovery fueled in large part by
21   drawing down on approximately $70 billion allowance
22   for loan loss reserves and 03-3 loans.  Do you see
 1   that?
 2         A.    Uh-huh.
 3         Q.    In May of 2012, was it your expectation
 4   that Fannie would experience a roaring recovery as a
 5   result of the recognition of money coming out of the
 6   loan loss reserve?
 7               MS. VERGOW:  Objection, vague.
 8               THE WITNESS:  I can't recall specifically,
 9   you know, May of 2012.  But in the period, in 2012,
10   when we returned to profitability, all -- you know,
11   the factors that would -- that we discussed, which
12   were improving home prices and better credit
13   conditions, and all of that, were playing into a
14   better profile for our profitability.  I think those
15   trends continued.  So we've already really discussed
16   what I think our -- you know, how we were thinking
17   about things in that early period, when we had just
18   begun to be profitable.
```

| Page 173:7 to 176:14 | ▶ 00:04:40 | Plaintiffs | Affirmative |

```
  7        Q.    Mr. Benson, have you seen this document
  8   before?  It's Bates stamped FNM-Fairholme-0039749.
  9        A.    Yes, I have.
 10        Q.    When was the last time you saw it?
 11              MS. VERGOW:  You can answer.
 12              THE WITNESS:  I saw this in preparation
 13   for this deposition.
 14   BY MR. BARNES:
 15        Q.    And did you have a role in preparing this
 16   document?
 17        A.    Yes.
 18        Q.    And the title of the document is strategic
 19   planning session.  What is that referring to,
 20   strategic planning session?
 21        A.    Each July, the board of directors
 22   typically would reserve two to three hours a time to
  1   talk about what they would call strategic planning.
  2   Strategic planning, in the context of being a GSE in
  3   conservatorship, might have a slightly different feel
  4   to it than in a normal commercial corporate setting,
  5   but nevertheless, it was to discuss, you know,
  6   matters of long-term, you know, import to the
  7   company.
  8        Q.    And in the course of these strategic
  9   planning sessions, would one thing that you would
 10   look at be the financial projections for the company?
 11              MS. VERGOW:  Objection, form.
 12              THE WITNESS:  The answer is sometimes, but
 13   not necessarily.
 14   BY MR. BARNES:
 15        Q.    Okay.  And if you would flip to slide 13
 16   of this document.  And there is a bar chart here, and
 17   it looks like it's got some projections about
 18   Fannie's dividend payments to the Treasury
 19   Department, is that right?
 20        A.    Correct.
```

```
21       Q.    And it appears that there is a -- the
22  chart -- the bars associated with 2020 are circled.
 1  Can you explain for me why those years are circled?
 2       A.    Sure.  There's two bars.  The lighter bar
 3  is dividend payments that have been made to Treasury.
 4  And many of these years, they're showing are
 5  obviously a stylized estimate of the future, because
 6  I think this has been published in 2012.  So you have
 7  maybe four years of actuals, and then the rest is
 8  some form of estimate or forecast of the type.
 9             And then the right gray bar, darker bar,
10  is the -- it's the aggregate amount of draws that had
11  been taken.  And so -- and then the circled bar is
12  where the dividend payments on a cumulative basis
13  that have gone to Treasury exceeded the cumulative
14  draws.  And this is a combination of both Fannie and
15  Freddie, so it's an estimate of both GSEs combined.
16       Q.    And to what extent, if any, did you think
17  the GSEs making combined dividend payments in excess
18  of Treasury's investment was a significant event?
19             MS. VERGOW:  Objection to form.
20             THE WITNESS:  It was a -- I would consider
21  this to have been in the category of a marketing
22  issue of representing the benefits that the
 1  government had received versus the commitment or the
 2  actual amounts that they had had to put in.  So using
 3  this as sort of a marketing spin on trying to put
 4  success on that wrapper.
 5  BY MR. BARNES:
 6       Q.    And who was the target of the marketing?
 7       A.    Well, this was a presentation to the board
 8  of directors, and offering to them ideas of how one
 9  might position, from a marketing standpoint, the
10  potential -- basically, the potential, you know,
11  success factors of how the GSEs could be looked at,
12  at some point in the future, potentially.
13       Q.    Looked at in the future by whom?
14       A.    The public.
```

| Page 176:15 to 176:21 ▶ 00:00:18 | Defendants | Affirmative |
|---|---|---|
| 15       Q.    And if you look at the next page, slide<br>16   14, it looks like there are some more detailed<br>17   financial projections for Fannie and Freddie both.<br>18   Do I have that right?<br>19       A.    Correct.<br>20       Q.    And why was Fannie preparing financial<br>21   projections for Freddie Mac? | | |
| **Page 177:1 to 177:8** ▶ 00:00:24 | Defendants | Affirmative |
| 1            THE WITNESS:  Well, this is not -- this<br>2   wouldn't have been information -- this would come<br>3   from public information, so it would be information<br>4   that -- we didn't have Freddie's internal.  So this<br>5   would have been our attempt to be able to frame, in<br>6   the same way that we would do for yourselves, to do<br>7   the best we could to try to estimate what their<br>8   position might be.  And that's what that is. | | |
| **Page 177:22 to 178:2** ▶ 00:00:09 | Defendants | Affirmative |
| 22       Q.    Do these projections reflect Fannie's best<br>1   and most honest assessment of how it expected to<br>2   perform in the future at the time? | | |

| Page 178:4 to 179:7 | ▶ 00:01:25 | Defendants | Affirmative |
|---|---|---|---|

```
 4            THE WITNESS:  This was intended as a
 5   strategic thought piece, as opposed to an audited
 6   financial statement.  So these would be, you know,
 7   estimates using information that came from our
 8   finance group with a lens on the various assumptions
 9   also that were -- I believe some of those assumptions
10   were listed in a previous page -- to really
11   illustrate what could be -- assuming that those
12   assumptions were reasonable.  Of course, the
13   actuality of events going forward were going to be
14   highly sensitive to many of those assumptions and
15   whether they were correct or not.
16            You've asked if it was the best estimate.
17   It wasn't -- the purpose of this wasn't necessarily
18   to go through the kind of rigor that one would
19   typically go through, in terms of the way we would do
20   our official forecast.  This was more of a -- call it
21   an unofficial, long-term forecast, which by the way
22   is not usual for us to do a 10-year forecast.  That's
 1   outside the bounds of what we would typically do for
 2   our own purposes.  Typically, that's more of a
 3   five-year forecast that we do.
 4            So, again, it was -- it was a reasonable
 5   estimate in the context of what we were trying to
 6   demonstrate for the purposes of this particular
 7   session.
```

| Page 182:15 to 183:8 | ▶ 00:02:14 | Plaintiffs | Affirmative |
|---|---|---|---|

```
15      Q.     So this is Benson 19, FHFA-00047889.
16   Mr. Benson, have you seen this document before?
17      A.     I have not.
18      Q.     It purports to be a set of notes from a
19   Fannie Mae executive management meeting on July 9th,
20   2012.
21      A.     Uh-huh.
22      Q.     And if you would, read for me the
 1   paragraph of text that is under GSE strategy update.
 2      A.     Okay.  Okay.
 3      Q.     Mr. Benson, did you say at a meeting of
 4   the executive management team on July 9th, 2012 that
 5   the next eight years were likely to be the golden
 6   years of GSE earnings?
 7      A.     That sounds like something I might have
 8   said.  I don't recall.
```

| Page 186:18 to 186:18 | ▶ 00:00:11 | Plaintiffs | Affirmative |
|---|---|---|---|

```
18      Q.     This is Benson 22.  It's also
```

| Page 186:21 to 187:2 | ▶ 00:00:24 | Plaintiffs | Affirmative |
|---|---|---|---|

```
21   UST 00005747.  I apologize.  And the first page here
22   is an email -- it looks like an email you sent to Tim
 1   Bowler.  Does that look right?
 2      A.     Tim Bowler.
```

| Page 187:5 to 187:13 | ▶ 00:00:30 | Plaintiffs | Affirmative |
|---|---|---|---|

```
 5      Q.    Who was or is Tim Bowler?
 6      A.    Tim Bowler, at the time, was working at
 7   the Treasury Department.  I believe he was a Deputy
 8   Assistant Secretary.  I believe that was the title.
 9      Q.    And did you routinely interact with
10   Mr. Bowler or --
11            MS. VERGOW:  Objection, vague.
12            THE WITNESS:  I would say it was
13   reasonably frequent.
```

| Page 188:4 to 188:10 | ▶ 00:00:15 | Plaintiffs | Affirmative |
|---|---|---|---|

```
 4      Q.    Would you have sent Mr. Bowler a set of
 5   financial projections that you thought were wrong?
 6            MS. VERGOW:  Objection, form --
 7            THE WITNESS:  No.
 8            MS. VERGOW:  -- lacks foundation, calls
 9   for speculation.
10            THE WITNESS:  No.
```

| Page 189:19 to 190:10 | ▶ 00:01:05 | Plaintiffs | Affirmative |

```
19        Q.    And the financial projections we've been
20   looking at, would these be projections that FHFA also
21   would have had access to?
22              MS. VERGOW:  Objection, form.
 1              THE WITNESS:  Yes.
 2   BY MR. BARNES:
 3        Q.    Do you recall during this period anyone
 4   from FHFA suggesting that Fannie's projections were
 5   too optimistic?
 6        A.    I don't recall.
 7        Q.    Do you recall anyone from the Treasury
 8   Department suggesting that Fannie Mae's projections
 9   were too optimistic?
10        A.    I don't recall that either.
```

| Page 198:16 to 199:8 | ▶ 00:00:53 | Plaintiffs | Affirmative |

```
16        Q.    Can you give me a sense for how Fannie's
17   financial condition had changed between September
18   2011 and August 2012?
19              MS. VERGOW:  Objection, vague.
20              THE WITNESS:  I just don't have the data
21   in front of me to represent -- give you much of a
22   representation on that, other than improving.
 1   BY MR. BARNES:
 2        Q.    Things were getting better?
 3        A.    Things were getting better.
 4        Q.    And as things got better, would that have
 5   an effect on projections of comprehensive income?
 6              MS. VERGOW:  Objection, vague, asked and
 7   answered.
 8              THE WITNESS:  As a general matter, yes.
```

| Page 212:11 to 213:10 | ▶ 00:01:41 | Plaintiffs | Affirmative |
|---|---|---|---|

```
11        Q.    Do you think it would be a good thing if
12   Fannie Mae exited from conservatorship?
13              MS. VERGOW:  Objection, vague, form.
14              THE WITNESS:  My opinion?  Yes.
15   BY MR. BARNES:
16        Q.    Why?
17        A.    I come from a commercial background
18   originally.  It's -- I believe that commercial
19   practices supported by private capital is a good
20   thing for our economy, and for good corporate
21   governance and practices.  I believe it leads to
22   better outcomes overall for society, in general,
 1   for -- if, you know -- so, you know, I just naturally
 2   am constituted to want to favor that form of
 3   structure, as opposed to, you know, having the
 4   government be involved in various matters that
 5   perhaps are better left to the private sector to deal
 6   with.
 7        Q.    And in order to exit conservatorship, is
 8   it necessary for Fannie to build capital?
 9              MS. VERGOW:  Objection, vague.
10              THE WITNESS:  Yes.
```