**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE FEDERAL HOUSING FINANCE AGENCY, et al., <br><br> *Defendants.* | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS <br> _____ <br><br> This document relates to: <br> ALL CASES | Case No. 1:13-mc-1288-RCL |

## PLAINTIFFS' PRETRIAL STATEMENT

Pursuant to the Court's Stipulated Order (Class ECF No. 282) and LCvR 16.5, Plaintiffs hereby submit their Pretrial Statement.

## I.    STATEMENT OF THE CASE

This case consists of both a class action brought by plaintiffs Joseph Cacciapalle, Michelle M. Miller, Timothy J. Cassell, and Barry P. Borodkin (the "Class Plaintiffs") against defendants Federal Housing Finance Agency ("FHFA"), Federal National Mortgage Association ("Fannie Mae"), and Federal Home Loan Mortgage Corporation ("Freddie Mac," and together with Fannie Mae, "Defendants" or the "Companies"), and an individual action brought by Berkley Insurance Company, Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred

Employers Insurance Company (the "Berkley Plaintiffs") against the same defendants.  Class Plaintiffs and the Berkley Plaintiffs (collectively "Plaintiffs") are holders of junior preferred stock of Fannie Mae and Freddie Mac and common stock of Freddie Mac.  The Plaintiffs commenced their respective actions in 2013, challenging the Third Amendment to Amended and Restated Senior Preferred Stock Purchase Agreements ("PSPAs") between FHFA (in its capacity as Conservator for the Companies) and the United States Department of the Treasury ("Treasury"), dated August 17, 2012 (the "Third Amendment").

Fannie Mae and Freddie Mac are private, shareholder-owned for-profit corporations created by Congress to increase liquidity and stability in the secondary market for home mortgages. For years, private shareholders provided the necessary capital to fund the public mission of Fannie Mae and Freddie Mac to promote affordable home ownership for all Americans.  Those investments continued during the financial crisis that began in 2007, with shareholders providing over $19 billion in crucial investments in 2007 and 2008.  Over a three-decade period beginning no later than 1977, and continuing through the second quarter of 2008, Fannie Mae and Freddie Mac consistently paid a dividend to preferred shareholders every quarter.

In July 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), which enumerated specific circumstances under which the newly-created FHFA could place Fannie Mae and Freddie Mac into conservatorship or receivership and which granted Treasury temporary authority to provide financial assistance by purchasing securities in the Companies.  On September 6, 2008, FHFA exercised its authority and placed the Companies into conservatorship.  Treasury thereafter provided funding to Fannie Mae and Freddie Mac through the PSPAs.

The conservatorships did not eliminate the contractual rights held by the Companies' preferred and common shareholders.  Indeed, FHFA expressly stated that Fannie's and Freddie's stockholders "continue to retain all rights in the stock's financial worth."  FHFA's then-Director, James Lockhart, testified to Congress that "shareholders are still in place"; that "both the preferred and common shareholders have an economic interest in the companies;" and that "going forward there may be some value" in that interest.  FHFA also repeatedly explained to investors that the conservatorships were "intended to have a limited duration," that the "objective" of the conservatorships was to "return the entit[ies] to normal business operations," and that FHFA would operate each "institution until it is stabilized and then returned to investors."  FHFA further stated that the conservatorships would last only "until [the Companies] are stabilized," promising that once the Companies had been restored to a "safe and solvent condition," "the Director will issue an order terminating the conservatorship."

These statements were consistent with the text of HERA, which charged FHFA as conservator with "preserv[ing] and conserv[ing] [the Companies'] assets and property" and managing them in a manner that would restore them to a "sound and solvent condition."  *See* 12 U.S.C. § 4617(b)(2)(D).  HERA also expressed Congress's clear intent to "protect the taxpayers" by maintaining Fannie's and Freddie's "status as a private shareholder-owned company[ies]."  *See* 12 U.S.C. § 1455(l)(1)(C); 1719(g)(1)(C).

The conservatorships and Treasury's investment into Fannie Mae and Freddie Mac were consistent with the federal government's history of providing rescue financing during financial downturns dating to the Great Depression, including in response to the financial crisis that began in 2007.  In fact, prior to the conservatorships, the federal government had never taken control of a private company through an indefinite conservatorship with no path to exit.

The recession caused by the financial crisis ended in June 2009, and the economy slowly grew over the next three years. By 2012, however, the overall economy had improved significantly. The housing market stabilized, as most of the distressed mortgage loans worked their way through workouts and foreclosures. Home sales and home prices increased, and improved underwriting standards led to much lower credit losses for Fannie Mae, Freddie Mac, and other financial institutions. Combined with the reversal of loan loss reserves that had over-estimated credit losses, and increased fees charged to financial institutions for selling mortgages to Fannie Mae and Freddie Mac, the strong economy and strengthening loan portfolio led Fannie Mae and Freddie Mac to realize record profits in the first half of 2012. Multiple executives recognized that the Companies had reached a period of "sustained profitability"—with some executives calling the first half of 2012 an "inflection point" and the beginning of the "golden age" of the Companies' earnings. The Companies' executives began managing the entities with an eye toward ending the Conservatorship and returning the Companies to private investors.

The Companies, FHFA, and Treasury each projected that the Companies would not need to take substantial additional draws from Treasury in the future. Fannie Mae's and Freddie Mac's positive projections also signaled that the Companies would be able to reverse accounting write-downs taken against their deferred tax assets taken at the onset of the conservatorship, worth approximately $100 billion, which would immediately add billions of dollars of net worth to the Companies.

Further, actual market data revealed that investors viewed Fannie Mae and Freddie Mac as safe investments throughout 2012. Mortgage-backed securities investors increased their investments of Fannie Mae and Freddie Mac MBS in the first half of 2012 as against comparable periods in the first half of 2011. Fannie Mae and Freddie Mac bond yield spreads narrowed against

comparable Treasury bonds throughout 2012, showing that bond investors viewed Fannie Mae and Freddie Mac as increasingly stable investments.  Market commentators were equally buoyed, remarking after second quarter 2012 earnings that Fannie Mae and Freddie Mac were "vastly outperforming even the most optimistic outcome listed," that they had made a "convincing return to profitability," and that their "strong operational performance is sustainable."  In fact, one of the major ratings agencies, Fitch, stated that improved GSE results would reduce "pressure in Congress for a major overhaul of the agencies' operations," and that "absent changes in the terms of government support for Fannie and Freddie under the conservatorship agreement, we do not expect any near-term pressure on GSE ratings."

On August 17, 2012, despite the positive prospects of the Companies and the overall economy, and without any meaningful analysis or consideration of possible alternatives that would not have harmed shareholders, FHFA and Treasury adopted the Third Amendment to the PSPAs. The Third Amendment replaced the existing 10% dividend with a variable dividend equal to 100% of each Company's entire net worth (the "Net Worth Sweep"), except for a small capital reserve that would shrink to zero by 2018.  Thus, each quarter, rather than the 10% dividend, Fannie Mae and Freddie Mac would have to pay their entire positive net worth to Treasury, which precluded the Companies from recapitalizing and exiting conservatorship.  This so-called Net Worth Sweep completely eliminated the private shareholders' ability to realize the benefits of their contractual rights to dividends and liquidation distributions.  Internal FHFA and Treasury documents demonstrate that the purpose of the Net Worth Sweep was to ensure that *all* future income from the Companies would be paid directly to Treasury, leaving nothing for the private shareholders.

The Companies' performance after the implementation of the Third Amendment lived up to the pre-amendment projections.  Fannie Mae reversed its deferred tax asset valuation allowance

in the first quarter of 2013, and Freddie Mac followed shortly thereafter in the third quarter of 2013.  The reversal of the valuation allowances caused a massive non-cash increase of net worth for both Companies, which caused Fannie Mae to pay $59.4 billion as a dividend to Treasury in the second quarter of 2013, and Freddie Mac to pay $30.4 billion as a dividend to Treasury in the fourth quarter of 2013.  Because the Net Worth Sweep deprived Fannie Mae and Freddie Mac of necessary capital to fund their operations, each was unable to make the dividend payment required by reversal of the valuation allowances.  Thus, each was forced to raise additional funds from bond investors—exactly what FHFA and Treasury told the public the Third Amendment was designed to prevent, placing the Companies in further debt contrary to any possible public interest.

Both Companies have reported billions of dollars in comprehensive income since 2012, and each has needed to take only one Treasury draw since 2012, which occurred in 2018 due to accounting adjustments that resulted from a reduction in the Companies' corporate tax rates.  If it were not for the Third Amendment stripping the Companies of their net worth, they would not have needed to take any draws since 2012.  While FHFA has asserted that the Net Worth Sweep was not intended to enrich Treasury or to provide more in dividend payments than would have been owed under the 10% dividend, no documents produced by FHFA or Treasury indicate any negative reaction or surprise in response to the massive windfall Treasury received, which suggests that the massive transfer of wealth from the Companies' shareholders to Treasury was the expected and intended outcome of the Third Amendment.

As a result of the Third Amendment's Net Worth Sweep, Fannie Mae and Freddie Mac paid cash dividends to Treasury from 2013-18 that were approximately $124 billion larger than the maximum they would have been under the original 10% dividend.  A large portion of the Companies' profits were driven by increased mortgage fees passed on to homeowners, which the

Net Worth Sweep caused Fannie Mae and Freddie Mac to funnel to Treasury.  That excess cash could have been used to repay Treasury the principal amount that was drawn under the PSPAs, which would have reduced the amount of the 10% dividend and allowed Fannie Mae and Freddie Mac to fully repay Treasury and return to sound and solvent operations.

From 2013 through to the second quarter of 2022, Treasury has received over $245.9 billion in Net Worth Sweep cash dividends, and over $94.8 billion in increased liquidation preference corresponding to GSE net worth increases – for a total of over $340.7 billion since the Net Worth Sweep became effective on January 1, 2013.  That is over $160 billion more than the most Treasury would have received under the original 10% dividend.  In fact, it is an even larger excess than that, because if there had been no Net Worth Sweep, the GSEs could have started in 2013 to repay the amounts drawn from Treasury, which in turn would have reduced their 10% dividend, and in turn would have allowed them to use more cash to repay Treasury.  Had that occurred, the GSEs would have fully repaid Treasury, with interest, many years ago.

Plaintiffs allege that Defendants violated the implied covenant of good faith and fair dealing inherent in the certificates of designation of Fannie Mae and Freddie Mac junior preferred stock and Freddie Mac common stock.  Plaintiffs allege that no reasonable investor would have expected FHFA to transfer the entirety of the Companies' net worth to Treasury, particularly at a time when the market had recovered and Fannie Mae and Freddie Mac had reached sustained profitability.  That is, no reasonable investor would have expected to be in a worse position in August 2012 upon the Companies' return to record profits within a robust economy than upon imposition of the conservatorship in September 2008.  Nor would any reasonable investor have expected FHFA to have made the decision to transfer the Companies' net worth to one shareholder,

Treasury, without any of the process or analysis one would expect to be undertaken given the magnitude of the decision.

This Court has subject matter jurisdiction over these actions by virtue of 12 U.S.C. §§ 1452(c), (f), 1723a(a), and 4617.  In addition, this Court has subject matter jurisdiction over the class action under 28 U.S.C. § 1332(d)(2)(A) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $5 million, exclusive of interest and costs. The Court additionally has subject matter jurisdiction over the Berkley action under 28 U.S.C. § 1367.

## II.    PLAINTIFFS' CLAIMS

Pursuant to the implied covenant of good faith and fair dealing, Fannie Mae, Freddie Mac, and FHFA were obligated not to take actions that were arbitrary and unreasonable, thereby frustrating the fruits of the bargain that Plaintiffs reasonably expected.  Plaintiffs contend that by entering into the Third Amendment and agreeing to the Net Worth Sweep with the purpose and effect of depriving Plaintiffs and members of the classes of any possibility of receiving dividends or a liquidation preference and otherwise diminishing the value of their shares, each of Fannie Mae and Freddie Mac, and FHFA as their conservator, violated the implied covenant of good faith and fair dealing inherent in the certificates of designation of Fannie Mae and Freddie Mac junior preferred stock and Freddie Mac common stock.  Defendants' breach of the implied covenant caused Plaintiffs and members of the classes to suffer $1.61 billion in damages, along with prejudgment interest dating to August 17, 2012.

## III.    STATEMENT OF DEFENSES

No claim has been brought against Plaintiffs.  Thus, Plaintiffs assert no defenses.

IV.    **PLAINTIFFS' SCHEDULE OF WITNESSES**

    A.    **Witnesses Plaintiffs Expect to Present at Trial**

       1.    **Dr. Mukkaram Attari (601 12th St Suite 1500, Oakland, CA 94607)**

Dr. Attari is Defendants' retained expert witness.  Per agreement of the parties, Plaintiffs will present Dr. Attari's deposition testimony regarding his equity event study as designated in Exhibit B.

       2.    **David Benson (7602 Glenbrook Road, Bethesda, MD  20814)**

David Benson is the current President of Fannie Mae and was Executive Vice President of Capital Markets at the time of the Third Amendment.  Mr. Benson is expected to testify regarding his role with Fannie Mae and his knowledge of Fannie Mae's and Freddie Mac's operations, projections, and financial condition.   Plaintiffs expect to present Mr. Benson's deposition testimony designated in Exhibit B.

       3.    **Joseph Cacciapalle (100 Glenbrook Rd., Freehold, NJ 07728)**

Joseph Cacciapalle is a class representative who holds shares of Fannie Mae junior preferred stock and Freddie Mac junior preferred stock.   Plaintiffs expect to present Mr. Cacciapalle's deposition testimony designated in Exhibit B, regarding his ownership of Fannie Mae junior preferred stock and Freddie Mac junior preferred stock and his reasons for bringing this lawsuit.

       4.    **Timothy Cassell (2462 Berwick Blvd., Columbus, OH 43209)**

Timothy Cassell is a class representative who holds shares of Freddie Mac common stock. Mr. Cassell is expected to testify about his ownership of Freddie Mac common stock and his reasons for bringing this lawsuit.  His direct testimony should take less than one hour.

5.      **Prof. Bala Dharan\* (Berkley Research Group, LLC, 99 High Street, 27th Floor, Boston, MA 02110)**

Prof. Bala Dharan is an expert witness retained by Plaintiffs to provide an analysis of whether the Net Worth Sweep (1) was reasonably necessary to avoid insolvency or other significant financial harm to Fannie Mae and Freddie Mac at the time of the Third Amendment, or (2) otherwise advanced, or was consistent with, FHFA's stated purpose of restoring Fannie Mae and Freddie Mac to a sound and solvent financial condition.  Prof. Dharan will testify regarding these topics and provide his economic and historical analysis supporting his conclusions, including that:

i.      The Net Worth Sweep could not reasonably have been viewed as necessary to avoid insolvency or other significant financial harm to Fannie Mae and Freddie Mac at the time of the Third Amendment given, *inter alia*, the overall economy and housing market and the current and expected financial performance of Fannie Mae and Freddie Mac.

ii.     The Net Worth Sweep could not reasonably have been understood as advancing the purpose of restoring Fannie Mae and Freddie Mac to a sound and solvent financial condition, was inconsistent with the stated purpose of the conservatorship, and exposed the GSEs to an increased risk of failure.

iii.    The Net Worth Sweep could only reasonably have been viewed as a means to transfer value from shareholders to Treasury and to financially weaken Fannie Mae and Freddie Mac;

iv.     The likelihood of the full restoration of the value of the deferred tax assets ("DTAs") by Fannie Mae and Freddie Mac in their respective balance sheets was reasonably foreseeable and undermines any suggestion that the Net Worth Sweep was reasonable, particularly since the restoration occurred so shortly after the Net Worth Sweep.

v.      Multiple alternatives, such as the "payment in kind" option, existed to alleviate any purported issues with the so-called "circular draw" problem identified by Defendants

vi.     Shareholders had not been "wiped out" at the outset of the conservatorship, but rather retained value in Fannie Mae and Freddie Mac.

vii.    The GSEs did not "shrink" under Acting Director DeMarco's tenure, and that any reduction in Fannie Mae and Freddie Mac's retained portfolio was offset by profits

from increases to the guarantee fees charged by Fannie Mae and Freddie Mac to financial institutions.

viii.   Dr. Attari's conclusions are not credibly supported and are methodologically unsound and incorrect.

Prof. Dharan's direct testimony should last approximately four hours.

### 6.    Document Reader (Employee of Lead Plaintiffs' Counsel)

Plaintiffs will present the contents of certain trial exhibits through an individual who will read portions of the documents into the record.  The document reader will be an associate attorney, paralegal, or employee of one of the Lead Plaintiffs' firms.

Subject to the Court's approval, the parties have agreed to certain aspects of the format in which the document reader will present excerpts of exhibits to the jury:

1.   Plaintiffs will identify the specific portions of the exhibits that the reader will read into the record in advance of the document reader's appearance.

2.   The parties will request that the Court provide an agreed-upon instruction in advance of the document reader's appearance, noting that the excerpts were chosen by Plaintiffs' counsel.

3.   If Defendants want additional portions of the same documents read to the jury, Defendants will identify any additional portions that they will seek the document reader to read into the record in advance of the document reader's appearance.

4.   The parties will request that the Court provide an agreed-upon instruction that such excerpts were chosen by Defendants' counsel.

Plaintiffs understand that Defendants will request two additional procedures for the document reader to follow, which Plaintiffs do not join.   First, Plaintiffs do not join Defendants' request that the document reader not be sworn in as a witness; instead, Plaintiffs defer to the Court's discretion.   Second, Plaintiffs oppose Defendants' request that the document reader only present excerpts from the podium, not the witness stand, as only the witness stand is equipped for the document reader to utilize the trial presentation software to display and read relevant excerpts to the jury.   In addition, Plaintiffs understand that Defendants will request that the Court provide

a final instruction to the jury regarding the document reader that is similar to the limiting instruction the Court will provide at the time the document reader presents excerpts of exhibits to the jury.  Plaintiffs will consider joining in that request to the extent that it is the Court's practice to incorporate similar, within-trial limiting instructions into the final instructions.

### 7.    Susan Hartman (Summary Witness) (BVA Group, 405 Lexington Ave., Floor 9, New York, NY 10174)

Susan Hartman is a Partner at BVA Group.  Ms. Hartman will be presented as a summary witness pursuant to Federal Rule of Evidence 1006 and is expected to provide a summary of financial results of Fannie Mae and Freddie Mac and contractual documents concerning the junior preferred stock and senior preferred stock.  Her direct testimony should last approximately two hours.

### 8.    Edward Linekin (25 Flat Rock Drive, Ridgefield, CT 06887)

Edward Linekin is Senior Vice President of W.R. Berkley Corp / Berkley Insurance Co., one of the Berkley Plaintiffs.  Mr. Linekin is expected to testify about W.R. Berkley Corp / Berkley Insurance Co.'s ownership of Fannie Mae junior preferred stock and Freddie Mac junior preferred stock and its reasons for bringing this lawsuit.  His direct testimony should take less than one hour.

### 9.    James B. Lockhart (5 Alden Road, Greenwich, CT 06831)

James B. Lockhart was the Director of FHFA when Fannie Mae and Freddie Mac were placed into Conservatorship.  Plaintiffs expect to present Mr. Lockhart's deposition testimony designated in Exhibit B.

### 10.    Dr. Joseph Mason* (BVA Group, 405 Lexington Ave., Floor 9, New York, NY  10174)

Dr. Joseph Mason, a financial economist, is an expert witness retained by Plaintiffs.  Dr. Mason will provide an analysis of the damages suffered by Plaintiffs as a result of the Net Worth Sweep.  In particular, Dr. Mason conducted an analysis of the loss in the value of the shares of

Fannie Mae and Freddie Mac that the Net Worth Sweep caused by effectively eliminating the dividend rights that came with those shares.  Based on Dr. Mason's analysis of a shareholder event study submitted by Defendants' expert, Dr. Attari, which Dr. Mason confirmed, the shareholders suffered damages that can be reasonably estimated to be $1.611 billion in total, broken down as follows:

    i.      $779 million of damages suffered by private preferred stock shareholders in Fannie Mae;

    ii.     $786 million of damages suffered by private preferred stock shareholders in Freddie Mac; and

    iii.    $46 million of damages suffered by private common stock shareholders in Freddie Mac.

Dr. Mason will testify regarding these topics and his supporting economic and historical analysis of the event study and his conclusions regarding damages.  In addition, Dr. Mason will testify regarding the calculation of prejudgment interest as applied to the damage amounts under Virginia law.

The parties have reached agreement regarding the scope of Dr. Mason's testimony as to damages, governed by Dr. Mason's prior testimony and those paragraphs of his supplemental expert report that incorporate his prior testimony and reflect his preexisting opinions in this matter. In connection with that agreement, Dr. Mason will not testify about the following paragraphs in his supplemental report:

- Paragraph 7 (other than the first sentence)

- The last sentence of Paragraph 13

- The last sentence of Paragraph 14

- The last three sentences of Paragraph 15

- Paragraphs 16-18 in their entirety

In addition, Dr. Mason will not testify that $1.611 billion represents a "conservative" estimate of damages.  Nor will he opine that the GSEs performance since 2012 makes the $1.611 billion measure of damages reasonable.  In exchange, Defendants have agreed not to ask Dr. Mason any questions about a purported price recovery in GSE shares following the Net Worth Sweep. Defendants have further agreed to not otherwise argue to the jury that the share increases after the Third Amendment mitigated damages.  Defendants have also represented that they will not present any testimony from Dr. Attari at trial regarding the equity event study.

As set forth in his expert reports, Dr. Mason is also an expert regarding financial crises and the macroeconomic dynamics of losses and recoveries.  In addition to his testimony regarding damages, Plaintiffs may seek to introduce the following testimony and evidence through Dr. Mason, including:

- A background overview of Fannie Mae and Freddie Mac, the GSEs' business model, an overview of the 2008 financial crisis and its impact on the GSEs, and an historical overview of the United States government's support for financial institutions.

- An opinion that the Net Worth Sweep was otherwise incompatible with the goals of the conservatorship.

- An opinion that the characteristics of the market for GSE debt in 2011 and 2012 do not reflect concern with GSE credit risk, including testimony and evidence that bond yield spreads declined in 2012 through the date of the Net Worth Sweep; testimony and evidence regarding credit ratings agencies; and testimony and evidence regarding broker dealer analyst commentary.

- An opinion rebutting Dr. Attari's opinion that the NWS alleviated debt investors' concerns over GSE creditworthiness, as such an opinion is based on faulty economic reasoning and a methodologically unsound event study.

Prof. Mason's direct testimony should last less than two hours.

**11.**     **Timothy Mayopoulos (12 Masterton Road, Bronxville, NY 10708)**

Timothy Mayopoulos was the Chief Executive Officer of Fannie Mae at the time of the Third Amendment.  Plaintiffs expect to present Mr. Mayopoulos' deposition testimony designated in Exhibit B.

**12.**     **Michelle Miller (4602 Ringer Road, St. Louis, MO 63129)**

Michelle Miller is a class representative who holds shares of Freddie Mac common stock.  Ms. Miller is expected to testify about her ownership of Freddie Mac common stock and her reasons for bringing this lawsuit.  Her direct testimony should take less than one hour.

**13.**     **Susan McFarland (162 W. Shore Drive, Montgomery, TX 77356)**

Susan McFarland was the Chief Financial Officer of Fannie Mae at the time of the Third Amendment.  Plaintiffs expect to present Ms. McFarland's deposition testimony designated in Exhibit B.

**14.**     **Naa Awaa Tagoe (10425 Fernwood Road, Bethesda, MD 20817)**

Naa Awaa Tagoe was Senior Associate Director of the Office of Financial Analysis, Modeling and Simulations at FHFA at the time of the Third Amendment.  Plaintiffs expect to present Ms. Tagoe's 30(b)(6) deposition testimony on behalf of FHFA, designated in Exhibit B.  Defendants have informed Plaintiffs that they will not call Ms. Tagoe in their case-in-chief.

**15.**     **Prof. Anjan Thakor\* (Washington University in St. Louis, Olin Business School, Campus Box 1133, One Brookings Drive, St. Louis, MO 63130)**

Prof. Anjan Thakor is an expert witness retained by Plaintiffs to provide an analysis of (1) what, if any, commercially reasonable methods would have been available to set a periodic commitment fee ("PCF") under the PSPAs between Fannie Mae and Freddie Mac and Treasury; and (2) in light of that conclusion, what an appropriate fee would have been (if any) if there had

been no Third Amendment to the PSPAs.  Prof. Thakor will testify regarding these topics and his economic and historical analysis supporting his conclusions that:

i.     The PCF language in the PSPAs is uncharacteristic of other commitment fee contracts and does not provide a clear and readily ascertainable method for determining the fee;

ii.     Internal documents reflected that certain Treasury officials did not view the provision as having a particular meaning;

iii.     A reasonable, market-based PCF would be 2.5 to 45 basis points (0.025% to 0.45%) on any undrawn portion of the Treasury commitment would have been appropriate, based on Prof. Thakor's review of:

    a.     Commercial loan commitments;
    b.     Assistance Treasury provided to other entities during the financial crisis as part of Troubled Asset Relief Program and the bailout of American International Group, Inc.; and
    c.     Federal deposit insurance premiums paid by large financial institutions.

iv.     Ultimately, the dividend rate paid by Fannie Mae and Freddie Mac well exceeds these rates.

The parties have reached an agreement that Prof. Thakor will not testify that the "most appropriate" PCF was or would have been zero, or otherwise testify to the effect that the PCF "should be" or "is" zero.  Instead, Prof. Thakor will testify that, assuming that some PCF had to be charged, an appropriate PCF would have been 2.5-45 basis points.  The parties agree that this agreement does not preclude Prof. Thakor from testifying that certain comparators he considered would yield a zero PCF.

Prof. Thakor's direct testimony should last approximately three hours.

### 16.    Mario Ugoletti (14496 Sedona Drive, Gainesville, VA 20155)

Mario Ugoletti was Special Advisor to Acting Director Edward DeMarco at FHFA at the time of the Third Amendment.  Plaintiffs expect to present Mr. Ugoletti's deposition testimony designated in Exhibit B.

**B.    Individual Plaintiffs Will Cross-Examine Without Scope Limitations in Defendants' Case-in-Chief**

      **1.    Edward DeMarco (422 Barlow Place, Bethesda, MD 20814)**

Edward DeMarco was the Acting Director of FHFA at the time of the Third Amendment. While Mr. DeMarco will testify in Defendants' case-in-chief, the parties have agreed that Plaintiffs may cross-examine Mr. DeMarco without limitations to the scope of the direct examination.

Mr. DeMarco is expected to testify regarding his role at FHFA, his knowledge of Fannie Mae and Freddie Mac and their financial condition, the purposes and goals of the Conservatorship, his expectations regarding the Conservatorship at the time of the Third Amendment, the negotiation of the Third Amendment, and the purposes and goals of the Third Amendment.

Plaintiffs' cross-examination of Mr. DeMarco without scope limitations should last approximately three hours.

**C.    Individuals Plaintiffs May Call if the Need Arises or May Call for Rebuttal**

      **1.    Any of the Individuals Listed in Section IV.A, *supra*.**

      **2.    James Parrott (500 L'Enfant Plaza SW, Washington, DC 20024)**

Jim Parrott was a Senior Advisor to the National Economic Council of the Executive Office of the President of the United States.  Plaintiffs issued a *Touhy* request for Mr. Parrott's testimony in April 2023, to which the Executive Office of the President has not yet responded.  If called by Plaintiffs, Mr. Parrott's direct testimony should last one hour, whether live or by trial deposition.

## V.     PLAINTIFFS' LIST OF EXHIBITS

Plaintiffs' list of exhibits is attached hereto as Exhibit A-1.  Plaintiffs expect to offer the highlighted exhibits into evidence at trial, and may offer the un-highlighted exhibits into evidence at trial.[1]

Additionally, attached hereto as Exhibit A-2 and marked "PX-SW-####" is a list of materials relied on to produce summary exhibits **PX-0001 and PX-0005** Plaintiffs are including these exhibits (which have been previously provided to Defendants) out of an abundance of caution, but Plaintiffs anticipate and intend that introduction of the summary exhibits will preclude the need to introduce these exhibits except where the exhibit is relevant for a purpose that is outside the scope of the summary witness' testimony.

## VI.    DEPOSITION DESIGNATIONS

The deposition designations of the parties are set forth as Exhibit B.

## VII.   PLAINTIFFS' ITEMIZATION OF DAMAGES

Plaintiffs claim total damages in the amounts as set forth below:

1.      Plaintiffs seek damages arising from Defendants' breach of the implied covenant of good faith and fair dealing as a result of the Net Worth Sweep.  Specifically, Plaintiffs seek damages based on the loss in value of Fannie Mae preferred shares, Freddie Mac preferred shares, and Freddie Mac common shares.  This analysis and calculation is based in part on a shareholder event study prepare by Defendants' experts and confirmed by Plaintiffs' expert, Dr. Joseph Mason. Under this method of damages, damages are $779 million for owners of the Fannie Mae Preferred,

---

[1] Plaintiffs served Defendants with an additional set of exhibits on June 29, 2023.  Plaintiffs' exhibit list attached to their pretrial statement reflects that Defendants have neither served objections nor indicated they have no objection to these additional exhibits.  The Parties agree that Defendants have not waived their objections to these additional exhibits and that Defendants will serve any objections to these exhibits by July 10, 2023.

$786 million for owners of the Freddie Mac Preferred, and $46 million for owners of the Freddie Mac Common, for a total of $1.611 billion.

2.      Plaintiffs also seek the application of prejudgment interest under Virginia and Delaware law to the date of the breach, August 17, 2012.

3.      Plaintiffs also seek reimbursement of attorneys' fees, costs, and expenses.  Counsel will present the Court with an application for attorneys' fees, costs, and expenses after trial.

## VIII.   **PLAINTIFFS' PROPOSED STIPULATIONS OF FACT**

The parties submitted a Joint Statement of Undisputed Facts at the first trial (Class ECF No. 230), which is attached as Exhibit C.  The parties have met and conferred and are continuing to meet and confer in good faith regarding various potential changes to the prior Joint Statement of Undisputed Facts in hopes of reaching an agreement.  Some potential changes to the prior Joint Statement of Undisputed Facts depend on the resolution of pending motions in limine. Accordingly, the parties have agreed to defer the filing of any new Joint Statement of Undisputed Facts until a later date, likely after resolution of the motions in limine.  The parties will promptly notify the Court if they reach agreement on a new Joint Statement of Undisputed Facts.

## IX.   **PROPOSED VOIR DIRE QUESTIONS**

The Parties have agreed to the attached proposed voir dire (Exhibit D).  If the Court orders that the voir dire be revised, the Parties would propose to meet and confer to discuss any revisions required by the Court's direction.

## X.   **PROPOSED JURY INSTRUCTIONS**

The Court previously provided the jury instructions attached as Exhibit E-1 (Preliminary Jury Instructions) and E-2 (Final Jury Instructions).  Other than correcting one typographical error from trial, agreed upon by the parties and reflected in the attached, the parties have not recommended any changes to the Preliminary Jury Instructions.

Defendants filed a motion to modify several jury instructions in the Final Jury Instructions

(Class ECF No. 303), which Plaintiffs opposed.  (Class ECF No. 314).

## XI.   PROPOSED VERDICT FORM

The Court previously provided the verdict form attached as Exhibit F.  Neither party filed

a request to modify the verdict form.

## XII.   REQUEST FOR OTHER RELIEF

Plaintiffs request no other relief.

Dated: June 30, 2023                                    Respectfully submitted,


*/s/ Charles J. Cooper*                                 */s/ Eric L. Zagar*
Charles J. Cooper (Bar No. 24870)           Eric L. Zagar (*Pro Hac Vice*)
David H. Thompson (Bar No. 450503)       **KESSLER TOPAZ**
Vincent J. Colatriano (Bar No. 429562)        **MELTZER & CHECK, LLP**
Peter A. Patterson (Bar No. 998668)          280 King of Prussia Rd.
Brian W. Barnes (*Pro Hac Vice*)               Radnor, PA 19087
**COOPER & KIRK, PLLC**                          Tel: (610) 667-7706
1523 New Hampshire Avenue, N.W.           Fax: (610) 667-7056
Washington, DC 20036                             ezagar@ktmc.com
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com
*Counsel for Berkley Plaintiffs, et al.*

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
John C. Kairis (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com
*Co-Lead Counsel for the Class*