# EXHIBIT A

**Statement of Melvin L. Watt**
**Director, Federal Housing Finance Agency**

Before the U.S. House of Representatives Committee on Financial Services

January 27, 2015

Chairman Hensarling, Ranking Member Waters and members of the Committee, thank you for inviting me to testify today about our work at the Federal Housing Finance Agency (FHFA) and for providing my first opportunity to return to this Committee since I left Congress.

FHFA was established by the Housing and Economic Recovery Act of 2008 (HERA) and is responsible for the effective supervision, regulation, and housing mission oversight of the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Federal Home Loan Bank System, which includes 12 Federal Home Loan Banks (FHLBanks) and the Office of Finance.  FHFA's mission is to ensure that these regulated entities operate in a safe and sound manner and that they serve as a reliable source of liquidity and funding for housing finance and community investment.  Since 2008, FHFA has also served as conservator of Fannie Mae and Freddie Mac (together, the Enterprises).

I am pleased to provide an overview of FHFA's statutory responsibilities and an update on the Enterprises' financial condition, FHFA's activities as regulator and conservator of the Enterprises, the FHLBanks' financial condition, and FHFA's regulatory activities as regulator of the FHLBanks.

## FHFA's Statutory Responsibilities

   I.   **FHFA's Regulatory Oversight of the Federal Home Loan Banks, Fannie Mae and Freddie Mac**

The Federal Housing Enterprises Financial Safety and Soundness Act (the Safety and Soundness Act), as amended by HERA, requires FHFA to fulfill the following responsibilities in our oversight of the Federal Home Loan Bank System (FHLBank System) and the Enterprises:

   (A) to oversee the prudential operations of each regulated entity; and
   (B) to ensure that--

1

> (i) each regulated entity operates in a safe and sound manner, including maintenance of adequate capital and internal controls;
>
> (ii) the operations and activities of each regulated entity foster liquid, efficient, competitive, and resilient national housing finance markets (including activities relating to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities);
>
> (iii) each regulated entity complies with this chapter and the rules, regulations, guidelines, and orders issued under this chapter and the authorizing statutes;
>
> (iv) each regulated entity carries out its statutory mission only through activities that are authorized under and consistent with this chapter and the authorizing statutes; and
>
> (v) the activities of each regulated entity and the manner in which such regulated entity is operated are consistent with the public interest.

12 U.S.C. § 4513(a)(1).

## II.     FHFA's Role as Conservator of Fannie Mae and Freddie Mac

Congress granted the Director of FHFA the discretionary authority in HERA to appoint FHFA as conservator or receiver of Fannie Mae, Freddie Mac, or any of the Federal Home Loan Banks, upon determining that specified criteria had been met.  On September 6, 2008, FHFA exercised this authority to place Fannie Mae and Freddie Mac into conservatorships.  Subsequently, Fannie Mae and Freddie Mac together received $187.5 billion in taxpayer support under the Senior Preferred Stock Purchase Agreements (PSPAs) executed with the U.S. Department of the Treasury.  FHFA continues to oversee these conservatorships.

As conservator of the Enterprises, FHFA is mandated to:

> (D) …take such action as may be--
>
> > (i) necessary to put the regulated entity in a sound and solvent condition; and
> >
> > (ii) appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity.

12 U.S.C. § 4617(b)(2)(D).

As conservator, FHFA must also fulfill the responsibilities enumerated above in 12 U.S.C. § 4513(a)(1).  Additionally, FHFA has a statutory responsibility under the Emergency Economic Stabilization Act of 2008 (EESA) to "implement a plan that seeks to maximize assistance for

homeowners and use its authority to encourage the servicers of the underlying mortgages, and considering net present value to the taxpayer, to take advantage of…available programs to minimize foreclosures." 12 U.S.C. § 5220(b)(1).

My goal, as Director of FHFA since January 6, 2014, has been to lead FHFA in meeting the mandates assigned to it by statute until such time as Congress revises those mandates.

## **FHFA's Actions as Regulator and Conservator of Fannie Mae and Freddie Mac**

As regulator and conservator of Fannie Mae and Freddie Mac, FHFA has taken consistent actions in the past year to ensure their safety and soundness, to ensure that they provide liquidity to the housing finance market, to preserve and conserve their assets, and to ensure that they meet their obligations to homeowners under EESA.

> I. **Financial Performance and Condition of Fannie Mae and Freddie Mac**

Since the Enterprises were placed in conservatorship in 2008, their operations have stabilized and their financial performance has improved significantly. Fannie Mae has not made a draw under the PSPA since the fourth quarter of 2011, and Freddie Mac has not made a draw since the first quarter of 2012. Some of the improvement in the Enterprises' performance relates to one-time or transitory items, such as the reversal of each Enterprise's deferred tax asset valuation allowance, legal settlements, and the release of loan loss reserves as a result of rising house prices. Part of the improvement is also attributable to other factors, including responsible business practices, strengthened underwriting practices, rising house prices, and increased guarantee fees.

While steps taken in the conservatorships have helped stabilize the Enterprises' financial condition and the mortgage market, significant challenges remain. Serious delinquencies have declined but remain historically high compared to pre-crisis levels, and counterparty exposure remains a concern. While risks from the Enterprises' mortgage-related investment portfolios are declining as the size of their portfolios shrinks, revenues from these portfolios are also shrinking. Both Enterprises continue to work to maintain and improve the effectiveness and efficiency of their operational and information technology infrastructures. Additionally, under the terms of the PSPAs, the Enterprises do not have the ability to build capital internally while they remain in conservatorship. Attracting and retaining the best qualified workforce in this period in which the future of the Enterprises is uncertain also continues to be a challenge.

Other significant financial and performance highlights about the Enterprises include the following:

Fannie Mae

- For the first nine months of 2014, Fannie Mae reported earnings of $12.9 billion compared to net income of $77.5 billion for the first nine months of 2013, which reflected a number of one-time or transitory items. Calculations have not yet been completed for 2014 and, therefore, comparisons are being made here on the basis of three quarters.

- The cumulative amount of draws that Fannie Mae has received from the Treasury to date under its PSPA is $116.1 billion. Through September 30, 2014, Fannie Mae has paid $130.5 billion in cash dividends to Treasury on the company's senior preferred stock. Under the PSPA, dividends do not offset prior Treasury draws.

- The credit quality of new single-family acquisitions was strong through the third quarter of 2014, with a weighted average FICO score of 743 and a weighted average loan-to-value (LTV) ratio of 77 percent.

- The serious delinquency rate was 1.96 percent for Fannie Mae's total single-family book of business as of September 30, 2014. The serious delinquency rate for loans acquired between 2005 and 2008 was 8.27 percent compared to 0.34 percent for loans acquired since 2009 as of September 30, 2014. The serious delinquency rate for loans acquired prior to 2005 was 3.27 percent.

- Fannie Mae continues to reduce its retained portfolio in accordance with the PSPA. As of September 30, 2014, Fannie Mae's retained portfolio balance was $438.1 billion, which represents a decline of $52.6 billion since the beginning of the year, when the balance was $490.7 billion.

Freddie Mac

- For the first nine months of 2014, Freddie Mac reported earnings of $7.5 billion, compared to net income of $40.1 billion for the first nine months of 2013, which reflected a number of one-time or transitory items.

- The cumulative amount of draws that Freddie Mac has received from the Treasury to date under its PSPA is $71.3 billion. Through September 30, 2014, Freddie Mac has paid $88.2 billion in cash dividends to Treasury on the company's senior preferred stock. Under the PSPA, dividends do not offset prior Treasury draws.

- The credit quality of new single-family acquisitions remained high through the third quarter of 2014, with a weighted average FICO score of 744 and a weighted average LTV ratio of 77 percent.

- The serious delinquency rate was 1.96 percent for Freddie Mac's single-family book of business as of September 30, 2014. The serious delinquency rate for loans originated between 2005 and 2008 was 7.66 percent compared to 0.23 percent for loans originated

    since 2009 as of September 30, 2014.  The serious delinquency rate for loans originated prior to 2005 was 3.12 percent.

- Freddie Mac continues to reduce its retained portfolio in accordance with the PSPA.  As of September 30, 2014, Freddie Mac's retained portfolio balance was $413.6 billion, which represents a decline of $47.4 billion since the beginning of the year, when the balance was $461.0 billion.

## II.     FHFA's Supervisory Activities Related to the Enterprises

FHFA's supervision function evaluates the safety and soundness of the Enterprises' operations.  Safety and soundness is a top priority in meeting FHFA's statutory obligations, in execution of Enterprise strategic initiatives and in all business and control functions.  FHFA takes a risk-based approach to supervision, which prioritizes examination activities based on the risk a given practice poses to a regulated entity's safe and sound operation or its compliance with applicable laws and regulations.  FHFA conducts on-site examinations at the regulated entities, ongoing risk analysis, and off-site review and surveillance.  FHFA communicates supervisory standards to the regulated entities, establishes expectations for strong risk management, identifies risks, and requires remediation of identified deficiencies.

In 2014, FHFA issued supervisory guidance to the Enterprises on topics related to operational risk management, counterparty risk management, mortgage servicing transfers, cyber risk management, and liquidity risk management.  This guidance articulates FHFA's supervisory expectations related to those matters and informs examination activities.  Examples of important guidance issued during 2014 include the following:

Advisory Bulletin 2014-05, *Cyber Risk Management Guidance*, describes the characteristics of a cyber risk management program that FHFA believes will enable the regulated entities to successfully perform their responsibilities and protect their environments.  FHFA's key expectations include Enterprise assessment of system vulnerabilities, effective monitoring of cyber risks, and oversight of third parties with access to Enterprise data.

Advisory Bulletin 2014-06, *Mortgage Servicing Transfers,* articulated FHFA's supervisory expectations for the Enterprises with regard to servicing transfers of mortgage loans that they hold or guarantee.  Pursuant to contracts with their counterparties, the Enterprises must approve the transfer of servicing operations or servicing rights.  FHFA has focused on Enterprise approval processes for these transactions due in large part to the significant recent transfers of mortgage servicing operations from federally-regulated banks to non-bank entities that are generally subject to less regulation and are more concentrated in their operations.

Advisory Bulletin 2014-07, *Oversight of Single Family Seller/Servicer Relationships*, articulated FHFA's requirement that the Enterprises assess financial, operational, and compliance risks associated with their counterparties and develop a risk management framework that can be applied throughout the Enterprise's contractual relationship with seller/servicers.

Standards set by FHFA are also reflected in guidance to our examiners, which is provided in FHFA's Examination Manual. The manual includes twenty-six modules that cover various Enterprise operations and provide background on a range of operational, credit, and market risks. The manual is a valuable tool for implementing FHFA's risk-based approach to supervision of the Enterprises and is available on FHFA's website.

FHFA maintains a team of examiners on-site at each Enterprise, and the examiners receive support from off-site analysts and subject matter experts. Examination teams perform targeted examinations of specific Enterprise operations and conduct ongoing monitoring of risk control functions and business lines. The examination work is performed in accordance with plans prepared annually for each Enterprise, taking into account factors such as analysis of existing risks, changes in business operations and strategic initiatives, and mortgage market developments. Where FHFA's Enterprise supervision team identifies deficiencies, examiners communicate expectations for remedial action. Examiner risk assessments are updated during the year to ensure that emerging risks and Enterprise business changes receive appropriate examination coverage.

Findings from targeted examinations and ongoing monitoring conducted through the course of the year are relied upon by examiners in assigning ratings to each Enterprise under the ratings system adopted by FHFA in 2013. The system, known as CAMELSO, includes separate ratings for Capital, Asset quality, Management, Earnings, Liquidity, Sensitivity to market risk, and Operations. The examination findings are also incorporated into annual Reports of Examination, which capture FHFA's view of the safety and soundness of each Enterprise's operations. Information from the Reports of Examination is included in FHFA's annual Report to Congress.

### III. FHFA's Strategic Goals and Scorecard Objectives for the Conservatorships of Fannie Mae and Freddie Mac

During 2014, FHFA defined and worked to further the objectives included in the *2014 Strategic Plan for the Conservatorships of Fannie Mae and Freddie Mac* (2014 Conservatorship Strategic Plan) and the 2014 Conservatorship Scorecard.

FHFA has already published the *2015 Scorecard for Fannie Mae, Freddie Mac and Common Securitization Solutions* (2015 Conservatorship Scorecard), which details FHFA's

conservatorship expectations for the Enterprises during 2015 and builds on last year's Scorecard. Both the 2014 and 2015 Conservatorship Scorecards are centered around three strategic goals.

> A. **MAINTAIN, in a safe and sound manner, credit availability and foreclosure prevention activities for new and refinanced mortgages to foster liquid, efficient, competitive, and resilient national housing finance markets**

FHFA's first strategic goal, MAINTAIN, requires the Enterprises to support access to credit for single-family and multifamily mortgages, as well as foreclosure prevention activities. FHFA and the Enterprises have focused on a number of objectives under this strategic goal in the last year, including clarifying the Representation and Warranty Framework, providing targeted access to credit opportunities for creditworthy borrowers, working with small and rural lenders, implementing loan modification and REO strategies in hardest hit communities, and prioritizing affordable housing through multifamily loan purchases. In the 2015 Conservatorship Scorecard, FHFA also expressed an expectation that the Enterprises address other priorities, such as assessing the reliability of and the operational feasibility of using alternate or updated credit score models.

*Representation and Warranty Framework*
FHFA and the Enterprises made substantial progress on updating and clarifying the Representation and Warranty Framework (Framework) during 2014, and these efforts build on the agency's work over the last several years to refine the Framework. The Framework provides Fannie Mae and Freddie Mac with remedies – such as requiring a lender to repurchase a loan – when they discover that a loan purchase does not meet their underwriting guidelines. In updating and clarifying the Framework, FHFA's objectives are to continue to support safe and sound Enterprise operations, encourage lenders to reduce their credit overlays, and complement the agency's efforts to strengthen the Enterprises' quality control process.

FHFA prioritized providing greater clarity around the life-of-loan exclusions used in the Framework during 2014, and the Enterprises announced further improvements in this area on November 20, 2014. Specifically, those changes 1) limit repurchase requests under the life-of-loan exclusions to significant matters that impact the overall credit risk of the loan; 2) modify the life-of-loan exclusions for misrepresentations and data inaccuracies to incorporate a significance test; 3) clarify the requirements for requesting repurchase related to compliance with applicable laws and regulations; and 4) provide lenders a list of unacceptable mortgage products. The changes provide all parties with greater clarity about when the life-of-loan exemptions apply and when they do not. These revisions also maintain and support safe and sound Enterprise operations and are consistent with FHFA's broader efforts to ensure that the Enterprises' place more emphasis on upfront quality control reviews and other upfront risk management practices.

Earlier in 2014, FHFA and the Enterprises also announced other Framework refinements that included revising payment history requirements, providing written notification of repurchase relief to lenders, and eliminating automatic repurchases for mortgage insurance rescissions.

We also started efforts in 2014 to develop an independent dispute resolution program that could be used as a last step, in certain circumstances, to resolve disputes between lenders and the Enterprises.  This would enable lenders to challenge a repurchase request by allowing them to request a neutral third party to determine whether there was a breach of the selling representations and warranties that justifies the repurchase request.  Currently, FHFA and the Enterprises are engaged in outreach activities with a variety of lenders and dispute resolution providers to solicit their input on the initial design of the dispute resolution process.  Under the 2015 Conservatorship Scorecard, FHFA expects the Enterprises to finalize these improvements to the Representation and Warranty Framework in 2015.

*Providing Targeted Access to Credit Opportunities for Creditworthy Borrowers*
On December 8, 2014, Fannie Mae and Freddie Mac announced purchase guidelines that enable creditworthy borrowers who meet stringent criteria and can afford a mortgage, but lack the resources to pay a substantial down payment plus closing costs, to get a mortgage with a three percent down payment.  These purchase guidelines will provide an important – but targeted – access to credit opportunity for creditworthy individuals and families.

To appropriately manage the Enterprises' risk, the Enterprises' purchase guidelines emphasize strong underwriting standards and do not allow the kind of risk layering that occurred in the years leading up to the housing crisis.  First, the purchase guidelines for these loans include compensating factors and risk mitigants – such as housing counseling, stronger credit histories, or lower debt-to-income ratios – to evaluate a borrower's creditworthiness.  Second, like other loans purchased by the Enterprises, these loans must have full documentation and cannot include 40-year or interest-only terms.  Third, 97 percent LTV loans must be fixed-rate and cannot have an adjustable rate.  Fourth, the products will leverage the Enterprises' existing automated underwriting systems.  Finally, like other loans with down payments below 20 percent, these loans require private capital credit enhancement, such as private mortgage insurance.

The Enterprises' purchase guidelines for the 97 percent LTV loan product provide a responsible approach to improving access to credit while also furthering safe and sound lending practices.  The product focuses on first-time homebuyers and requires borrowers to be owner-occupants.  Both Enterprises expect to purchase only a small amount of these loans each year compared to their overall loan purchase volume, and FHFA will be monitoring the ongoing performance of these loans.

PX-0585 - p. 8 of 19

*Working with Small Lenders, Rural Lenders and Housing Finance Agencies*
The Enterprises have also continued efforts to work with small lenders, rural lenders, and Housing Finance Agencies (HFAs) and to strengthen their understanding of how the Enterprises might be able to better serve these entities. This work is important because we know that community-based lenders and HFAs play a vital role in serving rural and underserved markets across the country.

In the first quarter of 2014, the Enterprises issued lender guidance clarifying a number of property and appraisal requirements for dwellings in small towns and rural areas. Further, as part of its ongoing effort to serve the affordable housing market and provide liquidity to small towns and rural areas, Fannie Mae revised its Selling Guide in September 2014 to allow for the delivery of Department of Housing and Urban Development (HUD)-guaranteed Section 184 mortgages and Department of Agriculture Rural Development (RD)-guaranteed Section 502 loans as standard instead of negotiated-only products. Fannie Mae also piloted expanded partnerships with county-level HFAs which go beyond its traditional state-level approach.

FHFA expects the Enterprises to continue outreach and initiatives with small lenders, rural lenders, and HFAs in 2015, including exploring the feasibility of purchasing a greater number of manufactured housing loans that are secured by real estate.

*Loss Mitigation and Foreclosure Prevention Activities*
Since entering conservatorship, the Enterprises have continued to focus on loss mitigation and borrower assistance activities. As of October 31, 2014, the Enterprises had conducted nearly 3.4 million foreclosure prevention actions since the start of the conservatorships in September 2008.

The 2015 Conservatorship Scorecard provides updated expectations for the Enterprises concerning their loss mitigation and foreclosure prevention activities. This includes expectations for the Enterprises to develop and execute strategies that reduce both the number of severely aged delinquent loans and the number of vacant real estate owned (REO) properties held by the Enterprises. These efforts will leverage and build on activities over the last year, including the Neighborhood Stabilization Initiative. Through this effort, FHFA has selected the City of Detroit and Cook County, IL for pilot programs. In these areas, the Enterprises have worked to improve outcomes in hardest hit markets through developing pre-foreclosure strategies, such as deeper loan modifications, and post-foreclosure strategies that address individual properties.

The 2015 Conservatorship Scorecard expectation that the Enterprises reduce the number of seriously delinquent loans they hold will also draw upon recent experience with non-performing loan (NPLs) sales. FHFA's expectation is that the sale of seriously delinquent loans through NPL sales will result in more favorable outcomes for borrowers, while also reducing losses to the Enterprises and, therefore, to taxpayers. In 2014, Freddie Mac conducted a pilot sale of loans

9

serviced by Bank of America that were, on average, more than three years delinquent at the time of sale. In addition, FHFA is working with both Enterprises to develop additional guidelines for ongoing NPL sales by the Enterprises, with a focus on guidelines that provide more favorable outcomes for borrowers, avoid foreclosure wherever possible and require post-sale reporting to track borrower outcomes. FHFA and the Enterprises plan to release further information about these NPL sale guidelines in early 2015.

FHFA also expects the Enterprises to continue targeted outreach activities to increase consumer awareness of the Home Affordable Refinance Program (HARP). Many borrowers could benefit from the HARP program, but may not fully understand the benefits or that they qualify. In addition, FHFA expects the Enterprises to continue refining and improving other loss mitigation and foreclosure prevention strategies. In 2014, Enterprise activities in this area included expanding the Streamlined Modification program, which addresses documentation challenges associated with traditional modifications, to include deeply delinquent loans. Moving forward, FHFA will continue to review loss mitigation options to help families stay in their homes, stabilize communities, and meet our conservatorship and EESA obligations.

*Multifamily*

For individuals and families who rent rather than buy, continuing to support affordable rental housing is also an ongoing priority for FHFA and the Enterprises. Fannie Mae and Freddie Mac have historically played a key role in providing financing to the multifamily housing finance market throughout all market cycles and their multifamily portfolios demonstrated strong performance even through the financial crisis.

FHFA's 2015 Conservatorship Scorecard requires each Enterprise to continue multifamily purchases, but not to exceed a volume cap of $30 billion each for these purchases. This continues the approach taken in the 2014 Conservatorship Scorecard. FHFA has also continued to emphasize the Enterprises' critical role in the affordable rental housing market by allowing the Enterprises to provide financing for affordable multifamily properties beyond the volume cap. Through this approach, the focus is to support the financing of affordable housing and the housing needs of people in rural and other underserved areas, including areas that rely heavily on manufactured housing.

On multifamily purchases, we are also requiring the companies to continue to share risk with the private sector, which Freddie Mac does through a capital markets structure and Fannie Mae does through a risk sharing model. Both approaches transfer significant risk in the multifamily business to the private market.

10

B.  **REDUCE taxpayer risk through increasing the role of private capital in the mortgage market**

FHFA's second strategic goal, REDUCE, is focused on ways to bring additional private capital into the system in order to reduce taxpayer risk.  This strategic goal, and the related expectations in the 2015 Conservatorship Scorecard, requires the Enterprises to reduce Fannie Mae and Freddie Mac's overall risk exposure.  FHFA's objectives include ongoing requirements for the Enterprises to conduct single-family credit risk transfers, reduce each Enterprises' retained portfolio, and update private mortgage insurance eligibility requirements.

*Credit Risk Transfers*
FHFA and the Enterprises remain focused on increasing the amount of credit risk transferred from the Enterprises.  FHFA increased the targeted levels of single-family credit risk transfers in 2014 and 2015.  FHFA increased the 2014 Conservatorship Scorecard target to achieve a meaningful credit risk transfer of $90 billion in unpaid principal balance (UPB), up from $30 billion in 2013.  In the 2015 Conservatorship Scorecard, FHFA increased these targets to $150 billion of UPB for Fannie Mae and $120 billion of UPB for Freddie Mac, subject to market conditions.  In meeting these thresholds, FHFA will continue to expect each Enterprise to execute a minimum of two different types of credit risk transfer transactions, which includes securities-based transactions and insurance transactions.  Additionally, FHFA expects all activities undertaken in fulfillment of these objectives to be conducted in a manner consistent with safety and soundness.

During 2014, the Enterprises executed credit risk transfers on single-family mortgages with a combined unpaid principal balance of over $300 billion.  In each transaction, the Enterprises retained a small first-loss position in the underlying loans, sold a significant portion of the risk beyond the initial loss and then retained the catastrophic risk in the event losses exceeded the private capital support.  As a result, private capital is absorbing significant credit risk on much of Fannie Mae and Freddie Mac's new purchases, thereby substantially reducing risk to taxpayers from these purchases.  Both Enterprises will also continue to utilize and test different risk transfer structures.

*Retained Portfolio Reductions*
Both Enterprises continue to reduce the size of their retained mortgage portfolios consistent with the terms of the PSPAs, which require them to reduce their portfolios to no more than $250 billion each by 2018.  Both Fannie Mae and Freddie Mac have developed plans to meet this target even under adverse market conditions.  As their portfolios continue to decline, they are transferring interest rate risk, credit risk on securities and liquidity risk from these portfolios to the private sector.  As of September 30, 2014, Freddie Mac's portfolio stood at $414 billion, and Fannie Mae's at $438 billion.

11

Under the 2015 Conservatorship Scorecard, FHFA is requiring the Enterprises to implement their approved retained portfolio reduction plans in order to meet the PSPA requirements. FHFA's guidelines require the Enterprises to implement these plans even under adverse market conditions while taking into consideration the impacts to the market, borrowers, and neighborhood stability.

*Private Mortgage Insurer Eligibility Requirements*
FHFA has continued to advance efforts to strengthen Fannie Mae and Freddie Mac's counterparty requirements for private mortgage insurers.  When a borrower makes a down payment of less than 20 percent, these mortgages are required by statute to have a credit enhancement – private capital standing behind the loan – in order to qualify for purchase by the Enterprises.  Private mortgage insurance has always played an important role in meeting this requirement and it is critical to make sure that private mortgage insurers are able to cover claims both in good times and in bad times.  To this end, in 2014 FHFA released a Request for Input on draft Private Mortgage Insurer Eligibility Requirements.  Our objective is to have the Enterprises strengthen their risk management by enhancing the financial, business, and operational requirements in place for their private mortgage insurer counterparties, thereby enhancing mortgage insurers' ability to pay claims over the long-term.

FHFA is in the process of reviewing and considering the public input we received as part of our comprehensive evaluation of this issue.  Consistent with our statutory mandates, our assessments and policy decisions will take into account both safety and soundness considerations and potential impacts on access to credit and housing finance market liquidity.

### C. BUILD a new single-family securitization infrastructure for use by the Enterprises and adaptable for use by other participants in the secondary market in the future

FHFA's final strategic goal is to BUILD a new infrastructure for the Enterprises' securitization functions.  This includes ongoing work to develop the Common Securitization Platform (CSP) infrastructure and to improve the liquidity of Enterprise securities.  FHFA has established that FHFA's first objective for the CSP is to make sure that it works for the benefit of Fannie Mae and Freddie Mac.  We are also requiring that the CSP leverage the systems, software and standards used in the private sector wherever possible, which will ensure that the CSP will be adaptable for use by other secondary market actors – including private-label securities issuers – in the future.  In addition, FHFA has worked with the Enterprises to leverage the CSP in order to develop a Single Security, which we believe will improve liquidity in the housing finance markets.  FHFA and the Enterprises have made significant progress on both the CSP and the Single Security in the past year, and we expect the Enterprises to continue moving aggressively on these multiyear initiatives in 2015.

12

*Common Securitization Platform*
The Enterprises made important progress during 2014 in establishing the organizational infrastructure for the CSP. This includes the announcement of a Chief Executive Officer for Common Securitization Solutions (CSS) – the entity that we expect to house and operate the CSP.

In addition, FHFA and the Enterprises made considerable progress on the design-and-build phase of the CSP. Each Enterprise has designated staff to work on the project at the CSS location, and this team has been developing the technology and infrastructure of the CSP platform during the last year. This includes work to incorporate the Single Security into the development of the CSP. Furthermore, Fannie Mae and Freddie Mac have reorganized their staffs with business operations and information technology experts to develop the systems and processes needed to integrate with the CSP. As this work continues, Fannie Mae and Freddie Mac staff will engage in continuous testing and will develop operating policies and procedures to ensure a smooth transition to the CSP. FHFA, Fannie Mae, and Freddie Mac are committed to achieving a seamless CSP launch, and the actions taken so far are moving us in the right direction toward this multiyear goal.

*Single Security*
FHFA's top priority in pursuing the Single Security is to deepen and strengthen liquidity in the housing finance markets. In today's market, the mortgage-backed securities issued by Fannie Mae and Freddie Mac trade in separate "to-be-announced" (TBA) markets. The forward-trading that takes place in TBA securities allows borrowers to lock in a mortgage rate. The TBA market also adds efficiencies to the process, which reduce transaction costs and result in lower mortgage rates for borrowers. In today's TBA market, there is a price disparity between Fannie Mae and Freddie Mac securities largely due to greater trading volumes of Fannie Mae securities. This price disparity imposes an additional cost on Freddie Mac – and therefore on taxpayers. We believe that a Single Security can further strengthen market liquidity by reducing the trading disparities between Fannie Mae and Freddie Mac securities.

FHFA issued a Request for Input on FHFA's proposed Single Security structure last year as the first step in a multiyear process. FHFA is working with the Enterprises to process the feedback we received and will move forward in a deliberative and transparent manner. FHFA will release a Progress Report on this initiative in the coming months. As part of the 2015 Conservatorship Scorecard, FHFA established the expectation that the Enterprises would finalize the Single Security structure during 2015 and would begin the process of developing a plan to implement the Single Security in the market. This remains a multiyear process, but we made significant progress during 2014.

IV.     Additional Matters and Initiatives Impacting Fannie Mae and Freddie Mac

In addition to the activities outlined above, FHFA continues to work on a number of other matters and initiatives that impact Fannie Mae and Freddie Mac, several of which are highlighted below.

*Guarantee Fees*
One of the first decisions I made as Director of FHFA was to suspend increases in guarantee fees that had been announced by FHFA in December of 2013. Given the impact of these fees on the Enterprises, the housing finance markets, and on borrowers, I believed that it was critical to do further evaluation and to get feedback from stakeholders. After additional assessment at FHFA, we issued a Request for Input that provided further details on how the Enterprises set these fees and posed a number of questions to prompt substantive feedback about how guarantee fee levels affect various aspects of the mortgage market.

FHFA is now reviewing and considering the input we received as part of our comprehensive evaluation of this issue. Consistent with our statutory mandates, our assessments and policy decisions will take into account both safety and soundness and possible impacts on access to credit and housing finance market liquidity.

*Fannie Mae and Freddie Mac Housing Goals*
On August 29, 2014, FHFA issued a proposed rule to set the Enterprises' housing goals for 2015 through 2017 for both single-family and multifamily loan purchases. FHFA's proposed rule raised questions for public comment about how best to set Fannie Mae and Freddie Mac's housing goals to encourage responsible lending that is done in a safe and sound manner and that also serves the single-family and rental housing needs of lower-income families as required in HERA. FHFA is in the process of evaluating comments submitted to the agency and finalizing the rule.

*Housing Trust Fund and Capital Magnet Fund*
Last month, FHFA directed Fannie Mae and Freddie Mac to begin setting aside funds to be allocated to the Housing Trust Fund and the Capital Magnet Fund pursuant to HERA. The statute authorized FHFA to temporarily suspend these allocations, and FHFA informed Fannie Mae and Freddie Mac of a temporary suspension on November 13, 2008. In letters sent to the Enterprises on December 11, 2014, FHFA notified Fannie Mae and Freddie Mac of the agency's decision to reverse the temporary suspension. These letters, copies of which were provided to Members of Congress who had communicated views to FHFA about whether or not the temporary suspension should continue, established prudent safeguards in the event of adverse changes in the Enterprises' financial condition or draws under the PSPAs.

14

*Certain Super Priority Lien Programs and Risk to the Enterprises*

During 2014, FHFA has continued to monitor and assess two areas of state-level actions that threaten the legal priority of single-family loans owned or guaranteed by Fannie Mae and Freddie Mac: 1) through certain energy retrofit financing programs structured as tax assessments and 2) through granting priority rights in foreclosure proceedings for homeowner associations.

While FHFA is not opposed to energy retrofit financing programs that allow homeowners to improve energy efficiency, these programs must be structured to ensure protection of the core financing for the home and, therefore, cannot undermine the first-lien status of Fannie Mae and Freddie Mac mortgages. Concerning certain energy retrofit financing programs, such as first-lien Property Assessed Clean Energy (PACE) programs, FHFA has reiterated that Fannie Mae and Freddie Mac's policies prohibit the purchase of a mortgage on property that has a first-lien PACE loan attached to it. This restriction has two potential implications for borrowers. First, a homeowner with a first-lien PACE loan cannot refinance their existing mortgage with a Fannie Mae or Freddie Mac mortgage. Second, anyone wanting to buy a home that already has a first-lien PACE loan cannot use a Fannie Mae or Freddie Mac loan for the purchase. In addition to aggressive enforcement of these existing policies, FHFA is continuing to evaluate or explore other possible remedies and legal actions to protect the Enterprises' lien position.

Additionally, FHFA has taken legal action in some instances in which unpaid homeowners association dues may be deemed under the laws of a state to be senior to preexisting mortgage liens owned or guaranteed by Fannie Mae or Freddie Mac on a homeowner's property. As conservator, FHFA has an obligation to protect Fannie Mae's and Freddie Mac's rights, and will aggressively do so.


## **FHFA's Actions as Regulator of the Federal Home Loan Banks**

The FHLBanks continue to play an important role in housing finance by providing a reliable funding source and other services to member institutions, including smaller institutions that would otherwise have limited access to these services. In addition, the FHLBanks have specific statutory requirements related to affordable housing and, as a result, the FHLBanks annually contribute substantially toward the development of affordable housing.

I.  **Financial Performance and Condition of the Federal Home Loan Banks**

The financial performance and condition of the FHLBank System remain strong. Led by growth in advances, the aggregate balance sheet of the FHLBanks has increased over the past two years, but remains considerably smaller than in peak years. Advances totaled $545 billion as the end of the third quarter of 2014, up from $499 billion at year-end 2013, but down approximately 50

15

percent from a peak of $1.01 trillion in the third quarter of 2008. The overall decline in advance volume from the peak is a result of increased market liquidity from deposits and sluggish economic growth.

Following are highlights of the financial performance of the FHLBanks:

- The FHLBanks, in aggregate, reported net income of $1.7 billion for the first three quarters of 2014 after earning $1.8 billion in the first three quarters of 2013. All twelve FHLBanks were profitable during these quarters.

- The FHLBanks saw substantial asset growth during the first nine months of 2014, driven by advances to members. As of the end of the third quarter of 2014, aggregate FHLBank assets totaled $883 billion and $545 billion in advances – up from $835 billion and $499 billion at the end of 2013. Advances constituted 62 percent of assets at the FHLBanks in aggregate at the end of the third quarter of 2014, up from 60 percent at the end of 2013.

- Retained earnings have grown significantly in recent years and totaled $13.0 billion, or 1.5 percent of assets, as of the third quarter of 2014.

- Also at the end of the third quarter of 2014, the FHLBanks had an aggregate regulatory capital ratio of 5.6 percent – comfortably above the statutory minimum of 4.0 percent.

- All FHLBanks had net asset values (equity values) in excess of the par value of their members' stock holdings. The market value of the FHLBanks was 142 percent of the par value of capital stock as of the third quarter of 2014, the highest ratio since FHFA started tracking this metric in 2002.

## II.    FHFA's Supervisory and Regulatory Activities Related to the FHLBanks

FHFA conducts annual safety and soundness and affordable housing program examinations of all 12 FHLBanks and the Office of Finance based on well-defined supervisory strategies. Similar to the approach utilized in supervision of the Enterprises, FHFA uses a risk-based approach to conducting supervisory examinations of the FHLBanks, which prioritizes examination activities based on the risks given practices pose to a regulated entity's safe and sound operations or to its compliance with applicable laws and regulations. FHFA's FHLBank supervision also utilizes the CAMELSO ratings system and incorporates these ratings into each FHLBanks' Report of Examination. Information from the Reports of Examination is included in FHFA's annual Report to Congress.

Over the last few years, FHFA's supervisory work has included assessments of FHLBank mortgage purchase programs, the substantial increase in advances to a few very large member institutions, the FHLBanks' changing capital composition in light of their increasing retained

16

earnings and reduced activity stock requirements, and their management of unsecured credit. We are also currently conducting reviews of FHLBank enterprise risk management structures and approaches to vendor management.

FHFA also provides the FHLBanks supervisory guidance in the form of Advisory Bulletins that outline the agency's regulatory expectations. In 2014, FHFA issued Advisory Bulletins 2014-02, *Operational Risk Management*, and 2014-05, *Cyber Risk Management*. Other Advisory Bulletins applicable to the FHLBanks covered areas such as model risk management, collateral valuation and management, and the classification of risky assets.

FHFA's supervision of the FHLBanks' expanding mortgage programs involves oversight of the operational issues raised by two new products – Mortgage Partner Finance (MPF) Direct and MPF Government MBS. The FHLBank of Chicago expects to begin offering these new products in early 2015, although this could change. Under MPF Direct, participating members may sell non-conforming and conforming, single-family, fixed-rate mortgage loans to the Chicago FHLBank, which would concurrently sell the loans to a third-party private investor that would accumulate the loans for securitization. The Chicago FHLBank expects, at least initially, that loans sold would be "jumbo conforming" loans capped at $729,750 for a single unit in the contiguous United States.

Under the MPF Government MBS program, the Chicago FHLBank would purchase government guaranteed or insured loans, accumulate the loans on its balance sheet as held for sale, and pool the loans in securities guaranteed by the Government National Mortgage Association (Ginnie Mae). The Chicago FHLBank would then sell the securities to other FHLBanks, members approved to participate in the mortgage programs, and external investors.

The mission focus of the FHLBank System is an important component of FHFA's regulatory activities. FHFA has undertaken three recent efforts related to the housing finance mission of the FHLBanks. First, in September 2014, FHFA released a proposed rulemaking involving membership requirements for the FHLBanks. Congress established the FHLBank System in 1932 as a government sponsored enterprise with a focus on housing finance. Over time, Congress has expanded the membership base, expanded the types of assets that are eligible collateral for advances, and made other incremental changes to the System. However, over eighty years later, the FHLBanks are still grounded in supporting housing finance.

Under the current membership rule, institutions may gain access to the benefits of FHLBank membership by meeting a one-time test showing the minimum required housing finance assets at the time of application. FHFA has proposed eliminating this one-time test and, instead, requiring that FHLBank members maintain a minimum amount of housing finance assets on an ongoing basis. In addition, FHFA has proposed defining an insurance company in such a way that

captive insurers would no longer be eligible for FHLBank membership. A captive insurance company provides benefits only for its parent company, which itself is often not eligible for FHLBank membership. While captive insurers may in some cases be involved in housing finance, allowing them to have access to the FHLBank System raises a number of policy issues that are discussed in the proposed rule.

The comment period for this proposed rule ended on January 12, 2015, and we received approximately 1,300 comments. FHFA is in the process of reviewing and considering these comments. As I have consistently emphasized since becoming Director of FHFA, getting input and feedback from stakeholders is a crucial part of FHFA's policymaking process, and we will carefully consider comments made by members of this Committee as well as the public in determining our final rule.

Second, FHFA has been in continued dialogue with the FHLBanks about "core mission assets." This also relates to the fundamental issue of how the FHLBanks use the benefits of their government-sponsored status to support their housing finance and community investment mission. In partnership with the FHLBanks, I believe we are making progress in developing a framework to describe the fundamental characteristics of what a FHLBank's balance sheet should look like in order to demonstrate a satisfactory mission commitment.

FHFA's third ongoing effort related to the mission of FHLBanks is a review of FHFA's Affordable Housing Program (AHP) regulation. The AHP program provides funding for both single-family and rental affordable housing – including housing affordable to very low-income individuals and families. In 2013, the FHLBanks allocated $297 million to their AHPs for the purchase, construction, or rehabilitation of over 37,800 housing units. FHFA is committed to working with the FHLBanks to make this program more efficient by reviewing, and possibly updating, our AHP regulation.

A new area of FHFA's recent regulatory work has involved the merger of the FHLBanks of Des Moines and Seattle, which would be the first merger ever of two FHLBanks. There has been considerable change in our nation's financial system, in the membership base of the FHLBanks, and in market conditions across the various FHLBank districts since the FHLBank System was established in 1932. As a result, the FHLBanks have seen changes in advance demand and membership composition which, in turn, has affected the fundamental franchise values of some of the FHLBanks.

These changes, in part, have led the Boards of Directors of the FHLBank of Des Moines and the FHLBank of Seattle to determine that a combined entity would better serve the needs of their members. The Boards of both FHLBanks voted to approve their merger on September 25, 2014. FHFA reviewed and evaluated the merger application submitted by the FHLBanks of Des

18

Moines and Seattle to ensure that the merger would be accomplished in a safe and sound manner and would result in a financially strong FHLBank that supports the interests of all its members. FHFA issued an approval of the merger application on December 22, 2014, contingent upon the members of both FHLBanks ratifying the merger and meeting other specified conditions. If ratified, the merger could be finalized as early as the second quarter of 2015.

## **Conclusion**

While I have not focused in my statement on administrative matters at FHFA, I would be remiss if I did not point out that none of the activities or initiatives described in this statement would be possible without the dedication of the staff at the Federal Housing Finance Agency. Since I became Director at FHFA last year, it has been a pleasure getting to know the very qualified staff at FHFA and working with them to reevaluate and pursue FHFA's priorities. I thank them for their service. I also want to recognize the hard work of the boards, management and staffs of Fannie Mae, Freddie Mac and the FHLBanks, who continue to restore and provide critical contributions to our nation's housing finance system.

In the coming year, FHFA will continue to work to meet the agency's statutory mandates to ensure the safe and sound operations of our regulated entities and to ensure that they provide liquidity in the national housing finance market. In addition, FHFA will continue to advance its Office of Minority and Women Inclusion responsibilities, which include furthering diversity in management, employment and business activities at FHFA, as well as at our regulated entities.

Thank you again for having me here this morning, and I look forward to answering your questions.