# EXHIBIT C


# SUSTAINABLE HOUSING FINANCE: AN UPDATE FROM THE DIRECTOR OF THE FEDERAL HOUSING FINANCE AGENCY

# HEARING

BEFORE THE

## COMMITTEE ON FINANCIAL SERVICES

## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTEENTH CONGRESS

FIRST SESSION

OCTOBER 3, 2017

Printed for the use of the Committee on Financial Services

**Serial No. 115–44**



30–240 PDF

U.S. GOVERNMENT PUBLISHING OFFICE
WASHINGTON : 2018

HOUSE COMMITTEE ON FINANCIAL SERVICES

JEB HENSARLING, Texas, *Chairman*

PATRICK T. MCHENRY, North Carolina, *Vice Chairman*
PETER T. KING, New York
EDWARD R. ROYCE, California
FRANK D. LUCAS, Oklahoma
STEVAN PEARCE, New Mexico
BILL POSEY, Florida
BLAINE LUETKEMEYER, Missouri
BILL HUIZENGA, Michigan
SEAN P. DUFFY, Wisconsin
STEVE STIVERS, Ohio
RANDY HULTGREN, Illinois
DENNIS A. ROSS, Florida
ROBERT PITTENGER, North Carolina
ANN WAGNER, Missouri
ANDY BARR, Kentucky
KEITH J. ROTHFUS, Pennsylvania
LUKE MESSER, Indiana
SCOTT TIPTON, Colorado
ROGER WILLIAMS, Texas
BRUCE POLIQUIN, Maine
MIA LOVE, Utah
FRENCH HILL, Arkansas
TOM EMMER, Minnesota
LEE M. ZELDIN, New York
DAVID A. TROTT, Michigan
BARRY LOUDERMILK, Georgia
ALEXANDER X. MOONEY, West Virginia
THOMAS MacARTHUR, New Jersey
WARREN DAVIDSON, Ohio
TED BUDD, North Carolina
DAVID KUSTOFF, Tennessee
CLAUDIA TENNEY, New York
TREY HOLLINGSWORTH, Indiana

MAXINE WATERS, California, *Ranking Member*
CAROLYN B. MALONEY, New York
NYDIA M. VELÁZQUEZ, New York
BRAD SHERMAN, California
GREGORY W. MEEKS, New York
MICHAEL E. CAPUANO, Massachusetts
WM. LACY CLAY, Missouri
STEPHEN F. LYNCH, Massachusetts
DAVID SCOTT, Georgia
AL GREEN, Texas
EMANUEL CLEAVER, Missouri
GWEN MOORE, Wisconsin
KEITH ELLISON, Minnesota
ED PERLMUTTER, Colorado
JAMES A. HIMES, Connecticut
BILL FOSTER, Illinois
DANIEL T. KILDEE, Michigan
JOHN K. DELANEY, Maryland
KYRSTEN SINEMA, Arizona
JOYCE BEATTY, Ohio
DENNY HECK, Washington
JUAN VARGAS, California
JOSH GOTTHEIMER, New Jersey
VICENTE GONZALEZ, Texas
CHARLIE CRIST, Florida
RUBEN KIHUEN, Nevada

KIRSTEN SUTTON MORK, *Staff Director*

(II)

17

risen dramatically, from $115 million when the agency approved the project in January 2015, to $171 million in March 2016, and that the plans for it included high-end features, such as multi-million dollar glass walkways between the towers Fannie Mae would occupy," end quote.

It has also been reported that the budget for the headquarters includes bars, quartz and glass countertops in the wellness room, town center cafe, freestanding decorative wood, quote, "lunch huts," whatever in the world that is, custom wood menus.

Mr. Watt, we are talking about spending hundreds of millions of dollars, tens of millions of dollars certainly of hardworking taxpayers' dollars on walkways, decorative walkways, and decorative wood lunch huts. I do want to see a picture of one of those.

Is that consistent with how we need to treat those taxpayer dollars? And are you concerned by this? And what are you doing to address these, what I would view as, outrageous overruns?

Mr. WATT. Well, first of all, I don't agree with you that they are outrageous overruns.

Mr. HUIZENGA. OK. Please then—here's my formal request—provide me with a photo of a wooden lunch hut. I want to see what this is. I am in developing. I am a builder.

Mr. WATT. You know, I—

Mr. HUIZENGA. I know what overruns are.

Mr. WATT. But you also know what projections are. And the original IG report was based on projections, and this IG report is also based on projections.

Mr. HUIZENGA. So it could be higher?

Mr. WATT. No. They are coming down every time we get a report, which is exactly what I told the IG.

Mr. HUIZENGA. What decisions have you—

Mr. WATT. Look, I did this when I was in the private practice of law. You set up a tenant improvement allowance and you work toward trying to bring this in under the tenant improvement allowance if you are in the real estate business. And that is what we have been doing.

Mr. HUIZENGA. Mr. Chairman, I will followup with some written questions, and hopefully I will get—

Chairman HENSARLING. The time of the gentleman—

Mr. HUIZENGA. Thank you.

Chairman HENSARLING. The time of the gentleman has expired.

The chair now recognizes the gentleman from Massachusetts, Mr. Capuano.

Mr. CAPUANO. Thank you, Mr. Chairman.

Before I get to Mr. Watt, I also want to talk about the debt clock. I will be very clear: Democrats have some blame for the debt clock. I voted for the stimulus. I am glad I did. I thought it was a good thing. I voted for the bailouts. I thought they were a good thing. And by the way, all those bailouts, almost all of them have been repaid. But I will take my share of the blame. But also, the Republicans on the other side voted for tax cuts under George Bush that were unnecessary and for two wars that are still going on that have been unfunded. So we all have something to share in the number that is there. But be warned, the minute you vote to in-

18

crease it $2 trillion to $5 trillion additional dollars, it belongs entirely to you.

So with that being said—and by the way, I want to be real clear. If you want to cut spending by $2 trillion to $5 trillion, I will disagree, but at least I will think it is internally consistent. The only thing I will say to that is I have no doubt whatsoever that the chairman would do so; and that being the case, that is one of the reasons I respect him, though deeply disagree.

So with that being said, Mr. Watt, I would like to talk about—the one thing normally we talk about is bulk sales, but we have had that conversation repeatedly. I think you have taken some steps in the direction I think is right. Obviously, you know I would like you to do more and quicker, but a discussion for another day.

I would like to talk a little bit about capital reserve. As I understand it, in the last 5 to 6 years, Fannie Mae and Freddie Mac have pretty much both made a profit, for the lack of a better word. Their revenues exceed their expenses. Is that right?

Mr. WATT. If you define profit that way, yes.

Mr. CAPUANO. Well, I am using the term loosely, mostly so average people, including my colleagues here, can understand. I will speak slower for some of them.

And so if they have what normal people would call a profit, that means their cash-flow has been positive over the years. That means your capital reserve must be incredibly good. You must have a lot of money there. So God forbid there is another bump in the economy, you will be able to cover it without a taxpayer bailout. Is that a fair assessment?

Mr. WATT. Well, not without drawing on taxpayer funding. We have taxpayer backing, but we have no capital buffer.

Mr. CAPUANO. No capital reserve? What has happened with all the money you made?

Mr. WATT. We have $600,000 until—$600 million until the end of the year, but then it goes to zero.

Mr. CAPUANO. And so what happened has with all the money you made?

Mr. WATT. It has gone to the Treasury under the—

Mr. CAPUANO. To the Treasury? To the general fund?

Mr. WATT —under the preferred stock purchase agreement (PSPA).

Mr. CAPUANO. Who pays all the revenue that you get? Am I wrong to think that the vast majority of your money comes out of fees that are charged to middle-income homeowners on top of their mortgage? Is that where most of the money comes from—almost all of it?

Mr. WATT. Yes. Disproportionately more and more of it is coming from that as opposed to portfolio income.

Mr. CAPUANO. So middle-income homeowners are paying extra on their mortgage so the United States Government's books look better than they should. By the way, those people are still paying income taxes and corporate taxes and all the other taxes that everybody else pays.

So they are paying extra for the ability to own a home? Do they know this? Have they been told this?

19

Mr. WATT. Well, I don't get into that part of it. What I have been very transparent and open about is that it is really irresponsible to try to run any business without some kind of capital cushion.

Mr. CAPUANO. So would you, if you have your druthers, would you like to increase that reserve?

Mr. WATT. Yes. And we are working with the Secretary of the Treasury to try to resolve that issue.

Mr. CAPUANO. It is my understanding that he doesn't think you should.

Mr. WATT. Well, I wouldn't say that. We are working with him now to try to resolve the issue.

Mr. CAPUANO. As I understand it, you need the permission and the agreement of the administration in order to do that. But you don't need—

Mr. WATT. No, I don't absolutely need it. I could do it by myself.

Mr. CAPUANO. Oh, good.

Mr. WATT. But I don't think that would be the best way to do it.

Mr. CAPUANO. I would agree with your interpretation, but some people might disagree with that. And I know there will be a family fight about who has the authority to do what. But it is unequivocal that you have the authority to lower fees on your own. No one has to approve those.

Mr. WATT. Well, I wouldn't lower fees to solve this problem.

Mr. CAPUANO. No, no, it won't solve the problem. But if the money is—if I am paying a mortgage and I know you are taking money and not building up a reserve and not using it to help me, and I am just adding, it is like an extra tax on me.

Why would you want to do that? If you can't buildup a reserve and therefore help provide housing to America, why don't you just cut the fees and that will solve all the problems. They are not going to let you keep it or give it back to your investors or reduce mortgages. Just cut the fees, that way you would effectively be reducing mortgages.

Mr. WATT. I don't think I could statutorily, consistent with the statutes, cut the fees to take that into account because I have an independent statutory responsibility in setting guarantee fees that are reasonable.

Mr. CAPUANO. I think you could, but we will talk about that later.

Thank you, Mr. Chairman.

Chairman HENSARLING. The time of the gentleman has expired.

The chair now recognizes the gentleman from Kentucky, Mr. Barr, Chairman of our Monetary Policy and Trade Subcommittee.

Mr. BARR. Director Watt, welcome back to the committee. Good to see you.

I know you share the general concern that the government has a near monopoly in the mortgage market. I think the most recent statistic, from 2017, is that 97 percent of all mortgaged-backed securities issued this year are explicitly backed by the Federal Government.

Given some of the changes that you started to make at FHFA, do you agree that additional steps should be taken to encourage greater private sector participation in the housing finance market?