# EXHIBIT D



**Speech**

# Prepared Remarks of Dr. Mark A. Calabria, Director of FHFA, at Mortgage Bankers Association National Secondary Market Conference & Expo 2019

5/20/2019

Remarks as Prepared for Delivery
Dr. Mark A. Calabria, Director
Federal Housing Finance Agency
Marriott Marquis – New York City, NY

**"The Housing Finance System's Status Quo is Over"**

Thank you, Bob, for that kind introduction and for your leadership.

It is great to be back at the Mortgage Bankers Association – and it is an honor to address such a distinguished group of leaders at your 2019 National Secondary Market Conference & Expo. Thank you all for being here today.

It's great to see so many friends and familiar faces. But there are many of you who I haven't yet met. So, I'd like to begin by briefly introducing myself and telling you a couple of things you might not know.

As Bob mentioned, I've done several tours of duty across two of the three branches of the federal government, including Congress, HUD, and the White House.

Throughout my career, I've had the honor of working with and learning from some extraordinary leaders – from Senators Shelby and Gramm to Vice President Pence. But the person who did more than any other to instill in me a deep respect for public service was my mother, Janie, who worked in county government for more than 20 years.

She also managed to raise four kids, teaching all of us along the way invaluable lessons about the importance of hard work, discipline, and honoring our obligations.

Those formative years inspired in me an interest in economics. And when I finished college, in the aftermath of the savings and loan crisis, one of the reasons I decided to go back to get my PhD is that it was the best way to avoid the dismal job market!

But for me, economics isn't just about theories and equations – it's also about the real-world impact and making a difference for American families.

And I'm fortunate to be able to continue this work in my current role as Director of the Federal Housing Finance Agency.

I've spent the better part of my career studying and working on housing policy. So, I've learned a few things about the history of our mortgage finance system, and I appreciate the challenges – and the urgent necessity – of reform.

I had the privilege to work on the Senate Banking Committee in 2003, when the accounting scandals at first Freddie and then Fannie came to light. And I was there in 2008, in the midst of the housing crash and financial crisis, when I helped craft the legislation that gave birth to the agency I now lead.

And I can tell you: everything looks a little different from the inside than it does from the outside.

That's why, for the past 5 weeks, I've been taking the time to "look under the hood," so to speak, at the agency, at Fannie Mae and Freddie Mac, and at the Federal Home Loan Banks. My objective is to get a clear understanding of both where we are today and where we can go over the next 5 years during my tenure as Director.

There's still more listening and learning to be done. But it's also time to start taking action – to move the agency forward and fulfill our statutory mandate to ensure a well-functioning national housing finance system.

And today, I'm here in New York City – the heart of the global financial system – to lay out my vision for reforming America's federal housing finance system.

But first, let me take a moment to make the case for reform – because it's important that this debate proceed from a shared understanding of why we need reform in the first place, and why we need it now.

The "why" is pretty straightforward. We need to reform our housing finance system because we never really fixed it after the housing collapse more than a decade ago.

To be sure, reforms have been implemented since the crash. Some have been helpful, many others have not. And thanks to the booming economy of the past 2 years housing prices have largely recovered to pre-crisis levels.

But since 2008, the basic structure of our mortgage finance system, centered around the federal government, has remained largely unchanged.

In fact, Washington's command of the nation's housing industry has grown even larger in the nearly 11 years since the crash, while the private-label securitization market has been and remains sluggish.

I think it's fair to say that housing policy broadly – and parts of the housing finance system in particular – are not working for many Americans today. For instance, the black-white home ownership gap is close to a 100-year high.

Meanwhile, the federal government's dominant share of the mortgage industry puts hardworking American taxpayers unfairly at risk. Fannie and Freddie remain "too big to fail." And while their books of business are in much better shape today, they have grown in size since the crisis.

With a leverage ratio of nearly one thousand to one, the GSEs' balance sheet capital cushion is razor thin relative to their huge amount of assets.

As a result, they remain vulnerable to fluctuations in housing prices, interest rates, and macroeconomic conditions. This leaves American taxpayers increasingly exposed to bearing the risks of these mortgage giants through another bailout.

Since 2008, mortgage finance reform has been "the great unfinished business" of the financial crisis. I hope you agree that these facts compel us to finally finish it.

But why is right now the right time for reform?

I'm old enough to remember when people used to say that the wrong time for reform is in the middle of a crisis.

We saw this in the early 1980s, as housing finance reform was postponed because the economy and the housing sector needed time to recover from the stagflation and double-digit interest rates of the late '70s.

And we saw it again in the years that followed the 2008 crisis.

But today, there are some who would have us believe the opposite. They argue that now is a bad time to reform our mortgage-finance system precisely because we are not in the middle of a crisis.

This is exactly the kind of shortsighted thinking that fueled the last housing market collapse.

In the years leading up to it, there were ample warning signs and ample opportunities to improve a system that a small number warned was flawed. But instead of trying to save the system from itself – and save hardworking Americans from the financial crisis – policymakers and regulators chose to wait.

More to the point, as we learned from the 2008 crisis – and as I saw firsthand from my front-row seat in the Senate Banking Committee – in the middle of a crisis it is simply impossible to develop comprehensive and long-term solutions to complex and deeply entrenched problems.

To paraphrase President John F. Kennedy, the time to repair the roof is not in the middle of a downpour, but when the sun is shining.

Reform shouldn't have to wait for the next crisis. Reform is about avoiding the next crisis.

Now is the right time to enact bold reforms to our mortgage finance system, because the sun is shining on our economy and our housing market.

If we fail to act now to make our mortgage finance system stronger, more resilient, and more equitable for American taxpayers and working families – the question will not be if the next crisis will hit, but when.

Death and taxes are not the only certainties in this world. It's also a guarantee that economic booms will eventually be followed by busts, just as housing prices will go up and they will go down.

And it is during these boom moments that we must prepare for the inevitable downturn.

It's important to keep in mind just what's at stake here – and the true costs of inaction.

We all remember the facts and figures of the financial crisis…

Thirty-five percent decline in home prices across the nation. Foreclosure filings skyrocketing by more than 80 percent. Trillions of dollars in household wealth evaporated.

All these years later, the numbers are still breathtaking.

But behind all the numbers are real stories of real Americans struggling to pick up the pieces after the crash turned their lives upside down.

While working on the Senate Banking Committee, I spent a considerable amount of my time taking calls from Americans in financial distress.

Their stories exemplified the consequences of our collective failure to make our mortgage finance system more resilient when we had the chance. We can't forget that when mortgage finance goes bad, it's families who pay the price.

Now, as a regulator, my job is to hope for the best but prepare for the worst. And that means ensuring that the entire housing finance system is strong and stable enough to weather the next downturn.

Mortgages are a huge asset class. They play a central role in the everyday lives of millions of Americans and in our broader economy. But housing can also be a volatile sector. And as 2008 proved once again, crashes in the housing market are often

the proximate cause of broader financial crises.

We have not solved the business cycle or the housing cycle – and I don't expect that we will any time soon.

But what we can do is address the vulnerabilities and inequities that remain at the heart of our mortgage finance system, to ensure that the next housing downturn doesn't spark another global financial catastrophe.

And that's exactly what I'll be focused on for the next 5 years as Director of FHFA.

FHFA's vision is "A reliable, stable, and liquid housing finance system."

This is the end state toward which all the agency's work – and all my work as Director – is guided: a housing finance system that is reliable, stable, and liquid. And, I should add, reliable, stable, and liquid over the long-term.

If you squint hard enough, anything can look reliable, stable, and liquid over a short period of time. But "long-term" means it must be reliable, stable, and liquid across the business cycle and the housing cycle.

This is the vision that will guide FHFA's work – including the work that we will do in consultation with Congress, the Administration, and other regulators.

The Administration's plan is underway, and I am fortunate to be working with Secretary Steven Mnuchin. He and I have worked often and well together in the past, and we are currently on track and meeting milestones. Given my background in housing and his in mortgages, we are moving very quickly and deliberately.

Our objective is to give taxpayers confidence that America's mortgage giants will never need another bailout. And to give investors confidence that America's secondary mortgage market is strong and resilient.

The centerpiece of our strategy is to end the Fannie and Freddie conservatorships. In their place, we will move toward a new, reformed structure of our mortgage finance system that meets the housing needs of American families, protects the American taxpayer, and supports financial stability at home and abroad.

New legislation passed by Congress and signed by the President would enable the kind of comprehensive, bold reforms we need to change the structure of our broken model. In fact, just a small number of key reforms, if enacted, would enable the development of a much better housing finance system. I plan to put forward such reforms for consideration.

For example, I'm a big believer in competition. History proves that competition works by serving consumers. It lowers prices, improves quality, and drives innovation. And when it comes to housing, competition would make the system more stable. If there were ten GSEs instead of two, it's unlikely any of them would be "too big to fail."

Right now, the market power exercised by the duopoly of Fannie and Freddie undercuts competition. But that would likely change if Congress were to authorize FHFA to issue more GSE charters, which would allow more competitors to enter the industry. Other federal regulators have the same authority – and FHFA should too.

And we have evidence that this kind of reform would succeed if enacted. Today's reemergent private mortgage insurance industry shows that there is a strong appetite and capacity for private capital to bear mortgage credit risk. And we've already seen some proposals – including a framework put out by Senator Crapo – that could support issuing new charters.

I will continue to consult with Congress on legislative reforms. And I'm hopeful that we'll be able to find broad bi-partisan agreement on some key issues, as we have in the past.

But while I'm committed to working with Congress, I'm not going to wait on Congress.

In fact, if you look at the statute, it contemplates an end to the conservatorships. The model is very similar model to how the FDIC operates. The law requires me to do what I can within my powers to fix the GSEs and then release them from conservatorship – and that's exactly what I intend to do.

The FHFA conservatorship has lasted far longer than anyone expected. Back in 2008, as it was being debated and developed, I remember thinking that any conservatorship was unlikely to last more than 6 months.

It has now been more than a decade. And while leaving Fannie and Freddie in this state of limbo may be comfortable for some, it is unsustainable as a matter of economic policy and it is unfair to American taxpayers and families.

So, for me, as Director of FHFA, five more years of limbo is not an option. It would be tantamount to economic malpractice.

I don't make a habit of predicting the future, but if there's one thing I know for sure it's that Fannie and Freddie will look much different at the end of my five-year term than they do today.

Since I'm in New York City – whose citizens are known for being direct – let me speak plainly to you: The status quo is no longer an option. The status quo is over. And my arrival at FHFA should be seen as the opening bell for change.

I can't tell you what exactly the new model will look like. But, as a regulator, what I do know is that the future role and structure of Fannie and Freddie will be determined by the amount of private capital they're able to build up.

This is a central tenet of finance – whether it's Citibank and Wells Fargo or Fannie Mae and Freddie Mac, for any financial institution, capital is the foundation of stability.

Just as the mortgage rate should reflect the underlying risk of the loan, the role and structure of Fannie and Freddie should reflect their capital levels. Institutions that have a lot of capital can afford to take more risk. Those that don't must de-risk.

As a regulator, my primary concern is that the GSEs maintain capital levels commensurate with their risk profiles. And over time I think Fannie and Freddie ought to operate under essentially the same capital rules as other large financial institutions.

So, the path out of the conservatorships that we will establish for Fannie and Freddie is not going to be calendar dependent. It will be driven, first and foremost, by their ability to raise capital.

An important step on the path to building the necessary capital will be to address the Net Worth Sweep. But it would likely take a very long time to build sufficient capital through retained earnings alone.

So, we will be exploring other avenues to raise capital, such as a public offering of some kind. There is much work and analysis to do in this arena to fully explore all the options.

We are still very much in the early stages of this process. Later this year, following the President's direction, we expect the Administration to release a Housing Finance Reform Plan.

Once that plan has been finalized, hopefully sometime this fall, I will sit down with my counterparts at Treasury to develop a responsible plan to end the conservatorships, with a clear road map and mile markers, and to adjust the Treasury share agreements accordingly. And by January 1 of next year, my hope and expectation is that we will be on the path to a new regime where the GSEs can start to build capital. At that point, the path out of the conservatorships will depend not on the calendar but on Fannie and Freddie meeting the mile markers we set out for them.

It was insufficient capital that triggered the conservatorship, and it's going to be sufficient capital that triggers an exit.

But building private capital to stand between mortgage credit risk and American taxpayers is just one of our strategic objectives.

In addition to strong private capital, a reliable, stable, and liquid housing finance system also requires prudent and sustainable lending standards, sound risk management, and world-class regulation that applies the same set of rules to all market participants.

Toward that end, FHFA will also be pursuing regulatory reforms that prepare the Agency to transition into the post-conservatorship world and that ensure Fannie and Freddie are first-in-class in corporate governance and risk management.

Any rule, regulation, program, or activity begun under FHFA's previous leadership that serves these objectives, we will continue and expand.

For instance, we are working diligently toward the upcoming launch of the Uniform Mortgage Backed Security, or UMBS, which will provide a "common security" on a "Common Securitization Platform" to support market liquidity.

And we will continue working on rule makings that establish sound, prudent standards regarding both the amount and the quality of capital – including the proposed risk-based capital standard and the Proposed Rule on Validation and Approval of Credit Score Models.

Likewise, we will reexamine all Agency policies that dilute or undercut our strategic objectives and vision.

For instance, we are actively reviewing all recent expansions into new markets and activities to put an end to the era of charter creep. Anything that falls outside the GSEs' core business model and mission will be curtailed or ended altogether.

And we are looking at every rule and regulation to ensure that we're creating a level playing field across the industry. One of my responsibilities as Director of FHFA is to help create a competitive mortgage market. And that means that everyone must operate under the same set of rules.

Fannie and Freddie should be successful because they have the best management, the best execution, the best business practices – not because they have the rules and regulations stacked in their favor.

To be fair to everyone else in the emerging marketplace, no one is going to get any special favors.

So, I will be taking action administratively – and working with other regulators where necessary – to ensure that everyone is playing by the same rules across the mortgage industry.

This kind of comprehensive reform agenda will strengthen Fannie Mae and Freddie Mac for the future. When implemented, it will allow them to build a sound capital base, backstopped by world-class supervision and regulation that ensures, in a post-conservatorship world, that lending remains prudent, risks are well-managed, and corporate governance is as good as any leading financial institution in our system.

This is a vision that should bring added confidence to all market participants.

Now, I recognize that we have our work cut out for us. By anyone's standards, the agenda I've just laid out is ambitious, even in the best of political climates. But I remain optimistic and determined – and I hope all of you do too.

Yes, the legislative process is slow and messy. And yes, partisan divisions are intense.

But Washington can come together to enact bold, comprehensive reform like what I've proposed here today, as long as two basic conditions are met.

First, the problem must be urgent and the stakes of inaction high. If you remember just one thing from my remarks today, it should be that the problems plaguing our mortgage finance system are urgent – and we owe it to the country to fix them soon.

But by itself, this isn't enough. If it were, we could have avoided the 2008 financial crisis.

The second, more difficult condition must also be met, which is that the advocates for reform must be educated, organized, and highly motivated.

Notice that I didn't say that the advocates for reform must be in lockstep agreement with one another.

Over the past 5 weeks, I've met with many individuals and organizations who support reform to our mortgage finance system. And I know they're not all going to agree on everything. But they don't need to. The legislative process is not just slow and messy – it's also imperfect. Always.

Highly motivated people don't let perfect become the enemy of the good. They build coalitions. They don't shrink from a debate – they run to it. They don't grow tired or impatient. They never give up fighting for what they know is right and necessary.

And that's exactly how I would describe the men and women of the Mortgage Bankers Association. Together, you speak with one voice as "the leading advocate for the real estate finance industry" – and you advance one vision of "a diverse and a competitive market for all industry participants."

That takes a high degree of motivation, and I've seen the positive impact of your work throughout my career in public service.

So, today, let me just encourage you to stay motivated and stay engaged in this effort.

The road ahead may be difficult. But with your support and dedication, I'm confident that we can reform our mortgage finance system, and finally complete "the great unfinished business" of the financial crisis. And together we will build a stronger, more secure housing market for all Americans.

Thank you for the opportunity to address you today.

**Contacts:**
Media: Stefanie Johnson (202) 649-3030 / Corinne Russell (202) 649-3032

Consumers: **Consumer Communications** or (202) 649-3811

© 2023 Federal Housing Finance Agency