# EXHIBIT F

**Testimony Before the U.S. House of Representatives Committee on Financial Services**
**"The Future of Affordable Housing in America Depends on Mortgage Finance Reform"**
**Dr. Mark A. Calabria – Director, Federal Housing Finance Agency**
**Tuesday, October 22, 2019**

Chairwoman Waters, Ranking Member McHenry, and distinguished members of the Committee, thank you for the invitation to appear at today's hearing.

Too many Americans lack what each of us deserves: an affordable place to call home, whether it is rented or owned.

This is a national problem that exists in communities across the country. But it has local roots. A fundamental cause of the housing affordability problem are local policies that make it harder and more expensive to build new housing.

Examples include zoning and land-use restrictions, environmental regulations, onerous building codes, and permitting requirements. These policies disproportionately hurt low-income Americans.

Our affordability problems will not be solved until local governments remove these impediments that limit the supply of affordable housing in their communities.

Our housing finance system also has a role to play. Fannie Mae and Freddie Mac ("the Enterprises") exist to ensure mortgage credit availability through the economic cycle.

This mission is critical to supporting sustainable homeownership and affordable housing, especially when the economy is weak and mortgage credit tightens.

But in their current condition, Fannie Mae and Freddie Mac will fail in a downturn. And as we learned in 2008, when Fannie and Freddie fail, America's housing affordability problems get even worse.

Together, Fannie and Freddie own or guarantee $5.6 trillion in single and multifamily mortgages, nearly half the market. Yet until very recently, they were limited to just $6 billion in allowable capital reserves. This put their combined leverage ratio at nearly a thousand to one.[1]

Last month, Secretary Mnuchin and I agreed to allow the Enterprises to retain capital of up to $45 billion combined. This is a significant step forward. Retaining just one quarter's net worth has improved their leverage ratio by roughly half. But it still stands at nearly five hundred to one. By contrast, the nation's largest banks have an average leverage ratio of around ten to one.[2]

---

[1] See Exhibit 1.
[2] See Exhibit 2.

Combined with these low capital levels, credit risk has been rising in the loans purchased by the Enterprises in recent years, with some risk factors exceeding the levels observed in 2004, the pre-crisis year that is a useful comparison case to today.[3] While average borrower credit scores are better today – 746 in the first half of 2019 compared to 706 in 2004 – the Enterprises' shares of low down payment and high debt-to-income mortgages are now higher than in 2004. Among 2019 Enterprise loan acquisitions, 20 percent had down payments of 5 percent or less, nearly double the rate in 2004, and nearly 30 percent had high debt-to-income ratios (exceeding 43 percent) compared to 27 percent in 2004.[4]

This pro-cyclical pattern of increasing mortgage risk harms first-time and lower-income borrowers. It makes it easier for them to buy homes beyond their means when the economy is strong, and harder to keep those homes when the economy is weak. More than a quarter of Enterprise acquisitions in the first half of 2019 were first-time buyer loans compared to just 10 percent in 2004.[5]

Borrower debt-to-income (DTI) is a widely used measure of ability to pay that is adversely impacted in a weak economy, when incomes tend to stagnate or decline, and household debt levels tend to stay the same or increase. Although debt-to-income ratios were initially low following the recession, between 2016 and 2018, the Enterprises nearly doubled their purchasing of loans with greater than 43 percent DTI.[6]

Market-wide serious delinquency rates in 2019 are low, between 0.6 and 0.7 percent. But the same was true in 2004. Delinquency rates today are a function of strong labor markets and rising house prices. The underlying risks in the system rarely appear until it is too late.

Regardless of loan quality, there will be defaults when the tide turns and, at their current levels of capital, Fannie Mac and Freddie Mae will fail in a downturn.

Our housing finance system is supposed to serve homeowners and renters while protecting taxpayers. Currently, it fails on both counts.

The reform plans that the Departments of Treasury and Housing and Urban Development (HUD) released last month will help address these problems. They aim to build a more resilient housing finance system that protects taxpayers and ensures the stable mortgage access upon which affordable housing depends.

Chairwoman Waters, I strongly share the principles for housing finance reform that you laid out at the beginning of this Congress. The Treasury and HUD plans are broadly consistent with your principles:

---

[3] According to inflation-adjusted house prices, the current point in the housing cycle is similar to 2004 – a point in time where real prices had been rising for about 7.5 years, and roughly 2.5 years before the downturn in house prices. While similar in terms of house price growth, 2004 and 2019 differ in terms of mortgage activity. Purchase mortgages represented more than two-thirds of Enterprise acquisitions in the first half of 2019, while refinances were more prevalent in 2004, comprising nearly 60 percent of acquisitions.
[4] Statistics on credit risk are from proprietary Enterprise data reported to FHFA.
[5] Ibid.
[6] Ibid.

- "maintaining access to the 30-year fixed rate mortgage;

- ensuring sufficient private capital is in place to protect taxpayers;

- providing stability and liquidity so that we can withstand any future financial crisis;

- ensuring a smooth transition to a new finance system;

- requiring transparency and standardization in a way that ensures a level playing field for all financial institutions, especially credit unions and community banks;

- maintaining access for all qualified borrowers that can sustain homeownership and serving homeowners of the future; and

- ensuring access to affordable rental housing."[7]

These principles, which I believe are widely shared by members of this Committee, are reflected in my top priorities at FHFA. First, cement FHFA as a world-class regulator so as to ensure Fannie Mae and Freddie Mac operate in a safe and sound condition. Second, end the 11-year conservatorships. Third, foster competitive, liquid, efficient, and resilient national housing finance markets.

Since this is my first appearance before the Committee in my capacity as FHFA Director, I would like to reiterate a commitment I made in my nomination hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs. For every decision I have faced or will face, including those regarding projects or initiatives that predate my confirmation as Director, my first question will always be: "what does the statute say?"

My role as Director of FHFA is to carry out the clear intent of Congress. Article I, Section 8 of the United States Constitution states, "All legislative powers herein granted are vested" – and vested exclusively – "in a Congress of the United States." By contrast, the powers and responsibilities of FHFA are limited to faithfully executing the laws, which apply equally to everyone at FHFA without exception.

For instance, the Housing and Economic Recovery Act of 2008 directs the FHFA Director to release the Enterprises from conservatorship through one of three mechanisms: "reorganizing, rehabilitating, or winding up [their] affairs."[8] Therefore, ending the Enterprise conservatorships is one of my top priorities first and foremost because it is what the statute requires.

---

[7] U.S. House Committee on Financial Services, "Waters Outlines Agenda in First Policy Speech as Committee Chairwoman," January 16, 2019. Accessed on October 17, 2019: https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=401718
[8] 12 U.S.C. § 4617(a)(2).

A precondition for responsibly ending the conservatorships is that the Enterprises must be well-regulated and well-capitalized, such that once Fannie Mae and Freddie Mac exit, they never have to return. To achieve this objective, since my tenure as Director began just over 6 months ago, FHFA has taken several important steps, summarized below, to strengthen the Agency and improve the resilience of our nation's mortgage finance system.

Cementing FHFA as a world-class regulator

A key source of FHFA's success is our commitment to diversity. FHFA has one of the most diverse workforces amongst federal financial regulatory agencies. To cement FHFA as a world-class regulator, we are strengthening our commitment to minority and women inclusion in our examination processes, hiring practices, and procurement and supplier policies. For instance, FHFA recently created and approved funding for a new executive Associate Director position within OMWI for diversity and inclusion examinations of all FHFA's regulated entities.

Prior to ending the conservatorships, FHFA's supervision of the Enterprises must be strong and well-executed. All supervisory and oversight procedures and systems must ensure that FHFA's examination work is consistently rigorous, timely, and effective, and that additional resources are efficiently allocated to meet the needs of critical areas such as risk modeling and information technology. Over the past 6 months, FHFA's Enterprise examination program, which includes on-site examiners at both Fannie Mae and Freddie Mac, implemented a range of examination plans aimed at ensuring safety and soundness.

First, FHFA accounting experts continued their oversight of the Enterprises' adoption of the new Current Expected Credit Loss (CECL) accounting standard. Second, FHFA published guidance to clarify certain supervisory expectations, providing supplemental detail to the Agency's Prudential Management and Operating Standards. Third, FHFA issued new advisory bulletins addressing business resiliency management, fraud reporting by Fannie Mae and Freddie Mac, and Enterprise-wide compliance risk management.

In addition to the supervision and regulation of the Enterprises, a vital role of FHFA is to oversee the Federal Home Loan Bank System. Since my tenure as Director began, FHFA's Division of Bank Regulation has issued reports of examination for 7 of the eleven Federal Home Loan Banks. These examinations concluded that the condition and operations at all 7 Banks were satisfactory. They also identified deficiencies in certain areas and put forward recommendations on how to address them in the normal course of business. In addition, 5 Community Investment Program examinations were completed, including advances and grants for housing and economic development.

Key Policy Actions

At the same time that FHFA has been strengthening our regulatory and supervisory capabilities the past 6 months, the Agency has also implemented new policies that focus the Enterprises and the Federal Home Loan Banks on fulfilling their statutory missions in a safe and sound manner that protects taxpayers.

**Revised Multi-Family Caps to Prioritize Affordable Housing**

On September 13, 2019, FHFA revised the Enterprise multi-family loan purchase caps to ensure a strong focus on their statutory mission while not crowding out private capital. The new caps provide ample support to the multi-family market with a combined $200 billion in purchase capacity through 2020, while closing loopholes that allowed the Enterprises to displace private capital where such other sources of financing were available. Importantly, the new cap framework increased the levels of the Enterprises' multi-family business that is mission-driven, affordable housing to at least 37.5 percent.

**Finalized Credit Score Rule to Support Sustainable Homeownership**

On August 16, 2019, FHFA issued a Final Rule on the Validation and Approval of Credit Score Models, fulfilling the congressional mandates of Section 310 of the Economic Growth, Regulatory Relief, and Consumer Protection Act of 2018. The Final Rule requires a four-phase process for validation and approval of credit score model(s):

1. Solicitation of applications from credit score model developers;
2. Submission and initial review of submitted applications;
3. Credit score assessment; and
4. Enterprise business assessment.

Issuing this Final Rule is an important step toward ensuring that the Enterprises utilize tools that accurately measure risk, so that borrowers have a safe and sound path to homeownership and taxpayers are protected.

**Protected Equitable Market Access for Small Lenders**

On September 16, 2019, FHFA issued formal policy guidance to the Enterprises prohibiting volume-based guaranty fee discounts in order to provide a level playing field for small lenders. A central reason for the existence of Fannie Mae and Freddie Mac is to provide small lenders, community banks, and credit unions with access to the secondary market. Large market entities have access to varied sources of liquidity and the scale to access Wall Street liquidity through securitization. Smaller lenders rely on the liquidity provided by the Enterprises. But access alone is not sufficient. Small lenders must have access at terms that are equitable with larger entities.

In the lead up to the 2008 financial crisis, large financial institutions that controlled substantial market share received significant guaranty fee discounts from the Enterprises because of their volume. These volume-based discounts disadvantaged smaller institutions and drove consolidation that was not healthy for the market. FHFA's formal policy guidance implements the principle of "same rate of the return for the same risks, regardless of size." This principle supports equitable access for small lenders while appropriately allowing for guaranty fees to reflect differences that may exist in the risk profiles between lenders of different size.

**Ended Enterprise Pilot That Fell Outside Core Guaranty Business**

FHFA has been actively reviewing Enterprise pilots and new programs to ensure that they align with activities core to the Enterprises' guaranty business and statutory mission, mitigate risk, and are essential to end the conservatorships. On September 18, 2019, FHFA announced the end of the Enterprises' Mortgage Servicing Rights (MSR) Financing Pilot Program. The MSR pilot, begun in 2018, provided financing to non-bank servicers. FHFA determined that a wide assortment of alternative sources of private capital and financing were readily available. The pilot, in which only Freddie Mac chose to participate, is being wound down in an orderly manner.

**Began Transition Away from LIBOR to Alternative Reference Rates**

The anticipated end of the availability of the London Interbank Offered Rate (LIBOR), and the need to transition to alternative reference rates, is a major issue for the markets and FHFA's regulated entities. Therefore, ensuring the Federal Home Loan Banks (Banks) and the Enterprises are able to reduce risk exposure and prudently expedite the transition away from LIBOR is a policy priority for FHFA.

On September 27, 2019, FHFA sent a supervisory letter to the Banks instructing them that, as of December 31, 2019, they should stop purchasing investments in assets tied to LIBOR with a contractual maturity beyond December 31, 2021. The letter further instructed that, as of March 31, 2020, the Banks should no longer enter into all other LIBOR-based transactions involving advances, debt, derivatives, or other products with maturities beyond December 31, 2021, with only very limited exceptions granted by FHFA.

**Conclusion**

There is broad, bipartisan agreement today that our nation's housing finance system is in urgent need of reform. There is no denying that the status quo poses significant risk to taxpayers, homeowners, renters, and the entire financial system. There is also a consensus building around the principles toward which we can work, including preserving access to the 30-year fixed-rate mortgage, building private capital to stand between mortgage credit risk and taxpayers, and supporting sustainable homeownership and affordable housing.

As Director of FHFA, I will continue to take action, consistent with my statutory responsibilities and the statutory mission of the entities I regulate, to build a stronger, more resilient mortgage finance system. And I stand willing to work with all who share these goals.

Thank you again for the opportunity to testify today. I look forward to answering your questions.

7

**Exhibit 1**[9]



---

[9] Large U.S. banks and the Enterprises are subject to separate leverage ratio requirements that use differing components, both in terms of what each firm can use to meet its respective requirements and which balance sheet measures the requirements are based on. To provide a simplified version of the actual requirements for the purposes of comparison, this graph uses Stockholders' Equity for the banks and Total Consolidated Assets (Total Capital) for the Enterprises.

8

**Exhibit 2**

