**UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., et al.,<br><br>        *Plaintiffs*,<br><br>v.<br><br>THE FEDERAL HOUSING FINANCE AGENCY, et al.,<br><br>        *Defendants*. | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS<br>_____<br><br>This document relates to:<br>ALL CASES | Case No. 1:13-mc-1288-RCL |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION IN LIMINE NO. 5 CONCERNING STATEMENTS
<u>BY FHFA DIRECTORS MELVIN WATT AND MARK CALABRIA</u>**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ........................................................................................................................ 3

    A. The Watt/Calabria Exhibits Are Plainly Relevant .................................................... 3

    B. The Probative Value Of The Watt/Calabria Exhibits Is Not Substantially Outweighed By A Danger Of Unfair Prejudice Or Jury Confusion. ....................... 8

    C. Defendants Have Not Identified Any Valid Basis Under Any Other Rule To Exclude The Watt/Calabria Exhibits. ................................................................ 15

III. CONCLUSION ................................................................................................................... 17

I.      INTRODUCTION

At the first trial, Defendants repeatedly asserted that the Net Worth Sweep component of the Third Amendment to the PSPAs was "in the public interest," was "critically important to the public interest," and was "in the best interests of the public." These unqualified statements of "public interest" became the linchpin of their defense, which portrayed the Net Worth Sweep as a necessary decision made by a career public servant that protected Fannie Mae and Freddie Mac over the long-term, particularly in the case of a so-called "stress scenario" or a future recession.

To be clear, Defendants did not simply argue that DeMarco "thought" the Net Worth Sweep was in the public interest; rather, from the start, in their Opening Statement, Defendants asserted a more grandiose and unqualified defense that DeMarco "*put the public interest first*" when FHFA agreed to the Net Worth Sweep "*to save the economy*."  Ex. A (Trial Tr. 322)[1]. DeMarco later testified that the Net Worth Sweep was about "*building for a future*." *Id.* at 855. Defense counsel told this Court that acting in the "public interest" was "the heart of [DeMarco's] job." *Id.* at 818.  And Defendants' expert, Dr. Mukarram Attari, offered as his "bottom-line conclusion" that the Third Amendment "achieved the goal" of protecting Fannie and Freddie "if you have a downturn." *Id.* at 1970:4-1971:4.

Defendants now seek to preclude evidence of statements made by FHFA Directors Mel Watt and Mark Calabria (the "Watt/Calabria Exhibits") that fairly demonstrate that the Net Worth Sweep was *not* in the "public interest" and did not help the GSEs "build for a better future," especially not "if you have a downturn."  Rather, the proffered evidence proves that by depriving Fannie Mae and Freddie Mac of a material capital buffer—which was a central element of the Third Amendment—Defendants actually and foreseeably *harmed* the public interest. The

---

[1] Exhibits attached to this motion are referenced as "Ex.__."

Watt/Calabria Exhibits contain critically important facts that are relevant to prove that the Net Worth Sweep prevented Fannie Mae and Freddie Mac from building the necessary capital to deal with a stress scenario, and thus *increased* the likelihood that Fannie Mae and Freddie Mac would have to take future draws from Treasury and rely on taxpayer funds as their sole remaining source of financial support.  Should Defendants present similar evidence or argument at the retrial, Plaintiffs should be allowed to respond by introducing the Watt/Calabria Exhibits in their case-in-chief, in cross-examining Defendants' witnesses, and/or in their rebuttal case.

The evidence is also relevant to the credibility of Dr. Attari's opinions, which include that it was reasonable for FHFA to agree to the Third Amendment because it furthered the Conservator's goals and the GSEs' public mission to promote the stability and liquidity of the secondary mortgage market, including in stress situations.  Despite advancing these opinions in a report issued on February 1, 2022, Dr. Attari did not consider multiple public statements made by the heads of the agency that retained him, which calls into question the accuracy and reliability of his opinions.  Dr. Attari's failure to consider relevant sources in forming his own *post hoc* assessment of reasonableness and the public interest constitutes proper grounds for cross-examination.  Plaintiffs thus should be permitted to utilize the Watt/Calabria Exhibits in their cross-examination of Dr. Attari.

Introduction of the Watt/Calabria Exhibits to refute specific arguments and evidence advanced by Defendants, and to challenge the reliability of Defendants' expert on cross-examination, does not violate Rule 403.  Defendants have framed the case to make the question of whether FHFA's decision to deprive Fannie Mae and Freddie Mac of capital was in the "public interest" *the* central question on which liability turns.  *See* Ex. A (Trial Tr. 2586) (DeMarco's "responsibility to act in the public interest" "lies at the very heart of this case").  That the

Watt/Calabria Exhibits squarely address this central factual question strongly favors admissibility. *See Fairshter v. Am. Nat'l Red Cross*, 322 F. Supp. 2d 646, 655 (E.D. Va. 2004) (Rule 403 objection properly denied because "the probative value of the evidence is insurmountable as it is relevant to . . . a core issue of the case and one that was strenuously disputed at trial by both parties"). Defendants should not be allowed to present a grandiose "public interest" defense, arguing that the Net Worth Sweep was necessary to "ensure the stability and safety of the United States housing market and **the entire United States economy**," Ex. A (Trial Tr. 2580:20-25), without Plaintiffs being allowed to counter that argument with facts demonstrating that the defense is factually false.

## II.     ARGUMENT

### A.     The Watt/Calabria Exhibits Are Plainly Relevant

"Federal Rules of Evidence 401 and 402 establish a liberal standard of relevance." *Fed. Hous. Fin. Agency v. Nomura Hldg. Am., Inc.*, 74 F. Supp. 3d 639, 650 (S.D.N.Y. 2015). "Broadly speaking, the Federal Rules of Evidence permit the admission of 'relevant evidence'—that is, evidence that 'has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence,' Fed. R. Evid. 401—provided it is not otherwise excluded by the Rules, the Constitution of the United States, or an Act of Congress, Fed. R. Evid. 402, and its probative value is not 'substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence,' Fed. R. Evid. 403." *Lenkiewicz v. Castro*, Civil Action No. 13-0261 (RCL), 2015 WL 13660482, at *1 (D.D.C. Jan. 20, 2015) (Lamberth, J.) (quoting *Graves v. D.C.*, 850 F. Supp. 2d 6, 10-11 (D.D.C. 2011)).

The statements in the Watt/Calabria Exhibits are relevant to numerous key issues in this case. ***First***, the statements are relevant because they make it less probable that the Net Worth

3

Sweep was actually in the "public interest," which, based on the first trial, is the cornerstone of the defense in this case. Rather, as the Watt/Calabria Exhibits reveal, the FHFA later acknowledged that the intended and actual effect of the Net Worth Sweep, to prevent the GSEs from building capital and leave them dependent solely on taxpayer funding, was *not* in the public interest. For instance,

- Mr. Watt identified as a "***significant challenge***[]" to "the Enterprises' financial condition and ***the mortgage market***" the fact that "under the terms of the PSPAs, the Enterprises do not have the ability to build capital internally while they remain in conservatorship." Ex. B (PX-585) at 3.

- Mr. Watt acknowledged that the PSPAs left the GSEs "unable to build capital" and described their "lack of capital" as "[t]he most ***serious risk*** and the one that has the most potential for escalating in the future." Ex. B (PX-586) at 4.

- Mr. Watt testified before Congress that because the PSPAs left the GSEs with "no capital buffer," they could not withstand losses "without ***drawing on taxpayer funding***." Ex. B (PX-587) at 4.

- Dr. Calabria admitted that "we never really fixed [the housing finance system] after the housing collapse." He also explained that because "the GSEs' balance sheet capital cushion is razor thin," "***American taxpayers [are] increasingly exposed to bearing the*** risks of these mortgage giants through another bailout." Ex. B (PX-588) at 2; *accord* Ex. B (PX-589) at 2.

- Dr. Calabria testified before Congress that "at their current levels of capital, Fannie Ma[e] and Freddie Ma[c] will fail in a downturn. Our housing finance system is supposed to serve homeowners and renters while protecting taxpayers. Currently, ***it fails on both counts***." Ex. B (PX-590) at 2.

- Dr. Calabria testified before Congress that "the Enterprises lack the capital to withstand a serious housing downturn. This ***jeopardizes their important mission to support borrowers*** in housing finance markets during periods of stress." Ex. B (PX-591) at 15; *see* Ex. B. (PX-592) at 4.

To summarize, the Watt/Calabria Exhibits contain numerous admissions by both Democratic and Republican heads of the FHFA that depriving Fannie and Freddie of a capital buffer harmed the public interest by creating significant risks to current and prospective homebuyers, renters, and taxpayers. These admissions directly rebut Defendants' argument that

the Net Worth Sweep helped Fannie and Freddie "build for a better future" and "put the public interest first," making them plainly relevant.

***Second***, the admissions are relevant because they make it less probable that Defendants' true motive for agreeing to the Net Worth Sweep was, as Defendants claim, to protect the Treasury commitment against erosion. During closing argument, counsel for Defendants claimed that the Net Worth Sweep completely eliminated the risk of erosion:

> So it boiled down to this: The risk to the GSEs, to the housing market and the economy, from the potential ***erosion of the commitment***, was so great. … Mr. DeMarco decided that he needed to ***eliminate that risk entirely***. He needed to take it down to zero. And ***that's exactly what the Third Amendment did and the net worth sweep accomplished***.

Ex. A  (Trial Tr. 2681).

But as Mr. Watt explained, the Net Worth Sweep actually *increased* the likelihood that the GSEs would need to draw additional funds from Treasury because they had no capital buffer:

> The [PSPAs] require each Enterprise to pay out comprehensive income generated from business operations as dividends to the Treasury Department, and the amount of funds each Enterprise is allowed to retain is often referred to as the Enterprises' "capital buffer." This capital buffer is available to absorb potential losses, which reduces the need for the Enterprises to draw additional funding from the Treasury Department. However, based on the terms of the PSPAs, this capital buffer is reducing each year. And, we are now over halfway down a five-year path toward eliminating the buffer completely.
>
> Starting January 1, 2018, ***the Enterprises will have no capital buffer and no ability to weather quarterly losses*** … ***without making a draw against the remaining Treasury commitments*** under the PSPAs.

Ex. B (PX-586) at 4 (emphasis added). Any such draws, Mr. Watt explained, would "chip away at the backing available by the Treasury Department under the PSPAs [and] could undermine confidence in the housing finance market." *Id.* at 5. This evidence squarely contradicts Defendants' claim that the Net Worth Sweep "removed this concern . . . about the potential erosion of the commitment." Ex. A (Trial Tr. 930).  Defendants argued that "by agreeing to the Net Worth Sweep

5

Mr. DeMarco and FHFA, acting as conservator, completely eliminated [circular draw] risk." Ex. A (Trial Tr. 369).  The Watt/Calabria Exhibits directly undermine that argument and the credibility of Defendants' purported motive of protecting the Treasury commitment against erosion, and therefore are plainly relevant.

  ***Third***, the Watt/Calabria Exhibits are relevant to cross-examine Dr. Attari regarding his opinions as to the reasonableness of the Net Worth Sweep.  Specifically, Dr. Attari opined, "It was reasonable for FHFA to agree to the Third Amendment because it furthered the Conservator's goals and the GSEs' public mission to promote the stability and liquidity of the secondary mortgage market, including in stress situations." Ex. C (Attari Rebuttal Report) ¶ 13.  It is axiomatic that "during cross-examination," a party may question experts "on the facts or data they did ***not*** consider in rendering their opinions." *See, e.g.*, *Slate v. N & F Logistic, Inc.*, Civil No. 1:21cv50-HSO-RHWR, 2022 WL 2913008, at *2 (S.D. Miss. July 22, 2022) (citing Fed. R. Evid. 705) (emphasis added); *Cowley v. Sunset Yacht Charters, Inc.*, No. 10-61928-CIV, 2011 WL 2938463, at *5 (S.D. Fla. July 20, 2011) ("Of course, Plaintiff's counsel will be free to cross examine [the expert] about his opinions, point out any evidence he did not consider, and argue to the jury that the failure to consider the evidence makes his opinion less probative than another expert's opinion."); *Reichhold, Inc. v. U.S. Metals Refin. Co.*, Civil No. 03-453 (DRD), 2007 WL 674686, at *13 (D.N.J. Feb. 28, 2007) (if an expert's "opinions are subject to impeachment because he did not consider [certain facts or] data, then that is an issue for cross-examination at trial"). Despite authoring his expert report ***after*** the statements made by Mr. Watt and Dr. Calabria, Dr. Attari failed to consider the statements, including those given in sworn testimony before Congress, discussing the substantial harm caused by the Net Worth Sweep's depriving the GSEs of capital.

6

These statements are plainly relevant to the reasonableness of the Net Worth Sweep, and Dr. Attari's failure to consider them makes his opinion less credible.

Defendants' Rule 402 relevance arguments are meritless. The statements made by Mr. Watt and Dr. Calabria are not, as Defendants suggest, mere "opinions about and reactions to the Net Worth Sweep." Mot. at 7. Indeed, many of the statements are not opinions at all, but rather statements of fact about the inherent characteristics of the Net Worth Sweep and its necessary consequences, including leaving Fannie Mae and Freddie Mac with a minimal capital buffer that was projected to decline to $0 by 2018. It is not Mr. Watt's "opinion" that "Fannie Mae and Freddie Mac are currently unable to build capital under the provisions of the PSPAs," nor that "[t]he agreements require each Enterprise to pay out comprehensive income generated from business operations as dividends to the Treasury Department." *Id*. at 7 (quoting PX-0586). Those are facts that existed as of the date of the Third Amendment's execution. It likewise is not Dr. Calabria's "opinion" that the GSEs' "balance sheet capital cushion is razor thin," Ex. B (PX-588) at 2, that Fannie's and Freddie's capital levels will cause them to "fail in a downturn," Ex. B (PX-590) at 2, and that "the Enterprises lack the capital to withstand a serious housing downturn." Ex. B (PX-591) at 15. Defendants acknowledge as much in elsewhere in their Motion. *Id*. at 15 (acknowledging that "[s]ome of Mr. Watt and Dr. Calabria's statements at issue merely summarize how the Net Worth Sweep operates.").

Defendants incorrectly contend that because "Mr. Watt and Dr. Calabria had no involvement in the negotiation of the Third Amendment," their statements "[b]y definition, . . . cannot be relevant to the reasonableness of Mr. DeMarco's decision years earlier to enter into the Third Amendment." *E.g.*, Mot. at 5-6. This argument pretends that Defendants have merely argued that the FHFA's decision was reasonable ***in 2012***. But Defendants deliberately took this case into

the "future" with their arguments that the Net Worth Sweep actually "achieved the goal" of protecting the public interest "if you have a downturn," Ex. A (Trial Tr. 932), helped Fannie and Freddie "build[] for a better future," *id.* at 855, and that the "mechanics and effects" "served the public interest," *id.* at 1970. They cannot now fairly argue that examination of ***the actual effects*** of the Net Worth Sweep should be off limits.[2]

Defendants' Motion inaccurately frames evidence concerning the inevitable consequences of the Net Worth Sweep as reflecting a mere disagreement rooted in "policy preferences" and "views" of Mr. Watt and Dr. Calabria on the one hand, and "Mr. DeMarco's decision in 2012" on the other. Mot. at 12. But a foreseeable and inevitable consequence of the agreement to deprive Fannie and Freddie of capital is not a policy dispute, nor does it depend on or reflect the personal views of Mr. Watt and Dr. Calabria. Mot. at 10. The FHFA's statements and admissions about the deprivation of capital (made by then-Directors Watt and Calabria, acting within the scope of their official duties) are relevant to the foreseeable impact of depriving Fannie and Freddie of capital and to rebut arguments as to its reasonableness.

    **B.    The Probative Value Of The Watt/Calabria Exhibits Is Not Substantially Outweighed By A Danger Of Unfair Prejudice Or Jury Confusion.**

Rule 403 favors the admissibility of relevant evidence. If a party wishes to exclude evidence, it carries the burden with respect to obtaining a ruling in advance of trial. That burden is significant, as exclusion under Rule 403 "is an extraordinary remedy to be used sparingly.'" *United States v. Libby*, 467 F. Supp. 2d 1, 20 (D.D.C. 2006) (citations omitted). The bar is even higher where the challenged evidence is offered solely or primarily to rebut a defense. *See, e.g.*,

---

[2] Further, Courts routinely admit later admissions made by parties and their agents in a variety of contexts, including, for example, in the form of a prior stipulation. *Hastings Christian Fellowship v. Martinez*, 561 U.S. 661, 677-78 (2010) ("factual stipulations are 'formal concessions' [] [t]hus, a judicial admission").

8

*United States v. Christensen*, 624 Fed. App'x 466, 484 (9th Cir. 2015) (affirming admission of evidence over Rule 403 objection "[b]ecause the evidence in question was relevant to rebutting [defendant's] defense"); *Goodloe v. Daphne Utils.*, Civil Action 13-0605-WS-C, 2015 WL 2165806, at *1 (S.D. Ala. May 7, 2015) (holding that defendant "cannot utilize Rules 401 or 403 to handcuff [plaintiff] from rebutting [defendant's] defense"). Moreover, "'unfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002) (quoting *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977)).

Defendants offer a laundry list of arguments under Rule 403. Each fails.

***First***, Defendants argue that the Watt/Calabria Exhibits are "likely to confuse the issues before the jury." Mot. at 10. Not so. The Watt/Calabria Exhibits do not, as Defendants incorrectly claim, "invite the jury to judge FHFA's decision through the lens of hindsight." *Id.* As Mr. Watt and Dr. Calabria explained, the Net Worth Sweep harmed the public interest by eliminating the GSEs' capital buffer and leaving them with no ability to absorb losses. This risk was not "unknown to the FHFA at the time of the Third Amendment," *id.* at 11, because it was an obvious, foreseeable, and inevitable consequence of the Net Worth Sweep. That a company stripped of all its surplus capital will be unable to build its capital reserves is tautological. Nor does one need "the benefit of 20/20 hindsight," Mot. at 9, to conclude that intentionally depriving the GSEs of capital would leave them undercapitalized. These consequences were (and always have been) obvious, foreseeable, and inevitable, and therefore are among the facts and circumstances that existed in August 2012 when the Third Amendment was executed. The statements in the

9

Watt/Calabria Exhibits describing these consequences thus do not create any danger of "hindsight bias."

Defendants' arguments concerning purported jury confusion include a long discussion of the "complex, competing policy considerations" implicated by the Watt/Calabria Exhibits. But "something other than the general complexity" is necessary to justify exclusion under Rule 403, and there is nothing "*particularly* confusing" about the Watt/Calabria Exhibits. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 747 (3d Cir. 1994) (emphasis in original).  Defendants chose to place these issues at the very heart of their defense—they clearly are not too "complex" for the jury to grasp.[3]

More fundamentally, it would be unfair to permit Defendants to argue that the Net Worth Sweep achieved its purported goal of advancing the public interest while precluding Plaintiffs from introducing evidence to rebut the argument.  Defendants "simply cannot have it both ways." *Sirmans v. Caldera*, 27 F. Supp. 2d 248, 251 (D.D.C. 1998) (Lamberth, J.) (citing *Baker v. United States*, 127 F.3d 1081, 1088 (Fed. Cir. 1997) ("The government cannot now argue that it wishes to reveal some, but not all, of the relevant information concerning the conduct of the [Board].")). Plaintiffs are entitled to rebut Defendants' defense that Mr. DeMarco "acted to serve the public interest by protecting the Treasury Commitment over the shareholders' interests," Mot. at 11, with evidence that the Net Worth Sweep was not in the public interest in August 2012, nor ever.[4]

---

[3] The remainder of Defendants' discussion of the "complex, competing policy considerations" simply rehashes Defendants' relevance arguments, which this Opposition addresses, *supra*, at Part II.A.

[4] Defendants' suggestion that the public interest varies based on the "policy preferences" of each successive FHFA Director, Mot. at 11, is unsupported by any authority and cannot be squared with the fact that the goals of conservatorship, and the powers and duties of the FHFA and its Director with respect to those goals, were set forth in HERA, and have not changed since HERA was enacted in 2008. *See, e.g.*, 12 U.S.C. § 4513(a)(1) (requiring the Director "to ensure that . . . the

Defendants further argue that "the former Directors' statements could also confuse the jury by leading it to infer" that subsequent FHFA Directors "did not have the authority to agree to an amendment to the PSPAs that could address" the GSEs' "inability to build capital." Mot. at 11. But then, in the very same paragraph, Defendants acknowledge that "[i]t is undisputed that both Mr. Watt and Dr. Calabria agreed to amendments to the PSPAs," as stated in a joint stipulation between the parties. *See* Ex. D (PX-593) (stipulating to subsequent agreements to the PSPAs)**.** Moreover, in several exhibits, Dr. Calabria discusses the steps he took to address the GSEs' inability to build capital, demonstrating that he did, in fact, have the authority to address this issue.[5] There is no danger of jury confusion on this point.

Defendants also suggest that Dr. Calabria's failure to accurately predict the outcome of the Supreme Court's decision in *Collins v. Yellen* somehow renders his statements inadmissible. As Defendants acknowledge, however, the Watt/Calabria Exhibits do not include ***any*** statements in which Dr. Calabria asserted that the Net Worth Sweep violated HERA. Mot. at 12-13 (citing

---

activities" of the GSEs "are consistent with the ***public interest***") (emphasis added); § 4617(b) (setting forth the FHFA's "[p]owers and duties . . . as conservator" of "critically undercapitalized regulated entities"). Particularly in light of recent Supreme Court precedent, it simply is not reasonable to conclude that Congress "intended to delegate" to the FHFA the "sweeping and consequential authority" to singlehandedly define the "public interest"—let alone to leave the determination of an issue of such "economic and political significance" to each individual Director's policy preferences. *West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2595 (2022) (holding that the "the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion," may "provide a reason to hesitate before concluding that Congress meant to confer such authority" (internal quotation marks omitted)); *Biden v. Nebraska*, No. 22-506, 600 U.S. ---, 2023 WL 4277210 (June 30, 2023) (indicating that this precept applies to "all corners of the administrative state").

[5] Ex. B (PX-590) ("Last month, Secretary Mnuchin and I agreed to allow the Enterprises to retain capital of up to $45 billion combined."); Ex. B (PX-591) ("FHFA has made progress in building capital at the Enterprises. Their combined leverage ratio improved from roughly 1,000 to 1 when I started last year to roughly 250 to 1 today."); Ex. B (PX-592) ("[W]hen I walked in the door at FHFA, Fannie and Freddie were leveraged about 1,000 to 1. If the Enterprises had still been leveraged 1,000 to 1, they would have already failed in response to COVID.").

11

exclusively to sources other than the Watt/Calabria Exhibits). Defendants' entirely speculative theorizing that Dr. Calabria's views on the legality of the Net Worth Sweep were among the motivations for his statements concerning its effects adds nothing to the Rule 403 analysis, and certainly does not demonstrate any danger of jury confusion.

***Second***, Defendants contend that the Watt/Calabria Exhibits "create a substantial likelihood of unfair prejudice," but none of Defendants' arguments support that conclusion. For instance, Defendants argue that the Watt/Calabria Exhibits "contain various statements that threaten to draw the jury's ire toward Defendants and induce a decision on an improper basis— namely, an emotional one," Mot. at 13, but do not explain how or why any particular statement would "draw the jury's ire." Nor do they provide any support for their conclusory assertion that an "emotional" response would induce the jury to make a decision on an improper basis. Regardless, none of the statements amount to the type of "undeniably explosive," or "shocking or heinous" evidence that would be "likely to inflame the jury." *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000) (internal quotation marks omitted); *see also United States v. Hassan*, 742 F.3d 104, 132 (4th Cir. 2014) ("evidence should only be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be ***excited to irrational behavior***, and this risk is disproportionate to the probative value of the offered evidence") (internal quotation maeks and citation omitted).

Defendants characterize former U.S. Representative Mike Capuano's tone in PX-587 as "emotionally charged," Mot. at 14, but this characterization is based solely on Defendants' own subjective judgment as to what is or is not "emotionally charged" and, thus, could not possibly provide a basis on which to exclude plainly relevant evidence. Moreover, Defendants' argument misapprehends Rule 403. As the Advisory Committee's Notes explain, evidence may be excluded

12

if it creates a danger of "inducing decision on a purely emotional basis." In other words, "emotional," as used in the Advisory Committee's Notes, refers to the *jurors'* emotional response to the evidence, not whether the evidence itself is, as Defendants put it, "emotionally charged." Regardless, the "tone" of Representative Capuano's statement is of no consequence in determining the admissibility of the statement under Rule 403. *See United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998) (affirming trial court's admission into evidence of "recordings of [defendant's] telephone conversations" as "admissions of a party opponent" over defendant's objection that "they were barred by Rule 403 because of their tone and profanity").

*Third*, Defendants argue that certain factors "compound[]" the risk of unfair prejudice. One such factor, Defendants argue, is "the fact that the statements at issue were made by former Directors of FHFA," Mot. at 14.  But Defendants ignore that statements of then-Directors of the FHFA are statements of the FHFA, *see* Fed. R. Evid. 801(d)(2); *English v. District of Columbia*, 651 F.3d 1, 7 (D.C. Cir. 2011) (holding that documents authored by government employees who "were acting within the scope of their employment by the . . . government, one of the defendants in this case—at the time they prepared and submitted them" are "party admissions")., which amplifies the probative value of the statements.[6]

Defendants also offhandedly suggest that the fact that "trial is two weeks away[] further compound[s] the unfair prejudice," Mot. at 14, but the only ground they raise is Rule 403, not that the exhibits were untimely disclosed.  Defendants cannot demonstrate any danger of undue prejudice, as Plaintiffs will seek leave of court to introduce the Watt/Calabria Exhibits in their case-in-chief only as necessary to respond to specific arguments and examination conducted by Defendants. Further, there is no possible timeliness objection to the use of the Watt/Calabria

exhibits solely for purposes of impeachment or for use in rebuttal, which are not subject to any disclosure requirement.[7]  If anything, Defendants have benefited by receiving four weeks' advance notice of a possible line of cross-examination and evidence Plaintiffs may seek to introduce in rebuttal, of which they otherwise would be unaware.

In addition, the manner in which Plaintiffs will seek leave to introduce the statements demonstrates that there will be no undue prejudice. It is likely that Plaintiffs will introduce the statements through their document reader, and the parties have already developed a process whereby Defendants can designate additional excerpts from exhibits that in fairness should be read to the jury, providing the "complete picture" that Defendants claim will be necessary to prevent undue prejudice.[8]   Mot. at 14-15;  *see Fleck v. GM LLC*, 14-MD-2543(JMF), 2015 U.S. Dist.

---

[7] **Impeachment**: Fed. R. Civ. P. 26 advisory committee's note to 2000 amendment ("Subdivision (a)(3) presently excuses pretrial disclosure of information solely for impeachment. Impeachment information is similarly excluded from the initial disclosure requirement."); LCvR 16.5(b)(5) ("A party need not list any witness who will be called solely for impeachment purposes."). **Rebuttal**: *Berkley Ins. Co. v. Fed. Hous. Fin. Agency*, Case No. 1:13-cv-1053-RCL, 2023 WL 3790739, at *4 (D.D.C. June 2, 2023) ("To the extent that Dr. Dharan wishes to opine on expert testimony or other evidence that defendants may present at trial, plaintiffs are free to re-call him in their rebuttal case. Assuming it is otherwise admissible, such testimony would be ***entirely permissible*** under Rule 703, which allows an expert to apply his previously disclosed methodology to evidence "present[ed] at the trial," without filing a report outlining that specific opinion in advance.") (citations omitted; emphasis added)); *Little v. Wash. Metro. Area Transit Auth.*, 249 F. Supp. 3d 394, 416 (D.D.C. 2017) (collecting authorities supporting that "[d]istrict courts routinely permit new experts for rebuttal purposes and permit rebuttal experts to use new methodologies to rebut the opinions of the opposing expert"). The standard is the same for both expert and lay witnesses. *In re HIV Antitrust Litig.*, 2023 WL 4226757, at *1 (N.D. Cal. June 26, 2023) (rejecting the "stricter view" of the appropriate scope for rebuttal as inconsistent with "the ***standard for evaluating rebuttal testimony*** (***expert or percipient***) at trial, where rebuttal witnesses typically need not be disclosed at all").

[8] The Watt/Calabria Exhibits include statements that are non-hearsay if offered by Plaintiffs, (*see United States v. Bailey*, No. 19-156 (CKK), 2022 U.S. Dist. LEXIS 171874, at *9 (D.D.C. Sep. 22, 2022) ("Defendant does not object to the admission of his own statements; nor could he, as they are admissible party admissions under Federal Rule of Evidence 801(d)(2)(A)."); *see also Bridges v. Clark*, 59 A.3d 978, 988 (D.C. 2013)) ("[A]n admission of a party opponent may not be excluded simply because the opposing party might wish to clarify the admission through further

LEXIS 169598, at *130-31 (S.D.N.Y. Dec. 9, 2015) (admitting excerpts of a report offered by plaintiffs as a subsequent adoptive admission and finding that defendants could move pursuant to Fed. R. Evid. 106 for "other parts of the Report should 'in 'fairness' be admitted"). Further, the use and introduction of the exhibits to cross-examine Dr. Attari and other witnesses is governed by well-established evidentiary rules and procedures that the Court may apply at trial. *See, e.g.*, Fed. R. Evid. 611 (scope of cross-examination); Fed. R. Evid. 705 (disclosure of the facts or data underlying an expert's opinion, including on cross-examination); Fed. R. Civ. P. 43 (taking testimony).

Defendants have not identified any credible danger of unfair prejudice that would result from introducing the Watt/Calabria Exhibits, let alone a danger that "substantially outweighs" the tremendous probative value of these exhibits. Accordingly, the Watt/Calabria Exhibits should not be excluded under Rule 403.

### C. Defendants Have Not Identified Any Valid Basis Under Any Other Rule To Exclude The Watt/Calabria Exhibits.

Defendants contend that "[m]any of Plaintiffs' new exhibits are inadmissible for additional reasons." Mot. at 15. None of these "reasons" is persuasive.

---

testimony []" "[o]ne rationale for this generous treatment of party admissions is a party's ability to rebut the out-of-court statement by putting himself on the stand and explaining his former assertion" (internal citations omitted)).  Under Federal Rule of Evidence 106, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at same time." Fed. R. Evid. 106; *see Wye Oak Tech., Inc. v. Republic of Iraq*, 2019 U.S. Dist. LEXIS 66953, at *14 (D.D.C. Apr. 18, 2019). Other than those that fall under Rule 106, Defendants cannot offer statements of Mr. Watt and Dr. Calabria because they would be inadmissible hearsay if offered by Defendants. Fed. R. Evid. 801(d)(2) (statement must be "offered ***against an opposing party***" to be non-hearsay); *McGee v. Zurich Am. Ins. Co.*, 2021 U.S. Dist. LEXIS 239713, at *14 (D. Ariz. Dec. 15, 2021) (rejecting as inadmissible hearsay an agreement offered by plaintiff as its own admission).

*First*, Defendants challenge two of the Watt/Calabria Exhibits on the basis that they contain "statements about dividends and value transferred to Treasury after the Third Amendment"—i.e., the subject of Defendants' pending Motion *in Limine* # 4. Mot. at 15-16. Plaintiffs, however, informed Defendants that they will not seek to introduce such evidence through the Watt/Calabria statements (including the specific statements cited on page 16 of the Motion) and will offer only the statements that relate to the deprivation of capital caused by the Third Amendment, which is admissible.[9]

*Second*, Defendants challenge three of the Watt/Calabria Exhibits on the basis that "they contain Dr. Calabria's legal opinions about the scope of the Conservator's authority under HERA." Mot. at 17. Defendants are wrong; Dr. Calabria's statements do not constitute improper legal opinions. In Ex. B (PX-0588), for example, his statement that "[t]he law requires me to do what I can within my powers to fix the GSEs and then release them from conservatorship" is not a statement of Dr. Calabria's legal opinion, but rather an expression of his understanding of the responsibilities and duties of his role, which is admissible. Indeed, during the first trial, Defendants argued, and the Court agreed, that similar testimony from Mr. DeMarco about his understanding of the conservatorship's requirements vis-à-vis the public interest was "not a lay opinion" because it "is the heart of his job." Ex. A(Trial Tr 818). There is no basis to exclude Dr. Calabria's statements as improper legal opinions.[10]

---

[9] ECF No. 304 (Pls.' Opp. to Defs.' Omnibus Mot.) at 15-30 (demonstrating that evidence of the value that the GSEs paid Treasury through the Net Worth Sweep is admissible)

[10] Even if the Watt/Calabria Exhibits did contain improper legal opinions (they do not), the appropriate remedy would be to redact or otherwise exclude those portions of the exhibits, not to exclude the entire exhibits, as Defendants suggest.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court DENY Defendants' Motion *in Limine* to exclude PX-585, PX-586, PX-587, PX-587-A, PX-588, PX-589, PX-589-A, PX-590, PX-591, and PX-592 from evidence for the second trial.

Dated: July 14, 2023

Respectfully Submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W. Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Berkley Plaintiffs, et al.*

/s/ Eric L. Zagar
Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
John Kairis *(Pro Hac Vice)*
Rebecca Musarra *(Pro Hac Vice)*
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com
jkairis@gelaw.com
rmusarra@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

17

*Co-Lead Counsel for the Class*