## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BERKLEY INSURANCE CO.**, *et al.*, | |
| *Plaintiffs,* | |
| **v.** | **Case No. 1:13-cv-1053-RCL** |
| **FEDERAL HOUSING FINANCE AGENCY**, *et al.*, | |
| *Defendants.* | |
| **In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations** | **Case No. 1:13-mc-1288-RCL** |
| This Memorandum Opinion relates to: ALL CASES | <u>CLASS ACTION</u> ***FILED UNDER SEAL*** *clf 7/25/23* |

## MEMORANDUM OPINION

Eight different pretrial motions are pending in this case, many of which contain several sub-motions. The Court heard arguments on seven of those motions at the pretrial conference on July 18 and 19, 2023. This Memorandum Opinion sets forth the reasoning for the Court's disposition in the accompanying Order of the motions argued at the pretrial conference, beginning with the plaintiffs' motions and proceeding to the defendants' motions. The Court assumes familiarity with the relevant factual and procedural background, which is detailed at length in numerous opinions. *See Berkley Ins. Co. v. FHFA*, Nos. 1:13-cv-1053, 1:13-mc-1288, 2023 WL 3790739, at *1–2 (D.D.C. June 2, 2023); *Fairholme Funds, Inc. v. FHFA* ("S.J. Op."), Nos. 1:13-cv-1053, 1:13-mc-1288, 2022 WL 4745970, at *1–3 (D.D.C. Sept. 23, 2022); *Fairholme Funds,*

1

*Inc. v. FHFA*, Nos. 1:13-cv-1053, 1:13-cv-1439, 2018 WL 4680197, at *1–4 (D.D.C. Sept. 28, 2018); *Perry Capital LLC v. Lew*, 70 F. Supp. 3d 208, 214–19 (D.D.C. 2014).

## I.     PLAINTIFFS' MOTIONS

### A.  Plaintiffs' Motion in Limine Regarding Expert Testimony (Berkley ECF No. 306, Class ECF No. 290)[1]

Plaintiffs' motion regarding expert testimony contains two different motions in limine, seeking to exclude the testimony of defense expert Dr. Mukarram Attari with respect to (1) a bond yield event study he conducted and (2) the state of the mortgage backed securities ("MBS") market following the announcement of the Net Worth Sweep ("NWS").

#### 1.  Bond Yield Event Study

Plaintiffs first move to preclude Dr. Attari from testifying about a "bond yield event study" in which he studied the effect of the Third Amendment to the Preferred Stock Purchase Agreements ("PSPAs") between the U.S. Department of the Treasury ("Treasury") and the Federal Housing Finance Agency ("FHFA") on government-sponsored entity ("GSEs")[2] bonds, on grounds that it is unreliable expert testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), as well as substantially more prejudicial than probative under Federal Rule of Evidence 403. *See* Pls.' MIL re: Expert Testimony at 1–14. Specifically, plaintiffs argue that the event study does not isolate the NWS from other parts of the Third Amendment not at issue in this case, rendering it both unreliable and confusing to the jury.

Plaintiffs made the same motion prior to the first trial and the Court denied it, reasoning that Dr. Attari's event study was not unreliable because he never *claimed* to isolate the effect of

---

[1] For purposes of this Memorandum Opinion, "Berkley ECF No." refers to the docket in No. 1:13-cv-1053, and "Class ECF No." refers to the docket in No. 1:13-mc-1288.

[2] The Court uses the term "GSEs" to refer to both Fannie Mae and Freddie Mac.

the NWS from that of other parts of the Third Amendment, and "understanding the effect of the entire . . . Third Amendment . . . could conceivably help the jury determine whether shareholders could reasonably have expected FHFA, under the circumstances, to agree to a major part of that package in its role as conservator." *Fairholme Funds, Inc. v. FHFA* ("First Pretrial Op."), Nos. 1:13-cv-1053, 1:13-mc-1288, 2022 WL 13937460, at *1 (D.D.C. Oct. 13, 2022). "Moreover," the Court noted, "plaintiffs can always cross-examine Dr. Attari regarding the weight that the jury should give to the market's reaction to the entire package." *Id.*

The only new argument plaintiffs offer in their present motion is that at the first trial, Dr. Attari in his testimony, and defense counsel in closing arguments, made statements implying that the event study actually showed that investors were responding positively to the NWS in particular, violating a "representation" defendants made in their briefing prior to the first trial. *See* Pls.' MIL re: Expert Testimony at 1–5. But as the trial transcript passages quoted in plaintiffs' own motion show, Dr. Attari was careful never to use the words "Net Worth Sweep" in describing his event study. *See id.* at 3–5. And to the extent that defense counsel argued in closing that Dr. Attari's testimony supports the conclusion that the NWS in particular addressed market concerns, such statements are consistent with drawing the entirely permissible inference that "shareholders could reasonably have expected FHFA, under the circumstances, to agree to a major part of [the Third Amendment] in its role as conservator." First Pretrial Op., 2022 WL 13937460, at *1. The Court will therefore **DENY** the motion with respect to the bond yield event study for the same reasons it denied the nearly identical motion prior to the first trial.

### 2. State of the Mortgage-Backed Securities Market

Plaintiffs next move to preclude Dr. Attari from testifying about the effect of the Third Amendment on the MBS market, arguing that such testimony is unreliable under *Daubert* and Rule

3

702 because it is based on Dr. Attari's reading of "cherry-picked" analyst reports, most of which only concern bonds and not MBS, and that it is substantially more confusing than probative under Rule 403. *See* Pls.' MIL re: Expert Testimony at 14–25. Defendants respond that experts are permitted to do "qualitative" rather than merely "quantitative" analyses, that various analyst reports support Dr. Attari's conclusions about the MBS market, and that Dr. Attari adequately explained why the MBS and bond markets are so similar that evidence about concerns in one market would also reflect concerns in the other. *See* Defs.' Opp'n to Pls.' MIL re: Expert Testimony at 14–24, Berkley ECF No. 315, Class ECF No. 306. This is a close issue, but the Court agrees with plaintiffs.

While defendants are right that experts may rely on qualitative methodology to support their conclusions, two of the three cases that they cite for that proposition involved application of the witness's expertise to draw from reports conclusions supported by a chain of factual inferences that is clearly laid out but that a lay jury would likely be unable to glean on its own by reading them. *See In re Xerox Corp. Securities Litig.*, No. 3:99-cv-2374, 2009 WL 8556135, at *3 (D. Conn. Apr. 22, 2009) (expert read reports and other documents to draw conclusion about date on which information was disclosed); *SEC v. Ustian*, No. 16-cv-3885, 2020 WL 416289, at *3–6 (N.D. Ill. Jan. 26, 2020) (expert read reports and other documents to draw conclusion about what information was available to the market); *but see Grae v. Corrections Corp. of Am.*, No. 3:16-cv-2267, 2021 WL 1100431, at *3–4 (M.D. Tenn. Mar. 17, 2021) (expert read reports to draw conclusion about "contemporaneous sense of the market"). Here, in contrast, Dr. Attari has simply read some analyst reports, most of which say little to nothing about the MBS market, and in an unexplained application of his expertise, concluded that those reports reflect the general sense of

that market.[3] In that sense, it appears that this portion of Dr. Attari's testimony "relies on essentially no methodology at all." *Cf.* First Pretrial Op., 2022 WL 13937460, at *2 (excluding other portions of Dr. Attari's testimony as unreliable where he made unexplained logical leaps). Rather, as explained below with respect to the analyst reports themselves and Dr. Attari's attempts to read them into the record, *see infra* Part. I.B.1, the Court is concerned that defendants are really using this portion of his testimony to sneak in otherwise inadmissible hearsay analyst reports under the guise of expert testimony. For these reasons, the Court will **GRANT** the motion with respect to the state of the MBS market.

### B. Plaintiffs' Omnibus Motion in Limine (Berkley ECF No. 307, Class ECF No. 292)

Plaintiffs' omnibus motion contains six different motions in limine.

### 1. Motion in Limine to Exclude Analyst Reports

Plaintiffs first move to exclude six market analyst reports that defendants introduced at the first trial: DX 412, 529, 538, 542, 553, and 590. *See* Pls.' Omnibus MIL at 1–6. In the First Pretrial Opinion, the Court observed that it appeared defendants intended to offer several analyst reports "for hearsay purposes—that is, for 'the truth of the matter asserted,'" and held that they could not introduce those reports "unless they can show that any specific report factored into FHFA's decisionmaking process," and thus could be offered for their effect on FHFA decisionmakers' state of mind, "or a hearsay exception applies." First Pretrial Op., 2022 WL 13937460, at *6 (quoting Fed. R. Evid. 801). Plaintiffs' present motion argues that (1) DX 412 and 529, which the Court admitted in part to show their effect on FHFA decisionmakers' state of mind, are inadmissible

---

[3] The challenged testimony is thus different from testimony by another defense expert, Professor S.P. Kothari, that the Court declined to exclude at the first trial. Unlike Dr. Attari's MBS testimony, which relies on a few analyst reports that say vanishingly little about the MBS market, the challenged portion of Professor Kothari's testimony analyzed a considerable volume of publicly available information and "provide[d] 'specialized context for understanding how to connect the dots.'" First Pretrial Op., 2022 WL 13937460, at *3 (quoting *SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp. 3d 942, 950 (N.D. Ind. 2021)).

hearsay;[4] and (2) defendants improperly used Dr. Attari's expert testimony as a conduit to disclose all six of the challenged analyst reports to the jury in violation of Federal Rule of Evidence 703.

At the first trial, the Court admitted DX 412 and 529—an email and a set of meeting notes, respectively, with analyst reports attached—over plaintiffs' objection. The Court accepted defendants' argument that since former FHFA Acting Director Edward DeMarco and his primary employee working on the Third Amendment, Mario Ugoletti, were on the email chain and DeMarco was present at the meeting associated with the notes—the meeting where he announced the Third Amendment to the GSE executives—there was some evidence that FHFA decisionmakers considered the analyst reports in deciding to enter the Third Amendment. *See* Trial Tr. 1877:5–1880:1, Berkley ECF No. 279.[5] Plaintiffs now argue that defendants did not present such evidence, largely because "DeMarco provided no testimony whatsoever about DX412 or DX529." Pls.' Omnibus MIL at 1. In response, defendants reiterate that DeMarco and Ugoletti were both parties to the email chain containing DX 412 and were both present at the meeting whose notes contain DX 529. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 4–5, Berkley ECF No. 320, Class ECF No. 309.

The Court agrees with defendants and will adhere to its initial ruling with respect to DX 412 and 529. Plaintiffs are asking the Court to require virtual certainty that DeMarco himself personally read and relied on the reports in order to make them admissible for their effect on FHFA decisionmakers' state of mind. But the Court never set such a strict bar in the First Pretrial Opinion. The relevance of these documents is conditional, but there is a clear chain of inferences the jury could draw: that the reports' presence in email chains and meeting notes related to the Third

---

[4] Defendants do not dispute that the other analyst reports would be inadmissible hearsay if offered on their own rather than as a part of Dr. Attari's expert testimony.

[5] The transcripts of the first trial are only available on the docket in No. 1:13-cv-1053.

Amendment implies that DeMarco and/or Ugoletti saw and read them, and that after doing so, they considered the reports in the decisionmaking process.

As for the other analyst reports, at the first trial, the Court allowed defendants' expert, Dr. Attari, to read them into the record over plaintiffs' objection even though they were otherwise inadmissible hearsay. The Court accepted defendants' argument that they helped the jury evaluate Dr. Attari's expert testimony about market concerns and rejected plaintiffs' argument that they should not be disclosed to the jury under Federal Rule of Evidence 703, which provides in relevant part that "if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." Fed. R. Evid. 703; *see* Trial Tr. 1877:5–1880:1, Berkley ECF No. 279. Plaintiffs now reiterate that argument but add that in closing arguments at the first trial, defense counsel made multiple statements that appeared to invite the jury to consider the reports for their own truth rather than simply as the basis for Dr. Attari's testimony. *See* Pls.' Omnibus MIL at 2–5. Defendants repeat their arguments on relevance and prejudice from the first trial and add that the only analyst reports they referenced in closing arguments were DX 412 and 529, which were also admitted independently of Dr. Attari's testimony. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 6–10.

The Court agrees with plaintiffs that Dr. Attari should not have been allowed to read the four other expert reports—DX 538, 542, 553, and 590—into the record. No one disputes at this stage that those four reports are inadmissible hearsay on their own. Any probative value in helping the jury to evaluate Dr. Attari's expert testimony is marginal at best, as he need not necessarily read the reports verbatim to get across to the jury that his methodology involved a qualitative study of reports by respected market analysts. Moreover, there is some potential for prejudice if the jury

mistakenly believes there is some evidence that FHFA actually relied on the analyst reports in reaching its decision. The Court does not doubt that they are a proper basis for Dr. Attari's expert testimony—except, as explained above, insofar as he extrapolates from them conclusions about the MBS market in particular, *see supra* Part I.A.2. But after watching Dr. Attari simply read these reports into the record at the first trial, the Court is convinced that whatever probative value they have with respect to anything other than their own truth does not "substantially outweigh their prejudicial effect," and thus they should not be disclosed to the jury. Fed. R. Evid. 703. "Rule 703 'was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of [others] on whose statements or opinions the expert purports to base his opinion.'" *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005)).

For these reasons, the Court will **DENY** the motion with respect to DX 412 and 529 and **GRANT** the motion with respect to the other analyst reports that Dr. Attari read into the record.

### 2. Motion in Limine to Preclude Testimony on Reactions to Net Worth Sweep

Plaintiffs next move to preclude defendants from offering portions of depositions of three former and current GSE and FHFA officials—Naa Awaa Tagoe, Timothy Mayopoulos, and Ross Kari—concerning their reactions upon learning about the NWS. *See* Pls.' Omnibus MIL at 6–9.

Plaintiffs first argue that the officials had no personal knowledge of the decisionmaking process behind the NWS and that to the extent that the disputed testimony concerns whether that decision was reasonable, it is improper lay opinion testimony. *See id.* at 6–7; Fed. R. Evid. 602, 701. Defendants counter, correctly, that the officials' *reactions* to the NWS were within their personal knowledge and that testimony concerning those reactions is not itself *opinion* testimony.

*See* Defs.' Opp'n to Pls.' Omnibus MIL at 10–13; *United States v. Morton*, 391 F.3d 274, 277 (D.C. Cir. 2004) ("A witness's testimony about his own state of mind is not opinion testimony.").

Plaintiffs next argue that the officials' reactions to the NWS are not actually relevant to any fact at issue in this case since DeMarco did not consult them before agreeing to the NWS. *See* Pls.' Omnibus MIL at 7–9. Defendants respond that plaintiffs have put the officials' states of mind in issue precisely *by* presenting evidence that DeMarco did not consult these employees before agreeing to the NWS and arguing that such omission proves his action was arbitrary or unreasonable. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 13. Moreover, defendants, argue, these high-level officials at the GSEs and FHFA were highly knowledgeable about the financial state of the GSEs at the time of the Third Amendment. *Id.* at 14.

The Court agrees with defendants. Evidence that DeMarco acted in a manner consistent with corporate and agency higher-ups' expectations and assessments of the GSEs' financial state is relevant to rebutting the argument that it was unreasonable not to consult them. Furthermore, though DeMarco may not have discussed the NWS in particular with these officials before agreeing to it, that same evidence is relevant to show that his decision was consistent with the general perception of the GSEs' financial state among others charged with running them rather than a rogue act. And both of those points, in turn, could help the jury determine "whether FHFA, in its role as conservator, reacted to [the] circumstances in a manner that shareholders reasonably could have expected." First Pretrial Op., 2022 WL 13937460, at *6.

The primary case plaintiffs cite—*Feld v. Fireman's Fund Ins. Co.*, No. 1:12-cv-1789, 2019 WL 13254353 (D.D.C. June 21, 2019)—is not to the contrary. In that case, the court held that a lay witness could not "*opine* on the objective reasonableness" of a party's actions because that would constitute improper lay opinion testimony under Federal Rule of Evidence 701. *Id.* at *2.

Here, in contrast, defendants may offer the statements by GSE and FHFA officials not as direct opinion evidence on the reasonableness of DeMarco's decision to agree to the NWS, but to prove the *consistency* of that decision with his colleague's expectations, which in turn would merely allow the jury to draw an *inference* of reasonableness.

For these reasons, the Court will **DENY** the motion.

### 3.   Motion in Limine to Clarify Ruling on Shareholder Expectations

Next, plaintiffs move for a clarification of the Court's ruling on the extent to which the class-action plaintiffs themselves and a representative of the Berkley Insurance Company can testify about their expectations as shareholders, and for certain defense objections to such testimony to be overruled. *See* Pls.' Omnibus MIL at 9–14.

In the First Pretrial Opinion, the Court held that any testimony from the class representatives regarding their subjective expectations about what FHFA would do as conservator was excludable as substantially more prejudicial than probative under Rule 403 because such testimony would likely confuse the jury about the relevance of those subjective expectations to the relevant legal standard for implied covenant claims, which is the *objectively* reasonable expectations of the parties at the time of contracting. *See* First Pretrial Op., 2022 WL 13937460, at *8–9. The Court qualified that ruling, however, by stating that the plaintiffs themselves could testify, "for example, that they own GSE stock, that their dividend rights were extinguished as a result of the Net Worth Sweep, and why they brought this lawsuit." *Id.* at *9. Plaintiffs' present motion for "clarification" of that ruling proceeds in three parts.

First, plaintiffs ask the Court to overrule a defense objection to deposition testimony by class representative Joseph Cacciapalle, in which, in response to a question about what he "believe[s] is the harm [he has] suffered," he answers, "I bought a security from someone who was receiving an A-plus percent dividend. And I expected to—I was expecting the same treatment,

getting the same thing. And it appears that the amendment has pretty much taken all that away." Cacciapalle Depo. Tr. 92:11–21, Ex. 3-B to Pls.' Omnibus MIL, Berkley ECF No. 307-8, Class ECF No. 292-8; *see* Pls.' Omnibus MIL at 10. They also ask the Court to overrule a similar objection to a passage in which Cacciapalle states that it "surprised" him for FHFA "to go and take all future profits from a company and they don't know what the future holds and leave the existing hold[ers] of common and preferred with no chance to ever receive any of the profits," Cacciapalle Depo. Tr. 83:3–11, and to revisit a ruling from the first trial in which the Court partially sustained an objection to class representative Michelle Miller's testimony that she "brought this lawsuit" because "[t]here were no more dividends, and the price had kind of remained stagnant," Trial Tr. 582:14–15, Berkley ECF No. 267; *see* Pls.' Omnibus MIL at 10–11. Defendants maintain that all of this testimony goes to subjective expectations and the "lost-dividends" theory of harm that the Court held at summary judgment was impermissibly speculative as a matter of law, *see* S.J. Op., 2022 WL 4745970, at *7–10, and is therefore irrelevant. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 18–22.

The first part of this motion is partially meritorious. While the first passage from Cacciapalle's deposition and the Miller testimony do say *something* about those plaintiffs' subjective expectations that they would continue to receive dividends, they also say something about those plaintiffs' perception "that their dividend rights were extinguished as a result of the Net Worth Sweep, and why they brought this lawsuit." First Pretrial Op., 2022 WL 13937460, at *9. Nor is that testimony only relevant to the lost-dividends theory of harm—the Court has previously clarified that under the summary judgment decision, "plaintiffs may argue to the jury that they thought they were buying shares that came with dividend rights, and as a result of defendants' actions, they ended up with less-valuable shares that effectively did not come with

dividend rights." *Fairholme Funds, Inc. v. FHFA*, 2022 WL 11110548, at *4 (D.D.C. Oct. 11, 2022). While there is a fine line between making that sort of argument and making one that plaintiffs in fact *would have* received some ascertainable amount of dividends in the future, that goes to what plaintiffs may argue about the evidence, not necessarily the content of the testimony itself, if such testimony is relevant to either theory of harm. What is more, plaintiffs indicate in their reply that they are willing to remove the sentence from the first Cacciapalle passage stating that he "*expected* the same treatment," *see* Pls.' Reply in Support of Pls.' Omnibus MIL at 10, Berkley ECF No. 324, Class ECF No. 313, which alleviates much of the concern about confusing the jury regarding the relevance of subjective expectations. As for Cacciapalle's statement that the NWS "surprised" him, however, it is hard to see how that testimony is relevant to anything but his subjective expectations regarding what FHFA would do, and the Court will therefore exclude that portion of his deposition.

Second, plaintiffs ask the Court to overrule a defense objection to a deposition passage in which Cacciapalle, in response to a question about his "views as to whether it was appropriate to appoint the conservator to Fannie Mae and Freddie Mac," answered that he "kind of understood that," "[b]ut it didn't seem to work out that they should be losing forever." Cacciapalle Depo. Tr. 51:4–16; *see* Pls.' Omnibus MIL at 11–12. Plaintiffs argue that that testimony clarifies that Cacciapalle is *not* suing over the decision to place the GSEs into conservatorship in the first place, and they indicate that they will seek to elicit similar testimony from live witnesses. According to plaintiffs, such testimony is needed to refute a defense argument that the shareholders should have known their dividend rights were never going to mean much because of the nature and history of the conservatorship. Defendants respond again that this testimony goes to Cacciapalle's subjective expectations. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 23.

The Court agrees with defendants on this point. Defendants never actually argued that plaintiffs were suing over the decision to place the GSEs into conservatorship, and an individual shareholder's subjective views as to whether it was "appropriate" to do so are totally irrelevant to any fact at issue in the case. To the extent that defendants argued at the first trial that private shareholders should have known something like the NWS was a possibility from the inception of the conservatorship, that goes to what it was objectively reasonable to expect at the time of contracting, not the impetus for bringing the lawsuit. The Court will therefore sustain defendants' objection and exclude as irrelevant Cacciapalle's testimony regarding the propriety of the conservatorship.

Third, plaintiffs note that defendants argued in closing that "not a single one of [the plaintiff-]witnesses . . . told [the jury] that sitting there in the summer of 2012 that circular draws weren't a problem," Trial Tr. 2667:2–7, Berkley ECF No. 288, and plaintiffs argue that in order to head off that argument, they should be allowed to present deposition and live testimony by the plaintiffs themselves that they did not believe the NWS was justified by a circular draw problem, *see* Pls.' Omnibus MIL at 12–14. Defendants respond once again that such testimony goes impermissibly to shareholders' subjective expectations and, further, that the challenged portion of their closing argument "was proper" because it was "an accurate summation . . . of the evidence that had been presented during trial consistent with the Court's rulings." Defs.' Opp'n to Pls.' Omnibus MIL at 24–25. In the alternative, defendants offer "to forgo making this argument . . . in closing at the upcoming trial," so long as plaintiffs are precluded from testifying about their own perception of the circular draw problem. *Id.* at 25 n.14.

The Court agrees with defendants on the relevance of the testimony at issue in the third part of plaintiffs' motion but agrees with plaintiffs that defendants' argument about the omission

of such testimony was improper. Individual shareholders' subjective perception of a circular draw problem could not be relevant to anything other than their subjective expectations about what FHFA might do. But precisely because plaintiffs may not offer such testimony, it is unfairly prejudicial for defendants to draw attention to that omission.

For these reasons, the Court will **GRANT** this motion in part and **DENY** it in part. Specifically, the Court will (1) allow plaintiffs to play the Cacciapalle deposition portion about the "harm" he suffered, but without the sentence about what he "expected"; (2) allow Miller and the other plaintiff-witnesses to testify that they brought the suit because their dividend rights were extinguished; (3) preclude defendants from drawing attention in their closing argument to the omission of testimony by the plaintiff-witnesses about circular draws; and (4) deny all other relief plaintiffs request in this motion.

### 4. Motion in Limine to Exclude Layton Deposition Testimony

Plaintiffs next move to exclude deposition testimony by former Freddie Mac CEO Donald Layton stating that he met with representatives of mortgage securities dealer Credit Suisse, who expressed concerns to him about circular draws. *See* Pls.' Omnibus MIL at 14–20. The Court admitted that testimony at the first trial over plaintiffs' hearsay objection, reasoning that it could be offered for the nonhearsay purpose of showing its effect on DeMarco's state of mind, because there was some evidence that Layton relayed these concerns to DeMarco and others at FHFA. *See* Trial Tr. 228:15–229:7, Berkley ECF No. 265.

Plaintiffs argue that defendants never actually presented evidence that the Credit Suisse concerns had any effect on DeMarco's state of mind, nor could they. *See* Pls.' Omnibus MIL at 17–20. But what plaintitfs are asking the Court to require is, in effect, virtual certainty that Layton relayed those concerns to DeMarco personally. As defendants point out, Layton, a key player as

Freddie Mac's CEO, testified that he heard Credit Suisse's concerns, and defendants introduced talking points Layton used at a meeting with DeMarco and others at FHFA—DX 912—which included a point about investors' concerns. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 27–30. That is more than enough to draw a reasonable inference that Credit Suisse's concerns were actually conveyed to DeMarco and that he had those concerns in mind when he agreed to the NWS.

Plaintiffs further argue that defendants' closing demonstrated that the Credit Suisse testimony was actually being offered for its truth, and thus as hearsay, because defense counsel stated, "That's how you know . . . that the circular draw and the problem of erosion is not just a plot by Mr. DeMarco or a figment of his imagination. This is Mr. Layton. This is Credit Suisse. This is the entire market expressing these concerns." Trial Tr. 2666:13–17, Berkley ECF No. 288; *see* Pls.' Omnibus MIL at 16–17. But that is proper argument because it is not a statement about the truth of Credit Suisse's beliefs, but rather one about DeMarco's state of mind—that he was taking what he understood to be widely shared concerns into account when he agreed to the NWS, and that he did not cynically make up a pretext in his own mind. For these reasons, the Court will **DENY** this motion.

### 5. Motion in Limine to Exclude McFarland Deposition Testimony and News Articles

Plaintiffs next move to exclude as hearsay and irrelevant deposition testimony by former Fannie Mae CFO Susan McFarland concerning statements she made in the press in 2012, as well as the articles containing those statements. *See* Pls.' Omnibus MIL at 20–25. The Court admitted that testimony and those articles at the first trial over plaintiffs' hearsay objection, reasoning that they were being offered not for the truth of the statement McFarland made about Fannie Mae's financial state, but as proof of what her beliefs were in 2012. *See* Trial Tr. 227:16–23, Berkley ECF No. 265. At the first trial, plaintiffs only raised a hearsay objection, not a relevance objection.

*See* Joint Submission of Depo. Objections at First Trial at 12, Berkley ECF No. 224, Class ECF No. 227.

Plaintiffs renew their argument that McFarland's statements to the press were hearsay. *See* Pls.' Omnibus MIL at 22–24. The Court rejects that argument for the same reason it did at the first trial: The news article excerpts could be offered not to prove their own truth, but to facilitate McFarland's *adoption* at her deposition of the views she earlier expressed. In other words, the articles could be offered not for the truth of the matter asserted, but to facilitate McFarland's testimony at her deposition about what she believed at the time of the Third Amendment.

Plaintiffs' new relevance objection presents a somewhat closer question, but the Court still is not persuaded. Plaintiffs argue that what McFarland thought about the state of Fannie Mae's finances in 2012 is irrelevant to the reasonableness of agreeing to the Third Amendment because DeMarco did not consult McFarland when he made that decision. *See* Pls.' Omnibus MIL at 21. Defendants' response is that the testimony is relevant because her statements "evince her personal knowledge of Fannie Mae's financial condition and her grasp of Fannie Mae's financial future—all of which is probative of the conditions factoring into FHFA's decision to execute the Third Amendment." Defs.' Opp'n to Pls.' Omnibus MIL at 34. The Court agrees with defendants. McFarland's statements that she sincerely believed in the bleak picture of Fannie Mae's finances that she painted in the press in 2012 are probative of whether FHFA acted in a manner consistent with internal assessments of the circumstances at a high level, which in turn could help the jury assess whether FHFA acted in a manner that shareholders reasonably could have expected under those circumstances. The Court will therefore **DENY** this motion.

### 6.  Motion in Limine to Exclude Improper Use of SEC Filings

The last motion in limine in plaintiffs' omnibus motion asks the Court to preclude defendants from arguing that misstatements in the GSEs' SEC filings could have subjected GSE executives to criminal or civil liability and to exclude as hearsay any forward-looking projections contained in those filings. *See* Pls.' Omnibus MIL at 26–33. Although the portion concerning arguments to the jury is meritless, the hearsay portion of this motion presents a somewhat closer question.

Plaintiffs argue that defendants should be precluded from arguing that misstatements in SEC filings could have subjected the GSEs' executives to criminal or civil liability, because a safe-harbor provision in the securities laws, 15 U.S.C. § 78u-5(c), precludes liability for forward-looking statements in SEC filings. *See* Pls.' Omnibus MIL at 26–30. But as defendants note, that provision only applies to *private* civil actions, not civil enforcement actions by the SEC or criminal prosecutions. *See SEC. v. E-Smart Technologies, Inc.*, 74 F. Supp. 3d 306, 324 (D.D.C. 2014); Defs.' Opp'n to Pls.' Omnibus MIL at 36–41. Plaintiffs argue in reply that civil or criminal liability would require some sort of scienter, *see* Pls.' Reply in Support of Pls.' Omnibus MIL at 24–25, but setting aside the extent to which that is true of criminal *and* civil liability, it is splitting hairs. It would be unduly pedantic for the Court to require defendants to explain every element of a securities fraud claim or offense in order to state the uncontroversial proposition that lying in an SEC form can expose one to liability.

The hearsay issue is more difficult. Plaintiffs argue, and defendants concede, that all the statements in the GSEs' SEC filings are hearsay unless some exception applies. *See* Pls.' Omnibus MIL at 30–33; Defs.' Opp'n to Pls.' Omnibus MIL at 41. Defendants invoke the business-records exception, Fed. R. Evid. 803(6), and the residual exception, Fed. R. Evid. 807. *See* Defs.' Opp'n to Pls.' Omnibus MIL at 41–45. Plaintiffs argue that the business-records exception does not apply to SEC filings generally, or at least not to forward-looking projections in those filings, which

defendants seek to admit here, *see* Pls.' Omnibus MIL at 30–32; that defendants have not laid the

proper foundation for introducing business records in this case *see* Pls.' Reply in Support of Pls.'

Omnibus MIL at 22–23; and that there are insignificant indicia of reliability for the residual

exception to apply, *see id.* at 23–24. The Court believes the SEC filings are likely to be admissible

under the business-records exception and thus declines to reach the residual exception issue at this

juncture.

Rule 803(6) carves out a hearsay exception for the following:

> A record of an act, event, condition, opinion, or diagnosis if: (A) the
> record was made at or near the time by—or from information
> transmitted by—someone with knowledge; (B) the record was kept
> in the course of a regularly conducted activity of a business,
> organization, occupation, or calling, whether or not for profit; (C)
> making the record was a regular practice of that activity; (D) all
> these conditions are shown by the testimony of the custodian or
> another qualified witness, or by a certification that complies with
> Rule 902(11) or (12) or with a statute permitting certification; and
> (E) the opponent does not show that the source of information or the
> method or circumstances of preparation indicate a lack of
> trustworthiness.

Defendants are right that, in general, statements contained in SEC filings may fall under the

business-records exception, assuming the proper foundation is laid—two courts of appeals have

held as much. *See United States v. Clay*, 832 F.3d 1259, 1316–18 (11th Cir. 2016); *SEC v. Jasper*,

678 F.3d 1116, 1122–23 (9th Cir. 2012).

Plaintiffs reply that the cases so holding dealt with backward-looking, factual statements

made in SEC filings, whereas defendants seek here to introduce forward-looking projections about

the GSEs' ability to pay dividends to Treasury in the future. *See* Pls.' Reply in Support of Pls.'

Reply in Support of Pls.' Omnibus MIL at 20–23. They rely on Second Circuit caselaw holding

that the business-records exception only applies to "hearsay documents that result from 'recording

observable information.'" *See Grant v. Lockett*, No. 19-469, 2021 WL 5816245, at *2 (2d Cir.

Dec. 8, 2021) (quoting *Abascal v. Fleckenstein*, 820 F.3d 561, 565 (2d Cir. 2016)). However, the business-records exception applies to "record[s] of an act, event, condition, [or] *opinion*," Fed. R. Evid. 803(6) (emphasis added), and the information in these SEC filings records the GSEs' opinions about their financial state. The Second Circuit cases that plaintiffs cite are distinguishable, because they involved attempts to admit records of conclusions drawn from underlying facts as records of those underlying facts, *see Grant*, 2021 WL 5816245, at *2 (holding that findings of fact made "after interviewing witnesses and interpreting evidence" were not admissible as business records); *Abascal*, 820 F.3d at 565–66 (holding that report that "required interpreting survey results and inmate interviews and then creating a summary of the findings" was not admissible as a business record).

Still, plaintiffs point out that in order to invoke the business-records exception, defendants must offer testimony supporting use of the SEC filings by a "custodian or other qualified witness." Fed. R. Evid. 803(6); *see* Pls.' Reply in Support of Pls.' Omnibus MIL at 23. Defendants argue that they offered just a "qualified witness" at the first trial: Nicholas Satriano, FHFA's chief accountant, who testified that "as a part of the preparation of a quarterly financial statement, management—in this case, we're talking about Fannie Mae or Freddie Mac's management—has the obligation to update and have a basis for all of the numbers they put in their financial statements." Trial Tr. 2214:2–9, Berkley ECF No. 281; *see* Defs.' Opp'n to Pls.' Omnibus MIL at 43. Plaintiffs argue that Satriano cannot serve as a qualified witness because he "did not testify how the forward-looking statements came to be included in the GSEs' SEC filings, what information they were based on, who drafted them, nor what knowledge that person or persons had," Pls.' Reply in Support of Pls.' Omnibus MIL at 23, but that is more than Rule 803(6) requires. A custodian or qualified witness "need not have personal knowledge of the actual creation

of the document." *United States v. Adefehinti*, 510 F.3d 319, 315 (D.C. Cir. 2007) (internal

quotation marks omitted) (quoting *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000)).

"Rather, a 'custodian or other qualified witness' need only be 'familiar with the record-keeping

procedures of the organization.'" *United States v. Khatallah*, 278 F. Supp. 3d 1, 6 (D.D.C. 2017)

(quoting *United States v. Baker*, 458 F.3d 513, 518 (6th Cir. 2006)). To be sure, Satriano did not

specifically testify that he was personally familiar with the GSEs' recordkeeping procedures, nor

do defendants point to any other witness who did. But that is not to say defendants will be unable

to elicit such testimony.

For these reasons, the Court will **DENY** this motion and reserve ruling on the admissibility

of the SEC filings until it is clear what, if any, testimony defendants may offer by a qualified

witness familiar with the GSEs' recordkeeping practices.

### C. Plaintiffs' Motion in Limine to Admit PX 550, 226, 562, 274, and 279 (Berkley ECF No. 308, Class ECF No. 294)

Prior to the first trial, the Court denied a defense motion to exclude virtually all evidence

of Treasury's and the White House's intent with respect to the Third Amendment, reasoning that

"it is conceivable that evidence of Treasury's negotiating position or pressures from the White

House could provide some insight into whether FHFA in fact negotiated the Third Amendment in

accordance with shareholders' reasonable expectations." First Pretrial Op., 2022 WL 13937460,

at *9. However, at trial, the Court excluded as irrelevant or unduly confusing PX 226, an email

from Treasury official Timothy Bowler, on grounds that he was only a mid-level official, and thus

there was no reason to believe his views reflected Treasury's or were ever communicated to FHFA,

Trial Tr. 1574:20–1575:24, Berkley ECF No. 276; and the Court excluded as irrelevant PX 274

and 279, emails from White House official Jim Parrott, on the ground that he was a White House

official and thus there was no reason to believe his views reflected Treasury's, Trial Tr. 1815:15–

1816:2, Berkley ECF No. 278. Plaintiffs now ask the Court to revisit those rulings and to admit two new exhibits that raise similar issues, PX 550 and 562.

### 1. PX 226

PX 226 is an email chain between Bowler and others at Treasury in which Bowler reacts to an email from FHFA regarding the GSEs' stronger than expected financial performance and states, "Really makes sense to push the net worth sweep this quarter[.] It will 'make sense' to GSE observers." PX 226 at 1, Ex. A to Pls.' Mot to Admit Exs., Berkley ECF No. 308-1, Class ECF No. 294-1. At the first trial, the Court excluded PX 226 on the ground that Bowler was merely a mid-level official at Treasury and there was no reason to believe his position reflected Treasury's overall position or was ever communicated to FHFA. Trial Tr. 1574:20–1575:24, Berkley ECF No. 276.

Plaintiffs have now provided further context as to who Bowler is and why his position on the NWS is relevant. Specifically, Bowler was the Deputy Assistant Secretary of the Treasury in charge of the Office of Capital Markets, and both DeMarco and Ugoletti testified that Bowler was their "point person" at Treasury in talks over the Third Amendment. *See* DeMarco Depo. Tr. 178:17–179:1, 303:16–305:5, Ex. K to Pls.' Mot. to Admit Exs., Berkley ECF No. 308-11, Class ECF No. 294-11; Ugoletti Depo. Tr. 151:5–152:1, Ex. M to Pls.' Mot. to Admit Exs., Berkley ECF No. 308-13, Class ECF No. 294-13. Defendants do not respond to that additional context, arguing instead that the underlying facts have not changed and thus the Court should adhere to its earlier ruling under the law of the case doctrine. *See* Defs.' Opp'n to Pls.' Mot. to Admit Exs. at 2–3, Berkley ECF No. 318, Class ECF No. 307 (citing *Berkley Ins. Co.*, 2023 WL 3790739, at *3). But the Court finds application of the law of the case doctrine or a reconsideration standard inappropriate here given that it had an incomplete picture of the document's relevance when it

made its ruling at the first trial. "For mid-trial evidentiary rulings, a new trial will result in different factual and evidentiary circumstances occasioning a new exercise of the district court's discretion." *United States v. Sanders*, 485 F.3d 654, 657 (D.C. Cir. 2007). That is just what has happened here. And applying that standard, the Court now concludes that the views of Bowler—one of the Treasury officials most heavily involved in negotiations over the Third Amendment—are probative of "Treasury's negotiating position" and are therefore relevant to help the jury determine "whether FHFA in fact negotiated the Third Amendment in accordance with shareholders' reasonable expectations." First Pretrial Op., 2022 WL 13937460, at *9.

Defendants further argue that PX 226 is inadmissible hearsay, *see* Defs.' Opp'n to Pls.' Mot. to Admit Exs. at 4–11, but that argument is unpersuasive. Bowler's statement that it "makes sense to push the net worth sweep this quarter," PX 226 at 1, is admissible under the hearsay exception for "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan)," Fed. R. Evid. 803(3). Defendants argue that that exception cannot apply because there are various other statements in the email chain that *do not* go to Bowler's state of mind, but plaintiffs are not offering those statements to prove the truth of the matter asserted—it is about showing Bowler's, and in turn Treasury's, intent to push the NWS. Moreover, plaintiffs represent that they are willing to redact many of the statements that say nothing about Bowler's state of mind. *See* Pls.' Reply in Support of Pls.' Mot. to Admit Exs. at 13–14, 16, Berkley ECF No. 327, Class ECF No. 316.

For these reasons, the Court will **GRANT** this motion as to PX 226, provided that plaintiffs redact the statements listed at page 16 of their reply brief.

2.  **PX 274 and 279**

PX 274 and 279 are an email recounting what a fellow from the American Enterprise Institute said about Treasury's likely motive for entering the Third Amendment in a Bloomberg interview and another email from White House official Jim Parrott calling that statement "exactly right on substance and intent." PX 279 at 2, Ex. C to Pls.' Mot. to Admit Exs., Berkley ECF No. 308-3, Class ECF No. 294-3. The Court excluded those exhibits at the first trial on grounds that they were evidence of what someone at the *White House* thought was Treasury's motive, not what *Treasury* thought was its own motive. Trial Tr. 1815:15–1816:2, Berkley ECF No. 278.

Plaintiffs now try to provide further factual context, explaining that Parrott was Special Counsel to the White House's National Economic Counsel, was a key player in the Administration on housing policy, and was a close contact of Bowler's. *See* Pls.' Mot. to Admit Exs. at 11–12. But this time, the Court is not convinced that the additional context makes a difference and will stand by its earlier ruling. As explained in the First Pretrial Opinion, the only reason why any of the Treasury or White House documents might be relevant is "that evidence of Treasury's negotiating position or pressures from the White House could provide some insight into whether *FHFA* in fact negotiated the Third Amendment in accordance with shareholders' reasonable expectations." First Pretrial Op., 2022 WL 13937460, at *9 (emphasis added). Evidence of political pressures from the White House on *Treasury* is irrelevant to what motivated *FHFA* to agree to the NWS, at least absent some indication that Treasury communicated that pressure to FHFA. And to the extent that Parrott's views may have influenced Bowler's, which in turn could have been relayed to FHFA, any relevance to FHFA's ultimate decisionmaking is so attenuated that the Court would exclude it as substantially more confusing than probative under Rule 403.

For these reasons, the Court will **DENY** this motion as to PX 274 and 279 on grounds of irrelevance and risk of substantial confusion.

### 3. PX 550

PX 550 is an email from Bowler to another Treasury official attaching a document titled "PSPA Covenant and Timing Proposal: July 30, 2012," which states that part of the "[r]ationale" for announcing changes to the PSPAs sooner rather than later is that the "GSE's will report very strong earnings on August 7, that will be in-excess of the 10% dividend to be paid to Treasury." PX 550 at 2, Ex. D to Pls.' Mot. to Admit Exs., Berkley ECF No. 308-4, Class ECF No. 294-4. The issues at play with respect to PX 550 are virtually identical to those with respect to PX 226. PX 550 is probative of Bowler's state of mind with respect to the NWS, and thus it is relevant for the same reasons as PX 226. And like that other document, it is admissible as excepted hearsay under Rule 803(3). For these reasons, the Court will **GRANT** this motion as to PX 550.

### 4. PX 562

PX 562 is an internal Treasury email attaching a draft press release (identical to a final press release the Court admitted at the first trial) about winding down the GSEs and stating that "[i]t reflects final edits from Acting FHFA Director DeMarco received this evening." PX 562 at 1, Ex. E to Pls.' Mot. to Admit Exs., Berkley ECF No. 308-5, Class ECF No. 294-5. It is certainly relevant to show DeMarco's state of mind, and thus the draft itself might be admissible for a nonhearsay purpose, but only if it were admitted alongside the statement that the draft reflects DeMarco's edits. That statement is clearly being offered for the truth of the matter asserted, and plaintiffs make no convincing argument why it would fall under any hearsay exception. While plaintiffs invoke the public-records exception and the residual exception, they make no effort

whatsoever to explain why the elements of those exceptions are met. *See* Pls.' Mot. to Admit Exs. at 28–29.[6] For these reasons, the Court will **DENY** this motion as to PX 562.

### D. Plaintiffs' Motion in Limine to Exclude Kari Deposition Testimony (Berkley ECF No. 313, Class ECF No. 301)

Plaintiffs' final motion discussed at the pretrial conference includes two motions in limine: to exclude certain passages from the deposition of former Freddie Mac CFO Ross Kari regarding (1) facts in Freddie Mac's SEC filings and (2) what he perceived as the benefits of the NWS.

#### 1. Facts in SEC Filings

Plaintiffs first move to exclude portions of Kari's deposition testimony in which he is asked to confirm the accuracy of certain statements in Freddie Mac's SEC filings, on the ground that the statements from those filings are inadmissible hearsay. *See* Pls.' MIL to Exclude Kari Depo. Testimony at 1–3. As explained above, *see supra* Part I.B.6, the Court expects that those filings will likely be admissible as business records, provided defendants can introduce supporting testimony from a proper qualified witness. The Court will therefore **DENY** this motion and reserve ruling on Kari's testimony regarding the SEC filings until it has ruled on the admissibility of the SEC filings themselves.

#### 2. Benefits of Net Worth Sweep

Plaintiffs next move to exclude portions of Kari's testimony stating that he viewed the NWS as beneficial, or at least not harmful, to shareholders. *See* Pls.' MIL to Exclude Kari Depo. Testimony at 3. The issues at play in this motion are virtually identical to those at play in plaintiffs' motion regarding reactions of other GSE and FHFA officials who were not consulted about the

---

[6] Plaintiffs argue that the statement would be admissible to impeach DeMarco's testimony about what he understood the purpose of the Third Amendment to be, but importantly, DeMarco is not himself the hearsay declarant. *See* Fed. R. Evid. 806 ("When a hearsay statement . . . has been admitted in evidence, the *declarant's* credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant testified as a witness." (emphasis added)).

Third Amendment. For the reasons discussed above, *see supra* Part I.B.2, the Court will **DENY** this motion.

## II.    DEFENDANTS' MOTIONS

### A. Defendants' Omnibus MIL (Berkley ECF No. 303, Class ECF No. 289)

Defendants' omnibus motion includes four different motions in limine.

#### 1.    Motion in Limine to Exclude Speculative Deposition Testimony

Defendants first move to exclude portions of McFarland's deposition testimony nearly identical to portions the Court excluded as speculative and unduly prejudicial at the first trial, in which she speculates to what Treasury's reasoning may have been for pushing the NWS. *See* Defs.' Omnibus MIL at 1–3; Trial Tr. 227:6–15, Berkley ECF No. 265. Plaintiffs argue that if the Court admits the other GSE and FHFA officials' testimony concerning their reactions to the NWS, *see supra* Part I.B.2, it would be inconsistent to exclude this portion of McFarland's testimony. *See* Pls.' Opp'n to Defs.' Omnibus MIL at 1–3, Berkley ECF No. 316, Class ECF No. 304. But the challenged McFarland testimony, unlike those other witnesses' testimony, speculates as to what the motives of *Treasury*—a third party—may have been. It therefore lacks a foundation in personal knowledge as required by Rule 602. It is also likely to be substantially more confusing to the jury than probative, and thus excludable under Rule 403, because if the jury believed that McFarland had personal knowledge of Treasury's position, it might wrongly take McFarland's speculation as actual evidence that the GSEs or FHFA adopted that position. The Court will therefore **GRANT** this motion for the same reason it sustained the corresponding objection at the first trial.

#### 2.    Motion in Limine to Exclude Evidence and Arguments About "Borrowing"

Defendants next move to preclude plaintiffs from offering evidence and arguments comparing the Treasury Commitment—the sum of money Treasury was willing to invest in the GSEs in exchange for adding to the Liquidation Preference, which in turn would increase the

amount of dividends Treasury would receive—to a loan. *See* Defs.' Omnibus MIL at 3–6. At the first trial, plaintiffs' counsel compared the Treasury Commitment to a loan multiple times during opening arguments. *See, e.g.*, Trial Tr. 261:8–14, 283:17–19, 311:6–9, 311:15–21, Berkley ECF No. 265. Defendants argue such a comparison is substantially more prejudicial than probative and should be precluded under Rule 403, because it could confuse the jury into believing that any draw on the Treasury Commitment was essentially a loan that could be, and had to be, repaid. Plaintiffs respond that they were merely drawing a helpful analogy and that what is good for the goose must be good for the gander; defense counsel compared the circular draw problem to "borrowing money to pay your credit card debt" during opening arguments at the first trial, Trial Tr. 361:5–9, ECF No. 266, and various GSE and FHFA personnel on occasion compared the Treasury Commitment to a loan. *See* Pls.' Opp'n to Defs.' Omnibus MIL at 3–7. Defendants reply that defense counsel's credit card analogy is different because it refers to the circular draw problem, not the Treasury Commitment itself, and that the statements by GSE and FHFA personnel are better interpreted as comparing the Treasury Commitment to a bailout than a loan. *See* Defs.' Reply in Support of Defs.' Omnibus MIL at 3–7, Berkley ECF No. 323, Class ECF No. 312. However, defendants represented at the pretrial conference that they are amenable to an across-the-board ruling and will not offer their credit card analogy in the event that the Court precludes plaintiffs from comparing the Treasury Commitment to a loan.

Defendants are correct, and plaintiffs do not dispute, that the Treasury Commitment was not literally a loan. Rather, Treasury committed to invest in the GSEs in exchange for an equity interest, with each draw on that commitment indirectly increasing the GSEs' dividend obligations to Treasury. *See* Joint Stip. of Undisputed Facts ¶¶ 17, 19, 31, Class ECF No. 230. The Treasury Commitment was thus unlike debt because it did not have to be, nor could it be, paid off. On the

other hand, the analogy is not entirely off-base. The Treasury Commitment does share some commonality in a loan in that, prior to the Third Amendment, drawing on it resulted in an increased financial obligation to Treasury.

While this motion presents a close question, the Court ultimately concludes that expressly comparing the Treasury Commitment, or even the circular draw problem, to loans or borrowing is likely to be substantially more prejudicial than probative. This is an extraordinarily complex case the likes of which are rarely put to a jury. It is hard enough for a lay juror with no background in finance to keep straight such concepts such as "deferred tax assets," "periodic commitment fees," and "bond spreads." The dizzying array of arcane terminology being thrown out left and right severely magnifies the risk that an imperfect analogy could leave jurors substantially more confused than helped. Put more concretely, the Court is concerned that some jurors may be so bewildered by a trial resembling a graduate-level course in financial economics that referring to the Treasury Commitment as a "loan" or comparing circular draws to a problem with credit card debt could lead them to draw unsupported conclusions about the terms of the PSPAs or the facts and circumstances surrounding FHFA's decision to agree to the NWS. The Court will therefore **GRANT** this motion and preclude both parties from making arguments expressly comparing the Treasury Commitment or its attendant financial obligations to loans or borrowing.

### 3. Motion in Limine to Exclude Evidence and Arguments Comparing Share Price and Dividends Paid

Defendants next move to preclude plaintiffs from offering evidence or arguments comparing the total amount private shareholders invested in the GSEs prior to the Third Amendment ($33.2 billion) and the amount they were paid in dividends ($5.1 billion). *See* Defs.' Omnibus MIL at 6–18. Specifically, defendants argue that plaintiffs should not be allowed to, as they did at the first trial, (1) suggest that "fairness" requires a "repayment" of the amount private

shareholders invested in the GSEs; (2) argue that the total amount invested, or the difference between that amount and the dividend amount ($28.2 billion), made it reasonable for shareholders to believe they would receive future dividends;[7] or (3) argue that GSE shares are "supposed to be better than a loan" because shareholders are "supposed to keep getting dividends" "as long as [the GSEs] can pay them," Trial Tr. 2536:19–22, Berkley ECF No. 284.

As a threshold matter, plaintiffs argue that the Court should deny this motion in full because it asks for reconsideration of a prior ruling without addressing the standard for doing so. *See* Pls.' Opp'n to Defs.' Omnibus MIL at 7–9. That argument is meritless, as the ruling plaintiffs reference was one denying defendants' motion prior to closing arguments to preclude plaintiffs from making a "pennies on the dollar" argument comparing their $1.6 billion in damages sought to the amount private shareholders invested and did not receive back, based on plaintiffs' representation that they did not intend to make such an argument. *See* Trial Tr. 2438:22–2440:18, Berkley ECF No. 283.

Turning to the merits, defendants argue that the challenged arguments by plaintiffs are unsupported by the record and thus improper. Defs.' Omnibus MIL at 10–12; *see United States v. Watson*, 171 F.3d 695, 702 (D.C. Cir. 1999). They also argue that those arguments are irrelevant and substantially more prejudicial than probative. *See* Defs.' Omnibus MIL at 13–18. In particular, defendants note that the shareholder contracts did not actually *guarantee* that dividends would be paid—they just provided for the *possibility* of declaring dividends. Plaintiffs respond primarily that their "net investment prior to the Conservatorship informs their expectations that, once the GSEs were stabilized and returned to shareholders—as Defendants said they would be—Plaintiffs could expect to share in the increased value of the GSEs," and that "the net investments tend to

---

[7] Defendants also ask the Court to preclude plaintiffs from making arguments connecting these numbers to the harm plaintiffs suffered or the damages they seek, but the Court already did so at the first trial, and plaintiffs do not ask the Court to reconsider that ruling.

prove that shareholder investments were not 'wiped out,' an argument made by Plaintiffs' counsel directly in response to Defendants' evidence and argument." Pls.' Opp'n to Defs.' Omnibus MIL at 10.

While defendants' motion has some merit, at least two versions of the challenged arguments by plaintiffs make intuitive sense. First, if one invests a large sum of money in stocks that carry dividend rights and for years receives some return on that investment, one might reasonably expect to continue receiving such a return on investment, absent some unforeseen change in circumstances. Second, if defendants argue that the private shareholders' investment was "wiped out" by the time the conservatorship started in 2008, the amount of that investment is relevant to rebutting that argument. But plaintiffs go too far when they suggest that the *difference* between the amount invested and the amount previously received in dividends informed the private shareholders' reasonable expectations. That sort of argument unmistakably implies, without any support in the record, that it was objectively reasonable for private GSE shareholders to expect at least a 100 percent return on their investment. That is not what the shareholder contracts say, it is not how the stock market works, and it amounts to an implicit "statement[] in closing argument unsupported by the evidence." *Watson*, 171 F.3d at 699.

Finally, plaintiffs failed to respond to defendants' argument that they should be precluded that arguing that investment in the GSEs is "supposed to be better than a loan." They have therefore conceded that point. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014).

For these reasons, the Court will **GRANT** the motion in part and **DENY** it in part. Specifically:

1. Plaintiffs may not suggest that the GSEs were obligated to repay private shareholders the entire amount they initially invested, that fairness would require that result, or that it would be objectively reasonable to expect that result.

2. Plaintiffs may not suggest that the difference between the amount they invested and the amount they received in dividends informed shareholders' reasonable expectations.

3. Plaintiffs may not suggest that GSE shares are "supposed to be better than a loan."

4. However, plaintiffs are free to introduce evidence of the amount private shareholders invested and the amount they received in dividends, and to argue that the fact that they received some return on their investment for years means they reasonably could have expected to receive such returns in the future.

**4. Motion in Limine to Exclude Evidence and Arguments Regarding Payments to Treasury**

The final motion in limine in defendants' omnibus motion asks the Court to exclude evidence and arguments concerning the sum paid to Treasury as a result of the NWS. *See* Defs.' Omnibus MIL at 19–29. Defendants argue that such evidence and arguments are irrelevant because they do not go to the information known to FHFA at the time it agreed to the Third Amendment, and substantially more prejudicial than probative because they prey on hindsight bias and plant the seed that plaintiffs' $1.6 billion in damages sought is merely "pennies on the dollar." Plaintiffs respond that such evidence and arguments are relevant because they shed light on whether the NWS was in fact necessary and whether eliminating circular draws was in fact FHFA's reason for agreeing to it; and that any prejudice that would result is not the sort of *unfair* prejudice that Rule 403 is aimed at. *See* Pls.' Opp'n to Defs.' Omnibus MIL at 15–30. The Court agrees with plaintiffs.

As for relevance, it is true that the relevant question is whether FHFA acted reasonably "on whatever information it had at the time of the alleged breach." First Pretrial Op., 2022 WL 13937460, at *3 (emphasis omitted). But "it is an accepted proposition, logically and legally, that subsequent events may shed light upon, and be relevant in determining, what transpired at an earlier time." *United States v. Sutton*, 970 F.2d 1001, 1007 (1st Cir. 1992). Defendants' primary theory of reasonableness is that the NWS was intended to stop circular draws; and plaintiffs have presented evidence that the GSEs were actually expected to make record profits, and that Treasury

31

intended the NWS, at least in part, to wind down the GSEs and send those profits to the taxpayers instead of allowing the GSEs to re-capitalize. If the GSEs indeed *did* make record profits, those profits were transferred to Treasury, and FHFA did nothing to change course in the following years, one could reasonably draw the inference that FHFA shared Treasury's alleged intent all along. *Cf. Sutton*, 970 F.2d at 1007–08 (reasoning that defendant's "continued promotion" of investment scheme after learning of its unlawful nature was relevant evidence of his "complicity and guilty knowledge from the start").

As for prejudice, defendants' primary argument concerns "hindsight bias"—the idea that the jury might unfairly inflate the probability at the relevant time that a future event would occur because of the fact that it did occur. But of the two cases defendants appear cite for the proposition that Rule 403 requires the elimination of hindsight bias, one actually involved use of Rule 403 to prevent a "trial within a trial" on an issue of marginal relevance, *see English v. District of Columbia*, 651 F.3d 1, 10 (D.C. Cir. 2011), and the other involved use of Rule 403 to exclude as unfairly prejudicial evidence that the government was "rooting" for the plaintiff over the defendant, *see Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 997 (D.C. Cir. 1977).[8] While the Court does not doubt that hindsight bias could, in some circumstances, be so severe as to render the evidence it attends substantially more prejudicial than probative, the Court does not see that risk here. The Court expects that the jury will be presented, as it was at the first trial, with substantial evidence that the relevant decisionmakers should have known at the relevant time that the event that in fact did occur—massive profits for the GSEs—was *likely* to occur. As for tainting the jury's

---

[8] Defendants do cite one case in which a court *discounted* evidence presented at trial as the product of hindsight bias, but that was a Delaware Chancery case in which the vice chancellor actually *admitted* the evidence at issue. *See Fox v. CDX Holdings, Inc.*, C.A. No. 8031, 2015 WL 4571398, at *3–4 (Del. Ch. July 28, 2015).

views on harm and damages, such prejudice could likely be cured by giving a limiting instruction

and once again precluding plaintiffs from making an explicit "pennies on the dollar" argument.

For these reasons, the Court will **DENY** this motion. However, the Court will give a

limiting instruction that the jury is not to consider the value transferred to Treasury as evidence of

either harm to the private shareholders or a measure of damages.

### B. Defendants' Motion in Limine to Revisit Ruling on PX 205 (Berkley ECF No. 304, Class ECF No. 291)

Defendants move for reconsideration of the Court's ruling at the first trial admitting PX

205, a memorandum from Treasury official Michael Stegman to another Treasury official

recording Treasury Secretary Timothy Geithner's overview of a meeting between Geithner and

DeMarco. The Court admitted that memo as a public record under Federal Rule of Evidence

803(8)(a)(i), relying on the First Pretrial Opinion, which characterized the very same memo as

"memorializ[ing] Treasury activities as they ostensibly occurred." *See* First Pretrial Op., 2022 WL

13937460, at *4. Defendants now argue that the Court's ruling dealt only with one level of hearsay,

Stegman's recording of the events in his memorandum, and not with another level, Geithner's

relation of the events of the meeting to Stegman. *See* Fed. R. Evid. 805 (requiring independent

exception for each embedded level of hearsay within a statement).

As defendants concede, they face a heavy burden in asking the Court to reconsider a prior

pretrial ruling on the exact same issue in the absence of changed circumstances. "In general, a

court will grant a motion for reconsideration of an interlocutory order only when the movant

demonstrates: '(1) an intervening change in the law; (2) the discovery of new evidence not

previously available; or (3) a clear error in the first order.'" *Zeigler v. Potter*, 555 F. Supp. 2d 126,

129 (D.D.C. 2008) (quoting *Keystone Tobacco Co., Inc. v. U.S. Tobacco Co.*, 217 F.R.D. 235, 237

(D.D.C. 2003)). The only basis defendants now advance for reconsideration is clear error. *See*

Defs.' Mot. to Revisit Ruling Admitting PX 205 at 2. While little law exists in this Circuit defining "clear error" in the context of interlocutory orders, definitions in related contexts reveal an extraordinarily exacting standard. *See, e.g., Lardner v. FBI*, 875 F. Supp. 2d 49, 53 (D.D.C. 2012) (explaining for purposes of Fed. R. Civ. P. 59(e) that "a final judgment must be 'dead wrong' to constitute clear error" (quoting *Parts & Electric. Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 233 (7th Cir. 1988)). Defendants have not met that standard.

To be sure, the Court did not explicitly state in its First Pretrial Opinion or its bench ruling admitting PX 205 that it was addressing multiple levels of hearsay. *See* First Pretrial Op., 2022 WL 13937460, at *4 ("But other documents actually memorialize Treasury activities as they ostensibly occurred—for example, a memorandum summarizing a meeting between Treasury Secretary Geithner and FHFA Acting Director DeMarco in June 2012."); Trial Tr. 238:22–24, Berkley ECF No. 265 ("I did, in my order, indicate that this is exactly the kind of document that I thought would be admissible."). But for the reasons that follow, there was effectively only one level of hearsay to address.

Plaintiffs argued at the first trial that the public-records exception is generally a multi-level hearsay exception beyond the reach of Rule 805, citing the Seventh Circuit case *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1308 (7th Cir. 1992). As defendants rightly argue, that is an untenable position. The D.C. Circuit has indicated, albeit implicitly and in a footnote, that it does not see Rule 803(8) as a multi-level hearsay exception. *See Czekalski v. Peters*, 475 F.3d 360, 366 n.2 (D.C. Cir. 2007) (reasoning that second level of hearsay in OIG report would be admissible as a party-opponent statement). And the Seventh Circuit itself has cabined *Amoco Cadiz*, explaining that it "merely acknowledges the reality that information may be passed among multiple public officials before being recorded in a document offered at trial, and it holds that the record will not

be excluded merely because its author does not have firsthand knowledge of the reported matters." *Jordan v. Binns*, 712 F.3d 1123, 1133 (7th Cir. 2013). Apparently recognizing the lack of support for a maximalist reading of *Amoco Cadiz*, plaintiffs have abandoned that argument. *See generally* Pls.' Opp'n to Defs.' Mot. to Exclude PX 205, Berkley ECF No. 317, Class ECF No. 305.

But here, the lack of a second hearsay exception is beside the point, because an agency record setting forth only *internal* agency activities presents only a single level of (excepted) hearsay. That conclusion is rooted firmly in the text of Rule 803(8). To start, the Rule applies to "[a] record or statement of a public *office*," Fed. R. Evid. 803(8) (emphasis added)—not a public *official*. Moreover, the Rule contemplates that in many cases, the agency official recording the statement will learn about the underlying facts from another source within the agency, as it places on "the opponent" the burden of "show[ing] that the *source of information* or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Along similar lines, courts have recognized (albeit sometimes in dicta)—and defendants do not dispute, *see generally* Defs.' Reply in Support of MIL to Exclude PX 205, Berkley ECF No. 322, Class ECF No. 311—that Rule 803(8) generally does not require that the person memorializing the public record have personal knowledge of the underlying facts, *see United States v. Warren*, 42 F.3d 647, 657 (D.C. Cir. 1994); *Amoco Cadiz*, 954 F.2d at 1308.

This reading is also consistent with the only binding authority defendants cite, which concerned statements related in a public record made by a third party external to the agency. In *Czekalski v. Peters*, the D.C. Circuit analyzed the double-hearsay implications of statements by a Federal Aviation Administration official contained in an Office of the Inspector General report. 475 F.3d at 366 n.2. It is also consistent with the nonbinding appellate authority defendants cite. In cabining *Amoco Cadiz*, the Seventh Circuit went on to stress that Rule 803(8) does not

"remove[] the hearsay bar from a *nongovernmental third-party* contained in a police report." *Jordan*, 712 F.3d at 1133 (emphasis added). Defendants do cite three out-of-Circuit cases for the proposition that statements by officials at the same agency embedded within a public record are only admissible under Rule 803(8) if a further hearsay exception applies. *See Taylor v. Erna*, No. 08-cv-10534, 2009 WL 2146675, at *8 (D. Mass. July 14, 2009); *Porter v. City of Lake Lotawana*, No. 07-cv-461, 2009 WL 10441610, at *20 (W.D. Mo. Mar. 31, 2009); *Lewis v. Velez*, 149 F.R.D. 474, 487 (S.D.N.Y. 1993). However, at least one of those cases appears to have involved a hearsay statement from a city legislator to a member of the city's executive branch rather than two officials in the same agency, *see Porter*, 2009 WL 10441610, at *20, 34, and all of them assumed that an intra-agency source of information presents another level of hearsay without giving that issue any analysis.

Moreover, defendants' position would have absurd consequences. The parties appear to agree that, assuming the memorandum itself is a public record, if Stegman did not state that his source was an "overview" that Geithner provided, the statements contained in the memorandum would be admissible, notwithstanding that Stegman was not at the meeting and could only have heard about it through the agency grapevine. But in defendants' view, as soon as Stegman specifies Geithner as his source, that adds another level of hearsay that Rule 803(8) does not reach. "Nothing in either the text or the history of Rule 803(8) supports an approach that would make the rule essentially useless—for the bureaucrat who fills out a governmental form usually incorporates information furnished by others." *Amoco Cadiz*, 954 F.2d at 1308.

In sum, the Stegman memorandum is admissible as a public record because it is a record *of the Treasury Department*, not a record of Geithner recounted in a record of Stegman. Defendants

have not met their burden of demonstrating that the Court's earlier ruling amounted to clear error, and the Court will therefore **DENY** this motion.

### C. Defendants' Omnibus Motion to Revise Jury Instructions (Berkley ECF No. 312, Class ECF No. 303)

Defendants initially moved for three revisions of the jury instructions from the first trial: (1) a revised instruction on unreasonable action, (2) a revised instruction on Virginia prejudgment interest, and (3) an additional instruction on nominal damages. However, the parties represented at the pretrial conference that they were close to reaching an agreement on the prejudgment interest instruction and requested that the Court reserve ruling on that point. Accordingly, the Court will only address the two other proposed revisions.

#### 1. Unreasonable Action

Defendants propose three major changes to the instructions given on unreasonable action for purposes of the implied covenant claim: (1) deleting language about "fairness" and "what is to be expected"; (2) adding that "[t]here can be multiple reasonable options in a given set of facts and circumstances," as well as language about considering defendants' "objectives, obligations, and the facts and circumstances at the time"; and (3) adding defendants' response to plaintiffs' allegations. *See* Defs.' Mot. to Rev. Jury Instrs. at 2–3. Defendants point out that the jury sent a note during the first trial asking for clarification of what arbitrary and unreasonable mean. *See* Jury Note No. 3, Berkley ECF No. 250, Class ECF No. 259. Plaintiffs object to all three changes. *See* Pls.' Opp'n to Defs.' Mot. to Rev. Jury Instrs. at 1–96 Berkley ECF No. 325, Class ECF No. 314.[9]

First, defendants argue that the language about "what can be expected" should be struck because such language is absent from most definitions of "unreasonable" and is circular for

---

[9] Defendants also propose adding the phrase "as of December 24, 2009" at several points in this instruction to emphasize that that is the "time of contracting" for purposes of plaintiffs' implied covenant claim. *See* Defs.' Mot. to Rev. Jury Instrs. at 7. Plaintiffs apparently do not oppose those additions, so the Court will grant defendants' request.

purposes of this instruction, since it results in defining reasonable expectations in reference to what

can be expected. *See* Defs.' Mot. to Rev. Jury Instrs. at 4–5. Plaintiffs respond, persuasively, that

for purposes of an implied covenant claim in particular, arbitrary or unreasonable conduct *is*

"determined in reference to" reasonable expectations. *See* S.J. Op., 2022 WL 4745970, at *6. The

Court therefore will not strike the language from the original instruction about "what can be

expected." Defendants also argue that the language from the first trial's instructions defining

"unreasonable" action in reference to "fairness" is confusing because it implies that the jury can

consider a "free-floating" notion of fairness, contradicting the principle that the implied covenant

is about expectations grounded in the contract. Defs.' Mot to Rev. Jury Instrs. at 5–6; *see Dunlap*

*v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005). Plaintiffs respond that the entire

point of an implied covenant claim is that the parties must "deal 'fairly'" with one another. *See*

*Gerber v. Enter. Prod. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013). But defendants reply,

persuasively, that "fair dealing" for purposes of the implied covenant is more precisely defined in

reference to reasonable expectations at the time of contracting, *see Dunlap*, 878 A.2d at 441–42,

and thus injecting the word "fairness" into the definition could confuse the jury into thinking of a

more abstract notion of fairness. The Court will therefore strike the language about "fairness."

Second, defendants argue that it would make the instruction more concrete and specific to

add that the jury may consider "the decision maker's objectives, obligations, and the facts and

circumstances at the time the action was taken," and that there can be "multiple reasonable options"

at a given time. Defs.' Mot. to Rev. Jury Instrs. at 6–9. Plaintiffs respond that defendants' proposed

additions confuse the governing standard by implying that the jury may evaluate whether

defendants acted reasonably *in the abstract* rather than specifically in reference to private

shareholders' reasonable expectations, a theory the Court has already rejected. Pls.' Opp'n to

Defs.' Mot. to Rev. Jury Instrs. at 5–6; *see* S.J. Op., 2022 WL 4745970, at \*6. The Court shares plaintiffs' concerns. While the Court held in its First Pretrial Opinion that information known to FHFA in 2012 "might be relevant to the circumstances surrounding the adoption of the Third Amendment, and whether FHFA, in its role as conservator, reacted to those circumstances in a manner that shareholders reasonably could have expected given the most recent, meaningful change in the contract," First Pretrial Op., 2022 WL 13937460, at \*6 (emphasis omitted), defendants' proposed additions confuse the standard by not specifying that the only considerations by the decisionmaker that are relevant for purposes of the implied covenant are those the parties reasonably could have *expected* the decisionmaker to take into account. The Court will therefore combine defendants' proposed additions and modify them as follows:

> In evaluating whether a decision was reasonable based on the parties' objectively reasonable expectations under the contract, you may consider whether the decisionmaker responded to its objectives, obligations, and the facts and circumstances at the time the action was taken, in a manner that the other party reasonably could have expected at the time of contracting. You should also keep in mind that, in some cases, there may be more than one option that could reasonably be expected under the circumstances.

Third, defendants argue that the instruction should include their response to plaintiffs' allegations. *See* Defs.' Mot. to Rev. Jury Instrs. at 7. Plaintiffs respond that that would result in improper argument in jury instructions, *see* Pls.' Opp'n to Defs.' Mot. to Rev. Jury Instrs. at 5–6, but it is unclear why defendants' response would be improper argument if plaintiffs' allegations are not. Defendants' proposed addition is similar to a "theory of the case" instruction. In criminal cases, "[t]he trial court is *required* . . . to instruct on the defendant's theory of the case if supported by the evidence." *United States v. Tarantino*, 846 F.2d 1384, 1400 (D.C. Cir. 1988) (emphasis added). And while defendants do not expressly invoke that requirement or contend that it applies in civil cases as well, the Court is unaware of any authority *prohibiting* it from doing so in civil

cases. To the contrary, although it appears neither the D.C. Circuit nor any court in this district has expressly addressed the issue, at least the Ninth Circuit has held that even in civil cases, "[e]ach party is [] entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (internal quotation marks and citations omitted). The Court therefore sees no reason to deny defendants' request. However, the Court will modify defendants' proposed addition as follows to avoid implying that defendants are not liable if their actions were reasonable only in the abstract:

> Defendants respond that the Net Worth Sweep was reasonable based on the parties' expectations at the time of contracting because in agreeing to it, FHFA was responding to the facts and circumstances known to FHFA in August 2012 in a manner that private shareholders reasonably could have expected as of December 24, 2009.

For these reasons, the Court will **GRANT** in part and **DENY** in part the motion with respect to unreasonable action.

### 2. Nominal Damages

Defendants move for an instruction on nominal damages, which the Court did not give at the first trial. *See* Defs.' Mot. to Rev. Jury Instrs. at 14. Plaintiffs respond that "a nominal damage instruction is not appropriate when there is proof of actual injury." *See Westcott v. Crinklaw*, 133 F.3d 658, 662 (8th Cir. 1998); *see* Pls.' Opp'n to Defs.' Mot. to Rev. Jury Instrs. at 8–9. But, as defendants argue in reply, the cases plaintiffs cite merely stand for the proposition that nominal damages are not appropriate if a plaintiff has *conclusively* proven actual damages. Defs.' Reply in Support of Defs.' Mot. to Rev. Jury Instrs. at 12–13, Berkley ECF No. 330, Class ECF No. 319; *see Westcott*, 133 F.3d at 662 (emphasizing that "[t]he evidence *conclusively established* that [the plaintiff] suffered fatal injuries and sustained actual damage of, at least, the amount of *stipulated* funeral expenses" (emphasis added)); *Tampa Port Auth. v. M/V Duchess*, 65 F. Supp. 2d 1305,

1307 (M.D. Fla. 1998) (in admiralty case, concluding after bench trial that the evidence supported an award of actual, not nominal, damages).

Based on the evidence presented at the first trial, the Court expects that plaintiffs will not be able to prove their damages *conclusively*, that is, with such certainty that a directed verdict would be appropriate.[10] Thus, the Court sees no basis for refusing to instruct on nominal damages, which are available as a matter of Delaware and Virginia law where the factfinder determines there has been an actual injury but the plaintiff has not proven the measure of damages with reasonable certainty. *See Powell v. AmGuard Ins. Co.*, C.A. No. K17C-11-003, 2019 WL 4509165, at *5–6 (Del. Super. Ct. Sept. 19, 2019); *Crist v. Metro. Mortg. Fund, Inc.*, 343 S.E.2d 308, 311 (Va. 1986). For these reasons, the Court will **GRANT** the motion as to nominal damages and give defendants' proposed instruction.

### III.    CONCLUSION

For the foregoing reasons:

Plaintiffs' Motion in Limine Regarding Expert Testimony will be **DENIED** with respect to the bond yield event study and **GRANTED** with respect to the state of the MBS market.

Plaintiffs' Omnibus Motion in Limine will be **GRANTED** in part and **DENIED** in part as follows:

1. The motion to exclude analyst reports will be **DENIED** with respect to DX 412 and 529 and **GRANTED** with respect to the other analyst reports that Dr. Attari read into the record.

2. The motion to preclude testimony regarding reactions to the NWS will be **DENIED**.

3. The motion to clarify the Court's ruling on testimony regarding shareholders' subjective expectations will be **GRANTED** in part and **DENIED** in part as follows:

---

[10] If this prediction is wrong, the Court will revisit this ruling.

      a.  Plaintiffs may play the portion of the Cacciapalle deposition portion about the "harm" he suffered, but without the sentence about what he "expected."

      b.  Miller and the other plaintiff-witnesses may testify that they brought the suit because their dividend rights were extinguished.

      c.  Defendants may not draw attention in their closing argument to the omission of testimony by the plaintiff-witnesses about circular draws.

      d.  All other relief plaintiffs request in the motion is denied.

4.  The motion to exclude the Layton deposition testimony will be **DENIED**.

5.  The motion to exclude McFarland's deposition testimony regarding news articles will be **DENIED**.

6.  The motion to exclude improper use of SEC filings will be **DENIED**, and the Court will reserve ruling on the admissibility of the SEC filings until it is clear what, if any, testimony defendants may offer by a qualified witness familiar with the GSEs' recordkeeping practices.

Plaintiffs' Motion in Limine to Admit PX 550, 226, 562, 274, and 279 will be **GRANTED** as to PX 226 and 550 and **DENIED** as to PX 274, 279, and 562.

Plaintiffs' Motion in Limine to Exclude the Kari Deposition Testimony will be **DENIED**.

Defendants' Omnibus Motion in Limine will be **GRANTED** in part and **DENIED** in part as follows:

1.  The motion to exclude speculative deposition testimony will be **GRANTED**.

2.  The motion to exclude evidence and arguments comparing the Treasury Commitment to borrowing will be **GRANTED**.

3.  The motion to exclude evidence and arguments comparing the issuance price of shares and dividends paid will be **GRANTED** in part and **DENIED** in part as follows:

      a.  Plaintiffs may not suggest that the GSEs were obligated to repay private shareholders the entire amount they initially invested, that fairness would require that result, or that it would be objectively reasonable to expect that result.

      b.  Plaintiffs may not suggest that the difference between the amount they invested and the amount they received in dividends informed shareholders' reasonable expectations.

    c.   Plaintiffs may not suggest that GSE shares are "supposed to be better than a loan."

    d.   However, plaintiffs are free to introduce evidence of the amount private shareholders invested and the amount they received in dividends, and to argue that the fact that they received some return on their investment for years means they reasonably could have expected to receive such returns in the future.

4.   The Motion to exclude evidence and arguments concerning payments to Treasury will be **DENIED**. However, the Court will give a limiting instruction that the jury is not to consider the value transferred to Treasury as evidence of either harm to the private shareholders or a measure of damages.

Defendants' Motion in Limine to Revisit the Court's Ruling Regarding PX 205 will be

**DENIED**.

Defendants' Omnibus Motion to Revise the Jury Instructions will be **GRANTED** in part

and **DENIED** in part with respect to the instruction on unreasonable action, with the modifications

to defendants' proposed language set forth above, and **GRANTED** with respect to the instruction

on nominal damages.

A separate Order in each case shall issue this date.

Date: July 21, 2023

Royce C. Lamberth
United States District Judge