## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BERKLEY INSURANCE, Co., *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>FEDERAL HOUSING FINANCE AGENCY, *et al.*,<br><br>            Defendants. | Case No. 1:13-cv-1053 (RCL) |
| In Re Fannie Mae / Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | Case No. 1:13-mc-01288 (RCL) |
| This document relates to:<br>*ALL CASES* | |

**PLAINTIFFS' MOTION FOR A CURATIVE INSTRUCTION**

On Friday, the Court made two comments during the cross-examination of Defendants' expert witness Dr. Mukkaram Attari. Plaintiffs are concerned that the jury's affection and respect for the Court may cause them to place improper weight on what the Court said. Plaintiffs therefore seek a curative instruction that largely previews the instruction the Court already intends to give concerning the irrelevance to the jury's deliberations of comments from the Court. Further, one of the Court's comments may have inadvertently suggested that the GSEs were responsible for the financial crisis and that this is relevant to the outcome of the case. That is not an argument either party has made. Indeed, the only evidence presented during the trial refutes it, and the GSEs' role in causing the financial crisis is, at a minimum, an issue of heavy and complicated dispute generally. Plaintiffs thus seek an instruction that the issue is not relevant to the case.

On Friday, August 4, 2023, counsel for Plaintiffs asked Dr. Attari about testimony from various executives that the GSEs had reached sustained profitability by August 2012. Dr. Attari responded by observing that after just "two quarters, I'm not very sure how they decided it was sustained." Trial Tr. (Aug. 4th PM) 110:19-20. The Court then said the following:

> THE COURT: Two quarters after how many years?
> THE WITNESS: After three years of large losses. Actually, four years of large losses.
> THE COURT: They turned the world around?
> THE WITNESS: Yes.
> THE COURT: After two quarters? And everybody should jump at that. Sorry. I'll try not to interject. I can't resist sometimes.

*Id.* at 110:21-111:4. After Plaintiffs' counsel asked, and Dr. Attari confirmed, that several executives had given testimony about sustained profitability, the Court then interjected again:

> THE COURT: I mean, these two companies brought the whole country to a halt. And all of a sudden, after two quarters, everything's wonderful?

*Id.* at 111:10-12.

1

The Court had previously asked Plaintiffs' expert witness, Dr. Bala Dharan, a similar but more neutrally-phrased question on the same topic:

> THE COURT: To be fair there, Doctor, that's a very short period of time where they were profitable. They had a long period where they weren't profitable. Maybe you need to explain to the jury how you project the future when they had such a long period, when they weren't profitable.
>
> \* \* \*
>
> THE WITNESS: The housing market – that's why I showed data on the turnaround, the housing market, the loading of the credit losses, the improvement in the credit portfolio that they had. So these are very critical features. And the fact that the DTA is dependent on making an assessment on these. It is really the change in the housing market is the most important information to consider for future profits.

Trial Tr. at 75:2-9.

The comments from Friday August 4, 2023 warrant a curative instruction. The central issue in this case is whether FHFA's decision to agree to the Net Worth Sweep on August 17, 2012 was arbitrary or unreasonable. Both Plaintiffs and Defendants have presented evidence relevant to that question, *e.g.*, what economic evidence was available and what was expected or foreseeable at that time. The jury is also asked to weigh whether concerns about eroding the Commitment through circular draws were so overwhelmingly pressing and urgent as to outweigh any concern about giving away hundreds of billions of dollars of future profits and net worth that could themselves have provided a further buffer to the GSEs, over and above the Commitment, to address any future stress scenario.

The Court's comments suggest that it is the Court's view that Plaintiffs' evidence is limited to "two quarters" of large profits (which is certainly relevant, but by no means the only relevant evidence). More damaging, it also could suggest that the Court believes it is the position of Plaintiffs that "everything" was "wonderful" by August 2012 and that any finding to the contrary defeats Plaintiffs' case. That would be an incorrect impression for the jury to form. Plaintiffs have

2

taken care to recognize that as of August 2012 nothing was certain, but that one foreseeable outcome was that the GSEs might soon start to generate substantial profits, including from anticipated very large, extraordinary "write ups" of assets that had been massively written down during the crisis—indeed, that outcome was foreseen by responsible GSE executives at the time.

Plaintiffs have presented substantial evidence that the GSEs might be poised to generate substantial profits in August 2012, beyond just two quarters of profitability. This evidence includes: positive macroeconomic trends; rising home prices (which are the single biggest driver of future GSE profits); the views and statements of FHFA's Principal Accounting Examiner (*see* PX 196, predicting a "roaring recovery, fueled in large part from drawing down their ~ $70 billion" allowance for loan losses); testimony from Defendants' executives (*see* PX 213, predicting the next 8 years would be "the golden years of GSE earnings"); Defendants' internal projections; the views of the Conservator himself as to the GSEs' economic prospects (*see* PX 205); and expert testimony evaluating this internal evidence, available alternatives to the Net Worth Sweep, macroeconomic conditions, and the lack of process or analysis.[1] Defendants obviously disagree with these points, and the jury ultimately will evaluate this evidence and reach its own conclusions. Plaintiffs respectfully submit that this should occur on a level playing field based on the Court's instructions and not based on comments from the Court that could lead the jury to misinterpret

---

[1] Plaintiffs and their expert Dr. Dharan have explained that the losses suffered from 2008-2011 reflected massive accounting write downs that were based on negative macro-economic and housing price indicators, negative predictions on future foreclosures, and a decision to write down to virtually zero Deferred Tax Assets that were worth approximately $100 billion. As a matter of basic accounting, those massive "write downs" could become equally massive "write ups" once the macroeconomic environment improved, housing prices started to increase, and the GSEs began to reasonably expect future profitability that would allow the Deferred Tax Assets to be utilized, at which point the accounting rules would require those assets to be written up. These various write ups and reversals of prior write downs are, of course, precisely what led to the enormous income levels generated by the GSEs in 2013 and thereafter.

what the issue in the case is or what the Court thinks about that issue, or be guided in its deliberations by its deference to and considerable respect for the Court, both of which are shared by all involved in this case.

Furthermore, by asserting that "these two companies brought the whole country to a halt," the Court's final comment risks injecting a new issue into the case. To begin with, the cause of the financial crisis is a subject of heavy and complicated dispute generally. The evidence in the record on this issue, however, says the GSEs were *not* the cause of the crisis.[2] Suggesting the GSEs were the cause of the crisis is also inconsistent with Defendant FHFA's own public position that the GSEs were *defrauded* by private banks into buying subprime loans.[3] Indeed, FHFA has recovered $24.9 billion from suing those banks for fraud.[4] Most importantly, neither party has suggested that the causes of the financial crisis are material to the dispute in this case. That is why it has not been the subject of any argument or competing evidence from the parties. The Court's comments risk suggesting both that the GSEs caused the financial crisis and that this is a reason why Plaintiffs should lose. At a minimum, this comment may unfairly bias jurors against the GSEs and their private shareholders.

---

[2] *See* PX 210 at 4-7 (discussing several potential causes of the financial crisis and noting that "[r]ather than leading the market into subprime and other risky mortgages, Fannie Mae and Freddie Mac followed the private sector."); Lockhart Dep. Tr. at 146:17 – 148:2 (the GSEs had "better books" of prime mortgages and "higher underwriting standards" than many private-label MBS issuers).

[3] FHFA has "filed 16 lawsuits on behalf of [Fannie Mae] and Freddie Mac against various financial institutions, their officers and affiliated and unaffiliated underwriters who were responsible for marketing and selling private-label mortgage-related securities to us." DX 476 at 163-64.

[4] Federal Housing Finance Agency, *FHFA Final Update on Private Label Securities Actions* (Sept. 17, 2018), available at https://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Final-Update-on-Private-Label-Securities-Actions-9172018.aspx (summarizing settlements).

The Court's comments came at a particularly impactful time during cross-examination of Defendants' expert. Thus, while the Court will soon instruct the jury that its comments are not relevant, Plaintiffs respectfully request that at the outset of the proceeding on Monday, the Court correct any misimpression that the jury may have. "The influence of a trial judge on the jury is necessarily and properly of great weight." *Miller v. Holzmann*, 563 F. Supp. 2d 54, 104 (D.D.C. 2008) (Lamberth, J.) (quoting *Quercia v. United States*, 289 U.S. 466, 470 (1933)), a*ff'd in part, vacated in part, remanded sub nom.*, *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871 (D.C. Cir. 2010). The D.C. Circuit has "emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided.'" *Wabisky v. D. C. Transit Sys., Inc.*, 326 F.2d 658, 659 (D.C. Cir. 1963) (Wright, J.). Because such comments "tread[] close to the line which divides proper judicial action from the field which is exclusively the jury's," it is important that the Court "make it unequivocally clear to the jurors that conclusions upon such matters are theirs, not his, to make; and he must do so in such manner and at such time that the jury will not be left in doubt." *Billeci v. United States*, 184 F.2d 394, 403 (D.C. Cir. 1950).

Plaintiffs respectfully request that the Court provide the following instruction (proposing minor modifications to the Court's final jury instructions, with the proposed changes shown in underline) to the jury before Plaintiffs resume their cross-examination of Dr. Attari on Monday morning:

> <u>You should not infer or conclude from any comment that I make during the examination of a witness that I have any opinion on the merits of the case favoring one side or the other. I do not favor one side or the other, and my opinion would not be relevant.</u> I also <u>instruct</u> you to draw no inference from the fact that upon occasion I may have asked questions of certain witnesses. These questions were only intended for clarification or to expedite matters and certainly were not intended to suggest any opinions on my part as to

<u>the verdict you should render, or whether any of the witnesses may have been more credible than any other witnesses.</u> Nothing I say or do should influence or suggest to you that I favor any party in this case. I did not mean to express or suggest any opinion about which witnesses should be believed or which facts are established. <u>You are expressly to understand that the court has no opinion as to the verdict you should render in this case.</u>

<u>Further, it is important for you to realize that the causes of the 2007-2008 financial crisis are not relevant to the outcome of this case. Those causes are vast, complex, and heavily debated by policy experts, and should be irrelevant to your deliberations over the verdict in this case</u>.

ECF No. 250 (proposed additional language underlined).

This Court has used similar language in jury instructions it has given in at least one other case.[5] The reason Plaintiffs' request this instruction be made Monday before the examination of Dr. Attari resumes is that the Court's comments quoted above were made late on Friday afternoon, and it is impossible to know what impact they might have had on the jurors over the weekend. The above instruction would mitigate any possible bias or risk of confusion that otherwise might result from the Court's comments. *See Miller*, 563 F. Supp. 2d at 104 n.62 (emphasizing that the instruction concerning comments by the Court was given twice).

---

[5] The proposed language comes from this Court's decision in *Miller*, 563 F. Supp. 2d at 104 n.62 (emphasis added), where the Court instructed the jury as follows:

> <u>You should not infer or conclude from any ruling or other comment that I make that I have any opinion on the merits of the case favoring one side or the other. I do not favor one side or the other.</u>... During the course of the trial I may ask a question of a witness. You <u>should not take my questions to witnesses as [ ] any indication as to my opinion of how you should determine the facts. If I say or do anything at any time during this case, including giving these instructions[,] which seem[s] to indicate my opinion on any of the evidence, then I instruct[ ] you to disregard that indication. Nothing I say or do should influence or suggest to you that I favor any party in this case. I did not mean to express or suggest any opinion about which witnesses should be believed or which facts are established.</u>

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court give the requested curative instruction, as set forth above, when the trial resumes on Monday, August 7, 2023.

Dated:

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Berkley Plaintiffs, et al.*

Respectfully submitted,

/s/ Eric L. Zagar
Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

*Co-Lead Counsel for the Class*