```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
     Fairholme Funds, Inc., et al.,  ) Civil Action
 3                                   ) No. 1:13-cv-01053-RCL
                        Plaintiffs,  )
 4                                   ) Jury Trial (Day 3)
     vs.                             ) Afternoon Session
 5                                   )
     Federal Housing Finance         )
 6   Agency, et al.                  ) Washington, D.C.
                                     ) July 26, 2023
 7                      Defendants.  ) Time: 1:15 p.m.
     _____
 8
     In re Fannie Mae/Freddie Mac    ) Civil Action
 9   Senior Preferred Stock          ) No. 1:13-mc-1288-RCL
     Purchase Agreement Class         )
10   Action Litigations.             )
     _____
11
           Transcript of Jury Trial (Day 3) Afternoon Session
12                           Held Before
                  The Honorable Royce C. Lamberth
13              United States Senior District Judge
     _____
14
                       A P P E A R A N C E S
15
     For the Fairholme Funds, Inc. Plaintiffs:
16                        Vincent J. Colatriano
                          COOPER & KIRK, PLLC
17                        1523 New Hampshire Avenue, Northwest
                          Washington, D.C. 20036
18
     For the Defendant Federal Housing Finance Agency:
19                        Asim Varma
                          David B. Bergman
20                        Ian S. Hoffman
                          R. Stanton Jones
21                        Jonathan L. Stern
                          ARNOLD & PORTER KAYE SCHOLER LLP
22                        601 Massachusetts Avenue, Northwest
                          Washington, D.C. 20001
23

24

25
```

1          A P P E A R A N C E S (continued)

2     For the Class Plaintiffs:
                          **Hamish P. M. Hume**
3                         **Kenya Khalelah Davis**
                          BOIES SCHILLER FLEXNER LLP
4                         1401 New York Avenue, Northwest
                          Washington, D.C. 20005

5
                          **Robert F. Kravetz**
6                         BERNSTEIN, LITOWITZ, BERGER &
                          GROSSMAN, LLP
7                         1251 Avenue of the Americas
                          New York, New York 10020

8
                          **Lee D. Rudy**
9                         KESSLER TOPAZ MELTZER & CHECK
                          280 King of Prussia Road
10                        Radnor, Pennsylvania 19087

11    _____

      Stenographic Official Court Reporter:
12                        Nancy J. Meyer
                          Registered Diplomate Reporter
13                        Certified Realtime Reporter
                          333 Constitution Avenue, Northwest
14                        Washington, D.C. 20001
                          202-354-3118

15
      Proceedings recorded by mechanical stenography.  Transcript
16    produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25

1                    <u>**I N D E X**</u>

2                                                     <u>PAGE:</u>

3     **Opening Statement:**

4         By Mr. Stern.................................. 496

5

6     **Witnesses:**

7     Jill Belack
          Direct Examination By Mr. Kravetz................ 570
8         Cross-Examination By Mr. Jones................... 576

9

10    **Exhibits Admitted:**

11        Plaintiffs' Exhibit JX-1......................... 570
          Plaintiffs' Exhibit PX-2-C...................... 570
12        Plaintiffs' Exhibit PX-2-D...................... 584
          Plaintiffs' Exhibit PX-2-E...................... 570
13        Plaintiffs' Exhibit PX-515-B.................... 584
          Plaintiffs' Exhibit PX-520...................... 584
14        Plaintiffs' Exhibit PX-521...................... 570
          Plaintiffs' Exhibit PX-522...................... 570
15        Plaintiffs' Exhibit PX-524...................... 570

16

17

18

19

20

21

22

23

24

25

```
1                    P R O C E E D I N G S
2              (REPORTER'S NOTE:  The morning portion of the trial
3      was reported by Lisa Edwards, who prepared said transcript.)
4              (Proceedings held out of the presence of the jury.)
5         THE COURT:  Some of the jurors were concerned about
6      the heat.  I told them we would have engineering look.  But I
7      told them we don't normally have this many people sucking up
8      all the air in the courtroom.  So I told them they could bring
9      fans with them, in the meantime.
10         I didn't tell them it was hot air from the lawyers, but
11     it was tempting.  As tempted as though I was.
12             (Proceedings held in the presence of the jury.)
13         THE COURT:  You may be seated.
14         All right.  The defendants may make your opening
15     statement.  Mr. Stern.
16             MR. STERN:  Thank you, Your Honor.  Is the gizmo
17     working, Ms. Calloway?
18             THE COURTROOM DEPUTY:  Yes.
19             MR. STERN:  Thank you.
20         Good morning, members of the jury.  I hope you had a
21     good lunch.
22         His Honor just told us that he's trying to do something
23     about the air in here and state of mind.  It's a state of mind.
24     Think cool.
25         My name is Jonathan Stern, and I represent the
```

1    defendants in the case.  I'm going to use the same lingo that

2    Judge Lamberth used and that counsel used this morning.  I'm

3    going to talk about FHFA.  I'm going to talk about Fannie Mae

4    and Freddie Mac.  Sometimes I may slip into something even more

5    informal and refer to Fannie and Freddie.

6         I want to begin where counsel ended, which is to thank

7    you for the time and attention that you've paid already and

8    that we know you'll pay for the rest of the case.  Lawyers

9    watch jurors.  Jurors watch lawyers.  And I've been watching

10   you all morning, and I've been seeing you pay very close

11   attention, and I'm very grateful for that, as are my clients.

12   And my team who is sitting behind me, we together represent

13   Fannie -- FHFA, Fannie Mae and Freddie Mac.

14        I'm going to get right to it.  What will the evidence

15   show in the case?  The evidence in the case is going to show

16   you that when FHFA agreed to the third amendment -- that I'm

17   going to talk more about that in a minute -- and one of its

18   terms, the net worth sweep, FHFA was taking action to protect

19   the United States housing market.

20        FHFA was taking action to protect the United States

21   economy, and FHFA was taking action to protect the American

22   public.

23        And counsel told you I'm going to talk about the public

24   interest.  And I am.  Because you're going to learn from the

25   evidence in the case -- not the talking of the lawyers, but

1    from the evidence in the case, you're going to learn that FHFA

2    had an obligation to act in the public interest.

3         And the evidence will show you that when FHFA put the

4    public interest first, when FHFA agreed to the third amendment

5    and one of its terms, the net worth sweep, and put the public

6    interest ahead of the interests of the private shareholders,

7    that action was completely reasonable; and it was completely

8    within the reasonable expectations of the shareholders.

9         And that, members of the jury, is going to be the key to

10   this case.  Because the evidence will show you that any

11   reasonable shareholder would have expected that FHFA was going

12   to act in the public interest, even if that meant private

13   shareholders might lose money or dividends.

14        And you're going to learn that when FHFA acted as

15   conservator and agreed to the third amendment and one of its

16   terms, the net worth sweep, that action in the public interest

17   was completely in line with reasonable shareholders' reasonable

18   expectations.

19        Because you're going to learn that reasonable

20   shareholders knew that they shouldn't expect dividends because

21   not a single shareholder, not one, not a single private

22   shareholder of Fannie and Freddie had received a penny of the

23   profits of the companies.  Not a penny of dividends for years

24   before the net worth sweep ever went into effect.

25        And shareholders knew that FHFA as conservator could

1    make decisions in the public interest, even at the expense of

2    the private shareholders.

3         And let me stop right here because I keep talking about

4    the third amendment, and I know you didn't hear about that this

5    morning, which is sort of curious because the third amendment

6    is at the very center of the case.  Because what you heard

7    referred to this morning as the net worth sweep is part of a

8    broader agreement between Treasury and FHFA called the third

9    amendment, and I'm going to talk more about that later on.  But

10   you heard this morning about the PSPAs, the preferred stock

11   purchase agreements, and I'll remind you a little bit of that

12   this afternoon.

13        Those are the agreements between Treasury and FHFA.

14   Well, the initial agreement was amended several times.  There

15   was a first amendment, a second amendment, and a third

16   amendment; and the net worth sweep is a provision of the third

17   amendment.

18        But the evidence will show you, members of the jury,

19   that it wasn't the only provision of the third amendment.  And

20   we respectfully submit to you that you will learn that when you

21   have to consider whether Mr. DeMarco acted reasonably, when you

22   have to consider whether his actions were in line with

23   shareholders' reasonable contractual expectations, it will only

24   make sense to evaluate that question in the context of the

25   entire contract, the entire third amendment of which the net

1    worth sweep was only a part.

2         So I'm going to sometimes refer to the third amendment,

3    sometimes the net worth sweep, but you're going to learn, as I

4    say, that the net worth sweep was just a component, a part of

5    the agreement that was called the third amendment.

6         I just mentioned Mr. DeMarco.  You heard a lot about

7    Mr. DeMarco this morning.  He got a lot of airtime.  And I'm

8    going to talk about Mr. DeMarco too.  Mr. DeMarco, as one of

9    those slides, I think, showed, was the acting director of FHFA

10   from -- you would think I could say this acronym by now.  He

11   was the acting director of FHFA from 2009 to 2013.

12        And you're going to learn from the evidence that

13   Mr. DeMarco has a Ph.D. in economics.  You're going to learn

14   that he was a dedicated public servant for decades.  You're

15   going to learn that he served under the administrations of five

16   Presidents -- three Republicans, two Democrats -- and you'll

17   learn that he was in charge at the time of the third amendment

18   and the net worth sweep.

19        He made the key decisions, including the decision to

20   enter into that agreement.

21        You heard a lot about him, as I said, this morning.

22        The evidence is going to show what Mr. DeMarco did and

23   why he did it, but you're going to learn that, members of the

24   jury, not from a lawyer, but from Mr. DeMarco himself because

25   he's going to come testify.  He's going to sit right there.

1    He's going to look you in the eye or he's going to look me in

2    the eye, because I'm going to stand right here.  I'm going to

3    ask you questions -- I'm going to ask him questions, and he is

4    going to give answers under oath.  The other side is going to

5    get to examine him.  And you'll learn from him the enormous

6    risks and uncertainties that he faced and the enormous

7    responsibilities that he had.

8         And you'll learn from the evidence that based on what he

9    knew at the time, back in 2012, Mr. DeMarco did what he

10   believed was the right thing to do.  And, more importantly, he

11   did what he had to do to carry out the mission that the law

12   told him to carry out.

13        He wasn't pursuing some rogue policy agenda.  He was

14   doing what the law told him to do to act in the best interests

15   of the public.

16        So even -- even, members of the jury, if that didn't

17   mean putting money into the pockets of the shareholders.

18        So I'll talk to you this afternoon about FHFA and Fannie

19   Mae and Freddie Mac and what the evidence will show about the

20   actions Mr. DeMarco took to protect the economy and why he took

21   them.  And to do that, I'm going to ask you to travel back in

22   time with me, because as you heard this morning, the key events

23   in this case, the only important events happened over a decade

24   ago.

25        They started in 2008, give or take, and the key event

1    for you, of course, is the third amendment and the provision of

2    the third amendment called the net worth sweep.  And that

3    happened on August 17th, 2012.  And I'm going to try to take us

4    all back in time to that 2008-2012 period in just a few

5    minutes, but before I do, I want to talk to you a little bit

6    about Fannie Mae and Freddie Mac and about how the mortgage

7    market works.

8         I'm going to try not to repeat stuff that you heard this

9    morning, but I'm going to try to fill in some things that may

10   not have been in the presentation you heard this morning,

11   because it's so important to understand how the mortgage market

12   works; because as His Honor instructed you and as I'll mention

13   in just a minute, Fannie and Freddie were created.  The reason

14   they exist is to provide stability in that market.

15        So it's important that we all understand what it was.

16        So you've already heard His Honor refer to Fannie and

17   Freddie as government-sponsored ent- -- enterprises, and that

18   means what it says.  As you heard this morning, they're

19   companies sponsored by the government.  That makes them very

20   different from most companies, as most of you probably know,

21   because unlike most companies, they were created by the

22   United States Congress.

23        Fannie Mae was created way back in 1938, and Freddie Mac

24   was created in 1970.  And as the judge told you and as the

25   evidence will show -- and this isn't in dispute, members of the

1    jury -- Congress created the companies to serve what you've

2    heard called a public mission, and there's absolutely no

3    dispute about that.  Ms. Davis referred to that public mission.

4    And that public mission is right there in the corporate

5    charters that Congress used to create these companies.

6         Can we get that slide.  So here are the charters, and

7    this is the actual evidence you're going to see in the case.

8         The Fannie Mae charter is on the left.  The Freddie Mac

9    charter is on the right.  And you'll see that the number one

10   item, the number one item is provide stability in the secondary

11   market for residential mortgages.  And it's not an accident

12   that that's number one.  Because that is the company's public

13   mission that's so important for this case.  That public mission

14   was and is critically important to the United States economy,

15   because the evidence will show that Fannie and Freddie own or

16   guarantee more than half the mortgages in this country.

17        The evidence will show that Fannie and Freddie are the

18   critical bridge that provides money to the mortgage market that

19   allows more people to buy homes, money that makes safe and

20   affordable housing available across the country.

21        And you'll learn that this case is about what Fannie and

22   Freddie can do, what FHFA could do, and what reasonable

23   shareholders would expect them to do to serve their public

24   mission even if that might not be in the financial interest of

25   the private shareholders.

1           And you'll learn that while Fannie and Freddie are

2     private companies that Congress has said can make money for

3     their shareholders, no other company, big or small, has the

4     public mission that Congress gave to Fannie and Freddie; that

5     mission to provide stability in the mortgage market.  So I want

6     to break that down just a little bit for a few minutes.

7           You're going to learn that Fannie and Freddie are

8     critical to making a flow of money available for borrowers to

9     obtain mortgages.  You're going to learn that they've always

10    been highly regulated by the government, and shareholders also

11    knew and reasonably expected that they were going to be highly

12    regulated by the federal government and FHFA.

13          The government could and did limit how much business

14    they did, what kind of loans and mortgages they could buy, when

15    they could pay dividends to shareholders.

16          Federal law also made it clear -- and this was part of

17    the shareholder contract -- federal law also made it clear that

18    the government could take over Fannie and Freddie, and the

19    shareholders knew all of this long before that HERA law -- that

20    you heard about this morning that I'll come back to -- and long

21    before the conservatorship.  They were always terms of the

22    shareholders' contract with the companies.

23          And the evidence will show that during the financial

24    crisis, when the companies were struggling, and struggling

25    desperately, Congress authorized FHFA to serve as conservator

1      and to manage the companies in the public interest to serve

2      that public interest.

3            So how did this work?  What do Fannie and Freddie do?

4      Well, Fannie and Freddie aren't banks.  You can't walk downtown

5      to their offices and walk in and apply for a loan.  They

6      support the mortgage market.

7            And, just briefly, you may hear a distinction in the

8      testimony between the primary mortgage market and the secondary

9      mortgage market.  And the primary mortgage market, as some of

10     you know, refers to borrowers looking for mortgages or loans so

11     they can buy a home.  And the goal of Congress when it created

12     Fannie and Freddie was to get more people access to loans so

13     that they could afford housing.

14           So that -- we all know how the primary mortgage market

15     works.  A borrower goes to a bank and borrows money to buy a

16     home.  They put some -- the borrower will put some portion of

17     the purchase price down as a down payment, and then there will

18     be monthly interest payments.

19           So there's also something called the secondary mortgage

20     market.  And that's where Fannie and Freddie come in.  And let

21     me try to break that down for you.

22           So this is the -- go back to the primary for just a

23     minute.

24           That's the primary mortgage market.  The borrower goes

25     in.  They get their loan.  They put down 40 grand.  They --

1    they borrow another 160,000, and they buy the house with the

2    200,000.

3         So let's go to the secondary mortgage market.  So this

4    is what Judge Lamberth referred to in his instruction when he

5    talked about providing stability and liquidity in the secondary

6    mortgage market for residential mortgages, because to keep that

7    money flowing and make it easier for borrowers to get

8    mortgages, what happens is that Fannie and Freddie buy -- I

9    can't even read this.

10        Go to the next slide.

11        So Fannie and Freddie go to the bank, and they buy a

12   mortgage from the bank.  So the bank has the mortgage with

13   the borrower.  Fannie and Freddie buy the mortgage.  And

14   the evidence will show that the main business of Fannie and

15   Freddie is to do what's called securitize the mortgages and

16   sell the securities to investors, and I'm going to break that

17   down.

18        Securitizing the mortgages means combining lots of

19   individual mortgages that are bought from the banks.  And

20   remember, the banks are selling mortgages to Fannie and

21   Freddie, Fannie and Freddie are accumulating them, and then

22   they securitize them.

23        That package of mortgages is called a security, and that

24   package of mortgages, that bundle of mortgages, is called a

25   mortgage-backed security.  So you heard reference this morning

1   to MBS.  That's mortgage-backed security.  So now we've got the

2   money from Fannie and Freddie to the bank.  They buy the

3   mortgages.  Fannie and Freddie has the mortgages.  They put

4   them in that package.  That's the security that's mortgaged

5   backed.  So what happens now?

6       What happens now is Fannie and Freddie sell the

7   securities to investors.  And you heard those people referred

8   to this morning as mortgage-backed securities investors, or MBS

9   investors.  And I want to be really clear, this can be

10  complicated, MBS investors, the people that buy these bundles

11  of securities, they are not the shareholders of Fannie Mae and

12  Freddie Mac.  That's a completely different set of players.

13      The shareholders are the people who own shares in Fannie

14  and Freddie, the mortgage-backed securities investors are the

15  people who buy the mortgage-backed securities from Fannie and

16  Freddie.

17      So what do those mortgage-backed securities investors

18  get, those MBS investors?  They get a steady stream of

19  payments, because, remember, this all started with a borrower

20  and a homeowner.  The homeowner is making a monthly payment,

21  but when the bank sells the mortgage to Fannie and Freddie, and

22  then Fannie and Freddie sells the securities to the investors,

23  that income stream -- that monthly payment that starts with the

24  borrower, that income stream goes into the hands of the

25  investors of the mortgage-backed securities.

1          So if you're an investor, or at least a portion of it --
2    if you're an investor in a mortgage-backed security, every
3    month you get a portion of that monthly payment.
4          Investors get that monthly payment out of what the
5    homeowner is paying, and there's something very special about
6    these mortgage-backed securities that's very important for this
7    case.  Because when the investors buy those mortgage-backed
8    securities -- you see it up on the slide -- if the homeowner
9    can't make the payment, the mortgage-backed security investor
10   still gets paid because they have a special guaranty from
11   Fannie and Freddie.
12         And that guaranty guarantees, again, that the
13   mortgage-backed security investor gets paid even if the
14   borrower doesn't make a mortgage payment.  You see that
15   guaranty on the bottom right.
16         So let's see how that works.  Can we get the -- is this
17   the guaranty slide?  Okay.
18         The borrower is supposed to pay $200, let's say, and
19   Fannie and Freddie -- the bank sells that mortgage, and now
20   Fannie and Freddie are supposed to be getting the 200.  They
21   package five of those together into mortgage-backed security,
22   and now some investor every month is going to get five -- it's
23   five times $200, a thousand dollars.  But that only works so
24   long as the homeowner is actually making the payments.  But
25   what if the homeowner doesn't make a payment?

1          The investor still gets the money because it has a

2   guaranty from Fannie and Freddie that the investors will

3   get the full amount.  So even if the homeowner doesn't pay,

4   Fannie and Freddie say to the mortgage-backed securities

5   investor, don't worry; we'll make it up.  And that is going to

6   be a very important part of the case, and I'm going to come

7   back to it.

8          So now I want to talk to you about the plaintiffs in the

9   case.  The plaintiffs are shareholders in Fannie and Freddie.

10  They bought stock in Fannie and Freddie.  And what you heard

11  this morning, what you probably already know, is that what it

12  means to own a share of stock in a company is that you own a

13  little piece of that company.  So when the plaintiffs bought

14  stock in Fannie and Freddie, they became part owners of the

15  company.

16         And, again, they are different from the mortgage-backed

17  securities investors.  So you can think of the shareholders --

18  let's think of Ford.  The shareholders are people who own stock

19  in Ford.  They are part owners of Ford.  The MBS investors are

20  like the people who buy Ford's products.  So if you buy a Ford

21  truck, you're buying the product.  If you are a shareholder in

22  Ford, you're a part owner of Ford.

23         If you're a shareholder in Fannie and Freddie, you're a

24  part owner.  If you're an MBS investor, you buy something from

25  Fannie and Freddie; namely, that mortgage-backed security.

```
1              And there's a fact that's really critical about this
2     case, about being a shareholder.  Because the evidence will
3     show you that shares of stock in a company are governed or
4     controlled by a contract.  A contract.  And whenever a
5     shareholder buys a share of stock in Fannie or Freddie, they
6     enter into a contract with Fannie and Freddie, and that
7     contract is what the whole case is about.
8              Because when a shareholder buys a share of stock in
9     Fannie or Freddie, that shareholder agrees to all of the terms
10    of that contract.  So I'm going to use Fannie Mae as an example
11    for a minute.  When a person or a company like an insurance
12    company buys a share of stock in Fannie Mae, they become a
13    party to an agreement with Fannie Mae.  And party is just a
14    legal word for someone.
15             And that is a special kind of contract, a different kind
16    of contract, to the extent that it was suggested this morning
17    that all contracts are alike, they're not.  Because this
18    contract is different from the kind of contract that you might
19    be familiar with or you might be in yourself.
20             Because these are contracts that the shareholders are
21    automatically parties to just by buying the share of stock even
22    though they didn't negotiate the contract.  So it's not like
23    you walk into the car dealership and you offer a certain amount
24    of money, and they say no.  And you go back and forth.  And you
25    reach an agreement.
```

 1          There's no negotiation with shares of Fannie and Freddie

 2   stock.  If you buy the share of stock, you are agreeing to all

 3   of the terms that come with it.  And if you don't want those

 4   terms, you don't buy the share of stock.  But you don't get to

 5   negotiate them with Fannie and Freddie.

 6          And that -- the other thing -- another thing that's

 7   different about that contract, members of the jury, is it's not

 8   just governed by what's in the stock certificate, the document

 9   that actually transfers the share to the shareholder.

10          It includes other things.  It includes federal laws that

11   relate to that contract, and there won't be any dispute in this

12   case that as the law changes, the terms of the contract change.

13   That's how it works.  And that's another difference between

14   these contracts and other kinds of contracts; the terms of the

15   contract change over time, as the law changes, and as other

16   aspects of the world change.  And His Honor will tell you more

17   about that in his final instructions.

18          And the evidence is going to show, and His Honor is

19   going to instruct you, that the terms of that changing contract

20   that matter are the ones that existed on December 24th, 2009.

21   And that is a very, very important date in the case.

22          I'm going to say it again.  December 24th, 2009.

23          Because I can agree with a few things that I heard this

24   morning.  One I definitely agree with is timing is everything.

25   And December 24th, 2009, is critical because that is the date

1    that we use to measure the shareholders' reasonable

2    expectations.

3         So if you hear something about what a shareholder might

4    have learned in 2010 or '11 or '12 or 2013 -- we even heard

5    about 2019 and 2021 today -- that doesn't count for the

6    shareholders' reasonable expectations.  All that counts are the

7    reasonable expectations of the shareholder as of December 24th,

8    2009.

9         So what do you get when you buy a share of stock?  You

10   own a little piece of that company.  And what can you do with

11   it?  Whatever you want.  You can hold it.  You can sell it.

12   You can trade it.  You can buy low, sell high.  If you're not

13   so fortunate, you might buy high, sell low.  You can trade the

14   shares.  The price may go up.  The price may go down.  The

15   company may do well.  The company may not do well.  You heard

16   that this morning from Ms. Davis.

17        Shareholders -- there's no dispute about this.

18   Shareholders never know for sure when they buy a share of stock

19   what's going to happen to it.  And it remains up to the

20   shareholder to buy or hold or sell.

21        And the evidence will show, members of the jury -- and

22   this may have gotten lost in this morning's presentation --

23   that the share -- the plaintiffs' shareholders in this case,

24   both before the third amendment and net worth sweep and after

25   the third amendment and the net worth sweep, had the right and

1   ability to do all of those things.  They could buy.  They

2   could sell.  They could hold before the third amendment and

3   after.

4        And I want to say another thing right now about owning a

5   share of stock, generally, in Fannie and Freddie in particular.

6   So dividends.  You heard about dividends this morning, and they

7   were described to you -- and this is generally accurate -- as a

8   share of the profits in the company.

9        And paying dividends is how some companies, if and when

10  they choose, share their profits with their shareholders.  And

11  to be clear, you will learn that Fannie Mae private

12  shareholders, and Freddie Mac private shareholders, the

13  plaintiffs in this case, didn't have an absolute right to a

14  dividend.  They never had an absolute right to a dividend,

15  because you'll recall that I told you that the evidence will

16  show that the shareholders' stock ownership was governed by a

17  contract.  I'll call it the shareholder contract.  There's no

18  dispute about that.

19       And the evidence will also show you that nothing in the

20  contract as of December 24th, 2009, the date that counts, gave

21  Fannie and Freddie private shareholders an absolute right to a

22  dividend.  And that's not unusual because you're going to

23  learn, you probably -- some of you may know this already, that

24  most shareholder contracts don't require the company to issue

25  dividends to their shareholders, even when things are going

1   well, even when they're making a profit, because under those

2   shareholder contracts, the company gets to decide.  Even if the

3   company is making a lot of money, whether to share that money

4   with the shareholders in the form of a dividend, and, if so,

5   how much, because a private company could be making a huge

6   profit.  They can decide to issue a dividend if they want, but

7   they can also decide to take that profit and put it back in the

8   business.  They can take that profit and buy a new plant or a

9   new truck or a new something else.  It's up to the company

10  whether and when to issue a dividend.

11       And, most importantly, shareholders know that going in.

12  And the evidence will show you that based on the terms of the

13  shareholders' contracts in this case, the plaintiff

14  shareholders of Fannie Mae and Freddie Mac knew all along,

15  long, long before the third amendment and the net worth sweep

16  that they didn't have an absolute right to a dividend.

17       They knew that it was completely up to Fannie and

18  Freddie whether to issue a dividend.  Their reasonable

19  contractual expectation was that it would be up to Fannie and

20  Freddie whether to share the profits with them in the form of a

21  dividend.

22       It was right there in that contract -- and, remember,

23  they agreed to that contract just by buying the share of stock.

24       So let's take a look.

25       Here is the stock certificate.  Now, this is long before

1    2012.  This is when the stock gets issued -- this particular

2    share of stock or series of stock was issued on May 13th, 2008.

3    Companies periodically issue shares of stock.  And when

4    people -- some people actually buy the share when it's issued,

5    but most people buy shares on the stock exchange.  So somebody

6    buys the share initially, and then it starts trading on the

7    stock exchange and that's what makes for the stock market.

8         So -- but here's the original shareholder contract:

9    Holders of Series T preferred stock -- that's a type of

10   Fannie Mae stock that the private shareholders here had, or

11   some of them did -- will be entitled to receive, ratably -- at

12   a certain right -- when, as, and if declared by the board of

13   directors, in its sole discretion.  So I'm buying this stock,

14   either from the jump and getting this certificate, or I buy it

15   on the stock market and I automatically become a party to this

16   certificate.

17        And I know and my reasonable contractual expectation

18   would be that I'm only going to get a dividend if declared by

19   the board of directors in its sole discretion.  And just to

20   break that down, that's just more lawyers writing contract kind

21   of language for totally up to them; right?  They get to decide

22   when, as, and if to issue a dividend.  This is a term of the

23   contract.

24        So when we're talking about what's fair and what's in

25   the contract and what's fair dealing and what you can expect,

1   well, you can expect that you are going to be bound by the

2   terms of the contract you're a party to.  And this contract

3   says, you know, no dividend unless the board of directors in

4   its sole discretion decides to issue one.

5       So now I'll take us back in time.  So as you've heard,

6   this case is about events that that happened over a decade ago

7   and that's the evidence you'll hear.  So let's go back to 2007,

8   15 years ago, when I was 19 years old.  I'd like to take us all

9   back and talk about what was going on all across the country

10  back then.  Because what the evidence is going to show you is

11  that by late 2007, as some of you may remember, banks and other

12  financial institutions in this country had begun losing

13  hundreds of billions of dollars.  And by the summer of 2008,

14  millions of people are losing their jobs.  Businesses are

15  failing left and right.

16      Not just small businesses, but giant companies that

17  played a big role in the economy.  Some of you may remember

18  some of these names:  Lehman Brothers, that's not on there;

19  Bear Stearns; Merrill Lynch.  You may remember some of these

20  names.  These are big financial institutions.  Some of them

21  survived, actually, some of them didn't, and the evidence will

22  show you that by the end of July 2008, banks had lost hundreds

23  of billions of dollars.  That's billions with a B.

24      The stock market and the people and institutions who

25  bought stocks were getting crushed.  And you'll learn, and you

1    might imagine this or know it, the reasons behind the financial

2    crisis were really complicated.  Experts have written entire

3    books trying to explain how the economy got to that point in

4    2008 where there was a very real risk that the entire economy

5    could collapse.

6          But one thing is clear.  The experts agree pretty much

7    on this.  And that is that one of the big causes of the

8    financial crisis had to do with the mortgage market that we've

9    been talking about and the housing market.  Because you'll

10   learn that housing prices had peaked in 2006.  Now, I think --

11   I can't remember whether -- Ms. Davis put up a couple of graphs

12   and one of them may have had this on it, but home price index,

13   and that's what we're talking about.

14         It had peaked in 2006, and then those prices went down

15   farther and faster than anyone had expected.  And as a result,

16   a huge number of people who bought homes in the early 2000s had

17   mortgages that were now underwater.  You may be familiar with

18   that term.  I hope not personally.  That means that people owed

19   more on their mortgage than the house was worth.

20         So that created massive problems for banks and other

21   institutions that owned the mortgages, because now the banks

22   hold these mortgages, but people can't make their mortgage

23   payments, and the house that secures the mortgage isn't even

24   worth what's left to pay on the mortgage.

25         Most of all, it created terrible problems for the people

1   who were stuck in those mortgages, many of whom lost their jobs

2   and their incomes and sometimes even their homes.

3        And you'll learn that the situation also created a huge,

4   huge problem for Fannie and Freddie, because, remember, Fannie

5   and Freddie are in the business of guaranteeing those

6   mortgage-backed securities.  Fannie and Freddie had to continue

7   paying those MBS investors even though Fannie and Freddie

8   weren't getting the mortgage payments anymore because the

9   homeowners had had to default.

10       And you'll learn that in 2008 alone -- excuse me -- that

11   one single year, Fannie and Freddie together lost close to a

12   hundred billion dollars.  That is a staggering amount of money,

13   and the evidence will show you that things were getting worse.

14   The economy and the housing market continued to tumble down,

15   and you'll learn that it was so bad that people were afraid

16   Fannie and Freddie might go under.

17       And why were people afraid?

18       Can we get 10.

19       So people were afraid -- and counsel said I was going to

20   talk about this, and I am.  Because people were afraid that if

21   MBS investors were worried about this guaranty, that they would

22   lose confidence and they would stop buying the mortgage-backed

23   securities; because these MBS investors are buying these

24   securities because they know they're going to get this stream

25   of payments even if the homeowner can't pay because they know

1      Fannie and Freddie's guaranty is standing behind that

2      investment.  But if they become concerned about that guaranty,

3      because they see Fannie and Freddie losing billions and

4      billions of dollars, they will lose confidence.  And if they

5      lose confidence, then they will stop buying those

6      mortgage-backed securities from Fannie and Freddie.

7              And then Fannie and Freddie would stop buying the

8      mortgages from the banks because they have no one to sell them

9      to.

10             If there's no one that's going to buy the mortgages from

11     Fannie and Freddie, they're going to stop buying them from the

12     banks.

13             And if Fannie and Freddie stop buying mortgages from the

14     banks, the money stops flowing to the banks, and it isn't

15     available for banks to lend to borrowers, and people will worry

16     that if that happened, the mortgage market would likely freeze

17     up, and that would have ripple effects all across the economy.

18     And you see it here, and that -- the term at the top is a term

19     that people sometimes use to describe this problem.  You see it

20     says systemic risk, and that means what it sounds like.

21             It's a risk to the system.  It's not just a risk to an

22     individual mortgage-backed securities investor.  It's not just

23     a risk to an individual homeowner.  It's not just a risk to an

24     individual bank.  It's not just a risk to the housing market.

25     It's a risk to the entire system if this happens.

1           So there we see Fannie and Freddie can't buy.

2    mortgage- -- MBS investors lose confidence, Fannie and Freddie

3    can't buy mortgages, banks have less money to loan, people are

4    unable to get a mortgage loan, fewer people are able to buy a

5    home.  And the whole reason Fannie and Freddie exist is to make

6    sure this doesn't happen.

7           The whole reason Fannie and Freddie exist is to provide

8    stability in this market, and their ability to do that was

9    being threatened by what was going on in the economy.

10          And if that systemic risk happened and banks got stuck

11   with the mortgages that weren't getting paid, that put the

12   banks in trouble.  It's not just a threat for the banks.  It's

13   a threat to the entire economy, because if the housing market

14   collapses, that would have catastrophic, disastrous

15   consequences for the entire economy.

16          So the -- you're going to hear expert testimony in this

17   case, and you're going to hear other evidence, and that

18   evidence is going to show you what this systemic risk was all

19   about and why it was such a danger.

20          And the evidence will show you that by 2008, the

21   situation had gotten so bad, so critical, that the federal

22   government had to step in.  The federal government had to step

23   in to save Fannie and Freddie, to save the housing market, to

24   protect the economy.

25          So what needed to happen for the federal government to

1   step in?  Congress had to pass a law, and that's what they did.

2   Congress passed a law and the President signed it on July 30th

3   of 2008.

4        And that law, you heard about it this morning.  It was

5   called the Housing and Economic Recovery Act of 2008.  And

6   that's the last time I'm going to say all those words.  I'm

7   going to call it HERA.  And the connection between the housing

8   market and the economy is right there in the title.  Congress

9   passed this law knowing that recovery was about the housing

10  market and the economy.  The Housing and Economic Recovery Act

11  of 2008.

12       Because Congress knew that economic recovery depended on

13  the government supporting the housing market.

14       So this is HERA.  HERA did a lot of things, and one of

15  the most important things it did was to create FHFA, one of my

16  clients here in this case.

17       And through HERA, Congress and the President gave FHFA

18  the job of making sure that Fannie and Freddie continued to

19  fulfill its public mission; that public mission of providing

20  stability in the secondary mortgage market.

21       Because, once again -- I'll beat this drum -- the whole

22  reason that Congress created Fannie and Freddie in the first

23  place was not to get profits to private shareholders.  The

24  reason they were created, the reason they were supported by the

25  government, the reason they were sponsored by the government,

1   government-sponsored enterprise was to promote access to home

2   mortgages -- to promote access to home mortgages by providing

3   stability in the secondary mortgage market.

4        So in order for Fannie and Freddie and FHFA to do that,

5   HERA gave FHFA and its director some very significant powers,

6   and one of those powers is extremely important to the issues

7   that you're going to be asked to decide in this case, and that

8   was the power to put Fannie and Freddie into something called

9   conservatorship.

10       And, again, sort of a drag to go twice sometimes.  I'm

11  going to try not to repeat everything that you heard this

12  morning, but I want to make sure that we've explored this

13  fully.

14       So I'm going to tell you a little more about what that

15  means in this case.

16       So someone -- when we were doing our *voir dire* process,

17  you remember you came in here and some of you were asked

18  separate questions.

19       There was a question about conservatorship, and somebody

20  mentioned Britney Spears, because that's sort of the first

21  thing a lot of people think of when they think of a

22  conservatorship, but that's not what we're talking about here.

23  This isn't someone taking charge of an individual person's

24  financial affairs.  This type of conservatorship is really an

25  authorization.  It's an authorization here for FHFA to manage

1    and run the business of Fannie and Freddie, to take them over;

2    but they didn't take them over to manage them, to get the best

3    deal for the private plaintiff shareholders.  They didn't take

4    them over to manage them, to get profits in the form of

5    dividends to private plaintiff shareholders.

6        They took them over to manage them in the public

7    interest, to fulfill their public interest, even if that was at

8    the expense of the private shareholders.

9        So you heard this morning -- and this is right -- that

10   the first person to be the director of FHFA after it was

11   created by HERA in July of 2008 is a man named James Lockhart.

12   You heard him referred to this morning.  You're going to hear

13   testimony from Mr. Lockhart.  And as counsel explained, clearly

14   and helpfully this morning, that will be the kind of testimony

15   you're going to get by video as opposed to the kind you're

16   going to get, like, from Mr. DeMarco and other witnesses on

17   both sides, who are going to sit in the chair and appear before

18   you live.  So -- but as counsel said, the testimony under oath

19   on the video, just as good as the testimony that you're going

20   to hear in court -- or it's up to you decide to decide whether

21   it's just as good.  They're both under oath.

22       And you're going to learn that when he became the first

23   director of FHFA in 2008, Mr. Lockhart, of course, knew that

24   things were bad, and he knew they were getting worse.  He knew

25   they were getting worse for Fannie.  He knew they were getting

1   worse for Freddie.  He knew they were getting worse for the

2   housing market, and he knew what the implications of that, the

3   consequences of that, could be for the entire United States

4   economy.

5        So Fannie and Freddie and Mr. Lockhart -- and Mr.

6   Lockhart is now FHFA.  And FHFA is the conservator.  So Fannie

7   and Freddie and Mr. Lockhart/FHFA/conservator are watching the

8   situation very closely in July and August of 2008.

9        And from his job overseeing and managing Fannie and

10  Freddie, Mr. Lockhart saw firsthand that they were in trouble.

11  And that was not a secret, and there's really not any dispute

12  about that.

13       By the end of 2008, everybody you hear from is going to

14  agree that Fannie and Freddie were insolvent.  And what that

15  means is that they both had what accountants and economists

16  call negative net worth.  I kind of like that slide we saw this

17  morning.  We had the green minus the red and then the line and

18  then what's underneath it.  So if you've got green and red and

19  you got green on the bottom, you have net worth.  And I just

20  want to add one thing about that slide.

21       You have positive net worth, whether you've got a dollar

22  of green or a trillion dollars of green.  It's just all about

23  being green below that line.  But if you're red below that

24  line, then you've got negative net worth and you're insolvent.

25  And if that sounds bad, it's because it is; because the

1    evidence will show that as we saw in the slide, negative net

2    worth means that the company's liabilities were more than their

3    assets.  In a nut shell, they were in the red.

4         But not just in the red.  The evidence will show you

5    that Fannie and Freddie were getting close to being on the

6    verge of collapse.  And all the money that you heard this

7    morning, the shareholders had invested in Fannie and Freddie in

8    good times, you saw that 33.2 billion on one of those slides,

9    that 33.2 billion was already used up by the time we got to

10   August of 2008.

11        Counsel said that shareholders supplied funding for

12   Fannie Mae and Freddie Mac and took risks, and counsel was

13   right.  Shareholders did take a risk, and things got so bad

14   that the money that they had put into Fannie and Freddie was

15   used up by the end of 2008.  It was completely gone by the end

16   of 2008, four years -- four years before the third amendment

17   and the net worth sweep ever happened.

18        And, again, timing is everything.  That investment was

19   gone in 2008, and that had absolutely nothing to do with the

20   third amendment and the net worth sweep, which happened

21   four years later.

22        That investment was gone, not because of the net worth

23   sweep, but because the economy was collapsing and because of

24   the financial crisis.  And the evidence will show you that

25   without the support that they ended up getting from Treasury,

1    without the support that they ended up getting from the federal

2    government, Fannie and Freddie would have gone under.

3         So as I said, under HERA, the director of FHFA had that

4    authorization, was legally authorized, to put Fannie and

5    Freddie into conservatorship, and just a little over a month

6    later, that's exactly what Mr. Lockhart did.  Because on

7    September 6th, 2008, Mr. Lockhart, as director of FHFA, put

8    Fannie and Freddie into conservatorship.  And why did he do

9    that?  You're going to learn why he did that from the evidence.

10   Not from a lawyer's speech; from the evidence.

11        And let's look at his written public decision.  I'm

12   going to have to get a little closer to that.  He, on

13   September 6th -- you have screens too.  Good.  Decision of the

14   director of the Federal Housing Finance Agency -- that's

15   Mr. Lockhart -- to appoint a conservator.  And it states the

16   grounds for his determination that a conservator should be

17   appointed.  He ends up appointing himself, but that's how it's

18   supposed to work.  And here's what he finds.  He says:  I adopt

19   the factual findings and determinations in this memo.  And he

20   says:  The enterprise -- and he's referring to both

21   companies -- is an unsafe or unsound condition to transact

22   business.  The enterprise is unlike -- is likely to be unable

23   to pay its obligations or meet the demands of its creditors in

24   the normal course of business.  The enterprise's unsafe,

25   unsound practices or conditions are likely to cause insolvency

1    and weaken the conditions of the enterprise.

2         So the short version of this is Mr. Lockhart is making a

3    legal determination that the enterprises are unsafe and

4    unsound, and their ability to fulfill the public mission is in

5    trouble.

6         So he is going to appoint FHFA as conservator.

7         So, again, what does it mean to become the conservator?

8    I told you that it means the conservator manages and runs the

9    business.  Well, more specifically, as director of FHFA and

10   conservator, Mr. Lockhart assumed all the powers of Freddie and

11   Fannie's corporate management and their boards of directors.

12   He got the power under this law to run Fannie and Freddie's

13   business.  And at the same time, FHFA got another very

14   important power, but it came with a very important

15   responsibility.

16        And that important responsibility is another one of the

17   very important features of the evidence that you're going to

18   hear in this case.  Because HERA, that law, made crystal clear

19   that when FHFA became conservator, FHFA was specifically

20   authorized by federal law to act in the best interests of the

21   public.

22        And you will decide based on the evidence and the

23   instructions how to evaluate that, but I'm going to

24   respectfully differ with what counsel said this morning.

25   Because, in fact, FHFA is completely authorized to take any

1        action in the public interest that's reasonable.

2                And as I'll get to in a few moments, you're going to

3        learn from the evidence that what FHFA did was completely

4        reasonable.  Any action in the public interest that's -- that's

5        reasonable.  It doesn't have to serve the interests of the

6        private shareholders.

7                So that authorization to act in the best interests of

8        the public was also clear that that meant that FHFA and Fannie

9        and Freddie didn't have to look out for the interests of the

10       shareholders.  They got the power and responsibility to put the

11       public first.  And what was in the public interest was to keep

12       the secondary mortgage market going; to keep the money flowing

13       to borrowers.

14               So do we have a slide?

15               So this is a quote from HERA on -- on the bottom.  So

16       the bullets are just a summary, and you're going to have a

17       chance to look at HERA itself.  You don't have to take my word

18       for it, you don't have to take the slide's word for it, but I

19       respectfully submit to you this is what the evidence will show.

20       HERA created FHFA; tasked FHFA with ensuring that Fannie and

21       Freddie operate in a safe and sound manner to keep the

22       secondary mortgage market going; authorized FHFA to place it in

23       conservatorship.

24               So here's the quote.  This comes directly from the law.

25       "The Agency may, as conservator . . . take any

1    action . . . which the Agency determines is in the best

2    interests of the regulated entity or the Agency."  And there

3    won't be any dispute, members of the jury, that that means that

4    as conservator, FHFA can take any action that's beneficial to

5    FHFA and, by extension, the public it serves.

6         So that's the reference to the public interest.  There

7    won't be any dispute about that.  That is the law.

8         So if FHFA decides that an action is in the best

9    interests of the public, then they can take that action even if

10   it's not in the best interests of even Fannie Mae or

11   Freddie Mac or the shareholders if it is in the best interest

12   of the public.

13        So you'll remember that I told you that the evidence

14   will show that when the shareholder buys the stock, they're

15   entering into the contract with the subject of the case.  And I

16   also said, and His Honor said, and His Honor will say again,

17   that federal law becomes part of the shareholder contract.

18        So this law actually became one of the terms in the

19   contract between the shareholders and Fannie and Freddie.

20        That means that once FHFA took over as conservator, the

21   shareholders were in an agreement with Fannie and Freddie, that

22   told those shareholders that FHFA had taken over the companies

23   because they were in serious financial trouble.  It also told

24   the shareholders that they were in agreement that told them

25   that in running the companies, FHFA had the full power -- the

 1    full power -- to act in the public interest and not just in the

 2    shareholders' interest.

 3         And how else will you -- are you going to know that

 4    shareholders knew that they had a reasonable contractual

 5    expectation before December 24th, 2009; that FHFA had the power

 6    and responsibility to put the best interests of the public

 7    ahead of the financial interests of the shareholders, ahead of

 8    the interests of the shareholders in getting profits?  You're

 9    going to know that from Fannie and Freddie's public filings

10    with the Securities and Exchange Commission.  So I'm going call

11    these the SEC filings.  I want to digress for a moment to talk

12    about what they are.

13         So you see at the top, it says:  Fannie Mae and

14    Freddie Mac 10-Qs.  And I apologize.  I think some people may

15    know this from their common knowledge, but you're going to

16    decide this case based on the evidence, so I'm going to talk

17    about the evidence.

18         So this is a securities filing for Fannie Mae.  The Q

19    means that it's a quarterly filing.  And the evidence will show

20    that Fannie Mae and Freddie Mac each made a quarterly filing

21    which had a Q, and they also made an annual filing, and those

22    annual filings are called 10-Ks.  And we're going to see those

23    as well.

24         So these are filings that Fannie and Freddie made to the

25    United States Securities and Exchange Commission, and I'm just

1    going to go with SEC starting now -- that Washington thing

2    again.  Without getting into too much detail, as some of you

3    may know, the SEC is the government agency that regulates a lot

4    of things having to do with the stock market and publicly

5    traded companies.

6         So when -- companies in which people can buy stock.  And

7    those publicly traded companies are required to make reports to

8    the SEC to say what's going on in their company.  These reports

9    are completely public, and they're really important, and they

10   are taken very, very seriously.

11        It is how the company keeps track for itself, reports to

12   the Securities and Exchange Commission, and notifies the public

13   about what's going on in the company.

14        And because they're taken so seriously, there are laws

15   that say if a company makes one of these filings, it has to be

16   signed by a human senior executive at the company.  They can't

17   just sign Fannie Mae and pretend there's somebody named that.

18   An actual person has to sign this thing, put their name and

19   themselves literally on the line.  Because if what that senior

20   executive says in the filing is wrong and they know it's wrong

21   and it's important, all sorts of bad things can happen to them,

22   including getting prosecuted and maybe even going to jail.

23        So when a company puts something in one of these

24   filings, you can take it to the bank, no pun intended, it's

25   something that the company takes very, very seriously.

```
 1              So what do these securities filings say?  These are

 2      again, the Qs -- the third-quarter Qs.

 3              Let's see if I have a print copy.  What number is that?

 4      19?

 5              So these are the Qs from the third quarter of 2008.

 6      So what does that mean?  Why does it say -- these are

 7      November 10, November 14.  That's the date of the filing;

 8      right?  So there's four quarters in the year.  Talk about

 9      math-challenged.  So the third quarter ends September 30th --

10      yeah, the third quarter ends September 30th.  So this is the

11      report of Fannie Mae on November 10th, the report of

12      Freddie Mac on November 14th, about what had gone on in the

13      company for the third quarter.

14              So what does it say about conservatorship?  It says --

15      actually -- yeah.  We have these charts in the -- it's

16      essentially the same chart for Fannie and Freddie.  And,

17      members of the jury, we respectfully submit to you, this is a

18      key piece of evidence in the case.  So let's remember Fannie

19      and Freddie, Q3 2008 SEC filings.

20              Topic:  Managing for the benefit of shareholders.

21              Before conservatorship.

22              Got the public mission.  But it's also got, along with

23      the public mission, maximize shareholder value over the long

24      term.  That's before September of 2008.  We are four years

25      before the third amendment and the net worth sweep during
```

 1    conservatorship.  And you can read that as after September 7th,

 2    2008.  What does it say?  No longer managed with a strategy to

 3    maximum common shareholder returns.

 4         No longer managed with a strategy to maximize common

 5    shareholder returns.  So it's saying to everyone, to every

 6    shareholder, to every reasonable shareholder, speaking to the

 7    reasonable contractual expectations of that shareholder, in

 8    conservatorship, the companies are no longer managed with a

 9    strategy to maximize returns.

10         Now the companies are being managed solely to fulfill

11    the public mission.

12         So the chart -- that's a different one.  I'll come back

13    to that one.

14         There are also SEC filings that said -- that made

15    clear --

16         Let's see 18.  Can we get 18.

17         So same quarter.  This would tell everyone -- the topic

18    is authority of board of directors, management of stockholders.

19    Before conservatorship, the board of Fannie and Freddie has

20    powers, stockholders have specified voting rights; but after

21    September 6th, 2008, FHFA is conservator, has all of the power

22    and authority of the board.  Stockholders have no voting

23    rights.  So this informs the reasonable contractual

24    expectations of the shareholders.

25         So you're also going to hear from Mr. Lockhart.  He's

1    going tell you in his deposition testimony that the most

2    important thing -- and he's to say this point blank -- the most

3    important thing for FHFA to do wasn't to make profits for

4    shareholders.  The most important thing for FHFA to do as

5    conservator was to keep the money flowing so the borrowers can

6    get mortgages.

7          The most important thing for FHFA to do was to act to

8    make sure that Fannie and Freddie fulfill their public mission.

9          Then you'll remember that even before conservatorship,

10   Fannie and Freddie had that public mission.  It was right in

11   their charters.  But when FHFA became conservator, fulfilling

12   that public mission became the goal of the conservatorship.

13   Because Congress, through HERA, told FHFA and everyone else,

14   that now that you're the conservator, you can and you must run

15   Fannie and Freddie in the best interest of the public who rely

16   on the secondary mortgage market.

17         And another point, members of the jury, about HERA and

18   conservatorship that's going to be important when I talk about

19   the plaintiffs' legal claim, HERA was not a secret.  The

20   conservatorship was not a secret.  The power and responsibility

21   of the conservator to act in the public interest was not a

22   secret, not even close, because that change in the law became

23   part of the contract.

24         And you'll also learn that Mr. Lockhart, when he became

25   conservator, he hit the ground running on September 6th.  And

1    he put out a press release with a public statement telling the

2    public, including all the shareholders of Fannie and Freddie

3    stock, what the conservatorship was about.

4          Do we have that?

5          And here's what he says -- one of the things -- he says:

6    The goal of these actions is to help restore confidence in

7    Fannie and Freddie, enhance their capabilities, fulfill their

8    mission, and mitigate the systemic risk -- there's that

9    phrase -- that has contributed directly to the instability in

10   the current market.

11         And what does he tell everyone?  He says:  In order to

12   conserve over 2 billion in capital, the common stock and the

13   preferred stock dividends will be eliminated.  Eliminated.

14         Director Lockhart on September 7th, 2008, eliminated all

15   dividends.  He eliminated all distributions of any profit to

16   the -- from the company to the shareholders on September 7th,

17   2008.

18         And I'm going to ask you, members of the jury, to keep

19   your eye on the ball because timing is, indeed, everything.

20         That says September 7th, 2008.  It's not August 17th,

21   2012.  It doesn't say that the third amendment eliminated the

22   dividends on that date.  It doesn't say that the net worth

23   sweep eliminated the dividends.

24         Under HERA, under the power that he had from Congress,

25   Director Lockhart eliminated all dividends back in 2008,

1    four years before the net worth sweep ever happened.

2          Because you'll remember that they made those filings,

3    and let me -- bear with me one second.

4          Let's get the -- I think Slide 22.  The SEC filing.

5          Okay.  So here's the SEC filing that says what

6    Mr. Lockhart had said.  So this is the 2008 10-K.  It's

7    dated 2009, but it's about the things that happened in 2008,

8    and it tells the world, including the private shareholders of

9    Fannie and Freddie, your dividends are gone.  They're

10   eliminated.  No more profits from the company, because in

11   conservatorship, we're not about your profits.  We're sorry

12   about that.  But we're not about your profits.  We're about the

13   public interest.

14         So those dividends had been eliminated as of 2008, and

15   everybody knew it.  Everybody knew it when it happened, and

16   then it's announced publicly again in these SEC filings.  So

17   that means if you're a Fannie and Freddie share- -- well, let

18   me go back to one other thing.

19         Can we get Slide 22.

20         This is that statement by Director Lockhart on

21   September 7th, and there's something that's not highlighted.

22   But it says:  The common and all preferred stocks will continue

23   to remain outstanding.  And that means if you're a Fannie and

24   Freddie shareholder, you know two things.  First, you know as

25   of September 6, 2008, your dividends, they're gone.  But the

1    good news is the stock will continue to remain outstanding.

2    That means that FHFA and Fannie and Freddie weren't taking your

3    stock shares from you.  They're not ripping your stock shares

4    from your hands.

5         If you're a Fannie and Freddie shareholder, you're being

6    told no more profits from the company, no more dividends, but

7    you still have your stock.  And if you want to sell it, that's

8    money you keep.  That's got nothing to do with the dividends.

9         So Director Lockhart is telling the shareholders, no

10   more dividends, but the stock is yours to keep or sell if you

11   want to.  If you don't want to own stock, if you don't want to

12   be a party to a shareholder contract that does not include

13   dividends after September 6th, 2008, you can sell your stock.

14   And whatever money you get from selling your stock, you keep,

15   and you can do with it what you will.

16        So that -- to the extent that there may have been some

17   confusion before about whether the stock remained outstanding,

18   it does.

19        So you also heard discussion about the phrase preserve

20   and conserve the company's assets and property.  And the

21   evidence will show you what that means.  The assets that FHFA

22   was talking about -- and you're going to hear this from

23   Mr. DeMarco.  The assets are the GSEs' business and,

24   Mr. DeMarco will tell you just as importantly, the GSEs' human

25   assets, the experienced, qualified people that run the business

1    day to day.  The business and the people.  Those were the

2    assets that the conservatorship preserved and conserved.

3         Those assets are the assets that keep the secondary

4    mortgage market working for the benefit of the public, and you

5    heard that the secondary mortgage market has continued to serve

6    the public interest throughout the conservatorship.

7         So going back to Mr. Lockhart, the action that he took

8    right away to protect the public interest was to eliminate the

9    dividends to conserve capital, but that wasn't enough.  He

10   needed to get some financial support for Fannie and Freddie.  A

11   lot of financial support and fast.

12        He needed to get financial support to restore market

13   confidence.  And what did that mean?  It meant that he had to

14   give those MBS investors confidence that Fannie and Freddie

15   would continue to stand behind the guarantee they had given the

16   MBS investors.

17        You were told this morning that I was going to say this,

18   and I am, because that is at the heart of the matter.

19        He needed to restore market confidence so that those MBS

20   investors would continue to buy the mortgage-backed securities,

21   to keep the money flowing for the secondary mortgage market.

22        And the evidence will show you that in September of

23   2008, the economy was going from bad to worse, and nobody, no

24   bank, no other financial institution, nobody, was going to make

25   that kind of money available to Fannie and Freddie that they

1    needed.

2         The evidence will show there was only one place where

3    Fannie and Freddie were going to be able to get that kind of

4    money committed to them, and that's the federal government.

5    And you're going to hear directly from Mr. Lockhart that Fannie

6    and Freddie needed that money to survive.

7         Now, Congress knew when they passed HERA that Fannie and

8    Freddie were going to need that support.  So in the law,

9    Congress said -- gave Treasury a way to get the funds to Fannie

10   and Freddie by buying stock in Fannie and Freddie.  And they

11   did that through these PSPAs, the preferred stock purchase

12   agreements that you heard about this morning.

13        And that was a contract between FHFA and Treasury, and

14   you'll learn that on the very next day, after the

15   conservatorship, Mr. Lockhart announced that FHFA and Treasury

16   had signed off on the first one of those preferred stock

17   purchase agreements.

18        So let's take a look.

19        So PSPA --

20        THE COURT REPORTER:  Mr. Stern, your microphone is

21   not working for me.

22        (REPORTER'S NOTE:  Off the record while the

23   microphone battery is being changed.)

24        MR. STERN:  So here's the first one of these

25   preferred stock purchase agreements.

1          And you're going to be able to see the complete

2     agreement when it comes into evidence, but here's a summary.

3          And the evidence will show you that the main point of

4     the PSPA was to make $100 billion available to Fannie and

5     Freddie.  A $200-billion total commitment from the federal

6     government to stand behind Fannie and Freddie in return for

7     stock.

8          And why did they do this?  Because, remember, there's

9     those investors out there who bought the mortgage-backed

10    securities and they've been told Fannie and Freddie are going

11    to guarantee their investment, but the investors -- the

12    mortgage-backed securities investors are looking at Fannie and

13    Freddie, and they're saying wait a minute, Fannie and Freddie

14    are hemorrhaging money.  They're going broke.  What about that

15    guaranty that I had?

16         What Congress authorized and what Treasury did by making

17    that huge commitment of a hundred billion dollars available to

18    Fannie and Freddie was to support Fannie and Freddie, to tell

19    the MBS investors their guaranty was safe, that the United

20    States government was going to stand behind Fannie and Freddie

21    to shore up MBS investor confidence so that Fannie and Freddie

22    could continue to support the housing market.

23         So that 200 billion was there as a safety net for Fannie

24    and Freddie, for the economy, for the housing market, and for

25    the American public.

1          So what are the other key provisions of this PSPA?

2    Well, for one thing, the PSPA said that Fannie and Freddie were

3    prohibited from issuing any dividends to shareholders without

4    the prior written consent or permission of the Treasury

5    Department.  So this is back in 2008.  Director Lockhart had

6    eliminated the dividends, and now there was an agreement with

7    Treasury that gave Treasury a veto right over dividends.

8          Dividends could not be issued to private plaintiff

9    shareholders unless Treasury gave written permission.

10   Four years before the net worth sweep, members of the jury,

11   plaintiff shareholders knew that they could expect that they

12   could not get dividends unless Treasury consented.

13         And I want to be very clear about something.  The

14   plaintiffs are not challenging this agreement.  They are not

15   saying there's something wrong with this.  They're not saying

16   wait a minute, FHFA should not have agreed to an agreement that

17   gave Treasury this veto power.  They're not challenging this

18   agreement at all.

19         And what else did it say?  It said that there would be

20   a fixed dividend of 10 percent of the liquidation preference.

21   And let me break that down because this is the key to the

22   case.

23         You heard this morning about the circular draws.  This

24   is where that all begins.

25         What Treasury said was, you can draw money from this

1    commitment that we're making to you, but when you do, it's

2    going to add to what's called the liquidation preference, and

3    we are going to get a fixed dividend of 10 percent of that

4    liquidation preference.  So every time you draw, the

5    liquidation preference goes up, and we get a 10 percent

6    dividend based on what is in that liquidation preference.

7         And that dividend, members of the jury, was a fixed

8    dividend every quarter.  It wasn't optional.  It was mandatory.

9    It was required by the contract.

10        The contract required that the 10 percent be calculated

11   each quarter.  So let's take Fannie as an example.

12        If the total amount drawn to date is, let's say, a

13   hundred billion dollars, the 10 percent dividend meant that

14   Fannie owed a $10-billion dividend to Treasury for that year.

15   But it had to pay a portion every quarter.  So every

16   three months Fannie had to pay a fourth of that 10 billion,

17   which would come to 2.5 billion per quarter.  So at the end of

18   the year, they would have paid 10 billion.

19        But here's the key.  If Fannie didn't have enough profit

20   in that quarter to pay the dividend, Fannie had to draw on the

21   commitment just to get the money to pay the dividend that they

22   owed for drawing on the commitment.  That would increase the

23   total amount drawn and increase the 10 percent dividend for the

24   next quarter and for all future quarters.

25        And when I say that 10 percent dividend was a fixed

1    dividend, why is that so important?  Because, again, they had

2    to pay that dividend; Fannie and Freddie had to pay Treasury

3    the 10 percent every quarter whether they made a profit in that

4    quarter or not.

5         And as I'll explain in more detail in a few minutes, the

6    fixed part of that dividend, the fact that the dividend had to

7    be paid every quarter, played a crucial role in the third

8    amendment and the net worth sweep provision of the third

9    amendment.

10        I want to talk about a few other provisions of the PSPA.

11        One had to do with something called the periodic

12   commitment fee.  And I want to distinguish between two things.

13   So you have the dividend and that's 10 percent -- a 10 percent

14   dividend payment of the amount of the commitment that's

15   actually used.

16        The PCF, the periodic commitment fee, is different than

17   the dividend.  The periodic commitment fee is a fee to which

18   Treasury was entitled just for having made the money available.

19   So Treasury is saying, look, we're making available to you

20   $200 billion of taxpayer money.  So in addition to the

21   10 percent dividend, we're entitled to a fee just for being the

22   American people stepping up to provide this safety net to keep

23   the secondary mortgage market going.

24        So you're going to learn that that fee was not

25   paid; that it was waived.  Treasury said each quarter,

1      we're not going to take the fee; and I'm going to talk more

2      about that.

3              But you'll learn from the evidence that whatever that

4      fee would have been, whatever the exact number would have been,

5      it would have been huge, because it had to compensate Treasury

6      and the American taxpayer for putting hundreds of billions of

7      dollars of taxpayer money at risk.

8              And you'll see the PSPA, you'll see it in evidence, and

9      it will tell you that the PCF, the periodic commitment fee, is

10     intended to fully compensate Treasury for the support provided

11     by the ongoing commitment.

12             So -- but, as I said, you're going to learn that because

13     Fannie and Freddie weren't making any money for years, Treasury

14     did not demand that that payment be made.  They agreed to waive

15     or give up the right to the payment, and they kept on waiving

16     it; meaning they didn't charge them.

17             But Treasury -- the reason Treasury agreed to do that

18     wasn't out of the goodness of their heart.  They agreed not to

19     charge the PCF because they knew that Fannie and Freddie

20     couldn't pay it, and it wouldn't be a benefit to the American

21     taxpayer to charge Fannie and Freddie something they couldn't

22     pay.  But it's still out there.  It could still be collected,

23     if FHFA wanted it; and, in fact, FHFA -- Treasury wrote to FHFA

24     every quarter to remind them that the fee was there, and they

25     said in that letter -- and you'll see those -- Treasury remains

1       committed to protecting taxpayers and ensuring that future

2       positive earnings of the enterprises are returned to the

3       taxpayers as compensation for their investments.

4              So that payment was hanging over Fannie and Freddie's

5       head, and it would have been huge.

6              I want to point out one more thing about this first

7       PSPA.  See at the bottom:  Treasury consent required to

8       terminate conservatorships.  A very important provision of this

9       contract, members of the jury, which the plaintiffs are not

10      challenging.  This contract said that whether or not to exit

11      conservatorship wasn't up to Fannie.  It wasn't up to Freddie.

12      Whether or not to exit conservatorship was up to Treasury.

13             Treasury had the right to veto exit from

14      conservatorship.  Or to put it a little more precisely,

15      their -- they had to give written permission before Fannie and

16      Freddie could get out of conservatorship.

17             So -- and, of course, these PSPAs weren't a secret.

18      They were known to the shareholders, and, in fact, like HERA,

19      the PSPAs became part of the shareholder contract.

20             So this agreement was in place until 2009.  And on

21      May 6, 2009, this first PSPA was amended.  It was amended on

22      May 6th because it turned out that people were worried that

23      $200 billion wasn't enough.  People were worried that

24      $200 billion was not enough to shore up confidence in the

25      guarantee.

1          So the first amendment, as it's called, of the PSPAs,

2     doubled that commitment from one and one to make two in the

3     original PSPA to two and two to make four in the

4     first amendment.  So there's the first amendment.  All the

5     other terms remain the same and the commitment is doubled.

6     And, again, the shareholders by their legal claim are not

7     challenging this agreement.

8          They're not saying wait a minute, FHFA shouldn't have

9     agreed to give Treasury veto power over dividends.  They're not

10    saying Treasury -- FHFA shouldn't have agreed to give Treasury

11    the power to decide whether or not the enterprises could exit

12    conservatorship.  They're not saying, wait a minute, FHFA

13    should not have agreed to this 10 percent dividend or to this

14    periodic commitment fee.

15         But even that wasn't enough, because by the time 2009

16    was coming to an end, FHFA and Treasury realized that things

17    weren't getting any better.  Fannie and Freddie were still

18    deeply in the red.  They were continuing to lose money every

19    quarter.  They had already drawn nearly a $100 billion from

20    that Treasury commitment.

21         So that brings us to December 24th, 2009, which we know

22    is a very important date in the case.

23         And on December 24th, 2009, Mr. DeMarco is now the

24    acting director.  And he and Treasury negotiated the second

25    amendment to the PSPA.  And in that amendment, they agreed to

1    this:  Treasury said you know what.  No dollar amount.  No cap

2    on the commitment.  You can take as much as you want, but you

3    still have to agree to all these conditions, including the

4    fixed dividend, including the written permission conditions.

5    But not only do you have to agree to all of that, in return for

6    the unlimited pot of money, you can draw as much as you need to

7    keep yourself going until December 31st, 2012; another

8    important date in the case, because that would be it.

9         Because under the second amendment, when December 31st,

10   2012, hit, the commitment would be capped.  That means there

11   would be a set amount of money available as of January 31st,

12   and that would be it.  When that commitment was used up, no

13   more support.

14        And that cap that was looming, that was going into place

15   on December 31st, 2012, became a very key and very problematic

16   fact that's very important to the case.

17        Because the evidence will show that even after the

18   conservatorship went into place in September of 2008 and on

19   into 2009, the economy continued to be in trouble.  In other

20   words, imposing the conservatorship in September of 2008 was

21   not like poof, it's magic, the economy is fine, because of the

22   conservatorship.  Far from it.

23        So I want to talk now more about December 24th and

24   reasonable expectations.  I've said it's a really important

25   date.  You heard a lot about reasonable expectations, and when

1    you consider those reasonable expectations, again, the ones

2    that count are the ones that were existing as of December 24th,

3    2009.

4             MR. HUME:  Objection, Your Honor.

5             THE COURT:  Overruled.

6             MR. STERN:  The judge will instruct you that when

7    you're considering reasonable contractual expectations, they're

8    to be determined as of December 24th, 2009.

9         And here's what the evidence will show you about what

10   shareholders knew on that date.  The evidence will show you

11   that reasonable shareholders would have known, as we have seen,

12   that their contract didn't guarantee them dividends.  They

13   would have known that the dividends were not guaranteed by the

14   contract.

15        They would have known that they were eliminated by

16   Mr. Lockhart.  They would have known that Treasury had the veto

17   power.  They would have known that even before conservatorship

18   the companies would decide whether dividends would be paid.

19   And they knew that in conservatorship they wouldn't be paid

20   without written permission of Treasury.

21        They knew that Fannie and Freddie were in

22   conservatorship and FHFA was responsible for running them.

23   They knew on December 24th, 2009, that Fannie and Freddie were

24   highly regulated by the government and much more restricted in

25   their activities than a company that wasn't supported by the

1    government.

2          They knew that Treasury was backing Fannie and Freddie,

3    and Fannie and Freddie had been drawing on that Treasury

4    commitment for months.  They knew that Treasury had just agreed

5    to an unlimited commitment, but they knew under the law that

6    Fannie and Freddie had the obligation and the responsibility to

7    further the public interest and protect the secondary mortgage

8    market.

9          And the evidence will show you, members of the jury,

10    that given this state of affairs, no reasonable shareholder

11    would reasonably expect that they would be receiving dividends.

12    And, more importantly, a reasonable shareholder would

13    understand and expect that the conservator was going to act in

14    whatever way the conservator deemed best to keep the money

15    flowing to borrowers.

16          In December of 2009, reasonable shareholders would know

17    that investors were only buying that MBS from Fannie and

18    Freddie because of the Treasury commitment that was going to be

19    capped on January 1st, 2013.

20          So that's what the evidence will show:  That reasonable

21    shareholders would have known what they would contractually

22    have expected on December 24th, 2009, that FHFA would use all

23    of the powers that it had -- all of the powers that it had --

24    to protect the secondary mortgage market, not to maximize

25    shareholder returns.

1          And what will the evidence show you happened after

2   December of 2009?  You're going to learn that from the end of

3   2008 until we see that from the end of the first quarter of

4   2012, taking Fannie as an example.

5          Can we get the slide.

6          So this is what's happening.  From 2008 to 2012, Fannie

7   is drawing on that commitment in every single quarter.  Now,

8   remember, they draw in a quarter when they have negative net

9   worth, when their liabilities exceed their assets, when they

10   are in the red.  That's when they take a draw.

11          So to get back into the black, they need to take the

12   draw to continue to operate to support the housing market or

13   the green on our other chart.  So, again, what this is showing

14   is that for every single quarter, from the first quarter of

15   2008 to the first quarter of 2012, Fannie was in the red.  And

16   in order to get just over that line and to be able to continue

17   to operate, they had to draw from the Treasury commitment.

18          Fannie took a total of $116.1 billion from the

19   Department of Treasury commitment over that time.

20          So for three years we see that Fannie had lost money.

21   They had to take those draws to cover their operating

22   losses and their fixed dividend payments.  They took 116.1.

23   And the evidence will show that Freddie drew a total of

24   $71.3 billion.

25          That's how much they needed because of the kinds of

1    losses they were suffering.  And over that period of time, the

2    evidence is going to show you that over 2007 to 2012, Fannie

3    and Freddie lost over $100 billion.

4         And you remember that fixed 10 percent dividend.  As

5    Fannie and Freddie were losing more and more money, they still

6    had to pay the 10 percent to the Treasury Department because

7    the contract required that payment.

8         They were in the red for all of those quarters.  So they

9    didn't have the money to make the 10 percent payment.  So what

10   did they do?  The circular draw.  They had to hit up the

11   Treasury commitment for the money to pay the dividend on their

12   previous draws, but that just increased the dividend for the

13   next quarter.  Because you remember how it worked?  The

14   dividend is 10 percent of the draw.

15        So the hole just keeps getting deeper and deeper.  And

16   the evidence will show that when Fannie and Freddie had to keep

17   drawing from the commitment to pay the 10 percent that was

18   based on what they had already drawn from the commitment, that

19   was a huge problem.

20        And you've heard it -- the term today and you'll hear it

21   from the witnesses, this is going to be referred to as the

22   circular draw problem, and the evidence will show you that the

23   circular draw problem threatened the entire housing market and

24   the entire economy.

25        So -- and you get the idea.  They're drawing money to

1    pay the dividend that continues to increase as they draw money.

2    Everything is going in exactly the wrong direction.

3          And the reason that was happening is because the

4    dividend was fixed at 10 percent.  And it was a required

5    payment.

6          So now we're in 2009, 2010, 2011.  The economy is in

7    really bad shape.  There's a 2011 government report on the

8    financial crisis, that you'll see, that said more than 26

9    million Americans were out of work.  Millions of people had

10   lost their homes, and FHFA was staring down that December 31st,

11   2012, cap, because once it was hit, it couldn't be reupped.  So

12   what came out of the commitment couldn't be replaced.

13         So if those draws continued, including the draws to pay

14   the dividend, the commitment would get smaller and smaller.

15         And that was something you're going to hear called

16   erosion of the commitment.  And it was a huge problem because

17   Fannie and Freddie were continuing to lose money.  And no one

18   had a crystal ball, as you heard this morning, telling them

19   when and if the housing market would recover.

20         So here we are in 2012.  Fannie and Freddie and the

21   housing market and the American people are facing this huge

22   problem.  Fannie and Freddie losing more and more money; stuck

23   with having to pay the 10 percent fixed dividend every quarter,

24   even though they had no profits.

25         And the evidence will show you what Fannie and Freddie

1          were saying about all of this.  Let's see Slide 34.

2                    So this -- and get to my slide.

3                    This is another one of those SEC filings.  And you'll

4          see that in their SEC filing reporting on the year 2011 -- this

5          is the beginning of -- it's filed in the beginning of

6          February of 2012.  Fannie and Freddie are saying that their

7          dividend obligation -- for Fannie they're saying, our

8          $11.7-billion annual dividend obligation, prospectively,

9          exceeds our reported annual net income for every year -- every

10         year -- since our inception.  And Freddie is saying something

11         similar.  The annual dividend obligation exceeds our annual

12         historical earnings in all but one period.

13                   So let's go to Slide 33.

14                   This is a quarterly filing in May of 2012 that's

15         reporting on January 1st to June 30th of 2012.  And what are

16         they saying?  They're saying the same thing.  The amount of

17         this dividend payment exceeds our reported annual net income.

18         Then they say that the annual cash dividend obligation as of

19         March 31st exceeded our annual historical earnings in all but

20         one period.

21                   And now let's look at what they say in August of 2012.

22         So these are the SEC filings dated August 8th and August 7th.

23         And, remember, timing is everything.

24                   These are the reports of these companies on the state of

25         play when these things are filed.

1        And what do they say?  Do they say anything about this

2   shining sun and the chirping birds?  They don't.  They say

3   exactly the opposite.  They say we do not expect to generate

4   net income or comprehensive income in excess of our individual

5   dividend obligations to Treasury over the long term.

6        They're saying we won't make enough money to pay the

7   10 percent.

8        And then they say, our dividend obligation to Treasury

9   will increasingly drive our future draws; and that's talking

10  about that circular draw problem.  What they're saying is that

11  the requirement to pay that 10 percent fixed dividend is going

12  to make us take more draws, which is going to increase the

13  amount of money we're going to owe for the dividend the next

14  time.

15       And Freddie is saying exactly the same thing.  Our

16  dividend obligation to Treasury will increasingly drive future

17  draws.  It is unlikely that we will generate net income or

18  comprehensive income in excess of our annual dividends payable

19  to Treasury over the long term.

20       And I want to tell you something else about that

21  Fannie Mae filing.  I told you that they had to be signed by

22  senior executives of the company.  Well, you're going to learn

23  who signed that one.  You saw a slide with a snippet of

24  testimony from Ms. McFarland, Susan McFarland.  She was the CFO

25  of Fannie when this was filed.  Her snippet of testimony from

 1    2013, five years later, talks about sustained profitability.

 2    Well, that's not what she signed her name to in 2008.

 3            What she signed her name to in 2008 was we do not expect

 4    to generate income in excess of our dividend obligations.

 5    You're going to see that securities filing.  You're going to

 6    see her name on it.

 7            THE COURT:  Are you almost winding up?

 8            MR. STERN:  Not quite, Your Honor.  Not too much

 9    more, but if the Court wants to take a break.

10            THE COURT:  I'd rather you wind up.  How much more do

11    you have?

12            MR. STERN:  Twelve minutes, Your Honor, give or take.

13            THE COURT:  All right.  We'll go ahead and take our

14    break first, then.

15            (Proceedings held out of the presence of the jury.)

16            THE COURTROOM DEPUTY:  The Court stands in recess.

17            (Recess taken.)

18            MR. HUME:  Thirty seconds, Judge.  This is

19    Hamish Hume for the plaintiffs.

20            Just before the jury comes in, to let you know what will

21    happen after openings finish, so it's as smooth as possible,

22    we'll have the document reader for whom there's an explanatory

23    instruction, which we can hand up.  Then the deposition of

24    Mr. Lockhart, for which there's also an explanatory

25    instruction.

```
 1                    THE COURT:  Okay.

 2                    MR. HUME:  And then that should bring us, basically,

 3       to the end of the day.

 4                    THE COURT:  Right.

 5                    MR. HUME:  We can't finish the next witness.  There

 6       is -- so we could let the jury go.  And then there is a dispute

 7       about -- a minor one, but a dispute about something to do with

 8       the summary witness who will be first thing in the morning.  So

 9       if the Court has time, we could do that, hopefully, very

10       briefly.

11                    Thank you.

12                    (Proceedings held in the presence of the jury.)

13                    THE COURT:  You may be seated.

14                All right.  Mr. Stern, you may proceed.

15                    MR. STERN:  Thank you, Your Honor.

16                    THE COURT:  Twelve minutes.

17                    MR. STERN:  Can we get the last slide back up.  One

18       of my team -- I have a team -- helped me, pointed out to me, I

19       referred -- I may have called these the 2008 filings.  They are

20       the 2012 filings, obviously.

21                So when Fannie and Freddie reported to the SEC, they

22       were confirming the danger of that circular draw erosion of the

23       commitment; that it was very real.  That it was very real and

24       posed a real threat to the American housing market and the

25       economy, and that's what brings us to the third amendment and
```

1    the net worth sweep.

2          But before I talk directly about the third amendment, I

3    want to talk a little bit about what Mr. DeMarco and FHFA and

4    the country were facing in August of 2012.  Because for

5    purposes of evaluating the reasonableness of Mr. DeMarco's

6    decision, you have to look at what he knew and understood as of

7    August of 2012.

8          We can't look backwards from 2023.  We can't look

9    backwards from 2013.  Whether or not he acted reasonably is

10   something that you'll need to decide based on what the evidence

11   shows about what he knew as of August 17th, 2012.

12         And what you're going to learn is that Mr. DeMarco knew

13   that the economy was not out of the woods of the financial

14   crisis.  And he's going to tell you that as conservator -- he's

15   going to be really direct about this -- putting money into the

16   pockets of Fannie and Freddie shareholders wasn't a priority.

17   His priority was not to pay dividends to shareholders.  It was

18   to protect the public interest.

19         So -- most of all, though, he's going to tell you that

20   he knew what he didn't know.  He knew that the long-term future

21   was unpredictable, and it was his job as steward of FHFA and as

22   steward of the commitment and as steward of the secondary

23   housing market to guard against the risk that unpredictable

24   events could take the housing market back to where it was in

25   2007 and 2008.

1      And he knew what the enterprises had been saying in

2   their filings.  He knew that they had had negative net worth

3   for three years.  He knew that they were continuing to draw on

4   the commitment in part just to pay the dividend from other

5   draws on the commitment.  Those were solid facts.  They were

6   solid facts as he knew them in August of 2012.

7      And those are the facts that matter when you think about

8   whether or not Mr. DeMarco acted reasonably in deciding to

9   agree to the third amendment and the net worth sweep.

10      And he's also going to tell you, members of the jury,

11   that given the high stakes, the incredibly high stakes, he had

12   to be very, very careful.  He knew things that could seem to be

13   going well right up to the point where they collapse, like they

14   did in 2008.

15      He knew that sometimes look -- things look like they're

16   getting better, only to get worse again.  And he will tell you

17   that wasn't a gamble that he could take with the life of the

18   housing market and the American economy.

19      So considering the stakes, because of the unpredictable

20   future, Mr. DeMarco will tell you that he had to consider the

21   worst-case scenario; and that wasn't only reasonable, it was

22   vital.  It was vital for Mr. DeMarco to make the decisions that

23   would protect the Treasury commitment that would keep the money

24   flowing to borrowers.

25      And he is going to tell you, no, there's not a memo; but

1     there's not going to be a box on the verdict form for you to

2     check was there a memo or not.  He's going to tell you

3     something much more important.  He's going to tell you what

4     information he had, where he got it, how he used it, and how he

5     made his decision.

6          And you're going to learn that he gathered all of the

7     relevant information from all of the relevant sources, and that

8     was the basis of the decision that he made.

9          And you will have an opportunity to evaluate that

10    testimony from right where you're sitting.  You won't need a

11    memo.  You'll have Mr. DeMarco.  And he will tell you that he

12    couldn't take chances with the housing market.  He had to do

13    the thing that was going to protect the mission of Fannie and

14    Freddie.

15         Now, I want to just touch briefly, before I finish up,

16    on something that Ms. Davis talked about for a little while

17    this morning, and that's this idea of wind-down.  I'll just say

18    this:  That you're going to hear Mr. DeMarco tell you what he

19    understood the term wind-down to mean, or at least how he used

20    it.  And he's going to tell you it was about shrinking and

21    de-risking Fannie and Freddie.  Not to get rid of them, but to

22    make sure that they could continue.

23         He's going to talk to you about reducing something

24    called the retained portfolio and he's going to explain to you

25    how he understood taking those actions to be in the best

1   interests of the secondary mortgage market.

2        And one other point on that, members of the jury, and,

3   again, timing is indeed everything.  You saw a whole lot of --

4   there was that slide that kept growing and the timing and it's

5   urgent, then it's not urgent.  There seemed to be some

6   suggestion that Mr. DeMarco and Treasury turned around in

7   August and woke up one day in early August and said, whoa, it

8   looks like Fannie and Freddie are about to become profitable,

9   let's do something nefarious.  Well, the evidence is going to

10  be crystal clear, members of the jury, that the net worth sweep

11  and the third amendment were on Mr. DeMarco's agenda in May of

12  2012 -- in May of 2012 -- long before those second quarter

13  results came out.

14       So the idea that Mr. DeMarco was in some sort of

15  conspiracy in August of 2012 to do something turning on a dime,

16  you [sic] will show, is not supported by the evidence and, in

17  fact, is completely contradicted by the evidence that you're

18  going to see in the case.

19       So how did the third amendment work?  How did the third

20  amendment and the net worth sweep eliminate the risk of

21  circular draws?  Well, the key to the third amendment is the --

22  is that it changed the way that Fannie and Freddie made these

23  dividend payments to Treasury.

24       The third amendment and the net worth sweep eliminated

25  the risk of circular draws and eliminated that risk entirely

1    because the real problem had been the fixed part of the fixed

2    dividend.  Because you'll remember that the evidence will show

3    that the fixed dividend required payments from Fannie and

4    Freddie of 10 percent, even in quarters when they couldn't

5    cover the payments on their own and had to draw from the

6    commitment to pay the dividend.

7         Mr. DeMarco is going to tell you that he knew that if he

8    could get rid of the fixed dividend, he could eliminate the

9    circular draw problem, and that's exactly -- exactly what the

10   net worth sweep and the third amendment did.

11        The third amendment and the net worth sweep eliminated

12   that problem by eliminating the fixed dividend and replacing it

13   with something we call a variable dividend.  And under that

14   variable dividend, this is how it worked:  Fannie and Freddie

15   would pay Treasury a cash dividend equal to their earnings --

16   their profits -- every quarter if they had any.

17        And it's that variable dividend that's being called the

18   net worth sweep.

19        And the thing about the variable dividend is this:  The

20   quarterly profits of Fannie and Freddie would always count as

21   payment in full of the dividend even in quarters when Fannie

22   and Freddie had no earnings at all.  In a quarter like that,

23   instead of having to pay 10 percent of what they had drawn,

24   Fannie and Freddie wouldn't have to pay a dime.

25        So the variable dividend, or net worth sweep, completely

1    eliminated the risk of those circular draws.  With the variable

2    dividend, Fannie and Freddie would never have to take a draw on

3    the commitment just to pay the quarterly dividend.

4         So it completely eliminated the risk that the Treasury

5    commitment would be eroded by dividend payments, and it

6    eliminated the risk that that posed to the housing market and

7    the economy.

8         And that, members of the jury, was Mr. DeMarco's

9    A-number one priority to guard against the worst-case scenario.

10   And the worst-case scenario was that those draws from the

11   circular dividend would erode the commitment so far that it

12   would get down so low that we'd have the same cycle all over

13   again; with the MBS investors losing confidence, not buying the

14   mortgage-backed securities and Fannie and Freddie not being

15   able to continue the flow of money into the secondary mortgage

16   market.

17        And Mr. DeMarco, as conservator, knew that his number

18   one job was to provide stability in the secondary mortgage

19   market, and this was the way.  This was the way.  This was a

20   reasonable way.  It was a completely effective way to eliminate

21   the risk of erosion of the commitment from the circular draws.

22        Now, Ms. Davis talked a lot this morning about something

23   she called a payment in kind, or PIK.  And Ms. Davis referred

24   to it as a safety valve available under the PSPA as though it

25   was -- you're not going to see safety valve in any document

1    from Treasury, FHFA, or Fannie or Freddie.

2         That's lawyers' lingo for whatever Ms. Davis was talking

3    about.

4         Ms. Davis talked about PIK as though Mr. DeMarco could

5    have just chosen not to pay the 10 percent dividend and instead

6    could have just chosen to pay the 12 percent payment in kind.

7         Well, you'll hear more about this in the evidence, but

8    the short version is that Mr. DeMarco had no such choice.

9    You're going to see the language of the PSPAs, and you're going

10   to see that it required Fannie and Freddie to pay the Treasury

11   the 10 percent cash dividend, and that the 12 percent dividend

12   increase to liquidation preference would only apply if Fannie

13   and Freddie failed to pay the 10 percent.

14        And you'll also hear evidence that the 12 percent

15   dividend was actually a penalty because of the extra 2 percent.

16   The only other thing I'm going to say about this is you also

17   heard Ms. Davis talk about some events in 2019 and 2021.  And

18   she said when money is added to liquidation preference, that's

19   just another way of sending profits to Treasury.  Well, that's

20   what would have happened under PIK, but instead of sending

21   10 percent to Treasury, it would have sent 12 percent to

22   Treasury.

23        But here's the bottom line on PIK.  The plaintiffs are

24   going to say that it was an option, it was a choice.  The

25   evidence is going to show that it wasn't a choice, but you're

1   going to learn from Judge Lamberth that that doesn't really

2   matter, because I expect that at the end of the case,

3   Judge Lamberth is going to instruct you that there can be more

4   than one action that shareholders reasonably can expect.  And

5   what we will submit to you that means is, reasonable doesn't

6   mean best.  Reasonable doesn't mean only.  Reasonable just

7   means exactly that.

8           Was it a reasonable way to achieve the objective?  Did

9   it work to achieve the objective?  What was the objective?

10  Eliminate the risk of circular draws that would erode the

11  commitment.  Did the third amendment and the net worth sweep

12  accomplish that objective?  Yes, completely.

13          And that's how the evidence will show you that what

14  Mr. DeMarco chose to do was not only reasonable, it was clearly

15  within the reasonable contractual expectations of the

16  shareholders.

17          So I'm going to finish up, members of the jury, by just

18  talking about the plaintiffs' specific legal claim.  And,

19  again, to be absolutely clear, the plaintiffs are not

20  challenging the conservatorship.  They're not challenging the

21  PSPAs that established a 10 percent dividend and gave Treasury

22  the veto right over the dividends.  They're not challenging

23  Director Lockhart's decision to eliminate the dividends.

24  They're not challenging any of those things.

25          All they're challenging is the third amendment, and

1    they've talked specifically about the net worth sweep provision

2    of the third amendment; and the specific legal claim, as you've

3    heard, both from His Honor and from counsel, is this breach of

4    good faith -- breach of the implied covenant of good faith and

5    fair dealing.

6          And that's a lot of legal words, but as you've heard,

7    the plaintiffs' claim is that by agreeing to the third

8    amendment and the net worth sweep, FHFA violated what

9    Judge Lamberth referred to as an unwritten part of the

10   shareholders' contracts with Fannie and Freddie.  They claim

11   that FHFA acted unreasonably in a way that frustrated the

12   reasonable expectations of the shareholders.  So I just want to

13   take a minute to break that down.

14         I've already talked to you about the evidence that will

15   show that FHFA and Mr. DeMarco acted reasonably when they

16   agreed to the third amendment and the net worth sweep.  But I

17   want to spend just a few minutes here at the end to talk one

18   more time about shareholders' reasonable expectations under

19   their contracts.

20         And I am going to respectfully submit to you that those

21   contracts, as His Honor instructed you, include the stock

22   certificate.  They include those changes in the law.  They

23   include all of those things that become part of the

24   shareholders' reasonable expectations.

25         And when you consider all of the things that the

1    shareholders knew as of December 24th, 2009, you will know that

2    a reasonable shareholder would certainly have expected -- would

3    certainly have expected -- that Mr. DeMarco would use all of

4    the powers that Congress had given to him to make sure that he

5    avoided the risk that the secondary housing market -- the

6    secondary mortgage market would come crashing down.

7         That was his focus.  That was his goal.  And the action

8    that he took achieved that goal.

9         That's all I have to say, with one exception.  I want to

10   touch briefly on damages.  I can't resist this.  Ms. Davis --

11   it's our respectful submission to you that at the end of the

12   case, we're -- we're going to come back to you and ask you to

13   return a verdict that says FHFA is not liable.  So that means

14   that damages won't be an issue, but you'll hear testimony about

15   damages, and you'll evaluate that as you see fit.

16        You heard that -- about the $1.6 billion and that you

17   wouldn't hear a different number from me.  Well, you are going

18   to hear a different number from me.  That different number is

19   zero, because our submission is that Fannie and Freddie and

20   FHFA and Mr. DeMarco as conservator acted entirely reasonable

21   under all of the circumstances that were known to him.  It was

22   completely within shareholders' reasonable expectations as of

23   December 24th, 2009, that he would exercise his powers.  And we

24   respectfully submit to you and will ask you at the end of the

25   case to return a verdict that Fannie and Freddie and FHFA are

1     not liable.

2          And with that, I want to thank you in advance for all

3     the attention I know you're going to be paying over the next

4     days to the testimony that you're going to hear.  And I look

5     forward to speaking to you again at the end of the case.

6          Thank you.

7          THE COURT:  All right.  Ladies and gentlemen, as I

8     told you in my preliminary instructions, of course, the

9     lawyers' statements are just what they expect the evidence to

10    be.  They're not evidence, and you'll hear the evidence

11    starting right now.  The plaintiffs will proceed.

12          MR. HUME:  Can we speak to you on the phone.

13          (Bench conference on the record.)

14          MR. STERN:  Your Honor, Jonathan Stern for the

15    defendants.

16          Just to let the Court know, by agreement of the parties,

17    the reader is going to take the witness stand but is not going

18    to be sworn as a witness.

19          That's by agreement of the parties, Your Honor.

20          (Proceedings held in open court.)

21          THE COURT:  Okay.  The old method for depositions and

22    things like that was to have a paralegal or somebody come and

23    read the deposition from the witness stand, and the more modern

24    method is now -- I know --

25          You want to say something else?  All right.

 1          (Bench conference on the record.)

 2          MR. STERN:  Your Honor, I apologize for interrupting

 3   with where the Court was going here.  I may be really

 4   embarrassed, but I just wanted to let the Court know, this is

 5   not a deposition read.  This is -- oh, I'm really embarrassed.

 6          THE COURT:  I understand.

 7          (Proceedings held in open court.)

 8          THE COURT:  The old method when we had depositions

 9   was a paralegal or somebody from the law firm would read the

10   deposition.  The lawyer would read the questions.  The

11   paralegal or someone would read the answers.  The jury would be

12   out like flies because it was so boring.  A newer method is a

13   lot of times we now have depositions on video.

14          Zoom got us more used to that.  We do a lot more of the

15   dep- -- you'll see some of that this way.

16          Some of these are taken a little time back, so we'll

17   have some depositions that'll be by video and the old method.

18   We are going to have some reading of some other things that

19   will be by what we call readers that will not be under oath.

20   They're just going to read documents that otherwise -- and,

21   hopefully, you won't fall asleep during all of these boring

22   readings, but some of these things have to be read into the

23   record.

24          So we're going to start, I think, with a reader, but

25   just so you know what's going on, readers are not sworn.

1    They're just going to be reading things.  Both sides have what

2    they're reading, so they're going to make sure they're reading

3    it accurately, and will bring to my attention anything that's

4    not being read accurately.

5         So that's just so you know what's going on.  I think the

6    first thing plaintiffs have is a reader.  Okay.

7              MR. KRAVETZ:  Good afternoon, Your Honor.

8    Robert Kravetz on behalf of plaintiffs.

9         We do have an agreed-upon instruction, if I could pass

10   that up at this time.

11             THE COURT:  Okay.  All right.

12             MR. KRAVETZ:  Thank you.

13             THE COURT:  Okay.  Plaintiffs' counsel will be

14   presenting to you excerpts they've chosen from exhibits that

15   have been admitted into evidence.  You'll have each of the full

16   exhibits available to you when you go to deliberate.

17        The excerpts chosen by plaintiffs' counsel will be read

18   out loud by Ms. Jill Belack, who is a paralegal at one of the

19   law firms representing the plaintiffs in this case.

20        Although Ms. Belack will sit in the witness chair to do

21   the reading, she's not herself a witness, but instead is here

22   to read out loud portions of the exhibits that are in evidence.

23        Okay.

24             MR. KRAVETZ:  And, Your Honor, before we call

25   Ms. Belack, plaintiffs would move the admission of

1    Exhibit JX-1, which is also ECF No. 335; PX-2-C; PX-2-E;

2    PX-521; PX-522; and PX-524.

3              THE COURT:  All right.  Without objection, they're

4    all received.

5              (Plaintiffs' Exhibit JX-1, PX-2-C, PX-2-E, PX-521,

6    PX-522, PX-524 admitted into evidence.)

7              MR. KRAVETZ:  All right.  Thank you.

8         At this time, we would ask Ms. Jill Belack to come

9    forward, Your Honor.

10             THE COURT:  Excuse me for mispronouncing your name.

11        You can have a seat.

12        Okay.  You may proceed.

13                       DIRECT EXAMINATION

14   BY MR. KRAVETZ:

15   Q.  Good afternoon, Ms. Belack.

16   A.  Good afternoon.

17   Q.  Can you please just state your name for the record.

18   A.  Jill Belack, B-e-l-a-c-k.

19   Q.  Ms. Belack, there's a binder at the podium and you also

20   have the documents that you'll be able to read on your screen.

21             MR. KRAVETZ:  If I can ask Ms. McGuire to please call

22   out Plaintiffs' Exhibit 2-C.  If I can go to the first part of

23   the document, please.

24   BY MR. KRAVETZ:

25   Q.  Ms. Belack, can you please read the title portion of the

1     document into the record.

2     A.  "Federal Housing Finance Agency Fact Sheet.  Questions and

3     Answers on Conservatorship."

4     Q.  All right.  Can we go to the next part of the document.

5     Please read that into the record.

6     A.  "Question:  What is a conservatorship?

7          "Answer:  A conservatorship is the legal process in

8     which a person or entity is appointed to establish control and

9     oversight of a Company to put it in a sound and solvent

10    condition.  In a conservatorship, the powers of the Company's

11    directors, officers, and shareholders are transferred to the

12    designated Conservator."

13    Q.  And the next part of the document, please.

14          THE COURT:  Let me interrupt to say one thing to the

15    jury.  Now, once a document is received into evidence like

16    this, if you want to note it on your pads, you can.  All the

17    documents that are received into evidence I will send into the

18    jury room so you'll have it with you in the jury room.  But

19    whatever notes you want to make to yourself, if you want to go

20    back and look at it later, you can put the document number.

21          The plaintiffs' exhibit number is 2-C.  So that's the

22    number I'm going to receive it under.  And when it goes back to

23    the jury room, that's how you'll be able to locate it, if you

24    want to look at it later too.

25          MR. KRAVETZ:  Thank you, Your Honor.

```
 1    BY MR. KRAVETZ:

 2    Q.  Ms. Belack, can you please read the next part of the

 3    document into the record.

 4    A.  "Question:  What is a Conservator?

 5         "Answer:  A Conservator is the person or entity

 6    appointed to oversee the affairs of a Company for the purpose

 7    of bringing the Company back to financial health."

 8    Q.  Can we go to the next part of the document, please.  And

 9    please read that into the record.

10    A.  "Question:  What are the goals of this conservatorship?

11         "Answer:  The purpose of appointing the Conservator is

12    to preserve and conserve the Company's assets and property and

13    to put the Company in a sound and solvent condition.  The goals

14    of the conservatorship are to help restore confidence in the

15    Company, enhance its capacity to fulfill its mission, and

16    mitigate the systemic risk that has contributed directly to the

17    instability in the current market.

18         "There is no reason for concern regarding the ongoing

19    operations of the Company.  The Company's operation will not be

20    impaired and business will continue without interruption."

21    Q.  Can we go to the next part of the document, please.  And

22    can you please read that into the record.

23    A.  "Question:  When will the conservatorship period end?

24         "Answer:  Upon the Director's determination that the

25    Conservator's plan to restore the Company to a safe and solvent
```

1    condition has been completed successfully, the Director will

2    issue an order terminating the conservatorship.  At present,

3    there is no exact time frame that can be given as to when this

4    conservatorship may end."

5    Q.  And if we can go to the next part of the document, please.

6    And can you please read that into the record.

7    A.  "Question:  What are the powers of the Conservator?

8         "Answer:  The FHFA, as Conservator, may take all actions

9    necessary and appropriate to (1) put the Company in a sound and

10   solvent condition and (2) carry on the Company's business and

11   preserve and conserve the assets and property of the Company."

12   Q.  And if we can go to the final part of the document, please.

13   Can you please read that into the record.

14   A.  "Question:  What happens to the Company's stock during the

15   conservatorship?

16        "Answer:  During the conservatorship, the Company's

17   stock will continue to trade.  However, by statute, the powers

18   of the stockholders are suspended until the conservatorship is

19   terminated.  Stockholders will continue to retain all rights in

20   the stock's financial worth; as such worth is determined by the

21   market."

22   Q.  Thank you.

23        Ms. Belack, if you can go to the next document in your

24   binder, Plaintiffs' Exhibit 2-E.

25             MR. KRAVETZ:  And if Ms. McGuire can please call out

BELACK - DIRECT

 1    the first part of the document.

 2    BY MR. KRAVETZ:

 3    Q.  Can you please read the header of the email into the

 4    record.

 5    A.  "From:  DeMarco, Edward.

 6         "Sent:  [October 30, 2008] 8:25 P.M.

 7         "To:  Collender, Robert.

 8         "CC:  Lawler, Patrick.

 9         "Subject:  RE:  Treasury support for the GSEs--request

10    for slides.

11         "Attachments:  ABS East [10-20-08 PowerPoint];

12    [10-20-08] Remarks to ABS East Conference EJD - Final

13    [document]."

14    Q.  Can you please read the text of the email into the record.

15    A.  "Here you go - my slides and notes from my talk to ABS

16    East.  See especially slides 17 and 18 and the notes that go

17    with slide 17."

18    Q.  And can you read the signature block.

19    A.  "Ed DeMarco, COO & Sr. Deputy Director, Federal Housing

20    Financial Agency."

21    Q.  All right.  Can we go to the first part of the document.

22    Please read the title page into the record.

23    A.  "Federal Housing Finance Agency, ABS East, October 20,

24    2008."

25    Q.  And the next part of the document.

1    A.   "Conservatorship.

2         "Conservatorship is defined as a statutory process to

3    stabilize a troubled institution which is intended to have a

4    limited duration and has as its objective to return the entity

5    to normal business operations once stabilized.  Conservatorship

6    statutes provide broad authority for a conservator to operate

7    the institution until it is stabilized and then returned to the

8    shareholders.

9         "FHFA is Conservator."

10   Q.   Can we go to the next part of the document, please.  If we

11   can go to the next document, which is Plaintiffs' Exhibit 521.

12        Can you please read the title page of the presentation

13   into the record.

14   A.   "Federal Housing Finance Agency, Stable Value Investment

15   Association, October 8, 2008."

16   Q.   And can we go to the next part of the document.

17   A.   "Conservatorship.

18        "Conservatorship is defined as a statutory process to

19   stabilize a troubled institution which is intended to have a

20   limited duration and has as its objective to return the entity

21   to normal business operations once stabilized.  Conservatorship

22   statutes provide broad authority for a conservator to operate

23   the institution until it is stabilized and then returned to the

24   shareholders.

25        "FHFA is Conservator."

```
1    Q.  And if we can go to the last document, Plaintiffs'
2    Exhibit 524, please.
3         Can you please read into the record the title page of
4    the presentation.
5    A.  "National Association of Realtors.  James B. Lockhart, III,
6    Director, Conventional Finance & Lending Committee, November 7,
7    2008, Orlando, Florida."
8         MR. KRAVETZ:  And can we go to the last excerpt,
9    please, Ms. McGuire.
10   A.  "Conservatorship to Support Mission.
11        "Conservatorship is a legal process to stabilize a
12   troubled institution with the objective of returning the GSEs
13   to normal business operations.
14        "FHFA as a conservator has broad authority to oversee
15   the GSEs until stabilized and returned to shareholders."
16   Q.  Thank you, Ms. Belack.
17        MR. KRAVETZ:  Nothing further from plaintiffs,
18   Your Honor.
19        THE COURT:  Okay.
20        MR. JONES:  Thank you, Your Honor.
21        Good afternoon, members of the jury.
22                      CROSS-EXAMINATION
23   BY MR. JONES:
24   Q.  And good afternoon, Ms. Belack.  I'm Stanton Jones, one of
25   the lawyers for the defendants.
```

1       And I'll now be asking you to read out loud some very

2   short portions of two of the documents that Mr. Kravetz showed

3   you earlier.

4       And I'll tell you, just to try to make things easy, in

5   our versions of these documents, we've gone ahead and

6   highlighted.  The yellow highlighting is what you just read

7   with Mr. Kravetz.  And I'll be asking you to read the

8   green-highlighted portion.

9           MR. JONES:  So can we pull up, please, Ms. Armstrong,

10  PX-2-C.  This is the first document.

11      Can we go to the first page just to show to the jury.

12  BY MR. JONES:

13  Q.  This is the first document that you read from, Ms. Belack.

14  And if we could go to page 2.

15      Could you read the question that's highlighted there in

16  green, please.

17  A.  "Question:  What happens upon appointment of a

18  Conservator?"

19  Q.  Could you read the answer, please.

20  A.  "Answer:  Once an 'Order Appointing a Conservator' is

21  signed by the Director of FHFA, the Conservator immediately

22  succeeds to the (1) rights, titles, powers, and privileges of

23  the Company, and any stockholder, officer, or director of

24  such . . . Company with respect to the Company and its assets,

25  and (2) title to all books, records and assets of the Company

1   held by any other custodian or third-party.  The Conservator is

2   then charged with the duty to operate the Company."

3   Q.  Thank you.

4       Now could we please pull up PX-2-E, which is the second

5   document that you read from with Mr. Kravetz; the one titled

6   ABS East on the cover of the slide deck.  And if we can skip to

7   page 9 of this document.

8       Could you just read the sentence that's highlighted

9   green above the graph.

10  A.  "Both Enterprises reported significant net losses in the

11  second half of 2007 and the first half of 2008, continuing a

12  trend of volatile and unattractive financial results over the

13  past several quarters."

14  BY MR. JONES:

15  Q.  Thank you.

16      Can we turn, please, to page 19 now.  If you could read

17  the first bullet at the top.

18  A.  "Senior Preferred Stock Purchase Agreement - no expiration

19  date."

20  Q.  Thank you.

21      Can you read now the first sub-bullet underneath that.

22  A.  "Binding legal agreement that ensures that each GSE

23  maintain a positive net worth through Treasury purchases of

24  senior preferred stock as needed.  Means the United States

25  stands behind the debt and the MBS of the GSEs."

1    Q.  Could you read the next sub-bullet.

2    A.  "Contract between Treasury and each GSE with a capacity of

3    $100 billion ($200 billion combined)."

4    BY MR. JONES:

5    Q.  Read the last sub-bullet beneath that one.

6    A.  "Nearly three and a quarter times the Enterprises combined

7    statutory minimum capital."

8    Q.  Thank you.  Could we turn now to page 20.

9         Can you read the first bullet and then the sub-bullet

10   underneath that.  Everything that's highlighted green on this

11   slide.

12   A.  "Senior Preferred Stock Purchase Agreement (continued).

13        "Holders of MBS, senior debt and subordinated debt,

14   including all maturities and issuances, are effectively

15   guaranteed by the U.S. Treasury."

16   Q.  Thank you.  Can we flip now to page 31.

17        And if you could read all the text highlighted in green

18   there, please.

19   A.  "In early September, we acted to place both companies into

20   conservatorship.

21        "The goal of these dual conservatorship actions is to

22   help restore confidence in Fannie Mae and Freddie Mac, enhance

23   their capacity to fulfill their mission, and reduce the

24   systemic risk that would have exacerbated the instability in

25   the current market."

```
1    Q.  Thank you.  Just a couple more.

2              Can we go to page 34, please.

3              If you could read the green-highlighted text above the

4    words Slide 17.

5    A.  "In order to conserve over $2 billion in capital every

6    year, the common stock and preferred stock dividends were

7    eliminated, but the common and all preferred stocks will

8    continue to remain outstanding.  In other words, the economic

9    interests of shareholders have not been eliminated, they

10   continue to exist."

11   Q.  Thank you.

12             And now if you could read the green-highlighted text

13   below Slide 17, and it will continue onto the next page.

14   A.  "Finally and very importantly, there is the financial

15   support provided by the U.S. Treasury at the time the

16   conservatorships were established.  This support implements

17   supplements the authority Congress gave to the Treasury

18   Department in late July in the same legislation that created

19   the FHFA.  We believe that the Treasury Facilities provide the

20   support needed to facilitate Freddie Mac and Fannie Mae

21   fulfilling their mission, most importantly of which is

22   providing liquidity to the mortgage market."

23   Q.  Thank you.

24             And, finally, if you can just read the bullet that's

25   highlighted there.
```

BELACK - CROSS

1    A.  "$100 billion <u>each</u> in senior preferred shares that protect

2    the credit interests of all holders of the Enterprises' debt

3    and mortgage-backed securities.  To put the combined

4    $200 billion in perspective, that amount is nearly

5    <u>three-and-a-quarter times</u> the Enterprises' statutory minimum

6    capital requirement."

7    Q.  Thank you, Ms. Belack.

8             MR. JONES:  Nothing further for the defendants.

9             THE COURT:  All right.

10            MR. KRAVETZ:  Nothing further, Your Honor.

11            THE COURT:  Okay.  Thank you.

12        Next witness.

13            MR. HUME:  Your Honor, plaintiffs call as their next

14    witness, Mr. James B. Lockhart, the director of the FHFA in

15    2008.  Mr. Lockhart's testimony will appear via videotape

16    deposition.

17        And I have a mutually agreed instruction to hand up to

18    the Court, if I may.

19            THE COURT REPORTER:  Have you agreed I won't need to

20    transcribe this video deposition?

21            MR. HUME:  I don't know that we made an agreement on

22    that.  I think the last time we put it in the transcript

23    afterwards.

24        You don't need to.

25            THE COURT:  All right.  The next witness is going to

1    appear by video deposition.

2         You heard about him in the opening statements.  He's the

3    first director of FHFA.

4         A deposition is the testimony of a person taken before

5    trial.  The witness is placed under oath and swears to tell

6    the truth.  Lawyers for each party may ask questions.  There

7    is a court reporter present who records the questions and

8    answers.

9         During the trial, you'll hear deposition testimony that

10   will be read from the deposition transcript or presented by

11   videotape.  You should give deposition testimony the same fair

12   and impartial consideration you give any other testimony.

13        You should not give more weight or less weight to

14   deposition testimony just because the witness did not testify

15   in court in person.  You must weigh deposition testimony just

16   like you do any other testimony.  It's up to you who you

17   believe and who you don't believe.

18        I'll give you a lot of instructions at the end of the

19   case about how you view credibility of witnesses.

20        But you must consider deposition testimony as if the

21   witnesses are here testifying on the witness stand.  The

22   witnesses are asked questions and cross-examined just like

23   they're in court, but they'll either be on the TV screen or

24   presented like a person -- through a person reading from a

25   transcript here on the witness stand.

1           So you may proceed with Mr. Lockhart's deposition.

2                (REPORTER'S NOTE:  The deposition of James Lockhart

3 was played and was not requested to be transcribed.)

4                MR. HUME:  Your Honor, Hamish Hume for the

5 plaintiffs.  In light of the hour and our next witness will

6 take more than half an hour and there's some issues to resolve

7 before she appears, we'd ask that the Court adjourn the jury

8 for the day.

9                THE COURT:  All right.

10                MR. STERN:  No objection, Your Honor.

11                THE COURT:  All right.  We'll start back at 10:00.

12           Don't let anyone talk to you about the case.  Don't

13 Twitter or tweet or X.  I'll see y'all tomorrow at 10 o'clock.

14           I'll do what I can about the air conditioning.

15           If you happen to see any press accounts about today,

16 don't read or listen to them and set them aside.  And if you do

17 get exposed to anything, tell me about it tomorrow, and I'll

18 talk to you about it.  Don't tell anyone else about it.  I'll

19 see you-all tomorrow.

20                (Proceedings held out of the presence of the jury.)

21                MR. KRAVETZ:  Just going to move some exhibits in

22 that -- I'll wait a moment, Your Honor.

23                THE COURT:  She may be a moment.  So we can take up

24 other issues in the meantime.

25                MR. KRAVETZ:  Certainly, Your Honor.

```
1              MR. HUME:  Your Honor, Mr. Hume for the --

2              MR. KRAVETZ:  So this will be the easy part,

3     Your Honor.  If we could move into evidence PX-2-D, PX-515-B,

4     and PX-520, each of which were referenced during Mr. Lockhart's

5     testimony.

6              THE COURT:  All right.  They're received.

7              (Plaintiffs' Exhibit PX-2-D, PX-515-B, and PX-520

8     admitted into evidence.)

9              MR. KRAVETZ:  Thank you, Your Honor.

10             THE COURT:  Okay.

11             MR. JONES:  Thank you, Your Honor.  Stanton Jones for

12    the defendants.

13         I have two very quick items -- where the parties totally

14    agree -- just to report; and then two items that are in dispute

15    and that affect the -- the testimony for -- for first thing

16    tomorrow morning.  So we'd like to present those.

17         Okay.  First the two easy ones.  The parties have agreed

18    that we won't make any reference to the first trial in front of

19    the jury, of course.  We've also agreed -- and the Court's

20    scheduling order from back in March says that for exhibits that

21    were admitted over an objection at the first trial, when those

22    are moved into evidence in the second trial now, the objections

23    from the first trial are preserved for purposes of the

24    appeal -- any appeal.

25         Nevertheless, the parties would feel most comfortable
```

 1     still saying objection rather than saying no objection, if

 2     there is an objection.

 3                    THE COURT:  That's fine.

 4                    MR. JONES:  And so what the parties have agreed is

 5     that if in those instances where -- we don't actually want to

 6     argue it.  No one is seeking reconsideration of Your Honor's

 7     earlier ruling.  We're just going to say -- both sides will

 8     just say object for the record.

 9                    THE COURT:  All right.

10                    MR. JONES:  When you hear that, you can say just

11     overruled.  And we're inviting that.

12                    THE COURT:  Without any more.  Okay.

13                    MR. JONES:  Exactly.  We don't need to go to the

14     phones or anything.

15          The second easy item is one I mentioned before but will

16     come up tomorrow morning.  The parties' joint submission of

17     deposition designation disputes.  It's the -- in the class

18     case, it's ECF No. 317.  In the Berkley case, it's ECF 328.

19          We would need decisions on those disputes

20     because those disputes over deposition testimony will come to

21     pass tomorrow.

22                    THE COURT:  Whose deposition?

23                    MR. JONES:  It's Mr. Benson, Mr. Mayopoulos, and

24     McFarland.  Although McFarland's -- I understand that her

25     deposition designations won't be presented to the jury quite as

1    soon.

2              THE COURT:  So the ones I should look at today are

3    Benson and Mayopoulos.

4              MR. JONES:  I think -- actually, I'm told,

5    Your Honor, that I think the plaintiffs are indicating that

6    they intend to present all three of those witnesses by

7    deposition tomorrow.

8              THE COURT:  Okay.

9              MR. JONES:  For what's it worth, it's a short

10   submission similar to how we did before.  It's a joint

11   submission by both parties with short position statements from

12   each party on each disputed position.

13             THE COURT:  Okay.  I can do that.

14             MR. JONES:  Those are the two easy issues.

15        Now, the two issues that are disputed and will come up

16   in the context of Ms. Hartman's testimony tomorrow morning, the

17   summary witness --

18             THE COURT:  That's who?

19             MR. JONES:  Ms. Hartman --

20             THE COURT:  Okay.

21             MR. JONES:  -- is the plaintiffs' summary witness,

22   which will be their first witness they'll be calling tomorrow

23   morning.

24        One pertains to a limiting instruction that Your Honor

25   said the Court would give in connection with the motion

1   *in limine* ruling last week.

2       Just a refresher, the defendants' Motion *in Limine* No. 4

3   sought to exclude evidence of the dividends and other value

4   that the enterprises paid or transferred to the Treasury

5   Department after the third amendment on grounds of relevance

6   and -- and undue prejudice under Rule 403; that it was,

7   essentially, using hindsight.

8       The Court did not exclude the evidence, but the Court

9   did say -- and I'll just read it.  "The Court will give a

10  limiting instruction that the jury is not to consider the value

11  transferred to Treasury" -- and that means after the third

12  amendment -- "as evidence of either harm to the private

13  shareholders or as a measure of damages."

14      And we have proposed -- we proposed to the plaintiffs an

15  instruction -- there are two versions of it to be given at

16  different times.  I can pass it up, if that's helpful.

17      So as I say -- and I'll get to this in a moment.  There

18  are two versions of it here.  One is to be given immediately

19  after the testimony, the other to be included in the final

20  instructions.  In both versions, the substance of the

21  instruction, which is the second sentence, is the same.

22      And it just says, "You," meaning the jury, "may not

23  consider this value transferred to Treasury after the third

24  amendment as evidence of either harm to the private

25  shareholders or as a way to determine damages."

1          And that language, Your Honor, tracks almost verbatim

2     the language in the Court's order.  I think the only change we

3     made was instead of saying a "measure of damages" -- that the

4     evidence shouldn't be considered as a measure of damages, we

5     changed that to say "as a way to determine damages," which was

6     just meant to be a little bit more understandable for

7     nonlawyers on the jury.

8          So -- so these proposed instructions -- again, the same

9     substance just to be given at the two different times closely

10    track the language the Court indicated in its ruling.

11         The plaintiffs have -- do not agree to this.  They have

12    proposed a version -- and I'll let them speak to it.  But for

13    our part, we disagree with their version for two reasons.

14         The first is it deletes a material portion of the

15    limitation that the Court said that it would describe.  It

16    deletes text that we pulled directly from the Court's order.

17    And then the plaintiffs' version also adds another sentence

18    that just says that the jury can consider this evidence of

19    post-third amendment dividends paid to Treasury as relevant to

20    whether the net worth sweep unreasonably or arbitrarily

21    violated shareholders' reasonable expectation.  And we think

22    that portion of that proposed instruction is not appropriate.

23         They can argue whatever relevance they think this

24    evidence has consistent with the limitation that the Court set

25    out in its order.  But in the context of a limiting

1    instruction, which, of course, is designed for the protection

2    of the defendants, the plaintiffs are not entitled to have the

3    Court, essentially, espouse their theory of how this evidence

4    supports their case.

5           And so we would ask that the Court give the -- the

6    limiting instruction that we have proposed here.

7           The plaintiffs also do not agree, I believe, to having

8    the instruction given twice.  But that's our understanding of

9    this Court's proposed -- procedure, typical procedure.  And

10   there's a case that we found from Your Honor.  It's *Miller v.*

11   *Holzmann*, 563 F. Supp. 2d 54.  It's a decision of this Court

12   from 2008.

13          And on pages 82 to 83, this Court explained that unfair

14   prejudice from some evidence that was admitted was

15   substantially diminished by limiting instructions that were

16   given to the jury both immediately after the relevant evidence

17   was introduced and again in the final instructions.  And so

18   that's what we've asked for, the same procedure here.

19          THE COURT:  All right.

20          MR. JONES:  Thank you, Your Honor.

21          MR. HUME:  Hamish Hume for the plaintiffs,

22   Your Honor.

23          We do object.  We do recognize the Court said this at

24   the end of that portion of its MIL ruling, which is on page 33

25   of Docket 336.  We object to it being given certainly at this

1   stage because we think it's going to confuse the jury and be

2   prejudicial.

3        They're going to hear the evidence.  They're going to

4   hear absolutely no argument that this is a measure of damages.

5   They are simply going to hear a summary of voluminous financial

6   information that calculates data and numbers.  And for them to

7   hear that and then be told they must disregard it is going to

8   confuse them.

9        Second, if the Court were to consider giving it at this

10  stage, after the summary witness, which we do object to, then

11  we think that it ought to be more clear to what it's saying to

12  the jury, which is what the Court actually ruled, which is you

13  can't consider this for determining damages.  You can consider

14  it for determining whether the net worth sweep arbitrarily or

15  unreasonably violated expectations.  That would be more

16  balanced and consistent with the Court's ruling.

17       We recognize that's not what was written on page 33, but

18  I don't think that was written as a quotation to be taken

19  verbatim.  So we just think that would be more fair.  That's

20  the main point.

21       And we'd be happy to submit competing -- or two versions

22  of the instruction if the Court really wanted to.

23       I think on the issue of harm, I think that's a little

24  bit -- the tail on the dog.  But it is also a little bit

25  confusing.  The Court did say both harm or damages.

```
 1              But our harm is -- you know, is demonstrated by the
 2     stock drop for sure.  But I think if one imagines the
 3     situation, that is the opposite of what happened; where for the
 4     next -- last ten years, the net worth sweep had transferred far
 5     less to Treasury than the 10 percent dividend had.
 6              I would think the defendants would fairly be arguing
 7     that that should be introduced to show that the shareholders
 8     really weren't harmed and a one-day stock drop is irrelevant in
 9     light of that.
10              So I think it is relevant to the existence of harm.
11     It's not our principal way of showing it, and it's -- but
12     it's -- I think it's confusing to the jury to tell them it's
13     not relevant to whether we suffered harm.
14              It is clearly not the way we are determining damages.
15     We don't mind the Court making that clear at the appropriate
16     time, but we think it should be in a balanced -- a balanced
17     way.
18              Thank you, Your Honor.
19              THE COURT:  All right.  I'll let y'all know in the
20     morning, but I'm -- what was *Miller*?  What kind of case was
21     *Miller*?  I don't remember what it was.
22              MR. HUME:  I apologize -- this is Hamish Hume for the
23     plaintiffs' -- I didn't address the case.  I'll confess I
24     haven't read it.
25              The way it was described by counsel sounded something
```

1    like that came in that shouldn't have come in.

2              THE COURT:  That's what it sounded like to me too.

3              MR. HUME:  It's a little different situation.

4              THE COURT:  All right.  Any other issues y'all want

5    to raise today?

6              MR. JONES:  One more issue, which is defendants have

7    an objection to two of the slides, the demonstrative slides,

8    that plaintiffs plan to use with Ms. Hartman in the morning, as

9    well as two of the exhibits that we understand they at least

10   may try to introduce through Ms. Hartman.  Exhibits -- two

11   exhibits are identical to the two slides.  So it's really just

12   one issue.

13             Can we pull up PX-1-H, please.

14             Okay.  So for context, Your Honor, this pertains, again,

15   to one of the motion *in limine* rulings.  In -- in response to

16   one of our motions *in limine*, the Court ruled that plaintiffs,

17   quote, may not suggest that the difference between the amount

18   they invested and the amount they received in dividends

19   informed shareholders' reasonable expectations.

20             We had moved to eliminate evidence comparing the

21   $33 billion, which was the adding up the -- the original

22   issuance price of all the junior preferred shares for Fannie

23   and Freddie, comparing that to the $5 billion in dividends that

24   Fannie and Freddie paid on those private preferred shares

25   before the conservatorship.

1            And in response to our motion challenging that

2     comparison, the Court ruled plaintiffs may not suggest that

3     that difference between the amount invested, 33 billion, and

4     the amount they received in dividends preconservatorship --

5     that's 5.1 billion -- informed shareholders' reasonable

6     expectations.

7            And these -- these exhibits and the related

8     demonstrative showing the amount that was invested, the

9     33.2 billion here, side by side -- or on top of each other in

10    this one -- with the amount received in dividends, the

11    $5.1 billion, that -- that suggests and supports the

12    impermissible inference that -- that the Court said plaintiffs

13    were -- was out of bounds.

14           And, in fact, it was slides exactly like this,

15    juxtaposing the $33 billion originally invested and 5.1 in

16    preconservatorship dividends.  It was the juxtaposition of just

17    these numbers on slides like these that was a large part of

18    what was challenged in our motion and what prompted the Court's

19    statement that the plaintiffs may not -- may not -- makes this

20    improper suggestion based on this comparison.

21           And we think just a straightforward application of the

22    Court's decision requires that this slide be eliminated.

23           I will say elsewhere in her slides -- elsewhere in the

24    slides for Ms. Hartman, there are individual slides that add up

25    to the 33 billion, and then separate slides that get the

1      5.1 billion.  We are not challenging those because we

2      understand the Court denied our motion *in limine* to exclude

3      this information completely.  The Court just said,

4      essentially and -- you can't draw -- you can't draw the

5      comparison.  And that's -- that is what these slides do.

6          One last note, just focusing on the title of the slide.

7      It says Total Amounts Invested by Private Preferred

8      Shareholders into Fannie Mae and Freddie Mac vs. Dividends

9      Paid.  Certainly, the word versus there compounds the problem

10     because it expressly invites and suggests that improper

11     comparison.

12         I understand plaintiffs have proposed or suggested

13     changing "versus" to "and."  So it would be total amounts

14     invested and dividends paid.  But, nevertheless, Your Honor,

15     the suggestion is -- is the same, especially -- I mean, putting

16     them on top of each other like this, it clearly suggests a -- a

17     subtraction, a 33.2 minus 1.5.

18         That's the clear purpose of presenting the information

19     this way, and we think that it's out of bounds under the

20     Court's ruling.

21             THE COURT:  What's your other one?

22             MR. JONES:  The other one is, Your Honor, PX-1-I.

23         Can we pull that one up.

24         So this, Your Honor, is a virtually identical format

25     and title, but this is just comparing total amounts invested

 1    specifically by private shareholders who bought into Fannie and

 2    Freddie stocks in 2007 and 2008 versus compared to the

 3    dividends that were paid on those specific shares.  But it's

 4    the exact same issue.  Just a different time period.

 5         This is -- this is comparing and juxtaposing the total

 6    amount invested by a set of Fannie and Freddie shareholders

 7    compared to the dividends that they were paid before the

 8    conservatorships.

 9              THE COURT:  The first one was PX-001 what?

10              MR. JONES:  H.

11              THE COURT:  H.  And that was I?

12              MR. JONES:  Yes, Your Honor.

13              THE COURT:  Is that an I?

14              MR. JONES:  PX-0001-I.

15              THE COURT:  Okay.

16              MR. JONES:  As in igloo.

17         Thank you, Your Honor.

18              MR. HUME:  Would you mind putting that back up so we

19    can just --

20         Your Honor, Hamish Hume for the plaintiffs.

21         The only purpose for presenting it -- the information

22    this way is the same purpose I described the other day in

23    arguing the motion *in limine*.  And it's actually always been

24    the only purpose.  Although I understand the way I did it in

25    the last trial was clumsy and led to different inferences.  And

1      we'll be much more careful this time.

2           We simply don't want people on the jury to hear about

3      the investments and then wonder -- especially since they also

4      learned that dividends were always paid in every quarter from

5      1996 to 2008 and then think, well, yeah, you invested a lot,

6      but you probably made even more.  That's the only purpose and

7      only reason to put them on the slide together is so they

8      understand these are the dividends on the shares issued for the

9      19.7 billion, how much they were, and on the previous slide,

10     you know, the end value of the dividends for the shares issued

11     for the 33 billion, the total amount.

12          We are not -- this is, again, going to come in not

13     through some expert or a testifying witness.  This is coming in

14     from a summary witness who's going to do nothing more than

15     present the facts.

16          We are not going to at any point in the trial suggest

17     that this informs our reasonable expectations or that we had

18     some right to get repaid in full.  We're going to hew directly

19     with what the Court ruled.  But the Court did rule this was

20     relevant, that the total investment is relevant to the

21     expectations.  And we're allowed to show the jury the amount of

22     dividends, just so they don't form the wrong impression.

23          I had understood defendants to be asking us to just put

24     them on separate slides.  The only reason we don't want to do

25     that is we think it will be harder to follow.  It will be

```
 1    confusing.
 2          As to the title, we did change "versus" to "and," but if
 3    that's not sufficient, if -- we can get rid of the title, if
 4    that would help.  We just want it to be clear.  That's all we
 5    want to do.
 6          Thank you.
 7          THE COURT:  All right.  I'll let y'all know in the
 8    morning before we start.
 9          Anything else y'all want to raise tonight?
10          MR. JONES:  Nothing else for defendants, Your Honor.
11    Thank you.
12          MR. HUME:  Thank you, Your Honor.
13          THE COURT:  Okay.
14          (Proceedings were concluded at 4:50 p.m.)
15
16
17
18
19
20
21
22
23
24
25
```

1      <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3           I, Nancy J. Meyer, Registered Diplomate Reporter,

4      Certified Realtime Reporter, do hereby certify that the above

5      and foregoing constitutes a true and accurate transcript of my

6      stenograph notes and is a full, true, and complete transcript

7      of the proceedings to the best of my ability.

8

9                          Dated this 26th day of July, 2023.

10

11                     /s/ Nancy J. Meyer
                       Nancy J. Meyer
12                     Official Court Reporter
                       Registered Diplomate Reporter
13                     Certified Realtime Reporter
                       333 Constitution Avenue Northwest
14                     Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$100** [5] - 48:4, 54:19, 59:3, 87:3, 89:1
**$200** [7] - 16:18, 16:23, 51:20, 53:23, 53:24, 87:3, 89:4
**$33** [2] - 100:21, 101:15

## '

**'11** [1] - 20:4
**'12** [1] - 20:4
**'Order** [1] - 85:20

## 1

**1** [2] - 81:9, 85:22
**1.5** [1] - 102:17
**1.6** [1] - 74:16
**10** [34] - 26:18, 40:7, 49:20, 50:3, 50:5, 50:10, 50:13, 50:16, 50:18, 50:23, 50:25, 51:3, 51:13, 51:21, 54:13, 59:4, 59:6, 59:9, 59:14, 59:17, 60:4, 60:23, 62:7, 62:11, 69:4, 69:23, 71:5, 71:11, 71:13, 71:21, 72:21, 91:13, 99:5
**10-20-08** [2] - 82:11, 82:12
**10-billion** [1] - 50:14
**10-K** [1] - 44:6
**10-Ks** [1] - 38:22
**10-Qs** [1] - 38:14
**10:00** [1] - 91:11
**10th** [1] - 40:11
**11.7-billion** [1] - 61:8
**116.1** [2] - 58:18, 58:22
**12** [4] - 71:6, 71:11, 71:14, 71:21
**13th** [1] - 23:2
**14** [1] - 40:7
**14th** [1] - 40:12
**15** [1] - 24:8
**160,000** [1] - 14:1
**17** [4] - 82:16, 82:17, 88:4, 88:13
**17th** [3] - 10:3, 43:20, 65:11
**18** [3] - 41:16, 82:16
**19** [3] - 24:8, 40:4, 86:16
**19.7** [1] - 104:9
**1938** [1] - 10:23
**1970** [1] - 10:24
**1996** [1] - 104:5
**1st** [2] - 57:19, 61:15

## 2

**2** [6] - 43:12, 71:15, 81:10, 85:14, 85:25, 88:5
**2-C** [2] - 78:22, 79:21
**2-E** [1] - 81:24
**2.5** [1] - 50:17
**20** [2] - 82:23, 87:8
**200** [2] - 16:20, 48:23
**200,000** [1] - 14:2
**200-billion** [1] - 48:5
**2000s** [1] - 25:16
**2006** [2] - 25:10, 25:14
**2007** [6] - 24:7, 24:11, 59:2, 65:25, 86:11, 103:2
**2008** [54] - 9:25, 23:2, 24:13, 24:22, 25:4, 26:10, 28:20, 29:3, 29:5, 29:11, 31:11, 31:23, 32:8, 32:13, 33:10, 33:15, 33:16, 33:19, 34:7, 40:5, 40:19, 40:24, 41:2, 41:21, 43:14, 43:17, 43:20, 43:25, 44:6, 44:7, 44:14, 44:25, 45:13, 46:23, 49:5, 55:18, 55:20, 58:3, 58:6, 58:15, 63:2, 63:3, 64:19, 65:25, 66:14, 82:6, 82:24, 83:15, 84:7, 86:11, 89:15, 97:12, 103:2, 104:5
**2008-2012** [1] - 10:4
**2009** [23] - 8:11, 19:20, 19:22, 19:25, 20:8, 21:20, 38:5, 44:7, 53:20, 53:21, 54:15, 54:21, 54:23, 55:19, 56:3, 56:8, 56:23, 57:16, 57:22, 58:2, 60:6, 74:1, 74:23
**2010** [2] - 20:4, 60:6
**2011** [3] - 60:6, 60:7, 61:4
**2012** [25] - 9:9, 10:3, 23:1, 43:21, 55:7, 55:10, 55:15, 58:4, 58:6, 58:15, 59:2, 60:11, 60:20, 61:6, 61:14, 61:15, 61:21, 64:20, 65:4, 65:7, 65:11, 66:6, 68:12, 68:15

## 3

**30** [1] - 82:6
**30th** [4] - 29:2, 40:9, 40:10, 61:15
**31** [1] - 87:16
**317** [1] - 93:18
**31st** [6] - 55:7, 55:9, 55:11, 55:15, 60:10, 61:19
**328** [1] - 93:18
**33** [6] - 61:13, 97:24, 98:17, 101:3, 101:25, 104:11
**33.2** [4] - 33:8, 33:9, 101:9, 102:17
**335** [1] - 78:1
**336** [1] - 97:25
**34** [2] - 61:1, 88:2

## 4

**4** [2] - 3:4, 95:2
**40** [1] - 13:25
**403** [1] - 95:6
**4:50** [1] - 105:14

## 5

**5** [1] - 100:23
**5.1** [4] - 101:5, 101:11, 101:15, 102:1
**521** [1] - 83:11
**524** [1] - 84:2
**54** [1] - 97:11
**563** [1] - 97:11

## 6

**6** [2] - 44:25, 53:21
**6th** [6] - 34:7, 34:13, 41:21, 42:25, 45:13, 53:22

## 7

**7** [1] - 84:6
**71.3** [1] - 58:24
**78** [7] - 3:7, 3:11, 3:11, 3:12, 3:14, 3:14, 3:15
**7th** [6] - 41:1, 43:14, 43:16, 43:20, 44:21, 61:22

## 8

**8** [1] - 83:15
**82** [1] - 97:13
**83** [1] - 97:13
**84** [1] - 3:8
**8:25** [1] - 82:6
**8th** [1] - 61:22

## 9

**9** [1] - 86:7
**92** [3] - 3:12, 3:13, 3:13

## A

**A-number** [1] - 70:9
**ability** [3] - 21:1, 28:8, 35:4
**able** [7] - 28:4, 47:3, 48:1, 58:16, 70:15, 78:20, 79:23
**ABS** [5] - 82:11, 82:12, 82:15, 82:23, 86:6
**absolute** [4] - 21:13, 21:14, 21:21, 22:16
**absolutely** [4] - 11:2, 33:19, 72:19, 98:4
**access** [3] - 13:12, 30:1, 30:2
**accident** [1] - 11:11
**accomplish** [1] - 72:12
**accountants** [1] - 32:15
**accounts** [1] - 91:15
**accumulating** [1] - 14:21
**accurate** [1] - 21:7
**accurately** [2] - 77:3, 77:4
**achieve** [2] - 72:8, 72:9
**achieved** [1] - 74:8
**acronym** [1] - 8:10
**Act** [2] - 29:5, 29:10
**act** [9] - 6:2, 6:12, 9:14, 35:20, 36:7, 38:1, 42:7, 42:21,

## 57:13

**acted** [8] - 6:14, 7:21, 65:9, 66:8, 73:11, 73:15, 74:20, 87:19
**acting** [3] - 8:9, 8:11, 54:24
**action** [14] - 5:18, 5:20, 5:21, 6:7, 6:16, 36:1, 36:4, 37:1, 37:4, 37:8, 37:9, 46:7, 72:4, 74:7
**actions** [6] - 7:22, 9:20, 43:6, 67:25, 81:8, 87:21
**activities** [1] - 56:25
**actual** [2] - 11:7, 39:18
**add** [3] - 32:20, 50:2, 101:24
**added** [1] - 71:18
**adding** [1] - 100:21
**addition** [1] - 51:20
**address** [1] - 99:23
**adds** [1] - 96:17
**adjourn** [1] - 91:7
**administrations** [1] - 8:15
**admission** [1] - 77:25
**Admitted** [1] - 3:10
**admitted** [5] - 77:15, 78:6, 92:8, 92:21, 97:14
**adopt** [1] - 34:18
**advance** [1] - 75:2
**affairs** [3] - 30:24, 57:10, 80:6
**affect** [1] - 92:15
**afford** [1] - 13:13
**affordable** [1] - 11:20
**afraid** [4] - 26:15, 26:17, 26:19, 26:20
**afternoon** [7] - 7:12, 9:18, 77:7, 78:15, 78:16, 84:21, 84:24
**afterwards** [1] - 89:23
**Agency** [3] - 34:14, 36:25, 37:1, 37:2, 79:2, 82:20, 82:23, 83:14
**agency** [1] - 39:3
**agenda** [2] - 9:13, 68:11
**ago** [3] - 9:24, 24:6, 24:8
**agree** [10] - 19:23, 19:24, 25:6, 32:14, 55:3, 55:5, 66:9, 92:14, 96:11, 97:7
**agreed** [20] - 5:16, 6:4, 6:15, 22:23, 49:16, 52:14, 52:17, 52:18,

54:9, 54:10, 54:13, 54:25, 57:4, 73:16, 77:9, 89:17, 89:19, 92:17, 92:19, 93:4

**agreed-upon** [1] - 77:9

**agreeing** [2] - 19:2, 73:7

**agreement** [19] - 7:8, 7:14, 8:5, 8:20, 18:13, 18:25, 37:21, 37:24, 48:2, 49:6, 49:14, 49:16, 49:18, 53:20, 54:7, 75:16, 75:19, 86:22, 89:21

**Agreement** [2] - 86:18, 87:12

**agreements** [5] - 7:11, 7:13, 47:12, 47:17, 47:25

**agrees** [1] - 18:9

**ahead** [5] - 6:6, 38:7, 63:13, 85:5

**air** [4] - 4:8, 4:10, 4:23, 91:14

**airtime** [1] - 8:7

**alike** [1] - 18:17

**allowed** [1] - 104:21

**allows** [1] - 11:19

**almost** [2] - 63:7, 96:1

**alone** [1] - 26:10

**amended** [3] - 7:14, 53:21

**amendment** [52] - 5:16, 6:4, 6:15, 7:4, 7:5, 7:9, 7:15, 7:16, 7:17, 7:19, 7:25, 8:2, 8:5, 8:17, 10:1, 10:2, 20:24, 20:25, 21:2, 22:15, 33:16, 33:20, 40:25, 43:21, 51:8, 51:9, 54:1, 54:4, 54:25, 55:9, 64:25, 65:2, 66:9, 68:11, 68:19, 68:20, 68:21, 68:24, 69:10, 69:11, 72:11, 72:25, 73:2, 73:8, 73:16, 95:5, 95:12, 95:24, 96:19

**American** [8] - 5:21, 48:25, 51:22, 52:6, 52:20, 60:21, 64:24, 66:18

**Americans** [1] - 60:9

**amount** [20] - 17:3, 18:23, 26:12, 50:12, 50:23, 51:14, 55:1, 55:11, 61:16, 62:13, 89:4, 100:17, 100:18, 101:3,

104:4, 101:8, 101:10, 103:6, 104:11, 104:21

**Amounts** [1] - 102:7

**amounts** [2] - 102:13, 102:25

**announced** [2] - 44:16, 47:15

**annual** [10] - 38:21, 38:22, 61:8, 61:9, 61:11, 61:17, 61:18, 61:19, 62:18

**answer** [8] - 79:7, 80:5, 80:11, 80:24, 81:8, 81:16, 85:19, 85:20

**answers** [3] - 9:4, 76:11, 90:8

**Answers** [1] - 79:3

**apologize** [3] - 38:14, 76:2, 99:22

**appeal** [2] - 92:24

**appear** [3] - 31:17, 89:15, 90:1

**application** [1] - 101:21

**apply** [2] - 13:5, 71:12

**appoint** [2] - 34:15, 35:6

**appointed** [3] - 34:17, 79:8, 80:6

**Appointing** [1] - 85:20

**appointing** [2] - 34:17, 80:11

**appointment** [1] - 85:17

**appropriate** [3] - 81:9, 96:22, 99:15

**arbitrarily** [2] - 96:20, 98:14

**argue** [2] - 93:6, 96:23

**arguing** [2] - 99:6, 103:23

**argument** [1] - 98:4

**Armstrong** [1] - 85:9

**aside** [1] - 91:16

**asleep** [1] - 76:21

**aspects** [1] - 19:16

**assets** [13] - 33:3, 45:20, 45:21, 45:23, 45:25, 46:2, 46:3, 58:9, 80:12, 81:11, 85:24, 85:25

**Association** [2] - 83:15, 84:5

**assumed** [1] - 35:10

**attachments** [1] - 82:11

**attention** [4] - 5:7, 5:11, 75:3, 77:3

**August** [14] - 10:3, 32:8, 33:10, 43:20, 61:21, 61:22, 65:4, 65:7, 65:11, 66:6, 68:7, 68:15

**authority** [6] - 41:18, 41:22, 83:6, 83:22, 84:14, 88:17

**authorization** [4] - 30:25, 34:4, 36:7

**authorized** [6] - 12:25, 34:4, 35:20, 35:25, 36:22, 48:16

**automatically** [2] - 18:21, 23:15

**available** [11] - 11:20, 12:8, 27:15, 46:25, 48:4, 48:17, 51:18, 51:19, 55:11, 70:24, 77:16

**avoided** [1] - 74:5

---

**B**

**B-e-l-a-c-k** [1] - 78:18

**backed** [26] - 14:25, 15:1, 15:5, 15:8, 15:14, 15:15, 15:17, 15:25, 16:2, 16:6, 16:7, 16:9, 16:13, 16:21, 17:4, 17:16, 17:25, 26:6, 26:22, 27:6, 27:22, 46:20, 48:9, 48:12, 70:14, 89:3

**backing** [1] - 57:2

**backwards** [2] - 65:8, 65:9

**bad** [8] - 26:15, 28:21, 31:24, 32:25, 33:13, 39:21, 46:23, 60:7

**balanced** [3] - 98:16, 99:16

**ball** [2] - 43:19, 60:18

**bank** [10] - 13:15, 14:11, 14:12, 15:2, 15:21, 16:19, 27:24, 39:24, 46:24

**banks** [16] - 13:4, 14:19, 14:20, 24:11, 24:22, 25:20, 25:21, 27:8, 27:12, 27:14, 27:15, 28:3, 28:10, 28:12

**based** [8] - 9:8, 22:12, 35:22, 38:16, 50:6, 59:18, 65:10, 101:20

**basis** [1] - 67:8

**battery** [1] - 47:23

**Bear** [1] - 24:19

**bear** [1] - 44:3

**beat** [1] - 29:21

**became** [10] - 17:14, 31:22, 35:19, 37:18, 42:11, 42:12, 42:22, 42:24, 53:19, 55:15

**become** [6] - 18:12, 23:15, 27:2, 35:7, 68:8, 73:23

**becomes** [1] - 37:17

**begin** [1] - 5:6

**beginning** [1] - 61:5

**begins** [1] - 49:24

**begun** [1] - 24:12

**behalf** [1] - 77:8

**behind** [7] - 5:12, 25:1, 27:1, 46:15, 48:6, 48:20, 86:25

**Belack** [15] - 3:7, 77:18, 77:20, 77:25, 78:8, 78:15, 78:18, 78:19, 78:25, 80:2, 81:23, 84:16, 84:24, 85:13, 89:7

**below** [3] - 32:23, 88:13

**Bench** [2] - 75:13, 76:1

**beneath** [1] - 87:5

**beneficial** [1] - 37:4

**benefit** [3] - 40:20, 46:4, 52:20

**Benson** [2] - 93:23, 94:3

**Berkley** [1] - 93:18

**best** [13] - 9:14, 31:2, 35:20, 36:7, 37:1, 37:8, 37:10, 37:11, 38:6, 42:15, 57:14, 67:25, 72:6

**better** [2] - 54:17, 66:16

**between** [11] - 7:8, 7:13, 13:8, 19:13, 29:7, 37:19, 47:13, 51:12, 87:2, 100:17, 101:3

**big** [4] - 12:3, 24:17, 24:20, 25:7

**billion** [35] - 26:12, 33:8, 33:9, 43:12, 48:4, 48:17, 48:23, 50:13, 50:16, 50:17, 50:18, 51:20, 53:23, 53:24, 54:19, 58:18, 58:24, 59:3, 74:16, 87:3, 88:5, 89:1, 89:4, 100:21, 100:23, 101:3, 101:5, 101:9,

101:11, 101:15, 101:25, 102:1, 104:9, 104:11

**billions** [6] - 24:13, 24:23, 27:3, 27:4, 52:6

**binder** [2] - 78:19, 81:24

**binding** [1] - 86:22

**birds** [1] - 62:2

**bit** [7] - 7:11, 10:5, 12:6, 65:3, 96:6, 98:24

**black** [1] - 58:11

**blank** [1] - 42:2

**block** [1] - 82:18

**board** [6] - 23:12, 23:19, 24:3, 41:18, 41:19, 41:22

**boards** [1] - 35:11

**books** [2] - 25:3, 85:25

**boring** [2] - 76:12, 76:21

**borrow** [1] - 14:1

**borrower** [8] - 13:15, 13:16, 13:24, 14:13, 15:19, 15:24, 16:14, 16:18

**borrowers** [8] - 12:8, 13:10, 14:7, 27:15, 36:13, 42:5, 57:15, 66:24

**borrows** [1] - 13:15

**bottom** [5] - 16:15, 32:19, 36:15, 53:7, 71:23

**bought** [7] - 14:19, 17:10, 17:13, 24:25, 25:16, 48:9, 103:1

**bound** [1] - 24:1

**bounds** [2] - 101:13, 102:19

**box** [1] - 67:1

**breach** [2] - 73:3, 73:4

**break** [6] - 6:6, 13:21, 14:16, 23:20, 49:21, 63:9, 63:14, 73:13

**bridge** [1] - 11:18

**briefly** [4] - 13:7, 64:10, 67:15, 74:10

**bring** [3] - 4:8, 64:2, 77:3

**bringing** [1] - 80:7

**brings** [2] - 54:21, 64:25

**Britney** [1] - 30:20

**broad** [3] - 83:6, 83:22, 84:14

**broader** [1] - 7:8
**broke** [1] - 48:14
**Brothers** [1] - 24:18
**bullet** [7] - 86:17, 86:21, 87:1, 87:5, 87:9, 88:24
**bullets** [1] - 36:16
**bundle** [1] - 14:24
**bundles** [1] - 15:10
**business** [17] - 12:13, 14:14, 22:8, 26:5, 31:1, 34:22, 34:24, 35:9, 35:13, 45:23, 45:25, 46:1, 80:20, 81:10, 83:5, 83:21, 84:13
**businesses** [2] - 24:14, 24:16
**buy** [33] - 11:19, 12:14, 13:11, 13:15, 14:1, 14:8, 14:11, 14:13, 15:2, 15:10, 15:15, 16:7, 17:20, 17:24, 19:2, 19:4, 20:9, 20:12, 20:13, 20:18, 20:20, 21:1, 22:8, 23:4, 23:5, 23:14, 27:10, 28:1, 28:3, 28:4, 39:6, 46:20
**buying** [13] - 17:21, 18:21, 22:23, 23:13, 26:22, 26:23, 27:5, 27:7, 27:11, 27:13, 47:10, 57:17, 70:13
**buys** [5] - 18:5, 18:8, 18:12, 23:6, 37:14

**C**

**calculated** [1] - 50:10
**calculates** [1] - 98:6
**Calloway** [1] - 4:17
**cap** [3] - 55:1, 55:14, 60:11
**capabilities** [1] - 43:7
**capacity** [3] - 80:15, 87:2, 87:23
**capital** [5] - 43:12, 46:9, 87:7, 88:5, 89:6
**capped** [2] - 55:10, 57:19
**car** [1] - 18:23
**careful** [2] - 66:12, 104:1
**carry** [3] - 9:11, 9:12, 81:10
**case** [52] - 5:1, 5:8, 5:15, 5:25, 6:1, 6:10,

7:6, 9:23, 11:7, 11:13, 11:21, 16:7, 17:6, 17:9, 18:2, 18:7, 19:12, 19:21, 20:23, 21:13, 22:13, 24:6, 28:17, 29:16, 30:7, 30:15, 35:18, 37:15, 38:16, 40:18, 49:22, 54:22, 55:8, 55:16, 66:21, 68:18, 70:9, 70:10, 72:2, 74:12, 74:25, 75:5, 77:19, 90:19, 91:12, 93:18, 97:4, 97:10, 99:20, 99:23
**cash** [3] - 61:18, 69:15, 71:11
**catastrophic** [1] - 28:14
**causes** [1] - 25:7
**CC** [1] - 82:8
**center** [1] - 7:6
**certain** [2] - 18:23, 23:12
**certainly** [5] - 74:2, 74:3, 91:25, 97:25, 102:9
**certificate** [1] - 19:8, 22:25, 23:14, 23:16, 73:22
**CFO** [1] - 62:24
**chair** [2] - 31:17, 77:20
**challenged** [2] - 40:9, 101:18
**challenging** [11] - 49:14, 49:17, 53:10, 54:7, 72:20, 72:22, 72:24, 72:25, 101:1, 102:1
**chance** [1] - 36:17
**chances** [1] - 67:12
**change** [6] - 19:12, 19:15, 19:16, 42:22, 96:2, 105:2
**changed** [3] - 47:23, 68:22, 96:5
**changes** [3] - 19:12, 19:15, 73:22
**changing** [2] - 19:19, 102:13
**charge** [5] - 8:17, 30:23, 52:16, 52:19, 52:21
**charged** [1] - 86:2
**chart** [3] - 40:16, 41:12, 58:13
**charter** [2] - 11:8, 11:9
**charters** [1] - 11:5, 11:6, 42:11

**charts** [1] - 40:15
**check** [1] - 67:2
**chirping** [1] - 62:2
**choice** [3] - 71:8, 71:24, 71:25
**choose** [1] - 21:10
**chose** [1] - 72:14
**chosen** [4] - 71:5, 71:6, 77:14, 77:17
**circular** [13] - 49:23, 59:10, 59:22, 59:23, 62:10, 64:22, 68:21, 68:25, 69:9, 70:1, 70:11, 70:21, 72:10
**circumstances** [1] - 74:21
**claim** [6] - 42:19, 54:6, 72:18, 73:2, 73:7, 73:10
**class** [1] - 93:17
**clear** [15] - 12:16, 12:17, 15:9, 21:11, 25:6, 35:18, 36:8, 41:15, 49:13, 68:10, 72:19, 98:11, 99:15, 102:18, 105:4
**clearly** [4] - 31:13, 72:14, 99:14, 102:16
**clients** [5] - 5:11, 29:16
**close** [4] - 5:10, 26:11, 33:5, 42:22
**closely** [2] - 32:8, 96:9
**closer** [1] - 34:12
**clumsy** [1] - 103:25
**collapse** [3] - 25:5, 33:6, 66:13
**collapses** [1] - 28:14
**collapsing** [1] - 33:23
**collected** [1] - 52:22
**Collender** [1] - 82:7
**combined** [2] - 87:6, 89:3
**combined)** [1] - 87:3
**combining** [1] - 14:18
**comfortable** [1] - 92:25
**coming** [2] - 54:16, 104:13
**Commission** [3] - 38:10, 38:25, 39:12
**commitment** [41] - 48:5, 48:17, 50:1, 50:21, 50:22, 51:12, 51:14, 51:16, 51:17, 52:9, 52:11, 54:2, 54:5, 54:14, 54:20, 55:2, 55:10, 55:12, 57:4, 57:5, 57:18, 58:7, 58:17, 58:19,

59:11, 59:17, 59:18, 60:12, 60:14, 60:16, 64:23, 65:22, 66:4, 66:5, 66:23, 69:6, 70:3, 70:5, 70:11, 70:21, 72:11
**committed** [2] - 47:4, 53:1
**Committee** [1] - 84:6
**common** [7] - 38:15, 41:3, 41:4, 43:12, 44:22, 88:6, 88:7
**companies** [24] - 6:23, 10:19, 10:20, 10:21, 11:1, 11:5, 12:2, 12:22, 12:24, 13:1, 21:9, 23:3, 24:16, 34:21, 37:22, 37:25, 39:5, 39:6, 39:7, 41:8, 41:10, 56:18, 61:24, 87:19
**Company** [14] - 79:9, 80:6, 80:7, 80:13, 80:15, 80:19, 80:25, 81:9, 81:11, 85:23, 85:24, 85:25, 86:2
**company** [29] - 12:3, 17:12, 17:13, 17:15, 18:3, 18:11, 18:12, 20:10, 20:15, 21:8, 21:24, 22:2, 22:3, 22:5, 22:9, 39:8, 39:11, 39:13, 39:15, 39:16, 39:23, 39:25, 40:13, 43:16, 44:10, 45:6, 56:25, 62:22
**Company's** [6] - 79:10, 80:12, 80:19, 81:10, 81:14, 81:16
**company's** [3] - 11:12, 33:2, 45:20
**compared** [2] - 103:2, 103:7
**comparing** [4] - 100:20, 100:23, 102:25, 103:5
**comparison** [4] - 101:2, 101:20, 102:5, 102:11
**compensate** [2] - 52:5, 52:10
**compensation** [1] - 53:3
**competing** [1] - 98:21
**complete** [1] - 48:1
**completed** [1] - 81:1
**completely** [16] - 6:7, 6:17, 15:12, 22:17, 33:15, 35:25, 36:3, 39:9, 68:17, 69:25,

70:4, 70:20, 72:12, 74:22, 102:3
**complicated** [2] - 15:10, 25:2
**component** [1] - 8:4
**compounds** [1] - 102:9
**comprehensive** [2] - 62:4, 62:18
**concern** [1] - 80:18
**concerned** [2] - 4:5, 27:2
**concluded** [1] - 105:14
**condition** [5] - 34:21, 79:10, 80:13, 81:1, 81:10
**conditioning** [1] - 91:14
**conditions** [4] - 34:25, 35:1, 55:3, 55:4
**Conference** [1] - 82:12
**conference** [2] - 75:13, 76:1
**confess** [1] - 99:23
**confidence** [13] - 26:22, 27:4, 27:5, 28:2, 43:6, 46:13, 46:14, 46:19, 48:21, 53:24, 70:13, 80:14, 87:22
**confirming** [1] - 64:22
**confuse** [2] - 98:1, 98:8
**confusing** [3] - 98:25, 99:12, 105:1
**confusion** [1] - 45:17
**Congress** [20] - 10:22, 11:1, 11:5, 12:2, 12:4, 12:25, 13:11, 29:1, 29:2, 29:8, 29:12, 29:17, 29:22, 42:13, 43:24, 47:7, 47:9, 48:16, 74:4, 88:17
**connection** [2] - 29:7, 94:25
**consent** [2] - 49:4, 53:7
**consented** [1] - 49:12
**consequences** [2] - 28:15, 32:3
**conservator** [28] - 6:15, 6:25, 12:25, 32:6, 34:15, 34:16, 35:6, 35:7, 35:8, 35:10, 35:19, 36:25, 37:4, 37:20, 41:21, 42:5, 42:11, 42:14,

42:21, 42:25, 57:13, 57:14, 65:14, 70:17, 74:20, 83:6, 83:22, 84:14

**Conservator** [11] - 79:12, 80:4, 80:5, 80:11, 81:7, 81:8, 83:9, 83:25, 85:18, 85:21, 86:1

**Conservator'** [1] - 85:20

**Conservator's** [1] - 80:25

**conservatorship** [56] - 12:21, 30:9, 30:19, 30:22, 30:24, 34:5, 34:8, 36:23, 40:14, 40:21, 41:1, 41:8, 41:19, 42:9, 42:12, 42:18, 42:20, 43:3, 44:11, 46:2, 46:6, 47:15, 53:11, 53:12, 53:14, 53:16, 54:12, 55:18, 55:20, 55:22, 56:17, 56:19, 56:22, 72:20, 79:6, 79:7, 79:10, 80:10, 80:14, 80:23, 81:2, 81:4, 81:15, 81:16, 81:18, 83:1, 83:2, 83:5, 83:17, 83:18, 83:21, 84:10, 84:11, 87:20, 87:21, 100:25

**Conservatorship** [1] - 79:3

**conservatorships** [3] - 53:8, 88:16, 103:8

**conserve** [6] - 43:12, 45:20, 46:9, 80:12, 81:11, 88:5

**conserved** [1] - 46:2

**consider** [12] - 7:21, 7:22, 56:1, 66:20, 73:25, 90:20, 95:10, 95:23, 96:18, 98:9, 98:13

**consideration** [1] - 90:12

**considered** [1] - 96:4

**considering** [2] - 56:7, 66:19

**consistent** [2] - 96:24, 98:16

**conspiracy** [1] - 68:15

**context** [4] - 7:24, 94:16, 96:25, 100:14

**continue** [16] - 26:6, 44:22, 45:1, 46:15, 46:20, 48:22, 58:12, 58:16, 67:22, 70:15,

80:20, 81:17, 81:19, 88:8, 88:10, 88:13

**continued** [5] - 26:14, 29:18, 46:5, 55:19, 60:13

**continued)** [1] - 87:12

**continues** [1] - 60:1

**continuing** [4] - 54:18, 60:17, 66:3, 86:11

**contract** [44] - 7:25, 12:17, 12:22, 18:4, 18:6, 18:7, 18:10, 18:15, 18:16, 18:18, 18:22, 19:7, 19:11, 19:12, 19:15, 19:19, 21:17, 21:20, 22:22, 22:23, 23:8, 23:20, 23:23, 23:25, 24:2, 37:15, 37:17, 37:19, 42:23, 45:12, 47:13, 50:9, 50:10, 53:9, 53:10, 53:19, 56:12, 56:14, 59:7, 87:2

**contracts** [10] - 18:17, 18:20, 19:14, 21:24, 22:2, 22:13, 73:10, 73:19, 73:21

**contractual** [8] - 7:23, 22:19, 23:17, 38:4, 41:7, 41:23, 56:7, 72:15

**contractually** [1] - 57:21

**contradicted** [1] - 68:17

**contributed** [2] - 43:9, 80:16

**control** [1] - 79:8

**controlled** [1] - 18:4

**Conventional** [1] - 84:6

**COO** [1] - 82:19

**cool** [1] - 4:24

**copy** [1] - 40:3

**corporate** [2] - 11:4, 35:11

**counsel** [13] - 5:2, 5:6, 5:23, 26:19, 31:13, 31:18, 33:11, 33:12, 35:24, 73:3, 77:13, 77:17, 99:25

**count** [3] - 20:5, 56:2, 69:20

**country** [5] - 11:16, 11:20, 24:9, 24:12, 65:4

**counts** [2] - 20:6, 21:20

**couple** [2] - 25:11, 88:1

course [7] - 10:1, 31:23, 34:24, 53:17, 75:8, 92:19, 97:1

**court** [6] - 31:20, 75:20, 76:7, 90:7, 90:15, 90:23

**Court** [32] - 63:9, 63:16, 64:9, 75:16, 76:3, 76:4, 89:18, 91:7, 94:25, 95:8, 95:9, 96:10, 96:15, 96:24, 97:3, 97:5, 97:11, 97:13, 97:23, 98:9, 98:12, 98:22, 98:25, 99:15, 100:16, 101:2, 101:12, 102:2, 102:3, 104:19

**COURT** [50] - 4:5, 4:13, 47:20, 56:5, 63:7, 63:10, 63:13, 64:1, 64:4, 64:13, 64:16, 75:7, 75:21, 76:6, 76:8, 77:11, 77:13, 78:3, 78:10, 79:14, 84:19, 89:9, 89:11, 89:19, 89:25, 91:9, 91:11, 91:23, 92:6, 92:10, 93:3, 93:9, 93:12, 93:22, 94:2, 94:8, 94:13, 94:18, 94:20, 97:19, 99:19, 100:2, 100:4, 102:21, 103:9, 103:11, 103:13, 103:15, 105:7, 105:13

**Court's** [8] - 92:19, 96:2, 96:16, 97:9, 98:16, 101:18, 101:22, 102:20

**COURTROOM** [2] - 4:18, 63:16

**courtroom** [1] - 4:8

**covenant** [1] - 73:4

**cover** [3] - 58:21, 69:5, 86:6

**crashing** [1] - 74:6

**create** [2] - 11:5, 29:15

**created** [14] - 10:13, 10:21, 10:23, 10:24, 11:1, 13:11, 25:20, 25:25, 26:3, 29:22, 29:24, 31:11, 36:20, 88:18

**credibility** [1] - 90:19

**credit** [1] - 89:2

**creditors** [1] - 34:23

**crisis** [6] - 12:24, 25:2, 25:8, 33:24, 60:8,

65:14

**critical** [5] - 11:18, 12:8, 18:1, 19:25, 28:21

**critically** [1] - 11:14

**cross** [1] - 90:22

**CROSS** [1] - 84:22

**Cross** [1] - 3:8

**CROSS-EXAMINATION** [1] - 84:22

**Cross-Examination** [1] - 3:8

**cross-examined** [1] - 90:22

**crucial** [1] - 51:7

**crushed** [1] - 24:25

**crystal** [3] - 35:18, 60:18, 68:10

**curious** [1] - 7:5

**current** [3] - 43:10, 80:17, 87:25

**custodian** [1] - 86:1

**cycle** [1] - 70:12

## D

**damages** [12] - 74:10, 74:14, 74:15, 95:13, 95:25, 96:3, 96:4, 96:5, 98:4, 98:13, 98:25, 99:14

**danger** [2] - 28:19, 64:22

**data** [1] - 98:6

**date** [11] - 19:21, 19:25, 21:20, 40:7, 43:22, 50:12, 54:22, 55:8, 55:25, 56:10, 86:19

**dated** [2] - 44:7, 61:22

**Davis** [10] - 11:3, 20:16, 25:11, 67:16, 70:22, 70:23, 71:2, 71:4, 71:17, 74:10

**days** [1] - 75:4

**de** [1] - 67:21

**de-risking** [1] - 67:21

**deal** [1] - 31:3

**dealership** [1] - 18:23

**dealing** [2] - 23:25, 73:5

**debt** [4] - 86:25, 87:13, 89:2

**decade** [2] - 9:23, 24:6

**decades** [1] - 8:14

**December** [21] - 19:20, 19:22, 19:25, 20:7, 21:20, 38:5, 54:21, 54:23, 55:7,

55:9, 55:15, 55:23, 56:2, 56:8, 56:23, 57:16, 57:22, 58:2, 60:10, 74:1, 74:23

**decide** [12] - 22:2, 22:6, 22:7, 23:21, 30:7, 31:20, 35:22, 38:16, 54:11, 56:18, 65:10

**decides** [2] - 24:4, 37:8

**deciding** [1] - 66:8

**decision** [9] - 8:19, 34:11, 34:13, 65:6, 67:5, 67:8, 72:23, 97:11, 101:22

**decisions** [4] - 7:1, 8:19, 66:22, 93:19

**deck** [1] - 86:6

**declared** [2] - 23:12, 23:18

**dedicated** [1] - 8:14

**deemed** [1] - 57:14

**deeper** [2] - 59:15

**deeply** [1] - 54:18

**default** [1] - 26:9

**defendants** [11] - 4:14, 5:1, 75:15, 84:25, 89:8, 92:12, 97:2, 99:6, 100:6, 104:23, 105:10

**defendants'** [1] - 95:2

**defined** [2] - 83:2, 83:18

**definitely** [1] - 19:24

**deletes** [2] - 96:14, 96:16

**deliberate** [1] - 77:16

**demand** [1] - 52:14

**demands** [1] - 34:23

**DeMarco** [33] - 7:21, 8:6, 8:7, 8:8, 8:13, 8:22, 8:24, 9:9, 9:20, 31:16, 45:23, 45:24, 54:23, 65:3, 65:12, 66:8, 66:20, 66:22, 67:11, 67:18, 68:6, 68:14, 69:7, 70:17, 71:4, 71:8, 72:14, 73:15, 74:3, 74:20, 82:5, 82:19

**DeMarco's** [3] - 65:5, 68:11, 70:8

**Democrats** [1] - 8:16

**demonstrated** [1] - 99:1

**demonstrative** [2] - 100:7, 101:8

**denied** [1] - 102:2

**dep** [1] - 76:15

**Department** [5] - 49:5, 58:19, 59:6, 88:18, 95:5
**depended** [1] - 29:12
**deposition** [22] - 42:1, 63:23, 75:23, 76:5, 76:10, 89:16, 89:20, 90:1, 90:4, 90:9, 90:10, 90:11, 90:14, 90:15, 90:20, 91:1, 91:2, 93:17, 93:20, 93:22, 93:25, 94:7
**depositions** [4] - 75:21, 76:8, 76:13, 76:17
**Deputy** [1] - 82:19
**DEPUTY** [2] - 4:18, 63:16
**describe** [2] - 27:19, 96:15
**described** [3] - 21:7, 99:25, 103:22
**designated** [1] - 79:12
**designation** [1] - 93:17
**designations** [1] - 93:25
**designed** [1] - 97:1
**desperately** [1] - 12:25
**detail** [2] - 39:2, 51:5
**determination** [3] - 34:16, 35:3, 80:24
**determinations** [1] - 34:19
**determine** [2] - 95:25, 96:5
**determined** [2] - 56:8, 81:20
**determines** [1] - 37:1
**determining** [3] - 98:13, 98:14, 99:14
**differ** [1] - 35:24
**difference** [3] - 19:13, 100:17, 101:3
**different** [16] - 10:20, 15:12, 17:16, 18:15, 18:18, 19:7, 41:12, 51:16, 74:17, 74:18, 95:16, 96:9, 100:3, 103:4, 103:25
**digress** [1] - 38:11
**dime** [2] - 68:15, 69:24
**diminished** [1] - 97:15
**dire** [1] - 30:16
**DIRECT** [1] - 78:13
**direct** [1] - 65:15
**Direct** [1] - 3:7
**direction** [1] - 60:2
**directly** [7] - 36:24,

43:9, 47:5, 65:2, 80:16, 96:16, 104:18
**Director** [8] - 43:25, 44:20, 45:9, 72:23, 81:1, 82:19, 84:6, 85:21
**director** [15] - 8:9, 8:11, 30:5, 31:10, 31:23, 34:3, 34:7, 34:14, 35:9, 43:14, 49:5, 54:24, 85:23, 89:14, 90:3
**Director's** [1] - 80:24
**directors** [6] - 23:13, 23:19, 24:3, 35:11, 41:18, 79:11
**disagree** [1] - 96:13
**disastrous** [1] - 28:14
**discretion** [3] - 23:13, 23:19, 24:4
**discussion** [1] - 45:19
**dispute** [11] - 10:25, 11:3, 19:11, 20:17, 21:18, 32:11, 37:3, 37:7, 64:6, 64:7, 92:14
**disputed** [2] - 94:12, 94:15
**disputes** [3] - 93:17, 93:19, 93:20
**disregard** [1] - 98:7
**distinction** [1] - 13:7
**distinguish** [1] - 51:12
**distributions** [1] - 43:15
**dividend** [77] - 21:14, 21:22, 22:4, 22:6, 22:10, 22:16, 22:18, 22:21, 23:18, 23:22, 24:3, 49:20, 50:3, 50:6, 50:7, 50:8, 50:13, 50:14, 50:20, 50:21, 50:23, 50:25, 51:1, 51:2, 51:6, 51:13, 51:14, 51:17, 51:21, 54:13, 55:4, 58:22, 59:4, 59:11, 59:12, 59:14, 60:1, 60:4, 60:14, 60:23, 61:7, 61:8, 61:11, 61:17, 61:18, 62:5, 62:8, 62:11, 62:13, 62:16, 63:4, 66:4, 68:23, 69:2, 69:3, 69:6, 69:8, 69:12, 69:13, 69:14, 69:15, 69:17, 69:19, 69:21, 69:25, 70:2, 70:3, 70:5, 70:11, 71:5, 71:11, 71:15, 72:21,

99:5
**dividends** [52] - 6:13, 6:20, 6:23, 12:15, 21:6, 21:9, 21:25, 31:5, 43:13, 43:15, 43:22, 43:23, 43:25, 44:9, 44:14, 44:25, 45:6, 45:8, 45:10, 45:13, 46:9, 49:3, 49:6, 49:7, 49:8, 49:12, 54:9, 56:12, 56:13, 56:18, 57:11, 62:18, 65:17, 72:22, 72:23, 88:6, 95:3, 96:19, 100:18, 100:23, 101:4, 101:10, 101:16, 102:8, 102:14, 103:3, 103:7, 104:4, 104:8, 104:10, 104:22
**Docket** [1] - 97:25
**document** [26] - 19:8, 63:22, 70:25, 78:23, 79:1, 79:4, 79:13, 79:15, 79:20, 80:3, 80:8, 80:21, 81:5, 81:12, 81:23, 82:1, 82:21, 82:25, 83:10, 83:11, 83:16, 84:1, 85:10, 85:13, 86:5, 86:7
**document]** [1] - 82:13
**documents** [5] - 76:20, 78:20, 79:17, 85:2, 85:5
**dog** [1] - 98:24
**dollar** [2] - 32:21, 55:1
**dollars** [9] - 16:23, 24:13, 24:23, 26:12, 27:4, 32:22, 48:17, 50:13, 52:7
**doubled** [2] - 54:2, 54:5
**down** [17] - 12:6, 13:17, 13:21, 13:25, 14:17, 20:14, 23:20, 25:14, 26:14, 49:21, 60:10, 67:17, 67:19, 70:12, 73:13, 74:6
**downtown** [1] - 13:4
**drag** [1] - 30:10
**draw** [21] - 49:25, 50:4, 50:20, 55:6, 58:8, 58:10, 58:12, 58:17, 59:10, 59:14, 59:22, 59:23, 60:1, 62:10, 64:22, 66:3, 69:5, 69:9, 70:2, 102:4

**drawing** [5] - 50:22, 57:3, 58:7, 59:17, 59:25
**drawn** [5] - 50:12, 50:23, 54:19, 59:18, 69:23
**draws** [15] - 49:23, 58:21, 59:12, 60:13, 62:9, 62:12, 62:17, 66:5, 68:21, 68:25, 70:1, 70:10, 70:21, 72:10
**drew** [1] - 58:23
**drive** [2] - 62:9, 62:16
**drop** [2] - 99:2, 99:8
**drum** [1] - 29:21
**dual** [1] - 87:21
**duration** [2] - 83:4, 83:20
**during** [7] - 12:23, 40:25, 76:21, 81:14, 81:16, 90:9, 92:4
**duty** [1] - 86:2

## E

**early** [3] - 25:16, 68:7, 87:19
**earnings** [5] - 53:2, 61:12, 61:19, 69:15, 69:22
**easier** [1] - 14:7
**East** [5] - 82:11, 82:12, 82:16, 82:23, 86:6
**easy** [5] - 85:4, 92:2, 92:17, 93:15, 94:14
**ECF** [3] - 78:1, 93:18
**Economic** [2] - 29:5, 29:10
**economic** [2] - 29:12, 88:8
**economics** [1] - 8:13
**economists** [1] - 32:15
**economy** [26] - 5:21, 9:20, 11:14, 24:17, 25:3, 25:4, 26:14, 27:17, 28:9, 28:13, 28:15, 28:24, 29:8, 29:10, 32:4, 33:23, 46:23, 48:24, 55:19, 55:21, 59:24, 60:6, 64:25, 65:13, 66:18, 70:7
**Ed** [1] - 82:19
**Edward** [1] - 82:5
**Edwards** [1] - 4:3
**effect** [1] - 6:24
**effective** [1] - 70:20

**effectively** [1] - 87:14
**effects** [1] - 27:17
**either** [4] - 23:14, 90:23, 95:12, 95:24
**EJD** [1] - 82:12
**eliminate** [7] - 46:8, 68:20, 69:8, 70:20, 72:10, 72:23, 100:20
**eliminated** [20] - 43:13, 43:14, 43:15, 43:21, 43:23, 43:25, 44:10, 44:14, 49:6, 56:15, 68:24, 68:25, 69:11, 70:1, 70:4, 70:6, 88:7, 88:9, 101:22
**eliminating** [1] - 69:12
**elsewhere** [2] - 101:23
**email** [2] - 82:3, 82:14
**embarrassed** [2] - 76:4, 76:5
**end** [19] - 24:22, 32:13, 33:15, 50:17, 54:16, 58:2, 58:3, 64:3, 72:2, 73:17, 74:11, 74:24, 75:5, 80:23, 81:4, 90:18, 97:24, 104:10
**ended** [3] - 5:6, 33:25, 34:1
**ends** [3] - 34:17, 40:9, 40:10
**engineering** [1] - 4:6
**enhance** [3] - 43:7, 80:15, 87:22
**enormous** [2] - 9:5, 9:6
**ensures** [1] - 86:22
**ensuring** [2] - 36:20, 53:1
**ent** [1] - 10:17
**enter** [2] - 8:20, 18:6
**entering** [1] - 37:15
**enterprise** [4] - 30:1, 34:20, 34:22, 35:1
**enterprise's** [1] - 34:24
**Enterprises** [2] - 86:10, 87:6
**enterprises** [6] - 10:17, 35:3, 53:2, 54:11, 66:1, 95:4
**Enterprises'** [2] - 89:2, 89:5
**entire** [10] - 7:25, 25:2, 25:4, 27:25, 28:13, 28:15, 32:3, 59:23, 59:24
**entirely** [2] - 68:25, 74:20

**entitled** [4] - 23:11, 51:18, 51:21, 97:2
**entity** [5] - 37:2, 79:8, 80:5, 83:4, 83:20
**equal** [1] - 69:15
**erode** [2] - 70:11, 72:10
**eroded** [1] - 70:5
**erosion** [3] - 60:16, 64:22, 70:21
**especially** [3] - 82:16, 102:15, 104:3
**espouse** [1] - 97:3
**essentially** [4] - 40:16, 95:7, 97:3, 102:4
**establish** [1] - 79:8
**established** [2] - 72:21, 88:16
**evaluate** [4] - 7:24, 35:23, 67:9, 74:15
**evaluating** [1] - 65:5
**event** [1] - 9:25
**events** [5] - 9:22, 9:23, 24:6, 65:24, 71:17
**evidence** [95] - 5:14, 5:15, 5:25, 6:1, 6:3, 6:10, 7:18, 8:12, 8:22, 9:8, 9:19, 10:25, 11:7, 11:15, 11:17, 12:23, 14:14, 18:2, 19:18, 20:21, 21:15, 21:19, 22:12, 24:7, 24:10, 24:21, 26:13, 28:17, 28:18, 28:20, 33:1, 33:4, 33:24, 34:9, 34:10, 35:17, 35:22, 36:3, 36:19, 37:13, 38:16, 38:17, 38:19, 40:18, 45:21, 46:22, 47:2, 48:2, 48:3, 52:3, 52:8, 55:17, 56:9, 56:10, 57:9, 57:20, 58:1, 58:23, 59:2, 59:16, 59:22, 60:25, 65:10, 68:9, 68:16, 68:17, 69:2, 71:7, 71:14, 71:25, 72:13, 73:14, 75:9, 75:10, 77:15, 77:22, 78:6, 79:15, 79:17, 92:3, 92:8, 92:22, 95:3, 95:8, 95:12, 95:24, 96:4, 96:18, 96:24, 97:3, 97:14, 97:16, 98:3, 100:20
**exacerbated** [1] - 87:24
**exact** [3] - 52:4, 81:3, 103:4

**exactly** [9] - 34:6, 60:2, 62:3, 62:15, 69:9, 72:7, 93:13, 101:14
**Examination** [2] - 3:7, 3:8
**EXAMINATION** [2] - 78:13, 84:22
**examine** [1] - 9:5
**examined** [1] - 90:22
**example** [3] - 18:10, 50:11, 58:4
**exceed** [1] - 58:9
**exceeded** [1] - 61:19
**exceeds** [3] - 61:9, 61:11, 61:17
**exception** [1] - 74:9
**excerpt** [1] - 84:8
**excerpts** [2] - 77:14, 77:17
**excess** [3] - 62:4, 62:18, 63:4
**exchange** [2] - 23:5, 23:7
**Exchange** [3] - 38:10, 38:25, 39:12
**exclude** [1] - 95:3, 95:8, 102:2
**excuse** [2] - 26:10, 78:10
**executive** [2] - 39:16, 39:20
**executives** [1] - 62:22
**exercise** [1] - 74:23
**exhibit** [1] - 79:21
**Exhibit** [16] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 78:1, 78:5, 78:22, 81:24, 83:11, 84:2, 92:7
**exhibits** [9] - 77:14, 77:16, 77:22, 91:21, 92:20, 100:9, 100:10, 100:11, 101:7
**Exhibits** [1] - 3:10
**exist** [4] - 10:14, 28:5, 28:7, 88:10
**existed** [1] - 19:20
**existence** [1] - 99:10
**existing** [1] - 56:2
**exit** [4] - 53:10, 53:12, 53:13, 54:11
**expect** [12] - 6:20, 11:23, 23:25, 24:1, 49:11, 57:11, 57:13, 62:3, 63:3, 72:2, 72:4, 75:9
**expectation** [4] -

22:19, 23:17, 38:5, 96:21
**expectations** [22] - 6:8, 6:18, 7:23, 20:2, 20:6, 20:7, 41:7, 41:24, 55:24, 55:25, 56:1, 56:7, 72:15, 73:12, 73:18, 73:24, 74:22, 98:15, 100:19, 101:6, 104:17, 104:21
**expected** [6] - 6:11, 12:11, 25:15, 57:22, 74:2, 74:3
**expense** [2] - 7:1, 31:8
**experienced** [1] - 45:25
**expert** [2] - 28:16, 104:13
**experts** [2] - 25:2, 25:6
**expiration** [1] - 86:18
**explain** [3] - 25:3, 51:5, 67:24
**explained** [2] - 31:13, 97:13
**explanatory** [2] - 63:22, 63:24
**explored** [1] - 30:12
**exposed** [1] - 91:17
**expressly** [1] - 102:10
**extension** [1] - 37:5
**extent** [2] - 18:16, 45:16
**extra** [1] - 71:15
**extremely** [1] - 30:6
**eye** [3] - 9:1, 9:2, 43:19

## F

**faced** [1] - 9:6
**facilitate** [1] - 88:20
**Facilities** [1] - 88:19
**facing** [2] - 60:21, 65:4
**Fact** [1] - 79:2
**fact** [8] - 18:1, 35:25, 51:6, 52:23, 53:18, 55:16, 68:17, 101:14
**facts** [4] - 66:5, 66:6, 66:7, 104:15
**factual** [1] - 34:19
**failed** [1] - 71:13
**failing** [1] - 24:15
**fair** [5] - 23:24, 23:25, 73:5, 90:11, 98:19
**fairly** [1] - 99:6
**faith** [2] - 73:4
**fall** [1] - 76:21

**familiar** [2] - 18:19, 25:17
**Fannie** [201] - 5:3, 5:5, 5:13, 6:22, 9:18, 10:6, 10:13, 10:16, 10:23, 11:8, 11:15, 11:17, 11:21, 12:1, 12:4, 12:7, 12:18, 13:3, 13:4, 13:12, 13:20, 14:8, 14:11, 14:13, 14:14, 14:20, 14:21, 15:2, 15:3, 15:6, 15:11, 15:13, 15:15, 15:21, 15:22, 16:11, 16:19, 16:20, 17:2, 17:4, 17:9, 17:10, 17:14, 17:23, 17:25, 18:5, 18:6, 18:9, 18:10, 18:12, 18:13, 19:1, 19:5, 21:5, 21:11, 21:21, 22:14, 22:17, 22:19, 23:10, 26:4, 26:6, 26:7, 26:11, 26:16, 27:1, 27:3, 27:6, 27:7, 27:11, 27:13, 28:1, 28:2, 28:5, 28:7, 28:23, 29:18, 29:22, 30:4, 30:8, 31:1, 31:25, 32:5, 32:6, 32:9, 32:14, 33:5, 33:7, 33:12, 33:14, 34:2, 34:4, 34:8, 35:12, 36:8, 36:20, 37:10, 37:19, 37:21, 38:9, 38:13, 38:18, 38:20, 38:24, 39:17, 40:11, 40:16, 40:18, 41:19, 42:8, 42:10, 42:15, 43:2, 43:7, 44:9, 44:17, 44:23, 45:2, 45:5, 46:10, 46:14, 46:25, 47:3, 47:5, 47:7, 47:9, 47:10, 48:4, 48:6, 48:10, 48:12, 48:13, 48:18, 48:20, 48:21, 48:23, 49:2, 50:11, 50:14, 50:16, 50:19, 50:20, 51:2, 52:13, 52:19, 52:21, 53:4, 53:11, 53:15, 54:17, 56:21, 56:23, 57:2, 57:3, 57:6, 57:17, 58:4, 58:6, 58:15, 58:18, 58:20, 59:2, 59:5, 59:16, 60:17, 60:20, 60:22, 60:25, 61:6, 61:7, 62:21, 62:25, 64:21, 65:16, 67:13, 67:21,

68:8, 68:22, 69:3, 69:14, 69:20, 69:21, 69:24, 70:2, 70:14, 71:1, 71:10, 71:12, 73:10, 74:19, 74:25, 87:22, 88:20, 100:22, 100:24, 102:8, 103:1, 103:6
**Fannie's** [1] - 35:11
**fans** [1] - 4:9
**far** [5] - 55:22, 70:11, 99:4
**fast** [1] - 46:11
**faster** [1] - 25:15
**features** [1] - 35:17
**February** [1] - 61:6
**Federal** [4] - 34:14, 79:2, 82:19, 82:23
**federal** [13] - 12:12, 12:16, 12:17, 19:10, 28:21, 28:22, 28:25, 34:1, 35:20, 37:17, 47:4, 48:5, 83:14
**fee** [11] - 51:12, 51:16, 51:17, 51:21, 51:24, 52:1, 52:4, 52:9, 52:24, 54:14
**few** [7] - 10:4, 12:6, 19:23, 36:2, 51:5, 51:10, 73:17
**fewer** [1] - 28:4
**FHFA** [87] - 5:3, 5:13, 5:16, 5:18, 5:20, 5:21, 6:1, 6:3, 6:4, 6:11, 6:14, 6:25, 7:8, 7:13, 8:9, 8:11, 9:18, 11:22, 12:12, 12:25, 29:15, 29:17, 30:4, 30:5, 30:25, 31:10, 31:23, 32:6, 34:3, 34:7, 35:6, 35:9, 35:13, 35:19, 35:25, 36:3, 36:8, 36:20, 36:22, 37:4, 37:5, 37:8, 37:20, 37:22, 37:25, 38:5, 41:21, 42:3, 42:4, 42:7, 42:11, 42:13, 45:2, 45:21, 47:13, 47:15, 49:16, 52:23, 54:8, 54:10, 54:12, 54:16, 56:22, 57:22, 60:10, 65:3, 65:21, 71:1, 73:8, 73:11, 73:15, 74:13, 74:20, 74:25, 81:8, 83:9, 83:25, 84:14, 85:21, 88:19, 89:14, 90:3
**filed** [3] - 61:5, 61:25, 62:25

**filing** [12] - 38:18, 38:19, 38:20, 38:21, 39:20, 40:7, 44:4, 44:5, 61:4, 61:14, 62:21, 63:5
**filings** [16] - 38:9, 38:11, 38:22, 38:24, 39:15, 39:24, 40:1, 40:19, 41:14, 44:2, 44:16, 61:3, 61:22, 64:19, 64:20, 66:2
**fill** [1] - 10:9
**Final** [1] - 82:12
**final** [4] - 19:17, 81:12, 95:19, 97:17
**finally** [2] - 88:14, 88:24
**Finance** [5] - 34:14, 79:2, 82:23, 83:14, 84:6
**financial** [21] - 11:24, 12:23, 24:12, 24:20, 25:1, 25:8, 30:24, 33:24, 37:23, 38:7, 46:10, 46:11, 46:12, 46:24, 60:8, 65:13, 80:7, 81:20, 86:12, 88:14, 98:5
**Financial** [1] - 82:20
**findings** [1] - 34:19
**fine** [2] - 55:21, 93:3
**finish** [4] - 63:21, 64:5, 67:15, 72:17
**firm** [1] - 76:9
**firms** [1] - 77:19
**first** [40] - 6:4, 7:15, 29:22, 30:20, 31:10, 31:22, 36:11, 44:24, 47:16, 47:24, 53:6, 53:21, 54:1, 54:4, 58:3, 58:14, 58:15, 63:14, 64:8, 77:6, 78:22, 82:1, 82:21, 85:10, 85:11, 85:13, 86:11, 86:17, 86:21, 87:9, 90:3, 92:15, 92:17, 92:18, 92:21, 92:23, 94:22, 96:14, 103:9
**firsthand** [1] - 32:10
**fit** [1] - 74:15
**five** [5] - 8:15, 16:21, 16:22, 16:23, 63:1
**fixed** [16] - 49:20, 50:3, 50:7, 50:25, 51:6, 55:4, 58:22, 59:4, 60:4, 60:23, 62:11, 69:1, 69:3, 69:8, 69:12
**flies** [1] - 76:12

**flip** [1] - 87:16
**Florida** [1] - 84:7
**flow** [2] - 12:8, 70:15
**flowing** [7] - 14:7, 27:14, 36:12, 42:5, 46:21, 57:15, 66:24
**focus** [1] - 74:7
**focusing** [1] - 102:6
**follow** [1] - 104:25
**Ford** [6] - 17:18, 17:19, 17:20, 17:22
**Ford's** [1] - 17:20
**form** [5] - 22:4, 22:20, 31:4, 67:1, 104:22
**format** [1] - 102:24
**forth** [1] - 18:24
**fortunate** [1] - 20:13
**forward** [2] - 75:5, 78:9
**four** [8] - 33:16, 33:21, 40:8, 40:24, 44:1, 49:10, 54:3
**fourth** [1] - 50:16
**frame** [1] - 81:3
**Freddie** [181] - 5:4, 5:5, 5:13, 6:22, 9:19, 10:6, 10:13, 10:17, 10:23, 11:8, 11:15, 11:17, 11:22, 12:1, 12:4, 12:7, 12:18, 13:3, 13:4, 13:12, 13:20, 14:8, 14:11, 14:13, 14:15, 14:21, 15:2, 15:3, 15:6, 15:12, 15:14, 15:16, 15:21, 15:22, 16:11, 16:19, 16:20, 17:2, 17:4, 17:9, 17:10, 17:14, 17:23, 17:25, 18:5, 18:6, 18:9, 19:1, 19:5, 21:5, 21:12, 21:21, 22:14, 22:18, 22:20, 26:4, 26:5, 26:6, 26:7, 26:11, 26:16, 27:3, 27:6, 27:7, 27:11, 27:13, 28:1, 28:2, 28:5, 28:7, 28:23, 29:18, 29:22, 30:4, 30:8, 31:1, 32:1, 32:5, 32:7, 32:10, 32:14, 33:5, 33:7, 33:12, 33:14, 34:2, 34:5, 34:8, 35:10, 36:9, 36:21, 37:11, 37:19, 37:21, 38:14, 38:20, 38:24, 40:12, 40:16, 40:19, 41:19, 42:8, 42:10, 42:15, 43:2, 43:7, 44:9,

44:17, 44:24, 45:2, 45:5, 46:10, 46:14, 46:25, 47:3, 47:6, 47:8, 47:10, 48:5, 48:6, 48:10, 48:13, 48:18, 48:20, 48:21, 48:24, 49:2, 51:2, 52:13, 52:19, 52:21, 53:11, 53:16, 54:17, 56:21, 56:23, 57:2, 57:3, 57:6, 57:18, 58:23, 59:3, 59:5, 59:16, 60:17, 60:20, 60:22, 60:25, 61:6, 61:10, 62:15, 64:21, 65:16, 67:14, 67:21, 68:8, 68:22, 69:4, 69:14, 69:20, 69:22, 69:24, 70:2, 70:14, 71:1, 71:10, 71:13, 73:10, 74:19, 74:25, 87:22, 88:20, 100:23, 100:24, 102:8, 103:2, 103:6
**Freddie's** [4] - 27:1, 35:12, 38:9, 53:4
**freeze** [1] - 27:16
**front** [1] - 92:18
**frustrated** [1] - 73:11
**fulfill** [8] - 29:19, 31:7, 35:4, 41:10, 42:8, 43:7, 80:15, 87:23
**fulfilling** [2] - 42:11, 88:21
**full** [6] - 17:3, 37:25, 38:1, 69:21, 77:15, 104:18
**fully** [2] - 30:13, 52:10
**funding** [1] - 33:11
**funds** [1] - 47:9
**future** [6] - 50:24, 53:1, 62:9, 62:16, 65:20, 66:20

**G**

**gamble** [1] - 66:17
**gathered** [1] - 67:6
**generally** [2] - 21:5, 21:7
**generate** [3] - 62:3, 62:17, 63:4
**gentlemen** [1] - 75:7
**giant** [1] - 24:16
**given** [11] - 46:15, 57:10, 66:11, 74:4, 81:3, 95:15, 95:18, 96:9, 97:8, 97:16, 97:25
**gizmo** [1] - 4:16

**goal** [6] - 13:11, 42:12, 43:6, 74:7, 74:8, 87:21
**goals** [2] - 80:10, 80:13
**goodness** [1] - 52:18
**governed** [3] - 18:3, 19:8, 21:16
**government** [21] - 10:17, 10:19, 12:10, 12:12, 12:13, 12:18, 28:22, 28:25, 29:13, 29:25, 30:1, 34:2, 39:3, 47:4, 48:6, 48:20, 56:24, 57:1, 60:7
**government-sponsored** [2] - 10:17, 30:1
**grand** [1] - 13:25
**graph** [1] - 86:9
**graphs** [1] - 25:11
**grateful** [1] - 5:11
**green** [14] - 32:17, 32:18, 32:19, 32:22, 32:23, 58:13, 85:8, 85:16, 86:9, 87:10, 87:17, 88:3, 88:12
**green-highlighted** [1] - 85:8, 88:3, 88:12
**ground** [1] - 42:25
**grounds** [2] - 34:16, 95:5
**growing** [1] - 68:4
**GSE** [2] - 86:22, 87:2
**GSEs** [4] - 82:9, 84:12, 84:15, 86:25
**GSEs'** [2] - 45:23, 45:24
**guarantee** [5] - 11:16, 46:15, 48:11, 53:25, 56:12
**guaranteed** [2] - 56:13, 87:15
**guaranteeing** [1] - 26:5
**guarantees** [1] - 16:12
**guaranty** [10] - 16:10, 16:12, 16:15, 16:17, 17:2, 26:21, 27:1, 27:2, 48:15, 48:19
**guard** [2] - 65:23, 70:9

**H**

**half** [4] - 11:16, 86:11, 91:6
**Hamish** [5] - 63:19, 91:4, 97:21, 99:22, 103:20

**hand** [2] - 63:23, 89:17
**hands** [2] - 15:24, 45:4
**hanging** [1] - 53:4
**happy** [1] - 98:21
**harder** [1] - 104:25
**harm** [7] - 95:12, 95:24, 98:23, 98:25, 99:1, 99:10, 99:13
**harmed** [1] - 99:8
**Hartman** [4] - 94:19, 100:8, 100:10, 101:24
**Hartman's** [1] - 94:16
**head** [1] - 53:5
**header** [1] - 82:3
**health** [1] - 80:7
**hear** [30] - 7:4, 13:7, 20:3, 24:7, 28:16, 28:17, 31:12, 31:20, 32:13, 35:18, 41:25, 45:22, 47:5, 59:20, 60:15, 67:18, 71:7, 71:14, 74:14, 74:17, 74:18, 75:4, 75:10, 90:9, 93:10, 98:3, 98:4, 98:5, 98:7, 104:2
**heard** [36] - 7:6, 7:10, 8:6, 8:21, 9:22, 10:8, 10:10, 10:16, 10:18, 11:2, 12:20, 14:25, 15:7, 17:10, 19:23, 20:4, 20:15, 21:6, 24:5, 29:4, 30:11, 31:9, 31:12, 33:6, 45:19, 46:5, 47:12, 49:23, 55:25, 59:20, 60:18, 71:17, 73:3, 73:6, 74:16, 90:2
**heart** [2] - 46:18, 52:18
**heat** [1] - 4:6
**held** [8] - 4:4, 4:12, 63:15, 64:12, 75:20, 76:7, 86:1, 91:20
**help** [4] - 43:6, 80:14, 87:22, 105:4
**helped** [1] - 64:18
**helpful** [1] - 95:16
**helpfully** [1] - 31:14
**hemorrhaging** [1] - 48:14
**HERA** [18] - 12:19, 29:7, 29:14, 29:17, 30:5, 31:11, 34:3, 35:18, 36:15, 36:17, 36:20, 42:13, 42:17, 42:19, 43:24, 47:7,

53:18
**herself** [1] - 77:21
**hew** [1] - 104:18
**high** [4] - 20:12, 20:13, 66:11
**highlighted** [10] - 44:21, 85:6, 85:8, 85:15, 86:8, 87:10, 87:17, 88:3, 88:12, 88:25
**highlighting** [1] - 85:6
**highly** [3] - 12:10, 12:11, 56:24
**himself** [2] - 8:24, 34:17
**hindsight** [1] - 95:7
**historical** [2] - 61:12, 61:19
**hit** [4] - 42:25, 55:10, 59:10, 60:11
**hold** [4] - 20:11, 20:20, 21:2, 25:22
**holders** [2] - 87:13, 89:2
**Holders** [1] - 23:9
**hole** [1] - 59:15
**Holzmann** [1] - 97:11
**home** [6] - 13:11, 13:16, 25:12, 28:5, 30:1, 30:2
**homeowner** [5] - 15:20, 16:5, 16:8, 16:24, 16:25, 17:3, 26:25, 27:23
**homeowners** [1] - 26:9
**homes** [4] - 11:19, 25:16, 26:2, 60:10
**Honor** [49] - 4:16, 4:22, 10:12, 10:16, 19:16, 19:18, 37:16, 56:4, 63:8, 63:12, 64:15, 73:3, 73:21, 75:14, 75:19, 76:2, 77:7, 77:24, 78:9, 79:25, 84:18, 84:20, 89:10, 89:13, 91:4, 91:10, 91:22, 91:25, 92:1, 92:3, 92:9, 92:11, 94:5, 94:24, 96:1, 97:10, 97:20, 97:22, 99:18, 100:14, 102:14, 102:22, 102:24, 103:12, 103:17, 103:20, 105:10, 105:12
**Honor's** [1] - 93:6
**hope** [2] - 4:20, 25:18
**hopefully** [2] - 64:9,

76:21
**hot** [1] - 4:10
**hour** [2] - 91:5, 91:6
**house** [3] - 14:1, 25:19, 25:23
**housing** [26] - 5:19, 11:20, 13:13, 25:9, 25:10, 26:14, 27:24, 28:13, 28:23, 29:7, 29:9, 29:13, 32:2, 48:22, 48:24, 58:12, 59:23, 60:19, 60:21, 64:24, 65:23, 65:24, 66:18, 67:12, 70:6, 74:5
**Housing** [7] - 29:5, 29:10, 34:14, 79:2, 82:19, 82:23, 83:14
**huge** [10] - 22:5, 25:16, 26:3, 26:4, 48:17, 52:5, 53:5, 59:19, 60:16, 60:21
**human** [2] - 39:16, 45:24
**Hume** [6] - 63:19, 91:4, 92:1, 97:21, 99:22, 103:20
**HUME** [14] - 56:4, 63:18, 64:2, 64:5, 75:12, 89:13, 89:21, 91:4, 92:1, 97:21, 99:22, 100:3, 103:18, 105:12
**hundred** [3] - 26:12, 48:17, 50:13
**hundreds** [3] - 24:13, 24:22, 52:6

---

### I

**idea** [3] - 59:25, 67:17, 68:14
**identical** [2] - 100:11, 102:24
**igloo** [1] - 103:16
**Ill** [1] - 84:5
**imagine** [1] - 25:1
**imagines** [1] - 99:2
**immediately** [3] - 85:21, 95:18, 97:16
**impaired** [1] - 80:20
**impartial** [1] - 90:12
**impermissible** [1] - 101:12
**implements** [1] - 88:16
**implications** [1] - 32:2
**implied** [1] - 73:4
**important** [28] - 9:23, 10:11, 10:15, 11:13,

11:14, 16:6, 17:6, 19:21, 29:15, 30:6, 35:14, 35:16, 35:17, 39:9, 39:21, 42:2, 42:3, 42:4, 42:7, 42:18, 51:1, 53:8, 54:22, 55:8, 55:16, 55:24, 67:3
**importantly** [6] - 9:10, 22:11, 45:24, 57:12, 88:14, 88:21
**imposing** [1] - 55:20
**impression** [1] - 104:22
**improper** [2] - 101:20, 102:10
**inception** [1] - 61:10
**include** [4] - 45:12, 73:21, 73:22, 73:23
**included** [1] - 95:19
**includes** [2] - 19:10
**including** [8] - 8:19, 39:22, 43:2, 44:8, 55:3, 55:4, 60:13, 87:14
**income** [9] - 15:23, 15:24, 61:9, 61:17, 62:4, 62:17, 62:18, 63:4
**incomes** [1] - 26:2
**increase** [5] - 50:22, 50:23, 60:1, 62:12, 71:12
**increased** [1] - 59:12
**increasingly** [2] - 62:9, 62:16
**incredibly** [1] - 66:11
**indeed** [2] - 43:19, 68:3
**index** [1] - 25:12
**indicated** [1] - 96:10
**indicating** [1] - 94:5
**individual** [7] - 14:19, 27:22, 27:23, 27:24, 30:23, 62:4, 101:24
**inference** [1] - 101:12
**inferences** [1] - 103:25
**informal** [1] - 5:5
**information** [6] - 67:4, 67:7, 98:6, 102:3, 102:18, 103:21
**informed** [2] - 100:19, 101:5
**informs** [1] - 41:23, 104:17
**initial** [1] - 7:14
**insolvency** [1] - 34:25
**insolvent** [2] - 32:14, 32:24

**instability** [3] - 43:9, 80:17, 87:24
**instances** [1] - 93:5
**instead** [5] - 69:23, 71:5, 71:20, 77:21, 96:3
**institution** [6] - 46:24, 83:3, 83:7, 83:19, 83:23, 84:12
**institutions** [4] - 24:12, 24:20, 24:24, 25:21
**instruct** [3] - 19:19, 56:6, 72:3
**instructed** [2] - 10:12, 73:21
**instruction** [14] - 14:4, 63:23, 63:25, 77:9, 89:17, 94:24, 95:10, 95:15, 95:21, 96:22, 97:1, 97:6, 97:8, 98:22
**instructions** [8] - 19:17, 35:23, 75:8, 90:18, 95:20, 96:8, 97:15, 97:17
**insurance** [1] - 18:11
**intend** [1] - 94:6
**intended** [4] - 39:24, 52:10, 83:3, 83:19
**interest** [27] - 5:24, 6:2, 6:4, 6:6, 6:12, 6:16, 7:1, 11:24, 13:1, 13:2, 13:18, 31:7, 36:1, 36:4, 36:11, 37:6, 37:11, 38:1, 38:2, 42:15, 42:21, 44:13, 46:6, 46:8, 57:7, 65:18
**interests** [15] - 6:6, 9:14, 35:20, 36:5, 36:7, 36:9, 37:2, 37:9, 37:10, 38:6, 38:7, 38:8, 68:1, 88:9, 89:2
**interrupt** [1] - 79:14
**interrupting** [1] - 76:2
**interruption** [1] - 80:20
**introduce** [1] - 100:10
**introduced** [2] - 97:17, 99:7
**invested** [9] - 33:7, 100:18, 101:3, 101:8, 101:15, 102:14, 102:25, 103:6, 104:5
**Invested** [1] - 102:7
**investment** [5] - 27:2, 33:18, 33:22, 48:11,

104:20
**Investment** [1] - 83:14
**investments** [2] - 53:3, 104:3
**investor** [10] - 16:1, 16:2, 16:9, 16:13, 16:22, 17:1, 17:5, 17:24, 27:22, 48:21
**investors** [28] - 14:16, 15:7, 15:8, 15:9, 15:10, 15:14, 15:17, 15:18, 15:22, 15:25, 16:4, 16:7, 17:2, 17:17, 17:19, 26:7, 26:21, 26:23, 28:2, 46:14, 46:16, 46:20, 48:9, 48:11, 48:12, 48:19, 57:17, 70:13
**invites** [1] - 102:10
**inviting** [1] - 93:11
**irrelevant** [1] - 99:8
**issuance** [1] - 100:22
**issuances** [1] - 87:14
**issue** [13] - 21:24, 22:6, 22:10, 22:18, 23:3, 23:22, 24:4, 74:14, 81:2, 98:23, 100:6, 100:12, 103:4
**issued** [6] - 23:1, 23:2, 23:4, 49:8, 104:8, 104:10
**issues** [6] - 30:6, 91:6, 91:24, 94:14, 94:15, 100:4
**issuing** [1] - 49:3
**item** [3] - 11:10, 93:15
**items** [2] - 92:13, 92:14
**itself** [2] - 36:17, 39:11

---

### J

**jail** [1] - 39:22
**James** [4] - 31:11, 84:5, 89:14, 91:2
**January** [3] - 55:11, 57:19, 61:15
**Jill** [4] - 3:7, 77:18, 78:8, 78:18
**job** [4] - 29:18, 32:9, 65:21, 70:18
**jobs** [2] - 24:14, 26:1
**joint** [2] - 93:16, 94:10
**Jonathan** [2] - 4:25, 75:14
**JONES** [25] - 84:20, 84:23, 85:9, 85:12, 86:14, 87:4, 89:8, 92:11, 93:4, 93:10, 93:13, 93:23, 94:4,

94:9, 94:14, 94:19, 94:21, 97:20, 100:6, 102:22, 103:10, 103:12, 103:14, 103:16, 105:10
**Jones** [2] - 84:24, 92:11
**Jones**................. [1] - 3:8
**judge** [2] - 10:24, 56:6
**Judge** [6] - 5:2, 14:4, 63:18, 72:1, 72:3, 73:9
**July** [5] - 24:22, 29:2, 31:11, 32:8, 88:18
**jump** [1] - 23:14
**June** [1] - 61:15
**junior** [1] - 100:22
**jurors** [2] - 4:5, 5:9
**jury** [48] - 4:4, 4:12, 4:20, 6:9, 7:18, 8:24, 9:16, 11:1, 19:7, 20:21, 37:3, 40:17, 42:17, 43:18, 49:10, 50:7, 53:9, 57:9, 63:15, 63:20, 64:6, 64:12, 66:10, 68:2, 68:10, 70:8, 72:17, 76:11, 79:15, 79:18, 79:23, 84:21, 85:11, 91:7, 91:20, 92:19, 93:25, 95:10, 95:22, 96:7, 96:18, 97:16, 98:1, 98:12, 99:12, 104:2, 104:21
**juxtaposing** [2] - 101:15, 103:5
**juxtaposition** [1] - 101:16
**JX-1** [2] - 78:1, 78:5
**JX-1** ........................ [1] - 3:11

## K

**keep** [17] - 7:3, 14:6, 36:11, 36:12, 36:21, 42:5, 43:18, 45:8, 45:10, 45:14, 46:3, 46:21, 51:22, 55:7, 57:14, 59:16, 66:23
**keeps** [2] - 39:11, 59:15
**kept** [2] - 52:15, 68:4
**key** [10] - 6:9, 8:19, 9:22, 9:25, 40:18, 49:1, 49:21, 50:19, 55:15, 68:21
**kind** [13] - 12:14, 18:15, 18:18, 23:20,

31:14, 31:15, 32:16, 46:25, 47:3, 70:23, 71:6, 99:20
**kinds** [2] - 19:14, 58:25
**knowing** [1] - 29:9
**knowledge** [1] - 38:15
**known** [8] - 53:18, 56:11, 56:13, 56:15, 56:16, 56:17, 57:21, 74:21
**KRAVETZ** [18] - 77:7, 77:12, 77:24, 78:7, 78:14, 78:21, 78:24, 79:25, 80:1, 81:25, 82:2, 84:8, 84:17, 89:10, 91:21, 91:25, 92:2, 92:9
**Kravetz** [4] - 77:8, 85:2, 85:7, 86:5
**Kravetz**............... [1] - 3:7

## L

**ladies** [1] - 75:7
**Lamberth** [5] - 5:2, 14:4, 72:1, 72:3, 73:9
**language** [5] - 23:21, 71:9, 96:1, 96:2, 96:10
**large** [1] - 101:17
**last** [10] - 29:6, 64:17, 84:1, 84:8, 87:5, 89:22, 95:1, 99:4, 102:6, 103:25
**late** [2] - 24:11, 88:18
**law** [24] - 9:11, 9:14, 12:16, 12:17, 12:19, 19:12, 19:15, 29:1, 29:2, 29:4, 29:9, 35:12, 35:18, 35:20, 36:24, 37:7, 37:17, 37:18, 42:22, 47:8, 57:5, 73:22, 76:9, 77:19
**Lawler** [1] - 82:8
**laws** [2] - 19:10, 39:14
**lawyer** [2] - 8:24, 76:10
**lawyer's** [1] - 34:10
**lawyers** [7] - 4:10, 5:8, 5:9, 5:25, 23:20, 84:25, 90:6
**lawyers'** [2] - 71:2, 75:9
**learn** [37] - 5:24, 6:1, 6:14, 6:19, 7:20, 8:3, 8:12, 8:13, 8:15,

8:17, 8:23, 9:5, 9:8, 11:21, 12:1, 12:7, 12:9, 21:11, 21:23, 24:25, 25:10, 26:3, 26:10, 26:15, 31:22, 34:9, 36:3, 42:24, 47:14, 51:24, 52:3, 52:12, 58:2, 62:22, 65:12, 67:6, 72:1
**learned** [2] - 20:4, 104:4
**least** [3] - 16:1, 67:19, 100:9
**led** [1] - 103:25
**left** [3] - 11:8, 24:15, 25:24
**legal** [10] - 18:14, 35:3, 42:19, 54:6, 72:18, 73:2, 73:6, 79:7, 84:11, 86:22
**legally** [1] - 34:4
**legislation** [1] - 88:18
**Lehman** [1] - 24:18
**lend** [1] - 27:15
**Lending** [1] - 84:6
**less** [3] - 28:3, 90:13, 99:5
**letter** [1] - 52:25
**liabilities** [2] - 33:2, 58:9
**liable** [2] - 74:13, 75:1
**life** [1] - 66:17
**light** [2] - 91:5, 99:9
**likely** [3] - 27:16, 34:22, 34:25
**limine** [5] - 95:1, 100:15, 100:16, 102:2, 103:23
**Limine** [1] - 95:2
**limit** [1] - 12:13
**limitation** [2] - 96:15, 96:24
**limited** [2] - 83:4, 83:20
**limiting** [5] - 94:24, 95:10, 96:25, 97:6, 97:15
**line** [8] - 6:17, 7:22, 32:17, 32:23, 32:24, 39:19, 58:16, 71:23
**lingo** [2] - 5:1, 71:2
**liquidation** [7] - 49:20, 50:2, 50:4, 50:5, 50:6, 71:12, 71:18
**liquidity** [2] - 14:5, 88:22
**Lisa** [1] - 4:3
**listen** [1] - 91:16
**literally** [1] - 39:19
**live** [1] - 31:18

**loan** [4] - 13:5, 13:25, 28:3, 28:4
**loans** [3] - 12:14, 13:10, 13:12
**locate** [1] - 79:23
**Lockhart** [27] - 31:11, 31:13, 31:23, 32:5, 32:6, 32:10, 34:6, 34:7, 34:15, 35:2, 35:10, 41:25, 42:24, 43:14, 43:25, 44:6, 44:20, 45:9, 46:7, 47:5, 47:15, 49:5, 56:16, 63:24, 84:5, 89:14, 91:2
**Lockhart's** [4] - 72:23, 89:15, 91:1, 92:4
**Lockhart/FHFA/ conservator** [1] - 32:7
**long-term** [1] - 65:20
**look** [19] - 4:6, 9:1, 22:24, 34:11, 36:9, 36:17, 47:18, 51:19, 61:21, 65:6, 65:8, 66:15, 75:4, 79:20, 79:24, 94:2
**looking** [2] - 13:10, 48:12
**looks** [1] - 68:8
**looming** [1] - 55:14
**lose** [7] - 6:13, 26:22, 27:4, 27:5, 28:2, 54:18, 60:17
**losing** [6] - 24:12, 24:14, 27:3, 59:5, 60:22, 70:13
**losses** [3] - 58:22, 59:1, 86:10
**lost** [7] - 20:22, 24:22, 26:1, 26:11, 58:20, 59:3, 60:10
**loud** [3] - 77:18, 77:22, 85:1
**low** [3] - 20:12, 20:13, 70:12
**lunch** [1] - 4:21
**Lynch** [1] - 24:19

## M

**Mac** [17] - 5:4, 5:13, 9:19, 10:6, 10:23, 11:8, 15:12, 21:12, 22:14, 33:12, 37:11, 38:14, 38:20, 40:12, 87:22, 88:20, 102:8
**Mae** [24] - 5:3, 5:13, 9:19, 10:6, 10:23, 11:8, 15:11, 18:10,

18:12, 18:13, 21:11, 22:14, 23:10, 33:12, 37:10, 38:13, 38:18, 38:20, 39:17, 40:11, 62:21, 87:22, 88:20, 102:8
**magic** [1] - 55:21
**main** [3] - 14:14, 48:3, 98:20
**maintain** [1] - 86:23
**man** [1] - 31:11
**manage** [5] - 13:1, 30:25, 31:2, 31:4, 31:6
**managed** [4] - 41:2, 41:4, 41:8, 41:10
**management** [2] - 35:11, 41:18
**manages** [1] - 35:8
**managing** [2] - 32:9, 40:20
**mandatory** [1] - 50:8
**manner** [1] - 36:21
**March** [2] - 61:19, 92:20
**market** [67] - 5:19, 10:7, 10:11, 10:14, 11:11, 11:18, 12:5, 13:6, 13:8, 13:9, 13:14, 13:20, 13:24, 14:3, 14:6, 23:7, 23:15, 24:24, 25:8, 25:9, 26:14, 27:16, 27:24, 28:8, 28:13, 28:23, 29:8, 29:10, 29:13, 29:20, 30:3, 32:2, 36:12, 36:22, 39:4, 42:16, 43:10, 46:4, 46:5, 46:12, 46:19, 46:18, 48:22, 48:24, 51:23, 57:8, 57:24, 58:12, 59:23, 60:19, 60:21, 64:24, 65:23, 65:24, 66:18, 67:12, 68:1, 70:6, 70:16, 70:19, 74:5, 74:6, 80:17, 81:21, 87:25, 88:22
**massive** [1] - 25:20
**material** [1] - 96:14
**math** [1] - 40:9
**math-challenged** [1] - 40:9
**matter** [4] - 19:20, 46:18, 66:7, 72:2
**maturities** [1] - 87:14
**maximize** [4] - 40:23, 41:4, 41:9, 57:24
**maximum** [1] - 41:3
**Mayopoulos** [2] -

93:23, 94:3

**MBS** [19] - 15:1, 15:8, 15:10, 15:18, 17:19, 17:24, 26:7, 26:21, 26:23, 28:2, 46:14, 46:16, 46:19, 48:19, 48:21, 57:17, 70:13, 86:25, 87:13

**McFarland** [3] - 62:24, 93:24

**McFarland's** [1] - 93:24

**McGuire** [3] - 78:21, 81:25, 84:9

**mean** [8] - 9:17, 35:7, 40:6, 46:13, 67:19, 72:6, 102:15

**meaning** [2] - 52:16, 95:22

**means** [22] - 10:18, 14:18, 17:12, 25:18, 27:20, 30:15, 32:15, 33:2, 35:8, 37:3, 37:20, 38:19, 44:17, 44:23, 45:2, 45:21, 55:10, 72:5, 72:7, 74:13, 86:24, 95:11

**meant** [5] - 6:12, 36:8, 46:13, 50:13, 96:6

**meantime** [2] - 4:9, 91:24

**measure** [5] - 20:1, 95:13, 96:3, 96:4, 98:4

**meet** [1] - 34:23

**members** [22] - 4:20, 6:9, 7:18, 8:23, 9:16, 10:25, 19:7, 20:21, 37:3, 40:17, 42:17, 43:18, 49:10, 50:7, 53:9, 57:9, 66:10, 68:2, 68:10, 70:8, 72:17, 84:21

**memo** [4] - 34:19, 66:25, 67:2, 67:11

**mention** [1] - 10:12

**mentioned** [3] - 8:6, 30:20, 93:15

**Merrill** [1] - 24:19

**method** [5] - 75:21, 75:24, 76:8, 76:12, 76:17

**microphone** [2] - 47:20, 47:23

**might** [8] - 6:13, 11:24, 18:18, 18:19, 20:3, 20:13, 25:1, 26:16

**MIL** [1] - 97:24

**Miller** [3] - 97:10,

99:20, 99:21

**million** [1] - 60:9

**millions** [2] - 24:14, 60:9

**mind** [4] - 4:23, 99:15, 103:18

**minimum** [2] - 87:7, 89:5

**minor** [1] - 64:7

**minus** [2] - 32:17, 102:17

**minute** [9] - 5:17, 10:13, 13:23, 18:11, 48:13, 49:16, 54:8, 54:12, 73:13

**minutes** [6] - 10:5, 12:6, 51:5, 63:12, 64:16, 73:17

**mispronouncing** [1] - 78:10

**mission** [23] - 9:11, 11:2, 11:3, 11:4, 11:13, 11:24, 12:4, 12:5, 29:19, 35:4, 40:22, 40:23, 41:11, 42:8, 42:10, 42:12, 43:8, 67:13, 80:15, 87:23, 88:21

**Mission** [1] - 84:10

**mitigate** [2] - 43:8, 80:16

**modern** [1] - 75:23

**moment** [4] - 38:11, 91:22, 91:23, 95:17

**moments** [1] - 36:2

**money** [51] - 6:13, 9:17, 11:18, 11:19, 12:2, 12:8, 13:15, 14:7, 15:2, 17:1, 18:24, 22:3, 26:12, 27:14, 28:3, 33:6, 33:14, 36:12, 42:5, 45:8, 45:14, 46:21, 46:25, 47:4, 47:6, 48:14, 49:25, 50:21, 51:18, 51:20, 52:7, 52:13, 54:18, 55:6, 55:11, 57:14, 58:20, 59:5, 59:9, 59:11, 59:25, 60:1, 60:17, 60:22, 62:6, 62:13, 65:15, 66:23, 70:15, 71:18

**month** [3] - 16:3, 16:22, 34:5

**monthly** [5] - 13:18, 15:20, 15:23, 16:3, 16:4

**months** [2] - 50:16, 57:4

morning [43] - 4:2, 4:20, 5:2, 5:10, 7:5, 7:7, 7:10, 8:7, 8:21, 9:22, 10:9, 10:10, 10:18, 12:20, 14:25, 15:8, 17:11, 18:16, 19:24, 20:16, 21:6, 29:4, 30:12, 31:9, 31:12, 31:14, 32:17, 33:7, 35:24, 46:17, 47:12, 49:23, 60:18, 64:8, 67:17, 70:22, 92:16, 93:16, 94:16, 94:23, 99:20, 100:8, 105:8

**morning's** [1] - 20:22

**mortgage** [69] - 10:6, 10:11, 11:18, 12:5, 13:6, 13:8, 13:9, 13:14, 13:19, 13:24, 14:3, 14:6, 14:12, 14:13, 14:25, 15:1, 15:8, 15:14, 15:15, 15:17, 15:21, 15:25, 16:2, 16:6, 16:7, 16:9, 16:13, 16:14, 16:19, 16:21, 17:4, 17:16, 17:25, 25:8, 25:19, 25:22, 25:23, 25:24, 26:6, 26:8, 26:22, 27:6, 27:16, 27:22, 28:2, 28:4, 29:20, 30:3, 36:12, 36:22, 42:16, 46:4, 46:5, 46:20, 46:21, 48:9, 48:12, 51:23, 57:7, 57:24, 68:1, 70:14, 70:15, 70:18, 74:6, 88:22, 89:3

**mortgage-backed** [25] - 14:25, 15:1, 15:8, 15:14, 15:15, 15:17, 15:25, 16:2, 16:6, 16:7, 16:9, 16:13, 16:21, 17:4, 17:16, 17:25, 26:6, 26:22, 27:6, 27:22, 46:20, 48:9, 48:12, 70:14, 89:3

**mortgaged** [1] - 15:4

**mortgages** [28] - 11:11, 11:16, 12:9, 12:14, 13:10, 14:6, 14:8, 14:15, 14:18, 14:19, 14:20, 14:23, 14:24, 15:3, 25:17, 25:21, 25:22, 26:1, 27:8, 27:10, 27:13, 28:3, 28:11, 30:2, 42:6

**most** [15] - 10:20, 10:21, 21:24, 22:11, 23:5, 25:25, 29:15, 42:1, 42:2, 42:4, 42:7, 65:19, 88:21, 92:25

**motion** [6] - 94:25, 100:15, 101:1, 101:18, 102:2, 103:23

**Motion** [1] - 95:2

**motions** [1] - 100:16

**move** [3] - 77:25, 91:21, 92:3

**moved** [2] - 92:22, 100:20

**must** [4] - 42:14, 90:15, 90:20, 98:7

**mutually** [1] - 89:17

# N

**name** [7] - 4:25, 39:18, 63:2, 63:3, 63:6, 78:10, 78:17

**named** [2] - 31:11, 39:17

**namely** [1] - 17:25

**names** [2] - 24:18, 24:20

**National** [1] - 84:5

**nearly** [3] - 54:19, 87:6, 89:4

**necessary** [1] - 81:9

**need** [9] - 47:8, 55:6, 58:11, 65:10, 67:10, 89:19, 89:24, 93:13, 93:19

**needed** [9] - 28:25, 46:10, 46:12, 46:19, 47:1, 47:6, 58:25, 86:24, 88:20

**nefarious** [1] - 68:9

**negative** [5] - 32:16, 32:24, 33:1, 58:8, 66:2

**negotiate** [2] - 18:22, 19:5

**negotiated** [1] - 54:24

**negotiation** [1] - 19:1

**net** [53] - 5:18, 6:5, 6:16, 6:24, 7:7, 7:16, 7:25, 8:3, 8:4, 8:18, 10:2, 20:24, 20:25, 22:15, 32:16, 32:19, 32:21, 32:24, 33:1, 33:17, 33:20, 33:22, 40:25, 43:22, 44:1, 48:23, 49:10, 51:8, 51:22, 58:8, 61:9,

61:17, 62:4, 62:17, 65:1, 66:2, 66:9, 68:10, 68:20, 68:24, 69:10, 69:11, 69:18, 69:25, 72:11, 73:1, 73:8, 73:16, 86:10, 86:23, 96:20, 98:14, 99:4

**never** [3] - 20:18, 21:14, 70:2

**nevertheless** [2] - 92:25, 102:14

**new** [3] - 22:8, 22:9

**newer** [1] - 76:12

**news** [1] - 45:1

**next** [25] - 14:10, 47:14, 50:24, 59:13, 62:13, 64:5, 75:3, 79:4, 79:13, 80:2, 80:8, 80:21, 81:5, 81:23, 82:25, 83:10, 83:11, 83:16, 87:1, 88:13, 89:12, 89:13, 89:25, 91:5, 99:4

**nobody** [2] - 46:23, 46:24

**nonlawyers** [1] - 96:7

**normal** [4] - 34:24, 83:5, 83:21, 84:13

**normally** [1] - 4:7

**note** [2] - 79:16, 102:6

**NOTE** [3] - 4:2, 47:22, 91:2

**notes** [3] - 79:19, 82:15, 82:16

**nothing** [8] - 21:19, 33:19, 45:8, 84:17, 89:8, 89:10, 104:14, 105:10

**notifies** [1] - 39:12

**November** [5] - 40:7, 40:11, 40:12, 84:6

**number** [14] - 11:9, 11:10, 11:12, 25:16, 40:3, 52:4, 70:9, 70:17, 74:17, 74:18, 79:20, 79:21, 79:22

**numbers** [2] - 98:6, 101:17

**nut** [1] - 33:3

# O

**o'clock** [1] - 91:13

**oath** [5] - 9:4, 31:18, 31:21, 76:19, 90:5

**object** [4] - 93:8, 97:23, 97:25, 98:10

**objection** [8] - 56:4, 78:3, 91:10, 92:21,

93:1, 93:2, 100:7
**objections** [1] - 92:22
**objective** [7] - 72:8, 72:9, 72:12, 83:4, 83:20, 84:12
**obligation** [8] - 6:2, 57:6, 61:7, 61:8, 61:11, 61:18, 62:8, 62:16
**obligations** [3] - 34:23, 62:5, 63:4
**obtain** [1] - 12:9
**obviously** [1] - 64:20
**October** [3] - 82:6, 82:23, 83:15
**offer** [1] - 18:23
**officer** [1] - 85:23
**officers** [1] - 79:11
**offices** [1] - 13:5
**old** [4] - 24:8, 75:21, 76:8, 76:17
**once** [7] - 29:21, 37:20, 60:11, 79:15, 83:5, 83:21, 85:20
**one** [73] - 5:17, 6:5, 6:15, 6:21, 8:8, 11:9, 11:10, 11:12, 19:24, 24:4, 25:6, 25:7, 25:12, 26:11, 27:8, 27:10, 29:14, 29:15, 30:6, 32:20, 33:8, 35:16, 37:18, 39:15, 39:23, 41:12, 41:13, 43:5, 44:3, 44:18, 47:2, 47:16, 47:24, 49:2, 51:11, 53:6, 54:2, 60:17, 61:3, 61:12, 61:20, 62:23, 64:7, 64:17, 68:2, 68:7, 70:9, 70:18, 72:4, 73:17, 74:9, 77:18, 79:14, 84:24, 86:5, 87:5, 93:6, 93:15, 94:24, 95:18, 99:2, 99:8, 100:6, 100:12, 100:15, 100:16, 101:10, 102:6, 102:21, 102:22, 102:23, 103:9
**one-day** [1] - 99:8
**ones** [5] - 19:20, 56:1, 56:2, 92:17, 94:2
**ongoing** [2] - 52:11, 80:18
**open** [2] - 75:20, 76:7
**opening** [2] - 4:14, 90:2
**Opening** [1] - 3:3
**openings** [1] - 63:21

**operate** [6] - 36:21, 58:12, 58:17, 83:6, 83:22, 86:2
**operating** [1] - 58:21
**operation** [1] - 80:19
**operations** [4] - 80:19, 83:5, 83:21, 84:13
**opportunity** [1] - 67:9
**opposed** [1] - 31:15
**opposite** [2] - 62:3, 99:3
**option** [1] - 71:24
**optional** [1] - 50:8
**order** [9] - 30:4, 43:11, 58:16, 81:2, 88:5, 92:20, 96:2, 96:16, 96:25
**original** [3] - 23:8, 54:3, 100:21
**originally** [1] - 101:15
**Orlando** [1] - 84:7
**otherwise** [1] - 76:20
**ought** [1] - 98:11
**outstanding** [4] - 44:23, 45:1, 45:17, 88:8
**overruled** [2] - 56:5, 93:11
**oversee** [2] - 80:6, 84:14
**overseeing** [1] - 32:9
**oversight** [1] - 79:9
**owe** [1] - 62:13
**owed** [3] - 25:18, 50:14, 50:22
**own** [8] - 11:15, 15:13, 17:12, 17:18, 20:10, 45:11, 69:5
**owned** [1] - 25:21
**owner** [2] - 17:22, 17:24
**owners** [2] - 17:14, 17:19
**ownership** [1] - 21:16
**owning** [1] - 21:4

## P

**P.M** [1] - 82:6
**p.m** [1] - 105:14
**package** [4] - 14:23, 14:24, 15:4, 16:21
**pads** [1] - 79:16
**PAGE** [1] - 3:2
**page** [13] - 82:22, 83:12, 84:3, 85:11, 85:14, 86:7, 86:16, 87:8, 87:16, 88:2, 88:13, 97:24, 98:17
**pages** [1] - 97:13

**Paid** [1] - 102:9
**paid** [16] - 5:7, 16:10, 16:13, 28:11, 50:18, 51:7, 51:25, 56:18, 56:19, 95:4, 96:19, 100:24, 102:14, 103:3, 103:7, 104:4
**paralegal** [4] - 75:22, 76:9, 76:11, 77:18
**part** [33] - 7:7, 8:1, 8:4, 12:16, 17:6, 17:14, 17:19, 17:22, 17:24, 37:17, 42:23, 51:6, 53:19, 66:4, 69:1, 73:9, 73:23, 78:22, 79:4, 79:13, 80:2, 80:8, 80:21, 81:5, 81:12, 82:1, 82:21, 82:25, 83:10, 83:16, 92:2, 96:13, 101:17
**particular** [2] - 21:5, 23:1
**parties** [8] - 18:21, 75:16, 75:19, 92:13, 92:17, 92:25, 93:4, 94:11
**parties'** [1] - 93:16
**party** [8] - 18:13, 23:15, 24:2, 45:12, 86:1, 90:6, 94:12
**pass** [4] - 29:1, 77:9, 93:21, 95:16
**passed** [3] - 29:2, 29:9, 47:7
**past** [1] - 86:13
**Patrick** [1] - 82:8
**pay** [35] - 5:8, 5:10, 12:15, 16:18, 17:3, 25:24, 26:25, 34:23, 50:15, 50:16, 50:20, 50:21, 51:2, 52:20, 52:22, 59:6, 59:11, 59:17, 60:1, 60:13, 60:23, 62:6, 62:11, 65:17, 66:4, 69:6, 69:15, 69:23, 69:24, 70:3, 71:5, 71:6, 71:10, 71:13
**payable** [1] - 62:18
**paying** [4] - 16:5, 21:9, 26:7, 75:3
**payment** [19] - 13:17, 15:20, 15:23, 16:3, 16:4, 16:9, 16:14, 16:25, 51:14, 52:14, 52:15, 53:4, 59:7, 59:9, 60:5, 61:17, 69:21, 70:23, 71:6
**payments** [11] - 13:18, 15:19, 16:24, 25:23,

26:8, 26:25, 58:22, 68:23, 69:3, 69:5, 70:5
**PCF** [3] - 51:16, 52:9, 52:19
**peaked** [2] - 25:10, 25:14
**penalty** [1] - 71:15
**penny** [2] - 6:22, 6:23
**people** [37] - 4:7, 11:19, 13:12, 15:7, 15:10, 15:13, 15:15, 17:18, 17:20, 23:4, 23:5, 24:14, 24:24, 25:16, 25:18, 25:22, 25:25, 26:15, 26:17, 26:19, 26:20, 27:15, 27:19, 28:3, 28:4, 30:21, 38:14, 39:6, 45:25, 46:1, 51:22, 53:22, 53:23, 60:9, 60:21, 104:2
**per** [1] - 50:17
**percent** [34] - 49:20, 50:3, 50:5, 50:10, 50:13, 50:23, 50:25, 51:3, 51:13, 51:21, 54:13, 59:4, 59:6, 59:9, 59:14, 59:17, 60:4, 60:23, 62:7, 62:11, 69:4, 69:23, 71:5, 71:6, 71:11, 71:13, 71:14, 71:15, 71:21, 72:21, 99:5
**period** [6] - 10:4, 59:1, 61:12, 61:20, 80:23, 103:4
**periodic** [5] - 51:11, 51:16, 51:17, 52:9, 54:14
**periodically** [1] - 23:3
**permission** [5] - 49:4, 49:9, 53:15, 55:4, 56:20
**person** [9] - 18:11, 31:10, 39:18, 79:8, 80:5, 90:4, 90:15, 90:24
**person's** [1] - 30:23
**personally** [1] - 25:18
**perspective** [1] - 89:4
**pertains** [2] - 94:24, 100:14
**Ph.D** [1] - 8:13
**phone** [1] - 75:12
**phones** [1] - 93:14
**phrase** [2] - 43:9, 45:19
**piece** [3] - 17:13, 20:10, 40:18

**PIK** [4] - 70:23, 71:4, 71:20, 71:23
**place** [7] - 29:23, 36:22, 47:2, 53:20, 55:14, 55:18, 87:19
**placed** [1] - 90:5
**plaintiff** [5] - 22:13, 31:3, 31:5, 49:8, 49:11
**plaintiffs** [30] - 17:8, 17:9, 17:13, 21:13, 49:14, 53:9, 63:19, 71:23, 72:19, 75:11, 77:6, 77:8, 77:19, 77:25, 84:17, 89:13, 91:5, 94:5, 95:14, 96:11, 97:2, 97:7, 97:21, 100:8, 100:16, 101:2, 101:12, 101:19, 102:12, 103:20
**plaintiffs'** [10] - 20:23, 42:19, 72:18, 73:7, 77:13, 77:17, 79:21, 94:21, 96:17, 99:23
**Plaintiffs'** [15] - 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 78:5, 78:22, 81:24, 83:11, 84:1, 92:7
**plan** [2] - 80:25, 100:8
**plant** [1] - 22:8
**play** [1] - 61:25
**played** [3] - 24:17, 51:7, 91:3
**players** [1] - 15:12
**pockets** [2] - 9:17, 65:16
**podium** [1] - 78:19
**point** [9] - 25:3, 42:2, 42:17, 48:3, 53:6, 66:13, 68:2, 98:20, 104:16
**pointed** [1] - 64:18
**policy** [1] - 9:13
**poof** [1] - 55:21
**portfolio** [1] - 67:24
**portion** [10] - 4:2, 13:16, 16:1, 16:3, 50:15, 78:25, 85:8, 96:14, 96:22, 97:24
**portions** [2] - 77:22, 85:2
**posed** [2] - 64:24, 70:6
**position** [2] - 94:11, 94:12
**positive** [3] - 32:21, 53:2, 86:23

**possible** [1] - 63:21
**post** [1] - 96:19
**post-third** [1] - 96:19
**pot** [1] - 55:6
**power** [14] - 30:8,
35:12, 35:14, 36:10,
37:25, 38:1, 38:5,
41:21, 42:20, 43:24,
49:17, 54:9, 54:11,
56:17
**PowerPoint** [1] -
82:11
**powers** [12] - 30:5,
30:6, 35:10, 41:20,
57:23, 74:4, 74:23,
79:10, 81:7, 81:17,
85:22
**practices** [1] - 34:25
**precisely** [1] - 53:14
**preconservatorship**
[2] - 101:4, 101:16
**preference** [7] - 49:20,
50:2, 50:4, 50:5,
50:6, 71:12, 71:18
**Preferred** [3] - 86:18,
87:12, 102:7
**preferred** [13] - 7:10,
23:9, 43:13, 44:22,
47:11, 47:16, 47:25,
86:24, 88:6, 88:7,
89:1, 100:22, 100:24
**prejudice** [2] - 95:6,
97:14
**prejudicial** [1] - 98:2
**preliminary** [1] - 75:8
**prepared** [1] - 4:3
**presence** [5] - 4:4,
4:12, 63:15, 64:12,
91:20
**present** [5] - 81:2,
90:7, 92:16, 94:6,
104:15
**presentation** [4] -
10:10, 20:22, 83:12,
84:4
**presented** [3] - 90:10,
90:24, 93:25
**preserve** [3] - 45:19,
80:12, 81:11
**preserved** [2] - 46:2,
92:23
**President** [2] - 29:2,
29:17
**Presidents** [1] - 8:16
**press** [2] - 43:1, 91:15
**pretend** [1] - 35:9
**pretty** [1] - 25:6
**previous** [2] - 59:12,

104:9
**price** [5] - 13:17,
20:14, 25:12, 100:22
**prices** [2] - 25:10,
25:14
**primary** [5] - 13:8,
13:9, 13:14, 13:22,
13:24
**principal** [1] - 99:11
**print** [1] - 40:3
**priority** [3] - 65:16,
65:17, 70:9
**private** [22] - 6:6, 6:12,
6:21, 7:2, 11:25,
12:2, 21:11, 21:12,
21:21, 22:5, 23:10,
29:23, 31:3, 31:5,
31:8, 36:6, 44:8,
49:8, 95:12, 95:24,
100:24, 103:1
**Private** [1] - 102:7
**privileges** [1] - 85:22
**problem** [12] - 26:4,
27:19, 59:19, 59:22,
59:23, 60:16, 60:22,
62:10, 69:1, 69:9,
69:12, 102:9
**problematic** [1] -
55:15
**problems** [2] - 25:20,
25:25
**procedure** [3] - 97:9,
97:18
**proceed** [4] - 64:14,
75:11, 78:12, 91:1
**Proceedings** [8] - 4:4,
4:12, 63:15, 64:12,
75:20, 76:7, 91:20,
105:14
**process** [5] - 30:16,
79:7, 83:2, 83:18,
84:11
**product** [1] - 17:21
**products** [1] - 17:20
**profit** [7] - 22:1, 22:6,
22:7, 22:8, 43:15,
50:19, 51:3
**profitability** [1] - 63:1
**profitable** [1] - 68:8
**profits** [16] - 6:23,
21:8, 21:10, 22:20,
29:23, 31:4, 38:8,
42:3, 44:10, 44:11,
44:12, 45:6, 60:24,
69:16, 69:20, 71:19
**prohibited** [1] - 49:3
**promote** [2] - 30:1,
30:2
**prompted** [1] - 101:18
**property** [3] - 45:20,

80:12, 81:11
**proposed** [8] - 95:14,
96:8, 96:12, 96:22,
97:6, 97:9, 102:12
**prosecuted** [1] - 39:22
**prospectively** [1] -
61:8
**protect** [12] - 5:18,
5:20, 5:21, 9:20,
28:24, 46:8, 57:7,
57:24, 65:18, 66:23,
67:13, 89:1
**protecting** [1] - 53:1
**protection** [1] - 97:1
**provide** [9] - 10:14,
11:10, 12:5, 28:7,
51:22, 70:18, 83:6,
83:22, 88:19
**provided** [2] - 52:10,
88:15
**provides** [1] - 11:18
**providing** [4] - 14:5,
29:19, 30:2, 88:22
**provision** [6] - 7:16,
7:19, 10:1, 51:8,
53:8, 73:1
**provisions** [2] - 49:1,
51:10
**PSPA** [11] - 47:19,
48:4, 49:1, 49:2,
51:10, 52:8, 53:7,
53:21, 54:3, 54:25,
70:24
**PSPAs** [7] - 7:10,
47:11, 53:17, 53:19,
54:1, 71:9, 72:21
**public** [57] - 5:22,
5:23, 6:2, 6:4, 6:5,
6:12, 6:16, 7:1, 8:14,
9:15, 11:2, 11:3,
11:4, 11:12, 11:13,
11:23, 12:4, 13:1,
13:2, 29:19, 31:6,
31:7, 34:11, 35:4,
35:21, 36:1, 36:4,
36:8, 36:11, 37:5,
37:6, 37:9, 37:12,
38:1, 38:6, 38:9,
39:9, 39:12, 40:22,
40:23, 41:11, 42:8,
42:10, 42:12, 42:15,
42:21, 43:1, 43:2,
44:13, 46:4, 46:6,
46:8, 48:25, 57:7,
65:18
**publicly** [3] - 39:4,
39:7, 44:16
**pull** [4] - 85:9, 86:4,
100:13, 102:23
**pulled** [1] - 96:16

**pun** [1] - 39:24
**Purchase** [2] - 86:18,
87:12
**purchase** [5] - 7:11,
13:17, 47:11, 47:17,
47:25
**purchases** [1] - 86:23
**purpose** [7] - 80:6,
80:11, 102:18,
103:21, 103:22,
103:24, 104:6
**purposes** [2] - 65:5,
92:23
**pursuing** [1] - 9:13
**puts** [1] - 39:23
**putting** [5] - 9:17,
52:6, 65:15, 102:15,
103:18
**PX-0001-I** [1] - 103:14
**PX-001** [1] - 103:9
**PX-1-H** [1] - 100:13
**PX-1-I** [1] - 102:22
**PX-2-C** [3] - 78:1,
78:5, 85:10
**PX-2-C..........................**
[1] - 3:11
**PX-2-D** [2] - 92:3, 92:7
**PX-2-D..........................**
[1] - 3:12
**PX-2-E** [3] - 78:1,
78:5, 86:4
**PX-2-E..........................**
[1] - 3:12
**PX-515-B** [2] - 92:3,
92:7
**PX-515-B..........................**
. [1] - 3:13
**PX-520** [2] - 92:4, 92:7
**PX-520..........................**
[1] - 3:13
**PX-521** [2] - 78:2, 78:5
**PX-521..........................**
[1] - 3:14
**PX-522** [2] - 78:2, 78:6
**PX-522..........................**
[1] - 3:14
**PX-524** [2] - 78:2, 78:6
**PX-524..........................**
[1] - 3:15

**Q**

**Q3** [1] - 40:19
**Qs** [3] - 40:2, 40:5
**qualified** [1] - 45:25
**quarter** [32] - 40:2,
40:5, 40:9, 40:10,
40:13, 41:17, 50:8,
50:11, 50:15, 50:17,
50:20, 50:24, 51:3,

51:4, 51:7, 51:25,
52:24, 54:19, 58:3,
58:7, 58:8, 58:14,
58:15, 59:13, 60:23,
68:12, 69:16, 69:22,
87:6, 89:5, 104:4
**quarterly** [5] - 38:19,
38:20, 61:14, 69:20,
70:3
**quarters** [6] - 40:8,
50:24, 59:8, 69:4,
69:21, 86:13
**questions** [8] - 9:3,
30:18, 76:10, 79:2,
90:6, 90:7, 90:22
**quick** [1] - 92:13
**quite** [2] - 63:8, 93:25
**quotation** [1] - 98:18
**quote** [3] - 36:15,
36:24, 100:17

**R**

**raise** [2] - 100:5, 105:9
**ratably** [1] - 23:11
**rather** [2] - 63:10, 93:1
**RE** [1] - 82:9
**reach** [1] - 18:25
**read** [47] - 14:9, 41:1,
75:23, 76:5, 76:9,
76:10, 76:11, 76:20,
76:22, 77:4, 77:17,
77:22, 78:20, 78:25,
79:5, 80:2, 80:9,
80:22, 81:6, 81:13,
82:3, 82:14, 82:18,
82:22, 83:12, 84:3,
85:1, 85:6, 85:7,
85:13, 85:15, 85:19,
86:5, 86:8, 86:16,
86:21, 87:1, 87:5,
87:9, 87:17, 88:3,
88:12, 88:24, 90:10,
91:16, 95:9, 99:24
**reader** [4] - 63:22,
75:17, 76:24, 77:6
**readers** [2] - 76:19,
76:25
**reading** [6] - 76:18,
77:1, 77:2, 77:21,
90:24
**readings** [1] - 76:22
**real** [5] - 25:4, 64:23,
64:24, 69:1
**realized** [1] - 54:16
**really** [15] - 15:9, 18:1,
25:2, 30:24, 32:11,
39:9, 55:24, 60:7,
65:15, 72:1, 76:3,
76:5, 98:22, 99:8,

100:11
**Realtors** [1] - 84:5
**reason** [12] - 10:13,
28:5, 28:7, 29:22,
29:24, 29:25, 52:17,
60:3, 80:18, 104:7,
104:24
**reasonable** [47] - 6:7,
6:8, 6:11, 6:17, 6:19,
7:23, 11:22, 20:1,
20:6, 20:7, 22:18,
23:17, 36:1, 36:4,
36:5, 38:4, 41:6,
41:7, 41:23, 55:24,
55:25, 56:1, 56:7,
56:11, 57:10, 57:12,
57:16, 57:20, 66:21,
70:20, 72:5, 72:6,
72:8, 72:14, 72:15,
73:12, 73:18, 73:24,
74:2, 74:20, 74:22,
96:21, 100:19,
101:5, 104:17
**reasonableness** [1] -
65:5
**reasonably** [7] - 7:21,
12:11, 57:11, 65:9,
66:8, 72:4, 73:15
**reasons** [2] - 25:1,
96:13
**receive** [2] - 23:11,
79:22
**received** [8] - 6:22,
78:4, 79:15, 79:17,
92:6, 100:18, 101:4,
101:10
**receiving** [1] - 57:11
**recess** [1] - 63:16
**Recess** [1] - 63:17
**recognize** [2] - 97:23,
98:17
**reconsideration** [1] -
93:6
**record** [18] - 47:22,
75:13, 76:1, 76:23,
78:17, 79:1, 79:5,
80:3, 80:9, 80:22,
81:6, 81:13, 82:4,
82:14, 82:22, 83:13,
84:3, 93:8
**records** [2] - 85:25,
90:7
**recover** [1] - 60:19
**Recovery** [2] - 29:5,
29:10
**recovery** [2] - 29:9,
29:12
**red** [9] - 32:17, 32:18,
32:23, 33:3, 33:4,
54:18, 58:10, 58:15,

59:8
**reduce** [1] - 87:23
**reducing** [1] - 67:23
**refer** [3] - 5:5, 8:2,
10:16
**reference** [3] - 14:25,
37:6, 92:18
**referenced** [1] - 92:4
**referred** [9] - 7:7, 11:3,
14:4, 15:7, 31:12,
59:21, 64:19, 70:23,
73:9
**referring** [1] - 34:20
**refers** [1] - 13:10
**refresher** [1] - 95:2
**regarding** [1] - 80:18
**regulated** [4] - 12:10,
12:12, 37:2, 56:24
**regulates** [1] - 39:3
**relate** [1] - 19:11
**related** [1] - 101:7
**release** [1] - 43:1
**relevance** [2] - 95:5,
96:23
**relevant** [8] - 67:7,
96:19, 97:16, 99:10,
99:13, 104:20
**rely** [1] - 42:15
**remain** [4] - 44:23,
45:1, 54:5, 88:8
**remained** [1] - 45:17
**remains** [2] - 20:19,
52:25
**Remarks** [1] - 82:12
**remember** [20] -
14:20, 15:19, 22:22,
24:11, 24:17, 24:19,
25:11, 26:4, 30:17,
37:13, 40:18, 42:9,
44:2, 48:8, 58:8,
59:4, 59:13, 61:23,
69:2, 99:21
**remind** [2] - 7:11,
52:24
**repaid** [1] - 104:18
**repeat** [2] - 10:8,
30:11
**replaced** [1] - 60:12
**replacing** [1] - 69:12
**report** [4] - 40:11,
60:7, 92:14
**reported** [5] - 4:3,
61:9, 61:17, 64:21,
86:10
**REPORTER** [2] -
47:20, 89:19
**reporter** [1] - 90:7
**REPORTER'S** [3] -
4:2, 47:22, 91:2
**reporting** [2] - 61:4,

61:15
**reports** [4] - 39:7,
39:8, 39:11, 61:24
**represent** [2] - 4:25,
5:12
**representing** [1] -
77:19
**Republicans** [1] - 8:16
**request** [1] - 82:9
**requested** [1] - 91:3
**require** [1] - 21:24
**required** [8] - 39:7,
50:9, 50:10, 53:7,
59:7, 60:4, 69:3,
71:10
**requirement** [2] -
62:11, 89:6
**requires** [1] - 101:22
**residential** [2] - 11:11,
14:6
**resist** [1] - 74:10
**resolve** [1] - 91:6
**respect** [1] - 85:24
**respectful** [1] - 74:11
**respectfully** [6] - 7:20,
35:24, 36:19, 40:17,
73:20, 74:24
**response** [2] - 100:15,
101:1
**responsibilities** [1] -
9:7
**responsibility** [6] -
35:15, 35:16, 36:10,
38:6, 42:20, 57:6
**responsible** [1] -
56:22
**rest** [1] - 5:8
**restore** [6] - 43:6,
46:12, 46:19, 80:14,
80:25, 87:22
**restricted** [1] - 56:24
**result** [1] - 25:15
**results** [2] - 68:13,
86:12
**retain** [1] - 81:19
**retained** [1] - 67:24
**return** [6] - 48:6, 55:5,
74:13, 74:25, 83:4,
83:20
**returned** [4] - 53:2,
83:7, 83:23, 84:15
**returning** [1] - 84:12
**returns** [4] - 41:3,
41:5, 41:9, 57:25
**reupped** [1] - 60:11
**rid** [3] - 67:21, 69:8,
105:3
**rights** [4] - 41:20,
41:23, 81:19, 85:22
**ripping** [1] - 45:3

ripple [1] - 27:17
**risk** [25] - 25:4, 27:20,
27:21, 27:23, 27:24,
27:25, 28:10, 28:18,
33:13, 43:8, 52:7,
65:23, 68:20, 68:25,
70:1, 70:4, 70:6,
70:21, 72:10, 74:5,
80:16, 87:24
**risking** [1] - 67:21
**risks** [2] - 9:6, 33:12
**Robert** [2] - 77:8, 82:7
**rogue** [1] - 9:13
**role** [2] - 24:17, 51:7
**room** [3] - 79:18,
79:23
**Rule** [1] - 95:6
**rule** [1] - 104:19
**ruled** [4] - 98:12,
100:16, 101:2,
104:19
**ruling** [6] - 93:7, 95:1,
96:10, 97:24, 98:16,
102:20
**rulings** [1] - 100:15
**run** [4] - 31:1, 35:12,
42:14, 45:25
**running** [3] - 37:25,
42:25, 56:22
**runs** [1] - 35:8

## S

**safe** [4] - 11:19, 36:21,
48:19, 80:25
**safety** [4] - 48:23,
51:22, 70:24, 70:25
**save** [2] - 28:23
**saw** [6] - 32:10, 32:16,
33:1, 33:8, 62:23,
68:3
**scenario** [3] - 66:21,
70:9, 70:10
**scheduling** [1] - 92:20
**screen** [2] - 78:20,
90:23
**screens** [1] - 34:13
**seat** [1] - 78:11
**seated** [2] - 4:13,
64:13
**SEC** [13] - 38:11, 39:1,
39:3, 39:8, 40:19,
41:14, 44:4, 44:5,
44:16, 61:3, 61:4,
61:22, 64:21
**second** [11] - 7:15,
44:3, 54:24, 55:9,
68:12, 86:4, 86:11,
92:22, 93:15, 95:21,
98:9

**secondary** [22] -
11:10, 13:8, 13:19,
14:3, 14:5, 29:20,
30:3, 36:12, 36:22,
42:16, 46:3, 46:5,
46:21, 51:23, 57:7,
57:24, 65:22, 68:1,
70:15, 70:18, 74:5,
74:6
**seconds** [1] - 63:18
**secret** [5] - 32:11,
42:19, 42:20, 42:22,
53:17
**secures** [1] - 25:23
**Securities** [3] - 38:10,
38:25, 39:12
**securities** [26] - 14:16,
15:7, 15:8, 15:11,
15:14, 15:15, 15:17,
15:22, 15:25, 16:6,
16:8, 17:4, 17:17,
26:6, 26:23, 26:24,
27:6, 27:22, 38:18,
40:1, 46:20, 48:10,
48:12, 63:5, 70:14,
89:3
**securitize** [2] - 14:15,
14:22
**securitizing** [1] -
14:18
**security** [9] - 14:23,
14:25, 15:1, 15:4,
16:2, 16:9, 16:13,
16:21, 17:25
**see** [35] - 11:7, 11:9,
16:8, 16:14, 16:16,
27:3, 27:18, 27:19,
28:1, 38:13, 38:22,
40:3, 41:16, 48:1,
52:8, 52:25, 53:7,
58:3, 58:20, 60:8,
61:1, 61:4, 63:5,
63:6, 68:18, 70:25,
71:9, 71:10, 74:15,
76:15, 82:16, 91:13,
91:15, 91:19
**seeing** [1] - 5:10
**seeking** [1] - 93:6
**seem** [1] - 66:12
**sell** [11] - 14:16, 15:6,
20:11, 20:12, 20:13,
20:20, 21:2, 27:8,
45:7, 45:10, 45:13
**selling** [2] - 14:20,
45:14
**sells** [3] - 15:21,
15:22, 16:19
**send** [1] - 79:17
**sending** [2] - 71:19,
71:20

**Senior** [2] - 86:18, 87:12
**senior** [6] - 39:16, 39:19, 62:22, 86:24, 87:13, 89:1
**sense** [1] - 7:24
**sent** [2] - 71:21, 82:6
**sentence** [3] - 86:8, 95:21, 96:17
**separate** [3] - 30:18, 101:25, 104:24
**September** [18] - 34:7, 34:13, 40:9, 40:10, 40:24, 41:1, 41:21, 42:25, 43:14, 43:16, 43:20, 44:21, 44:25, 45:13, 46:22, 55:18, 55:20, 87:19
**series** [1] - 23:2
**Series** [1] - 23:9
**serious** [1] - 37:23
**seriously** [3] - 39:10, 39:14, 39:25
**servant** [1] - 8:14
**serve** [6] - 11:1, 11:23, 12:25, 13:1, 36:5, 46:5
**served** [1] - 8:15
**serves** [1] - 37:5
**set** [5] - 15:12, 55:11, 91:16, 96:24, 103:6
**several** [2] - 7:14, 86:13
**shape** [1] - 60:7
**share** [21] - 17:12, 18:5, 18:8, 18:12, 18:21, 19:2, 19:4, 19:9, 20:9, 20:18, 20:23, 21:5, 21:8, 21:10, 22:3, 22:20, 22:23, 23:2, 23:4, 23:6, 44:17
**shareholder** [34] - 6:11, 6:21, 6:22, 12:17, 17:21, 17:23, 18:2, 18:5, 18:8, 18:9, 19:9, 20:3, 20:7, 20:20, 21:17, 21:24, 22:2, 23:8, 37:14, 37:17, 40:23, 41:3, 41:5, 41:6, 41:7, 44:24, 45:5, 45:12, 53:19, 57:10, 57:12, 57:25, 74:2
**Shareholders** [1] - 20:17, 102:8
**shareholders** [79] - 6:6, 6:8, 6:13, 6:20, 6:25, 7:2, 9:17, 11:23, 11:25, 12:3,

12:10, 12:15, 12:19, 15:11, 15:13, 17:9, 17:17, 17:18, 18:20, 20:18, 20:23, 21:10, 21:12, 21:21, 21:25, 22:4, 22:11, 22:14, 23:10, 29:23, 31:3, 31:5, 31:8, 33:7, 33:11, 33:13, 36:6, 36:10, 37:11, 37:19, 37:21, 37:22, 37:24, 38:4, 38:7, 38:8, 40:20, 41:24, 42:4, 43:2, 43:16, 44:8, 45:9, 49:3, 49:9, 49:11, 53:18, 54:6, 56:10, 56:11, 57:16, 57:21, 65:16, 65:17, 72:4, 72:16, 73:12, 74:1, 79:11, 83:8, 83:24, 84:15, 88:9, 95:13, 95:25, 99:7, 103:1, 103:6
**shareholders'** [15] - 6:17, 7:23, 12:22, 20:1, 20:6, 21:16, 22:13, 38:2, 73:10, 73:18, 73:24, 74:22, 96:21, 100:19, 101:5
**shares** [14] - 15:13, 18:3, 19:1, 20:14, 23:3, 23:5, 45:3, 89:1, 100:22, 100:24, 103:3, 104:8, 104:10
**Sheet** [1] - 79:2
**shell** [1] - 33:3
**shining** [1] - 62:2
**shore** [2] - 48:21, 53:24
**short** [5] - 35:2, 71:8, 85:2, 94:9, 94:11
**show** [52] - 5:15, 6:3, 6:10, 7:18, 8:22, 9:19, 10:25, 11:15, 11:17, 12:23, 14:14, 18:3, 19:18, 20:21, 21:16, 21:19, 22:12, 24:10, 24:22, 26:13, 28:18, 28:20, 33:1, 33:4, 33:24, 36:19, 37:14, 38:19, 45:21, 46:22, 47:2, 48:3, 55:17, 56:9, 56:10, 57:9, 57:20, 58:1, 58:23, 59:2, 59:16, 59:22, 60:25, 68:16, 69:2, 71:25, 72:13, 73:15, 85:11, 99:7, 104:21

**showed** [2] - 8:9, 85:2
**showing** [3] - 58:13, 99:11, 101:8
**shows** [1] - 65:11
**shrinking** [1] - 67:20
**sic** [1] - 68:16
**side** [3] - 9:4, 101:9
**sides** [3] - 31:17, 77:1, 93:7
**sign** [2] - 39:17, 39:18
**signature** [1] - 82:18
**signed** [8] - 29:2, 39:16, 47:16, 62:21, 62:23, 63:2, 63:3, 85:21
**significant** [2] - 30:5, 86:10
**similar** [2] - 61:11, 94:10
**simply** [2] - 98:5, 104:2
**single** [5] - 6:21, 26:11, 58:7, 58:14
**sit** [3] - 8:25, 31:17, 77:20
**sitting** [2] - 5:12, 67:10
**situation** [5] - 26:3, 28:21, 32:8, 99:3, 100:3
**skip** [1] - 86:6
**slide** [20] - 11:6, 14:10, 16:8, 16:17, 32:16, 32:20, 33:1, 36:14, 58:5, 61:2, 62:23, 64:17, 68:4, 82:17, 86:6, 87:11, 101:22, 102:6, 104:7, 104:9
**Slide** [6] - 44:4, 44:19, 61:1, 61:13, 88:4, 88:13
**slide's** [1] - 36:18
**slides** [16] - 8:9, 33:8, 82:10, 82:15, 82:16, 100:7, 100:11, 101:14, 101:17, 101:23, 101:24, 101:25, 102:5, 104:24
**slip** [1] - 5:4
**small** [2] - 12:3, 24:16
**smaller** [2] - 60:14
**smooth** [1] - 63:21
**snippet** [2] - 62:23, 62:25
**sole** [3] - 23:13, 23:19, 24:4
**solely** [1] - 41:10
**solid** [2] - 66:5, 66:6

**solvent** [4] - 79:9, 80:13, 80:25, 81:10
**someone** [4] - 18:14, 30:16, 30:23, 76:11
**sometimes** [7] - 5:4, 8:2, 8:3, 26:2, 27:19, 30:10, 66:15
**soon** [1] - 94:1
**sorry** [1] - 44:11
**sort** [4] - 7:5, 30:10, 30:20, 68:14
**sorts** [1] - 39:21
**sought** [1] - 95:3
**sound** [4] - 36:21, 79:9, 80:13, 81:9
**sounded** [2] - 99:25, 100:2
**sounds** [2] - 27:20, 32:25
**sources** [1] - 67:7
**speaking** [2] - 41:6, 75:5
**Spears** [1] - 30:20
**special** [3] - 16:5, 16:10, 18:15
**specific** [3] - 72:18, 73:2, 103:3
**specifically** [4] - 35:9, 35:19, 73:1, 103:1
**specified** [1] - 41:20
**speech** [1] - 34:10
**spend** [1] - 73:17
**sponsored** [4] - 10:17, 10:19, 29:25, 30:1
**Sr** [1] - 82:19
**stability** [8] - 10:14, 11:10, 12:5, 14:5, 28:8, 29:20, 30:3, 70:18
**stabilize** [1] - 83:3, 83:19, 84:11
**stabilized** [5] - 83:5, 83:7, 83:21, 83:23, 84:15
**Stable** [1] - 83:14
**stage** [2] - 98:1, 98:10
**staggering** [1] - 26:12
**stakes** [3] - 66:11, 66:19
**stand** [8] - 9:2, 46:15, 48:6, 48:20, 75:17, 75:23, 90:21, 90:25
**standing** [1] - 27:1
**stands** [2] - 63:16, 86:25
**Stanton** [2] - 84:24, 92:11
**staring** [1] - 60:10
**start** [3] - 76:24, 91:11, 105:8

**started** [2] - 9:25, 15:19
**starting** [2] - 39:1, 75:11
**starts** [2] - 15:23, 23:6
**state** [5] - 4:23, 57:10, 61:24, 78:17
**Statement** [1] - 3:3
**statement** [4] - 4:15, 43:1, 44:20, 101:19
**statements** [2] - 75:9, 90:2, 94:11
**states** [1] - 34:15
**States** [8] - 5:19, 5:20, 10:22, 11:14, 32:3, 38:25, 48:20, 86:24
**statute** [1] - 81:17
**statutes** [2] - 83:6, 83:22
**statutory** [4] - 83:2, 83:18, 87:7, 89:5
**steady** [1] - 15:18
**Stearns** [1] - 24:19
**step** [3] - 28:22, 29:1
**stepping** [1] - 51:22
**stern** [3] - 4:15, 47:20, 64:14
**STERN** [11] - 4:16, 4:19, 47:24, 56:6, 63:8, 63:12, 64:15, 64:17, 75:14, 76:2, 91:10
**Stern** [2] - 4:25, 75:14
**Stern.........................
..........** [1] - 3:4
**steward** [3] - 65:21, 65:22
**still** [9] - 16:10, 17:1, 45:7, 52:22, 54:17, 55:3, 59:5, 93:1
**stock** [60] - 7:10, 17:10, 17:12, 17:14, 17:18, 18:3, 18:5, 18:8, 18:12, 18:21, 19:2, 19:4, 19:8, 20:9, 20:18, 21:5, 21:16, 22:23, 22:25, 23:1, 23:2, 23:3, 23:5, 23:7, 23:9, 23:10, 23:13, 23:15, 24:24, 37:14, 39:4, 39:6, 43:3, 43:12, 43:13, 45:1, 45:3, 45:7, 45:10, 45:11, 45:13, 45:14, 45:17, 47:10, 47:11, 47:16, 47:25, 48:7, 73:21, 81:14, 81:17, 86:24, 88:6, 99:2, 99:8
**Stock** [2] - 86:18,

87:12

**stock's** [1] - 81:20
**stockholder** [1] - 85:23
**stockholders** [5] - 41:18, 41:20, 41:22, 81:18, 81:19
**stocks** [4] - 24:25, 44:22, 88:7, 103:2
**stop** [6] - 7:3, 26:22, 27:5, 27:7, 27:11, 27:13
**stops** [1] - 27:14
**straightforward** [1] - 101:21
**strategy** [3] - 41:2, 41:4, 41:9
**stream** [4] - 15:18, 15:23, 15:24, 26:24
**struggling** [2] - 12:24
**stuck** [3] - 26:1, 28:10, 60:22
**stuff** [1] - 10:8
**sub** [4] - 86:21, 87:1, 87:5, 87:9
**sub-bullet** [4] - 86:21, 87:1, 87:5, 87:9
**subject** [2] - 37:15, 82:9
**submission** [5] - 74:11, 74:19, 93:16, 94:10, 94:11
**submit** [7] - 7:20, 36:19, 40:17, 72:5, 73:20, 74:24, 98:21
**subordinated** [1] - 87:13
**substance** [2] - 95:20, 96:9
**substantially** [1] - 97:15
**subtraction** [1] - 102:17
**succeeds** [1] - 85:22
**successfully** [1] - 81:1
**sucking** [1] - 4:7
**suffered** [1] - 99:13
**suffering** [1] - 59:1
**sufficient** [1] - 105:3
**suggest** [3] - 100:17, 101:2, 104:16
**suggested** [2] - 18:16, 102:12
**suggestion** [3] - 68:6, 101:20, 102:15
**suggests** [3] - 101:11, 102:10, 102:16
**summary** [8] - 36:16, 48:2, 64:8, 94:17, 94:21, 98:5, 98:10,

104:14

**summer** [1] - 24:13
**sun** [1] - 62:2
**Supp** [1] - 97:11
**supplements** [1] - 88:17
**supplied** [1] - 33:11
**Support** [1] - 84:10
**support** [16] - 13:6, 33:25, 34:1, 46:10, 46:11, 46:12, 47:8, 48:18, 48:22, 52:10, 55:13, 58:12, 82:9, 88:15, 88:16, 88:20
**supported** [3] - 29:24, 56:25, 68:16
**supporting** [1] - 29:13
**supports** [2] - 97:4, 101:11
**supposed** [3] - 16:18, 16:20, 34:18
**survive** [1] - 47:6
**survived** [1] - 24:21
**Susan** [1] - 62:24
**suspended** [1] - 81:18
**sustained** [1] - 63:1
**swears** [1] - 90:5
**sweep** [38] - 5:18, 6:5, 6:16, 6:24, 7:7, 7:16, 8:1, 8:3, 8:4, 8:18, 10:2, 20:24, 20:25, 22:15, 33:17, 33:20, 33:23, 40:25, 43:23, 44:1, 49:10, 51:8, 65:1, 66:9, 68:10, 68:20, 68:24, 69:10, 69:11, 69:18, 69:25, 72:11, 73:1, 73:8, 73:16, 96:20, 98:14, 99:4
**sworn** [2] - 75:18, 76:25
**system** [2] - 27:21, 27:25
**systemic** [6] - 27:20, 28:10, 28:18, 43:8, 80:16, 87:24

---

**T**

**tail** [1] - 98:24
**talks** [1] - 63:1
**tasked** [1] - 36:20
**taxpayer** [4] - 51:20, 52:6, 52:7, 52:21
**taxpayers** [2] - 53:1, 53:3
**team** [3] - 5:12, 64:18
**tempted** [1] - 4:11
**tempting** [1] - 4:11

**ten** [1] - 99:4
**term** [10] - 23:22, 25:18, 27:18, 40:24, 59:20, 62:5, 62:19, 65:20, 67:19
**terminate** [1] - 53:8
**terminated** [1] - 81:19
**terminating** [1] - 81:2
**terms** [14] - 5:18, 6:5, 6:16, 12:21, 18:9, 19:3, 19:4, 19:12, 19:14, 19:19, 22:12, 24:2, 37:18, 54:5
**terrible** [1] - 25:25
**testify** [2] - 8:25, 90:14
**testifying** [2] - 90:21, 104:13
**testimony** [26] - 13:8, 28:16, 31:13, 31:14, 31:18, 31:19, 42:1, 62:24, 62:25, 67:10, 74:14, 75:4, 89:15, 90:4, 90:9, 90:11, 90:12, 90:14, 90:15, 90:16, 90:20, 92:5, 92:15, 93:20, 94:16, 95:19
**text** [5] - 82:14, 87:17, 88:3, 88:12, 96:16
**that'll** [1] - 76:17
**themselves** [1] - 39:19
**theory** [1] - 97:3
**they've** [4] - 12:9, 48:10, 73:1, 77:14
**third** [50] - 5:16, 6:4, 6:15, 7:4, 7:5, 7:8, 7:15, 7:16, 7:19, 7:25, 8:2, 8:5, 8:17, 10:1, 10:2, 20:24, 20:25, 21:2, 22:15, 33:16, 33:20, 40:2, 40:5, 40:9, 40:10, 40:13, 40:25, 43:21, 51:7, 51:8, 64:25, 65:2, 66:9, 68:11, 68:19, 68:21, 68:24, 69:10, 69:11, 72:11, 72:25, 73:2, 73:7, 73:16, 86:1, 95:5, 95:11, 95:23, 96:19
**third-party** [1] - 86:1
**third-quarter** [1] - 40:2
**thirty** [1] - 63:18
**thousand** [1] - 16:23
**threat** [3] - 28:12, 28:13, 64:24
**threatened** [2] - 28:9, 59:23
**three** [7] - 8:16, 50:16,

58:20, 66:3, 87:6, 89:5, 94:6
**three-and-a-quarter** [1] - 89:5
**throughout** [1] - 46:6
**timing** [6] - 19:24, 33:18, 43:19, 61:23, 68:3, 68:4
**title** [10] - 29:8, 78:25, 82:22, 83:12, 84:3, 85:25, 102:6, 102:25, 105:2, 105:3
**titled** [1] - 86:5
**titles** [1] - 85:22
**today** [5] - 20:5, 59:20, 91:15, 94:2, 100:5
**together** [4] - 5:12, 16:21, 26:11, 104:7
**tomorrow** [4] - 91:13, 91:17, 91:19, 92:16, 93:16, 93:21, 94:7, 94:16, 94:22
**tonight** [1] - 105:9
**took** [9] - 9:20, 31:6, 33:12, 37:20, 46:7, 58:18, 58:22, 74:8
**top** [5] - 27:18, 38:13, 86:17, 101:9, 102:16
**topic** [2] - 40:20, 41:17
**Total** [1] - 102:7
**total** [10] - 48:5, 50:12, 50:23, 58:18, 58:23, 102:13, 102:25, 103:5, 104:11, 104:20
**totally** [2] - 23:21, 92:13
**touch** [2] - 67:15, 74:10
**track** [2] - 39:11, 96:10
**tracks** [1] - 96:1
**trade** [3] - 20:12, 20:13, 81:17
**traded** [2] - 39:5, 39:7
**trading** [1] - 23:6
**transact** [1] - 34:21
**transcribe** [1] - 89:20
**transcribed** [1] - 91:3
**transcript** [4] - 4:3, 89:22, 90:10, 90:25
**transferred** [5] - 79:11, 95:4, 95:11, 95:23, 99:4
**transfers** [1] - 19:9
**travel** [1] - 9:21
**Treasury** [73] - 7:8, 7:13, 33:25, 47:9, 47:13, 47:15, 48:16, 49:4, 49:7, 49:9,

49:12, 49:17, 49:25, 50:14, 51:2, 51:18, 51:19, 51:25, 52:5, 52:10, 52:13, 52:17, 52:23, 52:25, 53:7, 53:12, 53:13, 54:9, 54:10, 54:16, 54:20, 54:24, 55:1, 56:16, 56:20, 57:2, 57:3, 57:4, 57:18, 58:17, 58:19, 59:6, 59:11, 62:5, 62:8, 62:16, 62:19, 66:23, 68:6, 68:23, 69:15, 70:4, 71:1, 71:10, 71:19, 71:21, 71:22, 72:21, 82:9, 86:23, 87:2, 87:15, 88:15, 88:17, 88:19, 95:4, 95:11, 95:23, 96:19, 99:5
**trend** [1] - 86:12
**trial** [9] - 4:2, 90:5, 90:9, 92:18, 92:21, 92:22, 92:23, 103:25, 104:16
**trillion** [1] - 32:22
**trouble** [5] - 28:12, 32:10, 35:5, 37:23, 55:19
**troubled** [3] - 83:3, 83:19, 84:12
**truck** [2] - 17:21, 22:9
**truth** [1] - 90:6
**try** [7] - 10:3, 10:8, 10:9, 13:21, 30:11, 85:4, 100:10
**trying** [2] - 4:22, 25:3
**tumble** [1] - 26:14
**turn** [2] - 86:16, 87:8
**turned** [2] - 53:22, 68:6
**turning** [1] - 68:15
**TV** [1] - 90:23
**tweet** [1] - 91:13
**Twelve** [1] - 64:16
**twelve** [1] - 63:12
**twice** [2] - 30:10, 97:8
**Twitter** [1] - 91:13
**two** [21] - 8:16, 44:24, 51:12, 54:2, 54:3, 85:2, 92:13, 92:14, 92:17, 94:14, 94:15, 95:15, 95:18, 96:9, 96:13, 98:21, 100:7, 100:9, 100:10, 100:11
**type** [2] - 23:9, 30:24
**typical** [1] - 97:9

## U

**U.S** [2] - 87:15, 88:15
**unable** [2] - 28:4, 34:22
**unattractive** [1] - 86:12
**uncertainties** [1] - 9:6
**under** [23] - 8:15, 9:4, 22:1, 26:16, 31:18, 31:21, 34:2, 34:3, 35:12, 43:24, 55:9, 57:5, 69:13, 70:24, 71:20, 73:18, 74:21, 76:19, 79:22, 90:5, 95:6, 102:19
**underneath** [3] - 32:18, 86:21, 87:10
**understandable** [1] - 96:6
**understood** [4] - 65:6, 67:19, 67:25, 104:23
**underwater** [1] - 25:17
**undue** [1] - 95:6
**unfair** [1] - 97:13
**United** [8] - 5:19, 5:20, 10:22, 11:14, 32:3, 38:25, 48:19, 86:24
**unless** [3] - 24:3, 49:9, 49:12
**unlike** [2] - 10:21, 34:22
**unlikely** [1] - 62:17
**unlimited** [2] - 55:6, 57:5
**unpredictable** [3] - 65:21, 65:23, 66:19
**unreasonably** [3] - 73:11, 96:20, 98:15
**unsafe** [3] - 34:21, 34:24, 35:3
**unsound** [3] - 34:21, 34:25, 35:4
**unusual** [1] - 21:22
**unwritten** [1] - 73:9
**up** [49] - 4:7, 16:8, 17:5, 20:14, 20:19, 22:9, 22:17, 22:19, 23:21, 25:11, 27:17, 31:20, 33:9, 33:15, 33:25, 34:1, 34:17, 48:21, 50:5, 51:22, 52:15, 53:11, 53:12, 53:24, 55:12, 59:10, 63:7, 63:10, 63:23, 64:17, 66:13, 67:15, 68:7, 72:17, 77:10, 85:9, 86:4, 89:17, 90:16, 91:23, 93:16, 94:15, 95:16,

100:13, 100:21, 101:24, 102:23, 103:18
**urgent** [2] - 68:5

## V

**value** [5] - 40:23, 95:3, 95:10, 95:23, 104:10
**Value** [1] - 83:14
**valve** [2] - 70:24, 70:25
**variable** [6] - 69:13, 69:14, 69:17, 69:19, 69:25, 70:1
**verbatim** [2] - 96:1, 98:19
**verdict** [3] - 67:1, 74:13, 74:25
**verge** [1] - 33:6
**version** [5] - 35:2, 71:8, 96:12, 96:13, 96:17
**versions** [5] - 85:5, 95:15, 95:18, 95:20, 98:21
**versus** [4] - 102:9, 102:13, 103:2, 105:2
**veto** [6] - 49:7, 49:17, 53:13, 54:9, 56:16, 72:22
**via** [1] - 89:15
**video** [6] - 31:15, 31:19, 76:13, 76:17, 89:20, 90:1
**videotape** [2] - 89:15, 90:11
**view** [1] - 90:19
**violated** [3] - 73:8, 96:21, 98:15
**virtually** [1] - 102:24
**vital** [2] - 66:22
**voir** [1] - 30:16
**volatile** [1] - 86:12
**voluminous** [1] - 98:5
**voting** [2] - 41:20, 41:22
**vs** [1] - 102:8

## W

**wait** [5] - 48:13, 49:16, 54:8, 54:12, 91:22
**waive** [1] - 52:14
**waived** [1] - 51:25
**waiving** [1] - 52:15
**walk** [3] - 13:4, 13:5, 18:23
**wants** [1] - 63:9
**Washington** [1] - 39:1

**watch** [2] - 5:9
**watching** [2] - 5:9, 32:7
**weaken** [1] - 35:1
**week** [1] - 95:1
**weigh** [1] - 90:15
**weight** [2] - 90:13
**whoa** [1] - 68:7
**whole** [5] - 18:7, 28:5, 28:7, 29:21, 68:3
**wind** [3] - 63:10, 67:17, 67:19
**wind-down** [2] - 67:17, 67:19
**winding** [1] - 63:7
**witness** [21] - 64:5, 64:8, 75:17, 75:18, 75:23, 77:20, 77:21, 89:12, 89:14, 89:25, 90:5, 90:14, 90:21, 90:25, 91:5, 94:17, 94:21, 94:22, 98:10, 104:13, 104:14
**witnesses** [6] - 31:16, 59:21, 90:19, 90:21, 90:22, 94:6
**Witnesses** [1] - 3:6
**woke** [1] - 68:7
**wonder** [1] - 104:3
**woods** [1] - 65:13
**word** [4] - 18:14, 36:17, 36:18, 102:9
**words** [5] - 29:6, 55:20, 73:6, 88:4, 88:8
**works** [6] - 10:7, 10:12, 13:15, 16:16, 16:23, 19:13
**world** [2] - 19:16, 44:8
**worried** [3] - 26:21, 53:22, 53:23
**worry** [2] - 17:5, 27:15
**worse** [7] - 26:13, 31:24, 31:25, 32:1, 46:23, 66:16
**worst** [3] - 66:21, 70:9, 70:10
**worst-case** [3] - 66:21, 70:9, 70:10
**worth** [51] - 5:18, 6:5, 6:16, 6:24, 7:7, 7:16, 8:1, 8:3, 8:4, 8:18, 10:2, 20:24, 20:25, 22:15, 25:19, 25:24, 32:16, 32:19, 32:21, 32:24, 33:2, 33:17, 33:20, 33:22, 40:25, 43:22, 44:1, 49:10, 51:8, 58:9, 65:1, 66:2, 66:9, 68:10,

68:20, 68:24, 69:10, 69:11, 69:18, 69:25, 72:11, 73:1, 73:8, 73:16, 81:20, 86:23, 94:9, 96:20, 98:14, 99:4
**writing** [1] - 23:20
**written** [9] - 25:2, 34:11, 49:4, 49:9, 53:15, 55:4, 56:20, 98:17, 98:18
**wrote** [1] - 52:23

## Y

**y'all** [5] - 91:13, 99:19, 100:4, 105:7, 105:9
**year** [8] - 26:11, 40:8, 50:14, 50:18, 61:4, 61:9, 61:10, 88:6
**years** [14] - 6:23, 24:8, 33:16, 33:21, 40:24, 44:1, 49:10, 52:13, 58:20, 63:1, 66:3, 99:4
**yellow** [1] - 85:6
**you-all** [1] - 91:19
**yourself** [3] - 18:19, 55:7, 79:19

## Z

**zero** [1] - 74:19