```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *    )
        FAIRHOLME FUNDS, INC., et al.,   )    Civil Action
 4                                       )    No. 13-1053
                      Plaintiffs,        )
 5                                       )
           vs.                           )
 6                                       )
        FEDERAL HOUSING FINANCE AGENCY,  )    Washington, D.C.
 7      et al.,                          )    July 27, 2023
                                         )    2:03 p.m.
 8                    Defendants.        )
                                         )
 9      * * * * * * * * * * * * * * *    )

10      IN RE:  FANNIE MAE/FREDDIE MAC   )
        SENIOR PREFERRED STOCK PURCHASE  )    MC Case No. 13-1288
11      AGREEMENT CLASS ACTION LITIGATION )

12

13                    TRANSCRIPT OF JURY TRIAL
                         DAY 4 - AFTERNOON SESSION
14           BEFORE THE HONORABLE ROYCE C. LAMBERTH,
              UNITED STATES SENIOR DISTRICT JUDGE
15

16
        APPEARANCES:
17
        FOR THE BERKLEY        VINCENT COLATRIANO, ESQ.
18      PLAINTIFFS:            COOPER & KIRK, PLLC
                               1523 New Hampshire Avenue, Northwest
19                             Washington, D.C. 20036

20      FOR THE CLASS          HAMISH P.M. HUME, ESQ.
        PLAINTIFFS:            KENYA KHALELAH DAVIS, ESQ.
21                             BOIES, SCHILLER & FLEXNER, LLP
                               1401 New York Avenue, Northwest
22                             Washington, D.C. 20005

23                             LEE D. RUDY, ESQ.
                               KESSLER, TOPAZ, MELTZER & CHECK, LLP
24                             280 King of Prussia Road
                               Radnor, Pennsylvania 19087
25
```

```
1       APPEARANCES, CONT'D:

2       FOR THE CLASS           ROBERT F. KRAVETZ, ESQ.
        PLAINTIFFS:             ADAM H. WIERZBOWSKI, ESQ.
3                               BERNSTEIN, LITOWITZ, BERGER &
                                   GROSSMAN, LLP
4                               1251 Avenue of the Americas
                                New York, New York 10020
5
        FOR THE DEFENDANTS      ASIM VARMA, ESQ.
6       FHFA, FANNIE MAE &      IAN HOFFMAN, ESQ.
        FREDDIE MAC:            DAVID BERGMAN, ESQ.
7                               JONATHAN LOUIS STERN, ESQ.
                                STANTON JONES, ESQ.
8                               ARNOLD & PORTER KAYE SCHOLER
                                601 Massachusetts Avenue, Northwest
9                               Washington, D.C. 20001

10      REPORTED BY:            LISA EDWARDS, RDR, CRR
                                Official Court Reporter
11                              United States District Court for the
                                   District of Columbia
12                              333 Constitution Avenue, Northwest
                                Room 6706
13                              Washington, D.C. 20001
                                (202) 354-3269
14

15

16

17

18

19

20

21

22

23

24

25
```

1

                              I N D E X

2

3

4                                    Direct      Cross        Red.

5

     WITNESSES FOR THE PLAINTIFFS:

6

     Edward Linekin                               706          714

7

     Timothy Cassell                 720          725          727

8

     Joseph Cacciapalle (video)      729

9

     Mukarram Attari, Ph.D. (video)  730

10

     Joseph Russell Mason, Ph.D.     734          773          796

11

12

     EXHIBITS RECEIVED IN EVIDENCE                            PAGE

13

     Plaintiffs' Exhibit No. 346                              729
14   Plaintiffs' Exhibit No. 375                              730
     Plaintiffs' Exhibit No. 402-A                            743
15   Plaintiffs' Exhibit Nos. 495-2, 496-2,
        497-2, 497-3, 497-4, 497-5                            754
16

17

18

19

20

21

22

23

24

25

```
 1                THE COURT:  What's next after this?

 2                MR. RUDY:  Your Honor, I can give you sort of the

 3     layout.

 4                So we have Mr. Linekin being cross-examined.

 5     Whenever that's finished, we have another client, Tim

 6     Cassell.  That's five minutes of direct and however long the

 7     cross is.

 8                Then after that, we're planning on playing a

 9     videotape of another client, which is about 20 minutes.

10                THE COURT:  Okay.

11                MR. RUDY:  That's --

12                THE COURT:  So I can do the ruling on the

13     depositions after that?  Okay.

14                MR. RUDY:  Sure.  Yeah.  I think there are a

15     couple of other, you know, evidentiary and other questions

16     that if you have another few minutes we'd like to be heard

17     on.

18                THE COURT:  All right.  Let's go and get the jury

19     now.

20                MR. RUDY:  Do you have time to hear it or not?

21                THE COURT:  I was hoping we could get the jury,

22     since they've been waiting.

23                MR. RUDY:  Well, I appreciate that, your Honor.  A

24     couple of these issues do relate to the scheduling that we

25     would love to maybe preview.
```

```
1                THE COURT:  All right.

2                MR. HUME:  This is Mr. Hume for the Plaintiffs,

3     your Honor.

4                Your Honor, we have an issue that I hate to

5     describe as interfering with our ability to schedule and

6     present the case the way we would like to present our case.

7                THE COURT:  Okay.

8                MR. HUME:  In August 2021, Professor Dharan, who's

9     a marketing expert scheduled to testify tomorrow, filed a

10    report.  In Paragraph 32, he talked about how what we call

11    the payment-in-kind option under the agreement was an option

12    that could have been considered.

13               We then had deadlines for Daubert, for motions in

14    limine and a full trial.

15               THE COURT:  Can we do this after the jury goes?

16               MR. HUME:  The problem is we've been told on the

17    night before the opening statements that they object to us

18    talking about the payment-in-kind provision in the same way

19    we did in the last trial.

20               They didn't file a motion in limine; they didn't

21    file a motion before the last trial, didn't file one before

22    this trial.  They told us the night before opening

23    statements.  Then they said:  We'll let you do opening

24    statements, but we're going to file a motion.

25               And they didn't file a motion.  Then we got an
```

1    email this morning at 9:30 saying they're going to file a

2    motion knowing Mr. Dharan is testifying tomorrow.

3            And a big part of his testimony, just like last

4    time, is talking about the payment in kind.

5            And they keep telling us they're going to file a

6    motion.  At 9:30 this morning, they said they're going to

7    file it this morning.  They still haven't filed it.  It's

8    interfering with our planning for how we want to present our

9    case.  We think they have waived their ability to bring

10    this, first point.

11             Second, if they're going to, it needs to be in an

12    orderly process that doesn't interrupt our ability to

13    present our case.

14                THE COURT:  All right.  Bring the jury in.

15                MR. HUME:  I don't --

16                THE COURT:  Bring in the jury.

17                THE COURTROOM DEPUTY:  Jury panel.

18                (Whereupon, the jury entered the courtroom at 2:06

19    p.m. and the following proceedings were had:)

20                THE COURT:  You may be seated.

21                (Witness retakes the witness stand.)

22                THE COURT:  You may proceed with your

23    cross-examination.

24                MR. HOFFMAN:  Thank you, your Honor.

25     (EDWARD LINEKIN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN.)

```
1              CONTINUED CROSS-EXAMINATION
2    BY MR. HOFFMAN:
3    Q.  Good afternoon, Mr. Linekin.
4           MR. HOFFMAN:  Members of the jury, again, Ian
5    Hoffman on behalf of the Defendants.
6    BY MR. HOFFMAN:
7    Q.  Mr. Linekin, you work for the Berkley Insurance Company.
8    Right?
9    A.  I do.
10   Q.  And on your direct examination, you mentioned some
11   examples of the types of insurance that the Berkley
12   Insurance Company offers.  Right?
13   A.  I did.  Yes.
14   Q.  You mentioned some things like workers' compensation
15   insurance, agricultural-related insurance, things like that.
16   Right?
17   A.  I did.
18   Q.  Berkley Insurance Company also sells insurance for
19   recreational marine vessels.  Right?
20   A.  It's possible.  I'm not an expert on that side of the
21   business.
22   Q.  So there's a side of the business that deals with things
23   like watercraft insurance, things like yachts.  Right?
24   A.  There's a lot of different business lines that we write.
25   So...
```

1    Q.  You don't have any reason to dispute that Berkley

2    Insurance Company sells things like yacht insurance?

3    A.  I don't have an opinion on it.  I don't know.

4    Q.  Now, the Berkley Insurance Company also buys stocks and

5    bonds.  Right?

6    A.  Correct.

7    Q.  Berkley takes the insurance premiums that people pay and

8    then uses that money to invest in stocks and bonds.  Is that

9    right?

10   A.  Yes.  In general.

11   Q.  And, Mr. Linekin, you oversee the preferred stock

12   investments, meaning which preferred stocks Berkley is going

13   to buy or sell?

14   A.  Yes.

15   Q.  At some point, Berkley Insurance Company decided to buy

16   stocks in Fannie Mae and Freddie Mac.  Right?

17   A.  Correct.

18   Q.  And Berkley Insurance Company currently owns 10.7

19   million shares in Fannie and Freddie preferred stock.

20   Right?

21   A.  Roughly, yes.

22   Q.  Okay.  Let's talk about dividends.

23           Mr. Linekin, you understand that for each type of

24   stock that Berkley Insurance owns, there's a stock

25   certificate.  Right?

 1    A.  Yes.

 2    Q.  That's sometimes referred to as the certificate of

 3    designation.  Is that right?

 4    A.  Yes.

 5    Q.  Okay.  And you understand that that is part of Berkley's

 6    contract with the enterprises.  Right?

 7              MR. COLATRIANO:  Objection, your Honor.  Calls for

 8    a legal conclusion.

 9              MR. HOFFMAN:  I'm asking him what he understood.

10              THE COURT:  Overruled.

11              THE WITNESS:  I'm sorry.  Could you repeat that?

12    BY MR. HOFFMAN:

13    Q.  Sure.

14              You understand that the stock certificate is part

15    of the contract between Berkley Insurance Company and the

16    enterprises.  Right?

17    A.  Yes.

18    Q.  And those stock certificates that are part of your

19    contract, they do not require Fannie or Freddie to declare

20    dividends.  Right?

21    A.  No.  No companies are really required.  It's usually at

22    the option of management.

23    Q.  So Fannie and Freddie are not required to pay dividends?

24    A.  No.

25    Q.  You're agreeing with me that they're not required.

1    Right?

2    A.  Excuse me?

3    Q.  You're agreeing with me that dividends are not required.

4    Right?

5    A.  Yes.

6    Q.  Okay.  Mr. Linekin, are you familiar with the senior

7    preferred stock purchase agreement?

8    A.  I am.  I haven't read it in a while.  But yes, I am.

9    Q.  But you understand that's the agreement between the

10   United States Treasury Department on the one hand and Fannie

11   Mae and Freddie Mac on the other hand.  Right?

12   A.  Yes.

13   Q.  And the original PSPAs -- I'll call it the PSPAs.  The

14   original PSPAs were entered into in September 2008.  You

15   understand that?

16   A.  Yes.

17   Q.  Are you familiar with the terms of those original PSPAs?

18   A.  As I mentioned, I haven't read it in a while, but I'm

19   somewhat familiar with it.  Yes.

20   Q.  So you understand, then, that those original PSPAs --

21   actually, strike that.  Let me back up a moment.

22           Berkley Insurance Company is not challenging the

23   original PSPAs in this litigation.  Right?

24   A.  I don't believe so.

25   Q.  Now, you understand that those original PSPAs barred

1     Fannie Mae and Freddie Mac from making any dividend payments

2     to shareholders without the consent of the United States

3     Treasury Department?

4                MR. COLATRIANO:  Objection.  Calls for a legal

5     conclusion.

6                MR. HOFFMAN:  I'm asking for his understanding.

7                THE COURT:  Overruled.

8     BY MR. HOFFMAN:

9     Q.  You understand that.  Correct?

10    A.  Yes.

11    Q.  That means that Fannie and Freddie can't pay Berkley

12    dividends or any other shareholder dividends without

13    Treasury giving the okay.  Right?

14    A.  While in conservatorship, yes.

15    Q.  You also understand that under the original PSPAs,

16    Fannie Mae and Freddie Mac cannot exit conservatorship

17    without the consent of the Treasury Department.  Right?

18    A.  Yes.

19    Q.  That means that Fannie and Freddie cannot get out unless

20    the Treasury Department gives the okay.  Right?

21    A.  Yes.

22    Q.  I believe you testified on direct that your

23    understanding is that dividends were suspended during the

24    conservatorship.  Is that your testimony?

25    A.  Yes.

```
 1                  MR. HOFFMAN:  Let's take a look at Plaintiffs'

 2      Exhibit 2-B, which is in evidence, Mr. Montgomery.

 3      BY MR. HOFFMAN:

 4      Q.  This is the document that your counsel was asking you

 5      questions about before lunch.  Right?

 6      A.  Yes, it was.

 7      Q.  This is the statement of FHFA Director James Lockhart

 8      from September 7th, 2008.  Right?

 9      A.  Yes.

10      Q.  And you understand that that was the first day of the

11      conservatorship.  Right?

12      A.  Yes.

13                  MR. HOFFMAN:  So let's go to Page 8 of 10.  Let's

14      zoom in on the seventh.  Let's highlight that first

15      sentence, Mr. Montgomery.

16      BY MR. HOFFMAN:

17      Q.  "Director Lockhart announced on September 7th that" --

18      I'm reading now -- "in order to conserve over 2 billion in

19      capital every year, the common stock and preferred stock

20      dividends will be eliminated."

21                  Did I read that correctly?

22      A.  You did.

23      Q.  It doesn't say "suspended"; it says "eliminated."

24      Right?

25      A.  I think it's implied it's during conservatorship,
```

1    though.

2    Q.  Oh.  So you're testifying about what you think it

3    implies.  I'm asking you about what it says.

4    A.  Well, the second part of it says, but the common and all

5    preferred stocks will continue to remain outstanding.

6    Q.  And it says that dividends will be eliminated.  Right?

7    A.  Yes.

8                MR. HOFFMAN:  Take that down, Mr. Montgomery.

9    BY MR. HOFFMAN:

10   Q.  Mr. Linekin, Berkley Insurance Company's shares did not

11   receive any dividends in 2009.  Right?

12   A.  No.

13   Q.  And that had nothing to do with the third amendment.

14   Right?

15   A.  No.  At the time, no.

16   Q.  Right.  Because the third amendment was entered into in

17   August of 2012.  Right?

18   A.  Right.

19   Q.  Berkley Insurance Company did not receive any dividends

20   in 2010, either.  Right?

21   A.  Correct.

22   Q.  That had nothing to do with the third amendment?

23   A.  (No response.)

24   Q.  It also had nothing to do with the net worth sweep.

25   Right?

```
 1              THE COURT REPORTER:  Counsel, I didn't get an
 2      answer.
 3      BY MR. HOFFMAN:
 4      Q.  The question was, that had nothing to do with the third
 5      amendment.  Right?
 6      A.  No.
 7      Q.  And that also had nothing to do with the net worth sweep
 8      part of the third amendment.  Right?
 9      A.  No.
10      Q.  Berkley Insurance Company's shares didn't receive any
11      dividends in 2011, either.  Right?
12      A.  Correct.
13      Q.  That didn't have anything to do with the third
14      amendment.  Right?
15      A.  Correct.  I'm sorry.  I was answering your prior
16      question.
17      Q.  The answer was yes.  Right?
18      A.  Would you repeat it?
19      Q.  Berkley Insurance Company's shares did not receive any
20      dividends in 2011.  Right?
21      A.  Yes.
22      Q.  And that had nothing to do with the third amendment.
23      Right?
24      A.  Yes.
25      Q.  And Berkley Insurance Company's shares did not receive
```

1   any dividends between January of 2012 and August of 2012,

2   either.  Right?

3   A.  No.

4   Q.  That also had nothing to do with the third amendment.

5   Right?

6   A.  Correct.

7   Q.  This also had nothing to do with the net worth sweep.

8   Right?

9   A.  Yes.

10          MR. HOFFMAN:  The Court's indulgence, your Honor.

11          Thank you, Mr. Linekin.

12          No further questions, your Honor.

13                  REDIRECT EXAMINATION

14  BY MR. COLATRIANO:

15  Q.  Good afternoon, Mr. Linekin.  Vince Colatriano again for

16  the Plaintiffs.

17          Counsel just asked you about Plaintiffs' Exhibit

18  2-B.  So I'd like to pull that up again.  This is the

19  statement of FHFA Director James Lockhart.

20          So you remember that discussion that just

21  happened.  Correct?

22  A.  Correct.

23  Q.  Can you please turn to Page 8.

24          And counsel read to you the sentence beginning at

25  the bottom:  Seventh, in order to conserve 2 billion in

1    capital every year, the common preferred stock dividends

2    will be eliminated.

3              Do you remember that discussion?

4    A.  I do.

5    Q.  And he stressed the word "eliminated" several times, I

6    think.

7              If you could turn to the -- as we talked about on

8    direct, this is a discussion of key components of the

9    conservatorship, is it not?

10             MR. HOFFMAN:  Objection.  Leading.

11             THE COURT:  Sustained.

12   BY MR. COLATRIANO:

13   Q.  Could you turn to Page 7 of the document.

14             And as we discussed this morning, this whole

15   passage is introduced by a statement.  Can you read that

16   statement again into the record.

17   A.  "There are several key components of this

18   conservatorship."

19   Q.  And so everything that follows is talking about the

20   conservatorship.  Correct?

21   A.  Correct.

22   Q.  Okay.  And if you could turn to the other -- one of the

23   other documents I gave you, questions and answers during the

24   conservatorship, which is Plaintiffs' Exhibit 2-C, and on

25   the third page, there is a question.  This was also issued

1    by the Federal Housing Finance Agency.  Correct?

2    A.  Correct.

3    Q.  Around the same time as the other document we were just

4    referencing?

5    A.  Yes.

6    Q.  And if you look at Page 3, it talks about what

7    happened -- there's a question:  What happens to the

8    company's stock during the conservatorship?

9         Do you see that?

10   A.  I do.

11   Q.  And what does that say about rights and powers of the

12   stockholders?

13   A.  During the conservatorship, the company's stock will

14   continue to trade.  However, by statute, the powers of the

15   stockholders are suspended until the conservatorship is

16   terminated.  Stockholders will continue to retain all rights

17   in the stock's financial worth, as such worth is determined

18   by the market.

19   Q.  Mr. Linekin, counsel asked you about the fact that

20   Berkley's not received dividends, and he said in 2009 and

21   2010 and 2011.  Have you -- are you suing over the loss of

22   dividends during those years?

23   A.  We are not.

24   Q.  Okay.  And he also asked you about the fact that there

25   have been no dividends since then.  Do you recall that?

```
1    A.  I do.

2    Q.  Are the companies still in conservatorship?

3    A.  They are.

4    Q.  And how long has -- I guess that's about 15 years.

5    Correct?

6    A.  Fifteen years.

7    Q.  Do you think that might have something to do with the

8    fact that you haven't received dividends?

9              MR. HOFFMAN:  Objection, your Honor.

10             THE WITNESS:  Absolutely.

11             THE COURT:  Overruled.

12   BY MR. COLATRIANO:

13   Q.  Counsel also asked you about the fact that under the

14   certificates of designation for the Fannie and Freddie

15   shares, the companies weren't required to pay dividends.  Do

16   you recall that?

17   A.  I do.

18   Q.  What was Fannie and Freddie's practice with respect to

19   declaring dividends before the conservatorship?

20   A.  Very consistent and very regular dividend payers.

21   Q.  And do you know whether profitable companies

22   typically -- or at least some profitable companies typically

23   pay dividends?

24   A.  Well, as I mentioned, it's at the option of the

25   management.  So some companies do pay dividends.  Other
```

1    companies decide to reinvest the proceeds inside themselves

2    and grow, use those for internal reasons.  And then there's

3    a mixture of both.  Some companies usually invest inside and

4    also pay dividends.  So it varies.

5    Q.  Did the net worth sweep allow either of those options?

6    A.  No.

7              MR. COLATRIANO:  I have no further questions, your

8    Honor.

9              Thank you, Mr. Linekin.

10             THE COURT:  You can step down.

11             (Witness excused.)

12             THE COURT:  Next witness?

13             MR. RUDY:  Your Honor, it's Lee Rudy for

14   Plaintiffs.  Good afternoon.  Or sometimes Rudy Lee, I

15   suppose.

16             Before the next witness, whose name is Tim

17   Cassell, there's an instruction that's been agreed to about

18   the jury's hearing of shareholder testimony that I'd like to

19   give up.

20             THE COURT:  All right.

21             THE COURTROOM DEPUTY:  Do you want me to swear him

22   in before you read the instruction or after?

23             THE COURT:  You can swear him in.

24             If you'll stand, the clerk will give you the oath.

25             THE COURTROOM DEPUTY:  Please raise your right

1    hand.

2            TIMOTHY CASSELL, PLAINTIFFS' WITNESS, SWORN.

3                THE COURTROOM DEPUTY:  Thank you.

4                THE COURT:  Ladies and gentlemen, as I mentioned

5    yesterday, one issue that you will be asked to decide in

6    this case is whether the Defendants took actions that

7    unreasonably or arbitrarily frustrated or interfered with

8    the reasonable contractual expectations of shareholders.  In

9    determining the reasonable expectations of shareholders, the

10   question is not what any individual shareholders actually

11   expected.

12           For this reason, you will not hear testimony from

13   individual shareholders, including any individual

14   Plaintiffs, about their individual expectations or other

15   details about their specific purchases.  You should not draw

16   any inferences, positive or negative, from the fact that

17   neither party presented testimony from an individual

18   shareholder about their individual expectations.  All right?

19           You can state your name for the record, if you

20   would.

21                THE WITNESS:  Timothy Cassell.

22                MR. RUDY:  May I proceed?  May I proceed?

23                THE COURT:  Yes.

24                MR. RUDY:  Thank you, your Honor.

25                           DIRECT EXAMINATION

```
 1    BY MR. RUDY:

 2    Q.  Mr. Cassell, are you one of the lead Plaintiffs

 3    appointed by the Court to represent the class of Fannie and

 4    Freddie shareholders?

 5    A.  I am.

 6    Q.  And where do you live?

 7    A.  Columbus, Ohio.

 8    Q.  Can you tell the jury about your educational background.

 9    A.  I completed two years of college.

10    Q.  Can you speak into the mic.

11    A.  I completed two years of college.

12    Q.  And what did you do after you left college?

13    A.  I worked for a chemical company as a merchandiser.

14    Q.  And what did you do after you worked for that chemical

15    company?

16    A.  Moved to another chemical company and was a sales

17    representative.

18    Q.  And speak a little slower so the jury can hear you.

19    A.  All right.

20    Q.  Thank you.

21         And after you left those companies, what was your

22    next job?

23    A.  I joined the carpenters' union.

24    Q.  And you worked as a carpenter?

25    A.  I did.
```

Cassell - DIRECT - By Mr. Rudy

```
 1    Q.  Did you have any leadership positions within your union?
 2    A.  Yes.  First I was elected as a trustee, then recording
 3    secretary and then I was appointed to the district council.
 4    Q.  And after you worked as a union carpenter, what did you
 5    do next?
 6    A.  I ran for office and got elected to state representative
 7    in Northeast Ohio.
 8    Q.  And how long did you serve as a state representative in
 9    Ohio?
10    A.  One term, two years.
11    Q.  And what years were those?
12    A.  I'm sorry?
13    Q.  What years were those?
14    A.  '05, '06.
15    Q.  And after you left office, what have you been doing for
16    a living since then?
17    A.  I opened up a small government relations firm.
18    Q.  And what kind of clients do you represent in your
19    government relations firm?
20    A.  Currently we have a group of charter schools, the Ohio
21    Professional Bail Bond Association.
22    Q.  A little slower so she can write it down.
23    A.  Got it.
24             Aflac and Paychecks.
25    Q.  And do you still manage that firm today?
```

Cassell - DIRECT - By Mr. Rudy

```
1    A.  I do.

2    Q.  Do you employ other people in that firm?

3    A.  I have four contracts.  Yes.

4    Q.  Why did you agree to serve as a class representative in

5    this case?

6    A.  I felt that I was capable of serving based on my

7    previous history of serving as a representative and in the

8    union.

9    Q.  What have you been asked to do as a class

10   representative?

11   A.  I've been asked to testify; I've been asked to take a

12   lengthy deposition, review a lot of documentation and be

13   here today.

14   Q.  At some point, did you purchase shares of Freddie Mac?

15   A.  I did.

16   Q.  How many shares did you buy?

17   A.  1,000 shares.

18   Q.  Did you buy common shares or preferred shares?

19   A.  Common shares.

20   Q.  Do you still own those 1,000 shares today?

21   A.  I do.

22   Q.  Why did you invest in Freddie Mac?

23   A.  I felt that investing in Freddie Mac was a sound

24   business decision.  The company had a lot of potential for

25   growth.
```

Cassell - DIRECT - By Mr. Rudy

1    Q.  Are you aware that Freddie Mac was placed into

2    conservatorship in 2008?

3    A.  Yes.

4    Q.  What was your understanding of the purpose of placing

5    Freddie Mac into conservatorship?

6         MR. HOFFMAN:  Objection, your Honor.  Lack of

7    foundation, relevance.

8         THE COURT:  Sustained.

9         MR. RUDY:  As to what his understanding was, your

10   Honor?

11        THE COURT:  All right.  You can try.

12   BY MR. RUDY:

13   Q.  What was your understanding of why the company was

14   placed into conservatorship?

15   A.  It was to preserve and conserve the company's assets and

16   return it to stability and solvency.

17   Q.  Do you understand as a part of the conservatorship that

18   the U.S. Treasury made an investment in Freddie Mac to

19   stabilize it?

20   A.  Yes.

21   Q.  What is your general understanding of the basic terms of

22   that investment?

23   A.  Freddie was -- Freddie and Fannie were both to pay a 10

24   percent dividend on those investments.

25   Q.  On what amounts?

1    A.  On the amount that was invested.

2    Q.  Are you aware that on August 17th, 2012, FHFA agreed to

3    what is called the third amendment or the net worth sweep?

4    A.  Yes.

5    Q.  Is it fair to say that much of what you know about this

6    you've learned from your counsel?

7    A.  That is correct.

8    Q.  Okay.  So I'm not going to ask you to disclose any

9    attorney-client-privileged information.  But I'll just ask

10   you generally what you understand the third amendment to be.

11   A.  The third amendment basically was a net profit sweep.

12   So every time the companies profited, that money would be

13   swept away to the Treasury.

14   Q.  Do you believe that you were harmed as a result of the

15   net worth sweep?

16   A.  I do believe so.

17   Q.  How do you believe that you were harmed by the net worth

18   sweep?

19   A.  There was a relatively substantial drop in the stock

20   price after the third amendment.

21   Q.  Okay.  At some point in 2013, did you decide to file

22   litigation challenging the net worth sweep?

23   A.  Yes.

24   Q.  And why did you bring that lawsuit?

25   A.  I did not believe that the government faithfully held up

1    its original bargain.

2    Q.  And why do you believe that?

3    A.  With the net worth sweep, the company could never

4    reinvest in itself.  Therefore, the stock prices would be

5    stagnant.

6              MR. RUDY:  I have nothing further, your Honor.

7              MR. HOFFMAN:  The Court's indulgence for one

8    moment, your Honor.

9                        CROSS-EXAMINATION

10   BY MR. HOFFMAN:

11   Q.  Good afternoon, Mr. Cassell.  I'm Ian Hoffman on behalf

12   of the Defendants.

13              At some point, you bought stocks in Freddie Mac;

14   is that right?

15   A.  That's correct.

16   Q.  You bought a thousand shares of common stock in Freddie

17   Mac.  Right?

18   A.  Correct.

19   Q.  You don't own any preferred stock in Freddie Mac?

20   A.  No, sir.

21   Q.  And you also don't own any stock in Fannie Mae.  Right?

22   A.  No, sir.

23   Q.  So the only stock that's relevant to this case at all is

24   Freddie Mac common stock.  Right?

25   A.  I'm sorry.  Can you repeat that?

1   Q.  The only stock that you own that's relevant to this case

2   is the Freddie Mac common stock that you own?

3   A.  That I own, yes.

4   Q.  And you understand that that Freddie Mac common stock

5   does not require Freddie Mac to pay you dividends.  Right?

6   A.  No, sir.  It does not require it.

7   Q.  And in fact, your common stock that you own, there was

8   no dividends issued on that common stock in 2009.  Right?

9   A.  I do not believe so.

10  Q.  And that had nothing to do with the third amendment,

11  which was signed in August of 2012.  Right?

12  A.  No.

13  Q.  And you also didn't receive any dividends in 2010 or

14  2011.  Right?

15  A.  I don't recall.

16  Q.  You gave some testimony on direct examination about the

17  purposes of the conservatorship.  Right?

18  A.  Yes.

19  Q.  Let's take a look at Plaintiffs' Exhibit 2-B, which is

20  in evidence.

21          This is the statement of FHFA Director James B.

22  Lockhart on September 7th, 2008.  Right?

23  A.  That's what it says, yes.

24  Q.  Let's go to Page 6 of Plaintiffs' Exhibit 2-B.

25          MR. HOFFMAN:  And, Mr. Montgomery, let's focus in

1    on the paragraph that starts with "the goal."  Let's

2    highlight the first sentence.

3    BY MR. HOFFMAN:

4    Q.  Here, FHFA Director Lockhart says:  "The goal of these

5    actions is to help restore confidence in Fannie Mae and

6    Freddie Mac, enhance their capacity to fulfill their mission

7    and mitigate the systemic risk that has contributed directly

8    to the instabilities in the current market."

9              Did I read that correctly?

10   A.  Yes.

11   Q.  That was Director Lockhart's words.  Right?

12   A.  I believe so.

13             MR. HOFFMAN:  The Court's indulgence, your Honor.

14             Thank you, Mr. Cassell.

15             No further questions, your Honor.

16             MR. RUDY:  Your Honor, very, very briefly.

17                      REDIRECT EXAMINATION

18   BY MR. RUDY:

19   Q.  Mr. Cassell, you were asked some questions about the

20   suspension of dividends in 2009, 2010, 2011.  Right?

21   A.  Yes.

22   Q.  Are you here from Ohio to testify about losing your

23   dividends --

24   A.  No, sir.

25   Q.  -- during the conservatorship before the net worth

 1   sweep?

 2   A.  No.

 3   Q.  Do you have any complaint about the fact that FHFA

 4   suspended dividends at that point when the company was --

 5   when they were trying to preserve and conserve assets?

 6   A.  No.

 7              MR. HOFFMAN:  Objection.  Leading.

 8              THE COURT:  Overruled.

 9              THE WITNESS:  No.

10   BY MR. RUDY:

11   Q.  Why are you here in court?

12   A.  I'm here on behalf of the class because we took an

13   effective large hit on the stock prices, and of course

14   dividends would be a factor of that.  But the biggest factor

15   for me was the actual loss in the stock prices and the fact

16   that they can't reinvest in themselves.  So that's never

17   going to change.

18              MR. RUDY:  Thank you, your Honor.

19              THE COURT:  Next witness.

20              You can step down.

21              (Witness excused.)

22              MR. RUDY:  Your Honor, at this time, we would

23   intend to play -- I think it's about a 20-minute video of

24   another stockholder, a preferred stockholder, named Joseph

25   Cacciapalle.  It's a video.

```
 1                 THE COURT:  All right.

 2                 MR. KRAVETZ:  Robert Kravetz on behalf of

 3     Plaintiffs.

 4                 Your Honor, before proceeding on to that,

 5     Plaintiffs would move into evidence Plaintiffs' Exhibit 346,

 6     your Honor.

 7                 I believe it's without objection.

 8                 MR. HOFFMAN:  No objection.  Apologies.

 9                 THE COURT:  Received.

10                 (Whereupon, Plaintiffs' Exhibit No. 346 was

11     entered into evidence.)

12                 THE COURT REPORTER:  Counsel, could I have some

13     clarity for the record as you to whether you want me to take

14     this video deposition down?

15                 MR. HOFFMAN:  No need.

16                 (Whereupon, the videotaped deposition of Joseph

17     Cacciapalle was published in open court.)

18                 MR. RUDY:  Your Honor, we have like a two-minute

19     video now of Professor Attari.  And actually, before we play

20     this, I just have one exhibit I'd like to move into

21     evidence, which is Exhibit PX-375.  I don't believe there's

22     any objection.

23                 MR. HOFFMAN:  No objection.

24                 THE COURT:  375?

25                 MR. RUDY:  Yes.  That'll be part of this video.
```

```
 1                    THE COURT:  Okay.

 2                    (Whereupon, Plaintiffs' Exhibit No. 375 was

 3        entered into evidence.)

 4                    (Whereupon, the videotaped deposition of Mukarram

 5        Attari, Ph.D., was published in open court.)

 6                    MR. RUDY:  Your Honor, the next witness is

 7        Professor Joseph Mason.  Should I call Professor Mason?

 8                    THE COURT:  Yes.

 9                    MR. RUDY:  Thank you.

10                    MR. JONES:  Your Honor, if we could go to the

11        phones briefly.

12                    (Whereupon, the following proceedings were had at

13        sidebar outside the presence of the jury:)

14                    MR. JONES:  Thank you, your Honor.  Stanton Jones

15        for Defendants.

16                    The Defendants have an objection to just a few of

17        the slides.  It's one objection that affects four slides in

18        this slide deck that the Plaintiffs disclosed to us

19        yesterday for use with Dr. Mason.

20                    As your Honor will recall, Dr. Mason testifies

21        about damages from the stock price declines on August 17th,

22        2012, which was the date of the third amendment.

23                    These four slides discuss the stock price

24        increases on earlier dates that are discussed in the event

25        study August 7th and August 8th.
```

1          The objection, your Honor, is that Dr. Mason's

2     expert reports in this case don't contain any analysis or

3     opinions or even discussion of the stock price increases on

4     those earlier dates.  There's no mention of them in the

5     portion of Dr. Mason's reply report that discusses the

6     $1.6 billion stock price drop on August 17th.  For that

7     reason, there's just no disclosure of anything related to

8     these other dates.

9          MR. RUDY:  Your Honor, Lee Rudy for the

10     Plaintiffs.

11          The two dates that Mr. Jones is referring to are

12     in the report and they're an integral part of the report.

13     Basically, what the report says is that Dr. Attari ran this

14     event study to see whether positive news affected the stock

15     price or negative news affected the stock price.

16          And there were three dates that we're going to be

17     discussing:  August 7th, when positive news was released,

18     the stock price went up.  August 8th, when positive stock --

19     positive news was released, the stock price went up.  And

20     August 17th, negative stock price -- when negative news was

21     released, then the stock price -- that was the net worth

22     sweep -- fell.

23          Dr. Mason testified in the last trial and I would

24     expect him to testify again today that the August 7th and

25     August 8th positive stock price movements were important to

1   his ability to assess whether the study was methodologically

2   sound, which is to say that the stock price reacted to

3   positive and negative news.  And that's why he was allowed

4   to testify with no objection in the last trial to this exact

5   testimony.

6          It's in -- it is in his reply report that he says

7   that market prices are informative and refer to highly

8   efficient markets.  That's why he's talking about the

9   movement in the stock price both up and down.

10          You know, I can read you the exact quote --

11   question and answer that he was asked without objection at

12   the last trial.

13          But this is highly probative of whether the study

14   is actually methodologically sound to say that the stock

15   price reacts positively and negatively to positive and

16   negative news.  And I can't see any basis to restrict him to

17   only talking about one stock price movement when he's

18   vouching for the methodological efficiency of a study that

19   he's trying to testify to.

20          MR. JONES:  Your Honor, Stanton Jones.

21          I'm looking at the relevant section of Dr. Mason's

22   reply report that Mr. Rudy was just referring to.  And it

23   actually has absolutely zero mention of August 7th or August

24   8th or any date other than August 17th, which was the date

25   of the third amendment.

```
1              The parties also have an agreement to restrict the

2     scope of Dr. Mason's testimony with respect to price changes

3     after August 17th.  And so I don't believe that this

4     testimony is consistent with that agreement either, which

5     came after the last trial.

6              MR. RUDY:  Your Honor, Lee Rudy again.

7              I'm looking at the paragraphs in Dr. Mason's reply

8     report that are the basis for introducing the event study.

9     It says:  Dr. Attari also claims that market prices are,

10    quote, "informative" and refers to, quote, "deep and highly

11    efficient markets."  There's been a footnote to the Attari

12    report -- and this is in his report -- and that footnote to

13    the Attari report, Paragraph 177, refers to market

14    efficiency and the stocks responding to new information in

15    realtime.

16             Your Honor, this is -- the basis of our damages --

17    our entire damage model is based on the jury believing that

18    this event study was properly conducted.  And that's what

19    Dr. Mason's going to say, is this is a properly conducted

20    event study.

21             And that's why in the last trial, like in this

22    trial, I would intend to ask him, "Did you look at the stock

23    price movements on August 7 and August 8," which are shortly

24    in time right before August 17 to corroborate that this is a

25    stock that moved in response to positive and negative news.
```

1              It would be very prejudicial to the Plaintiff for

2      him not to be able to explain why this is a properly

3      conducted event study and only have to refer to one date.

4      And it would certainly not be unduly prejudicial to the

5      Defendants for them -- for the jury to understand that this

6      is a properly conducted study where the stock responded in

7      realtime to real events.

8              THE COURT:  The objection is overruled.

9              (Whereupon, the following proceedings were had in

10     open court:)

11             THE COURT:  The witness can come forward.

12             THE COURTROOM DEPUTY:  Please raise your right

13     hand.

14        JOSEPH RUSSELL MASON, Ph.D., PLAINTIFFS' WITNESS, SWORN.

15             MR. RUDY:  May I proceed, your Honor?

16             THE COURT:  Yes.

17                          DIRECT EXAMINATION

18     BY MR. RUDY:

19     Q.  Could state your name for the record?

20     A.  Joseph Russell Mason.

21     Q.  And, Dr. Mason, how are you currently employed?

22     A.  I am a professor at Louisiana State University.

23     Q.  And have you been retained as an expert witness for the

24     Plaintiffs in this case?

25     A.  Yes.

 1    Q.  And what is the subject of your testimony here today?

 2    A.  I've been asked to opine upon the existence and

 3    magnitude or size of damages in this matter.

 4    Q.  Did you prepare any materials to help you explain your

 5    testimony today?

 6    A.  Yes.

 7    Q.  What did you prepare?

 8    A.  I prepared a PowerPoint slide deck.

 9    Q.  Okay.

10         MR. RUDY:  Janna, can you pull up the slide deck?

11    BY MR. RUDY:

12    Q.  I'd like to start with your background and specifically

13    your educational background.

14         You have a Ph.D. in economics; is that right?

15    A.  That's correct.

16    Q.  And do you have any particular academic focus in your

17    studies?

18    A.  My focus is financial economics.  In particular, I focus

19    on economic history with emphasis in financial crises, and

20    in particular government responses to financial crises

21    through history.

22         MR. RUDY:  I'm informed that the screens are not

23    on.  I don't know if --

24         THE COURTROOM DEPUTY:  If you could just let me

25    know when you want me to turn it on for the jurors, because

 1     I don't know when I'm supposed to turn it on.

 2              MR. RUDY:  I apologize.  I thought when she pulled

 3     it on, it was lighting up on the screens.  Are we good now?

 4              THE COURTROOM DEPUTY:  Yes.

 5              MR. RUDY:  Thank you.  I apologize.

 6     BY MR. RUDY:

 7     Q.  Professor Mason, what is financial economics?

 8     A.  Financial economics is the application of economic

 9     principles to the study of finance.

10     Q.  And within that field, do you have any particular focus?

11     A.  In particular, financial intermediation, financial

12     crises and how we deal with those financial crises when they

13     occur.

14     Q.  To get your Ph.D., did you have to write a thesis?

15     A.  I did.

16     Q.  What did you write your thesis on?

17     A.  My thesis was on the experience of the Reconstruction

18     Finance Corporation in the Great Depression.  The importance

19     of the Reconstruction Finance Corporation from my

20     perspective, the topic that I wrote on, was the -- before

21     this period, there were debates about how to go about

22     helping financial institutions.  And it was in the

23     Reconstruction Finance Corporation that we kind of developed

24     the playbook that is used today in financial crises, which

25     is where you assess the condition of institutions; you save

1    those that can be saved, often with an infusion of preferred

2    stock by the government; and then the government exits those

3    investments to allow the firm to return to the private

4    sector.

5    Q.  You mentioned that you're currently a professor; is that

6    right?

7    A.  That's right.

8    Q.  And where do you teach?

9    A.  I teach at Louisiana State University.

10   Q.  There's reference on this slide to the Wharton School at

11   the University of Pennsylvania.  What is your affiliation

12   with the University of Pennsylvania?

13   A.  I'm a senior fellow at the Wharton School.

14   Q.  Okay.  What do you teach at Louisiana State?

15   A.  At Louisiana State University, I teach courses for

16   undergraduates, master's students and Ph.D. students across

17   the full spectrum of finance.

18   Q.  As part of your job as a tenured professor, do you

19   perform scholarly research and publish on areas within your

20   expertise?

21   A.  Absolutely.

22   Q.  Has your academic research and scholarship focused on

23   any particular area or areas?

24   A.  A great deal of that has focused on the Great

25   Depression, the experience with the Reconstruction Finance

1    Corporation and also the dynamics of resolving these

2    institutions during a crisis.  I've also written focusing on

3    the 1980s savings and loan crisis as well as the 2007 and

4    2008 financial crisis, among others.

5    Q.  Have you actually published on any topics within your

6    expertise?

7    A.  Yes.

8    Q.  What have you published?

9    A.  I've published a number of book chapters as well as

10   scholarly articles in academic journals, mostly about

11   financial institution distress, financial institution

12   failures; and other times, about complex products that tend

13   to cause those failures.

14   Q.  You mentioned you published articles as well as book

15   chapters.  Are those articles published in what are referred

16   to as peer-reviewed journals?

17   A.  Yes.

18   Q.  And what does that mean, "peer-reviewed"?

19   A.  Peer review is a process where the editor of a journal,

20   if they think an article is good enough to begin with, will

21   then send that article out to other academics for them to

22   weigh in anonymously on the importance of the article as

23   well as the quality of the execution of the research.  In

24   other words, is it worth publishing in our journal?

25   Q.  And have you yourself served as a peer reviewer of other

1    people's writing?

2    A.  Yes.

3    Q.  Approximately how many times?

4    A.  Well over 50 times.

5    Q.  Has your research and economic commentary been cited in

6    any print media?

7    A.  Yes, it has.

8    Q.  On what types of topics?

9    A.  Typically on financial crises.  Prior to the global

10   financial crisis, many economists and others thought there

11   was never going to be another financial crisis again.  So --

12   but I studied these and I enjoyed studying these.  And when

13   it came along, I was one of the few people that had staked

14   my career on the study of financial crises.  So a lot of

15   newspapers and others called and asked me opinions and

16   quoted me.

17   Q.  How about television and radio?

18   A.  I also appeared on television and radio at the time,

19   made numerous appearances on CNBC, Bloomberg Radio,

20   Bloomberg Television, also National Public Radio, BBC Radio.

21   It was a very busy time.

22   Q.  So with all due respect, a financial economist finds

23   himself on television.  How does that come about?

24   A.  I really don't know.  I got a call one day and then kind

25   of got another and another.

1   Q.  Well, modesty aside, what is the reason that you think

2   they're calling you?

3   A.  Well, I was one of the few people that had -- I actually

4   studied two very unpopular subjects, not just financial

5   crises at the time, but also securitization.  And prior to

6   the global financial crisis, people would read my writings

7   on securitization and say, I don't know what that is and I

8   don't know why I should care.

9           And suddenly, overnight everybody cared about

10  both.

11  Q.  Can you describe your professional experience outside of

12  academics?

13  A.  Sure.  I began my career out of grad school going to the

14  Office of the Comptroller of the Currency.  The Office of

15  the Comptroller of the Currency is the primary regulator of

16  nationally chartered banks, the largest banks in the U.S.  I

17  became a senior financial economist there.

18          And I'd already been interested in financial

19  crises.  And as I said earlier, I was interested in the kind

20  of complex arrangements that would lead to financial crises

21  when they kind of blew up unexpectedly out of the blue.

22          And it was at the Office of the Comptroller of the

23  Currency that I began studying securitization, because banks

24  were very heavily relying upon securitization at the time.

25  I found that very interesting.

1    Q.  Have you ever been asked to testify before Congress?

2    A.  I have.

3    Q.  About how many times?

4    A.  Over 20 times.

5    Q.  And again, relating to what topics?

6    A.  Again, primarily relating to matters having to do with

7    the financial crisis, ranging from securitization to credit

8    ratings to consumer debt generally, sometimes to loan

9    modifications and how we could find a path out of this

10   crisis.

11   Q.  Have you had occasion to consult with or advise other

12   government agencies?

13   A.  Yes.  I advised some agencies directly, including the

14   Government Accountability Office, the Congressional Research

15   Service and Congress's Joint Economic Committee.

16   Q.  Have you testified before as an expert witness?

17   A.  I have.

18   Q.  About how many times?

19   A.  Well over 50 times.

20   Q.  On what topics have you testified or served on as an

21   expert witness?

22   A.  A good amount of my testimony has had to do with

23   mortgage-backed securities after the crisis.  Others had to

24   do with stocks, bonds, derivatives.

25   Q.  How about areas relating to damages?

1    A.  Many of those engagements had to do with estimating

2    damages as well as part of damages that we've referred to

3    sometimes as causation, what caused the damage to begin

4    with, which is of course an integral component of damages.

5    If there was no causation, there was no damage.

6    Q.  On whose behalf have you been hired as an expert witness

7    in these prior engagements?

8    A.  I've been hired by Plaintiffs in this matter.

9    Q.  And in prior engagements, plaintiffs?  Defendants?

10   Both?  Which?

11   A.  Oh, in prior engagements, primarily plaintiffs, though

12   I've worked for defendants as well.

13   Q.  Have you ever been hired by the federal government to

14   work as an expert witness?

15   A.  Yes, I have.

16   Q.  And what government agencies have hired you to work as

17   an expert?

18   A.  I've worked for the Department of Justice.  I've also

19   worked for the Securities and Exchange Commission.

20   Q.  If you look in your binder, there's a copy of PX-402-A.

21   Oh, I usually have a binder.  One second.

22           Do you see Exhibit 402-A in the binder?

23   A.  There we go.  Sorry.  The tab was hiding behind another

24   one.

25   Q.  Do you have 402-A in front of you?

 1    A.  I do.

 2    Q.  What is it?

 3    A.  That is my CV or my résumé.

 4    Q.  Okay.  Does it fairly and accurately describe your

 5    educational and professional background?

 6    A.  Yes.

 7           MR. RUDY:  I'm going to move Exhibit PX-402-A into

 8    evidence.

 9           MR. JONES:  No objection.

10           THE COURT:  Received.

11           (Whereupon, Plaintiffs' Exhibit No. 402-A was

12    entered into evidence.)

13           MR. RUDY:  Your Honor, at this time I would

14    respectfully tender Professor Mason as an expert on

15    financial economics, government bailouts, financial

16    valuation and damages.

17           MR. JONES:  No objection to his qualifications.

18           THE COURT:  You may proceed.

19           MR. RUDY:  So qualified?

20           THE COURT:  Yes.  You may proceed.

21           MR. RUDY:  Thank you, your Honor.

22    BY MR. RUDY:

23    Q.  Professor Mason, I'd like to turn to your assignment in

24    this case.  What was your assignment here?

25    A.  My assignment was to analyze the existence and magnitude

```
 1    of damages in this case.
 2    Q.  As a result of what?
 3    A.  In particular as a result of the net worth sweep --
 4    Q.  And damages --
 5    A.  -- imposed upon shareholders.
 6    Q.  Okay.  And damages on behalf of whom?
 7    A.  Damages on behalf of shareholder Plaintiffs.
 8    Q.  And damages means financial harm?
 9    A.  Yes.
10    Q.  And on the issue of damages, what conclusion did you
11    reach?
12    A.  I reached the conclusion that damages in this matter
13    amount to $1.61 billion.
14    Q.  Suffered by whom?
15    A.  Suffered by Plaintiff shareholders in this matter.
16    Q.  Professor Mason, before taking on this assignment, how
17    familiar were you with Fannie and Freddie?
18    A.  Oh, very familiar.
19    Q.  And why is that?
20    A.  As I said earlier, I'd been interested in securitization
21    since the beginning of my career.  These are two
22    institutions that securitize a lot of consumer loans,
23    mortgages in particular.  So they were behemoths in the
24    marketplace.
25    Q.  Can you describe as a general matter what the United
```

1    States government was to the 2008 financial crisis [sic]?

2    A.  I'm sorry.  What the what of the United States

3    government was?

4    Q.  I'll repeat it.

5         Can you describe as a general matter what the

6    United States government's response was to the 2008

7    financial crisis?

8    A.  The U.S. government's response was pretty typical of

9    financial crises, really injecting money into all types of

10   sectors of the economy, primarily the financial sector.

11   It's been estimated that such injections amounted to between

12   5 and 20 trillion dollars.

13   Q.  I'll ask you what this slide in front of you depicts.

14   A.  These are some of the larger injections of bailout funds

15   that were made to specific large financial intermediaries as

16   a response to the crisis.

17   Q.  Could you just list some of the companies?

18   A.  Number one on the list is AIG, a very large insurance

19   company.

20        General Motors, which had an arm that had begun

21   originating mortgages; Bank of America, Citigroup; JP Morgan

22   Chase; Wells Fargo, all of them very large financial

23   institutions.

24   Q.  Are any of these companies still under government

25   conservatorship?

1    A.  No.

2    Q.  Have all of these companies been returned to their

3    stockholders?

4    A.  Yes.

5    Q.  When Congress put Fannie and Freddie into

6    conservatorship in 2008, what did the FHFA say that its

7    responsibility was?

8    A.  They said their responsibility was kind of the typical

9    responsibility in conservatorship that we've seen since the

10   1930s:  To preserve and conserve the company's assets and

11   property and also to restore the institution to safety and

12   soundness so that they could be -- according to the playbook

13   since the 1930s, so the firms could be released back into

14   the private sector.

15          MR. RUDY:  Janna, could you highlight the words on

16   the third line, "sound and solvent"?  Oh, it's a .pdf.

17   BY MR. RUDY:

18   Q.  I'll direct you to the third line, where you see the

19   words "sound and solvent."

20   A.  Yes.

21   Q.  And can you describe what soundness and solvency means?

22   A.  That means that the firm's assets are worth more than

23   their liabilities and they can pay their bills on time and

24   in full.

25   Q.  Based on your expert opinion, did the net worth sweep

1    comport with the FHFA's stated purpose in placing Fannie and

2    Freddie into conservatorship?

3    A.  No.

4    Q.  Why not?

5    A.  Because by taking all the profits of the firms, it

6    prevented the firms from using those profits to build up

7    assets so that assets could be greater than liabilities and

8    restrained their ability to pay their bills.  They didn't

9    have any more cash.

10   Q.  I'm going to ask you historically from a historical

11   perspective, how common or uncommon is it for the U.S.

12   government to place a struggling company into

13   conservatorship?

14   A.  Companies are placed into conservatorship -- I don't

15   want to say all the time, but it's not at all unheard of.

16   It happens fairly regularly in response to these kind of

17   financial difficulties.

18   Q.  And historically, from a historical perspective, how

19   common or uncommon in your expert opinion is an action like

20   the net worth sweep?

21   A.  I've never seen it before.

22   Q.  Professor Mason, are you aware of the stock price

23   reaction of Fannie and Freddie's common and preferred stock

24   in reaction to the net worth sweep?

25   A.  Yes.

1   Q.  What does the blue bar here on the left represent?

2   A.  The blue bar shows the day before the announcement of

3   the net worth sweep, the companies' stock was worth a total

4   of $2.93 billion.

5   Q.  Are you aware in this case that Defendants are arguing

6   that by 2009 the $33 billion that the shareholders had

7   previously invested in Fannie and Freddie had already been

8   wiped out?

9   A.  I've heard that.  Yes.

10  Q.  Is a market capitalization of $2.9 billion on August

11  16th, 2012, before the net worth sweep consistent with the

12  argument that Fannie and Freddie's stockholders' previous

13  investment had been, quote, "wiped out"?

14  A.  No.

15  Q.  Would you agree at that time in 2012 Fannie and

16  Freddie's stockholders were down, but they were not out?

17  A.  That's an apt characterization, yes.

18  Q.  Professor, what financial methodology did you use as the

19  basis for your conclusion that Fannie and Freddie's

20  stockholders suffered $1.61 billion in damages?

21  A.  I used a tool from financial economics called an event

22  study.

23  Q.  And what is an event study?

24  A.  An event study is a structured analytical method for

25  looking at a stock price movement that one might think would

1    be associated with new news released to the marketplace and

2    evaluating whether that stock price movement is

3    statistically significant or meaningful and then evaluating

4    other potential causes that might have interfered before

5    reaching a conclusion that that stock price movement can be

6    attributed to the new information announced to the market

7    that day.

8    Q.  What was the particular piece of news that you were

9    testing in the event study that you relied on?

10   A.  Here I was interested in the net worth sweep.

11   Q.  And what specifically about the net worth sweep were you

12   testing?

13   A.  I was testing the effect upon shareholder value between

14   the day before and the end of the day after it was

15   announced.

16   Q.  You see on this slide in front of you that Fannie and

17   Freddie's stock price fell by about 50 percent.  Is that

18   about right?

19   A.  Yes.

20   Q.  Did you look at whether the entire stock market went

21   down on August 17th?

22   A.  I did.

23   Q.  And did it go down that day?

24   A.  No, it didn't.

25   Q.  Well, what if the entire stock market had gone down on

1    August 17th, 2012?  What would you have -- what would you

2    have done in creating an event study with that information?

3    A.  Well, then I'd have to break up this amount of decline

4    into that which would be attributed to the stock market

5    overall and that which would be attributed to the

6    announcements of the net worth sweep.

7    Q.  Is there any academic or legal support for using an

8    event study to determine the impact on a share price of new

9    information?

10   A.  Yes.

11   Q.  Is an event study commonly used in your work?

12   A.  Yes.  Event studies are used in the field of financial

13   economics quite regularly.  It's been estimated there are

14   tens of thousands of academic papers that use this

15   technique.

16   Q.  Did you actually yourself perform the event study that

17   you're relying on in your testimony here today?

18   A.  No.  I did not gather the data and write the code.

19   Defendants' experts did that.

20   Q.  I'm sorry.  Who --

21   A.  Defendants' experts did that.

22   Q.  Okay.  Can you tell us a little bit more about what you

23   mean by that?

24   A.  Well, earlier, you played the video from the deposition

25   of Dr. Attari, where he said that he performed this event

1    study.  I was given those materials and I validated his

2    approach, his data, made sure everything was done accurately

3    before using it to express my opinion that the damages in

4    this matter to shareholders are $1.61 billion.

5    Q.  So you relied on the Defendants' expert's event study

6    that concluded that the stock price fell by $1.6 billion as

7    a result of information released on August 17th, 2012?

8    A.  Yes.

9    Q.  Have you yourself performed your own event studies?

10   A.  Yes, I have.

11   Q.  How many times, would you say?

12   A.  Hundreds of times in the course of my career.

13   Q.  And based on your experience performing event studies

14   and your analysis of the event study performed by the

15   Defendants' expert in this matter, do you have an opinion as

16   to whether or not this particular event study as to the

17   stock price movement was properly constructed and performed?

18   A.  Yes.

19   Q.  What's your opinion?

20   A.  My opinion is that it was properly constructed and

21   performed.

22   Q.  Are the facts and the data in Defendants' event study

23   the kind of facts and data that financial economists

24   reasonably rely on in performing an event study?

25   A.  Yes.

1    Q.  And is Dr. Attari, the Defendants' expert -- is his

2    event study the kind of analysis that financial economists

3    and other experts in the field reasonably rely on to

4    evaluate stock price movements in response to new

5    information?

6    A.  Yes, it is.

7    Q.  Were you in the courtroom a few minutes ago when the

8    short video clip from Dr. Attari was played?

9    A.  Yes, I was.

10   Q.  Can you just explain to the jury in case they weren't --

11   in case it wasn't totally obvious what the purpose of that

12   video was?

13   A.  Well, that video --

14           MR. JONES:  Objection, your Honor.

15           THE COURT:  Overruled.

16           Go ahead.

17           THE WITNESS:  That video confirmed that Dr. Attari

18   himself did create this event study along with his staff.

19   BY MR. RUDY:

20   Q.  So did you limit your analysis in this case just to the

21   work that Dr. Attari did?

22   A.  No.

23   Q.  Other than relying on Dr. Attari's event study, what

24   other materials or information, if any, did you consider in

25   performing your assignment?

```
 1    A.  I reviewed a wealth of materials, including financial

 2    filings by Fannie Mae and Freddie Mac, FHFA reports,

 3    documents produced in this case, emails, deposition

 4    testimony, court documents.  A lot of materials and

 5    background.

 6    Q.  Do you recognize this slide?

 7    A.  I do.

 8    Q.  What is it?

 9    A.  This is the cover page from the PowerPoint presentation

10    that was prepared to summarize the results of that event

11    study.

12    Q.  Prepared by Dr. Attari?

13    A.  Yes.

14    Q.  And it has on it PX-375 that was just moved into

15    evidence.  Do you see that?

16    A.  Yes.

17    Q.  At the time that you reviewed this event study, PX-375,

18    did you also analyze the underlying computer programs and

19    the data that generated the conclusions reached in the event

20    study?

21    A.  Absolutely.  Yes.

22    Q.  Okay.  In your binder, you have several exhibits.  I'll

23    list them:   PX-495-2, 496-2, 497-2, 497-3, 497-4, 497-5.

24    Dr. Mason, do you have all those exhibits in the binder

25    there?
```

1    A.  I do.

2    Q.  Okay.  And have you had the opportunity to review those

3    exhibits?

4    A.  Yes, I have.

5    Q.  What are they?

6    A.  These are what you might call the guts of the model, the

7    data, the computer code behind it.  And I reviewed all of

8    that before opining that this model was a reasonable and

9    reliable estimate of damages in this matter.

10   Q.  Okay.  And so those guts, as you call it, of the event

11   study, those are the supporting materials to PX-375?

12   A.  Yes.

13   Q.  Okay.  And then those results from the code, et cetera,

14   are then summarized in PX-375, the actual PowerPoint event

15   study Dr. Attari prepared?

16   A.  Yes.

17   Q.  Okay.

18          MR. RUDY:  I'm going to offer those documents into

19   evidence.

20          MR. JONES:  No objection.

21          THE COURT:  Received.

22          (Whereupon, Plaintiffs' Exhibit Nos. 495-2, 496-2,

23   497-2, 497-3, 497-4 and 497-5 were entered into evidence.)

24   BY MR. RUDY:

25   Q.  Did Dr. Attari's event study analyze the stock price

1    movements in Fannie and Freddie's stock from August 16th to

2    August 17th, 2012?

3    A.  Yes, it did.

4    Q.  I'm showing you Page 6 from Defendants' event study

5    PX-375.  Can you describe what this slide illustrates?

6    A.  Sure.  This slide shows the change in the value of

7    Plaintiff shareholders' stocks in total from before the

8    announcement of the net worth sweep to after the

9    announcement of the net worth sweep.

10   Q.  Okay.  And just to clarify, the red boxes around certain

11   numbers and the red box at the bottom that says Damages,

12   were those included in the original slide in Defendants'

13   report?

14   A.  No.

15   Q.  But the three lines -- the three rows and all the

16   columns in the rest of the slide, was that actually pulled

17   directly from the Defendants' report, PX-375?

18   A.  Yes.

19   Q.  Okay.  Can you just summarize the -- what the columns of

20   numbers that result in those three yellow boxes represent

21   and explain to the jury what the purpose of this slide is to

22   show?

23   A.  Sure.

24           The leftmost box under the Fannie Mae junior

25   preferred column title shows that the day before the net

1    worth sweep, the Fannie Mae junior preferred stock was worth

2    a total of $1.459 billion.

3            After the net worth sweep, that Fannie Mae junior

4    preferred stock was worth $680 million, a total decline of

5    $779 million in value that day.

6    Q.  So the yellow box that says negative 779, that

7    represents the actual loss in value of the Fannie Mae junior

8    preferred stock on that one day?

9    A.  That's correct.

10   Q.  Okay.  Could you move to the next two yellow boxes and

11   explain what the slide illustrates?

12   A.  For Freddie Mac, the center column, junior preferred,

13   shows the total value of the junior preferred was $1.274

14   billion the day before.

15           And it fell to $488 million after the

16   announcement, for a total loss of $786 million.

17           And the column titled common under Freddie Mac, we

18   see that the common stock was worth a total market value of

19   $195 million the day before.  Then that fell to $150 million

20   after the announcement, for a total loss of $46 million.

21           We add up those three numbers, and those get us to

22   damages of $1.61 billion.

23   Q.  Okay.  So you've talked about Freddie Mac common and

24   junior preferred.  But as to Fannie Mae, you're only talking

25   about junior preferred.  There's no box around the common

```
1     stock.  Is that right?
2     A.  That's right.
3     Q.  Is it your understanding that Fannie Mae common shares
4     are just not part of this lawsuit?
5     A.  That's my understanding.  Correct.
6     Q.  And the lawsuit is about the three classes of stock that
7     are in yellow boxes.  Right?
8     A.  Yes.
9     Q.  Dr. Mason, did you corroborate that these numbers found
10    by Dr. Attari were actually the correct numbers?
11    A.  Yes.
12    Q.  This is Page 14 of Dr. Attari's report, PX-375.  Can you
13    explain what this page of his report shows?
14    A.  The bottom row of this page expresses what you just saw
15    in dollar terms and percent terms.  And the asterisks, the
16    little stars by those percent numbers, represent the
17    statistical significance of the decline or rather represent
18    that the statistical significance is at least 95 percent.
19    Q.  Okay.  So looking at Fannie Mae common and junior
20    preferred on August 17th, it says negative 47.1 percent.
21    What does that refer to?
22    A.  That is the amount expressed in percent terms that the
23    Fannie Mae common and junior preferred stock moved as a
24    result of the net worth sweep.
25    Q.  And then the Freddie Mac stock on that day fell by 56.8
```

1    percent.  Is that correct?

2    A.  That's correct.

3    Q.  You said the asterisks represent a 95 percent

4    statistical significance; is that right?

5    A.  95 percent or greater.

6    Q.  Or greater.

7            So did the model that Dr. Attari ran actually

8    determine the actual statistical significance of the stock

9    price movements on August 17th, 2012?

10   A.  Yes.

11   Q.  And was -- and what does "statistical significance"

12   means?

13   A.  Statistical significance gives you an indication of the

14   possibility that you might be observing this by random

15   chance.  And so with a 95 percent certainty, it leaves only

16   a 5 percent chance of you seeing this kind of stock price

17   movement just out of the blue for no particular reason just

18   on a given random day.

19   Q.  So the asterisk represents that it would be a 95 percent

20   or, you know, 19 out of 20 percent, you know, chance that

21   it's not random chance that caused the movement.  Is that

22   right?

23   A.  Right.  Or to flip that over, a 5 percent or less chance

24   that it is random.

25   Q.  Okay.  And did the code, the guts of the report,

1    actually allow you to determine what was the actual percent

2    chance that this would have been done by random, this

3    movement on August 17th?

4    A.  Yes.

5    Q.  Was that a percent less than 5 percent?

6    A.  Yes.  A great deal less than 5 percent.

7    Q.  Approximately how much was the percent that that

8    movement on August 17th would have been based on random

9    chance?

10   A.  Like -- I can't remember the number, but it's less than

11   1 trillionth of 1 percent.

12            THE COURT:  On that happy note, we'll take ten

13   minutes.  I can't even put that in my mind.  A trillionth of

14   1 percent.

15            (Whereupon, the jury exited the courtroom at 3:39

16   p.m. and the following proceedings were had:)

17            (Thereupon a recess was taken, after which the

18   following proceedings were had:)

19            THE COURT:  One of you is thinking we're going

20   read some deposition after this witness.  Which deposition

21   would we read?

22            MR. KRAVETZ:  Your Honor, Robert Kravetz on behalf

23   of Plaintiffs.

24            It really depends on timing.  It will either be

25   Mr. Mayopoulos or Mr. Benson, depending on how much we have

```
 1        left in the day.
 2                    THE COURT:  Is the Defendants' idea this is going
 3        to be a short cross?
 4                    MR. JONES:  It might be 20 to 30 minutes or less.
 5                    THE COURT:  How much more direct do you have?
 6                    MR. RUDY:  I'm going to guess 15 minutes.
 7                    THE COURT:  So I think we'll go ahead and go
 8        forward.
 9                    THE COURTROOM DEPUTY:  Should I get the jury?
10                    THE COURT:  I'd almost bet money y'all are not
11        going to stick to those times.  You haven't stuck to any
12        yet.
13                    MR. STERN:  That would be money well bet, your
14        Honor.
15                    THE COURT:  No offense.
16                    THE COURTROOM DEPUTY:  Jury panel.
17                    (Whereupon, the jury entered the courtroom at 3:57
18        p.m. and the following proceedings were had:)
19                    THE COURT:  You may be seated.
20                    All right, counsel.  You may proceed.
21                    MR. RUDY:  Thank you.  Lee Rudy again for
22        Plaintiffs.
23        BY MR. RUDY:
24        Q.  I'll pick up where we left off before the break.
25                    Professor Mason, how would you characterize a
```

1    stock price drop of 47 percent or 56.8 percent in terms of

2    event studies that you've worked on previously?

3    A.  It's huge.

4    Q.  What can you reasonably infer from the fact of a one-day

5    stock drop of 47 percent or 57 percent?

6    A.  Something unexpected and important happened on that day.

7    Q.  This is Page 15 of Dr. Attari's report, PX-375.  What

8    does this page indicate?

9    A.  This page indicates the next standard step of an event

10   study.  We've established that there are days where the

11   stock price moved by quantities that are important.

12   Something likely happened that day.  So now we look for what

13   happened that day that would have caused movement.  And this

14   is a set of news articles that were explaining what led to

15   the movements those days.

16   Q.  Okay.  Back to the page we were just looking at, Page 14

17   again, this is now highlighting the August 7th price

18   movements between Fannie and Freddie stock.  Is that right?

19   A.  That's right.

20   Q.  Can you explain what happened to Fannie and Freddie's

21   stock on August 7th, 2012?

22   A.  On August 7th, 2012, Fannie Mae's common and junior

23   preferred rose by 11.1 percent.  And the effect was

24   statistically significant.

25            And for Freddie Mac, the common and junior

1    preferred stock rose by 18 percent.  And again, the effect

2    was statistically significant.

3    Q.  Okay.  So then if you go back to the page we were just

4    looking at, did the Defendants' expert attribute a cause to

5    what had caused Fannie and Freddie's stock price to go up on

6    August 7th, 2012?

7    A.  Yes.

8    Q.  What was the cause that Defendants' expert attributed to

9    the August 7th stock price increases for Fannie and

10   Freddie's stock?

11   A.  Freddie Mac issued their financial results that day, and

12   they were really good.  It was a good, profitable quarter.

13   And they didn't require a draw from the Treasury.

14         Fannie Mae also released some industry research in

15   the housing market that showed that housing market

16   conditions were upbeat and improving and again really good.

17   So it's not at all surprising that we see the stocks of both

18   firms rise that day.

19   Q.  Back to the prior slide, August 8th:  Can you describe

20   what happened to Fannie and Freddie's stock the day after

21   the day we were just talking about?

22   A.  Sure.  The next day, Fannie Mae common and junior

23   preferred rose another 15.7 percent.  And the effect was

24   again statistically significant.

25         Freddie Mac's common and junior preferred rose

1    another 14.9 percent the next day.  And again, the effect

2    was statistically significant.

3    Q.  And did Defendants' expert attribute those stock price

4    increases on August 8 to particular news?

5    A.  Yes.

6    Q.  What news did Dr. Attari attribute the increases in

7    Fannie and Freddie's stock to on August 8th, 2012?

8    A.  We see here that on August 8th, Fannie Mae issued their

9    financial statements, which were again very positive.  They

10   in fact said:  We expect our financial results in 2012 to be

11   substantially better than the past few years.

12            Freddie Mac then released their own version of the

13   industry research showing that housing markets were doing

14   really well.  Both of these are positive sources of news.

15   And it's not surprising, therefore, that we see the stocks

16   of both firms rise on August 8th as well as August 7th.

17   Q.  Did you independently corroborate that Dr. Attari's

18   analysis of Fannie and Freddie's stock price movements on

19   August 7th and 8th was actually correct?

20   A.  Yes.

21   Q.  And what is the significance to you of the stock price

22   movements on August 7th and 8th, 2012?

23   A.  The significance to me is, I like to make sure that

24   stock prices are moving in response to news before the date

25   that we're really going to analyze; that is, August 17th.

1    And so these movements give me comfort that the stock is

2    responding to news.  Both stocks are responding to news, as

3    I would hope they would.  They're responding to information

4    so that we can use the response of the stock prices to

5    information released on the 17th as a valid measure of the

6    value of that information on the 17th.

7    Q.  So let's turn back to the 17th.

8         So on August 17th, as you previously testified,

9    Fannie Mae's stock fell by 47 percent and Freddie Mac's by

10   57 percent.  Right?

11   A.  Yes.

12   Q.  And again, back to the news:  What did Dr. Attari

13   attribute the stock drop on August 17th to?

14   A.  Dr. Attari cited an article from Reuters that says,

15   quote:  "Preferred and common shares lost more than half

16   their value in heavy trading as investors saw the plan as

17   undercutting the ability of either company to ever emerge

18   from government conservatorship as profitable entities,"

19   unquote.

20   Q.  What is the significance in -- to you of the article

21   observing that Fannie and Freddie's stock fell on heavy

22   trading?

23   A.  The significance to me is that there were a lot of

24   traders involved in establishing the price movement this

25   day.  So this wasn't driven by just a few large traders or

1    something like that.  This is a valid observation that we

2    can rely upon to measure the value of the information

3    announced this day.

4    Q.  Can you just remind the jury again, what was the net

5    worth sweep?

6    A.  Colloquially -- I can't cite the law, but the net worth

7    sweep was the movement by which the Treasury would now take

8    all of the profits of Fannie Mae and Freddie Mac.  All those

9    profits would not be available to the companies to reinvest

10   in new operations or distribute to shareholders as dividends

11   now or anytime in the future.

12   Q.  And given that that's what the net worth sweep was, is

13   the type of price reaction identified in the event study

14   what you would expect from an announcement like this?

15   A.  Absolutely.

16   Q.  And why is that?

17   A.  This was a very dramatic movement.  As I said before, in

18   my study of financial crises from my entire career, I've

19   never seen this done before, just taking all the profits and

20   saying to shareholders, You'll never see a thing and the

21   companies will never get to benefit from that money.  The

22   Treasury will just take them all.  It's really quite

23   dramatic.

24   Q.  In light of that dramatic and without-historic-precedent

25   event, would you expect to see a stock price drop consistent

Mason - DIRECT - By Mr. Rudy

1    with what you saw?

2    A.  Yes.  Absolutely.

3    Q.  Are you aware that the Defendants are arguing in this

4    case the shareholders should have reasonably expected a net

5    worth sweep?

6    A.  I've heard that argument.

7              MR. JONES:  Objection, your Honor.

8              THE COURT:  Overruled.

9    BY MR. RUDY:

10   Q.  Is the stock price drop of approximately 50 percent

11   consistent with an event that investors or the market

12   reasonably already expected?

13             MR. JONES:  Objection.

14             THE COURT:  Overruled.

15             THE WITNESS:  No.  If investors expected this was

16   coming up, they wouldn't have responded in this dramatic way

17   on the day when it was announced.

18   BY MR. RUDY:

19   Q.  If the shareholders and the market already should have

20   known that their dividends were, quote, "eliminated

21   forever," would you have expected to see the share price

22   fall by 50 percent in one day?

23   A.  No.  If they knew that, they would have been told by

24   this announcement this day only a confirmation of what they

25   already knew, and there would be no reason for a change in

1    the stock price.

2    Q.  Professor Mason, does the $1.6 billion in damages from

3    the net worth sweep still persist today?

4    A.  Yes.

5              MR. JONES:  Objection, your Honor.

6              THE COURT:  Overruled.

7              THE WITNESS:  Yes.

8    BY MR. RUDY:

9    Q.  Are you aware that the Defendants are arguing that the

10   stockholders weren't really harmed by the net worth sweep

11   because they weren't receiving dividends anyway during the

12   conservatorship?

13   A.  I've heard that argument as well.  Yes.

14   Q.  Do you have a reaction to that?

15   A.  Yes.  It doesn't make a bit of sense.  The value of a

16   stock comes from the company's future performance.  What

17   happened in the past is in the past.

18   Q.  But weren't stockholders' dividend rights already

19   suspended during the conservatorship before the net worth

20   sweep?  Why would the stock price fall if they weren't

21   getting dividends anyway?

22   A.  I would say their dividends were suspended like a

23   company that's paying zero dividends for a period of time.

24   But they still had rights to dividends in the future should

25   the company take earnings, reinvest them in the firm,

1   improve profitability, restore themselves to safety and

2   soundness while preserving and conserving the assets of the

3   firm so that eventually they'll return to profitability and

4   drive value that drives share prices and potentially

5   dividends in the future.

6   Q.  You're aware that a lot of companies don't pay dividends

7   at all.  Right?

8   A.  Sure.

9   Q.  And do those companies -- do those companies -- I'm

10  sorry -- so if Fannie and Freddie is not paying dividends,

11  don't those stocks still have value just like those other

12  companies?

13          MR. JONES:  Objection.  Vague.

14          THE COURT:  Overruled.

15          THE WITNESS:  No.  The private companies that are

16  choosing not to pay dividends are choosing that of their own

17  accord.  They're also taking the profits that they would

18  otherwise distribute to shareholders and reinvesting those

19  in the firm.

20          In a way, paying dividends says to the

21  shareholders, Well, I kind of don't have anything better to

22  do with your money.  If you have something better to do with

23  the money you'd give me, then do it.  And that's what those

24  firms are doing, so that the shareholders then continue to

25  increase in value under the idea that when and if such

Mason - DIRECT - By Mr. Rudy

 1    companies should pay dividends, those dividends would be

 2    much higher than they would have been otherwise.

 3    BY MR. RUDY:

 4    Q.  Here, after the net worth sweep, the dividends that

 5    aren't being paid to stockholders, are they being reinvested

 6    to Fannie and Freddie?

 7    A.  No.  They're being taken by Treasury.

 8    Q.  Professor, in your opinion, is there any reason to

 9    believe that anything besides the net worth sweep could have

10    caused the huge decline in stock price on August 17th, 2012?

11    A.  No.

12    Q.  Is it true that at the same time that the FHFA announced

13    the net worth sweep, it also announced that Fannie and

14    Freddie would accelerate the reduction of Fannie and

15    Freddie's retained mortgage portfolio from a 10 percent

16    reduction per year to a 15 percent reduction per year?

17    A.  Yes.

18    Q.  In your view, did that news cause the stock price

19    declines on that day?

20    A.  No.

21    Q.  Why is that?

22    A.  Because the overriding effect here comes from Treasury

23    taking all the money generated by the firms no matter

24    whether that was a little larger or a little smaller as a

25    result of this change to the target for the retained

1    portfolio, which is just a piece of the firm anyway.

2    Q.  Professor, as a part of your assignment, were you asked

3    to calculate prejudgment interest in this case?

4    A.  Yes.

5    Q.  What is prejudgment interest?

6    A.  Prejudgment interest is a way of making claimants,

7    Plaintiff shareholders in this matter, whole for having

8    waited over a decade to access their damages in this matter

9    should they be successful in doing so.

10   Q.  What date -- so you got some instructions from the

11   lawyers to run some calculations about that.  Right?

12   A.  Yes.

13   Q.  What date were you given to start the date of your

14   interest calculation?

15   A.  The date of the net worth sweep, August 17th, 2012.

16   Q.  And what date were you told to run the interest until?

17   A.  The date at which this trial began, which was July 24th,

18   2023.

19   Q.  What rate of interest were you asked to use?

20   A.  I was asked to evaluate claims for one of the entities

21   at 6 percent simple interest.

22   Q.  What does simple interest mean?

23   A.  It means that we don't assess interest on interest.  We

24   just let it run at 6 percent per year and we kind of put

25   that in piggy back.  We don't charge 6 percent on the 6

1     percent.  That was not paid the first year.

2     Q.  So it's not compounded.  Right?

3     A.  Correct.

4     Q.  Were you asked to create a summary slide of the damages

5     testimony you've given today?

6     A.  Yes.

7     Q.  Is this a portion of the summary slide?

8     A.  Yes.

9     Q.  Are these the same numbers that we looked at earlier

10    that were taken from Dr. Attari's report?

11    A.  Correct.  These are the damages numbers themselves

12    without prejudgment interest.  Yes.

13    Q.  Okay.

14              MR. RUDY:  Your Honor, briefly I'd like to read

15    two paragraphs of the joint stipulation agreed between the

16    parties.  This is Paragraphs 39 and 40.  I'll read it to the

17    jury.

18              Paragraph 39:  On August 16th, 2012, the value of

19    Fannie Mae's publicly traded preferred shares was 1.459

20    billion.

21              On August 17th, 2012, the value of Fannie Mae's

22    publicly traded preferred shares was 680 million,

23    representing a decline in value of 779 million.

24              Paragraph 40:  On August 16th, 2012, the value of

25    Freddie Mac's common shares was 195 million and the value of

```
 1    Freddie Mac's publicly traded preferred shares was 1.274

 2    billion, for a combined total value of 1.469 billion.

 3              On August 17th, 2012, the value of Freddie Mac's

 4    common shares was 150 million and the value of Freddie Mac's

 5    publicly traded preferred shares was 488 million,

 6    representing a decline in value of 46 million and 786

 7    million respectively and a combined decline in value of 831

 8    million.

 9    BY MR. RUDY:

10    Q.  Are these -- is this column a representation of the

11    interest that you were asked to calculate?

12    A.  Yes.

13    Q.  You mentioned that you ran interest for one of the

14    entities at 6 percent.  Is that Freddie Mac?

15    A.  Yes.

16    Q.  And is it your understanding that prejudgment interest

17    as to Fannie Mae is a function of something the Court would

18    deal with, not a jury?

19    A.  Yes.

20    Q.  Okay.  If you add the three numbers in the middle

21    column, what total of -- total damages do you reach?

22    A.  $1.61 billion.

23    Q.  Professor Mason, in your -- is it your opinion as a

24    financial economist that 1.61 billion is the correct measure

25    of damages that the Plaintiff shareholders suffered in this
```

1    case as a result of the net worth sweep?

2    A.  Yes.

3    Q.  And can you explain to the jury why $1.61 billion is an

4    appropriate measure of the damages or the harm that was

5    suffered by the stockholders in this case?

6    A.  Because we saw on the day the net worth sweep was

7    announced the stock fall in total value by this amount.  So

8    that with nothing else happening that day of value to these

9    shareholders, that value estimates shareholders' view of

10   their loss on that date.

11            MR. RUDY:  Thank you, Professor Mason.  I have

12   nothing further.

13            THE COURT:  You may cross-examine.

14            MR. JONES:  Thank you, your Honor.

15            Good afternoon, members of the jury.

16                      CROSS-EXAMINATION

17   BY MR. JONES:

18   Q.  Good afternoon, Dr. Mason.  It's nice to see you again.

19            I'd like to start with just a point of

20   clarification.

21            MR. JONES:  Can we pull up, please, Dr. Mason's

22   slide, the one about other bailout recipients?

23   BY MR. JONES:

24   Q.  Dr. Mason, this is one of the slides from the PowerPoint

25   presentation that you prepared for your testimony today.

1    Right?

2    A.  Yes.

3    Q.  And it's one of the slides that you discussed with

4    Mr. Rudy a few minutes ago.  Right?

5    A.  Yes.

6    Q.  And this is a list of other companies that received

7    government bailouts, investments of funds in 2008 or early

8    2009 as part of the government's response to the financial

9    crisis.  Right?

10   A.  Yes.

11   Q.  Okay.  And Mr. Rudy asked you a question, and I wrote

12   down all the words.  He asked you:  Are any of these

13   companies still under government conservatorships?  And you

14   answered no.

15          Do you recall that?

16   A.  Yes.

17   Q.  None of these companies were ever put in government

18   conservatorships in the first place.  Right?

19   A.  That may be true.

20   Q.  Do you know whether it is or not?  You've studied this

21   stuff, I gather.

22   A.  I haven't examined the conservatorship status of each of

23   these companies.  No.

24   Q.  So you don't know as part of your extensive work

25   studying financial crises, including the 2008 housing and

1    financial crisis that you testified about, you don't know

2    whether AIG or General Motors or Bank of America, Citigroup,

3    JP Morgan Chase, Wells Fargo, Chrysler, the car company,

4    Morgan Stanley or Goldman Sachs -- you don't know whether

5    any of those companies were put under government

6    conservatorships like Fannie Mae and Freddie Mac were as

7    part of the government's response to the 2008 housing and

8    financial crisis?

9    A.  Not sitting here today, though I do know that none of

10   them are under conservatorship today.

11   Q.  Okay.  So when you answered that none of them are still

12   under conservatorship, you didn't actually know whether any

13   of them were under government conservatorship in the first

14   place.  Right?

15   A.  I suppose the "still" was inapt.  So sure.

16   Q.  Okay.

17   A.  That's correct.

18   Q.  The "still" was inapt.  Okay.

19           And if none of these companies, AIG, Bank of

20   America, the Chrysler car company, if none of these

21   companies was put in government conservatorship as part of

22   the government's response to the financial crisis, it would

23   be highly inapt to say that none of them is still in

24   conservatorship today.  Right?  It would be misleading?

25   A.  Again, yes.  The "still" would be inapt, as I said.

1    Q.  Okay.  Good.

2              Just a couple more questions about these

3    companies, if we could leave that up.

4              None of these companies, these other companies

5    that got government bailout investment of funds as part of

6    the government's response to the financial crisis, none of

7    these are government-sponsored enterprises or GSEs like

8    Fannie Mae and Freddie Mac are.  Right?

9    A.  That's right.

10   Q.  They're all completely private companies.  Right?

11   A.  They are today.  Yes.

12   Q.  Okay.  And also, none of these other companies have

13   public missions that were established by the United States

14   Congress.  Right?

15   A.  Yes.  None of these were established by the United

16   States Congress, though I'm not sure what you mean by

17   "public missions."

18   Q.  Okay.  Are you aware that Fannie Mae and Freddie Mac

19   have public missions that were established by Congress?

20   A.  Generally, you can go into those; and I understand that

21   there were issues of the public interest involved in these

22   bailouts.  That's why I'm pushing a little bit against your

23   public missions.  If you want to be more specific about

24   that, I'm happy to take a look at something and

25   differentiate it.

1    Q.  Sure.  That's fine.  I'm -- I mean, you testified that

2    you've studied Fannie Mae and Freddie Mac extensively for

3    decades.  Are you aware that Fannie Mae and Freddie Mac have

4    public charters that were enacted into law by the United

5    States Congress that give each government-sponsored

6    enterprise a public mission?

7    A.  So now you're saying public charters versus public

8    missions.  The GSEs are the GSEs.  So yes.  They're

9    chartered by the U.S. government.  They're public-private

10    entities.  They help facilitate housing in the U.S. economy.

11    Sure.

12    Q.  Okay.  And none of these other companies have public

13    charters enacted into law by Congress giving these companies

14    public missions.  Right?

15    A.  Which companies public missions?

16    Q.  The ones in your list here.  None of these other

17    companies that you listed as other bailout recipients --

18    none of them is like Fannie Mae and Freddie Mac in having a

19    public charter established by the United States Congress to

20    serve a public mission.  Right?

21    A.  These don't have the same relationship to the government

22    as Fannie Mae and Freddie Mac.  That's correct.

23    Q.  Then the last point of clarification here, if we could

24    just focus on the dollar amounts in the list, it looks like

25    they're ranked from the company that got the most funds

1       invested, that was AIG, to the least funds invested, Goldman

2       Sachs.

3               Do you see that?

4       A.  Yes.

5       Q.  None of these companies got as big of a bailout as many

6       funds invested as either Fannie or Freddie.  Right?

7       A.  Well, you're saying neither one got as big a bailout.

8       AIG, for instance, benefited from money in the Federal

9       Reserve as well as the U.S. Treasury.  There were a number

10      of sources, a variety of different programs.  As I noted,

11      this bailout money throughout the U.S. economy totaled

12      between 5 and 20 trillion dollars, depending on how you add

13      it up.

14              So the 68 billion -- before I'd answer that

15      question, I'd want to look at the totality of the package,

16      for instance, for AIG and make a full comparison.

17              But the $68 billion is less than the roughly $100

18      billion per entity that went to each of Fannie Mae and

19      Freddie Mac.  One got a little bit more; one got a little

20      bit less.

21      Q.  Okay.  There was a lot there.  Let's just focus on the

22      information that you brought to court today to present to

23      the jury and the numbers that you put on this slide.

24              According to this slide, it reports $68 billion in

25      funds invested to AIG.  My question is just:  That is less

1    than the funds that the government invested in both Fannie

2    Mae and it's less than the funds that the government

3    invested in Freddie Mac.  Right?

4    A.  Sure.

5    Q.  Okay.  The government invested nearly $120 billion in

6    Fannie Mae and $71.6 billion in Freddie Mac for a total of

7    over $191 billion.  Right?

8    A.  Right.  So 71.6 and 120 are both greater than 68.

9    Q.  Okay.  Thank you.

10           MR. JONES:  We can pull this down.

11   BY MR. JONES:

12   Q.  Let's talk about this stock price event study that you

13   had testified about.

14           MR. JONES:  Could we pull up PX-375, please, which

15   is in evidence.

16   BY MR. JONES:

17   Q.  Dr. Mason, this PowerPoint is the summary of results or

18   a summary of the results of the stock price or equity event

19   study that you testified about with Mr. Rudy.  Correct?

20   A.  Yes.

21   Q.  And there's also some underlying materials, some

22   spreadsheets and complicated-looking computer code.  I think

23   you described it as the guts of the event study.  Is that

24   correct?

25   A.  Yes.

1    Q.  Okay.  You did not prepare this event study by either

2    this summary that we're going to look at on the screen or

3    any of the guts.  Right?

4    A.  That's correct.

5    Q.  You did not prepare any event study in this case at all.

6    Correct?

7    A.  Well, I'll agree I did look at things beyond this event

8    study.  But I'll agree I did not create this event study.

9    As I said before, I validated it.  I corroborated it.  But I

10   did not type the code myself or gather the data myself.

11   Q.  Okay.  My question is just a little different.  You did

12   not prepare any event study in this case.  Correct?

13   A.  As I said, I did not type my own code or gather my own

14   data.  Is there something else you're trying to get at with

15   that question?

16   Q.  I'm just trying to confirm that you did not prepare

17   either this event study titled Third Amendment:  Event Study

18   or any other event study at all in this case.  You prepared

19   zero event studies in this case.

20   A.  I'll stand by my prior answer.  If you can be more

21   specific about what it is you're trying to get at.

22   Q.  I don't think I could.  We'll move on.

23          So this event study which you did not prepare

24   measures the impact of the third amendment on the

25   enterprises' stock prices.  Right?

1    A.  That's right.

2    Q.  And the title of the PowerPoint of the summary of the

3    event study is Third Amendment:  Event Study.  And that's

4    because the event that's being studied in this event study

5    is the announcement of the entire third amendment.  Correct?

6    A.  That's right.  The PowerPoint deck that you see with

7    these results focused on the third amendment.  Yes.

8    Q.  It focused on the third amendment as a whole because the

9    event that's being studied is the announcement to the public

10   of the entire third amendment.  Right?

11   A.  The event that's being studied by whom?

12   Q.  The event that's being studied in this event study.

13   A.  This is -- whom?  I am studying the effect of the net

14   worth sweep, which is certainly a portion of the third

15   amendment.

16   Q.  Okay.  The event that's being studied in this event

17   study, the summary of which is on the screen, is the third

18   amendment as reflected in, well, the title right there?

19   A.  That's what the title says.  Correct.

20   Q.  Okay.  And this event study shows that the market value

21   of Fannie Mae and Freddie Mac's shares or Fannie Mae junior

22   preferred shares and Freddie Mac junior preferred and common

23   shares, to be specific, the event study shows that the

24   market value of those Fannie and Freddie shares declined by

25   a total of $1.6 billion on the day the third amendment was

```
 1    announced.  Right?
 2    A.  That's right.
 3    Q.  And the day the third amendment was announced was August
 4    17th, 2012.  Right?
 5    A.  That's right.
 6    Q.  And just to orient everyone, today is July 27th, 2023.
 7    So that means August 17, 2012, the day of this one-day
 8    decline in share prices, that was almost 11 years ago.
 9    Right?
10    A.  Yes.
11    Q.  You testified about some increases in the share prices
12    for Fannie and Freddie's stock on August 7th, 2012, which
13    was about ten days -- exactly ten days before the third
14    amendment.  Right?
15    A.  Yes.
16    Q.  Okay.  And you also testified about some share price
17    increases where the price of the stock went from somewhere
18    up on the next day, August 8th, 2012.  That was nine days
19    before the third amendment.  Right?
20    A.  Right.
21    Q.  Then you also testified about the decline in the share
22    prices on August 17th, 2012.  So they went up on August 7th,
23    up on August 8th; and then a few days, a week and a half
24    later, they went down on August 17th, 2012.  Right?
25    A.  Right.
```

1    Q.  Okay.

2            MR. JONES:  Let's take a look at some graphs that

3    illustrate that.  Can we turn to Page 3, please.

4    BY MR. JONES:

5    Q.  This graph shows the market value of Fannie Mae common

6    and junior preferred shares with the common shares in

7    orange, the junior preferred shares in gray and the common

8    and junior preferred together in blue.  Right?

9    A.  Right.

10   Q.  Okay.  And on the vertical axis on the left going up and

11   down, up and down the left side, we see the total market

12   value of the shares, all the shares, measured in millions of

13   dollars.  Right?

14   A.  Well, for the blue line, yes.

15   Q.  Okay.  And I think you testified with Mr. Rudy in this

16   case, you know that for Fannie Mae we're only focused on the

17   junior preferred shares, not the Fannie common shares.  Just

18   junior preferred.  That's the ones that are shown in gray.

19   Right?

20   A.  Right.

21   Q.  So for this chart, the only thing that would be relevant

22   for your purposes is the gray line that shows the market

23   value for Fannie Mae junior preferred shares.  Right?

24   A.  Well, sort of.  All of the little headers there with the

25   lines, you can imagine them pointing to the gray line

1    instead of the blue line.  But it does matter, too.  But

2    other than that, yeah.  You're right.  We're focusing on the

3    gray line.

4    Q.  Sure.

5         And if you look near -- pretty close to the --

6    smack dab in the middle of the page, there's a yellow dot

7    that's labeled 8/17 third amendment.  Do you see that?

8    A.  I see that.

9    Q.  Okay.  And the 8/17, that refers to August 17th, 2012,

10   which was the day of the third amendment.  Right?

11   A.  8/17 was the date of the third amendment.  When you say

12   "that relates," I just want to be sure what you're getting

13   at here.  I've noted that when this graph was prepared, the

14   dots were kind of put one day off.  So I want to make sure

15   that we understand where we're going here.

16        And also, those dots are on the blue line.

17   They're not on the gray line.  So you kind of have to

18   imagine moving that dot to the gray line where it should be

19   that day.

20        This is all clearly explained in those underlying

21   guts where we just have the numbers, if we want to turn to

22   those.  But I just want to make sure everybody's clear with

23   that because that can be a little bit confusing.

24   Q.  Okay.  And I think my question was a little simpler.  As

25   I understand it, 8/17 refers to, if it's a date, August

1     17th.  Right?

2     A.  As I said at the beginning of my answer, 8/17 was the

3     date of the third amendment.  I just want to be clear where

4     this is pointing to on the graph and make sure we're all on

5     the same page that it's not necessarily pointing to the

6     correct place.  And it's not necessarily pointing to the

7     correct line.  All of those pointers are pointing to the

8     blue line, not the gray line, so we kind of have to imagine

9     this is going to the gray line properly.

10            But I'm fine if you're fine with that.  We can

11    continue on.

12    Q.  Okay.  Very fair.

13            So focusing on the -- let me just make sure we can

14    clarify this.  You're saying that if you wanted to put the

15    yellow dot for August 17th, the third amendment, if you

16    wanted to put it on the gray line, you would just move it up

17    along the gray line essentially to its highest point there.

18    Is that right?

19    A.  I'm sorry.  I don't mean to be complex about this.  This

20    is just something about the way this graph was created.

21            You're right.  I would move it up to the top of

22    that where that gray line starts on August 17th, to show

23    that that day, to the end of that day, the price dropped way

24    down.

25    Q.  Okay.  That was my --

1    A.  When this was prepared, they put the dot at the end of

2    the day on the 17th so that it would show after the effect,

3    which kind of -- it's not the way we typically do things.  I

4    just want to make sure everybody's on the same page with

5    this, so that putting the dot on top would represent on the

6    day of August 17th the stock dropped by that huge magnitude

7    of the gray line.

8    Q.  Okay.  And if we focus on just the gray line for the

9    Fannie junior preferred shares, it shows that the market

10   value of Fannie junior preferred shares went down that day

11   on August 17th, 2012, about 11 years ago.  Right?

12   A.  Yes.

13   Q.  Okay.  And it also shows if you go back over to the

14   earlier dots -- I don't want to get caught up on the

15   complexities of where exactly they should be -- but you can

16   see it's reporting the price stock price movements on those

17   earlier days that you testified about, too, August 7 and

18   August 8.  Right?

19   A.  Sorry.  I was lost on the dots.  I appreciated you

20   saying that.

21   Q.  Sure.  I was just hoping to confirm with you, Dr. Mason,

22   that if you just move a little bit to the left of where we

23   were just looking, you can see this graph also reports the

24   stock price movements that you testified about earlier on

25   August 7th and August 8th.  Right?

 1   A.  Right.

 2   Q.  Okay.

 3   A.  You can see that bump-up in the gray line that you'd

 4   imagine would be on those days.  And it is on those days.

 5   Q.  Okay.  And we can see here from this graph that some of

 6   the market value that the Fannie Mae shares lost on August

 7   17th, the day of the third amendment, was market value that

 8   they had just gained nine to ten days earlier.  Right?

 9   A.  That they had just what?

10   Q.  Gained.

11   A.  Gained?

12   Q.  Correct.

13   A.  Sure.  Their performance was reported as very, very

14   positive and their stock went up that day as appropriate for

15   such positive news.

16   Q.  So just to help the members of the jury understand what

17   this means, this means if a person was holding Fannie Mae

18   junior preferred shares on August 7th, the shares -- the

19   market value, sort of paper value, of their shares went up,

20   went up again the next day, August 8, and then nine days

21   after that, it went down.  It lost that value it had just

22   gained, the market value it had just gained, and some more.

23   Right?

24   A.  Oh, that's a -- sure.  That's correct.

25   Q.  Okay.  If we wanted to know the numbers, we could

1    eyeball it.  But they're also in the document.  I think you

2    looked at them before.  The market value for the Fannie

3    preferred went down by $779 million.  That's the magnitude

4    of that drop just on that one day 11 years ago, August 17th,

5    2012.  Right?

6    A.  I'll take that as representative.  I don't remember the

7    number off the table exactly, but that's fine.

8    Q.  Excellent.

9              MR. JONES:  Can we turn to Page 4, please.

10   BY MR. JONES:

11   Q.  This graph is similar to the last one, but this is for

12   Freddie Mac.  So this graph shows the total market value of

13   the Freddie Mac shares using the same coloring system:

14   orange for common shares, gray for junior preferred and the

15   blue is the Freddie common and junior preferred together.

16   Right?

17   A.  Right.

18   Q.  For Freddie Mac, you know that both the junior preferred

19   shares and the common shares are in this case.  Right?

20   A.  That's correct.

21   Q.  And if you look again near the center of the chart --

22   I'll ask the question in the simplest way possible -- there

23   is a yellow dot that is labeled 8/17 third amendment.

24   Right?

25   A.  Yes.

1    Q.  Okay.  And that is similar.  I don't want to get in the

2    complexities of this.  That's signifying the same August

3    17th of the third amendment from the last graph that we

4    looked at for Fannie.  Right?

5    A.  Correct.

6    Q.  Okay.

7    A.  With all the same caveats as before.

8    Q.  Sure.

9         So let's start with the gray line for junior

10   preferred.  You can see on this graph the market value of

11   Freddie junior preferred shares in gray went down on that

12   day 11 years ago, August 17th, 2012.  Right?

13   A.  Right.  Again, the dot's on the blue line.  But it went

14   down.  And one can do that visual movement oneself.

15   Q.  Got it.

16        And again, rather than just eyeball, I went and

17   checked elsewhere.  If I tell you that that one-day decline

18   in the Freddie junior preferred shares was 786 million,

19   would you take my word for it on that?

20   A.  Sure.  I don't see any reason to disagree sitting here.

21   Q.  Now let's look at the common shares, the -- this is the

22   orange line at the bottom.  These are Freddie Mac common

23   shares.

24        You can see on this graph that the market value of

25   Freddie common shares went down on the day 11 years ago,

1   August 17th, 2012.  Right?

2   A.  Right.

3   Q.  Okay.  And they went down by $46 million.  I'm pretty

4   sure that was one you mentioned with Mr. Rudy.  Right?

5   A.  Yes.

6   Q.  Okay.  And again, if you look at the blue, that's just

7   adding the gray and orange lines together.  The blue is just

8   mathematically the market value of the common and the junior

9   preferred together.  Right?

10  A.  Yes.

11  Q.  And you can see, similar, like if you added up the gray

12  and the orange lines there, there was a one-day overall

13  decline of $831 million on August 17th, 2012, for that one

14  day 11 years ago?

15  A.  Yes.

16  Q.  Okay.  And just as a matter of arithmetic, as a matter

17  of math calculations, you got the $1.6 billion damages

18  estimate that you've offered today just by adding up the

19  decline in market value for that one day on August 17th,

20  2012, for the three that we looked at:  the Freddie common

21  shares in orange here, the Freddie junior preferred shares

22  in gray and the Fannie junior preferred shares on the other

23  chart.  Right?

24  A.  I disagree with that.  You said "just by adding up."  As

25  I noted previously, I looked at what happened in the market

1    that day.  The market was moving the other direction.  So

2    the market didn't require me to do anything more than adding

3    up.  Had I in fact included that market effect, damages

4    would be greater.

5              I also looked at other potential effects within

6    the third amendment.  So there was a bit more than adding

7    up.

8              But you're right:  The result comes about at the

9    end of the day as the adding up.

10   Q.  Okay.  So just to make sure we're on the same page,

11   mathematically speaking, the $1.6 billion is the sum of

12   three numbers.  And those three numbers are just the market

13   value decline that we looked at for the orange here and the

14   gray here and the gray for Fannie Mac [sic] on that one day,

15   August 17th, 2012, about 11 years ago?

16   A.  Yes.  I think you meant to say Fannie Mae, but that's

17   fine.

18   Q.  Great.  Thank you.  Sorry if I misspoke.

19              MR. JONES:  We can pull this down.

20   BY MR. JONES:

21   Q.  You testified earlier that this event study which you

22   did not prepare measures the impact of the third amendment

23   on the enterprises' stock prices.  Correct?

24   A.  The event study prepared by Defendants' expert measures

25   the effect of the third amendment.  That's correct.

1    Q.  And you know and you've said before that in order to be

2    a properly conducted event study, the event study must have

3    a method to exclude alternative potential causes of the

4    purported impact of the event in question.  Right?

5    A.  Sure.

6    Q.  And you know and you've said before that if the expert

7    has no such method for excluding alternative potential

8    causes, then their event study has no way of accounting for

9    potential alternative causes of the decline in prices that

10   the expert attributes to the net worth sweep.  Right?

11   A.  Right.

12   Q.  So we know that one thing that the third amendment did

13   was the net worth sweep.  Right?

14   A.  Correct.

15   Q.  The net worth sweep is just a component or one provision

16   of the overall third amendment.  Right?

17   A.  Right.

18   Q.  Okay.  And in addition to the net worth sweep, the third

19   amendment -- well, let's start generally.  It has other

20   provisions.  You know that.  Right?

21   A.  Sure.

22   Q.  Okay.  And in addition to the net worth sweep, one of

23   the other provisions of the third amendment required Fannie

24   Mae and Freddie Mac to do something that you've referred to

25   as accelerating the wind-down of their retained mortgage

1    portfolios.  Right?

2    A.  Right.  The provision was to start reducing those

3    retained portfolios by 15 percent rather than 10 percent

4    until they ultimately hit a floor of 250 billion for each

5    enterprise, at which point that would stop.

6    Q.  And those words, "accelerating the wind-down of the

7    retained mortgage portfolios," that's just a fancy way of

8    saying that Fannie Mae and Freddie Mac were going to shrink

9    a part of their business faster than they had been shrinking

10   it before.  Right?

11   A.  Sure.  I'd agree with that characterization.

12   Q.  Okay.  So one part of the third amendment was that

13   Fannie and Freddie were going to shrink the business that

14   they were doing faster.  Right?

15           MR. RUDY:  Objection.  Mischaracterizes his

16   testimony.

17           THE WITNESS:  No.  In your prior question, you

18   characterized it as shrinking one part of the business,

19   which I would agree with.  There, you're talking about

20   shrinking the entire business, which I would not agree with.

21   BY MR. JONES:

22   Q.  So one part of the third amendment is fancy words, "to

23   accelerate the wind-down," was that Fannie Mae and Freddie

24   Mac were going to shrink a part of their business faster?

25   A.  Correct.

1    Q.  Okay.  So the third amendment, which was announced on

2    that one day, August 17th, 2012, it did both of those

3    things.  It did the net worth sweep and it accelerated the

4    reduction of the retained mortgage portfolios.  Right?

5    A.  Yes.

6    Q.  Okay.  The event study that you testified about this

7    afternoon and that we've been looking at, which you did not

8    prepare, it does not say anything about that other

9    provision, the acceleration of the reduction of the retained

10   mortgage portfolios.  Right?  It just doesn't mention it?

11   A.  That's right.

12   Q.  The event study, which you did not prepare, does not

13   conduct any statistical analysis or regression attempting to

14   distinguish between the impact of the net worth sweep on the

15   stock prices and any impact of the acceleration of the

16   reduction of the retained mortgage portfolios.  Right?  It

17   doesn't do that?

18   A.  Correct.  Defendants' event study does not do that.

19   Q.  Okay.  The event study then does not try to analyze how

20   much of the $1.6 billion stock price drop may have been

21   caused by the net worth sweep and how much of that drop may

22   have been caused by this other acceleration of the reduction

23   of the retained mortgage portfolios.  Right?

24   A.  That's right.  Defendants' event study does not do that.

25   Q.  Okay.  And you know and you have said that when an event

1     study cannot distinguish between the impact of the net worth

2     sweep and the impact of the acceleration of the reduction of

3     the retained mortgage portfolios, your opinion, which you

4     have expressed in writing in this case, is that the expert

5     lacks any economically sound basis for concluding that the

6     net worth sweep had the effect that the expert claims.

7     Right?  That was your view?

8     A.  Yes.

9     Q.  The market prices, the market values or share prices of

10    Fannie Mae and Freddie Mac shares on August 17th, 2012 --

11    I'm just focused on that one day about 11 years ago -- the

12    share prices didn't go to zero.  Right?  They always stayed

13    positive, above zero territory.  Right?

14    A.  Yes.

15    Q.  And the above-zero share prices, again just focused on

16    August 17th, 2012, those above-zero share prices reflect a

17    view of at least some shareholders that, notwithstanding the

18    net worth sweep being put into place, shareholders might

19    still be able to receive financial benefits from owning

20    those shares in Fannie Mae and Freddie Mac.  Right?

21    A.  I think that's an appropriate characterization.  Yes.

22    Q.  So you would agree, then, that, again, just talking

23    about on August 17th, 2012, upon the announcement of the net

24    worth sweep and third amendment, that positive above-zero

25    trading price of the Fannie and Freddie shares reflects a

```
 1    view that there was still value in the shares, meaning there

 2    may be money available to shareholders at some point in the

 3    future.  Right?

 4    A.  Sure.

 5            MR. JONES:  Nothing further.  Thank you,

 6    Dr. Mason.

 7            THE COURT:  Any redirect?

 8            MR. RUDY:  Briefly.  Thank you, your Honor.

 9                     REDIRECT EXAMINATION

10    BY MR. RUDY:

11    Q.  Dr. Mason, you were asked some followup questions about

12    the other companies that got bailed out in the 2008

13    financial crisis.  Right?

14    A.  Yes.

15    Q.  Are you aware of what TARP is?

16    A.  Yes.

17    Q.  What is TARP?

18    A.  Did you say TARP or HARP?

19    Q.  With a T, as in Tom.

20    A.  The Troubled Asset Relief Program.  TARP.

21    Q.  What was that program?

22    A.  That was a program where companies could put up some of

23    their assets as collateral for borrowing.

24    Q.  And was that a way that the federal government bailed

25    out many of the companies listed on that slide that you were
```

```
1    looking at?

2    A.  Well, there was the borrowing component.  There was also

3    a preferred stock component.  And that was my point, that

4    there's a combination of things that benefit these

5    companies.  Yes.

6    Q.  Right.

7          So all of those companies that received bailout

8    funds in 2008 from the federal government, all of those

9    companies on the slide, is it your understanding that

10   they've all been allowed to pay back the government, exit

11   from government involvement and return their companies to

12   stockholders?

13          MR. JONES:  Objection.  Leading.

14          THE COURT:  Overruled.

15          THE WITNESS:  Yes.

16   BY MR. RUDY:

17   Q.  You were asked some questions about whether you yourself

18   prepared the event study that's at issue in this case.

19          Do you recall those questions?

20   A.  Yes.

21   Q.  And you were asked whether you yourself prepared the

22   guts of the study.  Right?

23   A.  Correct.

24   Q.  Is it your testimony here today that the event study

25   conducted by Professor Attari as to the stock drop of Fannie
```

1    and Freddie's stock was correctly prepared?

2    A.  Yes.

3    Q.  And did you yourself go and verify and corroborate the

4    facts, the guts and the conclusions reached by the

5    Defendants' expert in this case?

6    A.  Yes.

7    Q.  Because you described one of the slides you were shown

8    as confusing, I want to just see if you can un-confuse some

9    people.

10             MR. RUDY:  Can we pull up -- I think it's from

11   PX-375, Page 3, the stock chart that was just shown.  Yes.

12   BY MR. RUDY:

13   Q.  So you talked about these yellow dots being in the wrong

14   place.  So if I could -- do you recall on August 8th, for

15   example, did Fannie and Freddie's stock price move on August

16   8th, 2012?

17   A.  Yes.

18   Q.  What direction did Fannie and Freddie's stock price move

19   on August 8th?

20   A.  It went up.

21   Q.  By a statistically significant amount.  Right?

22   A.  Yes.

23   Q.  And you see that there's a red box that says August 8th,

24   Fannie earnings release, pointing to a yellow dot at the top

25   of the hill.  Right?

```
 1    A.  Yes.
 2    Q.  So is it fair to say that the yellow dot represents the
 3    end of the activity that was spawned by the announcement on
 4    August 8 as opposed to the beginning of the announcement on
 5    August 8?
 6    A.  Yes.
 7    Q.  Similarly for the third amendment you see on August 17
 8    there's a yellow dot all the way down at the bottom of the
 9    hill.  Right?
10    A.  For the blue line at the bottom.  Yes.
11    Q.  The blue line.  Right.
12              So is it your testimony that the yellow --
13    A.  To be clear, it's at the bottom of the hill for the gray
14    line.  It's just not represented on the gray line.  Sorry
15    it's so confusing.
16    Q.  Right.
17              So the yellow dot does not represent where the
18    stock price was before the third amendment was announced.
19    Correct?
20    A.  Correct.
21              MR. RUDY:  Thank you.  We can pull this down.
22    BY MR. RUDY:
23    Q.  Mr. Jones used -- mentioned that this happened 11 years
24    ago.  I counted, I think, about four times he said it
25    happened 11 years ago.  Did you notice that?
```

1    A.  Yes.

2    Q.  Your testimony earlier was that the damages from the net

3    worth sweep still persist today.  Is that a quote from your

4    testimony?

5              MR. JONES:  Objection, your Honor.  Could we go to

6    the phones briefly?

7              (Whereupon, the following proceedings were had at

8    sidebar outside the presence of the jury:)

9              MR. JONES:  Your Honor, Stanton Jones for the

10   Defendants.

11             The parties reached an agreement before this trial

12   about the scope of Dr. Mason's testimony.  And on the

13   Plaintiffs' side, they agreed that they would not present

14   testimony from Dr. Mason's supplemental report which they

15   had attempted -- they filed a motion to serve out of time

16   and the Court denied it; and they agreed they would not

17   elicit testimony from that supplemental report.

18             This is the testimony from that supplemental

19   report, that share prices would be higher today, that the

20   damages persist into the future.

21             MR. RUDY:  Lee Rudy.

22             It's completely wrong.

23             The agreement that we reached was that we were not

24   allowed to talk about any subsequent stock price movements

25   both on either side.  The sentence that I'm asking about was

1    specifically carved out of the agreement.  That's something

2    he can talk about.

3           And the sentence reads from the supplemental

4    report -- and this was specifically listed, you know,

5    chapter and verse.  The sentence says:  "The opinion in my

6    reply report regarding the 1.6 billion in damages estimated

7    at the announcement of the net worth sweep applies today as

8    well as in 2012."

9           That's the sentence that we agreed was entirely

10   proper testimony at this time.  And it's also completely in

11   bounds from the line of cross-examination that Mr. Jones

12   undertook.

13          THE COURT:  What is it you're seeking to elicit

14   now?

15          MR. RUDY:  Your Honor, I'm seeking to elicit now a

16   response to the fact that Mr. Jones has basically insinuated

17   by saying -- by showing a picture of stock -- subsequent

18   stock price movements, but then carefully not asking about

19   it, but showing it to the jury for ten minutes, so they see

20   that the stock price goes up after the net worth sweep and

21   asks "11 years ago, 11 years ago."  He's leaving the --

22   leaving a misleading impression in front of the jury that

23   this stock price may have sort of evaporated over the last

24   11 years.

25          I want to go back to the direct testimony where I

1    asked him, Does this damage still persist today, which is

2    something the parties agreed was entirely appropriate, and

3    ask him to explain what he meant by that.

4              MR. JONES:  Your Honor, this is Mr. Jones.

5              I would note there were no objections to the

6    references to 11 years ago or to displaying that graph,

7    which is simply a page in an admitted exhibit that's the

8    Plaintiffs' exhibit that they've just admitted into

9    evidence.  I'm not sure how it could be misleading simply to

10   display a page in one of the Plaintiffs' own decks.

11             But in any event, the question even as I think

12   Mr. Rudy just described it was already asked and answered

13   during the direct examination.

14             MR. RUDY:  During the direct examination, I asked:

15   Does the damage still persist today?

16             He said yes.

17             Then we get a series of questions about "It was 11

18   years ago, 11 years ago."

19             I'd like to ask him:  What did you mean by "still

20   persists today"?

21             THE COURT:  The objection is sustained.

22             (Whereupon, the following proceedings were had in

23   open court:)

24             MR. RUDY:  Thank you, your Honor.

25

1   BY MR. RUDY:

2   Q.  Professor Mason, you were asked a series of questions on

3   cross-examination about whether it wasn't actually the net

4   worth sweep but rather the slightly accelerated reduction of

5   Fannie and Freddie's retained mortgage portfolio announced

6   on August 17th that caused Fannie and Freddie's stock prices

7   to fall by 50 percent.

8            Do you recall those questions?

9   A.  Yes.

10  Q.  Can you just explain a little bit, what are Fannie and

11  Freddie's retained mortgage portfolios?

12  A.  The retained -- well, Fannie and Freddie do two things:

13  They securitize loans and then some of the loans they hold

14  on their balance sheet for a variety of reasons.

15           Coming off the financial crisis, these amounts on

16  the balance sheet were really large.  And so one of the

17  goals was to get them back in balance with the rest of the

18  organization and sell them off over time.

19           So this retained portfolio portion was due to be

20  decreased period by period under the initial

21  conservatorship.  And under the third amendment, there was a

22  provision that said:  We're going to go at a rate of 15

23  percent per annum as our goal, rather than 10 percent per

24  annum, 10 percent per year.

25  Q.  So starting in 2008, when Fannie and Freddie were put

 1      into conservatorship, is it right that FHFA told them to

 2      reduce that piece of their business by 10 percent per year?

 3      A.  Yes.

 4      Q.  And so then the third amendment changed that from

 5      "Reduce it at 10 percent a year" to "Reduce it at 15 percent

 6      a year."  Right?

 7      A.  Right.

 8      Q.  So that's what you mean by accelerated reduction?

 9      A.  Right.  And I also noted in my testimony they were to

10      stop at $250 billion of portfolio value per entity, so 250

11      for Fannie Mae, 250 for Freddie Mac, because again, this

12      portfolio is something that you carry in the normal course

13      of business when you're dealing with mortgages.

14      Q.  So the original -- in 2008, the target to reduce them to

15      was 250 billion per company.  Right?

16                MR. JONES:  Objection.  Leading.

17                THE COURT:  Sustained.

18                THE WITNESS:  Correct.

19      BY MR. RUDY:

20      Q.  So was -- did the target of 250 billion per Fannie and

21      Freddie, did that change with the third amendment?

22      A.  No.

23      Q.  So what was the target that they would shrink those

24      portfolios to after the third amendment?

25      A.  $250 billion apiece.

1   Q.  So that didn't change in the third amendment.  Right?

2   A.  Correct.

3   Q.  So the news that it would take -- do you know how many

4   years was it going to take in 2012 -- how many more years

5   was it going to take to get them to that 250 billion target?

6   Do you know?

7   A.  I don't remember how many more years it would take at

8   this point.  I remember it -- you got to the 250 billion

9   about four years earlier.

10  Q.  Four years earlier under the accelerated?

11  A.  Under the accelerated provision.  Yeah.

12  Q.  So what is your opinion about whether it was the net

13  worth sweep or what we've just been talking about, this

14  accelerated reduction, that actually caused Fannie and

15  Freddie's preferred and common stock to fall by 50 percent

16  on one day?

17          MR. JONES:  Objection, your Honor.  Could we be

18  heard on this briefly?

19          (Whereupon, the following proceedings were had at

20  sidebar outside the presence of the jury:)

21          MR. JONES:  Your Honor, Stanton Jones for the

22  Defendants.

23          Dr. Mason's expert reports don't disclose

24  anything, anything at all, about the possibility of

25  something other than the net worth sweep causing or

1    contributing either in whole or in part to the $1.6 billion

2    decline.  The entire sum and substance of his discussion of

3    the $1.6 billion damages expert is in a reply expert report.

4    It's two paragraphs.  And, your Honor, it just points to the

5    event study.

6              And the event study by Dr. Attari, as he

7    acknowledged on my cross-examination, it simply doesn't

8    mention this other thing, the accelerated reduction of the

9    mortgage portfolio.  There's no analysis, no statistical

10   analysis, no regression, no attempt to separate those two

11   things and isolate the impact of the net worth sweep from

12   the accelerated reduction.

13             MR. RUDY:  Your Honor, Lee Rudy.

14             This is the exact subject of his testimony that's

15   been disclosed and that's been examined and that's been

16   cross-examined and that's been deposed on.

17             He testified already with no objection on direct

18   that it was not the reduction of the retained mortgage

19   portfolio, but the net worth sweep.

20             The subject -- this is our expert, who's called to

21   testify that the net worth sweep caused the stock price to

22   fall by 50 percent.

23             Defendants seem to think that they can

24   cross-examine him and say there's another cause and he can't

25   respond to that line of cross-examination when he actually

1   did the analysis and has disclosed it to them and they've

2   deposed him on it and they've cross-examined him on it.

3            Your Honor, his report references the

4   methodological consistency of what Dr. Attari did and he's

5   also able to say what he did beyond that, which he's --

6   we've already widely disclosed to the Defendant and they've

7   had an opportunity with no objection, with no motion.

8   They've never lodged, you know -- sought to lodge the

9   objection to him testifying that the net worth sweep

10  actually caused this reduction.

11           And they're going to do it on redirect examination

12  at this moment and leave the Plaintiffs with no opportunity

13  to actually explain that this confounding cause that he

14  studied and they know he studied -- he can't testify about

15  it?

16           Your Honor, this should have been the subject of a

17  motion.  This isn't like an objection to leave us with no

18  recourse, that he can't actually explain what the net worth

19  sweep did.

20           THE COURT:  Why is this on redirect?

21           MR. RUDY:  It was on direct and then they followed

22  up on cross.  And I'm seeking to just clarify on redirect

23  why the arguments that Mr. Jones made don't work.  And I

24  want to ask him why it is that what he just got crossed on

25  is wrong.

1          MR. JONES:  Your Honor, this is Mr. Jones.

2          Dr. Mason testified that he relied on Dr. Attari's

3     event study.  And the event study does not make any attempt

4     to separate out the impact of the net worth sweep from the

5     accelerated reduction.  Dr. Mason's expert reports in this

6     case do not even mention this issue, make no attempt to --

7     or even address the possibility of separating the impact of

8     those two things.

9          And --

10          THE COURT:  The objection is sustained.

11          MR. RUDY:  Your Honor, can I just note that this

12     line of examination was brought by the Defendants because

13     they're criticizing Dr. Mason for how he is criticizing

14     Dr. Attari?  And he should be able to respond to that line

15     of cross-examination.

16          He's disclosed that he did more than just rely on

17     Dr. Attari.  He's not a mouthpiece for Dr. Attari.  He's his

18     own person who did his own analysis.  And he needs to be

19     able to explain to the jury why the Defendants' entire line

20     of cross-examination was not correct.

21          THE COURT:  But you didn't call him for that in

22     his direct.

23          MR. RUDY:  We did.  I asked him that exact

24     question on direct.  And then he asked more questions about

25     it.

1          I want to ask him:  Why is that?

2          THE COURT:  We'll resume tomorrow morning at

3     10:00.

4          (Whereupon, the following proceedings were had in

5     open court:)

6          THE COURT:  We'll be in recess until 10:00.  Don't

7     talk about the case.  Don't Twitter or tweet or X.  I'll see

8     you all at 10:00 tomorrow.

9          (Whereupon, the jury exited the courtroom at 5:04

10    p.m. and the following proceedings were had:)

11         THE COURT:  The witness will have to be available

12    at 10:00.  I'll think further about the question.  Can in

13    the meantime --

14         You can step down.

15         (Witness excused.)

16         THE COURT:  In the meantime, I'll look at this

17    deposition question, rule on the three deposition questions

18    I have.

19         The first objection was by the Plaintiffs to

20    the -- in the joint submissions on the counter-designations

21    to the deposition testimony of David Benson, president of

22    Fannie Mae.

23         The Plaintiffs designated parts of Benson's

24    testimony concerning his prediction in 2012 that the golden

25    years of GSE earnings were around the corner; and Defendants

1       have counter-designated several passages digging into the

2       specifics of his projections regarding GSEs' profitability,

3       invoking the rule of completeness embodied in Federal Rule

4       of Civil Procedure 32(a)(6).

5                   That rule provides that if a party offers in

6       evidence only part of a deposition, an adverse party may

7       require the offeror to introduce other parts of that in

8       fairness -- that in fairness should be considered with the

9       part introduced, and any party may itself introduce any

10      other parts.  That's Federal Rule of Procedure -- Civil

11      Procedure 32(a)(6).

12                  I believe the Defendants are correct that since

13      Plaintiffs are offering portions of the deposition in which

14      Benson makes broad statements about the GSEs' profitability,

15      then Defendants ought in fairness be allowed to offer

16      portions explaining the specific reasons for those

17      statements.

18                  And therefore, I overrule the objections that

19      Plaintiff has to the excerpts that Defendants have

20      counter-designated in the testimony of David Benson, which I

21      take it is the next deposition that you want to play.

22                  That's Plaintiffs' objections, then, to those

23      cross-designations.

24                  I take it Defendants object to some of Plaintiffs'

25      designations of the deposition testimony of two witnesses,

1    former Fannie Mae CFO Susan McFarland and former Fannie Mae

2    President and CEO Timothy Mayopoulos.

3           As to Susan McFarland, the defense objections are

4    overruled.  Defendants object to a statement in McFarland's

5    deposition that FHFA was on notice that she had sent a

6    message to Treasury regarding the possibility that Fannie

7    Mae would release the allowance in its deferred tax assets.

8    See the McFarland deposition at 60, Lines 7 to 16, Exhibit A

9    to the joint submission, ECF 328-1.

10          They argue that that statement lacks a foundation

11   in personal knowledge because McFarland also testified she

12   did not recall whether FHFA officials were at a particular

13   meeting.

14          But as Plaintiffs set out in their response,

15   McFarland testified extensively about other moments at which

16   to the best of her recollection she likely would have made

17   her message known to FHFA officials.  Therefore, I overrule

18   the objection.

19          As to Timothy Mayopoulos, the objection will be

20   sustained.  Defendants raise an objection to a portion of

21   Mayopoulos's deposition testimony that I sustained at the

22   first trial.

23          Plaintiffs have designated the passage in which

24   Mayopoulos agrees that 10 percent is a fairly representative

25   cost of capital in the commercial context, but explains that

1    an amendment to the PSPAs is not an arm's-length commercial

2    transaction, but a political transaction.

3           In the Mayopoulos deposition at 260:4 to 262:1 and

4    Exhibit B to the joint submission of deposition

5    opposition -- see ECF No. 328-2 -- the objection is

6    sustained for the same reason I did in the first trial.

7           Mayopoulos did not claim to have any personal

8    knowledge of the factors the negotiators of the third

9    amendment considered, and his own opinion about how one

10   would approach the negotiations is irrelevant.

11          So with that, I think that rules on all the

12   questions that y'all presented on the objections to the

13   depositions.

14          I'll rule in the morning on the issues that you

15   all were just raising.

16          Any other issues I need to rule on tonight?

17          MR. HUME:  Just very briefly, your Honor, picking

18   up on what I raised before.

19          THE COURT:  I have to look back at the testimony

20   that's just gone on.  But we'll see.

21          MR. HUME:  We're grateful for you looking at the

22   Mason dispute there.

23          I just wanted to raise again, our presentation

24   tomorrow -- we've had an unfortunate amount of lawyer

25   disputes on the phones in front of the jury.

1          We'd like to avoid that.  We've been told, as I

2     mentioned earlier, that the Defendants plan to file a motion

3     that sounds like it could have a significant impact on the

4     expert we were going to present tomorrow.

5          THE COURT:  What is that now?

6          MR. HUME:  It's related to his ability to do what

7     he did in the first trial, which is to talk about how the

8     certificates of designation between Treasury and the GSEs

9     said that if you don't pay the 10 percent dividend, it goes

10    to liquidation preference as a payment in kind and then the

11    rate goes up to 12 percent.  That would have been in his

12    view an option to deal with any concern about circular

13    draws.

14         And, your Honor, they're trying to say he can't

15    say that.

16         As I said earlier, we think they have waived the

17    ability to make this motion.  They've known since 2021 or

18    early 2022 that that was his opinion.  He gave it in the

19    last trial.  They didn't move before trial.  We had motions

20    *in limine* deadlines for this trial.  They didn't move.  I

21    think it's too late now.

22         But if they're going to -- they also told us at

23    9:30 this morning they were going to file this morning, and

24    they still haven't filed.  So we feel like, what are we

25    supposed to do in terms of which witness we call tomorrow?

 1        And we have to give them the slide for the witness.

 2              So I'd just like to know, are they going to file

 3        it or not?

 4              MR. BERGMAN:  David Bergman for Defendants.  Thank

 5        you.

 6              Your Honor, I appreciate Mr. Hume bringing this

 7        up.  The issue is one of contract interpretation of the

 8        PSPA.  It's our position that that's a matter of law and

 9        it's been resolved by the Supreme Court and by this Court.

10              It's relating to the 10 percent dividend and

11        whether that is a required or mandatory 10 percent cash

12        dividend.  And then if, as the Supreme Court and this Court

13        have held, the mandatory 10 percent required cash

14        dividend -- in the event that there is a failure to pay

15        that, then there is a 12 percent addition to the liquidation

16        preference.

17              So in our view, that's -- this Court and the

18        Supreme Court have both made that interpretation of how the

19        PSPA works.  That's a question of law for the courts, not a

20        question of fact for the jury.

21              We now understand that Professor Dharan is

22        apparently going to testify that the 10 percent cash

23        dividend is purely optional and that there was another

24        alternative freely available.

25              I'll just -- so it's our position that Dr. Dharan

```
 1    should not be able to give that testimony, that that's

 2    contrary to law.  Expert opinion based on something contrary

 3    to law is confusing, irrelevant, prejudicial and shouldn't

 4    be permitted.

 5            We first raised this issue.  I don't want to get

 6    into a lot of --

 7            THE COURT:  I thought he just told you that he did

 8    testify to that in the last trial without objection.

 9            MR. BERGMAN:  So he didn't testify to the extent

10    that he apparently is going to now.

11            I will say in his deposition, I'll have --

12            THE COURT:  Why am I hearing this now, then?

13            MR. BERGMAN:  Yes, your Honor.

14            We saw this in --

15            THE COURT:  It's better now than in the morning

16    while the jury is sitting here, I agree.

17            MR. BERGMAN:  Yes, your Honor.

18            THE COURT:  I don't know why I'm doing it now.  So

19    tell me that first.

20            MR. BERGMAN:  So we first raised this when we got

21    the Plaintiffs' slides over the weekend for openings.  And

22    we saw the 10 percent or 12 percent.

23            THE COURT:  That's over the weekend.  This is

24    Thursday.

25            MR. BERGMAN:  Yes.
```

1          THE COURT:  So why am I hearing it now?

2          MR. BERGMAN:  Yes, your Honor.

3          So we objected to Plaintiffs about the slides.

4          And they said:  We disagree; but also, please

5    don't raise this with respect to our opening slides.  You

6    can reserve your rights.  We will not assert that by failing

7    to raise with respect to the opening slides that you've

8    waived anything, et cetera.

9          So then the opening came yesterday.  And frankly,

10   it was more extensive than the slides.  It was a greater

11   emphasis than either the slides were in the first trial

12   about this option situation.

13         I will say that -- well, I'll get to what

14   Dr.  Dharan said in deposition, which is different than what

15   I understand he's going to say in trial.

16         And so when that happened, we then again said this

17   morning to the Plaintiffs that we continue to believe that's

18   an incorrect statement of law.  We're evaluating whether we

19   should ask for a curative instruction or whether we should

20   wait and instead just resolve this in the context of

21   Dr. Dharan's anticipated testimony.

22         We had some back-and-forth about the way to

23   resolve this.  We were not making progress.  And Mr. Hume

24   raised the issue this afternoon.

25         THE COURT:  We'll resolve it at the time of jury

1    instructions or when we hear the testimony.

2              MR. BERGMAN:  Thank you, your Honor.

3              MR. RUDY:  Thank you.

4              (Proceedings concluded.)

1                          **<u>CERTIFICATE</u>**

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                 Dated this 27th day of July, 2023.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$1.274** [1] - 57:13
**$1.459** [1] - 57:2
**$1.61** [6] - 45:13, 49:20, 52:4, 57:22, 73:22, 74:3
**$100** [1] - 79:17
**$120** [1] - 80:5
**$150** [1] - 57:19
**$191** [1] - 80:7
**$195** [1] - 57:19
**$2.93** [1] - 49:4
**$250** [2] - 105:10, 105:25
**$33** [1] - 49:6
**$46** [2] - 57:20, 91:3
**$488** [1] - 57:15
**$68** [2] - 79:17, 79:24
**$680** [1] - 57:4
**$779** [2] - 57:5, 89:3
**$786** [1] - 57:16
**$831** [1] - 91:13

## '

**'05** [1] - 22:14
**'06** [1] - 22:14

## /

**/s** [1] - 119:12

## 1

**1** [3] - 60:11, 60:14
**1,000** [2] - 23:17, 23:20
**1.274** [1] - 73:1
**1.459** [1] - 72:19
**1.469** [1] - 73:2
**1.6** [10] - 32:6, 52:6, 68:2, 82:25, 91:17, 92:11, 95:20, 102:6, 107:1, 107:3
**1.61** [1] - 73:24
**10** [15] - 12:13, 24:23, 70:15, 94:3, 104:23, 104:24, 105:2, 105:5, 112:24, 114:9, 115:10, 115:11, 115:13, 115:22, 116:22
**10.7** [1] - 8:18
**10020** [1] - 2:4
**10:00** [4] - 110:3, 110:6, 110:8, 110:12

**11** [16] - 83:8, 87:11, 89:4, 90:12, 90:25, 91:14, 92:15, 96:11, 100:23, 100:25, 102:21, 102:24, 103:6, 103:17, 103:18
**11.1** [1] - 62:23
**12** [3] - 114:11, 115:15, 116:22
**120** [1] - 80:8
**1251** [1] - 2:4
**13-1053** [1] - 1:4
**13-1288** [1] - 1:10
**14** [2] - 58:12, 62:16
**14.9** [1] - 64:1
**1401** [1] - 1:21
**15** [8] - 3:6, 18:4, 61:6, 62:7, 70:16, 94:3, 104:22, 105:5
**15.7** [1] - 63:23
**150** [1] - 73:4
**1523** [1] - 1:18
**16** [1] - 112:8
**16th** [4] - 49:11, 56:1, 72:18, 72:24
**17** [3] - 34:24, 83:7, 100:7
**177** [1] - 34:13
**17th** [47] - 25:2, 31:21, 32:6, 32:20, 33:24, 34:3, 50:21, 51:1, 52:7, 56:2, 58:20, 59:9, 60:3, 60:8, 64:25, 65:5, 65:6, 65:7, 65:8, 65:13, 70:10, 71:15, 72:21, 73:3, 83:4, 83:22, 83:24, 85:9, 86:1, 86:15, 86:22, 87:2, 87:6, 87:11, 88:7, 89:4, 90:3, 90:12, 91:1, 91:13, 91:20, 92:15, 95:2, 96:10, 96:16, 96:23, 104:6
**18** [1] - 63:1
**19** [1] - 59:20
**19087** [1] - 1:24
**1930s** [2] - 47:10, 47:13
**195** [1] - 72:25
**1980s** [1] - 39:3

## 2

**2** [2] - 12:18, 15:25
**2-B** [4] - 12:2, 15:18, 27:19, 27:24
**2-C** [1] - 16:24

**2.9** [1] - 49:10
**20** [7] - 3:7, 4:9, 42:4, 46:12, 59:20, 61:4, 79:12
**20-minute** [1] - 29:23
**20001** [3] - 2:9, 2:13, 119:14
**20005** [1] - 1:22
**20036** [1] - 1:19
**2007** [1] - 39:3
**2008** [15] - 10:14, 12:8, 24:2, 27:22, 39:4, 46:1, 46:6, 47:6, 75:7, 75:25, 76:7, 97:12, 98:8, 104:25, 105:14
**2009** [6] - 13:11, 17:20, 27:8, 28:20, 49:6, 75:8
**2010** [4] - 13:20, 17:21, 27:13, 28:20
**2011** [5] - 14:11, 14:20, 17:21, 27:14, 28:20
**2012** [46] - 13:17, 15:1, 25:2, 27:11, 31:22, 49:11, 49:15, 51:1, 52:7, 56:2, 59:9, 62:21, 62:22, 63:6, 64:7, 64:10, 64:22, 70:10, 71:15, 72:18, 72:21, 72:24, 73:3, 83:4, 83:7, 83:12, 83:18, 83:22, 83:24, 85:9, 87:11, 89:5, 90:12, 91:1, 91:13, 91:20, 92:15, 95:2, 96:10, 96:16, 96:23, 99:16, 102:8, 106:4, 110:24
**2013** [1] - 25:21
**202** [2] - 2:13, 119:15
**2021** [2] - 5:8, 114:17
**2022** [1] - 114:18
**2023** [4] - 1:7, 71:18, 83:6, 119:10
**24th** [1] - 71:17
**250** [7] - 94:4, 105:10, 105:11, 105:15, 105:20, 106:5, 106:8
**26** [1] - 3:7
**260:4** [1] - 113:3
**262:1** [1] - 113:3
**27** [1] - 1:7
**27th** [2] - 83:6, 119:10
**28** [1] - 3:7
**280** [1] - 1:24
**2:03** [1] - 1:7

**2:06** [1] - 6:18

## 3

**3** [3] - 17:6, 84:3, 99:11
**30** [3] - 3:8, 3:13, 61:4
**31** [2] - 3:9, 3:14
**32** [1] - 5:10
**32(a)(6)** [2] - 111:4, 111:11
**328-1** [1] - 112:9
**328-2** [1] - 113:5
**333** [2] - 2:12, 119:14
**346** [3] - 3:13, 30:5, 30:10
**35** [1] - 3:10
**354-3269** [2] - 2:13, 119:15
**375** [3] - 3:14, 30:24, 31:2
**39** [2] - 72:16, 72:18
**3:39** [1] - 60:15
**3:57** [1] - 61:17

## 4

**4** [2] - 1:13, 89:9
**40** [2] - 72:16, 72:24
**402-A** [4] - 3:14, 43:22, 43:25, 44:11
**44** [1] - 3:14
**46** [1] - 73:6
**47** [3] - 62:1, 62:5, 65:9
**47.1** [1] - 58:20
**488** [1] - 73:5
**495-2** [2] - 3:15, 55:22
**496-2** [2] - 3:15, 54:23, 55:22
**497-2** [3] - 3:15, 54:23, 55:23
**497-3** [3] - 3:15, 54:23, 55:23
**497-4** [3] - 3:15, 54:23, 55:23
**497-5** [3] - 3:15, 54:23, 55:23

## 5

**5** [6] - 46:12, 59:16, 59:23, 60:5, 60:6, 79:12
**50** [8] - 40:4, 42:19, 50:17, 67:10, 67:22,

104:7, 106:15, 107:22
**55** [1] - 3:15
**56.8** [2] - 58:25, 62:1
**57** [2] - 62:5, 65:10
**5:04** [1] - 110:9

## 6

**6** [7] - 27:24, 56:4, 71:21, 71:24, 71:25, 73:14
**60** [1] - 112:8
**601** [1] - 2:8
**6706** [1] - 2:12
**68** [2] - 79:14, 80:8
**680** [1] - 72:22

## 7

**7** [5] - 3:6, 16:13, 34:23, 87:17, 112:8
**71.6** [2] - 80:6, 80:8
**74** [1] - 3:10
**779** [2] - 57:6, 72:23
**786** [2] - 73:6, 90:18
**7th** [19] - 12:8, 12:17, 27:22, 31:25, 32:17, 32:24, 33:23, 62:17, 62:21, 62:22, 63:6, 63:9, 64:16, 64:19, 64:22, 83:12, 83:22, 87:25, 88:18

## 8

**8** [8] - 12:13, 15:23, 34:23, 64:4, 87:18, 88:20, 100:4, 100:5
**8/17** [6] - 85:7, 85:9, 85:11, 85:25, 86:2, 89:23
**831** [1] - 73:7
**8th** [17] - 31:25, 32:18, 32:25, 33:24, 63:19, 64:7, 64:8, 64:16, 64:19, 64:22, 83:18, 83:23, 87:25, 99:14, 99:16, 99:19, 99:23

## 9

**95** [5] - 58:18, 59:3, 59:5, 59:15, 59:19
**97** [1] - 3:10
**9:30** [3] - 6:1, 6:6, 114:23

## A

**ability** [9] - 5:5, 6:9, 6:12, 33:1, 48:8, 65:17, 114:6, 114:17, 119:7
**able** [6] - 35:2, 96:19, 108:5, 109:14, 109:19, 116:1
**above-zero** [3] - 96:15, 96:16, 96:24
**absolutely** [6] - 18:10, 33:23, 38:21, 54:21, 66:15, 67:2
**academic** [5] - 36:16, 38:22, 39:10, 51:7, 51:14
**academics** [2] - 39:21, 41:12
**accelerate** [2] - 70:14, 94:23
**accelerated** [9] - 95:3, 104:4, 105:8, 106:10, 106:11, 106:14, 107:8, 107:12, 109:5
**accelerating** [2] - 93:25, 94:6
**acceleration** [4] - 95:9, 95:15, 95:22, 96:2
**access** [1] - 71:8
**accord** [1] - 69:17
**according** [2] - 47:12, 79:24
**Accountability** [1] - 42:14
**accounting** [1] - 93:8
**accurate** [1] - 119:4
**accurately** [2] - 44:4, 52:2
**acknowledged** [1] - 107:7
**action** [1] - 48:19
**Action** [1] - 1:3
**ACTION** [1] - 1:11
**actions** [2] - 20:6, 28:5
**activity** [1] - 100:3
**actual** [5] - 29:15, 55:14, 57:7, 59:8, 60:1
**ADAM** [1] - 2:2
**add** [3] - 57:21, 73:20, 79:12
**added** [1] - 91:11
**adding** [6] - 91:7, 91:18, 91:24, 92:2, 92:6, 92:9

**addition** [3] - 93:18, 93:22, 115:15
**address** [1] - 109:7
**admitted** [2] - 103:7, 103:8
**adverse** [1] - 111:6
**advise** [1] - 42:11
**advised** [1] - 42:13
**affected** [2] - 32:14, 32:15
**affects** [1] - 31:17
**affiliation** [1] - 38:11
**Aflac** [1] - 22:24
**afternoon** [8] - 7:3, 15:15, 19:14, 26:11, 74:15, 74:18, 95:7, 117:24
**AFTERNOON** [1] - 1:13
**agencies** [3] - 42:12, 42:13, 43:16
**Agency** [1] - 17:1
**AGENCY** [1] - 1:6
**ago** [17] - 53:7, 75:4, 83:8, 87:11, 89:4, 90:12, 90:25, 91:14, 92:15, 96:11, 100:24, 100:25, 102:21, 103:6, 103:18
**agree** [9] - 23:4, 49:15, 81:7, 81:8, 94:11, 94:19, 94:20, 96:22, 116:16
**agreed** [7] - 19:17, 25:2, 72:15, 101:13, 101:16, 102:9, 103:2
**agreeing** [2] - 9:25, 10:3
**agreement** [8] - 5:11, 10:7, 10:9, 34:1, 34:4, 101:11, 101:23, 102:1
**AGREEMENT** [1] - 1:11
**agrees** [1] - 112:24
**agricultural** [1] - 7:15
**agricultural-related** [1] - 7:15
**ahead** [2] - 53:16, 61:7
**AIG** [7] - 46:18, 76:2, 76:19, 79:1, 79:8, 79:16, 79:25
**al** [2] - 1:3, 1:7
**allow** [3] - 19:5, 38:3, 60:1
**allowance** [1] - 112:7
**allowed** [4] - 33:3, 98:10, 101:24, 111:15
**almost** [2] - 61:10,

83:8
**alternative** [4] - 93:3, 93:7, 93:9, 115:24
**Amendment** [2] - 81:17, 82:3
**amendment** [54] - 13:13, 13:16, 13:22, 14:5, 14:8, 14:14, 14:22, 15:4, 25:3, 25:10, 25:11, 25:20, 27:10, 31:22, 33:25, 81:24, 82:5, 82:7, 82:8, 82:10, 82:15, 82:18, 82:25, 83:3, 83:14, 83:19, 85:7, 85:10, 85:11, 86:3, 86:15, 88:7, 89:23, 90:3, 92:6, 92:22, 92:25, 93:12, 93:16, 93:19, 93:23, 94:12, 94:22, 95:1, 96:24, 100:7, 100:18, 104:21, 105:4, 105:21, 105:24, 106:1, 113:1, 113:9
**America** [3] - 46:21, 76:2, 76:20
**Americas** [1] - 2:4
**amount** [8] - 25:1, 42:22, 45:13, 51:3, 58:22, 74:7, 99:21, 113:24
**amounted** [1] - 46:11
**amounts** [3] - 24:25, 78:24, 104:15
**analysis** [10] - 32:2, 52:14, 53:2, 53:20, 64:18, 95:13, 107:9, 107:10, 108:1, 109:18
**analytical** [1] - 49:24
**analyze** [5] - 44:25, 54:18, 55:25, 64:25, 95:19
**announced** [13] - 12:17, 50:6, 50:15, 66:3, 67:17, 70:12, 70:13, 74:7, 83:1, 83:3, 95:1, 100:18, 104:5
**announcement** [13] - 49:2, 56:8, 56:9, 57:16, 57:20, 66:14, 67:24, 82:5, 82:9, 96:23, 100:3, 100:4, 102:7
**announcements** [1] - 51:6
**annum** [2] - 104:23, 104:24
**anonymously** [1] -

39:22
**answer** [6] - 14:2, 14:17, 33:11, 79:14, 81:20, 86:2
**answered** [3] - 75:14, 76:11, 103:12
**answering** [1] - 14:15
**answers** [1] - 16:23
**anticipated** [1] - 117:21
**anytime** [1] - 66:11
**anyway** [3] - 68:11, 68:21, 71:1
**apiece** [1] - 105:25
**apologies** [1] - 30:8
**apologize** [2] - 37:2, 37:5
**APPEARANCES** [1] - 2:1
**appearances** [2] - 1:16, 40:19
**appeared** [1] - 40:18
**application** [1] - 37:8
**applies** [1] - 102:7
**appointed** [2] - 21:3, 22:3
**appreciate** [2] - 4:23, 115:6
**appreciated** [1] - 87:19
**approach** [2] - 52:2, 113:10
**appropriate** [4] - 74:4, 88:14, 96:21, 103:2
**apt** [1] - 49:17
**arbitrarily** [1] - 20:7
**area** [1] - 38:23
**areas** [3] - 38:19, 38:23, 42:25
**argue** [1] - 112:10
**arguing** [3] - 49:5, 67:3, 68:9
**argument** [3] - 49:12, 67:6, 68:13
**arguments** [1] - 108:23
**arithmetic** [1] - 91:16
**arm** [1] - 46:20
**arm's** [1] - 113:1
**arm's-length** [1] - 113:1
**ARNOLD** [1] - 2:8
**arrangements** [1] - 41:20
**article** [5] - 39:20, 39:21, 39:22, 65:14, 65:20
**articles** [4] - 39:10,

39:14, 39:15, 62:14
**aside** [1] - 41:1
**ASIM** [1] - 2:5
**assert** [1] - 117:6
**assess** [3] - 33:1, 37:25, 71:23
**Asset** [1] - 97:20
**assets** [9] - 24:15, 29:5, 47:10, 47:22, 48:7, 69:2, 97:23, 112:7
**assignment** [6] - 44:23, 44:24, 44:25, 45:16, 53:25, 71:2
**associated** [1] - 50:1
**Association** [1] - 22:21
**asterisk** [1] - 59:19
**asterisks** [2] - 58:15, 59:3
**Attari** [25] - 3:9, 30:19, 31:5, 32:13, 34:9, 34:11, 34:13, 51:25, 53:1, 53:8, 53:17, 53:21, 54:12, 55:15, 58:10, 59:7, 64:6, 65:12, 65:14, 98:25, 107:6, 108:4, 109:14, 109:17
**Attari's** [7] - 53:23, 55:25, 58:12, 62:7, 64:17, 72:10, 109:2
**attempt** [3] - 107:10, 109:3, 109:6
**attempted** [1] - 101:15
**attempting** [1] - 95:13
**attorney** [1] - 25:9
**attorney-client-privileged** [1] - 25:9
**attribute** [4] - 63:4, 64:3, 64:6, 65:13
**attributed** [4] - 50:6, 51:4, 51:5, 63:8
**attributes** [1] - 93:10
**August** [93] - 5:8, 13:17, 15:1, 25:2, 27:11, 31:21, 31:25, 32:6, 32:17, 32:18, 32:20, 32:24, 32:25, 33:23, 33:24, 34:3, 34:23, 34:24, 49:10, 50:21, 51:1, 52:7, 56:1, 56:2, 58:20, 59:9, 60:3, 60:8, 62:17, 62:21, 62:22, 63:6, 63:9, 63:19, 64:4, 64:7, 64:8, 64:16, 64:19, 64:22,

64:25, 65:8, 65:13, 70:10, 71:15, 72:18, 72:21, 72:24, 73:3, 83:3, 83:7, 83:12, 83:18, 83:22, 83:23, 83:24, 85:9, 85:25, 86:15, 86:22, 87:6, 87:11, 87:17, 87:18, 87:25, 88:6, 88:18, 88:20, 89:4, 90:2, 90:12, 91:1, 91:13, 91:19, 92:15, 95:2, 96:10, 96:16, 96:23, 99:14, 99:15, 99:19, 99:23, 100:4, 100:5, 100:7, 104:6
**available** [4] - 66:9, 97:2, 110:11, 115:24
**Avenue** [6] - 1:18, 1:21, 2:4, 2:8, 2:12, 119:14
**avoid** [1] - 114:1
**aware** [10] - 24:1, 25:2, 48:22, 49:5, 67:3, 68:9, 69:6, 77:18, 78:3, 97:15
**axis** [1] - 84:10

**B**

**back-and-forth** [1] - 117:22
**backed** [1] - 42:23
**background** [5] - 21:8, 36:12, 36:13, 44:5, 54:5
**Bail** [1] - 22:21
**bailed** [2] - 97:12, 97:24
**bailout** [8] - 46:14, 74:22, 77:5, 78:17, 79:5, 79:7, 79:11, 98:7
**bailouts** [3] - 44:15, 75:7, 77:22
**balance** [3] - 104:14, 104:16, 104:17
**Bank** [3] - 46:21, 76:2, 76:19
**banks** [3] - 41:16, 41:23
**bar** [2] - 49:1, 49:2
**bargain** [1] - 26:1
**barred** [1] - 10:25
**based** [6] - 23:6, 34:17, 47:25, 52:13, 60:8, 116:2
**basic** [1] - 24:21
**basis** [5] - 33:16,

34:8, 34:16, 49:19, 96:5
**BBC** [1] - 40:20
**became** [1] - 41:17
**BEFORE** [1] - 1:14
**began** [3] - 41:13, 41:23, 71:17
**begin** [2] - 39:20, 43:3
**beginning** [4] - 15:24, 45:21, 86:2, 100:4
**begun** [1] - 46:20
**behalf** [8] - 7:5, 26:11, 29:12, 30:2, 43:6, 45:6, 45:7, 60:22
**behemoths** [1] - 45:23
**behind** [2] - 43:23, 55:7
**benefit** [2] - 66:21, 98:4
**benefited** [1] - 79:8
**benefits** [1] - 96:19
**Benson** [4] - 60:25, 110:21, 111:14, 111:20
**Benson's** [1] - 110:23
**BERGER** [1] - 2:3
**Bergman** [1] - 115:4
**BERGMAN** [2] - 2:6, 115:4, 116:9, 116:13, 116:17, 116:20, 116:25, 117:2, 118:2
**Berkley** [18] - 7:7, 7:11, 7:18, 8:1, 8:4, 8:7, 8:12, 8:15, 8:18, 8:24, 9:15, 10:22, 11:11, 13:10, 13:19, 14:10, 14:19, 14:25
**BERKLEY** [1] - 1:17
**Berkley's** [2] - 9:5, 17:20
**BERNSTEIN** [1] - 2:3
**best** [2] - 112:16, 119:7
**bet** [2] - 61:10, 61:13
**better** [4] - 64:11, 69:21, 69:22, 116:15
**between** [11] - 9:15, 10:9, 15:1, 46:11, 50:13, 62:18, 72:15, 79:12, 95:14, 96:1, 114:8
**beyond** [2] - 81:7, 108:5
**big** [3] - 6:3, 79:5, 79:7

**biggest** [1] - 29:14
**billion** [41] - 12:18, 15:25, 32:6, 45:13, 49:4, 49:6, 49:10, 49:20, 52:4, 52:6, 57:2, 57:14, 57:22, 68:2, 72:20, 73:2, 73:22, 73:24, 74:3, 79:14, 79:17, 79:18, 79:24, 80:5, 80:6, 80:7, 82:25, 91:17, 92:11, 94:4, 95:20, 102:6, 105:10, 105:15, 105:20, 105:25, 106:5, 106:8, 107:1, 107:3
**bills** [2] - 47:23, 48:8
**binder** [5] - 43:20, 43:21, 43:22, 54:22, 54:24
**bit** [9] - 51:22, 68:15, 77:22, 79:19, 79:20, 85:23, 87:22, 92:6, 104:10
**blew** [1] - 41:21
**Bloomberg** [2] - 40:19, 40:20
**blue** [15] - 41:21, 49:1, 49:2, 59:17, 84:8, 84:14, 85:1, 85:16, 86:8, 89:15, 90:13, 91:6, 91:7, 100:10, 100:11
**BOIES** [1] - 1:21
**Bond** [1] - 22:21
**bonds** [3] - 8:5, 8:8, 42:24
**book** [2] - 39:9, 39:14
**borrowing** [2] - 97:23, 98:2
**bottom** [7] - 15:25, 56:11, 58:14, 90:22, 100:8, 100:10, 100:13
**bought** [2] - 26:13, 26:16
**bounds** [1] - 102:11
**box** [5] - 56:11, 56:24, 57:6, 57:25, 99:23
**boxes** [4] - 56:10, 56:20, 57:10, 58:7
**break** [2] - 51:3, 61:24
**briefly** [7] - 28:16, 31:11, 72:14, 97:8, 101:6, 106:18, 113:17
**bring** [4] - 6:9, 6:14, 6:16, 25:24
**bringing** [1] - 115:6

**broad** [1] - 111:14
**brought** [2] - 79:22, 109:12
**build** [1] - 48:6
**bump** [1] - 88:3
**bump-up** [1] - 88:3
**business** [11] - 7:21, 7:22, 7:24, 23:24, 94:9, 94:13, 94:18, 94:20, 94:24, 105:2, 105:13
**busy** [1] - 40:21
**buy** [4] - 8:13, 8:15, 23:16, 23:18
**buys** [1] - 8:4
**BY** [45] - 2:10, 7:2, 7:6, 9:12, 11:8, 12:3, 12:16, 13:9, 14:3, 15:14, 16:12, 18:12, 21:1, 24:12, 26:10, 28:3, 28:18, 29:10, 35:18, 36:11, 37:6, 44:22, 47:17, 53:19, 55:24, 61:23, 67:9, 67:18, 68:8, 70:3, 73:9, 74:17, 74:23, 80:11, 80:16, 84:4, 89:10, 92:20, 94:21, 97:10, 98:16, 99:12, 100:22, 104:1, 105:19

**C**

**Cacciapalle** [3] - 3:8, 29:25, 30:17
**calculate** [2] - 71:3, 73:11
**calculation** [1] - 71:14
**calculations** [2] - 71:11, 91:17
**cannot** [3] - 11:16, 11:19, 96:1
**capable** [1] - 23:6
**capacity** [1] - 28:6
**capital** [3] - 12:19, 16:1, 112:25
**capitalization** [1] - 49:10
**car** [2] - 76:3, 76:20
**care** [1] - 41:8
**cared** [1] - 41:9
**career** [5] - 40:14, 41:13, 45:21, 52:12, 66:18
**carefully** [1] - 102:18
**carpenter** [2] - 21:24, 22:4
**carpenters'** [1] -

21:23
**carry** [1] - 105:12
**carved** [1] - 102:1
**Case** [1] - 1:10
**case** [32] - 5:6, 6:9, 6:13, 20:6, 23:5, 26:23, 27:1, 32:2, 35:24, 44:24, 45:1, 49:5, 53:10, 53:11, 53:20, 54:3, 67:4, 71:3, 74:1, 74:5, 81:5, 81:12, 81:18, 81:19, 84:16, 89:19, 96:4, 98:18, 99:5, 109:6, 110:7
**cash** [4] - 48:9, 115:11, 115:13, 115:22
**Cassell** [8] - 3:7, 4:6, 19:17, 20:21, 21:2, 26:11, 28:14, 28:19
**CASSELL** [1] - 20:2
**caught** [1] - 87:14
**causation** [2] - 43:3, 43:5
**caused** [11] - 43:3, 59:21, 62:13, 63:5, 70:10, 95:21, 95:22, 104:6, 106:14, 107:21, 108:10
**causes** [4] - 50:4, 93:3, 93:8, 93:9
**causing** [1] - 106:25
**caveats** [1] - 90:7
**center** [2] - 57:12, 89:21
**CEO** [1] - 112:2
**certain** [1] - 56:10
**certainly** [2] - 35:4, 82:14
**certainty** [1] - 59:15
**certificate** [3] - 8:25, 9:2, 9:14
**CERTIFICATE** [1] - 119:1
**certificates** [3] - 9:18, 18:14, 114:8
**certify** [1] - 119:4
**cetera** [2] - 55:13, 117:8
**CFO** [1] - 112:1
**challenging** [2] - 10:22, 25:22
**chance** [7] - 59:15, 59:16, 59:20, 59:21, 59:23, 60:2, 60:9
**change** [6] - 29:17, 56:6, 67:25, 70:25, 105:21, 106:1
**changed** [1] - 105:4

822

**changes** [1] - 34:2
**chapter** [1] - 102:5
**chapters** [2] - 39:9, 39:15
**characterization** [3] - 49:17, 94:11, 96:21
**characterize** [1] - 61:25
**characterized** [1] - 94:18
**charge** [1] - 71:25
**chart** [4] - 84:21, 89:21, 91:23, 99:11
**charter** [2] - 22:20, 78:19
**chartered** [2] - 41:16, 78:9
**charters** [3] - 78:4, 78:7, 78:13
**Chase** [2] - 46:22, 76:3
**CHECK** [1] - 1:23
**checked** [1] - 90:17
**chemical** [3] - 21:13, 21:14, 21:16
**choosing** [2] - 69:16
**Chrysler** [2] - 76:3, 76:20
**circular** [1] - 114:12
**cite** [1] - 66:6
**cited** [2] - 40:5, 65:14
**Citigroup** [2] - 46:21, 76:2
**Civil** [3] - 1:3, 111:4, 111:10
**claim** [1] - 113:7
**claimants** [1] - 71:6
**claims** [3] - 34:9, 71:20, 96:6
**clarification** [2] - 74:20, 78:23
**clarify** [3] - 56:10, 86:14, 108:22
**clarity** [1] - 30:13
**class** [4] - 21:3, 23:4, 23:9, 29:12
**CLASS** [3] - 1:11, 1:20, 2:2
**classes** [1] - 58:6
**clear** [3] - 85:22, 86:3, 100:13
**clearly** [1] - 85:10
**clerk** [1] - 19:24
**client** [3] - 4:5, 4:9, 25:9
**clients** [1] - 22:18
**clip** [1] - 53:8
**close** [1] - 85:5
**CNBC** [1] - 40:19

**code** [7] - 51:18, 55:7, 55:13, 59:25, 80:22, 81:10, 81:13
**Colatriano** [1] - 15:15
**COLATRIANO** [7] - 1:17, 9:7, 11:4, 15:14, 16:12, 18:12, 19:7
**collateral** [1] - 97:23
**college** [3] - 21:9, 21:11, 21:12
**colloquially** [1] - 66:6
**coloring** [1] - 89:13
**Columbia** [2] - 2:11, 119:13
**COLUMBIA** [1] - 1:1
**Columbus** [1] - 21:7
**column** [5] - 56:25, 57:12, 57:17, 73:10, 73:21
**columns** [2] - 56:16, 56:19
**combination** [1] - 98:4
**combined** [2] - 73:2, 73:7
**comfort** [1] - 65:1
**coming** [2] - 67:16, 104:15
**commentary** [1] - 40:5
**commercial** [2] - 112:25, 113:1
**Commission** [1] - 43:19
**Committee** [1] - 42:15
**common** [42] - 12:19, 13:4, 16:1, 23:18, 23:19, 26:16, 26:24, 27:2, 27:4, 27:7, 27:8, 48:11, 48:19, 48:23, 57:17, 57:18, 57:23, 57:25, 58:3, 58:19, 58:23, 62:22, 62:25, 63:22, 63:25, 65:15, 72:25, 73:4, 82:22, 84:5, 84:6, 84:7, 84:17, 89:14, 89:15, 89:19, 90:21, 90:22, 90:25, 91:8, 91:20, 106:15
**commonly** [1] - 51:11
**companies** [46] - 9:21, 18:2, 18:15, 18:21, 18:22, 18:25, 19:1, 19:3, 21:21, 25:12, 46:17, 46:24,

47:2, 48:14, 66:9, 66:21, 69:6, 69:9, 69:12, 69:15, 70:1, 75:6, 75:13, 75:17, 75:23, 76:5, 76:19, 76:21, 77:3, 77:4, 77:10, 77:12, 78:12, 78:13, 78:15, 78:17, 79:5, 97:12, 97:22, 97:25, 98:5, 98:7, 98:9, 98:11
**companies'** [1] - 49:3
**Company** [10] - 7:7, 7:12, 7:18, 8:2, 8:4, 8:15, 8:18, 9:15, 10:22, 13:19
**company** [16] - 21:13, 21:15, 21:16, 23:24, 24:13, 26:3, 29:4, 46:19, 48:12, 65:17, 68:23, 68:25, 76:3, 76:20, 78:25, 105:15
**company's** [5] - 17:8, 17:13, 24:15, 47:10, 68:16
**Company's** [4] - 13:10, 14:10, 14:19, 14:25
**comparison** [1] - 79:16
**compensation** [1] - 7:14
**complaint** [1] - 29:3
**complete** [1] - 119:6
**completed** [2] - 21:9, 21:11
**completely** [3] - 77:10, 101:22, 102:10
**completeness** [1] - 111:3
**complex** [3] - 39:12, 41:20, 86:19
**complexities** [2] - 87:15, 90:2
**complicated** [1] - 80:22
**complicated-looking** [1] - 80:22
**component** [4] - 43:4, 93:15, 98:2, 98:3
**components** [2] - 16:8, 16:17
**comport** [1] - 48:1
**compounded** [1] - 72:2
**Comptroller** [3] - 41:14, 41:15, 41:22

**computer** [3] - 54:18, 55:7, 80:22
**concern** [1] - 114:12
**concerning** [1] - 110:24
**concluded** [2] - 52:6, 118:4
**concluding** [1] - 96:5
**conclusion** [6] - 9:8, 11:5, 45:10, 45:12, 49:19, 50:5
**conclusions** [2] - 54:19, 99:4
**condition** [1] - 37:25
**conditions** [1] - 63:16
**conduct** [1] - 95:13
**conducted** [6] - 34:18, 34:19, 35:3, 35:6, 93:2, 98:25
**confidence** [1] - 28:5
**confirm** [2] - 81:16, 87:21
**confirmation** [1] - 67:24
**confirmed** [1] - 53:17
**confounding** [1] - 108:13
**confuse** [1] - 99:8
**confusing** [4] - 85:23, 99:8, 100:15, 116:3
**Congress** [8] - 42:1, 47:5, 77:14, 77:16, 77:19, 78:5, 78:13, 78:19
**Congress's** [1] - 42:15
**Congressional** [1] - 42:14
**consent** [2] - 11:2, 11:17
**conservatorship** [37] - 11:14, 11:16, 11:24, 12:11, 12:25, 16:9, 16:18, 16:20, 16:24, 17:8, 17:13, 17:15, 18:2, 18:19, 24:2, 24:5, 24:14, 24:17, 27:17, 28:25, 46:25, 47:6, 47:9, 48:2, 48:13, 48:14, 65:18, 68:12, 68:19, 75:22, 76:10, 76:12, 76:13, 76:21, 76:24, 104:21, 105:1
**conservatorships** [3] - 75:13, 75:18, 76:6
**conserve** [5] - 12:18,

15:25, 24:15, 29:5, 47:10
**conserving** [1] - 69:2
**consider** [1] - 53:24
**considered** [3] - 5:12, 111:8, 113:9
**consistency** [1] - 108:4
**consistent** [5] - 18:20, 34:4, 49:11, 66:25, 67:11
**constitutes** [1] - 119:4
**Constitution** [2] - 2:12, 119:14
**constructed** [2] - 52:17, 52:20
**consult** [1] - 42:11
**consumer** [2] - 42:8, 45:22
**CONT'D** [1] - 2:1
**contain** [1] - 32:2
**context** [2] - 112:25, 117:20
**continue** [6] - 13:5, 17:14, 17:16, 69:24, 86:11, 117:17
**CONTINUED** [1] - 7:1
**contract** [4] - 9:6, 9:15, 9:19, 115:7
**contracts** [1] - 23:3
**contractual** [1] - 20:8
**contrary** [2] - 116:2
**contributed** [1] - 28:7
**contributing** [1] - 107:1
**COOPER** [1] - 1:18
**copy** [1] - 43:20
**corner** [1] - 110:25
**Corporation** [4] - 37:18, 37:19, 37:23, 39:1
**correct** [54] - 8:6, 8:17, 11:9, 13:21, 14:12, 14:15, 15:6, 15:21, 15:22, 16:20, 16:21, 17:1, 17:2, 18:5, 25:7, 26:15, 26:18, 36:15, 57:9, 58:5, 58:10, 59:1, 59:2, 64:19, 72:3, 72:11, 73:24, 76:17, 78:22, 80:19, 80:24, 81:4, 81:6, 81:12, 82:5, 82:19, 86:6, 86:7, 88:12, 88:24, 89:20, 90:5, 92:23,

92:25, 93:14, 94:25, 95:18, 98:23, 100:19, 100:20, 105:18, 106:2, 109:20, 111:12
**correctly** [3] - 12:21, 28:9, 99:1
**corroborate** [4] - 34:24, 58:9, 64:17, 99:3
**corroborated** [1] - 81:9
**cost** [1] - 112:25
**council** [1] - 22:3
**counsel** [8] - 12:4, 15:17, 15:24, 17:19, 18:13, 25:6, 30:12, 61:20
**Counsel** [1] - 14:1
**counted** [1] - 100:24
**counter** [3] - 110:20, 111:1, 111:20
**counter-designated** [2] - 111:1, 111:20
**counter-designations** [1] - 110:20
**couple** [3] - 4:15, 4:24, 77:2
**course** [4] - 29:13, 43:4, 52:12, 105:12
**courses** [1] - 38:15
**Court** [13] - 2:10, 2:11, 21:3, 73:17, 101:16, 115:9, 115:12, 115:17, 115:18, 119:12, 119:13
**court** [8] - 29:11, 30:17, 31:5, 35:10, 54:4, 79:22, 103:23, 110:5
**COURT** [76] - 1:1, 4:1, 4:10, 4:12, 4:18, 4:21, 5:1, 5:7, 5:15, 6:14, 6:16, 6:20, 6:22, 9:10, 11:7, 14:1, 16:11, 18:11, 19:10, 19:12, 19:20, 19:23, 20:4, 20:23, 24:8, 24:11, 29:8, 29:19, 30:1, 30:9, 30:12, 30:24, 31:1, 31:8, 35:8, 35:11, 35:16, 44:10, 44:18, 44:20, 53:15, 55:21, 60:12, 60:19, 61:2, 61:5, 61:7, 61:10, 61:15, 61:19, 67:8, 67:14, 68:6, 69:14, 74:13,

97:7, 98:14, 102:13, 103:21, 105:17, 108:20, 109:10, 109:21, 110:2, 110:6, 110:11, 110:16, 113:19, 114:5, 116:7, 116:12, 116:15, 116:18, 116:23, 117:1, 117:25
**Court's** [3] - 15:10, 26:7, 28:13
**COURTROOM** [9] - 6:17, 19:21, 19:25, 20:3, 35:12, 36:24, 37:4, 61:9, 61:16
**courtroom** [5] - 6:18, 53:7, 60:15, 61:17, 110:9
**courts** [1] - 115:19
**cover** [1] - 54:9
**create** [3] - 53:18, 72:4, 81:8
**created** [1] - 86:20
**creating** [1] - 51:2
**credit** [1] - 42:7
**crises** [13] - 36:19, 36:20, 37:12, 37:24, 40:9, 40:14, 41:5, 41:19, 41:20, 46:9, 66:18, 75:25
**crisis** [19] - 39:2, 39:3, 39:4, 40:10, 40:11, 41:6, 42:7, 42:10, 42:23, 46:1, 46:7, 46:16, 75:9, 76:1, 76:8, 76:22, 77:6, 97:13, 104:15
**criticizing** [2] - 109:13
**Cross** [1] - 3:4
**cross** [16] - 4:4, 4:7, 6:23, 61:3, 74:13, 102:11, 104:3, 107:7, 107:16, 107:24, 107:25, 108:2, 108:22, 109:15, 109:20, 111:23
**CROSS** [3] - 7:1, 26:9, 74:16
**cross-designations** [1] - 111:23
**cross-examination** [7] - 6:23, 102:11, 104:3, 107:7, 107:25, 109:15, 109:20
**CROSS-EXAMINATION** [3] - 7:1, 26:9, 74:16
**cross-examine** [2] - 74:13, 107:24

**cross-examined** [3] - 4:4, 107:16, 108:2
**crossed** [1] - 108:24
**CRR** [3] - 2:10, 119:3, 119:12
**curative** [1] - 117:19
**Currency** [3] - 41:14, 41:15, 41:23
**current** [1] - 28:8
**CV** [1] - 44:3

# D

**D.C** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 119:14
**dab** [1] - 85:6
**damage** [5] - 34:17, 43:3, 43:5, 103:1, 103:15
**Damages** [1] - 56:11
**damages** [32] - 31:21, 34:16, 36:3, 42:25, 43:2, 43:4, 44:16, 45:1, 45:4, 45:6, 45:7, 45:8, 45:10, 45:12, 49:20, 52:3, 55:9, 57:22, 68:2, 71:8, 72:4, 72:11, 73:21, 73:25, 74:4, 91:17, 92:3, 101:2, 101:20, 102:6, 107:3
**data** [8] - 51:18, 52:2, 52:22, 52:23, 54:19, 55:7, 81:10, 81:14
**date** [15] - 31:22, 33:24, 35:3, 64:24, 71:10, 71:13, 71:15, 71:16, 71:17, 74:10, 85:11, 85:25, 86:3
**Dated** [1] - 119:10
**dates** [5] - 31:24, 32:4, 32:8, 32:11, 32:16
**Daubert** [1] - 5:13
**David** [3] - 110:21, 111:20, 115:4
**DAVID** [1] - 2:6
**DAVIS** [1] - 1:20
**DAY** [1] - 1:13
**days** [11] - 62:10, 62:15, 83:13, 83:18, 83:23, 87:17, 88:4, 88:8, 88:20
**deadlines** [2] - 5:13, 114:20
**deal** [5] - 37:12,

38:24, 60:6, 73:18, 114:12
**dealing** [1] - 105:13
**deals** [1] - 7:22
**debates** [1] - 37:21
**debt** [1] - 42:8
**decade** [1] - 71:8
**decades** [1] - 78:3
**decide** [3] - 19:1, 20:5, 25:21
**decided** [1] - 8:15
**decision** [1] - 23:24
**deck** [4] - 31:18, 36:8, 36:10, 82:6
**decks** [1] - 103:10
**declare** [1] - 9:19
**declaring** [1] - 18:19
**decline** [15] - 51:3, 57:4, 58:17, 70:10, 72:23, 73:6, 73:7, 83:8, 83:21, 90:17, 91:13, 91:19, 92:13, 93:9, 107:2
**declined** [1] - 82:24
**declines** [2] - 31:21, 70:19
**decreased** [1] - 104:20
**deep** [1] - 34:10
**Defendant** [1] - 108:6
**DEFENDANTS** [1] - 2:5
**Defendants** [23] - 1:8, 7:5, 20:6, 26:12, 31:15, 31:16, 35:5, 49:5, 67:3, 68:9, 101:10, 106:22, 107:23, 109:12, 110:25, 111:12, 111:15, 111:19, 111:24, 112:4, 112:20, 114:2, 115:4
**defendants** [2] - 43:9, 43:12
**Defendants'** [18] - 51:19, 51:21, 52:5, 52:15, 52:22, 53:1, 56:4, 56:12, 56:17, 61:2, 63:4, 63:8, 64:3, 92:24, 95:18, 95:24, 99:5, 109:19
**defense** [1] - 112:3
**deferred** [1] - 112:7
**denied** [1] - 101:16
**Department** [5] - 10:10, 11:3, 11:17, 11:20, 43:18
**depicts** [1] - 46:13
**deposed** [2] -

107:16, 108:2
**deposition** [22] - 23:12, 30:14, 30:16, 31:4, 51:24, 54:3, 60:20, 110:17, 110:21, 111:6, 111:13, 111:21, 111:25, 112:5, 112:8, 112:21, 113:3, 113:4, 116:11, 117:14
**depositions** [2] - 4:13, 113:13
**Depression** [2] - 37:18, 38:25
**DEPUTY** [9] - 6:17, 19:21, 19:25, 20:3, 35:12, 36:24, 37:4, 61:9, 61:16
**derivatives** [1] - 42:24
**describe** [8] - 5:5, 41:11, 44:4, 45:25, 46:5, 47:21, 56:5, 63:19
**described** [3] - 80:23, 99:7, 103:12
**designated** [4] - 110:23, 111:1, 111:20, 112:23
**designation** [2] - 9:3, 18:14, 114:8
**designations** [3] - 110:20, 111:23, 111:25
**details** [1] - 20:15
**determine** [2] - 51:8, 59:8, 60:1
**determined** [1] - 17:17
**determining** [1] - 20:9
**developed** [1] - 37:23
**Dharan** [5] - 5:8, 6:2, 115:21, 115:25, 117:14
**Dharan's** [1] - 117:21
**different** [4] - 7:24, 79:10, 81:11, 117:14
**differentiate** [1] - 77:25
**difficulties** [1] - 48:17
**digging** [1] - 111:1
**DIRECT** [2] - 20:25, 35:17
**direct** [14] - 4:6, 7:10, 11:22, 16:8, 27:16, 47:18, 61:5, 102:25, 103:13,

103:14, 107:17, 108:21, 109:22, 109:24

**Direct** [1] - 3:4
**direction** [2] - 92:1, 99:18
**directly** [3] - 28:7, 42:13, 56:17
**Director** [6] - 12:7, 12:17, 15:19, 27:21, 28:4, 28:11
**disagree** [3] - 90:20, 91:24, 117:4
**disclose** [2] - 25:8, 106:23
**disclosed** [5] - 31:18, 107:15, 108:1, 108:6, 109:16
**disclosure** [1] - 32:7
**discuss** [1] - 31:23
**discussed** [3] - 16:14, 31:24, 75:3
**discusses** [1] - 32:5
**discussing** [1] - 32:17
**discussion** [5] - 15:20, 16:3, 16:8, 32:3, 107:2
**display** [1] - 103:10
**displaying** [1] - 103:6
**dispute** [2] - 8:1, 113:22
**disputes** [1] - 113:25
**distinguish** [2] - 95:14, 96:1
**distress** [1] - 39:11
**distribute** [2] - 66:10, 69:18
**district** [2] - 22:3, 119:13
**DISTRICT** [3] - 1:1, 1:1, 1:14
**District** [3] - 2:11, 2:11, 119:13
**dividend** [9] - 11:1, 18:20, 24:24, 68:18, 114:9, 115:10, 115:12, 115:14, 115:23
**dividends** [46] - 8:22, 9:20, 9:23, 10:3, 11:12, 11:23, 12:20, 13:6, 13:11, 13:19, 14:11, 14:20, 15:1, 16:1, 17:20, 17:22, 17:25, 18:8, 18:15, 18:19, 18:23, 18:25, 19:4, 27:5, 27:8, 27:13, 28:20, 28:23,

29:4, 29:14, 66:10, 67:20, 68:11, 68:21, 68:22, 68:23, 68:24, 69:5, 69:6, 69:10, 69:16, 69:20, 70:1, 70:4
**document** [4] - 12:4, 16:13, 17:3, 89:1
**documentation** [1] - 23:12
**documents** [4] - 16:23, 54:3, 54:4, 55:18
**dollar** [2] - 58:15, 78:24
**dollars** [3] - 46:12, 79:12, 84:13
**done** [4] - 51:2, 52:2, 60:2, 66:19
**dot** [10] - 85:6, 85:18, 86:15, 87:1, 87:5, 89:23, 99:24, 100:2, 100:8, 100:17
**dot's** [1] - 90:13
**dots** [2] - 85:14, 85:16, 87:14, 87:19, 99:13
**down** [30] - 13:8, 19:10, 22:22, 29:20, 30:14, 33:9, 49:16, 50:21, 50:23, 50:25, 75:12, 80:10, 83:24, 84:11, 86:24, 87:10, 88:21, 89:3, 90:11, 90:14, 90:25, 91:3, 92:19, 93:25, 94:6, 94:23, 100:8, 100:21, 110:14
**Dr** [54] - 31:19, 31:20, 32:1, 32:5, 32:13, 32:23, 33:21, 34:2, 34:7, 34:9, 34:19, 35:21, 51:25, 53:1, 53:8, 53:17, 53:21, 53:23, 54:12, 54:24, 55:15, 55:25, 58:9, 58:10, 58:12, 59:7, 62:7, 64:6, 64:17, 65:12, 65:14, 72:10, 74:18, 74:21, 74:24, 80:17, 87:21, 97:6, 97:11, 101:12, 101:14, 106:23, 107:6, 108:4, 109:2, 109:5, 109:13, 109:14, 109:17, 115:25, 117:14, 117:21
**dramatic** [4] - 66:17, 66:23, 66:24, 67:16

**draw** [2] - 20:15, 63:13
**draws** [1] - 114:13
**drive** [1] - 69:4
**driven** [1] - 65:25
**drives** [1] - 69:4
**drop** [11] - 25:19, 32:6, 62:1, 62:5, 65:13, 66:25, 67:10, 89:4, 95:20, 95:21, 98:25
**dropped** [2] - 86:23, 87:6
**due** [2] - 40:22, 104:19
**During** [1] - 17:13
**during** [11] - 11:23, 12:25, 16:23, 17:8, 17:22, 28:25, 39:2, 68:11, 68:19, 103:13, 103:14
**dynamics** [1] - 39:1

**E**

**early** [2] - 75:7, 114:18
**earnings** [3] - 68:25, 99:24, 110:25
**ECF** [2] - 112:9, 113:5
**economic** [3] - 36:19, 37:8, 40:5
**Economic** [1] - 42:15
**economically** [1] - 96:5
**economics** [7] - 36:14, 36:18, 37:7, 37:8, 44:15, 49:21, 51:13
**economist** [3] - 40:22, 41:17, 73:24
**economists** [3] - 40:10, 52:23, 53:2
**economy** [3] - 46:10, 78:10, 79:11
**editor** [1] - 39:19
**educational** [3] - 21:8, 36:13, 44:5
**EDWARD** [1] - 6:25
**Edward** [1] - 3:6
**Edwards** [1] - 119:12
**EDWARDS** [2] - 2:10, 119:3
**effect** [11] - 50:13, 62:23, 63:1, 63:23, 64:1, 70:22, 82:13, 87:2, 92:3, 92:25, 96:6

**effective** [1] - 29:13
**effects** [1] - 92:5
**efficiency** [2] - 33:18, 34:14
**efficient** [2] - 33:8, 34:11
**either** [13] - 13:20, 14:11, 15:2, 19:5, 34:4, 60:24, 65:17, 79:6, 81:1, 81:17, 101:25, 107:1, 117:11
**elected** [2] - 22:2, 22:6
**elicit** [3] - 101:17, 102:13, 102:15
**eliminated** [6] - 12:20, 12:23, 13:6, 16:2, 16:5, 67:20
**elsewhere** [1] - 90:17
**email** [1] - 6:1
**emails** [1] - 54:3
**embodied** [1] - 79:20
**emerge** [1] - 65:17
**emphasis** [2] - 36:19, 117:11
**employ** [1] - 23:2
**employed** [1] - 35:21
**enacted** [2] - 78:4, 78:13
**end** [5] - 50:14, 86:23, 87:1, 92:9, 100:3
**engagements** [4] - 43:1, 43:7, 43:9, 43:11
**enhance** [1] - 28:6
**enjoyed** [1] - 40:12
**entered** [8] - 6:18, 10:14, 13:16, 30:11, 31:3, 44:12, 55:23, 61:17
**enterprise** [2] - 78:6, 94:5
**enterprises** [3] - 9:6, 9:16, 77:7
**enterprises'** [2] - 81:25, 92:23
**entire** [9] - 34:17, 50:20, 50:25, 66:18, 82:5, 82:10, 94:20, 107:2, 109:19
**entirely** [2] - 102:9, 103:2
**entities** [4] - 65:18, 71:20, 73:14, 78:10
**entity** [2] - 79:18, 105:10
**equity** [1] - 80:18
**ESQ** [11] - 1:17, 1:20,

1:20, 1:23, 2:2, 2:2, 2:5, 2:6, 2:6, 2:7, 2:7
**essentially** [1] - 86:17
**established** [5] - 62:10, 77:13, 77:15, 77:19, 78:19
**establishing** [1] - 65:24
**estimate** [2] - 55:9, 91:18
**estimated** [3] - 46:11, 51:13, 102:6
**estimates** [1] - 74:9
**estimating** [1] - 43:1
**et** [4] - 1:3, 1:7, 55:13, 117:8
**evaluate** [2] - 53:4, 71:20
**evaluating** [3] - 50:2, 50:3, 117:18
**evaporated** [1] - 102:23
**Event** [2] - 81:17, 82:3
**event** [81] - 31:24, 32:14, 34:8, 34:18, 34:20, 35:3, 49:21, 49:23, 49:24, 50:9, 51:2, 51:8, 51:11, 51:12, 51:16, 51:25, 52:5, 52:9, 52:13, 52:14, 52:16, 52:22, 52:24, 53:2, 53:18, 53:23, 54:10, 54:17, 54:19, 55:10, 55:14, 55:25, 56:4, 62:2, 62:9, 66:13, 66:25, 67:11, 80:12, 80:18, 80:23, 81:1, 81:5, 81:7, 81:8, 81:12, 81:17, 81:18, 81:19, 81:23, 82:3, 82:4, 82:9, 82:11, 82:12, 82:16, 82:20, 82:23, 92:21, 92:24, 93:2, 93:4, 93:8, 95:6, 95:12, 95:18, 95:19, 95:24, 95:25, 98:18, 98:24, 103:11, 107:5, 107:6, 109:3, 115:14
**events** [1] - 35:7
**eventually** [1] - 69:3
**EVIDENCE** [1] - 3:12
**evidence** [14] - 12:2, 27:20, 30:5, 30:11, 30:21, 31:3, 44:8, 44:12, 54:15, 55:19, 55:23, 80:15, 103:9, 111:6

**evidentiary** [1] - 4:15
**exact** [4] - 33:4, 33:10, 107:14, 109:23
**exactly** [3] - 83:13, 87:15, 89:7
**examination** [13] - 6:23, 7:10, 27:16, 102:11, 103:13, 103:14, 104:3, 107:7, 107:25, 108:11, 109:12, 109:15, 109:20
**EXAMINATION** [8] - 7:1, 15:13, 20:25, 26:9, 28:17, 35:17, 74:16, 97:9
**examine** [2] - 74:13, 107:24
**examined** [5] - 4:4, 75:22, 107:15, 107:16, 108:2
**example** [1] - 99:15
**examples** [1] - 7:11
**excellent** [1] - 89:8
**excerpts** [1] - 111:19
**Exchange** [1] - 43:19
**exclude** [1] - 93:3
**excluding** [1] - 93:7
**excuse** [1] - 10:2
**excused** [3] - 19:11, 29:21, 110:15
**execution** [1] - 39:23
**exhibit** [3] - 30:20, 103:7, 103:8
**Exhibit** [19] - 3:13, 3:14, 3:14, 3:15, 12:2, 15:17, 16:24, 27:19, 27:24, 30:5, 30:10, 30:21, 31:2, 43:22, 44:7, 44:11, 55:22, 112:8, 113:4
**exhibits** [3] - 54:22, 54:24, 55:3
**EXHIBITS** [1] - 3:12
**existence** [2] - 36:2, 44:25
**exit** [2] - 11:16, 98:10
**exited** [2] - 60:15, 110:9
**exits** [1] - 38:2
**expect** [4] - 32:24, 64:10, 66:14, 66:25
**expectations** [4] - 20:8, 20:9, 20:14, 20:18
**expected** [5] - 20:11, 67:4, 67:12, 67:15, 67:21
**experience** [4] - 37:17, 38:25, 41:11,

52:13
**expert** [30] - 5:9, 7:20, 32:2, 35:23, 42:16, 42:21, 43:6, 43:14, 43:17, 44:14, 47:25, 48:19, 52:15, 53:1, 63:4, 63:8, 64:3, 92:24, 93:6, 93:10, 96:4, 96:6, 99:5, 106:23, 107:3, 107:20, 109:5, 114:4, 116:2
**expert's** [1] - 52:5
**expertise** [2] - 38:20, 39:6
**experts** [3] - 51:19, 51:21, 53:3
**explain** [13] - 35:2, 36:4, 53:10, 56:21, 57:11, 58:13, 62:20, 74:3, 103:3, 104:10, 108:13, 108:18, 109:19
**explained** [1] - 85:20
**explaining** [2] - 62:14, 111:16
**explains** [1] - 112:25
**express** [1] - 52:3
**expressed** [2] - 58:22, 96:4
**expresses** [1] - 58:14
**extensive** [2] - 75:24, 117:10
**extensively** [2] - 78:2, 112:15
**extent** [1] - 116:9
**eyeball** [2] - 89:1, 90:16

# F

**facilitate** [1] - 78:10
**fact** [13] - 17:19, 17:24, 18:8, 18:13, 20:16, 27:7, 29:3, 29:15, 62:4, 64:10, 92:3, 102:16, 115:20
**factor** [2] - 29:14
**factors** [1] - 113:8
**facts** [3] - 52:22, 52:23, 99:4
**failing** [1] - 117:6
**failure** [1] - 115:14
**failures** [2] - 39:12, 39:13
**fair** [3] - 25:5, 86:12, 100:2
**FAIRHOLME** [1] -

1:3
**fairly** [3] - 44:4, 48:16, 112:24
**fairness** [1] - 111:8, 111:15
**faithfully** [1] - 25:25
**fall** [6] - 67:22, 68:20, 74:7, 104:7, 106:15, 107:22
**familiar** [5] - 10:6, 10:17, 10:19, 45:17, 45:18
**fancy** [2] - 94:7, 94:22
**Fannie** [106] - 8:16, 8:19, 9:19, 9:23, 10:10, 11:1, 11:11, 11:16, 11:19, 18:14, 18:18, 21:3, 24:23, 26:21, 28:5, 45:17, 47:5, 48:1, 48:23, 49:7, 49:12, 49:15, 49:19, 50:16, 54:2, 56:1, 56:24, 57:1, 57:3, 57:7, 57:24, 58:3, 58:19, 58:23, 62:18, 62:20, 62:22, 63:5, 63:9, 63:14, 63:20, 63:22, 64:7, 64:8, 64:18, 65:9, 65:21, 66:8, 69:10, 70:6, 70:13, 70:14, 72:19, 72:21, 73:17, 76:6, 77:8, 77:18, 78:2, 78:3, 78:18, 78:22, 79:6, 79:18, 80:1, 80:6, 82:21, 82:24, 83:12, 84:5, 84:16, 84:17, 84:23, 87:9, 87:10, 88:6, 88:17, 89:2, 90:4, 91:22, 92:14, 92:16, 93:23, 94:8, 94:13, 94:23, 96:10, 96:20, 96:25, 98:25, 99:15, 99:18, 99:24, 104:5, 104:6, 104:10, 104:12, 104:25, 105:11, 105:20, 104:12, 110:22, 112:1, 112:6
**FANNIE** [2] - 1:10, 2:6
**Fargo** [2] - 46:22, 76:3
**faster** [3] - 94:9, 94:14, 94:24
**federal** [3] - 43:13, 97:24, 98:8
**Federal** [4] - 17:1,

79:8, 111:3, 111:10
**FEDERAL** [1] - 1:6
**fell** [8] - 32:22, 50:17, 52:6, 57:15, 57:19, 58:25, 65:9, 65:21
**fellow** [1] - 38:13
**felt** [2] - 23:6, 23:23
**few** [9] - 4:16, 31:16, 40:13, 41:3, 53:7, 64:11, 65:25, 75:4, 83:23
**FHFA** [14] - 2:6, 12:7, 15:19, 25:2, 27:21, 28:4, 29:3, 47:6, 54:2, 70:12, 105:1, 112:5, 112:12, 112:17
**FHFA's** [1] - 48:1
**field** [3] - 37:10, 51:12, 53:3
**fifteen** [1] - 18:6
**file** [12] - 5:20, 5:21, 5:24, 5:25, 6:1, 6:5, 6:7, 25:21, 114:2, 114:23, 115:2
**filed** [4] - 5:9, 6:7, 101:15, 114:24
**filings** [1] - 54:2
**FINANCE** [1] - 1:6
**finance** [2] - 37:9, 38:17
**Finance** [5] - 17:1, 37:18, 37:19, 37:23, 38:25
**financial** [55] - 17:17, 36:18, 36:19, 36:20, 37:7, 37:8, 37:11, 37:12, 37:22, 37:24, 39:4, 39:11, 40:9, 40:10, 40:11, 40:14, 40:22, 41:4, 41:6, 41:17, 41:18, 41:20, 42:7, 44:15, 45:8, 46:1, 46:7, 46:9, 46:10, 46:15, 46:22, 48:17, 49:18, 49:21, 51:12, 52:23, 53:2, 54:1, 63:11, 64:9, 64:10, 66:18, 73:24, 75:8, 75:25, 76:1, 76:8, 76:22, 77:6, 96:19, 97:13, 104:15
**fine** [5] - 78:1, 86:10, 89:7, 92:17
**finished** [1] - 4:5
**firm** [9] - 22:17, 22:19, 22:25, 23:2, 38:3, 68:25, 69:3, 69:19, 71:1
**firm's** [1] - 47:22
**firms** [7] - 47:13,

48:5, 48:6, 63:18, 64:16, 69:24, 70:23
**first** [16] - 6:10, 12:10, 12:14, 22:2, 28:2, 72:1, 75:18, 76:13, 110:19, 112:22, 113:6, 114:7, 116:5, 116:19, 116:20, 117:11
**five** [1] - 4:6
**FLEXNER** [1] - 1:21
**flip** [1] - 59:23
**floor** [1] - 94:4
**focus** [8] - 27:25, 36:16, 36:18, 37:10, 78:24, 79:21, 87:8
**focused** [7] - 38:22, 38:24, 82:7, 82:8, 84:16, 96:11, 96:15
**focusing** [3] - 39:2, 85:2, 86:13
**followed** [1] - 108:21
**following** [11] - 6:19, 31:12, 35:9, 60:16, 60:18, 61:18, 101:7, 103:22, 106:19, 110:4, 110:10
**follows** [1] - 16:19
**followup** [1] - 97:11
**footnote** [2] - 34:11, 34:12
**FOR** [5] - 1:1, 1:17, 1:20, 2:5, 3:5
**foregoing** [1] - 119:4
**forever** [1] - 67:21
**former** [2] - 112:1
**forth** [1] - 117:22
**forward** [2] - 35:11, 61:8
**foundation** [2] - 24:7, 112:10
**four** [6] - 23:3, 31:17, 31:23, 100:24, 106:9, 106:10
**frankly** [1] - 117:9
**FREDDIE** [1] - 2:6
**Freddie** [86] - 8:16, 8:19, 9:19, 9:23, 10:11, 11:1, 11:11, 11:16, 11:19, 18:14, 21:4, 23:14, 23:22, 23:23, 24:1, 24:5, 24:18, 24:23, 26:13, 26:16, 26:19, 26:24, 27:2, 27:4, 27:5, 28:6, 45:17, 47:5, 48:2, 49:7, 54:2, 57:12, 57:17, 57:23, 58:25, 62:18, 62:25, 63:11, 63:25, 64:12, 65:9,

66:8, 69:10, 70:6, 70:14, 72:25, 73:1, 73:3, 73:4, 73:14, 76:6, 77:8, 77:18, 78:2, 78:3, 78:18, 78:22, 79:6, 79:19, 80:3, 80:6, 82:21, 82:22, 82:24, 89:12, 89:13, 89:15, 89:18, 90:11, 90:18, 90:22, 90:25, 91:20, 91:21, 93:24, 94:8, 94:13, 94:23, 96:10, 96:20, 96:25, 104:12, 104:25, 105:11, 105:21

**Freddie's** [23] - 18:18, 48:23, 49:12, 49:16, 49:19, 50:17, 56:1, 62:20, 63:5, 63:10, 63:20, 64:7, 64:18, 65:21, 70:15, 83:12, 99:1, 99:15, 99:18, 104:5, 104:6, 104:11, 106:15

**freely** [1] - 115:24
**front** [5] - 43:25, 46:13, 50:16, 102:22, 113:25
**frustrated** [1] - 20:7
**fulfill** [1] - 28:6
**full** [5] - 5:14, 38:17, 47:24, 79:16, 119:5
**function** [1] - 73:17
**funds** [10] - 46:14, 75:7, 77:5, 78:25, 79:1, 79:6, 79:25, 80:1, 80:2, 98:8
**FUNDS** [1] - 1:3
**future** [6] - 66:11, 68:16, 68:24, 69:5, 97:3, 101:20

### G

**gained** [5] - 88:8, 88:10, 88:11, 88:22
**gather** [4] - 51:18, 75:21, 81:10, 81:13
**General** [2] - 46:20, 76:2
**general** [4] - 8:10, 24:21, 45:25, 46:5
**generally** [4] - 25:10, 42:8, 77:20, 93:19
**generated** [2] - 54:19, 70:23
**gentlemen** [1] - 20:4
**given** [5] - 52:1,

59:18, 66:12, 71:13, 72:5
**global** [2] - 40:9, 41:6
**goal** [3] - 28:1, 28:4, 104:23
**goals** [1] - 104:17
**golden** [1] - 110:24
**Goldman** [2] - 76:4, 79:1
**government** [33] - 22:17, 22:19, 25:25, 36:20, 38:2, 42:12, 43:13, 43:16, 44:15, 46:1, 46:3, 46:24, 48:12, 65:18, 75:7, 75:13, 75:17, 76:5, 76:13, 76:21, 77:5, 77:7, 78:5, 78:9, 78:21, 80:1, 80:2, 80:5, 97:24, 98:8, 98:10, 98:11
**Government** [1] - 42:14
**government's** [6] - 46:6, 46:8, 75:8, 76:7, 76:22, 77:6
**government-sponsored** [2] - 77:7, 78:5
**grad** [1] - 41:13
**graph** [12] - 84:5, 85:13, 86:4, 86:20, 87:23, 88:5, 89:11, 89:12, 90:3, 90:10, 90:24, 103:6
**graphs** [1] - 84:2
**grateful** [1] - 113:21
**gray** [25] - 84:7, 84:18, 84:22, 84:25, 85:3, 85:17, 85:18, 86:8, 86:9, 86:16, 86:17, 86:22, 87:7, 87:8, 88:3, 89:14, 90:9, 90:11, 91:7, 91:11, 91:22, 92:14, 100:13, 100:14
**great** [3] - 38:24, 60:6, 92:18
**Great** [2] - 37:18, 38:24
**greater** [6] - 48:7, 59:5, 59:6, 80:8, 92:4, 117:10
**GROSSMAN** [1] - 2:3
**group** [1] - 22:20
**grow** [1] - 19:2
**growth** [1] - 23:25
**GSE** [1] - 110:25
**GSEs** [4] - 77:7,

78:8, 114:8
**GSEs'** [2] - 111:2, 111:14
**guess** [2] - 18:4, 61:6
**guts** [8] - 55:6, 55:10, 59:25, 80:23, 81:3, 85:21, 98:22, 99:4

### H

**half** [2] - 65:15, 83:23
**HAMISH** [1] - 1:20
**Hampshire** [1] - 1:18
**hand** [4] - 10:10, 10:11, 20:1, 35:13
**happy** [2] - 60:12, 77:24
**harm** [2] - 45:8, 74:4
**harmed** [3] - 25:14, 25:17, 68:10
**HARP** [1] - 97:18
**hate** [1] - 5:4
**headers** [1] - 84:24
**hear** [4] - 4:20, 20:12, 21:18, 118:1
**heard** [5] - 4:16, 49:9, 67:6, 68:13, 106:18
**hearing** [3] - 19:18, 116:12, 117:1
**heavily** [1] - 119:3
**heavy** [2] - 65:16, 65:21
**held** [2] - 25:25, 115:13
**help** [4] - 28:5, 36:4, 78:10, 88:16
**helping** [1] - 37:22
**hereby** [1] - 119:3
**hiding** [1] - 43:23
**higher** [2] - 70:2, 101:19
**highest** [1] - 86:17
**highlight** [3] - 12:14, 28:2, 47:15
**highlighting** [1] - 62:17
**highly** [4] - 33:7, 33:13, 34:10, 76:23
**hill** [3] - 99:25, 100:9, 100:13
**himself** [2] - 40:23, 53:18
**hired** [4] - 43:6, 43:8, 43:13, 43:16
**historic** [1] - 66:24

**historical** [2] - 48:10, 48:18
**historically** [2] - 48:10, 48:18
**history** [3] - 23:7, 36:19, 36:21
**hit** [2] - 29:13, 94:4
**HOFFMAN** [29] - 2:6, 6:24, 7:2, 7:4, 7:6, 9:9, 9:12, 11:6, 11:8, 12:1, 12:3, 12:13, 12:16, 13:8, 13:9, 14:3, 15:10, 16:10, 18:9, 24:6, 26:7, 26:10, 27:25, 28:3, 28:13, 29:7, 30:8, 30:15, 30:23
**Hoffman** [2] - 7:5, 26:11
**hold** [1] - 104:13
**holding** [1] - 88:17
**Honor** [64] - 4:2, 4:23, 5:3, 5:4, 6:24, 9:7, 15:10, 15:12, 18:9, 19:8, 19:13, 20:24, 24:6, 24:10, 26:6, 26:8, 28:13, 28:15, 28:16, 29:18, 29:22, 30:4, 30:6, 30:18, 31:6, 31:10, 31:14, 31:20, 32:1, 32:9, 33:20, 34:6, 34:16, 35:15, 44:13, 44:21, 53:14, 60:22, 61:14, 67:7, 68:5, 72:14, 74:14, 97:8, 101:5, 101:9, 102:15, 103:4, 103:24, 106:17, 106:21, 107:4, 107:13, 108:3, 108:16, 109:1, 109:11, 113:17, 114:14, 115:6, 116:13, 116:17, 117:2, 118:2
**HONORABLE** [1] - 1:14
**hope** [1] - 65:3
**hoping** [2] - 4:21, 87:21
**Housing** [1] - 17:1
**housing** [6] - 63:15, 64:13, 75:25, 76:7, 78:10
**HOUSING** [1] - 1:6
**huge** [2] - 62:3, 70:10, 87:6
**Hume** [3] - 5:2, 115:6, 117:23
**HUME** [8] - 1:20, 5:2,

5:8, 5:16, 6:15, 113:17, 113:21, 114:6
**hundreds** [1] - 52:12

### I

**IAN** [1] - 2:6
**Ian** [2] - 7:4, 26:11
**idea** [2] - 61:2, 69:25
**identified** [1] - 66:13
**illustrate** [1] - 84:3
**illustrates** [2] - 56:5, 57:11
**imagine** [4] - 84:25, 85:18, 86:8, 88:4
**impact** [12] - 51:8, 81:24, 92:22, 93:4, 95:14, 95:15, 96:1, 96:2, 107:11, 109:4, 109:7, 114:3
**implied** [1] - 12:25
**implies** [1] - 13:3
**importance** [2] - 37:18, 39:22
**important** [3] - 32:25, 62:6, 62:11
**imposed** [1] - 45:5
**impression** [1] - 102:22
**improve** [1] - 69:1
**improving** [1] - 63:16
**IN** [2] - 1:10, 3:12
**inapt** [4] - 76:15, 76:18, 76:23, 76:25
**INC** [1] - 1:3
**included** [2] - 56:12, 92:3
**including** [4] - 20:13, 42:13, 54:1, 75:25
**incorrect** [1] - 117:18
**increase** [1] - 69:25
**increases** [7] - 31:24, 32:3, 63:9, 64:4, 64:6, 83:11, 83:17
**independently** [1] - 64:17
**indicate** [1] - 62:8
**indicates** [1] - 62:9
**indication** [1] - 59:13
**individual** [6] - 20:10, 20:13, 20:14, 20:17, 20:18
**indulgence** [3] - 15:10, 26:7, 28:13
**industry** [2] - 63:14, 64:13

**infer** [1] - 62:4
**inferences** [1] - 20:16
**information** [13] - 25:9, 34:14, 50:6, 51:2, 51:9, 52:7, 53:5, 53:24, 65:3, 65:5, 65:6, 66:2, 79:22
**informative** [2] - 33:7, 34:10
**informed** [1] - 36:22
**infusion** [1] - 38:1
**initial** [1] - 104:20
**injecting** [1] - 46:9
**injections** [2] - 46:11, 46:14
**inside** [2] - 19:1, 19:3
**insinuated** [1] - 102:16
**instabilities** [1] - 28:8
**instance** [2] - 79:8, 79:16
**instead** [2] - 85:1, 117:20
**institution** [3] - 39:11, 47:11
**institutions** [5] - 37:22, 37:25, 39:2, 45:22, 46:23
**instruction** [3] - 19:17, 19:22, 117:19
**instructions** [2] - 71:10, 118:1
**Insurance** [15] - 7:7, 7:12, 7:18, 8:2, 8:4, 8:15, 8:18, 8:24, 9:15, 10:22, 13:10, 13:19, 14:10, 14:19, 14:25
**insurance** [8] - 7:11, 7:15, 7:18, 7:23, 8:2, 8:7, 46:18
**integral** [2] - 32:12, 43:4
**intend** [2] - 29:23, 34:22
**interest** [15] - 71:3, 71:5, 71:6, 71:14, 71:16, 71:19, 71:21, 71:22, 71:23, 72:12, 73:11, 73:13, 73:16, 77:21
**interested** [4] - 41:18, 41:19, 45:20, 50:10
**interesting** [1] - 41:25
**interfered** [2] - 20:7, 50:4

**interfering** [2] - 5:5, 6:8
**intermediaries** [1] - 46:15
**intermediation** [1] - 37:11
**internal** [1] - 19:2
**interpretation** [2] - 115:7, 115:18
**interrupt** [1] - 6:12
**introduce** [2] - 111:7, 111:9
**introduced** [2] - 16:15, 111:9
**introducing** [1] - 34:8
**invest** [3] - 8:8, 19:3, 23:22
**invested** [9] - 25:1, 49:7, 79:1, 79:6, 79:25, 80:1, 80:3, 80:5
**investing** [1] - 23:23
**investment** [4] - 24:18, 24:22, 49:13, 77:5
**investments** [4] - 8:12, 24:24, 38:3, 75:7
**investors** [3] - 65:16, 67:11, 67:15
**invoking** [1] - 111:3
**involved** [2] - 65:24, 77:21
**involvement** [1] - 98:11
**irrelevant** [2] - 113:10, 116:3
**isolate** [1] - 107:11
**issue** [8] - 5:4, 20:5, 45:10, 98:18, 109:6, 115:7, 116:5, 117:24
**issued** [4] - 16:25, 27:8, 63:11, 64:8
**issues** [4] - 4:24, 77:21, 113:14, 113:16
**itself** [2] - 26:4, 111:9

**J**

**James** [3] - 12:7, 15:19, 27:21
**Janna** [2] - 36:10, 47:15
**January** [1] - 15:1
**job** [2] - 21:22, 38:18
**joined** [1] - 21:23
**Joint** [1] - 42:15

**joint** [4] - 72:15, 110:20, 112:9, 113:4
**JONATHAN** [1] - 2:7
**Jones** [11] - 31:14, 32:11, 33:20, 100:23, 101:9, 102:11, 102:16, 103:4, 106:21, 108:23, 109:1
**JONES** [37] - 2:7, 31:10, 31:14, 33:20, 44:9, 44:17, 53:14, 55:20, 61:4, 67:7, 67:13, 68:5, 69:13, 74:14, 74:17, 74:21, 74:23, 80:10, 80:11, 80:14, 80:16, 84:2, 84:4, 89:9, 89:10, 92:19, 92:20, 94:21, 97:5, 98:13, 101:5, 101:9, 103:4, 105:16, 106:17, 106:21, 109:1
**Joseph** [6] - 3:8, 3:10, 29:24, 30:16, 31:7, 35:20
**JOSEPH** [1] - 35:14
**journal** [2] - 39:19, 39:24
**journals** [2] - 39:10, 39:16
**JP** [2] - 46:21, 76:3
**JUDGE** [1] - 1:14
**July** [4] - 1:7, 71:17, 83:6, 119:10
**junior** [34] - 56:24, 57:1, 57:3, 57:7, 57:12, 57:13, 57:24, 57:25, 58:19, 58:23, 62:22, 62:25, 63:22, 63:25, 82:21, 82:22, 84:6, 84:7, 84:8, 84:17, 84:18, 84:23, 87:9, 87:10, 88:18, 89:14, 89:15, 89:18, 90:9, 90:11, 90:18, 91:8, 91:21, 91:22
**jurors** [1] - 36:25
**jury** [36] - 4:18, 4:21, 5:15, 6:14, 6:16, 6:17, 6:18, 7:4, 21:8, 21:18, 31:13, 34:17, 35:5, 53:10, 56:21, 60:15, 61:9, 61:16, 61:17, 66:4, 72:17, 73:18, 74:3, 74:15, 79:23, 88:16, 101:8, 102:19, 102:22, 106:20, 109:19, 110:9, 113:25, 115:20, 116:16, 117:25
**JURY** [1] - 1:13

**jury's** [1] - 19:18
**Justice** [1] - 43:18

**K**

**KAYE** [1] - 2:8
**keep** [1] - 6:5
**KENYA** [1] - 1:20
**KESSLER** [1] - 1:23
**key** [2] - 16:8, 16:17
**KHALELAH** [1] - 1:20
**kind** [20] - 5:11, 5:18, 6:4, 22:18, 37:23, 40:24, 41:19, 41:21, 47:8, 48:16, 52:23, 53:2, 59:16, 69:21, 71:24, 85:14, 85:17, 86:8, 87:3, 114:10
**King** [1] - 1:24
**KIRK** [1] - 1:18
**knowing** [1] - 6:2
**knowledge** [2] - 112:11, 113:8
**known** [3] - 67:20, 112:17, 114:17
**KRAVETZ** [3] - 2:2, 30:2, 60:22
**Kravetz** [2] - 30:2, 60:22

**L**

**labeled** [2] - 85:7, 89:23
**lack** [1] - 24:6
**lacks** [2] - 96:5, 112:10
**ladies** [1] - 20:4
**LAMBERTH** [1] - 1:14
**large** [6] - 29:13, 46:15, 46:18, 46:22, 65:25, 104:16
**larger** [2] - 46:14, 70:24
**largest** [1] - 41:16
**last** [14] - 5:19, 5:21, 6:3, 32:23, 33:4, 33:12, 34:5, 34:21, 78:23, 89:11, 90:3, 102:23, 114:19, 116:8
**late** [1] - 114:21
**law** [8] - 66:6, 78:4, 78:13, 115:8, 115:19, 116:2, 116:3, 117:18
**lawsuit** [3] - 25:24, 58:4, 58:6

**lawyer** [1] - 113:24
**lawyers** [1] - 71:11
**layout** [1] - 4:3
**lead** [2] - 21:2, 41:20
**leadership** [1] - 22:1
**leading** [4] - 16:10, 29:7, 98:13, 105:16
**learned** [1] - 25:6
**least** [4] - 18:22, 58:18, 79:1, 96:17
**leave** [3] - 77:3, 108:12, 108:17
**leaves** [1] - 59:15
**leaving** [2] - 102:21, 102:22
**led** [1] - 62:14
**Lee** [7] - 19:13, 19:14, 32:9, 34:6, 61:21, 101:21, 107:13
**LEE** [1] - 1:23
**left** [9] - 21:12, 21:21, 22:15, 49:1, 61:1, 61:24, 84:10, 84:11, 87:22
**leftmost** [1] - 56:24
**legal** [3] - 9:8, 11:4, 51:7
**length** [1] - 113:1
**lengthy** [1] - 23:12
**less** [9] - 59:23, 60:5, 60:6, 60:10, 61:4, 79:17, 79:20, 79:25, 80:2
**liabilities** [2] - 47:23, 48:7
**light** [1] - 66:24
**lighting** [1] - 37:3
**likely** [2] - 62:12, 112:16
**limine** [3] - 5:14, 5:20, 114:20
**limit** [1] - 53:20
**line** [32] - 47:16, 47:18, 84:14, 84:22, 84:25, 85:1, 85:3, 85:16, 85:17, 85:18, 86:7, 86:8, 86:9, 86:16, 86:17, 86:22, 87:7, 87:8, 88:3, 90:9, 90:13, 90:22, 100:10, 100:11, 100:14, 102:11, 107:25, 109:12, 109:14, 109:19
**LINEKIN** [1] - 6:25
**Linekin** [12] - 3:6, 4:4, 7:3, 7:7, 8:11, 8:23, 10:6, 13:10, 15:11, 15:15, 17:19, 19:9

**Lines** [1] - 112:8
**lines** [5] - 7:24,
56:15, 84:25, 91:7,
91:12
**liquidation** [2] -
114:10, 115:15
**LISA** [2] - 2:10, 119:3
**Lisa** [1] - 119:12
**list** [6] - 46:17, 46:18,
54:23, 75:6, 78:16,
78:24
**listed** [1] - 78:17,
97:25, 102:4
**LITIGATION** [1] -
1:11
**litigation** [2] - 10:23,
25:22
**LITOWITZ** [1] - 2:3
**live** [1] - 21:6
**living** [1] - 22:16
**LLP** [3] - 1:21, 1:23,
2:3
**loan** [2] - 39:3, 42:8
**loans** [3] - 45:22,
104:13
**Lockhart** [5] - 12:7,
12:17, 15:19, 27:22,
28:4
**Lockhart's** [1] -
28:11
**lodge** [1] - 108:8
**lodged** [1] - 108:8
**look** [18] - 12:1, 17:6,
27:19, 34:22, 43:20,
50:20, 62:12, 77:24,
79:15, 81:2, 81:7,
84:2, 85:5, 89:21,
90:21, 91:6, 110:16,
113:19
**looked** [7] - 72:9,
89:2, 90:4, 91:20,
91:25, 92:5, 92:13
**looking** [11] - 33:21,
34:7, 49:25, 58:19,
62:16, 63:4, 80:22,
87:23, 95:7, 98:1,
113:21
**looks** [1] - 78:24
**losing** [1] - 28:22
**loss** [6] - 17:21,
29:15, 57:7, 57:16,
57:20, 74:10
**lost** [4] - 65:15,
87:19, 88:6, 88:21
**LOUIS** [1] - 2:7
**Louisiana** [4] -
35:22, 38:9, 38:14,
38:15
**love** [1] - 4:25
**lunch** [1] - 12:5

# M

**Mac** [50] - 8:16,
10:11, 11:1, 11:16,
23:14, 23:22, 23:23,
24:1, 24:5, 24:18,
26:13, 26:17, 26:19,
26:24, 27:2, 27:4,
27:5, 28:6, 54:2,
57:12, 57:17, 57:23,
58:25, 62:25, 63:11,
64:12, 66:8, 73:14,
76:6, 77:8, 77:18,
78:2, 78:3, 78:18,
78:22, 79:19, 80:3,
80:6, 82:22, 89:12,
89:13, 89:18, 90:22,
92:14, 93:24, 94:8,
94:24, 96:10, 96:20,
105:11
**MAC** [2] - 1:10, 2:6
**Mac's** [7] - 63:25,
65:9, 72:25, 73:1,
73:3, 73:4, 82:21
**MAE** [1] - 2:6
**Mae** [48] - 8:16,
10:11, 11:1, 11:16,
26:21, 28:5, 54:2,
56:24, 57:1, 57:3,
57:7, 57:24, 58:3,
58:19, 58:23, 63:14,
63:22, 64:8, 66:8,
73:17, 76:6, 77:8,
77:18, 78:2, 78:3,
78:18, 78:22, 79:18,
80:2, 80:6, 82:21,
84:5, 84:16, 84:23,
88:6, 88:17, 92:16,
93:24, 94:8, 94:23,
96:10, 96:20, 105:11,
110:22, 112:1, 112:7
**Mae's** [4] - 62:22,
65:9, 72:19, 72:21
**MAE/FREDDIE** [1] -
1:10
**magnitude** [4] - 36:3,
44:25, 87:6, 89:3
**manage** [1] - 22:25
**management** [2] -
9:22, 18:25
**mandatory** [2] -
115:11, 115:13
**marine** [1] - 7:19
**market** [38] - 17:18,
28:8, 33:7, 34:9,
34:13, 49:10, 50:6,
50:20, 50:25, 51:4,
57:18, 63:15, 67:11,
67:19, 82:20, 82:24,

84:5, 84:11, 84:22,
87:9, 88:6, 88:7,
88:19, 88:22, 89:2,
89:12, 90:10, 90:24,
91:8, 91:19, 91:25,
92:1, 92:2, 92:3,
92:12, 96:9
**marketing** [1] - 5:9
**marketplace** [2] -
45:24, 50:1
**markets** [3] - 33:8,
34:11, 64:13
**MASON** [1] - 35:14
**Mason** [29] - 3:10,
31:7, 31:19, 31:20,
32:23, 35:20, 35:21,
37:7, 44:14, 44:23,
45:16, 48:22, 54:24,
58:9, 61:25, 68:2,
73:23, 74:11, 74:18,
74:24, 80:17, 87:21,
97:6, 97:11, 104:2,
109:2, 109:13, 113:22
**Mason's** [11] - 32:1,
32:5, 33:21, 34:2,
34:7, 34:19, 74:21,
101:12, 101:14,
106:23, 109:5
**Massachusetts** [1] -
2:8
**master's** [1] - 38:16
**materials** [7] - 36:4,
52:1, 53:24, 54:1,
54:4, 55:11, 80:21
**math** [1] - 91:17
**mathematically** [2] -
91:8, 92:11
**matter** [16] - 36:3,
43:8, 45:12, 45:15,
45:25, 46:5, 52:4,
52:15, 55:9, 70:23,
71:7, 71:8, 85:1,
91:16, 115:8
**matters** [1] - 42:6
**Mayopoulos** [6] -
60:25, 112:2, 112:19,
112:24, 113:3, 113:7
**Mayopoulos's** [1] -
112:21
**MC** [1] - 1:10
**McFarland** [5] -
112:1, 112:3, 112:8,
112:11, 112:15
**McFarland's** [1] -
112:4
**mean** [8] - 39:18,
51:23, 71:22, 77:16,
78:1, 86:19, 103:19,
105:8
**meaning** [2] - 8:12,

97:1
**meaningful** [1] - 50:3
**means** [10] - 11:11,
11:19, 45:8, 47:21,
47:22, 59:12, 71:23,
83:7, 88:17
**meant** [2] - 92:16,
103:3
**meantime** [2] -
110:13, 110:16
**measure** [4] - 65:5,
66:2, 73:24, 74:4
**measured** [1] - 84:12
**measures** [3] -
81:24, 92:22, 92:24
**media** [1] - 40:6
**meeting** [1] - 112:13
**MELTZER** [1] - 1:23
**members** [3] - 7:4,
74:15, 88:16
**mention** [5] - 32:4,
33:23, 95:10, 107:8,
109:6
**mentioned** [11] -
7:10, 7:14, 10:18,
18:24, 20:4, 38:5,
39:14, 73:13, 91:4,
100:23, 114:2
**merchandiser** [1] -
21:13
**message** [2] - 112:6,
112:17
**method** [3] - 49:24,
93:3, 93:7
**methodological** [2] -
33:18, 108:4
**methodologically**
[2] - 33:1, 33:14
**methodology** [1] -
49:18
**mic** [1] - 21:10
**middle** [2] - 73:20,
85:6
**might** [7] - 18:7,
49:25, 50:4, 55:6,
59:14, 61:4, 96:18
**million** [20] - 8:19,
57:4, 57:5, 57:15,
57:16, 57:19, 57:20,
72:22, 72:23, 72:25,
73:4, 73:5, 73:6, 73:7,
73:8, 89:3, 90:18,
91:3, 91:13
**millions** [1] - 84:12
**mind** [1] - 60:13
**minute** [1] - 30:18
**minutes** [9] - 4:6,
4:9, 4:16, 53:7, 60:13,
61:4, 61:6, 75:4,
102:19

**mischaracterizes** [1]
- 94:15
**misleading** [3] -
76:24, 102:22, 103:9
**mission** [3] - 28:6,
78:6, 78:20
**missions** [7] - 77:13,
77:17, 77:19, 77:23,
78:8, 78:14, 78:15
**misspoke** [1] - 92:18
**mitigate** [1] - 28:7
**mixture** [1] - 19:3
**model** [4] - 34:17,
55:6, 55:8, 59:7
**modesty** [1] - 41:1
**modifications** [1] -
42:9
**moment** [3] - 10:21,
26:8, 108:12
**moments** [1] -
112:15
**money** [12] - 8:8,
25:12, 46:9, 61:10,
61:13, 66:21, 69:22,
69:23, 70:23, 79:8,
79:11, 97:2
**Montgomery** [4] -
12:2, 12:15, 13:8,
27:25
**Morgan** [3] - 46:21,
76:3, 76:4
**morning** [10] - 6:1,
6:6, 6:7, 16:14, 110:2,
113:14, 114:23,
116:15, 117:17
**mortgage** [13] -
42:23, 70:15, 93:25,
94:7, 95:4, 95:10,
95:16, 95:23, 96:3,
104:5, 104:11, 107:9,
107:18
**mortgage-backed**
[1] - 42:23
**mortgages** [3] -
45:23, 46:21, 105:13
**most** [1] - 78:25
**mostly** [1] - 39:10
**motion** [11] - 5:20,
5:21, 5:24, 5:25, 6:2,
6:6, 101:15, 108:7,
108:17, 114:2, 114:17
**motions** [2] - 5:13,
114:19
**Motors** [2] - 46:20,
76:2
**mouthpiece** [1] -
109:17
**move** [12] - 30:5,
30:20, 44:7, 57:10,
81:22, 86:16, 86:21,

87:22, 99:15, 99:18, 114:19, 114:20
**moved** [5] - 21:16, 34:25, 54:14, 58:23, 62:11
**movement** [15] - 33:9, 33:17, 49:25, 50:2, 50:5, 52:17, 59:17, 59:21, 60:3, 60:8, 62:13, 65:24, 66:7, 66:17, 90:14
**movements** [14] - 32:25, 34:23, 53:4, 56:1, 59:9, 62:15, 62:18, 64:18, 64:22, 65:1, 87:16, 87:24, 101:24, 102:18
**moving** [3] - 64:24, 85:18, 92:1
**MR** [158] - 4:2, 4:11, 4:14, 4:20, 4:23, 5:2, 5:8, 5:16, 6:15, 6:24, 7:2, 7:4, 7:6, 9:7, 9:9, 9:12, 11:4, 11:6, 11:8, 12:1, 12:3, 12:13, 12:16, 13:8, 13:9, 14:3, 15:10, 15:14, 16:10, 16:12, 18:9, 18:12, 19:7, 19:13, 20:22, 20:24, 21:1, 24:6, 24:9, 24:12, 26:6, 26:7, 26:10, 27:25, 28:3, 28:13, 28:16, 28:18, 29:7, 29:10, 29:18, 29:22, 30:2, 30:8, 30:15, 30:18, 30:23, 30:25, 31:6, 31:9, 31:10, 31:14, 32:9, 33:20, 34:6, 35:15, 35:18, 36:10, 36:11, 36:22, 37:2, 37:5, 37:6, 44:7, 44:9, 44:13, 44:17, 44:19, 44:21, 44:22, 47:15, 47:17, 53:14, 53:19, 55:18, 55:20, 55:24, 60:22, 61:4, 61:6, 61:13, 61:21, 61:23, 67:7, 67:9, 67:13, 67:18, 68:5, 68:8, 69:13, 70:3, 72:14, 73:9, 74:11, 74:14, 74:17, 74:21, 74:23, 80:10, 80:11, 80:14, 80:16, 84:2, 84:4, 89:9, 89:10, 92:19, 92:20, 94:15, 94:21, 97:5, 97:8, 97:10, 98:13, 98:16, 99:10, 99:12, 100:21,

100:22, 101:5, 101:9, 101:21, 102:15, 103:4, 103:14, 103:24, 104:1, 105:16, 105:19, 106:17, 106:21, 107:13, 108:21, 109:1, 109:11, 109:23, 113:17, 113:21, 114:6, 115:4, 116:9, 116:13, 116:17, 116:20, 116:25, 117:2, 118:2, 118:3
**Mukarram** [2] - 3:9, 31:4
**must** [1] - 93:2

# N

**name** [3] - 19:16, 20:19, 35:19
**named** [1] - 29:24
**National** [1] - 40:20
**nationally** [1] - 41:16
**near** [2] - 85:5, 89:21
**nearly** [1] - 80:5
**necessarily** [2] - 86:5, 86:6
**need** [2] - 30:15, 113:16
**needs** [2] - 6:11, 109:18
**negative** [9] - 20:16, 32:15, 32:20, 33:3, 33:16, 34:25, 57:6, 58:20
**negatively** [1] - 33:15
**negotiations** [1] - 113:10
**negotiators** [1] - 113:8
**net** [64] - 13:24, 14:7, 15:7, 19:5, 25:3, 25:11, 25:15, 25:17, 25:22, 26:3, 28:25, 32:21, 45:3, 47:25, 48:20, 48:24, 49:3, 49:11, 50:10, 50:11, 51:6, 56:8, 56:9, 56:25, 57:3, 58:24, 66:4, 66:6, 66:12, 67:4, 68:3, 68:10, 68:19, 70:4, 70:9, 70:13, 71:15, 74:1, 74:6, 82:13, 93:10, 93:13, 93:15, 93:18, 93:22, 95:3, 95:14, 95:21, 96:1, 96:6,

96:18, 96:23, 101:2, 102:7, 102:20, 104:3, 106:12, 106:25, 107:11, 107:19, 107:21, 108:9, 108:18, 109:4
**never** [8] - 26:3, 29:16, 40:11, 48:21, 66:19, 66:20, 66:21, 108:8
**New** [4] - 1:18, 1:21, 2:4
**new** [6] - 34:14, 50:1, 50:6, 51:8, 53:4, 66:10
**news** [21] - 32:14, 32:15, 32:17, 32:19, 32:20, 33:3, 33:16, 34:25, 50:1, 50:8, 62:14, 64:4, 64:6, 64:14, 64:24, 65:2, 65:12, 70:18, 88:15, 106:3
**newspapers** [1] - 40:15
**next** [14] - 4:1, 19:12, 19:16, 21:22, 22:5, 29:19, 31:6, 57:10, 62:9, 63:22, 64:1, 83:18, 88:20, 111:21
**nice** [1] - 74:18
**night** [2] - 5:17, 5:22
**nine** [3] - 83:18, 88:8, 88:20
**none** [14] - 75:17, 76:9, 76:11, 76:19, 76:20, 76:23, 77:4, 77:6, 77:12, 77:15, 78:12, 78:16, 78:18, 79:5
**normal** [1] - 105:12
**Northeast** [1] - 22:7
**Northwest** [5] - 1:18, 1:21, 2:8, 2:12, 119:14
**Nos** [2] - 3:15, 55:22
**note** [3] - 60:12, 103:5, 109:11
**noted** [4] - 79:10, 85:13, 91:25, 105:9
**notes** [1] - 119:5
**nothing** [13] - 13:13, 13:22, 13:24, 14:4, 14:7, 14:22, 15:4, 15:7, 26:6, 27:10, 74:8, 74:12, 97:5
**notice** [2] - 100:25, 112:5
**notwithstanding** [1] - 96:17

**number** [5] - 39:9, 46:18, 60:10, 79:9, 89:7
**numbers** [14] - 56:11, 56:20, 57:21, 58:9, 58:10, 58:16, 72:9, 72:11, 73:20, 79:23, 85:21, 88:25, 92:12
**numerous** [1] - 40:19

# O

**oath** [1] - 19:24
**object** [3] - 5:17, 111:24, 112:4
**objected** [1] - 117:3
**objection** [41] - 9:7, 11:4, 16:10, 18:9, 24:6, 29:7, 30:7, 30:8, 30:22, 30:23, 31:16, 31:17, 32:1, 33:4, 33:11, 35:8, 44:9, 44:17, 53:14, 55:20, 67:7, 67:13, 68:5, 69:13, 94:15, 98:13, 101:5, 103:21, 105:16, 106:17, 107:17, 108:7, 108:9, 108:17, 109:10, 110:19, 112:18, 112:19, 112:20, 113:5, 116:8
**objections** [5] - 103:5, 111:18, 111:22, 112:3, 113:12
**observation** [1] - 66:1
**observing** [2] - 59:14, 65:21
**obvious** [1] - 53:11
**occasion** [1] - 42:11
**occur** [1] - 37:13
**OF** [2] - 1:1, 1:13
**offense** [1] - 61:15
**offer** [2] - 55:18, 111:15
**offered** [1] - 91:18
**offering** [1] - 111:13
**offeror** [1] - 111:7
**offers** [2] - 7:12, 111:5
**Office** [4] - 41:14, 41:22, 42:14
**office** [2] - 22:6, 22:15
**official** [1] - 119:12
**Official** [1] - 2:10

**officials** [2] - 112:12, 112:17
**often** [1] - 38:1
**Ohio** [5] - 21:7, 22:7, 22:9, 22:20, 28:22
**one** [55] - 5:21, 10:10, 16:22, 20:5, 21:2, 22:10, 26:7, 30:20, 31:17, 33:17, 35:3, 40:13, 40:24, 41:3, 43:21, 43:24, 46:18, 49:25, 57:8, 60:19, 62:4, 67:22, 71:20, 73:13, 74:22, 74:24, 75:3, 79:7, 79:19, 83:7, 85:14, 89:4, 89:11, 90:14, 90:17, 91:4, 91:12, 91:13, 91:19, 92:14, 93:12, 93:15, 93:22, 94:12, 94:18, 94:22, 95:2, 96:11, 99:7, 103:10, 104:16, 106:16, 113:9, 115:7
**one-day** [4] - 62:4, 83:7, 90:17, 91:12
**ones** [2] - 78:16, 84:18
**oneself** [1] - 90:14
**open** [5] - 30:17, 31:5, 35:10, 103:23, 110:5
**opened** [1] - 22:17
**opening** [6] - 5:17, 5:22, 5:23, 117:5, 117:7, 117:9
**openings** [1] - 116:21
**operations** [1] - 66:10
**opine** [1] - 36:2
**opining** [1] - 55:8
**opinion** [15] - 8:3, 47:25, 48:19, 52:3, 52:15, 52:19, 52:20, 70:8, 73:23, 96:3, 102:5, 106:12, 113:9, 114:18, 116:2
**opinions** [2] - 32:3, 40:15
**opportunity** [3] - 55:2, 108:7, 108:12
**opposed** [1] - 100:4
**opposition** [1] - 113:5
**option** [6] - 5:11, 9:22, 18:24, 114:12, 117:12
**optional** [1] - 115:23
**options** [1] - 19:5

830

**orange** [7] - 84:7, 89:14, 90:22, 91:7, 91:12, 91:21, 92:13
**order** [3] - 12:18, 15:25, 93:1
**orderly** [1] - 6:12
**organization** [1] - 104:18
**orient** [1] - 83:6
**original** [10] - 10:13, 10:14, 10:17, 10:20, 10:23, 10:25, 11:15, 26:1, 56:12, 105:14
**originating** [1] - 46:21
**otherwise** [2] - 69:18, 70:2
**ought** [1] - 111:15
**outside** [4] - 31:13, 41:11, 101:8, 106:20
**outstanding** [1] - 13:5
**overall** [3] - 51:5, 91:12, 93:16
**overnight** [1] - 41:9
**overriding** [1] - 70:22
**overrule** [2] - 111:18, 112:17
**overruled** [2] - 9:10, 11:7, 18:11, 29:8, 35:8, 53:15, 67:8, 67:14, 68:6, 69:14, 98:14, 112:4
**oversee** [1] - 8:11
**own** [16] - 23:20, 26:19, 26:21, 27:1, 27:2, 27:3, 27:7, 52:9, 64:12, 69:16, 81:13, 103:10, 109:18, 113:9
**owning** [1] - 96:19
**owns** [2] - 8:18, 8:24

---

**P**

---

**p.m** [5] - 1:7, 6:19, 60:16, 61:18, 110:10
**P.M** [1] - 1:20
**package** [1] - 79:15
**Page** [12] - 12:13, 15:23, 16:13, 17:6, 27:24, 56:4, 58:12, 62:7, 62:16, 84:3, 89:9, 99:11
**PAGE** [1] - 3:12
**page** [14] - 16:25, 54:9, 58:13, 58:14, 62:8, 62:9, 62:16, 63:3, 85:6, 86:5, 87:4,

92:10, 103:7, 103:10
**paid** [2] - 70:5, 72:1
**panel** [2] - 6:17, 61:16
**paper** [1] - 88:19
**papers** [1] - 51:14
**paragraph** [1] - 28:1
**Paragraph** [4] - 5:10, 34:13, 72:18, 72:24
**Paragraphs** [1] - 72:16
**paragraphs** [3] - 34:7, 72:15, 107:4
**part** [26] - 6:3, 9:5, 9:14, 9:18, 13:4, 14:8, 24:17, 30:25, 32:12, 38:18, 43:2, 58:4, 71:2, 75:8, 75:24, 76:7, 76:21, 77:5, 94:9, 94:12, 94:18, 94:22, 94:24, 107:1, 111:6, 111:9
**particular** [13] - 36:16, 36:18, 36:20, 37:10, 37:11, 38:23, 45:3, 45:23, 50:8, 52:16, 59:17, 64:4, 112:12
**parties** [4] - 34:1, 72:16, 101:11, 103:2
**parts** [3] - 110:23, 111:7, 111:10
**party** [4] - 20:17, 111:5, 111:6, 111:9
**passage** [2] - 16:15, 112:23
**passages** [1] - 111:1
**past** [3] - 64:11, 68:17
**path** [1] - 42:9
**pay** [17] - 8:7, 9:23, 11:11, 18:15, 18:23, 18:25, 19:4, 24:23, 27:5, 47:23, 48:8, 69:6, 69:16, 70:1, 98:10, 114:9, 115:14
**Paychecks** [1] - 22:24
**payers** [1] - 18:20
**paying** [3] - 68:23, 69:10, 69:20
**payment** [4] - 5:11, 5:18, 6:4, 114:10
**payment-in-kind** [2] - 5:11, 5:18
**payments** [1] - 11:1
**pdf** [1] - 47:16
**peer** [4] - 39:16, 39:18, 39:19, 39:25
**peer-reviewed** [2] -

39:16, 39:18
**Pennsylvania** [3] - 1:24, 38:11, 38:12
**people** [6] - 8:7, 23:2, 40:13, 41:3, 41:6, 99:9
**people's** [1] - 40:1
**per** [11] - 70:16, 71:24, 79:18, 104:23, 104:24, 105:2, 105:10, 105:15, 105:20
**percent** [62] - 24:24, 50:17, 58:15, 58:16, 58:18, 58:20, 58:22, 59:1, 59:3, 59:5, 59:15, 59:16, 59:19, 59:20, 59:23, 60:1, 60:5, 60:6, 60:7, 60:11, 60:14, 62:1, 62:5, 62:23, 63:1, 63:23, 64:1, 65:9, 65:10, 67:10, 67:22, 70:15, 70:16, 71:21, 71:24, 71:25, 72:1, 73:14, 94:3, 104:7, 104:23, 104:24, 105:2, 105:5, 106:15, 107:22, 112:24, 114:9, 114:11, 115:10, 115:11, 115:13, 115:15, 115:22, 116:22
**perform** [2] - 38:19, 51:16
**performance** [2] - 68:16, 88:13
**performed** [5] - 51:25, 52:9, 52:14, 52:17, 52:21
**performing** [3] - 52:13, 52:24, 53:25
**period** [4] - 37:21, 68:23, 104:20
**permitted** [1] - 116:4
**persist** [5] - 68:3, 101:3, 101:20, 103:1, 103:15
**persists** [1] - 103:20
**person** [2] - 88:17, 109:18
**personal** [2] - 112:11, 113:7
**perspective** [3] - 37:20, 48:11, 48:18
**Ph.D** [7] - 3:9, 3:10, 31:5, 35:14, 36:14, 37:14, 38:10
**phones** [3] - 31:11, 101:6, 113:25

**pick** [1] - 61:24
**picking** [1] - 113:17
**picture** [1] - 102:17
**piece** [3] - 50:8, 71:1, 105:2
**piggy** [1] - 71:25
**place** [6] - 48:12, 75:18, 76:14, 86:6, 96:18, 99:14
**placed** [3] - 24:1, 24:14, 48:14
**placing** [2] - 24:4, 48:1
**Plaintiff** [6] - 35:1, 45:15, 56:7, 71:7, 73:25, 111:19
**plaintiffs** [3] - 43:9, 43:11, 112:23
**Plaintiffs** [22] - 1:4, 5:2, 15:16, 19:14, 20:14, 21:2, 30:3, 30:5, 31:18, 32:10, 35:24, 43:8, 45:7, 60:23, 61:22, 108:12, 110:19, 110:23, 111:13, 112:14, 117:3, 117:17
**PLAINTIFFS** [4] - 1:18, 1:20, 2:2, 3:5
**PLAINTIFFS'** [3] - 6:25, 20:2, 35:14
**Plaintiffs'** [20] - 3:13, 3:14, 3:14, 3:15, 12:1, 15:17, 16:24, 27:19, 27:24, 30:5, 30:10, 31:2, 44:11, 55:22, 101:13, 103:8, 103:10, 111:22, 111:24, 116:21
**plan** [2] - 65:16, 114:2
**planning** [2] - 4:8, 6:8
**play** [3] - 29:23, 30:19, 111:21
**playbook** [2] - 37:24, 47:12
**played** [2] - 51:24, 53:8
**playing** [1] - 4:8
**PLLC** [1] - 1:18
**point** [13] - 6:10, 8:15, 23:14, 25:21, 26:13, 29:4, 74:19, 78:23, 86:17, 94:5, 97:2, 98:3, 106:8
**pointers** [1] - 86:7
**pointing** [6] - 84:25, 86:4, 86:5, 86:6, 86:7, 99:24

**points** [1] - 107:4
**political** [1] - 113:2
**PORTER** [1] - 2:8
**portfolio** [8] - 70:15, 71:1, 104:5, 104:19, 105:10, 105:12, 107:9, 107:19
**portfolios** [10] - 94:1, 94:3, 94:7, 95:4, 95:10, 95:16, 95:23, 96:3, 104:11, 105:24
**portion** [5] - 32:5, 72:7, 82:14, 104:19, 112:20
**portions** [2] - 111:13, 111:16
**position** [2] - 115:8, 115:25
**positions** [1] - 22:1
**positive** [15] - 20:16, 32:14, 32:17, 32:18, 32:19, 32:25, 33:3, 33:15, 34:25, 64:9, 64:14, 88:14, 88:15, 96:13, 96:24
**positively** [1] - 33:15
**possibility** [4] - 59:14, 106:24, 109:7, 112:6
**possible** [2] - 7:20, 89:22
**potential** [6] - 23:24, 50:4, 92:5, 93:3, 93:7, 93:9
**potentially** [1] - 69:4
**PowerPoint** [7] - 36:8, 54:9, 55:14, 74:24, 80:17, 82:2, 82:6
**powers** [2] - 17:11, 17:14
**practice** [1] - 18:18
**precedent** [1] - 66:24
**prediction** [1] - 110:24
**preference** [2] - 114:10, 115:16
**preferred** [54] - 8:11, 8:12, 8:19, 10:7, 12:19, 13:5, 16:1, 23:18, 26:19, 29:24, 38:1, 48:23, 56:25, 57:1, 57:4, 57:8, 57:12, 57:13, 57:24, 57:25, 58:20, 58:23, 62:23, 63:1, 63:23, 63:25, 65:15, 72:19, 72:22, 73:1, 73:5, 82:22, 84:6, 84:7, 84:8, 84:17, 84:18,

831

84:23, 87:9, 87:10, 88:18, 89:3, 89:14, 89:15, 89:18, 90:10, 90:11, 90:18, 91:9, 91:21, 91:22, 98:3, 106:15

**PREFERRED** [1] - 1:10

**prejudgment** [5] - 71:3, 71:5, 71:6, 72:12, 73:16

**prejudicial** [3] - 35:1, 35:4, 116:3

**premiums** [1] - 8:7

**prepare** [10] - 36:4, 36:7, 81:1, 81:5, 81:12, 81:16, 81:23, 92:22, 95:8, 95:12

**prepared** [12] - 36:8, 54:10, 54:12, 55:15, 74:25, 81:18, 85:13, 87:1, 92:24, 98:18, 98:21, 99:11

**presence** [3] - 31:13, 101:8, 106:20

**present** [7] - 5:6, 6:8, 6:13, 79:22, 101:13, 114:4

**presentation** [3] - 54:9, 74:25, 113:23

**presented** [2] - 20:17, 113:12

**preserve** [3] - 24:15, 29:5, 47:10

**preserving** [1] - 69:2

**president** [1] - 110:21

**President** [1] - 112:2

**pretty** [3] - 46:8, 85:5, 91:3

**prevented** [1] - 48:6

**preview** [1] - 4:25

**previous** [2] - 23:7, 49:12

**PREVIOUSLY** [1] - 6:25

**previously** [4] - 49:7, 62:2, 65:8, 91:25

**price** [65] - 25:20, 31:21, 31:23, 32:3, 32:6, 32:15, 32:18, 32:19, 32:20, 32:21, 32:25, 33:2, 33:9, 33:15, 33:17, 34:2, 34:23, 48:22, 49:25, 50:2, 50:5, 50:17, 51:8, 52:6, 52:17, 53:4, 55:25, 59:9, 59:16, 62:1, 62:11, 62:17, 63:5, 63:9,

64:3, 64:18, 64:21, 65:24, 66:13, 66:25, 67:10, 67:21, 68:1, 68:20, 70:10, 70:18, 80:12, 80:18, 83:16, 83:17, 86:23, 87:16, 87:24, 95:20, 96:25, 99:15, 99:18, 100:18, 101:24, 102:18, 102:20, 102:23, 107:21

**prices** [22] - 26:4, 29:13, 29:15, 33:7, 34:9, 64:24, 65:4, 69:4, 81:25, 83:8, 83:11, 83:22, 92:23, 93:9, 95:15, 96:9, 96:12, 96:15, 96:16, 101:19, 104:6

**primarily** [3] - 42:6, 43:11, 46:10

**primary** [1] - 41:15

**principles** [1] - 37:9

**print** [1] - 40:6

**private** [5] - 38:3, 47:14, 69:15, 77:10, 78:9

**privileged** [1] - 25:9

**probative** [1] - 33:13

**problem** [1] - 5:16

**Procedure** [3] - 111:4, 111:10, 111:11

**proceed** [7] - 6:22, 20:22, 35:15, 44:18, 44:20, 61:20

**proceeding** [1] - 30:4

**Proceedings** [1] - 118:4

**proceedings** [12] - 6:19, 31:12, 35:9, 60:16, 60:18, 61:18, 101:7, 103:22, 106:19, 110:4, 110:10, 119:6

**proceeds** [1] - 19:1

**process** [2] - 6:12, 39:19

**produced** [2] - 54:3, 119:6

**products** [1] - 39:12

**professional** [2] - 41:11, 44:5

**Professional** [1] - 22:21

**Professor** [16] - 5:8, 30:19, 31:7, 37:7, 44:14, 44:23, 45:16, 48:22, 61:25, 68:2, 73:23, 74:11, 98:25,

104:2, 115:21

**professor** [6] - 35:22, 38:5, 38:18, 49:18, 70:8, 71:2

**profit** [1] - 25:11

**profitability** [4] - 69:1, 69:3, 111:2, 111:14

**profitable** [4] - 18:21, 18:22, 63:12, 65:18

**profited** [1] - 25:12

**profits** [6] - 48:5, 48:6, 66:8, 66:9, 66:19, 69:17

**Program** [1] - 97:20

**program** [2] - 97:21, 97:22

**programs** [2] - 54:18, 79:10

**progress** [1] - 117:23

**projections** [1] - 111:2

**proper** [1] - 102:10

**properly** [8] - 34:18, 34:19, 35:2, 35:6, 52:17, 52:20, 86:9, 93:2

**property** [1] - 47:11

**provides** [1] - 111:5

**provision** [6] - 5:18, 93:15, 94:2, 95:9, 104:22, 106:11

**provisions** [2] - 93:20, 93:23

**Prussia** [1] - 1:24

**PSPA** [2] - 115:8, 115:19

**PSPAs** [9] - 10:13, 10:14, 10:17, 10:20, 10:23, 10:25, 11:15, 113:1

**public** [16] - 77:13, 77:17, 77:19, 77:21, 77:23, 78:4, 78:6, 78:7, 78:9, 78:12, 78:14, 78:15, 78:19, 78:20, 82:9

**Public** [1] - 40:20

**public-private** [1] - 78:9

**publicly** [4] - 72:19, 72:22, 73:1, 73:5

**publish** [1] - 38:19

**published** [7] - 30:17, 31:5, 39:5, 39:8, 39:9, 39:14, 39:15

**publishing** [1] -

39:24

**pull** [8] - 15:18, 36:10, 74:21, 80:10, 80:14, 92:19, 99:10, 100:21

**pulled** [2] - 37:2, 56:16

**purchase** [2] - 10:7, 23:14

**PURCHASE** [1] - 1:10

**purchases** [1] - 20:15

**purely** [1] - 115:23

**purported** [1] - 93:4

**purpose** [4] - 24:4, 48:1, 53:11, 56:21

**purposes** [2] - 27:17, 84:22

**pushing** [1] - 77:22

**put** [14] - 47:5, 60:13, 71:24, 75:17, 76:5, 76:21, 79:23, 85:14, 86:14, 86:16, 87:1, 96:18, 97:22, 104:25

**putting** [1] - 87:5

**PX-375** [11] - 30:21, 54:14, 54:17, 55:11, 55:14, 56:5, 56:17, 58:12, 62:7, 80:14, 99:11

**PX-402-A** [2] - 43:20, 44:7

**PX-495-2** [1] - 54:23

**qualifications** [1] - 44:17

**qualified** [1] - 44:19

**quality** [1] - 39:23

**quantities** [1] - 62:11

**quarter** [1] - 63:12

**questions** [17] - 4:15, 12:5, 15:12, 16:23, 19:7, 28:15, 28:19, 77:2, 97:11, 98:17, 98:19, 103:17, 104:2, 104:8, 109:24, 110:17, 113:12

**quite** [2] - 51:13, 66:22

**quote** [7] - 33:10, 34:10, 49:13, 65:15, 67:20, 101:3

**quoted** [1] - 40:16

**R**

**radio** [2] - 40:17, 40:18

**Radio** [3] - 40:19, 40:20

**Radnor** [1] - 1:24

**raise** [6] - 19:25, 35:12, 112:20, 113:23, 117:5, 117:7

**raised** [4] - 113:18, 116:5, 116:20, 117:24

**raising** [1] - 113:15

**ran** [4] - 22:6, 32:13, 59:7, 73:13

**random** [6] - 59:14, 59:18, 59:21, 59:24, 60:2, 60:8

**ranging** [1] - 42:7

**ranked** [1] - 78:25

**rate** [3] - 71:19, 104:22, 114:11

**rather** [4] - 58:17, 90:16, 94:3, 104:4, 104:23

**ratings** [1] - 42:8

**RDR** [3] - 2:10, 119:3, 119:12

**RE** [1] - 1:10

**reach** [2] - 45:11, 73:21

**reached** [5] - 45:12, 54:19, 99:4, 101:11, 101:23

**reaching** [1] - 50:5

**reacted** [1] - 33:2

**reaction** [4] - 48:23, 48:24, 66:13, 68:14

**reacts** [1] - 33:15

**read** [13] - 10:8, 10:18, 12:21, 15:24, 16:15, 19:22, 28:9, 33:10, 41:6, 60:20, 60:21, 72:14, 72:16

**reading** [1] - 12:18

**reads** [1] - 102:3

**real** [1] - 35:7

**really** [11] - 9:21, 40:24, 46:9, 60:24, 63:12, 63:16, 64:14, 64:25, 66:22, 68:10, 104:16

**realtime** [2] - 34:15, 35:7

**reason** [9] - 8:1, 20:12, 32:7, 41:1, 59:17, 67:25, 70:8, 90:20, 113:6

**reasonable** [3] -

20:8, 20:9, 55:8
**reasonably** [5] -
52:24, 53:3, 62:4,
67:4, 67:12
**reasons** [3] - 19:2,
104:14, 111:16
**receive** [7] - 13:11,
13:19, 14:10, 14:19,
14:25, 27:13, 96:19
**RECEIVED** [1] - 3:12
**received** [7] - 17:20,
18:8, 30:9, 44:10,
55:21, 75:6, 98:7
**receiving** [1] - 68:11
**recess** [2] - 60:17,
110:6
**recipients** [2] -
74:22, 78:17
**recognize** [1] - 54:6
**recollection** [1] -
112:16
**Reconstruction** [4] -
37:17, 37:19, 37:23,
38:25
**record** [4] - 16:16,
20:19, 30:13, 35:19
**recording** [1] - 22:2
**recourse** [1] - 108:18
**recreational** [1] -
7:19
**red** [3] - 56:10,
56:11, 99:23
**Red** [1] - 3:4
**redirect** [4] - 97:7,
108:11, 108:20,
108:22
**REDIRECT** [3] -
15:13, 28:17, 97:9
**reduce** [4] - 105:2,
105:5, 105:14
**reducing** [1] - 94:2
**reduction** [16] -
70:14, 70:16, 95:4,
95:9, 95:16, 95:22,
96:2, 104:4, 105:8,
106:14, 107:8,
107:12, 107:18,
108:10, 109:5
**refer** [3] - 33:7, 35:3,
58:21
**reference** [1] - 38:10
**references** [2] -
103:6, 108:3
**referencing** [1] -
17:4
**referred** [4] - 9:2,
39:15, 43:2, 93:24
**referring** [2] - 32:11,
33:22
**refers** [4] - 34:10,

34:13, 85:9, 85:25
**reflect** [1] - 96:16
**reflected** [1] - 82:18
**reflects** [1] - 96:25
**regarding** [3] -
102:6, 111:2, 112:6
**regression** [2] -
95:13, 107:10
**regular** [1] - 18:20
**regularly** [2] - 48:16,
51:13
**regulator** [1] - 41:15
**reinvest** [5] - 19:1,
26:4, 29:16, 66:9,
68:25
**reinvested** [1] - 70:5
**reinvesting** [1] -
69:18
**relate** [1] - 4:24
**related** [3] - 7:15,
32:7, 114:6
**relates** [1] - 85:12
**relating** [4] - 42:5,
42:6, 42:25, 115:10
**relations** [2] - 22:17,
22:19
**relationship** [1] -
78:21
**relatively** [1] - 25:19
**release** [2] - 99:24,
112:7
**released** [9] - 32:17,
32:19, 32:21, 47:13,
50:1, 52:7, 63:14,
64:12, 65:5
**relevance** [1] - 24:7
**relevant** [4] - 26:23,
27:1, 33:21, 84:21
**reliable** [1] - 55:9
**relied** [3] - 50:9,
52:5, 109:2
**Relief** [1] - 97:20
**rely** [4] - 52:24, 53:3,
66:2, 109:16
**relying** [3] - 41:24,
51:17, 53:23
**remain** [1] - 13:5
**remember** [6] -
15:20, 16:3, 60:10,
89:6, 106:7, 106:8
**remind** [1] - 66:4
**repeat** [4] - 9:11,
14:18, 26:25, 46:4
**reply** [6] - 32:5, 33:6,
33:22, 34:7, 102:6,
107:3
**report** [25] - 5:10,
32:5, 32:12, 32:13,
33:6, 33:22, 34:8,
34:12, 34:13, 56:13,

56:17, 58:12, 58:13,
59:25, 62:7, 72:10,
101:14, 101:17,
101:19, 102:4, 102:6,
107:3, 108:3
**REPORTED** [1] -
2:10
**reported** [1] - 88:13
**REPORTER** [2] -
14:1, 30:12
**Reporter** [2] - 2:10,
119:12
**reporting** [1] - 87:16
**reports** [6] - 32:2,
54:2, 79:24, 87:23,
106:23, 109:5
**represent** [9] - 21:3,
22:18, 49:1, 56:20,
58:16, 58:17, 59:3,
87:5, 100:17
**representation** [1] -
73:10
**representative** [8] -
21:17, 22:6, 22:8,
23:4, 23:7, 23:10,
89:6, 112:24
**represented** [1] -
100:14
**representing** [2] -
72:23, 73:6
**represents** [3] -
57:7, 59:19, 100:2
**require** [6] - 9:19,
27:5, 27:6, 63:13,
92:2, 111:7
**required** [8] - 9:21,
9:23, 9:25, 10:3,
18:15, 93:23, 115:11,
115:13
**research** [6] - 38:19,
38:22, 39:23, 40:5,
63:14, 64:13
**Research** [1] - 42:14
**reserve** [1] - 117:6
**Reserve** [1] - 79:9
**resolve** [3] - 117:20,
117:23, 117:25
**resolved** [1] - 115:9
**resolving** [1] - 39:1
**respect** [5] - 18:18,
34:2, 40:22, 117:5,
117:7
**respectfully** [1] -
44:14
**respectively** [1] -
73:7
**respond** [2] - 107:25,
109:14
**responded** [2] -
35:6, 67:16

**responding** [4] -
34:14, 65:2, 65:3
**response** [15] -
13:23, 34:25, 46:6,
46:8, 46:16, 48:16,
53:4, 64:24, 65:4,
75:8, 76:7, 76:22,
77:6, 102:16, 112:14
**responses** [1] -
36:20
**responsibility** [3] -
47:7, 47:8, 47:9
**rest** [2] - 56:16,
104:17
**restore** [1] - 28:5,
47:11, 69:1
**restrained** [1] - 48:8
**restrict** [2] - 33:16,
34:1
**result** [9] - 25:14,
45:2, 45:3, 52:7,
56:20, 58:24, 70:25,
74:1, 92:8
**results** [7] - 54:10,
55:13, 63:11, 64:10,
80:17, 80:18, 82:7
**resume** [1] - 110:2
**retain** [1] - 17:16
**retained** [16] - 35:23,
70:15, 70:25, 93:25,
94:3, 94:7, 95:4, 95:9,
95:16, 95:23, 96:3,
104:5, 104:11,
104:12, 104:19,
107:18
**retakes** [1] - 6:21
**return** [4] - 24:16,
38:3, 69:3, 98:11
**returned** [1] - 47:2
**Reuters** [1] - 65:14
**review** [3] - 23:12,
39:19, 55:2
**reviewed** [5] - 39:16,
39:18, 54:1, 54:17,
55:7
**reviewer** [1] - 39:25
**rights** [5] - 17:11,
17:16, 68:18, 68:24,
117:6
**rise** [2] - 63:18,
64:16
**risk** [1] - 28:7
**Road** [1] - 1:24
**Robert** [2] - 30:2,
60:22
**ROBERT** [1] - 2:2
**Room** [1] - 2:12
**rose** [4] - 62:23,
63:1, 63:23, 63:25
**roughly** [2] - 8:21,

79:17
**row** [1] - 58:14
**rows** [1] - 56:15
**ROYCE** [1] - 1:14
**Rudy** [14] - 19:13,
19:14, 32:9, 33:22,
34:6, 61:21, 75:4,
75:11, 80:19, 84:15,
91:4, 101:21, 103:12,
107:13
**RUDY** [71] - 1:23,
4:2, 4:11, 4:14, 4:20,
4:23, 19:13, 20:22,
20:24, 21:1, 24:9,
24:12, 26:6, 28:16,
28:18, 29:10, 29:18,
29:22, 30:18, 30:25,
31:6, 31:9, 32:9, 34:6,
35:15, 35:18, 36:10,
36:11, 36:22, 37:2,
37:5, 37:6, 44:7,
44:13, 44:19, 44:21,
44:22, 47:15, 47:17,
53:19, 55:18, 55:24,
61:6, 61:21, 61:23,
67:9, 67:18, 68:8,
70:3, 72:14, 73:9,
74:11, 94:15, 97:8,
97:10, 98:16, 99:10,
99:12, 100:21,
100:22, 101:21,
102:15, 103:14,
103:24, 104:1,
105:19, 107:13,
108:21, 109:11,
109:23, 118:3
**Rule** [2] - 111:3,
111:10
**rule** [5] - 110:17,
111:3, 111:5, 113:14,
113:16
**rules** [1] - 113:11
**ruling** [1] - 4:12
**run** [3] - 71:11,
71:16, 71:24
**RUSSELL** [1] - 35:14
**Russell** [2] - 3:10,
35:20
**résumé** [1] - 44:3

## S

**Sachs** [2] - 76:4,
79:2
**safety** [2] - 47:11,
69:1
**sales** [1] - 21:16
**save** [1] - 37:25
**saved** [1] - 38:1

833

**savings** [1] - 39:3
**saw** [6] - 58:14, 65:16, 67:1, 74:6, 116:14, 116:22
**schedule** [1] - 5:5
**scheduled** [1] - 5:9
**scheduling** [1] - 4:24
**SCHILLER** [1] - 1:21
**scholarly** [2] - 38:19, 39:10
**scholarship** [1] - 38:22
**SCHOLER** [1] - 2:8
**School** [2] - 38:10, 38:13
**school** [1] - 41:13
**schools** [1] - 22:20
**scope** [2] - 34:2, 101:12
**screen** [2] - 81:2, 82:17
**screens** [2] - 36:22, 37:3
**seated** [2] - 6:20, 61:19
**second** [3] - 6:11, 13:4, 43:21
**secretary** [1] - 22:3
**section** [1] - 33:21
**sector** [3] - 38:4, 46:10, 47:14
**sectors** [1] - 46:10
**securities** [1] - 42:23
**Securities** [1] - 43:19
**securitization** [6] - 41:5, 41:7, 41:23, 41:24, 42:7, 45:20
**securitize** [2] - 45:22, 104:13
**see** [36] - 17:9, 32:14, 33:16, 43:22, 47:18, 50:16, 54:15, 57:18, 63:17, 64:8, 64:15, 66:20, 66:25, 67:21, 74:18, 79:3, 82:6, 84:11, 85:7, 85:8, 87:16, 87:23, 88:3, 88:5, 90:10, 90:20, 90:24, 91:11, 99:8, 99:23, 100:7, 102:19, 110:7, 112:8, 113:5, 113:20
**seeing** [1] - 59:16
**seeking** [3] - 102:13, 102:15, 108:22
**seem** [1] - 107:23
**sell** [2] - 8:13, 104:18
**sells** [2] - 7:18, 8:2
**send** [1] - 39:21
**senior** [3] - 10:6,

38:13, 41:17
**SENIOR** [2] - 1:10, 1:14
**sense** [1] - 68:15
**sent** [1] - 112:5
**sentence** [7] - 12:15, 15:24, 28:2, 101:25, 102:3, 102:5, 102:9
**separate** [2] - 107:10, 109:4
**separating** [1] - 109:7
**September** [4] - 10:14, 12:8, 12:17, 27:22
**series** [2] - 103:17, 104:2
**serve** [4] - 22:8, 23:4, 78:20, 101:15
**served** [2] - 39:25, 42:20
**Service** [1] - 42:15
**serving** [2] - 23:6, 23:7
**SESSION** [1] - 1:13
**set** [2] - 62:14, 112:14
**seventh** [2] - 12:14, 15:25
**several** [4] - 16:5, 16:17, 54:22, 111:1
**share** [12] - 51:8, 67:21, 69:4, 83:8, 83:11, 83:16, 83:21, 96:9, 96:12, 96:15, 96:16, 101:19
**shareholder** [5] - 11:12, 19:18, 20:18, 45:7, 50:13
**shareholders** [23] - 11:2, 20:8, 20:9, 20:10, 20:13, 21:4, 45:5, 45:15, 49:6, 52:4, 66:10, 66:20, 67:4, 67:19, 69:18, 69:21, 69:24, 71:7, 73:25, 74:9, 96:17, 96:18, 97:2
**shareholders'** [2] - 56:7, 74:9
**shares** [56] - 8:19, 13:10, 14:10, 14:19, 14:25, 18:15, 23:14, 23:16, 23:17, 23:18, 23:19, 23:20, 26:16, 58:3, 65:15, 72:19, 72:22, 72:25, 73:1, 73:4, 73:5, 82:21, 82:22, 82:23, 82:24, 84:6, 84:7, 84:12,

84:17, 84:23, 87:9, 87:10, 88:6, 88:18, 88:19, 89:13, 89:14, 89:19, 90:11, 90:18, 90:21, 90:23, 90:25, 91:21, 91:22, 96:10, 96:20, 96:25, 97:1
**sheet** [2] - 104:14, 104:16
**short** [2] - 53:8, 61:3
**shortly** [1] - 34:23
**show** [3] - 56:22, 86:22, 87:2
**showed** [1] - 63:15
**showing** [4] - 56:4, 64:13, 102:17, 102:19
**shown** [3] - 84:18, 99:7, 99:11
**shows** [12] - 49:2, 56:6, 56:25, 57:13, 58:13, 82:20, 82:23, 84:5, 84:22, 87:9, 87:13, 89:12
**shrink** [4] - 94:8, 94:13, 94:24, 105:23
**shrinking** [3] - 94:9, 94:18, 94:20
**sic** [2] - 46:1, 92:14
**side** [5] - 7:20, 7:22, 84:11, 101:13, 101:25
**sidebar** [3] - 31:13, 101:8, 106:20
**signed** [1] - 27:11
**significance** [10] - 58:17, 58:18, 59:4, 59:8, 59:11, 59:13, 64:21, 64:23, 65:20, 65:23
**significant** [7] - 50:3, 62:24, 63:2, 63:24, 64:2, 99:21, 114:3
**signifying** [1] - 90:2
**similar** [3] - 89:11, 90:1, 91:11
**similarly** [1] - 100:7
**simple** [2] - 71:21, 71:22
**simpler** [1] - 85:24
**simplest** [1] - 89:22
**simply** [3] - 103:7, 103:9, 107:7
**sitting** [3] - 76:9, 90:20, 116:16
**situation** [1] - 117:12
**size** [1] - 36:3
**slide** [22] - 31:18, 36:8, 36:10, 38:10, 46:13, 50:16, 54:6, 56:5, 56:6, 56:12, 56:16, 56:21, 57:11,

63:19, 72:4, 72:7, 74:22, 79:23, 79:24, 97:25, 98:9, 115:1
**slides** [12] - 31:17, 31:23, 74:24, 75:3, 99:7, 116:21, 117:3, 117:5, 117:7, 117:10, 117:11
**slightly** [1] - 104:4
**slower** [2] - 21:18, 22:22
**smack** [1] - 85:6
**small** [1] - 22:17
**smaller** [1] - 70:24
**so..** [1] - 7:25
**solvency** [2] - 24:16, 47:21
**solvent** [2] - 47:16, 47:19
**sometimes** [4] - 9:2, 19:14, 42:8, 43:3
**somewhat** [1] - 10:19
**somewhere** [1] - 83:17
**sorry** [12] - 9:11, 14:15, 22:12, 26:25, 43:23, 46:2, 51:20, 69:10, 86:19, 87:19, 92:18, 100:14
**sort** [4] - 4:2, 84:24, 88:19, 102:23
**sought** [1] - 108:8
**sound** [6] - 23:23, 33:2, 33:14, 47:16, 47:19, 96:5
**soundness** [3] - 47:12, 47:21, 69:2
**sounds** [1] - 114:3
**sources** [2] - 64:14, 79:10
**spawned** [1] - 100:3
**speaking** [1] - 92:11
**specific** [6] - 20:15, 46:15, 77:23, 81:21, 82:23, 111:16
**specifically** [4] - 36:12, 50:11, 102:1, 102:4
**specifics** [1] - 111:2
**spectrum** [1] - 38:17
**sponsored** [2] - 77:7, 78:5
**spreadsheets** [1] - 80:22
**stability** [1] - 24:16
**stabilize** [1] - 24:19
**staff** [1] - 53:18
**stagnant** [1] - 26:5
**staked** [1] - 40:13

**stand** [3] - 6:21, 19:24, 81:20
**standard** [1] - 62:9
**Stanley** [1] - 76:4
**STANTON** [1] - 2:7
**Stanton** [4] - 31:14, 33:20, 101:9, 106:21
**stars** [1] - 58:16
**start** [6] - 36:12, 71:13, 74:19, 90:9, 93:19, 94:2
**starting** [1] - 104:25
**starts** [2] - 28:1, 86:22
**state** [4] - 20:19, 22:6, 22:8, 35:19
**State** [4] - 35:22, 38:9, 38:14, 38:15
**statement** [8] - 12:7, 15:19, 16:15, 16:16, 27:21, 112:4, 112:10, 117:18
**statements** [6] - 5:17, 5:23, 5:24, 64:9, 111:14, 111:17
**STATES** [2] - 1:1, 1:14
**States** [7] - 2:11, 10:10, 11:2, 46:1, 46:2, 46:6, 77:13, 77:16, 78:5, 78:19, 119:13
**statistical** [8] - 58:17, 58:18, 59:4, 59:8, 59:11, 59:13, 95:13, 107:9
**statistically** [6] - 50:3, 62:24, 63:2, 63:24, 64:2, 99:21
**status** [1] - 75:22
**statute** [1] - 17:14
**stayed** [1] - 96:12
**stenographic** [1] - 119:5
**step** [4] - 19:10, 29:20, 62:9, 110:14
**STERN** [2] - 2:7, 61:13
**stick** [1] - 61:11
**still** [21] - 6:7, 18:2, 22:25, 23:20, 46:24, 68:3, 68:24, 69:11, 75:13, 76:11, 76:15, 76:18, 76:23, 76:25, 96:19, 97:1, 101:3, 103:1, 103:15, 103:19, 114:24
**stipulation** [1] - 72:15
**STOCK** [1] - 1:10

834

**stock** [126] - 8:11, 8:19, 8:24, 9:14, 9:18, 10:7, 12:19, 16:1, 17:8, 17:13, 25:19, 26:4, 26:16, 26:19, 26:21, 26:23, 26:24, 27:1, 27:2, 27:4, 27:7, 27:8, 29:13, 29:15, 31:21, 31:23, 32:3, 32:6, 32:14, 32:15, 32:18, 32:19, 32:20, 32:21, 32:25, 33:2, 33:9, 33:14, 33:17, 34:22, 34:25, 35:6, 38:2, 48:22, 48:23, 49:3, 49:25, 50:2, 50:5, 50:17, 50:20, 50:25, 51:4, 52:6, 52:17, 53:4, 55:25, 56:1, 57:1, 57:4, 57:8, 57:18, 58:1, 58:6, 58:23, 58:25, 59:8, 59:16, 62:1, 62:5, 62:11, 62:18, 62:21, 63:1, 63:5, 63:9, 63:10, 63:20, 64:3, 64:7, 64:18, 64:21, 64:24, 65:1, 65:4, 65:9, 65:13, 65:21, 66:25, 67:10, 68:1, 68:16, 68:20, 70:10, 70:18, 74:7, 80:12, 80:18, 81:25, 83:12, 83:17, 87:6, 87:16, 87:24, 88:14, 92:23, 95:15, 95:20, 98:3, 98:25, 99:1, 99:11, 99:15, 99:18, 100:18, 101:24, 102:17, 102:18, 102:20, 102:23, 104:6, 106:15, 107:21

**stock's** [1] - 17:17

**stockholder** [2] - 29:24

**stockholders** [10] - 17:12, 17:15, 17:16, 47:3, 49:16, 49:20, 68:10, 70:5, 74:5, 98:12

**stockholders'** [2] - 49:12, 68:18

**stocks** [13] - 8:4, 8:8, 8:12, 8:16, 13:5, 26:13, 34:14, 42:24, 56:7, 63:17, 64:15, 65:2, 69:11

**stop** [2] - 94:5, 105:10

**stressed** [1] - 16:5

**strike** [1] - 10:21

**structured** [1] - 49:24

**struggling** [1] - 48:12

**stuck** [1] - 61:11

**students** [2] - 38:16

**studied** [11] - 40:12, 41:4, 75:20, 78:2, 82:4, 82:9, 82:11, 82:12, 82:16, 108:14

**studies** [6] - 36:17, 51:12, 52:9, 52:13, 62:2, 81:19

**study** [74] - 31:25, 32:14, 33:1, 33:13, 33:18, 34:8, 34:18, 34:20, 35:3, 35:6, 37:9, 40:14, 49:22, 49:23, 49:24, 50:9, 51:2, 51:8, 51:11, 51:16, 52:1, 52:5, 52:14, 52:16, 52:22, 52:24, 53:2, 53:18, 53:23, 54:11, 54:17, 54:20, 55:11, 55:15, 55:25, 56:4, 62:10, 66:13, 66:18, 80:12, 80:19, 80:23, 81:1, 81:5, 81:8, 81:12, 81:17, 81:18, 81:23, 82:3, 82:4, 82:12, 82:17, 82:20, 82:23, 92:21, 92:24, 93:2, 93:8, 95:6, 95:12, 95:18, 95:19, 95:24, 96:1, 98:18, 98:22, 98:24, 107:5, 107:6, 109:3

**Study** [2] - 81:17, 82:3

**studying** [4] - 40:12, 41:23, 75:25, 82:13

**stuff** [1] - 75:21

**subject** [4] - 36:1, 107:14, 107:20, 108:16

**subjects** [1] - 41:4

**submission** [2] - 112:9, 113:4

**submissions** [1] - 110:20

**subsequent** [2] - 101:24, 102:17

**substance** [1] - 107:2

**substantial** [1] - 25:19

**substantially** [1] - 64:11

**successful** [1] - 71:9

**suddenly** [1] - 41:9

**suffered** [5] - 45:14, 45:15, 49:20, 73:25, 74:5

**suing** [1] - 17:21

**sum** [2] - 92:11, 107:2

**summarize** [2] - 54:10, 56:19

**summarized** [1] - 55:14

**summary** [7] - 72:4, 72:7, 80:17, 80:18, 81:2, 82:2, 82:17

**supplemental** [4] - 101:14, 101:17, 101:18, 102:3

**support** [1] - 51:7

**supporting** [1] - 55:11

**suppose** [2] - 19:15, 76:15

**supposed** [2] - 37:1, 114:25

**Supreme** [3] - 115:9, 115:12, 115:18

**surprising** [2] - 63:17, 64:15

**Susan** [2] - 112:1, 112:3

**suspended** [6] - 11:23, 12:23, 17:15, 29:4, 68:19, 68:22

**suspension** [1] - 28:20

**sustained** [8] - 16:11, 24:8, 103:21, 105:17, 109:10, 112:20, 112:21, 113:6

**swear** [2] - 19:21, 19:23

**sweep** [64] - 13:24, 14:7, 15:7, 19:5, 25:3, 25:11, 25:15, 25:18, 25:22, 26:3, 29:1, 32:22, 45:3, 47:25, 48:20, 48:24, 49:3, 49:11, 50:10, 50:11, 51:6, 56:8, 56:9, 57:1, 57:3, 58:24, 66:5, 66:7, 66:12, 67:5, 68:3, 68:10, 68:20, 70:4, 70:9, 70:13, 71:15, 74:1, 74:6, 82:14, 93:10, 93:13, 93:15, 93:18, 93:22, 95:3, 95:14, 95:21, 96:2, 96:6, 96:18, 96:24, 101:3, 102:7,

102:20, 104:4, 106:13, 106:25, 107:11, 107:19, 107:21, 108:9, 108:19, 109:4

**swept** [1] - 25:13

**SWORN** [3] - 6:25, 20:2, 35:14

**system** [1] - 89:13

**systemic** [1] - 28:7

## T

**tab** [1] - 43:23

**table** [1] - 89:7

**talks** [1] - 17:6

**target** [5] - 70:25, 105:14, 105:20, 105:23, 106:5

**TARP** [4] - 97:15, 97:17, 97:18, 97:20

**tax** [1] - 112:7

**teach** [4] - 38:8, 38:9, 38:14, 38:15

**technique** [1] - 51:15

**television** [3] - 40:17, 40:18, 40:23

**Television** [1] - 40:20

**ten** [5] - 60:12, 83:13, 88:8, 102:19

**tend** [1] - 39:12

**tender** [1] - 44:14

**tens** [1] - 51:14

**tenured** [1] - 38:18

**term** [1] - 22:10

**terminated** [1] - 17:16

**terms** [7] - 10:17, 24:21, 58:15, 58:22, 62:1, 114:25

**territory** [1] - 96:13

**testified** [21] - 11:22, 32:23, 42:16, 42:20, 65:8, 76:1, 78:1, 80:13, 80:19, 83:11, 83:16, 83:21, 84:15, 87:17, 87:24, 92:21, 95:6, 107:17, 109:2, 112:11, 112:15

**testifies** [1] - 31:20

**testify** [12] - 5:9, 23:11, 28:22, 32:24, 33:4, 33:19, 42:1, 107:21, 108:14, 115:22, 116:8, 116:9

**testifying** [3] - 6:2, 13:2, 108:9

**testimony** [38] - 6:3,

11:24, 19:18, 20:12, 20:17, 27:16, 33:5, 34:2, 34:4, 36:1, 36:5, 42:22, 51:17, 54:4, 72:5, 74:25, 94:16, 98:24, 100:12, 101:2, 101:4, 101:12, 101:14, 101:17, 101:18, 102:10, 102:25, 105:9, 107:14, 110:21, 110:24, 111:20, 111:25, 112:21, 113:19, 116:1, 117:21, 118:1

**testing** [3] - 50:9, 50:12, 50:13

**that'll** [1] - 30:25

**THE** [102] - 1:1, 1:14, 1:17, 1:20, 2:2, 2:5, 3:5, 4:1, 4:10, 4:12, 4:18, 4:21, 5:1, 5:7, 5:15, 6:14, 6:16, 6:17, 6:20, 6:22, 9:10, 9:11, 11:7, 14:1, 16:11, 18:10, 18:11, 19:10, 19:12, 19:20, 19:21, 19:23, 19:25, 20:3, 20:4, 20:21, 20:23, 24:8, 24:11, 29:8, 29:9, 29:19, 30:1, 30:9, 30:12, 30:24, 31:1, 31:8, 35:8, 35:11, 35:12, 35:16, 36:24, 37:4, 44:10, 44:18, 44:20, 53:15, 53:17, 55:21, 60:12, 60:19, 61:2, 61:5, 61:7, 61:9, 61:10, 61:15, 61:16, 61:19, 67:8, 67:14, 67:15, 68:6, 68:7, 69:14, 69:15, 74:13, 94:17, 97:7, 98:14, 98:15, 102:13, 103:21, 105:17, 105:18, 108:20, 109:10, 109:21, 110:2, 110:6, 110:11, 110:16, 113:19, 114:5, 116:7, 116:12, 116:15, 116:18, 116:23, 117:1, 117:25

**themselves** [4] - 19:1, 29:16, 69:1, 72:11

**therefore** [4] - 26:4, 64:15, 111:18, 112:17

**Thereupon** [1] - 60:17

835

**thesis** [3] - 37:14, 37:16, 37:17
**they've** [8] - 4:22, 98:10, 103:8, 108:1, 108:2, 108:6, 108:8, 114:17
**thinking** [1] - 60:19
**Third** [2] - 81:17, 82:3
**third** [56] - 13:13, 13:16, 13:22, 14:4, 14:8, 14:13, 14:22, 15:4, 16:25, 25:3, 25:10, 25:11, 25:20, 27:10, 31:22, 33:25, 47:16, 47:18, 81:24, 82:5, 82:7, 82:8, 82:10, 82:14, 82:17, 82:25, 83:3, 83:13, 83:19, 85:7, 85:10, 85:11, 86:3, 86:15, 88:7, 89:23, 90:3, 92:6, 92:22, 92:25, 93:12, 93:16, 93:18, 93:23, 94:12, 94:22, 95:1, 96:24, 100:7, 100:18, 104:21, 105:4, 105:21, 105:24, 106:1, 113:8
**thousand** [1] - 26:16
**thousands** [1] - 51:14
**three** [11] - 32:16, 56:15, 56:20, 57:21, 58:6, 73:20, 91:20, 92:12, 110:17
**throughout** [1] - 79:11
**Thursday** [1] - 116:24
**Tim** [2] - 4:5, 19:16
**timing** [1] - 60:24
**TIMOTHY** [1] - 20:2
**Timothy** [4] - 3:7, 20:21, 112:2, 112:19
**title** [4] - 56:25, 82:2, 82:18, 82:19
**titled** [2] - 57:17, 81:17
**today** [25] - 22:25, 23:13, 23:20, 32:24, 36:1, 36:5, 37:24, 51:17, 68:3, 72:5, 74:25, 76:9, 76:10, 76:24, 77:11, 79:22, 83:6, 91:18, 98:24, 101:3, 101:19, 102:7, 103:1, 103:15, 103:20
**together** [4] - 84:8, 89:15, 91:7, 91:9

**Tom** [1] - 97:19
**tomorrow** [7] - 5:9, 6:2, 110:2, 110:8, 113:24, 114:4, 114:25
**tonight** [1] - 113:16
**took** [2] - 20:6, 29:12
**tool** [1] - 49:21
**top** [3] - 86:21, 87:5, 99:24
**topic** [1] - 37:20
**topics** [4] - 39:5, 40:8, 42:5, 42:20
**total** [16] - 49:3, 56:7, 57:2, 57:4, 57:13, 57:16, 57:18, 57:20, 73:2, 73:21, 74:7, 80:6, 82:25, 84:11, 89:12
**totaled** [1] - 79:11
**totality** [1] - 79:15
**totally** [1] - 53:11
**trade** [1] - 17:14
**traded** [4] - 72:19, 72:22, 73:1, 73:5
**traders** [2] - 65:24, 65:25
**trading** [3] - 65:16, 65:22, 96:25
**transaction** [1] - 113:2
**TRANSCRIPT** [1] - 1:13
**transcript** [2] - 119:5, 119:6
**Treasury** [15] - 10:10, 11:3, 11:13, 11:17, 11:20, 24:18, 25:13, 63:13, 66:7, 66:22, 70:7, 70:22, 79:9, 112:6, 114:8
**trial** [21] - 5:14, 5:19, 5:21, 5:22, 32:23, 33:4, 33:12, 34:5, 34:21, 34:22, 71:17, 101:11, 112:22, 113:6, 114:7, 114:19, 114:20, 116:8, 117:11, 117:15
**TRIAL** [1] - 1:13
**trillion** [2] - 46:12, 79:12
**trillionth** [2] - 60:11, 60:13
**Troubled** [1] - 97:20
**true** [4] - 70:12, 75:19, 119:4, 119:5
**trustee** [1] - 22:2
**try** [2] - 24:11, 95:19
**trying** [6] - 29:5, 33:19, 81:14, 81:16,

81:21, 114:14
**turn** [11] - 15:23, 16:7, 16:13, 16:22, 36:25, 37:1, 44:23, 65:7, 84:3, 85:21, 89:9
**tweet** [1] - 110:7
**Twitter** [1] - 110:7
**two** [14] - 21:9, 21:11, 22:10, 30:18, 32:11, 41:4, 45:21, 57:10, 72:15, 104:12, 107:4, 107:10, 109:8, 111:25
**two-minute** [1] - 30:18
**type** [4] - 8:23, 66:13, 81:10, 81:13
**types** [3] - 7:11, 40:8, 46:9
**typical** [2] - 46:8, 47:8
**typically** [4] - 18:22, 40:9, 87:3

## U

**U.S** [8] - 24:18, 41:16, 46:8, 48:11, 78:9, 78:10, 79:9, 79:11
**ultimately** [1] - 94:4
**un-confuse** [1] - 99:8
**uncommon** [2] - 48:11, 48:19
**under** [16] - 5:11, 11:15, 18:13, 46:24, 56:24, 57:17, 69:25, 75:13, 76:5, 76:10, 76:12, 76:13, 104:20, 104:21, 106:10, 106:11
**undercutting** [1] - 65:17
**undergraduates** [1] - 38:16
**underlying** [3] - 54:18, 80:21, 85:20
**understood** [1] - 9:9
**undertook** [1] - 102:12
**unduly** [1] - 35:4
**unexpected** [1] - 62:6
**unexpectedly** [1] - 41:21
**unfortunate** [1] - 113:24

**unheard** [1] - 48:15
**union** [4] - 21:23, 22:1, 22:4, 23:8
**United** [10] - 10:10, 11:2, 45:25, 46:2, 46:6, 77:13, 77:15, 78:4, 78:19, 119:13
**UNITED** [2] - 1:1, 1:14
**united** [1] - 2:11
**University** [5] - 35:22, 38:9, 38:11, 38:12, 38:15
**unless** [1] - 11:19
**unpopular** [1] - 41:4
**unquote** [1] - 65:19
**unreasonably** [1] - 20:7
**up** [47] - 10:21, 15:18, 19:19, 22:17, 25:25, 32:18, 32:19, 33:9, 36:10, 37:3, 41:21, 48:6, 51:3, 57:21, 61:24, 63:5, 67:16, 74:21, 77:3, 79:13, 80:14, 83:18, 83:22, 83:23, 84:10, 84:11, 86:16, 86:21, 87:14, 88:3, 88:14, 88:19, 88:20, 91:11, 91:18, 91:24, 92:3, 92:7, 92:9, 97:22, 99:10, 99:20, 102:20, 108:22, 113:18, 114:11, 115:7
**upbeat** [1] - 63:16
**uses** [1] - 8:8

## V

**vague** [1] - 69:13
**valid** [2] - 65:5, 66:1
**validated** [2] - 52:1, 81:9
**valuation** [1] - 44:16
**value** [47] - 50:13, 56:6, 57:5, 57:7, 57:13, 57:18, 65:6, 65:16, 66:2, 68:15, 69:4, 69:11, 69:25, 72:18, 72:21, 72:23, 72:24, 72:25, 73:2, 73:3, 73:4, 73:6, 73:7, 74:7, 74:8, 74:9, 82:20, 82:24, 84:5, 84:12, 84:23, 87:10, 88:6, 88:7, 88:19, 88:21, 88:22, 89:2, 89:12, 90:10, 90:24,

91:8, 91:19, 92:13, 97:1, 105:10
**values** [1] - 96:9
**varies** [1] - 19:4
**variety** [2] - 79:10, 104:14
**VARMA** [1] - 2:5
**verify** [1] - 99:3
**verse** [1] - 102:5
**version** [1] - 64:12
**versus** [1] - 78:7
**vertical** [1] - 84:10
**vessels** [1] - 7:19
**video** [12] - 3:8, 3:9, 29:23, 29:25, 30:14, 30:19, 30:25, 51:24, 53:8, 53:12, 53:13, 53:17
**videotape** [1] - 4:9
**videotaped** [2] - 30:16, 31:4
**view** [7] - 70:18, 74:9, 96:7, 96:17, 97:1, 114:12, 115:17
**Vince** [1] - 15:15
**VINCENT** [1] - 1:17
**visual** [1] - 90:14
**vouching** [1] - 33:18
**vs** [1] - 1:5

## W

**wait** [1] - 117:20
**waited** [1] - 71:8
**waiting** [1] - 4:22
**waived** [3] - 6:9, 114:16, 117:8
**Washington** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 119:14
**watercraft** [1] - 7:23
**wealth** [1] - 54:1
**week** [1] - 83:23
**weekend** [2] - 116:21, 116:23
**weigh** [1] - 39:22
**Wells** [2] - 46:22, 76:3
**Wharton** [2] - 38:10, 38:13
**whole** [4] - 16:14, 71:7, 82:8, 107:1
**widely** [1] - 108:6
**WIERZBOWSKI** [1] - 2:2
**wind** [3] - 93:25, 94:6, 94:23
**wind-down** [3] - 93:25, 94:6, 94:23

**wiped** [2] - 49:8, 49:13

**without-historic-precedent** [1] - 66:24

**Witness** [1] - 110:15

**witness** [18] - 6:21, 19:11, 19:12, 19:16, 29:19, 29:21, 31:6, 35:11, 35:23, 42:16, 42:21, 43:6, 43:14, 60:20, 110:11, 114:25, 115:1

**WITNESS** [14] - 6:25, 9:11, 18:10, 20:2, 20:21, 29:9, 35:14, 53:17, 67:15, 68:7, 69:15, 94:17, 98:15, 105:18

**witnesses** [1] - 111:25

**WITNESSES** [1] - 3:5

**word** [2] - 16:5, 90:19

**words** [7] - 28:11, 39:24, 47:15, 47:19, 75:12, 94:6, 94:22

**workers'** [1] - 7:14

**works** [1] - 115:19

**worth** [71] - 13:24, 14:7, 15:7, 17:17, 19:5, 25:3, 25:15, 25:17, 25:22, 26:3, 28:25, 32:21, 39:24, 45:3, 47:22, 47:25, 48:20, 48:24, 49:3, 49:11, 50:10, 50:11, 51:6, 56:8, 56:9, 57:1, 57:3, 57:4, 57:18, 58:24, 66:5, 66:6, 66:12, 67:5, 68:3, 68:10, 68:19, 70:4, 70:9, 70:13, 71:15, 74:1, 74:6, 82:14, 93:10, 93:13, 93:15, 93:18, 93:22, 95:3, 95:14, 95:21, 96:1, 96:6, 96:18, 96:24, 101:3, 102:7, 102:20, 104:4, 106:13, 106:25, 107:11, 107:19, 107:21, 108:9, 108:18, 109:4

**write** [5] - 7:24, 22:22, 37:14, 37:16, 51:18

**writing** [2] - 40:1, 96:4

**writings** [1] - 41:6

**written** [1] - 39:2

**wrote** [2] - 37:20,

75:11

## Y

**y'all** [2] - 61:10, 113:12

**yacht** [1] - 8:2

**yachts** [1] - 7:23

**year** [10] - 12:19, 16:1, 70:16, 71:24, 72:1, 104:24, 105:2, 105:5, 105:6

**years** [31] - 17:22, 18:4, 18:6, 21:9, 21:11, 22:10, 22:11, 22:13, 64:11, 83:8, 87:11, 89:4, 90:12, 90:25, 91:14, 92:15, 96:11, 100:23, 100:25, 102:21, 102:24, 103:6, 103:18, 106:4, 106:7, 106:9, 106:10, 110:25

**yellow** [13] - 56:20, 57:6, 57:10, 58:7, 85:6, 86:15, 89:23, 99:13, 99:24, 100:2, 100:8, 100:12, 100:17

**yesterday** [3] - 20:5, 31:19, 117:9

**York** [3] - 1:21, 2:4

**yourself** [6] - 39:25, 51:16, 52:9, 98:17, 98:21, 99:3

## Z

**zero** [8] - 33:23, 68:23, 81:19, 96:12, 96:13, 96:15, 96:16, 96:24

**zoom** [1] - 12:14