1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

2

Fairholme Funds, Inc., et al.,  ) Civil Action
                               ) No. 1:13-cv-01053-RCL
3
                  Plaintiffs,  )
4                              )
vs.                            ) <u>**Jury Trial (Day 8)**</u>
5                              ) **Morning Session**
Federal Housing Finance        )
6 Agency, et al.               ) Washington, D.C.
                               ) **August 2, 2023**
7                 Defendants.  ) Time:  10:00 a.m.
8 _____

In re Fannie Mae/Freddie Mac   ) Civil Action
9 Senior Preferred Stock        ) No. 1:13-mc-1288-RCL
Purchase Agreement Class       )
10 Action Litigations.          )
11 _____

**Transcript of <u>Jury Trial (Day 8) Morning Session</u>**
12 **Held Before**
**The Honorable Royce C. Lamberth**
13 **United States Senior District Judge**
14 _____

<u>A P P E A R A N C E S</u>
15

For the Fairholme Funds, Inc. Plaintiffs:
16                 **Vincent J. Colatriano**
                  COOPER & KIRK, PLLC
17                 1523 New Hampshire Avenue, Northwest
                  Washington, D.C. 20036
18

For the Defendant Federal Housing Finance Agency:
19                 **Asim Varma**
                  **David B. Bergman**
20                 **Ian S. Hoffman**
                  **R. Stanton Jones**
21                 **Jonathan L. Stern**
                  ARNOLD & PORTER KAYE SCHOLER LLP
22                 601 Massachusetts Avenue, Northwest
                  Washington, D.C. 20001
23

24

25

1          A P P E A R A N C E S (continued)

2     For the Class Plaintiffs:

                          **Hamish P. M. Hume**
3                         **Kenya Khalelah Davis**
                          BOIES SCHILLER FLEXNER LLP
4                         1401 New York Avenue, Northwest
                          Washington, D.C. 20005
5
                          **Robert Kravetz**
6                         BERNSTEIN LITOWITZ BERGER & GROSSMANN
                          LLP
7                         1251 Avenue of the Americas
                          New York, New York 10020
8
                          **Lee D. Rudy**
9                         **Lauren Lummus**
                          KESSLER TOPAZ MELTZER & CHECK
10                        280 King of Prussia Road
                          Radnor, Pennsylvania 19087
11    _____

12    Stenographic Official Court Reporter:
                          Nancy J. Meyer
13                        Registered Diplomate Reporter
                          Certified Realtime Reporter
14                        333 Constitution Avenue, Northwest
                          Washington, D.C. 20001
15                        202-354-3118

16    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
17

18

19

20

21

22

23

24

25

1

**I N D E X**

2

PAGE:

3

**Witnesses:**

4

Nicholas Satriano
     Direct Examination By Mr. Hoffman................ 1552

5

6

**Exhibits Admitted:**

7

        Defendants' Exhibit 102........................... 1570
8       Defendants' Exhibit 103........................... 1570
        Defendants' Exhibit 136........................... 1570
9       Defendants' Exhibit 137........................... 1570
        Defendants' Exhibit 158........................... 1570
10      Defendants' Exhibit 159........................... 1570
        Defendants' Exhibit 175........................... 1570
11      Defendants' Exhibit 176........................... 1570
        Defendants' Exhibit 188........................... 1570
12      Defendants' Exhibit 189........................... 1570
        Defendants' Exhibit 212........................... 1570
13      Defendants' Exhibit 213........................... 1570
        Defendants' Exhibit 226........................... 1570
14      Defendants' Exhibit 227........................... 1570
        Defendants' Exhibit 237........................... 1570
15      Defendants' Exhibit 238........................... 1570
        Defendants' Exhibit 252........................... 1570
16      Defendants' Exhibit 253........................... 1570
        Defendants' Exhibit 275........................... 1570
17      Defendants' Exhibit 276........................... 1570
        Defendants' Exhibit 297........................... 1570
18      Defendants' Exhibit 298........................... 1570
        Defendants' Exhibit 327........................... 1570
19      Defendants' Exhibit 328........................... 1570
        Defendants' Exhibit 341........................... 1570
20      Defendants' Exhibit 342........................... 1570
        Defendants' Exhibit 367........................... 1570
21      Defendants' Exhibit 369........................... 1570
        Defendants' Exhibit 420........................... 1570
22      Defendants' Exhibit 421........................... 1570
        Defendants' Exhibit 472-A......................... 1616
23      Defendants' Exhibit 476........................... 1570
        Defendants' Exhibit 477........................... 1570
24      Defendants' Exhibit 499-A......................... 1606
        Defendants' Exhibit 916........................... 1589

25

```
 1              P R O C E E D I N G S

 2              (Proceedings held out of the presence of the jury.)

 3              THE COURT:  If I can see counsel at the bench off the

 4    record, please.

 5              MR. STERN:  At the bench, Your Honor?

 6              THE COURT:  Yes.  As many of you who'd like to come.

 7              (Off the record.)

 8              THE COURTROOM DEPUTY:  This is Civil Action 13-1053,

 9    with related miscellaneous case 13-1288, In re:  Fannie

10    Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class

11    Action Litigations.

12              MR. HOFFMAN:  Good morning, Your Honor.  Ian Hoffman

13    on behalf of defendants.

14              One brief housekeeping matter, which relates to

15    Mr. Satriano.  The defendants intend to call Mr. Satriano

16    first, and we intend to start his testimony by laying the

17    foundation to admit the SEC filings.  I expect plaintiffs will

18    object and may ask permission to ask some *voir dire* questions,

19    and since it's a purely legal issue and because there might be

20    some back-and-forth on it, you know, I defer to the Court -- I

21    just want it to be as streamlined and smooth and least

22    disruptive to the jury as possible.

23              And so one idea, Your Honor, to streamline this could be

24    that I could put Mr. Satriano on the stand before the jury

25    comes and give a very brief direct to elicit testimony that
```

1    would lay the foundation for the SEC filings.

2         I could do this by submitting his declaration and just

3    having him adopt it.  I can do it, I think, in less than

4    10 minutes, and then if plaintiffs wish to ask him *voir dire*

5    questions about that and have argument about the SEC filings,

6    we can knock that out before the jury comes in so there's not a

7    lot of back-and-forth on just the legal issue of the

8    admissibility of the SEC filings.  I think that would be one

9    possible way to streamline it and, again, doing it through his

10   declaration and a few follow-up questions.

11        But I defer to the wishes of the Court.  If you prefer

12   to do it in the presence of the jury, I will just have to lay

13   the foundation a little longer because I wouldn't put in the

14   declaration with the jury.  I would just elicit all the same

15   testimony from him.  But if we're able to do it before the

16   jury, I think I can truncate some of it because Your Honor has

17   the declaration too and I can just have him adopt that.

18        But, again, defer to the wishes to the Court, however

19   you would prefer to do it, but that's just one proposal that

20   defendants would make.

21             MR. RUDY:  Good morning.  Lee Rudy for the

22   plaintiffs.

23        Your Honor, I will tell the Court, I don't intend to do

24   more than a four- or five-question *voir dire* on this, and I

25   would prefer not to keep the jury waiting in my own view.  I

1     also think the jury should be entitled to hear how a

2     nonemployee of Fannie and Freddie is capable of vouching for

3     the credibility of documents.

4            So my preference would be just that I ask my short

5     *voir dire* in front of the jury, but I, again, defer to the

6     Court.  If you prefer to do it outside of the presence of the

7     jury, I'll do that too.

8              THE COURT:  All right.  We can do it in front of the

9     jury.

10             MR. HOFFMAN:  May I bring the witness, Your Honor?

11             THE COURT:  Yes.

12             MR. HOFFMAN:  Permission to approach, Your Honor,

13    with a binder?

14          Your Honor, may Mr. Satriano take the witness stand?

15             THE COURT:  I'll just have -- yeah, just stand right

16    there for a moment until the jury is seated.

17          Good morning.

18          Off the record.

19             (Off the record.)

20             (Proceedings held in the presence of the jury.)

21             THE COURT:  You may be seated.  Good morning, ladies

22    and gentlemen.

23          The witness may come forward.  Face the clerk and raise

24    your right hand.

25             (Oath administered.)

```
 1              THE WITNESS:  I do.

 2              THE COURTROOM DEPUTY:  Thank you.  You may be seated.

 3              MR. HOFFMAN:  Good morning, Your Honor, members of

 4      the jury.  Ian Hoffman on behalf of the defendants.

 5          Just to make the record clear, defendants call

 6      Mr. Nicholas Satriano as defendants' next witness.

 7                            DIRECT EXAMINATION

 8      BY MR. HOFFMAN:

 9      Q.  Good morning, Mr. Satriano.

10      A.  Good morning.

11      Q.  Please introduce yourself to the members of the jury.

12      A.  Good morning.  My name is Nick Satriano.

13      Q.  Where do you work?

14      A.  I work at the Federal Housing Finance Agency, known as the

15      FHFA.

16      Q.  And how long have you worked at FHFA?

17      A.  I've worked at FHFA about 20 years and its predecessor

18      agencies.  There were some mergers that happened.

19      Q.  And what was the predecessor agency right before FHFA?

20      A.  It was called the Office of Federal Housing Enterprise

21      Oversight.  The acronym is OFHEO.

22      Q.  Is that O-F-H-E-O; is that right?

23      A.  Yes.

24      Q.  Okay.  And what is your current role at FHFA?

25      A.  I am the agency -- so the FHFA's chief accountant.
```

1   Q.  And how long have you been the agency's chief accountant?

2   A.  Since 2011.

3   Q.  And what was your role at FHFA before you were chief

4   accountant?

5   A.  Immediately before that position, I was the deputy chief

6   accountant.

7   Q.  During, approximately, what time period were you deputy

8   chief accountant?

9   A.  From around 2008 through 2011.

10  Q.  Backing up a few steps, where did you go to college?

11  A.  I went to college at Earlham College.

12  Q.  And what did you study?

13  A.  I studied Japanese history.

14  Q.  And did you do more schooling after college?

15  A.  Yes, I did.  I went on and received a master's degree in

16  international finance, and I also did further study in

17  accounting in Virginia.

18  Q.  And do you have any professional accounting certifications?

19  A.  Yes, I do.

20  Q.  And what are those?

21  A.  I have what is called a certified public accountant

22  license, and I'm licensed in the state of Virginia.

23  Q.  And what did you do for work after you finished your

24  education?

25  A.  Yeah.  So I went to work for a Federal Housing Finance

1    Agency called the GAO, the General Accounting Office; and while

2    there, I focused my activities on financial institutions

3    broadly, that includes banks, credit unions, and entities like

4    Fannie Mae, Freddie Mac.

5    Q.  And you eventually joined OFHEO?

6    A.  Subsequent to the General Accounting Office, I took a

7    position at OFHEO, yeah.

8    Q.  And how long have you been at OFHEO/FHFA?

9    A.  Since 2003.  So 20 years.

10   Q.  Mr. Satriano, can you explain to the jury, what do you do

11   as FHFA's chief accountant?

12   A.  So as you may know, FHFA is the regulatory agency charged

13   with overseeing the safe and sound operations of Fannie Mae,

14   Freddie Mac, and the federal home loan banks.  My primary

15   responsibility is to run the Office of the Chief Accountant

16   where we focus on looking at the companies -- so Fannie,

17   Freddie, the banks -- we look at their accounting policies.  We

18   look at their -- study and examine their financial disclosures,

19   which include SEC filings, and include other regulatory

20   reporting, and we also focus on their audit-related activities.

21   Q.  Do Fannie Mae and Freddie Mac make SEC filings?

22   A.  Yes, they do.

23   Q.  What are the most common types of SEC filings that Fannie

24   and Freddie make?

25   A.  The most common types of filings are periodic filings

1    called quarterly filings, Form 10-Q, and annual filings, which

2    are called form -- filed on Form 10-K.

3    Q.  This may be kind of embedded in the answer -- or in the

4    question, but how often do Fannie and Freddie file 10-Qs and

5    10-Ks?

6    A.  They are required to file them each quarter.  So March,

7    June, September they file quarterly documents.  At the end of

8    the year, December 31st, they file an annual document.

9    Q.  Mr. Satriano, are you familiar with Fannie Mae and

10   Freddie Mac's recordkeeping procedures with respect to their

11   SEC filings?

12   A.  Yes, I am.

13   Q.  And how would you describe that level of familiarity?

14   A.  I am very familiar with their recordkeeping procedures.

15   Q.  Who prepares Fannie Mae and Freddie Mac's SEC filings?

16   A.  Fannie Mae and Freddie Mac management.  Typically focused

17   on the -- in the finance area, take the lead in preparing the

18   financial statements.

19   Q.  And how -- how do you have familiarity about Fannie and

20   Freddie's recordkeeping procedures with respect to their SEC

21   filings?

22   A.  Yeah.  Since at least 2008, we have had regular interaction

23   with Fannie Mae and Freddie Mac management's finance teams,

24   primarily focused in -- on in their controllers' function.  So

25   the controller is the person at the company immediately

1  responsible for the preparation of the financial statements.

2  We typically meet with the controller and his financial -- or

3  her financial reporting staff on a weekly basis to discuss

4  issues related to accounting policy, financial disclosures,

5  completeness, accuracy, and timing, and matters such as

6  internal controls over financial reporting.

7  Q.  And you mentioned the controller.  What, if any, role does

8  each enterprise -- Fannie Mae and Freddie Mac's -- CFO have in

9  connection with the SEC filings?

10  A.  Yeah.  So the CFO, chief financial officer, is the person

11  primarily responsible from a finance perspective in the

12  preparation, approval, review of the financial statements.  The

13  controller reports up to the CFO.  So if you think about the

14  organizational chart, CFO, controller, financial reporting.

15  And that's the finan- -- we call it the finance organization of

16  Fannie Mae or Freddie Mac.

17  Q.  And how often do you interact with each enterprises' CFO

18  about their SEC filings?

19  A.  Usually formally twice per month or as needed if the

20  questions arise during the financial prep- -- the preparation

21  of the financial statements.

22  Q.  Do Fannie Mae or Freddie Mac have any committees related to

23  their preparation of the SEC filings?

24  A.  Yes, they do.

25  Q.  And what are those committees?

1    A.  So there's two broad groups.  There are management

2    committees and then there are committees of the board of

3    directors.  So the manage -- main management committee is

4    called the disclosure committee.  The disclosure committee is

5    tasked with ensuring the completeness and accuracy of each

6    filing, and they do this by corralling executives and

7    knowledgeable stakeholders from around the company to

8    participate and discuss disclosure -- needed disclosure topics

9    to ensure that all required disclosures are included in the

10   documents.

11   Q.  And what information do you get, if any, about the work of

12   the disclosure committee at Fannie Mae and Freddie Mac?

13   A.  In my role as chief accountant, I do participate in those

14   meetings as an observer and -- or my staff.  I don't do every

15   single action myself, but -- so me or my staff in the chief

16   accountant's office, we review -- participate in the meetings,

17   read the agendas, read the minutes, the formal minutes, that

18   result from those meetings, and follow up with management as

19   necessary and/or appropriate.

20   Q.  You referred a moment ago to another committee that's

21   connected to the board of directors.  Can you talk a little bit

22   more about that.

23   A.  Yeah.  So Fannie Mae and Freddie Mac are overseen by a

24   board of directors, which includes a subcommittee called the

25   audit committee.  An audit committee's function -- one of their

1   primary functions is to review and subsequently approve the

2   issuance of the SEC filings as another form of oversight and

3   control.

4   Q.  And what insight, if any, do you have into the ongoing work

5   of the Fannie Mae and Freddie Mac's audit committees about the

6   preparation of their SEC filings?

7   A.  I have insight based on my personal participation in each

8   company's -- Fannie and Freddie's -- audit committee meetings

9   where I see management's presentations to the audit committee.

10  I can hear what the audit committee's questioning and

11  deliberation related to the disclosures, and I can ask

12  questions or follow up as needed.

13  Q.  Do Fannie Mae and Freddie Mac have any written guidelines

14  that govern their preparation of the SEC filings?

15  A.  Yes, they do.

16  Q.  And are -- do you have familiarity with those guidelines?

17  A.  Yes, I do.

18  Q.  And has FHFA ever issued any written guidance to Fannie and

19  Freddie about the preparation of their SEC filings?

20  A.  Yes, we have.

21  Q.  And what is your level of familiarity with that guidance?

22  A.  I am very familiar with the disclosure guidance that we've

23  issued.  It was issued by the Office of the Chief Accountant.

24  Q.  Let's talk about the filings themselves, Mr. Satriano.  Do

25  the SEC filings have different sections?

1    A.  Yes, they do.

2    Q.  What are the main sections within Fannie and Freddie's SEC

3    filings?

4    A.  There are several main sections, primarily consisting of

5    management's discussion and analysis of financial results,

6    commonly referred to as MD&A.  And the other main section

7    include the financial statements, which are tabular --

8    traditional financial statements.  Perhaps you've heard of

9    income statement, balance sheet, statement of shareholders'

10   equity.

11   Q.  How would you describe sort of the high-level differences

12   between the MD&A section and the financial statements?

13   A.  The MD&A section is largely qualitative and written in the

14   form of a report, in paragraphs and text, describing

15   significant financial results and results of business

16   operations.

17   Q.  And does that contrast with the financial statements?

18   A.  Yes, it does.  The -- the financial statements are

19   quanti- -- primarily quantitative.  They are in a consistent

20   structure each period.  So they are comparable period over

21   period.  Total assets -- total assets, things like that.

22        So that's very quantitative, just a chart -- charts of

23   numbers.

24   Q.  Now, Mr. Satriano, do you have familiarity with Fannie and

25   Freddie's recordkeeping procedures with respect to the MD&A

1    section of their SEC filings?

2    A.  Yes, I do.

3    Q.  How so?

4    A.  I have it through my personal engagement with Fannie Mae

5    and Freddie Mac management on issues of required disclosure.

6    So when we talk about the SEC filings, they include

7    management's discussion and analysis, and they also include the

8    financial statements.  Management's discussion and analysis in

9    the area where we probably spend the majority of our time given

10   that there is a lot of information that is summarized and

11   highlighted in that section.

12   Q.  Do Fannie Mae and Freddie Mac have external auditors?

13   A.  Yes, they do.

14   Q.  Can you explain to the jury; what is an external auditor?

15   A.  Large public companies like Fannie Mae and Freddie Mac

16   file -- are required to have -- to receive an audit by an

17   independent external accounting firm.  And Fannie Mae and

18   Freddie Mac both have -- have that function.  And it -- you

19   know, the big picture is that it helps to enhance the

20   reliability of the financial filing.

21   Q.  And who is Fannie Mae's external auditor?  And who is

22   Freddie Mac's external auditor?

23   A.  Fannie Mae is audited by Deloitte & [sic] Touche.  And

24   Freddie Mac is audited by PricewaterhouseCoopers, both very

25   large public accounting firms.

1   Q.  And what role, if any, do those external auditors have in

2   connection with Fannie and Freddie's SEC filings?

3   A.  So part of their mandate, their assignment, is to review --

4   review each quarter's financial statements, and then annually,

5   perform an audit, typically focused on the information in the

6   Form 10-K.

7   Q.  And as FHFA's chief accountant, do you consider the

8   external auditors to be independent?

9   A.  Yeah.  So by definition, they must be independent of

10  management and FHFA.

11  Q.  And is that important to you in your role as FHFA's chief

12  accountant?

13  A.  Yes, it is, because one of the functions that the audit

14  provides is to perform certain test procedures to ensure that

15  the financial statements and related notes are not materially

16  misstated; so they're not incorrect.  And so that provides

17  extra assurance that the numbers and disclosures in the SEC

18  filings are accurate.

19  Q.  And who drafts the SEC filings in the first instance?

20  A.  Fannie Mae and Freddie Mac management.

21  Q.  Overseen by?

22  A.  Overseen by their executives, primarily the CFO, all the

23  way up to the chief executive officer, the CEO, and the board

24  of directors.

25  Q.  Now, does FHFA have a process for reviewing the draft SEC

1    filings before they're filed?

2    A.  Yes, we do.

3    Q.  And what's your role in that process?

4    A.  I am tasked with leading the review for FHFA of Fannie Mae

5    and Freddie Mac's financial statements.

6    Q.  And what does FHFA review the financial statements for --

7    I'm sorry -- the SEC filings for?

8    A.  Sure.  Our primary objective is to review the financial

9    filings to ensure, based on our knowledge, that they do not

10   contain material misstatements or material omissions of -- that

11   we are aware of.

12   Q.  And how does that review process at FHFA culminate?

13   A.  So the review process culminates in a written

14   communication -- so a letter -- from FHFA, to the management of

15   Fannie Mae and Freddie Mac citing our nonobjection or approval,

16   like an approval for them to issue their financial statements

17   to the SEC.

18   Q.  And what happens after that letter from FHFA is sent to

19   Fannie and Freddie?

20   A.  The letter is only sent at the end of the process, once

21   Fannie Mae's management and their board of directors have

22   reviewed and approved the document.  And sort of the final step

23   prior to filing these financial state- -- financial disclosures

24   with the SEC is the chief executive officer and chief financial

25   officer certifications.

1    Q.  And certifications, is that another way of saying their

2    signature?

3    A.  Right.  So they certify to a list of items, and they

4    ultimately have to sign their name to the document for each

5    quarter.

6    Q.  As FHFA's chief accountant, what do you understand the CFO

7    and CEO to be certifying when they sign the SEC filings?

8    A.  They certify that they have reviewed the report in

9    question.  So, for example, the June 30th, 2016, report, they

10   attest to the fact that they have reviewed it and that based on

11   their knowledge, they are not aware of any material omissions,

12   material misstatements, or other items that would cause the

13   financial statements to be, you know, untrue.

14   Q.  And when do Fannie and Freddie actually prepare the SEC

15   filings relative to when the quarter ends?

16   A.  So I'll just give you an example.  Quarter 1 typically ends

17   on March 31st.  Well, it always does.  And it takes companies

18   five to six weeks subsequent to the end of the quarter to

19   prepare, review, get approvals, and -- before they issue the

20   report.  So typically the Quarter 1 report would be filed with

21   the SEC sometime in early May.  So five to six weeks after the

22   end of the reporting period.

23   Q.  And when do Fannie and Freddie actually file their SEC

24   filings?

25   A.  They typically file them as soon as the document is

1  complete and reviewed and approved.  It takes five to six weeks

2  after the end of each quarter.

3  Q.  Are preparing SEC filings a regular or irregular practice

4  of Fannie and Freddie?

5  A.  It's a regular practice.

6  Q.  And where do Fannie Mae and Freddie Mac keep their SEC

7  filings after they're made?

8  A.  They are -- as I -- they're filed with the SEC, and so

9  they're publicly available on the SEC website, and Fannie Mae

10  and Freddie Mac each also make their financial statements

11  available to the public on their own websites.

12  Q.  Does FHFA review the entire SEC filing or only certain

13  sections of it?

14  A.  We review the whole document.

15  Q.  And with respect to the CEO and CFO certification, as

16  FHFA's chief accountant, do you understand whether those

17  certifications apply to the whole filing or only certain

18  sections?

19  A.  The CEO and CFO certifications apply to the whole SEC

20  filing.

21  Q.  And on the MD&A section that you were discussing earlier, I

22  believe you described that as qualitative section; is that

23  right?

24  A.  Yes, I did.

25  Q.  Okay.  Is there an executive summary section within the

1    MD&A?

2    A.  Yes, there is.

3    Q.  And what goes into the executive summary section?

4    A.  Just for context, the filings are very long, could be

5    200 pages.  So the executive summary is intended to assist

6    users of the SEC filing, which are investors, in highlighting

7    key financial results of the -- of the quarter that just passed

8    and/or key business operations that the company either is

9    required to disclose based on SEC rules or the company feels

10   should be disclosed in order for an investor to make meaningful

11   investment-related decisions.

12   Q.  And who at Fannie Mae and Freddie Mac is responsible for

13   drafting the executive summary section?

14   A.  The executive summary sections are typically drafted by the

15   finance -- the controller's function at each company with

16   oversight from lawyers who specialize in this type of

17   disclosure activity.

18   Q.  Mr. Satriano, how, if at all, did Fannie Mae and

19   Freddie Mac's recordkeeping procedures, with respect to their

20   SEC filings, change since the outset of the conservatorship in

21   September 2008?

22   A.  Their recordkeeping procedures are substantially the same

23   in all material respects over the period that we're talking

24   about.

25   Q.  Through today as well?

1      A.   Through today, yes.

2                MR. HOFFMAN:   Your Honor, at this time defendants

3      move into evidence Fannie Mae and Freddie Mac's SEC filings --

4      that is, their 10-Qs and their 10-Ks -- from the outset of the

5      conservatorship in September of 2008 through the second quarter

6      of 2012.   I have a list of numbers.   I can hand them up or read

7      them out or both, Your Honor.

8                THE COURT:   Is there any objection?

9                MR. RUDY:   I am going to ask a couple of questions,

10     if that's all right, but I'm happy for him to read the list of

11     numbers.

12               THE COURT:   All right.   Go ahead.

13               MR. HOFFMAN:   Should I read the list first or let --

14               THE COURT:   You don't need to read it.   He wants to

15     ask some questions first, he said, before I rule.

16               MR. HOFFMAN:   Your Honor, the numbers first or the

17     questions first?

18               THE COURT:   The questions first.

19               MR. HOFFMAN:   Okay.

20               THE COURT:   You don't need to read the numbers -- or

21     the --

22               MR. HOFFMAN:   Okay.   Thank you, Your Honor.

23               THE COURTROOM DEPUTY:   I would like them read just so

24     that the record is clear of what's been admitted.

25               THE COURT:   All right.   Okay.

```
 1              MR. HOFFMAN:  Okay.  I will read them, Your Honor,
 2     just so the record is clear.  Thank you.
 3              Defendants' Exhibit 102, 103 -- these are all
 4     defendants' exhibits -- 102, 103.
 5              THE COURT:  Let me hand this back to the clerk.  She
 6     needs it more than I do.
 7              MR. HOFFMAN:  Defendants' Exhibit 102, 103, 136, 137,
 8     158, 159, 175, 176, 188, 189, 212, 213, 226, 227, 237, 238,
 9     252, 253, 275, 276, 297, 298, 327, 328, 341, 342, 367, 369,
10     420, 421, 476, and 477.
11              MR. RUDY:  Lee Rudy for the plaintiffs.
12              Your Honor, if it's okay, I'd just like to ask him a
13     couple questions before we discuss whether we object to these
14     documents.
15              THE COURT:  Sure.
16              MR. RUDY:  Thank you, Your Honor.
17              So my name is Lee Rudy.
18              Mr. Satriano, you don't work for Fannie Mae or
19     Freddie Mac; right?
20              THE WITNESS:  Yes.  That's a true statement.
21              MR. RUDY:  Okay.  And you never have worked for
22     Fannie and Freddie?
23              THE WITNESS:  I have never worked for them, yes.
24              MR. RUDY:  Okay.  And you're being called, among
25     other things today, to give testimony about the -- about the
```

SATRIANO - DIRECT

```
 1    recordkeeping procedures for SEC filings at Fannie and Freddie;

 2    right?

 3              THE WITNESS:  Yes.

 4              MR. RUDY:  And you've just testified that you know

 5    enough about the way that Fannie and Freddie keep their records

 6    to be able to give competent testimony to this jury about why

 7    these SEC filings should be admitted?

 8              THE WITNESS:  Yes, I did.

 9              MR. RUDY:  And that knowledge extends to all parts of

10    the SEC filings, not just the numbers?

11              THE WITNESS:  Yes, as we discussed.

12              MR. RUDY:  Okay.  You mentioned the auditors that

13    look at the filings; right?

14              THE WITNESS:  Yes.

15              MR. RUDY:  And you said that Fannie Mae's audited by

16    Deloitte; is that right?

17              THE WITNESS:  Yes.

18              MR. RUDY:  And Freddie by Pricewaterhouse?

19              THE WITNESS:  Yes.

20              MR. RUDY:  And I think you said something about how

21    the auditors ensure the accuracy of the filings; is that right?

22              THE WITNESS:  That's one of their roles, yes.

23              MR. RUDY:  Okay.  Do the auditors audit the quarterly

24    filings?

25              THE WITNESS:  No.  What I said was that the auditors
```

1   perform a review of each quarter and they perform an annual

2   audit on the Form 10-K, which is the annual filing.

3           MR. RUDY:  Okay.  And when they -- so they don't

4   actually audit the quarterly filings; right?

5           THE WITNESS:  That's right.

6           MR. RUDY:  Okay.  They audit the annual filings;

7   right?

8           THE WITNESS:  Right.  So the auditing requirement

9   is --

10          MR. RUDY:  I asked you a yes-or-no question, sir.

11      Do they --

12          MR. HOFFMAN:  Your Honor.

13          MR. RUDY:  -- only audit the -- the annual filings --

14   that's right?

15          THE WITNESS:  The requirement is to get an annual

16   audit, and that's what they do.

17          MR. RUDY:  And they do no more?

18          THE WITNESS:  Yes.

19          MR. RUDY:  Okay.  And in the annual audit, they --

20   they audit the numbers; right?

21          THE WITNESS:  So the -- the external auditor's charge

22   is to audit the financial statements, which are the numbers and

23   the notes to the financial statements, which are extensive text

24   notes and tables that support the financial statements.

25          And then they have an obligation to read the MD&A to

1    ensure that there are -- nothing that they understand -- have

2    audited about the financial statements is incorrect in the

3    MD&A.

4              MR. RUDY:  So that's a yes?  They audit the numbers?

5              THE WITNESS:  Yes.

6              MR. RUDY:  As you sit here today, do you have any

7    reason to believe that the SEC filings aren't accurate or

8    reliable in your view?

9              THE WITNESS:  I do not.

10             MR. RUDY:  Okay.  Your Honor, on that basis, we -- we

11   consent to the SEC filings coming in.

12             THE COURT:  The documents are all received.

13        You may proceed.

14             (Defendants' Exhibit 102, 103, 136, 137, 158, 159,

15   175, 176, 188, 189, 212, 213, 226, 227, 237, 238, 252, 253,

16   275, 276, 297, 298, 327, 328, 341, 342, 367, 369, 420, 421,

17   476, and 477 admitted into evidence.)

18   BY MR. HOFFMAN:

19   Q.  Mr. Satriano, we've been talking a lot about the process

20   for how Fannie Mae and Freddie Mac's SEC filings are created,

21   but I want to zoom out a little bit and ask you this:  How

22   important are Fannie and Freddie's SEC filings to you in your

23   role as FHFA's chief accountant?

24   A.  The SEC filings are critical documents that we rely on in

25   the course of doing our oversight work.  For example, the

1    accounting policies management ultimately uses are -- and the

2    numbers related to those policies are reflected in the -- in

3    the SEC disclosures, and that's a primary record that we use in

4    our business and also investors use for their investment

5    decision-making purposes.

6    Q.  In your experience as FHFA's chief accountant, do you think

7    the SE- -- the enterprises' SEC filings are reliable?

8    A.  Yes, I do.

9    Q.  Why is that?

10   A.  Because of the process and the governance and controls that

11   are applied to the process each quarter.

12   Q.  Is that process the process that we just went through in my

13   prior questions?

14   A.  Yes, it is.

15   Q.  In your experience as FHFA's chief accountant, do you have

16   an understanding as to who is the intended audience for Fannie

17   Mae and Freddie Mac's SEC filings?

18   A.  Typically, the primary audience or users of SEC filings are

19   investors.

20   Q.  And what do you mean when you say investors?

21   A.  So people who invest in stock or debt instruments of

22   Fannie Mae and Freddie Mac or any public company.  Typically

23   called commons equity or common stock, preferred stock.  In the

24   case of Fannie Mae and Freddie Mac, they also issue

25   mortgage-backed securities, MDS.  Many investors also invest in

1       those.

2       Q.  Let's take a look at an actual SEC filing now.

3               MR. HOFFMAN:  Let's pull up Defendants' Exhibit 476,

4       which is in evidence.

5       BY MR. HOFFMAN:

6       Q.  Mr. Satriano, do you recognize this document?

7       A.  Yes, I do.

8       Q.  And what is Defendants' Exhibit 476?

9       A.  This looks like the first page of Fannie Mae's Form 10-Q

10      dated June 30th, 2012.

11      Q.  And do the first pages of these types of SEC filings

12      usually follow a specific type of form or template?

13      A.  Yes, they do.

14      Q.  And so where on this page does it indicate the time period

15      for which the SEC filing was made?

16      A.  On the first sort of bullet point -- underneath the first

17      bullet point, says for the quarterly period ending -- ended

18      June 30th, 2012.

19      Q.  And the big bold name there, Federal National Mortgage

20      Association, what does that refer to?

21      A.  That's Fannie Mae's formal name.  Fannie Mae is sort of a

22      commonly known-as name.

23      Q.  And commonly known name, is that on this page as well?

24      A.  Yeah, just below that.

25      Q.  And so this Form 10-K that we're looking at, this is for

                        SATRIANO - DIRECT

1    the period ending June 30th, 2012; is that right?

2    A.  Yes.

3    Q.  Okay.  Let's go to page 176 of Defendants' Exhibit 476.

4         What are we looking on at this page, Mr. Satriano?

5    A.  We are looking at a certification that Susan McFarland, in

6    her role as the chief financial officer, is required to make

7    pursuant to the securities rules.

8    Q.  And Ms. McFarland, who is she with at the time?  Which

9    company?

10   A.  Sorry.  Susan McFarland is the chief financial officer of

11   Fannie Mae during this time period.

12   Q.  And when did she sign this certification?

13   A.  She signed this certification on August 8th, 2012.

14   Q.  And as FHFA's chief accountant, again, what do you

15   understand her to be certifying to here, particularly with

16   respect to the first and second bullet points?

17   A.  So, obviously, there are a number of certifications on this

18   page, but as we talked about earlier, she's certifying that she

19   has read this report and reviewed -- reviewed this report, and

20   that, based on her knowledge, the report doesn't contain untrue

21   statements of material fact or omit statement -- omit to state

22   material facts that are necessary to make the document not

23   misleading.

24   Q.  And when is -- when is the certification signed, typically,

25   in relation to when the SEC filing is actually made?

1   A.  Typically, these certifications are done just prior to

2   filing the -- with the SEC.  So maybe the day before.

3   Q.  Brief aside, Mr. Satriano.  Are you familiar with the

4   third amendment to the PSPAs?

5   A.  Yes, I am.

6   Q.  Do you have an understanding as to when the third amendment

7   was signed?

8   A.  The third amendment of the PSPA was signed and issued on

9   August 17th, 2012.

10  Q.  So how close in time was this SEC filing to the signing of

11  the third amendment?

12  A.  Just over one week earlier.

13  Q.  And was this Fannie Mae's -- was this the most recent

14  Form 10-Q filed before the third amendment was signed?

15  A.  Yes, it was.

16  Q.  Okay.  Let's go to page 175 of Defendants' Exhibit 476.

17          And we don't have to dwell on this too long,

18  Mr. Satriano, but what are we looking at here on page 175?

19  A.  We are looking at a certification made by the chief

20  executive officer of Fannie Mae for the same time period.

21  Q.  And who was the CEO of Fannie Mae at this time period?

22  A.  A man by the name of Timothy Mayopoulos.

23  Q.  And when did he sign this certification?

24  A.  He signed the certification on August 8th, 2012.

25  Q.  And is the substance of what he was certifying to the same

1    as what Ms. McFarland was also certifying to?

2    A.  Yes, that's my understanding.

3            MR. HOFFMAN:  Okay.  Let's go to page 5 of this

4    exhibit.

5            And let's just zoom in on sort of the top portion.

6    That's fine.  Right there.

7    BY MR. HOFFMAN:

8    Q.  This is actually -- indicates it's page 1 of the SEC filing

9    itself.  So what are we looking at here, Mr. Satriano?

10   A.  We are -- we are looking at the first page of the

11   management discussion and analysis.

12   Q.  So is that what's under -- I'm sorry.  Is that what's under

13   Item No. 2 at the top?

14   A.  Yes.

15   Q.  And is that what you were referring to earlier as the MD&A

16   section?

17   A.  Yes, I was.

18   Q.  Okay.  And what is the section at the -- towards the bottom

19   of this page, of page 1?

20   A.  It is titled Executive Summary.

21   Q.  And you might have touched on this earlier, but what kinds

22   of information goes into the executive summary again?

23   A.  Typically, highlights of the financial results for the

24   period just ended or other required disclosures that company

25   wants to highlight to investors.

1    MR. HOFFMAN:  And let's go to page 16 of this

2    exhibit.  And let's zoom in on the bottom portion here that

3    reads "Uncertainty regarding."

4    BY MR. HOFFMAN:

5    Q.  Okay.  So which section of the SEC filing does this appear

6    in?

7    A.  This -- I believe this appears in the executive summary

8    section, the same section we just saw the header.

9    Q.  As part of the -- what's the broader section that it

10   appears?

11   A.  Oh, as part of the management discussion and analysis

12   section of the second-quarter filings.

13   Q.  And did you review this statement in Fannie's SEC filing at

14   the time?

15   A.  Yes, I did.

16   Q.  And what's the italicized heading for this section?  Can

17   you read that.

18   A.  "Uncertainty regarding our future status and ability to pay

19   dividends to Treasury."

20   Q.  And can you go ahead and read the sentence that starts "The

21   dividend payments we make."  It's on the third line.  Go ahead

22   and read that to the jury, please.

23   A.  "The dividend payments we make on Treasury's senior

24   preferred stock are substantial, currently $11.7 billion per

25   year."

1    Q.  And what did you understand the sentence to be referring to

2    at the time?

3    A.  I understood that to be Fannie Mae's current dividend

4    obligation that they are required to pay Treasury.

5    Q.  And did you have any understanding as to what's being

6    referenced there to the dividend payments and how those

7    dividend payments were calculated?

8    A.  Yes, I do.

9    Q.  And what was that understanding?

10   A.  My understanding is that, at this time, Fannie Mae was

11   making a dividend payment based on 10 percent of funds drawn on

12   the Treasury commitment.

13   Q.  Now, I skipped over the first sentence, but I think this is

14   important.  So let's go ahead and highlight the first sentence,

15   and if you could read that to the jury as well.

16   A.  Okay.  "There is significant uncertainty in the current

17   market environment, and any changes in the trends, in

18   macroeconomic factors that we currently anticipate, such as

19   home prices and unemployment, may cause our future

20   credit-related expenses or income and credit losses to vary

21   significantly from our current expectations."

22   Q.  And what did you understand that to be referring to at the

23   time?

24   A.  I understood this to be a statement related to future

25   events that may happen that are not in Fannie Mae's control,

1    but -- but that could have a significant effect or impact on

2    their financial performance.

3    Q.   Okay.  So now let's read the sentence that starts with

4    "Although we may experience."  Can you read that to the jury,

5    please.

6    A.   "Although we may experience period to period volatility in

7    earnings and comprehensive income, we do not expect to generate

8    net income or comprehensive income in excess of our annual

9    dividend obligation to Treasury over the long term."

10   Q.   What did you understand that to be referring to?

11   A.   It -- it is a warning to investors that the current

12   dividend obligation, which is stated above, $11.7 billion

13   per year, may not be payable from funds they generate via

14   net income or comprehensive income in any given year, or

15   over the long term, which I guess is looking out into the

16   future.

17   Q.   And did you have any understanding at the time as to what

18   would happen if Fannie Mae or Freddie Mac did not earn enough

19   money in a given period to pay the 10 percent dividend?  What

20   would happen?

21   A.   If they did not have enough funds to pay the Treasury

22   dividend --

23          MR. RUDY:  Your Honor, I'm going to object to this.

24   Foundation.

25          THE COURT:  Sustained.

1           MR. HOFFMAN:  Your Honor, at this time, I'd like

2     to read out a portion of the joint statement of undisputed

3     facts.

4           So I'll ask Mr. Montgomery to pull up JX-1.  And go to

5     paragraph 29.

6           And I'll read now from the joint statement of undisputed

7     facts.

8           "From the outset of the conservatorships in 2008 through

9     the first quarter of 2012, there were some quarters in which

10    the enterprises lacked the cash necessary to pay the 10 percent

11    dividend to Treasury.  On such occasions, the enterprises drew

12    from the Treasury commitment in order to pay Treasury its

13    quarterly dividend."

14          Now, Mr. Montgomery, let's go to paragraph 30 of the

15    parties' joint statement of undisputed facts.

16          Paragraph 30 reads, "When the enterprises drew against

17    the Treasury's commitment to pay Treasury dividends, such draws

18    increased the size of the liquidation preference, thereby

19    increasing the size of the enterprises' dividend obligation."

20          You can take that down, Mr. Montgomery.

21    BY MR. HOFFMAN:

22    Q.  Mr. Satriano, are those paragraphs that I just read, are

23    those consistent with your recollection of what occurred at the

24    time?

25    A.  Yes, they are.

1    Q.  And now let's go back to Defendants' Exhibit 476, please.

2         So we just finished talking about the sentence "Although

3    we may experience."  So now let's pick up with the sentence

4    with "However."  And could you read that sentence to the jury,

5    please.

6    A.  "However, we expect that in some future quarters, we will

7    be able to generate comprehensive income sufficient to cover

8    at least a portion of our quarterly dividend payment to

9    Treasury."

10   Q.  And go ahead and read to the end, please.

11   A.  Okay.  "We also expect that, over time, our dividend

12   obligation to Treasury will increasingly drive our future draws

13   under the senior preferred stock purchase agreement."

14   Q.  What did you understand those sentences to be referring to

15   at the time?

16   A.  The first sentence I read, I understood to be that

17   sometimes they would earn enough money to pay at least a

18   portion of what they owe to Treasury with respect to the

19   dividend.

20        And the second -- last sentence, I understand to be

21   that, increasingly, the dividend obligation will be such that

22   it will require future draws in order to pay historical amounts

23   drawn.

24   Q.  And the last sentence, "We also expect that, over time, our

25   dividend obligation to Treasury will increasingly drive our

SATRIANO - DIRECT

1  future draws."  What did you understand that to mean?

2  A.  I understood that to mean that they will -- in the future,

3  they will have to draw more frequently on the senior preferred

4  stock purchase agreement in order to pay the dividends that

5  they have already incurred.

6        MR. RUDY:  Your Honor, objection.

7  A.  You have to --

8        THE COURT:  Overruled.

9  BY MR. HOFFMAN:

10  Q.  Do you have any familiarity with what's sometimes referred

11  to as the circular draw issue?

12  A.  Yes, I do.

13  Q.  And what do you understand that to be referring to?

14  A.  I understand that to be referring to what we just talked

15  about.  Use Fannie Mae as an example.  Fannie Mae has a

16  dividend obligation to Treasury, and if they don't earn enough

17  money in a given period to pay that dividend, they would have

18  to borrow -- draw more -- sorry.  They would have to draw

19  further on the Treasury commitment --

20        MR. RUDY:  Your Honor, object to have to draw more.

21        THE COURT:  Overruled.

22  A.  They would have to draw more on the Treasury commitment in

23  order to pay the dividend that they've already incurred.

24  BY MR. HOFFMAN:

25  Q.  And what did you understand Fannie Mae to be saying here in

1    their SEC filings about that circular draw issue?

2    A.  I understand them to be highlighting for investors that

3    this will be an increasing problem in the future.

4            MR. HOFFMAN:  All right.  Mr. Montgomery, you can

5    take that down.  And you can go to Defendants' Exhibit 477

6    next.

7    BY MR. HOFFMAN:

8    Q.  All right.  Mr. Satriano, what are we looking at here on

9    the first page of Defendants' Exhibit 477, which is in

10   evidence?

11   A.  This is the first page of a Form 10-Q dated June 30th,

12   2012.

13   Q.  For which company?

14   A.  Prepared by Freddie Mac, formerly known as the Federal Home

15   Loan Mortgage Corporation.

16   Q.  So is this the corresponding 10-Q for Freddie Mac filed for

17   the same time period as the 10-Q for Fannie Mae that we were

18   just looking at?

19   A.  Yes, it is.

20           MR. HOFFMAN:  Okay.  So let's go to Defendants'

21   Exhibit 477 at page 209, please.

22           Actually -- I'm sorry -- let's go to page 248.  And

23   let's just zoom into the text here a little bit.

24   BY MR. HOFFMAN:

25   Q.  And what are we looking at here, Mr. Satriano?

SATRIANO - DIRECT

1    A.  We're looking at the certification page for the chief

2    executive officer, Donald Layton.

3    Q.  And when did Mr. Layton, the CEO of Freddie Mac -- when did

4    he sign this certification?

5    A.  He signed this certification on August 7th, 2012.

6    Q.  And is that on or near the time when the SEC filing was

7    made?

8    A.  Yes.  Typically, this would be prepared the day before the

9    SEC filing is actually performed.

10   Q.  And, again, very briefly at a high level, what did you

11   understand Mr. Layton to be certifying to here, particularly

12   with respect to Items 1 and 2?

13   A.  As we talked about earlier, the certification is the same;

14   that he has reviewed this report as of June 30th, 2012, and

15   that based on his knowledge, it doesn't contain untrue

16   statements of material fact or -- or make material omissions in

17   the report.

18            MR. HOFFMAN:  And let's go to page 249,

19   Mr. Montgomery.  And let's also zoom in here.

20   BY MR. HOFFMAN:

21   Q.  And whose certification is this?

22   A.  This is the certification of Ross Kari, who is

23   Freddie Mac's chief financial officer at the time.

24   Q.  And was he certifying to the same things?

25   A.  Yes, he was.

1  Q.  And when did he sign this certification?

2  A.  He signed the certification on August 7th, 2012.

3  Q.  And just like I asked you with Fannie Mae's SEC filing,

4  Mr. Satriano, was this SEC filing the last 10-Q filed before

5  the third amendment was signed?

6  A.  Yes, it was.

7  Q.  Let's go to page 5 of Defendants' Exhibit 477.

8      And what are we looking at here?

9  A.  We're looking at the first page or first part of

10 management's discussion and analysis for Freddie Mac.

11 Q.  And now let's go to page 12.  And let's zoom in on the very

12 top portion, the paragraph that starts with "We pay cash

13 dividends."

14      Do you recognize this paragraph?

15 A.  Yes, I do.

16 Q.  And did you review it at the time?

17 A.  Yes, I did.

18 Q.  And can you read the first sentence, please.

19 A.  "We pay cash dividends to Treasury at an annual rate of

20 10%."

21 Q.  And what did you understand that dividend -- what kind of

22 dividend is being referred to there?

23 A.  I believe that is the dividend obligation related to the

24 historical draws they have made on the Treasury commitment.

25 Q.  And at the annual rate of 10 percent, was that the dividend

SATRIANO - DIRECT

1    rate in effect at this time?

2    A.  Yes.  At this time they were paying -- they had agreed to

3    pay a 10-percent rate.

4    Q.  Now let's highlight the third sentence, which starts "As of

5    June 30th."

6         And can you read that sentence to the jury, please.

7    A.  "As of June 30th, 2012, our annual cash dividend obligation

8    to Treasury on the senior preferred stock of 7.2 billion

9    exceeded our annual historical earnings in all but one period."

10   Q.  And what did you understand that to be referring to at the

11   time?

12   A.  Freddie Mac was informing investors through this disclosure

13   that the dividend obligation that they already have, seven --

14   would be -- would exceed what they owe -- is it would exceed

15   what they would earn in any given year, historically speaking,

16   with -- except for one year.

17   Q.  And please read the last sentence that starts with "As a

18   result."

19   A.  "As a result, we expect to make additional draws in future

20   periods, even if our operating performance generates net income

21   or comprehensive income."

22   Q.  And what did you understand that sentence to mean at the

23   time?

24   A.  I understood them to be saying that because their income or

25   historical earnings, as they use in this section, would be

SATRIANO - DIRECT

1    insufficient, that they would have to make additional draws

2    from the Treasury commitment to pay the dividend obligation

3    that they have already incurred.

4    Q.  And how, if at all, does that relate to this concept of

5    circular draws that you mentioned earlier?

6    A.  To my understanding, this is a description of what a

7    circular draw is.

8    Q.  And what was your understanding as to what Freddie Mac was

9    saying here about circular draws?

10   A.  That the issue of circular draws will continue into future

11   periods given that their historical earnings are not sufficient

12   to cover the dividend obligation.

13           MR. HOFFMAN:  Let's go to page 14 of Defendants'

14   Exhibit 477, please.  And let's focus in on the section towards

15   the bottom that has the heading Long-Term Financial

16   Sustainability.

17       And let's look at the second paragraph here that starts

18   "We expect."  And if Mr. Montgomery could just highlight that

19   paragraph.

20   BY MR. HOFFMAN:

21   Q.  And, Mr. Satriano, go ahead and read that paragraph.

22   A.  "We expect to request additional draws under the

23   purchase agreement in future periods.  Over time, our

24   dividend obligation to Treasury will increasingly drive

25   future draws.  Although we may experience period-to-period

1    variability in earnings and comprehensive income, it is

2    unlikely that we will generate net income or comprehensive

3    income in excess of our annual dividends payable to Treasury

4    over the long term."

5    Q.  What did you understand this to mean at the time?

6    A.  I understood this to be a paragraph of caution informing

7    investors that the dividend obligation that they already owe

8    will increasingly cause them to draw more funds from the

9    Treasury commitment despite the fact that their earnings may go

10   up and down in any given period.  They say it is unlikely, so

11   they do not expect that they will generate net income earnings

12   in excess of the annual dividend obligations to Treasury

13   looking into the future.

14   Q.  And what, if anything, did you understand these sentences

15   to be saying about the issue of circular draws?

16   A.  I understood this to be a description of what a circular

17   draw is, and that it is -- it is happening and likely to get

18   worse.

19           MR. HOFFMAN:  You can take that down, Mr. Montgomery.

20   BY MR. HOFFMAN:

21   Q.  Now I'm going to change gears a little bit, Mr. Satriano,

22   and ask you some questions about the third amendment.

23           Are you familiar with the third amendment to the

24   preferred stock purchase agreements?

25   A.  Yes, I am.

```
 1    Q.  And did you review any drafts of what became the
 2    third amendment?
 3    A.  Yes, I did.
 4          MR. HOFFMAN:  Let's take a look at Defendants'
 5    Exhibit 916, which is not in evidence, but if we could display
 6    it to the jury, please -- I'm sorry.  Display it to the
 7    witness, please, not the jury.
 8          Your Honor, may I approach the witness for a bottle of
 9    water?
10          Thank you.
11          THE WITNESS:  Thank you.
12          MR. HOFFMAN:  I'll do the same.
13    BY MR. HOFFMAN:
14    Q.  Okay.  Mr. Satriano, can you see on your screen Defendants'
15    Exhibit 916?
16    A.  Yes.
17    Q.  And do you recognize this document?
18    A.  Yes, I do.
19    Q.  What is it?
20    A.  This is an email among several employees of the Federal
21    Housing Finance Agency.
22    Q.  And who sent this email?
23    A.  Mario Ugoletti.
24    Q.  And when did he send it?
25    A.  He send it on June 5th, 2012.
```

```
1    Q.  And were you one of the recipients?

2    A.  Yes, I was.

3    Q.  And do you recall receiving this email?

4    A.  Yes, I do.

5    Q.  And did Mr. Ugoletti attach something to this email?

6    A.  Yes, he did.

7    Q.  And what was the attachment?

8    A.  The attachment was a draft of what was to become the

9    third amendment to the PSPA.

10   Q.  And did you review that draft at the time?

11   A.  I did.

12          MR. HOFFMAN:  Your Honor, at this time defendants

13   would move into evidence Defendants' Exhibit 916.

14          MR. RUDY:  No objection.

15          THE COURT:  Received.

16          (Defendants' Exhibit 916 admitted into evidence.)

17          MR. HOFFMAN:  Okay.  If we could publish that to the

18   jury, please.

19       Okay.  So, Mr. Montgomery, let's take down the callout

20   for just a moment.

21   BY MR. HOFFMAN:

22   Q.  So just to reorient us, Mr. Satriano, this is an email from

23   Mr. Ugoletti to you on June 5th, 2012; is that right?

24   A.  Yes.

25   Q.  Okay.  Who was Mr. Ugoletti at this time?
```

SATRIANO - DIRECT

1    A.  Mr. Ugoletti worked for the Federal Housing Finance Agency.

2    His title was special advisor to the director.

3    Q.  And we're going to talk a little bit more about who else

4    received this email.  But let me ask you this first:  Is this

5    around the time when you first learned about the

6    third amendment -- or what would become the third amendment?

7    A.  Yes, it was.

8    Q.  Okay.  And who was the acting director at the time that

9    Mr. Ugoletti was reporting to?

10   A.  Edward DeMarco.

11   Q.  Now, I'd like to ask you --

12          MR. HOFFMAN:  First, I'd like to ask Mr. Montgomery

13   to highlight again the to and from and sent and subject fields.

14   BY MR. HOFFMAN:

15   Q.  And I'd like you to just help explain to the jury who all

16   is receiving this email in addition to yourself.  So let's

17   start with Mr. Alfred Pollard.  Who is Alfred Pollard, and what

18   was his role at the time?

19   A.  Alfred Pollard was FHFA's general counsel.  That's their --

20   the top lawyer.

21   Q.  And who was Mark Laponsky?  What was his role at the time?

22   A.  Mark Laponsky was an executive in the legal department,

23   primarily responsible for enterprise -- Fannie Mae,

24   Freddie Mac -- matters.

25   Q.  Patrick Lawler?

SATRIANO - DIRECT

1    A.  He was an executive also.  His role was the chief

2    economist.

3    Q.  Jon Greenlee?

4    A.  Jon Greenlee was an executive who ran the agency's

5    examination program of Fannie Mae and Freddie Mac.

6    Q.  Meg Burns?

7    A.  She was an executive who was a policy -- housing-policy

8    specialist.

9    Q.  Jeffrey Spohn?

10   A.  Jeffrey Spohn was the agency's executive in charge of

11   enterprise oversight from a conservator perspective.

12   Q.  Jamie Newell?

13   A.  Jamie Newell was an executive who assisted Jeff Spohn in

14   those duties.

15   Q.  And yourself?  What was your role at this time?

16   A.  My role was as the chief accountant of the agency.

17   Q.  So here Mr. Ugoletti was sending a draft of what would

18   become the third amendment to FHFA's top lawyer, top economist,

19   top accountant, top examiner, top conservatorship operations

20   person, and one of the top policy people; is that right?

21   A.  Yes.

22   Q.  And who did these people report to at FHFA?

23   A.  Most of the people on this list reported directly or close

24   to directly to Acting Director Ed DeMarco.

25            MR. HOFFMAN:  Okay.  We can take down the callout.

1  And let's go to page 2 of this exhibit.  We can zoom in to the

2  top portion.

3  BY MR. HOFFMAN:

4  Q.  And do you recognize this as the attachment to the email we

5  were just looking at?

6  A.  Yes.

7  Q.  And was this the draft of what would become the

8  third amendment?

9  A.  Yes, I -- yes.

10  Q.  And did you review this draft at the time?

11  A.  Yes, I did.

12  Q.  What were you reviewing it for?

13  A.  Well, as the agency's chief accountant, my primary focus

14  was on accounting and auditing matters that may be evident in

15  the draft.

16  Q.  Now, was this Fannie -- let me back up.

17      Was this the first amendment to the PSPAs?

18  A.  No, it wasn't.

19  Q.  Were there -- how many amendments to the PSPAs were there

20  prior to the third amendment?

21  A.  There were two.

22  Q.  And did you review drafts of those amendments as well?

23  A.  Yes, I did.

24  Q.  And what were you reviewing for those?

25  A.  So as I said, review for accounting matters and

1    auditing-related matters.  So as I had already reviewed two

2    amendments, one of my -- one of the issues that I was really

3    reading for was the issue around if this agreement provided

4    Fannie Mae and Freddie Mac enough, sort of, financial security

5    in order to maintain their business operations into the near

6    future.

7         There's an auditing standard that the external auditor

8    is required to comment on called going concern.  And they are

9    required to issue what is called a going-concern opinion if

10   they do not think the company that they are auditing will be in

11   business for about a year or one operating cycle.

12        So when I reviewed these earlier drafts and this draft,

13   I was cognizant of -- conscious -- focused on looking for any

14   changes in the agreement that would make that going concern an

15   issue.  And after reviewing the -- several of the components

16   that relate to, kind of, accounting and auditing matters in

17   this document, I did not have those concerns.

18   Q.  And what was -- and -- so what was your conclusion after

19   you did your review?

20   A.  That this -- these amendments embedded in this document

21   would not cause a going-concern issue with respect to the

22   changes that were being proposed.

23   Q.  What did you conclude, if anything, about whether the

24   third amendment would help the going-concern issue?

25   A.  I thought that it -- the changes that were being proposed

1    in this document would amend one of the concerns that we had

2    with the PSPA related to the circularity of dividends.

3    Q.  And what was that concern?

4    A.  Well, the concern was that they would -- if they didn't

5    have -- earn enough funds in any given period to pay the

6    dividend obligation, they would increasingly have to draw more

7    funds in order to pay the historical dividend.  And the amount

8    available under the commitment would be used up, and it was

9    considered to be a finite amount of funds available.

10        So using them carefully was always a high concern.

11   Q.  After you reviewed the draft third amendment, did you

12   communicate your assessment to anyone else at FHFA?

13   A.  Yes, I did.

14   Q.  And who did you communicate that to?

15   A.  At the time, I worked for a woman named Wanda DeLeo, and we

16   had met around this time to discuss the specific components of

17   the amendment that could potentially have an accounting effect

18   and -- and/or auditing effect.  So we talked about the two

19   issues -- these issues that we just mentioned here.

20   Q.  And what do you recall about what you relayed to her?

21   A.  I recall that after reviewing the proposed changes --

22             MR. RUDY:  Objection.  Hearsay.

23             THE COURT:  Overruled.

24   A.  I recall my comments -- my thoughts at the time were that

25   the changes to the dividend calculation formula would not cause

1    or exacerbate the going-concern issue, and that, if anything,

2    the amendments made the Treasury commitment more sustainable

3    going into the future given what people understood -- what I

4    understood at the time to be their historical -- their earnings

5    capacity.

6    BY MR. HOFFMAN:

7    Q.  And who did Ms. DeLeo report to at that time?

8    A.  Ms. DeLeo reported to Acting Director Ed DeMarco.

9             MR. HOFFMAN:  Okay.  You can take that down,

10   Mr. Montgomery.

11         Court's indulgence, Your Honor.

12   BY MR. HOFFMAN:

13   Q.  Okay.  Mr. Satriano, I want to change gears a little bit to

14   a different topic.

15   A.  Okay.

16   Q.  Are you familiar with deferred tax assets?

17   A.  Yes, I am.

18   Q.  At a high level, could you explain to the members of the

19   jury what is a deferred tax asset and how it's used.

20   A.  Okay.  So deferred tax assets are an area of U.S. GAAP,

21   generally accepted accounting principles, or what we would call

22   U.S. accounting rules.  Deferred tax assets are, essentially,

23   timing differences that are recognized between the financial

24   statements that we've just discussed and certain tax filings

25   that they're required to make.

SATRIANO - DIRECT

1    Q.  And are there any analogies that you think of as FHFA's

2    chief accountant when thinking about DTAs and how they can be

3    used?

4    A.  Yeah.  So a deferred tax asset is an asset.  So that is

5    something that would help you in the future to earn more money,

6    but the nuance with the deferred tax asset is that it works

7    effectively like a tax credit.  It helps -- it would help

8    offset taxable income in the future.  And that's its primary

9    benefit to -- to management.

10   Q.  So if a company has taxable income and they owe a hundred

11   dollars in taxes, but they have $10 worth of deferred tax

12   assets, how much would they have to pay in taxes?

13   A.  It would lower the tax liability down to 90.

14   Q.  Are you familiar with the terms write-up and write-down in

15   connection with deferred tax assets?

16   A.  Yes, I am.

17   Q.  And so can you explain that to the jury.  Can deferred tax

18   assets ever get written down?

19   A.  Yes, they can.

20   Q.  And how does that happen at a sufficiently high level?

21   A.  Okay.  So assets are supposed to be recorded on the -- in

22   the financial statements at their -- so realizable value.  And

23   so a company has the obligation each quarter to look at their

24   assets.  And let's just use deferred tax assets as the example.

25       If they think they will be able to realize the value of

1    those deferred tax assets, then they would not have to write

2    them down.  However, in the case of Fannie Mae and Freddie Mac,

3    where they started to forecast that they would not have taxable

4    income, the benefits provided by the deferred tax asset would

5    be severely impaired or muted given that the benefit really is

6    related to taxable income.

7    Q.  And so if a company concludes that they do not expect to

8    make enough money to owe taxes, what's the appropriate

9    accounting thing to do with the deferred tax assets?

10   A.  Yeah.  So they would -- this is using plain English.  They

11   would write down the value of that asset to what they think its

12   true value would be in that quarter.

13   Q.  And is there an accounting term that's used to refer to

14   what we're calling write-down?

15   A.  Yes, there is.

16   Q.  And what's that term?

17   A.  The term is the valuation allowance.

18   Q.  And today when you referred to write-down, is that a

19   shorthand for applying the valuation allowance?

20   A.  Yes, it is.

21   Q.  Now, Mr. Satriano, by the time the enterprises entered into

22   conservatorship in September 2008, did they have deferred tax

23   assets?

24   A.  Yes, they did.

25   Q.  And did there come a time when Fannie Mae and Freddie Mac

1    wrote down their deferred tax assets?

2    A.  Yes, they did.

3    Q.  When did that happen, approximately?

4    A.  That happened approximately at the end of 2008.

5    Q.  And based on your role in FHFA's Office of the Chief

6    Accountant at the time, what was your understanding as to why

7    Fannie and Freddie wrote down their DTAs at that time?

8    A.  The accounting rules require companies to perform a

9    calculation each quarter assessing the realizability of the

10   deferred tax asset, and if they conclude that they will not

11   be able to fully realize the value of those assets, they have

12   to write them down.  And that's what happened at the end of

13   2008.

14   Q.  After Fannie and Freddie wrote down the DTAs at the end of

15   2008, what happened to those DTAs?

16   A.  The DTAs remain as a component of their financial

17   statements, but they are at a much smaller value.

18   Q.  They remain written down?

19   A.  They remained written down subsequent to quarterly

20   analysis.

21   Q.  So let's talk about that.

22        What was -- what is your understanding, if any, about a

23   quarterly review process that happens with respect to DTAs that

24   have been written down?

25   A.  So U.S. accounting rules require that management perform an

1  assessment, an analysis, each quarter about the realizability

2  or the use of the deferred tax assets.

3  Q.  And how often does that review process happen with respect

4  to DTAs that have been written down?

5  A.  That happens each quarter as part of the preparation of the

6  SEC filings.

7  Q.  So it happens sort of in conjunction with the quarterly SEC

8  filings?

9  A.  Right, because the analysis is what supports the numbers in

10  the financial statements and supports the disclosures in the

11  MD&A.

12  Q.  And did Fannie Mae and Freddie Mac undertake that kind of

13  quarterly review process with respect to the DTAs that had been

14  written down?

15  A.  Yes, they did.

16  Q.  And what is your familiarity, if any, with Fannie and

17  Freddie's quarterly review process?

18  A.  I'm familiar with how they prepare and review and conclude

19  on the realizability of the deferred tax asset.

20  Q.  And how are you familiar?

21  A.  Through examination of their programs, through inquiry and

22  observation of management, through review of their documents,

23  and through kind of back-and-forth questioning of management

24  about the elements of their analysis.

25  Q.  Now, let's talk about how this quarterly review process

1    turned out for Fannie Mae and Freddie Mac.

2         You said they were written down at the end of 2008; is

3    that right?

4    A.  Yes.

5    Q.  Okay.  And so what did Fannie and Freddie conclude about

6    the written-down DTAs throughout the year of 2009?

7    A.  The -- even though they did the analysis each quarter, the

8    conclusion was the same; that it was more likely than not that

9    they would not be able to use the deferred tax assets, and,

10   therefore, keeping them written down was the appropriate

11   accounting.

12   Q.  And you mentioned more likely than not.  Can you say a

13   little bit more about what that means.

14   A.  Yes.  The accounting standard requires companies to perform

15   an analysis yielding a decision, a conclusion, whether it is

16   more likely than not that they will be able to use the deferred

17   tax assets or, said the other way, it is more likely than not

18   that they will not be able to use the deferred tax assets.

19        So -- sorry.  Accounting before lunch is not great.

20        So they -- if the evidence -- the negative evidence is

21   greater than the positive evidence that they collect -- so if

22   they -- it would be more likely that they would not be able to

23   use the -- the deferred tax asset and, therefore, they would

24   keep it written down.  If, for example, they had enough

25   positive evidence that outweighed the negative evidence that

SATRIANO - DIRECT

1   they also collected, they would conclude differently.  And they

2   would conclude that the deferred tax asset should be written

3   up.  And -- and so that's the decision that management is

4   required to make each quarter.

5   Q.  And what did Fannie Mae and Freddie Mac conclude about

6   their written-down DTAs in 2010 and also 2011 in each of the

7   quarterly reviews?

8   A.  You know, given the financial results during that time,

9   Fannie Mae and the analysis that they prepared, the results

10  were the same during the time period, 2010 and '11.

11  Q.  That's right.

12  A.  So in each of those quarters, management concluded that

13  they did not have enough evidence to support writing up the

14  DTAs, and, therefore, they left them at their written-down

15  value.

16  Q.  And what was the outcome of Fannie Mae and Freddie Mac's

17  quarterly review process for their DTAs in the first and second

18  quarter of 2012?

19  A.  It was the same; that they should remain written-down,

20  because they did not have enough positive evidence to overcome

21  the negative evidence that they also had.

22  Q.  I want to focus in on the second quarter of 2012.  Can you

23  remind the jury when the second quarter of 2012 ended.

24  A.  The second quarter financial reporting period ends on

25  June 30th, 2012, in this case.

1    Q.  Now, for the quarterly review process about the DTAs that

2    we've just been talking about, when did that process take place

3    for the second quarter of 2012?

4    A.  Typically, the deferred tax asset analysis occurs during

5    the preparation and review of the periodic -- of the financial

6    filings.  So in -- it happened in July of 2012.

7    Q.  Did it happen towards the beginning of July 2012 or later

8    in the month?

9    A.  It typically happens later in the month as -- as deferred

10   tax asset analysis is -- it requires many inputs that they need

11   to get first.  And so it's sort of a process that happens

12   towards the end of the preparation of the financial statements.

13   Q.  Now, as part of the quarterly review process about the DTAs

14   we're talking about, did Fannie Mae and Freddie Mac generate

15   memos that stated their conclusion?

16   A.  Yes, they did.

17   Q.  And what was the purpose of those memos?

18   A.  The purpose of the memos was to document management's

19   conclusion and analysis related to the deferred tax asset

20   write-down, write-up.

21              MR. HOFFMAN:  So let's take a look at one of those

22   memos, and this is not yet in evidence, so I would ask that it

23   just be displayed for the witness, please.

24              And this is Defendants' Exhibit 499-A, and we'll go to

25   page 2 of 499-A.

```
 1            And for Mr. Satriano only, can you zoom in,

 2    Mr. Montgomery, to the top portion of that.

 3    BY MR. HOFFMAN:

 4    Q.  Okay.  Mr. Satriano, do you recognize this document?

 5    A.  Yes, I do.

 6    Q.  What is it?

 7    A.  It is a document prepared by Fannie Mae related to the

 8    second quarter of 2012 -- so June 30th, 2012 -- related to

 9    their valuation allowance or, as we've been describing today,

10    the write-down.

11    Q.  And did you review this document at the time?

12    A.  Yes, I did.

13    Q.  As FHFA's chief accountant, do you have any familiarity

14    into Fannie Mae's recordkeeping procedures with respect to

15    these DTA memos?

16    A.  Yes, I do.

17    Q.  How so?

18    A.  Given my role as chief accountant, I am charged with

19    oversight of accounting estimates and accounting policy, and

20    this falls in that space.  And as I earlier described, we

21    gain that understanding through examination of these types

22    of estimates through interactions, review, and inquiry

23    with management, and review of their documents and

24    conclusions.

25    Q.  And did the office of chief accountant in FHFA ever conduct
```

SATRIANO - DIRECT

 1    an audit with respect to Fannie Mae and Freddie Mac's quarterly

 2    DTA review process?

 3    A.   Typically we refer to them as reviews or examinations, but,

 4    yes, my -- I had my team spend time reviewing just for this

 5    reason, the -- you know, the different components of the

 6    process, understanding how management came to their

 7    conclusions.

 8    Q.   And was the generation of these memos part of that process?

 9    A.   Yes.  So part of what they were looking at was how does

10    management arrive at a conclusion with respect to the deferred

11    tax asset write-down.

12    Q.   And did you oversee that review?

13    A.   Yes, I did.

14    Q.   Back to Defendants' Exhibit 499-A, who prepared this memo?

15    A.   This memo was prepared by Fannie Mae management, a woman

16    named Vicki Lyons.

17    Q.   And what was Ms. Lyons' role at this time?

18    A.   Ms. Lyons' role was the vice president for tax.

19    Q.   And did you work with Ms. Lyons?

20    A.   I interacted with her as part of my oversight

21    responsibilities.  And so, yes, we spoke and met from time to

22    time on these types of memos.

23    Q.   Did you find her knowledgeable about DTA issues?

24    A.   Yes.  She's an expert.

25    Q.   And when was this memo prepared, Defendants' Exhibit 499-A?

1    A.  Typically, these memos are prepared in the month after the

2    quarter ends.  So this memo was likely prepared in July of

3    2012.

4              MR. HOFFMAN:  And, Mr. Montgomery, if we can go to

5    the first page of this exhibit and zoom in on this --

6    BY MR. HOFFMAN:

7    Q.  This is the cover email attaching the memo; is that right?

8    A.  Yes.

9    Q.  And what's the date of the cover email attaching the memo?

10   A.  July 27th, 2012.

11   Q.  And is that consistent or inconsistent with your

12   recollection as to when this memo would have been drafted?

13   A.  It's consistent.

14   Q.  Okay.  Let's go back to page 2.

15        And the date here on the memo itself is listed as

16   June 30th.  Is that the -- is that the date that the memo was

17   prepared, or was the memo prepared at a different time?

18   A.  No.  My understanding of the process is that date refers to

19   the period, the -- the reporting period, but the analysis is

20   prepared subsequent to the end of the reporting period.

21   Q.  And how often did Fannie Mae create these kinds of memos?

22   A.  These memos were created for each quarter to support the

23   SEC filing.

24   Q.  And how did Fannie Mae maintain these kinds of memos?

25   A.  They maintained them in a centralized location to support

SATRIANO - DIRECT

1    the -- the audited -- the SEC filing numbers and disclosures.

2    Q.  And did Fannie Mae share these DTA memos, including this

3    one, with FHFA in real time?

4    A.  Yes, they did.

5    Q.  And did you review this memo at the time?

6    A.  Yes, I did.

7            MR. HOFFMAN:  At this time, Your Honor, defendants

8    would move into evidence Defendants' Exhibit 499-A.

9            MR. RUDY:  Your Honor, I object on hearsay and

10   foundation, and if I could just ask a few questions in *voir*

11   *dire*.

12           MR. HOFFMAN:  Your Honor --

13           THE COURT:  Did you receive that in the ordinary

14   course of business?

15           THE WITNESS:  Yes, I did, Your Honor.

16           THE COURT:  It's received.

17           (Defendants' Exhibit 499-A admitted into evidence.)

18           MR. RUDY:  The answer was received in the ordinary

19   course -- is that --

20           MR. HOFFMAN:  Your Honor, is the exhibit admitted

21   into evidence?

22           THE COURT:  I just received it.

23           MR. HOFFMAN:  Thank you, Your Honor.  I was

24   clarifying for plaintiffs.  Thank you.

25           Okay.  Let's publish this to the jury.

1        Thank you.

2    BY MR. HOFFMAN:

3    Q.  So what's the subject of this Fannie Mae memo?

4    A.  The subject is the second quarter 2012 valuation allowance.

5    Q.  And, again, your testimony is that this was -- even though

6    the date says June 30th, it was drafted in late July of 2012;

7    is that right?

8    A.  Yes.

9    Q.  And late July of 2012, how close in time was that to when

10   Fannie Mae made its SEC filing that we were looking at earlier?

11   A.  It was about nine days, ten days before they made the

12   actual filing.

13   Q.  And how close in time, then, was this memo to when the

14   third amendment was signed?

15   A.  An additional nine days -- eight days.

16   Q.  Okay.  So let's go to page 5 of Defendants' Exhibit 499-A,

17   and let's zoom in on the paragraph that has "Current Forecast"

18   as the heading.

19        Do you see what I'm looking at here, Mr. Satriano,

20   "Current Forecast"?

21   A.  Yes, I do.

22   Q.  So can you explain to the members of the jury, what is your

23   understanding as to why there is a current forecast in this DTA

24   memo?

25   A.  One of the requirements to perform the deferred tax asset

SATRIANO - DIRECT

1    analysis is to understand how much taxable income the

2    company -- so Fannie Mae -- would likely have in the future,

3    and they usually use a multiyear period.  So typically

4    four years.

5         Because these credits -- some of them have sort of time

6    frames associated with them.  So they look into the future and

7    they say, well, if we're -- you know, have income and then

8    taxable income in the next few years, maybe we can use these

9    credits in the future to help offset our taxable -- our tax

10   bill.

11        If they do this forecast and they determine that they --

12   the forecast is, say, not positive and they would not have

13   taxable income, that would help indicate to management that

14   they would need a write-down of the deferred tax asset.

15   Q.  So let's highlight the first sentence under this heading

16   Current Forecast.  Can you read that to the jury, please.

17   A.  "Over the four-year period of 2012-2015, the company is

18   forecasting GAAP income."

19   Q.  And who is the company that we're talking about?

20   A.  Fannie Mae.

21   Q.  And what did you understand this sentence to mean at the

22   time?

23   A.  I understood it to mean that the company has prepared

24   financial forecasts looking into the future that indicate

25   the -- the likelihood of having GAAP income.  So that is an

1      accounting-related income.

2      Q.  And let's highlight the third sentence, the one that starts

3      with "The company's current GAAP."  Can you read that sentence,

4      please, to the jury.

5      A.  Yes.  "The company's current GAAP consolidated forecast of

6      $31.3 billion -- 31.3 billion income over the 2012-2015 period

7      is a decrease from the 34.2 billion income over the period

8      2012-2015 reported in the previous quarter."

9      Q.  What did you understand this sentence to mean at the time,

10     Mr. Satriano?

11     A.  I understood this to be that, as we talked about, the

12     quarterly process typically provides updates from the previous

13     quarter.  So, apparently, management performed a similar

14     forecast in the -- the previous quarter, which would be

15     Quarter 1, and they're highlighting the difference in the --

16     what -- the forecasted results.

17     Q.  So the forecast between Quarter 1 and Quarter 2, the

18     forecasted income went down?

19     A.  Right.  So they're saying in Quarter 2, their forecast is

20     31.3 billion.  However, their forecast was 34.2 billion in

21     Quarter 1 for the same time period.

22     Q.  So taking a step back from this document for a moment --

23             MR. HOFFMAN:  You can keep it up, Mr. Montgomery.

24     BY MR. HOFFMAN:

25     Q.  -- what was your understanding as to what was Fannie Mae's

1  annual 10 percent dividend obligation to Treasury at this time?

2  A.  As we saw earlier, their annual dividend obligation to

3  Treasury was around $11.7 billion per year.

4  Q.  And so 11.7 billion per year -- I'm going to ask you to do

5  a little bit of math on the fly here -- how does that calculate

6  out over a four-year period, approximately?

7  A.  Approximately 47 -- or $46.8 billion.

8  Q.  So how does Fannie Mae's forecast over the next four years

9  of 31.3 billion -- how does that compare with the money that

10  they owed to Treasury under the 10 percent dividend over that

11  same time period?

12  A.  It -- it doesn't compare favorably.  Meaning that, you

13  know, they already owe more than they are expecting to make.

14  Q.  And so what's the comparison?  What is Fannie Mae

15  forecasting here over that period versus what they owe to

16  Treasury in 10 percent dividend?

17  A.  So what I mean is they state that their forecast for the

18  period of 2012 through 2015 is expected or likely to be

19  $31.3 billion.  But at this same time, management knows that

20  they have a dividend obligation over the same period of almost

21  $47 billion.  And so 47 is bigger than 31.  And so that means

22  their obligations are greater -- would be greater than their

23  earnings in this context.

24  Q.  As FHFA's chief accountant, what did you understand this to

25  mean in terms of Fannie Mae's ability to afford the 10 percent

1    dividend over time?

2    A.  That they would likely have to do something in order to

3    find -- find funds to pay that difference.

4    Q.  And how does this relate at all, if at all, to the circular

5    dividend you were discussing earlier?

6    A.  So, typically, the dividends are paid from earnings, also

7    known as income in this sentence.  And if they don't have

8    enough income, they need to find or get the funds from some

9    other source.

10          Typically, what had been happening at the time is that

11   they were borrowing -- they were -- sorry.  They were drawing

12   more funds from the Treasury commitment in order to fully pay

13   the dividend obligation.

14   Q.  And what did you understand Fannie Mae to be saying here

15   about their income and how, if at all, that would impact the

16   circular draw issue?

17   A.  They're -- they're saying that 31 -- that their estimate of

18   future income over the next four years is 31 billion, and that

19   clearly is not enough to cover what they would owe over the

20   same period, assuming no additional draws.

21          MR. HOFFMAN:  Okay.  Let's go to a different page --

22   I'm sorry, a different part of this page, Mr. Montgomery.

23   Let's look at the summary section of this page.

24   BY MR. HOFFMAN:

25   Q.  And if you could just read this paragraph to the jury, and

1      then I'll ask you a few questions about it, Mr. Satriano.

2          Go ahead.

3      A.  Read the whole paragraph?

4      Q.  Yes, you can read it.  Yes.

5      A.  Okay.  "Summary.

6          "Fannie Mae has significant negative evidence due to the

7      recent cumulative losses, uncertainty in the exit strategy from

8      conservatorship, uncertainty about long-term financial

9      sustainability due to the mandated reduction in our mortgage

10     portfolio, and continued forecasted charge-offs in the outer

11     years, resulting in a forecasted net taxable loss position.  We

12     believe there is not sufficient positive evidence to outweigh

13     this negative evidence and, therefore, do not believe it is

14     more likely than not that our deferred tax asset, with the

15     exception to the deferred tax asset related to unrealized

16     losses on AFS securities, will be realized."

17     Q.  And at a high level, what did you understand Fannie Mae to

18     be saying in this summary paragraph at the time?

19     A.  I understand them to be saying that the negative evidence

20     that they have collected outweighs the -- any positive evidence

21     that they also have collected, and, therefore, it will be --

22     more likely than not -- that's the standard -- that they will

23     be unable to use or they will -- unable to realize the

24     deferred -- the benefits of the deferred tax asset.  And,

25     therefore, you know, what I understand -- and, therefore, they

1    would have to maintain the write-down.

2    Q.  And on the very last line of this, there's an exception

3    there.  It says, ". . . with the exception to the deferred tax

4    asset related to unrealized losses on AFS securities."

5    A.  Yes.

6    Q.  Can you briefly touch on what that means and if it has any

7    impact on your testimony.

8    A.  So we're trying to provide a summarized version of deferred

9    tax assets today.  There are many, many components that make up

10   a deferred tax asset.  This is a subcomponent, this AFS

11   securities.  It's a very small amount, and what happened was

12   that they had gotten some indications from the SEC about how to

13   treat this.  So this small portfolio was being treated

14   differently with the permission or approval from the SEC.

15           MR. HOFFMAN:  Okay.  You can take that document down,

16   Mr. Montgomery.

17   BY MR. HOFFMAN:

18   Q.  Let's take a look at another --

19           THE COURT:  Your definition might be different of

20   that phrase than ours.  What is the small amount there?  It's

21   probably in millions; right?

22           THE WITNESS:  So the numbers that Fannie Mae and

23   Freddie Mac deal with are all shockingly large.

24           THE COURT:  Right.

25           THE WITNESS:  So I'm making a relative statement.  It

```
 1    is a number in the millions.  I believe it was about 4 -- 4 to

 2    5 million.  I'd have to look at the document.

 3                THE COURT:  Okay.  But it's still in that range, 4 or

 4    5 million?

 5                THE WITNESS:  So in percentage terms, it's very small

 6    relative to the deferred tax asset, but it's a large number for

 7    you and me.

 8                THE COURT:  All right.

 9                MR. HOFFMAN:  Okay.  Let's display for Mr. Satriano

10    only Defendants' Exhibit 472-A.  And let's go to page 2 of

11    472-A.  And let's zoom in on the top portion of that page,

12    please.

13    BY MR. HOFFMAN:

14    Q.  Mr. Satriano, do you recognize this document?

15    A.  Yes, I do.

16    Q.  And what is it?

17    A.  It is Freddie Mac's second quarter 2012 valuation allowance

18    assessment memo.

19    Q.  And did you review Freddie Mac's second quarter DTA memo at

20    the time?

21    A.  Yes, I did.

22    Q.  And are you familiar with Freddie Mac's recordkeeping

23    procedures for these types of DTA memos?

24    A.  Yes, I am.

25    Q.  And is that -- what is that familiarity based on?
```

1    A.  It is based on the description that I provided earlier with

2    respect to how we do our work in the chief accountant's office

3    at the FHFA.

4    Q.  So same familiarity with Fannie Mae's procedures with

5    respect to these DTA memos as Freddie Mac's?

6    A.  Yes.

7    Q.  Okay.  Who prepared this particular DTA memo for

8    Freddie Mac?

9    A.  This was prepared by employees of Freddie Mac.

10   Q.  And who in particular with this memo?

11   A.  I believe Gregory Metz was the senior person in the tax

12   team at the time.

13   Q.  And did you interact with Mr. Metz at -- around this time?

14   A.  Yes, I did.

15   Q.  And did you find him to be knowledgeable about

16   Freddie Mac's DTA issues?

17   A.  Yes, he was.

18   Q.  And what's the effective date of this Freddie Mac memo?

19   A.  June 30th, 2012.

20   Q.  Is that the same date as when this memo was prepared?

21   A.  No.  Typically these memos would be prepared subsequent to

22   the reporting period.  So that's the reporting period date.

23   The memo gets prepared, typically, after the date.

24   Q.  So when would this Freddie Mac memo have been finalized,

25   approximately?

1    A.  At the end of July or perhaps early August.

2    Q.  And how often did Freddie Mac create these kinds of DTA

3    memos?

4    A.  They created them each quarter to support the -- the

5    numbers in the SEC filings.

6    Q.  Did they create them in the ordinary course of

7    Freddie Mac's business?

8    A.  Yes, they did.

9    Q.  And how did Fannie Mae -- I'm sorry.  How did Freddie Mac

10   maintain these kinds of DTA memos?

11   A.  They were maintained electronically as evidence supporting

12   the numbers and disclosures in the financial statements that

13   were issued.

14   Q.  And did Freddie Mac share these DTA memos, including this

15   particular one that we are looking at here, with FHFA in real

16   time?

17   A.  Yes, they did.

18   Q.  And did you review this DTA memo at the time?

19   A.  Yes, I did.

20            MR. HOFFMAN:  At this time, defendants move into

21   evidence Defendants' Exhibit 472-A.

22            MR. RUDY:  Your Honor, same objection.  It appears

23   based on his conversation with others why he knows this.

24            THE COURT:  It's received.

25            (Defendants' Exhibit 472-A admitted into evidence.)

1      MR. HOFFMAN:  Okay.  Let's publish it to the jury,

2   please.

3          And let's, actually, go back to the first page,

4   Mr. Montgomery, of 472-A.  And let's zoom in on the bottom-most

5   email.

6   BY MR. HOFFMAN:

7   Q.  And do you understand this to be the email -- an email that

8   was attaching the memo we were looking at?

9   A.  Yes, I do.

10  Q.  And who sent this email?

11  A.  This email was sent by Tracy Mitchell, who is an employee

12  at Freddie Mac.

13  Q.  And when did she send this email attaching the DTA memo?

14  A.  She sent it on August 1st, 2012.

15  Q.  And was anyone at FHFA a recipient of this email?

16  A.  Yes.

17  Q.  And who was that?

18  A.  Stephen Lewis.

19  Q.  And who is Mr. Lewis?

20  A.  Mr. Lewis worked for me in the Office of the Chief

21  Accountant and one of the examiners who studied this deferred

22  tax asset issue.

23  Q.  And if we could just look at the text of Ms. Mitchell's

24  email here.  And if you could read the second sentence that

25  starts with "There were no."

1    A.  "There were no significant changes from the prior quarter

2    and the conclusion is unchanged."

3    Q.  And what did you understand that to mean at the time?

4    A.  I understood that to mean that after management has

5    performed -- after management had performed their second

6    quarter 2012 analysis, there was no significant changes related

7    to -- compared to the Quarter 1 and the conclusions reached in

8    both quarters were the same.

9    Q.  And what was that conclusion with respect to the write-down

10   of the DTA?

11   A.  That they needed to maintain the write-down of the

12   DTA because the negative evidence outweighed the positive

13   evidence.

14   Q.  And is the date that Ms. Mitchell sent this email,

15   August 1st, 2012, is this consistent with your recollection at

16   the time as to when this memo would have been finalized?

17   A.  Yes, it is.

18   Q.  And how close in time was this memo finalized to when

19   Freddie Mac made its quarterly SEC filing?

20   A.  Approximately one week prior.

21   Q.  And how close in time was this memo finalized to when

22   Freddie -- I'm sorry, when the third amendment was executed?

23   A.  Two and a half weeks.

24          MR. HOFFMAN:  Okay.  Mr. Montgomery, let's go back to

25   the last page of the DTA memo that's attached.  So it's 7 of 7.

1    And let's focus in on the two paragraphs.  The first one

2    beginning with "In order to."  Yes, exactly.

3    BY MR. HOFFMAN:

4    Q.  Okay.  Let's focus on the -- the sentence that begins with

5    "Forecasts become."  And if you could read that sentence and

6    the next sentence for the jury, I would appreciate it.

7    A.  "Forecasts become more difficult to be used as positive

8    evidence when there are cumulative losses.  Future income

9    projections following a cumulative loss are inherently

10   subjective since a return to profitability often involves a

11   turnaround plan that has not yet been demonstrated."

12   Q.  What did you understand Freddie Mac to be saying at the

13   time in these sentences?

14   A.  They were indicating that forecasts and future income

15   projections are difficult to use as positive evidence and/or

16   they are subjective in their nature.

17   Q.  What is -- I'm sorry.

18   A.  Especially in light of the -- they use the words cumulative

19   losses twice.

20       The idea in the accounting literature is that companies

21   look at their three-year history of their income or losses, and

22   they're referring to this cumulative losses.  Is they -- what

23   Freddie Mac is saying, that as of this date, they are still

24   experiencing cumulative losses.

25       So when you add up all of the three years prior to this

1    date, they still have cumulative losses.  And that is

2    considered in the accounting rules significant negative

3    evidence that is very hard to overcome, and I believe that's

4    what they're saying here.

5    Q.  And let's take a look at the last sentence.

6             THE COURT:  It's kind of a general accounting

7    principle?

8             THE WITNESS:  Under general accounting principles.

9             THE COURT:  Standards?

10             THE WITNESS:  Yes, under the accounting rules of the

11   United States.

12   BY MR. HOFFMAN:

13   Q.  And let's take a look at the last sentence of these two

14   sections that starts with "Thus."  And, Mr. Satriano, I'll ask

15   you to read the sentence.  But for a moment, let's skip over

16   the parenthetical, and we're going to circle back.  So you can

17   read the "Thus" sentence.

18   A.  "Thus, we determined that it is more likely than not that

19   the net deferred tax assets . . . will not be realizable in the

20   future."

21   Q.  And what did you understand Freddie Mac to be saying with

22   that sentence at the time?

23   A.  I understood them to be saying that since the negative

24   evidence outweighed the positive evidence that they were able

25   to collect as of this date, they would not be able to fully

1    realize the -- the benefits of the deferred tax assets and,

2    therefore, they needed to maintain the write-down.

3    Q.  Now, the parenthetical I asked you to skip over, but can

4    you briefly touch on what the parenthetical is saying.

5    A.  Yes.  The parenthetical is related to the same

6    sub-portfolio that I mentioned earlier in the Fannie Mae

7    document available for sale securities is a component of their

8    deferred tax asset -- of their deferred tax assets and they

9    were making a different assumption -- assertion related to that

10   small sub-portfolio.

11            MR. HOFFMAN:  Court's indulgence.

12            THE COURT:  That's sort of the same thing we were

13   just talking about a few minutes ago?

14            THE WITNESS:  Yes, Judge.

15            THE COURT:  Some small number --

16            THE WITNESS:  That's right.

17            THE COURT:  -- in the scheme of things?

18            THE WITNESS:  In the scheme of things, yes.

19            MR. HOFFMAN:  Okay.  You can take that down,

20   Mr. Montgomery.

21   BY MR. HOFFMAN:

22   Q.  Mr. Satriano, as of August 17th, 2012, the date the

23   third amendment was signed, what was your understanding as to

24   whether and when Fannie Mae and Freddie Mac would write up

25   their DTAs?

1    A.  My understanding was that they did not have the type of

2    evidence necessary in order to make that determination.  So one

3    week prior, two weeks prior, they were concluding that they

4    still had significant negative evidence.  And despite there

5    may be some positive evidence, it was not sufficient to

6    overcome the negative evidence that still existed as of that

7    date.

8    Q.  Now, Mr. Satriano, Fannie Mae had just had two quarters of

9    profitability at that time; right?

10   A.  Yes, they did.

11   Q.  And Freddie Mac had just had one quarter of profitability;

12   right?

13   A.  Yes, they did.

14   Q.  And how did that affect your understanding about whether

15   and when Fannie Mae would write up their DTAs?

16   A.  As I said, it's not that there is no positive information,

17   that there is not positive information to overcome the

18   significant negative evidence that exists.

19        And to add a little bit more color, most of the negative

20   evidence was historical information.  So things that have

21   already occurred in the past, readily verifiable.  So the

22   three-year cumulative loss history is -- those are just

23   numbers that are published.  The positive information -- so

24   they had some net income, positive net income, in the beginning

25   of 2012.  And that is listed in their analysis as positive

1    information.

2         However, there was not enough to kind of get over the

3    scales, tip the scales, in favor of writing up the valuation

4    allowance as of that date.

5    Q.  And how does that relate, if at all, to your discussion

6    earlier about the history of losses?

7    A.  So the history of losses captured in this concept of the

8    three-year cumulative loss history is a significant piece of

9    negative evidence that Fannie Mae and Freddie Mac were trying

10   to -- trying to overcome.  So I think that's how -- the

11   connection.

12   Q.  Let's take a look at -- in exhibit -- Plaintiffs'

13   Exhibit 259, which I believe is in evidence.

14        Mr. Satriano, do you recognize Plaintiffs' Exhibit 259?

15   A.  Yes, I do.

16         MR. HOFFMAN:  And, Mr. Montgomery, I want to start at

17   the bottom.  So if we could call that out.

18   BY MR. HOFFMAN:

19   Q.  And what are we looking at here, Mr. Satriano?

20   A.  We are looking at the first part of an email string.

21   Q.  And who sent this original email?

22   A.  This was sent by James Griffin.

23   Q.  And who did he send it to?

24   A.  He sent it to me.

25   Q.  And who was James Griffin?

1    A.   Jim Griffin at the time was the deputy chief accountant

2    in the Office of the Chief Accountant.   So he reported to me.

3    Q.   And when did Mr. Griffin send you this email?

4    A.   He sent this email to me on Tuesday, August 14th, 2012.

5    Q.   And what's the subject of this email?

6    A.   "SPSPA Meeting."

7    Q.   And what did you understand SPSPA to be referring to?

8    A.   That is the acronym of the senior purchase -- senior

9    preferred stock purchase agreement.

10   Q.   And is that the purchase PSPA with the Treasury Department?

11   A.   Yes, it is the same.   Different acronym.

12   Q.   And so can you read the first sentence, please.

13   A.   "The meeting with Ed went well."

14   Q.   And the second as well.

15   A.   "The amendment is expected to be made public sometime on

16   Friday."

17   Q.   And who did you understand the reference to Ed to be here?

18   A.   I understood that to mean Acting Director Ed DeMarco.

19   Q.   And what did you understand the reference to the amendment

20   to mean?

21   A.   I understood that to be the amendment which became known as

22   the third amendment.

23   Q.   And how close in time was this to when the third amendment

24   was actually signed?

25   A.   Well, several days prior.

1    Q.  And can you read the next sentence, please.

2    A.  "The Enterprises will be informed tomorrow of the changes

3    and FHFA will work with them to ensure a consistent

4    communication message."

5    Q.  And what did you understand that to mean at the time?

6    A.  I understood that to mean that as of Tuesday, August 14th,

7    the enterprises, the Fannie Mae and Freddie Mac management,

8    were not yet aware of these upcoming changes and that a

9    coordinated or consistent communication effort was needed.

10   Q.  Now, let's --

11             MR. HOFFMAN:  Mr. Montgomery, let's take a look at

12   the next email in the chain.

13   BY MR. HOFFMAN:

14   Q.  And is this your reply to Mr. Griffin?

15   A.  Yes, it is.

16   Q.  On the same day?

17   A.  Yes.

18   Q.  Okay.  And how did you reply?  Can you go ahead and read it

19   out.

20   A.  Sure.  "Hi.

21        "Any discussion of reaching out to the auditors?  Given

22   the changes, should be fine.

23        "Cheers,

24        "Nick."

25   Q.  What did you mean by that?

```
 1    A.  So Jim -- the context, I believe, is that Jim attended the

 2    meeting on my behalf.  And I asked him if we were going to --

 3    if the agency will be reaching out to Fannie Mae and

 4    Freddie Mac, the enterprises, the next day, was there

 5    discussion of also possibly reaching out to the external

 6    auditors.

 7    Q.  And who were those external auditors again?

 8    A.  Deloitte & [sic] Touche and PricewaterhouseCoopers.

 9    Q.  And what did you mean when you said given the changes

10    should be fine?

11    A.  What I meant was what we discussed earlier; given the

12    proposed changes to the third amendment, it -- the auditors

13    should not have a going-concern issue with respect to these

14    changes.

15    Q.  And can we take a look at the top-most email here.  And is

16    this Mr. Griffin's reply back to you?

17    A.  Yes, it is.

18    Q.  Also on the same day?

19    A.  Yes.

20    Q.  Okay.  And so can you read the first two sentences of his

21    email.

22    A.  "There was not.  I do not thing there would be a good

23    concern issue."

24    Q.  Do you think it was possibly a typo; thing versus think?

25    A.  Yes, I do.
```

1    THE COURT:  Okay.  And so what did you understand

2    Mr. Griffin to be saying here in these two sentences?

3         MR. RUDY:  Objection.

4         MR. HOFFMAN:  Just asking for his understanding.

5         THE COURT:  Overruled.

6    BY MR. HOFFMAN:

7    Q.  Go ahead.

8    A.  I understand that Jim was answering my question that I

9    asked in the earlier email.  So was there any discussion about

10   talking to the auditors?  Response, there was not.

11   Q.  The next --

12   A.  And the next sentence, I believe, to be Jim's opinion

13   that he wrote.  "I do not thing[k] there would be a going

14   concern issue."  And that was -- a shared view that Jim and I

15   had at the time.

16   Q.  Now, let's read the next two sentences, starting with

17   "There was a question."

18   A.  "There was a question about rerecording certain deferred

19   tax assets that had been written off.  Jeff indicated both of

20   the Boards had discussed this at the last meeting based on the

21   view that they were going to be profitable going forward."

22   Q.  And who did you understand the reference to Jeff to be

23   referring to?

24   A.  Jeffrey Spohn, who was FHFA's executive who oversaw our

25   conservator operations.

1   Q.  And what did you understand these sentences to mean at the

2   time?

3   A.  Jeff Spohn, given his role, often attended the board

4   meetings of Fannie Mae and Freddie Mac.  And I understand him

5   to be relaying information that he heard at the last board

6   meeting.

7   Q.  And what do you -- what was your reaction when you read

8   this email report from Mr. Spohn as to what Fannie and

9   Freddie's boards had discussed?  What was your reaction?

10  A.  My reaction is that was kind of a normal type of thing that

11  would be potentially discussed among the board members at

12  Fannie Mae and Freddie Mac.

13  Q.  What was the normal thing that could be discussed?

14  A.  So I have to sort of infer from this email that the boards

15  were talking about rerecording certain deferred tax assets.

16  And so that's -- to me that -- as an accountant, that is

17  normal.  As we've just gone through in a lot of detail, they're

18  required to perform this analysis quarterly.  The results of

19  that analysis are included in reports and the draft SEC filings

20  that go to the audit committee of the board of directors for

21  review.

22       The financial summary and forecasts are provided to the

23  board of directors each quarter.  So it is very typical that

24  the board of directors would ask a question:  Hey, what about

25  that DTA thing?  What's going on with that?  So that's the

1    context in which I understood -- I was talking about DTA all

2    the time during this period.  To see that others were talking

3    about, it was not surprising to me.

4    Q.  And we just reviewed both Fannie Mae and Freddie Mac's

5    formal DTA conclusion memos at the time; right?

6    A.  Yes, we did.

7    Q.  So did it surprise you when you saw this email after having

8    reviewed those memos?

9    A.  No, because this has -- this is kind of a forward-looking

10   statement.  And, you know, if they were -- if they're going to

11   be profitable going forward, that's -- in the future -- I don't

12   know when in the future.  But I know as of the end of July what

13   management thought and what they concluded on -- based on

14   U.S. GAAP, which are the accounting rules we follow.

15   Q.  And what was your takeaway from this email -- I'm sorry.

16   Was your takeaway from this email that the DTA would be written

17   up in the near future?

18   A.  No, it was not.

19   Q.  Why not?

20   A.  Because this wouldn't be the type of information that the

21   accounting rules would support.  It's not detailed enough.

22   Q.  Now, the next sentence, let's read that.  "I do not think."

23   A.  Okay.  "I do not think that makes sense given the

24   amendments are designed to demonstrate wind down."

25   Q.  What did you understand this to mean at the time?

SATRIANO - DIRECT

1    A.  So there are several significant amendments to the PSPA,

2    the third amendment.  One of them changed the way the dividend

3    is calculated.  But one of the other significant items was

4    accelerating the reduction of the mortgage-asset portfolio.  I

5    think in the amendments it's called the mortgage portfolio; we

6    commonly refer to it as the retained portfolio.

7         And so one of the item -- one of the changes that they

8    did not know at this time but will be informed of subsequent,

9    soon, is that the -- the agreement will require the

10   mortgage-asset portfolio to be accelerated -- the write-down of

11   that will be accelerated.  And it's specified that the current

12   shrinking of that portfolio was not considered fast enough.

13   And so one of the amendments in the PSPA third amendment was to

14   make that process happen quicker.

15   Q.  And what was your understanding at the time as to the

16   impact on Fannie and Freddie from that accelerated reduction,

17   that shrinkage of the retained portfolio?

18   A.  So with respect to this email, I understood that Jim was

19   keying off of the word profitable going forward.  And if you --

20   if you shrink the mortgage-retained portfolio, one of the

21   reasons why there was an interest to have that portfolio

22   smaller was because it was perceived to be a source of risk

23   for -- maybe an unnecessary source of risk for the companies,

24   and --

25        But on the other side, it was also a source of income.

SATRIANO - DIRECT

1    And so if you shrink that portfolio, the companies, Fannie Mae

2    and Freddie Mac, would be earning less money in the future, all

3    else equal.  So I think I understood this sentence to refer

4    to -- that they were going to be profitable going forward or

5    maybe more profitable.  So that was my understanding.

6    Q.  So if you accelerate and speed up the reduction in the

7    retained portfolio, what impact, if any, would that have?

8    A.  All else equal, it would cause there to be less income

9    quicker.

10   Q.  Now, Mr. Satriano, at the time you received this email, did

11   you understand this reference to wind-down to mean shutting

12   down Fannie Mae and Freddie Mac altogether?

13   A.  No, I did not.

14   Q.  Why not?

15   A.  Because I understood it to be in the context of the

16   mortgage-asset portfolio.  We often refer to -- in the --

17   accounting, if you're going to sell off a whole portfolio at

18   once, you might call it a discontinued operation.  But this was

19   more of -- you know, a certain percentage per year they needed

20   to liquidate or sell.

21       And so that's why, at least in the kind of accounting

22   perspective, we use this concept of wind-down.  And it was,

23   sort of, ending a part of their -- you know, one element of

24   their business -- well, taking it down to a smaller level.  I

25   think there was a stated level that it could remain at into the

1    future.

2    Q.  So that Fannie Mae and Freddie Mac's business was shrinking

3    faster?

4    A.  It was shrinking faster.  And then in order to -- if they

5    wanted to maintain the same amount of income into the future,

6    they would have to have other sources of income.  And just

7    remember, at this time, they don't know that this is about to

8    happen.

9    Q.  They don't know that what's about to happen?

10   A.  That the accelerated wind-down is a component that they

11   will have to address subsequent to the issuance of the

12   third amendment.

13   Q.  And when you say they don't know, who is the "they"?

14   A.  I'm sorry.  Fannie Mae and Freddie Mac management are

15   not -- are not yet aware that the third amendment will be

16   issued in this same week.

17            MR. HOFFMAN:  You can take that down, Mr. Montgomery.

18   BY MR. HOFFMAN:

19   Q.  The third amendment was signed on August 17th, 2012; is

20   that right?

21   A.  Yes, it was.

22            THE COURT:  Okay.  We'll -- we'll come back at 1:35.

23   Have a nice lunch.

24            Don't talk to anybody about the case.  Don't read or

25   listen to anything about the case.  We'll come back at 1:35.

1       (Proceedings held out of the presence of the jury.)

2       THE COURT:  You can step down.  Off the record.

3       (Off the record.)

4       (REPORTER'S NOTE:  The p.m. portion of the trial was

5    reported by Lorraine Herman, who prepared said transcript.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1634

1      <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3           I, Nancy J. Meyer, Registered Diplomate Reporter,

4      Certified Realtime Reporter, do hereby certify that the above

5      and foregoing constitutes a true and accurate transcript of my

6      stenograph notes and is a full, true, and complete transcript

7      of the proceedings to the best of my ability.

8

9                          Dated this 2nd day of August, 2023.

10

11                         /s/ Nancy J. Meyer
                           Nancy J. Meyer
12                         Official Court Reporter
                           Registered Diplomate Reporter
13                         Certified Realtime Reporter
                           333 Constitution Avenue Northwest
14                         Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [1] - 51:11
**$47** [1] - 65:21

## '

**'11** [1] - 56:10

## 1

**1** [9] - 18:16, 18:20, 30:8, 30:19, 38:12, 64:15, 64:17, 64:21, 73:7
**10** [9] - 5:4, 32:11, 33:19, 34:10, 39:25, 65:1, 65:10, 65:16, 65:25
**10%** [1] - 39:20
**10-K** [4] - 10:2, 16:6, 24:2, 27:25
**10-Ks** [2] - 10:5, 21:4
**10-percent** [1] - 40:3
**10-Q** [7] - 10:1, 27:9, 29:14, 37:11, 37:16, 37:17, 39:4
**10-Qs** [2] - 10:4, 21:4
**102** [4] - 22:3, 22:4, 22:7, 25:14
**102**............................ [1]
  - 3:7
**103** [4] - 22:3, 22:4, 22:7, 25:14
**103**............................ [1]
  - 3:8
**11.7** [4] - 31:24, 33:12, 65:3, 65:4
**12** [1] - 39:11
**13-1053** [1] - 4:8
**13-1288** [1] - 4:9
**136** [2] - 22:7, 25:14
**136**............................ [1]
  - 3:8
**137** [2] - 22:7, 25:14
**137**............................ [1]
  - 3:9
**14** [1] - 41:13
**14th** [2] - 79:4, 80:6
**158** [2] - 22:8, 25:14
**158**............................ [1]
  - 3:9
**159** [2] - 22:8, 25:14
**159**............................ [1]
  - 3:10
**16** [1] - 31:1
**175** [4] - 22:8, 25:15, 29:16, 29:18
**175**............................ [1]
  - 3:10
**176** [3] - 22:8, 25:15,

28:3
**176**............................ [1]
  - 3:11
**17th** [3] - 29:9, 76:22, 87:19
**188** [2] - 22:8, 25:15
**188**............................ [1]
  - 3:11
**189** [2] - 22:8, 25:15
**189**............................ [1]
  - 3:12
**1:35** [1] - 87:22, 87:25
**1st** [2] - 72:14, 73:15

## 2

**2** [8] - 30:13, 38:12, 47:1, 57:25, 60:14, 64:17, 64:19, 69:10
**20** [2] - 7:17, 9:9
**200** [1] - 20:5
**2003** [1] - 9:9
**2008** [10] - 8:9, 10:22, 20:21, 21:5, 34:8, 52:22, 53:4, 53:13, 53:15, 55:2
**2009** [1] - 55:6
**2010** [2] - 56:6, 56:10
**2011** [3] - 8:2, 8:9, 56:6
**2012** [39] - 21:6, 27:10, 27:18, 28:1, 28:13, 29:9, 29:24, 34:9, 37:12, 38:5, 38:14, 39:2, 40:7, 43:25, 44:23, 56:18, 56:22, 56:23, 56:25, 57:3, 57:6, 57:7, 58:8, 60:3, 60:10, 62:4, 62:6, 62:9, 65:18, 69:17, 70:19, 72:14, 73:6, 73:15, 76:22, 77:25, 79:4, 87:19
**2012-2015** [3] - 63:17, 64:6, 64:8
**2015** [1] - 65:18
**2016** [1] - 18:9
**209** [1] - 37:21
**212** [2] - 22:8, 25:15
**212**............................ [1]
  - 3:12
**213** [2] - 22:8, 25:15
**213**............................ [1]
  - 3:13
**226** [2] - 22:8, 25:15
**226**............................ [1]
  - 3:13
**227** [2] - 22:8, 25:15
**227**............................ [1]
  - 3:14

**237** [2] - 22:8, 25:15
**237**............................ [1]
  - 3:14
**238** [2] - 22:8, 25:15
**238**............................ [1]
  - 3:15
**248** [1] - 37:22
**249** [1] - 38:18
**25** [32] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:23, 3:23
**252** [2] - 22:9, 25:15
**252**............................ [1]
  - 3:15
**253** [2] - 22:9, 25:15
**253**............................ [1]
  - 3:16
**259** [2] - 78:13, 78:14
**275** [2] - 22:9, 25:16
**275**............................ [1]
  - 3:16
**276** [2] - 22:9, 25:16
**276**............................ [1]
  - 3:17
**27th** [1] - 60:10
**29** [1] - 34:5
**297** [2] - 22:9, 25:16
**297**............................ [1]
  - 3:17
**298** [2] - 22:9, 25:16
**298**............................ [1]
  - 3:18

## 3

**30** [2] - 34:14, 34:16
**30th** [13] - 18:9, 27:10, 27:18, 28:1, 37:11, 38:14, 40:5, 40:7, 56:25, 58:8, 60:16, 62:6, 70:19
**31** [3] - 65:21, 66:17, 66:18
**31.3** [5] - 64:6, 64:20, 65:9, 65:19
**31st** [2] - 10:8, 18:17
**327** [2] - 22:9, 25:16
**327**............................ [1]
  - 3:18
**328** [2] - 22:9, 25:16
**328**............................ [1]
  - 3:19

**34.2** [2] - 64:7, 64:20
**341** [2] - 22:9, 25:16
**341**............................ [1]
  - 3:19
**342** [2] - 22:9, 25:16
**342**............................ [1]
  - 3:20
**367** [2] - 22:9, 25:16
**367**............................ [1]
  - 3:20
**369** [2] - 22:9, 25:16
**369**............................ [1]
  - 3:21

## 4

**4** [3] - 69:1, 69:3
**420** [2] - 22:10, 25:16
**420**............................ [1]
  - 3:21
**421** [2] - 22:10, 25:16
**421**............................ [1]
  - 3:22
**44** [1] - 3:24
**46.8** [1] - 65:7
**47** [2] - 65:7, 65:21
**472-A** [5] - 69:10, 69:11, 71:21, 71:25, 72:4
**472-A**............................
  [1] - 3:22
**476** [7] - 22:10, 25:17, 27:3, 27:8, 28:3, 29:16, 35:1
**476**............................ [1]
  - 3:23
**477** [7] - 22:10, 25:17, 37:5, 37:9, 37:21, 39:7, 41:14
**477**............................ [1]
  - 3:23
**499-A** [7] - 57:24, 57:25, 59:14, 59:25, 61:8, 61:17, 62:16
**499-A**............................
  [1] - 3:24

## 5

**5** [5] - 30:3, 39:7, 62:16, 69:2, 69:4
**5th** [2] - 43:25, 44:23

## 6

**61** [1] - 3:24

## 7

**7** [3] - 3:4, 73:25
**7.2** [1] - 40:8

**71** [1] - 3:22
**7th** [2] - 38:5, 39:2

## 8

**8th** [2] - 28:13, 29:24

## 9

**90** [1] - 51:13
**916** [4] - 43:5, 43:15, 44:13, 44:16
**916**............................ [1]
  - 3:24

## A

**ability** [2] - 31:18, 65:25
**able** [11] - 5:15, 23:6, 35:7, 51:25, 53:11, 55:9, 55:16, 55:18, 55:22, 75:24, 75:25
**accelerate** [1] - 86:6
**accelerated** [4] - 85:10, 85:11, 85:16, 87:10
**accelerating** [1] - 85:4
**accepted** [1] - 50:21
**accountant** [26] - 7:25, 8:1, 8:4, 8:6, 8:8, 8:21, 9:11, 12:13, 16:7, 16:12, 18:6, 19:16, 25:23, 26:6, 26:15, 28:14, 46:16, 46:19, 47:13, 51:2, 58:13, 58:18, 58:25, 65:24, 79:1, 83:16
**Accountant** [5] - 9:15, 13:23, 53:6, 72:21, 79:2
**accountant's** [2] - 12:16, 70:2
**accounting** [32] - 8:17, 8:18, 9:17, 11:4, 15:17, 15:25, 26:1, 47:14, 47:25, 48:16, 49:17, 50:21, 50:22, 52:9, 52:13, 53:8, 53:25, 55:11, 55:14, 55:19, 58:19, 64:1, 74:20, 75:2, 75:6, 75:8, 75:10, 84:14, 84:21, 86:17, 86:21
**Accounting** [2] - 9:1, 9:6
**accounting-related** [1] - 64:1
**accuracy** [3] - 11:5,

12:5, 23:21
**accurate** [2] - 16:18, 25:7
**acronym** [3] - 7:21, 79:8, 79:11
**Acting** [3] - 46:24, 50:8, 79:18
**acting** [1] - 45:8
**Action** [2] - 4:8, 4:11
**action** [1] - 12:15
**activities** [2] - 9:2, 9:20
**activity** [1] - 20:17
**actual** [2] - 27:2, 62:12
**add** [2] - 74:25, 77:19
**addition** [1] - 45:16
**additional** [5] - 40:19, 41:1, 41:22, 62:15, 66:20
**address** [1] - 87:11
**administered** [1] - 6:25
**admissibility** [1] - 5:8
**admit** [1] - 4:17
**Admitted** [1] - 3:6
**admitted** [7] - 21:24, 23:7, 25:17, 44:16, 61:17, 61:20, 71:25
**adopt** [2] - 5:3, 5:17
**advisor** [1] - 45:2
**affect** [1] - 77:14
**afford** [1] - 65:25
**AFS** [3] - 67:16, 68:4, 68:10
**agencies** [1] - 7:18
**Agency** [4] - 7:14, 9:1, 43:21, 45:1
**agency** [5] - 7:19, 7:25, 9:12, 46:16, 81:3
**agency's** [4] - 8:1, 46:4, 46:10, 47:13
**agendas** [1] - 12:17
**ago** [2] - 12:20, 76:13
**agreed** [1] - 40:2
**Agreement** [1] - 4:10
**agreement** [7] - 35:13, 36:4, 41:23, 48:3, 48:14, 79:9, 85:9
**agreements** [1] - 42:24
**ahead** [9] - 21:12, 31:20, 31:21, 32:14, 35:10, 41:21, 67:2, 80:18, 82:7
**Alfred** [3] - 45:17, 45:19
**allowance** [4] - 52:17, 52:19, 58:9, 62:4, 69:17, 78:4

**almost** [1] - 65:20
**altogether** [1] - 86:12
**amend** [1] - 49:1
**amendment** [33] - 29:4, 29:6, 29:8, 29:11, 29:14, 39:5, 42:22, 42:23, 43:2, 44:9, 45:6, 46:18, 47:8, 47:17, 47:20, 48:24, 49:11, 49:17, 62:14, 73:22, 76:23, 79:15, 79:19, 79:21, 79:22, 79:23, 81:12, 85:2, 85:13, 87:12, 87:15, 87:19
**amendments** [9] - 47:19, 47:22, 48:2, 48:20, 50:2, 84:24, 85:1, 85:5, 85:13
**amount** [5] - 49:7, 49:9, 68:11, 68:20, 87:5
**amounts** [1] - 35:22
**analogies** [1] - 51:1
**analysis** [22] - 14:5, 15:7, 15:8, 30:11, 31:11, 39:10, 53:20, 54:1, 54:9, 54:24, 55:7, 55:15, 56:9, 57:4, 57:10, 57:19, 60:19, 63:1, 73:6, 77:25, 83:18, 83:19
**annual** [7] - 10:1, 10:8, 24:1, 24:2, 24:6, 24:13, 24:15, 24:19, 33:8, 39:19, 39:25, 40:7, 40:9, 42:3, 42:12, 65:1, 65:2
**annually** [1] - 16:4
**answer** [2] - 10:3, 61:18
**answering** [1] - 82:8
**anticipate** [1] - 32:18
**appear** [1] - 31:5
**applied** [1] - 26:11
**apply** [2] - 19:17, 19:19
**applying** [1] - 52:19
**appreciate** [1] - 74:6
**approach** [2] - 6:12, 43:8
**appropriate** [3] - 12:19, 52:8, 55:10
**approval** [4] - 11:12, 17:15, 17:16, 68:14
**approvals** [1] - 18:19
**approve** [1] - 13:1
**approved** [2] - 17:22, 19:1

**area** [3] - 10:17, 15:9, 50:20
**argument** [1] - 5:5
**arise** [1] - 11:20
**arrive** [1] - 59:10
**aside** [1] - 29:3
**assertion** [1] - 76:9
**assessing** [1] - 53:9
**assessment** [3] - 49:12, 54:1, 69:18
**asset** [27] - 50:19, 51:4, 51:6, 52:4, 52:11, 53:10, 54:19, 55:23, 56:2, 57:4, 57:10, 57:19, 59:11, 62:25, 63:14, 67:14, 67:15, 67:24, 68:4, 68:10, 69:6, 72:22, 76:8, 85:4, 85:10, 86:16
**assets** [26] - 14:21, 50:16, 50:20, 50:22, 51:12, 51:15, 51:18, 51:21, 51:24, 52:1, 52:9, 52:23, 53:1, 53:11, 54:2, 55:9, 55:17, 55:18, 68:9, 75:19, 76:1, 76:8, 82:19, 83:15
**assignment** [1] - 16:3
**assist** [1] - 20:5
**assisted** [1] - 46:13
**associated** [1] - 63:6
**Association** [1] - 27:20
**assuming** [1] - 66:20
**assumption** [1] - 76:9
**assurance** [1] - 16:17
**attach** [1] - 44:5
**attached** [1] - 73:25
**attaching** [4] - 60:7, 60:9, 72:8, 72:13
**attachment** [3] - 44:7, 44:8, 47:4
**attended** [2] - 81:1, 83:3
**attest** [1] - 18:10
**audience** [2] - 26:16, 26:18
**audit** [22] - 9:20, 12:25, 13:5, 13:8, 13:9, 13:10, 15:16, 16:5, 16:13, 23:23, 24:2, 24:4, 24:6, 24:13, 24:16, 24:19, 24:20, 24:22, 25:4, 59:1, 83:20
**audit-related** [1] - 9:20
**audited** [5] - 15:23,

15:24, 23:15, 25:2, 61:1
**auditing** [7] - 24:8, 47:14, 48:1, 48:7, 48:10, 48:16, 49:18
**auditing-related** [1] - 48:1
**auditor** [4] - 15:14, 15:21, 15:22, 48:7
**auditor's** [1] - 24:21
**auditors** [12] - 15:12, 16:1, 16:8, 23:12, 23:21, 23:23, 23:25, 80:21, 81:6, 81:7, 81:12, 82:10
**August** [12] - 28:13, 29:9, 29:24, 38:5, 39:2, 71:1, 72:14, 73:15, 76:22, 79:4, 80:6, 87:19
**available** [5] - 19:9, 19:11, 49:8, 49:9, 76:7
**aware** [4] - 17:11, 18:11, 80:8, 87:15

## B

**back-and-forth** [3] - 4:20, 5:7, 54:23
**backed** [1] - 26:25
**backing** [1] - 8:10
**balance** [1] - 14:9
**banks** [3] - 9:3, 9:14, 9:17
**based** [13] - 13:7, 17:9, 18:10, 20:9, 28:20, 32:11, 38:15, 53:5, 69:25, 70:1, 71:23, 82:20, 84:13
**basis** [2] - 11:3, 25:10
**became** [2] - 43:1, 79:21
**become** [6] - 44:8, 45:6, 46:18, 47:7, 74:5, 74:7
**beginning** [3] - 57:7, 74:2, 77:24
**begins** [1] - 74:4
**behalf** [3] - 4:13, 7:4, 81:2
**below** [1] - 27:24
**bench** [2] - 4:3, 4:5
**benefit** [2] - 51:9, 52:5
**benefits** [3] - 52:4, 67:24, 76:1
**between** [3] - 14:12, 50:23, 64:17
**big** [2] - 15:19, 27:19
**bigger** [1] - 65:21

**bill** [1] - 63:10
**billion** [15] - 31:24, 33:12, 40:8, 64:6, 64:7, 64:20, 65:3, 65:4, 65:7, 65:9, 65:19, 65:21, 66:18
**binder** [1] - 6:13
**bit** [9] - 12:21, 25:21, 37:23, 42:21, 45:3, 50:13, 55:13, 65:5, 77:19
**board** [11] - 12:2, 12:21, 12:24, 16:23, 17:21, 83:3, 83:5, 83:11, 83:20, 83:23, 83:24
**Boards** [1] - 82:20
**boards** [2] - 83:9, 83:14
**bold** [1] - 27:19
**borrow** [1] - 36:18
**borrowing** [1] - 66:11
**bottle** [1] - 43:8
**bottom** [5] - 30:18, 31:2, 41:15, 72:4, 78:17
**bottom-most** [1] - 72:4
**brief** [3] - 4:14, 4:25, 29:3
**briefly** [3] - 38:10, 68:6, 76:4
**bring** [1] - 6:10
**broad** [1] - 12:1
**broader** [1] - 31:9
**broadly** [1] - 9:3
**bullet** [3] - 27:16, 27:17, 28:16
**Burns** [1] - 46:6
**business** [9] - 14:15, 20:8, 26:4, 48:5, 48:11, 61:14, 71:7, 86:24, 87:2

## C

**calculate** [1] - 65:5
**calculated** [2] - 32:7, 85:3
**calculation** [2] - 49:25, 53:9
**callout** [1] - 44:19, 46:25
**capable** [1] - 6:2
**capacity** [1] - 50:5
**captured** [1] - 78:7
**carefully** [1] - 49:10
**case** [6] - 4:9, 26:24, 52:2, 56:25, 87:24, 87:25

**cash** [4] - 34:10, 39:12, 39:19, 40:7
**caution** [1] - 42:6
**centralized** [1] - 60:25
**CEO** [6] - 16:23, 18:7, 19:15, 19:19, 29:21, 38:3
**certain** [7] - 16:14, 19:12, 19:17, 50:24, 82:18, 83:15, 86:19
**certification** [16] - 19:15, 28:5, 28:12, 28:13, 28:24, 29:19, 29:23, 29:24, 38:1, 38:4, 38:5, 38:13, 38:21, 38:22, 39:1, 39:2
**certifications** [7] - 8:18, 17:25, 18:1, 19:17, 19:19, 28:17, 29:1
**certified** [1] - 8:21
**certify** [2] - 18:3, 18:8
**certifying** [7] - 18:7, 28:15, 28:18, 29:25, 30:1, 38:11, 38:24
**CFO** [9] - 11:8, 11:10, 11:13, 11:14, 11:17, 16:22, 18:6, 19:15, 19:19
**chain** [1] - 80:12
**change** [3] - 20:20, 42:21, 50:13
**changed** [1] - 85:2
**changes** [15] - 32:17, 48:14, 48:22, 48:25, 49:21, 49:25, 73:1, 73:6, 80:2, 80:8, 80:22, 81:9, 81:12, 81:14, 85:7
**charge** [3] - 24:21, 46:10, 67:10
**charge-offs** [1] - 67:10
**charged** [2] - 9:12, 58:18
**chart** [2] - 11:14, 14:22
**charts** [1] - 14:22
**cheers** [1] - 80:23
**Chief** [5] - 9:15, 13:23, 53:5, 72:20, 79:2
**chief** [35] - 7:25, 8:1, 8:3, 8:5, 8:8, 9:11, 11:10, 12:13, 12:15, 16:7, 16:11, 16:23, 17:24, 18:6, 19:16, 25:23, 26:6, 26:15, 28:6, 28:10, 28:14, 29:19, 38:1, 38:23, 46:1, 46:16, 47:13,

51:2, 58:13, 58:18, 58:25, 65:24, 70:2, 79:1
**circle** [1] - 75:16
**circular** [10] - 36:11, 37:1, 41:5, 41:7, 41:9, 41:10, 42:15, 42:16, 66:4, 66:16
**circularity** [1] - 49:2
**citing** [1] - 17:15
**Civil** [1] - 4:8
**clarifying** [1] - 61:24
**Class** [1] - 4:10
**clear** [3] - 7:5, 21:24, 22:2
**clearly** [1] - 66:19
**clerk** [2] - 6:23, 22:5
**close** [7] - 29:10, 46:23, 62:9, 62:13, 73:18, 73:21, 79:23
**cognizant** [1] - 48:13
**collect** [2] - 55:21, 75:25
**collected** [3] - 56:1, 67:20, 67:21
**college** [3] - 8:10, 8:11, 8:14
**College** [1] - 8:11
**color** [1] - 77:19
**coming** [1] - 25:11
**comment** [1] - 48:8
**comments** [1] - 49:24
**commitment** [11] - 32:12, 34:12, 34:17, 36:19, 36:22, 39:24, 41:2, 42:9, 49:8, 50:2, 66:12
**committee** [9] - 12:3, 12:4, 12:12, 12:20, 12:25, 13:8, 13:9, 83:20
**committee's** [2] - 12:25, 13:10
**committees** [5] - 11:22, 11:25, 12:2, 13:5
**common** [3] - 9:23, 9:25, 26:23
**commonly** [4] - 14:6, 27:22, 27:23, 85:6
**commons** [1] - 26:23
**communicate** [2] - 49:12, 49:14
**communication** [3] - 17:14, 80:4, 80:9
**companies** [8] - 9:16, 15:15, 18:17, 53:8, 55:14, 74:20, 85:23, 86:1
**company** [17] - 10:25,

12:7, 20:8, 20:9, 20:15, 26:22, 28:9, 30:24, 37:13, 48:10, 51:10, 51:23, 52:7, 63:2, 63:17, 63:19, 63:23
**company's** [3] - 13:8, 64:3, 64:5
**comparable** [1] - 14:20
**compare** [2] - 65:9, 65:12
**compared** [1] - 73:7
**comparison** [1] - 65:14
**competent** [1] - 23:6
**complete** [1] - 19:1
**completeness** [2] - 11:5, 12:5
**component** [3] - 53:16, 76:7, 87:10
**components** [4] - 48:15, 49:16, 59:5, 68:9
**comprehensive** [7] - 33:7, 33:8, 33:14, 35:7, 40:21, 42:1, 42:2
**concept** [3] - 41:4, 78:7, 86:22
**concern** [12] - 48:8, 48:9, 48:14, 48:21, 48:24, 49:3, 49:4, 49:10, 50:1, 81:13, 81:23, 82:14
**concerns** [2] - 48:17, 49:1
**conclude** [7] - 48:23, 53:10, 54:18, 55:5, 56:1, 56:2, 56:5
**concluded** [2] - 56:12, 84:13
**concludes** [1] - 52:7
**concluding** [1] - 77:3
**conclusion** [9] - 48:18, 55:8, 55:15, 57:15, 57:19, 59:10, 73:2, 73:9, 84:5
**conclusions** [3] - 58:24, 59:7, 73:7
**conduct** [1] - 58:25
**conjunction** [1] - 54:7
**connected** [1] - 12:21
**connection** [4] - 11:9, 16:2, 51:15, 78:11
**conscious** [1] - 48:13
**consent** [1] - 25:11
**conservator** [2] - 46:11, 82:25
**conservatorship** [5] -

20:20, 21:5, 46:19, 52:22, 67:8
**conservatorships** [1] - 34:8
**consider** [1] - 16:7
**considered** [3] - 49:9, 75:2, 85:12
**consistent** [7] - 14:19, 34:23, 60:11, 60:13, 73:15, 80:3, 80:9
**consisting** [1] - 14:4
**consolidated** [1] - 64:5
**contain** [3] - 17:10, 28:20, 38:15
**context** [5] - 20:4, 65:23, 81:1, 84:1, 86:15
**continue** [1] - 41:10
**continued** [1] - 67:10
**contrast** [1] - 14:17
**control** [2] - 13:3, 32:25
**controller** [5] - 10:25, 11:2, 11:7, 11:13, 11:14
**controller's** [1] - 20:15
**controllers'** [1] - 10:24
**controls** [2] - 11:6, 26:10
**conversation** [1] - 71:23
**coordinated** [1] - 80:9
**Corporation** [1] - 37:15
**corralling** [1] - 12:6
**corresponding** [1] - 37:16
**counsel** [2] - 4:3, 45:19
**couple** [2] - 21:9, 22:13
**course** [4] - 25:25, 61:14, 61:19, 71:6
**COURT** [37] - 4:3, 4:6, 6:8, 6:11, 6:15, 6:21, 21:8, 21:12, 21:14, 21:18, 21:20, 21:25, 22:5, 22:15, 25:12, 33:25, 36:8, 36:21, 44:15, 49:23, 61:13, 61:16, 61:22, 68:19, 68:24, 69:3, 69:8, 71:24, 75:6, 75:9, 76:12, 76:15, 76:17, 82:1, 82:5, 87:22, 88:2
**Court** [5] - 4:20, 5:11, 5:18, 5:23, 6:6
**Court's** [2] - 50:11,

76:11
**COURTROOM** [3] - 4:8, 7:2, 21:23
**cover** [5] - 35:7, 41:12, 60:7, 60:9, 66:19
**create** [3] - 60:21, 71:2, 71:6
**created** [3] - 25:20, 60:22, 71:4
**credibility** [1] - 6:3
**credit** [4] - 9:3, 32:20, 51:7
**credit-related** [1] - 32:20
**credits** [2] - 63:5, 63:9
**critical** [1] - 25:24
**culminate** [1] - 17:12
**culminates** [1] - 17:13
**cumulative** [9] - 67:7, 74:8, 74:9, 74:18, 74:22, 74:24, 75:1, 77:22, 78:8
**current** [9] - 7:24, 32:3, 32:16, 32:21, 33:11, 62:23, 64:3, 64:5, 85:11
**Current** [3] - 62:17, 62:20, 63:16
**cycle** [1] - 48:11

## D

**date** [16] - 60:9, 60:15, 60:16, 60:18, 62:6, 70:18, 70:20, 70:22, 70:23, 73:14, 74:23, 75:1, 75:25, 76:22, 77:7, 78:4
**dated** [2] - 27:10, 37:11
**days** [5] - 62:11, 62:15, 79:25
**deal** [1] - 68:23
**debt** [1] - 26:21
**December** [1] - 10:8
**decision** [3] - 26:5, 55:15, 56:3
**decision-making** [1] - 26:5
**decisions** [1] - 20:11
**declaration** [4] - 5:2, 5:10, 5:14, 5:17
**decrease** [1] - 64:7
**defendants** [9] - 4:13, 4:15, 5:20, 7:4, 7:5, 21:2, 44:12, 61:7, 71:20
**Defendants'** [60] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11,

3:11, 3:12, 3:12,
3:13, 3:13, 3:14,
3:14, 3:15, 3:15,
3:16, 3:16, 3:17,
3:17, 3:18, 3:18,
3:19, 3:19, 3:20,
3:20, 3:21, 3:21,
3:22, 3:22, 3:23,
3:23, 3:24, 3:24,
22:3, 25:14, 27:3,
27:8, 28:3, 29:16,
35:1, 37:5, 37:9,
37:20, 39:7, 41:13,
43:4, 43:14, 44:13,
44:16, 57:24, 59:14,
59:25, 61:8, 61:17,
62:16, 69:10, 71:21,
71:25
**defendants'** [3] - 7:6,
22:4, 22:7
**defer** [4] - 4:20, 5:11,
5:18, 6:5
**deferred** [44] - 50:16,
50:19, 50:20, 50:22,
51:4, 51:6, 51:11,
51:15, 51:17, 51:24,
52:1, 52:4, 52:9,
52:22, 53:1, 53:10,
54:2, 54:19, 55:9,
55:16, 55:18, 55:23,
56:2, 57:4, 57:9,
57:19, 59:10, 62:25,
63:14, 67:14, 67:15,
67:24, 68:3, 68:8,
68:10, 69:6, 72:21,
75:19, 76:1, 76:8,
82:18, 83:15
**definition** [2] - 16:9,
68:19
**degree** [1] - 8:15
**DeLeo** [3] - 49:15,
50:7, 50:8
**deliberation** [1] -
13:11
**Deloitte** [3] - 15:23,
23:16, 81:8
**DeMarco** [4] - 45:10,
46:24, 50:8, 79:18
**demonstrate** [1] -
84:24
**demonstrated** [1] -
74:11
**department** [1] - 45:22
**Department** [1] -
79:10
**deputy** [3] - 8:5, 8:7,
79:1
**DEPUTY** [3] - 4:8, 7:2,
21:23
**describe** [2] - 10:13,

14:11
**described** [2] - 19:22,
58:20
**describing** [2] - 14:14,
58:9
**description** [3] - 41:6,
42:16, 70:1
**designed** [1] - 84:24
**despite** [2] - 42:9,
77:4
**detail** [1] - 83:17
**detailed** [1] - 84:21
**determination** [1] -
77:2
**determine** [1] - 63:11
**determined** [1] - 75:18
**difference** [2] - 64:15,
66:3
**differences** [2] -
14:11, 50:23
**different** [9] - 13:25,
50:14, 59:5, 60:17,
66:21, 66:22, 68:19,
76:9, 79:11
**differently** [2] - 56:1,
68:14
**difficult** [2] - 74:7,
74:15
**dire** [5] - 4:18, 5:4,
5:24, 6:5, 61:11
**DIRECT** [1] - 7:7
**Direct** [1] - 3:4
**direct** [1] - 4:25
**directly** [2] - 46:23,
46:24
**director** [2] - 45:2,
45:8
**Director** [3] - 46:24,
50:8, 79:18
**directors** [8] - 12:3,
12:21, 12:24, 16:24,
17:21, 83:20, 83:23,
83:24
**disclose** [1] - 20:9
**disclosed** [1] - 20:10
**disclosure** [9] - 12:4,
12:8, 12:12, 13:22,
15:5, 20:17, 40:12
**disclosures** [11] -
9:18, 11:4, 12:9,
13:11, 16:17, 17:23,
26:3, 30:24, 54:10,
61:1, 71:12
**discontinued** [1] -
86:18
**discuss** [4] - 11:3,
12:8, 22:13, 49:16
**discussed** [7] - 23:11,
50:24, 81:11, 82:20,
83:9, 83:11, 83:13

**discussing** [2] -
19:21, 66:5
**discussion** [10] - 14:5,
15:7, 15:8, 30:11,
31:11, 39:10, 78:5,
80:21, 81:5, 82:9
**display** [3] - 43:5,
43:6, 69:9
**displayed** [1] - 57:23
**disruptive** [1] - 4:22
**dividend** [44] - 31:21,
31:23, 32:3, 32:6,
32:7, 32:11, 33:9,
33:12, 33:19, 33:22,
34:11, 34:13, 34:19,
35:8, 35:11, 35:19,
35:21, 35:25, 36:16,
36:17, 36:23, 39:21,
39:22, 39:23, 39:25,
40:7, 40:13, 41:2,
41:12, 41:24, 42:7,
42:12, 49:6, 49:7,
49:25, 65:1, 65:2,
65:10, 65:16, 65:20,
66:1, 66:5, 66:13,
85:2
**dividends** [8] - 31:19,
34:17, 36:4, 39:13,
39:19, 42:3, 49:2,
66:6
**document** [20] - 10:8,
17:22, 18:4, 18:25,
19:14, 27:6, 28:22,
43:17, 48:17, 48:20,
49:1, 57:18, 58:4,
58:7, 58:11, 64:22,
68:15, 69:2, 69:14,
76:7
**documents** [8] - 6:3,
10:7, 12:10, 22:14,
25:12, 25:24, 54:22,
58:23
**dollars** [1] - 51:11
**Donald** [1] - 38:2
**done** [1] - 29:1
**down** [50] - 34:20,
37:5, 42:10, 42:19,
44:19, 46:25, 50:9,
51:13, 51:14, 51:18,
52:2, 52:11, 52:14,
52:18, 53:1, 53:7,
53:12, 53:14, 53:18,
53:19, 53:24, 54:4,
54:14, 55:2, 55:6,
55:10, 55:24, 56:6,
56:14, 56:19, 57:20,
58:10, 59:11, 63:14,
64:18, 68:1, 68:15,
73:9, 73:11, 76:2,
76:19, 84:24, 85:10,

86:11, 86:12, 86:22,
86:24, 87:10, 87:17,
88:2
**draft** [10] - 16:25, 44:8,
44:10, 46:17, 47:7,
47:10, 47:15, 48:12,
49:11, 83:19
**drafted** [3] - 20:14,
60:12, 62:6
**drafting** [1] - 20:13
**drafts** [4] - 16:19,
43:1, 47:22, 48:12
**draw** [5] - 36:3,
36:11, 36:18, 36:20,
36:22, 37:1, 41:7,
42:8, 42:17, 49:6,
66:16
**drawing** [1] - 66:11
**drawn** [2] - 32:11,
35:23
**draws** [14] - 34:17,
35:12, 35:22, 36:1,
39:24, 40:19, 41:1,
41:5, 41:9, 41:10,
41:22, 41:25, 42:15,
66:20
**drew** [2] - 34:11, 34:16
**drive** [3] - 35:12,
35:25, 41:24
**DTA** [22] - 58:15, 59:2,
59:23, 61:2, 62:23,
69:19, 69:23, 70:5,
70:7, 70:16, 71:2,
71:10, 71:14, 71:18,
72:13, 73:10, 73:12,
73:25, 83:25, 84:1,
84:5, 84:16
**DTAs** [16] - 51:2, 53:7,
53:14, 53:15, 53:16,
53:23, 54:4, 54:13,
55:6, 56:6, 56:14,
56:17, 57:1, 57:13,
76:25, 77:15
**due** [2] - 67:6, 67:9
**during** [7] - 8:7, 11:20,
28:11, 56:8, 56:10,
57:4, 84:2
**duties** [1] - 46:14
**dwell** [1] - 29:17

## E

**Earlham** [1] - 8:11
**early** [2] - 18:21, 71:1
**earn** [6] - 33:18,
35:17, 36:16, 40:15,
49:5, 51:5
**earning** [1] - 86:2
**earnings** [10] - 33:7,
40:9, 40:25, 41:11,

42:1, 42:9, 42:11,
50:4, 65:23, 66:6
**economist** [2] - 46:2,
46:18
**Ed** [5] - 46:24, 50:8,
79:13, 79:17, 79:18
**education** [1] - 8:24
**Edward** [1] - 45:10
**effect** [4] - 33:1, 40:1,
49:17, 49:18
**effective** [1] - 70:18
**effectively** [1] - 51:7
**effort** [1] - 80:9
**eight** [1] - 62:15
**either** [1] - 20:8
**electronically** [1] -
71:11
**element** [1] - 86:23
**elements** [1] - 54:24
**elicit** [2] - 4:25, 5:14
**email** [35] - 43:20,
43:22, 44:3, 44:5,
44:22, 45:4, 45:16,
47:4, 60:7, 60:9,
72:5, 72:7, 72:10,
72:11, 72:13, 72:15,
72:24, 73:14, 78:20,
78:21, 79:3, 79:4,
79:5, 80:12, 81:15,
81:21, 82:9, 83:8,
83:14, 84:7, 84:15,
84:16, 85:18, 86:10
**embedded** [2] - 10:3,
48:20
**employee** [1] - 72:11
**employees** [2] - 43:20,
70:9
**end** [14] - 10:7, 17:20,
18:18, 18:22, 19:2,
35:10, 53:4, 53:12,
53:14, 55:2, 57:12,
60:20, 71:1, 84:12
**ended** [3] - 27:17,
30:24, 56:23
**ending** [3] - 27:17,
28:1, 86:23
**ends** [4] - 18:15,
18:16, 56:24, 60:2
**engagement** [1] - 15:4
**English** [1] - 52:10
**enhance** [1] - 15:19
**ensure** [6] - 12:9,
16:14, 17:9, 23:21,
25:1, 80:3
**ensuring** [1] - 12:5
**entered** [1] - 52:21
**Enterprise** [1] - 7:20
**enterprise** [3] - 11:8,
45:23, 46:11
**Enterprises** [1] - 80:2

**enterprises** [6] - 34:10, 34:11, 34:16, 52:21, 80:7, 81:4
**enterprises'** [3] - 11:17, 26:7, 34:19
**entire** [1] - 19:12
**entities** [1] - 9:3
**entitled** [1] - 6:1
**environment** [1] - 32:17
**equal** [2] - 86:3, 86:8
**equity** [2] - 14:10, 26:23
**especially** [1] - 74:18
**essentially** [1] - 50:22
**estimate** [1] - 66:17
**estimates** [2] - 58:19, 58:22
**events** [1] - 32:25
**eventually** [1] - 9:5
**evidence** [42] - 21:3, 25:17, 27:4, 37:10, 43:5, 44:13, 44:16, 55:20, 55:21, 55:25, 56:13, 56:20, 56:21, 57:22, 61:8, 61:17, 61:21, 67:6, 67:12, 67:13, 67:19, 67:20, 71:11, 71:21, 71:25, 73:12, 73:13, 74:8, 74:15, 75:3, 75:24, 77:2, 77:4, 77:5, 77:6, 77:18, 77:20, 78:9, 78:13
**evident** [1] - 47:14
**exacerbate** [1] - 50:1
**exactly** [1] - 74:2
**EXAMINATION** [1] - 7:7
**Examination** [1] - 3:4
**examination** [3] - 46:5, 54:21, 58:21
**examinations** [1] - 59:3
**examine** [1] - 9:18
**examiner** [1] - 46:19
**examiners** [1] - 72:21
**example** [6] - 18:9, 18:16, 25:25, 36:15, 51:24, 55:24
**exceed** [2] - 40:14
**exceeded** [1] - 40:9
**except** [1] - 40:16
**exception** [3] - 67:15, 68:2, 68:3
**excess** [3] - 33:8, 42:3, 42:12
**executed** [1] - 73:22
**executive** [18] - 16:23, 17:24, 19:25, 20:3,

20:5, 20:13, 20:14, 29:20, 30:22, 31:7, 38:2, 45:22, 46:1, 46:4, 46:7, 46:10, 46:13, 82:24
**Executive** [1] - 30:20
**executives** [2] - 12:6, 16:22
**Exhibit** [63] - 3:7, 3:8, 3:8, 3:9, 3:9, 3:10, 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 3:14, 3:14, 3:15, 3:15, 3:16, 3:16, 3:17, 3:17, 3:18, 3:18, 3:19, 3:19, 3:20, 3:20, 3:21, 3:21, 3:22, 3:22, 3:23, 3:23, 3:24, 3:24, 22:3, 22:7, 25:14, 27:3, 27:8, 28:3, 29:16, 35:1, 37:5, 37:9, 37:21, 39:7, 41:14, 43:5, 43:15, 44:13, 44:16, 57:24, 59:14, 59:25, 61:8, 61:17, 62:16, 69:10, 71:21, 71:25, 78:13, 78:14
**exhibit** [6] - 30:4, 31:2, 47:1, 60:5, 61:20, 78:12
**exhibits** [1] - 22:4
**Exhibits** [1] - 3:6
**existed** [1] - 77:6
**exists** [1] - 77:18
**exit** [1] - 67:7
**expect** [10] - 4:17, 33:7, 35:6, 35:11, 35:24, 40:19, 41:18, 41:22, 42:11, 52:7
**expectations** [1] - 32:21
**expected** [2] - 65:18, 79:15
**expecting** [1] - 65:13
**expenses** [1] - 32:20
**experience** [6] - 26:6, 26:15, 33:4, 33:6, 35:3, 41:25
**experiencing** [1] - 74:24
**expert** [1] - 59:24
**explain** [6] - 9:10, 15:14, 45:15, 50:18, 51:17, 62:22
**extends** [1] - 23:9
**extensive** [1] - 24:23
**external** [11] - 15:12, 15:14, 15:17, 15:21,

15:22, 16:1, 16:8, 24:21, 48:7, 81:5, 81:7
**extra** [1] - 16:17

# F

**face** [1] - 6:23
**fact** [4] - 18:10, 28:21, 38:16, 42:9
**factors** [1] - 32:18
**facts** [4] - 28:22, 34:3, 34:7, 34:15
**falls** [1] - 58:20
**familiar** [10] - 10:9, 10:14, 13:22, 29:3, 42:23, 50:16, 51:14, 54:18, 54:20, 69:22
**familiarity** [10] - 10:13, 10:19, 13:16, 13:21, 14:24, 36:10, 54:16, 58:13, 69:25, 70:4
**Fannie** [123] - 4:9, 6:2, 9:4, 9:13, 9:16, 9:21, 9:23, 10:4, 10:9, 10:15, 10:16, 10:19, 10:23, 11:8, 11:16, 11:22, 12:12, 12:23, 13:5, 13:8, 13:13, 13:18, 14:2, 14:24, 15:4, 15:12, 15:15, 15:17, 15:21, 15:23, 16:2, 16:20, 17:4, 17:15, 17:19, 17:21, 18:14, 18:23, 19:4, 19:6, 19:9, 20:12, 20:18, 21:3, 22:18, 22:22, 23:1, 23:5, 23:15, 25:20, 25:22, 26:16, 26:22, 26:24, 27:9, 27:21, 28:11, 29:13, 29:20, 29:21, 32:3, 32:10, 32:25, 33:18, 36:15, 36:25, 37:17, 39:3, 45:23, 46:5, 47:16, 48:4, 52:2, 52:25, 53:7, 53:14, 54:12, 54:16, 55:1, 55:5, 56:5, 56:9, 56:16, 57:14, 58:7, 58:14, 59:1, 59:15, 60:21, 60:24, 61:2, 62:3, 62:10, 63:2, 63:20, 64:25, 65:8, 65:14, 65:25, 66:14, 67:6, 67:17, 68:22, 70:4, 71:9, 76:6, 76:24, 77:8, 77:15, 78:9, 80:7, 81:3, 83:4, 83:8, 83:12, 84:4, 85:16,

86:1, 86:12, 87:2, 87:14
**Fannie's** [1] - 31:13
**fast** [1] - 85:12
**faster** [2] - 87:3, 87:4
**favor** [1] - 78:3
**favorably** [1] - 65:12
**federal** [1] - 9:14
**Federal** [7] - 7:14, 7:20, 8:25, 27:19, 37:14, 43:20, 45:1
**few** [6] - 5:10, 8:10, 61:10, 63:8, 67:1, 76:13
**FHFA** [24] - 7:15, 7:16, 7:17, 7:19, 7:24, 8:3, 9:12, 13:18, 16:10, 16:25, 17:4, 17:6, 17:12, 17:14, 17:18, 19:12, 46:22, 49:12, 58:25, 61:3, 70:3, 71:15, 72:15, 80:3
**FHFA's** [17] - 7:25, 9:11, 16:7, 16:11, 18:6, 19:16, 25:23, 26:6, 26:15, 28:14, 45:19, 46:18, 51:1, 53:5, 58:13, 65:24, 82:24
**fields** [1] - 45:13
**file** [7] - 10:4, 10:6, 10:7, 10:8, 15:16, 18:23, 18:25
**filed** [7] - 10:2, 17:1, 18:20, 19:8, 29:14, 37:16, 39:4
**filing** [25] - 12:6, 15:20, 17:23, 19:12, 19:17, 19:20, 20:6, 24:2, 27:2, 27:15, 28:25, 29:2, 29:10, 30:8, 31:5, 31:13, 38:6, 38:9, 39:3, 39:4, 60:23, 61:1, 62:10, 62:12, 73:19
**filings** [66] - 4:17, 5:1, 5:5, 5:8, 9:19, 9:21, 9:23, 9:25, 10:1, 10:11, 10:15, 10:21, 11:9, 11:18, 11:23, 13:2, 13:6, 13:14, 13:19, 13:24, 13:25, 14:3, 15:1, 15:6, 16:2, 16:18, 16:19, 17:1, 17:7, 17:9, 18:7, 18:15, 18:24, 19:3, 19:7, 20:4, 20:20, 21:3, 23:1, 23:7, 23:10, 23:13, 23:21, 23:24, 24:4,

24:6, 24:13, 25:7, 25:11, 25:20, 25:22, 25:24, 26:7, 26:17, 26:18, 27:11, 31:12, 37:1, 50:24, 54:6, 54:8, 57:6, 71:5, 83:19
**final** [1] - 17:22
**finalized** [4] - 70:24, 73:16, 73:18, 73:21
**finan** [1] - 11:15
**Finance** [4] - 7:14, 8:25, 43:21, 45:1
**finance** [6] - 8:16, 10:17, 10:23, 11:11, 11:15, 20:15
**financial** [56] - 9:2, 9:18, 10:18, 11:1, 11:2, 11:3, 11:4, 11:6, 11:10, 11:12, 11:14, 11:20, 11:21, 14:5, 14:7, 14:8, 14:12, 14:15, 14:17, 14:18, 15:8, 15:20, 16:4, 16:15, 17:5, 17:6, 17:8, 17:16, 17:23, 17:24, 18:13, 19:10, 20:7, 24:22, 24:23, 24:24, 25:2, 28:6, 28:10, 30:23, 33:2, 38:23, 48:4, 50:23, 51:22, 53:16, 54:10, 56:8, 56:24, 57:5, 57:12, 63:24, 67:8, 71:12, 83:22
**Financial** [1] - 41:15
**fine** [3] - 30:6, 80:22, 81:10
**finished** [2] - 8:23, 35:2
**finite** [1] - 49:9
**firm** [1] - 15:17
**firms** [1] - 15:25
**first** [35] - 4:16, 16:19, 21:13, 21:15, 21:16, 21:17, 21:18, 27:9, 27:11, 27:16, 28:16, 30:10, 32:13, 32:14, 34:9, 35:16, 37:9, 37:11, 39:9, 39:18, 45:4, 45:5, 45:12, 47:17, 56:17, 57:11, 60:5, 63:15, 72:3, 74:1, 78:20, 79:12, 81:20
**five** [4] - 5:24, 18:18, 18:21, 19:1
**five-question** [1] - 5:24
**fly** [1] - 65:5

**focus** [7] - 9:16, 9:20, 41:14, 47:13, 56:22, 74:1, 74:4
**focused** [5] - 9:2, 10:16, 10:24, 16:5, 48:13
**follow** [5] - 5:10, 12:18, 13:12, 27:12, 84:14
**follow-up** [1] - 5:10
**following** [1] - 74:9
**forecast** [11] - 52:3, 62:23, 63:11, 63:12, 64:5, 64:14, 64:17, 64:19, 64:20, 65:8, 65:17
**Forecast** [3] - 62:17, 62:20, 63:16
**forecasted** [4] - 64:16, 64:18, 67:10, 67:11
**forecasting** [2] - 63:18, 65:15
**Forecasts** [1] - 74:5
**forecasts** [4] - 63:24, 74:7, 74:14, 83:22
**Form** [8] - 10:1, 10:2, 16:6, 24:2, 27:9, 27:25, 29:14, 37:11
**form** [4] - 10:2, 13:2, 14:14, 27:12
**formal** [2] - 12:17, 27:21, 84:5
**formally** [1] - 11:19
**formerly** [1] - 37:14
**formula** [1] - 49:25
**forth** [3] - 4:20, 5:7, 54:23
**forward** [6] - 6:23, 82:21, 84:9, 84:11, 85:19, 86:4
**forward-looking** [1] - 84:9
**foundation** [5] - 4:17, 5:1, 5:13, 33:24, 61:10
**four** [6] - 5:24, 63:4, 63:17, 65:6, 65:8, 66:18
**four-year** [2] - 63:17, 65:6
**frames** [1] - 63:6
**Freddie** [101] - 6:2, 9:4, 9:14, 9:17, 9:21, 9:24, 10:4, 10:10, 10:15, 10:16, 10:23, 11:8, 11:16, 11:22, 12:12, 12:23, 13:5, 13:13, 13:19, 15:5, 15:12, 15:15, 15:18, 15:22, 15:24, 16:20,

17:5, 17:15, 17:19, 18:14, 18:23, 19:4, 19:6, 19:10, 20:12, 20:19, 21:3, 22:19, 22:22, 23:1, 23:5, 23:18, 25:20, 26:17, 26:22, 26:24, 33:18, 37:14, 37:16, 38:3, 38:23, 39:10, 40:12, 41:8, 45:24, 46:5, 48:4, 52:2, 52:25, 53:7, 53:14, 54:12, 55:1, 55:5, 56:5, 56:16, 57:14, 59:1, 68:23, 69:17, 69:19, 69:22, 70:5, 70:8, 70:9, 70:16, 70:18, 70:24, 71:2, 71:7, 71:9, 71:14, 72:12, 73:19, 73:22, 74:12, 74:23, 75:21, 76:24, 77:11, 78:9, 80:7, 81:2, 83:4, 83:12, 84:4, 85:16, 86:2, 86:12, 87:2, 87:14
**Freddie's** [8] - 10:20, 13:8, 14:2, 14:25, 16:2, 25:22, 54:17, 83:9
**frequently** [1] - 36:3
**Friday** [1] - 79:16
**front** [2] - 6:5, 6:8
**fully** [3] - 53:11, 66:12, 75:25
**function** [4] - 10:24, 12:25, 15:18, 20:15
**functions** [2] - 13:1, 16:13
**funds** [10] - 32:11, 33:13, 33:21, 42:8, 49:5, 49:7, 49:9, 66:3, 66:8, 66:12
**future** [33] - 31:18, 32:19, 32:24, 33:16, 35:6, 35:12, 35:22, 36:1, 36:2, 37:3, 40:19, 41:10, 41:23, 41:25, 42:13, 48:6, 50:3, 51:5, 51:8, 63:2, 63:6, 63:9, 63:24, 66:18, 74:8, 74:14, 75:20, 84:11, 84:12, 84:17, 86:2, 87:1, 87:5

**G**

**GAAP** [6] - 50:20, 63:18, 63:25, 64:3, 64:5, 84:14
**gain** [1] - 58:21

**GAO** [1] - 9:1
**gears** [2] - 42:21, 50:13
**General** [2] - 9:1, 9:6
**general** [3] - 45:19, 75:6, 75:8
**generally** [1] - 50:21
**generate** [6] - 33:7, 33:13, 35:7, 42:2, 42:11, 57:14
**generates** [1] - 40:20
**generation** [1] - 59:8
**gentlemen** [1] - 6:22
**given** [17] - 15:9, 33:14, 33:19, 36:17, 40:15, 41:11, 42:10, 49:5, 50:3, 52:5, 56:8, 58:18, 80:21, 81:9, 81:11, 83:3, 84:23
**going-concern** [5] - 48:9, 48:21, 48:24, 50:1, 81:13
**govern** [1] - 13:14
**governance** [1] - 26:10
**great** [1] - 55:19
**greater** [3] - 55:21, 65:22
**Greenlee** [2] - 46:3, 46:4
**Gregory** [1] - 70:11
**Griffin** [6] - 78:22, 78:25, 79:1, 79:3, 80:14, 82:2
**Griffin's** [1] - 81:16
**groups** [1] - 12:1
**guess** [1] - 33:15
**guidance** [3] - 13:18, 13:21, 13:22
**guidelines** [2] - 13:13, 13:16

**H**

**half** [1] - 73:23
**hand** [3] - 6:24, 21:6, 22:5
**happy** [1] - 21:10
**hard** [1] - 75:3
**header** [1] - 31:8
**heading** [4] - 31:16, 41:15, 62:18, 63:15
**hear** [2] - 6:1, 13:10
**heard** [2] - 14:8, 83:5
**hearsay** [2] - 49:22, 61:9
**held** [3] - 4:2, 6:20, 88:1
**help** [6] - 45:15, 48:24,

51:5, 51:7, 63:9, 63:13
**helps** [2] - 15:19, 51:7
**Herman** [1] - 88:5
**hi** [1] - 80:20
**high** [6] - 14:11, 38:10, 49:10, 50:18, 51:20, 67:17
**high-level** [1] - 14:11
**highlight** [7] - 30:25, 32:14, 40:4, 41:18, 45:13, 63:15, 64:2
**highlighted** [1] - 15:11
**highlighting** [3] - 20:6, 37:2, 64:15
**highlights** [1] - 30:23
**historical** [8] - 35:22, 39:24, 40:9, 40:25, 41:11, 49:7, 50:4, 77:20
**historically** [1] - 40:15
**history** [6] - 8:13, 74:21, 77:22, 78:6, 78:7, 78:8
**HOFFMAN** [81] - 4:12, 6:10, 6:12, 7:3, 7:8, 21:2, 21:13, 21:16, 21:19, 21:22, 22:1, 22:7, 24:12, 25:18, 27:3, 27:5, 30:3, 30:7, 31:1, 31:4, 34:1, 34:21, 36:9, 36:24, 37:4, 37:7, 37:20, 37:24, 38:18, 38:20, 41:13, 41:20, 42:19, 42:20, 43:4, 43:12, 43:13, 44:12, 44:17, 44:21, 45:12, 45:14, 46:25, 47:3, 50:6, 50:9, 50:12, 57:21, 58:3, 60:4, 60:6, 61:7, 61:12, 61:20, 61:23, 62:2, 64:23, 64:24, 66:21, 66:24, 68:15, 68:17, 69:9, 69:13, 71:20, 72:1, 72:6, 73:24, 74:3, 75:12, 76:11, 76:19, 76:21, 78:16, 78:18, 80:11, 80:13, 82:4, 82:6, 87:17, 87:18
**Hoffman** [2] - 4:12, 7:4
**Hoffman**............... [1] - 3:4
**Home** [1] - 37:14
**home** [2] - 9:14, 32:19
**Honor** [32] - 4:5, 4:12, 4:23, 5:16, 5:23,

6:10, 6:12, 6:14, 7:3, 21:2, 21:7, 21:16, 21:22, 22:1, 22:12, 22:16, 24:12, 25:10, 33:23, 34:1, 36:6, 36:20, 43:8, 44:12, 50:11, 61:7, 61:9, 61:12, 61:15, 61:20, 61:23, 71:22
**housekeeping** [1] - 4:14
**housing** [1] - 46:7
**Housing** [5] - 7:14, 7:20, 8:25, 43:21, 45:1
**housing-policy** [1] - 46:7
**hundred** [1] - 51:10

**I**

**Ian** [2] - 4:12, 7:4
**idea** [2] - 4:23, 74:20
**immediately** [2] - 8:5, 10:25
**impact** [5] - 33:1, 66:15, 68:7, 85:16, 86:7
**impaired** [1] - 52:5
**important** [3] - 16:11, 25:22, 32:14
**include** [5] - 9:19, 14:7, 15:6, 15:7
**included** [2] - 12:9, 83:19
**includes** [2] - 9:3, 12:24
**including** [2] - 61:2, 71:14
**income** [42] - 14:9, 32:20, 33:7, 33:8, 33:14, 35:7, 40:20, 40:21, 40:24, 42:1, 42:2, 42:3, 42:11, 51:8, 51:10, 52:4, 52:6, 63:1, 63:7, 63:8, 63:13, 63:18, 63:25, 64:1, 64:6, 64:7, 64:18, 66:7, 66:8, 66:15, 66:18, 74:8, 74:14, 74:21, 77:24, 85:25, 86:8, 87:5, 87:6
**inconsistent** [1] - 60:11
**incorrect** [2] - 16:16, 25:2
**increased** [1] - 34:18
**increasing** [2] - 34:19, 37:3

**increasingly** [6] - 35:12, 35:21, 35:25, 41:24, 42:8, 49:6
**incurred** [3] - 36:5, 36:23, 41:3
**independent** [3] - 15:17, 16:8, 16:9
**indicate** [3] - 27:14, 63:13, 63:24
**indicated** [1] - 82:19
**indicates** [1] - 30:8
**indicating** [1] - 74:14
**indications** [1] - 68:12
**indulgence** [2] - 50:11, 76:11
**infer** [1] - 83:14
**information** [11] - 12:11, 15:10, 16:5, 30:22, 77:16, 77:17, 77:20, 77:23, 78:1, 83:5, 84:20
**informed** [2] - 80:2, 85:8
**informing** [2] - 40:12, 42:6
**inherently** [1] - 74:9
**inputs** [1] - 57:10
**inquiry** [2] - 54:21, 58:22
**insight** [2] - 13:4, 13:7
**instance** [1] - 16:19
**institutions** [1] - 9:2
**instruments** [1] - 26:21
**insufficient** [1] - 41:1
**intend** [3] - 4:15, 4:16, 5:23
**intended** [2] - 20:5, 26:16
**interact** [2] - 11:17, 70:13
**interacted** [1] - 59:20
**interaction** [1] - 10:22
**interactions** [1] - 58:22
**interest** [1] - 85:21
**internal** [1] - 11:6
**international** [1] - 8:16
**introduce** [1] - 7:11
**invest** [2] - 26:21, 26:25
**investment** [2] - 20:11, 26:4
**investment-related** [1] - 20:11
**investor** [1] - 20:10
**investors** [10] - 20:6, 26:4, 26:19, 26:20, 26:25, 30:25, 33:11,

37:2, 40:12, 42:7
**involves** [1] - 74:10
**irregular** [1] - 19:3
**issuance** [2] - 13:2, 87:11
**issue** [20] - 4:19, 5:7, 17:16, 18:19, 26:24, 36:11, 37:1, 41:10, 42:15, 48:3, 48:9, 48:15, 48:21, 48:24, 50:1, 66:16, 72:22, 81:13, 81:23, 82:14
**issued** [2] - 13:18, 13:23, 29:8, 71:13, 87:16
**issues** [7] - 11:4, 15:5, 48:2, 49:19, 59:23, 70:16
**italicized** [1] - 31:16
**item** [1] - 85:7
**Item** [1] - 30:13
**items** [3] - 18:3, 18:12, 85:3
**Items** [1] - 38:12
**itself** [2] - 30:9, 60:15

## J

**James** [2] - 78:22, 78:25
**Jamie** [2] - 46:12, 46:13
**Japanese** [1] - 8:13
**Jeff** [4] - 46:13, 82:19, 82:22, 83:3
**Jeffrey** [3] - 46:9, 46:10, 82:24
**Jim** [6] - 79:1, 81:1, 82:8, 82:14, 85:18
**Jim's** [1] - 82:12
**joined** [1] - 9:5
**joint** [3] - 34:2, 34:6, 34:15
**Jon** [2] - 46:3, 46:4
**Judge** [1] - 76:14
**July** [8] - 57:6, 57:7, 60:2, 60:10, 62:6, 62:9, 71:1, 84:12
**June** [16] - 10:7, 18:9, 27:10, 27:18, 28:1, 37:11, 38:14, 40:5, 40:7, 43:25, 44:23, 56:25, 58:8, 60:16, 62:6, 70:19
**jury** [39] - 4:2, 4:22, 4:24, 5:6, 5:12, 5:14, 5:16, 5:25, 6:1, 6:5, 6:7, 6:9, 6:16, 6:20, 7:4, 7:11, 9:10, 15:14, 23:6, 31:22,

32:15, 33:4, 35:4, 40:6, 43:6, 43:7, 44:18, 45:15, 50:19, 51:17, 56:23, 61:25, 62:22, 63:16, 64:4, 66:25, 72:1, 74:6, 88:1
**JX-1** [1] - 34:4

## K

**Kari** [1] - 38:22
**keep** [5] - 5:25, 19:6, 23:5, 55:24, 64:23
**keeping** [1] - 55:10
**key** [2] - 20:7, 20:8
**keying** [1] - 85:19
**kind** [10] - 10:3, 39:21, 48:16, 54:12, 54:23, 75:6, 78:2, 83:10, 84:9, 86:21
**kinds** [5] - 30:21, 60:21, 60:24, 71:2, 71:10
**knock** [1] - 5:6
**knowledge** [5] - 17:9, 18:11, 23:9, 28:20, 38:15
**knowledgeable** [3] - 12:7, 59:23, 70:15
**known** [6] - 7:14, 27:22, 27:23, 37:14, 66:7, 79:21
**known-as** [1] - 27:22
**knows** [2] - 65:19, 71:23

## L

**lacked** [1] - 34:10
**ladies** [1] - 6:21
**Laponsky** [2] - 45:21, 45:22
**large** [4] - 15:15, 15:25, 68:23, 69:6
**largely** [1] - 14:13
**last** [10] - 35:20, 35:24, 39:4, 40:17, 68:2, 73:25, 75:5, 75:13, 82:20, 83:5
**late** [2] - 62:6, 62:9
**Lawler** [1] - 45:25
**lawyer** [2] - 45:20, 46:18
**lawyers** [1] - 20:16
**lay** [2] - 5:1, 5:12
**laying** [1] - 4:16
**Layton** [3] - 38:2, 38:3, 38:11
**lead** [1] - 10:17

**leading** [1] - 17:4
**learned** [1] - 45:5
**least** [5] - 4:21, 10:22, 35:8, 35:17, 86:21
**Lee** [3] - 5:21, 22:11, 22:17
**left** [1] - 56:14
**legal** [3] - 4:19, 5:7, 45:22
**less** [3] - 5:3, 86:2, 86:8
**letter** [3] - 17:14, 17:18, 17:20
**level** [9] - 10:13, 13:21, 14:11, 38:10, 50:18, 51:20, 67:17, 86:24, 86:25
**Lewis** [3] - 72:18, 72:19, 72:20
**liability** [1] - 51:13
**license** [1] - 8:22
**licensed** [1] - 8:22
**light** [1] - 74:18
**likelihood** [1] - 63:25
**likely** [13] - 42:17, 55:8, 55:12, 55:16, 55:17, 55:22, 60:2, 63:2, 65:18, 66:2, 67:14, 67:22, 75:18
**line** [2] - 31:21, 68:2
**liquidate** [1] - 86:20
**liquidation** [1] - 34:18
**list** [5] - 18:3, 21:6, 21:10, 21:13, 46:23
**listed** [2] - 60:15, 77:25
**listen** [1] - 87:25
**literature** [1] - 74:20
**Litigations** [1] - 4:11
**loan** [1] - 9:14
**Loan** [1] - 37:15
**location** [1] - 60:25
**long-term** [1] - 67:8
**Long-Term** [1] - 41:15
**look** [19] - 9:17, 9:18, 23:13, 27:2, 41:17, 43:4, 51:23, 57:21, 63:6, 66:23, 68:18, 69:2, 72:23, 74:21, 75:5, 75:13, 78:12, 80:11, 81:15
**looking** [27] - 9:16, 27:25, 28:4, 28:5, 29:18, 29:19, 30:9, 30:10, 33:15, 37:8, 37:18, 37:25, 38:1, 39:8, 39:9, 42:13, 47:5, 48:13, 59:9, 62:10, 62:19, 63:24, 71:15, 72:8, 78:19,

78:20, 84:9
**looks** [1] - 27:9
**Lorraine** [1] - 88:5
**loss** [4] - 67:11, 74:9, 77:22, 78:8
**losses** [12] - 32:20, 67:7, 67:16, 68:4, 74:8, 74:19, 74:21, 74:22, 74:24, 75:1, 78:6, 78:7
**lower** [1] - 51:13
**lunch** [2] - 55:19, 87:23
**Lyons** [2] - 59:16, 59:19
**Lyons'** [2] - 59:17, 59:18

## M

**Mac** [63] - 4:10, 9:4, 9:14, 9:21, 10:16, 10:23, 11:16, 11:22, 12:12, 12:23, 13:13, 15:5, 15:12, 15:15, 15:18, 15:24, 16:20, 17:15, 19:6, 19:10, 20:12, 22:19, 26:22, 26:24, 33:18, 37:14, 37:16, 38:3, 39:10, 40:12, 41:8, 45:24, 46:5, 48:4, 52:2, 52:25, 54:12, 55:1, 56:5, 57:14, 68:23, 70:8, 70:9, 70:18, 70:24, 71:2, 71:9, 71:14, 72:12, 73:19, 74:12, 74:23, 75:21, 76:24, 77:11, 78:9, 80:7, 81:4, 83:4, 83:12, 86:2, 86:12, 87:14
**Mac's** [21] - 10:10, 10:15, 11:8, 13:5, 15:22, 17:5, 20:19, 21:3, 25:20, 26:17, 38:23, 56:16, 59:1, 69:17, 69:19, 69:22, 70:5, 70:16, 71:7, 84:4, 87:2
**macroeconomic** [1] - 32:18
**Mae** [83] - 9:4, 9:13, 9:21, 10:9, 10:15, 10:16, 10:23, 11:8, 11:16, 11:22, 12:12, 12:23, 13:5, 13:13, 15:4, 15:12, 15:15, 15:17, 15:23, 16:20, 17:4, 17:15, 19:6, 19:9, 20:12, 20:18,

21:3, 22:18, 25:20, 26:17, 26:22, 26:24, 27:21, 28:11, 29:20, 29:21, 32:10, 33:18, 36:15, 36:25, 37:17, 45:23, 46:5, 48:4, 52:2, 52:25, 54:12, 55:1, 56:5, 56:9, 56:16, 57:14, 58:7, 59:1, 59:15, 60:21, 60:24, 61:2, 62:3, 62:10, 63:2, 63:20, 65:14, 66:14, 67:6, 67:17, 68:22, 71:9, 76:6, 76:24, 77:8, 77:15, 78:9, 80:7, 81:3, 83:4, 83:12, 84:4, 86:1, 86:12, 87:2, 87:14
**Mae's** [14] - 15:21, 17:21, 23:15, 27:9, 27:21, 29:13, 32:3, 32:25, 39:3, 58:14, 64:25, 65:8, 65:25, 70:4
**Mae/Freddie** [1] - 4:10
**main** [4] - 12:3, 14:2, 14:4, 14:6
**maintain** [7] - 48:5, 60:24, 68:1, 71:10, 73:11, 76:2, 87:5
**maintained** [2] - 60:25, 71:11
**majority** [1] - 15:9
**man** [1] - 29:22
**manage** [1] - 12:3
**management** [30] - 10:16, 12:1, 12:3, 12:18, 15:5, 16:10, 16:20, 17:14, 17:21, 26:1, 30:11, 31:11, 51:9, 53:25, 54:22, 54:23, 56:3, 56:12, 58:23, 59:6, 59:10, 59:15, 63:13, 64:13, 65:19, 73:4, 73:5, 80:7, 84:13, 87:14
**management's** [7] - 10:23, 13:9, 14:5, 15:7, 15:8, 39:10, 57:18
**mandate** [1] - 16:3
**mandated** [1] - 67:9
**March** [2] - 10:6, 18:17
**Mario** [1] - 43:23
**Mark** [2] - 45:21, 45:22
**master's** [1] - 8:15
**material** [9] - 17:10, 18:11, 18:12, 20:23,

28:21, 28:22, 38:16
**materially** [1] - 16:15
**math** [1] - 65:5
**matter** [1] - 4:14
**matters** [6] - 11:5, 45:24, 47:14, 47:25, 48:1, 48:16
**Mayopoulos** [1] - 29:22
**McFarland** [4] - 28:5, 28:8, 28:10, 30:1
**MD&A** [10] - 14:6, 14:12, 14:13, 14:25, 19:21, 20:1, 24:25, 25:3, 30:15, 54:11
**MDS** [1] - 26:25
**mean** [21] - 26:20, 36:1, 36:2, 40:22, 42:5, 63:21, 63:23, 64:9, 65:17, 65:25, 73:3, 73:4, 79:18, 79:20, 80:5, 80:6, 80:25, 81:9, 83:1, 84:25, 86:11
**meaning** [1] - 65:12
**meaningful** [1] - 20:10
**means** [3] - 55:13, 65:21, 68:6
**meant** [1] - 81:11
**meet** [1] - 11:2
**Meeting** [1] - 79:6
**meeting** [4] - 79:13, 81:2, 82:20, 83:6
**meetings** [5] - 12:14, 12:16, 12:18, 13:8, 83:4
**Meg** [1] - 46:6
**members** [5] - 7:3, 7:11, 50:18, 62:22, 83:11
**memo** [29] - 59:14, 59:15, 59:25, 60:2, 60:7, 60:9, 60:12, 60:15, 60:16, 60:17, 61:5, 62:3, 62:13, 62:24, 69:18, 69:19, 70:7, 70:10, 70:18, 70:20, 70:23, 70:24, 71:18, 72:8, 72:13, 73:16, 73:18, 73:21, 73:25
**memos** [20] - 57:15, 57:17, 57:18, 57:22, 58:15, 59:8, 59:22, 60:1, 60:21, 60:22, 60:24, 61:2, 69:23, 70:5, 70:21, 71:3, 71:10, 71:14, 84:5, 84:8
**mentioned** [6] - 11:7,

23:12, 41:5, 49:19, 55:12, 76:6
**mergers** [1] - 7:18
**message** [1] - 80:4
**met** [2] - 49:16, 59:21
**Metz** [2] - 70:11, 70:13
**might** [4] - 4:19, 30:21, 68:19, 86:18
**million** [2] - 69:2, 69:4
**millions** [2] - 68:21, 69:1
**minutes** [1] - 5:4, 12:17, 76:13
**miscellaneous** [1] - 4:9
**misleading** [1] - 28:23
**misstated** [1] - 16:16
**misstatements** [2] - 17:10, 18:12
**Mitchell** [2] - 72:11, 73:14
**Mitchell's** [1] - 72:23
**moment** [5] - 6:16, 12:20, 44:20, 64:22, 75:15
**money** [7] - 33:19, 35:17, 36:17, 51:5, 52:8, 65:9, 86:2
**Montgomery** [21] - 34:4, 34:14, 34:20, 37:4, 38:19, 41:18, 42:19, 44:19, 45:12, 50:10, 58:2, 60:4, 64:23, 66:22, 68:16, 72:4, 73:24, 76:20, 78:16, 80:11, 87:17
**month** [4] - 11:19, 57:8, 57:9, 60:1
**morning** [8] - 4:12, 5:21, 6:17, 6:21, 7:3, 7:9, 7:10, 7:12
**mortgage** [7] - 26:25, 67:9, 85:4, 85:5, 85:10, 85:20, 86:16
**Mortgage** [2] - 27:19, 37:15
**mortgage-asset** [3] - 85:4, 85:10, 86:16
**mortgage-backed** [1] - 26:25
**mortgage-retained** [1] - 85:20
**most** [7] - 9:23, 9:25, 29:13, 46:23, 72:4, 77:19, 81:15
**move** [4] - 21:3, 44:13, 61:8, 71:20
**multiyear** [1] - 63:3
**must** [1] - 16:9
**muted** [1] - 52:5

# N

**name** [8] - 7:12, 18:4, 22:17, 27:19, 27:21, 27:22, 27:23, 29:22
**named** [2] - 49:15, 59:16
**National** [1] - 27:19
**nature** [1] - 74:16
**near** [3] - 38:6, 48:5, 84:17
**necessary** [4] - 12:19, 28:22, 34:10, 77:2
**need** [5] - 21:14, 21:20, 57:10, 63:14, 66:8
**needed** [7] - 11:19, 12:8, 13:12, 73:11, 76:2, 80:9, 86:19
**needs** [1] - 22:6
**negative** [14] - 55:20, 55:25, 56:21, 67:6, 67:13, 67:19, 73:12, 75:2, 75:23, 77:4, 77:6, 77:18, 77:19, 78:9
**net** [9] - 33:8, 33:14, 40:20, 42:2, 42:11, 67:11, 75:19, 77:24
**never** [2] - 22:21, 22:23
**Newell** [2] - 46:12, 46:13
**next** [13] - 7:6, 37:6, 63:8, 65:8, 66:18, 74:6, 80:1, 80:12, 81:4, 82:11, 82:12, 82:16, 84:22
**nice** [1] - 87:23
**Nicholas** [2] - 3:4, 7:6
**Nick** [2] - 7:12, 80:24
**nine** [2] - 62:11, 62:15
**nonemployee** [1] - 6:2
**nonobjection** [1] - 17:15
**normal** [3] - 83:10, 83:13, 83:17
**NOTE** [1] - 88:4
**notes** [3] - 16:15, 24:23, 24:24
**nothing** [1] - 25:1
**nuance** [1] - 51:6
**number** [4] - 28:17, 69:1, 69:6, 76:15
**numbers** [17] - 14:23, 16:17, 21:6, 21:11, 21:16, 21:20, 23:10, 24:20, 24:22, 25:4, 26:2, 54:9, 61:1, 68:22, 71:5, 71:12,

77:23

# O

**Oath** [1] - 6:25
**object** [5] - 4:18, 22:13, 33:23, 36:20, 61:9
**objection** [6] - 21:8, 36:6, 44:14, 49:22, 71:22, 82:3
**objective** [1] - 17:8
**obligation** [22] - 24:25, 32:4, 33:9, 33:12, 34:19, 35:12, 35:21, 35:25, 36:16, 39:23, 40:7, 40:13, 41:2, 41:12, 41:24, 42:7, 49:6, 51:23, 65:1, 65:2, 65:20, 66:13
**obligations** [2] - 42:12, 65:22
**observation** [1] - 54:22
**observer** [1] - 12:14
**obviously** [1] - 28:17
**occasions** [1] - 34:11
**occurred** [2] - 34:23, 77:21
**occurs** [1] - 57:4
**office** [3] - 12:16, 58:25, 70:2
**Office** [8] - 7:20, 9:1, 9:6, 9:15, 13:23, 53:5, 72:20, 79:2
**officer** [9] - 11:10, 16:23, 17:24, 17:25, 28:6, 28:10, 29:20, 38:2, 38:23
**offs** [1] - 67:10
**offset** [2] - 51:8, 63:9
**OFHEO** [4] - 7:21, 7:22, 9:5, 9:7
**OFHEO/FHFA** [1] - 9:8
**often** [6] - 10:4, 11:17, 54:3, 60:21, 71:2, 74:10, 83:3, 86:16
**omissions** [3] - 17:10, 18:11, 38:16
**omit** [2] - 28:21
**once** [2] - 17:20, 86:18
**one** [33] - 4:14, 4:23, 5:8, 5:19, 12:25, 16:13, 23:22, 29:12, 40:9, 40:16, 44:1, 46:20, 48:2, 48:11, 49:1, 57:21, 61:3, 62:25, 64:2, 71:15, 72:21, 73:20, 74:1,

77:2, 77:11, 85:2,
85:3, 85:7, 85:13,
85:20, 86:23
**ongoing** [1] - 13:4
**operating** [2] - 40:20,
48:11
**operation** [1] - 86:18
**operations** [6] - 9:13,
14:16, 20:8, 46:19,
48:5, 82:25
**opinion** [2] - 48:9,
82:12
**order** [12] - 20:10,
34:12, 35:22, 36:4,
36:23, 48:5, 49:7,
66:2, 66:12, 74:2,
77:2, 87:4
**ordinary** [3] - 61:13,
61:18, 71:6
**organization** [1] -
11:15
**organizational** [1] -
11:14
**original** [1] - 78:21
**outcome** [1] - 56:16
**outer** [1] - 67:10
**outset** [2] - 20:20,
21:4, 34:8
**outside** [1] - 6:6
**outweigh** [1] - 67:12
**outweighed** [3] -
55:25, 73:12, 75:24
**outweighs** [1] - 67:20
**overcome** [5] - 56:20,
75:3, 77:6, 77:17,
78:10
**overruled** [4] - 36:8,
36:21, 49:23, 82:5
**oversaw** [1] - 82:24
**oversee** [1] - 59:12
**overseeing** [1] - 9:13
**overseen** [3] - 12:23,
16:21, 16:22
**Oversight** [1] - 7:21
**oversight** [6] - 13:2,
20:16, 25:25, 46:11,
58:19, 59:20
**owe** [8] - 35:18, 40:14,
42:7, 51:10, 52:8,
65:13, 65:15, 66:19
**owed** [1] - 65:10
**own** [2] - 5:25, 19:11

**P**

**p.m** [1] - 88:4
**PAGE** [1] - 3:2
**page** [36] - 27:9,
27:14, 27:23, 28:3,
28:4, 28:18, 29:16,

29:18, 30:3, 30:8,
30:10, 30:19, 31:1,
37:9, 37:11, 37:21,
37:22, 38:1, 38:18,
39:7, 39:9, 39:11,
41:13, 47:1, 57:25,
60:5, 60:14, 62:16,
66:21, 66:22, 66:23,
69:10, 69:11, 72:3,
73:25
**pages** [2] - 20:5, 27:11
**paid** [1] - 66:6
**paragraph** [13] - 34:5,
34:14, 34:16, 39:12,
39:14, 41:17, 41:19,
41:21, 42:6, 62:17,
66:25, 67:3, 67:18
**paragraphs** [3] -
14:14, 34:22, 74:1
**parenthetical** [4] -
75:16, 76:3, 76:4,
76:5
**part** [12] - 16:3, 31:9,
31:11, 39:9, 54:5,
57:13, 59:8, 59:9,
59:20, 66:22, 78:20,
86:23
**participate** [3] - 12:8,
12:13, 12:16
**participation** [1] -
13:7
**particular** [3] - 70:7,
70:10, 71:15
**particularly** [2] -
28:15, 38:11
**parties'** [1] - 34:15
**parts** [1] - 23:9
**passed** [1] - 20:7
**past** [1] - 77:21
**Patrick** [1] - 45:25
**pay** [21] - 31:18, 32:4,
33:19, 33:21, 34:10,
34:12, 34:17, 35:17,
35:22, 36:4, 36:17,
36:23, 39:12, 39:19,
40:3, 41:2, 49:5,
49:7, 51:12, 66:3,
66:12
**payable** [2] - 33:13,
42:3
**paying** [1] - 40:2
**payment** [2] - 32:11,
35:8
**payments** [4] - 31:21,
31:23, 32:6, 32:7
**people** [5] - 26:21,
46:20, 46:22, 46:23,
50:3
**per** [6] - 11:19, 31:24,
33:13, 65:3, 65:4,

86:19
**perceived** [1] - 85:22
**percent** [8] - 32:11,
33:19, 34:10, 39:25,
65:1, 65:10, 65:16,
65:25
**percentage** [2] - 69:5,
86:19
**perform** [9] - 16:5,
16:14, 24:1, 53:8,
53:25, 55:14, 62:25,
83:18
**performance** [2] -
33:2, 40:20
**performed** [4] - 38:9,
64:13, 73:5
**perhaps** [2] - 14:8,
71:1
**period** [42] - 8:7,
14:20, 14:21, 18:22,
20:23, 27:14, 27:17,
28:1, 28:11, 29:20,
29:21, 30:24, 33:6,
33:19, 36:17, 37:17,
40:9, 41:25, 42:10,
49:5, 56:10, 56:24,
60:19, 60:20, 63:3,
63:17, 64:6, 64:7,
64:21, 65:6, 65:11,
65:15, 65:18, 65:20,
66:20, 70:22, 84:2
**period-to-period** [1] -
41:25
**periodic** [2] - 9:25,
57:5
**periods** [3] - 40:20,
41:11, 41:23
**permission** [3] - 4:18,
6:12, 68:14
**person** [4] - 10:25,
11:10, 46:20, 70:11
**personal** [2] - 13:7,
15:4
**perspective** [3] -
11:11, 46:11, 86:22
**phrase** [1] - 68:20
**pick** [1] - 35:3
**picture** [1] - 15:19
**piece** [1] - 78:8
**place** [1] - 57:2
**plain** [1] - 52:10
**plaintiffs** [5] - 4:17,
5:4, 5:22, 22:11,
61:24
**Plaintiffs'** [2] - 78:12,
78:14
**plan** [1] - 74:11
**point** [2] - 27:16,
27:17
**points** [1] - 28:16

**policies** [3] - 9:17,
26:1, 26:2
**policy** [5] - 11:4, 46:7,
46:20, 58:19
**Pollard** [3] - 45:17,
45:19
**portfolio** [16] - 67:10,
68:13, 76:6, 76:10,
85:4, 85:5, 85:6,
85:10, 85:12, 85:17,
85:20, 85:21, 86:1,
86:7, 86:16, 86:17
**portion** [10] - 30:5,
31:2, 34:2, 35:8,
35:18, 39:12, 47:2,
58:2, 69:11, 88:4
**position** [3] - 8:5, 9:7,
67:11
**positive** [16] - 55:21,
55:25, 56:20, 63:12,
67:12, 67:20, 73:12,
74:7, 74:15, 75:24,
77:5, 77:16, 77:17,
77:23, 77:24, 77:25
**possible** [2] - 4:22,
5:9
**possibly** [2] - 81:5,
81:24
**potentially** [2] - 49:17,
83:11
**practice** [2] - 19:3,
19:5
**predecessor** [2] -
7:17, 7:19
**prefer** [4] - 5:11, 5:19,
5:25, 6:6
**preference** [2] - 6:4,
34:18
**Preferred** [1] - 4:10
**preferred** [7] - 26:23,
31:24, 35:13, 36:3,
40:8, 42:24, 79:9
**prep** [1] - 11:20
**preparation** [10] -
11:1, 11:12, 11:20,
11:23, 13:6, 13:14,
13:19, 54:5, 57:5,
57:12
**prepare** [3] - 18:14,
18:19, 54:18
**prepared** [19] - 37:14,
38:8, 56:9, 58:7,
59:14, 59:15, 59:25,
60:1, 60:2, 60:17,
60:20, 63:23, 70:7,
70:9, 70:20, 70:21,
70:23, 88:5
**prepares** [1] - 10:15
**preparing** [2] - 10:17,
19:3

**presence** [5] - 4:2,
5:12, 6:6, 6:20, 88:1
**presentations** [1] -
13:9
**president** [1] - 59:18
**previous** [3] - 64:8,
64:12, 64:14
**prices** [1] - 32:19
**Pricewaterhouse** [1] -
23:18
**PricewaterhouseCo
opers** [2] - 15:24,
81:8
**primarily** [6] - 10:24,
11:11, 14:4, 14:19,
16:22, 45:23
**primary** [7] - 9:14,
13:1, 17:8, 26:3,
26:18, 47:13, 51:8
**principle** [1] - 75:7
**principles** [2] - 50:21,
75:8
**problem** [1] - 37:3
**procedures** [11] -
10:10, 10:14, 10:20,
14:25, 16:14, 20:19,
20:22, 23:1, 58:14,
69:23, 70:4
**proceed** [1] - 25:13
**Proceedings** [3] - 4:2,
6:20, 88:1
**process** [26] - 16:25,
17:3, 17:12, 17:13,
17:20, 25:19, 26:10,
26:11, 26:12, 53:23,
54:3, 54:13, 54:17,
54:25, 56:17, 57:1,
57:2, 57:11, 57:13,
59:2, 59:6, 59:8,
60:18, 64:12, 85:14
**professional** [1] - 8:18
**profitability** [3] -
74:10, 77:9, 77:11
**profitable** [5] - 82:21,
84:11, 85:19, 86:4,
86:5
**program** [1] - 46:5
**programs** [1] - 54:21
**projections** [2] - 74:9,
74:15
**proposal** [1] - 5:19
**proposed** [4] - 48:22,
48:25, 49:21, 81:12
**provide** [1] - 68:8
**provided** [4] - 48:3,
52:4, 70:1, 83:22
**provides** [3] - 16:14,
16:16, 64:12
**PSPA** [6] - 29:8, 44:9,
49:2, 79:10, 85:1,

85:13
**PSPAs** [3] - 29:4, 47:17, 47:19
**public** [6] - 8:21, 15:15, 15:25, 19:11, 26:22, 79:15
**publicly** [1] - 19:9
**publish** [3] - 44:17, 61:25, 72:1
**published** [1] - 77:23
**pull** [2] - 27:3, 34:4
**purchase** [7] - 35:13, 36:4, 41:23, 42:24, 79:8, 79:9, 79:10
**Purchase** [1] - 4:10
**purely** [1] - 4:19
**purpose** [2] - 57:17, 57:18
**purposes** [1] - 26:5
**pursuant** [1] - 28:7

## Q

**qualitative** [2] - 14:13, 19:22
**quanti** [1] - 14:19
**quantitative** [2] - 14:19, 14:22
**quarter** [38] - 10:6, 18:5, 18:15, 18:16, 18:18, 19:2, 20:7, 21:5, 24:1, 26:11, 31:12, 34:9, 51:23, 52:12, 53:9, 54:1, 54:5, 55:7, 56:4, 56:18, 56:22, 56:23, 56:24, 57:3, 58:8, 60:2, 60:22, 62:4, 64:8, 64:13, 64:14, 69:17, 69:19, 71:4, 73:1, 73:6, 77:11, 83:23
**Quarter** [7] - 18:20, 64:15, 64:17, 64:19, 64:21, 73:7
**quarter's** [1] - 16:4
**quarterly** [21] - 10:1, 10:7, 23:23, 24:4, 27:17, 34:13, 35:8, 53:19, 53:23, 54:7, 54:13, 54:17, 54:25, 56:7, 56:17, 57:1, 57:13, 59:1, 64:12, 73:19, 83:18
**quarters** [5] - 34:9, 35:6, 56:12, 73:8, 77:8
**questioning** [2] - 13:10, 54:23
**questions** [14] - 4:18,

5:5, 5:10, 11:20, 13:12, 21:9, 21:15, 21:17, 21:18, 22:13, 26:13, 42:22, 61:10, 67:1
**quicker** [2] - 85:14, 86:9

## R

**raise** [1] - 6:23
**ran** [1] - 46:4
**range** [1] - 69:3
**rate** [4] - 39:19, 39:25, 40:1, 40:3
**re** [1] - 4:9
**reached** [1] - 73:7
**reaching** [3] - 80:21, 81:3, 81:5
**reaction** [3] - 83:7, 83:9, 83:10
**read** [44] - 12:17, 21:6, 21:10, 21:13, 21:14, 21:20, 21:23, 22:1, 24:25, 28:19, 31:17, 31:20, 31:22, 32:15, 33:3, 33:4, 34:2, 34:6, 34:22, 35:4, 35:10, 35:16, 39:18, 40:6, 40:17, 41:21, 63:16, 64:3, 66:25, 67:3, 67:4, 72:24, 74:5, 75:15, 75:17, 79:12, 80:1, 80:18, 81:20, 82:16, 83:7, 84:22, 87:24
**readily** [1] - 77:21
**reading** [1] - 48:3
**reads** [2] - 31:3, 34:16
**real** [2] - 61:3, 71:15
**realizability** [3] - 53:9, 54:1, 54:19
**realizable** [2] - 51:22, 75:19
**realize** [4] - 51:25, 53:11, 67:23, 76:1
**realized** [1] - 67:16
**really** [4] - 48:2, 52:5
**reason** [2] - 25:7, 59:5
**reasons** [1] - 85:21
**receive** [2] - 15:16, 61:13
**received** [9] - 8:15, 25:12, 44:15, 45:4, 61:16, 61:18, 61:22, 71:24, 86:10
**receiving** [2] - 44:3, 45:16
**recent** [2] - 29:13, 67:7

**recipient** [1] - 72:15
**recipients** [1] - 44:1
**recognize** [7] - 27:6, 39:14, 43:17, 47:4, 58:4, 69:14, 78:14
**recognized** [1] - 50:23
**recollection** [3] - 34:23, 60:12, 73:15
**record** [10] - 4:4, 4:7, 6:18, 6:19, 7:5, 21:24, 22:2, 26:3, 88:2, 88:3
**recorded** [1] - 51:21
**recordkeeping** [9] - 10:10, 10:14, 10:20, 14:25, 20:19, 20:22, 23:1, 58:14, 69:22
**records** [1] - 23:5
**reduction** [4] - 67:9, 85:4, 85:16, 86:6
**refer** [6] - 27:20, 52:13, 59:3, 85:6, 86:3, 86:16
**reference** [4] - 79:17, 79:19, 82:22, 86:11
**referenced** [1] - 32:6
**referred** [5] - 12:20, 14:6, 36:10, 39:22, 52:18
**referring** [11] - 30:15, 32:1, 32:22, 33:10, 35:14, 36:13, 36:14, 40:10, 74:22, 79:7, 82:23
**refers** [1] - 60:18
**reflected** [1] - 26:2
**regarding** [2] - 31:3, 31:18
**regular** [3] - 10:22, 19:3, 19:5
**regulatory** [2] - 9:12, 9:19
**relate** [4] - 41:4, 48:16, 66:4, 78:5
**related** [23] - 4:9, 9:20, 11:4, 11:22, 13:11, 16:15, 20:11, 26:2, 32:20, 32:24, 39:23, 48:1, 49:2, 52:6, 57:19, 58:7, 58:8, 64:1, 67:15, 68:4, 73:6, 76:5, 76:9
**relates** [1] - 4:14
**relation** [1] - 28:25
**relative** [3] - 18:15, 68:25, 69:6
**relayed** [1] - 49:20
**relaying** [1] - 83:5
**reliability** [1] - 15:20
**reliable** [2] - 25:8,

26:7
**rely** [1] - 25:24
**remain** [4] - 53:16, 53:18, 56:19, 86:25
**remained** [1] - 53:19
**remember** [1] - 87:7
**remind** [1] - 56:23
**reorient** [1] - 44:22
**reply** [3] - 80:14, 80:18, 81:16
**report** [13] - 14:14, 18:8, 18:9, 18:20, 28:19, 28:20, 38:14, 38:17, 46:22, 50:7, 83:8
**reported** [5] - 46:23, 50:8, 64:8, 79:2, 88:5
**REPORTER'S** [1] - 88:4
**reporting** [11] - 9:20, 11:3, 11:6, 11:14, 18:22, 45:9, 56:24, 60:19, 60:20, 70:22
**reports** [2] - 11:13, 83:19
**request** [1] - 41:22
**require** [4] - 35:22, 53:8, 53:25, 85:9
**required** [13] - 10:6, 12:9, 15:5, 15:16, 20:9, 28:6, 30:24, 32:4, 48:8, 48:9, 50:25, 56:4, 83:18
**requirement** [2] - 24:8, 24:15
**requirements** [1] - 62:25
**requires** [2] - 55:14, 57:10
**rerecording** [2] - 82:18, 83:15
**respect** [20] - 10:10, 10:20, 14:25, 19:15, 20:19, 28:16, 35:18, 38:12, 48:21, 53:23, 54:3, 54:13, 58:14, 59:1, 59:10, 70:2, 70:5, 73:9, 81:13, 85:18
**respects** [1] - 20:23
**response** [1] - 82:10
**responsibilities** [1] - 59:21
**responsibility** [1] - 9:15
**responsible** [4] - 11:1, 11:11, 20:12, 45:23
**result** [3] - 12:18, 40:18, 40:19

**resulting** [1] - 67:11
**results** [9] - 14:5, 14:15, 20:7, 30:23, 56:8, 56:9, 64:16, 83:18
**retained** [4] - 85:6, 85:17, 85:20, 86:7
**return** [1] - 74:10
**review** [42] - 11:12, 12:16, 13:1, 16:3, 16:4, 17:4, 17:6, 17:8, 17:12, 17:13, 18:19, 19:12, 19:14, 24:1, 31:13, 39:16, 43:1, 44:10, 47:10, 47:22, 47:25, 48:19, 53:23, 54:3, 54:13, 54:17, 54:18, 54:22, 54:25, 56:17, 57:1, 57:5, 57:13, 58:11, 58:22, 58:23, 59:2, 59:12, 61:5, 69:19, 71:18, 83:21
**reviewed** [12] - 17:22, 18:8, 18:10, 19:1, 28:19, 38:14, 48:1, 48:12, 49:11, 84:4, 84:8
**reviewing** [6] - 16:25, 47:12, 47:24, 48:15, 49:21, 59:4
**reviews** [2] - 56:7, 59:3
**risk** [2] - 85:22, 85:23
**role** [19] - 7:24, 8:3, 11:7, 12:13, 16:1, 16:11, 17:3, 25:23, 28:6, 45:18, 45:21, 46:1, 46:15, 46:16, 53:5, 58:18, 59:17, 59:18, 83:3
**roles** [1] - 23:22
**Ross** [1] - 38:22
**RUDY** [31] - 5:21, 21:9, 22:11, 22:16, 22:21, 22:24, 23:4, 23:9, 23:12, 23:15, 23:18, 23:20, 23:23, 24:3, 24:6, 24:10, 24:13, 24:17, 24:19, 25:4, 25:6, 25:10, 33:23, 36:6, 36:20, 44:14, 49:22, 61:9, 61:18, 71:22, 82:3
**Rudy** [3] - 5:21, 22:11, 22:17
**rule** [1] - 21:15
**rules** [9] - 20:9, 28:7, 50:22, 53:8, 53:25, 75:2, 75:10, 84:14,

84:21
**run** [1] - 9:15

## S

**safe** [1] - 9:13
**sale** [1] - 76:7
**Satriano** [43] - 3:4,
4:15, 4:24, 6:14, 7:6,
7:9, 7:12, 9:10, 10:9,
13:24, 14:24, 20:18,
22:18, 25:19, 27:6,
28:4, 29:3, 29:18,
30:9, 34:22, 37:8,
37:25, 39:4, 41:21,
42:21, 43:14, 44:22,
50:13, 52:21, 58:1,
58:4, 62:19, 64:10,
67:1, 69:9, 69:14,
75:14, 76:22, 77:8,
78:14, 78:19, 86:10
**saw** [3] - 31:8, 65:2,
84:7
**scales** [2] - 78:3
**scheme** [2] - 76:17,
76:18
**schooling** [1] - 8:14
**screen** [1] - 43:14
**SE** [1] - 26:7
**seated** [3] - 6:16, 6:21,
7:2
**SEC** [78] - 4:17, 5:1,
5:5, 5:8, 9:19, 9:21,
9:23, 10:11, 10:15,
10:20, 11:9, 11:18,
11:23, 13:2, 13:6,
13:14, 13:19, 13:25,
14:2, 15:1, 15:6,
16:2, 16:17, 16:19,
16:25, 17:7, 17:17,
17:24, 18:7, 18:14,
18:21, 18:23, 19:3,
19:6, 19:8, 19:9,
19:12, 19:19, 20:6,
20:9, 20:20, 21:3,
23:1, 23:7, 23:10,
25:7, 25:11, 25:20,
25:22, 25:24, 26:3,
26:7, 26:17, 26:18,
27:2, 27:11, 27:15,
28:25, 29:2, 29:10,
30:8, 31:5, 31:13,
37:1, 38:6, 38:9,
39:3, 39:4, 54:6,
54:7, 60:23, 61:1,
62:10, 68:12, 68:14,
71:5, 73:19, 83:19
**second** [17] - 21:5,
28:16, 31:12, 35:20,
41:17, 56:17, 56:22,
56:23, 56:24, 57:3,

58:8, 62:4, 69:17,
69:19, 72:24, 73:5,
79:14
**second-quarter** [1] -
31:12
**section** [21] - 14:6,
14:12, 14:13, 15:1,
15:11, 19:21, 19:22,
19:25, 20:3, 20:13,
30:16, 30:18, 31:5,
31:8, 31:9, 31:12,
31:16, 40:25, 41:14,
66:23
**sections** [7] - 13:25,
14:2, 14:4, 19:13,
19:18, 20:14, 75:14
**securities** [6] - 26:25,
28:7, 67:16, 68:4,
68:11, 76:7
**security** [1] - 48:4
**see** [5] - 4:3, 13:9,
43:14, 62:19, 84:2
**sell** [2] - 86:17, 86:20
**send** [5] - 43:24,
43:25, 72:13, 78:23,
79:3
**sending** [1] - 46:17
**Senior** [1] - 4:10
**senior** [7] - 31:23,
35:13, 36:3, 40:8,
70:11, 79:8
**sense** [1] - 84:23
**sent** [12] - 17:18,
17:20, 43:22, 45:13,
72:10, 72:11, 72:14,
73:14, 78:21, 78:22,
78:24, 79:4
**sentence** [36] - 31:20,
32:1, 32:13, 32:14,
33:3, 35:2, 35:3,
35:4, 35:16, 35:20,
35:24, 39:18, 40:4,
40:6, 40:17, 40:22,
63:15, 63:21, 64:2,
64:3, 64:9, 66:7,
72:24, 74:4, 74:5,
74:6, 75:5, 75:13,
75:15, 75:17, 75:22,
79:12, 80:1, 82:12,
84:22, 86:3
**sentences** [7] - 35:14,
42:14, 74:13, 81:20,
82:2, 82:16, 83:1
**September** [4] - 10:7,
20:21, 21:5, 52:22
**seven** [1] - 40:13
**several** [5] - 14:4,
43:20, 48:15, 79:25,
85:1
**severely** [1] - 52:5

**share** [2] - 61:2, 71:14
**shared** [1] - 82:14
**shareholders'** [1] -
14:9
**sheet** [1] - 14:9
**shockingly** [1] - 68:23
**short** [1] - 6:4
**shorthand** [1] - 52:19
**shrink** [2] - 85:20,
86:1
**shrinkage** [1] - 85:17
**shrinking** [1] - 85:12,
87:2, 87:4
**shutting** [1] - 86:11
**sic** [2] - 15:23, 81:8
**side** [1] - 85:25
**sign** [6] - 18:4, 18:7,
28:12, 29:23, 38:4,
39:1
**signature** [1] - 18:2
**signed** [13] - 28:13,
28:24, 29:7, 29:8,
29:14, 29:24, 38:5,
39:2, 39:5, 62:14,
76:23, 79:24, 87:19
**significant** [12] -
14:15, 32:16, 33:1,
67:6, 73:1, 73:6,
75:2, 77:4, 77:18,
78:8, 85:1, 85:3
**significantly** [1] -
32:21
**signing** [1] - 29:10
**similar** [1] - 64:13
**single** [1] - 12:15
**sit** [1] - 25:6
**six** [3] - 18:18, 18:21,
19:1
**size** [2] - 34:18, 34:19
**skip** [2] - 75:15, 76:3
**skipped** [1] - 32:13
**small** [6] - 68:11,
68:13, 68:20, 69:5,
76:10, 76:15
**smaller** [3] - 53:17,
85:22, 86:24
**smooth** [1] - 4:21
**sometime** [2] - 18:21,
79:15
**sometimes** [2] -
35:17, 36:10
**soon** [2] - 18:25, 85:9
**sorry** [14] - 17:7,
28:10, 30:12, 36:18,
37:22, 43:6, 55:19,
66:11, 66:22, 71:9,
73:22, 74:17, 84:15,
87:14
**sort** [12] - 14:11,
17:22, 27:16, 27:21,

30:5, 48:4, 54:7,
57:11, 63:5, 76:12,
83:14, 86:23
**sound** [1] - 9:13
**source** [4] - 66:9,
85:22, 85:23, 85:25
**sources** [1] - 87:6
**space** [1] - 58:20
**speaking** [1] - 40:15
**special** [1] - 45:2
**specialist** [1] - 46:8
**specialize** [1] - 20:16
**specific** [2] - 27:12,
49:16
**specified** [1] - 85:11
**speed** [1] - 86:6
**spend** [2] - 15:9, 59:4
**Spohn** [6] - 46:9,
46:10, 46:13, 82:24,
83:3, 83:8
**SPSPA** [2] - 79:6, 79:7
**staff** [3] - 11:3, 12:14,
12:15
**stakeholders** [1] -
12:7
**stand** [3] - 4:24, 6:14,
6:15
**standard** [3] - 48:7,
55:14, 67:22
**standards** [1] - 75:9
**start** [3] - 4:16, 45:17,
78:16
**started** [1] - 52:3
**starting** [1] - 82:16
**starts** [9] - 31:20,
33:3, 39:12, 40:4,
40:17, 41:17, 64:2,
72:25, 75:14
**state** [4] - 8:22, 17:23,
28:21, 65:17
**statement** [11] - 14:9,
22:20, 28:21, 31:13,
32:24, 34:2, 34:6,
34:15, 68:25, 84:10
**statements** [29] -
10:18, 11:1, 11:12,
11:21, 14:7, 14:8,
14:12, 14:17, 14:18,
15:8, 16:4, 16:15,
17:5, 17:6, 17:16,
18:13, 19:10, 24:22,
24:23, 24:24, 25:2,
28:21, 38:16, 50:24,
51:22, 53:17, 54:10,
57:12, 71:12
**States** [1] - 75:11
**status** [1] - 31:18
**step** [3] - 17:22, 64:22,
88:2
**Stephen** [1] - 72:18

**steps** [1] - 8:10
**STERN** [1] - 4:5
**still** [5] - 69:3, 74:23,
75:1, 77:4, 77:6
**stock** [9] - 26:21,
26:23, 31:24, 35:13,
36:4, 40:8, 42:24,
79:9
**Stock** [1] - 4:10
**strategy** [1] - 67:7
**streamline** [2] - 4:23,
5:9
**streamlined** [1] - 4:21
**string** [1] - 78:20
**structure** [1] - 14:20
**studied** [2] - 8:13,
72:21
**study** [3] - 8:12, 8:16,
9:18
**sub** [2] - 76:6, 76:10
**sub-portfolio** [2] -
76:6, 76:10
**subcommittee** [1] -
12:24
**subcomponent** [1] -
68:10
**subject** [4] - 45:13,
62:3, 62:4, 79:5
**subjective** [2] - 74:10,
74:16
**submitting** [1] - 5:2
**subsequent** [7] - 9:6,
18:18, 53:19, 60:20,
70:21, 85:8, 87:11
**subsequently** [1] -
13:1
**substance** [1] - 29:25
**substantial** [1] - 31:24
**substantially** [1] -
20:22
**sufficient** [4] - 35:7,
41:11, 67:12, 77:5
**sufficiently** [1] - 51:20
**summarized** [2] -
15:10, 68:8
**Summary** [1] - 30:20
**summary** [11] - 19:25,
20:3, 20:5, 20:13,
20:14, 30:22, 31:7,
66:23, 67:5, 67:18,
83:22
**support** [6] - 24:24,
56:13, 60:22, 60:25,
71:4, 84:21
**supporting** [1] - 71:11
**supports** [2] - 54:9,
54:10
**supposed** [1] - 51:21
**surprise** [1] - 84:7
**surprising** [1] - 84:3

**Susan** [2] - 28:5, 28:10
**Sustainability** [1] - 41:16
**sustainability** [1] - 67:9
**sustainable** [1] - 50:2
**sustained** [1] - 33:25

## T

**tables** [1] - 24:24
**tabular** [1] - 14:7
**takeaway** [2] - 84:15, 84:16
**tasked** [2] - 12:5, 17:4
**tax** [49] - 50:16, 50:19, 50:20, 50:22, 50:24, 51:4, 51:6, 51:7, 51:11, 51:13, 51:15, 51:17, 51:24, 52:1, 52:4, 52:9, 52:22, 53:1, 53:10, 54:2, 54:19, 55:9, 55:17, 55:18, 55:23, 56:2, 57:4, 57:10, 57:19, 59:11, 59:18, 62:25, 63:9, 63:14, 67:14, 67:15, 67:24, 68:3, 68:9, 68:10, 69:6, 70:11, 72:22, 75:19, 76:1, 76:8, 82:19, 83:15
**taxable** [9] - 51:8, 51:10, 52:3, 52:6, 63:1, 63:8, 63:9, 63:13, 67:11
**taxes** [3] - 51:11, 51:12, 52:8
**team** [2] - 59:4, 70:12
**teams** [1] - 10:23
**template** [1] - 27:12
**ten** [1] - 62:11
**term** [7] - 33:9, 33:15, 42:4, 52:13, 52:16, 52:17, 67:8
**Term** [1] - 41:15
**terms** [3] - 51:14, 65:25, 69:5
**test** [1] - 16:14
**testified** [1] - 23:4
**testimony** [7] - 4:16, 4:25, 5:15, 22:25, 23:6, 62:5, 68:7
**text** [4] - 14:14, 24:23, 37:23, 72:23
**themselves** [1] - 13:24
**thereby** [1] - 34:18
**therefore** [8] - 55:10, 55:23, 56:14, 67:13,

67:21, 67:25, 76:2
**they've** [1] - 36:23
**thing[k** [1] - 82:13
**thinking** [1] - 51:2
**third** [31] - 29:4, 29:6, 29:8, 29:11, 29:14, 31:21, 39:5, 40:4, 42:22, 42:23, 43:2, 44:9, 45:6, 46:18, 47:8, 47:20, 48:24, 49:11, 62:14, 64:2, 73:22, 76:23, 79:22, 79:23, 81:12, 85:2, 85:13, 87:12, 87:15, 87:19
**thoughts** [1] - 49:24
**three** [4] - 74:21, 74:25, 77:22, 78:8
**three-year** [3] - 74:21, 77:22, 78:8
**throughout** [1] - 55:6
**timing** [2] - 11:5, 50:23
**Timothy** [1] - 29:22
**tip** [1] - 78:3
**title** [1] - 45:2
**titled** [1] - 30:20
**today** [7] - 20:25, 21:1, 22:25, 25:6, 52:18, 58:9, 68:9
**tomorrow** [1] - 80:2
**took** [1] - 9:6
**top** [14] - 30:5, 30:13, 39:12, 45:20, 46:18, 46:19, 46:20, 47:2, 58:2, 69:11, 81:15
**top-most** [1] - 81:15
**topic** [1] - 50:14
**topics** [1] - 12:8
**total** [2] - 14:21
**touch** [2] - 68:6, 76:4
**Touche** [2] - 15:23, 81:8
**touched** [1] - 30:21
**towards** [4] - 30:18, 41:14, 57:7, 57:12
**Tracy** [1] - 72:11
**traditional** [1] - 14:8
**transcript** [1] - 88:5
**Treasury** [31] - 31:19, 32:4, 32:12, 33:9, 33:21, 34:11, 34:12, 34:17, 35:9, 35:12, 35:18, 35:25, 36:16, 36:19, 36:22, 39:19, 39:24, 40:8, 41:2, 41:24, 42:3, 42:9, 50:2, 50:6, 65:1, 65:3, 65:10, 65:16, 66:12, 79:10

**Treasury's** [2] - 31:23, 34:17
**treat** [1] - 68:13
**treated** [1] - 68:13
**trends** [1] - 32:17
**trial** [1] - 88:4
**true** [2] - 22:20, 52:12
**truncate** [1] - 5:16
**trying** [3] - 68:8, 78:9, 78:10
**Tuesday** [2] - 79:4, 80:6
**turnaround** [1] - 74:11
**turned** [1] - 55:1
**twice** [2] - 11:19, 74:19
**two** [12] - 12:1, 47:21, 48:1, 49:18, 73:23, 74:1, 75:13, 77:3, 77:8, 81:20, 82:2, 82:16
**type** [5] - 20:16, 27:12, 77:1, 83:10, 84:20
**types** [6] - 9:23, 9:25, 27:11, 58:21, 59:22, 69:23
**typical** [1] - 83:23
**typically** [23] - 10:16, 11:2, 16:5, 18:16, 18:20, 18:25, 20:14, 26:18, 26:22, 28:24, 29:1, 30:23, 38:8, 57:4, 57:9, 59:3, 60:1, 63:3, 64:12, 66:6, 66:10, 70:21, 70:23
**typo** [1] - 81:24

## U

**U.S** [4] - 50:20, 50:22, 53:25, 84:14
**Ugoletti** [7] - 43:23, 44:5, 44:23, 44:25, 45:1, 45:9, 46:17
**ultimately** [2] - 18:4, 26:1
**unable** [2] - 67:23
**Uncertainty** [1] - 31:3
**uncertainty** [4] - 31:18, 32:16, 67:7, 67:8
**unchanged** [1] - 73:2
**under** [9] - 30:12, 35:13, 41:22, 49:8, 63:15, 65:10, 75:8, 75:10
**underneath** [1] - 27:16
**understood** [20] -

32:3, 32:24, 35:16, 36:2, 40:24, 42:6, 42:16, 50:3, 50:4, 63:23, 64:11, 73:4, 75:23, 79:18, 79:21, 80:6, 84:1, 85:18, 86:3, 86:15
**undertake** [1] - 54:12
**undisputed** [3] - 34:2, 34:6, 34:15
**unemployment** [1] - 32:19
**unions** [1] - 9:3
**United** [1] - 75:11
**unlikely** [2] - 42:2, 42:10
**unnecessary** [1] - 85:23
**unrealized** [2] - 67:15, 68:4
**untrue** [3] - 18:13, 28:20, 38:15
**up** [25] - 5:10, 8:10, 11:13, 12:18, 13:12, 16:23, 21:6, 27:3, 34:4, 35:3, 42:10, 47:16, 49:8, 51:14, 56:3, 56:13, 57:20, 64:23, 68:9, 74:25, 76:24, 77:15, 78:3, 84:17, 86:6
**upcoming** [1] - 80:8
**updates** [1] - 64:12
**users** [2] - 20:6, 26:18
**uses** [1] - 26:1

## V

**valuation** [6] - 52:17, 52:19, 58:9, 62:4, 69:17, 78:3
**value** [7] - 51:22, 51:25, 52:11, 52:12, 53:11, 53:17, 56:15
**variability** [1] - 42:1
**vary** [1] - 32:20
**verifiable** [1] - 77:21
**version** [1] - 68:8
**versus** [2] - 65:15, 81:24
**via** [1] - 33:13
**vice** [1] - 59:18
**Vicki** [1] - 59:16
**view** [4] - 5:25, 25:8, 82:14, 82:21
**Virginia** [2] - 8:17, 8:22
**voir** [5] - 4:18, 5:4, 5:24, 6:5, 61:10
**volatility** [1] - 33:6

**vouching** [1] - 6:2

## W

**waiting** [1] - 5:25
**Wanda** [1] - 49:15
**wants** [2] - 21:14, 30:25
**warning** [1] - 33:11
**water** [1] - 43:9
**website** [1] - 19:9
**websites** [1] - 19:11
**week** [4] - 29:12, 73:20, 77:3, 87:16
**weekly** [1] - 11:3
**weeks** [5] - 18:18, 18:21, 19:1, 73:23, 77:3
**who'd** [1] - 4:6
**whole** [5] - 19:14, 19:17, 19:19, 67:3, 86:17
**wind** [4] - 84:24, 86:11, 86:22, 87:10
**wind-down** [3] - 86:11, 86:22, 87:10
**wish** [1] - 5:4
**wishes** [2] - 5:11, 5:18
**witness** [7] - 6:10, 6:14, 6:23, 7:6, 43:7, 43:8, 57:23
**WITNESS** [28] - 7:1, 22:20, 22:23, 23:3, 23:8, 23:11, 23:14, 23:17, 23:19, 23:22, 23:25, 24:5, 24:8, 24:15, 24:18, 24:21, 25:5, 25:9, 43:11, 61:15, 68:22, 68:25, 69:5, 75:8, 75:10, 76:14, 76:16, 76:18
**Witnesses** [1] - 3:3
**woman** [2] - 49:15, 59:15
**word** [1] - 85:19
**words** [1] - 74:18
**works** [1] - 51:6
**worse** [1] - 42:18
**worth** [1] - 51:11
**write** [19] - 51:14, 52:1, 52:11, 52:14, 52:18, 53:12, 57:20, 58:10, 59:11, 63:14, 68:1, 73:9, 73:11, 76:2, 76:24, 77:15, 85:10
**write-down** [12] - 51:14, 52:14, 52:18, 57:20, 58:10, 59:11, 63:14, 68:1, 73:9,

73:11, 76:2, 85:10

**write-up** [2] - 51:14,
57:20

**writing** [2] - 56:13,
78:3

**written** [20] - 13:13,
13:18, 14:13, 17:13,
51:18, 53:18, 53:19,
53:24, 54:4, 54:14,
55:2, 55:6, 55:10,
55:24, 56:2, 56:6,
56:14, 56:19, 82:19,
84:16

**written-down** [4] -
55:6, 56:6, 56:14,
56:19

**wrote** [4] - 53:1, 53:7,
53:14, 82:13

## Y

**year** [16] - 10:8, 31:25,
33:13, 33:14, 40:15,
40:16, 48:11, 55:6,
63:17, 65:3, 65:4,
65:6, 74:21, 77:22,
78:8, 86:19

**years** [8] - 7:17, 9:9,
63:4, 63:8, 65:8,
66:18, 67:11, 74:25

**yes-or-no** [1] - 24:10

**yielding** [1] - 55:15

**yourself** [3] - 7:11,
45:16, 46:15