<pre>
 1                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *    )
      FAIRHOLME FUNDS, INC., et al.,   )    Civil Action
 4                                     )    No. 13-1053
                      Plaintiffs,      )
 5                                     )
         vs.                           )
 6                                     )
      FEDERAL HOUSING FINANCE AGENCY,  )    Washington, D.C.
 7    et al.,                          )    August 4, 2023
                                       )    1:55 p.m.
 8                    Defendants.      )
                                       )
 9    * * * * * * * * * * * * * * *    )

10    IN RE:  FANNIE MAE/FREDDIE MAC   )
      SENIOR PREFERRED STOCK PURCHASE  )    MC Case No. 13-1288
11    AGREEMENT CLASS ACTION LITIGATION )

12

13                  TRANSCRIPT OF JURY TRIAL
                   DAY 9 - AFTERNOON SESSION
14           BEFORE THE HONORABLE ROYCE C. LAMBERTH,
                UNITED STATES SENIOR DISTRICT JUDGE
15


16
      APPEARANCES:
17
      FOR THE BERKLEY         VINCENT COLATRIANO, ESQ.
18    PLAINTIFFS:             COOPER & KIRK, PLLC
                              1523 New Hampshire Avenue, Northwest
19                            Washington, D.C. 20036

20    FOR THE CLASS           HAMISH P.M. HUME, ESQ.
      PLAINTIFFS:             KENYA KHALELAH DAVIS, ESQ.
21                            SAMUEL KAPLAN, ESQ.
                              BOIES, SCHILLER & FLEXNER, LLP
22                            1401 New York Avenue, Northwest
                              Washington, D.C. 20005
23
                              LEE D. RUDY, ESQ.
24                            KESSLER, TOPAZ, MELTZER & CHECK, LLP
                              280 King of Prussia Road
25                            Radnor, Pennsylvania 19087
</pre>

1    APPEARANCES, CONT'D:

2    FOR THE CLASS           ROBERT F. KRAVETZ, ESQ.
     PLAINTIFFS:             ADAM H. WIERZBOWSKI, ESQ.
3                            CAITLIN BOZMAN, ESQ.
                             BERNSTEIN, LITOWITZ, BERGER &
4                              GROSSMAN, LLP
                             1251 Avenue of the Americas
5                            New York, New York 10020

6    FOR THE DEFENDANTS      ASIM VARMA, ESQ.
     FHFA, FANNIE MAE &      IAN HOFFMAN, ESQ.
7    FREDDIE MAC:            DAVID BERGMAN, ESQ.
                             JONATHAN LOUIS STERN, ESQ.
8                            STANTON JONES, ESQ.
                             ARNOLD & PORTER KAYE SCHOLER
9                            601 Massachusetts Avenue, Northwest
                             Washington, D.C. 20001
10
     REPORTED BY:            LISA EDWARDS, RDR, CRR
11                           Official Court Reporter
                             United States District Court for the
12                             District of Columbia
                             333 Constitution Avenue, Northwest
13                           Room 6706
                             Washington, D.C. 20001
14                           (202) 354-3269

15

16

17

18

19

20

21

22

23

24

25

I  N  D  E  X

|                                  | Direct | Cross | Red. |
|----------------------------------|--------|-------|------|
| WITNESSES FOR THE DEFENDANTS:    |        |       |      |
| Mukarram Attari, Ph.D.           | 1101   | 1141  |      |

```
 1              THE COURTROOM DEPUTY:  Jury panel.
 2              (Whereupon, the jury entered the courtroom at 1:54
 3      p.m. and the following proceedings were had:)
 4              THE COURT:  You may be seated.
 5              Ms. Varma, you may proceed.
 6              MS. VARMA:  Thank you, your Honor.
 7      (MUKARRAM ATTARI, Ph.D., DEFENSE WITNESS, PREVIOUSLY SWORN.)
 8                   CONTINUED DIRECT EXAMINATION
 9      BY MS. VARMA:
10      Q.  Good afternoon, Dr. Attari.
11      A.  Good afternoon.
12      Q.  We'll pick up where we left off before lunch.
13              You had brought us one more analyst report, and
14      this is from Moody's dated August 13th, 2012.  This is the
15      Monday of the week in which the third amendment was
16      announced, August 17th, 2012.
17              Can you remind us who Moody's is or what Moody's
18      is?
19      A.  Moody's is a credit rating agency.  So they are one of
20      the people that -- one of the companies that rates Fannie
21      Mae and Freddie Mac, particularly the bonds.
22      Q.  Okay.  The first -- this is an admitted exhibit, so the
23      jury will have the ability to read the whole thing.
24              So let's just focus on what you've highlighted.
25      This report was issued after the second quarter earnings; is
```

Attari - DIRECT - By Ms. Varma

1    that correct?

2    A.  Yes.

3    Q.  How do you interpret what they're saying when they say,

4    "Fannie and Freddie's return to profitability is fleeting"?

5    A.  So they note in this -- and as we read it, we'll see --

6    what they're saying is that they've made profits, but they

7    don't view the profits as being sustainable.  They view it

8    as, you know, a one-off, as it were, or a temporary profit.

9    Q.  And why is that?

10   A.  They use the word "fleeting."  And in the text, they

11   kind of explain that, you know, the profits are the result

12   of reversal of loan loss reserves fueled by improving home

13   prices.  But as we'll see later, they believe there's a lot

14   of uncertainty about the direction of home prices.

15          MS. VARMA:  Let's go to the next excerpt.

16          THE WITNESS:  Sorry.  There's one other thing I'd

17   like to point out on the previous page.

18          And that is that they make the point that they

19   believe that the government-sponsored entities', that is,

20   the enterprises', ultimate path remains unchanged, that they

21   will deplete their capital basis because the dividends

22   they'll be paying on the preferred securities will be

23   greater than their earnings.  So this is the circular draws

24   kind of eroding the commitment.  So that's what they're

25   talking about, even after the second quarter earnings in

1    2012.

2    BY MS. VARMA:

3    Q.  By "capital basis," they mean the Treasury commitment?

4    A.  Yes.

5    Q.  The next excerpt of the same analyst report:  Can you

6    explain why you highlighted this section?

7    A.  This was the sentence I was talking about earlier that

8    they say, "if the housing market is turning for the better";

9    but then they have this parenthetical, which is a highly

10   debated subject.  So that kind of shows us that, you know,

11   they believe that -- or they think that there's a lot of

12   uncertainty around it in terms of a variety of opinions

13   about whether the housing market has in fact gone for the

14   better or not.

15   Q.  Aside from the reports that we've reviewed today, were

16   there any other analyst reports that you read?

17   A.  Yes, I did.

18   Q.  Are the reports that you read consistent with the ones

19   that we've reviewed today?

20   A.  Yes, they were.

21   Q.  In what way were they consistent or relevant to your

22   analysis?

23   A.  Well, so most of them noted the -- the analysts noted

24   the gap.  They noted the dividend would be insufficient --

25   sorry -- the profits would be insufficient to cover the

1    dividend.  They noted the issue of the circular draws -- or

2    the risk of the circular draws eroding the commitment and

3    posing a risk to bondholders.

4    Q.  In light of the analyst reports that you've seen as well

5    as the data and information and documents produced by Fannie

6    and Freddie, did you come to a conclusion about whether FHFA

7    should wait to address the cap that we've been calling on

8    the Treasury commitment for a few more quarters or that it

9    needed to do something that quarter?

10              MR. KRAVETZ:  Objection, your Honor.  Tied to

11   analyst reports.

12              THE COURT:  Overruled.

13   BY MS. VARMA:

14   Q.  I can rephrase the question.

15              Do you believe that a reasonable option of the

16   enterprises at the time would have been to wait and continue

17   to assess the problem as opposed to executing the third

18   amendment?

19   A.  No, because all of the various pieces we've talked about

20   are talking about long-term profits being below the dividend

21   payments.  So waiting would not really add value in that

22   sense.

23   Q.  Let's go on to the third amendment.  If you could

24   explain to us -- remind the jury what the third amendment is

25   comprised of.

Attari - DIRECT - By Ms. Varma

1    A.  So the third amendment had a number of different

2    components.  The two primary ones for purposes of my

3    analysis were the net worth sweep was consideration for the

4    10 percent dividend and PCF.  So the 10 percent dividend was

5    eliminated and the PCF was suspended while the net worth

6    sweep was in effect.

7            And the second piece was that the risk of the

8    enterprises was going to be reduced through acceleration in

9    the rate of reduction of the retained assets.

10   Q.  What do you understand -- what did you mean by

11   "consideration for the 10 percent dividend and PCF"?

12   A.  That the dividend -- that the net worth sweep was in

13   exchange for the 10 percent dividend and the PCF.

14   Q.  And what is the result of the reduced risk of the

15   enterprises by the accelerated reduction in the level of

16   retained assets?

17   A.  Well, that would further reduce the profits, the future

18   profits of the enterprises, because if you recall we talked

19   about the Deutsche Bank report before lunch.  And that one

20   made the point that other analysts were also making, which

21   was the retained assets were a big source of profits, an

22   important sorts of profits for the enterprises.

23   Q.  Now, you've summarized here the benefits of the third

24   amendment.  Could you explain the benefits, please?

25   A.  Sure.

1            So remember, the issue that FHFA said it was

2    trying to address was the ongoing erosion of the commitment

3    from circular draws.  And the third amendment accomplished

4    that, because now there would be no circular draws.  So if

5    the profits were lower than the 10 percent dividend, the

6    enterprises would pay whatever the profits were.  And if the

7    profits were higher, they would pay that.  But they wouldn't

8    have to make draws to pay the dividend once the net worth

9    sweep portion of the third amendment went into effect.

10            Also, because the PCF was suspended and the PCF

11    was viewed as being substantial, the only time that, you

12    know, the enterprises would pay more under the third

13    amendment than under the second is if their profits exceeded

14    19 billion plus a substantial PCF.  So...

15    Q.  Did you also do some analysis, quantitative analysis, on

16    the impact of the third amendment?

17    A.  Yes, I did.  I conducted a bond event study, which is

18    where -- you know, an event study is where you look at the

19    effect of an event on the prices of securities.  And in this

20    case, what I'm doing is I'm looking at the effect of the

21    third amendment on the prices of long-term bonds of Fannie

22    Mae and Freddie Mac.

23    Q.  And can you take us through the steps of the event

24    study?

25    A.  Sure.

1          So an event study typically has four steps.  One

2    is, you know, you have to identify the event that you are

3    studying.  And, you know, here it's a straightforward step.

4    We are interested in the third amendment, and we know that

5    the third amendment was announced on the morning of August

6    17th.

7          The next is to measure the change in the price of

8    the securities; in this case, the bonds of Fannie Mae, of

9    Freddie Mac, the long-term bonds of Fannie Mae and Freddie

10   Mac, from before the third amendment to after the third

11   amendment.

12         So I measure for these purposes the change in the

13   price from the end of the day on August 16th to the end of

14   the day on August 17th.

15         Then the third step is to account for changes that

16   are unrelated to the event, and that involves two kinds of

17   pieces of analysis.  One is to check if there were any other

18   events related to Fannie Mae or Freddie Mac on that day that

19   might account for the price changes.  And there weren't any.

20         And the other is to account for market-wide, you

21   know, price changes.  So, you know, if Treasury bond prices,

22   for example, go up on a particular day, you'd expect other

23   bond prices also to go up on that day.  And so this is the

24   piece that's kind of adjusting for that effect.

25         And then finally -- and that piece is done using a

1    regression analysis.  It's a statistical technique that

2    allows you to look at how changes are related to one

3    another.

4              And finally, the last step is to take the

5    remaining price change and to test whether you can say with

6    a high level of confidence that it's different from

7    day-to-day price changes.

8    Q.  Let's go through each of these steps.

9              Remind us what a bond is, first.

10   A.  So a bond is just a loan.  You know, when a company

11   typically borrows, a large company like Fannie Mae or

12   Freddie Mac, it doesn't go to the bank and borrow money like

13   a smaller business might or an individual might.  The loan

14   is structured in a way that makes it easy to trade.  So it's

15   chopped up into pieces of a thousand dollars, and it has the

16   various contractual conditions that make it easy to trade

17   that loan.  And that thousand-dollar piece is called a bond.

18             Just like a lender receives principal and interest

19   on a loan, principal payments and interest payments on a

20   loan, the bondholder, who's like the lender, receives

21   interest and principal on the loan.

22             And as I mentioned, these are structured in a way

23   to make them easy to trade.  And so they trade.  So we have

24   prices for these bonds day after day.

25   Q.  And when you say "trade," you mean they have an exchange

1   of some kind?

2   A.  Well, so this is done -- remember we talked about

3   Barclays and Deutsche Bank and RBC.  Those banks facilitate

4   the trading in these types of bonds.

5   Q.  What is a bond yield?

6   A.  So bond yield is the interest rate or the return that an

7   investor will earn from holding the bond to maturity.

8   Maturity is when the life of the bond ends.

9           And, you know, for bonds of companies, we often

10  look at the spread, which is the difference between the bond

11  of the company and the bond of a Treasury -- of a U.S.

12  government bond of the same maturity.  And that difference

13  is because companies are, you know, less safe than the U.S.

14  government.

15  Q.  And so the U.S. government Treasury bonds are what you

16  identified as a default-free investment?

17  A.  Yes.  They are viewed as being the safest kind of

18  investment, free of, you know, the risk of default or a very

19  low risk of default.

20  Q.  And do Fannie and Freddie issue different kind of bonds?

21  A.  They issue a variety of bonds.  They issue some bonds

22  that are just like Treasury bonds, so they pay a coupon over

23  the -- or interest over the life and then the principal in

24  one lump sum at maturity.

25          And those are issued in large amounts, you know.

1     Individual issues can be two to four billion dollars, and

2     they are referred to as benchmark bonds or reference notes.

3     Fannie calls them benchmark bonds; Freddie calls them

4     reference notes.  And those have very simple structures that

5     make them, you know, easy to analyze.

6          They have other complicated bonds that have all

7     kinds of options embedded in there that allow buyers to sell

8     the bonds back to Fannie and Freddie or Fannie and Freddie

9     to buy the bonds back at some fixed price.  And those are

10    issued in smaller amounts and have very complicated

11    structures, which make them, you know, much more difficult

12    to analyze.

13    Q.  Why did you focus on long-term bonds?

14    A.  Well, so there was very little risk that the commitment

15    would run out, for example, in 2013 or 2014.  But, you know,

16    it was really ten years out; and beyond that, there was the

17    risk.  So the short-term bonds wouldn't be -- wouldn't

18    reflect the risk as much.

19          And, you know, so what I was interested in is

20    using bonds whose prices would be sensitive to the -- you

21    know, the risk of the commitment running out.  And those

22    prices would react as that risk changed.

23    Q.  And when you talk about risk, it's the risk of the

24    circular draws eroding the agreement -- the commitment?

25    A.  Yes.

1   Q.  Is it common to focus on one type of bond for an event

2   study?

3   A.  Yes, it is.  It's pretty standard.  So, for example, if

4   you were doing a study -- you know, earlier this year, there

5   was a risk that the U.S. might not increase the -- you know,

6   the borrowing limit on Treasury securities.  And that

7   created a risk that the U.S. would default on securities.

8          And that risk affected very specific sets of

9   securities that were to mature around the date that the cap

10  would be breached, much more so than other securities.  So

11  if you were doing a study, for example, of the debt limit,

12  you'd want to focus on those specific bonds, because if you

13  focused on other bonds you'd be picking up a wide variety of

14  other effects and wouldn't be able to separate out the debt

15  limit, you know, effects from other effects.

16  Q.  And the next slide, I think, is a graph that shows your

17  results?

18  A.  Yes.  So this is kind of the yield spread.  So again,

19  this is the return on Fannie Mae bonds minus the return on

20  Treasury bonds and how that changed over time.

21         And you see that that spread declined from, you

22  know -- for the line that's at the top, it went from

23  something like 129 basis points, so 1.29 percent, to

24  something like 118 basis points, so about 11 basis points,

25  or .11 percent, which I know sounds small, but for bonds

 1    that is a big deal.

 2    Q.  What does it mean if the yield goes down?

 3    A.  If the yield goes down, that means the price went up,

 4    which means that investors view the securities as being

 5    safer.

 6    Q.  Because they were willing to pay more for safer

 7    securities?

 8    A.  Yes.  Because they're willing to pay more for safer

 9    securities.

10    Q.  So this was a Fannie Mae slide.  Let's take a look at

11    the Freddie Mac.

12         Is that the same results?

13    A.  Yes.  So again, you see that the difference between the

14    yield on Freddie Mac bonds and Treasury bonds is falling on

15    August 17th.

16    Q.  And again, the fact that the yield is falling means that

17    the price is increasing and the perception is that the bonds

18    are safer?

19    A.  Yes.  Correct.

20    Q.  And your next step was?

21    A.  Well, like I mentioned, you know, I needed to make sure

22    that there were no other events on August 17th, 2012.  So I

23    did that.

24         And I also conducted the statistical analysis, the

25    regression analysis that I talked about, to control for

1    changes in the yields on U.S. Treasury securities.

2    Q.  And what were your results?

3    A.  The results were unchanged.  You could tell with a high

4    level of confidence that the prices -- that the yields on

5    the Fannie Mae and Freddie Mac bonds changed on the day of

6    the third amendment.

7    Q.  Because of the third amendment?

8    A.  Because of the third amendment.

9    Q.  I know -- as the jury has heard, there are a number of

10   components.  As you've mentioned, there are a number of

11   components to the third amendment.  One includes the net

12   worth sweep and another includes the accelerated reduction

13   of the retained portfolio.

14           You looked at only long-term bonds, correct, for

15   your event study?

16   A.  Yes.  So I looked at long-term bonds for my event study.

17   And these bonds kind of were -- matured far in the future,

18   so they matured in 2029, between 2029 and 2032, by which

19   time the effects of the cap on the retained asset portfolio

20   were not in effect.

21           So under the second amendment, the retained asset

22   portfolio would be capped at 250 billion by that time.

23   Under the third amendment, the cap would be 250 billion by

24   that time.  So there was no difference in the level of the

25   cap by the time these bonds matured.

1   Q.  What did you conclude from that?

2   A.  So I concluded that the bond prices increased in

3   response to the third amendment.  Fannie and Freddie's bonds

4   were viewed -- you know, the bond price increasing means

5   they were viewed as being safer investments.  And they were

6   viewed as being safer investments because the third

7   amendment increased confidence in Fannie and Freddie's

8   ability to meet their long-term debt obligations.  That's

9   what I concluded.

10  Q.  And that's because your study was limited to long-term

11  bonds?

12  A.  That's because my study was limited to long-term bonds.

13  Yes.

14  Q.  Let's go to the fundamental question:  Did FHFA act

15  reasonably?

16          And this is your conclusion slide?

17  A.  Yes.  So this is getting to the end.

18          So my conclusion is that FHFA's decision to agree

19  to the third amendment was reasonable.  And that's because

20  the problem that the FHFA had -- or the issue that the FHFA

21  had stated was the problem is that circular dividends was --

22  there was a risk that circular dividends would erode the

23  Treasury commitment.

24          The third amendment ended circular draws on the

25  commitment, and so it protected the commitment and addressed

Attari - DIRECT - By Ms. Varma

```
 1        the impact of having to take draws to pay the dividends.
 2        Q.  Let's move on.  We're not quite done.  "Reasons
 3        Dr. Dharan is Wrong":  We talked about that earlier.
 4              Dr. Dharan said that the net worth sweep was not
 5        reasonably necessary to end circular draws.  And you have
 6        two reasons here.  So let's go through them.
 7              The first has to do with FHFA's goal for stability
 8        of the secondary mortgage market by eliminating the risk of
 9        circular draws.
10              And so you examined the goals of the
11        conservatorship?
12        A.  Yes.  So if you recall, I said that one of the things I
13        did is to understand what the goals of the conservatorship
14        were.  We looked at the slide earlier.
15              So in terms of assessing the reasonableness of a
16        decision, remember I said we needed to look at the
17        information that was available at the time.  And we've been
18        talking about that.  One needed to look at the goals.  And
19        so, you know, this -- we'll try and get a little bit more in
20        the goals, because this is where Professor Dharan and I kind
21        of diverge in our opinion about the -- or this is one of the
22        places we diverge in our opinion about the reasonableness.
23              The reason for that is that FHFA, unlike, say,
24        shareholders, was -- wanted to ensure the stability of the
25        market and to mitigate the systemic risk.  And that's all
```

1    the stuff that happens in bad times.  And so it was focused

2    on the outcomes that, you know, were below average, if you

3    think of it that way, or kind of, you know, really bad

4    outcomes.

5            And so it's -- a decision has to be analyzed in

6    the context of those kind of outcomes and trying to prevent

7    those outcomes.

8    Q.  And Dr. Dharan noted the same FHFA questions and answers

9    on conservatorship.  "What are the goals of this

10   conservatorship?"  And he focused on the first sentence:

11   The purpose of appointing the conservator is to preserve and

12   conserve the company's assets and property and to put the

13   company in a sound and solvent condition.

14           In your opinion, does the third amendment do that?

15   A.  Yes, it does, because by the time you get to the third

16   amendment, the Treasury commitment is basically the capital

17   that allows these companies to operate.  And protecting that

18   capital increases the -- you know, the confidence in the

19   companies, as we saw.  You know, that's what soundness and

20   solvency is, or that's one of the factors that matters for

21   soundness and solvency.

22   Q.  You focused also on the second sentence.  What does the

23   second sentence add to the sentence that Dr. Dharan relied

24   on?

25   A.  Well, this is where, you know, FHFA's talking about its

Attari - DIRECT - By Ms. Varma

 1     goals; and it's to restore confidence in the companies.  You

 2     know, these were companies, like I noted.  They didn't have

 3     their own capital.  The Treasury commitment was the capital.

 4     And so protecting it, you know, helped maintain that

 5     confidence.  If it had eroded, that would have reduced the

 6     confidence.  So that's why I think, you know, that second

 7     sentence is also important.

 8            Why did they want to restore confidence and

 9     maintain confidence?  Because that would enhance the

10     capacity of the enterprises to fulfill their mission.  And

11     also, kind of -- you know, if that confidence evaporated,

12     we'd probably end up in a situation where systemic risk

13     became a problem again and we'd have instability in the

14     marketplace.

15     Q.  You've also noted the Freddie Mac 10-K, which says "no

16     longer managed with a strategy to maximize common

17     stockholder returns."

18            How is that relevant in terms of the goals of

19     conservatorship?

20     A.  So shareholders will often want -- you know,

21     shareholders, especially if you think about Fannie Mae and

22     Freddie Mac, by the time you get to 2012, you know, they

23     will want to take actions that will, you know -- that they

24     may want to take actions that will increase the risk because

25     that increases the possibility of having a really good

1    outcome, you know, hitting a home run as it were.

2            But that's different than, you know, the objective

3    of a conservator, which is to make sure things don't end up

4    terribly.

5    Q.  You also looked at documents reflecting goals of the

6    conservatorship after 2008.  Why did you look at those

7    documents?

8    A.  Well, I wanted to see if the goals evolved and how they

9    evolved and, you know, what they were saying, because that's

10   going to be important in terms of the information that's

11   available to shareholders and to bondholders.

12   Q.  And what did you conclude?

13   A.  That the goals had remained essentially the same.  It

14   was about stability and liquidity to housing finance, for

15   example, in 2012.  It was about providing assurance to

16   capital market investors and the debt- and mortgage-backed

17   securities in 2010.  And the purpose was so that the

18   enterprises remain a stable source of funds for new home

19   purchases and refinancings of existing mortgages.

20           So it's all about the stability of the secondary

21   mortgage market.

22   Q.  Now, your second criticism of Dr. Dharan was his

23   optimism.

24   A.  Yes.

25   Q.  Is it bad to be optimistic?

1   A.  No.  It's good to be optimistic.  But I think it's

2   unwarranted in the situation that we're in in 2012.  I mean,

3   you know, at that time, optimism might lead to poor

4   decision-making.

5          So Freddie Mac, as you can see, had only made a

6   profit in excess of the dividends in the second quarter of

7   2012.  And Fannie Mae had two quarters in the middle of

8   2012.

9          But if you look back, you know, if they had made

10  decisions based on optimism, for example, Freddie Mac in

11  2009, things might have ended up very poorly because they

12  subsequently had large losses in 2010 and in 2011 and so on.

13  Q.  You also looked at some of the same projections that we

14  talked about earlier that Dr. Dharan relied on.

15         One of Dr. Dharan's criticisms, you may recall,

16  was that under the net worth sweep aspect of the third

17  amendment, the GSEs did not earn enough to build capital.

18  In other words, the net worth sweep would take the money

19  away to Treasury.

20         What did you conclude after looking at their

21  projections?

22  A.  Well, their projections show that they weren't going to

23  accumulate capital.  So if you look at the residual equity

24  line, which is really the line where any capital that they

25  accumulated would show up, it goes up a little bit by, you

1    know -- reaches 2.8 billion by 2017, which is peanuts for

2    companies of this size.  And then it goes back down to zero,

3    you know, by 2021.  And it's at zero in 2022.  So they

4    weren't going to accumulate capital.

5            This is -- remember, this is not kind of an

6    adverse scenario.  This is the expected.  So you can think

7    about it being that more than half the time they're not

8    going to accumulate capital because on average they don't

9    expect to.

10   Q.  Now, you also had some criticisms of these projections?

11   A.  Yes.  So these projections themselves have a certain

12   level of, you know, optimism built into them.  So they are

13   in some sense overstating what the profits will be.  And so

14   the expectations as of 2012 were actually worse than what's

15   in these projections.

16           Part of the reason that they are optimistic is

17   that what Fannie Mae typically did is that it made

18   three-year projections and then it took these and extended

19   them out to ten years, making simplifying assumptions.

20           And one of those simplifying assumptions was that

21   Fannie Mae would start growing again.  And that road

22   contributes to kind of, you know, higher profits than

23   expected or the -- particularly the out years, the years

24   from 2015 or 2016 through 2022.

25           The other thing is that they don't reflect the

1    stated objective of FHFA to shrink and de-risk the

2    companies.  There's only a base case.  There's no, you know,

3    what happens if things turn out to be worse than expected

4    or, you know, we hit another crisis.  Also, because they

5    don't have scenarios.  They don't account for the PCF.  They

6    don't have taxes in there.  They presume that there'll be no

7    taxes, so the benefit of the DTA is actually built into

8    these projections.

9    Q.  And were the assumptions that you've identified all

10   tending to go in one direction, which is to increase the

11   expected income?

12   A.  Yes.  So the expected income is overstated because of

13   all these assumptions.

14   Q.  Why is it important to look at the downside or stress

15   scenario?

16   A.  Well, again, this is, you know -- we are looking at the

17   conservator making the decision.  And for the conservator,

18   it's important to avoid kind of the companies getting into

19   trouble.  And for that, it's important to look at the

20   downside, you know.  What happens if things go less well

21   than we expect?

22   Q.  Were you aware whether Mr. DeMarco did look at downside

23   projections?

24   A.  It's my understanding that he had been following along

25   on projections.  But more importantly, I mean, you know,

1    if -- we saw all of this information where basically the

2    companies did not expect to earn enough to make the dividend

3    payment.  And that was information that was available to

4    Mr. DeMarco and everyone else.

5    Q.  Let's go back to the projections for a second.  You

6    mentioned that this projection does not include the PCF.

7    A.  Sorry.  I missed that.

8    Q.  That this projection does not include the PCF.

9    A.  Uh-huh.

10   Q.  Is there a way to tell how much room there would be for

11   a PCF, given that there's a zero net worth at the end in

12   2022?

13   A.  No, there isn't.  So in this projection, you know, the

14   Treasury would probably have waived the PCF because they had

15   no ability to pay.  But in an upside, you know, if you kind

16   of keep all of this the same and we believe that things turn

17   out better, then there would have been headroom for a PCF

18   and Treasury would have imposed it or started collecting and

19   stopped waiving the PCF.

20   Q.  Now, you may recall that Dr. Thakor estimated a PCF of

21   1.16 billion.  Can you tell from this projection whether

22   that would have been feasible for Fannie Mae and whether

23   that would have been better than the net worth sweep for

24   Fannie Mae?

25   A.  Fannie Mae wouldn't have been able to pay its share of

Attari - DIRECT - By Ms. Varma

1       the 1.16 billion.  It won't even have been able to pay its

2       share of the 65 million that Dr. Thakor estimated.

3       Q.  And you're talking about long-term?

4       A.  Well, over the ten years.  Yes.

5       Q.  Over the ten years.

6            You also identified Mr. Benson's deposition.  Why

7       was this important?

8       A.  Well, I was trying to understand those projections.  And

9       remember, I talked about the various issues with that

10      projection.  So one of the places where I looked was

11      Mr. Benson's deposition, because it's my understanding that

12      he was involved in producing those projections.

13           And, you know, much of what I described, these

14      were -- that these didn't go through the rigorous process

15      that their projections would typically have gone through,

16      that they didn't do ten-year projections and so on, are

17      based on Dr. Benson's -- on Mr. Benson's deposition

18      testimony.

19      Q.  Let's turn to Freddie Mac projections.  You mentioned

20      this excerpt earlier:  "Over the long term, it is likely our

21      dividend obligation will exceed comprehensive income,

22      resulting in additional Treasury draws."

23           Let's take a closer look at the projection.

24      A.  Okay.

25      Q.  What does this graph suggest?

Attari - DIRECT - By Ms. Varma

1   A.  So Freddie Mac had, you know -- remember I mentioned

2   that Fannie Mae had only a base case.  It didn't have

3   scenarios.

4           Freddie Mac actually produced scenarios.  And the

5   one that would be important from the conservator's

6   perspective is the stress scenario.  And what we see in that

7   is that the draws on the commitment are 199 billion by 2015.

8           So, you know, that's kind of what the -- you know,

9   what the situation, the lay of the land, is in 2012.  And

10  this shows why it's important to try and protect the

11  commitment.

12  Q.  Now, you may recall from Dr. Dharan's testimony that he

13  thought the stress scenario was very unlikely.  Do you have

14  a response to that?

15  A.  I agree.  Stress scenarios are unlikely by definition.

16  But then that's what you want to make sure that you survive,

17  because, you know, the crisis in 2008 was not something

18  people thought was going to happen.  In fact, right up to

19  when it happened, people said it wouldn't.  And, you know,

20  it was unlikely, but that's what, you know, the conservator

21  was planning for.

22  Q.  "Dr. Dharan ignores the benefits of the third

23  amendment."  Could you summarize what you mean by that?

24  A.  So, you know, you asked about waiting, you know, and so

25  on.  And so in terms of evaluating the third amendment and

Attari - DIRECT - By Ms. Varma

 1    comparing it to alternatives, I think what's important is to

 2    remember the benefits of the third amendment and then to

 3    make a comparison, you know, based on kind of the benefits

 4    of whatever the alternative you're considering is and the

 5    cost.

 6          So the first benefit was that it eliminated the

 7    circular draws, which were kind of the concern of the

 8    conservator or the stated concern of the conservator.

 9          The second is that the shortfalls, you know, if

10    they had insufficient money to pay a dividend, would not

11    lead to increases in the liquidation preference and

12    increases in future dividends while, you know, if they

13    continued under the second amendment or, you know, some of

14    the alternatives that Dr. Dharan considers, that liquidation

15    preference would increase.  Future dividends would increase.

16          The third is that the PCF was suspended while the

17    net worth sweep was in effect.  And what that does is that

18    it means that the enterprises would only pay more under the

19    third amendment than under the second if profits exceeded 19

20    billion plus a substantial PCF.

21          And on the next set of slides, we'll finally start

22    talking about what a substantial PCF is.

23    Q.  Okay.  You first have -- Dr. Thakor is the one who

24    estimated the PCF for Plaintiffs.  And his conclusion was

25    that if there was going to be a PCF, a positive PCF, that

1    the FDIC's method for determining fees for deposit insurance

2    might be adaptable to determining the PCF for the Treasury

3    commitment.

4              Can you go through the reasons why you think

5    Dr. Thakor's calculation was wrong?

6    A.  So again, I mean, I mentioned some of these earlier.

7    The first is that these were not like large banks.  Large

8    banks have to have capital to be able to continue to operate

9    and to have access to deposit insurance.

10             They don't get to, you know, run out of capital

11   and then continue to operate for a number of years after

12   that with no capital.

13   Q.  Why is that?  What is it that --

14   A.  I mean, who's going to put their money in a bank that

15   has no capital?  Earlier this year we saw what happens when

16   people start to get worried about the amount of capital

17   banks have.  A number of reasonably large banks failed, even

18   while they had capital, because people started to get

19   worried.

20   Q.  And the FDIC shuts down or the government shuts down

21   those banks?

22   A.  Yes.  The government steps in.  But even before that,

23   depositors take their money and move it to other banks.

24             So the second is that he's applying the method

25   incorrectly.  So even if he were to use the method, he'd

 1   have to adjust the deposit insurance rate to account for the

 2   fact that these companies had no capital.

 3           And he makes another error, which is that he

 4   applies it to the remaining amount of the commitment while

 5   the FDIC very explicitly states that the fee is to be

 6   applied to assets minus capital.

 7           And that's a huge mistake.  That throws him off by

 8   a factor of 20.  So, you know, we'll see that as the 1

 9   billion number kind of just for the second correction goes

10   upwards of 20 billion.

11           The third is that his results are not consistent

12   with what -- you know, what Treasury had been saying or what

13   FHFA had been saying, what the enterprises had been saying.

14   They all said that they expected a substantial PCF.

15           One of his results is 65 million for a company

16   that adds up to 5 trillion dollars.  I mean, there's no way

17   65 million is -- you know, meets any definition of

18   substantial.  Even a billion doesn't, really.  But we can

19   argue about that.

20           The last one is that he throws in a bunch of other

21   approaches that he himself says are not relevant to

22   estimating a positive PCF.  And I'm a little puzzled about

23   why he does that.

24   Q.  Let me go back to the FDIC methodology.

25           You had reasons why the FDIC insurance fees and

1   the way they're calculated may not be a perfect analogy.

2   What are the differences?

3   A.  Yes.  So like I mentioned, banks with zero capital

4   aren't allowed to continue to operate.  These companies that

5   had zero capital since the end of 2008, they had been

6   operating continuously for three years.  The reason they

7   were allowed to operate is there was this commitment and so,

8   you know, the bank treats the commitment like deposit

9   insurance because, you know, if they had been banks they

10  wouldn't have been able to have access to deposit insurance

11  in August of 2012.

12          The second is that the situation was so much worse

13  than the big banks that Dr. Thakor analyzes that the rate

14  that would have been applied to them would be much higher

15  than the 45 basis point upper end of the range that

16  Dr. Thakor uses.

17          And that's because they didn't have capital,

18  again.

19          And the third is a more technical issue, but I

20  think it's relevant:  Deposit insurance premiums are not

21  based on the market value of the insurance.

22  Q.  What does that mean?

23  A.  Because, you know, in the marketplace, if banks had

24  access in the marketplace to cheaper deposit insurance, they

25  would switch to that.  So -- which tells you that the

1    market -- you know, in a marketplace, the deposit insurance

2    would cost more.  And we are interested in the market value

3    of the insurance, not, you know, what the insurance is in a

4    government-organized program.

5    Q.  Well, the Treasury commitment is also not available in

6    that size from the market either, is it?

7    A.  Right.  But the PCF is specifically -- there's a

8    statement that says the PCF is to be determined based on the

9    market value of the commitment.  And so what we should be

10   doing is trying to figure out what the market value of that

11   commitment is.

12   Q.  There was another error that you mentioned, not just the

13   45 basis points, but the assessment base.

14            Can you first take us through what the actual

15   calculation for the fee is?

16   A.  Right.  So the way the fee is calculated is that you

17   take the deposit insurance rate, you know, let's say 45

18   basis points, and then you apply it -- multiply it by an

19   assessment base.  So this is -- you know, if you're, say,

20   buying insurance on a house, there are two things that

21   matter.  One is the value of the house you are insuring, for

22   example, and the risk of -- the risk in the area where you

23   live.

24            I live in California.  There's risk of fires, so

25   insurance tends to be costly.  Right?

1            So as I noted, he's using the wrong rate.  He's

2    using a rate that doesn't fully account for the risk.  He's

3    also not using the right base.  He's using a base that's too

4    small.

5            What I have up there is the statement that the

6    FDIC has -- had about the base in 2012.  And it says very

7    clearly to define a bank's assessment base -- that they

8    define the bank's assessment base as its average

9    consolidated total assets, so assets minus tangible equity.

10   Equity.  Which in Fannie Mae's and Freddie Mac's case in

11   August of 2012 was basically assets, because they had only

12   1 or 2 billion of equity each.

13           And so he gets the assessment base wrong, and so

14   he gets a number that is too low.

15   Q.  Now, he plugged in the number for the base of the

16   outstanding commitment.  I believe he did that because

17   that's the analogy to insure deposits that the FDIC used to

18   use.  Is that correct?

19   A.  It is not, because he kind of -- you know, he noted

20   that -- so here's some facts that kind of help, I think.

21   The deposit insurance fund at that time had roughly

22   $100 billion in it.  In his testimony, he noted that there

23   were banks like JPMorgan -- and I think he noted JPMorgan,

24   Bank of America, Wells Fargo -- each of which had, you know,

25   several hundred billion in insured deposits.

 1          And I think he also noted that the total of

 2     insured deposits was 7 trillion.

 3          So the FDIC's insuring 7 trillion of insured

 4     deposits with a fund of 100 billion.  And what Dr. Thakor is

 5     telling us to do is to use that 100 billion to determine,

 6     you know, different banks' -- or a piece of that 100 billion

 7     to determine different banks', you know, deposit insurance

 8     fee and to ignore how much in insured deposits they have or

 9     how much in assets they have.

10          And it's actually assets that the FDIC is telling

11     us to use.

12     Q.  Now, you corrected Dr. Thakor's calculation.  Can you

13     describe how you corrected it?

14     A.  So I made only one of the two corrections that I noted

15     were needed.  Remember, I said -- so he uses a 45 basis

16     points fee and he multiplies it into the undrawn commitment

17     amount of 258 billion to come up with the 1.16 upper end of

18     the deposit insurance -- you know, upper end of the PCF.

19          I corrected the assessment base and I replaced it

20     with the relevant number or the number that's correctly

21     computed based on the FDIC's definition that we saw on the

22     previous page.  And you get to 23.4 billion.

23          If you were to raise that 45 basis points to

24     account for the higher risk, we'd end up with an even higher

25     number.

1    Q.  What is the corrected assessment base?  Do you recall
2    what the number is?
3    A.  It's basically the total assets of Fannie Mae and
4    Freddie Mac minus the total equity of Fannie Mae and Freddie
5    Mac.  And the total assets are roughly 5.2 trillion and the
6    equity is about 4 billion at that time, 4 or 5 billion at
7    that point.  So that's what is taken out.
8    Q.  So the 5.2 trillion, is that the total obligations or
9    assets, if you will, in August 2012?
10   A.  Yes.  So Fannie Mae had about -- Fannie Mae and Freddie
11   Mac had about 4 trillion of mortgage-backed securities and
12   about 1.2 trillion of bonds.  And putting those together,
13   the 4 plus 1.2 gives you the 5.2 trillion that I have up
14   there.
15   Q.  Why did you put those two together?
16   A.  Well, because that's the way the FDIC requires the
17   calculation to be done.  And, you know, Dr. Thakor argued
18   for using the insured assets -- the insured deposits as the
19   base.  And that would be the same in this case, because
20   there's really very little else that Fannie Mae and Freddie
21   Mac have.
22   Q.  You next have the four components of compensation to
23   Treasury.  Can you explain why you go through these
24   components?
25   A.  So one of the things Dr. Thakor says is that we have to

1    look at this on an all-in basis.  So we have to look at all

2    of the components of compensation that Treasury is getting

3    for the commitment.

4             And this is -- this is the four components of

5    compensation to Treasury under the PSPAs.  There was an

6    initial commitment fee of $1 billion each from Fannie Mae

7    and Freddie Mac.  Excuse me.  Treasury received warrants for

8    79.9 percent of the common stock of Fannie Mae and Freddie

9    Mac.

10            Fannie Mae and Freddie Mac had to pay a 10 percent

11   dividend on the drawn amounts.  This is the 19 billion a

12   year that we've been talking about.

13            And there was a periodic commitment fee that was

14   to start on January 1, 2010, but had been waived because of

15   the -- you know, Fannie Mae and Freddie Mac wouldn't have

16   been able to pay it without making circular draws.

17            So I'm looking at these four.  And what I'm going

18   to do on the next slide is to compare this to the deal that

19   AIG got.  Now, the reason that AIG is interesting is that it

20   happens roughly a week after Freddie Mac and Fannie Mae.  So

21   the Fannie Mae and Freddie Mac conservatorship and the PSPAs

22   happen on September 7th, 2008.  AIG happens on September

23   16th, 2008.  So that's nine days later.

24            Fannie Mae and Freddie Mac get preferred equity

25   with an indefinite term and then get 100 billion each, for

1    Fannie Mae and 100 billion for Freddie Mac.

2              AIG gets secured loans.  So to access the money,

3    AIG actually has to put up assets and then they can borrow.

4    Unlike Fannie Mae and Freddie Mac, they can't just borrow

5    when they make losses.

6              The term of the loan was initially just two years.

7    Okay?  And the commitment was limited to 58 billion, not

8    100.

9              Now, for that, so as you can see, Fannie Mae and

10   Freddie Mac got a better deal.  They got kind of -- Treasury

11   was exposed to more risk because it was equity, not secured

12   loans.  This was indefinite and it was a larger amount.

13             Now -- now let's look at the various components of

14   the compensation.  Treasury received 1.7 billion as an

15   initial commitment fee from AIG.  It received only 1 billion

16   from Fannie Mae and 1 billion from Freddie Mac.  So it's a

17   smaller amount.

18             You know, so the initial commitment fee for AIG

19   was 2 percent of the commitment.  For Fannie and Freddie, it

20   was 1 percent of that initial commitment.

21             The warrants for AIG were $23 billion.  And that's

22   27 percent of the 85 billion that Treasury -- that the Fed

23   committed to lend to AIG.

24             The warrants for Fannie Mae and Freddie Mac -- for

25   Fannie Mae, the warrants were 3 and a half billion.  For

1    Freddie Mac, they were worth 2.3 billion.  So, you know,

2    we're talking an order of magnitude difference in terms of

3    the value of the warrants.

4    Q.  Can you describe what a warrant is?

5    A.  So a warrant allowed Treasury to obtain shares in these

6    companies, so AIG or Fannie Mae or Freddie Mac, essentially

7    for a very nominal payment.

8    Q.  And those are common shares?  It says common equity.

9    A.  Those are common equity.  And they would be equal to

10   79.9 percent of the common equity.

11   Q.  How was the equity value calculated?

12   A.  So these values are what were reported by AIG, Fannie

13   Mae and Freddie Mac in their SEC filings.

14   Q.  At the time of the origination?

15   A.  At the time of the origination.

16   Q.  Okay.

17   A.  So as we've seen, the initial commitment fee for AIG was

18   higher.  The value of the warrants for AIG was higher.  The

19   interest rate on the drawn amounts for AIG was also higher.

20   It was 12 percent and not -- instead of the 10 percent that

21   Fannie Mae and Freddie Mac would pay on the preferred

22   equity.  Right?

23         Now -- and on top of that, AIG had to pay a

24   periodic commitment fee of 8.5 percent, starting right in

25   September 2008.

1    Fannie and Freddie had to pay a periodic

2    commitment fee, but that would only start in January of

3    2010.  And then it was waived, as we know, for another two

4    and a half years.

5    So based on all of this, I think that 8 and a half

6    percent commitment fee would be kind of a lower bound.  Or

7    it had to be higher than 8.5 percent, you know.  And if you

8    apply that 8.5 percent to the 260 billion, you're basically

9    going to get a number that's close to what we saw on the

10   previous slide in terms of the FDIC fees, something in

11   excess of 20 billion.

12   Q.  Now, Dr. Thakor did not actually apply the agreement or

13   use the agreement at the date of origination, which was

14   September 16, 2008, for AIG.  He used a different agreement

15   that was executed in November.

16   Do you know why that is?

17   A.  So the agreement with AIG was redone in November, when

18   AIG received a preferred equity investment from the U.S.

19   Treasury.

20   So, you know, the equity came in below the secured

21   loan.  It made the secured loan safer.  And so when the

22   secured loan became safer, kind of the terms of the loan

23   were changed.

24   And he uses those revised terms in his analysis.

25   But I don't think that's relevant because -- or that's

1   correct because that's -- the situation has changed by then.

2   Q.  But the November agreement was for equity investment by

3   Treasury.  Correct?

4   A.  No.  The November -- he uses the revised version of the

5   agreement for the secured loans.

6   Q.  I see.  So it's still not an equity investment; it's

7   just assuming there's an equity investment below it?

8   A.  Yes.

9   Q.  You also mentioned Dr. Thakor did not take into account

10  the statements by Treasury and the GSEs about their

11  expectation or assessment of the PCF if it were to be

12  imposed.

13          We looked at this earlier.  Was there a particular

14  sentence that we had focused on?  I think it was the last

15  one.  "Treasury will" --

16  A.  The -- sorry.

17  Q.  Go ahead.

18  A.  So, you know, the thing with the FDIC fee or the AIG

19  periodic commitment fee is that banks have to pay the FDIC

20  fee.  It's not like, Oh, this period I can't afford it, you

21  know.  Can you waive it?

22          Treasury was providing, you know, waivers for two

23  and a half years.  Treasury had been waiving the PCF because

24  Fannie and Freddie could not afford to pay it without, you

25  know, circular draws.

Attari - DIRECT - By Ms. Varma

```
 1              That itself created even more value and would --
 2     taking that into account, you know -- again, remember, this
 3     is supposed to be based on a market value.  So a market
 4     value -- getting someone to give you a commitment where you
 5     only pay when you're able is going to even raise -- further
 6     raise the costs of that fee.
 7     Q.  Is there a reason that you believe Treasury would not
 8     have continued to waive the PCF?
 9     A.  Treasury had said that they would start to collect the
10     PCF when the companies were able to pay it without circular
11     draws.  So that -- I'm just taking them at their word.
12     Q.  When you say "collect," you mean negotiate the amount
13     for the PCF?
14     A.  Right.  So stop waiving it.
15     Q.  Okay.  So they would negotiate with FHFA on behalf of
16     Fannie and Freddie and consult with the Federal Reserve?
17     A.  Yes.
18     Q.  You mentioned Dr. Thakor's comparables.  Can you tell me
19     what you understand about the comparables he used that he
20     said yielded zero PCF, but he was going to ignore that
21     because he was going to assume there would be a positive
22     PCF?
23     A.  Right.
24              So he used, you know -- as I've noted repeatedly,
25     the Treasury commitment is a commitment for an equity
```

1    investment.  So it's equity.  It's when these companies have

2    no equity capital that Treasury will step in and put more

3    equity in to bring them back to zero.

4            Loan commitments are for loans.  And you only get

5    a loan commitment if you actually have equity and, you know,

6    the lender thinks you are going to be able to pay.  So

7    they're really not relevant for the purpose that Dr. Thakor

8    is trying to use them for.

9            The other thing he uses is the banks that received

10   money in the capital purchase program during the crisis.

11   There, that was an equity investment.  But it was an equity

12   investment in companies that already had a lot of equity and

13   needed a top-off.  So, you know, not a situation where the

14   equity was negative and it had to be brought back to zero.

15   There was equity.  You needed a top-off, you know, to make

16   people have more confidence and so on.  And so that's one

17   reason why it's not relevant.

18           The other is there was no commitment component to

19   it.  That was an actual investment, while here we have a

20   commitment.  And so I'm not even sure how it informs on the

21   commitment fees.

22   Q.  And you say the banks received.  Who did they receive

23   the money from?

24   A.  Treasury.

25   Q.  So these were also Treasury investments during the

Attari - DIRECT - By Ms. Varma

1    financial crisis?

2    A.  Yes.

3    Q.  So we come back to your conclusion.  Where do you come

4    out?

5    A.  So as I noted earlier, it's my opinion that it was

6    reasonable for FHFA to agree to the third amendment, because

7    the third amendment furthered the conservator's goal to

8    promote the stability of the secondary mortgage market in

9    all economic conditions.  So really the "all economic

10   conditions" is what is important, and it did so by

11   eliminating potential draws, the circular draws, on the

12   commitment to pay a dividend.

13              MS. VARMA:  Thank you.

14              THE WITNESS:  Thank you.

15              THE COURT:  We'll take ten minutes before we do

16   the cross.

17              (Whereupon, the jury exited the courtroom at 2:57

18   p.m. and the following proceedings were had:)

19              THE COURTROOM DEPUTY:  Jury panel.

20              (Whereupon, the jury entered the courtroom at 3:13

21   p.m. and the following proceedings were had:)

22              THE COURT:  You may be seated.

23              You may proceed with your cross-examination.

24              MR. KRAVETZ:  Thank you, your Honor.  Robert

25   Kravetz on behalf of Plaintiffs.

```
 1                      CROSS-EXAMINATION

 2   BY MR. KRAVETZ:

 3   Q.  Good afternoon, Dr. Attari.

 4   A.  Good afternoon.

 5   Q.  Dr. Attari, you're testifying on behalf of the

 6   Defendants.  Correct?

 7   A.  Yes.

 8   Q.  And that's FHFA, Fannie Mae and Freddie Mac?

 9   A.  Yes.

10   Q.  All right.  And your ultimate opinion is that it was

11   reasonable for FHFA to agree to the third amendment.

12   Correct?

13   A.  Yes.

14   Q.  When you gave that opinion, you're measuring

15   reasonableness solely from FHFA's standpoint.  Correct?

16   A.  No.  It's the same from Fannie Mae and Freddie Mac's

17   perspective, too.

18   Q.  Oh, you're measuring reasonableness from FHFA, Fannie

19   Mae and Freddie Mac's perspective?

20   A.  I'm measuring it from FHFA's perspective, but it's the

21   same from Fannie Mae and Freddie Mac's perspective, too.

22   Q.  Okay.  Understood.

23          And you did not consider reasonableness from the

24   standpoint of the shareholders of the class.  Correct?

25   A.  No, I did not.
```

1   Q.  In fact, you did not provide an opinion as to what

2   private shareholders could have reasonably expected.

3   Correct?

4   A.  I did not.

5   Q.  Now, let's start by talking about credit ratings

6   agencies.

7           You testified that there are three major credit

8   ratings agencies in the United States.  Correct?

9   A.  Yes.

10  Q.  You showed a report from Moody's, which is one of the

11  three.  Is that right?

12  A.  Yes.

13  Q.  And that report was dated October 2011?

14  A.  There was one, I believe, October 2011 and one was

15  August of 2012.

16  Q.  But from the ratings agency of Moody's -- we'll look at

17  each of them.  But just from the ratings agency side of

18  Moody's, the report that you showed was from October 2011.

19  Correct?

20  A.  There was a Moody's report from October 2011, but

21  there's also a Moody's report from August of 2012.

22  Q.  And you understand that Moody's has both a ratings

23  agency component and an investor services component?

24  A.  Yes.

25  Q.  All right.  And so when I'm describing the October 2011

 1    report, that's from the ratings agency side of Moody's.

 2    Correct?

 3    A.  Yes.

 4    Q.  Okay.  Now, you described how credit ratings agencies

 5    apply ratings to bonds that are issued by the government and

 6    corporations.  Is that correct?

 7    A.  Yes.

 8    Q.  And you described how normally having a higher rating

 9    signifies less credit risk?

10    A.  Yes.  Less risk that the borrower will not pay.

11    Q.  Now, generally, at the time of the third amendment, the

12    credit ratings of Fannie and Freddie bonds were the same as

13    U.S. Treasury bonds.  Correct?

14    A.  Yes.  And that was because of the commitment.

15    Q.  Well, but in terms of yes or no, just a yes-or-no

16    question.

17    A.  Yes.

18    Q.  Okay.  Thank you.

19            And you describe U.S. Treasury bonds as the safest

20    type of bond in the United States?

21    A.  Yes.

22    Q.  Now, just true or false, sir:  As Fannie and Freddie

23    were getting closer to the time period when the Treasury

24    caps were going to be imposed, their ratings did not change?

25    A.  True.

1    Q.  Now, there was also a concept known as a ratings outlook

2    or watch list.  Is that correct?

3    A.  Yes.

4    Q.  And this is when a ratings agency is reviewing a bond

5    for potentially upgrading or downgrading it.  Is that right?

6    A.  Yes.

7    Q.  All right.  And so that puts the company and bond

8    investors on notice of a potential ratings change?

9    A.  Yes.

10   Q.  And just that action alone can impact the price of a

11   bond; is that right?

12   A.  Yes.

13   Q.  All right.  And neither Fannie Mae nor Freddie Mac bonds

14   had actually been placed on a watch list or a ratings

15   outlook in 2012 before the third amendment.  Correct?

16   A.  Yes.

17   Q.  So none of what you displayed from the Moody's October

18   2011 document of the concern of a downgrade or multiple

19   downgrades actually happened?

20   A.  Yes.

21   Q.  Now, I'd like to show you a document in evidence.  It's

22   Plaintiffs' Exhibit 257.

23   A.  Should I look in the binder?

24   Q.  You can look on the screen.

25   A.  Okay.

```
 1              MR. KRAVETZ:  I'm sorry.  It's Plaintiffs' Exhibit

 2    257.  Thank you.

 3    BY MR. KRAVETZ:

 4    Q.  Dr. Attari, you've seen this document before; is that

 5    right, sir?

 6    A.  Yes.

 7    Q.  And this is from Fitch -- from the ratings side of

 8    Fitch; is that correct?

 9    A.  Yes.

10    Q.  And the date of this document is Monday, August 13,

11    2012.  Correct?

12    A.  Yes.

13    Q.  And the title is Improved GSE Results May Ease Push For

14    Immediate Reform.  Is that right?

15    A.  Yes.

16    Q.  And in this document, Fitch notes that, quote, "Improved

17    second quarter financial results" -- we can go back to the

18    top page, please, first paragraph -- Fitch notes that,

19    quote, "Improved second quarter financial results at Fannie

20    Mae and Freddie Mac, the government-sponsored enterprises

21    that finance much of the U.S. housing market, to ease

22    pressure on Congress and the next administration to pursue

23    far-reaching GSE reform."

24              Is that correct?

25    A.  Yes.
```

Attari - CROSS - By Mr. Kravetz

1    Q.  All right.  And in the second paragraph, if we start

2    with the second sentence, it indicates that, quote, "The

3    improvement in operating results was driven mainly by

4    reduced loan loss provisions on the back of a

5    better-than-expected increase in U.S. home prices in the

6    quarter."

7         Did I read that correctly?

8    A.  Yes.

9    Q.  All right.  And you have no reason to dispute that that

10   was the actual data as of August 2012.  Correct?

11   A.  Yes.  I don't believe that -- I don't know if that is a

12   Fitch opinion or they are just reporting what Fannie and

13   Freddie said.  But that is -- you read it right.

14   Q.  Okay.

15        MR. KRAVETZ:  Ms. McGuire, if we can go back out

16   to the second page.  I'm sorry, Ms. McGuire.  There is one

17   more item I wanted to ask Dr. Attari part about.  If we can

18   go to the prior page, beginning with the paragraph "As the

19   size of," please.

20   BY MR. KRAVETZ:

21   Q.  Dr. Attari, do you see that Fitch writes, "As the size

22   of the legacy mortgage portfolio at both agencies declined,

23   improving credit quality trends for loans originated since

24   2009 (now about 58 percent of all mortgage loans guaranteed

25   by the GSEs) could help limit future credit losses and

 1    stabilize earning trends at Fannie and Freddie."

 2              Did I read that correctly?

 3    A.  Yes.  You read that right.

 4    Q.  And that number there, you described earlier in your

 5    testimony how Fannie and Freddie would release a number of

 6    different types of results to the public on a rather regular

 7    basis.  Correct?

 8    A.  Yes.

 9    Q.  And you understand that that number there, that 58

10    percent number, actually comes from some of that

11    information, a second quarter credit supplement that Fannie

12    Mae put out just after their second quarter earnings?

13    A.  Yes.

14    Q.  Okay.

15    A.  I don't know if it came from that particular document,

16    but it's likely from Fannie Mae and Freddie Mac.

17    Q.  And you've seen that type of document before?

18    A.  Yes.

19    Q.  Generally that number, the 58 percent of loans that were

20    guaranteed after the financial crisis, that's consistent

21    with your understanding of what the loan portfolio was at

22    the time?

23    A.  Sitting here, I don't have a -- recall that number.  But

24    yes.

25    Q.  You don't know?

1    A.  Sitting here, I don't recall it.

2    Q.  Okay.

3           MR. KRAVETZ:  We can take that down.  Thank you,

4    Ms. McGuire.

5    BY MR. KRAVETZ:

6    Q.  Dr. Attari, you testified today about a bond event study

7    that you conducted in this case; is that right?

8    A.  Yes.

9    Q.  And you said that you were an expert in conducting event

10   studies?

11   A.  Yes.

12   Q.  And your bond event -- we're talking about a bond event

13   study that's different than an equity event study.  Correct?

14   A.  Well, the basic principles are the same.  But yes.

15   Q.  But on direct, you testified about a bond event study.

16   Right?

17   A.  Yes.

18   Q.  Okay.  Now, your bond event study looked at seven

19   longer-term bonds that were issued by Fannie Mae and Freddie

20   Mac.  Correct?

21   A.  Yes.

22   Q.  And there were four bonds that were issued by Fannie

23   Mae?

24   A.  Yes.  They were all of the Fannie Mae bonds that were

25   out there, but more than ten years to maturity.

1    Q.  And you examined three longer-term bonds that were

2    issued by Freddie Mac.  Correct?

3    A.  Yes.  Again, they were all of the Freddie Mac bonds that

4    had more than ten years' maturity.

5    Q.  Now, you understand that in general, Fannie and Freddie

6    have more than seven different bonds that are -- that would

7    have been outstanding as of August 2012.  Correct?

8    A.  Yes.  But I don't believe there were any of those that

9    had more than ten years' maturity.

10   Q.  But in terms of just the general volume, would you agree

11   with me that Fannie and Freddie had about a thousand bonds

12   or so that were trading in or around August 2012?

13   A.  They had lots of bonds.

14   Q.  Okay.  Now, in building your event study, did you choose

15   these long-term bonds because they were ones that traded

16   relatively frequently?

17   A.  The reference notes and benchmark bonds, as I noted,

18   were issued in large sizes and traded relatively frequently.

19   Yes.

20   Q.  Okay.  And you have the ability to access databases that

21   can determine the volume of trades for a particular bond on

22   a particular day.  Is that right?

23   A.  Yes.

24   Q.  And sometimes it's referred to as trace data.  Is that

25   correct?

1    A.  Yes.

2    Q.  Is that put out by the Bloomberg company?

3    A.  I don't know who puts it out.  It's collected by some

4    market organization.

5            MR. KRAVETZ:  And I'd ask if Ms. McGuire can

6    display to Dr. Attari what's been marked as Plaintiffs'

7    Exhibit 633.

8    BY MR. KRAVETZ:

9    Q.  Dr. Attari, this is a summary -- a chart that shows the

10   trading volume in the seven bonds that you studied on August

11   17th, 2012.  And I just want you to take a look for a moment

12   and confirm whether or not this is accurate information.

13   A.  You're asking me if the trade count's accurate?

14   Q.  Yes.

15   A.  I don't know how I can do that.  I mean, this is

16   something you are producing.  Right?

17   Q.  Well, do you know off the top of your head what the

18   actual trade count or trading volume was for the seven bonds

19   that you studied as part of your bond event study?

20   A.  No, I don't.

21   Q.  Let's --

22           MR. KRAVETZ:  Actually, just for a moment,

23   Ms. McGuire, if we can pull up Slide 47, please.

24   BY MR. KRAVETZ:

25   Q.  And, Dr. Attari, this slide -- it's marked 47, I

1   believe, and in a different version of the slide today it

2   was 46, for purposes of the record.  This slide is listing

3   the four bonds that you studied from Fannie Mae as part of

4   your long-term bond event study.  Correct?

5   A.  Yes.

6   Q.  All right.  One of the long-term bonds, the third one,

7   is -- ends with MFJ7.  Do you see that, sir?

8   A.  Yes.

9   Q.  Sir, do you know that there was zero trades for that

10  bond ending in MFJ7 on August 17, 2012, the date of the net

11  worth sweep?

12  A.  Well, that's, I think, what you showed me earlier.  And

13  that's not very surprising.  Bonds don't trade as often as

14  stocks, yet there are lots of academic event studies done on

15  bonds because there is pricing information available on

16  these bonds.

17  Q.  So you just testified a couple minutes ago that you

18  chose particular bonds that, quote, "traded relatively

19  frequently," end quote.

20           Do you recall that testimony?

21  A.  Yes.

22  Q.  But you're not denying that one of the bonds that you

23  actually include on this slide didn't have a single trade on

24  August 17, 2012.  Is that right?

25  A.  Yes.

1    Q.   Okay.  Did you tell the jury during your direct

2    testimony that there was zero trades for one of the bonds on

3    your chart on August 17?

4    A.   No, I did not.

5    Q.   Now, the data that you pulled to perform your analysis,

6    in pulling that analysis, were you the person who actually

7    pulled the trade information that you reviewed?

8    A.   No.  Someone on my team did.

9    Q.   Someone on your team?

10   A.   Uh-huh.

11   Q.   And in pulling that analysis, did you do anything or

12   ensure that your team did anything so that the analysis

13   would not include prices from the end of the day in which

14   there were no trades for a particular bond?

15   A.   So the standard approach in academic research, which is

16   what these event studies used in litigation are based on, is

17   to use prices even if there are no trades, because these

18   prices come from services that gather information from the

19   dealers.

20           Remember we talked about dealers?  Lots of dealers

21   are reporting prices.  And these pricing services put those

22   prices together, and there are prices that are used for a

23   variety of purposes, including, for example, for, you know,

24   net asset values or mutual funds and so on.  So this is a

25   standard data source.

1    Q.  So the answer, then, sir, is that you did not do

2    anything to ensure that your analysis would not include

3    prices from the end of the day for the bond ending in MFJ7

4    for which there were no trades?

5    A.  Correct.

6    Q.  Okay.  Thank you.

7         Do you know the next day after August 17th in

8    which the bond ending in MFJ7 was actually traded in the

9    market?

10   A.  Sitting here, I don't.

11   Q.  If I told you that it was August 21st, would you have

12   any reason to dispute that?

13   A.  No.

14   Q.  All right.  So we should probably take the gray line

15   representing MFJ7 out of your chart, then.  Correct?

16   A.  No.

17   Q.  So we're not down to six bonds?

18   A.  No, because, like I told you, this is a standard

19   approach that's used in academic studies.  And it's data

20   that's used in, you know -- regularly used in academic

21   studies.

22         MR. KRAVETZ:  Ms. McGuire, if we can -- if we can

23   pull back up Plaintiffs' Exhibit 633 once again.

24   BY MR. KRAVETZ:

25   Q.  Let's choose one of the bonds from Freddie Mac, sir.

Attari - CROSS - By Mr. Kravetz

1    It's the bond ending in 3U46.

2            Do you have any reason to dispute that there were

3    only three trades of that bond on August 17th, 2012,

4    totaling $27,000?

5    A.  No.

6            MR. KRAVETZ:  Thank you, Ms. McGuire.

7    BY MR. KRAVETZ:

8    Q.  Now, Dr. Attari --

9            MR. KRAVETZ:  If we can put that up one last time,

10   Ms. McGuire.

11   BY MR. KRAVETZ:

12   Q.  Sir, do you have any reason to dispute that the total

13   volume of the bonds that you selected to study on August

14   17th, 2012, the total volume of trades, was approximately

15   $43.1 million?

16   A.  No.

17   Q.  And now in your expert report, you stated that Fannie

18   Mae and Freddie Mac had an average daily trading volume of

19   approximately $6.4 billion.  Is that correct?

20   A.  Yes.

21   Q.  So if one was to do the math, then the bonds that you

22   selected in your long-term bond event study represent only

23   .67 percent of what the average daily volume for Fannie and

24   Freddie bonds were.  Is that right?

25   A.  Yes.  But again, these were --

1          MS. VARMA:  Objection.

2          MR. KRAVETZ:  I was just asking a math question

3     based on the report, your Honor.  I think the witness

4     answered.

5          THE COURT:  He didn't hear it.

6          THE WITNESS:  Sorry?

7          THE COURT:  He didn't hear your answer.

8          MS. VARMA:  No.  I --

9          MR. KRAVETZ:  I think there was an objection, your

10    Honor.

11         MS. VARMA:  Objection to the line of questioning.

12         THE COURT:  I don't know what the objection is.

13         (Whereupon, the following proceedings were had at

14    sidebar outside the presence of the jury:)

15         MS. VARMA:  Your Honor, this line of questioning

16    is actually coming from Dr. Mason's rebuttal report.  The

17    data has not been given to Professor Attari, and I'm not

18    sure what the point of it is to cross-examine him on data he

19    hasn't seen.

20         MR. KRAVETZ:  Your Honor, I asked him if the data

21    appeared to be valid.  He said so.  I'm certain he would

22    have reviewed Dr. Mason's report.  And the whole purpose of

23    the line of questioning is to establish that Dr. Attari only

24    studied .67 percent of the volume of outstanding bonds on

25    August 17th, 2012.

1      This is my last question on this particular topic.

2      But it's certainly relevant to the jury when we're

3  going to call into question the accuracy and reliability of

4  this type of study based only on seven bonds, one of which

5  did not even trade on the date of the third amendment, that

6  we can probe this.  I've basically reached the end of this

7  particular segment.

8      And the witness gave an answer, "yes," when I

9  asked him what the percentage was at .67 percent.

10      MS. VARMA:  Dr. -- this was in Dr. Mason's

11  supplemental report that the Court has already kicked out.

12      THE COURT:  The objection is overruled.

13      And you can ask him -- that's what recross is for.

14      (Whereupon, the following proceedings were had in

15  open court:)

16  BY MR. KRAVETZ:

17  Q.  So, Dr. Attari, we just looked at the value of the

18  specific trades and the bonds that occurred on August 17th.

19      Am I correct that in Fannie and Freddie's SEC

20  filings they list the total dollar value of bonds that are

21  outstanding, not just the value of specific trades that

22  happen on any particular day?

23  A.  Yes.

24  Q.  Okay.  And the last reporting period prior to the third

25  amendment was the second quarter of 2012.  Correct?

Attari - CROSS - By Mr. Kravetz

```
 1    A.  Yes.
 2    Q.  And SEC filings for Fannie and Freddie would report the
 3    total value of Fannie and Freddie bonds that were
 4    outstanding as of June 30, 2012.  Correct?
 5    A.  Yes.
 6    Q.  All right.  And you may have testified about this
 7    before.  I think you approximated that there were about
 8    $1.2 trillion of bonds for Fannie and Freddie that were
 9    outstanding as of the time of the third amendment.  Is that
10    right?
11    A.  Yes.
12    Q.  And does it sound right that the number for Fannie Mae
13    would be slightly higher than for Freddie Mac?
14    A.  Yes.
15    Q.  So for Fannie, approximately $659 billion worth of
16    bonds?
17    A.  Yes.
18    Q.  And Freddie, approximately $581 billion worth of bonds;
19    is that right?
20    A.  Again, I mean, I don't have a perfect recall.  But yes,
21    they add up to roughly 1.2 trillion.
22    Q.  The bonds that you analyzed -- do you recall in your
23    report you listed the total amount of the bonds that you
24    analyzed in this matter?  Correct?
25    A.  I listed that, yes.  But I don't recall the numbers.
```

1    Q.  Okay.

2          MR. KRAVETZ:  Ms. McGuire, if I can ask you just

3    to show the witness what's been marked as Defense Exhibit

4    892.

5    BY MR. KRAVETZ:

6    Q.  Dr. Attari, do you see the document that's on the screen

7    in front of you?

8    A.  Yes.

9    Q.  And do you recall that this is Exhibit 1 to your expert

10   report in this matter?

11   A.  Yes.

12   Q.  And if we look starting on Row 7 of the Excel, there are

13   four bonds that are listed for Fannie Mae.  Correct?

14   A.  Yes.

15   Q.  And starting on Row 13, there are three bonds that are

16   listed for Freddie Mac; is that right?

17   A.  Yes.

18   Q.  So let's make sure that we get the math correct here.

19          MR. KRAVETZ:  If I could ask Ms. McGuire to put

20   the cursor over Columns G7 to G10.

21   BY MR. KRAVETZ:

22   Q.  Sir, if you look at the very bottom there at the sum, do

23   you see that that is $13.24 billion?

24   A.  Yes.

25   Q.  Okay.  And then if we look at starting on Column G13 to

1    G15, if you look at the sum below, that's $7.7 billion.

2    Correct?

3    A.  Yes.

4    Q.  All right.  Now, for Fannie Mae, then, if you take

5    13.2 billion divided by 659 billion, it's approximately 2

6    percent.  Correct?

7    A.  Yes.

8    Q.  And if you take 7.7 billion of Freddie Mac bonds that

9    you analyzed divided by 581 billion, that's approximately

10   1.3 percent.  Correct?

11   A.  Yes.

12   Q.  Okay.

13   A.  Maybe 1.4.  But yes.

14        MR. KRAVETZ:  Your Honor, at this time, we would

15   request permission to display a demonstrative showing those

16   numbers to the jury.

17        THE COURT:  All right.

18        MR. KRAVETZ:  We can show the chart, please,

19   Ms. McGuire, the pie chart.

20   BY MR. KRAVETZ:

21   Q.  So, Dr. Attari, this is just a graphical depiction of

22   the numbers.  You see on the left-hand side Fannie Mae

23   listing at 2 percent with the 13.24 billion of the bonds you

24   analyzed and the 659.4 billion of the total outstanding

25   bonds.  Correct?

1     A.  Yes.

2     Q.  Then on the right for Freddie Mac, 1.3 percent.  And the

3     total bonds that you analyzed, 7.7 billion, out of total

4     outstanding bonds of 581.7 billion.  Correct?

5     A.  Yes.

6     Q.  All right, sir.  And, sir, you did not analyze or

7     perform any type of bond event study on the other 98 percent

8     of Fannie Mae's bonds.  Is that right?

9     A.  Yes, because, as I explained, they were all short-term

10    and would be less exposed to the risk of the commitment

11    running out.

12    Q.  And just in terms of the math, you didn't analyze or do

13    an event study for the other 98.7 percent of Freddie Mac

14    bonds.  Correct?

15    A.  Well, I did the event study for 100 percent of Freddie

16    Mac's bonds that had more than ten years' maturity.

17    Q.  But in terms of the total outstanding bonds, the number

18    is 1.3 percent.  Correct?

19    A.  Yes.

20    Q.  Okay.  Thank you.

21    A.  In terms of the relevant ten-year or plus bonds, it's

22    100 percent.

23            MR. KRAVETZ:  I want to move next to Slide 56,

24    please, of Dr. Attari's presentation.

25

Attari - CROSS - By Mr. Kravetz

 1    BY MR. KRAVETZ:

 2    Q.  And, sir, this is the slide that you showed to the jury

 3    regarding the goals of the conservatorship; is that correct?

 4    A.  Yes.

 5    Q.  And I think you referenced that one of the goals that is

 6    listed in the answer to the first question is to preserve

 7    and conserve the company's assets and property and to put

 8    the company in a sound and solvent condition.  Is that

 9    correct?

10    A.  Yes.

11    Q.  And you would agree that as a general matter, the term

12    "solvent" means having positive net worth.  Correct?

13    A.  Yes.

14    Q.  And you also, I think, earlier showed a slide that had a

15    statement from former Secretary of the Treasury Paulson.  Is

16    that right?

17    A.  Yes.

18    Q.  And you know that Secretary Paulson said at the time

19    that the conservatorship was announced that it was intended

20    to be a temporary time-out.  Correct?

21    A.  I don't recall that statement on the slide I showed.

22    Q.  But do you recall that he actually made that statement?

23    A.  Not sitting here.

24    Q.  Okay.  And, sir, do you dispute that there are documents

25    showing that both Mr. Lockhart and Mr. DeMarco stated that

1   the conservatorship was intended to have a limited duration?

2   A.  I mean, there were thousands of documents.  If you want

3   to show me something, I'm happy to agree or disagree.

4   But --

5   Q.  Okay.  Sure.

6          MR. KRAVETZ:  If we can ask Ms. McGuire to please

7   pull up Plaintiffs' Exhibit 2-E.  Just to orient Dr. Attari,

8   if we can enlarge the top portion of the email.

9   BY MR. KRAVETZ:

10  Q.  Sir, do you see this is an email from Mr. DeMarco on

11  October 2008?

12  A.  Yes.  This was before they had made any draws on the

13  commitment.

14  Q.  Well, that's not what I asked you.  I just asked you

15  whether this is an email dated October 30, 2008.

16  A.  Yes.  I was just trying to orient myself.  Sorry.

17  Q.  And it references in the text, "Here you go:  my slides

18  and notes from my talk to ABS East."

19          Did I read that correctly?

20  A.  Yes.

21          MR. KRAVETZ:  If we can go, Ms. McGuire, to Page

22  18 of the document.

23  BY MR. KRAVETZ:

24  Q.  Sir, do you see the first sentence states,

25  "Conservatorship is defined as a statutory process to

1    stabilize a troubled institution which is intended to have a

2    limited duration and has as its objective to return the

3    entity to normal business operations once stabilized"?

4              Did I read that correctly?

5    A.   Yes.

6    Q.   So in this particular presentation from Mr. DeMarco,

7    Mr. DeMarco presented a slide that referred to the

8    conservatorship as intended to have a limited duration.

9    Correct?

10   A.   Yes.  In October of 2008, before the companies had made

11   any draws on the commitment.

12   Q.   Right.

13              And just reading from the paper, Mr. DeMarco also

14   in the slide indicated that the objective of the

15   conservatorship was to, quote, "return the entity to normal

16   business operations once stabilized."  Correct?

17   A.   Yes.

18   Q.   And just to be clear, you didn't mention this particular

19   present ation in your testimony on direct.  Is that right?

20   A.   Yes.  But again, this was from 2008; and things had

21   evolved by the time we got to 2012.

22   Q.   So statements in 2008 you believe are completely

23   irrelevant?

24   A.   Not completely irrelevant; but I mean, you know, in

25   2008, the entities had not drawn any money on the

1    commitment.  By 2012, they had drawn 189 billion on the

2    commitment and the commitment had had to be increased to an

3    unlimited amount by then.  So I mean, we are talking about

4    very different situations.

5              MR. KRAVETZ:  Ms. McGuire, if we can please put

6    back up the prior slide from Dr. Attari's presentation.

7    BY MR. KRAVETZ:

8    Q.  You would agree with me, though, that the statement that

9    you highlighted here, that was a statement that was made in

10   2008 as well.  Correct?

11   A.  Yes.  And that also evolved, as we saw.  And I put up

12   statements from 2010 and from 2012.

13   Q.  Now, you said on direct that Dr. Dharan did not, quote,

14   "take into account the goal" that was listed in the

15   highlighted portion of the Q & A on your slide.  Is that

16   right?

17   A.  Yes.  I believe that he had the first sentence, which is

18   the purpose of appointing the conservator, highlighted, but

19   not the goal of the conservatorship.

20   Q.  And were you here for Dr. Dharan's testimony?

21   A.  No, but I've seen his slides and read the transcript.

22             MR. KRAVETZ:  If I can ask Ms. McGuire just to

23   display to Dr. Attari -- this would be the transcript dated

24   July 31st at Page 83, Line 22.

25

Attari - CROSS - By Mr. Kravetz

 1    BY MR. KRAVETZ:

 2    Q.  Sir, do you see that Dr. Dharan did in fact give

 3    testimony about what could happen that could impact the

 4    mission of Fannie Mae and Freddie Mac?

 5    A.  Sorry.  It just says:  Could that impact the mission of

 6    Fannie Mae and Freddie Mac?

 7              And it says yes.

 8              Now there's a little bit more.  I'm not sure what

 9    the context of this is.  Would what impact the mission of

10    Fannie Mae and Freddie Mac?

11    Q.  Well, you see in the portion that's starting at Line 25,

12    Dr. Dharan is testifying about the harm from a major asset

13    write-down.  Could the lack of having net worth lead to

14    instability in the secondary mortgage market?

15              Do you see that?

16    A.  Yes.  But when is this?  About 2008?  2012?

17    Q.  But I'm just -- you don't recall this particular

18    testimony in terms of your review?

19    A.  I've been reading pages and pages of testimony.  No.  I

20    don't recall this specifically.

21    Q.  That's fair.

22              MR. KRAVETZ:  We can take that down, Ms. McGuire.

23              Ms. McGuire, if we can put back up that same slide

24    from Dr. Attari.

25

```
 1    BY MR. KRAVETZ:

 2    Q.  In the bottom for the goals of the conservatorship, you

 3    cite to a Freddie Mac Form 10-K from 2008; is that correct?

 4    A.  Yes.

 5    Q.  And there's a particular portion of that document that

 6    you have highlighted; is that right?

 7    A.  Yes.

 8    Q.  All right.  I'd like to show you the document itself in

 9    the context in which that statement was made.

10    A.  Sure.

11          MR. KRAVETZ:  Ms. McGuire, could we -- I believe

12    this document is in evidence.  Can we display Defense

13    Exhibit 137 at Page 25 of 350.

14    BY MR. KRAVETZ:

15    Q.  And, Dr. Attari, on your slide, if you look, just to

16    have an understanding of this table, it starts by saying

17    "Topic:  Managing For the Benefit of the Stockholders."

18    Correct?

19    A.  Yes.

20    Q.  And then before conservatorship, there is a reference as

21    to how Fannie Mae was designed to be managed for the

22    shareholders' benefit.  Is that right?

23    A.  Yes.

24    Q.  All right.  And just looking at the language, the

25    language refers specifically to common stockholders; is that
```

Attari - CROSS - By Mr. Kravetz

```
1    correct?

2    A.  Yes.

3    Q.  There's not a reference in this text here to preferred

4    stockholders; is that right?

5    A.  Yes.

6    Q.  Then on the right-hand side, during conservatorship, you

7    highlighted the first bullet point, which states "No longer

8    managed with a strategy to maximize common stockholder

9    returns."  Is that right?

10   A.  Yes.

11   Q.  But the second bullet point -- I'll read it, and let me

12   know if I read it correctly -- quote:  "Maintain positive

13   net worth and fulfill our mission of providing liquidity,

14   stability and affordability to the mortgage market."

15            Did I read that correctly, sir?

16   A.  Yes.

17   Q.  Okay.

18            MR. KRAVETZ:  We can take that down, Ms. McGuire.

19   Thank you.

20   BY MR. KRAVETZ:

21   Q.  Now, you included a number of slides relating to SEC

22   reports and language from SEC reports in your presentation.

23   Correct?

24   A.  Yes.

25   Q.  And other than the one we just saw, all of the SEC
```

Attari - CROSS - By Mr. Kravetz

```
 1    filings that you included in your slide deck were from

 2    reports in 2011 or 2012.  Am I right?

 3    A.  I think the reports themselves were in 2012.  They

 4    were -- some of them were for 2011 and some of them were for

 5    the second quarter of 2012.

 6    Q.  Okay.  So all but one of the SEC reports that you've

 7    cited, then, postdate December 24, 2009.  Is that right?

 8    A.  Yes.

 9    Q.  Okay.  And do you realize, sir, that the reports from

10    2012 are not relevant to the expectations of common and

11    preferred shareholders of the class?

12              MS. VARMA:  Objection.

13              THE COURT:  Sustained.

14    BY MR. KRAVETZ:

15    Q.  Let me ask, sir:  Did you highlight the statements in

16    the SEC reports from 2012 because you think that that's

17    something that FHFA and Mr. DeMarco would have relied on?

18    A.  It was for a very specific purpose.  I was highlighting

19    statements about the past, so what they were saying about

20    the past profits and what they were saying about the

21    expected future profits.

22              And kind of looking at expectations of future

23    profits in 2009 wouldn't have made any sense because the --

24    I was trying to analyze the third amendment, which happened

25    in August of 2012.
```

1          So what I needed for that purpose, the purpose

2     that I used the SEC filings, is expectations of the

3     companies in August of 2012 and expectations of other

4     parties in August of 2012.

5     Q.  So it relates to expectations of FHFA, Fannie Mae and

6     Freddie Mac?

7     A.  Yes.

8     Q.  Okay.  Now, you used on your slide -- specifically, you

9     referred to the SEC reports as external statements.  Is that

10    right?

11    A.  I said that the projections and slides internally

12    matched up with the statements the companies were making to

13    investors in their SEC filings.

14    Q.  But just as a general matter, you're aware that there's

15    been testimony that FHFA had personnel present at every

16    executive and board meeting of Fannie Mae and Freddie Mac.

17    Correct?

18    A.  Yes.

19    Q.  And that FHFA personnel received and reviewed multiple

20    drafts of SEC filings prior to their being filed publicly?

21    A.  I don't specifically recall that.  But again, if you'll

22    tell me that is so or show me, I'm happy to agree.

23    Q.  And you know that FHFA was not finding out about

24    statements in Fannie and Freddie's SEC filings for the first

25    time when they were being released publicly.  Right?

1    A.   Right.   So the reason I was looking at those specific

2    SEC filings, the ones in August 2012, was to see what the

3    companies were saying about the future.   And it's my

4    understanding that there's been some testimony that some of

5    those statements are not -- you know, can't quite be taken

6    at their word because there are certain sections of SEC

7    filings where, you know, stuff is put to reduce liability

8    and so on.

9         And that's why I was looking at what were they

10   saying internally.   And it turned out that the internal view

11   was that profits would not be enough to meet dividends.   And

12   that was consistent with the external statements.   And those

13   external statements were picked up by market analysts, who

14   kind of then did analysis based on that about when the

15   commitment might run out and so on.

16   Q.   You mentioned market analysts.   Let's go there next.

17   A.   Sure.

18   Q.   Now, Dr. Attari, you showed on your slides some analyst

19   reports during your presentation; is that correct?

20   A.   Yes.

21   Q.   And you testified that you and your team pulled down

22   analyst reports from a subscription service.   Is that right?

23   A.   Yes.

24   Q.   I believe you said that there were more than 200 analyst

25   reports that would have been written on Fannie and Freddie

1     during calendar year 2012.  Do I have that right?

2     A.  No.  I said it was over 2008 to 2013.

3     Q.  Okay.

4     A.  And they were reports that mentioned Fannie and Freddie,

5     not necessarily were written on Fannie and Freddie.

6     Q.  And you selected four of those reports to show the jury.

7     Is that right?

8     A.  In --

9              MS. VARMA:  Objection.

10             THE COURT:  Sustained.

11    BY MR. KRAVETZ:

12    Q.  Well, in your slide presentation, in terms of the slides

13    that you showed to the jury, that depicted four different --

14             MS. VARMA:  Objection.

15             THE COURT:  Sustained.

16    BY MR. KRAVETZ:

17    Q.  Now, the analyst reports that you did show to the jury,

18    I just want to get a sense of the timing.  All but one of

19    those reports predated March 2012.  Correct?

20             MS. VARMA:  Objection.

21             THE COURT:  Overruled.

22             THE WITNESS:  No.  There were two -- there was one

23    in March 2012 and one in August 2012.

24    BY MR. KRAVETZ:

25    Q.  So there were -- I'll use the date April.  So there was

Attari - CROSS - By Mr. Kravetz

1  only one of the reports that you put in your slides to the

2  jury that postdated April 2012.  Correct?

3  A.  Right.  And that one was after Fannie and Freddie had

4  released their second quarter earnings in August of 2012.

5  So that had all of the information that was available at

6  that time.

7  Q.  One report?

8          MS. VARMA:  Objection.

9          THE COURT:  Overruled.

10          THE WITNESS:  One of the ones I showed.

11  BY MR. KRAVETZ:

12  Q.  So for the report that was issued in March of 2012 that

13  was on the slide that you showed to the jury, that would

14  have been prior to when Fannie and Freddie's first quarter

15  earnings for 2012 would have been released.  Correct?

16  A.  Yes.

17  Q.  Okay.  And it would have been prior to when Fannie and

18  Freddie's second quarter 2012 earnings would have been

19  released.  Is that right?

20  A.  Yes.

21  Q.  Okay.

22  A.  So -- yes.

23  Q.  And are you aware in general, sir, that analyst reports

24  often come with disclaimer language associated with them?

25  A.  Yes.  Pages and pages of it.

 1    Q.  And, for example, for DX-412, the document that's in

 2    evidence that you testified about, there's a specific

 3    disclaimer that investors should be aware that the firm may

 4    have a conflict of interest that could affect the

 5    objectivity of this report.  Investors should consider this

 6    report as only a single factor in making their investment

 7    decisions.

 8              Is that correct?

 9    A.  If you show me the language -- I wouldn't be surprised

10    it's there.  But if you want me to agree to specific

11    language, it might make sense to show me.

12    Q.  Sure.  Absolutely.

13              MR. KRAVETZ:  Ms. McGuire, can we pull up Defense

14    Exhibit 412, please.  And go to Page 2.  And if we can just

15    enlarge the language at the bottom of the screen.

16    BY MR. KRAVETZ:

17    Q.  So, sir, if you could just read along with me.  It

18    states, quote:  "Deutsche Bank does and seeks to do business

19    with companies covered in its research reports.  Thus,

20    investors should be aware that the firm may have a conflict

21    of interest that could affect the objectivity of this

22    report.  Investors should consider this report as only a

23    single factor in making their investment decision."

24              Did I read that correctly?

25    A.  Yes.

1    Q.  Okay.

2              MR. KRAVETZ:  You can take that down.  Thank you,

3    Ms. McGuire.

4    BY MR. KRAVETZ:

5    Q.  Now, sir, the analyst report that you've referred to a

6    couple times was one from Moody's from August 2012; is that

7    right?

8    A.  Yes.

9    Q.  And we know from your earlier testimony that the ratings

10   agency side of Moody's kept the ratings of Fannie and

11   Freddie the same as U.S. Treasury bonds as of August 2012.

12   Correct?

13   A.  Yes.

14   Q.  And we know from your earlier testimony that the ratings

15   agency side of Moody's did not have Fannie and Freddie on a

16   watch list as of August 2012.  Correct?

17   A.  Yes.  But they noted that if the commitment was eroded

18   or did not continue, then the ratings would fall

19   significantly.

20   Q.  And you're citing there a document from October 2011?

21   A.  Yes.

22   Q.  Okay.  Now, sir, analyst reports are often the opinion

23   of a particular analyst or a group of analysts employed by a

24   firm.  Would you agree with that?

25   A.  Yes.

1    Q.  All right.  And you wouldn't expect that analysts would

2    have access to internal Fannie and Freddie communications.

3    Correct?

4    A.  Credit rating agencies typically meet with management,

5    and management presents to them and provides a lot more

6    information than it does to analysts at banks.

7    Q.  Right.

8            And the credit ratings agencies did not downgrade

9    Fannie or Freddie during this time period.  Right?

10   A.  Yes.  But they noted the risk of a significant downgrade

11   if the commitment got eroded or disappears.

12   Q.  Well, you jumped to the credit rating agencies.  I'm

13   talking about market analysts.

14           So focusing specifically on market analysts like

15   Deutsche Bank and the Moody's investor service, you would

16   agree with me that analysts of those type would not have

17   access to internal Fannie and Freddie documentation.

18   Correct?

19   A.  Correct.  But as you noted and I noted earlier, that --

20   these companies are releasing massive amounts of raw data

21   and so on.  And these companies sit at the center of the

22   housing finance market.  So these are much more closely

23   followed than, say, a small company like, you know, maybe

24   CRA, where it's difficult to know what the earnings will be

25   like in the future.

```
 1    Q.  Who is CRA?

 2    A.  CRA is my employer.  It's a small company.  That's why I

 3    used it.

 4    Q.  All right.  But we saw the Fitch document, where the

 5    Fitch document was actually touting positive information

 6    that Fannie and Freddie had released relating to their loan

 7    data in August of 2012.

 8    A.  Well, there was a second page of that Fitch document

 9    that noted the uncertainty about housing prices and how that

10    might affect Fannie and Freddie.  So all of these analysts'

11    reports have positives and negatives because they're trying

12    to provide investors with information on the risks and

13    rewards.

14    Q.  Now, you described some of the more granular monthly

15    information that would be released by Fannie and Freddie.

16    But you would agree that the market analysts would not

17    generally have access to emails and communications from

18    Fannie and Freddie.  Is that correct?

19    A.  Yes.  They would not have internal emails.

20    Q.  So if there is an email referring to a golden age of

21    profitability that was to come from Fannie, that's not

22    something that a market analyst would have access to.

23    Correct?

24    A.  Right.  But my understanding is that that golden age of

25    profitability is the years that we were looking at where
```

1    they were not going to be able to meet the dividend

2    payments.

3    Q.  I'm just asking in general, if there's an email

4    referring to a roaring recovery for Fannie and Freddie,

5    that's not the type of email that a market analyst would

6    have access to?

7    A.  Right.  Again, I mean, the roaring recovery is a period

8    where the dividend is not -- they're not going to be able to

9    meet the dividend.

10   Q.  Market analysts would not have access if there were

11   internal documents that stated that the companies had

12   reached a period of sustainable or sustained profitability?

13   A.  Again, a period where they would not be able to pay the

14   dividends.  Yes.  They would not have access to that.

15   Q.  But in general, just to close the loop, analysts do not

16   have access to nonpublic Fannie and Freddie information.  Is

17   that right?

18   A.  Yes.  They do not have access to emails.

19   Q.  All right, sir.  Now, is one analyst's opinion

20   necessarily reflective of the overall market?

21   A.  No.

22   Q.  And is it helpful to look at the full spectrum of

23   analyst reports covering a company?

24   A.  Yes.

25             MS. VARMA:  Objection.

Attari - CROSS - By Mr. Kravetz

```
 1              THE COURT:  Overruled.

 2    BY MR. KRAVETZ:

 3    Q.  Now, sir, you have no personal knowledge sitting here

 4    today as to whether Ed DeMarco relied on any particular

 5    analyst's report in making the decision to enter into the

 6    third amendment.  Is that correct?

 7    A.  I know that he was copied on some analyst reports, but I

 8    don't know whether he relied on a specific one.

 9    Q.  And do you know, sir, whether I've asked you that

10    question previously?

11    A.  Probably.  I don't know.

12    Q.  And that would have been a time that you were under

13    oath?

14    A.  Yes.

15    Q.  And it would have been closer to the events in question

16    to the third amendment than today.  Correct?

17    A.  Yes.  Definitely.  I mean, if it was before today, it

18    would be closer than today.

19              MR. KRAVETZ:  If I could ask Ms. McGuire just to

20    pull up the transcript cite 2102, Lines 2 to 5, for

21    Dr. Attari, please.  I'm sorry.  It's 2104, Lines 10 to 21,

22    please.

23    BY MR. KRAVETZ:

24    Q.  Sir, do you see starting with Line 10 you were asked

25    whether sitting here today whether Ed DeMarco relied on
```

```
 1    either of those analyst reports in entering -- making the

 2    decision to enter into the third amendment?

 3              Correct?

 4              And your response was, "Relied on them?  Yes --

 5    no.  You're right."

 6              Do you see that prior testimony?

 7    A.  Yes.  That's what I said right now, too.  I just noted

 8    that they -- he was copied on one or both of the reports.

 9    Q.  Now, let's talk a little bit more about Mr. DeMarco and

10    some of the items that you considered in rendering your

11    decision that the third amendment was reasonable.

12              MR. KRAVETZ:  I'd like to show you a document

13    that's marked as -- that's been admitted as Plaintiffs'

14    Exhibit 205, please, Ms. McGuire.

15    BY MR. KRAVETZ:

16    Q.  Sir, you have -- if you need to see it, you have a copy

17    of your report with you; and we can also pull it up.  But do

18    you recall acknowledging previously that this was not an

19    exhibit or a document that you considered in issuing your

20    expert report regarding the reasonableness of FHFA's

21    decision to enter into the third amendment?

22    A.  I'll take your word for it.

23    Q.  Do you recall that?

24    A.  I don't.  But I'll take your word for it.

25    Q.  Well --
```

```
 1              MR. KRAVETZ:  -- Ms. McGuire --

 2   BY MR. KRAVETZ:

 3   Q.  -- I don't want you to do that.

 4              MS. McGUIRE:  If we can -- if we can just back up

 5   for a moment, Ms. McGuire.  And if we can show Dr. Attari

 6   DX-891 at Page 117.

 7   BY MR. KRAVETZ:

 8   Q.  Sir, do you recognize this to be information from

 9   Appendix B to your expert report in this matter?

10   A.  It says Appendix B.  I assume it's my expert report.

11   Q.  Do you see, sir, in the middle part of the document it

12   lists production documents?  Correct?

13   A.  Uh-huh.

14              THE COURT REPORTER:  Is that yes?

15              THE WITNESS:  Yes.  Sorry.

16              MR. KRAVETZ:  And if we scroll to the next page --

17   keep going a little further, Ms. McGuire.  We're looking for

18   UST.  If we can go up a little bit.  It's Line 96.

19   BY MR. KRAVETZ:

20   Q.  Dr. Attari, do you see in your Materials Considered

21   there is only one document that has a UST Bates number?

22   That is, the number that's at the bottom right-hand portion

23   of the documents admitted into evidence.

24   A.  Yes.

25   Q.  And that ends in 5750?
```

```
 1    A.  Yes.

 2    Q.  Okay.

 3              MR. KRAVETZ:  So, Ms. McGuire, if we can now go

 4    back to PX-205.  If we can highlight the Bates number in the

 5    bottom right-hand corner.

 6    BY MR. KRAVETZ:

 7    Q.  So that particular Bates number, Dr. Attari, ends in

 8    533645.  Correct?

 9    A.  Yes.

10              MS. VARMA:  Objection.

11              THE COURT:  Overruled.

12    BY MR. KRAVETZ:

13    Q.  Dr. Attari, then, this is not one of the documents

14    that's listed that you have previously considered in giving

15    your opinion in this matter.  Correct?

16    A.  At the time of writing my report, correct.

17              MR. KRAVETZ:  Ms. McGuire, if we can pull the

18    callout up again.

19    BY MR. KRAVETZ:

20    Q.  Dr. Attari, do you understand this to be a memo

21    reporting what an individual from the Treasury Department

22    reported that Mr. DeMarco said to the Secretary of the

23    Treasury?

24              MS. VARMA:  Objection.

25              THE COURT:  Overruled.
```

1    THE WITNESS:  It's my understanding that

2    Mr. DeMarco is going to be here tomorrow or Monday.  So it's

3    probably a question for him.

4    BY MR. KRAVETZ:

5    Q.  Well, you've been testifying about a number of internal

6    documents from FHFA, some other documents as well.  I'm just

7    asking, with respect to this particular document, if you're

8    aware that this is a memo purporting to report what

9    Mr. DeMarco told the Secretary of the Treasury on June 25,

10   2012.

11   A.  Yes.

12   Q.  Okay.  Now, sir, in the highlighted portion, do you

13   see -- we can even start the sentence before, Ms. McGuire --

14   "Since the secretary raised the possibility of a PR

15   covenant, DeMarco no longer sees the urgency of amending the

16   PSPAs this year.

17        "He has raised two competing reasons for this new

18   position:  One, the GSEs will be generating large revenues

19   over the coming years, thereby enabling them to pay the 10

20   percent annual dividend well into the future even with the

21   caps."

22        Did I read that correctly?

23   A.  Yes.

24   Q.  And this is not a document that you considered in

25   assessing the reasonableness of FHFA in your expert report.

```
 1    Correct?

 2    A.  In my expert report, correct.

 3    Q.  Thank you.

 4         MR. KRAVETZ:  We can take that down.

 5         Ms. McGuire, can we next show Plaintiffs' Exhibit

 6    246, which has been admitted into evidence.

 7    BY MR. KRAVETZ:

 8    Q.  Just for reference here, Dr. Attari, do you see that

 9    this is an email dated August 9th of 2012?

10    A.  Yes.

11    Q.  And the subject is Fannie Mae Executive Management

12    Meeting on August 6, 2012; is that right?

13    A.  Yes.

14    Q.  And August 6, 2012, would have been 11 days before the

15    third amendment was announced; is that right?

16    A.  Yes.

17    Q.  And do you see that the first recipient on the line is

18    Edward DeMarco?

19    A.  Yes.

20    Q.  And the second recipient was Mario Ugoletti?

21    A.  Yes.

22    Q.  Do you know who Mr. Ugoletti is?

23    A.  He was an advisor to Mr. DeMarco.

24         MR. KRAVETZ:  Ms. McGuire, if we can back out and

25    call out this particular item here relating to Goldman
```

1    Sachs.

2    BY MR. KRAVETZ:

3    Q.  Sir, you would agree with me that Goldman Sachs is one

4    of the largest investment banks in the world.  Correct?

5    A.  Yes.

6    Q.  Okay.  And in this particular email, which is

7    summarizing an executive management meeting 11 days before

8    the third amendment, it notes that there was a meeting

9    between Mr. Mayopoulos, the CEO of Fannie Mae, and Goldman

10   Sachs.  Is that right?

11   A.  Yes.

12   Q.  And in that meeting, Goldman Sachs, quote, "confirmed

13   that foreign investors seem to have little concern regarding

14   the PSPA's upcoming expiration date," end quote.  Did I read

15   that correctly?

16   A.  Yes.

17   Q.  Foreign investors would comprise a large percentage of

18   the bond of market; is that right?

19   A.  They would comprise a large percentage of the bond

20   market.  I don't know if they were larger than or smaller

21   than domestic investors.  So...

22   Q.  It's a somewhat large portion of the $1.2 trillion bond

23   market.  Correct?

24   A.  Some portion.  Yes.

25   Q.  And just to be clear, Dr. Attari, this is not a document

1   that you included in your Materials Considered either, is

2   it?

3   A.  If you're going to tell me it's not, it's not.  But I've

4   seen it since.

5   Q.  Okay.  And this is not a document that you displayed to

6   the jury during your direct testimony; is that right?

7   A.  I did not.

8   Q.  Because you never considered this document -- because

9   the document's not listed in your Materials Considered, this

10  is not a document that you considered in forming your expert

11  opinion that you expressed in your expert report.  Correct?

12  A.  Correct.  Not in my expert report.

13  Q.  Okay.

14          MR. KRAVETZ:  Ms. McGuire, if we can go next to

15  Plaintiffs' Exhibit 210, which is in evidence.

16  BY MR. KRAVETZ:

17  Q.  Dr. Attari --

18          MR. KRAVETZ:  If we can highlight, Ms. McGuire,

19  the UST Bates number.

20  BY MR. KRAVETZ:

21  Q.  And I think we saw before, Dr. Attari, that you had only

22  reviewed or listed as having reviewed in your expert report

23  one Treasury document ending in Bates No. 5450.  Do you

24  recall that?

25  A.  Yes.

```
1    Q.  Okay.

2              MR. KRAVETZ:  If we can back out.

3    BY MR. KRAVETZ:

4    Q.  Dr. Attari, this is an email dated July 9, 2012, with an

5    attachment containing talking points for the Secretary of

6    the Treasury to use in testifying before Congress.

7              MR. KRAVETZ:  And, Ms. McGuire, if we could please

8    call out Page 10 of 50.  And if we can enlarge the portion

9    starting with "Has the administration considered."  Thank

10   you.

11   BY MR. KRAVETZ:

12   Q.  Dr. Attari, do you see at the top portion of this

13   Treasury document from July 9th, 2012, prepared in advance

14   of Secretary Geithner's testimony to Congress, there's a

15   portion of the document that says, quote:  "Has the

16   administration considered modifying the PSPA agreements

17   before the capacity becomes fixed at the end of 2012?"

18              Do you see that, sir?

19   A.  Yes.

20   Q.  And then if we can take a look at the first bullet

21   point, the first bullet point states, quote:  "Under the

22   conservative baseline stress test forecasts conducted by

23   FHFA, both Fannie Mae and Freddie Mac are expected to have

24   positive net income in 2013."

25              Do you see that, sir?
```

1    A.  Yes.

2    Q.  And then it states further, quote:  "This will mean that

3    Treasury is not expected to need to fund any operating

4    losses at Fannie Mae and Freddie Mac after the expiration of

5    the PSPA funding commitment."  Is that correct?

6    A.  Yes.  But I'm not sure what "baseline stress test"

7    means.  And they're talking about funding operating losses.

8    So this is not about the circular draws; this is about

9    actual losses.

10   Q.  Right.  I guess you haven't reviewed this in connection

11   with your expert opinion, so you wouldn't have an occasion

12   to know what it means.  Correct?

13   A.  Well, I mean, "baseline" and "stress" normally don't go

14   together.  They're two kind of different things.

15   Q.  But under the baseline stress test forecast here, it

16   notes that both Fannie and Freddie are expected to have

17   positive net income in 2013?

18   A.  Yes.  So it's likely that they're talking about baseline

19   forecasts, not stress forecasts, because we saw that in the

20   stress case Freddie itself was expecting to have large

21   losses and draws in 2013.

22           MR. KRAVETZ:  Ms. McGuire, if we can show the

23   third bullet point.

24   BY MR. KRAVETZ:

25   Q.  Dr. Attari, do you see that in this particular bullet

1    point the Treasury document says, quote:  "We expect that

2    275 billion, nearly twice the amount of net funding provided

3    by Treasury to date, will provide a substantial cushion for

4    any unexpected losses and should give market participants

5    confidence about the government's commitment to these

6    institutions," end quote.

7            Did I read that correctly?

8    A.  You did.  But I mean, there's a bunch of inconsistencies

9    in here.  By the time this is written, the net funding is

10   189 billion.  And 275 is not nearly twice by any kind of

11   math.  So I'm not sure who's writing it or what they're

12   doing.

13           And we saw analyst reports all through the period

14   before July and after July that kind of market participants

15   didn't have the confidence about the commitment.

16   Q.  But you don't dispute in this document prepared by the

17   Treasury Department, it indicates that that cushion should

18   give market participants confidence about the government's

19   commitment to the institutions?  That's the language on the

20   page.  Correct?

21   A.  Yeah.  But the math kind of makes me worry about the

22   U.S. Treasury.

23   Q.  It makes you worry about the U.S. Treasury?

24   A.  Yeah.  They can't do simple math.

25   Q.  Does it call into question the distribution process of

Attari - CROSS - By Mr. Kravetz

1    the U.S. Treasury?

2    A.  I don't know.

3    Q.  Okay.  Dr. Attari, one of the items that you testified

4    about was that there was a plan to shrink what's known as

5    the retained portfolio of Fannie Mae and Freddie Mac.  Is

6    that correct?

7    A.  Yes.

8    Q.  And you put up a slide that includes a report from the

9    Deutsche Bank analyst report from March of 2012; is that

10   right?

11   A.  Yes.

12   Q.  Now, the original $250 billion threshold for reducing

13   the retained portfolio, that was something that was

14   established in the original PSPA agreement in September

15   2008.  Correct?

16   A.  Yes.

17   Q.  And that was at a time when the conservator was still

18   saying that the goal was to make the conservatorship

19   temporary and return it to the shareholders.  Correct?

20   A.  Yes.

21   Q.  So there was an understanding that the retained

22   portfolio would eventually decrease to that number of

23   $250 billion; is that right?

24   A.  Yes.

25   Q.  The fact that it was going to $250 billion, that was not

1    something new at the time of the third amendment.  Am I

2    right?

3    A.  Yes.

4    Q.  As a result, the size of the retained portfolio had

5    already been decreasing up to the date of the third

6    amendment.  Am I right?

7    A.  Yes.

8    Q.  And were you in court earlier this morning when the

9    testimony of Donald Layton was played to the jury?

10   A.  No, I was not.

11   Q.  Do you recall that Mr. Layton said that the rate of

12   reduction of the retained portfolio was only, quote,

13   "slightly speeded up," end quote, as a result of the third

14   amendment?

15   A.  I don't -- I mean, I haven't -- I wasn't here.  But I'd

16   agree with that characterization.

17   Q.  And he also said, quote, "The numbers were not that

18   large at that point," end quote, relating to the retained

19   portfolio.  Am I right?

20   A.  Yes.  I'd agree with that characterization.

21   Q.  Now, the other side of -- or one of the other generators

22   of profitability for Fannie and Freddie were g-fees,

23   guaranty fees.  Is that right?

24   A.  Yes.

25   Q.  And, sir, do you know that the GSEs themselves said in

Attari - CROSS - By Mr. Kravetz

1    public filings that the increase in g-fees was expected to

2    outpace or replace any reduction in income relating to the

3    retained portfolio?

4    A.  Yes.

5    Q.  And would you also agree that between the time of the

6    financial crisis and 2012, the GSEs were able to maintain

7    and grow their market share relating to the MBS market?  Is

8    that correct?

9    A.  I wouldn't be surprised, because they were -- you know,

10   a lot of the other mortgage providers were wiped out.  And

11   the GSEs had the Treasury commitment behind them.  So they

12   were able to, you know, take market share.

13   Q.  And until the private banks or the private issuers of

14   MBS came back to the market, the GSEs weren't able to

15   contract their dominant presence.  Would you agree with me

16   on that?

17   A.  Well, MBS is only one avenue for mortgages, you know,

18   one avenue where mortgages get -- kind of end up.  Banks

19   hold them on their balance sheets and so on.

20         So yes.  The MBS market share of the GSEs would

21   not decline.  But the share of mortgages that they handled

22   could change.

23   Q.  But at least as of that point, as of August 2012, that

24   contraction had not occurred yet.  Correct?

25   A.  Yes.

Attari - CROSS - By Mr. Kravetz

1    Q.  Okay.  Now, do you agree that, ultimately, much of what

2    FHFA wanted to do in terms of a contraction in the market

3    could only be accomplished if Congress passed housing reform

4    legislation?

5    A.  No.  It's my understanding that FHFA controlled, for

6    example -- so let's step back.

7         Fannie Mae and Freddie Mac, there were limits on

8    the size of loans that they could guarantee.  These loans

9    are called conforming loans, and there's a limit on the size

10   and there's a limit on payment to income and so on.

11        And some of these limits had been relaxed after

12   the financial crisis.  And, you know, FHFA could shrink or

13   cause Fannie Mae and Freddie Mac's share of the market to

14   shrink by limiting the increase in the size of the loans,

15   for example.

16        The increase in g-fees also, my understanding is,

17   was implemented as a way to shrink Fannie Mae and Freddie

18   Mac's market share because the idea was that if you raise

19   the prices, you'd bring in other parties into the mortgage

20   market, into the secondary mortgage market.

21   Q.  But you understand that as of August 2012, there had not

22   been a shrinkage of that market yet.  Correct?

23   A.  Well, steps had been taken.  So, you know, g-fees, you

24   yourself mentioned had been increased.  And that was done in

25   order to kind of facilitate or incentivize the entry of

1    other private capital into those markets.

2              MR. KRAVETZ:  Ms. McGuire, if we could just call

3    up as a demonstrative Dharan 48, please.

4    BY MR. KRAVETZ:

5    Q.  I just want to get a sense of whether -- Dr. Attari, if

6    you'd take a moment to review this chart.

7              MR. KRAVETZ:  Your Honor, this was displayed as a

8    demonstrative to the jury.  I would ask that they could see

9    it now.

10   BY MR. KRAVETZ:

11   Q.  Do you dispute, Dr. Attari, any of the numbers that are

12   set forth in this chart from Dr. Dharan?

13   A.  Is this supposed to be Fannie Mae and Freddie Mac?

14   Because it says at the bottom it's Fannie Mae, Freddie Mac

15   and Ginnie May.  So I don't know what the share of Fannie

16   Mae and Freddie Mac is.

17   Q.  Do you know sitting here what the share would be?

18   A.  No, I don't.

19   Q.  You haven't reviewed that information?

20   A.  No.

21   Q.  Okay.

22             MR. KRAVETZ:  We can take that down, Ms. McGuire.

23             If we can move next to Dr. Attari's slide relating

24   to Dr. Dharan.  It's Slide 54.

25   BY MR. KRAVETZ:

1    Q.  The title of this slide is:  Reasons Dr. Dharan is

2    Wrong.  Is that correct?

3    A.  Yes.

4    Q.  And you weren't here for Dr. Dharan's testimony, but

5    you've obviously reviewed his slides.  Is that right?

6    A.  His slides and his testimony.

7    Q.  Okay.  Now, before getting to those, I just want to

8    confirm a few things.

9         You yourself are not a certified public

10   accountant.  Correct?

11   A.  Yes.  I'm not.

12   Q.  And you've never worked as an auditor.  Correct?

13   A.  Correct.

14   Q.  All right.  And since Dr. Dharan was asked this

15   question, you have not served as a regulator, either.  Is

16   that right?

17   A.  Yes.

18   Q.  And am I right that other than one summer as an intern

19   in 1992, you've never worked at a financial institution?  Is

20   that right?

21   A.  Yes.

22   Q.  Okay.  Now, you've been qualified as an expert in

23   corporate finance and securities market.  Is that correct?

24   A.  Yes.

25   Q.  Not in accounting; is that right?

```
 1    A.  No.  Yes.  That's correct.
 2              MR. KRAVETZ:  If we can, Ms. McGuire, show
 3    Slide 85 from Dr. Dharan's presentation, please.
 4    BY MR. KRAVETZ:
 5    Q.  And, sir, have you had a chance to review this
 6    particular slide from Dr. Dharan?
 7    A.  If it was part of the slide pack, yes.
 8    Q.  And I just want to confirm a few items with you in
 9    relation to this slide from Dr. Dharan.
10              But before that, on direct examination, in
11    connection with describing the bond event study, you
12    testified that there was, quote, "very little risk that the
13    commitment would run out in 2013 or 2014."
14              Did I hear that correctly?
15    A.  Yes.
16    Q.  Now, a few other things to confirm with you.  On direct
17    examination, you did not testify about the possibility of
18    Fannie or Freddie releasing or restoring their deferred tax
19    assets.  Correct?
20              MS. VARMA:  Objection.
21              THE WITNESS:  Correct.
22    BY MR. KRAVETZ:
23    Q.  On direct examination, you did not --
24              MS. VARMA:  Objection.
25
```

```
1      BY MR. KRAVETZ:

2      Q.  -- testify about the --

3               MS. VARMA:  It's beyond the scope of the direct,

4      your Honor.

5               THE COURT:  Sustained.

6      BY MR. KRAVETZ:

7      Q.  Well, Dr. Attari, looking at this particular chart, did

8      you testify about the second bullet point?

9               MS. VARMA:  Objection.  It's the same question,

10     your Honor.  Just referring to the bullet point.

11              MR. KRAVETZ:  I'm trying to get a scope of the

12     testimony, your Honor, as to what --

13              MS. VARMA:  It was clear what the scope of the

14     direct was.

15              MR. KRAVETZ:  -- as to the reasons Dr. Dharan is

16     wrong.

17              And I just want to get a sense of why Dr. Dharan

18     is wrong and what in particular Dr. Attari is criticizing.

19              THE COURT:  He can answer that.  Overruled.  He

20     can answer that particular question, whether he commented on

21     that.

22              MR. KRAVETZ:  Overruled, your Honor?

23              THE COURT:  Your question was whether he commented

24     on that second bullet?

25              MR. KRAVETZ:  Yes.
```

Attari - CROSS - By Mr. Kravetz

```
1              THE COURT:  He can answer that.

2    BY MR. KRAVETZ:

3    Q.  Okay.  So --

4    A.  No, I did not.

5    Q.  And did you comment on the third bullet, "Payment in

6    kind plus net worth sweep alternatives addressed any

7    remaining risk of circular draw"?

8              MS. VARMA:  Objection.  Beyond the direct.

9              THE COURT:  The objection is overruled.

10             You can answer.

11             THE WITNESS:  No.

12             THE COURT:  He said no.

13   BY MR. KRAVETZ:

14   Q.  And the fourth bullet point, "Deficient process for a

15   decision of this magnitude ":  Did you testify about that on

16   direct?

17   A.  Yes, because I kind of laid out why it was, you know,

18   you didn't need to build fancy models to make this decision

19   because the history was available.  The future was kind

20   of -- you know, future profits were expected to be smaller

21   than historical profits.

22             So it's like saying I earned 5,000 a month in the

23   past, you know.  I expect to earn less in the future.  Can I

24   pay 7,000 a month?  It's not like you need a fancy model to

25   figure that one out.
```

 1     Q.  And what about the last bullet point, just so we have

 2     this clear?  "Net worth sweep exposed Fannie and Freddie to

 3     an increased risk of harm"?

 4              MS. VARMA:  Objection.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  I did explain how the net worth

 7     sweep protected the commitment from circular draws and

 8     reduced the risk for Fannie and Freddie.

 9     BY MR. KRAVETZ:

10     Q.  Okay.  Sir, are you aware that in -- within the first

11     few months after the net worth sweep, both Fannie and

12     Freddie restored what's known as the deferred tax asset,

13     which is in the amount of --

14              MS. VARMA:  Objection.  Beyond the scope.

15              THE COURT:  Overruled.

16     BY MR. KRAVETZ:

17     Q.  -- in the amount of $74.5 billion?

18     A.  Yes.

19     Q.  And were you aware that as a result, once the DTAs were

20     restored, that Fannie and Freddie had to borrow from the

21     bond markets to pay the increase in net worth in cash to the

22     Treasury Department?

23     A.  Yes.

24     Q.  Okay.

25              MR. KRAVETZ:  If we can pull up Slide 81 of the

Attari - CROSS - By Mr. Kravetz

```
1    Dharan presentation, please.

2    BY MR. KRAVETZ:

3    Q.  Are you aware, sir -- you talked about public filings on

4    direct examination; is that right?

5    A.  Yes.

6    Q.  And are you aware that, following the net worth sweep,

7    Freddie Mac at least had a disclosure in their 2013 annual

8    report that as a result of the net worth sweep dividend,

9    this, quote, "increases the likelihood of draws in future

10   periods, particularly as the permitted capital reserve

11   amount, which is $2.4 billion for 2014, declines over time"?

12            Were you aware of that public disclosure, sir?

13   A.  No.

14   Q.  Okay.  And were you aware of the disclosure at the

15   bottom of the page, stating, quote, "It is possible that,

16   due to noncash increases in net worth, the amount of our

17   dividend for a quarter could exceed the amount of available

18   cash, which could have an adverse effect on our financial

19   results," end quote?  Were you aware of that disclosure,

20   sir?

21   A.  No, because these are from February or March of 2014,

22   which is way after the third amendment.

23   Q.  Describing the harm as a result of the third amendment.

24   Correct?

25   A.  Describing the effects of the third amendment.
```

1      Q.  Okay.

2              MR. KRAVETZ:  Ms. McGuire, can we please call up

3      former Slide 64, please?  64.  It would be former Slide 64

4      from Dr. Attari.  Well, you can pull up Slide 38.  38.

5      Thank you.

6      BY MR. KRAVETZ:

7      Q.  So, Dr. Attari, I just want to walk through some of the

8      items here on Dr. Dharan's presentation.  And let's go

9      through each of these.

10              Would you agree, sir, that as of August 2012, home

11     sales and home prices had improved and were improving?

12     A.  Well, there was a great deal of uncertainty, as kind of

13     the previous -- you know, the document you put up previously

14     a minute ago noted.  There was an improvement, but there was

15     a great deal of uncertainty.

16     Q.  I'm just asking about the numbers.  Just the data.

17              Is it a fact that as of August 2012, through the

18     course of 2012, just from a numbers standpoint, home sales

19     and home prices had improved to that point in time?

20     A.  Just over January to whatever, June of 2012.

21     Q.  Correct.

22     A.  Yeah.

23     Q.  Okay.  And you know that internally, Fannie and Freddie

24     would estimate and give their best estimate as to whether

25     they believed that home prices would continue to improve

```
 1    over the next few years.  Is that right?

 2    A.  Yes.  I recall that all through the crisis they were

 3    projecting home prices going -- increasing.  And they kept

 4    falling quarter after quarter.  So I wouldn't be surprised.

 5    Q.  Well, you showed some documents from Fannie and Freddie

 6    from July and August of 2012.  Correct?

 7    A.  Yes.

 8    Q.  So there's not everything in those documents that you

 9    disagree with.  Am I right?

10    A.  I did note that especially the Fannie projections I

11    disagreed with, because I thought they were also optimistic

12    in various ways, that they projected growth; they made

13    optimistic assumptions about kind of how revenues would

14    change over time and so on.

15    Q.  So you disagree with your own client's projections?

16              MS. VARMA:  Objection.

17              THE COURT:  Sustained.

18              MR. KRAVETZ:  Ms. McGuire, if you can please

19    display Plaintiffs' Exhibit 211 at Page 25.  Let's first

20    show Dr. Attari the face page, please.

21    BY MR. KRAVETZ:

22    Q.  Dr. Attari, do you see that this is a financial update

23    for the management committee as of July 9, 2012, of Fannie

24    Mae?

25    A.  Yes.
```

Attari - CROSS - By Mr. Kravetz

```
1     Q.  All right.

2              MR. KRAVETZ:  Ms. McGuire, if we can go to

3     Page 25.  If we can enlarge the upper left-hand corner of

4     the screen.

5     BY MR. KRAVETZ:

6     Q.  Do you see the graph that's on the screen is entitled

7     Home Price Forecast?

8     A.  Yes.

9     Q.  And in this document, it's modeling the home price

10    forecast through calendar year 2016.  Correct?

11    A.  Yes.

12    Q.  All right.  And the direction here, at least from this

13    internal document from Fannie Mae, as of July 2012 is that

14    the home price forecast was expected to increase through and

15    including 2016.  Is that right?

16    A.  Yes.  And as I noted earlier, there was a great deal of

17    uncertainty around these forecasts and, you know, the

18    analyst reports that I showed you also made that point.  So

19    that's one thing.

20             And two is, even with these forecasts, Fannie Mae

21    did not believe they would meet the dividends over the ten

22    years from 2012 to 2022.

23    Q.  Well, sir, you understand this isn't a ten-year

24    forecast.

25    A.  I know that.  But they would have had similar -- you
```

Attari - CROSS - By Mr. Kravetz

```
1    know, they had said that they had made simple assumptions in

2    projecting for the period from 2016 to 2022.

3    Q.  But I want to be clear for the record.  This particular

4    forecast is not one of the ten-year forecasts that you

5    criticize on direct, is it?

6    A.  Right.  But there's no -- it doesn't reflect

7    uncertainty; and for the conservator, it was the uncertainty

8    that mattered.

9              MR. KRAVETZ:  If we can call out Page 9 of 30,

10   Ms. McGuire.

11   BY MR. KRAVETZ:

12   Q.  And do you see here, Dr. Attari, at the top of this

13   document, FY 2012?  And would that be full year 2012?

14   A.  Yes.

15   Q.  And this particular document indicates comprehensive

16   income forecast continues to trend upwards; is that correct?

17   A.  Yes.

18             MR. KRAVETZ:  If we can just back out for a

19   moment.  And if we can focus, Ms. McGuire, just on the

20   callout boxes that kind of look like a cartoon person would

21   be speaking.  That's the best way I have to describe it.

22   BY MR. KRAVETZ:

23   Q.  Sir, there's a reference here in two of the callout

24   boxes to greater allowance reduction resulting from lower

25   severities and delinquencies.
```

Attari - CROSS - By Mr. Kravetz

1                    Do you see that?

2     A.  Yes.

3     Q.  And the reference to an allowance there is to the loan

4     loss allowance or the allowance for loan loss reserves.  Is

5     that correct?

6     A.  Yes.

7     Q.  And this -- what this chart is showing is that because

8     there has been a greater reduction in the allowance, that

9     reduction in the allowance, the write-up, is going directly

10    to comprehensive income in the amount of $4.9 billion.  Is

11    that correct?

12    A.  I don't know if it is actually -- so its actual price

13    increases are causing this to be the expected increase in

14    profits; or it is the projected price increase that's

15    causing the projected increase in profits.  And again, the

16    thing to remember is if prices went up, profits would go up.

17    If prices went down, that 4.9 billion would reverse and

18    you'd actually have a reduction in profits.

19    Q.  Well, you understand that this -- sir, the allowance for

20    loan loss reserves doesn't have anything to do with home

21    prices.  Correct?

22    A.  No.  It does.

23    Q.  When the allowance which had been written down during

24    the financial crisis is now being written up, and it's your

25    testimony that relates to housing prices?

```
1    A.  Yes.  If you recall, we saw that in the analyst reports
2    that we were looking at.  Because home prices were
3    increasing, Fannie and Freddie were able to release these
4    allowances because their losses were not as large as
5    previously projected.
6    Q.  Well, the document itself refers to fewer delinquencies.
7    Is that correct?
8    A.  Yes.  And that's because prices are getting better.  So,
9    you know, people aren't kind of defaulting on the loans.
10   Q.  Now, let's stay with credit losses for a moment.  Sir,
11   you would have no basis to dispute that Fannie and Freddie
12   internally were modeling that credit losses had peaked in
13   the fourth quarter of 2011.  Am I correct?
14   A.  Yes.
15   Q.  You also would have no reason to dispute that Fannie and
16   Freddie reported publicly that the loans that they
17   guaranteed that were made after the financial crisis from
18   2009 forward were performing better that loan vintages of
19   the period 2005 to 2008.  Is that right?
20   A.  Yes.
21   Q.  And this is information that they would -- actual data
22   that Fannie and Freddie would report publicly.  Am I right?
23   A.  Yes.
24   Q.  And in terms of g-fees, you would agree that FHFA did in
25   fact increase the g-fees that were charged by Fannie and
```

Attari - CROSS - By Mr. Kravetz

```
1    Freddie between 2011 and 2012.  Correct?
2    A.  Well, I know FHFA increased them.  But I don't know when
3    exactly that increase happened.
4    Q.  That's not something that you've analyzed?
5    A.  Well, I don't recall sitting here.
6    Q.  And do you know that prior to the third amendment, in
7    August 2012, Fannie and Freddie announced that they expected
8    FHFA to increase g-fees even further?
9    A.  Yes.  And as I noted, FHFA had announced an intention to
10   increase g-fees to incentivize private capital to come in
11   and reduce -- shrink the role of Fannie and Freddie.
12   Q.  And in fact, just two weeks after the third amendment,
13   FHFA increased g-fees on or about -- announced an increase
14   in g-fees on or about August 31st of 2012.  Is that correct?
15   A.  I don't know sitting here.
16   Q.  Does that sound about right?  In or around that time
17   period?
18   A.  I don't know that I looked at it.
19   Q.  Now, you've testified that Dr. Dharan's optimism was not
20   shared by the enterprises or by FHFA.  Is that correct?
21   A.  Yes.
22   Q.  Okay.  And aren't you aware, though, sir, that there's
23   been testimony admitted at this trial by former executives
24   of Fannie, Fannie Mae, that the company had reached a period
25   of sustained or sustainable profitability as of the first
```

1   half of 2012?

2   A.  Well, as I noted, you know -- and you mentioned golden

3   age of profits and, you know, roaring recovery and other

4   statements like that.  All of that was baked into the

5   forecast that we looked at from 2012, the August 2012 Benson

6   forecast that Mr. Benson worked on.

7          And those forecasts with all of that optimism and

8   positivity still did not result in profit that would allow

9   Fannie and Freddie to make the dividend payments.

10  Q.  But, sir, just a more basic question:  I know you've

11  been following the testimony that's been presented at trial.

12  Correct?

13  A.  Yes.

14  Q.  All right.  And you are aware, though, that there has

15  been testimony from Susan McFarland and Timothy Mayopoulos

16  that Fannie Mae had returned to a period of sustained

17  profitability as of the first half of 2012.  Correct?

18  A.  Well, I mean, we saw what the profitability was.  You

19  know, in two quarters, I'm not very sure how they decided it

20  was sustained.

21          THE COURT:  Two quarters after how many years?

22          THE WITNESS:  After three years of large losses.

23  Actually, four years of large losses.

24          THE COURT:  They turned the world around?

25          THE WITNESS:  Yes.

```
 1                    THE COURT:  After two quarters?

 2                    And everybody should jump at that.

 3                    Sorry.  I'll try not to interject.  I can't resist

 4       sometimes.

 5       BY MR. KRAVETZ:

 6       Q.  Just to answer my question, you're aware there has been

 7       that testimony?

 8       A.  Yes.

 9       Q.  Okay.  Thank you.

10                    THE COURT:  I mean, these two companies brought

11       the whole country to a halt.  And all of a sudden, after two

12       quarters, everything's wonderful?

13       BY MR. KRAVETZ:

14       Q.  And, sir, you mentioned the projections from PX

15       Exhibit -- Plaintiffs' Exhibit 218; is that correct?

16       A.  I don't remember the exhibit number.  But I showed the

17       projections, so we can look that up.

18       Q.  Those were the ten-year projections from Fannie Mae?

19       A.  Yes.  I showed ten-year projections from Fannie Mae.

20                    MR. KRAVETZ:  If we can just display on the screen

21       Slide 61, please, from Dr. Attari's presentation.  Slide 61,

22       please.

23       BY MR. KRAVETZ:

24       Q.  And you highlighted in particular this testimony from

25       Mr. Benson; is that right?
```

```
1    A.  Yes.  My understanding was he worked for -- he worked as

2    the internal forecasting person at Fannie Mae and took over

3    from Ms. McFarland soon after.

4    Q.  And, sir, are you aware of what Mr. Mayopoulos, the

5    former CEO, testified about the accuracy of the information

6    provided to the Treasury Department and FHFA?

7    A.  Not sitting here.

8         MR. KRAVETZ:  Ms. McGuire, can we please play the

9    Mayopoulos deposition starting on Page 121.

10         (Whereupon, segments of the deposition of Timothy

11    Mayopoulos were published in open court.)

12    BY MR. KRAVETZ:

13    Q.  And you're aware of that testimony as well, sir?

14    A.  Yes.

15         MS. VARMA:  Objection.

16         THE COURT:  Overruled.

17    BY MR. KRAVETZ:

18    Q.  Now, sir, if I can ask --

19         MR. KRAVETZ:  If we can call up Plaintiffs'

20    Exhibit 262, please.  And if we can --

21    BY MR. KRAVETZ:

22    Q.  Are you familiar with this document, Dr. Attari?

23    A.  Yes.

24         MR. KRAVETZ:  If we could go to Page 3 of the

25    document, please.  Sorry.  Page 4.
```

```
 1    BY MR. KRAVETZ:

 2    Q.  Now, in terms of the Freddie Mac projections, the Fannie

 3    Mae document that you talked about had modeling for a

 4    particular exercise over ten years.  Correct?

 5    A.  Yes.

 6    Q.  And the Freddie Mac modeling, in this particular

 7    document -- and you showed one similar -- has the modeling

 8    over the course of the second half of 2012 through 2015.  Is

 9    that correct?

10    A.  Yes.

11    Q.  Okay.  And are you aware that the former CFO of Freddie

12    Mac, Ross Kari, testified that the base case was the

13    expected case for Freddie Mac?

14    A.  That's usually -- a base case is used as a label for the

15    expected case.

16    Q.  And under the expected case here, the base case, it's

17    showing that through 2015, there would be no additional

18    draws from the Treasury commitment.  Am I right?

19    A.  Yes.

20              MR. KRAVETZ:  Now, if we can call up --

21              THE WITNESS:  Which means 50 percent of the time

22    you'd be below the base and you'd have draws.

23    BY MR. KRAVETZ:

24    Q.  Right.  But under the expected case, no draws?

25    A.  Yes.  Half the time -- half the time, there would be no
```

```
 1    draws.  Half the time, there would be draws of some
 2    magnitude.
 3    Q.  And under the worst case, only $9 billion in draws.
 4    Correct?
 5    A.  And under the stress case, you'd have 32 billion left,
 6    which would basically mean you were finished.
 7    Q.  Right.  Right.  Under the stress case?
 8    A.  Yes.
 9    Q.  But under the expected case, zero?
10    A.  Yes.
11    Q.  Thank you.
12            MR. KRAVETZ:  If we can pull up Plaintiffs'
13    Exhibit 218.  We referenced this document earlier.
14    BY MR. KRAVETZ:
15    Q.  Sir, in general, are you aware whether the projections
16    in -- the ten-year projections that were set forth in
17    Plaintiffs' Exhibit 218 included a modeling of any possible
18    restoration of the deferred tax asset?
19    A.  There wasn't a restoration of the deferred tax asset.
20    But there was the benefit of the deferred tax asset in the
21    sense that profits were not taxed.
22    Q.  But in general, though, the answer is yes, it did not
23    include a possible restoration of the deferred tax asset?
24            MS. VARMA:  Objection.
25            THE COURT:  Overruled.
```

Attari - CROSS - By Mr. Kravetz

```
 1                    THE WITNESS:  Yes.

 2                    MR. KRAVETZ:  The Court's indulgence one moment,

 3      your Honor.

 4                    Thank you, your Honor.

 5                    Ms. McGuire, can we call up Plaintiffs' Exhibit --

 6      I'm sorry -- Dharan Slide 33, please.

 7      BY MR. KRAVETZ:

 8      Q.  Sir, are you aware whether Dr. Dharan has calculated

 9      what the 10 percent dividend payment would have been in 2013

10      had the net worth sweep not been enacted?

11      A.  Sorry.  Could you say that again?  I missed the

12      question.

13      Q.  Sure.  Sure.

14                    Dr. Attari, are you aware whether Dr. Dharan has

15      calculated what the 10 percent dividend would have been

16      absent the net worth sweep in 2013?

17      A.  Yes.  I mean, it's right there.  Sorry.  That's why I

18      was a little confused by your question.

19      Q.  And would you agree that that amount is $18.9 billion?

20      A.  I have no reason to disagree.

21      Q.  And you gave reference to what the overall dividend

22      amount would have been in or around 2013.  Correct?

23      A.  Yeah.  I was doing it as of August 2012.  But that

24      number seems right.

25      Q.  Okay.  And do you dispute that the actual dividends that
```

 1    were paid to the Treasury Department under the net worth

 2    sweep in 2013 were approximately $130.1 billion?

 3    A.  No.

 4    Q.  And do you dispute at least in terms of the math that

 5    the excess in those two numbers is approximately $111.2

 6    billion?

 7    A.  No.

 8    Q.  Dr. Attari, I want to see if we can --

 9              MR. KRAVETZ:  We can take that down, Ms. McGuire.

10    Thank you.

11    BY MR. KRAVETZ:

12    Q.  I want to see if we can agree on some of the basics of

13    the periodic commitment fee.  Okay?

14    A.  Sure.

15    Q.  Near the last part of your presentation, you had a

16    slide:  Reasons Why Dr. Thakor is Wrong.  Correct?

17    A.  Yes.

18    Q.  Now, sir, do you agree that the amount of the periodic

19    commitment fee was to be mutually agreed between the FHFA

20    and the Treasury Department?

21    A.  Yes.

22    Q.  And that the amount of the periodic commitment fee was

23    to be determined in reference to the market value of the

24    commitment as then in effect?

25    A.  Yes.

```
 1    Q.  And is your understanding of the amount that -- of the
 2    market value as then in effect would be at the amount -- the
 3    time -- the time the amount of the PCF was actually set?
 4    A.  Yes.
 5    Q.  And would you agree that the periodic commitment fee was
 6    to be subject to the reasonable discretion of the Treasury
 7    Department and the FHFA?
 8    A.  Unreasonable discretion?
 9    Q.  The reasonable discretion.
10    A.  I thought it was to be based on market value.  But...
11    Q.  Well, that was one component of it.  Right?
12    A.  Yeah.
13    Q.  Do you understand that another complain was that the PCF
14    would be determined subject to the reasonable discretion of
15    Treasury and FHFA?
16    A.  I don't understand what that means.  But...
17    Q.  Sure.
18              MR. KRAVETZ:  If we can please pull up
19    Dr. Attari's Slide 26, Ms. McGuire, please.
20    BY MR. KRAVETZ:
21    Q.  I'll have you take a moment, sir, to review that.
22    A.  Uh-huh.  Yes.  I see the words "subject to the
23    reasonable discretion."
24    Q.  And in addition, sir, the periodic commitment fee would
25    be in consultation with the chairman of the Federal Reserve.
```

```
 1    Is that correct?
 2    A.  Yes.
 3    Q.  Now, sir, do you understand that the amount of the
 4    periodic commitment fee had not been set as of the date of
 5    the third amendment?
 6    A.  Yes.  That's what I testified.
 7    Q.  And that Fannie and Freddie to date have never paid a
 8    periodic commitment fee to the Treasury Department?
 9    A.  That's because it was suspended as part of the third
10    amendment.
11    Q.  Prior to that date, it was not paid either?
12    A.  Yes, because, as I noted, Treasury sent letters
13    saying -- waiving the fee.
14    Q.  Now, just in terms of your background, sir, prior to
15    this case, you had never published an article about
16    commitment fees.  Am I right?
17    A.  Yes.
18    Q.  And prior to this case, you have not performed any
19    studies on commitment fees; is that right?
20    A.  Yes.
21    Q.  And prior to this case, you had not given an expert
22    opinion in another case about commitment fees; is that
23    correct?
24    A.  Yes.
25    Q.  And in fact, prior to this case, you had not examined a
```

Attari - CROSS - By Mr. Kravetz

```
1    commitment fee contract as an expert witness; is that right?
2    A.  Yes.
3    Q.  I want to move next to the several comparators that
4    you've described relating to Dr. Thakor.  I know we had some
5    reordering of the slides, so I just want to make sure --
6              THE COURT:  May I speak to counsel?
7              (Whereupon, the following proceedings were had at
8    sidebar outside the presence of the jury:)
9              THE COURT:  How much more do you expect?
10             MR. KRAVETZ:  I think probably 20 minutes, your
11   Honor, 25.
12             THE COURT:  Okay.  We'll start back Monday at
13   10:00, then.
14             MR. KRAVETZ:  Okay.  Thank you.
15             THE COURT:  I assume there will be some redirect?
16             MS. VARMA:  Yes.
17             THE COURT:  Okay.
18             (Whereupon, the following proceedings were had in
19   open court:)
20             THE COURT:  We're not going to try to finish the
21   witness today, so we'll resume at 10:00 Monday.
22             Don't talk about the case.  Don't let anyone talk
23   to you about the case.  Don't read or listen to anything
24   about the case.  I think it'll just be Trump this weekend,
25   anyway.  So I'll see you Monday at 10:00.  Don't Twitter or
```

Attari - CROSS - By Mr. Kravetz

```
 1     tweet or X, whatever it is.  Don't do any of those things,
 2     either.
 3               Y'all have a nice weekend.
 4               (Whereupon, the jury exited the courtroom at 4:59
 5     p.m. and the following proceedings were had:)
 6               THE COURT:  You can sit down.  Sorry we don't
 7     finish.
 8               (Witness excused.)
 9               THE COURT:  And you just have DeMarco?
10               We can go off the record.
11               (Proceedings concluded.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                              **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4     certify that the foregoing constitutes a true and accurate

5     transcript of my stenographic notes, and is a full, true,

6     and complete transcript of the proceedings produced to the

7     best of my ability.

8

9

10                   Dated this 4th day of August, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
              Official Court Reporter
13            United States District Court for the
                District of Columbia
14            333 Constitution Avenue, Northwest
              Washington, D.C. 20001
15            (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$100** [1] - 33:22
**$13.24** [1] - 61:23
**$23** [1] - 37:21
**$250** [1] - 92:12, 92:23, 92:25
**$27,000** [1] - 57:4
**$581** [1] - 60:18
**$659** [1] - 60:15

## /

**/s** [1] - 121:12

## 1

**1** [8] - 30:8, 33:12, 36:6, 36:14, 37:15, 37:16, 37:20, 61:9
**1.16** [3] - 25:21, 26:1, 34:17
**1.2** [5] - 35:12, 35:13, 60:8, 60:21, 87:22
**1.29** [1] - 14:23
**1.3** [3] - 62:10, 63:2, 63:18
**1.4** [1] - 62:13
**1.7** [1] - 37:14
**10** [13] - 8:4, 8:11, 8:13, 9:5, 36:10, 38:20, 81:21, 81:24, 85:19, 89:8, 115:9, 115:15
**10-K** [2] - 20:15, 69:3
**100** [8] - 34:4, 34:5, 34:6, 36:25, 37:1, 37:8, 63:15, 63:22
**10020** [1] - 2:5
**10:00** [3] - 119:13, 119:21, 119:25
**11** [4] - 14:24, 14:25, 86:14, 87:7
**111.2** [1] - 116:5
**117** [1] - 83:6
**118** [1] - 14:24
**12** [1] - 38:20
**121** [1] - 112:9
**1251** [1] - 2:4
**129** [1] - 14:23
**13** [2] - 48:10, 61:15
**13-1053** [1] - 1:4
**13-1288** [1] - 1:10
**13.2** [1] - 62:5
**13.24** [1] - 62:23
**130.1** [1] - 116:2
**137** [1] - 69:13

**13th** [1] - 4:14
**1401** [1] - 1:22
**1523** [1] - 1:18
**16** [1] - 39:14
**16th** [2] - 10:13, 36:23
**17** [3] - 54:10, 54:24, 55:3
**17th** [11] - 4:16, 10:6, 10:14, 15:15, 15:22, 53:11, 56:7, 57:3, 57:14, 58:25, 59:18
**18** [1] - 65:22
**18.9** [1] - 115:19
**189** [2] - 67:1, 91:10
**19** [3] - 9:14, 28:19, 36:11
**19087** [1] - 1:25
**199** [1] - 27:7
**1992** [1] - 97:19
**1:54** [1] - 4:2
**1:55** [1] - 1:7

## 2

**2** [6] - 33:12, 37:19, 62:5, 62:23, 76:14, 81:20
**2-E** [1] - 65:7
**2.3** [1] - 38:1
**2.4** [1] - 102:11
**2.8** [1] - 23:1
**20** [4] - 30:8, 30:10, 39:11, 119:10
**200** [1] - 73:24
**20001** [3] - 2:9, 2:13, 121:14
**20005** [1] - 1:22
**20036** [1] - 1:19
**2005** [1] - 108:19
**2008** [19] - 21:6, 27:17, 31:5, 36:22, 36:23, 38:25, 39:14, 65:11, 65:15, 66:10, 66:20, 66:22, 66:25, 67:10, 68:16, 69:3, 74:2, 92:15, 108:19
**2009** [5] - 22:11, 49:24, 71:7, 71:23, 108:18
**2010** [5] - 21:17, 22:12, 36:14, 39:3, 67:12
**2011** [12] - 22:12, 45:13, 45:14, 45:18, 45:20, 45:25, 47:18, 71:2, 71:4, 77:20, 108:13, 109:1
**2012** [86] - 4:14,

**4:16, 6:1, 15:22, 20:22, 21:15, 22:2, 22:7, 22:8, 23:14, 27:9, 31:11, 33:6, 33:11, 35:9, 45:15, 45:21, 47:15, 48:11, 49:10, 52:7, 52:12, 53:11, 54:10, 54:24, 57:3, 57:14, 58:25, 59:25, 60:4, 66:21, 67:1, 67:12, 68:16, 71:2, 71:3, 71:5, 71:10, 71:16, 71:25, 72:3, 72:4, 73:2, 74:1, 74:19, 74:23, 75:2, 75:4, 75:12, 75:15, 75:18, 77:6, 77:11, 77:16, 79:7, 85:10, 86:9, 86:12, 86:14, 89:4, 89:13, 89:17, 92:9, 94:6, 94:23, 95:21, 103:10, 103:17, 103:18, 103:20, 104:6, 104:23, 105:13, 105:22, 106:13, 109:1, 109:7, 109:14, 110:1, 110:5, 110:17, 113:8, 115:23**
**2013** [11] - 13:15, 74:2, 89:24, 90:17, 90:21, 98:13, 102:7, 115:9, 115:16, 115:22, 116:2
**2014** [4] - 13:15, 98:13, 102:11, 102:21
**2015** [4] - 23:24, 27:7, 113:8, 113:17
**2016** [4] - 23:24, 105:10, 105:15, 106:2
**2017** [1] - 23:1
**202** [2] - 2:14, 121:15
**2021** [1] - 23:3
**2022** [5] - 23:3, 23:24, 25:12, 105:22, 106:2
**2023** [2] - 1:7, 121:10
**2029** [2] - 16:18
**2032** [1] - 16:18
**205** [1] - 82:14
**21** [1] - 81:21
**210** [1] - 88:15
**2102** [1] - 81:20
**2104** [1] - 81:21
**211** [1] - 104:19
**218** [3] - 111:15, 114:13, 114:17
**21st** [1] - 56:11
**22** [1] - 67:24
**23.4** [1] - 34:22

**24** [1] - 71:7
**246** [1] - 86:6
**25** [6] - 68:11, 69:13, 85:9, 104:19, 105:3, 119:11
**250** [2] - 16:22, 16:23
**257** [2] - 47:22, 48:2
**258** [1] - 34:17
**26** [1] - 117:19
**260** [1] - 39:8
**262** [1] - 112:20
**27** [1] - 37:22
**275** [2] - 91:2, 91:10
**280** [1] - 1:24
**2:57** [1] - 43:17

## 3

**3** [2] - 37:25, 112:24
**30** [1] - 60:4, 65:15, 106:9
**31st** [2] - 67:24, 109:14
**32** [1] - 114:5
**33** [1] - 115:6
**333** [2] - 2:12, 121:14
**350** [1] - 69:13
**354-3269** [2] - 2:14, 121:15
**38** [2] - 103:4
**3:13** [1] - 43:20
**3U46** [1] - 57:1

## 4

**4** [7] - 1:7, 3:6, 35:6, 35:11, 35:13, 112:25
**4.9** [2] - 107:10, 107:17
**412** [1] - 76:14
**43.1** [1] - 57:15
**44** [1] - 3:6
**45** [5] - 31:15, 32:13, 32:17, 34:15, 34:23
**46** [1] - 54:2
**47** [2] - 53:23, 53:25
**48** [1] - 96:3
**4:59** [1] - 120:4
**4th** [1] - 121:10

## 5

**5** [3] - 30:16, 35:6, 81:20
**5,000** [1] - 100:22
**5.2** [2] - 35:5, 35:8, 35:13
**50** [2] - 89:8, 113:21

**533645** [1] - 84:8
**54** [1] - 96:24
**5450** [1] - 88:23
**56** [1] - 63:23
**5750** [1] - 83:25
**58** [4] - 37:7, 49:24, 50:9, 50:19
**581** [1] - 62:9
**581.7** [1] - 63:4

## 6

**6** [2] - 86:12, 86:14
**6.4** [1] - 57:19
**601** [1] - 2:9
**61** [2] - 111:21
**633** [2] - 53:7, 56:23
**64** [3] - 103:3
**65** [3] - 26:2, 30:15, 30:17
**659** [1] - 62:5
**659.4** [1] - 62:24
**67** [3] - 57:23, 58:24, 59:9
**6706** [1] - 2:13

## 7

**7** [3] - 34:2, 34:3, 61:12
**7,000** [1] - 100:24
**7.7** [3] - 62:1, 62:8, 63:3
**74.5** [1] - 101:17
**79.9** [2] - 36:8, 38:10
**7th** [1] - 36:22

## 8

**8** [1] - 39:5
**8.5** [3] - 38:24, 39:7, 39:8
**81** [1] - 101:25
**83** [1] - 67:24
**85** [2] - 37:22, 98:3
**892** [1] - 61:4

## 9

**9** [5] - 1:13, 89:4, 104:23, 106:9, 114:3
**96** [1] - 83:18
**98** [1] - 63:7
**98.7** [1] - 63:13
**9th** [2] - 86:9, 89:13

## A

**ability** [5] - 4:23, 17:8, 25:15, 52:20, 121:7
**able** [16] - 14:14, 25:25, 26:1, 29:8, 31:10, 36:16, 41:5, 41:10, 42:6, 80:1, 80:8, 80:13, 94:6, 94:12, 94:14, 108:3
**ABS** [1] - 65:18
**absent** [1] - 115:16
**absolutely** [1] - 76:12
**academic** [4] - 54:14, 55:15, 56:19, 56:20
**accelerated** [2] - 8:15, 16:12
**acceleration** [1] - 8:8
**access** [14] - 29:9, 31:10, 31:24, 37:2, 52:20, 78:2, 78:17, 79:17, 79:22, 80:6, 80:10, 80:14, 80:16, 80:18
**accomplished** [2] - 9:3, 95:3
**account** [10] - 10:15, 10:19, 10:20, 24:5, 30:1, 33:2, 34:24, 40:9, 41:2, 67:14
**accountant** [1] - 97:10
**accounting** [1] - 97:25
**accumulate** [3] - 22:23, 23:4, 23:8
**accumulated** [1] - 22:25
**accuracy** [2] - 59:3, 112:5
**accurate** [3] - 53:12, 53:13, 121:4
**acknowledging** [1] - 82:18
**act** [1] - 17:14
**action** [1] - 47:10
**Action** [1] - 1:3
**ACTION** [1] - 1:11
**actions** [2] - 20:23, 20:24
**actual** [8] - 32:14, 42:19, 49:10, 53:18, 90:9, 107:12, 108:21, 115:25
**ADAM** [1] - 2:2
**adaptable** [1] - 29:2

**add** [3] - 7:21, 19:23, 60:21
**addition** [1] - 117:24
**additional** [2] - 26:22, 113:17
**address** [2] - 7:7, 9:2
**addressed** [2] - 17:25, 100:6
**adds** [1] - 30:16
**adjust** [1] - 30:1
**adjusting** [1] - 10:24
**administration** [3] - 48:22, 89:9, 89:16
**admitted** [5] - 4:22, 82:13, 83:23, 86:6, 109:23
**advance** [1] - 89:13
**adverse** [2] - 23:6, 102:18
**advisor** [1] - 86:23
**affect** [3] - 76:4, 76:21, 79:10
**affected** [1] - 14:8
**afford** [2] - 40:20, 40:24
**affordability** [1] - 70:14
**AFTERNOON** [1] - 1:13
**afternoon** [4] - 4:10, 4:11, 44:3, 44:4
**age** [3] - 79:20, 79:24, 110:3
**agencies** [7] - 45:6, 45:8, 46:4, 49:22, 78:4, 78:8, 78:12
**agency** [8] - 4:19, 45:16, 45:17, 45:23, 46:1, 47:4, 77:10, 77:15
**AGENCY** [1] - 1:6
**ago** [2] - 54:17, 103:14
**agree** [25] - 17:18, 27:15, 43:6, 44:11, 52:10, 64:11, 65:3, 67:8, 72:22, 76:10, 77:24, 78:16, 79:16, 87:3, 93:16, 93:20, 94:5, 94:15, 95:1, 103:10, 108:24, 115:19, 116:12, 116:18, 117:5
**agreed** [1] - 116:19
**agreement** [8] - 13:24, 39:12, 39:13, 39:14, 39:17, 40:2, 40:5, 92:14
**AGREEMENT** [1] - 1:11

**agreements** [1] - 89:16
**ahead** [1] - 40:17
**AIG** [19] - 36:19, 36:22, 37:2, 37:3, 37:15, 37:18, 37:21, 37:23, 38:6, 38:12, 38:17, 38:18, 38:19, 38:23, 39:14, 39:17, 39:18, 40:18
**al** [2] - 1:3, 1:7
**all-in** [1] - 36:1
**allow** [2] - 13:7, 110:8
**allowance** [8] - 106:24, 107:3, 107:4, 107:8, 107:9, 107:19, 107:23
**allowances** [1] - 108:4
**allowed** [3] - 31:4, 31:7, 38:5
**allows** [2] - 11:2, 19:17
**alone** [1] - 47:10
**alternative** [1] - 28:4
**alternatives** [3] - 28:1, 28:14, 100:6
**amending** [1] - 85:15
**amendment** [59] - 4:15, 7:18, 7:23, 7:24, 8:1, 8:24, 9:3, 9:9, 9:13, 9:16, 9:21, 10:4, 10:5, 10:10, 10:11, 16:6, 16:7, 16:8, 16:11, 16:21, 16:23, 17:3, 17:7, 17:19, 17:24, 19:14, 19:16, 22:17, 27:23, 27:25, 28:2, 28:13, 28:19, 43:6, 43:7, 44:11, 46:11, 47:15, 59:5, 59:25, 60:9, 71:24, 81:6, 81:16, 82:2, 82:11, 82:21, 86:15, 87:8, 93:1, 93:6, 93:14, 102:22, 102:23, 102:25, 109:6, 109:12, 118:5, 118:10
**America** [1] - 33:24
**Americas** [1] - 2:4
**amount** [23] - 29:16, 30:4, 34:17, 37:12, 37:17, 41:12, 60:23, 67:3, 91:2, 101:13, 101:17, 102:11, 102:16, 102:17, 107:10, 115:19, 115:22, 116:18,

116:22, 117:1, 117:2, 117:3, 118:3
**amounts** [5] - 12:25, 13:10, 36:11, 38:19, 78:20
**analogy** [2] - 31:1, 33:17
**analysis** [15] - 6:22, 8:3, 9:15, 10:17, 11:1, 15:24, 15:25, 39:24, 55:5, 55:6, 55:11, 55:12, 56:2, 73:14
**analyst** [2] - 4:13, 6:5, 6:16, 7:4, 7:11, 73:18, 73:22, 73:24, 74:17, 75:23, 77:5, 77:22, 77:23, 79:22, 80:5, 80:23, 81:7, 82:1, 91:13, 92:9, 105:18, 108:1
**analyst's** [2] - 80:19, 81:5
**analysts** [13] - 6:23, 8:20, 73:13, 73:16, 77:23, 78:1, 78:6, 78:13, 78:14, 78:16, 79:16, 80:10, 80:15
**analysts'** [1] - 79:10
**analyze** [5] - 13:5, 13:12, 63:6, 63:12, 71:24
**analyzed** [7] - 19:5, 60:22, 60:24, 62:9, 62:24, 63:3, 109:4
**analyzes** [1] - 31:13
**announced** [7] - 4:16, 10:5, 64:19, 86:15, 100:7, 109:9, 109:13
**annual** [2] - 85:20, 102:7
**answer** [10] - 56:1, 58:7, 59:8, 64:6, 99:19, 99:20, 100:1, 100:10, 111:6, 114:22
**answered** [1] - 58:4
**answers** [1] - 19:8
**anyway** [1] - 119:25
**aPPEARANCES** [1] - 1:16
**APPEARANCES** [1] - 2:1
**appeared** [1] - 58:21
**Appendix** [2] - 83:9, 83:10
**applied** [2] - 30:6, 31:14
**applies** [1] - 30:4
**apply** [4] - 32:18, 39:8, 39:12, 46:5

**applying** [1] - 29:24
**appointing** [2] - 19:11, 67:18
**approach** [2] - 55:15, 56:19
**approaches** [1] - 30:21
**approximated** [1] - 60:7
**April** [2] - 74:25, 75:2
**area** [1] - 32:22
**argue** [1] - 30:19
**argued** [1] - 35:17
**ARNOLD** [1] - 2:8
**article** [1] - 118:15
**aside** [1] - 6:15
**ASIM** [1] - 2:6
**aspect** [1] - 22:16
**assess** [1] - 7:17
**assessing** [2] - 18:15, 85:25
**assessment** [8] - 32:13, 32:19, 33:7, 33:8, 33:13, 34:19, 35:1, 40:11
**asset** [9] - 16:19, 16:21, 55:24, 68:12, 101:12, 114:18, 114:19, 114:20, 114:23
**assets** [17] - 8:9, 8:16, 8:21, 19:12, 30:6, 33:9, 33:11, 34:9, 34:10, 35:3, 35:5, 35:9, 35:18, 37:3, 64:7, 98:19
**associated** [1] - 75:24
**assume** [3] - 41:21, 83:10, 119:15
**assuming** [1] - 40:7
**assumptions** [6] - 23:19, 23:20, 24:9, 24:13, 104:13, 106:1
**assurance** [1] - 21:15
**ation** [1] - 66:19
**attachment** [1] - 89:5
**Attari** [48] - 3:6, 4:10, 44:3, 44:5, 48:4, 49:17, 49:21, 51:6, 53:6, 53:9, 53:25, 57:8, 58:17, 58:23, 59:17, 61:6, 62:21, 65:7, 67:23, 68:24, 69:15, 73:18, 81:21, 83:5, 83:20, 84:7, 84:13, 84:20, 86:8, 87:25, 88:17, 88:21, 89:4, 89:12, 90:25,

92:3, 96:5, 96:11,
99:7, 99:18, 103:4,
103:7, 104:20,
104:22, 106:12,
112:22, 115:14, 116:8
**ATTARI** [1] - 4:7
**Attari's** [5] - 63:24,
67:6, 96:23, 111:21,
117:19
**auditor** [1] - 97:12
**August** [50] - 1:7,
4:14, 4:16, 10:5,
10:13, 10:14, 15:15,
15:22, 31:11, 33:11,
35:9, 45:15, 45:21,
48:10, 49:10, 52:7,
52:12, 53:10, 54:10,
54:24, 55:3, 56:7,
56:11, 57:3, 57:13,
58:25, 59:18, 71:25,
72:3, 72:4, 73:2,
74:23, 75:4, 77:6,
77:11, 77:16, 79:7,
86:9, 86:12, 86:14,
94:23, 95:21, 103:10,
103:17, 104:6, 109:7,
109:14, 110:5,
115:23, 121:10
**available** [8] - 18:17,
21:11, 25:3, 32:5,
54:15, 75:5, 100:19,
102:17
**avenue** [2] - 94:17,
94:18
**Avenue** [6] - 1:18,
1:22, 2:4, 2:9, 2:12,
121:14
**average** [5] - 19:2,
23:8, 33:8, 57:18,
57:23
**avoid** [1] - 24:18
**aware** [22] - 24:22,
72:14, 75:23, 76:3,
76:20, 85:8, 101:10,
101:19, 102:3, 102:6,
102:12, 102:14,
102:19, 109:22,
110:14, 111:6, 112:4,
112:13, 113:11,
114:15, 115:8, 115:14

**B**

**backed** [2] - 21:16,
35:11
**background** [1] -
118:14
**bad** [3] - 19:1, 19:3,
21:25
**baked** [1] - 110:4

**balance** [1] - 94:19
**bank** [3] - 11:12,
29:14, 31:8
**Bank** [6] - 8:19, 12:3,
33:24, 76:18, 78:15,
92:9
**bank's** [2] - 33:7,
33:8
**banks** [19] - 12:3,
29:7, 29:8, 29:17,
29:21, 29:23, 31:3,
31:9, 31:13, 31:23,
33:23, 40:19, 42:9,
42:22, 78:6, 87:4,
94:13, 94:18
**banks'** [1] - 34:6,
34:7
**Barclays** [1] - 12:3
**base** [18] - 24:2,
27:2, 32:13, 32:19,
33:3, 33:6, 33:7, 33:8,
33:13, 33:15, 34:19,
35:1, 35:19, 113:12,
113:14, 113:16,
113:22
**based** [13] - 22:10,
26:17, 28:3, 31:21,
32:8, 34:21, 39:5,
41:3, 55:16, 58:3,
59:4, 73:14, 117:10
**baseline** [5] - 89:22,
90:6, 90:13, 90:15,
90:18
**basic** [2] - 51:14,
110:10
**basics** [1] - 116:12
**basis** [13] - 5:21, 6:3,
14:23, 14:24, 31:15,
32:13, 32:18, 34:15,
34:23, 36:1, 50:7,
108:11
**Bates** [5] - 83:21,
84:4, 84:7, 88:19,
88:23
**became** [2] - 20:13,
39:22
**becomes** [1] - 89:17
**BEFORE** [1] - 1:14
**beginning** [1] - 49:18
**behalf** [3] - 41:15,
43:25, 44:5
**behind** [1] - 94:11
**below** [6] - 7:20,
19:2, 39:20, 40:7,
62:1, 113:22
**benchmark** [3] -
13:2, 13:3, 52:17
**Benefit** [1] - 69:17
**benefit** [4] - 24:7,
28:6, 69:22, 114:20

**benefits** [5] - 8:23,
8:24, 27:22, 28:2,
28:3
**Benson** [3] - 110:5,
110:6, 111:25
**Benson's** [4] - 26:6,
26:11, 26:17
**BERGER** [1] - 2:3
**BERGMAN** [1] - 2:7
**BERKLEY** [1] - 1:17
**BERNSTEIN** [1] - 2:3
**best** [3] - 103:24,
106:21, 121:7
**better** [8] - 6:8, 6:14,
25:17, 25:23, 37:10,
49:5, 108:8, 108:18
**better-than-
expected** [1] - 49:5
**between** [7] - 12:10,
15:13, 16:18, 87:9,
94:5, 109:1, 116:19
**beyond** [4] - 13:16,
99:3, 100:8, 101:14
**big** [3] - 8:21, 15:1,
31:13
**billion** [64] - 9:14,
13:1, 16:22, 16:23,
23:1, 25:21, 26:1,
27:7, 28:20, 30:9,
30:10, 30:18, 33:12,
33:22, 33:25, 34:4,
34:5, 34:6, 34:17,
34:22, 35:6, 36:6,
36:11, 36:25, 37:1,
37:7, 37:14, 37:15,
37:16, 37:21, 37:22,
37:25, 38:1, 39:8,
39:11, 57:19, 60:15,
60:18, 61:23, 62:1,
62:5, 62:8, 62:9,
62:23, 62:24, 63:3,
63:4, 67:1, 91:2,
91:10, 92:12, 92:23,
92:25, 101:17,
102:11, 107:10,
107:17, 114:3, 114:5,
115:19, 116:2, 116:6
**binder** [1] - 47:23
**bit** [5] - 18:19, 22:25,
68:8, 82:9, 83:18
**Bloomberg** [1] - 53:2
**board** [1] - 72:16
**BOIES** [1] - 1:21
**bond** [41] - 9:17,
10:21, 10:23, 11:9,
11:10, 11:17, 12:5,
12:6, 12:7, 12:8,
12:10, 12:11, 12:12,
14:1, 17:2, 17:4,
46:20, 47:4, 47:7,

47:11, 51:6, 51:12,
51:15, 51:18, 52:21,
53:19, 54:4, 54:10,
55:14, 56:3, 56:8,
57:1, 57:3, 57:22,
63:7, 87:18, 87:19,
87:22, 98:11, 101:21
**bondholder** [1] -
11:20
**bondholders** [2] -
7:3, 2:11:11
**bonds** [90] - 4:21,
9:21, 10:8, 10:9,
11:24, 12:4, 12:9,
12:15, 12:20, 12:21,
12:22, 13:2, 13:3,
13:6, 13:8, 13:9,
13:13, 13:17, 13:20,
14:12, 14:13, 14:19,
14:20, 14:25, 15:14,
15:17, 16:5, 16:14,
16:16, 16:17, 16:25,
17:3, 17:11, 17:12,
35:12, 46:5, 46:12,
46:13, 46:19, 47:13,
51:19, 51:22, 51:24,
52:1, 52:3, 52:6,
52:11, 52:13, 52:15,
52:17, 53:10, 53:18,
54:3, 54:6, 54:13,
54:15, 54:16, 54:18,
54:22, 55:2, 56:17,
56:25, 57:13, 57:21,
57:24, 58:24, 59:4,
59:18, 59:20, 60:3,
60:8, 60:16, 60:18,
60:22, 60:23, 61:13,
61:15, 62:8, 62:23,
62:25, 63:3, 63:4,
63:8, 63:14, 63:16,
63:17, 63:21, 77:11
**borrow** [4] - 11:12,
37:3, 37:4, 101:20
**borrower** [2] - 46:10
**borrowing** [1] - 14:6
**borrows** [1] - 11:11
**bottom** [7] - 61:22,
69:2, 76:15, 83:22,
84:5, 96:14, 102:15
**bound** [1] - 39:6
**boxes** [2] - 106:20,
106:24
**BOZMAN** [1] - 2:3
**breached** [1] - 14:10
**bring** [2] - 42:3,
95:19
**brought** [3] - 4:13,
42:14, 111:10
**build** [2] - 22:17,
100:18

**building** [1] - 52:14
**built** [2] - 23:12, 24:7
**bullet** [12] - 70:7,
70:11, 89:20, 89:21,
90:23, 90:25, 99:8,
99:10, 99:24, 100:5,
100:14, 101:1
**bunch** [2] - 30:20,
91:8
**business** [4] - 11:13,
66:3, 66:16, 76:18
**but..** [2] - 117:10,
117:16
**buy** [1] - 13:9
**buyers** [1] - 13:7
**buying** [1] - 32:20
**BY** [78] - 2:10, 4:9,
6:2, 7:13, 44:2, 48:3,
49:20, 51:5, 53:8,
53:24, 56:24, 57:7,
57:11, 59:16, 61:5,
61:21, 62:20, 64:1,
65:9, 65:23, 67:7,
68:1, 69:1, 69:14,
70:20, 71:14, 74:11,
74:16, 74:24, 75:11,
76:16, 77:4, 81:2,
81:23, 82:15, 83:2,
83:7, 83:19, 84:6,
84:12, 84:19, 85:4,
86:7, 87:2, 88:16,
88:20, 89:3, 89:11,
90:24, 96:4, 96:10,
96:25, 98:4, 98:22,
99:1, 99:6, 100:2,
100:13, 101:9,
101:16, 102:2, 103:6,
104:21, 105:5,
106:11, 106:22,
111:5, 111:13,
111:23, 112:12,
112:17, 112:21,
113:1, 113:23,
114:14, 115:7,
116:11, 117:20

**C**

**CAITLIN** [1] - 2:3
**calculated** [5] - 31:1,
32:16, 38:11, 115:8,
115:15
**calculation** [4] -
29:5, 32:15, 34:12,
35:17
**calendar** [2] - 74:1,
105:10
**California** [1] - 32:24
**callout** [3] - 84:18,
106:20, 106:23

**cap** [5] - 7:7, 14:9, 16:19, 16:23, 16:25
**capacity** [2] - 20:10, 89:17
**capital** [28] - 5:21, 6:3, 19:16, 19:18, 20:3, 21:16, 22:17, 22:23, 22:24, 23:4, 23:8, 29:8, 29:10, 29:12, 29:15, 29:16, 29:18, 30:2, 30:6, 31:3, 31:5, 31:17, 42:2, 42:10, 96:1, 102:10, 109:10
**capped** [1] - 16:22
**caps** [2] - 46:24, 85:21
**cartoon** [1] - 106:20
**Case** [1] - 1:10
**case** [27] - 9:20, 10:8, 24:2, 27:2, 33:10, 35:19, 51:7, 90:20, 113:12, 113:13, 113:14, 113:15, 113:16, 113:24, 114:3, 114:5, 114:7, 114:9, 118:15, 118:18, 118:21, 118:22, 118:25, 119:22, 119:23, 119:24
**cash** [2] - 101:21, 102:18
**causing** [2] - 107:13, 107:15
**center** [1] - 78:21
**CEO** [2] - 87:9, 112:5
**certain** [3] - 23:11, 58:21, 73:6
**certainly** [1] - 59:2
**CERTIFICATE** [1] - 121:1
**certified** [1] - 97:9
**certify** [1] - 121:4
**CFO** [1] - 113:11
**chairman** [1] - 117:25
**chance** [1] - 98:5
**change** [7] - 10:7, 10:12, 11:5, 46:24, 47:8, 94:22, 104:14
**changed** [5] - 13:22, 14:20, 16:5, 39:23, 40:1
**changes** [6] - 10:15, 10:19, 10:21, 11:2, 11:7, 16:1
**characterization** [2] - 93:16, 93:20
**charged** [1] - 108:25

**chart** [9] - 53:9, 55:3, 56:15, 62:18, 62:19, 96:6, 96:12, 99:7, 107:7
**cheaper** [1] - 31:24
**CHECK** [1] - 1:24
**check** [1] - 10:17
**choose** [2] - 52:14, 56:25
**chopped** [1] - 11:15
**chose** [1] - 54:18
**circular** [19] - 5:23, 7:1, 7:2, 9:3, 9:4, 13:24, 17:21, 17:22, 17:24, 18:5, 18:9, 28:7, 36:16, 40:25, 41:10, 43:11, 90:8, 100:7, 101:7
**cite** [2] - 69:3, 81:20
**cited** [1] - 71:7
**citing** [1] - 77:20
**Civil** [1] - 1:3
**class** [2] - 44:24, 71:11
**CLASS** [3] - 1:11, 1:20, 2:2
**clear** [5] - 66:18, 87:25, 99:13, 101:2, 106:3
**clearly** [1] - 33:7
**client's** [1] - 104:15
**close** [2] - 39:9, 80:15
**closely** [1] - 78:22
**closer** [4] - 26:23, 46:23, 81:15, 81:18
**COLATRIANO** [1] - 1:17
**collect** [2] - 41:9, 41:12
**collected** [1] - 53:3
**collecting** [1] - 25:18
**Columbia** [2] - 2:12, 121:13
**COLUMBIA** [1] - 1:1
**Column** [1] - 61:25
**Columns** [1] - 61:20
**coming** [2] - 58:16, 85:19
**comment** [1] - 100:5
**commented** [2] - 99:20, 99:23
**commitment** [75] - 5:24, 6:3, 7:2, 7:8, 9:2, 13:14, 13:21, 13:24, 17:23, 17:25, 19:16, 20:3, 27:7, 27:11, 29:3, 30:4, 31:7, 31:8, 32:5, 32:9, 32:11, 33:16, 34:16,

36:3, 36:6, 36:13, 37:7, 37:15, 37:18, 37:19, 37:20, 38:17, 38:24, 39:2, 39:6, 40:19, 41:4, 41:25, 42:5, 42:18, 42:20, 42:21, 43:12, 46:14, 63:10, 65:13, 66:11, 67:1, 67:2, 73:15, 77:17, 78:11, 90:5, 91:5, 91:15, 91:19, 94:11, 98:13, 101:7, 113:18, 116:13, 116:19, 116:22, 116:24, 117:5, 117:24, 118:4, 118:8, 118:16, 118:19, 118:22, 119:1
**commitments** [1] - 42:4
**committed** [1] - 37:23
**committee** [1] - 104:23
**common** [10] - 14:1, 20:16, 36:8, 38:8, 38:9, 38:10, 69:25, 70:8, 71:10
**communications** [2] - 78:2, 79:17
**companies** [26] - 4:20, 12:9, 12:13, 19:19, 19:19, 20:1, 20:2, 23:2, 24:2, 24:18, 25:2, 30:2, 31:4, 38:6, 41:10, 42:1, 42:12, 66:10, 72:3, 72:12, 73:3, 76:19, 78:20, 78:21, 80:11, 111:10
**company** [12] - 11:10, 11:11, 12:11, 19:13, 30:15, 47:7, 53:2, 64:8, 78:23, 79:2, 80:23, 109:24
**company's** [2] - 19:12, 64:7
**comparables** [2] - 41:18, 41:19
**comparators** [1] - 119:3
**compare** [1] - 36:18
**comparing** [1] - 28:1
**comparison** [1] - 28:3
**compensation** [4] - 35:22, 36:2, 36:5, 37:14
**competing** [1] - 85:17

**complain** [1] - 117:13
**complete** [1] - 121:6
**completely** [2] - 66:22, 66:24
**complicated** [2] - 13:6, 13:10
**component** [4] - 42:18, 45:23, 117:11
**components** [8] - 8:2, 16:10, 16:11, 35:22, 35:24, 36:2, 36:4, 37:13
**comprehensive** [3] - 26:21, 106:15, 107:10
**comprise** [2] - 87:17, 87:19
**comprised** [1] - 7:25
**computed** [1] - 34:21
**concept** [1] - 47:1
**concern** [4] - 28:7, 28:8, 47:18, 87:13
**conclude** [3] - 17:1, 21:12, 22:20
**concluded** [3] - 17:2, 17:9, 120:11
**conclusion** [5] - 7:6, 17:16, 17:18, 28:24, 43:3
**condition** [2] - 19:13, 64:8
**conditions** [3] - 11:16, 43:9, 43:10
**conducted** [4] - 9:17, 15:24, 51:7, 89:22
**conducting** [1] - 51:9
**confidence** [14] - 11:6, 16:4, 17:7, 19:18, 20:1, 20:5, 20:6, 20:8, 20:9, 20:11, 42:16, 91:5, 91:15, 91:18
**confirm** [4] - 53:12, 97:8, 98:8, 98:16
**confirmed** [1] - 87:12
**conflict** [2] - 76:4, 76:20
**conforming** [1] - 95:9
**confused** [1] - 115:18
**Congress** [4] - 48:22, 89:6, 89:14, 95:3
**connection** [2] - 90:10, 98:11
**conservative** [1] - 89:22

**conservator** [10] - 19:11, 21:3, 24:17, 27:20, 28:8, 67:18, 92:17, 106:7
**conservator's** [2] - 27:5, 43:7
**conservatorship** [18] - 18:11, 18:13, 19:9, 19:10, 20:19, 21:6, 36:21, 64:3, 64:19, 65:1, 65:25, 66:8, 66:15, 67:19, 69:2, 69:20, 70:6, 92:18
**conserve** [2] - 19:12, 64:7
**consider** [3] - 44:23, 76:5, 76:22
**consideration** [2] - 8:3, 8:11
**considered** [8] - 82:10, 82:19, 84:14, 85:24, 88:8, 88:10, 89:9, 89:16
**Considered** [3] - 83:20, 88:1, 88:9
**considering** [1] - 28:4
**considers** [1] - 28:14
**consistent** [5] - 6:18, 6:21, 30:11, 50:20, 73:12
**consolidated** [1] - 33:9
**constitutes** [1] - 121:4
**Constitution** [2] - 2:12, 121:14
**consult** [1] - 41:16
**consultation** [1] - 117:25
**CONT'D** [1] - 2:1
**containing** [1] - 89:5
**context** [3] - 19:6, 68:9, 69:9
**continue** [6] - 7:16, 29:8, 29:11, 31:4, 77:18, 103:25
**continued** [2] - 28:13, 41:8
**CONTINUED** [1] - 4:8
**continues** [1] - 106:16
**continuously** [1] - 31:6
**contract** [2] - 94:15, 119:1
**contraction** [1] - 94:24, 95:2
**contractual** [1] -

11:16
  **contributes** [1] - 23:22
  **control** [1] - 15:25
  **controlled** [1] - 95:5
  **COOPER** [1] - 1:18
  **copied** [2] - 81:7, 82:8
  **copy** [1] - 82:16
  **corner** [2] - 84:5, 105:3
  **corporate** [1] - 97:23
  **corporations** [1] - 46:6
  **correct** [122] - 5:1, 15:19, 16:14, 33:18, 40:1, 40:3, 44:6, 44:12, 44:15, 44:24, 45:3, 45:8, 45:19, 46:2, 46:6, 46:13, 47:2, 47:15, 48:8, 48:11, 48:24, 49:10, 50:7, 51:13, 51:20, 52:2, 52:7, 52:25, 54:4, 56:5, 56:15, 57:19, 59:19, 59:25, 60:4, 60:24, 61:13, 61:18, 62:2, 62:6, 62:10, 62:25, 63:4, 63:14, 63:18, 64:3, 64:9, 64:12, 64:20, 66:9, 66:16, 67:10, 69:3, 69:18, 70:1, 70:23, 72:17, 73:19, 74:19, 75:2, 75:15, 76:8, 77:12, 77:16, 78:3, 78:18, 78:19, 79:18, 79:23, 81:6, 81:16, 82:3, 83:12, 84:8, 84:15, 84:16, 86:1, 86:2, 87:4, 87:23, 88:11, 88:12, 90:5, 90:12, 91:20, 92:6, 92:15, 92:19, 94:8, 94:24, 95:22, 97:2, 97:10, 97:12, 97:13, 97:23, 98:1, 98:19, 98:21, 102:24, 103:21, 104:6, 105:10, 106:16, 107:5, 107:11, 107:21, 108:7, 108:13, 109:1, 109:14, 109:20, 110:12, 110:17, 111:15, 113:4, 113:9, 114:4, 115:22, 116:16, 118:1, 118:23
  **corrected** [4] - 34:12, 34:13, 34:19,

35:1
  **correction** [1] - 30:9
  **corrections** [1] - 34:14
  **correctly** [12] - 34:20, 49:7, 50:2, 65:19, 66:4, 70:12, 70:15, 76:24, 85:22, 87:15, 91:7, 98:14
  **cost** [2] - 28:5, 32:2
  **costly** [1] - 32:25
  **costs** [1] - 41:6
  **counsel** [1] - 119:6
  **count** [1] - 53:18
  **count's** [1] - 53:13
  **country** [1] - 111:11
  **couple** [2] - 54:17, 77:6
  **coupon** [1] - 12:22
  **course** [2] - 103:18, 113:8
  **Court** [5] - 2:11, 2:11, 59:11, 121:12, 121:13
  **court** [4] - 59:15, 93:8, 112:11, 119:19
  **COURT** [42] - 1:1, 4:4, 7:12, 43:15, 43:22, 58:5, 58:7, 58:12, 59:12, 62:17, 71:13, 74:10, 74:15, 74:21, 75:9, 81:1, 83:14, 84:11, 84:25, 99:5, 99:19, 99:23, 100:1, 100:9, 100:12, 101:5, 101:15, 104:17, 110:21, 110:24, 111:1, 111:10, 112:16, 114:25, 119:6, 119:9, 119:12, 119:15, 119:17, 119:20, 120:6, 120:9
  **Court's** [1] - 115:2
  **COURTROOM** [2] - 4:1, 43:19
  **courtroom** [4] - 4:2, 43:17, 43:20, 120:4
  **covenant** [1] - 85:15
  **cover** [1] - 6:25
  **covered** [1] - 76:19
  **covering** [1] - 80:23
  **CRA** [3] - 78:24, 79:1, 79:2
  **created** [2] - 14:7, 41:1
  **credit** [14] - 4:19, 45:5, 45:7, 46:4, 46:9, 46:12, 49:23, 49:25, 50:11, 78:4, 78:8,

78:12, 108:10, 108:12
  **crisis** [10] - 24:4, 27:17, 42:10, 43:1, 50:20, 94:6, 95:12, 104:2, 107:24, 108:17
  **criticism** [1] - 21:22
  **criticisms** [2] - 22:15, 23:10
  **criticize** [1] - 106:5
  **criticizing** [1] - 99:18
  **cross** [3] - 43:16, 43:23, 58:18
  **Cross** [1] - 3:4
  **CROSS** [1] - 44:1
  **cross-examination** [1] - 43:23
  **CROSS-EXAMINATION** [1] - 44:1
  **cross-examine** [1] - 58:18
  **CRR** [3] - 2:10, 121:3, 121:12
  **cursor** [1] - 61:20
  **cushion** [1] - 91:3, 91:17

### D

  **D.C** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 121:14
  **daily** [2] - 57:18, 57:23
  **data** [13] - 7:5, 49:10, 52:24, 55:5, 55:25, 56:19, 58:17, 58:18, 58:20, 78:20, 79:7, 103:16, 108:21
  **databases** [1] - 52:20
  **date** [12] - 14:9, 39:13, 48:10, 54:10, 59:5, 74:25, 87:14, 91:3, 93:5, 118:4, 118:7, 118:11
  **Dated** [1] - 121:10
  **dated** [6] - 4:14, 45:13, 65:15, 67:23, 86:9, 89:4
  **DAVID** [1] - 2:7
  **DAVIS** [1] - 1:20
  **DAY** [1] - 1:13
  **day-to-day** [1] - 11:7
  **days** [3] - 36:23, 86:14, 87:7
  **de** [1] - 24:1
  **de-risk** [1] - 24:1
  **deal** [1] - 15:1, 36:18,

37:10, 103:12, 103:15, 105:16
  **dealers** [3] - 55:19, 55:20
  **debated** [1] - 6:10
  **debt** [4] - 14:11, 14:14, 17:8, 21:16
  **December** [1] - 71:7
  **decided** [1] - 110:19
  **decision** [12] - 17:18, 18:16, 19:5, 22:4, 24:17, 76:23, 81:5, 82:2, 82:11, 82:21, 100:15, 100:18
  **decision-making** [1] - 22:4
  **decisions** [2] - 22:10, 76:7
  **deck** [1] - 71:1
  **decline** [1] - 94:21
  **declined** [2] - 14:21, 49:22
  **declines** [1] - 102:11
  **decrease** [1] - 92:22
  **decreasing** [1] - 93:5
  **default** [4] - 12:16, 12:18, 12:19, 14:7
  **default-free** [1] - 12:16
  **defaulting** [1] - 108:9
  **Defendants** [2] - 1:8, 44:6
  **DEFENDANTS** [2] - 2:6, 3:5
  **Defense** [3] - 61:3, 69:12, 76:13
  **DEFENSE** [1] - 4:7
  **deferred** [6] - 98:18, 101:12, 114:18, 114:19, 114:20, 114:23
  **deficient** [1] - 100:14
  **define** [2] - 33:7, 33:8
  **defined** [1] - 65:25
  **definitely** [1] - 81:17
  **definition** [3] - 27:15, 30:17, 34:21
  **delinquencies** [2] - 106:25, 108:6
  **DeMarco** [18] - 24:22, 25:4, 64:25, 65:10, 66:6, 66:7, 66:13, 71:17, 81:4, 81:25, 82:9, 84:22, 85:2, 85:9, 85:15, 86:18, 86:23, 120:9
  **demonstrative** [3] - 62:15, 96:3, 96:8
  **denying** [1] - 54:22

  **Department** [8] - 84:21, 91:17, 101:22, 112:6, 116:1, 116:20, 117:7, 118:8
  **depicted** [1] - 74:13
  **depiction** [1] - 62:21
  **deplete** [1] - 5:21
  **deposit** [12] - 29:1, 29:9, 30:1, 31:8, 31:10, 31:20, 31:24, 32:1, 32:17, 33:21, 34:7, 34:18
  **deposition** [5] - 26:6, 26:11, 26:17, 112:9, 112:10
  **depositors** [1] - 29:23
  **deposits** [6] - 33:17, 33:25, 34:2, 34:4, 34:8, 35:18
  **DEPUTY** [2] - 4:1, 43:19
  **describe** [4] - 34:13, 38:4, 46:19, 106:21
  **described** [6] - 26:13, 46:4, 46:8, 50:4, 79:14, 119:4
  **describing** [4] - 45:25, 98:11, 102:23, 102:25
  **designed** [1] - 69:21
  **determine** [3] - 34:5, 34:7, 52:21
  **determined** [3] - 32:8, 116:23, 117:14
  **determining** [2] - 29:1, 29:2
  **Deutsche** [5] - 8:19, 12:3, 76:18, 78:15, 92:9
  **Dharan** [25] - 18:3, 18:4, 18:20, 19:8, 19:23, 21:22, 22:14, 27:22, 28:14, 67:13, 68:2, 68:12, 96:3, 96:12, 96:24, 97:1, 97:14, 98:6, 98:9, 99:15, 99:17, 102:1, 115:6, 115:8, 115:14
  **Dharan's** [7] - 22:15, 27:12, 67:20, 97:4, 98:3, 103:8, 109:19
  **difference** [5] - 12:10, 12:12, 15:13, 16:24, 38:2
  **differences** [1] - 31:2
  **different** [14] - 8:1, 11:6, 12:20, 21:2, 34:6, 34:7, 39:14, 50:6, 51:13, 52:6,

54:1, 67:4, 74:13, 90:14

**difficult** [2] - 13:11, 78:24

**Direct** [1] - 3:4

**direct** [14] - 51:15, 55:1, 66:19, 67:13, 88:6, 98:10, 98:16, 98:23, 99:3, 99:14, 100:8, 100:16, 102:4, 106:5

**DIRECT** [1] - 4:8

**direction** [3] - 5:14, 24:10, 105:12

**directly** [1] - 107:9

**disagree** [4] - 65:3, 104:9, 104:15, 115:20

**disagreed** [1] - 104:11

**disappears** [1] - 78:11

**disclaimer** [2] - 75:24, 76:3

**disclosure** [4] - 102:7, 102:12, 102:14, 102:19

**discretion** [5] - 117:6, 117:8, 117:9, 117:14, 117:23

**display** [6] - 53:6, 62:15, 67:23, 69:12, 104:19, 111:20

**displayed** [3] - 47:17, 88:5, 96:7

**dispute** [11] - 49:9, 56:12, 57:2, 57:12, 64:24, 91:16, 96:11, 108:11, 108:15, 115:25, 116:4

**distribution** [1] - 91:25

**District** [3] - 2:11, 2:12, 121:13

**DISTRICT** [3] - 1:1, 1:1, 1:14

**district** [1] - 121:13

**diverge** [2] - 18:21, 18:22

**divided** [2] - 62:5, 62:9

**dividend** [25] - 6:24, 7:1, 7:20, 8:4, 8:11, 8:12, 8:13, 9:5, 9:8, 25:2, 26:21, 28:10, 36:11, 43:12, 80:1, 80:8, 80:9, 85:20, 102:8, 102:17, 110:9, 115:9, 115:15, 115:21

**dividends** [11] - 5:21, 17:21, 17:22,

18:1, 22:6, 28:12, 28:15, 73:11, 80:14, 105:21, 115:25

**document** [43] - 47:18, 47:21, 48:4, 48:10, 48:16, 50:15, 50:17, 61:6, 65:22, 69:5, 69:8, 69:12, 76:1, 77:20, 79:4, 79:5, 79:8, 82:12, 82:19, 83:11, 83:21, 85:7, 85:24, 87:25, 88:5, 88:8, 88:10, 88:23, 89:13, 89:15, 91:1, 91:16, 103:13, 105:9, 105:13, 106:13, 106:15, 108:6, 112:22, 112:25, 113:3, 113:7, 114:13

**document's** [1] - 88:9

**documentation** [1] - 78:17

**documents** [13] - 7:5, 21:5, 21:7, 64:24, 65:2, 80:11, 83:12, 83:23, 84:13, 85:6, 104:5, 104:8

**dollar** [2] - 11:17, 59:20

**dollars** [3] - 11:15, 13:1, 30:16

**domestic** [1] - 87:21

**dominant** [1] - 94:15

**Donald** [1] - 93:9

**done** [6] - 10:25, 12:2, 18:2, 35:17, 54:14, 95:24

**down** [18] - 15:2, 15:3, 23:2, 29:20, 51:3, 56:17, 68:13, 68:22, 70:18, 73:21, 77:2, 86:4, 96:22, 107:17, 107:23, 116:9, 120:6

**downgrade** [3] - 47:18, 78:8, 78:10

**downgrades** [1] - 47:19

**downgrading** [1] - 47:5

**downside** [3] - 24:14, 24:20, 24:22

**Dr** [100] - 4:10, 18:3, 18:4, 19:8, 19:23, 21:22, 22:14, 22:15, 25:20, 26:2, 26:17, 27:12, 27:22, 28:14, 28:23, 29:5, 31:13,

31:16, 34:4, 34:12, 35:17, 35:25, 39:12, 40:9, 41:18, 42:7, 44:3, 44:5, 48:4, 49:17, 49:21, 51:6, 53:6, 53:9, 53:25, 57:8, 58:16, 58:22, 58:23, 59:10, 59:17, 61:6, 62:21, 63:24, 65:7, 67:6, 67:13, 67:20, 67:23, 68:2, 68:12, 68:24, 69:15, 73:18, 81:21, 83:5, 83:20, 84:7, 84:13, 84:20, 86:8, 87:25, 88:17, 88:21, 89:4, 89:12, 90:25, 92:3, 96:5, 96:11, 96:12, 96:23, 96:24, 97:1, 97:4, 97:14, 98:3, 98:6, 98:9, 99:7, 99:15, 99:17, 99:18, 103:4, 103:7, 103:8, 104:20, 104:22, 106:12, 109:19, 111:21, 112:22, 115:8, 115:14, 116:8, 116:16, 117:19, 119:4

**drafts** [1] - 72:20

**draw** [1] - 100:7

**drawn** [4] - 36:11, 38:19, 66:25, 67:1

**draws** [3] - 5:23, 7:1, 7:2, 9:3, 9:4, 9:8, 13:24, 17:24, 18:1, 18:5, 18:9, 26:22, 27:7, 28:7, 36:16, 40:25, 41:11, 43:11, 65:12, 66:11, 90:8, 90:21, 101:7, 102:9, 113:18, 113:22, 113:24, 114:1, 114:3

**driven** [1] - 49:3

**DTA** [1] - 24:7

**DTAs** [1] - 101:19

**due** [1] - 102:16

**duration** [3] - 65:1, 66:2, 66:8

**during** [9] - 42:10, 42:25, 55:1, 70:6, 73:19, 74:1, 78:9, 88:6, 107:23

**DX-412** [1] - 76:1

**DX-891** [1] - 83:6

**E**

**earn** [4] - 12:7, 22:17, 25:2, 100:23

**earned** [1] - 100:22

**earning** [1] - 50:1

**earnings** [8] - 4:25, 5:23, 5:25, 50:12, 75:4, 75:15, 75:18, 78:24

**Ease** [1] - 48:13

**ease** [1] - 48:21

**East** [1] - 65:18

**easy** [4] - 11:14, 11:16, 11:23, 13:5

**economic** [2] - 43:9

**Ed** [2] - 81:4, 81:25

**Edward** [1] - 86:18

**EDWARDS** [2] - 2:10, 121:3

**Edwards** [1] - 121:12

**effect** [10] - 8:6, 9:9, 9:19, 9:20, 10:24, 16:20, 28:17, 102:18, 116:24, 117:2

**effects** [5] - 14:14, 14:15, 16:19, 102:25

**either** [6] - 32:6, 82:1, 88:1, 97:15, 118:11, 120:2

**eliminated** [2] - 8:5, 28:6

**eliminating** [2] - 18:8, 43:11

**email** [9] - 65:8, 65:10, 65:15, 79:20, 80:3, 80:5, 86:9, 87:6, 89:4

**emails** [3] - 79:17, 79:19, 80:18

**embedded** [1] - 13:7

**employed** [1] - 77:23

**employer** [1] - 79:2

**enabling** [1] - 85:19

**enacted** [1] - 115:10

**end** [23] - 10:13, 17:17, 18:5, 20:12, 21:3, 25:11, 31:5, 31:15, 34:17, 34:18, 34:24, 54:19, 55:13, 56:3, 59:6, 87:14, 89:17, 91:6, 93:13, 93:18, 94:18, 102:19

**ended** [2] - 17:24, 22:11

**ending** [5] - 54:10, 56:3, 56:8, 57:1, 88:23

**ends** [4] - 12:8, 54:7, 83:25, 84:7

**enhance** [1] - 20:9

**enlarge** [4] - 65:8, 76:15, 89:8, 105:3

**ensure** [3] - 18:24, 55:12, 56:2

**enter** [3] - 81:5, 82:2, 82:21

**entered** [2] - 4:2, 43:20

**entering** [1] - 82:1

**enterprises** [13] - 7:16, 8:8, 8:15, 8:18, 8:22, 9:6, 9:12, 20:10, 21:18, 28:18, 30:13, 48:20, 109:20

**enterprises'** [1] - 5:20

**entities** [1] - 66:25

**entities'** [1] - 5:19

**entitled** [1] - 105:6

**entity** [2] - 66:3, 66:15

**entry** [1] - 95:25

**equal** [1] - 38:9

**equity** [29] - 22:23, 33:9, 33:10, 33:12, 35:4, 35:6, 36:24, 37:11, 38:8, 38:9, 38:10, 38:11, 38:22, 39:18, 39:20, 40:2, 40:6, 40:7, 41:25, 42:1, 42:2, 42:3, 42:5, 42:11, 42:12, 42:14, 42:15, 51:13

**erode** [1] - 17:22

**eroded** [3] - 20:5, 77:17, 78:11

**eroding** [3] - 5:24, 7:2, 13:24

**erosion** [1] - 9:2

**error** [2] - 30:3, 32:12

**especially** [2] - 20:21, 104:10

**ESQ** [13] - 1:17, 1:20, 1:20, 1:21, 1:23, 2:2, 2:2, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8

**essentially** [2] - 21:13, 38:6

**establish** [1] - 58:23

**established** [1] - 92:14

**estimate** [2] - 103:24

**estimated** [3] - 25:20, 26:2, 28:24

**estimating** [1] - 30:22

**et** [2] - 1:3, 1:7

**evaluating** [1] - 27:25

**evaporated** [1] - 20:11

**event** [27] - 9:17, 9:18, 9:19, 9:23, 10:1,

10:2, 10:16, 14:1,
16:15, 16:16, 51:6,
51:9, 51:12, 51:13,
51:15, 51:18, 52:14,
53:19, 54:4, 54:14,
55:16, 57:22, 63:7,
63:13, 63:15, 98:11
**events** [3] - 10:18,
15:22, 81:15
**eventually** [1] -
92:22
**evidence** [6] - 47:21,
69:12, 76:2, 83:23,
86:6, 88:15
**evolved** [4] - 21:8,
21:9, 66:21, 67:11
**exactly** [1] - 109:3
**examination** [5] -
43:23, 98:10, 98:17,
98:23, 102:4
**EXAMINATION** [2] -
4:8, 44:1
**examine** [1] - 58:18
**examined** [3] -
18:10, 52:1, 118:25
**example** [11] - 10:22,
13:15, 14:3, 14:11,
21:15, 22:10, 32:22,
55:23, 76:1, 95:6,
95:15
**exceed** [2] - 26:21,
102:17
**exceeded** [2] - 9:13,
28:19
**Excel** [1] - 61:12
**excerpt** [3] - 5:15,
6:5, 26:20
**excess** [3] - 22:6,
39:11, 116:5
**exchange** [2] - 8:13,
11:25
**excuse** [1] - 36:7
**excused** [1] - 120:8
**executed** [1] - 39:15
**executing** [1] - 7:17
**executive** [2] -
72:16, 87:7
**Executive** [1] - 86:11
**executives** [1] -
109:23
**exercise** [1] - 113:4
**exhibit** [3] - 4:22,
82:19, 111:16
**Exhibit** [19] - 47:22,
48:1, 53:7, 56:23,
61:3, 61:9, 65:7,
69:13, 76:14, 82:14,
86:5, 88:15, 104:19,
111:15, 112:20,
114:13, 114:17, 115:5

**existing** [1] - 21:19
**exited** [2] - 43:17,
120:4
**expect** [8] - 10:22,
23:9, 24:21, 25:2,
78:1, 91:1, 100:23,
119:9
**expectation** [1] -
40:11
**expectations** [6] -
23:14, 71:10, 71:22,
72:2, 72:3, 72:5
**expected** [22] - 23:6,
23:23, 24:3, 24:11,
24:12, 30:14, 45:2,
49:5, 71:21, 89:23,
90:3, 90:16, 94:1,
100:20, 105:14,
107:13, 109:7,
113:13, 113:15,
113:16, 113:24, 114:9
**expecting** [1] - 90:20
**expert** [16] - 51:9,
57:17, 61:9, 82:20,
83:9, 83:10, 85:25,
86:2, 88:10, 88:11,
88:12, 88:22, 90:11,
97:22, 118:21, 119:1
**expiration** [2] -
87:14, 90:4
**explain** [6] - 5:11,
6:6, 7:24, 8:24, 35:23,
101:6
**explained** [1] - 63:9
**explicitly** [1] - 30:5
**exposed** [3] - 37:11,
63:10, 101:2
**expressed** [1] -
88:11
**extended** [1] - 23:18
**external** [2] - 72:9,
73:12, 73:13

## F

**face** [1] - 104:20
**facilitate** [2] - 12:3,
95:25
**fact** [11] - 6:13,
15:16, 27:18, 30:2,
45:1, 68:2, 92:25,
103:17, 108:25,
109:12, 118:25
**factor** [3] - 30:8,
76:6, 76:23
**factors** [1] - 19:20
**facts** [1] - 33:20
**failed** [1] - 29:17
**fair** [1] - 68:21

**FAIRHOLME** [1] -
1:3
**fall** [1] - 77:18
**falling** [3] - 15:14,
15:16, 104:4
**false** [1] - 46:22
**familiar** [1] - 112:22
**fancy** [2] - 100:18,
100:24
**Fannie** [147] - 4:20,
5:4, 7:5, 9:21, 10:8,
10:9, 10:18, 11:11,
12:20, 13:3, 13:8,
14:19, 15:10, 16:5,
17:3, 17:7, 20:21,
22:7, 23:17, 23:21,
25:22, 25:24, 25:25,
27:2, 33:10, 35:3,
35:4, 35:10, 35:20,
36:6, 36:8, 36:10,
36:15, 36:20, 36:21,
36:24, 37:1, 37:4,
37:9, 37:16, 37:19,
37:24, 37:25, 38:6,
38:12, 38:21, 39:1,
40:24, 41:16, 44:8,
44:16, 44:18, 44:21,
46:12, 46:22, 47:13,
48:19, 49:12, 50:1,
50:5, 50:11, 50:16,
51:19, 51:22, 51:24,
52:5, 52:11, 54:3,
57:17, 57:23, 59:19,
60:2, 60:3, 60:8,
60:12, 60:15, 61:13,
62:4, 62:22, 63:8,
68:4, 68:6, 68:10,
69:21, 72:5, 72:16,
72:24, 73:25, 74:4,
74:5, 75:3, 75:14,
75:17, 77:10, 77:15,
78:2, 78:9, 78:17,
79:6, 79:10, 79:15,
79:18, 79:21, 80:4,
80:16, 86:11, 87:9,
89:23, 90:4, 90:16,
92:5, 93:22, 95:7,
95:13, 95:17, 96:13,
96:14, 96:15, 98:18,
101:2, 101:8, 101:11,
101:20, 103:23,
104:5, 104:10,
104:23, 105:13,
105:20, 108:3,
108:11, 108:15,
108:22, 108:25,
109:7, 109:11,
109:24, 110:9,
110:16, 111:18,
111:19, 112:2, 113:2,

118:7
**FANNIE** [2] - 1:10,
2:6
**far** [2] - 16:17, 48:23
**far-reaching** [1] -
48:23
**Fargo** [1] - 33:24
**FDIC** [11] - 29:20,
30:5, 30:24, 30:25,
33:6, 33:17, 34:10,
35:16, 39:10, 40:18,
40:19
**FDIC's** [3] - 29:1,
34:3, 34:21
**feasible** [1] - 25:22
**February** [1] - 102:21
**Fed** [1] - 37:22
**FEDERAL** [1] - 1:6
**Federal** [2] - 41:16,
117:25
**fee** [26] - 30:5, 32:15,
32:16, 34:8, 34:16,
36:6, 36:13, 37:15,
37:18, 38:17, 38:24,
39:2, 39:6, 40:18,
40:19, 40:20, 41:6,
116:13, 116:19,
116:22, 117:5,
117:24, 118:4, 118:8,
118:13, 119:1
**fees** [18] - 29:1,
30:25, 39:10, 42:21,
93:22, 93:23, 94:1,
95:16, 95:23, 108:24,
108:25, 109:8,
109:10, 109:13,
109:14, 118:16,
118:19, 118:22
**few** [6] - 7:8, 97:8,
98:8, 98:16, 101:11,
104:1
**fewer** [1] - 108:6
**FHFA** [36] - 2:6, 7:6,
9:1, 17:14, 17:20,
18:23, 19:8, 24:1,
30:13, 41:15, 43:6,
44:8, 44:11, 44:18,
71:17, 72:5, 72:15,
72:19, 72:23, 85:6,
85:25, 89:23, 95:2,
95:5, 95:12, 108:24,
109:2, 109:8, 109:9,
109:13, 109:20,
112:6, 116:19, 117:7,
117:15
**FHFA's** [6] - 17:18,
18:7, 19:25, 44:15,
44:20, 82:20
**figure** [2] - 32:10,
100:25

**filed** [1] - 72:20
**filings** [12] - 38:13,
59:20, 60:2, 71:1,
72:2, 72:13, 72:20,
72:24, 73:2, 73:7,
94:1, 102:3
**finally** [3] - 10:25,
11:4, 28:21
**FINANCE** [1] - 1:6
**finance** [4] - 21:14,
48:21, 78:22, 97:23
**financial** [11] - 43:1,
48:17, 48:19, 50:20,
94:6, 95:12, 97:19,
102:18, 104:22,
107:24, 108:17
**finish** [2] - 119:20,
120:7
**finished** [1] - 114:6
**fires** [1] - 32:24
**firm** [4] - 76:3, 76:20,
77:24
**first** [22] - 4:22, 11:9,
18:7, 19:10, 28:6,
28:23, 29:7, 32:14,
48:18, 64:6, 65:24,
67:17, 70:7, 72:24,
75:14, 86:17, 89:20,
89:21, 101:10,
104:19, 109:25,
110:17
**Fitch** [9] - 48:7, 48:8,
48:16, 48:18, 49:12,
49:21, 79:4, 79:5,
79:8
**fixed** [2] - 13:9,
89:17
**fleeting** [2] - 5:4,
5:10
**FLEXNER** [1] - 1:21
**focus** [5] - 4:24,
13:13, 14:1, 14:12,
106:19
**focused** [5] - 14:13,
19:1, 19:10, 19:22,
40:14
**focusing** [1] - 78:14
**followed** [1] - 78:23
**following** [11] - 4:3,
24:24, 43:18, 43:21,
58:13, 59:14, 102:6,
110:11, 119:7,
119:18, 120:5
**FOR** [5] - 1:1, 1:17,
1:20, 2:6, 3:5
**Forecast** [1] - 105:7
**forecast** [8] - 90:15,
105:10, 105:14,
105:24, 106:4,
106:16, 110:5, 110:6

**forecasting** [1] - 112:2
**forecasts** [7] - 89:22, 90:19, 105:17, 105:20, 106:4, 110:7
**foregoing** [1] - 121:4
**foreign** [2] - 87:13, 87:17
**Form** [1] - 69:3
**former** [6] - 64:15, 103:3, 109:23, 112:5, 113:11
**forming** [1] - 88:10
**forth** [2] - 96:12, 114:16
**forward** [1] - 108:18
**four** [11] - 10:1, 13:1, 35:22, 36:4, 36:17, 51:22, 54:3, 61:13, 74:6, 74:13, 110:23
**fourth** [2] - 100:14, 108:13
**Freddie** [130] - 4:21, 7:6, 9:22, 10:9, 10:18, 11:12, 12:20, 13:3, 13:8, 15:11, 15:14, 16:5, 20:15, 20:22, 22:5, 22:10, 26:19, 27:1, 27:4, 33:10, 35:4, 35:10, 35:20, 36:7, 36:8, 36:10, 36:15, 36:20, 36:21, 36:24, 37:1, 37:4, 37:10, 37:16, 37:19, 37:24, 38:1, 38:6, 38:13, 38:21, 39:1, 40:24, 41:16, 44:8, 44:16, 44:19, 44:21, 46:12, 46:22, 47:13, 48:20, 49:13, 50:1, 50:5, 50:16, 51:19, 52:2, 52:3, 52:5, 52:11, 56:25, 57:18, 57:24, 60:2, 60:3, 60:8, 60:13, 60:18, 61:16, 62:8, 63:2, 63:13, 63:15, 68:4, 68:6, 68:10, 69:3, 72:6, 72:16, 73:25, 74:4, 74:5, 75:3, 77:11, 77:15, 78:2, 78:9, 78:17, 79:6, 79:10, 79:15, 79:18, 80:4, 80:16, 89:23, 90:4, 90:16, 90:20, 92:5, 93:22, 95:7, 95:13, 95:17, 96:13, 96:14, 96:16, 98:18, 101:2, 101:8, 101:12, 101:20, 102:7,

103:23, 104:5, 108:3, 108:11, 108:16, 108:22, 109:1, 109:7, 109:11, 110:9, 113:2, 113:6, 113:11, 113:13, 118:7
**FREDDIE** [1] - 2:7
**Freddie's** [7] - 5:4, 17:3, 17:7, 59:19, 72:24, 75:14, 75:18
**free** [2] - 12:16, 12:18
**frequently** [3] - 52:16, 52:18, 54:19
**front** [1] - 61:7
**fueled** [1] - 5:12
**fulfill** [2] - 20:10, 70:13
**full** [3] - 80:22, 106:13, 121:5
**fully** [1] - 33:2
**fund** [3] - 33:21, 34:4, 90:3
**fundamental** [1] - 17:14
**funding** [4] - 90:5, 90:7, 91:2, 91:9
**FUNDS** [1] - 1:3
**funds** [2] - 21:18, 55:24
**furthered** [1] - 43:7
**future** [14] - 8:17, 16:17, 28:12, 28:15, 49:25, 71:21, 71:22, 73:3, 78:25, 85:20, 100:19, 100:20, 100:23, 102:9
**FY** [1] - 106:13

## G

**g-fees** [10] - 93:22, 94:1, 95:16, 95:23, 108:24, 108:25, 109:8, 109:10, 109:13, 109:14
**G10** [1] - 61:20
**G13** [1] - 61:25
**G15** [1] - 62:1
**G7** [1] - 61:20
**gap** [1] - 6:24
**gather** [1] - 55:18
**Geithner's** [1] - 89:14
**general** [9] - 52:5, 52:10, 64:11, 72:14, 75:23, 80:3, 80:15, 114:15, 114:22
**generally** [3] - 46:11,

50:19, 79:17
**generating** [1] - 85:18
**generators** [1] - 93:21
**Ginnie** [1] - 96:15
**given** [3] - 25:11, 58:17, 118:21
**goal** [5] - 18:7, 43:7, 67:14, 67:19, 92:18
**goals** [13] - 18:10, 18:13, 18:18, 18:20, 19:9, 20:1, 20:18, 21:5, 21:8, 21:13, 64:3, 64:5, 69:2
**golden** [3] - 79:20, 79:24, 110:2
**Goldman** [4] - 86:25, 87:3, 87:9, 87:12
**government** [9] - 5:19, 12:12, 12:14, 12:15, 29:20, 29:22, 32:4, 46:5, 48:20
**government's** [2] - 91:5, 91:18
**government-organized** [1] - 32:4
**government-sponsored** [2] - 5:19, 48:20
**granular** [1] - 79:14
**graph** [3] - 14:16, 26:25, 105:6
**graphical** [1] - 62:21
**gray** [1] - 56:14
**great** [3] - 103:12, 103:15, 105:16
**greater** [3] - 5:23, 106:24, 107:8
**GROSSMAN** [1] - 2:4
**group** [1] - 77:23
**grow** [1] - 94:7
**growing** [1] - 23:21
**growth** [1] - 104:12
**GSE** [2] - 48:13, 48:23
**GSEs** [9] - 22:17, 40:10, 49:25, 85:18, 93:25, 94:6, 94:11, 94:14, 94:20
**guarantee** [1] - 95:8
**guaranteed** [3] - 49:24, 50:20, 108:17
**guaranty** [1] - 93:23
**guess** [1] - 90:10

## H

**half** [11] - 23:7,

37:25, 39:4, 39:5, 40:23, 110:1, 110:17, 113:8, 113:25, 114:1
**halt** [1] - 111:11
**HAMISH** [1] - 1:20
**Hampshire** [1] - 1:18
**hand** [5] - 62:22, 70:6, 83:22, 84:5, 105:3
**handled** [1] - 94:21
**happy** [2] - 65:3, 72:22
**harm** [3] - 68:12, 101:3, 102:23
**head** [1] - 53:17
**headroom** [1] - 25:17
**hear** [3] - 58:5, 58:7, 98:14
**heard** [1] - 16:9
**help** [2] - 33:20, 49:25
**helped** [1] - 20:4
**helpful** [1] - 80:22
**hereby** [1] - 121:3
**high** [2] - 11:6, 16:3
**higher** [11] - 9:7, 23:22, 31:14, 34:24, 38:18, 38:19, 39:7, 46:8, 60:13
**highlight** [3] - 71:15, 84:4, 88:18
**highlighted** [9] - 4:24, 6:6, 67:9, 67:15, 67:18, 69:6, 70:7, 85:12, 111:24
**highlighting** [1] - 71:18
**highly** [1] - 6:9
**himself** [1] - 30:21
**historical** [1] - 100:21
**history** [1] - 100:19
**hit** [1] - 24:4
**hitting** [1] - 21:1
**HOFFMAN** [1] - 2:6
**hold** [1] - 94:19
**holding** [1] - 12:7
**Home** [1] - 105:7
**home** [15] - 5:12, 5:14, 21:1, 21:18, 49:5, 103:10, 103:11, 103:18, 103:19, 103:25, 104:3, 105:9, 105:14, 107:20, 108:2
**Honor** [16] - 4:6, 7:10, 43:24, 58:3, 58:10, 58:15, 58:20, 62:14, 96:7, 99:4, 99:10, 99:12, 99:22,

115:3, 115:4, 119:11
**HONORABLE** [1] - 1:14
**house** [2] - 32:20, 32:21
**housing** [8] - 6:8, 6:13, 21:14, 48:21, 78:22, 79:9, 95:3, 107:25
**HOUSING** [1] - 1:6
**huge** [1] - 30:7
**HUME** [1] - 1:20
**hundred** [1] - 33:25

## I

**IAN** [1] - 2:6
**idea** [1] - 95:18
**identified** [3] - 12:16, 24:9, 26:6
**identify** [1] - 10:2
**ignore** [2] - 34:8, 41:20
**ignores** [1] - 27:22
**Immediate** [1] - 48:14
**impact** [6] - 9:16, 18:1, 47:10, 68:3, 68:5, 68:9
**implemented** [1] - 95:17
**important** [11] - 8:22, 20:7, 21:10, 24:14, 24:18, 24:19, 26:7, 27:5, 27:10, 28:1, 43:10
**importantly** [1] - 24:25
**imposed** [3] - 25:18, 40:12, 46:24
**improve** [1] - 103:25
**Improved** [1] - 48:13
**improved** [4] - 48:16, 48:19, 103:11, 103:19
**improvement** [2] - 49:3, 103:14
**improving** [3] - 5:12, 49:23, 103:11
**IN** [1] - 1:10
**INC** [1] - 1:3
**incentivize** [2] - 95:25, 109:10
**include** [6] - 25:6, 25:8, 54:23, 55:13, 56:2, 114:23
**included** [4] - 70:21, 71:1, 88:1, 114:17
**includes** [3] - 16:11, 16:12, 92:8

**including** [2] - 55:23, 105:15
**income** [9] - 24:11, 24:12, 26:21, 89:24, 90:17, 94:2, 95:10, 106:16, 107:10
**inconsistencies** [1] - 91:8
**incorrectly** [1] - 29:25
**increase** [19] - 14:5, 20:24, 24:10, 28:15, 49:5, 94:1, 95:14, 95:16, 101:21, 105:14, 107:13, 107:14, 107:15, 108:25, 109:3, 109:8, 109:10, 109:13
**increased** [7] - 17:2, 17:7, 67:2, 95:24, 101:3, 109:2, 109:13
**increases** [7] - 19:18, 20:25, 28:11, 28:12, 102:9, 102:16, 107:13
**increasing** [4] - 15:17, 17:4, 104:3, 108:3
**indefinite** [2] - 36:25, 37:12
**indicated** [1] - 66:14
**indicates** [3] - 49:2, 91:17, 106:15
**individual** [3] - 11:13, 13:1, 84:21
**indulgence** [1] - 115:2
**information** [20] - 7:5, 18:17, 21:10, 25:1, 25:3, 50:11, 53:12, 54:15, 55:7, 55:18, 75:5, 78:6, 79:5, 79:12, 79:15, 80:16, 83:8, 96:19, 108:21, 112:5
**informs** [1] - 42:20
**initial** [5] - 36:6, 37:15, 37:18, 37:20, 38:17
**instability** [2] - 20:13, 68:14
**instead** [1] - 38:20
**institution** [2] - 66:1, 97:19
**institutions** [2] - 91:6, 91:19
**insufficient** [3] - 6:24, 6:25, 28:10
**insurance** [18] - 29:1, 29:9, 30:1,

30:25, 31:9, 31:10, 31:20, 31:21, 31:24, 32:1, 32:3, 32:17, 32:20, 32:25, 33:21, 34:7, 34:18
**insure** [1] - 33:17
**insured** [6] - 33:25, 34:2, 34:3, 34:8, 35:18
**insuring** [2] - 32:21, 34:3
**intended** [4] - 64:19, 65:1, 66:1, 66:8
**intention** [1] - 109:9
**interest** [8] - 11:18, 11:19, 11:21, 12:6, 12:23, 38:19, 76:4, 76:21
**interested** [3] - 10:4, 13:19, 32:2
**interesting** [1] - 36:19
**interject** [1] - 111:3
**intern** [1] - 97:18
**internal** [8] - 73:10, 78:2, 78:17, 79:19, 80:11, 85:5, 105:13, 112:2
**internally** [4] - 72:11, 73:10, 103:23, 108:12
**interpret** [1] - 5:3
**investment** [13] - 12:16, 12:18, 39:18, 40:2, 40:6, 40:7, 42:1, 42:11, 42:12, 42:19, 76:6, 76:23, 87:4
**investments** [3] - 17:5, 17:6, 42:25
**investor** [3] - 12:7, 45:23, 78:15
**investors** [12] - 15:4, 21:16, 47:8, 72:13, 76:3, 76:5, 76:20, 76:22, 79:12, 87:13, 87:17, 87:21
**involved** [1] - 26:12
**involves** [1] - 10:16
**irrelevant** [2] - 66:23, 66:24
**issue** [7] - 7:1, 9:1, 12:20, 12:21, 17:20, 31:19
**issued** [9] - 4:25, 12:25, 13:10, 46:5, 51:19, 51:22, 52:2, 52:18, 75:12
**issuers** [1] - 94:13
**issues** [2] - 13:1, 26:9
**issuing** [1] - 82:19

**it'll** [1] - 119:24
**item** [2] - 49:17, 86:25
**items** [4] - 82:10, 92:3, 98:8, 103:8
**itself** [4] - 41:1, 69:8, 90:20, 108:6

**J**

**January** [3] - 36:14, 39:2, 103:20
**JONATHAN** [1] - 2:7
**JONES** [1] - 2:8
**JPMorgan** [2] - 33:23
**JUDGE** [1] - 1:14
**July** [8] - 67:24, 89:4, 89:13, 91:14, 104:6, 104:23, 105:13
**jump** [1] - 111:2
**jumped** [1] - 78:12
**June** [3] - 60:4, 85:9, 103:20
**JURY** [1] - 1:13
**jury** [23] - 4:1, 4:2, 4:23, 7:24, 16:9, 43:17, 43:19, 43:20, 55:1, 58:14, 59:2, 62:16, 64:2, 74:6, 74:13, 74:17, 75:2, 75:13, 88:6, 93:9, 96:8, 119:8, 120:4

**K**

**KAPLAN** [1] - 1:21
**Kari** [1] - 113:12
**KAYE** [1] - 2:8
**keep** [2] - 25:16, 83:17
**KENYA** [1] - 1:20
**kept** [2] - 77:10, 104:3
**KESSLER** [1] - 1:24
**KHALELAH** [1] - 1:20
**kicked** [1] - 59:11
**kind** [41] - 5:11, 5:24, 6:10, 10:24, 12:1, 12:17, 12:20, 14:18, 16:17, 18:20, 19:3, 19:6, 20:11, 23:5, 23:22, 24:18, 25:15, 27:8, 28:3, 28:7, 30:9, 33:19, 33:20, 37:10, 39:6, 39:22, 71:22, 73:14, 90:14, 91:10, 91:14, 91:21, 94:18,

95:25, 100:6, 100:17, 100:19, 103:12, 104:13, 106:20, 108:9
**kinds** [2] - 10:16, 13:7
**King** [1] - 1:24
**KIRK** [1] - 1:18
**knowledge** [1] - 81:3
**known** [3] - 47:1, 92:4, 101:12
**KRAVETZ** [140] - 2:2, 7:10, 43:24, 44:2, 48:1, 48:3, 49:15, 49:20, 51:3, 51:5, 53:5, 53:8, 53:22, 53:24, 56:22, 56:24, 57:6, 57:7, 57:9, 57:11, 58:2, 58:9, 58:20, 59:16, 61:2, 61:5, 61:19, 61:21, 62:14, 62:18, 62:20, 63:23, 64:1, 65:6, 65:9, 65:21, 65:23, 67:5, 67:7, 67:22, 68:1, 68:22, 69:1, 69:11, 69:14, 70:18, 70:20, 71:14, 74:11, 74:16, 74:24, 75:11, 76:13, 76:16, 77:2, 77:4, 81:2, 81:19, 81:23, 82:12, 82:15, 83:1, 83:2, 83:7, 83:16, 83:19, 84:3, 84:6, 84:12, 84:17, 84:19, 85:4, 86:4, 86:7, 86:24, 87:2, 88:14, 88:16, 88:18, 88:20, 89:2, 89:3, 89:7, 89:11, 90:22, 90:24, 96:2, 96:4, 96:7, 96:10, 96:22, 96:25, 98:2, 98:4, 98:22, 99:1, 99:6, 99:11, 99:15, 99:22, 99:25, 100:2, 100:13, 101:9, 101:16, 101:25, 102:2, 103:2, 103:6, 104:18, 104:21, 105:2, 105:5, 106:9, 106:11, 106:18, 106:22, 111:5, 111:13, 111:20, 111:23, 112:8, 112:12, 112:17, 112:19, 112:21, 112:24, 113:1, 113:20, 113:23, 114:12, 114:14, 115:2, 115:7, 116:9, 116:11,

117:18, 117:20, 119:10, 119:14
**Kravetz** [1] - 43:25

**L**

**label** [1] - 113:14
**lack** [1] - 68:13
**laid** [1] - 100:17
**LAMBERTH** [1] - 1:14
**land** [1] - 27:9
**language** [8] - 69:24, 69:25, 70:22, 75:24, 76:9, 76:11, 76:15, 91:19
**large** [16] - 11:11, 12:25, 22:12, 29:7, 29:17, 52:18, 85:18, 87:17, 87:19, 87:22, 90:20, 93:18, 108:4, 110:22, 110:23
**larger** [2] - 37:12, 87:20
**largest** [1] - 87:4
**last** [8] - 11:4, 30:20, 40:14, 57:9, 59:1, 59:24, 101:1, 116:15
**lay** [1] - 27:9
**Layton** [2] - 93:9, 93:11
**lead** [3] - 22:3, 28:11, 68:13
**least** [4] - 94:23, 102:7, 105:12, 116:4
**LEE** [1] - 1:23
**left** [4] - 4:12, 62:22, 105:3, 114:5
**left-hand** [2] - 62:22, 105:3
**legacy** [1] - 49:22
**legislation** [1] - 95:4
**lend** [1] - 37:23
**lender** [3] - 11:18, 11:20, 42:6
**less** [6] - 12:13, 24:20, 46:9, 46:10, 63:10, 100:23
**letters** [1] - 118:12
**level** [5] - 8:15, 11:6, 16:4, 16:24, 23:12
**liability** [1] - 73:7
**life** [2] - 12:8, 12:23
**light** [1] - 7:4
**likelihood** [1] - 102:9
**likely** [3] - 26:20, 50:16, 90:18
**limit** [6] - 14:6, 14:11, 14:15, 49:25,

95:9, 95:10
**limited** [6] - 17:10, 17:12, 37:7, 65:1, 66:2, 66:8
**limiting** [1] - 95:14
**limits** [2] - 95:7, 95:11
**line** [8] - 14:22, 22:24, 56:14, 58:11, 58:15, 58:23, 86:17
**Line** [4] - 67:24, 68:11, 81:24, 83:18
**Lines** [2] - 81:20, 81:21
**liquidation** [2] - 28:11, 28:14
**liquidity** [2] - 21:14, 70:13
**LISA** [2] - 2:10, 121:3
**Lisa** [1] - 121:12
**list** [4] - 47:2, 47:14, 59:20, 77:16
**listed** [9] - 60:23, 60:25, 61:13, 61:16, 64:6, 67:14, 84:14, 88:9, 88:22
**listen** [1] - 119:23
**listing** [2] - 54:2, 62:23
**lists** [1] - 83:12
**litigation** [1] - 55:16
**LITIGATION** [1] - 1:11
**LITOWITZ** [1] - 2:3
**live** [2] - 32:23, 32:24
**LLP** [3] - 1:21, 1:24, 2:4
**loan** [21] - 5:12, 11:10, 11:13, 11:17, 11:19, 11:20, 11:21, 37:6, 39:21, 39:22, 42:4, 42:5, 49:4, 50:21, 79:6, 107:3, 107:4, 107:20, 108:18
**loans** [13] - 37:2, 37:12, 40:5, 42:4, 49:23, 49:24, 50:19, 95:8, 95:9, 95:14, 108:9, 108:16
**Lockhart** [1] - 64:25
**long-term** [14] - 7:20, 9:21, 10:9, 13:13, 16:14, 16:16, 17:8, 17:10, 17:12, 26:3, 52:15, 54:4, 54:6, 57:22
**longer-term** [2] - 51:19, 52:1
**look** [29] - 9:18, 11:2, 12:10, 15:10, 18:16,

18:18, 21:6, 22:9, 22:23, 24:14, 24:19, 24:22, 26:23, 36:1, 37:13, 45:16, 47:23, 47:24, 53:11, 61:12, 61:22, 61:25, 62:1, 69:15, 80:22, 89:20, 106:20, 111:17
**looked** [11] - 16:14, 16:16, 18:14, 21:5, 22:13, 26:10, 40:13, 51:18, 59:17, 109:18, 110:5
**looking** [12] - 9:20, 22:20, 24:16, 36:17, 69:24, 71:22, 73:1, 73:9, 79:25, 83:17, 99:7, 108:2
**loop** [1] - 80:15
**loss** [5] - 5:12, 49:4, 107:4, 107:20
**losses** [13] - 22:12, 37:5, 49:25, 90:4, 90:7, 90:9, 90:21, 91:4, 108:4, 108:10, 108:12, 110:22, 110:23
**LOUIS** [1] - 2:7
**low** [2] - 12:19, 33:14
**lower** [3] - 9:5, 39:6, 106:24
**lump** [1] - 12:24
**lunch** [2] - 4:12, 8:19

# M

**MAC** [2] - 1:10, 2:7
**Mac** [68] - 4:21, 9:22, 10:9, 10:10, 10:18, 11:12, 15:11, 15:14, 16:5, 20:15, 20:22, 22:5, 22:10, 26:19, 27:1, 27:4, 35:4, 35:5, 35:11, 35:21, 36:7, 36:9, 36:10, 36:15, 36:20, 36:21, 36:24, 37:1, 37:4, 37:10, 37:16, 37:24, 38:1, 38:6, 38:13, 38:21, 44:8, 47:13, 48:20, 50:16, 51:20, 52:2, 52:3, 56:25, 57:18, 60:13, 61:16, 62:8, 63:2, 63:13, 68:4, 68:6, 68:10, 69:3, 72:6, 72:16, 89:23, 90:4, 92:5, 95:7, 96:13, 96:14, 96:16, 102:7, 113:2, 113:6, 113:12, 113:13

**Mac's** [7] - 33:10, 44:16, 44:19, 44:21, 63:16, 95:13, 95:18
**MAE** [1] - 2:6
**Mae** [81] - 4:21, 9:22, 10:8, 10:9, 10:18, 11:11, 14:19, 15:10, 16:5, 20:21, 22:7, 23:17, 23:21, 25:22, 25:24, 25:25, 27:2, 35:3, 35:4, 35:10, 35:20, 36:6, 36:8, 36:10, 36:15, 36:20, 36:21, 36:24, 37:1, 37:4, 37:9, 37:16, 37:24, 37:25, 38:6, 38:13, 38:21, 44:8, 44:16, 44:19, 44:21, 47:13, 48:20, 50:12, 50:16, 51:19, 51:23, 51:24, 54:3, 57:18, 60:12, 61:13, 62:4, 62:22, 68:4, 68:6, 68:10, 69:21, 72:5, 72:16, 86:11, 87:9, 89:23, 90:4, 92:5, 95:7, 95:13, 95:17, 96:13, 96:14, 96:16, 104:24, 105:13, 105:20, 109:24, 110:16, 111:18, 111:19, 112:2, 113:3
**Mae's** [2] - 33:10, 63:8
**MAE/FREDDIE** [1] - 1:10
**magnitude** [3] - 38:2, 100:15, 114:2
**maintain** [4] - 20:4, 20:9, 70:12, 94:6
**major** [2] - 45:7, 68:12
**managed** [3] - 20:16, 69:21, 70:8
**management** [4] - 78:4, 78:5, 87:7, 104:23
**Management** [1] - 86:11
**managing** [1] - 69:17
**March** [5] - 74:19, 74:23, 75:12, 92:9, 102:21
**Mario** [1] - 86:20
**marked** [4] - 53:6, 53:25, 61:3, 82:13
**market** [52] - 6:8, 6:13, 10:20, 18:8, 18:25, 21:16, 21:21, 31:21, 32:1, 32:2,

32:6, 32:9, 32:10, 41:3, 43:8, 48:21, 53:4, 56:9, 68:14, 70:14, 73:13, 73:16, 78:13, 78:14, 78:22, 79:16, 79:22, 80:5, 80:10, 80:20, 87:18, 87:20, 87:23, 91:4, 91:14, 91:18, 94:7, 94:12, 94:14, 94:20, 95:2, 95:13, 95:18, 95:20, 95:22, 97:23, 116:23, 117:2, 117:10
**market-wide** [1] - 10:20
**marketplace** [4] - 20:14, 31:23, 31:24, 32:1
**markets** [2] - 96:1, 101:21
**Mason's** [2] - 58:16, 58:22
**mason's** [1] - 59:10
**Massachusetts** [1] - 2:9
**massive** [1] - 78:20
**matched** [1] - 72:12
**Materials** [3] - 83:20, 88:1, 88:9
**math** [8] - 57:21, 58:2, 61:18, 63:12, 91:11, 91:21, 91:24, 116:4
**matter** [7] - 32:21, 60:24, 61:10, 64:11, 72:14, 83:9, 84:15
**mattered** [1] - 106:8
**matters** [1] - 19:20
**mature** [1] - 14:9
**matured** [3] - 16:17, 16:18, 16:25
**maturity** [8] - 12:7, 12:8, 12:12, 12:24, 51:25, 52:4, 52:9, 63:16
**maximize** [2] - 20:16, 70:8
**Mayopoulos** [5] - 87:9, 110:15, 112:4, 112:9, 112:11
**MBS** [4] - 94:7, 94:14, 94:17, 94:20
**MC** [1] - 1:10
**McFarland** [2] - 110:15, 112:3
**McGuire** [48] - 49:15, 49:16, 51:4, 53:5, 53:23, 56:22, 57:6, 57:10, 61:2, 61:19, 62:19, 65:6, 65:21,

67:5, 67:22, 68:22, 68:23, 69:11, 70:18, 76:13, 77:3, 81:19, 82:14, 83:1, 83:4, 83:5, 83:17, 84:3, 84:17, 85:13, 86:5, 86:24, 88:14, 88:18, 89:7, 90:22, 96:2, 96:22, 98:2, 103:2, 104:18, 105:2, 106:10, 106:19, 112:8, 115:5, 116:9, 117:19
**mean** [27] - 6:3, 8:10, 11:25, 15:2, 22:2, 24:25, 27:23, 29:6, 29:14, 30:16, 31:22, 41:12, 53:15, 60:20, 65:2, 66:24, 67:3, 80:7, 81:17, 90:2, 90:13, 91:8, 93:15, 110:18, 111:10, 114:6, 115:17
**means** [10] - 15:3, 15:4, 15:16, 17:4, 28:18, 64:12, 90:7, 90:12, 113:21, 117:16
**measure** [2] - 10:7, 10:12
**measuring** [3] - 44:14, 44:18, 44:20
**meet** [6] - 17:8, 73:11, 78:4, 80:1, 80:9, 105:21
**Meeting** [1] - 86:12
**meeting** [4] - 72:16, 87:7, 87:8, 87:12
**meets** [1] - 30:17
**MELTZER** [1] - 1:24
**memo** [2] - 84:20, 85:8
**mention** [1] - 66:18
**mentioned** [16] - 11:22, 15:21, 16:10, 25:6, 26:19, 27:1, 29:6, 31:3, 32:12, 40:9, 41:18, 73:16, 74:4, 95:24, 110:2, 111:14
**method** [2] - 29:1, 29:24, 29:25
**methodology** [1] - 30:24
**MFJ7** [5] - 54:7, 54:10, 56:3, 56:8, 56:15
**middle** [2] - 22:7, 83:11
**might** [10] - 10:19, 11:13, 14:5, 22:3,

22:11, 29:2, 73:15,
76:11, 79:10
  **million** [4] - 26:2,
30:15, 30:17, 57:15
  **minus** [4] - 14:19,
30:6, 33:9, 35:4
  **minute** [1] - 103:14
  **minutes** [3] - 43:15,
54:17, 119:10
  **missed** [2] - 25:7,
115:11
  **mission** [5] - 20:10,
68:4, 68:5, 68:9,
70:13
  **mistake** [1] - 30:7
  **mitigate** [1] - 18:25
  **model** [1] - 100:24
  **modeling** [6] - 105:9,
108:12, 113:3, 113:6,
113:7, 114:17
  **models** [1] - 100:18
  **modifying** [1] - 89:16
  **moment** [8] - 53:11,
53:22, 83:5, 96:6,
106:19, 108:10,
115:2, 117:21
  **Monday** [6] - 4:15,
48:10, 85:2, 119:12,
119:21, 119:25
  **money** [9] - 11:12,
22:18, 28:10, 29:14,
29:23, 37:2, 42:10,
42:23, 66:25
  **month** [2] - 100:22,
100:24
  **monthly** [1] - 79:14
  **months** [1] - 101:11
  **Moody's** [16] - 4:14,
4:17, 4:19, 45:10,
45:16, 45:18, 45:20,
45:21, 45:22, 46:1,
47:17, 77:6, 77:10,
77:15, 78:15
  **morning** [2] - 10:5,
93:8
  **mortgage** [12] - 18:8,
21:16, 21:21, 35:11,
43:8, 49:22, 49:24,
68:14, 70:14, 94:10,
95:19, 95:20
  **mortgage-backed**
[2] - 21:16, 35:11
  **mortgages** [4] -
21:19, 94:17, 94:18,
94:21
  **most** [1] - 6:23
  **move** [5] - 18:2,
29:23, 63:23, 96:23,
119:3
  **MR** [139] - 7:10,

43:24, 44:2, 48:1,
48:3, 49:15, 49:20,
51:3, 51:5, 53:5, 53:8,
53:22, 53:24, 56:22,
56:24, 57:6, 57:7,
57:9, 57:11, 58:2,
58:9, 58:20, 59:16,
61:2, 61:5, 61:19,
61:21, 62:14, 62:18,
62:20, 63:23, 64:1,
65:6, 65:9, 65:21,
65:23, 67:5, 67:7,
67:22, 68:1, 68:22,
69:1, 69:11, 69:14,
70:18, 70:20, 71:14,
74:11, 74:16, 74:24,
75:11, 76:13, 76:16,
77:2, 77:4, 81:2,
81:19, 81:23, 82:12,
82:15, 83:1, 83:2,
83:7, 83:16, 83:19,
84:3, 84:6, 84:12,
84:17, 84:19, 85:4,
86:4, 86:7, 86:24,
87:2, 88:14, 88:16,
88:18, 88:20, 89:2,
89:3, 89:7, 89:11,
90:22, 90:24, 96:2,
96:4, 96:7, 96:10,
96:22, 96:25, 98:2,
98:4, 98:22, 99:1,
99:6, 99:11, 99:15,
99:22, 99:25, 100:2,
100:13, 101:9,
101:16, 101:25,
102:2, 103:2, 103:6,
104:18, 104:21,
105:2, 105:5, 106:9,
106:11, 106:18,
106:22, 111:5,
111:13, 111:20,
111:23, 112:8,
112:12, 112:17,
112:19, 112:21,
112:24, 113:1,
113:20, 113:23,
114:12, 114:14,
115:2, 115:7, 116:9,
116:11, 117:18,
117:20, 119:10,
119:14
  **MS** [32] - 4:6, 4:9,
5:15, 6:2, 7:13, 43:13,
58:1, 58:8, 58:11,
58:15, 59:10, 71:12,
74:9, 74:14, 74:20,
75:8, 80:25, 83:4,
84:10, 84:24, 98:20,
98:24, 99:3, 99:9,
99:13, 100:8, 101:4,
101:14, 104:16,

112:15, 114:24,
119:16
  **Mukarram** [1] - 3:6
  **MUKARRAM** [1] -
4:7
  **multiple** [2] - 47:18,
72:19
  **multiplies** [1] - 34:16
  **multiply** [1] - 32:18
  **mutual** [1] - 55:24
  **mutually** [1] - 116:19

## N

  **near** [1] - 116:15
  **nearly** [2] - 91:2,
91:10
  **necessarily** [2] -
74:5, 80:20
  **necessary** [1] - 18:5
  **need** [4] - 82:16,
90:3, 100:18, 100:24
  **needed** [8] - 7:9,
15:21, 18:16, 18:18,
34:15, 42:13, 42:15,
72:1
  **negative** [1] - 42:14
  **negatives** [1] - 79:11
  **negotiate** [2] - 41:12,
41:15
  **net** [31] - 8:3, 8:5,
8:12, 9:8, 16:11, 18:4,
22:16, 22:18, 25:11,
25:23, 28:17, 54:10,
55:24, 64:12, 68:13,
70:13, 89:24, 90:17,
91:2, 91:9, 100:6,
101:2, 101:6, 101:11,
101:21, 102:6, 102:8,
102:16, 115:10,
115:16, 116:1
  **never** [5] - 88:8,
97:12, 97:19, 118:7,
118:15
  **new** [3] - 21:18,
85:17, 93:1
  **New** [18] - 1:18, 1:22,
2:5
  **next** [18] - 5:15, 6:5,
10:7, 14:16, 15:20,
28:21, 35:22, 36:18,
48:22, 56:7, 63:23,
73:16, 83:16, 86:5,
88:14, 96:23, 104:1,
119:3
  **nice** [1] - 120:3
  **nine** [1] - 36:23
  **nominal** [1] - 38:7
  **noncash** [1] - 102:16

  **none** [1] - 47:17
  **nonpublic** [1] - 80:16
  **normal** [2] - 66:3,
66:15
  **normally** [2] - 46:8,
90:13
  **Northwest** [5] - 1:18,
1:22, 2:9, 2:12,
121:14
  **note** [2] - 5:5, 104:10
  **noted** [27] - 6:23,
6:24, 7:1, 19:8, 20:2,
20:15, 33:1, 33:19,
33:22, 33:23, 34:1,
34:14, 41:24, 43:5,
52:17, 77:17, 78:10,
78:19, 79:9, 82:7,
103:14, 105:16,
109:9, 110:2, 118:12
  **notes** [9] - 13:2,
13:4, 48:16, 48:18,
52:17, 65:18, 87:8,
90:16, 121:5
  **notice** [1] - 47:8
  **November** [4] -
39:15, 39:17, 40:2,
40:4
  **number** [31] - 8:1,
16:9, 16:10, 29:11,
29:17, 30:9, 33:14,
33:15, 34:20, 34:25,
35:2, 39:9, 50:4, 50:5,
50:9, 50:10, 50:19,
50:23, 60:12, 63:17,
70:21, 83:21, 83:22,
84:4, 84:7, 85:5,
88:19, 92:22, 111:16,
115:24
  **numbers** [8] - 60:25,
62:16, 62:22, 93:17,
96:11, 103:16,
103:18, 116:5

## O

  **oath** [1] - 81:13
  **objection** [24] - 7:10,
58:1, 58:9, 58:11,
58:12, 59:12, 71:12,
74:9, 74:14, 74:20,
75:8, 80:25, 84:10,
84:24, 98:20, 98:24,
99:9, 100:8, 100:9,
101:4, 101:14,
104:16, 112:15,
114:24
  **objective** [4] - 21:2,
24:1, 66:2, 66:14
  **objectivity** [2] - 76:5,
76:21

  **obligation** [1] - 26:21
  **obligations** [2] -
17:8, 35:8
  **obtain** [1] - 38:5
  **obviously** [1] - 97:5
  **occasion** [1] - 90:11
  **occurred** [2] - 59:18,
94:24
  **October** [10] - 45:13,
45:14, 45:18, 45:20,
45:25, 47:17, 65:11,
65:15, 66:10, 77:20
  **OF** [2] - 1:1, 1:13
  **Official** [1] - 2:11
  **official** [1] - 121:12
  **often** [5] - 12:9,
20:20, 54:13, 75:24,
77:22
  **once** [5] - 9:8, 56:23,
66:3, 66:16, 101:19
  **one** [71] - 4:13, 4:19,
4:20, 5:8, 5:16, 8:19,
10:1, 10:17, 11:2,
12:24, 14:1, 16:11,
18:12, 18:18, 18:21,
19:20, 22:15, 23:20,
24:10, 26:10, 27:5,
28:23, 30:15, 30:20,
32:21, 34:14, 35:25,
40:15, 42:16, 45:10,
45:14, 49:16, 54:6,
54:22, 55:2, 56:25,
57:9, 57:21, 59:4,
64:5, 70:25, 71:6,
74:18, 74:22, 74:23,
75:1, 75:3, 75:7,
75:10, 77:6, 80:19,
81:8, 82:8, 83:21,
84:13, 85:18, 87:3,
88:23, 92:3, 93:21,
94:17, 94:18, 97:18,
100:25, 105:19,
106:4, 113:7, 115:2,
117:11
  **one-off** [1] - 5:8
  **ones** [5] - 6:18, 8:2,
52:15, 73:2, 75:10
  **ongoing** [1] - 9:2
  **open** [3] - 59:15,
112:11, 119:19
  **operate** [5] - 19:17,
29:8, 29:11, 31:4,
31:7
  **operating** [4] - 31:6,
49:3, 90:3, 90:7
  **operations** [2] -
66:3, 66:16
  **opinion** [14] - 18:21,
18:22, 19:14, 43:5,
44:10, 44:14, 45:1,

49:12, 77:22, 80:19, 84:15, 88:11, 90:11, 118:22
**opinions** [1] - 6:12
**opposed** [1] - 7:17
**optimism** [6] - 21:23, 22:3, 22:10, 23:12, 109:19, 110:7
**optimistic** [5] - 21:25, 22:1, 23:16, 104:11, 104:13
**option** [1] - 7:15
**options** [1] - 13:7
**order** [2] - 38:2, 95:25
**organization** [1] - 53:4
**organized** [1] - 32:4
**orient** [2] - 65:7, 65:16
**original** [2] - 92:12, 92:14
**originated** [1] - 49:23
**origination** [3] - 38:14, 38:15, 39:13
**outcome** [1] - 21:1
**outcomes** [4] - 19:2, 19:4, 19:6, 19:7
**outlook** [2] - 47:1, 47:15
**outpace** [1] - 94:2
**outside** [2] - 58:14, 119:8
**outstanding** [9] - 33:16, 52:7, 58:24, 59:21, 60:4, 60:9, 62:24, 63:4, 63:17
**overall** [2] - 80:20, 115:21
**overruled** [14] - 7:12, 59:12, 74:21, 75:9, 81:1, 84:11, 84:25, 99:19, 99:22, 100:9, 101:5, 101:15, 112:16, 114:25
**overstated** [1] - 24:12
**overstating** [1] - 23:13
**own** [2] - 20:3, 104:15

## P

**p.m** [3] - 1:7, 4:3, 43:18, 43:21, 120:5
**P.M** [1] - 1:20
**pack** [1] - 98:7

**page** [10] - 5:17, 34:22, 48:18, 49:16, 49:18, 79:8, 83:16, 91:20, 102:15, 104:20
**Page** [12] - 65:21, 67:24, 69:13, 76:14, 83:6, 89:8, 104:19, 105:3, 106:9, 112:9, 112:24, 112:25
**pages** [4] - 68:19, 75:25
**paid** [3] - 116:1, 118:7, 118:11
**panel** [2] - 4:1, 43:19
**paper** [1] - 66:13
**paragraph** [3] - 48:18, 49:1, 49:18
**parenthetical** [1] - 6:9
**part** [8] - 23:16, 49:17, 53:19, 54:3, 83:11, 98:7, 116:15, 118:9
**participants** [3] - 91:4, 91:14, 91:18
**particular** [30] - 10:22, 40:13, 50:15, 52:21, 52:22, 54:18, 55:14, 59:1, 59:7, 59:22, 66:6, 66:18, 68:17, 69:5, 77:23, 81:4, 84:7, 85:7, 86:25, 87:6, 90:25, 98:6, 99:7, 99:18, 99:20, 106:3, 106:15, 111:24, 113:4, 113:6
**particularly** [3] - 4:21, 23:23, 102:10
**parties** [2] - 72:4, 95:19
**passed** [1] - 95:3
**past** [3] - 71:19, 71:20, 100:23
**path** [1] - 5:20
**Paulson** [2] - 64:15, 64:18
**pay** [29] - 9:6, 9:7, 9:8, 9:12, 12:22, 15:6, 15:8, 18:1, 25:15, 25:25, 26:1, 28:10, 28:18, 36:10, 36:16, 38:21, 38:23, 39:1, 40:19, 40:24, 41:5, 41:10, 42:6, 43:12, 46:10, 80:13, 85:19, 100:24, 101:21
**paying** [1] - 5:22
**payment** [5] - 25:3, 38:7, 95:10, 100:5, 115:9

**payments** [5] - 7:21, 11:19, 80:2, 110:9
**PCF** [36] - 8:4, 8:5, 8:11, 8:13, 9:10, 9:14, 24:5, 25:6, 25:8, 25:11, 25:14, 25:17, 25:19, 25:20, 28:16, 28:20, 28:22, 28:24, 28:25, 29:2, 30:14, 30:22, 32:7, 32:8, 34:18, 40:11, 40:23, 41:8, 41:10, 41:13, 41:20, 41:22, 117:3, 117:13
**peaked** [1] - 108:12
**peanuts** [1] - 23:1
**Pennsylvania** [1] - 1:25
**people** [7] - 4:20, 27:18, 27:19, 29:16, 29:18, 42:16, 108:9
**percent** [38] - 8:4, 8:11, 8:13, 9:5, 14:23, 14:25, 36:8, 36:10, 37:19, 37:20, 37:22, 38:10, 38:20, 38:24, 39:6, 39:7, 39:8, 49:24, 50:10, 50:19, 57:23, 58:24, 59:9, 62:6, 62:10, 62:23, 63:2, 63:7, 63:13, 63:15, 63:18, 63:22, 85:20, 113:21, 115:9, 115:15
**percentage** [2] - 59:9, 87:17, 87:19
**perception** [1] - 15:17
**perfect** [2] - 31:1, 60:20
**perform** [2] - 55:5, 63:7
**performed** [1] - 118:18
**performing** [1] - 108:18
**period** [13] - 40:20, 46:23, 59:24, 78:9, 80:7, 80:12, 80:13, 91:13, 106:2, 108:19, 109:17, 109:24, 110:16
**periodic** [11] - 36:13, 38:24, 39:1, 40:19, 116:13, 116:18, 116:22, 117:5, 117:24, 118:4, 118:8
**periods** [1] - 102:10
**permission** [1] - 62:15

**permitted** [1] - 102:10
**person** [3] - 55:6, 106:20, 112:2
**personal** [1] - 81:3
**personnel** [2] - 72:15, 72:19
**perspective** [5] - 27:6, 44:17, 44:19, 44:20, 44:21
**Ph.D** [2] - 3:6, 4:7
**pick** [1] - 4:12
**picked** [1] - 73:13
**picking** [1] - 14:13
**pie** [1] - 62:19
**piece** [5] - 8:7, 10:24, 10:25, 11:17, 34:6
**pieces** [3] - 7:19, 10:17, 11:15
**placed** [1] - 47:14
**places** [2] - 18:22, 26:10
**Plaintiffs** [3] - 1:4, 28:24, 43:25
**PLAINTIFFS** [3] - 1:18, 1:20, 2:2
**Plaintiffs'** [14] - 47:22, 48:1, 53:6, 56:23, 65:7, 82:13, 86:5, 88:15, 104:19, 111:15, 112:19, 114:12, 114:17, 115:5
**plan** [1] - 92:4
**planning** [1] - 27:21
**play** [1] - 112:8
**played** [1] - 93:9
**PLLC** [1] - 1:18
**plugged** [1] - 33:15
**plus** [5] - 9:14, 28:20, 35:13, 63:21, 100:6
**point** [20] - 5:17, 5:18, 8:20, 31:15, 35:7, 58:18, 70:7, 70:11, 89:21, 90:23, 91:1, 93:18, 94:23, 99:8, 99:10, 100:14, 101:1, 103:19, 105:18
**points** [8] - 14:23, 14:24, 32:13, 32:18, 34:16, 34:23, 89:5
**poor** [1] - 22:3
**poorly** [1] - 22:11
**PORTER** [1] - 2:8
**portfolio** [12] - 16:13, 16:19, 16:22, 49:22, 50:21, 92:5, 92:13, 92:22, 93:4, 93:12, 93:19, 94:3
**portion** [12] - 9:9,

65:8, 67:15, 68:11, 69:5, 83:22, 85:12, 87:22, 87:24, 89:8, 89:12, 89:15
**posing** [1] - 7:3
**position** [1] - 85:18
**positive** [8] - 28:25, 30:22, 41:21, 64:12, 70:12, 79:5, 89:24, 90:17
**positives** [1] - 79:11
**positivity** [1] - 110:8
**possibility** [3] - 20:25, 85:14, 98:17
**possible** [3] - 102:15, 114:17, 114:23
**postdate** [1] - 71:7
**postdated** [1] - 75:2
**potential** [2] - 43:11, 47:8
**potentially** [1] - 47:5
**PR** [1] - 85:14
**predated** [1] - 74:19
**preference** [2] - 28:11, 28:15
**PREFERRED** [1] - 1:10
**preferred** [6] - 5:22, 36:24, 38:21, 39:18, 70:3, 71:11
**premiums** [1] - 31:20
**prepared** [2] - 89:13, 91:16
**presence** [3] - 58:14, 94:15, 119:8
**present** [2] - 66:19, 72:15
**presentation** [11] - 63:24, 66:6, 67:6, 70:22, 73:19, 74:12, 98:3, 102:1, 103:8, 111:21, 116:15
**presented** [2] - 66:7, 110:11
**presents** [1] - 78:5
**preserve** [2] - 19:11, 64:6
**pressure** [1] - 48:22
**presume** [1] - 24:6
**pretty** [1] - 14:3
**prevent** [1] - 19:6
**previous** [4] - 4:5, 5:17, 34:22, 39:10, 103:13
**previously** [5] - 81:10, 82:18, 84:14, 103:13, 108:5
**PREVIOUSLY** [1] - 4:7
**price** [15] - 10:7,

10:13, 10:19, 10:21, 11:5, 11:7, 13:9, 15:3, 15:17, 17:4, 47:10, 105:9, 105:14, 107:12, 107:14
**Price** [1] - 105:7
**prices** [31] - 5:13, 5:14, 9:19, 9:21, 10:21, 10:23, 11:24, 13:20, 13:22, 16:4, 17:2, 49:5, 55:13, 55:17, 55:18, 55:21, 55:22, 56:3, 79:9, 95:19, 103:11, 103:19, 103:25, 104:3, 107:16, 107:17, 107:21, 107:25, 108:2, 108:8
**pricing** [2] - 54:15, 55:21
**primary** [1] - 8:2
**principal** [4] - 11:18, 11:19, 11:21, 12:23
**principles** [1] - 51:14
**private** [5] - 45:2, 94:13, 96:1, 109:10
**probe** [1] - 59:6
**problem** [4] - 7:17, 17:20, 17:21, 20:13
**proceed** [2] - 4:5, 43:23
**proceedings** [10] - 4:3, 43:18, 43:21, 58:13, 59:14, 119:7, 119:18, 120:5, 120:11, 121:6
**process** [4] - 26:14, 65:25, 91:25, 100:14
**produced** [3] - 7:5, 27:4, 121:6
**producing** [2] - 26:12, 53:16
**production** [1] - 83:12
**Professor** [2] - 18:20, 58:17
**profit** [3] - 5:8, 22:6, 110:8
**profitability** [8] - 5:4, 79:21, 79:25, 80:12, 93:22, 109:25, 110:17, 110:18
**profits** [28] - 5:6, 5:7, 5:11, 6:25, 7:20, 8:17, 8:18, 8:21, 8:22, 9:5, 9:6, 9:7, 9:13, 23:13, 23:22, 28:19, 71:20, 71:21, 71:23, 73:11, 100:20, 100:21, 107:14, 107:15,

107:16, 107:18, 110:3, 114:21
**program** [2] - 32:4, 42:10
**projected** [4] - 104:12, 107:14, 107:15, 108:5
**projecting** [2] - 104:3, 106:2
**projection** [6] - 25:6, 25:8, 25:13, 25:21, 26:10, 26:23
**projections** [26] - 22:13, 22:21, 22:22, 23:10, 23:11, 23:15, 23:18, 24:8, 24:23, 24:25, 25:5, 26:8, 26:12, 26:15, 26:16, 26:19, 72:11, 104:10, 104:15, 111:14, 111:17, 111:18, 111:19, 113:2, 114:15, 114:16
**promote** [1] - 43:8
**property** [2] - 19:12, 64:7
**protect** [1] - 27:10
**protected** [2] - 17:25, 101:7
**protecting** [2] - 19:17, 20:4
**provide** [3] - 45:1, 79:12, 91:3
**provided** [2] - 91:2, 112:6
**providers** [1] - 94:10
**provides** [1] - 78:5
**providing** [3] - 21:15, 40:22, 70:13
**provisions** [1] - 49:4
**Prussia** [1] - 1:24
**PSPA** [3] - 89:16, 90:5, 92:14
**PSPA's** [1] - 87:14
**PSPAs** [3] - 36:5, 36:21, 85:16
**public** [5] - 50:6, 94:1, 97:9, 102:3, 102:12
**publicly** [4] - 72:20, 72:25, 108:16, 108:22
**published** [2] - 112:11, 118:15
**pull** [11] - 53:23, 56:23, 65:7, 76:13, 81:20, 82:17, 84:17, 101:25, 103:4, 114:12, 117:18
**pulled** [2] - 55:5, 55:7, 73:21

**pulling** [2] - 55:6, 55:11
**purchase** [1] - 42:10
**PURCHASE** [1] - 1:10
**purchases** [1] - 21:19
**purporting** [1] - 85:8
**purpose** [8] - 19:11, 21:17, 42:7, 58:22, 67:18, 71:18, 72:1
**purposes** [4] - 8:2, 10:12, 54:2, 55:23
**pursue** [1] - 48:22
**Push** [1] - 48:13
**put** [18] - 19:12, 29:14, 35:15, 37:3, 42:2, 50:12, 53:2, 55:21, 57:9, 61:19, 64:7, 67:5, 67:11, 68:23, 73:7, 75:1, 92:8, 103:13
**puts** [2] - 47:7, 53:3
**putting** [1] - 35:12
**puzzled** [1] - 30:22
**PX** [1] - 111:14
**PX-205** [1] - 84:4

**Q**

**qualified** [1] - 97:22
**quality** [1] - 49:23
**quantitative** [1] - 9:15
**quarter** [18] - 4:25, 5:25, 7:9, 22:6, 48:17, 48:19, 49:6, 50:11, 50:12, 59:25, 71:5, 75:4, 75:14, 75:18, 102:17, 104:4, 108:13
**quarters** [6] - 7:8, 22:7, 110:19, 110:21, 111:1, 111:12
**questioning** [3] - 58:11, 58:15, 58:23
**questions** [1] - 19:8
**quite** [2] - 18:2, 73:5
**quote** [24] - 48:16, 48:19, 49:2, 54:18, 54:19, 66:15, 67:13, 70:12, 76:18, 87:12, 87:14, 89:15, 89:21, 90:2, 91:1, 91:6, 93:12, 93:13, 93:17, 93:18, 98:12, 102:9, 102:15, 102:19

**R**

**Radnor** [1] - 1:25
**raise** [4] - 34:23, 41:5, 41:6, 95:18
**raised** [2] - 85:14, 85:17
**range** [1] - 31:15
**rate** [9] - 8:9, 12:6, 30:1, 31:13, 32:17, 33:1, 33:2, 38:19, 93:11
**rates** [1] - 4:20
**rather** [1] - 50:6
**rating** [4] - 4:19, 46:8, 78:4, 78:12
**ratings** [20] - 45:5, 45:8, 45:16, 45:17, 45:22, 46:1, 46:4, 46:5, 46:12, 46:24, 47:1, 47:4, 47:8, 47:14, 48:7, 77:9, 77:10, 77:14, 77:18, 78:8
**raw** [1] - 78:20
**RBC** [1] - 12:3
**RDR** [3] - 2:10, 121:3, 121:12
**RE** [1] - 1:10
**reached** [3] - 59:6, 80:12, 109:24
**reaches** [1] - 23:1
**reaching** [1] - 48:23
**react** [1] - 13:22
**read** [20] - 4:23, 5:5, 6:16, 6:18, 49:7, 49:13, 50:2, 50:3, 65:19, 66:4, 67:21, 70:11, 70:12, 70:15, 76:17, 76:24, 85:22, 87:14, 91:7, 119:23
**reading** [2] - 66:13, 68:19
**realize** [1] - 71:9
**really** [9] - 7:21, 13:16, 19:3, 20:25, 22:24, 30:18, 35:20, 42:7, 43:9
**reason** [13] - 18:23, 23:16, 31:6, 36:19, 41:7, 42:17, 49:9, 56:12, 57:2, 57:12, 73:1, 108:15, 115:20
**reasonable** [9] - 7:15, 17:19, 43:6, 44:11, 82:11, 117:6, 117:9, 117:14, 117:23
**reasonableness** [7] - 18:15, 18:22, 44:15,

44:18, 44:23, 82:20, 85:25
**reasonably** [4] - 17:15, 18:5, 29:17, 45:2
**reasons** [8] - 18:2, 18:6, 29:4, 30:25, 85:17, 97:1, 99:15, 116:16
**rebuttal** [1] - 58:16
**receive** [1] - 42:22
**received** [7] - 36:7, 37:14, 37:15, 39:18, 42:9, 42:22, 72:19
**receives** [2] - 11:18, 11:20
**recipient** [2] - 86:17, 86:20
**recognize** [1] - 83:8
**record** [3] - 54:2, 106:3, 120:10
**recovery** [3] - 80:4, 80:7, 110:3
**recross** [1] - 59:13
**Red** [1] - 3:4
**redirect** [1] - 119:15
**redone** [1] - 39:17
**reduce** [3] - 8:17, 73:7, 109:11
**reduced** [5] - 8:8, 8:14, 20:5, 49:4, 101:8
**reducing** [1] - 92:12
**reduction** [9] - 8:9, 8:15, 16:12, 93:12, 94:2, 106:24, 107:8, 107:9, 107:18
**reference** [10] - 13:2, 13:4, 52:17, 69:20, 70:3, 86:8, 106:23, 107:3, 115:21, 116:23
**referenced** [2] - 64:5, 114:13
**references** [1] - 65:17
**referred** [5] - 13:2, 52:24, 66:7, 72:9, 77:5
**referring** [3] - 79:20, 80:4, 99:10
**refers** [2] - 69:25, 108:6
**refinancings** [1] - 21:19
**reflect** [3] - 13:18, 23:25, 106:6
**reflecting** [1] - 21:5
**reflective** [1] - 80:20
**Reform** [1] - 48:14
**reform** [2] - 48:23,

95:3
**regarding** [3] - 64:3, 82:20, 87:13
**regression** [2] - 11:1, 15:25
**regular** [1] - 50:6
**regularly** [1] - 56:20
**regulator** [1] - 97:15
**related** [2] - 10:18, 11:2
**relates** [2] - 72:5, 107:25
**relating** [8] - 70:21, 79:6, 86:25, 93:18, 94:2, 94:7, 96:23, 119:4
**relation** [1] - 98:9
**relatively** [3] - 52:16, 52:18, 54:18
**relaxed** [1] - 95:11
**release** [2] - 50:5, 108:3
**released** [6] - 72:25, 75:4, 75:15, 75:19, 79:6, 79:15
**releasing** [2] - 78:20, 98:18
**relevant** [11] - 6:21, 20:18, 30:21, 31:20, 34:20, 39:25, 42:7, 42:17, 59:2, 63:21, 71:10
**reliability** [1] - 59:3
**relied** [7] - 19:23, 22:14, 71:17, 81:4, 81:8, 81:25, 82:4
**remain** [1] - 21:18
**remained** [1] - 21:13
**remaining** [3] - 11:5, 30:4, 100:7
**remains** [1] - 5:20
**remember** [12] - 9:1, 12:2, 18:16, 23:5, 26:9, 27:1, 28:2, 34:15, 41:2, 55:20, 107:16, 111:16
**remind** [3] - 4:17, 7:24, 11:9
**rendering** [1] - 82:10
**reordering** [1] - 119:5
**repeatedly** [1] - 41:24
**rephrase** [1] - 7:14
**replace** [1] - 94:2
**replaced** [1] - 34:19
**report** [41] - 4:13, 4:25, 6:5, 8:19, 45:10, 45:13, 45:18, 45:20, 45:21, 46:1, 57:17,

58:3, 58:16, 58:22, 59:11, 60:2, 60:23, 61:10, 75:7, 75:12, 76:5, 76:6, 76:22, 77:5, 81:5, 82:17, 82:20, 83:9, 83:10, 84:16, 85:8, 85:25, 86:2, 88:11, 88:12, 88:22, 92:8, 92:9, 102:8, 108:22
**REPORTED** [1] - 2:10
**reported** [3] - 38:12, 84:22, 108:16
**REPORTER** [1] - 83:14
**Reporter** [2] - 2:11, 121:12
**reporting** [4] - 49:12, 55:21, 59:24, 84:21
**reports** [32] - 6:15, 6:16, 6:18, 7:4, 7:11, 70:12, 71:2, 71:3, 71:6, 71:9, 71:16, 72:9, 73:19, 73:22, 73:25, 74:4, 74:6, 74:17, 74:19, 75:1, 75:23, 76:19, 77:22, 79:11, 80:23, 81:7, 82:1, 82:8, 91:13, 105:18, 108:1
**represent** [1] - 57:22
**representing** [1] - 56:15
**request** [1] - 62:15
**requires** [1] - 35:16
**research** [2] - 55:15, 76:19
**reserve** [1] - 102:10
**Reserve** [2] - 41:16, 117:25
**reserves** [3] - 5:12, 107:4, 107:20
**residual** [1] - 22:23
**resist** [1] - 111:3
**respect** [1] - 85:7
**response** [3] - 17:3, 27:14, 82:4
**restoration** [3] - 114:18, 114:19, 114:23
**restore** [2] - 20:1, 20:8
**restored** [2] - 101:12, 101:20
**restoring** [1] - 98:18
**result** [8] - 5:11, 8:14, 93:4, 93:13, 101:19, 102:8, 102:23, 110:8

**resulting** [2] - 26:22, 106:24
**Results** [1] - 48:13
**results** [11] - 14:17, 15:12, 16:2, 16:3, 30:11, 30:15, 48:17, 48:19, 49:3, 50:6, 102:19
**resume** [1] - 119:21
**retained** [13] - 8:9, 8:16, 8:21, 16:13, 16:19, 16:21, 92:5, 92:13, 92:21, 93:4, 93:12, 93:18, 94:3
**return** [7] - 5:4, 12:6, 14:19, 66:2, 66:15, 92:19
**returned** [1] - 5:12
**returns** [2] - 20:17, 70:9
**revenues** [2] - 85:18, 104:13
**reversal** [1] - 5:12
**reverse** [1] - 107:17
**review** [4] - 68:18, 96:6, 98:5, 117:21
**reviewed** [10] - 6:15, 6:19, 55:7, 58:22, 72:19, 88:22, 90:10, 96:19, 97:5
**reviewing** [1] - 47:4
**revised** [2] - 39:24, 40:4
**rewards** [1] - 79:13
**right-hand** [3] - 70:6, 83:22, 84:5
**rigorous** [1] - 26:14
**risk** [36] - 7:2, 7:3, 8:7, 8:14, 12:18, 12:19, 13:14, 13:17, 13:18, 13:21, 13:22, 13:23, 14:5, 14:7, 14:8, 17:22, 18:8, 18:25, 20:12, 20:24, 24:1, 32:22, 32:24, 33:2, 34:24, 37:11, 46:9, 46:10, 63:10, 78:10, 98:12, 100:7, 101:3, 101:8
**risks** [1] - 79:12
**Road** [1] - 1:24
**road** [1] - 23:21
**roaring** [3] - 80:4, 80:7, 110:3
**Robert** [1] - 43:24
**ROBERT** [1] - 2:2
**role** [1] - 109:11
**Room** [1] - 2:13
**room** [1] - 25:10
**Ross** [1] - 113:12

**roughly** [4] - 33:21, 35:5, 36:20, 60:21
**Row** [2] - 61:12, 61:15
**ROYCE** [1] - 1:14
**RUDY** [1] - 1:23
**run** [5] - 13:15, 21:1, 29:10, 73:15, 98:13
**running** [2] - 13:21, 63:11

---

**S**

---

**Sachs** [4] - 87:1, 87:3, 87:10, 87:12
**safe** [1] - 12:13
**safer** [8] - 15:5, 15:6, 15:8, 15:18, 17:5, 17:6, 39:21, 39:22
**safest** [2] - 12:17, 46:19
**sales** [2] - 103:11, 103:18
**SAMUEL** [1] - 1:21
**saw** [13] - 19:19, 25:1, 29:15, 34:21, 39:9, 67:11, 70:25, 79:4, 88:21, 90:19, 91:13, 108:1, 110:18
**scenario** [4] - 23:6, 24:15, 27:6, 27:13
**scenarios** [4] - 24:5, 27:3, 27:4, 27:15
**SCHILLER** [1] - 1:21
**SCHOLER** [1] - 2:8
**scope** [4] - 99:3, 99:11, 99:13, 101:14
**screen** [6] - 47:24, 61:6, 76:15, 105:4, 105:6, 111:20
**scroll** [1] - 83:16
**seated** [2] - 4:4, 43:22
**SEC** [15] - 38:13, 59:19, 60:2, 70:21, 70:22, 70:25, 71:6, 71:16, 72:2, 72:9, 72:13, 72:20, 72:24, 73:2, 73:6
**second** [34] - 4:25, 5:25, 8:7, 9:13, 16:21, 19:22, 19:23, 20:6, 21:22, 22:6, 25:5, 28:9, 28:13, 28:19, 29:24, 30:9, 31:12, 48:17, 48:19, 49:1, 49:2, 49:16, 50:11, 50:12, 59:25, 70:11, 71:5, 75:4, 75:18,

79:8, 86:20, 99:8, 99:24, 113:8
**secondary** [5] - 18:8, 21:20, 43:8, 68:14, 95:20
**Secretary** [6] - 64:15, 64:18, 84:22, 85:9, 89:5, 89:14
**secretary** [1] - 85:14
**section** [1] - 6:6
**sections** [1] - 73:6
**secured** [6] - 37:2, 37:11, 39:20, 39:21, 39:22, 40:5
**securities** [14] - 5:22, 9:19, 10:8, 14:6, 14:7, 14:9, 14:10, 15:4, 15:7, 15:9, 16:1, 21:17, 35:11, 97:23
**see** [42] - 5:5, 5:13, 14:21, 15:13, 21:8, 22:5, 27:6, 30:8, 37:9, 40:6, 49:21, 54:7, 61:6, 61:23, 62:22, 65:10, 65:24, 68:2, 68:11, 68:15, 73:2, 81:24, 82:6, 82:16, 83:11, 83:20, 85:13, 86:8, 86:17, 89:12, 89:18, 89:25, 90:25, 96:8, 104:22, 105:6, 106:12, 107:1, 116:8, 116:12, 117:22, 119:25
**seeks** [1] - 76:18
**seem** [1] - 87:13
**sees** [1] - 85:15
**segment** [1] - 59:7
**segments** [1] - 112:10
**selected** [3] - 57:13, 57:22, 74:6
**sell** [1] - 13:7
**SENIOR** [2] - 1:10, 1:14
**sense** [8] - 7:22, 23:13, 71:23, 74:18, 76:11, 96:5, 99:17, 114:21
**sensitive** [1] - 13:20
**sent** [1] - 118:12
**sentence** [11] - 6:7, 19:10, 19:22, 19:23, 20:7, 40:14, 49:2, 65:24, 67:17, 85:13
**separate** [1] - 14:14
**September** [5] - 36:22, 38:25, 39:14, 92:14
**served** [1] - 97:15

2043

**service** [2] - 73:22, 78:15
**services** [3] - 45:23, 55:18, 55:21
**SESSION** [1] - 1:13
**set** [5] - 28:21, 96:12, 114:16, 117:3, 118:4
**sets** [1] - 14:8
**seven** [5] - 51:18, 52:6, 53:10, 53:18, 59:4
**several** [2] - 33:25, 119:3
**severities** [1] - 106:25
**share** [10] - 25:25, 26:2, 94:7, 94:12, 94:20, 94:21, 95:13, 95:18, 96:15, 96:17
**shared** [1] - 109:20
**shareholders** [8] - 18:24, 20:20, 20:21, 21:11, 44:24, 45:2, 71:11, 92:19
**shareholders'** [1] - 69:22
**shares** [2] - 38:5, 38:8
**sheets** [1] - 94:19
**short** [2] - 13:17, 63:9
**short-term** [2] - 13:17, 63:9
**shortfalls** [1] - 28:9
**show** [18] - 22:22, 22:25, 47:21, 61:3, 62:18, 65:3, 69:8, 72:22, 74:6, 74:17, 76:9, 76:11, 82:12, 83:5, 86:5, 90:22, 98:2, 104:20
**showed** [15] - 45:10, 45:18, 54:12, 64:2, 64:14, 64:21, 73:18, 74:13, 75:10, 75:13, 104:5, 105:18, 111:16, 111:19, 113:7
**showing** [4] - 62:15, 64:25, 107:7, 113:17
**shows** [4] - 6:10, 14:16, 27:10, 53:9
**shrink** [6] - 24:1, 92:4, 95:12, 95:14, 95:17, 109:11
**shrinkage** [1] - 95:22
**shuts** [2] - 29:20
**side** [8] - 45:17, 46:1, 48:7, 62:22, 70:6, 77:10, 77:15, 93:21
**sidebar** [2] - 58:14,

119:8
**significant** [1] - 78:10
**significantly** [1] - 77:19
**signifies** [1] - 46:9
**similar** [2] - 105:25, 113:7
**simple** [3] - 13:4, 91:24, 106:1
**simplifying** [2] - 23:19, 23:20
**single** [3] - 54:23, 76:6, 76:23
**sit** [2] - 78:21, 120:6
**sitting** [10] - 50:23, 51:1, 56:10, 64:23, 81:3, 81:25, 96:17, 109:5, 109:15, 112:7
**situation** [6] - 20:12, 22:2, 27:9, 31:12, 40:1, 42:13
**situations** [1] - 67:4
**six** [1] - 56:17
**size** [8] - 23:2, 32:6, 49:19, 49:21, 93:4, 95:8, 95:9, 95:14
**sizes** [1] - 52:18
**slide** [30] - 14:16, 15:10, 17:16, 18:14, 36:18, 39:10, 53:25, 54:1, 54:2, 54:23, 64:2, 64:14, 64:21, 66:7, 66:14, 67:6, 67:15, 68:23, 69:15, 71:1, 72:8, 74:12, 75:13, 92:8, 96:23, 97:1, 98:6, 98:7, 98:9, 116:16
**Slide** [12] - 53:23, 63:23, 96:24, 98:3, 101:25, 103:3, 103:4, 111:21, 115:6, 117:19
**slides** [11] - 28:21, 65:17, 67:21, 70:21, 72:11, 73:18, 74:12, 75:1, 97:5, 97:6, 119:5
**slightly** [2] - 60:13, 93:13
**small** [4] - 14:25, 33:4, 78:23, 79:2
**smaller** [5] - 11:13, 13:10, 37:17, 87:20, 100:20
**so..** [2] - 9:14, 87:21
**solely** [1] - 44:15
**solvency** [2] - 19:20, 19:21
**solvent** [3] - 19:13,

64:8, 64:12
**someone** [3] - 41:4, 55:8, 55:9
**sometimes** [2] - 52:24, 111:4
**somewhat** [1] - 87:22
**soon** [1] - 112:3
**sorry** [17] - 5:16, 6:25, 25:7, 40:16, 48:1, 49:16, 58:6, 65:16, 68:5, 81:21, 83:15, 111:3, 112:25, 115:6, 115:11, 115:17, 120:6
**sorts** [1] - 8:22
**sound** [4] - 19:13, 60:12, 64:8, 109:16
**soundness** [2] - 19:19, 19:21
**sounds** [1] - 14:25
**source** [3] - 8:21, 21:18, 55:25
**speaking** [1] - 106:21
**specific** [9] - 14:8, 14:12, 59:18, 59:21, 71:18, 73:1, 76:2, 76:10, 81:8
**specifically** [6] - 32:7, 68:20, 69:25, 72:8, 72:21, 78:14
**spectrum** [1] - 80:22
**speeded** [1] - 93:13
**sponsored** [2] - 5:19, 48:20
**spread** [3] - 12:10, 14:18, 14:21
**stability** [6] - 18:7, 18:24, 21:14, 21:20, 43:8, 70:14
**stabilize** [2] - 50:1, 66:1
**stabilized** [2] - 66:3, 66:16
**stable** [1] - 21:18
**standard** [4] - 14:3, 55:15, 55:25, 56:18
**standpoint** [3] - 44:15, 44:24, 103:18
**STANTON** [1] - 2:8
**start** [10] - 23:21, 28:21, 29:16, 36:14, 39:2, 41:9, 45:5, 49:1, 85:13, 119:12
**started** [2] - 25:18, 29:18
**starting** [8] - 38:24, 61:12, 61:15, 61:25, 68:11, 81:24, 89:9,

112:9
**starts** [1] - 69:16
**statement** [8] - 32:8, 33:5, 64:15, 64:21, 64:22, 67:8, 67:9, 69:9
**statements** [12] - 40:10, 66:22, 67:12, 71:15, 71:19, 72:9, 72:12, 72:24, 73:5, 73:12, 73:13, 110:4
**STATES** [2] - 1:1, 1:14
**states** [6] - 30:5, 65:24, 70:7, 76:18, 89:21, 90:2
**States** [4] - 2:11, 45:8, 46:20, 121:13
**stating** [1] - 102:15
**statistical** [2] - 11:1, 15:24
**statutory** [1] - 65:25
**stay** [1] - 108:10
**stenographic** [1] - 121:5
**step** [6] - 10:3, 10:15, 11:4, 15:20, 42:2, 95:6
**steps** [5] - 9:23, 10:1, 11:8, 29:22, 95:23
**STERN** [1] - 2:7
**still** [3] - 40:6, 92:17, 110:8
**stock** [1] - 36:8
**STOCK** [1] - 1:10
**stockholder** [2] - 20:17, 70:8
**Stockholders** [1] - 69:17
**stockholders** [2] - 69:25, 70:4
**stocks** [1] - 54:14
**stop** [1] - 41:14
**stopped** [1] - 25:19
**straightforward** [1] - 10:3
**strategy** [2] - 20:16, 70:8
**stress** [12] - 24:14, 27:6, 27:13, 27:15, 89:22, 90:6, 90:13, 90:15, 90:19, 90:20, 114:5, 114:7
**structured** [2] - 11:14, 11:22
**structures** [2] - 13:4, 13:11
**studied** [4] - 53:10, 53:19, 54:3, 58:24

**studies** [6] - 51:10, 54:14, 55:16, 56:19, 56:21, 118:19
**study** [26] - 9:17, 9:18, 9:24, 10:1, 14:2, 14:4, 14:11, 16:15, 16:16, 17:10, 17:12, 51:6, 51:13, 51:15, 51:18, 52:14, 53:19, 54:4, 57:13, 57:22, 59:4, 63:7, 63:13, 63:15, 98:11
**studying** [1] - 10:3
**stuff** [2] - 19:1, 73:7
**subject** [5] - 6:10, 86:11, 117:6, 117:14, 117:22
**subscription** [1] - 73:22
**subsequently** [1] - 22:12
**substantial** [7] - 9:11, 9:14, 28:20, 28:22, 30:14, 30:18, 91:3
**sudden** [1] - 111:11
**suggest** [1] - 26:25
**sum** [3] - 12:24, 61:22, 62:1
**summarize** [1] - 27:23
**summarized** [1] - 8:23
**summarizing** [1] - 87:7
**summary** [1] - 53:9
**summer** [1] - 97:18
**supplement** [1] - 50:11
**supplemental** [1] - 59:11
**supposed** [2] - 41:3, 96:13
**surprised** [3] - 76:9, 94:9, 104:4
**surprising** [1] - 54:13
**survive** [1] - 27:16
**Susan** [1] - 110:15
**suspended** [4] - 8:5, 9:10, 28:16, 118:9
**sustainable** [3] - 5:7, 80:12, 109:25
**sustained** [9] - 71:13, 74:10, 74:15, 80:12, 99:5, 104:17, 109:25, 110:16, 110:20
**sweep** [20] - 8:3, 8:6, 8:12, 9:9, 16:12, 18:4,

22:16, 22:18, 25:23,
28:17, 54:11, 100:6,
101:2, 101:7, 101:11,
102:6, 102:8, 115:10,
115:16, 116:2
**switch** [1] - 31:25
**SWORN** [1] - 4:7
**systemic** [2] - 18:25,
20:12

**T**

**table** [1] - 69:16
**tangible** [1] - 33:9
**tax** [6] - 98:18,
101:12, 114:18,
114:19, 114:20,
114:23
**taxed** [1] - 114:21
**taxes** [2] - 24:6, 24:7
**team** [4] - 55:8, 55:9,
55:12, 73:21
**technical** [1] - 31:19
**technique** [1] - 11:1
**temporary** [3] - 5:8,
64:20, 92:19
**ten** [18] - 13:16,
23:19, 26:4, 26:5,
26:16, 43:15, 51:25,
52:4, 52:9, 63:16,
63:21, 105:21,
105:23, 106:4,
111:18, 111:19,
113:4, 114:16
**ten-year** [7] - 26:16,
63:21, 105:23, 106:4,
111:18, 111:19,
114:16
**tending** [1] - 24:10
**tends** [1] - 32:25
**term** [22] - 7:20, 9:21,
10:9, 13:13, 13:17,
16:14, 16:16, 17:8,
17:10, 17:12, 26:3,
26:20, 36:25, 37:6,
51:19, 52:1, 52:15,
54:4, 54:6, 57:22,
63:9, 64:11
**terms** [21] - 6:12,
18:15, 20:18, 21:10,
27:25, 38:2, 39:10,
39:22, 39:24, 46:15,
52:10, 63:12, 63:17,
63:21, 68:18, 74:12,
95:2, 108:24, 113:2,
116:4, 118:14
**terribly** [1] - 21:4
**test** [4] - 11:5, 89:22,
90:6, 90:15

**testified** [13] - 45:7,
51:6, 51:15, 54:17,
60:6, 73:21, 76:2,
92:3, 98:12, 109:19,
112:5, 113:12, 118:6
**testify** [4] - 98:17,
99:2, 99:8, 100:15
**testifying** [4] - 44:5,
68:12, 85:5, 89:6
**testimony** [29] -
26:18, 27:12, 33:22,
50:5, 54:20, 55:2,
66:19, 67:20, 68:3,
68:18, 68:19, 72:15,
73:4, 77:9, 77:14,
82:6, 88:6, 89:14,
93:9, 97:4, 97:6,
99:12, 107:25,
109:23, 110:11,
110:15, 111:7,
111:24, 112:13
**text** [3] - 5:10, 65:17,
70:3
**Thakor** [13] - 25:20,
26:2, 28:23, 31:13,
31:16, 34:4, 35:17,
35:25, 39:12, 40:9,
42:7, 116:16, 119:4
**Thakor's** [3] - 29:5,
34:12, 41:18
**THE** [64] - 1:1, 1:14,
1:17, 1:20, 2:2, 2:6,
3:5, 4:1, 4:4, 5:16,
7:12, 43:14, 43:15,
43:19, 43:22, 58:5,
58:6, 58:7, 58:12,
59:12, 62:17, 71:13,
74:10, 74:15, 74:21,
74:22, 75:9, 75:10,
81:1, 83:14, 83:15,
84:11, 84:25, 85:1,
98:21, 99:5, 99:19,
99:23, 100:1, 100:9,
100:11, 100:12,
101:5, 101:6, 101:15,
104:17, 110:21,
110:22, 110:24,
110:25, 111:1,
111:10, 112:16,
113:21, 114:25,
115:1, 119:6, 119:9,
119:12, 119:15,
119:17, 119:20,
120:6, 120:9
**themselves** [3] -
23:11, 71:3, 93:25
**there'll** [1] - 24:6
**thereby** [1] - 85:19
**they've** [1] - 5:6
**thinks** [1] - 42:6

**third** [64] - 4:15,
7:17, 7:23, 7:24, 8:1,
8:23, 9:3, 9:9, 9:12,
9:16, 9:21, 10:4, 10:5,
10:10, 10:15, 16:6,
16:7, 16:8, 16:11,
16:23, 17:3, 17:6,
17:19, 17:24, 19:14,
19:15, 22:16, 27:22,
27:25, 28:2, 28:16,
28:19, 30:11, 31:19,
43:6, 43:7, 44:11,
46:11, 47:15, 54:6,
59:5, 59:24, 60:9,
71:24, 81:6, 81:16,
82:2, 82:11, 82:21,
86:15, 87:8, 90:23,
93:1, 93:5, 93:13,
100:5, 102:22,
102:23, 102:25,
109:6, 109:12, 118:5,
118:9
**thousand** [3] - 11:15,
11:17, 52:11
**thousand-dollar** [1] -
11:17
**thousands** [1] - 65:2
**three** [8] - 23:18,
31:6, 45:7, 45:11,
52:1, 57:3, 61:15,
110:22
**three-year** [1] - 23:18
**threshold** [1] - 92:12
**throws** [2] - 30:7,
30:20
**tied** [1] - 7:10
**time-out** [1] - 64:20
**timing** [1] - 74:18
**Timothy** [2] - 110:15,
112:10
**title** [2] - 48:13, 97:1
**today** [10] - 6:15,
6:19, 51:6, 54:1, 81:4,
81:16, 81:17, 81:18,
81:25, 119:21
**together** [4] - 35:12,
35:15, 55:22, 90:14
**tomorrow** [1] - 85:2
**took** [2] - 23:18,
112:2
**top** [9] - 14:22,
38:23, 42:13, 42:15,
48:18, 53:17, 65:8,
89:12, 106:12
**top-off** [2] - 42:13,
42:15
**topic** [1] - 59:1
**Topic** [1] - 69:17
**total** [15] - 33:9, 34:1,
35:3, 35:4, 35:5, 35:8,

57:12, 57:14, 59:20,
60:3, 60:23, 62:24,
63:3, 63:17
**totaling** [1] - 57:4
**touting** [1] - 79:5
**trace** [1] - 52:24
**trade** [11] - 11:14,
11:16, 11:23, 11:25,
53:13, 53:18, 54:13,
54:23, 55:7, 59:5
**traded** [4] - 52:15,
52:18, 54:18, 56:8
**trades** [10] - 52:21,
54:9, 55:2, 55:14,
55:17, 56:4, 57:3,
57:14, 59:18, 59:21
**trading** [5] - 12:4,
52:12, 53:10, 53:18,
57:18
**TRANSCRIPT** [1] -
1:13
**transcript** [5] -
67:21, 67:23, 81:20,
121:5, 121:6
**Treasury** [68] - 6:3,
7:8, 10:21, 12:11,
12:15, 12:22, 14:6,
14:20, 15:14, 16:1,
17:23, 19:16, 20:3,
22:19, 25:14, 25:18,
26:22, 29:2, 30:12,
32:5, 35:23, 36:2,
36:5, 36:7, 37:10,
37:14, 37:22, 38:5,
39:19, 40:3, 40:10,
40:15, 40:22, 40:23,
41:7, 41:9, 41:25,
42:2, 42:24, 42:25,
46:13, 46:19, 46:23,
64:15, 77:11, 84:21,
84:23, 85:9, 88:23,
89:6, 89:13, 90:3,
91:1, 91:3, 91:17,
91:22, 91:23, 92:1,
94:11, 101:22, 112:6,
113:18, 116:1,
116:20, 117:6,
117:15, 118:8, 118:12
**treats** [1] - 31:8
**trend** [1] - 106:16
**trends** [2] - 49:23,
50:1
**TRIAL** [1] - 1:13
**trial** [2] - 109:23,
110:11
**trillion** [1] - 30:16,
34:2, 34:3, 35:5, 35:8,
35:11, 35:12, 35:13,
60:8, 60:21, 87:22
**trouble** [1] - 24:19

**troubled** [1] - 66:1
**true** [4] - 46:22,
46:25, 121:4, 121:5
**Trump** [1] - 119:24
**try** [4] - 18:19, 27:10,
111:3, 119:20
**trying** [9] - 9:2, 19:6,
26:8, 32:10, 42:8,
65:16, 71:24, 79:11,
99:11
**turn** [3] - 24:3, 25:16,
26:19
**turned** [2] - 73:10,
110:24
**turning** [1] - 6:8
**tweet** [1] - 120:1
**twice** [2] - 91:2,
90:10
**Twitter** [1] - 119:25
**two** [23] - 8:2, 10:16,
13:1, 18:6, 22:7,
32:20, 34:14, 35:15,
37:6, 39:3, 40:22,
74:22, 85:17, 90:14,
105:20, 106:23,
109:12, 110:19,
110:21, 111:1,
111:10, 111:11, 116:5
**type** [7] - 14:1,
46:20, 50:17, 59:4,
63:7, 78:16, 80:5
**types** [2] - 12:4, 50:6
**typically** [5] - 10:1,
11:11, 23:17, 26:15,
78:4

**U**

**U.S** [15] - 12:11,
12:13, 12:15, 14:5,
14:7, 16:1, 39:18,
46:13, 46:19, 48:21,
49:5, 77:11, 91:22,
91:23, 92:1
**Ugoletti** [2] - 86:20,
86:22
**ultimate** [2] - 5:20,
44:10
**ultimately** [1] - 95:1
**uncertainty** [8] -
5:14, 6:12, 79:9,
103:12, 103:15,
105:17, 106:7
**unchanged** [2] -
5:20, 16:3
**under** [19] - 9:12,
9:13, 16:21, 16:23,
22:16, 28:13, 28:18,
28:19, 36:5, 81:12,

89:21, 90:15, 113:16, 113:24, 114:3, 114:5, 114:7, 114:9, 116:1
**understood** [1] - 44:22
**undrawn** [1] - 34:16
**unexpected** [1] - 91:4
**united** [1] - 2:11
**UNITED** [2] - 1:1, 1:14
**United** [3] - 45:8, 46:20, 121:13
**unlike** [2] - 18:23, 37:4
**unlikely** [3] - 27:13, 27:15, 27:20
**unlimited** [1] - 67:3
**unreasonable** [1] - 117:8
**unrelated** [1] - 10:16
**unwarranted** [1] - 22:2
**up** [53] - 4:12, 10:22, 10:23, 11:15, 14:13, 15:3, 20:12, 21:3, 22:11, 22:25, 27:18, 30:16, 33:5, 34:17, 34:24, 35:13, 37:3, 53:23, 56:23, 57:9, 60:21, 65:7, 67:6, 67:11, 68:23, 72:12, 73:13, 76:13, 81:20, 82:17, 83:4, 83:18, 84:18, 92:8, 93:5, 93:13, 94:18, 96:3, 101:25, 103:2, 103:4, 103:13, 107:9, 107:16, 107:24, 111:17, 112:19, 113:20, 114:12, 115:5, 117:18
**upcoming** [1] - 87:14
**update** [1] - 104:22
**upgrading** [1] - 47:5
**upper** [4] - 31:15, 34:17, 34:18, 105:3
**upside** [1] - 25:15
**upwards** [2] - 30:10, 106:16
**urgency** [1] - 85:15
**uses** [5] - 31:16, 34:15, 39:24, 40:4, 42:9
**UST** [3] - 83:18, 83:21, 88:19

## V

**valid** [1] - 58:21
**value** [19] - 7:21, 31:21, 32:2, 32:9, 32:10, 32:21, 38:3, 38:11, 38:18, 41:1, 41:3, 41:4, 59:17, 59:20, 59:21, 60:3, 116:23, 117:2, 117:10
**values** [2] - 38:12, 55:24
**variety** [4] - 6:12, 12:21, 14:13, 55:23
**various** [5] - 7:19, 11:16, 26:9, 37:13, 104:12
**VARMA** [32] - 2:6, 4:6, 4:9, 5:15, 6:2, 7:13, 43:13, 58:1, 58:8, 58:11, 58:15, 59:10, 71:12, 74:9, 74:14, 74:20, 75:8, 80:25, 84:10, 84:24, 98:20, 98:24, 99:3, 99:9, 99:13, 100:8, 101:4, 101:14, 104:16, 112:15, 114:24, 119:16
**Varma** [1] - 4:5
**version** [2] - 40:4, 54:1
**view** [4] - 5:7, 15:4, 73:10
**viewed** [5] - 9:11, 12:17, 17:4, 17:5, 17:6
**VINCENT** [1] - 1:17
**vintages** [1] - 108:18
**volume** [9] - 52:10, 52:21, 53:10, 53:18, 57:13, 57:14, 57:18, 57:23, 58:24
**vs** [1] - 1:5

## W

**wait** [2] - 7:7, 7:16
**waiting** [2] - 7:21, 27:24
**waive** [2] - 40:21, 41:8
**waived** [3] - 25:14, 36:14, 39:3
**waivers** [1] - 40:22
**waiving** [4] - 25:19, 40:23, 41:14, 118:13
**walk** [1] - 103:7
**warrant** [2] - 38:4,

38:5
**warrants** [6] - 36:7, 37:21, 37:24, 37:25, 38:3, 38:18
**Washington** [6] - 1:6, 1:19, 1:22, 2:9, 2:13, 121:14
**watch** [3] - 47:2, 47:14, 77:16
**ways** [1] - 104:12
**week** [2] - 4:15, 36:20
**weekend** [2] - 119:24, 120:3
**weeks** [1] - 109:12
**Wells** [1] - 33:24
**whole** [3] - 4:23, 58:22, 111:11
**wide** [2] - 10:20, 14:13
**WIERZBOWSKI** [1] - 2:2
**willing** [2] - 15:6, 15:8
**wiped** [1] - 94:10
**Witness** [1] - 120:8
**witness** [5] - 58:3, 59:8, 61:3, 119:1, 119:21
**WITNESS** [15] - 4:7, 5:16, 43:14, 58:6, 74:22, 75:10, 83:15, 85:1, 98:21, 100:11, 101:6, 110:22, 110:25, 113:21, 115:1
**WITNESSES** [1] - 3:5
**wonderful** [1] - 111:12
**word** [5] - 5:10, 41:11, 73:6, 82:22, 82:24
**words** [2] - 22:18, 117:22
**world** [2] - 87:4, 110:24
**worried** [2] - 29:16, 29:19
**worry** [2] - 91:21, 91:23
**worse** [3] - 23:14, 24:3, 31:12
**worst** [1] - 114:3
**worth** [29] - 8:3, 8:5, 8:12, 9:8, 16:12, 18:4, 22:16, 22:18, 25:11, 25:23, 28:17, 38:1, 54:11, 60:15, 60:18, 64:12, 68:13, 70:13, 100:6, 101:2, 101:6, 101:11, 101:21,

102:6, 102:8, 102:16, 115:10, 115:16, 116:1
**write** [2] - 68:13, 107:9
**write-down** [1] - 68:13
**write-up** [1] - 107:9
**writes** [1] - 49:21
**writing** [2] - 84:16, 91:11
**written** [5] - 73:25, 74:5, 91:9, 107:23, 107:24

## Y

**y'all** [1] - 120:3
**year** [15] - 14:4, 23:18, 26:16, 29:15, 36:12, 63:21, 74:1, 85:16, 105:10, 105:23, 106:4, 106:13, 111:18, 111:19, 114:16
**years** [20] - 13:16, 23:19, 23:23, 26:4, 26:5, 29:11, 31:6, 37:6, 39:4, 40:23, 51:25, 79:25, 85:19, 104:1, 105:22, 110:21, 110:22, 110:23, 113:4
**years'** [3] - 52:4, 52:9, 63:16
**yes-or-no** [1] - 46:15
**yield** [7] - 12:5, 12:6, 14:18, 15:2, 15:3, 15:14, 15:16
**yielded** [1] - 41:20
**yields** [2] - 16:1, 16:4
**York** [3] - 1:22, 2:5
**yourself** [2] - 95:24, 97:9

## Z

**zero** [11] - 23:2, 23:3, 25:11, 31:3, 31:5, 41:20, 42:3, 42:14, 54:9, 55:2, 114:9