```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * * *   )
      FAIRHOLME FUNDS, INC., et al.,  )   Civil Action
 4                                    )   No. 13-1053
                    Plaintiffs,       )
 5                                    )
         vs.                          )
 6                                    )
      FEDERAL HOUSING FINANCE AGENCY, )   Washington, D.C.
 7    et al.,                         )   August 7, 2023
                                      )   1:41 p.m.
 8                    Defendants.     )
                                      )
 9    * * * * * * * * * * * * * * *   )

10    IN RE:  FANNIE MAE/FREDDIE MAC  )
      SENIOR PREFERRED STOCK PURCHASE )   MC Case No. 13-1288
11    AGREEMENT CLASS ACTION LITIGATION )

12
                       TRANSCRIPT OF JURY TRIAL
13                   DAY 10 - AFTERNOON SESSION
                 BEFORE THE HONORABLE ROYCE C. LAMBERTH,
14                UNITED STATES SENIOR DISTRICT JUDGE

15

16    APPEARANCES:

17    FOR THE BERKLEY        VINCENT COLATRIANO, ESQ.
      PLAINTIFFS:            COOPER & KIRK, PLLC
18                           1523 New Hampshire Avenue, Northwest
                             Washington, D.C. 20036
19
      FOR THE CLASS          HAMISH P.M. HUME, ESQ.
20    PLAINTIFFS:            KENYA KHALELAH DAVIS, ESQ.
                             SAMUEL KAPLAN, ESQ.
21                           JESSICA MUGLER, ESQ.
                             BOIES, SCHILLER & FLEXNER, LLP
22                           1401 New York Avenue, Northwest
                             Washington, D.C. 20005
23
                             LEE D. RUDY, ESQ.
24                           GRANT GOODHART, ESQ.
                             KESSLER, TOPAZ, MELTZER & CHECK, LLP
25                           280 King of Prussia Road
                             Radnor, Pennsylvania 19087
```

1       APPEARANCES, CONT'D:

2       FOR THE CLASS           ROBERT F. KRAVETZ, ESQ.
        PLAINTIFFS:             ADAM H. WIERZBOWSKI, ESQ.
3                               CAITLIN BOZMAN, ESQ.
                                BERNSTEIN, LITOWITZ, BERGER &
4                                 GROSSMAN, LLP
                                1251 Avenue of the Americas
5                               New York, New York 10020

6       FOR THE DEFENDANTS      ASIM VARMA, ESQ.
        FHFA, FANNIE MAE &      IAN HOFFMAN, ESQ.
7       FREDDIE MAC:            DAVID BERGMAN, ESQ.
                                JONATHAN LOUIS STERN, ESQ.
8                               STANTON JONES, ESQ.
                                ARNOLD & PORTER KAYE SCHOLER
9                               601 Massachusetts Avenue, Northwest
                                Washington, D.C. 20001
10
        REPORTED BY:            LISA EDWARDS, RDR, CRR
11                              Official Court Reporter
                                United States District Court for the
12                                District of Columbia
                                333 Constitution Avenue, Northwest
13                              Room 6706
                                Washington, D.C. 20001
14                              (202) 354-3269

15

16

17

18

19

20

21

22

23

24

25

1

<u>I N D E X</u>

2

3

4                                       <u>Direct</u>     <u>Cross</u>        <u>Red.</u>

5

<u>WITNESSES FOR THE DEFENSE:</u>

6

Edward DeMarco                    2153

7

8

<u>EXHIBITS RECEIVED IN EVIDENCE</u>                         <u>PAGE</u>

9

Defendants' Exhibit No. 381                         2153

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. STERN:  Your Honor, Jonathan Stern for the

2     Defendants.

3          If I may, your Honor, a one-minute housekeeping

4     matter.

5          THE COURT:  All right.

6          MR. STERN:  There is an exhibit, your Honor, that

7     was inadvertently omitted from the list of exhibits that

8     Mr. Hoffman moved in earlier.  It is DX-381.  I'd move that

9     exhibit into evidence, your Honor.  I understand there's no

10    objection.

11         THE COURT:  Received.

12         (Whereupon, Defendants' Exhibit No. 381 was

13    entered into evidence.)

14         MR. STERN:  That's it, your Honor.  Thank you.

15         THE COURTROOM DEPUTY:  I'll get the jury.

16         Jury panel.

17         (Whereupon, the jury entered the courtroom at 1:42

18    p.m. and the following proceedings were had:)

19         THE COURT:  You may be seated.

20         Mr. Stern, you may proceed.

21         MR. STERN:  Thank you, your Honor.

22    (EDWARD DeMARCO, DEFENSE WITNESS, PREVIOUSLY SWORN.)

23              CONTINUED DIRECT EXAMINATION

24         BY MR. STERN:  Good afternoon, Mr. DeMarco,

25    members of the jury.

```
1                    We left off looking at HERA.

2                    So I'd Mr. Montgomery to bring that up, please,

3       DX-58.  And this time, if we can go to Page 3, the bottom

4       left column, if you would, Mr. Montgomery, Incidental

5       Powers.  Great.

6       BY MR. STERN:

7       Q.  Mr. DeMarco, you've seen this provision of HERA before,

8       I take it?

9       A.  Yes, I have.

10      Q.  And this talks about the powers of the conservator.  Is

11      that your understanding?

12      A.  Yes.

13      Q.  And I'd like you to look at the --

14                   MR. STERN:  Mr. Montgomery, so if you could

15      highlight the top, "The agency may, as conservator or

16      receiver," and then skip down to (ii) where it's called --

17      okay.  There.

18      BY MR. STERN:

19      Q.  So that part of the statute, Mr. DeMarco, where it says,

20      starting at the top, "The agency may, as conservator, take

21      any action authorized by this section which the agency

22      determines is in the best interest of the regulated entity

23      or the agency."

24                   What is your understanding of the phrase "the best

25      interest of the agency"?  What is that referring to?
```

1   A.  I believe it's referring to, we can take action in the

2   best interest -- in the best interests of the public.

3   Q.  Okay.  Now --

4           MR. JONES:  We can take that down, Mr. Montgomery.

5   BY MR. STERN:

6   Q.  So I want to shift your attention to the time in 2008

7   when the GSEs were actually placed into conservatorship.

8           What was happening in 2008 with Fannie and

9   Freddie's ability to go out onto the market and get money?

10  A.  It was vanishing on them, particularly what we call

11  longer-term borrowing, which means if you're going out and

12  trying to borrow money for several years.  That was part of

13  their normal business operation to do that.  And they were

14  getting to the point that such funding wasn't available to

15  them at any cost.

16  Q.  Okay.  So you told us that part of what HERA did was

17  authorize Treasury to provide funding?

18  A.  Yes, I did.

19  Q.  In September of 2008, were there any other sources of

20  financing available to Fannie Mae other than Treasury?

21  A.  So are we talking about equity capital?  The answer is

22  no.

23  Q.  One of the witnesses in this case in describing Treasury

24  at this time for these purposes called Treasury the only

25  game in town.  Is that -- would you agree with that?

1    A.  Yes, I would.

2    Q.  So I want to take a look at the actual decision memo.

3            MR. STERN:  DX-78, please.

4    BY MR. STERN:

5    Q.  The jury's heard about this.  What is this, DX-78?

6    A.  This is the determination letter of Director Lockhart

7    stating the grounds for his decision to appoint a

8    conservator for Fannie Mae.

9    Q.  And is there a corresponding one for Freddie Mac?

10   A.  Yes, there is.

11   Q.  Just so we're complete here, let's see DX-79.

12           Same thing for Freddie Mac?

13   A.  Yes, sir.

14   Q.  So let's go back to DX-78, so we can stick with Fannie

15   Mae.  What does it say about why Fannie Mae was placed into

16   conservatorship?

17   A.  Well, it provides a set of grounds, five in particular,

18   the first being that the enterprises experienced substantial

19   dissipation of assets or earnings due to unsafe or unsound

20   practices.

21   Q.  How would you just sum up these five?

22   A.  It's saying basically they're not able to operate

23   normally, that their ability to operate normal business, to

24   serve their mission, to get funding, is no longer available

25   to them and there's a risk of, you know, what this is going

1    to mean for them in the market.

2    Q.  And this document, what's the date of this document?  Do

3    you know?

4    A.  I believe it's September 6th.

5    Q.  And on September 7th, did Director Lockhart make a

6    public statement announcing that he was placing Fannie and

7    Freddie into conservatorship?

8    A.  Yes, he did.

9            MR. STERN:  If we can we pull up PX-2B.

10   BY MR. STERN:

11   Q.  Is that the statement?

12   A.  Yes, it is.

13   Q.  So I'd like to walk through this with you, if I may, and

14   pick out a few excerpts.

15           Let's take a look at the -- do you see the first

16   sentence on the first page after "Good morning"?

17   A.  Yes, I do.

18   Q.  What does that say?

19   A.  It says that Fannie Mae and Freddie Mac share the

20   critical mission of providing stability and liquidity to the

21   housing market.

22   Q.  And what did you take that to mean?

23   A.  That means just what it says:  That this is their

24   critical mission, is providing stability; that is, that we

25   have a stable, functioning secondary mortgage market, and

1    that that stable market is providing liquidity to families

2    that want to get a mortgage to buy a home.

3    Q.  And let's go on to the second sentence.  Elaborate on

4    that for us, please.

5    A.  It says -- it's stating how much -- what their

6    outstanding mortgage-backed securities and debt outstanding

7    is.  That is, these are the liabilities, the financial

8    liabilities, of the company.  And it's stating that,

9    combined, it's $5.4 trillion.  And to give some sense of the

10   scale of that, it points out that $5.4 trillion is equal to

11   the publicly held debt of the United States at that time.

12           MR. STERN:  Now, if we can go -- scroll to the

13   bottom of that, Mr. Montgomery, please, the bottom of Page

14   1, three lines from the bottom.

15   BY MR. STERN:

16   Q.  So it says here -- there's a reference to safety and

17   soundness, inability to raise capital.  And it says that has

18   required a very careful and delicate balance of mission and

19   safety and soundness.

20           What did that mean to you?

21   A.  It means that the companies need to operate safely and

22   soundly, meaning that they need to protect their own

23   financial interests and financial well-being, but they have

24   a public mission of ensuring that there's a continued flow

25   of liquidity in the mortgage market in all market

1    conditions.

2    Q.  So let's go to Page 5.  We're going to look at a

3    sentence that the jury has heard about.  Last line.

4              MR. STERN:  If we can keep it in that

5    magnification, Mr. Montgomery, so long as everybody can read

6    it.

7    BY MR. STERN:

8    Q.  Do you see at the bottom, where it says -- the sentence

9    starting, "This is a -- that is a statutory process"?

10   A.  Yes.

11   Q.  Why don't you read that out loud slowly.  And

12   Mr. Montgomery will change the page when you get to the end

13   of the line.

14   A.  "That is a statutory process designed to stabilize a

15   troubled institution with the objective of returning the

16   entities to normal business operations."

17   Q.  And in that context, what did "stabilize" mean?

18   A.  Stabilize meant so that they could return to their

19   normal operations as a company, that they could

20   independently operate and fulfill their mission.

21   Q.  When you say "independently operate," independently of

22   what?

23   A.  Meaning independent of government support.

24   Q.  Independent.  Would that be the Treasury commitment in

25   this context?

1    A.  Yes.

2    Q.  And what did returning -- at least back in -- on

3    September 7th of 2008, what did "returning to normal

4    business operations" mean?

5    A.  Just that, that they were capable of financing

6    themselves without assistance from the Treasury Department.

7    Q.  And what did "normal business operations" refer to?

8    A.  It meant their ability to buy and sell mortgages, issue

9    mortgage-backed securities, raise debt in the debt markets

10   as a normal process, just like they had before the financial

11   crisis took hold.

12   Q.  And it says again, "FHFA will act as the conservator to

13   operate the enterprises until they are stabilized."

14            Did you understand that to be imposing a

15   particular timeframe on the conservatorship?

16   A.  No.

17   Q.  Elaborate on that, if you would.

18   A.  No.  I mean, we did not know how long it would take to

19   stabilize.  We did not know what the effect of these actions

20   on this day would be and we did not know what the broader

21   path that the housing market and the economy would follow.

22   So it was hard to know how long this would go.

23   Q.  At that point, did you or FHFA know whether and how much

24   GSEs would actually have to draw on that commitment?

25   A.  No, we did not.

1    Q.  So let's go to the middle of the page on Page 6, where

2    we are now.  And it says, "The goal of these actions is to

3    help restore confidence in Fannie Mae and Freddie Mac,

4    enhance their capacity to fulfill their mission and mitigate

5    the systemic risk that has contributed directly to the

6    instability in the current market."

7              The reference there is to the goal of these

8    actions.  What did -- what were these actions in the context

9    of this statement?

10   A.  The actions were placing Fannie Mae and Freddie Mac into

11   conservatorship, establishing the Treasury support

12   agreement, the PSPA, and then the other liquidity facilities

13   that were established at this time.

14   Q.  So let's go to Page 8, the paragraph beginning

15   "Seventh."  Could you read that, please.

16   A.  "Seventh:  In order to conserve over $2 billion in

17   capital every year, the common stock and preferred stock

18   dividends will be eliminated, but the common and all

19   preferred stocks will continue to remain outstanding."

20   Q.  And what did it mean that the dividends were eliminated?

21   A.  It means just what it sounds like.  It means that in

22   conservatorship here, the dividends would not be getting

23   paid to common and preferred shareholders.

24   Q.  And those are the private shareholders that we referred

25   to before?

1    A.  Yes.

2    Q.  Those would be the Plaintiffs in this case?

3    A.  Yes.

4    Q.  And what does it mean when it says -- well, what did

5    Mr. Lockhart's statement mean as you understood it when it

6    said the shares continue to remain outstanding?

7    A.  It was drawing a distinction that this was not a

8    receivership, which would have extinguished the claims.  It

9    was a conservatorship.  The shares remained outstanding; and

10   what happens to them and whether there was any value would

11   be determined as we went forward.

12   Q.  Now, on the next -- on that same day, did FHFA issue

13   another document related to the conservatorship?

14   A.  Yes, it did.

15           MR. STERN:  Let's pull up DX-81-A, please.

16   BY MR. STERN:

17   Q.  Do you recognize this?

18   A.  Yes, I do.

19   Q.  And what was this?

20   A.  This was the questions and answers on conservatorship

21   that were released on September 7th in conjunction with this

22   other announcement.

23   Q.  So the first question is:  What is a conservatorship?

24   And could you read that answer for us, please.

25   A.  "A conservatorship is the legal process in which a

DeMarco - DIRECT - By Mr. Stern

1    person or entity is appointed to establish control and

2    oversight of a company to put it in a sound and solvent

3    condition.  In a conservatorship, the powers of the

4    company's directors, officers and shareholders are

5    transferred to the designated conservator."

6    Q.  And FHFA was the designated conservator?

7    A.  Yes.

8    Q.  And by the way, does this answer match your

9    understanding at the time, and today, of what a

10   conservatorship was in this context?

11   A.  Yes.

12   Q.  Do you know where that definition or answer came from?

13   A.  I believe it comes from the statute.

14   Q.  "The statute" meaning?

15   A.  HERA.

16   Q.  So let's go to Page 2 of this document.  And at the

17   bottom -- give me one second.  I've lost my place.

18            MR. STERN:  I apologize, ladies and gentlemen.

19   Here we go.

20            The Court's indulgence.  Now I'm reoriented.

21   BY MR. STERN:

22   Q.  At the bottom of Page 1, there's a question.  And the

23   question is:  What are the goals of this conservatorship?

24            Do you see that?

25   A.  I do.

1    Q.  And the first sentence doesn't really answer that

2    question directly.  Right?  The first question [sic] refers

3    to the purpose?

4    A.  Correct.

5    Q.  The second question refers -- and I'm going to come back

6    to that one.  But the second question refers specifically to

7    the goals.

8            Do you see that?

9    A.  Yes, I do.

10   Q.  And what does it say the goals of the conservatorship

11   are?

12   A.  "The goals of the conservatorship are to help restore

13   confidence in the company, enhance its capacity to fulfill

14   its mission and mitigate the systemic risk that has

15   contributed directly to the instability in the current

16   market."

17   Q.  So let's break that down.

18            What did it mean when -- what did this Q & A --

19   and by the way, sometimes this is referred to as a fact

20   sheet?

21   A.  Yes.

22   Q.  What did this fact sheet mean when it talked about

23   helping restore confidence in the company?

24   A.  So we spoke this morning about when Fannie and Freddie

25   would gather up mortgages, put them in mortgage-backed

1    securities, sell them and guarantee to the holder of the

2    mortgage-backed security that if the borrower failed to make

3    the payment, the company would.  Right?

4         Confidence in the company meant the holder and the

5    MBS had to have confidence, meaning Fannie and Freddie were

6    making good on that guaranty.  So restoring confidence in

7    the company was part of ensuring that the holders of the MBS

8    would go back to having confidence that that guaranty was

9    sound.

10   Q.  Got it.

11        So the second goal listed there is "enhance its

12   capacity to fulfill its mission."  What did that mean?

13   A.  Well, we talked earlier about the mission of the company

14   being to provide stability to the mortgage market and to

15   ensure ongoing liquidity in the mortgage market.  So that's

16   the -- enhancing its capacity to fulfill its mission means

17   that these companies in conservatorship -- we want to get

18   them back to being able to do that.

19   Q.  And the third goal listed in that goals sentence is,

20   "mitigate the systemic risk that has contributed directly to

21   the instability in the current market."

22   A.  Yes.  And that means what we talked about this morning,

23   was systemic risk.  A few minutes ago, we looked that there

24   were $5.3 trillion of mortgage-backed securities and debt

25   outstanding issued by Fannie and Freddie.  If Fannie and

1    Freddie fail, default on those obligations, then think about

2    all the holders of that $5.3 trillion worth of debt and

3    mortgage-backed securities.  They would then face, you know,

4    direct losses, you know, absent this action and the failure

5    of the companies.

6    Q.  And how were these goals of the conservatorship

7    different from the goals that Fannie and Freddie had before

8    the conservatorship?

9    A.  Well, these particular goals are part of what they had

10   before conservatorship.  They're -- they operated to provide

11   a guaranty in the market.  They operated to have this

12   mission of stability and liquidity and, you know, they were

13   intended to operate safely and sound so that there wasn't

14   systemic risk.

15   Q.  And was there a difference otherwise between the goals

16   in the conservatorship and the goals before the

17   conservatorship?

18   A.  Well, yes.  I mean, conservatorship created an important

19   change here in terms of goals.  Before conservatorship, the

20   companies operated in the best interest of the shareholders.

21   Once in conservatorship, they're operating in the best

22   interest of the public.  A conservator is there to see that

23   they operate in the best interest of the public.

24   Q.  So now I want to go back to the sentence that we skipped

25   over.  And that sentence says, "The purpose of appointing

 1     the conservator is to preserve and conserve the company's

 2     assets and property and to put the company in a sound and

 3     solvent condition."

 4          I want to take the first phrase first.  What was

 5     this referring to when it referred to preserving and

 6     conserving the company's assets?

 7     A.  Yes.

 8     Q.  What was your understanding of what that meant, both at

 9     the time this came out and -- well, let me stop there.  What

10     was your understanding of the meaning of that phrase?

11     A.  That we're supposed to ensure the value of the company's

12     assets, make sure these assets are not dissipated, which was

13     in fact a risk just prior to the conservatorship.  And so

14     preserve and conserve means, let's ensure the value of these

15     assets.

16     Q.  And in this context, what did "assets" refer to?

17     A.  Yeah.  So assets, it's part of a balance sheet.  But,

18     you know, I actually thought about assets as -- so assets

19     are the mortgages that Fannie and Freddie owned.  But it's

20     also the processes, the business platforms and so forth they

21     own.  And that's an intangible asset.  And then the people,

22     the human capital of Fannie and Freddie, is also an

23     intangible asset of the company that helps it to produce

24     value.

25          And so for me, preserving and conserving assets

1    meant preserving and conserving all of these things,

2    protecting the people that work there, the processes and

3    platforms and then of course the mortgage assets that they

4    owned.

5    Q.  And fact sheet, I think, on the next page asks the

6    question at the top:  When will the conservatorship end?

7             Do you see that?

8    A.  I do.

9    Q.  Before we get to what's written here, was it your

10   understanding that the conservatorship was temporary or

11   permanent?

12   A.  Temporary.

13   Q.  And what does it say here about -- well, let me ask you

14   this question:  "temporary."  Did you think it had a

15   definite end date?

16   A.  No.

17   Q.  So what does it say here about when the conservatorship

18   might end?

19   A.  It says that there's no exact timeframe that can be

20   given as to when the conservatorship may end.

21   Q.  And that was your understanding in September of 2008?

22   A.  Yes, it was.

23   Q.  And that was your understanding when you became acting

24   director?

25   A.  Yes.

1    Q.  Was that your understanding during the entire time you

2    were acting director?

3    A.  Yes.

4    Q.  And just to remind the members of the jury, you became

5    acting director when?

6    A.  September 2009.

7    Q.  So that was one year after imposition of the

8    conservatorship?

9    A.  Correct.

10   Q.  So the second question says:  What are the powers of the

11   conservator?

12              Do you see that?

13   A.  Yes, I do.

14   Q.  And what are those powers?  Or what were they?

15   A.  Well, it says here, "The FHFA, as conservator, may take

16   all actions necessary and appropriate to put the company in

17   a sound and solvent condition and carry on the company's

18   business and preserve and conserve the assets and property

19   of the company."

20   Q.  So the second-to-the-last question on Page 2 asks:  How

21   will the company run during conservatorship?

22              What's the answer?  And why was this something

23   that was important to put in the fact sheet?

24   A.  It was very important to let the market participants,

25   that is, the people that purchased the debt and MBS of

```
 1    Fannie and Freddie, as well as all the mortgage lenders
 2    around the country that are originating mortgages, expecting
 3    to sell them to Fannie and Freddie, that in fact the
 4    conservatorship was expected to keep the companies running
 5    as they had been.  Day to day, we wanted those operations to
 6    continue to function as normal.
 7    Q.  And before I get to the next substantive question, do
 8    you see there's a legend at the bottom, https?
 9    A.  Yes, I do.
10    Q.  What's your understanding of that and how it relates to
11    the availability of this document?
12    A.  That's what we call the URL.  If you go on the internet
13    and you enter this, you know, in a Google search or
14    whatever, this will bring up the fact sheet.  It was
15    released to the public on September 7, and that's the link
16    to the FHFA's website as to where to find this document.
17    Q.  You anticipated my next question.  This was publicly
18    available to any shareholder or anybody else who had access
19    to the internet?
20    A.  It was and it is.
21    Q.  So the last question on Page 2 -- we're going to have to
22    flip over for the answer -- is:  What happens to the
23    company's stock during the conservatorship?
24         And do you see the answer there?  What does the
25    answer say?
```

1    A.  It says, "During the conservatorship, the company's

2    stock will continue to trade.  However, by statute, the

3    powers of the stockholders are suspended until the

4    conservatorship is terminated.  Stockholders will continue

5    to retain all rights in the stock's financial worth as such

6    worth is determined by the market."

7    Q.  And in plain language, what does that mean?

8           MR. HUME:  Objection.  Calls for a legal

9    conclusion.  He can ask him his understanding.

10          MR. STERN:  It's an FHFA document, your Honor.

11          THE COURT:  I'm sorry?

12          MR. STERN:  It's an FHFA document.

13          MR. HUME:  I object to the form of the question.

14          If you rephrase it --

15          MR. STERN:  Sure.

16          MR. HUME:  Thank you.

17   BY MR. STERN:

18   Q.  What's your understanding of what this means,

19   Mr. DeMarco?

20   A.  My understanding of what it means is that the company's

21   shares could continue to trade on whatever exchange they

22   traded on and that they continued to retain their rights

23   from that.  But what they did not retain is their ability to

24   control or direct the companies like shareholders normally

25   did.

1    Q.  Understood.

2           So let's go to DX-102.  Do you recognize what this

3    is?

4    A.  Yes, I do.

5    Q.  What is it?

6    A.  It's Fannie Mae's Securities and Exchange Commission

7    filing for the third quarter of 2008, so it's covering the

8    period through September 30th, 2008.  It's a Form 10-Q; that

9    is, a quarterly filing that registered companies are

10   supposed to file with the SEC.

11   Q.  So tell me again:  The third quarter is what date

12   to what --

13   A.  It's July 1st through September 30th of 2008.

14   Q.  And if we go to --

15          MR. STERN:  Let's go to the last page for just a

16   minute, please.

17   BY MR. STERN:

18   Q.  This is -- well, you tell me.  Is this the last page

19   or --

20          MR. STERN:  Go to the second-to-the-last page.

21   I'm sorry, Mr. Montgomery.  There we go.

22   BY MR. STERN:

23   Q.  What is this?

24   A.  This is the required certification to the -- for the

25   filing that is signed by Herb Allison, who at this point was

1     the CEO of Fannie Mae.

2     Q.  What's the date on there?

3     A.  November 10th, 2008.

4     Q.  And let's go to the next page.

5              Who signed this and when?

6     A.  This is David Hisey, who at the time was the chief

7     financial officer of Fannie Mae; and again, November 10th,

8     2008.

9     Q.  So the date here is November 10th.  You said that this

10    covers the period to September 30th.  Do you have an

11    understanding of what the lag time there was about?

12    A.  So it's about six weeks.

13    Q.  And why isn't this issued immediately on September 30th,

14    if you know?

15    A.  Because there's an entire process that needs to be

16    followed to compute the financial results of a company at

17    the end of a quarter.

18    Q.  And just briefly, because the jury has heard about SEC

19    filings and they're going to hear some more from you later

20    on that, what is an SEC filing and what purpose does it

21    serve?

22    A.  Right.  So these are required disclosures to provide

23    transparency to the market so that people that want to

24    invest in the securities issued by a company can look at an

25    SEC filing to get the financial performance of the company

1    to be able to evaluate its balance sheet, its outlook and so

2    forth.

3    Q.  And when was this filing in relationship to when Fannie

4    Mae was put into conservatorship?

5    A.  So this is just over two months later.

6    Q.  So would this be the first quarterly report since the

7    conservatorship began?

8    A.  Yes.

9    Q.  So let's go to the chart at Page 11.

10              MR. STERN:  And if we could, Mr. Montgomery, blow

11   up the --

12   BY MR. STERN:

13   Q.  This is the Fannie Q.  Right?

14   A.  Yes.

15              MR. STERN:  If we could blow up that chart,

16   Mr. Montgomery.

17   BY MR. STERN:

18   Q.  So do you see there where it says, Topic:  Managing for

19   the benefit of shareholders?  Do you see that?

20   A.  Yes, I do.

21   Q.  And before conservatorship, there are two bullets.

22   Right?

23   A.  Yes.

24   Q.  What does the second bullet say?

25   A.  "Fulfill our mission of providing liquidity, stability

1    and affordability to the mortgage market."

2    Q.  And that's the public mission you'd been talking about.

3    Right?

4    A.  Yes.

5    Q.  And what does the bullet above that say?

6    A.  "Maximize shareholder value over the long term."

7    Q.  And that's before conservatorship.  Right?

8    A.  Yes.

9    Q.  Then there's a column that says During Conservatorship.

10   Right?

11   A.  Yes.

12   Q.  And this filing came out during the conservatorship; is

13   that right?

14   A.  Yes, it did.

15   Q.  Okay.  So let's look at that box.  Does the second box

16   again refer to liquidity, stability, affordability?

17   A.  Yes, it does.

18   Q.  I said second box; I mean second bullet.

19        What does the first bullet say?

20   A.  The first bullet says:  No longer managed with a

21   strategy to maximize common shareholder returns.

22   Q.  And what is the significance of the difference between

23   before conservatorship, maximize shareholder value over the

24   long term and during conservatorship, no longer managed with

25   a strategy to maximize common shareholder returns?  Does

1    that relate in any way to what you've explained to the

2    members of the jury about the purpose of the

3    conservatorship?

4    A.  Yes.  It's saying that the purpose here is, as we said,

5    confidence in the companies' ability to fulfill their

6    mission, mitigate systemic risk.  And so what this is

7    indicating is that the objective is no longer to maximize

8    shareholder value.  The focus is on these other matters.

9    Q.  And does that relate in some way to HERA's provisions

10   about the public interest?  And if it does, how so?

11   A.  Yes.  I mean, so as we pointed out, the powers of the

12   conservator, the purpose, was to work in the best interest

13   of the public.  And what we're saying here is as we manage

14   these companies in conservatorship, we're managing them in

15   the best interest of the public.

16   Q.  What if an action is in the best interest of the public,

17   but may not be in the best interest of the shareholders?

18   A.  We operate in the best interest of the public.

19   Q.  So let's take a look at the Freddie version of it to see

20   if it says the same thing.  That's DX-103, I think.  Let's

21   go to the last page or second-to-the-last page.

22            MR. STERN:  And blow this up, please.

23   BY MR. STERN:

24   Q.  What is this?

25   A.  This is the certification to this 10-Q that was signed

1    by the CEO of Freddie Mac, David Moffett.

2    Q.  And does this have the same -- I didn't ask you to read

3    the Fannie version.  Does this have the same language as the

4    Fannie version?

5    A.  Yes.

6    Q.  And what does Paragraph 2 say?

7    A.  "The information contained in the report fairly

8    presents, in all material respects, the financial condition

9    and results of operations of the company."

10   Q.  So let's go to the next page.

11            MR. STERN:  Blow that up, please.

12   BY MR. STERN:

13   Q.  Who signed this?

14   A.  David Kellermann, the chief financial officer.

15   Q.  So I think we're seeing a pattern here.

16   A.  Yes.

17   Q.  Chief executive officer, that's CEO?

18   A.  Yes.

19   Q.  Chief financial officer, that's CFO?

20   A.  Yes, sir.

21   Q.  And what we're seeing is that each of these is signed by

22   both the CEO of Fannie and the CFO of Fannie for Fannie.

23   Right?

24   A.  Yes.

25   Q.  And for Freddie, the CEO and the CFO of Freddie?

```
 1    A.  Yes.

 2    Q.  What's the -- let's go back to the previous page.  On

 3    what date did Mr. Moffett sign?

 4    A.  November 14, 2008.

 5    Q.  Next page:  On what date did Mr. Kellermann sign?

 6    A.  The same.  November 14, 2008.

 7    Q.  And this next one, I think, is at Page 9.

 8            MR. STERN:  If we could blow up the bottom box.

 9    There we go.  The bottom row.  I don't know what else to

10    call that.

11    BY MR. STERN:

12    Q.  The topic is what?

13    A.  Managing for the benefit of shareholders.

14    Q.  And without reading everything all over again, does this

15    look the same way the Fannie one did?

16    A.  It does.

17            MR. STERN:  Take that down.

18    BY MR. STERN:

19    Q.  I want to change topics to talk about the PSPAs.  Okay?

20    And what does PSPA stand for?

21    A.  Preferred stock purchase agreement.

22    Q.  Were those sometimes called the senior preferred stock

23    purchase agreement?

24    A.  Yes.

25    Q.  So if the members of the jury are looking at some of the
```

DeMarco - DIRECT - By Mr. Stern

1    documents in this case and they see PSPA in some places and

2    SPSPA in other places, should they understand those to be

3    the same thing?

4    A.   Yes, they should.

5    Q.   Okay.  So how was Treasury's financial support of the

6    GSEs in conservatorship structured?

7    A.   It was structured with the issuance of this senior

8    preferred stock to Treasury.  But Treasury did not

9    immediately put cash into the companies.  The agreement was

10   structured so that at the end of each quarter, when these

11   securities filings were prepared, if the company had a

12   negative net worth, that is, if liabilities exceeded assets,

13   then Treasury would inject enough money.  This was their

14   commitment:  They committed to put the money into Fannie or

15   Freddie sufficient to make them solvent.

16   Q.   I'm going to come back to the operation in just a

17   moment.

18            But just so we're clear, was this a loan?

19   A.   No.  This is an equity investment.

20   Q.   All right, sir.  And I introduced the phrase "senior."

21   Is this stock sometimes referred to as senior stock?

22   A.   Yes.

23   Q.   And what does that mean?

24   A.   It means that in the various classes of stock that

25   Fannie or Freddie have outstanding, that this Treasury

1    shares, these Treasury shares, are senior to all the other

2    classes of stock that Fannie and Freddie had outstanding.

3    Q.  Were there any other senior preferred shareholders other

4    than Treasury?

5    A.  No.

6              MR. STERN:  Let's pull up D-86, please.

7    BY MR. STERN:

8    Q.  What is this?

9    A.  This is the stock purchase agreement.

10   Q.  And do you know who this one's for?

11   A.  Freddie Mac.

12   Q.  And were there material differences between the PSPAs

13   for Freddie and for Fannie?

14   A.  No.

15   Q.  So let's -- as long as we have this one up, let's go to

16   Page 4.

17             Do you see that section that says Commitment?

18   A.  Yes.

19             MR. STERN:  I guess we can blow that up a little,

20   please.

21   BY MR. STERN:

22   Q.  What does this say about how the investment works and

23   actually the actual amount that Treasury was committing to

24   make available?

25   A.  So it's explaining that the purchaser -- that's the

DeMarco - DIRECT - By Mr. Stern

1    Treasury Department -- is committing to provide the

2    seller -- in this case, Freddie Mac -- on the terms that are

3    outlined in this contract funds up to the available amount.

4    The available amount, as specified in this paragraph, is

5    $100 billion.  So this is -- so $100 billion is being

6    committed that the Treasury will put into Freddie Mac in

7    order to keep it solvent.

8    Q.  And how was that $100 billion number decided on?

9    A.  Treasury Secretary Paulson said he wanted a really big

10   number to convince the market of the seriousness of the

11   government's commitment to backstop Fannie Mae and Freddie

12   Mac.

13   Q.  And at the time, at least, did everyone think this was a

14   really big number?

15   A.  Yes.

16   Q.  And how would it -- I think you touched on this.  But

17   under what circumstances would Fannie or Freddie actually

18   draw on this commitment?

19   A.  They would draw on this commitment after their losses

20   were sufficiently large as to have wiped out the value of

21   the other shareholders.  So the existing shareholders, the

22   losses needed to exhaust that value, and then make the

23   company insolvent; that is, liabilities greater than assets.

24   And when that -- if and when that event occurred, then the

25   Treasury Department would inject funds sufficient to get

DeMarco - DIRECT - By Mr. Stern

1    them back above zero in terms of their net worth.

2    Q.  So just to get our terms straight again, they would, at

3    least as I understand what you've just described -- they

4    would draw on the commitment when liabilities exceeded

5    assets?

6    A.  Yes.

7    Q.  And that means the same thing as they would draw on the

8    commitment when their net worth was negative or positive?

9    A.  Negative.

10   Q.  And then the draw would do what to their negative net

11   worth?

12   A.  It would get it back above zero.  Make --

13   Q.  Okay.

14   A.  Make it positive.

15   Q.  I'm sorry.  I talked over you.

16   A.  I said to get it back above zero so that it would be

17   positive.

18   Q.  All right.  And another way to think of this or at least

19   talk about it is, if they were insolvent, they would draw on

20   the Treasury commitment to make them...?

21   A.  Solvent.

22   Q.  And that's again this idea of getting above the line?

23   A.  Yes.

24   Q.  All right.  So did that mean -- let me put it this way:

25   So long as there's funding available, would Fannie and

DeMarco - DIRECT - By Mr. Stern

1    Freddie ever have negative net worth?

2    A.   No, not as long as there was funding available under

3    this commitment.

4    Q.   Because?

5    A.   Because the Treasury was committing, signing contracts,

6    saying, We're going to put this money in to keep you

7    solvent.  This was quite intentional the way the whole thing

8    was structured.

9    Q.   And this is an agreement or a contract.  Right?

10   A.   Yes.

11   Q.   So -- and I take it there were various terms and

12   provisions of the agreement?

13   A.   Yes, there were.

14   Q.   So you've described one, and what you've described is

15   Treasury making $100 billion available.  And that was to

16   each -- a total of 100 for Fannie and Freddie or 100 each?

17   A.   It was $100 billion for each company.  So combined, it's

18   200 billion.

19   Q.   Okay.  So did -- I'll just take -- since we're looking

20   at Freddie, I'll take Freddie.  Actually, I'll take Fannie.

21   It comes out of my mouth easier.

22        Did Fannie have an obligation or obligations to

23   Treasury in return for Treasury making available the

24   $100 billion commitment?

25   A.   Yes, it did.

DeMarco - DIRECT - By Mr. Stern

1    Q.  And what were those, at least the key one, the financial

2    obligations?

3    A.  So the financial obligations were, they were required to

4    pay a dividend to Treasury on a quarterly basis in cash in

5    the amount of 10 percent of what had been drawn, plus a

6    minor adjustment.  But that was -- the technical term was

7    the "liquidation preference."  So each quarter, they had to

8    pay a quarter of 10 percent of the liquidation preference.

9    That was the dividend.

10   Q.  I'm sorry, Mr. DeMarco.  You said a quarter and 10

11   percent in the same sentence.

12   A.  Sorry.  Let me step back.  Yes.

13   Q.  Bring it back.

14   A.  Yes.  So the dividend rate was 10 percent, so it was 10

15   percent of the liquidation preference.  So the dividend is

16   10 percent.  That's paid on the amount that was actually

17   drawn from Treasury.

18          This agreement also included a provision called a

19   periodic commitment fee, which was a fee --

20   Q.  Let's put that aside for a moment.

21   A.  Okay.

22   Q.  So the 10 percent you're talking about -- and you

23   referred to the liquidation preference.  Tell us a little

24   bit more about how the liquidation preference worked.

25   A.  So the liquidation preference, the calculation of it was

1    in consideration for making this commitment, there was a

2    billion dollars of liquidation preference given to Treasury.

3           And then every time a dollar was drawn on the

4    Treasury commitment, the liquidation preference went up by

5    that dollar.  Right?

6           So what the liquidation preference represented was

7    in the event that the company -- let's say we reached an

8    end.  If the company were to be liquidated at some point,

9    the liquidation preference is how much -- what the

10   Treasury's claim in liquidation was.  And that stood in

11   front of any other shareholders' claim.

12          So keeping track of this liquidation preference

13   was keeping track of how much in an end game was going to be

14   owed to the Treasury Department in the event of the

15   liquidation of the company.

16   Q.  And so going back to the relationship among the draw,

17   the 10 percent and the liquidation preference, every time

18   there was a draw, that would add to the liquidation

19   preference?

20   A.  Yes.

21   Q.  And is that what the 10 percent is based on?

22   A.  Yes.

23   Q.  So leaving aside the timing, a draw of $100 would

24   require a dividend payment of --

25   A.  $10.  10 percent of 100.

1    Q.  Okay.  And that's separate and apart from the periodic

2    commitment fee?

3    A.  Yes.

4    Q.  And every time there was a draw, it would increase the

5    next dividend; is that right?

6    A.  That's correct.

7    Q.  So give us hypothetical, just to understand how that

8    works.

9    A.  Okay.  So let's say the first draw -- let's use your

10   $100.  The first draw is $100.  And so the dividend on that

11   would be 10 percent or $10.

12             Then suppose in the next year, there was $200

13   drawn.  So now the liquidation preference is $300.  It's the

14   original 100 plus the 200.

15             Now the dividend is going to be 10 percent of the

16   $300 drawn, or $30.

17   Q.  So that accumulates or grows as more draws are taken?

18   A.  Yes.  The amount owed in dividend increases as the draws

19   go up.

20   Q.  So what we're looking at is the PSPA; is that right?

21   A.  Yes.

22   Q.  There was something called a certificate of designation,

23   also.  Is that right?

24   A.  Yes.

25   Q.  And that's different from the PSPA?

1   A.  Different, but connected.  Yes.

2   Q.  Okay.

3           MR. STERN:  So let's pull up the Fannie senior

4   preferred certificate of designation, DX-89.

5   BY MR. STERN:

6   Q.  And this is -- do you know whether this is from

7   September 7th, the original issuance?

8   A.  I believe it is.

9   Q.  And what is this certificate of designation and how does

10  it relate to the -- well, let me back up.

11          Is the phrase "stock certificate" sometimes used

12  for a certificate of designation?

13  A.  Yes.

14  Q.  Does this have anything to do with the private

15  shareholders, what we're looking at right now?

16  A.  No.

17  Q.  So what is the relationship between this Treasury stock

18  certificate and the PSPA?

19  A.  So the PSPA is the contract that created, you know, all

20  the terms around the Treasury funding.  It included that

21  there was this senior preferred stock.

22          This document in front of us, the certificate, is

23  the certificate for that senior stock.

24          MR. STERN:  Let's go to Section 2 on Page 1,

25  please.

1    BY MR. STERN:

2    Q.  Do you see that at the bottom of the page?

3    A.  Yes.

4    Q.  And what's the rate there?

5    A.  Dividends.

6              MR. STERN:  I'm sorry.  We have to go to the next

7    page.  Sorry.

8    BY MR. STERN:

9    Q.  Do you see Paragraph C, the reference to the dividend

10   rate?

11   A.  Yes.  I'm sorry.  I misunderstood your question.

12   Q.  It was a bad question because it referred to something

13   that wasn't even on the screen.  Now it is.

14              Do you see that?

15   A.  I do.

16   Q.  And what is that a reference to?

17   A.  The dividend rate, meaning 10 percent.  That's setting

18   what the dividend rate on the senior preferred stock was

19   going to be.

20   Q.  And what is that dividend rate?

21   A.  10 percent.

22   Q.  And we're going to get a lot more into this later on.

23              But was that a fixed rate or a variable rate?

24   A.  Fixed.

25   Q.  So no matter how much or how little money Fannie or

1    Freddie had, they were obliged to pay this dividend every

2    quarter?

3    A.  Yes.

4              MR. HUME:  Objection.  Calls for a legal

5    conclusion.

6    BY MR. STERN:

7    Q.  Is that correct, sir?  That's your understanding?

8              MR. HUME:  Same objection.

9              I'll withdraw the objection with the rephrasing of

10   the question.  Thank you.

11   BY MR. STERN:

12   Q.  That's your understanding?

13   A.  Yes.

14   Q.  Do you see a reference in this paragraph to 12 percent?

15   Do you see that?

16   A.  I do.

17   Q.  And there's been some discussion about that in the case.

18   So what did you understand the reference to 12 percent to

19   be?

20   A.  So 12 percent is the penalty dividend rate that would be

21   assessed if the company failed to make the 10 percent

22   dividend in cash in a timely manner as specified in this

23   paragraph.

24   Q.  Did you ever direct the enterprises not to pay the 10

25   percent but instead to add 12 percent to the liquidation

1    preference?

2    A.  No.

3    Q.  For how long were Fannie and Freddie going to have to

4    pay dividends to Treasury?  Is there a time limit on that?

5    A.  As long as they were in conservatorship and this

6    commitment was operative.

7    Q.  And by the way, were either Fannie or Freddie permitted

8    to pay down the liquidation preference?

9    A.  No.

10   Q.  When I say "not permitted," what barred them from doing

11   that?

12   A.  There were terms in the stock purchase agreement that

13   precluded that.

14   Q.  Now, you referred earlier to the periodic commitment

15   fee.

16           MR. STERN:  Let's go back to Freddie's PSPA,

17   DX-86, Section 3.2, Page 6, please.

18   BY MR. STERN:

19   Q.  You said that besides the dividend and the liquidation

20   preference, there was something called the periodic

21   commitment fee?

22   A.  Yes.

23   Q.  And do we see that in Paragraph B here?

24   A.  Yes, we do.

25   Q.  And what was the periodic commitment fee?

1    A.  It was a fee that was to be paid by the company to

2    Treasury to compensate Treasury for making the commitment to

3    put more money into the company if and when needed.

4    Q.  So I think you just implied the answer to this question,

5    but let's make it express.

6         Was the periodic commitment fee different from the

7    10 percent dividend?

8    A.  Yes, it was.

9    Q.  And how were they different?

10   A.  So the 10 percent dividend was a set amount.  It was 10

11   percent of whatever had been drawn.

12        The periodic commitment fee was not compensating

13   Treasury for what they had put in; it was compensating them

14   for the value of what they were committed to still put in as

15   needed.

16   Q.  Now, the amount of that fixed dividend, 10 percent, is

17   in the contract --

18   A.  Yes.

19   Q.  -- or in the stock certificate?

20   A.  It's in the stock certificate.  Yes.

21   Q.  Was the amount of the -- the amount of the periodic

22   commitment fee in either the PSPA or the certificate of

23   designation?

24   A.  No.  The PSPA speaks to the future computation of it.

25   Q.  And what does it say?

1    A.  As we see right here, it says that the amount of the fee

2    shall be mutually agreed -- mutually agreed by the purchaser

3    and seller.  And it goes on to say that -- I'm sorry.  It's

4    up further.  The intent of the fee is to fully compensate

5    the purchaser -- that's Treasury -- for the support provided

6    by the ongoing commitment.

7              And then the amount is to be set later and shall

8    be determined with reference to the market value of the

9    commitment as then in effect.

10   Q.  So let's go to DX-86.  Again, this is the Freddie PSPA.

11   And we'll go to Page 8 and 9.

12             So do you see a section called Covenants?

13   A.  Yes.

14   Q.  What is a covenant in this context?

15   A.  It's a contractual term.  It's a particular agreement

16   that is part of the overall agreement.

17   Q.  So the first one --

18             MR. STERN:  Maybe we could just go to a single

19   page for now to make it a little bigger.

20   BY MR. STERN:

21   Q.  So Section 5.1:  Restricted payments.  What did that

22   covenant provide or require?

23   A.  It prohibited the seller -- that is, Fannie or

24   Freddie -- to pay any dividends.

25   Q.  To whom?

```
1    A.  To its shareholders other than the Treasury without the

2    prior written consent of Treasury.

3    Q.  So this didn't restrict Treasury from getting its 10

4    percent?

5    A.  No.

6    Q.  It said that the GSEs could not issue a dividend to

7    anyone else without Treasury's written consent.  Is that the

8    idea?

9    A.  Yes.  That's what it says.  Yes.

10   Q.  So what about -- go to Section 5.3.  There's been

11   discussion in the case about exiting conservatorship.

12            What does this covenant say about Fannie or

13   Freddie exiting conservatorship?

14   A.  It says it cannot exit conservatorship without the

15   written consent of the purchaser, the purchaser again being

16   Treasury.

17   Q.  So whose decision would it be whether or not Fannie

18   could exit conservatorship?

19   A.  Well, it's saying FHFA can't make that determination

20   without the written consent of Treasury.

21   Q.  Same for Freddie?

22   A.  Yes.

23   Q.  Okay.  And --

24   A.  Other than -- just to be fully complete here, Mr. Stern,

25   other than in connection with a receivership.  FHFA did have
```

DeMarco - DIRECT - By Mr. Stern

1    the authority to put Fannie or Freddie in receivership.

2    Q.  But just so we're clear, what we're talking about in

3    this whole case is the conservatorship and not receivership?

4    A.  That's correct.  And this whole PSPA was designed to

5    avoid receivership.

6    Q.  Okay.  So how much control did these covenants overall

7    give to Treasury?

8    A.  It gave considerable control to Treasury.

9    Q.  And why did Treasury get such broad rights in all of

10   this?

11   A.  Because Treasury was doing what no one else was able or

12   willing to do, which is to put $100 billion per company,

13   make it available to keep these companies solvent.  And

14   these different covenants are designed to protect Treasury's

15   interest in doing so.

16   Q.  So let's pick up on that 100 billion.

17              Back in September of 2008, when the

18   conservatorships were established, what were FHFA's

19   expectations about the adequacy of that amount for Fannie

20   and Freddie?

21   A.  So the expectation in September of 2008 is that

22   $100 billion per company would be adequate to provide the

23   assurance to the market to give them confidence to allow the

24   companies to be able to fulfill their mission.

25   Q.  Back in 2008, did you give presentations in which you

1    referred to returning the GSEs to their shareholders?

2    A.  I believe I gave one.  Yes.

3    Q.  And did you use that kind of language anytime after the

4    fall of 2008?

5    A.  No.

6    Q.  And why not?

7    A.  Because at the time, the conservatorship is newly

8    established.  The $100 billion had been committed to instill

9    confidence in the companies.  The companies still had

10   positive net worth from their shareholders.  Nothing had

11   been drawn.

12            And if the results of this action was, in fact, to

13   instill, you know, immediate and rapid restoration of market

14   functioning and stability in the housing market such that

15   draws were not needed, then the possibility of having these

16   companies returned to their shareholders was there.

17            MR. STERN:  And can you please pull up PX-2-E.

18   BY MR. STERN:

19   Q.  So this is a -- what is this?

20   A.  This is an email I sent to colleagues at FHFA at the end

21   of October of 2008.

22   Q.  And it refers to -- is it transmitting some slides for a

23   talk?

24   A.  Yes, it is.  A talk that I gave a couple weeks earlier.

25            MR. STERN:  Go to the next page.  Next page,

 1   please.

 2   BY MR. STERN:

 3   Q.  So this is a slide deck?

 4   A.  Yes.

 5   Q.  And is this presentation one of the ones in which you

 6   used that language, "returned to shareholders"?

 7   A.  Yes.

 8   Q.  And this is dated what?

 9   A.  October 20, 2008.

10   Q.  And again, was there any time after December 31st, 2008,

11   when you used that language?

12   A.  No.

13   Q.  And what changed?

14   A.  What changed was, the losses came in; and they came in

15   fast and they came in significant.  The companies' losses

16   exceeded the value of the shareholder equity that was there

17   and both companies were now needing to take draws from the

18   Treasury Department.  And by early '09, those are starting

19   to become considerable draws.

20   Q.  One of the experts in this case has testified that the

21   first 100 billion went very quickly, the first 100 billion

22   of draws.

23           Would you agree or disagree with that?

24   A.  Yes.  It went quickly.  I agree.

25           MR. STERN:  We can take this down.

1    BY MR. STERN:

2    Q.  When you say the losses exceeded the shareholder equity,

3    what does that mean?

4    A.  So let's say in early '08 the companies start the year

5    with about $70 billion combined in shareholder equity.

6    Q.  Let me stop you there.

7              What does "shareholder equity" mean in that

8    context?

9    A.  So now we're talking about the common and preferred

10   shareholders of Fannie Mae and Freddie Mac and looking at

11   the financial statements of Fannie and Freddie in early '08,

12   that this is what the combined value, the net worth of these

13   companies, was in '08.

14             By the end of '08 --

15   Q.  Let me stop you one more time.  Is another way to think

16   about this -- correct me if I'm wrong -- that that

17   represented the shareholders' investments in Fannie and

18   Freddie?

19   A.  Yes.

20   Q.  And what happened to those investments by the end of

21   '08?

22   A.  They were lost due to losses at the companies.

23   Q.  Did that have anything to do with the third amendment?

24   A.  At the time?

25   Q.  Yes.

1   A.   No.

2   Q.   Because the third amendment was four years later?

3   A.   Yes.

4   Q.   So let's go back to '08.  By the end -- I interrupted

5   you twice.  By the end of '08, that equity was gone.  And?

6   A.   So now with the equity gone, the Treasury commitment, as

7   specified in the stock purchase agreement, kicks in.  And

8   the Treasury Department -- the companies are making draws

9   against the Treasury commitment to get them solvent.

10   Q.   So what is keeping the companies afloat at that point:

11   the shareholder equity that had been in the company or the

12   Treasury commitment?

13   A.   No.  Now it's the Treasury commitment.

14   Q.   So the first 100 billion each, 200 billion, goes in

15   September 7, 2008.  Right?

16   A.   Yes.

17   Q.   Was that amount later changed?

18   A.   Yes.

19   Q.   Was it changed more than once?

20   A.   Yes, it was.

21   Q.   When was the first time that it was changed?

22   A.   May of 2009.

23   Q.   Do you remember the date?

24   A.   May 6th.

25   Q.   Very good.

```
 1              MR. STERN:  DX-163, please.

 2    BY MR. STERN:

 3    Q.  Do you recognize this?

 4    A.  Yes.

 5    Q.  What is this?

 6    A.  This is the amendment to the senior preferred stock

 7    purchase agreement, what we referred to as the First

 8    Amendment.

 9    Q.  Okay.  And what did this -- how -- what did this first

10    amendment amend about the PSPA?

11    A.  It amended the dollar value of the Treasury commitment.

12    Q.  And are we looking at the Fannie or the Freddie one?

13    A.  Fannie.

14    Q.  Okay.  And is the first amendment to the Fannie PSPA

15    different in any material way from the first amendment to

16    the Freddie PSPA?

17    A.  No.

18    Q.  And what did this first amendment to the PSPA

19    accomplish?

20    A.  It accomplished restoring some stability to the

21    companies and confidence in the marketplace.  It did that by

22    doubling the amount of the commitment from $100 billion to

23    $200 billion.

24    Q.  So this is, if my math is right, eight months almost to

25    the day -- is it eight months almost to the day --
```

1    A.  April, May -- yes.

2    Q.  I do the same thing.  I just do it down here.

3            So eight months almost to the day from the

4    original PSPA?

5    A.  Yes.

6    Q.  And why did FHFA -- by the way, were you yet the acting

7    director at this time?

8    A.  No.

9    Q.  So this is Mr. Lockhart still?

10   A.  Mr. Lockhart signed this.

11   Q.  All right.  So who signed it for Treasury?

12   A.  Treasury Secretary Geithner.

13   Q.  And this increased the commitment from what to what?

14   A.  From $100 billion to $200 billion per company.

15   Q.  And did the other terms remain the same?

16   A.  Maybe a couple of minor technical changes.  But yes.

17   This was it.

18   Q.  Well, let me ask you more specifically:  Under the first

19   amendment, were Fannie and Freddie permitted to pay

20   dividends to other shareholders without Treasury's consent?

21   A.  No.

22   Q.  Under the first amendment, could FHFA release Fannie and

23   Freddie from conservatorship or -- I'll be more precise --

24   could Fannie and Freddie exit conservatorship without

25   Treasury's written consent?

DeMarco - DIRECT - By Mr. Stern

1    A.  No.

2    Q.  But it did change the amount?

3    A.  It did change the amount.

4    Q.  Had all $200 billion been used up by May 6th, 2009?

5    A.  No.

6    Q.  So what was the thinking, if you know, or what was your

7    understanding about why that amount had to be doubled or

8    should be doubled?

9    A.  It's because there had already been considerable draws

10   on the commitment at each company; and looking at market

11   conditions, meaning looking at the continued decline in

12   house prices, the continued increase in mortgage delinquency

13   rates, the country's now in a deep recession, the market's

14   looking at the remaining amount of the original commitment,

15   and saying:  Wow.  There's more losses coming at these

16   companies, given these circumstances.  We're not sure

17   $100 billion is going to be enough.

18           Remember, that $100 billion has got to last for

19   the life of these securities.  These are 30-year mortgages.

20           So the market's reaction is -- we're starting to

21   see the same things we saw in the summer of '08 where the

22   market is now getting very concerned about continuing to

23   participate with Fannie Mae and Freddie Mac.

24   Q.  So let's put some numbers on this.

25           So is it your understanding that at the end of the

1   first quarter of 2009 -- so that would be March 31st --

2   Fannie had drawn 34.2 billion?

3   A.  Yes.

4   Q.  So they still had 65.8 billion left?

5   A.  Yes.

6   Q.  And is it your understanding that Freddie had drawn 50.7

7   billion?

8   A.  Yes.

9   Q.  So they had 49.3 billion left?

10  A.  Yes.

11  Q.  So why not just wait to see what happened with the rest

12  of it?

13  A.  Because we were already seeing the market effect.  We

14  were getting back to instability in the market.  The

15  market's looking at that remaining commitment and drawing

16  the conclusion, There's not enough money in this -- the

17  remaining money in this commitment to make good on all the

18  guaranties that are outstanding.

19        So this is having a direct effect now in housing

20  markets and how they operate.

21  Q.  So at the time of the first amendment, in May of 2009,

22  did you think that doubling the Treasury commitment to

23  200 billion apiece would be enough?

24  A.  Yes.

25  Q.  Why did you think it would be enough?

```
1    A.  Because that was an extraordinary amount of money.

2    $200 billion each was a considerable amount of money.  And I

3    viewed it as a significant commitment by the Treasury

4    Department to ensure the -- instill market confidence in

5    these companies.

6    Q.  Did that thinking change at some point?

7    A.  It did.

8    Q.  All right.  We'll get to that in a minute.

9          So a few months after the first amendment to the

10   PSPAs, you became acting director.  Is that right?

11   A.  Yes.

12   Q.  And as acting director, did that mean you took on any

13   other role?

14   A.  It meant that I was the conservator of Fannie Mae and

15   Freddie Mac at this time.

16   Q.  Acting conservator or conservator?

17   A.  Conservator.

18   Q.  So the jury has heard that there wasn't any written memo

19   leading up to the third amendment.  Did you -- skipping

20   ahead a little bit, did you think about the third amendment

21   before you entered into it?

22   A.  Yes.

23   Q.  So --

24          MR. STERN:  The Court's indulgence.  We'll come

25   back to that.
```

DeMarco - DIRECT - By Mr. Stern

1    BY MR. STERN:

2    Q.  First I want to ask you about the second amendment.

3              Did there come a time when the PSPAs were amended

4    again?

5    A.  Yes, there did.

6    Q.  Tell us about that.

7    A.  So this was Christmas Eve, December 24th, 2009.  We

8    entered into a second amendment of the PSPAs.

9    Q.  And what was your role at that time?

10   A.  I was the acting director and the conservator.  So I

11   signed the second amendment on behalf of Fannie Mae and

12   Freddie Mac as their conservator.

13   Q.  And who signed for Treasury?

14   A.  Treasury Secretary Geithner.

15   Q.  And was there a significant change -- well, let me ask

16   you about some things that didn't change.

17             Under the second amendment, was Treasury's written

18   consent still required for the GSEs to issue dividends to

19   private shareholders?

20   A.  Yes.

21   Q.  Under the second amendment to the PSPAs, was Treasury's

22   written consent still required for the GSEs to exit

23   conservatorship?

24   A.  Yes.

25   Q.  Did something change with respect to the financial

1    commitment?

2    A.  Yes.

3    Q.  Was it doubled again?

4    A.  No.

5    Q.  Well, what happened?

6    A.  So at this point, having already increased it, doubled

7    it once, a different approach was taken this time.

8           This time, the approach was to say:  Look, the

9    market hasn't hit bottom.  We don't know what the end of

10   these losses are.  So what we're going to do is keep the

11   200, but then allow for an infinite number, an infinite

12   amount, for the next three years.  In other words, for any

13   losses, 2010 -- in 2010, 2011 and 2012, draws that were

14   necessary in those years would not count against the

15   200 billion.

16   Q.  So essentially, could Fannie and Freddie draw as much as

17   they needed to in any quarter?

18   A.  As long as it met all the other terms, yes.

19   Q.  Including just getting into the black?

20   A.  Yes.

21   Q.  And why was it important -- well, was it important to do

22   this second amendment before the end of 2009?

23   A.  Yes.

24   Q.  Why?

25   A.  Because HERA put a time limit on the Treasury's

DeMarco - DIRECT - By Mr. Stern

1    authority for purchasing obligations of the companies.  So

2    any change in the amount under the commitment needed to be

3    completed or adjusted before the end of 2009.

4    Q.  Okay.  And what does the end of -- we're going to talk

5    about what you were confronting as you neared the end of

6    2012, three years later.

7          What does this provision about Treasury's funding

8    authority at the end of 2009 have to do with what you were

9    facing in 2012?

10   A.  So importantly, for 2010, 2011 and 2012, this meant that

11   the commitment was open.  There was no limit on the amount

12   that could be drawn under the commitment.  That's what the

13   second amendment accomplished.

14         But at the end of 2012, when you get to the end of

15   the third year, then there was going to be a calculation

16   that determined:  Okay.  Here's how much commitment is left.

17   That was a cap on the commitment.  At that point, there was

18   no ability to increase the cap again.

19         So think about what we've done.  We've increased

20   the cap in May of '09 from 100 billion to 200 billion.

21         In December of '09, we said:  Wow.  This may not

22   be enough.  We increased it so that we could have an

23   unlimited amount for the next three years.

24         So every time things continued to not get better,

25   but losses continued to grow, we were able to increase the

 1   commitment.

 2           At the end of 2012, we had no ability to increase

 3   the commitment going forward.

 4   Q.  So if in February of 2013, Fannie -- FHFA wanted more

 5   money in the commitment than they had on December 31st,

 6   there was no way to get it?

 7   A.  That's correct.

 8   Q.  So did that mean that Fannie and Freddie were just stuck

 9   with what was there on December 31st, 2012?

10   A.  That was their effective equity at that point.  Yes.

11   Q.  And how long would that have to last?

12   A.  As long as the conservatorships ran.

13   Q.  Well --

14   A.  I mean, let me go -- I mean, further than that.  Right?

15   It had to -- you know, it had -- every day, we're issuing

16   30-year mortgage-backed securities.  As long as those

17   mortgage-backed securities are being issued under this

18   Treasury commitment, that commitment had to last for the 30

19   years that those securities were outstanding.

20   Q.  So we're going to come back to this.

21           But just to preview it, do you know how much was

22   available as of January 1st, 2013?

23   A.  For Fannie Mae, it was about 117 billion.

24           And for Freddie Mac, I think it was about 140

25   billion.

1    Q.  And if that got used up, was there any way to get more

2    out of Treasury?

3    A.  No.

4    Q.  Okay.  So let's go back to the second amendment.

5            What was going on with Fannie and Freddie toward

6    the end of 2009 that made you think that 200 billion may not

7    be enough?  Well, you had just decided -- I'll start all

8    over.

9            In May of 2009, eight months earlier, FHFA had

10   decided and Treasury had decided that 400 billion would be

11   enough.  Right?

12   A.  Yes.

13   Q.  What made you -- what changed your mind?  What made you

14   think between May of 2009 and December of 2009 that you had

15   to go from 400 billion to unlimited?

16   A.  So importantly, house prices are continuing to decline

17   through 2009, which means that -- and of course mortgage

18   delinquencies, you know, had continued to grow from the time

19   of the conservatorship.

20           So we had a considerable overhang of delinquent

21   mortgages here.  And we were working like crazy to try to

22   resolve these delinquent mortgages without going to

23   foreclosure.

24           But nonetheless, there were losses taking place on

25   these mortgages.  And we had a considerable inventory of

1    mortgages.  With house prices continuing to decline, we

2    clearly had not hit bottom and we didn't know where bottom

3    was.

4                And so without that, you know, knowledge of, you

5    know, where are we, this was important because we didn't

6    want to get into the same situation we were in in the summer

7    of '08 and in the late winter and early spring of '09, where

8    the market's looking at the commitment and saying:  There

9    may not be enough left under this commitment.

10               MR. STERN:  So to compare September '08 to

11   December '09, let's pull up JX-1.

12   BY MR. STERN:

13   Q.  Do you see this says Joint Statement of Undisputed

14   Facts?

15   A.  Yes.

16   Q.  The jury has heard about this, and they've heard it

17   referred to as a stipulation.

18               Do you understand this document to contain

19   statements that both sides have agreed on?

20   A.  Yes.

21   Q.  Okay.  So let's go to Paragraph 33.

22               So this shows draws by Fannie from 2008 to 2012.

23   Do you see that?

24   A.  Yes.

25   Q.  And it's your understanding that a draw in a given

1    quarter is what would be needed to make up for a negative

2    net worth in the preceding quarter.  Is that right?

3    A.  Yes.

4    Q.  And we're going to show the jury some charts that I hope

5    will illustrate this.

6            But just looking here, what is the difference in

7    Fannie's condition between September of '08 and December of

8    '09?

9    A.  So it's showing in September of '08, there was no draw

10   on the Treasury.  That meant that the company still had

11   positive shareholder equity.

12           By the fourth quarter of '09, we see that the

13   cumulative -- cumulative draw is now about $60 billion.

14           MR. STERN:  We can take that down.

15   BY MR. STERN:

16   Q.  So what in your view was the overall purpose of the

17   second amendment?

18   A.  The overall purpose of the second amendment was to do

19   the same things that the prior amendment does:  It was to

20   instill greater confidence in the marketplace in Fannie Mae

21   and Freddie Mac; that is, to the reliability of their

22   guaranty backstopped by the Treasury commitment; and then

23   further, their ability to further their mission, to operate.

24   Q.  So let's take a look at DX-209.

25           Do you recognize this document?

DeMarco - DIRECT - By Mr. Stern

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  It's my statement issued that day when we signed the

4    second amendment.

5    Q.  And take a look at the third paragraph, the fifth line,

6    beginning "Your announcement says."

7              MR. STERN:  Can we highlight that, please?

8    BY MR. STERN:

9    Q.  What was this about?

10   A.  So this is about explaining that the objective of this

11   second amendment is to provide that additional confidence to

12   investors in both the debt and the mortgage-backed

13   securities of Fannie Mae and Freddie Mac.

14              It says that this increase, this second amendment,

15   should provide additional assurance to the investors in

16   their debt and investors in their mortgage-backed securities

17   that the government backstop, that being the Treasury

18   commitment, remains capable of offering the full protection

19   promised; in other words, have confidence there's enough

20   here to be able to backstop these securities for their life.

21   Q.  So putting together some of the terminology, you're

22   referring to the government backstop standing behind the

23   Fannie and Freddie guaranty to the mortgage-backed

24   securities investors.  Is that --

25   A.  Yes.  That's correct.

1    Q.  Am I putting it together correctly?

2    A.  Yes.  That's correct.

3    Q.  So if we go to the last paragraph on that page, it says,

4    "The steps taken today are important for ensuring that the

5    enterprises continue to perform their current functions in

6    the secondary mortgage market as the longer-term roles of

7    the federal government and the enterprises in the mortgage

8    and housing market are fully considered.

9         What did you mean by that?

10   A.  What I meant by that is that there were already

11   discussions underway and an expectation that the

12   administration and the Congress would get together and enact

13   legislation that would determine the ultimate resolution of

14   Fannie Mae and Freddie Mac.  And even beyond Fannie and

15   Fred, they had to determine:  What was really going to be

16   the longer-term role of the federal government?

17        You know, so, for example, with mortgage

18   securitization, what role, if any, would they have in that?

19   What role might they have in backstopping it?  There were

20   already congressional hearings going on and work being done

21   to come up with policy proposals in this area.

22   Q.  So all during this time period, were Fannie and Freddie

23   continuing to make SEC filings?

24   A.  Yes.

25   Q.  So let's -- we've looked at the first SEC filings after

DeMarco - DIRECT - By Mr. Stern

1    the conservatorship began.

2              Let's look at some from just before the second

3    amendment.

4              MR. STERN:  So let's start with DX-188, please.

5    BY MR. STERN:

6    Q.  What is this?

7    A.  So this is Fannie Mae's quarterly filing, so Form 10-Q,

8    for the quarter ended September 30th, 2009; that is, the

9    third quarter of 2009.

10   Q.  And let's see who signed this one.

11             MR. STERN:  Let's go to the preceding page,

12   please.

13   BY MR. STERN:

14   Q.  So who signed as CEO?

15   A.  Now the CEO is Michael Williams.  And he signed it for

16   Fannie Mae.

17   Q.  Who signed as CFO?

18   A.  The CFO signed on the next page, David Johnson.

19   Q.  So let's go to Page 135, the second paragraph from the

20   bottom.  And this is talking about the conservatorship?

21   A.  Yes.

22   Q.  And what's it saying?

23   A.  "The conservatorship has no specified termination date.

24   There can be no assurance as to when or how the

25   conservatorship will be terminated, whether we will continue

1    to exist following the conservatorship or what our business

2    structure will be during or following the conservatorship."

3    Q.  And by the way, this is something that again is a public

4    document for all shareholders to see?

5    A.  Well, shareholders, but for all investors.  So it's also

6    for their debt and MBS investors.  But yes.  It's for all to

7    see.

8    Q.  What's the date of this document?

9    A.  I believe it was November 5th, 2009.

10           MR. STERN:  Can we go to the back just to make

11   sure?  Thank you.

12   BY MR. STERN:

13   Q.  So let's go back to the page we were on.  And you just

14   read to us, "There can be no assurance as to when or how the

15   conservatorship will be terminated, whether we will continue

16   to exist following the conservatorship or what our business

17   structure will be during or following the conservatorship."

18           Can you explain what that means?  And did you

19   agree with it?

20   A.  Yes.  I agreed with it.

21           And what it means is that Fannie Mae is

22   communicating to investors that it doesn't know how long

23   this conservatorship's going to last and it doesn't know

24   what's going to happen to them when -- whenever it comes to

25   an end.

DeMarco - DIRECT - By Mr. Stern

1    Q.  And let's go to Page 188.  Actually, I'm sorry.  Yes.

2    DX-188, Page 7.  I'm sorry.

3          MR. STERN:  Could you blow up Our Business

4    Objectives and Strategy?

5    BY MR. STERN:

6    Q.  So do you see the list of objectives there?

7    A.  Yes.

8    Q.  Is that a good listing, from your perspective?

9    A.  Yes.

10   Q.  And does that relate in some way to fulfilling the

11   public mission and serving the public interest?

12   A.  Yes, it does.

13   Q.  Does this list include as an objective being able to pay

14   dividends to private shareholders?

15   A.  No.

16   Q.  Does it include as an objective this idea of return to

17   the shareholders?

18   A.  No.

19   Q.  Why not?

20   A.  Because that was not the objective that we were

21   operating under.  We were operating under the objective of

22   operating the companies in the public interest and making

23   sure that they were capable of fulfilling their public

24   mission.

25   Q.  And was that a different perspective than the

1    perspective FHFA had in September of 2008 before any draws

2    had been taken?

3    A.  No.

4    Q.  It was or was not a different --

5    A.  It was not different.  The objectives for -- these

6    objectives were the same.

7    Q.  I'm talking about the return to the shareholders.

8    A.  I'm sorry.  I misunderstood your question.

9    Q.  I'll start again.

10   A.  Yes.

11   Q.  Was the view about returning to the shareholders the

12   same or different at the time of this filing than it was in

13   September of 2008 and October of 2008, when you made your

14   presentation to ABS East?

15   A.  The view was different.  When those statements were

16   made, the companies still had their own shareholder equity.

17   There had been no draw.  While there was a lot of

18   uncertainty in the marketplace, we didn't know with

19   certainty what was going to happen.

20        By the time of this filing, of course, the

21   companies have drawn billions and billions of dollars.  And

22   we'd already amended the stock purchase agreement once to

23   double the Treasury commitment and we were in the process of

24   getting ready to make a second amendment to increase the

25   commitment even further.

 1              MR. STERN:  So let's go to the third paragraph

 2      from the bottom on Page 7, Mr. Montgomery.

 3      BY MR. STERN:

 4      Q.  Would you read this for us?

 5      A.  "We therefore regularly consult with and receive

 6      direction from our conservator on how to balance these

 7      objectives.  Our pursuit of our mission creates conflicts in

 8      strategic and day-to-day decision-making that could hamper

 9      achievement of some or all of these objectives.

10              "Our financial results are likely to suffer, at

11      least in the short term, as we expand our efforts to assist

12      the mortgage market, thereby increasing the amount of funds

13      that Treasury is required to provide to us and further

14      limiting our ability to return to long-term profitability."

15      Q.  And do you see the reference there to mission?  The

16      second sentence there, "pursuit of our mission"?

17      A.  Yes.

18      Q.  Is that a reference to the public mission that you've

19      described?

20      A.  Yes.

21      Q.  So what happens if the public mission or the public

22      interest comes into conflict with what it calls here

23      strategic and day-to-day decision-making?  When there is a

24      conflict, what comes first and why?

25      A.  So the public interest comes first.  This is what we

1    were -- it comes first.

2    Q.  So let's go to the second line, the last paragraph,

3    second line from the bottom.

4              MR. STERN:  Can we highlight that?  A bit further.

5    Page 7, last paragraph, second line from the bottom.  There

6    we go.  So I think we have to roll over pages here,

7    Mr. Montgomery.  Can you do that?

8              Thank you.

9    BY MR. STERN:

10   Q.  So further, there is significant uncertainty regarding

11   the future of our business; and our regulators, the

12   Administration and Congress, are discussing options for

13   reform of the GSEs.

14             What was your understanding of that statement?

15   A.  My understanding of this statement is that at this time,

16   policymakers were engaging in discussions, holding hearings

17   and so forth to determine a legislative path that would

18   determine not just the future of Fannie Mae and Freddie Mac,

19   but the future of the country's secondary mortgage market

20   and the role of the federal government in that.

21   Q.  And does the SEC filing, this one in particular, tell

22   the public anything about whether Fannie believes it's going

23   to be able to make its dividend obligations?

24   A.  In terms of what we've gone through here, no.  But I

25   believe there is reference in here to --

1    Q.  Let's try to --

2    A.  Yes.  Fannie Mae talks about the challenges of meeting

3    the dividend payment.

4    Q.  So let's go to Page 14, third paragraph, second

5    sentence.

6            MR. STERN:  Let's highlight that, please,

7    Mr. Montgomery.

8    BY MR. STERN:

9    Q.  If we go backwards, it talks about what Fannie's

10   dividend obligation is going to be.  Right?

11   A.  Yes.

12   Q.  And this is something that is made public in November of

13   2009?

14   A.  That's correct.

15   Q.  And what -- read the highlighted sentence and explain

16   what that means.

17   A.  "The dividend obligation exceeds our reported annual net

18   income for five of the past seven years and will contribute

19   to increasingly negative cash flows in future periods if we

20   continue to pay the dividends on a quarterly basis."

21   Q.  And what does that mean?

22   A.  It meant that the draws had been such that now they had

23   this dividend payment, that they -- that the previous line

24   says is going to be $6 billion a year, a little over.

25   That's the 10 percent dividend.  And it's saying, you know,

1    we have not made that much money five of the last seven

2    years.

3              So, you know, that's going to be a problem.  And

4    it's going to contribute to increasingly negative cash flows

5    in future periods.

6              What that means is, since we're not going to be

7    able to make this without drawing from Treasury, further

8    draws from Treasury to make this dividend payment means

9    future dividend payments are now going to be even higher.

10   Q.  Let me stop you right there to introduce a phrase that

11   the members of the jury have heard but that you and I

12   haven't used next.

13             You just referred to having to take a draw to pay

14   the dividend, thereby increasing the amount of the dividend

15   for the next quarter; and, if there was not enough income

16   the next quarter, to have to take another draw to pay the

17   dividend.  Right?

18   A.  Yes.

19   Q.  Are you familiar with the phrase "circular draw"?

20   A.  Yes, I am.

21   Q.  Is what I just described a circular draw?

22   A.  Yes.

23   Q.  Is that what this SEC filing is saying?

24   A.  Yes.

25   Q.  What part of this SEC filing is translated into "We will

1    have to take circular draws"?

2    A.  It's saying that because we're not -- we don't expect to

3    make enough money to pay this dividend in future years, in

4    order to pay it they're going to have to draw.  That's going

5    to create additional dividends in the future years.  And

6    that's what they mean by "contribute negative cash flows in

7    future periods."

8    Q.  And what does it -- what were they saying when they

9    said, "This dividend obligation" -- and that refers back to

10   the 6.1 annualized dividend?

11   A.  Yes.

12   Q.  What do they mean when they say, "This dividend

13   obligation exceeds our reported annual net income for five

14   of the past seven years"?

15   A.  It says:  Okay.  At this point, we now have an annual

16   dividend obligation to Treasury of $6.1 billion.

17           And to give a sense of, you know, how big a

18   $6.1 billion dividend payment for Fannie is, it's saying

19   five of the last seven years we didn't even earn that much

20   in a year.

21   Q.  And the next sentence again refers to this 12 percent

22   provision.  What does it say and what did you understand it

23   to mean?

24   A.  It says:  If we do not pay the dividend quarterly and in

25   cash, our dividend rate's going to go up by 20 percent.

1    It's going to go up to 12 percent.  And the unpaid dividend

2    gets added to and becomes part of the liquidation

3    preference, which means now it's -- our future dividends are

4    growing at an even greater rate.

5    Q.  Let's go to the fourth paragraph.  I'm not going to ask

6    you to read this aloud.  I'll give everybody a moment to

7    read it and I'll hit some highlights.

8              Due to current trends, we expect to have a net

9    worth deficit in future periods, and therefore we'll be

10   required to obtain additional funding from Treasury.  As a

11   result, we're dependent on the continued support of Treasury

12   to continue operating.  Our ability to access funds from

13   Treasury is critical to keeping us solvent.

14             I've obviously skipped some words, but the members

15   of the jury can read the whole thing for themselves.

16             What did you understand this to be communicating

17   to the public, to the shareholders and to the MBS investors?

18   A.  So it's communicating that we're reliant upon the

19   Treasury's commitment in order to continue to operate.  We

20   expect that we're going to have future -- our future

21   financial results will require us to make future draws.

22   Future draws means that our future dividends are going to go

23   up.  And that's just going to continue, you know, our

24   reliance on the Treasury to keep operating.

25             And the final point they're making is that having

1    access to these Treasury funds is essential to keeping them

2    solvent and operating.

3    Q.  So at this point -- and we're going to read a few more

4    paragraphs.  But at this point, is Freddie predicting a

5    happy future or an unhappy future?

6    A.  Well, I don't know about happy or unhappy.  But it's

7    certainly speaking to their expectation that they're not

8    going to be financially capable of meeting these obligations

9    without future draws on the Treasury commitment.

10   Q.  So let's go to the next paragraph beginning "Our senior

11   preferred stock obligation."  Again, reading selectively:

12   Our senior preferred stock dividend obligation -- that's the

13   10 percent dividend --

14   A.  Yes.

15   Q.  -- coupled with potentially substantially commitment

16   fees.

17              And what is that a reference to, "potentially

18   substantial commitment fees"?

19   A.  That's a reference to the periodic commitment fee that

20   we discussed when we reviewed the PSPA agreement.

21   Q.  And what did you understand "potentially substantial" to

22   mean?

23   A.  I understood it meant to be that this was going to

24   compensate Treasury for the value of its commitments, and

25   Treasury intended it to compensate the taxpayer for making

1    this commitment.  And it was going to be a substantial

2    amount of money.

3    Q.  And this reference to an inability to pay down draws:

4    You told us earlier that Fannie and Freddie did not have the

5    authority or ability to pay down the liquidation preference.

6    Is that what that's referring to?

7    A.  Yes.

8    Q.  Okay.  Putting all these things together, what does the

9    last part of that paragraph say and what does it mean?

10   A.  I'm sorry.  The --

11   Q.  The last part of that sentence.  I'm sorry.  "Will have

12   a significant adverse impact."

13   A.  Yes.  It will have a significant adverse impact on our

14   future financial position and net worth.  So things are

15   going to continue to get worse.

16   Q.  Meaning?

17   A.  Yes.  Things are going to continue to get worse for us.

18   It's going to adversely affect our future financial

19   position.

20   Q.  So let's go to DX -- was this Fannie or Freddie that we

21   were looking at?

22   A.  I'm sorry, Mr. Stern.  I've lost track.

23   Q.  Let's go to the end.

24   A.  Fannie Mae.

25   Q.  Is this Fannie or Freddie?

 1    A.   Fannie Mae.

 2    Q.   Okay.  So let's go to Freddie's third -- and this is the

 3    third-quarter 2009 filing?

 4    A.   Yes.

 5    Q.   Let's go to Freddie's third-quarter 2009 filing.  This

 6    is covering that same period?

 7    A.   Yes, it is.

 8    Q.   Which would be what?

 9    A.   The third quarter of 2009.  So July, August, September

10    2009.

11    Q.   And let's go to see who signed this one for Freddie.

12    Who's that?

13    A.   Mr. Haldeman at this point was the CEO of Freddie Mac.

14    And he signed it on November 6.

15    Q.   November 6, 2009?

16    A.   Yes.

17    Q.   So this is before December 24th, 2009?

18    A.   Yes.

19    Q.   By the way, that earlier -- this is going to sound like

20    a silly question, but the jury has heard a lot about

21    December 24, 2009.  But the 2008 filing we looked at, where

22    it said "no longer managing to maximize value" -- I'm

23    paraphrasing --

24    A.   Right.

25    Q.   -- that was also before December 24th, 2009?

1    A.  Yes.

2    Q.  Okay.  So coming back to this one, DX-189, Freddie's

3    third-quarter 10-Q, let's go to Page 6.  And here is a

4    reference to business objectives.  Right?

5    A.  Yes.

6    Q.  And this is not exactly the same as the section we

7    looked at in Fannie's.  Right?

8    A.  Correct.  This is Freddie's language.

9    Q.  And this doesn't have the bullets.  Right?

10   A.  Correct.

11   Q.  So the second paragraph says, in part:  We changed

12   certain business practices and other nonfinancial objectives

13   to provide support for the mortgage market in a manner that

14   serves public policy, but that may not contribute to

15   profitability.

16           What is that talking about and how does it relate

17   to some of the other things you've told us today?

18   A.  Yeah.  So we know at this time that there was

19   continued -- you know, considerable distress in the mortgage

20   market.  We've talked about how many people were delinquent

21   on their mortgages, how house prices had been falling and so

22   forth.

23           Earlier this year, 2009, the Obama Administration

24   had come in and established a program called HAMP,

25   Homeowner -- Homeownership Assistance -- Homeowner

 1    Modification Program.

 2              Anyway, Fannie Mae and Freddie Mac were acting as

 3    agents of the Treasury to help facilitate this program that

 4    was to assist not only families that had a mortgage owned by

 5    Fannie and Freddie, but to assist other families that had

 6    mortgages that were in trouble.  They did this by assisting

 7    the mortgage servicers that were working with those

 8    homeowners.

 9    Q.  I'm sorry.  So stepping back, the reference here to

10    "serving public policy in a way that may not contribute to

11    profitability," just as a matter of concept, what is that

12    saying?

13    A.  It's saying that providing these services serves the

14    public interest of helping to provide some support and

15    benefit to the housing market.  It wasn't a profit center

16    for Fannie Mae or Freddie Mac to do this.

17    Q.  And where there is a competition or a conflict between

18    serving public policy and contributing to profitability, who

19    wins?

20    A.  In this case, I mean, the public policy.  The public

21    interest is what was -- what was optimized here.

22    Q.  So let's take a look at the third paragraph, the first

23    sentence there.  It says:  There is significant uncertainty

24    as to whether or when we will emerge from conservatorship,

25    as it has no specified termination date, and as to what

1    changes may occur to our business structure during or

2    following our conservatorship, including whether we will

3    continue to exist.

4           What was this telling the public?

5    A.  Just exactly what it says:  that there's tremendous

6    uncertainty here.  We don't know if or when we're going to

7    get out of conservatorship.  Conservatorship's got no

8    termination date.

9           And whatever that future point is where this

10   conservatorship ends, we don't know what's going to happen

11   to our business either during conservatorship or following

12   conservatorship.

13          And the last part of this is saying, we don't even

14   know if we're going to continue to exist as a company.

15   Q.  And this is what you imagine a hypothetical reasonable

16   shareholder reading the SEC filing -- this is what they

17   would see?

18   A.  Yes.

19               MR. HUME:  Objection, your Honor.

20               THE COURT:  Overruled.

21               MR. HUME:  Lacks foundation.

22               MR. STERN:  Overruled, your Honor?

23               THE COURT:  Yes.

24   BY MR. STERN:

25   Q.  So let's go to Page 9.  First paragraph.

1          So "government support for our business":  What is

2    that referring to?

3    A.  It's referring to the -- directly to the Treasury

4    support that's being provided to keep Fannie and Freddie

5    operating, keep them solvent.

6    Q.  Meaning the Treasury commitment?

7    A.  Meaning the Treasury commitment.

8    Q.  As of the end of the quarter, what was that commitment?

9    A.  I'm sorry.  In terms of how much was remaining under it?

10   Q.  Yes.  Not how much was remaining; how much --

11   A.  Oh, it was -- so this is 200 billion.

12   Q.  Right.  Minus whatever had been --

13   A.  Minus whatever had been drawn.

14   Q.  Okay.  We're not yet in the unlimited phase?

15   A.  Correct.  Right.

16   Q.  And that first sentence says, "We are dependent upon the

17   continued support of Treasury and FHFA in order to continue

18   operating our business."

19          The financial support came all from Treasury.

20   Right?

21   A.  Yes.

22   Q.  And then it says, "We also receive substantial support

23   from the Federal Reserve."

24          Then it says, "Our ability to access funds from

25   Treasury under the purchase agreement" -- what is that a

1    reference to?

2    A.  It's referring to the PSPA and the Treasury commitment.

3    Q.  Okay.  And then it says "is critical to keeping us

4    solvent."  Right?

5    A.  Yes.

6    Q.  Does that imply that they are solvent at the time this

7    is being written?

8    A.  Yes.

9    Q.  And how are they solvent if all the shareholder equity

10   is gone?

11   A.  Because they've been taking draws from the Treasury

12   Department to ensure their solvency, to get them back into a

13   solvent position.

14   Q.  Again, that's how the commitment works?  Every quarter,

15   the commitment makes up the difference, if there is any,

16   between liabilities and assets --

17   A.  Yes.

18   Q.  -- and brings -- literally brings the company into

19   solvency?

20   A.  Yes.

21   Q.  And then it says, "avoiding the appointment of a

22   receiver."

23          I think we've reviewed the receivership is like

24   bankruptcy.  So is this saying:  Our ability to access funds

25   from Treasury is critical to avoiding bankruptcy?  Is that

 1      another way to read this?

 2      A.  Yes.

 3      Q.  So let's go to Page 14, third paragraph, first sentence.

 4              Based on the current liquidation preference,

 5      Treasury is entitled --

 6              MR. STERN:  And again, for the record, your Honor,

 7      I know I'm not reading every word.  I'm trying to move us

 8      along.  And I trust that the members of the jury can follow

 9      along.

10      BY MR. STERN:

11      Q.  Based on the current aggregate liquidation preference,

12      Treasury is entitled to annual cash dividends of

13      $5.2 billion -- and now I'm going to read every word --

14      "which exceeds our annual historical earnings in most

15      periods."

16              What does that mean?

17      A.  It means that they now have an annual dividend

18      obligation to Treasury of $5.2 billion.  And if you look

19      back over the history of Freddie Mac, that exceeds their

20      annual earnings in almost every year that they've existed.

21      Q.  And it goes on to say:  Continued cash payment of senior

22      preferred dividends -- and that's paying the 10 percent,

23      right? --

24      A.  Yes.

25      Q.  -- combined with potential -- potentially substantial

1    quarterly commitment fees payable to Treasury beginning in

2    2010.

3            What does that refer to?

4    A.  It refers to the periodic commitment fee that's in the

5    PSPA.

6    Q.  And then it goes on to say, referring to -- and I'm

7    trying to use less words.

8            The periodic commitment fee is sometimes referred

9    to as...?

10   A.  The PCF.

11   Q.  So let's call it the PCF.

12           So then it goes on to say, the amounts of which

13   must be determined by December 31, 2009.  And that means --

14   that's referring to the amounts of the quarterly PCFs,

15   periodic commitment fees?

16   A.  Yes.

17   Q.  Do you know why this says it has to be determined by

18   December 31st, 2009?

19   A.  Because the original PSPA required it to be set by then

20   so that the fee would start to be paid in 2010.

21   Q.  Was that December 31st, 2009, deadline at some point

22   changed?

23   A.  Yes, it was.

24   Q.  How so?

25   A.  The second amendment pushed it back a year.

1    Q.  So the second amendment was not yet effective when this

2    disclosure was made?

3    A.  Yes.  This disclosure's in early November.  The second

4    amendment was December 24th.

5    Q.  So it says:  Continued cash payment -- I'm

6    paraphrasing -- continued cash payment of the 10 percent

7    dividend, combined with potentially substantial PCF -- now

8    I'm quoting -- "will have an adverse impact on our future

9    financial condition and net worth."

10          What is Fannie saying here about the prospects for

11    the future?

12    A.  Well, I think we're talking about Freddie here.

13    Q.  I'm sorry.  You're right.  Freddie.

14    A.  It's saying, similar to what Fannie said, that these

15    financial obligations that the company now has to the

16    Treasury Department, while it's essential to keeping them

17    operating, it's going to have an adverse impact on future

18    financial condition and net worth, "net worth" meaning that

19    these obligations may be greater than what they actually

20    earn.

21    Q.  So the last question on the second amendment:  You told

22    us it was unlimited?

23    A.  For 2010, '11 and '12.

24    Q.  And December 31st, 2012, what happens?

25    A.  It becomes capped.  The amount remaining under the

1    commitment is going to be capped.

2    Q.  Did the second amendment turn out to be the right -- in

3    your view, at least -- the right long-term fix?

4    A.  It was the right fix for that period.  It was not the

5    right long-term fix.

6    Q.  So I'm going to switch gears now --

7           THE COURT:  Okay.  We're going to switch gears

8    right now.  I have a note that because of severe weather

9    conditions, the Court has just decided to close the court so

10   that all employees and jurors may make it home before the

11   expected severe weather hits.

12          So at this time, the Court will be in recess until

13   tomorrow morning at 10:00.

14          Take your things with you and try to get home as

15   quickly as you can because severe weather conditions are

16   expected in the immediate area.  You're excused for the day.

17   Don't talk about the case.  Don't let anyone talk to you

18   about the case.  Don't Twitter or tweet except about whether

19   or not -- I'll see you all tomorrow morning at 10:00.

20          (Whereupon, the jury exited the courtroom at 3:30

21   p.m. and the following proceedings were had:)

22          THE COURT:  The chief judge just sent me a note

23   that all of the court is closing.

24          MR. STERN:  I saw that in the news this morning,

25   your Honor, that it's supposed to get nasty.

1              THE COURT:  I'll see you tomorrow morning at

2      10:00.  Everybody is excused.

3              MR. STERN:  Safe travels, your Honor.

4              (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2

3                I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                Dated this 7th day of August, 2023.

11

12                <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, Northwest
                 Washington, D.C. 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25

## $

**$10** [2] - 36:25, 37:11
**$100** [16] - 32:5, 32:8, 34:15, 34:17, 34:24, 36:23, 37:10, 45:12, 45:22, 46:8, 50:22, 51:14, 52:17, 52:18
**$200** [5] - 37:12, 50:23, 51:14, 52:4, 54:2
**$30** [1] - 37:16
**$300** [2] - 37:13, 37:16
**$60** [1] - 61:13
**$70** [1] - 48:5

## '

**'08** [12] - 48:4, 48:11, 48:13, 48:14, 48:21, 49:4, 49:5, 52:21, 60:7, 60:10, 61:7, 61:9
**'09** [7] - 47:18, 57:20, 57:21, 60:7, 60:11, 61:8, 61:12
**'11** [1] - 84:23
**'12** [1] - 84:23

## /

**/s** [1] - 87:12

## 1

**1** [3] - 9:14, 14:22, 38:24
**10** [26] - 1:13, 35:5, 35:8, 35:10, 35:14, 35:16, 35:22, 36:17, 36:21, 36:25, 37:11, 37:15, 39:17, 39:21, 40:21, 40:24, 42:7, 42:10, 42:16, 44:3, 70:25, 74:13, 82:22, 84:6
**10-Q** [4] - 23:8, 27:25, 64:7, 77:3
**100** [9] - 34:16, 36:25, 37:14, 45:16, 47:21, 49:14, 57:20
**10020** [1] - 2:5
**10:00** [3] - 85:13, 85:19, 86:2
**10th** [3] - 24:3, 24:7,

24:9
**11** [1] - 25:9
**117** [1] - 58:23
**12** [6] - 40:14, 40:18, 40:20, 40:25, 72:21, 73:1
**1251** [1] - 2:4
**13-1053** [1] - 1:4
**13-1288** [1] - 1:10
**135** [1] - 64:19
**14** [1] - 29:4, 29:6, 70:4, 82:3
**140** [1] - 58:24
**1401** [1] - 1:22
**1523** [1] - 1:18
**188** [1] - 66:1
**19087** [1] - 1:25
**1:41** [1] - 1:7
**1:42** [1] - 4:17
**1st** [2] - 23:13, 58:22

## 2

**2** [6] - 12:16, 14:16, 20:20, 21:21, 28:6, 38:24
**20** [2] - 47:9, 72:25
**200** [9] - 34:18, 37:14, 49:14, 53:23, 56:11, 56:15, 57:20, 59:6, 80:11
**20001** [3] - 2:9, 2:13, 87:14
**20005** [1] - 1:22
**20036** [1] - 1:18
**2008** [25] - 6:6, 6:8, 6:19, 11:3, 19:21, 23:7, 23:8, 23:13, 24:3, 24:8, 29:4, 29:6, 45:17, 45:21, 45:25, 46:4, 46:21, 47:9, 47:10, 49:15, 60:22, 67:1, 67:13, 76:21
**2009** [30] - 20:6, 49:22, 52:4, 53:1, 53:21, 55:7, 56:22, 57:3, 57:8, 59:6, 59:9, 59:14, 59:17, 64:8, 64:9, 65:9, 70:13, 76:3, 76:5, 76:9, 76:10, 76:15, 76:17, 76:21, 76:25, 77:23, 83:13, 83:18, 83:21
**2010** [6] - 56:13, 57:10, 83:2, 83:20, 84:23
**2011** [2] - 56:13, 57:10
**2012** [9] - 56:13,

57:6, 57:9, 57:10, 57:14, 58:2, 58:9, 60:22, 84:24
**2013** [2] - 58:4, 58:22
**202** [2] - 2:14, 87:15
**2023** [2] - 1:7, 87:10
**24** [1] - 76:21
**24th** [4] - 55:7, 76:17, 76:25, 84:4
**280** [1] - 1:25

## 3

**3** [1] - 5:3
**3.2** [1] - 41:17
**30** [1] - 58:18
**30-year** [2] - 52:19, 58:16
**30th** [5] - 23:8, 23:13, 24:10, 24:13, 64:8
**31** [1] - 83:13
**31st** [7] - 47:10, 53:1, 58:5, 58:9, 83:18, 83:21, 84:24
**33** [1] - 60:21
**333** [2] - 2:12, 87:14
**34.2** [1] - 53:2
**354-3269** [2] - 2:14, 87:15
**381** [2] - 3:9, 4:12
**3:30** [1] - 85:20

## 4

**4** [3] - 3:6, 3:9, 31:16
**400** [2] - 59:10, 59:15
**49.3** [1] - 53:9

## 5

**5** [1] - 10:2
**5.1** [1] - 43:21
**5.2** [2] - 82:13, 82:18
**5.3** [1] - 16:24, 17:2, 44:10
**5.4** [2] - 9:9, 9:10
**50.7** [1] - 53:6
**5th** [1] - 65:9

## 6

**6** [6] - 12:1, 41:17, 70:24, 76:14, 76:15, 77:3
**6.1** [3] - 72:10, 72:16, 72:18

**601** [1] - 2:9
**65.8** [1] - 53:4
**6706** [1] - 2:13
**6th** [3] - 8:4, 49:24, 52:4

## 7

**7** [6] - 1:7, 21:15, 49:15, 66:2, 68:2, 69:5
**7th** [5] - 8:5, 11:3, 13:21, 38:7, 87:10

## 8

**8** [2] - 12:14, 43:11

## 9

**9** [3] - 29:7, 43:11, 79:25

## A

**ability** [14] - 6:9, 7:23, 11:8, 22:23, 27:5, 57:18, 58:2, 61:23, 68:14, 73:12, 75:5, 80:24, 81:24, 87:7
**able** [10] - 7:22, 16:18, 25:1, 45:11, 45:24, 57:25, 62:20, 66:13, 69:23, 71:7
**ABS** [1] - 67:14
**absent** [1] - 17:4
**access** [5] - 21:18, 73:12, 74:1, 80:24, 81:24
**accomplish** [1] - 50:19
**accomplished** [2] - 50:20, 57:13
**accumulates** [1] - 37:17
**accurate** [1] - 87:4
**achievement** [1] - 68:9
**act** [1] - 11:12
**acting** [9] - 19:23, 20:2, 20:5, 51:6, 54:10, 54:12, 54:16, 55:10, 78:2
**action** [5] - 5:21, 6:1, 17:4, 27:16, 46:12
**Action** [1] - 1:3

**ACTION** [1] - 1:11
**actions** [6] - 11:19, 12:2, 12:8, 12:10, 20:16
**actual** [2] - 7:2, 31:23
**ADAM** [1] - 2:2
**add** [2] - 36:18, 40:25
**added** [1] - 73:2
**additional** [4] - 62:11, 62:15, 72:5, 73:10
**adequacy** [1] - 45:19
**adequate** [1] - 45:22
**adjusted** [1] - 57:3
**adjustment** [1] - 35:6
**administration** [1] - 63:12
**Administration** [2] - 69:12, 77:23
**adverse** [4] - 75:12, 75:13, 84:8, 84:17
**adversely** [1] - 75:18
**affect** [1] - 75:18
**affordability** [2] - 26:1, 26:16
**afloat** [1] - 49:10
**afternoon** [1] - 4:24
**AFTERNOON** [1] - 1:13
**agency** [5] - 5:15, 5:20, 5:21, 5:23, 5:25
**AGENCY** [1] - 1:6
**agents** [1] - 78:3
**aggregate** [1] - 82:11
**ago** [1] - 16:23
**agree** [4] - 6:25, 47:23, 47:24, 65:19
**agreed** [4] - 43:2, 60:19, 65:20
**agreement** [16] - 12:12, 29:21, 29:23, 30:9, 31:9, 34:9, 34:12, 35:18, 41:12, 43:15, 43:16, 49:7, 50:7, 67:22, 74:20, 80:25
**AGREEMENT** [1] - 1:11
**ahead** [1] - 54:20
**al** [2] - 1:3, 1:7
**Allison** [1] - 23:25
**allow** [2] - 45:23, 56:11
**almost** [4] - 50:24, 50:25, 51:3, 82:20
**aloud** [1] - 73:6
**amend** [1] - 50:10
**amended** [3] - 50:11,

55:3, 67:22
**amendment** [34] -
48:23, 49:2, 50:6,
50:10, 50:14, 50:15,
50:18, 51:19, 51:22,
53:21, 54:9, 54:19,
54:20, 55:2, 55:8,
55:11, 55:17, 55:21,
56:22, 57:13, 59:4,
61:17, 61:18, 61:19,
62:4, 62:11, 62:14,
64:3, 67:24, 83:25,
84:1, 84:4, 84:21,
85:2
**Amendment** [1] -
50:8
**Americas** [1] - 2:4
**amount** [29] - 31:23,
32:3, 32:4, 35:5,
35:16, 37:18, 42:10,
42:16, 42:21, 43:1,
43:7, 45:19, 49:17,
50:22, 52:2, 52:3,
52:7, 52:14, 54:1,
54:2, 56:12, 57:2,
57:11, 57:23, 68:12,
71:14, 75:2, 84:25
**amounts** [2] - 83:12,
83:14
**announcement** [2] -
13:22, 62:6
**announcing** [1] - 8:6
**annual** [7] - 70:17,
72:13, 72:15, 82:12,
82:14, 82:17, 82:20
**annualized** [1] -
72:10
**answer** [10] - 6:21,
13:24, 14:8, 14:12,
15:1, 20:22, 21:22,
21:24, 21:25, 42:4
**answers** [1] - 13:20
**anticipated** [1] -
21:17
**anytime** [1] - 46:3
**anyway** [1] - 78:2
**apart** [1] - 37:1
**apiece** [1] - 53:23
**apologize** [1] - 14:18
**APPEARANCES** [1] -
2:1
**aPPEARANCES** [1] -
1:16
**appoint** [1] - 7:7
**appointed** [1] - 14:1
**appointing** [1] -
17:25
**appointment** [1] -
81:21
**approach** [2] - 56:7,

56:8
**appropriate** [1] -
20:16
**April** [1] - 51:1
**area** [2] - 63:21,
85:16
**ARNOLD** [1] - 2:8
**as..** [1] - 83:9
**aside** [2] - 35:20,
36:23
**ASIM** [1] - 2:6
**assessed** [1] - 40:21
**asset** [2] - 18:21,
18:23
**assets** [17] - 7:19,
18:2, 18:6, 18:12,
18:15, 18:16, 18:17,
18:18, 18:25, 19:3,
20:18, 30:12, 32:23,
33:5, 81:16
**assist** [3] - 68:11,
78:4, 78:5
**Assistance** [1] -
77:25
**assistance** [1] - 11:6
**assisting** [1] - 78:6
**assurance** [4] -
45:23, 62:15, 64:24,
65:14
**attention** [1] - 6:6
**August** [3] - 1:7,
76:9, 87:10
**authority** [4] - 45:1,
57:1, 57:8, 75:5
**authorize** [1] - 6:17
**authorized** [1] - 5:21
**availability** [1] -
21:11
**available** [13] - 6:14,
6:20, 7:24, 21:18,
31:24, 32:3, 32:4,
33:25, 34:2, 34:15,
34:23, 45:13, 58:22
**Avenue** [6] - 1:18,
1:22, 2:4, 2:9, 2:12,
87:14
**avoid** [1] - 45:5
**avoiding** [2] - 81:21,
81:25

**B**

**backed** [11] - 9:6,
11:9, 15:25, 16:2,
16:24, 17:3, 58:16,
58:17, 62:12, 62:16,
62:23
**backstop** [4] - 32:11,
62:17, 62:20, 62:22

**backstopped** [1] -
61:22
**backstopping** [1] -
63:19
**backwards** [1] - 70:9
**bad** [1] - 39:12
**balance** [4] - 9:18,
18:17, 25:1, 68:6
**bankruptcy** [2] -
81:24, 81:25
**barred** [1] - 41:10
**based** [3] - 36:21,
82:4, 82:11
**basis** [2] - 35:4,
70:20
**became** [3] - 19:23,
20:4, 54:10
**become** [1] - 47:19
**becomes** [2] - 73:2,
84:25
**BEFORE** [1] - 1:13
**began** [2] - 25:7,
64:1
**beginning** [4] -
12:14, 62:6, 74:10,
83:1
**behalf** [1] - 55:11
**behind** [1] - 62:22
**believes** [1] - 69:22
**benefit** [3] - 25:19,
29:13, 78:15
**BERGER** [1] - 2:3
**BERGMAN** [1] - 2:7
**BERKLEY** [1] - 1:17
**BERNSTEIN** [1] - 2:3
**best** [13] - 5:22, 5:24,
6:2, 17:20, 17:21,
17:23, 27:12, 27:15,
27:16, 27:17, 27:18,
87:7
**better** [1] - 57:24
**between** [8] - 17:15,
26:22, 31:12, 38:17,
59:14, 61:7, 78:17,
81:16
**beyond** [1] - 63:14
**big** [3] - 32:9, 32:14,
72:17
**bigger** [1] - 43:19
**billion** [46] - 12:16,
32:5, 32:8, 34:15,
34:17, 34:18, 34:24,
36:2, 45:12, 45:16,
45:22, 46:8, 47:21,
48:5, 49:14, 50:22,
50:23, 51:14, 52:4,
52:17, 52:18, 53:2,
53:4, 53:7, 53:9,
53:23, 54:2, 56:15,
57:20, 58:23, 58:25,

59:6, 59:10, 59:15,
61:13, 70:24, 72:16,
72:18, 80:11, 82:13,
82:18
**billions** [2] - 67:21
**bit** [3] - 35:24, 54:20,
69:4
**black** [1] - 56:19
**blow** [7] - 25:10,
25:15, 27:22, 28:11,
29:8, 31:19, 66:3
**BOIES** [1] - 1:21
**borrow** [1] - 6:12
**borrower** [1] - 16:2
**borrowing** [1] - 6:11
**bottom** [18] - 5:3,
9:13, 9:14, 10:8,
14:17, 14:22, 21:8,
29:8, 29:9, 39:2, 56:9,
60:2, 64:20, 68:2,
69:3, 69:5
**box** [4] - 26:15,
26:18, 29:8
**BOZMAN** [1] - 2:3
**break** [1] - 15:17
**briefly** [1] - 24:18
**bring** [3] - 5:2, 21:14,
35:13
**brings** [1] - 81:18
**broad** [1] - 45:9
**broader** [1] - 11:20
**bullet** [5] - 25:24,
26:5, 26:18, 26:19,
26:20
**bullets** [1] - 25:21,
77:9
**Business** [1] - 66:3
**business** [16] - 6:13,
7:23, 10:16, 11:4,
11:7, 18:20, 20:18,
65:1, 65:16, 69:11,
77:4, 77:12, 79:1,
79:11, 80:1, 80:18
**buy** [2] - 9:2, 11:8
**BY** [46] - 2:10, 4:24,
5:6, 5:18, 6:5, 7:4,
8:10, 9:15, 10:7,
13:16, 14:21, 22:17,
23:17, 23:22, 25:12,
25:17, 27:23, 28:12,
29:11, 29:18, 31:7,
31:21, 38:5, 39:1,
39:8, 40:6, 40:11,
41:18, 43:20, 46:18,
47:2, 48:1, 50:2, 55:1,
60:12, 61:15, 62:8,
64:5, 64:13, 65:12,
66:5, 68:3, 69:9, 70:8,
79:24, 82:10

**C**

**CAITLIN** [1] - 2:3
**calculation** [2] -
35:25, 57:15
**cannot** [1] - 44:14
**cap** [3] - 57:17,
57:18, 57:20
**capable** [4] - 11:5,
62:18, 66:23, 74:8
**capacity** [4] - 12:4,
15:13, 16:12, 16:16
**capital** [4] - 6:21,
9:17, 12:17, 18:22
**capped** [2] - 84:25,
85:1
**careful** [1] - 9:18
**carry** [1] - 20:17
**case** [11] - 6:23,
13:2, 30:1, 32:2,
40:17, 44:11, 45:3,
47:20, 78:20, 85:17,
85:18
**Case** [1] - 1:10
**cash** [1] - 30:9,
35:4, 40:22, 70:19,
71:4, 72:6, 72:25,
82:12, 82:21, 84:5,
84:6
**center** [1] - 78:15
**CEO** [8] - 24:1, 28:1,
28:17, 28:22, 28:25,
64:14, 64:15, 76:13
**certain** [1] - 77:12
**certainly** [1] - 74:7
**certainty** [1] - 67:19
**CERTIFICATE** [1] -
87:1
**certificate** [11] -
37:22, 38:4, 38:9,
38:11, 38:12, 38:18,
38:22, 38:23, 42:19,
42:20, 42:22
**certification** [2] -
23:24, 27:25
**certify** [1] - 87:4
**CFO** [5] - 28:19,
28:22, 28:25, 64:17,
64:18
**challenges** [1] - 70:2
**change** [10] - 10:12,
17:19, 29:19, 52:2,
52:3, 54:6, 55:15,
55:16, 55:25, 57:2
**changed** [8] - 47:13,
47:14, 49:17, 49:19,
49:21, 59:13, 77:11,
83:22
**changes** [2] - 51:16,

79:1
  **chart** [2] - 25:9, 25:15
  **charts** [1] - 61:4
  **CHECK** [1] - 1:24
  **chief** [5] - 24:6, 28:14, 28:17, 28:19, 85:22
  **Christmas** [1] - 55:7
  **circular** [3] - 71:19, 71:21, 72:1
  **circumstances** [2] - 32:17, 52:16
  **Civil** [1] - 1:3
  **claim** [2] - 36:10, 36:11
  **claims** [1] - 13:8
  **CLASS** [3] - 1:11, 1:19, 2:2
  **classes** [2] - 30:24, 31:2
  **clear** [2] - 30:18, 45:2
  **clearly** [1] - 60:2
  **close** [1] - 85:9
  **closing** [1] - 85:23
  **COLATRIANO** [1] - 1:17
  **colleagues** [1] - 46:20
  **Columbia** [2] - 2:12, 87:13
  **COLUMBIA** [1] - 1:1
  **column** [2] - 5:4, 26:9
  **combined** [6] - 9:9, 34:17, 48:5, 48:12, 82:25, 84:7
  **coming** [2] - 52:15, 77:2
  **Commission** [1] - 23:6
  **Commitment** [1] - 31:17
  **commitment** [72] - 10:24, 11:24, 30:14, 32:11, 32:18, 32:19, 33:4, 33:8, 33:20, 34:3, 34:24, 35:19, 36:1, 36:4, 37:2, 41:6, 41:14, 41:21, 41:25, 42:2, 42:6, 42:12, 42:22, 43:6, 43:9, 49:6, 49:9, 49:12, 49:13, 50:11, 50:22, 51:13, 52:10, 52:14, 53:15, 53:17, 53:22, 54:3, 56:1, 57:2, 57:11, 57:12, 57:16, 57:17, 58:1, 58:3,

58:5, 58:18, 60:8, 60:9, 61:22, 62:18, 67:23, 67:25, 73:19, 74:9, 74:15, 74:18, 74:19, 75:1, 80:6, 80:7, 80:8, 81:2, 81:14, 81:15, 83:1, 83:4, 83:8, 83:15, 85:1
  **commitments** [1] - 74:24
  **committed** [4] - 30:14, 32:6, 42:14, 46:8
  **committing** [3] - 31:23, 32:1, 34:5
  **common** [6] - 12:17, 12:18, 12:23, 26:21, 26:25, 48:9
  **communicating** [3] - 65:22, 73:16, 73:18
  **companies** [27] - 9:21, 16:17, 17:5, 17:20, 21:4, 22:24, 23:9, 27:14, 30:9, 45:13, 45:24, 46:9, 46:16, 47:17, 48:4, 48:13, 48:22, 49:8, 49:10, 50:21, 52:16, 54:5, 57:1, 66:22, 67:16, 67:21
  **companies'** [2] - 27:5, 47:15
  **company** [36] - 9:8, 10:19, 14:2, 15:13, 15:23, 16:3, 16:4, 16:7, 16:13, 18:2, 18:23, 20:16, 20:19, 20:21, 24:16, 24:24, 24:25, 28:9, 30:11, 32:23, 34:17, 36:7, 36:8, 36:15, 40:21, 42:1, 42:3, 45:12, 45:22, 49:11, 51:14, 52:10, 61:10, 79:14, 81:18, 84:15
  **company's** [8] - 14:4, 18:1, 18:6, 18:11, 20:17, 21:23, 22:1, 22:20
  **compare** [1] - 60:10
  **compensate** [4] - 42:2, 43:4, 74:24, 74:25
  **compensating** [2] - 42:12, 42:13
  **competition** [1] - 78:17
  **complete** [3] - 7:11, 44:24, 87:6

  **completed** [1] - 57:3
  **computation** [1] - 42:24
  **compute** [1] - 24:16
  **concept** [1] - 78:11
  **concerned** [1] - 52:22
  **concluded** [1] - 86:4
  **conclusion** [3] - 22:9, 40:5, 53:16
  **condition** [7] - 14:3, 18:3, 20:17, 28:8, 61:7, 84:9, 84:18
  **conditions** [4] - 10:1, 52:11, 85:9, 85:15
  **confidence** [15] - 12:3, 15:13, 15:23, 16:4, 16:5, 16:6, 16:8, 27:5, 45:23, 46:9, 50:21, 54:4, 61:20, 62:11, 62:19
  **conflict** [3] - 68:22, 68:24, 78:17
  **conflicts** [1] - 68:7
  **confronting** [1] - 57:5
  **Congress** [2] - 63:12, 69:12
  **congressional** [1] - 63:20
  **conjunction** [1] - 13:21
  **connected** [1] - 38:1
  **connection** [1] - 44:25
  **consent** [8] - 44:2, 44:7, 44:15, 44:20, 51:20, 51:25, 55:18, 55:22
  **conservator** [19] - 5:10, 5:15, 5:20, 7:8, 11:12, 14:5, 14:6, 17:22, 18:1, 20:11, 20:15, 27:12, 54:14, 54:16, 54:17, 55:10, 55:12, 68:6
  **conservatorship** [72] - 6:7, 7:16, 8:7, 11:15, 12:11, 12:22, 13:9, 13:13, 13:20, 13:23, 13:25, 14:3, 14:10, 14:23, 15:10, 15:12, 16:17, 17:6, 17:8, 17:10, 17:16, 17:17, 17:18, 17:19, 17:21, 18:13, 19:6, 19:10, 19:17, 19:20, 20:8, 20:21, 21:4, 21:23, 22:1, 22:4, 25:4, 25:7, 25:21, 26:7, 26:12,

26:23, 26:24, 27:3, 27:14, 30:6, 41:5, 44:11, 44:13, 44:14, 44:18, 45:3, 46:7, 51:23, 51:24, 55:23, 59:19, 64:1, 64:20, 64:23, 64:25, 65:1, 65:2, 65:15, 65:16, 65:17, 78:24, 79:2, 79:7, 79:10, 79:11, 79:12
  **Conservatorship** [1] - 26:9
  **conservatorship's** [2] - 65:23, 79:7
  **conservatorships** [2] - 45:18, 58:12
  **conserve** [4] - 12:16, 18:1, 18:14, 20:18
  **conserving** [3] - 18:6, 18:25, 19:1
  **considerable** [7] - 45:8, 47:19, 52:9, 54:2, 59:20, 59:25, 77:19
  **consideration** [1] - 36:1
  **considered** [1] - 63:8
  **constitutes** [1] - 87:4
  **Constitution** [2] - 2:12, 87:14
  **consult** [1] - 68:5
  **CONT'D** [1] - 2:1
  **contain** [1] - 60:18
  **contained** [1] - 28:7
  **context** [7] - 10:17, 10:25, 12:8, 14:10, 18:16, 43:14, 48:8
  **continue** [18] - 12:19, 13:6, 21:6, 22:2, 22:4, 22:21, 63:5, 64:25, 65:15, 70:20, 73:12, 73:19, 73:23, 75:15, 75:17, 79:3, 79:14, 80:17
  **CONTINUED** [1] - 4:23
  **continued** [13] - 9:24, 22:22, 52:11, 52:12, 57:24, 57:25, 59:18, 73:11, 77:19, 80:17, 82:21, 84:5, 84:6
  **continuing** [4] - 52:22, 59:16, 60:1, 63:23
  **contract** [4] - 32:3, 34:9, 38:19, 42:17
  **contracts** [1] - 34:5
  **contractual** [1] -

43:15
  **contribute** [5] - 70:18, 71:4, 72:6, 77:14, 78:10
  **contributed** [3] - 12:5, 15:15, 16:20
  **contributing** [1] - 78:18
  **control** [4] - 14:1, 22:24, 45:6, 45:8
  **convince** [1] - 32:10
  **COOPER** [1] - 1:17
  **correct** [13] - 15:4, 20:9, 37:6, 40:7, 45:4, 48:16, 58:7, 62:25, 63:2, 70:14, 77:8, 77:10, 80:15
  **correctly** [1] - 63:1
  **corresponding** [1] - 7:9
  **cost** [1] - 6:15
  **count** [1] - 56:14
  **country** [1] - 21:2
  **country's** [2] - 52:13, 69:19
  **couple** [2] - 46:24, 51:16
  **coupled** [1] - 74:15
  **course** [3] - 19:3, 59:17, 67:20
  **Court** [6] - 2:11, 2:11, 85:9, 85:12, 87:12, 87:13
  **court** [2] - 85:9, 85:23
  **COURT** [10] - 1:1, 4:5, 4:11, 4:19, 22:11, 79:20, 79:23, 85:7, 85:22, 86:1
  **Court's** [2] - 14:20, 54:24
  **COURTROOM** [1] - 4:15
  **courtroom** [2] - 4:17, 85:20
  **covenant** [3] - 43:14, 43:22, 44:12
  **Covenants** [1] - 43:12
  **covenants** [2] - 45:6, 45:14
  **covering** [2] - 23:7, 76:6
  **covers** [1] - 24:10
  **crazy** [1] - 59:21
  **create** [1] - 72:5
  **created** [2] - 17:18, 38:19
  **creates** [1] - 68:7
  **crisis** [1] - 11:11

**critical** [5] - 8:20, 8:24, 73:13, 81:3, 81:25
**Cross** [1] - 3:4
**CRR** [3] - 2:10, 87:3, 87:12
**cumulative** [2] - 61:13
**current** [7] - 12:6, 15:15, 16:21, 63:5, 73:8, 82:4, 82:11

**D**

**D-86** [1] - 31:6
**D.C** [6] - 1:6, 1:18, 1:22, 2:9, 2:13, 87:14
**date** [12] - 8:2, 19:15, 23:11, 24:2, 24:9, 29:3, 29:5, 49:23, 64:23, 65:8, 78:25, 79:8
**Dated** [1] - 87:10
**dated** [1] - 47:8
**David** [4] - 24:6, 28:1, 28:14, 64:18
**DAVID** [1] - 2:7
**DAVIS** [1] - 1:20
**DAY** [1] - 1:13
**day-to-day** [2] - 68:8, 68:23
**deadline** [1] - 83:21
**debt** [10] - 9:6, 9:11, 11:9, 16:24, 17:2, 20:25, 62:12, 62:16, 65:6
**December** [16] - 47:10, 55:7, 57:21, 58:5, 58:9, 59:14, 60:11, 61:7, 76:17, 76:21, 76:25, 83:13, 83:18, 83:21, 84:4, 84:24
**decided** [5] - 32:8, 59:7, 59:10, 85:9
**decision** [5] - 7:2, 7:7, 44:17, 68:8, 68:23
**decision-making** [2] - 68:8, 68:23
**deck** [1] - 47:3
**decline** [3] - 52:11, 59:16, 60:1
**deep** [1] - 52:13
**default** [1] - 17:1
**DEFENDANTS** [1] - 2:6
**Defendants** [2] - 1:8, 4:2

**Defendants'** [2] - 3:9, 4:12
**DEFENSE** [2] - 3:5, 4:22
**deficit** [1] - 73:9
**definite** [1] - 19:15
**definition** [1] - 14:12
**delicate** [1] - 9:18
**delinquencies** [1] - 59:18
**delinquency** [1] - 52:12
**delinquent** [3] - 59:20, 59:22, 77:20
**DeMarco** [7] - 3:6, 4:22, 4:24, 5:7, 5:19, 22:19, 35:10
**Department** [9] - 11:6, 32:1, 32:25, 36:14, 47:18, 49:8, 54:4, 81:12, 84:16
**dependent** [2] - 73:11, 80:16
**DEPUTY** [1] - 4:15
**described** [5] - 33:3, 34:14, 68:19, 71:21
**describing** [1] - 6:23
**designated** [2] - 14:5, 14:6
**designation** [5] - 37:22, 38:4, 38:9, 38:12, 42:23
**designed** [3] - 10:14, 45:4, 45:14
**determination** [2] - 7:6, 44:19
**determine** [4] - 63:13, 63:15, 69:17, 69:18
**determined** [6] - 13:11, 22:6, 43:8, 57:16, 83:13, 83:17
**determines** [1] - 5:22
**difference** [4] - 17:15, 26:22, 61:6, 81:15
**differences** [1] - 31:12
**different** [13] - 17:7, 37:25, 38:1, 42:6, 42:9, 45:14, 50:15, 56:7, 66:25, 67:4, 67:5, 67:12, 67:15
**Direct** [1] - 3:4
**DIRECT** [1] - 4:23
**direct** [4] - 17:4, 22:24, 40:24, 53:19
**direction** [1] - 68:6
**directly** [5] - 12:5, 15:2, 15:15, 16:20,

80:3
**director** [7] - 19:24, 20:2, 20:5, 51:7, 54:10, 54:12, 55:10
**Director** [2] - 7:6, 8:5
**directors** [1] - 14:4
**disagree** [1] - 47:23
**disclosure** [1] - 84:2
**disclosure's** [1] - 84:3
**disclosures** [1] - 24:22
**discussed** [1] - 74:20
**discussing** [1] - 69:12
**discussion** [2] - 40:17, 44:11
**discussions** [2] - 63:11, 69:16
**dissipated** [1] - 18:12
**dissipation** [1] - 7:19
**distinction** [1] - 13:7
**distress** [1] - 77:19
**District** [3] - 2:11, 2:12, 87:13
**district** [1] - 87:13
**DISTRICT** [3] - 1:1, 1:1, 1:14
**dividend** [45] - 35:4, 35:9, 35:14, 35:15, 36:24, 37:5, 37:10, 37:15, 37:18, 39:9, 39:17, 39:18, 39:20, 40:1, 40:20, 40:22, 41:19, 42:7, 42:10, 42:16, 44:6, 69:23, 70:3, 70:10, 70:17, 70:23, 70:25, 71:8, 71:9, 71:14, 71:17, 72:3, 72:9, 72:10, 72:12, 72:16, 72:18, 72:24, 72:25, 73:1, 74:12, 74:13, 82:17, 84:7
**dividends** [15] - 12:18, 12:20, 12:22, 39:5, 41:4, 43:24, 51:20, 55:18, 66:14, 70:20, 72:5, 73:3, 73:22, 82:12, 82:22
**document** [13] - 8:2, 13:13, 14:16, 21:11, 21:16, 22:10, 22:12, 38:22, 60:18, 61:25, 65:4, 65:8
**documents** [1] - 30:1
**dollar** [3] - 36:3, 36:5, 50:11

**dollars** [2] - 36:2, 67:21
**done** [2] - 57:19, 63:20
**double** [1] - 67:23
**doubled** [4] - 52:7, 52:8, 56:3, 56:6
**doubling** [2] - 50:22, 53:22
**down** [10] - 5:16, 6:4, 15:17, 29:17, 41:8, 47:25, 51:2, 61:14, 75:3, 75:5
**draw** [23] - 11:24, 32:18, 32:19, 33:4, 33:7, 33:10, 33:19, 36:16, 36:18, 36:23, 37:4, 37:9, 37:10, 56:16, 60:25, 61:9, 61:13, 67:17, 71:13, 71:16, 71:19, 71:21, 72:4
**drawing** [3] - 13:7, 53:15, 71:7
**drawn** [12] - 35:5, 35:17, 36:3, 37:13, 37:16, 42:11, 46:11, 53:2, 53:6, 57:12, 67:21, 80:13
**draws** [19] - 37:17, 37:18, 46:15, 47:17, 47:19, 47:22, 49:8, 52:9, 56:13, 60:22, 67:1, 70:22, 71:8, 72:1, 73:21, 73:22, 74:9, 75:3, 81:11
**due** [3] - 7:19, 48:22, 73:8
**during** [11] - 20:1, 20:21, 21:23, 22:1, 26:12, 26:24, 63:22, 65:2, 65:17, 79:1, 79:11
**During** [1] - 26:9
**DX** [1] - 75:20
**DX-102** [1] - 23:2
**DX-103** [1] - 27:20
**DX-163** [1] - 50:1
**DX-188** [2] - 64:4, 66:2
**DX-189** [1] - 77:2
**DX-209** [1] - 61:24
**DX-381** [1] - 4:8
**DX-58** [1] - 5:3
**DX-78** [3] - 7:3, 7:5, 7:14
**DX-79** [1] - 7:11
**DX-81-A** [1] - 13:15
**DX-86** [2] - 41:17, 43:10

**DX-89** [1] - 38:4

**E**

**early** [5] - 47:18, 48:4, 48:11, 60:7, 84:3
**earn** [2] - 72:19, 84:20
**earnings** [3] - 7:19, 82:14, 82:20
**easier** [1] - 34:21
**East** [1] - 67:14
**economy** [1] - 11:21
**EDWARD** [1] - 4:22
**Edward** [1] - 3:6
**Edwards** [1] - 87:12
**EDWARDS** [2] - 2:10, 87:3
**effect** [4] - 11:19, 43:9, 53:13, 53:19
**effective** [2] - 58:10, 84:1
**efforts** [1] - 68:11
**eight** [4] - 50:24, 50:25, 51:3, 59:9
**either** [3] - 41:7, 42:22, 79:11
**elaborate** [2] - 9:3, 11:17
**eliminated** [2] - 12:18, 12:20
**email** [1] - 46:20
**emerge** [1] - 78:24
**employees** [1] - 85:10
**enact** [1] - 63:12
**end** [28] - 10:12, 19:6, 19:15, 19:18, 19:20, 24:17, 30:10, 36:8, 36:13, 46:20, 48:14, 48:20, 49:4, 49:5, 52:25, 56:9, 56:22, 57:3, 57:4, 57:5, 57:8, 57:14, 58:2, 59:6, 65:25, 75:23, 80:8
**ended** [1] - 64:8
**ends** [1] - 79:10
**engaging** [1] - 69:16
**enhance** [3] - 12:4, 15:13, 16:11
**enhancing** [1] - 16:16
**ensure** [5] - 16:15, 18:11, 18:14, 54:4, 81:12
**ensuring** [3] - 9:24, 16:7, 63:4

enter [1] - 21:13
entered [4] - 4:13, 4:17, 54:21, 55:8
enterprises [5] - 7:18, 11:13, 40:24, 63:5, 63:7
entire [2] - 20:1, 24:15
entities [1] - 10:16
entitled [2] - 82:5, 82:12
entity [2] - 5:22, 14:1
equal [1] - 9:10
equity [13] - 6:21, 30:19, 47:16, 48:2, 48:5, 48:7, 49:5, 49:6, 49:11, 58:10, 61:11, 67:16, 81:9
ESQ [15] - 1:17, 1:19, 1:20, 1:20, 1:21, 1:23, 1:24, 2:2, 2:2, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8
essential [2] - 74:1, 84:16
essentially [1] - 56:16
establish [1] - 14:1
established [4] - 12:13, 45:18, 46:8, 77:24
establishing [1] - 12:11
et [2] - 1:3, 1:7
evaluate [1] - 25:1
Eve [1] - 55:7
event [3] - 32:24, 36:7, 36:14
evidence [2] - 4:9, 4:13
EVIDENCE [1] - 3:8
exact [1] - 19:19
exactly [2] - 77:6, 79:5
EXAMINATION [1] - 4:23
example [1] - 63:17
exceeded [4] - 30:12, 33:4, 47:16, 48:2
exceeds [4] - 70:17, 72:13, 82:14, 82:19
except [1] - 85:18
excerpts [1] - 8:14
exchange [1] - 22:21
Exchange [1] - 23:6
excused [2] - 85:16, 86:2
executive [1] - 28:17
exhaust [1] - 32:22
Exhibit [2] - 3:9, 4:12

exhibit [2] - 4:6, 4:9
EXHIBITS [1] - 3:8
exhibits [1] - 4:7
exist [4] - 65:1, 65:16, 79:3, 79:14
existed [1] - 82:20
existing [1] - 32:21
exit [4] - 44:14, 44:18, 51:24, 55:22
exited [1] - 85:20
exiting [2] - 44:11, 44:13
expand [1] - 68:11
expect [3] - 72:2, 73:8, 73:20
expectation [3] - 45:21, 63:11, 74:7
expectations [1] - 45:19
expected [3] - 21:4, 85:11, 85:16
expecting [1] - 21:2
experienced [1] - 7:18
experts [1] - 47:20
explain [2] - 65:18, 70:15
explained [1] - 27:1
explaining [2] - 31:25, 62:10
express [1] - 42:5
extinguished [1] - 13:8
extraordinary [1] - 54:1

F

face [1] - 17:3
facilitate [1] - 78:3
facilities [1] - 12:12
facing [1] - 57:9
fact [8] - 15:19, 15:22, 18:13, 19:5, 20:23, 21:3, 21:14, 46:12
Facts [1] - 60:14
fail [1] - 17:1
failed [2] - 16:2, 40:21
failure [1] - 17:4
FAIRHOLME [1] - 1:3
fairly [1] - 28:7
fall [1] - 46:4
falling [1] - 77:21
familiar [1] - 71:19
families [3] - 9:1, 78:4, 78:5

FANNIE [2] - 1:10, 2:6
Fannie [91] - 6:8, 6:20, 7:8, 7:14, 7:15, 8:6, 8:19, 12:3, 12:10, 15:24, 16:5, 16:25, 17:7, 18:19, 18:22, 21:1, 21:3, 23:6, 24:1, 24:7, 25:3, 25:13, 28:3, 28:4, 28:22, 29:15, 30:14, 30:25, 31:2, 31:13, 32:11, 32:17, 33:25, 34:16, 34:20, 34:22, 38:3, 39:25, 41:3, 41:7, 43:23, 44:12, 44:17, 45:1, 45:19, 48:10, 48:11, 48:17, 50:12, 50:13, 50:14, 51:19, 51:22, 51:24, 52:23, 53:2, 54:14, 55:11, 56:16, 58:4, 58:8, 58:23, 59:5, 60:22, 61:20, 62:13, 62:23, 63:14, 63:22, 64:7, 64:16, 65:21, 69:18, 69:22, 70:2, 72:18, 75:4, 75:20, 75:24, 75:25, 76:1, 78:2, 78:5, 78:16, 80:4, 84:10, 84:14
Fannie's [3] - 61:7, 70:9, 77:7
fast [1] - 47:15
February [1] - 58:4
Federal [1] - 80:23
federal [3] - 63:7, 63:16, 69:20
FEDERAL [1] - 1:6
fee [16] - 35:19, 37:2, 41:15, 41:21, 41:25, 42:1, 42:6, 42:12, 42:22, 43:1, 43:4, 74:19, 83:4, 83:8, 83:20
fees [4] - 74:16, 74:18, 83:1, 83:15
few [4] - 8:14, 16:23, 54:9, 74:3
FHFA [17] - 2:6, 11:12, 11:23, 13:12, 14:6, 20:15, 22:10, 22:12, 44:19, 44:25, 46:20, 51:6, 51:22, 58:4, 59:9, 67:1, 80:17
FHFA's [2] - 21:16, 45:18
fifth [1] - 62:5
file [1] - 23:10

filing [17] - 23:7, 23:9, 23:25, 24:20, 24:25, 25:3, 26:12, 64:7, 67:12, 67:20, 69:21, 71:23, 71:25, 76:3, 76:5, 76:21, 79:16
filings [4] - 24:19, 30:11, 63:23, 63:25
final [1] - 73:25
FINANCE [1] - 1:6
financial [24] - 9:7, 9:23, 11:10, 22:5, 24:7, 24:16, 24:25, 28:8, 28:14, 28:19, 30:5, 35:1, 35:3, 48:11, 55:25, 68:10, 73:21, 75:14, 75:18, 80:19, 84:9, 84:15, 84:18
financially [1] - 74:8
financing [2] - 6:20, 11:5
First [1] - 50:7
first [36] - 7:18, 8:15, 8:16, 13:23, 15:1, 15:2, 18:4, 25:6, 26:19, 26:20, 37:9, 37:10, 43:17, 47:21, 49:14, 49:21, 50:9, 50:14, 50:15, 50:18, 51:18, 51:22, 53:1, 53:21, 54:9, 55:2, 63:25, 68:24, 68:25, 69:1, 78:22, 79:25, 80:16, 82:3
five [6] - 7:17, 7:21, 70:18, 71:1, 72:13, 72:19
fix [3] - 85:3, 85:4, 85:5
fixed [3] - 39:23, 39:24, 42:16
FLEXNER [1] - 1:21
flip [1] - 21:22
flow [1] - 9:24
flows [3] - 70:19, 71:4, 72:6
focus [1] - 27:8
follow [2] - 11:21, 82:8
followed [1] - 24:16
following [8] - 4:18, 65:1, 65:2, 65:16, 65:17, 79:2, 79:11, 85:21
FOR [5] - 1:1, 1:17, 1:19, 2:6, 3:5
foreclosure [1] - 59:23

foregoing [1] - 87:4
form [1] - 22:13
Form [2] - 23:8, 64:7
forth [4] - 18:20, 25:2, 69:17, 77:22
forward [2] - 13:11, 58:3
foundation [1] - 79:21
four [1] - 49:2
fourth [2] - 61:12, 73:5
Fred [1] - 63:15
FREDDIE [1] - 2:7
Freddie [76] - 7:9, 7:12, 8:7, 8:19, 12:3, 12:10, 15:24, 16:5, 16:25, 17:1, 17:7, 18:19, 18:22, 21:1, 21:3, 27:19, 28:1, 28:25, 30:15, 30:25, 31:2, 31:11, 31:13, 32:2, 32:6, 32:11, 32:17, 34:1, 34:16, 34:20, 40:1, 41:3, 41:7, 43:10, 43:24, 44:13, 44:21, 45:1, 45:20, 48:10, 48:11, 48:18, 50:12, 50:16, 51:19, 51:23, 51:24, 52:23, 53:6, 54:15, 55:12, 56:16, 58:8, 58:24, 59:5, 61:21, 62:13, 62:23, 63:14, 63:22, 69:18, 74:4, 75:4, 75:20, 75:25, 76:11, 76:13, 78:2, 78:5, 78:16, 80:4, 82:19, 84:12, 84:13
Freddie's [6] - 6:9, 41:16, 76:2, 76:5, 77:2, 77:8
front [2] - 36:11, 38:22
fulfill [8] - 10:20, 12:4, 15:13, 16:12, 16:16, 25:25, 27:5, 45:24
fulfilling [2] - 66:10, 66:23
full [2] - 62:18, 87:5
fully [3] - 43:4, 44:24, 63:8
function [1] - 21:6
functioning [2] - 8:25, 46:14
functions [1] - 63:5
funding [8] - 6:14, 6:17, 7:24, 33:25, 34:2, 38:20, 57:7,

73:10
**FUNDS** [1] - 1:3
**funds** [7] - 32:3,
32:25, 68:12, 73:12,
74:1, 80:24, 81:24
**future** [26] - 42:24,
69:11, 69:18, 69:19,
70:19, 71:5, 71:9,
72:3, 72:5, 72:7, 73:3,
73:9, 73:20, 73:21,
73:22, 74:5, 74:9,
75:14, 75:18, 79:9,
84:8, 84:11, 84:17

## G

**game** [2] - 6:25,
36:13
**gather** [1] - 15:25
**gears** [2] - 85:6, 85:7
**Geithner** [2] - 51:12,
55:14
**gentlemen** [1] -
14:18
**given** [4] - 19:20,
36:2, 52:16, 60:25
**goal** [4] - 12:2, 12:7,
16:11, 16:19
**goals** [11] - 14:23,
15:7, 15:10, 15:12,
16:19, 17:6, 17:7,
17:9, 17:15, 17:16,
17:19
**GOODHART** [1] -
1:24
**Google** [1] - 21:13
**government** [7] -
10:23, 62:17, 62:22,
63:7, 63:16, 69:20,
80:1
**government's** [1] -
32:11
**GRANT** [1] - 1:24
**great** [1] - 5:5
**greater** [4] - 32:23,
61:20, 73:4, 84:19
**GROSSMAN** [1] - 2:4
**grounds** [2] - 7:7,
7:17
**grow** [2] - 57:25,
59:18
**growing** [1] - 73:4
**grows** [1] - 37:17
**GSEs** [8] - 6:7,
11:24, 30:6, 44:6,
46:1, 55:18, 55:22,
69:13
**guarantee** [1] - 16:1
**guaranties** [1] -

53:18
**guaranty** [5] - 16:6,
16:8, 17:11, 61:22,
62:23
**guess** [1] - 31:19

## H

**Haldeman** [1] - 76:13
**HAMISH** [1] - 1:19
**HAMP** [1] - 77:24
**hamper** [1] - 68:8
**Hampshire** [1] - 1:18
**happy** [2] - 74:5,
74:6
**hard** [1] - 11:22
**hear** [1] - 24:19
**heard** [8] - 7:5, 10:3,
24:18, 54:18, 60:16,
71:11, 76:20
**hearings** [2] - 63:20,
69:16
**held** [1] - 9:11
**help** [3] - 12:3,
15:12, 78:3
**helping** [2] - 15:23,
78:14
**helps** [1] - 18:23
**HERA** [5] - 5:1, 5:7,
6:16, 14:15, 56:25
**HERA's** [1] - 27:9
**Herb** [1] - 23:25
**hereby** [1] - 87:3
**higher** [1] - 71:9
**highlight** [4] - 5:15,
62:7, 69:4, 70:6
**highlighted** [1] -
70:15
**highlights** [1] - 73:7
**Hisey** [1] - 24:6
**historical** [1] - 82:14
**history** [1] - 82:19
**hit** [3] - 56:9, 60:2,
73:7
**hits** [1] - 85:11
**HOFFMAN** [1] - 2:6
**Hoffman** [1] - 4:8
**hold** [1] - 11:11
**holder** [2] - 16:1,
16:4
**holders** [2] - 16:7,
17:2
**holding** [1] - 69:16
**home** [3] - 9:2,
85:10, 85:14
**Homeowner** [2] -
77:25
**homeowners** [1] -
78:8

**Homeownership** [1]
- 77:25
**Honor** [12] - 4:1, 4:3,
4:6, 4:9, 4:14, 4:21,
22:10, 79:19, 79:22,
82:6, 85:25, 86:3
**HONORABLE** [1] -
1:13
**hope** [1] - 61:4
**house** [4] - 52:12,
59:16, 60:1, 77:21
**housekeeping** [1] -
4:3
**housing** [6] - 8:21,
11:21, 46:14, 53:19,
63:8, 78:15
**HOUSING** [1] - 1:6
**https** [1] - 21:8
**human** [1] - 18:22
**HUME** [8] - 1:19,
22:8, 22:13, 22:16,
40:4, 40:8, 79:19,
79:21
**hypothetical** [2] -
37:7, 79:15

## I

**IAN** [1] - 2:6
**idea** [3] - 33:22, 44:8,
66:16
**ii** [1] - 5:16
**illustrate** [1] - 61:5
**imagine** [1] - 79:15
**immediate** [2] -
46:13, 85:16
**immediately** [2] -
24:13, 30:9
**impact** [4] - 75:12,
75:13, 84:8, 84:17
**implied** [1] - 42:4
**imply** [1] - 81:6
**important** [7] -
17:18, 20:23, 20:24,
56:21, 60:5, 63:4
**importantly** [2] -
57:10, 59:16
**imposing** [1] - 11:14
**imposition** [1] - 20:7
**IN** [2] - 1:10, 3:8
**inability** [2] - 9:17,
75:3
**inadvertently** [1] -
4:7
**INC** [1] - 1:3
**Incidental** [1] - 5:4
**include** [2] - 66:13,
66:16
**included** [2] - 35:18,

38:20
**including** [2] - 56:19,
79:2
**income** [3] - 70:18,
71:15, 72:13
**increase** [7] - 37:4,
52:12, 57:18, 57:25,
58:2, 62:14, 67:24
**increased** [4] -
51:13, 56:6, 57:19,
57:22
**increases** [1] - 37:18
**increasing** [2] -
68:12, 71:14
**increasingly** [2] -
70:19, 71:4
**independent** [2] -
10:23, 10:24
**independently** [3] -
10:20, 10:21
**indicating** [1] - 27:7
**indulgence** [2] -
14:20, 54:24
**infinite** [1] - 56:11
**information** [1] -
28:7
**inject** [2] - 30:13,
32:25
**insolvent** [2] - 32:23,
33:19
**instability** [4] - 12:6,
15:15, 16:21, 53:14
**instead** [1] - 40:25
**instill** [4] - 46:8,
46:13, 54:4, 61:20
**institution** [1] -
10:15
**intangible** [2] -
18:21, 18:23
**intended** [2] - 17:13,
74:25
**intent** [1] - 43:4
**intentional** [1] - 34:7
**interest** [19] - 5:22,
5:25, 6:2, 17:20,
17:22, 17:23, 27:10,
27:12, 27:15, 27:16,
27:17, 27:18, 45:15,
66:11, 66:22, 68:22,
68:25, 78:14, 78:21
**interests** [2] - 6:2,
9:23
**internet** [2] - 21:12,
21:19
**interrupted** [1] - 49:4
**introduce** [1] - 71:10
**introduced** [1] -
30:20
**inventory** [1] - 59:25
**invest** [1] - 24:24

**investment** [2] -
30:19, 31:22
**investments** [2] -
48:17, 48:20
**investors** [8] - 62:12,
62:15, 62:16, 62:24,
65:5, 65:6, 65:22,
73:17
**issuance** [2] - 30:7,
38:7
**issue** [4] - 11:8,
13:12, 44:6, 55:18
**issued** [5] - 16:25,
24:13, 24:24, 58:17,
62:3
**issuing** [1] - 58:15

## J

**January** [1] - 58:22
**JESSICA** [1] - 1:21
**Johnson** [1] - 64:18
**Joint** [1] - 60:13
**JONATHAN** [1] - 2:7
**Jonathan** [1] - 4:1
**JONES** [2] - 2:8, 6:4
**judge** [1] - 85:22
**JUDGE** [1] - 1:14
**July** [2] - 23:13, 76:9
**jurors** [1] - 85:10
**JURY** [1] - 1:12
**jury** [17] - 4:15, 4:16,
4:17, 4:25, 10:3, 20:4,
24:18, 27:2, 29:25,
54:18, 60:16, 61:4,
71:11, 73:15, 76:20,
82:8, 85:20
**jury's** [1] - 7:5
**JX-1** [1] - 60:11

## K

**KAPLAN** [1] - 1:20
**KAYE** [1] - 2:8
**keep** [9] - 10:4, 21:4,
32:7, 34:6, 45:13,
56:10, 73:24, 80:4,
80:5
**keeping** [7] - 36:12,
36:13, 49:10, 73:13,
74:1, 81:3, 84:16
**Kellermann** [2] -
28:14, 29:5
**KENYA** [1] - 1:20
**KESSLER** [1] - 1:24
**key** [1] - 35:1
**KHALELAH** [1] -
1:20

**kicks** [1] - 49:7
**kind** [1] - 46:3
**King** [1] - 1:25
**KIRK** [1] - 1:17
**knowledge** [1] - 60:4
**KRAVETZ** [1] - 2:2

# L

**lacks** [1] - 79:21
**ladies** [1] - 14:18
**lag** [1] - 24:11
**LAMBERTH** [1] -
1:13
**language** [6] - 22:7,
28:3, 46:3, 47:6,
47:11, 77:8
**large** [1] - 32:20
**last** [21] - 10:3,
20:20, 21:21, 23:15,
23:18, 23:20, 27:21,
52:18, 58:11, 58:18,
63:3, 65:23, 69:2,
69:5, 71:1, 72:19,
75:9, 75:11, 79:13,
84:21
**late** [1] - 60:7
**leading** [1] - 54:19
**least** [7] - 11:2,
32:13, 33:3, 33:18,
35:1, 68:11, 85:3
**leaving** [1] - 36:23
**LEE** [1] - 1:23
**left** [6] - 5:1, 5:4,
53:4, 53:9, 57:16,
60:9
**legal** [3] - 13:25,
22:8, 40:4
**legend** [1] - 21:8
**legislation** [1] -
63:13
**legislative** [1] -
69:17
**lenders** [1] - 21:1
**less** [1] - 83:7
**letter** [1] - 7:6
**liabilities** [6] - 9:7,
9:8, 30:12, 32:23,
33:4, 81:16
**life** [2] - 52:19, 62:20
**likely** [1] - 68:10
**limit** [3] - 41:4,
56:25, 57:11
**limiting** [1] - 68:14
**line** [8] - 10:3, 10:13,
33:22, 62:5, 69:2,
69:3, 69:5, 70:23
**lines** [1] - 9:14
**link** [1] - 21:15

**liquidated** [1] - 36:8
**liquidation** [23] -
35:7, 35:8, 35:15,
35:23, 35:24, 35:25,
36:2, 36:4, 36:6, 36:9,
36:10, 36:12, 36:15,
36:17, 36:18, 37:13,
40:25, 41:8, 41:19,
73:2, 75:5, 82:4,
82:11
**liquidity** [8] - 8:20,
9:1, 9:25, 12:12,
16:15, 17:12, 25:25,
26:16
**LISA** [2] - 2:10, 87:3
**Lisa** [1] - 87:12
**list** [3] - 4:7, 66:6,
66:13
**listed** [2] - 16:11,
16:19
**listing** [1] - 66:8
**literally** [1] - 81:18
**LITIGATION** [1] -
1:11
**LITOWITZ** [1] - 2:3
**LLP** [3] - 1:21, 1:24,
2:4
**loan** [1] - 30:18
**Lockhart** [4] - 7:6,
8:5, 51:9, 51:10
**Lockhart's** [1] - 13:5
**long-term** [3] -
68:14, 85:3, 85:5
**longer-term** [3] -
6:11, 63:6, 63:16
**look** [14] - 5:13, 7:2,
8:15, 10:2, 24:24,
26:15, 27:19, 29:15,
56:8, 61:24, 62:5,
64:2, 78:22, 82:18
**looked** [4] - 16:23,
63:25, 76:21, 77:7
**looking** [14] - 5:1,
29:25, 34:19, 37:20,
38:15, 48:10, 50:12,
52:10, 52:11, 52:14,
53:15, 60:8, 61:6,
75:21
**losses** [12] - 17:4,
32:19, 32:22, 47:14,
47:15, 48:2, 48:22,
52:15, 56:10, 56:13,
57:25, 59:24
**lost** [3] - 14:17,
48:22, 75:22
**loud** [1] - 10:11
**LOUIS** [1] - 2:7

# M

**Mac** [23] - 7:9, 7:12,
8:19, 12:3, 12:10,
28:1, 31:11, 32:2,
32:6, 32:12, 48:10,
52:23, 54:15, 55:12,
58:24, 61:21, 62:13,
63:14, 69:18, 76:13,
78:2, 78:16, 82:19
**MAC** [2] - 1:10, 2:7
**MAE** [1] - 2:6
**Mae** [27] - 6:20, 7:8,
7:15, 8:19, 12:3,
12:10, 24:1, 24:7,
25:4, 32:11, 48:10,
52:23, 54:14, 55:11,
58:23, 61:20, 62:13,
63:14, 64:16, 65:21,
69:18, 70:2, 75:24,
76:1, 78:2, 78:16
**Mae's** [2] - 23:6, 64:7
**MAE/FREDDIE** [1] -
1:10
**magnification** [1] -
10:5
**manage** [1] - 27:13
**managed** [2] - 26:20,
26:24
**managing** [4] -
25:18, 27:14, 29:13,
76:22
**manner** [2] - 40:22,
77:13
**March** [1] - 53:1
**market** [36] - 6:9, 8:1,
8:21, 8:25, 9:1, 9:25,
11:21, 12:6, 15:16,
16:14, 16:15, 16:21,
17:11, 20:24, 22:6,
24:23, 26:1, 32:10,
43:8, 45:23, 46:13,
46:14, 52:10, 52:22,
53:13, 53:14, 54:4,
56:9, 63:6, 63:8,
68:12, 69:19, 77:13,
77:20, 78:15
**market's** [4] - 52:13,
52:20, 53:15, 60:8
**marketplace** [3] -
50:21, 61:20, 67:18
**markets** [2] - 11:9,
53:20
**Massachusetts** [1] -
2:9
**match** [1] - 14:8
**material** [3] - 28:8,
31:12, 50:15
**math** [1] - 50:24

**matter** [3] - 4:4,
39:25, 78:11
**matters** [1] - 27:8
**maximize** [6] - 26:6,
26:21, 26:23, 26:25,
27:7, 76:22
**MBS** [5] - 16:5, 16:7,
20:25, 65:6, 73:17
**MC** [1] - 1:10
**mean** [33] - 8:1, 8:22,
9:20, 10:17, 11:4,
11:18, 12:20, 13:4,
13:5, 15:18, 15:22,
16:12, 17:18, 22:7,
26:18, 27:11, 30:23,
33:24, 48:3, 48:7,
54:12, 58:8, 58:14,
63:9, 70:21, 72:6,
72:12, 72:23, 74:22,
75:9, 78:20, 82:16
**meaning** [11] - 9:22,
10:23, 14:14, 16:5,
18:10, 39:17, 52:11,
75:16, 80:6, 80:7,
84:18
**means** [22] - 6:11,
8:23, 9:21, 12:21,
16:16, 16:22, 18:14,
22:18, 22:20, 30:24,
33:7, 59:17, 65:18,
65:21, 70:16, 71:6,
71:8, 73:3, 73:22,
82:17, 83:13
**meant** [11] - 10:18,
11:8, 16:4, 18:8, 19:1,
54:14, 57:10, 61:10,
63:10, 70:22, 74:23
**meeting** [1] - 70:2,
74:8
**MELTZER** [1] - 1:24
**members** [7] - 4:25,
20:4, 27:2, 29:25,
71:11, 73:14, 82:8
**memo** [2] - 7:2,
54:18
**met** [1] - 56:18
**Michael** [1] - 64:15
**middle** [1] - 12:1
**might** [2] - 19:18,
63:19
**mind** [1] - 59:13
**minor** [2] - 35:6,
51:16
**minus** [2] - 80:12,
80:13
**minute** [3] - 4:3,
23:16, 54:8
**minutes** [1] - 16:23
**mission** [24] - 7:24,
8:20, 8:24, 9:18, 9:24,

10:20, 12:4, 15:14,
16:12, 16:13, 16:16,
17:12, 25:25, 26:2,
27:6, 45:24, 61:23,
66:11, 66:24, 68:7,
68:15, 68:16, 68:18,
68:21
**misunderstood** [2] -
39:11, 67:8
**mitigate** [4] - 12:4,
15:14, 16:20, 27:6
**Modification** [1] -
78:1
**Moffett** [2] - 28:1,
29:3
**moment** [3] - 30:17,
35:20, 73:6
**money** [15] - 6:9,
6:12, 30:13, 30:14,
34:6, 39:25, 42:3,
53:16, 53:17, 54:1,
54:2, 58:5, 71:1, 72:3,
75:2
**Montgomery** [13] -
5:2, 5:4, 5:14, 6:4,
9:13, 10:5, 10:12,
23:21, 25:10, 25:16,
68:2, 69:7, 70:7
**months** [6] - 25:5,
50:24, 50:25, 51:3,
54:9, 59:9
**morning** [7] - 8:16,
15:24, 16:22, 85:13,
85:19, 85:24, 86:1
**mortgage** [30] - 8:25,
9:2, 9:6, 9:25, 11:9,
15:25, 16:2, 16:14,
16:15, 16:24, 17:3,
19:3, 21:1, 26:1,
52:12, 58:16, 58:17,
59:17, 62:12, 62:16,
62:23, 63:6, 63:7,
63:17, 68:12, 69:19,
77:13, 77:19, 78:4,
78:7
**mortgage-backed**
[11] - 9:6, 11:9, 15:25,
16:2, 16:24, 17:3,
58:16, 58:17, 62:12,
62:16, 62:23
**mortgages** [11] -
11:8, 15:25, 18:19,
21:2, 52:19, 59:21,
59:22, 59:25, 60:1,
77:21, 78:6
**most** [1] - 82:14
**mouth** [1] - 34:21
**move** [2] - 4:8, 82:7
**moved** [1] - 4:8
**MR** [101] - 4:1, 4:6,

4:14, 4:21, 4:24, 5:6, 5:14, 5:18, 6:4, 6:5, 7:3, 7:4, 8:9, 8:10, 9:12, 9:15, 10:4, 10:7, 13:15, 13:16, 14:18, 14:21, 22:8, 22:10, 22:12, 22:13, 22:15, 22:16, 22:17, 23:15, 23:17, 23:20, 23:22, 25:10, 25:12, 25:15, 25:17, 27:22, 27:23, 28:11, 28:12, 29:8, 29:11, 29:17, 29:18, 31:6, 31:7, 31:19, 31:21, 38:3, 38:5, 38:24, 39:1, 39:6, 39:8, 40:4, 40:6, 40:8, 40:11, 41:16, 41:18, 43:18, 43:20, 46:17, 46:18, 46:25, 47:2, 47:25, 48:1, 50:1, 50:2, 54:24, 55:1, 60:10, 60:12, 61:14, 61:15, 62:7, 62:8, 64:4, 64:5, 64:11, 64:13, 65:10, 65:12, 66:3, 66:5, 68:1, 68:3, 69:4, 69:9, 70:6, 70:8, 79:19, 79:21, 79:22, 79:24, 82:6, 82:10, 85:24, 86:3

**MUGLER** [1] - 1:21
**must** [1] - 83:13
**mutually** [2] - 43:2

## N

**nasty** [1] - 85:25
**neared** [1] - 57:5
**necessary** [2] - 20:16, 56:14
**need** [2] - 9:21, 9:22
**needed** [7] - 32:22, 42:3, 42:15, 46:15, 56:17, 57:2, 61:1
**needing** [1] - 47:17
**needs** [1] - 24:15
**negative** [9] - 30:12, 33:8, 33:9, 33:10, 34:1, 61:1, 70:19, 71:4, 72:6
**net** [15] - 30:12, 33:1, 33:8, 33:10, 34:1, 46:10, 48:12, 61:2, 70:17, 72:13, 73:8, 75:14, 84:9, 84:18
**New** [4] - 1:18, 1:22, 2:5
**newly** [1] - 46:7
**news** [1] - 85:24

**next** [21] - 13:12, 19:5, 21:7, 21:17, 24:4, 28:10, 29:5, 29:7, 37:5, 37:12, 39:6, 46:25, 56:12, 57:23, 64:18, 71:12, 71:15, 71:16, 72:21, 74:10
**nonetheless** [1] - 59:24
**nonfinancial** [1] - 77:12
**normal** [8] - 6:13, 7:23, 10:16, 10:19, 11:3, 11:7, 11:10, 21:6
**normally** [2] - 7:23, 22:24
**Northwest** [5] - 1:18, 1:22, 2:9, 2:12, 87:14
**note** [2] - 85:8, 85:22
**notes** [1] - 87:5
**nothing** [1] - 46:10
**November** [10] - 24:3, 24:7, 24:9, 29:4, 29:6, 65:9, 70:12, 76:14, 76:15, 84:3
**number** [4] - 32:8, 32:10, 32:14, 56:11
**numbers** [1] - 52:24

## O

**Obama** [1] - 77:23
**object** [1] - 22:13
**objection** [6] - 4:10, 22:8, 40:4, 40:8, 40:9, 79:19
**objective** [7] - 10:15, 27:7, 62:10, 66:13, 66:16, 66:20, 66:21
**Objectives** [1] - 66:4
**objectives** [7] - 66:6, 67:5, 67:6, 68:7, 68:9, 77:4, 77:12
**obligation** [9] - 34:22, 70:10, 70:17, 72:9, 72:13, 72:16, 74:11, 74:12, 82:18
**obligations** [9] - 17:1, 34:22, 35:2, 35:3, 57:1, 69:23, 74:8, 84:15, 84:19
**obliged** [1] - 40:1
**obtain** [1] - 73:10
**obviously** [1] - 73:14
**occur** [1] - 79:1
**occurred** [1] - 32:24
**October** [3] - 46:21,

47:9, 67:13
**OF** [2] - 1:1, 1:12
**offering** [1] - 62:18
**officer** [4] - 24:7, 28:14, 28:17, 28:19
**officers** [1] - 14:4
**Official** [1] - 2:11
**official** [1] - 87:12
**omitted** [1] - 4:7
**once** [4] - 17:21, 49:19, 56:7, 67:22
**one** [22] - 4:3, 6:23, 7:9, 14:17, 15:6, 20:7, 29:7, 29:15, 31:15, 34:14, 35:1, 43:17, 45:11, 46:2, 47:5, 47:20, 48:15, 50:12, 64:10, 69:21, 76:11, 77:2
**one's** [1] - 31:10
**one-minute** [1] - 4:3
**ones** [1] - 47:5
**ongoing** [2] - 16:15, 43:6
**open** [1] - 57:11
**operate** [12] - 7:22, 7:23, 9:21, 10:20, 10:21, 11:13, 17:13, 17:23, 27:18, 53:20, 61:23, 73:19
**operated** [3] - 17:10, 17:11, 17:20
**operating** [10] - 17:21, 66:21, 66:22, 73:12, 73:24, 74:2, 80:5, 80:18, 84:17
**operation** [2] - 6:13, 30:16
**operations** [6] - 10:16, 10:19, 11:4, 11:7, 21:5, 28:9
**operative** [1] - 41:6
**optimized** [1] - 78:21
**options** [1] - 69:12
**order** [5] - 12:16, 32:17, 72:4, 73:19, 80:17
**original** [5] - 37:14, 38:7, 51:4, 52:14, 83:19
**originating** [1] - 21:2
**otherwise** [1] - 17:15
**outlined** [1] - 32:3
**outlook** [1] - 25:1
**outstanding** [10] - 9:6, 12:19, 13:6, 13:9, 16:25, 30:25, 31:2, 53:18, 58:19
**overall** [4] - 43:16, 45:6, 61:16, 61:18

**overhang** [1] - 59:20
**overruled** [2] - 79:20, 79:22
**oversight** [1] - 14:2
**owed** [2] - 36:14, 37:18
**own** [3] - 9:22, 18:21, 67:16
**owned** [3] - 18:19, 19:4, 78:4

## P

**p.m** [3] - 1:7, 4:18, 85:21
**P.M** [1] - 1:19
**page** [22] - 8:16, 10:12, 12:1, 19:5, 23:15, 23:18, 23:20, 24:4, 27:21, 28:10, 29:2, 29:5, 39:2, 39:7, 43:19, 46:25, 63:3, 64:11, 64:18, 65:13
**PAGE** [1] - 3:8
**Page** [24] - 5:3, 9:13, 10:2, 12:1, 12:14, 14:16, 14:22, 20:20, 21:21, 25:9, 29:7, 31:16, 38:24, 41:17, 43:11, 64:19, 66:1, 66:2, 68:2, 69:5, 70:4, 77:3, 79:25, 82:3
**pages** [1] - 69:6
**paid** [4] - 12:23, 35:16, 42:1, 83:20
**panel** [1] - 4:16
**Paragraph** [4] - 28:6, 39:9, 41:23, 60:21
**paragraph** [18] - 12:14, 32:4, 40:14, 40:23, 62:5, 63:3, 64:19, 68:1, 69:2, 69:5, 70:4, 73:5, 74:10, 75:9, 77:11, 78:22, 79:25, 82:3
**paragraphs** [1] - 74:4
**paraphrasing** [2] - 76:23, 84:6
**part** [13] - 5:19, 6:12, 6:16, 16:7, 17:9, 18:17, 43:16, 71:25, 73:2, 75:9, 75:11, 77:11, 79:13
**participants** [1] - 20:24
**participate** [1] - 52:23
**particular** [5] - 7:17,

11:15, 17:9, 43:15, 69:21
**particularly** [1] - 6:10
**past** [2] - 70:18, 72:14
**path** [2] - 11:21, 69:17
**pattern** [1] - 28:15
**Paulson** [1] - 32:9
**pay** [17] - 35:4, 35:8, 40:1, 40:24, 41:4, 41:8, 43:24, 51:19, 66:13, 70:20, 71:13, 71:16, 72:3, 72:4, 72:24, 75:3, 75:5
**payable** [1] - 83:1
**paying** [1] - 82:22
**payment** [9] - 16:3, 36:24, 70:3, 70:23, 71:8, 72:18, 82:21, 84:5, 84:6
**payments** [2] - 43:21, 71:9
**PCF** [3] - 83:10, 83:11, 84:7
**PCFs** [1] - 83:14
**penalty** [4] - 40:20
**Pennsylvania** [1] - 1:25
**people** [5] - 18:21, 19:2, 20:25, 24:23, 77:20
**per** [3] - 45:12, 45:22, 51:14
**percent** [32] - 35:5, 35:8, 35:11, 35:14, 35:15, 35:16, 35:22, 36:17, 36:21, 36:25, 37:11, 37:15, 39:17, 39:21, 40:14, 40:18, 40:20, 40:21, 40:25, 42:7, 42:10, 42:11, 42:16, 44:4, 70:25, 72:21, 72:25, 73:1, 74:13, 82:22, 84:6
**perform** [1] - 63:5
**performance** [1] - 24:25
**period** [5] - 23:8, 24:10, 63:22, 76:6, 85:4
**periodic** [12] - 35:19, 37:1, 41:14, 41:20, 41:25, 42:6, 42:12, 42:21, 74:19, 83:4, 83:8, 83:15
**periods** [5] - 70:19, 71:5, 72:7, 73:9, 82:15

**permanent** [1] - 19:11
**permitted** [3] - 41:7, 41:10, 51:19
**person** [1] - 14:1
**perspective** [3] - 66:8, 66:25, 67:1
**phase** [1] - 80:14
**phrase** [7] - 5:24, 18:4, 18:10, 30:20, 38:11, 71:10, 71:19
**pick** [2] - 8:14, 45:16
**place** [2] - 14:17, 59:24
**placed** [2] - 6:7, 7:15
**places** [2] - 30:1, 30:2
**placing** [2] - 8:6, 12:10
**plain** [1] - 22:7
**Plaintiffs** [2] - 1:4, 13:2
**PLAINTIFFS** [3] - 1:17, 1:20, 2:2
**platforms** [2] - 18:20, 19:3
**PLLC** [1] - 1:17
**plus** [2] - 35:5, 37:14
**point** [16] - 6:14, 11:23, 23:25, 36:8, 49:10, 54:6, 56:6, 57:17, 58:10, 72:15, 73:25, 74:3, 74:4, 76:13, 79:9, 83:21
**pointed** [1] - 27:11
**points** [1] - 9:10
**policy** [5] - 63:21, 77:14, 78:10, 78:18, 78:20
**policymakers** [1] - 69:16
**PORTER** [1] - 2:8
**position** [3] - 75:14, 75:19, 81:13
**positive** [5] - 33:8, 33:14, 33:17, 46:10, 61:11
**possibility** [1] - 46:15
**potential** [1] - 82:25
**potentially** [5] - 74:15, 74:17, 74:21, 82:25, 84:7
**Powers** [1] - 5:5
**powers** [6] - 5:10, 14:3, 20:10, 20:14, 22:3, 27:11
**practices** [2] - 7:20, 77:12
**preceding** [2] - 61:2,

64:11
**precise** [1] - 51:23
**precluded** [1] - 41:13
**predicting** [1] - 74:4
**preference** [21] - 35:7, 35:8, 35:15, 35:23, 35:24, 35:25, 36:2, 36:4, 36:6, 36:9, 36:12, 36:17, 36:19, 37:13, 41:1, 41:8, 41:20, 73:3, 75:5, 82:4, 82:11
**preferred** [15] - 12:17, 12:19, 12:23, 29:21, 29:22, 30:8, 31:3, 38:4, 38:21, 39:18, 48:9, 50:6, 74:11, 74:12, 82:22
**PREFERRED** [1] - 1:10
**prepared** [1] - 30:11
**presentation** [2] - 47:5, 67:14
**presentations** [1] - 45:25
**presents** [1] - 28:8
**preserve** [3] - 18:1, 18:14, 20:18
**preserving** [3] - 18:5, 18:25, 19:1
**preview** [1] - 58:21
**previous** [2] - 29:2, 70:23
**PREVIOUSLY** [1] - 4:22
**prices** [4] - 52:12, 59:16, 60:1, 77:21
**private** [4] - 12:24, 38:14, 55:19, 66:14
**problem** [1] - 71:3
**proceed** [1] - 4:20
**proceedings** [4] - 4:18, 85:21, 86:4, 87:6
**process** [6] - 10:9, 10:14, 11:10, 13:25, 24:15, 67:23
**processes** [2] - 18:20, 19:2
**produce** [1] - 18:23
**produced** [1] - 87:6
**profit** [1] - 78:15
**profitability** [4] - 68:14, 77:15, 78:11, 78:18
**program** [2] - 77:24, 78:3
**Program** [1] - 78:1
**prohibited** [1] - 43:23

**promised** [1] - 62:19
**property** [2] - 18:2, 20:18
**proposals** [1] - 63:21
**prospects** [1] - 84:10
**protect** [2] - 9:22, 45:14
**protecting** [1] - 19:2
**protection** [1] - 62:18
**provide** [12] - 6:17, 16:14, 17:10, 24:22, 32:1, 43:22, 45:22, 62:11, 62:15, 68:13, 77:13, 78:14
**provided** [2] - 43:5, 80:4
**provides** [1] - 7:17
**providing** [5] - 8:20, 8:24, 9:1, 25:25, 78:13
**provision** [4] - 5:7, 35:18, 57:7, 72:22
**provisions** [2] - 27:9, 34:12
**Prussia** [1] - 1:25
**PSPA** [21] - 12:12, 29:20, 30:1, 37:20, 37:25, 38:18, 38:19, 41:16, 42:22, 42:24, 43:10, 45:4, 50:10, 50:14, 50:16, 50:18, 51:4, 74:20, 81:2, 83:5, 83:19
**PSPAs** [6] - 29:19, 31:12, 54:10, 55:3, 55:8, 55:21
**public** [31] - 6:2, 8:6, 9:24, 17:22, 17:23, 21:15, 26:2, 27:10, 27:13, 27:15, 27:16, 27:18, 65:3, 66:11, 66:22, 66:23, 68:18, 68:21, 68:25, 69:22, 70:12, 73:17, 77:14, 78:10, 78:14, 78:18, 78:20, 79:4
**publicly** [2] - 9:11, 21:17
**pull** [6] - 8:9, 13:15, 31:6, 38:3, 46:17, 60:11
**PURCHASE** [1] - 1:10
**purchase** [8] - 29:21, 29:23, 31:9, 41:12, 49:7, 50:7, 67:22, 80:25
**purchased** [1] - 20:25

**purchaser** [5] - 31:25, 43:2, 43:5, 44:15
**purchasing** [1] - 57:1
**purpose** [8] - 15:3, 17:25, 24:20, 27:2, 27:4, 27:12, 61:16, 61:18
**purposes** [1] - 6:24
**pursuit** [2] - 68:7, 68:16
**pushed** [1] - 83:25
**put** [19] - 14:2, 15:25, 18:2, 20:16, 20:23, 25:4, 30:9, 30:14, 32:6, 33:24, 34:6, 35:20, 42:3, 42:13, 42:14, 45:1, 45:12, 52:24, 56:25
**putting** [2] - 62:21, 63:1, 75:8
**PX-2-E** [1] - 46:17
**PX-2B** [1] - 8:9

### Q

**quarter** [23] - 23:7, 23:11, 24:17, 30:10, 35:7, 35:8, 35:10, 40:2, 53:1, 56:17, 61:1, 61:2, 61:12, 64:8, 64:9, 71:15, 71:16, 76:3, 76:5, 76:9, 77:3, 80:8, 81:14
**quarterly** [8] - 23:9, 25:6, 35:4, 64:7, 70:20, 72:24, 83:1, 83:14
**questions** [1] - 13:20
**quickly** [3] - 47:21, 47:24, 85:15
**quite** [1] - 34:7
**quoting** [1] - 84:8

### R

**Radnor** [1] - 1:25
**raise** [2] - 9:17, 11:9
**ran** [1] - 58:12
**rapid** [1] - 46:13
**rate** [10] - 35:14, 39:4, 39:10, 39:17, 39:18, 39:20, 39:23, 40:20, 73:4
**rate's** [1] - 72:25
**rates** [1] - 52:13
**RDR** [3] - 2:10, 87:3,

87:12
**RE** [1] - 1:10
**reached** [1] - 36:7
**reaction** [1] - 52:20
**read** [14] - 10:5, 10:11, 12:15, 13:24, 28:2, 65:14, 68:4, 70:15, 73:6, 73:7, 73:15, 74:3, 82:1, 82:13
**reading** [4] - 29:14, 74:11, 79:16, 82:7
**ready** [1] - 67:24
**really** [4] - 15:1, 32:9, 32:14, 63:15
**reasonable** [1] - 79:15
**receive** [2] - 68:5, 80:22
**RECEIVED** [1] - 3:8
**received** [1] - 4:11
**receiver** [2] - 5:16, 81:22
**receivership** [6] - 13:8, 44:25, 45:1, 45:3, 45:5, 81:23
**recess** [1] - 85:12
**recession** [1] - 52:13
**recognize** [4] - 13:17, 23:2, 50:3, 61:25
**record** [1] - 82:6
**Red** [1] - 3:4
**refer** [4] - 11:7, 18:16, 26:16, 83:3
**reference** [16] - 9:16, 12:7, 39:9, 39:16, 40:14, 40:18, 43:8, 68:15, 68:18, 69:25, 74:17, 74:19, 75:3, 77:4, 78:9, 81:1
**referred** [12] - 12:24, 15:19, 18:5, 30:21, 35:23, 39:12, 41:14, 46:1, 50:7, 60:17, 71:13, 83:8
**referring** [10] - 5:25, 6:1, 18:5, 62:22, 75:6, 80:2, 80:3, 81:2, 83:6, 83:14
**refers** [7] - 15:2, 15:5, 15:6, 46:22, 72:9, 72:21, 83:4
**reform** [1] - 69:13
**regarding** [1] - 69:10
**registered** [1] - 23:9
**regularly** [1] - 68:5
**regulated** [1] - 5:22
**regulators** [1] - 69:11

**relate** [5] - 27:1, 27:9, 38:10, 66:10, 77:16
**related** [1] - 13:13
**relates** [1] - 21:10
**relationship** [3] - 25:3, 36:16, 38:17
**release** [1] - 51:22
**released** [2] - 13:21, 21:15
**reliability** [1] - 61:21
**reliance** [1] - 73:24
**reliant** [1] - 73:18
**remain** [3] - 12:19, 13:6, 51:15
**remained** [1] - 13:9
**remaining** [6] - 52:14, 53:15, 53:17, 80:9, 80:10, 84:25
**remains** [1] - 62:18
**remember** [2] - 49:23, 52:18
**remind** [1] - 20:4
**reoriented** [1] - 14:20
**rephrase** [1] - 22:14
**rephrasing** [1] - 40:9
**report** [2] - 25:6, 28:7
**reported** [2] - 70:17, 72:13
**REPORTED** [1] - 2:10
**Reporter** [2] - 2:11, 87:12
**represented** [2] - 36:6, 48:17
**require** [3] - 36:24, 43:22, 73:21
**required** [9] - 9:18, 23:24, 24:22, 35:3, 55:18, 55:22, 68:13, 73:10, 83:19
**Reserve** [1] - 80:23
**resolution** [1] - 63:13
**resolve** [1] - 59:22
**respect** [1] - 55:25
**respects** [1] - 28:8
**rest** [1] - 53:11
**restoration** [1] - 46:13
**restore** [3] - 12:3, 15:12, 15:23
**restoring** [2] - 16:6, 50:20
**restrict** [1] - 44:3
**restricted** [1] - 43:21
**result** [1] - 73:11
**results** [5] - 24:16,

28:9, 46:12, 68:10, 73:21
**retain** [3] - 22:5, 22:22, 22:23
**return** [5] - 10:18, 34:23, 66:16, 67:7, 68:14
**returned** [2] - 46:16, 47:6
**returning** [5] - 10:15, 11:2, 11:3, 46:1, 67:11
**returns** [2] - 26:21, 26:25
**reviewed** [2] - 74:20, 81:23
**rights** [3] - 22:5, 22:22, 45:9
**risk** [8] - 7:25, 12:5, 15:14, 16:20, 16:23, 17:14, 18:13, 27:6
**Road** [1] - 1:25
**ROBERT** [1] - 2:2
**role** [6] - 54:13, 55:9, 63:16, 63:18, 63:19, 69:20
**roles** [1] - 63:6
**roll** [1] - 69:6
**Room** [1] - 2:13
**row** [1] - 29:9
**ROYCE** [1] - 1:13
**RUDY** [1] - 1:23
**run** [1] - 20:21
**running** [1] - 21:4

**S**

**safe** [1] - 86:3
**safely** [2] - 9:21, 17:13
**safety** [2] - 9:16, 9:19
**SAMUEL** [1] - 1:20
**saw** [2] - 52:21, 85:24
**scale** [1] - 9:10
**SCHILLER** [1] - 1:21
**SCHOLER** [1] - 2:8
**screen** [1] - 39:13
**scroll** [1] - 9:12
**search** [1] - 21:13
**seated** [1] - 4:19
**SEC** [10] - 23:10, 24:18, 24:20, 24:25, 63:23, 63:25, 69:21, 71:23, 71:25, 79:16
**second** [40] - 9:3, 14:17, 15:5, 15:6, 16:11, 20:10, 20:20, 23:20, 25:24, 26:15,

26:18, 27:21, 55:2, 55:8, 55:11, 55:17, 55:21, 56:22, 57:13, 59:4, 61:17, 61:18, 62:4, 62:11, 62:14, 64:2, 64:19, 67:24, 68:16, 69:2, 69:3, 69:5, 70:4, 77:11, 83:25, 84:1, 84:3, 84:21, 85:2
**second-to-the-last** [3] - 20:20, 23:20, 27:21
**secondary** [3] - 8:25, 63:6, 69:19
**Secretary** [3] - 32:9, 51:12, 55:14
**section** [4] - 5:21, 31:17, 43:12, 77:6
**Section** [4] - 38:24, 41:17, 43:21, 44:10
**Securities** [1] - 23:6
**securities** [15] - 9:6, 11:9, 16:1, 16:24, 17:3, 24:24, 30:11, 52:19, 58:16, 58:17, 58:19, 62:13, 62:16, 62:20, 62:24
**securitization** [1] - 63:18
**security** [1] - 16:2
**see** [37] - 7:11, 8:15, 10:8, 14:24, 15:8, 17:22, 19:7, 20:12, 21:8, 21:24, 25:18, 25:19, 27:19, 30:1, 31:17, 39:2, 39:9, 39:14, 40:14, 40:15, 41:23, 43:1, 43:12, 52:21, 53:11, 60:13, 60:23, 61:12, 64:10, 65:4, 65:7, 66:6, 68:15, 76:11, 79:17, 85:19, 86:1
**seeing** [3] - 28:15, 28:21, 53:13
**selectively** [1] - 74:11
**sell** [3] - 11:8, 16:1, 21:3
**seller** [3] - 32:2, 43:3, 43:23
**SENIOR** [1] - 1:10, 1:14
**senior** [14] - 29:22, 30:7, 30:20, 30:21, 31:1, 31:3, 38:3, 38:21, 38:23, 39:18, 50:6, 74:10, 74:12, 82:21

**sense** [2] - 9:9, 72:17
**sent** [2] - 46:20, 85:22
**sentence** [17] - 8:16, 9:3, 10:3, 10:8, 15:1, 16:19, 17:24, 17:25, 35:11, 68:16, 70:5, 70:15, 72:21, 75:11, 78:23, 80:16, 82:3
**separate** [1] - 37:1
**September** [23] - 6:19, 8:4, 8:5, 11:3, 13:21, 19:21, 20:6, 21:15, 23:8, 23:13, 24:10, 24:13, 38:7, 45:17, 45:21, 49:15, 60:10, 61:7, 61:9, 64:8, 67:1, 67:13, 76:9
**seriousness** [1] - 32:10
**serve** [2] - 7:24, 24:21
**serves** [2] - 77:14, 78:13
**servicers** [1] - 78:7
**services** [1] - 78:13
**serving** [3] - 66:11, 78:10, 78:18
**SESSION** [1] - 1:13
**set** [4] - 7:17, 42:10, 43:7, 83:19
**setting** [1] - 39:17
**seven** [4] - 70:18, 71:1, 72:14, 72:19
**seventh** [2] - 12:15, 12:16
**several** [1] - 6:12
**severe** [3] - 85:8, 85:11, 85:15
**shall** [2] - 43:2, 43:7
**share** [1] - 8:19
**shareholder** [15] - 21:18, 26:6, 26:21, 26:23, 26:25, 27:8, 47:16, 48:2, 48:5, 48:7, 49:11, 61:11, 67:16, 79:16, 81:9
**shareholders** [27] - 12:23, 12:24, 14:4, 17:20, 22:24, 25:19, 27:17, 29:13, 31:3, 32:21, 38:15, 44:1, 46:1, 46:10, 46:16, 47:6, 48:10, 51:20, 55:19, 65:4, 65:5, 66:14, 66:17, 67:7, 67:11, 73:17
**shareholders'** [2] - 36:11, 48:17

**shares** [5] - 13:6, 13:9, 22:21, 31:1
**sheet** [7] - 15:20, 15:22, 18:17, 19:5, 20:23, 21:14, 25:1
**shift** [1] - 6:6
**short** [1] - 68:11
**show** [1] - 61:4
**showing** [1] - 61:9
**shows** [1] - 60:22
**sic** [1] - 15:2
**sides** [1] - 60:19
**sign** [2] - 29:3, 29:5
**signed** [17] - 23:25, 24:5, 27:25, 28:13, 28:21, 51:10, 51:11, 55:11, 55:13, 62:3, 64:10, 64:14, 64:15, 64:17, 64:18, 76:11, 76:14
**significance** [1] - 26:22
**significant** [7] - 47:15, 54:3, 55:15, 69:10, 75:12, 75:13, 78:23
**signing** [1] - 34:5
**silly** [1] - 76:20
**similar** [1] - 84:14
**single** [1] - 43:18
**situation** [1] - 60:6
**six** [1] - 24:12
**skip** [1] - 5:16
**skipped** [2] - 17:24, 73:14
**skipping** [1] - 54:19
**slide** [1] - 47:3
**slides** [1] - 46:22
**slowly** [1] - 10:11
**solvency** [2] - 81:12, 81:19
**solvent** [16] - 14:2, 18:3, 20:17, 30:15, 32:7, 33:21, 34:7, 45:13, 49:9, 73:13, 74:2, 80:5, 81:4, 81:6, 81:9, 81:13
**sometimes** [5] - 15:19, 29:22, 30:21, 38:11, 83:8
**sorry** [18] - 22:11, 23:21, 33:15, 35:10, 35:12, 39:6, 39:7, 39:11, 43:3, 66:1, 66:2, 67:8, 75:10, 75:11, 75:22, 78:9, 80:9, 84:13
**sound** [6] - 14:2, 16:9, 17:13, 18:2, 20:17, 76:19

**soundly** [1] - 9:22
**soundness** [2] -
9:17, 9:19
**sounds** [1] - 12:21
**sources** [1] - 6:19
**speaking** [1] - 74:7
**speaks** [1] - 42:24
**specifically** [2] -
15:6, 51:18
**specified** [5] - 32:4,
40:22, 49:7, 64:23,
78:25
**spring** [1] - 60:7
**SPSPA** [1] - 30:2
**stability** [8] - 8:20,
8:24, 16:14, 17:12,
25:25, 26:16, 46:14,
50:20
**stabilize** [4] - 10:14,
10:17, 10:18, 11:19
**stabilized** [1] - 11:13
**stable** [2] - 8:25, 9:1
**stand** [1] - 29:20
**standing** [1] - 62:22
**STANTON** [1] - 2:8
**start** [5] - 48:4, 59:7,
64:4, 67:9, 83:20
**starting** [4] - 5:20,
10:9, 47:18, 52:20
**Statement** [1] -
60:13
**statement** [7] - 8:6,
8:11, 12:9, 13:5, 62:3,
69:14, 69:15
**statements** [3] -
48:11, 60:19, 67:15
**States** [3] - 2:11,
9:11, 87:13
**STATES** [2] - 1:1,
1:14
**stating** [3] - 7:7, 9:5,
9:8
**statute** [4] - 5:19,
14:13, 14:14, 22:2
**statutory** [2] - 10:9,
10:14
**stenographic** [1] -
87:5
**step** [1] - 35:12
**stepping** [1] - 78:9
**steps** [1] - 63:4
**STERN** [94] - 2:7,
4:1, 4:6, 4:14, 4:21,
4:24, 5:6, 5:14, 5:18,
6:5, 7:3, 7:4, 8:9,
8:10, 9:12, 9:15, 10:4,
10:7, 13:15, 13:16,
14:18, 14:21, 22:10,
22:12, 22:15, 22:17,
23:15, 23:17, 23:20,

23:22, 25:10, 25:12,
25:15, 25:17, 27:22,
27:23, 28:11, 28:12,
29:8, 29:11, 29:17,
29:18, 31:6, 31:7,
31:19, 31:21, 38:3,
38:5, 38:24, 39:1,
39:6, 39:8, 40:6,
40:11, 41:16, 41:18,
43:18, 43:20, 46:17,
46:18, 46:25, 47:2,
47:25, 48:1, 50:1,
50:2, 54:24, 55:1,
60:10, 60:12, 61:14,
61:15, 62:7, 62:8,
64:4, 64:5, 64:11,
64:13, 65:10, 65:12,
66:3, 66:5, 68:1, 68:3,
69:4, 69:9, 70:6, 70:8,
79:22, 79:24, 82:6,
82:10, 85:24, 86:3
**Stern** [4] - 4:1, 4:20,
44:24, 75:22
**stick** [1] - 7:14
**still** [8] - 42:14, 46:9,
51:9, 53:4, 55:18,
55:22, 61:10, 67:16
**stipulation** [1] -
60:17
**STOCK** [1] - 1:10
**stock** [25] - 12:17,
21:23, 22:2, 29:21,
29:22, 30:8, 30:21,
30:24, 31:2, 31:9,
38:11, 38:17, 38:21,
38:23, 39:18, 41:12,
42:19, 42:20, 49:7,
50:6, 67:22, 74:11,
74:12
**stock's** [1] - 22:5
**stockholders** [2] -
22:3, 22:4
**stocks** [1] - 12:19
**stood** [1] - 36:10
**stop** [4] - 18:9, 48:6,
48:15, 71:10
**straight** [1] - 33:2
**strategic** [2] - 68:8,
68:23
**strategy** [2] - 26:21,
26:25
**Strategy** [1] - 66:4
**structure** [2] - 65:2,
65:17, 79:1
**structured** [4] - 30:6,
30:7, 30:10, 34:8
**stuck** [1] - 58:8
**substantial** [7] -
7:18, 74:18, 74:21,
75:1, 80:22, 82:25,

84:7
**substantially** [1] -
74:15
**substantive** [1] -
21:7
**suffer** [1] - 68:10
**sufficient** [2] - 30:15,
32:25
**sufficiently** [1] -
32:20
**sum** [1] - 7:21
**summer** [2] - 52:21,
60:6
**support** [12] - 10:23,
12:11, 30:5, 43:5,
73:11, 77:13, 78:14,
80:1, 80:4, 80:17,
80:19, 80:22
**suppose** [1] - 37:12
**supposed** [3] -
18:11, 23:10, 85:25
**suspended** [1] - 22:3
**switch** [2] - 85:6,
85:7
**SWORN** [1] - 4:22
**systemic** [6] - 12:5,
15:14, 16:20, 16:23,
17:14, 27:6

## T

**talks** [3] - 5:10, 70:2,
70:9
**taxpayer** [1] - 74:25
**technical** [2] - 35:6,
51:16
**temporary** [3] -
19:10, 19:12, 19:14
**term** [1] - 6:11, 26:6,
26:24, 35:6, 43:15,
63:6, 63:16, 68:11,
68:14, 85:3, 85:5
**terminated** [2] -
22:4, 64:25, 65:15
**termination** [3] -
64:23, 78:25, 79:8
**terminology** [1] -
62:21
**terms** [11] - 17:19,
32:2, 33:1, 33:2,
34:11, 38:20, 41:12,
51:15, 56:18, 69:24,
80:9
**testified** [1] - 47:20
**THE** [17] - 1:1, 1:13,
1:17, 1:19, 2:2, 2:6,
3:5, 4:5, 4:11, 4:15,
4:19, 22:11, 79:20,
79:23, 85:7, 85:22,

86:1
**them..** [1] - 33:20
**themselves** [2] -
11:6, 73:15
**thereby** [2] - 68:12,
71:14
**therefore** [2] - 68:5,
73:9
**they've** [3] - 60:16,
81:11, 82:20
**thinking** [1] - 52:6,
54:6
**third** [19] - 16:19,
23:7, 23:11, 48:23,
49:2, 54:19, 54:20,
57:15, 62:5, 64:9,
68:1, 70:4, 76:2, 76:3,
76:5, 76:9, 77:3,
78:22, 82:3
**third-quarter** [3] -
76:3, 76:5, 77:3
**three** [4] - 9:14,
56:12, 57:6, 57:23
**timeframe** [2] -
11:15, 19:19
**timely** [1] - 40:22
**timing** [1] - 36:23
**today** [3] - 14:9,
63:4, 77:17
**together** [4] - 62:21,
63:1, 63:12, 75:8
**tomorrow** [3] -
85:13, 85:19, 86:1
**took** [2] - 11:11,
54:12
**top** [3] - 5:15, 5:20,
19:6
**TOPAZ** [1] - 1:24
**topic** [1] - 29:12
**Topic** [1] - 25:18
**topics** [1] - 29:19
**total** [1] - 34:16
**touched** [1] - 32:16
**toward** [1] - 59:5
**town** [1] - 6:25
**track** [3] - 36:12,
36:13, 75:22
**trade** [2] - 22:2,
22:21
**traded** [1] - 22:22
**TRANSCRIPT** [1] -
1:12
**transcript** [2] - 87:5,
87:6
**transferred** [1] - 14:5
**translated** [1] - 71:25
**transmitting** [1] -
46:22
**transparency** [1] -
24:23

**travels** [1] - 86:3
**Treasury** [91] - 6:17,
6:20, 6:23, 6:24,
10:24, 11:6, 12:11,
30:8, 30:13, 30:25,
31:1, 31:4, 31:23,
32:1, 32:6, 32:9,
32:25, 33:20, 34:5,
34:15, 34:23, 35:4,
35:17, 36:2, 36:4,
36:14, 38:17, 38:20,
41:4, 42:2, 42:13,
43:5, 44:1, 44:2, 44:3,
44:16, 44:20, 45:7,
45:8, 45:9, 45:11,
47:18, 49:6, 49:8,
49:9, 49:12, 49:13,
50:11, 51:11, 51:12,
53:22, 54:3, 55:13,
55:14, 58:18, 59:2,
59:10, 61:10, 61:22,
62:17, 67:23, 68:13,
71:7, 71:8, 72:16,
73:10, 73:11, 73:13,
73:24, 74:1, 74:9,
74:24, 74:25, 78:3,
80:3, 80:6, 80:7,
80:17, 80:19, 80:25,
81:2, 81:11, 81:25,
82:5, 82:12, 82:18,
83:1, 84:16
**Treasury's** [11] -
30:5, 36:10, 44:7,
45:14, 51:20, 51:25,
55:17, 55:21, 56:25,
57:7, 73:19
**tremendous** [1] -
79:5
**trends** [1] - 73:8
**TRIAL** [1] - 1:12
**trillion** [4] - 9:9, 9:10,
16:24, 17:2
**trouble** [1] - 78:6
**troubled** [1] - 10:15
**true** [2] - 87:4, 87:5
**trust** [1] - 82:8
**try** [3] - 59:21, 70:1,
85:14
**trying** [3] - 6:12,
82:7, 83:7
**turn** [1] - 85:2
**tweet** [1] - 85:18
**twice** [1] - 49:5
**Twitter** [1] - 85:18
**two** [2] - 25:5, 25:21

## U

**ultimate** [1] - 63:13

**uncertainty** [4] - 67:18, 69:10, 78:23, 79:6

**under** [15] - 32:17, 34:2, 51:18, 51:22, 55:17, 55:21, 57:2, 57:12, 58:17, 60:9, 66:21, 80:9, 80:25, 84:25

**understood** [3] - 13:5, 23:1, 74:23

**underway** [1] - 63:11

**Undisputed** [1] - 60:13

**unhappy** [2] - 74:5, 74:6

**united** [1] - 2:11

**United** [2] - 9:11, 87:13

**UNITED** [2] - 1:1, 1:14

**unlimited** [4] - 57:23, 59:15, 80:14, 84:22

**unpaid** [1] - 73:1

**unsafe** [1] - 7:19

**unsound** [1] - 7:19

**up** [33] - 5:2, 7:21, 8:9, 13:15, 15:25, 21:14, 25:11, 25:15, 27:22, 28:11, 29:8, 31:6, 31:15, 31:19, 32:3, 36:4, 37:19, 38:3, 38:10, 43:4, 45:16, 46:17, 52:4, 54:19, 59:1, 60:11, 61:1, 63:21, 66:3, 72:25, 73:1, 73:23, 81:15

**URL** [1] - 21:12

---

## V

**value** [16] - 13:10, 18:11, 18:14, 18:24, 26:6, 26:23, 27:8, 32:20, 32:22, 42:14, 43:8, 47:16, 48:12, 50:11, 74:24, 76:22

**vanishing** [1] - 6:10

**variable** [1] - 39:23

**various** [2] - 30:24, 34:11

**VARMA** [1] - 2:6

**version** [3] - 27:19, 28:3, 28:4

**view** [4] - 61:16, 67:11, 67:15, 85:3

**viewed** [1] - 54:3

**VINCENT** [1] - 1:17

---

**vs** [1] - 1:5

## W

**wait** [1] - 53:11

**walk** [1] - 8:13

**Washington** [6] - 1:6, 1:18, 1:22, 2:9, 2:13, 87:14

**weather** [3] - 85:8, 85:11, 85:15

**website** [1] - 21:16

**weeks** [2] - 24:12, 46:24

**well-being** [1] - 9:23

**whole** [4] - 34:7, 45:3, 45:4, 73:15

**WIERZBOWSKI** [1] - 2:2

**Williams** [1] - 64:15

**willing** [1] - 45:12

**wins** [1] - 78:19

**winter** [1] - 60:7

**wiped** [1] - 32:20

**withdraw** [1] - 40:9

**WITNESS** [1] - 4:22

**WITNESSES** [1] - 3:5

**witnesses** [1] - 6:23

**word** [2] - 82:7, 82:13

**words** [4] - 56:12, 62:19, 73:14, 83:7

**works** [3] - 31:22, 37:8, 81:14

**worse** [2] - 75:15, 75:17

**worth** [16] - 17:2, 22:5, 22:6, 30:12, 33:1, 33:8, 33:11, 34:1, 46:10, 48:12, 61:2, 73:9, 75:14, 84:9, 84:18

**wow** [2] - 52:15, 57:21

**written** [10] - 19:9, 44:2, 44:7, 44:15, 44:20, 51:25, 54:18, 55:17, 55:22, 81:7

## Y

**year** [10] - 12:17, 20:7, 37:12, 48:4, 57:15, 70:24, 72:20, 77:23, 82:20, 83:25

**years** [13] - 6:12, 49:2, 56:12, 56:14, 57:6, 57:23, 58:19, 70:18, 71:2, 72:3,

---

72:5, 72:14, 72:19

**York** [3] - 1:22, 2:5

## Z

**zero** [3] - 33:1, 33:12, 33:16