```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3      * * * * * * * * * * * * * * *   )
        FAIRHOLME FUNDS, INC., et al.,  )   Civil Action
 4                                      )   No. 13-1053
                    Plaintiffs,         )
 5                                      )
           vs.                          )
 6                                      )
        FEDERAL HOUSING FINANCE AGENCY, )   Washington, D.C.
 7      et al.,                         )   August 8, 2023
                                        )   10:11 a.m.
 8                  Defendants.         )
                                        )
 9      * * * * * * * * * * * * * * *   )

10      IN RE:  FANNIE MAE/FREDDIE MAC  )
        SENIOR PREFERRED STOCK PURCHASE )   MC Case No. 13-1288
11      AGREEMENT CLASS ACTION LITIGATION )

12                    TRANSCRIPT OF JURY TRIAL
13                  DAY 11 - MORNING SESSION
              BEFORE THE HONORABLE ROYCE C. LAMBERTH,
14               UNITED STATES SENIOR DISTRICT JUDGE

15

16      APPEARANCES:

17      FOR THE BERKLEY          VINCENT COLATRIANO, ESQ.
        PLAINTIFFS:              COOPER & KIRK, PLLC
18                               1523 New Hampshire Avenue, Northwest
                                 Washington, D.C. 20036
19
        FOR THE CLASS            HAMISH P.M. HUME, ESQ.
20      PLAINTIFFS:              KENYA KHALELAH DAVIS, ESQ.
                                 SAMUEL KAPLAN, ESQ.
21                               JESSICA MUGLER, ESQ.
                                 BOIES, SCHILLER & FLEXNER, LLP
22                               1401 New York Avenue, Northwest
                                 Washington, D.C. 20005
23
                                 LEE D. RUDY, ESQ.
24                               GRANT GOODHART, ESQ.
                                 KESSLER, TOPAZ, MELTZER & CHECK, LLP
25                               280 King of Prussia Road
                                 Radnor, Pennsylvania 19087
```

```
 1      APPEARANCES, CONT'D:

 2      FOR THE CLASS           ROBERT F. KRAVETZ, ESQ.
        PLAINTIFFS:             ADAM H. WIERZBOWSKI, ESQ.
 3                              CAITLIN BOZMAN, ESQ.
                                BERNSTEIN, LITOWITZ, BERGER &
 4                                GROSSMAN, LLP
                                1251 Avenue of the Americas
 5                              New York, New York 10020

 6      FOR THE DEFENDANTS      ASIM VARMA, ESQ.
        FHFA, FANNIE MAE &      IAN HOFFMAN, ESQ.
 7      FREDDIE MAC:            DAVID BERGMAN, ESQ.
                                JONATHAN LOUIS STERN, ESQ.
 8                              STANTON JONES, ESQ.
                                ARNOLD & PORTER KAYE SCHOLER
 9                              601 Massachusetts Avenue, Northwest
                                Washington, D.C. 20001
10
        REPORTED BY:           LISA EDWARDS, RDR, CRR
11                              Official Court Reporter
                                United States District Court for the
12                                District of Columbia
                                333 Constitution Avenue, Northwest
13                              Room 6706
                                Washington, D.C. 20001
14                              (202) 354-3269

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2

3

4                              Direct      Cross        Red.

5

WITNESSES FOR THE DEFENSE:

6
Edward DeMarco                   2253

7

8
EXHIBITS RECEIVED IN EVIDENCE                         PAGE

9
Defendants' Exhibit Nos. 11, 76, 77 & 536            2252

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURTROOM DEPUTY:  This is Civil Action

 2    13-1053 with related Miscellaneous Case 13-1288, In Re:

 3    Fannie Mae/Freddie Mac Senior Preferred Stock Purchase

 4    Agreement Class Action Litigations.

 5              MR. STERN:  Good morning, your Honor.  Jonathan

 6    Stern for the Defendants.

 7              THE COURT:  Good morning.

 8              MR. STERN:  Your Honor, Mr. DeMarco is here.

 9    We're ready to go.  I had one housekeeping matter, if I may.

10              THE COURT:  Yes.

11              MR. STERN:  There are four exhibits that I'd move

12    into evidence.  My understanding is there are no objections

13    to any of these.  And they are DX --

14              THE COURT:  Sorry?  DX --

15              MR. STERN:  DX-11, DX-76, DX-77 and DX-536.

16              THE COURT:  They're all received without

17    objection.

18              (Whereupon, Defendants' Exhibit Nos. 11, 76, 77

19    and 536 were entered into evidence.)

20              THE COURT:  Mr. DeMarco can come forward.

21              (Witness retakes the witness stand.)

22              THE COURT:  Good morning.

23              THE WITNESS:  Good morning.

24              THE COURTROOM DEPUTY:  Jury panel.

25              (Whereupon, the jury entered the courtroom at
```

```
 1    10:12 a.m. and the following proceedings were had:)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3    You may be seated.

 4              Mr. DeMarco is on the stand.

 5              I'll remind you you're still under oath.

 6              You may resume your examination, Mr. Stern.

 7              MR. STERN:  Thank you, your Honor.

 8              Good morning.  Good morning, members of the jury.

 9              THE JURY:  Good morning.

10        (EDWARD DeMARCO, DEFENSE WITNESS, PREVIOUSLY SWORN.)

11                   CONTINUED DIRECT EXAMINATION

12    BY MR. STERN:

13    Q.  Good morning, Mr. DeMarco.

14    A.  Good morning, Mr. Stern.

15    Q.  Mr. DeMarco, yesterday, we left off with you telling us,

16    I believe, that the second amendment on December 24, 2009,

17    turned out not to be a long-term fix.  Is that correct?

18    A.  Yes.

19    Q.  And of course, thereafter, there was another amendment.

20    Right?

21    A.  Yes, there was.

22    Q.  And that was?

23    A.  The third amendment.

24    Q.  In?

25    A.  August 2012.
```

```
 1    Q.  So that's where we're going to go next.  But before we

 2    do, I'd like to take a little bit of a detour.

 3              The jury has heard testimony about FHFA

 4    projections that came out in October of 2011.  Are you

 5    familiar with those?

 6    A.  Yes.

 7              MR. STERN:  Can we pull up DX-346, please.

 8    BY MR. STERN:

 9    Q.  Do you recognize this, Mr. DeMarco?

10    A.  Yes, I do.

11    Q.  It says Projection.  Just so we understand the

12    terminology here, do you understand a projection to be a

13    prediction of an actual outcome?

14    A.  No.

15    Q.  What do you understand a projection to be in this

16    context?

17    A.  In this context, these projections were characterized

18    correctly as what-if scenarios.  It was:  What if house

19    prices did this?  Then what might we expect over the next

20    few years with regard to draws?  So it was simply that.  It

21    was not trying to predict the future.  It was trying to say,

22    Well, if this happened, then this might be the outcome with

23    respect to draws.

24    Q.  So if you could just keep your voice up.

25    A.  Yes.  Sorry.
```

```
1    Q.  If we come to Page 4, let's take a look at the fourth

2    bullet.

3              And it says -- is this a reference to what you

4    were just talking about?

5    A.  Yes, it is.

6    Q.  So it says, "The projections are not expected outcomes."

7    A.  That's correct.

8    Q.  "They are modeled projections in response to what-if

9    exercises."

10   A.  Yes.

11   Q.  And that's what you were just describing?

12   A.  Yes, it is.

13   Q.  And could you read the last -- the sentence that begins

14   "The projections do not define" and then the next sentence?

15   A.  "The projections do not define the full range of

16   possible outcomes.  Actual outcomes may be very different."

17   Q.  And I'm going to butcher this, I'm sure.  But the jury

18   has heard testimony from a witness who said something to the

19   effect of, an exact prediction will always turn out to be

20   wrong or the chances of it being right are zero.

21             Do you agree with that?

22   A.  Certainly in this context, yes.

23   Q.  This document mentions that projections were also done

24   in October of 2010.  And this is October of 2011.  Were

25   these annual exercises for FHFA?
```

DeMarco - DIRECT - By Mr. Stern

1    A.  Yes.

2    Q.  So going to the second bullet on Page 4 that begins, "To

3    date," that discusses three scenarios, can you characterize

4    what those three scenarios were?

5    A.  Basically, there was an improving-outlook scenario;

6    there was a baseline or base-case scenario; and there was a

7    worsening-outlook scenario.

8    Q.  And what was the worsening-outcome scenario showing

9    here?

10   A.  It was showing -- let me read this -- that the

11   cumulative --

12   Q.  That was too truncated a question.

13   A.  Yes.

14   Q.  What was the worsening-outlook scenario showing about

15   cumulative Treasury draws, including dividends, at the end

16   of 2014?

17   A.  Projecting them to be $311 billion.

18   Q.  So this was showing that by the end of 2014, on that

19   what-if scenario, the draws would be 311 billion?

20   A.  Yes.

21   Q.  So the jury has heard references to a worst-case

22   scenario and a stress-case scenario.  Which of those --

23   which of the various -- and they've heard about a base-case

24   scenario.

25            Which of those scenarios were your concern?

DeMarco - DIRECT - By Mr. Stern

1    A.   My concern in the context of the third amendment?  Yes.

2    My concern was a worst-case scenario.

3    Q.   We will come back to that.

4            But the idea of a worst-case scenario, is that --

5    was that an abstract or theoretical idea for you or did you

6    have some real-world example in mind when you were thinking

7    of the worst-case scenario?

8    A.   No.  It was not an abstract idea.  And I think that the

9    experience that we were still in had demonstrated itself to

10   be a worst-case scenario since the Great Depression.  And so

11   that certainly, you know, was one proxy for what one might

12   think is, you know, a worst-case scenario.  It's not the

13   only one.  It's not even saying that the great financial

14   crisis was, you know -- was the worst thing we could ever

15   experience.  But it certainly is a proxy for what a

16   worst-case scenario could look like.

17   Q.   And now I want to move on to the third amendment.

18           And let me just start by asking you, when do

19   discussions between Treasury and FHFA begin in earnest about

20   a possible third amendment?

21   A.   January of 2012.

22   Q.   So I want to look at these more later on.

23           But let me show you --

24           MR. STERN:  Can we see Slide 10, please.

25

DeMarco - DIRECT - By Mr. Stern

1    BY MR. STERN:

2    Q.  Have you seen this slide before?

3    A.  Yes.

4    Q.  And you understand that what it shows is Fannie's net

5    worth from the fourth quarter of 2008 -- that's the last

6    three months of 2008 -- to the end of the second quarter of

7    2012.  Right?

8    A.  Yes.

9    Q.  And you understand that -- by the way, those source

10   numbers on the bottom, you're aware that those are all SEC

11   filings?  That's where these numbers come from?

12   A.  Yes.

13   Q.  And what do the red bars represent on this chart?

14   A.  It represents that in those quarters, Fannie Mae had

15   negative net worth.

16   Q.  And the green bars?

17   A.  A green bar means that they had a positive net worth.

18   Q.  So as you were sitting there at the end of 2011 -- and

19   you said the discussions began in earnest in --

20   A.  January 2012.

21   Q.  Early January?  Late January?

22   A.  By mid-January.

23   Q.  So as you're sitting -- and had the first-quarter

24   results even happened by mid-January?

25   A.  No.  We did not know them at that time.

1     Q.  So the picture for you in early January started when and

2     ended when, as far as this chart's concerned?

3     A.  I would have known the results from the fourth quarter

4     of 2008 on the far left through the third quarter of 2011.

5     Q.  So how many consecutive quarters of negative net worth

6     were you looking back on at that point?

7     A.  Twelve.

8     Q.  Let's take a look at the -- let's take a look at the

9     draws for that period of time.

10              MR. STERN:  Slide 9, please.

11    BY MR. STERN:

12    Q.  So again, so the members of the jury always know what

13    the sources for these are, do you see it says JX-1 at the

14    bottom?

15    A.  I do.

16    Q.  It's your understanding -- and I think the members of

17    the jury have seen -- that's our joint statement of

18    undisputed facts, or stipulation.  Right?

19    A.  Yes.

20    Q.  Okay.  So what is this chart showing as you are looking

21    back at the beginning of the first quarter in 2012?  What is

22    this showing you were looking back on for draws over that

23    period of time?

24    A.  So I'm looking at a history of draws every quarter

25    beginning in the first quarter of 2009.

DeMarco - DIRECT - By Mr. Stern

```
 1    Q.  So let's take a look at the Freddie versions of these
 2    charts.  So let's take a look at 12.
 3              So what is this chart showing?
 4    A.  The same thing.  It's showing quarters in which Freddie
 5    Mac had negative net worth and quarters in which it had
 6    positive net worth.
 7    Q.  So you see there are red bars and green bars.  Right?
 8    A.  Correct.
 9    Q.  And there are red headings and green headings; is that
10    right?
11    A.  Yes.
12    Q.  So because 2011 -- the fourth quarter of 2011 and the
13    first quarter of 2012 are sort of hard to see as far as the
14    bars, are those in red or in green?
15    A.  Shaded in red.
16    Q.  And is it your understanding that that means there was
17    negative net worth?
18    A.  Yes.
19    Q.  Okay.  So when -- this is not every quarter of negative
20    net worth; is that right?
21    A.  That's correct.
22    Q.  So what are you seeing as you look at this chart?
23    A.  I'm seeing in this chart by January of 2012 that Freddie
24    Mac has had negative net worth in the majority of the
25    quarters since they were placed into conservatorship.
```

```
 1      Q.  And if we were to look at, let's say, these two
 2      consecutive quarters, 3Q 2009, 4Q 2009, we see two green
 3      quarters there.  Right?
 4      A.  We do.
 5      Q.  And did it follow that all the quarters after that were
 6      also going to be green?
 7      A.  No.  We then had a string of negative quarters.
 8      Q.  In fact, from Q1 2010 --
 9              MR. STERN:  The Court's indulgence.
10      BY MR. STERN:
11      Q.  From Q1 2010 to Q3 of 2011, which are the quarters that
12      follow those two green bars, how many red and how many green
13      do we have?
14      A.  I'm sorry, Mr. Stern.  I got confused.  Could you give
15      me the dates again?
16      Q.  Yes.
17      A.  We're looking at the first quarter of 2010?
18      Q.  I'm going to do it this way.  We had two green quarters:
19      2009, third quarter; 2009, fourth quarter.  Right?
20      A.  Well, it looks like we had three.  But yes.
21      Q.  I'm starting --
22      A.  Oh, you're starting in 2009.  I'm sorry.
23      Q.  We'll start in 2009.  For Q2, we had three-quarters of
24      green.
25              And did they continue to be green?
```

1    A.  No, they do not.

2    Q.  What was the next quarter after 2009, 4Q?  Red or green?

3    A.  Red.

4    Q.  Next quarter?

5    A.  Red.

6    Q.  Next quarter?

7    A.  Red.

8    Q.  Next quarter?

9    A.  Red.

10   Q.  Next quarter?

11   A.  Green.

12   Q.  Next quarter?

13   A.  Red.

14   Q.  Next quarter?

15   A.  Red.

16   Q.  Next quarter?

17   A.  Red.

18   Q.  Okay.  So at least as that history went, it didn't

19   follow from three green quarters that everything was going

20   to stay green after that.  Right?

21   A.  That is correct.

22   Q.  Okay.  So now let's --

23            MR. STERN:  You can take that down.

24   BY MR. STERN:

25   Q.  Actually, let's look at the Freddie draws, just to be

1   complete.

2          And what does this show, looking back from the

3   fourth quarter of 2011, about Freddie's quarterly draws on

4   the Treasury commitment, starting in the fourth quarter of

5   2008?

6   A.  That there were draws in the majority of the quarters

7   and that the cumulative draw was over $71 billion.

8   Q.  Well, just to be clear, the cumulative draw refers to

9   the period ending Q2 2012.  Right?

10  A.  It does.

11  Q.  You wouldn't have seen these Q1, Q2 results back at the

12  end of 2011, the beginning of 2012?

13  A.  That's correct.

14  Q.  All right.  So I asked you when the discussions between

15  Treasury and FHFA began in earnest about a possible third

16  amendment.  And you told us January of 2012.

17          Before we come to those discussions and what then

18  led up to August, I want to talk to you about how you

19  gathered information when you were conservator, including

20  how you gathered information in connection with the decision

21  to enter into the third amendment.  Okay?

22          And right from the jump, the jury has heard that

23  you did not prepare a written memo, written analysis, of the

24  third amendment and your decision to enter into it.  Is that

25  correct?

DeMarco - DIRECT - By Mr. Stern

```
1    A.  That's correct.

2    Q.  All right, sir.  Did you gather information to help you

3    make that decision?

4    A.  Yes, I did.

5    Q.  Did you talk to people to help you make that decision?

6    A.  Yes, I did.

7    Q.  Did you review information to help you make that

8    decision?

9    A.  Yes, I did.

10   Q.  Did you analyze that information?

11   A.  Yes.

12   Q.  Okay.  So let's talk about some of that.

13            Were your sources of information within FHFA?

14   Outside of FHFA?  Or both?

15   A.  Both.

16   Q.  So let's start with sources of information within FHFA.

17   Can you describe for the members of the jury how you would

18   go about gathering information from sources inside of FHFA?

19   A.  Yes.  As an executive, I was very interested in having

20   ongoing direct dialogue with my senior executive team.  So

21   that would include weekly senior staff meetings, weekly or

22   biweekly meetings with individual executives --

23   Q.  Well, let me stop you right there.  When you say senior

24   staff and weekly meetings with senior staff, let's be

25   specific.  Who are you talking about?
```

1    A.  So this would be a range of executives that would

2    include my senior advisor --

3    Q.  Let's be really granular.  Let's have some names.

4    A.  Okay.  Senior advisor was Mario Ugoletti.  The director

5    of conservatorship operations was Jeff Spohn.  Chief

6    economist was Pat Lawler.  The chief accountant would be

7    Nick Satriano.  Before Nick, it was Wanda DeLeo.  It would

8    be the heads of the supervision division, so that would be

9    John Greenly, Steve Cross, Andre Galliano.  These names

10   changed over time.

11           And so on.

12   Q.  And lawyers?

13   A.  I'm sorry.

14   Q.  Lawyers?

15   A.  That's just the one I was going to go to.  The obvious

16   void.

17           Yes.  The general counsel and deputy general

18   counsel.  So Alfred Pollard was there as well.

19   Q.  And what in this context was general -- who is the

20   general counsel?

21   A.  The general counsel was the lead lawyer for FHFA; and

22   his name was Alfred Pollard.

23   Q.  And is that what we sometimes call an in-house lawyer,

24   somebody who works full-time at FHFA as opposed to you are

25   hired from the outside?

2266

1    A.  Yes.

2    Q.  So what would go on at these weekly senior staff

3    meetings?

4    A.  I would share with them information that I had gathered,

5    concerns I had.  I would ask them questions.  I would tell

6    them things that were on my mind, what we were looking

7    forward to.

8            We'd look at the week that just passed, the weeks

9    coming up, so that we would as a team be prepared and be

10   in -- have common information about what was going on.

11   Q.  So staying inside FHFA for now, were there other regular

12   meetings you had with FHFA staff that informed your

13   decision-making as conservator?

14   A.  Yes.  So as I was saying, I had regular meetings with

15   all of these senior executives.  I had a monthly meeting

16   with the financial analysis group, which was a detailed

17   review of financial results and reports that they prepared.

18   And I would meet with the conservatorship operations team

19   and so on.

20           Certain people I met with on a highly regular,

21   almost daily, basis.  That would include people like Mario

22   Ugoletti, Alfred Pollard, Jeff Spohn.

23   Q.  So let's go outside of FHFA.

24           Did you get information from Fannie Mae and

25   Freddie Mac?

DeMarco - DIRECT - By Mr. Stern

1    A.  Yes, I did.

2    Q.  And how did you get -- when I say "information," the

3    whole rest of the sentence every time you should understand

4    to mean information that informed your decision-making

5    process and helped you in making decisions.  So that's what

6    I'm referring to when I refer to gathering information.

7          So back to the question:  Did you get information

8    directly from Fannie and Freddie?

9    A.  Yes, I did.

10   Q.  How did that work?

11   A.  I had either weekly or biweekly meetings with the CEOs

12   of each company, so separately.  So Jeff Spohn, and I would

13   meet with the CEO of Fannie Mae and one of his deputies on a

14   weekly or biweekly basis.  We did the same thing with the

15   CEO of Freddie Mac.

16         I met with the board of directors of Fannie Mae

17   and Freddie Mac at each of their board meetings.  We had an

18   executive session between me and the board.

19         And I also attended meetings with Fannie Mae

20   executives that may or may not have included the CEO, but

21   would have included other senior staff at each company.

22   Q.  Did you have a way of getting information from the

23   Treasury Department that was relevant to your

24   decision-making as conservator?

25   A.  Yes, I did.

1   Q.  And how did that go?

2   A.  Multiple channels again.  I had periodic meetings with

3   the Treasury Secretary Geithner, meetings even more regular

4   with the undersecretary of domestic finance, originally

5   Jeffrey Goldstein and then succeeded by Mary Miller.

6           I served on a couple of boards with the Treasury

7   secretary, and so I had opportunities to interact with him

8   and his senior staff in those capacities as well.  And those

9   were all focused on financial market conditions and so

10  forth.

11  Q.  Okay.

12  A.  That's just me personally.  And then, you know, my staff

13  interacted with the Treasury Department; and in particular,

14  Mario Ugoletti was my point person for interacting with

15  Treasury, and so I would have these communications with

16  Treasury through Mario.

17  Q.  And we keep talking about your staff.

18          Did you -- how big was the organization that you

19  were acting director of?

20  A.  About 600 people.

21  Q.  So did you rely on staff to support you in your running

22  of that organization?

23  A.  Most certainly.

24  Q.  Have you heard of something called the FHFA oversight

25  board?

```
 1    A.  Yes, I have.

 2    Q.  What was that and did that board provide you with

 3    information that informed your decision-making as

 4    conservator?

 5    A.  It did.  The FHFA oversight board was established in the

 6    HERA legislation that we discussed yesterday that created

 7    FHFA.  The board met quarterly.  And it was meant to be a

 8    policy advisory board for FHFA.

 9    Q.  So we've talked about inside FHFA; we've talked about

10    outside FHFA, sort of official government entities.

11         Did you consider the information or the views of

12    nongovernment market participants, I'll call them, in

13    helping inform your decision-making as conservator,

14    including your decision-making about the third amendment?

15    A.  Yes.

16    Q.  And tell us about that.

17    A.  So I viewed it important for me to be regularly tracking

18    what was going on in markets and economic conditions.  So it

19    was part of my daily routine to be reviewing relevant news

20    clips.

21         I certainly was reviewing the SEC filings of the

22    companies and I reviewed analyst reports that were brought

23    to my attention.

24    Q.  When you say "analyst reports," tell us -- the jury's

25    heard a little bit about those.  Can you tell us from your
```

1     perspective what they were and how they were informative to

2     you?

3     A.  Yes.  So analysts are writing reports for the benefit of

4     market participants.  So these would be entities like the

5     companies that -- or the entities that invest in the

6     mortgage-backed securities and debt securities of Fannie Mae

7     and Freddie Mac.  And I viewed these analyst reports as a

8     reflection of market outlook and market sentiment regarding

9     these companies.

10            So it was useful information to have as an

11     indicator of market sentiment and market concerns with

12     regard to what -- the companies directly as well as the

13     broader economic environment in which we were operating.

14     Q.  And did you review those reports directly yourself?  Did

15     you rely on other people to review them and summarize them

16     for you?  Or both?

17     A.  I generally relied on other people that had the

18     responsibility for tracking these things and making it a

19     more regular consumption.

20            But I did review some myself, usually when someone

21     on my team would bring a report to my attention because they

22     thought it was particularly noteworthy or relevant or

23     important for me to be aware of.

24     Q.  And apart from what you've already described, were there

25     other sources of information outside of the government that

DeMarco - DIRECT - By Mr. Stern

1    were important to you in your decision-making?

2    A.  Yes.  I would --

3    Q.  Tell us about those.

4    A.  Okay.  As part of my job, I would meet with industry

5    groups.  I would meet with stakeholder groups, consumer

6    advocates, civil rights advocates, folks -- so a spectrum

7    of, if you will, stakeholders in how the country's housing

8    finance system was working.

9    Q.  And what do you mean by "stakeholder"?

10   A.  So a stakeholder could be the National Housing

11   Conference.  It could be the Mortgage Bankers Association.

12   These are entities that represent broad interest in the --

13   how the housing market is working.  And so these meetings

14   were a useful source for me of information and sentiment

15   from those that are directly participating in housing

16   finance.

17   Q.  And were you gathering all that information from all of

18   those places -- when did you start doing that?

19   A.  From the beginning.

20   Q.  And were you doing that at the time that you were

21   considering the decision whether to enter into the third

22   amendment?

23   A.  Yes.

24   Q.  So let's talk about that now.

25        You said the discussions began in early 2012.  And

1    we have seen -- I'm not going to pull them up again now, but

2    we've all seen the charts that show the history that you

3    were looking at with respect to Fannie and Freddie's net

4    worth and their draws.

5              The jury's also heard about housing prices and the

6    impact that they have on Fannie and Freddie.  Can you

7    briefly describe your understanding of that?

8    A.  Yes.  House prices are very important to Fannie Mae and

9    Freddie Mac's role in guaranteeing mortgage performance.  As

10   we talked a little bit yesterday, when a borrower defaults

11   on their mortgage obligation, Fannie Mae and Freddie Mac

12   step in and make those payments on the borrower's behalf to

13   the holders of the mortgage-backed securities.

14             We certainly try to work with borrowers in trouble

15   to try to get them current on their mortgage, to get them

16   back in a pay status.  But that doesn't always result in a

17   successful outcome, and then the property goes through

18   foreclosure.  The property's taken and then is sold.

19             When house prices are going down, as they were

20   during this period, after a foreclosure, you take the house

21   and you sell it.  You're selling it oftentimes for less,

22   maybe a lot less, than what the purchaser paid for the house

23   and what the mortgage was.  And so this is directly

24   contributing to the credit losses that Fannie Mae and

25   Freddie Mac are experiencing.

1    Q.  And when we get to August, we're going to talk more

2    about housing prices.  And we'll see a slide.

3              But just in general, what was happening with home

4    prices in January of 2012, when you started your discussions

5    about the third amendment?

6    A.  At that point, house prices had been declining from

7    about 2007 at least into 2011 and, depending upon the

8    metrics you're looking at, still declining going into 2012.

9    Q.  And how did your experience with declines in house

10   prices affect your thinking as conservator about protecting

11   against that worst-case or stress scenario?

12   A.  Yes.  So a stress scenario is, look, we take a further

13   downturn in the economy.  House prices go down even further.

14   At this point, I'm looking at, you know, a lot of

15   under-water mortgages; that is, mortgages where the home is

16   worth less than what the mortgage is.  So there's a real

17   concern that if house prices continue to trend down or do a

18   dip up and then, you know, continue to decline down that

19   this is going to worsen the losses for Fannie Mae and

20   Freddie Mac.

21   Q.  So you've referred to this before.  But when you're

22   thinking about the future, are you talking -- are you

23   thinking about forever?  Or do you have a particular time

24   horizon in mind in protecting against this worst-case

25   scenario?

1     A.  So I have a time horizon in mind.  And that's because

2     every -- you know, every week, Fannie Mae and Freddie Mac

3     are issuing new mortgage-backed securities.

4          And as we talked about yesterday, most homebuyers

5     choose to take a 30-year mortgage, which means

6     mortgage-backed securities, you know, are backed by these

7     30-year mortgages.  Fannie and Freddie are making a guaranty

8     to the investors in the MBS that for the 30-year life of

9     that mortgage, if something happens here, they're going to

10    make good on the payment, the Treasury commitment, now, and

11    the conservatorship has got to back up that guaranty.

12         So as long as we're operating, so every day we

13    open for business and issue a new 30-year MBS, I've got a

14    new 30-year time horizon that this guaranty has to cover.

15    And that's 30 years no matter what happens over those 30

16    years.  You know, recessions, wars, pandemics.  You know,

17    anything can happen.

18         And we've got to make sure we've got resiliency

19    behind that guaranty in order to have stability in the

20    mortgage market and make sure that these MBS can be sold

21    into the market.

22    Q.  And we'll hear in a few minutes how that related to your

23    decision to actually enter into the third amendment and to

24    agree to the net worth sweep.

25         But let's start at what you've said is the

```
 1    beginning of that process.
 2              MR. STERN:  Can we pull up DX-374?  If we go --
 3    BY MR. STERN:
 4    Q.  What is this?
 5    A.  This is an email from Mario Ugoletti to me dated January
 6    2nd of 2012.
 7    Q.  Are we seeing one email or more than one email?
 8    A.  We're seeing the end of a string of emails.
 9    Q.  Okay.  On the bottom, it's got a header from you to
10    Mr. Ugoletti.  And it's December 29, 2011.
11              And Mr. Montgomery is showing us the email on the
12    next page.  So is this the first email in the string?
13    A.  No.
14    Q.  Okay.  There's the first email in the string.  What's
15    that one about?
16    A.  This is from my executive assistant to me indicating to
17    me that the Treasury secretary has requested a meeting with
18    me.  She's penciled it in.
19              MR. STERN:  Scroll up, Mr. Montgomery.
20    BY MR. STERN:
21    Q.  So this is your email to Mr. Ugoletti.  It is dated
22    December 29th; is that right?
23    A.  Yes.
24    Q.  And that was the Thursday between Christmas and New
25    Year's?
```

1    A.  Yes.

2    Q.  Okay.  And what's the purpose of your email to him?

3    A.  The purpose of my email to say, Hey, we just got this

4    notice that the Treasury secretary wants to meet.  And I'm

5    indicating to Mario things that I think he may want to talk

6    about.

7              MR. STERN:  Scroll up, please.

8    BY MR. STERN:

9    Q.  Here's Mr. Ugoletti's response, also on Thursday.  This

10   threw me the first time I saw it.  I want to skip to the

11   last sentence.  Do you see where he's talking about birds or

12   "off for some tough birds"?  He's not talking about -- what

13   is he talking about with birds?

14   A.  Mario is what one calls a birder.  He travels the world

15   looking for exotic birds.

16   Q.  So he's bird-watching?

17   A.  Yes.

18   Q.  He's not shooting them?

19   A.  He's not shooting birds.  He's off to find

20   difficult-to-find-and-identify birds.

21   Q.  Okay.  So what is -- this is Mario -- Mr. Ugoletti

22   responding to you; is that right?

23   A.  Yes.

24   Q.  And he is referring to some of the things that might be

25   discussed in the meeting; is that right?

1    A.  Yes.

2    Q.  Just to move us along.

3            Let's go to your response to him.  So you respond

4    to him on Monday.  That is -- it was probably a holiday that

5    year.  No?

6    A.  (No response.)

7    Q.  You shook your head no.

8    A.  Well, the next email is another followup.

9    Q.  Oh, I'm sorry.  From Mario --

10   A.  Mario to me.  This is Mario to me.

11   Q.  He's writing to you on Monday.  Is there a reference

12   here to the net income sweep?

13   A.  Yes.

14   Q.  And is there a reference -- and is that the thing that

15   later sort of morphed into the net worth sweep that the

16   members of the jury have heard about?

17   A.  Yes.

18   Q.  And he talks about removing the dividend.

19           What was that a reference to, as you understood

20   it?

21   A.  Removing the fixed 10 percent dividend that was part of

22   the PSPA that we talked about yesterday.

23   Q.  And he said -- and by the way, it says, "Want to do

24   something with the PSPAs."

25           Do you see that?

1    A.  Yes.

2    Q.  And what did you understand that to be talking about?

3    A.  That the Treasury was also interested in discussing an

4    amendment to the PSPA.

5    Q.  And that's what I want to focus on.  "Doing something

6    with the PSPAs," you understood that to be an amendment to

7    the PSPAs?

8    A.  Yes.

9    Q.  And at this time, the second amendment was in place?

10   A.  Yes.

11   Q.  And the next amendment would be the third?

12   A.  Yes.

13   Q.  So there is a reference at the end of that sentence to

14   creating more space under the cap as the end of 2012 nears.

15         Does that connect up with what you were telling us

16   yesterday about what was going to happen at the end of 2012

17   with the availability of the commitment?

18   A.  Yes.

19   Q.  And how does it connect up?

20   A.  As we talked yesterday, at the end of 2012, the

21   remaining Treasury commitment was going to be capped.  It

22   was going to be capped based upon the terms of the second

23   amendment, which was $200 billion plus losses in the years

24   2010, '11, '12, adjusted for any remaining -- any surplus

25   that might be there at the end of 2012.

DeMarco - DIRECT - By Mr. Stern

1          So he's -- what they're talking about here is

2     taking a portion of the book of business, probably the

3     securities part, and doing something called marking it to

4     market.

5               MR. STERN:  We can take that down.

6     BY MR. STERN:

7     Q.  By the way, these communications about what became the

8     net worth sweep and removing the 10 percent fixed dividend,

9     these are happening in December of '11 and January of '12?

10    A.  That's correct.

11    Q.  This may seem like a silly question, but I'm going to

12    ask it anyway.  Are you having these discussions before or

13    after you have any inkling of those green bars in the

14    beginning of January of 2012?

15    A.  Before.

16    Q.  Were the results for either the first quarter of 2012 or

17    the second quarter of 2012 available on January 2nd?

18    A.  No.

19    Q.  Had they even happened?

20    A.  That's correct.

21    Q.  Had they even happened?

22    A.  I'm sorry.  No.  They had not happened.

23    Q.  So let's move on to -- so this meeting that is the

24    subject of this email string with Treasury, did that end up

25    happening?

1    A.  It did.

2              MR. STERN:  Let's take a look at DX-381, please.

3    BY MR. STERN:

4    Q.  What is this?

5    A.  This is an email to me from Meg Burns, who was one of

6    the -- my senior executives, dated January 19th, 2012.

7    Q.  And what is it accomplishing?

8    A.  She is transmitting to me the presentation file, the

9    PowerPoint deck, that the team had prepared for me to use in

10   a discussion with the Treasury secretary that day.

11   Q.  So let's take a look at the next page.

12              What's this?

13   A.  This is the cover sheet for that PowerPoint.  It notes

14   that we're going to discuss mortgage market issues.  And the

15   discussion is with Treasury Secretary Tim Geithner, and it's

16   got the date, January 19th, 2012.

17   Q.  So let's go to the next page.

18              It says Background.  And again, you've heard the

19   expression "talking points"?

20   A.  Yes.

21   Q.  And would it be fair to characterize what's on this

22   slide as your talking points to the meeting?

23   A.  Yes.  Yes.

24   Q.  And was it your intention to actually put up these

25   slides during the meeting?

1    A.  It was my intention -- this would have been more -- I

2    probably would have had the deck available for Mr. Geithner

3    to follow along in the discussion.

4    Q.  So it is now -- what's the first line referring to?

5    A.  It's referring to the January 6 meeting that he and I

6    had that was the subject of that earlier email exchange that

7    we were just going through.

8    Q.  So let me go back, because I think I jumbled the

9    chronology.

10          You have your email correspondence with

11   Mr. Ugoletti between December 29th and January 2nd.  Right?

12   A.  Yes.

13   Q.  And that's about a meeting with Treasury?

14   A.  That's correct.

15   Q.  That's the meeting that happened on January 6?

16   A.  That's correct.

17   Q.  So let's go back to the first page of this, the first

18   page of the deck.

19          When was this meeting happening?

20   A.  January 19th.

21   Q.  Okay.

22          MR. STERN:  Now we'll go back to the next page,

23   please.

24   BY MR. STERN:

25   Q.  So tell us what you had in mind for your talking points

DeMarco - DIRECT - By Mr. Stern

1   with respect to background.

2   A.   So basically, I'm setting the context for this

3   discussion, which was, Hey, look, we met on January 6 to

4   discuss housing market issues and the Administration's

5   thoughts on near-term and long-term changes in housing

6   finance policy.

7           You asked me to -- you, Treasury Secretary

8   Geithner, asked me to consider these matters and rejoin the

9   discussion with thoughts.  And that this briefing, this deck

10  we are about to go through, responds to that request.

11  Q.   And I don't want to go through the whole deck.  Was part

12  of the presentation related to the PSPAs?

13  A.   Yes, it was.

14  Q.   Let's go to that part of the presentation.

15          MR. STERN:  And I think that's at Page 6 of the

16  exhibit, 6 of 17.

17  BY MR. STERN:

18  Q.   So is this -- are these the talking points, if you will,

19  that related to the PSPAs?

20  A.   Yes.

21  Q.   Walk us through this.  So the first bullet -- I'm not

22  going to read everything out loud.  Everybody can read this.

23  What is the first bullet talking about?

24  A.   The first bullet is discussing what we were talking

25  about a few minutes ago, that under the terms of the second

1   amendment, the Treasury commitment was going to be capped on

2   December 31st, 2012.  So after that point, there was going

3   to be a ceiling, a cap, on how much -- how many dollars were

4   available for the Treasury commitment.

5          That is not -- this would be the first time in

6   conservatorship effectively that we have this cap, because

7   up until this point, as we've already demonstrated, we were

8   able to amend the PSPA to increase the commitment as needed.

9   That's not the case anymore.  We're going to have a cap on

10  the remaining equity support for Fannie and Freddie as of

11  December 31st.

12  Q.  Just to review this, the cap meant there would be a set

13  amount as of January 1st, 2013.  And anything that drew down

14  on that amount could not be replaced.  Is that how it

15  worked?

16  A.  Yes.

17  Q.  Why couldn't -- so we started out -- the agreement

18  started out with 200 billion.  People realized that wasn't

19  enough.  It went to 400 billion.  People realized that

20  wasn't enough.  It went to unlimited.

21          Why couldn't that just happen again if there was a

22  problem?

23  A.  The statute had placed a limit on the Treasury's ability

24  to do this.  It ended that ability at the end of 2009.

25  Q.  So if FHFA and Treasury had wanted to agree to keep it

1   unlimited, did they have the legal authority to do that?

2   A.  No.

3   Q.  Okay.  So you refer in the first bullet to this set

4   amount that can't be increased, the funding cap.

5        What is the second bullet talking about?

6   A.  In the second bullet, I'm informing the Treasury

7   secretary that we're already observing market participants

8   raising questions that at the end of 2012, is that remaining

9   commitment going to be sufficient?  The words here are "to

10  justify continued investment in enterprise securities,"

11  translated as:  Is the market going to have enough

12  confidence in the remaining cap to be willing to continue to

13  buy the debt and mortgage-backed securities of Fannie Mae

14  and Freddie Mac?

15  Q.  I'm not going to ask you to repeat yourself.  But just

16  to connect things up, when we've been talking about the MBS

17  investors, are those the people that you're talking about in

18  the second bullet?

19  A.  Yes.

20  Q.  We've been talking about their confidence in the

21  guaranty.  That's what the second bullet is about?

22  A.  Yes.

23  Q.  So the third bullet.

24  A.  Okay.  And so the third bullet is describing -- it's

25  saying FHFA projections show draws leveling off, more

1    adverse house price paths and other operational changes at

2    the enterprises could lead to dividends eating into the

3    future cap space.

4    Q.  I want to focus on that last phrase, "dividends eating

5    future cap space."

6              We've heard testimony that I'm not going to repeat

7    about circular draws and erosion of the commitment based on

8    those circular draws.  What's the relationship between that

9    evidence that the members of the jury have heard and what's

10   in this third bullet?

11   A.  That's just what this third bullet is talking about.

12   It's saying that, you know, we could have future periods

13   once this cap's in place where there's not enough earnings

14   to pay the dividend and then we're going to have to draw

15   money against the commitment to pay the dividend; and that's

16   reducing the remaining amount of the commitment -- that

17   would reduce the remaining amount of the commitment.

18   Q.  So was -- this is dated January 19th?

19   A.  January 19th, 2012.

20   Q.  So was this idea of erosion of the commitment from draws

21   and concerns by the market about that, was that on the table

22   before the first-quarter results were out?

23   A.  Yes, it was.

24   Q.  When I say "before the first-quarter results were out,"

25   the financial results are reported in the SEC filings.  Is

DeMarco - DIRECT - By Mr. Stern

1    that right?

2    A.  Yes.

3    Q.  And we saw that there's a lag time.  I think the one we

4    looked at, it was -- I think you said it was six weeks

5    between the end of the quarter and the reporting.

6              In your capacity as acting director, did you have

7    to wait that whole six weeks to learn to get some idea what

8    those results are about?

9    A.  No.

10   Q.  How soon after the end of a quarter would you have some

11   idea?

12   A.  It would be three to four weeks after the end of the

13   quarter that I'd start to get preliminary unofficial

14   results.  It might be a little longer, four to five.  I

15   don't exactly remember.

16   Q.  But to be clear, in January -- on January 19th, 2012,

17   the first-quarter results certainly hadn't been published.

18   Is that right?

19   A.  That's correct.

20   Q.  And you didn't have any inside information about them?

21   A.  No.

22   Q.  And your answer?

23   A.  No, I did not.

24   Q.  So what -- take us to the fourth bullet.

25   A.  So the fourth bullet is raising the periodic commitment

DeMarco - DIRECT - By Mr. Stern

1    fee, which again we discussed yesterday, noting that the

2    Treasury has waived the commitment fee to date, but setting

3    this fee could also impact the near-term stability of the

4    companies.

5    Q.  So break down that second clause for us.  In what way

6    could the setting of the fee impact near-term stability?

7    And in particular, what does "stability" refer to in that

8    clause?

9    A.  So the companies already at this point have the fixed 10

10   percent dividend requirement.  If the periodic commitment

11   fee is set, then this becomes an additional financial

12   requirement on the companies beyond the 10 percent dividend.

13           And if this is set in such a way that it's fixed

14   and has to be paid, we're risking -- we've placed another

15   financial obligation on these companies.  Could this, you

16   know, affect the stability of the market in the sense of now

17   these analysts and investors in the mortgage-backed

18   securities and the debt are saying:  Okay.  Now we've got

19   two financial commitments to pay.  And do they have the

20   capacity to do that?

21   Q.  So we've heard you talk about stability in the secondary

22   mortgage market.  We saw it in the charters.

23           Does this relate back to the public mission of

24   Fannie and Freddie?

25   A.  Yes.  It directly does.  The stability of the market was

DeMarco - DIRECT - By Mr. Stern

1     a core part of their public mission.

2     Q.  Does it relate back to the public interest that HERA

3     told you you had to protect?

4     A.  Yes.  I mean, the conservatorships were created to

5     ensure that we continued to have a stable and liquid

6     secondary mortgage market.

7     Q.  And to get the calendar straight, I'm reminded to remind

8     all of us:  The first quarter started when?

9     A.  January 1st.

10    Q.  And when did it end?

11    A.  March 31st.

12    Q.  So let's go to the last bullet on this page.  What are

13    you talking about here?

14    A.  Here, I'm basically asking the Treasury secretary to

15    engage with FHFA in considering amending the PSPA in order

16    to add greater stability to the market.  Basically, I'm

17    saying:  These items that I've just gone through give me,

18    you know, concern about that long-term stability.  And I'm

19    asking -- I'm formally asking him here to engage with us,

20    set up a working group.  Let's work through these concerns.

21    And I even suggested, you know, let's try to have this done

22    by June 30th.

23    Q.  So I want to ask you about that.  You set a timeline to

24    wrap this up by the end of the second quarter.  So the end

25    of the second quarter was June 30th?

1    A.  Yes.

2    Q.  So when you say "wrap this up," are you referring to

3    taking some action, amending the PSPAs, to try to solve this

4    problem by June 30th?

5    A.  Yes.  That's what I'm saying.

6    Q.  And were you laying down that marker before or after you

7    knew what the first- and second-quarter results would be?

8    A.  Before.

9    Q.  Did you ever change your mind about wanting to get this

10   done by June 30th or as soon thereafter as you could?

11   A.  No.

12   Q.  Could you do that all on your own?

13   A.  No.

14   Q.  Why not?

15   A.  Because it took two parties to make an amendment to the

16   PSPA.  So I needed both the attention and the willingness of

17   the Treasury secretary to engage in this amendment.

18   Q.  Were you about to say it takes two to tango, or is that

19   just what occurred to me?

20   A.  Swimming in the back of my mind.

21   Q.  All right.  And just to finish off on this page, I'll

22   just call this the next steps in this last bullet.  One of

23   the things that you asked for was to establish an

24   FHFA/Treasury working group to work through the list, to try

25   to get this done by June 30th.

1              Was that working group ever set up?

2     A.  Yes.

3     Q.  And who was it?

4     A.  So from Treasury -- from FHFA, the lead person was Mario

5     Ugoletti.  And Mario brought in and included other

6     executives at FHFA in meetings, depending on what the issues

7     were and so forth.

8              Then there was a small group at Treasury.  The

9     participants in any one meeting, you know, may vary.  But

10    anyway, there was a series of meetings that followed this

11    request.

12    Q.  And did you continue to be in contact directly with

13    Secretary Geithner?

14    A.  Yes.

15    Q.  How often did you meet or speak with him?

16    A.  At this point, we're having meetings -- it wasn't as

17    regulated in terms of the fixed, like, monthly.  But there

18    were times it was monthly.  There was times it was more than

19    once a month.  We might go a few months in between meetings.

20    But we were meeting here.

21             And I'm also having meetings from time to time

22    with, as I said, the undersecretary for domestic finance.

23    Q.  And I think you implied this.  But the working group,

24    the meetings with Secretary Geithner, would we be correct in

25    understanding that at least part of the topics in those

DeMarco - DIRECT - By Mr. Stern

1    meetings were the things you were talking about on Slide 5,

2    the concerns of the market participants, doing something

3    with the PSPAs to address those concerns and so forth?

4    A.  Yes.

5    Q.  So we're going to keep going with the consideration of

6    the third amendment.

7           But about a month after this January 19th meeting,

8    you, as acting director of FHFA, issued something that was

9    called FHFA's strategic plan?

10   A.  Yes, I did.

11          MR. STERN:  Let's pull up DX-393.

12   BY MR. STERN:

13   Q.  What are we looking at here?

14   A.  We're looking at the news release that we posted on our

15   website to make -- to announce that FHFA had written a

16   strategic plan for the Fannie/Freddie conservatorships and

17   had submitted it to Congress that day.

18   Q.  And again, the members of the jury can read it here.

19   They'll have it available to them.  It's DX-393.  But just

20   to hit some of the highlights in this news release, there's

21   a reference to the acting director.  That's you, right?

22   A.  Yes.

23   Q.  It talks about taking steps to meet your obligations as

24   conservator?

25   A.  Yes.

DeMarco - DIRECT - By Mr. Stern

1    Q.  And it talks about your objectives as conservator?

2    A.  Yes.

3    Q.  And it recaps that Fannie and Freddie were placed into

4    conservatorships on September 6th.  I'm paraphrasing.  Now

5    I'm quoting.  Quote:  "...and have since received more than

6    $180 billion in taxpayer support," unquote.

7         What is that reference to taxpayer support?

8    A.  The $180 billion is referencing the cumulative draws

9    that the two companies have taken from the Treasury

10   Department at this point in time.

11   Q.  So just to get our vocabulary, you're referring to the

12   Treasury -- the availability of the Treasury commitment as

13   taxpayer support?  Is that what links up there?

14   A.  Yes.  The Treasury commitment is the taxpayer support.

15   It's where Treasury gets its money.

16   Q.  And what are you saying in the paragraph after the three

17   bullets?

18   A.  What I am saying is that the conservatorships have been

19   operating for more than three years.  I am noting that

20   there's no near-term resolution in sight; and yet FHFA as

21   conservator needs to continue to direct and guide these

22   companies.

23        And I felt like I owed it to Congress and to the

24   public to provide an updated vision or roadmap of how as

25   conservator we were planning to carry that out.

DeMarco - DIRECT - By Mr. Stern

2293

```
 1    Q.  So we're not going to take time now to go through the

 2    whole strategic plan.  I'm just going to ask a big-picture

 3    question:  From your perspective, was -- were the steps that

 4    you laid out in the strategic plan in February of 2012

 5    consistent or inconsistent with the public mission that

 6    Fannie and Freddie had always had?

 7    A.  Consistent.

 8    Q.  Was it consistent or inconsistent with the obligation to

 9    protect the public interest that Congress imposed on you in

10    July of 2008?

11    A.  Consistent.

12    Q.  So let's pick up again with your discussions with

13    Treasury about the third amendment.

14              MR. STERN:  Let's pull up DX-404.

15    BY MR. STERN:

16    Q.  What are we looking at here?

17    A.  We're looking at a cover sheet from me for a meeting

18    with Treasury on March 7th of 2012.

19    Q.  So this is about, oh -- I can't do this in my head --

20    about six weeks after the January 19th meeting?

21    A.  Something like that, yes.

22    Q.  And again, had the first-quarter results been public --

23    publicly released?

24    A.  March 7th?  I don't think they had.

25    Q.  Well, is that even possible?  When does the first
```

DeMarco - DIRECT - By Mr. Stern

1    quarter end?

2    A.  I'm sorry.  First quarter.  I missed that.

3    Q.  First quarter.

4    A.  Sorry.  I did not listen closely enough to which quarter

5    you were referring to.

6                No.  The first quarter --

7    Q.  First quarter.

8    A.  -- was not over.  The first-quarter results were

9    obviously not available.

10   Q.  And when you say "not available," you mean not available

11   publicly and not available to you?

12   A.  At all.  The quarter was still ongoing.

13   Q.  Okay.  So obviously, the second-quarter results weren't

14   available to you?

15   A.  That's correct.

16   Q.  So let's keep going with what we're seeing here.  So

17   this is -- tell us what this is about.

18   A.  So this is the cover sheet for the meeting.  It's saying

19   where and when the meeting is and it's listing the

20   participating attendees at the meeting.

21   Q.  And we know who you are; we know who Mr. Ugoletti is.

22                Then there's a space, a double space.  Who were

23   the people below the double space?  Where are they from?

24   A.  They are all Treasury officials.

25   Q.  Okay.  Do you see handwriting on here at the top and the

DeMarco - DIRECT - By Mr. Stern

1    bottom?

2    A.  I do.

3    Q.  Do you know whose handwriting that is?

4    A.  Mine.

5    Q.  Okay.  And what are you saying there at the bottom?

6    A.  I'm saying that the meeting notes had been scanned.

7    That's the file name for it.

8    Q.  Does that say .pdf at the end?

9    A.  Yes, it does.

10   Q.  Let's go to the next page.

11            Handwritten notes here.  Whose handwriting is

12   this?

13   A.  Mine.

14   Q.  You took these?

15   A.  Yes.

16   Q.  Okay.  Is there a reference -- do you know whether you

17   took these before the meeting happened, as -- I'll use that

18   phrase again -- talking points?  Do you know when you took

19   them?  During the meeting or after the meeting?  Do you

20   remember at this point?

21   A.  Looking at the organization of the outline with bullets

22   and sub-bullets, this appears to be my notes before the

23   meeting outlining topics expected for discussion that I want

24   to make sure we cover.

25   Q.  Again, I'll ask you for everyone's sake to keep your

1    voice up --

2    A.  Okay.

3    Q.  -- please.

4    A.  Apologies.

5    Q.  Is there -- I'm not going to go through all these notes.

6    But is there a reference here in your notes to prepare for

7    this meeting to the PSPA?

8    A.  Yes.  Two references.

9    Q.  So what's the numbered heading that that PSPA reference

10   is under?

11   A.  It's under No. 1, transition.  It's also under No. 2,

12   Financial Framework For Conservatorships.

13   Q.  Let's focus on No. 2.  What did -- what did you mean

14   when you said "financial framework for conservatorships"?

15   A.  So here, we're going to discuss -- the PSPA is the

16   financial support for the conservatorships.  We all know the

17   PSPA is the agreement between FHFA and Treasury.  And so

18   that's what No. 2 is about.

19   Q.  And you broke this out.  So financial framework, PSPA;

20   and then under PSPA you broke it out as financial and then a

21   bullet; and then operational -- tell me if I'm reading this

22   right -- operational covenants within strategic plan?

23   That's how you broke that out?

24   A.  Yes.

25   Q.  So under Financial, so Financial Frameworks, PSPA,

```
1    Financial, under Financial, what's the bullet?

2    A.  Net worth sweep.

3    Q.  And was -- were you using that term, "net worth sweep,"

4    in the way that the members of the jury have come to

5    understand it?

6              MR. HUME:  Objection, your Honor.

7              MR. STERN:  That's a bad question.

8    BY MR. STERN:

9    Q.  What did "net worth sweep" mean?

10   A.  "Net worth sweep" meant that the net income of the

11   companies would be swept to the Treasury Department.

12   Q.  Okay.  And this was the topic of a meeting in early

13   March of 2012?

14   A.  Yes.

15             MR. STERN:  So let's go to DX-444, please.

16   BY MR. STERN:

17   Q.  This is a reference to, again, a meeting with Mary

18   Miller.  But this says May 8th.  Is this a different meeting

19   than the one we saw referred to in the previous exhibit?

20   A.  Yes.

21   Q.  So what's this meeting?

22   A.  So this is a one-on-one meeting between me and Mary

23   Miller of the Treasury Department.

24   Q.  The other one had a bigger --

25   A.  The other one had more people from both sides.
```

DeMarco - DIRECT - By Mr. Stern

```
 1    Q.  Right.  So you're on your own here without Mr. Ugoletti,

 2    and Ms. Miller is on her own here without those other

 3    people?

 4    A.  That's what it says.  Yes.

 5    Q.  And is that your recollection of how the meeting went?

 6    A.  It is.

 7              MR. STERN:  Let's go to the next page, please.

 8    BY MR. STERN:

 9    Q.  So whose handwriting?

10    A.  Mine.

11    Q.  And at the top, it says -- the very top?

12    A.  It's got the date.  At the top it says:  May 8th, 2012.

13    Meet with Mary Miller.

14    Q.  Okay.  So we see -- and were these notes -- again, do

15    you remember whether you took them before the meeting?

16    During the meeting?  After the meeting?

17    A.  These look to be contemporaneous.  So I took them during

18    the meeting.

19    Q.  And is there a reference on this page to the net worth

20    sweep?

21    A.  Yes.

22    Q.  Where is that?

23    A.  It's under Item No. 1.

24    Q.  And as best you recall, does that mean to you, looking

25    at these notes, that you discussed the net worth sweep with
```

1    Ms. Miller of the Treasury Department on May 8th of 2012?

2    A.  Yes.

3    Q.  And at that point, do you know whether the first-quarter

4    results were known to you?

5    A.  Known to me?  Probably, yes.

6    Q.  What about second quarter?

7    A.  No, because we're in the early part of the second

8    quarter.

9    Q.  So I want to bring us now to --

10             MR. STERN:  Let's pull up --

11   BY MR. STERN:

12   Q.  Well, let me ask you this:  What was the status -- so we

13   see net worth sweep is referred to at least with respect to

14   Treasury.  We see something like it referred to in your

15   email exchange with Mr. Ugoletti, just to recap.  Then we

16   see references in these meetings.

17             As of May 8th, what was the status of your

18   discussions about the net worth sweep and your desire to get

19   it done by the end of the second quarter?

20   A.  The status was it had basically been agreed to in

21   principle, and the discussion's focusing on other elements

22   and aspects of the -- of what became the third amendment.

23   Q.  Were you still hopeful on May 8th that you could get

24   this done by the end of the second quarter?

25   A.  Yes.

DeMarco - DIRECT - By Mr. Stern

1    Q.  Was that still your intent?

2    A.  Yes.

3    Q.  So I want to flip to another document.

4           MR. STERN:  Let's go to PX-205.

5    BY MR. STERN:

6    Q.  Just walk us through the header here.

7    A.  The header is an email from Michael Stegman to Mary

8    Miller.  Both are Treasury Department officials.  The date

9    is June 25th, 2012.  And the subject line reads:

10   FHFA-Related Discussion at June 25 Morning Meeting.

11   Q.  And what did you -- when did you first see this memo?

12   A.  After I left FHFA as part of proceedings associated with

13   this trial.

14   Q.  So let's look at the first paragraph.  What does the

15   first paragraph say?

16   A.  The first paragraph says, "The secretary provided an

17   overview of his and your previous day's meeting with Ed

18   DeMarco.  This is the essence of the discussion that took

19   place."

20   Q.  And do you know whether or not -- well, I'll ask you

21   this:  Do you remember whether or not you had a meeting with

22   Treasury people on or around June 25th?

23   A.  Yes.

24   Q.  This memo that is supposed to be about that meeting --

25   tell us again.  When was the first you saw it?

 1    A.  In connection with proceedings associated with this --

 2    with this trial, this lawsuit, this suit.  I did not see it

 3    while I was employed at FHFA.

 4    Q.  So when we're talking about seeing it in connection with

 5    the case, if I understand correctly, that's years after the

 6    meeting took place?

 7    A.  Yes.

 8    Q.  I want to focus on a few things that have been the topic

 9    of some discussion in the trial.

10              You see in -- I'm trying to find the spot; bear

11    with me.  So in the bullet that begins Through Weeks of

12    Negotiating Terms -- do you see that?

13    A.  Yes.

14    Q.  The second sentence says, "DeMarco no longer sees the

15    urgency of amending the PSPAs this year."

16              Do you see that?

17    A.  I do.

18    Q.  Did you say that?

19    A.  No.

20    Q.  Would you have said that?

21    A.  No.

22    Q.  Did you think that?

23    A.  No.

24    Q.  Do you have any idea why Mr. Stegman wrote it in this

25    memo?

1    A.   No.

2    Q.   Do you know whether or not he was at that meeting?

3    A.   No.

4    Q.   You don't know one way or the other?

5    A.   I don't.

6    Q.   Then it goes on to say that you raise two competing

7    reasons for this new position.  And it says, "The GSEs will

8    be generating large revenues over the coming years, thereby

9    enabling them to pay the 10 percent annual dividend well

10   into the future even with the caps."

11            Do you see that?

12   A.   I do.

13   Q.   Did you say that?

14   A.   No.

15   Q.   Did you think that?

16   A.   No.

17   Q.   Would you have said that?

18   A.   No.

19   Q.   Did you have any information that would lead anyone to

20   believe -- well, withdrawn.

21            Did you have any information that could have led

22   you to believe that the GSEs will be generating large

23   revenues over the coming years?

24   A.   No.

25   Q.   Did you have any information that could have led you to

DeMarco - DIRECT - By Mr. Stern

1    believe that the GSEs would be able to pay the 10 percent

2    well into the future even with the caps?

3    A.  No.

4    Q.  Do you have any idea why Mr. Stegman wrote this in this

5    memo?

6    A.  I do not.  I cannot explain and I do not recall what was

7    discussed that could have generated this statement in this

8    email.

9    Q.  Okay.  So let's talk now --

10            MR. STERN:  We can take that down.

11   BY MR. STERN:

12   Q.  So we've talked about these discussions and

13   communications you're having with Treasury about the third

14   amendment in the first quarter and early second quarter of

15   2012.

16            I want to talk to you now about what was going on

17   inside of FHFA with respect to the third amendment.  Okay?

18   A.  Okay.

19   Q.  So besides you and Mr. Ugoletti, were other people at

20   FHFA involved in any way with the third amendment?

21   A.  Yes.

22   Q.  Tell us about that.

23   A.  There were a number of other executives that were

24   involved in reviewing drafts of it, in providing information

25   and advice to Mario as he's talking to the Treasury and

1    joining with Mario in some of these meetings.

2    Q.  So you talked before about your -- the ways in which you

3    gathered information from all of those different sources.

4             Did that information in whole or in part help

5    guide you in your decision-making on the third amendment?

6    A.  Yes.

7    Q.  Did you always -- did you tell the people from whom you

8    were gathering the information in every instance that you

9    were gathering it for purposes of making that decision?

10   A.  No.

11   Q.  Was the information helpful to you or unhelpful to you

12   even under those circumstances?

13   A.  Helpful.

14   Q.  So did you have any discussions about accounting issues

15   relating to the third amendment?

16   A.  We did.

17   Q.  And what were those discussions?

18   A.  The discussion had to do with, Would there be any

19   accounting implication, ramification, from adjusting the

20   dividend and the PCF to what became the third amendment?

21   Q.  And when -- let's take a look at PX-247.  This is

22   jumping ahead a little bit in time.

23             What is this?

24   A.  This is an email from Mario Ugoletti to me and a number

25   of senior staff at FHFA.  It's dated August 9th of 2012.


DeMarco - DIRECT - By Mr. Stern

```
 1        And the subject is PSPA Alert.

 2        Q.  And it refers to a renewed push.  Do you see that?

 3        A.  Yes.

 4        Q.  Who would that be from?

 5        A.  The Treasury Department.

 6        Q.  And was that good news or bad news to you?

 7        A.  Good news.

 8        Q.  How so?

 9        A.  Because I wanted the PSPA amendments done; and we had

10        been waiting on the Treasury Department to be ready to wrap

11        this up.

12        Q.  It read -- this is August 9th.  I'm sorry.  Is this

13        email circulating something?

14        A.  No.  It's just the -- it's just the content of the

15        message.

16        Q.  Does it refer to earlier drafts of the third amendment?

17        A.  Yes.

18        Q.  And what does it say about those drafts?

19        A.  It says, "Mario is saying that his understanding of what

20        Treasury's going to be putting forward is largely the same

21        as the previous drafts that we've reviewed."  And he

22        specifically identifies components of those previous drafts

23        he expects to be the same.

24        Q.  And when he says "as previous revisions -- versions we

25        had reviewed," what -- who's the "we" there as you
```

1    understood it?

2    A.   FHFA; and more particularly, the people that are on the

3    distribution of this email.

4    Q.   So you understood and were aware -- well, what was your

5    understanding about whether or not the people on this email

6    had seen drafts of the third amendment before August of

7    2012?

8    A.   It was my understanding that they had seen it.

9    Q.   And again, briefly, just tell us just by job title or

10   principal responsibility who these people are.

11   A.   Alfred Pollard is the general counsel.  Mark Laponsky

12   was a senior attorney in the office of the general counsel,

13   so he worked directly for Alfred.

14           Jeffrey Spohn was the director of conservatorship

15   operations.  Jon Greenlee was the director of supervision

16   for Fannie Mae and Freddie Mac.  Patrick Lawler was the

17   chief economist.  Wanda DeLeo -- Wanda had a number of jobs.

18   I can't remember which division she directed on August 9th.

19   But she was the former chief accountant and had a very

20   senior position.  And Nick Satriano was the chief

21   accountant.

22   Q.   Okay.

23           MR. STERN:  We can take this down.

24   BY MR. STERN:

25   Q.   I want to go back for a moment to market concerns about

DeMarco - DIRECT - By Mr. Stern

1    erosion of the Treasury commitment from draws to pay the

2    dividends.

3              You said that you had discussed -- well,

4    withdrawn.

5              That January 19th presentation referred to

6    expressing those concerns to Secretary Geithner.  Let's take

7    a look at DX-412.

8              What is this?

9    A.   This appears to be an email from Mario Ugoletti to me

10   dated March 14th of 2012.

11   Q.   And is it -- what's the subject line?

12   A.   GSE/PSPA Backstop Questions.

13   Q.   And what did you understand back in this timeframe the

14   term "backstop" to mean in this context?

15   A.   The Treasury commitment under the PSPA.

16   Q.   And that was the backstop to what?

17   A.   To the guaranty Fannie Mae and Freddie Mac make to MBS

18   holders.

19   Q.   And it says Attachments.  So this is attaching

20   something?

21   A.   Yes.

22   Q.   Let's flip the page and see what that is.

23             Was this attached to that email?

24   A.   Yes.

25   Q.   And I'm sorry.  The date on the top of -- just looking

DeMarco - DIRECT - By Mr. Stern

1    at the date on the top of this, it's what?

2    A.  March 14th, 2012.

3    Q.  And tell us what this is.

4    A.  This is an analyst report produced by Deutsche Bank.

5    Q.  And what was Deutsche Bank and what was this analyst

6    report about?

7    A.  So this analyst report is about MBS, mortgage-backed

8    securities, and securitized products.  There were other

9    assets besides mortgages that are financed through a

10   securitization process.  And this is the team that does that

11   kind of research at Deutsche Bank.

12   Q.  I've got to ask you to keep your voice up, Mr. DeMarco.

13   Thank you.

14          Let's go to Page 5 of 8.  I'm looking for the

15   third sentence of the second paragraph.  That sentence

16   begins, "But a close reading."  Could you read this one for

17   us?

18   A.  "But a close reading of the legislation that authorizes

19   Treasury support suggests that Treasury may not be able to

20   extend unlimited support without approval by Congress."

21   Q.  And is that what you were talking about before when you

22   said that FHFA and Treasury couldn't do this on their own,

23   that there would need to be congressional action?

24   A.  Yes.

25   Q.  Okay.  So what is this analyst report saying about those

DeMarco - DIRECT - By Mr. Stern

1    market concerns?

2    A.  It's expressing concern that, once capped, there's a

3    concern about whether that backstop is going to be

4    sufficient for ensuring the resiliency of that guaranty.

5    Q.  And let's go up in the document a little bit to the last

6    sentence of the preceding paragraph, beginning with "Both

7    Fannie Mae."

8    A.  "Both Fannie Mae and Freddie Mac have subsequently said

9    that the need to pay dividends to Treasury creates, quote,

10   'significant uncertainty about our long-term financial

11   sustainability,' closed quote.  That uncertainty puts both

12   their mortgage-backed securities and debt at risk."

13   Q.  And what did you understand that to be a reference to?

14   A.  It's a reference to the sustainability of the Treasury

15   commitment, once capped, to cover the -- ensure the

16   long-term financial sustainability of Fannie and Freddie,

17   meaning that investors in their debt and MBS could have

18   confidence in that commitment for the life of the securities

19   for which the commitment is being applied.

20   Q.  So let's go to Page 7 of this document.  Do you see the

21   Market Implications section?

22   A.  Yes.

23   Q.  What does that first sentence mean or what did it mean

24   to you?

25   A.  It means that MBS investors are aware that the Treasury

1    commitment is going to be capped and that continuing to draw

2    from Treasury to pay dividends to Treasury is going to

3    diminish, reduce, the remaining amount of support under that

4    commitment, and that one day that could pose a problem for

5    Fannie Mae and Freddie Mac being able to cover losses on

6    mortgages that are in mortgage-backed securities.

7    Q.  And the sentence that begins, "The risk," could you read

8    that to us and tell us if that relates to some of what

9    you've been talking about with us today and, if so, how.

10   A.  It says, "The risk becomes greater in a housing market

11   catastrophe, such as the one that started in the U.S. after

12   2006."

13          It's basically saying, if you have, you know, a

14   very bad outcome, a worst-case scenario -- it's referring to

15   the great financial crisis as an example of a worst-case

16   scenario -- that if you have that kind of repeat in the

17   housing market, that this concern they're raising here

18   becomes very heightened.

19   Q.  So let's talk about scenarios for just a minute.

20          MR. STERN:  We can take this down.

21   BY MR. STERN:

22   Q.  I'm going to put up a slide that the members of the jury

23   have seen during the testimony of another witness.  Okay?

24          MR. STERN:  Let's get Dharan Demonstrative Slide

25   No. 60.

1    BY MR. STERN:

2    Q.  I want to talk about this slide with you a little bit,

3    Mr. DeMarco.  But I want to talk about really where it comes

4    from.

5            Do you see those PX numbers at the bottom?

6    A.  Yes.

7    Q.  And do you understand those to be the sources for this

8    chart?

9    A.  Yes.

10   Q.  So let's take a look at PX-216, 218 and 269.  Do you see

11   that?

12   A.  Yes.

13   Q.  I'm going to want to focus mostly on 216.  But to do

14   that -- let me just back up one second.

15           Do you see at the top it says "Combined PSPA

16   funding"?  Just so our record is clear, was PSPA funding

17   ever combined in one big pot this way?

18   A.  No.

19   Q.  So elaborate.

20   A.  No.  So there were separate PSPA agreements between

21   Treasury and Fannie Mae, Treasury and Freddie Mac.  The

22   commitment that was made, the commitment amounts, there was

23   one each for Fannie and a separate one for Freddie.  These

24   were not commingled or managed jointly.

25   Q.  So if one company had a lot and another had a little,

1    could the company with a little say, Hey, let me have some

2    of yours?

3    A.  No.

4    Q.  So let's talk about where these bars come from.

5               MR. STERN:  Can you pull up PX-213?

6    BY MR. STERN:

7    Q.  Do you recognize this?

8    A.  Yes, I do.

9    Q.  What is it, just generally speaking?

10   A.  It's an email from Brad Martin, who's someone in the

11   office of conservatorship operations, to me and a number of

12   other FHFA officials, summarizing a Fannie Mae executive

13   management meeting.

14   Q.  Okay.  And do you remember whether you looked at this

15   email at the time that it was sent?

16   A.  No.

17   Q.  And you'll see that it transmits five attachments.

18   Right?

19   A.  Yes.

20   Q.  Okay.  So let's look at PX -- let me just stick with

21   PX-213 for just a minute.  In the first paragraph, what is

22   it saying?  GSE Strategy Update.  I'm sorry.

23   A.  So the first paragraph under that header says, "Dave

24   Benson walked through a draft copy of next week's board

25   strategy planning discussion intended to review areas where

DeMarco - DIRECT - By Mr. Stern

1    Fannie might facilitate the ongoing secondary market

2    transition."

3    Q.  And you see later on in the paragraph, just to

4    summarize, a reference to current projections and golden

5    years and cumulative dividends paid?

6    A.  Yes.

7    Q.  So let's take a look at --

8                MR. STERN:  Now let's go to PX-2 -- well, let's

9    stick with PX-213.

10   BY MR. STERN:

11   Q.  You see the paragraph that says Financial Forecast

12   Update on the next page?

13   A.  Yes.

14   Q.  And you see a reference there to Mr. Mayopoulos?

15   A.  Yes.

16   Q.  Where is that?

17   A.  It's in the middle of the paragraph.

18   Q.  And what does it say?

19   A.  It says, "Given this large change from the prior

20   forecast, Tim Mayopoulos wondered whether the board might

21   question the credibility of management's financial

22   projections."

23   Q.  And those are the projections -- I'll call them

24   Mr. Benson's projections?

25   A.  Yes.

1    Q.   And what was Mr. Mayopoulos's position at the time?

2    A.   Mr. Mayopoulos was the CEO of Fannie Mae.

3    Q.   And do you know Mr. Benson's position?

4    A.   Not at that time.  But he was a senior executive at

5    Fannie Mae.

6    Q.   Was he subordinate in the hierarchy --

7    A.   He reported --

8    Q.   -- to Mr. Mayopoulos?

9    A.   I'm sorry, Mr. Stern.

10   Q.   I'm sorry?

11   A.   I'm sorry.  I interrupted you.  I apologize.

12            Yes.  Mr. Benson reported to Mr. Mayopoulos.

13   Q.   Okay.  So let's take a look now at PX-216, which was the

14   source of the bar on that document.

15            Do you recognize this?

16   A.   Yes.

17   Q.   And what do you recognize it to be?

18   A.   It's the deck that was attached to the email that we

19   were looking at.

20   Q.   So let's go to Slide 14.  We saw on the -- I should have

21   called this out.  But I'll remind you that on the Dharan

22   demonstrative slide, we saw the figure 266.6 billion as the

23   amount remaining in 2022.

24            Do you remember that?

25   A.   Yes.

1    Q.  And if we look at remaining funding -- and that was

2    the -- he combined them on that slide.  Right?

3    A.  Yes.

4    Q.  So if we look at -- on this slide, if we look at

5    Remaining Funding Under SPSA Row for Fannie -- right?  So

6    Fannie.  Do you see Fannie at the top?

7    A.  Yes.

8    Q.  And you see Remaining Funding in 2022?

9    A.  Yes.

10   Q.  What's that number?

11   A.  118.3 billion.

12   Q.  Same exercise for Freddie, bottom right corner.

13   Remaining funding, 2022?

14   A.  148.3 billion.

15   Q.  And if you add those two numbers up?

16   A.  266.6 billion.

17             MR. STERN:  Let's flip back to the -- to Dharan 60

18   just for a minute.

19   BY MR. STERN:

20   Q.  So that matches up with that 266 billion on the first

21   bar?

22   A.  Yes.

23   Q.  And it says PX-216.  Right?

24   A.  Yes.

25   Q.  So we've just seen how PX-216 leads to that number.

DeMarco - DIRECT - By Mr. Stern

1    Correct?

2    A.  Yes.

3    Q.  Let's go back to the -- that page in PX-216.

4         So let's actually look at these projections.  They

5    begin in July of -- it has a summary column for 2008 to

6    2011.  Is that right?

7    A.  Yes.

8    Q.  For each entity?

9    A.  Yes.

10   Q.  And that's not a projection; that's something that's

11   happened in the past.  Right?

12   A.  Yes.

13   Q.  So when does the projection part of this projection

14   begin?

15   A.  2012.

16   Q.  And what does it go to?

17   A.  2022.

18   Q.  So that is at this point about ten and a half years?

19   A.  Yes.

20   Q.  Is that timeframe for a financial projection common or

21   uncommon?

22   A.  Uncommon.

23   Q.  In what respect?  Too small?  Too long?

24   A.  Financial projections like this do not typically go out

25   for ten or more years.

1    Q.  How -- what's the usual range of a projection like this?

2    A.  Two to three, three to five, something on that order.

3    Q.  So why don't official projections typically go this far?

4    A.  There is just tremendous uncertainty trying to predict

5    economic and market conditions that far out into the future.

6    Q.  So we saw on the FHFA projections that there were three

7    scenarios.  And you characterized those scenarios.

8             We see on this document how many scenarios?

9    A.  One.

10   Q.  And using the terminology that we've used before,

11   worsening outlook -- I'm sorry -- improving outlook, base

12   case and worsening outlook, when you first saw this, what

13   did you understand this to be?  Which of those three

14   scenarios?

15   A.  Well, certainly not a worsening outlook.  It's not

16   exactly clear, but I suppose a base or a base-to-improving

17   outlook.

18   Q.  Okay.  So let's just call it a base case.  Is that okay?

19   A.  That's fine.  Yes.

20   Q.  So do those projections tell us what the stress scenario

21   or worsening outlook or worst-case scenario would look like?

22   A.  No.

23   Q.  When the time came for you to decide whether to enter

24   into the third amendment, was your concern about the base

25   case?

1    A.   No.

2    Q.   Why not?

3    A.   My concern was because -- my concern was the stability

4    of these companies in conservatorship and the remaining

5    Treasury support needed to be sufficient for this long

6    period of time, as we've already discussed, no matter what

7    happened.  And in particular, my concern was bad outcomes

8    and how bad outcomes might erode that Treasury support.

9    Q.   And I want to just refer to some specifics on the chart

10   for just a minute.

11           What does this actually show about whether --

12   let's start with Fannie -- whether Fannie would be able to

13   pay the dividend in each of these quarters, the 10 percent

14   dividend, without taking a draw?

15   A.   It shows that it could do it in -- I believe it's --

16   Q.   Let me ask it this way:  Are there any -- does this show

17   that Fannie Mae would not have to take a draw in any

18   quarter?

19   A.   No.

20   Q.   In what quarters does it show that Fannie would need to

21   take a draw?

22   A.   So 2012, 2013, 2014, it looks like 2019 and then the

23   last couple years, 2021, 2022.

24   Q.   So let's recap.

25   A.   I'm sorry.

```
 1    Q.  2012, 2013, 2014.  Right?

 2    A.  Yes.

 3    Q.  So needing a draw?

 4    A.  Yes.

 5    Q.  2012, 2013, 2014.

 6             And again, in '21 and '22.  Right?

 7    A.  Yes.

 8    Q.  So this is not showing that as of 2012 there would never

 9    have to be another draw, right --

10    A.  No.

11    Q.  -- to cover the dividend?

12    A.  It is not.

13    Q.  So what was your takeaway when you saw this base case

14    projection?

15             MR. HUME:  Objection.  Lacks foundation.

16             MR. STERN:  I'm sorry?

17             MR. HUME:  Lacks foundation.  The witness said he

18    doesn't remember looking at it, I thought.

19             MR. STERN:  I don't think so.

20             THE COURT:  Did he say -- did he say he ever saw

21    it?

22             MR. STERN:  I'm sorry.

23    BY MR. STERN:

24    Q.  This was attached to the email that you got, right?

25    A.  Yes.
```

DeMarco - DIRECT - By Mr. Stern

1    Q.  Did you review it either at or around the time you got

2    the email?

3    A.  I don't recall.

4    Q.  Okay.  So if you had reviewed it, what impact would this

5    kind of ten-year projection about the base case have had on

6    your thinking about erosion of the commitment and entering

7    into the third amendment?

8    A.  None.

9           MR. HUME:  Objection.  Calls for hypothetical and

10   speculation.

11          THE COURT:  Overruled.

12          THE WITNESS:  None.

13   BY MR. STERN:

14   Q.  Why not?

15   A.  Because what I was concerned about, as I testified a few

16   minutes ago, is I needed to ensure the stability of these

17   companies and the remaining Treasury support for 30 years

18   out in terms of these securities, MBS, that are being issued

19   and need to be guaranteed.  And I am concerned about the

20   things that could happen that I don't know, the bad things

21   that could happen that could result in draws against that

22   remaining Treasury commitment that could introduce

23   instability to the country's housing finance system.

24          Basically, I felt responsible for making sure that

25   these companies in conservatorship with this remaining

1    commitment were going to be able to keep a stable secondary

2    mortgage market even if things got bad.

3    Q.  Okay.  So this brings us to early August of 2012.  In

4    August of 2012, before -- and the third amendment is August

5    17th.  Right?

6    A.  Yes.

7    Q.  Before, in August, between August 1st and August 17th,

8    did Fannie and Freddie issue their SEC filings for the

9    second quarter of 2012?

10   A.  Yes.

11   Q.  And that was the period ending when?

12   A.  That would be the period ending June 30th, 2012.

13   Q.  And were -- you talked about sources of information; and

14   I don't know that you included SEC filings.  Were SEC

15   filings a source of information for you in your

16   decision-making, including your decision-making about the

17   third amendment?

18   A.  Yes.

19   Q.  So --

20              THE COURT:  I think this is a good point for ten

21   minutes.  Let's take ten minutes.

22              (Whereupon, the jury exited the courtroom at 11:43

23   a.m. and the following proceedings were had:)

24              (Thereupon a recess was taken, after which the

25   following proceedings were had:)

1           THE COURTROOM DEPUTY:  Jury panel.

2           (Whereupon, the jury entered the courtroom at

3    11:57 a.m. and the following proceedings were had:)

4           THE COURT:  You may be seated.

5           Mr. Stern, you may proceed.

6           MR. STERN:  Thank you, your Honor.

7    BY MR. STERN:

8    Q.  Mr. DeMarco, just talking to you about SEC filings, so

9    at least with respect to the regular SEC filings, how often

10   do those come out?

11   A.  Quarterly.

12   Q.  And those are called the Qs?

13   A.  Yes.

14   Q.  The jury's also heard something about a K.  What's a K?

15   A.  So a 10-K is the fourth-quarter filing.  It is the

16   annual report.  So K is indicating that it's the annual.

17   Q.  Okay.  So then I presume -- I'm not going to try to

18   count -- there were filings that happened between December

19   24th, 2009, and the date of the third amendment on August

20   17th.  Is that right?

21   A.  Yes.

22   Q.  Multiple filings?

23   A.  Every quarter.

24   Q.  So I'd like to focus on the Fannie and Freddie SEC

25   filings that were most recent in time before August 17th.

                    DeMarco - DIRECT - By Mr. Stern

1    Okay?  To orient us.

2    A.  All right.

3    Q.  So I'd like to start with -- and the most recent filing

4    would be the filing that reported on the second quarter of

5    2012.  Right?

6    A.  Yes.

7    Q.  That quarter ended when?

8    A.  June 30th, 2012.

9    Q.  And the third quarter ended when?

10   A.  September 30, 2012.

11   Q.  So August 17th fell during the third quarter?

12   A.  Yes.

13   Q.  The last completed quarter was the second quarter?

14   A.  Yes.

15   Q.  And let's take a look at DX-476.

16          What is this?

17   A.  This is the cover sheet for Fannie Mae's second-quarter

18   2012 10-Q, their quarterly filing for the second quarter.

19   Q.  And just -- so the quarter ended when?

20   A.  June 30th.

21   Q.  So let's look to see when this filing was made.  Let's

22   go to the second-to-the-last page of the document.

23          What is this?

24   A.  This is the required certification signed by the CEO of

25   Fannie Mae.

1    Q.  And who was that at the time?

2    A.  Tim Mayopoulos.

3    Q.  And we just saw his name in that other document?

4    A.  Yes, we did.

5    Q.  And what's the date on here?

6    A.  August 8th, 2012.

7    Q.  So this -- the quarter ended June 30th and this filing

8    is coming out August 8th?

9    A.  Yes.

10   Q.  Let's go to the next page.  It's also signed here by the

11   CFO.  Who was that?

12   A.  Susan McFarland.

13   Q.  Did Ms. McFarland sign on the same date?

14   A.  Yes.

15   Q.  So let's go to Page 5.  The last paragraph is headed

16   what?

17   A.  Financial Results.

18   Q.  No.  The section is headed what?

19   A.  I'm sorry, Mr. Stern.  The last section is headed

20   Executive Summary.

21   Q.  And let's go to Page 16.  And do you see the

22   paragraph -- the last paragraph there?  This is still within

23   the Executive Summary?

24   A.  Yes.

25   Q.  The sentence that begins, "There is significant

1    uncertainty in the current market environment," well, what

2    is this paragraph telling you and anyone else who would read

3    it?

4    A.  It's telling me the uncertainty about both Fannie Mae's

5    status as a company and uncertainty about their ability to

6    pay dividends to the Treasury over time.

7    Q.  And what significance did uncertainty have for you in

8    this period leading up to the decision to enter into the

9    third amendment?

10   A.  Well, it was essential.  Right?  I mean, the uncertainty

11   that we could have a worsening outlook or a downturn that

12   could cause additional draws, anything that -- or even just

13   not enough earnings to pay the dividend and thereby erode

14   the Treasury commitment, as we've talked about earlier.

15   That reduction in the Treasury commitment, once it's capped,

16   created the prospect of instability in the market.

17   Q.  So --

18   A.  And maintaining stability was essential for me.

19   Q.  So we've seen on that bar chart that we're going to go

20   back to that was -- that draws on -- that was taken from the

21   SEC filings that in the first quarter and the second quarter

22   of 2012 -- this is reporting on the second quarter -- those

23   bars were green.  Right?

24   A.  Yes, they were.

25   Q.  So what did that mean about the first quarter and the

1    second quarter that was different from the -- however

2    many -- 14 quarters that preceded that?

3    A.  It meant that in those two quarters, Fannie Mae had

4    earned enough money to pay their dividend and did not

5    require a draw against the Treasury commitment.

6    Q.  And did those green bars on the net income chart -- what

7    did that mean about net income?

8    A.  It meant the net income was positive.

9    Q.  Why didn't that information remove the significant

10   uncertainty in the current market environment?

11   A.  Because no one -- because it would not be prudent to

12   rely upon one or two quarters' worth of earnings as

13   indicative of what's going -- what one can expect to happen

14   over the next 30 years.

15   Q.  And did the fact that those one or two quarters of

16   positive income were preceded by all those -- I'm sorry --

17   positive net worth -- I'll start over.

18          Does the fact that those two -- does the fact that

19   those two quarters of positive net worth were preceded by

20   all those quarters of negative net worth -- does that

21   history have any bearing on how you interpret the positive

22   quarters?

23   A.  Yes.

24   Q.  In what way?

25   A.  Well, because it shows what an incredibly stressful

1    economic environment we had been going through and all the

2    stress this had imposed on the companies and the massive

3    losses that they had endured.  And there's just no certainty

4    after one or two quarters that that's indicative that:

5    Okay.  That's it.  We're done.  We're not going to have

6    those bad outcomes again.

7    Q.  So let's go to page -- the last paragraph of Page 5.

8               MR. STERN:  Actually, the Court's indulgence.  I

9    apologize to the Court and the members of the jury.

10              Let's go to Page 16.  And let's go to the last

11   paragraph, please.  Same paragraph.

12   BY MR. STERN:

13   Q.  The second sentence here.

14   A.  Yes.

15              MR. STERN:  Skip down.  I apologize.  Here we go.

16   BY MR. STERN:

17   Q.  The middle of the paragraph, "Although we may

18   experience."  Can you read that sentence out loud?

19   A.  "Although we may experience period-to-period volatility

20   in earnings and comprehensive income, we do not expect to

21   generate net income or comprehensive income in excess of our

22   annual dividend obligation to Treasury over the long term."

23   Q.  And what does that mean and does it relate in any way to

24   what we've been calling circular draws?

25   A.  Yes, it does.

DeMarco - DIRECT - By Mr. Stern

1    Q.  What does it mean and how does it relate?

2    A.  So it means that, you know, the companies' expectation

3    is:  Okay.  We're going to have period-to-period volatility

4    and earnings, meaning it can go up and down.  But over time,

5    over the long term, they're saying we do not expect to earn

6    enough net income to pay that fixed 10 percent dividend,

7    which means if you're not paying the fixed 10 percent

8    dividend over time, that continued draws against that

9    Treasury commitment are going to be required.

10   Q.  And if those draws were to happen after January 1st of

11   2013, could that money be replaced in the commitment or not?

12   A.  No, it could not.

13   Q.  So it then says in the last sentence, "We also expect

14   that, over time, our dividend obligation to Treasury will

15   increasingly drive our future draws under the senior

16   preferred stock purchase agreement."

17           What is that saying?

18   A.  It's saying that the size of that dividend obligation

19   has reached a point that they're concerned that that's going

20   to be the main reason why they continue to take draws from

21   the Treasury against the Treasury commitment.

22           MR. STERN:  And let's go to Page 8, the first

23   paragraph, the second line that begins "The aggregate."  Can

24   we blow that up?

25

DeMarco - DIRECT - By Mr. Stern

```
1    BY MR. STERN:

2    Q.  So this is referring to the aggregate liquidation

3    preference on the senior preferred stock.  What does that

4    translate to?

5    A.  It translates into what the dividend is, because the

6    dividend is 10 percent of the liquidation preference.

7    Q.  I asked a bad question.

8              Is there a relationship -- it says 117.1 billion.

9    Is there a relationship between that $117.1 billion

10   aggregate liquidation preference and how much had been drawn

11   from the commitment as of that date?

12   A.  Yes.

13   Q.  What was the relationship?

14   A.  It was 117.1 billion minus 1 billion.

15   Q.  And we say minus 1 billion.  That's because it started

16   out with a billion and --

17   A.  Because it started out with a billion.  So it means if

18   the aggregate liquidation preference at this point in time

19   was 117.1 billion, you can know that at that point in time

20   they had drawn 116.1 billion.

21   Q.  And they -- this refers to an annualized dividend

22   payment.  Do you see that?

23   A.  Yes.

24   Q.  Is that just doing arithmetic to divide the 117 over

25   that period of time?
```

1    A.  It's just arithmetic.  It's taking the 10 percent of the

2    liquidation preference.

3    Q.  And that annualized dividend payment is what?

4    A.  11.7 billion.

5    Q.  And what do they say about that annual or annualized

6    dividend payment of 11.7 billion?  What are they saying

7    about that in the next sentence?

8    A.  That it exceeds their reported annual net income for

9    every year since the company had been created.

10   Q.  And what does that mean?

11   A.  It means it never earned $11.7 billion in a year.

12   Q.  So as a matter of history, what is that telling us about

13   their ability to pay the dividend without taking a draw?

14   A.  That they would have to have record earnings going

15   forward in order for that to -- record in terms of their

16   history.

17   Q.  And I'll ask an obvious question.  Is anticipating

18   record earnings the worst-case scenario?

19   A.  No.

20   Q.  Is it the base-case scenario?

21   A.  No.

22   Q.  What is it?

23   A.  It's -- that would be quite something to, you know,

24   guarantee you're never -- you're always going to earn more

25   than you've ever earned before.

DeMarco - DIRECT - By Mr. Stern

1    Q.  As it turns out, did that happen?

2    A.  In some years.

3    Q.  So let's look at DX -- just to back up for a minute,

4    when they are saying that they don't expect to generate

5    income in excess of the dividend obligation over the long

6    term, did they -- were they aware of the first-quarter

7    results?

8    A.  Yes.

9    Q.  Were they aware of the second-quarter results?

10   A.  Yes.

11   Q.  So let's go to Freddie Mac, DX-477.  So I just gave it

12   away.  What is this?

13   A.  This is Freddie Mac's quarterly filing for the second

14   quarter of 2012.

15   Q.  Same period as what we just saw?

16   A.  Yes.

17   Q.  Let's go to the second-to-the-last page.

18           Who is signing here and what's the date?

19   A.  The CEO, Don Layton, is signing.  The date is August

20   7th, 2012.

21   Q.  And let's go -- that name will be familiar to the

22   members of the jury.

23           Next page?  Another familiar name.  Who's this?

24   A.  Ross Kari, the CFO, also dated August 7th, 2012.

25   Q.  Okay.  So on this one, let's go to Page 5.  This also

     1    has a section entitled Executive Summary?

     2    A.  Yes.

     3    Q.  Let's go to Page 14.  Do you see the section that says

     4    Long-Term Financial Stability?

     5    A.  "Sustainability."  Yes.

     6    Q.  I'm sorry.  Sustainability.

     7            Do you see that section?

     8    A.  Yes, sir.

     9    Q.  Do you see the first sentence?

    10    A.  Yes.

    11    Q.  And what is that saying?

    12    A.  It says, "There is significant uncertainty as to our

    13    long-term financial sustainability."

    14    Q.  And is that -- not exactly the same words, but is that

    15    in essence what you understood the Fannie filing to be

    16    saying?

    17    A.  Yes.

    18    Q.  And then keep reading.  What does that next paragraph

    19    say?

    20    A.  It says, "We expect to request additional draws under

    21    the purchase agreement in future periods.  Over time, our

    22    dividend obligation to Treasury will increasingly drive

    23    future draws.  Although we may experience period-to-period

    24    variability in earnings and comprehensive income, it is

    25    unlikely that we will generate net income or comprehensive

 1    income in excess of our annual dividends payable to Treasury

 2    over the long term."

 3    Q.  So what is this saying about Freddie's expectations of

 4    being able to pay the fixed 10 percent dividend?

 5    A.  Same as Fannie:  They don't expect that over time

 6    they're going to be able to meet it without taking

 7    additional draws.

 8    Q.  So let's go to Page 119.  Do you see the section that is

 9    headed Government Support For Our Business?

10    A.  Yes.

11    Q.  Could you please read that first short paragraph and

12    explain your understanding of what's meant there.

13    A.  "We are dependent upon the continued support of Treasury

14    and FHFA in order to continue operating our business.  Our

15    ability to access funds from Treasury under the purchase

16    agreement is critical to keeping us solvent and avoiding the

17    appointment of a receiver by FHFA under statutory mandatory

18    receivership provisions."

19           What I believe this is saying is that they are

20    entirely dependent on that Treasury commitment to continue

21    to operate.  And it is -- their ability to access funds

22    under the remaining commitment is going to be essential to

23    keeping them solvent and avoiding a mandatory receivership.

24    Q.  When you say "keeping them solvent," the jury has heard

25    testimony that the Treasury commitment was a source of

1    capital for the GSEs.  Do you agree with that?

2    A.  Yes.

3    Q.  And how did that operate?

4    A.  So, I mean, when the senior preferred stock purchase

5    agreement was entered into, it was a -- it was an equity

6    transaction.  Treasury was taking an equity; that is, a

7    capital stake.  They were providing capital into Fannie and

8    Freddie.  They were doing it in a senior position, meaning

9    their position was senior to the other shareholders.

10           But this was capital.  It was not a loan; it was

11   capital.  And that capital is what market participants are

12   relying upon that's going to ensure the solvency of Fannie

13   and Freddie and give them confidence that they should

14   continue to purchase the debt and mortgage-backed securities

15   issued by Fannie and Freddie.

16   Q.  So the capital represented by the commitment is

17   available so long as there's something in the commitment.

18   Is that the idea?

19   A.  That's correct.

20   Q.  So let's take a look at Page 119.

21           MR. STERN:  Same section, next page.  I'm sorry.

22   The third -- thank you.

23   BY MR. STERN:

24   Q.  So the paragraph that begins at "June 30th, 2012."

25   A.  Yes.

DeMarco - DIRECT - By Mr. Stern

1    Q.  Do you see that?

2    A.  Yes.

3    Q.  It says, "As of June 30th, 2012" -- and that's the end

4    of the second quarter, right?

5    A.  Yes.

6    Q.  -- "our annual cash dividend obligation to Treasury on

7    the senior preferred stock is 7.2 billion."

8            Do you see that?

9    A.  Yes.

10   Q.  And what's that referring to more specifically?

11   A.  10 percent of the liquidation preference.  It's their

12   required dividend under the PSPA.

13   Q.  And it says that that exceeds our annual historical

14   earnings in all but one period.

15            What did that mean?

16   A.  It means that in Freddie Mac's history, there's only one

17   year in which they earned more than $7.2 billion.

18   Q.  So only one year in which they've earned enough to pay

19   the dividend as a matter of historical trend?

20   A.  Yes.

21   Q.  So let's take a look now at the fourth paragraph under

22   Government Support For Our Business.  Do you see that?

23   Through June 2012?

24   A.  Yes.

25   Q.  Everyone can read this for themselves.  Can you

1    summarize what this was saying to you and everyone else in

2    August of 2012?

3    A.  So what this paragraph is referring to is that we are

4    going to have an additional financial obligation payable to

5    Treasury; that is, the periodic commitment fee, and that

6    that also -- having to pay that will negatively impact our

7    future net worth.  And it notes that it's been waived, you

8    know, up to this point and not been established, but they

9    expect that the fee could be substantial.

10              So this could contribute to additional draws that

11   would increase liquidation preference, increase future

12   dividends and so --

13   Q.  Does it also talk in the second sentence about payment

14   and -- payment of senior preferred dividends, does that

15   again refer to the 10 percent fixed dividend?

16   A.  Yes.

17   Q.  So what does that second sentence say about payment of

18   that dividend?

19   A.  I'm sorry, Mr. Stern.  I'm -- the second sentence of

20   this paragraph, "In addition, cash payment"?

21   Q.  No.  Right.  "Continued cash payment."  Do you see the

22   paragraph beginning "Through June 2012"?

23   A.  Yes.

24   Q.  The second sentence.

25   A.  Oh, I'm sorry, Mr. Stern.  Yes.

1          "Continued cash payment of senior preferred

2     dividends will have an adverse impact on our future

3     financial condition and net worth."

4          So this is referring just to the 10 percent

5     dividend and saying that continuing to pay that each

6     quarter, we expect it to have an adverse impact on our

7     financial condition and our net worth.  That's what it says.

8     Q.  So I want you to read the last sentence and then I want

9     you to explain whether there is any relationship between

10    what's being said there and what we've described as circular

11    draws.

12    A.  Yes.  The last sentence says, "As a result of additional

13    draws and other factors, the liquidation preference of, and

14    the dividends we owe on, the senior preferred stock would

15    increase; and therefore, we may need additional draws from

16    Treasury in order to pay our dividend obligations; and, B,

17    there is significant uncertainty as to our long-term

18    financial sustainability."

19    Q.  And -- go ahead.

20    A.  What this is saying -- the first part is a direct

21    reference to borrowing from Treasury in order to pay the

22    dividend required to Treasury.  And the latter part is

23    simply saying if you put all this together, there is

24    significant uncertainty as to the long-term financial

25    sustainability of Freddie Mac.

1    Q.  And putting all of this together, was what Fannie and

2    Freddie were reporting in these SEC filings -- did that --

3    was that consistent or inconsistent with your understanding

4    of their situation in August of 2012?

5    A.  Consistent.

6    Q.  Did what they reported confirm or contradict your

7    understanding?

8    A.  Confirmed.

9    Q.  So we just referred to the PCF, or the periodic

10   commitment fee.  I'd like to just take a minute or two to

11   talk about that.

12        You testified that Treasury waived -- and by that

13   you mean give up, I understand?

14   A.  Yes.

15   Q.  Treasury waived the fee.  And did they do that once?  As

16   of August 2012, before the third amendment, was that waiver

17   a one-time thing or did it happen more than once?

18   A.  More than once.

19   Q.  Tell us about that.

20   A.  The first waiver was actually, if you will, an

21   amendment, part of the second amendment, where the original

22   obligation was for the commitment fee to start being paid in

23   2010.  The second amendment pushed it off a whole year,

24   changed the date by a year.

25        At that point, starting in 2011, Treasury made

DeMarco - DIRECT - By Mr. Stern

1    their determination on a quarterly basis to waive the

2    commitment fee.

3    Q.  And let's take a look at -- how did they communicate

4    that waiver?

5    A.  A letter from Treasury to me, saying that they were

6    exercising their right to waive the commitment fee for the

7    coming quarter.

8    Q.  So will you accept my math that there were eight PCF

9    waiver letters from the first to the last?

10   A.  Yes.

11   Q.  And the last waiver letter --

12   A.  No.  I'm sorry, Mr. Stern.  Eight.  There's four

13   quarters in 2011.  So then four in 2012.  Yes.  There were

14   eight quarters for which it was waived.

15   Q.  I didn't think I needed a Ph.D. in economics.

16   A.  Well, that's -- there were waivers in a number of

17   letters.

18   Q.  Let's take a look at the first PCF waiver, then.

19          MR. STERN:  DX-272, please.

20   BY MR. STERN:

21   Q.  What is this dated?

22   A.  December 29th, 2010.

23   Q.  And just generally, before we talk about the specific

24   language in the letter, how did you interpret or understand

25   those waiver letters over time?  What were they saying to

1    you?

2    A.  Over time, what they were saying is that Treasury was

3    finding the conditions not ripe to assess a fee because

4    there would be no added compensation to Treasury and the

5    taxpayer.

6         But I understood them to be a reaffirmation of

7    Treasury's intent to apply this fee and to collect that

8    added revenue to -- when the conditions allowed for it.

9    Q.  So let's take a look at what the letter actually says in

10   the last paragraph.  It says, "Treasury will reevaluate the

11   situation during the next calendar quarter to determine

12   whether the PCF should then be set."

13        And what did that mean?

14   A.  It means that they're -- that the waiver they're

15   providing is only for one quarter and they're going to make

16   an independent judgment about it in the coming quarter.

17   Q.  And then the next sentence says, "Treasury remains

18   committed to protecting taxpayers and ensuring that future

19   positive earnings of the enterprises are returned to

20   taxpayers as compensation for their investment."

21        Do you see that?

22   A.  Yes.

23   Q.  And how did you interpret that sentence?

24   A.  I understood this sentence to mean that the taxpayers

25   through the Treasury commitment was the only effective

1        source of capital that was keeping Fannie Mae and Freddie

2        Mac alive and operating and in business.  And it was the

3        Treasury's intent that the earnings of the company would

4        flow back to Treasury in compensation for that commitment

5        once there was actually income that could be collected.

6        Q.  And did you have an understanding of how that fee would

7        be set --

8        A.  We had --

9        Q.  -- the process?

10       A.  The process?  Yes.  The process for it was it was to be

11       negotiated between the Treasury Department and the FHFA in

12       consultation with the chairman of the Federal Reserve.

13       Q.  Let's go to the last waiver letter before the third

14       amendment.

15              MR. STERN:  I'm sorry.  It's DX-4 -- that was 469.

16       I'm sorry.  Let's go to DX-469.

17       BY MR. STERN:

18       Q.  What's the date of this?

19       A.  June 25th, 2012.

20       Q.  And do you see a reference to -- let's go to the second

21       paragraph.  What is this second paragraph saying in June of

22       2012?

23       A.  Treasury is advising me that they have determined that

24       they're going to waive the PCF for the third quarter of

25       2012.

1    Q.  And what does it go on to say about why they're doing

2    it?

3    A.  It said it takes that step due to the continued

4    fragility of the mortgage market and the belief that the

5    imposition of the PCF at this time would not fulfill its

6    intended purpose of generating increased compensation to the

7    American taxpayer.

8    Q.  And the last paragraph of the letter?  You don't need to

9    read it again.  That says the same thing as the first letter

10   we looked at, right?

11   A.  Yes.

12   Q.  So taking this letter that you received, that FHFA

13   received, sent to you on June 25th of 2012, and what

14   Treasury was saying here, how did this bear on your thinking

15   in July -- the end of June, July, early August of 2012 about

16   the third amendment?

17   A.  That it was -- it reinforced why I thought we needed to

18   do the third amendment, as Treasury is reinforcing to me

19   that there is this periodic commitment fee.  It's been part

20   of the PSPA from the beginning.  And it's Treasury's intent

21   to exercise the -- to assess the fee or collect the future

22   positive earnings of Fannie and Freddie because -- once

23   there are such earnings.

24          MR. STERN:  Your Honor, I'm about to switch

25   topics.  I can keep going.

DeMarco - DIRECT - By Mr. Stern

```
1              THE COURT:  We can take our lunch recess.

2              We'll come back at 1:30.  Don't talk about the

3       case.  Don't let anyone talk to you about the case.  Have a

4       nice lunch.

5              (Whereupon, the jury exited the courtroom at 12:28

6       p.m. and the following proceedings were had:)

7              (Thereupon, a luncheon recess was taken, after

8       which the following proceedings were had:)

9              (Proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2344

1                          <u>**CERTIFICATE**</u>

2

3                  I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8

9

10                 Dated this 8th day of August, 2023.

11

12               <u>/s/ Lisa Edwards, RDR, CRR</u>
                 Official Court Reporter
13               United States District Court for the
                   District of Columbia
14               333 Constitution Avenue, Northwest
                 Washington, D.C. 20001
15               (202) 354-3269

16

17

18

19

20

21

22

23

24

25

2345

## $

**$180** [2] - 44:6, 44:8
**$200** [1] - 30:23
**$311** [1] - 8:17
**$71** [1] - 15:7

## '

**'11** [2] - 30:24, 31:9
**'12** [2] - 30:24, 31:9
**'21** [1] - 71:6
**'22** [1] - 71:6
**'significant** [1] - 61:10

## /

**/s** [1] - 96:12

## 1

**1** [4] - 48:11, 50:23, 81:14, 81:15
**10** [16] - 9:24, 29:21, 31:8, 39:9, 39:12, 54:9, 55:1, 70:13, 80:6, 80:7, 81:6, 82:1, 85:4, 87:11, 88:15, 89:4
**10-K** [1] - 74:15
**10-Q** [1] - 75:18
**10020** [1] - 2:5
**10:11** [1] - 1:7
**10:12** [1] - 5:9
**11** [2] - 1:13, 4:18
**11.7** [3] - 82:4, 82:6, 82:11
**116.1** [1] - 81:20
**117** [1] - 81:24
**117.1** [4] - 81:8, 81:9, 81:14, 81:19
**118.3** [1] - 67:11
**119** [2] - 85:8, 86:20
**11:43** [1] - 73:22
**11:57** [1] - 74:3
**12** [1] - 12:2
**1251** [1] - 2:4
**12:28** [1] - 95:5
**13-1053** [2] - 1:4, 4:2
**13-1288** [2] - 1:10, 4:2
**14** [3] - 66:20, 78:2, 84:3
**1401** [1] - 1:22
**148.3** [1] - 67:14
**14th** [2] - 59:10, 60:2

**1523** [1] - 1:18
**16** [2] - 76:21, 79:10
**17** [1] - 34:16
**17th** [5] - 73:5, 73:7, 74:20, 74:25, 75:11
**19087** [1] - 1:25
**19th** [9] - 32:6, 32:16, 33:20, 37:18, 37:19, 38:16, 43:7, 45:20, 59:5
**1:30** [1] - 95:2
**1st** [4] - 35:13, 40:9, 73:7, 80:10

## 2

**2** [3] - 48:11, 48:13, 48:18
**200** [1] - 35:18
**20001** [3] - 2:9, 2:13, 96:14
**20005** [1] - 1:22
**20036** [1] - 1:18
**2006** [1] - 62:12
**2007** [1] - 25:7
**2008** [6] - 10:5, 10:6, 11:4, 15:5, 45:10, 68:5
**2009** [11] - 5:16, 11:25, 13:2, 13:19, 13:22, 13:23, 14:2, 35:24, 74:19
**2010** [7] - 7:24, 13:8, 13:11, 13:17, 30:24, 90:23, 91:22
**2011** [14] - 6:4, 7:24, 10:18, 11:4, 12:12, 13:11, 15:3, 15:12, 25:7, 27:10, 68:6, 90:25, 91:13
**2012** [69] - 5:25, 9:21, 10:7, 10:20, 11:21, 12:13, 12:23, 15:9, 15:12, 15:16, 23:25, 25:4, 25:8, 27:6, 30:14, 30:16, 30:20, 30:25, 31:14, 31:16, 31:17, 32:6, 32:16, 35:2, 36:8, 37:19, 38:16, 45:4, 45:18, 49:13, 50:12, 51:1, 52:9, 55:15, 56:25, 58:7, 59:10, 60:2, 68:15, 70:22, 71:1, 71:5, 71:8, 73:3, 73:4, 73:9, 73:12, 75:5, 75:8, 75:10, 75:18, 76:6, 77:22, 83:14, 83:20, 83:24,

86:24, 87:3, 87:23, 88:2, 88:22, 90:4, 90:16, 91:13, 93:19, 93:22, 93:25, 94:13, 94:15
**2013** [5] - 35:13, 70:22, 71:1, 71:5, 80:11
**2014** [5] - 8:16, 8:18, 70:22, 71:1, 71:5
**2019** [1] - 70:22
**202** [2] - 2:14, 96:15
**2021** [1] - 70:23
**2022** [5] - 66:23, 67:8, 67:13, 68:17, 70:23
**2023** [2] - 1:7, 96:10
**216** [1] - 63:13
**218** [1] - 63:10
**24** [1] - 5:16
**24th** [1] - 74:19
**25** [1] - 52:10
**25th** [4] - 52:9, 52:22, 93:19, 94:13
**266** [1] - 67:20
**266.6** [2] - 66:22, 67:16
**269** [1] - 63:10
**280** [1] - 1:25
**29** [1] - 27:10
**29th** [3] - 27:22, 33:11, 91:22
**2nd** [3] - 27:6, 31:17, 33:11

## 3

**30** [5] - 26:15, 72:17, 75:10, 78:14
**30-year** [5] - 26:5, 26:7, 26:8, 26:13, 26:14
**30th** [11] - 40:22, 40:25, 41:4, 41:10, 41:25, 73:12, 75:8, 75:20, 76:7, 86:24, 87:3
**311** [1] - 8:19
**31st** [3] - 35:2, 35:11, 40:11
**333** [2] - 2:12, 96:14
**354-3269** [2] - 2:14, 96:15
**381** [1] - 3:9
**3Q** [1] - 13:2

## 4

**4** [3] - 3:9, 7:1, 8:2
**400** [1] - 35:19
**469** [1] - 93:15
**4Q** [2] - 13:2, 14:2

## 5

**5** [6] - 3:6, 43:1, 60:14, 76:15, 79:7, 83:25
**536** [1] - 4:19

## 6

**6** [5] - 33:5, 33:15, 34:3, 34:15, 34:16
**60** [2] - 62:25, 67:17
**600** [1] - 20:20
**601** [1] - 2:9
**6706** [1] - 2:13
**6th** [1] - 44:4

## 7

**7** [1] - 61:20
**7.2** [2] - 87:7, 87:17
**76** [1] - 4:18
**77** [1] - 4:18
**7th** [4] - 45:18, 45:24, 83:20, 83:24

## 8

**8** [3] - 1:7, 60:14, 80:22
**8th** [8] - 49:18, 50:12, 51:1, 51:17, 51:23, 76:6, 76:8, 96:10

## 9

**9** [1] - 11:10
**9th** [3] - 56:25, 57:12, 58:18

## A

**a.m** [4] - 1:7, 5:1, 73:23, 74:3
**ability** [7] - 35:23, 35:24, 77:5, 82:13, 85:15, 85:21, 96:7

**able** [8] - 35:8, 55:1, 60:19, 62:5, 70:12, 73:1, 85:4, 85:6
**abstract** [2] - 9:5, 9:8
**accept** [1] - 91:8
**access** [2] - 85:15, 85:21
**accomplishing** [1] - 32:7
**accountant** [3] - 17:6, 58:19, 58:21
**accounting** [2] - 56:14, 56:19
**accurate** [4] - 96:4
**acting** [4] - 20:19, 38:6, 43:8, 43:21
**Action** [3] - 1:3, 4:1, 4:4
**action** [2] - 41:3, 60:23
**ACTION** [1] - 1:11
**actual** [2] - 6:13, 7:16
**ADAM** [1] - 2:2
**add** [2] - 40:16, 67:15
**added** [1] - 92:4, 92:8
**addition** [1] - 88:20
**additional** [8] - 39:11, 77:12, 84:20, 85:7, 88:4, 88:10, 89:12, 89:15
**address** [1] - 43:3
**adjusted** [1] - 30:24
**adjusting** [1] - 56:19
**Administration's** [1] - 34:4
**adverse** [3] - 37:1, 89:2, 89:6
**advice** [1] - 55:25
**advising** [1] - 93:23
**advisor** [2] - 17:2, 17:4
**advisory** [1] - 21:8
**advocates** [2] - 23:6
**affect** [2] - 25:10, 39:16
**AGENCY** [1] - 1:6
**aggregate** [4] - 80:23, 81:2, 81:10, 81:18
**ago** [2] - 34:25, 72:16
**agree** [4] - 7:21, 26:24, 35:25, 86:1
**agreed** [1] - 51:20
**Agreement** [1] - 4:4
**AGREEMENT** [1] - 1:11

2346

**agreement** [6] - 35:17, 48:17, 80:16, 84:21, 85:16, 86:5
**agreements** [1] - 63:20
**ahead** [2] - 56:22, 89:19
**al** [2] - 1:3, 1:7
**Alert** [1] - 57:1
**Alfred** [5] - 17:18, 17:22, 18:22, 58:11, 58:13
**alive** [1] - 93:2
**allowed** [1] - 92:8
**almost** [1] - 18:21
**amend** [1] - 35:8
**amending** [3] - 40:15, 41:3, 53:15
**amendment** [45] - 5:16, 5:19, 5:23, 9:1, 9:17, 9:20, 15:16, 15:21, 15:24, 21:14, 23:22, 25:5, 26:23, 30:4, 30:6, 30:9, 30:11, 30:23, 35:1, 41:15, 41:17, 43:6, 45:13, 51:22, 55:14, 55:17, 55:20, 56:5, 56:15, 56:20, 57:16, 58:6, 69:24, 72:7, 73:4, 73:17, 74:19, 77:9, 90:16, 90:21, 90:23, 93:14, 94:16, 94:18
**amendments** [1] - 57:9
**American** [1] - 94:7
**Americas** [1] - 2:4
**amount** [7] - 35:13, 35:14, 36:4, 37:16, 37:17, 62:3, 66:23
**amounts** [1] - 63:22
**analysis** [2] - 15:23, 18:16
**analyst** [7] - 21:22, 21:24, 22:7, 60:4, 60:5, 60:7, 60:25
**analysts** [2] - 22:3, 39:17
**analyze** [1] - 16:10
**Andre** [1] - 17:9
**announce** [1] - 43:15
**annual** [10] - 7:25, 54:9, 74:16, 79:22, 82:5, 82:8, 85:1, 87:6, 87:13
**annualized** [3] - 81:21, 82:3, 82:5
**answer** [1] - 38:22
**anticipating** [1] -

82:17
**anyway** [2] - 31:12, 42:10
**apart** [1] - 22:24
**apologies** [1] - 48:4
**apologize** [3] - 66:11, 79:9, 79:15
**APPEARANCES** [1] - 2:1
**aPPEARANCES** [1] - 1:16
**applied** [1] - 61:19
**apply** [1] - 92:7
**appointment** [1] - 85:17
**approval** [1] - 60:20
**areas** [1] - 64:25
**arithmetic** [2] - 81:24, 82:1
**ARNOLD** [1] - 2:8
**ASIM** [1] - 2:6
**aspects** [1] - 51:22
**assess** [2] - 92:3, 94:21
**assets** [1] - 60:9
**assistant** [1] - 27:16
**associated** [2] - 52:12, 53:1
**Association** [1] - 23:11
**attached** [3] - 59:23, 66:18, 71:24
**attaching** [1] - 59:19
**attachments** [1] - 64:17
**Attachments** [1] - 59:19
**attended** [1] - 19:19
**attendees** [1] - 46:20
**attention** [3] - 21:23, 22:21, 41:16
**attorney** [1] - 58:12
**August** [26] - 1:7, 5:25, 15:18, 25:1, 56:25, 57:12, 58:6, 58:18, 73:3, 73:4, 73:7, 74:19, 74:25, 75:11, 76:6, 76:8, 83:19, 83:24, 88:2, 90:4, 90:16, 94:15, 96:10
**authority** [1] - 36:1
**authorizes** [1] - 60:18
**availability** [2] - 30:17, 44:12
**available** [10] - 31:17, 33:2, 35:4, 43:19, 46:9, 46:10, 46:11, 46:14, 86:17

**Avenue** [1] - 1:18, 1:22, 2:4, 2:9, 2:12, 96:14
**avoiding** [2] - 85:16, 85:23
**aware** [6] - 10:10, 22:23, 58:4, 61:25, 83:6, 83:9

**B**

**backed** [11] - 22:6, 24:13, 26:3, 26:6, 36:13, 39:17, 60:7, 61:12, 62:6, 86:14
**Background** [1] - 32:18
**background** [1] - 34:1
**Backstop** [1] - 59:12
**backstop** [3] - 59:14, 59:16, 61:3
**bad** [9] - 49:7, 57:6, 62:14, 70:7, 70:8, 72:20, 73:2, 79:6, 81:7
**Bank** [3] - 60:4, 60:5, 60:11
**Bankers** [1] - 23:11
**bar** [4] - 10:17, 66:14, 67:21, 77:19
**bars** [10] - 10:13, 10:16, 12:7, 12:14, 13:12, 31:13, 64:4, 77:23, 78:6
**base** [10] - 8:6, 8:23, 69:11, 69:16, 69:18, 69:24, 71:13, 72:5, 82:20
**base-case** [3] - 8:6, 8:23, 82:20
**base-to-improving** [1] - 69:16
**based** [2] - 30:22, 37:7
**baseline** [1] - 8:6
**basis** [3] - 18:21, 19:14, 91:1
**bear** [2] - 53:10, 94:14
**bearing** [1] - 78:21
**became** [3] - 31:7, 51:22, 56:20
**becomes** [3] - 39:11, 62:10, 62:18
**BEFORE** [1] - 1:13
**began** [3] - 10:19, 15:15, 23:25
**begin** [3] - 9:19,

68:5, 68:14
**beginning** [9] - 11:21, 11:25, 15:12, 23:19, 27:1, 31:14, 61:6, 88:22, 94:20
**begins** [8] - 7:13, 8:2, 53:11, 60:16, 62:7, 76:25, 80:23, 86:24
**behalf** [1] - 24:12
**behind** [1] - 26:19
**belief** [1] - 94:4
**below** [1] - 46:23
**benefit** [1] - 22:3
**Benson** [2] - 64:24, 66:12
**Benson's** [2] - 65:24, 66:3
**BERGER** [1] - 2:3
**BERGMAN** [1] - 2:7
**BERKLEY** [1] - 1:17
**BERNSTEIN** [1] - 2:3
**best** [2] - 50:24, 96:7
**between** [27] - 9:19, 15:14, 19:18, 27:24, 33:11, 37:8, 38:5, 42:19, 48:17, 49:22, 63:20, 73:7, 74:18, 81:9, 89:9, 93:11
**beyond** [1] - 39:12
**big** [3] - 20:18, 45:2, 63:17
**big-picture** [1] - 45:2
**bigger** [1] - 49:24
**billion** [27] - 8:17, 8:19, 15:7, 30:23, 35:18, 35:19, 44:6, 44:8, 66:22, 67:11, 67:14, 67:16, 67:20, 81:8, 81:9, 81:14, 81:15, 81:16, 81:17, 81:19, 81:20, 82:4, 82:6, 82:11, 87:7, 87:17
**bird** [1] - 28:16
**bird-watching** [1] - 28:16
**birder** [1] - 28:14
**birds** [6] - 28:11, 28:12, 28:13, 28:15, 28:19, 28:20
**bit** [6] - 6:2, 21:25, 24:10, 56:22, 61:5, 63:2
**biweekly** [3] - 16:22, 19:11, 19:14
**blow** [1] - 80:24
**board** [10] - 19:16, 19:17, 19:18, 20:25, 21:2, 21:5, 21:7, 21:8,

64:24, 65:20
**boards** [1] - 20:6
**BOIES** [1] - 1:21
**book** [1] - 31:2
**borrower** [1] - 24:10
**borrower's** [1] - 24:12
**borrowers** [1] - 24:14
**borrowing** [1] - 89:21
**bottom** [7] - 10:10, 11:14, 27:9, 47:1, 47:5, 63:5, 67:12
**BOZMAN** [1] - 2:3
**Brad** [1] - 64:10
**break** [1] - 39:5
**briefing** [1] - 34:9
**briefly** [2] - 24:7, 58:9
**bring** [2] - 22:21, 51:9
**brings** [1] - 73:3
**broad** [1] - 23:12
**broader** [1] - 22:13
**broke** [3] - 48:19, 48:20, 48:23
**brought** [2] - 21:22, 42:5
**bullet** [7] - 7:2, 8:2, 34:21, 34:23, 34:24, 36:3, 36:5, 36:6, 36:18, 36:21, 36:23, 36:24, 37:10, 37:11, 38:24, 38:25, 40:12, 41:22, 48:21, 49:1, 53:11
**bullets** [2] - 44:17, 47:21, 47:22
**Burns** [1] - 32:5
**business** [4] - 26:13, 31:2, 85:14, 93:2
**Business** [2] - 85:9, 87:22
**butcher** [1] - 7:17
**buy** [1] - 36:13
**BY** [37] - 2:10, 5:12, 6:8, 10:1, 11:11, 13:10, 14:24, 27:3, 27:20, 28:8, 31:6, 32:3, 33:24, 34:17, 43:12, 45:15, 49:8, 49:16, 50:8, 51:11, 52:5, 55:11, 58:24, 62:21, 63:1, 64:6, 65:10, 67:19, 71:23, 72:13, 74:7, 79:12, 79:16, 81:1, 86:23, 91:20, 93:17

# C

**CAITLIN** [1] - 2:3
**calendar** [2] - 40:7, 92:11
**cannot** [1] - 55:6
**cap** [9] - 30:14, 35:3, 35:6, 35:9, 35:12, 36:4, 36:12, 37:3, 37:5
**cap's** [1] - 37:13
**capacities** [1] - 20:8
**capacity** [2] - 38:6, 39:20
**capital** [8] - 86:1, 86:7, 86:10, 86:11, 86:16, 93:1
**capped** [7] - 30:21, 30:22, 35:1, 61:2, 61:15, 62:1, 77:15
**caps** [2] - 54:10, 55:2
**carry** [1] - 44:25
**case** [26] - 8:6, 8:21, 8:22, 8:23, 9:2, 9:4, 9:7, 9:10, 9:12, 9:16, 25:11, 25:24, 35:9, 53:5, 62:14, 62:15, 69:12, 69:18, 69:21, 69:25, 71:13, 72:5, 82:18, 82:20, 95:3
**Case** [2] - 1:10, 4:2
**cash** [4] - 87:6, 88:20, 88:21, 89:1
**catastrophe** [1] - 62:11
**ceiling** [1] - 35:3
**CEO** [6] - 19:13, 19:15, 19:20, 66:2, 75:24, 83:19
**CEOs** [1] - 19:11
**certain** [1] - 18:20
**certainly** [8] - 7:22, 9:11, 9:15, 20:23, 21:21, 24:14, 38:17, 69:15
**certainty** [1] - 79:3
**CERTIFICATE** [1] - 96:1
**certification** [1] - 75:24
**certify** [1] - 96:4
**CFO** [2] - 76:11, 83:24
**chairman** [1] - 93:12
**chances** [1] - 7:20
**change** [2] - 41:9, 65:19
**changed** [2] - 17:10, 90:24

**changes** [2] - 34:5, 37:1
**channels** [1] - 20:2
**characterize** [2] - 8:3, 32:21
**characterized** [2] - 6:17, 69:7
**chart** [9] - 10:13, 11:20, 12:3, 12:22, 12:23, 63:8, 70:9, 77:19, 78:6
**chart's** [1] - 11:2
**charters** [1] - 39:22
**charts** [1] - 12:2, 24:2
**CHECK** [1] - 1:24
**chief** [5] - 17:5, 17:6, 58:17, 58:19, 58:20
**choose** [1] - 26:5
**Christmas** [1] - 27:24
**chronology** [1] - 33:9
**circular** [4] - 37:7, 37:8, 79:24, 89:10
**circulating** [1] - 57:13
**circumstances** [1] - 56:12
**civil** [1] - 23:6
**Civil** [2] - 1:3, 4:1
**Class** [1] - 4:4
**CLASS** [3] - 1:11, 1:19, 2:2
**clause** [2] - 39:5, 39:8
**clear** [4] - 15:8, 38:16, 63:16, 69:16
**clips** [1] - 21:20
**close** [2] - 60:16, 60:18
**closed** [1] - 61:11
**closely** [1] - 46:4
**COLATRIANO** [1] - 1:17
**collect** [2] - 92:7, 94:21
**collected** [1] - 93:5
**Columbia** [2] - 2:12, 96:13
**COLUMBIA** [1] - 1:1
**column** [1] - 68:5
**combined** [3] - 63:15, 63:17, 67:2
**coming** [6] - 18:9, 54:8, 54:23, 76:8, 91:7, 92:16
**commingled** [1] -
**commitment** [50] -

15:4, 26:10, 30:17, 30:21, 35:1, 35:4, 35:8, 36:9, 37:7, 37:15, 37:16, 37:17, 37:20, 38:25, 39:2, 39:10, 44:12, 44:14, 59:1, 59:15, 61:15, 61:18, 61:19, 62:1, 62:4, 63:22, 72:6, 72:22, 73:1, 77:14, 77:15, 78:5, 80:9, 80:11, 80:21, 81:11, 85:20, 85:22, 85:25, 86:16, 86:17, 88:5, 90:10, 90:22, 91:2, 91:6, 92:25, 93:4, 94:19
**commitments** [1] - 39:19
**committed** [1] - 92:18
**common** [2] - 18:10, 68:20
**communicate** [1] - 91:3
**communications** [3] - 20:15, 31:7, 55:13
**companies** [15] - 21:22, 22:5, 22:9, 22:12, 39:4, 39:9, 39:12, 39:15, 44:9, 44:22, 49:11, 70:4, 72:17, 72:25, 79:2
**companies'** [1] - 80:2
**company** [7] - 19:12, 19:21, 63:25, 64:1, 77:5, 82:9, 93:3
**compensation** [4] - 92:4, 92:20, 93:4, 94:6
**competing** [1] - 54:6
**complete** [2] - 15:1, 96:6
**completed** [1] - 75:13
**components** [1] - 57:22
**comprehensive** [4] - 79:20, 79:21, 84:24, 84:25
**concern** [2] - 8:25, 9:1, 9:2, 25:17, 40:18, 61:2, 61:3, 62:17, 69:24, 70:3, 70:7
**concerned** [4] - 11:2, 72:15, 72:19, 80:19
**concerns** [9] - 18:5, 22:11, 37:21, 40:20, 43:2, 43:3, 58:25,

59:6, 61:1
**concluded** [1] - 95:9
**condition** [2] - 89:3, 89:7
**conditions** [5] - 20:9, 21:18, 69:5, 92:3, 92:8
**Conference** [1] - 23:11
**confidence** [4] - 36:12, 36:20, 61:18, 86:13
**confirm** [1] - 90:6
**confirmed** [1] - 90:8
**confused** [1] - 13:14
**Congress** [4] - 43:17, 44:23, 45:9, 60:20
**congressional** [1] - 60:23
**connect** [3] - 30:15, 30:19, 36:16
**connection** [3] - 15:20, 53:1, 53:4
**consecutive** [2] - 11:5, 13:2
**conservator** [10] - 15:19, 18:13, 19:24, 21:4, 21:13, 25:10, 43:24, 44:1, 44:21, 44:25
**conservatorship** [9] - 12:25, 17:5, 18:18, 26:11, 35:6, 58:14, 64:11, 70:4, 72:25
**conservatorships** [6] - 40:4, 43:16, 44:4, 44:18, 48:14, 48:16
**Conservatorships** [1] - 48:12
**consider** [2] - 21:11, 34:8
**consideration** [1] - 43:5
**considering** [2] - 23:21, 40:15
**consistent** [6] - 45:5, 45:7, 45:8, 45:11, 90:3, 90:5
**constitutes** [1] - 96:4
**Constitution** [2] - 2:12, 96:14
**consultation** [1] - 93:12
**consumer** [1] - 23:5
**consumption** [1] - 22:19
**CONT'D** [1] - 2:1
**contact** [1] - 42:12
**contemporaneous**

[1] - 50:17
**content** [1] - 57:14
**context** [7] - 6:16, 6:17, 7:22, 9:1, 17:19, 34:2, 59:14
**continue** [10] - 13:25, 25:17, 25:18, 36:12, 42:12, 44:21, 80:20, 85:14, 85:20, 86:14
**CONTINUED** [1] - 5:11
**continued** [7] - 36:10, 40:5, 80:8, 85:13, 88:21, 89:1, 94:3
**continuing** [2] - 62:1, 89:5
**contradict** [1] - 90:6
**contribute** [1] - 88:10
**contributing** [1] - 24:24
**COOPER** [1] - 1:17
**copy** [1] - 64:24
**core** [1] - 40:1
**corner** [1] - 67:12
**correct** [17] - 5:17, 7:7, 12:8, 12:21, 14:21, 15:13, 15:25, 16:1, 31:10, 31:20, 33:14, 33:16, 38:19, 42:24, 46:15, 68:1, 86:19
**correctly** [2] - 6:18, 53:5
**correspondence** [1] - 33:10
**counsel** [6] - 17:17, 17:18, 17:20, 17:21, 58:11, 58:12
**count** [1] - 74:18
**country's** [2] - 23:7, 72:23
**couple** [2] - 20:6, 70:23
**course** [1] - 5:19
**COURT** [13] - 1:1, 4:7, 4:10, 4:14, 4:16, 4:20, 4:22, 5:2, 71:20, 72:11, 73:20, 74:4, 95:1
**Court** [5] - 2:11, 2:11, 79:9, 96:12, 96:13
**Court's** [2] - 13:9, 79:8
**COURTROOM** [3] - 4:1, 4:24, 74:1
**courtroom** [4] - 4:25,

2348

73:22, 74:2, 95:5
**covenants** [1] - 48:22
**cover** [9] - 26:14, 32:13, 45:17, 46:18, 47:24, 61:15, 62:5, 71:11, 75:17
**created** [4] - 21:6, 40:4, 77:16, 82:9
**creates** [1] - 61:9
**creating** [1] - 30:14
**credibility** [1] - 65:21
**credit** [1] - 24:24
**crisis** [2] - 9:14, 62:15
**critical** [1] - 85:16
**Cross** [2] - 3:4, 17:9
**CRR** [3] - 2:10, 96:3, 96:12
**cumulative** [6] - 8:11, 8:15, 15:7, 15:8, 44:8, 65:5
**current** [4] - 24:15, 65:4, 77:1, 78:10

**D**

**D.C** [6] - 1:6, 1:18, 1:22, 2:9, 2:13, 96:14
**daily** [2] - 18:21, 21:19
**date** [15] - 8:3, 32:16, 39:2, 50:12, 52:8, 59:25, 60:1, 74:19, 76:5, 76:13, 81:11, 83:18, 83:19, 90:24, 93:18
**Dated** [1] - 96:10
**dated** [8] - 27:5, 27:21, 32:6, 37:18, 56:25, 59:10, 83:24, 91:21
**dates** [1] - 13:15
**Dave** [1] - 64:23
**DAVID** [1] - 2:7
**DAVIS** [1] - 1:20
**DAY** [1] - 1:13
**day's** [1] - 52:17
**debt** [6] - 22:6, 36:13, 39:18, 61:12, 61:17, 86:14
**December** [9] - 5:16, 27:10, 27:22, 31:9, 33:11, 35:2, 35:11, 74:18, 91:22
**decide** [1] - 69:23
**decision** [19] - 15:20, 15:24, 16:3, 16:5, 16:8, 18:13, 19:4,

19:24, 21:3, 21:13, 21:14, 23:1, 23:21, 26:23, 56:5, 56:9, 73:16, 77:8
**decision-making** [10] - 18:13, 19:4, 19:24, 21:3, 21:13, 21:14, 23:1, 56:5, 73:16
**decisions** [1] - 19:5
**deck** [6] - 32:9, 33:2, 33:18, 34:9, 34:11, 66:18
**decline** [1] - 25:18
**declines** [1] - 25:9
**declining** [2] - 25:6, 25:8
**defaults** [1] - 24:10
**DEFENDANTS** [1] - 2:6
**Defendants** [2] - 1:8, 4:6
**Defendants'** [2] - 3:9, 4:18
**DEFENSE** [2] - 3:5, 5:10
**define** [2] - 7:14, 7:15
**DeLeo** [2] - 17:7, 58:17
**DeMarco** [13] - 3:6, 4:8, 4:20, 5:4, 5:10, 5:13, 5:15, 6:9, 52:18, 53:14, 60:12, 63:3, 74:8
**demonstrated** [2] - 9:9, 35:7
**Demonstrative** [1] - 62:24
**demonstrative** [1] - 66:22
**Department** [10] - 19:23, 20:13, 44:10, 49:11, 49:23, 51:1, 52:8, 57:5, 57:10, 93:11
**dependent** [2] - 85:13, 85:20
**Depression** [1] - 9:10
**deputies** [1] - 19:13
**deputy** [1] - 17:17
**DEPUTY** [3] - 4:1, 4:24, 74:1
**describe** [2] - 16:17, 24:7
**described** [2] - 22:24, 89:10
**describing** [2] - 7:11, 36:24

**desire** [1] - 51:18
**detailed** [1] - 18:16
**determination** [1] - 91:1
**determine** [1] - 92:11
**determined** [1] - 93:23
**detour** [1] - 6:2
**Deutsche** [3] - 60:4, 60:5, 60:11
**Dharan** [2] - 62:24, 66:21, 67:17
**dialogue** [1] - 16:20
**different** [4] - 7:16, 49:18, 56:3, 78:1
**difficult** [1] - 28:20
**difficult-to-find-and-identify** [1] - 28:20
**diminish** [1] - 62:3
**dip** [1] - 25:18
**DIRECT** [1] - 5:11
**Direct** [1] - 3:4
**direct** [3] - 16:20, 44:21, 89:20
**directed** [1] - 58:18
**directly** [8] - 19:8, 22:12, 22:14, 23:15, 24:23, 39:25, 42:12, 58:13
**director** [7] - 17:4, 20:19, 38:6, 43:8, 43:21, 58:14, 58:15
**directors** [1] - 19:16
**discuss** [3] - 32:14, 34:4, 48:15
**discussed** [7] - 21:6, 28:25, 39:1, 50:25, 55:7, 59:3, 70:6
**discusses** [1] - 8:3
**discussing** [2] - 30:3, 34:24
**Discussion** [1] - 52:10
**discussion** [10] - 32:10, 32:15, 33:3, 34:3, 34:9, 47:23, 52:18, 53:9, 56:18, 64:25
**discussion's** [1] - 51:21
**discussions** [12] - 9:19, 10:19, 15:14, 15:17, 23:25, 25:4, 31:12, 45:12, 51:18, 55:12, 56:14, 56:17
**distribution** [1] - 58:3
**District** [3] - 2:11, 2:12, 96:13
**DISTRICT** [3] - 1:1,

1:1, 1:14
**district** [1] - 96:13
**divide** [1] - 81:24
**dividend** [36] - 29:18, 29:21, 31:8, 37:14, 37:15, 39:10, 39:12, 54:9, 56:20, 70:13, 70:14, 71:11, 77:13, 78:4, 79:22, 80:6, 80:8, 80:14, 80:18, 81:5, 81:6, 81:21, 82:3, 82:6, 82:13, 83:5, 84:22, 85:4, 87:6, 87:12, 87:19, 88:15, 88:18, 89:5, 89:16, 89:22
**dividends** [13] - 8:15, 37:2, 37:4, 59:2, 61:9, 62:2, 65:5, 77:6, 85:1, 88:12, 88:14, 89:2, 89:14
**division** [2] - 17:8, 58:18
**document** [8] - 7:23, 52:3, 61:5, 61:20, 66:14, 69:8, 75:22, 76:3
**dollars** [1] - 35:3
**domestic** [2] - 20:4, 42:22
**Don** [1] - 83:19
**done** [8] - 7:23, 40:21, 41:10, 41:25, 51:19, 51:24, 57:9, 79:5
**double** [2] - 46:22, 46:23
**down** [14] - 14:23, 24:19, 25:13, 25:17, 25:18, 31:5, 35:13, 39:5, 41:6, 55:10, 58:23, 62:20, 79:15, 80:4
**downturn** [2] - 25:13, 77:11
**draft** [1] - 64:24
**drafts** [6] - 55:24, 57:16, 57:18, 57:21, 57:22, 58:6
**draw** [11] - 15:7, 15:8, 37:14, 62:1, 70:14, 70:17, 70:21, 71:3, 71:9, 78:5, 82:13
**drawn** [2] - 81:10, 81:20
**draws** [32] - 6:20, 6:23, 8:15, 8:19, 11:9, 11:22, 11:24, 14:25, 15:3, 15:6, 24:4,

36:25, 37:7, 37:8, 37:20, 44:8, 59:1, 72:21, 77:12, 77:20, 79:24, 80:8, 80:10, 80:15, 80:20, 84:20, 84:23, 85:7, 88:10, 89:11, 89:13, 89:15
**drew** [1] - 35:13
**drive** [2] - 80:15, 84:22
**due** [1] - 94:3
**during** [8] - 24:20, 32:25, 47:19, 50:16, 50:17, 62:23, 75:11, 92:11
**DX** [3] - 4:13, 4:14, 83:3
**DX-11** [1] - 4:15
**DX-272** [1] - 91:19
**DX-346** [1] - 6:7
**DX-374** [1] - 27:2
**DX-381** [1] - 32:2
**DX-393** [2] - 43:11, 43:19
**DX-4** [1] - 93:15
**DX-404** [1] - 45:14
**DX-412** [1] - 59:7
**DX-444** [1] - 49:15
**DX-469** [1] - 93:16
**DX-476** [1] - 75:15
**DX-477** [1] - 83:11
**DX-536** [1] - 4:15
**DX-76** [1] - 4:15
**DX-77** [1] - 4:15

**E**

**early** [8] - 10:21, 11:1, 23:25, 49:12, 51:7, 55:14, 73:3, 94:15
**earn** [2] - 80:5, 82:24
**earned** [5] - 78:4, 82:11, 82:25, 87:17, 87:18
**earnest** [3] - 9:19, 10:19, 15:15
**earnings** [13] - 37:13, 77:13, 78:12, 79:20, 80:4, 82:14, 82:18, 84:24, 87:14, 92:19, 93:3, 94:22, 94:23
**eating** [2] - 37:2, 37:4
**economic** [4] - 21:18, 22:13, 69:5, 79:1
**economics** [1] -

2349

91:15
**economist** [2] - 17:6, 58:17
**economy** [1] - 25:13
**Ed** [1] - 52:17
**Edward** [1] - 3:6
**EDWARD** [1] - 5:10
**Edwards** [1] - 96:12
**EDWARDS** [2] - 2:10, 96:3
**effect** [1] - 7:19
**effective** [1] - 92:25
**effectively** [1] - 35:6
**eight** [3] - 91:8, 91:12, 91:14
**either** [3] - 19:11, 31:16, 72:1
**elaborate** [1] - 63:19
**elements** [1] - 51:21
**email** [28] - 27:5, 27:7, 27:11, 27:12, 27:14, 27:21, 28:2, 28:3, 29:8, 31:24, 32:5, 33:6, 33:10, 51:15, 52:7, 55:8, 56:24, 57:13, 58:3, 58:5, 59:9, 59:23, 64:10, 64:15, 66:18, 71:24, 72:2
**emails** [1] - 27:8
**employed** [1] - 53:3
**enabling** [1] - 54:9
**end** [26] - 8:15, 8:18, 10:6, 10:18, 15:12, 27:8, 30:13, 30:14, 30:16, 30:20, 30:25, 31:24, 35:24, 36:8, 38:5, 38:10, 38:12, 40:10, 40:24, 46:1, 47:8, 51:19, 51:24, 87:3, 94:15
**ended** [6] - 11:2, 35:24, 75:7, 75:9, 75:19, 76:7
**ending** [3] - 15:9, 73:11, 73:12
**endured** [1] - 79:3
**engage** [2] - 40:15, 40:19, 41:17
**ensure** [4] - 40:5, 61:15, 72:16, 86:12
**ensuring** [2] - 61:4, 92:18
**enter** [6] - 15:21, 15:24, 23:21, 26:23, 69:23, 77:8
**entered** [4] - 4:19, 4:25, 74:2, 86:5
**entering** [1] - 72:6
**enterprise** [1] -

36:10
**enterprises** [2] - 37:2, 92:19
**entirely** [1] - 85:20
**entities** [4] - 21:10, 22:4, 22:5, 23:12
**entitled** [1] - 84:1
**entity** [1] - 68:8
**environment** [4] - 22:13, 77:1, 78:10, 79:1
**equity** [3] - 35:10, 86:5, 86:6
**erode** [2] - 70:8, 77:13
**erosion** [4] - 37:7, 37:20, 59:1, 72:6
**ESQ** [15] - 1:17, 1:19, 1:20, 1:20, 1:21, 1:23, 1:24, 2:2, 2:2, 2:3, 2:6, 2:6, 2:7, 2:7, 2:8
**essence** [2] - 52:18, 84:15
**essential** [3] - 77:10, 77:18, 85:22
**establish** [1] - 41:23
**established** [2] - 21:5, 88:8
**et** [2] - 1:3, 1:7
**EVIDENCE** [1] - 3:8
**evidence** [3] - 4:12, 4:19, 37:9
**exact** [1] - 7:19
**exactly** [3] - 38:15, 69:16, 84:14
**examination** [1] - 5:6
**EXAMINATION** [1] - 5:11
**example** [2] - 9:6, 62:15
**exceeds** [2] - 82:8, 87:13
**excess** [3] - 79:21, 83:5, 85:1
**exchange** [2] - 33:6, 51:15
**executive** [6] - 16:19, 16:20, 19:18, 27:16, 64:12, 66:4
**Executive** [3] - 76:20, 76:23, 84:1
**executives** [7] - 16:22, 17:1, 18:15, 19:20, 32:6, 42:6, 55:23
**exercise** [2] - 67:12, 94:21
**exercises** [2] - 7:9, 7:25
**exercising** [1] - 91:6

**Exhibit** [2] - 3:9, 4:18
**exhibit** [2] - 34:16, 49:19
**exhibits** [1] - 4:11
**EXHIBITS** [1] - 3:8
**exited** [2] - 73:22, 95:5
**exotic** [1] - 28:15
**expect** [10] - 6:19, 78:13, 79:20, 80:5, 80:13, 83:4, 84:20, 85:5, 88:9, 89:6
**expectation** [1] - 80:2
**expectations** [1] - 85:3
**expected** [2] - 7:6, 47:23
**expects** [1] - 57:23
**experience** [6] - 9:9, 9:15, 25:9, 79:18, 79:19, 84:23
**experiencing** [1] - 24:25
**explain** [3] - 55:6, 85:12, 89:9
**expressing** [2] - 59:6, 61:2
**expression** [1] - 32:19
**extend** [1] - 60:20

## F

**facilitate** [1] - 65:1
**fact** [4] - 13:8, 78:15, 78:18
**factors** [1] - 89:13
**facts** [1] - 11:18
**fair** [1] - 32:21
**FAIRHOLME** [1] - 1:3
**familiar** [3] - 6:5, 83:21, 83:23
**FANNIE** [2] - 1:10, 2:6
**Fannie** [54] - 4:3, 10:14, 18:24, 19:8, 19:13, 19:16, 19:19, 22:6, 24:3, 24:6, 24:8, 24:11, 24:24, 25:19, 26:2, 26:7, 35:10, 36:13, 39:24, 44:3, 45:6, 58:16, 59:17, 61:7, 61:8, 61:16, 62:5, 63:21, 63:23, 64:12, 65:1, 66:2, 66:5, 67:5, 67:6, 70:12, 70:17, 70:20,

73:8, 74:24, 75:17, 75:25, 77:4, 78:3, 84:15, 85:5, 86:7, 86:12, 86:15, 90:1, 93:1, 94:22
**Fannie's** [1] - 10:4
**Fannie/Freddie** [1] - 43:16
**far** [5] - 11:2, 11:4, 12:13, 69:3, 69:5
**February** [1] - 45:4
**Federal** [1] - 93:12
**FEDERAL** [1] - 1:6
**fee** [17] - 39:1, 39:2, 39:3, 39:6, 39:11, 88:5, 88:9, 90:10, 90:15, 90:22, 91:2, 91:6, 92:3, 92:7, 93:6, 94:19, 94:21
**fell** [1] - 75:11
**felt** [2] - 44:23, 72:24
**few** [6] - 6:20, 26:22, 34:25, 42:19, 53:8, 72:15
**FHFA** [43] - 2:6, 6:3, 7:25, 9:19, 15:15, 16:13, 16:14, 16:16, 16:18, 17:21, 17:24, 18:11, 18:12, 18:23, 20:24, 21:5, 21:7, 21:8, 21:9, 21:10, 35:25, 36:25, 40:15, 42:4, 42:6, 43:8, 43:15, 44:20, 48:17, 52:10, 52:12, 53:3, 55:17, 55:20, 56:25, 58:2, 60:22, 64:12, 69:6, 85:14, 85:17, 93:11, 94:12
**FHFA's** [1] - 43:9
**FHFA-Related** [1] - 52:10
**FHFA/Treasury** [1] - 41:24
**figure** [1] - 66:22
**file** [2] - 32:8, 47:7
**filing** [8] - 74:15, 75:3, 75:4, 75:18, 75:21, 76:7, 83:13, 84:15
**filings** [13] - 10:11, 21:21, 37:25, 73:8, 73:14, 73:15, 74:8, 74:9, 74:18, 74:22, 74:25, 77:21, 90:2
**finance** [6] - 20:4, 23:8, 23:16, 34:6, 42:22, 72:23
**FINANCE** [1] - 1:6
**financed** [1] - 60:9

**Financial** [7] - 48:12, 48:25, 49:1, 65:11, 84:4
**financial** [25] - 9:13, 18:16, 18:17, 20:9, 37:25, 39:11, 39:15, 39:19, 48:14, 48:16, 48:19, 48:20, 61:10, 61:16, 62:15, 65:21, 68:20, 68:24, 76:17, 84:13, 88:4, 89:3, 89:7, 89:18, 89:24
**fine** [1] - 69:19
**finish** [1] - 41:21
**first** [52] - 10:23, 11:21, 11:25, 12:13, 13:17, 27:12, 27:14, 28:10, 31:16, 33:4, 33:17, 34:21, 34:23, 34:24, 35:5, 36:3, 37:22, 37:24, 38:17, 40:8, 41:7, 45:22, 45:25, 46:2, 46:3, 46:6, 46:7, 46:8, 51:3, 52:11, 52:14, 52:15, 52:16, 52:25, 55:14, 61:23, 64:21, 64:23, 67:20, 69:12, 77:21, 77:25, 80:22, 83:6, 84:9, 85:11, 89:20, 90:20, 91:9, 91:18, 94:9
**first-quarter** [8] - 10:23, 37:22, 37:24, 38:17, 45:22, 46:8, 51:3, 83:6
**five** [3] - 38:14, 64:17, 69:2
**fix** [1] - 5:17
**fixed** [9] - 29:21, 31:8, 39:9, 39:13, 42:17, 80:6, 80:7, 85:4, 88:15
**FLEXNER** [1] - 1:21
**flip** [5] - 52:3, 59:22, 67:17
**flow** [1] - 93:4
**focus** [6] - 30:5, 37:4, 48:13, 53:8, 63:13, 74:24
**focused** [1] - 20:9
**focusing** [1] - 51:21
**folks** [1] - 23:6
**follow** [4] - 13:5, 13:12, 14:19, 33:3
**followed** [1] - 42:10
**following** [6] - 5:1, 73:23, 73:25, 74:3, 95:6, 95:8
**followup** [1] - 29:8

2350

**FOR** [5] - 1:1, 1:17, 1:19, 2:6, 3:5
**Forecast** [1] - 65:11
**forecast** [1] - 65:20
**foreclosure** [2] - 24:18, 24:20
**foregoing** [1] - 96:4
**forever** [1] - 25:23
**formally** [1] - 40:19
**former** [1] - 58:19
**forth** [3] - 20:10, 42:7, 43:3
**forward** [4] - 4:20, 18:7, 57:20, 82:15
**foundation** [2] - 71:15, 71:17
**four** [5] - 4:11, 38:12, 38:14, 91:12, 91:13
**fourth** [11] - 7:1, 10:5, 11:3, 12:12, 13:19, 15:3, 15:4, 38:24, 38:25, 74:15, 87:21
**fourth-quarter** [1] - 74:15
**fragility** [1] - 94:4
**Framework** [1] - 48:12
**framework** [2] - 48:14, 48:19
**Frameworks** [1] - 48:25
**Freddie** [41] - 12:1, 12:4, 12:23, 14:25, 18:25, 19:8, 19:15, 19:17, 22:7, 24:6, 24:9, 24:11, 24:25, 25:20, 26:2, 26:7, 35:10, 36:14, 39:24, 44:3, 45:6, 58:16, 59:17, 61:8, 61:16, 62:5, 63:21, 63:23, 67:12, 73:8, 74:24, 83:11, 83:13, 86:8, 86:13, 86:15, 87:16, 89:25, 90:2, 93:1, 94:22
**FREDDIE** [1] - 2:7
**Freddie's** [3] - 15:3, 24:3, 85:3
**fulfill** [1] - 94:5
**full** [3] - 7:15, 17:24, 96:5
**full-time** [1] - 17:24
**funding** [5] - 36:4, 63:16, 67:1, 67:13
**Funding** [2] - 67:5, 67:8
**funds** [2] - 85:15, 85:21

**FUNDS** [1] - 1:3
**future** [16] - 6:21, 25:22, 37:3, 37:5, 37:12, 54:10, 55:2, 69:5, 80:15, 84:21, 84:23, 88:7, 88:11, 89:2, 92:18, 94:21

**G**

**Galliano** [1] - 17:9
**gather** [1] - 16:2
**gathered** [4] - 15:19, 15:20, 18:4, 56:3
**gathering** [5] - 16:18, 19:6, 23:17, 56:8, 56:9
**Geithner** [7] - 20:3, 32:15, 33:2, 34:8, 42:13, 42:24, 59:6
**general** [8] - 17:17, 17:19, 17:20, 17:21, 25:3, 58:11, 58:12
**generally** [3] - 22:17, 64:9, 91:23
**generate** [3] - 79:21, 83:4, 84:25
**generated** [1] - 55:7
**generating** [3] - 54:8, 54:22, 94:6
**gentlemen** [1] - 5:2
**given** [1] - 65:19
**golden** [1] - 65:4
**Goldstein** [1] - 20:5
**GOODHART** [1] - 1:24
**Government** [2] - 85:9, 87:22
**government** [2] - 21:10, 22:25
**GRANT** [1] - 1:24
**granular** [1] - 17:3
**Great** [1] - 9:10
**great** [2] - 9:13, 62:15
**greater** [2] - 40:16, 62:10
**green** [19] - 10:16, 10:17, 12:7, 12:9, 12:14, 13:2, 13:6, 13:12, 13:18, 13:24, 13:25, 14:2, 14:11, 14:19, 14:20, 31:13, 77:23, 78:6
**Greenlee** [1] - 58:15
**Greenly** [1] - 17:9
**GROSSMAN** [1] - 2:4
**group** [6] - 18:16, 40:20, 41:24, 42:1,

42:8, 42:23
**groups** [2] - 23:5
**GSE** [1] - 64:22
**GSE/PSPA** [1] - 59:12
**GSEs** [4] - 54:7, 54:22, 55:1, 86:1
**guarantee** [1] - 82:24
**guaranteed** [1] - 72:19
**guaranteeing** [1] - 24:9
**guaranty** [7] - 26:7, 26:11, 26:14, 26:19, 36:21, 59:17, 61:4
**guide** [2] - 44:21, 56:5

**H**

**half** [1] - 68:18
**HAMISH** [1] - 1:19
**Hampshire** [1] - 1:18
**handwriting** [4] - 46:25, 47:3, 47:11, 50:9
**handwritten** [1] - 47:11
**hard** [1] - 12:13
**head** [2] - 29:7, 45:19
**headed** [4] - 76:15, 76:18, 76:19, 85:9
**header** [4] - 27:9, 52:6, 52:7, 64:23
**heading** [1] - 48:9
**headings** [2] - 12:9
**heads** [1] - 17:8
**hear** [1] - 26:22
**heard** [15] - 6:3, 7:18, 8:21, 8:23, 15:22, 20:24, 21:25, 24:5, 29:16, 32:18, 37:6, 37:9, 39:21, 74:14, 85:24
**heightened** [1] - 62:18
**help** [4] - 16:2, 16:5, 16:7, 56:4
**helped** [1] - 19:5
**helpful** [2] - 56:11, 56:13
**helping** [1] - 21:13
**HERA** [2] - 21:6, 40:2
**hereby** [1] - 96:3
**hierarchy** [1] - 66:6
**highlights** [1] - 43:20
**highly** [1] - 18:20
**hired** [1] - 17:25

**historical** [2] - 87:13, 87:19
**history** [7] - 11:24, 14:18, 24:2, 78:21, 82:12, 82:16, 87:16
**hit** [1] - 43:20
**HOFFMAN** [1] - 2:6
**holders** [2] - 24:13, 59:18
**holiday** [1] - 29:4
**home** [2] - 25:3, 25:15
**homebuyers** [1] - 26:4
**Honor** [6] - 4:5, 4:8, 5:7, 49:6, 74:6, 94:24
**HONORABLE** [1] - 1:13
**hopeful** [1] - 51:23
**horizon** [3] - 25:24, 26:1, 26:14
**house** [6] - 6:18, 17:23, 24:8, 24:19, 24:20, 24:22, 25:6, 25:9, 25:13, 25:17, 37:1
**housekeeping** [1] - 4:9
**HOUSING** [1] - 1:6
**housing** [10] - 23:7, 23:13, 23:15, 24:5, 25:2, 34:4, 34:5, 62:10, 62:17, 72:23
**Housing** [1] - 23:10
**HUME** [5] - 1:19, 49:6, 71:15, 71:17, 72:9
**hypothetical** [1] - 72:9

**I**

**IAN** [1] - 2:6
**idea** [9] - 9:4, 9:5, 9:8, 37:20, 38:7, 38:11, 53:24, 55:4, 86:18
**identifies** [1] - 57:22
**identify** [1] - 28:20
**impact** [7] - 24:6, 39:3, 39:6, 72:4, 88:6, 89:2, 89:6
**implication** [1] - 56:19
**Implications** [1] - 61:21
**implied** [1] - 42:23
**important** [4] - 21:17, 22:23, 23:1,

24:8
**imposed** [2] - 45:9, 79:2
**imposition** [1] - 94:5
**improving** [3] - 8:5, 69:11, 69:16
**improving-outlook** [1] - 8:5
**IN** [2] - 1:10, 3:8
**in-house** [1] - 17:23
**INC** [1] - 1:3
**include** [3] - 16:21, 17:2, 18:21
**included** [4] - 19:20, 19:21, 42:5, 73:14
**including** [4] - 8:15, 15:19, 21:14, 73:16
**income** [16] - 29:12, 49:10, 78:6, 78:7, 78:8, 78:16, 79:20, 79:21, 80:6, 82:8, 83:5, 84:24, 84:25, 85:1, 93:5
**inconsistent** [3] - 45:5, 45:8, 90:3
**increase** [4] - 35:8, 88:11, 89:15
**increased** [2] - 36:4, 94:6
**increasingly** [2] - 80:15, 84:22
**incredibly** [1] - 78:25
**independent** [1] - 92:16
**indicating** [3] - 27:16, 28:5, 74:16
**indicative** [2] - 78:13, 79:4
**indicator** [1] - 22:11
**individual** [1] - 16:22
**indulgence** [2] - 13:9, 79:8
**industry** [1] - 23:4
**inform** [1] - 21:13
**information** [34] - 15:19, 15:20, 16:2, 16:7, 16:10, 16:13, 16:16, 16:18, 18:4, 18:10, 18:24, 19:2, 19:4, 19:6, 19:7, 19:22, 21:3, 21:11, 22:10, 22:25, 23:14, 23:17, 38:20, 54:19, 54:21, 54:25, 55:24, 56:3, 56:4, 56:8, 56:11, 73:13, 73:15, 78:9
**informative** [1] - 22:1
**informed** [3] - 18:12,

2351

19:4, 21:3
**informing** [1] - 36:6
**inkling** [1] - 31:13
**inside** [5] - 16:18,
18:11, 21:9, 38:20,
55:17
**instability** [2] -
72:23, 77:16
**instance** [1] - 56:8
**intended** [2] - 64:25,
94:6
**intent** [4] - 52:1,
92:7, 93:3, 94:20
**intention** [2] - 32:24,
33:1
**interact** [1] - 20:7
**interacted** [1] - 20:13
**interacting** [1] -
20:14
**interest** [3] - 23:12,
40:2, 45:9
**interested** [2] -
16:19, 30:3
**interpret** [3] - 78:21,
91:24, 92:23
**interrupted** [1] -
66:11
**introduce** [1] - 72:22
**invest** [1] - 22:5
**investment** [2] -
36:10, 92:20
**investors** [5] - 26:8,
36:17, 39:17, 61:17,
61:25
**involved** [2] - 55:20,
55:24
**issue** [2] - 26:13,
73:8
**issued** [3] - 43:8,
72:18, 86:15
**issues** [4] - 32:14,
34:4, 42:6, 56:14
**issuing** [1] - 26:3
**Item** [1] - 50:23
**items** [1] - 40:17
**itself** [1] - 9:9

## J

**January** [31] - 9:21,
10:20, 10:21, 10:22,
10:24, 11:1, 12:23,
15:16, 25:4, 27:5,
31:9, 31:14, 31:17,
32:6, 32:16, 33:5,
33:11, 33:15, 33:20,
34:3, 35:13, 37:18,
37:19, 38:16, 40:9,
43:7, 45:20, 59:5,

80:10
**Jeff** [3] - 17:5, 18:22,
19:12
**Jeffrey** [2] - 20:5,
58:14
**JESSICA** [1] - 1:21
**job** [2] - 23:4, 58:9
**jobs** [1] - 58:17
**John** [1] - 17:9
**joining** [1] - 56:1
**joint** [1] - 11:17
**jointly** [1] - 63:24
**Jon** [1] - 58:15
**Jonathan** [2] - 40:22,
**JONATHAN** [1] - 2:7
**JONES** [1] - 2:8
**JUDGE** [1] - 1:14
**judgment** [1] - 92:16
**July** [4] - 45:10, 68:5,
94:15
**jumbled** [1] - 33:8
**jump** [1] - 15:22
**jumping** [1] - 56:22
**June** [20] - 40:22,
40:25, 41:4, 41:10,
41:25, 52:9, 52:10,
52:22, 73:12, 75:8,
75:20, 76:7, 86:24,
87:3, 87:23, 88:22,
93:19, 93:21, 94:13,
94:15
**jury** [22] - 4:24, 4:25,
5:8, 6:3, 7:17, 8:21,
11:12, 11:17, 15:22,
16:17, 29:16, 37:9,
43:18, 49:4, 62:22,
73:22, 74:1, 74:2,
79:9, 83:22, 85:24,
95:5
**JURY** [2] - 1:12, 5:9
**jury's** [1] - 21:24,
24:5, 74:14
**justify** [1] - 36:10
**JX-1** [1] - 11:13

## K

**KAPLAN** [1] - 1:20
**Kari** [1] - 83:24
**KAYE** [1] - 2:8
**keep** [10] - 6:24,
20:17, 35:25, 43:5,
46:16, 47:25, 60:12,
73:1, 84:18, 94:25
**keeping** [4] - 85:16,
85:23, 85:24, 93:1
**KENYA** [1] - 1:20
**KESSLER** [1] - 1:24
**KHALELAH** [1] -

1:20
**kind** [3] - 60:11,
62:16, 72:5
**King** [1] - 1:25
**KIRK** [1] - 1:17
**known** [3] - 11:3,
51:4, 51:5
**KRAVETZ** [1] - 2:2

## L

**lacks** [2] - 71:15,
71:17
**ladies** [1] - 5:2
**lag** [1] - 38:3
**laid** [1] - 45:4
**LAMBERTH** [1] -
1:13
**language** [1] - 91:24
**Laponsky** [1] - 58:11
**large** [3] - 54:8,
54:22, 65:19
**largely** [1] - 57:20
**last** [24] - 7:13, 10:5,
28:11, 37:4, 40:12,
41:22, 61:5, 70:23,
75:13, 75:22, 76:15,
76:19, 76:22, 79:7,
79:10, 80:13, 83:17,
89:8, 89:12, 91:9,
91:11, 92:10, 93:13,
94:8
**late** [1] - 10:21
**latter** [1] - 89:22
**Lawler** [2] - 17:6,
58:16
**lawsuit** [1] - 53:2
**lawyer** [2] - 17:21,
17:23
**lawyers** [2] - 17:12,
17:14
**laying** [1] - 41:6
**Layton** [1] - 83:19
**lead** [4] - 17:21, 37:2,
42:4, 54:19
**leading** [1] - 77:8
**leads** [1] - 67:25
**learn** [1] - 38:7
**least** [5] - 14:18,
25:7, 42:25, 51:13,
74:9
**led** [3] - 15:18, 54:21,
54:25
**LEE** [1] - 1:23
**left** [3] - 5:15, 11:4,
52:12
**legal** [1] - 36:1
**legislation** [2] - 21:6,
60:18

**less** [3] - 24:21,
24:22, 25:16
**letter** [8] - 91:5,
91:11, 91:24, 92:9,
93:13, 94:8, 94:9,
94:12
**letters** [3] - 91:9,
91:17, 91:25
**leveling** [1] - 36:25
**life** [2] - 26:8, 61:18
**limit** [1] - 35:23
**line** [4] - 33:4, 52:9,
59:11, 80:23
**links** [1] - 44:13
**liquid** [1] - 40:5
**liquidation** [8] -
81:2, 81:6, 81:10,
81:18, 82:2, 87:11,
88:11, 89:13
**LISA** [2] - 2:10, 96:3
**Lisa** [1] - 96:12
**list** [1] - 41:24
**listen** [1] - 46:4
**listing** [1] - 46:19
**LITIGATION** [1] -
1:11
**Litigations** [1] - 4:4
**LITOWITZ** [1] - 2:3
**LLP** [3] - 1:21, 1:24,
2:4
**loan** [1] - 86:10
**long-term** [8] - 5:17,
34:5, 40:18, 61:10,
61:16, 84:13, 89:17,
89:24
**Long-Term** [1] - 84:4
**look** [36] - 7:1, 9:16,
9:22, 11:8, 12:1, 12:2,
12:22, 13:1, 14:25,
18:8, 25:12, 32:2,
32:11, 34:3, 50:17,
52:14, 56:21, 59:7,
63:10, 64:20, 65:7,
66:13, 67:1, 67:4,
68:4, 69:21, 75:15,
75:21, 83:3, 86:20,
87:21, 91:3, 91:18,
92:9
**looked** [3] - 38:4,
64:14, 94:10
**looking** [21] - 11:6,
11:20, 11:22, 11:24,
13:17, 15:2, 18:6,
24:3, 25:8, 25:14,
28:15, 43:13, 43:14,
45:16, 45:17, 47:21,
50:24, 59:25, 60:14,
66:19, 71:18
**looks** [2] - 13:20,
70:22

**losses** [5] - 24:24,
25:19, 30:23, 62:5,
79:3
**loud** [2] - 34:22,
79:18
**LOUIS** [1] - 2:7
**lunch** [2] - 95:1, 95:4
**luncheon** [1] - 95:7

## M

**MAC** [2] - 1:10, 2:7
**Mac** [20] - 4:3, 12:5,
12:24, 18:25, 19:15,
19:17, 22:7, 24:11,
24:25, 25:20, 26:2,
36:14, 58:16, 59:17,
61:8, 62:5, 63:21,
83:11, 89:25, 93:2
**Mac's** [3] - 24:9,
83:13, 87:16
**MAE** [1] - 2:6
**Mae** [25] - 10:14,
18:24, 19:13, 19:16,
19:19, 22:6, 24:8,
24:11, 24:24, 25:19,
26:2, 36:13, 58:16,
59:17, 61:7, 61:8,
62:5, 63:21, 64:12,
66:2, 66:5, 70:17,
75:25, 78:3, 93:1
**Mae's** [2] - 75:17,
77:4
**Mae/Freddie** [1] - 4:3
**MAE/FREDDIE** [1] -
1:10
**main** [1] - 80:20
**maintaining** [1] -
77:18
**majority** [2] - 12:24,
15:6
**managed** [1] - 63:24
**management** [1] -
64:13
**management's** [1] -
65:21
**mandatory** [2] -
85:17, 85:23
**March** [6] - 40:11,
45:18, 45:24, 49:13,
59:10, 60:2
**Mario** [18] - 17:4,
18:21, 20:14, 20:16,
27:5, 28:5, 28:14,
28:21, 29:9, 29:10,
42:4, 42:5, 55:25,
56:1, 56:24, 57:19,
59:9
**mark** [1] - 58:11

**marker** [1] - 41:6
**Market** [1] - 61:21
**market** [34] - 20:9,
21:12, 22:4, 22:8,
22:11, 23:13, 26:20,
26:21, 31:4, 32:14,
34:4, 36:7, 36:11,
37:21, 39:16, 39:22,
39:25, 40:6, 40:16,
43:2, 58:25, 61:1,
62:10, 62:17, 65:1,
69:5, 73:2, 77:1,
77:16, 78:10, 86:11,
94:4
**markets** [1] - 21:18
**marking** [1] - 31:3
**Martin** [1] - 64:10
**Mary** [5] - 20:5,
49:17, 49:22, 50:13,
52:7
**Massachusetts** [1] -
2:9
**massive** [1] - 79:2
**matches** [1] - 67:20
**math** [1] - 91:8
**matter** [5] - 4:9,
26:15, 70:6, 82:12,
87:19
**matters** [1] - 34:8
**Mayopoulos** [6] -
65:14, 65:20, 66:2,
66:8, 66:12, 76:2
**Mayopoulos's** [1] -
66:1
**MBS** [9] - 26:8,
26:13, 26:20, 36:16,
59:17, 60:7, 61:17,
61:25, 72:18
**MC** [1] - 1:10
**McFarland** [2] -
76:12, 76:13
**mean** [21] - 19:4,
23:9, 40:4, 46:10,
48:13, 49:9, 50:24,
59:14, 61:23, 77:10,
77:25, 78:7, 79:23,
80:1, 82:10, 86:4,
87:15, 90:13, 92:13,
92:24
**meaning** [3] - 61:17,
80:4, 86:8
**means** [10] - 10:17,
12:16, 26:5, 61:25,
80:2, 80:7, 81:17,
82:11, 87:16, 92:14
**meant** [6] - 21:7,
35:12, 49:10, 78:3,
78:8, 85:12
**meet** [9] - 18:18,
19:13, 23:4, 23:5,

28:4, 42:15, 43:23,
50:13, 85:6
**Meeting** [1] - 52:10
**meeting** [40] - 18:15,
27:17, 28:25, 31:23,
32:22, 32:25, 33:5,
33:13, 33:15, 33:19,
42:9, 42:20, 43:7,
45:17, 45:20, 46:18,
46:19, 46:20, 47:6,
47:17, 47:19, 47:23,
48:7, 49:12, 49:17,
49:18, 49:21, 49:22,
50:5, 50:15, 50:16,
50:18, 52:17, 52:21,
52:24, 53:6, 54:2,
64:13
**meetings** [21] -
16:21, 16:22, 16:24,
18:3, 18:12, 18:14,
19:11, 19:17, 19:19,
20:2, 20:3, 23:13,
42:6, 42:10, 42:16,
42:19, 42:21, 42:24,
43:1, 51:16, 56:1
**Meg** [1] - 32:5
**MELTZER** [1] - 1:24
**members** [11] - 5:8,
11:12, 11:16, 16:17,
29:16, 37:9, 43:18,
49:4, 62:22, 79:9,
83:22
**memo** [5] - 15:23,
52:11, 52:24, 53:25,
55:5
**mentions** [1] - 7:23
**message** [1] - 57:15
**met** [4] - 18:20,
19:16, 21:7, 34:3
**metrics** [1] - 25:8
**Michael** [1] - 52:7
**mid** [2] - 10:22,
10:24
**mid-January** [2] -
10:22, 10:24
**middle** [2] - 65:17,
79:17
**might** [10] - 6:19,
6:22, 9:11, 28:24,
30:25, 38:14, 42:19,
65:1, 65:20, 70:8
**Miller** [7] - 20:5,
49:18, 49:23, 50:2,
50:13, 51:1, 52:8
**mind** [7] - 9:6, 18:6,
25:24, 26:1, 33:25,
41:9, 41:20
**mine** [3] - 47:4,
47:13, 50:10
**minus** [2] - 81:14,

81:15
**minute** [6] - 62:19,
64:21, 67:18, 70:10,
83:3, 90:10
**minutes** [5] - 26:22,
34:25, 72:16, 73:21
**Miscellaneous** [1] -
4:2
**missed** [1] - 46:2
**mission** [3] - 39:23,
40:1, 45:5
**modeled** [1] - 7:8
**moment** [1] - 58:25
**Monday** [2] - 29:4,
29:11
**money** [4] - 37:15,
44:15, 78:4, 80:11
**Montgomery** [2] -
27:11, 27:19
**month** [2] - 42:19,
43:7
**monthly** [3] - 18:15,
42:17, 42:18
**months** [2] - 10:6,
42:19
**morning** [10] - 4:5,
4:7, 4:22, 4:23, 5:2,
5:8, 5:9, 5:13, 5:14
**MORNING** [1] - 1:13
**Morning** [1] - 52:10
**morphed** [1] - 29:15
**mortgage** [23] - 22:6,
24:9, 24:11, 24:13,
24:15, 24:23, 25:16,
26:3, 26:5, 26:6, 26:9,
26:20, 32:14, 36:13,
39:17, 39:22, 40:6,
60:7, 61:12, 62:6,
73:2, 86:14, 94:4
**Mortgage** [1] - 23:11
**mortgage-backed**
[10] - 22:6, 24:13,
26:3, 26:6, 36:13,
39:17, 60:7, 61:12,
62:6, 86:14
**mortgages** [5] -
25:15, 26:7, 60:9,
62:6
**most** [4] - 20:23,
26:4, 74:25, 75:3
**mostly** [1] - 63:13
**move** [4] - 4:11,
9:17, 29:2, 31:23
**MR** [82] - 4:5, 4:8,
4:11, 4:15, 5:7, 5:12,
6:7, 6:8, 9:24, 10:1,
11:10, 11:11, 13:9,
13:10, 14:23, 14:24,
27:2, 27:3, 27:19,
27:20, 28:7, 28:8,

31:5, 31:6, 32:2, 32:3,
33:22, 33:24, 34:15,
34:17, 43:11, 43:12,
45:14, 45:15, 49:6,
49:7, 49:8, 49:15,
49:16, 50:7, 50:8,
51:10, 51:11, 52:4,
52:5, 55:10, 55:11,
58:23, 58:24, 62:20,
62:21, 62:24, 63:1,
64:5, 64:6, 65:8,
65:10, 67:17, 67:19,
71:15, 71:16, 71:17,
71:19, 71:22, 71:23,
72:9, 72:13, 74:6,
74:7, 79:8, 79:12,
79:15, 79:16, 80:22,
81:1, 86:21, 86:23,
91:19, 91:20, 93:15,
93:17, 94:24
**MUGLER** [1] - 1:21
**multiple** [2] - 20:2,
74:22

---

# N

**name** [5] - 17:22,
47:7, 76:3, 83:21,
83:23
**names** [2] - 17:3,
17:9
**National** [1] - 23:10
**near** [4] - 34:5, 39:3,
39:6, 44:20
**near-term** [4] - 34:5,
39:3, 39:6, 44:20
**nears** [1] - 30:14
**need** [6] - 60:23,
61:9, 70:20, 72:19,
89:15, 94:8
**needed** [6] - 35:8,
41:16, 70:5, 72:16,
91:15, 94:17
**needing** [1] - 71:3
**needs** [1] - 44:21
**negative** [8] - 10:15,
11:5, 12:5, 12:17,
12:19, 12:24, 13:7,
78:20
**negatively** [1] - 88:6
**negotiated** [1] -
93:11
**Negotiating** [1] -
53:12
**net** [36] - 10:4, 10:15,
10:17, 11:5, 12:5,
12:6, 12:17, 12:20,
12:24, 24:3, 26:24,
29:12, 29:15, 31:8,

49:2, 49:3, 49:9,
49:10, 50:19, 50:25,
51:13, 51:18, 78:6,
78:7, 78:8, 78:17,
78:19, 78:20, 79:21,
80:6, 82:8, 84:25,
88:7, 89:3, 89:7
**never** [3] - 71:8,
82:11, 82:24
**New** [5] - 1:18, 1:22,
2:5, 27:24
**new** [4] - 26:3, 26:13,
26:14, 54:7
**news** [6] - 21:19,
43:14, 43:20, 57:6,
57:7
**next** [30] - 6:1, 6:19,
7:14, 14:2, 14:4, 14:6,
14:8, 14:10, 14:12,
14:14, 14:16, 27:12,
29:8, 30:11, 32:11,
32:17, 33:22, 41:22,
47:10, 50:7, 64:24,
65:12, 76:10, 78:14,
82:7, 83:23, 84:18,
86:21, 92:11, 92:17
**nice** [1] - 95:4
**Nick** [3] - 17:7, 58:20
**none** [2] - 72:8,
72:12
**nongovernment** [1] -
21:12
**Northwest** [5] - 1:18,
1:22, 2:9, 2:12, 96:14
**Nos** [1] - 4:18
**notes** [10] - 32:13,
47:6, 47:11, 47:22,
48:5, 48:6, 50:14,
50:25, 88:7, 96:5
**noteworthy** [1] -
22:22
**notice** [1] - 28:4
**noting** [2] - 39:1,
44:19
**number** [7] - 55:23,
56:24, 58:17, 64:11,
67:10, 67:25, 91:16
**numbered** [1] - 48:9
**numbers** [4] - 10:10,
10:11, 63:5, 67:15

---

# O

**oath** [1] - 5:5
**objection** [4] - 4:17,
49:6, 71:15, 72:9
**objections** [1] - 4:12
**objectives** [1] - 44:1
**obligation** [11] -

2353

24:11, 39:15, 45:8,
79:22, 80:14, 80:18,
83:5, 84:22, 87:6,
88:4, 90:22
  **obligations** [2] -
43:23, 89:16
  **observing** [1] - 36:7
  **obvious** [2] - 17:15,
82:17
  **obviously** [2] - 46:9,
46:13
  **occurred** [1] - 41:19
  **October** [3] - 6:4,
7:24
  **OF** [2] - 1:1, 1:12
  **office** [2] - 58:12,
64:11
  **official** [2] - 21:10,
69:3, 96:12
  **Official** [1] - 2:11
  **officials** [3] - 46:24,
52:8, 64:12
  **often** [2] - 42:15,
74:9
  **oftentimes** [1] -
24:21
  **once** [10] - 37:13,
42:19, 61:2, 61:15,
77:15, 90:15, 90:17,
90:18, 93:5, 94:22
  **one** [40] - 4:9, 9:11,
9:13, 17:15, 19:13,
27:7, 27:15, 28:14,
32:5, 38:3, 41:22,
42:9, 49:19, 49:22,
49:24, 49:25, 54:4,
60:16, 62:4, 62:11,
63:14, 63:17, 63:23,
63:25, 69:9, 78:11,
78:12, 78:13, 79:15,
79:4, 83:25, 87:14,
87:16, 87:18, 90:17,
92:15
  **one-on-one** [1] -
49:22
  **one-time** [1] - 90:17
  **ongoing** [3] - 16:20,
46:12, 65:1
  **open** [1] - 26:13
  **operate** [2] - 85:21,
86:3
  **operating** [5] -
22:13, 26:12, 44:19,
85:14, 93:2
  **operational** [3] -
37:1, 48:21, 48:22
  **operations** [4] -
17:5, 18:18, 58:15,
64:11
  **opportunities** [1] -

20:7
  **opposed** [1] - 17:24
  **order** [7] - 26:19,
40:15, 69:2, 82:15,
85:14, 89:16, 89:21
  **organization** [3] -
20:18, 20:22, 47:21
  **orient** [1] - 75:1
  **original** [1] - 90:21
  **originally** [1] - 20:4
  **outcome** [5] - 6:13,
6:22, 8:8, 24:17,
62:14
  **outcomes** [6] - 7:6,
7:16, 70:7, 70:8, 79:6
  **outline** [1] - 47:21
  **outlining** [1] - 47:23
  **outlook** [11] - 8:5,
8:7, 8:14, 22:8, 69:11,
69:12, 69:15, 69:17,
69:21, 77:11
  **outside** [5] - 16:14,
17:25, 18:23, 21:10,
22:25
  **overruled** [1] - 72:11
  **oversight** [2] - 20:24,
21:5
  **overview** [1] - 52:17
  **owe** [1] - 89:14
  **owed** [1] - 44:23
  **own** [4] - 41:12, 50:1,
50:2, 60:22

# P

  **p.m** [1] - 95:6
  **P.M** [1] - 1:19
  **Page** [14] - 7:1, 8:2,
34:15, 60:14, 61:20,
76:15, 76:21, 79:7,
79:10, 80:22, 83:25,
84:3, 85:8, 86:20
  **PAGE** [1] - 3:8
  **page** [20] - 27:12,
32:11, 32:17, 33:17,
33:18, 33:22, 40:12,
41:21, 47:10, 50:7,
50:19, 59:22, 65:12,
68:3, 75:22, 76:10,
79:7, 83:17, 83:23,
86:21
  **paid** [4] - 24:22,
39:14, 65:5, 90:22
  **pandemics** [1] -
26:16
  **panel** [2] - 4:24, 74:1
  **paragraph** [31] -
44:16, 52:14, 52:15,
52:16, 60:15, 61:6,

64:21, 64:23, 65:3,
65:11, 65:17, 76:15,
76:22, 77:2, 79:7,
79:11, 79:17, 80:23,
84:18, 85:11, 86:24,
87:21, 88:3, 88:20,
88:22, 92:10, 93:21,
94:8
  **paraphrasing** [1] -
44:4
  **part** [16] - 21:19,
23:4, 29:21, 31:3,
34:11, 34:14, 40:1,
42:25, 51:7, 52:12,
56:4, 68:13, 89:20,
89:22, 90:21, 94:19
  **participants** [6] -
21:12, 22:4, 36:7,
42:9, 43:2, 86:11
  **participating** [2] -
23:15, 46:20
  **particular** [4] -
20:13, 25:23, 39:7,
70:7
  **particularly** [2] -
22:22, 58:2
  **parties** [1] - 41:15
  **passed** [1] - 18:8
  **past** [1] - 68:11
  **Pat** [1] - 17:6
  **paths** [1] - 37:1
  **Patrick** [1] - 58:16
  **pay** [21] - 24:16,
37:14, 37:15, 39:19,
54:9, 55:1, 59:1, 61:9,
62:2, 70:13, 77:6,
77:13, 78:4, 80:6,
82:13, 85:4, 87:18,
88:6, 89:5, 89:16,
89:21
  **payable** [1] - 85:1,
88:4
  **paying** [1] - 80:7
  **payment** [10] - 26:10,
81:22, 82:3, 82:6,
88:13, 88:14, 88:17,
88:20, 88:21, 89:1
  **payments** [1] - 24:12
  **PCF** [7] - 56:20, 90:9,
91:8, 91:18, 92:12,
93:24, 94:5
  **pdf** [1] - 47:8
  **penciled** [1] - 27:18
  **Pennsylvania** [1] -
1:25
  **people** [18] - 16:5,
18:20, 18:21, 20:20,
22:15, 22:17, 35:18,
35:19, 36:17, 46:23,
49:25, 50:3, 52:22,

55:19, 56:7, 58:2,
58:5, 58:10
  **percent** [15] - 29:21,
31:8, 39:10, 39:12,
54:9, 55:1, 70:13,
80:6, 80:7, 81:6, 82:1,
85:4, 87:11, 88:15,
89:4
  **performance** [1] -
24:9
  **period** [17] - 11:9,
11:23, 15:9, 24:20,
70:6, 73:11, 73:12,
77:8, 79:19, 80:3,
81:25, 83:15, 84:23,
87:14
  **period-to-period**
[3] - 79:19, 80:3, 84:23
  **periodic** [6] - 20:2,
38:25, 39:10, 88:5,
90:9, 94:19
  **periods** [2] - 37:12,
84:21
  **person** [2] - 20:14,
42:4
  **personally** [1] -
20:12
  **perspective** [2] -
22:1, 45:3
  **Ph.D** [1] - 91:15
  **phrase** [2] - 37:4,
47:18
  **pick** [1] - 45:12
  **picture** [2] - 11:1,
45:2
  **place** [4] - 30:9,
37:13, 52:19, 53:6
  **placed** [4] - 12:25,
35:23, 39:14, 44:3
  **places** [1] - 23:18
  **Plaintiffs** [1] - 1:4
  **PLAINTIFFS** [3] -
1:17, 1:20, 2:2
  **plan** [5] - 43:9,
43:16, 45:2, 45:4,
48:22
  **planning** [2] - 44:25,
64:25
  **PLLC** [1] - 1:17
  **plus** [1] - 30:23
  **point** [18] - 11:6,
20:14, 25:6, 25:14,
35:2, 35:7, 39:9,
42:16, 44:10, 47:20,
51:3, 68:18, 73:20,
80:19, 81:18, 81:19,
88:8, 90:25
  **points** [5] - 32:19,
32:22, 33:25, 34:18,
47:18

  **policy** [2] - 21:8,
34:6
  **Pollard** [4] - 17:18,
17:22, 18:22, 58:11
  **PORTER** [1] - 2:8
  **portion** [1] - 31:2
  **pose** [1] - 62:4
  **position** [6] - 54:7,
58:20, 66:1, 66:3,
86:8, 86:9
  **positive** [9] - 10:17,
12:6, 78:8, 78:16,
78:17, 78:19, 78:21,
92:19, 94:22
  **possible** [4] - 7:16,
9:20, 15:15, 45:25
  **posted** [1] - 43:14
  **pot** [1] - 63:17
  **PowerPoint** [1] -
32:9, 32:13
  **preceded** [3] - 78:2,
78:16, 78:19
  **preceding** [1] - 61:6
  **predict** [2] - 6:21,
69:4
  **prediction** [2] - 6:13,
7:19
  **preference** [8] -
81:3, 81:6, 81:10,
81:18, 82:2, 87:11,
88:11, 89:13
  **PREFERRED** [1] -
1:10
  **Preferred** [1] - 4:3
  **preferred** [7] - 80:16,
81:3, 86:4, 87:7,
88:14, 89:1, 89:14
  **preliminary** [1] -
38:13
  **prepare** [2] - 15:23,
48:6
  **prepared** [3] - 18:9,
18:17, 32:9
  **presentation** [4] -
32:8, 34:12, 34:14,
59:5
  **presume** [1] - 74:17
  **previous** [4] - 49:19,
52:17, 57:21, 57:22,
57:24
  **PREVIOUSLY** [1] -
5:10
  **price** [1] - 37:1
  **prices** [10] - 6:19,
24:5, 24:8, 24:19,
25:2, 25:4, 25:6,
25:10, 25:13, 25:17
  **principal** [1] - 35:22
  **principle** [1] - 51:21
  **problem** [3] - 35:22,

Case 1:13-mc-01288-RCL    Document 376    Filed 08/13/23    Page 106 of 110

2354

41:4, 62:4
**proceed** [1] - 74:5
**proceedings** [8] -
5:1, 52:12, 53:1,
73:23, 73:25, 74:3,
95:6, 95:8, 96:6
**Proceedings** [1] -
95:9
**process** [6] - 19:5,
27:1, 60:10, 93:9,
93:10
**produced** [2] - 60:4,
96:6
**products** [1] - 60:8
**projecting** [1] - 8:17
**Projection** [1] - 6:11
**projection** [9] - 6:12,
6:15, 68:10, 68:13,
68:20, 69:1, 71:14,
72:5
**projections** [17] -
6:4, 6:17, 7:6, 7:8,
7:14, 7:15, 7:23,
36:25, 65:4, 65:22,
65:23, 65:24, 68:4,
68:24, 69:3, 69:6,
69:20
**property** [1] - 24:17
**property's** [1] -
24:18
**prospect** [1] - 77:16
**protect** [2] - 40:3,
45:9
**protecting** [3] -
25:10, 25:24, 92:18
**provide** [2] - 21:2,
44:24
**provided** [1] - 52:16
**providing** [3] -
55:24, 86:7, 92:15
**provisions** [1] -
85:18
**proxy** [2] - 9:11, 9:15
**prudent** [1] - 78:11
**Prussia** [1] - 1:25
**PSPA** [20] - 29:22,
30:4, 35:8, 40:15,
41:16, 48:7, 48:9,
48:15, 48:17, 48:19,
48:20, 48:25, 57:1,
57:9, 59:15, 63:15,
63:16, 63:20, 87:12,
94:20
**PSPAs** [8] - 29:24,
30:6, 30:7, 34:12,
34:19, 41:3, 43:3,
53:15
**public** [7] - 39:23,
40:1, 40:2, 44:24,
45:5, 45:9, 45:22

**publicly** [2] - 45:23,
46:11
**published** [1] - 38:17
**pull** [2] - 6:7, 24:1,
27:2, 43:11, 45:14,
51:10, 64:5
**purchase** [5] - 80:16,
84:21, 85:15, 86:4,
86:14
**Purchase** [1] - 4:3
**PURCHASE** [1] -
1:10
**purchaser** [1] -
24:22
**purpose** [3] - 28:2,
28:3, 94:6
**purposes** [1] - 56:9
**push** [1] - 57:2
**pushed** [1] - 90:23
**put** [3] - 32:24,
62:22, 89:23
**puts** [1] - 61:11
**putting** [2] - 57:20,
90:1
**PX** [2] - 63:5, 64:20
**PX-2** [1] - 65:8
**PX-205** [1] - 52:4
**PX-213** [3] - 64:5,
64:21, 65:9
**PX-216** [5] - 63:10,
66:13, 67:23, 67:25,
68:3
**PX-247** [1] - 56:21

## Q

**Q1** [3] - 13:8, 13:11,
15:11
**Q2** [3] - 13:23, 15:9,
15:11
**Q3** [1] - 13:11
**Qs** [1] - 74:12
**quarter** [82] - 10:5,
10:6, 10:23, 11:3,
11:4, 11:21, 11:24,
11:25, 12:12, 12:13,
12:19, 13:17, 13:19,
14:2, 14:4, 14:6, 14:8,
14:10, 14:12, 14:14,
14:16, 15:3, 15:4,
31:16, 31:17, 37:22,
37:24, 38:5, 38:10,
38:13, 38:17, 40:8,
40:24, 40:25, 41:7,
45:22, 46:1, 46:2,
46:3, 46:4, 46:6, 46:7,
46:8, 46:12, 46:13,
51:3, 51:6, 51:8,
51:19, 51:24, 55:14,

70:18, 73:9, 74:15,
74:23, 75:4, 75:7,
75:9, 75:11, 75:13,
75:17, 75:18, 75:19,
76:7, 77:21, 77:22,
77:25, 78:1, 83:6,
83:9, 83:14, 87:4,
89:6, 91:7, 92:11,
92:15, 92:16, 93:24
**quarterly** [6] - 15:3,
21:7, 74:11, 75:18,
83:13, 91:1
**quarters** [25] - 10:14,
11:5, 12:4, 12:5,
12:25, 13:2, 13:3,
13:5, 13:7, 13:11,
13:18, 13:23, 14:19,
15:6, 70:13, 70:20,
78:2, 78:3, 78:15,
78:19, 78:20, 78:22,
79:4, 91:13, 91:14
**quarters'** [1] - 78:12
**Questions** [1] -
59:12
**questions** [2] - 18:5,
36:8
**quite** [1] - 82:23
**quote** [3] - 44:5,
61:9, 61:11
**quoting** [1] - 44:5

## R

**Radnor** [1] - 1:25
**raise** [1] - 54:6
**raising** [3] - 36:8,
38:25, 62:17
**ramification** [1] -
56:19
**range** [3] - 7:15,
17:1, 69:1
**RDR** [3] - 2:10, 96:3,
96:12
**RE** [1] - 1:10
**Re** [1] - 4:2
**reached** [1] - 80:19
**read** [14] - 7:13, 8:10,
34:22, 43:18, 57:12,
60:16, 62:7, 77:2,
79:18, 85:11, 87:25,
89:8, 94:9
**reading** [4] - 48:21,
60:16, 60:18, 84:18
**reads** [1] - 52:9
**ready** [2] - 4:9, 57:10
**reaffirmation** [1] -
92:6
**real** [2] - 9:6, 25:16
**real-world** [1] - 9:6

**realized** [2] - 35:18,
35:19
**really** [2] - 17:3, 63:3
**reason** [1] - 80:20
**reasons** [1] - 54:7
**recap** [2] - 51:15,
70:24
**recaps** [1] - 44:3
**RECEIVED** [1] - 3:8
**received** [4] - 4:16,
44:5, 94:12, 94:13
**receiver** [1] - 85:17
**receivership** [2] -
85:18, 85:23
**recent** [2] - 74:25,
75:3
**recess** [3] - 73:24,
95:1, 95:7
**recessions** [1] -
26:16
**recognize** [4] - 6:9,
64:7, 66:15, 66:17
**recollection** [1] -
50:5
**record** [4] - 63:16,
82:14, 82:15, 82:18
**red** [14] - 10:13, 12:7,
12:9, 12:14, 12:15,
13:12, 14:2, 14:3,
14:5, 14:7, 14:9,
14:13, 14:15, 14:17
**Red** [1] - 3:4
**reduce** [2] - 37:17,
62:3
**reducing** [1] - 37:16
**reduction** [1] - 77:15
**reevaluate** [1] -
92:10
**refer** [6] - 19:6, 36:3,
39:7, 57:16, 70:9,
88:15
**reference** [18] - 7:3,
29:11, 29:14, 29:19,
30:13, 43:21, 44:7,
47:16, 48:6, 48:9,
49:17, 50:19, 61:13,
61:14, 65:4, 65:14,
89:21, 93:20
**references** [3] - 8:21,
48:8, 51:16
**referencing** [1] -
44:8
**referred** [6] - 25:21,
49:19, 51:13, 51:14,
59:5, 90:9
**referring** [12] - 19:6,
28:24, 33:4, 33:5,
41:2, 44:11, 46:5,
62:14, 81:2, 87:10,
88:3, 89:4

**refers** [3] - 15:8,
57:2, 81:21
**reflection** [1] - 22:8
**regard** [2] - 6:20,
22:12
**regarding** [1] - 22:8
**regular** [6] - 18:11,
18:14, 18:20, 20:3,
22:19, 74:9
**regularly** [1] - 21:17
**regulated** [1] - 42:17
**reinforced** [1] -
94:17
**reinforcing** [1] -
94:18
**rejoin** [1] - 34:8
**relate** [4] - 39:23,
40:2, 79:23, 80:1
**related** [4] - 4:2,
26:22, 34:12, 34:19
**Related** [1] - 52:10
**relates** [1] - 62:8
**relating** [1] - 56:15
**relationship** [5] -
37:8, 81:8, 81:9,
81:13, 89:9
**release** [2] - 43:14,
43:20
**released** [1] - 45:23
**relevant** [3] - 19:23,
21:19, 22:22
**relied** [1] - 22:17
**rely** [3] - 20:21,
22:15, 78:12
**relying** [1] - 86:12
**remaining** [16] -
30:21, 30:24, 35:10,
36:8, 36:12, 37:16,
37:17, 62:3, 66:23,
67:1, 67:13, 70:4,
72:17, 72:22, 72:25,
85:22
**Remaining** [2] -
67:5, 67:8
**remains** [1] - 92:17
**remember** [8] -
38:15, 47:20, 50:15,
52:21, 58:18, 64:14,
66:24, 71:18
**remind** [3] - 5:5,
40:7, 66:21
**reminded** [1] - 40:7
**remove** [1] - 78:9
**removing** [3] - 29:18,
29:21, 31:8
**renewed** [1] - 57:2
**repeat** [3] - 36:15,
37:6, 62:16
**replaced** [2] - 35:14,
80:11

2355

**report** [6] - 22:21,
60:4, 60:6, 60:7,
60:25, 74:16
**reported** [6] - 37:25,
66:7, 66:12, 75:4,
82:8, 90:6
**REPORTED** [1] -
2:10
**Reporter** [2] - 2:11,
96:12
**reporting** [3] - 38:5,
77:22, 90:2
**reports** [6] - 18:17,
21:22, 21:24, 22:3,
22:7, 22:14
**represent** [2] -
10:13, 23:12
**represented** [1] -
86:16
**represents** [1] -
10:14
**request** [3] - 34:10,
42:11, 84:20
**requested** [1] - 27:17
**require** [1] - 78:5
**required** [4] - 75:24,
80:9, 87:12, 89:22
**requirement** [2] -
39:10, 39:12
**research** [1] - 60:11
**Reserve** [1] - 93:12
**resiliency** [2] -
26:18, 61:4
**resolution** [1] -
44:20
**respect** [7] - 6:23,
24:3, 34:1, 51:13,
55:17, 68:23, 74:9
**respond** [1] - 29:3
**responding** [1] -
28:22
**responds** [1] - 34:10
**response** [4] - 7:8,
28:9, 29:3, 29:6
**responsibility** [2] -
22:18, 58:10
**responsible** [1] -
72:24
**rest** [1] - 19:3
**result** [3] - 24:16,
72:21, 89:12
**results** [18] - 10:24,
11:3, 15:11, 18:17,
31:16, 37:22, 37:24,
37:25, 38:8, 38:14,
38:17, 41:7, 45:22,
46:8, 46:13, 51:4,
83:7, 83:9
**Results** [1] - 76:17
**resume** [1] - 5:6

**retakes** [1] - 4:21
**returned** [1] - 92:19
**revenue** [1] - 92:8
**revenues** [2] - 54:8,
54:23
**review** [8] - 16:7,
18:17, 22:14, 22:15,
22:20, 35:12, 64:25,
72:1
**reviewed** [4] - 21:22,
57:21, 57:25, 72:4
**reviewing** [3] -
21:19, 21:21, 55:24
**revisions** [1] - 57:24
**rights** [1] - 23:6
**ripe** [1] - 92:3
**risk** [3] - 61:12, 62:7,
62:10
**risking** [1] - 39:14
**Road** [1] - 1:25
**roadmap** [1] - 44:24
**ROBERT** [1] - 2:2
**role** [1] - 24:9
**Room** [1] - 2:13
**Ross** [1] - 83:24
**routine** [1] - 21:19
**Row** [1] - 67:5
**ROYCE** [1] - 1:13
**RUDY** [1] - 1:23
**running** [1] - 20:21

## S

**sake** [1] - 47:25
**SAMUEL** [1] - 1:20
**Satriano** [2] - 17:7,
58:20
**saw** [13] - 28:10,
38:3, 39:22, 49:19,
52:25, 66:20, 66:22,
69:6, 69:12, 71:13,
71:20, 76:3, 83:15
**scanned** [1] - 47:6
**scenario** [24] - 8:5,
8:6, 8:7, 8:8, 8:14,
8:19, 8:22, 8:24, 9:2,
9:4, 9:7, 9:10, 9:12,
9:16, 25:11, 25:12,
25:25, 62:14, 62:16,
69:20, 69:21, 82:18,
82:20
**scenarios** [9] - 6:18,
8:3, 8:4, 8:25, 62:19,
69:7, 69:8, 69:14
**SCHILLER** [1] - 1:21
**SCHOLER** [1] - 2:8
**scroll** [2] - 27:19,
28:7
**seated** [2] - 5:3, 74:4

**SEC** [11] - 10:10,
21:21, 37:25, 73:8,
73:14, 74:8, 74:9,
74:24, 77:21, 90:2
**second** [47] - 5:16,
8:2, 10:6, 30:9, 30:22,
31:17, 34:25, 36:5,
36:6, 36:18, 36:21,
39:5, 40:24, 40:25,
41:7, 46:13, 51:6,
51:7, 51:19, 51:24,
53:14, 55:14, 60:15,
63:14, 73:9, 75:4,
75:13, 75:17, 75:18,
75:22, 77:21, 77:22,
78:1, 79:13, 80:23,
83:9, 83:13, 83:17,
87:4, 88:13, 88:17,
88:19, 88:24, 90:21,
90:23, 93:20, 93:21
**second-quarter** [4] -
41:7, 46:13, 75:17,
83:9
**second-to-the-last**
[2] - 75:22, 83:17
**secondary** [4] -
39:21, 40:6, 65:1,
73:1
**secretary** [8] - 20:7,
27:17, 28:4, 32:10,
36:7, 40:14, 41:17,
52:16
**Secretary** [6] - 20:3,
32:15, 34:7, 42:13,
42:24, 59:6
**section** [6] - 61:21,
76:18, 76:19, 84:1,
84:3, 84:7, 85:8,
86:21
**securities** [15] - 22:6,
24:13, 26:3, 26:6,
31:3, 36:10, 36:13,
39:18, 60:8, 61:12,
61:18, 62:6, 72:18,
86:14
**securitization** [1] -
60:10
**securitized** [1] - 60:8
**see** [45] - 9:24,
11:13, 12:7, 12:13,
13:2, 25:2, 28:11,
29:25, 46:25, 50:14,
51:13, 51:14, 51:16,
52:11, 53:2, 53:10,
53:12, 53:16, 54:11,
57:2, 59:22, 61:20,
63:5, 63:10, 63:15,
64:17, 65:3, 65:11,
65:14, 67:6, 67:8,
69:8, 75:21, 76:21,

81:22, 84:3, 84:7,
84:9, 85:8, 87:1, 87:8,
87:22, 88:21, 92:21,
93:20
**seeing** [6] - 12:22,
12:23, 27:7, 27:8,
46:16, 53:4
**seem** [1] - 31:11
**sees** [1] - 53:14
**sell** [1] - 24:21
**selling** [1] - 24:21
**senior** [24] - 16:20,
16:21, 16:23, 16:24,
17:2, 17:4, 18:2,
18:15, 19:21, 20:8,
32:6, 56:25, 58:12,
58:20, 66:4, 80:15,
81:3, 86:4, 86:8, 86:9,
87:7, 88:14, 89:1,
89:14
**SENIOR** [2] - 1:10,
1:14
**Senior** [1] - 4:3
**sense** [1] - 39:16
**sent** [2] - 64:15,
94:13
**sentence** [26] - 7:13,
7:14, 19:3, 28:11,
30:13, 53:14, 60:15,
61:6, 61:23, 62:7,
76:25, 79:13, 79:18,
80:13, 82:7, 84:9,
88:13, 88:17, 88:19,
88:24, 89:8, 89:12,
92:17, 92:23, 92:24
**sentiment** [3] - 22:8,
22:11, 23:14
**separate** [2] - 63:20,
63:23
**separately** [1] -
19:12
**September** [2] -
44:4, 75:10
**series** [1] - 42:10
**served** [1] - 20:6
**SESSION** [1] - 1:13
**session** [1] - 19:18
**set** [9] - 35:12, 36:3,
39:11, 39:13, 40:20,
40:23, 42:1, 92:12,
93:7
**setting** [3] - 34:2,
39:2, 39:6
**shaded** [1] - 12:15
**share** [1] - 18:4
**shareholders** [1] -
86:9
**sheet** [4] - 32:13,
45:17, 46:18, 75:17
**shook** [1] - 29:7

**shooting** [2] - 28:18,
28:19
**short** [1] - 85:11
**show** [9] - 9:23, 15:2,
24:2, 36:25, 70:11,
70:16, 70:20
**showing** [10] - 8:8,
8:10, 8:14, 8:18,
11:20, 11:22, 12:3,
12:4, 27:11, 71:8
**shows** [3] - 10:4,
70:15, 78:25
**sides** [1] - 49:25
**sight** [1] - 44:20
**sign** [1] - 76:13
**signed** [2] - 75:24,
76:10
**significance** [1] -
77:7
**significant** [5] -
76:25, 78:9, 84:12,
89:17, 89:24
**signing** [2] - 83:18,
83:19
**silly** [1] - 31:11
**simply** [2] - 6:20,
89:23
**sitting** [2] - 10:18,
10:23
**situation** [2] - 90:4,
92:11
**six** [3] - 38:4, 38:7,
45:20
**size** [1] - 80:18
**skip** [2] - 28:10,
79:15
**Slide** [5] - 9:24,
11:10, 43:1, 62:24,
66:20
**slide** [8] - 10:2, 25:2,
32:22, 62:22, 63:2,
66:22, 67:2, 67:4
**slides** [1] - 32:25
**small** [2] - 42:8,
68:23
**sold** [2] - 24:18,
26:20
**solve** [1] - 41:3
**solvency** [1] - 86:12
**solvent** [3] - 85:16,
85:23, 85:24
**someone** [2] - 22:20,
64:10
**sometimes** [1] -
17:23
**soon** [2] - 38:10,
41:10
**sorry** [28] - 4:14,
6:25, 13:14, 13:22,
17:13, 29:9, 31:22,

2356

46:2, 46:4, 57:12,
59:25, 64:22, 66:9,
66:10, 66:11, 69:11,
70:25, 71:16, 71:22,
76:19, 78:16, 84:6,
86:21, 88:19, 88:25,
91:12, 93:15, 93:16
**sort** [3] - 12:13,
21:10, 29:15
**source** [6] - 10:9,
23:14, 66:14, 73:15,
85:25, 93:1
**sources** [8] - 11:13,
16:13, 16:16, 16:18,
22:25, 56:3, 63:7,
73:13
**space** [6] - 30:14,
37:3, 37:5, 46:22,
46:23
**speaking** [1] - 64:9
**specific** [2] - 16:25,
91:23
**specifically** [2] -
57:22, 87:10
**specifics** [1] - 70:9
**spectrum** [1] - 23:6
**speculation** [1] -
72:10
**Spohn** [4] - 17:5,
18:22, 19:12, 58:14
**spot** [1] - 53:10
**SPSA** [1] - 67:5
**Stability** [1] - 84:4
**stability** [12] - 26:19,
39:3, 39:6, 39:7,
39:16, 39:21, 39:25,
40:16, 40:18, 70:3,
72:16, 77:18
**stable** [2] - 40:5,
73:1
**staff** [11] - 16:21,
16:24, 18:2, 18:12,
19:21, 20:8, 20:12,
20:17, 20:21, 56:25
**stake** [1] - 86:7
**stakeholder** [2] -
23:5, 23:9, 23:10
**stakeholders** [1] -
23:7
**stand** [2] - 4:21, 5:4
**STANTON** [1] - 2:8
**start** [10] - 9:18,
13:23, 16:16, 23:18,
26:25, 38:13, 70:12,
75:3, 78:17, 90:22
**started** [8] - 11:1,
25:4, 35:17, 35:18,
40:8, 62:11, 81:15,
81:17
**starting** [4] - 13:21,

13:22, 15:4, 90:25
**statement** [2] -
11:17, 55:7
**STATES** [2] - 1:1,
1:14
**States** [2] - 2:11,
96:13
**status** [5] - 24:16,
51:12, 51:17, 51:20,
77:5
**statute** [1] - 35:23
**statutory** [1] - 85:17
**stay** [1] - 14:20
**staying** [1] - 18:11
**Stegman** [3] - 52:7,
53:24, 55:4
**stenographic** [1] -
96:5
**step** [2] - 24:12, 94:3
**steps** [3] - 41:22,
43:23, 45:3
**Stern** [10] - 4:6, 5:6,
5:14, 13:14, 66:9,
74:5, 76:19, 88:19,
88:25, 91:12
**STERN** [79] - 2:7,
4:5, 4:8, 4:11, 4:15,
5:7, 5:12, 6:7, 6:8,
9:24, 10:1, 11:10,
11:11, 13:9, 13:10,
14:23, 14:24, 27:2,
27:3, 27:19, 27:20,
28:7, 28:8, 31:5, 31:6,
32:2, 32:3, 33:22,
33:24, 34:15, 34:17,
43:11, 43:12, 45:14,
45:15, 49:7, 49:8,
49:15, 49:16, 50:7,
50:8, 51:10, 51:11,
52:4, 52:5, 55:10,
55:11, 58:23, 58:24,
62:20, 62:21, 62:24,
63:1, 64:5, 64:6, 65:8,
65:10, 67:17, 67:19,
71:16, 71:19, 71:22,
71:23, 72:13, 74:6,
74:7, 79:8, 79:12,
79:15, 79:16, 80:22,
81:1, 86:21, 86:23,
91:19, 91:20, 93:15,
93:17, 94:24
**Steve** [1] - 17:9
**stick** [2] - 64:20, 65:9
**still** [7] - 5:5, 9:9,
25:8, 46:12, 51:23,
52:1, 76:22
**stipulation** [1] -
11:18
**stock** [5] - 80:16,
81:3, 86:4, 87:7,

89:14
**Stock** [1] - 4:3
**STOCK** [1] - 1:10
**stop** [1] - 16:23
**straight** [1] - 40:7
**strategic** [5] - 43:9,
43:16, 45:2, 45:4,
48:22
**strategy** [1] - 64:25
**Strategy** [1] - 64:22
**stress** [5] - 8:22,
25:11, 25:12, 69:20,
79:2
**stress-case** [1] -
8:22
**stressful** [1] - 78:25
**string** [5] - 13:7,
27:8, 27:12, 27:14,
31:24
**sub** [1] - 47:22
**sub-bullets** [1] -
47:22
**subject** [5] - 31:24,
33:6, 52:9, 57:1,
59:11
**submitted** [1] - 43:17
**subordinate** [1] -
66:6
**subsequently** [1] -
61:8
**substantial** [1] - 88:9
**succeeded** [1] - 20:5
**successful** [1] -
24:17
**sufficient** [3] - 36:9,
61:4, 70:5
**suggested** [1] -
40:21
**suggests** [1] - 60:19
**suit** [1] - 53:2
**summarize** [3] -
22:15, 65:4, 88:1
**summarizing** [1] -
64:12
**Summary** [3] - 76:20,
76:23, 84:1
**summary** [1] - 68:5
**supervision** [2] -
17:8, 58:15
**support** [14] - 20:21,
35:10, 44:6, 44:7,
44:13, 44:14, 48:16,
60:19, 60:20, 62:3,
70:5, 70:8, 72:17,
85:13
**Support** [2] - 85:9,
87:22
**suppose** [1] - 69:16
**supposed** [1] - 52:24
**surplus** [1] - 30:24

**Susan** [1] - 76:12
**sustainability** [8] -
61:11, 61:14, 61:16,
84:5, 84:6, 84:13,
89:18, 89:25
**sweep** [12] - 26:24,
29:12, 29:15, 31:8,
49:2, 49:3, 49:9,
49:10, 50:20, 50:25,
51:13, 51:18
**swept** [1] - 49:11
**swimming** [1] -
41:20
**switch** [1] - 94:24
**SWORN** [1] - 5:10
**system** [2] - 23:8,
72:23

## T

**table** [1] - 37:21
**takeaway** [1] - 71:13
**talks** [3] - 29:18,
43:23, 44:1
**tango** [1] - 41:18
**taxpayer** [6] - 44:6,
44:7, 44:13, 44:14,
92:5, 94:7
**taxpayers** [3] -
92:18, 92:20, 92:24
**team** [6] - 16:20,
18:9, 18:18, 22:21,
32:9, 60:10
**ten** [5] - 68:18,
68:25, 72:5, 73:20,
73:21
**ten-year** [1] - 72:5
**Term** [1] - 84:4
**term** [18] - 5:17, 34:5,
39:3, 39:6, 40:18,
44:20, 49:3, 59:14,
61:10, 61:16, 79:22,
80:5, 83:6, 84:13,
85:2, 89:17, 89:24
**terminology** [2] -
6:12, 69:10
**Terms** [1] - 53:12
**terms** [5] - 30:22,
34:25, 42:17, 72:18,
82:15
**testified** [2] - 72:15,
90:12
**testimony** [5] - 6:3,
7:18, 37:6, 62:23,
85:25
**THE** [25] - 1:1, 1:13,
1:17, 1:19, 2:2, 2:6,
3:5, 4:1, 4:7, 4:10,
4:14, 4:16, 4:20, 4:22,

4:23, 4:24, 5:2, 5:9,
71:20, 72:11, 72:12,
73:20, 74:1, 74:4,
95:1
**themselves** [1] -
87:25
**theoretical** [1] - 9:5
**thereafter** [2] - 5:19,
41:10
**thereby** [1] - 54:8,
77:13
**therefore** [1] - 89:15
**Thereupon** [2] -
73:24, 95:7
**they've** [2] - 8:23,
87:18
**thinking** [6] - 9:6,
25:10, 25:22, 25:23,
72:6, 94:14
**third** [44] - 5:23, 9:1,
9:17, 9:20, 11:4,
13:19, 15:15, 15:21,
15:24, 21:14, 23:21,
25:5, 26:23, 30:11,
36:23, 36:24, 37:10,
37:11, 43:6, 45:13,
51:22, 55:13, 55:17,
55:20, 56:5, 56:15,
56:20, 57:16, 58:6,
60:15, 69:24, 72:7,
73:4, 73:17, 74:19,
75:9, 75:11, 77:9,
86:22, 90:16, 93:13,
93:24, 94:16, 94:18
**thoughts** [2] - 34:5,
34:9
**three** [13] - 8:3, 8:4,
10:6, 13:20, 13:23,
14:19, 38:12, 44:16,
44:19, 69:2, 69:6,
69:13
**three-quarters** [1] -
13:23
**threw** [1] - 28:10
**Thursday** [2] - 27:24,
28:9
**Tim** [3] - 32:15,
65:20, 76:2
**timeframe** [2] -
59:13, 68:20
**timeline** [1] - 40:23
**title** [1] - 58:9
**today** [1] - 62:9
**together** [2] - 89:23,
90:1
**took** [8] - 41:15,
47:14, 47:17, 47:18,
50:15, 50:17, 52:18,
53:6
**top** [8] - 46:25,

50:11, 50:12, 59:25, 60:1, 63:15, 67:6
**TOPAZ** [1] - 1:24
**topic** [2] - 49:12, 53:8
**topics** [3] - 42:25, 47:23, 94:25
**tough** [1] - 28:12
**tracking** [2] - 21:17, 22:18
**transaction** [1] - 86:6
**transcript** [2] - 96:5, 96:6
**TRANSCRIPT** [1] - 1:12
**transition** [2] - 48:11, 65:2
**translate** [1] - 81:4
**translated** [1] - 36:11
**translates** [1] - 81:5
**transmits** [1] - 64:17
**transmitting** [1] - 32:8
**travels** [1] - 28:14
**Treasury** [99] - 8:15, 9:19, 15:4, 15:15, 19:23, 20:3, 20:6, 20:13, 20:15, 20:16, 26:10, 27:17, 28:4, 30:3, 30:21, 31:24, 32:10, 32:15, 33:13, 34:7, 35:1, 35:4, 35:25, 36:6, 39:2, 40:14, 41:17, 42:4, 42:8, 44:9, 44:12, 44:14, 44:15, 45:13, 45:18, 46:24, 48:17, 49:11, 49:23, 51:1, 51:14, 52:8, 52:22, 55:13, 55:25, 57:5, 57:10, 59:1, 59:15, 60:19, 60:22, 61:9, 61:14, 61:25, 62:2, 63:21, 70:5, 70:8, 72:17, 72:22, 77:6, 77:14, 77:15, 78:5, 79:22, 80:9, 80:14, 80:21, 84:22, 85:1, 85:13, 85:15, 85:20, 85:25, 86:6, 87:6, 88:5, 89:16, 89:21, 89:22, 90:12, 90:15, 90:25, 91:5, 92:2, 92:4, 92:10, 92:17, 92:25, 93:4, 93:11, 93:23, 94:14, 94:18
**Treasury's** [5] - 35:23, 57:20, 92:7, 93:3, 94:20

**tremendous** [1] - 69:4
**trend** [2] - 25:17, 87:19
**TRIAL** [1] - 1:12
**trial** [3] - 52:13, 53:2, 53:9
**trouble** [1] - 24:14
**true** [2] - 96:4, 96:5
**truncated** [1] - 8:12
**try** [6] - 24:14, 24:15, 40:21, 41:3, 41:24, 74:17
**trying** [4] - 6:21, 53:10, 69:4
**turn** [1] - 7:19
**turned** [1] - 5:17
**turns** [1] - 83:1
**twelve** [1] - 11:7
**two** [19] - 13:1, 13:2, 13:12, 13:18, 39:19, 41:15, 41:18, 44:9, 48:8, 54:6, 67:15, 69:2, 78:3, 78:12, 78:15, 78:18, 78:19, 79:4, 90:10
**typically** [2] - 68:24, 69:3

## U

**U.S** [1] - 62:11
**Ugoletti** [15] - 17:4, 18:22, 20:14, 27:5, 27:10, 27:21, 28:21, 33:11, 42:5, 46:21, 50:1, 51:15, 55:19, 56:24, 59:9
**Ugoletti's** [1] - 28:9
**uncertainty** [12] - 61:10, 61:11, 69:4, 77:1, 77:4, 77:5, 77:7, 77:10, 78:10, 84:12, 89:17, 89:24
**uncommon** [2] - 68:21, 68:22
**under** [22] - 5:5, 25:15, 30:14, 34:25, 48:10, 48:11, 48:20, 48:25, 49:1, 50:23, 56:12, 59:15, 62:3, 64:23, 80:15, 84:20, 85:15, 85:17, 85:22, 87:12, 87:21
**Under** [1] - 67:5
**under-water** [1] - 25:15
**undersecretary** [2] - 20:4, 42:22

**understood** [7] - 29:19, 30:6, 58:1, 58:4, 84:15, 92:6, 92:24
**undisputed** [1] - 11:18
**unhelpful** [1] - 56:11
**United** [1] - 96:13
**united** [1] - 2:11
**UNITED** [2] - 1:1, 1:14
**unlikely** [1] - 84:25
**unlimited** [1] - 35:20, 36:1, 60:20
**unofficial** [1] - 38:13
**unquote** [1] - 44:6
**up** [40] - 6:7, 6:24, 15:18, 18:9, 24:1, 25:18, 26:11, 27:2, 27:19, 28:7, 30:15, 30:19, 31:24, 32:24, 35:7, 36:16, 40:20, 40:24, 41:2, 42:1, 43:11, 44:13, 45:12, 45:14, 48:1, 51:10, 57:11, 60:12, 61:5, 62:22, 63:14, 64:5, 67:15, 67:20, 77:8, 80:4, 80:24, 83:3, 88:8, 90:13
**Update** [2] - 64:22, 65:12
**updated** [1] - 44:24
**urgency** [1] - 53:15
**useful** [2] - 22:10, 23:14
**usual** [1] - 69:1

## V

**variability** [1] - 84:24
**various** [1] - 8:23
**VARMA** [1] - 2:6
**vary** [1] - 42:9
**versions** [2] - 12:1, 57:24
**viewed** [2] - 21:17, 22:7
**views** [1] - 21:11
**VINCENT** [1] - 1:17
**vision** [1] - 44:24
**vocabulary** [1] - 44:11
**voice** [3] - 6:24, 48:1, 60:12
**void** [1] - 17:16
**volatility** [2] - 79:19, 80:3
**vs** [1] - 1:5

## W

**wait** [1] - 38:7
**waiting** [1] - 57:10
**waive** [3] - 91:1, 91:6, 93:24
**waived** [5] - 39:2, 88:7, 90:12, 90:15, 91:14
**waiver** [9] - 90:16, 90:20, 91:4, 91:9, 91:11, 91:18, 91:25, 92:14, 93:13
**waivers** [1] - 91:16
**walk** [3] - 34:21, 52:6
**walked** [1] - 64:24
**Wanda** [3] - 17:7, 58:17
**wants** [1] - 28:4
**wars** [1] - 26:16
**Washington** [6] - 1:6, 1:18, 1:22, 2:9, 2:13, 96:14
**watching** [1] - 28:16
**water** [1] - 25:15
**ways** [1] - 56:2
**website** [1] - 43:15
**week** [2] - 18:8, 26:2
**week's** [1] - 64:24
**weekly** [6] - 16:21, 16:24, 18:2, 19:11, 19:14
**Weeks** [1] - 53:11
**weeks** [5] - 18:8, 38:4, 38:7, 38:12, 45:20
**what-if** [3] - 6:18, 7:8, 8:19
**whole** [6] - 19:3, 34:11, 38:7, 45:2, 56:4, 90:23
**WIERZBOWSKI** [1] - 2:2
**willing** [1] - 36:12
**willingness** [1] - 41:16
**withdrawn** [2] - 54:20, 59:4
**witness** [5] - 4:21, 7:18, 62:23, 71:17
**WITNESS** [3] - 4:23, 5:10, 72:12
**WITNESSES** [1] - 3:5
**wondered** [1] - 65:20
**words** [2] - 36:9, 84:14
**works** [1] - 17:24
**world** [2] - 9:6, 28:14
**worsen** [1] - 25:19

**worsening** [8] - 8:7, 8:8, 8:14, 69:11, 69:12, 69:15, 69:21, 77:11
**worsening-outcome** [1] - 8:8
**worsening-outlook** [2] - 8:7, 8:14
**worst** [14] - 8:21, 9:2, 9:4, 9:7, 9:10, 9:12, 9:14, 9:16, 25:11, 25:24, 62:14, 62:15, 69:21, 82:18
**worst-case** [13] - 8:21, 9:2, 9:4, 9:7, 9:10, 9:12, 9:16, 25:11, 25:24, 62:14, 62:15, 69:21, 82:18
**worth** [29] - 10:5, 10:15, 10:17, 11:5, 12:5, 12:6, 12:17, 12:20, 12:24, 24:4, 25:16, 26:24, 29:15, 31:8, 49:2, 49:3, 49:9, 49:10, 50:19, 50:25, 51:13, 51:18, 78:12, 78:17, 78:19, 78:20, 88:7, 89:3, 89:7
**wrap** [3] - 40:24, 41:2, 57:10
**writing** [1] - 22:3, 29:11
**written** [3] - 15:23, 43:15
**wrote** [2] - 53:24, 55:4

## Y

**year** [9] - 29:5, 53:15, 72:5, 82:9, 82:11, 87:17, 87:18, 90:23, 90:24
**Year's** [1] - 27:25
**years** [15] - 6:20, 26:15, 26:16, 30:23, 44:19, 53:5, 54:8, 54:23, 65:5, 68:18, 68:25, 70:23, 72:17, 78:14, 83:2
**yesterday** [8] - 5:15, 21:6, 24:10, 26:4, 29:22, 30:16, 30:20, 39:1
**York** [3] - 1:22, 2:5
**yourself** [2] - 22:14, 36:15

2358

| Z |
|---|
| **zero** [1] - 7:20 |