1          **UNITED STATES DISTRICT COURT**
          **FOR THE DISTRICT OF COLUMBIA**

2

3 Fairholme Funds, Inc., et al.,  ) Civil Action
                         ) No. 1:13-cv-01053-RCL
              Plaintiffs,  )

4                         )
  vs.                    ) **Jury Trial (Day 12)**

5                         ) **Afternoon Session**
  Federal Housing Finance     )

6  Agency, et al.          ) Washington, D.C.
                         ) **August 9, 2023**

7             Defendants.  ) Time:  1:30 p.m.
  _____

8

  In re Fannie Mae/Freddie Mac  ) Civil Action

9  Senior Preferred Stock      ) No. 1:13-mc-1288-RCL
  Purchase Agreement Class    )

10  Action Litigations.       )
  _____

11

12      **Transcript of Jury Trial (Day 12) Afternoon Session**
                  **Held Before**

13          **The Honorable Royce C. Lamberth**
         **United States Senior District Judge**

14  _____

               A P P E A R A N C E S

15

16 For the Fairholme Funds, Inc. Plaintiffs:
             **Vincent J. Colatriano**

17           COOPER & KIRK, PLLC
           1523 New Hampshire Avenue, Northwest

18           Washington, D.C. 20036

19 For the Defendant Federal Housing Finance Agency:
             **Asim Varma**

20            **David B. Bergman**
            **Ian S. Hoffman**

21            **R. Stanton Jones**
            **Jonathan L. Stern**

22            ARNOLD & PORTER KAYE SCHOLER LLP
           601 Massachusetts Avenue, Northwest

23           Washington, D.C. 20001

24

25

1                    A P P E A R A N C E S (continued)

2    For the Class Plaintiffs:
                              **Hamish P. M. Hume**
3                             **Kenya Khalelah Davis**
                              **Samuel C. Kaplan**
4                             BOIES SCHILLER FLEXNER LLP
                              1401 New York Avenue, Northwest
5                             Washington, D.C. 20005

6                             **Robert Kravetz**
                              BERNSTEIN LITOWITZ BERGER & GROSSMANN
7                             LLP
                              1251 Avenue of the Americas
8                             New York, New York 10020

9                             **Lee D. Rudy**
                              **Grant Goodhart**
10                            KESSLER TOPAZ MELTZER & CHECK
                              280 King of Prussia Road
11                            Radnor, Pennsylvania 19087
     _____
12
     Stenographic Official Court Reporter:
13                            Nancy J. Meyer
                              Registered Diplomate Reporter
14                            Certified Realtime Reporter
                              333 Constitution Avenue, Northwest
15                            Washington, D.C. 20001
                              202-354-3118
16
     Proceedings recorded by mechanical stenography.  Transcript
17   produced by computer-aided transcription.

18

19

20

21

22

23

24

25

1

## I N D E X

2                                                                    PAGE:

3     **Witnesses:**

4     Anjan Thakor

5          Rebuttal Direct Examination By Ms. Davis......... 2627
           Rebuttal Cross-Examination By Mr. Hoffman........ 2651
           Rebuttal Redirect Examination By Ms. Davis....... 2663
6     Bala Dharan
           Rebuttal Direct Examination By Mr. Kravetz....... 47
7          Rebuttal Cross-Examination By Mr. Bergman........ 2698
           Rebuttal Redirect Examination By Mr. Kravetz..... 93

8

9     **Exhibits Admitted:**

10

           Plaintiffs' Exhibit 458.......................... 2626
11         Plaintiffs' Exhibit 460.......................... 2626
           Plaintiffs' Exhibit 498.......................... 2626
12         Plaintiffs' Exhibit 499.......................... 2626
           Plaintiffs' Exhibit 566.......................... 2727
13         Plaintiffs' Exhibit 647.......................... 2626
           Plaintiffs' Exhibit 648.......................... 2626

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (Proceedings held out of the presence of the jury.)

3          MR. KRAVETZ:  Good afternoon, Your Honor.

4     Robert Kravetz on behalf of plaintiffs.

5          We have several exhibits to move in in our rebuttal

6     case.  There are still a couple that we're discussing between

7     the parties, but the exhibits to move in without objection are

8     Plaintiffs' Exhibits 458, 460, 498, 499, 647, and 648.  We

9     may --

10          THE COURT:  I'm sorry.  647?

11          MR. KRAVETZ:  And 648, Your Honor.

12          THE COURT:  Okay.

13          MR. KRAVETZ:  And we may reach a resolution with

14     respect to a couple of the outstanding exhibits.  It would be

15     our recommendation to take that up after Dr. Thakor.

16          THE COURT:  Okay.  All right.

17          (Plaintiffs' Exhibit 458, 460, 498, 499, 647, and 648

18     admitted into evidence.)

19          MR. KRAVETZ:  Okay.  Thank you, Your Honor.

20          THE COURT:  Bring in the jury.

21          Do you have your witness here?

22          MS. DAVIS:  Yes, Your Honor.

23          (Proceedings held in the presence of the jury.)

24          THE COURT:  All right.  You may be seated.

25          MS. DAVIS:  Thank you, Your Honor.  Kenya Davis for

1    the plaintiffs.

2                    REBUTTAL DIRECT EXAMINATION

3    BY MS. DAVIS:

4    Q.  Good afternoon.

5    A.  Good afternoon.

6              MS. DAVIS:  Go afternoon to y'all too.

7    BY MS. DAVIS:

8    Q.  Welcome back, Professor Thakor.

9         In a loud, clear voice, can you give us your full name

10   and spell it for the record.

11   A.  Anjan Thakor, A-n-j-a-n T-h-a-k-o-r.

12             THE COURT:  Okay.  You previously have been sworn.

13   I'll remind you you're still under oath.  You may proceed,

14   Counsel.

15             MS. DAVIS:  Thank you, Your Honor.

16   BY MS. DAVIS:

17   Q.  Since you left us, Dr. Thakor, you are aware that

18   Dr. Attari testified in this case?

19   A.  Yes.

20   Q.  Have you reviewed his testimony?

21   A.  Yes, I have.

22   Q.  We're not going to get into the details now, but can you

23   tell us generally what your reaction was to his testimony.

24   A.  So I think he ignored parts of my testimony.  In other

25   cases, he either misunderstood or he misrepresented some of my

1    testimony.

2         And he made a number of errors.

3    Q.  Can you very broadly at a high level remind the jury of

4    what your opinion was and how you came to it.

5    A.  Sure.  So my opinion is that based on an all-in cost

6    analysis, the PCF should be in the range of 2 and a half to

7    45 basis points; and I did this by examining a broad range of

8    market comparables as instructed by the PSPA.

9    Q.  And what methodology did you use when you came up with your

10   opinion?

11   A.  So the methodology that I used was to look at close

12   market comparables, bank loan commitments, the financial

13   assistance provided to banks during the financial crisis by

14   Treasury, the terms provided to AIG, as well as FDIC deposit

15   insurance.

16        And then based on that, I came up with my -- my

17   conclusion.

18   Q.  Okay.  And you used the all-in cost method; is that right?

19   A.  That's correct.

20   Q.  Do you understand Dr. Attari to be disagreeing with the

21   all-in cost methodology?

22   A.  Not that I can tell.  I don't think he disagreed with that.

23   Q.  Did he offer an alternative methodology for the jury to

24   think about or evaluate?

25   A.  No, he did not.

1    Q.  And just to remind us, because there -- there seems to be

2    some confusion at some points during the trial about the

3    difference between an interest rate and a periodic commitment

4    fee.  Can you just explain to us, again, what the difference --

5    what the difference is.

6    A.  Sure.  So commitment is basically a promise to provide some

7    funding in the future.  A PCF or a commitment fee is a very

8    small fee, typically, that's charged for making these funds

9    available.  The -- it's not the interest rate on the loan or

10   the dividend on the preferred stock.  That's completely

11   different.

12   Q.  Okay.  And can you remind us if the Treasury or FHFA took

13   steps in this case to estimate an appropriate periodic

14   commitment fee?

15   A.  No, they did not.

16   Q.  And on this preliminary point, can you tell us or remind us

17   of what Dr. Attari said about the SEC statement and its

18   reference to a periodic commitment fee?

19   A.  Well, my recollection is that he basically said that the

20   SEC statement said that it would be substantial -- actually, it

21   said could be substantial, and, you know, substantial is a

22   vague term.  What does it mean?

23        It also means that it may not be substantial.  And to

24   me, $1.16 billion is a lot of money.  It is substantial.

25   Q.  Okay.  And just to be clear, did he give a number -- did he

1   offer the ladies and gentlemen of the jury a number that

2   would -- would be substantial in terms of -- in relation to

3   that particular statement out of the SEC statement?

4   A.  No, he never quantified it.

5   Q.  Okay.  Now, just briefly, we're going to look at the

6   comparators you used in order to come up with your opinion on

7   this.  Just looking at your comparators, which the jury has

8   already seen before so we won't go through each and every one,

9   but can you tell us, did Dr. Attari address each and every one

10  of these?

11  A.  No, he did not.  For example, he did not address the terms

12  of the Capital Purchase Program from the standpoint of an

13  all-in cost comparison with the GSEs' terms.  He did not

14  address the terms of the U.S. Treasury's commitment to -- or

15  assistance to AIG, again, based on an all-in cost comparison.

16      He did not address the second step in my calculation of

17  the -- the effective cost of FDIC deposit insurance, and he did

18  not address the FDIC's credit line with the U.S. Treasury.

19  Q.  Okay.  Now I'm going to show you a slide.  You mentioned

20  that there was some misstatements about your testimony.  So I

21  want to show you a slide that references that.

22      What is this slide intending to demonstrate?

23  A.  Right.  So this -- I recall when he was asked about this on

24  direct.  And it was -- had to do with whether the comparables

25  that I used for my all-in cost analysis that yielded a zero PCF

1    were actually relevant or not relevant to my analysis.   And he

2    said, you know -- to quote him, he says -- he himself says

3    they're not relevant to estimating a positive PCF.

4         The fact of the matter is I never said that.   In fact,

5    you may recall that on cross-examination, I was asked a couple

6    of times about the usefulness of the all-in cost analysis that

7    yielded a zero PCF, and I repeatedly said that the entire

8    analysis was necessary for me to reach my conclusion that the

9    appropriate range for the PCF was 2 and a half to 45 basis

10   points; that every analysis that I did was relevant.   That's

11   what I said.

12   Q.   So none of them were sort of useless or not necessary for

13   you to reach your conclusion?

14   A.   Yeah, it's almost like -- I don't know if he read my

15   testimony or not or he got confused by it, but I thought I was

16   pretty clear in my responses in the cross-examination.

17   Q.   Okay.   Let's look at what you actually said about, for

18   instance, loan commitments.   What did you say about its

19   usefulness in your evaluation?

20   A.   So loan commitments, you know, I said it was an extremely

21   useful piece of information because the structure of the

22   Treasury commitment -- the pricing structure actually mimics

23   the pricing structure of loan commitments.   The Capital

24   Purchase Program, I said it was extremely useful guidance for

25   determining the PCF because it involved Treasury providing

1    assistance in the form of preferred stock purchases.

2          On AIG, I said that the different analyses that do give

3    you certain outputs, you have to put them all together and the

4    final answer is the outcome of the entire analysis, not just

5    one piece of it.

6    Q.  And, Dr. Thakor, did Dr. Attari identify any comparators

7    that you should have included in your analysis but you didn't?

8    A.  No, he did not.

9    Q.  So let's look at just a few of those.  On the slide here,

10   is your analysis of the commercial loan commitment contracts.

11   What was his critique of this particular comparable?

12   A.  So my recollection is that he had two criticisms of the

13   loan commitment analysis.  One was that a lot of the borrowers

14   of have positive equity capital ratios, and the GSEs had -- did

15   not have the same kind of equity capital.

16         And his second criticism was that, well, these are loan

17   contracts, and the Treasury's commitment was in the form of

18   preferred stock, and so one is equity and the other is debt.

19   Q.  Okay.  And what was your reaction to that particular

20   critique?

21   A.  So on the -- on the preferred stock versus loan issue, I

22   basically testified earlier that the yields on -- the empirical

23   evidence and the research shows that the yields on preferred

24   stock are actually lower than the yields on corporate bonds.

25   So if, in fact, in, sort of, bank loan commitments I had looked

1    at equity commitments, these numbers would have been even

2    lower.  And the contrast with the terms that the GSEs got would

3    have been even -- more stark because the difference would have

4    been even bigger.

5            So that's one point.

6            On the issue of these borrowers having equity capital

7    that the GSEs did not, the fact of the matter is that book

8    equity capital ratios are extremely misleading during times of

9    crises, but apart from that, I do have in my loan commitment

10   data highly leveraged borrowers, like leverage buyouts, debtor

11   in possession financing, and so on.  So it's not true that all

12   of these loan commitments were given to highly capitalized

13   borrowers.

14           And then, finally, the difference between the terms that

15   the -- that the borrowers, the customers of banks got under

16   these loan commitments were so much better or the prices were

17   so much lower than what the GSEs got with their arrangement

18   with the Treasury, that any sort of impact of differences in

19   capital ratios would be swamped by this enormous difference in

20   prices.  Okay?

21           And so -- and then -- and also don't forget that the

22   customers of banks under these commitments are taking down

23   their commitments at much lower rates; right?  We're talking

24   about 2.1 percent, 2.9 percent versus 10 percent, which is

25   the rate at which the GSEs are drawing down on their

1    commitment.

2    Q.  Okay.  And just to that last point about when he said you

3    could only get a loan commitment if you actually have equity --

4    A.  Uh-huh.

5    Q.  -- what was your response to that?

6    A.  Well, that's -- that's what I said -- is that a lot of

7    these borrowers did not actually have that much equity capital;

8    you know, the DI- -- the debtor in possession financing and the

9    leverage buyouts.

10   Q.  That's what you mean --

11   A.  Yeah.

12   Q.  -- when you say they were highly leveraged, meaning they

13   had a lot of debt too?

14   A.  They had very little capital.

15   Q.  Okay.

16   A.  And they're part of the sample in these studies.

17   Q.  Okay.  So, quickly, we're going to move to your analysis of

18   the Capital Purchase Program.  You taught us about the Capital

19   Purchase Program as a program that was used for many banks

20   during the course of the financial crisis.  What was -- what

21   were the number of banks that were included in that Capital

22   Purchase Program?

23   A.  So it was a very large number of banks.  This is a program

24   that Treasury designed to ensure that the banking system would

25   not collapse, because a lot of these banks needed to be

1    recapitalized, and so the CPP covered 707 banks and Treasury

2    invested a total of $205 billion.

3           And so this was a very significant program to get us out

4    of the financial crisis.

5    Q.  And what was the -- what was your bottom-line opinion about

6    the PCF under that analysis?

7    A.  Well, the bottom-line opinion was that, you know, this --

8    the assistance that Treasury provided was very similar to the

9    assistance that it provided to the GSEs, both in terms of the

10   nature of the security and the public interest rationale for

11   doing it, financial stability.

12   Q.  Okay.

13   A.  But yet the terms that the CPP banks got were substantially

14   more favorable to them than the terms given to the GSEs.

15   Q.  Now, what about Mr. -- Dr. Attari's critique of your using

16   the Capital Purchase Program as a comparator to bring to the

17   jury?

18   A.  So his criticism was -- well, first he agreed that this was

19   an equity investment, but he says it was an equity investment

20   in companies that already had a lot of equity and needed a

21   top-off.

22   Q.  Uh-huh.

23   A.  So, you know, not a situation where equity was

24   negative and -- you just needed a top-off.

25   Q.  What does that mean?

```
1    A.  I'm not sure.  It sounds like icing on the cake.  Something
2    that's not really necessary, but -- so -- but, you know, if
3    that's what he meant, then he's completely wrong.
4    Q.  And why is he wrong?
5    A.  He's wrong because that's not the reason why the U.S.
6    government intervened in the banking system and invested
7    $205 billion.  It did so -- Treasury did this because this was
8    desperately needed, in the opinion of Treasury, to save the
9    banking system from collapse.
10        And I know this because I've written a research paper on
11   this.  I've studied the terms of these contracts.  This is a
12   paper that has been presented all over the world by my
13   coauthors and me.  I presented this a short while back at the
14   office of the comptroller of the currency.  And so I knew
15   something about these investments and the rationale for doing
16   it.
17        I've also talked to people within the Federal Reserve,
18   some of whom were involved in actually designing the terms of
19   these arrangements and this assistance; because remember all of
20   this during the financial crisis was done by Treasury in
21   partnership with the Federal Reserve, and none of them would
22   agree with this characterization that this was some kind of
23   top-off that wasn't necessary.  They felt it was absolutely
24   essential in the public interest for financial stability to
25   save the banking system from collapse.
```

```
1    Q.  Now, did Dr. Attari prepare any research on this particular

2    subject, the Capital Purchase Program?

3    A.  Not that I know of.  I mean, I've reviewed his vitae, I

4    don't think he's written anything on the subject that I could

5    look at.

6    Q.  And you've indicated that some of these banks were really

7    in really bad shape when this happened.  What -- what was --

8    what was one of the indicators to tell you that that was the

9    case?

10   A.  Yeah.  So there were 569 banks in this sample that received

11   assistance in the form of Treasury preferred stock, where

12   Treasury bought preferred stock in these banks.  Out of the

13   569, almost 200 -- 196 to be exact -- actually missed a

14   dividend payment.  Now, you wouldn't miss a dividend payment if

15   you were financially sound.  And we heard earlier today from

16   Acting Director DeMarco that, you know, that's a contract

17   violation.

18        So, you know, these banks were not financially sound.

19   Q.  In your opinion, was there any conflict between the

20   investment that Treasury made in these 707 banks and serving

21   the public interest?

22   A.  No.  It was absolutely -- in fact, providing this

23   assistance was viewed as being completely consistent with

24   the public interest because the goal was financial stability

25   in preventing the collapse of the banking system.  And you saw
```

1   that they did this at terms that were substantially more

2   favorable to the banks than the terms offered to the -- to

3   the GSEs.  There was no inconsistency between these terms

4   and serving the public interest and ensuring financial

5   stability.

6   Q.  Okay.  Now we're going to look at another one of your

7   comparators, AIG.  What -- just as sort of very briefly, what

8   was your opinion as to why AIG was a good comparator for the

9   situation that the GSEs were in?

10  A.  So AIG was a -- was a really good comparable for a number

11  of reasons.  First, it was systematically important, just like

12  the GSEs were.

13       Second, the assistance that was provided to AIG was very

14  large.  Just like the assistance to -- to the GSEs.  And it was

15  during the same time as the financial crisis.  So their

16  assistance package was also initially put together in

17  September of 2008.

18  Q.  Okay.  And we're going to look at his slide on AIG.  What's

19  your impression of this analysis of the AIG commitment?

20  A.  Oh, this is a slide that Dr. Attari used; right?

21  Q.  Yeah.

22  A.  So this is a very misleading slide.

23  Q.  Why so?

24  A.  And this comparison is actually completely invalid.

25  Q.  What's wrong with it?

```
 1     A.  Well, what's wrong with it is that this is -- these are not
 2     the terms that AIG ended up paying.  Okay?  This was the
 3     initial line of credit that the Federal Reserve Bank of
 4     New York negotiated with AIG in September of 2008.  Within
 5     two years, very ra- -- I mean, within two months, very rapidly,
 6     this was renegotiated.
 7             By November of 2008, the terms were substantially
 8     different.  Okay?  Also, at that time, Treasury came in with a
 9     $40 billion preferred stock purchase in AIG; the 85-billion
10     line was reduced to 60 billion.  The term was extended from
11     two years to five years.  The interest rate was reduced
12     downward to LIBOR plus 3 percent, which, at that time in
13     November of 2008, was only 5.93 percent.  It wasn't 12 percent
14     or higher.  And the PCF was negotiated down to 75 basis points.
15     So those were the prices they actually paid.
16     Q.  So you were focused on what they actually paid; right?
17     A.  Correct.
18     Q.  Okay.  What did he say about what they actually paid?
19     A.  Well, I think that's on this slide.  He was asked about the
20     fact that the AIG agreement was redone in November when this
21     preferred equity investment came from U.S. Treasury.  And I've
22     read this about three times.  It's really hard to make sense of
23     it.  Something about equity coming in below -- below the credit
24     line and making it safer and -- and then he discusses how I
25     used the revised version of the agreement for the secured
```

1  loans, but it's still not an equity investment.  It's just

2  assuming there's an equity investment, and he says yes to it.

3  Q.  Okay.  So in the end, did he ever do an analysis that

4  compared the November 2018 [sic] terms to Fannie and Freddie?

5  A.  Not only did he not do an analysis of the actual terms that

6  prevailed in -- you know, two months after the initial

7  agreement, but his criticism of my use of the November 2008

8  terms makes absolutely no sense to me.

9       Because he says, well, the situation changed, and that's

10  why I don't want to use the -- the revised terms.  Well, what

11  is it that changed?  What changed is that AIG was hemorrhaging

12  money.  They were just bleeding money.  And so the initial

13  assistance was considered not to be adequate.

14       So the government put in more money and they lowered the

15  price.  That's what changed.  And so what should you be using?

16  You should be using the terms that correspond to the new

17  assistance that came in at the lower price, which is what AIG

18  ended up paying.

19  Q.  Okay.  And, again, what was your conclusion with comparing

20  the AIG terms to the terms that were -- that were talked about

21  for Fannie and Freddie?

22  A.  Sure.  So, you know, if you look at in August of 2012,

23  AIG is paying 3.43 percent versus 10 percent.  So based on

24  this comparison, my conclusion was that even without a PCF,

25  Treasury was adequately compensated if one uses AIG as a

1   benchmark.

2   Q.  Okay.  And, again, was Treasury's investment in AIG -- was

3   that in conflict with the public interest?

4   A.  Well, absolutely.  I mean, the reason for assisting AIG was

5   in the public interest as stated by Treasury for financial

6   stability.

7   Q.  Okay.  The last one we're going to look is the FDIC.  So

8   tell us how it is you derived your 2.5 basis points to 45 basis

9   points as the appropriate -- if you're going to apply a PCF,

10   the appropriate range.

11   A.  So I looked at all of these comparables, and they were

12   extremely useful because they told me that with the terms that

13   Treasury itself said, the taxpayers actually made a good return

14   on in these other assistance packages.

15         You could get that even with -- without a positive PCF,

16   but if I -- I was asked to assume a positive PCF, and so having

17   settled the adequate compensation issue, it looked at other

18   benchmarks for positive PCF, and one of the benchmarks actually

19   comes from the loan commitment data we saw earlier which said

20   26 to 38 basis points if you just focus on the commitment fee

21   as opposed to the all-in cost.  The other benchmark came from

22   FDIC deposit insurance.

23         So, remember, the FDIC is essentially making a

24   commitment to provide banks with the funds that they need if

25   the bank experience is a bank run and depositors want to

1    withdraw their money that the bank doesn't have; and the FDIC

2    says, okay, if you don't have the money, we'll make these funds

3    available to you so you can pay off the depositors.

4         So it's very similar to -- to the Treasury's commitment,

5    which was to say, you know, if you need the money, we'll give

6    you the money in these other terms, and the FDIC charges you a

7    fee for it, which is like the PCF.

8         And so the FDIC states that for large and complex

9    financial institutions, the range is 2 and a half to 45 basis

10   points.  And the reason why there's a range is there are a lot

11   of bank-specific factors that come into play in determining the

12   exact price.

13   Q.  Okay.  So there was an effort made by Dr. Attari to correct

14   your FDIC calculation.  Can you tell us what your impression of

15   that was.

16   A.  Oh, it's completely misguided.  He completely misses the

17   point of what I did and why I did it and how I did it.  So I

18   think the easiest way to show what I did in the simplest

19   possible terms that I can think of is if I could just go to the

20   flip chart.

21   Q.  Sure.

22   A.  And --

23   Q.  Okay.

24        MR. HOFFMAN:  Your Honor, may I approach so I can

25   see?  Thank you.

1    BY MS. DAVIS:

2    Q.  So, Dr. Thakor, just to focus us, it appears that he uses a

3    different base for his calculation?

4    A.  Yes.  So what he did was -- so let me just show you what I

5    did --

6    Q.  Okay.

7    A.  -- and then we'll talk about what Dr. Attari did.

8         So what I did in my calculation is to say, well, let's

9    say that we have a bank here.  Okay?  And I'm going to take a

10   very simple example.  It has insured deposits.  Let's say for

11   the sake of this example, it's a hundred dollars.  Okay?  And

12   then I have a bunch of other liabilities that I'm not insured

13   by the FDIC.  So it could be uninsured deposits.  It could be

14   subordinated debt.  It could be a bunch of other stuff.  And

15   then below this, I'll have equity.  Okay?

16        Now, what Dr. Attari does is he says, well, the 2 and a

17   half to 45 basis points the FDIC says is on total assets

18   minus -- minus tangible equity, so it's all of these

19   liabilities.  Okay?

20        All right.  So what I did in my calculation was to

21   say -- for a start, that's true, but then what Dr. Attari did

22   not mention is that the FDIC has a whole slew of additional

23   adjustments that they make to that base.  And so it gets pretty

24   complicated as a formula.

25        The simplest way to look at this -- which is what I

1    did -- is for these institutions between 2011 and 2016, I just

2    asked, what did they pay as a fee for this deposit insurance

3    premium?  Okay?  That's in the public records.  You can go to

4    these banks.  There are nine banks in my sample, and I can look

5    up the fee.

6        Then I say, how much did the FDIC ensure?  The FDIC only

7    insures this.  They don't insure all this other stuff.  Okay?

8    So no matter how many times somebody says that, it's not true.

9    They only insured the insured deposits.  Okay?  That's the

10   contract.

11       So when I looked at the data, I saw that the range for

12   these banks is 30 -- $0.13 -- thank you -- to $0.43 -- okay? --

13   to insure a hundred dollars in deposits.  So it's 13 to 43

14   basis points.  Okay?

15       Then when I go to the GSEs, I say, what is the

16   Treasury's commitment?  Well, at this time, in August of 2012,

17   this was about $258 billion.  This is the undrawn portion of

18   the commitment; right?  Then they've got a whole bunch of other

19   liabilities that is, you know, over $5 trillion.  Treasury had

20   nothing to do with this.  Treasury is not guaranteeing any of

21   this.  Treasury is only making a commitment to let them draw

22   down an additional $258 billion.

23       So what is the PCF?  What is the price for making this

24   funding available?  Well, take the 13- to 43-cents range;

25   right?  And here the average is 23 basis points; that's my

1    average.  Okay?  So I said -- the 13 to 43 falls inside of my

2    2.5- to 45-basis point range.  So I'm still good; right?  This

3    range contains the 13 to 43.

4         By the way, this range also contains the 26 to 38 basis

5    points that I got from my loan commitment analysis.  So it's

6    all consistent; right?  They're multiple checks on my range,

7    and they all support the range.

8         And so what I did is I took the 45 basis points and

9    applied it to the 258 billion and I got 1.16 billion.  Okay?

10   Whereas what Dr. Attari does is -- he takes it and applies

11   this -- and applies it to all of the liabilities, which is

12   completely wrong, and misses the whole point of the analysis.

13   Q.  Thank you, Dr. Thakor.

14        So this 23 basis points that ended up being your

15   average, that's what we see here in this slide?

16   A.  Yes.  So 13 to 43 is the range.  And the average is 23 for

17   these nine large and complex institutions, between 2011 and

18   2016.

19   Q.  Okay.

20   A.  So this was what they paid for deposit insurance.

21        And, by the way, some of these banks were really large.

22   Like Bank of America has over $800 billion in insured deposits.

23   So the commitments are extremely large, even larger than those

24   to the GSEs.

25   Q.  Now, Dr. Thakor, there has been discussion about the --

1    sort of -- what you just referenced, the volume of the GSEs,

2    the commitment that was needed for them.  That -- that

3    particular issue has been raised and that is so large that you

4    can't possibly compare it to any of the -- the comparables that

5    you had here.  What's your response to that?

6    A.  Well, yeah, these were large commitments.  I mean, there's

7    no disagreement with that.  But they were made in the public

8    interest for financial stability.  The commitments that the

9    FDIC makes to commercial banks are extremely large too.  I just

10   mentioned Bank of America, $800 billion.

11        You know, JPMorgan Chase, $665 billion in insured

12   deposits.  So these are also very large commitments.  The

13   commitments made to the CPP banks, $205 billion, very large;

14   right?

15        And at the end of the day, Treasury had as much interest

16   in supporting the commitment as the GSEs had in receiving the

17   commitment because there's no way that either the Federal

18   Reserve or the Treasury wanted the financial system to fail.

19        So, you know, the -- the interest of all parties were

20   aligned.  The U.S. government and -- I mean, broadly the

21   Federal Reserve and Treasury and other agencies -- all had an

22   interest in having these banks and these institutions actually

23   accept this recapitalization assistance because they wanted

24   them to recover and they wanted financial stability.

25        This is something that -- every conversation I've had

1    with people in the Federal Reserve, I've heard the same thing

2    over and over again; that we wanted to recapitalize these

3    banks.  We wanted them to accept these assistance packages

4    because it was important for the financial system to recover.

5    It wasn't just a one-sided deal.

6    Q.  Okay.  And the -- your opinion about, sort of, the volume

7    and everything else that we've heard here today, it is just

8    about the periodic commitment fee, you're not, sort of, opining

9    on the entire package -- the entire package that was offered to

10   the GSEs, but rather just -- whether or not that commitment

11   fee, if it were assessed above zero, what it would look like?

12   A.  Right.  My -- my testimony is confined to the commitment

13   fee.  I was asked to assume positive commitment fee, and given

14   that a positive commitment fee had to be charged, what would be

15   a reasonable commitment fee based on market value.

16   Q.  Okay.

17   A.  And that's exactly what I've done.

18   Q.  And did Dr. Attari address this particular slide at all,

19   this 23 basis points that you got to?

20   A.  No.  He actually ignored -- he completely ignored this

21   calculation that I just showed you, where I looked at the

22   actual dollar amounts that the banks paid for their insurance

23   and then just divided it by the dollar amount of insured

24   deposits to compute the effective premium as a percentage of

25   insured deposits.  He just -- he never referred to it.

```
 1    Q.  Okay.  Now, there come a time when -- let's do this first.

 2         In the end, there was a Treasury standing commitment to

 3    FDIC.  Do you remember talking about that?

 4    A.  Yes.  So in addition to the FDIC providing insurance to

 5    banks, the FDIC also has a credit line with the Treasury.  So

 6    if there are massive bank failures and -- and the FDIC runs out

 7    of its deposit insurance fund, if that gets exhausted, then the

 8    FDIC has the ability to go to Treasury and borrow up to a

 9    $100 billion.  There's no commitment fee here.

10         And they can borrow at the same rate as the U.S.

11    government can.  So the ten-year Treasury rate in August of

12    2012 was 1.81 percent.  So that would have been their cost if

13    they had tapped this credit line back then.

14    Q.  Okay.  And did Dr. Attari talk at all about or opine at all

15    on this particular comparable?

16    A.  No, he did not.

17    Q.  Okay.  So to summarize, just quickly, can you walk us

18    through your impression of Dr. Attari's critique.

19    A.  So, first, is I think he -- you know, he either

20    misunderstood or misstated my opinion, as I indicated earlier.

21    He ignored this critical second step in the FDIC analysis where

22    I took the actual insurance fees paid by banks and divided it

23    by -- divided that by the actual amount of insured deposits

24    to compute the effective price that I then used to infer the

25    PCF range.  He ignored certain comparators entirely, as we
```

1    covered.

2         His statement about equity being needed just to top off

3    the equity capital in CPP banks misstates the reality that

4    existed back then.

5         And the rationale that the Federal Reserve and Treasury

6    had for bailing out these banks and assisting them, he ignored

7    the terms of the CPP, the Capital Purchase Program, in terms of

8    an all-in cost comparison, the way that I conducted that

9    analysis.

10         He ignores the revised terms that AIG ended up with in

11    November of 2008, what they actually paid.  He did not offer

12    any additional comparators, and he did not provide any of his

13    own market-based analysis.

14         So, you know, I did all this work with all of these

15    market-value-based comparables the way that the PSPA actually

16    instructs us to do and came up with a range that is supported

17    by multiple perspectives.  And he has a lot of criticisms,

18    which I've addressed, but he doesn't offer any of his own

19    market-based PCF analysis.

20    Q.  While you were here, Dr. Thakor, did you hear Mr. DeMarco

21    say anything about the PCF?

22    A.  No.  I mean, he -- you know, he used words like substantial

23    and so on, but he did not -- in fact, he said that they --

24    at -- neither he nor anybody else at FHFA conducted an analysis

25    to quantify the PCF, to come up with a number.

1    Q.  Now, were you here when he claimed that the -- that the --

2    that the entire net worth could be something that would be

3    reasonable as a substantial PCF?

4    A.  Yeah.  He said something like that; that the net worth

5    sweep taking away all the profits would be sort of a reasonable

6    approximation of the PCF.  I don't remember his exact words,

7    but I -- I remember that he definitely implied that.  Yes.

8    Q.  And what was your reaction to that?

9    A.  Well, based on the analysis that I've presented and the

10   analysis that Mr. DeMarco did not do -- neither did Treasury --

11   that statement is completely wrong, because as you can see from

12   this chart, if you take 45 basis points, the upper end of my

13   range, for the PCF and the 10 percent dividend -- remember that

14   was 18.9 billion, plus you add 1.16, you're at around 20

15   billion plus something.  Okay?  And the excess over this

16   $18.9 billion in dividends that the GSEs actually paid Treasury

17   was $111.2 billion.

18        That is not equal to $1.16 billion.

19   Q.  And, Dr. Thakor, who is the only person in this entire

20   case to have actually done the market base all-in cost PCF

21   analysis?

22   A.  I am.

23        MS. DAVIS:  Court's indulgence.

24        That's all.  I tender the witness.

25        THE COURT:  The defendants may cross-examine.

THAKOR - REBUTTAL DIRECT

```
1                    REBUTTAL CROSS-EXAMINATION

2    BY MR. HOFFMAN:

3    Q.  Good afternoon, again, Dr. Thakor.  Ian Hoffman on behalf

4    of the defendants.

5              MR. HOFFMAN:  Good afternoon, members of the jury.

6    A.  Good afternoon.

7    BY MR. HOFFMAN:

8    Q.  Dr. Thakor, you testified with Ms. Davis, I believe while

9    you were drawing on the easel, that in August 2012, the undrawn

10   portion of the Treasury commitment was about 258 billion.  Do

11   you recall that?

12   A.  Yes.

13   Q.  That's just wrong; right?  It's untrue?

14   A.  Well, it was -- at the time of the -- at the time of the

15   third amendment, it was about $114 billion that Fannie still

16   had to draw down on the commitment, and -- and Freddie was

17   about 140; right?

18   Q.  At the time of the third amendment in August of 2012, the

19   Treasury commitment was infinite; right?

20   A.  Well, we're talking about in lieu of the third amendment.

21   If, in fact, Treasury had -- the -- you're talking about the

22   second amendment being in effect?

23   Q.  So, yes, in December -- on December 24th of 2009, a date

24   that the jury has heard a lot about, FHFA and Treasury entered

25   into the second amendment to the PSPAs, and the second
```

1    amendment lifted the cap on the Treasury commitment until the

2    end of 2012, until December 31st, 2012.  Isn't that right?

3    A.  Right.

4    Q.  So in August of 2012, which is before December of 2012, the

5    Treasury commitment was unlimited, no cap?  It was effectively

6    infinite; isn't that right?

7    A.  No, that's not correct.  I mean, everybody has been talking

8    about -- in this trial about the cap was anticipated.  It was

9    going to come when this expired, and that the net worth sweep

10   basically replaced the possibility of a cap.

11        So we're talking about what the undrawn commitment was

12   in effect once the cap was in place.  And at that point, the --

13   you know, based on how much they've drawn down with respect to

14   the $200 billion, this was a portion that was left.

15   Q.  So in August of 2012, the undrawn portion of the Treasury

16   commitment was unlimited?  It was effectively infinite.  You

17   don't dispute that; right?

18   A.  If, in fact, the Treasury commitment would never have had a

19   cap.  What I'm saying is that with the cap, with the

20   $258 billion that was left on the undrawn portion of the

21   commitment, this is what the PCF would have been.

22   Q.  Before the cap went into place at the end of 2012, no

23   matter how great Fannie and Freddie's losses, Treasury's

24   obligated to cover those losses and cure any net worth deficit

25   no matter the amount.  That was the truth in August of 2012;

1      right?

2      A.  No.  But if you have -- that doesn't make any sense.  I'm

3      sorry.  If you're going to have a PCF on a commitment, you have

4      to stipulate what the commitment is.  You can't say -- that's

5      very circular reasoning to say, well, the PCF is infinite

6      because the commitment is infinite.  Then you can't even talk

7      about a PCF in the PSPAs.

8      Q.  So if the Treasury commitment was effectively infinite,

9      then a PCF of even 1 basis point, that would impose an infinite

10     cost on Fannie and Freddie; right?

11     A.  No.  If it's to be literally interpreted as infinite, the

12     PSPA whose guidance on setting the PCF makes no sense to me as

13     an economist.

14          When I go back to the PSPA and what it said -- and I'm

15     just interpreting this as an economist when it says use

16     market-value-based comparables, reasonable discretion of the

17     two parties in consultation with the Federal Reserve.  If it's

18     infinite, you don't need to say any of that.  You can charge

19     whatever you want.

20     Q.  What I'm going back to is what you told the jury; that in

21     August of 2012, the amount remaining of the Treasury commitment

22     was $258 billion.  And that was incorrect; right?

23     A.  That was not incorrect.  The statement that this is

24     infinite and, therefore, the PCF is infinite does not make any

25     economic sense.

1              MR. HOFFMAN:  I'd like to ask Mr. Montgomery to pull

2      up JX-1 and let's go to paragraph 26.  So JX-1, page 7 of 19.

3              And I'm just going to read this to the members of the

4      jury.

5              And this, again, is from the joint statement of

6      undisputed facts that all the parties have agreed to.

7              On December 24th, 2009, Treasury and FHFA, acting as

8      conservator for the enterprises, again amended the PSPAs, the

9      second amendment.  The second amendment replaced the

10     200-billion Treasury commitment to each enterprise with a new

11     commitment to provide as much funding as each enterprise needed

12     to prevent insolvency through December 31st, 2012, after which

13     time a cap on the commitment would be reinstated and fixed

14     pursuant to a formula.

15     BY MR. HOFFMAN:

16     Q.  Dr. Thakor, you don't disagree with the joint statement of

17     undisputed facts between the plaintiffs and the defendants in

18     this case; right?

19     A.  I have no reason to.

20     Q.  Okay.

21             MR. HOFFMAN:  You can take that down, Mr. Montgomery.

22     BY MR. HOFFMAN:

23     Q.  You were also asked some questions, Dr. Thakor, about

24     whether Dr. Attari offered his own methodology or whether he

25     offered a number; meaning an amount for the PCF.  Do you recall

THAKOR - REBUTTAL CROSS

1    that?

2    A.  Yes, I do.

3    Q.  And I believe you testified that Dr. Attari did not offer a

4    number.  Do you recall that?

5    A.  Yes, I do.

6    Q.  Okay.  So let's take a look at what Dr. Attari actually

7    presented to the members of the jury.

8                MR. HOFFMAN:  So, Mr. Montgomery, if you could pull

9    up Slide 68 from Dr. Attari's presentation that he gave to the

10   members of the jury.

11   BY MR. HOFFMAN:

12   Q.  This is one of the slides that he presented during his

13   testimony, and I'm -- you've seen this before; right?

14   A.  Uh-huh.  Yeah, and I testified this is incorrect.

15   Q.  You've seen this before?

16   A.  Yeah, I've seen this.

17   Q.  Okay.  And you see at the top of the page, it says:

18   Dr. Thakor's calculation.  In red font.  Do you see that?

19   A.  Yes.

20   Q.  And it's a PCF of 1.16 billion per year, and that is, in

21   fact, your calculation of the PCF using 45 basis points, the

22   high end of your range; right?

23   A.  Correct.

24   Q.  Okay.  And then on the bottom line, it says:  Dr. Attari's

25   calculations.  Do you see that?

```
 1    A.  Yes.

 2    Q.  And there's a different calculation there, different than

 3    yours, and Dr. Attari's calculation there, it says:

 4    23.4 billion; right?

 5    A.  Right.

 6    Q.  And you understand that means a PCF of 23.4 billion per

 7    year; right?

 8    A.  Right.

 9    Q.  And you were asked some questions about the SEC filings

10    where Fannie and Freddie said the PCF could be substantial.  Do

11    you recall that?

12    A.  Correct.

13    Q.  Okay.  And you'd agree with me, Dr. Thakor, that a

14    $23.4 billion per year PCF, that would be substantial; right?

15    A.  And wrong.

16    Q.  It would be substantial -- right? -- because I believe you

17    testified that even 1.16 would be substantial.  So 23 --

18    A.  It would be --

19    Q.  I'm sorry.  23.4 would be substantial as well; right?

20    A.  It would be substantial and it's a wrong number.

21    Q.  And it would also be wrong to tell the members of the jury

22    that Dr. Attari didn't come up with a number -- right? --

23    because we're looking at a number right here?

24    A.  Well, I just testified with this slide, and I explained to

25    the jury that this is what Dr. Attari did and why he -- what he
```

1    did was wrong.  This is not his --

2    Q.  Right.  Right now --

3    A.  May I finish?

4    Q.  I'm sorry.  Yes.

5    A.  This is not his own methodology based on anything.  He's

6    simply taking my methodology and saying that he's got a

7    different way to insert the base in this multiplication, which

8    is incorrect, as I pointed out.

9        And so this is not his methodology.  This is his claim

10   that he's correcting my calculation.

11   Q.  What I'm asking about now is not whether you think

12   Dr. Attari was incorrect.  I'm asking you about what you told

13   the jury, and you told the jury when you took the stand in

14   response to Ms. Davis's questions that Dr. Attari hadn't

15   offered a number.  But he offered a number right here; right?

16   It's a number you disagreed with, but he offered this number;

17   right?

18   A.  Maybe it's just semantics, but I think I explained this to

19   the jury quite clearly; that this wasn't his methodology.  This

20   was his attempt -- an incorrect attempt to try and correct my

21   calculations.  That's all.

22       MR. HOFFMAN:  All right.  Thanks, Mr. Montgomery.

23   You can take that down.

24   BY MR. HOFFMAN:

25   Q.  Now, Dr. Thakor, you understand that Fannie and Freddie

1    owed the Treasury Department a 10 percent dividend and also a

2    PCF; and that throughout 2011 and 2012, Treasury waived the PCF

3    because Fannie and Freddie didn't have enough money to pay the

4    10 percent dividend?  You understand that; right?

5    A.  They waived the PCF -- they never actually charged a PCF.

6    They waived it, yes.

7    Q.  And you understand that if Fannie and Freddie had ever

8    started earning enough money to afford the 10 percent dividend

9    and if they had money left over, then Treasury could have

10   started charging a PCF?  You understand that; right?

11   A.  Yes.

12   Q.  And you understand that if that had happened, FHFA and

13   Treasury -- they would have to get together to negotiate the

14   amount of the PCF in consultation with the chair of the Federal

15   Reserve?  You understand that; right?

16   A.  Yes.

17   Q.  Okay.  So, Dr. Thakor, you're not offering an opinion about

18   what Treasury would have said or done or agreed to in that kind

19   of negotiation; right?

20   A.  Right.  I'm not opining on behalf of Treasury.

21   Q.  And you were not offering any opinion about what FHFA would

22   have said or done or agreed to in such a negotiation about the

23   amount of the PCF; right?

24   A.  I can't -- I can't read anybody's mind.  I'm simply

25   interpreting the economic guidance provided by -- by the PSPA

1    in terms of how to set the PCF, which is what I used to do my

2    analysis.

3    Q.  So the answer is no, you're not offering that kind of

4    opinion; right?

5    A.  Correct.

6    Q.  Okay.  And you're not offering any opinion about what the

7    chair of the Federal Reserve would have said or done in such a

8    negotiation; right?

9    A.  No, I'm not.  But I'm saying that if, in fact, a reasonable

10   assessment of the PCF had been made based on market value as

11   the PSPA directed the parties to do, the way that I present my

12   analysis is a reasonable way to do the analysis based on market

13   value comparables.  So whether they would have followed that or

14   not, obviously, I can't speak to, but the PSPAs provided some

15   guidance in terms of how to go about doing it.  I would assume

16   that reasonable people, economists, would have followed that

17   guidance if they had attempted to quantify the PCF, and that's

18   exactly the -- the analysis that I did.

19   Q.  So the answer is no, you're not offering any opinion about

20   what the chair of the Federal Reserve would have said or done

21   in such a negotiation; right?  The answer is no?

22   A.  I'm offering an opinion about what a reasonable way to

23   assess the PCF based on market value would have yielded.

24   Q.  So nothing about what the chair of the Federal Reserve

25   would have done; right?

```
1              MS. DAVIS:  Asked and answered.
2    A.  I think the Federal Reserve has been very reasonable.
3    BY MR. HOFFMAN:
4    Q.  Okay.  You recall that you gave testimony in a prior
5    proceeding about the PCF; right?
6    A.  Yes.
7    Q.  And you were asked similar questions about what Treasury
8    would have -- about whether you had an opinion on what Treasury
9    would have done, what FHFA would've done, and what the chair of
10   the Federal Reserve would have done in such a negotiation.  You
11   recall you were asked questions about that; right?
12   A.  Yes.
13             MR. HOFFMAN:  Okay.  So let's pull up the transcript,
14   page 1676, from the prior proceedings, Mr. Montgomery.
15             MS. DAVIS:  Counsel, can you give me notice of page
16   and line, please.
17             MR. HOFFMAN:  At line 21.  It's page 1676, starting
18   at line 21 and going to line 25.
19             MR. KAPLAN:  Your Honor, may we go to the phones
20   briefly, please.
21             THE COURT:  Yes.
22             (Bench conference on the record.)
23             MR. KAPLAN:  Your Honor, I -- this is Sam Kaplan for
24   the plaintiffs.
25             I think where Mr. Hoffman is going is going to be okay,
```

1    but there is -- on this page there is a reference to

2    Dr. Thakor's opinion that the PCF would have been zero.

3         The parties had an agreement in this case that he was

4    just going to say that he assumed that the PCF would have been

5    positive -- and that he was going to assume the PCF would have

6    been positive.  He was not going to reference his zero PCF

7    opinion.

8         So I just want to make sure that counsel is not going to

9    go anywhere near the zero PCF.  If he's asking about something

10   else, that's -- that's perfectly fine, as long as it doesn't

11   reveal to the jury anything about this zero PCF, which would

12   open doors and mess things up.

13        MR. HOFFMAN:  Your Honor, Ian Hoffman on behalf of

14   the defendants.

15        The lines that I have highlighted here -- first of all,

16   I'm not going to display them to the jury.  And lines 21

17   through 25 of page 1676 do not mention zero PCF.  I have

18   been very careful to zoom in only on these lines.  And the

19   lines read:  What Chairman Bernanke would have opined in a

20   meeting with Treasury and FHFA, you know, I can't speak to

21   that.

22        I'm going to ask him if that was truthful and accurate

23   testimony and leave it there.

24        MR. KAPLAN:  We have no problem with that,

25   Your Honor.  That's fine.

```
 1                  (Proceedings held in open court.)
 2              MR. HOFFMAN:  Okay.  Mr. Montgomery, if you could
 3      pull up that just for the witness and the Court.
 4      BY MR. HOFFMAN:
 5      Q.  And, again, just to reorient us, Dr. Thakor, you gave
 6      testimony at a prior proceeding and you answered similar
 7      questions about what the Federal Reserve chair would have said
 8      or done in a negotiation about the PCF; right?
 9              MS. DAVIS:  Objection, Your Honor.  It's not
10      inconsistent.
11              MR. HOFFMAN:  Your Honor, I'm just reorienting the
12      jury to catch them back up on the questions that I asked.
13              MS. DAVIS:  Same objection.
14              THE COURT:  Go ahead.
15              MR. HOFFMAN:  Okay.
16      BY MR. HOFFMAN:
17      Q.  And you can see the -- the prior testimony on the screen;
18      is that right, Dr. Thakor?
19      A.  Yes.
20      Q.  And in that prior proceeding, you said:  What Chairman
21      Bernanke would have opined in a meeting with Treasury and FHFA,
22      you know, I can't speak to that.  I'm not here to speak for
23      Chairman Bernanke.  I mean, he's a person for whom I have
24      enormous respect, but I can't speak for him.
25              Do you see that?
```

```
 1   A.  Yes.

 2   Q.  Did I read that correctly?

 3   A.  Yes.

 4   Q.  And it was truthful and accurate testimony; right?

 5   A.  Yes.

 6   Q.  Okay.

 7           MR. HOFFMAN:  No further questions, Your Honor.

 8           THE COURT:  Any redirect?

 9           MS. DAVIS:  Just briefly, Your Honor.

10        Can we call up paragraph 41 of JX-1.

11               REBUTTAL REDIRECT EXAMINATION

12   BY MS. DAVIS:

13   Q.  And, Dr. Thakor, was the PCF to be set with respect to the

14   market value of the commitment as they were -- as it was then

15   in effect?

16   A.  Right.

17   Q.  Is that how you got your range for what you evaluated your

18   basis points against?

19   A.  Yeah.  This was the undrawn portion as stated here; the

20   258 billion is what you get if you add up the 117.6 and 140.5.

21   Q.  Okay.  And --

22           MS. DAVIS:  You can take that down.  Thank you.

23   BY MS. DAVIS:

24   Q.  And you were asked questions about Dr. Attari's number.

25   A.  Uh-huh.
```

1    Q.   Do you remember that series of questions?

2    A.   Yes.

3    Q.   And exactly what -- what was it that you were referring to

4    when you referred to the number?

5    A.   Well, what I was referring to was that he did not perform

6    any of his own analysis to come up with a number that he

7    presented to the jury as the appropriate PCF.  All that he

8    did was -- well, if I take Professor Thakor's number and I

9    correct it the way I want to, I get a different number.  But I

10   didn't see him offer any number as an affirmative estimate of

11   the PCF.  And that's what I was indicating.

12   Q.   So he used the top of your PCF range, 45, to apply it to a

13   different base; is that right?

14   A.   Yeah.  He used the 45 basis points from my analysis and

15   applied it to the wrong base to come up with a number and said

16   this is the corrected number that I should have arrived at.

17   Q.   Okay.

18   A.   And that's not the same as doing your own analysis.

19   Q.   Indeed.

20            Thank you so much, Dr. Thakor.

21            MS. DAVIS:  Thank you, Your Honor.

22            THE COURT:  All right.  You can step down.

23       Next witness.

24            (Witness excused.)

25            MR. KRAVETZ:  Your Honor, may we be heard briefly

THAKOR - REBUTTAL REDIRECT

1     on -- on the phone for one moment?

2              THE COURT:  All right.

3              (Bench conference on the record.)

4          MR. KRAVETZ:  Thank you, Your Honor.  Robert Kravetz

5     on behalf of plaintiffs.

6          I appreciate Mr. Bergman and -- we have gone back and

7     forth.  There's only one objection, Your Honor.  It's to

8     Slide 17 of plaintiffs' presentation.

9          MR. BERGMAN:  Your Honor, David Bergman for

10    defendants.

11         Shall I state the objection?

12             THE COURT:  Yes.

13         MR. BERGMAN:  So Slide 17 is presenting some data

14    and calculations that has not been disclosed previously.

15    It was disclosed last night.  It's responsive to a point

16    that Dr. Attari made in his expert report of February 2022.

17    Dr. Dharan had an opportunity -- he submitted an expert

18    report subsequent to that, but he did not present these

19    calculations.

20         The issue is Dr. Attari had looked at the Benson

21    projections -- Your Honor may recall those -- and Dr. Attari

22    had said that the DTA was accounted for rather than in a lump

23    sum by -- by Mr. Benson, apparently assuming that there would

24    be no taxes paid on profits going forward, and so in that way,

25    the DTA was used over time.  And, apparently, Dr. Dharan, who

1    did not address this in his subsequent expert report now as of

2    last night, wants to present these figures showing -- I guess

3    illustrating what would have happened if Mr. Benson had done

4    his projections in a different way and accounted for the DTA

5    reversal up front rather than over time.  And so we object to

6    that.

7         MR. KRAVETZ:  Your Honor, Robert Kravetz on behalf of

8    plaintiffs.

9         Just starting with the methodology here, Slide 14

10   discusses -- and this is what Dr. Dharan testified about

11   earlier, that there would have been a release of the deferred

12   tax asset of $58.4 billion in 2013.  And then if you proceed to

13   the next slide, Slide 15, Slide 15 includes direct testimony

14   from Dr. Attari regarding the projections and, in particular,

15   what was in the projections and what was not in the

16   projections.

17        And so Dr. Attari said if you look at the residual

18   equity line, which is really the line running capital that they

19   accumulated would show up, it goes up a little bit.  So they

20   weren't going to accumulate capital.

21        And Dr. Attari testified that they didn't have taxes in

22   there.  They presumed there will be no taxes.  So the benefit

23   of the DTA is actually built into these projections.

24        And then when we look at Slide 16, this is the actual

25   slide that -- that Dr. Attari showed during his presentation.

1    And if Your Honor recalls, that residual equity line is zero

2    and then it goes up to, I think, a high of 2.8 and then back to

3    zero in 2022.

4         Now, Dr. Dharan has already criticized the projections

5    for not taking into account the fact that there would have --

6    reasonably foreseeable that there would be a release of the DTA

7    evaluation allowance; and I've placed on the screen

8    paragraph 26 of Dr. Dharan's March 2021 report in this case.

9         So I think it's clear that Dr. Dharan can -- you know,

10   can criticize the fact that the projections don't include the

11   additional number and then just describe to the jury just in

12   general what the change in residual equity would have been

13   that's consistent with his previous methodology in his prior

14   report.

15        The only difference in Slide 17 is that based on the

16   specific testimony from Dr. Attari in this case, is that

17   Dr. Dharan inserted the number from Slide 14 to which there's

18   no objection into the comprehensive income line for 2013 on

19   Slide 17.

20        That's the only -- the only difference.  We -- our

21   position is that this is a previously disclosed methodology in

22   terms of calculating the DTA.  There certainly is criticism in

23   terms of what the projections would have shown if the DTA was

24   reasonably foreseeable.

25        And to the extent that this is any new information in

2668

1    Slide 17, we are in rebuttal right now, and district courts

2    routinely permit experts for rebuttal purposes to use any

3    methodology to rebut the opinion of the opposing expert.  This

4    really isn't a new methodology.  It's just using something that

5    he's already done to illustrate the point for the jury.

6         So while we believe he can already, you know, criticize

7    the testimony based on what's in Slide 16 -- and there's no

8    objection to Slide 16 -- we think that Slide 17 would be

9    helpful to the jury on this run.

10        MR. BERGMAN:  Your Honor, David Bergman for the

11   defendants.

12        I would just point out the -- the language on Slide 14

13   quoting Dr. Attari's trial testimony, that is -- that is an

14   opinion that Dr. Attari expressed in his report back in 2022,

15   and so to now set this up as rebuttal testimony that Dr. Dharan

16   has made a point at trial is, I think, not a fair

17   characterization.

18        This has been Dr. Attari's position for a year and a

19   half or more, and Dr. Dharan had an opportunity to present

20   these calculations and to do whatever methodology he wanted in

21   his second report and he didn't do it.  So this is the first

22   we're seeing it.

23        THE COURT:  The objection is sustained.  I agree with

24   that.

25        MR. KRAVETZ:  All right, Your Honor.

```
 1                    (Proceedings held in open court.)

 2              THE COURT:  You can bring your witness.

 3              MR. KRAVETZ:  Thank you, Your Honor.

 4          Plaintiffs call Dr. Bala Dharan.

 5              THE COURT:  Okay.  Doctor, you've previously

 6    testified, so you can resume the stand.  I'll remind you you're

 7    still under oath.

 8          You may proceed.

 9              MR. KRAVETZ:  All right.

10                    REBUTTAL DIRECT EXAMINATION

11    BY MR. KRAVETZ:

12    Q.  Good afternoon, Dr. Dharan.

13    A.  Good afternoon.

14    Q.  Can you please just state and spell your name for the

15    record.

16    A.  Bala Dharan.

17    Q.  All right.  And, Dr. Dharan, have you been present in the

18    courtroom throughout these trial proceedings?

19    A.  Most of the time, yes.

20    Q.  And have you had an opportunity to observe the defense case

21    in this trial?

22    A.  Yes.

23    Q.  All right.  And have you put together some slides that set

24    forth your opinions in response to what you -- you have

25    observed as part of the defense case?
```

```
1    A.  Yes.

2              MR. KRAVETZ:  Your Honor, permission to display the

3    slides?

4              THE COURT:  Yes.

5    BY MR. KRAVETZ:

6    Q.  Dr. Dharan, I want to start by displaying your -- your

7    second slide, which has a particular slide from Dr. Attari.

8              MR. KRAVETZ:  Thank you.

9    BY MR. KRAVETZ:

10   Q.  All right.  Now, Dr. Dharan, are you familiar with

11   testimony that Dr. Attari gave in this matter?

12   A.  Yes.

13   Q.  Were you present for that?

14   A.  Yes.

15   Q.  All right.  And you're aware that this -- what's being

16   shown right now on the screen is a slide entitled Reasons

17   Dr. Dharan is Wrong?

18   A.  Right.

19   Q.  All right.  And, in general, there are two reasons that are

20   listed as to why Dr. Attari testified that your opinions were

21   wrong in this matter; correct?

22   A.  Right.

23   Q.  Okay.  Now -- and the first indicates:  Minimizes that

24   FHFA's stated goal was to promote stability of secondary

25   mortgage market by eliminating the risk of circular draws?
```

```
1    A.  Yes.

2    Q.  And the second is:  Dr. Dharan's optimism about the

3    enterprises' prospects in 2012 was not shared by the

4    enterprises or FHFA?

5    A.  Yes.

6    Q.  Okay.  Now, let's start with the first.  And so can you

7    just describe to the members of the jury, what is the slide

8    that we're viewing?

9    A.  Okay.  So on the left, I have the testimony from

10   Dr. Attari.  So if it's in quote, I tried to get us the

11   original testimony in quotation there.  And then on the right,

12   I have summarized my responses and I have a couple more slides

13   to expand on those.

14   Q.  All right.  So on the left, sir, you have:  From

15   Dr. Attari's claim, my overall conclusion was it was reasonable

16   for FHFA to agree to the third amendment, and that's because it

17   furthered the conservator's goal to promote stability of the

18   secondary mortgage market in all economic conditions, by

19   eliminating draws on the commitment to pay the dividends -- the

20   dividends.

21        Did I read that correctly?

22   A.  Yes.

23   Q.  Okay.  And do you have a response to that, sir?

24   A.  Yes.  So I have two major responses.  First of all, the

25   third amendment does not promote stability in all economic
```

1    conditions.  In fact, during my -- in my testimony, I

2    identified specific conditions, at least three, and I tried to

3    explain, you know, each of them -- and I've summarized a couple

4    of them here -- in which the third amendment will -- especially

5    the net worth sweep -- will, in fact, lead to potential

6    shortfalls in -- in capital, which is going to make the

7    enterprises less stable and not more stable.

8    Q.  And when you list there that the third amendment deprives

9    the GSEs of necessary capital in a shortfall, what do you mean

10   by that?

11   A.  Yes.  So the word shortfall there, I'm referring to some

12   ordinary losses.  Let's say in 2013 or 2014 or '15, there's a

13   small operating loss for the enterprises.  Because of the net

14   worth sweep, there would be no capital -- other than the bare

15   minimum allowed, there would be no capital to dip into to

16   account for the shortfall.  So if the shortfall is even a small

17   amount, the enterprises would have to draw from Treasury to

18   make up for the shortfall.  So that's the first item that I

19   have listed there.

20   Q.  And then the second item lists:  Exposes GSEs to risks from

21   noncash increases to net worth.  Can you describe to the

22   members of the jury what you mean by that?

23   A.  Yes.  So a typical noncash increase in net worth would

24   be -- let's say writing up the different tax assets.  I know

25   we've heard the phrase many times, so hopefully not too often

1    from now, but -- so writing up the deferred tax assets could

2    lead to a big profit, but under the net worth sweep, there is

3    no -- the entire amount has to be paid up, and so that's going

4    to create a potential risk for the enterprises as to how to pay

5    for them.  So that's what I'm referring to in the second

6    bullet.

7    Q.  And did that, in fact, happen?

8    A.  That, in fact, exactly happened in 2013 when the DTAs came

9    back onto the balance sheet and each of the enterprises,

10   therefore, had to effectively borrow money in the bond market

11   to pay for that dividend that they had to pay as part of net

12   worth sweep.

13   Q.  And in your opinion, is the fact that Fannie and Freddie

14   had to borrow from the bond market to make their combined

15   $74.5 billion in dividend payments to Treasury consistent or

16   inconsistent with furthering a goal to promote stability of the

17   secondary mortgage market in all economic conditions?

18   A.  It's inconsistent.

19   Q.  Why is that, sir?

20   A.  Because they had to borrow all this money, which is now

21   sitting -- you know, which goes on their balance sheet,

22   $75 billion in debt -- I'm not saying all of it, but, you know,

23   a significant amount of -- the bulk of it, they had to borrow

24   to pay for the dividend.

25           So that loan is sitting on their books.  They are to pay

1    interest on it, and so on.  And more debt means, you know,

2    essentially, more risk that they have taken.

3    Q.  Now, the next -- your next slide, it states on the left for

4    Dr. Attari's claim:  I think the reason Dr. Dharan got it wrong

5    is that his analysis doesn't fully take into account that

6    FHFA's stated goal was to promote the stability of the

7    secondary mortgage market.  Did you do that, sir?

8    A.  No.  I actually did address that goal specifically in my

9    testimony.  So Dr. Attari's claim is not correct.

10   Q.  And how did you specifically address that goal in your

11   testimony, sir?

12   A.  I think -- yes.  In fact, I have a quotation on the right.

13   I believe, again, this is verbatim from my trial testimony;

14   that the lack of capital directly impacts the mission of Fannie

15   and Freddie and leads to instability in the secondary mortgage

16   market.  Essentially, what happens is when you don't have

17   capital, then it makes it more difficult to really deliver on

18   this mission that Fannie and Freddie have.

19   Q.  And just in terms of -- of just reminding the jury in terms

20   of the features of the net worth sweep and the relationship to

21   building or retaining capital.

22   A.  Right.  So the two features -- this is actually a slide I

23   used in my initial testimony.  The two features that are

24   important are, number one, the dividend is 100 percent of the

25   net worth.  So this is what we've been referring to for the

 1    last, you know, ten days as the net worth sweep; but the second

 2    one is a follow-up that I think is very important.  Namely,

 3    that Fannie and Freddie cannot retain any capital.  They cannot

 4    build capital, and so that's basically what causes the

 5    instability issue.

 6    Q.  Now, Dr. Dharan, you've also described before in terms of

 7    the stability of the secondary mortgage market that there could

 8    be -- that Fannie and Freddie could be exposed to certain

 9    harm --

10    A.  Right.

11    Q.  -- regarding the net worth sweep and stress scenarios; is

12    that correct?

13    A.  Yes, correct.

14    Q.  Can you describe what you mean.

15    A.  Yes.  So the first one is already something I mentioned

16    before, but I wanted to put this in here because this is the

17    slide I used in my initial testimony regarding this first item.

18    I'll have a second item in a moment.

19         So the first item says that because there is no net

20    worth buffer after the net worth sweep, even a small operating

21    loss, as I said earlier, even a few million dollars, even a

22    hundred million, whatever the amount is, would require that --

23    so it'd take the net worth down to the required minimum or even

24    zero.  So then you have to draw down from Treasury to cover

25    that.

1          But as -- before the net worth sweep, the enterprises

2     had the opportunity to build their capital.  So they could use

3     their capital that has been built up to take care of these

4     types of temporary short needs that happens to any company over

5     time.

6     Q.  And what about from a longer-term stress scenario?

7     A.  Yes.  So this is a different one from the one I mentioned

8     earlier.  This is a write-down.  Earlier I talked about what

9     happens when there's a write-up.  You have to pay all the

10    dividend and you have to borrow money.  Here we're talking

11    about -- I think bigger -- maybe -- you know, one of the

12    largest, biggest problems, which is if there is a write-down

13    that happens because of whatever reason -- could be an

14    accounting reason; could be economic reason -- but if there's a

15    write-down, it would require a major drawdown from the Treasury

16    commitment.

17         Again, if the capital had been allowed to build up, you

18    know, this -- this problem would be less severe because there

19    would be existing capital to take care of it.

20    Q.  Dr. Dharan, have you also reviewed language in SEC filings

21    from Fannie Mae and Freddie Mac that you think are relevant to

22    rebutting the testimony of Dr. Attari that the third amendment

23    furthered the conservator's goal in all economic conditions?

24    A.  Yes, I have.

25    Q.  All right.  And have you put some of those in a slide or

DHARAN - REBUTTAL DIRECT

1    two?

2    A.  Yes.

3    Q.  Okay.  And can you describe to us, sir, the particular

4    passage of an SEC report that you've chosen on this slide?

5    A.  Okay.  So first of all -- so this is an SEC report.  This

6    is from Fannie Mae.  It's a 2012 annual report.  You can see in

7    the bottom, it says Form 10-K.  That's the name of the annual

8    report, as I'm sure we have heard several times here.

9         So I'm highlighting an item that is almost identical to

10   what I just said in the previous slide.  So let me -- and I'll

11   be happy to read it out just to show how this is related to my

12   earlier comments.

13        So the first one is:  Because we are permitted to retain

14   only a limited and decreasing amount of capital reserves

15   through 2017, we may not have sufficient reserves to avoid a

16   net worth deficit if we experience a comprehensive loss in a

17   future quarter.

18        So this is the first item I showed earlier about just

19   your normal operating losses.  Even those would need a Treasury

20   draw; the first one they're talking about.

21        And then they're saying that -- the second highlighted

22   statement:  For any quarter for which we have a net worth

23   deficit, we will be required to draw funds from Treasury under

24   the senior preferred stock purchase agreements in order to

25   avoid being placed into receivership.

1   Q.  So the third amendment does not preclude the possibility of

2   future draws; is that correct?

3   A.  It did not, and I think, in fact, it increases it in

4   situations like this, since before the third amendment, the

5   enterprises would have had an opportunity to build -- would

6   have had an opportunity to build capital to take care of a

7   situation like this.

8   Q.  All right.  And then another portion of the Fannie Mae

9   annual report that you highlighted, sir, can you describe that

10  to the members of the jury.

11  A.  Right.  Right.  So this one, for example, it says:  It is

12  possible that due to noncash changes in net worth, the amount

13  of our dividend for a quarter could exceed the amount of

14  available cash, which could have an adverse effect on our

15  financial results.

16       So this is noncash changes in net worth.  So this is

17  exactly the first -- one of the first slides I showed where,

18  you know, there's a DTA coming back to the balance sheet.

19  There's a huge profit, and you have to pay that as dividend,

20  and you don't have enough money to pay.  So you have to borrow

21  money.  So this is basically what they are describing here.

22  Q.  And, Dr. Attari [sic], just the final --

23  A.  Thakor.

24  Q.  -- language that you have on the slide, this comes from

25  Freddie Mac; is that correct?

1      A.  Yes.

2      Q.  And -- and rather than reading all of it to the members of

3      the jury, does the Freddie Mac annual report contain similar

4      language regarding potential adverse effects on the financial

5      results of -- of Freddie Mac?

6      A.  Yes, it does.

7      Q.  Okay.

8      A.  Same kind -- same -- the three situations that I

9      described -- operating losses, major asset write-downs causing

10     major draws, and major asset write-ups causing major dividend

11     payments resulting in potential borrowing to pay for it.  Those

12     are all described in these.

13     Q.  Now, the -- the second criticism from Dr. Attari -- and

14     I'll just read -- just for purposes of the record, is this a

15     slide relating to the second bullet point for which Dr. Attari

16     criticized your opinions in this case?

17     A.  Yes.

18     Q.  And on the left-hand side -- so Dr. Attari stated:  And the

19     second reason I think that he doesn't get it right is that the

20     optimism that Dr. Dharan thinks, you know, about the situation

21     in 2012 was not really shared by either the enterprises or by

22     FHFA, end quote.  Did I read that correctly?

23     A.  Yes.

24     Q.  And then just to close the loop, the other portion on the

25     left-hand part of the slide:  Their views of the future were

 1     both less, kind of, positive and had more uncertainty around

 2     them than Dr. Dharan -- than what Dr. Dharan had in his

 3     analysis.  Did I read that correctly?

 4     A.  Yes.

 5     Q.  And, Dr. Dharan, just briefly, can you describe your

 6     response to the members of the jury.

 7     A.  Yes, I will.  I have some summaries on the right, but

 8     before I get to that, it's surprising that, you know,

 9     Dr. Attari says I have optimism here because the actual results

10     turned out to be even better than what I had shown to you in

11     terms of all the projections.  So, essentially, the data that

12     turned out to be -- the actuals were even better.

13          And, secondly, I did show to the jury various excerpts

14     from testimony -- I'm sorry -- excerpt from the, you know,

15     executives, either comments or emails and testimony that really

16     reflected what I had.  So I just wanted to put that as a

17     background.

18          But, specifically, what I think is worth mentioning is

19     that my analysis is entirely data-driven.  I rely on data and

20     available evidence.  I put them together.  That's the kind of

21     training that I'm bringing to this analysis.  And it's not

22     just -- it's not optimism, but it's just data and wherever the

23     data take us, along with the case evidence.  And I also talked

24     about how the write-downs and write-ups result in these

25     increased profits in the future.  I have some slides that I

1    showed, and I'll be happy to show them again.

2         And, thirdly, I showed the jury internal projections

3    both from Fannie Mae and from Freddie Mac.

4         And, finally, as I said earlier, we had some emails and

5    testimony which also reflected my conclusion.

6    Q.  And, Dr. Dharan, just staying with that first point, in

7    terms of the data point, I just want to ask a direct question.

8    Did you base your analysis solely on two positive quarters of

9    results?

10   A.  Solely on?

11   Q.  Solely on two positive quarters of earnings results?

12   A.  No.  I think that this was -- this came up and, you know,

13   we addressed this specifically with this slide.  So this is

14   clearly one of my favorite slides.  I love everything about

15   this one.

16        But let's walk through this very quickly.  There are

17   just a few points, and I think just to summarize what I

18   previously testified.  I walked us through all the changes that

19   were going on in the economy -- the home sale prices improving,

20   the home sales improving, the portfolio that they had causing

21   them all those problems were running off the book, and they

22   were bringing in new loan portfolios that were better and lower

23   risk.  And also we talked about the g-fees going up.  And,

24   finally, I showed slides on the dominate market share.

25        So, overall, it's not just the two quarters of profits.

1    It is the entire structure underlying the enterprises and

2    supported by the economy.  That's what was changing.

3         And there was a lot of evidence which caused the

4    potential for the profit growth.

5    Q.  And, Dr. Dharan, have you seen anything over the course of

6    this trial that calls into dispute, in your mind, the data

7    points on this slide?

8    A.  No.

9    Q.  All right.  Now, sir, we've also heard evidence about

10   analyst reports.  Do you recall that?

11   A.  Yes.

12   Q.  And defendants have introduced into evidence a handful of

13   analyst reports.  Are you aware of that?

14   A.  Yes.

15   Q.  In your opinion, how should the jury view analyst reports?

16   A.  It's really an important item to think about.  There are

17   lots of analysts.  So the analyst community is pretty large.

18   And for a big enterprise that is pretty important to the

19   economy, like Fannie or Freddie, there's going to be a lot of

20   analyst coverage and mention in their reports.

21        So I think the important thing to keep in mind is that

22   there are hundreds and hundreds -- in fact, I counted as many

23   as thousand analyst reports in the relevant period here that

24   referred to or talked about Fannie and Freddie.  I think that

25   Dr. Attari said a couple of hundred, and -- but, in fact, my

1    search and filtering came up with as many as -- maybe close to

2    a thousand analyst reports.  There are lots of them, lots of

3    diversity, and some opinions that might conflict with each

4    other and so on.

5    Q.  Are analyst reports based, generally, on nonpublic

6    information?

7    A.  They are exclusively nonpublic -- exclusively public

8    information.  They don't have access to nonpublic information.

9    Q.  Now, you have on your slide in the first bullet point:

10   Market sentiment not uniform.

11   A.  Right.

12   Q.  What do you mean by that, Dr. Dharan?

13   A.  So as I said earlier, the sentiment as -- at least as

14   reflected in the analyst reports, you will see a variety.

15   There are -- different analysts take different positions.  Some

16   of them might be, you know, buying the stocks and some of them

17   might be selling stocks.  Or at least, you know, in terms of

18   bonds, some of them may be also buying bonds and some of them

19   may be selling bonds.  A market consists of all varieties of

20   buyers and sellers.  So you do see that in terms of the

21   sentiment.

22   Q.  And you list particular exhibits on your slide?

23   A.  Yes.

24   Q.  And why are those important to you?

25   A.  I just wanted to show the contrasting type of evidence that

1    we already have in the -- in our position -- in our hands.  For

2    example, you know, the Treasury had talked about what the

3    market thought, and Treasury had opinions that they had

4    gathered.  We also have additional market analyst reports from,

5    you know, BNP Paribas, for example, or Goldman Sachs; they were

6    expressing very positive opinions.  And we also have executives

7    like Mr. Mayopoulos who were asked about this, and they had

8    some very positive opinions.

9         So we have a combination of very -- you know, different

10   opinions and positive, many of them, that we have seen in this

11   proceeding.

12   Q.  I just want to briefly ask you about one of the analyst

13   reports submitted into evidence.

14        MR. KRAVETZ:  And if I could ask, Ms. McGuire, if you

15   could please call up Defense Exhibit 380-A, and if we could

16   compare that to Dr. Dharan's Slide 74.

17        Okay.  Thank you.

18   BY MR. KRAVETZ:

19   Q.  Dr. Dharan, do you recognize the document on the right?

20   A.  Yes.

21   Q.  And what is that?

22   A.  So this is a Barclays capital analyst report, if I

23   remember, from January 2012.

24   Q.  And is there something about DX380-A that you noticed in

25   comparison to some of the alternatives that you proposed to the

1    net worth sweep?

2    A.  Yes.  So the analyst report on -- in their summary -- you

3    know, the third bullet point, which I've highlighted, they

4    describe what the FHFA could do to potentially address the GSE

5    credit worries.  This is, again, in reference to the -- the

6    PSPA having a potential cap.  You know, they propose something

7    which is exactly the same as what I had discussed as one of the

8    potential alternatives to net worth that FHFA could have

9    considered.  So I thought this was an interesting example of an

10   analyst report looking at potential alternatives for the net

11   worth sweep.

12             MR. KRAVETZ:  All right.  Thank you, Ms. McGuire, if

13   we can call back up -- up the presentation.

14   BY MR. KRAVETZ:

15   Q.  And, sir, just in terms of the data outweighs analyst

16   reports, what is your second bullet point and what does it

17   mean?

18   A.  So the second bullet point talks about, you know, we -- we

19   have all the data about the bond market, other -- you know, we

20   have heard here, and the yield spread, which is the difference

21   between the yield on the GSE bonds and the Treasury bonds.  So

22   Treasury bonds as we have heard before here are the safest bond

23   investments in the U.S.  They are the safest.

24             And the GSE bonds are the -- are just about little above

25   that, and the difference between the two in terms of what we

1    call yield -- the yield spread is very small.  And what I
2    wanted to mention here is that the data shows that the yield
3    spreads were declining throughout the year 2012.
4         And that is not consistent with somebody saying that the
5    bond market was worried about the caps coming in at the end of
6    2012.  If the caps are coming in, you would think that the
7    yield spread would go up.  The bigger yield spread, by the way,
8    is more risky.  So when the yield spreads decrease, that's less
9    risk.
10   Q.  And, Dr. Dharan, the next bullet point, can you describe
11   what that means to the jury.
12   A.  I think this is, you know, really a quantitative analysis.
13   You know, it's important to -- there's no quantitative analysis
14   to establish that the MBS investors needed reassurance.  I
15   haven't seen anything here that showed that the MBS
16   investors -- in a quantitative way, any study that said the
17   MBS investors needed reassurance or, alternatively, that the
18   net worth sweep, when it came in, provided the reassurance.
19   Q.  And could a type of quantitative analysis be an event
20   study?
21   A.  Event study would be one.  Surveys and many other
22   methodologies.  Event study is the most common one.
23   Q.  And are you aware of whether Dr. Attari performed an event
24   study relating to the MBS market?
25   A.  He did not -- I'm not aware that he did.

1    Q.  And, finally, you list:  Post-third amendment MBS trading

2    has almost been a nonevent.  What do you mean by that?

3    A.  So this is actually a statement that I -- I pulled out from

4    an FHFA weekly credit report.  So they prepare -- I think it's

5    weekly.  I've seen weekly credit reports.  They could be

6    skipping a couple weeks.  But these reports summarize for

7    internal FHFA consumption -- because if you see the email,

8    they're all the FHFA people -- what's going on in the

9    marketplace.  And this one right -- like, I think, a day or two

10   after the net worth sweep, said that the MBS trading has

11   been -- has almost been a nonevent.

12           So the net worth sweep was -- was announced on

13   August 17th.  I believe this one was either the 18th or 19th of

14   2012.  And they did not observe any market reaction one way or

15   the other in the MBS market, which, again, says that there's

16   no evidence that the MBS investors needed reassurance.

17   There's no evidence that I have seen in terms of quantitative

18   analysis.

19   Q.  Another data point that you mentioned were write-downs and

20   write-ups of assets; correct?

21   A.  Yes.

22   Q.  And can you just briefly remind the members of the jury,

23   what are credit write-downs and write-ups?

24   A.  Definitely.  Again, the context of this is to show that the

25   data and the evidence are pointing to future profitability.

1    It's really a data-driven analysis of future profitability.

2    And a write-down, if -- just to recall what we talked about,

3    some assets, assets such as deferred tax asset and loans,

4    receivables, those are periodically written down if you think

5    that -- periodically assessed as to are we going to collect all

6    of this.  And if you don't think they're going to collect -- we

7    are going to collect everything, we write them down.

8         So, for example, with the -- with the loans, we take a

9    good look at the future and look at -- based on today's

10   information and try to assess what portion of these loans may

11   not be collected.  It's a judgment call that accountants have

12   to make.

13        And that was the write-down that I have highlighted for

14   2008 to 2011, both for Fannie and Freddie, and this is for

15   credit losses.

16   Q.  And then another form of the write-downs and write-ups are

17   the DTAs; correct?

18   A.  That is correct.  So on the credit losses, what happened

19   was they wrote it down and then later on it turned out they

20   didn't need as much amount that they had set aside in the

21   vault as they initially thought.  So they went out -- or

22   at least came back to -- out of the vault into the profit

23   numbers.

24        Same thing is happening with DTA, deferred tax asset.

25   So every now and then, the company has to take a good look at

1   every quarter.  Are we going to realize the value of these

2   deferred tax assets, and if not, what should we do?  And they

3   did that in 2008 and wrote down the deferred tax asset because

4   they didn't think they were going to make enough profits in the

5   future to make use of all of these tax credits and tax

6   benefits.

7         So they wrote down in 2008, '09, '10, and '11, but by

8   2012, they were starting to reassess that.  And by third

9   quarter, they were already starting the process to see, shall

10  we -- you know, what shall we do with this should we have to

11  bring it back to the balance sheet?  And that actually ended up

12  happening in 2013.

13        So there was an indication -- already an analysis done

14  in 2012, starting to be done, showing that this needs to be

15  potentially brought back.  So that information was something I

16  looked at.

17  Q.  And to write up the DTA, what is the standard from an

18  accounting standpoint?

19  A.  So the standard for that, to write up the DTA, which

20  technically -- you know, the right way to say that is to reduce

21  the valuation allowance, but we'll just say write-up for

22  convenience.

23        But the write-up is done when you -- when you determine

24  that the future profits are more likely than not.  I think you

25  heard the phrase here before.  But I wanted to really emphasize

1     that more likely than not it really basically means more than

2     50 percent.  So let's say 51 percent or more.  So you're

3     looking for the tipping point to go from less than 50 to more

4     than 50.

5     Q.  And does part of the DTA analysis involve projections?

6     A.  They involve projections of the profits for the company,

7     for the future; right.

8     Q.  And do you know whether under the accounting rules the DTA

9     projections focus on a base or expected case or a stress

10    scenario?

11    A.  Expected future profits.

12    Q.  Now, are -- is the judgment related to whether to restore

13    the DTA made at a particular point in time?

14    A.  It's made every quarter, and it is made -- yes, it's made

15    in a particular point in time.

16    Q.  Now, your testimony is not that the DTA should have been

17    released prior to the third amendment, is it, sir?

18    A.  Right.  I'm not testifying that.  I'm just saying the

19    process involves taking a good look at it every quarter.

20    Q.  All right.  And what is your opinion, however, regarding

21    the DTA and whether it was reasonably foreseeable that it would

22    be restored in 2013?

23    A.  Right.  My -- my understanding is that the -- the process

24    already started in 2012.  All the changes we talked about

25    earlier -- the housing market is recovering, the prices are

 1    starting to show up -- go up.  Not only the housing prices, but

 2    also the housing -- in terms of the sales and so on were going

 3    up, and the g-fee is expected to go up.  There was an

 4    announcement of further increase in g-fee in early August to be

 5    implemented by December.

 6          And the credit quality I mentioned, the loan portfolio

 7    was improving, and the market position was dominant.  All that

 8    together is what's pointing to potential DTA coming back to the

 9    balance sheet.

10          MR. KRAVETZ:  And if I could just ask Ms. McGuire to

11    take down the slide for a moment and to call up Plaintiffs'

12    Exhibit 458, please.

13    BY MR. KRAVETZ:

14    Q.  And do you recognize this, sir, to be a Form 10-K for one

15    of the GSEs?

16    A.  Yes.

17    Q.  All right.  If we can go to page 131 of 446, please.

18          All right.  And, sir, do you see -- this would have been

19    what the deferred tax assets would have been reported as of

20    December 31st, 2012; is that correct?

21    A.  Right.  And this is for Freddie Mac.

22          MR. KRAVETZ:  All right.  And if I could ask

23    Ms. McGuire just to highlight the sentence beginning with:  It

24    is possible.

25    A.  Okay.

```
 1    BY MR. KRAVETZ:

 2    Q.  Sir, can you just read that to the jury and give your

 3    accounting interpretation of that.

 4    A.  Yeah, sure.  So this is being done at the end of

 5    December 31, 2012.  And the sentence reads:  It is possible

 6    that, in future periods, the uncertainties regarding our future

 7    operations and profitability could be resolved such that it

 8    could become more likely than not that the deferred tax assets

 9    would be realized and that a valuation allowance would no

10    longer be necessary.

11    Q.  And are you familiar, sir, whether that's a change in

12    language from the prior year?

13    A.  I -- I think -- yes, this -- this sentence was not -- this

14    language was not there in 2011.

15    Q.  Now --

16              MR. KRAVETZ:  Thank you, Ms. McGuire.

17         If we can call up the presentation.

18    BY MR. KRAVETZ:

19    Q.  Just a couple more slides, sir.

20         All right.  And do you recall that Dr. Attari gave some

21    testimony regarding some of Fannie Mae's projections in this

22    case?

23    A.  Yes.

24    Q.  And, in particular, there was testimony regarding a certain

25    line item and the impact on that line item of the DTAs being
```

1    restored; is that correct?

2    A.   Correct.

3    Q.   Okay.  Now, I want to show you the slide that Dr. Attari

4    showed to the jury, but without giving any calculations, just

5    in general, given your testimony and what you've done in your

6    reports regarding the DTAs, to the extent that the DTA was

7    restored in 2013, what impact would that have on the residual

8    equity line?

9    A.   The residual equity in 2013 would go up.  Not by the entire

10   amount, but would go to most of the amount.  Essentially, if --

11   say $57 billion is coming back in 2013 as DTA, there will be,

12   maybe, 53 or $54 billion that would be the increase in residual

13   equity.

14   Q.   And just in general without specific calculations, would

15   you expect that the residual equity number would be around 0.0

16   to 0.2 over the next few years?

17   A.   No.  Once the residual equity comes onto the balance sheet,

18   it will go down a little bit each year because of using up the

19   taxes, but, really, the amount is going to be very significant

20   for the remainder of the period.

21   Q.   All right.  Dr. Attari also referenced projections from

22   October 2011 from FHFA.  Do you recall that?

23   A.   Yes.

24   Q.   And what is --

25               MR. KRAVETZ:  If I could ask Ms. McGuire just to call

1     up Defense Exhibit 346, just to orient Dr. Dharan.

2     BY MR. KRAVETZ:

3     Q.  All right.  And, sir, the -- the document's dated

4     October 27, 2011; is that correct?

5     A.  Right.

6     Q.  And would that have been before even results were reported

7     for the third quarter of 2011?

8     A.  Yes.

9     Q.  Or at least the -- the fourth quarter?

10    A.  Certainly -- even the -- potentially the third quarter.

11    Q.  Now --

12    A.  I -- I think so.  For sure there's no fourth quarter data

13    here yet.

14    Q.  All right.  And, sir, do you have an understanding as to

15    how often FHFA would produce these projections?

16    A.  So these reports are done annually.  They are done annually

17    to -- I think as part of a mandate.  And, yes, they are

18    prepared around October -- they are released around October of

19    each year.

20    Q.  And are you aware of what -- the as-of date in terms of the

21    information that's relied upon for these projections for FHFA,

22    generally?

23    A.  Yes.  To the extent I could determine, it's as of June 30,

24    2011; although, I did see a couple of July numbers.

25    Q.  Now, Dr. Dharan, are you aware whether these projections

1   were updated at any time prior to the third amendment in

2   August 2012?

3   A.  No.  This report was not updated.  The next report, similar

4   to this, was released in October 2012.

5   Q.  And, in your opinion, is it relevant when -- when making a

6   decision about the GSEs in August 2012 that such information

7   had not been updated since October 2011?

8   A.  It will be very relevant, especially given the changes that

9   I mentioned happening in 2012, the inflexion point in the

10  economy.

11          MR. KRAVETZ:  Thank you, Ms. McGuire.  You can pull

12  up the slide presentation.

13  BY MR. KRAVETZ:

14  Q.  All right.  Now, just one more -- one more item that

15  Dr. Attari testified to.  Do you see on the left of the slide

16  that Dr. Attari said that you failed to take into account plans

17  to shrink and derisk Fannie and Freddie set forth in FHFA's

18  February 2012 strategic plan?

19  A.  Yes.

20  Q.  And what's your response to that, Dr. Dharan?

21  A.  Well, it's an interesting suggestion -- I mean, the comment

22  Dr. Attari's making -- because it really is part of a plan that

23  FHFA had that had multiple phases.  FHFA said there's a first

24  phase which is a building-out of a whole bunch of

25  infrastructure to facilitate other companies also potentially

1    doing securitization.  And then there's a second phase before

2    doing the shrinking -- you can't shrink these enterprises

3    because they're so critical to the economy; right?  The economy

4    -- for the U.S. economy, housing market is like one-sixth of

5    the economy.  So really that big.

6         And Fannie Mae and Freddie Mac are a critical part of

7    that.  So you can't just shrink them until you bring in new

8    players and new enterprises.  And that phase, the shrinking

9    phrase, cannot be done until the derisking phase is done.  And

10   that had not been done either.

11        So the build phase had not been done by 2012, and the

12   derisk phase had not been done, and you can't shrink the

13   portfolios until those phases are completed.  And so

14   Dr. Attari, you know, recognized it was never implemented.  So,

15   essentially, given that it was never implemented, you can't do

16   the shrinking.

17   Q.  All right.  And, Dr. Dharan, just in terms of -- just a

18   final response to Dr. Attari and the defense case.  Can you

19   just briefly summarize how your opinion was based on data and

20   evidence and not just optimism?

21   A.  Right.  I'll be happy to.

22        So I did this analysis about not reasonably necessary

23   part.  If you recall, I had these five aspects.  I went through

24   them in detail here.  In particular, Dr. Attari focused on some

25   criticisms on the first one, which I addressed, and -- but I

 1    think the main point is that my analysis was driven by data

 2    looking at all of these five factors; the strong economic

 3    fundamentals and profitability, the prospects of the DTAs

 4    coming back to the balance sheet, and the, you know, peak and

 5    the other alternatives also being there, the deficient process

 6    that we talked about during my testimony that I addressed.

 7    And, finally, which I showed again today, that the net worth

 8    sweep exposed the GSEs to increased harm as a result of lack of

 9    capital.

10    Q.  And, Dr. Dharan, are Fannie and Freddie bigger now today

11    than they were in August 2012?

12    A.  Are they?

13    Q.  Larger now?

14    A.  They are much -- I believe they are larger, yes.

15           MR. KRAVETZ:  Your Honor, the Court's indulgence for

16    one moment.

17           Thank you, Dr. Dharan.

18           Tender for cross, Your Honor.

19           THE COURT:  All right.  We'll take 10 minutes.

20           (Proceedings held out of the presence of the jury.)

21           THE COURT:  You can be seated.  Off the record.

22           (Off the record.)

23           (Recess taken.)

24           MR. KRAVETZ:  Your Honor, Robert Kravetz on behalf of

25    plaintiffs.

1          Just briefly, when we're finished with Dr. Dharan,

2     plaintiffs will have one additional exhibit to move in without

3     objection.  There's one exhibit to which there is an objection

4     that would have to be argued.  The parties have been working

5     diligently to resolve the number of disputes relating to the

6     jury instructions.  My understanding is there may only be one

7     or two disputes remaining, and that's, essentially, it.

8          And we also have a few resolutions of disputes to place

9     on the record.

10               THE COURT:  Okay.

11               (Proceedings held in the presence of the jury.)

12               THE COURT:  You may be seated.

13          All right, Mr. Bergman, you may cross-examine.

14               MR. BERGMAN:  Thank you.

15          Good afternoon.  David Bergman for defendants.

16                    REBUTTAL CROSS-EXAMINATION

17     BY MR. BERGMAN:

18     Q.  Dr. Dharan, I'm going to try to be very efficient here, and

19     I'm going to try to limit myself to one topic that you

20     presented, which you testified about and put on a slide; that

21     market sentiment was not uniform.  And I want to try to address

22     that and also place it sort of chronologically and place that

23     assessment in time.  And you were here, I know, when -- and

24     listened to Mr. DeMarco's testimony.  You've seen the evidence

25     so you're aware that in January 2012 were the first discussions

1   around the possibility of an amendment to the PSPAs and a net

2   worth sweep; correct?

3   A.  Yes, I heard him say that.

4   Q.  Okay.  And in January 2012, would you agree with me that

5   there was a lot of chatter in the market about the potential

6   for a ratings downgrade of Fannie and Freddie?

7   A.  I heard the phrase, but I don't know whether that was -- I

8   did see the phrase in an anonymous report, but I don't know how

9   they determined that.

10  Q.  Okay.  You know that there was a belief that Moody's could

11  downgrade Fannie and Freddie if they dipped into their cap --

12  into the Treasury commitment post-2012?

13  A.  I think that might have been -- also in one of the analyst

14  reports.

15          MR. BERGMAN:  Okay.  Let's pull up DX380-A, quickly,

16  please, Mr. Montgomery.

17  BY MR. BERGMAN:

18  Q.  This is the -- this is in evidence.  And this is a cover

19  note from one of the Barclays' analysts to FHFA, and there's

20  commentary in the email that says:  In recent days there has

21  been a lot of chatter about the potential for a ratings

22  downgrade of the GSEs.

23          And then toward the bottom there, it says:  That the

24  Moody's analyst appears very concerned and Moody's could

25  downgrade the GSEs if the finite capital support available to

1    support Fannie and Freddie starts to get dipped into after

2    2012.  Correct?

3    A.  Yes.

4    Q.  And on -- then there's -- attached is an actual analyst

5    report from Barclays, and if we turn to page 3 of 19, you can

6    see:  Worries about GSE credit risk could become a factor

7    starting in late 2012 when limits on PSPAs draws are

8    reinstated.  Correct?

9    A.  Yes.

10   Q.  And also in January 2012, BofA Merrill Lynch --

11              MR. BERGMAN:  Your Honor, may I pull up -- DX377 is

12   not admitted, but I would like to display it to the jury under

13   Rule 703, please.

14              THE COURT:  Any objection?

15              MR. KRAVETZ:  May I see a copy?

16              MR. BERGMAN:  Yes.

17              MR. KRAVETZ:  No objection.  Just for purposes of

18   Rule 703, Your Honor.

19              THE COURT:  All right.

20              MR. BERGMAN:  Thank you.

21   BY MR. BERGMAN:

22   Q.  And you'll see, Dr. Dharan, on page 1 of 6, Bank of America

23   Merrill Lynch states:  There was a possibility that S&P and

24   Moody's decide to lower the credit ratings of Fannie Mae and

25   Freddie Mac based on the fact that we have now entered the

1    final year of unlimited capital availability and no plan has

2    been put in place to make sure that these two GSEs have enough

3    capital to weather a moderately bad economic scenario beyond

4    2012.  Correct?

5    A.  Yes.

6    Q.  That's consistent -- the Bank of America Merrill Lynch

7    analysis is very consistent with the Barclays analysis, would

8    you agree?

9    A.  Yes, it reflects their -- those analysts' beliefs at the

10   time, yes.

11   Q.  And we haven't seen any contrary views from January 2012;

12   correct?

13   A.  We haven't seen any again what?  Can you repeat that.

14   Q.  Any contrary views.  There's been no market analyst reports

15   from January 2012 that contradict these that you've presented

16   to the jury or seen; correct?

17   A.  I'm not sure I'll be able to say categorically, but I think

18   generally you're right, but I'm not sure if it's a, you know,

19   hundred percent statement.

20          MR. BERGMAN:  Okay.  If we could pull up now,

21   Mr. Montgomery, DX381.  This is in evidence.

22   BY MR. BERGMAN:

23   Q.  This is Mr. DeMarco's slide deck to Treasury from a meeting

24   January 19th, 2012.  So around the time of these two analyst

25   reports we just looked at; correct?

1    A.  Yes.

2    Q.  And if we look at Slide 5, it says:  Some market

3    participants -- second bullet -- have begun to raise questions

4    regarding whether this -- the funding cap coming December 31,

5    2012 -- whether this will be sufficient to justify continued

6    investment in enterprise securities.  That's consistent with

7    the Barclays and Bank of America analyst reports we just looked

8    at; correct?

9    A.  Well, it's not quite -- the general answer is it's

10   consistent with the sentiment, but it doesn't completely

11   reflect those two, but you're -- you know, you're asking about

12   the market sentiment; right?  So I think --

13   Q.  Yes.

14   A.  It does show that at that time they were concerned

15   because the economy still hadn't shown the signs of the

16   recovery yet.

17   Q.  Yes.  In January the economy had not shown signs of a

18   recovery?  January of 2012; correct?

19   A.  There might have been some small, you know, evidence, but

20   not yet large enough.

21   Q.  Okay.  And I think you testified the other day that in --

22   in March 2012, still, there weren't signs of recovery -- I

23   think you called it turnaround.  The turnaround news hadn't

24   come yet; correct?

25   A.  Right.  Yes, you're right.

1    Q.  And so we saw DX412.

2           MR. BERGMAN:  If we could pull that up, please.

3    BY MR. BERGMAN:

4    Q.  This is March 14, 2012, Deutsche Bank report, page 7 of 8.

5    And I'll just read this quickly because I think the jury has

6    seen it a couple times.  But it says:  For MBS investors,

7    diminishing Treasury support raises the risk that the agencies

8    one day might face challenges in covering MBS losses.

9           This again, March 2012, before the turnaround news has

10   come, in your view and the -- the analyst reports are

11   consistent in expressing this concern about the Treasury

12   commitment being capped; correct?

13   A.  It is correct, but just one caveat that I would like to

14   add, and that is, at this point, the ratings had not yet

15   changed or they had not put the enterprises in a ratings watch.

16   So in that sense, the sentiment was not completely, you know

17   bad, because rating agencies were still saying we don't have a

18   problem yet.  But other than that, there were a lot of these

19   analyst reports that were still reflecting the state of the

20   economy at that time.

21   Q.  Okay.  And so they're still in March 2012 expressing that

22   there's risk about erosion of the Treasury commitment once the

23   cap is in place as Deutsche Bank does here; correct?

24   A.  Well, yes.  But, again, with the caveat that they were

25   really talking about the economy at that point and -- you know,

1    they are extrapolating from that economic concerns.

2    Q.  And you recall in March of 2012, that was another time when

3    Mr. DeMarco met with Treasury, specifically about amending the

4    PSPA and incorporating a net worth sweep element; correct?

5    A.  I think I heard him say that, yes.

6    Q.  Yes.

7         Now, you testified the other day that -- as I say, you

8    called it turnaround news, and I think you said that that first

9    came to light in about June 2012; is that correct?

10   A.  I don't remember exactly if I said it that way, but I think

11   what I said was that the housing price turnaround news would

12   have hit sometime in May 2012.

13   Q.  So you said -- and I'll just --

14        MR. BERGMAN:  Mr. Montgomery, do we have the trial

15   August 1 a.m. transcript 84:17 to :21.  If we can pull that up.

16   Otherwise, I can just read it.

17   BY MR. BERGMAN:

18   Q.  Dr. Dharan, you said housing price information, that's only

19   coming out that the prices are starting to improve by May and

20   June --

21   A.  Yep.

22   Q.  -- so that's why, December, January, February, up to even

23   March, it's still preceding all these turnaround news; correct?

24   A.  Yes.  Exactly.  So by May, the first evidence of price from

25   Case-Shiller was starting to show up.  There may have been --

1    although there are other aspects going on with the actual sales

2    and demand and supply.  But the price information from

3    Case-Shiller first turnaround, I think, was in May 2012.

4    Q.  Okay.  And in June 2012, you heard that -- that

5    Freddie Mac's CEO Don Layton had a meeting in June with Credit

6    Suisse, where Credit Suisse expressed concerns about the

7    adequacy of the Treasury commitment following the cap; correct?

8    A.  Yeah.  I know -- I remember that he met with the

9    Credit Suisse analyst as part of coming on board at

10   Freddie Mac, but I don't remember exactly the -- the

11   information that he got.

12   Q.  Okay.  Well, let's -- it's a short clip.  So we'll play

13   that video, and I'm -- I want to make sure that we're all

14   agreed that this is affixing June 2012 as the time that

15   Mr. Layton is hearing concerns from the investment community.

16              MR. BERGMAN:  Can we play that, please.

17              (An audio-visual recording was played.)

18   BY MR. BERGMAN:

19   Q.  So that's June 2012.  Mr. Layton is reporting a market

20   sentiment that is consistent with what we've been seeing up to

21   that point in time; correct?

22   A.  Consistent with what again?

23   Q.  With what we saw from Barclays, from Bank of America, from

24   Deutsche Bank, from January all the way to June, consistent

25   with what we've seen; correct?

```
 1    A.  Well, in terms of the -- what somebody called the chatter,
 2    yes, there was a lot of the chatter; but at the same time, just
 3    to make sure we see how the market was, the -- the enterprises
 4    were still able to issue all the MBS they wanted and debt that
 5    they wanted.  And we have seen also data that the yield spreads
 6    were declining.  So all that was simultaneously going on and
 7    the sentiment was also showing these concerns.
 8    Q.  Okay.  And I think you just stated a few minutes ago -- and
 9    the other day -- that the home prices start going up and that
10    becomes visible to people in late May, early June, mid-June,
11    something around that time frame; is that correct?
12    A.  Yeah.  Exactly.  Again, that is specific to the
13    Case-Shiller index, but -- there are other home price indexes
14    that are also being published, and I think FHFA had its own
15    index.  So I'm not sure what the timing on that was, but the
16    one that is most widely popularized in the media and it's
17    available to the Federal Reserve of, I think, St. Louis, as one
18    of these speakers said earlier.  That one is coming out around
19    end of May and the end of June 2012.
20    Q.  But you will acknowledge -- am I correct? -- that still in
21    June, July, August, no one knows if home prices have hit
22    bottom; correct?
23    A.  I wouldn't put it no one knows.  That's -- that's a bit too
24    strong.  But I think what I would say, that there was a lot of
25    evidence.  And the way the home prices historically had behaved
```

1   was -- you know, generally, in the U.S. the house prices go up

2   every year.  Traditionally, home prices generally go up.  When

3   they go down, very little -- but this was a big decline in

4   the -- you know, during the financial crisis, and then it came

5   back.

6        So in the sense it was coming back, there was a lot

7   of -- the economy was doing well.  The GDP was growing.  People

8   were getting jobs.  Unemployment coming down.  So if you put it

9   all together, there was clear evidence that the prices were

10  starting to move in a very systematic way.  So that information

11  was there.

12  Q.  Let's see what Fannie Mae had to say in DX476.  This is

13  Fannie Mae's 10-Q.  It's dated August 8th, 2012.  Maybe we

14  can pull up that last page just to display that.  August 8,

15  2012, with the signature of Susan McFarland on this particular

16  page.

17       If we turn to page 16 of 178, the second full paragraph

18  begins, home prices.  And it says:  We believe home prices may

19  decline again through early 2013.  Do you see that?

20  A.  Yes.

21       MR. BERGMAN:  It's the second -- second line -- yes,

22  thank you.

23  BY MR. BERGMAN:

24  Q.  And it says:  Future home price changes may be very

25  different from -- from our estimates as a result of significant

1    uncertainty in the current market environment.  Correct?

2    A.  Right.  But on the previous sentence, they do say that the

3    home prices will not decline on a national basis; right?  Below

4    the first quarter level.

5    Q.  So there's uncertainty around home prices is the punch line

6    in this; correct?

7    A.  The punch line is that the home prices are starting to show

8    up -- go up, but there's going to be some bumps on the -- in

9    the process.

10   Q.  And if we'd look at DX476, same document, page 16 of 178,

11   the last full paragraph, uncertainty regarding our future

12   status.  It says:  There are significant uncertainty in the

13   current market environment.  Any changes in the trends in

14   macroeconomic factors that we currently anticipate, such as

15   home prices and unemployment, may cause our future

16   credit-related expenses or income and credit losses to vary

17   significantly from our current expectations.  Correct?

18   A.  Right.  Again, so this is an uncertainty part of the MD&A.

19   So that's exactly what I would expect to see.

20   Q.  Yes.  And it's -- it's an accurate statement attested to by

21   the Fannie Mae CEO and CFO; correct?

22   A.  Yes.

23   Q.  And if we turn to Freddie Mac DX477, this is Freddie Mac's

24   10-Q issued -- we'll pull up the last page -- issued August 7,

25   2012.

1   A.  Yes.

2   Q.  And if we go to page 14 of 251, second paragraph from the

3   bottom.  There continues to be significant uncertainty in the

4   current mortgage market environment.  And continued high levels

5   of unemployment, weakness in home prices, and adverse changes

6   in interest rates, mortgage security prices, and spreads could

7   lead to additional draws.  That's draws on the Treasury

8   commitment; correct?

9   A.  It is also in the uncertainty section of the MD&A that

10  you're highlighting.

11  Q.  I believe this is in the executive summary.

12  A.  Okay.  Same idea.  Okay.

13       So the executive summary and the uncertainty -- which

14  summarizes the rest of the report, is capturing this

15  information from the uncertainty disclosure.  So, yes, both

16  Fannie and Freddie, as part of the uncertainty and risk

17  factors, would describe exactly what we are seeing here.

18  Q.  Yes.  So in August -- early August, August 8th, August 7th,

19  2012, there is uncertainty around the housing market, the

20  mortgage market, unemployment; correct?

21  A.  Yes.  That's what they're saying.

22  Q.  And you also testified -- well, let me just jump ahead with

23  respect to market sentiment and whether it's uniform.  We've

24  now gone through August -- or early August.  Let's jump to the

25  day of the third amendment, August 17th.

1          MR. BERGMAN:  And can we have copies for some of

2     these for plaintiffs' counsel.

3     BY MR. BERGMAN:

4     Q.  And I'm going to show you some market analyst reports from

5     August 17th, and let's see if -- if they're consistent with one

6     another.

7          The first is DX924.  This is Bank of America Merrill

8     Lynch, August 17, 2012.

9          MR. BERGMAN:  Again, Your Honor, not admitted.  We

10    would like to display pursuant to Rule 703.

11         MR. KRAVETZ:  Objection, Your Honor.  May we be

12    heard?

13         THE COURT:  Yes.

14         (Bench conference on the record.)

15         MR. KRAVETZ:  Thank you, Your Honor.  Robert Kravetz

16    on behalf of the plaintiffs.

17         There's no objection to showing the witness analyst

18    reports that are in evidence, but we're getting far afield of

19    what the exact testimony was on direct.  And so to the extent

20    there's something in evidence and there's several -- there's

21    one on DX529 that's in evidence.  There's one that went into

22    evidence the next day that's in evidence.  That's fine.

23         But, you know, the Court's ruling was that Dr. Attari

24    was prohibited from testifying about certain analyst reports.

25    They've certainly have had the chance to cross-examine him as

 1   to a number of these reports.  And it -- we're just getting

 2   well beyond the scope of what the direct was at this point.

 3         They can certainly show what's in evidence, but in terms

 4   of 703, there's no basis to show the witness these additional

 5   analyst reports at this time.

 6         MR. BERGMAN:  Your Honor, David Bergman for

 7   defendants.

 8         Dr. Dharan testified that there were hundreds of analyst

 9   reports; that he thought they were, sort of, all over the

10   place, not a uniform reaction or analysis of the economy or

11   Fannie and Freddie.  These -- I think we have four reports that

12   are issued on the day of -- of the third amendment.  All of

13   them are favorable, say this is a -- solves a problem and the

14   like.  They're uniform.

15         And -- and Dr. Dharan certainly is -- he's aware of all

16   of these.  He's been aware of them for a very long time.  He's

17   stated that he's reviewed the analyst reports and concluded

18   that they're not uniform.

19         THE COURT:  You're not moving them in evidence?

20         MR. BERGMAN:  No, Your Honor, just -- I believe a

21   couple are in evidence, but --

22         THE COURT:  Why don't you use the ones that are in

23   evidence.

24         MR. BERGMAN:  It's -- Your Honor, I'll do that.  I

25   would like permission to, just very briefly, go through the

1   couple that are not in evidence because the point is there's

2   uniformity.  There's a power from the fact there's more than a

3   couple.

4              THE COURT:  Let's just use the ones in evidence.

5              MR. BERGMAN:  Thank you, Your Honor.

6              (Proceedings held in open court.)

7   BY MR. BERGMAN:

8   Q.  Dr. Dharan, you've -- you've reviewed analyst reports that

9   were issued on August 17th, 2012; correct?

10  A.  I don't recall, but I -- if you can show me, I'd be happy

11  to.

12  Q.  Yes.

13             MR. BERGMAN:  Your Honor, may I show without showing

14  the jury?  Thank you.

15  BY MR. BERGMAN:

16  Q.  We'll pull up DX924, Bank of America Merrill Lynch,

17  August 17th, 2012.  They're commenting on the third amendment.

18  And page 1 of 8 says that the third amendment, the net worth

19  sweep, quote, means that the GSEs do not have to borrow from

20  the Treasury to pay dividends back to the Treasury alleviating

21  concerns about limited capital post-December 2012 when the

22  Treasury unlimited capital support runs out.

23             MR. KRAVETZ:  Your Honor, objection.  This is not in

24  evidence.

25             MR. BERGMAN:  Yes, not in evidence, Your Honor.  I'm

 1    not displaying to the jury.  I was --

 2              THE COURT:  You can't use it if it's not in evidence.

 3              MR. BERGMAN:  Okay.  I apologize.

 4              THE COURT:  The objection is sustained.  The jury

 5    will disregard the last.

 6              MR. BERGMAN:  Let's pull up DX549.

 7    BY MR. BERGMAN:

 8    Q.  This is a Barclays report.  And this is dated August 17,

 9    2012.  If we go to page 2.

10         This says:  With the change in support, we see virtually

11    no chance of the post-YE 12 -- you understand that to be

12    year-end 2012 -- capital supports being exhausted over a

13    multi-decade period.  Do you see that, sir?

14    A.  Yes.

15    Q.  And then they say -- skipping to the next paragraph:  -- in

16    our view, this puts to rest any worries about GSE credit risk

17    even in intermediate maturities; correct?

18    A.  Yes.

19    Q.  And --

20    A.  But there was no risk in the first place, but, you know,

21    that's what I was mentioning earlier.  If there is any worry,

22    that puts to rest.  But the data and the evidence I talked

23    about says there was no credit risk.  The yield spreads are not

24    reflecting that.

25    Q.  Yes.  We've seen a number of analyst reports suggesting

```
1     there is risk; correct?
2     A.  Yes.  That's the market sentiment diversity that I was
3     mentioning earlier.
4     Q.  Yes.  And you haven't seen any reports after the
5     declared -- the date of the third amendment or after the third
6     amendment that contradict what Barclays is saying; correct?
7     A.  Again, I don't know what contradicts means, but I have -- I
8     think I cited earlier the BNP Paribas and Goldman Sachs.  Those
9     two both were right around August 17, and they were both very
10    different in sentiment.
11    Q.  And are you aware of -- I think we looked the other day at
12    a Guggenheim Partners report that you saw that was -- was
13    similar to the Barclays and saying that the --
14            MR. KRAVETZ:  Objection, Your Honor.  Not in
15    evidence.
16            THE COURT:  Sustained.
17    BY MR. BERGMAN:
18    Q.  Am I right, Dr. Dharan, that under the net worth sweep, if
19    there are no profits, there's no dividend owed; correct?
20    A.  If there is no profit, there's no dividend, yes.
21    Q.  Okay.  And if no profits, no circular draws needed to pay
22    dividend; correct?
23    A.  Correct.
24    Q.  Okay.  Thank you.
25            MR. BERGMAN:  Thank you, Your Honor.
```

```
1              THE COURT:  Okay.  Any redirect?

2              MR. KRAVETZ:  Very briefly, Your Honor.

3         Ms. McGuire, can we please pull up Defense Exhibit 476.

4                    REBUTTAL REDIRECT EXAMINATION

5    BY MR. KRAVETZ:

6    Q.  Sir, do you recall this is one of the documents that was

7    shown to you by defense counsel on cross-examination?

8    A.  Yes.

9              MR. KRAVETZ:  Ms. McGuire, can we go to page 85 of

10   the document, please.  And if we could enlarge, Ms. McGuire,

11   the statements on the bottom of page 81 onto the next page.

12   BY MR. KRAVETZ:

13   Q.  Sir, you were asked a number of questions about

14   statements that were in the second quarter SEC report; is that

15   correct?

16   A.  Yes.

17   Q.  And some of the uncertainties that you were asked about

18   were described in a negative fashion; would that be fair?

19   A.  Yes.  Negative sentiments and so on.

20   Q.  Are there also statements in this document that are

21   described positively, albeit they are uncertainties?

22   A.  Very much.  I think I mentioned that even the very first

23   item was a positive item.

24   Q.  And you were asked specifically about home prices; correct?

25   A.  Yes.
```

1    Q.  And if you can look to the next to last -- or the last

2    bullet point in the document beginning with our belief.

3    A.  Yes.

4    Q.  Our belief that our total loss reserves peaked as of

5    December 31st, 2011, and will not increase above 76.9 billion

6    in the foreseeable future.  Do you see that?

7    A.  Yes.

8    Q.  Is that consistent with some of the data that you testified

9    about on direct?

10   A.  Yes.  It's very consistent with home prices expected to

11   increase because -- or at least not go down because credit

12   losses are very much a function of home prices.  So if -- if it

13   says that our credit losses peaked -- I think I even showed the

14   graph on the peak, around $76 billion, and then the forecast

15   showing it going all the way to 30 billion -- that indicates

16   that the expectation is for the home prices to increase.

17   Q.  There's also a reference in the bullet immediately above

18   that to:  Trends of stabilizing home prices and declining

19   single-family serious delinquency rates will continue, as

20   well as our expectation that serious delinquency rates will

21   decline at a slower pace than in recent periods.  Do you see

22   that?

23   A.  Yes.

24   Q.  Is that consistent with the data you talked about on direct

25   examination?

1    A.  Exactly.

2    Q.  And you've testified about this before.  But do you see in

3    the -- the second highlighted bullet point it refers to:  Our

4    expectation that the single-family loans we have acquired since

5    the beginning of 2009 in the aggregate will be profitable over

6    their lifetime by which we mean that we expect our fee on these

7    loans to exceed our credit losses and administrative costs for

8    them.  Did I read that correctly?

9    A.  Yes.

10   Q.  What's your understanding of that?

11   A.  Well, this is exactly -- this is very much consistent -- in

12   fact, exactly the same as the chart I showed during my initial

13   direct presentation, the big pie chart, and this is what that

14   is saying; that in the aggregate, the new loans coming in after

15   2009 are having a very lower -- much lower loss rate.  I think

16   I had the number like 4.2 percent on my chart.  And that is

17   less than the g-fee they're charging to cover those loans.  So

18   they're saying they're making profit on that.

19        MR. KRAVETZ:  All right.  Thank you.  We can take

20   that down, Ms. McGuire.

21   BY MR. KRAVETZ:

22   Q.  You were also asked about Credit Suisse; is that correct,

23   sir?

24   A.  Yes.

25        MR. KRAVETZ:  If I could ask Ms. McGuire to pull up

1    Plaintiffs' Exhibit 460.

2    BY MR. KRAVETZ:

3    Q.  All right.  Sir, do you see that this is a 10-K for the

4    period ending 12/31/2012?

5    A.  Yes.

6            MR. KRAVETZ:  All right.  If I could ask Ms. McGuire

7    to go to page 69, please, and to highlight the portion on the

8    bottom.

9    BY MR. KRAVETZ:

10   Q.  And, sir, do you see in this particular securities filing

11   there's a reference to lawsuits that FHFA brought on behalf of

12   Fannie Mae and Freddie Mac against various financial

13   institutions, their officers, and affiliated and unaffiliated

14   underwriters that were responsible for marketing and selling

15   private label mortgage securities to us?

16   A.  Yes.

17           MR. KRAVETZ:  All right.  And in particular, if I

18   could ask Ms. McGuire to highlight --

19   BY MR. KRAVETZ:

20   Q.  Do you see that Credit Suisse is one of the defendants in

21   that lawsuit?

22   A.  Yes.

23           MR. KRAVETZ:  All right.  If we can go to the next

24   page, please, Ms. McGuire, and keep that up.  And the first

25   paragraph, please.

DHARAN - REBUTTAL REDIRECT

1   BY MR. KRAVETZ:

2   Q.  Okay.  And, sir, do you see that there's a reference there

3   to amended lawsuits being filed on June 13, 2012, and June 28,

4   2012?

5   A.  Yes.

6           MR. KRAVETZ:  All right.  Thank you, Ms. McGuire.  We

7   can take that down.

8   BY MR. KRAVETZ:

9   Q.  Now, defense counsel showed you two analyst reports from

10  January 2012 and another one from March of 2012; correct?

11  A.  Yes.

12  Q.  And you were asked questions about ratings downgrades;

13  correct?

14  A.  Yes.

15  Q.  All right.  Did Moody's ever downgrade Fannie or Freddie?

16  A.  No.

17  Q.  All right.  Did Moody's --

18  A.  Not during that period.

19  Q.  Did Moody's ever place Fannie or Freddie on a watch list

20  during -- between the period of January 2012 and August 17,

21  2012?

22  A.  No.

23           MR. KRAVETZ:  If I could -- if we could ask

24  Ms. McGuire to pull up Defense Exhibit 380-A, please.  And just

25  to enlarge the -- the second portion of the email from Rajiv.

1   Setia.

2   BY MR. KRAVETZ:

3   Q.  All right.  And Mr. Bergman asked you about the -- it's the

4   second full sentence where there's a reference to:  There's

5   been a lot of chatter about the potential for a ratings

6   downgrade of the GSEs.

7   A.  Yes.

8   Q.  Do you see that?

9           MR. KRAVETZ:  Okay.  And if we can just go down four

10  lines, Ms. McGuire, starting with:  For my part.

11  BY MR. KRAVETZ:

12  Q.  Do you see what the response is from the Barclays analyst?

13  A.  Yes.

14  Q.  What is it?

15  A.  The analyst says:  From my part, this logic is nonsensical.

16  Limited further -- I was just laughing.  Maybe I shouldn't

17  have.  Using revenues of GSEs to fund deficits actually

18  strengthens the links of these entities to the government.

19          MR. KRAVETZ:  We can take that one down.  Thank you,

20  Ms. McGuire.

21          If we can pull up DX412.  I would just ask if you could

22  call up page 7.  And the possible solutions in the right-hand

23  corner, if we can enlarge.

24  BY MR. KRAVETZ:

25  Q.  Now, sir, are you aware that as part of recommendations in

1    this analyst report, there was a recommendation in terms of

2    what could happen with the dividend for the PSPAs?

3    A.  Yes.

4              MR. KRAVETZ:  And what was the analyst -- if we could

5    highlight the bottom portion of the -- beginning with based on,

6    the last sentence.

7    BY MR. KRAVETZ:

8    Q.  What is the recommendation of this particular analyst in

9    terms of what the dividend should be?

10   A.  This analyst is recommending reducing the dividend rate to

11   5 percent.

12   Q.  Not increasing it to all of net worth; correct?

13   A.  No.  It's the opposite.

14             MR. KRAVETZ:  We can take that down.  Thank you,

15   Ms. McGuire.

16   BY MR. KRAVETZ:

17   Q.  Just a few more documents, Dr. Dharan.

18             You had focused on cross-examination on that period

19   between January and March of 2012; correct?

20   A.  Some questions, yes.

21             MR. KRAVETZ:  If we could just pull up PX-205, just

22   briefly.  And just the header, please.

23             MR. BERGMAN:  Objection, Your Honor.

24             THE COURT:  What's --

25             MR. BERGMAN:  Beyond the scope of cross.

DHARAN - REBUTTAL REDIRECT

```
1     BY MR. KRAVETZ:

2     Q.  What's the date of PX-205?

3     A.  June 25, 2012.

4     Q.  Is that before or after March of 2012?

5     A.  After.

6              MR. BERGMAN:  Objection, Your Honor, as beyond the

7     scope.

8              THE COURT:  Overruled.

9              MR. KRAVETZ:  All right.  Now, just to be clear --

10    Ms. McGuire, if we can pull up Dr. Dharan's presentation on --

11    on Slide 12, please, from today.

12    BY MR. KRAVETZ:

13    Q.  And, sir, again, you were asked questions about, quote,

14    unquote, chatter that was in the bond and MBS markets; correct?

15    A.  Yes.

16    Q.  Can you just remind us, what was the data actually showing

17    in those markets?

18    A.  Yeah.  The data was showing completely different from this

19    chatter that we saw in some of the earlier documents.  That's

20    why I said market sentiment is something -- it's not uniform.

21    What you really need is data.  You have to, at the end of the

22    day, go to the data and see what the data are saying.  And here

23    the bond yield spreads were going down.  The yield spread is,

24    again, the difference between the bond yield of the GSEs

25    compared to the U.S. Treasury.
```

1          And they were decreasing throughout 2012.  And that's,

2     basically, saying that there is no concern as far as the market

3     was concerned acquiring -- buying these securities and holding

4     them and wanting to hold them.  And so that -- that's a very

5     different outcome.  When you look at the data, you always get

6     more clear evidence.

7     Q.  And I'm just going to show one of the documents that's

8     actually on the slide.

9          MR. KRAVETZ:  If we can call up PX-246, please,

10    Ms. McGuire.

11    BY MR. KRAVETZ:

12    Q.  Again, I know you cited several documents on your slide;

13    correct?

14    A.  Yes.

15    Q.  But just to get a sense of the date here of PX-246, what is

16    the date of this document, sir?

17    A.  August 9th, 2012.

18    Q.  That's approximately eight days before the net worth sweep

19    was imposed?

20    A.  Yes.

21    Q.  All right.  And do you see the first recipient of this

22    email?

23    A.  Yes.  Mr. DeMarco.

24          MR. KRAVETZ:  All right.  If we can just call out,

25    Ms. McGuire, I believe, the second full paragraph of the

 1     document.  I believe the third.  My apologies.

 2     BY MR. KRAVETZ:

 3     Q.  And you've discussed this before.  And you talked about in

 4     your testimony there's a reference to Goldman Sachs?

 5     A.  Yes.

 6     Q.  Who is Goldman Sachs?

 7     A.  Goldman Sachs is one of the largest investment banks.  It

 8     was perhaps the largest.  It may be the top two or three now,

 9     and it's a highly respected investment bank.

10     Q.  And what was the sentiment that was expressed by Goldman

11     Sachs regarding the concern of the upcoming PSPAs' expiration

12     date?

13     A.  They were saying -- the Goldman Sachs analysts that were

14     mentioned here, they made note of the disparity in Fannie and

15     Freddie's security trading and confirmed that foreign investors

16     seemed to have little concern regarding the PSPAs' upcoming

17     expiration date.

18              MR. KRAVETZ:  All right.  And final document,

19     Ms. McGuire.  If we can call up PX-257, please.

20     BY MR. KRAVETZ:

21     Q.  You were asked several questions about Moody's; correct?

22     A.  Yes.  Correct.

23     Q.  Is Fitch one of the other ratings agencies out there?

24     A.  Yes.  Moody's, S&P, and Fitch are the three well-know

25     rating agencies.

1    Q.  And just from the perspective of the date, what's the date

2    of this document, Dr. Dharan?

3    A.  13th August 2012.

4    Q.  Four days before the net worth sweep?

5    A.  Yes.

6              MR. KRAVETZ:  And, Ms. McGuire, if we can just call

7    out the very last paragraph of this document, please, on

8    page 2.  Page 2.

9          All right.  And if we could just highlight the last

10   sentence here for Dr. Dharan.

11   BY MR. KRAVETZ:

12   Q.  All right.  And, sir, can you just read this into the

13   record and describe what it means to the members of the jury.

14   A.  Okay.  In light of the more stable regulatory outlook and

15   absent changes in the terms of government support for Fannie

16   and Freddie under the conservatorship agreement, we do not

17   expect any near-term pressure on GSE ratings.

18   Q.  Four days before the net worth sweep?

19   A.  Yes.

20             MR. KRAVETZ:  Nothing further, Your Honor.

21             THE COURT:  All right.  You can step down.

22             (Witness excused.)

23             THE COURT:  Ladies and gentlemen, the evidence is now

24   closed with one exception of some exhibits I'll rule on in a

25   minute.

DHARAN - REBUTTAL REDIRECT

1          Before the lawyers make their closings, they're entitled

2    to know my final instructions.  So I'll go ahead and release

3    you.  We'll begin closing arguments tomorrow at 10:30.

4          Don't discuss the case with anybody.  Don't let anyone

5    talk to you about the case.

6          I'll talk to the lawyers about how much time we're going

7    to take for the closing arguments.  We'll have the case to you

8    tomorrow.

9          Have a nice evening.  Don't talk about the case with

10   anyone.  Don't let anyone talk to you about the case.  Don't

11   Twitter, tweet, or X.

12         I'll see y'all tomorrow at 10:30.

13              (Proceedings held out of the presence of the jury.)

14              THE COURT:  Okay.  Let's talk about what's unopposed,

15   and we'll talk about what's opposed in terms of exhibits.

16              MR. JONES:  Thank you, Your Honor.  Stanton Jones for

17   the defendants.

18              I'll start with some --

19              THE COURT:  Well, I think the plaintiffs had, in

20   their rebuttal case, something still.

21              MR. JONES:  Got it.

22              MR. KAPLAN:  Good afternoon, Your Honor.  Sam Kaplan

23   for the plaintiffs.

24         Your Honor, first of all, the -- we had previously three

25   disputed documents, but we've reached a trade; where they're

1    going to withdraw their objection on one; we're going to going

2    to withdraw one.

3          So at this point I move in Plaintiffs' Exhibit 566,

4    which I believe is without objection.

5              THE COURT:  556 is received without objection.

6              MR. KAPLAN:  566.

7              THE COURT:  566.  All right.

8              MR. HOFFMAN:  No objection.

9          (Plaintiffs' Exhibit 566 admitted into evidence.)

10             MR. KAPLAN:  The -- the one remaining disputed

11   exhibit, Your Honor, is 584.

12         Your Honor, this document was dealt with, at first, in

13   the testimony of Mr. DeMarco yesterday.  And Your Honor

14   sustained an objection to it because Mr. DeMarco was not on the

15   document and Your Honor didn't view it as appropriate to

16   question him on it.  We understand that ruling.  Nonetheless,

17   the document should -- should be admitted into evidence.

18         Ms. McGuire, could you call up PX-584, please.

19         Your Honor is aware, of course, with PX-205 and saw --

20             THE COURT:  Of course.

21             MR. KAPLAN:  -- and saw the testimony yesterday that

22   Mr. DeMarco gave about it.

23         This document is relevant to that.  It is -- as

24   Your Honor knows, PX-205 was Mr. Stegman recording what

25   Mr. Geithner had told him.

1          This document is an email exchange between employees at

2     the Department of the Treasury, including Mr. Stegman, about a

3     premeeting that occurred just shortly before the meeting

4     with -- with Mr. Geithner maybe a day or two before.  And it

5     contains Mr. Stegman's --

6               THE COURT:  May I look at it first?

7               MR. KAPLAN:  Oh, of course, Your Honor.

8          The email I'll be talking about is at the bottom, but,

9     of course, Your Honor can read it from the bottom on page 2.

10              THE COURT:  Okay.  This is internal within the

11    Treasury?

12              MR. KAPLAN:  That's correct.

13              THE COURT:  Okay.  And then that got passed to

14    Fannie Mae?

15              MR. KAPLAN:  If you could enlarge -- yes, that would

16    be great.  Thank you.

17              THE COURT:  Remind me who Stegman was.  Isn't Stegman

18    at Treasury?

19              MR. KAPLAN:  I'm sorry, Your Honor?

20              THE COURT:  Isn't Stegman at Treasury?

21              MR. KAPLAN:  Yes, he is, Your Honor.

22              THE COURT:  So this is all internal Treasury.

23              MR. KAPLAN:  It is.  It's the same Stegman --

24    obviously, the same Stegman who wrote the memo that is PX-205.

25              THE COURT:  I understand.  It is incorporating what

```
1    he says occurred in a meeting with DeMarco.
2              MR. KAPLAN:  Yes.  And this -- oh, I'm sorry.  I
3    haven't clarified the most important part.  This meeting --
4    this premeeting was with DeMarco.
5              THE COURT:  It's a premeeting?
6              MR. KAPLAN:  Yes, the premeeting was with DeMarco.
7              THE COURT:  Without DeMarco allegedly present?
8              MR. KAPLAN:  Yes, not just allegedly.  He confirmed
9    in his testimony that he -- he recalled that this meeting
10   occurred or recalled something to that effect, so.
11             THE COURT:  But the document is not even in the
12   custody or control of the housing agency.
13             MR. KAPLAN:  Let me just pass it up, Your Honor, so
14   it's a little easier for you to read.
15             THE COURT:  And are you asking me to reconsider my
16   motion -- my objection -- sustaining my objection.
17             MR. KAPLAN:  Well --
18             THE COURT:  I'll save you a lot of time right now, if
19   that's what you're asking.
20             MR. KAPLAN:  Well, Your Honor, I didn't --
21   yesterday I understood Your Honor's ruling to be based
22   largely --
23             THE COURT:  You didn't ask DeMarco about it.
24             MR. KAPLAN:  Well, we attempted to.
25             THE COURT:  I know.  And I sustained it.
```

```
 1                  MR. KAPLAN:  Yes, and we understood --

 2                  THE COURT:  And now you want to admit it.  And how

 3       are you admitting it?

 4                  MR. KAPLAN:  Well, Your Honor, as -- as in a number

 5       of -- as a number of hearsay exceptions, the public record --

 6                  THE COURT:  Okay.  It will not be admitted.  It's

 7       denied.

 8            Okay.  What's next?

 9                  MR. KAPLAN:  The -- I don't think there's anything

10       else on exhibits, Your Honor.  There's -- there's instructions.

11                  THE COURT:  All right.  So with that, the plaintiffs

12       rest in your rebuttal case?

13                  MR. KAPLAN:  Let me just make sure of that,

14       Your Honor.  Well --

15                  MS. DAVIS:  Kenya Davis for the plaintiffs.

16            Your Honor, before we'd had a discussion about the

17       Susan Hartman exhibits, having split those from Fannie and

18       Freddie to make sure that the version that we send back to the

19       jury will be the version that has the split.  I wanted to pass

20       those up to Your Honor just to see if this is -- if this falls

21       within your order.  I haven't marked all of this, but --

22                  THE COURT:  What are these now?

23                  MS. DAVIS:  I'll show you, Your Honor.  These were --

24                  THE COURT:  Well, aren't these demonstratives?

25                  MS. DAVIS:  This was the discussion that we had the
```

1    other day about the summary exhibits -- the summary --

2            THE COURT:  Aren't summary exhibits going to the

3    jury?  I thought demonstratives were not going.

4            MS. DAVIS:  Right.  And so one of the rulings that

5    you gave us was that for some of the graphs -- not for the --

6    not for the amounts that we had separated out, and there was

7    discussion about how they were put together.  But for some of

8    the graphs, you would allow us to send those back if we split

9    them between Fannie and Freddie.

10           Because one of the things you said, which is right, that

11   their numbers are different.  So we did that.  And I can show

12   you --

13           THE COURT:  I thought I was saying you could show

14   them.  I don't know that I was saying you could send them.  I

15   don't what -- are we sending any demonstratives to the jury?

16           MS. DAVIS:  Your Honor, these are summary --

17           THE COURT:  Aren't these graphs?

18           MS. DAVIS:  These -- they were graphs, but, remember,

19   the volume of the information was extensive.  And so that was

20   one of the reasons why we were going to be able to use these

21   graphs with them.

22           THE COURT:  Well, normally, then, you've got to

23   mark it as an exhibit to have it admitted and sent to the

24   jury.

25           MS. DAVIS:  That's right.  And we marked it as such.

1    And that was -- that was the argument that we had with defense

2    about whether or not you would allow us to submit them as

3    substantive evidence.

4              THE COURT:  Right.

5              MS. DAVIS:  And one of the distinctions you had, as

6    to trial, for purposes of sending as substantive evidence --

7              THE COURT:  Was taking the label off.

8              MS. DAVIS:  Take the label off and also split them,

9    Fannie and Freddie.  So this graph, for instance, that you're

10   holding in your hand, 1-P --

11             THE COURT:  And you're saying you want that to go to

12   the jury as an exhibit?

13             MS. DAVIS:  Yes, Your Honor.

14             THE COURT:  Admitted into evidence?

15             MS. DAVIS:  Yes, Your Honor.

16             THE COURT:  What's the objection to that, then?

17             MR. JONES:  Our position has been -- first of all, we

18   don't have copies of these.  So I don't know what y'all are

19   looking at.  We'd like copies.

20             But our position has been that these documents are

21   demonstratives; that they are not the summary evidence.  The

22   summary evidence consists of data, tables, spreadsheets that

23   have lots of numbers.  These are demonstratives created for

24   purposes of demonstrating that underlying evidence.  And our

25   position has been that as these sorts of -- and I'm looking at

1    them now for the first time.

2         THE COURT:  I have to say, that's what I thought we

3    were doing as well.  So that objection will be sustained.

4         MS. DAVIS:  They did.  I'll just note for the

5    record -- I understand your ruling.  They did come in as

6    summary exhibits last time.  But I'll just -- I just want to

7    make sure it was on the record.

8         The other question --

9         THE COURT:  Because I -- I don't know that the jury

10   necessarily understood.  I probably should have given an

11   earlier instruction that demonstratives don't go back to them.

12        MS. DAVIS:  All right.  The last question I had --

13   and this is a practice question.  When I've appeared before

14   Your Honor before in other criminal cases, when there's a point

15   of -- when there is a point of impeachment before the Court,

16   there's a portion of the -- the transcript that is redacted out

17   to show that pure impeachment with a cover page, and that's

18   marked as an exhibit that goes to the jury.  Is that -- is that

19   also the practice in civil cases as well?  And if so --

20        THE COURT:  It can be.

21        MS. DAVIS:  It can be.  And if so, that's what we'd

22   be looking to do with the DeMarco exhibits, those -- those

23   points of impeachment.  I think they have them marked.  What's

24   the --

25        We've marked them as PX-652, and we can -- they've

1    already been redacted.  And I want to send them up to

2    Your Honor so that you can review them and let us know if that,

3    in fact, is going to the practice for civil cases as well.

4            THE COURT:  You can show them to the -- you can show

5    them to the -- I thought -- oh, he's -- he's a joint witness?

6    I don't know -- I don't know about that.

7            MS. DAVIS:  I'm just asking the Court what the

8    practice is here.

9            THE COURT:  I don't really understand what it is

10   you're seeking to do with this.

11           MS. DAVIS:  Your Honor -- and, again, this may be

12   confusion on my part alone.  So I just -- I wanted to ask for

13   clarity's purpose.

14           So my understanding is that when a witness is impeached

15   with sworn -- prior sworn testimony, that portion of direct

16   impeachment is then -- if the Court so finds, it's marked as an

17   exhibit and made part of the record and such redacted exhibit

18   will go back to the jury.

19           THE COURT:  I think -- I think you better give me

20   some law on that.  I don't recall.

21           MS. DAVIS:  I have the rules, Your Honor.

22           THE COURT:  Okay.  I'll look at the issue tonight.

23           MS. DAVIS:  Okay.

24           THE COURT:  Do you have some contrary law?

25           MR. STERN:  I'm sorry?

1            THE COURT:  Do you have any contrary law.

2            MR. STERN:  Your Honor, I have some representations,

3     but I'll wait my turn.

4            THE COURT:  I'm not going to do it now.  So in any

5     event, if we can go over the next issue.

6            MS. DAVIS:  Okay.  Let me just --

7            THE COURT:  I'll look at it tonight.

8            MS. DAVIS:  Yes.  Let me just give you the authority.

9     It's going to be Federal Rules of Evidence 801(d)(1) and also

10    Federal Rule of Civil Procedure 32.

11           THE COURT:  Okay.

12           MS. DAVIS:  Thank you.

13           MR. STERN:  I would just note that we just -- I'll go

14    backwards.  We got an email at 4:30 this afternoon saying the

15    plaintiffs intended to do this.  We had an earlier email that

16    said they intended to create this but just submit it for the

17    record and not try to get it to the jury.

18           But, most importantly, Your Honor, before trial began,

19    the plaintiffs had proposed to designate from Mr. DeMarco's

20    deposition.  Through negotiation, they agreed not to do that.

21    And this is, essentially -- I appreciate that this is

22    impeachment as opposed to affirmative designations.  But it

23    comes to the same thing.

24           So I would submit, Your Honor, under -- and we also

25    haven't had an opportunity to determine whether these fit

1    truly, squarely within the rule.  And it's within the Court's

2    discretion to actually allow the jury to have the transcript in

3    deliberations.

4         The jury, of course, heard the impeachment in open

5    court.  It was featured.  It's not something they would have

6    missed.  And we respectfully submit, Your Honor, that --

7    especially given the background here, that we negotiated away

8    designations for Mr. DeMarco's deposition that, as a matter of

9    the Court exercising its discretion over the control of the

10   evidence, and in particular Rule 403, we would object -- we

11   don't object to these being submitted for the record, which is

12   what we were earlier told was going to happen.  But we would

13   object to having the actual written transcript submitted to the

14   jury.

15        The other point is, Your Honor, the Court has told the

16   jury that the transcript from the trial -- I'm sorry,

17   Your Honor.  I withdraw that comment.

18             THE COURT:  Okay.  Okay.

19        All right.  Now, let me tell you about the jury

20   instructions.  Anything else y'all want to raise before we go

21   that?

22             MR. KAPLAN:  No, I don't believe so, Your Honor.

23             THE COURT:  Okay.  All right.  In my ruling at -- at

24   Document 292, I indicated that any change to the jury

25   instructions should be done pretrial.

1          I have two changes that I will make from what I had

2     that -- so I'm going to distribute to you now my draft jury

3     instructions.

4          On page 2, the two paragraphs beginning at you should

5     not infer, we'll incorporate the plaintiffs' proposed curative

6     instruction to which no objection has been filed.

7               MR. STERN:  Your Honor --

8               THE COURT:  So I'll grant their motion for a

9     curative instruction about any comments that I made during the

10    trial.

11              MR. STERN:  Your Honor, may I be heard just on -- and

12    I apologize, Your Honor.  I know we didn't submit a written

13    objection but we thought we were going to have an opportunity

14    to address this.

15              I defer -- we defer to the Court on the entire --

16              THE COURT:  Deferring to the Court is granted.

17              MR. STERN:  Your Honor, just one -- except for one

18    paragraph.

19              THE COURT:  Okay.

20              MR. STERN:  The last paragraph asserts that the

21    financial crisis and the housing crisis had no relationship to

22    each other.  That is clearly contradictory to the evidence in

23    the case.  We defer to the Court on the entire rest of the

24    instruction.

25              But the part of the instruction that says that the

 1    housing -- that the financial crisis is irrelevant to the case,

 2    we, respectfully, submit is contrary to the evidence.

 3         So, again, we defer to the Court with respect to the

 4    rest of the instruction, but we would move to strike that last

 5    paragraph.  And I have --

 6         THE COURT:  I agree that any comment the Court

 7    made --

 8         MR. STERN:  Your Honor, we submitted just drop the

 9    paragraph that says further.

10         THE COURT:  Well, I'll leave that to the plaintiffs.

11    I agree I can't say that -- I can't make a finding that the

12    causes are not relevant.  But I can say any comments the Court

13    made are irrelevant.

14         MR. KAPLAN:  Yes.  Would it be -- would it be

15    acceptable to the Court if we conferred with defense counsel

16    about the second paragraph and emailed your clerk later this

17    evening?

18         THE COURT:  Yeah.

19         MR. KAPLAN:  Thank you.

20         THE COURT:  Yeah, I agree it's any comment made by

21    the Court about the causes.  Okay.

22         Yeah, you can work on that wording there.

23         All right.  The second change I have is on page 5, which

24    was fully briefed by both sides, with reply, during the

25    cross-examination of Mr. Satriano.  The curative instruction

1     I've modified a little to be a little less inflammatory.  But

2     the curative instruction is granted in part.

3          On page 8, the last paragraph to -- page 10, the first

4     paragraph, that passage incorporates changes consistent with my

5     pretrial opinion which granted in part and denied in part

6     defendants' motion to modify the instructions.

7          And then on page 10, the last paragraph, which runs on

8     to the next page, is the instruction on nominal damages that I

9     explained I would give in my pretrial opinion.

10          And then on page 10, the paragraph beginning under

11     Virginia law is copied verbatim from the parties' joint

12     proposal.

13          So, otherwise, the instructions are identical to the

14     instructions from the first trial.

15          I will grant the motion to modify the verdict form

16     over the objection.  The only part of the third amendment

17     plaintiffs have ever challenged is the net worth sweep.  And

18     the -- the wording, as I re-read the jury instructions

19     themselves, it's clear that's what we're talking about is the

20     net worth sweep.

21          So I think the -- although I -- it would be only fitting

22     to sustain the objection as untimely -- and under my order that

23     change is untimely -- but I'm willing to make the change in the

24     verdict form to say net worth sweep because I think it would be

25     clear -- more clear to the jury what we're actually asking them

```
1    to decide.

2          So with that, are there any other arguments you want to

3    make about the jury instructions themselves?

4          MR. KAPLAN:  Yes, Your Honor.  I think both sides

5    will still have a couple things.  Number one -- and my friend

6    Mr. Jones will correct me if I'm wrong.  I think that both

7    sides -- both parties -- sides at this point are no longer

8    seeking the nominal damages instructions.  I believe -- we

9    opposed it originally, of course, and I believe that the

10   plaintiffs -- I mean, defendants are intending to withdraw it.

11   But, obviously, Mr. Jones can correct me if I'm wrong on that.

12          THE COURT:  Is that correct?

13          MR. JONES:  Yes.  Stanton Jones for the defendants.

14          That's correct.  Neither side at this point is seeking

15   the instruction on nominal damages.  So that can be stricken.

16          THE COURT:  All right.  It'll be stricken.

17          MR. KAPLAN:  The -- we -- the plaintiffs have two

18   other things, Your Honor.  And one of them may be moot.

19   Because I didn't fully -- I think I didn't fully hear

20   Your Honor.

21          But on their motion about post-2013 financial

22   performance and the curative instruction that they had asked

23   for, we had actually reached agreement on slight modifications

24   to their proposed language.

25          THE COURT:  You can hand it up if you reached
```

```
1    agreement.  I'll look at it.
2              MR. KAPLAN:  It may be Your Honor had not addressed
3    that one yet.  And if so, I may be --
4              THE COURT:  This is a different one, yeah.
5              MR. KAPLAN:  Okay.  I heard with one ear and wasn't
6    sure if you had addressed it.
7              THE COURT:  This is the one you reached agreement on?
8              MR. KAPLAN:  It is.
9              THE COURT:  Okay.  What about the other one, the
10   Satriano?
11             MR. KAPLAN:  We had not reached agreement, but I
12   understand Your Honor has ruled.
13             THE COURT:  I've ruled on that.  Okay.
14             MR. KAPLAN:  Yes.
15             THE COURT:  And this is an agreement y'all reached.
16   Where do you want to put this one?
17             MR. KAPLAN:  We haven't conferred on the insertion
18   page.  So we'll discuss that, Your Honor.
19             THE COURT:  Okay.  Anything else?
20             MR. KAPLAN:  Yes.  All right.  Your Honor, I
21   realize -- I realize this comes late, but it was prompted, in
22   large part, by Mr. DeMarco's testimony, which only finished
23   yesterday.
24             As Your Honor knows, you ruled -- effectively granted
25   our motion on analyst reports and established a standard
```

 1   whereby Your Honor said the relevance of these documents is

 2   conditional but there's a clear chain of inferences the jury

 3   could draw that the reports' presence and email chains and

 4   meeting notes related to the third amendment implies that

 5   DeMarco and/or Ugoletti saw and read them and that, after doing

 6   so, they considered the reports and the decision-making

 7   process.  That was Your Honor's ruling.

 8         After the conclusion of Mr. DeMarco's testimony we

 9   respectfully submit, Your Honor, that that -- that that chain

10   of inferences was not established.  However, we're not moving

11   to strike the testimony.  Our proposal is to allow the jury to

12   consider it, but we believe they should be properly instructed

13   on the purpose for which these analyst reports were admitted.

14   And, therefore, we have a proposed curative instruction on

15   analyst reports that I can pass up to the Court.

16         And I -- I realize this comes late, Your Honor, but it

17   comes late because we couldn't know how they were going to

18   connect it up until the end of the day yesterday.

19              THE COURT:  Okay.  That request is denied.

20              MR. KAPLAN:  I believe that's all we have.  Let me

21   just check with my colleagues.

22              MR. RUDY:  Good afternoon, Your Honor.  Lee Rudy.

23         I don't want to extend things too long.  I'm actually

24   here to report on --

25              THE COURT:  Give me a break.

```
 1              MR. RUDY:  It's a bit of a joke, I suppose.  Yes.

 2         I'm reporting on two motions that have been resolved.

 3    But with the resolution, I'd like to put a couple things on the

 4    record.  One is a motion that the plaintiffs made to prevent

 5    defendants in their closing argument to make reference to

 6    purported price recovery in Fannie and Freddie stock.  You may

 7    recall this was a motion that we made based on events in the

 8    last trial that then sort of re-repeated despite an agreement

 9    we had reached during Professor Mason's testimony.  So we made

10    this motion.

11         And we've basically reached a resolution that the items

12    from PX-375, which are really illustrative, will not be

13    referenced in the defendants' closing.  So I think this motion

14    is resolved.  But because we hate to object during closing

15    arguments, I just wanted to, sort of, state for the record, we

16    do believe that any events relating to Fannie and Freddie stock

17    after August 17, 2012, would not be relevant.

18         Moreover, the passage of time, 11 years since

19    August 2012, not relevant.  So we don't want to object,

20    interrupt each other's closing.  But this is resolved, assuming

21    that there's not something we haven't thought of that could

22    come up during the closing.

23         With that, that one is resolved.  And if defendants

24    have anything they'd like to add, I have one thing that is

25    resolved.
```

```
1           MR. STERN:  Your Honor, I may have missed a memo or
2    somebody missed a memo.  We've sent an email to the plaintiffs
3    explaining -- I'm going to do the closing.  Those words will
4    not pass my lips.  We are not going to -- I'm not going to say
5    anything about any -- any of what was in their motion.  And I
6    think there's an email memorializing that.  I didn't transmit
7    it, but I have it on good authority that it was sent.
8           So this is -- we'd ask it to be denied as moot or
9    however the Court wants to deal with it.
10          THE COURT:  All right.
11          MR. RUDY:  So that's the first that's been resolved.
12          The second was a motion to exclude evidence that has
13   been pending throughout the trial relating to evidence by
14   Mr. Watt and Mr. Calabria.  You may recall earlier in the
15   trial, there was evidence that we produced to the defense that
16   said we wanted to introduce as exhibits from the subsequent
17   directors of the FHFA relating to the effects of the net worth
18   sweep downstream 13, 14, 15, you know, years after.
19          And we, basically, reached a resolution of this earlier
20   in the trial that as long as the defendants didn't make certain
21   kinds of allegations about the net worth sweep saved the
22   economy, the net worth sweep fixed the -- saved the housing
23   market, or the net worth sweep prevented any sort of erosion of
24   the commitment forever, et cetera -- as long as those lines
25   weren't crossed, we sort of forbore -- if that's a verb -- on
```

1    our motion, and we held it in abeyance.

2          We believe that the motion is now largely moot, and

3    we're not going to press it; again, with the same caveat that

4    we expect that defendants will not make any sort of argument in

5    their closing about how the net worth sweep saved the world.

6    And if they do, potentially we will be objecting.  Obviously,

7    the objection would have to be ruled upon.

8          THE COURT:  All right.

9          MR. JONES:  Your Honor, Stanton Jones for the

10   defendants.  If I could just be heard on that briefly.

11         For context, this was a motion that the defendants had

12   filed pretrial to exclude or preclude plaintiffs from admitting

13   ten exhibits, which were referred to as the Watt/Calabria

14   exhibits.  As Your Honor will recall, at the pretrial

15   conference, the parties reached an agreement.  But the

16   agreement was just that we would not argue that motion because

17   the plaintiffs might never move those exhibits into evidence.

18         And the evidence is done, and they never moved those

19   exhibits into evidence.  So our position is -- that was the

20   extent of the agreement.  The plaintiffs had told us that

21   they -- they might try to move the exhibits into evidence if we

22   said or did certain things during the trial.  But the only

23   agreement was that we would then argue -- we would then

24   litigate our motion.  And so we had just agreed to, basically,

25   table the motion to see if they ever moved those exhibits into

1    trial, which they did not do.

2         So our position is that the evidence having closed

3    without the plaintiffs ever moving those exhibits into

4    trial, our motion to exclude those exhibits is a nullity,

5    essentially.

6              THE COURT:  How long do the parties expect for your

7    closings?

8              MR. HUME:  We don't have a great record of being

9    accurate on our predictions, Your Honor.

10             THE COURT:  Well.  One thing I did tell the jury is I

11   hold the parties to their estimates on closings, so --

12             MR. HUME:  Well, I think -- so big picture, we want

13   to get it finished today -- tomorrow, I assume.

14             THE COURT:  Right.

15             MR. HUME:  Unless there's a chance it'll spill over.

16   I would say --

17             THE COURT:  It won't spill over.

18             MR. HUME:  All right.  Well, you know, I think

19   that -- for my -- first part of my closing is going to be about

20   an hour 45 to two hours, and then I'd like another 45 minutes

21   to an hour for rebuttal.

22        So, you know, ideally I'd like to reserve two hours for

23   the beginning part and one hour for --

24             THE COURT:  Not beginning at 10:30.

25             MR. HUME:  Well, I understand that, and I'm -- I'm

1    conscious of how we fit this all in.  So I will expect a little

2    less than what I asked for, but I do think it's fair for the

3    plaintiffs to get a little more time than the defendants since

4    we have the burden.

5              THE COURT:  Why is that?

6              MR. HUME:  Because we have the burden of proof.

7              THE COURT:  What do the defendants want?

8              MR. STERN:  (Inaudible.)

9              THE COURT REPORTER:  I couldn't hear you, Mr. Stern.

10             MR. STERN:  It was a flip comment that I won't

11   repeat.

12        Your Honor, and I don't mean to be flip about this, but

13   we would ask for, essentially, what Mr. Hume gets.  So if he's

14   asking for three and willing to take a little less.

15             THE COURT:  No, he didn't ask for three.

16             MR. STERN:  Yeah, I think -- last time, Your Honor, I

17   think I was about two and a half.  I'm striving to make it less

18   than that, but because we're being held to these, I would ask

19   for two and a half.

20             MR. HUME:  I think the burden of proof, Your Honor,

21   might be worth an extra 15 minutes for the plaintiffs.  Unless

22   the defendants would like to stipulate that we don't have the

23   burden of proof.

24             THE COURT:  All right.  We'll try to do two and a

25   half on each side, and that's still going to be a full day by

1    the time I read the instructions to the jury.  That's still

2    going to be a full day.

3           There is going to be a problem with -- there will be a

4    Trump hearing at 10:00 a.m. on Friday, but I'm assuming the

5    President will not be here.  So there will be some delay in

6    entering the building, but if Trump waives his appearance, it

7    won't be as bad as the other day.  It's at 10:00 a.m.

8           So I'm going to tell the jury to report, and I

9    understand the jury will be able to get in without any great

10   difficulty.  And I think there will not be any great

11   difficulty for y'all either, as long as the President does not

12   appear.

13                MR. JONES:  If I could, Your Honor, Stanton Jones.

14          One last issue on the jury instructions.  Over the last

15   few weeks, since the Court's July 21st opinion, the parties

16   have worked together to prepare an updated version of the final

17   instructions that incorporate all of the changes that

18   Your Honor accepted or adopted in the July 21st.

19          I understand -- I haven't had a chance to study what we

20   were given by the Court just a little while ago, but we would

21   request the opportunity just -- as I say, the parties had

22   reached agreement on a set of changes.  If we could just

23   compare those changes to what the Court has done.  And if there

24   are any discrepancies, reserve the right to present those by

25   agreement tomorrow morning.

1          THE COURT:  Feel free.

2          MR. JONES:  Thank you.

3          THE COURT:  I'll see y'all tomorrow morning at 10:30.

4          MR. STERN:  Your Honor, if I may --

5          (Proceedings were concluded at 4:53 p.m.)

1          <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3              I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                         Dated this 9th day of August, 2023.

10

11                        /s/ Nancy J. Meyer_____
                          Nancy J. Meyer
12                        Official Court Reporter
                          Registered Diplomate Reporter
13                        Certified Realtime Reporter
                          333 Constitution Avenue Northwest
14                        Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

## $

**$0.13** [1] - 22:12
**$0.43** [1] - 22:12
**$1.16** [2] - 7:24, 28:18
**$100** [1] - 26:9
**$114** [1] - 29:15
**$200** [1] - 30:14
**$205** [3] - 13:2, 14:7, 24:13
**$258** [4] - 22:17, 22:22, 30:20, 31:22
**$40** [1] - 17:9
**$54** [1] - 71:12
**$57** [1] - 71:11
**$665** [1] - 24:11
**$75** [1] - 51:22
**$76** [1] - 94:14
**$800** [2] - 23:22, 24:10

## '

**'09** [1] - 67:7
**'10** [1] - 67:7
**'11** [1] - 67:7
**'15** [1] - 50:12

## 0

**0.0** [1] - 71:15
**0.2** [1] - 71:16

## 1

**1** [4] - 31:9, 78:22, 82:15, 90:18
**1-P** [1] - 110:10
**1.16** [4] - 23:9, 28:14, 33:20, 34:17
**1.81** [1] - 26:12
**10** [10] - 11:24, 18:23, 28:13, 36:1, 36:4, 36:8, 75:19, 117:3, 117:7, 117:10
**10-K** [1] - 55:7, 69:14, 96:3
**10-Q** [2] - 85:13, 86:24
**100** [1] - 52:24
**105** [1] - 3:12
**10:00** [2] - 126:4, 126:7
**10:30** [4] - 104:3, 104:12, 124:24, 127:3
**11** [1] - 121:18
**111.2** [1] - 28:17
**117.6** [1] - 41:20
**12** [3] - 17:13, 91:11, 100:11
**12/31/2012** [1] - 96:4
**13** [7] - 22:13, 22:24,

23:1, 23:3, 23:16, 97:3, 122:18
**131** [1] - 69:17
**13th** [1] - 103:3
**14** [6] - 44:9, 45:17, 46:12, 81:4, 87:2, 122:18
**140** [1] - 29:17
**140.5** [1] - 41:20
**15** [4] - 44:13, 122:18, 125:21
**16** [5] - 44:24, 46:7, 46:8, 85:17, 86:10
**1676** [2] - 38:14, 38:17, 39:17
**17** [11] - 43:8, 43:13, 45:15, 45:19, 46:1, 46:8, 88:8, 91:8, 92:9, 97:20, 121:17
**178** [2] - 85:17, 86:10
**17th** [5] - 65:13, 87:25, 88:5, 90:9, 90:17
**18.9** [2] - 28:14, 28:16
**18th** [1] - 65:13
**19** [2] - 32:2, 78:5
**196** [1] - 15:13
**19th** [2] - 65:13, 79:24

## 2

**2** [9] - 6:6, 9:9, 20:9, 21:16, 91:9, 103:8, 106:9, 115:4
**2.1** [1] - 11:24
**2.5** [2] - 19:8, 23:2
**2.8** [1] - 45:2
**2.9** [1] - 11:24
**20** [1] - 28:14
**200** [1] - 15:13
**200-billion** [1] - 32:10
**2008** [9] - 16:17, 17:4, 17:7, 17:13, 18:7, 27:11, 66:14, 67:3, 67:7
**2009** [4] - 29:23, 32:7, 95:5, 95:15
**2011** [11] - 22:1, 23:17, 36:2, 66:14, 70:14, 71:22, 72:4, 72:7, 72:24, 73:7, 94:5
**2012** [81] - 18:22, 22:16, 26:12, 29:9, 29:18, 30:2, 30:4, 30:15, 30:22, 30:25, 31:21, 32:12, 36:2, 49:3, 55:6, 57:21, 62:23, 64:3, 64:6, 65:14, 67:8, 67:14, 68:24, 69:20, 70:5, 73:2, 73:4, 73:6,

73:9, 73:18, 74:11, 75:11, 76:25, 77:4, 78:2, 78:7, 78:10, 79:4, 79:11, 79:15, 79:24, 80:5, 80:18, 80:22, 81:4, 81:9, 81:21, 82:2, 82:9, 82:12, 83:3, 83:4, 83:14, 83:19, 84:19, 85:13, 85:15, 86:25, 87:19, 88:8, 90:9, 90:17, 90:21, 91:9, 91:12, 97:3, 97:4, 97:10, 97:20, 97:21, 99:19, 100:3, 100:4, 101:1, 101:17, 103:3, 121:17, 121:19
**2013** [10] - 44:12, 45:18, 50:12, 51:8, 67:12, 68:22, 71:7, 71:9, 71:11, 85:19
**2014** [1] - 50:12
**2016** [2] - 22:1, 23:18
**2017** [1] - 55:15
**2018** [1] - 18:4
**2021** [1] - 45:8
**2022** [3] - 43:16, 45:3, 46:14
**21** [4] - 38:17, 38:18, 39:16, 82:15
**21st** [2] - 126:15, 126:18
**23** [5] - 22:25, 23:14, 23:16, 25:19, 34:17
**23.4** [4] - 34:4, 34:6, 34:14, 34:19
**24th** [2] - 29:23, 32:7
**25** [3] - 38:18, 39:17, 100:3
**251** [1] - 87:2
**258** [3] - 23:9, 29:10, 41:20
**26** [4] - 19:20, 23:4, 32:2, 45:8
**27** [1] - 72:4
**28** [1] - 97:3
**29** [1] - 3:5
**292** [1] - 114:24

## 3

**3** [2] - 17:12, 78:5
**3.43** [1] - 18:23
**30** [3] - 22:12, 72:23, 94:15
**31** [2] - 70:5, 80:4
**31st** [4] - 30:2, 32:12, 69:20, 94:5
**32** [1] - 113:10

**346** [1] - 72:1
**38** [2] - 19:20, 23:4
**380-A** [2] - 62:15, 97:24

## 4

**4** [6] - 3:10, 3:11, 3:11, 3:12, 3:13, 3:13
**4.2** [1] - 95:16
**403** [1] - 114:10
**41** [2] - 3:5, 41:10
**43** [4] - 22:13, 23:1, 23:3, 23:16
**43-cents** [1] - 22:24
**446** [1] - 69:17
**45** [12] - 6:7, 9:9, 19:8, 20:9, 21:17, 23:8, 28:12, 33:21, 42:12, 42:14, 124:20
**45-basis** [1] - 23:2
**458** [3] - 4:8, 4:17, 69:12
**458** ...................... [1] - 3:10
**460** [3] - 4:8, 4:17, 96:1
**460** ...................... [1] - 3:11
**47** [1] - 3:6
**476** [1] - 93:3
**498** [2] - 4:8, 4:17
**498** ...................... [1] - 3:11
**499** [2] - 4:8, 4:17
**499** ...................... [1] - 3:12
**4:30** [1] - 113:14
**4:53** [1] - 127:5

## 5

**5** [5] - 3:4, 22:19, 80:2, 99:11, 116:23
**5.93** [1] - 17:13
**50** [3] - 68:2, 68:3, 68:4
**51** [1] - 68:2
**53** [1] - 71:12
**556** [1] - 105:5
**566** [4] - 105:3, 105:6, 105:7, 105:9
**566** ...................... [1] - 3:12
**569** [2] - 15:10, 15:13
**58.4** [1] - 44:12
**584** [1] - 105:11

## 6

**6** [1] - 78:22

**60** [1] - 17:10
**647** [3] - 4:8, 4:10, 4:17
**647** ...................... [1] - 3:13
**648** [3] - 4:8, 4:11, 4:17
**648** ...................... [1] - 3:13
**68** [1] - 33:9
**69** [1] - 96:7

## 7

**7** [4] - 32:2, 81:4, 86:24, 98:22
**703** [4] - 78:13, 78:18, 88:10, 89:4
**707** [2] - 13:1, 15:20
**74** [1] - 62:16
**74.5** [1] - 51:15
**75** [1] - 17:14
**76** [1] - 3:7
**76.9** [1] - 94:5
**7th** [1] - 87:18

## 8

**8** [4] - 81:4, 85:14, 90:18, 117:3
**801(d)(1** [1] - 113:9
**81** [1] - 93:11
**84:17** [1] - 82:15
**85** [1] - 93:9
**85-billion** [1] - 17:9
**8th** [2] - 85:13, 87:18

## 9

**93** [1] - 3:7
**9th** [1] - 101:17

## A

**a.m** [3] - 82:15, 126:4, 126:7
**abeyance** [1] - 123:1
**ability** [1] - 26:8
**able** [4] - 79:17, 84:4, 109:20, 126:9
**absent** [1] - 103:15
**absolutely** [4] - 14:23, 15:22, 18:8, 19:4
**accept** [2] - 24:23, 25:3
**acceptable** [1] - 116:15
**accepted** [1] - 126:18
**access** [1] - 61:8
**account** [4] - 45:5, 50:16, 52:5, 73:16

**accountants** [1] - 66:11

**accounted** [2] - 43:22, 44:4

**accounting** [4] - 54:14, 67:18, 68:8, 70:3

**accumulate** [1] - 44:20

**accumulated** [1] - 44:19

**accurate** [4] - 39:22, 41:4, 86:20, 124:9

**acknowledge** [1] - 84:20

**acquired** [1] - 95:4

**acquiring** [1] - 101:3

**acting** [1] - 32:7

**Acting** [1] - 15:16

**actual** [9] - 18:5, 25:22, 26:22, 26:23, 44:24, 58:9, 78:4, 83:1, 114:13

**actuals** [1] - 58:12

**add** [4] - 28:14, 41:20, 81:14, 121:24

**addition** [1] - 26:4

**additional** [8] - 21:22, 22:22, 27:12, 45:11, 62:4, 76:2, 87:7, 89:4

**address** [12] - 8:9, 8:11, 8:14, 8:16, 8:18, 25:18, 44:1, 52:8, 52:10, 63:4, 76:21, 115:14

**addressed** [6] - 27:18, 59:13, 74:25, 75:6, 119:2, 119:6

**adequacy** [1] - 83:7

**adequate** [2] - 18:13, 19:17

**adequately** [1] - 18:25

**adjustments** [1] - 21:23

**administrative** [1] - 95:7

**admit** [1] - 108:2

**admitted** [9] - 4:18, 78:12, 88:9, 105:9, 105:17, 108:6, 109:23, 110:14, 120:13

**Admitted** [1] - 3:9

**admitting** [2] - 108:3, 123:12

**adopted** [1] - 126:18

**adverse** [3] - 56:14, 57:4, 87:5

**affiliated** [1] - 96:13

**affixing** [1] - 83:14

**afford** [1] - 36:8

**afield** [1] - 88:18

**afternoon** [13] - 4:3, 5:4, 5:5, 5:6, 29:3, 29:5, 29:6, 47:12, 47:13, 76:15, 104:22, 113:14, 120:22

**agencies** [5] - 24:21, 81:7, 81:17, 102:23, 102:25

**agency** [1] - 107:12

**aggregate** [2] - 95:5, 95:14

**ago** [2] - 84:8, 126:20

**agree** [9] - 14:22, 34:13, 46:23, 49:16, 77:4, 79:8, 116:6, 116:11, 116:20

**agreed** [7] - 13:18, 32:6, 36:18, 36:22, 83:14, 113:20, 123:24

**agreement** [17] - 17:20, 17:25, 18:7, 39:3, 103:16, 118:23, 119:1, 119:7, 119:11, 119:15, 121:8, 123:15, 123:16, 123:20, 123:23, 126:22, 126:25

**agreements** [1] - 55:24

**ahead** [3] - 40:14, 87:22, 104:2

**AIG** [21] - 6:14, 8:15, 10:2, 16:7, 16:8, 16:10, 16:13, 16:18, 16:19, 17:2, 17:4, 17:9, 17:20, 18:11, 18:17, 18:20, 18:23, 18:25, 19:2, 19:4, 27:10

**albeit** [1] - 93:21

**aligned** [1] - 24:20

**all-in** [10] - 6:5, 6:18, 6:21, 8:13, 8:15, 8:25, 9:6, 19:21, 27:8, 28:20

**allegations** [1] - 122:21

**allegedly** [2] - 107:7, 107:8

**alleviating** [1] - 90:20

**allow** [4] - 109:8, 110:2, 114:2, 120:11

**allowance** [3] - 45:7, 67:21, 70:9

**allowed** [2] - 50:15, 54:17

**almost** [5] - 9:14, 15:13, 55:9, 65:2, 65:11

**alone** [1] - 112:12

**alternative** [1] - 6:23

**alternatively** [1] - 64:17

**alternatives** [4] - 62:25, 63:8, 63:10, 75:5

**amended** [2] - 32:8, 97:3

**amending** [1] - 82:3

**amendment** [27] - 29:15, 29:18, 29:20, 29:22, 29:25, 30:1, 32:9, 49:16, 49:25, 50:4, 50:8, 54:22, 56:1, 56:4, 65:1, 68:17, 73:1, 77:1, 87:25, 89:12, 90:17, 90:18, 92:5, 92:6, 117:16, 120:4

**America** [8] - 23:22, 24:10, 78:22, 79:6, 80:7, 83:23, 88:7, 90:16

**amount** [18] - 25:23, 26:23, 30:25, 31:21, 32:25, 36:14, 36:23, 50:17, 51:3, 51:23, 53:22, 55:14, 56:12, 56:13, 66:20, 71:10, 71:19

**amounts** [2] - 25:22, 109:6

**analyses** [1] - 10:2

**analysis** [49] - 6:6, 8:25, 9:1, 9:6, 9:8, 9:10, 10:4, 10:7, 10:10, 10:13, 12:17, 13:6, 16:19, 18:3, 18:5, 23:5, 23:12, 26:21, 27:9, 27:13, 27:19, 27:24, 28:9, 28:10, 28:21, 37:2, 37:12, 37:18, 42:6, 42:14, 42:18, 52:5, 58:3, 58:19, 58:21, 59:8, 64:12, 64:13, 64:19, 65:18, 66:1, 67:13, 68:5, 74:22, 75:1, 79:7, 89:10

**analyst** [42] - 60:10, 60:13, 60:15, 60:17, 60:20, 60:23, 61:2, 61:5, 61:14, 62:4, 62:12, 62:22, 63:2,

63:10, 63:15, 77:13, 77:24, 78:4, 79:14, 79:24, 80:7, 81:10, 81:19, 83:9, 88:4, 88:17, 88:24, 89:5, 89:8, 89:17, 90:8, 91:25, 97:9, 98:12, 98:15, 99:1, 99:4, 99:8, 99:10, 119:25, 120:13, 120:15

**analysts** [4] - 60:17, 61:15, 77:19, 102:13

**analysts'** [1] - 79:9

**ANJAN** [1] - 5:11

**Anjan** [2] - 3:4, 5:11

**announced** [1] - 65:12

**announcement** [1] - 69:4

**annual** [4] - 55:6, 55:7, 56:9, 57:3

**annually** [2] - 72:16

**anonymous** [1] - 77:8

**answer** [5] - 10:4, 37:3, 37:19, 37:21, 80:9

**answered** [2] - 38:1, 40:6

**anticipate** [1] - 86:14

**anticipated** [1] - 30:8

**apart** [1] - 11:9

**apologies** [1] - 102:1

**apologize** [2] - 91:3, 115:12

**appear** [1] - 126:12

**appearance** [1] - 126:6

**appeared** [1] - 111:13

**applied** [2] - 23:9, 42:15

**applies** [2] - 23:10, 23:11

**apply** [2] - 19:9, 42:12

**appreciate** [2] - 43:6, 113:21

**approach** [1] - 20:24

**appropriate** [6] - 7:13, 9:9, 19:9, 19:10, 42:7, 105:15

**approximation** [1] - 28:6

**argue** [2] - 123:16, 123:23

**argued** [1] - 76:4

**argument** [3] - 110:1, 121:5, 123:4

**arguments** [4] - 104:3, 104:7, 118:2, 121:15

**arrangement** [1] - 11:17

**arrangements** [1] -

14:19

**arrived** [1] - 42:16

**as-of** [1] - 72:20

**aside** [1] - 66:20

**aspects** [2] - 74:23, 83:1

**asserts** [1] - 115:20

**assess** [2] - 37:23, 66:10

**assessed** [2] - 25:11, 66:5

**assessment** [2] - 37:10, 76:23

**asset** [6] - 44:12, 57:9, 57:10, 66:3, 66:24, 67:3

**assets** [9] - 21:17, 50:24, 51:1, 65:20, 66:3, 67:2, 69:19, 70:8

**assistance** [16] - 6:13, 8:15, 10:1, 13:8, 13:9, 14:19, 15:11, 15:23, 16:13, 16:14, 16:16, 18:13, 18:17, 19:14, 24:23, 25:3

**assisting** [1] - 19:4, 27:6

**assume** [5] - 19:16, 25:13, 37:15, 39:5, 124:13

**assumed** [1] - 39:4

**assuming** [4] - 18:2, 43:23, 121:20, 124:4

**attached** [1] - 78:4

**Attari** [51] - 5:18, 6:20, 7:17, 8:9, 10:6, 15:1, 16:20, 20:13, 21:7, 21:16, 21:21, 23:10, 25:18, 26:14, 32:24, 33:3, 33:6, 34:22, 34:25, 35:12, 35:14, 43:16, 43:20, 43:21, 44:14, 44:17, 44:21, 44:25, 45:16, 46:14, 48:7, 48:11, 48:20, 49:10, 54:22, 56:22, 57:13, 57:15, 57:18, 58:9, 60:25, 64:23, 70:20, 71:3, 71:21, 73:15, 73:16, 74:14, 74:18, 74:24, 88:23

**Attari's** [12] - 13:15, 26:18, 33:9, 33:24, 34:3, 41:24, 46:13, 46:18, 49:15, 52:4, 52:9, 73:22

**attempt** [1] - 35:20

**attempted** [2] - 37:17, 107:24

**attested** [1] - 86:20
**audio** [1] - 83:17
**audio-visual** [1] - 83:17
**August** [37] - 18:22, 22:16, 26:11, 29:9, 29:18, 30:4, 30:15, 30:25, 31:21, 65:13, 69:4, 73:2, 73:6, 75:11, 82:15, 84:21, 85:13, 85:14, 86:24, 87:18, 87:24, 87:25, 88:5, 88:8, 90:9, 90:17, 91:8, 92:9, 97:20, 101:17, 103:3, 121:17, 121:19
**authority** [2] - 113:8, 122:7
**availability** [1] - 79:1
**available** [7] - 7:9, 20:3, 22:24, 56:14, 58:20, 77:25, 84:17
**average** [4] - 22:25, 23:1, 23:15, 23:16
**avoid** [2] - 55:15, 55:25
**aware** [13] - 5:17, 48:15, 60:13, 64:23, 64:25, 72:20, 72:25, 76:25, 89:15, 89:16, 92:11, 98:25, 105:19

**B**

**background** [2] - 58:17, 114:7
**backwards** [1] - 113:14
**bad** [4] - 15:7, 79:3, 81:17, 126:7
**bailing** [1] - 27:6
**Bala** [3] - 3:6, 47:4, 47:16
**balance** [7] - 51:9, 51:21, 56:18, 67:11, 69:9, 71:17, 75:4
**bank** [9] - 6:12, 10:25, 19:25, 20:1, 20:11, 21:9, 26:6, 102:9
**Bank** [12] - 17:3, 23:22, 24:10, 78:22, 79:6, 80:7, 81:4, 81:23, 83:23, 83:24, 88:7, 90:16
**bank-specific** [1] - 20:11
**banking** [5] - 12:24, 14:6, 14:9, 14:25, 15:25

**banks** [30] - 6:13, 11:15, 11:22, 12:19, 12:21, 12:23, 12:25, 13:1, 13:13, 15:6, 15:10, 15:12, 15:18, 15:20, 16:2, 19:24, 22:4, 22:12, 23:21, 24:9, 24:13, 24:22, 25:3, 25:22, 26:5, 26:22, 27:3, 27:6, 102:7
**Barclays** [9] - 62:22, 78:5, 79:7, 80:7, 83:23, 91:8, 92:6, 92:13, 98:12
**Barclays'** [1] - 77:19
**bare** [1] - 50:14
**base** [8] - 21:3, 21:23, 28:20, 35:7, 42:13, 42:15, 59:8, 68:9
**based** [24] - 6:5, 6:16, 8:15, 18:23, 25:15, 27:13, 27:15, 27:19, 28:9, 30:13, 31:16, 35:5, 37:10, 37:12, 37:23, 45:15, 46:7, 61:5, 66:9, 74:19, 78:25, 99:5, 107:21, 121:7
**basis** [21] - 6:7, 9:9, 17:14, 19:8, 19:20, 20:9, 21:17, 22:14, 22:25, 23:4, 23:8, 23:14, 25:19, 28:12, 31:9, 33:21, 41:18, 42:14, 86:3, 89:4
**become** [2] - 70:8, 78:6
**becomes** [1] - 84:10
**began** [1] - 113:18
**begin** [1] - 104:3
**beginning** [8] - 69:23, 94:2, 95:5, 99:5, 115:4, 117:10, 124:23, 124:24
**begins** [1] - 85:18
**begun** [1] - 80:3
**behalf** [9] - 4:4, 29:3, 36:20, 39:13, 43:5, 44:7, 75:24, 88:16, 96:11
**behaved** [1] - 84:25
**belief** [3] - 77:10, 94:2, 94:4
**beliefs** [1] - 79:9
**below** [4] - 17:23, 21:15, 86:3
**Bench** [3] - 38:22, 43:3, 88:14
**benchmark** [2] - 19:1,

19:21
**benchmarks** [2] - 19:18
**benefit** [1] - 44:22
**benefits** [1] - 67:6
**Benson** [3] - 43:20, 43:23, 44:3
**Bergman** [7] - 43:6, 43:9, 46:10, 76:13, 76:15, 89:6, 98:3
**BERGMAN** [40] - 43:9, 43:13, 46:10, 76:14, 76:17, 77:15, 77:17, 78:11, 78:16, 78:20, 78:21, 79:20, 79:22, 81:2, 81:3, 82:14, 82:17, 83:16, 83:18, 85:21, 85:23, 88:1, 88:3, 88:9, 89:6, 89:20, 89:24, 90:5, 90:7, 90:13, 90:15, 90:25, 91:3, 91:6, 91:7, 92:17, 92:25, 99:23, 99:25, 100:6
**Bergman.......** [1] - 3:7
**Bernanke** [3] - 39:19, 40:21, 40:23
**better** [5] - 11:16, 58:10, 58:12, 59:22, 112:19
**between** [15] - 4:6, 7:3, 11:14, 15:19, 16:3, 22:1, 23:17, 32:17, 63:21, 63:25, 97:20, 99:19, 100:24, 106:1, 109:9
**beyond** [4] - 79:3, 89:2, 99:25, 100:6
**big** [6] - 51:2, 60:18, 74:5, 85:3, 95:13, 124:12
**bigger** [4] - 11:4, 54:11, 64:7, 75:10
**biggest** [1] - 54:12
**billion** [37] - 7:24, 13:2, 14:7, 17:9, 17:10, 22:17, 22:22, 23:9, 23:22, 24:10, 24:11, 24:13, 26:9, 28:14, 28:15, 28:16, 28:17, 28:18, 29:10, 29:15, 30:14, 30:20, 31:22, 33:20, 34:4, 34:6, 34:14, 41:20, 44:12, 51:15, 51:22, 71:11, 71:12, 94:5, 94:14, 94:15
**bit** [4] - 44:19, 71:18, 84:23, 121:1
**bleeding** [1] - 18:12

**BNP** [2] - 62:5, 92:8
**board** [1] - 83:9
**BofA** [1] - 78:10
**bond** [8] - 51:10, 51:14, 63:19, 63:22, 64:5, 100:14, 100:23, 100:24
**bonds** [8] - 10:24, 61:18, 61:19, 63:21, 63:22, 63:24
**book** [1] - 17:1, 59:21
**books** [1] - 51:25
**borrow** [9] - 26:8, 26:10, 51:10, 51:14, 51:20, 51:23, 54:10, 56:20, 90:19
**borrowers** [6] - 10:13, 11:6, 11:10, 11:13, 11:15, 12:7
**borrowing** [1] - 57:11
**bottom** [12] - 13:5, 13:7, 33:24, 55:7, 77:23, 84:22, 87:3, 93:11, 96:8, 99:5, 106:8, 106:9
**bottom-line** [2] - 13:5, 13:7
**bought** [1] - 15:12
**break** [1] - 120:25
**briefed** [1] - 116:24
**briefly** [14] - 8:5, 16:7, 38:20, 41:9, 42:25, 58:5, 62:12, 65:22, 74:19, 76:1, 89:25, 93:2, 99:22, 123:10
**bring** [5] - 4:20, 13:16, 47:2, 67:11, 74:7
**bringing** [1] - 58:21, 59:22
**broad** [1] - 6:7
**broadly** [2] - 6:3, 24:20
**brought** [2] - 67:15, 96:11
**buffer** [1] - 53:20
**build** [6] - 53:4, 54:2, 54:17, 56:5, 56:6, 74:11
**building** [1] - 52:21, 73:24, 126:6
**building-out** [1] - 73:24
**built** [2] - 44:23, 54:3
**bulk** [1] - 51:23
**bullet** [11] - 51:6, 57:15, 61:9, 63:3, 63:16, 63:18, 64:10, 80:3, 94:2, 94:17, 95:3
**bumps** [1] - 86:8

**BNP** section continues:
**bunch** [4] - 21:12, 21:14, 22:18, 73:24
**burden** [4] - 125:4, 125:6, 125:20, 125:23
**buyers** [1] - 61:20
**buying** [3] - 61:16, 61:18, 101:3
**buyouts** [2] - 11:10, 12:9

**C**

**cake** [1] - 14:1
**Calabria** [1] - 122:14
**calculating** [1] - 45:22
**calculation** [11] - 8:16, 20:14, 21:3, 21:18, 21:20, 25:21, 33:18, 33:21, 34:2, 34:3, 35:10
**calculations** [7] - 33:25, 35:21, 43:14, 43:19, 46:20, 71:4, 71:14
**cannot** [2] - 53:3, 74:9
**cap** [14] - 30:1, 30:5, 30:8, 30:10, 30:12, 30:19, 30:22, 32:13, 63:6, 77:11, 80:4, 81:23, 83:7
**capital** [33] - 10:14, 10:15, 11:6, 11:8, 11:19, 12:7, 12:14, 27:3, 44:18, 44:20, 50:6, 50:9, 50:14, 50:15, 52:14, 52:17, 52:21, 53:3, 53:4, 54:2, 54:3, 54:17, 54:19, 55:14, 56:6, 62:22, 75:9, 77:25, 79:1, 79:3, 90:21, 90:22, 91:12
**Capital** [8] - 8:12, 9:23, 12:18, 12:21, 13:16, 15:2, 27:7
**capitalized** [1] - 11:12
**capped** [1] - 81:12
**caps** [2] - 64:5, 64:6
**capturing** [1] - 87:14
**care** [3] - 54:3, 54:19, 56:6
**careful** [1] - 39:18
**Case** [3] - 82:25, 83:3, 84:13
**case** [25] - 4:6, 5:18, 7:13, 15:9, 28:20, 32:18, 39:3, 45:8, 45:16, 47:20, 47:25, 57:16, 58:23, 68:9,

70:22, 74:18, 104:4, 104:5, 104:7, 104:9, 104:10, 104:20, 108:12, 115:23, 116:1
**Case-Shiller** [3] - 82:25, 83:3, 84:13
**cases** [4] - 5:25, 111:14, 111:19, 112:3
**cash** [1] - 56:14
**catch** [1] - 40:12
**categorically** [1] - 79:17
**caused** [1] - 60:3
**causes** [3] - 53:4, 116:12, 116:21
**causing** [3] - 57:9, 57:10, 59:20
**caveat** [3] - 81:13, 81:24, 123:3
**CEO** [2] - 83:5, 86:21
**certain** [7] - 10:3, 26:25, 53:8, 70:24, 88:24, 122:20, 123:22
**certainly** [5] - 45:22, 72:10, 88:25, 89:3, 89:15
**cetera** [1] - 122:24
**CFO** [1] - 86:21
**chain** [2] - 120:2, 120:9
**chains** [1] - 120:3
**chair** [6] - 36:14, 37:7, 37:20, 37:24, 38:9, 40:7
**Chairman** [3] - 39:19, 40:20, 40:23
**challenged** [1] - 117:17
**challenges** [1] - 81:8
**chance** [4] - 88:25, 91:11, 124:15, 126:19
**change** [7] - 45:12, 70:11, 91:10, 114:24, 116:23, 117:23
**changed** [5] - 18:9, 18:11, 18:15, 81:15
**changes** [14] - 56:12, 56:16, 59:18, 68:24, 73:8, 85:24, 86:13, 87:5, 103:15, 115:1, 117:4, 126:17, 126:22, 126:23
**changing** [1] - 60:2
**characterization** [2] - 14:22, 46:17

**charge** [1] - 31:18
**charged** [3] - 7:8, 25:14, 36:5
**charges** [1] - 20:6
**charging** [2] - 36:10, 95:17
**chart** [5] - 20:20, 28:12, 95:12, 95:13, 95:16
**Chase** [1] - 24:11
**chatter** [7] - 77:5, 77:21, 84:1, 84:2, 98:5, 100:14, 100:19
**check** [1] - 120:21
**checks** [1] - 23:6
**chosen** [1] - 55:4
**chronologically** [1] - 76:22
**circular** [3] - 31:5, 48:25, 92:21
**cited** [2] - 92:8, 101:12
**civil** [2] - 111:19, 112:3
**Civil** [1] - 113:10
**claim** [4] - 35:9, 49:15, 52:4, 52:9
**claimed** [1] - 28:1
**clarified** [1] - 107:3
**clarity's** [1] - 112:13
**clear** [1] - 5:9, 7:25, 9:16, 45:9, 85:9, 100:9, 101:6, 117:19, 117:25, 120:2
**clearly** [3] - 35:19, 59:14, 115:22
**clerk** [1] - 116:16
**clip** [1] - 83:12
**close** [3] - 6:11, 57:24, 61:1
**closed** [2] - 103:24, 124:2
**closing** [10] - 104:3, 104:7, 121:5, 121:13, 121:14, 121:20, 121:22, 122:3, 123:5, 124:19
**closings** [3] - 104:1, 124:7, 124:11
**coauthors** [1] - 14:13
**collapse** [4] - 12:25, 14:9, 14:25, 15:25
**colleagues** [1] - 120:21
**collect** [3] - 66:5, 66:6, 66:7
**collected** [1] - 66:11
**combination** [1] - 62:9
**combined** [1] - 51:14
**coming** [14] - 17:23,

56:18, 64:5, 64:6, 69:8, 71:11, 75:4, 80:4, 82:19, 83:9, 84:18, 85:6, 85:8, 95:14
**comment** [5] - 73:21, 114:17, 116:6, 116:20, 125:10
**commentary** [1] - 77:20
**commenting** [1] - 90:17
**comments** [4] - 55:12, 58:15, 115:9, 116:12
**commercial** [2] - 10:10, 24:9
**commitment** [59] - 7:3, 7:6, 7:7, 7:14, 7:18, 8:14, 9:22, 10:10, 10:13, 10:17, 11:9, 12:1, 12:3, 16:19, 19:19, 19:20, 19:24, 20:4, 22:16, 22:18, 22:21, 23:5, 24:2, 24:16, 24:17, 25:8, 25:10, 25:12, 25:13, 25:14, 25:15, 26:2, 26:9, 29:10, 29:16, 29:19, 30:1, 30:5, 30:11, 30:16, 30:18, 30:21, 31:3, 31:4, 31:6, 31:8, 31:21, 32:10, 32:11, 32:13, 41:14, 49:19, 54:16, 77:12, 81:12, 81:22, 83:7, 87:8, 122:24
**commitments** [15] - 6:12, 9:18, 9:20, 9:23, 10:25, 11:1, 11:12, 11:16, 11:22, 11:23, 23:23, 24:6, 24:8, 24:12, 24:13
**common** [1] - 64:22
**community** [2] - 60:17, 83:15
**companies** [2] - 13:20, 73:25
**company** [3] - 54:4, 66:25, 68:6
**comparable** [3] - 10:11, 16:10, 26:15
**comparables** [8] - 6:8, 6:12, 8:24, 19:11, 24:4, 27:15, 31:16, 37:13
**comparator** [2] - 13:16, 16:8
**comparators** [6] - 8:6, 8:7, 10:6, 16:7,

26:25, 27:12
**compare** [3] - 24:4, 62:16, 126:23
**compared** [2] - 18:4, 100:25
**comparing** [1] - 18:19
**comparison** [6] - 8:13, 8:15, 16:24, 18:24, 27:8, 62:25
**compensated** [1] - 18:25
**compensation** [1] - 19:17
**completed** [1] - 74:13
**completely** [12] - 7:10, 14:3, 15:23, 16:24, 20:16, 23:12, 25:20, 28:11, 80:10, 81:16, 100:18
**complex** [2] - 20:8, 23:17
**complicated** [1] - 21:24
**comprehensive** [2] - 45:18, 55:16
**comptroller** [1] - 14:14
**compute** [2] - 25:24, 26:24
**concern** [4] - 81:11, 101:2, 102:11, 102:16
**concerned** [3] - 77:24, 80:14, 101:3
**concerns** [5] - 82:1, 83:6, 83:15, 84:7, 90:21
**concluded** [2] - 89:17, 127:5
**conclusion** [8] - 6:17, 9:8, 9:13, 18:19, 18:24, 49:15, 59:5, 120:8
**conditional** [1] - 120:2
**conditions** [5] - 49:18, 50:1, 50:2, 51:17, 54:23
**conducted** [2] - 27:8, 27:24
**conference** [4] - 38:22, 43:3, 88:14, 123:15
**conferred** [2] - 116:15, 119:17
**confined** [1] - 25:12
**confirmed** [2] - 102:15, 107:8
**conflict** [3] - 15:19, 19:3, 61:3
**confused** [1] - 9:15

**confusion** [2] - 7:2, 112:12
**connect** [1] - 120:18
**conscious** [1] - 125:1
**conservator** [1] - 32:8
**conservator's** [2] - 49:17, 54:23
**conservatorship** [1] - 103:16
**consider** [1] - 120:12
**considered** [3] - 18:13, 63:9, 120:6
**consistent** [19] - 15:23, 23:6, 45:13, 51:15, 64:4, 79:6, 79:7, 80:6, 80:10, 81:11, 83:20, 83:22, 83:24, 88:5, 94:8, 94:10, 94:24, 95:11, 117:4
**consists** [2] - 61:19, 110:22
**consultation** [2] - 31:17, 36:14
**consumption** [1] - 65:7
**contain** [1] - 57:3
**contains** [3] - 23:3, 23:4, 106:5
**context** [2] - 65:24, 123:11
**continue** [1] - 94:19
**continued** [2] - 80:5, 87:4
**continues** [1] - 87:3
**contract** [2] - 15:16, 22:10
**contracts** [3] - 10:10, 10:17, 14:11
**contradict** [2] - 79:15, 92:6
**contradictory** [1] - 115:22
**contradicts** [1] - 92:7
**contrary** [5] - 79:11, 79:14, 122:24, 113:1, 116:2
**contrast** [1] - 11:2
**contrasting** [1] - 61:25
**control** [2] - 107:12, 114:9
**convenience** [1] - 67:22
**conversation** [1] - 24:25
**copied** [1] - 117:11
**copies** [3] - 88:1, 110:18, 110:19
**copy** [1] - 78:15

**corner** [1] - 98:23
**corporate** [1] - 10:24
**correct** [73] - 6:19, 17:17, 20:13, 30:7, 33:23, 34:12, 35:20, 37:5, 42:9, 48:21, 52:9, 53:12, 53:13, 56:2, 56:25, 65:20, 66:17, 66:18, 69:20, 71:1, 71:2, 72:4, 77:2, 78:2, 78:8, 79:4, 79:12, 79:16, 79:25, 80:8, 80:18, 80:24, 81:12, 81:13, 81:23, 82:4, 82:9, 82:23, 83:7, 83:21, 83:25, 84:11, 84:20, 84:22, 86:1, 86:6, 86:17, 86:21, 87:8, 87:20, 90:9, 91:17, 92:1, 92:6, 92:19, 92:22, 92:23, 93:15, 93:24, 95:22, 97:10, 97:13, 99:12, 99:19, 100:14, 101:13, 102:21, 102:22, 106:12, 118:6, 118:11, 118:12, 118:14
**corrected** [1] - 42:16
**correcting** [1] - 35:10
**correctly** [5] - 41:2, 49:21, 57:22, 58:3, 95:8
**correspond** [1] - 18:16
**cost** [13] - 6:5, 6:18, 6:21, 8:13, 8:15, 8:17, 8:25, 9:6, 19:21, 26:12, 27:8, 28:20, 31:10
**costs** [1] - 95:7
**counsel** [6] - 38:15, 39:8, 88:2, 93:7, 97:9, 116:15
**Counsel** [1] - 5:14
**counted** [1] - 60:22
**couple** [15] - 4:6, 4:14, 9:5, 49:12, 50:3, 60:25, 65:6, 70:19, 72:24, 81:6, 89:21, 90:1, 90:3, 118:5, 121:3
**course** [8] - 12:20, 60:5, 105:19, 105:20, 106:7, 106:9, 114:4, 118:9
**COURT** [114] - 4:10, 4:12, 4:16, 4:20, 4:24, 5:12, 28:25,

38:21, 40:14, 41:8, 42:22, 43:2, 43:12, 46:23, 47:2, 47:5, 48:4, 75:19, 75:21, 76:10, 76:12, 78:14, 78:19, 88:13, 89:19, 89:22, 90:4, 91:2, 91:4, 92:16, 93:1, 99:24, 100:8, 103:21, 103:23, 104:14, 104:19, 105:5, 105:7, 105:20, 106:6, 106:10, 106:13, 106:17, 106:20, 106:22, 106:25, 107:5, 107:7, 107:11, 107:15, 107:18, 107:23, 107:25, 108:2, 108:6, 108:11, 108:22, 108:24, 109:2, 109:13, 109:17, 109:22, 110:4, 110:7, 110:11, 110:14, 110:16, 111:2, 111:9, 111:20, 112:4, 112:9, 112:19, 112:22, 112:24, 113:1, 113:4, 113:7, 113:11, 114:18, 114:23, 115:8, 115:16, 115:19, 116:6, 116:10, 116:18, 116:20, 118:12, 118:16, 118:25, 119:4, 119:7, 119:9, 119:13, 119:15, 119:19, 120:19, 120:25, 122:10, 123:8, 124:6, 124:10, 124:14, 124:17, 124:24, 125:5, 125:7, 125:9, 125:15, 125:24, 127:1, 127:3
**court** [4] - 40:1, 47:1, 90:6, 114:5
**Court** [18] - 40:3, 111:15, 112:7, 112:16, 114:9, 114:15, 115:15, 115:16, 115:23, 116:3, 116:6, 116:12, 116:15, 116:21, 120:15, 122:9, 126:20, 126:23

**Court's** [5] - 28:23, 75:15, 88:23, 114:1, 126:15
**courtroom** [1] - 47:18
**courts** [1] - 46:1
**cover** [5] - 30:24, 53:24, 77:18, 95:17, 111:17
**coverage** [1] - 60:20
**covered** [2] - 13:1, 27:1
**covering** [1] - 81:8
**CPP** [5] - 13:1, 13:13, 24:13, 27:3, 27:7
**create** [2] - 51:4, 113:16
**created** [1] - 110:23
**Credit** [5] - 83:5, 83:6, 83:9, 95:22, 96:20
**credit** [21] - 8:18, 17:3, 17:23, 26:5, 26:13, 63:5, 65:4, 65:5, 65:23, 66:15, 66:18, 69:6, 78:6, 78:24, 86:16, 91:16, 91:23, 94:11, 94:13, 95:7
**credit-related** [1] - 86:16
**credits** [1] - 67:5
**criminal** [1] - 111:14
**crises** [1] - 11:9
**crisis** [9] - 6:13, 12:20, 13:4, 14:20, 16:15, 85:4, 115:21, 116:1
**critical** [3] - 26:21, 74:3, 74:6
**criticism** [5] - 10:16, 13:18, 18:7, 45:22, 57:13
**criticisms** [3] - 10:12, 27:17, 74:25
**criticize** [2] - 45:10, 46:6
**criticized** [2] - 45:4, 57:16
**critique** [4] - 10:11, 10:20, 13:15, 26:18
**CROSS** [2] - 29:1, 76:16
**cross** [10] - 9:5, 9:16, 28:25, 75:18, 76:13, 88:25, 93:7, 99:18, 99:25, 116:25
**Cross** [2] - 3:5, 3:7
**cross-examination** [5] - 9:5, 9:16, 93:7, 99:18, 116:25
**CROSS-EXAMINATION** [2] - 29:1, 76:16

**Cross-Examination** [2] - 3:5, 3:7
**cross-examine** [3] - 28:25, 76:13, 88:25
**crossed** [1] - 122:25
**curative** [6] - 115:5, 115:9, 116:25, 117:2, 118:22, 120:14
**cure** [1] - 30:24
**currency** [1] - 14:14
**current** [4] - 86:1, 86:13, 86:17, 87:4
**custody** [1] - 107:12
**customers** [2] - 11:15, 11:22

**D**

**damages** [3] - 117:8, 118:8, 118:15
**data** [31] - 11:10, 19:19, 22:11, 43:13, 58:11, 58:19, 58:22, 58:23, 59:7, 60:6, 63:15, 63:19, 64:2, 65:19, 65:25, 66:1, 72:12, 74:19, 75:1, 84:5, 91:22, 94:8, 94:24, 100:16, 100:18, 100:21, 100:22, 101:5, 110:22
**data-driven** [2] - 58:19, 66:1
**date** [10] - 29:23, 72:20, 92:5, 100:2, 101:15, 101:16, 102:12, 102:17, 103:1
**dated** [3] - 72:3, 85:13, 91:8
**David** [4] - 43:9, 46:10, 76:15, 89:6
**DAVIS** [39] - 4:22, 4:25, 5:3, 5:6, 5:7, 5:15, 5:16, 21:1, 28:23, 38:1, 38:15, 40:9, 40:13, 41:9, 41:12, 41:22, 41:23, 42:21, 108:15, 108:23, 108:25, 109:4, 109:16, 109:18, 109:25, 110:5, 110:8, 110:13, 110:15, 111:4, 111:12, 111:21, 112:7, 112:11, 112:21, 112:23, 113:6, 113:8, 113:12

**Davis** [3] - 4:25, 29:8, 108:15
**Davis's** [1] - 35:14
**Davis......** [1] - 3:5
**Davis........** [1] - 3:4
**days** [5] - 53:1, 77:20, 101:18, 103:4, 103:18
**deal** [2] - 25:5, 122:9
**dealt** [1] - 105:12
**debt** [6] - 10:18, 12:13, 21:14, 51:22, 52:1, 84:4
**debtor** [2] - 11:10, 12:8
**decade** [1] - 91:13
**December** [13] - 29:23, 30:2, 30:4, 32:7, 32:12, 69:5, 69:20, 70:5, 80:4, 82:22, 90:21, 94:5
**decide** [2] - 78:24, 118:1
**decision** [2] - 73:6, 120:6
**decision-making** [1] - 120:6
**deck** [1] - 79:23
**declared** [1] - 92:5
**decline** [4] - 85:3, 85:19, 86:3, 94:21
**declining** [3] - 64:3, 84:6, 94:18
**decrease** [1] - 64:8
**decreasing** [2] - 55:14, 101:1
**defendants** [22] - 28:25, 29:4, 32:17, 39:14, 43:10, 46:11, 60:12, 76:15, 89:7, 96:20, 104:17, 118:10, 118:13, 121:5, 121:23, 122:20, 123:4, 123:10, 123:11, 125:3, 125:7, 125:22
**defendants'** [2] - 117:6, 121:13
**defense** [8] - 47:20, 47:25, 74:18, 93:7, 97:9, 110:1, 116:15, 122:15
**Defense** [4] - 62:15, 72:1, 93:3, 97:24
**defer** [4] - 115:15, 115:23, 116:3
**deferred** [8] - 44:11, 51:1, 66:3, 66:24, 67:2, 67:3, 69:19, 70:8

**deferring** [1] - 115:16
**deficient** [1] - 75:5
**deficit** [3] - 30:24,
55:16, 55:23
**deficits** [1] - 98:17
**definitely** [2] - 28:7,
65:24
**delay** [1] - 126:5
**deliberations** [1] -
114:3
**delinquency** [2] -
94:19, 94:20
**deliver** [1] - 52:17
**demand** [1] - 83:2
**DeMarco** [15] - 15:16,
27:20, 28:10, 82:3,
101:23, 105:13,
105:14, 105:22,
107:1, 107:4, 107:6,
107:7, 107:23,
111:22, 120:5
**DeMarco's** [6] - 76:24,
79:23, 113:19,
114:8, 119:22, 120:8
**demonstrate** [1] - 8:22
**demonstrating** [1] -
110:24
**demonstratives** [6] -
108:24, 109:3,
109:15, 110:21,
110:23, 111:11
**denied** [4] - 108:7,
117:5, 120:19, 122:8
**Department** [2] - 36:1,
106:2
**deposit** [6] - 6:14,
8:17, 19:22, 22:2,
23:20, 26:7
**deposition** [2] -
113:20, 114:8
**depositors** [2] - 19:25,
20:3
**deposits** [9] - 21:10,
21:13, 22:9, 22:13,
23:22, 24:12, 25:24,
25:25, 26:23
**deprives** [1] - 50:8
**derisk** [2] - 73:17,
74:12
**derisking** [1] - 74:9
**derived** [1] - 19:8
**describe** [11] - 45:11,
49:7, 50:21, 53:14,
55:3, 56:9, 58:5,
63:4, 64:10, 87:17,
103:13
**described** [5] - 53:6,
57:9, 57:12, 93:18,
93:21
**describing** [1] - 56:21

**designate** [1] - 113:19
**designations** [2] -
113:22, 114:8
**designed** [1] - 12:24
**designing** [1] - 14:18
**desperately** [1] - 14:8
**despite** [1] - 121:8
**detail** [1] - 74:24
**details** [1] - 5:22
**determine** [3] - 67:23,
72:23, 113:25
**determined** [1] - 77:9
**determining** [2] -
9:25, 20:11
**Deutsche** [3] - 81:4,
81:23, 83:24
**Dharan** [45] - 3:6,
43:17, 43:25, 44:10,
45:4, 45:9, 45:17,
46:15, 46:19, 47:4,
47:12, 47:16, 47:17,
48:6, 48:10, 48:17,
52:4, 53:6, 54:20,
57:20, 58:2, 58:5,
59:6, 60:5, 61:12,
62:19, 64:10, 72:1,
72:25, 73:20, 74:17,
75:10, 75:17, 76:1,
76:18, 78:22, 82:18,
89:8, 89:15, 90:8,
92:18, 99:17, 103:2,
103:10
**Dharan's** [4] - 45:8,
49:2, 62:16, 100:10
**DI** [1] - 12:8
**difference** [11] - 7:3,
7:4, 7:5, 11:3, 11:14,
11:19, 45:15, 45:20,
63:20, 63:25, 100:24
**differences** [1] - 11:18
**different** [21] - 7:11,
10:2, 17:8, 21:3,
34:2, 35:7, 42:9,
42:13, 44:4, 50:24,
54:7, 61:15, 62:9,
85:25, 92:10,
100:18, 101:5,
109:11, 119:4
**difficult** [1] - 52:17
**difficulty** [2] - 126:10,
126:11
**diligently** [1] - 76:5
**diminishing** [1] - 81:7
**dip** [1] - 50:15
**dipped** [2] - 77:11,
78:1
**DIRECT** [2] - 5:2,
47:10
**Direct** [2] - 3:4, 3:6
**direct** [9] - 8:24,

44:13, 59:7, 88:19,
89:2, 94:9, 94:24,
95:13, 112:15
**directed** [1] - 37:11
**directly** [1] - 52:14
**Director** [1] - 15:16
**directors** [1] - 122:17
**disagree** [1] - 32:16
**disagreed** [2] - 6:22,
35:16
**disagreeing** [1] - 6:20
**disagreement** [1] -
24:7
**disclosed** [3] - 43:14,
43:15, 45:21
**disclosure** [1] - 87:15
**discrepancies** [1] -
126:24
**discretion** [3] - 31:16,
114:2, 114:9
**discuss** [2] - 104:4,
119:18
**discussed** [2] - 63:7,
102:3
**discusses** [2] - 17:24,
44:10
**discussing** [1] - 4:6
**discussion** [4] -
23:25, 108:16,
108:25, 109:7
**discussions** [1] -
76:25
**disparity** [1] - 102:14
**display** [5] - 39:16,
48:2, 78:12, 85:14,
88:10
**displaying** [2] - 48:6,
91:1
**dispute** [2] - 30:17,
60:6
**disputed** [2] - 104:25,
105:10
**disputes** [3] - 76:5,
76:7, 76:8
**disregard** [1] - 91:5
**distinctions** [1] -
110:5
**distribute** [1] - 115:2
**district** [1] - 46:1
**diversity** [2] - 61:3,
92:2
**divided** [3] - 25:23,
26:22, 26:23
**dividend** [21] - 7:10,
15:14, 28:13, 36:1,
36:4, 36:8, 51:11,
51:15, 51:24, 52:24,
54:10, 56:13, 56:19,
57:10, 92:19, 92:20,
92:22, 99:2, 99:9,

99:10
**dividends** [4] - 28:16,
49:19, 49:20, 90:20
**Doctor** [1] - 47:5
**Document** [1] -
114:24
**document** [16] -
62:19, 86:10, 93:10,
93:20, 94:2, 101:16,
102:1, 102:18,
103:2, 103:7,
105:12, 105:15,
105:17, 105:23,
106:1, 107:11
**document's** [1] - 72:3
**documents** [8] - 93:6,
99:17, 100:19,
101:7, 101:12,
104:25, 110:20,
120:1
**dollar** [2] - 25:22,
25:23
**dollars** [3] - 21:11,
22:13, 53:21
**dominant** [1] - 69:7
**dominate** [1] - 59:24
**Don** [1] - 83:5
**done** [29] - 14:20,
25:17, 28:20, 36:18,
36:22, 37:7, 37:20,
37:25, 38:9, 38:10,
40:8, 44:3, 46:5,
67:13, 67:14, 67:23,
70:4, 71:5, 72:16,
74:9, 74:10, 74:11,
74:12, 114:25,
123:18, 126:23
**doors** [1] - 39:12
**down** [34] - 11:22,
11:25, 17:14, 22:22,
29:16, 30:13, 32:21,
35:23, 41:22, 42:22,
53:23, 53:24, 54:8,
54:12, 54:15, 66:2,
66:4, 66:7, 66:13,
66:19, 67:3, 67:7,
69:11, 71:18, 85:3,
85:8, 94:11, 95:20,
97:7, 98:9, 98:19,
99:14, 100:23,
103:21
**downgrade** [6] - 77:6,
77:11, 77:22, 77:25,
97:15, 98:6
**downgrades** [1] -
97:12
**downs** [5] - 57:9,
58:24, 65:19, 65:23,
66:16
**downstream** [1] -

122:18
**downward** [1] - 17:12
**Dr** [131] - 4:15, 5:17,
5:18, 6:20, 7:17, 8:9,
10:6, 13:15, 15:1,
16:20, 20:13, 21:2,
21:7, 21:16, 21:21,
23:10, 23:13, 23:25,
25:18, 26:14, 26:18,
27:20, 28:19, 29:3,
29:8, 32:16, 32:23,
32:24, 33:3, 33:6,
33:9, 33:18, 33:24,
34:3, 34:13, 34:22,
34:25, 35:12, 35:14,
35:25, 36:17, 39:2,
40:5, 40:18, 41:13,
41:24, 42:20, 43:16,
43:17, 43:20, 43:21,
43:25, 44:10, 44:14,
44:17, 44:21, 44:25,
45:4, 45:8, 45:9,
45:16, 45:17, 46:13,
46:14, 46:15, 46:18,
46:19, 47:4, 47:12,
47:17, 48:6, 48:7,
48:10, 48:11, 48:17,
48:20, 49:2, 49:10,
49:15, 52:4, 52:9,
53:6, 54:20, 54:22,
56:22, 57:13, 57:15,
57:18, 57:20, 58:2,
58:5, 58:9, 59:6,
60:5, 60:25, 61:12,
62:16, 62:19, 64:10,
64:23, 70:20, 71:3,
71:21, 72:1, 72:25,
73:15, 73:16, 73:20,
73:22, 74:14, 74:17,
74:18, 74:24, 75:10,
75:17, 76:1, 76:18,
78:22, 82:18, 88:23,
89:8, 89:15, 90:8,
92:18, 99:17,
100:10, 103:2,
103:10
**draft** [1] - 115:2
**draw** [7] - 22:21,
29:16, 50:17, 53:24,
55:20, 55:23, 120:3
**drawdown** [1] - 54:15
**drawing** [2] - 11:25,
29:9
**drawn** [1] - 30:13
**draws** [8] - 48:25,
49:19, 56:2, 57:10,
78:7, 87:7, 92:21
**driven** [3] - 58:19,
66:1, 75:1
**drop** [1] - 116:8

**DTA** [19] - 43:22, 43:25, 44:4, 44:23, 45:6, 45:22, 45:23, 56:18, 66:24, 67:17, 67:19, 68:5, 68:8, 68:13, 68:16, 68:21, 69:8, 71:6, 71:11

**DTAs** [5] - 51:8, 66:17, 70:25, 71:6, 75:3

**due** [1] - 56:12

**during** [20] - 6:13, 7:2, 11:8, 12:20, 14:20, 16:15, 33:12, 44:25, 50:1, 75:6, 85:4, 95:12, 97:18, 97:20, 115:9, 116:24, 121:9, 121:14, 121:22, 123:22

**DX377** [1] - 78:11

**DX380-A** [2] - 62:24, 77:15

**DX381** [1] - 79:21

**DX412** [2] - 81:1, 98:21

**DX476** [2] - 85:12, 86:10

**DX477** [1] - 86:23

**DX529** [1] - 88:21

**DX549** [1] - 91:6

**DX924** [2] - 88:7, 90:16

**E**

**ear** [1] - 119:5

**early** [5] - 69:4, 84:10, 85:19, 87:18, 87:24

**earning** [1] - 36:8

**earnings** [1] - 59:11

**easel** [1] - 29:9

**easier** [1] - 107:14

**easiest** [1] - 20:18

**economic** [10] - 31:25, 36:25, 49:18, 49:25, 51:17, 54:14, 54:23, 75:2, 79:3, 82:1

**economist** [2] - 31:13, 31:15

**economists** [1] - 37:16

**economy** [15] - 59:19, 60:2, 60:19, 73:10, 74:3, 74:4, 74:5, 80:15, 80:17, 81:20, 81:25, 85:7, 89:10, 122:22

**effect** [5] - 29:22, 30:12, 41:15, 56:14, 107:10

**effective** [1] - 8:17,

25:24, 26:24

**effectively** [5] - 30:5, 30:16, 31:8, 51:10, 119:24

**effects** [2] - 57:4, 122:17

**efficient** [1] - 76:18

**effort** [1] - 20:13

**eight** [1] - 101:18

**either** [8] - 5:25, 24:17, 26:19, 57:21, 58:15, 65:13, 74:10, 126:11

**element** [1] - 82:4

**eliminating** [2] - 48:25, 49:19

**email** [11] - 65:7, 77:20, 97:25, 101:22, 106:1, 106:8, 113:14, 113:15, 120:3, 122:2, 122:6

**emailed** [1] - 116:16

**emails** [2] - 58:15, 59:4

**emphasize** [1] - 67:25

**empirical** [1] - 10:22

**employees** [1] - 106:1

**end** [15] - 18:3, 24:15, 26:2, 28:12, 30:2, 30:22, 33:22, 57:22, 64:5, 70:4, 84:19, 91:12, 100:21, 120:18

**ended** [5] - 17:2, 18:18, 23:14, 27:10, 67:11

**ending** [1] - 96:4

**enlarge** [4] - 93:10, 97:25, 98:23, 106:15

**enormous** [2] - 11:19, 40:24

**ensure** [2] - 12:24, 22:6

**ensuring** [1] - 16:4

**entered** [2] - 29:24, 78:25

**entering** [1] - 126:6

**enterprise** [4] - 32:10, 32:11, 60:18, 80:6

**enterprises** [15] - 32:8, 49:4, 50:7, 50:13, 50:17, 51:4, 51:9, 54:1, 56:5, 57:21, 60:1, 74:2, 74:8, 81:15, 84:3

**enterprises'** [1] - 49:3

**entire** [11] - 9:7, 10:4, 25:9, 28:2, 28:19, 51:3, 60:1, 71:9,

115:15, 115:23

**entirely** [2] - 26:25, 58:19

**entities** [1] - 98:18

**entitled** [2] - 48:16, 104:1

**environment** [3] - 86:1, 86:13, 87:4

**equal** [1] - 28:18

**equity** [28] - 10:14, 10:15, 10:18, 11:1, 11:6, 11:8, 12:3, 12:7, 13:19, 13:20, 13:23, 17:21, 17:23, 18:1, 18:2, 21:15, 21:18, 27:2, 27:3, 44:18, 45:1, 45:12, 71:8, 71:9, 71:13, 71:15, 71:17

**erosion** [2] - 81:22, 122:23

**errors** [1] - 6:2

**especially** [3] - 50:4, 73:8, 114:7

**essential** [1] - 14:24

**essentially** [10] - 19:23, 52:2, 52:16, 58:11, 71:10, 74:15, 76:7, 113:21, 124:5, 125:13

**establish** [1] - 64:14

**established** [2] - 119:25, 120:10

**estimate** [2] - 7:13, 42:10

**estimates** [2] - 85:25, 124:11

**estimating** [1] - 9:3

**et** [1] - 122:24

**evaluate** [1] - 6:24

**evaluated** [1] - 41:17

**evaluation** [2] - 9:19, 45:7

**evening** [2] - 104:9, 116:17

**event** [5] - 64:19, 64:21, 64:22, 64:23, 113:5

**events** [2] - 121:7, 121:16

**evidence** [57] - 4:18, 10:23, 58:20, 58:23, 60:3, 60:9, 60:12, 61:25, 62:13, 65:16, 65:17, 65:25, 74:20, 76:24, 77:18, 79:21, 80:19, 82:24, 84:25, 85:9, 88:18, 88:20, 88:21, 88:22, 89:3, 89:19, 89:21, 89:23,

90:1, 90:4, 90:24, 90:25, 91:2, 91:22, 92:15, 101:6, 103:23, 105:9, 105:17, 110:3, 110:6, 110:14, 110:21, 110:22, 110:24, 114:10, 115:22, 116:2, 122:12, 122:13, 122:15, 123:17, 123:18, 123:19, 123:21, 124:2

**Evidence** [1] - 113:9

**exact** [4] - 15:13, 20:12, 28:6, 88:19

**exactly** [15] - 25:17, 37:18, 42:3, 51:8, 56:17, 63:7, 82:10, 82:24, 83:10, 84:12, 86:19, 87:17, 95:1, 95:11, 95:12

**examination** [6] - 9:5, 9:16, 93:7, 94:25, 99:18, 116:25

**EXAMINATION** [6] - 5:2, 29:1, 41:11, 47:10, 76:16, 93:4

**Examination** [6] - 3:4, 3:5, 3:5, 3:6, 3:7, 3:7

**examine** [3] - 28:25, 76:13, 88:25

**examining** [1] - 6:7

**example** [8] - 8:11, 21:10, 21:11, 56:11, 62:2, 62:5, 63:9, 66:8

**exceed** [2] - 56:13, 95:7

**except** [1] - 115:17

**exception** [1] - 103:24

**exceptions** [1] - 108:5

**excerpt** [1] - 58:14

**excerpts** [1] - 58:13

**excess** [1] - 28:15

**exchange** [1] - 106:1

**exclude** [3] - 122:12, 123:12, 124:4

**exclusively** [2] - 61:7

**excused** [2] - 42:24, 103:22

**executive** [1] - 87:11, 87:13

**executives** [2] - 58:15, 62:6

**exercising** [1] - 114:9

**exhausted** [2] - 26:7, 91:12

**exhibit** [8] - 76:2, 76:3, 105:11,

109:23, 110:12, 111:18, 112:17

**Exhibit** [16] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 4:17, 62:15, 69:12, 72:1, 93:3, 96:1, 97:24, 105:3, 105:9

**Exhibits** [2] - 3:9, 4:8

**exhibits** [21] - 4:5, 4:7, 4:14, 61:22, 103:24, 104:15, 108:10, 108:17, 109:1, 109:2, 111:6, 111:22, 122:16, 123:13, 123:14, 123:17, 123:19, 123:21, 123:25, 124:3, 124:4

**existed** [1] - 27:4

**existing** [1] - 54:19

**expand** [1] - 49:13

**expect** [7] - 71:15, 86:19, 95:6, 103:17, 123:4, 124:6, 125:1

**expectation** [3] - 94:16, 94:20, 95:4

**expectations** [1] - 86:17

**expected** [4] - 68:9, 68:11, 69:3, 94:10

**expenses** [1] - 86:16

**experience** [2] - 19:25, 55:16

**expert** [4] - 43:16, 43:17, 44:1, 46:3

**experts** [1] - 46:2

**expiration** [2] - 102:11, 102:17

**expired** [1] - 30:9

**explain** [2] - 7:4, 50:3

**explained** [3] - 34:24, 35:18, 117:9

**explaining** [1] - 122:3

**exposed** [2] - 53:8, 75:8

**exposes** [1] - 50:20

**expressed** [3] - 46:14, 83:6, 102:10

**expressing** [3] - 62:6, 81:11, 81:21

**extend** [1] - 120:23

**extended** [1] - 17:10

**extensive** [1] - 109:19

**extent** [5] - 45:25, 71:6, 72:23, 88:19, 123:20

**extra** [1] - 125:21

**extrapolating** [1] - 82:1

2758

**extremely** [6] - 9:20, 9:24, 11:8, 19:12, 23:23, 24:9

**F**

**face** [1] - 81:8
**facilitate** [1] - 73:25
**fact** [26] - 9:4, 10:25, 11:7, 15:22, 17:20, 27:23, 29:21, 30:18, 33:21, 37:9, 45:5, 45:10, 50:1, 50:5, 51:7, 51:8, 51:13, 52:12, 56:3, 60:22, 60:25, 78:25, 90:2, 95:12, 112:3
**factor** [1] - 78:6
**factors** [4] - 20:11, 75:2, 86:14, 87:17
**facts** [2] - 32:6, 32:17
**fail** [1] - 24:18
**failed** [1] - 73:16
**failures** [1] - 26:6
**fair** [3] - 46:16, 93:18, 125:2
**falls** [2] - 23:1, 108:20
**familiar** [2] - 48:10, 70:11
**family** [2] - 94:19, 95:4
**Fannie** [45] - 18:4, 18:21, 29:15, 30:23, 31:10, 34:10, 35:25, 36:3, 36:7, 51:13, 52:14, 52:18, 53:3, 53:8, 54:21, 55:6, 56:8, 59:3, 60:19, 60:24, 66:14, 70:21, 73:17, 74:6, 75:10, 77:6, 77:11, 78:1, 78:24, 85:12, 85:13, 86:21, 87:16, 89:11, 96:12, 97:15, 97:19, 102:14, 103:15, 106:14, 108:17, 109:9, 110:9, 121:6, 121:16
**far** [2] - 88:18, 101:2
**fashion** [1] - 93:18
**favorable** [3] - 13:14, 16:2, 89:13
**favorite** [1] - 59:14
**FDIC** [21] - 6:14, 8:17, 19:7, 19:22, 19:23, 20:1, 20:6, 20:8, 20:14, 21:13, 21:17, 21:22, 22:6, 24:9, 26:3, 26:4, 26:5, 26:6, 26:8, 26:21
**FDIC's** [1] - 8:18

**featured** [1] - 114:5
**features** [3] - 52:20, 52:22, 52:23
**February** [3] - 43:16, 73:18, 82:22
**Federal** [18] - 14:17, 14:21, 17:3, 24:17, 24:21, 25:1, 27:5, 31:17, 36:14, 37:7, 37:20, 37:24, 38:2, 38:10, 40:7, 84:17, 113:9, 113:10
**fee** [20] - 7:4, 7:7, 7:8, 7:14, 7:18, 19:20, 20:7, 22:2, 22:5, 25:8, 25:11, 25:13, 25:14, 25:15, 26:9, 69:3, 69:4, 95:6, 95:17
**fees** [2] - 26:22, 59:23
**felt** [1] - 14:23
**few** [8] - 10:9, 53:21, 59:17, 71:16, 76:8, 84:8, 99:17, 126:15
**FHFA** [26] - 7:12, 27:24, 29:24, 32:7, 36:12, 36:21, 38:9, 39:20, 40:21, 49:4, 49:16, 57:22, 63:4, 63:8, 65:4, 65:7, 65:8, 71:22, 72:15, 72:21, 73:23, 77:19, 94:14, 96:11, 122:17
**FHFA's** [3] - 48:24, 52:6, 73:17
**figures** [1] - 44:2
**filed** [3] - 97:3, 115:6, 123:12
**filing** [1] - 96:10
**filings** [2] - 34:9, 54:20
**filtering** [1] - 61:1
**final** [7] - 10:4, 56:22, 74:18, 79:1, 102:18, 104:2, 126:16
**finally** [5] - 11:14, 59:4, 59:24, 65:1, 75:7
**financial** [23] - 6:12, 6:13, 12:20, 13:4, 13:11, 14:20, 14:24, 15:24, 16:4, 16:15, 19:5, 20:9, 24:8, 24:18, 24:24, 25:4, 56:15, 57:4, 85:4, 96:12, 115:21, 116:1, 118:21
**financially** [2] - 15:15, 15:18
**financing** [2] - 11:11,

12:8
**fine** [3] - 39:10, 39:25, 88:22
**finish** [1] - 35:3
**finished** [3] - 76:1, 119:22, 124:13
**finite** [1] - 77:25
**first** [42] - 13:18, 16:11, 26:1, 26:19, 39:15, 46:21, 48:23, 49:6, 49:24, 50:18, 53:15, 53:17, 53:19, 55:5, 55:13, 55:18, 55:20, 56:17, 59:6, 61:9, 73:23, 74:25, 76:25, 82:8, 82:24, 83:3, 86:4, 88:7, 91:20, 93:22, 96:24, 101:21, 104:24, 105:12, 106:6, 110:17, 111:1, 117:3, 117:14, 122:11, 124:19
**fit** [2] - 113:25, 125:1
**Fitch** [2] - 102:21, 102:24
**fitting** [1] - 117:21
**five** [3] - 17:11, 74:23, 75:2
**fixed** [2] - 32:13, 122:22
**flip** [3] - 20:20, 125:10, 125:12
**focus** [3] - 19:20, 21:2, 68:9
**focused** [3] - 17:16, 74:24, 99:18
**follow** [1] - 53:2
**follow-up** [1] - 53:2
**followed** [2] - 37:13, 37:16
**following** [1] - 83:7
**font** [1] - 33:18
**forbore** [1] - 122:25
**forecast** [1] - 94:14
**foreign** [1] - 102:15
**foreseeable** [4] - 45:6, 45:24, 68:21, 94:6
**forever** [1] - 122:24
**forget** [1] - 11:21
**form** [6] - 10:1, 10:17, 15:11, 66:16, 117:15, 117:24
**Form** [2] - 55:7, 69:14
**formula** [2] - 21:24, 32:14
**forth** [3] - 43:7, 47:24, 73:17
**forward** [1] - 43:24
**four** [4] - 89:11, 98:9,

103:4, 103:18
**fourth** [2] - 72:9, 72:12
**frame** [1] - 84:11
**Freddie** [44] - 18:4, 18:21, 29:16, 31:10, 34:10, 35:25, 36:3, 36:7, 51:13, 52:15, 52:18, 53:3, 53:8, 54:21, 56:25, 57:3, 57:5, 59:3, 60:19, 60:24, 66:14, 69:21, 73:17, 74:6, 75:10, 77:6, 77:11, 78:1, 78:25, 83:5, 83:10, 86:23, 87:16, 89:11, 96:12, 97:15, 97:19, 103:16, 108:18, 109:9, 110:9, 121:6, 121:16
**Freddie's** [2] - 30:23, 102:15
**free** [1] - 127:1
**Friday** [1] - 46:24
**friend** [1] - 118:5
**front** [1] - 44:5
**full** [7] - 5:9, 85:17, 86:11, 98:4, 101:25, 125:25, 126:2
**fully** [4] - 52:5, 116:24, 118:19
**function** [1] - 94:12
**fund** [2] - 26:7, 98:17
**fundamentals** [1] - 75:3
**funding** [4] - 7:7, 22:24, 32:11, 80:4
**funds** [4] - 7:8, 19:24, 20:2, 55:23
**furthered** [2] - 49:17, 54:23
**furthering** [1] - 51:16
**future** [18] - 7:7, 55:17, 56:2, 57:25, 58:25, 65:25, 66:1, 66:9, 67:5, 67:24, 68:7, 68:11, 70:6, 85:24, 86:11, 86:15, 94:6

**G**

**g-fee** [3] - 69:3, 69:4, 95:17
**g-fees** [1] - 59:23
**gathered** [1] - 62:4
**GDP** [1] - 85:7
**Geithner** [2] - 105:25, 106:4
**general** [5] - 45:12, 48:19, 71:5, 71:14,

80:9
**generally** [6] - 5:23, 61:5, 72:22, 79:18, 85:1, 85:2
**gentlemen** [2] - 8:1, 103:23
**given** [9] - 11:12, 13:14, 25:13, 71:5, 73:8, 74:15, 111:10, 114:7, 126:20
**goal** [8] - 15:24, 48:24, 49:17, 51:16, 52:6, 52:8, 52:10, 54:23
**Goldman** [7] - 62:5, 92:8, 102:4, 102:6, 102:7, 102:10, 102:13
**government** [6] - 14:6, 18:14, 24:20, 26:11, 98:18, 103:15
**grant** [2] - 115:8, 117:15
**granted** [4] - 115:16, 117:2, 117:5, 119:24
**graph** [2] - 94:14, 110:9
**graphs** [5] - 109:5, 109:8, 109:17, 109:18, 109:21
**great** [5] - 30:23, 106:16, 124:8, 126:9, 126:10
**growing** [1] - 85:7
**growth** [1] - 60:4
**GSE** [6] - 63:4, 63:21, 63:24, 78:6, 91:16, 103:17
**GSEs** [29] - 10:14, 11:2, 11:7, 11:17, 11:25, 13:9, 13:14, 16:3, 16:9, 16:12, 16:14, 22:15, 23:24, 24:1, 24:16, 25:10, 28:16, 50:9, 50:20, 69:15, 73:6, 75:8, 77:22, 77:25, 79:2, 90:19, 98:6, 98:17, 100:24
**GSEs'** [1] - 8:13
**guaranteeing** [1] - 22:20
**guess** [1] - 44:2
**Guggenheim** [1] - 92:12
**guidance** [5] - 9:24, 31:12, 36:25, 37:15, 37:17

# H

**half** [8] - 6:6, 9:9, 20:9, 21:17, 46:19, 125:17, 125:19, 125:25
**hand** [5] - 57:18, 57:25, 98:22, 110:10, 118:25
**handful** [1] - 60:12
**hands** [1] - 62:1
**happy** [4] - 55:11, 59:1, 74:21, 90:10
**hard** [1] - 17:22
**harm** [2] - 53:9, 75:8
**Hartman** [1] - 108:17
**hate** [1] - 121:14
**header** [1] - 99:22
**hear** [3] - 27:20, 118:19, 125:9
**heard** [20] - 15:15, 25:1, 25:7, 29:24, 42:25, 50:25, 55:8, 60:9, 63:20, 63:22, 67:25, 77:3, 77:7, 82:5, 83:4, 88:12, 114:4, 115:11, 119:5, 123:10
**hearing** [2] - 83:15, 126:4
**hearsay** [1] - 108:5
**held** [10] - 4:2, 4:23, 40:1, 47:1, 75:20, 76:11, 90:6, 104:13, 123:1, 125:18
**helpful** [1] - 46:9
**hemorrhaging** [1] - 18:11
**high** [4] - 6:3, 33:22, 45:2, 87:4
**higher** [1] - 17:14
**highlight** [5] - 69:23, 96:7, 96:18, 99:5, 103:9
**highlighted** [6] - 39:15, 55:21, 56:9, 63:3, 66:13, 95:3
**highlighting** [2] - 55:9, 87:10
**highly** [4] - 11:10, 11:12, 12:12, 102:9
**himself** [1] - 9:2
**historically** [1] - 84:25
**hit** [2] - 82:12, 84:21
**HOFFMAN** [23] - 20:24, 29:2, 29:5, 29:7, 32:1, 32:15, 32:21, 32:22, 33:8, 33:11, 35:22, 35:24, 38:3, 38:13, 38:17,

39:13, 40:2, 40:4, 40:11, 40:15, 40:16, 41:7, 105:8
**Hoffman** [3] - 29:3, 38:25, 39:13
**Hoffman.......** [1] - 3:5
**hold** [2] - 101:4, 124:11
**holding** [2] - 101:3, 110:10
**home** [20] - 59:19, 59:20, 84:9, 84:13, 84:21, 84:25, 85:2, 85:18, 85:24, 86:3, 86:5, 86:7, 86:15, 87:5, 93:24, 94:10, 94:12, 94:16, 94:18
**Honor** [110] - 4:3, 4:11, 4:19, 4:22, 4:25, 5:15, 20:24, 38:19, 38:23, 39:13, 39:25, 40:9, 40:11, 41:7, 41:9, 42:21, 42:25, 43:4, 43:7, 43:9, 43:21, 44:7, 45:1, 46:10, 46:25, 47:3, 48:2, 75:15, 75:18, 75:24, 78:11, 78:18, 88:9, 88:11, 88:15, 89:6, 89:20, 89:24, 90:5, 90:13, 90:23, 90:25, 92:14, 92:25, 93:2, 99:23, 100:6, 103:20, 104:16, 104:22, 104:24, 105:11, 105:12, 105:13, 105:15, 105:19, 105:24, 106:7, 106:9, 106:19, 106:21, 107:13, 107:20, 108:4, 108:10, 108:14, 108:16, 108:20, 108:23, 109:16, 110:13, 110:15, 111:14, 112:2, 112:11, 112:21, 113:2, 113:18, 113:24, 114:6, 114:15, 114:17, 114:22, 115:7, 115:11, 115:12, 115:17, 116:8, 118:4, 118:18, 118:20, 119:2, 119:12, 119:18, 119:20, 119:24, 120:1, 120:9, 120:16, 120:22,

122:1, 123:9, 123:14, 124:9, 125:12, 125:16, 125:20, 126:13, 126:18, 127:4
**Honor's** [2] - 107:21, 120:7
**hopefully** [1] - 50:25
**hour** [3] - 124:20, 124:21, 124:23
**hours** [2] - 124:20, 124:22
**house** [1] - 85:1
**housing** [11] - 68:25, 69:1, 69:2, 74:4, 82:11, 82:18, 87:19, 107:12, 115:21, 116:1, 122:22
**huge** [1] - 56:19
**HUME** [7] - 124:8, 124:12, 124:15, 124:18, 124:25, 125:6, 125:20
**Hume** [1] - 125:13
**hundred** [5] - 21:11, 22:13, 53:22, 60:25, 79:19
**hundreds** [3] - 60:22, 89:8

# I

**Ian** [2] - 29:3, 39:13
**icing** [1] - 14:1
**idea** [1] - 87:12
**ideally** [1] - 124:22
**identical** [2] - 55:9, 117:13
**identified** [1] - 50:2
**identify** [1] - 10:6
**ignored** [6] - 5:24, 25:20, 26:21, 26:25, 27:6
**ignores** [1] - 27:10
**illustrate** [1] - 46:5
**illustrating** [1] - 44:3
**illustrative** [1] - 121:12
**immediately** [1] - 94:17
**impact** [3] - 11:18, 70:25, 71:7
**impacts** [1] - 52:14
**impeached** [1] - 112:14
**impeachment** [6] - 111:15, 111:17, 111:23, 112:16, 113:22, 114:4
**implemented** [3] -

69:5, 74:14, 74:15
**implied** [1] - 28:7
**implies** [1] - 120:4
**important** [16] - 16:11, 25:4, 52:24, 53:2, 60:16, 60:18, 60:21, 61:24, 64:13, 107:3
**importantly** [1] - 113:18
**impose** [1] - 31:9
**imposed** [1] - 101:19
**impression** [3] - 16:19, 20:14, 26:18
**improve** [1] - 82:19
**improving** [3] - 59:19, 59:20, 69:7
**Inaudible** [1] - 125:8
**include** [1] - 45:10
**included** [2] - 10:7, 12:21
**includes** [1] - 44:13
**including** [1] - 106:2
**income** [2] - 45:18, 86:16
**inconsistency** [1] - 16:3
**inconsistent** [3] - 40:10, 51:16, 51:18
**incorporate** [2] - 115:5, 126:17
**incorporates** [1] - 117:4
**incorporating** [2] - 82:4, 106:25
**incorrect** [6] - 31:22, 31:23, 33:14, 35:8, 35:12, 35:20
**increase** [6] - 50:23, 69:4, 71:12, 94:5, 94:11, 94:16
**increased** [2] - 58:25, 75:8
**increases** [2] - 50:21, 56:3
**increasing** [1] - 99:12
**indeed** [1] - 42:19
**index** [2] - 84:13, 84:15
**indexes** [1] - 84:13
**indicated** [3] - 15:6, 26:20, 114:24
**indicates** [2] - 48:23, 94:15
**indicating** [1] - 42:11
**indication** [1] - 67:13
**indicators** [1] - 15:8
**indulgence** [2] - 28:23, 75:15
**infer** [1] - 26:24, 115:5
**inferences** [1] - 120:2,

120:10
**infinite** [11] - 29:19, 30:6, 30:16, 31:5, 31:6, 31:8, 31:9, 31:11, 31:18, 31:24
**inflammatory** [1] - 117:1
**inflexion** [1] - 73:9
**information** [15] - 9:21, 45:25, 61:6, 61:8, 66:10, 67:15, 72:21, 73:6, 82:18, 83:2, 83:11, 85:10, 87:15, 109:19
**infrastructure** [1] - 73:25
**initial** [6] - 17:3, 18:6, 18:12, 52:23, 53:17, 95:12
**insert** [1] - 35:7
**inserted** [1] - 45:17
**insertion** [1] - 119:17
**inside** [1] - 23:1
**insolvency** [1] - 32:12
**instability** [2] - 52:15, 53:5
**instance** [2] - 9:18, 110:9
**institutions** [5] - 20:9, 22:1, 23:17, 24:22, 96:13
**instructed** [2] - 6:8, 120:12
**instruction** [12] - 111:11, 115:6, 115:9, 115:24, 115:25, 116:4, 116:25, 117:2, 117:8, 118:15, 118:22, 120:14
**instructions** [15] - 76:6, 104:2, 108:10, 114:20, 114:25, 115:3, 117:6, 117:13, 117:14, 117:18, 118:3, 118:8, 126:1, 126:14, 126:17
**instructs** [1] - 27:16
**insurance** [9] - 6:15, 8:17, 19:22, 22:2, 23:20, 25:22, 26:4, 26:7, 26:22
**insure** [2] - 22:7, 22:13
**insured** [9] - 21:10, 21:12, 22:9, 23:22, 24:11, 25:23, 25:25, 26:23
**insures** [1] - 22:7

**intended** [2] - 113:15, 113:16
**intending** [2] - 8:22, 118:10
**interest** [16] - 7:3, 7:9, 13:10, 14:24, 15:21, 15:24, 16:4, 17:11, 19:3, 19:5, 24:8, 24:15, 24:19, 24:22, 52:1, 87:6
**interesting** [2] - 63:9, 73:21
**intermediate** [1] - 91:17
**internal** [4] - 59:2, 65:7, 106:10, 106:22
**interpretation** [1] - 70:3
**interpreted** [1] - 31:11
**interpreting** [2] - 31:15, 36:25
**interrupt** [1] - 121:20
**intervened** [1] - 14:6
**introduce** [1] - 122:16
**introduced** [1] - 60:12
**invalid** [1] - 16:24
**invested** [2] - 13:2, 14:6
**investment** [11] - 13:19, 15:20, 17:21, 18:1, 18:2, 19:2, 80:6, 83:15, 102:7, 102:9
**investments** [2] - 14:15, 63:23
**investors** [6] - 64:14, 64:16, 64:17, 65:16, 81:6, 102:15
**involve** [2] - 68:5, 68:6
**involved** [2] - 9:25, 14:18
**involves** [1] - 68:19
**irrelevant** [2] - 116:1, 116:13
**issue** [10] - 10:21, 11:6, 19:17, 24:3, 43:20, 53:5, 84:4, 112:22, 113:5, 126:14
**issued** [4] - 86:24, 89:12, 90:9
**it'd** [1] - 53:23
**it'll** [2] - 118:16, 124:15
**item** [13] - 50:18, 50:20, 53:17, 53:18, 53:19, 55:9, 55:18, 60:16, 70:25, 73:14, 93:23
**items** [1] - 121:11

**itself** [1] - 19:13

**J**

**January** [14] - 62:23, 76:25, 77:4, 78:10, 79:11, 79:15, 79:24, 80:17, 80:18, 82:22, 83:24, 97:10, 97:20, 99:19
**jobs** [1] - 85:8
**joint** [4] - 32:5, 32:16, 112:5, 117:11
**joke** [1] - 121:1
**JONES** [7] - 104:16, 104:21, 110:17, 118:13, 123:9, 126:13, 127:2
**Jones** [6] - 104:16, 118:6, 118:11, 118:13, 123:9, 126:13
**JPMorgan** [1] - 24:11
**judgment** [2] - 66:11, 68:12
**July** [4] - 72:24, 84:21, 126:15, 126:18
**jump** [2] - 87:22, 87:24
**June** [15] - 72:23, 82:9, 82:20, 83:4, 83:5, 83:14, 83:19, 83:24, 84:10, 84:19, 84:21, 97:3, 100:3
**jury** [76] - 4:2, 4:20, 4:23, 6:3, 6:23, 8:1, 8:7, 13:17, 29:5, 29:24, 31:20, 32:4, 33:7, 33:10, 34:21, 34:25, 35:13, 35:19, 39:11, 39:16, 40:12, 42:7, 45:11, 46:5, 46:9, 49:7, 50:22, 52:19, 56:10, 57:3, 58:6, 58:13, 59:2, 60:15, 64:11, 65:22, 70:2, 71:4, 75:20, 76:6, 76:11, 78:12, 79:16, 81:5, 90:14, 91:1, 91:4, 103:13, 104:13, 108:19, 109:3, 109:15, 109:24, 110:12, 111:9, 111:18, 112:18, 113:17, 114:2, 114:4, 114:14, 114:16, 114:19, 114:24, 115:2, 117:18, 117:25, 118:3, 120:2, 120:11,

124:10, 126:1, 126:8, 126:9, 126:14
**justify** [1] - 80:5
**JX-1** [3] - 32:2, 41:10

**K**

**KAPLAN** [37] - 38:19, 38:23, 39:24, 104:22, 105:6, 105:10, 105:21, 106:7, 106:12, 106:15, 106:19, 106:21, 106:23, 107:2, 107:6, 107:8, 107:13, 107:17, 107:20, 107:24, 108:1, 108:4, 108:9, 108:13, 114:22, 116:14, 116:19, 118:4, 118:17, 119:2, 119:5, 119:8, 119:11, 119:14, 119:17, 119:20, 120:20
**Kaplan** [2] - 38:23, 104:22
**keep** [2] - 60:21, 96:24
**Kenya** [2] - 4:25, 108:15
**kind** [7] - 10:15, 14:22, 36:18, 37:3, 57:8, 58:1, 58:20
**kinds** [1] - 122:21
**knows** [4] - 84:21, 84:23, 105:24, 119:24
**KRAVETZ** [76] - 4:3, 4:11, 4:13, 4:19, 42:25, 43:4, 44:7, 46:25, 47:3, 47:9, 47:11, 48:2, 48:5, 48:8, 48:9, 62:14, 62:18, 63:12, 63:14, 69:10, 69:13, 69:22, 70:1, 70:16, 70:18, 71:25, 72:2, 73:11, 73:13, 75:15, 75:24, 78:15, 78:17, 88:11, 88:15, 90:23, 92:14, 93:2, 93:5, 93:9, 93:12, 95:19, 95:21, 95:25, 96:2, 96:6, 96:9, 96:17, 96:19, 96:23, 97:1, 97:6, 97:8, 97:23, 98:2, 98:9, 98:11, 98:19, 98:24, 99:4, 99:7, 99:14, 99:16, 99:21, 100:1, 100:9, 100:12, 101:9,

101:11, 101:24, 102:2, 102:18, 102:20, 103:6, 103:11, 103:20
**Kravetz** [5] - 4:4, 43:4, 44:7, 75:24, 88:15
**Kravetz....** [1] - 3:7
**Kravetz......** [1] - 3:6

**L**

**label** [3] - 96:15, 110:7, 110:8
**lack** [2] - 52:14, 75:8
**ladies** [2] - 8:1, 103:23
**language** [7] - 46:12, 54:20, 56:24, 57:4, 70:12, 70:14, 118:24
**large** [14] - 12:23, 16:14, 20:8, 23:17, 23:21, 23:23, 24:3, 24:6, 24:9, 24:12, 24:13, 60:17, 80:20, 119:22
**largely** [2] - 107:22, 123:2
**larger** [3] - 23:23, 75:13, 75:14
**largest** [3] - 54:12, 102:7, 102:8
**last** [24] - 12:2, 19:7, 43:15, 44:2, 53:1, 85:14, 86:11, 86:24, 91:5, 94:1, 99:6, 103:7, 103:9, 111:6, 111:12, 115:20, 116:4, 117:3, 117:7, 121:8, 125:16, 126:14
**late** [5] - 78:7, 84:10, 119:21, 120:16, 120:17
**laughing** [1] - 98:16
**law** [4] - 112:20, 112:24, 113:1, 117:11
**lawsuit** [1] - 96:21
**lawsuits** [2] - 96:11, 97:3
**lawyers** [2] - 104:1, 104:6
**Layton** [3] - 83:5, 83:15, 83:19
**lead** [3] - 50:5, 51:2, 87:7
**leads** [1] - 52:15
**least** [6] - 50:2, 61:13, 61:17, 66:22, 72:9, 94:11
**leave** [2] - 39:23,

116:10
**Lee** [1] - 120:22
**left** [10] - 5:17, 30:14, 30:20, 36:9, 49:9, 49:14, 52:3, 57:18, 57:25, 73:15
**left-hand** [2] - 57:18, 57:25
**less** [10] - 50:7, 54:18, 58:1, 64:8, 68:3, 95:17, 117:1, 125:2, 125:14, 125:17
**level** [2] - 6:3, 86:4
**levels** [1] - 87:4
**leverage** [2] - 11:10, 12:9
**leveraged** [2] - 11:10, 12:12
**liabilities** [4] - 21:12, 21:19, 22:19, 23:11
**LIBOR** [1] - 17:12
**lieu** [1] - 29:20
**lifetime** [1] - 95:6
**lifted** [1] - 30:1
**light** [2] - 82:9, 103:14
**likely** [3] - 67:24, 68:1, 70:8
**limit** [1] - 76:19
**limited** [3] - 55:14, 90:21, 98:16
**limits** [1] - 78:7
**line** [23] - 8:18, 13:5, 13:7, 17:3, 17:10, 17:24, 26:5, 26:13, 33:24, 38:16, 38:17, 38:18, 44:18, 45:1, 45:18, 70:25, 71:8, 85:21, 86:5, 86:7
**lines** [6] - 39:15, 39:16, 39:18, 39:19, 98:10, 122:24
**links** [1] - 98:18
**lips** [1] - 122:4
**list** [4] - 50:8, 61:22, 65:1, 97:19
**listed** [2] - 48:20, 50:19
**listened** [1] - 76:24
**lists** [1] - 50:20
**literally** [1] - 31:11
**litigate** [1] - 123:24
**loan** [19] - 6:12, 7:9, 9:18, 9:20, 9:23, 10:10, 10:13, 10:16, 10:21, 10:25, 11:9, 11:12, 11:16, 12:3, 19:19, 23:5, 51:25, 59:22, 69:6
**loans** [8] - 18:1, 66:3, 66:8, 66:10, 95:4,

2761

95:7, 95:14, 95:17
**logic** [1] - 98:15
**longer-term** [1] - 54:6
**look** [27] - 6:11, 8:5,
9:17, 10:9, 15:5,
16:6, 16:18, 18:22,
19:7, 21:25, 22:4,
25:11, 33:6, 44:17,
44:24, 66:9, 66:25,
68:19, 80:2, 86:10,
94:1, 101:5, 106:6,
112:22, 113:7, 119:1
**looked** [10] - 10:25,
19:11, 19:17, 22:11,
25:21, 43:20, 67:16,
79:25, 80:7, 92:11
**looking** [8] - 8:7,
34:23, 63:10, 68:3,
75:2, 110:19,
110:25, 111:22
**loop** [1] - 57:24
**loss** [5] - 50:13, 53:21,
55:16, 94:4, 95:15
**losses** [12] - 30:23,
30:24, 50:12, 55:19,
57:9, 66:15, 66:18,
81:8, 86:16, 94:12,
94:13, 95:7
**loud** [1] - 5:9
**Louis** [1] - 84:17
**love** [1] - 59:14
**lower** [9] - 10:24, 11:2,
11:17, 11:23, 18:17,
59:22, 78:24, 95:15
**lowered** [1] - 18:14
**lump** [1] - 43:22
**Lynch** [5] - 78:10,
78:23, 79:6, 88:8,
90:16

## M

**Mac** [11] - 54:21,
56:25, 57:3, 57:5,
59:3, 69:21, 74:6,
78:25, 83:10, 86:23,
96:12
**Mac's** [2] - 83:5, 86:23
**macroeconomic** [1] -
86:14
**Mae** [10] - 54:21, 55:6,
56:8, 59:3, 74:6,
78:24, 85:12, 86:21,
96:12, 106:14
**Mae's** [2] - 70:21,
85:13
**main** [1] - 75:1
**major** [6] - 49:24,
54:15, 57:9, 57:10
**mandate** [1] - 72:17

**March** [10] - 45:8,
80:22, 81:4, 81:9,
81:21, 82:2, 82:23,
97:10, 99:19, 100:4
**mark** [1] - 109:23
**marked** [6] - 108:21,
109:25, 111:18,
111:23, 111:25,
112:16
**market** [51] - 6:8, 6:12,
25:15, 27:13, 27:15,
27:19, 28:20, 31:16,
37:10, 37:12, 37:23,
41:14, 48:25, 49:18,
51:10, 51:14, 51:17,
52:7, 52:16, 53:7,
59:24, 61:10, 61:19,
62:3, 62:4, 63:19,
64:5, 64:24, 65:14,
65:15, 68:25, 69:7,
74:4, 76:21, 77:5,
79:14, 80:2, 80:12,
83:19, 84:3, 86:1,
86:13, 87:4, 87:19,
87:20, 87:23, 88:4,
92:2, 100:20, 101:2,
122:23
**market-based** [2] -
27:13, 27:19
**market-value-based**
[2] - 27:15, 31:16
**marketing** [1] - 96:14
**marketplace** [1] - 65:9
**markets** [2] - 100:14,
100:17
**Mason's** [1] - 121:9
**massive** [1] - 26:6
**matter** [8] - 9:4, 11:7,
22:8, 30:23, 30:25,
48:11, 48:21, 114:8
**maturities** [1] - 91:17
**Mayopoulos** [1] - 62:7
**MBS** [12] - 64:14,
64:15, 64:17, 64:24,
65:1, 65:10, 65:15,
65:16, 81:6, 81:8,
84:4, 100:14
**McFarland** [1] - 85:15
**McGuire** [26] - 62:14,
63:12, 69:10, 69:23,
70:16, 71:25, 73:11,
93:3, 93:9, 93:10,
95:20, 95:25, 96:6,
96:18, 96:24, 97:6,
97:24, 98:10, 98:20,
99:15, 100:10,
101:10, 101:25,
102:19, 103:6,
105:18
**MD&A** [2] - 86:18,

87:9
**mean** [21] - 7:22,
12:10, 13:25, 15:3,
17:5, 19:4, 24:6,
24:20, 27:22, 30:7,
40:23, 50:9, 50:22,
53:14, 61:12, 63:17,
65:2, 73:21, 95:6,
118:10, 125:12
**meaning** [2] - 12:12,
32:25
**means** [8] - 7:23, 34:6,
52:1, 64:11, 68:1,
90:19, 92:7, 103:13
**meant** [1] - 14:3
**media** [1] - 84:16
**meeting** [9] - 39:20,
40:21, 79:23, 83:5,
106:3, 107:1, 107:3,
107:9, 120:4
**members** [12] - 29:5,
32:3, 33:7, 33:10,
34:21, 49:7, 50:22,
56:10, 57:2, 58:6,
65:22, 103:13
**memo** [3] - 106:24,
122:1, 122:2
**memorializing** [1] -
122:6
**mention** [4] - 21:22,
39:17, 60:20, 64:2
**mentioned** [9] - 8:19,
24:10, 53:15, 54:7,
65:19, 69:6, 73:9,
93:22, 102:14
**mentioning** [3] -
58:18, 91:21, 92:3
**Merrill** [5] - 78:10,
78:23, 79:6, 88:7,
90:16
**mess** [1] - 39:12
**met** [2] - 82:3, 83:8
**method** [1] - 6:18
**methodologies** [1] -
64:22
**methodology** [15] -
6:9, 6:11, 6:21, 6:23,
32:24, 35:5, 35:6,
35:9, 35:19, 44:9,
45:13, 45:21, 46:3,
46:4, 46:20
**mid** [1] - 84:10
**mid-June** [1] - 84:10
**might** [9] - 61:3,
61:16, 61:17, 77:13,
80:19, 81:8, 123:17,
123:21, 125:21
**million** [2] - 53:21,
53:22
**mimics** [1] - 9:22

**mind** [3] - 36:24, 60:6,
60:21
**minimizes** [1] - 48:23
**minimum** [2] - 50:15,
53:23
**minus** [1] - 21:18
**minute** [1] - 103:25
**minutes** [4] - 75:19,
84:8, 124:20, 125:21
**misguided** [1] - 20:16
**misleading** [2] - 11:8,
16:22
**misrepresented** [1] -
5:25
**miss** [1] - 15:14
**missed** [4] - 15:13,
114:6, 122:1, 122:2
**misses** [2] - 20:16,
23:12
**mission** [2] - 52:14,
52:18
**misstated** [1] - 26:20
**misstatements** [1] -
8:20
**misstates** [1] - 27:3
**misunderstood** [2] -
5:25, 26:20
**moderately** [1] - 79:3
**modifications** [1] -
118:23
**modified** [1] - 117:1
**modify** [2] - 117:6,
117:15
**moment** [4] - 43:1,
53:18, 69:11, 75:16
**money** [16] - 7:24,
18:12, 18:14, 20:1,
20:2, 20:5, 20:6,
36:3, 36:8, 36:9,
51:10, 51:20, 54:10,
56:20, 56:21
**Montgomery** [9] -
32:1, 32:21, 33:8,
35:22, 38:14, 40:2,
77:16, 79:21, 82:14
**months** [2] - 17:5,
18:6
**Moody's** [9] - 77:10,
77:24, 78:24, 97:15,
97:17, 97:19,
102:21, 102:24
**moot** [3] - 118:18,
122:8, 123:2
**moreover** [1] - 121:18
**morning** [2] - 126:25,
127:3
**mortgage** [10] - 48:25,
49:18, 51:17, 52:7,
52:15, 53:7, 87:4,
87:6, 87:20, 96:15

**most** [6] - 47:19,
64:22, 71:10, 84:16,
107:3, 113:18
**motion** [19] - 107:16,
115:8, 117:6,
117:15, 118:21,
119:25, 121:4,
121:7, 121:10,
121:13, 122:5,
122:12, 123:1,
123:2, 123:11,
123:16, 123:24,
123:25, 124:4
**motions** [1] - 121:2
**move** [9] - 4:5, 4:7,
12:17, 76:2, 85:10,
105:3, 116:4,
123:17, 123:21
**moved** [2] - 123:18,
123:25
**moving** [3] - 89:19,
120:10, 124:3
**multi** [1] - 91:13
**multi-decade** [1] -
91:13
**multiple** [3] - 23:6,
27:17, 73:23
**multiplication** [1] -
35:7

## N

**name** [3] - 5:9, 47:14,
55:7
**namely** [1] - 53:2
**national** [1] - 86:3
**nature** [1] - 13:10
**near** [2] - 39:9, 103:17
**near-term** [1] - 103:17
**necessarily** [1] -
111:10
**necessary** [7] - 9:8,
9:12, 14:2, 14:23,
50:9, 70:10, 74:22
**need** [6] - 19:24, 20:5,
31:18, 55:19, 66:20,
100:21
**needed** [11] - 12:25,
13:20, 13:24, 14:8,
24:2, 27:2, 32:11,
64:14, 64:17, 65:16,
92:21
**needs** [2] - 54:4, 67:14
**negative** [3] - 13:24,
93:18, 93:19
**negotiate** [1] - 36:13
**negotiated** [3] - 17:4,
17:14, 114:7
**negotiation** [7] -
36:19, 36:22, 37:8,

37:21, 38:10, 40:8,
113:20
**net** [45] - 28:2, 28:4,
30:9, 30:24, 50:5,
50:13, 50:21, 50:23,
51:2, 51:11, 52:20,
52:25, 53:1, 53:11,
53:19, 53:20, 53:23,
54:1, 55:16, 55:22,
56:12, 56:16, 63:1,
63:8, 63:10, 64:18,
65:10, 65:12, 75:7,
77:1, 82:4, 90:18,
92:18, 99:12,
101:18, 103:4,
103:18, 117:17,
117:20, 117:24,
122:17, 122:21,
122:22, 122:23,
123:5
**never** [9] - 8:4, 9:4,
25:25, 30:18, 36:5,
74:14, 74:15,
123:17, 123:18
**New** [1] - 17:4
**new** [8] - 18:16, 32:10,
45:25, 46:4, 59:22,
74:7, 74:8, 95:14
**news** [5] - 80:23, 81:9,
82:8, 82:11, 82:23
**next** [15] - 42:23,
44:13, 52:3, 64:10,
71:16, 73:3, 88:22,
91:15, 93:11, 94:1,
96:23, 108:8, 113:5,
117:8
**nice** [1] - 104:9
**night** [2] - 43:15, 44:2
**nine** [2] - 22:4, 23:17
**nominal** [3] - 117:8,
118:8, 118:15
**noncash** [4] - 50:21,
50:23, 56:12, 56:16
**none** [2] - 9:12, 14:21
**nonetheless** [1] -
105:16
**nonevent** [2] - 65:2,
65:11
**nonpublic** [3] - 61:5,
61:7, 61:8
**nonsensical** [1] -
98:15
**normal** [1] - 55:19
**normally** [1] - 109:22
**note** [4] - 77:19,
102:14, 111:4,
113:13
**notes** [1] - 120:4
**nothing** [3] - 22:20,
37:24, 103:20

**notice** [1] - 38:15
**noticed** [1] - 62:24
**November** [6] - 17:7,
17:13, 17:20, 18:4,
18:7, 27:11
**nullity** [1] - 124:4
**number** [36] - 6:2,
7:25, 8:1, 12:21,
12:23, 16:10, 27:25,
32:25, 33:4, 34:20,
34:22, 34:23, 35:15,
35:16, 41:24, 42:4,
42:6, 42:8, 42:9,
42:10, 42:15, 42:16,
45:11, 45:17, 52:24,
71:15, 76:5, 89:1,
91:25, 93:13, 95:16,
108:4, 108:5, 118:5
**numbers** [5] - 11:1,
66:23, 72:24,
109:11, 110:23

**O**

**oath** [2] - 5:13, 47:7
**object** [6] - 44:5,
114:10, 114:11,
114:13, 121:14,
121:19
**objecting** [1] - 123:6
**objection** [33] - 4:7,
40:9, 40:13, 43:7,
43:11, 45:18, 46:8,
46:23, 76:3, 78:14,
78:17, 88:11, 88:17,
90:23, 91:4, 92:14,
99:23, 100:6, 105:1,
105:4, 105:5, 105:8,
105:14, 107:16,
110:16, 111:3,
115:6, 115:13,
117:16, 117:22,
123:7
**obligated** [1] - 30:24
**observe** [2] - 47:20,
65:14
**observed** [1] - 47:25
**obviously** [4] - 37:14,
106:24, 118:11,
123:6
**occurred** [3] - 106:3,
107:1, 107:10
**October** [6] - 71:22,
72:4, 72:18, 73:4,
73:7
**offer** [6] - 6:23, 8:1,
27:11, 27:18, 33:3,
42:10
**offered** [7] - 16:2,
25:9, 32:24, 32:25,

35:15, 35:16
**offering** [6] - 36:17,
36:21, 37:3, 37:6,
37:19, 37:22
**office** [1] - 14:14
**officers** [1] - 96:13
**often** [2] - 50:25,
72:15
**once** [3] - 30:12,
71:17, 81:22
**one** [87] - 8:8, 8:9,
10:5, 10:13, 10:18,
11:5, 15:8, 16:6,
18:25, 19:7, 19:18,
25:5, 33:12, 43:1,
43:7, 52:24, 53:2,
53:15, 54:7, 54:11,
55:13, 55:20, 56:11,
56:17, 59:14, 59:15,
62:12, 63:7, 64:21,
64:22, 65:9, 65:13,
65:14, 69:14, 73:14,
74:4, 74:25, 75:16,
76:2, 76:3, 76:6,
76:19, 77:13, 77:19,
81:8, 81:13, 84:16,
84:17, 84:18, 84:21,
84:23, 88:5, 88:21,
93:6, 96:20, 97:10,
98:19, 101:7, 102:7,
102:23, 103:24,
105:1, 105:2,
105:10, 109:4,
109:10, 109:20,
110:5, 115:17,
118:5, 118:18,
119:3, 119:4, 119:5,
119:7, 119:9,
119:16, 121:4,
121:23, 121:24,
124:10, 124:23,
126:14
**one-sided** [1] - 25:5
**one-sixth** [1] - 74:4
**ones** [2] - 89:22, 90:4
**open** [5] - 39:12, 40:1,
47:1, 90:6, 114:4
**operating** [4] - 50:13,
53:20, 55:19, 57:9
**operations** [1] - 70:7
**opine** [1] - 26:14
**opined** [2] - 39:19,
40:21
**opining** [2] - 25:8,
36:20
**opinion** [30] - 6:4, 6:5,
6:10, 8:6, 13:5, 13:7,
14:8, 15:19, 16:8,
25:6, 26:20, 36:17,
36:21, 37:4, 37:6,

37:19, 37:22, 38:8,
39:2, 39:7, 46:3,
46:14, 51:13, 60:15,
68:20, 73:5, 74:19,
117:5, 117:9, 126:15
**opinions** [8] - 47:24,
48:20, 57:16, 61:3,
62:3, 62:6, 62:8,
62:10
**opportunity** [9] -
43:17, 46:19, 47:20,
54:2, 56:5, 56:6,
113:25, 115:13,
126:21
**opposed** [4] - 19:21,
104:15, 113:22,
118:9
**opposing** [1] - 46:3
**opposite** [1] - 99:13
**optimism** [5] - 49:2,
57:20, 58:9, 58:22,
74:20
**order** [4] - 8:6, 55:24,
108:21, 117:22
**ordinary** [1] - 50:12
**orient** [1] - 72:1
**original** [1] - 49:11
**originally** [1] - 118:9
**otherwise** [2] - 82:16,
117:13
**outcome** [2] - 10:4,
101:5
**outlook** [1] - 103:14
**outputs** [1] - 10:3
**outstanding** [1] - 4:14
**outweighs** [1] - 63:15
**overall** [2] - 49:15,
59:25
**overruled** [1] - 100:8
**owed** [2] - 36:1, 92:19
**own** [7] - 27:13, 27:18,
32:24, 35:5, 42:6,
42:18, 84:14

**P**

**p.m** [1] - 127:5
**pace** [1] - 94:21
**package** [3] - 16:16,
25:9
**packages** [2] - 19:14,
25:3
**page** [37] - 32:2,
33:17, 38:14, 38:15,
38:17, 39:1, 39:17,
69:17, 78:5, 78:22,
81:4, 85:14, 85:16,
85:17, 86:10, 86:24,
87:2, 90:18, 91:9,
93:9, 93:11, 96:7,

96:24, 98:22, 103:8,
106:9, 111:17,
115:4, 116:23,
117:3, 117:7, 117:8,
117:10, 119:18
**PAGE** [1] - 3:2
**paid** [10] - 17:15,
17:16, 17:18, 23:20,
25:22, 26:22, 27:11,
28:16, 43:24, 51:3
**paper** [2] - 14:10,
14:12
**paragraph** [19] - 32:2,
41:10, 45:8, 85:17,
86:11, 87:2, 91:15,
96:25, 101:25,
103:7, 115:18,
115:20, 116:5,
116:9, 116:16,
117:3, 117:4, 117:7,
117:10
**paragraphs** [1] - 115:4
**Paribas** [2] - 62:5,
92:8
**part** [26] - 12:16,
47:25, 51:11, 57:25,
68:5, 72:17, 73:22,
74:6, 74:23, 83:9,
86:18, 87:16, 98:10,
98:15, 98:25, 107:3,
112:12, 112:17,
115:25, 117:2,
117:5, 117:16,
119:22, 124:19,
124:23
**participants** [1] - 80:3
**particular** [20] - 8:3,
10:11, 10:19, 15:1,
24:3, 25:18, 26:15,
44:14, 48:7, 55:3,
61:22, 68:13, 68:15,
70:24, 74:24, 85:15,
96:10, 96:17, 99:8,
114:10
**parties** [13] - 4:7,
24:19, 31:17, 32:6,
37:11, 39:3, 76:4,
118:7, 123:15,
124:6, 124:11,
126:15, 126:21
**parties'** [1] - 117:11
**Partners** [1] - 92:12
**partnership** [1] -
14:21
**parts** [1] - 5:24
**pass** [4] - 107:13,
108:19, 120:15,
122:4
**passage** [3] - 55:4,
117:4, 121:18

**passed** [1] - 106:13
**pay** [15] - 20:3, 22:2, 36:3, 49:19, 51:4, 51:11, 51:24, 51:25, 54:9, 56:19, 56:20, 57:11, 90:20, 92:21
**paying** [3] - 17:2, 18:18, 18:23
**payment** [2] - 15:14
**payments** [2] - 51:15, 57:11
**PCF** [61] - 6:6, 7:7, 8:25, 9:3, 9:7, 9:9, 9:25, 13:6, 17:14, 18:24, 19:9, 19:15, 19:16, 19:18, 20:7, 22:23, 26:25, 27:19, 27:21, 27:25, 28:3, 28:6, 28:13, 28:20, 30:21, 31:3, 31:5, 31:7, 31:9, 31:12, 31:24, 32:25, 33:20, 33:21, 34:6, 34:10, 34:14, 36:2, 36:5, 36:10, 36:14, 36:23, 37:1, 37:10, 37:17, 37:23, 38:5, 39:2, 39:4, 39:5, 39:6, 39:9, 39:11, 39:17, 40:8, 41:13, 42:7, 42:11, 42:12
**peak** [2] - 75:4, 94:14
**peaked** [2] - 94:4, 94:13
**pending** [1] - 122:13
**people** [6] - 14:17, 25:1, 37:16, 65:8, 84:10, 85:7
**per** [3] - 33:20, 34:6, 34:14
**percent** [19] - 11:24, 17:12, 17:13, 18:23, 26:12, 28:13, 36:1, 36:4, 36:8, 52:24, 68:2, 79:19, 95:16, 99:11
**percentage** [1] - 25:24
**perfectly** [1] - 39:10
**perform** [1] - 42:5
**performance** [1] - 118:22
**performed** [1] - 64:23
**perhaps** [1] - 102:8
**period** [7] - 60:23, 71:20, 91:13, 96:4, 97:18, 97:20, 99:18
**periodic** [4] - 7:3, 7:13, 7:18, 25:8
**periodically** [2] - 66:4, 66:5

**periods** [2] - 70:6, 94:21
**permission** [2] - 48:2, 89:25
**permit** [1] - 46:2
**permitted** [1] - 55:13
**person** [2] - 28:19, 40:23
**perspective** [1] - 103:1
**perspectives** [1] - 27:17
**phase** [6] - 73:24, 74:1, 74:8, 74:9, 74:11, 74:12
**phases** [2] - 73:23, 74:13
**phone** [1] - 43:1
**phones** [1] - 38:19
**phrase** [5] - 50:25, 67:25, 74:9, 77:7, 77:8
**picture** [1] - 124:12
**pie** [1] - 95:13
**piece** [2] - 9:21, 10:5
**place** [10] - 30:12, 30:22, 76:8, 76:22, 79:2, 81:23, 89:10, 91:20, 97:19
**placed** [2] - 45:7, 55:25
**plaintiffs** [28] - 4:4, 5:1, 32:17, 38:24, 43:5, 44:8, 47:4, 75:25, 76:2, 88:16, 104:19, 104:23, 108:11, 108:15, 113:15, 113:19, 116:10, 117:17, 118:10, 118:17, 121:4, 122:2, 123:12, 123:17, 123:20, 124:3, 125:3, 125:21
**plaintiffs'** [3] - 43:8, 88:2, 115:5
**Plaintiffs'** [13] - 3:10, 3:11, 3:11, 3:12, 3:12, 3:13, 3:13, 4:8, 4:17, 69:11, 96:1, 105:3, 105:9
**plan** [3] - 73:18, 73:22, 79:1
**plans** [1] - 73:16
**play** [3] - 20:11, 83:12, 83:16
**played** [1] - 83:17
**players** [1] - 74:8
**plus** [3] - 17:12, 28:14, 28:15

**point** [39] - 7:16, 11:5, 12:2, 20:17, 23:2, 23:12, 30:12, 31:9, 43:15, 46:5, 46:12, 46:16, 57:15, 59:6, 59:7, 61:9, 63:3, 63:16, 63:18, 64:10, 65:19, 68:3, 68:13, 68:15, 73:9, 75:1, 81:14, 81:25, 83:21, 89:2, 90:1, 94:2, 95:3, 105:3, 111:14, 111:15, 114:15, 118:7, 118:14
**pointed** [1] - 35:8
**pointing** [2] - 65:25, 69:8
**points** [22] - 6:7, 7:2, 9:10, 17:14, 19:8, 19:9, 19:20, 20:10, 21:17, 22:14, 22:25, 23:5, 23:8, 23:14, 25:19, 28:12, 33:21, 41:18, 42:14, 59:17, 60:7, 111:23
**popularized** [1] - 84:16
**portfolio** [2] - 59:20, 69:6
**portfolios** [2] - 59:22, 74:13
**portion** [14] - 22:17, 29:10, 30:14, 30:15, 30:20, 41:19, 56:8, 57:24, 66:10, 96:7, 97:25, 99:5, 111:16, 112:15
**position** [9] - 45:21, 46:18, 62:1, 69:7, 110:17, 110:20, 110:25, 123:19, 124:2
**positions** [1] - 61:15
**positive** [16] - 9:3, 10:14, 19:15, 19:16, 19:18, 25:13, 25:14, 39:5, 39:6, 58:1, 59:8, 59:11, 62:6, 62:8, 62:10, 93:23
**positively** [1] - 93:21
**possession** [2] - 11:11, 12:8
**possibility** [4] - 30:10, 56:1, 77:1, 78:23
**possible** [5] - 20:19, 56:12, 69:24, 70:5, 98:22
**possibly** [1] - 24:4
**Post** [1] - 65:1
**post** [2] - 90:21, 91:11

**post-2012** [1] - 77:12
**post-2013** [1] - 118:21
**post-December** [1] - 90:21
**Post-third** [1] - 65:1
**post-YE** [1] - 91:11
**potential** [12] - 50:5, 51:4, 57:4, 57:11, 60:4, 63:6, 63:8, 63:10, 69:8, 77:5, 77:21, 98:5
**potentially** [5] - 63:4, 67:15, 72:10, 73:25, 123:6
**power** [1] - 90:2
**practice** [4] - 111:13, 111:19, 112:3, 112:8
**preceding** [1] - 82:23
**preclude** [1] - 56:1, 123:12
**predictions** [1] - 124:9
**preferred** [10] - 7:10, 10:1, 10:18, 10:21, 10:23, 15:11, 15:12, 17:9, 17:21, 55:24
**preliminary** [1] - 7:16
**premeeting** [4] - 106:3, 107:4, 107:5, 107:6
**premium** [2] - 22:3, 25:24
**prepare** [3] - 15:1, 65:4, 126:16
**prepared** [1] - 72:18
**presence** [6] - 4:2, 4:23, 75:20, 76:11, 104:13, 120:3
**present** [8] - 37:11, 43:18, 44:2, 46:19, 47:17, 48:13, 107:7, 126:24
**presentation** [8] - 33:9, 43:8, 44:25, 63:13, 70:17, 73:12, 95:13, 100:10
**presented** [8] - 14:12, 14:13, 28:9, 33:7, 33:12, 42:7, 76:20, 79:15
**presenting** [1] - 43:13
**President** [2] - 126:5, 126:11
**press** [1] - 123:3
**pressure** [1] - 103:17
**presumed** [1] - 44:22
**pretrial** [5] - 114:25, 117:5, 117:9, 123:12, 123:14
**pretty** [4] - 9:16, 21:23, 60:17, 60:18

**prevailed** [1] - 18:6
**prevent** [2] - 32:12, 121:4
**prevented** [1] - 122:23
**preventing** [1] - 15:25
**previous** [3] - 45:13, 55:10, 86:2
**previously** [6] - 5:12, 43:14, 45:21, 47:5, 59:18, 104:24
**price** [12] - 18:15, 18:17, 20:12, 22:23, 26:24, 82:11, 82:18, 82:24, 83:2, 84:13, 85:24, 121:6
**prices** [26] - 11:16, 11:20, 17:15, 59:19, 68:25, 69:1, 82:19, 84:9, 84:21, 84:25, 85:1, 85:2, 85:9, 85:18, 86:3, 86:5, 86:7, 86:15, 87:5, 87:6, 93:24, 94:10, 94:12, 94:16, 94:18
**pricing** [2] - 9:22, 9:23
**private** [1] - 96:15
**problem** [5] - 39:24, 54:18, 81:18, 89:13, 126:3
**problems** [2] - 54:12, 59:21
**Procedure** [1] - 113:10
**proceed** [3] - 5:13, 44:12, 47:8
**proceeding** [4] - 38:5, 40:6, 40:20, 62:11
**Proceedings** [9] - 4:2, 4:23, 40:1, 47:1, 75:20, 76:11, 90:6, 104:13, 127:5
**proceedings** [2] - 38:14, 47:18
**process** [6] - 67:9, 68:19, 68:23, 75:5, 86:9, 120:7
**produce** [1] - 72:15
**produced** [1] - 122:15
**Professor** [3] - 5:8, 42:8, 121:9
**profit** [6] - 51:2, 56:19, 60:4, 66:22, 92:20, 95:18
**profitability** [4] - 65:25, 66:1, 70:7, 75:3
**profitable** [1] - 95:5
**profits** [10] - 28:5, 43:24, 58:25, 59:25, 67:4, 67:24, 68:6,

68:11, 92:19, 92:21
**Program** [8] - 8:12,
9:24, 12:18, 12:19,
12:22, 13:16, 15:2,
27:7
**program** [3] - 12:19,
12:23, 13:3
**prohibited** [1] - 88:24
**projections** [19] -
43:21, 44:4, 44:14,
44:15, 44:16, 44:23,
45:4, 45:10, 45:23,
58:11, 59:2, 68:5,
68:6, 68:9, 70:21,
71:21, 72:15, 72:21,
72:25
**promise** [1] - 7:6
**promote** [5] - 48:24,
49:17, 49:25, 51:16,
52:6
**prompted** [1] - 119:21
**proof** [3] - 125:6,
125:20, 125:23
**properly** [1] - 120:12
**proposal** [2] - 117:12,
120:11
**propose** [1] - 63:6
**proposed** [5] - 62:25,
113:19, 115:5,
118:24, 120:14
**prospects** [2] - 49:3,
75:3
**provide** [4] - 7:6,
19:24, 27:12, 32:11
**provided** [8] - 6:13,
6:14, 13:8, 13:9,
16:13, 36:25, 37:14,
64:18
**providing** [3] - 9:25,
15:22, 26:4
**PSPA** [8] - 6:8, 27:15,
31:12, 31:14, 36:25,
37:11, 63:6, 82:4
**PSPAs** [7] - 29:25,
31:7, 32:8, 37:14,
77:1, 78:7, 99:2
**PSPAs'** [2] - 102:11,
102:16
**public** [11] - 13:10,
14:24, 15:21, 15:24,
16:4, 19:3, 19:5,
22:3, 24:7, 61:7,
108:5
**published** [1] - 84:14
**pull** [20] - 32:1, 33:8,
38:13, 40:3, 73:11,
77:15, 78:11, 79:20,
81:2, 82:15, 85:14,
86:24, 90:16, 91:6,
93:3, 95:25, 97:24,

98:21, 99:21, 100:10
**pulled** [1] - 65:3
**punch** [2] - 86:5, 86:7
**purchase** [2] - 17:9,
55:24
**Purchase** [8] - 8:12,
9:24, 12:18, 12:19,
12:22, 13:16, 15:2,
27:7
**purchases** [1] - 10:1
**pure** [1] - 111:17
**purported** [1] - 121:6
**purpose** [2] - 112:13,
120:13
**purposes** [5] - 46:2,
57:14, 78:17, 110:6,
110:24
**pursuant** [2] - 32:14,
88:10
**puts** [2] - 91:16, 91:22
**PX-205** [5] - 99:21,
100:2, 105:19,
105:24, 106:24
**PX-246** [2] - 101:9,
101:15
**PX-257** [1] - 102:19
**PX-375** [1] - 121:12
**PX-584** [1] - 105:18
**PX-652** [1] - 111:25

## Q

**quality** [1] - 69:6
**quantified** [1] - 8:4
**quantify** [2] - 27:25,
37:17
**quantitative** [5] -
64:12, 64:13, 64:16,
64:19, 65:17
**quarter** [13] - 55:17,
55:22, 56:13, 67:1,
67:9, 68:14, 68:19,
72:7, 72:9, 72:10,
72:12, 86:4, 93:14
**quarters** [3] - 59:8,
59:11, 59:25
**questions** [16] - 32:23,
34:9, 35:14, 38:7,
38:11, 40:7, 40:12,
41:7, 41:24, 42:1,
80:3, 93:13, 97:12,
99:20, 100:13,
102:21
**quickly** [5] - 12:17,
26:17, 59:16, 77:15,
81:5
**quite** [2] - 35:19, 80:9
**quotation** [2] - 49:11,
52:12
**quote** [5] - 9:2, 49:10,

57:22, 90:19, 100:13
**quoting** [1] - 46:13

## R

**ra** [1] - 17:5
**raise** [2] - 80:3, 114:20
**raised** [1] - 24:3
**raises** [1] - 81:7
**Rajiv** [1] - 97:25
**range** [20] - 6:6, 6:7,
9:9, 19:10, 20:9,
20:10, 22:11, 22:24,
23:2, 23:3, 23:4,
23:6, 23:7, 23:16,
26:25, 27:16, 28:13,
33:22, 41:17, 42:12
**rapidly** [1] - 17:5
**rate** [8] - 7:3, 7:9,
11:25, 17:11, 26:10,
26:11, 95:15, 99:10
**rates** [4] - 11:23, 87:6,
94:19, 94:20
**rather** [4] - 25:10,
43:22, 44:5, 57:2
**rating** [2] - 81:17,
102:25
**ratings** [9] - 77:6,
77:21, 78:24, 81:14,
81:15, 97:12, 98:5,
102:23, 103:17
**rationale** [3] - 13:10,
14:15, 27:5
**ratios** [3] - 10:14,
11:8, 11:19
**re** [2] - 117:18, 121:8
**re-read** [1] - 117:18
**re-repeated** [1] - 121:8
**reach** [3] - 4:13, 9:8,
9:13
**reached** [11] - 104:25,
118:23, 118:25,
119:7, 119:11,
119:15, 121:9,
121:11, 122:19,
123:15, 126:22
**reaction** [5] - 5:23,
10:19, 28:8, 65:14,
89:10
**read** [21] - 9:14, 17:22,
32:3, 36:24, 39:19,
41:2, 49:21, 55:11,
57:14, 57:22, 58:3,
70:2, 81:5, 82:16,
95:8, 103:12, 106:9,
107:14, 117:18,
120:5, 126:1
**reading** [1] - 57:2
**reads** [1] - 70:5
**reality** [1] - 27:3

**realize** [4] - 67:1,
119:21, 120:16
**realized** [1] - 70:9
**really** [23] - 14:2, 15:6,
15:7, 16:10, 17:22,
23:21, 44:18, 46:4,
52:17, 57:21, 58:15,
60:16, 64:12, 66:1,
67:25, 68:1, 71:19,
73:22, 74:5, 81:25,
100:21, 112:9,
121:12
**reason** [9] - 14:5,
19:4, 20:10, 32:19,
52:4, 54:13, 54:14,
57:19
**reasonable** [10] -
25:15, 28:3, 28:5,
31:16, 37:9, 37:12,
37:16, 37:22, 38:2,
49:15
**reasonably** [4] - 45:6,
45:24, 68:21, 74:22
**reasoning** [1] - 31:5
**reasons** [3] - 16:11,
48:19, 109:20
**Reasons** [1] - 48:16
**reassess** [1] - 67:8
**reassurance** [4] -
64:14, 64:17, 64:18,
65:16
**rebut** [1] - 46:3
**Rebuttal** [6] - 3:4, 3:5,
3:5, 3:6, 3:7, 3:7
**REBUTTAL** [6] - 5:2,
29:1, 41:11, 47:10,
76:16, 93:4
**rebuttal** [7] - 4:5, 46:1,
46:2, 46:15, 104:20,
108:12, 124:21
**rebutting** [1] - 54:22
**recalled** [2] - 107:9,
107:10
**recapitalization** [1] -
24:23
**recapitalize** [1] - 25:2
**recapitalized** [1] -
13:1
**receivables** [1] - 66:4
**received** [2] - 15:10,
105:5
**receivership** [1] -
55:25
**receiving** [1] - 24:16
**recent** [2] - 77:20,
94:21
**Recess** [1] - 75:23
**recipient** [1] - 101:21
**recognize** [2] - 62:19,
69:14

**recognized** [1] - 74:14
**recollection** [2] - 7:19,
10:12
**recommendation** [3] -
4:15, 99:1, 99:8
**recommendations** [1]
- 98:25
**recommending** [1] -
99:10
**reconsider** [1] -
107:15
**record** [19] - 5:10,
38:22, 43:3, 47:15,
57:14, 75:21, 75:22,
76:9, 88:14, 103:13,
108:5, 111:5, 111:7,
112:17, 113:17,
114:11, 121:4,
121:15, 124:8
**recording** [2] - 83:17,
105:24
**records** [1] - 22:3
**recover** [2] - 24:24,
25:4
**recovering** [1] - 68:25
**recovery** [4] - 80:16,
80:18, 80:22, 121:6
**red** [1] - 33:18
**redacted** [3] - 111:16,
112:1, 112:17
**redirect** [2] - 41:8,
93:1
**Redirect** [2] - 3:5, 3:7
**REDIRECT** [2] - 41:11,
93:4
**redone** [1] - 17:20
**reduce** [1] - 67:20
**reduced** [2] - 17:10,
17:11
**reducing** [1] - 99:10
**reference** [10] - 7:18,
39:1, 39:6, 63:5,
94:17, 96:11, 97:2,
98:4, 102:4, 121:5
**referenced** [3] - 24:1,
71:21, 121:13
**references** [1] - 8:21
**referred** [4] - 25:25,
42:4, 60:24, 123:13
**referring** [5] - 42:3,
42:5, 50:11, 51:5,
52:25
**refers** [1] - 95:3
**reflect** [1] - 80:11
**reflected** [3] - 58:16,
59:5, 61:14
**reflecting** [2] - 81:19,
91:24
**reflects** [1] - 79:9
**regarding** [13] - 44:14,

2765

53:11, 53:17, 57:4,
  68:20, 70:6, 70:21,
  70:24, 71:6, 80:4,
  86:11, 102:11,
  102:16
**regulatory** [1] - 103:14
**reinstated** [2] - 32:13,
  78:8
**related** [4] - 55:11,
  68:12, 86:16, 120:4
**relating** [6] - 57:15,
  64:24, 76:5, 121:16,
  122:13, 122:17
**relation** [1] - 8:2
**relationship** [2] -
  52:20, 115:21
**release** [3] - 44:11,
  45:6, 104:2
**released** [3] - 68:17,
  72:18, 73:4
**relevance** [1] - 120:1
**relevant** [12] - 9:1, 9:3,
  9:10, 54:21, 60:23,
  73:5, 73:8, 105:23,
  116:12, 121:17,
  121:19
**relied** [1] - 72:21
**rely** [1] - 58:19
**remainder** [1] - 71:20
**remaining** [3] - 31:21,
  76:7, 105:10
**remember** [12] -
  14:19, 19:23, 26:3,
  28:6, 28:7, 28:13,
  42:1, 62:23, 82:10,
  83:8, 83:10, 109:18
**remind** [9] - 5:13, 6:3,
  7:1, 7:12, 7:16, 47:6,
  65:22, 100:16,
  106:17
**reminding** [1] - 52:19
**renegotiated** [1] -
  17:6
**reorient** [1] - 40:5
**reorienting** [1] - 40:11
**repeat** [2] - 79:13,
  125:11
**repeated** [1] - 121:8
**repeatedly** [1] - 9:7
**replaced** [2] - 30:10,
  32:9
**reply** [1] - 116:24
**report** [29] - 43:16,
  43:18, 44:1, 45:8,
  45:14, 46:14, 46:21,
  55:4, 55:5, 55:6,
  55:8, 56:9, 57:3,
  62:22, 63:2, 63:10,
  65:4, 73:3, 77:8,
  78:5, 81:4, 87:14,

91:8, 92:12, 93:14,
  99:1, 120:24, 126:8
**reported** [2] - 69:19,
  72:6
**REPORTER** [1] -
  125:9
**reporting** [2] - 83:19,
  121:2
**reports** [37] - 60:10,
  60:13, 60:15, 60:20,
  60:23, 61:2, 61:5,
  61:14, 62:4, 62:13,
  63:16, 65:5, 65:6,
  71:6, 72:16, 77:14,
  79:14, 79:25, 80:7,
  81:10, 81:19, 88:4,
  88:18, 88:24, 89:1,
  89:5, 89:9, 89:11,
  89:17, 90:8, 91:25,
  92:4, 97:9, 119:25,
  120:6, 120:13,
  120:15
**reports'** [1] - 120:3
**representations** [1] -
  113:2
**request** [2] - 120:19,
  126:21
**require** [2] - 53:22,
  54:15
**required** [2] - 53:23,
  55:23
**research** [3] - 10:23,
  14:10, 15:1
**reserve** [2] - 124:22,
  126:24
**Reserve** [16] - 14:17,
  14:21, 17:3, 24:18,
  24:21, 25:1, 27:5,
  31:17, 36:15, 37:7,
  37:20, 37:24, 38:2,
  38:10, 40:7, 84:17
**reserves** [3] - 55:14,
  55:15, 94:4
**residual** [8] - 44:17,
  45:1, 45:12, 71:7,
  71:9, 71:12, 71:15,
  71:17
**resolution** [4] - 4:13,
  121:3, 121:11,
  122:19
**resolutions** [1] - 76:8
**resolve** [1] - 76:5
**resolved** [7] - 70:7,
  121:2, 121:14,
  121:20, 121:23,
  121:25, 122:11
**respect** [6] - 4:14,
  30:13, 40:24, 41:13,
  87:23, 116:3
**respected** [1] - 102:9

**respectfully** [3] -
  114:6, 116:2, 120:9
**response** [9] - 12:5,
  24:5, 35:14, 47:24,
  49:23, 58:6, 73:20,
  74:18, 98:12
**responses** [3] - 9:16,
  49:12, 49:24
**responsible** [1] -
  96:14
**responsive** [1] - 43:15
**rest** [6] - 87:14, 91:16,
  91:22, 108:12,
  115:23, 116:4
**restore** [1] - 68:12
**restored** [3] - 68:22,
  71:1, 71:7
**result** [3] - 58:24,
  75:8, 85:25
**resulting** [1] - 57:11
**results** [6] - 56:15,
  57:5, 58:9, 59:9,
  59:11, 72:6
**resume** [1] - 47:6
**retain** [2] - 53:3, 55:13
**retaining** [1] - 52:21
**return** [1] - 19:13
**reveal** [1] - 39:11
**revenues** [1] - 98:17
**reversal** [1] - 44:5
**review** [1] - 112:2
**reviewed** [5] - 5:20,
  15:3, 54:20, 89:17,
  90:8
**revised** [3] - 17:25,
  18:10, 27:10
**right-hand** [1] - 98:22
**risk** [13] - 48:25, 51:4,
  52:2, 59:23, 64:9,
  78:6, 81:7, 81:22,
  87:16, 91:16, 91:20,
  91:23, 92:1
**risks** [1] - 50:20
**risky** [1] - 64:8
**Robert** [5] - 4:4, 43:4,
  44:7, 75:24, 88:15
**routinely** [1] - 46:2
**RUDY** [3] - 120:22,
  121:1, 122:11
**Rudy** [1] - 120:22
**Rule** [5] - 78:13,
  78:18, 88:10,
  113:10, 114:10
**rule** [2] - 103:24,
  114:1
**ruled** [4] - 119:12,
  119:13, 119:24,
  123:7
**rules** [2] - 68:8,
  112:21

**Rules** [1] - 113:9
**ruling** [6] - 88:23,
  105:16, 107:21,
  111:5, 114:23, 120:7
**rulings** [1] - 109:4
**run** [2] - 19:25, 46:9
**running** [2] - 44:18,
  59:21
**runs** [3] - 26:6, 90:22,
  117:7

## S

**S&P** [2] - 78:23,
  102:24
**Sachs** [7] - 62:5, 92:8,
  102:4, 102:6, 102:7,
  102:11, 102:13
**safer** [1] - 17:24
**safest** [2] - 63:22,
  63:23
**sake** [1] - 21:11
**sale** [1] - 59:19
**sales** [3] - 59:20, 69:2,
  83:1
**Sam** [2] - 38:23,
  104:22
**sample** [3] - 12:16,
  15:10, 22:4
**Satriano** [2] - 116:25,
  119:10
**save** [3] - 14:8, 14:25,
  107:18
**saved** [3] - 122:21,
  122:22, 123:5
**saw** [10] - 15:25,
  19:19, 22:11, 81:1,
  83:23, 92:12,
  100:19, 105:19,
  105:21, 120:5
**scenario** [3] - 54:6,
  68:10, 79:3
**scenarios** [1] - 53:11
**scope** [3] - 89:2,
  99:25, 100:7
**screen** [3] - 40:17,
  45:7, 48:16
**search** [1] - 61:1
**seated** [3] - 4:24,
  75:21, 76:12
**SEC** [8] - 7:17, 7:20,
  8:3, 34:9, 54:20,
  55:4, 55:5, 93:14
**second** [36] - 8:16,
  10:16, 16:13, 26:21,
  29:22, 29:25, 32:9,
  46:21, 48:7, 49:2,
  50:20, 51:5, 53:1,
  53:18, 55:21, 57:13,
  57:15, 57:19, 63:16,

63:18, 74:1, 80:3,
  85:17, 85:21, 87:2,
  93:14, 95:3, 97:25,
  98:4, 101:25,
  116:16, 116:23,
  122:12
**secondary** [6] - 48:24,
  49:18, 51:17, 52:7,
  52:15, 53:7
**secondly** [1] - 58:13
**section** [1] - 87:9
**secured** [1] - 17:25
**securities** [4] - 80:6,
  96:10, 96:15, 101:3
**securitization** [1] -
  74:1
**security** [3] - 13:10,
  87:6, 102:15
**see** [43] - 20:25, 23:15,
  28:11, 33:17, 33:18,
  33:25, 40:17, 40:25,
  42:10, 55:6, 61:14,
  61:20, 65:7, 67:9,
  69:18, 72:24, 73:15,
  77:8, 78:6, 78:15,
  78:22, 84:3, 85:12,
  85:19, 86:19, 88:5,
  91:10, 91:13, 94:6,
  94:21, 95:2, 96:3,
  96:10, 96:20, 97:2,
  98:8, 98:12, 100:22,
  101:21, 104:12,
  108:20, 123:25,
  127:3
**seeing** [3] - 46:22,
  83:20, 87:17
**seeking** [3] - 112:10,
  118:8, 118:14
**sellers** [1] - 61:20
**selling** [3] - 61:17,
  61:19, 96:14
**semantics** [1] - 35:18
**send** [4] - 108:18,
  109:8, 109:14, 112:1
**sending** [2] - 109:15,
  110:6
**senior** [1] - 55:24
**sense** [8] - 17:22,
  18:8, 31:2, 31:12,
  31:25, 81:16, 85:6,
  101:15
**sent** [3] - 109:23,
  122:2, 122:7
**sentence** [7] - 69:23,
  70:5, 70:13, 86:2,
  98:4, 99:6, 103:10
**sentiment** [14] - 61:10,
  61:13, 61:17, 76:21,
  80:10, 80:12, 81:16,
  83:20, 84:7, 87:23,

92:2, 92:10, 100:20, 102:10
**sentiments** [1] - 93:19
**separated** [1] - 109:6
**September** [2] - 16:17, 17:4
**series** [1] - 42:1
**serious** [2] - 94:19, 94:20
**serving** [2] - 15:20, 16:4
**set** [7] - 37:1, 41:13, 46:15, 47:23, 66:20, 73:17, 126:22
**Setia** [1] - 98:1
**setting** [1] - 31:12
**settled** [1] - 19:17
**several** [5] - 4:5, 55:8, 88:20, 101:12, 102:21
**severe** [1] - 54:18
**shall** [3] - 43:11, 67:9, 67:10
**shape** [1] - 15:7
**share** [1] - 59:24
**shared** [2] - 49:3, 57:21
**sheet** [7] - 51:9, 51:21, 56:18, 67:11, 69:9, 71:17, 75:4
**Shiller** [3] - 82:25, 83:3, 84:13
**short** [3] - 14:13, 54:4, 83:12
**shortfall** [5] - 50:9, 50:11, 50:16, 50:18
**shortfalls** [1] - 50:6
**shortly** [1] - 106:3
**show** [27] - 8:19, 8:21, 20:18, 21:4, 44:19, 55:11, 58:13, 59:1, 61:25, 65:24, 69:1, 71:3, 80:14, 82:25, 86:7, 88:4, 89:3, 89:4, 90:10, 90:13, 101:7, 108:23, 109:11, 109:13, 111:17, 112:4
**showed** [13] - 25:21, 44:25, 55:18, 56:17, 59:1, 59:2, 59:24, 64:15, 71:4, 75:7, 94:13, 95:12, 97:9
**showing** [8] - 44:2, 67:14, 84:7, 88:17, 90:13, 94:15, 100:16, 100:18
**shown** [6] - 45:23, 48:16, 58:10, 80:15, 80:17, 93:7

**shows** [2] - 10:23, 64:2
**shrink** [4] - 73:17, 74:2, 74:7, 74:12
**shrinking** [3] - 74:2, 74:8, 74:16
**sic** [2] - 18:4, 56:22
**side** [3] - 57:18, 118:14, 125:25
**sided** [1] - 25:5
**sides** [4] - 116:24, 118:4, 118:7
**signature** [1] - 85:15
**significant** [6] - 13:3, 51:23, 71:19, 85:25, 86:12, 87:3
**significantly** [1] - 86:17
**signs** [3] - 80:15, 80:17, 80:22
**similar** [7] - 13:8, 20:4, 38:7, 40:6, 57:3, 73:3, 92:13
**simple** [1] - 21:10
**simplest** [2] - 20:18, 21:25
**simply** [2] - 35:6, 36:24
**simultaneously** [1] - 84:6
**single** [2] - 94:19, 95:4
**single-family** [2] - 94:19, 95:4
**sitting** [2] - 51:21, 51:25
**situation** [5] - 13:23, 16:9, 18:9, 56:7, 57:20
**situations** [2] - 56:4, 57:8
**sixth** [1] - 74:4
**skipping** [2] - 65:6, 91:15
**slew** [1] - 21:22
**slide** [38] - 8:19, 8:21, 8:22, 10:9, 16:18, 16:20, 16:22, 17:19, 23:15, 25:18, 34:24, 44:13, 44:25, 48:7, 48:16, 49:7, 52:3, 52:22, 53:17, 54:25, 55:4, 55:10, 56:24, 57:15, 57:25, 59:13, 60:7, 61:9, 61:22, 69:11, 71:3, 73:12, 73:15, 76:20, 79:23, 101:8, 101:12
**Slide** [18] - 33:9, 43:8, 43:13, 44:9, 44:13, 44:24, 45:15, 45:17,

45:19, 46:1, 46:7, 46:8, 46:12, 62:16, 80:2, 100:11
**slides** [9] - 33:12, 47:23, 48:3, 49:12, 56:17, 58:25, 59:14, 59:24, 70:19
**slight** [1] - 118:23
**slower** [1] - 94:21
**small** [6] - 7:8, 50:13, 50:16, 53:20, 64:1, 80:19
**solely** [3] - 59:8, 59:10, 59:11
**solutions** [1] - 98:22
**solves** [1] - 89:13
**sometime** [1] - 82:12
**sorry** [9] - 4:10, 31:3, 34:19, 35:4, 58:14, 106:19, 107:2, 112:25, 114:16
**sort** [15] - 9:12, 10:25, 11:18, 16:7, 24:1, 25:6, 25:8, 28:5, 76:22, 89:9, 121:8, 121:15, 122:23, 122:25, 123:4
**sorts** [1] - 110:25
**sound** [2] - 15:15, 15:18
**sounds** [1] - 14:1
**speakers** [1] - 84:18
**specific** [5] - 20:11, 45:16, 50:2, 71:14, 84:12
**specifically** [6] - 52:8, 52:10, 58:18, 59:13, 82:3, 93:24
**spell** [2] - 5:10, 47:14
**spill** [2] - 124:15, 124:17
**split** [4] - 108:17, 108:19, 109:8, 110:8
**spread** [5] - 63:20, 64:1, 64:7, 100:23
**spreads** [6] - 64:3, 64:8, 84:5, 87:6, 91:23, 100:23
**spreadsheets** [1] - 110:22
**squarely** [1] - 114:1
**St** [1] - 84:17
**stability** [13] - 13:11, 14:24, 15:24, 16:5, 19:6, 24:8, 24:24, 48:24, 49:17, 49:25, 51:16, 52:6, 53:7
**stabilizing** [1] - 94:18
**stable** [3] - 50:7, 103:14

**stand** [2] - 35:13, 47:6
**standard** [3] - 67:17, 67:19, 119:25
**standing** [1] - 26:2
**standpoint** [2] - 8:12, 67:18
**Stanton** [4] - 104:16, 118:13, 123:9, 126:13
**stark** [1] - 11:3
**start** [5] - 21:21, 48:6, 49:6, 84:9, 104:18
**started** [3] - 36:8, 36:10, 68:24
**starting** [12] - 38:17, 44:9, 67:8, 67:9, 67:14, 69:1, 78:7, 82:19, 82:25, 85:10, 86:7, 98:10
**starts** [1] - 78:1
**state** [4] - 43:11, 47:14, 81:19, 121:15
**statement** [13] - 7:17, 7:20, 8:3, 27:2, 28:11, 31:23, 32:5, 32:16, 55:22, 65:3, 79:19, 86:20
**statements** [3] - 93:11, 93:14, 93:20
**states** [3] - 20:8, 52:3, 78:23
**status** [1] - 86:12
**staying** [1] - 59:6
**Stegman** [7] - 105:24, 106:2, 106:17, 106:20, 106:23, 106:24
**Stegman's** [1] - 106:5
**step** [4] - 8:16, 26:21, 42:22, 103:21
**steps** [1] - 7:13
**STERN** [13] - 112:25, 113:2, 113:13, 115:7, 115:11, 115:17, 115:20, 116:8, 122:1, 125:8, 125:10, 125:16, 127:4
**stern** [1] - 125:9
**still** [18] - 4:6, 5:13, 18:1, 23:2, 29:15, 47:7, 80:15, 80:22, 81:17, 81:19, 81:21, 82:23, 84:4, 84:20, 104:20, 118:5, 125:25, 126:1
**stipulate** [2] - 31:4, 125:22
**stock** [11] - 7:10, 10:1, 10:18, 10:21, 10:24,

15:11, 15:12, 17:9, 55:24, 121:6, 121:16
**stocks** [2] - 61:16, 61:17
**strategic** [1] - 73:18
**strengthens** [1] - 98:18
**stress** [3] - 53:11, 54:6, 68:9
**stricken** [2] - 118:15, 118:16
**strike** [2] - 116:4, 120:11
**striving** [1] - 125:17
**strong** [2] - 75:2, 84:24
**structure** [4] - 9:21, 9:22, 9:23, 60:1
**studied** [1] - 14:11
**studies** [1] - 12:16
**study** [6] - 64:16, 64:20, 64:21, 64:22, 64:24, 126:19
**stuff** [2] - 21:14, 22:7
**subject** [2] - 15:2, 15:4
**submit** [7] - 110:2, 113:16, 113:24, 114:6, 115:12, 116:2, 120:9
**submitted** [5] - 43:17, 62:13, 114:11, 114:13, 116:8
**subordinated** [1] - 21:14
**subsequent** [3] - 43:18, 44:1, 122:16
**substantial** [14] - 7:20, 7:21, 7:23, 7:24, 8:2, 27:22, 28:3, 34:10, 34:14, 34:16, 34:17, 34:19, 34:20
**substantially** [3] - 13:13, 16:1, 17:7
**substantive** [2] - 110:3, 110:6
**sufficient** [2] - 55:15, 80:5
**suggesting** [1] - 91:25
**suggestion** [1] - 73:21
**Suisse** [5] - 83:6, 83:9, 95:22, 96:20
**sum** [1] - 43:23
**summaries** [1] - 58:7
**summarize** [4] - 26:17, 59:17, 65:6, 74:19
**summarized** [2] - 49:12, 50:3
**summarizes** [1] -

87:14
**summary** [10] - 63:2, 87:11, 87:13, 109:1, 109:2, 109:16, 110:21, 110:22, 111:6
**supply** [1] - 83:2
**support** [7] - 23:7, 77:25, 78:1, 81:7, 90:22, 91:10, 103:15
**supported** [2] - 27:16, 60:2
**supporting** [1] - 24:16
**supports** [1] - 91:12
**suppose** [1] - 121:1
**surprising** [1] - 58:8
**surveys** [1] - 64:21
**Susan** [2] - 85:15, 108:17
**sustain** [1] - 117:22
**sustained** [6] - 46:23, 91:4, 92:16, 105:14, 107:25, 111:3
**sustaining** [1] - 107:16
**swamped** [1] - 11:19
**sweep** [32] - 28:5, 30:9, 50:5, 50:14, 51:2, 51:12, 52:20, 53:1, 53:11, 53:20, 54:1, 63:1, 63:11, 64:18, 65:10, 65:12, 75:8, 77:2, 82:4, 90:19, 92:18, 101:18, 103:4, 103:18, 117:17, 117:20, 117:24, 122:18, 122:21, 122:22, 122:23, 123:5
**sworn** [3] - 5:12, 112:15
**system** [7] - 12:24, 14:6, 14:9, 14:25, 15:25, 24:18, 25:4
**systematic** [1] - 85:10
**systematically** [1] - 16:11

**T**

**T-h-a-k-o-r** [1] - 5:11
**table** [1] - 123:25
**tables** [1] - 110:22
**talks** [1] - 63:18
**tangible** [1] - 21:18
**tapped** [1] - 26:13
**taught** [1] - 12:14
**tax** [11] - 44:12, 50:24, 51:1, 66:3, 66:24,

67:2, 67:3, 67:5, 69:19, 70:8
**taxes** [4] - 43:24, 44:21, 44:22, 71:19
**taxpayers** [1] - 19:13
**technically** [1] - 67:20
**temporary** [1] - 54:4
**ten** [3] - 26:11, 53:1, 123:13
**ten-year** [1] - 26:11
**tender** [2] - 28:24, 75:18
**term** [4] - 7:22, 17:10, 54:6, 103:17
**terms** [53] - 6:14, 8:2, 8:11, 8:13, 8:14, 11:2, 11:14, 13:9, 13:13, 13:14, 14:11, 14:18, 16:1, 16:2, 16:3, 17:2, 17:7, 18:4, 18:5, 18:8, 18:10, 18:16, 18:20, 19:12, 20:6, 20:19, 27:7, 27:10, 37:1, 37:15, 45:22, 45:23, 52:19, 53:6, 58:11, 59:7, 61:17, 61:20, 63:15, 63:25, 65:17, 69:2, 72:20, 74:17, 84:1, 89:3, 99:1, 99:9, 103:15, 104:15
**testified** [20] - 5:18, 10:22, 29:8, 33:3, 33:14, 34:17, 34:24, 44:10, 44:21, 47:6, 48:20, 59:18, 73:15, 76:20, 80:21, 82:7, 87:22, 89:8, 94:8, 95:2
**testifying** [2] - 68:18, 88:24
**testimony** [47] - 5:20, 5:23, 5:24, 6:1, 8:20, 9:15, 25:12, 33:13, 38:4, 39:23, 40:6, 40:17, 41:4, 44:13, 45:16, 46:7, 46:13, 46:15, 48:11, 49:9, 49:11, 50:1, 52:9, 52:11, 52:13, 52:23, 53:17, 54:22, 58:14, 58:15, 59:5, 68:16, 70:21, 70:24, 71:5, 75:6, 76:24, 88:19, 102:4, 105:13, 105:21, 107:9, 112:15, 119:22, 120:8, 120:11, 121:9
**Thakor** [23] - 3:4, 4:15, 5:8, 5:11, 5:17, 10:6,

21:2, 23:13, 23:25, 27:20, 28:19, 29:3, 29:8, 32:16, 32:23, 34:13, 35:25, 36:17, 40:5, 40:18, 41:13, 42:20, 56:23
**Thakor's** [3] - 33:18, 39:2, 42:8
**themselves** [2] - 117:19, 118:3
**therefore** [3] - 31:24, 51:10, 120:14
**they've** [4] - 22:18, 30:13, 88:25, 111:25
**thinks** [1] - 57:20
**third** [26] - 29:15, 29:18, 29:20, 49:16, 49:25, 50:4, 50:8, 54:22, 56:1, 56:4, 63:3, 65:1, 67:8, 68:17, 72:7, 72:10, 73:1, 87:25, 89:12, 90:17, 90:18, 92:5, 102:1, 117:16, 120:4
**thirdly** [1] - 59:2
**thousand** [2] - 60:23, 61:2
**three** [8] - 17:22, 50:2, 57:8, 102:8, 102:24, 104:24, 125:14, 125:15
**throughout** [5] - 36:2, 47:18, 64:3, 101:1, 122:13
**timing** [1] - 84:15
**tipping** [1] - 68:3
**today** [6] - 15:15, 25:7, 75:7, 75:10, 100:11, 124:13
**today's** [1] - 66:9
**together** [9] - 10:3, 16:16, 36:13, 47:23, 58:20, 69:8, 85:9, 109:7, 126:16
**tomorrow** [6] - 104:3, 104:8, 104:12, 124:13, 126:25, 127:3
**tonight** [2] - 112:22, 113:7
**took** [4] - 7:12, 23:8, 26:22, 35:13
**top** [7] - 13:21, 13:24, 14:23, 27:2, 33:17, 42:12, 102:8
**top-off** [3] - 13:21, 13:24, 14:23
**topic** [1] - 76:19
**total** [3] - 13:2, 21:17, 94:4

**toward** [1] - 77:23
**trade** [1] - 104:25
**trading** [3] - 65:1, 65:10, 102:15
**traditionally** [1] - 85:2
**training** [1] - 58:21
**transcript** [6] - 38:13, 82:15, 111:16, 114:2, 114:13, 114:16
**transmit** [1] - 122:6
**Treasury** [82] - 6:14, 7:12, 8:18, 9:22, 9:25, 11:18, 12:24, 13:1, 13:8, 14:7, 14:8, 14:20, 15:11, 15:12, 15:20, 17:8, 17:21, 18:25, 19:5, 19:13, 22:19, 22:20, 22:21, 24:15, 24:18, 24:21, 26:2, 26:5, 26:8, 26:11, 27:5, 28:10, 28:16, 29:10, 29:19, 29:21, 29:24, 30:1, 30:5, 30:15, 30:18, 31:8, 31:21, 32:7, 32:10, 36:1, 36:2, 36:9, 36:13, 36:18, 36:20, 38:7, 38:8, 39:20, 40:21, 50:17, 51:15, 53:24, 54:15, 55:19, 55:23, 62:2, 62:3, 63:21, 63:22, 77:12, 79:23, 81:7, 81:11, 81:22, 82:3, 83:7, 87:7, 90:20, 90:22, 100:25, 106:2, 106:11, 106:18, 106:20, 106:22
**Treasury's** [6] - 8:14, 10:17, 19:2, 20:4, 22:16, 30:23
**trends** [2] - 86:13, 94:18
**trial** [21] - 7:2, 30:8, 46:13, 46:16, 47:18, 47:21, 52:13, 60:6, 82:14, 110:6, 113:18, 114:16, 115:10, 117:14, 121:8, 122:13, 122:15, 122:20, 123:22, 124:1, 124:4
**tried** [2] - 49:10, 50:2
**trillion** [1] - 22:19
**true** [3] - 11:11, 21:21, 22:8
**truly** [1] - 114:1
**Trump** [2] - 126:4,

126:6
**truth** [1] - 30:25
**truthful** [2] - 39:22, 41:4
**try** [8] - 35:20, 66:10, 76:18, 76:19, 76:21, 113:17, 123:21, 125:24
**turn** [4] - 78:5, 85:17, 86:23, 113:3
**turnaround** [7] - 80:23, 81:9, 82:8, 82:11, 82:23, 83:3
**turned** [3] - 58:10, 58:12, 66:19
**tweet** [1] - 104:11
**Twitter** [1] - 104:11
**two** [33] - 10:12, 17:5, 17:11, 18:6, 31:17, 48:19, 49:24, 52:22, 52:23, 55:1, 59:8, 59:11, 59:25, 63:25, 65:9, 76:7, 79:2, 79:24, 80:11, 92:9, 97:9, 102:8, 106:4, 115:1, 115:4, 118:17, 121:2, 124:20, 124:22, 125:17, 125:19, 125:24
**type** [2] - 61:25, 64:19
**types** [1] - 54:4
**typical** [1] - 50:23
**typically** [1] - 7:8

**U**

**U.S** [10] - 8:14, 8:18, 14:5, 17:21, 24:20, 26:10, 63:23, 74:4, 85:1, 100:25
**Ugoletti** [1] - 120:5
**unaffiliated** [1] - 96:13
**uncertainties** [3] - 70:6, 93:17, 93:21
**uncertainty** [12] - 58:1, 86:1, 86:5, 86:11, 86:12, 86:18, 87:3, 87:9, 87:13, 87:15, 87:16, 87:19
**under** [14] - 5:13, 11:15, 11:22, 13:6, 47:7, 51:2, 55:23, 68:8, 78:12, 92:18, 103:16, 113:24, 117:10, 117:22
**underlying** [2] - 60:1, 110:24
**understood** [3] - 107:21, 108:1,

111:10
**underwriters** [1] - 96:14
**undisputed** [2] - 32:6, 32:17
**undrawn** [6] - 22:17, 29:9, 30:11, 30:15, 30:20, 41:19
**unemployment** [4] - 85:8, 86:15, 87:5, 87:20
**uniform** [7] - 61:10, 76:21, 87:23, 89:10, 89:14, 89:18, 100:20
**uniformity** [1] - 90:2
**uninsured** [1] - 21:13
**unless** [2] - 124:15, 125:21
**unlimited** [4] - 30:5, 30:16, 79:1, 90:22
**unopposed** [1] - 104:14
**unquote** [1] - 100:14
**untimely** [2] - 117:22, 117:23
**untrue** [1] - 29:13
**up** [93] - 4:15, 6:9, 6:16, 8:6, 17:2, 18:18, 22:5, 23:14, 26:8, 27:10, 27:16, 27:25, 32:2, 33:9, 34:22, 38:13, 39:12, 40:3, 40:12, 41:10, 41:20, 42:6, 42:15, 44:5, 44:19, 45:2, 46:15, 50:18, 50:24, 51:1, 51:3, 53:2, 54:3, 54:9, 54:17, 59:12, 59:23, 61:1, 62:15, 63:13, 64:7, 67:11, 67:17, 67:19, 67:21, 67:23, 69:1, 69:3, 69:11, 70:17, 71:9, 71:18, 72:1, 73:12, 77:15, 78:11, 79:20, 81:2, 82:15, 82:22, 82:25, 83:20, 84:9, 85:1, 85:2, 85:14, 86:8, 86:24, 90:16, 91:6, 93:3, 95:25, 96:24, 97:24, 98:21, 98:22, 99:21, 100:10, 101:9, 102:19, 105:18, 107:13, 108:20, 112:1, 118:25, 120:15, 120:18, 121:22
**upcoming** [2] - 102:11, 102:16

**updated** [4] - 73:1, 73:3, 73:7, 126:16
**upper** [1] - 28:12
**ups** [5] - 57:10, 58:24, 65:20, 65:23, 66:16
**useful** [3] - 9:21, 9:24, 19:12
**usefulness** [2] - 9:6, 9:19
**useless** [1] - 9:12
**uses** [2] - 18:25, 21:2

## V

**vague** [1] - 7:22
**valuation** [2] - 67:21, 70:9
**value** [8] - 25:15, 27:15, 31:16, 37:10, 37:13, 37:23, 41:14, 67:1
**varieties** [1] - 61:19
**variety** [1] - 61:14
**various** [2] - 58:13, 96:12
**vary** [1] - 86:16
**vault** [2] - 66:21, 66:22
**verb** [1] - 122:25
**verbatim** [2] - 52:13, 117:11
**verdict** [2] - 117:15, 117:24
**version** [4] - 17:25, 108:18, 108:19, 126:16
**versus** [3] - 10:21, 11:24, 18:23
**video** [1] - 83:13
**view** [4] - 60:15, 81:10, 91:16, 105:15
**viewed** [1] - 15:23
**viewing** [1] - 49:8
**views** [3] - 57:25, 79:11, 79:14
**violation** [1] - 15:17
**Virginia** [1] - 117:11
**virtually** [1] - 91:10
**visible** [1] - 84:10
**visual** [1] - 83:17
**vitae** [1] - 15:3
**voice** [1] - 5:9
**volume** [3] - 24:1, 25:6, 109:19

## W

**wait** [1] - 113:3
**waived** [3] - 36:2, 36:5, 36:6
**waives** [1] - 126:6

**walk** [2] - 26:17, 59:16
**walked** [1] - 59:18
**wants** [2] - 44:2, 122:9
**watch** [2] - 81:15, 97:19
**watt** [1] - 122:14
**Watt/Calabria** [1] - 123:13
**weakness** [1] - 87:5
**weather** [1] - 79:3
**weekly** [3] - 65:4, 65:5
**weeks** [2] - 65:6, 126:15
**Welcome** [1] - 5:8
**well-know** [1] - 102:24
**whereas** [1] - 23:10
**whereby** [1] - 120:1
**whole** [4] - 21:22, 22:18, 23:12, 73:24
**widely** [1] - 84:16
**willing** [2] - 117:23, 125:14
**withdraw** [5] - 20:1, 105:1, 105:2, 114:17, 118:10
**Witness** [2] - 42:24, 103:22
**witness** [9] - 4:21, 28:24, 40:3, 42:23, 47:2, 88:17, 89:4, 112:5, 112:14
**Witnesses** [1] - 3:3
**word** [1] - 50:11
**wording** [2] - 116:22, 117:18
**words** [3] - 27:22, 28:6, 122:3
**world** [2] - 14:12, 123:5
**worried** [1] - 64:5
**worries** [3] - 63:5, 78:6, 91:16
**worry** [1] - 91:21
**worth** [47] - 28:2, 28:4, 30:9, 30:24, 50:5, 50:14, 50:21, 50:23, 51:2, 51:12, 52:20, 52:25, 53:1, 53:11, 53:20, 53:23, 54:1, 55:16, 55:22, 56:12, 56:16, 58:18, 63:1, 63:8, 63:11, 64:18, 65:10, 65:12, 75:7, 77:2, 82:4, 90:18, 92:18, 99:12, 101:18, 103:4, 103:18, 117:17, 117:20, 117:24, 122:17, 122:21, 122:22, 122:23,

123:5, 125:21
**would've** [1] - 38:9
**write** [21] - 54:8, 54:9, 54:12, 54:15, 57:9, 57:10, 58:24, 65:19, 65:20, 65:23, 66:2, 66:7, 66:13, 66:16, 67:17, 67:19, 67:21, 67:23
**write-down** [5] - 54:8, 54:12, 54:15, 66:2, 66:13
**write-downs** [5] - 57:9, 58:24, 65:19, 65:23, 66:16
**write-up** [3] - 54:9, 67:21, 67:23
**write-ups** [5] - 57:10, 58:24, 65:20, 65:23, 66:16
**writing** [2] - 50:24, 51:1
**written** [5] - 14:10, 15:4, 66:4, 114:13, 115:12
**wrote** [4] - 66:19, 67:3, 67:7, 106:24

## Y

**y'all** [7] - 5:6, 104:12, 110:18, 114:20, 119:15, 126:11, 127:3
**YE** [1] - 91:11
**year** [12] - 26:11, 33:20, 34:7, 34:14, 46:18, 64:3, 70:12, 71:18, 72:19, 79:1, 85:2, 91:12
**year-end** [1] - 91:12
**years** [6] - 17:5, 17:11, 71:16, 121:18, 122:18
**yesterday** [5] - 105:13, 105:21, 107:21, 119:23, 120:18
**yield** [13] - 63:20, 63:21, 64:1, 64:2, 64:7, 64:8, 84:5, 91:23, 100:23, 100:24
**yielded** [3] - 8:25, 9:7, 37:23
**yields** [3] - 10:22, 10:23, 10:24
**York** [1] - 17:4

## Z

**zero** [11] - 8:25, 9:7, 25:11, 39:2, 39:6, 39:9, 39:11, 39:17, 45:1, 45:3, 53:24