**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., *et al*., | |
| Plaintiffs, | |
| v. | Case No. 1:13-cv-1053 (RCL) |
| FEDERAL HOUSING FINANCE AGENCY, *et al.*, | |
| Defendants. | |
| In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations | |
| _____ | Case No. 1:13-mc-1288 (RCL) |
| This document relates to: ALL CASES | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR ENTRY OF FINAL JUDGMENT AND PLAN OF ALLOCATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION .....................................................................................................................1

PROCEDURAL BACKGROUND..............................................................................................3

ARGUMENT ..........................................................................................................................5

I.      The Portion of the Verdict Attributable to Opted-Out Shares Must Be
        Deducted from the Total Amount To Be Distributed to Class Members ...........................5

II.     Plaintiffs' Proposed Plan Would Improperly Pay Damages to Holders of
        Shares That Were Opted Out of the Classes......................................................................9

III.    Any Unclaimed Funds Must Revert to Defendants in Lieu of a Cy Pres Fund................17

CONCLUSION.......................................................................................................................21

## <u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Allapattah Servs., Inc. v. Exxon Corp.*,
  157 F. Supp. 2d 1291 (S.D. Fla. 2001) ...............................................................5, 6

*In re Am. Online, Inc. Version 5.0 Software Litig.*,
  No. 00–1341, 2003 WL 27167779 (S.D. Fla. Jan. 29, 2003) ................................19

*Amchem Prods, Inc. v. Windsor*,
  521 U.S. 591 (1997).............................................................................................5, 10

*Augustin v. Jablonsky*,
  819 F. Supp. 2d 153 (E.D.N.Y. 2011) .....................................................................19

*In re BankAmerica Corp. Sec. Litig.*,
  775 F.3d 1060 (8th Cir. 2015) ..........................................................................17, 19

*Boeing Co. v. Van Germert*,
  444 U.S. 472 (1980)..................................................................................................18

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015)........................................................................................15

*Brockenbrough's Ex'x v. Brockenbrough's Adm'r*,
  72 Va. 580 (1879) .....................................................................................................12

*Broussard v. Meineke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) .....................................................................................5

*Cheatham I.R.A. v. Huntington Nat'l Bank*,
  137 N.E.3d 45 (Ohio 2019).......................................................................................12

*Diamond Chem. Co. v. Akzo Nobel Chemicals B.V.*,
  517 F. Supp. 2d 212 (D.D.C. 2007) ....................................................................18, 21

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  636 F. Supp. 3d 144 (D.D.C. 2022) ..........................................................................12

*Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*,
  No. CV 13-1053, 2018 WL 4680197 (D.D.C. Sept. 28, 2018) .........................11, 12

*In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class
  Action Litigations*,
  No. 1:13-MC-1288, 2021 WL 5799379 (D.D.C. Dec. 7, 2021)...............................11

*Friedman v. Lansdale Parking Auth'y*,
    No. 92-7257, 1995 U.S. Dist. LEXIS 4003 (E.D. Pa. Mar. 30, 1995)..............................18, 20

*Fringer v. Kersey Homes, Inc.*,
    C.A. No. 9780, 2018 WL 3107961 (Del. Ch. June 25, 2018) .................................................12

*FTC v. Figgie Int'l, Inc.*,
    994 F.2d 595 (9th Cir. 1993) .................................................................................................19

*Gasperini v. Ctr. for Humanities, Inc.*,
    518 U.S. 415 (1996)...............................................................................................................8

*Greenhaw v. Lubbock Cnty. Beverage Ass'n*,
    721 F.2d 1019 (5th Cir. 1983) ............................................................................................6, 9

*Hickory Sec. Ltd. v. Republic of Argentina*,
    493 F. App'x 156 (2d Cir. 2012) ........................................................................................6, 9

*Klier v. Elf Atochem N. Am., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ...............................................................................................18

*Krakauer v. Dish Network, LLC*,
    No. 1:14-CV-333, 2017 WL 3206324 (M.D.N.C. July 27, 2017).........................................16

*In re Lidoderm Antitrust Litig.*,
    No. 14-md-02521, 2017 WL 679367 (N.D. Cal. Feb. 21, 2017)............................................6

*Marek v. Lane*,
    571 U.S. 1003, 134 S. Ct. 8 (2013).....................................................................................18

*Marshall v. Honeywell Tech. Sys., Inc.*,
    73 F. Supp. 3d 5 (D.D.C. 2014) ...........................................................................................14

*Mitchell v. Hawley*,
    83 U.S. 544 (1872)................................................................................................................13

*Moses v. Howard Univ. Hosp.*,
    606 F.3d 789 (D.C. Cir. 2010) .............................................................................................14

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..............................................................................................................14

*Patterson v. Gardner*,
    No. CL22-10435, 2023 Va. Cir. LEXIS 225 (Va. Cir. Nov. 21, 2023)..................................12

*\*Seijas v. Republic of Argentina*,
    606 F.3d 53 (2d Cir. 2010).................................................................................................5, 6

*Simon v. Republic of Hungary*,
  77 F.4th 1077 (D.C. Cir. 2023) .................................................................................14

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ...................................................................17, 18, 21

*Tyler v. Hennepin Cnty., Minnesota*,
  598 U.S. 631 (2023) ...............................................................................................9, 21

*United States v. Slatten*,
  395 F. Supp. 3d 45 (D.D.C. 2019) ......................................................................14, 15

*In re Urethane Antitrust Litigation*,
  No. 04–1616, 2013 WL 3879264 (D. Kan. July 26, 2013) ........................................9

*Valentino v. U.S. Postal Serv.*,
  674 F.2d 56 (D.C. Cir. 1982) ....................................................................................16

*Van Gemert v. Boeing Co.*,
  739 F.2d 730 (2d Cir.1984)...................................................................................17, 18

*Willcox v. Lloyds TSB Bank, plc*,
  No. 13-00508, 2017 WL 487018 (D. Haw. Feb. 6, 2017) ........................................19

*\*Wilson v. Southwest Airlines, Inc.*,
  880 F.2d 807 (5th Cir. 1989) .............................................................................17, 18, 19

*\*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*,
  No. 06-0620, 2020 WL 5211035 (E.D. Pa. Sept. 1, 2020) ................................12, 13

**Statutes**

12 U.S.C. § 1451 .................................................................................................................20

12 U.S.C. § 1716 .................................................................................................................20

12 U.S.C. § 4501 .................................................................................................................20

28 U.S.C. § 2072(b) .............................................................................................................5

**Rules**

Fed. R. Civ. P. 23(c)(2)(B) ...............................................................................................10

**Other Authorities**

S. Rep. No. 102-282 (1992) ...............................................................................................20

29 Williston on Contracts § 74:56 (4th ed. 1999).............................................................13

## INTRODUCTION

Plaintiffs' proposed Plan of Allocation (the "Proposed Plan" or "Plan") suffers from manifest defects—defects that Defendants highlighted to Plaintiffs during the meet-and-confer process, but Plaintiffs failed to address. Instead, Plaintiffs urge the Court to adopt a flawed plan where class members would receive damages attributable to Enterprise shares that were validly opted out of the classes, while at the same time some shareholders who opted out could nonetheless receive damages that were awarded to the classes. The Proposed Plan is inconsistent with the Rules Enabling Act, blackletter class action law, and Plaintiffs' core theory of this case.

*First*, Plaintiffs' Proposed Plan would distribute to class members the portion of the jury's damages award that was based on harm to shareholders who opted out of the classes. The jury undeniably awarded damages based on the total number of outstanding shares for each category of stock, including shares owned by opt-outs. Yet, under the Proposed Plan, the jury's entire award would be distributed to class members and the Berkley Plaintiffs, with no accounting for the fact that a portion of that award is attributable to non-Berkley opt-outs. As explained below, forcing Defendants to pay damages based on harm to opt-outs abridges Defendants' substantive rights and violates the Rules Enabling Act. In a footnote, Plaintiffs all but admit as much: they invite the Court to make a "reduction in the judgment by the aggregate amount allocable to the shares" held by non-Berkey opt-outs at the time they filed their exclusion notices. Mot. at 12 n.4. The Court should order the appropriate reduction. Correcting this obviously improper component of the Proposed Plan, however, still leaves other fundamental defects that cannot be ignored.

*Second*, even if the overall damages award is reduced by an amount attributable to opt-outs, the Proposed Plan still suffers from another critical problem: It would authorize distributions to holders of shares that were validly opted out of the classes but then sold again

after the opt-out deadline.  Under the Proposed Plan, if a shareholder validly opted out, the shares they listed on their exclusion notice are identified and excluded from payment so long as that same shareholder still holds them on the date of "final judgment" as set forth in the class definitions.  But if that opt-out shareholder has sold the shares (or sells them between now and the date of final judgment), then those same shares become part of the classes again and receive a distribution as part of the class recovery.  That is contrary to the common law principle that a person can only sell what she owns.  In other words, an assignor (here, the opt out) cannot assign more rights than they have.  Rather, the purchasers of opted-out shares stand in the assignor's shoes; they have the right to bring an individual opt-out lawsuit, but not the right to share in damages awarded to the classes.

*Third*, Plaintiffs' Proposed Plan seeks to distribute unclaimed funds to an unidentified charity through a *cy pres* distribution in lieu of reversion to the Defendants.  But members of the Supreme Court have questioned the lawfulness of *cy pres.*  In any event, the equities here favor reverting any unclaimed funds to the Enterprises.  Courts repeatedly have held that reversion is appropriate where, as here, the classes' claims are compensatory in nature.  Reversion is particularly appropriate here because it aligns with the interests of absent class members, who hold stock in the Enterprises and thus would directly benefit from returning any unclaimed funds to the Enterprises.  Reversion also is in the public interest because the Enterprises, and FHFA's conservatorship, are designed to further important public purposes and missions, including stabilizing the mortgage loan industry and supporting affordable housing.

Unable to defend these improper components of their Plan, Plaintiffs rely mostly on procedural and waiver arguments.  Those arguments are incorrect and, in any case, cannot justify this Court's approval of a plan of allocation that is legally improper in multiple ways.

## PROCEDURAL BACKGROUND

On October 24, 2023, the Court directed the parties to submit "a proposed order of final judgment."  ECF No. 402, at 2.[1]  On November 17, 2023, the parties filed a joint statement setting forth their respective positions regarding the entry of final judgment.  *See* ECF No. 408. Defendants explained that any judgment would not be final or appealable unless it included a Court-approved plan of allocation, which Plaintiffs at that time had not yet proposed.  *See id.* at 4-6.  Plaintiffs argued that the Court could and should enter a final judgment without considering or approving any plan of allocation.  *See id.* at 8.

On December 5, 2023, this Court denied Plaintiffs' request to enter final judgment.  *See* ECF 409.  Agreeing with Defendants, the Court "conclude[d] that a judgment in this case cannot be final and appealable unless the Court has approved a plan of allocation."  *Id.* at 1.  The Court accordingly directed the parties to submit a written report regarding Plaintiffs' proposed plan of allocation by December 21, 2023.  *See id.*  Plaintiffs provided Defendants with a proposed plan of allocation and proposed judgment on December 19, and on December 21, the parties submitted a joint statement.  *See* Mot. at 5.  On December 22, the Court entered a schedule for further meet-and-confer discussions and for briefing the parties' disputes, *see* ECF No. 412, which it later extended at the joint request of the parties, ECF No. 414.

The parties engaged in further meet-and-confer discussions but were unable to reach agreement on the Proposed Plan.  On January 22, 2024, Plaintiffs submitted their Proposed Plan. The Plan proposes the appointment of an administrator and a distribution mechanism that essentially seeks to provide class members a "proportional share" of the jury's damages award, minus attorneys' fees and various expenses.

---

[1] "ECF No." refers to Case No. 1:13–mc–1288–RCL.

The Proposed Plan includes several components at issue here.  *First*, the Plan would pay out the entire damages award to class members without any accounting for the portion of the award attributable to Enterprise shares that were validly opted out of the classes.  Ex. B, ECF 415-2, at 7 (showing formulas for allocating damages to the class).

*Second*, the Plan provides that some opted-out shares should be excluded from the class recovery, but not others.  The Plan defines an "Opt-out" as "a shareholder, other than one or more of the WR Berkley Plaintiffs, that submitted a timely, complete, and accurate request for exclusion from the relevant Class(es) in accordance with the instructions set forth in the Notice of Class Action, and which included an identification of Specified Shares."  *Id.* at 3-4.  The Plan defines "Specified Shares," in turn, to mean "the shares of Fannie Mae Junior Preferred Stock, Freddie Mac Junior Preferred Stock, and/or Freddie Mac Common Stock identified in the 'Exclusion Report' dated May 13, 2022."  *Id.* at 4.  The Plan further defines "Held Specified Shares" to mean "Specified Shares still held by Opt-outs at the time of distribution."  *Id.*  The Plan provides that *only* "Held Specified Shares" are excluded from the class recovery.  *Id.* at 5-6, 8-9.  The Plan thus simultaneously provides that opt-outs may participate in the class recovery to the extent the opt-outs hold "Additional Shares" in addition to the shares identified in their opt-out notice *and* that any shareholder that purchases "Specified Shares" that were opted-out may also share in the class recovery.  *Id.* at 9.

*Finally*, the Plan provides that in the event there are "any undistributed funds" "such funds shall be distributed to a *cy pres* fund for the benefit of an affordable housing fund, for such subsequent distribution as the Court may later direct."  *Id.*

**ARGUMENT**

**I.     The Portion of the Verdict Attributable to Opted-Out Shares Must Be Deducted from the Total Amount To Be Distributed to Class Members**

Plaintiffs' Proposed Plan would improperly pay the entirety of the damages award to class members and the Berkley Plaintiffs without any accounting for the portion of that award attributable to shares that were validly opted out of the classes by shareholders other than the Berkley Plaintiffs.  Thus, Defendants would be forced to pay class members for harm that the jury found was suffered by opt-outs.  This violates baseline principles of class actions.  Indeed, in a footnote, Plaintiffs essentially invite the Court to correct this flaw by deducting the amount of the verdict attributable to opt outs and distributing only the remainder to class members.  Mot. at 12 n.4.  The Court should do so, although, as discussed below, correcting this flaw does not resolve the Plan's other defects.

Under the Rules Enabling Act, the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right."  28 U.S.C. § 2072(b).  Accordingly, "[i]t is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members."  *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998); *see Amchem Prods, Inc. v. Windsor,* 521 U.S. 591, 613 (1997) (similar).  When proceeding via a class action, class members may not recover damages greater than they would be entitled to recover through separate individual actions.

If a factfinder awards "gross damages for … the class[] as a whole," the district court must "us[e] appropriate procedures to ensure that the damages awards roughly reflect the aggregate amount owed to class members."  *Seijas v. Republic of Argentina*, 606 F.3d 53, 58-59 (2d Cir. 2010).  "[O]nce all class members … are made whole, the compensatory purpose of any damage award has been completely satisfied."  *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F.

Supp. 2d 1291, 1306 (S.D. Fla. 2001), *aff'd*, 333 F.3d 1248 (11th Cir. 2003), *aff'd sub nom.*

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).  "To the extent that any

aggregate award exceeds the total amount of such damages," it "would thereby violate [the

defendant]'s substantive rights … and would be contrary to the Rules Enabling Act."  *Id.*

      Courts employ a "variety of tools" to ensure that aggregate awards do not

overcompensate class members, *Seijas*, 606 F.3d at 59, including "revis[ing] aggregate damages

awards" to "deduct[]" amounts attributable to "parties who had opted out," *Hickory Sec. Ltd. v.*

*Republic of Argentina*, 493 F. App'x 156, 158 (2d Cir. 2012).  *See also, e.g.*, *Greenhaw v.*

*Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1026-27 (5th Cir. 1983) (holding that, when

awarding damages to individual class members, the district court "correctly" accounted for the

fact that the jury's prior aggregate damages finding had included opt-outs), *overruled on other*

*grounds by Int'l Woodworkers of Am., AFL-CIO & its Loc. No. 5-376 v. Champion Int'l Corp.*,

790 F.2d 1174 (5th Cir. 1986); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521, 2017 WL

679367, at *12 (N.D. Cal. Feb. 21, 2017) ("If further analysis or refinement of who is in the class

and what purchases are relevant to the aggregate damages determination is necessary—because it

becomes clear that some proposed … class members were not injured or they decide [to] opt

out—that can be readily managed.").

      Here, a portion of the jury's aggregate damages award indisputably is attributable to

Enterprise shares that were validly opted out of the classes.  At trial, Plaintiffs presented

evidence, and the jury found damages, based on losses experienced by *all* shareholders—100%

of the relevant Enterprise shares, including shares held by opt outs.  The only damages evidence

Plaintiffs presented was testimony from their expert Dr. Mason regarding an event study

performed by Defendants' expert Dr. Attari.  *See* Trial II Tr. (excerpts attached as **Exhibit A**) at

748:18-23, 750:16-52:8.  The event study did not exclude, deduct, or account for shares held by opt-outs, which were unknown at the time it was created.  *See* PX-497-3 (attached as **Exhibit B**) (data on the number of outstanding shares used in the event study); Trial II Tr. (Ex. A) at 753:17-754:12 (Dr. Mason referring to PX-497-3 as part of "the guts of the model" that produced the results "summarized in PX-375").  Dr. Mason, who did know the number of shares that were held by opt-outs, likewise made no attempt to account for opt-outs; indeed, he never mentioned them.  At no point did the jury hear *any* evidence about opt-outs, let alone how opt-outs should affect the award of damages.  The jury instructions and verdict form likewise addressed *all* current shareholders without addressing opt-outs.  ECF No. 383 ("Final Jury Instr."), at 7; ECF No. 392 ("Verdict Form"), at 2.

Plaintiffs do not suggest that the jury already accounted for the existence of opt-outs when awarding aggregate damages.  Yet Plaintiffs' Proposed Plan nevertheless would distribute the *entire* aggregate amounts found by the jury, without accounting for the fact that a portion of those aggregate amounts are attributable to the one-day loss of market value of *opted-out* shares.  *See* Mot. at 10-12.  In other words, Plaintiffs' Plan of Allocation would distribute damages to class members based on harm suffered by shareholders who are *not* class members.  That is an abridgement of Defendants' substantive rights and an enlargement of Plaintiffs' rights—a textbook violation of the Rules Enabling Act.

The Court can correct this obvious defect in Plaintiffs' Proposed Plan—as Plaintiffs themselves suggest—by simply setting the judgment amount for each class as the damages amount found by the jury less the amount attributable to opt-outs.  *See* Mot. at 12 n.4 (offering proposed language).  Plaintiffs cannot reasonably object to this approach.  For one thing, it is consistent with how their Proposed Plan already treats the shares owned by the Berkley

Plaintiffs; the Berkley Plaintiffs are opt-outs, and under the Proposed Plan, the pro rata portion of the jury's damages award attributable to the Berkley Plaintiffs' opted-out shares will be paid to the Berkley Plaintiffs directly, not to the classes.  *See* Ex. B, ECF No. 415-2, at 9-10.

What's more, Plaintiffs all but invite the Court to enter a judgment that is reduced by the amount of damages associated with the non-Berkley shares that were opted out.  *See* Mot. at 12 n.4.[2]  While Plaintiffs argue that the amount of money at stake is small relative to Defendants' total liability, that amount—roughly $200,000 by Plaintiffs' estimation—is far from trivial in absolute terms.  *See id.* at 11-12.  And Plaintiffs offer no basis for this Court to approve a Plan of Allocation that would give class members improper additional payments  merely because, in their view, such payment is "*de minimis.*"  *Id.* at 10 n.2.

Plaintiffs also contend that now is the wrong time to litigate this issue.  On the one hand, Plaintiffs assert that Defendants have objected too *early*—in Plaintiffs words, this is "a topic more properly the subject of a remittitur motion than an objection to the Plan of Allocation."  *Id.* at 12 n.4.  On the other hand, Plaintiffs also assert that Defendants have objected too *late*—in Plaintiffs' words, because Defendants "failed to raise the issue either before or at trial," it is "waived."  *Id.* at 11.  In addition to being contradictory, those assertions are wrong.  This is not a remittitur argument.  Defendants are not contending that the jury's aggregate damages award was "excessive."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996).  The point is that the Plan of Allocation must account for the existence of opt-outs, distributing damages to class members based solely on class members' *own* losses, not those of *non*-class members.

---

[2]  During the parties' meet-and-confer discussions, Plaintiffs offered to revise their plan of allocation to deduct the portion of the jury's aggregate damages award attributable to opt-outs, *see* Mot. 11-12 & n.4, but were unwilling to address Defendants' other objections discussed herein.

Nor were Defendants required to raise this issue "before or at trial."  Other courts have adjusted aggregate damages awards to account for opt-outs after a jury trial, *see Greenhaw*, 721 F.2d at 1026-27, or even on remand after an appeal, *see Hickory Sec. Ltd.*, 493 F. App'x at 158. Tellingly, Plaintiffs do not specify when or how Defendants should have raised this issue previously—before Plaintiffs had presented a Proposed Plan that created this problem.  Nor do they identify any prejudice resulting from Defendants raising this issue now.  Plaintiffs cite only one case in support of their waiver argument—*In re Urethane Antitrust Litigation*, No. 04–1616, 2013 WL 3879264 (D. Kan. July 26, 2013), *aff'd*, 768 F.3d 1245 (10th Cir. 2014)—and it is clearly distinguishable.  In contrast to the defendants in *In re Urethane*, Defendants are not arguing "that the jury could not find aggregate damages or that a separate trial was required for an adjudication of individual members' damages."  *Id.* at *1.  Defendants simply contend that the Proposed Plan should distribute damages to class members based on the harm suffered by class members, not opt-outs.

Finally, Plaintiffs' repeated argument that "Defendants lack standing" to object to how the judgment against them is distributed, *e.g.*, Mot. at 1, 2, falls flat.  Whether Defendants must pay the full aggregate verdict or a lesser amount that accounts for opt-outs is not a purely internal matter "among Class members."  *Id.* at 1.  It affects "the total amount for which [Defendants] would be liable," which Plaintiffs *concede* Defendants have standing to challenge.  *Id.* at 13. Requiring Defendants to pay a larger amount to the class would result in a "classic pocketbook injury" to the Defendants.  *Tyler v. Hennepin Cnty., Minnesota*, 598 U.S. 631, 636 (2023).

## II.   Plaintiffs' Proposed Plan Would Improperly Pay Damages to Holders of Shares That Were Opted Out of the Classes

Even if the Court excludes the distribution of any damages attributable to opted-out shares, *see supra* Part I, the Proposed Plan still suffers from another fatal flaw relating to its

treatment of opt outs.  It would allow damages awarded to the classes to be paid to the holders of shares that were opted out by a prior holder, in violation of the baseline principle that a person (here, the prior holder) can only sell what she owns.

Any proper plan of allocation must include a mechanism for identifying and excluding from payment all opted-out shares, thereby limiting distributions only to class members.  That is a foundational principle of the Rule 23(b)(3) class action device.  For any class certified under Rule 23(b)(3), "the court must direct to class members the best notice that is practicable under the circumstances," which "must clearly and concisely state in plain, easily understood language" that "the court will exclude from the class any member who requests exclusion."  Fed. R. Civ. P. 23(c)(2)(B); *see Amchem Prods., Inc.*, 521 U.S. at 614-15 (discussing the necessity of opt-out procedures in class actions under Rule 23(b)(3)).

Here, however, Plaintiffs' Proposed Plan lacks a method to identify and exclude from payment certain shares that were opted out.  In particular, it would allow subsequent purchasers of shares that had been opted out to receive damages awarded to the classes.  *See* Mot. at 15.  For instance, if Person A opted out of the classes and listed 100 Fannie Mae junior preferred shares on their exclusion notice, the Plan identifies those shares and excludes them from payment *only* if they are still owned by Person A on the date of "final judgment" as set out in the class definitions.  By contrast, if Person A sells their opted-out shares at any point between the filing of their exclusion notice and the final judgment date, then those same shares come back into the class and their holder participates in the class recovery as if Person A had never opted out. Plaintiffs do not deny that their Proposed Plan has no method for identifying these opted-out shares, and they do not deny that their Plan would pay a subsequent purchaser of those shares as if their prior holder had never opted out.  That approach is erroneous.

In addition, Plaintiffs' treatment of shares that are *purchased* by opt-outs is at odds with their treatment of shares that are *sold* by opt-outs.  Under Plaintiffs' Plan, if an opt-out *sells* shares that were listed on their exclusion notice, then their decision to opt out does *not* travel with those shares, and thus the purchaser participates in the class recovery as if the seller had never opted out.  But if an opt-out subsequently *buys* shares from a non-opt-out, then the seller's decision *not* to opt out effectively *does* travel with those shares, and thus the purchaser, who opted out, participates in the class recovery.  In other words, under the Plan, a shareholder's decision to opt out does *not* travel with the shares, but a shareholder's decision *not* to opt out effectively *does* travel with the shares.[3]  Plaintiffs do not—and cannot—provide any principled basis for that inconsistency.

In this regard, the Proposed Plan is contrary to Plaintiffs' longstanding argument that their rights in this case "travel with the share"—*i.e.*, that the sale of securities automatically assigns the rights at issue in this case to the buyer.  While Defendants have disagreed with that interpretation, the Court has adopted it.[4]  And if the sale of the security entails an automatic

---

[3] Alternatively, Plaintiffs argue that opt-out status does not travel with the share because it is "personal."  *See* Email from Plaintiffs' counsel to Defendants' counsel, Dec. 29, 2023 (attached as **Exhibit C**); *infra*, pp.13-14.  And yet Plaintiffs maintain that a person who opted out can still participate in the recovery, so long as they buy new shares, notwithstanding the "personal" nature of opting out.  That suggests that Plaintiffs are taking inconsistent positions about the "personal" status of opting out as well.

[4] In its 2018 ruling on Defendants' motion to dismiss, the Court held for the first time that "the bargained-for rights related to dividends and liquidation preferences traveled with the shares to subsequent purchasers."  *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency ("MTD Ruling II")*, No. CV 13-1053, 2018 WL 4680197, at *8 (D.D.C. Sept. 28, 2018).  The Court reiterated the view that the claim here "traveled with the shares" in multiple subsequent orders, even after Plaintiffs' theories had fundamentally changed.  *See In re Fannie Mae/Freddie Mac Senior Preferred Stock Purchase Agreement Class Action Litigations*, No. 1:13-MC-1288, 2021 WL 5799379, at *8 (D.D.C. Dec. 7, 2021) ("[B]ecause the '[r]ights associated with dividends and liquidation preferences inhere in the security,' the Court need not further divide the classes for those who purchased their shares after the Third Amendment." (quoting *MTD Ruling II*, 2018

assignment to the buyer, then that assignment is subject to the longstanding principle that "a man cannot grant a thing which he has not—*nemo dat quod non habet*." *Patterson v. Gardner*, No. CL22-10435, 2023 Va. Cir. LEXIS 225, *9 (Va. Cir. Nov. 21, 2023) (quoting *Brockenbrough's Ex'x v. Brockenbrough's Adm'r*, 72 Va. 580, 592 (1879)); *accord Fringer v. Kersey Homes, Inc.*, C.A. No. 9780, 2018 WL 3107961, at *5 n.88 (Del. Ch. June 25, 2018) (recognizing the general legal rule that "no one gives which he does not possess"). Here, an opt-out has no right to participate in the class recovery, and thus they cannot assign a right to participate in the class recovery. Put differently, if the claim travels with the shares, then the opt-out election must do so as well.

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*, No. 06-0620, 2020 WL 5211035 (E.D. Pa. Sept. 1, 2020), is instructive. There, Company A was a plaintiff in an antitrust class action and expressly assigned its claims to Company B, which filed its own separate opt-out action purportedly as Company A's assignee. *Id.* at *7-*8. Company A, however, had not opted out of the class by the opt-out deadline. The defendants thus "argue[d] that, because [Company A] conveyed its antitrust claims after the deadline to opt out of the class

---

WL 4680197, at *8)); *see also id.* ("Those stockholders that held stock on August 12, 2012, but sold shares thereafter are no longer members of the class and their claims traveled to the purchasers of their shares."); *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency ("MIL Ruling")*, 636 F. Supp. 3d 144, 158 (D.D.C. 2022) ("Because 'the contractual rights [plaintiffs] seek to enforce … inhere in the security, traveling to each subsequent acquirer,' the time that any plaintiff purchased GSE shares is irrelevant." (quoting *MTD Ruling II*, 2018 WL 4680197, at *8)); *accord* Aug. 1, 2023, Minute Entry (denying Rule 50(a) motion at second trial that challenged travel with the share ruling); Oct. 26, 2022, Minute Entry (denying Rule 50(a) and class decertification motion at first trial that challenged travel with the share rulings). Defendants have repeatedly argued that the claim here does not travel with the shares and reserve all rights to challenge any ruling that the claim here does travel with the shares. *See, e.g.*, *Cheatham I.R.A. v. Huntington Nat'l Bank*, 137 N.E.3d 45 (Ohio 2019) (surveying law and holding that breach of contract claims do not automatically travel with the share through sale of the security).

action had passed, [Company B] never had the right" to bring a separate action as an opt-out. *Id.*
at *8. The court agreed and dismissed Company B's lawsuit. The court reasoned that, "[u]nder
the common law principle of *nemo dat quod non habet*, . . . the assignee[] obtains by the transfer
only what its assignor had." *Id.* at *10 (citing 29 Williston on Contracts § 74:56 (4th ed. 1999);
*Mitchell v. Hawley*, 83 U.S. 544, 550 (1872)) (cleaned up)). Thus, "[b]ecause [Company A]
lacked the right to prosecute its own claims outside the class action, . . . [Company B] as
assignee, also lacks the right to do so." *Id.* In other words, when a non-opt-out assigns a claim,
the assigned claim is part of the class and cannot be asserted in a separate individual action.

The corollary is true here. When an opt-out assigns a claim, the assigned claim is *not* part
of the class and can *only* be asserted in a separate individual action. Because shareholders who
opted out of the classes lack the ability to participate in any class recovery, so too do any
purported assignees who purchased the opt-out's shares. If there is a valid assignment, "[i]t is
blackletter law that 'the assignee steps into the shoes of the assignor.'" *Id.* at *11 (quoting
Williston on Contracts § 74:56). As a result, "an assignee's right against the obligor is subject to
all . . . defenses thereto" including "defenses based on where and how the claims may be
prosecuted." *Id.* (internal citation omitted).

Plaintiffs' sole response to this point during the meet-and-confer was to argue that the
relevant rights of the assignor (here, the opt-out) do *not* travel with the share. As Plaintiffs put it:

> *Urdan v. WR Capital Partners*, 244 A.3d 668, 677-80 (Del. 2020), discusses, in
> general terms, the distinction between claims that inhere in the shares (and thus
> travel with the shares) and claims that are personal to the shareholder (and thus do
> not travel with the shares).
>
> As the Delaware Court of Chancery discussed in *In re Activision Blizzard, Inc.
> Stockholder Litig*., 124 A.3d 1025, 1056 (Del. Ch. 2015) regarding a claim for
> securities fraud, which the Court held was a personal claim, "The property
> happens to be shares, but the cause of action is not a property right carried by the
> shares, nor does it arise out of the relationship between the stockholder and the
> corporation." Likewise, the right to opt out "is not a property right carried by the

13

shares, nor does it arise out of the relationship between the stockholder and the corporation.

Ex. C (Email from Plaintiffs' counsel to Defendants' counsel, Dec. 29, 2023).

But this position is contrary to the position Plaintiffs have successfully advanced throughout this case, and thus is barred by judicial estoppel. "Judicial estoppel prevents a party from obtaining an unfair advantage by 'prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.'" *Simon v. Republic of Hungary*, 77 F.4th 1077, 1100 (D.C. Cir. 2023) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)); *accord Moses v. Howard Univ. Hosp.*, 606 F.3d 789, 798 (D.C. Cir. 2010) (similar). "Under this rule, a court may block a party from shifting its position if the positions clearly contradict, if the party successfully persuaded one court to adopt its first position so that flip-flopping creates the perception a court was misled, or if the party would derive an unfair advantage from the change." *United States v. Slatten*, 395 F. Supp. 3d 45, 76 (D.D.C. 2019) (Lamberth, J.); *see also Marshall v. Honeywell Tech. Sys., Inc.*, 73 F. Supp. 3d 5, 9 (D.D.C. 2014) (Lamberth, J.) (holding the facts justified the application of judicial estoppel).

Here, Plaintiffs repeatedly argued that the claims travel with the share when it was to their benefit, including in their opposition to the motion to dismiss, ECF No. 72, at 33-34; in support of class certification, ECF No. 132-1, at 9 & n.4; in opposition to summary judgment, ECF No. 147, at 46; and in support of their motions in limine. *See* ECF No. 176, at 19-21; ECF No. 193, at 17-18. As explained, if the claim travels with the share, then the buyer steps into the seller's shoes and holds what the seller held—no more, no less. But now that that principle would complicate their Plan of Allocation, Plaintiffs maintain that the buyer does *not* step into the seller's shoes, such that a buyer of opted-out shares can participate in the class recovery even

14

when the seller could not.  Plaintiffs should be prohibited from "changing positions according to the exigencies of the moment."  *E.g.*, *Slatten*, 395 F. Supp. 3d at 76.

Indeed, adopting Plaintiffs' approach would call the certification of the classes into question.  In *Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015), for instance, the Second Circuit vacated a judgment in favor of classes made up of current holders of beneficial interests in bonds, in part, because it would run the risk that current holders had purchased bonds from individuals who obtained the bonds from opt-outs.  The court used a hypothetical to illustrate the problem:

> Two bondholders—*A* and *B*—each hold beneficial interests in \$50,000 of bonds. *A* opts out of the class, while *B* remains in the class.  Following a grant of summary judgment on liability, both *A* and *B* then sell their interests on the secondary market to a third party, *C.*  *C* now holds a beneficial interest in \$100,000 of bonds, half inside the class and half outside the class.  If *C* then sells a beneficial interest in \$25,000 of bonds to a fourth party, *D,* the absence of a temporal limitation like the continuous holder requirement ensures that neither the purchaser nor the court can ascertain whether *D'*s beneficial interest falls inside or outside of the class.

*Id.* at 26.  Because there was no way to identify whether the subsequent purchasers held opt-out shares, the Court found the classes "insufficiently definite as a matter of law."  *Id.*  The court further noted that "[e]ven if there were a method by which the beneficial interests could be traced, determining class membership would require the kind of individualized mini-hearings that run contrary to the principle of ascertainability."  *Id.*  Here, as in *Brecher*, Plaintiffs' Proposed Plan would impermissibly allow individuals who purchased securities from opt-outs to participate in the class recovery.  A proper plan of allocation must include a feasible method of excluding such shares from payment.

Finally, Plaintiffs' only other arguments are that defendants "should have objected to the definitions [of the classes] at the class certification stage" and that Defendants lack standing.  Mot. at 10, 14.  Both are specious.  As to waiver, just as the parties' consent is irrelevant to

whether a class may be certified, *see Valentino v. U.S. Postal Serv.*, 674 F.2d 56, 66 n.12 (D.C. Cir. 1982), consent to class certification cannot excuse a defect in a plan of allocation. Moreover, Plaintiffs fail to mention that Defendants *have* objected to these classes: after Plaintiffs fundamentally changed the theory of their case, Defendants moved to decertify the classes. And the proposed stipulation that Plaintiffs reference was never entered, and in any event does not say that opt-outs can participate in a class recovery. *See* ECF No. 133. In any event, that the class definitions "provided for the participation of the 'successors in interest,'" Mot. at 14, says nothing about opt-out rights. A successor in interest to a class member can participate in the class recovery, but a successor in interest to an opt-out cannot. It is Plaintiffs' burden, not Defendants', to propose a plan of allocation that provides a feasible way to exclude opted-out shares from the class recovery.

As to standing, "[a]s a matter of fairness and 'basic due process,' in a class action not resolved by settlement, a defendant who will ultimately pay damages to class members has a right to participate in claims administration and to object and oppose any unfounded or incorrect claim. Apart from any element of liability, [the defendant] has an interest in not paying damages to persons who are not proper class members, which aligns with the Court's interest in insuring that only class members receive damages awards." *Krakauer v. Dish Network, LLC*, No. 1:14-CV-333, 2017 WL 3206324, at *6 (M.D.N.C. July 27, 2017). Plaintiffs attempt to distinguish *Krakauer* on the facts, *see* Mot. 13, but the principles it recognized are not so limited. And the other cases Plaintiffs cite, *see id.* at 12, address the standing of *non-defendant third parties*, not *defendants*. Nor do Plaintiffs' cases address this Court's independent responsibility to ensure that the class recovery is distributed to class members rather than holders of opted-out shares. *See Krakauer*, 2017 WL 3206324, at *6; *Valentino*, 674 F.2d at 66 n.12.

The Court should reject the Plan to the extent it authorizes the payment of class damages to the holders of shares that were opted out of the classes.

## III.     Any Unclaimed Funds Must Revert to Defendants in Lieu of a Cy Pres Fund

The Court should decline to allocate any unclaimed funds for *cy pres* distribution.  *Cy pres* distributions are of questionable legality, and, in any event, the equities overwhelmingly favor returning unclaimed funds to the Enterprises, both because Plaintiffs' cause of action is compensatory and because of the Enterprises' critical public missions in sustaining the secondary mortgage market and supporting affordable housing.

District courts are "required to formulate a procedure for distributing unclaimed funds" because "[i]n a majority of class actions at least some unclaimed damages or unlocated class members remain."  *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1306-07 (9th Cir. 1990).  Federal courts have employed varying methods for distributing unclaimed class action funds.  *See Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 812 (5th Cir. 1989); *Van Gemert v. Boeing Co.,* 739 F.2d 730, 737 (2d Cir.1984).

Although some courts have used *cy pres* to distribute unclaimed funds, the use of *cy pres* is inconsistent with the Rules Enabling Act.  As explained above, *supra*, p. 5, under the Rules Enabling Act, use of the class action device is not permitted to modify, enlarge, or diminish any party's substantive rights.  Yet, in an individual lawsuit, if a plaintiff fails to enforce the judgment, the defendant retains the funds; it is only in class actions under Rule 23 that federal courts have used the *cy pres* remedy to transfer the money from the defendant to a third party. Therefore, when *cy pres* is used, the class action device is modifying the defendant's substantive rights in contravention of the Rules Enabling Act.

Courts and jurists have thus been correctly skeptical that *cy pres* distributions in class actions are lawful.  *See In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1066 (8th Cir. 2015)

17

("Distribution of funds at the discretion of the court is not a traditional Article III function.")

(internal citation omitted); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 481-82 (5th Cir.

2011) (Jones J., concurring) (suggesting *cy pres* distributions "violate the Rules Enabling Act");

*see also Marek v. Lane*, 571 U.S. 1003, 134 S. Ct. 8, 9 (2013) (Roberts, C.J., statement

respecting the denial of certiorari) (explaining that in a "suitable case, this Court may need to

clarify the limits on the use of such remedies" including addressing "fundamental concerns

surrounding the use of such remedies in class action litigation, including when, *if ever*, such

relief should be considered" (emphasis added)).

Courts that have considered *cy pres* funds, moreover, have done so as an exercise of their

equitable powers. *See, e.g.*, *Boeing Co. v. Van Germert*, 444 U.S. 472, 482 (1980)

(acknowledging defendant's equitable claim to unclaimed class settlement funds); *Friedman v.

Lansdale Parking Auth'y*, No. 92-7257, 1995 U.S. Dist. LEXIS 4003, *1, (E.D. Pa. Mar. 30,

1995) (holding that refunding unclaimed settlement funds to defendant was "the most equitable

solution").  In exercising its equitable powers, the Court should follow numerous other courts

that have ordered reversion to the defendants. *See, e.g.*, *Wilson*, 880 F.2d at 816 (approving

reversion of unclaimed settlement funds to defendant); *Van Germert.*, 739 F.2d at 736-37 (same);

*Friedman*, 1995 U.S. Dist. LEXIS 4003, at *1 (holding that refunding unclaimed settlement

funds to defendant was "the most equitable solution").  "The district court's choice among

distribution options should be guided by the objectives of the underlying statute and the interests

of the silent class members." *Six (6) Mexican Workers*, 904 F.2d at 1307.  Here, all of those

interests favor reversion.

*First*, courts have reverted unclaimed funds to defendants when the plaintiffs' cause of

action is compensatory, rather than punitive or about deterrence. *See Diamond Chem. Co. v.

*Akzo Nobel Chemicals B.V.*, 517 F. Supp. 2d 212, 218-19 (D.D.C. 2007); *Willcox v. Lloyds TSB Bank, plc*, No. 13-00508, 2017 WL 487018, at *3 (D. Haw. Feb. 6, 2017); *Wilson*, 880 F.2d at 816; *see also Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 177 (E.D.N.Y. 2011) (rejecting proposal to distribute unclaimed funds to class members who already received payment because it would give class members "a windfall," which would be "inconsistent with the general legal ten[e]t that compensatory damages should do no more than compensate a victim for their injury").  Using *cy pres* in a compensatory case would go beyond the plaintiffs' cause of action to impose a remedy that is "in effect … punitive."  *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 607 (9th Cir. 1993).  Indeed, "it would be inherently punitive to the [defendants] not to return all unused funds that are no longer needed for compensation."  *In re Am. Online, Inc. Version 5.0 Software Litig.*, No. 00–1341, 2003 WL 27167779, at *1 (S.D. Fla. Jan. 29, 2003).  Here, Plaintiffs' contract-based claim is purely compensatory, and all identifiable class members will be fully compensated before any unclaimed funds are distributed.  To Defendants' knowledge, no court has *ever* ordered a *cy pres* fund over a defendant's objection in a case exclusively involving claims for breach of contract or another compensatory cause of action.  This Court should not be the first.

*Second*, courts generally strive to put unclaimed funds to a use that will benefit unidentifiable class members as directly as possible.  As one court put it, "unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated."  *See In re BankAmerica Corp. Sec. Litig.*, 775 F.3d at 1067.  Here, the best way to benefit the class members who could not receive their proportionate share of the judgment is to revert the unclaimed funds to the Enterprises, whose stock they own.  Plaintiffs' theory in this case was

that Enterprise capital was improperly diverted to Treasury.  Reverting the unclaimed funds would increase the Enterprises' capital, which would benefit all shareholders and would do so more directly than diverting funds to a third-party charity.

*Third*, reversion is uniquely appropriate in this case, where the Defendants generally, and FHFA's conservatorship specifically, have important public missions.  Congress has affirmed the Enterprises' "important public missions" "reflected in the statutes and charter Acts establishing" them, and has provided that their "continued ability … to accomplish their public missions is important to providing housing in the United States and the health of the Nation's economy." 12 U.S.C. § 4501(1), (2).  Congress also has made clear that the Enterprises have "an affirmative obligation to facilitate the financing of affordable housing for low- and moderate-income families in a manner consistent with their overall public purposes, while maintaining a strong financial condition and a reasonable economic return." *Id.* § 4501(7); *see* 12 U.S.C. § 1716 (Fannie Mae charter statement of purpose); 12 U.S.C. § 1451 note (same for Freddie Mac).  Each Enterprise thus has a "special, public purpose" and a "special relationship with the federal government."  S. Rep. No. 102-282 (1992), at 25, 34.

Indeed, a critical part of each Enterprise's public mission is to facilitate and fund affordable housing—the same purpose served by Plaintiffs' proposed *cy pres* fund.  The Enterprises are the largest funders of affordable housing in the country.

Permitting the Enterprises to retain unclaimed funds thus would further the important public missions of the Enterprises and of FHFA—including supporting affordable housing.  *See Friedman*, 1995 U.S. Dist. LEXIS 4003, at *14 ("[S]ince public funds paid for the [judgment], it is only just that the excess be returned to the [agency] for the benefit of the entire community.").

That is vastly preferable to expanding the *cy pres* doctrine beyond the limited circumstances where it has previously been found appropriate—especially in light of its questionable legality.

Contrary to Plaintiffs' assertion, *see* Mot. 17, Defendants have standing to object to a *cy pres* distribution for the obvious reason that *not* reverting the funds to the Enterprises would result in injury to the Defendants. *See Tyler*, 598 U.S. at 636 (holding that an "illegally appropriated … surplus" is "a classic pocketbook injury sufficient to give … standing"). Courts routinely decide motions by Defendants seeking reversion on the merits. *See, e.g.*, *Diamond Chem. Co.*, 517 F. Supp. 2d at 216–17. To Defendants' knowledge, no court has ever held they lacked standing to do so. The lone case Plaintiffs cite as "holding" that a defendant "lack[s] standing to challenge the distribution of unclaimed funds" did not hold that—in fact, the court ruled on the defendants' objections on the merits. *See* Mot. at 17 (citing *Six (6) Mexican Workers*, 904 F.2d at 1306-07).

Plaintiffs are also incorrect that Defendants have "no basis to seek reversion of any undistributed funds" because Defendants "failed to object at trial to the verdict form that required the jury to determine the total aggregate 'amount of damages.'" Mot. at 17. There is simply no connection between the verdict and the issue of unclaimed funds, and Plaintiffs cite no authority drawing such a connection. The issue of unclaimed funds arises in virtually all class actions, and courts are thus often called upon to resolve this issue post-trial.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for entry of final judgment and should decline to enter any final judgment or approve any plan of allocation unless (1) the portion of the jury's aggregate damages award attributable to shares held by opt-outs is deducted from the total amount to be distributed to class members; (2) all shares held by opt-outs

at the time of their opt-out notices are excluded from payment; and (3) any unclaimed funds

revert to Defendants in lieu of a *cy pres* fund.

Dated: February 5, 2024

Respectfully submitted,

 /s/ Asim Varma
Asim Varma (D.C. Bar # 426364)
Jonathan L. Stern (D.C. Bar # 375713)
David B. Bergman (D.C. Bar # 435392)
Ian S. Hoffman (D.C. Bar # 983419)
R. Stanton Jones (D.C. Bar # 987088)
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave NW
Washington, D.C. 20001
(202) 942-5000
Asim.Varma@arnoldporter.com
Jonathan.Stern@arnoldporter.com
David.Bergman@arnoldporter.com
Ian.Hoffman@arnoldporter.com
Stanton.Jones@arnoldporter.com

*Attorneys for Defendant Federal Housing Finance Agency*

 /s/ Michael J. Ciatti
Michael J. Ciatti (D.C. Bar # 467177)
KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC 20006
Tel: (202) 661-7828
Fax: (202) 626-3737
mciatti@kslaw.com

*Attorney for the Federal Home Loan Mortgage Corp.*

 /s/ Meaghan VerGow
Meaghan VerGow (D.C. Bar # 977165)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414
mvergow@omm.com

*Attorney for the Federal National Mortgage Association*