**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BERKLEY INSURANCE CO., et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> THE FEDERAL HOUSING FINANCE AGENCY, et al., <br><br> *Defendants.* | Case No. 1:13-cv-1053-RCL |
| IN RE FANNIE MAE/FREDDIE MAC SENIOR PREFERRED STOCK PURCHASE AGREEMENT CLASS ACTION LITIGATIONS <br><br> _____ <br><br> This document relates to: <br> ALL CASES | Case No. 1:13-mc-1288-RCL |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR ENTRY OF**
**<u>PROPOSED JUDGMENT AND PLAN OF ALLOCATION</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    A.    Defendants' Request To Reduce The Judgment Amount By Two-Hundredths Of A Percent Is Not A Basis For Denying The Plan Of Allocation ............................ 2

    B.    The Court Should Reject Defendants' Argument That The Plan Improperly Distributes Money To Class Members Who May Have Purchased Shares Previously Owned By Opt-Outs ................................................................................ 3

        1.    Defendants Lack Standing To Challenge Whether A De Minimis Part of the Judgment Goes to Class Members Who Purchased Shares That Were Previously Owned By Individuals Who Opted Out.................................... 3

        2.    Defendants' Objection to the Plan of Allocation Fails on the Merits......... 5

            a.    The Plan of Allocation Operates Precisely as the Class Definitions Require ............................................................................ 6

            b.    Defendants' Arguments Fail ............................................................. 8

    C.    There is No Basis for Undistributed Funds to Revert to Defendants ................... 15

CONCLUSION ................................................................................................................ 21

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Activision Blizzard, Inc. Stockholder Litig.*,
  124 A.3d 1025 (Del. Ch. 2015).....................................................................................10, 13

*In re America Online, Inc. Version 5.0 Software Litig.*,
  MDL No. 00-1341, 2003 WL 27167779 (S.D. Fla. Jan. 29, 2003)..................................17, 20

*Augustin v. Jablonsky*,
  819 F. Supp. 2d 153 (E.D.N.Y. 2011) .......................................................................19

*In re BankAmerica Corp. Sec. Litig.*,
  775 F.3d 1060 (8th Cir. 2015) ...................................................................................16, 19

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  115 F.3d 456 (7th Cir. 1997) (Posner, J.) ..............................................................11

*Brecher v. Republic of Argentina*,
  806 F.3d 22 (2d Cir. 2015).........................................................................................14

*Calderone v. Scott*,
  838 F.3d 1101 (11th Cir. 2016) ..................................................................................7

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  MDL No. 17-2795, 2020 WL 3512807 (D. Minn. June 29, 2020)............................9

*Cook v. Rockwell Int'l Corp.*,
  618 F.3d 1127 (10th Cir. 2010) ..................................................................................2

*Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.*,
  517 F. Supp. 2d 212 (D.D.C. 2007) ........................................................................15, 17, 18

*Ervin v. OS Rest. Servs.*,
  632 F.3d 971 (7th Cir. 2011) .....................................................................................7

*F.T.C. v. Figgie Int'l Inc.*,
  994 F.2d 595 (9th Cir. 1993) .....................................................................................19

*Friedman v. Lansdale Parking Auth.*,
  No. 92-7257, 1995 WL 141467 (E.D. Pa. Mar. 31, 1995) ..............................19, 20

*Fringer v. Kersey Homes, Inc.*,
  No. 9780-VCG, 2018 WL 3107961 (Del. Ch. June 25, 2018) ...............................12

*Keepseagle v. Vilsack*,
  118 F. Supp. 3d 98 (D.D.C. 2015) ........................................................................15

*Kern v. Siemens Corp.*,
  393 F.3d 120 (2d Cir. 2004)................................................................................11

*Klier v. Elf Atochem North America, Inc.*,
  658 F.3d 468 (5th Cir. 2011) ........................................................................16, 17

*Krakauer v. Dish Network, LLC*,
  No. 1:14-cv-333, 2017 WL 3206324 (M.D.N.C. July 27, 2017)...........................4

*In re Lorazepam & Clorazepate Antitrust Litig.*,
  261 F. Supp. 3d 14 (D.D.C. 2017) ........................................................................3

*Marek v. Lane*,
  571 U.S. 1003, 134 S.Ct. 8 (2013) (Roberts, C.J.) ..............................................20

*Patterson v. Gardner*,
  No. CL22-10435, 2023 Va. Cir. LEXIS 225 (Cir. Ct. Norfolk Nov. 21, 2023)...............12, 13

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)........................................................................................11, 12

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F. 2d 1301 (9th Cir. 1990) ...........................................................................17

*In re Tiktok, Inc., Consumer Privacy Litig.*,
  565 F. Supp. 3d 1076 (N.D. Il. 2021) ...................................................................9

*In re Urethane Antitrust Litig.*,
  MDL No. 1616, 2013 WL 3879264 (D. Kan. July 26, 2013)................................17

*In re Urethane Antitrust Litig.*,
  No. 04-MD-1616, 2008 WL 5215980 (D. Kan. Dec. 12, 2008)...........................11

*Willcox v. Lloyds TSB Bank, plc*,
  No. 13-00508, 2017 WL 487018 (D. Haw. Feb. 6, 2017) ....................................17

*Wilson v. Southwest Airlines, Inc.*,
  880 F.2d 807 (5th Cir. 1989) ...............................................................................19

*Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*,
  No. 06-0620, 2020 WL 5211035 (E.D. Pa. Sept. 1, 2020)..............................12, 13

**Rules and Statutes**

Rules Enabling Act .........................................................................................................17

Fed. R. Civ. P. 23 ................................................................................................ *passim*

**Other Authorities**

Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center,
    *Managing Class Action Litigation: A Pocket Guide for Judges* (3d ed. 2010) ......................19

Joe Light, *Fannie, Freddie to Begin Payments to Affordable Housing Funds*, The
    Wall Street Journal (Dec. 11, 2014, 5:09 PM).........................................................................18

*Newberg and Rubenstein on Class Actions* .....................................................................15, 17, 19

*Newberg on Class Actions* (5th ed.) (Westlaw 2018).....................................................................5

American Law Institute, *Principles of the Law of Aggregate Litig.*..............................................15

## INTRODUCTION

Defendants advance three objections, none of which justify refusing to approve the Plan of Allocation and entering final judgment.

First, Defendants ask the Court to reduce the total judgment by less than two hundredths of a percent to reflect the amount of the damages award allocable to stockholders other than Berkley who submitted valid opt-out requests ("Opt-Outs"). While Plaintiffs believe that argument is waived and unjustified, if the Court deems it appropriate to make such a reduction, Plaintiffs will acquiesce to it.

Second, Defendants argue that no damages should be distributed to Class members who purchase shares that can be traced (at substantial expense) to shares sold by Opt-Outs. Defendants have no standing to advance this objection. How the damages are allocated among Class members does not impact Defendants in any way. Further, the maximum amount of the judgment that could even theoretically be distributed to Class members based on shares that were previously owned by Opt-Outs is, again, less than two hundredths of a percent of the total. Moreover, the objection is meritless. The Plan of Allocation reflects a straightforward implementation of the Class Definitions that were approved by this Court, and consented to by Defendants, over two years ago. Those Class Definitions provide that "successors in interest" who purchase shares after the date of the class certification, but before the date when the final judgment becomes non-appealable, are members of the respective Classes. Thus, if an Opt-Out sells shares into the market before the date when the final judgment becomes non-appealable, then the purchaser of those shares becomes a Class member. That is what the simple application of the Class Definitions dictates. And that is what the Plan of Allocation properly does.

Third, Defendants object to a *cy pres* award of any undistributed funds. Since the Plan of Allocation provides for direct disbursement to all Class members, there should be either zero

1

undistributed funds, or at most a very small amount.  Under the governing precedents, it is entirely appropriate to make a *cy pres* award of any such amounts.  By the same token, if the Court prefers to defer any decision on how such funds (if any) should be handled, Plaintiffs do not object to that and provide alternative language below to that effect.

When Defendants objected to entry of final judgment several months ago, they cited the decision in *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137-38 (10th Cir. 2010), which held that before entry of final judgment in a class case, the Court should approve "a framework" for allocation and a "basic formula for determining individual damages."  *Id*. at 1137-38.  The Plan of Allocation amply satisfies that standard, and Defendants' objections are meritless and advanced for the purpose of delay and obstructionism.  The Classes have an interest in having final judgment entered promptly, so that post-judgment interest may begin to accrue.  Plaintiffs respectfully ask the Court to reject Defendants' objections, approve the Plan of Allocation, and enter final judgment.

## **ARGUMENT**

### A.   **Defendants' Request To Reduce The Judgment Amount By Two-Hundredths Of A Percent Is Not A Basis For Denying The Plan Of Allocation**

Defendants complain that the judgment amount reflects damages suffered by the entire class, including Opt-Outs, and therefore it must be reduced by the amount allocable to Opt-Outs other than the Berkley Plaintiffs (who will receive an allocable portion of it).  Defendants needed to have raised any argument like this before or during trial.  Defendants knew the damage measure that Plaintiffs were presenting, and could have argued to the jury that this amount must be reduced by the amount allocable to Opt-Outs.  They chose not to raise that argument at trial.  They also chose not to raise it when the parties jointly negotiated and finalized the jury instructions—and therefore those instructions explained that the damages would go entirely to the Class Plaintiffs,

except for the portion allocable to the Berkley Plaintiffs.  ECF No. 393 at 7, 10.  By failing to raise

the argument before or during trial, Defendants have waived the argument.  ECF No. 415 at 11-

12.  In addition, given that the jury awarded less than half the amount of the share price reduction

suffered by the Class as a result of the Net Worth Sweep, there is no just basis for the reduction

sought by Defendants.

Alternatively, if it has not been waived, this issue would be more appropriately raised

through a remittitur or other post-trial motion.  *In re Lorazepam & Clorazepate Antitrust Litig.*,

261 F. Supp. 3d 14, 17 (D.D.C. 2017).  In any event, if the Court disagrees that the argument has

been waived, Plaintiffs have made clear their willingness to acquiesce to the reduction now.  ECF

No. 415 at 12, n.4.  It amounts to a reduction of less than two-hundredths of one percent, and

should not be a basis for delaying the entry of final judgment and the triggering of post-judgment

interest on the entire judgment.

### B.   The Court Should Reject Defendants' Argument That The Plan Improperly Distributes Money To Class Members Who May Have Purchased Shares Previously Owned By Opt-Outs

Defendants object that the Plan provides for distributions to Class Members who never

opted out, who fully meet the class definitions, but who purchase shares that were previously

owned by those who previously opted out.  The Court should reject this argument for two reasons.

First, Defendants lack standing to raise it.  Second, it is wrong as a matter of law and basic logic

based on the Court-approved definitions of the Classes.

#### 1.   Defendants Lack Standing To Challenge Whether A De Minimis Part of the Judgment Goes to Class Members Who Purchased Shares That Were Previously Owned By Individuals Who Opted Out

As established in Plaintiffs' motion, Defendants lack standing to raise their principal

objection to the allocation plan—*i.e.*, the possibility that a maximum of less than two hundredths

of one percent of the judgment could be paid to purchasers of shares once held by individuals who opted out of the Classes.

Defendants barely even attempt to establish their standing and identify no cognizable legal interest they have in how the distribution of the judgment will be allocated among class members.  Nor do they point to any case that recognizes their standing to challenge an allocation plan provision in which they have no interest.  Instead, they cite *Krakauer v. Dish Network, LLC*, No. 1:14-cv-333, 2017 WL 3206324 (M.D.N.C. July 27, 2017) e, which involved a defendant's challenge to a claims administration issue that, unlike the issue here, could have affected the defendant by increasing the total amount it would have to pay.  *See* ECF 415 at 13.  Defendants claim that the "principles [*Krakauer*] recognized were not so limited."  ECF No. 417 at 16.  This is meaningless *ipse dixit*.  Nothing in *Krakauer* departs from the basic principle of American jurisprudence that a party must be injured by something to have standing to challenge it. Defendants have been unable to identify any other case where Defendants have been permitted to challenge a provision of a class action allocation plan.  Defendants are not injured by the allocation plan's formulas for allocating the judgment among various Class Members, and therefore have no standing to challenge those formulas.

Defendants seek to sidestep their lack of standing by (i) burying their paltry discussion of the issue deep in their brief, and (ii) summarily referring to what they call the Court's "independent responsibility to ensure that the class recovery is distributed to class members rather than holders of opted-out shares."  ECF No. 417 at 16.  But as shown below, the Court-approved definition of Class Members clearly includes all those who purchase shares after the date of trial and before any appeals are exhausted, which necessarily includes those who purchase shares previously owned by Opt-Outs.  Further, the maximum amount allocable to the non-Berkley Opt-Outs is less than

two-hundredths of one percent of the judgment.  Treating this *de minimis* amount as if it raised a crucial issue of fundamental fairness is disingenuous.  A plan of allocation need only be "reasonable"; it does not have to be perfect.  ECF No. 415 at 15-16.  The Court's independent duty to the Classes is "to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible."  *Newberg on Class Actions* § 12:15 (5th ed.) (Westlaw 2018).  That duty requires approval of the Plan of Allocation and rejection of Defendants' objection, which directly contravenes the interests of the Classes and in which Defendants have no cognizable legal interest.

### 2.    Defendants' Objection to the Plan of Allocation Fails on the Merits

Defendants object that the Plan of Allocation "would allow subsequent purchasers of shares that had been opted out to receive damages awarded to the classes."  ECF No. 417 at 10. The Court should see this objection for what it is—an impermissible collateral attack on the definitions of the Classes (the "Class Definitions") set forth in the Court's December 7, 2021 Memorandum Opinion Granting Plaintiffs' Motion for Class Certification [ECF No. 138] and Order [ECF No. 139] (collectively, the "Class Certification Decision").  Having consented to the Class Definitions more than two years ago—and in the interim having tried one jury trial to a hung jury and lost a second jury trial, received a multi-hundred-million-dollar verdict against them, and repeatedly tried and failed to persuade the Court to decertify the Classes—Defendants are now experiencing "consenter's remorse."  They are using their objection to the Plan of Allocation as an opportunity to attempt to overturn the Class Certification Decision.  Defendants' tactic is both procedurally improper and substantively meritless, and, therefore, the Court should disregard the objection and approve the Plan of Allocation as submitted.

### a. The Plan of Allocation Operates Precisely as the Class Definitions Require

The Class Definitions provide that the Classes shall consist of "all current holders of [Fannie Preferred, Freddie Preferred, or Freddie Common] stock as of the date of certification, or ***their successors in interest to the extent shares are sold after the date of certification and before any final judgment*** or settlement." ECF No. 139 (emphasis added).

The Class Definitions do not distinguish between subsequent purchasers who purchase shares sold into the market by Class members and those who purchase shares sold into the market by Opt-outs. On the contrary, the Class Definitions provide that ***all*** shareholders who purchase shares "sold after the date of certification and before any final judgment" are Class members, regardless of the source of the shares they purchased. That stands to reason, because it would be impractical to try to distinguish between purchasers based on the person who sold the shares into the market that were then purchased.

Defendants consented to the Class Definitions prior to the entry of the Class Certification Decision, have long been aware of this feature of the Class Definitions, and have never previously objected to it.[1] Accordingly, it is with ill grace that they come to this Court at this late date to complain that the Plan of Allocation implements the Class Definitions that have been in place for more than two years.

The Plan of Allocation is entirely consistent with the Class Definitions in including as members of the Classes all shareholders who purchase shares post-certification, regardless of whether the shares were sold into the market by Class members or Opt-outs. Indeed, treating all

---

[1] Defendants' motions to decertify the Classes filed during the first and second trials did not address this aspect of the Class Definitions.

subsequent purchasers as Class members is not only ***permissible***, it is ***required*** to give effect to the plain language of the Class Definitions, which mandates exactly that.[2]

Treating all subsequent purchasers as Class members is likewise consistent with, and arguably required by, Fed. R. Civ. P. 23(b)(3) and 23(c)(3)(B). The fundamental principle underlying Rule 23(b)(3) is that all eligible class members are included in the class unless they specifically request to be excluded. *See, e.g.*, *Calderone v. Scott*, 838 F.3d 1101, 1104 (11th Cir. 2016) ("In a Rule 23(b)(3) class action, all qualifying class members become members unless they opt out of the action."); *Ervin v. OS Rest. Servs.*, 632 F.3d 971, 976 (7th Cir. 2011) ("potential members of a Rule 23(b)(3) class must be given only the opportunity to opt out of the class action; they will automatically be included in the class if they do not speak up."). Pursuant to Rule 23(c)(3)(B), "the judgment in a class action must … for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members."

Excluding from the Classes subsequent purchasers "who have not requested exclusion" would run afoul of these Rules and contradict the fundamental principle of the opt-out Classes certified under Rule 23(b)(3). Indeed, all subsequent purchasers are entitled to rely on the Class Definitions. Those definitions make clear that if you purchase shares after the date of certification and before all appeals of the final judgment are exhausted, then you are in the Class. It would be fundamentally unfair to exclude from the Classes subsequent purchasers who were assured they would be Class members.

---

[2] Defendants' contention that "Plaintiff's treatment of shares that are *purchased* by opt-outs is at odds with their treatment of shares that are *sold* by opt-outs," ECF No. 417 at 11, is false. The Plan of Allocation in fact treats all subsequent purchasers identically: as Class members.

### b. Defendants' Arguments Fail

Defendants contend that "a successor in interest to a class member can participate in the class recovery, but a successor in interest to an opt-out cannot." ECF No. 417 at 16. That assertion is not supported by any legal authority. It also flatly contradicts the Class Certification Decision as well as federal law, Delaware law, and the law of the case established by this Court's prior rulings.

*First and foremost*, Defendants' argument ignores the plain language of the Class Definitions, to which they consented, which specifies that ***all*** successors in interest, meaning all those who purchase shares after the date of certification but before the final, non-appealable judgment, are Class members. Excluding from the Class Definitions those successors in interest who purchased shares sold into the market by Opt-Outs would impermissibly violate the Class Certification Decision. Defendants' observation that the Class Definitions "say[] nothing about opt-out rights," ECF No. 417 at 16, is precisely the point—the Class Definitions draw no distinction between subsequent purchasers of shares based on whether those were sold into the market by Class members vs. by Opt-Outs. Thus, there is no basis for the Plan of Allocation to do so, either.

*Second*, Defendants' argument is based entirely on their fabrication of a non-existent category of "shares that were validly opted out of the classes." ECF No. 417 at 1, 6. The Class Definitions specify that the Classes consist of "holders" of Fannie Preferred, Freddie Preferred, and Freddie Common shares, not the shares themselves. Defendants' contention that "Plaintiffs' Proposed Plan lacks a method to identify and exclude from payment certain shares that were opted out," ECF No. 417 at 10, is a non sequitur, as no such shares exist. The Plan of Allocation provides an adequate "method to identify and exclude from payment" the ***shareholders*** who have opted out, which is all that Rule 23(b)(3) requires.

*Third*, Defendants argue—without any support—that "if the claim travels with the shares, then the opt-out election must do so as well." ECF No. 417 at 12. They are wrong. There is a difference between (a) the claims against Defendants based on the Net Worth Sweep, which run with the shares, ECF Nos. 84 at 17; 138 at 16, 18; and (b) the decision by an individual shareholder to opt out of the Class, which is a personal right that is limited to that shareholder, and does not run with the shares.

The notes to Rule 23 explicitly provide that "[e]xclusion may be requested only by individual class members; no class member may purport to opt out other class members . . . . ." Fed. R. Civ. P. 23, committee notes to 2003 amendment. Courts have reaffirmed this bedrock principle time and again, recognizing that "opting out is an individual right that must be exercised individually." *In re Tiktok*, *Inc., Consumer Privacy Litig.,* 565 F. Supp. 3d 1076, 1092 (N.D. Il. 2021) (citations omitted); *see In re CenturyLink Sales Pracs. & Sec. Litig*., MDL No. 17-2795, 2020 WL 3512807, at *2 (D. Minn. June 29, 2020) ("The right to opt out of a class action is one that must be exercised individually, because individual class members … have the right to intelligently and individually choose whether to continue in a suit as class members."); *see also* 3 Newberg & Rubenstein on Class Actions § 9:49 (6th ed.) ("The right to opt out in a Rule 23(b)(3) class action is considered an individual right."). Accordingly, the decision to opt out is limited to the shareholder; it does not extend to anyone else. In particular, that decision does not extend to a shareholder who purchases shares after the date of certification but before the judgment becomes fully final and all appeals exhausted; that shareholder acquires shares based on Class Definitions that treat him or her as a Class member, not as an opt out.

Throughout the litigation, the parties operated with the understanding that the opt-out right was personal to class members, and not tied to their shares. On January 21, 2022, Defendants

stipulated to the issuance of the Class Notice to potential class members.  *See* ECF No. 140.  In

that Stipulation, Defendants agreed with Plaintiffs that the proposed Class Notice was "sufficient

to inform the members of the Classes" that "the Court will exclude from the Classes ***any member***

***who requests exclusion*."  *Id*. at 2.  The Stipulation thus spoke in terms of excluding ***persons*** and

***not shares*.  *Id*.  Its reference to Class members "who request[] exclusion" is also consistent with

the fact that individuals who have bought shares after the date of certification have not themselves

requested exclusion from the Classes – regardless of whether they may have acquired shares that

may have been sold into the market by Opt-Outs.  That fact is irrelevant.  The purchasers have not

excluded themselves, and therefore are part of the Classes.  The Class Notice that the Court issued

also described that, in this case, "One court will resolve the issues for everyone in the Classes,

except for those people who ***choose to exclude themselves from the Classes*."  ECF No. 140-1 at

5.  Again, any class member who purchases shares that may have been sold into the market by an

Opt-Out has not chosen to exclude himself from the Classes, and eliminating him from the Classes

would contravene the terms of the stipulated Notice.  The Class Notice also described the process

of opting out as opting out a person or an entity with respect to the shares they own, not as opting

out the shares themselves.  The Notice explained that "If you ***exclude yourself*** from one or more

of the Class(es)," that "means ***to remove yourself*** from or 'opt out' of the Class(es)."  *Id*. at 7.  The

Notice did ***not*** say that it would "remove yourself" and anyone to whom you sell your shares.

Delaware law further demonstrates why a prior shareholder's decision to opt out cannot

possibly travel with the shares.  Where, as here, "the right to assert the claim and benefit from any

recovery is a property right associated with the shares," the transaction is presumed to be fair to

the seller because they "made a ***conscious business decision*** to sell their shares into a market that

implicitly reflect[s] the value of the [claim]."  *In re Activision Blizzard, Inc. Stockholder Litig.*,

124 A.3d 1025, 1044 (Del. Ch. 2015) (collecting cases).  In other words, the sale price of the shares would adequately compensate the seller for the value of the claim.  By contrast, Defendants have come forward with no evidence here that any Opt-Outs sold shares to subsequent purchasers and explicitly communicated to them that those shares were previously held by a class member who exercised their right to opt out.  Thus, there is no evidence that the price any subsequent purchasers paid for those shares reflected a prior holder's decision to opt out.

Similarly, one holder's decision to opt out should not bind subsequent holders because the decision significantly alters the legal rights with respect to the claim.  Indeed, by opting out of a class, a holder foregoes their right to share pro rata in any class recovery, **and** their right to assert claim or issue preclusion based on findings in the class action.  *See* 3 Newberg & Rubenstein on Class Actions § 9:39 (6th ed.) ("opt-out class member may not take advantage of the class action judgment by using it to assert claim or issue preclusion in her individual litigation").  Although these rights can be recovered by "opting back into" the class,[3] "***the default rule*** in class actions is that a class member is included in the class unless she excludes herself."  3 Newberg and Rubenstein on Class Actions § 9:48 (6th ed.).  In fact, courts have held that "by adding the 'opt out' requirement to Rule 23 in the 1966 amendments, Congress *prohibited* 'opt in' provisions" in class actions.  *Kern v. Siemens Corp.*, 393 F.3d 120, 124 (2d Cir. 2004) (emphasis in original) (collecting "substantial legal authority").[4]  Thus, class members who acquired their shares from

---

[3] "[C]ourts have consistently permitted parties to withdraw requests to opt out of class actions." *In re Urethane Antitrust Litig.*, No. 04-MD-1616, 2008 WL 5215980, at *1 (D. Kan. Dec. 12, 2008) (collecting cases); *see also In re Brand Name Prescription Drugs Antitrust Litig.*, 115 F.3d 456, 457 (7th Cir. 1997) (Posner, J.) ("Although it would be peculiar for an opt-out to seek to opt back in, this is occasionally sought and allowed.").

[4] In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the United States Supreme Court expressly rejected the notion that the Due Process Clause requires an "opt in," in part because it ***impedes*** plaintiffs' rights, rather than protecting them:

opt-outs—like **all** class members—are included in the class under the default rule that governs all class actions.

Because the right to opt out must be exercised individually, an individual class member's decision whether to opt out, which relates to how a particular person wishes to pursue a legal claim they own, is personal to each shareholder and has no effect on the rights, powers, and privileges of the shares, which are governed exclusively by the shareholder contract, *i.e.*, the certificate of designation and applicable laws.  Opting out does not amend or alter the shareholder contract, and therefore Defendants' reliance on the principle of *nemo dat quod non habet* and case law concerning assignment of rights is misplaced.  A shareholder who has opted out still owns the shares; the Net Worth Sweep claims run with those shares; when those shares are sold, the purchaser acquires the shares with those Net Worth Sweep claims, and becomes part of the Class based on the plain text of the Class Definitions set forth in the Class Certification Decision.

The cases on which Defendants rely, *Fringer v. Kersey Homes, Inc*., No. 9780-VCG, 2018 WL 3107961 (Del. Ch. June 25, 2018), *Patterson v. Gardner*, No. CL22-10435, 2023 Va. Cir. LEXIS 225 (Cir. Ct. Norfolk Nov. 21, 2023), and *Winn-Dixie Stores, Inc. v. Eastern Mushroom Marketing Cooperative*, No. 06-0620, 2020 WL 5211035 (E.D. Pa. Sept. 1, 2020), have nothing to do with sales of shares of stock or the rights inherent therein, and thus are inapposite.  *Fringer*

---

Requiring a plaintiff to affirmatively request inclusion would probably impede the prosecution of those class actions involving an aggregation of small individual claims, where a large number of claims are required to make it economical to bring suit.  The plaintiff's claim may be so small, or the plaintiff so unfamiliar with the law, that he would not file suit individually, nor would he affirmatively request inclusion in the class if such a request were required by the Constitution.  If, on the other hand, the plaintiff's claim is sufficiently large or important that he wishes to litigate it on his own, he will likely have retained an attorney or have thought about filing suit, and should be fully capable of exercising his right to "opt out."

*Id.* at 812-13.

and *Patterson* concerned ownership interests in real property and involved no claims for damages, and in *Winn-Dixie*, the seller assigned to the buyer via a private contractual transaction the ***personal*** right to pursue an antitrust claim, not a claim for breach of a shareholder contract.  As discussed *supra*, a sale of shares on a public market conveys to the buyer the bundle of rights, powers, and privileges provided in the shareholder contract, *e.g.*, the right to enforce the implied covenant, but ***not*** the seller's personal rights, *e.g.*, the exercised right to opt out under Rule 23(b)(3).

Plaintiffs repeatedly explained this distinction to Defendants in the meet-and-confer process, and Defendants provided no response because they have none.  Their opposition brief, too, completely ignores this distinction and the legal authorities Plaintiffs provided to Defendants.[5] Instead, Defendants speciously argue that Plaintiffs' position, reflected in the Plan of Allocation, that the claim travels with the shares but a shareholder's decision to opt out of the Classes does not, "is contrary to the position Plaintiffs have successfully advanced throughout this case, and thus is barred by judicial estoppel."  ECF No. 417 at 14.  This argument is nonsensical.  Plaintiffs' position is, and always has been, that the implied covenant claim travels with the shares. Accordingly, a subsequent purchaser who acquires the shares acquires the right to recover a pro rata portion of the judgment awarded to the pertinent Class.  *See Activision Blizzard*, 124 A.3d at 1050 (collecting sources) ("When a share of stock is sold, the property rights associated with the shares, including any claim for breach of those rights and the ability to benefit from any recovery or other remedy, travel with the shares.").  Plaintiffs have never argued, and do not now argue, that

---

[5] Email dated Dec. 29, 2023, from Eric Zagar, Esq., to Asim Varma, Esq., *et al.*, regarding "Question re opt out traveling with the share?" (attached hereto as Exhibit A).

a Class member's decision to opt out attaches to the shares, nor have they ever changed their position "according to the exigencies of the moment." ECF No. 417 at 15.

Defendants argue that "adopting Plaintiffs' approach would call the certification of the classes into question." ECF No. 417 at 15. That is meritless. As shown above, the Class Certification Decision reflects the principle that the implied covenant claims run with the shares. The Plan of Allocation likewise reflects that principle. The two are perfectly consistent.

Defendants cite to *Brecher v. Republic of Argentina*, 806 F.3d 22 (2d Cir. 2015), claiming it "vacated a judgment in favor of classes made up of current holders of beneficial interests in bonds, in part, because it would run the risk that current holders had purchased bonds from individuals who obtained the bonds from opt-outs." ECF No. 417 at 15. That is false. In *Brecher*, the Second Circuit held that a class defined as anyone who held a beneficial interest in the bonds *at any time*, *i.e.*, "[w]ithout a defined class period or temporal limitation," *Brecher*, 806 F.3d at 25, presented an ascertainability problem because "nothing in the new class definition freezes the class composition at any designated time," *id*. at 25 n.3, and therefore the definition was "insufficiently definite to allow ready identification of the class or the persons who will be bound by the judgment." *Id*. at 25. The court held that it was "the lack of a defined class period," not potential sales of bonds by opt-outs, that "makes the modified class insufficiently definite as a matter of law." *Id*. at 26.[6] Unlike the class definition in *Brecher*, the Class Definitions in this case do have a defined class period and "freeze[] the class composition" at a "designated time," the Final Non-appealable Judgment Date. The shareholders who hold shares at that time can be readily

---

[6] The court postulated a hypothetical involving multiple sales of bonds to illustrate why "the absence of a temporal limitation" created an ascertainability problem. *Id*.

identified through broker records.  Hence, the composition of the Classes is ascertainable, and nothing in the Plan of Allocation causes any ascertainability problem.

Finally, Defendants' argument that the Plan of Allocation must trace which (if any) purchasers have acquired shares held by prior opt-outs is impractical.  The administrative cost of doing so would exceed the maximum possible value of the recovery allocable to such shares, and thus would result in a net harm to the Classes.

**C.     There is No Basis for Undistributed Funds to Revert to Defendants**

District courts have four options in exercising equitable principles to distribute unclaimed or undistributed funds: (1) *pro rata* distribution to claiming class members; (2) general or specific escheat to a governmental body; (3) reversion to the defendant; or (4) *cy pres* distribution. *Diamond Chem. Co., Inc. v. Akzo Nobel Chems. B.V.*, 517 F. Supp. 2d 212, 217 (D.D.C. 2007). Because "funds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members," any award of unclaimed or undistributed funds "should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair."  American Law Institute ("ALI"), *Principles of the Law of Aggregate Litig.* § 3.07 (cited favorably by *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98 (D.D.C. 2015)); *Newberg and Rubenstein on Class Actions* § 12.30 n.13 (citing multiple decisions in which courts have adopted the ALI's principles); *id.* § 12:28 (stating that "the trend has been toward redistributing funds pro rata among claiming class members before any *cy pres* distributions are made").

Here, the Plan of Allocation provides for direct broker disbursements to Class Members. POA ¶ 13.  Given this disbursement methodology, to which Defendants have not objected, it is probable that the amount of undistributed funds will be minimal to non-existent, with the

associated costs of disbursement outweighing the overall benefit to Class Members (leading to a lower Net Class Award due to additional expenses incurred by the Distribution Administrator). ECF No. 415 at 9, 17.  Defendants have not disagreed with Plaintiffs' assessment regarding the expected amount of any undistributed funds.[7]  Under such circumstances, a *cy pres* distribution of any possible, minimal remaining funds, where individual distributions are not otherwise viable (or otherwise detract from the overall award), is appropriate and consistent with the principles of a *cy pres* distribution.  *See* ECF No. 415 at 17-18.

Under no circumstances should the Court order reversion of undistributed funds.  If the amount of undistributed funds turns out to be larger than expected, such funds should be distributed *pro rata* to Class Members, not sent back to Defendants.  *See, e.g., Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468, 475 (5th Cir. 2011) ("Where it is still logistically feasible and economically viable to make additional *pro rata* distributions to class members, the district court should do so . . . .").  Plaintiffs have no objection to the Court deferring any decision regarding whether any remaining undistributed funds are too small to make individual distributions economically viable until after the expiration of the distribution period.  *See* ECF No. 415 at 17 (citing *In re Urethane Antitrust Litig.,* MDL No. 1616, 2013 WL 3879264, at *3 (D. Kan. July 26, 2013) ("any final determination concerning the disposition of unclaimed funds should be left until the expiration of the claims period")); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1064 (8th Cir. 2015) (remand appropriate post-distribution as to additional funds to determine whether to implement *cy pres* award or an additional distribution to the class).

---

[7] During the meet-and-confer process, Defendants expressed the possibility of including with the Plan of Allocation a minimum amount that would trigger reversion.  Ultimately, Defendants did not provide any such amount nor any specific language regarding reversion.

Defendants are wrong when they claim they would suffer an injury if undistributed damages do not revert to them. As the case law makes clear, Defendants lack any legal right to any undistributed funds. *Diamond Chem. Co.,* 517 F. Supp. 2d at 217 (D.D.C. 2007); *In re Urethane*, 2013 WL 3879264, at *3 (the defendant "has no interest in the particular manner in which the total damages found by the jury are distributed among class members"); *Newberg and Rubenstein on Class Actions* § 12:28 (noting that "most courts start from the proposition" that neither defendants nor class members "have any right" to unclaimed funds) (citing cases). Defendants' invocation of the Rules Enabling Act is therefore misplaced, as a "distribution of unclaimed funds does not subject defendants to greater liability or alter their substantive rights." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F. 2d 1301, 1307 (9th Cir. 1990).[8]

Regardless, Defendants have no equitable claim to reversion of undistributed funds, for several reasons.

*First*, the jury determined that Defendants engaged in conduct that was arbitrary and unreasonable. ECF No. 393 (Jury Instructions) at 8-9. The bad faith nature of Defendants' conduct, as reflected by the jury's verdict, distinguishes it from some of the examples identified in Defendants' briefing.[9] Further, Defendants exploited the purported "special relationship" between

---

[8] While Defendants cite the concurring opinion in *Klier* (ECF No. 417 at 18), neither the panel nor the concurring judge held that a *cy pres* distribution violates the Rules Enabling Act. Instead, the majority noted that while the Rules Enabling Act serves as a limitation on class-action litigation, a *cy pres* distribution is permissible "when it is not feasible to make further distributions to class members," 658 F.3d at 475, which is consistent with the principles outlined by Plaintiffs above. Further, in her concurrence, Judge Jones acknowledged: "Whether *cy pres* distributions violate the Constitution or Rules Enabling Act has not, to my knowledge, been fully litigated in any court and these questions are neither briefed nor presented for review here." *Id.* at 481 (Jones, J., concurring)

[9] *See, e.g., Willcox v. Lloyds TSB Bank, plc*, No. 13-00508, 2017 WL 487018, at *3 (D. Haw. Feb. 6, 2017) (noting that the defendant "has not been found liable on any claims"); *In re America Online, Inc. Version 5.0 Software Litig.*, MDL No. 00-1341, 2003 WL 27167779, at *1 (S.D. Fla.

the Enterprises and the federal government they tout in their briefing (ECF No. 417 at 20), leading to the harm suffered by Plaintiffs and a "windfall" to the federal government, during which time the Enterprises **suspended** statutory payments to designated affordable housing funds through December 2014.[10]  In light of Defendants' conduct, there is no basis for Defendants' assertion that "silent Class Members" would prefer reversion to the parties who acted in bad faith over a *pro rata* redistribution directly to Class members (if economically feasible) or to a public benefit, which indirectly benefits the Classes, through a *cy pres* distribution.  *See, e.g., Diamond Chem.*, 517 F. Supp. 2d at 219-220 (finding that a *cy pres* award appeared to be a more appropriate disposition of a settlement fund than reversion).

*Second*, the Plan of Allocation provides for the proportional recovery of Class members from the aggregate damages award set by the jury.  Any remaining funds are presumptively the property of the Class, to be used for its direct or indirect benefit.  Plaintiffs' request of a *cy pres* award is wholly consistent with the ALI approach in such cases, as adopted by numerous courts. To the extent that *cy pres* is inappropriate, *pro rata* distribution is clearly preferable to reversion and would be appropriate here, given that (i) the aggregate damages award is the property of the Class, (ii) the proportional distribution methodology in the Plan of Allocation can be easily applied to undistributed funds, and (iii) the lack of liquidated damages claims that were fully satisfied by

---

Jan. 29, 2003) ("By all accounts, **the insurers of AOL** in this case acted in good faith and agreed to fund the settlement fund in order to compensate harmed individuals.") (emphasis added).

[10]  *See* Audit of FHFA's Oversight of the Enterprises' Affordable Housing Set-Asides and Allocation (AUD-2018-012), available at: https://www.fhfaoig.gov/Content/Files/AUD-2018-012%20FHFA%20Oversight%20of%20Affordable%20Housing.pdf (Sept. 24, 2018) (stating that the FHFA Director "suspended the Enterprises' affordable housing set-asides and transmissions until futher notice"); Joe Light, *Fannie, Freddie to Begin Payments to Affordable Housing Funds*, The Wall Street Journal (Dec. 11, 2014, 5:09 PM), https://www.wsj.com/articles/fannie-freddie-to-begin-payments-to-affordable-housing-funds-1418316369.

the initial distribution, foreclosing any "windfall."  *See, e.g.*, *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d at 1064 (adopting ALI criteria and holding that initial distributions to class members in aggregate securities class action settlement did not foreclose further distribution to the class or to *cy pres* recipients if appropriate); *Newberg and Rubenstein on Class Actions* § 12.29 (stating that reversion is "disfavored"); Barbara J. Rothstein and Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, 20 (3d ed. 2010) (suggesting that instead of approving reversion, courts should "consider encouraging the parties to use an alternative approach, such as distributing the entire settlement fund to class members who file claims").

*Finally*, the cases cited by Defendants to support their claim that reversion is an appropriate equitable remedy are wholly inapposite.  This is not a case where the parties' mutual mistake as to the size of a compensatory settlement fund or the aggregate amount of individual claims resulted in an unanticipated pool of undistributed funds.  *See, e.g., Wilson v. Southwest Airlines, Inc.*, 880 F.2d 807, 815 (5th Cir. 1989) (reverting excess funds to defendants and Class counsel based upon mistaken assumption regarding the size of the settlement fund and the fees spent in administering the fund); *Friedman v. Lansdale Parking Auth.*, No. 92-7257, 1995 WL 141467, at *4 (E.D. Pa. Mar. 31, 1995) ("[I]t is evidence that the excess is due to the mutually held erroneous assumption that the class" would be larger, weighing in favor of reversion).  Nor is this a case involving exact liquidated damages that will be fully satisfied by the initial distribution.  *See, e.g., Augustin v. Jablonsky*, 819 F. Supp. 2d 153, 176-77 (E.D.N.Y. 2011) (denying *pro rata* distribution where the court specifically set the damages award at $500 per strip search and declined to enter an aggregate judgment); *F.T.C. v. Figgie Int'l Inc.*, 994 F.2d 595, 607 (9th Cir. 1993) (reversion appropriate where maximum individual damages set based on the price consumers paid for heat detectors);

*Friedman*, 1995 WL 141467, at *4 & n.3 (stating that the plaintiffs received "complete reimbursement for their loss" as such losses, "which were determined with exactitude, consisted of lost interest for a specified period of time"). Nor is this a case where the potential *cy pres* award would far outpace the compensatory damages actually awarded to Class members. *See, e.g., Marek v. Lane*, 571 U.S. 1003, 134 S.Ct. 8, 9 (2013) (Roberts, C.J.) (noting that the parties allocated the settlement fund "in an unusual way," including where the "unnamed class members . . . received no damages"); *In re America Online*, 2003 WL 27167779, at *1 (stating that only $1 million out of a $15.5 million settlement fund had been disbursed to harmed individuals).

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' request for reversion of undistributed funds, which Plaintiffs expect to be minimal to non-existent. As indicated above, should the Court prefer, Plaintiffs do not object to reserving decision as to the appropriateness of a *cy pres* award until after the distribution process. Should the Court be inclined to do so, it may order a modification of Proposed ¶ 15 of the POA as follows:

> 15. Given the Allocation Plan and Distribution Method, Plaintiffs expect there will not be any unclaimed or undistributed funds in this case. **The Court shall defer decision on the distribution of undistributed funds until such time as it is determined the amount of undistributed funds and whether disbursement of such undistributed funds shall be made through a *cy pres* award or a *pro rata* distribution to the Classes**. ~~To the extent any undistributed funds remain and can be identified, such funds shall be distributed to a *cy pres* fund for the benefit of an affordable housing fund, for such subsequent distribution as the Court may later direct.~~ In implementing the Allocation Plan and Distribution Method, the Distribution Administrator shall issue the Net Berkley Award to the WR Berkley Plaintiffs based on the shares they held on the date of their opt-out notice, as proven in trial in PX-0462, in accordance with the procedures and principles described herein with respect to the Net Class Award except that the portion of the Total

Plaintiffs' award allocable to the WR Berkley Plaintiffs shall not be reduced by any of the amounts referenced in the definition of Net Class Award.

## CONCLUSION

For the reasons set forth above, as well as in Plaintiffs' Opening Brief, Plaintiffs respectfully request prompt approval of the proposed Judgment and Plan of Allocation.

Dated: February 12, 2024

Respectfully submitted,

/s/ Charles J. Cooper
Charles J. Cooper (Bar No. 24870)
David H. Thompson (Bar No. 450503)
Vincent J. Colatriano (Bar No. 429562)
Peter A. Patterson (Bar No. 998668)
Brian W. Barnes (*Pro Hac Vice*)
**COOPER & KIRK, PLLC**
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
ccooper@cooperkirk.com

*Counsel for Berkley Plaintiffs, et al.*

/s/ Eric L. Zagar
Eric L. Zagar (*Pro Hac Vice*)
**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
280 King of Prussia Rd.
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
ezagar@ktmc.com

Hamish P.M. Hume (Bar No. 449914)
Samuel C. Kaplan (Bar No. 463350)
**BOIES SCHILLER FLEXNER LLP**
1401 New York Ave. NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131
hhume@bsfllp.com
skaplan@bsfllp.com

Michael J. Barry (*Pro Hac Vice*)
**GRANT & EISENHOFER, P.A.**
123 Justison Street
Wilmington, DE 19801
Tel: (302) 622-7000
Fax: (302) 622-7100
mbarry@gelaw.com

Adam Wierzbowski (*Pro Hac Vice*)
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
adam@blbglaw.com

21

*Co-Lead Counsel for the Class*